## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br>         Plaintiff, <br><br>    v. <br><br> AGILON HEALTH, INC., STEVEN J. SELL, TIMOTHY S. BENSLEY, PRISCILLA KASENCHAK, RONALD A. WILLIAMS, SHARAD MANSUKANI, DIANA L. MCKENZIE, KAREN MCLOUGHLIN, CLAY RICHARDS, RAVI SACHDEV, RICHARD J. SCHNALL, JEFFREY A. SCHWANEKE, DEREK L. STRUM, WILLIAM WULF, J.P. MORGAN SECURITIES LLC, GOLDMAN SACHS & CO. LLC, BOFA SECURITIES, INC., WELLS FARGO SECURITIES, LLC, DEUTSCHE BANK SECURITIES INC., COWEN AND COMPANY, LLC, NOMURA SECURITIES INTERNATIONAL, INC., RBC CAPITAL MARKETS, LLC, LEERINK PARTNERS f/k/a SVB SECURITIES LLC, TRUIST SECURITIES, INC., WILLIAM BLAIR & COMPANY, L.L.C., ACADEMY SECURITIES, INC., R. SEELAUS & CO., LLC, SAMUEL A. RAMIREZ & COMPANY, INC., SIEBERT WILLIAMS SHANK & CO., LLC, WR SECURITIES, LLC, CLAYTON, DUBILIER & RICE, LLC, CD&R VECTOR HOLDINGS, L.P., CD&R INVESTMENT ASSOCIATES IX, LTD., and CD&R ASSOCIATES IX, L.P., <br><br>         Defendants. | Civil Action No.  1:24-cv-00297 <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................................... 1

II.    NATURE OF THE ACTION ................................................................................... 1

III.   JURISDICTION AND VENUE .............................................................................. 5

IV.    COMPANY BACKGROUND ................................................................................. 6

V.     PARTIES .................................................................................................................. 8

       A.     Plaintiff ........................................................................................................ 8

       B.     Exchange Act Defendants............................................................................ 9

       C.     Securities Act Defendants.......................................................................... 10

VI.    SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS ............................... 14

       A.     Material Misrepresentations and Omissions During the Class Period................. 14

       B.     The Truth Emerges While agilon Continues to Mislead Investors...................... 18

       C.     Additional Scienter Allegations Related to Exchange Act Claims...................... 21

       D.     Loss Causation/Economic Loss ................................................................ 22

       E.     Applicability of Presumption of Reliance: Fraud on the Market......................... 23

       F.     No Safe Harbor .......................................................................................... 24

       COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against
       agilon and the Exchange Act Individual Defendants....................................... 25

       COUNT II For Violation of Section 20(a) of the Exchange Act Against the Exchange
       Act Individual Defendants ................................................................................. 26

VII.   SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS.............................. 26

       A.     Material Misrepresentations and Omissions in the SPO Materials .................... 26

       B.     Events After the SPO .................................................................................. 27

       COUNT III For Violation of Section 11 of the Securities Act Against agilon, the
       Securities Act Individual Defendants, and the Underwriter Defendants......................... 29

COUNT IV For Violation of Section 12(a)(2) of the Securities Act Against agilon, the Securities Act Individual Defendants, the CD&R Defendants, and the Underwriter Defendants .................................................................................................................. 30

COUNT V For Violation of Section 15 of the Securities Act Against the Securities Act Individual Defendants and the CD&R Defendants .................................................... 32

VIII.   CLASS ACTION ALLEGATIONS ............................................................... 33

IX.   PRAYER FOR RELIEF ................................................................................. 35

X.   JURY DEMAND ............................................................................................ 36

## I.      INTRODUCTION

Plaintiff New England Teamsters Pension Fund ("New England Teamsters" or "Plaintiff"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of agilon health, inc. ("agilon" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company.   Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## II.     NATURE OF THE ACTION

1.      This federal securities class action asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act").   These claims arise from Defendants' (as defined herein) materially false and misleading statements and omissions to investors concerning agilon's medical costs and profit margins.

2.       This action is brought on behalf of a "Class" of:

(a)      All persons or entities who purchased or otherwise acquired agilon common stock between January 9, 2023 and January 4, 2024, inclusive (the "Class Period"), against agilon and the Exchange Act Individual Defendants (as defined herein), for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

(b)      All persons and entities that purchased or otherwise acquired agilon common stock pursuant, or traceable, or both, to the SPO Materials (as defined herein) issued in

connection with agilon's May 2023 secondary public offering (the "SPO") against agilon and the Securities Act Defendants (as defined herein), for violations of Sections 11, 12(a)(2), and 15 of the Securities Act.

3.      Under Sections 11, 12(a)(2), and 15 of the Securities Act, the Securities Act Defendants are liable for materially false and misleading statements contained in the SPO Materials.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional reckless conduct as to the Securities Act claims.

4.      agilon, headquartered in Austin, Texas, generates profits from reducing medical expenditures.  By partnering primarily with Medicare Advantage ("MA") plans as well as traditional Medicare and commercial managed care organizations, agilon receives a fixed monthly payment from payers for each patient under its care.  In return, agilon takes on the responsibility of managing the total cost and quality of care for those patients.  This model incentivizes agilon and its contracted physician partners to focus on preventive care and improve health outcomes in order to control costs.  If the total cost of caring for patients is less than the fixed payments agilon receives, it realizes a profit.  However, if costs exceed the payments, agilon incurs a loss.  This aspect of financial risk is inherent in agilon's business model.

