UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § | Master File No. 1:24-cv-00297-RP |
| | | <u>CLASS ACTION</u> |
| | § § | |
| This Document Relates To: | § | |
| ALL ACTIONS. | § § § | |
| | § | <u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ...........................................................................................1

II.     INTRODUCTION ..........................................................................................................2

III.    JURISDICTION AND VENUE .....................................................................................7

IV.     PARTIES .......................................................................................................................7

        A.      Plaintiffs ............................................................................................................7

        B.      Issuer Defendant ...............................................................................................8

        C.      Exchange Act Individual Defendants ..............................................................8

        D.      Securities Act Defendants...............................................................................10

                1.      Individuals..............................................................................................10

                2.      Underwriters ..........................................................................................12

                3.      CD&R .....................................................................................................14

V.      SUMMARY OF THE FRAUD ...................................................................................16

        A.      Company Background and IPO .......................................................................16

        B.      Defendants Misrepresent Critical Aspects of agilon's Business Model................17

                1.      agilon Misleadingly Claimed that its "High-Touch," Cost-
                        Controlling Model Provided Visibility and Predictability of
                        Medical Costs........................................................................................18

                2.      Significant Growth Model and Robust Onboarding Procedures ..............21

                3.      Seamless Collection, Tracking, and Integration of Critical Payer
                        Data .......................................................................................................23

        C.      The Fraud Unravels.........................................................................................26

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS .......................................................................................................29

        A.      The April 2021 Registration Statement ..........................................................29

        B.      May 26, 2021 Through November 18, 2021.....................................................31

        C.      January 10, 2022 Through November 3, 2022 .................................................35

4859-2284-9249.v1

**Page**

D.     January 9, 2023 Through June 7, 2023 ................................................................42

E.     August 3, 2023 Through September 12, 2023 .......................................................50

F.     November 2, 2023 Through November 14, 2023 ...................................................58

G.     January 5, 2024 ....................................................................................................63

VII.    LOSS CAUSATION.............................................................................................................65

A.     November 2, 2023 Disclosure...............................................................................66

B.     January 5, 2024 Disclosure ..................................................................................67

C.     February 27, 2024 Disclosure ..............................................................................70

VIII.   ADDITIONAL SCIENTER ALLEGATIONS......................................................................72

A.     Defendants' Billions of Dollars of Insider Sales ..................................................72

B.     Defendants Repeatedly Emphasized agilon's Comprehensive Data on
       Patient Utilization, Medical Costs and Other Metrics ..........................................73

C.     The Alleged Fraud Centered on agilon's Core Business .......................................75

D.     Defendants Inflated agilon's Medical Margin by Concealing Medical
       Costs.....................................................................................................................76

E.     The Close Temporal Proximity Between Defendants' False Statements
       and the Corrective Disclosures .............................................................................77

F.     Defendants Were Motivated to Conceal Deteriorating Profits in Order to
       Retain and Attract Physician Partners..................................................................78

G.     The Abrupt Departures of agilon's Officers ..........................................................79

H.     Physician Partners' Representations to CMS Regarding agilon's Full-Risk
       Model ...................................................................................................................80

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON
       THE MARKET....................................................................................................................82

X.      CLASS ACTION ALLEGATIONS .....................................................................................83

XI.     CLAIMS FOR RELIEF .......................................................................................................85

4859-2284-9249.v1

**Page**

COUNT I ...................................................................................................................85

For Violation of §11 of the Securities Act Against agilon, the Securities Act Individual
    Defendants, and the Underwriter Defendants...................................................85

COUNT II ..................................................................................................................92

For Violation of §12(a)(2) of the Securities Act Against the Underwriter Defendants.................92

COUNT III.................................................................................................................94

For Violation of §15 of the Securities Act Against the Securities Act Individual
    Defendants and the CD&R Defendants .............................................................94

COUNT IV.................................................................................................................98

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
    Against agilon and the Exchange Act Individual Defendants ...........................98

COUNT V ..................................................................................................................99

For Violation of §20(a) of the Exchange Act Against the Exchange Act Individual
    Defendants and the CD&R Defendants .............................................................99

COUNT VI.................................................................................................................100

For Violation of §20A of the Exchange Act Against Defendant Sell and the CD&R
    Defendants ........................................................................................................100

PRAYER FOR RELIEF ............................................................................................102

- iii -

Lead Plaintiffs Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems ("NCRS"), the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans ("NCSRP") (collectively, the "North Carolina Funds"), Indiana Public Retirement System ("Indiana"), and the North Atlantic States Carpenters Pension Fund ("NASCPF") and Guaranteed Annuity Fund ("NASCGAF") (collectively, the "North Atlantic Carpenters Funds") (collectively, "Plaintiffs"), allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, a review of U.S. Securities and Exchange Commission ("SEC") filings of agilon health, inc. ("agilon" or the "Company"), press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons who purchased agilon common stock between April 15, 2021 and February 27, 2024, inclusive (the "Class Period") and were damaged thereby (the "Class"), including those who purchased agilon common stock traceable to registration statements[1] used in connection with agilon's April 16, 2021, September 13, 2021, and May 17, 2023 public offerings.

---

[1]    The registration statements at issue refer to agilon's: (1) March 18, 2021 Form S-1 Registration Statement and April 16, 2021 Form 424B4 Prospectus (the "April 16, 2021 Prospectus" and together with the March 18, 2021 Form S-1, the "April 2021 Registration Statement"), utilized in connection with agilon's April 2021 initial public offering ("April 2021 Offering" or "IPO"); (2) September 7, 2021 Amendment No. 1 to Form S-1 Registration Statement and September 13, 2021 Form 424B4 Prospectus (the "September 13, 2021 Prospectus" and together with the September 7, 2021 Amendment No. 1 to Form S-1, the "September 2021 Registration Statement") utilized in connection with the September 13, 2021 public offering of agilon common stock ("September 2021 Offering"); and (3) May 15, 2023 Form S-3 Registration Statement and May 17, 2023 Form 424B4

- 1 -

2.      Plaintiffs assert claims for violation of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder against agilon, certain of its current and former officers and directors (as defined in ¶¶22-27, *infra*), and Clayton, Dubilier & Rice, LLC and its affiliates.  Plaintiffs also assert strict liability claims for violation of §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against agilon, certain of its current and former officers and directors (as defined in ¶¶28-43, *infra*), Clayton, Dubilier & Rice, LLC and its affiliates, and the underwriters of the Offerings.  *See* ¶¶44-45, *infra.*

## II.    INTRODUCTION

3.      agilon was formed in July 2016 by New York-based private equity firm Clayton, Dubilier & Rice, LLC ("CD&R") in order to take advantage of the billions of dollars paid each year by Medicare and Medicaid in connection with the provision of medical services to senior citizens. Under its "Total Care Model," agilon acts as a middleman, contracting with Medicare Advantage health plans (or "payors") and agreeing to accept 100% of the financial risk of the medical costs associated with the payors' provision of medical services to Medicare Advantage patients.  In exchange, a payor gives agilon a portion of the funds the payor receives from the federal government's Centers for Medicare & Medicaid Services ("CMS").  In this way, payors offload to agilon the full financial risk of their patients' medical costs, while retaining a small portion of the monies paid by CMS.

---

Prospectus (the "May 17, 2023 Prospectus" and together with the May 15, 2023 Form S-3, the "May 2023 Registration Statement") utilized in connection with the May 17, 2023 public offering of agilon common stock (the "May 2023 Offering").  The April 2021 Offering, September 2021 Offering, and May 2023 Offering are collectively referred to as the "Offerings."  The April 2021 Registration Statement, September 2021 Registration Statement, and May 2023 Registration Statement are collectively referred to as the "Registration Statements."

4859-2284-9249.v1

4. To actually deliver the medical services to patients, concurrent with entering the payor agreements described above, agilon enters into multi-decade agreements with physician practice groups located within the same geographies as the payors. Under these agreements, physicians provide medical care to agilon's patients, and agilon splits 50/50 with its physician partners any unexpended "capitation" revenue it receives from payors. Thus, in order to turn a profit, agilon and its physician partners must spend less on medical care for Medicare Advantage patients than they receive from payors – a term agilon refers to as "medical margin." Conversely, if its patient medical expenses and/or patient utilization rates increase, agilon's medical margin (and therefore its profit) shrinks or disappears entirely.

5. By 2020, agilon was responsible for the full-risk of 131,000 Medicare Advantage members. When the COVID-19 pandemic struck in early 2020 and more than one hundred million Americans went into lockdown, utilization of "non-essential" healthcare services declined significantly, as did the medical costs for which agilon was responsible under its Total Care Model payor agreements. This temporary suppression of medical procedures buoyed agilon's financial results. Patient utilization remained suppressed even as the country reopened, further boosting agilon's bottom line.

6. To CD&R and agilon, the decline in medical procedures and healthcare services utilization associated with the COVID-19 pandemic spawned not just a temporary financial windfall, it also presented a unique window of opportunity to take agilon public. The private equity firm owned 69% of agilon's shares as of the beginning of 2021, and through a stockholder agreement had the power to appoint the Chairman of agilon's Board of Directors ("Board") and other Board members, approve corporate transactions, and maintain CD&R's unlimited access to agilon's non-public financial, operational, and business information, including monthly financial statements, forecasts, and business plans. Using its control over agilon, CD&R orchestrated its plan to capitalize

4859-2284-9249.v1

on the pandemic and monetize its substantial equity stake in agilon via an initial public share offering.

7.      Because agilon had historically operated at a net loss, to successfully consummate a public offering agilon and CD&R first needed to convince investors that agilon could operate profitably.   Thus, CD&R and agilon needed to persuade analysts and investors (as well as prospective new physician partners) that agilon's first-of-its-kind business model could generate predictable and sustainable growth, medical cost savings, and profits.   One key aspect of that business model was that – as a middleman between payors and patients – agilon, and its physician partners were generating and utilizing accurate, comprehensive, standardized, and timely data in treating patients and managing their utilization and medical costs.

8.      During 1Q21, CD&R worked with agilon and its senior insiders to prepare drafts of a registration statement which discussed agilon's operations and the strength of its operating prospects. The April 2021 Registration Statement used to complete the IPO assured investors that agilon's "unique" Total Care Model "differentiated" the Company from other medical providers, which in turn allowed agilon to avoid upticks in patient utilization and medical costs.   The April 2021 Registration Statement stressed the Company's "***ability to accurately predict and effectively manage our medical margin***" which "provides ***significant visibility into the near-term and long-term financial trajectory*** for both agilon and our anchor physician groups."   The April 2021 Registration Statement also confirmed that the Company's platform was such that it "extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience."

9.      On April 16, 2021, defendants completed the IPO, selling over 53 million agilon shares at $23 per share, raising approximately $1.2 billion from Plaintiffs and other members of the Class.  The representations made by defendants in connection with agilon's April 2021 Offering and

- 4 -

thereafter during the Class Period about agilon's Total Care Model and the Company's ability to manage its medical margins were materially false and misleading.

10. The truth was that agilon suffered from systemic data and analytics gaps, including an inability to timely obtain and analyze data on agilon's members. agilon was relying on substantially delayed and incomplete data, which prevented agilon from accurately tracking, managing, reporting, and forecasting medical margin and members' medical costs. During the Class Period, agilon also concealed the fact it was unable to effectively integrate payor systems and payor data with agilon's platform, and lacked the systems and actuarial personnel and resources necessary to reliably track, report, and forecast medical expenses. agilon also concealed that it had historically failed to provide basic onboarding and education to new physicians in mature markets which was having a material adverse impact on agilon's medical margins. These issues enabled agilon to underreport medical expenses and thereby post inflated medical margins, which defendants touted as validation of agilon's "high-touch" model.

11. While concealing the truth about agilon and its defective business model, agilon's insiders cashed in, selling **billions** of dollars worth of their agilon stock at artificially inflated prices as high as $28.98 per share. This includes the 123 million shares sold by CD&R for proceeds of more than $2.7 billion (or about 1.6 times agilon's current market capitalization) while in possession of material, non-public information about agilon, including non-public financial reports, budgets, and business plans. Notably, CD&R also used its control over agilon to force agilon to use more than $200 million of the Company's own cash to buy *directly from CD&R* 9.6 million of the shares CD&R sold.

12. The truth began to emerge soon after CD&R's final insider sale in May 2023. On November 2, 2023, agilon cut its fiscal year ("FY") 2023 outlook, revealing a significant deterioration in key profit metrics, and that agilon had suffered an undisclosed spike in patient

4859-2284-9249.v1

utilization beginning by at least May 2023 – notwithstanding defendants' prior claims to the contrary. agilon's stock price sharply declined 13% in response. Analysts were shocked by agilon's acknowledgment of a 2Q23 member utilization spike (the same quarter during which CD&R had sold almost $2 billion worth of agilon stock), which "*contradict[ed]*" agilon's prior statements that agilon "was not experiencing the same MA cost pressure as MCOs [managed care organizations] with 2Q23 results."

13.     Then, on January 5, 2024, agilon stunned the market again when it lowered its FY23 outlook for the second time in nine weeks, and announced Timothy S. Bensley's "retirement" as Chief Financial Officer ("CFO"). In addition, agilon revealed that: (i) it had been suffering FY23 utilization rates up to 350% of FY22 rates; (ii) it had been saddled with a "backlog of pent-up demand from COVID"; (iii) the surge in patient utilization agilon had previously denied would persist through FY24; and (iv) it would not generate positive cash flow in FY24. The Company also divulged tens of millions of dollars in undisclosed medical costs from 2Q23 and 3Q23, that its 3Q23 medical margin had been overstated by at least *40%*, and that its 2Q23 medical margin had been materially overstated as well. Further, agilon disclosed it had failed to onboard hundreds of physicians in mature markets, causing a significant drag on medical margins.

14.     On this news, agilon's stock price dropped another 29% as the revelations "fuel[ed] investor concern[] around sustainability of the AGL model." Analysts lowered their price targets further, observing that agilon's troubling revelations were "nonlinear and difficult to follow."

15.     Then, on February 27, 2024, agilon disclosed it had missed the FY23 profit forecast provided *just weeks earlier* on January 5, had overstated historical medical margins for multiple market classes, was slowing down its membership growth rate, and was cutting its FY24 guidance. Analysts reduced their price targets again given agilon's "model weaknesses" and "lack of visibility," and the Company's stock price declined another 7% by March 1, 2024. By the end of the

4859-2284-9249.v1

Class Period, agilon's stock price had plummeted 85% from its Class Period high of over $44 per share to less than $6.50, a decline of over $38 per share.

## III.   JURISDICTION AND VENUE

16.   The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77o, and 77l(a)(2), §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, 15 U.S.C. §77(v), and §27 of the Exchange Act, 15 U.S.C. §78aa.

17.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act, and §22 of the Securities Act, as agilon is headquartered and conducts substantial business in this District.

18.   In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   PARTIES

### A.   Plaintiffs

19.   Indiana is among the largest one hundred public pension funds in the United States, overseeing approximately $50 billion of assets for the benefit of its more than 500,000 members. Indiana purchased shares of agilon common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein, and suffered damages as a result of defendants' alleged violations of the federal securities law.  ECF 11-3.

20.   North Carolina Funds manages more than $120 billion in assets and administers pension benefits for state and local government employees in North Carolina, distributing billions of dollars annually to more than 330,000 members and beneficiaries.  Additionally, North Carolina

Funds administers retirement savings accounts on behalf of more than 600,000 public employees in North Carolina. North Carolina Funds purchased shares of agilon common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein, including shares of agilon common stock traceable to the April 2021 Registration Statement and the September 2021 Registration Statement, and suffered damages as a result of defendants' alleged violations of the federal securities law. ECF 11-3.

21.     The North Atlantic Carpenters Funds are multi-employer benefit funds that provide retirement, health, and/or welfare benefits for 45,000 participants and families of the United Brotherhood of Carpenters across New England and New York State. The North Atlantic Carpenters Funds purchased shares of agilon common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein, including shares of agilon common stock traceable to the May 2023 Registration Statement, and suffered damages as a result of defendants' alleged violations of the federal securities law. ECF 11-3.

**B.     Issuer Defendant**

22.     Defendant agilon is a Delaware Corporation with principal executive offices located at 6210 E. US Highway 290, Suite 450, Austin, Texas 78723. agilon stock is registered and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AGL."

**C.     Exchange Act Individual Defendants**

23.     Defendant Steven J. Sell ("Sell") was at all relevant times Chief Executive Officer ("CEO"), President, and a member of agilon's Board. Prior to joining agilon in June 2020, Sell was CEO, President, and a Regional President at Health Net, a California-based health plan provider. During the Class Period, Sell repeatedly emphasized the unique insight and "experience" he gained from "running [a] payor for 20 years," which he assured investors bolstered his visibility into agilon's business, financial results, and payor relationships. Sell signed agilon's April 2021

- 8 -

Registration Statement, September 2021 Registration Statement, and May 2023 Registration Statement; FY21-23 Reports on Forms 10-K; and Sarbanes-Oxley Act of 2002 ("SOX") Certifications attached to agilon's Reports on Forms 10-K and Reports on Forms 10-Q filed during the Class Period.

24. Defendant Timothy S. Bensley ("Bensley") served as agilon's CFO from January 2021 through the end of the Class Period.  On January 5, 2024, agilon announced Bensley's abrupt retirement from agilon.  Bensley signed agilon's April 2021 Registration Statement, September 2021 Registration Statement, and May 2023 Registration Statement; FY21-23 Reports on Forms 10-K; 1Q21-3Q23 Reports on Forms 10-Q; SOX Certifications attached to agilon's Reports on Forms 10-K and Reports on Forms 10-Q filed during the Class Period; and quarterly Reports on Forms 8-K announcing agilon's financial results during the Class Period.

25. Girish Venkatachaliah ("Venkatachaliah") joined agilon in January 2021 as its Chief Technology Officer.  Prior to joining agilon, Venkatachaliah held several executive roles in technology, data, and analytics companies.

26. Heidi Hittner ("Hittner") served as agilon's Senior Vice President, Provider Strategies and Growth from January 2019 through February 2022, and Chief Experience Officer from February 2022 through the end of the Class Period.

27. Defendants referenced in ¶¶23-26 above are collectively referred to herein as the "Exchange Act Individual Defendants," and along with agilon, the "Exchange Act Defendants." The Exchange Act Individual Defendants were directly involved in the management and day-to-day operations of agilon, were privy to and reviewed confidential proprietary information concerning agilon, its business operations, and its present and future business prospects.  In addition, the Exchange Act Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein and approved or

- 9 -

ratified these statements. As officers and controlling persons of agilon, the Exchange Act Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to agilon's operations, business, and present and future business prospects. In addition, the Exchange Act Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of agilon's publicly traded shares would be based upon truthful and accurate information.

## D.    Securities Act Defendants

### 1.    Individuals

28.    Sell and Bensley are also named as defendants under the Securities Act as each signed agilon's April 2021 Registration Statement, September 2021 Registration Statement, and May 2023 Registration Statement.

29.    Defendant Glenn Sobotka ("Sobotka") joined agilon in 2019 and served as its Chief Accounting Officer ("CAO"). Sobotka resigned on May 13, 2022. Sobotka signed agilon's April 2021 Registration Statement and September 2021 Registration Statement.

30.    Defendant Priscilla Kasenchak ("Kasenchak") became agilon's CAO on September 30, 2022. Kasenchak resigned as CAO in August 2023 and terminated her relationship with the Company in September 2023. Kasenchak signed agilon's May 2023 Registration Statement.

31.    Defendant Michelle A. Gourdine ("Gourdine") joined agilon's Board in January 2021. She resigned from the Board on December 19, 2022. Gourdine signed agilon's April 2021 Registration Statement and September 2021 Registration Statement (via power of attorney granted to Bensley).

32.    Defendant Michael L. Smith ("Smith") joined agilon's Board in 2017. He resigned from the Board on August 10, 2022. Smith signed agilon's April 2021 Registration Statement and September 2021 Registration Statement (via power of attorney granted to Bensley).

