**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

IN RE AGILON HEALTH, INC. SECURITIES
LITIGATION

Master File No.: 1:24-cv-00297-DAE

**AGILON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................... 1

II.  BACKGROUND ................................................................................................. 7

    A.  agilon's Business ........................................................................................ 7

    B.  Initial Public Offering (IPO) ..................................................................... 8

    C.  2021 Secondary Public Offering (SPO) .................................................... 9

    D.  agilon Hits or Exceeds Guidance on Multiple Fronts in 2021 and 2022 ...... 9

    E.  2023 Guidance and Second SPO ............................................................... 10

    F.  The Risks agilon Cautioned Investors About Began to Materialize ............... 10

III.  ARGUMENT ................................................................................................... 13

    A.  Plaintiffs Fail to State a Claim Under the Securities Act ............................. 13

        1.  Statements about agilon's business model ......................................... 14

        2.  Statements about visibility ............................................................... 16

        3.  Statements about data and data management ..................................... 18

    B.  Plaintiffs' Section 10(b) Claim Fails on Falsity Grounds ............................ 20

        1.  Plaintiffs' attack on agilon's guidance and statements about financial forecasting fails on falsity grounds ............................................. 21

        2.  Plaintiffs' attack on statements about agilon's business model fails on falsity grounds ......................................................................... 26

        3.  Plaintiffs' attack on statements about data integration fails on falsity grounds ........... 27

        4.  Plaintiffs' attack on statements about growth fails on falsity grounds ........ 29

        5.  Plaintiffs' attack on statements about utilization fails on falsity grounds ...... 29

        6.  Plaintiffs' attack on reported financial results fails on falsity grounds. ........ 32

    C.  Plaintiffs' Section 10(b) Claim Fails on Scienter Grounds ........................... 33

        1.  Plaintiffs' motive allegations are deficient ...................................... 35

        2.  Plaintiffs' references to the May 2024 CMS letter do not support an inference of scienter .................................................................... 37

        3.  Plaintiffs' core operations allegations are deficient ........................... 38

        4.  Plaintiffs' additional scienter allegations are makeweight .................. 40

        5.  Benign inferences outweigh any inference of deliberate wrongdoing ........ 43

    D.  Plaintiffs' Claims Against Hittner and Venkatachaliah Fail for Additional Reasons ...... 45

IV.  CONCLUSION ................................................................................................. 46

## TABLE OF AUTHORITIES

**Page(s)**

**Decisions**

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) .......................................................................34, 36, 42

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .........................................................................37

*Alaska Electrical Pension Fund v. Flotek Indus., Inc.*,
  915 F.3d 975 (5th Cir. 2019) .....................................................................................33, 39

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010)....................................................................41, 42

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................13

*In re Azurix Corp. Sec. Litig.*,
  198 F. Supp. 2d 862 (S.D. Tex. 2002), *aff'd*, 332 F.3d 854 (5th Cir. 2003) ...........15

*Baker v. Llano Cnty.*,
  2024 WL 4002470 (W.D. Tex. Aug. 27, 2024).........................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................................13

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) .......................................................................................35

*City of Monroe Emps' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
  2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011).............................................................34

*Crutchfield v. Match Group, Inc.*,
  529 F. Supp. 3d 570 (N.D. Tex. 2021)  ......................................................................15

*In re Dell Inc., Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)........................................................................45

*Fener v. Belo Corp.*,
  425 F. Supp. 2d 788 (N.D. Tex. 2006) .......................................................................36

*Hall v. Rent-a-Center*,
  2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ............................................................38

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) ............................................................................................45

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ............................................................................................16

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) ......................................................................................39, 40

*Lovelace v. Software Spectrum Inc.*,
   78 F.3d 1015 (5th Cir. 1996) ..............................................................................................8

*McCloskey v. Match Grp., Inc.*,
   2018 WL 4053362 (N.D. Tex. Aug. 24, 2018).................................................................14

*Neiman v. Bulmahn*,
   854 F.3d 741 (5th Cir. 2017) ............................................................................................39

*Oklahoma Firefighters Pension and Ret. Sys. v. Six Flags Ent. Corp.*,
   58 F.4th 195 (5th Cir. 2023) ............................................................................................35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).........................................................................................................30

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ................................................................................... *passim*

*In re Plains All American Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019) ..............13, 31

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
   777 F. App'x 726 (5th Cir. 2019) .....................................................................................13

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ................................................................................14, 15, 19

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ................................................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................................................33

*Tran v. XBiotech Inc.*,
   2016 WL 5408382 (W.D. Tex. Sept. 23, 2016)...........................................................34, 37

*Truk Int'l Fund LP v. Wehlmann*,
   737 F. Supp. 2d 611 (N.D. Tex. 2009) ..............................................................................16

iii

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) ....................................................................13

*Whole Foods. Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*,
905 F.3d 892 (5th Cir. 2018) ...........................................................................15, 28

*Wu Winfred Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. 2017)............................................................34, 42

*Yoshikawa v. Exxon Mobil Corp.*,
2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)........................................................40

**Statutes**

15 U.S.C. § 77k..........................................................................................................13

15 U.S.C. § 78u-4(b)(1) .............................................................................................20

15 U.S.C. § 78u-4(b)(2) .............................................................................................33

15 U.S.C. § 78u-5(i)(1)(C).........................................................................................21

**Other Authorities**

Fed. R. Evid. 201(b)(2) ................................................................................................8

Fed. R. Civ. P. Rule 9(b)........................................................................................4, 13

Fed. R. Civ. P. Rule 12(b)(6) .......................................................................................4

This motion is brought by the agilon Defendants, consisting of:

- agilon health, inc. (the Company), Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, and Heidi Hittner, against whom Plaintiffs alleged claims under both the Securities Act of 1933 and the Securities Exchange Act of 1934, and

- Glenn Sobotka, Priscilla Kasenchak, Michelle A. Gourdine, Michael L. Smith, Sharad Mansukani, Diana L. McKenzie, Karen McLoughlin, Jeffrey A. Schwaneke, and William Wulf, against whom Plaintiffs have alleged claims only under the Securities Act.

The agilon Defendants move to dismiss all claims Plaintiffs have alleged against them in the Consolidated Class Action Complaint (CAC). The agilon Defendants join in the arguments made in the motions to dismiss filed by the Underwriter Defendants and CD&R Defendants.

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT

agilon became a public company in April 2021. Its business is built on a novel solution to a problem that has for decades plagued the healthcare industry: rising costs. The Company's business model works by supporting primary care practices and incentivizing preventative medicine; its aim is to eliminate the inefficiencies of traditional "fee-for-service" healthcare. agilon aspires to provide primary care physicians with the tools to help them achieve better health care outcomes for their patients.

At an operational level, agilon enters into long-term contracts with primary care physician (PCP) groups that have patients (called members) enrolled in Medicare or Medicare Advantage plans. agilon and the physician groups then enter into "capitation" agreements with health insurers, under which they receive fixed payments for each member in exchange for a commitment to financially cover a range of healthcare services for a specified period. Both agilon and the physician groups share in any cost savings from lowering members' healthcare costs, while agilon bears sole financial responsibility for excess costs.

agilon uses the "medical margin" metric to gauge the effectiveness of this model. That

1

metric has two components: (1) medical services revenue, which consists of fixed payments from insurers, and (2) medical services expense, which consists of the member healthcare costs for which agilon is responsible.

agilon has consistently cautioned investors that calculating medical services expense is a highly complex undertaking, involving judgment on multiple levels and actuarial analysis of vast amounts of data from various sources. The flow of cost and claims information to agilon is also subject to a timing gap that is not typical in other industries, and the Company reminded investors of this aspect of its business every quarter. agilon receives information about members' covered costs through claims data provided by insurers under the capitation agreements; agilon uses that data to project costs for the period in which healthcare services are provided. But in many instances, agilon receives data from the insurers—private companies that administer Medicare Advantage plans—months after the members receive care. As agilon explained, its Medicare Advantage "claims data has some lag." By necessity, agilon therefore relies on estimates and assumptions based on actuarial assessments to fill these gaps, even in historic financial reporting.

The Company disclosed its reliance on estimates in every quarterly and annual filing Plaintiffs cite. Although agilon has had success in leveraging data to make informed estimates, it has consistently cautioned investors that these estimates are not foolproof. Risks abound in predicting the future, particularly for a young company operating in a complex industry. agilon's investors understood these risks, and they understand that the further into the future agilon's estimates reach, the greater those risks become.

At bottom, this is a missed guidance case. In the second half of 2023, healthcare utilization surged unexpectedly, the result of patients seeking care they had delayed during the COVID-19 pandemic. The trend impacted the healthcare industry broadly. But even Plaintiffs do not allege

2

that the surge had begun in March 2023, when agilon issued annual full-year guidance.  At that time, moreover, agilon was coming off two years of successfully meeting or exceeding annual medical margin guidance, and had confidence in its ability to do the same for 2023.

As it began to receive more information, agilon was able to provide investors with updates. In August 2023, agilon told investors that others in the industry were seeing higher utilization, and that while it did not see this trend in available data for agilon's members, it was taking measures to account for the possibility.  Between August 2023 and February 2024, the news worsened; agilon received additional data showing that the utilization trend continued to accelerate, and the Company re-estimated medical service expenses and medical margin three times.  On each occasion, agilon promptly shared the disappointing news with investors, and its stock price fell.

Seeking to capitalize on these events, Plaintiffs insist that the Company's guidance was intended to defraud investors, and that its revisions to guidance were corrective disclosures.  But the securities laws do not impose liability based on such fraud-by-hindsight theories.  agilon's guidance comes squarely within two statutory safe harbors for forward-looking statements, and both safe harbors are fully applicable here.  First, agilon identified the guidance as forward-looking and accompanied it with meaningful cautionary language.  Second, Plaintiffs plead no facts suggesting that agilon or its executives actually knew—the statutory standard—that their financial projections were false or misleading when made.

Because Plaintiffs cannot convert missed forecasts into fraud as a legal or factual matter, they dramatically expand their claims by attacking virtually everything agilon has said about its business since its April 2021 IPO.  But like their challenge to agilon's guidance, these attacks are impermissibly premised on hindsight.  Plaintiffs' claims are based on events that had yet to occur, and on knowledge the Company had yet to attain at the time of the challenged statements.