5.      As part of its business model, agilon must estimate and set appropriate reserves to account for medical costs incurred on patients that have not yet been reported or submitted for payment.  This is known as the incurred-but-not-reported ("IBNR") reserve (the "IBNR Reserve").  agilon determines the IBNR Reserve on a quarterly basis using historical utilization trends and other data sources to forecast upcoming medical costs, including: (1) real-time data sharing with MA partners on actual medical expenditures for agilon members which provides better visibility into current spending trends compared to lagged reports; (2) understanding care management

decisions and utilization patterns from their affiliated primary care physicians who direct patient care which offers insights into key cost drivers; (3) leveraging their own patient data on enrollment, demographics, conditions, etc. to build predictive models estimating future costs which can incorporate different growth scenarios and account for impacts like pent-up demand from new patients or an influx of complex cases; and (4) public spending data from large, established MA plans focused on senior/MA patients similar to agilon's model which is critical to contextualizing agilon's own cost trends.  Combining leading-indicator utilization data with long-term trends, adjustments for one-time events, and clinical program insights allows agilon to quantify and reserve for medical costs.

6.      Having clear visibility into utilization trends over time is critical for agilon.  The Company's business model relies on analyzing this data to develop evidence-based care plans and coordinate patient care with its partner physicians.  agilon claims to track patient healthcare utilization on an ongoing basis, allowing its teams to actively manage costs and quality of care. The ability to forecast utilization accurately and adjust clinical programs accordingly is key to agilon's goal of reducing expenses in order to produce profits.

7.      Throughout the Class Period and in the SPO Materials, Defendants misled investors about agilon's medical costs by: (1) touting the Company's purported visibility into utilization trends and medical costs; (2) failing to disclose increased medical costs that agilon had incurred prior to and during the Class Period due to higher utilization of healthcare by MA patients; (3) falsely stating that its IBNR Reserve was adequate; (4) making false and misleading statements about the effectiveness of its business model; (5) issuing overly optimistic financial guidance; and (6) issuing risk disclosures that were materially false and misleading because they characterized adverse facts that had ***already materialized*** as mere possibilities.

8.     As a result of these materially false and misleading statements and omissions, agilon stock traded at artificially high prices during the Class Period as investors were conditioned to believe that the Company's medical cost expenses were lower than represented.  In May 2023, Defendants took advantage and profited enormously by selling hundreds of millions worth of their agilon stock through the SPO at the inflated price of $21.50 per share.

9.     The truth about the higher medical costs that agilon had been facing began to emerge on November 2, 2023.  On that date, agilon reported lower-than-expected third quarter 2023 results due to increased utilization and medical costs.  Defendants also lowered the Company's 2023 full-year revenue outlook and informed investors that agilon had increased its IBNR Reserve to account for prior period medical expenses.  These results caught analysts off guard.  For example, analysts at Wells Fargo called this "cost pressure . . . surprising because of [agilon's] confidence it did not have an issue in [August and September.]."  On this news, agilon's stock price *fell $2.23, or 13.2 percent*, to close at $14.66 on November 3, 2023.

10.    Then, on January 5, 2024, agilon surprised investors again by lowering its 2023 profit forecasts.  Specifically, the Company reduced its 2023 Medical Margin and Adjusted EBITDA[1] guidance citing high-than-expected medical costs.  Specifically, agilon reduced its 2023 Medical Margin and Adjusted EBITDA outlooks by more than $110 million and $73 million, respectively.  agilon also announced that its Chief Financial Officer, Timothy Bensley would retire and be replaced later in the year.  Analysts continued to express their concern about these cost issues.  For example, analysts at BTIG called the lowered guidance "a significant negative surprise" and analysts at Leerink Partners noted that the results underscore blind spots in agilon's

---

[1]  Adjusted EBITDA is a profit metric that measures earnings before interest, taxes, depreciation, amortization, and handful of other expenses.

model and data visibility issues.  On this news, agilon's stock *fell $3.45, or 28.6 percent*, to close at $8.63 on January 5, 2024.

11.     As a result of these disclosures, the prices of agilon common stock dropped significantly causing substantial damages to the Company's investors.

## III.     JURISDICTION AND VENUE

12.     The claims asserted arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b).  Defendant agilon is headquartered in this District and it conducts business operations within this District.

15.     Because the Underwriter Defendants (as defined herein) were counterparties to the Underwriting Agreement and each of Exchange Act Individual Defendants and the Securities Act Individual Defendants (as defined herein) authorized the execution of the Underwriting Agreement by agilon, each of them also submitted to the jurisdiction of this Court by directing acts within this District out of which this action arises.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   COMPANY BACKGROUND

17.   Founded in 2016, agilon's business is based on building partnerships with private insurance companies who cover MA patients, traditional Medicare payers, commercial managed care payers, and primary care physician groups.   Through these partnerships, primary care physicians (supported by agilon's platform) provide medical care to their MA patients in a handful of markets throughout the United States.

18.   In 2016, the Company was formed by private equity firm Clayton, Dubilier & Rice. In April 2021, after expanding its business into 17 different geographies with approximately 210,000 members on its platform, agilon held its initial public offering ("IPO").   Through the IPO, agilon raised $1.2 billion from public investors, and thereafter, its common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AGL."   After the IPO and during the Class Period, Clayton, Dubilier & Rice owned a substantial portion of agilon's equity through its affiliate CD&R Vector Holdings, L.P.   By the end of 2022 agilon had further expanded its geographical reach into 25 markets serving 358,600 members on its platform, including 269,500 MA patients.