- 10 -

33.     Defendant Ronald A. Williams ("Williams") joined agilon's Board in 2017 and served as the Chairman of the Board throughout the Class Period.  Williams co-founded agilon and was an operating advisor to CD&R during the Class Period.  Williams was designated as Chairman of the Board based on his affiliation with CD&R.[2]  Williams signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

34.     Defendant Sharad Mansukani ("Mansukani") joined agilon's Board in 2017.  Mansukani signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

35.     Defendant Diana L. McKenzie ("McKenzie") joined agilon's Board in February 2023.  McKenzie signed agilon's May 2023 Registration Statement.

36.     Defendant Karen McLoughlin ("McLoughlin") joined agilon's Board in July 2021.  McLoughlin signed agilon's September 2021 Registration Statement (via power of attorney granted to Bensley) and May 2023 Registration Statement.

37.     Defendant Clay Richards ("Richards") joined agilon's Board in January 2021.  Richards also served as an operating advisor to CD&R during the Class Period.  Richards signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

38.     Defendant Ravi Sachdev ("Sachdev") joined agilon's Board in 2017.  In addition to serving as the Board's Vice Chairman, Sachdev also served as a partner of CD&R during the Class Period.  Sachdev signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

---

[2]     In connection with the April 2021 Offering, CD&R caused agilon to agree that a "CD&R Designee will serve as [agilon's] Chairman of the board of directors as long as the CD&R Investor holds at least 25% of the outstanding shares of our common stock."

4859-2284-9249.v1

39.    Defendant Richard J. Schnall ("Schnall") joined agilon's Board in 2017 and resigned from the Board on June 22, 2023. Schnall also served as Co-President of CD&R during the Class Period. Schnall signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

40.    Defendant Jeffrey A. Schwaneke ("Schwaneke") joined agilon's Board on August 10, 2022, and succeeded Bensley as agilon's CFO on July 1, 2024. Schwaneke signed agilon's May 2023 Registration Statement.

41.    Defendant Derek L. Strum ("Strum") joined agilon's Board in 2017 and resigned from the Board on June 22, 2023. Strum also served as a partner of CD&R during the Class Period. Strum signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

42.    Defendant William Wulf ("Wulf") joined agilon's Board in 2017. Wulf signed agilon's April 2021 Registration Statement, September 2021 Registration Statement (via power of attorney granted to Bensley), and May 2023 Registration Statement.

43.    Each of the defendants listed above in ¶¶23, 31-42 served as an agilon director during the Class Period, and along with Bensley, are referred to herein as the "Securities Act Individual Defendants."

## 2.    Underwriters

44.    Defendants Academy Securities, Inc., BofA Securities, Inc., Deutsche Bank Securities Inc., Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Nomura Securities International, Inc., R. Seelaus & Co., LLC, Samuel A. Ramirez & Company, Inc., Siebert Williams Shank & Co., LLC, Truist Securities, Inc., Wells Fargo Securities, LLC, and William Blair & Company, L.L.C. served as underwriters of the April 2021 Offering, the September 2021 Offering, and the May 2023 Offering.

4859-2284-9249.v1

45.    Defendants Cowen and Company, LLC, Leerink Partners f/k/a SVB Securities LLC, RBC Capital Markets, LLC, and WR Securities, LLC served together with the defendants named in ¶44 as underwriters of the May 2023 Offering.

46.    The defendants listed in ¶¶44-45 above are collectively referred to herein as the "Underwriter Defendants."

47.    The Underwriter Defendants listed above in ¶44 served as underwriters of the April 2021 Offering and: (i) participated in the drafting and/or dissemination of the April 2021 Registration Statement, as well as in the sale of more than 53 million agilon shares at $23 per share, in connection with the April 2021 Offering; (ii) were responsible for ensuring the completeness and accuracy of the statements contained in, or incorporated by reference into, the April 2021 Registration Statement; and (iii) collectively received more than $61 million in connection therewith.

48.    The Underwriter Defendants listed above in ¶44 served as underwriters of the September 2021 Offering and: (i) participated in the drafting and/or dissemination of the September 2021 Registration Statement, as well as in the sale of over 19.5 million agilon shares at $30 per share, in connection with the September 2021 Offering; (ii) were responsible for ensuring the completeness and accuracy of the statements contained in, or incorporated by reference into, the September 2021 Registration Statement; and (iii) collectively received more than $19 million in connection therewith.

49.    The Underwriter Defendants listed above in ¶¶44-45 served as underwriters of the May 2023 Offering and: (i) participated in the drafting and/or dissemination of the May 2023 Registration Statement, as well as in the sale of over 94 million agilon shares at $21.50 per share, in connection with the May 2023 Offering; (ii) were responsible for ensuring the completeness and accuracy of the statements contained in, or incorporated by reference into, the May 2023 Registration Statement; and (iii) collectively received more than $59 million in connection therewith.

4859-2284-9249.v1

### 3.    CD&R

50.    Defendant CD&R is a private equity firm headquartered in New York, New York. CD&R was agilon's controlling shareholder during the Class Period and the owner of agilon stock sold in the September 2021 Offering and May 2023 Offering.

51.    Defendant CD&R Vector Holdings, L.P. ("CD&R Vector"), an affiliate of CD&R, is owned by investment funds managed by or affiliated with CD&R.  CD&R Vector directly held agilon stock during the relevant period.

52.    Defendant CD&R Investment Associates IX, Ltd. ("CD&R IX Ltd.") is the "General Partner" of CD&R Vector, and was managed by Donald J. Gogel (the Chairman of CD&R) and Nathan K. Sleeper (the Chief Executive Officer of CD&R) during the Class Period.

53.    Defendant CD&R Associates IX, L.P. ("CD&R IX L.P.") made investment and voting decisions with respect to the agilon shares held by CD&R Vector, through an "investment committee" of limited partners (each of whom were investment professionals of Clayton, Dubilier & Rice, LLC).  According to agilon, CD&R Vector, CD&R IX Ltd., and CD&R IX L.P. shared voting and dispositive power over the agilon shares held by CD&R Vector during the Class Period.

54.    The defendants listed in ¶¶50-53 are collectively referred to herein as "CD&R" or the "CD&R Defendants."  The CD&R Defendants, reflected in the chart below, all maintained the same principal business address and mailing address during the Class Period:

- 14 -

4859-2284-9249.v1



55.     CD&R controlled agilon throughout the Class Period, including as agilon's controlling shareholder during the Class Period as reflected in the table below:

| CD&R's Ownership of agilon's Common Stock | | | | |
|---|---|---|---|---|
| At the time of the April 2021 Offering | Following the April 2021 Offering | Following the September 2021 Offering | Following CD&R's August 11, 2022 sale | Following the May 2023 Offering |
| 69% | 58.5% | 52.6% | 47.3% | 24.7% |

56.     CD&R controlled agilon through various means, including its controlling stake in agilon stock, ability to appoint Board members (including the Chairman), significant influence over agilon's management, founding relationship with agilon, and various agreements that CD&R had caused agilon to enter into.

57.     CD&R's insider sales during the Class Period while agilon's stock price traded at artificially inflated prices were:

- On September 14, 2021, the CD&R Defendants sold more than **$518 million** in agilon stock at $28.98 per share, over 345% higher than the price at which agilon shares traded at the end of the Class Period.

- 15 -

- On August 11, 2022, the CD&R Defendants sold more than ***$276 million*** in agilon stock at $24.35 per share, over 270% higher than the price at which agilon shares traded at the end of the Class Period.

- On May 18, 2023, the CD&R Defendants sold nearly ***$2 billion*** in agilon stock at $20.80 per share, over 220% higher than the price at which agilon shares traded at the end of the Class Period.

## V.    SUMMARY OF THE FRAUD

### A.    Company Background and IPO

58.    CD&R created agilon in July 2016 through the merger of two healthcare acquisitions: (i) Primary Provider Management Company, Inc. ("PPMC"), a private subcontractor that ran several medical groups across Southern California; and (ii) Cyber-Pro Systems, Inc., which operated a network of contracted physicians in Hawaii. By 2019, agilon had expanded its Medicare-centric line of business through new physician partnerships in Ohio, Texas, and Pennsylvania.

59.    In early 2020, the COVID-19 pandemic struck. The pandemic presented a window of opportunity to CD&R, as the pandemic curtailed non-essential healthcare utilization, which in turn reduced medical costs, and buoyed agilon's financial results. As agilon's controlling shareholder, CD&R knew that completing an initial public offering in this environment where medical costs were artificially depressed albeit temporarily, would allow CD&R to cash out its holdings at a much higher valuation than it otherwise would be able to. Thus, CD&R and agilon immediately took steps necessary to take agilon public, including preparing a registration statement to be filed with the SEC which was carefully crafted to portray agilon's operations and prospects in a favorable light.

60.    Given agilon's enormous financial exposure under its payor agreements, the April 2021 Registration Statement used to complete the April 2021 Offering was written to persuade investors that agilon's first-of-its-kind model was not just viable, but could generate predictable and sustainable medical cost savings and profits. This also required agilon to convince investors that – as a middleman between payors and patients – agilon and its physician partners were treating

- 16 -

agilon's senior patients in a cost-effective manner, utilizing accurate, comprehensive, and timely data.

61.     The April 2021 Registration Statement repeatedly emphasized the purported advantages of agilon's business model.  For example, the April 2021 Registration Statement underscored agilon's sophisticated and data-rich "purpose-built model," which "provides the necessary capabilities" and "extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve . . . cost[s]," highlighting the model's "Data Integration and Management" capabilities, which "enables ease of integration with payor systems."

62.     agilon also highlighted the platform's power to enhance agilon's "ability to accurately predict and effectively manage our medical margin," as well as how agilon was "effectively managing costs," which purportedly yielded "significant visibility into the near-term and long-term financial trajectory."  In addition, agilon billed its "ability to deliver actionable insight at the patient and physician level" as one of the "[c]ritical factors" that "enhance our ability to improve medical margin."  The April 2021 Registration Statement also highlighted agilon's significant growth potential in its mature markets, which included its "ability to add new physician partners and to attract additional PCPs to our physician partners."

63.     On April 16, 2021, CD&R, agilon, the Securities Act Individual Defendants, and the Underwriter Defendants, successfully completed the April 2021 Offering, selling to Plaintiffs and the Class approximately $1.2 billion of agilon shares at $23 per share.

**B.      Defendants Misrepresent Critical Aspects of agilon's Business Model**

64.     Following the April 2021 Offering, agilon continued to emphasize the themes it had introduced in the April 2021 Registration Statement, including that agilon's "differentiated," "high-touch" model allowed the Company to effectively manage patient medical costs and patient

- 17 -

4859-2284-9249.v1

utilization, while avoiding upticks in patient utilization and medical costs.  Quarter after quarter throughout 2021 and 2022, agilon delivered its financial results while repeatedly emphasizing its model's unrivaled benefits and claiming the Company's "*differentiated*," "*high-visibility partnership model*" was "*deliver[ing] predictable, quality outcomes*."

65.    While underscoring the purported competitive advantages and sustainability of agilon's business model, defendants were concealing the known adverse impact of the fundamental defects in agilon's model.  In particular, as detailed below, defendants misrepresented agilon's: (i) expertise in effectively controlling medical costs and utilization through its "high-touch" model; (ii) potential for sustainable Medicare Advantage member growth by seamlessly entering new markets, expanding in existing markets, and onboarding new physicians; and (iii) visibility into its operational and financial results, and the predictability of its future medical costs gleaned through the Company's proprietary data and analytics platform and ability to seamlessly integrate with numerous payor systems across disparate markets.

### 1.    agilon Misleadingly Claimed that its "High-Touch," Cost-Controlling Model Provided Visibility and Predictability of Medical Costs

66.    Throughout the Class Period, defendants emphasized that agilon's differentiated, "high-touch" business model enabled agilon to effectively manage medical costs and member utilization and avoid upticks in utilization and medical care costs, and that the comparably better outcomes achieved by agilon validated the success of its Total Care Model.  In discussions with analysts and investors about member utilization and medical costs, Sell frequently reinforced the theme that "different models will yield different outcomes."  For instance, Sell claimed that agilon's "high-touch primary care model really distinguishes us," explaining "[w]e've been able to maintain those touchpoints" and "manage costs and deliver predictable results through each one of these [COVID] surges."  Sell repeated this contention on multiple occasions, claiming agilon's ability to

- 18 -

drive down medical costs, manage patient utilization, and increase medical margin was the result of the "touch points" agilon's partners employed using agilon's platform.

67.     Defendants also emphasized the "visibility" and "predictability" inherent in agilon's "high-touch" model.  Moreover, agilon's physician partners similarly contended that "the chief enabler for success" under agilon's model "is ***predictability***."[3]

68.     To convince analysts and investors of the strength of agilon's full-risk model, defendants frequently emphasized their extensive "visibility" into agilon's revenues, medical costs, and profits, as well as the significant "predictability" of agilon's financial results.  Sell echoed this sentiment in September 2022, confirming agilon knows on "day one, year one" what the "revenues" and "cost structure looks like" for its new physician partners.  Bensley similarly assured investors in June 2023 that "long before we go live, we have really, really strong visibility into exactly what's happening," and "what the economics . . . look like."

69.     Analysts embraced defendants' assurances regarding their extensive visibility and agilon's predictable results.  For instance, in a September 27, 2021 report, Leerink confirmed that it "view[ed] [agilon] as 'safer' in this environment of rising and unpredictable medical costs" given the model's "key attributes."  Likewise in a December 17, 2021 report, Truist commented on agilon's "visibility around trends" and "cost/medical margin predictability as practices go live," while J.P. Morgan issued a April 29, 2022 report which praised the "predictable utilization" of agilon's members.  Additionally, Jefferies issued a May 6, 2022 report which noted that agilon's stock price "warrants a valuation premium to peers" due to "AGL's earnings predictability."

70.     In 2023, as member utilization rates jumped up to 350% of FY22 rates, the Exchange Act Defendants concealed these trends while continuing to assure investors that agilon's unique

---

[3]     Analysts similarly agreed that predictability was critical to agilon's business model: "the only way investors can assess if AGL is making progress on margins (the key debate) is simple: numbers need to go up in a predictable way."

"high-touch" model insulated agilon from pent-up demand and utilization upticks. For instance, in connection with the May 9, 2023 release, defendants Sell and Bensley dismissed analysts' concerns over rising cost trends in the Medicare Advantage industry, citing the "power" of their model's "touch points." Reporting on rising industry cost trends on June 14, 2023, William Blair issued a report which noted defendants' frequent assurances that by "active[ly] ensuring that care for its population was managed during the pandemic," agilon's model had enabled the Company to sidestep the higher medical costs and patient utilization that were affecting national Medicare Advantage plans.

71.     During an August 3, 2023 earnings call, as concerns over industry-wide utilization and cost trends mounted, defendant Sell again firmly assured the market that "different models will yield different outcomes," and that agilon's "high-touch approach has ***prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization***."

72.     In reality, agilon, Sell and Bensley were affirmatively misrepresenting agilon's results, cost trends, and ability to avoid increases in member utilization and medical care costs. While agilon claimed its "high-touch" approach had "prevented a pent-up demand for care," in truth, the Company was actively monitoring a progression of its massive "backlog" of pent-up demand during the Class Period. Although defendants successfully concealed spiking patient utilization and medical costs, while affirmatively claiming that agilon's "high-touch" model had "prevented . . . pent-up demand" among members, defendants were later forced to admit that member utilization and medical costs had surged beginning by at least May 2023. Further, when defendants admitted in November 2023 of having been aware of this spike in May-June 2023, they further acknowledged that agilon's "high-touch," cost-controlling model had not in fact staved off such a spike. As Sell was forced to admit in January 2024, members' pent-up demand for medical care had largely caused

the elevated member utilization in 2023, as necessary medical care could *no longer* be deferred.

Further, by January 2024, the Company had still only worked through 60% of its pent-up demand.

### 2. Significant Growth Model and Robust Onboarding Procedures

73. The April 2021 Registration Statement asserted that one of the advantages that differentiated the Company was its vigorous growth model. Yet, to drive membership and profit growth, agilon needed to increase the number of primary care physicians on the platform.

74. agilon claimed to execute its physician growth strategy though two ways: (i) by partnering with new physician groups in geographies in which agilon did not already conduct operations; and (ii) by adding new physicians in agilon's existing or "mature" markets.

75. In particular, agilon stressed its differentiated ability to add new physicians in mature markets, which agilon claimed presented a highly efficient and powerful method of driving growth quickly in a market, given that agilon already possessed payor contracts, care delivery resources, clinical programs, and other existing infrastructure within the market.

76. However, simply adding new doctors to existing partner groups was insufficient to ensure profitability to agilon. For these new physicians to be successful, agilon needed to thoroughly onboard and educate them. As defendants Sell and Bensley emphasized, new physicians in *new* markets underwent a 12-month (or longer) implementation period before agilon began taking risk on those new physicians' patients.[4] During the course of this implementation period, new physicians received structured training on various aspects of the agilon partnership, including the

---

[4] agilon typically commenced operations (or went "live") with new physician partner groups on January 1, at which time: (i) Medicare Advantage payors with whom agilon had contracted officially "attributed" members to agilon's platform; (ii) agilon began assuming the full risk for the attributed members' healthcare costs; and (iii) agilon began earning "capitation" revenue on the attributed members. agilon sometimes referred to its cohorts of new physician partner groups as "classes," designated by the year in which the physician partner group went "live" on agilon's platform. For example, the "class of 2022" included the new partner groups that went "live" on agilon's platform on January 1, 2022, and so on.

4859-2284-9249.v1

basic features regarding the agilon partnership and model, the personnel and resources available to the new physicians, the ways in which new physicians were expected to leverage agilon's personnel and resources, and important steps the new physicians needed to take in order to manage the medical costs and utilization of agilon's patients, and provide care consistent with agilon's model.

77.    Thoroughly onboarding and educating new physicians was especially important under agilon's business model for several reasons.  First, agilon neither owned the practices nor employed its physicians (as do agilon's competitors under the "traditional," "de novo" clinic model), and therefore had less of a direct say over care delivery.  Second, because agilon partnered with physicians that had been practicing for years (if not decades), physicians joined the platform with an ingrained way of practicing medicine.  Third, because agilon focused on entering fee-for-service-dominated geographies, its physician partners were generally unfamiliar with practicing "value-based" care.  Fourth, because agilon only took risk on its partners' Medicare Advantage patients, its partners continued to practice traditional, fee-for-service medicine for other types of patients.  Finally, given that agilon bore 100% of the financial responsibility for the medical costs of its physicians' patients, its ability to scale and control its model was critical to the Company's bottom line.

78.    Defendants represented that agilon's robust onboarding and education and lengthy "implementation period" for new physicians significantly increased agilon's "visibility" into its members' healthcare needs and costs, as well as the "predictability" of agilon's financial results. Critically, notwithstanding that a substantial portion of agilon's growth came from adding new physicians in mature markets, as agilon was forced to admit in early 2024, agilon historically did not provide those new physicians with the basic onboarding and education needed to integrate into the agilon partnership.  In truth, as the Company was later forced to concede, it had failed to onboard and educate hundreds of new physicians about topics such as: (i) "the basics of the agilon

- 22 -

partnership"; (ii) "the key things [that agilon's partners] need[ed] to be doing around access and quality and cost management"; and (iii) "how [the new physicians were to] leverage the care teams that are around them and the resources that are there."

79.     agilon's financial results materially suffered due to this undisclosed flaw in agilon's growth model.  For example, as the Company was forced to admit on January 5, 2024, at least 30% of the doctors in just one of agilon's mature markets had not received basic onboarding and orientation from agilon.  As a result, these new physicians had generated medical margins 80% lower on average than the medical margins posted by physicians who had received onboarding and education from agilon.  Although defendants had been aware that underperforming physicians were dragging down the Company's medical margins, the Company concealed that the root cause of the drastic underperformance was agilon's own failure to onboard and educate new physicians.