3

At the motion to dismiss stage, this case is governed by two separate pleading standards:

1.  Plaintiffs challenge all but a handful of statements under Section 10(b) of the Exchange Act, an antifraud provision.  For these statements, Plaintiffs must meet the demanding standards of the Private Securities Litigation Reform Act (PSLRA), which Congress passed in 1995 to curb abuses by the plaintiffs' securities bar.  Under the PSLRA, Plaintiffs must plead particularized facts (a) establishing a materially false or misleading statement, and (b) supporting a strong inference of scienter.  The scienter standard is particularly stringent and differs from normal pleading rules.  Courts must consider not only inferences favorable to plaintiffs but also competing benign inferences favoring defendants.

2.  Plaintiffs challenge nine statements in agilon's stock offering documents under Section 11 of the Securities Act.  While this is not a statutory fraud claim, Plaintiffs' allegations sound in fraud and are thus subject to the heightened pleading requirement of Rule 9(b), as well as the plausibility standard of Rule 12(b)(6).

Plaintiffs cannot meet any of these standards for any of their claims.

***Section 11.***  Under Section 11, Plaintiffs target high-level statements largely contained in the overview section of agilon's stock offering documents—statements about the Company's business model, plans for growth, and data capabilities.  This challenge fails on multiple grounds.  Among other things, Plaintiffs fail to reckon with the extensive disclosures in the offering documents addressing the very risks that form the basis of their claims.  Allegations of falsity are not plausible where that is the case.  In addition, virtually all of the statements Plaintiffs challenge are highly generalized expressions of corporate optimism.  Courts in the Fifth Circuit have repeatedly held that such statements cannot be materially misleading as a matter of law.

***Section 10(b).***  Plaintiffs' Section 10(b) falsity allegations also fall short in multiple ways,

4

under the PSLRA and otherwise.  In challenging statements agilon made in 2021 and 2022, Plaintiffs disregard the Company's successful forecasting during this period:  agilon met its 2021 and 2022 guidance.  Against that background, Plaintiffs fail to show that the Company's positive statements about its ability to manage healthcare utilization were materially false or misleading.

The same is true of the 2023 guidance and the statements agilon made about its business and forecasting abilities that year.  Here too, agilon made extensive risk disclosures and fully described the role of forecasts and estimates in both historical financial reporting and its guidance.  Indeed, agilon identified the very risks whose materialization in late 2023 and early 2024 caused the disappointing developments and stock price drops on which Plaintiffs' claims are based.  And here too, many if not most of the statements Plaintiffs attack are generalized expressions of corporate optimism, which the Fifth Circuit has rejected as bases of securities claims.

Plaintiffs' scienter allegations are equally defective, if not more so.  Plaintiffs conspicuously fail to identify a single person or document showing that anybody at agilon believed that the 2023 guidance was unachievable, or that any other challenged statement was false or misleading.  This shortfall is striking.  As a procedural matter, Plaintiffs have a statutory burden to create, by means of particularized facts, a strong inference of fraud—one that is as cogent and compelling as any competing benign inference.  As a substantive matter, the scienter standard is equally rigorous.  Plaintiffs must show that each of the four individual Section 10(b) defendants acted with a conscious intent to deceive investors, or with recklessness so severe it approximates that intent.  If Plaintiffs cannot show that with respect to the four individuals, they cannot state a Section 10(b) claim against agilon either.

In the absence of facts bearing directly on the four executives' states of mind, Plaintiffs turn to speculation.  They contend that agilon's CEO was motivated to defraud the market because

5

he sold stock in 2021.  But they fail to show, as required by law, that the sale was suspicious in timing or amount—and it is plainly irrelevant to any *subsequent* challenged statement.  The Fifth Circuit has stressed the significance of motive in the scienter calculus, and Plaintiffs have come up with nothing.  Even colorable stock sale allegations—and they make none—could not substantiate Plaintiffs' nonsensical premise that agilon would provide the market with guidance it knew it could not meet.

Plaintiffs seek to cover for what is missing from their scienter allegations with increasingly desperate allegations.  (1) They cite circumstances that apply to any public company—the desire to grow a business and to maintain or increase stock price.  As a matter of law, such allegations show nothing relevant to scienter.  (2)  They cite "temporal proximity"—the supposedly short lapse of time between the challenged statements and the purported corrective disclosures.  The defect of that tactic in a *three-year* putative class period is obvious.  (3) They cite as "concealment" basic features of agilon's financial reporting that the Company disclosed to investors with every periodic public filing it made.  (4) They cite the resignation of three officers over a nearly 18-month period, but plead no facts connecting those resignations with any purported wrongdoing. (5) Finally, Plaintiffs cite a letter in which agilon's physician partners asked the Centers for Medicare and Medicaid Services for assistance in obtaining better-organized data from private health insurers.  That too in no way suggests an intention to deceive investors.

Benign inferences plainly predominate here.  None of the agilon Defendants had any motive to provide the market with unachievable guidance for 2023, nor to characterize the Company's predictive abilities untruthfully.  When agilon realized that its estimates needed refinement, it promptly reported this to investors.  The fact that agilon did so multiple times between August 2023 and February 2024 shows good faith, not fraud.  agilon's successive

6

disclosures show a company anxious to communicate with investors when it learned bad news, not a company seeking to defraud the market.

## II.    BACKGROUND

### A.    agilon's Business

agilon provides value-based healthcare for Medicare beneficiaries.  ¶ 3.[1]  Traditional Medicare is based primarily on a fee-for-service structure, in which physicians are paid for the services they provide.  ¶ 77.  The concept behind value-based healthcare is that better patient outcomes and better economics are possible if physicians are rewarded for the value, rather than the volume, of the care they provide.  ¶ 4.

agilon seeks to promote value-based care by enabling primary care physicians to focus on preventative medicine, including by providing the necessary infrastructure to support value-based care.  ¶ 4.  On the one hand, agilon enters into long-term contracts with physician groups treating patients enrolled in Medicare or a Medicare Advantage plan.  On the other hand, agilon enters into "capitation" agreements with insurers, under which agilon and the physicians receive up-front fees to cover a defined set of services for patients during a given period.  *Id.*  The physicians are entitled to an equal share of any cost savings, while agilon assumes the risk of excess costs.  *Id.*  If payments from insurers under the capitation agreements exceed the actual costs of providing medical services, both agilon and the physician groups are rewarded.  *Id.*

"Medical margin" is the metric the value-based health care industry uses to track the economics of this model.  *Id.*  It is the difference between "medical services revenues" (fees under capitation agreements) and "medical services expenses" (actual patient healthcare costs based on insurance claims data).  *Id.*  With respect to expenses, agilon consistently cautioned the market

---

[1] "¶ _" citations in this brief refer to the paragraphs of the CAC.

that the reported medical expenses for a given period include estimates and assumptions.  Ex. 1 at

93-95.[2]  Estimating expenses is necessary because the submission of claims for medical expenses

lags behind the provision of medical services by many months.  *Id.* at 95.

### B.       **Initial Public Offering (IPO)**

On April 16, 2021, agilon completed its IPO, an underwritten offering of 46 million shares

at $23 per share.  ¶ 63.

agilon's IPO Registration Statement included extensive and detailed risk disclosures.

Among other things, agilon cautioned investors:

- That physicians may face challenges integrating into agilon's model, and that other "fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians."  Ex. 1 at 40.

- That "market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate."  *Id.*

- That the Company considers many factors in estimating medical services expenses, and that "[g]iven the numerous uncertainties inherent in such estimates, [agilon's] actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served."  *Id.* at 42.

- That the Company could not provide "any prediction as to the ultimate impact on us of COVID-19," and that "such impacts could be material to our business, financial

---

[2] "Ex. _" citations refer to the exhibits contained in the Joint Appendix (Appendix A), which are numbered sequentially from APP 005 through 1064.  All exhibits are properly before the Court. The Court may take judicial notice of facts that are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned.  FED. R. EVID. 201(b)(2); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018, 1018 n. 1 (5th Cir. 1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC.").  A court may also consider documents that a defendant attaches to a motion to dismiss.  *Baker v. Llano Cnty.*, 2024 WL 4002470, at *4 (W.D. Tex. Aug. 27, 2024) (quoting *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)).

condition, cash flows and results of operations." *Id.* at 41-42.

- That the Company relies on data provided by payors, "including information related to revenue and risk adjustment factors for [the Company's] members, and details associated with amounts paid by payors for medical services rendered to [the Company's] members," and that if "a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information which payors provide to us, we and our physicians may not be able to effectively ensure our members disease burdens are identified and may not be able to effectively operate our business." *Id.* at 48.

- That the Company has "experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data . . . [and] may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems." *Id.* at 49.

C.      **2021 Secondary Public Offering (SPO)**

On September 13, 2021, agilon completed a secondary public offering of approximately 19.5 million shares of common stock at $30 per share.  ¶ 106.  agilon's 2021 SPO Registration Statement included the same detailed risk disclosures cited above.  Ex. 5 at 250-94.

D.      **agilon Hits or Exceeds Guidance on Multiple Fronts in 2021 and 2022**

Following the IPO, agilon successfully executed on its business plan and growth strategy. agilon grows by entering into new contracts with physician groups, whose Medicare patients become agilon's members.  In May 2021, agilon projected that it would be managing the care of 182,000 members by year-end, and predicted an adjusted EBITDA loss of $41 million for 2021. Ex. 4 at 211.  agilon outperformed these estimates, ending the year with 238,000 members and an adjusted EBIDTA loss of $39 million.  Ex. 7 at 394.

agilon again outperformed its 2022 guidance.  The Company projected (1) 340,000 members by year-end, (2) annual adjusted EBIDTA of $0-$10 million, and (3) medical margin of $290-$305 million.  *Id.*  agilon met or exceeded guidance on all three measures: (1) 358,600

members by year-end, (2) positive annual adjusted EBITDA of $4 million, and (3) a medical margin of $305 million.  Ex. 12 at 626.

E.    **2023 Guidance and Second SPO**

On March 1, 2023, agilon provided annual guidance on the same three metrics, predicting (1) 485,000 members by year-end, (2) annual adjusted EBITDA of $75 to $90 million, and (3) medical margin of $535 to $560 million.  *Id*.  These projections reflected steady year-over-year growth, consistent with agilon's estimates and performance in 2021 and 2022.[3]

On May 17, 2023, agilon completed another SPO, selling approximately 94 million shares of common stock at $21.50 per share.  ¶ 49.  The offering materials again included the risk disclosures discussed on pages 8-9, above.  The 2023 offering materials also incorporated by reference risk disclosures in periodic filings (a Form 10-Q and Form 10-K) issued after the two 2021 offerings.  These included, among others (1) "COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members," and (2) "[g]iven the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period."  Ex. 11 at 565-66; Ex. 16 at 694.