19.   The Company derives a large portion of its revenue from MA insurers which in turn receive funds from the federal Medicare program.   The federal government pays MA insurers a flat fee for insuring MA patients.   If the cost to treat those patients exceeds the flat fee, insurers lose money on those patients and their profits decrease.   In exchange for a *fixed* portion of the flat fee, agilon takes on some of that financial risk of MA members who are managed through the Company's Total Care Model ("TCM").

20.     The TCM is a platform that advises agilon's partner physicians on how to manage their MA patients' healthcare needs.  The Company touts the TCM as one of the critical services it provides for physician groups.  The TCM assists physician groups with clinical and financial management by, for instance, consolidating actionable information, which helps physicians make healthcare decisions and assists them with financial reporting.  The purpose of this platform is to provide physicians with treatment plans that lower the *variable* healthcare costs for MA patients, which ultimately generates positive and growing profit margins for the Company on its *fixed* revenues.

21.     agilon claims that this platform gives it up-to-date visibility into healthcare utilization trends of Medicare patients.  This visibility is critical to agilon's business because if patients utilize more healthcare, agilon's profit margins decrease.  Therefore, agilon needs this line of sight on costs to assure that the cost and margin figures it publishes to investors are accurate.  In fact, agilon claims to closely monitor utilization trends and medical costs so that it can accurately forecast its financial results.

22.     One key financial metric that is closely tracked by agilon's investors and analysts is "Medical Margin," which the Company defines as "the amount earned from medical services revenue after medical services expenses are deducted," meaning the "costs incurred for medical services provided to our members."  Thus, agilon's Medical Margin, and its overall financial performance, is stronger when lower medical costs are incurred on patients' healthcare needs.  Inversely, if healthcare utilization, and the overall cost of providing care, increases, agilon's Medical Margin decreases.  The Company consistently published guidance on its projected 2023 Medical Margin throughout the Class Period.

23.     The Company is required under U.S. Generally Accepted Accounting Principles to establish an adequate IBNR Reserve, or a liability for claims that it is obligated to pay for medical costs that have been incurred but not yet reported.  Among other things, agilon estimates its IBNR Reserve based on utilization trends.  The level of its IBNR Reserve for unreported claims directly impacts key financial metrics, including its Medical Margin.  During the Class Period, the Company assured investors it had accurately projected its medical costs and that it had a strong IBNR Reserve in place.  Throughout the Class Period, the IBNR Reserve was an area of focus for Defendants and their outside auditor, Ernst & Young LLP.  In fact, in agilon's Form 10-K filed with the SEC on February 27, 2023, Ernst & Young LLP identified the "[v]aluation of incurred but not reported claims," as the only "critical audit matter."

24.     On May 15, 2023, agilon filed with the SEC an automatic shelf registration statement on Form S-3 ("Registration Statement") which included a Prospectus ("Prospectus").  Subsequently, on Forms 424B7, agilon filed with the SEC a preliminary prospectus supplement on May 15, 2023 and a final prospectus supplement on May 17, 2023 (the "Prospectus Supplements" and together with the Prospectus and Registration Statement and attendant materials filed or published with these forms, the "SPO Materials").  Pursuant to the SPO Materials, the CD&R Defendants (as defined herein), along with other selling stockholders, sold to the investing public approximately 94.6 million shares of agilon common stock at $21.50 per share, for total gross proceeds of approximately $2.03 billion.

## V.      PARTIES

### A.      Plaintiff

25.     Plaintiff New England Teamsters provides pension and other benefits for union members.  As indicated on the Certification attached herewith, Plaintiff purchased shares of agilon

common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.  Exchange Act Defendants

26.     Defendant agilon is incorporated in Delaware and headquartered in Austin, Texas. Agilon common stock trades on the NYSE under the ticker symbol "AGL."

27.     Defendant Steven J. Sell ("Sell"), at all relevant times, was agilon's Chief Executive Officer ("CEO") and served as a Director on agilon's Board of Directors (the "Board").

28.     Defendant Timothy S. Bensley ("Bensley") served as agilon's Chief Financial Officer ("CFO") at all relevant times.

29.     Defendants Sell and Bensley are collectively referred to hereinafter as the "Exchange Act Individual Defendants."  The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of agilon's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading.  The Exchange Act Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Exchange Act Individual Defendants.

30.     The Exchange Act Individual Defendants along with agilon are herein referred to as the "Exchange Act Defendants."

**C.     Securities Act Defendants**

31.     Defendant agilon is both an Exchange Act and a Securities Act Defendant (as defined herein).

32.     Defendant Sell is both an Exchange Act and a Securities Act Defendant and signed the SPO Materials.

33.     Defendant Bensley is both an Exchange Act and a Securities Act Defendant and signed the SPO Materials.

34.     Defendant Priscilla Kasenchak was agilon's Chief Accounting Officer at all relevant times and signed the SPO Materials.

35.     Defendant Ronald A. Williams was Chairman of agilon's Board at the time of the SPO and signed the SPO Materials.

36.     Defendant Sharad Mansukani was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

37.     Defendant Diana L. McKenzie was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

38.     Defendant Karen McLoughlin was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

39.     Defendant Clay Richards was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

40.     Defendant Ravi Sachdev was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

41.     Defendant Richard J. Schnall was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

42.     Defendant Jeffrey A. Schwaneke was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

43.     Defendant Derek L. Strum was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

44.     Defendant William Wulf was a Director on agilon's Board at the time of the SPO and signed the SPO Materials.

45.     The defendants identified in ¶¶ 31-44 above are also referred to herein as the "Securities Act Individual Defendants."