### 3.     Seamless Collection, Tracking, and Integration of Critical Payer Data

80.     Defendants also claimed that agilon's unique ability to leverage the comprehensive, standardized data agilon received from contracted Medicare Advantage payors, *inter alia*: (i) enhanced defendants' visibility into agilon's operational and financial performance; (ii) enhanced the predictability of members' medical costs and agilon's medical margins; (iii) validated agilon's business model premised on taking full-risk on payors' Medicare Advantage patients; and (iv) enabled agilon's partners to effectively manage members' full-risk while driving down medical costs.   For instance,  agilon  frequently  highlighted  its  "Data  Integration  and  Management" capabilities, stating: "Our purpose-built and flexible platform enables *ease of integration with payor systems*, physician EMR systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month."

81.     Defendants also emphasized agilon's ability to collect and organize immense volumes of data and "real-time insights" from various disparate sources (including payors, physicians'

- 23 -

offices, CMS, hospitals, ADT feeds, and other healthcare institutions), check that data for quality and completeness, and synthesize the data into clean, accurate, and "actionable" insights.[5] According to the Company, the sources from which it "assemble[d]" and "integrate[d] data" included: (i) over 660 physician offices; (ii) 170 electronic medical record systems or "EMRs"; (iii) over 130 health plans; (iv) health information exchanges; and (v) miscellaneous lab and pharmacy data.[6] agilon also touted the extensive data it received from CMS through the Accountable Care Organization Realizing Equity, Access, and Community Health ("ACO REACH") Model, which Bensley assured was "really good" "current" and "complete data."[7]

82.     Sell described agilon's platform as a "surveillance system" of all of agilon's members, whose ability to track member utilization in real-time ensured that agilon constantly knew "where [our] patients are" ("Are they going into ER?  Are they going to the hospital"), "when [a member's] appointment has been scheduled," "when [a member's appointment] occurs and what happened during that [member's] visit."  agilon also tracked patient referrals, such as referrals to specialists for knee and hip surgeries, as well as other leading indicators of medical care, including prior authorization data and medical tests (*e.g.*, echocardiogram tests).   agilon claimed its

---

[5]     Admission-Discharge-Transfer ("ADT") are real-time alerts that notify a patient's physician and care team when a patient is admitted to, transferred to, or discharged from, a care setting, and can include the patient's personal information, the care setting that generated the alert, the type of event being reported, clinical observations, diagnoses, and insurance information.

[6]     Throughout the Class Period, based on the Exchange Act Defendants' statements, analysts applauded agilon's platform capabilities.  For example, in its March 30, 2023 report, William Blair stated: "Management also consistently highlighted their continued focus on the speed and depth of their data assets [including] more than 130 health plan sources.  Even more, the platform is able to provide real-time insights with artificial intelligence (AI) and integrated workflows [and] grows smarter and more efficient with each partner and data source that joins."  Similarly, in its August 5, 2021 report, BofA noted agilon's position that "integrations are going well with new payor EHRs and systems."

[7]     Under CMS' ACO REACH Model, agilon contracted directly with CMS to manage the healthcare needs of fee-for-service Medicare patients, and assumed full financial responsibility for the medical services agilon's physician partners rendered to agilon's ACO REACH patients.

4859-2284-9249.v1

"surveillance capability" in all of its markets, coupled with its "real-time insights," enabled the Company to both closely track member utilization as well as "show [agilon's partners] what they can do to improve that utilization."

83.    To further enhance its visibility into its members, agilon also claimed it utilized "standard data formats" and "standard data sharing agreements" with agilon's payors.  agilon also claimed it employed 2,000 automated data quality checks *every second*, assuring that "[i]f our data is wrong or something is incorrect, we work to get that corrected."  By harnessing its immense payor data and systems capabilities, during the Class Period agilon touted its physician partners' "simple" ability to view "all of [their patients'] data . . . from all of [their Medicare Advantage] plans in one spot:"

> Imagine you're getting *all of your data about your senior population now from all of your MA plans in one spot*, you combine that with your EMR data . . . Now you have the ability to see a view of your senior panel and their holistic journey, you never had access to before. *And it's simple.  It's all in one spot that you can access that*.

84.    In truth, agilon lacked the critical systems it needed to reliably track and analyze the member-level data received from payors, and to accurately track and forecast medical costs and medical margin.  agilon also lacked vital actuarial and data personnel and resources to accurately track and forecast medical costs and medical margin.  As a result of agilon's systemic data and analytics gaps, the Company was unable to reliably track, report and forecast medical expenses or medical margin, concealed tens of millions of dollars in medical costs, reported materially inflated profits, and issued financial guidance that was knowingly premised on insufficient, incomplete and faulty data.  Further, as defendants would eventually reveal in early 2024, the data agilon had historically received from payors was incomplete, delayed, and so heterogeneous and difficult to analyze that agilon had to establish an entirely new "data pipeline" to enable agilon to view and analyze payor data in a consistent and standardized format.

- 25 -

85.     agilon's undisclosed data and analytics issues directly affected agilon's physician partners.  Critically, agilon's physician partners relied on agilon to collect, synthesize and analyze data from payors as part of agilon's full-risk model, while agilon relied on its physician partners to help drive down medical costs and utilization.  In fact, after the Class Period, in May 2024, approximately 80 high-ranking representatives of over a dozen of agilon's partners reached out to CMS, confirming significant limitations faced by managing agilon's patients and pleading for CMS to compel Medicare Advantage payors to provide the critical data agilon's partners needed.  Citing significant gaps in payor data, these representatives confirmed to CMS that agilon's partners lacked "the comprehensive data necessary to manage th[e] risk" of agilon's members, and relied on "altered and often delayed, non-standard data files" "with several fields masked, combined or otherwise distorted."   Furthermore, agilon's partners further acknowledged they continued to lack the information they "need to appropriately manage the risk [they] carry for [their] attributed patients."

## C.     The Fraud Unravels

86.     Beginning in late 2023, the Company began to reveal that its "differentiated" business model was not able to deliver the "predictable" cost savings and profits as represented, and that agilon had in fact been suffering the same dramatic uptick in healthcare utilization and medical claims as other Medicare Advantage providers, as agilon's patients who had delayed elective procedures and healthcare utilization following the COVID-19 pandemic sought treatment.  In fact, as the Company was forced to admit, it had been saddled with significant pent-up demand for costly medical services and procedures, and by the end of 2023 was still only about 60% of the way through its backlog of pent-up demand.  The Company also disclosed agilon was experiencing utilization rates as much as 350% of FY22 rates, and had suffered tens of millions of dollars in

4859-2284-9249.v1

excess medical costs previously concealed from investors, including costs related to specialists, outpatient surgeries, and Part B drugs.[8]

87.    In addition, defendants began to reveal the existence and impact of undisclosed systemic problems with agilon's business model, including data and analytics deficiencies that had rendered agilon incapable of accurately and reliably tracking and reporting members' medical costs and medical margin, and problems with collecting, analyzing, and/or integrating payor data and payor systems that had tainted agilon's financial reporting and forecasts.  Defendants also revealed that agilon had not provided new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership.  As a result, agilon was running hundreds of millions of dollars below the medical margin trend represented to investors earlier in the Class Period, with drastic implications for agilon's profitability and the viability of its business model.  As these facts reached the market, agilon's stock price declined.

88.    On November 2, 2023, agilon revealed that notwithstanding defendants Sell's and Bensley's prior claims to the contrary, agilon had experienced significant deterioration in key profit metrics due to an undisclosed utilization spike earlier in the year.  agilon's stock price declined more than 13% in response to this news.  Analysts were shocked by agilon's acknowledgment of a utilization spike in 2Q23, which "***contradict[ed]***" its prior statements that agilon "was not experiencing the same Medicare Advantage cost pressure as MCOs with 2Q23 results."

89.    On January 5, 2024 – nine weeks after revising its FY23 guidance and 5 days after the end of 2023 – agilon slashed its FY23 outlook again, revealed tens of millions of dollars in concealed medical costs, revealed its previously reported medical margin for 3Q23 had been overstated by at least ***40%***, introduced a disappointing outlook for 2024, and announced the

---

[8]    Medicare "Part B" covers most drugs that are administered by a healthcare provider, *i.e.*, drugs that are typically not self-administered.

"retirement" of its CFO, Timothy Bensley.  In addition, agilon revealed it was suffering cost trends that were up to 350% of 2022 rates, that the elevated utilization it had previously denied witnessing was actually expected to persist through 2024, that agilon was only 60% through its "backlog of pent-up demand from COVID," and that agilon would not post positive cash flow of even a single dollar in 2024.

90.    Further, agilon disclosed it had failed to onboard hundreds of physicians in new markets, causing a significant drag on medical margins.  agilon's stock price sank a further 29% as the news "fuel[ed] investor concerns around sustainability of the AGL model."  Analysts lowered their price targets further.  One firm found agilon's serial "guidance revisions" and "scattered timeline" "nonlinear and difficult to follow," while another "lack[ed] the confidence to recommend this stock."

91.    On February 27, 2024 – less than eight weeks after issuing FY23 medical margin and adjusted EBITDA guidance – defendants Sell and Bensley acknowledged their prior representations about FY23 guidance had been significantly overstated, that agilon had badly missed its FY23 profit forecast provided on January 5, and that the Company had cut the FY24 guidance it had issued just weeks earlier.  The Company also announced a previously undisclosed material weakness in the Company's internal controls over financial reporting ("ICFR") concerning the Company's medical claims and related payables, which agilon admitted rendered its disclosure controls and procedures ("DCP") ineffective.  As a result of these disclosures, the trading price of agilon stock dropped from $6.48 per share when the market closed on February 27, 2024 to $6.04 per share on March 1, 2024, a 7% decline on abnormally heavy volume of over 26 million shares, and more than 85% below its Class Period high.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

92.    During the Class Period, defendants agilon, Sell, Bensley, Hittner and Venkatachaliah made materially false and misleading statements and omitted material  facts which were designed to, and did conceal: (i) massive pent-up demand among agilon's members for surgical procedures and other medical services; (ii) tens of millions of dollars in undisclosed medical costs, causing agilon to publicly report inflated profits; (iii) surging utilization and medical costs among agilon's members; (iv) agilon's failure to provide new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership, dragging down profits; (v) that agilon's physician partners relied on significantly altered and distorted data in managing agilon's members, and lacked the data necessary to effectively manage agilon's members; and (vi) that debilitating data, analytics and other systemic gaps prevented agilon from accurately tracking, reporting, and forecasting medical costs and medical margins.

### A.    The April 2021 Registration Statement

93.    The April 2021 Registration Statement stated that agilon's "differentiated," full-risk model was "transforming healthcare by empowering [physicians] to be the agents for change."  The April 2021 Registration Statement went on to state that agilon provided such a model for "***successfully improving quality of care and reducing costs***" and that "[o]ur purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business."

94.    The April 2021 Registration Statement emphasized the strengths and benefits of agilon's "Data Integration and Management" capabilities, stating:

> Our purpose-built and flexible platform enables ease of integration with payor systems, physician EMR systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.  The agilon platform extracts needed financial, clinical and social determinants data and organizes this disparate

- 29 -

4859-2284-9249.v1

data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience.

95.     The April 2021 Registration Statement stated that agilon's model "provides *significant visibility into the near-term and long-term financial trajectory* for both agilon and our anchor physician groups."

96.     As to agilon's ability to "deliver actionable insight at the patient and physician level" the April 2021 Registration Statement specifically stated:

> Two critical factors that enhance our ability to improve medical margin over a long period of time that we believe are unique to our model are . . . (ii) our ability to deliver actionable insight at the patient and physician level through our aligned partnership model with peer-to-peer physician feedback driving accountability and accelerating the pace of change to a Total Care Model.

97.     The April 2021 Registration Statement also emphasized agilon's significant growth potential in existing geographies, including agilon's "ability to add new physician partners and to attract additional PCPs to our physician partners."

98.     The statements by defendants agilon, Sell, and Bensley in the April 2021 Registration Statement as detailed in ¶¶93-97 above, were false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)     that agilon's physician partners were not provided with the data necessary to effectively manage patients' medical costs or ensure the viability and sustainably of the Company's full-risk model. As agilon's physician partners later confirmed with CMS, they historically had not been provided the data necessary to accurately manage members' medical costs, including standardized and comprehensive payor data corresponding to the claims, costs and risk of agilon's patients. Instead, agilon's physician partners received altered (and often delayed), non-standard data files that varied in format and quality, with fields masked, combined or otherwise distorted, which prevented agilon's physician partners from managing patients' medical costs;

- 30 -

(b)    that because agilon's model suffered from systemic data and analytics gaps involving payor data, agilon was in fact unable to timely obtain and/or analyze payor claims data for its members as it relied on non-standardized, delayed, and incomplete data from payors, which prevented agilon from accurately tracking, managing and forecasting members' medical costs and medical margin.  Further, agilon was relying on incomplete and delayed payor data as it had been unable to integrate payor systems and payor data with agilon's platform and lacked the systems and actuarial personnel and resources necessary to accurately track and forecast medical expenses;

(c)    that because agilon was unable to accurately analyze payor data and its inability to do so adversely impacted the quality of agilon's forecasting of medical costs and medical margin, agilon needed to construct an entirely new "financial data pipeline" (which it did in 2024) to enable the Company to accurately view and analyze payor data in a consistent and standardized format; and

(d)    that agilon had not provided new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these newly added physicians in mature markets generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon, and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin.

**B.    May 26, 2021 Through November 18, 2021**

99.    On <u>May 26, 2021</u>, agilon announced its results for the period ending March 31, 2021 (the "1Q21 Release").  The same day, agilon filed with the SEC its Reports on Forms 10-Q for the same period (the "1Q21 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶93.

100.    On May 27, 2021, defendants Sell and Bensley convened a conference call with investors to discuss agilon's 1Q21 financial results, during which Sell emphasized his "***high degree of visibility*** into future revenues and margin progression," as well as agilon's "growth strategy, both with our existing partners and current geographies and with new partners in new markets."  Sell also underscored agilon's "[s]ame geography membership growth" as "a key differentiator in our model."

101.    During the call, Sell touted agilon's ability to seamlessly add new doctors to existing partnerships in mature markets, claiming agilon's "same geography growth is driven" in large part by "new physicians joining our anchor partner," adding that "[t]his results in a ***highly efficient growth model*** with extremely strong returns on investment."  In response to an analyst's question about the "benefit[s]" of "adding new docs" in existing markets, Sell boasted that a substantial portion of agilon's growth came from "new physicians joining into . . . existing markets."

102.    On June 8, 2021, Sell and Bensley presented at the Goldman Sachs Global Healthcare Conference.  During the call, Sell emphasized "adding physicians on the platform is an area of tremendous opportunity," and added that agilon's "real outsized [growth] lever is in the same-geography growth."  In response to an analyst's question regarding the "mechanics" of adding new physicians to existing practices, Sell emphasized agilon's "same-geography growth is a big differentiator. . . .  But back to that partnership [with physicians], just like everything we do, it works very well in terms of adding physicians in these communities."

103.    Sell also boasted of agilon's platform capabilities, stating:

We've taken an incredible amount of data today.  We've gone from 9 to now 16 health plan relationships.  Every time we go in, there's different EMRs that we're integrating with, so the data growth has been logarithmic.  And our job is to provide that in a clean and actionable way to the primary care physician, where they can have really kind of a scaled total care model type of relationship with their patients. . . . ***That comes from providing really clean and actionable data, working with your partner to get them comfortable around that***.

4859-2284-9249.v1

104.     On August 4, 2021, agilon announced its results for the period ending June 30, 2021 (the "2Q21 Release"). That same day, agilon filed its Report on Form 10-Q for the same period (the "2Q21 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶93.

105.     On August 5, 2021, Sell and Bensley convened an investor call to discuss agilon's 2Q21 financial results. During the call, Sell boasted that agilon's "same geography growth approach is distinctive and highly efficient as it is driven by . . . new physicians joining our anchor partners on the platform."

106.     On September 7, 2021, agilon filed with the SEC an Amendment No. 1 to Form S-1 Registration Statement, which was signed by Sell and Bensley (among others, *see* ¶¶29, 31-34, 36-39, 41-42). On September 13, 2021, agilon filed with the SEC a Form 424B4 Prospectus for the September 2021 Offering, which was incorporated into and formed part of the September 2021 Registration Statement. Defendants used the September 2021 Registration Statement to sell more than 19.5 million agilon shares at $30 per share by agilon, including 17.9 million shares sold by CD&R.

107.     The September 2021 Registration Statement repeated the statements set forth in ¶¶93-97, which were contained in the April 2021 Registration Statement.

108.     On October 28, 2021, agilon announced its results for the period ending September 30, 2021 (the "3Q21 Release"). In the 3Q21 Release, Sell touted agilon's "***high-visibility partnership model***," which he claimed "***deliver[s] predictable, quality outcomes***." The same day, agilon filed its Report on Form 10-Q for the same period (the "3Q21 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶93.

109.     On October 29, 2021, Sell and Bensley convened a conference call with investors to discuss agilon's 3Q21 financial results. During the call, Sell touted agilon's full-risk model,

4859-2284-9249.v1

claiming its ability to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market."  Sell also boasted of agilon's ability to "***drive sustainably lower cost[s]***."

110.    During the call, Sell also highlighted agilon's "strong momentum in same-geography growth," which he contended is "going to drive our growth for a long time."  In response to an analyst's question regarding Sell's "visibility" into agilon's "same geography" growth, Sell assured that agilon's growth from "other physicians joining locally" was "sustainable":

> What's becoming a growing piece of this is this improvement in access and other physicians joining locally.  That's the biggest part of that 20% to 40-plus percent growth in MA and 45% growth overall in terms of membership is really the visibility.  We know who those groups are that are joining in January.  We know those groups are who are joining further out in the year.  The timing might slide a quarter one way or other, but we have – those groups are effectively in an implementation period of their own right now.  And so that visibility forward to '22 and even into '23 is really pretty strong around that.  And that will be a continued driver of same geography growth.  That's why we've talked about low to mid-teens same geo growth on a kind of ***sustainable*** basis.

111.    On <u>November 18, 2021</u>, Sell and Bensley presented at the Wolfe Research Healthcare Conference, during which Sell emphasized the sustainability of agilon's growth through adding "more and more physicians joining in locally in the markets that we're in."

112.    The statements by defendants agilon, Sell, and Bensley, between May 26, 2021 and November 18, 2021 as detailed in ¶¶99-105, 107-111 above, were false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)     That agilon had not provided new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these newly added physicians in mature markets generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon,

and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin.

(b)     That agilon concealed its lack of visibility into members' medical costs and agilon's medical margin, which compromised the validity and sustainability of agilon's business model.  As agilon disclosed in early 2024, because the payor data it received during the Class Period was so heterogeneous and difficult to analyze, agilon had been unable to timely obtain and analyze payor claims data or reliably track and forecast medical expenses and medical margin.  Further, agilon was relying on incomplete and delayed payor data, and lacked the systems and actuarial personnel and resources necessary to accurately track and forecast medical expenses.

(c)     That agilon's physician partners were not provided the necessary data to effectively manage members' medical costs or ensure the viability and sustainability of agilon's full-risk model.  Instead, agilon's physician partners received altered (and delayed), non-standard data files that varied in format and quality, with fields masked, combined or otherwise distorted, which prevented agilon's physician partners from managing patients' medical costs.  Moreover, because agilon was unable to accurately analyze payor data or reliably forecast medical costs and medical margin, agilon needed to construct an entirely new "financial data pipeline" (which it did in 2024) to enable the Company to accurately view and analyze payor data in a consistent and standardized format.

**C.     January 10, 2022 Through November 3, 2022**

113.    On January 10, 2022, Sell presented at the JP Morgan Healthcare Conference, during which he boasted of agilon's "distinguish[ed]," "high-touch" model and its ability to "manage costs" and deliver "predicable results" through "multiple surges" in utilization:

> ***I think our high-touch primary care model really distinguishes us.  We've been able to manage costs and deliver predictable results through each one of these surges***.  We've been able to maintain those touchpoints.  And so we don't see the volatility in our RAF that perhaps you do in other models.