F.    **The Risks agilon Cautioned Investors About Began to Materialize**

Later in 2023, the risks about which agilon had cautioned investors since the IPO began to materialize.  Member utilization accelerated through the second half of 2023 due in large part to pent-up demand following the COVID-19 pandemic.  ¶ 86.  Actual results began to diverge from

---

[3] On May 9, 2023, agilon revised its adjusted EBIDTA guidance, based on a technical accounting change in SEC literature, to a range of negative $3 million to $25 million.  Ex. 15 at 683.

agilon's predictions, and the delta grew over the five-month period from August 2023 through February 2024. ¶ 173. agilon promptly reported the disconnect it was seeing in August and returned to the market with updates on three successive occasions. ¶¶ 195, 198, 206.

Specifically, in its August 2023 second-quarter earnings call, agilon lowered its medical margin guidance by $30 million, to a range of $500-$530 million, based on "a range of scenarios on utilization and cost trend." Ex. 18 at 733. The Company reported that "fee-for-service utilization is up," and that it was increasing its reserves because "there could be a change . . . in utilization trends in the second half" of 2023. *Id.* at 734, 741.[4]

At the same time, agilon told investors that it was *not*—or at least not yet—experiencing effects from what others in the healthcare industry were describing as a broad trend of increasing utilization. *Id.* at 730. In seeking to account for the difference between its own experience and the industry trend, agilon expressed optimism that its model was "more durable and predictable in driving cost and quality results compared to the broad fee-for-service system, which predominates across health care today." *Id.*

The industry-wide trend of increased utilization persisted over the next quarter, and in its November 2023 third-quarter earnings call, agilon again lowered its medical margin guidance, this time to a range of $455-$470 million. The Company explained that it had now observed an increase in utilization during May and early June "which resulted in some in-period development that [the Company] recognized during the third quarter," but that utilization appeared to be moderating. Ex. 21 at 807. agilon further explained that it was adjusting guidance in part as an effort to "proactively refine [its] model to account for utilization trends as well as any potential

---

[4] Plaintiffs do not claim that the August 3 earnings release constitutes a corrective disclosure, and we do not treat it as one for purposes of this brief.

blind spots with health plans." *Id.* The new guidance incorporated the assumption that "utilization will not moderate any further from recent levels." *Id.*

On January 5, 2024, agilon again lowered 2023 medical margin guidance, this time in an announcement outside the cadence of scheduled quarterly earnings calls. The Company lowered guidance by approximately $100 million—to a midpoint of $350 million—explaining that higher cost trends "became visible to us starting in mid-December as we closed our November results." Ex. 23 at 838. agilon explained that the "underperformance was largely driven by two issues: a forecast that failed to recognize these elevated cost trends and a data and analytics gap that led to our being late in both recognizing the magnitude and source of the utilization shifts." *Id.* agilon provided updated guidance for 2024, with a medical margin midpoint of $580 million. *Id.* at 840.

On February 27, 2024, agilon reported actual 2023 year-end medical margin of $299 million—well below the $350 million midpoint forecast on January 5. The Company explained that since that time, it had received "updated data including relatively complete claims data from its largest payors, and additional information such as seasonality factors and census data . . . which indicated medical claims were higher than the company's previous estimate." Ex. 25 at 883. agilon also lowered its 2024 medical margin guidance to a midpoint of $425 million, citing the continuation of higher medical costs into 2024. *Id.* at 884.

Plaintiffs allege that agilon's stock price fell in response to the November 2, January 5, and February 27 announcements. They claim that their investment losses are recoverable as damages under Section 11 and Section 10(b).[5]

---

[5] For the Court's convenience, we list in Appendix B to this brief every statement Plaintiffs challenge under either Section 10(b) or Section 11, together with a reference to the arguments in this brief showing why Plaintiffs have failed to state a claim on the basis of that statement.

III.    **ARGUMENT**

    A.    **Plaintiffs Fail to State a Claim Under the Securities Act**

    To state a claim under Section 11, an investor who bought stock in or traceable to a public offering must plead that the registration statement for the offering "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k; *see also, e.g.*, *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019).[6]

    Plaintiffs' Section 11 claim sounds in fraud. It is based on the same factual allegations as Plaintiffs' Section 10(b) claim. ¶¶ 256, 310-11. Plaintiffs must accordingly satisfy the factual particularity standard of Rule 9(b). For claims under the Securities Act, Rule 9(b)'s particularity requirement is equivalent to the PSLRA's heightened pleading standard for falsity. *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 669 (S.D. Tex. 2021).[7] Plaintiffs must also satisfy the plausibility standard of *Twombly* and *Iqbal*. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

    Plaintiffs challenge statements in agilon's IPO and SPO offering documents on three subjects: agilon's (1) business model, (2) visibility into its financial trajectory, and (3) data

---

[6] Plaintiffs allege claims against the underwriters of agilon's public offerings under Section 12(a)(2) of the Securities Act, but do not bring that claim against agilon or its officers or directors.

[7] In an effort to avoid Rule 9(b), Plaintiffs "disavow" the extensive allegations of fraud that make up of the bulk of the CAC. ¶ 257. Courts in the Fifth Circuit reject that gambit where, as here, plaintiffs "support both their section 11 claims and their Exchange Act claims with the same IPO and SPO materials." *Venator*, 547 F. Supp. 3d at 669. When that is the case, "[b]oilerplate disavowal of an intent to plead fraudulent conduct is unpersuasive. . . ." *Id.* The law is thus clear that "[w]hen the Securities Act and Exchange Act allegations are substantively identical, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity." *In re Plains All American Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 619 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019).

integration and management.  On each subject, Plaintiffs fail to plead with particularity facts showing that the challenged statements were materially false or misleading when made.

### 1.    Statements about agilon's business model

Plaintiffs first challenge agilon's general statements about its business model.  These statements, like most of the statements Plaintiffs challenge under Section 11, are contained in a business overview section of the offering documents.  In that overview, agilon told investors that it was "transforming healthcare by empowering [physicians] to be the agents for change," and was "successfully improving quality of care and reducing costs."  ¶¶ 93, 117, 267, 273.  agilon explained that it "provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business." ¶¶ 93, 118.

Plaintiffs plead no facts showing that these statements were materially false or misleading. The statements must be read "in the context of the [offering materials] as a whole." *McCloskey v. Match Grp., Inc*., 2018 WL 4053362, at *3 (N.D. Tex. Aug. 24, 2018).  In the context relevant here, agilon drew a distinction between its value-based care model and "traditional fee-for-service medicine."  ¶ 77; *see also* Ex. 1 at 98 ("PCPs [are] transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient.").  Plaintiffs do not and cannot dispute that agilon operated on a value-based care model as opposed to a fee-for-service model.

agilon's positive outlook on value-based care does not provide a basis for liability.  The Fifth Circuit has consistently held that generalized expressions of corporate optimism are not actionable as a matter of law:  Because such statements are too vague to verify or falsify, they cannot support a Section 11 claim.  *E.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) ("generalized, positive statements about the company's competitive strengths, experienced

14

management, and future prospects are not actionable because they are immaterial. . . . [An issuer is] under no duty to cast its business in a pejorative, rather than a positive, light."); *see also, e.g., Whole Foods. Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 896–98, 902 (5th Cir. 2018) (reasonable investors do not rely on "generalized and self-serving statements"); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004); *Crutchfield v. Match Group, Inc.*, 529 F. Supp. 3d 570 (N.D. Tex. 2021) ("The Fifth Circuit has repeatedly held that generalized positive statements are immaterial.").

These authorities dispose of Plaintiffs' attack on agilon's statements that it was "transforming healthcare" and "empowering physicians," and that it "had the business model to achieve its goals." The district court's decision in *Azurix* is closely on point. In that case, as here, plaintiffs targeted a company's positive characterization of its business plan. The court dismissed the claim, holding that "[s]uch statements are not actionable because no reasonable investor would rely on obvious 'puffery.'" *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 881 (S.D. Tex. 2002), *aff'd*, 332 F.3d 854 (5th Cir. 2003).

These authorities also dispose of Plaintiffs' attack on agilon's statement about growth—that it had the "ability to add new physician partners and to attract additional PCPs to our physician partners." ¶¶ 97, 121, 271, 274. That too is a generalized expression of optimism. And notably, Plaintiffs do not challenge the more specific statement through which agilon substantiated its positive characterization. After describing its growth model in favorable terms, agilon noted that "[f]or example, in Ohio we have grown from one physician partner to five physician partners, approximately 180 PCPs to approximately 360 PCPs and approximately 21,000 members to approximately 65,000 members in fewer than four years." Ex. 1 at 99. Plaintiffs do not and cannot question those figures.

15

Beyond this, Plaintiffs' own allegations contradict any inference of falsity. Plaintiffs allege that "a substantial portion of agilon's growth came from adding new physicians in mature markets." ¶ 78. They further allege that by 2023, agilon had signed on "hundreds of physicians in new markets." ¶ 90. Plaintiffs cannot plausibly attack agilon's statement that it had the ability to grow by adding physicians while at the same time affirmatively stating that the Company had done exactly that. Plaintiffs go on to claim that agilon was unable to provide the new physicians with adequate training, ¶ 98(d), but that hindsight-based assertion says nothing about agilon's ability to add and attract physicians.

### 2.    **Statements about visibility**

Plaintiffs next challenge agilon's statement that its model "provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups." ¶¶ 95, 120, 269, 274. Plaintiffs claim that this statement was false because agilon was purportedly unable to "accurately track[], manag[e] and forecast[] members' medical costs and medical margin." ¶ 98.

Plaintiffs' claim again fails on falsity and materiality grounds when the statements are viewed in context, as they must be. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 214 (5th Cir. 2004) (information is material only if "it would have altered the way a reasonable investor would have perceived the total mix of information available in the prospectus as a whole"). agilon repeatedly explained and extensively cautioned investors about the limits inherent in its financial reporting and estimation processes. As a legal matter, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."

16

*Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 624 (N.D. Tex. 2009) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)).