46.     Defendant J.P. Morgan Securities LLC served as an underwriter for the SPO.  J.P. Morgan Securities LLC maintains its corporate headquarters in New York, New York and conducts business operations in this District.

47.     Defendant Goldman Sachs & Co. LLC served as an underwriter for the SPO. Goldman Sachs & Co. LLC maintains its corporate headquarters in New York, New York and conducts business operations in this District.

48.     Defendant BofA Securities, Inc. served as an underwriter for the SPO.  BofA Securities, Inc. maintains its corporate headquarters in New York, New York and conducts business operations in this District.

49.     Defendant Wells Fargo Securities, LLC served as an underwriter for the SPO. Wells Fargo Securities, LLC maintains its corporate headquarters in Charlotte, North Carolina and conducts business operations in this District.

50.     Defendant Deutsche Bank Securities Inc. served as an underwriter for the SPO. Deutsche Bank Securities Inc. maintains its corporate headquarters in New York, New York and conducts business operations in this District.

51.     Defendant Cowen and Company, LLC served as an underwriter for the SPO. Cowen and Company, LLC maintains its corporate headquarters in New York, New York and conducts business operations in this District.

52.     Defendant Nomura Securities International, Inc. served as an underwriter for the SPO.  Nomura Securities International, Inc. maintains its corporate headquarters in New York, New York and conducts business operations in this District.

53.     Defendant RBC Capital Markets, LLC served as an underwriter for the SPO.  RBC Capital Markets, LLC maintains its corporate headquarters in New York, New York and conducts business operations in this District.

54.     Defendant Leerink Partners f/k/a SVB Securities LLC served as an underwriter for the SPO.  Leerink Partners f/k/a SVB Securities LLC maintains its corporate headquarters in Boston, Massachusetts and conducts business operations in this District.

55.     Defendant Truist Securities, Inc. served as an underwriter for the SPO.  Truist Securities, Inc. maintains its corporate headquarters in Nashville, Tennessee and conducts business operations in this District.

56.     Defendant William Blair & Company, L.L.C. served as an underwriter for the SPO. William Blair & Company, L.L.C. maintains its corporate headquarters in Chicago, Illinois and conducts business operations in this District.

57.     Defendant Academy Securities, Inc. served as an underwriter for the SPO. Academy Securities, Inc. maintains its corporate headquarters in New York, New York and conducts business operations in this District.

58.     Defendant R. Seelaus & Co., LLC served as an underwriter for the SPO.  R. Seelaus & Co., LLC maintains its corporate headquarters in Chatham, New Jersey and conducts business operations in this District.

59.     Defendant Samuel A. Ramirez & Company, Inc. served as an underwriter for the SPO.  Samuel A. Ramirez & Company, Inc. maintains its corporate headquarters in New York, New York and conducts business operations in this District.

60.     Defendant Siebert Williams Shank & Co., LLC served as an underwriter for the SPO.  Siebert Williams Shank & Co., LLC maintains its corporate headquarters in New York, New York and conducts business operations in this District.

61.     Defendant WR Securities, LLC served as an underwriter for the SPO.   WR Securities, LLC maintains its corporate headquarters in New York, New York and conducts business operations in this District.

62.     The defendants identified in ¶¶ 46-61 (collectively, the "Underwriter Defendants") served as the underwriters for the SPO.  According to the SPO Materials, the Underwriter Defendants sold the total 94,611,308 million agilon shares sold in the SPO at $21.50 per share and shared approximately $66 million in underwriting discounts and commissions.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with the SPO and the preparation of the SPO Materials was a substantial factor leading to the harm complained of herein.

63.     Defendant Clayton, Dubilier & Rice, LLC is a private investment firm that formed agilon in 2016 with offices in New York and London.

64.     Defendant CD&R Vector Holdings, L.P. is owned by investment funds managed by or affiliated with Clayton, Dubilier & Rice, LLC.  CD&R Vector Holdings, L.P. owned agilon stock during the relevant period and sold stock in the SPO.  Specifically, CD&R Vector Holdings, L.P. owned approximately 46.8% of agilon's common stock prior to the SPO and owned approximately 24.7% after the SPO.  In fact, CD&R Vector Holdings, L.P. sold over 99% of the shares sold in the SPO.

65.     Defendant CD&R Investment Associates IX, Ltd. is the general partner of CD&R Vector Holdings, L.P.

66.     Defendant CD&R Associates IX, L.P. is an entity with more than ten limited partners, each an investment professional of Clayton, Dubilier & Rice, LLC, which during the relevant period made voting decisions with respect to the shares held by CD&R Vector Holdings, L.P.

67.     The defendants identified in ¶¶ 63-66 are referred to herein as the "CD&R Defendants."  During the relevant period, executives of the CD&R Defendants served as Directors of agilon.

68.     All Securities Act Individual Defendants and Underwriter Defendants, along with agilon and the CD&R Defendants are referred to herein as the "Securities Act Defendants."

69.     All defendants, including both Exchange Act Defendants and Securities Act Defendants, are collectively and in part referred to herein as "Defendants."

VI.     **SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS**

A.     **Material Misrepresentations and Omissions During the Class Period**

70.     The Class Period begins on January 9, 2023, when Defendant Sell attended a healthcare conference hosted by J.P. Morgan.  At this conference, Defendant Sell touted "the

power of [agilon's] business model," claiming this model would positively impact the Company's margin.