- 35 -

*     *     *

[T]he quality of our economic model has allowed us and will continue to allow us to *deliver predictable results in periods of volatility*.  No one can predict exactly what the future is with this pandemic, but *we know that we can deliver predictable results*.  New government programs evolve over time, but *we can deliver predictable results*."

114.    In response to an analyst's question regarding whether "there's any pent-up demand around things like elective surgeries" among agilon's patients, Sell dismissed the analyst's concern while referring back to agilon's "high-touch" model:

I don't know that we believe there's a massive set of pent-up demand, *particularly in our model, because we've got those touchpoints*, and we've been working very closely with those senior patients, particularly those high-risk patients.  That's why that 50% increase in terms of touches with those patients yields such positive results.

115.    During the conference, Sell touted agilon's "really strong same-geography growth" driven by "adding additional physicians" to existing practices:

*We have a very predictable and highly visible growth algorithm*.  We grow in new geographies and we grow in same geographies. . . .  Once we're in a geography, we're able to consistently deliver growth rates in the low to mid-teens.  That comes, both from an organic perspective of patients in the practice . . . and adding additional physicians.

116.    On March 3, 2022, agilon announced its results for the period ending December 31, 2021 (the "FY21 Release").  In the FY21 Release, Sell underscored agilon's model's "*distinctive, predictable results* . . . despite evolving COVID dynamics."

117.    The same day, agilon filed with the SEC the Company's 2021 Report on Form 10-K, which was signed by Sell and Bensley.  The 2021 Report on Form 10-K stated that agilon's differentiated business model was "transforming healthcare by empowering the primary care physicians ('PCPs') to be the agents for change."

118.    The 2021 Report on Form 10-K went on to state that agilon provided such a model for "successfully improving quality of care and reducing costs," and that "[o]ur purpose-built model

- 36 -

provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business."

119.    The 2021 Report on Form 10-K also emphasized agilon's platform provides robust "Data Integration and Management," stating:

Data Integration and Management: Integration with health plan systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms to organize disparate data into actionable insights for our PCPs to improve quality of care, cost and patient and physician experience.

120.    The 2021 Report on Form 10-K also noted that agilon's model "provides *significant visibility into the near-term and long-term financial trajectory* for both agilon and our anchor physician groups."

121.    The 2021 Report on Form 10-K also highlighted agilon's "ability to add new physician partners and to attract additional PCPs to our physician partners."

122.    On <u>March 11, 2022</u>, Sell, Bensley, Hittner and Venkatachaliah participated in agilon's 2022 Investor Day.  During the call, Sell boasted of agilon's ability to utilize "standard data formats" as part of its "integration . . . with our largest payers," stating:

But that national scale gives us tremendous benefit with payers, right?  *The integration that we're seeing with our largest payers, the joint operating committees, we have standard data formats with them*.  We are talking about expanding into other geographies.  We have the ability to bring a national payer into a market literally within 6 to 8 weeks like we did in Buffalo with a couple of national payers.

123.    Presenting on agilon's platform and data capabilities, Venkatachaliah emphasized agilon's ability to seamlessly and "consistent[ly]" aggregate and "thread" payor data, stating:

This platform that we talk about, the thing that we do is we are able to take data from all of these diverse sources.  We stitch it together in what we call as the member information profile and construct a single longitudinal view of that patient across their entire landscape.

*        *        *

Firstly, we are consistent across payers. Most people don't realize how varied the information is that they get from payers. ***The fact that we threaded together and we are consistent***, and they know exactly the same place to look for chronic conditions, the same place to look for a med list, same place to look for a problem list makes it so much easier for them.

The second thing they love is that we slipstream this into their existing workflows, into their EMRs . . . they don't have to learn anything new. They don't have any training costs associated with it. They start to see the information in context of all the things and exactly how they're been [sic] practicing medicine over the last x number of years.

124. Venkatachaliah further assured that agilon's physician partners "trust the data" they

receive, stating:

Is that not just do we deliver this information, we actually listen to feedback of our doctors. ***If our data is wrong or something is incorrect, we work to get that corrected***. If we don't deliver it into the right workflow, we make it sure that it does get delivered better, right? And the fact that they don't have to learn a new system and many of your investors, it feeds into the fact that we have low capital cost. We don't have to buy them an EMR or buy them some system or have them buy software. It lowers capital costs. ***The thing that's really beautiful about this is that they trust the data. They trust the data***.

125. Venkatachaliah listed other "advantages" of agilon's data capabilities, stating:

One, to all the things that Ben Shaker [agilon's Chief Markets Officer] alluded to this morning, this is what lets him and his market operators see all these markets in the same consistent way, the same consistent way, right? So whatever be the endpoints in how we get the data, when it gets mapped back into our enterprise, we have the same consistent way of looking across these markets.

The second is that it lets us drive programs and operations very consistently, right? So when we construct the program, we're able to deploy it in these markets with the same speed and ease and measure their effectiveness as effect across all of this.

126. Presenting on agilon's relationships with payors, Hittner emphasized that agilon's

"standard data sharing agreements" with payors "allows us to move very rapidly into new

geographies[,] [s]o as we expand with new partners, we can move very quickly with these national

relationships."

4859-2284-9249.v1

127.    Hittner also underscored physician partners' "simple" ability to view "all of [their] senior population's] data . . . from all of [their] MA plans in one spot," stating:

Imagine you're getting all of your data about your senior population now from all of your MA plans in one spot, you combine that with your EMR data . . . .  Now you have the ability to see a view of your senior panel and their holistic journey, you never had access to before.  And it's simple.  It's all in one spot that you can access that.  And so we are able to move the community to value.

128.    On May 5, 2022, agilon announced its results for the period ending March 31, 2022 (the "1Q22 Release").  The same day, agilon filed its Report on Form 10-Q for the same period (the "1Q22 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶¶117-118.

129.    On May 11, 2022, Sell presented at the Bank of America Healthcare Conference. During the presentation, an analyst asked Sell what "visibility you have . . . from a cost perspective . . . from the way that you've built your model."  In response, Sell emphasized that thanks to agilon's "high-touch" model, agilon's patients had avoided a "huge amount of deferred issues," stating:

I mean I think **one of the real differentiators in our model is in the high-touch nature** between the primary care physician and the patient.  Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade.  And so we understand those groups very well.  As we bring them on board, **we have great visibility from a cost perspective** because we've got that experience with them.  We take a 12-month implementation period, which I think is distinctive. And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective.  And so **that visibility and that continuity is a big differentiator**.

In COVID, what we were able to maintain was the touch points with these senior patients. . . .  And I think that translated into **more predictably from a cost perspective**, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points.  And **we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues**.

130.    Commenting on agilon's "high-touch" model, Sell assured that agilon "make[s] sure [its physician partners] have the data they need" in managing members' medical costs:

- 39 -

4859-2284-9249.v1

It has a dramatic impact on the cost areas that I just talked about, but *it really goes back to that high-touch relationship* between the physician and patient and *making sure they have the data they need* and they have the team around them that gives them the time to spend with those most complex patients.

131.    On June 8, 2022, Bensley presented at the William Blair Growth Stock Conference, during which he claimed that agilon did not just have a good handle on growth, costs and margins, but assured analyst and investors that "*[w]e have tremendous visibility* into both growth and embedded margins in our existing PCP groups."

132.    On August 4, 2022, agilon announced its results for the quarter ended June 30, 2022 (the "2Q22 Release").  The same day, agilon filed its Report on Form 10-Q for the same period (the "2Q22 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶¶117-118.

133.    On September 8, 2022, Bensley presented at the Wells Fargo Healthcare Conference. In response to an analyst's question regarding agilon's growth model, Bensley stated:

Our model is basically one about really strong growth, bringing new PCPs and new members onto the platform.  Really having a great – aligned set of PCPs, the model aligning them to basically drive significantly improved cost and quality outcome for the members.  So that's driving the margin part of it at the end of the day.

134.    On September 14, 2022, Sell presented at the Morgan Stanley Global Healthcare Conference, during which Sell boasted:

[Two] points I would add that I think is kind of distinctive about our model that allows us to deliver *really predictable costs kind of quarter in, quarter out*, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side.  But the 2 things are: one, we work with existing doctors and existing patients and we take them through a 12-month implementation period.  So *when they go live, we have a very good idea of what that cost structure looks like* and a very good idea along -- what the revenues like.  But the second piece that I think is really important is, *we have this high-touch model*.

135.    On November 3, 2022, agilon announced its third quarter ended September 30, 2022 (the "3Q22 Release").  The same day, agilon filed its Report on Form 10-Q for the same period (the

4859-2284-9249.v1

"3Q22 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶¶117-118.

136.    That same day, Sell and Bensley convened a conference call with investors to discuss agilon's 3Q22 results.  In response to an analyst's question about the key drivers of agilon's medical margin, Sell emphasized that agilon's "newer partners" were excelling by leveraging agilon's platform and "high-touch model":

> [W]e are experiencing the benefits of learning from our platform that is ***allowing our newer partners to perform at the high end of our range***.

*        *        *

> I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of ***the benefits of the high-touch model***, and it's coming through in terms of better satisfaction, ***better health outcomes and ultimately lower costs and better margins overall.  So those are the things that I would really call out***.

137.    The statements by defendants agilon, Sell, Bensley, Hittner and Venkatachaliah, between January 10, 2022 and November 3, 2022 as detailed in ¶¶113-136 above, were each false and misleading when made.  The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)    that agilon's physician partners had not been provided the data they needed to manage members' medical costs, including standardized and comprehensive payer data corresponding to the claims, costs and risk of agilon's patients.  Instead, agilon's physician partners received altered and often delayed, non-standard data files that varied in format and quality, with fields masked, combined or otherwise distorted, all of which prevented agilon's physician partners from effectively managing members' medical costs;

(b)    that agilon concealed its lack of visibility into members' medical expenses and agilon's medical margin, which compromised the predictability of agilon's financial results.  Additionally, because the payor data agilon received during the Class Period was so heterogeneous

- 41 -

and difficult to analyze, agilon was unable to timely obtain and analyze payor claims data or reliably track and forecast medical expenses unless and until agilon established a financial data pipeline which allowed payor data to be processed, viewed and analyzed in a consistent and standardized format;

(c)    that agilon historically did not provide new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these new physicians in mature markets generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon, and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin; and

(d)    that agilon concealed that the Company was saddled with a significant backlog of pent-up demand from COVID that still needed to be rendered to patients in the form of medical procedures and other services.

### D.    January 9, 2023 Through June 7, 2023

138.    On January 9, 2023, Sell participated in a conference call as part of the J.P. Morgan Healthcare Conference, during which he provided agilon's FY23 adjusted EBITDA guidance of $75 million to $90 million (compared to $4 million in 2022).

139.    On January 24, 2023, agilon issued a release co-written by Hittner titled "*Improving Outcomes for Medicare Patients With Diabetes: agilon health's Total Care Model.*"  The release assured that "***PCPs know exactly who they are accountable for***" under agilon's full-risk model. The release also stated:

> The agilon model integrates multi-payer claims data and clinical electronic medical record (EMR) ***data to create a comprehensive picture of each patient's needs and gaps in care, such as the need for screening or follow-up diagnostic exams, labs, or medication titration***.  Data is aggregated from all contracted MA plans, along with Medicare FFS ACO REACH, so each PCP can see a single view of their panel of Medicare patients.

- 42 -

140.    On <u>March 1, 2023</u>, agilon announced its results for the fourth quarter and full year ending December 31, 2022 (the "FY22 Release"), which included FY23 medical margin guidance of $535-$560 million and $75-$90 million adjusted EBITDA, respectively.  The same day, Sell and Bensley convened an investor call to discuss agilon's 4Q22 and FY22 financial results, during which Sell stated agilon was on track to post FY23 medical margin of nearly $550 million (compared to $304 million in FY22), explaining:

> Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally.

141.    Sell further stated the maturation of agilon's member cohorts was driving sustained earnings growth:

> Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year.

142.    Also on <u>March 1, 2023</u>, agilon filed with the SEC its 2022 annual Report on Form 10-K ("2022 Report on Form 10-K"), which included the financial results provided in the 2022 Release.  The 2022 Report on Form 10-K was signed by Sell and Bensley, and repeated the statements set forth in ¶¶117-118, 120-121 from the 2021 Report on Form 10-K.

143.    On <u>March 30, 2023</u>, Sell, Bensley and Hittner participated in agilon's 2023 Investor Day, during which Sell highlighted that agilon was on track to post FY23 medical margin of $550 million.  During the call, Bensley again emphasized agilon's accelerated growth in medical margin and adjusted EBITDA, stating:

> Adjusted EBITDA at agilon is inflecting in a positive way.  That's driven by a – that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage.  All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability. . . .  We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond.

*    *    *

- 43 -

So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million.

*        *        *

Medical margins growing at even a faster rate with a 60% CAGR over that same time period.  And we expect medical margin dollars to inflect up to about $550 million in 2023.  That's an 80% year-over-year increase from what we just reported for 2022.  And I think *that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership*.

144.    agilon published the below presentation slide in connection with the Investor Day, purporting to show the medical margin per-member-per-month ("PMPM") figures for each agilon "Market Class" from 2018 to 2023.[9]  Commenting on the slide during the Investor Day, Bensley underscored agilon's purportedly "*great visibility*" into the underlying drivers of agilon's medical margin.



---

[9]    As Bensley explained, "what this [slide in ¶144] shows is each of these lines represents all the markets that went live during that year and how those full markets have progressed over time. So this includes any dilution from same geography growth of the members that we've added over time in each of these member cohorts."

- 44 -

145.    Highlighting agilon's data capabilities, Hittner stated:

Across our access for patients, across our quality programs, *we have a consistent process* and a common operating system that helps us to narrow the variability *across* different communities, *different payers*, different EMRs, different partner types *and individual physicians to be able to create consistent outcome*. . . .

Now our superpower is our aligned and activated physician network across the country.  You combine that with a data set of multiyear, multi-payer, multi-EMR, and now *our physicians have information they never had before about their entire population*.

146.    On May 9, 2023, agilon announced its financial results for the quarter ended March 31, 2023 (the "1Q23 Release"), which reiterated agilon's FY23 medical margin and adjusted EBITDA expectations, confirming that agilon was on track to post FY23 medical margin of $535-$560 million.  The release also explained that, beginning with its 1Q23 results, agilon was now including its geography entry costs in agilon's calculation of adjusted EBITDA, to comply with SEC guidance.  Under its new calculation, agilon's FY23 adjusted EBITDA outlook from March 1, 2023 ($75-$90 million) was reduced by the amount of agilon's FY23 geography entry costs ($65-$78 million), yielding a FY23 adjusted EBITDA outlook of ($3 million) to $25 million.  That same day, Sell and Bensley convened a conference call with investors to discuss agilon's 1Q23 financial results, during which Sell reiterated agilon's FY23 medical margin and adjusted EBITDA outlook previously provided on March 1, 2023, notwithstanding agilon's revised adjusted EBITDA calculation.

147.    During the call, Sell emphasized agilon's "long-term growth" strategy of adding new physicians in mature markets:

As discussed at our Investor Day, once the infrastructure for full risk is established in a community, other doctors can easily join our network and access a new and *sustainable* model for primary care.

148.    agilon's 1Q23 results reflected $28.5 million in medical costs associated with medical services rendered in 2022.  During the May 9 call, an analyst observed there were "a lot of questions

- 45 -

around cost trends," and asked "what drove the [$28.5 million] PYD" (*i.e.*, the "prior year development"). Bensley downplayed the significance of the charge in response, assuring that it was largely due to "a couple of old" claims, and did not signify any fundamental issues with agilon's model or level of visibility.

149. When asked by an analyst to discuss the cost trends agilon was seeing, Sell assured that "utilization was very much in line with what we would expect," while adding "the power of the primary care physician touch points were really strong in the quarter."

150. Also on May 9, 2023, agilon filed its Report on Form 10-Q for the first quarter of 2023 ("1Q23 Report on Form 10-Q"), which was signed by Bensley and repeated the statements set forth in ¶¶117-118.

151. On May 11, 2023, Bensley presented at the Bank of America Global Healthcare Conference, during which he attributed members' declining medical costs to agilon's model:

> [T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024. . . . *[O]ur model is so geared to improving the quality and outcome for our patients that actually drives cost down*.
>
> When there is a pretty good high benchmark year, the differential between that benchmark revenue rate and what we're doing in cost just gets wider. And so that drives a higher point of inflection because *our costs continue to just go in the right direction* because of all the things that Kenny [Bellendir, agilon's Markets CFO] was talking about.

152. On May 15, 2023, agilon filed with the SEC a Form S-3 Registration Statement for the May 2023 Offering, which was signed by Sell and Bensley (among others as indicated in ¶¶30, 33-42).

153. On May 17, 2023, agilon filed with the SEC a prospectus which was incorporated into and formed part of the May 2023 Registration Statement for the May 2023 Offering, pursuant to which CD&R sold over *$1.95 billion* in agilon common stock at $20.80 per share, including 9.6

- 46 -

4859-2284-9249.v1

million shares that CD&R forced agilon to purchase from CD&R using a large portion of agilon's remaining cash.

154.    The May 2023 Registration Statement incorporated by reference, *inter alia*, agilon's 2022 Report on Form 10-K and 1Q23 Report on Form 10-Q, which contained the statements as set forth in ¶¶142 and 150, above.  The May 2023 Registration Statement also repeated the statements set forth in ¶93, which appeared in the April 2021 Registration Statement and September 2021 Registration Statement.

155.    On June 7, 2023, defendants Sell and Bensley participated in a conference call as part of the William Blair Growth Stock Conference, during which Bensley reiterated agilon's FY23 outlook of approximately $550 million in medical margin.  After touting agilon's "tremendously high visibility to growth" and "really good forward-looking visibility to our future growth," Bensley added:

> And we also have a process in which we implement our new markets up to 12 months before going live.  ***So long before we go live, we have really, really strong visibility into exactly what's happening***.  So right now, for the class of 2024, we're already implementing those partners, and we have good visibility into not only what that membership is but what the economics for that cloud will look like going into 2024.
>
> *            *            *
>
> So as our members and our partners mature on the agilon platform, margins grow over time.  And as Steve said, I'll show you a really great slide as exactly how that's been working in practice.  ***So we have really great confidence and visibility in our long-term value drivers***.  And right now, our EBITDA has actually been inflecting positive year-over-year.

156.    Near the end of the call, Sell reiterated agilon's "really strong start this year," adding "I don't know many businesses that show an 88% step-up in their main margin metric [medical margin].  We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent."