That is exactly the case here.  agilon included detailed and on-point explanations and cautionary language in its offering documents.  The Company told investors that as a matter of financial reporting, it relies on estimates "to determine revenues and related receivables from risk adjustment [and] medical services expense and related payables[.]" Ex. 1 at 106.  agilon then explained that this poses risks: "Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period." *Id.* at 42.  agilon also tailored its warnings to the context of the then-ongoing pandemic, telling investors that "[m]anagement's estimates for revenue recognition, medical services expense and other estimates, judgments and assumptions may be materially and adversely different from actual results as a result of the COVID-19 pandemic, among other things." *Id.* at 106.

By disclosing that its estimates could prove to be inaccurate, particularly in relation to the ongoing impact of COVID, agilon warned investors of the same limits on visibility that Plaintiffs allege it concealed.  As a matter of law, that renders immaterial any purported falsity in the statements.  Similar risk disclosures were fatal to Section 11 claims in *Marquez v. Bright Health Group Inc.*, another case against a company in the healthcare industry that went public in 2021 and failed to meet forecasts due in part to unexpected costs associated with COVID.  2024 WL 4654137, at *8 (E.D.N.Y. Nov. 1, 2024).  There, as here, the company warned that its estimates were based on third-party data and actuarial assumptions, and that it could face difficulties in forecasting medical claims liability. *Id.* at *2, 8.  The court dismissed the claims on that basis.

Plaintiffs' challenge to the visibility statements fails for additional reasons.  Plaintiffs

17

allege no facts contradicting the statements—contemporaneous facts showing that agilon *lacked* visibility. And agilon's statements about "significant visibility," like its positive statements about its business model, are too vague to be actionable under controlling law. The term "significant visibility" is not objectively verifiable, and thus cannot support a securities claim. *Supra* at 16-17.

### 3.     **Statements about data and data management**

Plaintiffs finally challenge statements about technology—specifically, that agilon had the ability to "deliver actionable insight at the patient and physician level," and that its "platform extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience." ¶¶ 94, 96, 267-70.

Again, Plaintiffs allege no facts—with particularity or otherwise—suggesting that these statements were materially false or misleading when agilon made them in the 2021 IPO and SPO offering documents.[8]   Once again, the statements were qualified by agilon's risk disclosures. agilon warned investors that it depended on third parties to provide data—specifically, that it relied on the private health insurers with which it contracted through the capitation agreements. As the Company explained, "[w]e rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions . . . we may not receive complete and accurate information necessary to effectively manage our business." Ex. 1 at 48. Plaintiffs ignore this context, which is critical to assessing whether the challenged statements were false or misleading. *Supra* at 15 (citing authorities).

In attacking agilon's statements about technology and data, Plaintiffs rely heavily on a May

---

[8] Plaintiffs do not challenge statements about data integration in agilon's 2023 SPO offering documents. ¶¶ 273-74.

2024 letter sent by agilon and a number of its physician partners to the Centers for Medicare and Medicaid Services (CMS).  ¶ 272(a).  But that letter, like the challenged statements themselves, can properly be assessed only against the background of the risks agilon disclosed—and only against the chronology of agilon's post-IPO forecasting.  agilon's physician partners sent the letter more than three years after the challenged IPO statements.  The physicians sought to enlist the government's help in obtaining "more complete and timely data" from private health insurers.  Ex. 27 at 969.  The letter confirms what agilon consistently told investors—that it relies on data from third parties to run its business and to generate financial reports, and that when third parties do not provide data as they should, agilon's ability to manage certain aspects of its business may suffer.  *Supra* at 8-9, 18-19.  Elsewhere in the letter, moreover, the physicians corroborated agilon's positive statements about its business model and use of data.  The physicians told CMS that their partnership with agilon enables them to "view a streamlined dashboard comprised of data from disparate sources" and thereby to "better understand who [their] most vulnerable patients are and when they are utilizing health care benefits through Medicare."  Ex. 27 at 970.  That is entirely consistent with the statements Plaintiffs attack.  The letter does not show falsity.

Finally, agilon's statements about data are non-actionable expressions of corporate optimism—statements that the Company's data platforms "enable easy consumption . . . to improve quality of care, cost and patient experience," and provide "actionable insights."  ¶ 96.  And here too, Plaintiffs contradict themselves.  They themselves claim that physicians perform better with more training on agilon's platform.  ¶ 79.  Plaintiffs cannot both make that claim and plausibly allege falsity as to agilon's statement that its platform improves the "quality of care, cost and patient experience."  ¶ 268.  Because Plaintiffs fail to allege that any challenged statement was

19

materially false or misleading when made, they cannot state a claim under Section 11.[9]

B.    **Plaintiffs' Section 10(b) Claim Fails on Falsity Grounds**

In their Section 10(b) claim, Plaintiffs attack, seemingly indiscriminately, scores of statements agilon made in earnings calls and at investor conferences between April 2021 and January 2024. Plaintiffs allege fraud as to seemingly everything agilon said about value-based healthcare, the design and performance of its forecasting processes, its work with its physician partners, the growth of its business, healthcare utilization trends, and—of course—the 2023 medical margin guidance that agilon adjusted in what Plaintiffs claim were corrective disclosures.

This kitchen-sink approach runs up against the PSLRA's heightened pleading standards. Claims under Section 10(b) are not limited to statements in offering documents, but they are subject to demanding substantive and procedural requirements. Plaintiffs must identify with particularity the reasons each statement was purportedly false or misleading when made. 15 U.S.C. § 78u-4(b)(1). They must also plead particularized facts supporting a "strong inference" of scienter. § 78u-4(b)(2). Plaintiffs have not satisfied these requirements for any of the challenged statements, let alone all of them.

For the Court's convenience, we group the challenged statements into six categories, covering the following subjects: (1) agilon's medical margin guidance and the bases of its financial projections, (2) agilon's business model, (3) agilon's data integration, (4) agilon's growth strategy, (5) healthcare utilization trends, and (6) agilon's reported financial results. We discuss falsity in

---

[9] The failure of Plaintiffs' claim for primary liability under Section 11 also disposes of their control person claim under Section 15. The latter claim depends on a predicate violation under Section 11 or another provision of the Securities Act. *Rosenzweig*, 332 F.3d at 863.

this section and scienter in the next.[10]

1.    **Plaintiffs' attack on agilon's guidance and statements about financial forecasting fails on falsity grounds**

agilon provided medical margin and EBITDA guidance to the market on March 1, 2023, and revised aspects of that guidance in August 2023, November 2023, January 2024, and February 2024.  *Supra* at 10-12.  Plaintiffs challenge both the statements containing or explaining the guidance itself, *e.g.*, ¶¶ 138, 140-41, 143-44, 146, 156, 159, 178, 190, and agilon's statements about its ability to forecast its financial performance, *e.g.*, ¶¶ 100, 164, 169-70, 177, 184.

Plaintiffs fail to allege with the required particularity that either set of statements was materially false or misleading when made.  The guidance itself falls squarely within the PSLRA's safe harbors for forward-looking statements.  The safe harbors protect, among other things, any "statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(C).  Two safe harbors apply here.  The first covers any statement identified as forward looking and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ." § 78u-5(c)(1)(A).  The second covers any statement made without "actual knowledge by [the speaker] that [it] was false or misleading."  § 78u-5(c)(1)(B).  The two safe harbors operate disjunctively:  A statement is protected if it falls within either.  *Southland,* 365 F.3d at 371-72.

*agilon's guidance comes within the meaningful cautionary statements safe harbor.*  The challenged guidance falls within the first safe harbor.  When agilon provided the guidance on March 1, 2023, it told investors it was making forward-looking statements.  Ex. 13 at 639.  agilon

---

[10] As noted, the Section 10(b) defendants are agilon and four of its officers.  Plaintiffs' allegations are overwhelmingly concentrated on two of the four—the Company's CEO (Sell) and former CFO (Bensley).  We address the defects in Plaintiffs' claims against the remaining two officers, Venkatachaliah and Hittner, at the end of this brief.  *Infra* at 45-46.

also referred investors to the risk disclosures in its most recent Form 10-K.  *Id.* agilon did the same

in subsequent adjustments to the guidance.  Ex. 14 at 661; Ex. 18 at 729; Ex. 21 at 803.

In its risk disclosures, agilon alerted investors to the following:

- Medical expenses are subject to "utilization rates of healthcare services, including inpatient hospitalization, by our members" and "[t]he utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members."  Ex. 11 at 562.

-  "The spread of COVID-19 and its impact on the worldwide economy and the healthcare industry underscores risks [the Company] face[s]," and "[t]he rapid development and fluidity of COVID-19 precludes any prediction as to the ultimate impact on us of COVID-19." *Id.* at 565.

- "COVID-19 has . . . resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members." *Id.* at 565.

- "Given the numerous uncertainties inherent in [medical margin] estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period.  Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served." *Id.* at 566.

By means of these disclosures, agilon warned investors of its dependence on estimates, and of the

vulnerability of those estimates to changes in the medical landscape, including the extraordinary

changes wrought by COVID-19.  agilon's investors knew that the estimates on which the Company

relied—even in historical financial reporting—were subject to error.  Plainly, the risk was even

greater when agilon sought to project its performance in future periods.

These disclosures easily satisfy statutory requirements.  agilon identified "important

factors that could cause actual results to differ materially from those in the forward-looking

statement."  § 78u-5(c)(1)(A)(i).  The Company provided "substantive company-specific warnings

based on a realistic description of the risks applicable to the particular circumstances, not merely

22

a boilerplate litany of generally applicable risk factors." *Southland,* 365 F.3d at 372 (internal quotations marks and citation omitted).  That is sufficient.

*agilon's guidance comes within the actual knowledge safe harbor.*  The actual knowledge safe harbor also covers the guidance.  Plaintiffs cite nothing suggesting that agilon's executives actually knew the guidance was wrong.  Plaintiffs draw on agilon's reference in November 2023 to a "spike" in utilization between May and June 2023, and jump to the conclusion that agilon knew that its medical margin guidance was unachievable as a result of the spike. *E.g.,* ¶ 12.  That is plainly wrong as a matter of chronology.  agilon issued the guidance in March 2023.  It could not have known about a May-June "spike" at that time.  *See also infra* at 30-31 (discussing defects in Plaintiffs' "spike" allegation as to subsequent challenged statements).