71.      Then, on March 1, 2023, the Company filed with the SEC its Form 10-K reporting the Company's financial and operational results for the 2022 (the "2022 10-K") which included the following false and misleading risk factors:

> We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability . . . These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business.
>
> . . .
>
> [F]actors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following . . . The utilization rates of healthcare services, including inpatient hospitalization, by our members.
>
> . . .
>
> Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.
>
> . . .
>
> [O]ur actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period.
>
> . . .
>
> Our estimates of [medical services that have been incurred but not reported] liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate [medical services that have been incurred but not reported] levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

72.     Appended as an exhibit to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Exchange Act Individual Defendants certified that "[t]he [2022 10-K] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

73.     On May 9, 2023, agilon issued a press release announcing its results for the first fiscal quarter of 2023 ended March 31, 2023.  In the press release, agilon issued guidance that its Medical Margin would be between $535 million and $560 million for the year ended December 31, 2023.  On the same day, the Company also filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter (the "Q1 2023 10-Q").  In the Q1 2023 10-Q, the Company claimed its costs incurred for medical services provided to patients was approximately $733.5 million.  In the Q1 2023 10-Q, the Company also claimed there had been "no material changes to the risk factors disclosed in the [2022 10-K]."

74.     Then, on May 11, 2023, Defendant Bensley attended a healthcare conference hosted by Bank of America.  At the conference, Defendant Bensley touted Defendants' "continued confidence . . . with [agilon's] full year medical margin guidance."

75.     On June 7, 2023, Defendants Sell and Bensley attended a conference hosted by William Blair.  At the conference, Defendant Sell touted the Company's ability to control and reduce medical costs, claiming that its "[h]igh quality care leads to cost-effective care."  Defendant Bensley claimed that agilon had "really, really strong visibility into exactly what's happening" in the economics of new partner physician groups.

76.     On August 3, 2023, agilon issued a press release announcing its results for the second quarter of 2023 ended June 30, 2023.  In the press release agilon issued guidance that its

2023 Medical Margin would be between $500 and $530 million.  On the same day, the Company also filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter (the "Q2 2023 10-Q").  In the Q2 2023 10-Q, the Company claimed its costs incurred for medical services provided to patients was approximately $1.09 billion.  In the Q2 2023 10-Q, the Company also claimed there had been "no material changes to the risk factors disclosed in the [2022 10-K]."

77.     Also on August 3, 2023, agilon hosted a conference call to discuss the Company's financial results for the second quarter of 2023.  During the call, Defendant Sell boasted that agilon's "model has natural advantages in terms of leading indicators and visibility," and claimed that the Company did not just receive "macro utilization trends," but had more real-time insight into utilization because its "teams are actively managing utilization on the ground every day."  Sell further claimed that agilon "operate[s] in a very forward-looking model," that its "visibility on the key levers for driving next year's performance [was] quite high," and that agilon had an "incredible level of visibility" on Medicare claims.  Further, he claimed that despite the possibility of changing utilization trends agilon's "model is distinctively different and more durable and predictable in driving cost and quality results compared to the broad fee-for-service system, which predominates across health care."

78.     During the same call, Defendant Bensley claimed that agilon was "strengthening [its] . . . reserves on a go-forward basis, which will significantly reduce the potential of negative claims development next year."

79.     Then, on September 6, 2023, Defendant Bensley attended a conference hosted by Wells Fargo.  At the conference, Defendant Bensley stated that agilon had "strengthen[ed] [its] reserves . . . to make sure that we're covering any potential increase in utilization and . . . make

sure we're properly reserved as we end the year."  Defendant Bensley also claimed that the Company was "confident in the guidance that [it] put out," in the second quarter of 2023.

80.     On September 12, 2023, Defendant Bensley attended a healthcare conference hosted by Morgan Stanley.  At that conference, Defendant Bensley claimed that agilon had "strengthened [its] reserves," so that "if we do that at some point, see that, that -- there was some kind of a spike up or an increase in utilization that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there. . ..  [W]e're well reserved and we feel really confident with the guidance -- with that guidance that we put forward for the balance of the year."

81.     The statements in ¶¶ 70-80 were materially false and misleading when made because throughout the Class Period, Defendants misled investors about agilon's medical costs by: (1) touting the Company's purported visibility into utilization trends and medical costs; (2) failing to disclose increased medical costs that agilon had incurred prior to and during the Class Period due to higher utilization of healthcare by MA patients; (3) falsely stating that its IBNR Reserve was adequate; (4) making false and misleading statements about the effectiveness of its business model; (5) issuing overly optimistic financial guidance; and (6) issuing risk disclosures that were materially false and misleading because they characterized adverse facts that had ***already materialized*** as mere possibilities.

**B.     The Truth Emerges While agilon Continues to Mislead Investors**

82.     Investors began to learn the truth behind Defendants' misrepresentations on November 2, 2023 when, after the close of trading, agilon issued a press release announcing its financial results for the third quarter of 2023 ended September 30, 2023.  As part of these results, the Company lowered its full year outlook for 2023 and reported increasing cost pressure.  For instance, the Company lowered its 2023 Medical Margin guidance range from $500-$530 million

to $455-$470 million.  Also on November 2, 2023, the Company hosted an earnings call to discuss its third quarter 2023 results.  During this call, Defendants explained that agilon would maintain more conservative reserves for 2023 and moving forward.  Analysts at Wells Fargo covering agilon called the "cost pressure . . . surprising because of [agilon's] confidence it did not have an issue in [August and September.]."  On this news, agilon's stock price *fell $2.23, or 13.2 percent*, to close at $14.66 on November 3, 2023.