4859-2284-9249.v1

157.    The statements by defendants agilon, Sell, Bensley, and Hittner, between January 9, 2023 and June 7, 2023 as detailed in ¶¶138-151, 154-156 above, were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)    that agilon had not provided new physicians joining mature markets with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these newly added physicians in mature markets were generating medical margins significantly lower on average than medical margins posted by physicians who had received onboarding and education from agilon, and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin;

(b)    that the root cause of the drastic underperformance of physicians who dragged down the Company's medical margins was agilon's failure to onboard and educate those new physicians;

(c)    that agilon's physician partners were not being provided with the comprehensive patient data necessary to manage the full-risk of agilon's patients;

(d)    that while agilon claimed its physician partners "know exactly wh[ich patients] they are accountable for" under agilon's full-risk model (*see* ¶139), in truth, agilon's physician partners lacked critical payor data for ensuring the physicians knew which patients the payors had attributed to agilon's physician partners under agilon's full-risk model;

(e)    that although agilon touted its ability to create a "comprehensive picture of each patient's needs and gaps in care" by "aggregat[ing] [data] from all contracted MA plans" (¶139) agilon's physician partners lacked comprehensive data necessary for managing agilon's patients, and relied on altered, incomplete and distorted data, which was delayed by up to three months;

(f)    that systemic data and analytics gaps at agilon precluded Sell, Bensley and agilon's other senior insiders from visibility into its members' medical expenses.  Further, because

- 48 -

the payor data agilon received during the Class Period was so heterogeneous and difficult to analyze, agilon was unable to timely obtain and analyze payor claims data or reliably track and forecast medical expenses unless and until agilon established a financial data pipeline which allowed payor data to be processed, viewed and analyzed in a consistent and standardized format;

(g)     that because of pent-up demand, agilon was experiencing dramatically higher FY23 medical costs, including specialist utilization rates up to 350% of FY22 rates; Part B drug utilization rates equal to 300% of FY22 rates, and outpatient surgeries 90% above FY22 rates. Moreover, because agilon tracked its pent-up demand, the Company concealed that a significant portion of that pent-up demand still needed to be rendered to patients in the form of medical procedures and other services;

(h)     due to the undisclosed adverse impact of agilon's data and analytics gaps on agilon's financial reporting, including incomplete and delayed data from payors, the Company's lack of a "financial data pipeline" for standardizing and analyzing payor data required the Company to overhaul its data and actuarial teams in order to accurately track and forecast medical expenses;

(i)     that while defendant Bensley boasted on June 7, 2023 of his "really good forward-looking visibility to our future growth," "really great confidence and visibility in our long-term value drivers," "tremendously high visibility to growth" and "really, really strong visibility into exactly what's happening," and Sell touted agilon's "really strong start this year," they did so while concealing the large May 2023 spike in utilization and medical costs that had continued into June while Bensley and Sell were presenting on June 7, 2023;

(j)     that as a result of (a) – (i) above, defendants agilon, Sell, and Bensley had no reasonable basis to believe, and did not in fact believe, that agilon was on track to achieve FY23 medical margin of either $550 million or a range of $535-$560 million or adjusted EBITDA of up to $25 million;

- 49 -

4859-2284-9249.v1

(k)    that as a result of (a) – (i) above, defendants agilon, Sell, and Bensley had no reasonable basis to believe, and did not in fact believe that agilon's FY23 medical margin and EBITDA would "grow even faster" than FY22; and

(l)    that because the Company's medical margin and adjusted EBITDA performance in FY23 largely determined the Company's ability to generate "positive cash flow in 2024," defendant Bensley had no reasonable basis to believe, and did not in fact believe, that agilon was on track to generate "positive cash flow in 2024," as a result of (a) – (i) above.

E.    **August 3, 2023 Through September 12, 2023**

158.    On August 3, 2023, agilon announced its financial results for the quarter ended June 30, 2023 (the "2Q23 Release"), reporting $138 million medical margin, $10 million adjusted EBITDA, and a $17 million net loss for 2Q23.  The release also stated agilon's 2Q23 medical margin increased 69% compared to 2Q22 ($82 million).  In the release, Sell claimed "***[t]he durability and predictability of our partnership model*** enabled agilon to deliver strong performance during the second quarter and first half of 2023."

159.    The release also stated that agilon lowered its FY23 medical margin by approximately $32.5 million (from $535-$560 million to $500-$530 million), while ***raising*** its FY23 adjusted EBITDA guidance to $0-23 million.

160.    That same day, Sell and Bensley convened an investor call to discuss agilon's 2Q23 results.  During the call, Sell highlighted agilon's 69% year-over-year growth in medical margin, emphasizing that agilon's "profitability gains [were] even more outsized on an underlying basis" given "MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA."

161.    During the call, Sell dismissed concerns that higher industry utilization rates were impacting agilon, asserting that agilon's model "insulated" agilon from "spikes" in utilization rates:

One theme I would like to drive home, given all of the speculation on utilization trends is that *different models will yield different outcomes*. *agilon's model is distinctively different and more durable and predictable in driving cost and quality results* compared to the broad fee-for-service system, which predominates across health care today.

Let me highlight how we are producing such *strong and predictable results* and what drives our forward confidence in the business. First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care. We do not take risk on a broad set of patients in an unmanaged fee-for-service system. Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.

*                    *                    *

*We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization*.

162.    Sell further sought to quell concerns about utilization rates by assuring investors that agilon was actually "tracking ahead" of its expected utilization rates, stating:

Second point on differentiation. For our members, our year-to-date *composite utilization trend is in line or better than our expectations*. Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range. Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.

All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date.

163.    Sell added that agilon's strong "visibility" and "active management" of utilization rates further bolstered the reliability of agilon's earnings estimates, stating:

Third, *our model has natural advantages in terms of leading indicators and visibility*. From an operational standpoint, we are not just receivers of macro utilization trends. Our teams are actively managing utilization on the ground every day. This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers. Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete. *We have not seen any meaningful change in our expected cost trend, including outpatient procedures*.

- 51 -

164.    Sell also claimed that agilon's unique business model "buffers our financial results up and down":

> Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down.  As a result, *we are able to guide to relatively tight ranges* on medical margin and adjusted EBITDA *and absorb puts and takes* that may arise during a given period.

165.    Sell further emphasized the "predictability" of agilon's business model, stating:

> Ultimately, the *durability and predictability of our model* has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, *even as some health plans with broad fee-for-service networks are seeing pockets of higher costs*.  Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability.

> As we have discussed previously, we operate in a very forward-looking model.  *And our visibility on the key levers for driving next year's performance is quite high*.

*     *     *

> Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023.  This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.

> On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations.  This is obviously important as you think about the stepping off point for 2024.

166.    During the call, Bensley highlighted agilon's 69% year-over-year medical margin growth, and touted that "the strength and durability of [agilon's] business model has enabled us to . . . improve our adjusted EBITDA outlook," adding that agilon's "updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend."  Bensley also referred investors to the market class data from agilon's 2023 Investor Day (¶144), claiming the data presented a "really . . . good indicator of exactly where we expect them to be from a medical margin standpoint."

- 52 -

4859-2284-9249.v1

167.    In response to an analyst's request for "clarifications" regarding agilon's medical cost trend, and the reasoning behind increasing agilon's reserves, Bensley concealed the dramatic utilization spike witnessed in May-June, while assuring investors that the decision to increase agilon's reserves was merely a precaution for the possibility that "there could be a change, for instance, in utilization trends in the second half" of the year:

> So rather than saying, hey, this percentage of this is for this or this is for that, we've looked at the range of potential outcomes that can happen in the second half. Want to make sure that we've got enough reserve to minimize the probability of any prior period development going into next year, and that would include things like *being respectful of the fact that there could be a change, for instance, in utilization trends in the second half*. So I don't want to quantify it and break it out into components other than to say, we've tried to increase the strength of the reserves to cover that sort of range of outcomes.

168.    Bensley also reassured that agilon's increase in reserves was merely intended to cover the "possibility" of a "change [in] utilization in the back half of the year":

> And when we talk about then the strengthening of our reserves that are in our guidance, we've essentially said, hey, with the understanding that our reserve should probably be stronger in terms of the range of potential reserves that we could build, both because of those potential blind spots and also just to cover for the possibility and be respectful of the fact that *there may be some change and [sic] utilization in the back half of the year*.

169.    In response to a Wells Fargo analyst's question regarding "how closely is ACO REACH claims data track with your actual [Medicare Advantage] claims experience," and corresponding request that Sell and Bensley "be as specific as possible about what your level of claims visibility is for [2Q23]," Sell assured that agilon possessed "incredible" visibility into its members' medical costs and utilization, stating:

> So I think *our visibility is extremely strong,* Stephen, and we have high confidence. I think *it's a function of our model, which is very different*, right? We are on the ground with PCPs every day, we are managing those most complex patients. And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs.
>
> The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER. And we put that together, we're able to drive the type

- 53 -

of results that I talked about with inpatient down in the flat to down in the mid-single-digit range.

From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims.  And so *there is incredibly high visibility*.  There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis.

But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims.  ***And so we feel like we have an incredible level of visibility on that***.  And I think the last thing I would just say is, I think we've demonstrated that ***our model really stands out in higher utilization periods that broader fee-for-service markets are seeing***.

\* \* \*

Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year.  It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range.  So I think this is an area where we feel like we have incredible confidence.  The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators.

170.   Also on <u>August 3, 2023</u>, agilon filed its Report on Form 10-Q ("2Q23 Report on Form 10-Q"), which was signed by Bensley, included the medical margin and adjusted EBITDA results provided in the 2Q23 Release, and claimed that agilon's 2Q23 medical margin increased 69% compared to 2Q22.  The 2Q23 Report on Form 10-Q also repeated the statements set forth in ¶¶117-118.

171.   On <u>September 6, 2023</u>, Bensley participated in a conference call as part of the Wells Fargo Healthcare Conference.  During the call, an analyst observed that "utilization has been a huge area of focus" and asked Bensley "what you're seeing on the utilization front."  Concealing the significant utilization spike in May-June 2023, Bensley responded that agilon's "power[ful]" model was "***driv[ing] utilization down***," noting:

[O]bviously, there has been a lot of focus on utilization coming through the first half of the year.  And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model.  I know that sounds like it's simple, but ***our model is essentially designed to have a more efficient and really more***

- 54 -

*consistent impact on utilization than probably just any other model out there*, just certainly the normal fee-for-service environment.

. . . But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients that then essentially over time does have that kind of leveling impact on utilization.

It also helps us *drive utilization down* below what the overall, I think, fee-for-service environment would be. . . .

What we have much better continuity of care. We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen. I think that has the impact of both *lowering utilization* as well as having *more consistent utilization* over time. It may even have a positive impact on *avoiding some of the pent-up demand issues that came out of post-COVID*.

Having said that, you can see the results in our numbers. So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side. And by the way, of course, inpatient is by far the largest part of our cost basis. We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2.

Now at the same time, of course, we have been seeing pretty large increases in outpatient. *That's a smaller portion of the overall cost pie. And so the inpatient decrease is more than offsetting that*.

172.    On <u>September 12, 2023</u>, Sell and Bensley presented at the Morgan Stanley Global Healthcare Conference. In response to an analyst's request for "a more recent update on utilization," Bensley responded that "we're seeing [] an absolute decrease in patient utilization," reassured investors of the "guidance that we put forward for the balance of the year," and reiterated agilon's 2023 profit outlook:

Yes. I mean, we haven't given a kind of inter-quarter update. We'll give one here in a bit when obviously we report Q3. It was interesting when we were coming through Q2 that's where we started to – and everyone else are to hear some commentary from the big payers that, hey, there may be some kind of a spike going on utilization. Of course, when we reported Q2, we hadn't seen that in our numbers yet. And in fact, our performance is more along the lines of what Steve was saying. But even in that higher rate environment or *even potentially*, I'm sorry, *in that higher utilization environment, we were pretty encouraged obviously by the overall trends that we're seeing in an absolute decrease in patient utilization*. Mean we are seeing, and we have been seeing, just like everybody else was talking about an increase in outpatient, but that's not really new to us, right?

- 55 -

We've been talking about that now for a number of quarters even coming through last year that there's been some shift, I think, going on in terms of side of service for procedures from inpatient to outpatient. But ***the overall decrease in inpatient, which is by far the largest bucket of cost for us has obviously been offsetting that***. So – but the second thing that we did, of course, coming through that and hearing that commentary from the payers was we also strengthened our reserves for somewhat in Q2 and then also in our guidance for balance of the year, with the understanding that if there – ***if we do that at some point, see that, that – there was some kind of a spike up or an increase in utilization*** that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there.

And all of that, ***notwithstanding any commentary from the payers and utilization leads us to believe we're well reserved*** and we feel really confident with the guidance – with that guidance that we put forward for the balance of the year.

173.    The statements by defendants agilon, Sell, and Bensley, between August 3, 2023 and September 12, 2023 as detailed in ¶¶158-172 above, were false and misleading when made. The true facts, which were then known to or recklessly disregarded by these defendants, were:

(a)    that while defendants claimed that agilon was not experiencing the same cost pressures as commercial payors and that agilon's high-touch model had prevented pent-up demand, as Sell and Bensley were later forced to admit, by at least May 2023, agilon had in fact experienced increases in member utilization and medical costs. Further, when Sell and Bensley admitted on November 2, 2023 of having been aware of this spike in May-June 2023, they were compelled to acknowledge that agilon's "high-touch," cost-controlling model had not positioned agilon to stave off such a spike;

(b)    that since at least May 2023 agilon had been experiencing a large spike in member utilization and medical costs driven by higher specialist utilization, Part B drugs, and outpatient surgeries. In addition, agilon was burdened with pent-up demand for outpatient surgeries and other medical services, which pent up demand was so substantial, agilon was not yet even 60% of the way through its backlog of pent-up demand;

- 56 -

(c)      that because of pent-up demand, agilon was experiencing dramatically higher FY23 medical costs and member utilization rates, including specialist utilization rates up to 350% of FY22 rates; Part B drug utilization rates equal to 300% of FY22 rates, and outpatient surgeries 90% above FY22 rates;

(d)      that agilon's lack of visibility into its members' medical expenses prevented agilon from accurately tracking and forecasting medical expenses.  Moreover, because the payor data it received during the Class Period was so heterogeneous and difficult to analyze, agilon was unable to timely obtain and analyze payor claims data or reliably track and forecast medical expenses unless and until agilon established a financial data pipeline which allowed payor data to be processed, viewed and analyzed in a consistent and standardized format;

(e)      that agilon had incurred tens of millions of dollars in undisclosed medical costs in connection with the 2Q23 large, undisclosed spike in member utilization.  As a result of these tens of millions of dollars in undisclosed medical costs, agilon's 2Q23 reported medical margin of $138 million was overstated by at least $45 million (48%);

(f)      that agilon had increased its "reserves" because of the large, undisclosed spike in member utilization and medical costs that had already occurred in 2Q23, which increases in member utilization and medical costs were not being "more than offset[]" by inpatient decreases;

(g)      that agilon had further inflated its reported medical margin during 2023 by concealing millions of dollars of additional costs from medical services that had been rendered to agilon's members in FY22;

(h)      that while defendants agilon, Sell and Bensley claimed agilon's medical margin had increased 69% between 2Q22 and 2Q23, agilon's actual 2Q23 medical margin was in fact relatively flat compared to 2Q22 due to the tens of millions of dollars in undisclosed medical costs;

(i)      that agilon overstated its FY23 medical margin guidance of $500-530 million by at least 67%;

(j)      that agilon had not provided new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these newly added physicians in mature markets generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon, and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin; and

(k)      that as a result of (a)-(j) above, defendants agilon, Sell, and Bensley had no reasonable basis to believe and did not in fact believe that agilon was insulated from "spikes in utilization" or that agilon was on track to post FY23 medical margin of $500-$530 million or $0-$23 million of adjusted EBITDA.

**F.**      **November 2, 2023 Through November 14, 2023**

174.     On <u>November 2, 2023</u>, agilon announced its financial results for the quarter ended September 30, 2023 (the "3Q23 Release"), reporting $108 million medical margin, negative $6 million adjusted EBITDA, and a net loss of $31 million.  agilon also reported that 3Q23 medical margin increased 42% compared to 3Q22 ($76 million), and confirmed the Company remained on track to post FY23 medical margin and adjusted EBITDA of $455-$470 million and $6-$18 million, respectively.

175.     That same day, Sell and Bensley convened an investor call to discuss agilon's 3Q23 results.  During the call, Sell and Bensley revealed that agilon had experienced a large spike in utilization and medical costs beginning in May 2023, months prior to the August 3, 2023 earnings call.

- 58 -

176.    During the November 2, 2023 call, Sell reassured investors that, notwithstanding the utilization spike that began in May 2023, "[a]ll of [agilon's] key financial metrics were generally in line or above our guidance ranges," and that agilon's "results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth."

177.    Sell further stated that agilon's "more conservative reserving approach" was "intentionally reflected in [its] medical margin outlook for [Medicare Advantage] and will support [its] future performance in 2024," and agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model."  Sell also reassured investors that he "remain[s] highly confident in the trajectory of our adjusted EBITDA," adding "our visibility into the key drivers for next year's performance are quite high."

178.    Referring to agilon's 3Q23 medical margin, Bensley assured that miss "was primarily driven by performance in Hawaii" – which agilon had recently sold – and a "negative claims development this quarter [that] was almost entirely isolated to system issues with a single payor related to supplemental benefit costs."  Bensley also emphasized that medical margin had "***increased 42% year-over-year***."

179.    In response to an analyst's question about the 2Q23 spike in medical costs and patient utilization, Sell again denied that agilon was experiencing abnormal utilization trends, stating:

> From a utilization perspective, composite utilization was in line with our overall expectations.  As Tim kind of outlined, ***we did see a step-up in Q2 utilization*** in MA and REACH.  The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period.  ***In Q3, we've seen a deceleration***.  And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [posture] that Tim talked about in terms of an extra $3 million [sic].

180.    Bensley added that utilization trends had "greatly started to moderate in June," which he once again claimed demonstrated the "strength of [agilon's] model":

4859-2284-9249.v1

In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward. As it turned out, as we just reported, *we did see some increased utilization in May that was – greatly started to moderate in June*. And as we've seen so far, started to – continued to moderate in early Q3 as well.

I'm not completely surprised by that. Compared to some of the comments that I've made from some of the big payers, I mean I think our model and even some of them have said should be performing better than the average out there. So *the fact that we saw a spike up and some moderation down is probably just a factor also of the strength of our model*.

181. During the call, an analyst asked Sell what "you are seeing in terms of utilization trends," to which Sell responded:

In terms of our PPO experience, we've talked about this before. We are probably the largest risk-based player in terms of PPO in the country. Our PPO business is just over 50% of our membership, it's also the fastest-growing component. And our PPO business is – performance is in line with our HMO business.

And I think the reason for that is *the differences in our model*. [A] large payer with a broad network versus *our high-touch PCP patient model, which has the ability to guide that patient on where they're going to go for specialty care*. At our Investor Day, we shared over 90% of specialty referrals come through that primary care physician even in a PPO model, that is allowing us to really deliver cost-effective care. And so our PPO experience is very strong.

182. During the November 2, 2023 call, Bensley assured that agilon's increased reserves simply reflected a "*more conservative reserving posture*," rather than any fundamental deterioration in the business, and would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance."

183. Also on November 2, 2023, agilon filed its Report on Form 10-Q for the 3Q23 ("3Q23 Report on Form 10-Q"), which was signed by Bensley, included the medical margin and adjusted EBITDA results provided in the 3Q23 Release, and represented that agilon's medical

- 60 -

margin increased 42% in 3Q23 compared to 3Q22.  The 3Q23 Report on Form 10-Q also repeated the statements set forth in ¶¶117-118.

184.    Following the quarterly conference call, agilon convened calls with several analysts and confirmed that agilon was confident in its ability to capture payor data and build its accruals based on that data, and that it was not seeing any broad, pervasive problems.

185.    On November 14, 2023, defendants Sell and Bensley participated in a conference call as part of the Wolfe Research Healthcare Conference, during which Sell reassured investors that adverse medical costs trends were "moderating," and that agilon remained on track to meet its FY23 guidance.  Bensley similarly assured that "as we came through July and June, those same [utilization cost] categories continue to moderate – moderated back down," adding "[w]e didn't see like a huge spike up in utilization that's continue[d] . . . all 3 of them moderated back down."

186.    Later in the call, Bensley affirmed the Company's reserving included a "***decent amount of conservatism***," stating that agilon was appropriately reserved and that there would be no more negative surprises heading into 2024:

> Yes.  I mean our objective is to say, hey, let's put enough into our outlook for the year to make sure that we're covering those – that potential that we could see actually higher utilization.  So that's why we picked that right now, we picked that original 60 up to 90 when we saw what was actually coming through Q2.  So that's what gets you that kind of $10 million incremental versus the asset that we would have given to go.  But the idea is, yes, that we're going to end the year with that's going to be – put us in a very good position to be appropriately accrued for the year.
>
> You can look at it on a net basis, but there's no reason why we would expect to have.  We shouldn't be going into a year with a significant underaccrual of our cost stand-alone either.