*Both safe harbors apply to agilon's reiteration of the guidance in 2023 and issuance of new guidance in 2023 and 2024.*  The two safe harbors apply equally to agilon's reiteration of the guidance in a presentation on May 9, when agilon again referred investors to its risk disclosures. Ex. 14 at 661.  And Plaintiffs again plead no facts suggesting that agilon or its executives actually knew that reiteration of the guidance was false or misleading.  Plaintiffs cite an analyst's May 9 question about what agilon refers to as a "prior-year development" or PYD.  ¶ 148.  agilon incorporates PYDs into its financial statements when it learns in one period that claims in an earlier period have exceeded the medical expense estimate the Company used in financial reporting for that earlier period.  ¶ 224.  agilon recognizes PYD expenses in the later period—the period in which it becomes aware of them.  *Infra* at 32-33.  During the May 9 call, agilon's CFO, Bensley, attributed a $28.5 million PYD charge to a "'couple of old' claims," which he did not believe "signif[ied] any fundamental issues with agilon's model or level of visibility." ¶ 148.  Plaintiffs allege nothing contradicting that explanation.

23

Moving ahead in time, Plaintiffs allege that even as agilon was adjusting its guidance downward—in August 2023, November 2023, and January 2024—it was deceiving investors, and that each revised figure was itself a renewed fraud.  ¶¶ 158-59, 173, 174, 182-83, 188-91.  But the revised guidance, like the original guidance, was identified as forward-looking and accompanied by risk disclosures.  Ex. 18 at 729; Ex. 21 at 803; Ex. 23 at 838.  These later statements therefore also come within the cautionary statement safe harbor.  They are also protected by the actual knowledge safe harbor:  Plaintiffs do not plead facts suggesting that Sell or Bensley actually knew that the newly-issued guidance was false or misleading.

*Plaintiffs' attack on agilon's statements about predictability and visibility fails for similar reasons.*  In addition to the guidance itself, Plaintiffs challenge agilon's statements about the "predictability" of its model and its "visibility" into financial outcomes.  Those statements include or refer to the following:

- "We have tremendous visibility into both growth and embedded margins in our existing PCP groups." ¶ 131.
- "before we go live, we have really, really strong visibility into exactly what's happening . . . . we have really great confidence and visibility in our long-term value drivers." ¶ 155.
- agilon's "model has natural advantages in terms of leading indicators and visibility" ¶ 163.
- the model's "durability and predictability."  ¶ 165; *see also* ¶ 158.
- agilon's "visibility on the key levers for driving next year's performance." ¶ 165.
- agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024." ¶ 177.
- agilon was "confident in its ability to capture payor data and build its accruals based on that data, and that it was not seeing any broad, pervasive problems." ¶ 184.

Whether or not these statements come within the safe harbors, Plaintiffs fail to satisfy the PSLRA's requirements.  Plaintiffs once again plead no facts showing that the statements were false or misleading when made, let alone made with a deliberate intent to defraud.  Among other things,

24

Plaintiffs disregard agilon's history of successful forecasting.  agilon met its 2021 and 2022 guidance for medical margin and EBITDA.  *Supra* at 9-10.  agilon's past forecasting success provided its executives with an empirically reasonable basis for their confidence.

Plaintiffs also ignore agilon's extensive risk disclosures and careful explanation of its dependence on estimation even for historical financial reporting.  *Supra* at 8-9.  Those risks increase when forecasting future performance.  The same is true of the other risks agilon disclosed and repeated in its periodic filings—that it depended on third parties to provide data and could be adversely impacted if the payors failed to provide timely and complete information.  *Id.*; Ex. 1 at 48.  Indeed, in the very statements Plaintiffs challenge, agilon highlighted the risk for its Medicare Advantage business in particular.  A small number of patients for whom agilon is responsible are covered by the ACO Reach program, and the Company told investors in August 2023 that claims data for these patients was "90% complete," which provided "incredibly high visibility" in this area.  ¶ 169.  Bensley contrasted this with the situation for Medicare Advantage patients, who make up the vast majority of agilon's business.  Medicare Advantage, Bensley explained, involves a "complex situation of payers," which "makes it more difficult to do . . . estimation."  Ex. 18 at 737.  Bensley candidly referred to "the blind spots" in the estimation process.  *Id.*  He also highlighted the risk that utilization (and hence expense) could increase as the year went on.  agilon had not yet itself experienced that wider industry trend, but Bensley told investors that "there could be a change . . . in utilization trends in the second half."  *Id.* at 734; *infra* at 31, 40.

***The challenged statements about predictability and visibility are also non-actionable expressions of corporate optimism.***  Finally, Plaintiffs' attack on agilon's positive statements about its forecasting processes fails under Section 10(b) for the same reason it fails under Section 11.  The statements agilon made on this subject throughout the putative class period, like the

statements in the offering materials, are generalized expressions of corporate optimism that the Fifth Circuit has held are immaterial a matter of law. *E.g., Southland*, 365 F.3d at 372 ("positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial.").[11]

        2.      **Plaintiffs' attack on statements about agilon's business model fails on falsity grounds**

Plaintiffs next take aim at agilon's statements about the advantages and distinguishing characteristics of its business model. *E.g.*, ¶ 108 (high-visibility partnership model); ¶ 109 ("[our] ability to drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model"); ¶ 113 (agilon's "high-touch primary care model really distinguishes us" and "[t]he quality of our economic model has allowed us and will continue to allow us to deliver predictable results in periods of volatility"); *see also* ¶¶ 116, 129, 134, 136, 151, 158, 163, 166-67, 176-77.

Plaintiffs have not pled facts showing that these statements were false or misleading. The terms "high touch," "differentiated," and "high-visibility partnership model" all refer to value-based care in which primary-care physicians see patients frequently to improve health outcomes and manage healthcare costs. *E.g.*, ¶¶ 65, 129. Plaintiffs do not dispute that agilon's business is built on this model, or that this distinguishes it from traditional fee-for-service medicine.

Plaintiffs' real complaint appears to be that they do not believe the model works: Plaintiffs repeatedly attack agilon's statements that the model is capable of producing predictable results and

---

[11] *Southland* is very closely on point. Like Plaintiffs here, the *Southland* plaintiffs challenged statements about predictability. Ex. 28 at ¶ 40 (challenging statement that "contract wins so far demonstrated demand was strong and provided increased visibility as to future revenues and earnings").

cost savings. *E.g.*, ¶¶ 109, 113, 116, 119. Here too, Plaintiffs fall far short on falsity grounds. agilon did not promise a particular quantum of cost savings; the challenged statements were general and largely aspirational. *E.g.*, ¶ 109 ("we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market"; reference to Company's "ability to 'drive sustainably lower costs'"). At the same time, agilon and its physician partners *did* experience— and profit from—cost savings. Without such savings, agilon would not have been able to report any medical margin at all. Medical margin is by definition the difference between medical services revenue and medical services expense. *Supra* at 7. Plaintiffs' core theory is that agilon did not save as much as it predicted—not that its model failed to produce cost savings generally. *Cf.* ¶ 79 (alleging that newer physicians averaged savings 80% lower than physicians with more training and experience in agilon's model).

Finally, like the aspirational statements just cited, the bulk of agilon's statements about its business model are not actionable under Fifth Circuit law on generalized expressions of corporate optimism. *E.g.,* ¶ 100 ("high degree of visibility into future revenues and margin progression"); ¶ 129 ("real differentiators in our model is in the high-touch nature"); ¶ 136 ("benefits of the high-touch model [include] . . . better satisfaction, better health outcomes and ultimately lower costs and better margins overall"); ¶ 158 ("durability and predictability of our partnership model enabled agilon to deliver strong performance").

3. **Plaintiffs' attack on statements about data integration fails on falsity grounds**

Plaintiffs next challenge agilon's statements about its processes of integrating data for physicians to use. *E.g.*, ¶ 122 ("The integration that we're seeing with our largest payers, the joint operating committees, we have standard data formats with them."), ¶ 130 ("it really goes back to that high-touch relationship between the physician and patient and making sure they have the data

27

they need"); *see also* ¶¶ 103, 123, 124, 126, 139, 145, 184. Plaintiffs claim that these statements are inconsistent with "gaps," "lags," and "blind spots" in the data. ¶¶ 112, 137, 157(e). But agilon *disclosed* these vulnerabilities to investors during the putative class period; it did not conceal them. ¶¶ 163, 168, 169; *supra* at 8-9, 25. Resorting to hindsight, Plaintiffs note that in 2024, after it had adjusted guidance three times, agilon told investors that it had re-assessed and improved certain forecasting processes. ¶ 157(h). That does not show that the challenged statements were false or misleading when made. *E.g., Bright Health*, 2024 WL 4654137, at *3 (health insurer's statement, after guidance miss, that it had been unable to "accurately capture the risk of [its] members" does not show that challenged statements were false or misleading when made).

In other ways too, Plaintiffs' purported reasons for falsity simply do not align with or contradict the challenged statements. Plaintiffs allege no facts suggesting that agilon cannot have been confident in its forecasting ability—with all the caveats it made to investors—at the same time it was aware of certain gaps in its data. Where there is no disconnect, there is no fraud. *See, e.g.*, *Whole Foods*, 905 F.3d at 901 ("just because [the company's] prices were not *as* competitive as advertised, it need not follow that they were not competitive"). Plaintiffs do not allege that agilon told investors it had perfect access to data. Indeed, agilon said the opposite. *Supra* at 8-9.

As with their challenge to statements about data and technology, Plaintiffs again invoke the letter agilon's physician partners sent to CMS in May 2024. *Supra* at 19. As discussed, the letter shows that physicians were at times frustrated by the failure of private health insurers to provide timely, complete, and well-organized data. That does not show fraud, even setting aside the obvious chronological problem inherent in challenging statements dating back to 2021 by means of a letter in 2024. agilon did not conceal the issues it faced in obtaining data from private insurers. It disclosed them explicitly, at multiple times and in multiple ways. *Supra* at 8-9, 18-19.

28

4. **Plaintiffs' attack on statements about growth fails on falsity grounds**

Plaintiffs next challenge agilon's statements about growth.  One way in which agilon grew, as it told investors, was by adding new physicians to geographical areas and practice groups in which agilon-affiliated physicians were already operating.  agilon referred to these as "mature" markets.  ¶ 75; *see also, e.g.*, ¶¶ 100-02, 105, 110-11, 115, 133, 144, 147.  Plaintiffs do not dispute that agilon was in fact growing its business in this way.  They affirmatively state it was doing so. ¶189(c); *supra* at 9.  The same applies to challenged statements about future growth.  *E.g.*, ¶ 187.