83.     Nevertheless, Defendants continued to issue false and misleading statements during the November 2, 2023 earnings call.  Defendant Sell claimed that agilon's "ability to execute against [its] Adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of our model," and that its "visibility into the key drivers for next year's performance are quite high," including the "attractive margin profile" of its new partners.  Defendant Sell further claimed that agilon was "building reserves so that [it makes] sure we're adequately reserved."  Defendant Bensley claimed that agilon "continue[d] to proactively refine [its] model to account for utilization trends as well as any potential blind spots with health plans."

84.     Further, as mentioned above, in the November 2, 2023 press release, agilon issued guidance that its Medical Margin would be between $455 and $470 million for the year ended December 31, 2023.  On the same day, the Company also filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter (the "Q3 2023 10-Q").  In the Q3 2023 10-Q, the Company claimed its costs incurred for medical services provided to patients was approximately $992.5 million.  In the Q3 2023 10-Q, the Company also claimed there had been "no material changes to the risk factors disclosed in the [2022 10-K]."

85.     The statements in ¶¶ 83-84 were materially false and misleading when made because Defendants misled investors about agilon's medical costs by: (1) touting the Company's purported visibility into utilization trends and medical costs; (2) failing to disclose increased medical costs that agilon had incurred prior to and during the Class Period due to higher utilization of healthcare by MA patients; (3) falsely stating that its IBNR Reserves were adequate; (4) making false and misleading statements about the effectiveness of its business model; (5) issuing risk disclosures that were materially false and misleading because they characterized adverse facts that had *already materialized* as mere possibilities.

86.     Finally, on January 5, 2024, the Company issued press releases announcing both that Defendant Bensley was retiring from his position as Chief Financial Officer and that agilon was lowering its 2023 Medical Margin.  Specifically, agilon revised its 2023 Medical Margin expectation to "$340 million to $360 million, approximately $110 million below the previous guidance range . . . due to $90 million in higher-than-expected medical costs."  The Company also announced plans to fix issues with its data visibility, including personnel changes to its internal and external actuarial teams and better alignment with its payor partners.  Analysts at BTIG covering the Company called the Medical Margin reduction "a significant negative surprise" and analysts at Leerink Partners noted that the results underscore blind spots in agilon's model and data visibility issues.  On this news, agilon's stock *fell $3.45, or 28.6 percent*, to close at $8.63 on January 5, 2023.

87.     After the end of the Class Period, on February 8, 2024, agilon announced that its chief medical officer ("CMO") Benjamin Kornitzer was stepping down.  As CMO, Kornitzer helped lead agilon's clinical strategy and oversee the TCM while working with the Company's physician partners.

88.     Then, on February 27, 2024, agilon issued a press release announcing its financial results for its fourth quarter of 2023 ended December 31, 2023.  As part of these results, the Company's reported 2023 Medical Margin was $299 million, "approximately $51 million below the midpoint of the company's guidance of range of $340 million to $360 million provided on January 5, 2024."  The Company also disclosed that increased medical costs would continue and revised its 2024 Medical Margin guidance range down to $400-$450 million (from $560-$600 million).

89.     Also on February 27, 2024, the Company hosted a related earnings call.  Contrary to Defendants' claim during the Class Period that agilon had an "incredible level of visibility" on Medicare claims, during this call, Defendants admitted agilon had been implementing significant operational changes to address its "data visibility gaps."

90.     In reaction to this news, analysts continued to express their concern with the high medical costs that agilon had been facing.  For example, on February 28, 2024, analysts at RBC Capital lowered their price target on agilon stock from $11 to $8 noting that the Company's fourth quarter 2023 results were well below the pre-announced targets from early January and reduced 2024 guidance was based on sustained elevated utilization trends.

C.     **Additional Scienter Allegations Related to Exchange Act Claims**

91.     During the Class Period, as alleged herein, the Exchange Act Individual Defendants acted with scienter in that the Exchange Act Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

92.     The Exchange Act Individual Defendants permitted agilon to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

93.     As set forth herein, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding agilon, their control over, receipt, or modification of agilon's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning agilon, participated in the fraudulent scheme alleged herein.

94.     The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of agilon common stock by disseminating materially false and misleading statements or concealing material adverse facts.  The scheme deceived the investing public regarding agilon's business, operations, and management and the intrinsic value of agilon common stock and caused Plaintiff and members of the Class to purchase agilon common stock at artificially inflated prices.

**D.     Loss Causation/Economic Loss**

95.     During the Class Period, as detailed herein, agilon and the Exchange Act Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of agilon common stock and operated as a fraud or deceit on Class Period purchasers of agilon common stock by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of agilon common stock declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of agilon common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal common stock laws.

E.        **Applicability of Presumption of Reliance: Fraud on the Market**

96.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased agilon common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

97.    At all relevant times, the markets for agilon common stock were efficient for the following reasons, among others:

(a)    as a regulated issuer, agilon filed periodic public reports with the SEC;

(b)    agilon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    agilon was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     agilon common stock were actively traded in an efficient market, including its common stock that was traded on the New York Stock Exchange, under the ticker symbol "AGL."

98.    As a result of the foregoing, the market for agilon common stock promptly digested current information regarding agilon from publicly available sources and reflected such information in agilon's common stock prices.  Under these circumstances, all purchasers of agilon common stock during the Class Period suffered similar injury through their purchase of agilon common stock at artificially inflated prices and the presumption of reliance applies.

99.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**F.    No Safe Harbor**

100.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or

the forward-looking statement was authorized or approved by an executive officer of agilon who knew that the statement was false when made.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against agilon and the Exchange Act Individual Defendants**

101.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102.    During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of agilon common stock during the Class Period.