187.    During the call, an analyst questioned Sell and Bensley about agilon's membership growth, including the number of new Medicare Advantage patients and new physician groups that were set to go "live" on agilon's platform in January 2025 (*i.e.*, the "class of 2025").  In response, Sell assured that agilon's robust membership growth was continuing with the class of 2025, which

- 61 -

he described as "large" and similar in size to agilon's "class of 2024" of approximately 140,000 new Medicare Advantage members.

188.    The statements by defendants agilon, Sell, and Bensley, between November 2 and 14, 2023 as detailed in ¶¶174, 176-187 above, were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by these defendants, were:

(a)    that because of pent-up demand, agilon was experiencing dramatically higher FY23 medical costs, including specialist utilization rates up to 350% of FY22  rates, Part B drug utilization rates equal to 300% of FY22 rates, and outpatient surgeries 90% above FY22 rates;

(b)    that agilon's November 2, 2023 FY23 profit guidance concealed that agilon: (1) lacked visibility into members' medical expenses and agilon's medical margin; and (2) had experienced increases in medical costs and FY23 utilization rates in specialists, Part B drugs, and outpatient surgeries, of as much as 350% of FY22 rates;

(c)    that agilon's FY23 profit guidance from November 2, 2023 did not reflect tens of millions of dollars in additional, undisclosed FY23 medical costs, including $18 million in 2Q23 and $31 million in 3Q23, as well as a $20 million negative revenue revision;

(d)    that agilon was burdened with substantial pent-up demand for outpatient surgeries and other medical services such that agilon was not yet even 60% of the way through its backlog of pent-up demand;

(e)    given the Company's undisclosed medical costs, agilon's reported medical margin for 3Q23 of $108 million was inflated by at least $31 million (40%);

(f)    that due to the tens of millions of dollars in undisclosed medical costs, rather than having "increased 42% year-over-year" as Bensley falsely claimed, agilon's actual 3Q23 medical margin was at best flat compared to 3Q22;

- 62 -

(g)    that agilon's FY23 medical margin outlook of $455-470 million was overstated by more than 50%;

(h)    that membership growth was one of the primary drivers of agilon's revenue, adjusted EBITDA and medical margin, yet by 4Q23 agilon had significantly scaled back its membership growth such that these defendants were aware that the January 2025 cohort of new Medicare Advantage patients could not reach even half the approximately 140,000-member cohort that went live in January 2024;

(i)    that agilon had not provided new physicians in mature markets with the basic onboarding and education needed to integrate into the agilon partnership.  As a result, these new physicians generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon, including 80% lower on average in one of agilon's mature markets;

(j)    that as a result of agilon's lack of visibility into, and inability to accurately track, report, and forecast its members' medical costs and agilon's medical margin, agilon's profitability outlook for FY23 and thereafter lacked a reasonable basis when made; and

(k)    that as a result of (a)-(i) above, defendants agilon, Sell, and Bensley had no reasonable basis to believe, and did not in fact believe, that agilon's revised outlook was conservative, or that agilon was on track to meet its FY23 profit guidance as the FY23 medical margin guidance of $455-$470 million was overstated by 52%-57%, nor was agilon on track to meet its FY23 adjusted EBITDA guidance of $6-$18 million, which amount was overstated by $101-$113 million.

G.    **January 5, 2024**

189.    On <u>January 5, 2024</u>, agilon issued a release revising agilon's FY23 guidance, introducing its FY24 guidance, and withdrawing its FY26 guidance (the "January 5 Release").

agilon stated it would generate FY23 medical margin of $340-$360 million and adjusted EBITDA of negative $55-$69 million. For FY24, agilon projected $560-$600 million of medical margin and adjusted EBITDA of $40-$60 million.

190.    That same day, Sell and Bensley convened an investor call to discuss agilon's revised and withdrawn forecasts. During the call, in response to an analyst's question regarding whether any of agilon's "individual markets" were "losing money," Sell represented that only one market "would run at a loss for 2023," which Bensley confirmed stating "one market . . . gets below breakeven market EBITDA in 2023."

191.    The statements by defendants agilon, Sell, and Bensley, on January 5, 2024 as detailed in ¶¶189-190 above, were false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)    that agilon continued to conceal tens of millions of dollars in medical costs that agilon had incurred during and prior to 4Q23;

(b)    that the historical medical margin results of multiple agilon market classes had been overstated, including by 8-23% in FY21 and 12-26% in FY22, as a result of the Company's inability to accurately track and report medical costs;

(c)    that in light of the Company's systemic data visibility issues and lower medical margins, the Company was scaling back its membership growth, which was one of the primary drivers of agilon's revenue, adjusted EBITDA, and medical margin;

(d)    that agilon continued to overstate its FY23 medical margin guidance by at least 14%;

(e)    that although defendants Sell and Bensley assured the market that only one market had "run at a loss in 2023," several markets were on track to report a FY23 EBITDA loss;

- 64 -

(f)    that agilon was not on track to meet its FY23 profit guidance, as the FY23 medical margin guidance was overstated by $41-$61 million and FY23 adjusted EBITDA guidance was overstated by $26-$40 million;

(g)    that agilon's FY24 medical margin guidance was overstated by $150-$160 million (more than 25%), and adjusted EBITDA guidance was overstated by $75-$100 million (more than 125%);

(h)    that as a result of (a)-(g) above, defendants agilon, Sell, and Bensley had no reasonable basis to believe, and did not in fact believe, that agilon was on track to post FY23 medical margin of $340-$360 million and FY23 adjusted EBITDA of negative $55-$69 million; and

(i)    that as a result of (a)-(g) above, defendants agilon, Sell, and Bensley had no reasonable basis to believe, and did not in fact believe, that agilon could post the FY24 medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million.

## VII.    LOSS CAUSATION

192.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. The market for agilon's common stock was open, well-developed, and efficient during the Class Period. Throughout the Class Period, agilon's stock traded at artificially inflated prices as a direct result of the Exchange Act Defendants' false and misleading statements and omissions, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired agilon's stock relying upon the integrity of the market price for agilon's stock, and have been damaged thereby.

193.    The Class Period inflation in agilon's stock price was removed when information concealed by the Exchange Act Defendants' false or misleading statements and omissions were revealed to the market through a series of partial disclosures, as more particularly described below.

- 65 -

4859-2284-9249.v1

The relevant stock price declines were due to firm specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraudulent factors. When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of agilon common stock declined as the prior artificial inflation came out of the stock's price.

194. Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages as a result of their purchases of agilon common stock during the Class Period. The economic loss suffered by Plaintiffs and the other Class members was a direct result of the nature and extent of the Exchange Act Defendants' false and misleading statements and omissions being revealed to investors and the market.

A.    **November 2, 2023 Disclosure**

195. On November 2, 2023, after the market closed, agilon issued the 3Q23 Release, and held a conference call with investors to discuss agilon's third quarter 2023 financial results. The Company revealed medical margin of $108 million for the quarter, far below expectations. In addition, the Company also disclosed that it suffered quarterly adjusted EBITDA of negative $6 million. The Company also sharply lowered agilon's FY23 medical margins to a range of just $455-$470 million. On the conference call, defendants Sell and Bensley revealed that agilon had suffered higher patient utilization rates earlier in the year (notwithstanding their prior representations to the contrary), had already significantly drawn down the reserves agilon had set aside earlier in the year to cover increased medical costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue in the future.

196. As a result of the disclosures on November 2, 2023, the price of agilon common stock dropped 13% from its close of $16.89 per share on November 2, 2023, to $14.66 per share on November 3, 2023, on abnormally heavy trading volume of nearly 17 million shares. The price of

- 66 -

agilon common stock declined an additional 11% on November 6, 2023, closing at $13.11 per share that day on trading volume of over 9 million shares, as the market continued to digest the news. However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of agilon stock remained artificially inflated.

197.    Analysts were shocked by the November 2, 2023 disclosures, and promptly responded by issuing reports expressing their surprise and frustration.  For instance:

- On November 2, 2023, Wells Fargo issued a report which stated that agilon's admission that it saw 2Q23 utilization "spike" "*contradict[ed]*" its prior statements on August 3, 2023 it "was not experiencing the same MA cost pressure as MCOs with 2Q23 results."[10]

- On November 2, 2023, J.P. Morgan issued a report which questioned "investor confidence" in agilon following the November 2 disclosures, and observed analysts' "confusion" over the Company's contradictory statements between August 3, 2023 and November 2, 2023.

- On November 6, 2023, Jefferies issued a report which cut agilon's price target by 39% given the "heightened concern about AGL's updated reserving actions & guidance" and "significant confusion" following agilon's November 2, 2023 statements.

**B.      January 5, 2024 Disclosure**

198.    On January 5, 2024, before the market opened, agilon revealed that it had suffered dramatically higher prior medical expenses than previously revealed and, as a result, agilon was lowering its FY23 expected medical margin to $340-$360 million, or approximately $112 million

---

[10]    In a November 10, 2023 report, Wells Fargo reduced agilon's price target by 30%, explaining agilon's "*downplaying [of] cost pressures . . . has strained trust and credibility*," and "[i]t is clear that AGL is experiencing the same cost pressure as most MA plans. *This is only surprising because of AGL's confidence it did not have an issue in Aug/Sept*."  The report further noted: "*AGL was adamant that it is not seeing the same cost pressure as MA Plans had experienced*.  AGL believed it had high visibility into Q2 costs given ACO Reach claims data (claimed May ~90% visible), which it said had tracked well against its MA claims data. *The company emphasized how different their model is* vs. unmanaged FFS and viewed 2Q23 results as further validation of their strategy and care model.  *AGL's continued confidence at September conferences was also notable*."

(24%) below the already substantially reduced guidance and nearly $200 million (36%) below agilon's original FY23 medical margin guidance. agilon also disclosed its FY23 adjusted EBITDA would not be $6-$18 million as previously represented in November 2023, but rather would be a ***loss*** of $55-$69 million. The Company also disclosed that:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions. While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

199.    Moreover, the Company revealed that its 3Q23 medical margin of $108 million had been overstated by at least $31 million (***40%***), and thus agilon's 3Q23 medical margin had ***been flat (at best) compared to 3Q22***. agilon also revealed that, due to higher-than-reported medical costs from 2Q23, rather than having increased 69% year-over-year versus 2Q22 (as defendants Sell and Bensley had claimed, ¶¶158, 160, 166, 170), agilon's 2Q23 medical margin had remained relatively flat compared to 2Q22.

200.    agilon also provided a dismal FY24 outlook, including medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million, and withdrew its FY26 guidance, which the Company had reaffirmed only seven weeks earlier.

201.    The Company also revealed that it had failed to provide new physicians that had joined agilon's mature markets with the basic onboarding and education needed to integrate into the agilon partnership, that these newer physicians had been dragging down medical margins as a result, and that agilon would need to provide the necessary onboarding and education to these physicians, meaning that agilon would incur additional onboarding and education costs in FY24 and going forward.

202.    The Company also announced that Bensley would be stepping down as CFO of agilon.

- 68 -

203.    Sell and Bensley convened an investor call that day, during which Sell admitted that agilon had failed to incorporate both "elevated cost trends" and the "magnitude and source of the utilization shifts" in the forecasts provided to investors.  Rather than the industry-leading utilization trends that defendants represented throughout the Class Period and held up as validation of agilon's business model, Sell stated that agilon was in fact suffering "cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs."  Sell also acknowledged that the increased utilizations, which would "persist through 2024," were due to a "backlog of pent-up demand from COVID."  Bensley, meanwhile, admitted that agilon was *not* on track to generate positive cash flow in 2024.

204.    agilon's stock price sank 29% in response to the January 5, 2024 disclosures, from more than $12 per share at market close on January 4, 2024, to $8.63 per share on January 5, 2024, on abnormally heavy trading volume of nearly 37 million shares.  However, the price of agilon stock remained artificially inflated as defendants continued to make materially false and misleading statements and omissions, as detailed herein.

205.    The January 5, 2024 disclosures shocked analysts, who promptly cut their price targets following the news.  For example:

- On January 5, 2024, Deutsche Bank issued a report which reduced agilon's price target given agilon's "scattered timeline of incoming data collection" and "non-linear and difficult to follow" guidance revisions.

- On January 5, 2024, J.P. Morgan issued a report which cut agilon's price target 47% given the market's lack of confidence in agilon following the January 5 news.

- On January 8, 2024, BofA issued a report observing that agilon's disclosures on January 5, 2024 had "fuel[ed] investor concerns around sustainability of the AGL model."

- On January 8, 2024, TD Cowen issued a report which lowered agilon's price target by 33% given agilon's "confounding issues" including "lag of claims trend data, lack of visibility," "inadequate conservatism and forecasting for medical claims accruals and newly cited lapse of training/onboarding efforts for new physicians/groups in 'mature' markets."

- 69 -

- On January 8, 2024, Leerink issued a report which cut agilon's price target by 60% given "the persistent inability of management to forecast its business," the fact that "AGL is taking risks on costs that it seemingly can't control" and "[w]e simply lack the confidence to recommend this stock."

- On January 8, 2024, JMP issued a report which lowered agilon's price target by 39% in light of the fact that agilon's "management's guidance credibility" is "impaired" and the Company's newly-disclosed failure to onboard new physicians in mature markets.

### C.    February 27, 2024 Disclosure

206.    On February 27, 2024, after the market closed, agilon announced its 4Q23 and FY23 financial results, revealing that agilon's medical costs and patient utilization rates were even higher than the Company had previously reported, causing the Company to widely miss the guidance it had provided less than eight weeks earlier.  agilon revealed: (i) it had suffered an additional $38 million in undisclosed net medical costs during 4Q23, as well as $13 million in additional medical costs from prior to 4Q23; (ii) its actual FY23 medical margin ($299 million) was $41-$61 million less than agilon had announced less than eight weeks earlier; and (iii) it incurred a FY23 net loss of $263 million, and FY23 adjusted EBITDA of ***negative $95 million***.  agilon also announced it had drastically lowered the FY24 guidance it had just given in January, including medical margin by 25%-29% (from $560-$600 million to $400-$450 million) and adjusted EBITDA guidance by 125%-250% (a $40-$60 million ***gain*** to a $15-$60 million ***loss***).

207.    In its FY23 Report on Form 10-K filed on the same day, agilon also revealed a previously undisclosed material weakness in the Company's ICFR concerning agilon's medical claims and related payables (*i.e.*, amounts agilon owed for its members' healthcare), acknowledging that the material weakness rendered agilon's DCP ineffective and noting:

> Management has identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, risk adjusted premium revenue and certain care management expenses.

4859-2284-9249.v1

\*        \*        \*

In 2023, we identified certain sources of information utilized in our medical claims and related payables, risk adjusted premium revenue, and care management expense processes that contained specific data attributes utilized in executing an internal control by management. Management did not sufficiently design controls or control activities to ensure the completeness and accuracy of the related IPE in executing certain controls associated with these processes.

208. agilon also published the following slide on February 27, 2024, indicating that the medical margin figures for multiple market classes reported during agilon's March 30, 2023 Investor Day (*see* ¶144), and again highlighted on agilon's August 3, 2023 call (*see* ¶166), had been overstated, including by 8%-23% for FY21 and 12%-26% for FY22:



209. agilon further revealed that the Company was scaling back its aggressive membership growth, and that its next cohort of new Medicare Advantage members contained approximately 60,000 patients, less than half the size of the cohort that had went "live" in January 2024.

210. Analyst firms lowered their price targets further in response to the news, with BTIG stating on February 28, 2024 it was "negatively surprised" by the guidance reduction and "worr[ied]

- 71 -

about AGL's lack of visibility." RBC issued a report on February 28, 2024, which underscored the negative impact on agilon's results due to the fact that "newer docs have never been trained on AGL's systems/processes."

211. As a result of the disclosures on February 27, 2024, the price of agilon common stock dropped from $6.48 per share to $6.04 per share on March 1, 2024, a 7% decline on abnormally heavy volume of over 26 million shares as the market digested the revelations.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

212. The Exchange Act Defendants knowingly participated or acquiesced in the issuance or dissemination of material misstatements and omissions. The Exchange Act Defendants controlled the contents of agilon's public statements during the Class Period, and were each provided with or had access to the information alleged herein to be false or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Exchange Act Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. Indeed, the specific undisclosed issues involved critical information for investors that the Exchange Act Individual Defendants held themselves out as most knowledgeable about during earnings and other conference calls during the Class Period.

### A. Defendants' Billions of Dollars of Insider Sales

213. During the Class Period, CD&R sold more than $2.7 billion of agilon common stock at inflated prices, while defendant Sell offloaded nearly several million dollars' worth of his personal agilon shares.

214. CD&R alone sold over 123 million shares of agilon during the Class Period for proceeds of more than $2.7 billion:

| CD&R's Insider Sales During the Class Period | | | |
|---|---|---|---|
| **Transaction Date** | **Shares Sold** | **Share Price** | **Proceeds** |
| September 14, 2021 | 17,904,257 | $28.98 | $518,865,368 |
| August 11, 2022 | 11,337,500 | $24.35 | $276,068,125 |
| May 18, 2023 | 94,173,804 | $20.80 | $1,958,815,123 |
| *Totals* | 123,415,561 | -- | $2,753,748,616 |

215.   As shown above, CD&R's insider trading increased dramatically in 2023, with the sale of over 94 million shares in May 2023 as agilon's member utilization and medical costs were massively spiking.  The sheer magnitude of more than $2.7 billion of insider selling may well represent the largest case of insider trading ever brought before this Court.  In connection with CD&R's anticipated sale, CD&R also forced agilon to transfer $200 million of agilon's remaining cash to CD&R to purchase 9.6 million of CD&R's shares in May 2023.  This $200 million equated to approximately 50% of agilon's then cash and cash equivalents.[11]  agilon then "retired" the 9.6 million shares.  Remarkably, agilon was compelled by CD&R to agree to buy $200 million worth of CD&R's shares even though the Company was not yet profitable and was burning through cash.

216.   Sell also cashed in by selling 100,000 shares of agilon stock on September 14, 2021 at $28.98 per share, for gross proceeds of nearly $3 million – four times the amount of Sell's base salary in 2021.  Sell reported no other stock sales during the entire Class Period.

### B.   Defendants Repeatedly Emphasized agilon's Comprehensive Data on Patient Utilization, Medical Costs and Other Metrics

217.   The Exchange Act Defendants frequently emphasized their intimate knowledge of agilon's platform and data capabilities, and knew agilon's platform and data capabilities were

---

[11]   agilon reported $394 million, and $191 million, in cash and cash equivalents in 1Q23 and 2Q23, respectively.

important to analysts and investors, as illustrated by: (i) analysts' repeated inquiries regarding agilon's platform and data capabilities; and (ii) defendants' frequent statements emphasizing the Company's platform and data capabilities. For instance, defendants Sell and Bensley regularly boasted: (i) that agilon's "surveillance system" (*i.e.*, agilon's platform) provided real-time and near-real-time data and "insights" on member utilization and other key metrics; (ii) of agilon's ability to easily collect and synthesize claims, pharmacy, lab and other data from payors and other sources; (iii) that agilon continuously checked data for accuracy and completeness; and (iv) that the platform synthesized immense payor data into actionable insights for agilon's physician partners.

218.    agilon also stated that it was able to track patient referrals (*e.g.*, a primary care physician's referral of a patient to a specialist for a surgical procedure), and influence which specialists received referrals for agilon's patients. In fact, according to Sell, "90% of our senior patients are relying on their PCP for their referrals." agilon also tracked other leading indicators of medical care, including prior authorization data and patient medical testing. Sell also indicated that agilon specifically tracked its outstanding "pent-up demand from COVID," disclosing on January 5, 2024, that agilon still only made it "about 60% of the way through a backlog of pent-up demand" for "outpatient surgeries like hips and knees." On January 9, 2024, Sell again quantified that agilon was only 60% through its outstanding "backlog of delayed outpatient procedures for things like hips and knees that maybe someone got a referral during COVID, but has taken time to sort of feel comfortable and pursue that."