Plaintiffs' real complaint, again, is that they disagree with the way agilon was running its business.  According to Plaintiffs, agilon's growth model was neither "efficient" nor "sustainable," and the Company purportedly misled investors by describing it that way.  *E.g.*, ¶¶ 101, 147.  As they do throughout the CAC, Plaintiffs rely on hindsight.  They pluck information from agilon's 2024 disclosures and assume without support that the conditions agilon identified at that time had existed for the prior three years—and that agilon knew about this and deliberately concealed it from investors.  agilon told investors on January 5, 2024, that it had "failed to appreciate" issues that may arise when new physicians are added in mature markets, but that the Company had an "opportunity to do a better job in terms of onboarding and educating these newer doctors[.]" Ex. 23 at 838.  Setting aside the temporal disconnect, that explanation does not show fraud because it does not contradict agilon's statements that its growth model was "efficient" and "sustainable."

5. **Plaintiffs' attack on statements about utilization fails on falsity grounds**

Plaintiffs next challenge agilon's statements about utilization trends.  *E.g.,* ¶¶ 114, 149, 161, 162, 167-68, 171, 172, 179, 180-81, 185, 186.  agilon discussed both what its own data showed about utilization and industry commentary about utilization trends, noting that the industry data did not in all cases align with agilon's experience.

Plaintiffs challenge statements beginning in June 2022, nine months before agilon provided the guidance at the center of this litigation. In response to an analyst's question, Sell stated "I don't know that we believe there's a massive set of pent-up demand." ¶ 114. Plaintiffs plead no facts showing that pent-up demand did in fact exist at that time. Nor does Plaintiffs' attack on this opinion statement— "I don't *know* that we *believe*"—come within the three narrow channels the Supreme Court set out for challenging opinion statements in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Plaintiffs fail to allege that Sell did not "honestly h[o]ld" the belief he expressed, that Sell omitted particularized and material facts about the inquiry or knowledge on which his opinion was based, or that any embedded factual statement was false. *Id.* at 185-86, 194.

Plaintiffs then jump ahead nearly a year. In a May 2023 statement, addressing first-quarter 2023 results, Sell stated that "utilization was very much in line with what we would expect." ¶ 149. Plaintiffs plead no facts to the contrary. They cite agilon's November 2023 reference to a utilization spike in the *second* quarter of 2023. *Supra* at 11-12, 23. Plaintiffs provide no basis for pushing either the spike or agilon's purported awareness of it back to the first quarter.

Plaintiffs' attack on agilon's statements about second-quarter trends—in its August 2023 earnings call—fails for a different reason. During this call, both Sell and Bensley referred to industry commentary and speculation about higher utilization but noted that agilon had not to date discerned such a trend in the data it currently had. Sell stated that agilon "had not seen any meaningful change in our expected cost trend, including outpatient procedures." ¶ 163. Bensley noted that the Company "did see some increased utilization in May," but that it appeared to be moderating. ¶ 180. At the same time, Bensley reminded investors about the well-known "lag on the [Medicare Advantage] claims." ¶ 169; *see supra* at 8-9, 22 (discussing risk disclosures

concerning the lag).  In light of these factors, Bensley announced, agilon was increasing reserves to account for "blind spots and also just to cover the possibility and be respectful of the fact that there may be some change and [sic] utilization in the back half of the year." ¶ 168.

As part of the same discussion, Sell outlined possible explanations for the difference between what others in the industry were seeing—a trend of increased utilization—and what agilon was seeing—no sustained trend.  ¶¶ 161-64 (identifying agilon's focus on primary care and utilization management through healthcare providers "on the ground").  Against that background, Sell told investors "We *believe* this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization."  ¶ 161.  Plaintiffs dispute that explanation, but again fail to come within the narrow channels for challenging opinion statements. Plaintiffs do not allege that Sell disbelieved the stated opinion, omitted material facts about its basis, or made an embedded factual statement that was materially false or misleading.  *Supra* at 30 (citing *Omnicare*); *Plains*, 307 F. Supp. 3d at 635 (dismissing both Section 10(b) and Section 11 claims challenging opinion statements).

Ultimately, agilon determined that its business was vulnerable to the same COVID-related increased utilization trends seen elsewhere in the healthcare industry.  *Supra* at 10-11.  It was this trend that put agilon's 2023 guidance out of reach; the expected persistence of that trend meant that agilon revised its 2024 guidance at a very early point too.  ¶ 203.  But Plaintiffs' allegations do not show that agilon knowingly concealed bad news.  The allegations show that when agilon saw that changes in utilization put the guidance in peril, it told investors this—three times in succession over a period of four months.  That alone strongly suggests that agilon was reacting to new information, not concealing information to mislead the market.  Far from defrauding investors, agilon took responsibility for flaws in its forecasting processes when it learned of them.

31

6.      **Plaintiffs' attack on reported financial results fails on falsity grounds.**

Plaintiffs finally claim that agilon's historical financial reporting for the second and third quarters of 2023 was inaccurate.  ¶¶ 156, 160.  They say that agilon overstated second-quarter medical margin by $45 million and third-quarter medical margin by $31 million.  ¶¶ 173(e), 188(e). Plaintiffs appear to pull these figures from agilon's presentations during its November 14, 2023 conference call and January 5, 2024 investor call, both of which they cite.  ¶¶ 88-89, 185.

In its November 14 presentation, agilon stated that "May/June/July costs were $30M higher than expected[.]" Ex. 22 at 828.  On January 5, 2024, agilon identified $18 million of second-quarter medical expenses in excess of expectations.  Ex. 24 at 867.  The Company also identified $31 million of third-quarter medical expenses in excess of expectations.  *Id.*  None of these figures shows that agilon's historical financial reporting was inaccurate.  Plaintiffs do not allege that agilon was ever required to restate any quarterly or annual financial report.

Plaintiffs are improperly trying to convert into financial statement fraud what was in reality an entirely acceptable and well-understood feature of agilon's financial reporting.  In its SEC filings, agilon consistently advised investors that it uses estimates and assumptions in reporting financial results, and that those estimates are based on "the best information available at the time . . . historical experience, known trends and events, and various other assumptions that we believe are reasonable under the circumstances." Ex. 20 at 797; *see also supra* at 8.  The Company then explained what happens if later events show that the estimates used to generate already-reported financial results prove to be inaccurate:  "In the event estimates or assumptions prove to be different from actual results, adjustments are made in *subsequent periods* to reflect more current estimates and assumptions about matters that are inherently uncertain." Ex. 20 at 797 (emphasis added).   agilon was crystal-clear about the matter: "Each period, the Company re-examines

previously established medical claims payable estimates based on actual claim submissions and other changes in fact and circumstances. . . . As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates *in the period in which the change is identified*." Ex. 11 at 621 (emphasis added).

The variance between the estimate-based reported medical margin for the second and third quarters of 2023 and actual results for those periods thus does not show that the challenged figures were false. That variance is part of the Company's business and financial reporting, and investors understood this. Plaintiffs' financial statement fraud allegations depend entirely on a misunderstanding of—or willful refusal to acknowledge—well-disclosed and well-understood aspects of the Company's financial reporting.

C.      **Plaintiffs' Section 10(b) Claim Fails on Scienter Grounds**

Plaintiffs have not satisfied the PSLRA's demanding scienter pleading standards as to any of the six categories of statements just discussed. Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That inference must be "more than merely plausible or reasonable—it must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *Alaska Electrical Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) (emphasis added). "The strong inference standard unequivocally raised the bar for pleading scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 321 (2007).

The substantive scienter standard is equally demanding. "In this circuit, the required state of mind for scienter is an intent to deceive, manipulate, defraud or severe recklessness." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (quotation marks omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely

simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.* at 536 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).  A Section 10(b) plaintiff can create a strong inference of scienter on the part of a corporation only by showing scienter on the part of an individual officer or employee.  *Southland*, 365 F.3d at 366.

Plaintiffs' scienter allegations are most notable for what they lack.  Plaintiffs identify no person inside or outside the Company who (1) believed any challenged statement was false or misleading, (2) raised concerns about any statement to agilon's executives, or (3) has cast doubt in any way on the executives' own beliefs that they were speaking truthfully.  The CAC contains no confidential witness allegations and no references to internal documents bearing on the individual defendants' state of mind (or, indeed, on falsity).

The absence of such allegations profoundly impairs a Section 10(b) plaintiff's ability to create the required strong inference of intentional deceit.  *E.g., Owens,* 789 F.3d at 545 (affirming dismissal on scienter grounds where plaintiffs "did not allege that [the defendant executive] was ever informed of internal disagreements or warnings regarding" the company's estimates of asset value, or that the executive "received any communications from any . . . confidential witnesses"); *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 577 (W.D. Tex. 2017) (partial dismissal where plaintiffs made "no allegation [the executive] actually saw or received" an internal report); *see also, e.g.*, *City of Monroe Emps' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *1 (S.D.N.Y. Sept. 19, 2011) (dismissing where, "unlike [in] many securities class actions, plaintiffs do not rely on a single confidential witness or internal document in order to support their allegations").  By the same token, courts reject "unsupported general claim[s]" about witnesses or

34

company reports that purportedly contradict challenged statements. *Baker Hughes*, 292 F.3d at 432; *Tran v. XBiotech Inc*., 2016 WL 5408382, at \*9 (W.D. Tex. Sept. 23, 2016).

In the absence of factual information about what Sell and Bensley believed, Plaintiffs speculate about what those executives must have known based on agilon's business model, or on industry discussion of utilization trends in the summer of 2023. Taken separately or together, those allegations do not support an inference of deliberate fraud, let alone an inference as cogent or compelling as the obvious benign one—that agilon's executives provided guidance they believed the Company could achieve, and described in positive terms features of the business in which they had confidence. Notably, Plaintiffs cannot explain why agilon would provide guidance it knew it could *not* achieve, or would highlight visibility as an advantage of its model if it knew visibility was poor. Nor can Plaintiffs reconcile agilon's successive revisions of guidance with a deliberate effort to deceive investors: agilon had nothing to gain by reporting in three successive disclosures over a four-month period that it would not achieve its forecasts.