104.    Plaintiff and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for agilon common stock.  Plaintiff and Class members would not have purchased agilon common stock at the prices they paid, or at all,

if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

105.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of agilon common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants

106.    Plaintiff repeats and realleges allegations contained in ¶¶ 1-100 as if fully set forth herein.

107.    The Exchange Act Individual Defendants acted as controlling persons of agilon within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control the actions of agilon and its employees.  By reason of such conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VII.    SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

### A.    Material Misrepresentations and Omissions in the SPO Materials

108.    The Securities Act claims in this case relate to false and misleading statements issued in the SPO Materials.

109.    The SPO Materials incorporated by reference the Company's 2022 10-K which included the false and misleading risk factors described in ¶ 71.

110.    Appended as an exhibit to the 2022 10-K were signed certifications pursuant to SOX, wherein the Exchange Act Individual Defendants certified that "[t]he [2022 10-K] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he

information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

111.    The statements in ¶¶ 109-110 were materially false and misleading when made because in the SPO Materials, Defendants misled investors about agilon's medical costs by: (1) failing to disclose increased medical costs that agilon had incurred prior to and during the Class Period due to higher utilization of healthcare by MA patients;  (2) making false and misleading statements about the effectiveness of its business model; and (3) issuing risk disclosures that were materially false and misleading because they characterized adverse facts that had ***already materialized*** as mere possibilities.

### B.    Events After the SPO

112.    Investors began to learn the truth behind Defendants' misrepresentations on November 2, 2023 when, after the close of trading, agilon issues a press release announcing its financial results for the third quarter of 2023.  As part of these results, the Company lowered its full year outlook for 2023 and reported increasing cost pressure in 2023.  For instance, the Company lowered its 2023 Medical Margin estimates from $500-$530 million to $455-$470 million.  Also on November 2, 2023, after the close of trading, the Company hosted a related earnings call.  During this call, Defendants discussed that agilon would maintain more conservative reserves for 2023 and moving forward.  Analysts at Wells Fargo covering agilon called the "cost pressure . . . surprising because of [agilon's] confidence it did not have an issue in [August and September.]."

113.    Then, on January 5, 2024, before the opening of trading, the Company issued press releases announcing both that Defendant Bensley was retiring from his position as Chief Financial Officer and that agilon was revising its 2023 guidance to account for higher-than-expected costs leading to a lower Medical Margin.  Specifically, agilon revised its 2023 Medical Margin

expectation to "$340 million to $360 million, approximately $110 million below the previous guidance range . . . due to $90 million in higher-than-expected medical costs, as well as $20 million of negative revenue revision with two regional health plans in new geographies."  Analysts at BTIG covering the Company called the Medical Margin reduction "a significant negative surprise" and analysts at Leerink Partners noted that the results underscore blind spots in agilon's model and data visibility issues.

114.    Then, on February 8, 2024, agilon announced CMO Benjamin Kornitzer was stepping down.  As CMO, Kornitzer helped lead agilon's clinical strategy.

115.    Finally, on February 27, 2024, agilon issued a press release announcing its financial results for its fourth quarter of 2023 ended December 31, 2023.  As part of these results, the Company's reported 2023 Medical Margin was $299 million, "approximately $51 million below the midpoint of the company's guidance of range of $340 million to $360 million provided on January 5, 2024."  The Company also disclosed that increased medical costs would continue and revised its 2024 Medical Margin guidance range down to $400-$450 million (from $560-$600 million).

116.    Also on February 27, 2024, the Company hosted a related earnings call.  Contrary to Defendants' claim during the Class Period that agilon had an "incredible level of visibility" on Medicare claims, during this call, Defendants admitted agilon had been implementing significant operational changes to address its "data visibility gaps."

117.    Subsequent to the SPO, the price of agilon's common stock declined substantially. By March 18, 2024, agilon common stock closed at $5.40 per share, *a 75 percent decline* from the SPO price.

118.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Class members have suffered significant losses and damages.

## COUNT III

**For Violation of Section 11 of the Securities Act Against agilon, the Securities Act Individual Defendants, and the Underwriter Defendants**

119.    Plaintiff repeats, incorporates, and realleges allegations contained in ¶¶ 1-100 & 108-118 as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

120.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the above-listed defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

121.    The SPO Materials contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

122.    agilon is the registrant for the SPO.  Defendants named herein were responsible for the contents and dissemination of the SPO Materials.  Each of the Securities Act Individual Defendants signed or authorized the signing of the SPO Materials on their own behalf.  The Underwriter Defendants marketed and underwrote the SPO and sold the majority of agilon stock issued in the SPO to the Class.

123.    As the issuer of the shares, agilon is strictly liable to the Class for the SPO Materials' material misstatements and omissions.  Signatories of the SPO Materials, and possibly other Defendants, may also be strictly liable the Class for such material misstatements and

omissions.  None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the SPO Materials were complete, accurate, or non-misleading.

124.    None of the Defendants named herein made a reasonable investigation of or possessed reasonable grounds for the belief that the statements contained in the SPO Materials were true and without omissions of any material facts and were not misleading.

125.    By reasons of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated Section 11 of the Securities Act.

126.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

127.    The Class has sustained damages.  The value of agilon common stock has declined substantially subsequent to and because of Defendants' violations.

## COUNT IV

**For Violation of Section 12(a)(2) of the Securities Act Against agilon, the Securities Act Individual Defendants, the CD&R Defendants, and the Underwriter Defendants**

128.    Plaintiff repeats, incorporates, and realleges allegations contained in ¶¶ 1-100 & 108-118 as if fully set forth herein.