219.    As detailed in ¶¶217-218 above, defendants agilon, Sell and Bensley knew during the Class Period – including prior to the May 2023 Offering – that agilon: (i) was burdened with significant, outstanding "demand" from COVID; (ii) had a "backlog" that had to be addressed (*e.g.*, agilon's patients needed the "outpatient surgeries" performed); and (iii) expected to incur significant increases in medical expenses from this "pent-up demand."

220.    To supplement the data described above, agilon also received data from CMS through agilon's participation in CMS' ACO REACH Model.  Highlighting his personal knowledge of CMS' data, Bensley assured it was "really good," "current," and "complete."  Defendants Sell and Bensley repeatedly emphasized aligon's ability to leverage CMS' data in assessing its Medicare Advantage claims, given that (according to defendants) Medicare Advantage and ACO REACH utilized the same platform, markets, doctors, and clinical programs, which data would therefore have supplemented agilon's other data during the Class Period, including during 2023 when agilon was experiencing elevated patient utilization and medical costs.

### C.    The Alleged Fraud Centered on agilon's Core Business

221.    Given that the alleged misstatements and omissions addressed core issues of agilon's business – including agilon's two key profit metrics (medical margin and adjusted EBITDA), and members' medical costs and utilization rates – a strong inference arises that the Exchange Act Defendants knowingly or recklessly withheld information that was material to investors.

222.    Defendants Sell and Bensley knew that medical margin and adjusted EBITDA, as well as members' medical costs and utilization rates, were central to agilon's core business.  They were also well aware that their public statements regarding those metrics were critically important to agilon's investors and analysts.  Throughout the Class Period, defendants agilon, Sell and Bensley repeatedly described medical margin as a "key metric for our business" and agilon's "main margin metric," and acknowledged that investors, analysts, and other stakeholders widely used medical margin to evaluate agilon's financial performance, identify trends in agilon's business, and compare agilon's results over multiple periods.

223.    Defendants Sell's and Bensley's extensive knowledge of agilon's medical margin, adjusted EBITDA, and members' medical costs and utilization rates is illustrated by the fact that these defendants: (i) frequently discussed medical margin and medical expenses in agilon's SEC

- 75 -

filings and earnings calls; and (ii) often responded to direct questions from analysts about agilon's medical margin and members' medical costs and utilization rates. Correspondingly, as illustrated in §VI, *supra*, analysts devoted substantial attention to these metrics in securities research reports about agilon, and during earnings and conference calls with defendants Sell and Bensley.

**D.    Defendants Inflated agilon's Medical Margin by Concealing Medical Costs**

224.    agilon's consistent underreporting of medical expenses, which served to inflate agilon's medical margin, further supports the Exchange Act Defendants' scienter. agilon purported to recognize medical costs in the period in which medical services were rendered to members. However, in 2021, agilon began delaying recognition of millions of dollars in medical costs, thereby inflating agilon's publicly-reported medical margin. agilon referred to medical costs recognized in one year associated with services rendered in the prior year as a "prior year development" or "PYD."

225.    Delaying the recognition of tens of millions of dollars in medical costs had the effect of inflating agilon's publicly-reported medical margin. For example, although agilon had reported FY22 medical margin of $305 million, agilon subsequently recognized over $50 million in PYD in FY23, including over $9 million in 3Q23, leading Leerink to observe on November 3, 2023, that "PYD is now running at $53m YTD," meaning that agilon's "2022 medical margin ($305m) was 20% too high," and that "medical margin PMPMs only slightly improved in 2022 vs. 2021."

226.    Defendants agilon, Sell and Bensley knew agilon's delayed recognition of medical costs had the effect of artificially inflating agilon's key financial metrics, underscoring agilon's, Sell's and Bensley's awareness of the systemic data and visibility defects with agilon's model, and the substantial impact of those defects on agilon's financial reporting.

227.    Nevertheless, during the Class Period, defendant Bensley downplayed agilon's PYD, assuring investors and analysts that he had investigated the matter and that agilon's prior year developments were normal, isolated, explainable events. For instance, shortly after reporting over

- 76 -

$4.7 million of PYD in 1Q22, Bensley represented on May 5, 2022 that agilon's "nominal negative prior year development . . . wasn't really related to any one particular payer or any one particular geography. . . .  So nothing really of note to report on that.  Just . . . some normal fluctuation, obviously, in development quarter-to-quarter, positive and negative."  A year later, on May 9, 2023, Bensley casually attributed agilon's 1Q23 PYD of $28.5 million to "a couple of old very high-cost claims that were kind of spread out through the year that we got visibility to after we closed Q4."  And, in November 2, 2023, Bensley assured that agilon's 3Q23 PYD of $9.1 million "was almost entirely isolated to system issues with a single payer."

> **E.    The Close Temporal Proximity Between Defendants' False Statements and the Corrective Disclosures**

228.    At least as late as September 12, 2023, defendant Bensley continued to reassure investors that agilon was not experiencing the same cost pressures adversely affecting commercial payors.

229.    Just seven weeks later on November 2, 2023, agilon shocked investors when it reported 3Q23 results and dramatically reduced agilon's FY23 medical margin and adjusted EBITDA outlook, while revealing that agilon had in fact experienced a substantial increase in member utilization and medical costs beginning by at least May 2023.  ¶195.

230.    Despite the unexpected results, defendants Sell and Bensley insisted on November 2, 2023 that their "visibility into the key drivers" of agilon's performance "are quite high," that the "negative [prior year] claims" hit to medical margin "was almost entirely isolated to system issues with a single payor," and that agilon's revised targets were both conservative and achievable.  *See* ¶¶177-178, 182.  Defendants Sell and Bensley then reiterated agilon's FY23 outlook twelve days later on November 14, 2023.  *See* ¶¶185-186.

231.    On January 5, 2024 – just seven weeks after defendants Sell and Bensley reiterated agilon's FY23 outlook – defendants shocked the market again by: (i) lowering agilon's FY23

medical margin outlook by more than $110 million (24%); (ii) cutting agilon's FY23 adjusted EBITDA outlook from $6-$18 million to negative $55-$69 million (a dramatic reduction of over $73 million); (iii) introducing a disappointing outlook for FY24; and (iv) announcing Bensley's abrupt retirement.  ¶¶198-203.

232.    Less than eight weeks later, on February 27, 2024, agilon revealed it: (i) had badly missed its *revised* FY23 outlook from January 5 (including medical margin by $41-$61 million (17% at the midpoint) and adjusted EBITDA by $26-$40 million (53% at the midpoint); (ii) had cut its FY24 medical margin and adjusted EBITDA guidance from eight weeks earlier by more than 25% and 125%, respectively; (iii) expected utilization to remain elevated going forward; and (iv) had overstated its historical medical margins in multiple markets.  *See* ¶206-211.

233.    These events unfolded over a compact time period, during which defendants agilon, Sell and Bensley repeatedly missed their own representations about agilon's FY23 performance by staggering amounts.  Moreover, each time agilon announced a revised outlook in November 2023 and January 2024, defendants agilon, Sell and Bensley knew that agilon's model suffered from systemic data and analytics gaps involving payor data and notwithstanding that fact, these defendants misleadingly issued the financial outlook.

### F.    Defendants Were Motivated to Conceal Deteriorating Profits in Order to Retain and Attract Physician Partners

234.    agilon's medical margin and EBITDA growth depended on attracting new physicians (in both new and existing geographies) and retaining existing physician partners.  Likewise, the viability of agilon's full-risk model depended on agilon's ability to attract and retain physician partners which required a promise of a high stock price and alluring profits.  The market for physician groups is highly competitive, and in order to attract new physicians, agilon needed to persuade current and prospective physician partners that agilon's full-risk model was both viable and

predictable, as well as offered a favorable reimbursement structure superior to those offered by agilon's competitors.

235.    To attract and retain physicians, agilon relied in part on offering agilon common stock as compensation.  In connection with the April 2021 Offering, agilon granted approximately 11.7 million shares of agilon common stock to agilon's physician partners, which agilon contemporaneously valued at $268.5 million.  In conjunction with these stock awards, agilon also gave its physician partners $67.8 million in net loans, to cover the taxes that were payable on the shares agilon had granted.  In order to retain its physician partners, the Exchange Act Defendants were sensitive to the need to ensure that the nearly $270 million in equity agilon had granted to physicians prior to April 2021 retained its value subsequent to the April 2021 Offering.

236.    Importantly, for agilon's 50/50 profit sharing structure to appear competitive, agilon needed its physician groups to quickly post profits after going "live," and progressively increase their profits.  To do this, agilon needed to post decreases in member utilization and medical costs, and increases in medical margin following the April 2021 Offering.

237.    The Exchange Act Defendants knew that any public information suggesting that agilon's physician groups were taking longer to generate or increase profits, or were operating at a loss, or that agilon's platform and full-risk model were seriously flawed, would eliminate agilon's ability to attract and retain physicians.  Thus, these defendants were highly motivated to inflate agilon's stock price following the April 2021 Offering, by concealing the deteriorating profits, spiking medical costs, and other adverse issues subsequent to the April 2021 Offering.

### G.    The Abrupt Departures of agilon's Officers

238.    agilon announced Bensley's sudden "retirement" on January 5, 2024, only three years after Bensley joined agilon as CFO in January 2021, and on the same date on which agilon drastically lowered its FY23 outlook and revealed further deterioration in profits and tens of millions

- 79 -

of dollars in undisclosed medical costs.  ¶¶198-202.  By terminating his relationship with agilon, Bensley was foregoing substantial compensation as agilon's CFO, including a $500,000 base salary and millions of dollars in share-based compensation.

239.    On August 11, 2023, less than 5 months prior to Bensley's departure, agilon announced that its CAO (defendant Kasenchak) was also leaving agilon, just one year after she had taken-over the CAO position.  Kasenchak had assumed the CAO role in September 2022, following defendant Sobotka's May 2022 resignation as CAO.  Upon leaving agilon in September 2023, Kasenchak left behind several thousand unvested shares (which, at the time of her departure, would have been valued at approximately $140,000).

240.    agilon announced Kasenchak's departure less than one month after three directors affiliated with CD&R resigned in June 2023 (defendants Richards, Schnall, and Strum).  So since May 2022, no less than three financial officers – CFO Bensley, CAO Kasenchak, and CAO Sobotka – in addition to the three directors (defendants Richards, Schnall, and Strum), have terminated their relationships with agilon.

### H.    Physician Partners' Representations to CMS Regarding agilon's Full-Risk Model

241.    On May 29, 2024, approximately 80 representatives of agilon's physician partners – including various Chief Executive Officers, Presidents, Vice Presidents, and Medical Directors, among others – sent a letter to the Administrator of CMS (Chiquita Brooks-LaSure) regarding agilon's full-risk model (the "CMS Letter").  The CMS Letter bears the distinct "agilon health" letterhead and logo, and the authors represent themselves as members of the "agilon health Physician Network."

242.    The agilon partners who sent the CMS Letter include over a dozen healthcare providers that the Exchange Act Defendants highlighted in their Class Period statements, including but not limited to: Answer Health, Austin Regional Clinic, Center for Primary Care, Central Ohio

4859-2284-9249.v1

Primary Care, Entira Family Clinics, Family Practice Center, Graves Gilbert Clinic, Holland PHO, Lexington Clinic, Mankato Clinic, Pioneer Physician Network, Richfield Medical Group, Springfield Clinic, and United Physicians.

243.    In the CMS Letter, agilon's partners made several representations to CMS (*see* ¶¶244-246 below) that directly contradict the Exchange Act Defendants' statements to investors during the Class Period.  For example, as outlined in §VI., *supra*, the Exchange Act Defendants frequently assured analysts and investors that agilon's physician partners, *inter alia*: (i) unquestionably "trust the data" they receive; (ii) were provided the data they needed in order to manage the full-risk of agilon's members and drive down medical costs and patient utilization; and (iii) "know exactly who they are accountable for."

244.    In the May 29, 2024 CMS Letter, dozens of representatives of agilon's partners confirm that they continue to lack "the comprehensive data necessary to manage th[e] risk" of agilon's members, as well as "standardized, comprehensive" payor data.  These representatives also contend that they rely on "altered and often delayed, non-standard data files that vary in format and quality, with several fields masked, combined or otherwise distorted."  Moreover, agilon's partners indicate that they have been "prevent[ed] from understanding real-time developments and accurately forecasting future developments" with respect to the members they treat, and lack the information they "need to appropriately manage the risk [they] carry for [their] attributed patients."  agilon's partners also contend that payor data is delayed by up to ***three months*** – the length of agilon's fiscal quarter.

245.    agilon's partners also catalogue several types of information that they purport to require in order to manage the full-risk of agilon's members, including "critical [information] for subcapitated models" like agilon's.  According to agilon's partners, the information they lacked included information which would allow agilon's partners to "[e]nsure[] we know who the plan has

attributed to us" and that agilon's patients' "conditions are correctly accounted for," as well as "[p]rovide[] real-time information on our patients and the transactions initiated by [payors]." agilon's partners further assert that they "require this data to perform against the[ir] contract[s]" and "drive value for each patient."

246.    These and other acknowledgements in the CMS Letter by agilon's own partners starkly contrast with the Exchange Act Defendants' Class Period assurances about agilon's platform and full-risk model set forth above in §VI., *supra*.  Foremost, the CMS Letter confirms that agilon's physician partners, *inter alia*: (i) lack the "data necessary to manage th[e] risk" of agilon's members; (ii) were forced to rely on "altered and often delayed, non-standard data files that vary in format and quality, with several fields masked, combined or otherwise distorted" in managing agilon's patients; and (iii) lack the information they "need to appropriately manage the risk [they] carry for [their] attributed patients."

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

247.    At all relevant times, the market for agilon common stock was an efficient market for the following reasons, among others:

(a)    agilon common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, agilon filed periodic public reports with the SEC;

(c)    agilon regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

4859-2284-9249.v1

(d)     agilon was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

248.    As a result of the foregoing, the market for agilon common stock promptly digested current information regarding agilon from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of agilon common stock during the Class Period suffered similar injury through their purchases of agilon common stock at artificially inflated prices and a presumption of reliance applies.

249.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material, adverse information regarding agilon's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     CLASS ACTION ALLEGATIONS

250.    Plaintiffs bring this action as a class action on behalf of a class consisting of all persons who purchased agilon common stock during the Class Period, including persons who purchased agilon common stock traceable to the registration statements used in connection with the April 2021, September 2021 and May 2023 Offerings (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant

- 83 -

times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

251.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, agilon common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by agilon or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

252.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

253.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

254.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the registration statements used in connection with the Offerings were materially false and misleading;

(b)   whether defendants' statements during the Class Period were materially false and misleading;

(c)    for the Exchange Act of 1934 allegations only, whether the Exchange Act Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(d)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

255.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I

**For Violation of §11 of the Securities Act
Against agilon, the Securities Act Individual Defendants,
and the Underwriter Defendants**

256.    Plaintiffs repeat and reallege the allegations contained in ¶¶16-22, 28-56, 250-254(a), 254(d), 255 as if fully set forth herein.

257.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, against agilon, the Securities Act Individual Defendants, and the Underwriter Defendants.  This claim is based on strict liability and does not sound in fraud.  Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct as part of this Count.

258.    This claim is brought by North Carolina Funds and North Atlantic Carpenters Funds on behalf of themselves and all other members of the Class who purchased shares of agilon common stock traceable to the April 2021 Registration Statement, September 2021 Registration Statement, and May 2023 Registration Statement (the "Registration Statements").

259.    Plaintiffs NCRS and NCSRP purchased shares of agilon common stock traceable to the April 2021 Registration Statement, as well as shares of agilon common stock in the September 2021 Offering traceable to the September 2021 Registration Statement.  Plaintiffs North Atlantic States Carpenters Pension Fund and North Atlantic States Carpenters Guaranteed Annuity Fund purchased shares of agilon common stock in the May 2023 Offering traceable to the May 2023 Registration Statement.

260.    agilon is the registrant for the Offerings.  As issuer of the shares, agilon is strictly liable to Plaintiffs and members of the Class who purchased shares traceable to the Registration Statements for the misstatements and omissions therein.

261.    agilon, the Securities Act Individual Defendants, and the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statements.

262.    The Securities Act Individual Defendants each signed one or more of the Registration Statements, was a director of agilon at the time one or more of the Registration Statements were declared effective, and/or was named in the Registration Statements, with their consent, as about to become a director and was responsible for the contents of the Registration Statements, as set forth in ¶¶28-43.

263.    The Underwriter Defendants are investment banking houses that specialize in underwriting public offerings of securities.  The Underwriter Defendants collectively received more than $140 million in fees for serving as underwriters of the Offerings.

264.    The Underwriter Defendants were required to conduct an adequate and reasonable due diligence investigation into the business and operations of agilon.  During the course of their purported due diligence, the Underwriter Defendants had access to internal, confidential, then-current corporate information concerning agilon.

4859-2284-9249.v1

265. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements that are herein alleged to be materially false and misleading were true and without omissions of any material facts and were not misleading.

266. The Registration Statements contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein, as set forth below.

**A.    Untrue Statements and Omissions in the April 2021 and September 2021 Registration Statements**

267. The April 2021 Registration Statement and the September 2021 Registration Statement both stated that agilon's "differentiated," full-risk model was "transforming healthcare by empowering [physicians] to be the agent[s] for change."  Each of these registration statements went on to state that agilon provided a model for "successfully improving quality of care and reducing costs," and that "[o]ur purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business.

268. The April 2021 Registration Statement and the September 2021 Registration Statement likewise each emphasized the strengths and benefits of agilon's "Data Integration and Management" capabilities, stating:

> Our purpose-built and flexible platform enables ease of integration with payor systems, physician EMR systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.  The agilon platform extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience.

269. The April 2021 Registration Statement and the September 2021 Registration Statement likewise each stated that agilon's model "provides *significant visibility into the near-term and long-term financial trajectory* for both agilon and our anchor physician groups."

- 87 -

270.    The April 2021 Registration Statement and the September 2021 Registration Statement each specifically noted agilon's ability to "deliver actionable insight at the patient and physician level":

> Two critical factors that enhance our ability to improve medical margin over a long period of time that we believe are unique to our model are . . . (ii) our ability to deliver actionable insight at the patient and physician level through our aligned partnership model with peer-to-peer physician feedback driving accountability and accelerating the pace of change to a Total Care Model.

271.    The April 2021 Registration Statement and the September 2021 Registration Statement also each discussed agilon's significant growth potential in existing geographies, including agilon's "ability to add new physician partners and to attract additional PCPs to our physician partners."

272.    The statements in ¶¶267-271 were untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.  The true facts were:

(a)     that agilon's physician partners were not provided with the data necessary to effectively manage patients' medical costs, which compromised the viability and sustainably of the Company's full-risk model.  As agilon's physician partners later confirmed with CMS, they historically had not been provided the data necessary to accurately manage members' medical costs, including standardized and comprehensive payor data corresponding to the claims, costs and risk of agilon's patients.  Instead, agilon's physician partners received altered (and often delayed), non-standard data files that varied in format and quality, with fields masked, combined or otherwise distorted, which prevented agilon's physician partners from accurately managing patients' medical costs;

(b)     that while each registration statement represented that agilon possessed the "ability to accurately predict and effectively manage medical margin" and members' medical costs, agilon's model suffered from systemic data and analytics gaps involving payor data, and agilon was

- 88 -

in fact unable to timely obtain and/or analyze payor claims data for its members, as it relied on non-standardized, delayed, and incomplete data from payors, which prevented agilon from accurately tracking, managing and forecasting medical margin and members' medical costs. agilon was relying on incomplete and delayed payor data as it had been unable to integrate payor systems and payor data with agilon's platform and lacked the systems and actuarial personnel and resources necessary to accurately track and forecast medical expenses;

(c)      even though the April 2021 Registration Statement and September 2021 Registration Statement emphasized agilon's "ease of integration with payor systems," because the payor data it received during the Class Period was so heterogeneous and difficult to analyze, agilon was unable to timely obtain and analyze payor claims data or reliably track and forecast medical expenses unless and until agilon established a financial data pipeline which allowed payor data to be processed, viewed and analyzed in a consistent and standardized format; and

(d)      that although both the April 2021 Registration Statement and the September 2021 Registration Statement emphasized agilon's substantial membership growth via adding new physicians to the platform in mature markets, they each omitted the fact that agilon was not providing those new physicians with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these newly added physicians in mature markets generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon, and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin.