### 1.    **Plaintiffs' motive allegations are deficient**

Because Plaintiffs cannot establish scienter directly, they seek to do so circumstantially, first by alleging motive. The Fifth Circuit has held that "[a]n important aspect of pleading scienter is establishing motive," while also recognizing that "[m]otive alone . . . is generally insufficient to support a strong inference of scienter." *Oklahoma Firefighters Pension and Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 215 (5th Cir. 2023) (citing *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc*., 810 F.3d 951, 958 (5th Cir. 2016)). To establish motive, a Section 10(b) plaintiff must identify "concrete benefits" a defendant could realize by means of the allegedly false statements. *Id.* Plaintiffs have not done that here.

***Stock sales.*** The sole fact-based motive Plaintiffs allege relates to stock sales. Plaintiffs

35

note that Sell made a single sale in September 2021. An executive's stock sales can support an inference of scienter only if made "at suspicious times or in suspicious amounts." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552–53 (5th Cir. 2007).

The timing of Sell's stock sale is the opposite of suspicious. The sale predates the challenged guidance by 18 months and the alleged mid-2023 "spike" in utilization by even longer. Based on timing, the stock sale provides no motive for the bulk of the challenged statements, including the guidance at the core of the case. Where Section 10(b) plaintiffs "make no allegations that . . . sales are out of line with prior trading practices or at times calculated to maximize personal profit," those sales contribute nothing to the scienter analysis under Fifth Circuit law. *Baker Hughes*, 292 F.3d at 435. Further, "[e]ven unusual sales by one insider do not give rise to a strong inference of scienter" when other "equally knowledgeable" insiders make no such sales; the absence of sales by other executives is "inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.'" *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 813 (N.D. Tex. 2006) (internal quotations omitted). Plaintiffs do not allege stock sales by any other agilon officer.

Plaintiffs rely heavily on sales by CD&R Vector Holdings, L.P. ¶¶ 213-215, 327, 330. The CD&R Defendants have shown in their own brief that those sales do not support a strong inference of deliberate fraud. From the perspective of the Section 10(b) defendants, what is most notable is the disconnect between the sales and the challenged statements. Vector did not make any of those statements, and Plaintiffs do not allege that Vector played any role behind the scenes. Vector's sales have no bearing on the state of mind of agilon's executives—and it is only through the scienter of the executives that any inference of scienter on the part of agilon could arise.

***Other alleged motives.*** Apart from stock sales, Plaintiffs speculate that agilon and its

36

executives wanted to maintain the Company's stock price to facilitate growth by adding and retaining new physicians or groups. ¶¶ 234-37. Because such allegations could be made against any company and its executives, they cannot support a strong inference of fraud. *E.g.*, *Owens*, 789 F.3d at 539 (motives shared by "virtually all corporate insiders" do not support a strong inference of scienter); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("desirability for growth is too universal a corporate goal to constitute a basis for scienter"); *Tran*, 2016 WL 5408382, at *8 (motivation to inflate stock price and thereby raise capital supports "a weak inference of scienter," if "any inference at all."). Plaintiffs' defective motive allegations cannot support a strong inference of fraud.

2.      **Plaintiffs' references to the May 2024 CMS letter do not support an inference of scienter**

In the absence of facts establishing motive, Plaintiffs again turn to the letter agilon's physician partners sent to CMS in May 2024, months after the end of the putative class period. ¶¶ 241-46; *supra* at 19, 28. The authors of the letter note that private health insurers (referred to as "MA plans") exchange "comprehensive data" with CMS, a system that "works very well." Ex. 27 at 970. The MA plans are not, however, required to share the same data with physicians — although agilon's physicians partners bear financial risk, just as insurers do. *Id.* As a result, while "CMS and MA plans exchange very detailed, standardized data files outlining payment data," the physicians "instead receive altered and often delayed non-standard data files that vary in format and quality." *Id.* The physicians asked CMS to intervene by requiring the MA plans to provide the same comprehensive and standardized data to "downstream" parties. *Id.* at 971.

Plaintiffs invite the Court to infer based on the CMS letter that Sell and Bensley deliberately deceived investors. No such inference is warranted. The letter, again, post-dates the end of the putative class period by months. It post-dates the challenged 2023 guidance by more

37

than a year and the earliest challenged statements by more than three years. The physicians do not say when the data issues they identify began, or when they became aware of those issues. They certainly do not suggest that agilon concealed issues with the data. Nor could they. As discussed, the Company alerted investors to those issues, identifying the MA plans in particular. *Supra* at 25.

The letter does not contradict the challenged statements; it does not show falsity, let alone scienter. The point of the letter is that physicians who provide value-based care assume risk—just like health insurers—but do not receive data in the same well-organized way the insurers use with CMS. The physicians instead receive "non-standard data files" in which information may be missing and generally comes late. agilon did not say otherwise. Again, agilon warned investors, as Plaintiffs observe, that the MA plan data it receives "has some lag." ¶ 163. And Plaintiffs plead no facts suggesting that the flaws in the data agilon knew about—and told investors about—were so significant that they undermined Sell's or Bensley's belief in agilon's guidance, or in the truth of any other challenged statement.[12]

### 3. Plaintiffs' core operations allegations are deficient

Plaintiffs next contend that Sell and Bensley knew that medical margin, earnings, and medical costs and utilization rates were "central to agilon's core business." ¶ 221. They seek thereby to invoke the "core operations" doctrine—an "extremely narrow exception to the rule that scienter may not rest on the inference that defendants must have been aware of the alleged

---

[12] Plaintiffs seek to manufacture a contradiction between the CMS letter and the challenged statements by accusing agilon of "repeatedly emphasiz[ing] [its] comprehensive data on patient utilization, medical costs and other metrics." ¶ 217 (heading; capitalization altered). But "comprehensive" is Plaintiffs' word, not agilon's. agilon warned investors from the beginning that it "may not receive complete and accurate information necessary to effectively manage our business." Ex. 1 at 48; *see also id.* at 49 (risk disclosure titled "Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.").

misconduct based on their positions within [a] company." *Hall v. Rent-a-Center*, 2017 WL 6398742, at *33 (E.D. Tex. Oct. 19, 2017) (quoting *Baker Hughes*, 292 F.3d at 432). Under Fifth Circuit law, only "special circumstances" can justify considering an officer's position as part of the demanding scienter analysis. *Diodes*, 810 F.3d at 958-59. The *Diodes* court outlined four inquiries that may be relevant in assessing whether such special circumstances are present: (1) the size of the company, (2) whether a given transaction was "critical to the company's continued vitality," (3) whether the purported falsity of the challenged statements would have been "readily apparent" to an executive, and (4) whether an executive made internally inconsistent statements. *Id*. at 959. None of those inquiries justifies an inference based on "core operations" here.

First, agilon is a large company, with over 1000 employees. Ex. 26 at 925. The Fifth Circuit has held that this factor weighs against any core operations inference even where a company has as few as 60 employees. *Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017); *see also Flotek*, 915 F.3d at 985. This in itself is dispositive unless Plaintiffs can provide more. The Fifth Circuit has "never found special circumstances permitting an inference of scienter based solely on a defendant's position when the company was large." *Flotek,* 915 F.3d at 985.

Second, Plaintiffs have not identified a transaction "critical to the company's continued vitality." *Diodes*, 810 F.3d at 959. To the contrary, Plaintiffs' claim concerns a routine part of business. Most public companies issue financial forecasts; when later events put the achievability of those forecasts into jeopardy, companies revise them. To be sure, tracking, estimating, and growing medical margin were key aspects of agilon's business. But that cannot convert every statement or activity related to medical margin into a special circumstance "critical" to "continued vitality." *Id.* The inquiry under this factor is whether the subject of the challenged statements "jeopardized the company's existence." *Id.* Plaintiffs have not alleged that here.

39

Third, the extraordinarily complicated nature of agilon's business shows that flaws in forecasting or mistakes about the existence and visibility of trends were anything *but* "readily apparent." *Id.* Even for a single patient, agilon must analyze a large quantity of data. ¶ 123. Extrapolating from that data involves a complicated actuarial process, conducted by technical specialists within the business. Ex. 10 at 533 ("estimates are developed using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions including medical service utilization trends, changes in membership, observed medical cost trends, historical claim payment patterns and other factors."). Discerning trends from those extrapolations requires further complex analysis. *Id.*[13] And ultimately, an allegation that purported falsity is readily apparent cannot "bypass [a plaintiff's] failure to plead exactly that" with particularized facts. *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *4 (N.D. Tex. Sept. 29, 2022).

Finally, Plaintiffs do not allege that Sell or Bensley made internally inconsistent statements. The fact that agilon adjusted the challenged guidance over time testifies to the good faith of the Company's executives. It is not a special circumstance that would justify a negative inference arising from Sell's and Bensley's positions. Thus, *non*e of the *Diodes* factors support a core operations inference, let alone the larger required inference of intentional fraud.

### 4. **Plaintiffs' additional scienter allegations are makeweight**

Plaintiffs' other scienter allegations are speculative, conclusory, and internally inconsistent. None supports a strong inference of scienter.

***Plaintiffs' "temporal proximity" theory is self-defeating***. Plaintiffs assert that the Court can infer that Sell and Bensley acted with an intent to deceive investors because certain challenged

---

[13] Third parties recognized the same complexity. Ernst & Young explained that in conducting an audit, it needed to engage "actuarial specialists due to the highly judgmental nature of the factors and assumptions used in the measurement process." Ex. 11 at 618.

statements were made a matter of weeks or months before agilon revised its 2023 guidance ("temporal proximity"). ¶¶ 228-33. Plaintiffs' allegation is self-defeating. Plaintiffs single out agilon's reference to the guidance on September 12, alleging "temporal proximity" because just "seven weeks later," the Company "shocked the market" by revising guidance. ¶ 229. If "temporal proximity" supports an inference of scienter as to the September 12 statement, then the lack of proximity must defeat any such inference as to the original provision of guidance in March, or agilon's later references to it in May through August—not to mention the other challenged statements dating back to April 2021. The Company's successive revisions show that it was genuinely struggling with the limitations of its forecasting processes and communicating with investors when it had news. That shows good faith, not an intent to deceive.

**Plaintiff's allegations about officer and director resignations border on the frivolous**. Plaintiffs invite the Court to infer deliberate fraud based on Bensley's retirement, announced on January 5, 2024, and the departure of the Company's Chief Accounting Officer in August 2023. ¶¶ 238-89. Under controlling law, corporate resignations are generally "unavailing as proof of the commission of fraud." *Southland*, 365 F.3d at 383. Courts in the Fifth Circuit have repeatedly recognized that departures do not show fraud; they show at most that executives took responsibility or were held responsible for disappointing performance. *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724-25 (W.D. Tex. 2010) ("Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis."). Plaintiffs allege no facts suggesting that Bensley retired for any reason other than that he chose to do so. Their allegations about the Chief Accounting Officer, Priscilla Kasenchak, are close to frivolous. ¶ 239. Kasenchak is not even a defendant in the fraud claim. Plaintiffs go further still with Glenn Sobotka, who was Kasenchak's predecessor in the CAO role. He left nearly a year before agilon issued its 2023 guidance. ¶ 240.