129.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against agilon, the Securities Act Individual Defendants, the CD&R Defendants, and the Underwriter Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

130.     Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective Prospectuses which respectively formed in relevant part the SPO Materials.   The actions of solicitation by the Defendants named herein include participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

131.     The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

132.     Each of the Defendants named in this count owed members of the Class who purchased or otherwise acquired agilon common stock pursuant to the Prospectus issued in connection with the SPO Materials a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   By virtue of each of the Defendants named in this Count's failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

133.     Members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the SPO at the time they purchased or otherwise acquired agilon common stock.

134.     By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, members of the Class who purchased or otherwise acquired agilon common stock pursuant to the Prospectus issued in connection with the SPO Materials sustained substantial damages in

connection therewith.  Accordingly, members of the Class who hold the common stock issued pursuant to the Prospectus issued in connection with the SPO Materials have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their agilon common stock seek damages to the extent permitted by law.

135.    The Class has suffered damages as the value of agilon stock sold pursuant to the SPO has declined substantially as a result of the violations of the Defendants named herein.

136.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT V

### For Violation of Section 15 of the Securities Act Against the Securities Act Individual Defendants and the CD&R Defendants

137.    Plaintiff repeats, incorporates, and realleges allegations contained in ¶¶ 1-100 & 108-118 as if fully set forth herein.

138.    This Count is brought under Section 15 of the Securities Act, 15 U.S.C. §77o, against the Securities Act Individual Defendants and the CD&R Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

139.    As detailed above, each of the Defendants named herein committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

140.    The Securities Act Individual Defendants were each control persons of agilon by virtue of their positions as directors, senior officers, and/or significant shareholders of the Company.  They each had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.  The Company also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all its employees.  The CD&R Defendants were control persons of agilon by virtue of their significant influence over the Company's management and Board, including through executives of the CD&R Defendants which served as members of agilon's Board and its substantial ownership of agilon stock.

141.    By reason of the conduct alleged herein, the Defendants named herein violated Section 15 of the Securities Act, and Class members suffered harm as a result.

## VIII.   CLASS ACTION ALLEGATIONS

142.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)    All persons and entities that purchased or otherwise acquired agilon common stock during the Class Period and were damaged thereby, except those who are excluded below, as against the Defendants for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder; and

(b)    All persons and entities that purchased or otherwise acquired agilon common stock pursuant, or traceable, or both, to the SPO Materials issued in connection with the SPO, except those who are excluded below, for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, against agilon and the Securities Act Defendants.

(c)    Excluded from the Class are: (i) all Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or

33

director of agilon during the Class Period; (iv) any firm, trust, corporation, or other entity in which

any Defendant has or had a controlling interest; (v) agilon's employee retirement and benefit

plan(s) and their participants or beneficiaries, to the extent they made purchases through such

plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any

such excluded person.

143.    The members of the Class are so numerous that joinder is impracticable.  agilon

common stock shares are actively traded on the NYSE and tens of millions of shares were sold in

the SPO.  While the exact number of Class members is unknown to Plaintiff at this time and can

only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of

members in the Class.  Record owners and other Class members may be identified from records

procured from or maintained by the Company or its transfer agent and may be notified of the

pendency of this action using a form of notice similar to that customarily used in securities class

actions.

144.    Common questions of law and fact exist as to all Class members and predominate

over any questions solely affecting individual Class members, including:

(a)    Whether Defendants violated the Securities Act or Exchange Act, or both;

(b)    Whether Defendants omitted or misrepresented material facts, including

whether the SPO Materials misrepresented and/or omitted material information in violation of the

Securities Act;

(c)    Whether Defendants' statements omitted material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading;

(d)     Whether, with respect to the Exchange Act claims only, the Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of agilon common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

145.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

146.    Plaintiff will adequately protect the Class' interests.  It has retained counsel experienced in securities class action litigation and its interests do not conflict with the Class'.

147.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against Defendants as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.      Granting such other, further, and/or different relief as the Court deems just and proper.

## X.      JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 19, 2024                 **LABATON KELLER SUCHAROW LLP**,

_/s/ Guillaume Buell_
Eric J. Belfi
Guillaume Buell (TX Bar # 24080813)
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ebelfi@labaton.com
gbuell@labaton.com
fmcconville@labaton.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATION

I, Daniel J. Greene, as Chief Administrative Officer of New England Teamsters Pension Fund ("New England Teamsters"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of New England Teamsters.  I have reviewed a complaint prepared against agilon health, inc. ("agilon") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      New England Teamsters did not purchase agilon common stock at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      New England Teamsters is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  New England Teamsters fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      New England Teamsters' transactions in agilon common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      New England Teamsters sought to serve as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*Erie County Employees' Retirement System v. Cutera, Inc.*, No. 5:23-cv-02560 (N.D. Cal.)
*New England Teamsters Pension Fund v. RTX Corporation*, No. 3:23-cv-1274 (D. Conn.)

6.      Beyond its pro rata share of any recovery, New England Teamsters will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is

true and correct this 19th day of March, 2024.

Daniel J. Greene
Chief Administrative Officer
New England Teamsters Pension Fund

2

## EXHIBIT A

## TRANSACTIONS IN AGILON HEALTH, INC.

| Transaction Type | Trade Date | Quantity | Price per Share | Cost Proceeds |
|---|---|---|---|---|
| Purchases | 04/28/23 | 2,280 | $24.27 | ($55,335.60) |
| Purchases | 06/23/23 | 1,100 | $17.09 | ($18,799.00) |
| Sales | 10/27/23 | (400) | $18.06 | $7,224.00 |