**B.      Untrue Statements and Omissions in the May 2023 Registration Statement**

273.      The May 2023 Registration Statement stated that agilon's business model was "transforming healthcare by empowering [physicians] to be the agent for change." The May 2023 Registration Statement went on to state that agilon provided such a model for "successfully

- 89 -

improving quality of care and reducing costs," and stating that "[o]ur purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business."

274.    The May 2023 Registration Statement incorporated by reference, *inter alia*, agilon's FY22 Report on Form 10-K and 1Q23 Report on Form 10-Q.  The FY22 Report on Form 10-K stated that agilon's model "provides ***significant visibility into the near-term and long-term financial trajectory*** for both agilon and our anchor physician groups," while emphasizing agilon's "ability to add new physician partners and to attract additional PCPs to our physician partners."

275.    The statements in ¶¶273-274 were untrue statements of material fact and/or omitted material facts necessary to make the statements made therein not misleading.  The true facts were:

(a)    that the statements regarding agilon's growth through new physicians joining mature markets, omitted that agilon had not provided those new physicians with the basic onboarding and education needed to integrate into the agilon partnership, and as a result these newly added physicians in mature markets generated medical margins significantly lower on average than the medical margins posted by physicians who had received onboarding and education from agilon, and that this undisclosed flaw in agilon's growth model was having a material adverse effect on the Company's medical margin;

(b)    that the root cause of the drastic underperformance of physicians who dragged down the Company's medical margins was agilon's own failure to onboard and educate new physicians;

(c)    the May 2023 Registration Statement omitted that agilon's physician partners were not provided with the comprehensive patient data necessary to manage the full-risk of agilon's patients;

(d)     systemic data and analytics gaps precluded agilon's visibility into its members' medical expenses and therefore, agilon lacked the basic ability to timely obtain and/or analyze payor claims data for its members, which prevented agilon from accurately tracking and forecasting patients' medical expenses;

(e)     that because of pent-up demand, agilon was experiencing dramatically higher FY23 medical costs, including specialist utilization rates up to 350% of FY22 specialist utilization rates, Part B drug utilization rates equal to 300% of FY22 rates, and outpatient surgeries 90% above FY22 rates; and

(f)     due to the undisclosed adverse impact of agilon's data and analytics gaps on agilon's financial reporting, including incomplete and delayed data from payors, the Company's lack of a "financial data pipeline" for standardizing and analyzing payor data required the Company to overhaul its data and actuarial teams in order to accurately track and forecast medical expenses.

276.    Plaintiffs and the Class have sustained damages due to the violations of §11 alleged herein.

277.    At the time of their purchases of agilon common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

278.    Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based to the time that Plaintiffs commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public.

279.    By reason of the conduct herein alleged, each defendant named in this count violated §11 of the Securities Act.

4859-2284-9249.v1

## COUNT II

### For Violation of §12(a)(2) of the Securities Act
### Against the Underwriter Defendants

280.    Plaintiffs repeat and reallege the allegations contained in ¶¶16-22, 28-56, 250-254(a), 254(d), and 255-279 as if fully set forth herein.

281.    This claim is brought on behalf of the Class pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against the Underwriter Defendants.  This claim is based on strict liability and does not sound in fraud.  Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct as part of this Count.

282.    By means of the Prospectuses utilized in connection with the April 2021 Offering filed on April 16, 2021, the September 2021 Offering filed on September 13, 2021, and the May 2023 Offering filed on May 17, 2023 (collectively, the "Prospectuses"), which were incorporated into and formed part of the Registration Statements, the Underwriter Defendants sold agilon common stock to Plaintiffs and other members of the Class.

283.    As reflected in their respective certifications, Plaintiffs purchased agilon common stock pursuant to each of the Prospectuses from the Underwriter Defendants, as reflected below:

| Offering | Plaintiff | Shares Purchased | Price |
|---|---|---|---|
| Apr. 2021 Prospectus | NCRS | 52,500 | $23.00 |
| Apr. 2021 Prospectus | NCRS | 221,388 | $23.00 |
| Apr. 2021 Prospectus | NCSRP | 137,459 | $23.00 |
| Sep. 2021 Prospectus | NCRS | 30,361 | $30.00 |
| Sep. 2021 Prospectus | NCSRP | 18,373 | $30.00 |
| May 2023 Prospectus | NASCPF | 15,873 | $21.50 |
| May 2023 Prospectus | NASCGAF | 16,484 | $21.50 |

4859-2284-9249.v1

284.    The Prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

285.    The Underwriter Defendants owed Plaintiffs and the other members of the Class who purchased the Company's securities, sold pursuant to the Prospectuses, the duty to make a reasonable and diligent investigation of the Prospectuses contained therein to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

286.    In the exercise of reasonable care, the Underwriter Defendants should have known of the misstatements and omissions contained in each of the Prospectuses as set forth above.

287.    The Underwriter Defendants financially benefitted by soliciting investors and otherwise participating in each of the Offerings for their own financial benefit, sharing underwriting discounts and commissions of more than $61 million from the April 2021 Offering, more than $19 million from the September 2021 Offering, and more than $59 million from the May 2023 Offering.

288.    Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Prospectuses at the time Plaintiffs acquired agilon's common stock.

289.    Each of the defendants alleged herein participated in the offers for sale and sale of agilon stock for financial gain by means of the Prospectuses.

290.    By reason of the conduct alleged herein, the defendants named herein violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2).  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased agilon securities pursuant to the Prospectuses sustained substantial damages in connection with those purchases.

- 93 -

291. Accordingly, Plaintiffs and the other members of the Class who hold agilon securities sold pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to the Underwriter Defendants named herein. Class members who have sold their securities seek damages to the extent permitted by law.

292. This claim is timely brought within one year after discovery of the untrue statements and/or omissions in the Offerings that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offerings.

**COUNT III**

**For Violation of §15 of the Securities Act**
**Against the Securities Act Individual Defendants and the CD&R Defendants**

293. Plaintiffs repeat and reallege the allegations contained in ¶¶16-22, 28-56, 250-254(a), 254(d), and 255-279 as if fully set forth herein.

294. This claim is brought on behalf of the Class pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Securities Act Individual Defendants and the CD&R Defendants. This claim is based on strict liability and does not sound in fraud. Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct as part of this Count.

295. By reason of their positions as officers and/or directors of agilon and/or their ownership of agilon stock, the Securities Act Individual Defendants had the power and authority to control, and did control, agilon during the Class Period.

296. Sell was the CEO and President of agilon, spoke during earnings calls and presentations during the Class Period, and signed agilon's Registration Statements and Reports on Forms 10-K.

297. Bensley was agilon's CFO from January 2021 through the end of the Class Period. Bensley spoke during earnings calls and presentations during the Class Period, and signed agilon's

- 94 -

Registration Statements, Reports on Forms 8-K, Reports on Forms 10-K, and Reports on Forms 10-Q, and SOX Certifications, filed on various dates during the Class Period.

298.    Sobotka was agilon's CAO from 2019 through May 2022 and signed agilon's April 2021 and September 2021 Registration Statements, and the FY21 Report on Form 10-K.

299.    Kasenchak was agilon's CAO from September 2022 through August 2023 and signed agilon's FY22 Report on Form 10-K and May 2023 Registration Statement.

300.    Sell, Gourdine, Smith, Williams, Mansukani, McKenzie, McLoughlin, Richards, Sachdev, Schnall, Schwaneke, Strum, and Wulf were each directors of agilon during the Class Period.  In their capacity as directors, they: (i) were responsible for overseeing and directing agilon's operations; (ii) sat on one or more committees of the Board (except for defendant Schnall); and (iii) were responsible for signing documents that agilon filed with the SEC, including annual Reports on Forms 10-K and/or one or more of the Registration Statements agilon filed in connection with its Class Period offerings.

301.    The CD&R Defendants had the power and authority to control, and did control, agilon during the Class Period, including through: (i) its substantial ownership stake in agilon common stock; (ii) its ability to appoint various CD&R insiders to the Board (including the Chairman); (iii) its significant influence over agilon's management; (iv) its historical relationship with agilon, which CD&R founded in 2016; and (v) through the various preferential agreements that CD&R Defendants had caused agilon to enter into around the April 2021 Offering.  CD&R also controlled Williams, Richards, Sachdev, Schnall, and Strum, the CD&R insiders whom CD&R had nominated to agilon's Board.

302.    The CD&R Defendants leveraged their controlling share ownership to appoint CD&R insiders to agilon's Board.  In connection with the April 2021 Offering, agilon entered into a Stockholder Agreement with CD&R Vector, which entitled CD&R Vector to designate for

- 95 -

nomination: (i) a majority of agilon's directors while it beneficially owned at least 50% of agilon's outstanding shares; and (ii) fewer than a majority of agilon's directors so long as it beneficially owned at least 5% of agilon's outstanding shares. Additionally, the Stockholder Agreement provided that a CD&R designee would serve as the Chairman of the Board so long as CD&R Vector beneficially owned at least 25% of agilon's common stock.

303. Pursuant to the Stockholder Agreement, CD&R insiders were elected and re-elected to agilon's Board year after year, and CD&R's operating advisor (Williams) and partner (Sachdev) presided as Chairman and Vice Chairman (respectively) of the Board throughout the Class Period. CD&R insiders filled a total of five Board seats during the Class Period, including in September 2021, August 2022, and May 2023, when CD&R sold massive amounts of agilon stock.

304. CD&R derived several other distinct privileges from the Stockholder Agreement with agilon. For instance, so long as CD&R Vector beneficially owned at least 40% of agilon's outstanding shares, which was the case until May 2023, it could "determine the outcome of corporate actions requiring stockholder approval, including the election of the members of our board of directors and the approval of significant corporate transactions, such as mergers and the sale of substantially all of [agilon's] assets."

305. The Stockholder Agreement also granted CD&R with unlimited access to agilon's non-public financial, operational, and other information, including:

(a) access to agilon's "officers, employees, auditors, legal counsel, properties, offices and other facilities";

(b) "all books and records" of agilon;

(c) "the opportunity to discuss the affairs, finances and accounts of the Company and its Subsidiaries with their respective officers";

4859-2284-9249.v1

(d)     agilon's monthly financial statements (including balance sheets, statements of operations, income, cash flows, retained earnings, and stockholders' equity), together with a detailed comparison to agilon's Board-approved business plan, which were to be provided to CD&R no later than 30 days after the end of each month;

(e)     agilon's annual budgets, business plans, financial forecasts, and projections, along with the assumptions upon which the budgets and projection were based, which were to be provided to CD&R no later than 30 days before the beginning of the Company's next fiscal year;

(f)     other categories of financial and operational information, including deadlines by which such information was to be provided to CD&R; and

(g)     such other information concerning the Company's business or financial condition and the Company's management.

306.    CD&R Defendants also caused agilon to execute indemnification and registration rights agreements.[12]

307.    Given CD&R's unfettered access to agilon's non-public information, substantial Board representation, history with the Company, and agreements with agilon, CD&R Defendants continued to exercise control over agilon even after CD&R Defendants owned less than 50% of agilon's shares.  Using this control, CD&R caused agilon to purchase 9.6 million of CD&R Defendants' shares in the May 2023 Offering, using $200 million of agilon's own cash (approximately half its cash on hand), only for agilon to cancel those shares following the transaction.

---

[12]     These agreements were signed by persons employed by Clayton, Dubilier & Rice, LLC, including by its Fund Controller (as "Vice President, Treasurer and Secretary" of CD&R Investment Associates IX, Ltd.) and former CFO (as "Vice President, Treasurer and Assistant Secretary" of CD&R Investment Associates IX, Ltd.).

4859-2284-9249.v1

308.   agilon qualified as a "controlled company" under NYSE corporate governance standards because CD&R controlled more than 50% of the voting power for the election of agilon's directors.  agilon itself has acknowledged it did not "move[] from being a controlled company to one of independence" until June 2023 when CD&R insiders Richards, Schnall, and Strum resigned from the Board.

309.   By reason of such conduct alleged herein, defendants named in this Count are liable pursuant to §15 of the Securities Act.

**COUNT IV**

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against agilon and the Exchange Act Individual Defendants**

310.   Plaintiffs incorporate only ¶¶1-255 above for purposes of this Count.

311.   This Count is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78(b), and SEC Rule 10b-5 promulgated thereunder, against agilon and the Exchange Act Individual Defendants.

312.   During the Class Period, the defendants named herein disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

313.   The defendants named herein violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 98 -

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of agilon common stock during the Class Period.

314.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for agilon common stock.  Plaintiffs and the Class would not have purchased agilon common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' false and misleading statements and omissions.

315.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of agilon common stock during the Class Period.

## COUNT V

### For Violation of §20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants and the CD&R Defendants

316.    Plaintiffs incorporate ¶¶1-255, 300-308 and 310-315 above for purposes of this Count.

317.    This Count is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a) against the Exchange Act Individual Defendants and the CD&R Defendants.

318.    As detailed *supra*, agilon and the Exchange Act Individual Defendants violated §10(b) and Rule 10b-5, and Plaintiffs and other members of the Class suffered damages in connection with their purchases of agilon common stock.

319.    During the Class Period, the Exchange Act Individual Defendants acted as controlling persons of agilon within the meaning of §20(a) of the Exchange Act.  Specifically, by virtue of their stock ownership, high-level positions, and/or their ability to control and influence agilon's decision-making and day-to-day operations, the Exchange Act Individual Defendants, and CD&R

- 99 -

Defendants, had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the conduct alleged herein, including, without limitation, the content and dissemination of the false and misleading material misstatements and omissions set forth *supra*.

320.     CD&R Defendants controlled agilon and the Exchange Act Individual Defendants for the reasons detailed herein, including its substantial ownership of agilon stock, ability to appoint agilon's Board members (including the Chairman and Vice Chairman), significant influence over agilon's management, historical relationship with agilon, and various agreements between CD&R and agilon.

321.     As a result, the Exchange Act Individual Defendants and CD&R are liable pursuant to §20(a) of the Exchange Act.

## COUNT VI

### For Violation of §20A of the Exchange Act
### Against Defendant Sell and the CD&R Defendants

322.     Plaintiffs incorporate only ¶¶1-255 and 310-321 above for purposes of this Count.

323.     This Count is brought pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1, against defendant Sell and the CD&R Defendants.

324.     During the Class Period, Sell and CD&R Defendants were in possession of material, non-public information concerning agilon.  As alleged herein, Sell was the CEO, President, and a director of agilon throughout the Class Period, signed agilon's annual Reports on Forms 10-K and Registration Statements, executed SOX certifications, and displayed his extensive knowledge of agilon's operations and financial performance while interfacing with analysts during agilon's quarterly earnings calls and investor conferences.

4859-2284-9249.v1

325. Like Sell, CD&R Defendants had unlimited access to agilon's material, non-public information throughout the Class Period. As agilon's founder and controlling shareholder, CD&R filled several Board seats (including the Chairman's and Vice Chairman's) with CD&R insiders.

326. As set forth in ¶¶301-305, the Stockholder Agreement also supplied CD&R with virtually unlimited and timely access to material, non-public information about agilon. The Stockholder Agreement included deadlines by which non-public information about agilon was required to be provided to CD&R Defendants, ensuring that CD&R Defendants maintained access to non-public information about agilon before it was widely published (if at all).

327. While Sell and CD&R were in possession of material, non-public information regarding agilon, Sell and CD&R took advantage of the material, non-public information to obtain millions of dollars in insider trading profits. Sell's and CD&R's Class Period sales of agilon common stock (set forth below) were made contemporaneously with certain of Plaintiffs' purchases of agilon common stock (set forth below and in ECF 11-3) and the purchases of other Class members during the Class Period.

328. For instance, CD&R Defendants made the following sales of agilon common stock contemporaneously with the following purchases by Plaintiffs:

| CD&R Defendants' Sales | | | | Plaintiffs' Purchases | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Price | Shares | Proceeds | Plaintiff | Date | Price | Shares | Cost |
| 9/14/2021 | $28.98 | 17,904,257 | $518,865,368 | Indiana | 9/17/2021 | $29.01 | 2,560 | $74,266 |
| | | | | NCRS | 9/17/2021 | $29.01 | 6,400 | $185,664 |
| 8/11/2022 | $24.35 | 11,337,500 | $276,068,125 | NCRS | 8/16/2022 | $22.45 | 50 | $1,123 |
| 5/18/2023 | $20.80 | 94,173,804 | $1,958,815,123 | NCRS | 5/18/2023 | $22.39 | 31,210 | $698,792 |
| | | | | NASCGAF | 5/19/2023 | $21.86 | 1,843 | $40,288 |
| | | | | NASCPF | 5/19/2023 | $21.86 | 1,774 | $38,780 |
| | | | | NASCGAF | 5/25/2023 | $19.99 | 977 | $19,530 |
| | | | | NASCGAF | 5/25/2023 | $20.07 | 1,946 | $39,056 |
| | | | | NASCPF | 5/25/2023 | $19.99 | 940 | $18,791 |
| | | | | NASCPF | 5/25/2023 | $19.99 | 1,875 | $37,481 |
| | | | | NASCGAF | 5/26/2023 | $20.25 | 1,006 | $20,372 |

4859-2284-9249.v1

| CD&R Defendants' Sales | | Plaintiffs' Purchases | | | |
|---|---|---|---|---|---|
| | | NASCPF | 5/26/2023 | $20.25 | 968 | $19,602 |

329. Sell made the following sales of agilon common stock contemporaneously with the following purchases by Plaintiffs:

| Sell's Sales | | | | Plaintiffs' Purchases | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Price | Shares | Proceeds | Plaintiff | Date | Price | Shares | Cost |
| 9/14/2021 | $28.98 | 100,000 | $2,898,000 | Indiana | 9/17/2021 | $29.01 | 2,560 | $74,266 |
| | | | | NCRS | 9/17/2021 | $29.01 | 6,400 | $185,664 |

330. Other Class members also purchased shares of agilon common stock contemporaneously with Sell's and CD&R's insider sales of agilon common stock. Plaintiffs, along with other Class members who purchased shares of agilon common stock contemporaneously with Sell's and CD&R's insider sales, suffered damages because: (i) they paid artificially inflated prices as a result of the Exchange Act violations alleged herein; and (ii) they would not have purchased the stock at the prices paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions alleged herein.

331. By reason of the above conduct, Sell and the CD&R Defendants are liable pursuant to §20A of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives of the Class;

B. Requiring agilon, the Individual Defendants, the Underwriter Defendants, and the CD&R Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

- 102 -

4859-2284-9249.v1

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their attorneys' fees, expert fees, and other costs; and

D.      Awarding such other equitable relief, including disgorgement and such injunctive relief this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  September 6, 2024                    Respectfully submitted,

                                            KENDALL LAW GROUP, PLLC
                                            JOE KENDALL (Texas Bar No. 11260700)


                                                    s/ Joe Kendall
                                            JOE KENDALL

                                            3811 Turtle Creek Blvd., Suite 825
                                            Dallas, TX  75219
                                            Telephone:  214/744-3000
                                            214/744-3015 (fax)
                                            jkendall@kendalllawgroup.com

                                            Local Counsel

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            LUCAS F. OLTS
                                            CHRISTOPHER D. STEWART
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone: 619/231-1058
                                            619/231-7423 (fax)
                                            lolts@rgrdlaw.com
                                            cstewart@rgrdlaw.com

                                            Lead Counsel for Lead Plaintiff

- 103 -