41

Plaintiffs again make no effort to tie him to the purported fraud; again, they allege nothing more than that he signed the 2021 registration statements. Finally, Plaintiffs point to the June 2023 departure of three directors—not officers—all of whom were CD&R's board designees. *Id.* As Plaintiffs surely know, the directors resigned because CD&R's voting power dropped below 50%, which required a board restructuring. Ex. 17 at 720. That does not support an inference of deceit.

***Plaintiffs' allegations about access to data are deficient***. Plaintiffs say the Court can infer scienter because agilon referred to data "repeatedly." ¶¶ 217-20. That "repetition" arises from Plaintiffs' choice to extend the putative class period back to April 2021, almost two years before agilon provided the guidance at the heart of this case. During the bulk of the class period, agilon successfully predicted medical margin and earnings; it met guidance. *Supra* at 9-10. "Repeating" points about data over the years does not show intentional deceit.

Plaintiffs are also confusing knowledge of raw facts with the required intent to deceive. Access to or knowledge of data does not show that Bensley or Sell believed that agilon's forecasts were wrong or that its positive statements about growth, data, visibility, and the like were false, let alone that these senior officers intended to deceive agilon's investors. Access to—even knowledge of—raw facts is critically distinct from a belief that those facts render challenged statements misleading. *See, e.g.*, *Owens*, 789 F.3d at 544 (distinguishing between warnings to an executive and the required belief on the executive's part that the company's portfolio was fraudulently overvalued); *EZCORP*, 259 F. Supp. 3d at 577 (distinguishing between executive's access to internal report and the required belief that the company's financial statements were false).

Beyond this, Plaintiffs do not plead facts showing that Sell or Bensley even reviewed the raw data, let alone that they concluded that the data rendered their statements materially false or misleading. That too is fatal. *See Baker Hughes*, 292 F.3d at 432 ("An unsupported general claim

42

about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss.").

*Plaintiffs' "concealment" allegations are specious.* Plaintiffs contend that the Court should infer deliberate fraud because agilon "concealed medical costs." ¶ 224. But what Plaintiffs label concealment is nothing more than the Company's amply-disclosed and well-understood financial reporting practice, in which agilon used estimates to record medical claims for a given period and then recorded variances between its estimates and actual costs in the period in which it learned of that variance—the phenomenon of prior-year developments, or PYD. Ex. 10 at 533; *supra* at 23, 32-33. Plaintiffs assert that the "delayed recognition of medical costs" underscores "agilon's, Sell's and Bensley's awareness of the systemic data and visibility defects with agilon's model, and the substantial impact of those defects on agilon's financial reporting." ¶¶ 163, 226. But "delayed recognition" was built into agilon's financial reporting, as the Company repeatedly told investors. Ex. 1 at 107; Ex. 10 at 533; *supra* at 32-33. It does not show fraud.

Plaintiffs also complain that when agilon discussed PYD charges with investors, the Company "downplayed" the issue. ¶¶ 148, 227. Contradicting themselves, Plaintiffs say that agilon misled investors by commenting in 2022 that PYD that year was *not* related to any one particular payor, and then misled investors in 2023 by commenting that PYD that year *was* largely attributable to a single payor. ¶ 227. In neither case do Plaintiffs plead facts calling the Company's explanation of PYD into question. Plaintiffs' concealment allegations are specious.

### 5.   Benign inferences outweigh any inference of deliberate wrongdoing

The strongest inference arising from the facts Plaintiffs allege is that after agilon's internal processes produced accurate forecasts for 2021 and 2022, the Company came to see in the last quarter of 2023 that its guidance for that year was out of reach. That was the result in part of a

post-COVID surge in utilization that the Company had previously believed would not significantly impact its patient population. When agilon and its executives learned that the Company's covered members were also susceptible to that surge, they promptly informed investors of the fact. When additional information became available shortly after the year ended, agilon twice again recalibrated its medical margin figure—and promptly informed investors of this too. *Supra* at 12.

agilon's forecasts were built on medical and claims data, but they also required a substantial degree of judgment and interpretation. *Supra* at 8-9. Courts are wary of inferring deliberate fraud in such circumstances. The Fifth Circuit's *Owens* decision exemplifies this. The plaintiffs there faulted defendants for not properly valuing mortgage-backed securities under GAAP, attacking the company's financial reporting as fraudulent. 789 F.3d at 540-41. The court held that plaintiffs' scienter allegations were inadequate: the strongest inference arising from the facts pled in *Owens* was that the company's executives "believed that [the company's] internal models were accurate" in valuing mortgage-backed securities during an industry collapse. *Id.* at 545.

The guidance at the heart of this case is similarly judgment-based. The same is true of challenged statements in which agilon characterized its "visibility"—the ability of its systems to capture claims data in both present and future periods. agilon had a solid basis for believing that its forecasting processes were functioning well in 2023—they had done so in 2021 and 2022. As it turned out, 2023 marked a break in agilon's successful forecasting. But errors in estimation are not fraud. Plaintiffs plead no facts suggesting that Bensley or Sell did not believe in the soundness of agilon's processes. agilon's thorough disclosure of the risks inherent in its complex data analysis systems further undercuts any inference of intentional deceit. *Owens*, 789 F.3d at 541 ("Defendants' disclosure of the 'red flags' and candidness about the uncertainty underlying its models neutralize any scienter inference from 'red flags.'").

44

Finally, Plaintiffs' theory of fraud contravenes common sense. Plaintiffs provide no reason to infer that agilon deliberately provided guidance that it knew (or recklessly disregarded) it would fail to meet. The strongest and most obvious inference is the benign one: agilon's forecasting processes did not properly gauge the 2023 post-COVID utilization surge, but Defendants did not seek to deceive the market about that or any other issue. On scienter grounds, as on falsity grounds, the Court should dismiss Plaintiffs' Section 10(b) claim in its entirety.[14]

D.    **Plaintiffs' Claims Against Hittner and Venkatachaliah Fail for Additional Reasons**

Plaintiffs challenge only eight statements made by either Hittner or Venkatachaliah, agilon's Chief Experience Officer and Chief Technology Officer respectively. ¶¶ 122-27, 139, 145.[15] Plaintiffs' attack on all eight statements fails for the reason just discussed—Plaintiffs have not alleged facts creating a strong inference of deliberate fraud as to any agilon executive. Indeed, Plaintiffs do not even mention Hittner or Venkatachaliah in their scienter allegations. They allege no stock sales, no resignations, and no control over the measures through which agilon purportedly "concealed" facts about its financial reporting and forecasting. Nor do they even try to explain why the position of Chief Experience Officer or Chief Technology Officer could serve as a foundation for a core operations inference.

Plaintiffs' claims against Hittner and Venkatachaliah also fail on falsity grounds. Five of the eight statements fall into the categories discussed above, and Plaintiffs' attack on those

---

[14] Because Plaintiffs fail to allege a primary violation under Section 10(b), their Section 20(a) control person claim also fails, as does their Section 20A insider trading claim. *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.,* 537 F.3d 527, 545 (5th Cir. 2008); *Southland,* 365 F.3d at 383; *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 912 (W.D. Tex. 2008) ("Section 20A mandates an independent, predicate violation of the 1934 Act or of its rules and regulations.").

[15] Hittner also served as VP, Provider Strategies and Growth between 2019 and early 2022. ¶ 26.

statements fails for all of the reasons set forth there. *Supra* at 27-28, 40. Plaintiffs' attack on the three remaining statements is equally defective.

At an investor day event on March 11, 2022, Venkatachaliah referred to an earlier presentation made by the Company's Chief Markets Officer, and then commented that the data agilon obtains "lets us drive programs and operations very consistently" across markets. ¶ 125. Plaintiffs do not explain how this is supposed to be false; in contrast with their other attacks, they do not identify with bolded font the part of the statement at which they aim. *Id.*

Plaintiffs also challenge Venkatachaliah's statement, made at the same investor event, that physicians "love that we slipstream [information] into their existing workflows, into their [Electronic Medical Records] *if* they don't have to learn anything new." ¶ 123; Ex. 9 at 489. Plaintiffs omit the word "if," apparently seeking to create the impression that Venkatachaliah was minimizing the work involved in the physician onboarding process. But Venkatachaliah was not discussing onboarding at all; he was referring to one feature of agilon's model that was attractive to physicians *if* it matched their existing data technology. *Id.*

Hittner also spoke at the investor day event, stating that agilon's "standard data sharing agreements" with payors "allows us to move very rapidly into new geographies." ¶ 126. Plaintiffs say this statement was false or misleading because agilon was "unable to timely obtain and analyze payor claims data," apparently relying on the May 2024 CMS letter. For the reasons discussed above, that letter neither demonstrates that any statement was false nor supports an inference of deliberate fraud. *Supra* at 37-38.

IV.   **CONCLUSION**

The Court should dismiss in their entirety Plaintiffs' claims against the agilon Defendants.

DATED:  November 8, 2024

*/s/ Yolanda C. Garcia*
YOLANDA C. GARCIA
ygarcia@sidley.com
State Bar No. 24012457
MASON PARHAM
mparham@sidley.com
BARRET V. ARMBRUSTER
barmbruster@sidley.com
**SIDLEY AUSTIN LLP**
2021 McKinney Avenue, Suite 2000
Dallas, TX  75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

ROBIN WECHKIN (*pro hac vice* app. forthcoming)
rwechkin@sidley.com
**SIDLEY AUSTIN LLP**
8426 316th Place Southeast
Issaquah, WA 98027
Telephone: (415) 439-1799

*Attorneys for Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, Heidi Hittner, Glenn Sobotka, Sharad Mansukani, Michelle A. Gourdine, Michael L. Smith, Priscilla Kasenchak, Diana L. McKensie, Karen McLoughlin, Jeffrey A. Schwaneke and William Wulf*

## CERTIFICATE OF SERVICE

I certify that on November 8, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Yolanda C. Garcia*
Yolanda C. Garcia