**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION | Master File No.: 1:24-cv-00297-DAE |

**JOINT APPENDIX (APPENDIX A) IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, Heidi Hittner, Glenn Sobotka, Michelle A. Gourdine, Michael L. Smith, Sharad Mansukani, Diana L. McKenzie, Priscilla Kasenchak, Karen McLoughlin, Jeffrey Schwaneke, and William Wulf ("agilon Defendants"), by and through their undersigned counsel, hereby submit this Joint Appendix (Appendix A) In Support of Defendants' Motions to Dismiss Plaintiffs' Consolidated Class Action Complaint.

| Ex. | Description | APP |
|---|---|---|
| | Declaration of M. Parham | APP 001-APP 004 |
| 1. | March 18, 2021, S-1 (excerpts) | APP 005-APP 107 |
| 2. | April 16, 2021, IPO final prospectus (excerpts) | APP 108-APP 188 |
| 3. | April 16, 2021, CD&R Stockholders Agreement | APP 189-APP 206 |
| 4. | May 26, 2021, 8-K, with attachment | APP 207-APP 219 |
| 5. | Sept. 7, 2021, 2021 S-1/A (excerpts) | APP 220-APP 304 |
| 6. | Sept. 13, 2021, SPO final prospectus (excerpts) | APP 305-APP 389 |
| 7. | Mar. 3, 2022, 8-K, with attachment | APP 390-APP 403 |
| 8. | Mar. 3, 2022, 10-K (excerpts) | APP 404-APP 469 |
| 9. | Mar. 11, 2022, Analyst/Investor Day Transcript | APP 470-APP 519 |
| 10. | Aug. 04, 2022, 10-Q (excerpt) | APP 520-APP 534 |
| 11. | Mar. 1, 2023, 10-K (excerpts) | APP 535-APP 621 |
| 12. | Mar. 1, 2023, 8-K with attachment | APP 622-APP 634 |
| 13. | Mar 1, 2023, Earnings Call Transcript | APP 635-APP 656 |

1

| 14. | May 9, 2023, Earnings Call Transcript | APP 657-APP 676 |
| 15. | May 9, 2023, 8-K with attachment | APP 677-APP 691 |
| 16. | May 15, 2023, Prospectus (excerpts) | APP 692-APP 717 |
| 17. | June 26, 2023, 8-K with attachment | APP 718-APP 724 |
| 18. | Aug. 3, 2023, Earnings Call Transcript | APP 725-APP 746 |
| 19. | Aug. 3, 2023, 8-K with attachment | APP 747-APP 760 |
| 20. | Aug. 3, 2023, 10-Q (excerpt) | APP 761-APP 798 |
| 21. | Nov. 2, 2023, Earnings Call Transcript | APP 799-APP 818 |
| 22. | Nov. 14, 2023, 8-K with attachment | APP 819-APP 833 |
| 23. | Jan. 5, 2024, Guidance Update Transcript | APP 834-APP 854 |
| 24. | Jan. 5, 2024, 8-K with attachment | APP 855-APP 876 |
| 25. | Feb. 27, 2024, 8-K with attachment | APP 877-APP 913 |
| 26. | Feb. 27, 2024, 10-K (excerpts) | APP 914-APP 966 |
| 27. | May 29, 2024, CMS Letter | APP 967-APP 979 |
| 28. | *Southland Secs. Corp. v. Inspire Ins. Solutions, Inc*., No. 4:00-cv-355y, Dkt. 63, First Amended Complaint (N.D. Tex. May 16, 2001) | APP 980-APP 1064 |

DATED:  November 8, 2024

/s/ *Yolanda C. Garcia*

YOLANDA C. GARCIA
ygarcia@sidley.com
State Bar No. 24012457
MASON PARHAM
mparham@sidley.com
BARRET V. ARMBRUSTER
barmbruster@sidley.com
**SIDLEY AUSTIN LLP**
2021 McKinney Avenue, Suite 2000
Dallas, TX  75201
Telephone:  (214) 981-3300
Facsimile:  (214) 981-3400

ROBIN WECHKIN (*pro hac vice* app. forthcoming)
rwechkin@sidley.com
**SIDLEY AUSTIN LLP**
8426 316th Place Southeast
Issaquah, WA 98027
Telephone:  (415) 439-1799

Attorneys for Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, Heidi Hittner, Glenn Sobotka, Sharad Mansukani, Michelle A. Gourdine, Michael L. Smith, Priscilla

Kasenchak, Diana L. McKensie, Karen McLoughlin, Jeffrey A. Schwaneke and William Wulf

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 8, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Yolanda C. Garcia*
Yolanda C. Garcia

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

IN RE AGILON HEALTH, INC. SECURITIES
LITIGATION

Master File No.: 1:24-cv-00297-DAE

**DECLARATION OF D. MASON PARHAM IN SUPPORT OF
AGILON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED CLASS ACTION COMPLAINT**

I, Mason Parham, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The facts set out in this Declaration are based on my personal knowledge and, if called as a witness, I could competently testify to the following matters.

2.      I am an attorney licensed to practice law in the State of Texas. I am a Partner at the law firm Sidley Austin LLP. I am one of the attorneys responsible for the preparation of agilon Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint.

3.      Attached hereto as **Exhibit 1** are true and correct copies of excerpts from agilon health, inc.'s ("agilon") Form S-1 dated March 18, 2021.

4.      Attached hereto as **Exhibit 2** are true and correct copies of excerpts from agilon's IPO Prospectus filed April 16, 2021.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of agilon's Stockholders Agreement dated April 16, 2021, as attached to agilon's Form 8-K dated April 19, 2021.

1

**APP 001**

6.      Attached hereto as **Exhibit 4** is a true and correct copy of agilon's Form 8-K dated May 26, 2021, attaching agilon's Press Release dated May 26, 2021.

7.      Attached hereto as **Exhibit 5** are true and correct copies of excerpts from agilon's 2021 Form S-1/A dated September 7, 2021.

8.      Attached hereto as **Exhibit 6** are true and correct copies of excerpts from agilon's SPO Prospectus filed September 13, 2021.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of agilon's Form 8-K dated March 3, 2022, attaching agilon's Press Release dated March 3, 2022.

10.     Attached hereto as **Exhibit 8** are true and correct copies of excerpts from agilon's Form 10-K dated March 3, 2022.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of a transcript from agilon's Investor Day dated March 11, 2022.

12.     Attached hereto as **Exhibit 10** are true and correct copies of excerpts from agilon's Form 10-Q dated August 4, 2022.

13.     Attached hereto as **Exhibit 11** are true and correct copies of excerpts from agilon's Form 10-K dated March 1, 2023.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of agilon's Form 8-K dated March 1, 2023, attaching agilon's Press Release dated March 1, 2023.

15.     Attached hereto as **Exhibit 13** is a true and correct copy of agilon's Earnings Call Transcript dated March 1, 2023.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of agilon's Earnings Call Transcript dated May 9, 2023.

17.     Attached hereto as **Exhibit 15** is a true and correct copy of agilon's Form 8-K dated May 9, 2023, attaching agilon's Press Release dated May 9, 2023.

2

18. Attached hereto as **Exhibit 16** are true and correct copies of excerpts from agilon's Prospectus filed May 17, 2023.

19. Attached hereto as **Exhibit 17** is a true and correct copy of agilon's Form 8-K dated June 26, 2023, attaching agilon's Press Release dated June 26, 2023.

20. Attached hereto as **Exhibit 18** is a true and correct copy of agilon's Earnings Call Transcript dated August 3, 2023.

21. Attached hereto as **Exhibit 19** is a true and correct copy of agilon's Form 8-K dated August 3, 2023, attaching agilon's Press Release dated August 3, 2023.

22. Attached hereto as **Exhibit 20** are true and correct copies of excerpts from agilon's Form 10-Q dated August 3, 2023.

23. Attached hereto as **Exhibit 21** is a true and correct copy of agilon's Earnings Call Transcript dated November 2, 2023.

24. Attached hereto as **Exhibit 22** is a true and correct copy of agilon's Form 8-K dated November 14, 2023, attaching agilon's Investor Presentation Slides dated November 14, 2023.

25. Attached hereto as **Exhibit 23** is a true and correct copy of agilon's Guidance Update Transcript dated January 5, 2024.

26. Attached hereto as **Exhibit 24** is a true and correct copy of agilon's Form 8-K dated January 5, 2024, attaching agilon's Press Release dated January 5, 2024 and Investor Presentation dated January 5, 2024.

27. Attached hereto as **Exhibit 25** is a true and correct copy of agilon's Form 8-K dated February 27, 2024, attaching agilon's Press Release dated February 27, 2024 and Investor Presentation dated February 27, 2024.

28. Attached hereto as **Exhibit 26** are true and correct copies of excerpts from agilon's Form 10-K dated February 27, 2024.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of a letter addressed to Chiquita Brooks-LaSure, Administrator for the Centers for Medicare and Medicaid Services, dated May 29, 2024, and which is referred to in Plaintiffs' Complaint as the "CMS Letter."

30.     Attached hereto as **Exhibit 28** is a true and correct copy of the First Amended Complaint (Dkt. 63) filed in the matter of *Southland Secs. Corp. v. Inspire Ins. Solutions, Inc*., No. 4:00-cv-355y, in the Northern District of Texas on May 16, 2001.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  November 8, 2024                              Respectfully submitted,

By: */s/ D. Mason Parham*
     D. Mason Parham

4

**APP 004**

# EXHIBIT  1

Table of Contents

Index to Financial Statements

As filed with the Securities and Exchange Commission on March 18, 2021

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM S-1
# REGISTRATION STATEMENT
*UNDER THE*
*SECURITIES ACT OF 1933*

# agilon health, inc.
**(Exact Name of Registrant as Specified in its Charter)**

| Delaware | 8090 | 37-1915147 |
|---|---|---|
| **(State or Other Jurisdiction** | **(Primary Standard Industrial** | **(I.R.S. Employer** |
| **of Incorporation or Organization)** | **Classification Code Number)** | **Identification Number)** |

**1 World Trade Center, Suite 2000**
**Long Beach, CA 90831**
**(562) 256-3800**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Steven J. Sell
**Chief Executive Officer**
**agilon health, inc.**
**1 World Trade Center, Suite 2000**
**Long Beach, CA 90831**
**(562) 256-3800**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Peter J. Loughran, Esq.** | **William V. Fogg, Esq.** |
| **Paul M. Rodel, Esq.** | **Cravath, Swaine & Moore LLP** |
| **Debevoise & Plimpton LLP** | **825 Eighth Avenue** |
| **919 Third Avenue** | **New York, New York 10019** |
| **New York, New York 10022** | **(212) 474-1000** |
| **(212) 909-6000** | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee |
|---|---|---|
| Common Stock, par value $0.01 per share | $100,000,000 | $10,910 |

(1) Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(o) of the Securities Act of 1933, as amended.

(2) Includes shares of common stock subject to the underwriters' option to purchase additional shares.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the U.S. Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

**Index to Financial Statements**

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the U.S. Securities and Exchange Commission declares our registration statement effective. This preliminary prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state or jurisdiction where the offer or sale is not permitted.**
**SUBJECT TO COMPLETION, DATED , 2021**

# Shares



# agilon health, inc.

### Common Stock

This is the initial public offering of shares of common stock of agilon health, inc. ("agilon health"). We are offering shares of common stock. We anticipate that the initial public offering price will be between $ and $ per share.

Prior to this offering, there has been no public market for our common stock. Upon the completion of this offering, we intend to apply to list our common stock on the New York Stock Exchange (the "NYSE") under the symbol "AGL".

After the completion of this offering, we expect to be a "controlled company" within the meaning of the corporate governance standards of the NYSE.

**We will be treated as an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, for certain purposes until we complete this offering. As such, in this prospectus, we have taken advantage of certain reduced disclosure obligations that apply to emerging growth companies. See "Prospectus Summary—Implications of Being an Emerging Growth Company."**

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 23 of this prospectus to read about factors you should consider before buying shares of our common stock.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions(1) | $ | $ |
| Proceeds, before expenses, to agilon health, inc. | $ | $ |

(1)    See "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters also may purchase up to additional shares from us at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus.

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved the securities described herein or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares to purchasers on or about , 2021.

| | | |
|---|---|---|
| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **BofA Securities** |
| | **Deutsche Bank Securities** | **Wells Fargo Securities** |
| **William Blair** | **Truist Securities** | **Nomura** |

**Prospectus dated , 2021**

**APP 007**

**Table of Contents**

**Index to Financial Statements**



"We believe that the long–term, independent relationship between a PCP and his/her patient is the most valuable relationship in the healthcare universe. It is the best way to drive behavior and thus, value."

– Gary Pinta, MD
*Pioneer Physicians, Akron*

**Table of Contents**

**Index to Financial Statements**



"This partnership provides physicians the ability to share in the development of a new payment model for PCPs. We are engaged and the model has physician fingerprints all over it."

– Mary Cook, MD
*Central Ohio Primary Care, Columbus*

**Table of Contents**

**Index to Financial Statements**



**Table of Contents**

**Index to Financial Statements**

TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 23 |
| Special Note Regarding Forward-Looking Statements and Information | 67 |
| Use of Proceeds | 70 |
| Dividend Policy | 71 |
| Capitalization | 72 |
| Dilution | 74 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 76 |
| Business | 103 |
| Management | 142 |
| Executive Compensation | 149 |
| Principal Stockholders | 159 |
| Certain Relationships and Related Party Transactions | 161 |
| Description of Capital Stock | 164 |
| Shares Available for Future Sale | 170 |
| Description of Certain Indebtedness | 172 |
| Certain U.S. Federal Income Tax Considerations for Non-U.S. Holders | 175 |
| Underwriting | 179 |
| Validity of Common Stock | 190 |
| Experts | 190 |
| Where You Can Find More Information | 190 |
| Index to Consolidated Financial Statements | F-1 |

**You should rely only on the information contained in this prospectus and any free writing prospectus we may authorize to be delivered to you. We have not, and the underwriters have not, authorized anyone to provide you with information different from, or in addition to, that contained in this prospectus and any related free writing prospectus. We and the underwriters take no responsibility for, and can provide no assurances as to the reliability of, any information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is only accurate as of the date of this prospectus, regardless of the time of delivery of this prospectus and any sale of shares of our common stock.**

i

APP 011

**Table of Contents**

**Index to Financial Statements**

**Certain Important Terms**

- "We," "us," "our," "agilon" and the "Company" mean agilon health, inc., a Delaware corporation and its consolidated subsidiaries, unless the context refers only to agilon health, inc., as a corporate entity (which we refer to as "agilon health").
- "Anchor geography" means the geographies in which our anchor physician groups operate.
- "Anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography.
- "Capitation" means a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.
- "CMS" means the Centers for Medicare & Medicaid Services.
- "CMS Innovation Center" means the Center for Medicare & Medicaid Innovation.
- "DCE" means a Direct Contracting Entity participating in the CMS Innovation Center Direct Contracting Model.
- "FFS" means fee-for-service.
- "Independent physicians" means physicians not employed by health systems or insurance providers.
- "Live," when referring to a physician partner or a geography, means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with payors.
- "MA" means Medicare Advantage.
- "Members" means the MA patients who are attributed to our PCPs (as defined below) by our payors (as defined below).
- "Payors" means health insurance providers.
- "Our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.
- "PCP" means primary care physician.
- "Physician partners" means our anchor physician groups and all other physicians with whom we have contractual arrangements.
- "PMPM" means per member per month.
- "RBE" means a risk-bearing entity.
- "STAR rating" means annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics.
- "Total Care Model" means a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients.

**Market and Industry Data**

This prospectus includes estimates regarding market and industry data and forecasts, which are based on publicly available information, industry publications and surveys, reports from government agencies, reports by market research firms and our own estimates based on our management's knowledge of, and experience in, the

ii

**Table of Contents**

**Index to Financial Statements**

healthcare industry. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable.

Throughout this prospectus, all references to "net promoter score" or "NPS" are to a measure of satisfaction widely used in the healthcare industry. We calculate patient and provider net promoter score based on responses to patient and provider surveys, administered as electronic surveys annually, that ask the patient or provider to rank, on a scale of 0 to 10, how likely they are to recommend their (or their provider's) practice to a friend or family member. We assign the designation of "Promoter" to respondents who provide a score of 9 or 10, the designation of "Passive" to respondents who provide a score of 7 or 8, and the designation of "Detractor" to respondents who provide a score of 0 to 6. We then subtract the percentage of Detractors from Promoters to determine our overall net promoter score. We believe that this method of calculation aligns with industry standards and that this metric is meaningful for investors because of the correlation that we believe exists between net promoter score and patient and provider satisfaction.

Our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the captions "Risk Factors," "Special Note Regarding Forward-Looking Statements and Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Service Marks, Trademarks and Trade Names**

We hold various service marks, trademarks and trade names, such as "agilon health," "agilon" and our logo design, that we deem particularly important to the advertising activities conducted by each of our businesses. This prospectus also contains trademarks, service marks and trade names of other companies which are the property of their respective holders. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

**Basis of Presentation**

During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. As a result of the divestiture of all of our California operations, our financial statements included in this prospectus reflect discontinued operations presentation for all California operations. Financial and operating information contained in this prospectus is presented without California operations data unless expressly stated otherwise. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

iii

**Table of Contents**

**Index to Financial Statements**

**PROSPECTUS SUMMARY**

*The following summary highlights selected information contained elsewhere in this prospectus. Because this is only a summary, it does not contain all of the information you should consider before investing in our common stock. You should carefully read the entire prospectus, including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as our consolidated financial statements included elsewhere in this prospectus, before making an investment decision.*

**Overview**

Our business is transforming healthcare by empowering the primary care physician ("PCP") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming risk-bearing entities (each, an "RBE") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. Currently, the PCPs on our platform serve approximately 210,000 patients enrolled in Medicare Advantage ("MA"), which includes approximately 49,000 patients with physician groups contracted to go-live on January 1, 2022 (we refer to these patients as the "members on our platform"). In addition, through our participation in the Center for Medicare & Medicaid Innovation ("CMS Innovation Center") Direct Contracting Model, our PCPs are expected to serve over 50,000 Medicare fee-for-service ("FFS") beneficiaries through our five currently approved Direct Contracting Entities ("DCEs"). For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

1

**APP 014**

**Table of Contents**

**Index to Financial Statements**

**Empower PCPs to Transform Care in Their Communities**

| What We Do | How We Do It | Powerful Results |
|---|---|---|
| *Disrupt the rapidly-growing Medicare market for physicians, patients and payors* | *Migrate physicians, patients and payors from the traditional fee-for-service to a subscription-like Total Care Model* | *Since 2016, this capital-light, exportable and scalable model has grown* |
| • Empower community-based physicians to create a Medicare-centric globally capitated line of business | • Unified set of payment, data, clinical, quality and growth capabilities deployed as single platform | • 17 diverse geographies |
| | | • 16 anchor physician groups: average tenure of 40+ years in their community |
| • Enable PCPs to quarterback their patients' healthcare in a long-term, highly engaged relationship | • Deployed through a long-term partnership model based on aligned outcomes and economics | • 15 payors |
| | | • 210,000 MA members including approximately 49,000 that go-live in 2022 |
| • Transform the PCP business model from a transaction-based model to a long-term, holistic membership-based model | • Enhanced through a growing network of like-minded physician partners that enable powerful network effect | • NPS of 83 for patients and 73 for providers at live anchor physician groups |

The current state of the U.S. healthcare system is defined by the following key factors:

- Unsustainably high and rising costs characterized by waste, unnecessary variation in care and poor patient experience and health outcomes;
- FFS reimbursement model focused on units of service rather than a coordinated approach to meet the unique needs of individual patients;
- The Medicare population is projected to grow from approximately 62 million in 2020 to more than 70 million individuals in 2025 with a total spend of approximately $1.25 trillion, and MA enrollment is projected to comprise 47% of total Medicare enrollment (which we refer to as the "MA penetration rate"); and
- PCPs are positioned—but not currently empowered or incentivized—to act as the quarterback for healthcare delivery, with their decisions estimated to influence up to 90% of total healthcare spending according to a 2017 study.

We believe that failing to empower PCPs has fostered waste, needless variability in care and unsustainable growth in healthcare costs. According to a 2019 article entitled "Waste in the US Health Care System: Estimated Costs and Potential for Savings" published in the Journal of the American Medical Association, failure of care delivery, failure of care coordination and overtreatment or low-value care were estimated to represent $205.3 billion to $345.1 billion of waste annually in the U.S. healthcare system. While there is broad recognition of the need to move beyond a volume-based, FFS reimbursement model, structural hurdles have impeded rapid adoption of a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients, which we refer to as a Total Care Model. In this prospectus, we refer to "capitation" as a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.

To overcome these hurdles and achieve our mission of being the trusted long-term partner to community-based physicians, we have developed what we believe is a first-of-its-kind Total Care Model for community-based physicians that focuses exclusively on Medicare and manages subscription-like per member per month ("PMPM") arrangements with health plans or directly with the government. The agilon Total Care Model is powered by our platform, enabled through a long-term partnership model and reinforced via our growing national

2

**APP 015**

Table of Contents

Index to Financial Statements

network of like-minded physicians. Our position as innovators is demonstrated by a series of transformative accomplishments since the formation of the company in July 2016, and our first partnership in 2017, many of which we believe to be industry-firsts:

- Implemented the first MA multi-payor, globally capitated risk model with a community-based physician group in all of our diverse geographies in which our anchor physician groups operate ("anchor geographies");
- Exported the Total Care Model from one to 17 geographies ranging from communities as small as Zanesville, Ohio to large and rapidly growing communities such as Austin, Texas;
- Grew from approximately 24,000 patients attributed to our PCPs by our payors ("members") to approximately 210,000 MA members on our platform;
- Expanded from two payors to 15 payors on our platform; and
- Poised to participate in the Direct Contracting Model, with over 50,000 Medicare FFS beneficiaries expected to be served by our existing PCPs contracted through our five currently approved DCEs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements:

- agilon's platform, which is holistic in enabling the rapid transformation to risk, is comprised of an integrated set of capabilities designed to continuously improve, and is delivered to our anchor physician groups through an aligned long-term partnership model;
- agilon's long-term physician partnership approach with community-based physician groups, which is designed to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician; and
- agilon's network of leading community-based physician partners, functioning as a collaborative group which can share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another.

With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients. The combination of subscription-like PMPM agreements with payors, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue.

The result is PCPs transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient. Despite our history of net losses, we believe this membership-based model results in a recurring revenue stream and provides our anchor physician groups with access to an incremental profit margin opportunity based on delivering high-quality care and health outcomes. Freed from the constraints of the transactional FFS reimbursement model, our PCPs are empowered to practice team-based, coordinated care when addressing individual patient needs and transition to a sustainable long-term business model for their senior patients. We believe enabling PCPs to unlock the value of a Medicare-centric, globally capitated line of business while remaining independent can transform the community-based physician business model.

3

APP 016

**Table of Contents**

**Index to Financial Statements**

In this prospectus, when referring to a physician partner or a geography, "live" means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with health insurance providers ("payors"). In addition, "anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography. We refer to our anchor physician groups and the other physicians with whom we have contracted arrangements as our "physician partners." Finally, "our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.

*The agilon Flywheel Effect: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients. The power of the agilon flywheel is highlighted by our total membership growth of 45%, of which 42% was driven by same geography membership growth and 58% was driven by entry into new geographies from December 31, 2019 to December 31, 2020, and general and administrative expenses per member contracted by 23% over the same period. Over the same period, we had revenue of $1.2 billion and a net loss of $60.1 million.*



**Our Market**

In 2020, approximately 62 million Americans were enrolled in Medicare nationally, of which we estimate approximately 27 million to be affiliated with independent physicians. We define independent physicians as physicians not employed by health systems or insurance providers. We consider our current addressable market to be the estimated 17.5 million Medicare beneficiaries affiliated with independent PCPs in states in which we

4

**APP 017**

**Table of Contents**

**Index to Financial Statements**

already have a physician partner or a signed letter of intent with a physician group as of January 2021, and those in which we have identified near-term prioritized geographies. Based on 2021 estimated average annual revenue per Medicare member to us of approximately $10,000, we estimate that this represents a total addressable market ("TAM") size of approximately $175 billion in 2020. We believe this addressable market will increase to nearly 20 million Medicare beneficiaries and $253 billion by 2025, based on the Centers for Medicare & Medicaid Services' ("CMS") projected Medicare enrollment and spending per beneficiary growth rates.



Rapidly Expanding Actionable TAM Growing at 8% CAGR

| | 2020 | | Projected 2025 | |
| --- | --- | --- | --- | --- |
| | # Patient | Spend[1] | # Patient | Spend[2] |
| Total Medicare beneficiaries | 61.7M | $859B | 70.3M | $1,250B |
| Medicare beneficiaries attributed to Independent PCPs | 26.7M | $267B | 30.4M | $389B |
| agilon TAM: Medicare beneficiaries attributed to Independent PCPs in Existing & Prioritized Geographies | 17.5M | $175B | 19.8M | $253B |

(1)    2020 Medicare spend for total Medicare beneficiaries is based on CMS spend per beneficiary.
(2)    2025 Medicare spend for total Medicare beneficiaries, beneficiaries attributed to independent PCPs and agilon total addressable market is based on CMS projected Medicare enrollment and spending per beneficiary growth rates.

Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021, and $24 billion is based in counties in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021. In addition to the MA members our physician partners currently serve, we estimate our physician partners also serve approximately 375,000 patients that are addressable, which includes all Medicare FFS beneficiaries and commercial patients expected to age into Medicare over the next five years. This represents a 2020 market size of approximately $3.8 billion, using the same assumed annual revenue per Medicare member to us.

In addition, we see an additional opportunity for growth of our addressable market in physicians currently affiliated with health systems or insurance providers who become increasingly dissatisfied with those models. In considering our total addressable market, please also see "Risk Factors—Risks Related to Our Business."

**Industry Challenges and Our Opportunity**

We believe there is a significant opportunity to impact growth in U.S. healthcare costs and change the trajectory of the primary care business model through a platform, such as ours, in which PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients and share in the financial surplus created to the extent premiums received exceed the cost of medical care.

*Unsustainably high and rising U.S. healthcare costs*

According to CMS, U.S. national healthcare expenditures are expected to increase from $3.81 trillion in 2019 to $4.01 trillion in 2020. CMS projects that by 2028, healthcare expenditures will reach $6.20 trillion and will account for 19.7% of the U.S. GDP, up from 17.7% in 2018.

5

**APP 018**

**Table of Contents**

**Index to Financial Statements**

*Patients are dissatisfied with the fragmented and uncoordinated healthcare experience*

In the current FFS model, reimbursement is focused on units of service rather than a coordinated approach to meet the unique needs of individual patients. As a result, care delivery is often uncoordinated, leaving patients frustrated and responsible to navigate their own way through a fragmented and complex healthcare system.

*PCPs are well-positioned to be agents of change*

According to Oregon's Patient-Centered Primary Care Home Program, every $1 spent on primary care services can save $13 of future healthcare costs. Across the U.S., there are more than 486,000 active PCPs who serve as patients' first and most frequent point of contact for their healthcare experience.

*The trajectory of the current independent primary care business model is unsustainable*

In the current FFS reimbursement model, as average reimbursement rates decline, PCPs must increase the number of patients they see to sustain their practice. This volume-based model perpetuates physician burnout and jeopardizes the long-term sustainability of the independent primary care business model. According to a 2019 report, more than 50% of family physicians show symptoms of burnout, driven in part the FFS reimbursement model and increasing administrative burden. We believe this has been exacerbated by the effects of COVID-19.

*Growth of the complex and costly Medicare population is accelerating pressure on primary care*

The Medicare population is expected to grow from approximately 62 million individuals in 2020 to approximately 70 million individuals by 2025. As the medically complex Medicare population disproportionately drives utilization and cost, and is typically reimbursed at a lower rate than the commercial population, the primary care delivery system and the overall healthcare system are further strained.

**Structural Hurdles to Adoption of a Total Care Model**

We believe that all key stakeholders—patients, physicians and payors—benefit significantly from an environment where PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients versus operating in the current FFS reimbursement model that primarily rewards units of service. However, over time, the existing FFS system has created structural hurdles that now impede rapid and broad adoption of a PCP-led Total Care Model.
- PCPs lack the incentive structure to reorganize the healthcare delivery system.
- PCPs lack the infrastructure to participate in a multi-payor model.
- PCPs lack the breadth of capabilities and resources necessary to transition to a Total Care Model.
- PCP groups are highly fragmented and lack the benefits of scale.
- Limited long-term, deep collaboration between payors and physicians.

**Our Answer**

*We have created a Total Care Model for community-based physicians that focuses exclusively on Medicare and manages the comprehensive healthcare needs of our members through subscription-like PMPM arrangements with health plans or directly with CMS—powered by the agilon platform, enabled through a long-term partnership model and reinforced via a growing national network.*

**The agilon Platform:** The agilon platform is focused on existing community-based physician groups, senior patients within these practices and enabling our physician partners to rapidly move to a subscription-like Total

6

**APP 019**

Table of Contents

Index to Financial Statements

Care Model. Our platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital, and recognizes that enhanced capabilities are needed at multiple levels and must be deeply integrated within existing physician group operating processes to successfully execute the transition. The agilon platform was co-developed and has been continuously refined with our physician partners since the formation of the company. The agilon platform comprises an integrated set of capabilities, delivered as a unified platform to enable successful partnerships at the community level, create a national network of PCPs and physician groups and empower our PCPs to improve health outcomes for their patients.

*Our platform capabilities include:*
- *Payor Engagement*: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one approach to quality, patient experience, clinical program management and financial management.
- *Direct Contracting Model*: In each community we serve, our Total Care Model can be extended to patients enrolled in traditional Medicare through the CMS Innovation Center Direct Contracting Model.
- *Data Integration and Management*: Our purpose-built and flexible platform enables ease of integration with payor systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.
- *Clinical Programs and Product Development*: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value actionable playbooks for partner physicians to deliver quality care, which include operational plans, analytics and tracking metrics.
- *Quality (Clinical and Experience)*: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.
- *Growth*: We enable our partners to extend their local brand into a senior care brand for their Total Care Model that embodies the history and culture of their local physician group. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their approximately 220,000 patients that are currently Medicare-eligible but are not covered by an MA plan and their approximately 156,000 60-64 year-old patients, to enable their patients to make educated healthcare choices. These patients represent an embedded growth opportunity.
- *Performance Management Analytics*: One of the most powerful parts of our platform is enabled by the peer-to-peer comparison of efficiency and clinical metrics at the physician, population and network level.
- *Financial Management*: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.
- *National Policy*: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

*agilon's Long-term Physician Partner Model*

*Physician Relationships*

We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to address the need to move healthcare closer to the physician, be outcome-

7

APP 020

Table of Contents

Index to Financial Statements

centric and optimize the long-term sticky relationship between a patient and their existing physician. Our anchor physician group relationships have the following characteristics:

- Long-term partnership model that allows both agilon and physicians to take the long-term view and benefit from the maturity of a growing number of members on the platform;
- Shared governance and co-location of staff to manage our local partnerships;
- Local dyad leadership structure that includes a medical director from the local anchor physician group;
- Local brand which reflects the local anchor physician group or geography;
- Capital from agilon to support value-based care infrastructure supporting the delivery of high-quality healthcare, and 100% downside protection, which removes a major obstacle to physicians making the leap to a Total Care Model;
- Operating leverage created by amortizing centralized investments in the platform infrastructure across a growing number of physician partners; and
- Surplus dollars generated locally due to improvements in quality of care and healthcare costs are shared with the local anchor physician group.

Under the Total Care Model, we typically operate by RBE's within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups. Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. Through incentive compensation arrangements, we share with our anchor physician groups a portion of the RBE's savings from successfully improving the quality of care and reducing costs. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. Most of our contracts with our anchor physician groups contain exclusivity provisions, as well as termination rights that are triggered upon certain events.

*Payor Relationships*

In each of our geographies, we enter into subscription-like PMPM agreements with payors to manage the total healthcare costs of our attributed members. Through this partnership model, we believe we:

- empower PCPs to act as the quarterback for healthcare delivery;
- enable PCPs to define a tailored patient experience across multiple payors;
- create an operating partnership and economic model built around improved health outcomes instead of a transaction-based model; and
- align the physician business model with the strength of their long-term patient relationships enabling the long-term growth of independent, community-based physician groups.

8

APP 021

Table of Contents

Index to Financial Statements

Under a typical agreement, we are entitled to monthly PMPM fees, which are typically based on a defined percentage of the corresponding premium which payors receive from CMS. We generally accept full financial risk for members attributed to us through our contracted PCPs and, therefore, are responsible for the cost of all healthcare services required by those members, which generally includes healthcare costs which CMS considers Part A and B costs. Our agreements with payors may delegate claims payment to us, or such responsibility may be retained by the payor, as is the case today in the majority of our payor agreements. The majority of our agreements are for terms ranging from one to three years and contain automatic annual renewal provisions as well as various termination rights. We also typically agree to indemnify our payors against certain third-party claims. As we continue to expand the agilon platform and enter into additional long-term partnerships, we will negotiate payor agreements in new geographies, including with Humana, Aetna and United Healthcare.

The power of our local partnership model is defined by the scale, breadth and local brand of our physician partners. On average, our anchor physician groups have been serving their communities for more than 40 years, have a PCP tenure of approximately 13 years, and receive exceptionally strong NPS from their PCPs and patients in live geographies of 73 and 83, respectively. We believe this gives us the ability to influence the local healthcare delivery system at scale. We expect our physician partner patient panels to systematically migrate to MA as the patient population ages and our partnerships mature. We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000.

The table below presents an overview of our anchor physician groups:

| Go-Live Year | Geography | Anchor Physician Group | Founded | PCPs | Average PCP Tenure | Approx. MA, FFS, Commercial Lives |
|---|---|---|---|---|---|---|
| 2018 | Columbus, OH | Central Ohio Primary Care | 1996 | >100 | 13 | 265K |
| 2019 | Akron, OH | Pioneer | 1995 | 25-100 | 18 | 60K |
| | Austin, TX | Austin Regional Clinic / Premier Family Physicians | 1980/1994 | >100 | 10 | 375K |
| 2020 | Pittsburgh, PA | preferred | 1995 | 25-100 | 13 | 65K |
| | Dayton, OH | PriMED | 1995 | <25 | 13 | 30K |
| | Southeast OH | Physicians Group | 2001 | <25 | 14 | 35K |
| | Wilmington, NC | | 1971 | 25-100 | 14 | 115K |
| 2021 | Buffalo, NY | Buffalo Medical Group | 1946 | 25-100 | 10 | 70K |
| | Toledo, OH | The Toledo Clinic | 1926 | 25-100 | 9 | 45K |
| | Hartford, CT | Starling | 1947 | 25-100 | 17 | 45K |
| 2022 | Syracuse, NY | FamilyCare Medical Group, PC | 1996 | 25-100 | 17 | 75K |
| | Pinehurst, NY | | 1952 | 25-100 | 10 | 60K |
| | Texarkana, TX | Collom & Carney Clinic | 1947 | <25 | 13 | 15K |
| | Longview, TX | Diagnostic Clinic of Longview | 1975 | <25 | 16 | 75K |
| | Grand Rapids & Traverse City, MI | Answer Health | 1986 | >100 | 10 | 120K |

In addition to our anchor physician groups in the table above, we have broadly contracted with PCPs across the state of Hawaii and have developed select deeper primary care relationships within that network.

9

Table of Contents

Index to Financial Statements

*Our Network*

We believe the agilon network creates significant value for our patients, our physician partners, our payors and our organization. The ability to share best practices, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. Our physician partners are both collaborative and constructively competitive in service of their patients. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

*Value Proposition to Stakeholders*

Our Total Care Model empowers community-based physician groups to lead local healthcare transformation and ensure the long-term sustainability of the community-based physician model.

We believe the benefits of this differentiated model to community-based physician groups and the patients they serve include:
- Rapid creation of a Medicare Total Care Model that enables our PCPs to take a long-term view of their relationships with their patients and allocate resources to meet individual member health needs.
- Sustainable long-term business model alongside commercial and Medicare FFS.
- Provides access to network of like-minded partners.
- Improved economics.
- Improving the physician experience.
- Improving the patient experience.
- Supporting superior health outcomes.

We have also become an important strategic partner for our payors, as we are a material portion of their membership base, delivery network and annual membership growth in many of the geographies we serve. Through our subscription-like agreements, we ensure a consistent gross margin on a growing membership base. The strength of our relationships with payors has resulted in our establishment of national joint-operating committees with five national health plans through which we develop, execute and monitor a strategy for growth and performance as part of their Medicare delivery network.

**Our Strengths**

*Local and National Leadership and First-Mover Dynamics*

Core to our model is partnering in local geographies with leading physician groups that have already built significant scale and strong brands in the communities they serve. Our local leadership is highlighted by our position in Columbus, Ohio, where we have more than 200 PCPs on our platform, whose patient panels include approximately 50% of total MA lives among independent PCPs.

We believe we are pioneers in providing a full-risk, multi-payor Total Care Model within our local geographies, our growing regional hubs and the country. We believe we are the only MA multi-payor, globally capitated risk vehicle available for independent physician groups to access a Total Care Model in our local geographies. The sustainability of this local leadership position is also enhanced by our long-term partnerships with our anchor physician groups.

10

APP 023

Table of Contents

Index to Financial Statements

We've established a strong local leadership position in 17 geographies creating what we believe to be the first national platform for a Medicare-centric, globally capitated line of business. We believe our position as a first-mover creates a competitive advantage, resulting in other independent physician groups viewing us as an established and trusted partner.

### Long-Term Economic Model

We believe our membership and per-member profitability will grow over time due to structural characteristics inherent to our long-term partnerships, durable and growing MA membership within our physician partners and the nature of the MA economic model. The key strengths of our economic model include:

- We believe we have the ability to generate significant, recurring and growing medical margin in concert with our physician partners over the course of our long-term partnerships and the inherently sticky physician-patient relationship.
  - Our physician partnerships are typically 20 years.
  - Average physician tenure within our anchor physician groups is 13 years.
  - Patients 65 years of age and older remain with their PCP for an average of 10 years, according to a 2004 study.
- Embedded same-geography, long-term organic membership growth resulting from our physician partners' existing patients who age into Medicare and elect to enroll in MA or who elect to convert from Medicare FFS to MA over the life of our long-term partnership.

Although we have incurred net losses since our formation in 2016, we believe that the combination of a growing membership base and improving medical margin over the life of our long-term partnerships creates a significant lifetime value ("LTV") for the geographies we enter. We are able to access this attractive LTV through what we believe to be a low-cost and increasingly cost-efficient model. We believe this low-cost and increasingly cost-efficient growth model represents a significant advantage supporting our rapid scaling to new geographies and sustainable existing geography growth.

### Model for Long-Term Sustainable Growth

We have created a multi-pronged growth strategy that has powerful tailwinds for our physician partners and our business by leveraging existing physician capacity in local geographies, establishing long-term partnerships with significant embedded growth opportunities and expanding through multiple regional levels. The "flywheel" nature of our model has allowed us to expand from one geography to 17 in fewer than five years and has resulted in an additional approximately 186,000 MA lives being attributed to our platform over the same time period.

11

**Table of Contents**

**Index to Financial Statements**

*Purpose-Built, Exportable, Scalable Platform*

The creation of the agilon platform and an aligned physician partnership approach has enabled the consistent deployment of a Medicare-centric, globally capitated line of business across 17 heterogeneous geographies, 16 anchor physician groups and multiple payors. The components of our Total Care Model (including, data, payor engagement, clinical programs and growth) are discrete but are delivered as a unified platform through a highly-aligned model with physicians to optimize success. Our platform has enabled us to grow revenue 53% year-over-year for the year ended December 31, 2020, while operating costs to support live geographies and enterprise functions grew 12% over the same period. Our net loss for the year ended December 31, 2020 was $60.1 million, a 79% decline from losses of $282.7 million in the year ended December 31, 2019.

*Network Feedback Loop*

We believe our growing network of community-based physicians at the national, regional and local level drives continuous improvement of our platform, enables best practices sharing and innovation and accelerates the growth of independent physicians joining the agilon network. Many of our physician partners and individual physicians have joined our platform based on references from existing like-minded physician partners, and the credibility and quality of our physician partners is consistently cited as a deciding factor for joining the platform.

*Differentiated Physician and Patient Experience*

We designed our platform, partnership and network approach with the goal of delivering a superior and continuously improving experience to our physician partners and their patients. We believe our model enables PCPs to unlock the value in a Medicare-centric, globally capitated line of business while remaining independent. Subsequent to joining our platform, our PCPs have increased their average annual income by successfully managing healthcare costs and improving health outcomes. We believe that our PCPs' engagement is manifested through deeper relationships with patients and results in a greater opportunity to improve our members' health. For example, in 2019, 78% of our members attributed to our live anchor physician groups attended their wellness visits, compared to the FFS national average CMS Annual Wellness Visit completion rate of 35% in 2019.

*Mission-Driven Team and Culture*

We have a world-class management team, which is differentiated by its breadth and depth of expertise in healthcare. Our senior management team has an average of more than 15 years of experience in the healthcare industry and has significant exposure across all components of the payment and delivery continuum. We believe our management team's collective robust, diverse and complementary exposure to different facets of the healthcare industry positions our team to navigate and enable the shift to a physician-driven Total Care Model.

Our team is united by our mission of being the trusted long-term partner to community-based physicians and driven by our vision of transforming healthcare at the community level through exceptional patient-physician relationships.

**APP 025**

**Table of Contents**

**Index to Financial Statements**

**Our Growth Strategy**

We intend to utilize our competitive strengths and capitalize on favorable industry trends to increase the number of regional hubs, local markets within those hubs and ultimately physicians and members we serve. The key elements of our growth include:

*The power of our model at work: Case study of Ohio expansion*



Note: Year in map refers to year partner joined the platform (global risk contract effective the following year)

*Establish New Regional Hubs across the Country*

We believe we are well-positioned to expand the number of our physician partners nationally across a diverse set of geographies. We have developed sophisticated business development capabilities and have established a robust pipeline with an array of physician groups across the country. We are also benefitting from the network effect of our growing network of like-minded physician partners.

*Access the Large and Embedded Membership Opportunity within Our Existing Networks*

We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000. As these patients enroll in MA through our payors, they become attributed to our platform with little incremental cost to us.

*Facilitate and Capitalize on the Growth of Our Physician Partners*

As the PCP base of our physician partners grows, our physician partners are better positioned to serve a growing Medicare population.

13

**APP 026**

Table of Contents

Index to Financial Statements

*Expand into Adjacent Geographies*

Once we establish a presence in a geography, we have the opportunity to accelerate the addition of new physician partnerships in the region. We leverage our multi-payor MA risk platform and regional infrastructure to efficiently grow into adjacent geographies. Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021.

*Increase Quality and Improve Health Outcomes to Drive Profitability*

We believe our Total Care Model drives increased profitability per member over time through increasing quality and improving health outcomes. As members and physicians mature on our platform, we increasingly recognize the benefits of improved quality of care and effectively managed healthcare costs. We believe there is significant opportunity to improve profitability per member over the course of our long-term partnerships by improving healthcare outcomes and effectively managing costs, with 70% of our MA members as of December 31, 2020 on our platform for fewer than three years.

*Demonstrate Operating Leverage*

We expect to drive increasing profitability by leveraging both our market-level operating costs and centralized infrastructure, as we manage increased MA and DCE membership on our platform that has maturing medical margin over time.

*Capitalize on Emerging Value-Based Care Opportunities*

We believe we are positioned to capitalize on the shift from FFS towards a Total Care Model across the broader healthcare system. Through five currently approved DCEs, which encompass more than 500 of our existing PCPs, we expect to provide care to over 50,000 traditional Medicare members in seven geographies. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

**Impact of COVID-19 Pandemic on Our Business**

Commencing in March 2020, we implemented various measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. These measures included relocating employees to home-based work settings, coordinating with physician partners to accelerate telehealth activity and coordinating daily huddles for physicians and team members on clinical and operational impacts of COVID, which included participation by nationally-recognized experts in infectious disease and epidemiology. Despite the challenges and uncertainties created by the COVID-19 pandemic, we believe that our response to the pandemic has reinforced the value of our platform, long-term partnership model and network.

Throughout most of 2020, our members incurred lower healthcare costs than we would have otherwise expected, which resulted in lower medical services expenses incurred. These costs may be incurred at future points in time and it is possible that the deferral of healthcare services could cause additional health problems in our existing members, which could increase our costs in the future. Additionally, our members' risk adjustment factors, which are reflective of documented clinical conditions during 2020 and which impact our 2021 revenues, may be lower than would have occurred without the impact of the COVID-19 pandemic, resulting from members' avoidance or deferral of care during 2020. We cannot accurately estimate the net ultimate impact, positive or negative, to revenue or medical services expense at this time.

Also see "Risk Factors—Risks Related to Our Business— The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this

APP 027

Table of Contents

Index to Financial Statements

situation precludes any prediction as to the ultimate adverse impact to us of COVID-19," "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of COVID-19" and "Business—Impact of COVID-19 Pandemic on Our Business."

**Company History**

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, NY. Our business was formed in 2016 through the completion of two acquisitions by CD&R: In July 2016, Primary Provider Management Company, Inc. ("PPMC") was acquired, which, together with its affiliated independent practice associations ("California IPAs"), operated in Southern California. Also in July 2016, Cyber-Pro Systems, Inc. ("CPS") was acquired, which, together with its subsidiaries and affiliates, operates a network of contracted physicians in Hawaii and provides software and medical billing solutions to independent healthcare organizations. During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

agilon health, inc., the issuer in this offering, was incorporated in the State of Delaware in April 2017 in connection with our entry into a physician partnership with Central Ohio Primary Care Physicians, Inc. ("COPC"), a physician-owned medical group, to establish a Medicare-centric, globally capitated line of business in the Columbus, Ohio region. Since that time, we have expanded and entered into new partnerships in Austin, Akron, Pittsburgh, North Carolina, Hartford, Buffalo, Toledo, Dayton and Southeast Ohio. In March 2021, we changed our name from Agilon Health Topco, Inc. to agilon health, inc., and changed the name of our subsidiary, agilon health, inc., to agilon health management, inc.

**Our Majority Shareholder and Organizational Structure**

*Clayton, Dubilier & Rice, LLC.* Founded in 1978, CD&R employs a distinctive approach to private equity investing, bringing together investment professionals and operating executives to pursue a strategy predicated on building stronger, more profitable businesses. Since inception, CD&R has managed the investment of more than $30 billion in 95 businesses with an aggregate transaction value of over $150 billion. CD&R has a disciplined and clearly defined investment strategy and has extensive experience investing across the healthcare industry.

After the completion of this offering, we expect that CD&R Vector Holdings, L.P. (the "CD&R Investor"), which is owned by investment funds managed by, or affiliated with, CD&R, will hold approximately   % of our common stock (or approximately   % if the underwriters exercise in full their option to purchase additional shares). As a result, we expect to be a "controlled company" within the meaning of the NYSE rules following the completion of this offering. This election will allow us to rely on exemptions from certain corporate governance requirements otherwise applicable to NYSE-listed companies. See "Management—Corporate Governance."

15

APP 028

**Table of Contents**

**Index to Financial Statements**

The following chart presents an overview of our ownership and organizational structure, after giving effect to this offering. For additional information with respect to our ownership structure, see "Principal Stockholders":

1    Includes COPC and certain private investment funds.
2    Includes indebtedness related to the 2021 Credit Facilities (as defined herein), including term loan indebtedness, revolver indebtedness and letters of credit. On February 18, 2021, we, through agilon health management, inc. ("agilon management"), entered in the 2021 Secured Credit Agreement (as defined herein) to refinance our outstanding indebtedness under the Credit Facilities (as defined herein). See "Description of Certain Indebtedness."
3    Operating subsidiaries include wholly-owned RBEs, independent practice associations and other immaterial subsidiaries, which have been omitted from this chart for convenience.

**Our Corporate Information**

agilon health, inc. is a Delaware corporation. Our principal executive offices are located at 1 World Trade Center, Suite 2000, Long Beach, CA 90831, and our telephone number is (562) 256-3800. Our website is *www.agilonhealth.com*. None of the information contained on, or that may be accessed through, our website or any other website identified herein is part of, or incorporated into, this prospectus, and you should not rely on any such information in connection with your decision to invest in our common stock.

16

**APP 029**

**Table of Contents**

**Index to Financial Statements**

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows and results of operations that you should consider before making a decision to invest in our common stock. These risks are discussed more fully under the caption "Risk Factors." These risks include, but are not limited to, the following:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- significant reductions in membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts, which contracts generally provide that if the cost of care exceeds the corresponding capitation revenue we receive from payors in respect of attributed members we may realize operating deficits, which are typically not capped, and could lead to substantial losses;
- dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- ability to comply with federal, state and local regulations and laws we are subject to, or to adapt to changes in or new regulations or laws, including as such regulations and laws that relate to our physician alignment strategies with our physician partners or the corporate practice of medicine;
- our physician partners' compliance with federal and state healthcare fraud and abuse laws and regulations; and
- the influence of the CD&R Investor and our status as a "controlled company."

17

**APP 030**

Table of Contents

Index to Financial Statements

**Implications of Being an Emerging Growth Company**

As a company with less than $1.07 billion in annual gross revenue for the year ended December 31, 2019, we were an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). An emerging growth company may take advantage of specified reduced reporting and other reduced requirements that are otherwise applicable generally to public companies. These provisions include:

- in this prospectus, we may present only two years of audited financial statements and only two years of related Management's Discussion and Analysis of Financial Condition and Results of Operations disclosure; and
- in this prospectus, we are permitted to provide less extensive disclosure about our executive compensation arrangements such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, under the JOBS Act, emerging growth companies can also delay adopting new or revised financial accounting standards until such time as those standards would otherwise apply to private companies. We have elected to avail ourselves of this exemption from new or revised accounting standards and, therefore, will not be subject to the new or revised accounting standards other public companies will implement that are not emerging growth companies. As a result, our consolidated financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of the effective dates applicable to public companies.

We ceased to be an emerging growth company on December 31, 2020 because our annual gross revenues exceeded $1.07 billion for the year ended December 31, 2020. However, we will continue to be treated as an emerging growth company for disclosure purposes in this prospectus until the completion of our initial public offering. We have elected to take advantage of certain of the foregoing reduced burdens in this prospectus and, as such, the information in this prospectus may be different than the information provided by other public companies. Some investors could find our common stock less attractive as a result of our utilization of these or other exemptions. This could result in a less active trading market for our common stock and increased volatility in the price of our common stock.

18

APP 031

Table of Contents

Index to Financial Statements

**THE OFFERING**

| | |
|---|---|
| Common stock offered by us | shares. |
| Common stock to be outstanding after this offering | shares. |
| Option to purchase additional shares | The underwriters also may purchase up to additional shares from us at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus. |
| Use of proceeds | We estimate that the net proceeds to us from this offering, after deducting estimated underwriting discounts and commissions and estimated offering expenses, will be approximately $ million, or approximately $ million if the underwriters exercise in full their option to purchase additional shares. |
| | We intend to use the net proceeds of this offering for working capital and other general corporate purposes. See "Use of Proceeds." |
| Dividend policy | We do not currently anticipate paying dividends on our common stock for the foreseeable future. Any future determination to pay dividends on our common stock will be subject to the discretion of our board of directors and depend upon various factors. See "Dividend Policy." |
| Risk Factors | Our business is subject to a number of risks that you should consider before making a decision to invest in our common stock. See "Risk Factors." |
| Reserved Share Program | At our request, an affiliate of BofA Securities, Inc., a participating underwriter, has reserved for sale, at the public offering price, up to 5% of the shares offered by this prospectus. If purchased, these shares of common stock will not be subject to a lock-up restriction. The number of shares of common stock available for sale to the general public will be reduced to the extent such shares of common stock are purchased pursuant to this program. Any reserved shares that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares of common stock offered by this prospectus. The underwriters will receive the same underwriting discounts and commissions on any shares of common stock purchased pursuant to this program as they will on any other shares of common stock sold to the public in this offering. |
| Proposed symbol | "AGL". |

The number of shares of our common stock to be outstanding immediately following this offering is based on shares outstanding as of , 2021, and excludes:

- shares of common stock issuable upon exercise of options outstanding as of , 2021 at a weighted average exercise price of $ per share, of which shares will be exercisable as of the consummation of this offering;

19

APP 032

**Table of Contents**

**Index to Financial Statements**

- shares of common stock reserved for future issuance following this offering under our Omnibus Incentive Plan and ESPP; and
- shares of our common stock subject to outstanding RSUs granted to directors.

Unless otherwise indicated, all information in this prospectus:
- gives effect to a -for- stock split on our common stock effected on , 2021;
- gives effect to the issuance of shares of common stock in this offering;
- assumes no exercise by the underwriters of their option to purchase additional shares;
- assumes that the initial public offering price of our common stock will be $ per share (which is the midpoint of the price range set forth on the cover page of this prospectus);
- assumes the issuance of shares of common stock issuable under partner physician group equity agreements conditioned on completion of this offering; and
- gives effect to amendments to our amended and restated certificate of incorporation (the "Certificate of Incorporation") and amended and restated by-laws (the "By-laws") to be adopted prior to the completion of this offering.

20

**APP 033**

Table of Contents

Index to Financial Statements

**SUMMARY HISTORICAL CONSOLIDATED FINANCIAL DATA**

The following tables set forth our summary historical consolidated financial data derived from our consolidated financial statements as of the dates and for each of the periods indicated. The summary historical consolidated financial data as of and for the years ended December 31, 2019 and December 31, 2020 are derived from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results to be expected for any future period.

You should read this summary historical consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements included elsewhere in this prospectus.

| | Year Ended December 31, | |
|---|---|---|
| (dollars in thousands) | 2020 | 2019 |
| **Consolidated Statement of Operations Data:** | | |
| **Revenues:** | | |
| Medical services revenue | $ 1,214,270 | $ 788,566 |
| Other operating revenue | 4,063 | 5,845 |
| Total revenues | 1,218,333 | 794,411 |
| **Expenses:** | | |
| Medical services expense | 1,021,877 | 725,374 |
| Other medical expenses | 102,306 | 40,526 |
| General and administrative | 137,292 | 122,832 |
| Depreciation and amortization | 13,531 | 12,253 |
| Total expenses | 1,275,006 | 900,985 |
| **Income (loss) from operations** | (56,673) | (106,574) |
| **Other income (expense):** | | |
| Other income (expense), net | 2,465 | 955 |
| Interest expense | (8,135) | (9,068) |
| **Income (loss) before income taxes** | (62,343) | (114,687) |
| Income tax benefit (expense) | (865) | 232 |
| **Income from continuing operations** | (63,208) | (114,455) |
| **Discontinued operations:** | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | (20,049) | (86,108) |
| Impairments | — | (98,343) |
| Gain (loss) on sales of assets, net | 20,401 | — |
| Income tax benefit (expense) | 2,804 | 16,166 |
| **Total discontinued operations** | 3,156 | (168,285) |
| **Net income (loss)** | (60,052) | (282,740) |
| Noncontrolling interests' share in discontinued operations | — | 152 |
| **Net income (loss) attributable to common shares** | $ (60,052) | $ (282,588) |
| **Consolidated Balance Sheet Data (at period end):** | | |
| Cash and cash equivalents | $ 106,795 | $ 123,633 |
| Total assets | $ 446,361 | $ 402,794 |
| Total liabilities | $ 421,591 | $ 353,822 |

21

APP 034

**Table of Contents**

**Index to Financial Statements**

| (dollars in thousands) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
|---|---|---|---|---|
| Contingently redeemable common stock | $ | 309,500 | $ | 281,000 |
| Total stockholders' deficit | $ | (284,730) | $ | (232,028) |

| (dollars in thousands) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
|---|---|---|---|---|
| **Consolidated Statement of Cash Flows Data:** | | | | |
| Cash flows from: | | | | |
| Operating activities | $ | (53,204) | $ | (103,861) |
| Investing activities | $ | 22,066 | $ | (5,060) |
| Financing activities | $ | 24,621 | $ | 176,298 |

| (dollars in thousands) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
|---|---|---|---|---|
| **Other Financial Data:** | | | | |
| Medical margin(1) | $ | 192,393 | $ | 63,192 |
| Network contribution(2) | $ | 99,016 | $ | 25,598 |
| Adjusted EBITDA(3) | $ | 5,827 | $ | (56,711) |

(1) Medical margin represents medical services revenue after deducting medical services expense.

(2) Network contribution is a non-GAAP financial measure. Network contribution represents medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Income (loss) from operations is the most directly comparable U.S. generally accepted accounting principles ("GAAP") measure to network contribution. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding network contribution and a reconciliation to income (loss) from operations.

(3) Adjusted EBITDA is a non-GAAP financial measure. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding Adjusted EBITDA and a reconciliation to net income (loss).

22

**APP 035**

Table of Contents

Index to Financial Statements

**RISK FACTORS**

*Risks Related to Our Business*

*We have a history of net losses, we anticipate increasing expenses in the future and we may not achieve or maintain profitability.*

We have incurred significant net losses in the past, including net losses (including discontinued operations) of $60.1 million for the year ended December 31, 2020 and $282.7 million for the year ended December 31, 2019. As a result of these losses, we had accumulated deficits of $551.2 million as of December 31, 2020 and $491.1 million as of December 31, 2019. We expect that our expenses will increase substantially in the foreseeable future and our losses will continue, including for the year ended December 31, 2021, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

*Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows and results of operations.*

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As an immature and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures

23

APP 036

Table of Contents

Index to Financial Statements

to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business, financial condition, cash flows and results of operations could be harmed.

*We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.*

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing upon these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, as a rapidly growing and relatively immature company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows and results of operations could be harmed.

*Amounts of medical expenses which are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.*

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows and results of operations.

Additionally, factors which impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:
- Changes to the Medicare fee schedule or other rate schedules which serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

24

APP 037

Table of Contents

Index to Financial Statements

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;
- The utilization rates of healthcare services, including inpatient hospitalization, by our members;
- Changes to member benefit levels established annually by payors; and
- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows and results of operations.

*As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.*

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and ,therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or which are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

*We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.*

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As a result, as our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows and results of operations could be materially adversely affected.

25

**Table of Contents**

**Index to Financial Statements**

*We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.*

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. As of December 31, 2020 and December 31, 2019, our cash and cash equivalents were $106.8 million and $123.6 million, respectively. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced extreme volatility and disruption, which has increased due to the effects of COVID-19. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our Credit Facilities.

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable time, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

*Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows and results of operations.*

A significant reduction in membership could adversely affect our business, financial condition, cash flows and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:
- failure to obtain new physician partners or members or to retain existing physician partners or members;
- decision by a payor to not renew the existing contractual agreement upon termination of such contract;
- low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;
- alternative care opportunities that are more attractive than those provided by our physician partners;
- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;
- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

26

**APP 039**

Table of Contents

Index to Financial Statements

- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and
- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

### *The transition to a Total Care Model may be challenging for physician partners.*

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows and results of operations could be materially adversely affected.

### *If the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies are inaccurate, our future growth rate may be impacted and we may generate losses in such markets, or we may fail to attain financial performance targets.*

We often do not have access to reliable historical data regarding the size, revenue or medical expense levels of our target geographies or potential physician partners. As a result, our market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size and expected growth of the market for our services and the estimates of our market opportunity may prove to be inaccurate.

Principal assumptions relating to our market opportunity include estimates of the total number and average length of relationships between MA patients and their physicians, historical MA patient growth rates, amount of revenue and medical expenses associated with MA members expected to be attributed to our physician partners and historical experience that physician partners have with a Total Care Model. Our opportunity is based on the assumption that our platform, partnership and network model will be more attractive to potential physician partners than competing options. However, potential physician partners may elect to pursue a different strategic option.

### *The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19.*

COVID-19 continues to spread in the United States and throughout the world. COVID-19 and the efforts to contain the outbreak have led to significant economic disruption, including extreme volatility in financial markets, reduced economic activity and a sharp increase in unemployment claims, as well as disruption in some of our physician partners' businesses. The spread of COVID-19 underscores certain risks we face in our business described herein.

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, increasing the potential for harm for our members. If the spread of COVID-19 is not contained, the

27

Table of Contents

Index to Financial Statements

medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to manage their existing clinical conditions, and the amount of medical care which has been deferred during the pandemic may exceed our expectations. Furthermore, we may experience reduced revenues as a result of changes to future capitation payment rates if Medicare members use fewer services due to COVID-19. For example, restrictions imposed as a result of COVID-19 may continue to decrease utilization of preventative or non-emergency healthcare, significantly decreasing provider costs. Should CMS adjust reimbursement rates based on margins during the pendency of COVID-19, our revenues in future periods and financial results may be materially adversely affected. Such measures and any further steps taken by us, or governmental action, to expand or otherwise modify the services delivered to our enrolled members, provide relief for the healthcare provider community, or in connection with the relaxation of stay-at-home and physical distancing orders and other restrictions on movement and economic activity intended to reduce the spread of COVID-19, including enhanced measures to implement widespread testing as a component of lifting these measures, could adversely impact our business, financial condition, cash flows and results of operations.

The spread of COVID-19, or actions taken to mitigate this spread, including the efficacy, ability to administer or extent of adoption of COVID-19 vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations. We have transitioned a significant subset of our employee population to a remote work environment in an effort to mitigate the spread of COVID-19, which could exacerbate certain risks to our business, including an increased demand for information technology resources, increased risk of phishing and other cybersecurity attacks as well as other risks to the privacy and confidentiality of data, and increased risk of unauthorized dissemination of sensitive personal information or proprietary or confidential information about us or our members or other third parties. We have taken, and may take, further actions that alter our business operations as may be required by local, state, or federal authorities or that we determine are in the best interests of our employees. Such measures could negatively affect our ability to provide care to members, relationship with physician partners, marketing efforts, employee productivity, or customer retention, any of which could harm our business, financial condition, cash flows and results of operations.

Further, due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient, based on each patient's documented clinical diagnoses activity in the preceding calendar year. Medicare requires that a patient's health issues be clinically assessed and sufficiently documented annually regardless of the permanence of the underlying clinical conditions. Historically, this clinical assessment and documentation was required to be completed during an in-person visit with a patient. As part of the Coronavirus Aid, Relief and Economic Security Act, or "CARES Act," Medicare is allowing documentation for conditions identified during video visits with patients. However, given the disruption caused by COVID-19, it is unclear whether our physician partners will be able to conduct patient interactions to clinically assess and accurately and sufficiently document the health conditions of our members, which could adversely impact our revenue in 2021 and beyond.

The rapid development and fluidity of this situation precludes any prediction as to the ultimate impact on us of COVID-19. We are continuing to monitor the spread of COVID-19, changes to our payors' benefit coverages, the

28

APP 041

Table of Contents

Index to Financial Statements

ongoing costs and business impacts of dealing with COVID-19, including the potential costs associated with lifting restrictions on movement and economic activity and with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of the pandemic and its ultimate impact on us is uncertain as this continues to evolve globally, but such impacts could be material to our business, financial condition, cash flows and results of operations.

*Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.*

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services which have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

*Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.*

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions

29

**Table of Contents**

**Index to Financial Statements**

typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows and results of operations to be harmed.

*Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.*

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions which would adversely affect our business, financial condition, cash flows and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

*We rely on our management team and key employees and our business, financial condition, cash flows and results of operations could be harmed if we are unable to retain qualified personnel.*

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. Prior to this offering, in order to retain and motivate valuable employees, in addition to salary and cash incentives, we provided stock options that either vest over time or are based on the equity return realized by our controlling stockholder. The value to employees of these stock options is significantly affected by movements in our stock price that are outside our control. The compensation and benefits we provide to our employees, together with the value of stock options that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all. Following the offering, we intend to continue to use equity awards as part of our executive compensation program, and volatility or lack of performance in our stock price may also affect our ability to attract any replacements or retain these employees.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows and results of operations will be harmed.

30

Table of Contents

Index to Financial Statements

***We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.***

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. As of December 31, 2020 and December 31, 2019, respectively, we had $102.0 million and $112.7 million of net intangible assets, including $41.5 million of goodwill. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. A detailed discussion of our impairment testing is included in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates."

Due to the continued deterioration in the performance of our California reporting unit, in the fourth quarter of 2019, we initiated a process to evaluate strategic alternatives for our California operations, including a sale or abandonment of all or substantially all of such operations. We therefore performed an assessment of the long-lived assets in the California reporting unit for impairment and determined that the carrying value of certain of those assets was not recoverable. Accordingly, we wrote-down such assets to fair value, resulting in the recognition of a $98.3 million impairment charge included in discontinued operations in the audited consolidated statement of operations for the year ended December 31, 2019. See "Note 19. Discontinued Operations" in our consolidated financial statements included elsewhere in this prospectus.

Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Adverse determinations of tax matters could adversely affect our business, financial condition, cash flows and results of operations.***

We are subject to tax laws in the various jurisdictions in which we operate, and the application of these laws to us may be unclear. Some interpretations adopted by us could be challenged by the relevant tax authorities. A successful challenge could result in adverse consequences for us, including potentially the payment of taxes, penalties or interest in amounts that may be material. See "Note 11. Commitments and Contingencies" in our audited consolidated financial statements included elsewhere in this prospectus.

***Security breaches, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.***

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as protected health information ("PHI") and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The

31

Table of Contents

Index to Financial Statements

security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing.

We have experienced cybersecurity incidents in the past and may experience them in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of

32

APP 045

**Table of Contents**

**Index to Financial Statements**

system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;
- communications failures;
- software and hardware errors, failures and crashes;
- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and
- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***We could be required to devote significant attention and resources to the provision of certain transition services in connection with the disposition of our California Operations.***

In February 2021, we completed the divestiture of our California Operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes in our financial statements included elsewhere in this prospectus.

In connection with the divestiture, we have agreed to continue to provide administrative support and transition services for a specified period of time. The transition services to be provided by us could require significant management attention and resources which could negatively affect our ongoing business. Additionally, we could experience operational difficulties and increased costs that exceed our estimates to provide the transition services if we are unable to perform such services with our existing resources at an acceptable level, or at all, or obtain them from a third party on reasonable terms.

**APP 046**

Table of Contents

Index to Financial Statements

For the Southern California and Fresno divestiture transactions, we will continue to be responsible for any liabilities arising from the business prior to the closing date of each transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction. We may not be successful in managing the risks associated with the divestiture of our California operations.

### *Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.*

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *Risks Related to Our Reliance on Third Parties*

### *We are economically dependent on maintaining our contracts with a limited number of key payors.*

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

### *Our contracts with our payors are for limited terms, and may not be renewed upon their expiration.*

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

34

Table of Contents

Index to Financial Statements

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. For example, a group contract through which certain of our members in our Texas geography receive care was awarded to a new payor with whom we are not currently contracted to attribute members for 2021. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.*

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information which payors provide to us, we and our physician partners may not be able to effectively ensure our members disease burdens are identified and may not be able to effective operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we

35

APP 048

**Table of Contents**

**Index to Financial Statements**

do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

*Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

36

**APP 049**

Table of Contents

Index to Financial Statements

***We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.***

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

In recent years, the U.S. Department of Justice has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors for alleged upcoding or improper coding of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for penalties to the government under the FCA that range from $11,181 to $22,363 (adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting

37

APP 050

**Table of Contents**

**Index to Financial Statements**

documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.

*Risks Related to Our Industry and Government Programs*

***Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally,

38

**APP 051**

**Table of Contents**

**Index to Financial Statements**

consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows and results of operations.***

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for approximately 100% and 99% of our total revenues for the year ended December 31, 2020 and the year ended December 31, 2019, respectively. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Furthermore, changes to Medicare or MA, such as if CMS were to scale back these programs or discontinue MA, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

***Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets

39

**APP 052**

Table of Contents

Index to Financial Statements

have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

***We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows and results of operations will be harmed.***

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows and results of operations could be materially adversely affected.

40

Table of Contents

Index to Financial Statements

*Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.*

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the Patient Protection and Affordable Care Act (the "ACA"), the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low quality rating for three consecutive years. Low quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations.

*Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.*

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past and could in the future result in substantial reductions in our revenue and operating margins. For example, since the passage of the Sequestration Transparency Act of 2012, Medicare payments have been subject to a 2% sequestration reduction; these cuts were the result of a congressional deal to address the debt ceiling crisis. The CARES Act temporarily suspended the 2% sequestration payment adjustment on Medicare payments from May 1, 2020 through December 31, 2020, which was extended to March 31, 2021 by the Consolidated Appropriations Act, 2021. Further, the passage of the Improving Medicare Post-Acute Care Transformation

41

APP 054

Table of Contents

Index to Financial Statements

("IMPACT") Act imposes a stringent timeline for implementing benchmark quality measures and data metrics across post-acute care providers. CMS has promulgated, and may continue to promulgate, regulations to implement provisions of the IMPACT Act. The costs of implementation could be significant, particularly with respect to the design of a unified payment methodology for post-acute providers. Failure to meet implementation requirements could expose providers to payment reductions and penalties.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and risks generated from managing such beneficiaries. We, in conjunction with some of our physician partners, have applied and been accepted to participate in the Direct Contracting Model in certain geographies beginning April 1, 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has not yet been finalized by CMS, particularly as CMS continues to address the COVID-19 public health emergency. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model by utilizing, for example, MA-like market benchmarks, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Further, the CMS Innovation Center has not yet finalized its attribution methodology under the Direct Contracting Model's Geographic Population-Based Payment ("Geographic PBP") model option. If the CMS Innovation Center grants Geographic PBP DCEs an attribution advantage over other types of performance-based risk model participants, the impact on our business, financial condition, cash flows and operations may depend on our arrangements with CMS. In arrangements where we are contracted directly as a DCE, we may benefit, and in arrangements where we are downstream from a DCE, we may be adversely impacted. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

Additionally, we are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific

42

**Table of Contents**

**Index to Financial Statements**

licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations, including with respect to our contractual relationships with providers and payors.

*We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.*

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

*We have in the past, and may in the future, be subject to regulatory inquiries and CAPs imposed by our payors.*

We have in the past been, and may in the future be, subject to regulatory inquiries and corrective action plans ("CAPs") imposed by our payors, and the status of certain state regulatory and payor inquiries is uncertain. For example, in February 2018, our subsidiary, PPMC, self-disclosed to the California Department of Managed Health Care ("DMHC"), the California Department of Health Care Services, and our affected payors certain noncompliant practices in our claims and utilization management. We submitted an interim report on May 17, 2018 and coordinated with the DMHC and certain of our payors to remediate noncompliant claims and utilization management practices and implement improvements through various CAPs. On December 17, 2019, we completed substantial remediation of all known deficiencies identified by the DMHC's audit findings. In February 2021, we divested all of our California operations. On March 9, 2021, we received a set of investigative interrogatories from the DMHC pursuant to its investigation of conduct and matters described in our interim report. The interrogatories seek information concerning certain claims data and authorizations denied due to lack of medical necessity, including information regarding the health plans affected thereby. We are cooperating with the DMHC to provide all requested information. While we have divested all of our California operations as of February 2021, we retain certain liabilities stemming therefrom. Any adverse review, audit or investigation could result in, among other things: refunding of amounts we have been paid pursuant to our contracts; or the imposition of fines, penalties and other sanctions on us, or certain of our payors. We are unable to predict the potential dollar value of recoupments or fines, penalties or other sanctions that may be imposed on us related to

**APP 056**

Table of Contents

Index to Financial Statements

the DMHC's audit findings, if any. Additionally, while our payors have not to date sought indemnification for penalties, if any, related to DMHC's audit findings, we are unable to predict the potential dollar value of claims or demands that could be asserted in the future, if any.

Further, we may be audited by payors and regulatory bodies, and we have been required to engage in and respond to payor corrective action plans and regulatory inquiries in the past. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. As of December 31, 2020, risk-bearing capital required across our geographies and payors totaled $38.8 million. There is also a risk that such amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

### *Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.*

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

### *CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.*

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. For 2020 and 2019, respectively, 50% and 25% of our MA members' risk adjustment factor was calculated from claims data submitted through EDS. In 2021, CMS increased that percentage to 75%. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues.

44

Table of Contents

Index to Financial Statements

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;
- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or
- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

***Legal and Regulatory Risks***

***The healthcare industry is intensely regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our current conduct or even conduct that occurred a number of years ago, including prior to the acquisition of our subsidiary, PPMC, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law, or whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the False Claims Act and the Civil Monetary Penalties Law ("CMPL"), which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;
- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;
- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing designated health services ("DHS") if the physician (or his/her immediate family member) has a financial relationship with that entity;

45

**APP 058**

**Table of Contents**

**Index to Financial Statements**

- Provisions of, and regulations enacted pursuant to, HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act") and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;
- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;
- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;
- State laws that govern the activities of third-party administrators and utilization review agents; and
- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters."

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been and may be a party to various lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in federal healthcare programs;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;
- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;
- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;
- mandated changes to our practices or procedures that materially increase operating expenses;
- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;
- termination of various relationships or contracts related to our business; and
- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

46

**Table of Contents**

**Index to Financial Statements**

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

***The healthcare industry is subject to antitrust scrutiny, and if it is found that we violate antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

The healthcare industry is subject to antitrust scrutiny. The federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. The Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice ("DOJ") and state Attorneys General actively review and, in some cases, take enforcement action against business conduct and acquisitions in the healthcare industry. Private parties harmed by alleged anti-competitive conduct can also bring antitrust suits. Violations of antitrust laws may be punishable by substantial penalties, including significant monetary fines and treble damages, civil penalties, criminal sanctions and consent decrees and injunctions prohibiting certain activities or requiring divestiture or discontinuance of business operations. If antitrust enforcement authorities conclude that we violate any antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting the U.S. healthcare reform, our business may be harmed.***

Due to the importance of the healthcare industry in the lives of all Americans, federal, state and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect the healthcare industry. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. We cannot predict the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect our business or could change the operating environment of our primary care centers. It is also possible that the changes to federal healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in federal healthcare programs, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

There can be no assurance that we will be able to successfully address changes in the current regulatory environment. Some of the healthcare laws and regulations applicable to us are subject to limited or evolving interpretations, and a review of our business or operations by a court, law enforcement or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

47

**APP 060**

Table of Contents

Index to Financial Statements

***If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.***

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to (i) increase the quality of care while appropriately managing overall costs and (ii) participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law."

The laws and regulations, however, are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.***

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms, but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute." Our physician partners and the payors with which we contract risk running afoul of applicable

48

APP 061

Table of Contents

Index to Financial Statements

state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (*e.g.*, the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Our business development and member engagement activities may implicate the federal Telephone Consumer Protection Act ("TCPA"), related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws." A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's protected health information in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

***Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.***

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters." Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory Matters—Other Laws and Regulations." If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

49

**Table of Contents**

**Index to Financial Statements**

***Our use, disclosure and processing of protected health information is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time to time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply

50

Table of Contents

Index to Financial Statements

with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows and results of operations.

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. To the extent the physician partners' non-compliance impacts members who are attributed to our RBEs (*e.g.*, through the loss of protected patient information), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows and results of operations.

***Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.***

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws." We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.***

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a lay entity may violate the corporate practice of medicine doctrine. See "Business—Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine." A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

51

Table of Contents

Index to Financial Statements

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

*If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.*

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person which could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

*We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows and results of operations.*

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also

52

Table of Contents

Index to Financial Statements

be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation, and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

### *Risks Related to Our Indebtedness*

### *We have substantial indebtedness and may incur additional indebtedness, which could adversely affect our financial health and our ability to obtain financing in the future, react to changes in our business or satisfy our obligations.*

As of December 31, 2020 we, through our wholly-owned subsidiary agilon health management, inc., had approximately $68.6 million of total long-term consolidated indebtedness outstanding under our secured credit agreement, dated as of July 1, 2016 (as amended from time to time, the "Secured Credit Agreement") governing the term loan and revolving credit facility (the "Secured Credit Facility"), and our unsecured credit agreement, dated as of December 22, 2017 (the "Unsecured Credit Agreement"), governing our unsecured term loan facility (the "Unsecured Term Loan Facility" and, together with the Secured Credit Facility, the "Credit Facilities"). As of such date, we also had $41.5 million of additional borrowings available under our revolving credit facility after taking into account $18.5 million of letters of credit outstanding. On February 18, 2021, we, through our wholly-owned subsidiary agilon health management, inc., entered into the 2021 Secured Credit Agreement to refinance our outstanding indebtedness under the Credit Facilities, consisting of (i) a senior secured term loan facility in an aggregate principal amount of $100.0 million and (ii) a senior secured revolving credit facility in an aggregate principal amount of $100.0 million. See "Description of Certain Indebtedness." In addition, we may incur additional indebtedness in the future, subject to the limitations contained in the agreements governing our indebtedness. Our substantial indebtedness could have important consequences to you. Because of our substantial indebtedness:

- our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements, pay dividends and make other distributions or to purchase, redeem or retire

53

Table of Contents

Index to Financial Statements

capital stock or for general corporate purposes and our ability to satisfy our obligations with respect to our indebtedness may be impaired in the future;

- a large portion of our cash flow from operations must be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available to us for other purposes;
- we are exposed to the risk of increased interest rates because a significant portion of our borrowings are at variable rates of interest;
- it may be more difficult for us to satisfy our obligations to our creditors, resulting in possible defaults on, and acceleration of, such indebtedness;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be at a competitive disadvantage compared to our competitors with proportionately less indebtedness or with comparable indebtedness on more favorable terms and, as a result, they may be better positioned to withstand economic downturns;
- our ability to refinance indebtedness may be limited or the associated costs may increase;
- our flexibility to adjust to changing market conditions and ability to withstand competitive pressures could be limited;
- our ability to pay dividends and make other distributions or to purchase, redeem or retire capital stock may be limited; and
- we may be prevented from carrying out capital spending and restructurings that are necessary or important to our growth strategy and efforts to improve our operating margins.

*Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.*

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the credit agreement, dated as of February 18, 2021 (the "2021 Credit Agreement") governing our term loan and revolving credit facility (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "2021 Secured Credit Facilities") by and among agilon health management, inc., Agilon Health Intermediate Holdings, Inc. ("Intermediate Holdings"), the Lenders party thereto, the Issuers party thereto (each as defined therein), JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and JPMorgan Chase Bank, N.A. Bank of America, N.A., Wells Fargo Securities, LLC, Deutsche Bank Securities Inc. and Nomura Securities International Inc., as joint lead arrangers and joint bookrunners does not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the 2021 Secured Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the 2021 Secured Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

*Increases in interest rates would increase the cost of servicing our indebtedness and could reduce our profitability.*

A significant portion of our outstanding indebtedness bears interest at variable rates, including $48.6 million of outstanding borrowings and $41.5 million of additional borrowings available under our Secured Credit Facility after taking into account $18.5 million of letters of credit outstanding, as of December 31, 2020. As adjusted for the entry into the 2021 Credit Facilities, $100.0 million of outstanding borrowings and $81.5 million of additional borrowings available under the 2021 Credit Facilities bear interest at variable rates, after taking into

54

**Table of Contents**

**Index to Financial Statements**

account $18.5 million of letters of credit outstanding as of February 18, 2021. As a result, increases in interest rates would increase the cost of servicing our indebtedness and could materially and adversely affect our business, financial condition, cash flows and results of operations. As of December 31, 2020, assuming the London Interbank Offered Rate ("LIBOR") exceeded 1.00%, each one percentage point change in interest rates would have resulted in a change of approximately $0.5 million in the annual interest expense on our Secured Credit Facility. As of December 31, 2020, assuming availability was fully utilized, each one percentage point change in interest rates would have resulted in a change of approximately $1.1 million in annual interest expense on the Secured Credit Facility. The impact of increases in interest rates could be more significant for us than it would be for some other companies because of our indebtedness, thereby affecting our profitability.

Furthermore, uncertainty about the continuing availability of LIBOR may adversely affect our business, financial condition, cash flows and results of operations. On July 27, 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that after December 31, 2021, it would no longer compel banks to submit the rates required to calculate LIBOR. On March 5, 2021, the current administrator of LIBOR, ICE Benchmark Administration, announced that it would cease publication of certain tenors of U.S. dollar LIBOR on June 30, 2023. With this announcement, there is uncertainty about the continued availability of LIBOR after 2021 or, in certain circumstances, 2023. If LIBOR ceases to be available or the methods of calculating LIBOR change from the current methods, financial products with interest rates tied to LIBOR may be adversely affected. Even if LIBOR remains available, it is uncertain whether it will continue to be viewed as an acceptable market benchmark, what rate or rates may become accepted alternatives to LIBOR or what the effect of any such changes in views or alternatives may be on the markets for LIBOR-indexed financial instruments. As of December 31, 2020, adjusted to reflect the entry into the 2021 Secured Credit Facilities, all of our aggregate consolidated indebtedness was indexed to LIBOR. If any of the foregoing were to occur, the interest rates on such indebtedness may be adversely affected.

*The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.*

Our 2021 Secured Credit Facilities contain covenants that, among other things, restrict the ability of agilon management and its subsidiaries to:

- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;
- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and
- enter into lines of business.

agilon management and its subsidiaries accounted for 100% of our total assets and 100% of our total liabilities as of December 31, 2020. Consequently, the restrictions in the 2021 Secured Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

55

**APP 068**

Table of Contents

Index to Financial Statements

The ability of agilon management to comply with the covenants and restrictions contained in the 2021 Secured Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the 2021 Secured Credit Facilities, could proceed against the collateral securing the indebtedness. All obligations under the 2021 Secured Credit Facilities are guaranteed by Intermediate Holdings and each domestic subsidiary of agilon management other than certain excluded subsidiaries. All obligations of agilon management and each guarantor are secured by a perfected security interest in substantially all tangible and intangible assets of agilon management and each such guarantor, including the capital stock of each domestic subsidiary of agilon management and each such guarantor, and 65% of each series of capital stock of any non U.S. subsidiary held directly by agilon management or any guarantor, subject to certain exceptions. In any such case, we may be unable to borrow under the 2021 Secured Credit Facilities and may not be able to repay the amounts due under such facilities. This could materially and adversely affect our business, financial condition, cash flows and results of operations, and could cause us to become bankrupt or insolvent.

***Our ability to generate the significant amount of cash needed to pay interest and principal on our indebtedness and our ability to refinance all or a portion of our indebtedness or obtain additional financing depends on many factors outside our control.***

agilon management, the borrower under the 2021 Secured Credit Facilities, is a holding company, and as such it has no independent operations or material assets other than ownership of equity interests in its subsidiaries. agilon management depends on its subsidiaries to distribute funds to it so that it may pay obligations and expenses, including satisfying obligations with respect to indebtedness. Our ability to make scheduled payments on, or to refinance our obligations under, our indebtedness depends on the financial and operating performance of the subsidiaries of agilon management and their ability to make distributions and dividends to it, which, in turn, depends on their results of operations, cash flows, cash requirements, financial position and general business conditions and any legal and regulatory restrictions on the payment of dividends to which they may be subject, many of which could be outside our control.

We may be unable to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness. If our cash flow and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek to obtain additional equity capital or restructure our indebtedness. In the future, our cash flow and capital resources may not be sufficient for payments of interest on and principal of our indebtedness, and such alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations.

The final maturity date of the 2021 Secured Term Loan Facility and the 2021 Secured Revolving Facility is February 18, 2024 or, following consummation of this offering (so long as this offering generates total gross proceeds in excess of $500.0 million), February 18, 2026. We may be unable to refinance any of our indebtedness or obtain additional financing, particularly because of our substantial indebtedness. Market disruptions, such as those experienced in 2008, 2009 and March 2020, as well as our indebtedness levels, may increase our cost of borrowing or adversely affect our ability to refinance our obligations as they become due. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all. If we are unable to refinance our indebtedness or access additional credit, or if short-term or long-term borrowing costs dramatically increase, our ability to finance current operations and meet our short-term and long-term obligations could be adversely affected.

If agilon management cannot make scheduled payments on its indebtedness, it will be in default and the lenders under the 2021 Secured Credit Facilities could terminate their commitments to loan money or, in the case of lenders under the 2021 Secured Credit Facilities, foreclose against the assets securing their borrowings, and

56

APP 069

**Table of Contents**

**Index to Financial Statements**

we could be forced into bankruptcy or liquidation. Any of these actions could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Common Stock and This Offering

#### An active trading market for our common stock may not develop, and you may not be able to resell your shares at or above the initial public offering price.

Prior to this offering, there has been no public market for shares of our common stock. Although our common stock will be approved for listing on the NYSE, an active trading market for our shares may never develop or be sustained following this offering. The initial public offering price of our common stock was determined through negotiations between us and the underwriters. This initial public offering price may not be indicative of the market price of our common stock after this offering. In the absence of an active trading market for our common stock, investors may not be able to sell their common stock at or above the initial public offering price or at the time that they would like to sell.

#### agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. See "Management's Discussion and Analysis of Financial Condition and Results of Operations." To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography and ranged from $50,000 to $10.0 million, or $38.8 million in the aggregate across all of our geographies and payors, as of December 31, 2020. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

#### The market price of our common stock may be volatile and could decline after this offering.

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. The market price of our common stock may fluctuate significantly. Among the factors that could affect our stock price are:

- industry, regulatory or general market conditions;
- domestic and international economic factors unrelated to our performance;

**APP 070**

Table of Contents

Index to Financial Statements

- changes in our physician partners' or their patients' preferences;
- new regulatory pronouncements and changes in regulatory guidelines;
- lawsuits, enforcement actions and other claims by third parties or governmental authorities;
- actual or anticipated fluctuations in our quarterly operating results;
- lack of research coverage and reports by industry analysts or changes in any securities analysts' estimates of our financial performance;
- action by institutional stockholders or other large stockholders, including future sales of our common stock;
- failure to meet any guidance given by us or any change in any guidance given by us, or changes by us in our guidance practices;
- announcements by us of significant impairment charges;
- speculation in the press or investment community;
- investor perception of us and our industry;
- changes in market valuations or earnings of similar companies;
- the impact of short selling or the impact of a potential "short squeeze" resulting from a sudden increase in demand for our common stock;
- announcements by us or our competitors of significant contracts, acquisitions, dispositions or strategic partnerships;
- war, terrorist acts and epidemic disease, including COVID-19;
- any future sales of our common stock or other securities;
- additions or departures of key personnel; and
- misconduct or other improper actions of our employees.

In particular, we cannot assure you that you will be able to resell your shares at or above the public offering price. Stock markets have experienced extreme volatility in recent years that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against the affected company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which could materially and adversely affect our business, financial condition, cash flows and results of operations.

*Our management will have broad discretion over the use of the proceeds we receive in this offering and might not apply the proceeds in ways that increase the value of your investment.*

Our management will have broad discretion to use the net proceeds we receive from this offering, and you will be relying on the judgment of our management regarding the use of these proceeds. Our management might not apply the net proceeds of this offering in ways that increase the value of your investment. We expect to use the net proceeds from this offering for working capital and other general corporate purposes, including accelerating the growth of our existing geographies and our national network of partners, and to make available financing options to our physician partners in connection with taxes payable on shares to be distributed to them upon consummation of the offering under the partner physician group equity agreements, in an aggregate amount estimated to be approximately $90 million to $120 million. Additionally, if the gross proceeds from this offering exceed $1.0 billion, the 2021 Secured Term Loan Facility requires a mandatory prepayment and reduction in an

58

**Table of Contents**

**Index to Financial Statements**

amount equal to the lesser of the net cash proceeds arising from this offering and $50.0 million. In addition, we may also use a portion of the net proceeds to establish a foundation to advance our commitment to the future of diversity and growth in primary care leadership and education and training in value-based care. We do not currently have a specific plan for a significant portion of the remaining net proceeds. Our management might not be able to yield a significant return, if any, on any investment of the net proceeds received from this offering, which could compromise our ability to pursue our growth strategy. You will not have the opportunity to influence our decisions on how to use the net proceeds from this offering.

*Future sales of shares by us or our existing stockholders could cause our stock price to decline.*

Sales of substantial amounts of our common stock in the public market following this offering, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

As of , 2021, we had outstanding shares of common stock. Of these shares, all of the shares to be sold in this offering will be immediately tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any shares held by "affiliates," as that term is defined in Rule 144 under the Securities Act ("Rule 144"). Upon the completion of this offering, we intend to file a registration statement on Form S-8 under the Securities Act to register the shares of common stock to be issued under our equity compensation plans and, as a result, all shares of common stock acquired upon exercise of stock options granted under our plan will also be freely tradable under the Securities Act, subject to the terms of the lock-up agreements, unless purchased by our affiliates. As of , 2021, there were stock options outstanding to purchase a total of shares of our common stock. Conditioned on completion of this offering, shares will be issued pursuant to our partner physician group equity agreements. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates—Stock-based Compensation" for additional information.

The remaining shares of common stock outstanding as of , 2021 are restricted securities within the meaning of Rule 144 under the Securities Act, but will be eligible for resale subject to applicable volume, means of sale, holding period and other limitations of Rule 144 under the Securities Act or pursuant to an exemption from registration under Rule 701 under the Securities Act, or "Rule 701," subject to the lock-up agreements to be entered into by us, the CD&R Investor, certain of our stockholders and our executive officers and directors.

In connection with this offering, we, the CD&R Investor, certain of our stockholders and our executive officers and directors will sign lock-up agreements under which we and they will agree not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 180 days after the date of this prospectus. See "Underwriting." Following the expiration of this 180-day lock-up period, shares of our common stock will be eligible for future sale, subject to the applicable volume, manner of sale, holding period and other limitations of Rule 144 or pursuant to an exemption from registration under Rule 701. See "Shares Available for Future Sale" for a discussion of the shares of common stock that may be sold into the public market in the future. In addition, our significant stockholders may distribute shares that they hold to their investors who themselves may then sell into the public market following the expiration of the lock-up period. Such sales may not be subject to the volume, manner of sale, holding period and other limitations of Rule 144. Furthermore, the CD&R Investor and other significant stockholders have the right to require us to register shares of common stock for resale in certain circumstances. As resale restrictions end, the market price of our common stock could decline if the holders of those shares sell them or are perceived by the market as intending to sell them.

Table of Contents

Index to Financial Statements

In the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

*If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts may publish about us or our business. We may never obtain research coverage by industry or financial analysts. If no or few analysts commence coverage of us, the trading price of our stock would likely decrease. Even if we do obtain analyst coverage, if one or more of the analysts that covers our common stock downgrades our stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of the analysts ceases coverage of our common stock or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our common stock price or trading volume to decline.

*If you invest in our common stock in this offering, you will incur immediate and substantial dilution in the book value of your shares.*

If you invest in our common stock in this offering, your ownership interest will be immediately diluted to the extent of the difference between the initial public offering price per share of our common stock and the net tangible book value per share of our common stock immediately after this offering. Assuming an initial public offering price of $ per share, purchasers of our common stock in this offering will experience immediate and substantial dilution in net tangible book value of $ per share. See "Dilution" for a more detailed description of the dilution to new investors in the offering.

*Fulfilling our obligations incident to being a public company, including compliance with the Exchange Act and the requirements of the Sarbanes-Oxley Act and the Dodd-Frank Act, will be expensive and time-consuming, and any delays or difficulties in satisfying these obligations could have a material adverse effect on our future results of operations and our stock price.*

As a public company, we will be subject to the reporting, accounting and corporate governance requirements of the NYSE, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Sarbanes-Oxley Act and Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") that apply to issuers of listed equity, which impose certain significant compliance requirements, costs and obligations upon us. The changes necessitated by being a publicly listed company and ongoing compliance with these rules and regulations require a significant commitment of additional resources and management oversight, which will increase our operating costs and could divert our management and personnel from other business concerns, particularly after we are no longer an emerging growth company. Further, to comply with the requirements of being a public company, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring additional accounting or internal audit staff.

The Sarbanes-Oxley Act requires us, among other things, to maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

In addition, our internal resources and personnel may in the future be insufficient to avoid accounting errors, and our auditors may identify deficiencies, significant deficiencies or material weaknesses in our internal control

60

APP 073

Table of Contents

Index to Financial Statements

environment in the future. Any failure to develop or maintain effective controls or any difficulties encountered implementing required new or improved controls could harm our operating results or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE. As a public company, we are required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose, but we are not required to provide an annual management report on the effectiveness of our internal control over financial reporting until our second Annual Report on Form 10-K. Our independent registered public accounting firm has identified material weaknesses in the past, and the measures we implemented to remediate such weaknesses may be insufficient to identify or prevent material weaknesses in the future. As of December 31, 2019, these material weaknesses have been remediated. However, the measures we implemented may be insufficient to identify or prevent future material weaknesses.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until we cease to be an emerging growth company or a non-accelerated filer. We ceased to be an emerging growth company on December 31, 2020, and we do not expect to be a non-accelerated filer beginning as of December 31, 2022. As such, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting in our 2022 Annual Report on Form 10-K. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business, financial condition, cash flows and results of operations.

The expenses associated with being a public company include increases in auditing, accounting and legal fees and expenses, investor relations expenses, increased directors' fees and director and officer liability insurance costs, registrar and transfer agent fees and listing fees, as well as other expenses. As a public company, we are required, among other things, to define and expand the roles and the duties of our board of directors and its committees and institute more comprehensive compliance and investor relations functions. Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage us as a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, cash flows and results of operation. Failure to comply with the requirements of being a public company could potentially subject us to sanctions or investigations by the U.S. Securities and Exchange Commission (the "SEC") or other regulatory authorities.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal

61

APP 074

**Table of Contents**

**Index to Financial Statements**

proceedings against us, and there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

***Following the completion of this offering, the CD&R Investor will continue to control us and may have conflicts of interest with other stockholders.***

Following the completion of this offering, the CD&R Investor will own approximately % of the outstanding shares of our common stock. As a result, the CD&R Investor will have sufficient voting power without the consent of our other stockholders to be able to control all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which could reduce the market price of our common stock.

Because the CD&R Investor's interests may differ from your interests, actions the CD&R Investor takes as our controlling stockholder may not be favorable to you. For example, the concentration of ownership held by the CD&R Investor could delay, defer or prevent a change of control of us, impede a merger, takeover or other business combination that another stockholder may otherwise view favorably or cause us to enter into transactions or agreements that are not in the best interests of all stockholders. Other potential conflicts could arise, for example, over matters such as employee retention or recruiting, or our dividend policy.

Furthermore, as long as the CD&R Investor continues to beneficially own at least 40% of our outstanding common stock, the CD&R Investor will be able to determine the outcome of corporate actions requiring stockholder approval, including the election of the members of our board of directors and the approval of significant corporate transactions, such as mergers and the sale of substantially all of our assets. Even after the CD&R Investor reduces its beneficial ownership below 40% of our outstanding common stock, it will likely still be able to assert significant influence over our board of directors and certain corporate actions. Following the completion of this offering, the CD&R Investor will continue to have the right to designate for nomination for election at least a majority of our directors as long as the CD&R Investor beneficially owns at least 50% of our common stock and to designate our Chairman of the board of directors so long as it beneficially owns at least 25% of our common stock.

***Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, any of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, will have no obligation to offer us corporate opportunities.***

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation will address potential conflicts of interest between agilon health, on the one hand, and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

***Future offerings of debt or equity securities which would rank senior to our common stock may adversely affect the market price of our common stock.***

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Issuing additional shares of our common stock or other equity securities or securities convertible into equity may dilute the economic and voting rights of our stockholders or reduce the market price of our common stock. Additionally, any convertible or exchangeable securities that we issue in the future may

62

**Table of Contents**

**Index to Financial Statements**

have rights, preferences and privileges more favorable than those of our common stock and may result in dilution to owners of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors outside our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings, reducing the market price of our common stock or diluting the value of their stock holdings in us.

*Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.*

Our Certificate of Incorporation and our By-laws will include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively will:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;
- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;
- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;
- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- opt out of Section 203 of the DGCL, which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;
- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and
- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future. See "Description of Capital Stock—Anti-Takeover Effects of Our Certificate of Incorporation and By-Laws."

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor will continue to own following this offering, could limit the

63

Table of Contents

Index to Financial Statements

price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We could be the subject of securities class action litigation due to future stock price volatility, which could divert management's attention and materially and adversely affect our business, financial condition, cash flows and results of operations.***

The stock market in general, and market prices for the securities of companies like ours in particular, have from time to time experienced volatility that often has been unrelated to the operating performance of the underlying companies. A certain degree of stock price volatility can be attributed to being a newly public company. These broad market and industry fluctuations may adversely affect the market price of our common stock, regardless of our operating performance. In certain situations in which the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders were to bring a similar lawsuit against us, the defense and disposition of the lawsuit could be costly and divert the time and attention of our management and could materially and adversely affect our business, financial condition, cash flows and results of operations.

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***Although we ceased to be an "emerging growth company," we can continue to take advantage of certain reduced disclosure requirements in this registration statement, which may make our common stock less attractive to investors.***

We ceased to be an emerging growth company as defined in the JOBS Act on December 31, 2020, because our annual revenue for the fiscal year ended December 31, 2020 exceeded $1.07 billion. However, because we ceased to be an emerging growth company after we confidentially submitted our registration statement related to this offering to the SEC, we will be treated as an emerging growth company for certain purposes until the earlier of the date on which we complete this offering and December 31, 2021. As such, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies, including (i) reduced disclosure obligations regarding executive compensation in this prospectus and (ii) not being required to provide more than two years of audited financial statements in this prospectus. We cannot predict if investors

64

**APP 077**

**Table of Contents**

**Index to Financial Statements**

will find our common stock less attractive because we have relied on these exemptions. If some investors find our common stock less attractive, there may be less demand for our common stock and the price that some investors are willing to pay for our common stock may decrease.

***We expect to be a "controlled company" within the meaning of rules and, as a result, we will qualify for, and currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

After the completion of this offering, the CD&R Investor will continue to control a majority of the voting power of our outstanding common stock. Accordingly, we expect to be a "controlled company" within the meaning of corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including:

- the requirement that a majority of the board of directors consist of independent directors;
- the requirement that our Nominating and Governance Committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
- the requirement that we have a Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
- the requirement for an annual performance evaluation of the Nominating and Governance and Compensation Committees.

Following this offering, we intend to continue to utilize these exemptions. As a result, we do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations. Consequently, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance rules and requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

***At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of the NYSE corporate governance standards. The NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualify as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualify as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

65

APP 078

**Table of Contents**

**Index to Financial Statements**

***Our Certificate of Incorporation will designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation will provide that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the Delaware General Corporation Law (the "DGCL"), or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation will provide that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows and results of operations.

**APP 079**

Table of Contents

Index to Financial Statements

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION**

This prospectus contains forward-looking statements and cautionary statements. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this prospectus and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this prospectus. In addition, even if our results of operations, financial condition and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this prospectus, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives;
- our ability to execute our operation strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with MA payors or to secure MA at favorable financial terms;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;

67

APP 080

Table of Contents

Index to Financial Statements

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new RBEs within certain geographies in the future;
- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;
- our ability to retain our management team and key employees or attract qualified personnel in the future;
- our ability to realize the full value of our intangible assets and any impairment charges we have or may record;
- adverse determinations of tax matters;
- security breaches, loss of data or other disruptions to our data platforms;
- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations;
- our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses;
- our dependence on a limited number of key payors;
- the limited terms of our contracts with payors and that they may not be renewed upon their expiration;
- our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment;
- our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- difficulties in obtaining accurate and complete diagnosis data;
- our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- our reliance on third-party software and data to operate our business and provide services to our members and physician partners;
- the impact of consolidation in the healthcare industry;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;
- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;
- our ability to compete in our competitive industry;
- the impact of government performance standards and benchmarks on our compensation and reputation;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements;

68

Table of Contents

Index to Financial Statements

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;
- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;
- regulatory inquiries and corrective action plans imposed by our payors;
- repayment obligations arising out of payor audits;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- negative publicity regarding the managed healthcare industry;
- the extensive regulation of the healthcare industry at the federal, state and local levels;
- our substantial indebtedness and the potential that we may incur additional indebtedness;
- no public market for our common stock and the potential that one may not develop;
- the significant influence the CD&R Investor has over us; and
- risks related to other factors discussed under "Risk Factors" in this prospectus.

You should read this prospectus completely and with the understanding that actual future results may be materially different from expectations. All forward-looking statements made in this prospectus are qualified by these cautionary statements. These forward-looking statements are made only as of the date of this prospectus, and we do not undertake any obligation, other than as may be required by law, to update or revise any forward-looking or cautionary statements to reflect changes in assumptions, the occurrence of events, unanticipated or otherwise, and changes in future operating results over time or otherwise.

69

APP 082

Table of Contents

Index to Financial Statements

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS**

*The following information should be read in conjunction with the consolidated financial statements included elsewhere in this prospectus and "Prospectus Summary—Summary Historical Consolidated Financial Data." The following discussion may contain forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed below and elsewhere in this prospectus, particularly under the captions "Risk Factors" and "Special Note Regarding Forward-Looking Statements and Information."*

**Company Overview**

Our business is transforming healthcare by empowering the PCP to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. Currently, the PCPs on our platform serve approximately 210,000 MA members on our platform. In addition, through our participation in the CMS Innovation Center Direct Contracting Model, our PCPs are expected to serve over 50,000 Medicare FFS beneficiaries through our five currently approved DCEs. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients.

APP 083

**Table of Contents**

**Index to Financial Statements**

**Impact of Medicare Advantage and Traditional Medicare on the Business**

MA is a federal program that provides eligible persons age 65 years of age and over and some disabled persons with a variety of hospital, medical insurance and prescription drug benefits. In 2020, approximately 62 million Americans were enrolled in Medicare nationally, of which nearly 25 million, or 40%, were enrolled in MA. Medicare beneficiaries may enroll in an MA plan, under which payors contract with CMS to provide a defined range of healthcare services that are comparable to Medicare FFS (which is also referred to as "traditional Medicare").

The Direct Contracting Model is a voluntary payment model option aimed at reducing expenditures and preserving or enhancing quality of care for beneficiaries in Medicare established by the CMS Innovation Center that is set to begin in the first half of 2021. A key aspect of the Direct Contracting Model is providing new opportunities for us to participate in value-based care arrangements directly with our existing physician partners for their current Medicare members. In each community we serve, our Total Care Model can be extended to our physician partners' patients enrolled in traditional Medicare through the Direct Contracting Model. We have applied and been approved to participate in the program through five currently approved DCEs. Because of the size and scale of our network, we expect to be able to serve over 50,000 Medicare FFS beneficiaries in 2021 through the Direct Contracting Model.

Under MA, CMS issues a fixed PMPM premium, or capitation payment, to payors in exchange for providing defined healthcare benefits to attributed MA members. Under the typical capitation arrangement, we are entitled to monthly PMPM fees from payors to provide a defined range of healthcare services for MA health plan members attributed to our PCPs. These PMPM fees comprise our medical services revenue and are determined as a percent of the premium payors receive from CMS for these members. The amount of the monthly premium payment varies based on the county in which a member resides, adjusted for demographic and health risk factors. CMS assigns to each member a "risk adjustment factor," which is based on, among other things, the member's age, gender and diagnosed disease conditions, and is utilized by CMS to determine the amount of monthly premium payment paid to payors. MA revenue received by us is subject to federal government reviews and audits which can result, and have resulted, in retroactive and prospective revenue adjustments.

**Key Factors Affecting Our Performance**

*Growing Medicare Advantage Membership on Our Platform*

Membership and revenue are tied to the number of members attributed to our physician partners by our payors. We believe we have multiple avenues to serve additional members, including through:
- Adding new physician partnerships through the expansion into new geographies,
- Growth in membership in existing geographies as a result of:
  - Patients who are attributed to our physician partners who (a) age into Medicare and elect to enroll in MA or (b) elect to convert from Medicare FFS to MA, and
  - Growth in the number of PCPs at existing physician partners, expanding our physician partners' capacity to care for a greater membership population.

The retention of existing members is also important to our membership and revenue growth. We believe we are well-positioned to continue our relationships with existing members due to the sticky patient-physician relationship, 13-year average physician tenure at our anchor physician groups and long-term agreements with anchor physician groups that are typically 20-years in duration.

The strength of our multi-pronged growth strategy is evident by our growth from 2017 to 2020. At December 31, 2020, we managed global risk for 131,000 members on our platform as compared to 28,900

77

**Table of Contents**

**Index to Financial Statements**

members at December 31, 2017, representing a compound annual growth rate ("CAGR") of 65% over this period. Additionally, we have approximately 49,000 additional MA members with physician groups contracted to go-live on January 1, 2022.

The chart and table below illustrate membership growth since 2017:



| Geography Go-Live | MA Membership | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2017 | December 31, 2018 | December 31, 2019 | December 31 2020 | CAGR |
| 2017 & Prior | 28,900 | 31,400 | 33,700 | 36,700 | 8% |
| 2018 | — | 25,100 | 29,700 | 35,500 | 19% |
| 2019 | — | — | 26,800 | 33,000 | 23% |
| 2020 | — | — | — | 25,800 | |
| | 28,900 | 56,500 | 90,200 | 131,000 | 65% |

*Expanding into New Geographies*

The proven exportability of our platform, partnership and network model positions us to expand into new geographies by establishing new regional hubs across the country. We have historically demonstrated success in effectively establishing new geographies. We have entered into 17 geographies within eight states, which includes three geographies that became operational in January 2021 and six geographies that will become operational in January 2022. We believe growth in the MA market overall will further increase our market opportunity. We consider our current addressable market to be the estimated 17.5 million Medicare beneficiaries affiliated with independent PCPs in states in which we already have a physician partner or a signed letter of intent with a physician group as of January 2021, and those in which we have identified near-term prioritized geographies. Based on 2021 estimated average annual revenue per Medicare member to us of approximately $10,000, we estimate that this represents a total addressable market size of approximately $175 billion in 2020.

Our business development team maintains an active pipeline of new partnership opportunities. These potential opportunities are developed through significant inbound interest through the powerful network effect we have seen from our highly engaged existing physician partners, our proactive assessment of the independent provider market landscape and opportunities identified through our strategic relationships with national payors. With partnership dialogue and implementation planning often commencing 12 months prior to standing up operations in a given

78

**Table of Contents**

**Index to Financial Statements**

geography, we have significant forward visibility into new membership and associated revenue coming onto the platform. We currently have approximately 49,000 MA members with physician groups for which we are contracted to go live on January 1, 2022. Furthermore, in January of each year we typically have visibility into greater than 90% of that year's projected revenue.

### *Growing Members in Existing Geographies*

Within our existing geographies, our attributed membership grows through:
- Patients who are attributed to our physician partners who age-in to Medicare and elect to enroll in MA or otherwise transition to MA.
- Growth in the number of PCPs at existing physician partners, expanding our physician partners' capacity to care for a greater membership population.

We have three anchor geographies on the platform that have been live for two or three years that have grown at an average CAGR of 18% over the course of their time on our platform. Our anchor geography that went live January 1, 2018 has grown at a CAGR of 17% over the last three years and the two anchor geographies that went live January 1, 2019 have grown at an average CAGR of 24% over the last two years.

### *Patients who are attributed to our physician partners who age-in or transition to MA*

We have embedded growth opportunity within our existing PCP base. Our physician partners' patient panels include individuals anticipated to reach Medicare eligibility in the next five years who may elect to enroll in MA and existing Medicare FFS patients who may elect to transition to MA. Across our current physician partners, we estimate this opportunity to be approximately 375,000 members. These existing patients represent a large, growing and durable source of potential attributed member growth. As these patients enroll in MA through our payors, they become attributed to our platform with little incremental cost to us. We expect this embedded opportunity will continue to grow as we enter new geographies and add PCPs to our network who serve under-65 commercially insured patients and Medicare FFS patients.

### *Growth in the number of PCPs in our local geographies*

We seek to increase the number of PCPs on our platform in local geographies and, through that, increase capacity to serve the approximately two million Medicare lives in our existing communities through:
- Affiliated physician groups recruiting new PCPs.
- Affiliated physician groups acquiring other physician groups.
- Contract with additional local physicians and physician groups by leveraging our local infrastructure and existing subscription-like PMPM agreements with payors.

### *Growing Medical Services Revenue*

We expect to have significant visibility to our future revenue as our partnerships with our anchor physician groups are typically structured as 20-year partnerships for the MA line of business. Based on a 2004 study, patients 65 years of age and older remain with their PCP for an average of 10 years, and this sticky patient-physician relationship is further reinforced by a 13-year average physician tenure at our anchor physician groups. These relationships, when combined with the fixed monthly payment dynamics of the MA reimbursement model, create an extremely powerful long-term subscription-like revenue model.

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to monthly PMPM fees to provide a defined range of healthcare

**APP 086**

Table of Contents

Index to Financial Statements

services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium which payors receive from CMS. We generally accept full financial risk for members attributed to us through our contracted PCPs and, therefore, are responsible for the cost of all healthcare services required by those members. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services. We expect that our PMPM revenue will continue to improve the longer our members are on our platform as we better understand and assess their health status (acuity) and coordinate their medical care.

We have been able to increase our revenue by growing our network in existing geographies, expanding into new geographies, and attracting new PCPs to join our existing physician partners on our platform in existing geographies. During the year ended December 31, 2020, we generated medical services revenue of $1.2 billion compared to $196.5 million for the year ended December 31, 2017.

### *Growing Medical Margin*

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Our profitability depends to a significant degree on our ability to accurately predict and effectively manage our medical margin, through improving healthcare quality and effectively managing costs. We believe our membership and per-member profitability will grow over time due to structural characteristics inherent to our long-term partnerships, durable and growing MA membership within our physician partners and the nature of the MA economic model.

Through our platform, partnership and network model, we enter a geography by creating a long-term partnership with an existing physician group. After we enter a geography, our local network in that geography grows through our low cost and increasingly cost-efficient multi-pronged growth strategy. We also seek to grow medical margin over the course of our partnerships through this growth in our local networks and through improvement of per member medical margin, through improving healthcare quality and effectively managing costs. Medical margin and the pace of medical margin growth is influenced by the historical performance of our anchor physician groups in population health, regional variance in MA premium and healthcare utilization, the rate of member growth in the geography, per member revenue growth, and medical expenses associated with a member's healthcare delivery. As our membership matures and our physician partners become more adept at effectively managing the continuum of care of our members under a Total Care Model, we have observed that the profitability (measured by medical margin PMPM) of our live geographies typically increases over time.

Two critical factors that enhance our ability to improve medical margin over a long period of time that we believe are unique to our model are (i) our anchor physician groups are critical components of their local healthcare delivery system, having operated in their local geographies for more than 40 years, developing relationships with specialists, hospitals and post-acute facilities, enhancing their ability to coordinate care and (ii) our ability to deliver actionable insight at the patient and physician level through our aligned partnership model with peer-to-peer physician feedback driving accountability and accelerating the pace of change to a Total Care Model.

The power of our model is reflected in the relative performance of our network when compared to local FFS benchmarks. For example, in 2019, our members' ER utilization was 42% lower than the local FFS benchmark, inpatient acute utilization was 47% lower than the local FFS benchmark and hospital re-admission rate was 26% lower than the local FFS benchmark.

This has resulted in improving year-over-year performance in our anchor physician groups and acceleration of performance in our geographies that are newer to our platform versus markets that joined the platform previously. This ongoing improvement has occurred while membership during that same period in such geographies grew.

APP 087

Table of Contents

Index to Financial Statements

The information below illustrates average membership and medical margin PMPM growth for our anchor physician groups that have been operational for more than two years. The medical margin PMPM data presented below reflect the ongoing dilutive impact of new members in any year. Medical margin profiles of cohorts of members grouped by enrollment year have historically improved over their duration on our platform.

| | | Year 0 | Year 1 | Year 2 | Year 3 | CAGR |
|---|---|---|---|---|---|---|
| Geography 1 | Average Membership | 21,488 | 24,456 | 28,124 | 34,140 | 17% |
| | Medical Margin PMPM | $76 | $132 | $142 | $201 | 38% |
| Geography 2 | Average Membership | 6,871 | 8,291 | 9,851 | | 20% |
| | Medical Margin PMPM | $21 | $40 | $154 | | 169% |
| Geography 3 | Average Membership | 14,790 | 17,014 | 21,636 | | 21% |
| | Medical Margin PMPM | ($18) | $32 | $55 | | n/m |

*Note: Year 0 is the period of implementation prior to a geography being live. Year 0 statistics are attributable to the respective geography before joining on our platform.*

The following table incorporates all live geographies on our platform regardless of time on the platform. We have also included Hawaii in our year 3+ geographies, which is different than our traditional anchor physician group model because Hawaii is not a single partner structure, but is a network of contracted physicians and accepts delegation of certain traditional health plan functions from our contracted payors, such as utilization review, provider network development and claims adjudication. The information below illustrates the medical margin maturity in our live geographies inclusive of the geographies that went live in 2020 and are considered to be in year 1 of their maturity cycle. We believe medical margin rates within any geography will continue to increase over the course of our long-term partnerships, as cohorts of members within the geography are on our platform for longer periods of time. With 70% of our members on our platform for fewer than three years, we believe that we are well-positioned to benefit from significant embedded margin growth from our long-term economic model by improving healthcare outcomes and effectively managing costs.

| | | 2018 | 2019 | 2020 | CAGR |
|---|---|---|---|---|---|
| Year 3+ Geographies | Average Membership | 55,535 | 61,299 | 70,053 | 12% |
| | Medical Margin PMPM | $83 | $72 | $139 | 30% |
| Year 2 Geographies | Average Membership | | 25,306 | 31,488 | 24% |
| | Medical Margin PMPM | | $35 | $86 | 146% |
| Year 1 Geographies | Average Membership | | | 24,708 | |
| | Medical Margin PMPM | | | $146 | |

Medical margin and the pace of medical margin growth is influenced by the historical performance of our anchor physician groups in population health, regional variance in MA premium and healthcare utilization, the rate of member growth in the geography, per member revenue growth, and medical expenses associated with a member's healthcare delivery. For this reason, in future periods, we expect to have geographies with different

81

**APP 088**

**Table of Contents**

**Index to Financial Statements**

medical margin PMPM starting points and trajectories. While we believe the data reflected in the preceding tables accurately reflects the directional margin maturity trends in our geographies, the most recent year includes the impact of utilization avoidance resulting from COVID-19. We cannot accurately estimate the net ultimate impact to medical services expense at this time. See "—Impact of COVID-19."

*Achieving Operating Efficiencies*

As a result of our aligned partnership model and ability to grow our platform through our low cost and increasingly cost-efficient model, we generate operating efficiencies at both the geography and enterprise level. Our geography operating expenses, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions. We continue to enhance existing service offerings by designing and developing technology and clinical solutions that can be leveraged by the entire platform across all geographies. While we expect our absolute investment in our enterprise resources to increase over time, we expect it will decrease as a percentage of revenue when we are able to scale this investment across a broader group of physician partners and our attributed membership. We expect our general and administrative expenses to increase in absolute dollars in the future as we continue to invest to support growth of our business, as well as due to the costs required to operate as a public company, including resulting from increased cost of insurance coverage, investments in internal audit, investor relations and financial reporting functions, fees paid to the exchange on which we list our securities and increased legal and audit fees. The operating efficiencies we are able to achieve with our aligned partnership model have enabled us to grow operating costs to support live geographies and enterprise functions by 12% year-over-year for the year ended December 31, 2020, while revenue grew 53% over the same period.

The table below illustrates our live geographies and enterprise level operating expenses since 2018 (dollars in thousands):

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Platform supporting costs | $59,254 | $89,266 | $99,943 |
| % of Revenue | 13% | 11% | 8% |

*Note: Represents costs to support our live geographies and enterprise functions, which are included in general and administrative expenses.*

*Investing in Growth*

We expect to continue to focus on long-term growth through investments in onboarding new geographies onto our platform and supporting the continued growth of physicians in our existing geographies. Our new geography investments include establishing local market infrastructure and investments to drive the improvement in cost and quality ahead of a geography becoming live. Following the launch of our foundational partnership with COPC in 2017, the average total launch cost, including both implementation year costs and initial losses (if applicable), for subsequent partnerships has been $4.2 million.

We intend to continue to invest in improving the agilon platform and our technology to drive medical margin growth and enable further reinvestment in local care delivery. We also intend to continue to invest in growing our existing geographies by attracting new PCPs to join our local physician partners. In support of that, we may provide capital support to accelerate the recruitment of new PCPs to our anchor partners. Accordingly, in the short term, we expect our operating expenses to increase. However, in the long term, we anticipate that these investments will positively impact our results of operations.

82

Table of Contents

Index to Financial Statements

*Impact of Seasonality*

Our business is influenced by seasonality in the following primary manners:

- Growth in New Membership—While new members are attributed to our platform throughout the year, our largest amount of growth typically occurs in January of each year. Operations in our new geographies generally begin on January 1, at which time our MA payors attribute members from our new physician partners to our platform as our agreements with those payors in those geographies become effective. This coincides with the beginning of the Medicare program year. Similarly, our same market growth within a given year is typically greatest in January, as a result of the outcome of the Medicare Open Enrollment Period (sometimes called Annual Election Period or AEP), which runs each year from October 15 to December 7.
- Per Member Revenue—Our revenue is a function of the percent of premium we have negotiated with our payors as well as our ability to accurately and appropriately document the acuity of a member's total health status. We experience an element of seasonality with respect to our average per member revenue as it generally declines over the course of a given year. This results from the monthly cycle of (i) attributed members aging into Medicare, who typically have lower acuity profiles (and, therefore, lower average per member revenue rates) and (ii) older members with more severe acuity profiles (and, therefore, higher per member revenue rates) expiring. Additionally, in January of each year, CMS resets county-level benchmark rates, the risk adjustment factor for each member based upon health conditions documented in the prior year, and other components of premium revenue. The collective impact of these revisions has historically led to an increase in our average per member revenue.
- Medical Expense—Medical expense is driven by utilization of healthcare services by attributed membership. There are seasonal factors that can influence healthcare utilization, such as the flu season or the number of calendar or working days in a given period.

**Impact of COVID-19**

Since March 2020, we have implemented precautionary measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. Because COVID-19 infections have been reported throughout the United States, certain national, provincial, state and local governmental authorities have issued proclamations and/or directives aimed at minimizing the spread of COVID-19. Additional, more restrictive proclamations and/or directives may be issued in the future.

The ultimate impact of the COVID-19 pandemic on our operations is unknown and will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the COVID-19 outbreak, new information which may emerge concerning the severity of the COVID-19 pandemic and any additional preventative and protective actions that governments, or we, may direct, which may result in an extended period of continued business disruption. The ultimate impact of these matters to us and our financial condition cannot be reasonably estimated at this time.

Throughout most of 2020, our members incurred lower healthcare costs than we would have otherwise expected, which resulted in lower medical services expenses incurred. Average medical services expense per member declined 3% relative to 2019. This reduction was impacted by the temporary deferral of non-essential care amid the COVID-19 pandemic and improved medical cost management, among other factors. These costs may be incurred at future points in time, and it is possible that the deferral of healthcare services, or the impact of our members (who are seniors typically with chronic conditions) being diagnosed with COVID-19, could cause additional health problems in our existing members, which could increase our costs in the future. We cannot accurately estimate the net ultimate impact, positive or negative, to medical services expense at this time.

Given the disruption caused by COVID-19, it is unclear whether our physicians will be able to document the health conditions of our members as comprehensively as they did in historical periods. Because risk adjustment factors in the current period are based on the preceding year's diagnosed disease conditions, our revenue in future periods may be adversely impacted.

APP 090

Table of Contents

Index to Financial Statements

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") was enacted to provide economic relief to individuals and businesses facing economic hardship as a result of the COVID-19 public health emergency. The CARES Act includes, among other things, provisions relating to payroll tax credits and deferrals, net operating loss carryback periods, alternative minimum tax credits refunds, modifications to the net interest deduction limitations and technical corrections to tax depreciation methods for qualified improvement property. The changes in tax law did not have a material impact on our results of operations for the year ended December 31, 2020. We will continue to monitor possible future impacts of changes in tax legislation.

See "Risk Factors—Risks Related to Our Business—The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19."

### Key Financial and Operating Metrics

*All of our key metrics exclude historical results from our California operations, which are included as discontinued operations in our consolidated financial statements. See "—California Operations."*

We monitor the following key financial and operating metrics to help us evaluate our business, identify trends affecting our business, formulate business plans and make strategic decisions. We believe the following key metrics are useful in evaluating our business (dollars in thousands):

| | As of and for the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | % change |
| MA members(1) | 131,000 | 90,200 | 45% |
| Medical services revenue | $1,214,270 | $788,566 | 54% |
| Medical margin | $ 192,393 | $ 63,192 | 204% |
| Network contribution(2) | $ 99,016 | $ 25,598 | 287% |
| Adjusted EBITDA(2) | $ 5,827 | $ (56,711) | 110% |

(1)    Excludes MA members with physician groups contracted to go-live on January 1, 2021.
(2)    Network contribution and Adjusted EBITDA are non-GAAP financial measures. See "—Non-GAAP Financial Measures" for additional information, including reconciliations to the most directly comparable GAAP measures.

*Medicare Advantage Members*

Our MA members include all individuals enrolled in an MA plan that are attributed to the PCPs on our platform at the end of a given period.

*Medical Services Revenue*

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to PMPM fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium which payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

*Medical Margin*

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our

84

**Table of Contents**

**Index to Financial Statements**

members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin PMPM may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM. Furthermore, in light of COVID-19, we continue to evaluate the ultimate impact of the pandemic on medical margin.

The following table presents our medical margin (dollars in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Medical services revenue | $ 1,214,270 | $ 788,566 |
| Medical services expense | (1,021,877) | (725,374) |
| Medical margin | $ 192,393 | $ 63,192 |

### Network Contribution

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner incentive and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

The following table presents our network contribution (dollars in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Medical services revenue | $ 1,214,270 | $ 788,566 |
| Medical services expense | (1,021,877) | (725,374) |
| Other medical expenses—live geographies(1) | (93,377) | (37,594) |
| Network contribution | $ 99,016 | $ 25,598 |

(1) Excludes costs in geographies for which we are contracted to go live in January of the following period. For the years ended December 31, 2020 and 2019, costs incurred in implementing geographies were $8.9 million and $2.9 million, respectively.

See "—Non-GAAP Financial Measures" for information regarding our use of network contribution and a reconciliation of income (loss) from operations to network contribution.

### Adjusted EBITDA

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization costs, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related expense and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

See "—Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

85

Table of Contents

Index to Financial Statements

At our option, borrowings under the 2021 Secured Credit Facilities, as defined in the credit agreement, can be either: (i) LIBO Rate Loans or (ii) Base Rate Loans. LIBO Rate Loans bear interest at a rate equal to the sum of 4.00% (stepping down to 3.50% on and following October 1, 2023) and the higher of (a) LIBO, as defined in the credit agreement, and (b) 0%. Base Rate Loans bear interest at a rate equal to the sum of 3.00% (stepping down to 2.50% on and following October 1, 2023) and the highest of: (a) 0.50% in excess of the overnight federal funds rate, (b) the prime rate established by the administrative agent from time to time, (c) the one-month LIBO rate (adjusted for maximum reserves) plus 1.00% and (d) 0%. Additionally, we pay a commitment fee on the unfunded 2021 Revolving Credit Facility amount of 0.50% (stepping down to 0.375% on and following October 1, 2023). We must also pay customary letter of credit fees.

The 2021 Secured Credit Facilities contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

For additional discussion on our debt obligations, see Note 10 to our audited consolidated financial statements included elsewhere in this prospectus and "Description of Certain Indebtedness."

## Contractual Obligations and Commitments

The following table summarizes our material contractual payment obligations and commitments as of December 31, 2020 (dollars in thousands):

| | | Payments Due by Period | | | |
| | Total | 2021 | 2022-2023 | 2024-2025 | More than Five Years |
|---|---|---|---|---|---|
| Term loan(1) | $ 48,649 | $ 3,041 | $ 45,608 | $ — | $ — |
| Unsecured debt(1) | 20,000 | — | 20,000 | — | — |
| Operating leases | 11,268 | 3,554 | 4,559 | 1,201 | 1,954 |
| Capital commitments(2) | 18,662 | 16,412 | 2,250 | — | — |
| Interest(3) | 12,459 | 6,459 | 3,726 | 2,274 | — |
| Total | $111,038 | $29,466 | $ 76,143 | $ 3,475 | $ 1,954 |

(1)    On February 18, 2021, we executed a credit facility agreement that includes a $100.0 million senior secured term loan, which was used to repay the term loan and unsecured debt presented in the table above.
(2)    Represents capital commitments to physician partners to support physician partner expansion and related purposes.
(3)    Interest on variable-rate debt is calculated using rates in effect as of December 31, 2020.

For additional discussion on our operating leases, other liabilities and capital commitments, see Notes 5, 9 and 11, respectively, to our audited consolidated financial statements included elsewhere in this prospectus.

## Off-Balance Sheet Arrangements

We had no material off-balance sheet arrangements as of December 31, 2020.

## Critical Accounting Estimates

Management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with GAAP. The preparation of financial statements in conformity with GAAP requires us to use judgment in the application of accounting policies, including making estimates and assumptions. We base estimates on the best information available to us at the time, our historical experience, known trends and events and various other assumptions that we believe are reasonable under the circumstances. These estimates affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of

APP 093

**Table of Contents**

**Index to Financial Statements**

revenue and expenses during the reporting periods. If our judgment or interpretation of the facts and circumstances relating to various transactions or other matters had been different, it is possible that different accounting would have been applied, resulting in a different presentation of our consolidated financial statements. From time to time, we re-evaluate our estimates and assumptions. In the event estimates or assumptions prove to be different from actual results, adjustments are made in subsequent periods to reflect more current estimates and assumptions about matters that are inherently uncertain. For a more detailed discussion of our significant accounting policies, see Note 2 to our audited consolidated financial statements included elsewhere in this prospectus. Below is a discussion of accounting policies that we consider critical in that they may require complex judgment in their application or require estimates about matters that are inherently uncertain.

### Principles of Consolidation

The consolidated financial statements include the accounts of agilon health, our wholly-owned subsidiaries and entities that we control, through voting rights or other means. We consolidate investments in variable interest entities ("VIEs") when we are the primary beneficiary of the VIE. A variable interest holder is considered to be the primary beneficiary of a VIE if it has the power to direct the activities that most significantly impact the VIE's economic performance and has the obligation to absorb losses, or the right to receive benefits, that could potentially be significant to the VIE.

We make judgments about which entities are VIEs based on an assessment of whether: (i) the equity investment at risk is insufficient to finance that entity's activities without additional subordinated financial support, (ii) substantially all of an entity's activities either involve or are conducted on behalf of an investor that has disproportionately few voting rights, or (iii) the equity investors as a group lack any of the following: (a) the power through voting or similar rights to direct the activities of an entity that most significantly impact the entity's economic performance, (b) the obligation to absorb the expected losses of an entity or (c) the right to receive the expected residual returns of an entity.

We also make judgments with respect to our level of influence or control over an entity and whether we are (or are not) the primary beneficiary of a VIE. Consideration of various factors includes, but is not limited to:
- which activities most significantly impact the entity's economic performance, and our ability to direct those activities;
- our form of ownership interest;
- our representation on the entity's governing body;
- the size and seniority of our investment;
- our ability to manage our ownership interest relative to other interest holders;
- our ability and the rights of other parties to participate in policy making decisions; and
- our ability to liquidate the entity.

Our ability to correctly assess our influence or control over a VIE when determining the primary beneficiary affects the presentation of these VIEs in our consolidated financial statements. When we perform a reassessment of the primary beneficiary at a date other than at inception of the VIE, our assumptions may be different and may result in the identification of a different primary beneficiary. If we determine that we are the primary beneficiary of a VIE, our consolidated financial statements include the operating results of the VIE.

### Revenue Recognition

We recognize revenue in accordance with Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("ASC 606"), which we adopted as of January 1, 2019 using the modified

97

Table of Contents

Index to Financial Statements

retrospective transition method. The adoption of ASC 606 had no impact on our revenue recognition, as revenue from our contracts with customers continues to be recognized over time as services are rendered, and therefore, no cumulative effect adjustment was recorded. Medical services revenue consists of capitation fees under contracts with various payors. Under the typical capitation arrangement, we are entitled to monthly PMPM fees to provide a defined range of healthcare services for MA health plan members attributed to our contracted physicians. PMPM fees are determined as a percent of the premium payors receive from CMS for these members. We generally accept full financial risk for members attributed to our contracted physicians, which means we are responsible for the cost of all healthcare services required by them. Contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by ASC 606, to stand ready on a monthly basis to provide all aspects of necessary medical care to members for the contracted period. We recognize revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for our MA capitation contracts is variable as the PMPM fees to which we are entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. We and our healthcare providers collect and submit the necessary and available diagnosis data to payors and we utilize such data to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in our contracts with payors. We recognize incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

The determination of these estimates is subject to significant judgment. If these assessments were to change, the timing and amount of our revenue recognized would be impacted, which may be material to our consolidated financial statements.

### *Medical Services Expense and Related Payables*

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which we are financially responsible, and which are paid either directly by us or by payors with whom we have contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of our obligations for medical services that have been rendered by third parties, but for which claims have either not yet been received, processed or paid.

Such estimates are based on many variables, including utilization trends and historical and statistical lag analysis, among other factors. The assumptions for making such estimates and establishing liabilities are continually reviewed and updated, and any adjustments resulting therein are reflected in current period earnings. These estimates may differ from actual results, which could be material to our consolidated financial statements. The difference between the estimated liability and the related actual settlement of claims is recognized in the period the claims are settled.

If it is determined that our assumptions in estimating such liabilities are significantly different than actual results, our results of operations and financial position could be impacted in future periods. Adjustments of prior period estimates may result in additional medical care expense or a reduction of medical care expense in the period an adjustment is made. Further, due to the considerable variability of healthcare costs, adjustments to claim liabilities occur each period and may be significant as compared to the net income (loss) recorded in that period.

The estimate of medical costs payable represents our best estimate of our liability for unpaid medical costs.

APP 095

Table of Contents

Index to Financial Statements

**BUSINESS**

**Overview**

Our business is transforming healthcare by empowering the PCP to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. Currently, the PCPs on our platform serve approximately 210,000 MA members on our platform, which includes approximately 49,000 MA patients with physician groups contracted to go-live on January 1, 2022. In addition, through our participation in the CMS Innovation Center Direct Contracting Model, our PCPs are expected to serve over 50,000 Medicare FFS beneficiaries through our five currently approved DCEs. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

**Empower PCPs to Transform Care in Their Communities**

| What We Do | How We Do It | Powerful Results |
|---|---|---|
| *Disrupt the rapidly-growing Medicare market for physicians, patients and payors* | *Migrate physicians, patients and payors from the traditional fee-for-service to a subscription-like Total Care Model* | *Since 2016, this capital-light, exportable and scalable model has grown* |
| • **Empower community-based physicians** to create a Medicare-centric globally capitated line of business | • **Unified set of payment, data, clinical, quality and growth capabilities** deployed as single platform | • 17 diverse geographies |
| • **Enable PCPs to quarterback their patients' healthcare** in a long-term, highly engaged relationship | • **Deployed through a long-term partnership model** based on aligned outcomes and economics | • 16 anchor physician groups; average tenure of 40+ years in their community |
| • **Transform the PCP business model** from a transaction-based model to a long-term, holistic membership-based model | • **Enhanced through a growing network of like-minded physician partners** that enable powerful network effect | • 15 payors |
| | | • 210,000 MA members including approximately 49,000 that go-live in 2022 |
| | | • NPS of 83 for patients and 73 for providers at live anchor physician groups |

The current state of the U.S. healthcare system is defined by:

- Unsustainably high and rising costs characterized by waste, unnecessary variation in care and poor patient experience and health outcomes;
- FFS reimbursement model focused on units of service rather than a coordinated approach to meet the unique needs of individual patients;

103

APP 096

Table of Contents

Index to Financial Statements

- High incidence of physician burnout driven by growing administrative burden and the FFS reimbursement model;
- An aging U.S. population, with the over 65 population projected to grow from approximately 49 million in 2016 to approximately 77 million in 2034, driving Medicare growth and pressuring the healthcare system as average reimbursement fails to keep pace with the rise in average patient complexity;
- Rapid patient adoption of MA plans, private health plans administering Medicare benefits, as seniors increasingly value supplemental benefits and low monthly premiums;
- The Medicare population is projected to grow from approximately 62 million in 2020 to more than 70 million individuals in 2025 with a total spend of approximately $1.25 trillion, and MA enrollment comprised 37% of total Medicare enrollment in 2019 and is projected to comprise 47% of total Medicare enrollment in 2025;
- PCPs are positioned—but not currently empowered or incentivized—to act as the quarterback for healthcare delivery, with their decisions estimated to influence up to 90% of total healthcare spending according to a 2017 study; and
- The United States spends only 5% to 7% of its total healthcare dollars on primary care in contrast to 14% among OECD nations on average.

We believe that failing to empower PCPs has fostered waste, needless variability in care and unsustainable growth in healthcare costs. According to a 2019 article entitled "Waste in the US Health Care System: Estimated Costs and Potential for Savings" published in the Journal of the American Medical Association, failure of care delivery, failure of care coordination and overtreatment or low-value care were estimated to represent $205.3 billion to $345.1 billion of waste annually in the U.S. healthcare system. While there is broad recognition of the need to move beyond a volume-based, FFS reimbursement model, structural hurdles have impeded rapid adoption of a PCP-led Total Care Model.

To overcome these hurdles and achieve our mission of being the trusted long-term partner to community-based physicians, we have developed what we believe is a first-of-its-kind Total Care Model for community-based physicians that focuses exclusively on Medicare and manages subscription-like PMPM arrangements with health plans or directly with the government. The agilon Total Care Model is powered by our platform, enabled through a long-term partnership model and reinforced via our growing national network of like-minded physicians. Our position as innovators is demonstrated by a series of transformative accomplishments since the formation of the company in July 2016, and our first partnership in 2017, many of which we believe to be industry-firsts:

- Implemented the first MA multi-payor, globally capitated risk model with a community-based physician group in all of our diverse anchor geographies;
- Exported the Total Care Model from one to 17 geographies ranging from communities as small as Zanesville, Ohio to large and rapidly growing communities such as Austin, Texas;
- Built strong local positions with established community-based physician group leaders who have intimate and trusted relationships with patients in their communities, such as Austin Regional Clinic in Austin, Texas, Buffalo Medical Group in Buffalo, New York, Central Ohio Primary Care in Columbus, Ohio, Preferred Primary Care Physicians in Pittsburgh, Pennsylvania and Wilmington Health in Wilmington, North Carolina;
- Grew from approximately 24,000 MA members to approximately 210,000 MA members on our platform;
- Expanded from two payors to 15 payors on our platform; and
- Poised to participate in the Direct Contracting Model, with over 50,000 Medicare FFS beneficiaries expected to be served by our existing PCPs contracted through our five currently approved DCEs.

APP 097

Table of Contents

Index to Financial Statements

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

The result is PCPs transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient. Despite our history of net losses, we believe this membership-based model results in a recurring revenue stream and provides our anchor physician groups with access to an incremental profit margin opportunity based on delivering high-quality care and health outcomes. Freed from the constraints of the transactional FFS reimbursement model, our PCPs are empowered to practice team-based, coordinated care when addressing individual patient needs and transition to a sustainable long-term business model for their senior patients. We believe enabling PCPs to unlock the value of a Medicare-centric, globally capitated line of business while remaining independent can transform the community-based physician business model.

*The agilon Platform*: The agilon platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital. Our purpose-built platform comprises an integrated set of capabilities designed to continuously improve. Our platform is delivered to our anchor physician groups through a long-term partnership model to support the adoption and success of a Medicare-centric, globally capitated line of business:

- *Payor Engagement*: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one streamlined and simplified approach to quality, patient experience, clinical program management and financial management.
- *Direct Contracting Model*: Enables our PCPs to expand our Total Care Model to patients enrolled in traditional Medicare FFS through the CMS Innovation Center Direct Contracting Model. This enables our PCPs to align the healthcare delivery of MA and Medicare FFS patients, providing them with greater opportunities to engage these patients and improve their overall experience.
- *Data Integration and Management*: Integration with health plan systems, physician EMR systems, labs, pharmacies and other third-party platforms to organize disparate data into actionable insights for our PCPs to improve quality of care, cost and patient and physician experience.
- *Clinical Programs and Product Development*: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value, actionable playbooks for physicians to deliver quality care, which include operational plans, analytics and tracking metrics.
- *Quality (Clinical and Experience)*: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.
- *Growth*: We enable our partners to create a local brand that embodies the value of the Total Care Model for patients as well as the history and culture of our physician partners. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their approximately 220,000 patients that are currently Medicare-eligible but are not covered by an MA plan and their approximately 156,000 60-64 year old patients, to enable their patients to make educated healthcare choices. These existing patients represent a large, growing and durable source of potential attributed member growth.
- *Performance Management Analytics*: Our quality and cost network dashboards are continuously updated and used by physician group leaders to facilitate constructive dialogue and best practice sharing that benefits from the growth of the network.

APP 098

Table of Contents

Index to Financial Statements

- *Financial Management*: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.
- *National Policy*: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

*agilon's Long-term Physician Partner Model*: We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Through this partnership, our physician partners' existing MA patient panels are attributed to our platform through our subscription-like PMPM agreements with payors. The combination of these subscription-like agreements, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue. As earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings with our anchor physician groups.

The power of our local partnership model is defined by the scale, breadth and local brand of our physician partners. On average, our anchor physician groups have been serving their communities for more than 40 years, have a PCP tenure of approximately 13 years and receive exceptionally strong NPS from their PCPs and patients in live geographies of 73 and 83, respectively. We believe this gives us the ability to influence the local healthcare delivery system at scale. We expect our physician partner patient panels to systematically migrate to MA as the patient population ages and our partnerships mature. We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000.

*agilon's Network*: Enhancing the power and growth of the agilon platform is the rapidly expanding group of leading community-based physician partners, functioning as a collaborative group through the agilon network. We believe the power of this network is demonstrated by our ability to add new physician partners and to attract additional PCPs to our physician partners. For example, in Ohio we have grown from one physician partner to five physician partners, approximately 180 PCPs to approximately 360 PCPs and approximately 21,000 members to approximately 65,000 members in fewer than four years. Columbus, the first market we entered in Ohio, has grown membership at a CAGR of 17%, and membership in Ohio overall has grown at a CAGR of 41%. The ability to share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

*The agilon Flywheel Effect*: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients. The power of the agilon flywheel is highlighted by our total membership growth of 45%, of which 42% was driven by same geography membership growth and 58% was driven by entry into new geographies,

106

Table of Contents

Index to Financial Statements

**PRINCIPAL STOCKHOLDERS**

The following table sets forth information as of            , 2021 with respect to the ownership of our common stock by:

- each person known to own beneficially more than five percent of our common stock;

- each of our directors;

- each of our named executive officers; and

- all of our current executive officers and directors as a group.

The amounts and percentages of shares beneficially owned are reported on the basis of regulations of the SEC governing the determination of beneficial ownership of securities. Under SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest.

Percentage computations are based on approximately            shares of our common stock outstanding as of            , 2021, and shares outstanding following the completion of this offering.

Except as otherwise indicated in the footnotes to the table, each of the beneficial owners listed has, to our knowledge, sole voting and investment power with respect to the indicated shares of common stock. Unless otherwise set forth in the footnotes to the table, the address for each listed stockholder is 1 World Trade Center, Suite 2000, Long Beach, CA 90831.

| | Shares Beneficially Owned Before the Offering and After the Offering Assuming the Underwriters' Option Is Not Exercised[1] | | | Shares Beneficially Owned After the Offering Assuming the Underwriters' Option Is Exercised in Full | |
| --- | --- | --- | --- | --- | --- |
| **Name and Address of Beneficial Owner** | **Number of Shares Owned** | **Percent of Class Before the Offering (%)** | **Percent of Class After the Offering (%)** | **Number of Shares Owned** | **Percent of Class After the Offering (%)** |
| CD&R Vector Holdings, L.P[2] | | | | | |
| Morgan Stanley Investor[3] | | | | | |
| Capital World Investor[4] | | | | | |
| Ron Williams | | | | | |
| Michelle A. Gourdine, M.D. | | | | | |
| Sharad Mansukani, M.D. | | | | | |
| Clay Richards | | | | | |
| Michael Smith | | | | | |
| William Wulf, M.D. | | | | | |
| Ravi Sachdev | | | | | |
| Richard J. Schnall | | | | | |
| Derek L. Strum | | | | | |
| Steven J. Sell | | | | | |
| Lisa Dombro | | | | | |
| Benjamin Kornitzer, M.D. | | | | | |
| All current directors and executive officers as a group (        persons)[5] | | | | | |

159

**Table of Contents**

**Index to Financial Statements**

---

\*      Less than one percent.

(1)    We have granted the underwriters an option to purchase up to an additional       shares.

(2)    CD&R Investment Associates IX, Ltd. ("CD&R Holdings GP"), as the general partner of the CD&R Investor, may be deemed to beneficially own the shares of common stock in which the CD&R Investor has beneficial ownership. CD&R Holdings GP expressly disclaims beneficial ownership of the shares of common stock in which the CD&R Investor has beneficial ownership. Investment and voting decisions with respect to the shares of common stock held by the CD&R Investor are made by an investment committee of limited partners of CD&R Associates IX, L.P., currently consisting of more than ten individuals, each of whom is also an investment professional of CD&R (the "Investment Committee"). All members of the Investment Committee disclaim beneficial ownership of the shares shown as beneficially owned by the CD&R Investor. CD&R Holdings GP is managed by a two-person board of directors. Donald J. Gogel and Nathan K. Sleeper, as the directors of CD&R Holdings GP, may be deemed to share beneficial ownership of the shares of common stock directly held by the CD&R Investor. Such persons expressly disclaim such beneficial ownership. The principal office of the CD&R Investor is c/o Maples Corporate Services Limited, PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands.

(3)    Includes       shares owned by Morgan Stanley Investment Management Inc. on behalf of certain funds and accounts (such entities collectively, the "Morgan Stanley Investor"). The mailing address for each of the foregoing entities is c/o Morgan Stanley Investment Management Inc., 522 Fifth Avenue, New York, New York 10036.

(4)    Includes       shares owned by The New Economy Fund and       shares owned by SMALLCAP World Fund, Inc. (such entities together, the "Capital World Investor"). The mailing address of each of the foregoing entities is c/o Capital Research and Management Company, 333 South Hope Street, 55th Floor, Los Angeles, CA 90071.

(5)    Includes shares which the current executive officers have the right to acquire prior to       , 2021 through the exercise of stock options. All current executive officers as a group have the right to acquire       shares prior to       , 2021 through the exercise of stock options.

160

**APP 101**

Table of Contents

Index to Financial Statements

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

**Policies and Procedures for Related Person Transactions**

Prior to the completion of this offering, we expect that our board of directors will approve policies and procedures with respect to the review and approval of certain transactions between us and a Related Person (as defined herein) or a Related Person Transaction (as defined herein) (the "Related Person Transaction Policy"). Pursuant to the terms of the Related Person Transaction Policy, our board of directors, acting through our Audit Committee, must review and decide whether to approve or ratify any Related Person Transaction. Any Related Person Transaction is required to be reported to our legal department, which will then determine whether it should be submitted to our Audit Committee for consideration. The Audit Committee must then review and decide whether to approve any Related Person Transaction.

For the purposes of the Related Person Transaction Policy, a "Related Person Transaction" means a transaction, arrangement or relationship (or any series of similar transactions, arrangements or relationships) in which we (including any of our subsidiaries) were, are or will be a participant and the amount involved exceeds $120,000, and in which any Related Person had, has or will have a direct or indirect interest; and a "Related Person" means any person who is, or at any time since the beginning of our last fiscal year was, a director or executive officer of agilon health or a nominee to become a director of agilon health; any person who is the beneficial owner of more than five percent of our common stock; any immediate family member of any of the foregoing persons, including any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of the director, executive officer, nominee or more than five percent beneficial owner, and any person (other than a tenant or employee) sharing the household of such director, executive officer, nominee or more than five percent beneficial owner; and "spouse" includes an individual married to a person of the same sex if the couple is lawfully married under state law, regardless of the individual's domicile; and any firm, corporation or other entity in which any of the foregoing persons is a general partner or, for other ownership interests, a limited partner or other owner in which such person has a beneficial ownership interest of ten percent or more.

**Stockholders Agreements**

*CD&R Stockholder Agreement*

Prior to the completion of this offering, we expect to enter into a stockholders agreement with the CD&R Investor. The stockholders agreement will grant the CD&R Investor the right to designate for nomination for election to our board of directors a number of CD&R Designees equal to:

- at least a majority of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 50% of the outstanding shares of our common stock;

- at least 40% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 40% but less than 50% of the outstanding shares of our common stock;

- at least 30% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 30% but less than 40% of the outstanding shares of our common stock;

- at least 20% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 20% but less than 30% of the outstanding shares of our common stock; and

- at least 5% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 5% but less than 20% of the outstanding shares of our common stock.

161

**APP 102**

Table of Contents

Index to Financial Statements

For purposes of calculating the number of CD&R Designees that the CD&R Investor is entitled to nominate pursuant to the formula outlined above, any fractional amounts would be rounded up to the nearest whole number and the calculation would be made on a pro forma basis after taking into account any increase in the size of our board of directors. If the CD&R Investor beneficially owns less than 5% of the outstanding shares of common stock, the CD&R Investor will no longer be entitled to designate any designees for nomination by the board of directors.

With respect to any vacancy of a CD&R-designated director, the CD&R Investor will have the right to designate a new director for election by a majority of the remaining directors then in office.

The stockholders agreement will provide that a CD&R Designee will serve as the Chairman of our board of directors as long as the CD&R Investor beneficially owns at least 25% of the outstanding shares of our common stock.

The stockholders agreement will also grant to the CD&R Investor certain other rights, including specified information and access rights.

*Existing Stockholders' Agreement*

We are a party to an Amended and Restated Stockholders' Agreement, dated as of November 29, 2019 (as amended or otherwise modified, the "Existing Stockholders Agreement"), by and among agilon health, and our existing stockholders, including the CD&R Investor, the Morgan Stanley Investor and the Capital World Investor. The Existing Stockholders Agreement provides, among other things, (i) that each stockholder is obligated to vote the shares of voting securities owned by such stockholder to ensure that the composition of and directors on the board are as designated by the CD&R Investor, (ii) for transfer restrictions, including rights of first refusal for the CD&R Investor and non-selling stockholders in the event that a stockholder would like to transfer its shares, (iii) for a 180-day lock-up period in the event of an IPO and (iv) for drag-along rights in the event that a person or group of persons acquires more than 50% of the outstanding voting power of agilon health. Other than the lock-up provisions, the Existing Stockholders Agreement will terminate upon the completion of this offering.

**Registration Rights Agreements**

Prior to the closing of this offering, we expect to enter into a registration rights agreement with the CD&R Investor. The registration rights agreement will grant to the CD&R Investor and its permitted assigns, customary Form S-1 and Form S-3 demand registration rights and piggyback registration rights, in each case subject to customary terms and conditions.

We are a party to registration rights agreements with each of our existing stockholders, including the Morgan Stanley Investor and the Capital World Investor. The registration rights agreements grant to the existing stockholders and each of their respective permitted assigns, customary Form S-3 demand registration rights and piggyback registration rights, in each case subject to customary terms and conditions.

**Investment Agreements**

We are a party to an Investment Agreement, dated as of November 7, 2018, as amended by the first amendment, dated as of October 21, 2020 (as may be further amended or restated, the "Morgan Stanley Investment Agreement"), with the Morgan Stanley Investor, pursuant to which the Morgan Stanley Investor purchased the shares of our common stock that it owns. In addition to customary sale and issuance provisions and representations by us and the Morgan Stanley Investor, the Morgan Stanley Investment Agreement contains certain put rights regarding the ownership of our common stock and customary information rights. All such rights will terminate automatically upon the consummation of this offering.

162

**APP 103**

**Table of Contents**

**Index to Financial Statements**

**agilon health, inc.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1. Business

*Description of Business*

agilon health, inc. (formerly Agilon Health Topco, Inc.), together with its consolidated subsidiaries and variable interest entities (the "Company"), through its purpose-built model provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. As of December 31, 2020, the Company, through its contracted physician networks, provided care to approximately 131,000 Medicare Advantage members enrolled with private health plans in Hawaii, North Carolina, Ohio, Pennsylvania, and Texas. agilon health, inc. was incorporated in the state of Delaware in April 2017.

The following provides information regarding the Company's strategic partnerships to deliver healthcare services:
- The Company operates an independent practice association ("IPA") in Hawaii.
- During 2017, the Company entered into a strategic partnership to expand its operations beginning January 1, 2018 into Columbus, Ohio.
- During 2018, the Company entered into strategic partnerships to further expand its operations beginning January 1, 2019 into the Greater Akron/Canton area of Ohio and Austin, Texas.
- During 2019, the Company entered into strategic partnerships to expand its operations beginning January 1, 2020 into: (i) Dayton, Ohio; (ii) Southeast Ohio; and (iii) Pittsburgh, Pennsylvania.
- During 2020, the Company entered into a strategic partnership to further expand its operations beginning April 1, 2020 into Wilmington, North Carolina. Additionally, during 2020, the Company entered into strategic partnerships to further expand its operations beginning January 1, 2021 into: (i) Buffalo, New York; (ii) Toledo, Ohio; and (iii) Hartford, Connecticut. In December 2020, the Company entered into a strategic partnership to further expand its operations beginning January 1, 2022 into Syracuse, New York.
- During 2021, the Company entered into strategic partnerships to further expand its operations beginning January 1, 2022 into: (i) Grand Rapids, Michigan; (ii) Pinehurst, North Carolina; and (iii) Longview, Texas, along with additional partnerships in the Company's existing Ohio and Texas markets.

See Note 17 for additional discussions related to the Company's involvement with variable interest entities.

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, New York. All funds affiliated with CD&R are considered related parties.

## NOTE 2. Summary of Significant Accounting Policies

*Disposition of California Operations*

During 2020, the Company implemented a plan to divest its California operations, which included the entirety of its Medicaid line of business, via three separate transactions with different parties. In August 2020, the Company disposed of its Southern California operations for a gross sales price of $2.5 million and recognized a gain on sale of $1.3 million. In October 2020, the Company disposed of its Fresno, California operations for a gross sales price of $26.0 million and recognized a gain on sale of approximately $19.1 million. In December

F-7

Table of Contents

Index to Financial Statements

2020, the Company signed a definitive agreement to sell its remaining California operations for a gross sales price of $1.0 million. The sale closed in February 2021. The Company's decision to exit California and the Medicaid line of business represents a strategic shift that will have a major effect on its operations and financial results. As such, the Company's California operations are reflected in the consolidated financial statements as discontinued operations. See Note 19 for additional information.

## Basis of Presentation

The accompanying consolidated financial statements have been prepared by management in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

## Principles of Consolidation

The consolidated financial statements include the accounts of agilon health, inc., its wholly-owned subsidiaries and VIEs that it controls through voting rights or other means. Intercompany transactions and balances have been eliminated in consolidation.

The Company is required to continually evaluate its VIE relationships and consolidate these entities when it is determined to be the primary beneficiary of their operations. A VIE is broadly defined as an entity that has any of the following three characteristics:

  i.    the equity investment at risk is insufficient to finance the entity's activities without additional subordinated financial support;
  ii.   substantially all of the entity's activities either involve or are conducted on behalf of an investor that has disproportionately few voting rights; or
  iii.  the equity investors as a group lack any of the following:
    •    the power through voting or similar rights to direct the activities of the entity that most significantly impact the entity's economic performance;
    •    the obligation to absorb the expected losses of the entity; or
    •    the right to receive the expected residual returns of the entity.

The designation of an entity as a VIE should be reassessed upon certain events, including, but not limited to:

  i.    a change to the terms or in the ability of a party to exercise its kick-out rights;
  ii.   a change in the capital structure of the entity; or
  iii.  acquisitions or sales of interests that constitute a change in control.

A variable interest holder is considered to be the primary beneficiary of a VIE if it has the power to direct the activities of a VIE that most significantly impact the entity's economic performance and has the obligation to absorb losses or the right to receive benefits that could potentially be significant to the VIE. The Company continuously assesses whether it is (or is not) the primary beneficiary of a VIE. That assessment involves the consideration of various factors, including, but not limited to, the form of the Company's ownership interest, its representation on the VIE's governing body, the size and seniority of its investment, its ability and the rights of other variable interest holders to participate in policy making decisions, its ability to manage its ownership interest relative to the other variable interest holders, and its ability to liquidate the entity.

## Use of Estimates

Management is required to make estimates and assumptions in the preparation of financial statements. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of

F-8

**APP 105**

**Table of Contents**

**Index to Financial Statements**

contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates can include, among other things, those used to determine revenues and related receivables from risk adjustment, medical services expense and related payables (including the reserve for incurred but not reported ("IBNR") claims), and the valuation and related recognition of impairments of long-lived assets, including goodwill. Management's estimates for revenue recognition, medical services expense and other estimates, judgments, and assumptions, may be materially and adversely different from actual results as a result of the COVID-19 pandemic, among other things. These estimates are based on knowledge of current events and anticipated future events, and accordingly, actual results may ultimately differ materially from those estimates.

**Revenue Recognition and Receivables**

*Medical Services Revenue*

Medical services revenue consists of capitation fees under contracts with various Medicare Advantage payors ("payors"). Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members ("members") attributed to the Company's contracted primary care physicians. PMPM fees are determined as a percent of the premium payors receive from the Centers for Medicare & Medicaid Services' ("CMS") for these members. The Company generally accepts full financial risk for members attributed to its contracted primary care physicians and therefore is responsible for the cost of all healthcare services required by those members. Fees are recorded gross in revenue because the Company is acting as a principal in coordinating and controlling the range of services provided (other than clinical decisions) under its capitation contracts with payors. Capitation contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by Accounting Standards Codification ("ASC") 606, *Revenue From Contracts With Customers* ("ASC 606"), to stand ready on a monthly basis to provide all aspects of necessary medical care to members for the contracted period. The Company recognizes revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for the Company's capitation contracts is variable, as the PMPM fees to which the Company is entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. The Company and healthcare providers collect and submit the necessary and available diagnosis data to payors and such data is utilized by the Company to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in the Company's contracts with payors. The Company recognizes incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

*Receivables*

Receivables primarily consist of amounts due under capitation contracts with various payors. Receivables due under capitation contracts are recorded monthly based on reports received from payors and management's estimate of risk adjustment payments to be received in subsequent periods for open performance years. Receivables are recorded and stated at the amount expected to be collected.

F-9

**Table of Contents**

**Index to Financial Statements**

**Medical Services Expenses and Related Payables**

*Medical Services Expense*

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which the Company is financially responsible and which are paid either directly by the Company or by payors with whom the Company has contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of the Company's obligations for medical services that have been rendered by third parties, but for which claims have either not yet been received, processed, or paid.

Such estimates are based on many variables, including utilization trends, membership volumes, and historical claim payment patterns which are used to develop "completion factors" used to determine the amount of incurred but unpaid services using an actuarial process that is consistently applied each reporting period and that is commonly used by health insurance actuaries. Generally, for the most recent months, the Company estimates claim costs incurred by applying observed medical cost trend factors to the average PMPM medical costs incurred in prior months for which more complete claims data are available.

Each period, the Company re-examines previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances. As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates in the period in which the change is identified. The difference between the estimated liability and the actual settlements of claims is recognized in the period the claims are settled. The Company's medical claims payable balance represents management's best estimate of its liability for unpaid medical costs as of December 31, 2020 and 2019. The Company uses judgment to determine the appropriate assumptions for developing the required estimates.

The Company assesses the profitability of its managed care capitation arrangement to identify contracts where current operating results or forecasts indicate probable future losses. If anticipated future variable costs exceed anticipated future revenues, a premium deficiency reserve is recognized. Premium deficiency reserves as of December 31, 2020 and 2019 were immaterial.

*Other Medical Expenses*

Other medical expenses include: (i) partner physician incentive expense and (ii) other provider costs. Partner physician incentive expense relates to incentive obligations to the Company's physician partners. Other provider costs include payments for additional incentives to support physician-patient engagement and other care management expenses.

**Goodwill and Amortizable Intangible Assets**

Goodwill represents the excess purchase price consideration over the estimated fair value of net assets acquired in a business combination. The Company tests goodwill for impairment annually in the fourth quarter, and on an interim basis when events or changes in circumstances indicate that the carrying value may not be recoverable. The Company first assesses qualitative factors to determine whether it is more likely than not that the carrying value of a reporting unit exceeds its fair value. Qualitative analysis involves assessing situations and developments that could affect key drivers used to evaluate whether the value of goodwill is impaired. The Company's procedures include assessing its financial performance, macroeconomic conditions, industry and market considerations, various asset-specific factors, and entity-specific events. The Company may also elect to skip the qualitative testing and proceed directly to the quantitative testing.

In the quantitative assessment, the fair value of the reporting unit is determined primarily by an income approach, utilizing discounted cash flows and a market approach looking at comparable companies and related transactions. An impairment is recognized only to the extent that the carrying value of a reporting unit exceeds its fair value. If the fair value exceeds the carrying amount, goodwill is not considered impaired.

# EXHIBIT  2

APP 108

**Table of Contents**

**Index to Financial Statements**

Filed pursuant to Rule 424(b)(4)
Registration No. 333-254435

# 46,600,000 Shares



# agilon health, inc.

## Common Stock

This is the initial public offering of shares of common stock of agilon health, inc. ("agilon health"). We are offering 46,600,000 shares of common stock. The initial public offering price per share is $23.00.

Prior to this offering, there has been no public market for our common stock. We have been approved to list our common stock on the New York Stock Exchange (the "NYSE") under the symbol "AGL".

After the completion of this offering, we expect to be a "controlled company" within the meaning of the corporate governance standards of the NYSE.

**We will be treated as an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, for certain purposes until we complete this offering. As such, in this prospectus, we have taken advantage of certain reduced disclosure obligations that apply to emerging growth companies. See "Prospectus Summary—Implications of Being an Emerging Growth Company."**

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 23 of this prospectus to read about factors you should consider before buying shares of our common stock.**

| | Per Share | | Total |
|---|---|---|---|
| Initial public offering price | $ 23.00 | $ | 1,071,800,000 |
| Underwriting discounts and commissions(1) | $ 1.15 | $ | 53,590,000 |
| Proceeds, before expenses, to agilon health, inc. | $ 21.85 | $ | 1,018,210,000 |

(1)    See "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters also may purchase up to 6,990,000 additional shares from us at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus.

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved the securities described herein or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

One or more funds and/or accounts affiliated with Counterpoint Global (Morgan Stanley Investment Management), Capital World Investors, Wellington Management, Fidelity Management & Research Company LLC, and Rock Springs (collectively, the "cornerstone investors") have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering.

The underwriters expect to deliver the shares to purchasers on or about April 19, 2021.

| | | |
|---|---|---|
| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **BofA Securities** |
| **Deutsche Bank Securities** | | **Wells Fargo Securities** |
| **Nomura** | **William Blair** | **Truist Securities** |
| **Academy Securities** | **R. Seelaus & Co., LLC**    **Ramirez & Co., Inc.** | **Siebert Williams Shank** |

**Prospectus dated April 14, 2021**

**APP 109**

**Table of Contents**

**Index to Financial Statements**



"We believe that the long–term, independent relationship between a PCP and his/her patient is the most valuable relationship in the healthcare universe. It is the best way to drive behavior and thus, value."

– Gary Pinta, MD
*Pioneer Physicians, Akron*

**Table of Contents**

**Index to Financial Statements**



"This partnership provides physicians the ability to share in the development of a new payment model for PCPs. We are engaged and the model has physician fingerprints all over it."

– Mary Cook, MD
*Central Ohio Primary Care, Columbus*

**Table of Contents**

**Index to Financial Statements**



"This is a team sport . . .

We have similar goals but

we got to them in different

ways. We learn from each

other. We feed on each

other's excitement and

passion."

– Anas Daghestani, MD
*Austin Regional Clinic, Austin*

**Table of Contents**

**Index to Financial Statements**

TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 23 |
| Special Note Regarding Forward-Looking Statements and Information | 67 |
| Use of Proceeds | 70 |
| Dividend Policy | 71 |
| Capitalization | 72 |
| Dilution | 74 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 76 |
| Business | 103 |
| Management | 142 |
| Executive Compensation | 149 |
| Principal Stockholders | 159 |
| Certain Relationships and Related Party Transactions | 161 |
| Description of Capital Stock | 164 |
| Shares Available for Future Sale | 170 |
| Description of Certain Indebtedness | 172 |
| Certain U.S. Federal Income Tax Considerations for Non-U.S. Holders | 175 |
| Underwriting | 179 |
| Validity of Common Stock | 190 |
| Experts | 190 |
| Where You Can Find More Information | 190 |
| Index to Consolidated Financial Statements | F-1 |

**You should rely only on the information contained in this prospectus and any free writing prospectus we may authorize to be delivered to you. We have not, and the underwriters have not, authorized anyone to provide you with information different from, or in addition to, that contained in this prospectus and any related free writing prospectus. We and the underwriters take no responsibility for, and can provide no assurances as to the reliability of, any information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is only accurate as of the date of this prospectus, regardless of the time of delivery of this prospectus and any sale of shares of our common stock.**

i

Table of Contents

Index to Financial Statements

**Certain Important Terms**

- "We," "us," "our," "agilon" and the "Company" mean agilon health, inc., a Delaware corporation and its consolidated subsidiaries, unless the context refers only to agilon health, inc., as a corporate entity (which we refer to as "agilon health").
- "Anchor geography" means the geographies in which our anchor physician groups operate.
- "Anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography.
- "Capitation" means a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.
- "CMS" means the Centers for Medicare & Medicaid Services.
- "CMS Innovation Center" means the Center for Medicare & Medicaid Innovation.
- "DCE" means a Direct Contracting Entity participating in the CMS Innovation Center Direct Contracting Model.
- "FFS" means fee-for-service.
- "Independent physicians" means physicians not employed by health systems or insurance providers.
- "Live," when referring to a physician partner or a geography, means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with payors.
- "MA" means Medicare Advantage.
- "Members" means the MA patients who are attributed to our PCPs (as defined below) by our payors (as defined below).
- "Payors" means health insurance providers.
- "Our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.
- "PCP" means primary care physician.
- "Physician partners" means our anchor physician groups and all other physicians with whom we have contractual arrangements.
- "PMPM" means per member per month.
- "RBE" means a risk-bearing entity.
- "STAR rating" means annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics.
- "Total Care Model" means a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients.

**Market and Industry Data**

This prospectus includes estimates regarding market and industry data and forecasts, which are based on publicly available information, industry publications and surveys, reports from government agencies, reports by market research firms and our own estimates based on our management's knowledge of, and experience in, the

ii

**APP 114**

**Table of Contents**

**Index to Financial Statements**

healthcare industry. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable.

Throughout this prospectus, all references to "net promoter score" or "NPS" are to a measure of satisfaction widely used in the healthcare industry. We calculate patient and provider net promoter score based on responses to patient and provider surveys, administered as electronic surveys annually, that ask the patient or provider to rank, on a scale of 0 to 10, how likely they are to recommend their (or their provider's) practice to a friend or family member. We assign the designation of "Promoter" to respondents who provide a score of 9 or 10, the designation of "Passive" to respondents who provide a score of 7 or 8, and the designation of "Detractor" to respondents who provide a score of 0 to 6. We then subtract the percentage of Detractors from Promoters to determine our overall net promoter score. We believe that this method of calculation aligns with industry standards and that this metric is meaningful for investors because of the correlation that we believe exists between net promoter score and patient and provider satisfaction.

Our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the captions "Risk Factors," "Special Note Regarding Forward-Looking Statements and Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Service Marks, Trademarks and Trade Names**

We hold various service marks, trademarks and trade names, such as "agilon health," "agilon" and our logo design, that we deem particularly important to the advertising activities conducted by each of our businesses. This prospectus also contains trademarks, service marks and trade names of other companies which are the property of their respective holders. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

**Basis of Presentation**

During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. As a result of the divestiture of all of our California operations, our financial statements included in this prospectus reflect discontinued operations presentation for all California operations. Financial and operating information contained in this prospectus is presented without California operations data unless expressly stated otherwise. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

**APP 115**

**Table of Contents**

**Index to Financial Statements**

**PROSPECTUS SUMMARY**

*The following summary highlights selected information contained elsewhere in this prospectus. Because this is only a summary, it does not contain all of the information you should consider before investing in our common stock. You should carefully read the entire prospectus, including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as our consolidated financial statements included elsewhere in this prospectus, before making an investment decision.*

**Overview**

Our business is transforming healthcare by empowering the primary care physician ("PCP") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming risk-bearing entities (each, an "RBE") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. Currently, the PCPs on our platform serve approximately 210,000 patients enrolled in Medicare Advantage ("MA"), which includes approximately 49,000 patients with physician groups contracted to go-live on January 1, 2022 (we refer to these patients as the "members on our platform"). In addition, through our participation in the Center for Medicare & Medicaid Innovation ("CMS Innovation Center") Direct Contracting Model, our PCPs are expected to serve over 50,000 Medicare fee-for-service ("FFS") beneficiaries through our five currently approved Direct Contracting Entities ("DCEs"). For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

1

Table of Contents

Index to Financial Statements

**Empower PCPs to Transform Care in Their Communities**

| What We Do | How We Do It | Powerful Results |
|---|---|---|
| *Disrupt the rapidly-growing Medicare market for physicians, patients and payors* | *Migrate physicians, patients and payors from the traditional fee-for-service to a subscription-like Total Care Model* | *Since 2016, this capital-light, exportable and scalable model has grown* |
| • **Empower community-based physicians** to create a Medicare-centric globally capitated line of business | • **Unified set of payment, data, clinical, quality and growth capabilities** deployed as single platform | • 17 diverse geographies |
| • **Enable PCPs to quarterback their patients' healthcare** in a long-term, highly engaged relationship | • **Deployed through a long-term partnership model** based on aligned outcomes and economics | • 16 anchor physician groups; average tenure of 40+ years in their community |
| • **Transform the PCP business model** from a transaction-based model to a long-term, holistic membership-based model | • **Enhanced through a growing network of like-minded physician partners** that enable powerful network effect | • 15 payors |
| | | • 210,000 MA members including approximately 49,000 that go-live in 2022 |
| | | • NPS of 83 for patients and 73 for providers at live anchor physician groups |

The current state of the U.S. healthcare system is defined by the following key factors:

- Unsustainably high and rising costs characterized by waste, unnecessary variation in care and poor patient experience and health outcomes;
- FFS reimbursement model focused on units of service rather than a coordinated approach to meet the unique needs of individual patients;
- The Medicare population is projected to grow from approximately 62 million in 2020 to more than 70 million individuals in 2025 with a total spend of approximately $1.25 trillion, and MA enrollment is projected to comprise 47% of total Medicare enrollment (which we refer to as the "MA penetration rate"); and
- PCPs are positioned—but not currently empowered or incentivized—to act as the quarterback for healthcare delivery, with their decisions estimated to influence up to 90% of total healthcare spending according to a 2017 study.

We believe that failing to empower PCPs has fostered waste, needless variability in care and unsustainable growth in healthcare costs. According to a 2019 article entitled "Waste in the US Health Care System: Estimated Costs and Potential for Savings" published in the Journal of the American Medical Association, failure of care delivery, failure of care coordination and overtreatment or low-value care were estimated to represent $205.3 billion to $345.1 billion of waste annually in the U.S. healthcare system. While there is broad recognition of the need to move beyond a volume-based, FFS reimbursement model, structural hurdles have impeded rapid adoption of a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients, which we refer to as a Total Care Model. In this prospectus, we refer to "capitation" as a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.

To overcome these hurdles and achieve our mission of being the trusted long-term partner to community-based physicians, we have developed what we believe is a first-of-its-kind Total Care Model for community-based physicians that focuses exclusively on Medicare and manages subscription-like per member per month ("PMPM") arrangements with health plans or directly with the government. The agilon Total Care Model is powered by our platform, enabled through a long-term partnership model and reinforced via our growing national

2

Table of Contents

Index to Financial Statements

network of like-minded physicians. Our position as innovators is demonstrated by a series of transformative accomplishments since the formation of the company in July 2016, and our first partnership in 2017, many of which we believe to be industry-firsts:

- Implemented the first MA multi-payor, globally capitated risk model with a community-based physician group in all of our diverse geographies in which our anchor physician groups operate ("anchor geographies");
- Exported the Total Care Model from one to 17 geographies ranging from communities as small as Zanesville, Ohio to large and rapidly growing communities such as Austin, Texas;
- Grew from approximately 24,000 patients attributed to our PCPs by our payors ("members") to approximately 210,000 MA members on our platform;
- Expanded from two payors to 15 payors on our platform; and
- Poised to participate in the Direct Contracting Model, with over 50,000 Medicare FFS beneficiaries expected to be served by our existing PCPs contracted through our five currently approved DCEs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements:

- agilon's platform, which is holistic in enabling the rapid transformation to risk, is comprised of an integrated set of capabilities designed to continuously improve, and is delivered to our anchor physician groups through an aligned long-term partnership model;
- agilon's long-term physician partnership approach with community-based physician groups, which is designed to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician; and
- agilon's network of leading community-based physician partners, functioning as a collaborative group which can share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another.

With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients. The combination of subscription-like PMPM agreements with payors, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue.

The result is PCPs transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient. Despite our history of net losses, we believe this membership-based model results in a recurring revenue stream and provides our anchor physician groups with access to an incremental profit margin opportunity based on delivering high-quality care and health outcomes. Freed from the constraints of the transactional FFS reimbursement model, our PCPs are empowered to practice team-based, coordinated care when addressing individual patient needs and transition to a sustainable long-term business model for their senior patients. We believe enabling PCPs to unlock the value of a Medicare-centric, globally capitated line of business while remaining independent can transform the community-based physician business model.

3

**Table of Contents**

**Index to Financial Statements**

In this prospectus, when referring to a physician partner or a geography, "live" means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with health insurance providers ("payors"). In addition, "anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography. We refer to our anchor physician groups and the other physicians with whom we have contracted arrangements as our "physician partners." Finally, "our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.

*The agilon Flywheel Effect*: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients. The power of the agilon flywheel is highlighted by our total membership growth of 45%, of which 42% was driven by same geography membership growth and 58% was driven by entry into new geographies from December 31, 2019 to December 31, 2020, and general and administrative expenses per member contracted by 23% over the same period. Over the same period, we had revenue of $1.2 billion and a net loss of $60.1 million.



**Our Market**

In 2020, approximately 62 million Americans were enrolled in Medicare nationally, of which we estimate approximately 27 million to be affiliated with independent physicians. We define independent physicians as physicians not employed by health systems or insurance providers. We consider our current addressable market to be the estimated 17.5 million Medicare beneficiaries affiliated with independent PCPs in states in which we

4

**Table of Contents**

**Index to Financial Statements**

already have a physician partner or a signed letter of intent with a physician group as of January 2021, and those in which we have identified near-term prioritized geographies. Based on 2021 estimated average annual revenue per Medicare member to us of approximately $10,000, we estimate that this represents a total addressable market ("TAM") size of approximately $175 billion in 2020. We believe this addressable market will increase to nearly 20 million Medicare beneficiaries and $253 billion by 2025, based on the Centers for Medicare & Medicaid Services' ("CMS") projected Medicare enrollment and spending per beneficiary growth rates.



Rapidly Expanding Actionable TAM Growing at 8% CAGR

| | 2020 | | Projected 2025 | |
|---|---|---|---|---|
| | # Patient | Spend[1] | # Patient | Spend[2] |
| **Total Medicare beneficiaries** | 61.7M | $859B | 70.3M | $1,250B |
| **Medicare beneficiaries attributed to Independent PCPs** | 26.7M | $267B | 30.4M | $389B |
| **agilon TAM: Medicare beneficiaries attributed to Independent PCPs in Existing & Prioritized Geographies** | 17.5M | $175B | 19.8M | $253B |

(1)    2020 Medicare spend for total Medicare beneficiaries is based on CMS spend per beneficiary.
(2)    2025 Medicare spend for total Medicare beneficiaries, beneficiaries attributed to independent PCPs and agilon total addressable market is based on CMS projected Medicare enrollment and spending per beneficiary growth rates.

Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021, and $24 billion is based in counties in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021. In addition to the MA members our physician partners currently serve, we estimate our physician partners also serve approximately 375,000 patients that are addressable, which includes all Medicare FFS beneficiaries and commercial patients expected to age into Medicare over the next five years. This represents a 2020 market size of approximately $3.8 billion, using the same assumed annual revenue per Medicare member to us.

In addition, we see an additional opportunity for growth of our addressable market in physicians currently affiliated with health systems or insurance providers who become increasingly dissatisfied with those models. In considering our total addressable market, please also see "Risk Factors—Risks Related to Our Business."

**Industry Challenges and Our Opportunity**

We believe there is a significant opportunity to impact growth in U.S. healthcare costs and change the trajectory of the primary care business model through a platform, such as ours, in which PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients and share in the financial surplus created to the extent premiums received exceed the cost of medical care.

*Unsustainably high and rising U.S. healthcare costs*

According to CMS, U.S. national healthcare expenditures are expected to increase from $3.81 trillion in 2019 to $4.01 trillion in 2020. CMS projects that by 2028, healthcare expenditures will reach $6.20 trillion and will account for 19.7% of the U.S. GDP, up from 17.7% in 2018.

5

**APP 120**

**Table of Contents**

**Index to Financial Statements**

*Patients are dissatisfied with the fragmented and uncoordinated healthcare experience*

In the current FFS model, reimbursement is focused on units of service rather than a coordinated approach to meet the unique needs of individual patients. As a result, care delivery is often uncoordinated, leaving patients frustrated and responsible to navigate their own way through a fragmented and complex healthcare system.

*PCPs are well-positioned to be agents of change*

According to Oregon's Patient-Centered Primary Care Home Program, every $1 spent on primary care services can save $13 of future healthcare costs. Across the U.S., there are more than 486,000 active PCPs who serve as patients' first and most frequent point of contact for their healthcare experience.

*The trajectory of the current independent primary care business model is unsustainable*

In the current FFS reimbursement model, as average reimbursement rates decline, PCPs must increase the number of patients they see to sustain their practice. This volume-based model perpetuates physician burnout and jeopardizes the long-term sustainability of the independent primary care business model. According to a 2019 report, more than 50% of family physicians show symptoms of burnout, driven in part the FFS reimbursement model and increasing administrative burden. We believe this has been exacerbated by the effects of COVID-19.

*Growth of the complex and costly Medicare population is accelerating pressure on primary care*

The Medicare population is expected to grow from approximately 62 million individuals in 2020 to approximately 70 million individuals by 2025. As the medically complex Medicare population disproportionately drives utilization and cost, and is typically reimbursed at a lower rate than the commercial population, the primary care delivery system and the overall healthcare system are further strained.

**Structural Hurdles to Adoption of a Total Care Model**

We believe that all key stakeholders—patients, physicians and payors—benefit significantly from an environment where PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients versus operating in the current FFS reimbursement model that primarily rewards units of service. However, over time, the existing FFS system has created structural hurdles that now impede rapid and broad adoption of a PCP-led Total Care Model.
- PCPs lack the incentive structure to reorganize the healthcare delivery system.
- PCPs lack the infrastructure to participate in a multi-payor model.
- PCPs lack the breadth of capabilities and resources necessary to transition to a Total Care Model.
- PCP groups are highly fragmented and lack the benefits of scale.
- Limited long-term, deep collaboration between payors and physicians.

**Our Answer**

*We have created a Total Care Model for community-based physicians that focuses exclusively on Medicare and manages the comprehensive healthcare needs of our members through subscription-like PMPM arrangements with health plans or directly with CMS—powered by the agilon platform, enabled through a long-term partnership model and reinforced via a growing national network.*

**The agilon Platform:** The agilon platform is focused on existing community-based physician groups, senior patients within these practices and enabling our physician partners to rapidly move to a subscription-like Total

6

**APP 121**

**Table of Contents**

**Index to Financial Statements**

Care Model. Our platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital, and recognizes that enhanced capabilities are needed at multiple levels and must be deeply integrated within existing physician group operating processes to successfully execute the transition. The agilon platform was co-developed and has been continuously refined with our physician partners since the formation of the company. The agilon platform comprises an integrated set of capabilities, delivered as a unified platform to enable successful partnerships at the community level, create a national network of PCPs and physician groups and empower our PCPs to improve health outcomes for their patients.

### *Our platform capabilities include:*

- *Payor Engagement*: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one approach to quality, patient experience, clinical program management and financial management.
- *Direct Contracting Model*: In each community we serve, our Total Care Model can be extended to patients enrolled in traditional Medicare through the CMS Innovation Center Direct Contracting Model.
- *Data Integration and Management*: Our purpose-built and flexible platform enables ease of integration with payor systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.
- *Clinical Programs and Product Development*: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value actionable playbooks for partner physicians to deliver quality care, which include operational plans, analytics and tracking metrics.
- *Quality (Clinical and Experience)*: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.
- *Growth*: We enable our partners to extend their local brand into a senior care brand for their Total Care Model that embodies the history and culture of their local physician group. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their approximately 220,000 patients that are currently Medicare-eligible but are not covered by an MA plan and their approximately 156,000 60-64 year-old patients, to enable their patients to make educated healthcare choices. These patients represent an embedded growth opportunity.
- *Performance Management Analytics*: One of the most powerful parts of our platform is enabled by the peer-to-peer comparison of efficiency and clinical metrics at the physician, population and network level.
- *Financial Management*: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.
- *National Policy*: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

### *agilon's Long-term Physician Partner Model*

*Physician Relationships*

We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to address the need to move healthcare closer to the physician, be outcome-

7

**APP 122**

Table of Contents

Index to Financial Statements

centric and optimize the long-term sticky relationship between a patient and their existing physician. Our anchor physician group relationships have the following characteristics:

- Long-term partnership model that allows both agilon and physicians to take the long-term view and benefit from the maturity of a growing number of members on the platform;
- Shared governance and co-location of staff to manage our local partnerships;
- Local dyad leadership structure that includes a medical director from the local anchor physician group;
- Local brand which reflects the local anchor physician group or geography;
- Capital from agilon to support value-based care infrastructure supporting the delivery of high-quality healthcare, and 100% downside protection, which removes a major obstacle to physicians making the leap to a Total Care Model;
- Operating leverage created by amortizing centralized investments in the platform infrastructure across a growing number of physician partners; and
- Surplus dollars generated locally due to improvements in quality of care and healthcare costs are shared with the local anchor physician group.

Under the Total Care Model, we typically operate by RBE's within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups. Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. Through incentive compensation arrangements, we share with our anchor physician groups a portion of the RBE's savings from successfully improving the quality of care and reducing costs. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. Most of our contracts with our anchor physician groups contain exclusivity provisions, as well as termination rights that are triggered upon certain events.

*Payor Relationships*

In each of our geographies, we enter into subscription-like PMPM agreements with payors to manage the total healthcare costs of our attributed members. Through this partnership model, we believe we:

- empower PCPs to act as the quarterback for healthcare delivery;
- enable PCPs to define a tailored patient experience across multiple payors;
- create an operating partnership and economic model built around improved health outcomes instead of a transaction-based model; and
- align the physician business model with the strength of their long-term patient relationships enabling the long-term growth of independent, community-based physician groups.

8

Table of Contents

Index to Financial Statements

Under a typical agreement, we are entitled to monthly PMPM fees, which are typically based on a defined percentage of the corresponding premium which payors receive from CMS. We generally accept full financial risk for members attributed to us through our contracted PCPs and, therefore, are responsible for the cost of all healthcare services required by those members, which generally includes healthcare costs which CMS considers Part A and B costs. Our agreements with payors may delegate claims payment to us, or such responsibility may be retained by the payor, as is the case today in the majority of our payor agreements. The majority of our agreements are for terms ranging from one to three years and contain automatic annual renewal provisions as well as various termination rights. We also typically agree to indemnify our payors against certain third-party claims. As we continue to expand the agilon platform and enter into additional long-term partnerships, we will negotiate payor agreements in new geographies, including with Humana, Aetna and United Healthcare.

The power of our local partnership model is defined by the scale, breadth and local brand of our physician partners. On average, our anchor physician groups have been serving their communities for more than 40 years, have a PCP tenure of approximately 13 years, and receive exceptionally strong NPS from their PCPs and patients in live geographies of 73 and 83, respectively. We believe this gives us the ability to influence the local healthcare delivery system at scale. We expect our physician partner patient panels to systematically migrate to MA as the patient population ages and our partnerships mature. We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000.

The table below presents an overview of our anchor physician groups:

| Go-Live Year | Geography | Anchor Physician Group | Founded | PCPs | Average PCP Tenure | Approx. MA, FFS, Commercial Lives |
|---|---|---|---|---|---|---|
| 2018 | Columbus, OH | CENTRAL OHIO PRIMARY CARE | 1996 | >100 | 13 | 265K |
| 2019 | Akron, OH | PIONEER PHYSICIANS NETWORK | 1995 | 25-100 | 18 | 60K |
| | Austin, TX | AUSTIN REGIONAL CLINIC / PREMIER FAMILY PHYSICIANS | 1980/1994 | >100 | 10 | 375K |
| 2020 | Pittsburgh, PA | preferred primary care physicians | 1995 | 25-100 | 13 | 65K |
| | Dayton, OH | PriMED | 1995 | <25 | 13 | 30K |
| | Southeast OH | Physicians Group | 2001 | <25 | 14 | 35K |
| | Wilmington, NC | | 1971 | 25-100 | 14 | 115K |
| 2021 | Buffalo, NY | Buffalo Medical Group | 1946 | 25-100 | 10 | 70K |
| | Toledo, OH | Toledo Clinic | 1926 | 25-100 | 9 | 45K |
| | Hartford, CT | Starling | 1947 | 25-100 | 17 | 45K |
| 2022 | Syracuse, NY | FamilyCare Medical Group, PC | 1996 | 25-100 | 17 | 75K |
| | Pinehurst, NC | | 1952 | 25-100 | 10 | 60K |
| | Texarkana, TX | Collom & Carney Clinic | 1947 | <25 | 13 | 15K |
| | Longview, TX | DC DIAGNOSTIC CLINIC of Longview | 1975 | <25 | 16 | 75K |
| | Grand Rapids & Traverse City, MI | ANSWER HEALTH | 1986 | >100 | 10 | 120K |

In addition to our anchor physician groups in the table above, we have broadly contracted with PCPs across the state of Hawaii and have developed select deeper primary care relationships within that network.

9

**APP 124**

**Table of Contents**

**Index to Financial Statements**

*Our Network*

We believe the agilon network creates significant value for our patients, our physician partners, our payors and our organization. The ability to share best practices, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. Our physician partners are both collaborative and constructively competitive in service of their patients. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

*Value Proposition to Stakeholders*

Our Total Care Model empowers community-based physician groups to lead local healthcare transformation and ensure the long-term sustainability of the community-based physician model.

We believe the benefits of this differentiated model to community-based physician groups and the patients they serve include:
- Rapid creation of a Medicare Total Care Model that enables our PCPs to take a long-term view of their relationships with their patients and allocate resources to meet individual member health needs.
- Sustainable long-term business model alongside commercial and Medicare FFS.
- Provides access to network of like-minded partners.
- Improved economics.
- Improving the physician experience.
- Improving the patient experience.
- Supporting superior health outcomes.

We have also become an important strategic partner for our payors, as we are a material portion of their membership base, delivery network and annual membership growth in many of the geographies we serve. Through our subscription-like agreements, we ensure a consistent gross margin on a growing membership base. The strength of our relationships with payors has resulted in our establishment of national joint-operating committees with five national health plans through which we develop, execute and monitor a strategy for growth and performance as part of their Medicare delivery network.

**Our Strengths**

*Local and National Leadership and First-Mover Dynamics*

Core to our model is partnering in local geographies with leading physician groups that have already built significant scale and strong brands in the communities they serve. Our local leadership is highlighted by our position in Columbus, Ohio, where we have more than 200 PCPs on our platform, whose patient panels include approximately 50% of total MA lives among independent PCPs.

We believe we are pioneers in providing a full-risk, multi-payor Total Care Model within our local geographies, our growing regional hubs and the country. We believe we are the only MA multi-payor, globally capitated risk vehicle available for independent physician groups to access a Total Care Model in our local geographies. The sustainability of this local leadership position is also enhanced by our long-term partnerships with our anchor physician groups.

10

**APP 125**

**Table of Contents**

**Index to Financial Statements**

We've established a strong local leadership position in 17 geographies creating what we believe to be the first national platform for a Medicare-centric, globally capitated line of business. We believe our position as a first-mover creates a competitive advantage, resulting in other independent physician groups viewing us as an established and trusted partner.

*Long-Term Economic Model*

We believe our membership and per-member profitability will grow over time due to structural characteristics inherent to our long-term partnerships, durable and growing MA membership within our physician partners and the nature of the MA economic model. The key strengths of our economic model include:

- We believe we have the ability to generate significant, recurring and growing medical margin in concert with our physician partners over the course of our long-term partnerships and the inherently sticky physician-patient relationship.
  - Our physician partnerships are typically 20 years.
  - Average physician tenure within our anchor physician groups is 13 years.
  - Patients 65 years of age and older remain with their PCP for an average of 10 years, according to a 2004 study.
- Embedded same-geography, long-term organic membership growth resulting from our physician partners' existing patients who age into Medicare and elect to enroll in MA or who elect to convert from Medicare FFS to MA over the life of our long-term partnership.

Although we have incurred net losses since our formation in 2016, we believe that the combination of a growing membership base and improving medical margin over the life of our long-term partnerships creates a significant lifetime value ("LTV") for the geographies we enter. We are able to access this attractive LTV through what we believe to be a low-cost and increasingly cost-efficient model. We believe this low-cost and increasingly cost-efficient growth model represents a significant advantage supporting our rapid scaling to new geographies and sustainable existing geography growth.

*Model for Long-Term Sustainable Growth*

We have created a multi-pronged growth strategy that has powerful tailwinds for our physician partners and our business by leveraging existing physician capacity in local geographies, establishing long-term partnerships with significant embedded growth opportunities and expanding through multiple regional levels. The "flywheel" nature of our model has allowed us to expand from one geography to 17 in fewer than five years and has resulted in an additional approximately 186,000 MA lives being attributed to our platform over the same time period.

*Purpose-Built, Exportable, Scalable Platform*

The creation of the agilon platform and an aligned physician partnership approach has enabled the consistent deployment of a Medicare-centric, globally capitated line of business across 17 heterogeneous geographies, 16 anchor physician groups and multiple payors. The components of our Total Care Model (including data, payor engagement, clinical programs and growth) are discrete but are delivered as a unified platform through a highly-aligned model with physicians to optimize success. Our platform has enabled us to grow revenue 53% year-over-year for the year ended December 31, 2020, while operating costs to support live geographies and enterprise functions grew 12% over the same period. Our net loss for the year ended December 31, 2020 was $60.1 million, a 79% decline from losses of $282.7 million in the year ended December 31, 2019.

11

**APP 126**

**Table of Contents**

**Index to Financial Statements**

*Network Feedback Loop*

We believe our growing network of community-based physicians at the national, regional and local level drives continuous improvement of our platform, enables best practices sharing and innovation and accelerates the growth of independent physicians joining the agilon network. Many of our physician partners and individual physicians have joined our platform based on references from existing like-minded physician partners, and the credibility and quality of our physician partners is consistently cited as a deciding factor for joining the platform.

*Differentiated Physician and Patient Experience*

We designed our platform, partnership and network approach with the goal of delivering a superior and continuously improving experience to our physician partners and their patients. We believe our model enables PCPs to unlock the value in a Medicare-centric, globally capitated line of business while remaining independent. Subsequent to joining our platform, our PCPs have increased their average annual income by successfully managing healthcare costs and improving health outcomes. We believe that our PCPs' engagement is manifested through deeper relationships with patients and results in a greater opportunity to improve our members' health. For example, in 2019, 78% of our members attributed to our live anchor physician groups attended their wellness visits, compared to the FFS national average CMS Annual Wellness Visit completion rate of 35% in 2019.

*Mission-Driven Team and Culture*

We have a world-class management team, which is differentiated by its breadth and depth of expertise in healthcare. Our senior management team has an average of more than 15 years of experience in the healthcare industry and has significant exposure across all components of the payment and delivery continuum. We believe our management team's collective robust, diverse and complementary exposure to different facets of the healthcare industry positions our team to navigate and enable the shift to a physician-driven Total Care Model.

Our team is united by our mission of being the trusted long-term partner to community-based physicians and driven by our vision of transforming healthcare at the community level through exceptional patient-physician relationships.

12

**APP 127**

**Table of Contents**

**Index to Financial Statements**

**Our Growth Strategy**

We intend to utilize our competitive strengths and capitalize on favorable industry trends to increase the number of regional hubs, local markets within those hubs and ultimately physicians and members we serve. The key elements of our growth include:

*The power of our model at work: Case study of Ohio expansion*



Note: Year in map refers to year partner joined the platform (global risk contract effective the following year)

**Establish New Regional Hubs across the Country**

We believe we are well-positioned to expand the number of our physician partners nationally across a diverse set of geographies. We have developed sophisticated business development capabilities and have established a robust pipeline with an array of physician groups across the country. We are also benefitting from the network effect of our growing network of like-minded physician partners.

*Access the Large and Embedded Membership Opportunity within Our Existing Networks*

We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000. As these patients enroll in MA through our payors, they become attributed to our platform with little incremental cost to us.

*Facilitate and Capitalize on the Growth of Our Physician Partners*

As the PCP base of our physician partners grows, our physician partners are better positioned to serve a growing Medicare population.

13

**APP 128**

**Table of Contents**

**Index to Financial Statements**

*Expand into Adjacent Geographies*

Once we establish a presence in a geography, we have the opportunity to accelerate the addition of new physician partnerships in the region. We leverage our multi-payor MA risk platform and regional infrastructure to efficiently grow into adjacent geographies. Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021.

*Increase Quality and Improve Health Outcomes to Drive Profitability*

We believe our Total Care Model drives increased profitability per member over time through increasing quality and improving health outcomes. As members and physicians mature on our platform, we increasingly recognize the benefits of improved quality of care and effectively managed healthcare costs. We believe there is significant opportunity to improve profitability per member over the course of our long-term partnerships by improving healthcare outcomes and effectively managing costs, with 70% of our MA members as of December 31, 2020 on our platform for fewer than three years.

*Demonstrate Operating Leverage*

We expect to drive increasing profitability by leveraging both our market-level operating costs and centralized infrastructure, as we manage increased MA and DCE membership on our platform that has maturing medical margin over time.

*Capitalize on Emerging Value-Based Care Opportunities*

We believe we are positioned to capitalize on the shift from FFS towards a Total Care Model across the broader healthcare system. Through five currently approved DCEs, which encompass more than 500 of our existing PCPs, we expect to provide care to over 50,000 traditional Medicare members in seven geographies. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

**Impact of COVID-19 Pandemic on Our Business**

Commencing in March 2020, we implemented various measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. These measures included relocating employees to home-based work settings, coordinating with physician partners to accelerate telehealth activity and coordinating daily huddles for physicians and team members on clinical and operational impacts of COVID, which included participation by nationally-recognized experts in infectious disease and epidemiology. Despite the challenges and uncertainties created by the COVID-19 pandemic, we believe that our response to the pandemic has reinforced the value of our platform, long-term partnership model and network.

Throughout most of 2020, our members incurred lower healthcare costs than we would have otherwise expected, which resulted in lower medical services expenses incurred. These costs may be incurred at future points in time and it is possible that the deferral of healthcare services could cause additional health problems in our existing members, which could increase our costs in the future. Additionally, our members' risk adjustment factors, which are reflective of documented clinical conditions during 2020 and which impact our 2021 revenues, may be lower than would have occurred without the impact of the COVID-19 pandemic, resulting from members' avoidance or deferral of care during 2020. We cannot accurately estimate the net ultimate impact, positive or negative, to revenue or medical services expense at this time.

Also see "Risk Factors—Risks Related to Our Business— The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this

14

Table of Contents

Index to Financial Statements

situation precludes any prediction as to the ultimate adverse impact to us of COVID-19," "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of COVID-19" and "Business—Impact of COVID-19 Pandemic on Our Business."

**Company History**

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, NY. Our business was formed in 2016 through the completion of two acquisitions by CD&R: In July 2016, Primary Provider Management Company, Inc. ("PPMC") was acquired, which, together with its affiliated independent practice associations ("California IPAs"), operated in Southern California. Also in July 2016, Cyber-Pro Systems, Inc. ("CPS") was acquired, which, together with its subsidiaries and affiliates, operates a network of contracted physicians in Hawaii and provides software and medical billing solutions to independent healthcare organizations. During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. However, we will continue to be responsible for any liabilities arising from certain of the divested businesses which were incurred prior to the applicable closing date. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

agilon health, inc., the issuer in this offering, was incorporated in the State of Delaware in April 2017 in connection with our entry into a physician partnership with Central Ohio Primary Care Physicians, Inc. ("COPC"), a physician-owned medical group, to establish a Medicare-centric, globally capitated line of business in the Columbus, Ohio region. Since that time, we have expanded and entered into new partnerships in Austin, Akron, Pittsburgh, North Carolina, Hartford, Buffalo, Toledo, Dayton and Southeast Ohio. In March 2021, we changed our name from Agilon Health Topco, Inc. to agilon health, inc., and changed the name of our subsidiary, agilon health, inc., to agilon health management, inc.

**Our Majority Shareholder and Organizational Structure**

*Clayton, Dubilier & Rice, LLC.* Founded in 1978, CD&R employs a distinctive approach to private equity investing, bringing together investment professionals and operating executives to pursue a strategy predicated on building stronger, more profitable businesses. Since inception, CD&R has managed the investment of more than $30 billion in 95 businesses with an aggregate transaction value of over $150 billion. CD&R has a disciplined and clearly defined investment strategy and has extensive experience investing across the healthcare industry.

After the completion of this offering, we expect that CD&R Vector Holdings, L.P. (the "CD&R Investor"), which is owned by investment funds managed by, or affiliated with, CD&R, will hold approximately 59% of our common stock (or approximately 58% if the underwriters exercise in full their option to purchase additional shares). As a result, we expect to be a "controlled company" within the meaning of the NYSE rules following the completion of this offering. This election will allow us to rely on exemptions from certain corporate governance requirements otherwise applicable to NYSE-listed companies. See "Management—Corporate Governance."

15

Table of Contents

Index to Financial Statements

The following chart presents an overview of our ownership and organizational structure, after giving effect to this offering. For additional information with respect to our ownership structure, see "Principal Stockholders":

1    Includes COPC, certain private investment funds and our physician partners with whom we have physician partner group equity agreements.
2    Includes indebtedness related to the 2021 Credit Facilities (as defined herein), including term loan indebtedness, revolver indebtedness and letters of credit. On February 18, 2021, we, through agilon health management, inc. ("agilon management"), entered in the 2021 Secured Credit Agreement (as defined herein) to refinance our outstanding indebtedness under the Credit Facilities (as defined herein). See "Description of Certain Indebtedness."
3    Operating subsidiaries include wholly-owned RBEs, independent practice associations and other immaterial subsidiaries, which have been omitted from this chart for convenience.
4    Ownership percentages assume no exercise of the underwriters option to purchase up to 6,990,000 additional shares of common stock in the offering, and are determined as described in "—The Offering."

**Our Corporate Information**

agilon health, inc. is a Delaware corporation. Our principal executive offices are located at 1 World Trade Center, Suite 2000, Long Beach, CA 90831, and our telephone number is (562) 256-3800. Our website is *www.agilonhealth.com*. None of the information contained on, or that may be accessed through, our website or any other website identified herein is part of, or incorporated into, this prospectus, and you should not rely on any such information in connection with your decision to invest in our common stock.

16

**APP 131**

Table of Contents

Index to Financial Statements

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows and results of operations that you should consider before making a decision to invest in our common stock. These risks are discussed more fully under the caption "Risk Factors." These risks include, but are not limited to, the following:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- significant reductions in membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts, which contracts generally provide that if the cost of care exceeds the corresponding capitation revenue we receive from payors in respect of attributed members we may realize operating deficits, which are typically not capped, and could lead to substantial losses;
- dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- ability to comply with federal, state and local regulations and laws we are subject to, or to adapt to changes in or new regulations or laws, including as such regulations and laws that relate to our physician alignment strategies with our physician partners or the corporate practice of medicine;
- our physician partners' compliance with federal and state healthcare fraud and abuse laws and regulations; and
- the influence of the CD&R Investor and our status as a "controlled company."

17

APP 132

Table of Contents

Index to Financial Statements

**Implications of Being an Emerging Growth Company**

As a company with less than $1.07 billion in annual gross revenue for the year ended December 31, 2019, we were an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). An emerging growth company may take advantage of specified reduced reporting and other reduced requirements that are otherwise applicable generally to public companies. These provisions include:

- in this prospectus, we may present only two years of audited financial statements and only two years of related Management's Discussion and Analysis of Financial Condition and Results of Operations disclosure; and
- in this prospectus, we are permitted to provide less extensive disclosure about our executive compensation arrangements such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, under the JOBS Act, emerging growth companies can also delay adopting new or revised financial accounting standards until such time as those standards would otherwise apply to private companies. We have elected to avail ourselves of this exemption from new or revised accounting standards and, therefore, will not be subject to the new or revised accounting standards other public companies will implement that are not emerging growth companies. As a result, our consolidated financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of the effective dates applicable to public companies.

We ceased to be an emerging growth company on December 31, 2020 because our annual gross revenues exceeded $1.07 billion for the year ended December 31, 2020. However, we will continue to be treated as an emerging growth company for disclosure purposes in this prospectus until the completion of our initial public offering. We have elected to take advantage of certain of the foregoing reduced burdens in this prospectus and, as such, the information in this prospectus may be different than the information provided by other public companies. Some investors could find our common stock less attractive as a result of our utilization of these or other exemptions. This could result in a less active trading market for our common stock and increased volatility in the price of our common stock.

18

Table of Contents

Index to Financial Statements

**THE OFFERING**

| | |
|---|---|
| Common stock offered by us | 46,600,000 shares. |
| Common stock to be outstanding after this offering | 384,021,560 shares. |
| Option to purchase additional shares | The underwriters also may purchase up to 6,990,000 additional shares from us at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus. |
| Use of proceeds | We estimate that the net proceeds to us from this offering, after deducting estimated underwriting discounts and commissions and estimated offering expenses, will be approximately $1,009.6 million, or approximately $1,162.4 million if the underwriters exercise in full their option to purchase additional shares. |
| | We intend to use the net proceeds of this offering as described in "Use of Proceeds." |
| Dividend policy | We do not currently anticipate paying dividends on our common stock for the foreseeable future. Any future determination to pay dividends on our common stock will be subject to the discretion of our board of directors and depend upon various factors. See "Dividend Policy." |
| Risk Factors | Our business is subject to a number of risks that you should consider before making a decision to invest in our common stock. See "Risk Factors." |
| Reserved Share Program | At our request, an affiliate of BofA Securities, Inc., a participating underwriter, has reserved for sale, at the public offering price, up to 5% of the shares offered by this prospectus. If purchased, these shares of common stock will not be subject to a lock-up restriction. The number of shares of common stock available for sale to the general public will be reduced to the extent such shares of common stock are purchased pursuant to this program. Any reserved shares that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares of common stock offered by this prospectus. The underwriters will receive the same underwriting discounts and commissions on any shares of common stock purchased pursuant to this program as they will on any other shares of common stock sold to the public in this offering. |
| Indications of Interest | Prior to the date hereof, the cornerstone investors have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the |

19

APP 134

Table of Contents

Index to Financial Statements

|  |  |
|---|---|
|  | cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering. |
| Proposed symbol | "AGL". |

The number of shares of our common stock to be outstanding immediately following this offering is based on 325,749,077 shares outstanding as of March 31, 2021, and excludes:

- 41,412,100 shares of common stock issuable upon exercise of options outstanding as of March 31, 2021 at a weighted average exercise price of $3.85 per share, of which 25,546,250 shares will be exercisable as of the consummation of this offering;
- 28,661,509 shares of common stock reserved for future issuance following this offering under our Omnibus Incentive Plan and ESPP; and
- 35,400 shares of our common stock subject to outstanding unvested RSUs granted to directors.

Unless otherwise indicated, all information in this prospectus:

- gives effect to a 100-for-1 stock split on our common stock effected on April 1, 2021;
- gives effect to the issuance of 46,600,000 shares of common stock in this offering;
- assumes no exercise by the underwriters of their option to purchase additional shares;
- gives effect to the issuance of 11,672,483 shares of common stock issuable under partner physician group equity agreements conditioned on completion of this offering (representing a number of shares equivalent to $268.5 million); and
- gives effect to amendments to our amended and restated certificate of incorporation (the "Certificate of Incorporation") and amended and restated by-laws (the "By-laws") to be adopted prior to the completion of this offering.

20

**Table of Contents**

**Index to Financial Statements**

**SUMMARY HISTORICAL CONSOLIDATED FINANCIAL DATA**

The following tables set forth our summary historical consolidated financial data derived from our consolidated financial statements as of the dates and for each of the periods indicated. The summary historical consolidated financial data as of and for the years ended December 31, 2019 and December 31, 2020 are derived from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results to be expected for any future period.

You should read this summary historical consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements included elsewhere in this prospectus.

|  | Year Ended December 31, | |
| --- | --- | --- |
| (*dollars in thousands*) | **2020** | **2019** |
| **Consolidated Statement of Operations Data:** | | |
| **Revenues:** | | |
| Medical services revenue | $ 1,214,270 | $ 788,566 |
| Other operating revenue | 4,063 | 5,845 |
| Total revenues | 1,218,333 | 794,411 |
| **Expenses:** | | |
| Medical services expense | 1,021,877 | 725,374 |
| Other medical expenses | 102,306 | 40,526 |
| General and administrative | 137,292 | 122,832 |
| Depreciation and amortization | 13,531 | 12,253 |
| Total expenses | 1,275,006 | 900,985 |
| **Income (loss) from operations** | (56,673) | (106,574) |
| **Other income (expense):** | | |
| Other income (expense), net | 2,465 | 955 |
| Interest expense | (8,135) | (9,068) |
| **Income (loss) before income taxes** | (62,343) | (114,687) |
| Income tax benefit (expense) | (865) | 232 |
| **Income from continuing operations** | (63,208) | (114,455) |
| **Discontinued operations:** | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | (20,049) | (86,108) |
| Impairments | — | (98,343) |
| Gain (loss) on sales of assets, net | 20,401 | — |
| Income tax benefit (expense) | 2,804 | 16,166 |
| **Total discontinued operations** | 3,156 | (168,285) |
| **Net income (loss)** | (60,052) | (282,740) |
| Noncontrolling interests' share in discontinued operations | — | 152 |
| **Net income (loss) attributable to common shares** | $ (60,052) | $ (282,588) |
| **Consolidated Balance Sheet Data (at period end):** | | |
| Cash and cash equivalents | $ 106,795 | $ 123,633 |
| Total assets | $ 446,361 | $ 402,794 |
| Total liabilities | $ 421,591 | $ 353,822 |

21

**APP 136**

**Table of Contents**

**Index to Financial Statements**

| (dollars in thousands) | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Contingently redeemable common stock | $ 309,500 | $ 281,000 |
| Total stockholders' deficit | $ (284,730) | $ (232,028) |
| (dollars in thousands) | **Year Ended December 31,** | |
| | **2020** | **2019** |
| **Consolidated Statement of Cash Flows Data:** | | |
| Cash flows from: | | |
| Operating activities | $ (53,204) | $ (103,861) |
| Investing activities | $ 22,066 | $ (5,060) |
| Financing activities | $ 24,621 | $ 176,298 |
| (dollars in thousands) | **Year Ended December 31,** | |
| | **2020** | **2019** |
| **Other Financial Data:** | | |
| Medical margin(1) | $ 192,393 | $ 63,192 |
| Network contribution(2) | $ 99,016 | $ 25,598 |
| Adjusted EBITDA(3) | $ 5,827 | $ (56,711) |

(1)   Medical margin represents medical services revenue after deducting medical services expense.

(2)   Network contribution is a non-GAAP financial measure. Network contribution represents medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Income (loss) from operations is the most directly comparable U.S. generally accepted accounting principles ("GAAP") measure to network contribution. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding network contribution and a reconciliation to income (loss) from operations.

(3)   Adjusted EBITDA is a non-GAAP financial measure. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding Adjusted EBITDA and a reconciliation to net income (loss).

22

**APP 137**

Table of Contents

Index to Financial Statements

RISK FACTORS

*Risks Related to Our Business*

***We have a history of net losses, we anticipate increasing expenses in the future and we may not achieve or maintain profitability.***

We have incurred significant net losses in the past, including net losses (including discontinued operations) of $60.1 million for the year ended December 31, 2020 and $282.7 million for the year ended December 31, 2019. As a result of these losses, we had accumulated deficits of $551.2 million as of December 31, 2020 and $491.1 million as of December 31, 2019. We expect that our expenses will increase substantially in the foreseeable future and our losses will continue, including for the year ended December 31, 2021, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

***Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As an immature and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures

23

**APP 138**

Table of Contents

Index to Financial Statements

to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business, financial condition, cash flows and results of operations could be harmed.

*We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.*

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing upon these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, as a rapidly growing and relatively immature company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows and results of operations could be harmed.

*Amounts of medical expenses which are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.*

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows and results of operations.

Additionally, factors which impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:
- Changes to the Medicare fee schedule or other rate schedules which serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

24

**APP 139**

**Table of Contents**

**Index to Financial Statements**

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;
- The utilization rates of healthcare services, including inpatient hospitalization, by our members;
- Changes to member benefit levels established annually by payors; and
- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows and results of operations.

*As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.*

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and ,therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or which are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

*We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.*

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As a result, as our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows and results of operations could be materially adversely affected.

25

Table of Contents

Index to Financial Statements

***We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.***

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. As of December 31, 2020 and December 31, 2019, our cash and cash equivalents were $106.8 million and $123.6 million, respectively. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced extreme volatility and disruption, which has increased due to the effects of COVID-19. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our Credit Facilities.

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable time, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

***Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows and results of operations.***

A significant reduction in membership could adversely affect our business, financial condition, cash flows and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:
- failure to obtain new physician partners or members or to retain existing physician partners or members;
- decision by a payor to not renew the existing contractual agreement upon termination of such contract;
- low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;
- alternative care opportunities that are more attractive than those provided by our physician partners;
- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;
- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

26

**APP 141**

Table of Contents

Index to Financial Statements

- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and
- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

### *The transition to a Total Care Model may be challenging for physician partners.*

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows and results of operations could be materially adversely affected.

### *If the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies are inaccurate, our future growth rate may be impacted and we may generate losses in such markets, or we may fail to attain financial performance targets.*

We often do not have access to reliable historical data regarding the size, revenue or medical expense levels of our target geographies or potential physician partners. As a result, our market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size and expected growth of the market for our services and the estimates of our market opportunity may prove to be inaccurate.

Principal assumptions relating to our market opportunity include estimates of the total number and average length of relationships between MA patients and their physicians, historical MA patient growth rates, amount of revenue and medical expenses associated with MA members expected to be attributed to our physician partners and historical experience that physician partners have with a Total Care Model. Our opportunity is based on the assumption that our platform, partnership and network model will be more attractive to potential physician partners than competing options. However, potential physician partners may elect to pursue a different strategic option.

### *The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19.*

COVID-19 continues to spread in the United States and throughout the world. COVID-19 and the efforts to contain the outbreak have led to significant economic disruption, including extreme volatility in financial markets, reduced economic activity and a sharp increase in unemployment claims, as well as disruption in some of our physician partners' businesses. The spread of COVID-19 underscores certain risks we face in our business described herein.

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, increasing the potential for harm for our members. If the spread of COVID-19 is not contained, the

27

Table of Contents

Index to Financial Statements

medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to manage their existing clinical conditions, and the amount of medical care which has been deferred during the pandemic may exceed our expectations. Furthermore, we may experience reduced revenues as a result of changes to future capitation payment rates if Medicare members use fewer services due to COVID-19. For example, restrictions imposed as a result of COVID-19 may continue to decrease utilization of preventative or non-emergency healthcare, significantly decreasing provider costs. Should CMS adjust reimbursement rates based on margins during the pendency of COVID-19, our revenues in future periods and financial results may be materially adversely affected. Such measures and any further steps taken by us, or governmental action, to expand or otherwise modify the services delivered to our enrolled members, provide relief for the healthcare provider community, or in connection with the relaxation of stay-at-home and physical distancing orders and other restrictions on movement and economic activity intended to reduce the spread of COVID-19, including enhanced measures to implement widespread testing as a component of lifting these measures, could adversely impact our business, financial condition, cash flows and results of operations.

The spread of COVID-19, or actions taken to mitigate this spread, including the efficacy, ability to administer or extent of adoption of COVID-19 vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations. We have transitioned a significant subset of our employee population to a remote work environment in an effort to mitigate the spread of COVID-19, which could exacerbate certain risks to our business, including an increased demand for information technology resources, increased risk of phishing and other cybersecurity attacks as well as other risks to the privacy and confidentiality of data, and increased risk of unauthorized dissemination of sensitive personal information or proprietary or confidential information about us or our members or other third parties. We have taken, and may take, further actions that alter our business operations as may be required by local, state, or federal authorities or that we determine are in the best interests of our employees. Such measures could negatively affect our ability to provide care to members, relationship with physician partners, marketing efforts, employee productivity, or customer retention, any of which could harm our business, financial condition, cash flows and results of operations.

Further, due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient, based on each patient's documented clinical diagnoses activity in the preceding calendar year. Medicare requires that a patient's health issues be clinically assessed and sufficiently documented annually regardless of the permanence of the underlying clinical conditions. Historically, this clinical assessment and documentation was required to be completed during an in-person visit with a patient. As part of the Coronavirus Aid, Relief and Economic Security Act, or "CARES Act," Medicare is allowing documentation for conditions identified during video visits with patients. However, given the disruption caused by COVID-19, it is unclear whether our physician partners will be able to conduct patient interactions to clinically assess and accurately and sufficiently document the health conditions of our members, which could adversely impact our revenue in 2021 and beyond.

The rapid development and fluidity of this situation precludes any prediction as to the ultimate impact on us of COVID-19. We are continuing to monitor the spread of COVID-19, changes to our payors' benefit coverages, the

28

**Table of Contents**

**Index to Financial Statements**

ongoing costs and business impacts of dealing with COVID-19, including the potential costs associated with lifting restrictions on movement and economic activity and with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of the pandemic and its ultimate impact on us is uncertain as this continues to evolve globally, but such impacts could be material to our business, financial condition, cash flows and results of operations.

*Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.*

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services which have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

*Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.*

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions

29

Table of Contents

Index to Financial Statements

typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows and results of operations to be harmed.

*Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.*

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions which would adversely affect our business, financial condition, cash flows and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

*We rely on our management team and key employees and our business, financial condition, cash flows and results of operations could be harmed if we are unable to retain qualified personnel.*

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. Prior to this offering, in order to retain and motivate valuable employees, in addition to salary and cash incentives, we provided stock options that either vest over time or are based on the equity return realized by our controlling stockholder. The value to employees of these stock options is significantly affected by movements in our stock price that are outside our control. The compensation and benefits we provide to our employees, together with the value of stock options that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all. Following the offering, we intend to continue to use equity awards as part of our executive compensation program, and volatility or lack of performance in our stock price may also affect our ability to attract any replacements or retain these employees.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows and results of operations will be harmed.

30

Table of Contents

Index to Financial Statements

***We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.***

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. As of December 31, 2020 and December 31, 2019, respectively, we had $102.0 million and $112.7 million of net intangible assets, including $41.5 million of goodwill. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. A detailed discussion of our impairment testing is included in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates."

Due to the continued deterioration in the performance of our California reporting unit, in the fourth quarter of 2019, we initiated a process to evaluate strategic alternatives for our California operations, including a sale or abandonment of all or substantially all of such operations. We therefore performed an assessment of the long-lived assets in the California reporting unit for impairment and determined that the carrying value of certain of those assets was not recoverable. Accordingly, we wrote-down such assets to fair value, resulting in the recognition of a $98.3 million impairment charge included in discontinued operations in the audited consolidated statement of operations for the year ended December 31, 2019. See "Note 19. Discontinued Operations" in our consolidated financial statements included elsewhere in this prospectus.

Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Adverse determinations of tax matters could adversely affect our business, financial condition, cash flows and results of operations.***

We are subject to tax laws in the various jurisdictions in which we operate, and the application of these laws to us may be unclear. Some interpretations adopted by us could be challenged by the relevant tax authorities. A successful challenge could result in adverse consequences for us, including potentially the payment of taxes, penalties or interest in amounts that may be material. See "Note 11. Commitments and Contingencies" in our audited consolidated financial statements included elsewhere in this prospectus.

***Security breaches, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.***

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as protected health information ("PHI") and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The

31

Table of Contents

Index to Financial Statements

security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing.

We have experienced cybersecurity incidents in the past and may experience them in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of

32

Table of Contents

Index to Financial Statements

system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;
- communications failures;
- software and hardware errors, failures and crashes;
- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and
- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

*If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.*

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows and results of operations.

*We could be required to devote significant attention and resources to the provision of certain transition services in connection with the disposition of our California Operations.*

In February 2021, we completed the divestiture of our California Operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes in our financial statements included elsewhere in this prospectus.

In connection with the divestiture, we have agreed to continue to provide administrative support and transition services for a specified period of time. The transition services to be provided by us could require significant management attention and resources which could negatively affect our ongoing business. Additionally, we could experience operational difficulties and increased costs that exceed our estimates to provide the transition services if we are unable to perform such services with our existing resources at an acceptable level, or at all, or obtain them from a third party on reasonable terms.

33

**Table of Contents**

**Index to Financial Statements**

For the Southern California and Fresno divestiture transactions, we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus. We may not be successful in managing the risks associated with the divestiture of our California operations.

***Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.***

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows and results of operations.

*Risks Related to Our Reliance on Third Parties*

***We are economically dependent on maintaining our contracts with a limited number of key payors.***

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

***Our contracts with our payors are for limited terms, and may not be renewed upon their expiration.***

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

34

Table of Contents

Index to Financial Statements

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. For example, a group contract through which certain of our members in our Texas geography receive care was awarded to a new payor with whom we are not currently contracted to attribute members for 2021. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.*

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information which payors provide to us, we and our physician partners may not be able to effectively ensure our members disease burdens are identified and may not be able to effective operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we

35

**Table of Contents**

**Index to Financial Statements**

do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

*Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

**APP 151**

Table of Contents

Index to Financial Statements

*We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.*

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

In recent years, the U.S. Department of Justice has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors for alleged upcoding or improper coding of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for penalties to the government under the FCA that range from $11,181 to $22,363 (adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting

37

Table of Contents

Index to Financial Statements

documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.

*Risks Related to Our Industry and Government Programs*

***Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally,

38

**APP 153**

Table of Contents

Index to Financial Statements

consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows and results of operations.***

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for approximately 100% and 99% of our total revenues for the year ended December 31, 2020 and the year ended December 31, 2019, respectively. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Furthermore, changes to Medicare or MA, such as if CMS were to scale back these programs or discontinue MA, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

***Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets

39

**APP 154**

**Table of Contents**

**Index to Financial Statements**

have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

*We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows and results of operations will be harmed.*

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows and results of operations could be materially adversely affected.

40

Table of Contents

Index to Financial Statements

***Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.***

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the Patient Protection and Affordable Care Act (the "ACA"), the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low quality rating for three consecutive years. Low quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.***

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past and could in the future result in substantial reductions in our revenue and operating margins. For example, since the passage of the Sequestration Transparency Act of 2012, Medicare payments have been subject to a 2% sequestration reduction; these cuts were the result of a congressional deal to address the debt ceiling crisis. The CARES Act temporarily suspended the 2% sequestration payment adjustment on Medicare payments from May 1, 2020 through December 31, 2020, which was extended to March 31, 2021 by the Consolidated Appropriations Act, 2021. Further, the passage of the Improving Medicare Post-Acute Care Transformation

41

Table of Contents

Index to Financial Statements

("IMPACT") Act imposes a stringent timeline for implementing benchmark quality measures and data metrics across post-acute care providers. CMS has promulgated, and may continue to promulgate, regulations to implement provisions of the IMPACT Act. The costs of implementation could be significant, particularly with respect to the design of a unified payment methodology for post-acute providers. Failure to meet implementation requirements could expose providers to payment reductions and penalties.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and risks generated from managing such beneficiaries. We, in conjunction with some of our physician partners, have applied and been accepted to participate in the Direct Contracting Model in certain geographies beginning April 1, 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has not yet been finalized by CMS, particularly as CMS continues to address the COVID-19 public health emergency. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model by utilizing, for example, MA-like market benchmarks, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Further, the CMS Innovation Center has not yet finalized its attribution methodology under the Direct Contracting Model's Geographic Population-Based Payment ("Geographic PBP") model option. If the CMS Innovation Center grants Geographic PBP DCEs an attribution advantage over other types of performance-based risk model participants, the impact on our business, financial condition, cash flows and operations may depend on our arrangements with CMS. In arrangements where we are contracted directly as a DCE, we may benefit, and in arrangements where we are downstream from a DCE, we may be adversely impacted. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

Additionally, we are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific

42

Table of Contents

Index to Financial Statements

licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations, including with respect to our contractual relationships with providers and payors.

### *We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.*

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

### *We have in the past, and may in the future, be subject to regulatory inquiries and CAPs imposed by our payors.*

We have in the past been, and may in the future be, subject to regulatory inquiries and corrective action plans ("CAPs") imposed by our payors, and the status of certain state regulatory and payor inquiries is uncertain. For example, in February 2018, our subsidiary, PPMC, self-disclosed to the California Department of Managed Health Care ("DMHC"), the California Department of Health Care Services, and our affected payors certain noncompliant practices in our claims and utilization management. We submitted an interim report on May 17, 2018 and coordinated with the DMHC and certain of our payors to remediate noncompliant claims and utilization management practices and implement improvements through various CAPs. On December 17, 2019, we completed substantial remediation of all known deficiencies identified by the DMHC's audit findings. In February 2021, we divested all of our California operations. On March 9, 2021, we received a set of investigative interrogatories from the DMHC pursuant to its investigation of conduct and matters described in our interim report. The interrogatories seek information concerning certain claims data and authorizations denied due to lack of medical necessity, including information regarding the health plans affected thereby. We are cooperating with the DMHC to provide all requested information. Any adverse review, audit or investigation could result in, among other things: refunding of amounts we have been paid pursuant to our contracts; or the imposition of fines, penalties and other sanctions on us, or certain of our payors. While we do not expect the amount to be material, we are unable to predict the potential dollar value of recoupments or fines, penalties or other sanctions that may be imposed on us or our payors related to the DMHC's audit findings, if any. Additionally, while our payors have not to date sought indemnification for penalties related to DMHC's audit findings, we are unable to predict the potential dollar value of claims or demands that could be asserted in the future, if any. While we have

43

Table of Contents

Index to Financial Statements

divested all of our California operations as of February 2021, for the Southern California and Fresno divestiture transactions we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including any fines, penalties and other sanctions relating to the DMHC matter described above, the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus.

Further, we may be audited by payors and regulatory bodies, and we have been required to engage in and respond to payor corrective action plans and regulatory inquiries in the past. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. As of December 31, 2020, risk-bearing capital required across our geographies and payors totaled $38.8 million. There is also a risk that such amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

### *Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.*

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

### *CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.*

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. For 2020 and 2019, respectively, 50% and 25% of our MA members' risk adjustment factor was calculated from claims data submitted through EDS. In 2021, CMS increased that percentage to 75%. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows and results of operations.

44

Table of Contents

Index to Financial Statements

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues.

*Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.*

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;
- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or
- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

*Legal and Regulatory Risks*

*The healthcare industry is intensely regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.*

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our current conduct or even conduct that occurred a number of years ago, including prior to the acquisition of our subsidiary, PPMC, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law, or whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the False Claims Act and the Civil Monetary Penalties Law ("CMPL"), which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;

45

**APP 160**

Table of Contents

Index to Financial Statements

- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;
- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing designated health services ("DHS") if the physician (or his/her immediate family member) has a financial relationship with that entity;
- Provisions of, and regulations enacted pursuant to, HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act") and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;
- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;
- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;
- State laws that govern the activities of third-party administrators and utilization review agents; and
- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters."

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been and may be a party to various lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:
- suspension or termination of our participation in federal healthcare programs;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;
- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;
- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;
- mandated changes to our practices or procedures that materially increase operating expenses;

APP 161

**Table of Contents**

**Index to Financial Statements**

- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;
- termination of various relationships or contracts related to our business; and
- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

***The healthcare industry is subject to antitrust scrutiny, and if it is found that we violate antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

The healthcare industry is subject to antitrust scrutiny. The federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. The Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice ("DOJ") and state Attorneys General actively review and, in some cases, take enforcement action against business conduct and acquisitions in the healthcare industry. Private parties harmed by alleged anti-competitive conduct can also bring antitrust suits. Violations of antitrust laws may be punishable by substantial penalties, including significant monetary fines and treble damages, civil penalties, criminal sanctions and consent decrees and injunctions prohibiting certain activities or requiring divestiture or discontinuance of business operations. If antitrust enforcement authorities conclude that we violate any antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting the U.S. healthcare reform, our business may be harmed.***

Due to the importance of the healthcare industry in the lives of all Americans, federal, state and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect the healthcare industry. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. We cannot predict the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect our business or could change the operating environment of our primary care centers. It is also possible that the changes to federal healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in federal healthcare programs, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

47

Table of Contents

Index to Financial Statements

There can be no assurance that we will be able to successfully address changes in the current regulatory environment. Some of the healthcare laws and regulations applicable to us are subject to limited or evolving interpretations, and a review of our business or operations by a court, law enforcement or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.***

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to (i) increase the quality of care while appropriately managing overall costs and (ii) participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law."

The laws and regulations, however, are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.***

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms, but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

48

Table of Contents

Index to Financial Statements

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute." Our physician partners and the payors with which we contract risk running afoul of applicable state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (*e.g.*, the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Our business development and member engagement activities may implicate the federal Telephone Consumer Protection Act ("TCPA"), related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws." A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's protected health information in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

***Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.***

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters." Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory Matters—Other Laws and Regulations." If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Table of Contents

Index to Financial Statements

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

***Our use, disclosure and processing of protected health information is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time to time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the

50

Table of Contents

Index to Financial Statements

future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows and results of operations.

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. To the extent the physician partners' non-compliance impacts members who are attributed to our RBEs (*e.g.*, through the loss of protected patient information), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows and results of operations.

***Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.***

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws." We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.***

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an

51

Table of Contents

Index to Financial Statements

arrangement that confers too much control over a physician practice to a lay entity may violate the corporate practice of medicine doctrine. See "Business —Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine." A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.***

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person which could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

***We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows and results of operations.***

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed

52

**APP 167**

Table of Contents

Index to Financial Statements

care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation, and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

### Risks Related to Our Indebtedness

***We have substantial indebtedness and may incur additional indebtedness, which could adversely affect our financial health and our ability to obtain financing in the future, react to changes in our business or satisfy our obligations.***

As of December 31, 2020 we, through our wholly-owned subsidiary agilon health management, inc., had approximately $68.6 million of total long-term consolidated indebtedness outstanding under our secured credit agreement, dated as of July 1, 2016 (as amended from time to time, the "Secured Credit Agreement") governing the term loan and revolving credit facility (the "Secured Credit Facility"), and our unsecured credit agreement, dated as of December 22, 2017 (the "Unsecured Credit Agreement"), governing our unsecured term loan facility (the "Unsecured Term Loan Facility" and, together with the Secured Credit Facility, the "Credit Facilities"). As of such date, we also had $41.5 million of additional borrowings available under our revolving credit facility after taking into account $18.5 million of letters of credit outstanding. On February 18, 2021, we, through our wholly-owned subsidiary agilon health management, inc., entered into the 2021 Secured Credit Agreement to refinance our outstanding indebtedness under the Credit Facilities, consisting of (i) a senior secured term loan

Table of Contents

Index to Financial Statements

facility in an aggregate principal amount of $100.0 million and (ii) a senior secured revolving credit facility in an aggregate principal amount of $100.0 million. See "Description of Certain Indebtedness." In addition, we may incur additional indebtedness in the future, subject to the limitations contained in the agreements governing our indebtedness. Our substantial indebtedness could have important consequences to you. Because of our substantial indebtedness:

- our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements, pay dividends and make other distributions or to purchase, redeem or retire capital stock or for general corporate purposes and our ability to satisfy our obligations with respect to our indebtedness may be impaired in the future;
- a large portion of our cash flow from operations must be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available to us for other purposes;
- we are exposed to the risk of increased interest rates because a significant portion of our borrowings are at variable rates of interest;
- it may be more difficult for us to satisfy our obligations to our creditors, resulting in possible defaults on, and acceleration of, such indebtedness;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be at a competitive disadvantage compared to our competitors with proportionately less indebtedness or with comparable indebtedness on more favorable terms and, as a result, they may be better positioned to withstand economic downturns;
- our ability to refinance indebtedness may be limited or the associated costs may increase;
- our flexibility to adjust to changing market conditions and ability to withstand competitive pressures could be limited;
- our ability to pay dividends and make other distributions or to purchase, redeem or retire capital stock may be limited; and
- we may be prevented from carrying out capital spending and restructurings that are necessary or important to our growth strategy and efforts to improve our operating margins.

***Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the credit agreement, dated as of February 18, 2021 (the "2021 Credit Agreement") governing our term loan and revolving credit facility (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "2021 Secured Credit Facilities") by and among agilon health management, inc., Agilon Health Intermediate Holdings, Inc. ("Intermediate Holdings"), the Lenders party thereto, the Issuers party thereto (each as defined therein), JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and JPMorgan Chase Bank, N.A. Bank of America, N.A., Wells Fargo Securities, LLC, Deutsche Bank Securities Inc. and Nomura Securities International, Inc., as joint lead arrangers and joint bookrunners does not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the 2021 Secured Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the 2021 Secured Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

Table of Contents

Index to Financial Statements

***Increases in interest rates would increase the cost of servicing our indebtedness and could reduce our profitability.***

A significant portion of our outstanding indebtedness bears interest at variable rates, including $48.6 million of outstanding borrowings and $41.5 million of additional borrowings available under our Secured Credit Facility after taking into account $18.5 million of letters of credit outstanding, as of December 31, 2020. As adjusted for the entry into the 2021 Credit Facilities, $100.0 million of outstanding borrowings and $81.5 million of additional borrowings available under the 2021 Credit Facilities bear interest at variable rates, after taking into account $18.5 million of letters of credit outstanding as of February 18, 2021. As a result, increases in interest rates would increase the cost of servicing our indebtedness and could materially and adversely affect our business, financial condition, cash flows and results of operations. As of December 31, 2020, assuming the London Interbank Offered Rate ("LIBOR") exceeded 1.00%, each one percentage point change in interest rates would have resulted in a change of approximately $0.5 million in the annual interest expense on our Secured Credit Facility. As of December 31, 2020, assuming availability was fully utilized, each one percentage point change in interest rates would have resulted in a change of approximately $1.1 million in annual interest expense on the Secured Credit Facility. The impact of increases in interest rates could be more significant for us than it would be for some other companies because of our indebtedness, thereby affecting our profitability.

Furthermore, uncertainty about the continuing availability of LIBOR may adversely affect our business, financial condition, cash flows and results of operations. On July 27, 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that after December 31, 2021, it would no longer compel banks to submit the rates required to calculate LIBOR. On March 5, 2021, the current administrator of LIBOR, ICE Benchmark Administration, announced that it would cease publication of certain tenors of U.S. dollar LIBOR on June 30, 2023. With this announcement, there is uncertainty about the continued availability of LIBOR after 2021 or, in certain circumstances, 2023. If LIBOR ceases to be available or the methods of calculating LIBOR change from the current methods, financial products with interest rates tied to LIBOR may be adversely affected. Even if LIBOR remains available, it is uncertain whether it will continue to be viewed as an acceptable market benchmark, what rate or rates may become accepted alternatives to LIBOR or what the effect of any such changes in views or alternatives may be on the markets for LIBOR-indexed financial instruments. As of December 31, 2020, adjusted to reflect the entry into the 2021 Secured Credit Facilities, all of our aggregate consolidated indebtedness was indexed to LIBOR. If any of the foregoing were to occur, the interest rates on such indebtedness may be adversely affected.

***The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.***

Our 2021 Secured Credit Facilities contain covenants that, among other things, restrict the ability of agilon management and its subsidiaries to:
- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;
- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and
- enter into lines of business.

55

Table of Contents

Index to Financial Statements

agilon management and its subsidiaries accounted for 100% of our total assets and 100% of our total liabilities as of December 31, 2020. Consequently, the restrictions in the 2021 Secured Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the 2021 Secured Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the 2021 Secured Credit Facilities, could proceed against the collateral securing the indebtedness. All obligations under the 2021 Secured Credit Facilities are guaranteed by Intermediate Holdings and each domestic subsidiary of agilon management other than certain excluded subsidiaries. All obligations of agilon management and each guarantor are secured by a perfected security interest in substantially all tangible and intangible assets of agilon management and each such guarantor, including the capital stock of each domestic subsidiary of agilon management and each such guarantor, and 65% of each series of capital stock of any non U.S. subsidiary held directly by agilon management or any guarantor, subject to certain exceptions. In any such case, we may be unable to borrow under the 2021 Secured Credit Facilities and may not be able to repay the amounts due under such facilities. This could materially and adversely affect our business, financial condition, cash flows and results of operations, and could cause us to become bankrupt or insolvent.

***Our ability to generate the significant amount of cash needed to pay interest and principal on our indebtedness and our ability to refinance all or a portion of our indebtedness or obtain additional financing depends on many factors outside our control.***

agilon management, the borrower under the 2021 Secured Credit Facilities, is a holding company, and as such it has no independent operations or material assets other than ownership of equity interests in its subsidiaries. agilon management depends on its subsidiaries to distribute funds to it so that it may pay obligations and expenses, including satisfying obligations with respect to indebtedness. Our ability to make scheduled payments on, or to refinance our obligations under, our indebtedness depends on the financial and operating performance of the subsidiaries of agilon management and their ability to make distributions and dividends to it, which, in turn, depends on their results of operations, cash flows, cash requirements, financial position and general business conditions and any legal and regulatory restrictions on the payment of dividends to which they may be subject, many of which could be outside our control.

We may be unable to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness. If our cash flow and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek to obtain additional equity capital or restructure our indebtedness. In the future, our cash flow and capital resources may not be sufficient for payments of interest on and principal of our indebtedness, and such alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations.

The final maturity date of the 2021 Secured Term Loan Facility and the 2021 Secured Revolving Facility is February 18, 2026. We may be unable to refinance any of our indebtedness or obtain additional financing, particularly because of our substantial indebtedness. Market disruptions, such as those experienced in 2008, 2009 and March 2020, as well as our indebtedness levels, may increase our cost of borrowing or adversely affect our ability to refinance our obligations as they become due. We may be unable to refinance our indebtedness, at

Table of Contents

Index to Financial Statements

maturity or otherwise, on terms acceptable to us or at all. If we are unable to refinance our indebtedness or access additional credit, or if short-term or long-term borrowing costs dramatically increase, our ability to finance current operations and meet our short-term and long-term obligations could be adversely affected.

If agilon management cannot make scheduled payments on its indebtedness, it will be in default and the lenders under the 2021 Secured Credit Facilities could terminate their commitments to loan money or, in the case of lenders under the 2021 Secured Credit Facilities, foreclose against the assets securing their borrowings, and we could be forced into bankruptcy or liquidation. Any of these actions could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *Risks Related to Our Common Stock and This Offering*

#### *An active trading market for our common stock may not develop, and you may not be able to resell your shares at or above the initial public offering price.*

Prior to this offering, there has been no public market for shares of our common stock. Although our common stock has been approved for listing on the NYSE, an active trading market for our shares may never develop or be sustained following this offering. The initial public offering price of our common stock was determined through negotiations between us and the underwriters. This initial public offering price may not be indicative of the market price of our common stock after this offering. In the absence of an active trading market for our common stock, investors may not be able to sell their common stock at or above the initial public offering price or at the time that they would like to sell.

#### *agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.*

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. See "Management's Discussion and Analysis of Financial Condition and Results of Operations." To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography and ranged from $50,000 to $10.0 million, or $38.8 million in the aggregate across all of our geographies and payors, as of December 31, 2020. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

57

Table of Contents

Index to Financial Statements

***The market price of our common stock may be volatile and could decline after this offering.***

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. The market price of our common stock may fluctuate significantly. Among the factors that could affect our stock price are:

- industry, regulatory or general market conditions;
- domestic and international economic factors unrelated to our performance;
- changes in our physician partners' or their patients' preferences;
- new regulatory pronouncements and changes in regulatory guidelines;
- lawsuits, enforcement actions and other claims by third parties or governmental authorities;
- actual or anticipated fluctuations in our quarterly operating results;
- lack of research coverage and reports by industry analysts or changes in any securities analysts' estimates of our financial performance;
- action by institutional stockholders or other large stockholders, including future sales of our common stock;
- failure to meet any guidance given by us or any change in any guidance given by us, or changes by us in our guidance practices;
- announcements by us of significant impairment charges;
- speculation in the press or investment community;
- investor perception of us and our industry;
- changes in market valuations or earnings of similar companies;
- the impact of short selling or the impact of a potential "short squeeze" resulting from a sudden increase in demand for our common stock;
- announcements by us or our competitors of significant contracts, acquisitions, dispositions or strategic partnerships;
- war, terrorist acts and epidemic disease, including COVID-19;
- any future sales of our common stock or other securities;
- additions or departures of key personnel; and
- misconduct or other improper actions of our employees.

In particular, we cannot assure you that you will be able to resell your shares at or above the public offering price. Stock markets have experienced extreme volatility in recent years that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against the affected company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***Our management will have broad discretion over the use of the proceeds we receive in this offering and might not apply the proceeds in ways that increase the value of your investment.***

Our management will have broad discretion to use the net proceeds we receive from this offering, and you will be relying on the judgment of our management regarding the use of these proceeds. Our management might

58

Table of Contents

Index to Financial Statements

not apply the net proceeds of this offering in ways that increase the value of your investment. We expect to use the net proceeds from this offering for working capital and other general corporate purposes, including accelerating the growth of our existing geographies and our national network of partners, and to make available financing options to our physician partners in connection with taxes payable on shares to be distributed to them upon consummation of the offering under the partner physician group equity agreements, in an aggregate amount estimated to be approximately $90 million to $120 million. Additionally, because the gross proceeds from this offering exceed $1.0 billion, the 2021 Secured Term Loan Facility requires a mandatory prepayment and reduction in an amount equal to $50.0 million. In addition, we may also use a portion of the net proceeds to establish a foundation to advance our commitment to the future of diversity and growth in primary care leadership and education and training in value-based care. We do not currently have a specific plan for a significant portion of the remaining net proceeds. Our management might not be able to yield a significant return, if any, on any investment of the net proceeds received from this offering, which could compromise our ability to pursue our growth strategy. You will not have the opportunity to influence our decisions on how to use the net proceeds from this offering.

*Future sales of shares by us or our existing stockholders could cause our stock price to decline.*

Sales of substantial amounts of our common stock in the public market following this offering, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

As of March 31, 2021, adjusted to give effect to this offering, we had 384,021,560 outstanding shares of common stock. Of these shares, all of the 46,600,000 shares to be sold in this offering will be immediately tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any shares held by "affiliates," as that term is defined in Rule 144 under the Securities Act ("Rule 144"). We intend to file a registration statement on Form S-8 under the Securities Act to register the shares of common stock to be issued under our equity compensation plans and, as a result, all shares of common stock acquired upon exercise of stock options granted under our plan will also be freely tradable under the Securities Act, subject to the terms of the lock-up agreements, unless purchased by our affiliates. As of March 31, 2021, there were stock options outstanding to purchase a total of 41,412,100 shares of our common stock. Upon completion of this offering, 11,672,483 shares will be issued pursuant to our partner physician group equity agreements (representing a number of shares equivalent to $268.5 million). See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates—Stock-based Compensation" for additional information.

The remaining 325,749,077 shares of common stock outstanding as of March 31, 2021 are restricted securities within the meaning of Rule 144 under the Securities Act, but will be eligible for resale subject to applicable volume, means of sale, holding period and other limitations of Rule 144 under the Securities Act or pursuant to an exemption from registration under Rule 701 under the Securities Act, or "Rule 701," subject to the lock-up agreements to be entered into by us, the CD&R Investor, certain of our stockholders and our executive officers and directors.

The CD&R Investor, certain of our stockholders and our executive officers and directors have entered into lock-up agreements under which we and they have agreed not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 180 days after the date of this prospectus. See "Underwriting." Following the expiration of this 180-day lock-up period, 337,421,560 shares of our common stock will be eligible for future sale, subject to the applicable volume, manner of sale, holding period and other limitations of Rule 144 or

59

**Table of Contents**

**Index to Financial Statements**

pursuant to an exemption from registration under Rule 701. See "Shares Available for Future Sale" for a discussion of the shares of common stock that may be sold into the public market in the future. In addition, our significant stockholders may distribute shares that they hold to their investors who themselves may then sell into the public market following the expiration of the lock-up period. Such sales may not be subject to the volume, manner of sale, holding period and other limitations of Rule 144. Furthermore, the CD&R Investor and other significant stockholders have the right to require us to register shares of common stock for resale in certain circumstances. As resale restrictions end, the market price of our common stock could decline if the holders of those shares sell them or are perceived by the market as intending to sell them.

In the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

### *If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts may publish about us or our business. We may never obtain research coverage by industry or financial analysts. If no or few analysts commence coverage of us, the trading price of our stock would likely decrease. Even if we do obtain analyst coverage, if one or more of the analysts that covers our common stock downgrades our stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of the analysts ceases coverage of our common stock or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our common stock price or trading volume to decline.

### *If you invest in our common stock in this offering, you will incur immediate and substantial dilution in the book value of your shares.*

If you invest in our common stock in this offering, your ownership interest will be immediately diluted to the extent of the difference between the initial public offering price per share of our common stock and the net tangible book value per share of our common stock immediately after this offering. Based on the initial public offering price of $23.00 per share, purchasers of our common stock in this offering will experience immediate and substantial dilution in net tangible book value of $20.57 per share. See "Dilution" for a more detailed description of the dilution to new investors in the offering.

### *Participation in this offering by the cornerstone investors could reduce the public float for our shares of common stock.*

The cornerstone investors have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering. If the cornerstone investors are allocated all or a portion of the shares in which they have indicated an interest in this offering or more, and purchase any such shares, such purchase could reduce the available public float for our shares if the cornerstone investors hold these shares long term.

**APP 175**

Table of Contents

Index to Financial Statements

***Fulfilling our obligations incident to being a public company, including compliance with the Exchange Act and the requirements of the Sarbanes-Oxley Act and the Dodd-Frank Act, will be expensive and time-consuming, and any delays or difficulties in satisfying these obligations could have a material adverse effect on our future results of operations and our stock price.***

As a public company, we will be subject to the reporting, accounting and corporate governance requirements of the NYSE, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Sarbanes-Oxley Act and Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") that apply to issuers of listed equity, which impose certain significant compliance requirements, costs and obligations upon us. The changes necessitated by being a publicly listed company and ongoing compliance with these rules and regulations require a significant commitment of additional resources and management oversight, which will increase our operating costs and could divert our management and personnel from other business concerns, particularly after we are no longer an emerging growth company. Further, to comply with the requirements of being a public company, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring additional accounting or internal audit staff.

The Sarbanes-Oxley Act requires us, among other things, to maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

In addition, our internal resources and personnel may in the future be insufficient to avoid accounting errors, and our auditors may identify deficiencies, significant deficiencies or material weaknesses in our internal control environment in the future. Any failure to develop or maintain effective controls or any difficulties encountered implementing required new or improved controls could harm our operating results or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE. As a public company, we are required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose, but we are not required to provide an annual management report on the effectiveness of our internal control over financial reporting until our second Annual Report on Form 10-K. Our independent registered public accounting firm has identified material weaknesses in the past, and the measures we implemented to remediate such weaknesses may be insufficient to identify or prevent material weaknesses in the future. As of December 31, 2019, these material weaknesses have been remediated. However, the measures we implemented may be insufficient to identify or prevent future material weaknesses.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until we cease to be an emerging growth company or a non-accelerated filer. We ceased to be an emerging growth company on December 31, 2020, and we do not expect to be a non-accelerated filer beginning as of December 31, 2022. As such, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting in our 2022 Annual Report on Form 10-K. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business, financial condition, cash flows and results of operations.

The expenses associated with being a public company include increases in auditing, accounting and legal fees and expenses, investor relations expenses, increased directors' fees and director and officer liability insurance costs,

APP 176

**Table of Contents**

**Index to Financial Statements**

registrar and transfer agent fees and listing fees, as well as other expenses. As a public company, we are required, among other things, to define and expand the roles and the duties of our board of directors and its committees and institute more comprehensive compliance and investor relations functions. Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage us as a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, cash flows and results of operation. Failure to comply with the requirements of being a public company could potentially subject us to sanctions or investigations by the U.S. Securities and Exchange Commission (the "SEC") or other regulatory authorities.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us, and there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

*Following the completion of this offering, the CD&R Investor will continue to control us and may have conflicts of interest with other stockholders.*

Following the completion of this offering, the CD&R Investor will own approximately 59% of the outstanding shares of our common stock (or approximately 58% if the underwriters exercise in full their option to purchase additional shares). As a result, the CD&R Investor will have sufficient voting power without the consent of our other stockholders to be able to control all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which could reduce the market price of our common stock.

Because the CD&R Investor's interests may differ from your interests, actions the CD&R Investor takes as our controlling stockholder may not be favorable to you. For example, the concentration of ownership held by the CD&R Investor could delay, defer or prevent a change of control of us, impede a merger, takeover or other business combination that another stockholder may otherwise view favorably or cause us to enter into transactions or agreements that are not in the best interests of all stockholders. Other potential conflicts could arise, for example, over matters such as employee retention or recruiting, or our dividend policy.

Furthermore, as long as the CD&R Investor continues to beneficially own at least 40% of our outstanding common stock, the CD&R Investor will be able to determine the outcome of corporate actions requiring stockholder approval, including the election of the members of our board of directors and the approval of significant corporate transactions, such as mergers and the sale of substantially all of our assets. Even after the CD&R Investor reduces its beneficial ownership below 40% of our outstanding common stock, it will likely still be able to assert significant influence over our board of directors and certain corporate actions. Following the completion of this offering, the CD&R Investor will continue to have the right to designate for nomination for election at least a majority of our directors as long as the CD&R Investor beneficially owns at least 50% of our common stock and to designate our Chairman of the board of directors so long as it beneficially owns at least 25% of our common stock.

*Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, any of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, will have no obligation to offer us corporate opportunities.*

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation will address potential conflicts of interest between agilon health, on the one hand,

62

**Table of Contents**

**Index to Financial Statements**

and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

*Future offerings of debt or equity securities which would rank senior to our common stock may adversely affect the market price of our common stock.*

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Issuing additional shares of our common stock or other equity securities or securities convertible into equity may dilute the economic and voting rights of our stockholders or reduce the market price of our common stock. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock and may result in dilution to owners of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors outside our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings, reducing the market price of our common stock or diluting the value of their stock holdings in us.

*Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.*

Our Certificate of Incorporation and our By-laws will include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively will:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;
- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;
- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;
- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- opt out of Section 203 of the DGCL, which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;
- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

63

Table of Contents

Index to Financial Statements

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future. See "Description of Capital Stock—Anti-Takeover Effects of Our Certificate of Incorporation and By-Laws."

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor will continue to own following this offering, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

*We could be the subject of securities class action litigation due to future stock price volatility, which could divert management's attention and materially and adversely affect our business, financial condition, cash flows and results of operations.*

The stock market in general, and market prices for the securities of companies like ours in particular, have from time to time experienced volatility that often has been unrelated to the operating performance of the underlying companies. A certain degree of stock price volatility can be attributed to being a newly public company. These broad market and industry fluctuations may adversely affect the market price of our common stock, regardless of our operating performance. In certain situations in which the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders were to bring a similar lawsuit against us, the defense and disposition of the lawsuit could be costly and divert the time and attention of our management and could materially and adversely affect our business, financial condition, cash flows and results of operations.

*We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.*

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock.

64

**APP 179**

**Table of Contents**

**Index to Financial Statements**

In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***Although we ceased to be an "emerging growth company," we can continue to take advantage of certain reduced disclosure requirements in this registration statement, which may make our common stock less attractive to investors.***

We ceased to be an emerging growth company as defined in the JOBS Act on December 31, 2020, because our annual revenue for the fiscal year ended December 31, 2020 exceeded $1.07 billion. However, because we ceased to be an emerging growth company after we confidentially submitted our registration statement related to this offering to the SEC, we will be treated as an emerging growth company for certain purposes until the earlier of the date on which we complete this offering and December 31, 2021. As such, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies, including (i) reduced disclosure obligations regarding executive compensation in this prospectus and (ii) not being required to provide more than two years of audited financial statements in this prospectus. We cannot predict if investors will find our common stock less attractive because we have relied on these exemptions. If some investors find our common stock less attractive, there may be less demand for our common stock and the price that some investors are willing to pay for our common stock may decrease.

***We expect to be a "controlled company" within the meaning of rules and, as a result, we will qualify for, and currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

After the completion of this offering, the CD&R Investor will continue to control a majority of the voting power of our outstanding common stock. Accordingly, we expect to be a "controlled company" within the meaning of corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including:

- the requirement that a majority of the board of directors consist of independent directors;
- the requirement that our Nominating and Governance Committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
- the requirement that we have a Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
- the requirement for an annual performance evaluation of the Nominating and Governance and Compensation Committees.

Following this offering, we intend to continue to utilize these exemptions. As a result, we do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations. Consequently, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance rules and requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

***At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of the NYSE corporate

65

**APP 180**

**Table of Contents**

**Index to Financial Statements**

governance standards. The NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualify as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualify as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

### *Our Certificate of Incorporation will designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.*

Our Certificate of Incorporation will provide that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the Delaware General Corporation Law (the "DGCL"), or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation will provide that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows and results of operations.

Table of Contents

Index to Financial Statements

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION**

This prospectus contains forward-looking statements and cautionary statements. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this prospectus and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this prospectus. In addition, even if our results of operations, financial condition and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this prospectus, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives;
- our ability to execute our operation strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with MA payors or to secure MA at favorable financial terms;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;

67

Table of Contents

Index to Financial Statements

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new RBEs within certain geographies in the future;
- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;
- our ability to retain our management team and key employees or attract qualified personnel in the future;
- our ability to realize the full value of our intangible assets and any impairment charges we have or may record;
- adverse determinations of tax matters;
- security breaches, loss of data or other disruptions to our data platforms;
- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations;
- our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses;
- our dependence on a limited number of key payors;
- the limited terms of our contracts with payors and that they may not be renewed upon their expiration;
- our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment;
- our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- difficulties in obtaining accurate and complete diagnosis data;
- our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- our reliance on third-party software and data to operate our business and provide services to our members and physician partners;
- the impact of consolidation in the healthcare industry;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;
- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;
- our ability to compete in our competitive industry;
- the impact of government performance standards and benchmarks on our compensation and reputation;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements;

68

Table of Contents

Index to Financial Statements

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;
- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;
- regulatory inquiries and corrective action plans imposed by our payors;
- repayment obligations arising out of payor audits;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- negative publicity regarding the managed healthcare industry;
- the extensive regulation of the healthcare industry at the federal, state and local levels;
- our substantial indebtedness and the potential that we may incur additional indebtedness;
- no public market for our common stock and the potential that one may not develop;
- the significant influence the CD&R Investor has over us; and
- risks related to other factors discussed under "Risk Factors" in this prospectus.

You should read this prospectus completely and with the understanding that actual future results may be materially different from expectations. All forward-looking statements made in this prospectus are qualified by these cautionary statements. These forward-looking statements are made only as of the date of this prospectus, and we do not undertake any obligation, other than as may be required by law, to update or revise any forward-looking or cautionary statements to reflect changes in assumptions, the occurrence of events, unanticipated or otherwise, and changes in future operating results over time or otherwise.

APP 184

Table of Contents

Index to Financial Statements

## UNDERWRITING

We are offering the shares of common stock described in this prospectus through a number of underwriters. J.P. Morgan Securities LLC is acting as bookrunning manager of the offering and representative of the underwriters. We will enter into an underwriting agreement with the underwriters. Subject to the terms and conditions of the underwriting agreement, we have agreed to sell to the underwriters, and each underwriter has severally agreed to purchase, at the public offering price less the underwriting discounts and commissions set forth on the cover page of this prospectus, the number of shares of common stock listed next to its name in the following table:

| Underwriter | Number of Shares |
|---|---|
| J.P. Morgan Securities LLC | 12,696,704 |
| Goldman Sachs & Co. LLC | 9,245,173 |
| BofA Securities, Inc. | 9,245,173 |
| Deutsche Bank Securities Inc. | 4,508,550 |
| Wells Fargo Securities, LLC | 4,194,000 |
| Nomura Securities International, Inc. | 2,830,950 |
| William Blair & Company, L.L.C. | 1,677,600 |
| Truist Securities, Inc. | 1,363,050 |
| Academy Securities, Inc. | 209,700 |
| R. Seelaus & Co., LLC | 209,700 |
| Samuel A. Ramirez & Company, Inc. | 209,700 |
| Siebert Williams Shank & Co., LLC | 209,700 |
| Total | 46,600,000 |

The underwriters are committed to purchase all the common shares offered by us if they purchase any shares, other than those shares covered by the underwriters' option to purchase additional shares described below. The underwriting agreement also provides that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may also be increased or the offering may be terminated.

The underwriters have an option to buy on a pro rata basis up to 6,990,000 additional shares of common stock from us at the public offering price less the underwriting discounts and commissions to cover sales of shares by the underwriters which exceed the number of shares specified in the table above. The underwriters have 30 days from the date of this prospectus to exercise this option. If any additional shares of common stock are purchased, the underwriters will offer the additional shares on the same terms as those on which the shares are being offered.

The underwriters propose to offer the common shares directly to the public at the public offering price set forth on the cover page of this prospectus and to certain dealers at that price less a concession not in excess of $1.15 per share. After the public offering of the shares, the offering price and other selling terms may be changed by the underwriters. The offering of the shares by the underwriters is subject to receipt and acceptance and subject to the underwriters' right to reject any order in whole or in part. The underwriters may offer and sell the shares through certain of their affiliates or other registered broker-dealers or selling agents. Sales of shares made outside of the United States may be made by affiliates of the underwriters.

The underwriting fee is the difference between the public offering price and the amount the underwriters pay us for the shares of common stock. The underwriting fee is $1.15 per share. The following table summarizes the per share and total underwriting discounts and commissions we will pay to the underwriters. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase additional shares of common stock from us.

| | Per Share | | Total | |
|---|---|---|---|---|
| | No Exercise | Full Exercise | No Exercise | Full Exercise |
| Public offering price | $ 23.00 | $ 23.00 | $ 1,071,800,000 | $ 1,232,570,000 |
| Underwriting discounts and commissions | $ 1.15 | $ 1.15 | $ 53,590,000 | $ 61,628,500 |

179

**APP 185**

**Table of Contents**

**Index to Financial Statements**

We estimate that the total expenses of this offering, including registration, filing and listing fees, printing fees and legal and accounting expenses, but excluding the underwriting discounts and commissions, are approximately $8.6 million. The underwriters have agreed to reimburse us for certain expenses incurred in connection with this offering.

A prospectus in electronic format may be made available on the websites maintained by one or more underwriters, or selling group members, if any, participating in the offering. The underwriters may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the representative to underwriters and selling group members that may make internet distributions on the same basis as other allocations.

We have agreed that we will not (i) offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, except as provided in the underwriting agreement, any of our securities that are substantially similar to the securities offered hereby, including but not limited to any options or warrants to purchase shares of our common stock or any securities that are convertible into or exchangeable for, or that represent the right to receive, shares of our common stock or any such substantially similar securities, or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of our common stock or any such other securities (regardless of whether any of these transactions are to be settled by the delivery of our common stock or such other securities, in cash or otherwise), in each case without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 180 days after the date of this prospectus, subject to certain limited exceptions set forth in the underwriting agreement.

Our directors, executive officers and certain stockholders have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, for a period of 180 days after the date of this prospectus, may not, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, including but not limited to any options or warrants to purchase shares of our common stock or any securities that are convertible into or exchangeable for, or that represent the right to receive, shares of our common stock or any such substantially similar securities, subject to certain exceptions.

We have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act, or contribute payments that the underwriters may be required to make in that respect.

We have been approved to list our common stock on the NYSE under the symbol "AGL".

Prior to the date hereof, the cornerstone investors have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering.

The underwriters have advised us that, in connection with this offering, the underwriters may engage in stabilizing transactions, which involves making bids for, purchasing and selling shares of common stock in the open market for the purpose of preventing or retarding a decline in the market price of the common stock while this offering is in progress. These stabilizing transactions may include making short sales of the common stock, which involves the sale by the underwriters of a greater number of shares of common stock than they are required to purchase in this offering, and purchasing shares of common stock on the open market to cover positions

180

**Table of Contents**

**Index to Financial Statements**

created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' option to purchase additional shares referred to above, or may be "naked" shorts, which are short positions in excess of that amount. The underwriters may close out any covered short position either by exercising their option to purchase additional shares, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters will consider, among other things, the price of shares available for purchase in the open market compared to the price at which the underwriters may purchase shares through the option to purchase additional shares. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market that could adversely affect investors who purchase in this offering. To the extent that the underwriters create a naked short position, they will purchase shares in the open market to cover the position.

The underwriters have advised us that, pursuant to Regulation M of the Securities Act, they may also engage in other activities that stabilize, maintain or otherwise affect the price of the common stock, including the imposition of penalty bids. This means that if the representative of the underwriters purchases common stock in the open market in stabilizing transactions or to cover short sales, the representative can require the underwriters that sold those shares as part of this offering to repay the underwriting discount received by them.

These activities may have the effect of raising or maintaining the market price of the common stock or preventing or retarding a decline in the market price of the common stock, and, as a result, the price of the common stock may be higher than the price that otherwise might exist in the open market. If the underwriters commence these activities, they may discontinue them at any time. The underwriters may carry out these transactions on the NYSE, in the over-the-counter market or otherwise.

Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiations between us and the representative of the underwriters. In determining the initial public offering price, we and the representative of the underwriters considered a number of factors, including:

- the information set forth in this prospectus and otherwise available to the underwriters;
- our prospects and the history and prospects for the industry in which we compete;
- an assessment of our management;
- our prospects for future earnings;
- the general condition of the securities markets at the time of this offering;
- the recent market prices of, and demand for, publicly-traded common stock of generally comparable companies; and
- other factors deemed relevant by the underwriters and us.

Neither we nor the underwriters can assure investors that an active trading market will develop for shares of our common stock, or that the shares will trade in the public market at or above the initial public offering price.

**Reserved Share Program**

At our request, an affiliate of BofA Securities, Inc., a participating underwriter, has reserved for sale, at the public offering price, up to 5% of the shares offered by this prospectus. If purchased, these shares will not be subject to a lock-up restriction. The number of shares of common stock available for sale to the general public will be reduced to the extent shares of common stock are purchased pursuant to this program. Any reserved shares that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares of common stock offered by this prospectus. The underwriters will receive the same underwriting discounts and commissions on any shares of common stock purchased pursuant to this program as they will on any other shares of common stock sold to the public in this offering.

181

**Table of Contents**

**Index to Financial Statements**

**Selling Restrictions**

*General*

Other than in the United States, no action has been taken by us or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to the offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities offered by this prospectus in any jurisdiction in which such an offer or a solicitation is unlawful.

**Notice to Prospective Investors in the European Economic Area**

In relation to each Member State of the European Economic Area (each a "Member State"), no shares have been offered or will be offered pursuant to the offering to the public in that Member State prior to the publication of a prospectus in relation to the shares which has been approved by the competent authority in that Member State or, where appropriate, approved in another Member State and notified to the competent authority in that Member State, all in accordance with the Prospectus Regulation, except that offers of shares may be made to the public in that Member State at any time under the following exemptions under the Prospectus Regulation:

(a) to any legal entity which is a qualified investor as defined under the Prospectus Regulation;

(b) to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent of the underwriters; or

(c) in any other circumstances falling within Article 1(4) of the Prospectus Regulation,

*provided* that no such offer of shares shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation and each person who initially acquires any shares or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with each of the underwriters and the Company that it is a "qualified investor" within the meaning of Article 2(e) of the Prospectus Regulation. In the case of any shares being offered to a financial intermediary as that term is used in the Prospectus Regulation, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the shares acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer of any shares to the public other than their offer or resale in a Member State to qualified investors as so defined or in circumstances in which the prior consent of the underwriters has been obtained to each such proposed offer or resale.

For the purposes of this provision, the expression an "offer to the public" in relation to shares in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any shares to be offered so as to enable an investor to decide to purchase or subscribe for any shares, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

**Notice to Prospective Investors in the United Kingdom**

In relation to the United Kingdom, no shares have been offered or will be offered pursuant to the offering to the public in the United Kingdom prior to the publication of a prospectus in relation to the shares that has been approved by the Financial Conduct Authority in accordance with the transitional provisions in Regulation 74 of the Prospectus (Amendment etc.) (EU exit) Regulations 2019, except that offers of shares may be made to public

182

# EXHIBIT 3

STOCKHOLDERS AGREEMENT

of

AGILON HEALTH, INC.

Dated as of April 16, 2021

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITIONS |  | 1 |
| 1.1 Certain Defined Terms |  | 1 |
| 1.2 Other Definitional Provisions |  | 4 |
| ARTICLE II CORPORATE GOVERNANCE |  | 5 |
| 2.1 Board Representation |  | 5 |
| 2.2 Available Financial Information |  | 7 |
| 2.3 Other Information |  | 8 |
| 2.4 Access |  | 9 |
| 2.5 Termination of Rights |  | 9 |
| ARTICLE III MISCELLANEOUS |  | 9 |
| 3.1 Confidentiality |  | 9 |
| 3.2 Amendments and Waivers |  | 10 |
| 3.3 Successors, Assigns and Permitted Transferees |  | 10 |
| 3.4 Notices |  | 10 |
| 3.5 Further Assurances |  | 11 |
| 3.6 Entire Agreement; No Third Party Beneficiaries |  | 11 |
| 3.7 Restrictions on Other Agreements; By-laws |  | 12 |
| 3.8 Governing Law |  | 12 |
| 3.9 Jurisdiction and Forum; Waiver of Jury Trial |  | 12 |
| 3.10 Severability |  | 12 |
| 3.11 Enforcement |  | 12 |
| 3.12 Titles and Subtitles |  | 13 |
| 3.13 Effectiveness |  | 13 |
| 3.14 No Recourse |  | 13 |
| 3.15 Counterparts; Facsimile Signatures |  | 13 |

Exhibit A – Joinder Agreement

- i -

THIS STOCKHOLDERS AGREEMENT is entered into as of April 16, 2021, by and among agilon health, inc., a Delaware corporation (and any successor in interest thereto, the "<u>Company</u>"), CD&R Vector Holdings, L.P., a Cayman Islands exempted limited partnership (and any successor in interest thereto, the "<u>CD&R Investor</u>"), and any Person who executes a Joinder Agreement in the form of Exhibit A hereto (each, a "<u>Stockholder</u>" and collectively, the "<u>Stockholders</u>"). Capitalized terms used herein without definition shall have the meanings set forth in Section 1.1.

RECITALS

WHEREAS, the Company intends to undertake an underwritten initial public offering (the "<u>IPO</u>") of Common Stock; and

WHEREAS, in connection with the IPO, and effective as of the date of the initial listing (the "<u>Listing Date</u>") of the Common Stock on the New York Stock Exchange (the "<u>NYSE</u>"), the Company and the CD&R Investor wish to set forth their respective rights and obligations on and after the Listing Date, including with respect to certain governance matters.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1 <u>Certain Defined Terms</u>. As used herein, the following terms shall have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, (<u>i</u>) any Person directly or indirectly controlling, controlled by or under common control with such Person, (<u>ii</u>) any Person directly or indirectly owning or controlling 10% or more of any class of outstanding voting securities of such Person or (<u>iii</u>) any officer, director, general partner or trustee of any such Person described in clause (i) or (ii).

"<u>Agreement</u>" means this Stockholders Agreement, as amended from time to time in accordance with Section 3.2.

"<u>Annual Budget</u>" has the meaning given to such term in Section 2.2(b).

"<u>Applicable Law</u>" means all applicable provisions of (<u>i</u>) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Entity, (<u>ii</u>) any consents or approvals of any Governmental Entity and (<u>iii</u>) any orders, decisions, injunctions, judgments, awards, decrees of or agreements with any Governmental Entity.

**APP 192**

"beneficial owner" or "beneficially own" has the meaning given such term in Rule 13d-3 under the Exchange Act and a Person's beneficial ownership of Common Stock or other voting securities of the Company shall be calculated in accordance with the provisions of such Rule.

"Board" means the Board of Directors of the Company.

"By-laws" means the Amended and Restated By-laws of the Company, as in effect on the date hereof and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the Charter.

"CD&R Designee" has the meaning given to such term in Section 2.1(b).

"CD&R Investor" has the meaning given to such term in the Preamble.

"Chairman" has the meaning given to such term in Section 2.1(e).

"Charter" means the Amended and Restated Certificate of Incorporation of the Company, as in effect on the date hereof and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Common Stock" means the shares of common stock, par value $0.01 per share, of the Company including any shares of capital stock into which Common Stock may be converted (as a result of recapitalization, share exchange or similar event) or are issued with respect to Common Stock, including with respect to any stock split or stock dividend, or a successor security.

"Company" has the meaning given to such term in the Preamble.

"control" (including the terms "controlling", "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

"Director" means any member of the Board.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

2

APP 193

"GAAP" means generally accepted accounting principles, as in effect in the United States of America from time to time.

"Governmental Entity" means any federal, state, local or foreign court, legislative, executive or regulatory authority or agency.

"Group" has the meaning given to such term in Section 13(d)(3) of the Exchange Act.

"Information" means all confidential information about the Company or any of its Subsidiaries that is or has been furnished to any Stockholder or any of its Representatives by or on behalf of the Company or any of its Subsidiaries, or any of their respective Representatives, whether written or oral or in electronic or other form and whether prepared by the Company, its Representatives or otherwise, together with all written or electronically stored documentation prepared by such Stockholder or its Representatives based on or reflecting, in whole or in part, such information; provided that the term "Information" does not include any information that (i) is or becomes generally available to the public through no action or omission by such Stockholder or its Representatives, (ii) is or becomes available to such Stockholder on a non-confidential basis from a source, other than the Company or any of its Subsidiaries, or any of their respective Representatives, that to such Stockholder's knowledge, after reasonable inquiry, is not prohibited from disclosing such portions to such Stockholder by a contractual, legal or fiduciary obligation, (iii) is independently developed by a Stockholder or its Representatives or Affiliates on its own behalf without use of any of the confidential information or (iv) was in such Stockholder's, its Affiliates' or its Representatives' possession prior to the date of this Agreement.

"IPO" has the meaning set forth in the Recitals.

"Issuer Competitor" means any Person that directly competes with the business of the Company and its direct and indirect Subsidiaries from time to time.

"Listing Date" has the meaning set forth in the Recitals.

"NYSE" has the meaning set forth in the Recitals.

"Permitted Transferee" means with respect to any Stockholder, an Affiliate of such Stockholder, including to any investment fund or other entity controlled or managed by, or under common control or management with, such Stockholder; provided, however, that any such transferee agrees in a writing in the form attached as Exhibit A hereto to be bound by and to comply with all applicable provisions of this Agreement. Any Stockholder shall also be a Permitted Transferee of the Permitted Transferees or itself.

3

"Person" means any individual, corporation, limited liability company, limited or general partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivisions thereof or any Group comprised of any two or more of the foregoing.

"Representatives" means with respect to any Person, any of such Person's, or its Affiliates', directors, officers, employees, general partners, Affiliates, direct or indirect shareholders, members or limited partners, attorneys, accountants, financial and other advisers, and other agents and representatives, including in the case of the CD&R Investor, any person designated for nomination by the Board as a Director by the CD&R Investor.

"Stockholder" and "Stockholders" have the meanings given to such terms in the Preamble.

"Subsidiary" means, with respect to any Person, any corporation, entity or other organization whether incorporated or unincorporated, of which (i) such first Person directly or indirectly owns or controls at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions or (ii) such first Person is a general partner, managing member or otherwise exercises similar management control.

"Transfer" means, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any shares of Common Stock beneficially owned by a Person or any interest in any shares of Common Stock beneficially owned by a Person.

1.2 Other Definitional Provisions.

(a) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article and Section references are to this Agreement unless otherwise specified. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(b) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

APP 195

ARTICLE II

CORPORATE GOVERNANCE

2.1 Board Representation.

(a) Following the Listing Date, the CD&R Investor shall have the right, but not the obligation, to designate for nomination by the Board as Directors a number of designees equal to at least: (i) at least a majority of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 50% of the outstanding shares of the Common Stock; (ii) at least 40% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 40% but less than 50% of the outstanding shares of the Common Stock; (iii) at least 30% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 30% but less than 40% of the outstanding shares of the Common Stock; (iv) at least 20% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 20% but less than 30% of the outstanding shares of the Common Stock; and (v) at least 5% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 5% but less than 20% of the outstanding shares of the Common Stock. For purposes of calculating the number of CD&R Designees that the CD&R Investor is entitled to designate for nomination pursuant to the formula outlined above, any fractional amounts would be rounded up to the nearest whole number and the calculation would be made on a pro forma basis after taking into account any increase in the size of the Board. For the avoidance of doubt, if the CD&R Investor beneficially owns less than 5% of the outstanding shares of the Common Stock, the CD&R Investor shall no longer be entitled to designate any designees for nomination by the Board as Directors.

(b) In the event that the CD&R Investor has designated for nomination by the Board less than the total number of designees the CD&R Investor shall be entitled to designate for nomination pursuant to Section 2.1(a), the CD&R Investor shall have the right, at any time, to designate for nomination such additional designees to which it is entitled, in which case, the Company and the Directors shall take all necessary action, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), to (x) enable the CD&R Investor to designate for nomination and effect the election or appointment of such additional individuals, whether by increasing the size of the Board, or otherwise, and (y) to designate such additional individuals designated for nomination by the CD&R Investor to fill such newly-created vacancies or to fill any other existing vacancies. Each such individual whom the CD&R Investor shall actually designate for nomination pursuant to this Section 2.1 and who is thereafter elected to the Board to serve as a Director shall be referred to herein as a "CD&R Designee."

5

**APP 196**

(c) In the event that a vacancy is created at any time by the death, retirement or resignation of any Director designated by the CD&R Investor pursuant to this Section 2.1, the remaining Directors and the Company shall, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), cause the vacancy created thereby to be filled by a new designee of the CD&R Investor as soon as possible, and the Company hereby agrees to take, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), at any time and from time to time, all actions necessary to accomplish the same.

(d) The Company agrees, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law) and notwithstanding any mandatory Director retirement age that may be adopted by the Company, to include in the slate of nominees recommended by the Board for election at any meeting of stockholders called for the purpose of electing Directors the individuals designated pursuant to this Section 2.1 and to nominate and recommend each such individual to be elected as a Director as provided herein, and to solicit proxies or consents in favor thereof. The Company is entitled to identify such individual as a CD&R Designee pursuant to this Agreement.

(e) For so long as the CD&R Investor beneficially owns at least 25% of the outstanding shares of the Common Stock, a CD&R Designee shall serve as the Chairman of the Board ("Chairman") and in such capacity as Chairman shall preside over meetings of the Board and the stockholders, among other duties.

(f) Insofar as the Company is or becomes subject to requirements under Applicable Law or the regulations of any self-regulatory organization, including the NYSE or such other national securities exchange upon which the Common Stock is listed to which the Company is then subject, relating to the composition of the Board or committees thereof, their respective responsibilities or the qualifications of their respective members, the CD&R Investor shall cooperate in good faith to select for nomination its designees to the Board under this Section 2.1 so as to permit the Company to comply with all such applicable legal or regulatory requirements.

(g) No CD&R Designee shall be paid any fee (or provided any equity-based compensation) for service as Director or member of any committee of the Board, unless otherwise determined by the Board; provided that each CD&R Designee shall be entitled to reimbursement by the Company for reasonable expenses incurred while traveling to and from Board and committee meetings as well as travel for other business related to his or her service on the Board or committees thereof, subject to any maximum reimbursement obligations as may be established by the Board from time to time. Notwithstanding the foregoing, any CD&R Designee whom the Board determines to be "independent" as defined under NYSE and Exchange Act rules and regulations shall be entitled to participate in the Company's compensation arrangements in which non-CD&R Designees, or other "independent" Directors, participate.

6

2.2 <u>Available Financial Information</u>. Upon written request of the CD&R Investor, the Company will deliver, or cause to be delivered, to the CD&R Investor or its designated Representative:

(a) as soon as available after the end of each month and in any event within 30 days thereafter, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such month and consolidated statements of operations, income, cash flows, retained earnings and stockholders' equity of the Company and its Subsidiaries, for each month and for the current fiscal year of the Company to date, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of notes thereto), together with a comparison of such statements to the corresponding periods of the prior fiscal year and to the Company's business plan then in effect and approved by the Board;

(b) an annual budget, a business plan and financial forecasts for the Company for the next fiscal year of the Company (the "<u>Annual Budget</u>"), no later than 30 days before the beginning of the Company's next fiscal year, in such manner and form as approved by the Board, which shall include at least a projection of income and a projected cash flow statement for each fiscal quarter in such fiscal year and a projected balance sheet as of the end of each fiscal quarter in such fiscal year, in each case prepared in reasonable detail, with appropriate presentation and discussion of the principal assumptions upon which such budgets and projections are based, which shall be accompanied by the statement of the chief executive officer or chief financial officer or equivalent officer of the Company to the effect that such budget and projections are based on reasonable and good faith estimates and assumptions made by the management of the Company for the respective periods covered thereby; it being recognized by the CD&R Investor that such budgets and projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by them may differ from the projected results. Any material changes in such Annual Budget shall be delivered to the CD&R Investor as promptly as practicable after such changes have been approved by the Board;

(c) as soon as available after the end of each fiscal year of the Company, and in any event within 90 days thereafter, (<u>i</u>) the annual financial statements required to be filed by the Company pursuant to the Exchange Act, (<u>ii</u>) a consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year, and consolidated statements of income, retained earnings and cash flows of the Company and its Subsidiaries for such year, prepared in accordance with GAAP and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and accompanied by the opinion of independent public accountants of recognized national standing selected by the Company and (<u>iii</u>) a Company-prepared comparison to the Annual Budget for such year as approved by the Board; and

(d) as soon as available after the end of the first, second and third quarterly accounting periods in each fiscal year of the Company, and in any event within 45 days thereafter, (i) the quarterly financial statements required to be filed by the Company pursuant to the Exchange Act, (ii) a consolidated balance sheet of the Company and its Subsidiaries as of the end of each such quarterly period, and consolidated statements of income, retained earnings and cash flows of the Company and its Subsidiaries for such period and for the current fiscal year to date, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of notes thereto) and (iii) a Company-prepared comparison to the corresponding periods of the previous fiscal year and to the Annual Budget then in effect as approved by the Board, all of the information to be provided pursuant to this Section 2.2(d) in reasonable detail and certified by the principal financial or accounting officer of the Company.

(e) Notwithstanding anything to the contrary in Sections 2.2(c) and (d), the Company may satisfy its obligations thereunder (other than its obligations under Sections 2.2(c)(iii) and 2.2(d)(iii)) by (i) providing the financial statements of any wholly-owned Subsidiary of the Company to the extent such financial statements reflect the entirety of the operations of the business or (ii) filing such financial statements of the Company or any wholly-owned Subsidiary of the Company whose financial statements satisfy the requirements of clause (i), as applicable, with the U.S. Securities and Exchange Commission on EDGAR or in such other manner as makes them publicly available. The Company's obligation to furnish the materials described in Sections 2.2(c) and (d) shall be satisfied so long as it transmits such materials to the CD&R Investor within the time periods specified therein, notwithstanding that such materials may actually be received after the expiration of such periods.

2.3 Other Information. The Company covenants and agrees to deliver to the CD&R Investor, upon written request, with reasonable promptness, such other information and data (including such information and reports made available to any lender of the Company or any of its Subsidiaries under any credit agreement or otherwise) with respect to the Company and each of its Subsidiaries as from time to time may be reasonably requested by the CD&R Investor; provided that the Company reserves the right to withhold any information under this Section 2.3 or access under Section 2.4 from the CD&R Investor if the Board determines that providing such information or granting such access would reasonably be expected to materially adversely affect the Company on a competitive basis or otherwise. The CD&R Investor shall have access to such other information concerning the Company's business or financial condition and the Company's management as may be reasonably requested, including all information that is necessary for (x) each of the CD&R Investor and its Affiliates to comply with income tax reporting and regulatory requirements and (y) the CD&R Investor to prepare its quarterly and annual financial statements.

8

APP 199

2.4 Access. Subject to Section 2.3, the Company shall, and shall cause its Subsidiaries, officers, Directors, employees, auditors and other agents to (a) afford the CD&R Investor and its Representatives, during normal business hours and upon reasonable notice, reasonable access at all reasonable times to its officers, employees, auditors, legal counsel, properties, offices and other facilities and to all books and records, and (b) afford the CD&R Investor the opportunity to discuss the affairs, finances and accounts of the Company and its Subsidiaries with their respective officers from time to time as the CD&R Investor may reasonably request upon reasonable notice.

2.5 Termination of Rights. This Agreement shall terminate on the earlier to occur of (a) such time as the CD&R Investor is no longer entitled to nominate a Director pursuant to Section 2.1(a) of this Agreement and (b) upon the delivery of a written notice by the CD&R Investor to the Company requesting that this Agreement terminate.

## ARTICLE III

## MISCELLANEOUS

3.1 Confidentiality. Each party hereto agrees to, and shall cause its Representatives to, keep confidential and not divulge any Information, and to use, and cause its Representatives to use, such Information only in connection with the operation of the Company and its Subsidiaries and monitoring and making voting and investment decisions with respect to the Company; provided that nothing herein shall prevent any party hereto from disclosing such Information (a) upon the order of any court or administrative agency, (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such party, (c) to the extent required by law or legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (d) to the extent necessary in connection with the exercise of any remedy hereunder, (e) to other Stockholders, (f) to such party's Representatives that in the reasonable judgment of such party need to know such Information, (g) to any potential Permitted Transferee of a Stockholder to whom such proposed Transfer would be permitted in accordance with Section 3.3 as long as such potential Permitted Transferee agrees to be bound by the provisions of this Section 3.1 as if a Stockholder or (h) to any prospective purchaser of all of a Stockholder's shares of the Common Stock, provided that (1) such prospective purchaser shall have been advised of this Agreement and shall have expressly agreed to be bound by the confidentiality provisions hereof, (2) such prospective purchaser is not an Issuer Competitor or a Person who controls any Issuer Competitor, and (3) such prospective purchaser shall be responsible for any breach of or failure to comply with the confidentiality provisions of this Agreement by any of its Affiliates and such prospective purchaser agrees, at its sole expense, to take reasonable measures (including but not limited to court proceedings) to restrain its Representatives

9

and Affiliates from prohibited or unauthorized disclosure or use of any Information; provided further that, in the case of clause (a) or (c), such party shall notify the other parties hereto of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment, when and if available.

3.2 Amendments and Waivers. This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by the Company and the CD&R Investor. Neither the failure nor delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

3.3 Successors, Assigns and Permitted Transferees. This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. Any Stockholder may assign its rights and obligations hereunder to any Permitted Transferee.

3.4 Notices. All notices and other communications to be given to any party hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service, or when received in the form of a facsimile or other electronic transmission (receipt confirmation requested), and shall be directed to the address set forth below (or at such other address or facsimile number as such party shall designate by like notice):

(a) if to the Company, to:

agilon health, inc.
1 World Trade Center
Suite 2000
Long Beach, CA 90831
Attention: Chief Business Officer
Email: ted.halkias@agilonhealth.com

10

(b) if to the CD&R Investor, to:

> Clayton, Dubilier & Rice, LLC
> 375 Park Avenue
> 18th Floor
> New York, New York 10152
> Attention: Chief Financial Officer
> Email: Finance@cdr-inc.com

(c) if to any other Stockholder, to the address of such other Stockholder as shown in the stock record book of the Company.

in each case, with a copy (which shall not constitute notice) to:

> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Peter J. Loughran, Esq. and Paul M. Rodel, Esq.
> Fax: (212) 909-6836
> Email: pjloughran@debevoise.com; pmrodel@debevoise.com

3.5 <u>Further Assurances</u>. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder. To the fullest extent permitted by Applicable Law, the Company shall not directly or indirectly take any action that is intended to, or would reasonably be expected to result in, any Stockholder being deprived of the rights contemplated by this Agreement.

3.6 <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement constitutes the entire agreement among the parties with respect to the subject matter of this Agreement and supersedes any prior discussions, correspondence, negotiation, proposed term sheet, agreement or understanding and there are no agreements, understandings, representations or warranties between the parties with respect to the subject matter of this Agreement other than those set forth or referred to in this Agreement, and this Agreement is not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

11

**APP 202**

3.7 <u>Restrictions on Other Agreements; By-laws</u>. The provisions of this Agreement shall be controlling if any such provision or the operation thereof conflicts with the provisions of the By-laws. Each of the parties covenants and agrees to take, or cause to be taken, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), any action reasonably requested by the Company or any Stockholder, as the case may be, to amend the By-laws so as to avoid any conflict with the provisions hereof, including, in the case of the Stockholders, to vote their shares of Common Stock.

3.8 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof to the extent that such principles would require or permit the application of laws of another jurisdiction.

3.9 <u>Jurisdiction and Forum; Waiver of Jury Trial</u>. In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement, each of the parties unconditionally accepts the jurisdiction and venue of or, if the Court of Chancery does not have subject matter jurisdiction over this matter, the Superior Court of the State of Delaware (Complex Commercial Division), or if jurisdiction over the matter is vested exclusively in federal courts, the United States District Court for the District of Delaware, and the appellate courts to which orders and judgments thereof may be appealed. In any such judicial proceeding, the parties agree that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by delivery provided pursuant to the directions in Section 3.4. EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

3.10 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any Person or circumstance or in any jurisdiction, shall be held to be invalid or unenforceable to any extent, (<u>a</u>) the remainder of this Agreement shall not be affected thereby, and each other provision hereof shall be valid and enforceable to the fullest extent permitted by law, (<u>b</u>) as to such Person or circumstance or in such jurisdiction such provision shall be reformed to be valid and enforceable to the fullest extent permitted by law and (<u>c</u>) the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby.

3.11 <u>Enforcement</u>. Each party hereto acknowledges that money damages would not be an adequate remedy in the event that any of the covenants or agreements in this Agreement are not performed in accordance with its terms, and it is therefore agreed that in addition to and without limiting any other remedy or right it may have, the non-breaching party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically the terms and provisions hereof.

12

3.12 <u>Titles and Subtitles</u>. The titles of the articles, sections and subsections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

3.13 <u>Effectiveness</u>. This Agreement shall become effective upon the Listing Date.

3.14 <u>No Recourse</u>. This Agreement may only be enforced against, and any claims or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no past, present or future Affiliate, Director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

3.15 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of this Agreement by one party to the others may be made by facsimile, electronic mail, other electronic format (including any electronic signature complying with the Delaware Uniform Electronic Transactions Act, as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of page intentionally left blank]*

13

**APP 204**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date set forth in the first paragraph hereof.

AGILON HEALTH, INC.

By:  /s/ Theodore Halkias
       Name: Theodore Halkias
       Title: Chief Business Officer

[*Signature Page - Stockholders Agreement*]

CD&R VECTOR HOLDINGS, L.P.

By:  CD&R Investment Associates IX, Ltd., its general partner

By:  /s/ Rima Simson

Name: Rima Simson
Title:   Vice President, Treasurer and Secretary

[*Signature Page - Stockholders Agreement*]

# EXHIBIT  4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 26, 2021**

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

| | | |
|---|---|---|
| **Delaware** | **001-40332** | **37-1915147** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |
| **1 World Trade Center, Suite 2000** | | |
| **Long Beach, California** | | **90831** |
| (Address of Principal Executive Offices) | | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: (562) 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02.   Results of Operations and Financial Condition.**

On May 26, 2021, agilon health, inc., a Delaware corporation ("agilon"), issued a press release setting forth its financial results for the quarter ended March 31, 2021. The press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01   Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated May 26, 2021. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

1

**APP 209**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date: May 26, 2021

By: /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

2

**APP 210**

Exhibit 99.1

# agilon health Reports First Quarter 2021 Results

LONG BEACH, Calif. – May 26, 2021 – agilon health, inc. (NYSE: AGL), the company transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients, announced results for the first quarter ended March 31, 2021.

### First Quarter 2021 Results:

- Total revenue of $413 million increased 42% from 2020 and would have increased approximately 50% including a recently completed group Medicare Advantage (MA) contract that is retroactive to January 2021
- Members of approximately 165,300 as of March 31 increased 35% from 2020 and would have increased 42% to approximately 174,300 including the retroactive group contract
- Same geography membership growth of 8% from 2020 and same geography membership growth of 15% including the retroactive group contract
- Net loss from continuing operations of $14 million, compared to $8 million in 2020
- Medical Margin of $52 million, compared to $42 million in 2020
- Adjusted EBITDA of $4 million, compared to $3 million in 2020

"We are pleased with our first quarter results, highlighted by 42% revenue growth and 35% membership growth. Including the retroactive group MA contract, same geography membership growth increased 15%, reflective of strong member retention and broad-based additions across all markets. Our aligned partnership model is resonating with physician groups and we began implementing six new geographies with approximately 49,000 members that will go-live in January 2022." said Steve Sell, Chief Executive Officer. "With the completion of our initial public offering, we are well capitalized to support our growth strategy. We plan to use the proceeds to scale our platform, support growth of our existing physician partners, and partner with additional groups to help transform senior care in local communities across the country."

### Outlook for Second Quarter and Fiscal Year 2021:

| | Quarter End June 30, 2021 | | Year End December 31, 2021 | |
| --- | --- | --- | --- | --- |
| | Low | High | Low | High |
| Ending members | 175,000 | 177,000 | 182,000 | 184,000 |
| Total revenues ($M) | $ 470 | $ 475 | $ 1,765 | $ 1,780 |
| Adjusted EBITDA ($M) | | | $ (41) | $ (38) |

Total revenue outlook for the second quarter 2021 includes an estimated $24 million associated with the group MA contract attributable to the first quarter. Adjusted EBITDA loss reflected in the full year 2021 outlook is expected to be weighted to the back half of the fiscal year.

We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most directly comparable GAAP measure, and have not provided forward-looking guidance for net income (loss), because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation, that are not within our control or cannot be reasonably predicted.

*Membership Details*

Membership as of March 31, 2021 was approximately 165,300, an increase of 35% from 2020. Average membership during the first quarter 2021 was approximately 163,000. Including an estimated 49,000 members currently in implementation for 2022 go-live, total MA membership on the agilon platform was approximately 214,300 as of March 31, 2021.

Same geography membership increased 8% year-over-year during the first quarter 2021 and increased 15% including a recently completed group MA contract that is retroactive to January 2021. During the first quarter, a group MA contract transitioned between two payers in one of our geographies. Due to the timing required to complete the transition, agilon health's first quarter 2021 results do not include the revenue, membership, or costs of these members. agilon health recently completed a new agreement covering this membership and this will be reflected in the company's financial results for the second quarter 2021, including retroactive amounts associated with first quarter 2021. We estimate the retroactive revenue and membership associated with this contract for the first quarter 2021 are approximately $24 million and 9,000, respectively. Importantly, patients covered by this group plan were under the continuous care of their primary care doctor during this transition.

*Direct Contracting*

In collaboration with seven of our physician group partners, we launched five Direct Contracting Entities (DCE) with over 50,000 attributed beneficiaries on April 1, 2021.  The DCE program allows physician groups on the agilon platform to operate a single line of business for Medicare patients.  While the recent announcement from the Center for Medicare and Medicaid Innovation will limit new DCE entrants for 2022, we will be able to utilize existing DCEs as a vehicle for existing or new physician groups to participate in the Direct Contracting program.

*Initial Public Offering and Debt Refinancing*

On April 19, 2021, we completed the initial public offering of 53,590,000 shares of common stock at a price of $23.00 per share.  The net proceeds of the offering were approximately $1.16 billion, after underwriting fees and other offering expenses.

On February 18, 2021, we executed a new credit facility agreement (2021 Secured Credit Facilities). The 2021 Secured Credit Facilities included an initial $100 million senior secured term loan and a $100 million senior secured revolving credit facility.  Subsequent to the end of the first quarter and in connection with our initial public offering, we repaid $50 million of the senior secured term loan.

As of April 30, 2021, including the impact from the initial public offering, debt refinancing, debt repayment and other items, agilon health had approximately $1.1 billion of cash and $50 million of debt outstanding.

**Webcast and Conference Call:**

agilon health will host a conference call and webcast to discuss first quarter 2021 results on Thursday, May 27, 2021 at 8:30 AM Eastern Time. The conference call and webcast can be accessed by dialing (855) 435-0829 for U.S. participants, or +1 (639) 491-2399 for international participants, and referencing participant code 9436419, or visiting the "Events & Presentations" section of https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients. Through our partnerships and our platform, agilon is leading the nation in creating the system we need – one built on the value of care, not the volume of fees. We honor the independence of local physicians and serve as their partners so they can be the doctors they trained to be. agilon provides the capital, data, payor relationships, executive experience and contract support that allow physician groups to take on the risk of total care for their most vulnerable patients. The result: healthier communities, and doctors who can devote the right amount of time with the patients who need it most. With rapidly growing appeal, agilon is scaled to grow and is here to help our nation's best independent physician groups have a sustained, thriving future. Together, we are reinventing primary care.

**APP 212**

**Forward Looking Statements**

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: (i) statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, dispositions, or other transactions discussed in this release; and (ii) statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plan including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operation strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market; the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us; security breaches, loss of data or other disruptions to our data platforms; the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; our substantial indebtedness and the potential that we may incur additional indebtedness; and risks related to other factors discussed under "Risk Factors" in our Registration Statement on Form S-1. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**APP 213**

# agilon health, inc.
### Consolidated Balance Sheets
### In thousands, except share and per share data

| | March 31, 2021 (unaudited) | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 105,289 | $ 106,795 |
| Restricted cash and equivalents | 14,202 | 28,383 |
| Receivables, net | 288,827 | 144,555 |
| Prepaid expenses and other current assets, net | 9,314 | 9,639 |
| Current assets held for sale and discontinued operations, net | — | 4,825 |
| Total current assets | 417,632 | 294,197 |
| Property and equipment, net | 4,799 | 6,456 |
| Intangible assets, net | 61,609 | 60,468 |
| Goodwill | 41,540 | 41,540 |
| Other assets, net | 47,259 | 43,700 |
| Non-current assets held for sale, net | 1,199 | — |
| Total assets | $ 574,038 | $ 446,361 |
| **LIABILITIES, CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 276,984 | $ 162,868 |
| Accounts payable and accrued expenses | 95,122 | 97,244 |
| Current portion of long-term debt | — | 3,041 |
| Current liabilities held for sale and discontinued operations | — | 3,682 |
| Total current liabilities | 372,106 | 266,835 |
| Long-term debt, net of current portion | 99,412 | 64,665 |
| Other liabilities | 91,264 | 90,091 |
| Total liabilities | 562,782 | 421,591 |
| Commitments and contingencies | | |
| Contingently redeemable common stock, $0.01 par value: 76,201 shares issued and outstanding | 309,500 | 309,500 |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value: 500,000 shares authorized; 249,474 and 249,374 shares issued and outstanding, respectively | 2,494 | 2,494 |
| Additional paid-in capital | 265,603 | 263,966 |
| Accumulated deficit | (566,268) | (551,190) |
| Total agilon health, inc. stockholders' equity | (298,171) | (284,730) |
| Noncontrolling interests | (73) | — |
| Total stockholders' equity (deficit) | (298,244) | (284,730) |
| Total liabilities, contingently redeemable common stock and stockholders' equity (deficit) | $ 574,038 | $ 446,361 |

# agilon health, inc.

**Consolidated Statements of Operations**
**In thousands, except per share data**
**(unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Revenues:** | | |
| Medical services revenue | $ 412,412 | $ 289,814 |
| Other operating revenue | 692 | 1,234 |
| Total revenues | 413,104 | 291,048 |
| **Expenses:** | | |
| Medical services expense | 360,354 | 247,653 |
| Other medical expenses | 23,661 | 18,426 |
| General and administrative | 37,777 | 27,605 |
| Depreciation and amortization | 3,427 | 3,198 |
| Total expenses | 425,219 | 296,882 |
| **Income (loss) from operations** | (12,115) | (5,834) |
| **Other income (expense):** | | |
| Other income (expense), net | 1,336 | 122 |
| Interest expense | (2,941) | (2,149) |
| **Income (loss) before income taxes** | (13,720) | (7,861) |
| Income tax benefit (expense) | (16) | — |
| **Income (loss) from continuing operations** | (13,736) | (7,861) |
| **Discontinued operations:** | | |
| Income (loss) before income taxes | (1,351) | (8,089) |
| Income tax benefit (expense) | (64) | (149) |
| **Total discontinued operations** | (1,415) | (8,238) |
| **Net income (loss)** | (15,151) | (16,099) |
| Noncontrolling interests' share in earnings (loss) | 73 | — |
| **Net income (loss) attributable to common shares** | $ (15,078) | $ (16,099) |
| | | |
| **Net income (loss) per common share, basic and diluted** | | |
| Continuing operations | $ (0.04) | $ (0.02) |
| Discontinued operations | $ (0.01) | $ (0.03) |
| **Weighted average shares outstanding, basic and diluted** | 325,659 | 321,250 |

**agilon health, inc.**
Condensed Consolidated Statements Of Cash Flows
In thousands, except per share data
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (15,151) | $ (16,099) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 3,481 | 3,363 |
| Stock-based compensation expense | 1,472 | 1,071 |
| Loss on debt extinguishment | 1,186 | — |
| Other noncash items | 1,766 | 837 |
| Changes in operating assets and liabilities | (33,582) | (15,299) |
| Net cash provided by (used in) operating activities | (40,828) | (26,127) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (178) | (345) |
| Purchase of intangible assets | (3,986) | (33) |
| Investment in loans receivable and other | (1,204) | (359) |
| Proceeds from repayment of loans receivable | — | 1,056 |
| Proceeds from sale of business, net of cash divested | (3,706) | — |
| Net cash provided by (used in) investing activities | (9,074) | 319 |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | — | 28,128 |
| Proceeds from exercise of stock options | 165 | — |
| Proceeds from the issuance of long-term debt | 100,000 | — |
| Debt issuance costs | (1,218) | — |
| Repayments of long-term borrowings | (68,649) | (760) |
| Net cash provided by (used in) financing activities | 30,298 | 27,368 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (19,604) | 1,560 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | 135,178 | 139,152 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | 3,917 | 6,460 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 139,095 | 145,612 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of period | 119,491 | 142,563 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of period | — | 4,609 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 119,491 | $ 147,172 |

# agilon health, inc.
## Key Operating Metrics
### In thousands
#### (unaudited)

*MEDICAL MARGIN*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Medical services revenue | $ 412,412 | $ 289,814 |
| Medical services expense | (360,354) | (247,653) |
| Medical margin | $ 52,058 | $ 42,161 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Platform support costs | $ 28,408 | $ 23,520 |
| Geography entry costs[1] | 3,222 | 652 |
| Severance and related costs | 454 | 2 |
| Management fees[2] | 375 | 330 |
| Stock-based compensation expense | 1,472 | 1,021 |
| Other[3] | 3,846 | 2,080 |
| General and administrative | $ 37,777 | $ 27,605 |

[1]    Represents physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies for which we are contracted to go live in January of the following year.

[2]    Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R"). In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

[3]    Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

# agilon health, inc.

**Non-GAAP Financial Measures**

**In thousands**

**(unaudited)**

*NETWORK CONTRIBUTION*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Income (loss) from operations | $ (12,115) | $ (5,834) |
| Other operating revenue | (692) | (1,234) |
| Other medical expenses | 23,661 | 18,426 |
| Other medical expenses—live geographies[1] | (21,916) | (17,421) |
| General and administrative | 37,777 | 27,605 |
| Depreciation and amortization | 3,427 | 3,198 |
| Network contribution | $ 30,142 | $ 24,740 |

(1) Represents physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies for which we are contracted to go live in January of the following period. For the three months ended March 31, 2021 and 2020, costs incurred in implementing geographies were $1.8 million and $1.0 million, respectively.

*ADJUSTED EBITDA*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Net income (loss) | $ (15,151) | $ (16,099) |
| (Income) loss from discontinued operations, net of income taxes | 1,415 | 8,238 |
| Interest expense | 2,941 | 2,149 |
| Income tax expense (benefit) | 16 | 0 |
| Depreciation and amortization | 3,427 | 3,198 |
| Geography entry costs[1] | 4,967 | 1,658 |
| Severance and related costs | 454 | 2 |
| Management fees[2] | 375 | 330 |
| Stock-based compensation expense | 1,472 | 1,021 |
| Other[3] | 3,846 | 2,080 |
| Adjusted EBITDA | $ 3,762 | $ 2,577 |

(1) Represents direct geography entry costs, including investments to develop and expand our platform, physician incentive expense, employee-related expenses and marketing. For the three months ended March 31, 2021 and 2020, (i) $1.8 million and $1.0 million, respectively, are included in other medical expenses and (ii) $3.2 million and $0.7 million, respectively, are included in general and administrative expenses.

(2) Represents management fees and other expenses paid to CD&R. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3) Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner incentive and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for

greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly-titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP of Investor Relations
investor.relations@agilonhealth.com

**Media Contact**
Shannan Siemens
Managing Director, Mercury
media@agilonhealth.com

**APP 219**

# EXHIBIT 5

Table of Contents

Index to Financial Statements

**As filed with the Securities and Exchange Commission on September 7, 2021**

Registration No. 333-259159

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Amendment No. 1
## to
## FORM S-1
## REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# agilon health, inc.
**(Exact Name of Registrant as Specified in its Charter)**

| Delaware | 8090 | 37-1915147 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1 World Trade Center, Suite 2000**
**Long Beach, CA 90831**
**(562) 256-3800**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Steven J. Sell**
**Chief Executive Officer**
**agilon health, inc.**
**1 World Trade Center, Suite 2000**
**Long Beach, CA 90831**
**(562) 256-3800**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| Paul M. Rodel, Esq. | William V. Fogg, Esq. |
| Debevoise & Plimpton LLP | Michael E. Mariani, Esq. |
| 919 Third Avenue | Cravath, Swaine & Moore LLP |
| New York, New York 10022 | 825 Eighth Avenue |
| (212) 909-6000 | New York, New York 10019 |
| | (212) 474-1000 |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Share(1)(2) | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee(3) |
|---|---|---|---|---|
| Common Stock, par value $0.01 per share | 19,550,000 | $35.05 | $685,129,750.00 | $74,747.66 |

(1) Includes shares/offering price of shares that may be sold upon exercise of the underwriters' option to purchase additional shares.

(2) This amount represents the proposed maximum aggregate offering price of the securities registered hereunder. These figures are estimated solely for the purpose of calculating the amount of the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended, based on the average high and low prices of the registrant's common stock on September 1, 2021 as reported on the New York Stock Exchange.

(3) The registrant previously paid $10,910.00 of the registration fee in connection with a prior filing of this Registration Statement.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the U.S. Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

**Index to Financial Statements**

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the U.S. Securities and Exchange Commission declares our registration statement effective. This preliminary prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state or jurisdiction where the offer or sale is not permitted.**
**SUBJECT TO COMPLETION, DATED SEPTEMBER 7, 2021**

# 17,000,000 Shares

# agilon health, inc.

### Common Stock

The selling stockholders identified in this prospectus are offering 17,000,000 shares of common stock of agilon health, inc. ("agilon health"). We will not receive any of the proceeds of the sale of our common stock being sold in this offering, including any shares that certain of the selling stockholders may sell pursuant to the underwriters' option to purchase additional shares of our common stock.

Our common stock is listed on the New York Stock Exchange (the "NYSE") under the symbol "AGL". The last reported sale price of our common stock on September 3, 2021 was $36.48 per share.

After the completion of this offering, we expect to continue to be a "controlled company" within the meaning of the corporate governance standards of the NYSE.

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 22 of this prospectus to read about factors you should consider before buying shares of our common stock.**

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions(1) | $ | $ |
| Proceeds, before expenses, to the selling stockholders | $ | $ |

(1)    See "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters also may purchase up to 2,550,000 additional shares from certain of the selling stockholders at the public offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus.

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved the securities described herein or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares to purchasers on or about , 2021.

| | | |
|---|---|---|
| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **BofA Securities** |
| **Deutsche Bank Securities** | | **Wells Fargo Securities** |
| **Nomura** | **William Blair** | **Truist Securities** |

**Prospectus dated , 2021**

**Table of Contents**

**Index to Financial Statements**



"We believe that the long-term, independent relationship between a PCP and his/her patient is the most valuable relationship in the healthcare universe. It is the best way to drive behavior and thus, value."

– Gary Pinta, MD
*Pioneer Physicians, Akron*



**Table of Contents**

**Index to Financial Statements**



"This partnership provides physicians the ability to share in the development of a new payment model for PCPs. We are engaged and the model has physician fingerprints all over it."

– Mary Cook, MD
*Central Ohio Primary Care, Columbus*

Table of Contents

Index to Financial Statements



**Table of Contents**

**Index to Financial Statements**

TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 22 |
| Special Note Regarding Forward-Looking Statements and Information | 66 |
| Use of Proceeds | 69 |
| Dividend Policy | 70 |
| Capitalization | 71 |
| Dilution | 72 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 74 |
| Business | 106 |
| Management | 146 |
| Executive Compensation | 153 |
| Principal and Selling Stockholders | 166 |
| Certain Relationships and Related Party Transactions | 169 |
| Description of Capital Stock | 172 |
| Shares Available for Future Sale | 178 |
| Description of Certain Indebtedness | 181 |
| Certain U.S. Federal Income Tax Considerations for Non-U.S. Holders | 184 |
| Underwriting | 188 |
| Validity of Common Stock | 199 |
| Experts | 199 |
| Where You Can Find More Information | 199 |
| Index to Consolidated Financial Statements | F-1 |

**You should rely only on the information contained in this prospectus and any free writing prospectus we may authorize to be delivered to you. We have not, and the selling stockholders and the underwriters have not, authorized anyone to provide you with information different from, or in addition to, that contained in this prospectus and any related free writing prospectus. We, the selling stockholders and the underwriters take no responsibility for, and can provide no assurances as to the reliability of, any information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is only accurate as of the date of this prospectus, regardless of the time of delivery of this prospectus and any sale of shares of our common stock.**

i

**APP 226**

**Table of Contents**

**Index to Financial Statements**

**Certain Important Terms**

- "We," "us," "our," "agilon" and the "Company" mean agilon health, inc., a Delaware corporation and its consolidated subsidiaries, unless the context refers only to agilon health, inc., as a corporate entity (which we refer to as "agilon health").
- "Anchor geography" means the geographies in which our anchor physician groups operate.
- "Anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography.
- "Capitation" means a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.
- "CMS" means the Centers for Medicare & Medicaid Services.
- "CMS Innovation Center" means the Center for Medicare & Medicaid Innovation.
- "DCE" means a Direct Contracting Entity participating in the CMS Innovation Center Direct Contracting Model.
- "FFS" means fee-for-service.
- "Independent physicians" means physicians not employed by health systems or insurance providers.
- "Live," when referring to a physician partner or a geography, means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with payors.
- "MA" means Medicare Advantage.
- "Members" means the MA patients who are attributed to our PCPs (as defined below) by our payors (as defined below).
- "Payors" means health insurance providers.
- "Our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.
- "PCP" means primary care physician.
- "Physician partners" means our anchor physician groups and all other physicians with whom we have contractual arrangements.
- "PMPM" means per member per month.
- "RBE" means a risk-bearing entity.
- "STAR rating" means annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics.
- "Total Care Model" means a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients.

**Market and Industry Data**

This prospectus includes estimates regarding market and industry data and forecasts, which are based on publicly available information, industry publications and surveys, reports from government agencies, reports by market research firms and our own estimates based on our management's knowledge of, and experience in, the

ii

Table of Contents

Index to Financial Statements

healthcare industry. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable.

Throughout this prospectus, all references to "net promoter score" or "NPS" are to a measure of satisfaction widely used in the healthcare industry. We calculate patient and provider net promoter score based on responses to patient and provider surveys, administered as electronic surveys annually, that ask the patient or provider to rank, on a scale of 0 to 10, how likely they are to recommend their (or their provider's) practice to a friend or family member. We assign the designation of "Promoter" to respondents who provide a score of 9 or 10, the designation of "Passive" to respondents who provide a score of 7 or 8, and the designation of "Detractor" to respondents who provide a score of 0 to 6. We then subtract the percentage of Detractors from Promoters to determine our overall net promoter score. We believe that this method of calculation aligns with industry standards and that this metric is meaningful for investors because of the correlation that we believe exists between net promoter score and patient and provider satisfaction.

Our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the captions "Risk Factors," "Special Note Regarding Forward-Looking Statements and Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Service Marks, Trademarks and Trade Names**

We hold various service marks, trademarks and trade names, such as "agilon health," "agilon" and our logo design, that we deem particularly important to the advertising activities conducted by each of our businesses. This prospectus also contains trademarks, service marks and trade names of other companies which are the property of their respective holders. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

**Basis of Presentation**

During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. As a result of the divestiture of all of our California operations, our financial statements included in this prospectus reflect discontinued operations presentation for all California operations. Financial and operating information contained in this prospectus is presented without California operations data unless expressly stated otherwise. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

iii

**Table of Contents**

**Index to Financial Statements**

**PROSPECTUS SUMMARY**

*The following summary highlights selected information contained elsewhere in this prospectus. Because this is only a summary, it does not contain all of the information you should consider before investing in our common stock. You should carefully read the entire prospectus, including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as our consolidated financial statements included elsewhere in this prospectus, before making an investment decision.*

**Overview**

Our business is transforming healthcare by empowering the primary care physician ("PCP") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming risk-bearing entities (each, an "RBE") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. As of June 30, 2021, the PCPs on our platform serve approximately 230,700 patients enrolled in Medicare Advantage ("MA"), which includes approximately 49,000 patients with physician groups contracted to go-live on January 1, 2022 (we refer to these patients as the "members on our platform"). In addition, through our participation in the Center for Medicare & Medicaid Innovation ("CMS Innovation Center") Direct Contracting Model, our PCPs serve over 50,000 Medicare fee-for-service ("FFS") beneficiaries through five currently approved Direct Contracting Entities ("DCEs"). For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

1

Table of Contents

Index to Financial Statements

**Empower PCPs to Transform Care in Their Communities**

| What We Do | How We Do It | Powerful Results |
|---|---|---|
| *Disrupt the rapidly-growing Medicare market for physicians, patients and payors* | *Migrate physicians, patients and payors from the traditional fee-for-service to a subscription-like Total Care Model* | *Since 2016, this capital-light, exportable and scalable model has grown* |
| • **Empower community-based physicians** to create a Medicare-centric globally capitated line of business | • **Unified set of payment, data, clinical, quality and growth capabilities** deployed as single platform | • 17 diverse geographies |
| • **Enable PCPs to quarterback their patients' healthcare** in a long-term, highly engaged relationship | • **Deployed through a long-term partnership model** based on aligned outcomes and economics | • 16 anchor physician groups; average tenure of 40+ years in their community |
| • **Transform the PCP business model** from a transaction-based model to a long-term, holistic membership-based model | • **Enhanced through a growing network of like-minded physician partners** that enable powerful network effect | • 15 payors<br>• 230,700 MA members including approximately 49,000 that go-live in 2022<br>• NPS of 83 for patients and 73 for providers at live anchor physician groups |

The current state of the U.S. healthcare system is defined by the following key factors:

- Unsustainably high and rising costs characterized by waste, unnecessary variation in care and poor patient experience and health outcomes;
- FFS reimbursement model focused on units of service rather than a coordinated approach to meet the unique needs of individual patients;
- The Medicare population is projected to grow from approximately 62 million in 2020 to more than 70 million individuals in 2025 with a total spend of approximately $1.25 trillion, and MA enrollment is projected to comprise 47% of total Medicare enrollment (which we refer to as the "MA penetration rate"); and
- PCPs are positioned—but not currently empowered or incentivized—to act as the quarterback for healthcare delivery, with their decisions estimated to influence up to 90% of total healthcare spending according to a 2017 study.

We believe that failing to empower PCPs has fostered waste, needless variability in care and unsustainable growth in healthcare costs. According to a 2019 article entitled "Waste in the US Health Care System: Estimated Costs and Potential for Savings" published in the Journal of the American Medical Association, failure of care delivery, failure of care coordination and overtreatment or low-value care were estimated to represent $205.3 billion to $345.1 billion of waste annually in the U.S. healthcare system. While there is broad recognition of the need to move beyond a volume-based, FFS reimbursement model, structural hurdles have impeded rapid adoption of a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients, which we refer to as a Total Care Model. In this prospectus, we refer to "capitation" as a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.

To overcome these hurdles and achieve our mission of being the trusted long-term partner to community-based physicians, we have developed what we believe is a first-of-its-kind Total Care Model for community-based physicians that focuses exclusively on Medicare and manages subscription-like per member per month ("PMPM") arrangements with health plans or directly with the government. The agilon Total Care Model is powered by our platform, enabled through a long-term partnership model and reinforced via our growing national

2

APP 230

**Table of Contents**

**Index to Financial Statements**

network of like-minded physicians. Our position as innovators is demonstrated by a series of transformative accomplishments since the formation of the company in July 2016, and our first partnership in 2017, many of which we believe to be industry-firsts:

- Implemented the first MA multi-payor, globally capitated risk model with a community-based physician group in all of our diverse geographies in which our anchor physician groups operate ("anchor geographies");
- Exported the Total Care Model from one to 17 geographies ranging from communities as small as Zanesville, Ohio to large and rapidly growing communities such as Austin, Texas;
- Grew from approximately 24,000 patients attributed to our PCPs by our payors ("members") to approximately 230,700 MA members on our platform;
- Expanded from two payors to 15 payors on our platform; and
- Began participating in the Direct Contracting Model, with over 50,000 Medicare FFS beneficiaries served by our existing PCPs contracted through five currently approved DCEs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements:

- agilon's platform, which is holistic in enabling the rapid transformation to risk, is comprised of an integrated set of capabilities designed to continuously improve, and is delivered to our anchor physician groups through an aligned long-term partnership model;
- agilon's long-term physician partnership approach with community-based physician groups, which is designed to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician; and
- agilon's network of leading community-based physician partners, functioning as a collaborative group which can share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another.

With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients. The combination of subscription-like PMPM agreements with payors, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue.

The result is PCPs transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient. Despite our history of net losses, we believe this membership-based model results in a recurring revenue stream and provides our anchor physician groups with access to an incremental profit margin opportunity based on delivering high-quality care and health outcomes. Freed from the constraints of the transactional FFS reimbursement model, our PCPs are empowered to practice team-based, coordinated care when addressing individual patient needs and transition to a sustainable long-term business model for their senior patients. We believe enabling PCPs to unlock the value of a Medicare-centric, globally capitated line of business while remaining independent can transform the community-based physician business model.

In this prospectus, when referring to a physician partner or a geography, "live" means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming

3

**Table of Contents**

**Index to Financial Statements**

financial risk pursuant to agreements with health insurance providers ("payors"). In addition, "anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography. We refer to our anchor physician groups and the other physicians with whom we have contracted arrangements as our "physician partners." Finally, "our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.

*The agilon Flywheel Effect*: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients. The power of the agilon flywheel is highlighted by our total membership growth of 45%, of which 42% was driven by same geography membership growth and 58% was driven by entry into new geographies from December 31, 2019 to December 31, 2020, and general and administrative expenses per member contracted by 23% over the same period. Our general and administrative expenses per member contracted by 18% from December 31, 2018 to December 31, 2019. For the years ended December 31, 2020, 2019, and 2018 we had revenue of $1.2 billion, $794.4 million, and $474.8 million, respectively, and net loss of $60.1 million, $282.7 million, and $146.5 million, respectively. For the six months ended June 30, 2021, we had revenue of $912.1 million and net loss of $314.1 million.



**Our Market**

In 2020, approximately 62 million Americans were enrolled in Medicare nationally, of which we estimate approximately 27 million to be affiliated with independent physicians. We define independent physicians as

4

**Table of Contents**

**Index to Financial Statements**

physicians not employed by health systems or insurance providers. We consider our current addressable market to be the estimated 17.5 million Medicare beneficiaries affiliated with independent PCPs in states in which we already have a physician partner or a signed letter of intent with a physician group as of January 2021, and those in which we have identified near-term prioritized geographies. Based on 2021 estimated average annual revenue per Medicare member to us of approximately $10,000, we estimate that this represents a total addressable market ("TAM") size of approximately $175 billion in 2020. We believe this addressable market will increase to nearly 20 million Medicare beneficiaries and $253 billion by 2025, based on the Centers for Medicare & Medicaid Services' ("CMS") projected Medicare enrollment and spending per beneficiary growth rates.



**Rapidly Expanding Actionable TAM Growing at 8% CAGR**

|  | 2020 | | Projected 2025 | |
|---|---|---|---|---|
|  | # Patient | Spend[1] | # Patient | Spend[2] |
| Total Medicare beneficiaries | 61.7M | $859B | 70.3M | $1,250B |
| Medicare beneficiaries attributed to Independent PCPs | 26.7M | $267B | 30.4M | $389B |
| agilon TAM: Medicare beneficiaries attributed to Independent PCPs in Existing & Prioritized Geographies | 17.5M | $175B | 19.8M | $253B |

(1)    2020 Medicare spend for total Medicare beneficiaries is based on CMS spend per beneficiary.
(2)    2025 Medicare spend for total Medicare beneficiaries, beneficiaries attributed to independent PCPs and agilon total addressable market is based on CMS projected Medicare enrollment and spending per beneficiary growth rates.

Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021, and $24 billion is based in counties in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021. In addition to the MA members our physician partners currently serve, we estimate our physician partners also serve approximately 375,000 patients that are addressable, which includes all Medicare FFS beneficiaries and commercial patients expected to age into Medicare over the next five years. This represents a 2020 market size of approximately $3.8 billion, using the same assumed annual revenue per Medicare member to us.

In addition, we see an additional opportunity for growth of our addressable market in physicians currently affiliated with health systems or insurance providers who become increasingly dissatisfied with those models. In considering our total addressable market, please also see "Risk Factors—Risks Related to Our Business."

**Industry Challenges and Our Opportunity**

We believe there is a significant opportunity to impact growth in U.S. healthcare costs and change the trajectory of the primary care business model through a platform, such as ours, in which PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients and share in the financial surplus created to the extent premiums received exceed the cost of medical care.

5

**APP 233**

Table of Contents

Index to Financial Statements

*Unsustainably high and rising U.S. healthcare costs*

According to CMS, U.S. national healthcare expenditures are expected to increase from $3.81 trillion in 2019 to $4.27 trillion in 2021. CMS projects that by 2028, healthcare expenditures will reach $6.20 trillion and will account for 19.7% of the U.S. GDP, up from 17.7% in 2018.

*Patients are dissatisfied with the fragmented and uncoordinated healthcare experience*

In the current FFS model, reimbursement is focused on units of service rather than a coordinated approach to meet the unique needs of individual patients. As a result, care delivery is often uncoordinated, leaving patients frustrated and responsible to navigate their own way through a fragmented and complex healthcare system.

*PCPs are well-positioned to be agents of change*

According to Oregon's Patient-Centered Primary Care Home Program, every $1 spent on primary care services can save $13 of future healthcare costs. Across the U.S., there are more than 486,000 active PCPs who serve as patients' first and most frequent point of contact for their healthcare experience.

*The trajectory of the current independent primary care business model is unsustainable*

In the current FFS reimbursement model, as average reimbursement rates decline, PCPs must increase the number of patients they see to sustain their practice. This volume-based model perpetuates physician burnout and jeopardizes the long-term sustainability of the independent primary care business model. According to a 2019 report, more than 50% of family physicians show symptoms of burnout, driven in part the FFS reimbursement model and increasing administrative burden. We believe this has been exacerbated by the effects of COVID-19.

*Growth of the complex and costly Medicare population is accelerating pressure on primary care*

The Medicare population is expected to grow from approximately 62 million individuals in 2020 to approximately 70 million individuals by 2025. As the medically complex Medicare population disproportionately drives utilization and cost, and is typically reimbursed at a lower rate than the commercial population, the primary care delivery system and the overall healthcare system are further strained.

**Structural Hurdles to Adoption of a Total Care Model**

We believe that all key stakeholders—patients, physicians and payors—benefit significantly from an environment where PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients versus operating in the current FFS reimbursement model that primarily rewards units of service. However, over time, the existing FFS system has created structural hurdles that now impede rapid and broad adoption of a PCP-led Total Care Model.

- PCPs lack the incentive structure to reorganize the healthcare delivery system.
- PCPs lack the infrastructure to participate in a multi-payor model.
- PCPs lack the breadth of capabilities and resources necessary to transition to a Total Care Model.
- PCP groups are highly fragmented and lack the benefits of scale.
- Limited long-term, deep collaboration between payors and physicians.

**Our Answer**

*We have created a Total Care Model for community-based physicians that focuses exclusively on Medicare and manages the comprehensive healthcare needs of our members through subscription-like PMPM arrangements with health plans or directly with CMS—powered by the agilon platform, enabled through a long-term partnership model and reinforced via a growing national network.*

6

APP 234

Table of Contents

Index to Financial Statements

*The agilon Platform:* The agilon platform is focused on existing community-based physician groups, senior patients within these practices and enabling our physician partners to rapidly move to a subscription-like Total Care Model. Our platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital, and recognizes that enhanced capabilities are needed at multiple levels and must be deeply integrated within existing physician group operating processes to successfully execute the transition. The agilon platform was co-developed and has been continuously refined with our physician partners since the formation of the company. The agilon platform comprises an integrated set of capabilities, delivered as a unified platform to enable successful partnerships at the community level, create a national network of PCPs and physician groups and empower our PCPs to improve health outcomes for their patients.

*Our platform capabilities include:*
- *Payor Engagement*: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one approach to quality, patient experience, clinical program management and financial management.
- *Direct Contracting Model*: In each community we serve, our Total Care Model can be extended to patients enrolled in traditional Medicare through the CMS Innovation Center Direct Contracting Model.
- *Data Integration and Management*: Our purpose-built and flexible platform enables ease of integration with payor systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.
- *Clinical Programs and Product Development*: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value actionable playbooks for partner physicians to deliver quality care, which include operational plans, analytics and tracking metrics.
- *Quality (Clinical and Experience)*: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.
- *Growth*: We enable our partners to extend their local brand into a senior care brand for their Total Care Model that embodies the history and culture of their local physician group. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their approximately 220,000 patients that are currently Medicare-eligible but are not covered by an MA plan and their approximately 156,000 60-64 year-old patients, to enable their patients to make educated healthcare choices. These patients represent an embedded growth opportunity.
- *Performance Management Analytics*: One of the most powerful parts of our platform is enabled by the peer-to-peer comparison of efficiency and clinical metrics at the physician, population and network level.
- *Financial Management*: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.
- *National Policy*: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

7

**APP 235**

Table of Contents

Index to Financial Statements

***agilon's Long-term Physician Partner Model***

*Physician Relationships*

We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to address the need to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Our anchor physician group relationships have the following characteristics:

- Long-term partnership model that allows both agilon and physicians to take the long-term view and benefit from the maturity of a growing number of members on the platform;
- Shared governance and co-location of staff to manage our local partnerships;
- Local dyad leadership structure that includes a medical director from the local anchor physician group;
- Local brand which reflects the local anchor physician group or geography;
- Capital from agilon to support value-based care infrastructure supporting the delivery of high-quality healthcare, and 100% downside protection, which removes a major obstacle to physicians making the leap to a Total Care Model;
- Operating leverage created by amortizing centralized investments in the platform infrastructure across a growing number of physician partners; and
- Surplus dollars generated locally due to improvements in quality of care and healthcare costs are shared with the local anchor physician group.

Under the Total Care Model, we typically operate by RBE's within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups. Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. Through incentive compensation arrangements, we share with our anchor physician groups a portion of the RBE's savings from successfully improving the quality of care and reducing costs. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. Most of our contracts with our anchor physician groups contain exclusivity provisions, as well as termination rights that are triggered upon certain events.

*Payor Relationships*

In each of our geographies, we enter into subscription-like PMPM agreements with payors to manage the total healthcare costs of our attributed members. Through this partnership model, we believe we:

- empower PCPs to act as the quarterback for healthcare delivery;
- enable PCPs to define a tailored patient experience across multiple payors;

8

**APP 236**

Table of Contents

Index to Financial Statements

- • create an operating partnership and economic model built around improved health outcomes instead of a transaction-based model; and
- • align the physician business model with the strength of their long-term patient relationships enabling the long-term growth of independent, community-based physician groups.

Under a typical agreement, we are entitled to monthly PMPM fees, which are typically based on a defined percentage of the corresponding premium which payors receive from CMS. We generally accept full financial risk for members attributed to us through our contracted PCPs and, therefore, are responsible for the cost of all healthcare services required by those members, which generally includes healthcare costs which CMS considers Part A and B costs. Our agreements with payors may delegate claims payment to us, or such responsibility may be retained by the payor, as is the case today in the majority of our payor agreements. The majority of our agreements are for terms ranging from one to three years and contain automatic annual renewal provisions as well as various termination rights. We also typically agree to indemnify our payors against certain third-party claims. As we continue to expand the agilon platform and enter into additional long-term partnerships, we will negotiate payor agreements in new geographies, including with Humana, Aetna and United Healthcare.

The power of our local partnership model is defined by the scale, breadth and local brand of our physician partners. On average, our anchor physician groups have been serving their communities for more than 40 years, have a PCP tenure of approximately 13 years, and receive exceptionally strong NPS from their PCPs and patients in live geographies of 73 and 83, respectively. We believe this gives us the ability to influence the local healthcare delivery system at scale. We expect our physician partner patient panels to systematically migrate to MA as the patient population ages and our partnerships mature. We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000.

The table below presents an overview of our anchor physician groups:

| Go-Live Year | Geography | Anchor Physician Group | Founded | PCPs | Average PCP Tenure | Approx. MA, FFS, Commercial Lives |
|---|---|---|---|---|---|---|
| 2018 | Columbus, OH | CENTRAL OHIO PRIMARY CARE | 1996 | >100 | 13 | 265K |
| 2019 | Akron, OH | PIONEER | 1995 | 25-100 | 18 | 60K |
| | Austin, TX | AUSTIN REGIONAL CLINIC / PREMIER FAMILY PHYSICIANS | 1980/1994 | >100 | 10 | 375K |
| 2020 | Pittsburgh, PA | preferred | 1995 | 25-100 | 13 | 65K |
| | Dayton, OH | PriMED | 1995 | <25 | 13 | 30K |
| | Southeast OH | Physicians Group | 2001 | <25 | 14 | 35K |
| | Wilmington, NC | | 1971 | 25-100 | 14 | 115K |
| 2021 | Buffalo, NY | Buffalo Medical Group | 1946 | 25-100 | 10 | 70K |
| | Toledo, OH | Toledo Clinic | 1926 | 25-100 | 9 | 45K |
| | Hartford, CT | Starling | 1947 | 25-100 | 17 | 45K |
| 2022 | Syracuse, NY | FamilyCare Medical Group, PC | 1996 | 25-100 | 17 | 75K |
| | Pinehurst, NC | | 1952 | 25-100 | 10 | 60K |
| | Texarkana, TX | Collom & Carney Clinic | 1947 | <25 | 13 | 15K |
| | Longview, TX | DIAGNOSTIC CLINIC of Longview | 1975 | <25 | 16 | 75K |
| | Grand Rapids & Traverse City, MI | ANSWER HEALTH | 1986 | >100 | 10 | 120K |

9

Table of Contents

Index to Financial Statements

In addition to our anchor physician groups in the table above, we have broadly contracted with PCPs across the state of Hawaii and have developed select deeper primary care relationships within that network.

### Our Network

We believe the agilon network creates significant value for our patients, our physician partners, our payors and our organization. The ability to share best practices, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. Our physician partners are both collaborative and constructively competitive in service of their patients. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

### Value Proposition to Stakeholders

Our Total Care Model empowers community-based physician groups to lead local healthcare transformation and ensure the long-term sustainability of the community-based physician model.

We believe the benefits of this differentiated model to community-based physician groups and the patients they serve include:
- Rapid creation of a Medicare Total Care Model that enables our PCPs to take a long-term view of their relationships with their patients and allocate resources to meet individual member health needs.
- Sustainable long-term business model alongside commercial and Medicare FFS.
- Provides access to network of like-minded partners.
- Improved economics.
- Improving the physician experience.
- Improving the patient experience.
- Supporting superior health outcomes.

We have also become an important strategic partner for our payors, as we are a material portion of their membership base, delivery network and annual membership growth in many of the geographies we serve. Through our subscription-like agreements, we ensure a consistent gross margin on a growing membership base. The strength of our relationships with payors has resulted in our establishment of national joint-operating committees with five national health plans through which we develop, execute and monitor a strategy for growth and performance as part of their Medicare delivery network.

### Our Strengths

### Local and National Leadership and First-Mover Dynamics

Core to our model is partnering in local geographies with leading physician groups that have already built significant scale and strong brands in the communities they serve. Our local leadership is highlighted by our position in Columbus, Ohio, where we have more than 200 PCPs on our platform, whose patient panels include approximately 50% of total MA lives among independent PCPs.

10

APP 238

Table of Contents

Index to Financial Statements

We believe we are pioneers in providing a full-risk, multi-payor Total Care Model within our local geographies, our growing regional hubs and the country. We believe we are the only MA multi-payor, globally capitated risk vehicle available for independent physician groups to access a Total Care Model in our local geographies. The sustainability of this local leadership position is also enhanced by our long-term partnerships with our anchor physician groups.

We've established a strong local leadership position in 17 geographies creating what we believe to be the first national platform for a Medicare-centric, globally capitated line of business. We believe our position as a first-mover creates a competitive advantage, resulting in other independent physician groups viewing us as an established and trusted partner.

*Long-Term Economic Model*

We believe our membership and per-member profitability will grow over time due to structural characteristics inherent to our long-term partnerships, durable and growing MA membership within our physician partners and the nature of the MA economic model. The key strengths of our economic model include:

- We believe we have the ability to generate significant, recurring and growing medical margin in concert with our physician partners over the course of our long-term partnerships and the inherently sticky physician-patient relationship.
  - Our physician partnerships are typically 20 years.
  - Average physician tenure within our anchor physician groups is 13 years.
  - Patients 65 years of age and older remain with their PCP for an average of 10 years, according to a 2004 study.
- Embedded same-geography, long-term organic membership growth resulting from our physician partners' existing patients who age into Medicare and elect to enroll in MA or who elect to convert from Medicare FFS to MA over the life of our long-term partnership.

Although we have incurred net losses since our formation in 2016, we believe that the combination of a growing membership base and improving medical margin over the life of our long-term partnerships creates a significant lifetime value ("LTV") for the geographies we enter. We are able to access this attractive LTV through what we believe to be a low-cost and increasingly cost-efficient model. We believe this low-cost and increasingly cost-efficient growth model represents a significant advantage supporting our rapid scaling to new geographies and sustainable existing geography growth.

*Model for Long-Term Sustainable Growth*

We have created a multi-pronged growth strategy that has powerful tailwinds for our physician partners and our business by leveraging existing physician capacity in local geographies, establishing long-term partnerships with significant embedded growth opportunities and expanding through multiple regional levels. The "flywheel" nature of our model has allowed us to expand from one geography to 17 in fewer than five years and has resulted in an additional approximately 186,000 MA lives being attributed to our platform over the same time period.

*Purpose-Built, Exportable, Scalable Platform*

The creation of the agilon platform and an aligned physician partnership approach has enabled the consistent deployment of a Medicare-centric, globally capitated line of business across 17 heterogeneous geographies, 16 anchor physician groups and multiple payors. The components of our Total Care Model (including data, payor

11

Table of Contents

Index to Financial Statements

engagement, clinical programs and growth) are discrete but are delivered as a unified platform through a highly-aligned model with physicians to optimize success. Our platform has enabled us to grow revenue 53% year-over-year for the year ended December 31, 2020, while operating costs to support live geographies and enterprise functions grew 12% over the same period. Our revenue grew 67% year-over-year for the year ended December 31, 2019, while operating costs to support live geographies and enterprise functions grew 42% over the same period. Our net loss for the year ended December 31, 2020 was $60.1 million, a 79% decline from losses of $282.7 million in the year ended December 31, 2019. Our net loss for the year ended December 31, 2019 was $282.7 million, a 93% increase from losses of $146.5 million for the year ended December 31, 2018. Our net loss for the six months ended June 30, 2021 was $314.1 million compared to losses of $24.0 million in the six months ended June 30, 2020.

*Network Feedback Loop*

We believe our growing network of community-based physicians at the national, regional and local level drives continuous improvement of our platform, enables best practices sharing and innovation and accelerates the growth of independent physicians joining the agilon network. Many of our physician partners and individual physicians have joined our platform based on references from existing like-minded physician partners, and the credibility and quality of our physician partners is consistently cited as a deciding factor for joining the platform.

*Differentiated Physician and Patient Experience*

We designed our platform, partnership and network approach with the goal of delivering a superior and continuously improving experience to our physician partners and their patients. We believe our model enables PCPs to unlock the value in a Medicare-centric, globally capitated line of business while remaining independent. Subsequent to joining our platform, our PCPs have increased their average annual income by successfully managing healthcare costs and improving health outcomes. We believe that our PCPs' engagement is manifested through deeper relationships with patients and results in a greater opportunity to improve our members' health. For example, in 2019, 78% of our members attributed to our live anchor physician groups attended their wellness visits, compared to the FFS national average CMS Annual Wellness Visit completion rate of 35% in 2019.

*Mission-Driven Team and Culture*

We have a world-class management team, which is differentiated by its breadth and depth of expertise in healthcare. Our senior management team has an average of more than 15 years of experience in the healthcare industry and has significant exposure across all components of the payment and delivery continuum. We believe our management team's collective robust, diverse and complementary exposure to different facets of the healthcare industry positions our team to navigate and enable the shift to a physician-driven Total Care Model.

Our team is united by our mission of being the trusted long-term partner to community-based physicians and driven by our vision of transforming healthcare at the community level through exceptional patient-physician relationships.

12

**Table of Contents**

**Index to Financial Statements**

**Our Growth Strategy**

We intend to utilize our competitive strengths and capitalize on favorable industry trends to increase the number of regional hubs, local markets within those hubs and ultimately physicians and members we serve. The key elements of our growth include:

*The power of our model at work: Case study of Ohio expansion*



Note: Year in map refers to year partner joined the platform (global risk contract effective the following year)

*Establish New Regional Hubs across the Country*

We believe we are well-positioned to expand the number of our physician partners nationally across a diverse set of geographies. We have developed sophisticated business development capabilities and have established a robust pipeline with an array of physician groups across the country. We are also benefitting from the network effect of our growing network of like-minded physician partners.

*Access the Large and Embedded Membership Opportunity within Our Existing Networks*

We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000. As these patients enroll in MA through our payors, they become attributed to our platform with little incremental cost to us.

*Facilitate and Capitalize on the Growth of Our Physician Partners*

As the PCP base of our physician partners grows, our physician partners are better positioned to serve a growing Medicare population.

13

**APP 241**

Table of Contents

Index to Financial Statements

*Expand into Adjacent Geographies*

Once we establish a presence in a geography, we have the opportunity to accelerate the addition of new physician partnerships in the region. We leverage our multi-payor MA risk platform and regional infrastructure to efficiently grow into adjacent geographies. Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021.

*Increase Quality and Improve Health Outcomes to Drive Profitability*

We believe our Total Care Model drives increased profitability per member over time through increasing quality and improving health outcomes. As members and physicians mature on our platform, we increasingly recognize the benefits of improved quality of care and effectively managed healthcare costs. We believe there is significant opportunity to improve profitability per member over the course of our long-term partnerships by improving healthcare outcomes and effectively managing costs, with 70% of our MA members as of December 31, 2020 on our platform for fewer than three years.

*Demonstrate Operating Leverage*

We expect to drive increasing profitability by leveraging both our market-level operating costs and centralized infrastructure, as we manage increased MA and DCE membership on our platform that has maturing medical margin over time.

*Capitalize on Emerging Value-Based Care Opportunities*

We believe we are positioned to capitalize on the shift from FFS towards a Total Care Model across the broader healthcare system. Through five currently approved DCEs, which encompass more than 500 of our existing PCPs, we provide care to over 50,000 traditional Medicare members in seven geographies. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

**Impact of COVID-19 Pandemic on Our Business**

Commencing in March 2020, we implemented various measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. These measures included relocating employees to home-based work settings, coordinating with physician partners to accelerate telehealth activity and coordinating daily huddles for physicians and team members on clinical and operational impacts of COVID, which included participation by nationally-recognized experts in infectious disease and epidemiology. Despite the challenges and uncertainties created by the COVID-19 pandemic, we believe that our response to the pandemic has reinforced the value of our platform, long-term partnership model and network.

Throughout most of 2020, our members incurred lower healthcare costs than we would have otherwise expected, which resulted in lower medical services expenses incurred. These costs may be incurred at future points in time and it is possible that the deferral of healthcare services could cause additional health problems in our existing members, which could increase our costs in the future. Additionally, our members' risk adjustment factors, which are reflective of documented clinical conditions during 2020 and which impact our 2021 revenues, may be lower than would have occurred without the impact of the COVID-19 pandemic, resulting from members' avoidance or deferral of care during 2020. We cannot accurately estimate the net ultimate impact, positive or negative, to revenue or medical services expense at this time.

Also see "Risk Factors—Risks Related to Our Business— The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this

14

Table of Contents

Index to Financial Statements

situation precludes any prediction as to the ultimate adverse impact to us of COVID-19," "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of COVID-19" and "Business—Impact of COVID-19 Pandemic on Our Business."

## Company History

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, NY. Our business was formed in 2016 through the completion of two acquisitions by CD&R: In July 2016, Primary Provider Management Company, Inc. ("PPMC") was acquired, which, together with its affiliated independent practice associations ("California IPAs"), operated in Southern California. Also in July 2016, Cyber-Pro Systems, Inc. ("CPS") was acquired, which, together with its subsidiaries and affiliates, operates a network of contracted physicians in Hawaii and provides software and medical billing solutions to independent healthcare organizations. During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. However, we will continue to be responsible for any liabilities arising from certain of the divested businesses which were incurred prior to the applicable closing date. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

agilon health, inc., the issuer in this offering, was incorporated in the State of Delaware in April 2017 in connection with our entry into a physician partnership with Central Ohio Primary Care Physicians, Inc. ("COPC"), a physician-owned medical group, to establish a Medicare-centric, globally capitated line of business in the Columbus, Ohio region. Since that time, we have expanded and entered into new partnerships in Austin, Akron, Pittsburgh, North Carolina, Hartford, Buffalo, Toledo, Dayton and Southeast Ohio. In March 2021, we changed our name from Agilon Health Topco, Inc. to agilon health, inc., and changed the name of our subsidiary, agilon health, inc., to agilon health management, inc. On April 19, 2021, we completed the initial public offering ("IPO") of 53,590,000 shares of common stock at a price of $23.00 per share. The net proceeds of the offering were approximately $1.2 billion, after underwriting fees and other offering expenses.

## Our Majority Shareholder and Organizational Structure

*Clayton, Dubilier & Rice, LLC.* Founded in 1978, CD&R employs a distinctive approach to private equity investing, bringing together investment professionals and operating executives to pursue a strategy predicated on building stronger, more profitable businesses. Since inception, CD&R has managed the investment of more than $30 billion in 100 businesses with an aggregate transaction value of over $150 billion. CD&R has a disciplined and clearly defined investment strategy and has extensive experience investing across the healthcare industry.

After the completion of this offering, we expect that CD&R Vector Holdings, L.P. (the "CD&R Investor"), which is owned by investment funds managed by, or affiliated with, CD&R, will hold approximately 53.3% of our common stock (or approximately 52.6% if the underwriters exercise in full their option to purchase additional shares). As a result, we expect to continue to be a "controlled company" within the meaning of the NYSE rules following the completion of this offering. This election will allow us to continue to rely on exemptions from certain corporate governance requirements otherwise applicable to NYSE-listed companies. See "Management—Corporate Governance."

15

Table of Contents

Index to Financial Statements

The following chart presents an overview of our ownership and organizational structure, after giving effect to this offering. For additional information with respect to our ownership structure, see "Principal Stockholders":

1   Includes COPC, certain private investment funds and our physician partners with whom we have physician partner group equity agreements.
2   Includes indebtedness related to the 2021 Credit Facilities (as defined herein), including term loan indebtedness, revolver indebtedness and letters of credit. On February 18, 2021, we, through agilon health management, inc. ("agilon management"), entered in the 2021 Secured Credit Agreement (as defined herein) to refinance our outstanding indebtedness under the Credit Facilities (as defined herein). See "Description of Certain Indebtedness."
3   Operating subsidiaries include wholly-owned RBEs, independent practice associations and other immaterial subsidiaries, which have been omitted from this chart for convenience.
4   Ownership percentages assume no exercise of the underwriters option to purchase up to 2,550,000 additional shares of common stock in the offering, and are determined as described in "—The Offering."

**Our Corporate Information**

agilon health, inc. is a Delaware corporation. Our principal executive offices are located at 1 World Trade Center, Suite 2000, Long Beach, CA 90831, and our telephone number is (562) 256-3800. Our website is *www.agilonhealth.com*. None of the information contained on, or that may be accessed through, our website or

16

**APP 244**

**Table of Contents**

**Index to Financial Statements**

any other website identified herein is part of, or incorporated into, this prospectus, and you should not rely on any such information in connection with your decision to invest in our common stock.

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows and results of operations that you should consider before making a decision to invest in our common stock. These risks are discussed more fully under the caption "Risk Factors." These risks include, but are not limited to, the following:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- significant reductions in membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts, which contracts generally provide that if the cost of care exceeds the corresponding capitation revenue we receive from payors in respect of attributed members we may realize operating deficits, which are typically not capped, and could lead to substantial losses;
- dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- ability to comply with federal, state and local regulations and laws we are subject to, or to adapt to changes in or new regulations or laws, including as such regulations and laws that relate to our physician alignment strategies with our physician partners or the corporate practice of medicine;
- our physician partners' compliance with federal and state healthcare fraud and abuse laws and regulations; and
- the influence of the CD&R Investor and our status as a "controlled company."

17

**APP 245**

**Table of Contents**

**Index to Financial Statements**

**THE OFFERING**

| | |
|---|---|
| Common stock offered by the selling stockholders | 17,000,000 shares. |
| Common stock to be outstanding after this offering | 391,221,574 shares, including 339,014 shares (or up to 404,867 shares giving effect to the underwriters' option to purchase additional shares) issued pursuant to options exercised by the selling stockholders in connection with this offering. |
| Option to purchase additional shares | The underwriters also may purchase up to 2,550,000 additional shares from certain of the selling stockholders at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus. |

IPO lock-up release; new lock-up agreement

In connection with this offering, J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters in our IPO, have agreed to waive the prior lock-up agreements with respect to up to 17,000,000 shares (or up to 19,550,000 shares including the underwriters' option to purchase additional shares) of our common stock for the sale by the selling stockholders in this offering, which includes shares beneficially owned by certain of our officers and directors, provided that the waiver is limited to the shares actually sold in this offering. Additionally, certain of the selling stockholders will enter into new lock-up agreements with J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters of this offering, pursuant to which those selling stockholders, for a period of 90 days after the date of this prospectus, may not, among other things and subject to certain exceptions, sell their remaining shares following the completion of this offering. See "Underwriting."

| | |
|---|---|
| Use of proceeds | We will not receive any of the proceeds from the sale of our common stock by the selling stockholders in this offering, including any shares the selling stockholders may sell pursuant to the underwriters' option to purchase additional shares of our common stock. |
| Dividend policy | We do not currently anticipate paying dividends on our common stock for the foreseeable future. Any future determination to pay dividends on our common stock will be subject to the discretion of our board of directors and depend upon various factors. See "Dividend Policy." |
| Risk Factors | Our business is subject to a number of risks that you should consider before making a decision to invest in our common stock. See "Risk Factors." |
| NYSE symbol | "AGL". |

18

**APP 246**

**Table of Contents**

**Index to Financial Statements**

The number of shares of our common stock to be outstanding immediately following this offering is based on 390,882,560 shares outstanding as of June 30, 2021, and excludes:

- 41,197,388 shares of common stock issuable upon exercise of options outstanding as of June 30, 2021 at a weighted average exercise price of $4.40 per share, of which 30,634,736 options will be exercisable as of the consummation of this offering, including after taking into account the satisfaction of performance conditions applicable to certain options as a result of this offering;
- 28,453,653 shares of common stock reserved for future issuance under our Omnibus Incentive Plan and ESPP; and
- 1,112,131 shares of our common stock subject to outstanding unvested RSUs granted to directors and employees.

Unless otherwise indicated, all information in this prospectus assumes no exercise by the underwriters of their option to purchase additional shares.

**APP 247**

Table of Contents

Index to Financial Statements

**SUMMARY HISTORICAL CONSOLIDATED FINANCIAL DATA**

The following tables set forth our summary historical consolidated financial data derived from our consolidated financial statements as of the dates and for each of the periods indicated. The summary historical consolidated financial data as of and for the years ended December 31, 2020, 2019, and 2018 are derived from our audited consolidated financial statements included elsewhere in this prospectus. The summary historical consolidated financial data as of and for the three and six months ended June 30, 2021 and 2020 are derived from our unaudited interim condensed consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results to be expected for any future period.

You should read this summary historical consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements included elsewhere in this prospectus.

| (dollars in thousands) | Six Months Ended June 30, | | Three Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 | 2020 | 2019 | 2018 |
| **Consolidated Statement of Operations Data:** | | | | | | | |
| **Revenues:** | | | | | | | |
| Medical services revenue | $ 910,090 | $ 582,309 | $ 497,678 | $ 292,495 | $ 1,214,270 | $ 788,566 | $ 466,612 |
| Other operating revenue | 1,970 | 2,333 | 1,278 | 1,099 | 4,063 | 5,845 | 8,215 |
| Total revenues | 912,060 | 584,642 | 498,956 | 293,594 | 1,218,333 | 794,411 | 474,827 |
| **Expenses:** | | | | | | | |
| Medical services expense | 802,837 | 468,016 | 442,483 | 220,363 | 1,021,877 | 725,374 | 412,669 |
| Other medical expenses | 57,355 | 53,187 | 33,694 | 34,761 | 102,306 | 40,526 | 34,092 |
| General and administrative | 79,318 | 60,832 | 43,013 | 34,248 | 137,292 | 122,832 | 88,745 |
| Stock-based compensation expense(1) | 276,020 | 3,176 | 274,548 | 2,155 | | | |
| Depreciation and amortization | 7,008 | 6,517 | 3,581 | 3,319 | 13,531 | 12,253 | 11,385 |
| Total expenses | 1,222,538 | 591,728 | 797,319 | 294,846 | 1,275,006 | 900,985 | 546,891 |
| **Income (loss) from operations** | (310,478) | (7,086) | (298,363) | (1,252) | (56,673) | (106,574) | (72,064) |
| **Other income (expense):** | | | | | | | |
| Other income (expense), net | 4,303 | 48 | 2,967 | (74) | 2,465 | 955 | 611 |
| Interest expense | (4,439) | (4,229) | (1,498) | (2,080) | (8,135) | (9,068) | (9,839) |
| **Income (loss) before income taxes** | (310,614) | (11,267) | (296,894) | (3,406) | (62,343) | (114,687) | (81,292) |
| Income tax benefit (expense) | (451) | (39) | (435) | (39) | (865) | 232 | 113 |
| **Income (loss) from continuing operations** | (311,065) | (11,306) | (297,329) | (3,445) | (63,208) | (114,455) | (81,179) |
| **Discontinued operations:** | | | | | | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | (2,898) | (12,429) | (1,547) | (4,340) | (20,049) | (86,108) | (32,132) |
| Impairments | — | — | — | — | — | (98,343) | (40,794) |
| Gain (loss) on sales of assets, net | — | — | — | — | 20,401 | — | — |
| Income tax benefit (expense) | (129) | (275) | (65) | (126) | 2,804 | 16,166 | 7,588 |
| **Total discontinued operations** | (3,027) | (12,704) | (1,612) | (4,466) | 3,156 | (168,285) | (65,338) |
| **Net income (loss)** | (314,092) | (24,010) | (298,941) | (7,911) | (60,052) | (282,740) | (146,517) |
| Noncontrolling interests' share in (earnings) loss | 169 | — | 96 | — | — | 152 | (409) |
| **Net income (loss) attributable to common shares** | $ (313,923) | $ (24,010) | $ (298,845) | $ (7,911) | $ (60,052) | $ (282,588) | $ (146,926) |

(1)   For annual periods prior to 2021, stock-based compensation expense is included in general and administrative expenses.

20

APP 248

Table of Contents

Index to Financial Statements

| | June 30, 2021 | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| **Consolidated Balance Sheet Data (at period end):** | | | |
| Cash and cash equivalents | $1,109,372 | $ 106,795 | $ 123,633 |
| Total assets | 1,701,734 | 446,361 | 402,794 |
| Total liabilities | 551,456 | 421,591 | 353,822 |
| Contingently redeemable common stock | — | 309,500 | 281,000 |
| Total stockholders' equity (deficit) | 1,150,278 | (284,730) | (232,028) |

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| (dollars in thousands) | 2021 | 2020 | 2020 | 2019 | 2018 |
| **Consolidated Statement of Cash Flows Data:** | | | | | |
| Cash flows from: | | | | | |
| Operating activities | $ (80,119) | $ (35,498) | $ (53,204) | $ (103,861) | $ (67,531) |
| Investing activities | (76,338) | (2,351) | $ 22,066 | $ (5,060) | $ (7,970) |
| Financing activities | 1,143,077 | 31,522 | $ 24,621 | $ 176,298 | $ 84,743 |

| | Six Months Ended June 30, | | Three Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | 2021 | 2020 | 2021 | 2020 | 2020 | 2019 | 2018 |
| **Other Financial Data:** | | | | | | | |
| Medical margin(1) | $ 107,253 | $ 114,293 | $ 55,195 | $ 72,132 | $ 192,393 | $ 63,192 | $ 53,943 |
| Network contribution(2) | 54,436 | 63,250 | 24,294 | 38,510 | 99,016 | 25,598 | 22,083 |
| Adjusted EBITDA(3) | 2,088 | 16,888 | (1,674) | 14,311 | 5,827 | (56,711) | (32,240) |

(1)   Medical margin represents medical services revenue after deducting medical services expense.

(2)   Network contribution is a non-GAAP financial measure. Network contribution represents medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Income (loss) from operations is the most directly comparable U.S. generally accepted accounting principles ("GAAP") measure to network contribution. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding network contribution and a reconciliation to income (loss) from operations.

(3)   Adjusted EBITDA is a non-GAAP financial measure. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding Adjusted EBITDA and a reconciliation to net income (loss).

21

Table of Contents

Index to Financial Statements

RISK FACTORS

*Risks Related to Our Business*

***We have a history of net losses, we anticipate increasing expenses in the future and we may not achieve or maintain profitability.***

We have incurred significant net losses in the past, including net losses (including discontinued operations) of $314.1 million for the six months ended June 30, 2021, $60.1 million for the year ended December 31, 2020, $282.7 million for the year ended December 31, 2019, and $146.5 million for the year ended December 31, 2018. As a result of these losses, we had accumulated deficits of $865.1 million as of June 30, 2021, $551.2 million as of December 31, 2020 and $491.1 million as of December 31, 2019. We expect that our expenses will increase substantially in the foreseeable future and our losses will continue, including for the year ended December 31, 2021, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

***Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As an immature and rapidly growing company, we may be unfamiliar with the

22

**Table of Contents**

**Index to Financial Statements**

regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business, financial condition, cash flows and results of operations could be harmed.

### *We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.*

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing upon these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, as a rapidly growing and relatively immature company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows and results of operations could be harmed.

### *Amounts of medical expenses which are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.*

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows and results of operations.

Additionally, factors which impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:

- Changes to the Medicare fee schedule or other rate schedules which serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

23

**APP 251**

Table of Contents

Index to Financial Statements

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;
- The utilization rates of healthcare services, including inpatient hospitalization, by our members;
- Changes to member benefit levels established annually by payors; and
- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows and results of operations.

***As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.***

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and ,therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or which are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

***We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.***

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As a result, as our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows and results of operations could be materially adversely affected.

24

Table of Contents

Index to Financial Statements

***We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.***

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. As of June 30, 2021, December 31, 2020 and December 31, 2019, our cash and cash equivalents were $1,109.4 million, $106.8 million and $123.6 million, respectively. On April 19, 2021, we completed our initial public offering and received net proceeds of approximately $1.2 billion, after underwriting discounts and commissions and other offering expenses. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced extreme volatility and disruption, which has increased due to the effects of COVID-19. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our Credit Facilities.

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable time, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

***Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows and results of operations.***

A significant reduction in membership could adversely affect our business, financial condition, cash flows and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:
- failure to obtain new physician partners or members or to retain existing physician partners or members;
- decision by a payor to not renew the existing contractual agreement upon termination of such contract;
- low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;
- alternative care opportunities that are more attractive than those provided by our physician partners;
- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;

25

**APP 253**

Table of Contents

Index to Financial Statements

- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;
- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and
- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

***The transition to a Total Care Model may be challenging for physician partners.***

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows and results of operations could be materially adversely affected.

***If the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies are inaccurate, our future growth rate may be impacted and we may generate losses in such markets, or we may fail to attain financial performance targets.***

We often do not have access to reliable historical data regarding the size, revenue or medical expense levels of our target geographies or potential physician partners. As a result, our market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size and expected growth of the market for our services and the estimates of our market opportunity may prove to be inaccurate.

Principal assumptions relating to our market opportunity include estimates of the total number and average length of relationships between MA patients and their physicians, historical MA patient growth rates, amount of revenue and medical expenses associated with MA members expected to be attributed to our physician partners and historical experience that physician partners have with a Total Care Model. Our opportunity is based on the assumption that our platform, partnership and network model will be more attractive to potential physician partners than competing options. However, potential physician partners may elect to pursue a different strategic option.

***The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19.***

COVID-19 continues to spread in the United States and throughout the world. COVID-19 and the efforts to contain the outbreak have led to significant economic disruption, including extreme volatility in financial markets, reduced economic activity and a sharp increase in unemployment claims, as well as disruption in some of our physician partners' businesses. The spread of COVID-19 underscores certain risks we face in our business described herein.

26

Table of Contents

Index to Financial Statements

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, increasing the potential for harm for our members. If the spread of COVID-19 is not contained, the medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to manage their existing clinical conditions, and the amount of medical care which has been deferred during the pandemic may exceed our expectations. Furthermore, we may experience reduced revenues as a result of changes to future capitation payment rates if Medicare members use fewer services due to COVID-19. For example, restrictions imposed as a result of COVID-19 may continue to decrease utilization of preventative or non-emergency healthcare, significantly decreasing provider costs. Should CMS adjust reimbursement rates based on margins during the pendency of COVID-19, our revenues in future periods and financial results may be materially adversely affected. Such measures and any further steps taken by us, or governmental action, to expand or otherwise modify the services delivered to our enrolled members, provide relief for the healthcare provider community, or in connection with the relaxation of stay-at-home and physical distancing orders and other restrictions on movement and economic activity intended to reduce the spread of COVID-19, including enhanced measures to implement widespread testing as a component of lifting these measures, could adversely impact our business, financial condition, cash flows and results of operations.

The spread of COVID-19, or actions taken to mitigate this spread, including the efficacy, ability to administer or extent of adoption of COVID-19 vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations. We have transitioned a significant subset of our employee population to a remote work environment in an effort to mitigate the spread of COVID-19, which could exacerbate certain risks to our business, including an increased demand for information technology resources, increased risk of phishing and other cybersecurity attacks as well as other risks to the privacy and confidentiality of data, and increased risk of unauthorized dissemination of sensitive personal information or proprietary or confidential information about us or our members or other third parties. We have taken, and may take, further actions that alter our business operations as may be required by local, state, or federal authorities or that we determine are in the best interests of our employees. Such measures could negatively affect our ability to provide care to members, relationship with physician partners, marketing efforts, employee productivity, or customer retention, any of which could harm our business, financial condition, cash flows and results of operations.

Further, due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient, based on each patient's documented clinical diagnoses activity in the preceding calendar year. Medicare requires that a patient's health issues be clinically assessed and sufficiently documented annually regardless of the permanence of the underlying clinical conditions. Historically, this clinical assessment and documentation was required to be completed during an in-person visit with a patient. As part of the Coronavirus Aid, Relief and Economic Security Act, or "CARES Act," Medicare is allowing documentation for conditions identified during video visits with patients. However, given the disruption caused by COVID-19, it is unclear whether our physician partners will be able to conduct patient interactions to clinically assess and accurately and sufficiently document the health conditions of our members, which could adversely impact our revenue in 2021 and beyond.

27

Table of Contents

Index to Financial Statements

In response to COVID-19, the United States Congress, CMS and other federal agencies with oversight of care delivery requirements made several changes to the manner in which Medicare will pay for telemedicine visits, many of which relax previous requirements, including site requirements for both providers and members, telemedicine modality requirements and others. State laws and regulations applicable to telemedicine, particularly licensure requirements, also were relaxed in many jurisdictions as a result of the COVID-19 pandemic. These relaxed regulations have allowed our physician partners to keep operating and deliver care to members predominantly through telemedicine modalities. Nearly all of the Federal measures will expire at the end of the Public Health Emergency declaration, which the Biden administration has indicated will last through the end of 2021. Many State law and regulatory changes have already expired while others have continued. It is unclear which, if any, of these changes will remain in place permanently and which will be rolled-back following the COVID-19 pandemic, although there have been a number of state law and regulatory changes over the past year that clarify requirements or remove impediments. If regulations change to restrict the ability to deliver care or receive reimbursement for care delivered through telemedicine modalities, our financial condition and results of operations may be adversely affected.

The rapid development and fluidity of this situation precludes any prediction as to the ultimate impact on us of COVID-19. We are continuing to monitor the spread of COVID-19, changes to our payors' benefit coverages, the ongoing costs and business impacts of dealing with COVID-19, including the potential costs associated with lifting restrictions on movement and economic activity and with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of the pandemic and its ultimate impact on us is uncertain as this continues to evolve globally, but such impacts could be material to our business, financial condition, cash flows and results of operations.

*Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.*

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services which have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

28

Table of Contents

Index to Financial Statements

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

### *Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.*

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows and results of operations to be harmed.

### *Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.*

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions which would adversely affect our business, financial condition, cash flows and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

### *We rely on our management team and key employees and our business, financial condition, cash flows and results of operations could be harmed if we are unable to retain qualified personnel.*

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. Prior to this offering, in order to retain and motivate valuable employees, in addition to salary and cash incentives, we provided stock options that either vest over time or are based on the equity return realized by our controlling stockholder. The value to employees of these stock options is significantly affected by movements in our stock price that are outside our control. The compensation and benefits we provide to our employees, together with the value of stock options that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all. Following the offering, we intend to continue to use equity awards as part of our executive compensation

29

Table of Contents

Index to Financial Statements

program, and volatility or lack of performance in our stock price may also affect our ability to attract any replacements or retain these employees.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows and results of operations will be harmed.

*We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.*

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. As of June 30, 2021, December 31, 2020 and December 31, 2019, respectively, we had $100.2 million, $102.0 million, and $112.7 million of net intangible assets, including $41.5 million of goodwill. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. A detailed discussion of our impairment testing is included in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates."

Due to the continued deterioration in the performance of our California reporting unit, in the fourth quarter of 2019, we initiated a process to evaluate strategic alternatives for our California operations, including a sale or abandonment of all or substantially all of such operations. We therefore performed an assessment of the long-lived assets in the California reporting unit for impairment and determined that the carrying value of certain of those assets was not recoverable. Accordingly, we wrote-down such assets to fair value, resulting in the recognition of a $98.3 million impairment charge included in discontinued operations in the audited consolidated statement of operations for the year ended December 31, 2019. See "Note 19. Discontinued Operations" in our consolidated financial statements included elsewhere in this prospectus.

Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows and results of operations.

*Adverse determinations of tax matters could adversely affect our business, financial condition, cash flows and results of operations.*

We are subject to tax laws in the various jurisdictions in which we operate, and the application of these laws to us may be unclear. Some interpretations adopted by us could be challenged by the relevant tax authorities. A successful challenge could result in adverse consequences for us, including potentially the payment of taxes, penalties or interest in amounts that may be material. See "Note 11. Commitments and Contingencies" and "Note 14. Income Taxes" in our audited consolidated financial statements for the year ended December 31, 2020 included elsewhere in this prospectus.

30

Table of Contents

Index to Financial Statements

*Security breaches, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.*

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as protected health information ("PHI") and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing.

We have experienced cybersecurity incidents in the past and may experience them in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

31

Table of Contents

Index to Financial Statements

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;
- communications failures;
- software and hardware errors, failures and crashes;
- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and
- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows and results of operations.

32

Table of Contents

Index to Financial Statements

***We could be required to devote significant attention and resources to the provision of certain transition services in connection with the disposition of our California Operations.***

In February 2021, we completed the divestiture of our California Operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes in our financial statements included elsewhere in this prospectus.

In connection with the divestiture, we have agreed to continue to provide administrative support and transition services for a specified period of time. The transition services to be provided by us could require significant management attention and resources which could negatively affect our ongoing business. Additionally, we could experience operational difficulties and increased costs that exceed our estimates to provide the transition services if we are unable to perform such services with our existing resources at an acceptable level, or at all, or obtain them from a third party on reasonable terms.

For the Southern California and Fresno divestiture transactions, we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus. We may not be successful in managing the risks associated with the divestiture of our California operations.

***Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.***

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Reliance on Third Parties

***We are economically dependent on maintaining our contracts with a limited number of key payors.***

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

33

Table of Contents

Index to Financial Statements

***Our contracts with our payors are for limited terms, and may not be renewed upon their expiration.***

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. For example, a group contract through which certain of our members in our Texas geography receive care was awarded to a new payor with whom we were not contracted at the time to attribute members for 2021. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.***

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively

34

**Table of Contents**

**Index to Financial Statements**

ingest the information which payors provide to us, we and our physician partners may not be able to effectively ensure our members disease burdens are identified and may not be able to effective operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows and results of operations could be adversely impacted.

***We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.***

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

***Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.***

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on

35

Table of Contents

Index to Financial Statements

providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

*We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.*

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

In recent years, the U.S. Department of Justice has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors for alleged upcoding or improper coding of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on

36

**Table of Contents**

**Index to Financial Statements**

medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for penalties to the government under the FCA that range from $11,803 to $23,607 (adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of

**APP 265**

Table of Contents

Index to Financial Statements

their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.

### Risks Related to Our Industry and Government Programs

#### Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally, consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows and results of operations.

#### Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows and results of operations.

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for approximately 100%, 99%, and 98% of our total revenues for the years ended December 31, 2020, 2019, and 2018, respectively. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. Additionally, we are participating in the Direct Contracting Model and our first performance period began on April 1, 2021. While the DCE's are not consolidated, they still have an impact on our profitability. The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

38

Table of Contents

Index to Financial Statements

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

The financial aspects of the Direct Contracting Model are set forth in an agreement between the DCE and CMS. CMS has the right to amend the agreement without the consent of the DCE for good cause or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules. We cannot predict whether CMS will amend such agreements and, if CMS amends such agreements, the impact such amendments may have on the financial aspects of our participation in the model, including, but not limited to, risk adjustment models used to set benchmarks, the rate book, capitation payment mechanisms and the calculation of shared savings and losses. Furthermore, changes to Medicare (including the Direct Contracting Model) or MA, such as if CMS were to scale back these programs or discontinue MA, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us. Additionally, on August 10, 2021, the U.S. Senate passed the bipartisan Infrastructure Investment and Jobs Act, a $1.2 trillion infrastructure package. Although the Senate-passed infrastructure bill has now been sent to the House, it is not expected to be voted on in the House until later this year; the House is not expected to vote on the infrastructure bill until the Senate also passes the $3.5 trillion budget reconciliation bill. If enacted, the two bills are anticipated to have consequences for the healthcare industry, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. The infrastructure and reconciliation bills are expected, for example, to expand Medicare coverage and lower the program's eligibility age, increase the Medicare Advantage coding intensity adjustment and subject Medicare payments to a 2% sequestration reduction through 2031.

***Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

***We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows and results of operations will be harmed.***

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care

39

Table of Contents

Index to Financial Statements

Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows and results of operations could be materially adversely affected.

***Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.***

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the Patient Protection and Affordable Care Act (the "ACA"), the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low quality rating for three consecutive years. Low quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations.

40

Table of Contents

Index to Financial Statements

***Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.***

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past and could in the future result in substantial reductions in our revenue and operating margins. For example, since the passage of the Sequestration Transparency Act of 2012, Medicare payments have been subject to a 2% sequestration reduction; these cuts were the result of a congressional deal to address the debt ceiling crisis. The CARES Act temporarily suspended the 2% sequestration payment adjustment on Medicare payments from May 1, 2020 through December 31, 2020, which was extended through December 31, 2021 by the Act to Prevent Across-the-Board Direct Spending Cuts, and for Other Purposes, signed on April 14, 2021. However, passage of the Infrastructure Investment and Jobs Act and budget reconciliation bill is expected to effectuate a mandatory sequestration reduction, through 2031. Further, the passage of the Improving Medicare Post-Acute Care Transformation ("IMPACT") Act imposes a stringent timeline for implementing benchmark quality measures and data metrics across post-acute care providers. CMS has promulgated, and may continue to promulgate, regulations to implement provisions of the IMPACT Act. The costs of implementation could be significant, particularly with respect to the design of a unified payment methodology for post-acute providers. Failure to meet implementation requirements could expose providers to payment reductions and penalties.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Passage of the Infrastructure Investment and Jobs Act and budget reconciliation bill is expected to expand traditional Medicare coverage, likely to vision, dental and hearing coverage, and lower the program's eligibility age; such changes may increase competition between traditional Medicare and MA, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and

41

Table of Contents

Index to Financial Statements

regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.*

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. We, in conjunction with some of our physician partners, began participating in the Direct Contracting Model in certain geographies on April 1, 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has been built upon CMS' experience with other programs, including MA and the Medicare Shared Savings Program, but also has new elements, such as a risk adjustment model developed specifically for use in the Direct Contracting Model. Likewise, the Direct Contracting Model rate book is based on the same methodology used for the MA rate book but has been modified in light of the characteristics of the Direct Contracting Model. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency. Further, the future of the Direct Contracting Model under the Biden administration is unclear. On March 1, 2021, the CMS Innovation Center announced that the Geographic Population-Based Payment ("Geographic PBP") model is under review and will no longer begin on January 1, 2022. On April 1, 2021, the CMS Innovation Center announced it would no longer be accepting applications from organizations interested in participating in the Global Professional Direct Contracting Model and will not solicit applications for a second round of participants to start the model on January 1, 2022 (subsequently, participation was opened to participants in the Next Generation ACO Model). The overall effect of these programmatic changes on the Direct Contracting Model is unknown.

Additionally, we are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations, including with respect to our contractual relationships with providers and payors.

### *We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.*

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by

42

Table of Contents

Index to Financial Statements

governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

*We have in the past, and may in the future, be subject to regulatory inquiries and CAPs imposed by our payors.*

We have in the past been, and may in the future be, subject to regulatory inquiries and corrective action plans ("CAPs") imposed by our payors, and the status of certain state regulatory and payor inquiries is uncertain. For example, in February 2018, our subsidiary, PPMC, self-disclosed to the California Department of Managed Health Care ("DMHC"), the California Department of Health Care Services, and our affected payors certain noncompliant practices in our claims and utilization management. We submitted various reports in May, June and August of 2018 and coordinated with the DMHC and certain of our payors to remediate noncompliant claims and utilization management practices and implement improvements through various CAPs. On December 17, 2019, we completed substantial remediation of all known deficiencies identified by the DMHC's audit findings. In February 2021, we divested all of our California operations. On March 9, 2021, we received a set of investigative interrogatories from the DMHC pursuant to its investigation of conduct and matters described in our various reports. The interrogatories sought information concerning certain claims data and authorizations denied due to lack of medical necessity, including information regarding the health plans affected thereby. We responded timely to such interrogatories and provided requested information. Any adverse review, audit or investigation could result in, among other things: refunding of amounts we have been paid pursuant to our contracts; or the imposition of fines, penalties and other sanctions on us, or certain of our payors. While we do not expect the amount to be material, we are unable to predict the potential dollar value of recoupments or fines, penalties or other sanctions that may be imposed on us or the impacted payors related to the DMHC's audit findings, if any. Per publicly available information, five out of the nine impacted payors have entered into letters of agreement with the DMHC whereby each of the payors have agreed to pay an administrative penalty related to the deficiencies. These penalties equal $122,500 in the aggregate. The DMHC has imposed an administrative penalty on at least one of the remaining impacted payors. At least one payor has formally sought indemnification from us in the amount of $80,000 for penalties related to the DMHC audit findings. We are unable to predict the potential dollar value of claims or demands that could be asserted in the future, if any. While we have divested all of our California operations as of February 2021, for the Southern California and Fresno divestiture transactions we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including any fines, penalties and other sanctions relating to the DMHC matter described above, the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus.

43

Table of Contents

Index to Financial Statements

Further, we may be audited by payors and regulatory bodies, and we have been required to engage in and respond to payor corrective action plans and regulatory inquiries in the past. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. As of June 30, 2021 and December 31, 2020, risk-bearing capital required across our geographies and payors totaled $57.8 million and $38.8 million, respectively. There is also a risk that such amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

### *Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.*

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

### *CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.*

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. For 2020 and 2019, respectively, 50% and 25% of our MA members' risk adjustment factor was calculated from claims data submitted through EDS. CMS increased that percentage to 75% in 2021 and will increase that percentage to 100% in 2022. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues. Our revenues could be further reduced by passage of the Infrastructure Investment and Jobs Act and budget reconciliation bill, which are expected to increase the MA coding intensity adjustment.

44

**APP 272**

Table of Contents

Index to Financial Statements

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:
- requiring us to change our platform and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;
- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or
- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

*Legal and Regulatory Risks*

***The healthcare industry is intensely regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our current conduct or even conduct that occurred a number of years ago, including prior to the acquisition of our subsidiary, PPMC, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law, or whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:
- Federal and state laws, and related regulations, including the False Claims Act and the Civil Monetary Penalties Law ("CMPL"), which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;
- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;
- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing designated health services ("DHS") if the physician (or his/her immediate family member) has a financial relationship with that entity;

45

**APP 273**

Table of Contents

Index to Financial Statements

- Provisions of, and regulations enacted pursuant to, HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act") and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;
- Provisions of, and regulations enacted pursuant to, the 21st Century Cures Act, regarding interoperability and prohibitions against information blocking;
- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;
- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;
- State laws that govern the activities of third-party administrators and utilization review agents; and
- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters."

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been and may be a party to various lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:
- suspension or termination of our participation in federal healthcare programs;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;
- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;
- enforcement actions by governmental agencies or monetary penalties for violations of the 21st Century Cures Act;
- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;
- mandated changes to our practices or procedures that materially increase operating expenses;
- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;

46

**APP 274**

Table of Contents

Index to Financial Statements

- termination of various relationships or contracts related to our business; and
- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

***The healthcare industry is subject to antitrust scrutiny, and if it is found that we violate antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

The healthcare industry is subject to antitrust scrutiny. The federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. The Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice ("DOJ") and state Attorneys General actively review and, in some cases, take enforcement action against business conduct and acquisitions in the healthcare industry. Private parties harmed by alleged anti-competitive conduct can also bring antitrust suits. Violations of antitrust laws may be punishable by substantial penalties, including significant monetary fines and treble damages, civil penalties, criminal sanctions and consent decrees and injunctions prohibiting certain activities or requiring divestiture or discontinuance of business operations. If antitrust enforcement authorities conclude that we violate any antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting the U.S. healthcare reform, our business may be harmed.***

Due to the importance of the healthcare industry in the lives of all Americans, federal, state and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect the healthcare industry. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. We cannot predict the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect our business or could change the operating environment of our primary care centers. It is also possible that the changes to federal healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in federal healthcare programs, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

There can be no assurance that we will be able to successfully address changes in the current regulatory environment. Some of the healthcare laws and regulations applicable to us are subject to limited or evolving

47

**APP 275**

Table of Contents

Index to Financial Statements

interpretations, and a review of our business or operations by a court, law enforcement or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

*If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.*

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to (i) increase the quality of care while appropriately managing overall costs and (ii) participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law."

The laws and regulations, however, are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows and results of operations.

*Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.*

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms, but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. In addition, through our participation in the CMS Innovation Center Direct Contracting Model, we (either as a DCE or as a service provider to our physician partners who are participating in the model) must comply with provisions in the participation agreements with CMS regarding marketing and outreach

48

Table of Contents

Index to Financial Statements

activities. For example, DCEs must have their plans for marketing activities approved by CMS and are prohibited from engaging in some forms of marketing activities such as door-to-door solicitation. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute." Our physician partners and the payors with which we contract risk running afoul of applicable state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (*e.g.*, the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Our business development and member engagement activities may implicate the federal Telephone Consumer Protection Act ("TCPA"), related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws." A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's protected health information in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

### *Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.*

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters." Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory

49

Table of Contents

Index to Financial Statements

Matters—Other Laws and Regulations." If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

***Our use, disclosure and processing of personally identifiable information, protected health information and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security

50

Table of Contents

Index to Financial Statements

breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be directly liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time to time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows and results of operations.

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. For example, we note that in 2019, the Office for Civil Rights (OCR) announced the creation of its Right of Access Initiative, intended to support individuals' right of timely access to their health records. Since the creation of the Right of Access Initiative, there has been substantial enforcement activity related to covered entities' alleged failures to provide individuals with timely access to their health records. To the extent the physician partners' non-compliance impacts members who are attributed to our RBEs (*e.g.*, through the loss of protected health information or failure to provide timely access to health records), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows and results of operations.

*Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.*

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws." We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

51

Table of Contents

Index to Financial Statements

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.***

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a lay entity may violate the corporate practice of medicine doctrine. See "Business—Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine." A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.***

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person which could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

52

Table of Contents

Index to Financial Statements

***We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows and results of operations.***

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation, and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

***Risks Related to Our Indebtedness***

***We have substantial indebtedness and may incur additional indebtedness, which could adversely affect our financial health and our ability to obtain financing in the future, react to changes in our business or satisfy our obligations.***

As of December 31, 2020 we, through our wholly-owned subsidiary agilon health management, inc., had approximately $68.6 million of total long-term consolidated indebtedness outstanding under our secured credit agreement, dated as of July 1, 2016 (as amended from time to time, the "Secured Credit Agreement") governing the term loan and revolving credit facility (the "Secured Credit Facility"), and our unsecured credit agreement, dated as of December 22, 2017 (the "Unsecured Credit Agreement"), governing our unsecured term loan facility

53

Table of Contents

Index to Financial Statements

(the "Unsecured Term Loan Facility" and, together with the Secured Credit Facility, the "Credit Facilities"). As of such date, we also had $41.5 million of additional borrowings available under our revolving credit facility after taking into account $18.5 million of letters of credit outstanding. On February 18, 2021, we, through our wholly-owned subsidiary agilon health management, inc., entered into the credit agreement, dated as of February 18, 2021 (the "2021 Credit Agreement") governing our term loan and revolving credit facility (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "2021 Secured Credit Facilities") by and among agilon health management, inc., Agilon Health Intermediate Holdings, Inc. ("Intermediate Holdings"), the Lenders party thereto, the Issuers party thereto (each as defined therein), JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and JPMorgan Chase Bank, N.A. Bank of America, N.A., Wells Fargo Securities, LLC, Deutsche Bank Securities Inc. and Nomura Securities International, Inc., as joint lead arrangers and joint bookrunners to refinance our outstanding indebtedness under the Credit Facilities, consisting of (i) a senior secured term loan facility in an aggregate principal amount of $100.0 million and (ii) a senior secured revolving credit facility in an aggregate principal amount of $100.0 million. In connection with our IPO, on April 26, 2021 we made a mandatory prepayment of $50.0 million of the 2021 Secured Term Loan Facility as a result of the gross proceeds from the IPO exceeding $1.0 billion. Following the mandatory prepayment, we had $50.0 million outstanding under our Secured Term Loan Facility.

See "Description of Certain Indebtedness." In addition, we may incur additional indebtedness in the future, subject to the limitations contained in the agreements governing our indebtedness. Our substantial indebtedness could have important consequences to you. Because of our substantial indebtedness:

- our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements, pay dividends and make other distributions or to purchase, redeem or retire capital stock or for general corporate purposes and our ability to satisfy our obligations with respect to our indebtedness may be impaired in the future;
- a large portion of our cash flow from operations must be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available to us for other purposes;
- we are exposed to the risk of increased interest rates because a significant portion of our borrowings are at variable rates of interest;
- it may be more difficult for us to satisfy our obligations to our creditors, resulting in possible defaults on, and acceleration of, such indebtedness;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be at a competitive disadvantage compared to our competitors with proportionately less indebtedness or with comparable indebtedness on more favorable terms and, as a result, they may be better positioned to withstand economic downturns;
- our ability to refinance indebtedness may be limited or the associated costs may increase;
- our flexibility to adjust to changing market conditions and ability to withstand competitive pressures could be limited;
- our ability to pay dividends and make other distributions or to purchase, redeem or retire capital stock may be limited; and
- we may be prevented from carrying out capital spending and restructurings that are necessary or important to our growth strategy and efforts to improve our operating margins.

***Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the 2021 Credit Agreement do not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in

54

APP 282

Table of Contents

Index to Financial Statements

compliance with certain coverage ratios set forth in the agreements governing the 2021 Secured Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the 2021 Secured Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

*Increases in interest rates would increase the cost of servicing our indebtedness and could reduce our profitability.*

A significant portion of our outstanding indebtedness bears interest at variable rates, including $48.6 million of outstanding borrowings and $41.5 million of additional borrowings available under our Secured Credit Facility after taking into account $18.5 million of letters of credit outstanding, as of December 31, 2020. As adjusted for the entry into the 2021 Credit Facilities, as of June 30, 2021, we had $50.0 million of outstanding borrowings and $64.4 million of additional borrowings available under the 2021 Credit Facilities, after taking into account outstanding letters of credit totaling $35.6 million, of which $14.0 million is related to DCEs. As a result, increases in interest rates would increase the cost of servicing our indebtedness and could materially and adversely affect our business, financial condition, cash flows and results of operations. As of December 31, 2020, assuming the London Interbank Offered Rate ("LIBOR") exceeded 1.00%, each one percentage point change in interest rates would have resulted in a change of approximately $0.5 million in the annual interest expense on our Secured Credit Facility. As of December 31, 2020, assuming availability was fully utilized, each one percentage point change in interest rates would have resulted in a change of approximately $1.1 million in annual interest expense on the Secured Credit Facility. The impact of increases in interest rates could be more significant for us than it would be for some other companies because of our indebtedness, thereby affecting our profitability.

Furthermore, uncertainty about the continuing availability of LIBOR may adversely affect our business, financial condition, cash flows and results of operations. On July 27, 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that after December 31, 2021, it would no longer compel banks to submit the rates required to calculate LIBOR. On March 5, 2021, the current administrator of LIBOR, ICE Benchmark Administration, announced that it would cease publication of certain tenors of U.S. dollar LIBOR on June 30, 2023. With this announcement, there is uncertainty about the continued availability of LIBOR after 2021 or, in certain circumstances, 2023. If LIBOR ceases to be available or the methods of calculating LIBOR change from the current methods, financial products with interest rates tied to LIBOR may be adversely affected. Even if LIBOR remains available, it is uncertain whether it will continue to be viewed as an acceptable market benchmark, what rate or rates may become accepted alternatives to LIBOR or what the effect of any such changes in views or alternatives may be on the markets for LIBOR-indexed financial instruments. As of December 31, 2020, adjusted to reflect the entry into the 2021 Secured Credit Facilities, all of our aggregate consolidated indebtedness was indexed to LIBOR. If any of the foregoing were to occur, the interest rates on such indebtedness may be adversely affected.

*The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.*

Our 2021 Secured Credit Facilities contain covenants that, among other things, restrict the ability of agilon management and its subsidiaries to:
- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;

55

**APP 283**

Table of Contents

Index to Financial Statements

- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and
- enter into lines of business.

agilon management and its subsidiaries accounted for 100% of our total assets and 100% of our total liabilities as of December 31, 2020. Consequently, the restrictions in the 2021 Secured Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the 2021 Secured Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the 2021 Secured Credit Facilities, could proceed against the collateral securing the indebtedness. All obligations under the 2021 Secured Credit Facilities are guaranteed by Intermediate Holdings and each domestic subsidiary of agilon management other than certain excluded subsidiaries. All obligations of agilon management and each guarantor are secured by a perfected security interest in substantially all tangible and intangible assets of agilon management and each such guarantor, including the capital stock of each domestic subsidiary of agilon management and each such guarantor, and 65% of each series of capital stock of any non U.S. subsidiary held directly by agilon management or any guarantor, subject to certain exceptions. In any such case, we may be unable to borrow under the 2021 Secured Credit Facilities and may not be able to repay the amounts due under such facilities. This could materially and adversely affect our business, financial condition, cash flows and results of operations, and could cause us to become bankrupt or insolvent.

***Our ability to generate the significant amount of cash needed to pay interest and principal on our indebtedness and our ability to refinance all or a portion of our indebtedness or obtain additional financing depends on many factors outside our control.***

agilon management, the borrower under the 2021 Secured Credit Facilities, is a holding company, and as such it has no independent operations or material assets other than ownership of equity interests in its subsidiaries. agilon management depends on its subsidiaries to distribute funds to it so that it may pay obligations and expenses, including satisfying obligations with respect to indebtedness. Our ability to make scheduled payments on, or to refinance our obligations under, our indebtedness depends on the financial and operating performance of the subsidiaries of agilon management and their ability to make distributions and dividends to it, which, in turn, depends on their results of operations, cash flows, cash requirements, financial position and general business conditions and any legal and regulatory restrictions on the payment of dividends to which they may be subject, many of which could be outside our control.

We may be unable to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness. If our cash flow and capital resources are insufficient to fund our

56

**APP 284**

Table of Contents

Index to Financial Statements

debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek to obtain additional equity capital or restructure our indebtedness. In the future, our cash flow and capital resources may not be sufficient for payments of interest on and principal of our indebtedness, and such alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations.

The final maturity date of the 2021 Secured Term Loan Facility and the 2021 Secured Revolving Facility is February 18, 2026. We may be unable to refinance any of our indebtedness or obtain additional financing, particularly because of our substantial indebtedness. Market disruptions, such as those experienced in 2008, 2009 and March 2020, as well as our indebtedness levels, may increase our cost of borrowing or adversely affect our ability to refinance our obligations as they become due. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all. If we are unable to refinance our indebtedness or access additional credit, or if short-term or long-term borrowing costs dramatically increase, our ability to finance current operations and meet our short-term and long-term obligations could be adversely affected.

If agilon management cannot make scheduled payments on its indebtedness, it will be in default and the lenders under the 2021 Secured Credit Facilities could terminate their commitments to loan money or, in the case of lenders under the 2021 Secured Credit Facilities, foreclose against the assets securing their borrowings, and we could be forced into bankruptcy or liquidation. Any of these actions could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Common Stock and This Offering

#### agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. See "Management's Discussion and Analysis of Financial Condition and Results of Operations." To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography and ranged from $50,000 to $10.0 million, or $38.8 million to $57.8 million in the aggregate across all of our geographies and payors, as of December 31, 2020 and June 30, 2021, respectively. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

57

Table of Contents

Index to Financial Statements

***The market price of our common stock may be volatile and could decline after this offering.***

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. The market price of our common stock may fluctuate significantly. Among the factors that could affect our stock price are:

- industry, regulatory or general market conditions;
- domestic and international economic factors unrelated to our performance;
- changes in our physician partners' or their patients' preferences;
- new regulatory pronouncements and changes in regulatory guidelines;
- lawsuits, enforcement actions and other claims by third parties or governmental authorities;
- actual or anticipated fluctuations in our quarterly operating results;
- lack of research coverage and reports by industry analysts or changes in any securities analysts' estimates of our financial performance;
- action by institutional stockholders or other large stockholders, including future sales of our common stock;
- failure to meet any guidance given by us or any change in any guidance given by us, or changes by us in our guidance practices;
- announcements by us of significant impairment charges;
- speculation in the press or investment community;
- investor perception of us and our industry;
- changes in market valuations or earnings of similar companies;
- the impact of short selling or the impact of a potential "short squeeze" resulting from a sudden increase in demand for our common stock;
- announcements by us or our competitors of significant contracts, acquisitions, dispositions or strategic partnerships;
- war, terrorist acts and epidemic disease, including COVID-19;
- any future sales of our common stock or other securities;
- additions or departures of key personnel; and
- misconduct or other improper actions of our employees.

In particular, we cannot assure you that you will be able to resell your shares at or above the public offering price. Stock markets have experienced extreme volatility in recent years that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against the affected company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***An active, liquid trading market for our common stock may not be sustained.***

Although our common stock is currently listed on the NYSE under the symbol "AGL," an active trading market for our shares may not be sustained. Accordingly, if an active trading market for our common stock is not maintained, the liquidity of our common stock, your ability to sell your shares of our common stock when desired and the prices that you may obtain for your shares of common stock will be adversely affected.

58

**APP 286**

Table of Contents

Index to Financial Statements

*Future sales of shares by us or our existing stockholders could cause our stock price to decline.*

Sales of substantial amounts of our common stock in the public market following this offering, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

As of June 30, 2021, adjusted to give effect to this offering, we had 391,221,574 outstanding shares of common stock. Of these shares, all of the 53,590,000 shares sold in our IPO are, and the 17,000,000 shares to be sold in this offering will be, immediately tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any shares held by "affiliates," as that term is defined in Rule 144 under the Securities Act ("Rule 144"). On April 14, 2021, we filed a registration statement on Form S-8 under the Securities Act to register the shares of common stock to be issued under our equity compensation plans and, as a result, all shares of common stock acquired upon exercise of stock options granted under our plan will also be freely tradable under the Securities Act, subject to the terms of the lock-up agreements, unless purchased by our affiliates. As of June 30, 2021, there were stock options outstanding to purchase a total of 41,197,388 shares of our common stock, of which 30,634,736 options will be exercisable as of the consummation of this offering, including after taking into account the satisfaction of performance conditions applicable to certain options as a result of this offering. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates—Stock-based Compensation" for additional information.

The remaining 320,631,574 shares of common stock outstanding as of June 30, 2021 are restricted securities within the meaning of Rule 144 under the Securities Act, but will be eligible for resale subject to applicable volume, means of sale, holding period and other limitations of Rule 144 under the Securities Act or pursuant to an exemption from registration under Rule 701 under the Securities Act, or "Rule 701," subject to the lock-up agreements to be entered into by us, the CD&R Investor, certain of our stockholders and our executive officers and directors.

In connection with our IPO, the CD&R Investor, certain of our stockholders and our executive officers and directors entered into lock-up agreements for a period of 180 days after the date of the prospectus for our IPO. In connection with this offering, J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters in our IPO, have agreed to waive the prior lock-up agreements with respect to up to 17,000,000 shares (or up to 19,550,000 shares including the underwriters' option to purchase additional shares) of our common stock for the sale by the selling stockholders in this offering, which includes shares beneficially owned by certain of our officers and directors, provided that the waiver is limited to the shares actually sold in this offering. Additionally, in connection with this offering, the CD&R Investor, certain of our stockholders, including certain of the selling stockholders, and our executive officers and directors have entered into lock-up agreements under which we and they have agreed not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 90 days after the date of this prospectus. See "Underwriting." Following the expiration of this 90-day lock-up period, 320,631,574 shares of our common stock will be eligible for future sale, subject to the applicable volume, manner of sale, holding period and other limitations of Rule 144 or pursuant to an exemption from registration under Rule 701. See "Shares Available for Future Sale" for a discussion of the shares of common stock that may be sold into the public market in the future. In addition, our significant stockholders may distribute shares that they hold to their investors who themselves may then sell into the public market following the expiration of the lock-up period. Such sales may not be subject to the volume, manner of sale, holding period and other limitations of Rule 144. Furthermore, the CD&R Investor and other significant stockholders have the right to require us to register shares of common stock for resale in certain circumstances. As resale restrictions end, the market price of our common stock could decline if the holders of those shares sell them or are perceived by the market as intending to sell them.

59

**APP 287**

Table of Contents

Index to Financial Statements

In the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

***If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for our common stock depends in part on the research and reports that securities or industry analysts may publish about us or our business. If one or more of the analysts that covers our common stock downgrades our stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of the analysts ceases coverage of our common stock or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our common stock price or trading volume to decline.

***Fulfilling our obligations incident to being a public company, including compliance with the Exchange Act and the requirements of the Sarbanes-Oxley Act and the Dodd-Frank Act, will be expensive and time-consuming, and any delays or difficulties in satisfying these obligations could have a material adverse effect on our future results of operations and our stock price.***

In connection with the completion of our IPO on April 19, 2021, we became a public company. As a public company, we are subject to the reporting, accounting and corporate governance requirements of the NYSE, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Sarbanes-Oxley Act and Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") that apply to issuers of listed equity, which impose certain significant compliance requirements, costs and obligations upon us. The changes necessitated by being a publicly listed company and ongoing compliance with these rules and regulations require a significant commitment of additional resources and management oversight, which increases our operating costs and could divert our management and personnel from other business concerns, particularly since we are no longer an emerging growth company. Further, to continue to comply with the requirements of being a public company, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring additional accounting or internal audit staff.

The Sarbanes-Oxley Act requires us, among other things, to maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

In addition, our internal resources and personnel may in the future be insufficient to avoid accounting errors, and our auditors may identify deficiencies, significant deficiencies or material weaknesses in our internal control environment in the future. Any failure to develop or maintain effective controls or any difficulties encountered implementing required new or improved controls could harm our operating results or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the U.S. Securities and Exchange Commission (the "SEC"). Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE. As a public company, we are required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore required to make a

60

APP 288

Table of Contents

Index to Financial Statements

formal assessment of the effectiveness of our internal control over financial reporting for that purpose, but we are not required to provide an annual management report on the effectiveness of our internal control over financial reporting until our second Annual Report on Form 10-K. Our independent registered public accounting firm has identified material weaknesses in the past, and the measures we implemented to remediate such weaknesses may be insufficient to identify or prevent material weaknesses in the future. These material weaknesses have been remediated. However, the measures we implemented may be insufficient to identify or prevent future material weaknesses.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until we cease to be an emerging growth company or a non-accelerated filer. We ceased to be an emerging growth company on December 31, 2020, and we do not expect to be a non-accelerated filer beginning as of December 31, 2022. As such, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting in our 2022 Annual Report on Form 10-K. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business, financial condition, cash flows and results of operations.

The expenses associated with being a public company include increases in auditing, accounting and legal fees and expenses, investor relations expenses, increased directors' fees and director and officer liability insurance costs, registrar and transfer agent fees and listing fees, as well as other expenses. As a public company, we are required, among other things, to define and expand the roles and the duties of our board of directors and its committees and institute more comprehensive compliance and investor relations functions. Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage us as a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, cash flows and results of operation. Failure to comply with the requirements of being a public company could potentially subject us to sanctions or investigations by the SEC or other regulatory authorities.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us, and there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

***Following the completion of this offering, the CD&R Investor will continue to control us and may have conflicts of interest with other stockholders.***

Following the completion of this offering, the CD&R Investor will own approximately 53.3% of the outstanding shares of our common stock (or approximately 52.6% if the underwriters exercise in full their option to purchase additional shares). As a result, the CD&R Investor will have sufficient voting power without the consent of our other stockholders to be able to control all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which could reduce the market price of our common stock.

Because the CD&R Investor's interests may differ from your interests, actions the CD&R Investor takes as our controlling stockholder may not be favorable to you. For example, the concentration of ownership held by the

61

Table of Contents

Index to Financial Statements

CD&R Investor could delay, defer or prevent a change of control of us, impede a merger, takeover or other business combination that another stockholder may otherwise view favorably or cause us to enter into transactions or agreements that are not in the best interests of all stockholders. Other potential conflicts could arise, for example, over matters such as employee retention or recruiting, or our dividend policy.

Furthermore, as long as the CD&R Investor continues to beneficially own at least 40% of our outstanding common stock, the CD&R Investor will be able to determine the outcome of corporate actions requiring stockholder approval, including the election of the members of our board of directors and the approval of significant corporate transactions, such as mergers and the sale of substantially all of our assets. Even after the CD&R Investor reduces its beneficial ownership below 40% of our outstanding common stock, it will likely still be able to assert significant influence over our board of directors and certain corporate actions. Following the completion of this offering, the CD&R Investor will continue to have the right to designate for nomination for election at least a majority of our directors as long as the CD&R Investor beneficially owns at least 50% of our common stock and to designate our Chairman of the board of directors so long as it beneficially owns at least 25% of our common stock.

***Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities.***

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation address potential conflicts of interest between agilon health, on the one hand, and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

***Future offerings of debt or equity securities which would rank senior to our common stock may adversely affect the market price of our common stock.***

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Issuing additional shares of our common stock or other equity securities or securities convertible into equity may dilute the economic and voting rights of our stockholders or reduce the market price of our common stock. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock and may result in dilution to owners of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors outside our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings, reducing the market price of our common stock or diluting the value of their stock holdings in us.

***Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.***

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:
- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;

APP 290

Table of Contents

Index to Financial Statements

- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;
- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;
- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- opt out of Section 203 of the DGCL, which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;
- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and
- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future. See "Description of Capital Stock—Anti-Takeover Effects of Our Certificate of Incorporation and By-Laws."

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor will continue to own following this offering, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We could be the subject of securities class action litigation due to future stock price volatility, which could divert management's attention and materially and adversely affect our business, financial condition, cash flows and results of operations.***

The stock market in general, and market prices for the securities of companies like ours in particular, have from time to time experienced volatility that often has been unrelated to the operating performance of the underlying companies. A certain degree of stock price volatility can be attributed to being a newly public company. These broad market and industry fluctuations may adversely affect the market price of our common stock, regardless of our operating performance. In certain situations in which the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders were to bring a similar lawsuit against us, the defense and disposition of the lawsuit could be costly and divert the time and attention of our management and could materially and adversely affect our business, financial condition, cash flows and results of operations.

63

**Table of Contents**

**Index to Financial Statements**

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***We expect to continue to be a "controlled company" within the meaning of rules and, as a result, we will qualify for, and currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

After the completion of this offering, the CD&R Investor will continue to control a majority of the voting power of our outstanding common stock. Accordingly, we expect to continue to be a "controlled company" within the meaning of corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including:

- the requirement that a majority of the board of directors consist of independent directors;
- the requirement that our Nominating and Governance Committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
- the requirement that we have a Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
- the requirement for an annual performance evaluation of the Nominating and Governance and Compensation Committees.

Following this offering, we intend to continue to utilize these exemptions. As a result, we do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations. Consequently, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance rules and requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

64

**Table of Contents**

**Index to Financial Statements**

***At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of the NYSE corporate governance standards. The NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualify as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualify as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the Delaware General Corporation Law (the "DGCL"), or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows and results of operations.

65

Table of Contents

Index to Financial Statements

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION**

This prospectus contains forward-looking statements and cautionary statements. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this prospectus and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this prospectus. In addition, even if our results of operations, financial condition and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this prospectus, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives;
- our ability to execute our operation strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with MA payors or to secure MA at favorable financial terms;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;

66

APP 294

Table of Contents

Index to Financial Statements

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new RBEs within certain geographies in the future;
- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;
- our ability to retain our management team and key employees or attract qualified personnel in the future;
- our ability to realize the full value of our intangible assets and any impairment charges we have or may record;
- adverse determinations of tax matters;
- security breaches, loss of data or other disruptions to our data platforms;
- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations;
- our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses;
- our dependence on a limited number of key payors;
- the limited terms of our contracts with payors and that they may not be renewed upon their expiration;
- our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment;
- our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- difficulties in obtaining accurate and complete diagnosis data;
- our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- our reliance on third-party software and data to operate our business and provide services to our members and physician partners;
- the impact of consolidation in the healthcare industry;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;
- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;
- our ability to compete in our competitive industry;
- the impact of government performance standards and benchmarks on our compensation and reputation;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements;

67

**APP 295**

**Table of Contents**

**Index to Financial Statements**

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;
- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;
- regulatory inquiries and corrective action plans imposed by our payors;
- repayment obligations arising out of payor audits;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- negative publicity regarding the managed healthcare industry;
- the extensive regulation of the healthcare industry at the federal, state and local levels;
- our substantial indebtedness and the potential that we may incur additional indebtedness;
- our ability to sustain an active, liquid trading market for our common stock;
- the significant influence the CD&R Investor has over us; and
- risks related to other factors discussed under "Risk Factors" in this prospectus.

You should read this prospectus completely and with the understanding that actual future results may be materially different from expectations. All forward-looking statements made in this prospectus are qualified by these cautionary statements. These forward-looking statements are made only as of the date of this prospectus, and we do not undertake any obligation, other than as may be required by law, to update or revise any forward-looking or cautionary statements to reflect changes in assumptions, the occurrence of events, unanticipated or otherwise, and changes in future operating results over time or otherwise.

**APP 296**

**Table of Contents**

**Index to Financial Statements**

we may provide capital support to accelerate the recruitment of new PCPs to our anchor partners. Accordingly, in the short term, we expect our operating expenses to increase. However, in the long term, we anticipate that these investments will positively impact our results of operations.

*Impact of Seasonality*

Our business is influenced by seasonality in the following primary manners:

- Growth in New Membership—While new members are attributed to our platform throughout the year, our largest amount of growth typically occurs in January of each year. Operations in our new geographies generally begin on January 1, at which time our MA payors attribute members from our new physician partners to our platform as our agreements with those payors in those geographies become effective. This coincides with the beginning of the Medicare program year. Similarly, our same market growth within a given year is typically greatest in January, as a result of the outcome of the Medicare Open Enrollment Period (sometimes called Annual Election Period or AEP), which runs each year from October 15 to December 7.
- Per Member Revenue—Our revenue is a function of the percent of premium we have negotiated with our payors as well as our ability to accurately and appropriately document the acuity of a member's total health status. We experience an element of seasonality with respect to our average per member revenue as it generally declines over the course of a given year. This results from the monthly cycle of (i) attributed members aging into Medicare, who typically have lower acuity profiles (and, therefore, lower average per member revenue rates) and (ii) older members with more severe acuity profiles (and, therefore, higher per member revenue rates) expiring. Additionally, in January of each year, CMS resets county-level benchmark rates, the risk adjustment factor for each member based upon health conditions documented in the prior year, and other components of premium revenue. The collective impact of these revisions has historically led to an increase in our average per member revenue.
- Medical Expense—Medical expense is driven by utilization of healthcare services by attributed membership. There are seasonal factors that can influence healthcare utilization, such as the flu season or the number of calendar or working days in a given period.

**Impact of COVID-19**

Since March 2020, we have implemented precautionary measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. Because COVID-19 infections have been reported throughout the United States, certain national, provincial, state and local governmental authorities have issued proclamations and/or directives aimed at minimizing the spread of COVID-19. Additional, more restrictive proclamations and/or directives may be issued in the future.

The ultimate impact of the COVID-19 pandemic on our operations is unknown and will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the COVID-19 outbreak, new information which may emerge concerning the severity of the COVID-19 pandemic and any additional preventative and protective actions that governments, or we, may direct, which may result in an extended period of continued business disruption. The ultimate impact of these matters to us and our financial condition cannot be reasonably estimated at this time.

Throughout most of 2020, our members incurred lower healthcare costs than otherwise would have been expected, which resulted in lower medical services expenses incurred. Average medical services expense per member declined 3% relative to 2019. This reduction was impacted by the temporary deferral of non-essential care amid the COVID-19 pandemic and improved medical cost management, among other factors. These costs may be incurred at future points in time, and it is possible that the deferral of healthcare services, or the impact of our members (who are seniors typically with chronic conditions) being diagnosed with COVID-19, could cause additional health problems in our existing members, which could increase our costs in the future. We cannot accurately estimate the net ultimate impact, positive or negative, to medical services expense at this time.

81

Table of Contents

Index to Financial Statements

Given the disruption caused by COVID-19, it is unclear whether our physicians will be able to document the health conditions of our members as comprehensively as they did in historical periods. Because risk adjustment factors in the current period are based on the preceding year's diagnosed disease conditions, our revenue in future periods may be adversely impacted.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") was enacted to provide economic relief to individuals and businesses facing economic hardship as a result of the COVID-19 public health emergency. The CARES Act includes, among other things, provisions relating to payroll tax credits and deferrals, net operating loss carryback periods, alternative minimum tax credits refunds, modifications to the net interest deduction limitations and technical corrections to tax depreciation methods for qualified improvement property. The changes in tax law did not have a material impact on our results of operations for the year ended December 31, 2020 or the three or six months ended June 30, 2021. We will continue to monitor possible future impacts of changes in tax legislation.

See "Risk Factors—Risks Related to Our Business—The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19."

### Key Financial and Operating Metrics

*All of our key metrics exclude historical results from our California operations, which are included as discontinued operations in our consolidated financial statements. See "—California Operations."*

We monitor the following key financial and operating metrics to help us evaluate our business, identify trends affecting our business, formulate business plans and make strategic decisions. We believe the following key metrics are useful in evaluating our business (dollars in thousands):

| | As of and For the Three Months Ended June 30, | | | As of and For the Six Months Ended June 30, | | As of and for the Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | % Change | 2021 | 2020 | 2020 | 2019 | 2018 |
| MA members | 181,700 | 125,400 | 45% | 181,700 | 125,400 | 131,000 | 90,200 | 56,500 |
| Medical services revenue | $ 497,678 | $ 292,495 | 70% | $ 910,090 | $ 582,309 | $1,214,270 | $788,566 | $466,612 |
| Medical margin | $ 55,195 | $ 72,132 | (23)% | $ 107,253 | $ 114,293 | $ 192,393 | $ 63,192 | $ 53,943 |
| Platform support costs | $ 30,667 | $ 25,223 | 22% | $ 59,075 | $ 48,743 | $ 99,943 | $ 89,266 | $ 62,739 |
| Network contribution(1) | $ 24,294 | $ 38,510 | (37)% | $ 54,436 | $ 63,250 | $ 99,016 | $ 25,598 | $ 22,083 |
| Adjusted EBITDA(1) | $ (1,674) | $ 14,311 | (112)% | $ 2,088 | $ 16,888 | $ 5,827 | $ (56,711) | $(32,240) |

(1)   Network contribution and Adjusted EBITDA are non-GAAP financial measures. See "—Non-GAAP Financial Measures" for additional information, including reconciliations to the most directly comparable GAAP measures.

### Medicare Advantage Members

Our MA members include all individuals enrolled in an MA plan that are attributed to the PCPs on our platform at the end of a given period.

### Medical Services Revenue

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to PMPM fees to provide a defined range of healthcare services

82

**APP 298**

**Table of Contents**

**Index to Financial Statements**

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table sets forth information as of August 31, 2021 with respect to the ownership of our common stock by:

- the selling stockholders and each person known to own beneficially more than five percent of our common stock;
- each of our directors;
- each of our named executive officers; and
- all of our current executive officers and directors as a group.

The amounts and percentages of shares beneficially owned are reported on the basis of regulations of the SEC governing the determination of beneficial ownership of securities. Under SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest.

Percentage computations are based on approximately 390,882,560 shares of our common stock outstanding as of August 31, 2021, and 391,085,516 shares outstanding following the completion of this offering.

Except as otherwise indicated in the footnotes to the table, each of the beneficial owners listed has, to our knowledge, sole voting and investment power with respect to the indicated shares of common stock. Unless otherwise set forth in the footnotes to the table, the address for each listed stockholder is 1 World Trade Center, Suite 2000, Long Beach, CA 90831.

| Name and Address of Beneficial Owner | Shares Beneficially Owned Before the Offering and After the Offering Assuming the Underwriters' Option Is Not Exercised(1) | | | | | Shares Beneficially Owned After the Offering Assuming the Underwriters' Option Is Exercised in Full | | |
|---|---|---|---|---|---|---|---|---|
| | Number of Shares Owned Before the Offering | Percent of Class Before the Offering (%) | Shares Offered by Selling Stockholder | Number of Shares Owned After the Offering | Percent of Class After the Offering (%) | Shares Offered by Selling Stockholder | Number of Shares Owned After the Offering | Percent of Class After the Offering (%) |
| **5% Stockholders** | | | | | | | | |
| CD&R Vector Holdings, L.P.(2)(3) | 224,718,177 | 57.5% | 16,306,557 | 208,411,620 | 53.3% | 18,752,540 | 205,965,637 | 52.6% |
| Morgan Stanley Investor(4) | 26,444,000 | 6.8% | — | 26,444,000 | 6.8% | — | 26,444,000 | 6.8% |
| Capital World Investor(5) | 21,946,500 | 5.6% | — | 21,946,500 | 5.6% | — | 21,946,500 | 5.6% |
| **Directors and Named Executive Officers** | | | | | | | | |
| Ron Williams | 3,394,900 | * | — | 3,394,900 | * | — | 3,394,900 | * |
| Michelle A. Gourdine, M.D. | 6,956 | * | — | 6,956 | * | — | 6,956 | * |
| Sharad Mansukani, M.D.(6) | 1,872,400 | * | 135,870 | 1,886,530 | * | 156,250 | 1,866,150 | * |
| Clay Richards | 6,956 | * | — | 6,956 | * | — | 6,956 | * |
| Michael Smith(7) | 283,300 | * | — | 283,300 | * | — | 283,300 | * |
| William Wulf, M.D.(8) | 183,850 | * | 13,341 | 230,509 | * | 15,342 | 228,508 | * |
| Karen McLoughlin | — | * | — | — | * | — | — | * |
| Ravi Sachdev | — | * | — | — | * | — | — | * |
| Richard J. Schnall | — | * | — | — | * | — | — | * |
| Derek L. Strum | — | * | — | — | * | — | — | * |
| Steven J. Sell(9) | 1,400,000 | * | 101,590 | 1,798,410 | * | 116,829 | 1,783,171 | * |
| Theodore Halkias(10) | 1,900,000 | * | 137,872 | 3,462,128 | * | 158,553 | 3,441,447 | * |

166

**APP 299**

Table of Contents

Index to Financial Statements

| Name and Address of Beneficial Owner | Shares Beneficially Owned Before the Offering and After the Offering Assuming the Underwriters' Option Is Not Exercised(1) | | | | | Shares Beneficially Owned After the Offering Assuming the Underwriters' Option Is Exercised in Full | | |
| | Number of Shares Owned Before the Offering | Percent of Class Before the Offering (%) | Shares Offered by Selling Stockholder | Number of Shares Owned After the Offering | Percent of Class After the Offering (%) | Shares Offered by Selling Stockholder | Number of Shares Owned After the Offering | Percent of Class After the Offering (%) |
|---|---|---|---|---|---|---|---|---|
| Joan Danieley(11) | 550,000 | * | — | 1,150,000 | * | — | 1,150,000 | * |
| Lisa Dombro(12) | 737,500 | * | 53,516 | 1,433,984 | * | 61,543 | 1,425,957 | * |
| Benjamin Kornitzer, M.D.(13) | 137,500 | * | 9,978 | 377,522 | * | 11,475 | 376,025 | * |
| Veeral Desai(14) | 1,450,000 | * | 105,218 | 3,044,782 | * | 121,001 | 3,028,999 | * |
| Benjamin Shaker(15) | 875,000 | * | 63,494 | 1,311,506 | * | 73,018 | 1,301,982 | * |
| All current directors and executive officers as a group (19 persons)(16) | 12,784,450 | 3.3% | 620,879 | 18,373,571 | 4.7% | 714,011 | 18,430,439 | 4.7% |
| Ronald Kuerbitz(17) | 5,100,000 | 1.3% | — | 5,100,000 | 1.3% | — | 5,100,000 | 1.3% |
| Kenneth Bellendir(18) | 1,000,000 | * | 72,564 | 2,127,436 | * | 83,449 | 2,116,551 | * |

\*    Less than one percent.

(1)    The selling stockholders have granted the underwriters an option to purchase up to an additional 2,550,000 shares.

(2)    CD&R Investment Associates IX, Ltd. ("CD&R Holdings GP"), as the general partner of the CD&R Investor, may be deemed to beneficially own the shares of common stock in which the CD&R Investor has beneficial ownership. CD&R Holdings GP expressly disclaims beneficial ownership of the shares of common stock in which the CD&R Investor has beneficial ownership. Investment and voting decisions with respect to the shares of common stock held by the CD&R Investor are made by an investment committee of limited partners of CD&R Associates IX, L.P., currently consisting of more than ten individuals, each of whom is also an investment professional of CD&R (the "Investment Committee"). All members of the Investment Committee disclaim beneficial ownership of the shares shown as beneficially owned by the CD&R Investor. CD&R Holdings GP is managed by a two-person board of directors. Donald J. Gogel and Nathan K. Sleeper, as the directors of CD&R Holdings GP, may be deemed to share beneficial ownership of the shares of common stock directly held by the CD&R Investor. Such persons expressly disclaim such beneficial ownership. The principal office of the CD&R Investor is c/o Clayton, Dubilier & Rice, LLC, 375 Park Avenue, New York, New York, 10152.

(3)    Certain CD&R investment professionals may make a contribution of shares to one or more charities prior to this offering. In that event, a recipient charity, if it chooses to participate in this offering, will be the selling stockholder with respect to the donated shares.

(4)    Includes 26,444,000 shares owned by Morgan Stanley Investment Management Inc. on behalf of certain funds and accounts (such entities collectively, the "Morgan Stanley Investor"). The mailing address for each of the foregoing entities is c/o Morgan Stanley Investment Management Inc., 522 Fifth Avenue, New York, New York 10036.

(5)    Includes 8,832,200 shares owned by The New Economy Fund and 13,114,300 shares owned by SMALLCAP World Fund, Inc. (such entities together, the "Capital World Investor"). The mailing address of each of the foregoing entities is c/o Capital Research and Management Company, 333 South Hope Street, 55th Floor, Los Angeles, CA 90071.

(6)    Prior to this offering, includes 650,000 shares which Mr. Mansukani has the right to acquire through the exercise of stock options. Also included are 150,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(7)    Prior to this offering, includes 133,300 shares of our common stock subject to outstanding vested RSUs.

167

**APP 300**

Table of Contents

Index to Financial Statements

(8)    Prior to this offering, includes 97,700 shares of our common stock subject to outstanding vested RSUs, and 40,000 shares, which Mr. Wulf has the right to acquire through the exercise of options. Also included are 60,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(9)    Prior to this offering, represents 1,400,000 shares which Mr. Sell has the right to acquire through the exercise of stock options. Also represented are 500,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions. Excluded are 556,200 shares held by the Sell Family Trust and the Sell Children's Trust, each an irrevocable trust of which Mr. Sell is neither the trustee nor a beneficiary.

(10)    Prior to this offering, includes 1,800,000 shares which Mr. Halkias has the right to acquire through the exercise of options, and 100,000 shares held by the Halkias Irrevocable Trust, of which Mr. Halkias is a trustee. Also included are 1,700,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(11)    Prior to this offering, represents 550,000 shares which Ms. Danieley has the right to acquire through the exercise of options. Also represented are 600,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(12)    Prior to this offering, represents 737,500 shares which Ms. Dombro has the right to acquire through the exercise of options. Also represented are 750,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(13)    Prior to this offering, represents 137,500 shares which Dr. Kornitzer has the right to acquire through the exercise of options. Also represented are 250,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(14)    Prior to this offering, includes 1,200,000 shares which Mr. Desai has the right to acquire through the exercise of options. Also included are 1,700,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(15)    Prior to this offering, includes 775,000 shares which Mr. Shaker has the right to acquire through the exercise of options. Also included are 500,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

(16)    Prior to this offering, includes an aggregate amount of 8,415,000 shares which the current executive officers and directors have the right to acquire through the exercise of stock options. Also included are 6,510,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions, and 231,000 shares of our common stock subject to outstanding vested RSUs granted to directors.

(17)    Prior to this offering, represents 5,100,000 shares which Mr. Kuerbitz has the right to acquire through the exercise of stock options.

(18)    Prior to this offering, includes 900,000 shares which Mr. Bellendir has the right to acquire through the exercise of options. Also included are 1,200,000 options that will become exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions.

168

Table of Contents

Index to Financial Statements

CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Policies and Procedures for Related Person Transactions**

Our board of directors has approved policies and procedures with respect to the review and approval of certain transactions between us and a Related Person (as defined herein) or a Related Person Transaction (as defined herein) (the "Related Person Transaction Policy"). Pursuant to the terms of the Related Person Transaction Policy, our board of directors, acting through our Audit Committee, must review and decide whether to approve any Related Person Transaction. Any Related Person Transaction is required to be reported to our legal department, which will then determine whether it should be submitted to our Audit Committee for consideration. The Audit Committee must then review and decide whether to approve any Related Person Transaction.

For the purposes of the Related Person Transaction Policy, a "Related Person Transaction" means a transaction, arrangement or relationship (or any series of similar transactions, arrangements or relationships) in which we (including any of our subsidiaries) were, are or will be a participant and in which any Related Person had, has or will have a direct or indirect interest; and a "Related Person" means any person who is, or at any time since the beginning of our last fiscal year was, a director or executive officer of agilon health or a nominee to become a director of agilon health; any person who is the beneficial owner of more than five percent of our common stock; any immediate family member of any of the foregoing persons, including any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of the director, executive officer, nominee or more than five percent beneficial owner, and any person (other than a tenant or employee) sharing the household of such director, executive officer, nominee or more than five percent beneficial owner; and "spouse" includes an individual married to a person of the same sex if the couple is lawfully married under state law, regardless of the individual's domicile; and any firm, corporation or other entity in which any of the foregoing persons is a general partner or, for other ownership interests, a limited partner or other owner in which such person has a beneficial ownership interest of ten percent or more.

**Stockholders Agreements**

*CD&R Stockholder Agreement*

In connection with our IPO, we entered into a stockholders agreement with the CD&R Investor. The stockholders agreement granted to the CD&R Investor the right to designate for nomination for election to our board of directors a number of CD&R Designees equal to:

- at least a majority of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 50% of the outstanding shares of our common stock;
- at least 40% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 40% but less than 50% of the outstanding shares of our common stock;
- at least 30% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 30% but less than 40% of the outstanding shares of our common stock;
- at least 20% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 20% but less than 30% of the outstanding shares of our common stock; and
- at least 5% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 5% but less than 20% of the outstanding shares of our common stock.

169

APP 302

Table of Contents

Index to Financial Statements

For purposes of calculating the number of CD&R Designees that the CD&R Investor is entitled to nominate pursuant to the formula outlined above, any fractional amounts would be rounded up to the nearest whole number and the calculation would be made on a pro forma basis after taking into account any increase in the size of our board of directors. If the CD&R Investor beneficially owns less than 5% of the outstanding shares of common stock, the CD&R Investor will no longer be entitled to designate any designees for nomination by the board of directors.

With respect to any vacancy of a CD&R-designated director, the CD&R Investor will have the right to designate a new director for election by a majority of the remaining directors then in office.

The stockholders agreement provides that a CD&R Designee will serve as the Chairman of our board of directors as long as the CD&R Investor beneficially owns at least 25% of the outstanding shares of our common stock.

The stockholders agreement also grants to the CD&R Investor certain other rights, including specified information and access rights.

### *Existing Stockholders' Agreement*

Prior to our IPO, we were a party to an Amended and Restated Stockholders' Agreement, dated as of November 29, 2019 (as amended or otherwise modified, the "Existing Stockholders Agreement"), by and among agilon health, and our existing stockholders, including the CD&R Investor, the Morgan Stanley Investor and the Capital World Investor. Other than a 180-day lock-up provision in the event of an IPO, the Existing Stockholders Agreement terminated upon the completion of our IPO.

### Registration Rights Agreements

In connection with our IPO, we entered into a registration rights agreement with the CD&R Investor. The registration rights agreement grants to the CD&R Investor and its permitted assigns customary Form S-1 and Form S-3 demand registration rights and piggyback registration rights, in each case subject to customary terms and conditions.

We are a party to registration rights agreements with each of our pre-IPO stockholders, including the Morgan Stanley Investor and the Capital World Investor. The registration rights agreements grant to the existing stockholders and each of their respective permitted assigns, customary Form S-3 demand registration rights and piggyback registration rights, in each case subject to customary terms and conditions.

### Investment Agreements

We are a party to an Investment Agreement, dated as of November 7, 2018, as amended by the first amendment, dated as of October 21, 2020 (as may be further amended or restated, the "Morgan Stanley Investment Agreement"), with the Morgan Stanley Investor, pursuant to which the Morgan Stanley Investor purchased the shares of our common stock that it owns. All put rights and information rights provided pursuant to the Morgan Stanley Investment Agreement terminated automatically upon the consummation of our IPO.

We are also party to an Investment Agreement, dated as of January 4, 2019, as amended by the first amendment, dated as of October 5, 2020, and an Investment Agreement, dated as of March 4, 2020 (as may be amended or restated, together, the "Capital World Investment Agreements"), with the Capital World Investor, pursuant to which the Capital World Investor purchased the shares of our common stock that it owns. All rights provided in the Capital World Investment Agreement that were substantially the same as the put rights and information rights provided under the Morgan Stanley Investment Agreement, as well as certain consent rights, terminated automatically upon the consummation of our IPO.

170

APP 303

**Table of Contents**

**Index to Financial Statements**

We are also party to Investment Agreements with our other pre-IPO stockholders, which contain substantially similar rights as described above for the Morgan Stanley Investment Agreement and the Capital World Investment Agreements. All such rights terminated automatically upon the consummation of the IPO.

**Consulting Agreement**

Prior to our IPO, we were a party to a consulting agreement with CD&R, dated as of July 1, 2016. For each of the years ended December 31, 2020, 2019 and 2018, we paid $1.5 million to CD&R in advisory consulting fees, in addition to certain expense reimbursements. The consulting agreement with CD&R was terminated in connection with our IPO. No additional fee was paid in connection with the termination.

**Indemnification Agreements**

We are a party to an indemnification agreement (the "Indemnification Agreement") with the CD&R Investor, Clayton, Dubilier & Rice Fund IX, L.P., Clayton, Dubilier & Rice Fund IX-A, L.P., CD&R Advisor Fund IX, L.P. (together, the "CD&R Funds") and CD&R, pursuant to which we indemnify the CD&R Investor, the CD&R Funds and CD&R and each of their respective affiliates, successors, assigns, directors, officers, partners, members, employees, agents, advisors, consultants, representatives and controlling persons, against certain liabilities arising out of performance of the consulting agreements and any transaction fee agreements and certain other claims and liabilities, including liabilities arising out of financing arrangements and securities offerings. Our indemnification obligations under the Indemnification Agreements are primary to any similar rights to which any indemnitee may be entitled under any other agreement or document.

We are a party to indemnification agreements with our directors. The indemnification agreements provide the directors with contractual rights to indemnification and expense advancement. See "Description of Capital Stock—Limitations on Liability and Indemnification."

**Transactions with Other Related Parties**

We were a party to the Unsecured Credit Facility with Arawak IX, L.P., an affiliate of the CD&R Investor. The Unsecured Credit Facility was repaid in full in connection with the entry into the 2021 Secured Credit Agreement. See "Description of Certain Indebtedness."

171

# EXHIBIT 6

**Table of Contents**

**Filed pursuant to Rule 424(b)(4)**
**Registration No. 333-259159**

# 17,000,000 Shares



# agilon health, inc.

### Common Stock

The selling stockholders identified in this prospectus are offering 17,000,000 shares of common stock of agilon health, inc. ("agilon health"). We will not receive any of the proceeds of the sale of our common stock being sold in this offering, including any shares that certain of the selling stockholders may sell pursuant to the underwriters' option to purchase additional shares of our common stock.

Our common stock is listed on the New York Stock Exchange (the "NYSE") under the symbol "AGL". The last reported sale price of our common stock on September 3, 2021 was $36.48 per share.

After the completion of this offering, we expect to continue to be a "controlled company" within the meaning of the corporate governance standards of the NYSE.

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 22 of this prospectus to read about factors you should consider before buying shares of our common stock.**

|  | Per Share | | Total |
|---|---|---|---|
| Public offering price | $ 30.00 | $ | 510,000,000 |
| Underwriting discounts and commissions(1) | $ 1.02 | $ | 17,340,000 |
| Proceeds, before expenses, to the selling stockholders | $ 28.98 | $ | 492,660,000 |

(1)    See "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters also may purchase up to 2,550,000 additional shares from certain of the selling stockholders at the public offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus.

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved the securities described herein or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares to purchasers on or about September 14, 2021.

| | | |
|---|---|---|
| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **BofA Securities** |
| **Deutsche Bank Securities** | | **Wells Fargo Securities** |
| **Nomura** | **William Blair** | **Truist Securities** |
| **Academy Securities** | **R. Seelaus & Co., LLC**      **Ramirez & Co., Inc.** | **Siebert Williams Shank** |

**Prospectus dated September 9, 2021**

Table of Contents



**APP 307**

"We believe that the long-term, independent relationship between a PCP and his/her patient is the most valuable relationship in the healthcare universe. It is the best way to drive behavior and thus, value."

– Gary Pinta, MD
*Pioneer Physicians, Akron*



Table of Contents



"This partnership provides physicians the ability to share in the development of a new payment model for PCPs. We are engaged and the model has physician fingerprints all over it."

– Mary Cook, MD
*Central Ohio Primary Care, Columbus*

Table of Contents



APP 309

**Table of Contents**

TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 22 |
| Special Note Regarding Forward-Looking Statements and Information | 66 |
| Use of Proceeds | 69 |
| Dividend Policy | 70 |
| Capitalization | 71 |
| Dilution | 72 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 74 |
| Business | 106 |
| Management | 146 |
| Executive Compensation | 153 |
| Principal and Selling Stockholders | 166 |
| Certain Relationships and Related Party Transactions | 170 |
| Description of Capital Stock | 173 |
| Shares Available for Future Sale | 179 |
| Description of Certain Indebtedness | 182 |
| Certain U.S. Federal Income Tax Considerations for Non-U.S. Holders | 185 |
| Underwriting | 189 |
| Validity of Common Stock | 200 |
| Experts | 200 |
| Where You Can Find More Information | 200 |
| Index to Consolidated Financial Statements | F-1 |

**You should rely only on the information contained in this prospectus and any free writing prospectus we may authorize to be delivered to you. We have not, and the selling stockholders and the underwriters have not, authorized anyone to provide you with information different from, or in addition to, that contained in this prospectus and any related free writing prospectus. We, the selling stockholders and the underwriters take no responsibility for, and can provide no assurances as to the reliability of, any information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is only accurate as of the date of this prospectus, regardless of the time of delivery of this prospectus and any sale of shares of our common stock.**

i

Table of Contents

**Certain Important Terms**

- "We," "us," "our," "agilon" and the "Company" mean agilon health, inc., a Delaware corporation and its consolidated subsidiaries, unless the context refers only to agilon health, inc., as a corporate entity (which we refer to as "agilon health").
- "Anchor geography" means the geographies in which our anchor physician groups operate.
- "Anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography.
- "Capitation" means a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.
- "CMS" means the Centers for Medicare & Medicaid Services.
- "CMS Innovation Center" means the Center for Medicare & Medicaid Innovation.
- "DCE" means a Direct Contracting Entity participating in the CMS Innovation Center Direct Contracting Model.
- "FFS" means fee-for-service.
- "Independent physicians" means physicians not employed by health systems or insurance providers.
- "Live," when referring to a physician partner or a geography, means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with payors.
- "MA" means Medicare Advantage.
- "Members" means the MA patients who are attributed to our PCPs (as defined below) by our payors (as defined below).
- "Payors" means health insurance providers.
- "Our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.
- "PCP" means primary care physician.
- "Physician partners" means our anchor physician groups and all other physicians with whom we have contractual arrangements.
- "PMPM" means per member per month.
- "RBE" means a risk-bearing entity.
- "STAR rating" means annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics.
- "Total Care Model" means a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients.

**Market and Industry Data**

This prospectus includes estimates regarding market and industry data and forecasts, which are based on publicly available information, industry publications and surveys, reports from government agencies, reports by market research firms and our own estimates based on our management's knowledge of, and experience in, the

APP 311

[Table of Contents](#)

healthcare industry. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable.

Throughout this prospectus, all references to "net promoter score" or "NPS" are to a measure of satisfaction widely used in the healthcare industry. We calculate patient and provider net promoter score based on responses to patient and provider surveys, administered as electronic surveys annually, that ask the patient or provider to rank, on a scale of 0 to 10, how likely they are to recommend their (or their provider's) practice to a friend or family member. We assign the designation of "Promoter" to respondents who provide a score of 9 or 10, the designation of "Passive" to respondents who provide a score of 7 or 8, and the designation of "Detractor" to respondents who provide a score of 0 to 6. We then subtract the percentage of Detractors from Promoters to determine our overall net promoter score. We believe that this method of calculation aligns with industry standards and that this metric is meaningful for investors because of the correlation that we believe exists between net promoter score and patient and provider satisfaction.

Our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the captions "Risk Factors," "Special Note Regarding Forward-Looking Statements and Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Service Marks, Trademarks and Trade Names**

We hold various service marks, trademarks and trade names, such as "agilon health," "agilon" and our logo design, that we deem particularly important to the advertising activities conducted by each of our businesses. This prospectus also contains trademarks, service marks and trade names of other companies which are the property of their respective holders. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

**Basis of Presentation**

During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. As a result of the divestiture of all of our California operations, our financial statements included in this prospectus reflect discontinued operations presentation for all California operations. Financial and operating information contained in this prospectus is presented without California operations data unless expressly stated otherwise. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

iii

**Table of Contents**

**PROSPECTUS SUMMARY**

*The following summary highlights selected information contained elsewhere in this prospectus. Because this is only a summary, it does not contain all of the information you should consider before investing in our common stock. You should carefully read the entire prospectus, including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as our consolidated financial statements included elsewhere in this prospectus, before making an investment decision.*

**Overview**

Our business is transforming healthcare by empowering the primary care physician ("PCP") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming risk-bearing entities (each, an "RBE") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. As of June 30, 2021, the PCPs on our platform serve approximately 230,700 patients enrolled in Medicare Advantage ("MA"), which includes approximately 49,000 patients with physician groups contracted to go-live on January 1, 2022 (we refer to these patients as the "members on our platform"). In addition, through our participation in the Center for Medicare & Medicaid Innovation ("CMS Innovation Center") Direct Contracting Model, our PCPs serve over 50,000 Medicare fee-for-service ("FFS") beneficiaries through five currently approved Direct Contracting Entities ("DCEs"). For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

1

**Table of Contents**

**Empower PCPs to Transform Care in Their Communities**

| What We Do | How We Do It | Powerful Results |
|---|---|---|
| *Disrupt the rapidly-growing Medicare market for physicians, patients and payors* | *Migrate physicians, patients and payors from the traditional fee-for-service to a subscription-like Total Care Model* | *Since 2016, this capital-light, exportable and scalable model has grown* |
| • **Empower community-based physicians** to create a Medicare-centric globally capitated line of business | • **Unified set of payment, data, clinical, quality and growth capabilities** deployed as single platform | • 17 diverse geographies |
| • **Enable PCPs to quarterback their patients' healthcare** in a long-term, highly engaged relationship | • **Deployed through a long-term partnership model** based on aligned outcomes and economics | • 16 anchor physician groups: average tenure of 40+ years in their community |
| • **Transform the PCP business model** from a transaction-based model to a long-term, holistic membership-based model | • **Enhanced through a growing network of like-minded physician partners** that enable powerful network effect | • 15 payors |
| | | • 230,700 MA members including approximately 49,000 that go-live in 2022 |
| | | • NPS of 83 for patients and 73 for providers at live anchor physician groups |

The current state of the U.S. healthcare system is defined by the following key factors:

- Unsustainably high and rising costs characterized by waste, unnecessary variation in care and poor patient experience and health outcomes;
- FFS reimbursement model focused on units of service rather than a coordinated approach to meet the unique needs of individual patients;
- The Medicare population is projected to grow from approximately 62 million in 2020 to more than 70 million individuals in 2025 with a total spend of approximately $1.25 trillion, and MA enrollment is projected to comprise 47% of total Medicare enrollment (which we refer to as the "MA penetration rate"); and
- PCPs are positioned—but not currently empowered or incentivized—to act as the quarterback for healthcare delivery, with their decisions estimated to influence up to 90% of total healthcare spending according to a 2017 study.

We believe that failing to empower PCPs has fostered waste, needless variability in care and unsustainable growth in healthcare costs. According to a 2019 article entitled "Waste in the US Health Care System: Estimated Costs and Potential for Savings" published in the Journal of the American Medical Association, failure of care delivery, failure of care coordination and overtreatment or low-value care were estimated to represent $205.3 billion to $345.1 billion of waste annually in the U.S. healthcare system. While there is broad recognition of the need to move beyond a volume-based, FFS reimbursement model, structural hurdles have impeded rapid adoption of a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients, which we refer to as a Total Care Model. In this prospectus, we refer to "capitation" as a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.

To overcome these hurdles and achieve our mission of being the trusted long-term partner to community-based physicians, we have developed what we believe is a first-of-its-kind Total Care Model for community-based physicians that focuses exclusively on Medicare and manages subscription-like per member per month ("PMPM") arrangements with health plans or directly with the government. The agilon Total Care Model is powered by our platform, enabled through a long-term partnership model and reinforced via our growing national

2

**APP 314**

**Table of Contents**

network of like-minded physicians. Our position as innovators is demonstrated by a series of transformative accomplishments since the formation of the company in July 2016, and our first partnership in 2017, many of which we believe to be industry-firsts:

- Implemented the first MA multi-payor, globally capitated risk model with a community-based physician group in all of our diverse geographies in which our anchor physician groups operate ("anchor geographies");
- Exported the Total Care Model from one to 17 geographies ranging from communities as small as Zanesville, Ohio to large and rapidly growing communities such as Austin, Texas;
- Grew from approximately 24,000 patients attributed to our PCPs by our payors ("members") to approximately 230,700 MA members on our platform;
- Expanded from two payors to 15 payors on our platform; and
- Began participating in the Direct Contracting Model, with over 50,000 Medicare FFS beneficiaries served by our existing PCPs contracted through five currently approved DCEs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements:

- agilon's platform, which is holistic in enabling the rapid transformation to risk, is comprised of an integrated set of capabilities designed to continuously improve, and is delivered to our anchor physician groups through an aligned long-term partnership model;
- agilon's long-term physician partnership approach with community-based physician groups, which is designed to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician; and
- agilon's network of leading community-based physician partners, functioning as a collaborative group which can share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another.

With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients. The combination of subscription-like PMPM agreements with payors, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue.

The result is PCPs transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient. Despite our history of net losses, we believe this membership-based model results in a recurring revenue stream and provides our anchor physician groups with access to an incremental profit margin opportunity based on delivering high-quality care and health outcomes. Freed from the constraints of the transactional FFS reimbursement model, our PCPs are empowered to practice team-based, coordinated care when addressing individual patient needs and transition to a sustainable long-term business model for their senior patients. We believe enabling PCPs to unlock the value of a Medicare-centric, globally capitated line of business while remaining independent can transform the community-based physician business model.

In this prospectus, when referring to a physician partner or a geography, "live" means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming

3

Table of Contents

financial risk pursuant to agreements with health insurance providers ("payors"). In addition, "anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography. We refer to our anchor physician groups and the other physicians with whom we have contracted arrangements as our "physician partners." Finally, "our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.

*The agilon Flywheel Effect*: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients. The power of the agilon flywheel is highlighted by our total membership growth of 45%, of which 42% was driven by same geography membership growth and 58% was driven by entry into new geographies from December 31, 2019 to December 31, 2020, and general and administrative expenses per member contracted by 23% over the same period. Our general and administrative expenses per member contracted by 18% from December 31, 2018 to December 31, 2019. For the years ended December 31, 2020, 2019, and 2018 we had revenue of $1.2 billion, $794.4 million, and $474.8 million, respectively, and net loss of $60.1 million, $282.7 million, and $146.5 million, respectively. For the six months ended June 30, 2021, we had revenue of $912.1 million and net loss of $314.1 million.



**Our Market**

In 2020, approximately 62 million Americans were enrolled in Medicare nationally, of which we estimate approximately 27 million to be affiliated with independent physicians. We define independent physicians as

4

APP 316

Table of Contents

physicians not employed by health systems or insurance providers. We consider our current addressable market to be the estimated 17.5 million Medicare beneficiaries affiliated with independent PCPs in states in which we already have a physician partner or a signed letter of intent with a physician group as of January 2021, and those in which we have identified near-term prioritized geographies. Based on 2021 estimated average annual revenue per Medicare member to us of approximately $10,000, we estimate that this represents a total addressable market ("TAM") size of approximately $175 billion in 2020. We believe this addressable market will increase to nearly 20 million Medicare beneficiaries and $253 billion by 2025, based on the Centers for Medicare & Medicaid Services' ("CMS") projected Medicare enrollment and spending per beneficiary growth rates.



**Rapidly Expanding Actionable TAM Growing at 8% CAGR**

| | 2020 | | Projected 2025 | |
|---|---|---|---|---|
| | # Patient | Spend[1] | # Patient | Spend[2] |
| Total Medicare beneficiaries | 61.7M | $859B | 70.3M | $1,250B |
| Medicare beneficiaries attributed to Independent PCPs | 26.7M | $267B | 30.4M | $389B |
| agilon TAM: Medicare beneficiaries attributed to Independent PCPs in Existing & Prioritized Geographies | 17.5M | $175B | 19.8M | $253B |

(1)    2020 Medicare spend for total Medicare beneficiaries is based on CMS spend per beneficiary.
(2)    2025 Medicare spend for total Medicare beneficiaries, beneficiaries attributed to independent PCPs and agilon total addressable market is based on CMS projected Medicare enrollment and spending per beneficiary growth rates.

Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021, and $24 billion is based in counties in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021. In addition to the MA members our physician partners currently serve, we estimate our physician partners also serve approximately 375,000 patients that are addressable, which includes all Medicare FFS beneficiaries and commercial patients expected to age into Medicare over the next five years. This represents a 2020 market size of approximately $3.8 billion, using the same assumed annual revenue per Medicare member to us.

In addition, we see an additional opportunity for growth of our addressable market in physicians currently affiliated with health systems or insurance providers who become increasingly dissatisfied with those models. In considering our total addressable market, please also see "Risk Factors—Risks Related to Our Business."

**Industry Challenges and Our Opportunity**

We believe there is a significant opportunity to impact growth in U.S. healthcare costs and change the trajectory of the primary care business model through a platform, such as ours, in which PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients and share in the financial surplus created to the extent premiums received exceed the cost of medical care.

5

**Table of Contents**

*Unsustainably high and rising U.S. healthcare costs*

According to CMS, U.S. national healthcare expenditures are expected to increase from $3.81 trillion in 2019 to $4.27 trillion in 2021. CMS projects that by 2028, healthcare expenditures will reach $6.20 trillion and will account for 19.7% of the U.S. GDP, up from 17.7% in 2018.

*Patients are dissatisfied with the fragmented and uncoordinated healthcare experience*

In the current FFS model, reimbursement is focused on units of service rather than a coordinated approach to meet the unique needs of individual patients. As a result, care delivery is often uncoordinated, leaving patients frustrated and responsible to navigate their own way through a fragmented and complex healthcare system.

*PCPs are well-positioned to be agents of change*

According to Oregon's Patient-Centered Primary Care Home Program, every $1 spent on primary care services can save $13 of future healthcare costs. Across the U.S., there are more than 486,000 active PCPs who serve as patients' first and most frequent point of contact for their healthcare experience.

*The trajectory of the current independent primary care business model is unsustainable*

In the current FFS reimbursement model, as average reimbursement rates decline, PCPs must increase the number of patients they see to sustain their practice. This volume-based model perpetuates physician burnout and jeopardizes the long-term sustainability of the independent primary care business model. According to a 2019 report, more than 50% of family physicians show symptoms of burnout, driven in part the FFS reimbursement model and increasing administrative burden. We believe this has been exacerbated by the effects of COVID-19.

*Growth of the complex and costly Medicare population is accelerating pressure on primary care*

The Medicare population is expected to grow from approximately 62 million individuals in 2020 to approximately 70 million individuals by 2025. As the medically complex Medicare population disproportionately drives utilization and cost, and is typically reimbursed at a lower rate than the commercial population, the primary care delivery system and the overall healthcare system are further strained.

**Structural Hurdles to Adoption of a Total Care Model**

We believe that all key stakeholders—patients, physicians and payors—benefit significantly from an environment where PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients versus operating in the current FFS reimbursement model that primarily rewards units of service. However, over time, the existing FFS system has created structural hurdles that now impede rapid and broad adoption of a PCP-led Total Care Model.

- PCPs lack the incentive structure to reorganize the healthcare delivery system.
- PCPs lack the infrastructure to participate in a multi-payor model.
- PCPs lack the breadth of capabilities and resources necessary to transition to a Total Care Model.
- PCP groups are highly fragmented and lack the benefits of scale.
- Limited long-term, deep collaboration between payors and physicians.

**Our Answer**

*We have created a Total Care Model for community-based physicians that focuses exclusively on Medicare and manages the comprehensive healthcare needs of our members through subscription-like PMPM arrangements with health plans or directly with CMS—powered by the agilon platform, enabled through a long-term partnership model and reinforced via a growing national network.*

6

**Table of Contents**

***The agilon Platform:*** The agilon platform is focused on existing community-based physician groups, senior patients within these practices and enabling our physician partners to rapidly move to a subscription-like Total Care Model. Our platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital, and recognizes that enhanced capabilities are needed at multiple levels and must be deeply integrated within existing physician group operating processes to successfully execute the transition. The agilon platform was co-developed and has been continuously refined with our physician partners since the formation of the company. The agilon platform comprises an integrated set of capabilities, delivered as a unified platform to enable successful partnerships at the community level, create a national network of PCPs and physician groups and empower our PCPs to improve health outcomes for their patients.

*Our platform capabilities include:*

- ***Payor Engagement***: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one approach to quality, patient experience, clinical program management and financial management.
- ***Direct Contracting Model***: In each community we serve, our Total Care Model can be extended to patients enrolled in traditional Medicare through the CMS Innovation Center Direct Contracting Model.
- ***Data Integration and Management***: Our purpose-built and flexible platform enables ease of integration with payor systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.
- ***Clinical Programs and Product Development***: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value actionable playbooks for partner physicians to deliver quality care, which include operational plans, analytics and tracking metrics.
- ***Quality (Clinical and Experience)***: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.
- ***Growth***: We enable our partners to extend their local brand into a senior care brand for their Total Care Model that embodies the history and culture of their local physician group. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their approximately 220,000 patients that are currently Medicare-eligible but are not covered by an MA plan and their approximately 156,000 60-64 year-old patients, to enable their patients to make educated healthcare choices. These patients represent an embedded growth opportunity.
- ***Performance Management Analytics***: One of the most powerful parts of our platform is enabled by the peer-to-peer comparison of efficiency and clinical metrics at the physician, population and network level.
- ***Financial Management***: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.
- ***National Policy***: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

7

**Table of Contents**

*agilon's Long-term Physician Partner Model*

*Physician Relationships*

We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to address the need to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Our anchor physician group relationships have the following characteristics:

- Long-term partnership model that allows both agilon and physicians to take the long-term view and benefit from the maturity of a growing number of members on the platform;
- Shared governance and co-location of staff to manage our local partnerships;
- Local dyad leadership structure that includes a medical director from the local anchor physician group;
- Local brand which reflects the local anchor physician group or geography;
- Capital from agilon to support value-based care infrastructure supporting the delivery of high-quality healthcare, and 100% downside protection, which removes a major obstacle to physicians making the leap to a Total Care Model;
- Operating leverage created by amortizing centralized investments in the platform infrastructure across a growing number of physician partners; and
- Surplus dollars generated locally due to improvements in quality of care and healthcare costs are shared with the local anchor physician group.

Under the Total Care Model, we typically operate by RBE's within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups. Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. Through incentive compensation arrangements, we share with our anchor physician groups a portion of the RBE's savings from successfully improving the quality of care and reducing costs. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. Most of our contracts with our anchor physician groups contain exclusivity provisions, as well as termination rights that are triggered upon certain events.

*Payor Relationships*

In each of our geographies, we enter into subscription-like PMPM agreements with payors to manage the total healthcare costs of our attributed members. Through this partnership model, we believe we:

- empower PCPs to act as the quarterback for healthcare delivery;
- enable PCPs to define a tailored patient experience across multiple payors;

8

Table of Contents

- create an operating partnership and economic model built around improved health outcomes instead of a transaction-based model; and
- align the physician business model with the strength of their long-term patient relationships enabling the long-term growth of independent, community-based physician groups.

Under a typical agreement, we are entitled to monthly PMPM fees, which are typically based on a defined percentage of the corresponding premium which payors receive from CMS. We generally accept full financial risk for members attributed to us through our contracted PCPs and, therefore, are responsible for the cost of all healthcare services required by those members, which generally includes healthcare costs which CMS considers Part A and B costs. Our agreements with payors may delegate claims payment to us, or such responsibility may be retained by the payor, as is the case today in the majority of our payor agreements. The majority of our agreements are for terms ranging from one to three years and contain automatic annual renewal provisions as well as various termination rights. We also typically agree to indemnify our payors against certain third-party claims. As we continue to expand the agilon platform and enter into additional long-term partnerships, we will negotiate payor agreements in new geographies, including with Humana, Aetna and United Healthcare.

The power of our local partnership model is defined by the scale, breadth and local brand of our physician partners. On average, our anchor physician groups have been serving their communities for more than 40 years, have a PCP tenure of approximately 13 years, and receive exceptionally strong NPS from their PCPs and patients in live geographies of 73 and 83, respectively. We believe this gives us the ability to influence the local healthcare delivery system at scale. We expect our physician partner patient panels to systematically migrate to MA as the patient population ages and our partnerships mature. We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000.

The table below presents an overview of our anchor physician groups:

| Go-Live Year | Geography | Anchor Physician Group | Founded | PCPs | Average PCP Tenure | Approx. MA, FFS, Commercial Lives |
|---|---|---|---|---|---|---|
| 2018 | Columbus, OH | CENTRAL OHIO PRIMARY CARE | 1996 | >100 | 13 | 265K |
| 2019 | Akron, OH | PIONEER | 1995 | 25-100 | 18 | 60K |
| 2019 | Austin, TX | AUSTIN REGIONAL CLINIC / PREMIER FAMILY PHYSICIANS | 1980/1994 | >100 | 10 | 375K |
| 2020 | Pittsburgh, PA | preferred primary care physicians | 1995 | 25-100 | 13 | 65K |
| 2020 | Dayton, OH | PriMED | 1995 | <25 | 13 | 30K |
| 2020 | Southeast OH | Physicians Group | 2001 | <25 | 14 | 35K |
| 2020 | Wilmington, NC | | 1971 | 25-100 | 14 | 115K |
| 2021 | Buffalo, NY | Buffalo Medical Group | 1946 | 25-100 | 10 | 70K |
| 2021 | Toledo, OH | The Toledo Clinic | 1926 | 25-100 | 9 | 45K |
| 2021 | Hartford, CT | Starling | 1947 | 25-100 | 17 | 45K |
| 2022 | Syracuse, NY | FamilyCare Medical Group, PC | 1996 | 25-100 | 17 | 75K |
| 2022 | Pinehurst, NC | | 1952 | 25-100 | 10 | 60K |
| 2022 | Texarkana, TX | Collom & Carney Clinic | 1947 | <25 | 13 | 15K |
| 2022 | Longview, TX | DC DIAGNOSTIC CLINIC of Longview | 1975 | <25 | 16 | 75K |
| 2022 | Grand Rapids & Traverse City, MI | ANSWER HEALTH | 1986 | >100 | 10 | 120K |

9

**Table of Contents**

In addition to our anchor physician groups in the table above, we have broadly contracted with PCPs across the state of Hawaii and have developed select deeper primary care relationships within that network.

### Our Network

We believe the agilon network creates significant value for our patients, our physician partners, our payors and our organization. The ability to share best practices, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. Our physician partners are both collaborative and constructively competitive in service of their patients. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

### Value Proposition to Stakeholders

Our Total Care Model empowers community-based physician groups to lead local healthcare transformation and ensure the long-term sustainability of the community-based physician model.

We believe the benefits of this differentiated model to community-based physician groups and the patients they serve include:
- Rapid creation of a Medicare Total Care Model that enables our PCPs to take a long-term view of their relationships with their patients and allocate resources to meet individual member health needs.
- Sustainable long-term business model alongside commercial and Medicare FFS.
- Provides access to network of like-minded partners.
- Improved economics.
- Improving the physician experience.
- Improving the patient experience.
- Supporting superior health outcomes.

We have also become an important strategic partner for our payors, as we are a material portion of their membership base, delivery network and annual membership growth in many of the geographies we serve. Through our subscription-like agreements, we ensure a consistent gross margin on a growing membership base. The strength of our relationships with payors has resulted in our establishment of national joint-operating committees with five national health plans through which we develop, execute and monitor a strategy for growth and performance as part of their Medicare delivery network.

### Our Strengths

#### Local and National Leadership and First-Mover Dynamics

Core to our model is partnering in local geographies with leading physician groups that have already built significant scale and strong brands in the communities they serve. Our local leadership is highlighted by our position in Columbus, Ohio, where we have more than 200 PCPs on our platform, whose patient panels include approximately 50% of total MA lives among independent PCPs.

10

**Table of Contents**

We believe we are pioneers in providing a full-risk, multi-payor Total Care Model within our local geographies, our growing regional hubs and the country. We believe we are the only MA multi-payor, globally capitated risk vehicle available for independent physician groups to access a Total Care Model in our local geographies. The sustainability of this local leadership position is also enhanced by our long-term partnerships with our anchor physician groups.

We've established a strong local leadership position in 17 geographies creating what we believe to be the first national platform for a Medicare-centric, globally capitated line of business. We believe our position as a first-mover creates a competitive advantage, resulting in other independent physician groups viewing us as an established and trusted partner.

### Long-Term Economic Model

We believe our membership and per-member profitability will grow over time due to structural characteristics inherent to our long-term partnerships, durable and growing MA membership within our physician partners and the nature of the MA economic model. The key strengths of our economic model include:

- We believe we have the ability to generate significant, recurring and growing medical margin in concert with our physician partners over the course of our long-term partnerships and the inherently sticky physician-patient relationship.
    - Our physician partnerships are typically 20 years.
    - Average physician tenure within our anchor physician groups is 13 years.
    - Patients 65 years of age and older remain with their PCP for an average of 10 years, according to a 2004 study.
- Embedded same-geography, long-term organic membership growth resulting from our physician partners' existing patients who age into Medicare and elect to enroll in MA or who elect to convert from Medicare FFS to MA over the life of our long-term partnership.

Although we have incurred net losses since our formation in 2016, we believe that the combination of a growing membership base and improving medical margin over the life of our long-term partnerships creates a significant lifetime value ("LTV") for the geographies we enter. We are able to access this attractive LTV through what we believe to be a low-cost and increasingly cost-efficient model. We believe this low-cost and increasingly cost-efficient growth model represents a significant advantage supporting our rapid scaling to new geographies and sustainable existing geography growth.

### Model for Long-Term Sustainable Growth

We have created a multi-pronged growth strategy that has powerful tailwinds for our physician partners and our business by leveraging existing physician capacity in local geographies, establishing long-term partnerships with significant embedded growth opportunities and expanding through multiple regional levels. The "flywheel" nature of our model has allowed us to expand from one geography to 17 in fewer than five years and has resulted in an additional approximately 186,000 MA lives being attributed to our platform over the same time period.

### Purpose-Built, Exportable, Scalable Platform

The creation of the agilon platform and an aligned physician partnership approach has enabled the consistent deployment of a Medicare-centric, globally capitated line of business across 17 heterogeneous geographies, 16 anchor physician groups and multiple payors. The components of our Total Care Model (including data, payor

11

**Table of Contents**

engagement, clinical programs and growth) are discrete but are delivered as a unified platform through a highly-aligned model with physicians to optimize success. Our platform has enabled us to grow revenue 53% year-over-year for the year ended December 31, 2020, while operating costs to support live geographies and enterprise functions grew 12% over the same period. Our revenue grew 67% year-over-year for the year ended December 31, 2019, while operating costs to support live geographies and enterprise functions grew 42% over the same period. Our net loss for the year ended December 31, 2020 was $60.1 million, a 79% decline from losses of $282.7 million in the year ended December 31, 2019. Our net loss for the year ended December 31, 2019 was $282.7 million, a 93% increase from losses of $146.5 million for the year ended December 31, 2018. Our net loss for the six months ended June 30, 2021 was $314.1 million compared to losses of $24.0 million in the six months ended June 30, 2020.

*Network Feedback Loop*

We believe our growing network of community-based physicians at the national, regional and local level drives continuous improvement of our platform, enables best practices sharing and innovation and accelerates the growth of independent physicians joining the agilon network. Many of our physician partners and individual physicians have joined our platform based on references from existing like-minded physician partners, and the credibility and quality of our physician partners is consistently cited as a deciding factor for joining the platform.

*Differentiated Physician and Patient Experience*

We designed our platform, partnership and network approach with the goal of delivering a superior and continuously improving experience to our physician partners and their patients. We believe our model enables PCPs to unlock the value in a Medicare-centric, globally capitated line of business while remaining independent. Subsequent to joining our platform, our PCPs have increased their average annual income by successfully managing healthcare costs and improving health outcomes. We believe that our PCPs' engagement is manifested through deeper relationships with patients and results in a greater opportunity to improve our members' health. For example, in 2019, 78% of our members attributed to our live anchor physician groups attended their wellness visits, compared to the FFS national average CMS Annual Wellness Visit completion rate of 35% in 2019.

*Mission-Driven Team and Culture*

We have a world-class management team, which is differentiated by its breadth and depth of expertise in healthcare. Our senior management team has an average of more than 15 years of experience in the healthcare industry and has significant exposure across all components of the payment and delivery continuum. We believe our management team's collective robust, diverse and complementary exposure to different facets of the healthcare industry positions our team to navigate and enable the shift to a physician-driven Total Care Model.

Our team is united by our mission of being the trusted long-term partner to community-based physicians and driven by our vision of transforming healthcare at the community level through exceptional patient-physician relationships.

**APP 324**

**Table of Contents**

**Our Growth Strategy**

We intend to utilize our competitive strengths and capitalize on favorable industry trends to increase the number of regional hubs, local markets within those hubs and ultimately physicians and members we serve. The key elements of our growth include:

*The power of our model at work: Case study of Ohio expansion*



**Establish New Regional Hubs across the Country**

We believe we are well-positioned to expand the number of our physician partners nationally across a diverse set of geographies. We have developed sophisticated business development capabilities and have established a robust pipeline with an array of physician groups across the country. We are also benefitting from the network effect of our growing network of like-minded physician partners.

**Access the Large and Embedded Membership Opportunity within Our Existing Networks**

We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000. As these patients enroll in MA through our payors, they become attributed to our platform with little incremental cost to us.

**Facilitate and Capitalize on the Growth of Our Physician Partners**

As the PCP base of our physician partners grows, our physician partners are better positioned to serve a growing Medicare population.

13

Table of Contents

*Expand into Adjacent Geographies*

Once we establish a presence in a geography, we have the opportunity to accelerate the addition of new physician partnerships in the region. We leverage our multi-payor MA risk platform and regional infrastructure to efficiently grow into adjacent geographies. Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021.

*Increase Quality and Improve Health Outcomes to Drive Profitability*

We believe our Total Care Model drives increased profitability per member over time through increasing quality and improving health outcomes. As members and physicians mature on our platform, we increasingly recognize the benefits of improved quality of care and effectively managed healthcare costs. We believe there is significant opportunity to improve profitability per member over the course of our long-term partnerships by improving healthcare outcomes and effectively managing costs, with 70% of our MA members as of December 31, 2020 on our platform for fewer than three years.

*Demonstrate Operating Leverage*

We expect to drive increasing profitability by leveraging both our market-level operating costs and centralized infrastructure, as we manage increased MA and DCE membership on our platform that has maturing medical margin over time.

*Capitalize on Emerging Value-Based Care Opportunities*

We believe we are positioned to capitalize on the shift from FFS towards a Total Care Model across the broader healthcare system. Through five currently approved DCEs, which encompass more than 500 of our existing PCPs, we provide care to over 50,000 traditional Medicare members in seven geographies. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

**Impact of COVID-19 Pandemic on Our Business**

Commencing in March 2020, we implemented various measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. These measures included relocating employees to home-based work settings, coordinating with physician partners to accelerate telehealth activity and coordinating daily huddles for physicians and team members on clinical and operational impacts of COVID, which included participation by nationally-recognized experts in infectious disease and epidemiology. Despite the challenges and uncertainties created by the COVID-19 pandemic, we believe that our response to the pandemic has reinforced the value of our platform, long-term partnership model and network.

Throughout most of 2020, our members incurred lower healthcare costs than we would have otherwise expected, which resulted in lower medical services expenses incurred. These costs may be incurred at future points in time and it is possible that the deferral of healthcare services could cause additional health problems in our existing members, which could increase our costs in the future. Additionally, our members' risk adjustment factors, which are reflective of documented clinical conditions during 2020 and which impact our 2021 revenues, may be lower than would have occurred without the impact of the COVID-19 pandemic, resulting from members' avoidance or deferral of care during 2020. We cannot accurately estimate the net ultimate impact, positive or negative, to revenue or medical services expense at this time.

Also see "Risk Factors—Risks Related to Our Business— The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this

14

Table of Contents

situation precludes any prediction as to the ultimate adverse impact to us of COVID-19," "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of COVID-19" and "Business—Impact of COVID-19 Pandemic on Our Business."

**Company History**

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, NY. Our business was formed in 2016 through the completion of two acquisitions by CD&R: In July 2016, Primary Provider Management Company, Inc. ("PPMC") was acquired, which, together with its affiliated independent practice associations ("California IPAs"), operated in Southern California. Also in July 2016, Cyber-Pro Systems, Inc. ("CPS") was acquired, which, together with its subsidiaries and affiliates, operates a network of contracted physicians in Hawaii and provides software and medical billing solutions to independent healthcare organizations. During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. However, we will continue to be responsible for any liabilities arising from certain of the divested businesses which were incurred prior to the applicable closing date. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

agilon health, inc., the issuer in this offering, was incorporated in the State of Delaware in April 2017 in connection with our entry into a physician partnership with Central Ohio Primary Care Physicians, Inc. ("COPC"), a physician-owned medical group, to establish a Medicare-centric, globally capitated line of business in the Columbus, Ohio region. Since that time, we have expanded and entered into new partnerships in Austin, Akron, Pittsburgh, North Carolina, Hartford, Buffalo, Toledo, Dayton and Southeast Ohio. In March 2021, we changed our name from Agilon Health Topco, Inc. to agilon health, inc., and changed the name of our subsidiary, agilon health, inc., to agilon health management, inc. On April 19, 2021, we completed the initial public offering ("IPO") of 53,590,000 shares of common stock at a price of $23.00 per share. The net proceeds of the offering were approximately $1.2 billion, after underwriting fees and other offering expenses.

**Our Majority Shareholder and Organizational Structure**

*Clayton, Dubilier & Rice, LLC.* Founded in 1978, CD&R employs a distinctive approach to private equity investing, bringing together investment professionals and operating executives to pursue a strategy predicated on building stronger, more profitable businesses. Since inception, CD&R has managed the investment of more than $30 billion in 100 businesses with an aggregate transaction value of over $150 billion. CD&R has a disciplined and clearly defined investment strategy and has extensive experience investing across the healthcare industry.

After the completion of this offering, we expect that CD&R Vector Holdings, L.P. (the "CD&R Investor"), which is owned by investment funds managed by, or affiliated with, CD&R, will hold approximately 53.2% of our common stock (or approximately 52.6% if the underwriters exercise in full their option to purchase additional shares). As a result, we expect to continue to be a "controlled company" within the meaning of the NYSE rules following the completion of this offering. This election will allow us to continue to rely on exemptions from certain corporate governance requirements otherwise applicable to NYSE-listed companies. See "Management—Corporate Governance."

15

Table of Contents

The following chart presents an overview of our ownership and organizational structure, after giving effect to this offering. For additional information with respect to our ownership structure, see "Principal Stockholders":



1    Includes COPC, certain private investment funds and our physician partners with whom we have physician partner group equity agreements.
2    Includes indebtedness related to the 2021 Credit Facilities (as defined herein), including term loan indebtedness, revolver indebtedness and letters of credit. On February 18, 2021, we, through agilon health management, inc. ("agilon management"), entered in the 2021 Secured Credit Agreement (as defined herein) to refinance our outstanding indebtedness under the Credit Facilities (as defined herein). See "Description of Certain Indebtedness."
3    Operating subsidiaries include wholly-owned RBEs, independent practice associations and other immaterial subsidiaries, which have been omitted from this chart for convenience.
4    Ownership percentages assume no exercise of the underwriters option to purchase up to 2,550,000 additional shares of common stock in the offering, and are determined as described in "—The Offering."

**Our Corporate Information**

agilon health, inc. is a Delaware corporation. Our principal executive offices are located at 1 World Trade Center, Suite 2000, Long Beach, CA 90831, and our telephone number is (562) 256-3800. Our website is *www.agilonhealth.com*. None of the information contained on, or that may be accessed through, our website or

16

APP 328

**Table of Contents**

any other website identified herein is part of, or incorporated into, this prospectus, and you should not rely on any such information in connection with your decision to invest in our common stock.

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows and results of operations that you should consider before making a decision to invest in our common stock. These risks are discussed more fully under the caption "Risk Factors." These risks include, but are not limited to, the following:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- significant reductions in membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts, which contracts generally provide that if the cost of care exceeds the corresponding capitation revenue we receive from payors in respect of attributed members we may realize operating deficits, which are typically not capped, and could lead to substantial losses;
- dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- ability to comply with federal, state and local regulations and laws we are subject to, or to adapt to changes in or new regulations or laws, including as such regulations and laws that relate to our physician alignment strategies with our physician partners or the corporate practice of medicine;
- our physician partners' compliance with federal and state healthcare fraud and abuse laws and regulations; and
- the influence of the CD&R Investor and our status as a "controlled company."

17

**Table of Contents**

**THE OFFERING**

| | |
|---|---|
| Common stock offered by the selling stockholders | 17,000,000 shares. |
| Common stock to be outstanding after this offering | 391,448,029 shares, including 565,469 shares (or up to 665,289 shares giving effect to the underwriters' option to purchase additional shares) issued pursuant to options exercised by the selling stockholders in connection with this offering. |
| Option to purchase additional shares | The underwriters also may purchase up to 2,550,000 additional shares from certain of the selling stockholders at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus. |

IPO lock-up release; new lock-up agreement

In connection with this offering, J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters in our IPO, have agreed to waive the prior lock-up agreements with respect to up to 17,000,000 shares (or up to 19,550,000 shares including the underwriters' option to purchase additional shares) of our common stock for the sale by the selling stockholders in this offering, which includes shares beneficially owned by certain of our officers and directors, provided that the waiver is limited to the shares actually sold in this offering. Additionally, certain of the selling stockholders will enter into new lock-up agreements with J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters of this offering, pursuant to which those selling stockholders, for a period of 90 days after the date of this prospectus, may not, among other things and subject to certain exceptions, sell their remaining shares following the completion of this offering. See "Underwriting."

| | |
|---|---|
| Use of proceeds | We will not receive any of the proceeds from the sale of our common stock by the selling stockholders in this offering, including any shares the selling stockholders may sell pursuant to the underwriters' option to purchase additional shares of our common stock. |
| Dividend policy | We do not currently anticipate paying dividends on our common stock for the foreseeable future. Any future determination to pay dividends on our common stock will be subject to the discretion of our board of directors and depend upon various factors. See "Dividend Policy." |
| Risk Factors | Our business is subject to a number of risks that you should consider before making a decision to invest in our common stock. See "Risk Factors." |
| NYSE symbol | "AGL". |

18

**APP 330**

**Table of Contents**

The number of shares of our common stock to be outstanding immediately following this offering is based on 390,882,560 shares outstanding as of June 30, 2021, and excludes:

- 41,197,388 shares of common stock issuable upon exercise of options outstanding as of June 30, 2021 at a weighted average exercise price of $4.40 per share, of which 18,509,531 options are expected to be exercisable as of the consummation of this offering (or 30,308,461 options, after taking into account the satisfaction of performance conditions applicable to certain options as a result of this offering and assuming the exercise in full by the underwriters of their option to purchase additional shares);
- 28,453,653 shares of common stock reserved for future issuance under our Omnibus Incentive Plan and ESPP; and
- 1,112,131 shares of our common stock subject to outstanding unvested RSUs granted to directors and employees.

Unless otherwise indicated, all information in this prospectus assumes no exercise by the underwriters of their option to purchase additional shares.

19

**APP 331**

Table of Contents

**SUMMARY HISTORICAL CONSOLIDATED FINANCIAL DATA**

The following tables set forth our summary historical consolidated financial data derived from our consolidated financial statements as of the dates and for each of the periods indicated. The summary historical consolidated financial data as of and for the years ended December 31, 2020, 2019, and 2018 are derived from our audited consolidated financial statements included elsewhere in this prospectus. The summary historical consolidated financial data as of and for the three and six months ended June 30, 2021 and 2020 are derived from our unaudited interim condensed consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results to be expected for any future period.

You should read this summary historical consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements included elsewhere in this prospectus.

| (dollars in thousands) | Six Months Ended June 30, 2021 | Six Months Ended June 30, 2020 | Three Months Ended June 30, 2021 | Three Months Ended June 30, 2020 | Year Ended December 31, 2020 | Year Ended December 31, 2019 | Year Ended December 31, 2018 |
|---|---|---|---|---|---|---|---|
| **Consolidated Statement of Operations Data:** | | | | | | | |
| **Revenues:** | | | | | | | |
| Medical services revenue | $ 910,090 | $ 582,309 | $ 497,678 | $ 292,495 | $ 1,214,270 | $ 788,566 | $ 466,612 |
| Other operating revenue | 1,970 | 2,333 | 1,278 | 1,099 | 4,063 | 5,845 | 8,215 |
| Total revenues | 912,060 | 584,642 | 498,956 | 293,594 | 1,218,333 | 794,411 | 474,827 |
| **Expenses:** | | | | | | | |
| Medical services expense | 802,837 | 468,016 | 442,483 | 220,363 | 1,021,877 | 725,374 | 412,669 |
| Other medical expenses | 57,355 | 53,187 | 33,694 | 34,761 | 102,306 | 40,526 | 34,092 |
| General and administrative | 79,318 | 60,832 | 43,013 | 34,248 | 137,292 | 122,832 | 88,745 |
| Stock-based compensation expense(1) | 276,020 | 3,176 | 274,548 | 2,155 | | | |
| Depreciation and amortization | 7,008 | 6,517 | 3,581 | 3,319 | 13,531 | 12,253 | 11,385 |
| Total expenses | 1,222,538 | 591,728 | 797,319 | 294,846 | 1,275,006 | 900,985 | 546,891 |
| **Income (loss) from operations** | (310,478) | (7,086) | (298,363) | (1,252) | (56,673) | (106,574) | (72,064) |
| **Other income (expense):** | | | | | | | |
| Other income (expense), net | 4,303 | 48 | 2,967 | (74) | 2,465 | 955 | 611 |
| Interest expense | (4,439) | (4,229) | (1,498) | (2,080) | (8,135) | (9,068) | (9,839) |
| **Income (loss) before income taxes** | (310,614) | (11,267) | (296,894) | (3,406) | (62,343) | (114,687) | (81,292) |
| Income tax benefit (expense) | (451) | (39) | (435) | (39) | (865) | 232 | 113 |
| **Income (loss) from continuing operations** | (311,065) | (11,306) | (297,329) | (3,445) | (63,208) | (114,455) | (81,179) |
| **Discontinued operations:** | | | | | | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | (2,898) | (12,429) | (1,547) | (4,340) | (20,049) | (86,108) | (32,132) |
| Impairments | — | — | — | — | — | (98,343) | (40,794) |
| Gain (loss) on sales of assets, net | — | — | — | — | 20,401 | — | — |
| Income tax benefit (expense) | (129) | (275) | (65) | (126) | 2,804 | 16,166 | 7,588 |
| **Total discontinued operations** | (3,027) | (12,704) | (1,612) | (4,466) | 3,156 | (168,285) | (65,338) |
| **Net income (loss)** | (314,092) | (24,010) | (298,941) | (7,911) | (60,052) | (282,740) | (146,517) |
| Noncontrolling interests' share in (earnings) loss | 169 | — | 96 | — | — | 152 | (409) |
| **Net income (loss) attributable to common shares** | $ (313,923) | $ (24,010) | $ (298,845) | $ (7,911) | $ (60,052) | $ (282,588) | $ (146,926) |

(1)    For annual periods prior to 2021, stock-based compensation expense is included in general and administrative expenses.

20

APP 332

Table of Contents

| | June 30, 2021 | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| **Consolidated Balance Sheet Data (at period end):** | | | |
| Cash and cash equivalents | $1,109,372 | $ 106,795 | $ 123,633 |
| Total assets | 1,701,734 | 446,361 | 402,794 |
| Total liabilities | 551,456 | 421,591 | 353,822 |
| Contingently redeemable common stock | — | 309,500 | 281,000 |
| Total stockholders' equity (deficit) | 1,150,278 | (284,730) | (232,028) |

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| (dollars in thousands) | 2021 | 2020 | 2020 | 2019 | 2018 |
| **Consolidated Statement of Cash Flows Data:** | | | | | |
| Cash flows from: | | | | | |
| Operating activities | $ (80,119) | $ (35,498) | $ (53,204) | $ (103,861) | $ (67,531) |
| Investing activities | (76,338) | (2,351) | $ 22,066 | $ (5,060) | $ (7,970) |
| Financing activities | 1,143,077 | 31,522 | $ 24,621 | $ 176,298 | $ 84,743 |

| | Six Months Ended June 30, | | Three Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | 2021 | 2020 | 2021 | 2020 | 2020 | 2019 | 2018 |
| **Other Financial Data:** | | | | | | | |
| Medical margin(1) | $ 107,253 | $ 114,293 | $ 55,195 | $ 72,132 | $ 192,393 | $ 63,192 | $ 53,943 |
| Network contribution(2) | 54,436 | 63,250 | 24,294 | 38,510 | 99,016 | 25,598 | 22,083 |
| Adjusted EBITDA(3) | 2,088 | 16,888 | (1,674) | 14,311 | 5,827 | (56,711) | (32,240) |

(1)  Medical margin represents medical services revenue after deducting medical services expense.

(2)  Network contribution is a non-GAAP financial measure. Network contribution represents medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Income (loss) from operations is the most directly comparable U.S. generally accepted accounting principles ("GAAP") measure to network contribution. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding network contribution and a reconciliation to income (loss) from operations.

(3)  Adjusted EBITDA is a non-GAAP financial measure. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding Adjusted EBITDA and a reconciliation to net income (loss).

21

Table of Contents

**RISK FACTORS**

*Risks Related to Our Business*

***We have a history of net losses, we anticipate increasing expenses in the future and we may not achieve or maintain profitability.***

We have incurred significant net losses in the past, including net losses (including discontinued operations) of $314.1 million for the six months ended June 30, 2021, $60.1 million for the year ended December 31, 2020, $282.7 million for the year ended December 31, 2019, and $146.5 million for the year ended December 31, 2018. As a result of these losses, we had accumulated deficits of $865.1 million as of June 30, 2021, $551.2 million as of December 31, 2020 and $491.1 million as of December 31, 2019. We expect that our expenses will increase substantially in the foreseeable future and our losses will continue, including for the year ended December 31, 2021, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

***Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As an immature and rapidly growing company, we may be unfamiliar with the

22

Table of Contents

regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business, financial condition, cash flows and results of operations could be harmed.

*We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.*

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing upon these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, as a rapidly growing and relatively immature company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows and results of operations could be harmed.

*Amounts of medical expenses which are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.*

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows and results of operations.

Additionally, factors which impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:
- Changes to the Medicare fee schedule or other rate schedules which serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

23

**Table of Contents**

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;
- The utilization rates of healthcare services, including inpatient hospitalization, by our members;
- Changes to member benefit levels established annually by payors; and
- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows and results of operations.

***As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.***

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and ,therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or which are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

***We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.***

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As a result, as our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows and results of operations could be materially adversely affected.

24

Table of Contents

***We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.***

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. As of June 30, 2021, December 31, 2020 and December 31, 2019, our cash and cash equivalents were $1,109.4 million, $106.8 million and $123.6 million, respectively. On April 19, 2021, we completed our initial public offering and received net proceeds of approximately $1.2 billion, after underwriting discounts and commissions and other offering expenses. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced extreme volatility and disruption, which has increased due to the effects of COVID-19. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our Credit Facilities.

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable time, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

***Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows and results of operations.***

A significant reduction in membership could adversely affect our business, financial condition, cash flows and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:
- failure to obtain new physician partners or members or to retain existing physician partners or members;
- decision by a payor to not renew the existing contractual agreement upon termination of such contract;
- low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;
- alternative care opportunities that are more attractive than those provided by our physician partners;
- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;

25

**APP 337**

Table of Contents

- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;
- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and
- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

### *The transition to a Total Care Model may be challenging for physician partners.*

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows and results of operations could be materially adversely affected.

### *If the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies are inaccurate, our future growth rate may be impacted and we may generate losses in such markets, or we may fail to attain financial performance targets.*

We often do not have access to reliable historical data regarding the size, revenue or medical expense levels of our target geographies or potential physician partners. As a result, our market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size and expected growth of the market for our services and the estimates of our market opportunity may prove to be inaccurate.

Principal assumptions relating to our market opportunity include estimates of the total number and average length of relationships between MA patients and their physicians, historical MA patient growth rates, amount of revenue and medical expenses associated with MA members expected to be attributed to our physician partners and historical experience that physician partners have with a Total Care Model. Our opportunity is based on the assumption that our platform, partnership and network model will be more attractive to potential physician partners than competing options. However, potential physician partners may elect to pursue a different strategic option.

### *The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19.*

COVID-19 continues to spread in the United States and throughout the world. COVID-19 and the efforts to contain the outbreak have led to significant economic disruption, including extreme volatility in financial markets, reduced economic activity and a sharp increase in unemployment claims, as well as disruption in some of our physician partners' businesses. The spread of COVID-19 underscores certain risks we face in our business described herein.

26

**Table of Contents**

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, increasing the potential for harm for our members. If the spread of COVID-19 is not contained, the medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to manage their existing clinical conditions, and the amount of medical care which has been deferred during the pandemic may exceed our expectations. Furthermore, we may experience reduced revenues as a result of changes to future capitation payment rates if Medicare members use fewer services due to COVID-19. For example, restrictions imposed as a result of COVID-19 may continue to decrease utilization of preventative or non-emergency healthcare, significantly decreasing provider costs. Should CMS adjust reimbursement rates based on margins during the pendency of COVID-19, our revenues in future periods and financial results may be materially adversely affected. Such measures and any further steps taken by us, or governmental action, to expand or otherwise modify the services delivered to our enrolled members, provide relief for the healthcare provider community, or in connection with the relaxation of stay-at-home and physical distancing orders and other restrictions on movement and economic activity intended to reduce the spread of COVID-19, including enhanced measures to implement widespread testing as a component of lifting these measures, could adversely impact our business, financial condition, cash flows and results of operations.

The spread of COVID-19, or actions taken to mitigate this spread, including the efficacy, ability to administer or extent of adoption of COVID-19 vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations. We have transitioned a significant subset of our employee population to a remote work environment in an effort to mitigate the spread of COVID-19, which could exacerbate certain risks to our business, including an increased demand for information technology resources, increased risk of phishing and other cybersecurity attacks as well as other risks to the privacy and confidentiality of data, and increased risk of unauthorized dissemination of sensitive personal information or proprietary or confidential information about us or our members or other third parties. We have taken, and may take, further actions that alter our business operations as may be required by local, state, or federal authorities or that we determine are in the best interests of our employees. Such measures could negatively affect our ability to provide care to members, relationship with physician partners, marketing efforts, employee productivity, or customer retention, any of which could harm our business, financial condition, cash flows and results of operations.

Further, due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient, based on each patient's documented clinical diagnoses activity in the preceding calendar year. Medicare requires that a patient's health issues be clinically assessed and sufficiently documented annually regardless of the permanence of the underlying clinical conditions. Historically, this clinical assessment and documentation was required to be completed during an in-person visit with a patient. As part of the Coronavirus Aid, Relief and Economic Security Act, or "CARES Act," Medicare is allowing documentation for conditions identified during video visits with patients. However, given the disruption caused by COVID-19, it is unclear whether our physician partners will be able to conduct patient interactions to clinically assess and accurately and sufficiently document the health conditions of our members, which could adversely impact our revenue in 2021 and beyond.

27

**Table of Contents**

In response to COVID-19, the United States Congress, CMS and other federal agencies with oversight of care delivery requirements made several changes to the manner in which Medicare will pay for telemedicine visits, many of which relax previous requirements, including site requirements for both providers and members, telemedicine modality requirements and others. State laws and regulations applicable to telemedicine, particularly licensure requirements, also were relaxed in many jurisdictions as a result of the COVID-19 pandemic. These relaxed regulations have allowed our physician partners to keep operating and deliver care to members predominantly through telemedicine modalities. Nearly all of the Federal measures will expire at the end of the Public Health Emergency declaration, which the Biden administration has indicated will last through the end of 2021. Many State law and regulatory changes have already expired while others have continued. It is unclear which, if any, of these changes will remain in place permanently and which will be rolled-back following the COVID-19 pandemic, although there have been a number of state law and regulatory changes over the past year that clarify requirements or remove impediments. If regulations change to restrict the ability to deliver care or receive reimbursement for care delivered through telemedicine modalities, our financial condition and results of operations may be adversely affected.

The rapid development and fluidity of this situation precludes any prediction as to the ultimate impact on us of COVID-19. We are continuing to monitor the spread of COVID-19, changes to our payors' benefit coverages, the ongoing costs and business impacts of dealing with COVID-19, including the potential costs associated with lifting restrictions on movement and economic activity and with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of the pandemic and its ultimate impact on us is uncertain as this continues to evolve globally, but such impacts could be material to our business, financial condition, cash flows and results of operations.

***Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.***

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services which have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

28

Table of Contents

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

### Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows and results of operations to be harmed.

### Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions which would adversely affect our business, financial condition, cash flows and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

### We rely on our management team and key employees and our business, financial condition, cash flows and results of operations could be harmed if we are unable to retain qualified personnel.

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. Prior to this offering, in order to retain and motivate valuable employees, in addition to salary and cash incentives, we provided stock options that either vest over time or are based on the equity return realized by our controlling stockholder. The value to employees of these stock options is significantly affected by movements in our stock price that are outside our control. The compensation and benefits we provide to our employees, together with the value of stock options that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all. Following the offering, we intend to continue to use equity awards as part of our executive compensation

29

**Table of Contents**

program, and volatility or lack of performance in our stock price may also affect our ability to attract any replacements or retain these employees.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows and results of operations will be harmed.

### *We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.*

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. As of June 30, 2021, December 31, 2020 and December 31, 2019, respectively, we had $100.2 million, $102.0 million, and $112.7 million of net intangible assets, including $41.5 million of goodwill. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. A detailed discussion of our impairment testing is included in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates."

Due to the continued deterioration in the performance of our California reporting unit, in the fourth quarter of 2019, we initiated a process to evaluate strategic alternatives for our California operations, including a sale or abandonment of all or substantially all of such operations. We therefore performed an assessment of the long-lived assets in the California reporting unit for impairment and determined that the carrying value of certain of those assets was not recoverable. Accordingly, we wrote-down such assets to fair value, resulting in the recognition of a $98.3 million impairment charge included in discontinued operations in the audited consolidated statement of operations for the year ended December 31, 2019. See "Note 19. Discontinued Operations" in our consolidated financial statements included elsewhere in this prospectus.

Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *Adverse determinations of tax matters could adversely affect our business, financial condition, cash flows and results of operations.*

We are subject to tax laws in the various jurisdictions in which we operate, and the application of these laws to us may be unclear. Some interpretations adopted by us could be challenged by the relevant tax authorities. A successful challenge could result in adverse consequences for us, including potentially the payment of taxes, penalties or interest in amounts that may be material. See "Note 11. Commitments and Contingencies" and "Note 14. Income Taxes" in our audited consolidated financial statements for the year ended December 31, 2020 included elsewhere in this prospectus.

Table of Contents

***Security breaches, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.***

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as protected health information ("PHI") and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing.

We have experienced cybersecurity incidents in the past and may experience them in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters— Federal and State Privacy and Security Requirements." Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

31

Table of Contents

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;
- communications failures;
- software and hardware errors, failures and crashes;
- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and
- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows and results of operations.

32

APP 344

Table of Contents

***We could be required to devote significant attention and resources to the provision of certain transition services in connection with the disposition of our California Operations.***

In February 2021, we completed the divestiture of our California Operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes in our financial statements included elsewhere in this prospectus.

In connection with the divestiture, we have agreed to continue to provide administrative support and transition services for a specified period of time. The transition services to be provided by us could require significant management attention and resources which could negatively affect our ongoing business. Additionally, we could experience operational difficulties and increased costs that exceed our estimates to provide the transition services if we are unable to perform such services with our existing resources at an acceptable level, or at all, or obtain them from a third party on reasonable terms.

For the Southern California and Fresno divestiture transactions, we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus. We may not be successful in managing the risks associated with the divestiture of our California operations.

***Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.***

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Reliance on Third Parties

***We are economically dependent on maintaining our contracts with a limited number of key payors.***

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

33

Table of Contents

***Our contracts with our payors are for limited terms, and may not be renewed upon their expiration.***

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. For example, a group contract through which certain of our members in our Texas geography receive care was awarded to a new payor with whom we were not contracted at the time to attribute members for 2021. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.***

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively

34

Table of Contents

ingest the information which payors provide to us, we and our physician partners may not be able to effectively ensure our members disease burdens are identified and may not be able to effective operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

### *Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on

35

APP 347

Table of Contents

providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

*We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.*

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

In recent years, the U.S. Department of Justice has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors for alleged upcoding or improper coding of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on

36

Table of Contents

medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for penalties to the government under the FCA that range from $11,803 to $23,607 (adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of

37

Table of Contents

their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.

### Risks Related to Our Industry and Government Programs

#### Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally, consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows and results of operations.

#### Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows and results of operations.

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for approximately 100%, 99%, and 98% of our total revenues for the years ended December 31, 2020, 2019, and 2018, respectively. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. Additionally, we are participating in the Direct Contracting Model and our first performance period began on April 1, 2021. While the DCE's are not consolidated, they still have an impact on our profitability. The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

38

**Table of Contents**

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

The financial aspects of the Direct Contracting Model are set forth in an agreement between the DCE and CMS. CMS has the right to amend the agreement without the consent of the DCE for good cause or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules. We cannot predict whether CMS will amend such agreements and, if CMS amends such agreements, the impact such amendments may have on the financial aspects of our participation in the model, including, but not limited to, risk adjustment models used to set benchmarks, the rate book, capitation payment mechanisms and the calculation of shared savings and losses. Furthermore, changes to Medicare (including the Direct Contracting Model) or MA, such as if CMS were to scale back these programs or discontinue MA, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us. Additionally, on August 10, 2021, the U.S. Senate passed the bipartisan Infrastructure Investment and Jobs Act, a $1.2 trillion infrastructure package. Although the Senate-passed infrastructure bill has now been sent to the House, it is not expected to be voted on in the House until later this year; the House is not expected to vote on the infrastructure bill until the Senate also passes the $3.5 trillion budget reconciliation bill. If enacted, the two bills are anticipated to have consequences for the healthcare industry, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. The infrastructure and reconciliation bills are expected, for example, to expand Medicare coverage and lower the program's eligibility age, increase the Medicare Advantage coding intensity adjustment and subject Medicare payments to a 2% sequestration reduction through 2031.

*Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows and results of operations.*

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

*We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows and results of operations will be harmed.*

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care

39

**APP 351**

Table of Contents

Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows and results of operations could be materially adversely affected.

***Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.***

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the Patient Protection and Affordable Care Act (the "ACA"), the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low quality rating for three consecutive years. Low quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations.

40

Table of Contents

***Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.***

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past and could in the future result in substantial reductions in our revenue and operating margins. For example, since the passage of the Sequestration Transparency Act of 2012, Medicare payments have been subject to a 2% sequestration reduction; these cuts were the result of a congressional deal to address the debt ceiling crisis. The CARES Act temporarily suspended the 2% sequestration payment adjustment on Medicare payments from May 1, 2020 through December 31, 2020, which was extended through December 31, 2021 by the Act to Prevent Across-the-Board Direct Spending Cuts, and for Other Purposes, signed on April 14, 2021. However, passage of the Infrastructure Investment and Jobs Act and budget reconciliation bill is expected to effectuate a mandatory sequestration reduction, through 2031. Further, the passage of the Improving Medicare Post-Acute Care Transformation ("IMPACT") Act imposes a stringent timeline for implementing benchmark quality measures and data metrics across post-acute care providers. CMS has promulgated, and may continue to promulgate, regulations to implement provisions of the IMPACT Act. The costs of implementation could be significant, particularly with respect to the design of a unified payment methodology for post-acute providers. Failure to meet implementation requirements could expose providers to payment reductions and penalties.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Passage of the Infrastructure Investment and Jobs Act and budget reconciliation bill is expected to expand traditional Medicare coverage, likely to vision, dental and hearing coverage, and lower the program's eligibility age; such changes may increase competition between traditional Medicare and MA, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and

41

APP 353

Table of Contents

regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.*

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. We, in conjunction with some of our physician partners, began participating in the Direct Contracting Model in certain geographies on April 1, 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has been built upon CMS' experience with other programs, including MA and the Medicare Shared Savings Program, but also has new elements, such as a risk adjustment model developed specifically for use in the Direct Contracting Model. Likewise, the Direct Contracting Model rate book is based on the same methodology used for the MA rate book but has been modified in light of the characteristics of the Direct Contracting Model. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency. Further, the future of the Direct Contracting Model under the Biden administration is unclear. On March 1, 2021, the CMS Innovation Center announced that the Geographic Population-Based Payment ("Geographic PBP") model is under review and will no longer begin on January 1, 2022. On April 1, 2021, the CMS Innovation Center announced it would no longer be accepting applications from organizations interested in participating in the Global Professional Direct Contracting Model and will not solicit applications for a second round of participants to start the model on January 1, 2022 (subsequently, participation was opened to participants in the Next Generation ACO Model). The overall effect of these programmatic changes on the Direct Contracting Model is unknown.

Additionally, we are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations, including with respect to our contractual relationships with providers and payors.

### *We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.*

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by

42

**APP 354**

**Table of Contents**

governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

### *We have in the past, and may in the future, be subject to regulatory inquiries and CAPs imposed by our payors.*

We have in the past been, and may in the future be, subject to regulatory inquiries and corrective action plans ("CAPs") imposed by our payors, and the status of certain state regulatory and payor inquiries is uncertain. For example, in February 2018, our subsidiary, PPMC, self-disclosed to the California Department of Managed Health Care ("DMHC"), the California Department of Health Care Services, and our affected payors certain noncompliant practices in our claims and utilization management. We submitted various reports in May, June and August of 2018 and coordinated with the DMHC and certain of our payors to remediate noncompliant claims and utilization management practices and implement improvements through various CAPs. On December 17, 2019, we completed substantial remediation of all known deficiencies identified by the DMHC's audit findings. In February 2021, we divested all of our California operations. On March 9, 2021, we received a set of investigative interrogatories from the DMHC pursuant to its investigation of conduct and matters described in our various reports. The interrogatories sought information concerning certain claims data and authorizations denied due to lack of medical necessity, including information regarding the health plans affected thereby. We responded timely to such interrogatories and provided requested information. Any adverse review, audit or investigation could result in, among other things: refunding of amounts we have been paid pursuant to our contracts; or the imposition of fines, penalties and other sanctions on us, or certain of our payors. While we do not expect the amount to be material, we are unable to predict the potential dollar value of recoupments or fines, penalties or other sanctions that may be imposed on us or the impacted payors related to the DMHC's audit findings, if any. Per publicly available information, five out of the nine impacted payors have entered into letters of agreement with the DMHC whereby each of the payors have agreed to pay an administrative penalty related to the deficiencies. These penalties equal $122,500 in the aggregate. The DMHC has imposed an administrative penalty on at least one of the remaining impacted payors. At least one payor has formally sought indemnification from us in the amount of $80,000 for penalties related to the DMHC audit findings. We are unable to predict the potential dollar value of claims or demands that could be asserted in the future, if any. While we have divested all of our California operations as of February 2021, for the Southern California and Fresno divestiture transactions we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including any fines, penalties and other sanctions relating to the DMHC matter described above, the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus.

43

Table of Contents

Further, we may be audited by payors and regulatory bodies, and we have been required to engage in and respond to payor corrective action plans and regulatory inquiries in the past. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. As of June 30, 2021 and December 31, 2020, risk-bearing capital required across our geographies and payors totaled $57.8 million and $38.8 million, respectively. There is also a risk that such amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

### *Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.*

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

### *CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.*

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. For 2020 and 2019, respectively, 50% and 25% of our MA members' risk adjustment factor was calculated from claims data submitted through EDS. CMS increased that percentage to 75% in 2021 and will increase that percentage to 100% in 2022. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues. Our revenues could be further reduced by passage of the Infrastructure Investment and Jobs Act and budget reconciliation bill, which are expected to increase the MA coding intensity adjustment.

44

Table of Contents

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;
- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or
- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

### Legal and Regulatory Risks

***The healthcare industry is intensely regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our current conduct or even conduct that occurred a number of years ago, including prior to the acquisition of our subsidiary, PPMC, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law, or whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the False Claims Act and the Civil Monetary Penalties Law ("CMPL"), which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;
- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;
- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing designated health services ("DHS") if the physician (or his/her immediate family member) has a financial relationship with that entity;

45

**APP 357**

**Table of Contents**

- Provisions of, and regulations enacted pursuant to, HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act") and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;
- Provisions of, and regulations enacted pursuant to, the 21st Century Cures Act, regarding interoperability and prohibitions against information blocking;
- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;
- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;
- State laws that govern the activities of third-party administrators and utilization review agents; and
- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters."

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been and may be a party to various lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in federal healthcare programs;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;
- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;
- enforcement actions by governmental agencies or monetary penalties for violations of the 21st Century Cures Act;
- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;
- mandated changes to our practices or procedures that materially increase operating expenses;
- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;

46

**APP 358**

**Table of Contents**

- termination of various relationships or contracts related to our business; and
- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

***The healthcare industry is subject to antitrust scrutiny, and if it is found that we violate antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

The healthcare industry is subject to antitrust scrutiny. The federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. The Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice ("DOJ") and state Attorneys General actively review and, in some cases, take enforcement action against business conduct and acquisitions in the healthcare industry. Private parties harmed by alleged anti-competitive conduct can also bring antitrust suits. Violations of antitrust laws may be punishable by substantial penalties, including significant monetary fines and treble damages, civil penalties, criminal sanctions and consent decrees and injunctions prohibiting certain activities or requiring divestiture or discontinuance of business operations. If antitrust enforcement authorities conclude that we violate any antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting the U.S. healthcare reform, our business may be harmed.***

Due to the importance of the healthcare industry in the lives of all Americans, federal, state and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect the healthcare industry. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. We cannot predict the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect our business or could change the operating environment of our primary care centers. It is also possible that the changes to federal healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in federal healthcare programs, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

There can be no assurance that we will be able to successfully address changes in the current regulatory environment. Some of the healthcare laws and regulations applicable to us are subject to limited or evolving

Table of Contents

interpretations, and a review of our business or operations by a court, law enforcement or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.***

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to (i) increase the quality of care while appropriately managing overall costs and (ii) participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law."

The laws and regulations, however, are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.***

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms, but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. In addition, through our participation in the CMS Innovation Center Direct Contracting Model, we (either as a DCE or as a service provider to our physician partners who are participating in the model) must comply with provisions in the participation agreements with CMS regarding marketing and outreach

48

**Table of Contents**

activities. For example, DCEs must have their plans for marketing activities approved by CMS and are prohibited from engaging in some forms of marketing activities such as door-to-door solicitation. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute." Our physician partners and the payors with which we contract risk running afoul of applicable state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (*e.g.*, the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Our business development and member engagement activities may implicate the federal Telephone Consumer Protection Act ("TCPA"), related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws." A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's protected health information in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

### *Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.*

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters." Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory

49

**APP 361**

Table of Contents

Matters—Other Laws and Regulations." If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

***Our use, disclosure and processing of personally identifiable information, protected health information and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security

50

Table of Contents

breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be directly liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time to time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows and results of operations.

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. For example, we note that in 2019, the Office for Civil Rights (OCR) announced the creation of its Right of Access Initiative, intended to support individuals' right of timely access to their health records. Since the creation of the Right of Access Initiative, there has been substantial enforcement activity related to covered entities' alleged failures to provide individuals with timely access to their health records. To the extent the physician partners' non-compliance impacts members who are attributed to our RBEs (*e.g.*, through the loss of protected health information or failure to provide timely access to health records), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows and results of operations.

***Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.***

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws." We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

51

Table of Contents

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.***

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a lay entity may violate the corporate practice of medicine doctrine. See "Business—Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine." A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.***

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person which could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

52

**Table of Contents**

***We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows and results of operations.***

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation, and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

### Risks Related to Our Indebtedness

***We have substantial indebtedness and may incur additional indebtedness, which could adversely affect our financial health and our ability to obtain financing in the future, react to changes in our business or satisfy our obligations.***

As of December 31, 2020 we, through our wholly-owned subsidiary agilon health management, inc., had approximately $68.6 million of total long-term consolidated indebtedness outstanding under our secured credit agreement, dated as of July 1, 2016 (as amended from time to time, the "Secured Credit Agreement") governing the term loan and revolving credit facility (the "Secured Credit Facility"), and our unsecured credit agreement, dated as of December 22, 2017 (the "Unsecured Credit Agreement"), governing our unsecured term loan facility

53

Table of Contents

(the "Unsecured Term Loan Facility" and, together with the Secured Credit Facility, the "Credit Facilities"). As of such date, we also had $41.5 million of additional borrowings available under our revolving credit facility after taking into account $18.5 million of letters of credit outstanding. On February 18, 2021, we, through our wholly-owned subsidiary agilon health management, inc., entered into the credit agreement, dated as of February 18, 2021 (the "2021 Credit Agreement") governing our term loan and revolving credit facility (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "2021 Secured Credit Facilities") by and among agilon health management, inc., Agilon Health Intermediate Holdings, Inc. ("Intermediate Holdings"), the Lenders party thereto, the Issuers party thereto (each as defined therein), JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and JPMorgan Chase Bank, N.A. Bank of America, N.A., Wells Fargo Securities, LLC, Deutsche Bank Securities Inc. and Nomura Securities International, Inc., as joint lead arrangers and joint bookrunners to refinance our outstanding indebtedness under the Credit Facilities, consisting of (i) a senior secured term loan facility in an aggregate principal amount of $100.0 million and (ii) a senior secured revolving credit facility in an aggregate principal amount of $100.0 million. In connection with our IPO, on April 26, 2021 we made a mandatory prepayment of $50.0 million of the 2021 Secured Term Loan Facility as a result of the gross proceeds from the IPO exceeding $1.0 billion. Following the mandatory prepayment, we had $50.0 million outstanding under our Secured Term Loan Facility.

See "Description of Certain Indebtedness." In addition, we may incur additional indebtedness in the future, subject to the limitations contained in the agreements governing our indebtedness. Our substantial indebtedness could have important consequences to you. Because of our substantial indebtedness:

- our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements, pay dividends and make other distributions or to purchase, redeem or retire capital stock or for general corporate purposes and our ability to satisfy our obligations with respect to our indebtedness may be impaired in the future;
- a large portion of our cash flow from operations must be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available to us for other purposes;
- we are exposed to the risk of increased interest rates because a significant portion of our borrowings are at variable rates of interest;
- it may be more difficult for us to satisfy our obligations to our creditors, resulting in possible defaults on, and acceleration of, such indebtedness;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be at a competitive disadvantage compared to our competitors with proportionately less indebtedness or with comparable indebtedness on more favorable terms and, as a result, they may be better positioned to withstand economic downturns;
- our ability to refinance indebtedness may be limited or the associated costs may increase;
- our flexibility to adjust to changing market conditions and ability to withstand competitive pressures could be limited;
- our ability to pay dividends and make other distributions or to purchase, redeem or retire capital stock may be limited; and
- we may be prevented from carrying out capital spending and restructurings that are necessary or important to our growth strategy and efforts to improve our operating margins.

***Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the 2021 Credit Agreement do not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in

54

**Table of Contents**

compliance with certain coverage ratios set forth in the agreements governing the 2021 Secured Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the 2021 Secured Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

*Increases in interest rates would increase the cost of servicing our indebtedness and could reduce our profitability.*

A significant portion of our outstanding indebtedness bears interest at variable rates, including $48.6 million of outstanding borrowings and $41.5 million of additional borrowings available under our Secured Credit Facility after taking into account $18.5 million of letters of credit outstanding, as of December 31, 2020. As adjusted for the entry into the 2021 Credit Facilities, as of June 30, 2021, we had $50.0 million of outstanding borrowings and $64.4 million of additional borrowings available under the 2021 Credit Facilities, after taking into account outstanding letters of credit totaling $35.6 million, of which $14.0 million is related to DCEs. As a result, increases in interest rates would increase the cost of servicing our indebtedness and could materially and adversely affect our business, financial condition, cash flows and results of operations. As of December 31, 2020, assuming the London Interbank Offered Rate ("LIBOR") exceeded 1.00%, each one percentage point change in interest rates would have resulted in a change of approximately $0.5 million in the annual interest expense on our Secured Credit Facility. As of December 31, 2020, assuming availability was fully utilized, each one percentage point change in interest rates would have resulted in a change of approximately $1.1 million in annual interest expense on the Secured Credit Facility. The impact of increases in interest rates could be more significant for us than it would be for some other companies because of our indebtedness, thereby affecting our profitability.

Furthermore, uncertainty about the continuing availability of LIBOR may adversely affect our business, financial condition, cash flows and results of operations. On July 27, 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that after December 31, 2021, it would no longer compel banks to submit the rates required to calculate LIBOR. On March 5, 2021, the current administrator of LIBOR, ICE Benchmark Administration, announced that it would cease publication of certain tenors of U.S. dollar LIBOR on June 30, 2023. With this announcement, there is uncertainty about the continued availability of LIBOR after 2021 or, in certain circumstances, 2023. If LIBOR ceases to be available or the methods of calculating LIBOR change from the current methods, financial products with interest rates tied to LIBOR may be adversely affected. Even if LIBOR remains available, it is uncertain whether it will continue to be viewed as an acceptable market benchmark, what rate or rates may become accepted alternatives to LIBOR or what the effect of any such changes in views or alternatives may be on the markets for LIBOR-indexed financial instruments. As of December 31, 2020, adjusted to reflect the entry into the 2021 Secured Credit Facilities, all of our aggregate consolidated indebtedness was indexed to LIBOR. If any of the foregoing were to occur, the interest rates on such indebtedness may be adversely affected.

*The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.*

Our 2021 Secured Credit Facilities contain covenants that, among other things, restrict the ability of agilon management and its subsidiaries to:
- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;

55

**Table of Contents**

- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and
- enter into lines of business.

agilon management and its subsidiaries accounted for 100% of our total assets and 100% of our total liabilities as of December 31, 2020. Consequently, the restrictions in the 2021 Secured Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the 2021 Secured Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the 2021 Secured Credit Facilities, could proceed against the collateral securing the indebtedness. All obligations under the 2021 Secured Credit Facilities are guaranteed by Intermediate Holdings and each domestic subsidiary of agilon management other than certain excluded subsidiaries. All obligations of agilon management and each guarantor are secured by a perfected security interest in substantially all tangible and intangible assets of agilon management and each such guarantor, including the capital stock of each domestic subsidiary of agilon management and each such guarantor, and 65% of each series of capital stock of any non U.S. subsidiary held directly by agilon management or any guarantor, subject to certain exceptions. In any such case, we may be unable to borrow under the 2021 Secured Credit Facilities and may not be able to repay the amounts due under such facilities. This could materially and adversely affect our business, financial condition, cash flows and results of operations, and could cause us to become bankrupt or insolvent.

***Our ability to generate the significant amount of cash needed to pay interest and principal on our indebtedness and our ability to refinance all or a portion of our indebtedness or obtain additional financing depends on many factors outside our control.***

agilon management, the borrower under the 2021 Secured Credit Facilities, is a holding company, and as such it has no independent operations or material assets other than ownership of equity interests in its subsidiaries. agilon management depends on its subsidiaries to distribute funds to it so that it may pay obligations and expenses, including satisfying obligations with respect to indebtedness. Our ability to make scheduled payments on, or to refinance our obligations under, our indebtedness depends on the financial and operating performance of the subsidiaries of agilon management and their ability to make distributions and dividends to it, which, in turn, depends on their results of operations, cash flows, cash requirements, financial position and general business conditions and any legal and regulatory restrictions on the payment of dividends to which they may be subject, many of which could be outside our control.

We may be unable to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness. If our cash flow and capital resources are insufficient to fund our

56

**APP 368**

**Table of Contents**

debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek to obtain additional equity capital or restructure our indebtedness. In the future, our cash flow and capital resources may not be sufficient for payments of interest on and principal of our indebtedness, and such alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations.

The final maturity date of the 2021 Secured Term Loan Facility and the 2021 Secured Revolving Facility is February 18, 2026. We may be unable to refinance any of our indebtedness or obtain additional financing, particularly because of our substantial indebtedness. Market disruptions, such as those experienced in 2008, 2009 and March 2020, as well as our indebtedness levels, may increase our cost of borrowing or adversely affect our ability to refinance our obligations as they become due. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all. If we are unable to refinance our indebtedness or access additional credit, or if short-term or long-term borrowing costs dramatically increase, our ability to finance current operations and meet our short-term and long-term obligations could be adversely affected.

If agilon management cannot make scheduled payments on its indebtedness, it will be in default and the lenders under the 2021 Secured Credit Facilities could terminate their commitments to loan money or, in the case of lenders under the 2021 Secured Credit Facilities, foreclose against the assets securing their borrowings, and we could be forced into bankruptcy or liquidation. Any of these actions could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Common Stock and This Offering

#### agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. See "Management's Discussion and Analysis of Financial Condition and Results of Operations." To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography and ranged from $50,000 to $10.0 million, or $38.8 million to $57.8 million in the aggregate across all of our geographies and payors, as of December 31, 2020 and June 30, 2021, respectively. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

Table of Contents

***The market price of our common stock may be volatile and could decline after this offering.***

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. The market price of our common stock may fluctuate significantly. Among the factors that could affect our stock price are:
- industry, regulatory or general market conditions;
- domestic and international economic factors unrelated to our performance;
- changes in our physician partners' or their patients' preferences;
- new regulatory pronouncements and changes in regulatory guidelines;
- lawsuits, enforcement actions and other claims by third parties or governmental authorities;
- actual or anticipated fluctuations in our quarterly operating results;
- lack of research coverage and reports by industry analysts or changes in any securities analysts' estimates of our financial performance;
- action by institutional stockholders or other large stockholders, including future sales of our common stock;
- failure to meet any guidance given by us or any change in any guidance given by us, or changes by us in our guidance practices;
- announcements by us of significant impairment charges;
- speculation in the press or investment community;
- investor perception of us and our industry;
- changes in market valuations or earnings of similar companies;
- the impact of short selling or the impact of a potential "short squeeze" resulting from a sudden increase in demand for our common stock;
- announcements by us or our competitors of significant contracts, acquisitions, dispositions or strategic partnerships;
- war, terrorist acts and epidemic disease, including COVID-19;
- any future sales of our common stock or other securities;
- additions or departures of key personnel; and
- misconduct or other improper actions of our employees.

In particular, we cannot assure you that you will be able to resell your shares at or above the public offering price. Stock markets have experienced extreme volatility in recent years that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against the affected company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***An active, liquid trading market for our common stock may not be sustained.***

Although our common stock is currently listed on the NYSE under the symbol "AGL," an active trading market for our shares may not be sustained. Accordingly, if an active trading market for our common stock is not maintained, the liquidity of our common stock, your ability to sell your shares of our common stock when desired and the prices that you may obtain for your shares of common stock will be adversely affected.

Table of Contents

*Future sales of shares by us or our existing stockholders could cause our stock price to decline.*

Sales of substantial amounts of our common stock in the public market following this offering, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

As of June 30, 2021, adjusted to give effect to this offering, we had 391,448,029 outstanding shares of common stock. Of these shares, all of the 53,590,000 shares sold in our IPO are, and the 17,000,000 shares to be sold in this offering will be, immediately tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any shares held by "affiliates," as that term is defined in Rule 144 under the Securities Act ("Rule 144"). On April 14, 2021, we filed a registration statement on Form S-8 under the Securities Act to register the shares of common stock to be issued under our equity compensation plans and, as a result, all shares of common stock acquired upon exercise of stock options granted under our plan will also be freely tradable under the Securities Act, subject to the terms of the lock-up agreements, unless purchased by our affiliates. As of June 30, 2021, there were stock options outstanding to purchase a total of 41,197,388 shares of our common stock, of which 18,509,531 options are expected to be exercisable as of the consummation of this offering (or 30,308,461 options, after taking into account the satisfaction of performance conditions applicable to certain options as a result of this offering and assuming the exercise in full by the underwriters of their option to purchase additional shares). See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates—Stock-based Compensation" for additional information.

The remaining 320,858,029 shares of common stock outstanding as of June 30, 2021 are restricted securities within the meaning of Rule 144 under the Securities Act, but will be eligible for resale subject to applicable volume, means of sale, holding period and other limitations of Rule 144 under the Securities Act or pursuant to an exemption from registration under Rule 701 under the Securities Act, or "Rule 701," subject to the lock-up agreements to be entered into by us, the CD&R Investor, certain of our stockholders and our executive officers and directors.

In connection with our IPO, the CD&R Investor, certain of our stockholders and our executive officers and directors entered into lock-up agreements for a period of 180 days after the date of the prospectus for our IPO. In connection with this offering, J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters in our IPO, have agreed to waive the prior lock-up agreements with respect to up to 17,000,000 shares (or up to 19,550,000 shares including the underwriters' option to purchase additional shares) of our common stock for the sale by the selling stockholders in this offering, which includes shares beneficially owned by certain of our officers and directors, provided that the waiver is limited to the shares actually sold in this offering. Additionally, in connection with this offering, the CD&R Investor, certain of our stockholders, including certain of the selling stockholders, and our executive officers and directors have entered into lock-up agreements under which we and they have agreed not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 90 days after the date of this prospectus. See "Underwriting." Following the expiration of this 90-day lock-up period, 320,858,029 shares of our common stock will be eligible for future sale, subject to the applicable volume, manner of sale, holding period and other limitations of Rule 144 or pursuant to an exemption from registration under Rule 701. See "Shares Available for Future Sale" for a discussion of the shares of common stock that may be sold into the public market in the future. In addition, our significant stockholders may distribute shares that they hold to their investors who themselves may then sell into the public market following the expiration of the lock-up period. Such sales may not be subject to the volume, manner of sale, holding period and other limitations of Rule 144. Furthermore, the CD&R Investor and other significant stockholders have the right to require us to register shares of common stock for resale in certain circumstances. As resale restrictions end, the market price of our common stock could decline if the holders of those shares sell them or are perceived by the market as intending to sell them.

Table of Contents

In the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

***If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for our common stock depends in part on the research and reports that securities or industry analysts may publish about us or our business. If one or more of the analysts that covers our common stock downgrades our stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of the analysts ceases coverage of our common stock or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our common stock price or trading volume to decline.

***Fulfilling our obligations incident to being a public company, including compliance with the Exchange Act and the requirements of the Sarbanes-Oxley Act and the Dodd-Frank Act, will be expensive and time-consuming, and any delays or difficulties in satisfying these obligations could have a material adverse effect on our future results of operations and our stock price.***

In connection with the completion of our IPO on April 19, 2021, we became a public company. As a public company, we are subject to the reporting, accounting and corporate governance requirements of the NYSE, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Sarbanes-Oxley Act and Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") that apply to issuers of listed equity, which impose certain significant compliance requirements, costs and obligations upon us. The changes necessitated by being a publicly listed company and ongoing compliance with these rules and regulations require a significant commitment of additional resources and management oversight, which increases our operating costs and could divert our management and personnel from other business concerns, particularly since we are no longer an emerging growth company. Further, to continue to comply with the requirements of being a public company, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring additional accounting or internal audit staff.

The Sarbanes-Oxley Act requires us, among other things, to maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

In addition, our internal resources and personnel may in the future be insufficient to avoid accounting errors, and our auditors may identify deficiencies, significant deficiencies or material weaknesses in our internal control environment in the future. Any failure to develop or maintain effective controls or any difficulties encountered implementing required new or improved controls could harm our operating results or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the U.S. Securities and Exchange Commission (the "SEC"). Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE. As a public company, we are required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore required to make a

Table of Contents

formal assessment of the effectiveness of our internal control over financial reporting for that purpose, but we are not required to provide an annual management report on the effectiveness of our internal control over financial reporting until our second Annual Report on Form 10-K. Our independent registered public accounting firm has identified material weaknesses in the past, and the measures we implemented to remediate such weaknesses may be insufficient to identify or prevent material weaknesses in the future. These material weaknesses have been remediated. However, the measures we implemented may be insufficient to identify or prevent future material weaknesses.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until we cease to be an emerging growth company or a non-accelerated filer. We ceased to be an emerging growth company on December 31, 2020, and we do not expect to be a non-accelerated filer beginning as of December 31, 2022. As such, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting in our 2022 Annual Report on Form 10-K. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business, financial condition, cash flows and results of operations.

The expenses associated with being a public company include increases in auditing, accounting and legal fees and expenses, investor relations expenses, increased directors' fees and director and officer liability insurance costs, registrar and transfer agent fees and listing fees, as well as other expenses. As a public company, we are required, among other things, to define and expand the roles and the duties of our board of directors and its committees and institute more comprehensive compliance and investor relations functions. Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage us as a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, cash flows and results of operation. Failure to comply with the requirements of being a public company could potentially subject us to sanctions or investigations by the SEC or other regulatory authorities.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us, and there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

***Following the completion of this offering, the CD&R Investor will continue to control us and may have conflicts of interest with other stockholders.***

Following the completion of this offering, the CD&R Investor will own approximately 53.2% of the outstanding shares of our common stock (or approximately 52.6% if the underwriters exercise in full their option to purchase additional shares). As a result, the CD&R Investor will have sufficient voting power without the consent of our other stockholders to be able to control all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which could reduce the market price of our common stock.

Because the CD&R Investor's interests may differ from your interests, actions the CD&R Investor takes as our controlling stockholder may not be favorable to you. For example, the concentration of ownership held by the

61

Table of Contents

CD&R Investor could delay, defer or prevent a change of control of us, impede a merger, takeover or other business combination that another stockholder may otherwise view favorably or cause us to enter into transactions or agreements that are not in the best interests of all stockholders. Other potential conflicts could arise, for example, over matters such as employee retention or recruiting, or our dividend policy.

Furthermore, as long as the CD&R Investor continues to beneficially own at least 40% of our outstanding common stock, the CD&R Investor will be able to determine the outcome of corporate actions requiring stockholder approval, including the election of the members of our board of directors and the approval of significant corporate transactions, such as mergers and the sale of substantially all of our assets. Even after the CD&R Investor reduces its beneficial ownership below 40% of our outstanding common stock, it will likely still be able to assert significant influence over our board of directors and certain corporate actions. Following the completion of this offering, the CD&R Investor will continue to have the right to designate for nomination for election at least a majority of our directors as long as the CD&R Investor beneficially owns at least 50% of our common stock and to designate our Chairman of the board of directors so long as it beneficially owns at least 25% of our common stock.

### Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities.

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation address potential conflicts of interest between agilon health, on the one hand, and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

### Future offerings of debt or equity securities which would rank senior to our common stock may adversely affect the market price of our common stock.

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Issuing additional shares of our common stock or other equity securities or securities convertible into equity may dilute the economic and voting rights of our stockholders or reduce the market price of our common stock. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock and may result in dilution to owners of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors outside our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings, reducing the market price of our common stock or diluting the value of their stock holdings in us.

### Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;

62

**APP 374**

Table of Contents

- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;
- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;
- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- opt out of Section 203 of the DGCL, which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;
- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and
- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future. See "Description of Capital Stock—Anti-Takeover Effects of Our Certificate of Incorporation and By-Laws."

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor will continue to own following this offering, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

### *We could be the subject of securities class action litigation due to future stock price volatility, which could divert management's attention and materially and adversely affect our business, financial condition, cash flows and results of operations.*

The stock market in general, and market prices for the securities of companies like ours in particular, have from time to time experienced volatility that often has been unrelated to the operating performance of the underlying companies. A certain degree of stock price volatility can be attributed to being a newly public company. These broad market and industry fluctuations may adversely affect the market price of our common stock, regardless of our operating performance. In certain situations in which the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders were to bring a similar lawsuit against us, the defense and disposition of the lawsuit could be costly and divert the time and attention of our management and could materially and adversely affect our business, financial condition, cash flows and results of operations.

63

**APP 375**

Table of Contents

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***We expect to continue to be a "controlled company" within the meaning of rules and, as a result, we will qualify for, and currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

After the completion of this offering, the CD&R Investor will continue to control a majority of the voting power of our outstanding common stock. Accordingly, we expect to continue to be a "controlled company" within the meaning of corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including:

- the requirement that a majority of the board of directors consist of independent directors;
- the requirement that our Nominating and Governance Committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
- the requirement that we have a Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
- the requirement for an annual performance evaluation of the Nominating and Governance and Compensation Committees.

Following this offering, we intend to continue to utilize these exemptions. As a result, we do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations. Consequently, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance rules and requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

64

**APP 376**

Table of Contents

***At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of the NYSE corporate governance standards. The NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualify as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualify as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the Delaware General Corporation Law (the "DGCL"), or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows and results of operations.

65

Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION

This prospectus contains forward-looking statements and cautionary statements. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this prospectus and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this prospectus. In addition, even if our results of operations, financial condition and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this prospectus, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives;
- our ability to execute our operation strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with MA payors or to secure MA at favorable financial terms;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;

66

APP 378

Table of Contents

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new RBEs within certain geographies in the future;
- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;
- our ability to retain our management team and key employees or attract qualified personnel in the future;
- our ability to realize the full value of our intangible assets and any impairment charges we have or may record;
- adverse determinations of tax matters;
- security breaches, loss of data or other disruptions to our data platforms;
- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations;
- our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses;
- our dependence on a limited number of key payors;
- the limited terms of our contracts with payors and that they may not be renewed upon their expiration;
- our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment;
- our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- difficulties in obtaining accurate and complete diagnosis data;
- our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- our reliance on third-party software and data to operate our business and provide services to our members and physician partners;
- the impact of consolidation in the healthcare industry;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;
- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;
- our ability to compete in our competitive industry;
- the impact of government performance standards and benchmarks on our compensation and reputation;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements;

67

**APP 379**

Table of Contents

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;
- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;
- regulatory inquiries and corrective action plans imposed by our payors;
- repayment obligations arising out of payor audits;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- negative publicity regarding the managed healthcare industry;
- the extensive regulation of the healthcare industry at the federal, state and local levels;
- our substantial indebtedness and the potential that we may incur additional indebtedness;
- our ability to sustain an active, liquid trading market for our common stock;
- the significant influence the CD&R Investor has over us; and
- risks related to other factors discussed under "Risk Factors" in this prospectus.

You should read this prospectus completely and with the understanding that actual future results may be materially different from expectations. All forward-looking statements made in this prospectus are qualified by these cautionary statements. These forward-looking statements are made only as of the date of this prospectus, and we do not undertake any obligation, other than as may be required by law, to update or revise any forward-looking or cautionary statements to reflect changes in assumptions, the occurrence of events, unanticipated or otherwise, and changes in future operating results over time or otherwise.

68

APP 380

Table of Contents

| Name and Address of Beneficial Owner | Number of Shares Owned Before the Offering | Percent of Class Before the Offering (%) | Shares Offered by Selling Stockholder | Number of Shares Owned After the Offering | Percent of Class After the Offering (%) | Shares Offered by Selling Stockholder | Number of Shares Owned After the Offering | Percent of Class After the Offering (%) |
|---|---|---|---|---|---|---|---|---|
| Joan Danieley(11) | 550,000 | * | — | 550,000 | * | — | 1,150,000 | * |
| Lisa Dombro(12) | 737,500 | * | 53,516 | 683,984 | * | 61,543 | 1,425,957 | * |
| Benjamin Kornitzer, M.D.(13) | 137,500 | * | 9,978 | 127,522 | * | 11,475 | 376,025 | * |
| Veeral Desai(14) | 1,450,000 | * | 105,218 | 1,344,782 | * | 121,001 | 3,028,999 | * |
| Benjamin Shaker(15) | 875,000 | * | 63,494 | 811,506 | * | 73,018 | 1,301,982 | * |
| All current directors and executive officers as a group (19 persons)(16) | 12,784,450 | 3.3% | 606,246 | 12,178,204 | 3.3% | 697,182 | 18,447,268 | 4.7% |
| Ronald Kuerbitz(17) | 5,100,000 | 1.3% | — | 5,100,000 | 1.3% | — | 5,100,000 | 1.3% |
| **Other Selling Stockholders** | | | | | | | | |
| Kenneth Bellendir(18) | 1,000,000 | * | 72,564 | 927,436 | * | 83,449 | 2,116,551 | * |
| National Philanthropic Trust(19)(20) | 601,795 | * | 601,795 | — | * | 601,795 | — | * |
| Fidelity Investments Charitable Gift Fund(19)(21) | 243,433 | * | 243,433 | — | * | 243,433 | — | * |
| Southampton Row Trust Limited(19)(22) | 19,884 | * | 19,884 | — | * | 19,884 | — | * |

\*  Less than one percent.

(1)  The selling stockholders have granted the underwriters an option to purchase up to an additional 2,550,000 shares.

(2)  CD&R Investment Associates IX, Ltd. ("CD&R Holdings GP"), as the general partner of the CD&R Investor, may be deemed to beneficially own the shares of common stock in which the CD&R Investor has beneficial ownership. CD&R Holdings GP expressly disclaims beneficial ownership of the shares of common stock in which the CD&R Investor has beneficial ownership. Investment and voting decisions with respect to the shares of common stock held by the CD&R Investor are made by an investment committee of limited partners of CD&R Associates IX, L.P., currently consisting of more than ten individuals, each of whom is also an investment professional of CD&R (the "Investment Committee"). All members of the Investment Committee disclaim beneficial ownership of the shares shown as beneficially owned by the CD&R Investor. CD&R Holdings GP is managed by a two-person board of directors. Donald J. Gogel and Nathan K. Sleeper, as the directors of CD&R Holdings GP, may be deemed to share beneficial ownership of the shares of common stock directly held by the CD&R Investor. Such persons expressly disclaim such beneficial ownership. The principal office of the CD&R Investor is c/o Clayton, Dubilier & Rice, LLC, 375 Park Avenue, New York, New York, 10152.

(3)  Includes 26,444,000 shares owned by Morgan Stanley Investment Management Inc. on behalf of certain funds and accounts (such entities collectively, the "Morgan Stanley Investor"). The mailing address for each of the foregoing entities is c/o Morgan Stanley Investment Management Inc., 522 Fifth Avenue, New York, New York 10036.

(4)  Includes 8,832,200 shares owned by The New Economy Fund and 13,114,300 shares owned by SMALLCAP World Fund, Inc. (such entities together, the "Capital World Investor"). The mailing address of each of the foregoing entities is c/o Capital Research and Management Company, 333 South Hope Street, 55th Floor, Los Angeles, CA 90071.

(5)  Prior to this offering, includes 950,000 shares which Mr. Williams has the right to acquire through the exercise of stock options. Also included are 150,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(6)  Prior to this offering, includes 650,000 shares which Mr. Mansukani has the right to acquire through the exercise of stock options. Also included are 150,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(7)  Prior to this offering, includes 133,300 shares of our common stock subject to outstanding vested RSUs.

167

Table of Contents

(8)    Prior to this offering, includes 97,700 shares of our common stock subject to outstanding vested RSUs, and 40,000 shares, which Mr. Wulf has the right to acquire through the exercise of options. Also included are 60,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(9)    Prior to this offering, represents 1,400,000 shares which Mr. Sell has the right to acquire through the exercise of stock options. Also represented are 500,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares. Excluded are 556,200 shares held by the Sell Family Trust and the Sell Children's Trust, each an irrevocable trust of which Mr. Sell is neither the trustee nor a beneficiary.

(10)    Prior to this offering, includes 1,800,000 shares which Mr. Halkias has the right to acquire through the exercise of options, and 100,000 shares held by the Halkias Irrevocable Trust, of which Mr. Halkias is a trustee. Also included are 1,700,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(11)    Prior to this offering, represents 550,000 shares which Ms. Danieley has the right to acquire through the exercise of options. Also represented are 600,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(12)    Prior to this offering, represents 737,500 shares which Ms. Dombro has the right to acquire through the exercise of options. Also represented are 750,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(13)    Prior to this offering, represents 137,500 shares which Dr. Kornitzer has the right to acquire through the exercise of options. Also represented are 250,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(14)    Prior to this offering, includes 1,200,000 shares which Mr. Desai has the right to acquire through the exercise of options. Also included are 1,700,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(15)    Prior to this offering, includes 775,000 shares which Mr. Shaker has the right to acquire through the exercise of options. Also included are 500,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(16)    Prior to this offering, includes an aggregate amount of 8,415,000 shares which the current executive officers and directors have the right to acquire through the exercise of stock options. Also included are 6,510,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares, and 231,000 shares of our common stock subject to outstanding vested RSUs granted to directors.

(17)    Prior to this offering, represents 5,100,000 shares which Mr. Kuerbitz has the right to acquire through the exercise of stock options.

(18)    Prior to this offering, includes 900,000 shares which Mr. Bellendir has the right to acquire through the exercise of options. Also included are 1,200,000 options that are expected to be exercisable as of the consummation of this offering after taking into account the satisfaction of applicable performance conditions and assuming the exercise in full by the underwriters of their option to purchase additional shares.

(19)    Represents shares received by such entity as a charitable contribution from certain CD&R investment professionals on September 9, 2021. These charities will be selling stockholders with respect to this offering, but not participate in the exercise of the underwriters' option to purchase additional shares.

APP 382

**Table of Contents**

(20)    The address of National Philanthropic Trust is 165 Township Line Road, Suite 1200, Jenkintown, PA 19046.

(21)    The address of Fidelity Investments Charitable Gift Fund is 200 Seaport Boulevard, Z3B, Boston, Massachusetts 02210.

(22)    The address of Southampton Row Trust Limited is 225 Reinekers Lane, Suite 375, Alexandria, VA 22314.

169

**APP 383**

**Table of Contents**

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

**Policies and Procedures for Related Person Transactions**

Our board of directors has approved policies and procedures with respect to the review and approval of certain transactions between us and a Related Person (as defined herein) or a Related Person Transaction (as defined herein) (the "Related Person Transaction Policy"). Pursuant to the terms of the Related Person Transaction Policy, our board of directors, acting through our Audit Committee, must review and decide whether to approve any Related Person Transaction. Any Related Person Transaction is required to be reported to our legal department, which will then determine whether it should be submitted to our Audit Committee for consideration. The Audit Committee must then review and decide whether to approve any Related Person Transaction.

For the purposes of the Related Person Transaction Policy, a "Related Person Transaction" means a transaction, arrangement or relationship (or any series of similar transactions, arrangements or relationships) in which we (including any of our subsidiaries) were, are or will be a participant and in which any Related Person had, has or will have a direct or indirect interest; and a "Related Person" means any person who is, or at any time since the beginning of our last fiscal year was, a director or executive officer of agilon health or a nominee to become a director of agilon health; any person who is the beneficial owner of more than five percent of our common stock; any immediate family member of any of the foregoing persons, including any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of the director, executive officer, nominee or more than five percent beneficial owner, and any person (other than a tenant or employee) sharing the household of such director, executive officer, nominee or more than five percent beneficial owner; and "spouse" includes an individual married to a person of the same sex if the couple is lawfully married under state law, regardless of the individual's domicile; and any firm, corporation or other entity in which any of the foregoing persons is a general partner or, for other ownership interests, a limited partner or other owner in which such person has a beneficial ownership interest of ten percent or more.

**Stockholders Agreements**

*CD&R Stockholder Agreement*

In connection with our IPO, we entered into a stockholders agreement with the CD&R Investor. The stockholders agreement granted to the CD&R Investor the right to designate for nomination for election to our board of directors a number of CD&R Designees equal to:
- at least a majority of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 50% of the outstanding shares of our common stock;
- at least 40% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 40% but less than 50% of the outstanding shares of our common stock;
- at least 30% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 30% but less than 40% of the outstanding shares of our common stock;
- at least 20% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 20% but less than 30% of the outstanding shares of our common stock; and
- at least 5% of the total number of directors comprising our board of directors at such time as long as the CD&R Investor beneficially owns at least 5% but less than 20% of the outstanding shares of our common stock.

170

**APP 384**

**Table of Contents**

For purposes of calculating the number of CD&R Designees that the CD&R Investor is entitled to nominate pursuant to the formula outlined above, any fractional amounts would be rounded up to the nearest whole number and the calculation would be made on a pro forma basis after taking into account any increase in the size of our board of directors. If the CD&R Investor beneficially owns less than 5% of the outstanding shares of common stock, the CD&R Investor will no longer be entitled to designate any designees for nomination by the board of directors.

With respect to any vacancy of a CD&R-designated director, the CD&R Investor will have the right to designate a new director for election by a majority of the remaining directors then in office.

The stockholders agreement provides that a CD&R Designee will serve as the Chairman of our board of directors as long as the CD&R Investor beneficially owns at least 25% of the outstanding shares of our common stock.

The stockholders agreement also grants to the CD&R Investor certain other rights, including specified information and access rights.

*Existing Stockholders' Agreement*

Prior to our IPO, we were a party to an Amended and Restated Stockholders' Agreement, dated as of November 29, 2019 (as amended or otherwise modified, the "Existing Stockholders Agreement"), by and among agilon health, and our existing stockholders, including the CD&R Investor, the Morgan Stanley Investor and the Capital World Investor. Other than a 180-day lock-up provision in the event of an IPO, the Existing Stockholders Agreement terminated upon the completion of our IPO.

**Registration Rights Agreements**

In connection with our IPO, we entered into a registration rights agreement with the CD&R Investor. The registration rights agreement grants to the CD&R Investor and its permitted assigns customary Form S-1 and Form S-3 demand registration rights and piggyback registration rights, in each case subject to customary terms and conditions.

We are a party to registration rights agreements with each of our pre-IPO stockholders, including the Morgan Stanley Investor and the Capital World Investor. The registration rights agreements grant to the existing stockholders and each of their respective permitted assigns, customary Form S-3 demand registration rights and piggyback registration rights, in each case subject to customary terms and conditions.

**Investment Agreements**

We are a party to an Investment Agreement, dated as of November 7, 2018, as amended by the first amendment, dated as of October 21, 2020 (as may be further amended or restated, the "Morgan Stanley Investment Agreement"), with the Morgan Stanley Investor, pursuant to which the Morgan Stanley Investor purchased the shares of our common stock that it owns. All put rights and information rights provided pursuant to the Morgan Stanley Investment Agreement terminated automatically upon the consummation of our IPO.

We are also party to an Investment Agreement, dated as of January 4, 2019, as amended by the first amendment, dated as of October 5, 2020, and an Investment Agreement, dated as of March 4, 2020 (as may be amended or restated, together, the "Capital World Investment Agreements"), with the Capital World Investor, pursuant to which the Capital World Investor purchased the shares of our common stock that it owns. All rights provided in the Capital World Investment Agreement that were substantially the same as the put rights and information rights provided under the Morgan Stanley Investment Agreement, as well as certain consent rights, terminated automatically upon the consummation of our IPO.

**APP 385**

**Table of Contents**

## UNDERWRITING

The selling stockholders are offering the shares of common stock described in this prospectus through a number of underwriters. J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC and BofA Securities, Inc. are acting as bookrunning managers of the offering and representatives of the underwriters. The selling stockholders will enter into an underwriting agreement with the underwriters. Subject to the terms and conditions of the underwriting agreement, the selling stockholders have agreed to sell to the underwriters, and each underwriter has severally agreed to purchase, at the public offering price less the underwriting discounts and commissions set forth on the cover page of this prospectus, the number of shares of common stock listed next to its name in the following table:

| Underwriter | Number of Shares |
|---|---|
| J.P. Morgan Securities LLC | 4,489,711 |
| Goldman Sachs & Co. LLC | 3,269,207 |
| BofA Securities, Inc. | 3,269,207 |
| Deutsche Bank Securities Inc. | 1,746,875 |
| Wells Fargo Securities, LLC | 1,625,000 |
| Nomura Securities International, Inc. | 1,096,875 |
| William Blair & Company, L.L.C. | 650,000 |
| Truist Securities, Inc. | 528,125 |
| Academy Securities, Inc. | 81,250 |
| R. Seelaus & Co., LLC | 81,250 |
| Samuel A. Ramirez & Company, Inc. | 81,250 |
| Siebert Williams Shank & Co., LLC | 81,250 |
| Total | 17,000,000 |

The underwriters are committed to purchase all the common shares offered by the selling stockholders if they purchase any shares, other than those shares covered by the underwriters' option to purchase additional shares described below. The underwriting agreement also provides that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may also be increased or the offering may be terminated.

The underwriters have an option to buy on a pro rata basis up to 2,550,000 additional shares of common stock from certain of the selling stockholders at the public offering price less the underwriting discounts and commissions to cover sales of shares by the underwriters which exceed the number of shares specified in the table above. The underwriters have 30 days from the date of this prospectus to exercise this option. If any additional shares of common stock are purchased, the underwriters will offer the additional shares on the same terms as those on which the shares are being offered.

The underwriters propose to offer the common shares directly to the public at the public offering price set forth on the cover page of this prospectus and to certain dealers at that price less a concession not in excess of $0.612 per share. After the public offering of the shares, the offering price and other selling terms may be changed by the underwriters. The offering of the shares by the underwriters is subject to receipt and acceptance and subject to the underwriters' right to reject any order in whole or in part. The underwriters may offer and sell the shares through certain of their affiliates or other registered broker-dealers or selling agents. Sales of shares made outside of the United States may be made by affiliates of the underwriters.

The underwriting fee is the difference between the public offering price and the amount the underwriters pay the selling stockholders for the shares of common stock. The underwriting fee is $1.02 per share. The following table summarizes the per share and total underwriting discounts and commissions the selling stockholders will pay to the underwriters. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase additional shares of common stock from certain of the selling stockholders.

| | Per Share | | Total | |
|---|---|---|---|---|
| | No Exercise | Full Exercise | No Exercise | Full Exercise |
| Public offering price | $ 30.00 | $ 30.00 | $510,000,000 | $586,500,000 |
| Underwriting discounts and commissions borne by the selling stockholders | $ 1.02 | $ 1.02 | $ 17,340,000 | $ 19,941,000 |

189

Table of Contents

We estimate that the total expenses of this offering, including registration, filing and listing fees, printing fees and legal and accounting expenses, but excluding the underwriting discounts and commissions, are approximately $1.9 million. The underwriters have agreed to reimburse us for certain expenses incurred in connection with this offering. The selling stockholders will bear the underwriting commissions and discounts attributable to their sale of our common stock.

A prospectus in electronic format may be made available on the websites maintained by one or more underwriters, or selling group members, if any, participating in the offering. The underwriters may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the representative to underwriters and selling group members that may make internet distributions on the same basis as other allocations.

We have agreed that we will not (i) offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, except as provided in the underwriting agreement, any of our securities that are substantially similar to the securities offered hereby, including but not limited to any options or warrants to purchase shares of our common stock or any securities that are convertible into or exchangeable for, or that represent the right to receive, shares of our common stock or any such substantially similar securities, or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of our common stock or any such other securities (regardless of whether any of these transactions are to be settled by the delivery of our common stock or such other securities, in cash or otherwise), in each case without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 90 days after the date of this prospectus, subject to certain limited exceptions set forth in the underwriting agreement.

In connection with our IPO, certain of our stockholders and our executive officers and directors entered into lock-up agreements for a period of 180 days after the date of the prospectus for our IPO. In connection with this offering, J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, as representatives of the several underwriters in our IPO, have agreed to waive the prior lock-up agreements with respect to 17,000,000 shares (or up to 19,550,000 shares including the underwriters' option to purchase additional shares) of our common stock for the sale by the selling stockholders in this offering, which includes shares beneficially owned by certain of our officers and directors, provided that that waiver is limited to the shares actually sold in this offering.

Additionally, in connection with this offering, our directors, executive officers and certain stockholders, including certain of the selling stockholders have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, for a period of 90 days after the date of this prospectus, may not, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, including but not limited to any options or warrants to purchase shares of our common stock or any securities that are convertible into or exchangeable for, or that represent the right to receive, shares of our common stock or any such substantially similar securities.

The restrictions in the immediately preceding paragraph with respect to our directors, executive officers and certain stockholders are subject to certain exceptions and will not apply, subject in certain cases to various conditions, to certain transactions, including (a) transfers of shares of common stock or any securities convertible into or exercisable or exchangeable for shares of common stock (i) as a bona fide gift or gifts, (ii) by will, other testamentary document or intestacy, (iii) to any member of a signatory of the lock-up agreement's immediate family or to any trust or other legal entity for the direct or indirect benefit of a signatory to the lock-up agreement, (iv) to a corporation, partnership, limited liability company, trust or other entity of which the signatory of the lock-up agreement, or any of its affiliates, and the immediate family of the signatory of the lock-up agreement, are the legal and beneficial owner of all of the outstanding equity securities or similar interests, (v) to a nominee or custodian of a person or entity to whom a disposition or transfer would be permissible under clauses (i) through (iv) above, (vi) if the signatory to the lock-up agreement is a corporation, partnership, limited liability company, trust or other business entity, transfers or distributions to its members, stockholders, partners

190

**Table of Contents**

or equityholders or its affiliates, (vii) by operation of law or pursuant to a qualified domestic order, divorce settlement, divorce decree or separation agreement or other final order of a court or regulatory agency, (viii) to the Company from an employee, independent contractor or services provider of the Company upon death, disability or termination of employment or cessation of services, in each case, of such employee, independent contractor or services provider, (ix) as part of a sale of a signatory to the lock-up agreement's shares of common stock acquired in this offering or in open market transactions on or after the date of this prospectus, (x) pursuant to the exercise, on a "cashless" or "net" exercise basis, of any option to purchase securities granted by the Company pursuant to stock option or incentive plans described in this prospectus, or for the purpose of satisfying any withholding taxes (including estimated taxes) due as a result of the exercise of any option to purchase securities or the vesting of any awards granted by the Company pursuant to stock option or incentive plans described in this prospectus, (xi) pursuant to a bona fide third-party tender offer, merger, consolidation or other similar transaction made to all or substantially all holders of the Company's capital stock involving a "change of control" (as defined below) of the Company (for purposes of the lock-up agreement, "change of control" shall mean the transfer (whether by tender offer, merger, consolidation or other similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated persons, of shares of capital stock if, after such transfer, such person or group of affiliated persons would hold a majority of the outstanding voting securities of the Company (or the surviving entity)); provided that in the event that such tender offer, merger, consolidation or other similar transaction is not completed, the signatory of the lock-up agreement's common stock shall remain subject to the provisions of the lock-up agreement and (xii) as transfers in connection with bona fide gifts of the shares of common stock subject to the lock-up agreement to charitable organizations by certain partners and employees of a signatory to the lock-up agreement, its affiliates or any investment fund or other entity controlled or managed by, or under common control or management with, a signatory to the lock-up agreement, (b) the exercise of outstanding options, settlement of restricted stock units or other equity awards or the exercise of warrants pursuant to plans described in this prospectus, (c) conversions of outstanding preferred stock, warrants to acquire preferred stock or convertible securities into shares of common stock or warrants to acquire shares of common stock, (d) the entering into of trading plans pursuant to Rule 10b5-1 under the Exchange Act ("10b5-1 Plans") for the transfer of shares of common stock; provided that (i) such plans do not provide for the transfer of shares of common stock during the restricted period and (ii) no filing by any party under the Exchange Act or other public announcement shall be required or made voluntarily during the restricted period in connection with the establishment of such trading plan, (e) selling shares of common stock pursuant to a 10b5-1 Plan existing on the date of the lock-up agreement; provided that (i) the signatory of the lock-up agreement may not amend, alter or modify any such plan to provide for the transfer of shares of common stock during the restricted period and (ii) no public announcement shall be made, voluntarily or otherwise, during the restricted period, other than filings required under the Exchange Act and provided further that any signatory to the lock-up agreement shall include a statement in any such required filing to the effect that such transfer was made pursuant to a 10b5-1 Plan under the Exchange Act adopted prior to the date of the lock-up agreement and (f) selling shares of common stock by any signatory to the lock-up agreement pursuant to the terms of the underwriting agreement.

We and the selling stockholders have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act, or contribute payments that the underwriters may be required to make in that respect.

Our common stock is listed on the NYSE under the symbol "AGL".

The underwriters have advised us and the selling stockholders that, in connection with this offering, the underwriters may engage in stabilizing transactions, which involves making bids for, purchasing and selling shares of common stock in the open market for the purpose of preventing or retarding a decline in the market price of the common stock while this offering is in progress. These stabilizing transactions may include making short sales of the common stock, which involves the sale by the underwriters of a greater number of shares of common stock than they are required to purchase in this offering, and purchasing shares of common stock on the open market to cover positions created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' option to purchase additional shares referred to above, or may be "naked" shorts, which are short positions in excess of that amount. The underwriters may close out any covered short position either

191

**APP 388**

**Table of Contents**

by exercising their option to purchase additional shares, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters will consider, among other things, the price of shares available for purchase in the open market compared to the price at which the underwriters may purchase shares through the option to purchase additional shares. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market that could adversely affect investors who purchase in this offering. To the extent that the underwriters create a naked short position, they will purchase shares in the open market to cover the position.

The underwriters have advised us that, pursuant to Regulation M of the Securities Act, they may also engage in other activities that stabilize, maintain or otherwise affect the price of the common stock, including the imposition of penalty bids. This means that if the representative of the underwriters purchases common stock in the open market in stabilizing transactions or to cover short sales, the representative can require the underwriters that sold those shares as part of this offering to repay the underwriting discount received by them.

These activities may have the effect of raising or maintaining the market price of the common stock or preventing or retarding a decline in the market price of the common stock, and, as a result, the price of the common stock may be higher than the price that otherwise might exist in the open market. If the underwriters commence these activities, they may discontinue them at any time. The underwriters may carry out these transactions on the NYSE, in the over-the-counter market or otherwise.

## Selling Restrictions

### *General*

Other than in the United States, no action has been taken by us, the selling stockholders or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to the offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities offered by this prospectus in any jurisdiction in which such an offer or a solicitation is unlawful.

### Notice to Prospective Investors in the European Economic Area

In relation to each Member State of the European Economic Area (each a "Member State"), no shares have been offered or will be offered pursuant to the offering to the public in that Member State prior to the publication of a prospectus in relation to the shares which has been approved by the competent authority in that Member State or, where appropriate, approved in another Member State and notified to the competent authority in that Member State, all in accordance with the Prospectus Regulation, except that offers of shares may be made to the public in that Member State at any time under the following exemptions under the Prospectus Regulation:

(a) to any legal entity which is a qualified investor as defined under the Prospectus Regulation;

(b) to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent of the underwriters; or

(c) in any other circumstances falling within Article 1(4) of the Prospectus Regulation,

*provided* that no such offer of shares shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation and each person who initially acquires any shares or to whom any offer is made will be deemed to

192

# EXHIBIT 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 03, 2022**

# agilon health, inc.

**(Exact name of Registrant as Specified in Its Charter)**

| Delaware | 001-40332 | 37-1915147 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 6210 E Hwy 290, Suite 450 Austin, Texas | 78723 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On March 3, 2022, agilon health, inc., a Delaware corporation ("agilon"), issued a press release setting forth its financial results for the quarter ended December 31, 2021. The press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated March 3, 2022. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:    March 3, 2022                                      By:    /s/ TIMOTHY S. BENSLEY
                                                                  Timothy S. Bensley
                                                                  Chief Financial Officer

**Exhibit 99.1**



# agilon health Reports Fourth Quarter and Fiscal Year 2021 Results

*Revenue growth of 44% for the fourth quarter and 50% for fiscal year 2021*

*Total members live on the agilon platform grew 82% to 238,000, driven by 42% growth in Medicare Advantage and contribution from Direct Contracting*

*Guidance for 2022 includes significant gains in Adjusted EBITDA while maintaining strong revenue growth, reflecting agilon's capital efficient partnership model*

*Class of 2023 new partners expected to add 80,000 Medicare Advantage members across 7 physician groups, including entry into 4 states and 8 geographies*

*agilon health scheduled to host inaugural Investor Day on March 11*

**AUSTIN, T.X., March 3, 2022** – agilon health, inc. (NYSE: AGL), the company transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients, announced results for the fourth quarter and year ended December 31, 2021.

**Fourth Quarter and Fiscal Year 2021 Results:**

•Total revenue of $463 million increased 44% during the fourth quarter, driven by 42% growth in Medicare Advantage membership, including 15% membership growth in same geographies.  For fiscal year 2021, total revenues of $1.83 billion increased 50% from 2020.

•Total members live on the agilon platform increased 82% to 238,000 as of December 31, including 186,300 Medicare Advantage members and 51,700 Direct Contracting beneficiaries.

•Net loss of $57 million in the fourth quarter compared to a net loss of $24 million in the fourth quarter 2020.  For fiscal year 2021, net loss of $407 million compared to a net loss of $60 million in 2020. Net loss for the fiscal year 2021 includes $292 million in non-cash stock-based compensation expense primarily related to agilon's initial public offering in April 2021.

•Medical margin of $31 million in the fourth quarter compared to $27 million in the fourth quarter 2020.  For fiscal year 2021, medical margin of $182 million compared to $192 million in 2020.  The year-over-year change in medical margin during fiscal 2021 in part reflects the impact from COVID on healthcare utilization in the prior year.

•Adjusted EBITDA loss of $27 million during the fourth quarter compared to a loss of $13 million during the fourth quarter 2020. For fiscal year 2021, Adjusted EBITDA loss of $39 million compared to a $6 million gain in 2020.

"Our partnership model produced distinctive, predictable results in 2021, despite evolving COVID dynamics," said Steve Sell, Chief Executive Officer. "Looking ahead to 2022, we expect to generate significant gains in profitability while maintaining strong growth in membership and revenue.  Our partnership model and purpose-built platform, supported by powerful structural drivers, has enabled us to make rapid progress against our vision to transform healthcare in 100+ communities by empowering primary care.

**Outlook for First Quarter and Fiscal Year 2022:**

|  | Quarter Ended March 31, 2022 | | Year Ended December 31, 2022 | |
|---|---|---|---|---|
|  | Low | High | Low | High |
| Medicare Advantage Members[1] | 245,000 | 250,000 | 260,000 | 270,000 |
| Direct Contracting Members[1] | 85,000 | 90,000 | 80,000 | 85,000 |
| Total Members Live on Platform[1] | 330,000 | 340,000 | 340,000 | 355,000 |
| Total revenues ($M) | $635 | $650 | $2,505 | $2,590 |
| Medical Margin ($M) | $82 | $88 | $290 | $305 |
| Adjusted EBITDA ($M)[2] | $10 | $14 | $0 | $10 |

[1]Membership reflects management's outlook for end of period.  agilon's partnered Direct Contracting Entities (DCEs) are not consolidated within its financial results.

[2]We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most comparable GAAP measure, and have not provided forward-looking guidance for net income (loss), because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation, that are not within our control or cannot be reasonably predicted.

*Membership Details for the Year Ending 2021*

Total members live on the agilon platform as of December 31, 2021, were 238,000, an increase of 82% from 2020.  Total members live on the platform include 186,300 Medicare Advantage members and 51,700 attributed Direct Contracting beneficiaries.

agilon's consolidated Medicare Advantage membership increased 42% during 2021, driven by contributions from new geographies and 15% growth within same geographies.  Average Medicare Advantage membership was 186,200 during the fourth quarter and 181,800 for the fiscal year 2021.

*Outlook for Class of 2023 New Partners*

agilon health expects to add 80,000 Medicare Advantage members from 7 new partner groups in 2023, driving record growth and entry into 4 new states and 8 new geographies. With the addition of these new partner groups, agilon health will have long-term partnerships with 23 physician groups in 12 states and 25 geographies.  Management intends to provide additional details on the Class of 2023 new partners at the company's investor day on March 11, 2022.

**Webcast and Conference Call:**

agilon health will host a conference call and webcast to discuss fourth quarter and fiscal year 2021 results on Friday, March 4, 2022 at 8:30 AM Eastern Time. The conference call can be accessed by dialing (844) 200-6205 for U.S. participants and +1 (929) 526-1599 for international participants, and referencing participant code 269811.  A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients. Through our partnerships and our platform, agilon is leading the nation in creating the system we need – one built on the value of care, not the volume of fees. We honor the independence of local physicians and serve as their partners so they can be the doctors they trained to be. agilon provides the capital, data, payor relationships, executive experience and contract support that allow physician groups to take on the risk of total care for their most vulnerable patients. The result: healthier communities, and doctors who can devote the right amount of time with the patients who need it most. With rapidly growing appeal, agilon is scaled to grow and is here to help our nation's best independent physician groups have a sustained, thriving future. Together, we are reinventing primary care. For more information about agilon health, visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: (i) statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, dispositions, or other transactions discussed in this release; and (ii) statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plan including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operation strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage payments at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target markets; the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us; security breaches, loss of data or other disruptions to our data platforms; the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; the potential that we may incur future indebtedness; and risks related to other factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2021. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

# agilon health, inc.
**Consolidated Balance Sheets**
**In thousands, except share and per share data**

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,040,039 | $ 106,795 |
| Restricted cash and equivalents | 14,781 | 28,383 |
| Receivables, net | 293,407 | 144,555 |
| Prepaid expenses and other current assets, net | 18,968 | 9,639 |
| Current assets held for sale and discontinued operations, net | — | 4,825 |
| Total current assets | 1,367,195 | 294,197 |
| Property and equipment, net | 9,161 | 6,456 |
| Intangible assets, net | 55,398 | 60,468 |
| Goodwill | 41,540 | 41,540 |
| Other assets, net | 112,958 | 43,700 |
| Total assets | $ 1,586,252 | $ 446,361 |
| **LIABILITIES, CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 239,014 | $ 162,868 |
| Accounts payable and accrued expenses | 112,946 | 97,244 |
| Current portion of long-term debt | 5,000 | 3,041 |
| Current liabilities held for sale and discontinued operations | — | 3,682 |
| Total current liabilities | 356,960 | 266,835 |
| Long-term debt, net of current portion | 43,401 | 64,665 |
| Other liabilities | 94,295 | 90,091 |
| Total liabilities | 494,656 | 421,591 |
| Commitments and contingencies | | |
| Contingently redeemable common stock, $0.01 par value: 76,201 shares issued and outstanding at December 31, 2020 | — | 309,500 |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value: 2,000,000 and 500,000 shares authorized; 400,095 and 249,374 shares issued and outstanding, respectively | 4,001 | 2,494 |
| Additional paid-in capital | 2,045,572 | 263,966 |
| Accumulated deficit | (957,677 ) | (551,190 ) |
| Total agilon health, inc. stockholders' equity (deficit) | 1,091,896 | (284,730 ) |
| Noncontrolling interests | (300 ) | — |
| Total stockholders' equity (deficit) | 1,091,596 | (284,730 ) |
| Total liabilities, contingently redeemable common stock and stockholders' equity (deficit) | $ 1,586,252 | $ 446,361 |

# agilon health, inc.
## Consolidated Statements of Operations
### In thousands, except per share data

| | | Three Months Ended December 31, | | Year Ended December 31, | |
| --- | ---: | ---: | ---: | ---: | ---: |
| | | 2021 | 2020 | 2021 | 2020 |
| | | (unaudited) | | | |
| **Revenues:** | | | | | |
| Medical services revenue | $ | 461,999 | $   320,227 | $   1,829,735 | $   1,214,270 |
| Other operating revenue | | 887 | 780 | 3,824 | 4,063 |
| Total revenues | | 462,886 | 321,007 | 1,833,559 | 1,218,333 |
| **Expenses:** | | | | | |
| Medical services expense | | 430,620 | 292,928 | 1,647,659 | 1,021,877 |
| Other medical expenses | | 22,678 | 22,794 | 109,487 | 102,306 |
| General and administrative (including noncash stock-based compensation expense of $4,414, $1,738, $292,394, and $6,472, respectively) | | 53,840 | 41,358 | 455,821 | 137,292 |
| Depreciation and amortization | | 3,621 | 3,670 | 14,544 | 13,531 |
| Total expenses | | 510,759 | 360,750 | 2,227,511 | 1,275,006 |
| **Income (loss) from operations** | | (47,873) | (39,743) | (393,952) | (56,673) |
| **Other income (expense):** | | | | | |
| Other income (expense), net | | (8,534) | 2,886 | (4,500) | 2,465 |
| Interest expense | | (840) | (1,953) | (6,146) | (8,135) |
| **Income (loss) before income taxes** | | (57,247) | (38,810) | (404,598) | (62,343) |
| Income tax benefit (expense) | | (179) | (791) | (886) | (865) |
| **Income (loss) from continuing operations** | | (57,426) | (39,601) | (405,484) | (63,208) |
| **Discontinued operations:** | | | | | |
| Income (loss) before gain (loss) on sales and income taxes | | (1,209) | (6,890) | (3,463) | (20,049) |
| Gain (loss) on sales of assets, net | | — | 19,087 | 473 | 20,401 |
| Income tax benefit (expense) | | 1,898 | 3,189 | 1,687 | 2,804 |
| **Total discontinued operations** | | 689 | 15,386 | (1,303) | 3,156 |
| **Net income (loss)** | | (56,737) | (24,215) | (406,787) | (60,052) |
| Noncontrolling interests' share in (earnings) loss | | 16 | — | 300 | — |
| **Net income (loss) attributable to common shares** | $ | (56,721) | $   (24,215) | $   (406,487) | $   (60,052) |
| | | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | | |
| Continuing operations | $ | (0.14) | $   (0.12) | $   (1.09) | $   (0.20) |
| Discontinued operations | $ | — | $   0.05 | $   — | $   0.01 |
| **Weighted average shares outstanding, basic and diluted** | | 396,411 | 327,231 | 372,931 | 323,462 |

# agilon health, inc.
**Consolidated Statements of Cash Flows**
**In thousands, except per share data**

|  | Year Ended December 31, | |
|  | 2021 | 2020 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (406,787 ) | $ (60,052 ) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 14,670 | 14,099 |
| Stock-based compensation expense | 292,394 | 6,688 |
| Loss on debt extinguishment | 1,590 | — |
| Loss (income) from equity method investments | 6,766 | (514 ) |
| Deferred income taxes and uncertain tax positions | (3,231 ) | (2,809 ) |
| Release of indemnification assets | 1,705 | 3,475 |
| (Gain) loss on sale of assets, net | (473 ) | (20,401 ) |
| Distributions of earnings from equity method investments | 174 | — |
| Other non-cash items | 58 | (162 ) |
| Changes in operating assets and liabilities: | | |
| Receivables, net | (149,041 ) | (59,381 ) |
| Prepaid expense and other current assets | (3,916 ) | (5,085 ) |
| Other assets | 3,931 | (1,977 ) |
| Medical claims and related payables | 76,339 | 42,383 |
| Accounts payable and accrued expenses | 19,360 | 24,922 |
| Other liabilities | (1,698 ) | 5,610 |
| Net cash provided by (used in) operating activities | (148,159 ) | (53,204 ) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (6,564 ) | (1,775 ) |
| Purchase of intangible assets | (6,862 ) | (575 ) |
| Investment in loans receivable and other | (82,831 ) | (3,847 ) |
| Proceeds from repayment of loans receivable and other | 7,095 | 2,058 |
| Proceeds from sale of business and property, net of cash divested | (1,344 ) | 26,205 |
| Net cash provided by (used in) investing activities | (90,506 ) | 22,066 |
| **Cash flows from financing activities:** | | |
| Proceeds from initial public offering | 1,170,942 | — |
| Proceeds from other equity issuances, net | — | 33,590 |
| Proceeds from exercise of stock options | 18,086 | 814 |
| Repurchase of shares, net | — | (6,742 ) |
| Proceeds from the issuance of long-term debt | 100,000 | — |
| Repayments of long-term borrowings and other | (119,899 ) | (3,041 ) |
| Equity and debt issuance costs and other | (14,739 ) | — |
| Net cash provided by (used in) financing activities | 1,154,390 | 24,621 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | 915,725 | (6,517 ) |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | 135,178 | 139,152 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | 3,917 | 6,460 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 139,095 | 145,612 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of period | 1,054,820 | 135,178 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of period | — | 3,917 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 1,054,820 | $ 139,095 |

# agilon health, inc.
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2021** | | **2020** | |
| Medical services revenue | $ | 461,999 | $ | 320,227 | $ | 1,829,735 | $ | 1,214,270 |
| Medical services expense | | (430,620) | | (292,928) | | (1,647,659) | | (1,021,877) |
| Medical margin | $ | 31,379 | $ | 27,299 | $ | 182,076 | $ | 192,393 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2021** | | **2020** | |
| Platform support costs | $ | 30,899 | $ | 25,802 | $ | 123,521 | $ | 99,943 |
| Geography entry costs[1] | | 7,872 | | 11,607 | | 20,583 | | 17,945 |
| Severance and related costs | | 7,763 | | 493 | | 12,861 | | 4,009 |
| Management fees[2] | | — | | 395 | | 433 | | 1,530 |
| Stock-based compensation expense | | 4,414 | | 1,738 | | 292,394 | | 6,472 |
| Other[3] | | 2,892 | | 1,323 | | 6,029 | | 7,393 |
| General and administrative | $ | 53,840 | $ | 41,358 | $ | 455,821 | $ | 137,292 |

(1)Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue.

(2)Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R"). In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3)Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

# agilon health, inc.
**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

## NETWORK CONTRIBUTION

| | | Three Months Ended December 31, | | | Year Ended December 31, | |
|---|---|---|---|---|---|---|
| | | 2021 | 2020 | | 2021 | 2020 |
| Income (loss) from operations | $ | (47,873) | $ (39,743) | $ | (393,952) | $ (56,673) |
| Other operating revenue | | (887) | (780) | | (3,824) | (4,063) |
| Other medical expenses | | 22,678 | 22,794 | | 109,487 | 102,306 |
| Other medical expenses—live geographies[1] | | (18,704) | (17,957) | | (97,498) | (93,377) |
| General and administrative | | 53,840 | 41,358 | | 455,821 | 137,292 |
| Depreciation and amortization | | 3,621 | 3,670 | | 14,544 | 13,531 |
| Network contribution | $ | 12,675 | $ 9,342 | $ | 84,578 | $ 99,016 |

(1)Represents physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2021 and 2020, costs incurred in implementing geographies were $4.0 million and $4.8 million, respectively. For the years ended December 31, 2021 and 2020, costs incurred in implementing geographies were $12.0 million and $8.9 million, respectively.

## ADJUSTED EBITDA

| | | Three Months Ended December 31, | | | Year Ended December 31, | |
|---|---|---|---|---|---|---|
| | | 2021 | 2020 | | 2021 | 2020 |
| Net income (loss) | $ | (56,737) | $ (24,215) | $ | (406,787) | $ (60,052) |
| (Income) loss from discontinued operations, net of income taxes | | (689) | (15,386) | | 1,303 | (3,156) |
| Interest expense | | 840 | 1,953 | | 6,146 | 8,135 |
| Income tax expense (benefit) | | 179 | 791 | | 886 | 865 |
| Depreciation and amortization | | 3,621 | 3,670 | | 14,544 | 13,531 |
| Geography entry costs[1] | | 11,846 | 16,670 | | 32,572 | 27,100 |
| Severance and related costs[2] | | 7,763 | 493 | | 12,861 | 4,009 |
| Management fees[3] | | — | 395 | | 433 | 1,530 |
| Stock-based compensation expense | | 4,414 | 1,738 | | 292,394 | 6,472 |
| EBITDA adjustments related to equity method investments[4] | | (571) | — | | 1,736 | — |
| Other[5] | | 2,642 | 1,323 | | 5,293 | 7,393 |
| Adjusted EBITDA | $ | (26,692) | $ (12,568) | $ | (38,619) | $ 5,827 |

(1)Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2021 and 2020, (i) $4.0 million and $4.8 million, respectively, are included in other medical expenses and (ii) $7.9 million and $11.6 million, respectively, are included in general and administrative expenses. For the years ended December 31, 2021 and 2020, (i) $12.0 million and $8.9 million, respectively, are included in other medical expenses and (ii) $20.6 million and $17.9 million, respectively, are included in general and administrative expenses.

(2)For the three months and year ended December 31, 2021, includes taxes and related costs on stock option exercises for departed executives of $5.4 million.

(3)Represents management fees and other expenses paid to CD&R. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(4)Includes direct geography entry costs of $0.1 million and $1.3 million for the three and twelve months ended December 31, 2021, respectively.

(5)Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner compensation and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) stock-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity by entity basis.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications Officer
media@agilonhealth.com

Source: agilon health

# EXHIBIT 8

APP 404

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the fiscal year ended December 31, 2021**

**or**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-40332**

# agilon health, inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **37-1915147** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **6210 E Hwy 290, Suite 450** **Austin, Texas** | **78723** (Zip Code) |
| (Address of principal executive offices) | |

Registrant's telephone number, including area code **(562) 256-3800**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | AGL | The New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant; (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐       Accelerated filer ☐       Non-accelerated filer ☒       Smaller reporting company ☐       Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act.) Yes ☐ No ☒

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $6.6 billion.

As of February 15, 2022, there were 401,177,778 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the registrant's 2022 Annual Meeting of Stockholders have been incorporated by reference into Part III of this Report.

**APP 405**

Table of Contents

**agilon health, inc.**
Form 10-K
For the Fiscal Year Ended December 31, 2021

**Table of Contents**

| | | |
|---|---|---|
| **Cautionary Language Regarding Forward-Looking Statements** | | 1 |
| **Part I** | | **4** |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 23 |
| Item 1B. | Unresolved Staff Comments | 57 |
| Item 2. | Properties | 57 |
| Item 3. | Legal Proceedings | 57 |
| Item 4. | Mine Safety Disclosures | 57 |
| | | |
| **Part II** | | **57** |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 57 |
| Item 6. | [Reserved] | 58 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 59 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 79 |
| Item 8. | Financial Statements and Supplementary Data | 80 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 81 |
| Item 9A. | Controls and Procedures | 81 |
| Item 9B. | Other Information | 81 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 81 |
| | | |
| **Part III** | | **82** |
| Item 10. | Directors, Executive Officers and Corporate Governance | 82 |
| Item 11. | Executive Compensation | 82 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 82 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 82 |
| Item 14. | Principal Accounting Fees and Services | 82 |
| | | |
| **Part IV** | | **83** |
| Item 15. | Exhibits and Financial Statement Schedules | 83 |
| Item 16. | Form 10-K Summary | 85 |

**APP 406**

Table of Contents

*All references in this report to "agilon," "we," "us" or "our" mean agilon health, inc., together with its consolidated subsidiaries. Unless the context suggests otherwise, references to "agilon health, inc." mean the parent company without its subsidiaries.*

**Cautionary Language Regarding Forward-Looking Statements**

Statements in this Annual Report on Form 10-K (the "Report") that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this Report and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results of operations, financial condition, and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under "Item 1A, Risk Factors" in this Report, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Report. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;

- our ability to identify and develop successful new geographies, physician partners and health plan payors, or to execute upon our growth initiatives;

- our ability to execute our operating strategies or to achieve results consistent with our historical performance;

- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;

- our ability to secure contracts with Medicare Advantage ("MA") payors or to secure MA at favorable financial terms;

- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;

- our ability to obtain additional capital needed to support our business;

- significant reductions in our membership;

- challenges for our physician partners in the transition to our "Total Care Model";

- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;

- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;

1

Table of Contents

- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities (each, an "RBE") within certain geographies in the future;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;

- our ability to retain our management team and key employees or attract qualified personnel in the future;

- our ability to realize the full value of our intangible assets and any impairment charges we have or may record;

- adverse determinations of tax matters;

- security breaches, loss of data or other disruptions to our data platforms;

- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;

- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information

- our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses;

- our dependence on a limited number of key health plan payors;

- the limited terms of our contracts with health plan payors and that they may not be renewed upon their expiration;

- our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment;

- our dependence on physician partners and other providers to effectively manage the quality and cost of care, and perform obligations under payor contracts;

- difficulties in obtaining accurate and complete diagnosis data;

- our dependence on physician partners to accurately, timely, and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;

- our reliance on third-party software and data to operate our business and provide services to our members and physician partners;

- the impact of consolidation in the healthcare industry;

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;

- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;

- the impact of government performance standards and benchmarks on our compensation and reputation;

- statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements;

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;

2

**APP 408**

Table of Contents

- we, our physician partners or affiliates being subject to federal or state investigations, audits, and enforcement actions;

- regulatory inquiries and corrective action plans imposed by our health plan payors;

- repayment obligations arising out of payor audits;

- the impact on our revenue of Centers for Medicare & Medicaid Services' ("CMS") modifying the methodology used to determine the revenue associated with MA members;

- negative publicity regarding the managed healthcare industry;

- the extensive regulation of the healthcare industry at the federal, state, and local levels;

- our indebtedness and the potential that we may incur additional substantial indebtedness;

- our ability to compete in our competitive industry; and

- risks related to other factors discussed under "Risk Factors" in this Annual Report on Form 10-K.

Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

3

**APP 409**

Table of Contents
**PART I**

**ITEM 1. Business**

**Overview**

Our business is transforming healthcare by empowering the primary care physicians ("PCPs") to be the agents for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by primarily forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 42% and revenue by 50% from December 31, 2020 to December 31, 2021. As of December 31, 2021, the PCPs on our platform serve approximately 238,000 senior members, which includes 186,300 MA members and 51,700 Medicare fee-for-service ("FFS") beneficiaries through five direct contracting entities ("DCEs") through our participation in the CMS Innovation Center Direct Contracting Model, which our PCPs serve.

For a description of our significant activities during 2021, see "Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations—2021 Transaction Overview" in this report.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

***The agilon Platform***: The agilon platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital. Our purpose-built platform comprises an integrated set of capabilities designed to continuously improve. Our platform is delivered to our anchor physician groups through a long-term partnership model to support the adoption and success of a Medicare-centric, globally capitated line of business:

- ***Health Plan Payor Engagement***: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one streamlined and simplified approach to quality, patient experience, clinical program management and financial management.

- ***Direct Contracting Model***: Enables our PCPs to expand our Total Care Model to patients enrolled in traditional Medicare FFS through the CMS Innovation Center Direct Contracting Model. This enables our PCPs to align the healthcare delivery of MA and Medicare FFS patients, providing them with greater opportunities to engage these patients and improve their overall experience.

- ***Data Integration and Management***: Integration with health plan systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms to organize disparate data into actionable insights for our PCPs to improve quality of care, cost and patient and physician experience.

- ***Clinical Programs and Product Development***: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value, actionable playbooks for physicians to deliver quality care, which include operational plans, analytics and tracking metrics.

4

APP 410

Table of Contents

- ***Quality (Clinical and Experience)***: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.

- ***Growth***: We enable our partners to create a local brand that embodies the value of the Total Care Model for patients as well as the history and culture of our physician partners. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their patients who are currently Medicare-eligible but are not covered by an MA plan and their 60-64 year old patients who will become Medicare-eligible, to enable their patients to make educated healthcare choices. These existing patients represent a large, growing and durable source of potential attributed member growth.

- ***Performance Management Analytics***: Our quality and cost network dashboards are continuously updated and used by physician group leaders to facilitate constructive dialogue and best practice sharing that benefits from the growth of our network.

- ***Financial Management***: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.

- ***National Policy***: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

***agilon's Long-term Physician Partner Model***: We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Through this partnership, our physician partners' existing MA patient panels are attributed to our platform through our subscription-like per-member per-month ("PMPM") agreements with payors. The combination of these subscription-like agreements, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue. As earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings with our anchor physician groups.

***agilon's Network***: Enhancing the power and growth of the agilon platform is the rapidly expanding group of leading community-based physician partners, functioning as a collaborative group through the agilon network. We believe the power of this network is demonstrated by our ability to add new physician partners and to attract additional PCPs to our physician partners. The ability to share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

***The agilon Flywheel Effect***: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients.

5

Table of Contents

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows, and results of operations that you should consider before making a decision to invest in our common stock. These risks include, but are not limited to, the following:

*Risks Related to Our Business*

- our history of net losses and the expectation that our expenses will increase in the future;

- failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives;

- success in executing our operating strategies or achieving results consistent with our historical performance;

- significant reductions in membership;

- challenges for our physician partners in the transition to a Total Care Model;

- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;

- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;

*Risks Related to Our Reliance on Third Parties*

- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;

- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts, which contracts generally provide that if the cost of care exceeds the corresponding capitation revenue we receive from payors in respect of attributed members we may realize operating deficits, which are typically not capped, and could lead to substantial losses;

- dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;

*Risks Related to Our Industry and Government Programs*

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;

- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;

- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;

*Legal and Regulatory Risks*

- ability to comply with federal, state and local regulations and laws we are subject to, or to adapt to changes in or new regulations or laws, including as such regulations and laws that relate to our physician alignment strategies with our physician partners or the corporate practice of medicine;

- our physician partners' compliance with federal and state healthcare fraud and abuse laws and regulations;

6

Table of Contents

*Risks Related to Our Indebtedness*

- potential to incur substantial indebtedness, which could adversely affect our financial health and our ability to obtain financing in the future, react to changes in our business or satisfy our obligations; and

*Risks Related to Our Common Stock*

- the influence of CD&R Vector Holdings, L.P. (the "CD&R Investor") and our status as a "controlled company."

These risks are discussed in more detail in Item 1A below.

## Reimbursement Model and Organization

Under a traditional FFS reimbursement model, physicians are paid a fixed amount for services provided during a patient visit, regardless of a patient's medical need or health outcome. As a result, physician reimbursement is solely related to the volume of patient visits and procedures performed, thereby offering limited financial incentive to focus on preventative care and cost containment. Value-based care models offer alternative reimbursement models, which typically incentivize physicians for improving the cost and quality of healthcare provided for an attributed patient population. Various types of value-based care reimbursement models exist, including capitation, bundled payments, or payments for attainment of improved quality metrics or medical cost efficiency.

Under our Total Care Model, which is a type of value-based care reimbursement model, we are responsible for managing the medical costs associated with our attributed members. This structure empowers physicians to focus on the improvement of the quality of care provided, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care. Under such a structure, physicians are incentivized to improve the quality and efficiency of care as well as health outcomes for their patients.

### *Physician and Payor Contractual Relationships*

*Physicians*

Our business model combines the agilon platform, a network of like-minded physicians and a long-term partnership model in order to provide physician groups with the necessary capabilities, capital and business model to create a Medicare-centric, globally capitated line of business. We believe that failing to empower PCPs to drive meaningful change in quality, cost and patient experience has historically fostered waste, unnecessary variability in care and poor patient experience and health outcomes. We seek to partner with leading community-based physician groups under a Total Care Model. We have formed long-term partnerships with diverse leading community-based physician groups in geographies such as Columbus, Austin, Pittsburgh, Michigan, North Carolina, Hartford and Buffalo. By providing technology, people, process and capital, we aim to improve the quality and cost of healthcare and drive long-term growth while creating a sustainable business model for our physician partners.

Under the Total Care Model, we typically operate by forming RBEs within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more partner primary care or multi-specialty physician groups. We refer to these groups as our "anchor physician groups." Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. We have entered into long-term professional services agreements with our anchor physician groups, which typically have a contractual duration of 20 years. In accordance with relevant accounting guidance, each of these RBEs is determined to be a variable interest entity consolidated by agilon, as we have: (i) the ability, through the management services and governance arrangements, to direct the activities (excluding clinical decisions) that most significantly affect the RBE's economic performance; and (ii) the obligation to absorb losses of or the right to receive benefits that could be potentially significant to the RBE.

7

Table of Contents

Through incentive compensation arrangements, we share a portion of the RBE's savings from successfully improving the quality of care and reducing costs with our anchor physician groups. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. This base compensation is initially negotiated with the RBE for the first ten years of each agreement, subject to annual increases based on current market rates and other agreed upon adjustment factors, after which it is subject to renegotiation. Although our RBEs are wholly-owned subsidiaries of agilon, our anchor physician groups participate in each RBE's governance, with individuals designated or nominated by the applicable anchor physician groups having representation on each RBE's board of directors. Most of our contracts with our anchor physician groups contain exclusivity or other provisions intended to promote interconnectedness with our physician partners for applicable lines of business in order to facilitate the longevity and stability of the partnership. Typically, these contracts provide for termination rights that are triggered upon certain events, subject to applicable cure periods, including bankruptcy or insolvency events, exclusion, suspension or debarment from state or federal government programs and the occurrence of government action that can be reasonably expected to negatively influence our business. We have historically issued certain stock-based instruments, which we refer to as "partner physician group equity agreements," to our anchor physician groups pursuant to which they are entitled to receive equity of their local RBE or agilon health, respectively, in the future only upon the occurrence of certain events deemed a "change of control" of the RBE, or a "change of control" of agilon health, if such event occurs before a "change of control" of the RBE. Upon our initial public offering, a "change of control" event occurred for the agilon health related instruments and the respective physician groups received equity. For additional discussion related the agilon health related instruments, see "Critical Accounting Policies – Stock-Based Compensation."

In addition, in Hawaii we operate under a risk-bearing independent practice association model through which we have broadly contracted with physicians across the state and have developed select deeper primary care relationships within the network. PCPs in our Hawaii network are typically compensated on an FFS basis based on applicable Medicare fee schedules.

In addition to our contractual arrangements with our physician partners, we also maintain relationships with other providers who care for our members, including hospitals, specialists and ancillary providers. Such providers typically contract directly with payors. We and our physician partners maintain effective working relationships with the majority of the higher-volume providers in our geographies in order to retain insight into the provision of care to our members and ensure care is rendered effectively and in a manner which supports the achievement of appropriate clinical outcomes.

*Health Plan Payors*

We enter into contractual agreements with health plan payors in each of our geographies, under which we are financially responsible for our physician partners' provision of a defined spectrum of healthcare services to our members, in exchange for a defined PMPM fee for each of our members (which is also referred to as "global capitation"). The healthcare services for which we are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services cost. In certain of our payor arrangements, we are also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members. Through these payor agreements, we help to create access for our physician partners to value-based care reimbursement structures through our Total Care Model, which allow our physician partners to focus on the improvement of the quality of care provided to their patients, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care.

8

Table of Contents

The global capitation fees we are entitled to receive from our health plan payor contracts are typically based on a defined percentage of the corresponding monthly premium payments which the payor receives from CMS for members attributed to our PCPs and covered under such contracts. The premium payments to payors are based on county-level benchmark rates established by CMS and payors' annual bid of amounts necessary to cover the cost of a standard MA patient, and are influenced by several factors, including, but not limited to, the applicable MA plan's STAR rating and CMS' risk-adjustment model, which compensates payors based on the health status (acuity) of each individual patient in the preceding calendar year. For agreements where we are delegated for claims payment, we utilize amounts received under the applicable agreement on a monthly basis to pay such claims for medical services rendered to our members. For agreements where the payor retains responsibility for paying claims on our behalf, as is the case today in the majority of our payor agreements, funding under the applicable agreement is utilized by the payor to pay such claims, and we receive surplus distributions on a monthly or quarterly basis. In these arrangements, the payor maintains the responsibility for entering into contractual agreements with network hospitals, network specialty physicians, and ancillary or other providers. Additionally, certain of our contracts with payors incorporate provisions in which we are eligible to earn additional payments on top of our capitation payments based upon the attainment of defined quality performance criteria correlated to applicable STAR ratings criteria. Premiums received may be subject to future adjustment.

We have developed local contracts across multiple payors, along with national form contracts with certain key payors, which provide a consistency of non-financial contract terms, data sharing, operational processes and governance structures and support portability of the agilon platform. We typically maintain various contracts with a single national payor in order to reflect varying economic terms across our geographies, and to provide for distinct subsidiary entities of our company and a national payor as parties to these contracts. As of December 31, 2021, we have relationships with 15 health plan payors across 17 geographies. Payors with which we contract include large national health plans as well as smaller local and regional insurers. We believe our ability to offer multiple MA plans and products to our physician partners in each geography creates significant value for our physician partners and the members that they serve. Members are able to select the plan and benefit design that meets their individual needs while our platform enables a seamless experience regardless of plan or product for all patients and physician groups. For the year ended December 31, 2021, Humana represented approximately 26% of our total revenue, and Humana, Aetna and United Healthcare collectively represented approximately 62% of our total revenue.

The agreements with our payors outline the range of healthcare services for which we are financially responsible and at risk, the services for which we are contracted to perform on the payor's behalf and the key financial terms. Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography, but typically averages between 1.5-2.0% of projected annual gross revenue attributable to the corresponding agreement, and ranged from $50,000 to $10.0 million as of December 31, 2021.

Our payor agreements also typically incorporate various termination rights, which are negotiated based on the scope of the market-facing solutions that the payor has adopted and the duration of the contract. Most of our contracts include cure periods during which time we may attempt to resolve any issues that would trigger a payor's ability to terminate the contract. However, certain of our contracts are also terminable immediately upon the occurrence of certain events. For example, some of our contracts may be terminated immediately by the payor if we lose applicable licenses, go bankrupt, lose our liability insurance or receive an exclusion, suspension or debarment from state or federal government authorities.

The contracts with our payors impose other obligations on us. For example, we typically agree that all services provided under our contract and all employees providing such services will comply with such payor's policies and procedures. We also typically agree to indemnify our payors against certain third-party claims.

9

Table of Contents

*Direct Contracting Model*

On April 1, 2021, we, in conjunction with some of our physician partners, began participating in the Direct Contracting Model (currently referred to as the Global and Professional Direct Contracting ("GPDC") Model) in certain geographies, through five currently approved DCEs which encompass more than 500 of our existing PCPs and serve over 50,000 Medicare FFS beneficiaries. The Direct Contracting Model is a voluntary payment model option aimed at reducing expenditures and preserving or enhancing quality of care for beneficiaries in traditional Medicare FFS established by the CMS Innovation Center.

Under the Direct Contracting Model, CMS contracts directly with each of the DCEs pursuant to participation agreements, in which such DCE selects risk-sharing and fee payment options. The participation agreements include various terms and conditions each DCE must comply with, including meeting certain operational requirements. Each of the DCEs has selected the Global risk-sharing option, in which the DCE assumes accountability for the total cost of care of the FFS beneficiaries aligned to such DCEs. In addition, each of our DCEs has selected the Primary Care Capitation Payment (the "PCC") option. The participation agreements between our DCEs and CMS expire two years after the "Model Performance Period" established by CMS, which lasts from April 1, 2021 through December 31, 2026. The DCE may terminate its participation agreement with CMS at any time upon advance written notice. CMS has certain additional termination rights, including in connection with the termination of the Direct Contracting Model or non-compliance of the DCE. Additionally, CMS has the right to amend a participation agreement without the consent of the DCE for good cause, or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules.

In addition, the DCEs operate in partnership pursuant to participating medical group agreements with one or more of our physician partners in certain geographies. Our contracted physician partners provide Medicare services to their aligned beneficiaries, and bill CMS on a FFS basis for such services. In turn, in accordance with the PCC option, CMS compensates each physician partner for a portion of their billed services based on the applicable rate, and the remaining portion is paid to each DCE on a per Medicare beneficiary per month ("PBPM") basis based on a prospective estimate of such remaining portion of billed services. In five years, CMS will no longer pay any portion to such physician partner based on FFS compensation rates, and will transition to compensating physician partners through their applicable DCE on a PBPM basis. Each DCE then remits payment out of the PBPM payments from CMS to its contracted physician partners on a monthly or quarterly basis pursuant to the applicable participating medical group agreement, which agreement also includes incentive compensation tied to the DCE's net profits received for aligned beneficiaries. In addition, certain participating medical group agreements also allow the relevant physician partner to choose an adjustment to the applicable incentive compensation to receive a portion of such compensation in equity of agilon. Our DCEs' participating medical group agreements provide for mutual indemnification rights, and have an initial term through December 31, 2026, unless earlier terminated.

On February 24, 2022, the CMS Innovation Center announced that it is redesigning the GPDC model and renaming it the Accountable Care Organization Realizing Equity, Access, and Community Health ("ACO REACH"). The CMS Innovation Center concurrently introduced a Request for Applications ("RFA") for a new cohort to begin the model on January 1, 2023, and it announced that all current GPDC model participants that meet ACO REACH requirements would be permitted to continue participating in the ACO REACH model as ACOs. The ACO REACH requirements outlined thus far include: 1) The development and implementation of a robust health equity plan to identify and better serve underserved communities; 2) the requirement that at least 75% control of each ACO's governing body be held by participating providers or their designated representatives (compared to 25% during the first two Performance Years of the GPDC model); and 3) the requirement that there be at least two beneficiary advocates on the governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. We do not anticipate that these new requirements will have a material impact on agilon's current or future participation in this program, or inhibit our ability to continue and grow our participation in the model. In addition, The CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes is not yet known.

Table of Contents

**Marketing and Distribution**

In accordance with Medicare marketing guidelines, health plan payors are responsible for marketing directly to patients. Our focus is on outreach to existing community-based physician groups to join our platform, establishing and maintaining our local branding and strategies to support education for our Medicare-eligible members in evaluating their Medicare options.

Through our long-term partnership model, we partner with leading community-based physician groups in our existing geographies and aim to expand our geographic reach by partnering with community-based physician groups in new geographies, across the United States. Our growth strategy is supported by a dedicated business development team that works closely with physician groups, senior management and key stakeholders to identify potential physician groups to partner with and integrate onto our platform and into our network. Additionally, we believe our network of like-minded physician partners also attracts new physicians to join, as access to cross-market know-how and best practices encourages success in a Total Care Model.

Our enterprise marketing team develops branding strategies and identities in our geographies and supports the development of communication and branding materials to support the local growth of our physician partners and their Medicare patient population. This begins with our entry into a new geography. We create a local brand that embodies the value of the Total Care Model for patients as well as the history and culture of our physician partner. Each geography has its own customized brand, which includes "Senior Care Advantage" as part of the naming convention to help reinforce the value of our national network to payors, policy makers and other industry constituents. To empower patients to make informed decisions about their coverage options, educational opportunities and materials are offered throughout the year, including educational physician presentations, monthly "Medicare 101" sessions across every geography, on-line resources, in-office materials that explain the difference between traditional Medicare and MA, and patient communications that highlight Medicare election coverage windows.

**Competition**

The healthcare industry is highly competitive and fragmented. We currently face competition in every aspect of our business, including in offering a favorable reimbursement structure for existing physician partners and attracting health plan payors and physician partners who are not contracted with us, from a range of companies that provide care under a variety of models that could attract patients, providers and payors. Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks. Other organizations may also seek to apply specialized services or programs, including providing data analytics or disease-based programs, designed to enable physicians or payors to operate successfully under value-based care arrangements. Although some of our competitors utilize elements of our MA multi-payor, globally capitated risk model deployed with community-based physician groups, including in certain of the geographies we serve, we do not believe any of our competitors offer a model that captures all elements of the agilon model. Our competitors typically vary by geography, and we may also encounter competition in the future from other new entrants. Our growth strategy and our business could be adversely affected if we are not able to continue to access existing geographies, successfully expand into new geographies or maintain or establish new relationships with payors and physician partners.

The principal competitive factors in our business include the nature and caliber of relationships with physicians; patient healthcare quality, outcomes and cost; the strength of relationships with payors; the quality of the physician experience; local geography leadership position; and the strength of the underlying economic model. We believe our first-of-its-kind platform, partnership and network model enables us to compete favorably.

Table of Contents

**Intellectual Property**

We rely on a combination of trademark laws in the U.S. as well as confidentiality procedures and contractual provisions to protect our trade secrets, including proprietary technology, databases and our brand.

We have registered "agilon" and our logo as trademarks in the U.S. We also have filed other trademark applications that are meaningful to our business in the U.S. across various states and local jurisdictions, including for the use of the local brand created within each of our geographies, and will pursue additional trademark registrations to the extent we believe it would be beneficial and cost-effective.

We are the registered holder of a variety of domain names that include "agilon" and similar variations.

We have developed proprietary technology and processes that support our operational programs and clinical insights, including our "CORE" technology platform and HCC Manager risk adjustment software application, both of which are proprietary systems that aid in the aggregation and analysis of third-party data we collect. Our internally developed technology is continuously refined to support the needs of our platform and partners. Although we do not currently hold a patent for CORE or HCC Manager, we continually assess the most appropriate methods of protecting our intellectual property and may decide to pursue available protections in the future.

We maintain our intellectual property and confidential business information in a number of ways. For instance, we have a policy of requiring all employees and consultants to execute confidentiality agreements upon the commencement of an employment or consulting relationship with us. Our employee agreements also require relevant employees to assign to us all rights to any inventions made or conceived during their employment with us in accordance with applicable law. In addition, we have a policy of requiring individuals and entities with which we discuss potential business relationships to sign non-disclosure agreements. Lastly, our agreements with customers include confidentiality and non-disclosure provisions.

We may be unable to obtain, maintain and enforce our intellectual property rights, and assertions by third parties that we violate their intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

**Human Capital**

*Overview*

People join agilon because of our vision: To transform the future of healthcare in communities across the country by empowering exceptional patient-physician relationships. Together with our employees and physician partners, we have defined our company values and commitments to guide our everyday actions in executing our mission:

- Partnership and Collaboration: We are One Team. We collaborate deeply. We embrace diversity. Together with our physician partners, we empower the care that our families and friends deserve.

- Innovation: We rapidly adapt to our changing world and embrace the creativity of our physician partners and each other.

- Quality and Service Excellence: We value results, not activity. We serve others with passion and humility.

- Continuous Improvement: We are agile and move fast. We actively seek out and share feedback. We learn and improve every day.

- Expertise: We are curious. We aspire to be experts and share our knowledge.

- Accountability and Integrity: We celebrate our successes. We take ownership in everything we do.

Our human capital efforts are supported by our dedicated human resources team. This team supports the business in identifying and recruiting top talent, supporting the onboarding and orientation of new hires through a comprehensive new employee orientation, a manager's toolkit and resources to support onboarding, goal setting, and in-year management, as well as a comprehensive semi-annual review process that ties to our company values and supports continuous learning and improvement. Our efforts to promote a positive employee experience and build

12

APP 418

Table of Contents

culture are further supported and enhanced by local and national in-person and virtual events, including town halls, in-office celebrations, employee activity committees and most-valuable-player awards, meant to champion our employees and create a sense of community. We conduct annual employee engagement surveys to solicit feedback and help guide annual planning on efforts and initiatives to support our team members. We have also developed a taskforce that seeks to drive focused and targeted diversity and inclusion efforts, including employee focus groups and participation up and down the organization to ensure all voices are heard.

### Total Rewards

We recognize how vital our employees are to our success and strive to offer comprehensive and competitive compensation and benefits to meet the varying needs of our colleagues and their families. The benefits and programs include annual and long-term incentives, a 401(k) plan, health and welfare insurance benefits, paid time off, flexible work schedules, and family leave, among many others, depending on eligibility.

### Diversity, Equity & Inclusion ("DE&I")

We believe a great workplace fosters an environment where all employees can thrive and grow, and where differences are both encouraged and celebrated. We aim to attract, develop, retain and support a diverse workforce that reflects the many members, physician partners, and communities we serve. Under our DE&I Taskforce, we collaborate with our employees to develop and promote an internal diversity, equity and inclusion strategy that aims to foster a culture of inclusion. Our DE&I programs include development programs for high-potential female leaders (expanding opportunity to all under-represented groups), an unconscious bias curriculum, and DE&I training for our workforce.

### Training and Development

We prioritize and invest in creating opportunities to help employees grow and build their careers through a multitude of training and development programs. Our training and development program promotes the importance of compliance across our business. Our employees demonstrate this commitment through our annual Code of Conduct training. We also provide training and development to all employees, focusing on career development, and professional development, including online courses designed to strengthen technical and hard-skills and enhance leadership development. We support career coaching, mentorship and accelerated leadership development programs to ensure mobility and advancement for our employees. Our employees are also encouraged to participate in mentoring programs with people of various backgrounds and cultures. We view mentoring as an essential development tool for sharing skills and knowledge so we can all succeed. Our commitment to mentoring feeds the successful future of our company.

### Health & Safety

The health, safety, and wellness of our employees are vital to our success. We have a strong commitment to providing a safe working environment. From the outset of the COVID-19 pandemic, we took a comprehensive approach to managing occupational health and safety challenges presented by the pandemic, including implementing facial covering requirements for our workplaces, providing sick leave, and implementing additional protocols in accordance with applicable Occupational Safety and Health Administration ("OSHA") requirements and guidance and Centers for Disease Control and Prevention ("CDC") guidelines for workplaces. In 2020, we quickly and effectively transitioned a significant subset of our employees to a fully remote work environment in an effort to mitigate the spread of COVID-19. To date, our employees have continued to support our partners with the highest level of service from their home offices without a disruption in our business operations. We have taken this opportunity to maintain a fully remote work environment for the vast majority of our employees as part of our culture.

As of December 31, 2021, agilon and its subsidiaries had 648 employees, of whom 646 were full-time and two were part-time. None of our employees is a member of a labor union, and we have not experienced a work stoppage. Our employees do not include our physician partners, whom we do not directly employ. We believe we enjoy a good working relationship with our employees.

13

Table of Contents

**Healthcare and Other Applicable Regulatory Matters**

The healthcare industry is highly regulated under both state and federal laws and regulations. Our operations and relationships with healthcare plans and providers are subject to extensive and increasing regulation by numerous federal, state, and local government agencies including the Office of Inspector General ("OIG"), the Department of Justice ("DOJ"), the CMS, the Office of Civil Rights, and various state authorities.

*Corporate Practice of Medicine*

Some states in which we operate have laws prohibiting the corporate practice of medicine; such laws generally prohibit business entities with non-physician owners, such as agilon and certain of its subsidiaries, from practicing medicine. States that have corporate practice of medicine laws limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals; therefore, non-medical professional entities are prohibited from employing or contracting with physicians (unless the entity satisfies a limited exception), exercising control over medical decisions, or engaging in certain arrangements with other physicians, such as fee-splitting. These laws vary widely from state to state. A violation of the corporate practice of medicine prohibition constitutes the unlawful practice of medicine, which is a public offense punishable by fines or criminal penalties. In addition, any physician who participates in a scheme that violates the state's corporate practice of medicine prohibition may be subject to disciplinary action or potential forfeiture of revenues from payors for services rendered, or may be punished for aiding and abetting a non-medical professional entity in the unlawful practice of medicine. We typically operate by forming RBEs which contract with payors on the one hand and provide professional services through contractual relationships with PCPs on the other hand. While we believe that our practices are in substantial compliance with the corporate practice of medicine laws to which we are subject, if a state determines that we are not in compliance that may result in a material adverse effect on our business, results of operations or financial condition. See "Risk Factors—Legal and Regulatory Risks—Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries."

*Fee-Splitting Prohibitions*

The laws of some states prohibit physicians from splitting with anyone, other than providers who are part of the same group practice, any professional fee, commission, rebate or other form of compensation for any services not actually and personally rendered. Fee-splitting laws and their interpretations vary from state to state and are enforced by state courts and regulatory authorities that have broad discretion in their enforcement. Courts in some states have interpreted fee-splitting statutes as prohibiting all percentage of gross revenue and percentage of net profit fee arrangements, despite the performance of legitimate services. In addition, courts have refused to enforce contracts found to violate state fee-splitting prohibitions. Further, fee-splitting arrangements could implicate other laws applicable to our business, such as anti-kickback and corporate practice of medicine laws and regulations.

While we believe we are in substantial compliance with fee-splitting laws in the states in which we operate, if we are found to be non-compliant, penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary action against our affiliated providers.

*False Claims Acts*

We are subject to numerous federal and state laws that prohibit the presentation of false information, or the failure to disclose information, in connection with the submission and payment of medical claims for reimbursement.

The federal civil and criminal false claims laws and civil monetary penalties laws, such as the federal False Claims Act, 31 U.S.C. §§ 3729—3733, impose civil liability on individuals or entities that submit false or fraudulent claims for payment to the federal government. The False Claims Act provides, in part, that the federal government may bring a lawsuit against any person whom it believes has knowingly or recklessly: presented, or caused to be presented, a false or fraudulent claim for payment or approval to the federal government; made, used or caused to be made or used a false statement or a false record to get a claim for payment approved, including a false or fraudulent claim; concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money or

14

Table of Contents

property to the federal government; or conspired to commit any of the foregoing. The government may deem entities to have "caused" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information, billing for services not rendered, billing services at a higher payment rate than appropriate and billing for care that is not considered medically necessary.

The federal government has used the False Claims Act to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare and state healthcare programs. The federal government, including as a result of the passage of the ACA, and a number of courts have taken the position that claims presented in violation of certain other statutes, including the federal Anti-Kickback Statute ("AKS") or the federal physician referral law, 42 U.S.C. 1395nn (the "Stark Law"), can also be considered a violation of the False Claims Act. Some government healthcare programs, including, but not limited to, the MA program, use a risk-adjustment model that adjusts premiums paid to contracted payors to reflect the specific characteristics of each enrolled member (including demographics, government program eligibility and health status). Many payors and government healthcare programs have set forth specific documentation rules that must be followed in compliantly selecting allowable codes. We rely on physician partners to follow the CMS documentation rules and code their claim submissions with accurate and substantially documented diagnoses, which we send to the payors, some of whom, in turn, submit the data to government healthcare agencies including CMS. In recent years, the DOJ has brought a number of investigations and actions under the federal False Claims Act against both payors and providers for alleged upcoding or improper coding of diagnosis coding under the risk-adjustment methodology. Further, amendments to the federal False Claims Act and Social Security Act impose severe penalties for the knowing and improper retention of overpayments collected from government payors.

A number of states have enacted laws that are similar to the federal False Claims Act. Under Section 6031 of the Deficit Reduction Act of 2005, as amended, if a state enacts a false claims act that is at least as stringent as the federal statute and that also meets certain other requirements, the state will be eligible to receive a greater share of any monetary recovery obtained pursuant to certain actions brought under the state's false claims act. As a result, more states are expected to enact laws that are similar to the federal False Claims Act in the future along with a corresponding increase in state false claims enforcement efforts. Violations of federal and state fraud and abuse laws may be punishable by criminal and/or civil sanctions, including significant penalties, fines, disgorgement, additional reporting requirements and oversight under a corporate integrity agreement or similar agreement to resolve allegations of noncompliance with these laws, and/or exclusion or suspension from federal healthcare programs, such as Medicare, and debarment from contracting with the U.S. government. Penalties for False Claims Act violations include fines ranging from $12,537 to $25,076 for each false claim, plus up to three times the amount of damages sustained by the government. In addition to the provisions of the False Claims Act, which provide for civil enforcement, the federal government also can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims to the government for payments. Additionally, private parties may initiate *qui tam* whistleblower lawsuits against any person or entity under the False Claims Act in the name of the federal government, as well as under the false claims laws of several states, and may share in the proceeds of a successful suit. Generally, federal and state governments have made investigating and prosecuting healthcare fraud and abuse a priority.

### *Federal and State Anti-Kickback Statutes*

The AKS, set forth in Section 1128B of the Social Security Act, prohibits the knowing and willful offer, payment, solicitation or receipt of any form of remuneration in return for, or to induce, (i) the referral of a person for items or services reimbursable under federal healthcare programs, (ii) the furnishing or arranging for the furnishing of items or services reimbursable under federal healthcare programs or (iii) the purchase, lease or order or arranging or recommending purchasing, leasing or ordering of any item or service reimbursable under federal healthcare programs. The core of a violation of the AKS is an "inducement" to refer patients for services or items that are reimbursed under a federal healthcare program, such as Medicare, Medicaid, or Tricare (which covers military personnel). The ACA amended the AKS to make it clear that a person need not have actual knowledge of the statute, or specific intent to violate the statute, as a predicate for a violation. Court cases have resulted in the interpretation that a violation may occur where even one purpose of the remuneration is to induce or reward referrals, and the OIG, which has the authority to impose administrative sanctions for violation of the statute, has adopted a similar standard.

15

**APP 421**

Table of Contents

There are certain AKS "safe harbors" which, if the respective requirements are met, would afford protection from the AKS. Failure to meet all requirements of an AKS safe harbor does not necessarily mean the arrangement violates the AKS, but it may be subject to scrutiny by legal authorities, in light of the parties' intent and arrangements. In other words, if an arrangement does not fit within a safe harbor, it does not necessarily mean that the arrangement is *per se* illegal—only that it is not shielded from regulatory scrutiny. The federal AKS provides criminal penalties for individuals or entities that knowingly and willfully solicit or receive any remuneration. A violation of the AKS is punishable by imprisonment of up to ten years, fines of up to $100,000 per offense, or both. Violation can also give rise to federal healthcare program exclusion, liability under the False Claims Act and civil penalties, which may include monetary penalties of up to $100,000 per offense, repayments of up to three times the total payments between the parties to the arrangement and suspension from future participation in Medicare and Medicaid.

We have endeavored to structure our business arrangements to fit within applicable federal AKS safe harbors and to otherwise operate in material compliance with the AKS. Federal courts in the U.S., for instance, have recognized that a referring party's provision of legitimate services to a referral recipient may not constitute prohibited remuneration for AKS purposes when the referral recipient pays fair market value in return for what it receives. Many of our arrangements are structured to provide for compensation that is fair market value for services actually rendered and in a manner that does not reflect the volume or value of referrals generated between the parties. In structuring our relationships with providers, including our physician partners, and other healthcare entities, we are careful to try to ensure wherever possible that we are in compliance with all of the regulatory requirements of such safe harbors and exceptions. In particular, a key managed care safe harbor under the AKS upon which we regularly rely allows for payments to providers for "healthcare services and items," but does not allow incentive payments for marketing or to encourage member enrollment. We therefore carefully analyze all payment structures to ensure that they constitute "services and items" that fall within this safe harbor or are otherwise in compliance with the AKS.

Additionally, some states have enacted statutes and regulations similar to the AKS, but which may be applicable regardless of the payor source for the patient. These state laws may contain exceptions and safe harbors that are different from and/or more limited than those of federal law and that may vary from state to state.

To help accelerate the U.S. healthcare system's transition from an FFS to a value-based system, the U.S. Department of Health and Human Services ("HHS") launched the "Regulatory Sprint to Coordinated Care" initiative ("Regulatory Sprint") in 2018, which aims to change the manner in which the healthcare regulatory framework has traditionally been applied to stakeholder arrangements. In connection with the Regulatory Sprint, the OIG issued final rules amending the AKS by adding new safe harbors and modifying existing safe harbors that protect certain payment practices and business arrangements from sanctions under the AKS in order to remove potential barriers to more effective coordination and management of patient care and delivery of value-based care. Among other changes, the new regulations contain safe harbors for value-based arrangements centering around value-based enterprises, which are enterprises composed of participants collaborating to achieve one or more value-based purposes, including coordinating and managing the care of a target patient population and coordinating and managing the care of a target population. These new final rules provide additional protections to our payment models with providers.

We have also endeavored to structure our participation in the Direct Contracting Model to comply with waivers of the AKS issued by the Secretary of HHS. The conditions of such waivers are to ensure that protected arrangements: (i) are consistent with the quality, care coordination, and cost-reduction goals of the Direct Contracting Model, (ii) are subject to safeguards designed to mitigate the risk of fraud and abuse; and (iii) can be readily monitored and audited.

***Stark Law***

The Stark Law generally prohibits a physician from referring Medicare and Medicaid patients to an entity providing designated health services ("DHS") if such physician, or a member of the physician's immediate family, has a financial relationship with the entity, unless a specific exception applies. DHS is defined to mean any of the following enumerated items or services: clinical laboratory services; physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; and outpatient speech-language pathology services. The types of financial arrangements between the referring physician and an entity providing DHS

16

Table of Contents

that trigger the Stark Law are broad, including direct and indirect ownership and investment interests, and compensation arrangements. The Stark Law also prohibits any entity providing DHS and receiving a prohibited referral from presenting, or causing to be presented, a claim or billing for the services arising out of the prohibited referral. Similarly, the Stark Law prohibits an entity from "furnishing" a DHS to another entity in which it has a financial relationship when that entity bills for the service. The Stark Law also prohibits self-referrals within an organization by its own physicians, although broad exceptions exist that cover employed physicians and those referring DHS that are ancillary to the physician's practice to the physician group. The prohibition applies regardless of the reasons for the financial relationship and the referral; intent to induce referrals is not required. Like the federal AKS, the federal Stark Law contains statutory and regulatory exceptions intended to protect certain types of transactions and arrangements. If the Stark Law is implicated, the financial relationship must fully satisfy a Stark Law exception; if an exception is not satisfied, then the parties to the arrangement could be subject to sanctions. Sanctions for violation of the Stark Law include denial of payment for claims for services provided in violation of the prohibition, refunds of amounts collected in violation of the prohibition, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law prohibition, civil assessment of up to three times the amount claimed, and potential exclusion from the federal healthcare programs, including Medicare and Medicaid. Amounts collected on claims related to prohibited referrals must be reported and refunded generally within sixty (60) days after the date on which the overpayment was identified. Furthermore, Stark Law violations and failure to return overpayments in a timely manner can form the basis for False Claims Act liability, as further discussed herein. Additionally, several states have enacted physician self-referral laws.

Notably, compensation pursuant to a risk-sharing arrangement between a managed care organization or an independent practice association and a physician (either directly or indirectly through a contractor) for services provided to enrollees of a health plan (an MA plan, for example) does not constitute a financial arrangement for Stark purposes. Further, physician incentive plans ("PIPs") are allowable provided that (i) the compensation is not determined in any manner (withhold, capitation, bonus, or otherwise) that takes into account, directly or indirectly, volume or value of referrals and (ii) the PIP does not induce the reduction of medically necessary care to individual patients and does not place the physician at substantial financial risk for services not provided by the physician.

As part of the Regulatory Sprint, CMS also issued a sweeping set of regulations that introduce significant new value-based terminology and exceptions to the Stark Law. CMS has implemented new exceptions for certain remuneration exchanged between or among eligible participants in value-based arrangements. These exceptions and their various requirements apply based on the level of risk assumed by the arrangement's participants. These new regulations purport to ease the compliance burden for healthcare providers across the industry while maintaining strong safeguards to protect patients and programs from fraud and abuse. These or other changes may change the parameters of the Stark Law exceptions that we rely upon and impact our business, results of operations and financial condition.

### Section 1876 of the Social Security Act

Section 1876 of the Social Security Act prohibits MA plans and their downstream entities from entering into compensation arrangements with physicians that may directly or indirectly have an effect of reducing or limiting services to individual members. We have sought to structure our compensation arrangements with physicians to ensure compliance with this requirement.

### Health Care Fraud Statute

The Health Care Fraud Statute, 18 U.S.C. § 1347, prohibits any person from knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, which can be either a government or private payor plan. Violation of this statute, even in the absence of actual knowledge of or specific intent to violate the statute, may be charged as a felony offense and may result in fines, imprisonment or both. The Health Care False Statement Statute, 18 U.S.C. § 1035, prohibits, in any matter involving a federal healthcare program, anyone from knowingly and willfully falsifying, concealing or covering up, by any trick, scheme or device, a material fact, or making any materially false, fictitious, or fraudulent statement or representation, or making or using any materially false writing or document knowing that it contains a materially false or fraudulent statement. A violation of this statute may be charged as a felony offense and may result in fines, imprisonment, or both.

17

**APP 423**

Table of Contents

*Civil Monetary Penalties Statute*

The Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. § 1320a-7a, authorizes the imposition of civil monetary penalties, assessments, and exclusions against an individual or entity based on a variety of prohibited conduct, including, but not limited to: (i) presenting, or causing to be presented, claims for payment to Medicare, Medicaid, or other third-party payors that the individual or entity knows or should know are for an item or service that was not provided as claimed or is false or fraudulent; (ii) offering remuneration to a federal healthcare program beneficiary that the individual or entity knows or should know is likely to influence the beneficiary to order or receive healthcare items or services from a particular provider; (iii) arranging contracts with an entity or individual excluded from participation in a federal healthcare program; (iv) violating the federal AKS; (v) making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a federal healthcare program; (vi) making, using, or causing to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a federal healthcare program; and (vii) failing to report and return an overpayment owed to the federal government. We could be exposed to a wide range of allegations to which the federal CMPL would apply. We perform monthly checks on our employees, affiliated providers and certain affiliates and vendors using government databases to confirm that these individuals have not been excluded from federal programs. However, should an individual become excluded and we fail to detect it, a federal agency could require us to refund amounts attributable to all claims or services performed or sufficiently linked to an excluded individual. Thus, we cannot foreclose the possibility that we will face allegations subject to the CMPL with the potential for a material adverse impact on our business, results of operations and financial condition. Substantial civil monetary penalties may be imposed under the federal Civil Monetary Penalty Statute and may vary, depending on the underlying violation. In addition, an assessment of not more than three (3) times the total amount claimed for each item or service may also apply, and a violator may be subject to exclusion from federal and state healthcare programs.

*Federal and State Insurance and Managed Care Laws*

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. Some states require downstream entities and RBEs to obtain an insurance license, a certificate of authority, or an equivalent authorization, in order to participate in downstream risk-sharing arrangements with payors. In some states, statutes, regulations and/or formal guidance explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity. However, the majority of states do not explicitly address the issue, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements, as well as reporting obligations. Further, state regulatory stances regarding downstream risk-sharing arrangements can change rapidly and codified provisions may not keep pace with evolving risk-sharing mechanisms.

*Healthcare Reform*

In March 2010, the Patient Protection and Affordable Care Act (the "ACA") and the accompanying Health Care and Education Affordability Reconciliation Act, collectively referred to as the ACA, were enacted. The ACA includes a variety of healthcare reform provisions and requirements, which continue to be implemented and substantially changed the way healthcare is financed by both governmental and private insurers.

However, as a result of the election of former President Trump, the Republican control of the Senate, and the former Republican control of the House, several changes have been made to the provisions of the ACA since 2010, including reduced funding. Looking forward, the future of the ACA and its underlying programs are subject to continuing and substantial uncertainty, making long-term business planning exceedingly difficult. However, it is expected that a Biden administration will work to strengthen the law and build upon it. In line with this expectation, on September 17, 2021, the U.S. Department of Health and Human Services and the Treasury Department issued a final rule to bolster access to marketplace coverage and reverse several Trump-era regulatory changes under the ACA, including reversing regulations that limited the duration of the annual open enrollment period, as well as adding new policies, including a monthly special enrollment period for low-income individuals.

18

**APP 424**

Table of Contents

The prior administration and Congress were seeking legislative and regulatory changes to healthcare laws and regulations, including repeal and replacement of certain provisions of the ACA. To date, Congressional efforts to completely repeal and replace the ACA have been unsuccessful. However, the individual mandate was repealed by Congress as part of the Tax Cuts and Jobs Act that was signed into law on December 22, 2017. In December 2018, in a case brought by the state of Texas and nineteen other states, a federal judge in Texas struck down the ACA based on his determination that the ACA's individual mandate is unconstitutional and, since that mandate cannot be separated from the rest of the ACA, the judge ruled that the rest of the ACA is also unconstitutional. The decision was appealed to the United States Supreme Court, which ruled on June 17, 2021 that the plaintiff states did not have standing to challenge the law's individual mandate. The United States Supreme Court, however, did not decide on the main issue in the case; whether the entirety of the ACA was rendered unconstitutional when Congress eliminated the penalty for failing to obtain health insurance.

Because of the continued uncertainty about the implementation of the ACA, including the timing of and potential for further legal challenges, repeal or amendment of that legislation and the future of the health insurance exchanges, we cannot quantify or predict with any certainty the likely impact of the ACA on our business, financial condition, operating results and prospects.

Additionally, the CMS Innovation Center continues to test an array of alternative payment models, including the Direct Contracting Model to allow DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. State regulation of DCEs will likely be variable. For example, certain states may require DCEs to obtain specific licensure to participate in the Direct Contracting Model and assume risk directly from CMS. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare. Further, CMS also routinely adjusts the risk adjustment factor which is central to payment under the MA program. The monetary "coefficient" values associated with diseases that we manage in our population are subject to change by CMS. Such changes could have a material adverse effect on our financial condition.

### *Federal and State Privacy and Security Requirements*

We are subject to various federal, state and local laws and rules regarding the use, security and disclosure of protected health information ("PHI"), personally identifiable information, de-identified data and other categories of confidential or legally protected data that our businesses may handle. Such laws and rules include, without limitation, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") and state privacy and security laws. Privacy and security laws and regulations often change due to new or amended legislation, regulations or administrative interpretation. We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We also utilize third-party service providers for important aspects of the collection, storage and transmission of such sensitive information.

Congress enacted HIPAA, in part, to combat healthcare fraud and to protect the privacy and security of patients' individually identifiable healthcare information. Among other things, HIPAA requires healthcare providers and their business associates to maintain the privacy and security of individually identifiable PHI. The HIPAA Security Rule requires both covered entities and business associates to develop and maintain policies and procedures with respect to PHI, including adherence to HIPAA's security standards through the implementation of administrative, physical and technical safeguards to protect PHI. Additionally, the Privacy Rule contains requirements with respect to the use and disclosure of individuals' PHI, including a prohibition on a covered entity or business associate using or disclosing an individual's PHI unless the use or disclosure is authorized by the individual or is specifically required or permitted under the Privacy Rule. The Health Information Technology for Economic and Clinical Health of 2009 ("HITECH") dramatically expanded, among other things, (1) the scope of HIPAA to now apply directly to "business associates," or independent contractors who receive or obtain PHI in connection with providing a service to a covered entity or another business associate, (2) substantive security and privacy obligations, including a new federal security breach notification requirement that unauthorized acquisitions, access, use or disclosure of PHI be reported to, depending on the number of people affected and their location, affected individuals, the Department of Health and Human Services and local media outlets, (3) restrictions on marketing communications, a prohibition on business associates from receiving remuneration in exchange for PHI, and a prohibition on covered entities from receiving remuneration in exchange for PHI without express patient authorization and (4) the civil and criminal penalties that may be imposed

19

Table of Contents

for HIPAA violations. Pursuant to HIPAA, as amended by HITECH, we are required to report breaches of unsecured PHI to our covered entity clients, such as our physician group partners, within 60 days of discovery of the breach, and notify certain agencies and potentially the media in accordance with clause (2) above. We have experienced cybersecurity incidents in the past and may experience them in the future. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could result in, among other things, federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties.

HIPAA mandates that the Secretary of HHS conduct periodic audits of covered entities and business associates for compliance with the HIPAA Privacy and Security Rules. HIPAA imposes penalties for certain violations, subject to a cap of $1.5 million for violations of the same standard in a single calendar year. A single data privacy or data security incident can, in the view of HHS, result in violations of multiple standards. HIPAA, as amended by the HITECH Act, also authorizes state attorneys general to file suit on behalf of their states' residents. While HIPAA does not create a private right of action allowing individuals to sue us in federal court for violations of HIPAA, its standards have been used as a basis for establishing a duty of care in state-law civil suits alleging negligence or recklessness for the misuse of PHI. A finding of liability under HIPAA could have a material adverse effect on our business, financial condition and results of operations. In order to ensure compliance, we encrypt and back up data, maintain company-wide security awareness training, enter into business associate agreements with our partners, as well as ensure our partners have implemented physical security and safeguards at the data centers where our data is stored and conduct regular internal and external security audits. Although we employ administrative, physical and technological safeguards to help protect confidential and other sensitive information from unauthorized access or disclosure, our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to attacks by hackers or viruses, failures or breaches due to third-party action and employee (including contractor) negligence, error or malfeasance.

Additionally, many states also enacted laws that protect the privacy and security of confidential, personal and health information, which may be even more stringent than HIPAA and may add additional compliance costs and legal risks to our operations. Some of these state laws may impose fines and penalties on violators and may afford private rights of action to individuals who believe their personal information has been misused.

We are also subject to a provision of the federal 21st Century Cures Act that is intended to facilitate the appropriate exchange of health information. In May 2020, the United States Department of Health and Human Services Office of the National Coordinator for Health Information Technology and CMS issued complementary new rules that are intended to clarify provisions of the 21st Century Cures Act. The rules, intended to enhance interoperability and prevent information blocking, create significant new requirements for healthcare industry participants, including requirements to (i) provide patients with convenient access to health care information, (ii) support electronic exchange of data for transitions of care and (iii) require participation in trust networks to improve interoperability. The 21st Century Cures Act authorizes civil monetary penalties up to $1 million per information blocking "violation." It is unclear at this time what the costs of compliance with the new rules will be, and what additional risks there may be to our business. Various other federal and state laws may apply that restrict the use and protect the privacy and security of individually identifiable information, as well as employee personal information, including certain state laws modeled to some extent on the European Union's General Data Protection Regulation. Federal and state consumer protection laws, including laws that do not on their face specifically address data privacy or security, have been applied to data privacy and security matters by a range of government agencies and courts.

### *Consumer Protection Laws*

Healthcare providers are also subject to the Telephone Consumer Protection Act ("TCPA"), which regulates the manner in which a business may advertise its products and services to consumers by phone, text and fax. The TCPA was enacted by Congress to combat aggressive telemarketing and fax advertising practices believed to invade consumer privacy. The TCPA also regulates the use of automated equipment to deliver calls or text messages to mobile phones without prior express consent. Congress empowered the FCC to interpret the TCPA through rules, regulations and declaratory rulings. A 2015 order from the FCC clarified that calls or text messages that have an express healthcare-related purpose—such as treatment follow-up, appointment confirmations and reminders or pre-operative instructions—are exempt from the TCPA. In these instances, providers are not required to receive prior express consent from patients before reaching out by phone or text. As healthcare companies, such as ourselves, increasingly

20

Table of Contents

rely on mobile delivery platforms and other technologies to communicate with patients about appointments, billing and other issues, the potential for legal exposure under the TCPA also increases. Each call or text made in violation of the TCPA can cost up to $1,500 per instance in fines and damages. Because there is no cap on statutory damages, violations can result in millions of dollars in penalties.

### *Competition and Antitrust Laws*

We are subject to numerous statutes that govern competition in our industry, including the Sherman Act, the FTC Act and the Clayton Act. The Sherman Act, 15 U.S.C. §§ 1-7, outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." The penalties for violating the Sherman Act can be severe. Most enforcement actions are civil, but individuals and businesses that violate the Sherman Act may be prosecuted criminally by the DOJ. Criminal prosecutions are typically limited to clear violations, such as when competitors fix prices, allocate markets or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a corporation and $1 million for an individual, along with up to 10 years in prison. Under federal law, the maximum fine may be increased to twice the amount the conspirators gained from the illegal acts or twice the money lost by the victims of the crime, if either of those amounts is more than $100 million.

The FTC Act, 15 U.S.C. §§ 41-58, bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said that all violations of the Sherman Act also violate the FTC Act. Thus, although the FTC does not technically enforce the Sherman Act, it can bring cases under the FTC Act against the same kinds of activities that violate the Sherman Act. The FTC Act also reaches other practices that harm competition, but that may not fit neatly into categories of conduct formally prohibited by the Sherman Act. Only the FTC brings cases under the FTC Act.

The Clayton Act, 15 U.S.C. §§ 12-27, addresses specific practices that the Sherman Act does not clearly prohibit, such as mergers and interlocking directorates (that is, the same person serving as an officer or director of two competing companies). Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, 15 U.S.C. § 13, the Clayton Act also bans certain discriminatory prices, services and allowances in dealings between merchants. The Clayton Act was amended again in 1976 by the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, to require companies planning large mergers or acquisitions to notify the government of their plans in advance. The Clayton Act also authorizes private parties to sue for treble damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

In addition to these federal statutes, most states have antitrust laws that are enforced by state attorneys general or private plaintiffs. Many state statutory provisions are based on federal antitrust law, namely, Sections 1 and 2 of the Sherman Act, and Sections 3 and 7 of the Clayton Act.

As the healthcare industry has continued to evolve in response to consumer demand and competition in the marketplace, the effect of the antitrust laws in healthcare is also changing. We have expanded our operations significantly since our inception, organically as well as through acquisitions. Such growth, and our long-term contracts with physician partners, could expose us to risks related to antitrust investigations and litigation. Competition and antitrust law inquiries often continue for several years and, if violations are found, can result in substantial fines.

### *Other Laws and Regulations*

Some states in which we operate require licensing or registration for operations related to, among others, utilization review on behalf of payors, including reviewing medical necessity and appropriateness of healthcare services, or processing claims in connection with insurance or managed care products. Such laws vary from state to state, and our operations may be subject to exemption in certain states.

21

**APP 427**

Table of Contents

Additionally, our physician partners are subject to numerous federal, state and local licensing laws and regulations, relating to, among other things, professional credentialing and professional ethics. Our physician partners, as well as their nurse practitioners, must satisfy and maintain their individual professional licensing in each state where they practice medicine.

Further, organizations that receive reimbursement from a federal or state government payor are expected by the federal government to have a compliance program. For those organizations that do not receive reimbursement from any federal or state government payors, a compliance program is not mandatory but is considered best practice. As a result, we maintain a program to monitor compliance with federal and state laws and regulations applicable to healthcare entities. We have a compliance department that is charged with implementing and supervising our compliance program, which includes the adoption of (i) a Code of Conduct for our employees and affiliates and (ii) a process that specifies how employees, affiliates and others may report regulatory or ethical concerns to our compliance officer. We believe that our compliance program meets the relevant standards provided by the OIG of the Department of Health and Human Services. An important part of our compliance program consists of conducting periodic audits of various aspects of our operations. We also conduct mandatory educational programs designed to familiarize our employees with the regulatory requirements and specific elements of our compliance program.

We are also impacted by federal and state laws and policies that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in its operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare.

**Available Information**

Our website address is www.agilonhealth.com. We use our website as a routine channel for distribution of information that may be material to investors, including news releases, financial information, presentations and corporate governance information. Information contained or connected to our website is not incorporated by reference in this Annual Report on Form 10-K unless expressly noted. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") are available on our website, free of charge, as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the U.S. Securities and Exchange Commission ("SEC"). Additionally, the SEC maintains a website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us, at www.sec.gov.

APP 428

Table of Contents

**ITEM 1A. Risk Factors**

**The section below discusses the most significant risk factors that may materially adversely affect our business, results of operations and financial condition.**

**Risks Related to Our Business**

***We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability.***

We have incurred significant net losses in the past, including net losses (including discontinued operations) of $406.8 million, $60.1 million, and $282.7 million for the years ended December 31, 2021, 2020, and 2019, respectively. As a result of these losses, we had accumulated deficits of $957.7 million and $551.2 million as of December 31, 2021 and 2020, respectively. We expect that our expenses will increase substantially in the foreseeable future and our losses will continue, including for the year ended December 31, 2022, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

***Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows, and results of operations.***

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As an immature and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

23

APP 429

Table of Contents

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business, financial condition, cash flows, and results of operations could be harmed.

### *We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.*

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing upon these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, as a rapidly growing and relatively immature company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows, and results of operations could be harmed.

### *Amounts of medical expenses that are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.*

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows, and results of operations.

Additionally, factors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:

- Changes to the Medicare fee schedule or other rate schedules that serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;

- The utilization rates of healthcare services, including inpatient hospitalization, by our members;

- Changes to member benefit levels established annually by payors; and

- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

24

Table of Contents

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows, and results of operations.

***As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.***

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and, therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or that are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

***We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.***

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

***We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.***

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. As of December 31, 2021 and 2020, our cash and cash equivalents were $1.0 billion and $106.8 million, respectively. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced extreme volatility and disruption, which has increased due to the effects of COVID-19. The

25

**APP 431**

Table of Contents

availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access the credit facility agreement we executed in February 2021 (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "Secured Credit Facilities").

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable timeframe, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

***Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows, and results of operations.***

A significant reduction in membership could adversely affect our business, financial condition, cash flows, and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:

- failure to obtain new physician partners or members or to retain existing physician partners or members;

- decision by a payor to not renew the existing contractual agreement upon termination of such contract;

- low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;

- alternative care opportunities that are more attractive than those provided by our physician partners;

- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;

- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and

- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

26

Table of Contents

***The transition to a Total Care Model may be challenging for physician partners.***

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

***The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19.***

COVID-19 continues to spread in the United States and throughout the world. COVID-19 and the efforts to contain the outbreak have led to significant economic disruption, including extreme volatility in financial markets, reduced economic activity and a sharp increase in unemployment claims, as well as disruption in some of our physician partners' businesses. The spread of COVID-19 underscores certain risks we face in our business described herein.

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, increasing the potential for harm for our members. If the spread of COVID-19 is not contained, the medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to manage their existing clinical conditions, and the amount of medical care which has been deferred during the pandemic may exceed our expectations. Furthermore, we may experience reduced revenues as a result of changes to future capitation payment rates if Medicare members use fewer services due to COVID-19. For example, restrictions imposed as a result of COVID-19 may continue to decrease utilization of preventative or non-emergency healthcare, significantly decreasing provider costs. Should CMS adjust reimbursement rates based on margins during the pendency of COVID-19, our revenues in future periods and financial results may be materially adversely affected. Such measures and any further steps taken by us, or governmental action, to expand or otherwise modify the services delivered to our enrolled members, provide relief for the healthcare provider community, or in connection with the relaxation of stay-at-home and physical distancing orders and other restrictions on movement and economic activity intended to reduce the spread of COVID-19, including enhanced measures to implement widespread testing as a component of lifting these measures, could adversely impact our business, financial condition, cash flows, and results of operations.

The spread of COVID-19, or actions taken to mitigate this spread, including the efficacy, ability to administer or extent of adoption of COVID-19 vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations. We have transitioned a significant subset of our employee population to a remote work environment in an effort to mitigate the spread of COVID-19, which could exacerbate certain risks to our business, including an increased demand for information technology resources, increased risk of phishing and other cybersecurity attacks as well as other risks to the privacy and confidentiality of data, and increased risk of unauthorized dissemination of sensitive personal information or proprietary or confidential information about us or our members or other third parties. We have taken, and may take, further actions that alter our business operations as may be required by local, state, or federal authorities or that we determine are in the best interests of our employees. Such measures could negatively affect our ability to provide care to members, relationship with physician partners, marketing efforts, employee productivity, or customer retention, any of which could harm our business, financial condition, cash flows, and results of operations.

Table of Contents

Further, due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient, based on each patient's documented clinical diagnoses activity in the preceding calendar year. Medicare requires that a patient's health issues be clinically assessed and sufficiently documented annually regardless of the permanence of the underlying clinical conditions. Historically, this clinical assessment and documentation was required to be completed during an in-person visit with a patient. As part of the Coronavirus Aid, Relief and Economic Security Act, or "CARES Act," Medicare is allowing documentation for conditions identified during video visits with patients. However, given the disruption caused by COVID-19, it is unclear whether our physician partners will be able to conduct patient interactions to clinically assess and accurately and sufficiently document the health conditions of our members, which could adversely impact our revenue in 2022 and beyond.

In response to COVID-19, the United States Congress, CMS and other federal agencies with oversight of care delivery requirements made several changes to the manner in which Medicare will pay for telemedicine visits, many of which relax previous requirements, including site requirements for both providers and members, telemedicine modality requirements and others. For example, CMS added 135 services to the Medicare telehealth list in 2020 on an interim basis. State laws and regulations applicable to telemedicine, particularly licensure requirements, also were relaxed in many jurisdictions as a result of the COVID-19 pandemic. These relaxed regulations have allowed our physician partners to keep operating and deliver care to members predominantly through telemedicine modalities. Nearly all of the Federal measures will expire at the end of the Public Health Emergency ("PHE") declaration, which was extended on January 16, 2022. It is uncertain if the PHE will continue to be extended in 2022. Many state law and regulatory changes have already expired while others have continued. It is unclear which, if any, of these changes will remain in place permanently and which will be rolled-back following the COVID-19 pandemic, although there have been a number of federal and state law and regulatory changes over the past year that clarify requirements or remove impediments that include, but are not limited to, telehealth flexibilities pertaining to state licensure requirements, audio-technology services, and payment parity. For example, on November 2, 2021, CMS issued the 2022 Medicare Physician Fee Schedule ("MPFS") Final Rule, which finalizes the extension of coverage of certain Medicare telehealth services through calendar year 2023, permanently extends coverage of tele-behavioral health services delivered to patients in their homes and via audio-only technology. However, CMS signaled in the MPFS Final Rule that many services that were temporarily added on an interim basis during the PHE will not be continued on the list after the end of the PHE. In addition, although there is agreement on telehealth expansion, House and Senate committees disagree on whether such extensions should be permanent or temporary. On December 9, 2021, members of the House Ways and Means Health Subcommittee introduced a bill aimed at securing permanent access to telehealth services. Subsequently, on February 7, 2022, a Senate bill, the "Telehealth Extension and Evaluation Act," was introduced that would allow CMS to extend Medicare payments for a variety of telehealth services for two years after the PHE has ended. If statutes and regulations change to restrict the ability to deliver care or receive reimbursement for care delivered through telemedicine modalities, our financial condition and results of operations may be adversely affected.

The rapid development and fluidity of this situation precludes any prediction as to the ultimate impact on us of COVID-19. We are continuing to monitor the spread of COVID-19, changes to our payors' benefit coverages, the ongoing costs and business impacts of dealing with COVID-19, including the potential costs associated with lifting restrictions on movement and economic activity and with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of the pandemic and its ultimate impact on us is uncertain as this continues to evolve globally, but such impacts could be material to our business, financial condition, cash flows, and results of operations.

***Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.***

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical

APP 434

Table of Contents

assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services that have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

### *Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.*

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows, and results of operations to be harmed.

### *Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.*

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions that would adversely affect our business, financial condition, cash flows, and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

29

Table of Contents

***We rely on our management team and key employees and our business, financial condition, cash flows, and results of operations could be harmed if we are unable to retain qualified personnel.***

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. In order to retain and motivate valuable employees, in addition to salary and cash incentives, we provide stock options and restricted stock units that either vest over time or are based on the equity return realized by our controlling stockholder. The value to employees of these stock options is significantly affected by movements in our stock price that are outside our control. The compensation and benefits we provide to our employees, together with the value of stock options and restricted stock units that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows, and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. Continued increased competition for, or a shortage of, qualified personnel due to the COVID-19 pandemic, general labor market conditions, low levels of unemployment, or general inflationary pressures, may require that we enhance our pay and benefits package to compete effectively for such personnel. We may not be able to retain our current key personnel or attract, train, integrate, or retain other highly skilled personnel in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows, and results of operations will be harmed.

***We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.***

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. As of December 31, 2021 and 2020, we had $96.9 million and $102.0 million, respectively, of net intangible assets, including $41.5 million of goodwill. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations.

Due to the continued deterioration in the performance of our California reporting unit, in the fourth quarter of 2019, we initiated a process to evaluate strategic alternatives for our California operations, including a sale or abandonment of all or substantially all of such operations. We therefore performed an assessment of the long-lived assets in the California reporting unit for impairment and determined that the carrying value of certain of those assets was not recoverable. Accordingly, we wrote-down such assets to fair value, resulting in the recognition of a $98.3 million impairment charge included in discontinued operations for the year ended December 31, 2019. See "Note 19. Discontinued Operations" in our consolidated financial statements included elsewhere in this report.

Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Table of Contents

***Security breaches, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.***

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as PHI and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing.

We have experienced cybersecurity incidents in the past and may experience them in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements" in Item 1 above. Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely

31

**APP 437**

Table of Contents

on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;
- communications failures;
- software and hardware errors, failures and crashes;
- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and
- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***We could be required to devote significant attention and resources to the provision of certain transition services in connection with the disposition of our California Operations.***

In February 2021, we completed the divestiture of our California Operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes in our financial statements included elsewhere in this report.

For the Southern California and Fresno divestiture transactions, we will continue to be responsible for any liabilities arising from the business that were incurred prior to the closing date of each transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are

32

Table of Contents

remote. See "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this report. We may not be successful in managing the risks associated with the divestiture of our California operations.

***Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.***

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

**Risks Related to Our Reliance on Third Parties**

***We are economically dependent on maintaining our contracts with a limited number of key payors.***

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this report. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

***Our contracts with our payors are for limited terms and may not be renewed upon their expiration.***

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Table of Contents

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.***

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information that payors provide to us, we and our physician partners may not be able to effectively ensure our members' disease burdens are identified and may not be able to effectively operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows, and results of operations could be adversely impacted.

***We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.***

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

34

Table of Contents

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

### *Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

APP 441

Table of Contents

***We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.***

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

According to the DOJ's 2021 False Claims Act statistics, over $5 billion was collected in connection with healthcare fraud in 2021. The DOJ has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors, including MA plans, for alleged falsification of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues. Furthermore, in some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other fraud and abuse laws, such as the federal Anti-Kickback Statute. While we believe that our data recordation practices and relationships with providers comply with applicable laws and regulations, such arrangements may be subject to audits, reviews and investigation, which may result in substantial costs and may divert management's attention and resources.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for penalties to the government under the False Claims Act that range from $12,537 to $25,076 for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

36

APP 442

Table of Contents

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows, and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.

37

Table of Contents

**Risks Related to Our Industry and Government Programs**

*Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows, and results of operations.*

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally, consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

*Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows, and results of operations.*

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for approximately 100%, 100%, and 99% of our total revenues for the years ended December 31, 2021, 2020, and 2019, respectively. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this report. Additionally, we began participating in the Direct Contracting Model on April 1, 2021. While the DCE's are not consolidated, they still have an impact on our profitability. The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows, and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

The financial aspects of the Direct Contracting Model are set forth in an agreement between the DCE and CMS. CMS has the right to amend the agreement without the consent of the DCE for good cause or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules. We cannot predict whether CMS will amend such agreements and, if CMS amends such agreements, the impact such amendments may have on the financial aspects of our participation in the model, including, but not limited to, risk

38

Table of Contents

adjustment models used to set benchmarks, the rate book, capitation payment mechanisms and the calculation of shared savings and losses. Furthermore, changes to Medicare (including the Direct Contracting Model) or MA, such as if CMS were to scale back models or cut MA payments, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

***Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

***We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows, and results of operations will be harmed.***

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums

APP 445

Table of Contents

that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

***Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.***

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the ACA, the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows, and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low-quality rating for three consecutive years. Low-quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.***

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past resulted, and could in the future result, in substantial reductions in our revenue and operating margins. For example, since the passage of the Budget Control Act of 2011, Medicare payments have been subject to a 2% sequestration reduction; these cuts were the result of a congressional deal to address the debt ceiling crisis. The CARES Act temporarily suspended the 2% sequestration payment adjustment on Medicare payments from May 1, 2020 through December 31, 2020, which was extended through December 31, 2021 by the Act to Prevent Across-the-Board Direct Spending Cuts, and for Other Purposes, signed on April 14, 2021. On December 10, 2021, President Biden signed into law the Protecting Medicare and American Farmers from Sequester Cuts Act, which further delays the Medicare sequester and makes other changes to Medicare payments, among other actions. Specifically, the law exempts Medicare programs from sequestration cuts

40

**APP 446**

Table of Contents

through March 31, 2022. The sequestration reductions will then be 1% from April 1, 2022, through June 30, 2022, and 2% for the rest of 2022. Further, the passage of the Improving Medicare Post-Acute Care Transformation ("IMPACT") Act imposes a stringent timeline for implementing benchmark quality measures and data metrics across post-acute care providers. CMS has promulgated, and may continue to promulgate, regulations to implement provisions of the IMPACT Act. The costs of implementation could be significant, particularly with respect to the design of a unified payment methodology for post-acute providers. Failure to meet implementation requirements could expose providers to payment reductions and penalties.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. In connection with the fiscal year 2022 budget resolution process, Democrats in the House of Representatives sought to expand traditional Medicare coverage, likely to cover vision, dental and hearing coverage, and benefits, as well as lower the program's eligibility age. However, the final version of the House legislation, the Build Back Better Act, only addresses expanded hearing coverage. This legislation, as well as several appropriations bills and an omnibus budget bill for fiscal year 2022, are currently under consideration by the Senate. Such changes if adopted may increase competition between traditional Medicare and MA, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business. We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. We, in conjunction with some of our physician partners, began participating in the Direct Contracting Model in certain geographies on April 1, 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has been built upon CMS' experience with other programs, including MA and the Medicare Shared Savings Program, but also has new elements, such as a risk adjustment model developed specifically for use in the Direct Contracting Model. Likewise, the Direct Contracting Model rate book is based on the same methodology used for the MA rate book but has been modified in light of the characteristics of the Direct Contracting Model. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements

41

Table of Contents

for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

On February 24, 2022, the CMS Innovation Center announced that it is redesigning the GPDC model and renaming it the Accountable Care Organization Realizing Equity, Access, and Community Health (ACO REACH). The CMS Innovation Center concurrently introduced a Request for Applications (RFA) for a new cohort to begin the model on January 1, 2023, and it announced that all current GPDC model participants that meet ACO REACH requirements would be permitted to continue participating in the ACO REACH model as ACOs. The ACO REACH requirements outlined thus far include: 1) The development and implementation of a robust health equity plan to identify and better serve underserved communities; 2) the requirement that at least 75% control of each ACO's governing body be held by participating providers or their designated representatives (compared to 25% during the first two Performance Years of the GPDC model); and 3) the requirement that there be at least two beneficiary advocates on the governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. We do not anticipate that these new requirements will have a material impact on agilon's current or future participation in this program, or inhibit our ability to continue and grow our participation in the model. In addition, The CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes is not yet known.

Additionally, we are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. Alternatively, CMS may choose to limit additional new DCE entrants in future years to those who attend to underserved communities or are controlled by provider entities. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations, including with respect to our contractual relationships with providers and payors.

***We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.***

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition*,* cash flows, and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

42

Table of Contents

***We have in the past, and may in the future, be subject to regulatory inquiries and CAPs imposed by our payors.***

We have in the past been, and may in the future be, subject to regulatory inquiries and corrective action plans ("CAPs") imposed by our payors, and the status of certain state regulatory and payor inquiries is uncertain. For example, in February 2018, our subsidiary, PPMC, self-disclosed to the California Department of Managed Health Care ("DMHC"), the California Department of Health Care Services, and our affected payors certain noncompliant practices in our claims and utilization management. We submitted various reports in May, June and August of 2018 and coordinated with the DMHC and certain of our payors to remediate noncompliant claims and utilization management practices and implement improvements through various CAPs. On December 17, 2019, we completed substantial remediation of all known deficiencies identified by the DMHC's audit findings. In February 2021, we divested all of our California operations. On March 9, 2021, we received a set of investigative interrogatories from the DMHC pursuant to its investigation of conduct and matters described in our various reports. The interrogatories sought information concerning certain claims data and authorizations denied due to lack of medical necessity, including information regarding the health plans affected thereby. We responded timely to such interrogatories and provided requested information. Any adverse review, audit or investigation could result in, among other things: refunding of amounts we have been paid pursuant to our contracts; or the imposition of fines, penalties and other sanctions on us, or certain of our payors. While we do not expect the amount to be material, we are unable to predict the potential dollar value of recoupments or fines, penalties or other sanctions that may be imposed on us or the impacted payors related to the DMHC's audit findings, if any. Per publicly available information, six out of the nine impacted payors have entered into letters of agreement with the DMHC whereby each of the payors have agreed to pay an administrative penalty related to the deficiencies. These penalties equal $202,500 in the aggregate. At least one payor formally sought indemnification from us in the amount of $80,000 for penalties related to the DMHC audit findings. We are unable to predict the potential dollar value of claims or demands that could be asserted in the future, if any. While we have divested all of our California operations as of February 2021, for the Southern California and Fresno divestiture transactions we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including any fines, penalties and other sanctions relating to the DMHC matter described above, the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote.

Further, we may be audited by payors and regulatory bodies, and we have been required to engage in and respond to payor corrective action plans and regulatory inquiries in the past. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. As of December 31, 2021 and 2020, risk-bearing capital required across our geographies and payors totaled $58.5 million and $38.8 million, respectively. There is also a risk that such amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

***Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.***

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

43

**APP 449**

Table of Contents

***CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.***

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. For 2020 and 2019, respectively, 50% and 25% of our MA members' risk adjustment factor was calculated from claims data submitted through EDS. CMS increased that percentage to 75% in 2021 and 100% in 2022. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues. Our revenues could be further reduced by budget reconciliation bills, which could increase the MA coding intensity adjustment.

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;

- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;

- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or

- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

44

Table of Contents

**Legal and Regulatory Risks**

***The healthcare industry is intensely regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our current conduct or even conduct that occurred a number of years ago, including prior to the acquisition of our subsidiary, PPMC, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law, or whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows, and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the CMPL, which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;

- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;

- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing DHS if the physician (or his/her immediate family member) has a financial relationship with that entity;

- Provisions of, and regulations enacted pursuant to, HIPAA, as amended, HITECH, and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;

- Provisions of, and regulations enacted pursuant to, the 21st Century Cures Act, regarding interoperability and prohibitions against information blocking;

- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;

- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;

- State laws that govern the activities of third-party administrators and utilization review agents; and

- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters" in Item 1.

45

Table of Contents

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We have been and may be a party to various lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in federal healthcare programs;

- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;

- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;

- enforcement actions by governmental agencies or monetary penalties for violations of the 21st Century Cures Act;

- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;

- mandated changes to our practices or procedures that materially increase operating expenses;

- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;

- termination of various relationships or contracts related to our business; and

- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly, any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

46

Table of Contents

***If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.***

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to (i) increase the quality of care while appropriately managing overall costs and (ii) participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law" in Item 1.

The laws and regulations, however, are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows, and results of operations.

***Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.***

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. In addition, through our participation in the CMS Innovation Center Direct Contracting Model, we (either as a DCE or as a service provider to our physician partners who are participating in the model) must comply with provisions in the participation agreements with CMS regarding marketing and outreach activities. For example, DCEs must have their plans for marketing activities approved by CMS and are prohibited from engaging in some forms of marketing activities such as door-to-door solicitation. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute" in Item 1. Our physician partners and the payors with which we contract risk running afoul of applicable state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (e.g., the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties,

47

Table of Contents

including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Our business development and member engagement activities may implicate the TCPA, related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws" in Item 1. A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows, and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's PHI in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

***Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.***

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters" in Item 1. Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs, as well as significant potential monetary liabilities. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory Matters—Other Laws and Regulations" in Item 1. If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows, and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

48

Table of Contents

***Our use, disclosure and processing of personally identifiable information, PHI, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements" in Item 1. These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be directly liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time-to-time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows, and results of operations.

Table of Contents

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. For example, we note that in 2019, the Office of Civil Rights announced the creation of its Right of Access Initiative, intended to support individuals' right of timely access to their health records. Since the creation of the Right of Access Initiative, there has been substantial enforcement activity related to covered entities' alleged failures to provide individuals with timely access to their health records. To the extent the physician partners' non-compliance impacts members who are attributed to our RBEs (*e.g.*, through the loss of PHI or failure to provide timely access to health records), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.***

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws" in Item 1. We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.***

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a non-medical professional entity may violate the corporate practice of medicine doctrine. See "Business—Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine" in Item 1. A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be

50

Table of Contents

accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.***

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person who could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

***We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows, and results of operations.***

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony

51

Table of Contents

and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

**Risks Related to Our Indebtedness**

***Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the 2021 Credit Agreement do not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

***The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.***

Our Credit Facilities contain covenants that, among other things, restrict the ability of agilon health management, inc. ("agilon management") and its subsidiaries to:

- incur additional indebtedness and create liens;

- pay dividends and make other distributions or to purchase, redeem or retire capital stock;

- purchase, redeem or retire certain junior indebtedness;

- make loans and investments;

- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;

- sell assets;

- enter into certain types of transactions with affiliates;

- consolidate, merge or sell substantially all assets;

- make voluntary payments or modifications of junior indebtedness; and

- enter into lines of business.

agilon management and its subsidiaries accounted for 95% of our total assets and 100% of our total liabilities as of December 31, 2021. Consequently, the restrictions in the Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business

52

Table of Contents

strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the Credit Facilities, could proceed against the collateral securing the indebtedness. This could materially and adversely affect our business, financial condition, cash flows, and results of operations, and could cause us to become bankrupt or insolvent.

### Risks Related to Our Common Stock

***agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.***

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows, and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography and ranged from $50,000 to $10.0 million, or $58.5 million and $38.8 million in the aggregate across all of our geographies and payors, as of December 31, 2021 and 2020, respectively. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

***Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities.***

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation address potential conflicts of interest between agilon health, on the one hand, and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

Table of Contents

***Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.***

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;

- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;

- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;

- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- opt out of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;

- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future.

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor owns, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at

54

Table of Contents

the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***We expect to continue to be a "controlled company" within the meaning of rules and, as a result, we will qualify for, and currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

The CD&R Investor controls a majority of the voting power of our outstanding common stock. Accordingly, we are, and expect to continue to be, a "controlled company" within the meaning of corporate governance standards until the CD&R Investor owns less than 50% of our outstanding common stock. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including:

- the requirement that a majority of the board of directors consist of independent directors;

- the requirement that our Nominating and Governance Committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;

- the requirement that we have a Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- the requirement for an annual performance evaluation of the Nominating and Governance and Compensation Committees.

We intend to continue to utilize these exemptions for as long as we are a "controlled company." As a result, we do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations. Consequently, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance rules and requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

55

**APP 461**

Table of Contents

***At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of the NYSE corporate governance standards. The NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualify as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualify as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies and may result in deviations from our current strategy.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the DGCL, or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows, and results of operations.

56

**APP 462**

Table of Contents

**ITEM 1B. Unresolved Staff Comments**

None.

**ITEM 2. Properties**

As of December 31, 2021, we leased approximately 4.8 million gross square feet relating to 18 office facilities. We believe our facilities are adequate and suitable for our current needs and that should it be needed, suitable additional or alternative space will be available to accommodate our operations.

**ITEM 3. Legal Proceedings**

Except as described below, we are not aware of any legal proceedings or claims that we believe could have, individually or taken together, a material adverse effect on our financial condition, results of operations or cash flows.

See "Legal Proceedings" section of Note 11 to the Consolidated Financial Statements for information regarding legal proceedings, which information is incorporated by reference in this Item 3.

**ITEM 4. Mine Safety Disclosures**

Not applicable.

**PART II**

**ITEM 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information for Common Stock**

Our Class A common stock, par value $0.01 per share, is listed on the New York Stock Exchange under the symbol "AGL" and began trading on April 15, 2021. Prior to that date, there was no public trading market for our common stock.

**Holders of Common Stock**

At February 15, 2022, we had 1,106 stockholders of record of common stock. The actual number of holders of our Class A common stock is greater than the number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or other nominees. The number of holders of record present here also do not include stockholders whose shares may be held in trust by other entities.

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock, and we do not currently intend to pay any cash dividends for the foreseeable future. We expect to retain future earnings, if any, to fund the development and growth of our business. Any future determination to pay dividends on our common stock will be made at the discretion of the Board and will depend upon, among other factors, our financial condition, operating results, current and anticipated cash needs, plans for expansion and other factors that the Board may deem relevant. In addition, our ability to pay dividends to holders of our common stock is significantly limited as a practical matter by the Credit Facilities insofar as we may seek to pay dividends out of funds made available to us by agilon health management inc. or its subsidiaries, because the Credit Facilities restrict agilon management's ability to pay dividends or make loans to us.

57

Table of Contents

**Unregistered Sales of Equity Securities and Issuer Purchases of Equity Securities**

*Unregistered Sales of Equity Securities*

There were no sales of unregistered equity securities subsequent to our initial public offering ("IPO") on April 15, 2021.

*Issuer Purchases of Equity Securities*

There were no repurchases of equity securities during the year ended December 31, 2021.

**Performance Graph**

The graph and table below compare the cumulative total return of agilon and the S&P 500 Health Care Index from April 15, 2021 (the date our common stock began trading on the NYSE) to December 31, 2021. Total cumulative return is based on a $100 investment and assumes reinvestment of dividends before consideration of income taxes. Stockholder returns over the indicated periods should not be considered indicative of future stock prices or stockholder returns.

**COMPARISON OF FIVE-YEAR CUMULATIVE TOTAL RETURN**

**RATE OF RETURN TREND COMPARISON**

**April 15, 2021–DECEMBER 31, 2021**

**(April 15, 2021 = $100)**

**Performance Graph Total Stockholder Return**



| | 4/15/21 | 4/30/21 | 5/31/21 | 6/30/21 | 7/31/21 | 8/31/21 | 9/30/21 | 10/31/21 | 11/30/21 | 12/31/21 |
|---|---|---|---|---|---|---|---|---|---|---|
| agilon health, inc. | $ 100.00 | $ 137.09 | $ 156.26 | $ 176.39 | $ 159.96 | $ 152.17 | $ 113.96 | $ 106.52 | $ 95.65 | $ 117.39 |
| S&P 500 Health Care | 100.00 | 102.35 | 104.29 | 106.73 | 111.96 | 114.62 | 108.26 | 113.85 | 110.43 | 120.35 |

**ITEM 6. [Reserved]**

58

Table of Contents

**ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The information set forth in this Item 7 is intended to provide readers with an understanding of our financial condition, changes in financial condition and results of operations. We will discuss and provide our analysis in the following order:

- Overview and Key Developments
- COVID-19 Update
- Key Financial and Operating Metrics
- Key Components of Our Results of Operations
- Results of Operations
- Non-GAAP Financial Measures
- Liquidity and Capital Resources
- Critical Accounting Estimates
- Recent Accounting Pronouncements

**Overview and Key Developments**

Our business is transforming healthcare by empowering the primary care physician ("PCP") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost, and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

*2021 Results:*

- Medicare Advantage members of approximately 186,300 as of December 31, 2021 increased 42% from 2020.
- DCE attributed beneficiaries of approximately 51,700 as of December 31, 2021.
- Total revenue of $1.83 billion increased 50% from 2020.
- Net loss of $407 million, compared to $60 million in 2020. The year-over-year change reflects the impact of a $286 million increase in non-cash stock-based compensation expense in 2021, substantially all of which relates to shares issued under partner physician group equity agreements in connection with our IPO in April 2021.

59

**APP 465**

Table of Contents

- Medical Margin of $182 million, compared to $192 million in 2020. The year-over-year change in part reflects the impact of lower healthcare utilization in the prior year as a result of the COVID-19 pandemic.

- Adjusted EBITDA of negative $39 million, compared to positive $6 million in 2020.

### Platform Membership Details

Medicare Advantage members increased 42% during 2021, which includes contributions from new geographies and growth within geographies existing prior to 2021. Total members live on the agilon platform include 186,300 Medicare Advantage members and 51,700 attributed Direct Contracting beneficiaries. Average Medicare Advantage membership during 2021 was approximately 181,800, an increase of 44% from 2020.

### Direct Contracting

In collaboration with seven of our physician group partners, we launched five DCEs on April 1, 2021. The CMS Innovation Center created the Direct Contracting Model to allow a variety of DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and risks generated from managing the health services provided to such beneficiaries. As of December 31, 2021, the DCEs provided coordinated care for approximately 51,700 attributed beneficiaries covered under traditional Medicare.

On February 24, 2022, the CMS Innovation Center announced that it is redesigning the GPDC model and renaming it the Accountable Care Organization Realizing Equity, Access, and Community Health (ACO REACH). The CMS Innovation Center concurrently introduced a Request for Applications (RFA) for a new cohort to begin the model on January 1, 2023, and it announced that all current GPDC model participants that meet ACO REACH requirements would be permitted to continue participating in the ACO REACH model as ACOs. The ACO REACH requirements outlined thus far include: 1) The development and implementation of a robust health equity plan to identify and better serve underserved communities; 2) the requirement that at least 75% control of each ACO's governing body be held by participating providers or their designated representatives (compared to 25% during the first two Performance Years of the GPDC model); and 3) the requirement that there be at least two beneficiary advocates on the governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. We do not anticipate that these new requirements will have a material impact on agilon's current or future participation in this program, or inhibit our ability to continue and grow our participation in the model. In addition, The CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes is not yet known.

### Initial Public Offering and Debt Refinancing

On April 19, 2021, we completed the initial public offering ("IPO") of 53,590,000 shares of common stock at a price of $23.00 per share. The net proceeds of the offering were approximately $1.2 billion, after underwriting fees and other offering expenses. See Note 1 to the Consolidated Financial Statements.

Upon the completion of the IPO, we issued 11.7 million shares of common stock under partner physician group equity agreements and recognized stock-based compensation expense of $268.5 million in April 2021.

On February 18, 2021, we executed a new credit facility agreement. The Credit Facilities included an initial $100.0 million senior secured term loan and a $100.0 million senior secured revolving credit facility. Subsequent to the end of the first quarter and in connection with our IPO, we repaid $50.0 million of the senior secured term loan. See Note 10 to the Consolidated Financial Statements.

APP 466

Table of Contents

*California Operations*

In February 2021, we completed the divesture of our California operations by selling the remaining disposal group for a gross sales price of $1.0 million. Our California operations are reflected in the consolidated financial statements as discontinued operations. See Note 11 to the Consolidated Financial Statements for additional details on the Company's investigative interrogatories from the California Department of Managed Health Care.

*Secondary Public Offering*

On September 14, 2021, the CD&R Investor and certain of our officers and directors completed a secondary offering of 19,550,000 shares of common stock at a price to the public of $30.00 per share. We did not receive any proceeds from the secondary offering.

**COVID-19 Update**

Since March 2020, we have implemented precautionary measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. Because COVID-19 infections have been reported throughout the United States, certain national, provincial, state, and local governmental authorities have issued proclamations and/or directives aimed at minimizing the spread of COVID-19. Additionally, more restrictive proclamations and/or directives may be issued in the future.

The ultimate impact of the COVID-19 pandemic on our operations is unknown and will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the COVID-19 outbreak, new information that may emerge concerning the severity of the COVID-19 pandemic, and any additional preventative and protective actions that governments, or we, may direct, which may result in an extended period of continued business disruption. The ultimate impact of these matters to us and our financial condition cannot be reasonably estimated at this time.

The COVID-19 pandemic continues to evolve and the ultimate impact on our business, results of operations, financial condition and cash flows remains uncertain. During 2021, overall care activity continued to increase, including a mix of temporary deferral of care activity and COVID-19 related care costs. These costs may be incurred at future points in time, and it is possible that the deferral of healthcare services, or the impact of our members (who are seniors typically with chronic conditions) being diagnosed with COVID-19, could cause additional health problems in our existing members, which could increase costs in the future. In future periods, care patterns may moderately exceed normal baselines as previously deferred care is obtained and acuity temporarily rises due to missed regular care. From time to time, health system capacity may be subject to possible increased volatility due to the pandemic. We cannot accurately estimate the net ultimate impact, positive or negative, to medical services expense at this time.

Given the disruption caused by COVID-19, it is unclear whether our contracted physicians will be able to document the health conditions of our members as comprehensively as they did in historical periods. Because risk adjustment factors in the current period are based on the preceding year's diagnosed disease conditions, our revenue in future periods may be adversely impacted.

61

**APP 467**

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: March 3, 2022

| | agilon health, inc. (Registrant) |
|---|---|
| | /s/ STEVEN J. SELL |
| | Steven J. Sell, *Chief Executive Officer and President* *(Principal Executive Officer)* |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ STEVEN J. SELL<br>Steven J. Sell | Chief Executive Officer and President<br>(Principal Executive Officer), Director | March 3, 2022 |
| /s/ TIMOTHY S. BENSLEY<br>Timothy S. Bensley | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | March 3, 2022 |
| /s/ GLENN W. SOBOTKA<br>Glenn W. Sobotka | Chief Accounting Officer<br>(Principal Accounting Officer) | March 3, 2022 |
| /s/ RONALD A. WILLIAMS<br>Ronald A. Williams | Chairman of the Board | March 3, 2022 |
| /s/ RAVI SACHDEV<br>Ravi Sachdev | Vice Chairman of the Board | March 3, 2022 |
| /s/ MICHELLE A. GOURDINE, M.D.<br>Michelle A. Gourdine, M.D. | Director | March 3, 2022 |
| /s/ SHARAD MANSUKANI, M.D.<br>Sharad Mansukani, M.D. | Director | March 3, 2022 |
| /s/ CLAY RICHARDS<br>Clay Richards | Director | March 3, 2022 |

86

**APP 468**

Table of Contents

| | | |
|---|---|---|
| /s/ RICHARD J. SCHNALL | Director | March 3, 2022 |
| Richard J. Schnall | | |
| /s/ MICHAEL L. SMITH | Director | March 3, 2022 |
| Michael L. Smith | | |
| /s/ DEREK L. STRUM | Director | March 3, 2022 |
| Derek L. Strum | | |
| /s/ WILLIAM WULF, M.D. | Director | March 3, 2022 |
| William Wulf, M.D. | | |
| /s/ KAREN MCLOUGHLIN | Director | March 3, 2022 |
| Karen McLoughlin | | |

87

# EXHIBIT 9

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Analyst/Investor Day
Friday, March 11, 2022 2:00 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

APP 471

2

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................ | 3 |
| Presentation | ................................................................ | 4 |
| Question and Answer | ................................................................ | 14 |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 472**

# Call Participants

## EXECUTIVES

**Ben Shaker**
*Chief Markets Officer*

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

**Dana Carne**

**Girish Venkatachaliah**
*Chief Technology Officer*

**Heidi Hittner**
*Chief Experience Officer*

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**Unknown Executive**

**Veeral Desai**
*Chief Strategy & Development Officer*

## ANALYSTS

**George Robert Hill**
*Deutsche Bank AG, Research Division*

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

**Joshua Richard Raskin**
*Nephron Research LLC*

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

**Kris Harland Jenner**
*Rock Springs Capital Management LP*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

**Unknown Analyst**

## ATTENDEES

**Frank Civitarese**

**Kevin Spencer**

**Patrick Goggin**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 473

# Presentation

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

My name is Matthew Gillmor, and I'm the Head of Investor Relations for agilon health. On behalf of our entire team, we're really excited and thrilled to have you here for folks that are both in person and joining us virtually. We've got a great program for you today. You're also going to hear from leaders across our company. You're also going to hear from several of our physician partners. We hope you come away with a deeper understanding of our business, why we're the trusted partner for physicians moving to value, how our platform and partnership works, and ultimately, how that translates into an attractive financial model for our company.

Before we begin, I do need to remind you that we will be making forwards looking statements and will also be referencing some non-GAAP financial measures. So we'd encourage you to read our 10-K filing with the SEC. So I wanted to walk you through the day for a couple of minutes just to get everyone oriented. We're going to start off with Steve Sell, our Chief Executive Officer. Steve is really going to lay the foundation for the day and give an overview and tell you what's to come. Veeral Desai, who's our Chief Business and Development Officer, he's going to discuss our growth strategy. He's also going to be discussing the announcement we made this morning with MaineHealth. After Veeral, Ben Shaker, our Chief Market Officer, is going to come to the stage and talk about our platform and partnership model and really how that works every day with our physician partners. From there, we'll do a brief Q&A session with those speakers. We'll take a short break after that.

When we come back, you'll hear from Girish, our Chief Technology Officer; and Dr. Dana Carne to discuss our technology platform and how that drives clinical innovation. And then really, I think one of the centerpieces for the day will be a physician panel discussion with 3 of our physician partners who are nice enough to be here today, so thank you. And that will be moderated by Dr. Ben Kornitzer, our Chief Medical Officer. And we'll be delighted to take questions from the group again at that time.

And then finally, we'll wrap up with Heidi Hittner, our Chief Experience Officer, to discuss stakeholder benefits. And then Tim Bensley, our Chief Financial Officer, will bring it home with the financials. And then we'll do a third round of Q&A.

I'm going to introduce a video to you that's going to tell a little bit about agilon, and then our CEO, Steve Sell, will get us kicked off. But we really appreciate you all being here, and hope you have a great day.

[Presentation]

**Steven Jackson Sell**
*President, CEO & Director*

Good morning. It's so great to see all of you here, and that's such a great video to kick off our day, it really speaks to what we do. When I joined agilon just over 2 years ago, we talked about a vision of creating a really big company that could meaningfully transform healthcare. At that time, I had brought, I had brought 2 decades of experience running a large California health plan. And I've seen firsthand the powerful impact that a primary care physician empowered as the care quarterback could have on patient and community health like you heard in that video. Today, we're going to give you a very encouraging progress report about out move towards that vision. What you will hear is that we are well ahead of schedule in terms of reach, scale and impact. Our partners in the agilon team that you're going to hear from today have made this possible, and you'll hear from them about why this is so special and why we're so bullish on the future.

There are 3 takeaways for you today. One, our market opportunity is inflecting. That's a function of 2 things. There is a need out there among virtually every physician organization in the country for a new primary care model that puts that PCP as the care quarterback. And second, we have had incredible

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

success with the 11 markets that were live through 2021 in terms of demonstrating the impact that can happen locally.

Second, we have a distinctive partnership and platform model that puts that PCP in an aligned position, and they are able to drive meaningful impacts, and we'll show that to you throughout the day. And finally, there is a massive opportunity for value creation as we change health care locally and nationally. Our vision is about empowering that primary care physician to play that role. We have made incredible progress in the last 12 months, and we now have 2,200 primary care physicians on the platform. That progress for the first time, gives us confidence that all of the primary care physicians in the country will need a new primary care model and that our total addressable market includes all types of physician organizations. And so in addition to targeting 100-plus communities that we're looking to transform, for the first time, we are adding to our vision this goal of 10,000 primary care physicians on the platform.

The acceleration of demand that we are seeing has driven national scale for us. When you look at these numbers, 500,000 senior patients and risk relationships, 12 new states and 2,200 primary care physicians, these are critical national milestones that give us confidence in moving towards that vision. The significance of the class of 2023 that you'll hear Veeral talk about beyond demonstrating broad demand because it is our largest class, is in the diversity of groups in that class. This class has primary care only groups, multi-specialty groups, scaled physician network groups, and this morning with the announcement of MaineHealth, we have our first integrated health system with the medical group.

To say the announcement of MaineHealth is a big deal for agilon would be an understatement. MaineHealth is the largest single aggregated physician partner in our history. They are the first statewide partner that we've brought on the platform, and they're obviously our first health system partner. When you listen to Andy Mueller, who is the CEO of MaineHealth and really an outstanding physician leader. He's a family physician. He sounds remarkably like the physicians that you heard in the opening video. Primary care physicians across the country, regardless our group, have the same need. And we know given our dialogue with main health and the success that we're seeing in the early part of our implementation that we believe this is going to be an outstanding partnership and that every health system in the country will be facing a similar dilemma with the need for a different primary care model in a different way to take care of their senior patients.

And health care challenges are requiring a scaled solution. We've said that since the beginning. And it's more -- it's never been more to them today. The senior population is growing. 10,000 people a day are turning to age 65. Primary care capacity is strained and physicians are facing burnout. And there's incredible variation in terms of the health outcomes around minorities and low-income populations. All stakeholders see primary care as the key to solving that dilemma. But physicians don't have the business model to enable it and agilon has filled that need. Our success across diverse partners and geographies is both visible and compelling to physician organizations that are thinking about making the move to value. We now, for the first time, have basically a reference point for every physician organization in the country regardless of size, MA penetration type, the type of group they're in or the EMR that they sit on. They can hear from doctors that look like them, that think like them and have made the same decision that can give them confidence that they can make that move to value.

Our success is not an accident. We have made very clear strategic choices, and we have refined those choices and there is a purity and a clarity to our business model. Those choices are: one, we have chosen to partner with existing scaled physician organizations, groups that have been in their communities for decades and are extremely well respected. Two, we are targeting fee-for-service dominant geographies in which value is a relatively new concept. And three, and you'll hear, Girish, who's our CTO, and Dr. Dana Carne, who's our National Medical Director, talk about this. We have been very purposeful in building a platform that enables those primary care physicians to play that care quarterback role.

There are 3 advantages that come from those strategic choices. First, we are a first mover in these markets. That allows us to shape value-based care in these communities for decades and it provides a path for other primary care physicians to join value through our partnership and our platform. Second, local market scale provides leverage and that primary care physician can now better influence activity

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 475**

outside of the primary care office where the majority of costs occur. And then third, and this is such an important part of our secret sauce, we create that alignment with that primary care physician.

That comes from the right economic model, that comes from the right set of data insights that they can leverage and resources that allow them to operate at the top of their license and practice medicine the way they were trained. And aligned primary care physicians and value drive better outcomes. The holy grail in health care is to drive new behaviors that change how health care is delivered and deliver better outcomes. An aligned primary care quarter back with the benefits I talked about of scale, of differential information and with targeted resources can make changes in seemingly small things locally that can have a dramatic effect from an experience outcomes and cost perspective.

Things are changing which specialist a referral is made to, which drug is prescribed, how many times a high-risk patient goes to the hospital or the emergency room. The results on this page speak for themselves. Our partners are reducing health care costs and meaningfully influencing how care delivery is delivered. And our goal is to continue to improve that alignment for them and put them in a position to really drive outcomes. Our primary care physicians have the most important thing that you need in health care, a trusted relationship with their senior patients. That trust allows them to impact things differentially outside of their office.

We will share many data points with you today. This, to me, is one of the most impactful, 89% of our patients or 9 in 10 rely on their primary care physician for specialist recommendations. That is a dramatic statistic. It's 2 to 3x what I've seen in other open access models, and it reflects that trust that has built over decades of our physicians being there and a decade-long-plus relationship between the patient and the physician. And local market scale is crucial. When we have an aligned physician, and we're able to add local market scale, they can drive significant impact. Well, we are very proud of the 2,200 physicians that we have on the platform nationally, health care is delivered locally. And when you look at these scale numbers in terms of primary care physician capacity and the total patients across Medicare and Commercial, our partners are able to meaningfully drive outcomes.

You can staff the market differently and you can influence specialist and hospital behavior. Note on this page, we have our veteran markets of Columbus and Austin and Akron that have delivered results and have great alignment and scale. But a big part of our model is bringing on new partners that start with meaningful scale. And so Syracuse, New York and Pinehurst, North Carolina, that just came on the platform on January 1, start with meaningful scale and should be able to very quickly influence how care is delivered in those communities. And an aligned and scaled primary care physician properly supported with the right information can meaningfully change local care delivery.

Here, we show you a year 4 market of Akron. You heard from a couple of the physicians on that video about how dramatically different things are for them. We show you the old world on the left and the new world on the right. What's different? In Akron, we now have primary care physicians able to refer to top-quality specialists, they have the information they need and they have a referral support team to make sure that, that patient gets to that specialist. They also have the technology and the information to come back so they know when that appointment occurred, what the result was so they can discuss in the next primary care visit.

We have resources in the emergency department that can divert folks to home if appropriate and provide appropriate support. And in the post-acute facilities, we have staff that transitions people to the right side of care. The largest payer in the country's goals, CMS, is a huge tailwind for agilon health. Recently, they have announced the REACH program that focuses on equity and access and community health, and they've said primary care is at the core. They've also, as of this last fall, announced a 10-year strategy that says, every Medicare beneficiary should be in a trusted relationship with a primary care physician in a total care model.

These announcements are a huge tailwind for agilon. And the choices that we make strategically show up in our business model results that we discuss with you each quarter. We're able to grow more efficiently. We're able to grow faster. We're able to reach profitability within our markets by year 2. We're able to drive meaningful medical margin improvement. And we're able to generate attractive subscriber economics that lay across a long-term patient-physician relationship.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 476**

All of these choices and the experiences that we're seeing say there is a massive opportunity for value creation for our partners and for agilon. For the first time, as I said, we are changing our aspiration to look at all of the primary care physicians in the country across all types of organizations with 2,200 PCPs on the platform, we've added that 10,000 PCP goal to our vision. And we also now have real clarity, greater clarity on the value drivers for agilon. It's very simple. One, we need to increase the number of primary care physicians on the platform. That comes through new markets and new partners, as well as growth within existing markets. Two, we need to increase the number of patients and do that by increasing panel size as well as organic growth; and three, we need to increase the annual value of a Medicare patient through the impact that I talked about.

And so let me tee up today, we have some really important themes that you're going to hear about from the team. The first from Veeral, you're going to hear about how our market opportunity is inflecting and our network is growing. Ben Shaker and our physician panel are going to talk to you about the compelling advantages that our partnership and platform bring to them and what means for PCPs, groups and communities. Girish and Dr. Dana Carne will talk to you about the platform that we have purposely built that is enabling higher value care at scale. Tim will talk to you about cohort data that shows our increasing confidence in member and primary care economics. And finally, Tim will show you a view out to 2026 that says the opportunity for value creation is massive. So this is going to be a special day.

I'm really pleased that we have the opportunity here from our physician partners and our team and together collaboratively these people and their teams are making it happen every day. So with that, let me introduce Veeral. Veeral is our Chief Strategy and Development Officer. He and his team have had an incredible last 12 months and give you a chance to hear from him.

**Veeral Desai**
*Chief Strategy & Development Officer*

Thanks Steve. I've been fortunate to be part of the agilon health team since our founding. I'm thrilled to be here today. As part of my experience here, I've led the standup of our operating platform, I've led our market operations in the West and the East. Each of those experiences have given me a unique lens into the development of our platform and each of our physician partners. Today, I lead strategy, development and the payer segment of the business, and I'd like to share perspective around both the development and onboarding of our new partners across the country.

So as Steve talked about, the market and our opportunity is at a tipping point. That's both a function of increasing well-understood macro factors with really the impact that are success with current partners is having on the engagement with future prospective partners. As a result of the pace of our new market entry and our expansion into new partner archetypes inclusive of today's announcement around our first health system partnership, we have significantly expanded our total addressable market. We have a very simple growth algorithm. We put partners on the platform. Those partners bring with them existing primary care physicians with embedded Medicare panels. We are creating the market for risk in each of our geographies.

That allows us to then add additional primary care physicians and members to address what is a massive in-market TAM in each of our geographies. That algorithm it's translated in 2022 into 6 new partners and 50,000 members and as Steve talked about, 2023, a real inflection, 7 partners, 80,000 members. Our new markets have dramatically increased our TAM by 60% in a single year, and it's our execution against that opportunity that's driven 15% same geography growth. The market is at a tipping point, it's our focus on existing physician capacity that creates a highly scaled Medicare opportunity. Senior population growth, 62 million people going to 72 million people with rapid growth and MA penetration, the market we are now chasing is 200,000 primary care physicians across the country and a key driver of that opportunity is a PCP business model that is fundamentally flawed and fundamentally challenged.

A declining fee-for-service commercial business, a nascent Medicare panel that is effectively a loser within their panel and their economics and a limited ability to meet the clinical needs of their vulnerable senior populations. PCPs are able to take on these challenges and fundamentally transform their business model through a partnership with agilon health. This growing demand for real PCP business model change, combined with the extensive success of our partners across the platform which you'll hear more

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

about today, is combining to drive a meaningful inflection in our business. Two years ago, we were in 11 communities. Today, we are live or implementing in 25 communities, 2,200 PCPs on the platform compared to 1,350 a year ago. That is what's led us to increase our guidance from 40,000 new members to 80,000 new members from new markets and we now have visibility in 2023 to 0.5 million members on the platform.

The class of 2023, we're incredibly proud of our progress and the quality of the partners that we're bringing on to the platform. Four new states, 12 in total, that's 50% growth in the number of states or hubs that we are now in, 8 new geographies, each of these new markets highlight our role in introducing global risk into those communities. And our -- each of those geographies are early in their MA cycle. As Steve talked about, these are nontraditional risk markets and we still have tremendous benefit to accrue from the rapid growth in the Medicare population in each of those geographies.

This class of new partners also meaningfully expands our total addressable market, inclusive of scale networks, multiple groups across different EMRs and now health systems which we're going to talk more about in the course of this conversation. It also highlights the diversity of the types of groups that we're working with. We have a health system group, a health system employed medical group with 215 primary care physicians. We have a primary care only group of 25 physicians. So why are we winning? As I'm out there talking to provider organizations every day, I would tell you thinking back over the history of the company, our conversation is fundamentally different than even 2 or 3 years ago. The macro backdrop is a burning platform. Every primary care physician in the country needs to figure out what to do. The fee-for-service model is not sustainable. They need to get into value. And what we have is tremendous and unique product market fit. And now we have the proof points. Our physicians are winning across the board. And the power of the network is real.

As you'll hear today from our partners, there is nothing more powerful than a conversation with a prospective partner and hearing from one of our existing physicians in our network. Our partners describe their experience before the partnership, declining commercial business, Medicare is a losing business, dabbling in value, struggling to sustain their independence. Post partnership, most importantly, they're able to invest differentially against clinical capacity against the patients that really need it, deliver better care, win economically, create long-term sustainability and fundamentally, they are more fulfilled.

As one of our favorite partners Gary Pinta often says, I get to be the doctor I train to be. This manifests itself in the type of physician organization, the number of engaged groups and the pace of our development cycle. So we just talked about, we grew from 1,300 to 2,200 physicians in 2 years, 240,000 members to 0.5 million members in that same time period. Pace is the defining element of our model. Our model has worked across diverse geographies, diverse market entry points, allows us to enter a market at true scale, move the market to let risk and use that first-mover advantage to unlock the tremendous in-market opportunity that exists at a physician and member level.

Pace is accelerating, now has us in 12 states, 8 new -- 8 states in our first 5 years, 4 in 2023. Pace also reflects how we enter and stand up a new market. We immediately flip a market to risk. We sign a partnership, we go through an extensive 6- to 12-month implementation cycle, and we enter into full risk on a multi-payer basis. And as Ben Shaker will talk about, our platform is getting smarter. We are getting to economic endpoints and most importantly, delivery system impact faster. That is a function of a hub-and-spoke model. We enter a state, we started in Columbus in 2018, 4 years later, we have 5 markets with 5 terrific partners.

Austin, Texas, we started in 2019. We now have 3 communities in the state of Texas. It speaks to the power of the network effect within the state and it also speaks to our ability to leverage common payer contracts, a common set of infrastructure we build out at the level of the hub and drive performance out of the box. And to be very clear, in each of these geographies, we are early in the life cycle of our opportunity.

Ohio and Michigan really bring these to life. Ohio, 4 years ago, we got started with Columbus. Now we're 5 groups, 400 physicians 135,000 MA and DCE lives, and that's against the backdrop of a total market that's $1.6 million of addressable opportunity that we still have in front of us. Michigan, we went live 1/1/21 -- 1/1/22. The value of a hub is increasing as evidenced in Michigan. We've created payer contracts, a

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 478

common set of infrastructure and what we have now is an opportunity in front of us that's 55,000 lives by 2023.

And so when we started the company, the nature of physician risk and where it could be applied was very narrow. It was a Southern California and Southern Florida thing. We unlocked risk in a nontraditional geography in Columbus in 2018. And now we've demonstrated the ability to apply the platform across highly diverse markets, partners, that's fueled a flywheel. For a new partner prospect, they can see that market looks like my market. That group looks like my group. That physician, she looks like me. Other players who want to move at that pace, they have to go buy a group and put that group on the platform.

For us, because of the way our platform can be applied across these groups and archetypes, without owning the group, we can drive a pace and a differentiated competitive moat. Our partners reflect that our partners are 30 to 90 years in the community, trusted leaders. These scaled assets in their geographies. I'm always so proud of the quality of the groups, and you'll see that today in our physician panel represented by our physicians. Primary care groups, multi-specialty groups, scaled physician networks, they vary in size from 30 docs to 300 docs, and as Girish will talk about our technology platform allows us to meet them where they are, to work seamlessly across EMRs and payer data to create a single physician experience at the point of care.

We are adding hubs and that significantly addresses our end-market TAM. This is a big question we get in a lot of our earnings calls. The power of the geographies we have entered is significant. Our in-market opportunity if you think back in 2021 was 4 million lives on that 4 million lives, we were delivering 15% same market growth. Now we've grown that total addressable market to 7.5 million lives, and that is with the addition of very attractive markets like the state of Maine. That dramatically increases our opportunity but also our confidence level around the total member opportunity and our ability to deliver sustained same geography growth.

We are in some of the most meaningful MA and risk geographies in the country; Ohio, North Carolina, Western New York. Leveraging our first-mover advantage and competitive differentiation, physicians and groups in our existing geographies are flocking to the partnership. We are the place in the market to access global risk, to deliver a differentiated experience, to have a sustainable model in primary care. So because we get a lot of questions around end-market TAM, this Akron example really brings it all to life. We introduced risk in 2019. We entered the market with the leader in the geography. We added a second community-based group. We then scaled primary care capacity from 41 physicians to 73 physicians through a combination of acquisitions and hiring. We added a line of business. Now we're working across all of the seniors within our partner practices through the direct contracting or ACO reach program. And we've tripled our membership in 4 years. This is the power of the model, and the power of scale at work.

Expanding access points. So I finally want to talk about we are expanding the way in which we enter geographies, our access points into new markets with different partner archetypes. When we started the company, we had single physician groups, all primary care, physician-owned and operated. This is a subset of the independent community opportunity. Over the last 4 years, we've added multi-specialty, primary care and specialist groups, scaled networks, providers on different EMRs. And today we're announcing and very excited to announce our first integrated health system, a dramatic expansion of our TAM and importantly, a dramatic expansion of the application of our platform to serve primary care.

So a lot of people ask about health systems. Health systems are a natural evolution, we believe. Our health system partners are facing a common set of challenges to our existing partners. They lack an economic model for growing and sustaining primary care. Primary care is often a loser within a health system. Their Medicare business is a losing business and now they're seeing more of their commercial business shift into Medicare, and they have no strategy to fundamentally pivot into value.

To be clear, this is not any willing partner, but the right system partners possess the same ingredients, community focus, scale, leadership and governance, strong physician organization. For progressive systems like Maine, this is actually a great synergy because of their investments that they've made in ambulatory assets in primary care and specialty care. That accelerates the move into risk and fundamentally this represents a powerful strategy to unlock their Medicare business and transform the delivery system through value through the senior business. So with that I'm thrilled to introduce a video of

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 479**

Andy Mueller, we talked about him a little bit earlier, a truly bold physician leader, the CEO of MaineHealth. He talks about a mission to build the healthiest community in the country, a need to invest differentially in primary care to achieve that strategy.

That is highly aligned with who we are, our mission, our belief set, but it's also reflective of our national opportunity. Andy has built a tremendous team, including a distinctive physician organization that will be our partner in this venture together. MaineHealth's medical group is distinctive. It is the largest primary care group in Northern New England, 215 primary care physicians. And so with that, let's hear directly from Andy on why MaineHealth has chosen to partner with agilon health.

[Presentation]

**Veeral Desai**
*Chief Strategy & Development Officer*

Partnership with Maine, it unlocks a new segment of our total addressable market, and we believe our platform is truly at an inflection point, and that is really driven by the performance of our existing partners. So we're going to have Ben Shaker come up and talk to us about how we're driving these outcomes with our partners. Ben?

**Ben Shaker**
*Chief Markets Officer*

Thanks Veeral. Good morning. So I'm the Chief Markets Officer at agilon health. I've been with the company since the founding. So I started back in 2017, was hired to stand up our first partnership in Columbus, Ohio, with Central Ohio Primary Care. The best part of my job is I get to work each and every day with our physician partners all over the network as well as our agilon health team in our markets. We've really been able to drive a ton of progress in such a short amount of time. Going back to where we started in Columbus and to be operating across 17 communities today, it's awesome. The cool thing is I think everybody involved realizes just how much opportunity there still is to really redefine the delivery system kind of through the primary care lens.

So today with that as a backdrop, I want to really bring alive 3 main points. First, I'm going to talk to guys how purposeful we've been within our model to really design it through the lens of the primary care physician. Second, our model is consistently deployed. We've built a platform that can -- a very common platform that is consistent across all of our geographies. And third, the values proving out. I'm going to walk you through that. We have a very simple goal. We are trying to drive health care change through the primary care physician. Our business model is predicated on our proximity to the physician. We're ultimately moving from the left side of the page, a very traditional fee-for-service model to the right side of the page which is really built on a subscription-based relationship.

The nature of our subscription-based model is all around the alignment and the mindset of the physician and patient, that sticky relationship that takes place over a long period of time. Physicians are moving from a transactional model to a model to where they're now paid for quality and total cost of care outcome. We're also changing the dynamic from the historical model of physicians who only manage patients within the 4 walls of their office to a model that is really built around comprehensive care teams across the delivery system. And we're also creating a single experience, one that's not defined by the payer. That's ultimately what's different.

In order to make that work, we have 2 core concepts. Our model optimizes for the physician group structure. We felt that there was real advantages as you heard, in working through existing physician capacity. Within that structure, there's existing physician leadership. Physicians already have panels that are applied into the model. There's existing infrastructure across these markets, and the scale, the reputation and brand, these physicians group bring into the partnership is significant. On our platform side, we are very specific about how we've built out our model. We are focused on the senior population. And so everything we've done is really built around how to drive support to get to the level of outcomes that we're all after.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 480**

It's also purposely delivered our platform through the physicians in our markets. Tech, people, process, capital, everything is delivered through that partnership. And our model is built on a shared economic foundation. Everything we've done to date is through the lens of how that leads to outcome. As you heard from Veeral, we work with now physician groups of all different sizes, types. It's a very diverse group. But in order to operate effectively, we've delivered our platform in a very common way. As I talked about, we moved from the physicians that were in a fee-for-service model moving to risk, they weren't equipped to do that. The payment model didn't support it. The care didn't transcend across the delivery system. The data that they've had access to is really through what's defined in the EMR. As each one of our partners joins our platform, it's getting smarter and it's getting stronger. We're moving to a different model and we're doing so in a very purposeful way.

We've been very intentional about how we operate across our markets. We've designed our operating structure to work just like any other multisite business. The structure that you see up here is very similar and is very consistent across all of our markets. We operate through our physician partners. We operate using a dyad structure that includes a physician leader in each one of our markets from one of our groups. Each one of our partnerships is governed 50-50, and we operate with a shared resource structure between agilon health resources and the existing resources and team members that are already part of the partner organizations. And this creates significant leverage for us. It allows us to port our model rapidly and effectively and to do so in a very consistent way.

Given the components of our model and how we've structured ourselves and how we work with our physician partners, we can get after very -- we can get after operating metrics in a very differentiated way. The types of metrics that we're focused on really allow us to drive enhanced quality and cost savings across the board. When most people in value think about what metrics are tracked, admits per thousand, that's something that we look at as well, but we've been able to move beyond that. For instance, given our local scale, across many of our markets, we're working with hospital partners to impact observation stays, but that might be unnecessary from patients coming through the ER.

We also make investments in things like physical medicine and rehab to create alternatives for potentially unnecessary surgical interventions. And because we're in the senior business, we have the ability to manage our highest-risk patients and provide services such as home-based palliative care to help manage unnecessary utilization. This is all possible because of the alignment that we've created, how we're deploying our platform and the local scale that already exists in our geographies.

All of this ultimately drives a flywheel effect. Because physicians are aligned around outcome, we have the opportunity to drive performance through the group structure. This is an example of one of our physician partners and how they've even evolved over the course of the 3 years that they've been in our partnership. They have redesigned their compensation model. They moved from a traditional fee-for-service model to one in which rewards them for quality and cost. They've taken the data that they've had and we've been able to infuse additional information to actually create insights rather than just a fragmented set of information.

And finally, the impact to this practice from the senior line of business is significant. And as we continue to drive outcome, it does create that flywheel effect. They get more excited about what we're doing. We're investing in more capability. We're growing mind share from the physician base. The flywheel effect is powerful. We know there is variability everywhere in health care. We talk about it all the time, this isn't new. But our proximity to the physician allows us to get after it in a very differentiated way. We can impact micro variability at the provider level. You can see in the scatter plot here, what we're working to do is to move physicians to the lower right quadrant. This is an example of a group that has 41 physicians. We're operating at the physician level, powered by their engagement, their alignment to the outcome, our ability to provide better data.

On the right side here, you can see just a significant opportunity that exists across our markets given our local scale. So when you look at what we can impact at a very granular level as it relates to physician level variability and then you take a step back and you can see, given the local scale that we have in these geographies, we can also impact large buckets of medical expense. Our model allows us to scale fast. You heard from Veeral in terms of just the rapid growth that we've seen and what's on the horizon. But

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 481

because we operate in a consistent manner with such pace, what we can do is we can grow in a way that not only drives the performance, but it looks very similar.

And so when you look to see how we've grown and what that means, you can see here, we're operating in over 400 sites, 17 communities. In places like Columbus, we've gone from 20,000 members to 70,000 members. We've added geographies in Ohio from 1 to 5. In Austin, we went from working with 2 partners to 7 partners. We've added an entire line of business last year around Direct Contracting. All of this is built around the same regional infrastructure, the same data structure, the same clinical programs, leveraging common payer contracts. We are designed to scale and operate at scale, and that leverage is significant.

So what is really exciting here is when we started the business and what we wanted to see happen and what we are driving towards in terms of outcome and changing the delivery system for primary care physicians and their patients, it's starting to prove out. We're seeing strong and improving quality, cost and experience outcomes. Our gross medical margin is improving in our most mature markets. And our cohorts are improving as well. Market medical margin across all classes of partners is also improving, kind of driving home the consistency point. And we are sharing more dollars back with our primary care physicians to reinvest in how they're transforming their own practice as well as the delivery system. So the separation that we see between our performance and some of those national benchmarks is significant. And at the same time, we're also driving improvement.

Take access, we're able to identify patients in a way that we can identify who needs to come in. As we're able to improve these access measures, we're seeing correlation back to improved utilization measures. So not only are we seeing admits per thousand improving, we're also seeing ourselves perform better than many national benchmarks. And we're doing this all wrapped around a patient experience that is very, very strong.

Our medical margin is growing exponentially looking at our most mature markets. We know there is significant ability to expand across these geographies, both in terms of margin as well as growth. And you can see that compounding effect. You can see as we've grown our membership across these most mature geographies, that we're expanding medical margin 4x. This is with growth of over 70%.

And another look at this shows just how those older cohorts are performing. You can see here our 2018 and 2019 cohorts. Our 2018 cohort, which started in a good place has still seen significant year-over-year improvement. Our 2019 cohort while starting lower has seen a much higher rate of change. This gives us a ton of confidence in the value of a member who comes on to our platform. And you're going to hear a lot more from Tim in terms of the details behind this.

We're also seeing that individual market level performance. We are working at massive scale. And irregardless of starting point, we are seeing consistent improvement across these geographies. And these numbers are inclusive of some significant membership dilution. Again, the value of the members on our platform is proving out and it's happening on a scale basis. And finally, because we're in the partnership business with an aligned economic structure, one of the most important metrics that we also track is the value going back into the primary care model. This is another example of the flywheel effect. As we drive towards more of a value-centric model, it creates a new level of economics, one that can be reinvested back into the business to align the primary care physicians, to create more mind share and to invest in the capabilities that are also -- that are ultimately going to drive patient care.

This is ultimately why we believe everybody should be contracted in this structure. So in closing, I want to reiterate 4 key takeaways. One, we are optimizing for the alignment with our partner. This is foundational to our business. We deploy a common platform across all of our geographies. Our data and insights are getting better and you are going to hear much more about that. And finally, the network is getting smarter and stronger with each new group that we bring on to the platform. So with that, you're going to hear a video from Dr. Pinta and Dr. De Janeiro, two of our great physicians in Akron, Ohio with Pioneer Physicians Network. They're going to build on some of my points and also really reinforce the importance of that physician patient relationship and how it applies to the model.

[Presentation]

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 482

**Matthew Dale Gillmor**
*Vice President of Investor Relations*
We have Tim and Steve who will come up on the stage. I think we've got about 10 to 15 minutes for Q&A and after that we'll take a quick break, but couple logistical things.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 483**

# Question and Answer

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

We've got some mic runners. So if you could just raise your hand, we'll get a mic over to you. If there are any questions from the virtual audience, please just email the Investor relations website. Why don't we go with Lisa Gill. I see she's got her hand raised. And if you could state the name of your firm and your...

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Sure. It's Lisa Gill with JPMorgan. Steve, let's start with main announcement. Really just a couple of questions there. As we think about this, one, what does that add to 2023? You've already given some updates around membership. So if you can talk about that. And then secondly, as we think about 2023, are we done with the class of 2023? Or is there still opportunities to add more? Sorry to put for more work on here.

**Steven Jackson Sell**
*President, CEO & Director*

No, thanks Lisa. Well, as we said, we're really excited about the MaineHealth announcement. It's our first health system partner. And I think it opens up the opportunity for potentially more down the line. Andy is a great first parter to work with and a visionary. And I sort of think about him the way Bill Wulf who is here. We started with COPC and a primary care only group, and Andy really opens that up. And so the majority of that class came from our other partners that are there and Veeral can talk about tha, but it does add our largest physician group, and it is the largest member count, I think, within that group. So it's meaningful for '23, but it's also meaningful in terms of longer term. Veeral?

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Before you go on to, like how do I think about it the longer term? And are this opportunities where we're going to see you start to partner more with health systems so that we think about overall cost? Are we thinking about health systems because they are not really sure what to do with primary care doctors? I mean, how do we think about it more from a bigger picture, yes?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Well, holistically, as Veeral said, they look and sound and feel like a lot of our other partners. They have the same issues around primary care capacity and burnout and they need to deal with this growing senior population. So I think that there is a need there. Tim will show you kind of an outlook to '26 and I think what we'll say is, there's different paths that we can get there on. We feel really good about sort of how we've been doing things, but this opens up an additional opportunity for us. And we're going to learn a lot through this implementation. So I think what we said is our opportunity set has broadened. Veeral?

**Veeral Desai**
*Chief Strategy & Development Officer*

Yes. I would just say on the core independent segment, that remains robust. It's a majority of the new membership that we're going to be putting on the platform, as Steve talked about, specifically as it relates to health system. I made the comment pretty deliberately to say it's not any willing partner and that's really the case for us nationally. I think what makes this particularly unique is we have, one, some of the, the same underlying needs that we're solving for relative to our existing partners.

They don't have a -- Medicare is a loser for them, they don't have a way to accelerate into value. Some of the unique attributes relative to Maine is their extremely strong physician lead who are partnering with

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 484**

the medical group organization, our ability to integrate from a technology and data standpoint on their epic platforms gives us high levels of confidence around the execution and reaching similar level economic endpoints in terms of what does mature medical margin in a market this looks like. But I think what Steve talked about is important, this as an archetype will be a tremendous learning experience for us to say how big and broad can the aperture be relative to this segment of the market?

**Steven Jackson Sell**
*President, CEO & Director*

And I'll just add, we are talking to other health systems that look and sound like Andy and the main health team. That doesn't mean necessarily we're going to be doing them in the near term. But as we learn a lot from this, there's that opportunity.

**Unknown Analyst**

Great. Two questions. One is, obviously, health care is local. But as you think about moving across the country and being more broad nationally, what are the kind of nonobvious benefits of that, understanding that there's reference accounts and all that, but like what does a bigger national footprint get you? And then the second question is, as you think about standing up each one of these markets, going to 23 markets now, lots of different communities. Can you talk a little bit about internal agilon hiring, like how big the teams are, how that's evolved? What are the phenotypes of the kind of individuals you're looking for?

**Steven Jackson Sell**
*President, CEO & Director*

Sure. So I'll start on national scale and maybe you guys can add in. I mean, I think national scale is making us much more of a player. And the first point is there are groups out there that can see someone with an agilon that look and feel like them. So there is that referenceability. But that national scale gives us tremendous benefit with payers, right? The integration that we're seeing with our largest payers, the joint operating committees, we have standard data formats with them. We are talking about expanding into other geographies. We have the ability to bring a national payer into a market literally within 6 to 8 weeks like we did in Buffalo with a couple of national payers. And so I think that, that national scale makes us much more of a player from a payer perspective. Veeral or Ben?

**Veeral Desai**
*Chief Strategy & Development Officer*

Yes. The only other thing I would add is you talk about network in terms of referenceability around the development process. I think the biggest place the network effect pays is operationally. What type of comp model are you driving? How are you getting to that level of outcome around your palate care program? And so I think that network effect is very real. But I think the biggest place it actually plays in helping us replicate, create labs in markets, develop clinical programs, port them across the country and create similar benefits and outcomes across communities.

**Steven Jackson Sell**
*President, CEO & Director*

Just one thing I'll add to that is, last week, we had our Future Medicine Summit, we had 120 payer representatives, including the innovation center attend that. It's really because of our national scale in the different payers or partners that we're able to bring together. And so we are seen as a leader, we're seen as an innovator. I think there's an opportunity for us to influence growth more, but also policy.

**Ben Shaker**
*Chief Markets Officer*

Yes. And also Jason, I was going to take your hiring question. I mean, certainly, the talent piece is critical, especially as we scale. A couple of things. First, a lot of people that we have on our teams today have grown up in the business because we're still so early in the life cycle. And so those people that have helped build the model and know it as well as anybody, what we're doing is taking those geographies and

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 485**

starting to even supplant people that are operating in existing markets and kind of moving them into our newer geographies. We're hiring kind of earlier into our implementation process to where we're getting people in the seats much earlier on. And we're also, I think have done a really good job finding talent in our local geographies. So bringing in team members who really understand the group, the local dynamics and kind of then plugging into some of the subject matter expertise that we already have at a platform level.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. On the talent issue, I would say, that's been a huge focus for me, Jason. I mean, we've added incredible talent and being exposed to some of them this morning as we go forward. Our hiring practices, Andy Mueller said to me last week, what is it that you're doing at agilon to bring in these people because they're not just exceptional in their field and bring functional expertise, but they're tremendous collaborators, and we've built a really great team. And so we have ramped our hiring tremendously at all levels. I think for us to pursue this opportunity the way we've laid out, we need to win on the talent side and we need to bring in exceptional partners like the ones you're going to hear from.

**Veeral Desai**
*Chief Strategy & Development Officer*

The one place just on talent I double-click is technology. If you think about the biggest place we've made progress in the last 12 months, and Girish will talk about this in his talk, is both the phenotype, the quality of the talent and the capability set, and that's been an area of significant investment in terms of where we put both capital to work as well as deployed our standup of our India development center and again, the quality of the talent against one of the most important aspects of the business, which is the technology and data integration that drives the ability for a physician to really engage at the point of care differently.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

Kevin Fischbeck, BofA. I guess 2 questions. First one, with this health system partnership, you mentioned that there's a lot of similarities that you're addressing in this versus a normal PCP relationship. But obviously, there's another one that the hospital group got that physician group in the first place to drive volume back to the hospital. Now you're helping them keep people out of the hospital. So how does the hospital think about the economics of this, but the physician group is pretty clear you improve it. Here, there's losses on one side, gains on the other. I can almost imagine economics not working out potentially if you're very successful. So how does that work out?

**Veeral Desai**
*Chief Strategy & Development Officer*

So it's about partnering with the right progressive systems. MaineHealth is not looking at Medicare to drive their inpatient strategy. Medicare is a losing segment of their business today. They have an unsustainable model for funding primary care and growing primary care. And so what this really allows us to do is take advantage of the unique assets of the health care system, hospitalists to drive ED diversion, the ability to leverage the significant investments in ambulatory assets that in this strategy, a risk strategy, a value-based strategy, you can monetize post-acute, the ability to interact with PCP-owned facilities. So I think it goes back to not any willing partner and how does a risk strategy and a senior strategy help us really address and accelerate a primary care-oriented strategy and turning Medicare from a losing business into a winning business and an ability to advance the community mission on that basis.

**Steven Jackson Sell**
*President, CEO & Director*

Kevin, the reason I said, Andy and Maine are such a great first partner is there's alignment with what we're trying to do. They like the idea of fewer senior patients in the ER. They like the idea of fewer senior patients in the inpatient setting, and they're looking for primary care to be something that they can invest more in. They lose money on primary care today, they lose money on Medicare. This allows that to

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 486**

transition and really take primary care to the forefront for them, and it allows them because they're really at capacity to potentially add more commercial business into their facilities. So it's really -- it lines up very well from that perspective.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

Okay. And then just the last question. You mentioned that all these partnerships are helping kind of feed on the next one to become kind of -- become this momentum that you create by adding more partnerships. At the same time, though, it seems like competition is increasing as well. I assume that your success rate is not 100% to the extent that you work with the visiting group and ultimately they choose a different solution or a different outcome. Where are you losing to? Is there something else that you need to add or other service line need to be offered to be competitive to capture all the opportunity?

**Steven Jackson Sell**
*President, CEO & Director*

So from a new market perspective, Kevin, new partner, new market, for the groups that we're talking to that are at scale and have the characteristics that we laid out, we are not seeing as much competition there. And frankly, our success is driving that. The place we see competition is in these geographies. And so we tried to show you the size of the other groups that sit within those communities, groups that might have sold to a health system historically that was a small independent or a group that might have sold out to Optum, we're now starting to see them join in. But that is definitely the area in which that competition and the capital is coming after that. Veeral's point about pace, I think, is an important one in that.

**Veeral Desai**
*Chief Strategy & Development Officer*

And I think it's about the quality of the group and their mindset. If a group wants to go sell, we're not the right partner. But it's a massive market of physician groups that want to stay independent and that there's a real commitment around the senior patient population, the ability to leverage a different model, a different payment model to do more for that patient population and sustain and advance their practice on that basis. So I think just like we talked about with the health systems, I would say, the thing that we've gotten much more deliberate about is our filtering criteria around what's going to make an attractive partner and a partner that can win in our model. And I think that's really supporting the success of our existing partners in our -- across the platform.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

Can you talk about [Technical Difficulty]

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean, I tried to hit this point about being this first mover into geographies that are not familiar with value, Kevin. And so we're basically creating the opportunity there. The groups that line up really well are those that are at scale and thinking about making that move, not just for themselves, but for their entire community. And in fact, just as an example, we'll announce our class of '23 partnerships here over the course of the next couple of months. The reason we're doing that this way is because we're introducing value in these communities. And it's not just about the group, it's about what the other physicians within the community are going to hear around that. And so that's the advantage of being this first mover in these geographies.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

I'm going to cut it off here. We just to keep us on time. There'll be plenty of opportunities for additional Q&A throughout the day. We're going to have a 10-minute break. So if you could please rejoin us at about 10:20 Eastern, that would be great. So thank you.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 487**

[Break]

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 488

# Presentation

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

I'm going to introduce you to our Chief Technology Officer, Girish. Girish, thank you.

**Girish Venkatachaliah**
*Chief Technology Officer*

Thank you, Matt. Welcome back indeed. I forgot that I need to do a clicker thing here. I was also on a break. So over the next few minutes, I'll talk more about how this platform that Steve talked about this morning, how real is it? And how is that we rapidly move partners to risk? How does that enable higher value care? And we will actually demonstrate how we operate at scale. And what gives us the confidence to handle the growth that Veeral talked about? And how do we believe that we can actually deliver consistently?

I've spent 2.5 decades building scale systems in data and AI. Prior to agilon, I was at an EHR company that had over 100,000 physicians in their network. I thought we were doing great. And it's only in joining agilon and really walking in the shoes of our physicians that I appreciate, well, all the data we were giving them was only so much of that story. So let me take this example. There's an 82-year-old Mrs. Jones who has COPD and walks into one of our physicians' office with shortness of breath. The physician has to figure out is this shortness of breath due to the fact that she didn't fill her refill or is it that something about some specialists she visited changed some medication or is it some hospitalization that changed something?

Anyway, the physician has to look through immediate data sources. The thing that our physicians describe is how despite all this data, they are flying blind. And this is for one patient for one episode. Imagine how bad this is if they have to take risk on that patient. In order to do that, they have to understand the claims history, the pharmacy claims, this, that and the other. Flying blind doesn't even begin to describe the challenge. Most of them will say they can't even get to take off, and they have tried. They understand the existential crisis that Veeral talked about this morning, they've tried. It's not for the lack of trying. As Dr. Civitarese, see talked about in the video, it has been incredibly hard. They didn't have a talent to do it. They didn't have the capital to do it. They couldn't bring it all together, and you have to do this day in and day out every single day.

So this is really where we come in. This is where our uniqueness starts. This platform that we talk about, the thing that we do is we are able to take data from all of these diverse sources. We stitch it together in what we call as the member information profile and construct a single longitudinal view of that patient across their entire landscape. And we then extrapolate that the entire panel that the physician has and help enable them to see this bird's eye view of value-based care. And just to give you a sense, we do that across billions of data points. Just over the last year, we've enabled over 1 million touch points for our physicians with this information.

And we do this every single day for every one of our members in every one of our markets for every one of our physicians, and our physicians are delighted because we've made this information relevant in the context of care. They're delighted. And if my clicker works, that's now adjusted. It gets better. Not just do they love the information and how we assemble it together for them, they love how we deliver it to them.

Firstly, we are consistent across payers. Most people don't realize how varied the information is that they get from payers. The fact that we threaded together and we are consistent, and they know exactly the same place to look for chronic conditions, the same place to look for a med list, same place to look for a problem list makes it so much easier for them.

The second thing they love is that we slipstream this into their existing workflows, into their EMRs, if we need to. If they don't have to learn anything new. They don't have any training costs associated with it. They start to see the information in context of all the things and exactly how they're been practicing

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 489**

medicine over the last x number of years. And this is amazing, right? And you can already see that with that information, our physicians even in the video talked about how they're starting to see their higher-risk patients more. This enables them to get that view.

And you see that they're actually doing 44% more, right? And they get to see and reassess chronic conditions much more easily, 98%, right? Now let me get to the third part that is exciting. Is that not just do we deliver this information, we actually listen to feedback of our doctors. If our data is wrong or something is incorrect, we work to get that corrected. If we don't deliver it into the right workflow, we make it sure that it does get delivered better, right? And the fact that they don't have to learn a new system and many of your investors, it feeds into the fact that we have low capital cost. We don't have to buy them an EMR or buy them some system or have them buy software. It lowers capital costs. The thing that's really beautiful about this is that they trust the data. They trust the data. And it gives them the sense of co-authorship and co-ownership. And it really helps them champion this talking about champions. Let's hear from our National Medical Director and how all of this differentiated enrich data is actually making a difference in higher value care. Dr. Carne.

**Dana Carne**

As Girish said, I'm the National Medical Director, I joined agilon, I've made a career specifically focused on how to improve the value of care from Dartmouth to Massachusetts General, to McKinsey to a value-based care organization in Philadelphia and finally to agilon. And in speaking with all these physicians as well as my own practicing history, it's clear that physicians aren't waking up wanting to practice low-value care. They just don't know how to. They don't have the right information at the right time to be able to make the right decisions. And this is why what Girish has built is so innovative. It's purpose-built to deliver higher-value care. For example, when a physician is looking at data that a payer is giving them, it's 1 piece of the puzzle, and they have to sort of extrapolate what the rest of the puzzle looks like.

When we can combine all the data together, I don't have to convince a practice or a physician what their ED utilization is in aggregate by just 1 piece of the puzzle. We can combine all that information together to show them their ED utilization and then go a step further to actually show insights on what they can do to improve that utilization. For example, this practice had high utilization, and we realized that Mondays were especially high utilization for them.

We worked with the practice and found out that they were short staffed on Mondays. And due to the excessive high call volume on Monday mornings and people being on hold and going to the ED instead. And fixing that shortage was able to significantly reduce their ED utilization. It also allows me as a medical director to understand the variation in the value levers across all our networks. It allows us to learn from that variation and be able to attack it. Be able to address a specific area where a market can improve in value to be able to learn in a specific area where market is doing well in value and understand where to invest in clinical programs to be able to address issues that across the network.

And all this data and insights and information creates an educational and activational mechanism for PCPs to start to understand how to learn how to drive value and practice high-value care. Our scale and data infrastructure allows us to leverage insights from across the network to identify and deliver high-value opportunities at all levels of the business. So for example, we can look at any 1 market, Austin, for example, and see that their PCP touch points is quite a bit less than agilon average and that they're cardiology, patients being referred to cardiology is quite a bit higher than the agilon average.

And these are 2 sort of specific insights that we've been able to understand over the past few years. given the immense data that we've had access to and how we've been able to structure it and then act on it as well. Austin was able to hire 3 new cardiologists specifically because of this data, focused on delivering high-value care, non-interventional cardiologists. We can look at a segment in a market such as we call a pod to understand specifically what is that, what does practice care look like in that segment of the city. For example, this pod 1 in Austin, they had an especially high readmission rate and we're able to correlate that with not many people were being seen within 2 days of discharge. And this is another sort of specific insight that we were able to see at agilon that there's something special and unique about seeing patients within 2 days.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Seeing patients within 2 days doesn't work in a fee-for-service world. There is a 14-day or 30-day, but in a value-based care world where you can reduce the readmissions, there's all of a sudden a way to do that. We can look at any physician and understand their opportunities to improve value of care. There is a physician that our Medical Director in Columbus was working with in Ohio, who had especially high utilization of vitamin D test.

And we know that this test for most people is hardly ever necessary. Their guidance now is if there's a concern about vitamin D being low to just supplement and that's safe and effective and high value. And so she is able to work with this physician and reduce unnecessary low-value testing, and there's a host of other examples. And then, of course, at the patient level, being able to show for any 1 patient, for example, this Mrs. Jones, due for colorectal cancer screening. She's seeing 7 different specialists and 4 of them are ones that we've identified as low value. And so the physician can have a specific conversation with her about how do we collaborate and do this better and see that she has had 3 avoidable emissions and talk with her about understanding the risk factors and what we can do to reduce these avoidable emissions.

We can do this across the entire network for any market, any pod, any physician, any patient. We understand that to succeed in this business, we have to get our physicians to do something different tomorrow than they were doing yesterday. And this data and insights and specifically activating our physicians is allowing us to do that.

So let me turn it over back to Girish to understand to talk about how we do this at scale and what's ahead in the future.

**Girish Venkatachaliah**
*Chief Technology Officer*

Thank you, Dr. Carne. It's always such a pleasure to be working with physicians like Dr. Carne. So one of the things we talked about that Veeral highlighted was pace. We fixate on speed. So the nice thing is that every time we see an EMR in market, we built a reusable pattern on how to work with that EMR. We see a new payer contract in market. We built a reusable pattern with it. Our goal is that every time, the next time we see it, we are that much faster.

Let's take the example of MaineHealth that we announced this morning, right? When we started the conversation, they were like, "Oh, my God, we are a massive epic shop. How will you do this?" They said, okay, this is how we have done this in Buffalo Medical Group. This is how we've done this in Austin Regional Clinic. This is what we've learned from that implementation. And it was a straightforward conversation on how do we get start to do this with them. But it got better, right? They were like, oh, this is how we send data to our population health provider. We are like, okay, how can we leverage that? And so we start to collaborate on it. And they want to think about like how will we handle 200 physicians.

So we are talking about how we do single sign-on across our both networks. These are examples. But the point is we don't worry about the 40,000 members that join our platform. What we fix it on is how do we do that at speed. And we not just with main health. We do that with payers, too. Heidi will talk more later on today what payers. We are doing that approach to payers? Like how do we get data, how do we get data sharing with you in a way that is agile and nimble. But even more impressive than all that is how do we take all this information and how do we assemble it at the back end.

So what we have built is this consistent information backbone we call as the agilon information model. And this is really what gives us at least 3 advantages. One, to all the things that Ben Shaker alluded to this morning, this is what lets him and his market operators see all these markets in the same consistent way, the same consistent way, right? So whatever be the endpoints in how we get the data, when it gets mapped back into our enterprise, we have the same consistent way of looking across these markets.

The second is that it lets us drive programs and operations very consistently, right? So when we construct the program, we're able to deploy it in these markets with the same speed and ease and measure their effectiveness as effect across all of this.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 491**

The third, probably the most beautiful thing of it all is that we are able to support best practices, what works in 1 market, take it and see like, hey, these set of interventions with this set of conditions is what is probably the best practice that you should learn from and the physicians start talking to each other, then they just start to get themselves better at this. And that flywheel effect that everybody talks about, this is really how it really manifests.

Not just that, we are not resting. We're investing to stay ahead. We are investing to stay ahead of this game. Perhaps the proudest thing and the technology is that we will be 100% cloud-based by third quarter of this year. We will be retiring all of agilon data centers and 100% on the public cloud, gives us incredible agility and flexibility, right? We don't have to worry about supply chain problems, ordering 4 months ahead because MaineHealth is coming on board or any of that. We can spin up compute in seconds now. Equally, we can spin down compute in seconds still, so that its saves us on cost.

The second, Veeral alluded to this on the talent discussion that Jason was asking about, is that we've set up an office in agilon, India. We are at already 50 employees. It gives us access to an immense talent pool. And not just that, it gets -- has the ability to stretch our day to the full 24/7.

And we have to follow the sun model that makes it so much more effective for us to deliver that much more capability. The thing that we're also doing is we are focusing on building bots for the manual Monday and repetitive task that either our market operators do or our physicians do. And this is really allowing us to have them practice at the top of their license.

Perhaps the thing that I'm proudest of is the investment we are making in AI. We are starting to see that bear real fruits already. But we are where we're heading to go is even more exciting, right? Take this example of Mrs. Jones where I started this conversation, right? COPD. But we also know that she lives in Buffalo, New York. We also know that is June. We also know that Buffalo New York is the top 10 places for seasonal allergies. We also know that she hasn't refilled our medication.

The question really is what do we do with that information? More importantly, when does that care team need that information, and what is the right intervention because Mrs. Jones doesn't answer to text messages only to a landline. The point is simple. I don't know what we will do with it. But what we are trying to do is go beyond the health care system and data just in the health care system to the wider world of data out there and bring it all together in the context of care.

And this could well mean the difference between Mrs. Jones spending time in our garden or in a hospital bed. And you need AI to triangulate that large droves of data and to do it at speed and to do it at speed to be meaningful at the point of care. That is what we are investing in. The thing that is true is that no matter where we go in the future. The one thing that is sure about our lives is that our goal is to delight our physicians. And we don't ever get confused by the fact in their success lies our success. Thank you.

**Steven Jackson Sell**
*President, CEO & Director*

Great. Thanks, Girish. Thanks, Dana. I think that's a tremendous example of a competitive advantage that agilon has. What these 2 guys have created with an incredible team that allows us to take any market to risk for the first time, pull together all of that information and provide the primary care physician and the group with that composite view across a panel is really unique, and it's a big part of our success. And so now I get the chance to introduce our physician panel.

I think this is going to be a big highlight of today for you to hear really how this works in a series of diverse markets. And so Ben Kornitzer, who is our Chief Medical Officer, will come on up here with Frank, Pat and Kevin so guys, come on.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you, Steve. Thank you, everyone. I'm Ben Kornitzer, agilon Chief Medical Officer. I'm also a primary care physician, my own area of specialization is the care high-risk homebound older adults. I've been with agilon since 2019 before joining agilon as a Chief Medical Officer for Mount Sinai's network here in New

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 492**

York. And prior to that, I led the largest community-based ACO in New York City. My entire professional career has really been devoted to high-value care for seniors. And my core belief is that there's no more powerful intervention when it comes to impacting our health care system than the deep relationship between a physician and patients. These are remarkable partners. Each one of them represents the leading group in their market. They have tremendous influence. They have tremendous credibility. They've been taking care of their patients for decades.

One of the things that I would point out is they represent a whole range of different practice archetypes. We have groups that are large multi-specialty practices in urban centers. We have suburban primary care only practices, and then we also have distributed primary care IPAs in rural geographies. What we'd like to do is sort of see what it's like to touch and feel our practice through the eyes of our physician partners and really understand why they've joined agilon and how that's transformed their model.

So let me begin with my first question for Dr. Spencer. So tell us a little bit about your practice, why do you join agilon? What was it about your business model that you felt you needed to change?

**Kevin Spencer**

Thank you, Ben. Thanks for having us. So we're 1 of the markets where we had 2 different practices come together and partner with agilon as an anchor group in Austin, Texas. We now have 7 different practices in that geography, as you heard a little bit about our growth. And really, what we saw is fundamentally our business model was unsustainable.

Despite our success, these practices had been in the geography since the 1980s for decades as we said, we had about 700,000 patients, and we started with about 15,000 MA patients, it's now over 30,000. Yet, yet in the model, we saw our practices getting less and less valuable year-over-year as more and more people age into Medicare model. So we knew we needed to do something different. We knew there was inherent value in value-based care, especially in the senior section that we did not have the capability to get at that without a partnership.

So we were looking for a partner for someone who could help us, and that's when we introduced agilon. We learned so much from Bill Wolf in Columbus. We were the second market with agilon. So that network of being able to go to other peers to say, how does this work with something that we were able to take advantage of. But those -- we were really solving for that. We saw fee-for-service medicine declining our economics. We saw labor costs increasing. We saw overhead increasing, and we knew that we needed to get into something where we can tap the value of those senior lives within our practice.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you very much, Dr. Spencer. Dr. Civitarese, the same question for you, you can tell us a little bit about your practice, why you joined agilon? And what sort of the impetus was for changing your business model in Pittsburgh?

**Frank Civitarese**

Sure. I'm Frank Civitarese. I'm a boarded family physician and geriatrician. I practice with my 42 partners in Western Pennsylvania, primarily around the Pittsburgh area. We're an independent primary care-only physician group. We've been in existence since 1994. We were pretty successful as an organization. I think as primary care physicians, we became increasingly aware of the fact that we were unable to touch our patients in the outpatient setting. We felt handicap and felt an inability to actually reach beyond our office visit to impact the care that we deliver to our patients. As a result, when we looked at -- if you think about it, a Medicare patient at best may be in your office, 4x a year or for 30 minutes. That's a total of 2 hours of face-to-face contact with the patient.

Obviously, what happens outside of the 4 walls of our practice is critical to the patient's health care. We tried to make some inroads into developing programs to touch those patients on the outpatient basis, but they generally fell short of our expectations. We realized that we needed a partner to be able to reach into

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 493**

patients' homes to touch them and to be able to create points with them that could ultimately impact and change the delivery of care that we currently give.

Actually, the nice thing about the agilon partnership is that we've been exposed in the past to a variety of programs that were developed by health plans, which, for the most part, were health care maintenance policies and we felt that we needed disease-specific policies to address our patients' needs. We with in conjunction with agilon, have been able to create models of care that we direct and we change. And so we create a model. We create a care management program. We roll it out. And if we as physicians don't like it or we don't think it's achieving the goals that we want, we just reinvent it because we own it. And we're responsible for it. We're arrogant enough to believe that we're primary care physicians.

We know -- we think what's best for our patients. And so our ability to change the model on the fly to make sure that we're meeting the needs of our patients was a critical decision for us in the partnership with agilon.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you, Dr. Civitarese. Dr. Goggin, can you tell us a little bit about your practice and why you decided to partner with agilon?

**Patrick Goggin**

Sure, Ben. I'm an internist and a member of an independent practice association made up of 40 independent primary care physicians scattered across 4 counties in rural Southeast Ohio. As a third-generation physician in my family's medical practice, I saw firsthand what health care should be. As a boy and then later on as a young doctor, I worked side by side with my dad, I saw him making house calls on evenings and weekends. He spent countless nights, sleepless nights in the ICU taking care of its sick patients. And he always took the extra time it needed that, that patient needed, a complex patient needed in the office, no matter how hopelessly he was behind the office. To dad, there was only 1 patient on his attribution list, and that was the patient in the room with him right then.

I'm the primary care position now for Dana, an 84-year old, and she loves to tell the story about when she was a child, and fell very sick, my grandfather went to the home to care for her. When she woke up in the morning, he was a sleep on the floor [ foot up for bed ]. But then health care devolved. To survive, we had to see more and more patients in less and less time. Meanwhile, our patients are getting sicker and older with more complex social issues. It was untenable. It was a system that was broken. It wasn't good for us as physicians and it absolutely wasn't good for our patients, and we knew it.

Look, we didn't want another tech vendor, we didn't want a management consultant, okay? And we didn't want a hospital system coming in and buying our practices. What we needed was a novel business model. We needed a partner that could align financial success with what we knew as doctors was best for our patients. Spending more time with them, more individualized care and creating embedded care teams to take care of them. That's why we partnered with agilon health.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you, Dr. Goggin. One thing I would say we were talking a little bit earlier, right? And I said that you ever think when you were graduating medical school or practicing in rural Ohio, that you'd be sitting on a panel along Investor Day in New York, and you said, listen, as PCPs, we've always done what it takes improved care for our patients, and this is part of it, I'm absolutely going to be there. And so everyone that you see here, right, none of them are spokespeople. They're all frontline PCPs, but I think that's sort of authenticity and passion and lived experience really speaks volumes for our model. So the next thing I'd love to understand is how has this partnership allowed you to practice differently. So again, Dr. Spencer, why don't you walk us through what that's been like in Austin.

**Kevin Spencer**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 494**

Yes. I think I've just been amazed by what you heard from Girish and Dana, the insights and the ability to really understand what we can do to impact our communities. And Frank will talk to you and you've heard what we can do within the PCP office is better. We can see our sickest patients more often. We can do a transition of care right when they get out of a facility. But what's been so empowering is our ability to influence the total cost of care. So take renal patients. Renal patients are some of our very sickest patients. Many of them are at end stage or on dialysis. They have a lot of comorbidities. We were able to see in our market that we were one of the worst agilon markets around renal care and renal spend. That wasn't because our nephrology colleagues in the market are bad doctors. They're in a fee-for-service model. They didn't create the care around the patient.

So we've been able to partner with a third party that does this extremely well, and we have a medical actuary team. And we have a medical finance team that can help us to make the right deal with this party, third party. So not only are we guaranteeing a savings on a patient base that we used to lose on from a cost. What I care about is 2 things as a position. One is, our patients are now having optimal starts for dialysis in our market. They're not crashing into the hospital to get that kind of care where complications are high.

They have real renal trained care management nurses going to their home, going and interacting with them and bubble wrapping this very sick group of people and patients are getting better outcomes. Renal patients, some of them shouldn't go on dialysis, they're so sick that dialysis does not prolong their life. They were never getting end-of-life discussion to have dignity to decide how they want to pursue their health in this area, because the business model was that the nephrologist on the dialysis center, and it's easier to put folks on dialysis, not because they're trying to do the wrong thing. It's just that's the way the model worked.

So we went to this nephrology group as the delivery care model in our market and in a very collaborative way, but in a very assertive way said, this is the way we're going to care for our renal patients. Remind you, this is a group of patients that we don't see very much. Most of the time, they're under the care of the nephrologists and they no longer come to the primary care, yet we've changed their care in our market based on our size, our influence, the model that we're in and the partnership with agilon.

So it's just empowering to say not only did we need to do things better in the PCP office. We did and we are, but we have other things in other areas that we're able to influence around other parts of the care that we never would have been able to do without the agilon partnership, the type of model that we're in and the alignment that we have.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Dr. Spencer just as a follow-up question, right? Given the fact that there's commonality among senior patients that we have multiple partners who were thinking through similar issues. Can you share any of the learnings that you've had or the benefits of the platform and the network as you thought about this opportunity?

**Kevin Spencer**

Absolutely. I mean, so that example that I'm talking about in Austin, Texas is going on in 5 different agilon markets today and probably the other 15 will be added because this makes a lot of sense. So -- so Frank, Pat, Bill, others, we collaborate commonly and often around all of these issues. So again, Girish and Dana are delivering this same view across the entire network. So the medical directors, the physician leaders, the market teams and the markets we're talking about a lot of these same consistent issues that happen across markets.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you, Dr. Spencer. Dr. Civitarese, you're talking over the week. I know you were just on service. And one of the things that came up that seems very different to me, right, is how you're really dealing with

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 495**

transitions as patients navigate different parts of their acute episode. So do you want to sort of share how this has been different in your market?

**Frank Civitarese**

Sure. So Ben was referencing the fact that yesterday, I got texted by our hospitals that their census 21 and they needed help rounding. So fortunately, my partners were on the group tech. So they helped around in the hospital this morning. I could speak to a variety of value adds that we've benefited from with the partnership with agilon. But I think I'll probably just focus on one concrete example, and I'll call it the transition of care cascade.

And so nationally, we've recognized as physicians that as patients transition from one care system to another, where it be from the hospital to the nursing home, the nursing home to the rehab unit, a hospital to home or home to the hospital. All of those transitions, place the care -- place the patient in a very vulnerable position because there's potential for errors in medication reconciliation for inability to deliver outpatient services that were intended.

And so as physicians prior to our relationship with agilon, I would be in the office, I would see a patient, and I would ask them, well, how have you been for the last 3 months. And they said, well, I was admitted to the hospital across town, and I had a surgery. And then I went to the nursing home, and I ended up with a complication in the nursing home and went back to the hospital, and I had a 2-weeks stay in the hospital, and then I went to a rehab unit and I got discharged and here I am now. And so it was really frustrating because I'm their primary care physician, and I had little or no ability to impact that transition.

And so as a partnership with agilon, we now have software, which I euphemistically call, Where's Waldo? And we have a dedicated RN that monitors the software, and we get daily real-time ADT feeds, admission discharge and transfer feeds on all 20,000 of our Medicare patients no matter where they're at in the city, and our RN monitors that software and reaches out to those patients that day when she sees it, to talk to them to find out how their care is progressing, what potential needs they might have and the transition of care from eventually when they're discharged from the hospital.

For those patients that we take care of in the hospital, and we are primarily responsible for, we have daily conversations as I did in the text yesterday with our hospitalist in regards to the progress of each of our patients in the hospital. At the time of discharge, our hospitalist has a communication with our transition of care nurse. That transition of care nurse understands all the medications that have been changed, those that have been stopped, those have been started, the procedures that have been done and also all of the interventions that the hospitalist intends for that patient as they transition to the outpatient setting. So if they're going home, do they need home oxygen, do they need DME equipment and ultimately, do they need home care. On the day of discharge, our transition of care nurse then calls that patient and make sure that every -- all of the intended interventions that our hospitalist has written for have been completed.

So she speaks with the patient and says, is it the oxygen there. Did the hospital bed arrive. And during the course of that visit at the end of the visit, actually reconciles the medications to make sure they're accurate, she then schedules a follow-up appointment with me within 48 hours of a discharge.

By the same token, we have, with the aid of Girish and Dr. Carne has been able to do a rigorous review of the post-acute care facilities that are within our catchment area. And we've looked at them from a quality and cost standpoint, and we've tiered them. And so we have Tier 1, Tier 2 and Tier 3 facilities, and we preferentially discharge with the aid of our hospitalists and our transition to care nurse, discharge of those patients to Tier 1 facilities.

Why do we do that? Well, those facilities historically have provided better care at a lower cost. But also more importantly, we found out that those facilities have our physicians on staff. So our physicians are taking care of our patients. And what we found is that if we discharge our patients to a Tier 1 facility, our costs, our episode of cost for 90 days is $4,000 less. Our outcomes are better, our readmission rate to nursing to hospital or readmission rate from home back to hospital from the nursing home has markedly decreased.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 496**

It makes sense. Our physicians know our patients, our physicians have a vested interest in their care. So the care they are delivered is better, it's more efficient and it's more timely. And the nice thing about it is that we now feel like we are back in control of our patients. We're now the quarterbacks of their care. We feel that we are the most appropriate people to manage that care through the transitions of their health care.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you, Dr. Civitarese. It's been really just inspiring to see the transformation that you've had in the Pittsburgh market. So Dr. Goggin, and you come from rural Southeast Ohio, you have a large high-risk population. How has the partnership really allowed you to practice differently?

**Patrick Goggin**

I think the best example is our current high-risk patient care project. And I want to describe that like before and after as it pertains to this project. Any full-time primary care doctor can tell you who their sick patients are. They could name their top 10 or 15 sickest patients off the top of their heads. But we didn't know what we didn't know. We didn't have embedded analytics at the point of care to tell us when they were getting sick. And as Frank mentioned, we often didn't know that they were in the ER last night or they're currently in the hospital of the next county over. Even if a patient would reach out to us and let us know that they were sick, we hadn't built the flexibility and scheduling to provide access to be able to see them right then and to provide the time they needed to keep them out of the ER. It felt like our care for them was always reactionary, always putting out fires.

Now what we're seeing is we have advanced analytics at the point of care. This is identifying our high-risk patients. It's identifying for us their most threatening risks. We are hopping off the treadmill of fee-for-service and redesigning our schedule so that we have more time to spend with these sickest patients now that we've identified them. And we're building a highly coordinated embedded care team to help us care for them.

In essence, what started in the 1930s with my grandparents making house calls to homes and farms across [indiscernible] County has evolved to the point that now we have a highly integrated team, physicians, advanced practice providers, or in care managers, clinical pharmacists, social workers -- and an ironic turn now 90 years later, we're returning to the home. We've built a home visit program, and we're taking palliative care services to our most vulnerable and sick patients where they need the care, it's very impactful.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

It's very impactful. It's also very inspired that we were on a Zoom call and you actually showed me at the house you're living in is the same house that your grandfather who was a fairly practitioner in the same community lived in. So I think that really speaks to the long-term relationships and trust.

And finally, I'd love to sort of understand everything we do, we do through either our doctors or through patients, right? And so let's start with a Dr. Spencer expenditure again. So what is the impact of this partnership been on your physicians and on their patients?

**Kevin Spencer**

Yes. It really nagged me as the physician leader of our group. You began to see physician burnout. You began to see them lose their hope that the mission that we all went into the field for was not being accomplished. We inherently knew that we were doing a good job in front of that patient for 20 minutes, but we weren't necessarily impacting their overall course.

And so we've really seen physician burnout improve we've been able to see less patients per day and spend more time with patients. We're hearing from our patients. We do survey our patients, listen to our patients and they're 94% of them feel like in this model of care that they're receiving high-value care and getting what they need from their physician office, we're really proud of that.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 497**

So honestly, we're able to hire physicians better. We -- before, we were unable to hire at the pace that the market, in the market share that we could have taken, we didn't have the capital or the business model. So we're hiring great young physicians who are excited about practicing in this model. And then our older physicians are able to slow down and get off the treadmill and spend the time that they need because all the analytics are great, but they're only great if we can actually impact the life in front of us with that and that takes time and thought and a plan. And so they're more professionally satisfied.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

Thank you, Dr. Spencer. So you actually brought a very interesting point in terms of growth, right? And so we'll go to Dr. Goggin. So as you think about the impact on physicians or patients, I know that you've had significant growth in your own market. Can you talk through that and how that's impacted your physicians?

**Patrick Goggin**

Ben, I'm more optimistic about primary care now than at any other time in my career. I mean just 2 or 3 years ago, our group, although we were good at a lot of things, we're highly fragmented. Across 25 practices, we had 8 or 10 electronic health records, we had 5 practices still on paper. We're all working and toiling away on our own or doing it in our own way without a real line of sight into our patients and their risks.

Now we've been able to stay independent, but more importantly, we are interdependent. Our physicians are more highly engaged now than ever. They're invested in this partnership, and that's allowed them and empowered them to jump off that fee-for-service treadmill, roll up their sleeves and help work with our partners to develop the clinical programs that we need to improve the care for our communities. And the health care community in our areas took note. Like just last year, a 14 physician primary care practice left their employed model with the primary hospital system in our network and joined us in this endeavor as partners, and our IPA grew by 40%. That's also an outcome I could not have imagined 2 or 3 years ago.

**Benjamin Kornitzer**
*Chief Medical & Quality Officer*

That was absolutely remarkable. And Dr. Civitarese, can you talk a little about the impact for your physicians and patients?

**Frank Civitarese**

Sure. As I was thinking about how I was going to answer the question, I thought this is going to sound really ironic, but the partnership with agilon has given us more control over our practice and that sounds kind of anachronistic. But we felt for the longest time that even though we were autonomous and an independent physician group, we were losing control over the care of our patients. And I think the partnership has actually given us back control, as I highlighted with the transition of care, but also as importantly, to speak to some of the comments that Girish and Dana made, for years, we were -- we had access to data that was pushed down to us from the health plans.

The vast majority of that data was oftentimes invalid, and it was not actionable. And the beauty of this model is that with Dana and Girish and my partner Louis Civitarese, who is a technology geek, in addition to a physician, they've created a team of people that actually look at data critically from a physician's viewpoint. And the ability of that team to synthesize data and actually present us data that's actionable that we can validate.

And the nice thing about it now is that our physicians, and I believe the other partner groups actually trust the data that's now coming from agilon and from our partner. And with that data, we feel, once again, that we now have control and we'll have future control over our patients as opposed to the model that we were engaged in prior to the partnership.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 498**

[indiscernible] of Q&A, but I did just want to thank you all so much for being here. It's great to have you. So we -- again, we've got a couple of mic runners. So if you just raise your hand, we'll get a mic over to you. Lisa, I saw you first.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 499**

# Question and Answer

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Lisa Gill, JPMorgan. I always have lots of questions. So -- we're all financial analysts, so we think about things from the finance side. So first off, can you talk about the economics of your practice and what agilon has been able to bring from that perspective?

And then secondly, one of the things that really resonated with me was losing control of the patient when you talked about previously, even though you were autonomous, was that loss to the health systems? And if so, are you feeling any pushback? I know we talked about Maine earlier, but are you feeling pushback from the health systems that we really enjoyed when your person came to the emergency room and spent longer in the hospital than they should have.

**Steven Jackson Sell**
*President, CEO & Director*

Lisa, first of all, thank you. Thank you so much for the question. Why don't we start with Dr. Spencer, right? So in your market here in Austin, I would be very curious to how are you reinvesting the economics? I know Ben Shaker spoke earlier about One of the ways we as an organization sort of measure ourselves or are we returning those economics to the physicians and what's it meaning for their practice. And also you certainly have a market with significant density in terms of specialty care in terms of hospitals. And so what that relationship has been like?

**Kevin Spencer**

Yes. I mean I think on the economics of the situation in this business model, we're able to invest ahead of the outcome now. So physicians are earning more, but a big piece of this is to reinvest in the clinical care because, as we pointed out earlier, we are having success in these early years, but there is a lot more there to go get. And the only way to get that is to invest in the clinical care of our patients.

So things that we invest in our nursing care management, pharmacists, we didn't have that before social workers. We work -- we interact more closely with the health plan around our dual eligible patients, so that the community resources and some of the health plan resources that used to feel fragmented. We're working with our payer partners to unlock that. So we're able to hire physicians and pay competitive salaries in our market against the health system. So that's what we're seeing economically.

As far as the health systems go, it's -- the more you learn and get into this business, it's very interesting. They really actually don't make money on sick medicare patients with medical DRG diagnosis sitting in their hospital. They're -- press gaining surveys, quality surveys go down, their ERs are full. It's not what they do. So they actually welcome us. We've embedded nurses and nurse practitioners in the ER who meet our patients there to our patients that feels like a white glove incredible experience. Their ER is getting better surveys because it feels like they're delivering a different product when it's really us and we're keeping the medical patients out. The patients who need heart surgery and need things like that, those are the patients that are designed. So -- now we're in a growing market in Austin with the bed capacity pretty full. So we're actually pretty aligned around that. That's what we're experiencing in our market.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Lisa, why don't you get to Stephen. He's right next to you.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Okay. So Steve Baxter, Wells Fargo. So it seems like your model would be extremely well positioned to benefit from biosimilar competition as physicians, I was hoping you could talk about what you're doing

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 500

operationally be ready for biosimilars? And I guess how much of a priority is you versus other areas of potential savings you're exploring in the future?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So I think the question, if you flat just sort of expand it just beyond just biosimilars, but very broadly in terms of drugs, Dr. Spencer don't want to pick on you with every single question to know that that's something in terms of high-cost specialty medications that you specifically looked in your market. I don't know if you want to walk through that example.

**Kevin Spencer**

Yes. I mean we've looked at the Part B drug costs, Part D drug cost as it relates to that. And first and foremost, it gets back to low-value care and high-value care. So there are certainly patients that will need certain medications where that can really impact their care. But we also know, and we share this with our specialty partners in our market that there's patients who don't benefit from that. There's also patient exposure for that, that we work on to do that.

We also work in research and try to get a lot of these patients into a research study. Our groups are in our markets are at scale. So we have access to the research dollars and often then it's not adding to the total cost of care of the patient. It's not adding to the total cost of care of the market. And so those are different ways that we've looked at that. But honestly, we -- we put the patient first. And if they need a therapy that's expensive, they need a therapy that's expensive. There is so much inherent waste and inefficiency in the system before we have to go to any specific drug. We are attacking more of an overall problem.

So yes, there will be new therapies that come out that patients need, and we want our patients to have those because it can impact their life and prolong their life, but that's how I think I would answer that.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

We want to go to George Hill, right behind Stephen.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

We're playing past the mic today. George Hill from Deutsche Bank. What I'm interested in hearing from the practice side is could you talk about -- could you quantify tell us what are the quantifiable performance metrics you guys use to measure your relationship with agilon? And then please talk about how you're performing against those metrics?

**Steven Jackson Sell**
*President, CEO & Director*

Great. So Dr. Goggin, would you like to sort of take it on or how are you setting the priority? How are we setting our priorities? And how are you sort of measuring yourself? I know that we talked about the high-risk patient example. I know that's an area that you're focusing on that you've set sort of very specific metrics on.

**Patrick Goggin**

I think the primary metrics we're looking at meaningful health outcomes for our patients. So ED admissions, hospitalizations, readmissions, what can we do to control those metrics? So the enterprise analytics team not only delivers those metrics to us, but they've helped develop systems so that we're not waiting on claims data to bring that delayed information. We need real-time data every day. And so they've interfaced with our electronic health records around scheduling of visits, closing care gaps and these utilization metrics so that we can measure that on a day-to-day basis and then take that back to our

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 501

clinical operative teams to refine on a week-to-week basis, what we're doing and how to improve the care for our patients.

**Unknown Executive**

Can I just a quick comment, and I would only say that this is a more generic comment. The reference was to how do you benchmark it against agilon and how we're performing for agilon. When we initiated our market in Pittsburgh, I said euphemistically to everybody agilon is a 4-letter word, we're not going to use it here. As in PPCP is a 4-letter word, we're not going to use it here. We created an entity called Preferred Senior Care Advantage with agilon. They are our partners we own this business together. So there's no such thing as it's the agilon team or it's the preferred primary care physician team. It's the Preferred Senior Care Advantage team and so we believe we're true partners. We act that way. And to date, the performance of our organization in conjunction with agilon to create this new entity has been engaging and inspiring for us as physicians. So physicians are always suspicious of partnerships because partnerships with specialists and health plans, generally and poorly but our relationship has been as pure as a partnership can be.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Why don't we take one more question? Please go ahead.

**Kris Harland Jenner**
*Rock Springs Capital Management LP*

Kris Jenner, Rock Springs Capital. Dr. Spencer, you shared an example of best practices that started in your market in Austin related to the care of ESRD. And then if I understood what you said correctly, it was disseminated broadly. As I listen to all of you. It's very clear that agilon partnership is very impactful to you locally and to providing better care. But I was wondering if you could provide like additional examples, any one of the physician panelists could provide additional examples of best practices that has been broadly disseminated from whether being Wilmington, North Carolina or Austin or Southeast Ohio or Western Pennsylvania, that speaks directly to AHAs in terms of providing better care locally, but actually originated outside of your market, but was provided to you as another powerful example of the benefits of an agilon partnership.

**Kevin Spencer**

Yes. I mean I think I would answer that in a couple of ways. One is there are some things that aren't very AHA that we just needed to do better. So Dana and Girish bring us things like you need to see your sickest 15% of patients 5, 6, 7x per year. Your busy physicians and you can't get them on the schedule. So how do you operationalize that?

So the best practices was less about what kind of innovative clinical care, and it was more around how do you operationalize that back to we have different types of partners, different sizes, different locales. So I always can go find someone that looks and feels just like me, and we can compare notes on the operations side.

So one, this business is a lot about execution more than I ever realize as a doctor than it is necessarily about innovative care. So I would say that as one thing that we're learning. So to be data-driven, look at the KPIs, drive towards those have doctors understand why something that feels so business like is actually so important to the health of your patient is one big thing. The other is -- other examples, people are doing innovative things. So we have had markets from Austin, who is doing a home visit program, share that with Columbus. Columbus who was doing an extensive care clinic has shared that multiple market, a great one that we're working on across the entire system. And what I really like about the agilon management team led by Steve and Steve preaches this is there's -- we're developing a product at the enterprise level. So yes, we do learn from all of our local partners who are great partners and are doing innovative things, but take palliative care.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 502

Buffalo and Akron, we're working on palliative care. Now we have a palliative care, end-of-life approach that we're trying to bring that all of us are studying across all the markets. So there's an actual -- what does the staffing look like? What is the model? What are the touch points? What's the conversation need to be in the room to get patients to be willing to have that kind of discussion that feels like giving and dignified and not scaring them into saying they're about down to that level of detail, that's all codified now. So when another market wants to say, "Hey, so you not only have it from our product team that can project manage it, run the playbook in the market for our patients. I can pick up the phone and call Frank and say, "Frank, what were the issues that you had, what -- how did your physicians respond? How do we move this over the finish line?

So that's the kind of cross-pollination, but I've been very interested as a physician to say, there are a lot of innovative clinical things that we need to be doing differently, but there's also just a lot of execution at the practice level. We were all running pretty successful businesses, and we've all learned we can be a lot better just on doing the main things well.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*
I think we have to cut it there. We love to celebrate our partners at agilon. So if you could please join me in thanking.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 503

# Presentation

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right. It's my pleasure to introduce you to Heidi Hittner, our Chief Experience Officer, to discuss stakeholder impact.

**Heidi Hittner**
*Chief Experience Officer*

Thank you, Matt. Good morning. Thank you all for being here. We really appreciate the opportunity to share our story with you. I'm Heidi Hittner. I'm Heidi Hittner, and I've been with agilon since nearly the beginning, starting with the class of 2019. I've had the opportunity to work with our physician partners and our markets and enjoy the opportunities we're expanding and rapidly growing the platform. You just heard from our physician panel about the difference our agilon model has made for them and their physician practice. And now I would like to share with you how our other stakeholders are payers, patients, and communities as we're able to move the market to value at scale are also benefiting from the agilon model.

Payers benefit from our agilon model in 3 key ways. The first thing is we create scalable partnerships, starting with CMS, the largest payer. CMS has stated their goal of having 100% of seniors in total cost models by 2030. We have national relationships, and we meet with our national relationships plus CMMI leaders on a quarterly basis. We had 16 joint operating committee meetings last year, and we have 16 on the calendar already in 2022.

Our national payers tell us that our JOCs elevate our relationship with them in a way, they don't experience with other providers. We're learning labs with those payers who can continually help to evolve the model. And we have 20 health plan contracts nationally. 2/3 of our 2022 membership is covered by these national relationships. They are scalable. We're on standard paper, standard data sharing agreements. And that allows us to move very rapidly into new geographies. So as we expand with new partners, we can move very quickly with these national relationships.

The regional payers are very important to us, too. 2/3 of our markets have a regional payer. And those regional payers have deep, long-standing relationships in their markets and with our physician partners who have been in those communities for a long time. With limited exception, however, we are the first global risk arrangement those regional payers have ever been in. And so we have to provide the tools, the framework, the structure that's needed to move into a global risk arrangement.

How do you support a partner in being successful? And we're able to bring that capability to our regional payers. Both are important to us. That ability to help them to move to value. Our payers also benefit because of enhanced quality and benefit design. Our physician partners deliver phenomenal quality outcomes, 4- and 5-star Medicare preventive ratings. But we also give our payers something to talk about that goes just beyond the supplemental value of the benefits that they offer. Because together, through the lens of their primary care physician, we enhance their quality strategies with the way that we're able to help patients in engaging with their benefits are really good partners.

We know that patients who engage with their benefits are stickier with the health plan. And so every new patient as they join the program, they get materials from their primary care physician, helping to ensure that they know how to engage with their benefits. Some of the health plans offer gift cards for getting your annual wellness visit or your colonoscopy, your mamogram. And we make it easy for patients to ensure that they engage with those benefits and learn about the options.

Payers are also winning because of our predictable and optimized economics. We grow at 1.5 to 2x market growth in these nontraditional PPO geographies. Payers lock in a consistent gross margin to derisk their business. And especially in the PPO space, we have a much more extensive and mature attribution

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 504**

playbook to help to progress payers, both national and especially regional in moving to take PPO risk. We're the catalyst for them to develop processes, systems and support to manage PPO risk.

So payers benefit from this growth in these nontraditional geographies. Outside of Southern California and South Florida, your traditional kind of value-based care market, PPO in those markets only 6% to 10%, right? The national stat is much higher. And in our markets, 50% of our business is PPO. And we've demonstrated consistently that in those local communities, we are able to grow and help our payers grow out 1.5 to 2x market rate. And we're able to do that to create a single experience for the patient in a way that no one payer could do because we have the opportunity and the ability to communicate with patients through the lens of their primary care provider.

We know who those patients are. We can quantify that. We know we have 100,000 patients today on commercial insurance who are Medicare eligible, and we're able to engage with those patients throughout the year with unique educational opportunities to learn about their Medicare options. We know we have another 165,000 patients who are aging into Medicare over the next 5 years. And today, on the platform, existing patients within our partner's practice, there are 200,000 traditional Medicare patients. We engage with those patients on a consistent schedule weekly during the annual enrollment period, we sent over 1 million pieces of communication last year during AEP. And it's all templated. It's replicable. It's scalable. It's standard customization. It's through the lens of their primary care provider, but it's their local brand. It comes from their local doctor.

So patients get to experience the relationship they've already had long-standing relationship with their primary care physician, and now it's enhanced. The average tenure of our primary care physicians is 11 years. They've been with these patients for a long time. And that trusted relationship shows up in the way that patients rely on their primary care provider for who to seek for care. 89% of our patients rely on their primary care physician for recommendations on which specialists to see. And as we're engaging with front-line physicians like you just heard from our physician panel, we know through our analytics and data insight that frequent touches to certain patients at key times matter. It allows our physicians to see their high-risk patients with 44% more touches than non-high risk patients.

And even partners who've only been on the platform for a short time, you got to hear Dr. Civitarese in Pittsburgh, we know that they already see their patients who've been in the hospital 48 hours post discharge, twice the national average. Patients get to have not just an educational model about their clinical care, but they also get to learn about their options for HealthEquity. We know there's more comprehensive benefits offered through Medicare Advantage. Many of the MA programs have meals available post hospitalization to ensure patients remain healthy. They offer rewards for healthy behaviors. We just created a 10-minute 12-week video series about patients specifically focused for seniors on the benefits of remaining physically active, all through the lens of their primary care physician. And many of our payer partners have rewards for patients for engaging in those healthy behaviors.

So that shows up for patients in this industry-leading patient experience. I'm sure you're all familiar with the Net Promoter Score, right, the likely to recommend question, it runs from negative 100 to positive 100. As the score you can get, we're really proud of the 80 Net Promoter Score that our practices have. We're also very proud of the voice that our patients tell us, 94% believe that they get comprehensive, high-quality care from their primary care physician. And they are sticky with that provider. 94% of patients also tell us they plan to remain with their primary care provider.

Patients see better outcomes in their health. We look at that from the lens of preventive care, chronic care management and also overall health of the annual wellness visit. So cancer screenings, breast cancer, colorectal cancer screening, 18% better than the national average, 82% is a 5-star rating.

Medication adherence, especially for chronic disease, is critically important. You see nearly 80% better than benchmark on adherence for medications around high blood pressure, high cholesterol, diabetes. And for patients who have cardiovascular disease or diabetes, the importance of being on statin, nearly 40% better than benchmark. What really pulls it all together though, is the annual wellness visit. The ability to spend time with their primary care physician, focused on preventive care, laying out a plan for their overall health and wellness, charting a course to ensure that those patients have more healthy days than

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 505

sick days. We're really proud of the ability to be nearly a 100% better than benchmark and our annual wellness visits.

These healthy patients create healthy communities. Our communities benefit from increased access and capacity to primary care. We're located in areas that serve the underserved population. And because of our scale and our mind share and the presence that we have in that local community, we are able to help to move that community and the local delivery system to value. So how does that show up for access?

89% of our PCPs have panels open to new seniors that's 25% better than the national average at 70%. And in a pandemic over the last 12 months, our physician practices have invested in new primary care capacity, increasing by 6%. And now we have access, we have capacity. And because we're contracted with 85% of the leading plans in that market, plus CMS, patients have a real choice. 43% Our payer of our PCP locations are located in federally designated underserved communities. You heard Steve talk about our partners and our nontraditional geographies that we enter Southeast Ohio, you heard from Dr. Goggin ran East Texas, Pinehurst, North Carolina.

CMS has recently talked about the expansion of the ACO program with reach, with the goal of health equity and access, and we are very aligned and supported with that.

And finally, because of our scale, and the mind share of the primary care physician. Imagine you're getting all of your data about your senior population now from all of your MA plans in one spot, you combine that with your EMR data, like Dr. Karen talked about. Now you have the ability to see a view of your senior panel and their holistic journey, you never had access to before. And it's simple. It's all in one spot that you can access that. And so we are able to move the community to value.

In 6 of our 15 markets, covering 56% of our lives, we are larger than the largest single payer. And even in markets, where we aren't the largest, our primary care physicians are key referral sources in the local delivery system. You heard Dr. Spencer talk about how they engage with the specialists Dr. Civitarese talk about how they engage with their post-acute facilities, how they're really able to make an impact in moving the entire delivery system to value. And that shows up in a reduced burden to that local communities health care delivery system.

We see a 30% reduction in readmission rates, 14% decrease in our inpatient rates. And in our Columbus market in those last key 90 days before death, a 58% reduction in spend. So you can see 3 key things that are a benefit to our stakeholders. The communities benefit from moving to value, and we're able to do that at scale. Our payers are benefiting from above-market growth in nontraditional geographies.

And I'd like you to hear directly from one of our patients, Gary in Pittsburgh. His primary care physician is Dr. Doshi. And I'd like you to hear from Gary, how the agilon partnership has changed his life, his wife and even his extended family.

[Presentation]

**Heidi Hittner**
*Chief Experience Officer*

Wasn't that powerful? That was one of the first programs that Dr. Civitarese practice was able to invest in because of the agilon partnership. I'd like to introduce you now to Tim Bensley, our Chief Financial Officer.

**Timothy S. Bensley**
*Chief Financial Officer*

Well, thank you, Heidi, and good morning, everyone. I'm Tim Bensley, agilon's Chief Financial Officer. I joined agilon in January of 2020, right before the IPO. And I brought with me 30-plus years of experience building and scaling finance organizations and public company environment.

And I think maybe just before I jump into my slides, I'm going to say, after listening to my agilon colleagues and our physician partners this morning I'm just really excited to be part of this very impressive team.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 506

Okay. 3 key themes that I hope you can take away from my presentation today. First, with the strong growth that we've seen in membership through 2021, expected to continue in 2022 and beyond. We're really happy that at the same time, we've been able to grow medical margins, both at the market level and at the member cohort level as those members mature on the agilon platform. We deliver that growth through a leverageable capital-light partnership model that drives significant returns on capital. And we have high visibility and confidence into our long-term outlook which we believe is going to benefit from the record growth in both numbers and diversity for geographies, partners, members and PCPs in our class of 2023.

The agilon economic model really is driven by 4 key attributes. We enter into long-term partnerships, long-term 20-year partnerships with leading PCP groups. We have very high visibility into both future revenues and margins. Because we enter markets through existing capacity, we have a very capital-light model with extremely low customer acquisition costs. I'll talk more about that later. And with 60% of our membership having been on the platform for less than 3 years, we have significant embedded margins that we're able to access over the long term as our members mature on the platform. All of that sits on top of a very light overhead model, driving significant leverage.

We've had a lot of momentum since our inception -- since the company's inception in 2017, and we have a high level of confidence in our 2022 guidance. Now that includes our expectation to improve overall membership by over 100,000 members in 2022 to about 350,000 members. That includes both direct contracting and MA, and that will result in about $2.5 billion in revenue.

Now we have a lot of confidence in that membership growth number for a couple of reasons. First of all, 50,000 of those members are the new MA members that will come on board because of the 6 new geographies which went live in January of this year. There's another 35000-or-so members in new direct contracting members that also went live in January. And then we expect to drive 13% to 15% same geography growth, and that is very consistent with our recent -- really with our last 2 years' historical performance.

We're also going to show significant improvement in medical margin, growing overall medical margin dollars more than $120 million to about $300 million in 2022. And most of that growth is going to come from markets that were on the platform in 2021 and before. You take that growth in medical margin in combination with a continued leverage against our platform support cost, and an expectation that direct contracting will be a modest positive contributor to adjusted EBITDA, leads us to a 2020 where we'll move to a positive overall adjusted EBITDA for agilon, an improvement of $40 million to $50 million on a year-over-year basis.

So let's break that down into a few of the drivers of that growth. If you look at the top of the slide, boxed in red, you can see that we have an expectation that those markets that have been on the platform -- those partners and markets that have been on the platform in 2021 and before are going to drive significant improvements in medical margin.

From -- and by the way, that group represents about 63% of our overall membership. They'll go from about a $94 medical margin that we delivered across those markets in 2021, up to $127 to $130 medical margin PMPM. And that's going to drive more than 80% of our overall medical margin for year.

Now our new partners, which represents that about 50,000 members coming onboard in those 6 new geographies, are going to start at a lower rate of about $36 to $37 medical margin PMPM and obviously be a lower contributor to our overall medical margin growth in 2022. But with 50,000 members, that brings a lot of embedded margin that they will then be developing over the next 2-plus years.

And then our non-partner market of Hawaii, which I'll talk a bit more about later, doesn't really benefit from the alignment of our partnership models and so operates at a lower medical margin PMPM of about $46. But with some of the improvements and programs that we're implementing there this year, we expect that we'll see improvement pretty significant up to $56 to $58 of medical margin PMPM and that Hawaii should be a contributor to our year-over-year both medical margin increase and adjusted EBITDA growth.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 507**

As Ben Shaker talked about earlier, we've seen really strong medical margin progression at a market level across our markets. So let's start with some of our more mature markets. And on the left-hand side, our most mature market that we went live with in 2018 with about 25,000 members and a very robust $133 medical margin PMPM.

We've seen tremendous growth in membership growing more than 70% to 42,000 members expected in 2022. And notwithstanding the dilution of that those new members as they come on the platform, we've seen steady progressive -- steady medical margin progression up to $150 in year 4. And we're expecting to see about $170 in this market in year 5, which is 2022.

I will point out that, that circle, that one outlier year is, of course, 2020, which was significantly impacted by COVID utilization suppression. The year 4 market example next to it, starting at a lower level of $40 medical margin PMPM. Its second year was actually that year where we had some COVID-suppressed utilization, but it continued to progress beyond that, delivering $186 medical margin PMPM in year 3, and we expect it to progress even further in year 4. I really think this market is pretty impressive because the year 3 $186 PMPM is even greater than what they saw during that year of COVID-suppressed utilization.

Looking at a few of the newer markets, and particularly this year, 3 market is impressive. We started with 14,000 members in 2020, which, of course, started with a pretty high medical margin dollar because of the COVID-suppressed utilization but was able to even grow out of that to over $200, and we expect it to maintain a medical margin PMPM of over $200 going into 2022 as well.

Now up to this point, I've really been talking about medical margin at a market level, which includes, as I said, that dilution from new members as they come onto the platform in each of those markets. But I think it's really helpful to look at medical margin to the lens of annual member cohorts, which then removes that dilution from the equation.

So here is our first annual cohort that we brought on in 2018, that was about 24,000 members that came on. Again, it started with about $133 medical margin PMPM. That was after a very robust year of implementation. That individual cohort, as we move forward, has done tremendously well, progressing to $168 and all the way through in year 4 to $193, really starting to get close to that $200 medical margin PMPM. And again, I'll point out that year 3 was 2020, which was significantly impacted by COVID-suppressed utilization.

So here's the 2019 cohort. So this cohort represents both the 2 new markets that came on in 2019 as well as all the same geography growth from the earlier market that came into the -- onto the platform in 2019. So it's all the members essentially that came on to our platform in 2019. Again, starting at a lower medical margin of about $39 but a bigger class of about 35,000 members increasing through year 2, which was that COVID impacted year, but then continuing to increase further very impressively even beyond that COVID impact, still increasing medical margin in year 3 to $161.

Now if you look at the 2020 membership cohort, it's interesting because, of course, it started in that year that had the COVID-suppressed utilization. So it started at a very high rate of $120, but progressed even beyond that to $125 in year 2. And now our largest group to date coming on this year, which we expect will be about 52,000 members, starting at a $51 medical margin, but with -- again, with over 50,000 members, a significant amount of medical margin embedded in that class that we expect now, as you can see from the rest of the curves to generate over the coming 2 or 3 years.

So up to this point, I've talked quite a bit about our partner markets and how they've been pressing medical margin. I want to take a second and step back and talk about are a couple of things. First, our non-partner market in Hawaii, and then in second, our direct contracting members.

So Hawaii is interesting. As I said before, it doesn't really benefit broadly from the same alignment that we get in our partnership models. So you see in the middle of the page, operating at a lower overall medical margin PMPM with a lot more variability in that number. You can see on the left-hand side of the page that we have a very diverse population of members and PCP groups. A large percentage are independent and PO-type organizations, another chunk that's in health systems. And now for the first time, as we talked

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 508

about earlier today, our partnership that we've just entered into with the Hawaii Health Network, which will represent about 18% of membership.

With that inflation, some other initiatives that we're employing in 2021 and 2022, we do expect to see pretty significant improvement in Hawaii overall medical margin performance going, as I said before, from about $46 to $57. And one other thing about Hawaii, it's interesting is because of that diversity of our member and provider base, it really does also serve as a great laboratory for how we think about operating in our partnership models as we increase the diversity of those models as well.

Direct contracting, still a pretty new program. We are literally this month, just finishing up the first year of our direct contracting experience. We're still pretty optimistic about direct contracting ability to contribute positively over time. That's really based on a couple of things. First of all, you see that red circle in the middle of the page. I mean, this has been a largely unmanaged population with a very high medical claims expense. And even though as you can see that we have overall pretty low medical margin expectations in the first year of about $26. As we have the opportunity to really have those members on the platform, to improve patient outcomes and to increase overall efficiency, we think that direct contracting really can be a positive contributor.

And one of the other factors in that is when we put direct contracting members on our platform with a partner, we increase our local market scale by about 30% to 70%, so we get the benefit of that. And we're also just leveraging the investments that we've already made in MA in those markets. So there isn't a huge incremental investment to get these members on the platform and moving in the right direction.

So we talked about our 2021 momentum that we've seen. We already talked at some length now about our 2022 guidance and our confidence in that. We talked earlier today about the accelerated growth in both numbers and diversity that we're going to see in our class of 2023 and taking our MA population up to around 390,000 members. If you assume as well some nominal incremental growth in DC members getting us to over to around 500,000 members on the platform in 2023 and over 2,200 PCPs on the platform.

Now as we look forward to 2026, there's a couple of different ways or several different paths we can take to get to this growth that I'm about to talk to. But one way to think about this is even if we take a relatively traditional path to growth, the kind of path that we've seen so far through our -- from our inception in 2017. And so let's say, something like 50,000 new market members per year over that time period and sticking with that 13% to 15% same geography growth, we would get to -- and by the way, this is largely because of the accelerated growth in members in 2023, we would get to about 750,000 members in 2026.

By the way, as you see from the cohort curves, we would expect to continue to see our membership improve in medical margin, notwithstanding the dilution of all these new members coming on and get our overall medical margin PMPM to up around $165. That would drive over $1.4 billion of medical margin and approaching $600 million of adjusted EBITDA, which, by the way, is about 7% of revenue.

By the way, all of this assumes that we don't have a significant increase in direct contracting members, still a new program. We'll kind of see how that goes. But we do assume that we're going to see some, of course, continued migration or continued maturation of our DC members in terms of medical margin through that time period.

But as Veeral talked about earlier, we're not really looking anymore at a traditional growth algorithm. We're kind of thinking about a new dynamic in which we've significantly increased the diversity of our partner organizations and significantly, therefore, increased both the same geography and the new market TAM. If we access that new TAM, it gives us access to a larger base of PCPs and members, of course, access to more medical margin dollars, more members will be mature margin dollars over time, even additional leverage on our platform and support costs. And again, just assuming that we're going to get the same kind of level of margin maturation across our ACO reach members, that can look like something different like the right-hand side of our target page here, potentially growing to as much as 850,000 members.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 509

Now interestingly, when we have that additional growth, a lot more members on the platform, a lot newer members diluting it. We probably have a little bit lower medical margin PMPM out in 2026 and maybe closer to $150 or $155. But with those extra members, that would generate even more medical margin dollars and even more adjusted EBITDA. So a couple of different now paths to growth opened up to us, particularly driven by this new, more diverse class of 2023.

Let me turn for a second to talk about returns, balance sheet and cash flow. One of the things I talked about in one of my original slides was we enter markets at-scale with existing PCP partners. So that means we're not spending a lot of capital on physical infrastructure into a market. We're not spending really any material marketing dollars to attract new members on to our platform. The members are there when we start the platform, when we start the partnership up. Because of that, we have extremely low customer acquisition cost. Really, all of our customer acquisition costs are the cost that we invest in a market or most of our customer acquisition costs are the costs that we invest in the market in that year 0 of implementation when we're readying that market for go-live.

I think in the past, we've shown a couple of examples of markets and how this has worked on an LTV to CAC base or a lifetime value to customer acquisition cost basis. Here what I'm showing you is all the members that we brought on the platform in 2020 and all the new members that we brought on the platform in 2021 on the bottom of the page.

The customer acquisition cost for all 41,000 new members in 2020 was only about $412 and it was actually under $400 for the 47,000 members we brought in this 2021. If you think about that we're generating in excess of probably $800 medical margin per member per year on those new members which, of course, we are -- half of that is going back into our PCP partnerships. We're maintaining in excess probably a $400 medical margin per year. I mean we're essentially getting a 1 year or better payback on those investments.

And one of the things Heidi talked about was the very sticky nature of our members and their PCPs, that drives significant lifetime value over the course of their tenure on the platform and leads to lifetime value customer acquisition cost ratios of like an extremely impressive 12:13:1.

We have a really strong balance sheet, okay? We've got over $1 billion in cash right now. We've only got about $50 million of outstanding debt. We're planning on deploying that capital really in support of the initiatives that you heard today. We'll continue to deploy capital to help our physician partners grow. We'll continue to deploy capital to invest in the technology and clinical innovation that you heard and my colleagues talked about today. And we'll also deploy capital to add additional capabilities, either through internal investment in agilon or when appropriate through selected M&A. We do expect to generate substantial cash flow in 2022 through 2026. And because of all this, we will not be reliant on external capital to drive our growth.

So before I wrap up, just to go back to the 3 key takeaways that I hope you walk away from this with. We are maturing medical margins while we're growing members. We're getting that growth through a very leverageable, capital-efficient model, and we have high visibility and confidence in our long-term EBITDA outlook.

So with that, I think I'll turn it back over to our CEO, Steve Sell for a couple of closing comments, and then we'll go to Q&A.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Tim. So I thought I would close with some thoughts on what you heard today and from my perspective as the CEO, what are really important takeaways and then we'll bring up the team and we can do Q&A.

So first, you heard from Veeral that agilon's market opportunity is really inflecting. We see it in our opportunity set in terms of broader new market opportunities and a diversity of partners that we could do that with. And you also heard him talk about a substantial increase in terms of the in-market TAM that is there.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Secondly, Ben Shaker and our physician panel on Heidi talked about the compelling advantages in our partnership model. You heard our primary care physicians talk about how it had enabled them for the first time to have the total visibility on their practice to truly influence what was happening outside of that primary care office, whether it was a transition of care program, a renal program or as Dr. Gagan talked about, going back to the home the way his grandfather did so many years ago.

The video that you saw with Gary Grons is a real example of what that means for patients. Gary is living longer. He's living a better life. He's, obviously, not going to the hospital. I think we talked about 17 avoided hospital visits as a result of that. And that's all a result of this partnership. I really want to call out what Girish and Dr. Dana Carne talked about. The platform that we are building is very specific. It is intended to support exactly what we talked about around the aligned primary care physician and allowing them to operate at the top of their license and practice medicine the way they were trained to.

The fact that we're able to do it at-scale, the fact that we're able to pull together all of these different pieces of information and give them that view that they have never had before. They're not going to get that from a payer. They've not been able to have that before. That is an advantage that comes from this platform.

Frank talked about [indiscernible] Waldo, understanding where 20,000 patients in Pittsburgh are at any point in time and if they needed to intervene.

Tim and Ben Shaker talked to you about cohort data that gives us increasing confidence in member and PCP economics. And Ben talked to you about how that's possible. He talked about improving alignment and putting that PCP in a position to do that. He talked about the scale. He showed you a case study of a market that started low and went high. And then Tim showed you one market after another doing that. That's because of alignment and because of scale and because of actionable insights.

And finally, Tim just told you, our company is going to be a lot bigger. It's going to be a lot more profitable and the opportunity for value creation is really massive.

Now let me tell you what I'm focused on for us to go and pursue that opportunity, I'm focused on 3 things: building the best team. You've gotten a sense of how we're doing that and just how exceptional these people are in their individual domains, but they're exceptional teammates. And we're doing that at every level within our organization and across the country.

Secondly, we're really pushing the pace. We are setting the pace on the move to value in new communities and in the communities in which we've got a partnership. And you're seeing physicians vote with their feet. They hear our physicians are winning. They hear how satisfied they are with that and physicians are starting to recognize that and all types of groups are making that move.

And finally, I'm focused on driving impact, having great implementations, having more stories like Gary Grons and the outcomes that our doctors talked about. If we do those things, we are going to be highly successful and we'll go back to where I started. This is going to be a very big company that's going to have an outsized impact on changing health care in the country.
So thanks. And with that, we'll go to Q&A.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Over time. So we'll go for 15 or 20 minutes, but we'll have Veeral and Ben and Tim come up. And if you've got a question for anybody of the management team, we've got a mic over here.

**Steven Jackson Sell**
*President, CEO & Director*

Or the partner.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Yes, our partners that matter. I see Josh Raskin over there with his hand raise. I don't think the mic is working. I'll just repeat it, Josh.

**Joshua Richard Raskin**
*Nephron Research LLC*

[indiscernible]

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Let me repeat that. So I think, Josh, the question was sort of physician acquisitions. We may need to kind of reframe it with our model and then what our acquisition costs were with the question?

**Steven Jackson Sell**
*President, CEO & Director*

Do you want to talk about how?

**Veeral Desai**
*Chief Strategy & Development Officer*

So when you think about our same market geography, we talked about this in the context of the Akron example, 15% same market growth. That's a function of organic growth, our market selection. So more patients choosing Medicare Advantage. It's about 8% to 10%. We're then driving growth incremental to that against the massive total addressable market from a physician and member perspective. That's achieved from -- in a couple of different ways.

First, the example you called out, which is our partners, to be clear. Our partners are making acquisitions within the market. They are the most attractive place to access physician risk and can offer the most compelling value proposition to physicians in their community. So that's been a powerful and rapidly evolving source of same market growth.

The second way is physicians can affiliate and become part of our network without joining a partner practice. So Kevin talked about 7 different physician groups, all working part of our Austin network. Those groups remain independent but are accessing the contract structure, the operating infrastructure we've established in the market to be able to go and perform and drive the economics and the clinical value out of the model.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 512**

And Josh, I don't know if I can say something just to clarify. I think it was just the way you asked the question. So you know this, but agilon is not acquiring physician practices. We're partnering with PCPs and we allow them to grow their practice. So just to be clear, I know you knew that, but the question...

**Steven Jackson Sell**
*President, CEO & Director*

Maybe the way the efficiency of growth model and Tim comes out of this world previously is like $400 per member in terms of what that acquisition is looking like for patients being put on the platform, if that's sort of -- that's a big part of our model, the efficiency with which we're able to grow.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And Josh, really that's the power of partnering with existing capacity. If you think about the theme we're playing against a huge number of PCPs and to change their business model, and there has to be a solution for existing capacity. They've got patients, they've got history in their community.

**Timothy S. Bensley**
*Chief Financial Officer*

We quote that number really just to show how low it is. I mean it's obviously a very low cost, considering lifetime value and what we're going to generate for those over time. So it's a pretty impressive return on. And I came out of a member subscription kind of model consumer products goods company. And it is like this is off the chart is obviously positive.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right. Kevin Fischbeck, I saw your hand.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

Great. Kevin Fischbeck from BofA. It's -- you guys laid out a pretty bullish growth outlook here for the next several years, which I generally agree with the deals actually like probably will be too conservative if anything over next few years. Everything is coming together. I see the tipping point you're talking about.

My question is really about like year 6 through 10, because it feels to me like this is -- you guys laid out why this is so obvious that physicians have to make this change. Won't everyone have a partner over the next 5 years? Like won't you blow a number in the next 5 years, but then what -- what drives the growth in year 6 through 10? I'd love to hear your answer, but I also would love to hear maybe one of the physician panelists. Talk about why a physician might not be ready in the next 5 years, but will then make that transition in year 6 or 7?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, I'll start, and Veeral maybe you can chime here. But I think we've really derisked our growth algorithm based on the entry into these new states. Veeral talked about how significant that is once we land in the state, the ability to go to other communities. I think the point I made about getting there first and having the advantage around that is huge. But the point about pushing pace is exactly what you're getting at.

There is this tremendous opportunity and we're aggressively going after that as long as we continue to deliver successful results, we will be successful and our physicians will reflect that and other physicians will join. So I think that's a big part of it.

**Veeral Desai**
*Chief Strategy & Development Officer*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 513**

Yes. I mean I think one of the things I get to do with Bureau is go around the country and talk to frontline physicians. I do think that physicians are going to have to pick a partner of some sort in the next few years, and then that's becoming pretty obvious. Even health systems are having to figure out the solution. So I do think that's true.

I think the longer-term part of the business is we think we're earlier than most. We think we're ahead. Other physicians are going to have a landing place, new residents coming out are going to have a landing place. We think primary care is going to grow. We're doing some things going into academic centers and being able to network with rising physicians as to what kind of model they want to practice in.

And then I'll just go back to in regards to the economic reality and the type of clinical care that we're delivering. The margins that you see today are scratching the surface. There's so much more value. We're not as good at this as we're going to be. So I think between all of those things, I think year 6 through 10 will look like more growth potentially from people switching from other teams at that point. There will be different teams out there, and I think that's what I'm seeing. And -- but I will say, in talking to physicians around the country, there are certainly a need to pick a partner and to pick a team very soon. There is an urgency to this, which is why I think we're so focused on pace.

**Unknown Executive**

The only other thing I'd add is I would think about it as an overall membership opportunity. And when we talk about the total addressable market unlocked in the geographies that we're in, 7.5 million members, at 7.5 million members, and we are so early in the life cycle of launching these partnerships. So to the prior question, it really puts our partners in the position to be the aggregators, the conveners of risk in the market and then be the best place to practice because this is the place that you can access full risk on a multi-payer basis, and we're so early in accessing that highly fragmented but scaled downstream membership opportunity.

**Steven Jackson Sell**
*President, CEO & Director*

And Kevin, 2 years ago, at end market TAM was $4 million?

**Veeral Desai**
*Chief Strategy & Development Officer*

$4 million.

**Steven Jackson Sell**
*President, CEO & Director*

So we've gone from $4 million to $7.5 million, a point about pushing the pace and being first.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

We're going to Lisa Gill.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

I'm right here. I'll ask you another question. Tim, thank you so much for all the details on 2026. As I look, though, at the membership of 750,000 to 850,000. If I listen to you earlier and we think about just organic growth of roughly 15%. That tells me that you're anticipating that the growth rate will slow from the 80,000 in 2023. Is that conservative on your side, number one? How are we thinking about this? Because everything we're hearing, it feels like those numbers are going to continue to accelerate. It would be my first question.

**Timothy S. Bensley**
*Chief Financial Officer*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 514**

That was the point between the 2 slides I was trying to make, which I think even if you take that more you call it, traditional way that we've grown. So you can get to 750,000 from our 2023 membership by saying, well, add 50,000 new member markets a year and do 13% to 15% growth, 50% or plus or minus and plus or minus 15% growth, you're going to get to that number. And the big opportunity for us is, especially now that we've seen the Class of '23 and that tremendously increased diversity, which drove that same geography, which will drive the same geography TAM from 4 million members of 7.5 million members, obviously, that opens us up to a bigger growth number.

And so that's why we kind of range it and said, we have a high confidence certainly in 750,000 because we think we can get there the way we've been getting there, but we have an opportunity do more with this new diverse opportunity set, I guess, that's out there.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Okay. Conservative. The second part of my question -- the second part of my question really is for you Steve. As we think about these capitated models, and we think about it from the managed care side, right, more competition in the marketplace. What's your confidence over time that the current rates as they stand today, that the level of competition that you at agilon stays #1?

And number two, how you see that shifting amongst players over time. So we hear a lot in the marketplace around upcoding and other things, right? And So just any views that you have about the future of these kinds of programs?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean I think we're very comfortable in terms of the unit revenue progression you're talking about. We're at about 85% of premium today. We've got the 6 national partnerships that we talk about and then the locals. I think the value that we're providing to these payers and Heidi really hit that pretty clearly is so great that we feel very confident that, that is going to continue. And our early experience in terms of those renewals in some cases, it actually steps up. In some cases, it stays at the same place.

Payers are going to need to have far more senior patients in these types of models. And right now, we are the vehicle for them in so made communities and once we're there. So I think we feel incredibly comfortable around that.

**Veeral Desai**
*Chief Strategy & Development Officer*

Yes. I would just say from a payer perspective, that's probably been the biggest evolution. You think about 4 years ago when we started the company, trying to go get a full risk contract. Now we're working with national payers across the board, as Heidi talked about, but that have bespoke provider relationships in these geographies. They view us as the way to organize that geography and then to be able to take risk at scale, which is Heidi talked about brings tremendous value. They get outsized membership growth that's derisked from a profitability perspective with high confidence around quality.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

And what about the scrutiny, though on risk scoring in the marketplace? Do you think that, that has an impact on the future overall premium?

**Steven Jackson Sell**
*President, CEO & Director*

So I think there may be changes in terms of what's allowed from a process perspective. But I think our out-year forecast is very modest in terms of the improvement that we see from risk adjustment. You want to share sort of the context?

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 515**

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I mean I think just to give kind of a full match because we get asked it all the time. I mean most of the benefit that we get from improved just or more accurate risk adjustment happens really early in the life cycle of these markets. In fact, a lot of it happens through our building up compliance with a high level of those annual wellness business was structured annual wellness visits during even the implementation year.

So if you go back -- and then as we move forward, obviously, more and more of our medical margin improvement comes from impacting the rest of it, not just from risk adjustment improvement. So just maybe an interesting data point is if you look at our 3 most mature markets, so those 3 markets that were implemented in 2018 and 2019, Columbus, Akron Austin, they -- look at their performance from risk adjustment from 2019 to 2021 to kind of skip over the COVID impacted here. But over that 2-year period, our impact to revenue from just improved risk adjustments in that time was less than 1.5% in each of those years for those markets.

And I think our actual total average RAF scores for those markets is like, I don't think it's meaningfully over a 1. So we're not like pushing the envelope on our risk adjustment scores. And I think that plays into the question around is there's more scrutiny on it, how does that apply to us?

**Steven Jackson Sell**
*President, CEO & Director*

So I think the takeaway is we're not relying heavily on in RAF in terms of what we are showing you from a margin perspective. And I think there are changes within it. It's going to drive more patients into models like ours. And I think we're doing it the right way. It's a physician peer-reviewed process.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Why don't we go to the Jefferies team in the back.

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

Yes. This is Jack Slevin with Jefferies. I'm not sure if this is a try [indiscernible] is probably dovetails off question nicely but the anecdote around ESRD and kidney think was particularly interesting. It's one of the -- probably key area outside of primary care what we're seeing close to innovation in terms of value-based care and total risk paving. Do you think with your flexible model that direct partnership with nephrologists is something we can consider or do you think it [indiscernible] relationship? I think I heard you say that you're a third-party partner that are using in that?

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Let me repeat it for the webcast. But the question was about our strategy around end-stage renal disease. So Steve, why don't you?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, Jack, it's a big area for us. We do have a partner that we're working with across a series of markets. We believe it's a significant opportunity from a cost and quality experience. And we'll start maybe 5 or 6 markets and will rapidly expand out with that. But that's how we're looking. But the idea in that is that it constantly comes back to that primary care physician. They've got that information back and thinking about in-home care teams as an extension of that primary care physician. So it all goes back to that patient physician relationship.

**Timothy S. Bensley**
*Chief Financial Officer*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 516**

Yes. And I think the other thing I would add, too, is given the scale that we have in these geographies I mean just over the course of the last 2 weeks, we've had multiple meetings with what's typically the large nephrology group in these geographies. And so they're very tuned in, in terms of what's happening and what our primary care physicians are doing. Just given the magnitude of senior patients that we're managing.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Why don't we go to George Hill over here?

**George Robert Hill**
*Deutsche Bank AG, Research Division*

And Tim, I'm going pull some of the 2026 numbers apart and I ask you to comment on them. I thought it was interesting as you guys have framed the numbers that the variance decreases as you go down what I would call the KPIs as opposed to increases as you go down the KPIs. So there's a 13% variance in the expectation for lives and 7% on Med margin and then like 3% or 4% -- 5% when you get down to the adjusted EBITDA.

So I guess I'd ask can you talk about kind of the interplay of the numbers and how you think about that, but I'm actually surprised the EBITDA expectation for 2026 is so narrow the range. So I guess just -- I'd love to kind of -- if you could kind of walk through the build and how you think about that -- and what are the big factors that push it to one end to the other?

**Timothy S. Bensley**
*Chief Financial Officer*

Interesting. So I'm going to go back and take a look at that. Now that you've quoted it that way. But I think the flow-through of the numbers is pretty -- you'll find it's pretty consistent. If you think about the really big factor that drives it is how much are maturing the medical margin on those underlying cohorts? And I don't know if that's what's driving that compression as you come down through it. But then when you get down to the bottom, it's the platform support costs are kind of the platform support cost.

So you're going to get leverage out of those one way or another. But I think probably what's driving the numbers that you're talking about is this factor of how are we actually looking at new members when they come in, how they either dilute or develop over time. And so -- but it is -- you're right, it is a pretty tight range when we look at that to understand what that impact is, say, the incremental numbers of 750 to 850 really only has about a $10 impact on medical margin PMPM dilution. But that's interesting that you put it that way.

So I'll go back and look at it, but I think it's probably -- everything in the P&L is very largely a factor of how those medical margin dollars progressed underneath that number.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Why don't we take one more question just because we've gone over time. But if anyone wanted to as a final question, we can conclude it there. But I think seeing no questions, I think we've answered -- okay. How about in the back there.

**Unknown Analyst**

Can we just go back to ACO reach for a second and just maybe spike out any major differences there that we should be mindful of versus DC?

And then secondly, Tim, you mentioned just given the balance sheet some M&A optionality. Maybe talk a little bit about what that could look like over time?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 517

Yes. So reach goes live in '23 and still getting information on that. But at a high level, it increases the focus on equity and on access and on proving community health. And so we believe based on the communities that we serve and our conversations with the innovation center, it lines up very well with our mission and that we will benefit from that. There are some changes in terms of things like quality withholds and some others that the existing participants asked for changes around, which are positive in effect some of the out-year economics in that program. But the innovation center is committed, they want more participants in that program, and we believe there's the opportunity to expand it in other communities.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. M&A question. Let me start and Veeral you might have a comment to make on this, too. First of all, just going back to an earlier question, we're definitely not talking about when we speak about M&A acquiring, obviously, physician groups that's not obviously our model. And right now, we certainly don't have any major M&A, anything in the pipeline that we're getting right to announce anything like that. So with that as kind of background. If there are opportunities where we can acquire a capability, acquire an organization that has a capability that will help us to deliver on a lot of those clinical programs that we were talking about during the day, then that's something that would definitely be interesting to us and that we would look at and think about.

Like I said, we don't have anything major kind of in the pipeline right now to talk about. But we would -- we're constantly looking at those, and we're very open to those. And anything way that we can use -- anyway that we can use our capital or deploy our capital to support those objectives, particularly in advancing those clinical programs would be of great interest to us.

So -- and Veeral, I don't know if you want to jump in?

**Veeral Desai**
*Chief Strategy & Development Officer*

Yes. I think you said well, platform acceleration from a capability perspective, enabling what we're doing from a data and technology perspective, from a clinical perspective to go attack medical margin based off our scale membership base would be a primary focus. And then I think selectively, we will evaluate where can capital be deployed in a way that's can grow with our growth strategy. But I wouldn't say that's a principal focus. I think it's disproportionately around platform and platform capability.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right. Before I think we'll conclude it here. We really appreciate it. But before I hand it over to Steve, just to say a quick thank you. I want to let you know, we'll be hanging around in the hallway for 20 or 30 minutes if you want to catch up. But Steve, any kind of last closing remarks for you?

**Steven Jackson Sell**
*President, CEO & Director*

No, I would just say we're really excited about where we're at, and we see a tremendous opportunity going forward. And we're making a real live real difference in patients' lives and for our partner physicians and their communities. So thanks, everybody. We'll be around to talk to you.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*
Thanks, Steve.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 518**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT 10

APP 520

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**
**For the quarterly period ended June 30, 2022**
**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to**
**Commission file number 001-40332**

# agilon health, inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **37-1915147** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**6210 E Hwy 290, Suite 450**
**Austin, TX 78723**
(Address of principal executive offices)
**(562) 256-3800**
(Registrant's telephone number, including area code)
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | AGL | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☐ | Accelerated Filer | ☐ |
| Non-accelerated Filer | ☒ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) YES ☐ NO ☒

At July 29, 2022, there were 410,936,377 shares of the registrant's $0.01 par value common stock outstanding.

**agilon health, inc.**

**INDEX**

**PART I. FINANCIAL INFORMATION**

Item 1.    Unaudited Financial Statements:

Condensed Consolidated Balance Sheets as of June 30, 2022 and December 31, 2021 .... 3

Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2022 and 2021 .... 4

Condensed Consolidated Statements of Comprehensive Income (Loss) for the Three and Six Months Ended June 30, 2022 and 2021 .... 5

Condensed Consolidated Statements of Contingently Redeemable Common Stock and Stockholders' Equity (Deficit) for the Three and Six Months Ended June 30, 2022 and 2021 .... 6

Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2022 and 2021 .... 8

Notes to the Condensed Consolidated Financial Statements .... 9

Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations .... 21

Item 3.    Quantitative and Qualitative Disclosures About Market Risk .... 35

Item 4.    Controls and Procedures .... 35

**PART II. OTHER INFORMATION**

Item 1.     Legal Proceedings .... 36

Item 1A.    Risk Factors .... 36

Item 2.     Unregistered Sales of Equity Securities and Use of Proceeds .... 36

Item 6.     Exhibits .... 37

Signatures .... 38

2

**APP 522**

**agilon health, inc.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share data)

| | | June 30, 2022 (unaudited) | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 668,574 | $ | 1,040,039 |
| Restricted cash and equivalents | | 15,085 | | 14,781 |
| Marketable securities | | 285,590 | | — |
| Receivables, net | | 607,632 | | 293,407 |
| Prepaid expenses and other current assets, net | | 24,528 | | 18,968 |
| Total current assets | | 1,601,409 | | 1,367,195 |
| Property and equipment, net | | 15,808 | | 9,161 |
| Intangible assets, net | | 62,505 | | 55,398 |
| Goodwill | | 41,540 | | 41,540 |
| Other assets, net | | 119,260 | | 112,958 |
| Total assets | $ | 1,840,522 | $ | 1,586,252 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Current liabilities: | | | | |
| Medical claims and related payables | $ | 458,038 | $ | 239,014 |
| Accounts payable and accrued expenses | | 142,048 | | 112,946 |
| Current portion of long-term debt | | 5,000 | | 5,000 |
| Total current liabilities | | 605,086 | | 356,960 |
| Long-term debt, net of current portion | | 40,943 | | 43,401 |
| Other liabilities | | 91,122 | | 94,295 |
| Total liabilities | | 737,151 | | 494,656 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Stockholders' equity (deficit): | | | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 408,204 and 400,095 shares issued and outstanding, respectively | | 4,082 | | 4,001 |
| Additional paid-in capital | | 2,076,329 | | 2,045,572 |
| Accumulated deficit | | (977,096) | | (957,677) |
| Accumulated other comprehensive income (loss) | | 513 | | — |
| Total agilon health, inc. stockholders' equity (deficit) | | 1,103,828 | | 1,091,896 |
| Noncontrolling interests | | (457) | | (300) |
| Total stockholders' equity (deficit) | | 1,103,371 | | 1,091,596 |
| Total liabilities and stockholders' equity (deficit) | $ | 1,840,522 | $ | 1,586,252 |

The condensed consolidated balance sheets include assets and liabilities of consolidated variable interest entities ("VIEs") as agilon health, inc., together with its consolidated subsidiaries and variable interest entities (the "Company"), is the primary beneficiary of these VIEs. The condensed consolidated balance sheets include total assets that can only be used to settle obligations of the Company's consolidated VIEs totaling $748.3 million and $420.5 million as of June 30, 2022 and December 31, 2021, respectively, and total liabilities of the Company's consolidated VIEs for which creditors do not have recourse to the general credit of the primary beneficiary of $539.9 million and $282.0 million as of June 30, 2022 and December 31, 2021, respectively. See Note 13 for additional details.

See accompanying Notes to the Condensed Consolidated Financial Statements.

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)
(unaudited)

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2022 | | 2021 |
| **Revenues:** | | | | | | | | |
| Medical services revenue | $ | 669,184 | $ | 497,678 | $ | 1,321,607 | $ | 910,090 |
| Other operating revenue | | 950 | | 1,278 | | 1,972 | | 1,970 |
| Total revenues | | 670,134 | | 498,956 | | 1,323,579 | | 912,060 |
| **Expenses:** | | | | | | | | |
| Medical services expense | | 587,140 | | 442,483 | | 1,153,348 | | 802,837 |
| Other medical expenses | | 49,080 | | 33,694 | | 93,853 | | 57,355 |
| General and administrative (including noncash stock-based compensation expense of $6,553, $274,548, $10,523, and $276,020, respectively) | | 51,924 | | 317,561 | | 91,758 | | 355,338 |
| Depreciation and amortization | | 3,042 | | 3,581 | | 6,415 | | 7,008 |
| Total expenses | | 691,186 | | 797,319 | | 1,345,374 | | 1,222,538 |
| **Income (loss) from operations** | | (21,052) | | (298,363) | | (21,795) | | (310,478) |
| **Other income (expense):** | | | | | | | | |
| Other income (expense), net | | 6,997 | | 2,967 | | 9,266 | | 4,303 |
| Gain (loss) on lease terminations | | (5,458) | | — | | (5,458) | | — |
| Interest expense | | (945) | | (1,498) | | (1,816) | | (4,439) |
| **Income (loss) before income taxes** | | (20,458) | | (296,894) | | (19,803) | | (310,614) |
| Income tax benefit (expense) | | (580) | | (435) | | (509) | | (451) |
| **Income (loss) from continuing operations** | | (21,038) | | (297,329) | | (20,312) | | (311,065) |
| **Discontinued operations:** | | | | | | | | |
| Income (loss) before income taxes | | 321 | | (1,547) | | 750 | | (2,898) |
| Income tax benefit (expense) | | (14) | | (65) | | (14) | | (129) |
| **Total discontinued operations** | | 307 | | (1,612) | | 736 | | (3,027) |
| **Net income (loss)** | | (20,731) | | (298,941) | | (19,576) | | (314,092) |
| Noncontrolling interests' share in (earnings) loss | | 82 | | 96 | | 157 | | 169 |
| **Net income (loss) attributable to common shares** | $ | (20,649) | $ | (298,845) | $ | (19,419) | $ | (313,923) |
| | | | | | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | | | | | |
| Continuing operations | $ | (0.05) | $ | (0.79) | $ | (0.05) | $ | (0.88) |
| Discontinued operations | $ | — | $ | — | $ | — | $ | (0.01) |
| **Weighted average shares outstanding, basic and diluted** | | 407,339 | | 377,445 | | 404,666 | | 351,695 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

4

**APP 524**

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
(in thousands)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| Net income (loss) | $ (20,731) | $ (298,941) | $ (19,576) | $ (314,092) |
| Other comprehensive income (loss): | | | | |
|   Net unrealized gain (loss) on marketable securities, net of tax | 513 | — | 513 | — |
| Total comprehensive income (loss) | (20,218) | (298,941) | (19,063) | (314,092) |
| Comprehensive (income) loss attributable to noncontrolling interests | 82 | 96 | 157 | 169 |
| Total comprehensive income (loss) attributable to agilon health, inc. | $ (20,136) | $ (298,845) | $ (18,906) | $ (313,923) |

See accompanying Notes to the Condensed Consolidated Financial Statements.

5

**APP 525**

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)
(unaudited)

For the three months ended June 30, 2022:

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
| | Shares | Amount | | | | | |
|---|---|---|---|---|---|---|---|
| **April 1, 2022** | 405,727 | $ 4,057 | $ 2,064,242 | $ (956,447) | $ — | $ (375) | $ 1,111,477 |
| Net income (loss) | — | — | — | (20,649) | — | (82) | (20,731) |
| Other comprehensive income (loss) | — | — | — | — | 513 | — | 513 |
| Exercise of stock options | 2,370 | 24 | 6,293 | — | — | — | 6,317 |
| Vesting of restricted stock units | 140 | 1 | (1) | — | — | — | — |
| Shares withheld related to net share settlement | (33) | — | (758) | — | — | — | (758) |
| Stock-based compensation expense | — | — | 6,553 | — | — | — | 6,553 |
| **June 30, 2022** | 408,204 | $ 4,082 | $ 2,076,329 | $ (977,096) | $ 513 | $ (457) | $ 1,103,371 |

For the six months ended June 30, 2022:

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
| | Shares | Amount | | | | | |
|---|---|---|---|---|---|---|---|
| **January 1, 2022** | 400,095 | $ 4,001 | $ 2,045,572 | $ (957,677) | $ — | $ (300) | $ 1,091,596 |
| Net income (loss) | — | — | — | (19,419) | — | (157) | (19,576) |
| Other comprehensive income (loss) | — | — | — | — | 513 | — | 513 |
| Exercise of stock options | 8,002 | 80 | 20,993 | — | — | — | 21,073 |
| Vesting of restricted stock units | 140 | 1 | (1) | — | — | — | — |
| Shares withheld related to net share settlement | (33) | — | (758) | — | — | — | (758) |
| Stock-based compensation expense | — | — | 10,523 | — | — | — | 10,523 |
| **June 30, 2022** | 408,204 | $ 4,082 | $ 2,076,329 | $ (977,096) | $ 513 | $ (457) | $ 1,103,371 |

6

APP 526

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)
(unaudited)

For the three months ended June 30, 2021:

| | Contingently Redeemable Common Stock | | Total Stockholders' Equity | | | | | |
| | Shares | Amount | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Accumulated Deficit | Noncontrolling Interests | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| **April 1, 2021** | 76,201 | $ 309,500 | 249,474 | $ 2,494 | $ 265,603 | $ (566,268) | $ (73) | $ (298,244) |
| Net income (loss) | — | — | — | — | — | (298,845) | (96) | (298,941) |
| Reclassification of contingently redeemable common stock in connection with initial public offering ("IPO") | (76,201) | (309,500) | 76,201 | 762 | 308,738 | — | — | 309,500 |
| Issuance of common stock in connection with IPO, net of offering costs | — | — | 53,590 | 536 | 1,162,493 | — | — | 1,163,029 |
| Issuance of common stock under partner physician group equity agreements upon IPO | — | — | 11,672 | 117 | 268,350 | — | — | 268,467 |
| Exercise of stock options and other, net | — | — | (54) | — | 386 | — | — | 386 |
| Stock-based compensation expense | — | — | — | — | 6,081 | — | — | 6,081 |
| **June 30, 2021** | — | $ — | 390,883 | $ 3,909 | 2,011,651 | $ (865,113) | $ (169) | $ 1,150,278 |

For the six months ended June 30, 2021:

| | Contingently Redeemable Common Stock | | Total Stockholders' Equity | | | | | |
| | Shares | Amount | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Accumulated Deficit | Noncontrolling Interests | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| **January 1, 2021** | 76,201 | $ 309,500 | 249,374 | $ 2,494 | $ 263,966 | $ (551,190) | $ — | $ (284,730) |
| Net income (loss) | — | — | — | — | — | (313,923) | (169) | (314,092) |
| Reclassification of contingently redeemable common stock in connection with IPO | (76,201) | (309,500) | 76,201 | 762 | 308,738 | — | — | 309,500 |
| Issuance of common stock in connection with IPO, net of offering costs | — | — | 53,590 | 536 | 1,162,493 | — | — | 1,163,029 |
| Issuance of common stock under partner physician group equity agreements upon IPO | — | — | 11,672 | 117 | 268,350 | — | — | 268,467 |
| Exercise of stock options and other, net | — | — | 46 | — | 551 | — | — | 551 |
| Stock-based compensation expense | — | — | — | — | 7,553 | — | — | 7,553 |
| **June 30, 2021** | — | $ — | 390,883 | $ 3,909 | 2,011,651 | $ (865,113) | $ (169) | $ 1,150,278 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

7

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)
(unaudited)

| | | Six Months Ended June 30, | | |
| | | 2022 | | 2021 |
|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | |
| Net income (loss) | $ | (19,576 ) | $ | (314,092 ) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
|   Depreciation and amortization | | 6,415 | | 7,095 |
|   Stock-based compensation expense | | 10,523 | | 276,020 |
|   Loss on debt extinguishment | | — | | 1,590 |
|   Loss (income) from equity method investments | | (7,787 ) | | (2,532 ) |
|   Other noncash items | | 3,497 | | 2,011 |
| Changes in operating assets and liabilities | | (76,568 ) | | (50,211 ) |
|   Net cash provided by (used in) operating activities | | (83,496 ) | | (80,119 ) |
| **Cash flows from investing activities:** | | | | |
| Purchase of property and equipment, net | | (8,504 ) | | (646 ) |
| Purchase of intangible assets | | (12,168 ) | | (4,018 ) |
| Investment in loans receivable and other | | (4,510 ) | | (70,307 ) |
| Investments in marketable securities | | (285,077 ) | | — |
| Proceeds from repayment of loans receivable and other | | 4,279 | | 1,277 |
| Proceeds from sale of business and property, net of cash divested | | 500 | | (2,644 ) |
|   Net cash provided by (used in) investing activities | | (305,480 ) | | (76,338 ) |
| **Cash flows from financing activities:** | | | | |
| Proceeds from initial public offering | | — | | 1,170,942 |
| Proceeds from other equity issuances, net | | 20,315 | | 551 |
| Proceeds from the issuance of long-term debt | | — | | 100,000 |
| Repayments of long-term debt | | (2,500 ) | | (118,648 ) |
| Equity and debt issuance costs and other | | — | | (9,768 ) |
|   Net cash provided by (used in) financing activities | | 17,815 | | 1,143,077 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | | (371,161 ) | | 986,620 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | | 1,054,820 | | 135,178 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | | — | | 3,917 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | | 1,054,820 | | 139,095 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ | 683,659 | $ | 1,125,715 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

8

**APP 528**

**agilon health, inc.**
**NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(Unaudited)

## NOTE 1. Business

*Description of Business*

agilon health, inc., through its partnerships and platform, provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. As of June 30, 2022, the Company, through its contracted physician networks, provided care to approximately 261,300 Medicare Advantage members enrolled with private health plans. Beginning January 1, 2022, the Company expanded its operations into: (i) Syracuse, New York, (ii) Grand Rapids and Traverse City, Michigan; (iii) Pinehurst, North Carolina; and (iii) Longview and Texarkana, Texas, along with additional partnerships in the Company's existing Ohio markets. Beginning January 1, 2022, the Company also began operating three additional Direct Contracting Entities ("DCE") that, in collaboration with four of its physician group partners, are participating in the Center for Medicare & Medicaid Services Innovation Center's Direct Contracting Model, which is being redesigned and renamed the Accountable Care Organization Realizing Equity, Access, and Community Health ("ACO REACH") Model beginning in 2023.

See Note 14 for additional discussions related to the Company's involvement with VIEs.

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, New York. All funds affiliated with CD&R are considered related parties.

## NOTE 2. Summary of Significant Accounting Policies

### Basis of Presentation

The accompanying condensed consolidated financial statements have been prepared by management in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information.

The condensed consolidated financial statements include the accounts of agilon health, inc., its wholly-owned subsidiaries, and both joint ventures and VIEs that it controls through voting rights or other means. Intercompany transactions and balances have been eliminated upon consolidation. All adjustments (consisting of normal recurring adjustments unless otherwise indicated), which the Company considers necessary to present fairly its financial position, results of operations, and cash flows, have been included. Operating results for the three and six months ended June 30, 2022, including the impact of COVID-19, are not necessarily indicative of the results that may be expected for the year ending December 31, 2022. The accompanying condensed consolidated financial information should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2021 included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission.

### Use of Estimates

Management is required to make estimates and assumptions in the preparation of financial statements. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates can include, among other things, those used to determine revenues and related receivables from risk adjustments, medical services expense and related payables (including the reserve for incurred but not reported ("IBNR") claims), and the valuation and related recognition of impairments of long-lived assets, including goodwill. Management's estimates for revenue recognition, medical services expense, and other estimates, judgments, and assumptions, may be materially and adversely different from actual results as a result of the COVID-19 pandemic, among other things. See Note 9 for additional discussion on the impact of the COVID-19 pandemic. These estimates are based on knowledge of current events and anticipated future events, and accordingly, actual results may ultimately differ materially from those estimates.

### Goodwill and Amortizable Intangible Assets

As of both June 30, 2022 and December 31, 2021, goodwill of $39.0 million was allocated to the Company's Hawaii reporting unit, which had a negative carrying value.

9

As of June 30, 2022 and December 31, 2021, the Company's gross carrying amount of amortizable intangible assets was $120.9 million and $108.7 million, with accumulated amortization of $58.4 million and $53.3 million, respectively. For the three months ended June 30, 2022 and 2021, the Company recognized $2.4 million and $3.0 million, respectively, in amortization expense, which is included in depreciation and amortization expense in the condensed consolidated statement of operations. For the six months ended June 30, 2022 and 2021, the Company recognized $5.1 million and $5.8 million, respectively, in amortization expense, which is included in depreciation and amortization expense in the condensed consolidated statement of operations.

**Property and Equipment**

As of June 30, 2022 and December 31, 2021, the Company's gross carrying amount of property and equipment was $23.6 million and $17.4 million, with accumulated depreciation of $7.8 million and $8.2 million, respectively. For the three months ended June 30, 2022 and 2021, the Company recognized $0.6 million and $0.6 million, respectively, in depreciation expense, which is included in depreciation and amortization expense in the condensed consolidated statement of operations. For the six months ended June 30, 2022 and 2021, the Company recognized $1.3 million and $1.1 million, respectively, in depreciation expense, which is included in depreciation and amortization expense in the condensed consolidated statement of operations.

**Marketable Securities**

The Company's investments in marketable securities are classified as available-for-sale and are carried at fair value, with the unrealized gains and losses reported as a component of accumulated other comprehensive income (loss) in total stockholders' equity (deficit). The Company determines the appropriate classification of these investments at the time of purchase and reevaluates such designation at each balance sheet date. In general, the Company's marketable securities are classified as current assets without regard to the securities' contractual maturity dates because they may be readily liquidated.

Interest income, realized gains and losses on sales of securities, and other-than-temporary declines in the fair value of marketable securities, if any, are included as a component of other income (expense), net in the condensed consolidated statements of operations. The cost of securities sold is based on the specific identification method.

At each reporting period, the Company evaluates available-for-sale marketable securities for any credit-related impairment when the fair value of the investment is less than its amortized cost. The Company evaluates the underlying credit quality and credit ratings of the issuers, and, if necessary, the expected cash flows of the financial instruments. When the Company determines that the decline in fair value of an investment is below the carrying value and this decline is other-than-temporary, the Company reduces the carrying value of the marketable security it holds and records a loss for the amount of such decline. As of June 30, 2022, the Company did not record any impairment related to other-than-temporary declines in the fair value of marketable securities.

**Income Taxes**

The Company determined the income tax provision for interim periods using an estimate of the Company's annual effective tax rate, applied to year-to-date results, adjusted for discrete items arising in that quarter. In each quarter, the Company updates its estimated annual effective tax rate, and if the estimated annual effective tax rate changes, a cumulative catch-up adjustment is recorded in that quarter. The Company applied the intra-period tax allocation rules to allocate income taxes between continuing operations and discontinued operations as prescribed in U.S. GAAP, where the tax effect of income (loss) before income taxes from continuing operations is computed without regard to the tax effects of income (loss) before income taxes from the other categories.

**NOTE 3. Revenue, Receivables, and Concentration of Credit Risk**

*Medical Services Revenue*

Medical services revenue consists of capitation fees under contracts with various Medicare Advantage payors ("payors"). Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members ("members") attributed to the Company's contracted primary care physicians. PMPM fees are determined as a percent of the premium payors receive from the Centers for Medicare & Medicaid Services' ("CMS") for these members. The Company generally accepts full financial risk for members attributed to its contracted primary care physicians and therefore is responsible for the cost of all healthcare services required by those members. Fees are generally recorded gross in revenue because the Company is acting as a principal in coordinating and controlling the range of services provided (other than clinical decisions) under its capitation contracts with payors. Capitation contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by Accounting Standards Codification ("ASC") 606, *Revenue From Contracts With Customers*, to stand ready on a monthly basis to provide all aspects of necessary medical

10

care to members for the contracted period. The Company recognizes revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for the Company's capitation contracts is variable, as the PMPM fees to which the Company is entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. The Company and healthcare providers collect and submit the necessary and available diagnosis data to payors and such data is utilized by the Company to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in the Company's contracts with payors. The Company recognizes incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

*Receivables*

Receivables primarily consist of amounts due under capitation contracts with various payors. Receivables due under capitation contracts are recorded monthly based on reports received from payors and management's estimate of risk adjustment payments to be received in subsequent periods for open performance years. Receivables are recorded and stated at the amount expected to be collected.

*Concentration*

The Company contracts with various payors whereby the Company is entitled to monthly PMPM fees to provide a defined range of healthcare services for members attributed to its contracted primary care physicians. Substantially all of these PMPM fees are derived from the Medicare Advantage program, accounting for nearly 100% of the totals for the three and six months ended June 30, 2022 and 2021. The Company generally accepts full financial risk for such members and therefore is responsible for the cost of all healthcare services required by them. Substantially all of the Company's receivable balances are from a small number of payors.

The following table provides the Company's revenue concentration with respect to major payors as a percentage of the Company's total revenues:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| Payor A | 24 % | 24 % | 25 % | 26 % |
| Payor B | 19 % | 19 % | 19 % | 20 % |
| Payor C | 13 % | 20 % | 14 % | 17 % |
| Payor D | 11 % | 11 % | 10 % | 10 % |

The following table provides the Company's concentration of credit risk with respect to major payors as a percentage of receivables, net:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| Payor A | 14 % | 18 % |
| Payor B | 22 % | 21 % |
| Payor C | 13 % | 14 % |
| Payor D | * | 12 % |

* Less than 10% of total receivables.

11

**NOTE 4. Marketable Securities and Fair Value Measurements**

*Marketable Securities*

The following table summarizes the Company's marketable securities (in thousands):

| | | June 30, 2022 | | |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| **Marketable securities:** | | | | |
| Corporate debt securities | $ 137,407 | $ 25 | $ (141 ) | $ 137,291 |
| U.S. Treasury notes | 137,719 | 625 | — | 138,344 |
| Other | 9,951 | 4 | — | 9,955 |
| | $ 285,077 | $ 654 | $ (141 ) | $ 285,590 |

The Company's unrealized losses from marketable securities as of June 30, 2022 were caused primarily by interest rate increases and not by unfavorable changes in the credit quality associated with these securities that impacted the Company's assessment on collectability of principal and interest. At June 30, 2022, the Company had $131.0 million marketable securities in an unrealized loss position for less than twelve months. The Company does not intend to sell marketable securities that are in an unrealized loss position, and it is not more likely than not that the Company will be required to sell the investments before recovery of their amortized cost bases, which may be maturity. As of June 30, 2022, the Company did not have the intent to sell any of the available-for-sale debt securities in an unrealized loss position. Therefore, the Company believes these losses to be temporary. There was no allowance for credit losses on available-for-sale marketable securities at June 30, 2022.

*Fair Value Measurements*

The Company's financial instruments consist of cash and cash equivalents, restricted cash equivalents, marketable securities, receivables, other liabilities, accounts payable, certain accrued expenses, and borrowings which consist of a term loan and a revolving credit facility. The carrying values of the financial instruments classified as current in the condensed consolidated balance sheets approximate their fair values due to their short-term maturities. The Company may be required, from time to time, to measure its loans to physician partner groups in connection with taxes payable on shares distributed to them upon completion of the IPO at fair value on a nonrecurring basis. Such measurements are classified within Level 2 of the fair value hierarchy. The carrying values of the term loan and revolving credit facility are a reasonable estimate of fair value because the interest rates on such borrowings approximate market rates as of the reporting date. Such borrowings are classified within Level 2 of the fair value hierarchy. During the six months ended June 30, 2022 and 2021, there were no material transfers of financial assets or liabilities between Level 1, Level 2 and Level 3.

The Company measures and discloses the fair value of nonfinancial and financial assets and liabilities utilizing a hierarchy of valuation techniques based on whether the inputs to a fair value measurement are considered to be observable or unobservable in a marketplace. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect the Company's market assumptions. This hierarchy requires the use of observable market data when available. These inputs have created the following fair value hierarchy:

- Level 1—quoted prices for identical instruments in active markets;

- Level 2—quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which significant inputs and significant value drivers are observable in active markets; and

- Level 3—fair value measurements derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable.

The table below summarizes the Company's financial instruments measured at fair value on a recurring basis (in thousands):

| | June 30, 2022 | | |
| | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
| **Marketable securities:** | | | |
| Corporate debt securities | $ — | $ 137,291 | $ — |
| U.S. Treasury notes | 138,344 | — | — |
| Other | 9,955 | — | — |
| | $ 148,299 | $ 137,291 | $ — |

12

**APP 532**

**NOTE 5. Other Assets, net**

The following table summarizes the Company's other assets, net (in thousands):

| | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|
| Loans to physician partners | $ | 74,519 | $ | 76,821 |
| Indemnification assets | | 2,130 | | 2,107 |
| Health plan deposits | | 11,728 | | 11,523 |
| Equity method investments[1] | | 13,402 | | 6,690 |
| Right-of-use assets | | 13,758 | | 11,739 |
| Other | | 3,723 | | 4,078 |
| | $ | 119,260 | $ | 112,958 |

(1)    See Note 14 for additional discussion related to the Company's equity method investments.

*Loans to Physician Partners*

The Company provided loans to its physician partners in connection with taxes payable on shares distributed to them in connection with the initial public offering ("IPO"). These loans mature between 2026 and 2031 with nominal interest compounding annually and no prepayment penalties. Such loans are stated at the amount expected to be collected.

*Indemnification Assets*

Indemnification assets have been established to offset certain pre-closing liabilities for which the prior owners of some of the Company's California subsidiaries are obligated to indemnify the Company. The Company deems the amounts receivable under the indemnification agreements to be fully collectible should indemnification claims arise, and, as such, a valuation allowance is not deemed necessary.

**NOTE 6. Medical Claims and Related Payables**

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which the Company is financially responsible and that are paid either directly by the Company or by payors with whom the Company has contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported.

Such estimates are developed using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions including medical service utilization trends, changes in membership, observed medical cost trends, historical claim payment patterns and other factors. Generally, for the most recent months, the Company estimates claim costs incurred by applying observed medical cost trend factors to the average PMPM medical costs incurred in prior months for which more complete claims data are available.

Each period, the Company re-examines previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances. As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates in the period in which the change is identified. The difference between the estimated liability and the actual settlements of claims is recognized in the period the claims are settled. The Company's medical claims payable balance represents management's best estimate of its liability for unpaid medical costs as of June 30, 2022 and 2021. The Company uses judgment to determine the appropriate assumptions for developing the required estimates.

13

The following table presents the components of changes in medical claims and related payables (in thousands):

| | June 30, | | | |
| | 2022 | | 2021 | |
|---|---|---|---|---|
| **Medical claims and related payables, beginning of the year** | $ | 239,014 | $ | 164,161 |
| Components of incurred costs related to: | | | | |
|   Current year | | 1,140,375 | | 803,711 |
|   Prior years | | 12,973 | | (874) |
|   Discontinued operations - current year | | — | | 1,234 |
|   Discontinued operations - prior years | | (229) | | (1,862) |
| | | 1,153,119 | | 802,209 |
| Claims paid related to: | | | | |
|   Current year | | (706,478) | | (517,368) |
|   Prior years | | (227,777) | | (144,260) |
|   Discontinued operations - current year | | — | | (298) |
|   Discontinued operations - prior year | | 160 | | (3,463) |
| | | (934,095) | | (665,389) |
| **Medical claims and related payables, end of the period** | $ | 458,038 | $ | 300,981 |

Medical claims and related payables presented in the periods above include immaterial balances related to claims liabilities associated with certain divested California businesses for which the Company has retained the liability for claims incurred prior to the date of divestiture.

## NOTE 7. Other Liabilities

The following table summarizes the Company's other liabilities (in thousands):

| | June 30, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| Other long-term contingencies | $ | 68,761 | $ | 71,344 |
| Reserve for uncertain tax positions | | 2,130 | | 2,107 |
| Lease liabilities, long-term | | 11,038 | | 7,904 |
| Equity method liabilities – DCEs | | 3,639 | | 6,380 |
| Other | | 5,554 | | 6,560 |
| | $ | 91,122 | $ | 94,295 |

As of June 30, 2022 and December 31, 2021, the Company's accruals for contingent liabilities related to unasserted claims were $68.8 million and $71.3 million, respectively. The accrued amounts represent the Company's estimate of probable losses in accordance with ASC Topic 450, *Contingencies*. The Company's estimate of the range of reasonably possible losses in excess of such accruals was $0 to $42.2 million as of June 30, 2022.

See Note 14 for equity method liabilities related to the Company's DCE investments.

## NOTE 8. Debt

On February 18, 2021, the Company executed a credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "Credit Facilities"). The Credit Facilities include: (i) a $100.0 million secured term loan (the "Secured Term Loan Facility") and (ii) a $100.0 million senior secured revolving credit facility (the "Secured Revolving Facility") with a capacity to issue standby letters of credit in certain circumstances up to a maximum of $80.0 million. Subject to specified conditions and receipt of commitments, the Secured Term Loan Facility may be expanded (or a new term loan facility, revolving credit facility or letter of credit facility added) by up to (i) $50.0 million plus (ii) an additional amount determined in accordance with a formula tied to repayment of certain of the Company's indebtedness. The proceeds from the Secured Term Loan Facility were used to refinance an aggregate of $68.6 million of outstanding indebtedness under the prior credit facility and unsecured debt, with the remaining $30.1 million of net proceeds used for working capital and other general corporate purposes. In connection with the refinance of the existing debt, the Company recognized $1.1 million of additional interest expense for the write-off of the related debt issuance costs. The Secured Term Loan Facility required, among other things, a mandatory prepayment of $50.0 million if gross proceeds from the IPO exceeded

14

# EXHIBIT 11

APP 535

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the fiscal year ended December 31, 2022**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-40332**

# agilon health, inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **37-1915147** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **6210 E Hwy 290, Suite 450**<br>**Austin, Texas** | **78723** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(562) 256-3800**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value | AGL | The New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant; (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐     Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act.) Yes ☐ No ☒

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $4.5 billion.

As of February 24, 2023, there were 413,118,724 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the registrant's 2023 Annual Meeting of Stockholders have been incorporated by reference into Part III of this Report.

Table of Contents
**agilon health, inc.**
Form 10-K
For the Fiscal Year Ended December 31, 2022

**Table of Contents**

| | | |
|---|---|---|
| **Cautionary Language Regarding Forward-Looking Statements** | | 1 |
| **Part I** | | **5** |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 55 |
| Item 2. | Properties | 55 |
| Item 3. | Legal Proceedings | 56 |
| Item 4. | Mine Safety Disclosures | 56 |
| | | |
| **Part II** | | **56** |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 56 |
| Item 6. | [Reserved] | 57 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 58 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 75 |
| Item 8. | Financial Statements and Supplementary Data | 76 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 81 |
| Item 9A. | Controls and Procedures | 81 |
| Item 9B. | Other Information | 84 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 84 |
| | | |
| **Part III** | | **85** |
| Item 10. | Directors, Executive Officers and Corporate Governance | 85 |
| Item 11. | Executive Compensation | 85 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 85 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 85 |
| Item 14. | Principal Accounting Fees and Services | 85 |
| | | |
| **Part IV** | | **86** |
| Item 15. | Exhibits and Financial Statement Schedules | 86 |
| Item 16. | Form 10-K Summary | 88 |
| | Signatures | 89 |

Table of Contents

*All references in this report to "agilon," "the Company", "we," "us" or "our" mean agilon health, inc., together with its consolidated subsidiaries. Unless the context suggests otherwise, references to "agilon health, inc." mean the parent company without its subsidiaries.*

**Cautionary Language Regarding Forward-Looking Statements**

Statements in this Annual Report on Form 10-K (the "Report") that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this Report and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results of operations, financial condition, and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under "Item 1A, Risk Factors" in this Report, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Report. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and health plan payors, and to execute upon our growth initiatives and achieve required operational scale;
- our ability to execute our operating strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with Medicare Advantage ("MA") payors and to ensure such contracts are on financial terms sufficient to meet our financial targets;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to our "Total Care Model";
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;
- the spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics, and the inability to predict the ultimate impact of pandemics on us;

1

APP 538

Table of Contents

- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings under payor contracts;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities (each, an "RBE") within certain geographies in the future;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;

- our ability to retain our management team and key employees or attract qualified personnel in the future;

- our ability to realize the full value of our intangible assets and any negative impact from impairment charges we may record;

- security breaches, loss of data and other disruptions to our data platforms could adversely impact us;

- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;

- our responsibility for certain liabilities in connection with the disposition of our California operations;

- our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses;

- our dependence on a limited number of key health plan payors;

- our contracts with our payors are for limited terms and may not be renewed upon their expiration;

- our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment;

- our dependence on physician partners and other providers to effectively manage the quality and cost of care, and perform obligations under payor contracts;

- difficulties in obtaining accurate and complete diagnosis data;

- our dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate or incorrect;

- we rely on third party software and data to operate our business and restrictions on the use of third-party resources could adversely affect us;

- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;

- consolidation in our industry could adversely impact us;

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;

- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;

- our ability to compete in our industry;

- the impact of government performance standards and benchmarks on our compensation and reputation;

- statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements;

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;

- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;

2

APP 539

Table of Contents

- regulatory inquiries and corrective action plans imposed by our health plan payors;

- repayment obligations arising out of payor audits;

- the impact on our revenue of Centers for Medicare & Medicaid Services' ("CMS") modifying the methodology used to determine the revenue associated with MA members;

- negative publicity regarding the managed healthcare industry;

- the extensive regulation of the healthcare industry at the federal, state, and local levels;

- if our physician alignment strategies with our physician partners, including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements, are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties;

- our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and the use of protected health information;

- our physician partners are subject to federal and state healthcare fraud and abuse regulations;

- our use, disclosure and processing of personally identifiable information, personal health information, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could adversely impact us;

- our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could adversely impact us;

- laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could adversely impact us;

- if we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions;

- we may face litigation not covered by insurance;

- our indebtedness and the potential that we may incur additional substantial indebtedness;

- the agreements and instruments governing our indebtedness contain restrictions and limitations that could adversely impact us;

- agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses;

- under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities;

- anti-takeover provisions in our certificate of incorporation and by-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock;

- we do not intend to pay dividends on our common stock for the foreseeable future and, consequently, a shareholder's return on investment depends on appreciation in the price of our common stock;

- we are no longer a controlled company within the meaning of the NYSE rules; however, we expect to continue to rely on exemptions from certain corporate governance requirements during a one-year transition period;

- our certificate of incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders;

3

Table of Contents

- we identified material weaknesses in our internal control over financial reporting and, if our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us; and

- risks related to other factors discussed under "Risk Factors" in this Annual Report on Form 10-K.

Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

4

**APP 541**

Table of Contents
**PART I**

**ITEM 1. Business**

**Overview**

Our business is transforming healthcare by empowering the primary care physicians ("PCPs") to be the agents for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by primarily forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 23 anchor physician groups and 25 geographies in five years. Our platform has enabled us to grow our total membership by 45% and revenue by 48% from December 31, 2021 to December 31, 2022. As of December 31, 2022, the PCPs on our platform serve approximately 269,500 MA members and 89,000 Medicare fee-for-service ("FFS") beneficiaries through eight direct contracting entities ("DCEs") through our participation in the CMS Innovation Center Direct Contracting Model, which our PCPs serve. The Direct Contracting Model was redesigned and renamed the Accountable Care Organization Realizing Equity, Access, and Community Health ("ACO REACH") Model beginning in 2023.

For a description of our significant activities during 2022, see "Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations—2022 Results" in this Report.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

*The agilon Platform*: The agilon platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital. Our purpose-built platform comprises an integrated set of capabilities designed to continuously improve. Our platform is delivered to our anchor physician groups through a long-term partnership model to support the adoption and success of a Medicare-centric, globally capitated line of business.

*agilon's Long-term Physician Partner Model*: We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Through this partnership, our physician partners' existing MA patient panels are attributed to our platform through our subscription-like per-member per-month ("PMPM") agreements with payors. The combination of these subscription-like agreements, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue. As earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings with our anchor physician groups.

5

Table of Contents

*agilon's Network*: Enhancing the power and growth of the agilon platform is the rapidly expanding group of leading community-based physician partners, functioning as a collaborative group through the agilon network. We believe the power of this network is demonstrated by our ability to add new physician partners and to attract additional PCPs to our physician partners. The ability to share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows, and results of operations that you should consider before making a decision to invest in our common stock. These risks include, but are not limited to, the following:

*Risks Related to Our Business*

- our history of net losses and the expectation that our expenses will increase in the future;

- failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives;

- success in executing our operating strategies or achieving results consistent with our historical performance;

- significant reductions in membership;

- challenges for our physician partners in the transition to a Total Care Model;

- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings under payor contracts;

*Risks Related to Our Reliance on Third Parties*

- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;

- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;

- dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate;

*Risks Related to Our Industry and Government Programs*

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;

- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;

- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;

*Legal and Regulatory Risks*

- our ability to comply with federal, state and local regulations and laws, or to adapt to changes in or new regulations or laws;

6

Table of Contents

- our physician partners' compliance with federal and state healthcare laws and regulations;

*Risks Related to Our Indebtedness*

- potential to incur additional indebtedness; and

*Risks Related to Our Common Stock*

- we identified material weaknesses in our internal control over financial reporting and, if our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us.

These risks are discussed in more detail in Item 1A below.

## Reimbursement Model and Organization

Under a traditional FFS reimbursement model, physicians are paid a fixed amount for services provided during a patient visit, regardless of a patient's medical need or health outcome. As a result, physician reimbursement is solely related to the volume of patient visits and procedures performed, thereby offering limited financial incentive to focus on preventative care and cost containment. Value-based care models offer alternative reimbursement models, which typically incentivize physicians for improving the cost and quality of healthcare provided for an attributed patient population. Various types of value-based care reimbursement models exist, including capitation, bundled payments, or payments for attainment of improved quality metrics or medical cost efficiency.

Under our Total Care Model, which is a type of value-based care reimbursement model, we are responsible for managing the medical costs associated with our attributed members. This structure empowers physicians to focus on the improvement of the quality of care provided, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care. Under such a structure, physicians are incentivized to improve the quality and efficiency of care as well as health outcomes for their patients.

### *Physician and Payor Contractual Relationships*

*Physicians*

Our business model combines the agilon platform, a network of like-minded physicians and a long-term partnership model in order to provide physician groups with the necessary capabilities, capital and business model to create a Medicare-centric, globally capitated line of business. We believe that failing to empower PCPs to drive meaningful change in quality, cost and patient experience has historically fostered waste, unnecessary variability in care and poor patient experience and health outcomes. We seek to partner with leading community-based physician groups under a Total Care Model. We have formed long-term partnerships with diverse leading community-based physician groups in geographies such as Ohio, Connecticut, Michigan, New York, North Carolina, Pennsylvania, and Texas. By providing technology, people, process and capital, we aim to improve the quality and cost of healthcare and drive long-term growth while creating a sustainable business model for our physician partners.

Under the Total Care Model, we typically operate by forming RBEs within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more partner primary care or multi-specialty physician groups. We refer to these groups as our "anchor physician groups." Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. We have entered into long-term professional services agreements with our anchor physician groups, which typically have a contractual duration of 20 years. In accordance with relevant accounting guidance, each of these RBEs is determined to be a variable interest entity consolidated by agilon, as we have: (i) the ability, through the management services and governance arrangements, to direct the activities (excluding clinical decisions) that most significantly affect the RBE's economic performance; and (ii) the obligation to absorb losses of or the right to receive benefits that could be potentially significant to the RBE.

7

APP 544

Table of Contents

Through incentive compensation arrangements, we share a portion of the RBE's savings from successfully improving the quality of care and reducing costs with our anchor physician groups. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. This base compensation is initially negotiated with the RBE for the first ten years of each agreement, subject to annual increases based on current market rates and other agreed upon adjustment factors, after which it is subject to renegotiation. Although our RBEs are wholly-owned subsidiaries of agilon, our anchor physician groups participate in each RBE's governance, with individuals designated or nominated by the applicable anchor physician groups having representation on each RBE's board of directors. Most of our contracts with our anchor physician groups contain exclusivity or other provisions intended to promote interconnectedness with our physician partners for applicable lines of business in order to facilitate the longevity and stability of the partnership. Typically, these contracts provide for termination rights that are triggered upon certain events, subject to applicable cure periods, including bankruptcy or insolvency events, exclusion, suspension or debarment from state or federal government programs and the occurrence of government action that can be reasonably expected to negatively influence our business. We have historically issued certain stock-based instruments, which we refer to as "partner physician group equity agreements," to our anchor physician groups pursuant to which they are entitled to receive equity of their local RBE or agilon health, respectively, in the future only upon the occurrence of certain events deemed a "change of control" of the RBE, or a "change of control" of agilon health, if such event occurs before a "change of control" of the RBE. Upon our initial public offering, a "change of control" event occurred for the agilon health related instruments and the respective physician groups received equity. For additional discussion related the agilon health related instruments, see "Critical Accounting Estimates – Stock-Based Compensation."

In addition, in Hawaii we operate under a risk-bearing independent practice association model through which we have broadly contracted with physicians across the state and have developed select deeper primary care relationships within the network. PCPs in our Hawaii network are typically compensated on a FFS basis based on applicable Medicare fee schedules.

In addition to our contractual arrangements with our physician partners, we also maintain relationships with other providers who care for our members, including hospitals, specialists and ancillary providers. Such providers typically contract directly with payors. We and our physician partners maintain effective working relationships with the majority of the higher-volume providers in our geographies in order to retain insight into the provision of care to our members and ensure care is rendered effectively and in a manner which supports the achievement of appropriate clinical outcomes.

*Health Plan Payors*

We enter into contractual agreements with health plan payors in each of our geographies, under which we are financially responsible for our physician partners' provision of a defined spectrum of healthcare services to our members, in exchange for a defined PMPM fee for each of our members (which is also referred to as "global capitation"). The healthcare services for which we are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services costs. In certain of our payor arrangements, we are also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members. Through these payor agreements, we help to create access for our physician partners to value-based care reimbursement structures through our Total Care Model, which allow our physician partners to focus on the improvement of the quality of care provided to their patients, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care.

Table of Contents

The global capitation fees we are entitled to receive from our health plan payor contracts are typically based on a defined percentage of the corresponding monthly premium payments which the payor receives from CMS for members attributed to our PCPs and covered under such contracts. The premium payments to payors are based on county-level benchmark rates established by CMS and payors' annual bid of amounts necessary to cover the cost of a standard MA patient, and are influenced by several factors, including, but not limited to, the applicable MA plan's STAR rating and CMS' risk-adjustment model, which compensates payors based on the health status (acuity) of each individual patient in the preceding calendar year. For agreements where we are delegated for claims payment, we utilize amounts received under the applicable agreement on a monthly basis to pay such claims for medical services rendered to our members. For agreements where the payor retains responsibility for paying claims on our behalf, as is the case today in the majority of our payor agreements, funding under the applicable agreement is utilized by the payor to pay such claims, and we receive surplus distributions on a monthly or quarterly basis. In these arrangements, the payor maintains the responsibility for entering into contractual agreements with network hospitals, network specialty physicians, and ancillary or other providers. Additionally, certain of our contracts with payors incorporate provisions in which we are eligible to earn additional payments on top of our capitation payments based upon the attainment of defined quality performance criteria correlated to applicable STAR ratings criteria. Premiums received may be subject to future adjustment.

We have developed local contracts across multiple payors, along with national form contracts with certain key payors, which provide a consistency of non-financial contract terms, data sharing, operational processes and governance structures and support portability of the agilon platform. We typically maintain various contracts with a single national payor in order to reflect varying economic terms across our geographies, and to provide for distinct subsidiary entities of our company and a national payor as parties to these contracts. As of January 1, 2023, we have relationships with 23 health plan payors across 25 geographies. Payors with which we contract include large national health plans as well as smaller local and regional insurers. We believe our ability to offer multiple MA plans and products to our physician partners in each geography creates significant value for our physician partners and the members that they serve. Members are able to select the plan and benefit design that meets their individual needs while our platform enables a seamless experience regardless of plan or product for all patients and physician groups.

The agreements with our payors outline the range of healthcare services for which we are financially responsible and at risk, the services for which we are contracted to perform on the payor's behalf and the key financial terms. Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography, but typically averages between 1.0-3.0% of projected annual gross revenue attributable to the corresponding agreement.

Our payor agreements also typically incorporate various termination rights, which are negotiated based on the scope of the market-facing solutions that the payor has adopted and the duration of the contract. Most of our contracts include cure periods during which time we may attempt to resolve any issues that would trigger a payor's ability to terminate the contract. However, certain of our contracts are also terminable immediately upon the occurrence of certain events. For example, some of our contracts may be terminated immediately by the payor if we lose applicable licenses, go bankrupt, lose our liability insurance or receive an exclusion, suspension or debarment from state or federal government authorities.

The contracts with our payors impose other obligations on us. For example, we typically agree that all services provided under our contract and all employees providing such services will comply with such payor's policies and procedures. We also typically agree to indemnify our payors against certain third-party claims.

9

Table of Contents

*Direct Contracting Model (ACO REACH beginning 2023)*

During 2021 and 2022, agilon, in conjunction with some of our physician partners, participated in the Direct Contracting Model (referred to as the Global and Professional Direct Contracting ("GPDC") Model) in certain geographies, through eight approved DCEs. The Direct Contracting Model was a voluntary payment model option aimed at reducing expenditures and preserving or enhancing quality of care for beneficiaries in traditional Medicare FFS established by the CMS Innovation Center.

Under the Direct Contracting Model, CMS contracted directly with each of the DCEs pursuant to participation agreements, in which such DCE selects risk-sharing and fee payment options. The participation agreements included various terms and conditions each DCE must comply with, including meeting certain operational requirements. Each of the DCEs selected the Global risk-sharing option, in which the DCE assumed accountability for the total cost of care of the FFS beneficiaries aligned to such DCEs. In addition, each of our DCEs had selected the Primary Care Capitation Payment (the "PCC") option. The participation agreements between our DCEs and CMS expire two years after the "Model Performance Period" established by CMS, which lasts from April 1, 2021 through December 31, 2026. The DCE may terminate its participation agreement with CMS at any time upon advance written notice. CMS has certain additional termination rights, including in connection with the termination of the Direct Contracting Model or non-compliance of the DCE. Additionally, CMS has the right to amend a participation agreement without the consent of the DCE for good cause, or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules.

In addition, the DCEs operate in partnership pursuant to participating medical group agreements with one or more of our physician partners in certain geographies. Our contracted physician partners provide Medicare services to their aligned beneficiaries, and bill CMS on a FFS basis for such services. In turn, in accordance with the PCC option, CMS compensates each physician partner for a portion of their billed services based on the applicable rate, and the remaining portion is paid to each DCE on a per Medicare beneficiary per month ("PBPM") basis based on a prospective estimate of such remaining portion of billed services. By 2025, CMS will no longer pay any portion to such physician partner based on FFS compensation rates, and will transition to compensating physician partners through their applicable DCE on a PBPM basis. Each DCE then remits payment out of the PBPM payments from CMS to its contracted physician partners on a monthly or quarterly basis pursuant to the applicable participating medical group agreement, which agreement also includes incentive compensation tied to the DCE's net profits received for aligned beneficiaries. In addition, certain participating medical group agreements also allow the relevant physician partner to choose an adjustment to the applicable incentive compensation to receive a portion of such compensation in equity of agilon. Our DCEs' participating medical group agreements provide for mutual indemnification rights, and have an initial term through December 31, 2026, unless earlier terminated.

The ACO REACH model, which formally launched on January 1, 2023, is largely the same as its predecessor model, GPDC, with the following minor differences: (i) all ACOs are required to develop and implement a robust health equity plan to identify and better serve underserved communities; (ii) 75% control of each ACO's governing body must be held by participating providers or their designated representatives (compared to 25% during the first two performance years of the GPDC model); and (iii) each ACO must have at least two beneficiary representatives on its governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. agilon has implemented these changes for the 2023 performance year with minimal disruption. In addition, the CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes on our ACO's benchmarks has been minimal.

10

Table of Contents

**Marketing and Distribution**

In accordance with Medicare marketing guidelines, health plan payors are responsible for marketing directly to patients. Our focus is on outreach to existing community-based physician groups to join our platform, establishing and maintaining our local branding and strategies to support education for our Medicare-eligible members in evaluating their Medicare options.

Through our long-term partnership model, we partner with leading community-based physician groups in our existing geographies and aim to expand our geographic reach by partnering with community-based physician groups in new geographies, across the United States. Our growth strategy is supported by a dedicated business development team that works closely with physician groups, senior management and key stakeholders to identify potential physician groups to partner with and integrate onto our platform and into our network. Additionally, we believe our network of like-minded physician partners also attracts new physicians to join, as access to cross-market know-how and best practices encourages success in a Total Care Model.

Our enterprise marketing team develops branding strategies and identities in our geographies and supports the development of communication and branding materials to support the local growth of our physician partners and their Medicare patient population. This begins with our entry into a new geography. We create a local brand that embodies the value of the Total Care Model for patients as well as the history and culture of our physician partner. Each geography has its own customized brand, which includes "Senior Care Advantage" as part of the naming convention to help reinforce the value of our national network to payors, policy makers and other industry constituents. To empower patients to make informed decisions about their coverage options, educational opportunities and materials are offered throughout the year, including educational physician presentations, monthly "Medicare 101" sessions across every geography, on-line resources, in-office materials that explain the difference between traditional Medicare and MA, and patient communications that highlight Medicare election coverage windows.

**Competition**

The healthcare industry is highly competitive and fragmented. We currently face competition in every aspect of our business, including in offering a favorable reimbursement structure for existing physician partners and attracting health plan payors and physician partners who are not contracted with us, from a range of companies that provide care under a variety of models that could attract patients, providers and payors. Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks. Other organizations may also seek to apply specialized services or programs, including providing data analytics or disease-based programs, designed to enable physicians or payors to operate successfully under value-based care arrangements. Although some of our competitors utilize elements of our MA multi-payor, globally capitated risk model deployed with community-based physician groups, including in certain of the geographies we serve, we do not believe any of our competitors offer a model that captures all elements of the agilon model. Our competitors typically vary by geography, and we may also encounter competition in the future from other new entrants. Our growth strategy and our business could be adversely affected if we are not able to continue to access existing geographies, successfully expand into new geographies or maintain or establish new relationships with payors and physician partners.

The principal competitive factors in our business include the nature and caliber of relationships with physicians; patient healthcare quality, outcomes and cost; the strength of relationships with payors; the quality of the physician experience; local geography leadership position; and the strength of the underlying economic model. We believe our first-of-its-kind platform, partnership and network model enables us to compete favorably.

11

Table of Contents

**Intellectual Property**

We rely on a combination of trademark laws in the U.S. as well as confidentiality procedures and contractual provisions to protect our trade secrets, including proprietary technology, databases and our brand.

We have registered "agilon" and our logo as trademarks in the U.S. We also have filed other trademark applications that are meaningful to our business in the U.S. across various states and local jurisdictions, including for the use of the local brand created within each of our geographies, and will pursue additional trademark registrations to the extent we believe it would be beneficial and cost-effective.

We are the registered holder of a variety of domain names that include "agilon" and similar variations.

We have developed proprietary technology and processes that support our operational programs and clinical insights, including our "CORE" technology platform and HCC Manager risk adjustment software application, both of which are proprietary systems that aid in the aggregation and analysis of third-party data we collect. Our internally developed technology is continuously refined to support the needs of our platform and partners. Although we do not currently hold a patent for CORE or HCC Manager, we continually assess the most appropriate methods of protecting our intellectual property and may decide to pursue available protections in the future.

We maintain our intellectual property and confidential business information in a number of ways. For instance, we have a policy of requiring all employees and consultants to execute confidentiality agreements upon the commencement of an employment or consulting relationship with us. Our employee agreements also require relevant employees to assign to us all rights to any inventions made or conceived during their employment with us in accordance with applicable law. In addition, we have a policy of requiring individuals and entities with which we discuss potential business relationships to sign non-disclosure agreements. Lastly, our agreements with customers include confidentiality and non-disclosure provisions.

We may be unable to obtain, maintain and enforce our intellectual property rights, and assertions by third parties that we violate their intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

**Human Capital**

*Overview*

People join agilon because of our vision: To transform the future of healthcare in communities across the country by empowering exceptional patient-physician relationships. Together with our employees and physician partners, we have defined our company values and commitments to guide our everyday actions in executing our mission:

- Partnership and Collaboration: We are One Team. We collaborate deeply. We embrace diversity. Together with our physician partners, we empower the care that our families and friends deserve.

- Innovation: We rapidly adapt to our changing world and embrace the creativity of our physician partners and each other.

- Quality and Service Excellence: We value results, not activity. We serve others with passion and humility.

- Continuous Improvement: We are agile and move fast. We actively seek out and share feedback. We learn and improve every day.

- Expertise: We are curious. We aspire to be experts and share our knowledge.

- Accountability and Integrity: We celebrate our successes. We take ownership in everything we do.

Our human capital efforts are supported by our dedicated human resources team. This team supports the business in identifying and recruiting top talent, supporting the onboarding and orientation of new hires through a comprehensive new employee orientation, a manager's toolkit and resources to support onboarding, goal setting, and in-year management, as well as a comprehensive semi-annual review process that ties to our company values and supports continuous learning and improvement. Our efforts to promote a positive employee experience and build

12

Table of Contents

culture are further supported and enhanced by local and national in-person and virtual events, including town halls, in-office celebrations, employee activity committees and most-valuable-player awards, meant to champion our employees and create a sense of community. We conduct annual employee engagement surveys to solicit feedback and help guide annual planning on efforts and initiatives to support our team members. We have also developed a taskforce that seeks to drive focused and targeted diversity and inclusion efforts, including employee focus groups and participation up and down the organization to ensure all voices are heard.

### Total Rewards

We recognize how vital our employees are to our success and strive to offer comprehensive and competitive compensation and benefits to meet the varying needs of our colleagues and their families. The benefits and programs include annual and long-term incentives, a 401(k) plan, health and welfare insurance benefits, paid time off, flexible work schedules, and family leave, among many others, depending on eligibility.

### Diversity, Equity & Inclusion ("DE&I")

We believe a great workplace fosters an environment where all employees can thrive and grow, and where differences are both encouraged and celebrated. We aim to attract, develop, retain and support a diverse workforce that reflects the many members, physician partners, and communities we serve. Under our DE&I Taskforce, we collaborate with our employees to develop and promote an internal diversity, equity and inclusion strategy that aims to foster a culture of inclusion. Our DE&I programs include development programs for high-potential female leaders (expanding opportunity to all under-represented groups), an unconscious bias curriculum, and DE&I training for our workforce.

### Training and Development

We prioritize and invest in creating opportunities to help employees grow and build their careers through a multitude of training and development programs. Our training and development program promotes the importance of compliance across our business. Our employees demonstrate this commitment through our annual Code of Conduct training. We also provide training and development to all employees, focusing on career development, and professional development, including online courses designed to strengthen technical and hard-skills and enhance leadership development. We support career coaching, mentorship and accelerated leadership development programs to ensure mobility and advancement for our employees. Our employees are also encouraged to participate in mentoring programs with people of various backgrounds and cultures. We view mentoring as an essential development tool for sharing skills and knowledge so we can all succeed. Our commitment to mentoring feeds the successful future of our company.

### Health & Safety

The health, safety, and wellness of our employees are vital to our success. We have a strong commitment to providing a safe working environment. From the outset of the COVID-19 pandemic, we took a comprehensive approach to managing occupational health and safety challenges presented by the pandemic, including implementing facial covering requirements for our workplaces, providing sick leave, and implementing additional protocols in accordance with applicable Occupational Safety and Health Administration ("OSHA") requirements and guidance and Centers for Disease Control and Prevention ("CDC") guidelines for workplaces. In 2020, we quickly and effectively transitioned a significant subset of our employees to a fully remote work environment in an effort to mitigate the spread of COVID-19. To date, our employees have continued to support our partners with the highest level of service from their home offices without a disruption in our business operations. We have taken this opportunity to maintain a fully remote work environment for the vast majority of our employees as part of our culture.

As of December 31, 2022, agilon and its subsidiaries had 747 employees, substantially all were full-time. None of our employees are members of a labor union, and we have not experienced a work stoppage. Our employees do not include our physician partners, whom we do not directly employ. We believe we enjoy a good working relationship with our employees.

13

Table of Contents

**Healthcare and Other Applicable Regulatory Matters**

The healthcare industry is highly regulated under both state and federal laws and regulations. Our operations and relationships with healthcare plans and providers are subject to extensive and increasing regulation by numerous federal, state, and local government agencies including the Office of Inspector General ("OIG"), the Department of Justice ("DOJ"), the CMS, the Office of Civil Rights, and various state authorities.

*Corporate Practice of Medicine*

Some states in which we operate have laws prohibiting the corporate practice of medicine; such laws generally prohibit business entities with non-physician owners, such as agilon and certain of its subsidiaries, from practicing medicine. States that have corporate practice of medicine laws limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals; therefore, non-medical professional entities are prohibited from employing or contracting with physicians (unless the entity satisfies a limited exception), exercising control over medical decisions, or engaging in certain arrangements with other physicians, such as fee-splitting. These laws vary widely from state to state and change frequently based on new case law, opinions from state attorneys general and regulations promulgated by medical boards. A majority of states have adopted express corporate practice of medicine prohibitions, and several states that have not explicitly adopted the doctrine have, nonetheless, established regulations that echo its principles. A violation of the corporate practice of medicine prohibition constitutes the unlawful practice of medicine, which is a public offense punishable by fines or criminal penalties. In addition, any physician who participates in a scheme that violates the state's corporate practice of medicine prohibition may be subject to disciplinary action or potential forfeiture of revenues from payors for services rendered, or may be punished for aiding and abetting a non-medical professional entity in the unlawful practice of medicine. We typically operate by forming RBEs which contract with payors on the one hand and provide professional services through contractual relationships with PCPs on the other hand. While we believe that our practices are in substantial compliance with the corporate practice of medicine laws to which we are subject, if a state determines that we are not in compliance that may result in a material adverse effect on our business, results of operations or financial condition. See "Risk Factors—Legal and Regulatory Risks—Laws regarding the laws that regulate the corporate practice of medicine, which laws could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries."

*Fee-Splitting Prohibitions*

The laws of some states prohibit physicians from splitting with anyone, other than providers who are part of the same group practice, any professional fee, commission, rebate or other form of compensation for any services not actually and personally rendered. Fee-splitting laws and their interpretations vary from state to state and are enforced by state courts and regulatory authorities that have broad discretion in their enforcement. Courts in some states have interpreted fee-splitting statutes as prohibiting all percentage of gross revenue and percentage of net profit fee arrangements, despite the performance of legitimate services. In addition, courts have refused to enforce contracts found to violate state fee-splitting prohibitions. Further, fee-splitting arrangements could implicate other laws applicable to our business, such as anti-kickback and corporate practice of medicine laws and regulations.

While we believe we are in substantial compliance with fee-splitting laws in the states in which we operate, if we are found to be non-compliant, penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary action against our affiliated providers.

*False Claims Acts*

We are subject to numerous federal and state laws that prohibit the presentation of false information, or the failure to disclose information, in connection with the submission and payment of medical claims for reimbursement.

The federal civil and criminal false claims laws and civil monetary penalties laws, such as the federal False Claims Act, 31 U.S.C. §§ 3729—3733, impose civil liability on individuals or entities that submit false or fraudulent claims for payment to the federal government. The False Claims Act provides, in part, that the federal government may bring a lawsuit against any person whom it believes has knowingly or recklessly: presented, or caused to be

14

**APP 551**

Table of Contents

presented, a false or fraudulent claim for payment or approval to the federal government; made, used or caused to be made or used a false statement or a false record to get a claim for payment approved, including a false or fraudulent claim; concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money or property to the federal government; or conspired to commit any of the foregoing. The government may deem entities to have "caused" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information, billing for services not rendered, billing services at a higher payment rate than appropriate and billing for care that is not considered medically necessary. Healthcare-related fraud continues to be the leading source of False Claims Act settlements and judgments.

The federal government has used the False Claims Act to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare and state healthcare programs. The federal government, including as a result of the passage of the ACA, and a number of courts have taken the position that claims presented in violation of certain other statutes, including the federal Anti-Kickback Statute ("AKS") or the federal physician referral law, 42 U.S.C. 1395nn (the "Stark Law"), can also be considered a violation of the False Claims Act. Some government healthcare programs, including, but not limited to, the MA program, use a risk-adjustment model that adjusts premiums paid to contracted payors to reflect the specific characteristics of each enrolled member (including demographics, government program eligibility and health status). Many payors and government healthcare programs have set forth specific documentation rules that must be followed in compliantly selecting allowable codes. We rely on physician partners to follow the CMS documentation rules and code their claim submissions with accurate and substantially documented diagnoses, which we send to the payors, some of whom, in turn, submit the data to government healthcare agencies including CMS. In recent years, the DOJ has brought a number of investigations and actions under the federal False Claims Act against both payors and providers for alleged upcoding or improper coding of diagnosis coding under the risk-adjustment methodology. Further, amendments to the federal False Claims Act and Social Security Act impose severe penalties for the knowing and improper retention of overpayments collected from government payors. On December 14, 2022, CMS released a proposed rule ("2022 Proposed Rule") that, among other things, revises the existing regulatory negligence standard for when an overpayment is "identified," following a decision that vacated the "reasonable diligence" standard. The 2022 Proposed Rule would provide that "[a] person has identified an overpayment when the person knowingly receives or retains an overpayment." The proposal references the definition of "knowingly" under the False Claims Act, which extends to actual knowledge, reckless disregard, and willful blindness.

A number of states have enacted laws that are similar to the federal False Claims Act. Under Section 6031 of the Deficit Reduction Act of 2005, as amended, if a state enacts a false claims act that is at least as stringent as the federal statute and that also meets certain other requirements, the state will be eligible to receive a greater share of any monetary recovery obtained pursuant to certain actions brought under the state's false claims act. As a result, more states are expected to enact laws that are similar to the federal False Claims Act in the future along with a corresponding increase in state false claims enforcement efforts. Violations of federal and state fraud and abuse laws may be punishable by criminal and/or civil sanctions, including significant penalties, fines, disgorgement, additional reporting requirements and oversight under a corporate integrity agreement or similar agreement to resolve allegations of noncompliance with these laws, and/or exclusion or suspension from federal healthcare programs, such as Medicare, and debarment from contracting with the U.S. government. Penalties for False Claims Act violations include substantial fines for each false claim, plus up to three times the amount of damages sustained by the government. In addition to the provisions of the False Claims Act, which provide for civil enforcement, the federal government also can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims to the government for payments. Additionally, private parties may initiate *qui tam* whistleblower lawsuits against any person or entity under the False Claims Act in the name of the federal government, as well as under the false claims laws of several states, and may share in the proceeds of a successful suit. Generally, federal and state governments have made investigating and prosecuting healthcare fraud and abuse a priority.

### Federal and State Anti-Kickback Statutes

The AKS, set forth in Section 1128B of the Social Security Act, prohibits the knowing and willful offer, payment, solicitation or receipt of any form of remuneration in return for, or to induce, (i) the referral of a person for items or services reimbursable under federal healthcare programs, (ii) the furnishing or arranging for the furnishing of items or services reimbursable under federal healthcare programs or (iii) the purchase, lease or order or arranging or recommending purchasing, leasing or ordering of any item or service reimbursable under federal healthcare

15

Table of Contents

programs. The core of a violation of the AKS is an "inducement" to refer patients for services or items that are reimbursed under a federal healthcare program, such as Medicare, Medicaid, or Tricare (which covers military personnel). Kickbacks undermine the integrity of federal healthcare programs by tainting medical decision-making, increasing healthcare costs and negatively impacting competition. The ACA amended the AKS to make it clear that a person need not have actual knowledge of the statute, or specific intent to violate the statute, as a predicate for a violation. Court cases have resulted in the interpretation that a violation may occur where even one purpose of the remuneration is to induce or reward referrals, and the OIG, which has the authority to impose administrative sanctions for violation of the statute, has adopted a similar standard.

There are certain AKS "safe harbors" which, if the respective requirements are met, would afford protection from the AKS. Failure to meet all requirements of an AKS safe harbor does not necessarily mean the arrangement violates the AKS, but it may be subject to scrutiny by legal authorities, in light of the parties' intent and arrangements. In other words, if an arrangement does not fit within a safe harbor, it does not necessarily mean that the arrangement is *per se* illegal—only that it is not shielded from regulatory scrutiny. The federal AKS provides criminal penalties for individuals or entities that knowingly and willfully solicit or receive any remuneration. A violation of the AKS is punishable by imprisonment of up to ten years, fines of up to $100,000 per offense, or both. Violation can also give rise to federal healthcare program exclusion, liability under the False Claims Act and civil penalties, which may include monetary penalties of up to $100,000 per offense, repayments of up to three times the total payments between the parties to the arrangement and suspension from future participation in Medicare and Medicaid.

We have endeavored to structure our business arrangements to fit within applicable federal AKS safe harbors and to otherwise operate in material compliance with the AKS. Federal courts in the U.S., for instance, have recognized that a referring party's provision of legitimate services to a referral recipient may not constitute prohibited remuneration for AKS purposes when the referral recipient pays fair market value in return for what it receives. Many of our arrangements are structured to provide for compensation that is fair market value for services actually rendered and in a manner that does not reflect the volume or value of referrals generated between the parties. In structuring our relationships with providers, including our physician partners, and other healthcare entities, we are careful to try to ensure wherever possible that we are in compliance with all of the regulatory requirements of such safe harbors and exceptions. In particular, a key managed care safe harbor under the AKS upon which we regularly rely allows for payments to providers for "healthcare services and items," but does not allow incentive payments for marketing or to encourage member enrollment. We therefore carefully analyze all payment structures to ensure that they constitute "services and items" that fall within this safe harbor or are otherwise in compliance with the AKS.

Additionally, some states have enacted statutes and regulations similar to the AKS, but which may be applicable regardless of the payor source for the patient. These state laws may contain exceptions and safe harbors that are different from and/or more limited than those of federal law and that may vary from state to state.

To help accelerate the U.S. healthcare system's transition from a FFS to a value-based system, the U.S. Department of Health and Human Services ("HHS") launched the "Regulatory Sprint to Coordinated Care" initiative ("Regulatory Sprint") in 2018, which aims to change the manner in which the healthcare regulatory framework has traditionally been applied to stakeholder arrangements. In connection with the Regulatory Sprint, the OIG issued final rules amending the AKS by adding new safe harbors and modifying existing safe harbors that protect certain payment practices and business arrangements from sanctions under the AKS in order to remove potential barriers to more effective coordination and management of patient care and delivery of value-based care. Among other changes, the new regulations contain safe harbors for value-based arrangements centering around value-based enterprises, which are enterprises composed of participants collaborating to achieve one or more value-based purposes, including coordinating and managing the care of a target patient population and coordinating and managing the care of a target population. These new final rules provide additional protections to our payment models with providers.

We have also endeavored to structure our participation in the Direct Contracting Model to comply with waivers of the AKS issued by the Secretary of HHS. The conditions of such waivers are to ensure that protected arrangements: (i) are consistent with the quality, care coordination, and cost-reduction goals of the Direct Contracting Model, (ii) are subject to safeguards designed to mitigate the risk of fraud and abuse; and (iii) can be readily monitored and audited.

16

Table of Contents

*Stark Law*

The Stark Law generally prohibits a physician from referring Medicare and Medicaid patients to an entity providing designated health services ("DHS") if such physician, or a member of the physician's immediate family, has a financial relationship with the entity, unless a specific exception applies. DHS is defined to mean any of the following enumerated items or services: clinical laboratory services; physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; and outpatient speech-language pathology services. The types of financial arrangements between the referring physician and an entity providing DHS that trigger the Stark Law are broad, including direct and indirect ownership and investment interests, and compensation arrangements. The Stark Law also prohibits any entity providing DHS and receiving a prohibited referral from presenting, or causing to be presented, a claim or billing for the services arising out of the prohibited referral. Similarly, the Stark Law prohibits an entity from "furnishing" a DHS to another entity in which it has a financial relationship when that entity bills for the service. The Stark Law also prohibits self-referrals within an organization by its own physicians, although broad exceptions exist that cover employed physicians and those referring DHS that are ancillary to the physician's practice to the physician group. The prohibition applies regardless of the reasons for the financial relationship and the referral; intent to induce referrals is not required. Like the federal AKS, the federal Stark Law contains statutory and regulatory exceptions intended to protect certain types of transactions and arrangements. If the Stark Law is implicated, the financial relationship must fully satisfy a Stark Law exception; if an exception is not satisfied, then the parties to the arrangement could be subject to sanctions. Sanctions for violation of the Stark Law include denial of payment for claims for services provided in violation of the prohibition, refunds of amounts collected in violation of the prohibition, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law prohibition, civil assessment of up to three times the amount claimed, and potential exclusion from the federal healthcare programs, including Medicare and Medicaid. Amounts collected on claims related to prohibited referrals must be reported and refunded generally within sixty (60) days after the date on which the overpayment was identified. Furthermore, Stark Law violations and failure to return overpayments in a timely manner can form the basis for False Claims Act liability, as further discussed herein. Additionally, several states have enacted physician self-referral laws.

Notably, compensation pursuant to a risk-sharing arrangement between a managed care organization or an independent practice association and a physician (either directly or indirectly through a contractor) for services provided to enrollees of a health plan (an MA plan, for example) does not constitute a financial arrangement for Stark purposes. Further, physician incentive plans ("PIPs") are allowable provided that (i) the compensation is not determined in any manner (withhold, capitation, bonus, or otherwise) that takes into account, directly or indirectly, volume or value of referrals and (ii) the PIP does not induce the reduction of medically necessary care to individual patients and does not place the physician at substantial financial risk for services not provided by the physician.

As part of the Regulatory Sprint, CMS also issued a sweeping set of regulations that introduce significant new value-based terminology and exceptions to the Stark Law. CMS has implemented new exceptions for certain remuneration exchanged between or among eligible participants in value-based arrangements. These exceptions and their various requirements apply based on the level of risk assumed by the arrangement's participants. These new regulations purport to ease the compliance burden for healthcare providers across the industry while maintaining strong safeguards to protect patients and programs from fraud and abuse. These or other changes may change the parameters of the Stark Law exceptions that we rely upon and impact our business, results of operations and financial condition.

*Section 1876 of the Social Security Act*

Section 1876 of the Social Security Act prohibits MA plans and their downstream entities from entering into compensation arrangements with physicians that may directly or indirectly have an effect of reducing or limiting services to individual members. We have sought to structure our compensation arrangements with physicians to ensure compliance with this requirement.

17

**APP 554**

Table of Contents

### Health Care Fraud Statute

The Health Care Fraud Statute, 18 U.S.C. § 1347, prohibits any person from knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, which can be either a government or private payor plan. Violation of this statute, even in the absence of actual knowledge of or specific intent to violate the statute, may be charged as a felony offense and may result in fines, imprisonment or both. The Health Care False Statement Statute, 18 U.S.C. § 1035, prohibits, in any matter involving a federal healthcare program, anyone from knowingly and willfully falsifying, concealing or covering up, by any trick, scheme or device, a material fact, or making any materially false, fictitious, or fraudulent statement or representation, or making or using any materially false writing or document knowing that it contains a materially false or fraudulent statement. A violation of this statute may be charged as a felony offense and may result in fines, imprisonment, or both.

### Civil Monetary Penalties Statute

The Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. § 1320a-7a, authorizes the imposition of civil monetary penalties, assessments, and exclusions against an individual or entity based on a variety of prohibited conduct, including, but not limited to: (i) presenting, or causing to be presented, claims for payment to Medicare, Medicaid, or other third-party payors that the individual or entity knows or should know are for an item or service that was not provided as claimed or is false or fraudulent; (ii) offering remuneration to a federal healthcare program beneficiary that the individual or entity knows or should know is likely to influence the beneficiary to order or receive healthcare items or services from a particular provider; (iii) arranging contracts with an entity or individual excluded from participation in a federal healthcare program; (iv) violating the federal AKS; (v) making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a federal healthcare program; (vi) making, using, or causing to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a federal healthcare program; and (vii) failing to report and return an overpayment owed to the federal government. We could be exposed to a wide range of allegations to which the federal CMPL would apply. We perform monthly checks on our employees, affiliated providers and certain affiliates and vendors using government databases to confirm that these individuals have not been excluded from federal programs. However, should an individual become excluded and we fail to detect it, a federal agency could require us to refund amounts attributable to all claims or services performed or sufficiently linked to an excluded individual. Thus, we cannot foreclose the possibility that we will face allegations subject to the CMPL with the potential for a material adverse impact on our business, results of operations and financial condition. Substantial civil monetary penalties may be imposed under the federal Civil Monetary Penalty Statute and may vary, depending on the underlying violation. In addition, an assessment of not more than three (3) times the total amount claimed for each item or service may also apply, and a violator may be subject to exclusion from federal and state healthcare programs.

### Federal and State Insurance and Managed Care Laws

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. Some states require downstream entities and RBEs to obtain an insurance license, a certificate of authority, or an equivalent authorization, in order to participate in downstream risk-sharing arrangements with payors. In some states, statutes, regulations and/or formal guidance explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity. However, the majority of states do not explicitly address the issue, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements, as well as reporting obligations. Further, state regulatory stances regarding downstream risk-sharing arrangements can change rapidly and codified provisions may not keep pace with evolving risk-sharing mechanisms.

18

APP 555

Table of Contents

*Healthcare Reform*

In March 2010, the Patient Protection and Affordable Care Act (the "ACA") and the accompanying Health Care and Education Affordability Reconciliation Act, collectively referred to as the ACA, were enacted. The ACA includes a variety of healthcare reform provisions and requirements, which continue to be implemented and substantially changed the way healthcare is financed by both governmental and private insurers.

However, due to government action over the last several years, a number of changes have been made to the provisions of the ACA since 2010, including reduced funding. Looking forward, the future of the ACA and its underlying programs are subject to continuing and substantial uncertainty, making long-term business planning exceedingly difficult. Because of the continued uncertainty about the implementation of the ACA, including the timing of and potential for further legal challenges, repeal or amendment of that legislation and the future of the health insurance exchanges, we cannot quantify or predict with any certainty the likely impact of the ACA on our business, financial condition, operating results and prospects.

The CMS Innovation Center continues to test an array of alternative payment models, including the Direct Contracting Model to allow DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. State regulation of DCEs will likely be variable. For example, certain states may require DCEs to obtain specific licensure to participate in the Direct Contracting Model and assume risk directly from CMS. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare. Further, CMS also routinely adjusts the risk adjustment factor which is central to payment under the MA program. The monetary "coefficient" values associated with diseases that we manage in our population are subject to change by CMS. Such changes could have a material adverse effect on our financial condition.

In February 2022, the CMS Innovation Center announced that it is redesigning the Direct Contracting model and renaming it the ACO REACH Model. The ACO REACH Model aims to improve quality of care through better care coordination and increased access to accountable care in underserved communities. The CMS Innovation Center concurrently introduced a Request for Applications (RFA) for a new cohort to begin the model on January 1, 2023, and it announced that all current Direct Contracting model participants that meet ACO REACH requirements would be permitted to continue participating in the ACO REACH model as ACOs. The ACO REACH requirements outlined thus far include the development and implementation of a robust health equity plan to identify disparities in care and better serve underserved communities; the requirement that at least 75% control of each ACO's governing body be held by participating providers or their designated representatives (compared to 25% during the first two performance years of the Direct Contracting model); and the requirement that there be at least two beneficiary advocates on the governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. We began our participation in the ACO REACH Model in January 2023, and these new requirements have not had a material impact on our current or future participation in this program, or inhibited our ability to continue and grow our participation in the model. In addition, the CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes has been minimal thus far.

*Federal and State Privacy and Security Requirements*

We are subject to various federal, state and local laws and rules regarding the use, security and disclosure of protected health information ("PHI"), personally identifiable information, de-identified data and other categories of confidential or legally protected data that our businesses may handle. Such laws and rules include, without limitation, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") and state privacy and security laws. Privacy and security laws and regulations often change due to new or amended legislation, regulations or administrative interpretation. We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We also utilize third-party service providers for important aspects of the collection, storage and transmission of such sensitive information.

Congress enacted HIPAA, in part, to combat healthcare fraud and to protect the privacy and security of patients' individually identifiable healthcare information. Among other things, HIPAA requires healthcare providers and their

19

**APP 556**

Table of Contents

business associates to maintain the privacy and security of individually identifiable PHI. The HIPAA Security Rule requires both covered entities and business associates to develop and maintain policies and procedures with respect to PHI, including adherence to HIPAA's security standards through the implementation of administrative, physical and technical safeguards to protect PHI. Additionally, the Privacy Rule contains requirements with respect to the use and disclosure of individuals' PHI, including a prohibition on a covered entity or business associate using or disclosing an individual's PHI unless the use or disclosure is authorized by the individual or is specifically required or permitted under the Privacy Rule. The Health Information Technology for Economic and Clinical Health of 2009 ("HITECH") dramatically expanded, among other things, (1) the scope of HIPAA to now apply directly to "business associates," or independent contractors who receive or obtain PHI in connection with providing a service to a covered entity or another business associate, (2) substantive security and privacy obligations, including a new federal security breach notification requirement that unauthorized acquisitions, access, use or disclosure of PHI be reported to, depending on the number of people affected and their location, affected individuals, the Department of Health and Human Services and local media outlets, (3) restrictions on marketing communications, a prohibition on business associates from receiving remuneration in exchange for PHI, and a prohibition on covered entities from receiving remuneration in exchange for PHI without express patient authorization and (4) the civil and criminal penalties that may be imposed for HIPAA violations. Pursuant to HIPAA, as amended by HITECH, we are required to report breaches of unsecured PHI to our covered entity clients, such as our physician group partners, within 60 days of discovery of the breach, and notify certain agencies and potentially the media in accordance with clause (2) above. We have experienced cybersecurity incidents in the past and may experience them in the future. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could result in, among other things, federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties.

HIPAA mandates that the Secretary of HHS conduct periodic audits of covered entities and business associates for compliance with the HIPAA Privacy and Security Rules. HIPAA imposes penalties for certain violations, subject to a cap of $1.5 million for violations of the same standard in a single calendar year. A single data privacy or data security incident can, in the view of HHS, result in violations of multiple standards. HIPAA, as amended by the HITECH Act, also authorizes state attorneys general to file suit on behalf of their states' residents. While HIPAA does not create a private right of action allowing individuals to sue us in federal court for violations of HIPAA, its standards have been used as a basis for establishing a duty of care in state-law civil suits alleging negligence or recklessness for the misuse of PHI. A finding of liability under HIPAA could have a material adverse effect on our business, financial condition and results of operations. In order to ensure compliance, we encrypt and back up data, maintain company-wide security awareness training, enter into business associate agreements with our partners, as well as ensure our partners have implemented physical security and safeguards at the data centers where our data is stored and conduct regular internal and external security audits. Although we employ administrative, physical and technological safeguards to help protect confidential and other sensitive information from unauthorized access or disclosure, our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to attacks by hackers or viruses, failures or breaches due to third-party action and employee (including contractor) negligence, error or malfeasance.

Additionally, many states also enacted laws that protect the privacy and security of confidential, personal and health information, which may be even more stringent than HIPAA and may add additional compliance costs and legal risks to our operations. Some state privacy and security laws overlap with federal law, some of which are preempted, in part, by federal laws, whereas others are not. States have also passed privacy and security laws and regulations that apply across sectors and go beyond federal law, such as data security laws, secure destruction, Social Security number privacy, online privacy, biometric information privacy, and data breach notification laws. Some of these state laws may impose fines and penalties on violators and may afford private rights of action to individuals who believe their personal information has been misused.

We are also subject to a provision of the federal 21st Century Cures Act that is intended to facilitate the appropriate exchange of health information. In May 2020, the United States Department of Health and Human Services Office of the National Coordinator for Health Information Technology and CMS issued complementary new rules that are intended to clarify provisions of the 21st Century Cures Act. The rules, intended to enhance interoperability and prevent information blocking, create significant new requirements for healthcare industry participants, including requirements to (i) provide patients with convenient access to health care information, (ii) support electronic exchange of data for transitions of care and (iii) require participation in trust networks to improve

APP 557

Table of Contents

interoperability. The 21st Century Cures Act authorizes civil monetary penalties up to $1 million per information blocking "violation." It is unclear at this time what the costs of compliance with the new rules will be, and what additional risks there may be to our business. Looking ahead, it is possible that the American Data Privacy and Protection Act ("ADPPA"), a landmark federal privacy bill with significant bipartisan support, may gain traction. Although ADPPA would not apply to health data covered by HIPAA, it would apply to other health data, such as health data controlled by certain entities in the digital health space. Various other federal and state laws may apply that restrict the use and protect the privacy and security of individually identifiable information, as well as employee personal information, including certain state laws modeled to some extent on the European Union's General Data Protection Regulation. Federal and state consumer protection laws, including laws that do not on their face specifically address data privacy or security, have been applied to data privacy and security matters by a range of government agencies and courts.

**Consumer Protection Laws**

Healthcare providers are also subject to the Telephone Consumer Protection Act ("TCPA"), which regulates the manner in which a business may advertise its products and services to consumers by phone, text and fax. The TCPA was enacted by Congress to combat aggressive telemarketing and fax advertising practices believed to invade consumer privacy. The TCPA also regulates the use of automated equipment to deliver calls or text messages to mobile phones without prior express consent. Congress empowered the FCC to interpret the TCPA through rules, regulations and declaratory rulings. A 2015 order from the FCC clarified that calls or text messages that have an express healthcare-related purpose —such as treatment follow-up, appointment confirmations and reminders or pre-operative instructions—are exempt from the TCPA. In these instances, providers are not required to receive prior express consent from patients before reaching out by phone or text. As healthcare companies, such as ourselves, increasingly rely on mobile delivery platforms and other technologies to communicate with patients about appointments, billing and other issues, the potential for legal exposure under the TCPA also increases. Each call or text made in violation of the TCPA can cost up to $1,500 per instance in fines and damages. Because there is no cap on statutory damages, violations can result in millions of dollars in penalties.

**Competition and Antitrust Laws**

We are subject to numerous statutes that govern competition in our industry, including the Sherman Act, the FTC Act and the Clayton Act. The Sherman Act, 15 U.S.C. §§ 1-7, outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." The penalties for violating the Sherman Act can be severe. Most enforcement actions are civil, but individuals and businesses that violate the Sherman Act may be prosecuted criminally by the DOJ. Criminal prosecutions are typically limited to clear violations, such as when competitors fix prices, allocate markets or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a corporation and $1 million for an individual, along with up to 10 years in prison. Under federal law, the maximum fine may be increased to twice the amount the conspirators gained from the illegal acts or twice the money lost by the victims of the crime, if either of those amounts is more than $100 million.

The FTC Act, 15 U.S.C. §§ 41-58, bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said that all violations of the Sherman Act also violate the FTC Act. Thus, although the FTC does not technically enforce the Sherman Act, it can bring cases under the FTC Act against the same kinds of activities that violate the Sherman Act. The FTC Act also reaches other practices that harm competition, but that may not fit neatly into categories of conduct formally prohibited by the Sherman Act. Only the FTC brings cases under the FTC Act.

The Clayton Act, 15 U.S.C. §§ 12-27, addresses specific practices that the Sherman Act does not clearly prohibit, such as mergers and interlocking directorates (that is, the same person serving as an officer or director of two competing companies). Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, 15 U.S.C. § 13, the Clayton Act also bans certain discriminatory prices, services and allowances in dealings between merchants. The Clayton Act was amended again in 1976 by the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, to require companies planning large mergers or acquisitions to notify the government of their plans in advance. The Clayton Act also authorizes private parties to sue for treble damages when they have been

21

Table of Contents

harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

In addition to these federal statutes, most states have antitrust laws that are enforced by state attorneys general or private plaintiffs. Many state statutory provisions are based on federal antitrust law, namely, Sections 1 and 2 of the Sherman Act, and Sections 3 and 7 of the Clayton Act. Further complicating matters, state lawmakers are increasingly seeking to exercise oversight over healthcare transactions and allow state agencies to analyze potential anticompetitive effects of healthcare consolidation, including smaller transactions that do not meet federal reporting thresholds.

As the healthcare industry has continued to evolve in response to consumer demand and competition in the marketplace, the effect of the antitrust laws in healthcare is also changing. We have expanded our operations significantly since our inception, organically as well as through acquisitions. Such growth, and our long-term contracts with physician partners, could expose us to risks related to antitrust investigations and litigation. Competition and antitrust law inquiries often continue for several years and, if violations are found, can result in substantial fines.

### Other Laws and Regulations

Some states in which we operate require licensing or registration for operations related to, among others, utilization review on behalf of payors, including reviewing medical necessity and appropriateness of healthcare services, or processing claims in connection with insurance or managed care products. Such laws vary from state to state, and our operations may be subject to exemption in certain states.

Additionally, our physician partners are subject to numerous federal, state and local licensing laws and regulations, relating to, among other things, professional credentialing and professional ethics. Our physician partners, as well as their nurse practitioners, must satisfy and maintain their individual professional licensing in each state where they practice medicine.

Further, organizations that receive reimbursement from a federal or state government payor are expected by the federal government to have a compliance program. For those organizations that do not receive reimbursement from any federal or state government payors, a compliance program is not mandatory but is considered best practice. As a result, we maintain a program to monitor compliance with federal and state laws and regulations applicable to healthcare entities. We have a compliance department that is charged with implementing and supervising our compliance program, which includes the adoption of (i) a Code of Conduct for our employees and affiliates and (ii) a process that specifies how employees, affiliates and others may report regulatory or ethical concerns to our compliance officer. We believe that our compliance program meets the relevant standards provided by the OIG of the Department of Health and Human Services. An important part of our compliance program consists of conducting periodic audits of various aspects of our operations. We also conduct mandatory educational programs designed to familiarize our employees with the regulatory requirements and specific elements of our compliance program.

Table of Contents

We are also impacted by federal and state laws and policies that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in its operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare.

**Available Information**

Our website address is www.agilonhealth.com. We use our website as a routine channel for distribution of information that may be material to investors, including news releases, financial information, presentations and corporate governance information. Information contained or connected to our website is not incorporated by reference in this Annual Report on Form 10-K unless expressly noted. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") are available on our website, free of charge, as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the U.S. Securities and Exchange Commission ("SEC"). Additionally, the SEC maintains a website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us, at www.sec.gov.

23

APP 560

Table of Contents

**ITEM 1A. Risk Factors**

**The section below discusses the most significant risk factors that may materially adversely affect our business, results of operations and financial condition.**

**Risks Related to Our Business**

*We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability.*

We have incurred significant net losses in prior years and have a substantial accumulated deficit. We expect that our expenses will increase substantially in the foreseeable future and our losses may continue, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

*Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives and achieve required operational scale to support our growth may have a material adverse effect on our business, financial condition, cash flows, and results of operations.*

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As a young and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and

24

**APP 561**

Table of Contents

financial management, including our reporting systems, procedures and controls and management and mitigation of enterprise and operational risks. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations, maintaining adequate financial and operating systems and controls, executing upon our growth initiatives and achieving required operational scale to support our growth. If we do not successfully manage these processes, our business, financial condition, cash flows, and results of operations could be harmed.

***We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.***

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, as a young and rapidly growing company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows, and results of operations could be harmed.

***Amounts of medical expenses that are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.***

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows, and results of operations.

Additionally, factors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:

- Changes to the Medicare fee schedule or other rate schedules that serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;

- The utilization rates of healthcare services, including inpatient hospitalization, by our members;

- Changes to member benefit levels established annually by payors; and

- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows, and results of operations.

25

**APP 562**

Table of Contents

***As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.***

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and, therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or that are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

***We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.***

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

***We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.***

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced significant volatility and disruption. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access the credit facility agreement we executed in February 2021 (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "Secured Credit Facilities").

26

APP 563

Table of Contents

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable timeframe, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

### Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows, and results of operations.

A significant reduction in membership could adversely affect our business, financial condition, cash flows, and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:

• failure to obtain new physician partners or members or to retain existing physician partners or members;

• decision by a payor to not renew the existing contractual agreement upon termination of such contract;

• low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;

• alternative care opportunities that are more attractive than those provided by our physician partners;

• premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;

• negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

• failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and

• federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

### The transition to a Total Care Model may be challenging for physician partners.

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

27

Table of Contents

***The spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics may adversely affect us.***

COVID-19 continues to impact the United States and the rest of the world and the pandemic has led to significant economic disruption. Although the COVID-19 public health emergency is set to end on May 11, 2023, the spread of COVID-19 and its impact on the worldwide economy and the healthcare industry underscores risks we face related to pandemics.

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, potential new variants of COVID-19 and entirely new pandemics, increasing the potential for harm for our members. If the spread of COVID-19, potential new variants of COVID-19, and entirely new pandemics are not contained, the medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, potential new variants of COVID-19 and entirely new pandemics, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time and reduce preventative care to manage their existing clinical conditions.

The spread of COVID-19, potential new variants of COVID-19 and entirely new pandemics, or actions including the efficacy, ability to administer or extent of adoption of applicable vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations.

The rapid development and fluidity of COVID-19 precludes any prediction as to the ultimate impact on us of COVID-19, potential new variants of COVID-19, and entirely new pandemics. We are continuing to monitor the spread of COVID-19, potential new variants of COVID-19, and entirely new pandemics, changes to our payors' benefit coverages, the ongoing costs and business impacts of dealing with the pandemic, including the potential costs associated with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of any pandemic and its ultimate impact on us are uncertain, but such impacts could be material to our business, financial condition, cash flows, and results of operations.

***Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.***

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services that have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

28

APP 565

Table of Contents

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

***Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.***

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows, and results of operations to be harmed.

***Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.***

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions that would adversely affect our business, financial condition, cash flows, and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

***We rely on our management team and key employees and our business, financial condition, cash flows, and results of operations could be harmed if we are unable to retain qualified personnel.***

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. In order to retain and motivate valuable employees, in addition to salary and cash incentives, we provide stock options and restricted stock units that either vest over time or are based on the performance against predetermined financial targets. The value to employees of these stock options is significantly affected by movements in our stock price that are substantially outside our control. The compensation and benefits we provide to our employees, together with the value of stock options and restricted

29

Table of Contents

stock units that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows, and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. Continued increased competition for, or a shortage of, qualified personnel due to pandemics, general labor market conditions, low levels of unemployment, or general inflationary pressures, may require that we enhance our pay and benefits package to compete effectively for such personnel. We may not be able to retain our current key personnel or attract, train, integrate, or retain other highly skilled personnel in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows, and results of operations will be harmed.

*We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.*

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

*Security breaches, cybersecurity attacks, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.*

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as PHI and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches

30

Table of Contents

in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing. The risk of cyberattacks has also increased and will continue to increase in connection with Russia's invasion of Ukraine. In light of the Ukraine war and other geopolitical events and dynamics, including ongoing tensions with North Korea, Iran and other states, state-sponsored parties or their supporters may launch retaliatory cyberattacks, and may attempt to cause supply chain disruptions, or carry out other geopolitically motivated retaliatory actions that may adversely disrupt or degrade our operations and may result in data compromise. State-sponsored parties have, and will continue, to conduct cyberattacks to achieve their goals that may include espionage, monetary gain, disruption, and destruction. To accomplish their goals, state-sponsored parties and other cyber criminals have used, and may continue to use, various attack vectors and methods as discussed above.

We, like most companies today, are subject to cybersecurity attacks and may experience cybersecurity incidents in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements" in Item 1 above. Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

### *If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.*

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

31

Table of Contents

***We may be responsible for certain liabilities in connection with the disposition of our California Operations.***

In February 2021, we completed the divestiture of our California Operations. We will continue to be responsible for any liabilities arising from the business that were incurred prior to the closing date of the transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 20. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this report. We may not be successful in managing the risks associated with the divestiture of our California operations.

***Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.***

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

## Risks Related to Our Reliance on Third Parties

***We are economically dependent on maintaining our contracts with a limited number of key payors.***

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this report. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

***Our contracts with our payors are for limited terms and may not be renewed upon their expiration.***

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

32

Table of Contents

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.*

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information that payors provide to us, we and our physician partners may not be able to effectively ensure our members' disease burdens are identified and may not be able to effectively operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows, and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

33

Table of Contents

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

### *Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

34

Table of Contents

***We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.***

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

The DOJ has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors, including MA plans, for alleged falsification of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues. Furthermore, in some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other fraud and abuse laws, such as the federal Anti-Kickback Statute. While we believe that our data recordation practices and relationships with providers comply with applicable laws and regulations, such arrangements may be subject to audits, reviews and investigation, which may result in substantial costs and may divert management's attention and resources.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for substantial penalties to the government under the False Claims Act for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was

35

Table of Contents

not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows, and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.

36

APP 573

Table of Contents

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;

- communications failures;

- software and hardware errors, failures and crashes;

- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and

- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

**Risks Related to Our Industry and Government Programs**

***Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows, and results of operations.***

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally, consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows, and results of operations.***

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for substantially all of our revenues for our immediately preceding fiscal years. Additionally, we

37

Table of Contents

began participating in the Direct Contracting Model in April 2021. While the DCE's are not consolidated, they still have an impact on our profitability.

Additionally, in February 2022, the CMS Innovation Center announced that it is redesigning the Direct Contracting model and renaming it the ACO REACH Model. The CMS Innovation Center concurrently introduced a Request for Applications ("RFA") for a new cohort to begin the model on January 1, 2023, and it announced that all current Direct Contracting model participants that meet ACO REACH requirements would be permitted to continue participating in the ACO REACH model as ACOs. The ACO REACH requirements outlined thus far include the development and implementation of a robust health equity plan to identify and better serve underserved communities; the requirement that at least 75% control of each ACO's governing body be held by participating providers or their designated representatives (compared to 25% during the first two Performance Years of the Direct Contracting model); and the requirement that there be at least two beneficiary advocates on the governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. We began our participation in the ACO REACH Model in January 2023, and these new requirements have not had a material impact on our current or future participation in this program, or inhibited our ability to continue and grow our participation in the model. In addition, the CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes has been minimal thus far.

The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows, and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

The financial aspects of the ACO REACH Model are set forth in an agreement between the ACO and CMS. CMS has the right to amend the agreement without the consent of the DCE for good cause or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules. We cannot predict whether CMS will amend such agreements and, if CMS amends such agreements, the impact such amendments may have on the financial aspects of our participation in the model, including, but not limited to, risk adjustment models used to set benchmarks, the rate book, capitation payment mechanisms and the calculation of shared savings and losses. Furthermore, changes to Medicare (including the ACO REACH Model) or MA, such as if CMS were to scale back models or cut MA payments, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

38

Table of Contents

***Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

***We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows, and results of operations will be harmed.***

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

Table of Contents

***Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.***

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the ACA, the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. Certain flexibilities that allowed plans to score higher on STAR ratings to counteract financial pressures caused by the COVID-19 pandemic are no longer in effect. Further, the 2022 Proposed Rule sets forth several proposals that would, among other things, impact the STAR ratings program, including: (i) developing a health equity index to reward contracts that obtain a high measure-level score for the subset of enrollees with specified social risk factors, (ii) reducing the weight of patient experience/complaints and access measures, and (iii) removing select measures. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows, and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low-quality rating for three consecutive years. Low-quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.***

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past resulted, and could in the future result, in substantial reductions in our revenue and operating margins.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may be further impacted

40

**APP 577**

Table of Contents

by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business, particularly in recent years, as MA payment rates have been subjected to increased scrutiny. We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. We, in conjunction with some of our physician partners, began participating in the Direct Contracting Model in certain geographies in 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has been built upon CMS' experience with other programs, including MA and the Medicare Shared Savings Program, but also has new elements, such as a risk adjustment model developed specifically for use in the Direct Contracting Model. Likewise, the Direct Contracting Model rate book is based on the same methodology used for the MA rate book but has been modified in light of the characteristics of the Direct Contracting Model. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

We are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. Alternatively, CMS may choose to limit additional new DCE entrants in future years to those who attend to underserved communities or are controlled by provider entities.

41

Table of Contents

Additionally, in February 2022, the CMS Innovation Center announced that it is redesigning the Direct Contracting model and renaming it the ACO REACH Model. The CMS Innovation Center concurrently introduced a RFA for a new cohort to begin the model on January 1, 2023, and it announced that all current Direct Contracting model participants that meet ACO REACH requirements would be permitted to continue participating in the ACO REACH model as ACOs. The ACO REACH requirements outlined thus far include the development and implementation of a robust health equity plan to identify and better serve underserved communities; the requirement that at least 75% control of each ACO's governing body be held by participating providers or their designated representatives (compared to 25% during the first two Performance Years of the Direct Contracting model); and the requirement that there be at least two beneficiary advocates on the governing board (at least one Medicare beneficiary and at least one consumer advocate), both of whom must hold voting rights. We began our participation in the ACO REACH Model in January 2023, and these new requirements have not had a material impact on our current or future participation in this program, or inhibited our ability to continue and grow our participation in the model. In addition, the CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations. The overall effect of these changes has been minimal thus far.

There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations, including with respect to our contractual relationships with providers and payors.

*We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.*

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows, and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

*We may be subject to regulatory inquiries and corrective action plans imposed by our payors and may be required to contribute a material amount of risk-bearing capital to our local operating subsidiaries.*

We may be subject to regulatory inquiries and corrective action plans imposed by our payors and we may be audited by payors and regulatory bodies. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. There is also a risk that such risk-bearing capital amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

APP 579

Table of Contents

*Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.*

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

*CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.*

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues. Our revenues could be further reduced by budget reconciliation bills, which could increase the MA coding intensity adjustment.

*Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.*

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;

- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;

- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or

- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

**Legal and Regulatory Risks**

Table of Contents

***The healthcare industry is heavily regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our prior or current conduct, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law. Further, it is unknown, whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows, and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the CMPL, which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;

- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;

- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing DHS if the physician (or his/her immediate family member) has a financial relationship with that entity;

- Provisions of, and regulations enacted pursuant to, HIPAA, as amended, HITECH, and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;

- Provisions of, and regulations enacted pursuant to, the 21st Century Cures Act, regarding interoperability and prohibitions against information blocking;

- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;

- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;

- State laws that govern the activities of third-party administrators and utilization review agents; and

- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters" in Item 1.

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or

44

**APP 581**

Table of Contents

alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may in the future be a party to various and material lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in federal healthcare programs;

- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;

- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;

- enforcement actions by governmental agencies or monetary penalties for violations of the 21st Century Cures Act;

- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;

- mandated changes to our practices or procedures that materially increase operating expenses;

- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;

- termination of various relationships or contracts related to our business; and

- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly, any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

45

Table of Contents

***If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.***

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to increase the quality of care while appropriately managing overall costs and participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law" in Item 1.

The laws and regulations are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows, and results of operations.

***Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.***

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. Notably, CMS's 2022 Proposed Rule includes, among other things, significant new MA marketing requirements and modifications. CMS's proposals are a response to increased congressional and press attention to MA marketing practices, including a 2022 US Senate Finance Committee report that detailed deceptive marketing practices by MA plans; the report urged CMS to take action to protect Medicare beneficiaries. The 2022 Proposed Rule includes more than 20 distinct changes to the marketing regulations as well as broad-ranging proposals that address potentially misleading advertising. In addition, through our participation in the CMS Innovation Center Direct Contracting Model, we (either as a DCE or as a service provider to our physician partners who are participating in the model) must comply with provisions in the participation agreements with CMS regarding marketing and outreach activities. For example, DCEs must have their plans for marketing activities approved by CMS and are prohibited from engaging in some forms of marketing activities such as door-to-door solicitation. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse.

46

APP 583

Table of Contents

See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute" in Item 1. Our physician partners and the payors with which we contract risk violating applicable state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (e.g., the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Our business development and member engagement activities may implicate the TCPA, related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws" in Item 1. A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows, and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's PHI in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

### *Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.*

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters" in Item 1. Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs, as well as significant potential monetary liabilities. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory Matters—Other Laws and Regulations" in Item 1. If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows, and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

47

**APP 584**

Table of Contents

***Our use, disclosure and processing of personally identifiable information, PHI, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements" in Item 1. These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be directly liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time-to-time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Additionally, on December 1, 2022, OCR issued guidance on the use of tracking technologies on websites and mobile applications, indicating that certain information collected from websites and applications may

48

Table of Contents

implicate HIPAA. Although HIPAA does not itself provide a private right of action, it is commonly cited in consumer actions that allege improper use and disclosure of sensitive patient data: use of tracking technologies, such as cookies, web beacons, and pixels, by covered entities or their business associates has recently been subject to class action lawsuits alleging improper disclosure of patient information. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows, and results of operations.

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. For example, we note that in 2019, the Office of Civil Rights announced the creation of its Right of Access Initiative, intended to support individuals' right of timely access to their health records. Since the creation of the Right of Access Initiative, there has been substantial enforcement activity related to covered entities' alleged failures to provide individuals with timely access to their health records. To the extent the physician partners' non-compliance with HIPAA rules and regulations impacts members who are attributed to our RBEs (*e.g.*, through the loss of PHI or failure to provide timely access to health records), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.***

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws" in Item 1. We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.***

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a non-medical professional entity may violate the corporate practice of medicine doctrine. See "Business—Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine" in Item 1. A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

49

Table of Contents

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.*

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person who could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

### *We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows, and results of operations.*

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

50

Table of Contents

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

## Risks Related to Our Indebtedness

***Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the 2021 Credit Agreement do not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

***The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.***

Our Credit Facilities contain covenants that, among other things, restrict the ability of our subsidiary agilon health management, inc. ("agilon management") and its subsidiaries to:

- incur additional indebtedness and create liens;

- pay dividends and make other distributions or to purchase, redeem or retire capital stock;

- purchase, redeem or retire certain junior indebtedness;

- make loans and investments;

- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;

- sell assets;

- enter into certain types of transactions with affiliates;

- consolidate, merge or sell substantially all assets;

- make voluntary payments or modifications of junior indebtedness; and

51

**APP 588**

Table of Contents

- enter into lines of business.

agilon management and its subsidiaries account for substantially all of our assets and total liabilities. Consequently, the restrictions in the Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the Credit Facilities, could proceed against the collateral securing the indebtedness. This could materially and adversely affect our business, financial condition, cash flows, and results of operations, and could cause us to become bankrupt or insolvent.

## Risks Related to Our Common Stock

***agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.***

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows, and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

***Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities.***

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation address potential conflicts of interest between agilon health, on the one hand, and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve

52

Table of Contents

conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

***Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.***

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;

- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;

- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;

- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- opt out of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;

- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future.

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor owns, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital

53

**APP 590**

Table of Contents

needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***We are no longer a "controlled company" within the meaning of the NYSE rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

From August 12, 2022, CD&R Investor no longer controlled a majority of the voting power of our outstanding common stock, and we ceased to be a "controlled company" within the meaning of the NYSE corporate governance standards. As a result, the NYSE rules require that we have a majority of independent directors on our board of directors within one year of the date we no longer qualified as a "controlled company," have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualified as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules and we presently do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations during the transition period. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance rules and requirements of the NYSE discussed herewith. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the DGCL, or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for

Table of Contents

the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows, and results of operations.

*We have identified material weaknesses in our internal control over financial reporting. If we are unable to remediate these material weaknesses, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial results, in which case our business may be harmed, investors may lose confidence in the accuracy and completeness of our financial reports and, as a result, our common stock price may be adversely affected and we may be unable to maintain compliance with NYSE listing requirements.*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on our system of internal control. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. As a public company, we are required to comply with the Sarbanes-Oxley Act and other rules that govern public companies. In particular, we are required to certify our compliance with Section 404 of the Sarbanes-Oxley Act, which requires us to furnish annually a report by management on the effectiveness of our internal control over financial reporting. In addition, our independent registered public accounting firm is required to report on the effectiveness of our internal control over financial reporting.

In connection with our year-end assessment of internal control over financial reporting, we identified material weaknesses in our internal control over financial reporting as of December 31, 2022. For a discussion of our internal control over financial reporting and a description of the identified material weaknesses, see Part II, Item 9A, "Controls and Procedures."

As further described in Item 9A "Controls and Procedures - Management's Report on Internal Control Over Financial Reporting and Remediation of the Material Weaknesses in Internal Control Over Financial Reporting," we are undertaking steps to improve our internal control over financial reporting. We expect that we will need to improve existing operational and financial systems, procedures and controls, and implement new ones, to manage our future business effectively. However, we may not be successful in making the improvements necessary to remediate the material weaknesses identified by management or be able to do so in a timely manner, or be able to identify and remediate additional control deficiencies or material weaknesses in the future. Any implementation delays, or disruption in the transition to new or enhanced systems, procedures or controls, could harm our ability record and report financial and management information on a timely and accurate basis. If our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us.

**ITEM 1B. Unresolved Staff Comments**

None.

**ITEM 2. Properties**

As of December 31, 2022, we leased approximately 147,000 gross square feet relating to 16 office facilities. We believe our facilities are adequate and suitable for our current needs and that should it be needed, suitable additional or alternative space will be available to accommodate our operations.

Table of Contents

**ITEM 3. Legal Proceedings**

See "Legal Proceedings" section of Note 12 to the Consolidated Financial Statements for information regarding legal proceedings, which information is incorporated by reference in this Item 3.

**ITEM 4. Mine Safety Disclosures**

Not applicable.

**PART II**

**ITEM 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information for Common Stock**

Our Class A common stock, par value $0.01 per share, is listed on the New York Stock Exchange under the symbol "AGL" and began trading on April 15, 2021. Prior to that date, there was no public trading market for our common stock.

**Holders of Common Stock**

At February 24, 2023, we had 772 stockholders of record of common stock. The actual number of holders of our Class A common stock is greater than the number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or other nominees. The number of holders of record present here also do not include stockholders whose shares may be held in trust by other entities.

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock, and we do not currently intend to pay any cash dividends for the foreseeable future. We expect to retain future earnings, if any, to fund the development and growth of our business. Any future determination to pay dividends on our common stock will be made at the discretion of the Board and will depend upon, among other factors, our financial condition, operating results, current and anticipated cash needs, plans for expansion and other factors that the Board may deem relevant. In addition, our ability to pay dividends to holders of our common stock is significantly limited as a practical matter by the Credit Facilities insofar as we may seek to pay dividends out of funds made available to us by agilon health management inc. or its subsidiaries, because the Credit Facilities restrict agilon management's ability to pay dividends or make loans to us.

**Unregistered Sales of Equity Securities and Issuer Purchases of Equity Securities**

*Unregistered Sales of Equity Securities*

During the fiscal year ended December 31, 2022, we issued 247,200 legacy director restricted stock units for retirement and amendment. The issuances of these securities described above were deemed to be exempt from registration under the Securities Act in reliance on Section 4(a)(2) of the Securities Act as transactions by an issuer not involving a public offering. The recipients of securities in each of these transactions acquired the securities for investment only and not with a view to or for sale in connection with any distribution thereof. Each of the recipients of securities in these transactions was an accredited investor within the meaning of Rule 501 of Regulation D under the Securities Act.

*Issuer Purchases of Equity Securities*

There were no repurchases of equity securities during the year ended December 31, 2022.

Table of Contents

**Performance Graph**

The graph and table below compare the cumulative total return of agilon, the S&P 500, and the S&P 500 Health Care Index from April 15, 2021 (the date our common stock began trading on the NYSE) to December 31, 2022. Total cumulative return is based on a $100 investment and assumes reinvestment of dividends before consideration of income taxes. Stockholder returns over the indicated periods should not be considered indicative of future stock prices or stockholder returns.

**COMPARISON OF FIVE-YEAR CUMULATIVE TOTAL RETURN**

**RATE OF RETURN TREND COMPARISON**

**April 15, 2021–DECEMBER 31, 2022**

**(April 15, 2021 = $100)**

**Performance Graph Total Stockholder Return**

| | 4/15/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 |
|---|---|---|---|---|---|---|---|---|
| agilon health, inc. | $ 100 | $ 176 | $ 114 | $ 117 | $ 110 | $ 95 | $ 102 | $ 70 |
| S&P 500 | 100 | 104 | 105 | 117 | 111 | 93 | 89 | 96 |
| S&P 500 Health Care | 100 | 107 | 108 | 120 | 117 | 110 | 105 | 118 |

**ITEM 6. [Reserved]**

57

**APP 594**

Table of Contents

**ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The information set forth in this Item 7 is intended to provide readers with an understanding of our financial condition, changes in financial condition and results of operations. We will discuss and provide our analysis in the following order:

- Overview and Key Developments
- COVID-19
- Key Financial and Operating Metrics
- Key Components of Our Results of Operations
- Results of Operations
- Non-GAAP Financial Measures
- Liquidity and Capital Resources
- Critical Accounting Estimates

**Overview and Key Developments**

Our business is transforming healthcare by empowering the PCP to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost, and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

*2022 Results:*

- Medicare Advantage members of approximately 269,500 as of December 31, 2022 increased 45% from 2021.
- DCE attributed beneficiaries of approximately 89,000 as of December 31, 2022 increased 72% from 2021.
- Total revenue of $2.7 billion increased 48% from 2021.
- Net loss of $107 million, compared to $407 million in 2021. 2021 includes the impact of $292 million in non-cash stock-based compensation expense, substantially all of which relates to shares issued under partner physician group equity agreements in connection with our IPO in April 2021.

58

Table of Contents

- Medical Margin of $305 million, compared to $182 million in 2021.

- Adjusted EBITDA of positive $4 million, compared to negative $39 million in 2021.

### *Platform Membership Details*

Medicare Advantage members increased 45% during 2022, which includes contributions from new geographies and growth within geographies existing prior to 2022. Total members live on the agilon platform include 269,500 Medicare Advantage members and 89,000 attributed Direct Contracting beneficiaries. Average Medicare Advantage membership during 2022 was approximately 263,900.

### COVID-19

We continue to monitor and assess the estimated operating and financial impact of COVID-19. Future developments, such as the severity and duration of new COVID-19 variants, COVID-19's impact on the U.S. economy, consumer behavior and health care utilization patterns, and the timing, scope, and impact of legislation as well as other federal, state, and local governmental responses to the pandemic could introduce new uncertainties to care patterns and our business. During the year ended December 31, 2022, overall care was near normal baseline levels, with certain areas of care at or approaching seasonal baselines. Future care patterns and acuity may temporarily rise due to missed regular care.

### Key Financial and Operating Metrics

*All of our key metrics exclude historical results from our California operations (which are included as discontinued operations in our consolidated financial statements).*

We monitor the following key financial and operating metrics to help us evaluate our business, identify trends affecting our business, formulate business plans and make strategic decisions. We believe the following key metrics are useful in evaluating our business (dollars in thousands):

| | As of and for the Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2020 |
| MA members | | 269,500 | | 186,300 | | 131,000 |
| Medical services revenue | $ | 2,704,396 | $ | 1,829,735 | $ | 1,214,270 |
| Medical margin | $ | 304,598 | $ | 182,076 | $ | 192,393 |
| Platform support costs | $ | 146,481 | $ | 123,521 | $ | 99,943 |
| Income (loss) from operations | $ | (120,431 ) | $ | (393,952 ) | $ | (56,673 ) |
| Network contribution[1] | $ | 132,322 | $ | 84,578 | $ | 99,016 |
| Net income (loss) | $ | (106,864 ) | $ | (406,787 ) | $ | (60,052 ) |
| Adjusted EBITDA[1] | $ | 4,251 | $ | (38,619 ) | $ | 5,827 |

[1] Network contribution and Adjusted EBITDA are non-GAAP financial measures. See "—Non-GAAP Financial Measures" for additional information, including reconciliations to the most directly comparable measures under generally accepted accounting principles ("GAAP").

### *Medicare Advantage Members*

Our MA members include all individuals enrolled in an MA plan that are attributed to the PCPs on our platform at the end of a given period.

### *Medical Services Revenue*

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to PMPM fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium that payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

Table of Contents

*Medical Margin*

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin PMPM may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

The following table presents our medical margin (dollars in thousands):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Medical services revenue | $ 2,704,396 | $ 1,829,735 | $ 1,214,270 |
| Medical services expense | (2,399,798) | (1,647,659) | (1,021,877) |
| Medical margin | $ 304,598 | $ 182,076 | $ 192,393 |

*Platform Support Costs*

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

The table below represents costs to support our live geographies and enterprise functions, which are included in general and administrative expenses (dollars in thousands):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Platform support costs | $ 146,481 | $ 123,521 | $ 99,943 |
| % of Revenue | 5% | 7% | 8% |

*Income (Loss) From Operations and Network Contribution*

Income (loss) from operations is the most directly comparable U.S. GAAP measure to network contribution. We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model, as it includes all medical services expense associated with our members' care as well as partner compensation and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

The following table presents our network contribution (dollars in thousands):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Medical services revenue | $ 2,704,396 | $ 1,829,735 | $ 1,214,270 |
| Medical services expense | (2,399,798) | (1,647,659) | (1,021,877) |
| Other medical expenses - operating geographies[1] | (172,276) | (97,498) | (93,377) |
| Network contribution | $ 132,322 | $ 84,578 | $ 99,016 |

(1)  Represents physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the years ended December 31, 2022, 2021, and 2020, costs incurred in implementing geographies were $23.9 million, $12.0 million and $8.9 million, respectively.

60

**APP 597**

Table of Contents

See "—Non-GAAP Financial Measures" for information regarding our use of network contribution and a reconciliation of income (loss) from operations to network contribution.

### Net Income (Loss) and Adjusted EBITDA

Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) geography entry costs, (vi) stock-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

See "—Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

## Key Components of Our Results of Operations

### Revenues

#### Medical Services Revenue

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to PMPM fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium that payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

Medical services revenue constitutes substantially all of our total revenue for the years ended December 31, 2022, 2021, and 2020.

For additional discussion related to our revenue, see "—Critical Accounting Estimates" and Note 2 to the Consolidated Financial Statements.

### Operating Expenses

#### Medical Services Expense

In each of our geographies, a network of physicians, hospitals, and other healthcare providers provide care to our members. Medical services expense represents costs incurred for medical services provided to our members. Our medical services expense trends primarily relate to changes in per visit costs incurred by our members, along with changes in health system and provider utilization of services. Medical services expenses are recognized in the period in which services are provided and include estimates of our obligations for medical services that have been rendered by third parties, but for which claims have either not yet been received, processed or paid.

For additional discussion related to our medical services expense, see "—Critical Accounting Estimates" and Note 2 to the Consolidated Financial Statements.

Table of Contents

*Other Medical Expenses*

Other medical expenses include: (i) partner physician compensation expense and (ii) other provider costs. Partner physician compensation expense represents obligations to our physician partners corresponding to a portion of the surplus generated in our geographies, which is a function of medical services revenues less the sum of medical services expenses, other provider costs and market operating costs, for the respective geography. Physician payment obligations are reconciled quarterly, and settlement payments are typically issued to providers on an annual basis in arrears, with interim payments issued periodically. Other provider costs include payments to support physician-patient engagement, certain other medical costs, and other care management expenses that help to create medical cost efficiency. Other provider costs include costs incurred for geographies that are in implementation and are not yet generating revenue.

*General and Administrative*

General and administrative expenses consist of market-based support personnel and other operating costs to support our geographies, personnel and other operating costs to support our enterprise functions, and investments to support development and expansion of our physician partners. Our enterprise functions include salaries and related expenses, stock-based compensation (including shares issued under partner physician group equity agreements), operational support expenses, technology infrastructure, finance, legal, as well as other costs associated with the continued growth of our platform. For the purposes of calculating physician partner incentive expense, we allocate a portion of our enterprise general and administrative expenses to our geographies.

General and administrative expenses also include severance, management fees paid to our largest shareholder prior to our IPO and accruals for unasserted claims.

*Depreciation and Amortization*

Depreciation and amortization expenses are associated with our property and equipment and acquired intangible assets. Depreciation includes expenses associated with buildings, computer and network equipment, furniture and fixtures, and leasehold improvements. Amortization primarily includes expenses associated with acquired intangible assets.

**Other Income (Expense)**

*Other Income (Expense), Net*

Other income (expense), net includes the following items:

- Equity income (loss) from unconsolidated joint ventures; and

- Interest income, which consists primarily of interest earned on our cash and cash equivalents, restricted cash and cash equivalents, and marketable securities, including amortization/accretion of discount/premium.

*Interest Expense*

Interest expense consists primarily of interest expense associated with our outstanding debt, including amortization of debt issuance costs.

**Income Tax Benefit (Expense)**

We are subject to corporate U.S. federal, state, and local income taxation. Deferred tax assets are reduced by a valuation allowance to the extent management believes it is not more likely than not to be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income. Management makes estimates and judgments about future taxable income based on assumptions that are consistent with our plans and estimates.

Table of Contents

***Total Discontinued Operations***

Total discontinued operations consist of the results of our California operations, which include the entirety of our Medicaid line of business. For certain of our California divestiture transactions, we continue to be responsible for any liabilities arising from the business that were incurred prior to the closing date of such transaction, including any fines, penalties, and other sanctions, the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified, and other contingent liabilities that we currently believe are remote. For additional discussion, see Note 20 to the Consolidated Financial Statements.

**Results of Operations**

The following table summarizes key components of our results of operations (dollars in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| **Revenues:** | | | |
| Medical services revenue | $ 2,704,396 | $ 1,829,735 | $ 1,214,270 |
| Other operating revenue | 3,815 | 3,824 | 4,063 |
| Total revenues | 2,708,211 | 1,833,559 | 1,218,333 |
| **Expenses:** | | | |
| Medical services expense | 2,399,798 | 1,647,659 | 1,021,877 |
| Other medical expenses | 196,127 | 109,487 | 102,306 |
| General and administrative (including noncash stock-based compensation expense of $28,381, $292,394, and $6,472, respectively) | 218,945 | 455,821 | 137,292 |
| Depreciation and amortization | 13,772 | 14,544 | 13,531 |
| Total expenses | 2,828,642 | 2,227,511 | 1,275,006 |
| **Income (loss) from operations** | (120,431) | (393,952) | (56,673) |
| **Other income (expense):** | | | |
| Other income (expense), net | 24,725 | (4,500) | 2,465 |
| Gain (loss) on lease terminations | (5,458) | — | — |
| Interest expense | (4,525) | (6,146) | (8,135) |
| **Income (loss) before income taxes** | (105,689) | (404,598) | (62,343) |
| Income tax benefit (expense) | (1,640) | (886) | (865) |
| **Income (loss) from continuing operations** | (107,329) | (405,484) | (63,208) |
| **Discontinued operations:** | | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | 491 | (3,463) | (20,049) |
| Gain (loss) on sales of assets, net | — | 473 | 20,401 |
| Income tax benefit (expense) | (26) | 1,687 | 2,804 |
| **Total discontinued operations** | 465 | (1,303) | 3,156 |
| **Net income (loss)** | (106,864) | (406,787) | (60,052) |
| Noncontrolling interests' share in (earnings) loss | 311 | 300 | — |
| **Net income (loss) attributable to common shares** | $ (106,553) | $ (406,487) | $ (60,052) |

APP 600

Table of Contents

The following table summarizes our results of operations as a percentage of total revenues:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **Revenues:** | | | |
| Medical services revenue | 100 % | 100 % | 100 % |
| Other operating revenue | — | — | — |
| Total revenues | 100 | 100 | 100 |
| **Expenses:** | | | |
| Medical services expense | 89 | 90 | 84 |
| Other medical expenses | 7 | 6 | 8 |
| General and administrative (including noncash stock-based compensation expense of 1%, 16%, and 1%, respectively) | 8 | 25 | 11 |
| Depreciation and amortization | 1 | 1 | 1 |
| Total expenses | 104 | 121 | 105 |
| **Income (loss) from operations** | (4 ) | (21 ) | (5 ) |
| **Other income (expense):** | | | |
| Other income (expense), net | 1 | — | — |
| Gain (loss) on lease terminations | — | — | — |
| Interest expense | — | — | (1 ) |
| **Income (loss) before income taxes** | (4 ) | (22 ) | (5 ) |
| Income tax benefit (expense) | — | — | — |
| **Income (loss) from continuing operations** | (4 ) | (22 ) | (5 ) |
| **Discontinued operations:** | | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | — | — | (2 ) |
| Gains (losses), net | — | — | 2 |
| Income tax benefit (expense) | — | — | — |
| **Total discontinued operations** | — | — | — |
| **Net income (loss)** | (4 ) | (22 ) | (5 ) |
| Noncontrolling interests' share in (earnings) loss | — | — | — |
| **Net income (loss) attributable to common shares** | (4 %) | (22 %) | (5 %) |

*Comparison of Year Ended December 31, 2022 and 2021*

*Medical Services Revenue*

| | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| *(dollars in thousands)* | 2022 | 2021 | $ | % |
| Medical services revenue | $ 2,704,396 | $ 1,829,735 | $ 874,661 | 48 % |
| *% of total revenues* | *100%* | *100%* | | |

Medical services revenue increased by 48%, due primarily to growth in average membership of 45% that was attributable to six new geographies that became operational in 2022 and growth in our existing geographies. The increase in medical services revenue was also driven, to a lesser extent, by a 2% increase in PMPM capitation rates.

64

**APP 601**

Table of Contents

*Medical Services Expense*

| (dollars in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | $ | % |
| Medical services expense | $ 2,399,798 | $ 1,647,659 | $ 752,139 | 46 % |
| % of total revenues | 89 % | 90 % | | |

Medical services expense increased by 46% due primarily to average membership growth of 45%, which was attributable to six new geographies that became operational in 2022 and growth in our existing geographies. Average medical services expense per member remained relatively flat compared to prior year.

*Other Medical Expenses*

| (dollars in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | $ | % |
| Other medical expenses | $ 196,127 | $ 109,487 | $ 86,640 | 79 % |
| % of total revenues | 7 % | 6 % | | |

Other medical expenses increased by $86.6 million, or 79%, for the year ended December 31, 2022 compared to 2021. Partner physician compensation expense increased by $42.8 million to $95.0 million in 2022 compared to $52.2 million in 2021 as a result of six new geographies that became operational in 2022 and growth in our existing geographies. Other provider costs increased by $43.9 million to $101.2 million in 2022 compared to $57.3 million in 2021, as the number of geographies and members on our platform increased in 2022. Other provider costs in 2022 include $23.9 million related to geographies that became operational in January 2023, while other provider costs in 2021 include $12.0 million of costs related to geographies that became operational in 2022.

*General and Administrative*

| (dollars in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | $ | % |
| General and administrative | $ 218,945 | $ 455,821 | $ (236,876 ) | (52 % ) |
| % of total revenues | 8 % | 25 % | | |

General and administrative expenses decreased $236.9 million, or 52%, for the year ended December 31, 2022 compared to 2021. Substantially all of the year-over-year decrease in general and administrative expenses is attributable to a $264.0 million decrease in non-cash stock-based compensation expense, which was largely related to shares issued under partner physician group equity agreements in connection with our IPO in April 2021 and the satisfaction of a performance condition associated with certain stock options in the third quarter of 2021.

Operating costs to support our live geographies and enterprise functions (platform support costs) increased by $23.0 million to $146.5 million in 2022 compared to $123.5 million in 2021 due primarily to growth in operating costs incurred to support geographies that became operational in 2022. Operating costs to support our live geographies and enterprise functions as a percentage of revenue decreased to 5% for the year ended December 31, 2022 compared to 7% for the same period in 2021. Investments to support geography entry increased to $43.9 million in 2022, compared to $20.6 million in 2021 due to increased costs associated with our geographies that become operational in the following calendar year.

In aggregate, costs incurred for severance, fees paid to our largest shareholder (pursuant to a consulting agreement, which terminated prior to the IPO), and accruals for unasserted claims and contingent liabilities decreased by $19.1 million primarily as a result of a reduction in reserves for certain contingent liabilities and severance.

Table of Contents

***Other income (expense), net***

| (dollars in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2022 | 2021 | $ | % |
| Other income (expense), net | $ 24,725 | $ (4,500) | $ 29,225 | 649 % |
| *% of total revenues* | *1 %* | *— %* | | |

Other income (expense), net generated income of $24.7 million for the year ended December 31, 2022 compared to expenses of $4.5 million in 2021. Equity income from our DCE investments increased $17.7 million as a result of new investments in 2022 and a full year of operations from our existing DCE investments, which became operational in April 2021. Interest income increased $13.8 million primarily as a result of our marketable securities investments in 2022.

***Comparison of Year Ended December 31, 2021 and 2020***

***Medical Services Revenue***

| (dollars in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2021 | 2020 | $ | % |
| Medical services revenue | $ 1,829,735 | $ 1,214,270 | $ 615,465 | 51 % |
| *% of total revenues* | *100 %* | *100 %* | | |

Medical services revenue increased by 51%, due primarily to growth in average membership of 44% that was attributable to three new geographies that became operational in 2021 and growth in our existing geographies. The increase in medical services revenue was also driven, to a lesser extent, by a 5% increase in PMPM capitation rates.

***Medical Services Expense***

| (dollars in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2021 | 2020 | $ | % |
| Medical services expense | $ 1,647,659 | $ 1,021,877 | $ 625,782 | 61 % |
| *% of total revenues* | *90 %* | *84 %* | | |

Medical services expense increased by 61% due primarily to average membership growth of 44%, which was attributable to three new geographies that became operational in 2021 and growth in our existing geographies. The increase in medical services expense was also driven, to a lesser extent, by an increase in average medical services expense per member of 12%. The increase in average medical services expense reflects, in part, the impact of lower healthcare utilization experienced in the prior year due to the COVID-19 pandemic.

***Other Medical Expenses***

| (dollars in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2021 | 2020 | $ | % |
| Other medical expenses | $ 109,487 | $ 102,306 | $ 7,181 | 7 % |
| *% of total revenues* | *6 %* | *8 %* | | |

Other medical expenses increased by $7.2 million, or 7%, for the year ended December 31, 2021 compared to 2020. Partner physician compensation expense declined by $13.1 million to $52.2 million in 2021 compared to $65.3 million in 2020. Other provider costs increased by $20.3 million to $57.3 million in 2021 compared to $37.0 million in 2020, as the number of geographies and members on our platform increased in 2021. Other provider costs in 2021 include $12.0 million related to geographies that became operational in January 2022, while other provider costs in 2020 include $8.9 million of costs related to geographies that became operational in 2021.

66

Table of Contents

### General and Administrative

| (dollars in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ | % |
| General and administrative | $ 455,821 | $ 137,292 | $ 318,529 | 232 % |
| % of total revenues | 25 % | 11 % | | |

General and administrative expenses increased $318.5 million, or 232%, for the year ended December 31, 2021 compared to 2020. About 90% of the year-over-year increase in general and administrative expenses is attributable to a $285.9 million increase in non-cash stock-based compensation expense, substantially all of which relates to shares issued under partner physician group equity agreements in connection with our IPO in April 2021 and the satisfaction of a performance condition associated with certain employee stock options in the third quarter of 2021.

Platform support costs, which are operating costs to support our live geographies and enterprise functions, increased by $23.5 million to $123.5 million in 2021 compared to $100.0 million in 2020 due primarily to growth in operating costs incurred to support geographies that became operational in 2021, along with additional costs related to our operations as a public company. Platform support costs as a percentage of revenue decreased to 7% for the year ended December 31, 2021 compared to 8% for the same period in 2020. Investments to support geography entry increased to $20.6 million in 2021, compared to $17.9 million in 2020 due to increased costs associated with our geographies that become operational in the following calendar year.

In aggregate, (i) costs incurred for severance, which include taxes and related costs on stock option exercises for departed executives, (ii) fees paid to our largest shareholder, and (iii) accruals for unasserted claims and contingent liabilities increased to $19.3 million in 2021, compared to $12.9 million in 2020.

### Other income (expense), net

| (dollars in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ | % |
| Other income (expense), net | $ (4,500 ) | $ 2,465 | $ (6,965 ) | (283 %) |
| % of total revenues | — % | — % | | |

Other income (expense), net generated expenses of $4.5 million for the year ended December 31, 2021 compared to income of $2.5 million in 2020. Substantially all of the expense increase relates to equity losses of $7.1 million in connection with our DCE investments, which became operational in April 2021.

### Total Discontinued Operations

| (dollars in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ | % |
| Total discontinued operations | $ (1,303 ) | $ 3,156 | $ (4,459 ) | (141 %) |
| % of total revenues | — % | — % | | |

Discontinued operations generated losses of $1.3 million for the year ended December 31, 2021 compared to income of $3.2 million for the year ended December 31, 2020. As we completed the dispositions of our Southern California, Fresno and remaining California operations in August 2020, October 2020, and February 2021, respectively, medical margin and general and administrative expenses related to discontinued operations declined during 2021. Additionally, gains on sales of assets related to the dispositions declined by $19.9 million in 2021. For additional discussion related to discontinued operations, see Note 19 to the Consolidated Financial Statements.

Table of Contents

**Non-GAAP Financial Measures**

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner incentive and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) geography entry costs, (vi) stock-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

Adjusted EBITDA is not considered a measure of financial performance under GAAP, and the items excluded therefrom are significant components in understanding and assessing our financial performance. Adjusted EBITDA has limitations as an analytical tool and should not be considered in isolation or as an alternative to such GAAP measures as net income (loss), cash flows provided by or used in operating, investing or financing activities or other financial statement data presented in our consolidated financial statements as an indicator of financial performance or liquidity. Some of these limitations are:

- Adjusted EBITDA does not reflect changes in, or cash requirements for, working capital needs;

- Adjusted EBITDA does not reflect interest expense, or the requirements necessary to service interest or principal payments on debt;

- Adjusted EBITDA does not reflect income tax expense (benefit) or the cash requirements to pay taxes;

- Adjusted EBITDA does not reflect historical cash expenditures or future requirements for capital expenditures or contractual commitments;

- Although depreciation and amortization charges are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and Adjusted EBITDA does not reflect any cash requirements for such replacements; and

68

Table of Contents

- The expenses and other items that we exclude in our calculation of Adjusted EBITDA may differ from the expenses and other items, if any, that other companies may exclude from similarly titled non-GAAP financial measures.

The following table sets forth a reconciliation of income (loss) from operations to network contribution using data derived from the consolidated financial statements for the periods indicated (dollars in thousands):

| | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2020 |
| Income (loss) from operations | $ | (120,431 ) | $ | (393,952 ) | $ | (56,673 ) |
| Other operating revenue | | (3,815 ) | | (3,824 ) | | (4,063 ) |
| Other medical expenses | | 196,127 | | 109,487 | | 102,306 |
| Other medical expenses (live geographies)[1] | | (172,276 ) | | (97,498 ) | | (93,377 ) |
| General and administrative | | 218,945 | | 455,821 | | 137,292 |
| Depreciation and amortization | | 13,772 | | 14,544 | | 13,531 |
| Network contribution | $ | 132,322 | $ | 84,578 | $ | 99,016 |

(1)    Represents physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the years ended December 31, 2022, 2021, and 2020, costs incurred in implementing geographies were $23.9 million, $12.0 million, and $8.9 million, respectively.

The following table sets forth a reconciliation of net income (loss) to Adjusted EBITDA using data derived from the consolidated financial statements for the periods indicated (dollars in thousands):

| | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2020 |
| Net income (loss) | $ | (106,864 ) | $ | (406,787 ) | $ | (60,052 ) |
| (Income) loss from discontinued operations, net of income taxes | | (465 ) | | 1,303 | | (3,156 ) |
| Interest expense | | 4,525 | | 6,146 | | 8,135 |
| Income tax expense (benefit) | | 1,640 | | 886 | | 865 |
| Depreciation and amortization | | 13,772 | | 14,544 | | 13,531 |
| (Gain) loss on lease terminations | | 5,458 | | — | | — |
| Geography entry costs[1] | | 67,741 | | 32,572 | | 27,100 |
| Severance and related costs[2] | | 2,470 | | 12,861 | | 4,009 |
| Management fees[3] | | — | | 433 | | 1,530 |
| Stock-based compensation expense | | 28,381 | | 292,394 | | 6,472 |
| EBITDA adjustments related to equity method investments[4] | | 3,737 | | 1,736 | | — |
| Other[5] | | (16,144 ) | | 5,293 | | 7,393 |
| Adjusted EBITDA | $ | 4,251 | $ | (38,619 ) | $ | 5,827 |

(1)    Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue. For the years ended December 30, 2022, 2021, and 2020, (i) $23.9 million, $12.0 million, and $8.9 million, respectively, are included in other medical expenses and (ii) $43.9 million, $20.6 million, and $17.9 million respectively, are included in general and administrative expenses.

(2)    For the years ended December 31, 2022 and 2021, includes taxes and related costs on stock option exercises for departed executives of $2.0 million and $5.4 million, respectively.

(3)    Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R") prior to our initial public offering ("IPO"). In connection with our IPO, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(4)    Includes direct geography entry costs of $1.3 million for the year ended December 31, 2021.

(5)    Includes interest income and non-cash accruals for unasserted claims and contingent liabilities.

69

Table of Contents

**Liquidity and Capital Resources**

We have historically financed our operations primarily through funds generated from our capitation arrangements with payors, issuances of equity securities, and borrowings under credit agreements. We generally invest any excess cash in money market accounts, which are classified as cash equivalents, and marketable securities. Our investment strategies are designed to provide safety and preservation of capital, sufficient liquidity to meet the cash flow needs of our business operations and attainment of a competitive return.

As of December 31, 2022, we had cash and cash equivalents of $497.1 million and investments in marketable securities of $411.9 million.

We expect to continue to incur operating losses and generate negative cash flows from operations for the foreseeable future due to the investments we intend to continue to make in expanding our business and additional general and administrative costs we expect to incur related to our operation as a public company. As a result, we may require additional capital resources in the future to execute strategic initiatives to grow our business.

Our primary uses of cash include payments for medical claims and other medical expenses, general and administrative expenses, costs associated with the development of new geographies and expansion of existing geographies, debt service and capital expenditures. Final reconciliation and receipt of amounts due from payors are typically settled in arrears, following completion of the contractual program year.

Our investment strategies are designed to provide safety and preservation of capital, sufficient liquidity to meet the cash flow needs of our business operations, and attainment of a competitive return.

Based on our planned operations, we believe that our existing cash and cash equivalents, as well as available borrowing capacity under the Credit Facilities, will be sufficient to meet our working capital and capital expenditure needs over at least the next 12 months, though we may require additional capital resources in the future. We have based these estimates on assumptions that may prove to be wrong, and we could utilize our available capital resources sooner than we expect.

We may require additional financing in the future to fund working capital and pay our obligations. We may seek to raise any necessary additional capital through a combination of public or private equity offerings and/or debt financings. There can be no assurance that we will be successful in acquiring additional funding at levels sufficient to fund our operations or on terms favorable to us, if at all. If adequate funds are not available on acceptable terms when needed, we may be required to significantly reduce operating expenses, which may have a material adverse effect on our business, financial condition, cash flows, and results of operations. If we do raise additional capital through public or private equity, the ownership interest of our existing stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our existing stockholders' rights. If we raise additional capital through debt financing, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends.

Our ability to pay dividends to holders of our common stock is significantly limited as a practical matter by our growth plans as well as the Credit Facilities insofar as we may seek to pay dividends out of funds made available to us by agilon management or its subsidiaries because the Credit Facilities restrict agilon management's ability to pay dividends or make loans to us. The borrower on the Credit Facilities is agilon management, our wholly-owned subsidiary. The Credit Facilities are guaranteed by certain of our subsidiaries, including those identified as VIEs, and contain customary covenants including, among other things, limitations on restricted payments such as: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

70

Table of Contents

***Cash Flows***

The following summary discussion of our cash flows is based on the consolidated statements of cash flows. The following table sets forth changes in cash flows for the periods indicated (dollars in thousands):

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (130,808) | $ (148,159) | $ (53,204) |
| Net cash provided by (used in) investing activities | (444,388) | (90,506) | 22,066 |
| Net cash provided by (used in) financing activities | 28,056 | 1,154,390 | 24,621 |

*Net Cash Provided By (Used In) Operating Activities*

Net cash used in operating activities was $130.8 million for the year ended December 31, 2022 compared to $148.2 million and $53.2 million for the years ended December 31, 2021 and 2020, respectively. The decrease in net cash used in operating activities in 2022 compared to 2021 was primarily a result of the increase in medical margin contributed from new and existing geographies, partially offset by increased provider costs, including partner physician incentive expenses and the timing of settlements with payors from new and existing geographies. The increase in net cash used in operating activities in 2021 compared to 2020 was primarily a result of: (i) the transition of claims payment services back to the health plan for one of our capitation contracts effective January 1, 2021, (ii) higher geography entry costs, (iii) accelerated timing of claims payments in certain markets, and (iv) an increase in general and administrative expenses, including prepayments related to public company insurance, partially offset by lower cash used in our California operations. Additionally, 2020 benefitted from lower claims payments due to reduced utilization as a result of the impact of COVID-19.

Our cash flow from operations is dependent upon the number of members on our platform, the timing of settlements with payors and the level of operating and general and administrative expenses necessary to operate and grow our business, among other factors.

*Net Cash Provided By (Used In) Investing Activities*

Net cash used in investing activities was $444.4 million for the year ended December 31, 2022 compared to $90.5 million and $22.1 million for the years ended and December 31, 2021 and 2020, respectively. The increase in net cash used in investing activities in 2022 compared to 2021 was due primarily to investments in marketable securities of $458.3 million during 2022. The increase in net cash used in investing activities in 2021 compared to 2020 was due primarily to $76.8 million, net in loans we provided to our physician partner groups in connection with taxes payable on shares distributed to them upon completion of the IPO under the partner physician group equity agreements and a $13.4 million increase in investments in property and equipment and intangible assets.

*Net Cash Provided By (Used In) Financing Activities*

Net cash provided by financing activities was $28.1 million for the year ended December 31, 2022 compared to $1.2 billion and $24.6 million for the years ended December 31, 2021 and 2020, respectively. During the year ended December 31, 2022, we received net proceeds of $33.1 million from the exercise of stock options. In February 2021, we refinanced our existing debt with a $100.0 million term loan, receiving net proceeds of $30.1 million. In April 2021, we received net proceeds of approximately $1.2 billion upon the completion of our IPO, after deducting underwriting discounts and commissions and offering costs. Upon completion of our IPO in April 2021, we repaid $50.0 million of the term loan as required under the terms of our credit facility. During the year ended December 31, 2020, we raised net proceeds of $34.4 million from private sales of our common stock, including stock option exercises, and repurchased $6.7 million of common stock.

***Debt Obligations***

On February 18, 2021, we executed a credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021). The Credit Facilities include: (i) a $100.0 million senior secured term loan (the "2021 Secured Term Loan Facility") and (ii) a $100.0 million senior secured revolving credit facility (the "2021

71

Table of Contents

Secured Revolving Facility") with a capacity to issue standby letters of credit in certain circumstances up to a maximum of $80.0 million. Subject to specified conditions and receipt of commitments, the 2021 Secured Term Loan Facility may be expanded (or a new term loan facility, revolving credit facility or letter of credit facility added) by up to (i) $50.0 million plus (ii) an additional amount determined in accordance with a formula tied to repayment of certain of our indebtedness. The 2021 Secured Term Loan Facility requires, among other things, a mandatory prepayment of $50.0 million if gross proceeds from the IPO exceed $1.0 billion. On April 26, 2021, we repaid $50.0 million of the 2021 Secured Term Loan Facility. The maturity date of the Credit Facilities was extended to February 18, 2026.

At our option, borrowings under the Credit Facilities, as defined in the credit agreement, can be either: (i) LIBO Rate Loans or (ii) Base Rate Loans. LIBO Rate Loans bear interest at a rate equal to the sum of 4.00% (stepping down to 3.50% on and following October 1, 2023) and the higher of (a) LIBO, as defined in the credit agreement, and (b) 0%. Base Rate Loans bear interest at a rate equal to the sum of 3.00% (stepping down to 2.50% on and following October 1, 2023) and the highest of: (a) 0.50% in excess of the overnight federal funds rate, (b) the prime rate established by the administrative agent from time to time, (c) the one-month LIBO rate (adjusted for maximum reserves) plus 1.00% and (d) 0%. Additionally, we pay a commitment fee on the unfunded 2021 Revolving Credit Facility amount of 0.50% (stepping down to 0.375% on and following October 1, 2023). We must also pay customary letter of credit fees.

The Credit Facilities contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

For additional discussion on our debt obligations, see Note 11 to the Consolidated Financial Statements for additional information about our outstanding debt.

### Equity

As of December 31, 2022, we had 412.4 million shares of common stock outstanding. See Note 13 to the Consolidated Financial Statements for additional information about our equity transactions.

### Future Cash Requirements

The following table summarizes certain estimated future cash requirements under the Company's various contractual obligations and commitments as of December 31, 2022, in total and disaggregated into current and long-term obligations (dollars in thousands):

| | Total | Current | Long-Term |
|---|---|---|---|
| Term loan[1] | $ 43,750 | $ 5,000 | $ 38,750 |
| Operating leases[2] | 15,950 | 3,840 | 12,110 |
| Capital commitments[3] | 134,835 | 112,092 | 22,743 |
| Interest[1] | 12,048 | 5,845 | 6,203 |
| Total | $ 206,583 | $ 126,777 | $ 79,806 |

(1) See Note 11 for additional information regarding the maturities of debt principal. Interest payments on debt are calculated using outstanding balances and interest rates in effect on December 31, 2022.
(2) See Note 6 for additional information regarding the maturity of lease liabilities under operating leases.
(3) See Note 12 for additional information regarding capital commitments to physician partners to support physician partner expansion and related purposes.

The table above does not include future payments of claims to healthcare providers because certain terms of these payments are not determinable at December 31, 2022 (for example, the timing and volume of future medical services provided under capitation contracts).

72

APP 609

Table of Contents

**Critical Accounting Estimates**

Management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with GAAP. The preparation of financial statements in conformity with GAAP requires us to use judgment in the application of accounting policies, including making estimates and assumptions. We base estimates on the best information available to us at the time, our historical experience, known trends and events and various other assumptions that we believe are reasonable under the circumstances. These estimates affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting periods. If our judgment or interpretation of the facts and circumstances relating to various transactions or other matters had been different, it is possible that different accounting would have been applied, resulting in a different presentation of our consolidated financial statements. From time to time, we re-evaluate our estimates and assumptions. In the event estimates or assumptions prove to be different from actual results, adjustments are made in subsequent periods to reflect more current estimates and assumptions about matters that are inherently uncertain. For a more detailed discussion of our significant accounting policies, see Note 2 to the Consolidated Financial Statements. Below is a discussion of accounting policies that we consider critical in that they may require complex judgment in their application or require estimates about matters that are inherently uncertain.

*Revenue Recognition*

We recognize revenue in accordance with Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("ASC 606"). Medical services revenue consists of capitation fees under contracts with various payors. Under the typical capitation arrangement, we are entitled to monthly PMPM fees to provide a defined range of healthcare services for MA health plan members attributed to our contracted physicians. PMPM fees are determined as a percent of the premium payors receive from CMS for these members. We generally accept full financial risk for members attributed to our contracted physicians, which means we are responsible for the cost of all healthcare services required by them. Contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by ASC 606, to stand ready on a monthly basis to provide all aspects of necessary medical care to members for the contracted period. We recognize revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for our MA capitation contracts is variable as the PMPM fees to which we are entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. We and our healthcare providers collect and submit the necessary and available diagnosis data to payors and we utilize such data to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in our contracts with payors. We recognize incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

The determination of these estimates is subject to significant judgment. If these assessments were to change, the timing and amount of our revenue recognized would be impacted, which may be material to our consolidated financial statements.

*Medical Services Expense and Related Payables*

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which we are financially responsible, and which are paid either directly by us or by payors with whom we have contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of our obligations for medical services that have been rendered by third parties, but for which claims have either not yet been received, processed or paid.

73

Table of Contents

Such estimates are based on many variables, including utilization trends and historical and statistical lag analysis, among other factors. The assumptions for making such estimates and establishing liabilities are continually reviewed and updated, and any adjustments resulting therein are reflected in current period earnings. These estimates may differ from actual results, which could be material to our consolidated financial statements. The difference between the estimated liability and the related actual settlement of claims is recognized in the period the claims are settled.

If it is determined that our assumptions in estimating such liabilities are significantly different than actual results, our results of operations and financial position could be impacted in future periods. Adjustments of prior period estimates may result in additional medical care expense or a reduction of medical care expense in the period an adjustment is made. Further, due to the considerable variability of healthcare costs, adjustments to claim liabilities occur each period and may be significant as compared to the net income (loss) recorded in that period.

The estimate of medical costs payable represents our best estimate of our liability for unpaid medical costs.

### Impairment of Long-Lived Assets

Amortizable intangible assets include health plan contracts, trade names, provider networks, developed software, physician rosters and noncompete enforcement agreements. Amortization expense is computed using the straight-line method over the estimated useful life of these assets. We consider the period of expected cash flows and related underlying data used to measure the fair value of the intangible assets (or the length of time for a noncompete agreement) when selecting a useful life.

Intangible assets are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. In such circumstances, we compare the carrying value of an amortizable intangible asset to the estimated future undiscounted cash flows generated by the asset or asset group. The estimated future undiscounted cash flows are calculated using the lowest level of identifiable cash flows that are largely independent of the cash flows of other assets and liabilities.

The impairment tests are based on financial projections prepared by us that incorporate anticipated results from programs and initiatives being implemented. If projections are not met, or if negative trends occur that impact the outlook, the value of the intangible assets may be impaired.

Goodwill represents the acquired fair value of a business in excess of the fair values of tangible and identifiable intangible assets acquired. We test goodwill for impairment annually and on an interim basis if an event occurs or if circumstances change that would indicate the carrying amount may not be recoverable. When testing goodwill for impairment, we may first assess qualitative factors to determine if it is more likely than not that the carrying value of a reporting unit exceeds its estimated fair value. If the qualitative assessment indicates that it is more likely than not that the carrying value of a reporting unit exceeds its estimated fair value, we perform the quantitative assessment. In the quantitative assessment, an estimate of the fair value of the reporting unit is determined primarily by an income approach, utilizing discounted cash flows and a market approach which considers comparable public companies and related transactions.

The determination of the fair value of intangible assets and goodwill involves significant judgment. This judgment is based on our analysis and estimates of fair value of intangible assets and goodwill, future operating results and resulting cash flows, and the period over which we will hold each asset. Our ability to accurately predict future operating results and resulting cash flows, and estimate fair values, impacts the timing and recognition of impairments. While we believe our assumptions are reasonable, changes in these assumptions may have a material impact on our consolidated financial statements.

### Stock-based Compensation

Stock-based compensation cost is measured at grant date, based on the fair value of the award, and is recognized (i) on a straight-line basis over the requisite service period for awards subject only to service-based vesting conditions or (ii) upon the achievement of the underlying performance condition for awards subject to such conditions. We

Table of Contents

determine the fair value of stock-based option awards subject to a service condition on the date of grant using the Black-Scholes option pricing model, unless the awards are also subject to a market condition, in which case we use a Monte Carlo simulation valuation model. Assumptions for volatility, expected option life and risk free interest rate are used in our models.

Certain of our arrangements provided for the vesting of share-based awards to third parties at the time of an initial public offering or sale of a controlling interest ("Change of Control Event"). Such share-based instruments granted to third parties are accounted for as non-employee awards for which compensation cost is recognized upon the achievement of the underlying performance condition of a Change of Control Event. As the instruments were liability-classified, the amount of shares ultimately issued and related compensation cost were measured at the vesting date in April 2021, as a Change of Control Event was not deemed probable until consummated. Upon our initial public offering, we recognized stock-based compensation cost relating to these share-based instruments of $268.5 million.

**ITEM 7A. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to various market risks, including the potential loss arising from adverse changes in interest rates. We do not use derivative financial instruments in the normal course of business or for speculative or trading purposes.

Our exposures to market risk for changes in interest expense relate primarily to the Credit Facilities. Indebtedness under the Credit Facilities is floating rate debt and is carried at amortized cost. Therefore, fluctuations in interest rates will impact our consolidated financial statements. A rising interest rate environment will increase the amount of interest paid on this debt. A hypothetical 100 basis point change in interest rates would not have a material impact on our interest expense.

We held cash, cash equivalents, restricted cash equivalents, and marketable securities of $919.6 million and $1.1 billion as of December 31, 2022 and 2021, respectively, consisting of bank deposits, certificates of deposits, money market funds, U.S. Treasury notes, and corporate debt securities. Such interest-earning instruments carry a degree of interest rate risk. A hypothetical 100 basis point change in interest rates would not have a material impact on the fair value of our marketable securities. Declines in interest rates over time will reduce our investment income. The goals of our investment policy are liquidity and capital preservation. We do not enter into investments for trading or speculative purposes.

Table of Contents
**ITEM 8. Financial Statements and Supplementary Data**

**agilon health, inc.**

**Index to Consolidated Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 42) | F-1 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | F-4 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021 and 2020 | F-5 |
| Consolidated Statements of Comprehensive Income (Loss) for the Years Ended December 31, 2022, 2021 and 2020 | F-7 |
| Consolidated Statements of Contingently Redeemable Common Stock and Stockholders' Equity (Deficit) for the Years Ended December 31, 2022, 2021 and 2020 | F-7 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021 and 2020 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |
| Schedule I—Registrant's Financial Statements | F-39 |

76

**APP 613**

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: March 1, 2023

agilon health, inc. (Registrant)

/s/ STEVEN J. SELL

Steven J. Sell,
*Chief Executive Officer and President*
*(Principal Executive Officer)*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ STEVEN J. SELL<br>Steven J. Sell | Chief Executive Officer and President<br>(Principal Executive Officer), Director | March 1, 2023 |
| /s/ TIMOTHY S. BENSLEY<br>Timothy S. Bensley | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | March 1, 2023 |
| /s/ PRISCILLA KASENCHAK<br>Priscilla Kasenchak | Chief Accounting Officer<br>(Principal Accounting Officer) | March 1, 2023 |
| /s/ RONALD A. WILLIAMS<br>Ronald A. Williams | Chairman of the Board | March 1, 2023 |
| /s/ RAVI SACHDEV<br>Ravi Sachdev | Vice Chairman of the Board | March 1, 2023 |
| /s/ SHARAD MANSUKANI, M.D.<br>Sharad Mansukani, M.D. | Director | March 1, 2023 |
| /s/ CLAY RICHARDS<br>Clay Richards | Director | March 1, 2023 |
| /s/ RICHARD J. SCHNALL<br>Richard J. Schnall | Director | March 1, 2023 |

89

APP 614

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ JEFFREY A. SCHWANEKE<br>Jeffrey A. Schwaneke | Director | March 1, 2023 |
| /s/ DEREK L. STRUM<br>Derek L. Strum | Director | March 1, 2023 |
| /s/ WILLIAM WULF, M.D.<br>William Wulf, M.D. | Director | March 1, 2023 |
| /s/ KAREN MCLOUGHLIN<br>Karen McLoughlin | Director | March 1, 2023 |
| Diana L. McKenzie | Director | March 1, 2023 |

90

APP 615

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of agilon health, inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of agilon health, inc. (the Company) as of December 31, 2022 and 2021, the related consolidated statements of operations, contingently redeemable common stock and stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2022, and the related notes and the financial statement schedules in Item 15 (collectively referred to as the "consolidated financial

statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework),and our report dated March 1, 2023, expressed an adverse opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatements of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing a separate opinion on the critical audit matters or on the accounts or disclosures to which they relate.

F-1

APP 616

Table of Contents

***Estimating Medicare Advantage risk adjustment revenue***

| | |
|---|---|
| *Description of the Matter* | As described in Note 2 to the consolidated financial statements, for the year ended December 31, 2022, the Company had $2,704 million in medical services revenue. Medical services revenue primarily consists of capitation fees under contracts with various Medicare Advantage payors. Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members attributed to the Company's contracted primary care physicians. The transaction price for the Company's capitation contracts is variable, as the PMPM fees to which the Company is entitled are subject to periodic adjustment under the Center for Medicare & Medicaid Services ("CMS") risk adjustment payment methodology and it may take a significant amount of time for such PMPM fees, including the periodic adjustments, to finally get settled.  Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. |
| | Auditing the Company's estimation of variable consideration under the CMS risk adjustment methodology, specifically the CMS risk adjustment accrual, was especially challenging because the calculation involves subjective management assumptions about current members' health status to determine the risk adjustment payment estimated to be received in the future. |
| *How We Addressed the Matter in Our Audit* | To test the estimation of variable consideration under the CMS risk adjustment methodology, our audit procedures included, among others, understanding and evaluating the subjective management assumptions used in management's CMS risk adjustment accrual calculation. We evaluated the current members' health status utilizing historical experience of the Company and by comparing a sample of members' health status assumptions to underlying medical diagnosis data, and other relevant factors. We further reviewed the medical risk adjustment PMPMs on a market by market basis to evaluate consistency in management's accruals. Additionally, we performed a review of prior period estimates using subsequent health plan data and evaluated management's related disclosures. |

F-2

**APP 617**

Table of Contents

|  | ***Valuation of incurred but not reported claims*** |
|---|---|
| *Description of the Matter* | As of December 31, 2022, the Company's medical claims and related payables totaled $347 million, substantially all of which related to the Company's estimate for claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported ("IBNR"). As discussed in Note 2 to the consolidated financial statements, management develops its IBNR liability estimate using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions, including medical service utilization trends, changes in membership, observed medical cost trends, historical claims payment patterns and other factors. |
|  | Auditing management's estimate of the IBNR liability was complex and required the involvement of actuarial specialists due to the highly judgmental nature of the factors and assumptions used in the measurement process. These assumptions have a significant effect on the valuation of the IBNR liability. |
| *How We Addressed the Matter in Our Audit* | To test the IBNR liability, our audit procedures included, among others, testing the completeness and accuracy of data used in the Company's models by testing reconciliations of underlying claims and membership data recorded in source systems to the actuarial reserve models, and comparing claims to source documentation, including statements and claims data received from health plans. With the assistance of our actuarial specialists, we used the Company's underlying claims, membership data and generally accepted actuarial methodologies used within the industry to develop an independent range of IBNR estimates and compared those estimates to management's recorded IBNR liability. Additionally, we performed a review of prior period estimates using subsequent claims development, and we evaluated management's IBNR disclosures. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2017.

Los Angeles, California
March 1, 2023

F-3

Table of Contents

partner groups in connection with taxes payable on shares distributed to them upon completion of the IPO. Such amounts are included in other assets, net in the consolidated balance sheets. See Note 8.

The Company also recognized $2.6 million of expense related to stock options that vested upon the completion of the IPO in 2021 and $3.7 million of expense related to a severance payment to its former chief executive officer contingent upon the completion of the IPO.

In connection with the IPO, the Company's Board of Directors approved the agilon health, inc. 2021 Omnibus Equity Incentive Plan. The equity awards approved by the compensation committee for grants to employees in connection with the completion of the IPO represent 1.9 million shares of common stock issuable upon the exercise or vesting of such awards.

In connection with the completion of the IPO, the Company's management agreement with CD&R was terminated as of April 16, 2021. The Company was not charged a fee in connection with the termination of this agreement.

## NOTE 2. Summary of Significant Accounting Policies

### Basis of Presentation

The accompanying consolidated financial statements have been prepared by management in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

### Principles of Consolidation

The consolidated financial statements include the accounts of agilon health, inc., its wholly-owned subsidiaries and VIEs that it controls through voting rights or other means. Intercompany transactions and balances have been eliminated in consolidation.

The Company is required to continually evaluate its VIE relationships and consolidate these entities when it is determined to be the primary beneficiary of their operations. A VIE is broadly defined as an entity that has any of the following three characteristics:

i.   the equity investment at risk is insufficient to finance the entity's activities without additional subordinated financial support;

ii.  substantially all of the entity's activities either involve or are conducted on behalf of an investor that has disproportionately few voting rights; or

iii. the equity investors as a group lack any of the following:

- the power through voting or similar rights to direct the activities of the entity that most significantly impact the entity's economic performance;

- the obligation to absorb the expected losses of the entity; or

- the right to receive the expected residual returns of the entity.

The Company reassesses the designation of an entity as a VIE upon certain events, including, but not limited to:

i.   a change to the terms or in the ability of a party to exercise its kick-out rights;

ii.  a change in the capital structure of the entity; or

iii. acquisitions or sales of interests that constitute a change of control.

The Company is considered to be the primary beneficiary of a VIE if it has the power to direct the activities of a VIE that most significantly impact the entity's economic performance and has the obligation to absorb losses or the right to receive benefits that could potentially be significant to the VIE. The Company continuously assesses whether

F-10

Table of Contents

it is (or is not) the primary beneficiary of a VIE. That assessment involves the consideration of various factors, including, but not limited to, the form of the Company's ownership interest, its representation on the VIE's governing body, the size and seniority of its investment, its ability and the rights of other variable interest holders to participate in policy making decisions, its ability to manage its ownership interest relative to the other variable interest holders, and its ability to liquidate the entity.

**Use of Estimates**

Management is required to make estimates and assumptions in the preparation of financial statements. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates can include, among other things, those used to determine revenues and related receivables from risk adjustment, medical services expense and related payables (including the reserve for incurred but not reported ("IBNR") claims), and the valuation and related recognition of impairments of long-lived assets, including goodwill. Management's estimates for revenue recognition, medical services expense and other estimates, judgments, and assumptions may be materially and adversely different from actual results. These estimates are based on knowledge of current events and anticipated future events, and accordingly, actual results may ultimately differ materially from those estimates.

**Revenue Recognition and Receivables**

*Medical Services Revenue*

Medical services revenue consists of capitation fees under contracts with various Medicare Advantage payors ("payors"). Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members ("members") attributed to the Company's contracted primary care physicians. PMPM fees are determined as a percent of the premium payors receive from the Centers for Medicare & Medicaid Services' ("CMS") for these members. The Company generally accepts full financial risk for members attributed to its contracted primary care physicians and therefore is responsible for the cost of all healthcare services required by those members. Fees are recorded gross in revenue because the Company is acting as a principal in coordinating and controlling the range of services provided (other than clinical decisions) under its capitation contracts with payors. Capitation contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by Accounting Standards Codification ("ASC") 606, *Revenue From Contracts With Customers* ("ASC 606"), to stand ready on a monthly basis to provide all aspects of necessary medical care to members for the contracted period. The Company recognizes revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for the Company's capitation contracts is variable, as the PMPM fees to which the Company is entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. The Company and healthcare providers collect and submit the necessary and available diagnosis data to payors and such data is utilized by the Company to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in the Company's contracts with payors. The Company recognizes incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

F-11

Table of Contents

*Receivables*

Receivables primarily consist of amounts due under capitation contracts with various payors. Receivables due under capitation contracts are recorded monthly based on reports received from payors and management's estimate of risk adjustment payments to be received in subsequent periods for open performance years. Receivables are recorded at the amount expected to be collected.

**Medical Services Expenses and Related Payables**

*Medical Services Expense*

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which the Company is financially responsible and that are paid either directly by the Company or by payors with whom the Company has contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported.

Such estimates are developed using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions including medical service utilization trends, changes in membership, observed medical cost trends, historical claim payment patterns and other factors. Generally, for the most recent months, the Company estimates claim costs incurred by applying observed medical cost trend factors to the average PMPM medical costs incurred in prior months for which more complete claims data are available.

Each period, the Company re-examines previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances. As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates in the period in which the change is identified. The difference between the estimated liability and the actual settlements of claims is recognized in the period the claims are settled. The Company's medical claims payable balance represents management's best estimate of its liability for unpaid medical costs as of December 31, 2022 and 2021. The Company uses judgment to determine the appropriate assumptions for developing the required estimates.

The Company assesses the profitability of its managed care capitation arrangement to identify contracts where current operating results or forecasts indicate probable future losses. If anticipated future variable costs exceed anticipated future revenues, a premium deficiency reserve is recognized. Premium deficiency reserves as of December 31, 2022 and 2021 were immaterial.

*Other Medical Expenses*

Other medical expenses include: (i) partner physician compensation expense and (ii) other provider costs. Partner physician compensation expense relates to surplus sharing obligations to the Company's physician partners. Other provider costs include payments for additional compensation to support physician-patient engagement and other care management expenses.

**Goodwill and Amortizable Intangible Assets**

Goodwill represents the excess purchase price consideration over the estimated fair value of net assets acquired in a business combination. The Company tests goodwill for impairment annually in the fourth quarter, and on an interim basis when events or changes in circumstances indicate that the carrying value may not be recoverable. The Company first assesses qualitative factors to determine whether it is more likely than not that the carrying value of a reporting unit exceeds its fair value. Qualitative analysis involves assessing situations and developments that could affect key drivers used to evaluate whether the value of goodwill is impaired. The Company's procedures include assessing its financial performance, macroeconomic conditions, industry and market considerations, various asset-specific factors, and entity-specific events. The Company may also elect to skip the qualitative testing and proceed directly to the quantitative testing.

# EXHIBIT 12

APP 622

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 01, 2023**

---

# agilon health, inc.

**(Exact name of Registrant as Specified in Its Charter)**

---

| **Delaware** | **001-40332** | **37-1915147** |
|:---:|:---:|:---:|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**6210 E Hwy 290, Suite 450**
**Austin, Texas**      **78723**
(Address of Principal Executive Offices)      (Zip Code)

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On March 1, 2023, agilon health, inc., a Delaware corporation, issued a press release setting forth its financial results for the quarter and year ended December 31, 2022. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated March 1, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 624**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

| Date: | March 1, 2023 | By: | /s/ TIMOTHY S. BENSLEY |
|---|---|---|---|
| | | | Timothy S. Bensley |
| | | | Chief Financial Officer |

**APP 625**

**Exhibit 99.1**



# agilon health Reports Fourth Quarter and Fiscal Year 2022 Results

*Revenue increased 49% to $690 million, Medicare Advantage membership increased 45% to 269,500, and Medical Margin increased 93% to $61 million during the fourth quarter*

*Guidance for 2023 includes significant gains in Adjusted EBITDA to $75 million to $90 million while maintaining strong revenue and membership growth[1]*

*Class of 2024 new partners expected to add at least 80,000 Medicare Advantage members across 6 physician groups, driving growth of over 130,000 new Medicare Advantage members in 2024*

*Acquisition of mphrX enables faster onboarding of agilon physician partners and rapid integration of clinical data, accelerating performance and speed to value*

**AUSTIN, T.X., March 1, 2023** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the fourth quarter and fiscal year ended December 31, 2022.

## Fourth Quarter and Fiscal Year 2022 Results:

- Total revenue of $690 million increased 49% during the fourth quarter compared to $463 million in the fourth quarter 2021.  For the fiscal year 2022, total revenue of $2.71 billion increased 48% compared to $1.83 billion in the comparable 2021 period.
- Total members live on the agilon platform increased to 358,600 as of December 31, including 269,500 Medicare Advantage members and 89,000 Direct Contracting beneficiaries.  Medicare Advantage membership increased 45%, with 13% growth in same geographies.
- Medical margin of $61 million increased 93% during the fourth quarter compared to $31 million in the fourth quarter 2021. For the fiscal year 2022, medical margin of $305 million increased 67% compared to $182 million in 2021. Medical margin represented 8.8% of revenue during the fourth quarter and 11.2% for the fiscal year 2022, compared to 6.8% and 9.9% of revenue in the fourth quarter and full year 2021, respectively.
- Net loss of $57 million in the fourth quarter, compared to a net loss of $57 million in fourth quarter 2021. For the fiscal year 2022, net loss of $107 million compared to a net loss of $407 million in 2021. Net loss for the fiscal year 2021 includes $292 million in non-cash stock-based compensation expense primarily related to agilon's initial public offering in April 2021.
- Adjusted EBITDA of negative $11 million in the fourth quarter compared to negative $27 million during the fourth quarter 2021. For the fiscal year 2022, Adjusted EBITDA of positive $4 million compared to negative $39 million in the comparable 2021 period.  Adjusted EBITDA contribution from Direct Contracting was $8 million during the fourth quarter 2022 and $14 million for the for the fiscal year 2022.

"Our strong results in 2022 demonstrate the power of our aligned partnership model to drive consistently better outcomes for patients and physicians," said Steve Sell, chief executive officer.  "We are entering 2023 with incredible momentum and the Class of 2024 new partners will expand our national network to 2,700 primary care physicians and 30+ communities."

*Outlook for First Quarter and Fiscal Year 2023*:

| | Quarter Ended March 31, 2023 | | Year Ended December 31, 2023 | |
|---|---|---|---|---|
| | Low | High | Low | High |
| Medicare Advantage Members[2] | 385,000 | 390,000 | 400,000 | 410,000 |
| ACO REACH Members[2] | 85,000 | 90,000 | 85,000 | 90,000 |
| Total Members Live on Platform[2] | 470,000 | 480,000 | 485,000 | 500,000 |
| Total revenues ($M) | $1,070 | $1,090 | $4,280 | $4,370 |
| Medical Margin ($M) | $160 | $170 | $535 | $560 |
| Adjusted EBITDA ($M)[1] | $32 | $37 | $75 | $90 |

[1]We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most comparable GAAP measure, and have not provided forward-looking guidance for net income (loss) because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation and geography entry costs.

[2]Membership reflects management's outlook for end of period.  agilon's partnered ACO REACH Entities (formerly Direct Contracting) are not consolidated within its financial results.

Adjusted EBITDA contribution from ACO REACH (formerly Direct Contracting) is expected in a range of $5 million to $10 million for 2023.[1]

*Membership Details for the Year Ended 2022*

Total members live on the agilon platform increased to 358,600 as of December 31, 2022.  Total members live on the platform include 269,500 Medicare Advantage members and 89,000 attributed Direct Contracting beneficiaries.  Average Medicare Advantage membership was 272,000 during the fourth quarter and 264,000 for the fiscal year 2022.

*Acquisition of mphrX*

On February 28, 2023, agilon health completed the acquisition of mphrX, a leading provider of value-based care technology and interoperability solutions.  mphrX's Minerva Healthcare Data Platform uses FHIR-based standards to rapidly aggregate, access, and exchange data across healthcare delivery networks.  Minerva's integration into agilon's existing technology platform will enable faster onboarding of agilon partners and rapid integration of clinical data, accelerating performance and speed to value for patients and physicians.  Management does not anticipate mphrX will have a meaningful impact on agilon's Adjusted EBITDA during 2023.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss fourth quarter and fiscal year 2022 results on Wednesday, March 1, 2023 at 4:30 PM Eastern Time. The conference call can be accessed by dialing (844) 200-6205 for U.S. participants and +1 (929) 526-1599 for international participants and referencing participant code 553857. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups transition to a value-based Total Care Model for senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,200+ PCPs that allow physician groups to maintain

their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 25 diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

## Forward-Looking Statements

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, acquisitions and dispositions, or other transactions discussed in this release; and statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plans including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operating strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage payments at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; our ability to obtain additional capital needed to support our business; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target markets; the spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics, and the inability to predict the ultimate impact of pandemics on us; inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings under payor contracts; the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities within certain geographies in the future; the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation; security breaches, loss of data or other disruptions to our data platforms; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; the potential that we may incur future indebtedness; our ability to successfully integrate acquired businesses; our ability to remediate material weaknesses in our internal control over financial reporting or if additional material weaknesses occur in the future; and risks related to other factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2022. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

# agilon health, inc.
**Consolidated Balance Sheets**
**In thousands, except per share data**

| | December 31, 2022 | December 31, 2021 |
|---|---:|---:|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 497,070 | $ 1,040,039 |
| Restricted cash and equivalents | 10,610 | 14,781 |
| Marketable securities | 411,901 | — |
| Receivables, net | 497,574 | 293,407 |
| Prepaid expenses and other current assets, net | 34,119 | 18,968 |
| Total current assets | 1,451,274 | 1,367,195 |
| Property and equipment, net | 20,050 | 9,161 |
| Intangible assets, net | 67,680 | 55,398 |
| Goodwill | 41,540 | 41,540 |
| Other assets, net | 116,924 | 112,958 |
| Total assets | $ 1,697,468 | $ 1,586,252 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 346,727 | $ 239,014 |
| Accounts payable and accrued expenses | 183,364 | 112,946 |
| Current portion of long-term debt | 5,000 | 5,000 |
| Total current liabilities | 535,091 | 356,960 |
| Long-term debt, net of current portion | 38,482 | 43,401 |
| Other liabilities | 83,286 | 94,295 |
| Total liabilities | 656,859 | 494,656 |
| Commitments and contingencies | | |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 412,385 and 400,095 shares issued and outstanding, respectively | 4,124 | 4,001 |
| Additional paid-in capital | 2,106,886 | 2,045,572 |
| Accumulated deficit | (1,064,230) | (957,677) |
| Accumulated other comprehensive income (loss) | (5,560) | — |
| Total agilon health, inc. stockholders' equity (deficit) | 1,041,220 | 1,091,896 |
| Noncontrolling interests | (611) | (300) |
| Total stockholders' equity (deficit) | 1,040,609 | 1,091,596 |
| Total liabilities and stockholders' equity (deficit) | $ 1,697,468 | $ 1,586,252 |

**APP 629**

## agilon health, inc.
### Consolidated Statements of Operations
### In thousands, except per share data

| | Three Months Ended December 31, | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (unaudited) | | | |
| **Revenues:** | | | | |
| Medical services revenue | $ 688,855 | $ 461,999 | $ 2,704,396 | $ 1,829,735 |
| Other operating revenue | 919 | 887 | 3,815 | 3,824 |
| Total revenues | 689,774 | 462,886 | 2,708,211 | 1,833,559 |
| **Expenses:** | | | | |
| Medical services expense | 628,163 | 430,620 | 2,399,798 | 1,647,659 |
| Other medical expenses | 51,615 | 22,678 | 196,127 | 109,487 |
| General and administrative (including noncash stock-based compensation expense of $9,951, $4,414, $28,381, and $292,394, respectively) | 75,207 | 53,840 | 218,945 | 455,821 |
| Depreciation and amortization | 3,907 | 3,621 | 13,772 | 14,544 |
| Total expenses | 758,892 | 510,759 | 2,828,642 | 2,227,511 |
| **Income (loss) from operations** | (69,118) | (47,873) | (120,431) | (393,952) |
| **Other income (expense):** | | | | |
| Other income (expense), net | 14,885 | (8,534) | 24,725 | (4,500) |
| Gain (loss) on lease terminations | — | — | (5,458) | — |
| Interest expense | (1,709) | (840) | (4,525) | (6,146) |
| **Income (loss) before income taxes** | (55,942) | (57,247) | (105,689) | (404,598) |
| Income tax benefit (expense) | (572) | (179) | (1,640) | (886) |
| **Income (loss) from continuing operations** | (56,514) | (57,426) | (107,329) | (405,484) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | (35) | (1,209) | 491 | (3,463) |
| Gain (loss) on sales of assets, net | — | — | — | 473 |
| Income tax benefit (expense) | — | 1,898 | (26) | 1,687 |
| **Total discontinued operations** | (35) | 689 | 465 | (1,303) |
| **Net income (loss)** | (56,549) | (56,737) | (106,864) | (406,787) |
| Noncontrolling interests' share in (earnings) loss | 83 | 16 | 311 | 300 |
| **Net income (loss) attributable to common shares** | $ (56,466) | $ (56,721) | $ (106,553) | $ (406,487) |
| **Net income (loss) per common share, basic and diluted (continuing operations)** | $ (0.14) | $ (0.14) | $ (0.26) | $ (1.09) |
| **Weighted average shares outstanding, basic and diluted** | 412,103 | 396,411 | 408,154 | 372,931 |

# agilon health, inc.
### Consolidated Statements of Cash Flows
### In thousands

| | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2022 | | 2021 |
| **Cash flows from operating activities:** | | | | |
| Net income (loss) | $ | (106,864) | $ | (406,787) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 13,772 | | 14,670 |
| Stock-based compensation expense | | 28,381 | | 292,394 |
| Loss on debt extinguishment | | — | | 1,590 |
| Loss (income) from equity method investments | | (10,720) | | 6,766 |
| Deferred income taxes and uncertain tax positions | | 532 | | (3,231) |
| Release of indemnification assets | | 553 | | 1,705 |
| (Gain) loss on sale of assets, net | | — | | (473) |
| Distributions of earnings from equity method investments | | — | | 174 |
| Other non-cash items | | 2,973 | | 58 |
| Changes in operating assets and liabilities: | | | | |
| Receivables, net | | (204,167) | | (149,041) |
| Prepaid expense and other current assets | | (16,620) | | (3,916) |
| Other assets | | (205) | | 3,931 |
| Medical claims and related payables | | 107,713 | | 76,339 |
| Accounts payable and accrued expenses | | 65,736 | | 19,360 |
| Other liabilities | | (11,892) | | (1,698) |
| Net cash provided by (used in) operating activities | | (130,808) | | (148,159) |
| **Cash flows from investing activities:** | | | | |
| Purchase of property and equipment, net | | (15,426) | | (6,564) |
| Purchase of intangible assets | | (17,235) | | (6,862) |
| Investment in loans receivable and other | | (6,510) | | (82,831) |
| Investments in marketable securities | | (458,265) | | — |
| Proceeds from maturities and sales of marketable securities and other | | 52,548 | | 7,095 |
| Proceeds from sale of business and property, net of cash divested | | 500 | | (1,344) |
| Net cash provided by (used in) investing activities | | (444,388) | | (90,506) |
| **Cash flows from financing activities:** | | | | |
| Proceeds from initial public offering | | — | | 1,170,942 |
| Proceeds from other equity issuances, net | | 33,056 | | 18,086 |
| Proceeds from the issuance of long-term debt | | — | | 100,000 |
| Repayments of long-term debt | | (5,000) | | (119,899) |
| Equity and debt issuance costs and other | | — | | (14,739) |
| Net cash provided by (used in) financing activities | | 28,056 | | 1,154,390 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | | (547,140) | | 915,725 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | | 1,054,820 | | 135,178 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | | — | | 3,917 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | | 1,054,820 | | 139,095 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ | 507,680 | $ | 1,054,820 |

# agilon health, inc.
**Key Operating Metrics**
**In thousands**
**(unaudited)**

## *MEDICAL MARGIN*

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2022** | | **2021** | |
| Medical services revenue | $ | 688,855 | $ | 461,999 | $ | 2,704,396 | $ | 1,829,735 |
| Medical services expense | | (628,163) | | (430,620) | | (2,399,798) | | (1,647,659) |
| Medical margin | $ | 60,692 | $ | 31,379 | $ | 304,598 | $ | 182,076 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

## *GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2022** | | **2021** | |
| Platform support costs | $ | 41,613 | $ | 30,899 | $ | 146,481 | $ | 123,521 |
| Geography entry costs[1] | | 19,434 | | 7,872 | | 43,890 | | 20,583 |
| Severance and related costs | | — | | 7,763 | | 2,470 | | 12,861 |
| Management fees[2] | | — | | — | | — | | 433 |
| Stock-based compensation expense | | 9,951 | | 4,414 | | 28,381 | | 292,394 |
| Other[3] | | 4,209 | | 2,892 | | (2,277) | | 6,029 |
| General and administrative | $ | 75,207 | $ | 53,840 | $ | 218,945 | $ | 455,821 |

(1)    Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue.

(2)    Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R") prior to our IPO. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3)    Includes non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

# agilon health, inc.
**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

*NETWORK CONTRIBUTION*

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Income (loss) from operations | $ (69,118) | $ (47,873) | $ (120,431) | $ (393,952) |
| Other operating revenue | (919) | (887) | (3,815) | (3,824) |
| Other medical expenses | 51,615 | 22,678 | 196,127 | 109,487 |
| Other medical expenses—live geographies[1] | (38,653) | (18,704) | (172,276) | (97,498) |
| General and administrative | 75,207 | 53,840 | 218,945 | 455,821 |
| Depreciation and amortization | 3,907 | 3,621 | 13,772 | 14,544 |
| Network contribution | $ 22,039 | $ 12,675 | $ 132,322 | $ 84,578 |

(1)  Represents physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2022 and 2021, costs incurred in implementing geographies were $13.0 million and $4.0 million, respectively. For the years ended December 31, 2022 and 2021, costs incurred in implementing geographies were $23.9 million and $12.0 million, respectively.

*ADJUSTED EBITDA*

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Net income (loss) | $ (56,549) | $ (56,737) | $ (106,864) | $ (406,787) |
| (Income) loss from discontinued operations, net of income taxes | 35 | (689) | (465) | 1,303 |
| Interest expense | 1,709 | 840 | 4,525 | 6,146 |
| Income tax expense (benefit) | 572 | 179 | 1,640 | 886 |
| Depreciation and amortization | 3,907 | 3,621 | 13,772 | 14,544 |
| (Gain) loss on lease terminations | — | — | 5,458 | — |
| Geography entry costs[1] | 32,396 | 11,846 | 67,741 | 32,572 |
| Severance and related costs[2] | — | 7,763 | 2,470 | 12,861 |
| Management fees[3] | — | — | — | 433 |
| Stock-based compensation expense | 9,951 | 4,414 | 28,381 | 292,394 |
| EBITDA adjustments related to equity method investments[4] | 749 | (571) | 3,737 | 1,736 |
| Other[5] | (3,391) | 2,642 | (16,144) | 5,293 |
| Adjusted EBITDA | $ (10,621) | $ (26,692) | $ 4,251 | $ (38,619) |

(1)  Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2022 and 2021, (i) $13.0 million and $4.0 million, respectively, are included in other medical expenses and (ii) $19.4 million and $7.9 million, respectively, are included in general and administrative expenses. For the years ended December 31, 2022 and 2021, (i) $23.9 million and $12.0 million, respectively, are included in other medical expenses and (ii) $43.9 million and $20.6 million, respectively, are included in general and administrative expenses.

(2)  For the year ended December 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $2.0 million. For the three months and year ended December 31, 2021, includes taxes and related costs on stock option exercises for departed executives of $5.4 million.

(3)  Represents management fees and other expenses paid to CD&R prior to our IPO. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(4)  Includes direct geography entry costs of $0.1 million and $1.3 million for the three and twelve months ended December 31, 2021, respectively.

(5)  Includes interest income and non-cash accruals for unasserted claims and contingent liabilities.

**APP 633**

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner compensation and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) geography entry costs, (vi) stock-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

## Contacts

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health

# EXHIBIT 13

**APP 635**

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ4 2022 Earnings Call Transcripts

## Wednesday, March 01, 2023 9:30 PM GMT

## S&P Global Market Intelligence Estimates

| | -FQ4 2022- | | | -FQ1 2023- | -FY 2022- | | | -FY 2023- |
|---|---|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS |
| EPS Normalized | (0.05) | (0.06) | NM | 0.06 | (0.07) | (0.08) | NM | 0.10 |
| Revenue (mm) | 663.99 | 689.77 | ▲3.88 | 956.08 | 2682.43 | 2708.21 | ▲0.96 | 3927.55 |

Currency: USD
Consensus as of  Mar-01-2023 2:18 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

▲ Positive EPS Normalized surprise     ▼ Negative EPS Normalized surprise     ● Neutral EPS Normalized surprise

- EPS NORMALIZED -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| FQ1 2022 | 0.01 | 0.01 | ①0.00 % |
| FQ2 2022 | (0.01) | (0.01) | NM |
| FQ3 2022 | (0.04) | (0.02) | NM |
| FQ4 2022 | (0.05) | (0.06) | NM |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

1

**APP 636**

# Table of Contents

Call Participants ...................................................................................... 3

Presentation ...................................................................................... 4

Question and Answer ...................................................................................... 10

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 637**

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Alexander Yearley Draper**
*Guggenheim Securities, LLC, Research Division*

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

**Brian Gil Tanquilut**
*Jefferies LLC, Research Division*

**David Michael Larsen**
*BTIG, LLC, Research Division*

**George Robert Hill**
*Deutsche Bank AG, Research Division*

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 638

# Presentation

**Operator**

Hello, everybody, and welcome to the agilon health Fourth Quarter 2022 earnings call. My name is Sam, and I'll be coordinating your call today. [Operator Instructions] I will now hand you over to your host, Matthew Gillmor, Vice President of Investor Relations, to begin. Please go ahead.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good afternoon, and welcome to the call. With me is our CEO, Steve Sell and our CFO, Tim Bensley. Following prepared remarks from Steve and Tim, we will conduct a Q&A session.

Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results.

A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

And with that, I'll turn the call over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good evening, and thank you for joining us. 2022 was a very strong year for agilon and our physician partners, and we have entered 2023 with incredible momentum. We have made significant progress against our vision to transform healthcare in 100-plus communities by empowering primary care doctors to accelerate the transition to a value-based care system.

The research analysis we published in mid-January highlights the success of our model, specifically in patients with diabetes. As many of you know, diabetes affects about 30% of the Medicare population and if not properly managed, can have significant long-term health consequences for seniors.

Our analysis found that diabetic patients cared for by agilon physician partners when compared to Medicare Advantage and Medicare fee-for-service benchmarks, saw a 2x greater improvement in A1C control, a 19% lower total cost of care and a meaningful improvement in health equity access and quality.

Consistent results like these are simply not possible in the legacy fee-for-service model, which is prevalent in the vast majority of communities in this country.

With our early success in managing diabetics, we see a multi-decade opportunity for agilon and our partners in addressing significant variability in the way complex patients are managed, ultimately driving better outcomes at lower cost.

To that end, we are making meaningful strides in addressing the access, cost and quality variability that defines the fee-for-service system.

Our distinctive platform is rapidly unlocking for more primary care doctors, a care delivery and payment model that allows them to operate an outcome versus transaction-driven business model.

This new primary care model delivers consistently better outcomes across our network and creates an infrastructure for additional doctors and communities to make the transition to a value-based model.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 639**

What is good for our physician partners and their patients is ultimately good for agilon, and you can see it in the incredible results of our business.

Today, we are serving 25 diverse geographies with 2,200 primary care doctors in nearly 500,000 senior patients. These figures include the record 130,000 new senior patients we will add in 2023. And today, we are pleased to share that in 2024, we will add at least another 130,000 new members, with the opportunity for that number to grow.

For context, our 2024 total Medicare Advantage membership will be approximately double the membership in the 2022 period, which we are reporting today on this call.

Our accelerating momentum in both new and current markets comes from our ability to drive meaningful reductions in wasteful health spending, generating a surplus that we call medical margin and reinvest roughly half of that surplus back into local primary care. Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally.

The rapid inflection in membership and maturation of earnings across a large and diverse set of markets, highlights that the agilon platform can be the standard for how primary care doctors operate in this changing healthcare landscape.

We believe this latest step-change in the business is also reflective of the power of a large and growing number of physicians winning together on a common platform.

Now to 2022 performance. The overall momentum in our business was evident as our fourth quarter results closed out a very strong year.

Performance across Medicare Advantage and Direct Contracting was in line or better across all key metrics, enabling a full-year adjusted EBITDA of $4.3 million, even as we made substantial platform investments in technology and infrastructure to scale our organization for the future.

For the full year, our core MA business performed extremely well, with membership increasing 45%, medical margin increasing 67% and medical margin per member per month increasing 15%.

On one of the most important metrics in our fast-growing subscription business, our 10 year 2-plus partners improved their medical margin by 33% from $93 to $124, which accounted for 90-plus percent of the full year $43 million improvement in adjusted EBITDA.

Similarly, for the quarter and the full year, our Direct Contracting or REACH business came in ahead of expectations and contributed modestly to adjusted EBITDA.

We continue to demonstrate the power of our model to deliver strong cost and quality performance as costs for our Direct Contracting patients were 1% better than the national trend, and we are on track to achieve a 100% quality score, reflecting excellence in areas such as post-hospital discharge and timely follow-up visits.

Our performance in 2022 drove an estimated $20 million in savings back to the Medicare program as well as positive surplus to our physician partners. The combination of 2 years of experience in this program and an increased level of transparency on the revenue calculations from the innovation center has increased our level of confidence in REACH and the overall opportunity that we see to drive future performance.

Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year.

Our adjusted EBITDA guidance of $75 million to $90 million reflects a year-over-year increase of approximately $78 million at the midpoint, where we are sustaining 50% MA membership growth. Just like in 2022, the inflection in our 2023 adjusted EBITDA is powered by our year 2-plus markets, which generate substantial operating leverage at the market and corporate level.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 640**

This step-change in earnings is being delivered while 44% of our membership is in year 1 or 2 markets versus 37% in 2022, highlighting the long-term embedded earnings being created. But we continue to drive significant improvements in the current period.

These results also highlight the operating leverage inherent in setting up the infrastructure for full risk in a local market as the flow-through of incremental medical margin dollars to adjusted EBITDA is significant.

The takeaway is that the maturation of our markets and members is accelerating our adjusted EBITDA gains in 2023 and beyond. Looking to 2024. As I mentioned earlier, the success of the agilon network is both improving our collective performance and driving our growth. The class of 2024 will reflect that momentum as we will onboard at least 6 new groups, 2 new states, 80,000 members and 500 primary care physicians.

This class will be at least double the size that we predicted last March at our Investor Day and reflects the accelerating demand for a new primary care model, driven by the success of our partners,and powerful dynamics with senior demographics, physician practice challenges and payer demand for a move away from fee-for-service.

The class of 2024 partners are very diverse and include primary care, multi-specialty and both independent and employee groups affiliated with health systems.

Of note, the class of 2024 represents a meaningful step forward for the organization in tapping the unique power of the large and growing local addressable market. We have highlighted in the past the power of transforming the payment model in a local market to full risk.

Once our value-based care infrastructure is established, other physician organizations, including health systems, can confidently and quickly move into full-risk value-based care, leveraging the infrastructure and learnings of that local market.

As we have purposely expanded to 14 states and 30-plus markets over the past 6 years, we have established for ourselves an in-market TAM of 33,000 primary care doctors and 10.5 million senior patients. This year's class includes particularly large new partner organizations within our existing markets and states, driving outsized in-market growth for next year.

As I mentioned in our last call, our sales cycle has accelerated, and this will allow for a longer implementation period for new partner groups in 2024. This, coupled with the increasing scale of our platform, positions our new partners to generate outcomes much earlier in their life cycle, including a higher starting point for quality performance and medical margin.

Performance of our new partners will be further supported by the acquisition of mphrX, which we completed yesterday. The company's Minerva platform uses FHIR-based standards to aggregate, access and exchange data across healthcare delivery networks. We have known their team for some time and piloted their technology during our 2022 new market implementation process.

The integration of this technology into agilon's existing technology platform will enable faster onboarding of our partners and more rapid integration with EMR systems. This improvement in speed, particularly with complex EMR integrations, will support our ability to scale and enter additional communities, especially with distributed physician networks and health systems.

Every incremental week is important during our implementation process, and this technology will effectively buy us time and accelerate our ability to drive outcomes for both patients and physician partners. And continued investment in our platform to accelerate success of current and new partners should allow us to further strengthen our leadership position.

Let me close with some perspective on the macro environment. The tailwinds for the move to agilon's new primary care model have never been stronger. And in that assessment, I would include the recent advanced notice from CMS and the final RADV rule.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 641

It is increasingly clear that the challenges of the fee-for-service system are too great in both health plans and CMS, are looking to a healthcare system that emphasizes the relationship between a senior patient and their primary care doctor and rewards health outcomes rather than the volume of visits.

Agilon has been solely built for success in that type of environment. And these developments only increase our opportunity.

When I look more immediately at the levers in our business, like getting members on the platform earlier, delivering a more effective implementation period with improved starting points for new partners and accelerating quality and medical cost performance in our more mature markets, I am less feeling extremely bullish on 2023, 2024 and beyond. With that, let me turn things over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve, and good evening, everyone. I'll review highlights for our financial statements and provide some additional details on our guidance for 2023.

Starting with our membership. Medicare Advantage membership increased 45% to approximately 270,000 at the high end of our guidance range. Direct Contracting membership increased 72% to approximately 89,000. Total members live on the agilon platform, including both Medicare Advantage and Direct Contracting, increased to 359,000.

Our MA membership growth was driven by the 6 new partner geographies that went live in January 2022 and 13% growth within our existing geographies. Revenues increased 49% on a year-over-year basis to $690 million during the fourth quarter.

For the full year, revenues increased 48% to $2.7 billion. Revenue growth was driven primarily by MA membership gains from our new and existing geographies.

On a per member per month basis or PMPM, revenue increased approximately 2% for the quarter and for full year, which primarily reflects benchmark updates and market and member mix. Medical margin increased 93% year-over-year to $61 million in the fourth quarter. For the full year, medical margin increased 67% to $305 million.

Even with the dilution from our strong membership growth and a higher proportion of members in our year 1 markets, medical margin increased as a percentage of revenue and on a PMPM basis. For the full year 2022, medical margins were 11.2% of revenue compared to 9.9% last year and medical margin PMPM increased 15% to $96 versus $83 last year.

Medical margins benefited from stronger performance in our year 1 markets and significant gains in our year 2-plus partner markets. As Steve mentioned, in our 10 year 2-plus partner markets, medical margin PMPM increased by 33% to $124 in 2022, up from $93 in 2021. Network contribution, which reflects agilon share of medical margin, increased 74% to $22 million during the fourth quarter.

For the full year, network contribution increased 56% to $132 million. The year-over-year increase in network contribution reflects gains in medical margin as well as the relative contribution of medical margin across our markets.

Platform support costs, which include market and enterprise-level G&A, increased 35% to $42 million in the fourth quarter. For the full year, platform support costs increased 19% to $146 million.

Platform support costs were higher than our internal forecast during Q4, largely due to investments to help scale our business in 2023 and beyond. The growth in our platform support cost continues to trend well below our revenue growth, reflecting the efficiency of our partnership model. For the full year, platform support cost declined to 5.4% of revenue compared to 6.7% last year.

Our adjusted EBITDA was negative $10.6 million in the quarter compared to negative $26.7 million last year. On a full-year basis, adjusted EBITDA was positive $4.3 million compared to negative $38.6 million last year.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The $43 million year-over-year gain in adjusted EBITDA for the full year was primarily driven by higher medical margins in our year 2-plus partner markets, which generate significant operating leverage against market and enterprise G&A.

Adjusted EBITDA contribution from Direct Contracting, which is reflected on a net basis within other income, was positive $8 million in the quarter and positive $14 million for the full year. Our underlying performance in Direct Contracting, from a cost and quality standpoint, remains strong and continues to outperform benchmarks.

During the quarter, CMS provided updated estimates for the retro trend adjustment, which positively impacted our revenue benchmarks. This drove modest upside to adjusted EBITDA contribution and offset the platform support investments I mentioned previously.

Turning to our balance sheet and cash flow. As of December 31, we had $909 million in cash and marketable securities and $43 million in outstanding debt. We remain extremely well capitalized and do not anticipate needing any external capital to drive our future growth. Additionally, we continue to anticipate generating positive cash flow as we move into 2024.

Our strong balance sheet position and adjusted EBITDA progression gives us significant flexibility to make targeted investments to further strengthen our scale and scale our platform, including both internal and external investments.

From an external perspective, we continue to revaluate targeted capabilities that can leverage our growing membership base. To that end, we are pleased to complete the acquisition of mphrX.

As referenced in the accompanying press release we issued this afternoon, we expect the integration of mphrX into our existing technology platform will accelerate the onboarding and performance of our new partners through faster data integration. While the acquisition will contribute to our adjusted EBITDA in 2023, we do expect modest levels of accretion in 2024 and beyond.

From an internal perspective, we can -- continue to focus our investments in technology and growth. In 2022, we stepped up our geographic entry costs, going from $33 million last year to $68 million in 2022. The increase in geographic entry costs relates to two factors, which we view as key positives.

First, the class of 2023 new partners included over 100,000 members, which went live in January of this year. This is almost double the size of the class of 2022 and compared to our original estimate of 80,000. Second, given the shorter sales cycle, our 2022 financials include some costs associated with implementing the class of 2024 new partners, which will go live in January of next year.

In total, our member acquisition costs, including both new geographies and same geography, remain in the $400 to $600 range. This is incredibly efficient and considering our high member retention and improving unit economics, will generate very attractive returns.

Before turning to our guidance for 2023, I want to note that we did identify two material weaknesses in our internal controls, which we have disclosed in our 10-K filing. These were identified during our first Sarbanes-Oxley audit as a public company and did not impact our financial statements. We are committed to maintaining strong internal controls and are implementing procedures to remediate this as soon as possible.

Turning now to our guidance. For the full year 2023, we expect ending membership live on the agilon platform will grow to a range of 485,000 to 500,000 members, including 50% growth in MA membership to approximately 405,000 and steady ACO REACH membership at approximately 88,000 at the midpoints.

We expect revenue in the range of approximately $4.28 billion to $4.37 billion or 60% growth at the midpoint. At the same time, we anticipate our adjusted EBITDA will continue to inflect higher to a range of $75 million to $90 million.

This is driven by continued progression in medical margins across our maturing partner markets, along with platform support cost leverage. This more than offsets dilution from new members and markets as we are accelerating our EBITDA growth while also accelerating our membership growth in 2023.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 643

For the first quarter, we expect MA membership growth of 385,000 to $390,000, revenue of $1.07 billion to $1.09 billion and adjusted EBITDA of $32 million to $37 million.

As you can see in the guidance table from our press release, we expect normal seasonality and our medical margins will drive moderating adjusted EBITDA throughout the year. This reflects the higher mix of [ agents ] in the latter part of the year. Three other items to call out as it relates to our 2023 guidance.

First, we expect Direct Contracting will generate modest adjusted EBITDA contribution in 2023 in a range of $5 million to $10 million. We also expect this will be weighted towards the back half of the year as we plan to take a prudent approach in estimating the retro trend adjustment and other factors.

Second, we expect the mphrX acquisition will contribute approximately $6 million in revenue for 2023, with an immaterial impact on our adjusted EBITDA for the year.

Finally, I'd note that our same geography growth will likely trend in the low double-digit range during 2023 across our partner markets. This reflects our decision to push several new partners within our existing geographies into the class of 2024 and provide for a longer implementation period.
With that, we're now ready to take your questions.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Lisa Gill of JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

You got through a lot of detail here. But I wanted to hone in on the revenue number for next year, is that that's substantially here. I know you gave a few of the metrics at our conference just a little over a month ago.

But Steve, if I think about the revenue being higher, can you maybe just talk about the components to that? One, is it risk scores? Are the acuity levels higher? Two, I know that we had a nice rates. MA rates were better for 2023. How do I think about the revenue? And then, how that translates to medical margin?

**Steven Jackson Sell**
*President, CEO & Director*

So '23 unit revenue has a nice step-up. I'll let Tim kind of dimensionalize that for you, Lisa.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. In fact, of course, the first pickup in revenue is because we have this very large increase in membership coming in. Then when you look at, I think, revenue, at least on a PMPM basis, that's going up around [ 6% ], which, of course, is a big number. But the benchmark increase itself is your kind of blended across our markets and members, is in that 4% to approaching 5% range to begin with.

And then on top of that, I mean, we would expect, especially in our kind of year 1 and year 2 sort of younger markets, that we would get some continued wrap improvement as well, and that kind of tops you out to that sort of 6% or so range on a revenue PMPM basis. So that, in combination with a very strong membership growth, gets us to that overall revenue number.

**Steven Jackson Sell**
*President, CEO & Director*

And Lisa, one thing I would add to Tim's comment is, if you think about what we do, we love going to these markets and being first. They're 100% fee-for-service, and we want to move them to value.

I think we found that there are markets out there with higher healthcare spend and therefore, higher starting points on rates as part of our mix that are really attractive for us, and we've been able to demonstrate success within them.

And when you realize how large this class is with those year 1 markets that have a higher baseline, plus the factors that Tim talked about, that accounts for that higher composite revenue number you referenced.

**Operator**

Our next question is from Justin Lake of Wolfe Research.

**Justin Lake**
*Wolfe Research, LLC*

So I wanted to ask two quickies. One, on the ACO REACH membership not -- basically flat year-over-year. What are you seeing in terms of physician groups? I know not every physician group is in there. So are you seeing some entering, some exit? Are you seeing changes in the underlying membership? Just trying to understand that.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 645**

And then Steve, you gave some positive commentary on rates. And probably the bigger question that I get from people is on this new risk model. Would love to hear your comments on how you lived through this back in California the last time they put through a big change in the risk score model.

So I would love to hear your thoughts on kind of maybe how that -- how you've seen that change of implemented and how you think it might affect agilon.

**Steven Jackson Sell**
*President, CEO & Director*

Sure. Thanks, Justin. Two fulsome questions. So real quickly on ACO REACH, same partners in '23 that we had in '22, and that's sort of the year-over-year relatively flat. As we shared early in January, we did have some partners that could have gone in '23. We pushed to '24 because we're very focused on having a strong implementation and a good starting point.

And so we see opportunity in '24 and beyond for additional ACO REACH membership. We continue to see it as a very strategic program. I think we're really pleased with our results, from a cost and quality perspective.

The value that we get both in Direct Contracting and Medicare Advantage of having that concentration within the practice and with the community is really very strong. So we're bullish on Direct Contracting.

And now with 2 years of visibility and experience and better transparency and almost a full runout on 2022, you can see in our results that there was some upside within that, which is encouraging for us as we go forward, although we are being cautious. Do you have anything to add?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Before we move on to the advanced rate notice question, I'd just say that obviously, we're pretty pleased with the overall performance so far of Direct Contracting now transition to ACO REACH.

I mean the name of the game is drive costs out, beat cost benchmark and have high quality, and we're basically doing both those, where we continue to beat the cost benchmarks and we've got 100% quality score. And that really helped drive that a little bit higher performance than we expect -- than we had previously expected for DC in 2022.

We did mention that for 2023, we're being -- trying to be very prudent. We've got both the combination of the step down and the global -- or the step-up, I guess, in the global discount. And just trying to be a little bit prudent, we're saying that we would expect it -- ACO REACH in 2023 will probably contribute a little bit less than that in the $5 million to $10 million range.

**Steven Jackson Sell**
*President, CEO & Director*

And then, Justin, on your second question about the 24% rate notice and the recalibration of the risk adjustment model within the context of that, we, like everyone has -- we've done our preliminary work. We've gone through this on a market-by-market basis, looked at the [ HCCs ] and kind of the proposed changes.

And I think the headline for you is we feel like it's very manageable for us. The composite is probably in line with that 3% impact that's been called out nationally. And if you think about what we do in the markets, we go to in the populations we serve, that really makes sense.

We are going to markets that are 100% fee-for-service. They're really early in their life cycle. 44% of our membership is in year 1 or year 2 markets. We are working on taking out variability on cost and quality, but also on risk adjustment.

And so when we look at some of our prevalence numbers relative to -- or when we look at regional prevalence numbers relative to our capture, we can be below those.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 646**

So I think there's opportunity. And therefore, the impact of this is not nearly as great as you might find in a clinic model that's very concentrated with more complex patients such as duals.

I think we are -- when I talked about how confident I am in '24 and beyond as well as '23, it's really about the levers that we're exercising today, and we continue to exercise that are going to give us a nice lift in '24. We're getting members on the platform earlier.

Think about what I said, we are going to double our membership in MA from what we just reported to you today for the close of '22 and what we're seeing out in '24, which is just significant, 2 classes of at least 130,000, with the opportunity for '24 to be larger than that.

Second point is higher starting points. We've got year 1 markets that typically come in, they're breakeven. They're certainly dilutive on a med margin level. Our ability with a longer implementation cycle on this acquisition, which we're really excited about, can help that starting point.

And then the third thing is really just the cohort migration across time. And so I think we feel like we can manage it. We're obviously in the comment period. We participated with APG and BMA and the healthcare transformation task force on this.

I think there are others that are much more dramatically impacted than we would be, and we are supportive of phasing in something of this magnitude and type of change.

But for us, it's manageable. And I guess the last point I'd make is what I talked about in my remarks, which is I think there's just a macro trend in terms of the push towards value from fee-for-service.

There's always been the factors of the challenge for physicians, the demographic surge in terms of seniors and payers demanding, looking for more to value. I think what just happened with this notice is going to accelerate that.

If you think about payers and Medicare Advantage, the vast majority nationally of their membership in MA sits on a fee-for-service chassis. They are going to want to move that because of that variability that I talked about. And who is the solution for that from a payer side, I think it's agilon.

Who is the solution for that from the physician side, I think it's agilon. And so I think from a volume perspective, we're going to win on it. We'll see where this settles out. We'll know in a month. But I think the headline is it's manageable.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And just one clarification. Steve mentioned new markets being dilutive on a medical margin basis. I think you probably meant EBITDA.

**Steven Jackson Sell**
*President, CEO & Director*

I'm sorry. Yes.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

It's okay, but just to clarify. Operator, we can move to the next question, please.

**Operator**

And our next question comes from Jailendra Singh from Truist Securities.

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

Actually, my question is related to what the clarification, Matt, you just gave. So on this, clearly, class of '22 performed well compared to your medical margin PMPM target of $30 to $60.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 647**

How should we think about year 1 medical margin guidance in terms of class of '23? Does the unique nature of this year's class impact your view how you think about year 1 medical margin this year?

**Timothy S. Bensley**
*Chief Financial Officer*

This is Tim. I'll take that. I don't think so. I think we're still -- looking at the class of '23, we'd still say that, that range of $30 to $60 is going to be the starting point.

We've got -- within -- within the class, it's a very large class in 2023. We've got some on both sides of that. But that range is still very appropriate for the class of 2023 for this year.

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

If I can ask one more quick here on the -- any update you can provide on your discussions with health systems? Are you actively exploring those partnerships for class of '24? Or do you believe that there is a wait-and-see approach on how MaineHealth plays out?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I can update you on that. I mean I think it's a great question. As I shared in our remarks, part of the class '24 includes health systems or the physicians affiliated with them, both employed and independent physicians that are affiliated. And so we will -- we're going to expand a lot more at our Investor Day on our class of '24 and give you that.

But I think we see this as a tremendous growth area for us. I think that health systems are seeing many of the challenges from this fee-for-service world, reimbursement changes, labor costs that our physician partners are seeing. And they've got a tremendous opportunity with their primary care physicians in a senior population to move to value.

So we're going to see that again with the class of '24, and we'll be able to give you much more detail at that [ meeting ] at the end of the month.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Operator, why don't we move on. If we could just keep it to one question, just so we can get to the full queue.

**Operator**

And our next question comes from Kevin Fischbeck from Bank of America.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

Great. I just wanted to get a little more color on this implementation time frame that you guys talked about with mphrX. Are you thinking about this is more about being more prepared when you go live because of faster implementation? Or does this potentially accelerate your ability to bring someone on faster, where you would have had to wait 12 months implementation I can do it with only 10 months of advanced warning?

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think we're going to continue to take as many months as we can on an implementation period. The example I'll give you, Kevin, is in our 2022 pilot, we utilized this in a market that took us 4 months doing it the old way. And using the technology of the Minerva technology, we were able to do it in 4 weeks. It's 75% faster in that example.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 648**

Each month is worth a lot in terms of our ability to get patients scheduled, get them in for visits, get clinical programs set up earlier, the ability to stratify that population.

And so what I would say, when I said it buys us time is it gives us more time to get into the really the heart of that implementation, which is getting that patient in, getting that assessment and getting them the resources that they need around that. And so that is the most immediate and powerful impact.

This will improve our clinical quality over time, should help us on the medical expense because we're getting there. The quality of our data through this was improved, too, versus the way we were doing it. Some of that variability came out. So I think it's a combination of those things, Kevin, that leaves us pretty excited about the acquisition.

**Timothy S. Bensley**
*Chief Financial Officer*

I think it's really important strategically as we have continued to diversify the kind of partners that we go out now and partner with, including some of these very large kind of PO type organizations that have multiple EMRs within their system, this really just gives us more capability to be able to service a large number of types and diverse types of partners. So this is -- it's going to be really impactful with that kind of partnership as well.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Operator, why don't we move to the next one.

**Operator**

Our next question comes from Sean Dodge from RBC.

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

Yes. The class of 2024, 130,000 members, Steve, you made the point that's much larger than you had initially contemplated. Should we think about 2024 being fully based now? Or do you expect there will be more to be added there? I guess I would point that you start to kind of shift over to building out 2025.

**Steven Jackson Sell**
*President, CEO & Director*

Sean, we'll give you a lot more context at our Investor Day at the end of the month. I think I said it's going to be at least that, right? The class of new partners, new markets is 80,000 that's coming on the composite when you think about what we're doing, and same geography could get you to that 130.

But it could be larger than that. And it could be a combination of there are additional partners that we have letters of intent with that we could put into that class of '24 or we could push them, as we did last year, out a year. So in this case, they would go out to the class of '25.

There also is -- that's an estimate on those 6 partners I talked about, but there is some additional membership, potentially, within that. We try to be really kind of smart about the way we do this. But with some of the technologies, some of the faster implementation period, maybe some of that gets into 2024.

So we'll update you at the end of the month at our Investor Day on it. But I think we're pretty positive on the class and what the opportunity could be for it.

**Operator**

Our next question comes from George Hill from Deutsche Bank.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 649**

Yes. Steven, I think you probably just answered this question because it got a little bit of a long preamble. But if I look at what you guys have signed already for the class of '24, it looks like [ FPC ] in Pennsylvania, if the national averages apply, will contribute 30,000 to 35,000. And again, with Lexington Clinic, that looks like it could be as many as 60,000 MA lives.

You said end market growth could probably be over [ 30 ]. I guess my question is, a follow-up on [indiscernible], when do you cut the class of '24 off? And kind of what size is too big for you to ramp '24 and then kind of push people into '25?

**Steven Jackson Sell**
*President, CEO & Director*

Well, so George, thanks for the question. Well, first, let me say, FPC and Lexington are the two partners out of the class of '24 they put releases out. We'll do those on the others, and we'll talk to you fulsomely at our Investor Day at the end of the month.

They both are great partners and they're emblematic of how strong this class is, FPC is the largest independent primary care group in Central Pennsylvania. We've talked about this phenomenon of groups in an existing state or region in which -- we talked to them previously. And for whatever reason, it wasn't right.

And we came back then a few years later, and when they wanted to make the move to value, agilon was the partner for them. That's the case of FPC. And I mean, they're an outstanding group. We're really excited to have them.

And then Lexington Clinic is really a phenomenal largest multi-specialty -- oldest multi-specialty group in Central Kentucky. And so we're excited to bring them on as well. And they were a group that we've got a longer implementation period as we talked about. And we push them from -- mutually, we agreed to have them go into the class of '24 instead of the class of '23.

So we'll talk about it at the end of the month. We are approaching the period in which in another month or so, it's probably going to push folks into that next class of '25, so you can have that long runway and get that great starting point that I talked about.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

Okay. We'll hold up for the Analyst Day.

**Operator**

Our next question comes from Ryan Daniels from William Blair.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Congrats on the announcement. Tim, a lot of data, but I want to hone in, again, on your comments on medical margins. They were interesting, looking at the year 2 cohort. So I'm curious if you could give us any color on how that contrasts to what that year 2 cohort may have looked like a year or 2 ago?

And then second, do you think that's due to more rapid and better implementation, so starting at a higher point, or is it more to do with kind of the operational speed to value as you move into the second year of those performance metrics?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. No, that's a great question. I think our -- we'll update you, again, Steve was just talking about it, in about a month on the cohort data, you'll get even a better look at this. But even if you refer back to a year ago, I think you can -- the information we put out on cohort data at last year's Investor Day, you can see that.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 650**

Yes, I mean, our year 2-plus market performance has been consistent across cohorts as we move through time. So we're not necessarily seeing a faster pickup. We're just seeing that same kind of progression, I guess, in each cohort as they move forward.

I don't think, at least right now, in the last couple of years, it hasn't been really a higher starting point. I think we've been consistently in that $30 to $60 range.

More important, when we start something in the $30, $60 range, the more important thing is that we're quickly moving those folks up on that maturation curve and medical margin kind of as we walked you through in the cohort analysis last year as they move into year from year 1 to year 2 and year 3.

And they're quickly getting the numbers up into the mid-100s. And we even showed you markets that by year 3 are getting up and are already pushing between $150 and $200 medical margin PMPM. So I don't think it's necessarily a higher starting point. I think it is our ability to quickly ramp those markets up in year 2 and year 3.

And basically, that ramp-up is coming because as they mature in the market, we're just getting tremendous physician variability out of the system. We're getting tremendous compliance with our -- and execution of our clinical programs that are driving quality up and cost out.

**Operator**

Our next question comes from Brian Tanquilut from Jefferies.

**Brian Gil Tanquilut**
*Jefferies LLC, Research Division*

Tim, just a quick question on the EBITDA to cash flow conversion. So obviously, a strong outlook in EBITDA growth. But how should we be thinking about cash flows this year and into next year as well?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So one of the things that happens is our cash flow typically is going to lag our EBITDA. And the reason for that is a couple of things. One is just the timing of how we settle up our risk pools with the payers means that we're getting the cash for our EBITDA performance kind of well behind the time here that we're reporting the EBITDA.

And the second thing is we are actually investing in these larger and larger markets. And so that year one or -- I'm sorry, that year 0 implementing market expense is actually going up as well. And obviously, we don't get any revenue or any cash for that until the following year. So typically, we're seeing cash flow kind of lag EBITDA.

So for instance, in 2023, a significant portion of our cash flow improvement year-over-year, we would expect to see a significant pickup in cash year-over-year will come from 2022. And certainly in 2022, the fact that we had significantly more EBITDA gain than we did cash flow is driven by the -- by those same factors.

**Operator**

Our next question comes from David Larsen of BTIG.

**David Michael Larsen**
*BTIG, LLC, Research Division*

Can you talk about any conversations you might be having with your base around the RADV rule or the final rate notice? It seems to me like physician practices will need basically all of the assistance they can get in terms of like coding and implementing restricted and effective narrow networks. Is that driving up demand for your platform or not? Just some thoughts there would be helpful.

**Steven Jackson Sell**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 651**

*President, CEO & Director*

Yes. David, really appreciate the conversation -- question. And I'll just say, this weekend, we're going to be with 200 physicians in Florida. And the regulatory environment and how it is increasing the acceleration of value and how together we can take advantage of that and even perform better is really kind of at the heart of that discussion.

So I think from a -- opportunity for us, we're saying that we can just perform better on value. We will work with them very closely to make sure that we have high accuracy from a coding perspective.

We've done a very good job to date. We'll continue to do that. And so we're constantly looking at how we can make improvements. We'll walk them through that this weekend. They want to make sure that we're all doing things the right ways.

If you think about the power of -- what I'm talking about $550 million of medical margin in 2023, roughly half of that goes back to be invested in these practices. And so it's a tremendous catalyst for them, tremendous catalyst for their communities, but we just want to make sure that we're doing things in a really smart way. So it's a key part of that.

And then obviously, what that impact is from that advanced notice. We're talking to them because it's different by market, but it's not the final notice. And we'll find out in a month what that looks like. So we'll make preliminary plans around that and then adjust as we see what that final looks like.

### Operator

Our next question comes from Jamie Perse from Goldman Sachs.

### Jamie Aaron Perse
*Goldman Sachs Group, Inc., Research Division*

Just wanted to follow up on the platform support cost. I think you said those were higher than expected due to infrastructure to scale over 2023 and beyond. Can you elaborate on what these investments are a little bit more? And should we think about them as accelerating growth, accelerating profitability or just necessary investments to support what's already in place?

### Timothy S. Bensley
*Chief Financial Officer*

Yes. And first of all, I think we're really pleased with our ability to get leverage out of platform support costs. I mean I think we talked about, again, platform support costs as a percentage of revenue, overall, for 2022 was down by more than another 100 basis points, and we continue to see -- expect to see that improvement year-over-year as we move forward.

I mean, I think getting that leverage against platform support cost is obviously a big part of how our model works.

Specifically in Q4, we did have the opportunity to step up platforms support costs. And you kind of see it when you look across the quarters and the higher absolute level of spend in Q4 versus the first 3 quarters.

And that was really to support this very large class of 2023 coming in. So we're able to do things like kind of proactively increase our technology infrastructure and data storage, for instance.

So we were able to do these kinds of things that would essentially put us in a position to get that huge class of 2023 on board and really put us in a position to scale our business over time.

So I don't think it's indicative of anything, going forward, other than we'll continue to get great leverage out of platform support costs, but I think we're in a good position to do that. Now of course, in Q4, one of the reasons we were able to do that is we did have a little bit higher Direct Contracting EBITDA flow-through that offset that increase.

### Steven Jackson Sell

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 652**

*President, CEO & Director*

And Jamie, if I can just add to that. I think just the macro is we are investing heavily in our business in a variety of ways. I think we are the solution out there. I think we have a lead. We are trying to invest in a period of dislocation and frankly, advance that lead.

And so meaningful step-up in terms of the platform support costs, a lot around technology, the amount of data that we are taking in and providing to our partners on a daily basis to help do the things that we talked about for better cost and quality has escalated dramatically.

When you have a much larger class, getting in front of that is a key part of it. The geo entry costs that Tim talked about, now that's just a function of the -- double the class size, but that's a substantial investment.

And then this acquisition that we talked about. So in a variety of ways, we are trying to do things that are going to put our partners in a position to really extend their lead in their communities and attract other doctors and other patients.

### Operator

Our next question comes from Whit Mayo of [ Bravo ] Securities.

### Benjamin Whitman Mayo
*SVB Securities LLC, Research Division*

Tim, I was just wondering if you guys are making any changes in your patient attribution initiatives or process, if It's just anything new with the systems to ensure that you're matching with the plans, given the materiality of the membership growth in front of you? And maybe, do you find that the plans are getting better with this as well? They obviously have some huge incentives to match alongside you.

### Steven Jackson Sell
*President, CEO & Director*

So Whit, it's Steve. I can chime in on this one. We are spending a lot of time with our plans right now. We are on the phone with the Humana National team on Monday. We collectively have a goal to really accelerate that period. So there's not as much retroactivity. And so both of us are saying, what do we need to do earlier?

When you have a mix shift, like you talked about, between plans, obviously, there's more work around that. And so it's what I would say, it's a lot of logic, it's a lot of process. It's a lot of data that's going on to make that work happen.

There's still going to be some retroactivity through this first quarter, given the magnitude of some of those shifts. But it's just kind of table stakes in this business. And we've got a great relationship with the plans, and we're working on it.

### Timothy S. Bensley
*Chief Financial Officer*

Yes. No, I think that's fair. I don't think we're doing anything new, but I would say that, that continues to be a strength of our model and one of the strengths that we bring to our partnerships, both with the payers and with our provider groups.

Our ability to have a really good attribution logic and process for -- obviously, it's easy to do for HMO membership, but to be able to do that for the significant mix of PPO membership that we have is something that actually essentially makes our model work.

So I wouldn't say we're necessarily doing anything new, but our ability to sort of leverage that core expertise that we have really makes it a lot easier for us to expand both with the national payers and with all these new regional payers that we're bringing on.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 653**

**Operator**

Our next question comes from Sandy Draper from Guggenheim.

**Alexander Yearley Draper**
*Guggenheim Securities, LLC, Research Division*

A lot of questions have been asked and answered, but maybe just a follow-up on the comments about the platform support costs in the same geography.

Given the strength of the pipeline, the outlook for '24 and beyond, is it fair to assume that we're not going to necessarily see those -- this wasn't sort of onetime, 1 quarter, and we're going to fall off? It seems like we're sort of stepping up to a new level just because the visibility for long-term growth is there. Just want to make sure I'm thinking about that right.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So I'd answer it in a couple of ways. On platform support costs specifically, we had the opportunity, particularly after -- on top of the strong performance we had on both the MA side and the Direct Contracting side sort of ramp-up platform support cost in advance of 2023 and sort of kind of get a jump start up to that 2023 run rate.

So our fourth quarter platforms support cost is more in line with what we would expect our '23 run rate to be. And that's -- as we go into '23, increases, is heavily in platform support cost, is heavily influenced by the fact that we're bringing on a lot of new markets and a lot of the young members. So that makes sense.

But still getting a significant reduction in platform support cost as a percentage of revenue. So still getting leverage out of it.

On the implementation costs, that continues on a per member basis to stay in a very good range and say that $400 to $600 range. And when we spend $400 to $600 to bring a new member on, we're getting phenomenally quick payback on that and getting like -- we consider the lifetime value of the medical margin and network contribution that we're going to be generating off of that membership.

And considering the really good retention that we have with membership, we're going to go to get a lifetime value to customer acquisition costs ratio of something like 10, 12 to 1. So really, really positive.

The fact that we had a big pickup in implementation costs this year is really primarily a factor of having twice as many members that we were implementing. I mean we implemented over 100,000 new members in 2022 that went live now at the beginning of 2023. The year before class is like 57,000.

So that increase in membership obviously, at a still a really good cost per member, just generating a bigger number. We're -- I mean, we will make that investment all day long, right?

Getting those members on the platform early today as many as we can with all that embedded margin just puts us in better shape to be able to hit both our membership and our medical margin and EBITDA projections for the future.

**Operator**

And our final question comes from Stephen Baxter of Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

I was hoping you could talk in a little greater detail about your ability to manage margins and margin progression in a more challenging rate environment inclusive of that risk model headwind.

Not to harp on it too much, but the risk model change alone that you size is larger than the average annual EBITDA margin expansion that's implied to reach your long-term guidance target. So I'm just

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 654**

trying to understand why this would be a bigger setback for you in 2024, absent some kind of mitigation in the final rule.

**Steven Jackson Sell**
*President, CEO & Director*

So Stephen, I think my headline to you was that it's manageable. It's in that 3% range. And the reason is those levers I talked about. So getting more members on the platform earlier, the fact that we are doubling our MA membership from '22 to '24, that's far greater than what we would have told you a year ago.

And then the year-over-year maturation that's driven by earlier rollout of clinical programs, better quality, the diabetes research that I cited at the beginning, where we're 20% better than Medicare Advantage on a national basis in terms of total cost of care, go down the list of sort of complex patients, and we're getting much better on that.

And so -- and I'm not even counting anything that might happen on the benefit side. There's a lot of dialogue that we have going with plans on that, that could be -- there could be adjustments on benefits. And we have that discussion every year. Last couple of years has been about increasing benefits this year.

And depending upon the market, it could be about, "Hey, are there places where we tune and reduce some of those benefits?" But it's a pretty normal cycle.

And so I think -- and then the starting point that we talked about, if you think about the year 1 markets being dilutive potentially at that adjusted EBITDA level, each incremental dollar we're able to drive there by having a better implementation period really helps a lot.

**Operator**

And there are no further questions. So I would like to hand the call back to the management team for any closing remarks.

**Steven Jackson Sell**
*President, CEO & Director*

We're obviously excited about our performance in '22 and what's ahead in '23 and '24. And we look forward to seeing all of you at the end of the month at our Investor Day here in New York. I think it's going to be a great discussion. So see you then.

**Operator**
This concludes today's call. Thank you, everyone, for joining. You may now disconnect.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 655**

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.

# EXHIBIT 14

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ1 2023 Earnings Call Transcripts

Tuesday, May 09, 2023 8:30 PM GMT

S&P Global Market Intelligence Estimates

| | -FQ1 2023- | | | -FQ2 2023- | -FY 2023- | -FY 2024- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | 0.06 | 0.04 | ▼ (33.33 %) | 0.04 | 0.12 | 0.30 |
| Revenue (mm) | 1076.96 | 1136.15 | ▲ 5.50 | 1071.40 | 4330.61 | 5742.20 |

Currency: USD
Consensus as of May-05-2023 9:16 PM GMT



| - EPS NORMALIZED - | | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| FQ2 2022 | (0.01) | (0.01) | NM |
| FQ3 2022 | (0.04) | (0.02) | NM |
| FQ4 2022 | (0.05) | (0.06) | NM |
| FQ1 2023 | 0.06 | 0.04 | ▼ (33.33 %) |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 658**

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................................. | 3 |
| Presentation | ................................................................................. | 4 |
| Question and Answer | ................................................................................. | 9 |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 659**

# Call Participants

## EXECUTIVES

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

## ANALYSTS

**Adam Matan Ron**
*BofA Securities, Research Division*

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

**Brian Gil Tanquilut**
*Jefferies LLC, Research Division*

**Carol Wong**
*Wells Fargo Securities, LLC, Research Division*

**David Michael Larsen**
*BTIG, LLC, Research Division*

**Gary Paul Taylor**
*TD Cowen, Research Division*

**George Robert Hill**
*Deutsche Bank AG, Research Division*

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

**APP 660**

# Presentation

**Operator**

Thank you all for joining. I would like to welcome you all to the agilon health First Quarter 2023 Earnings Conference Call. My name is Brika, and I will be your operator for today's call. [Operator Instructions]

I would now like to turn the call over to Matthew Gillmor, Vice President of Investor Relations. Matthew, you may begin.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good afternoon, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley. Following prepared remarks from Steve and Tim, we will conduct a Q&A session.

I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

You'll note from the press release that we've changed the presentation for certain non-GAAP financial measures. Before Steve's remarks, Tim will review these changes.

So with that, let me turn the call over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Matt. Before we give our prepared remarks, I want to review the revised presentation for adjusted EBITDA and gross profit. As you know, we've always been committed to transparency and provide a lot of details on our performance. We recently made the determination that we should include geography entry costs within adjusted EBITDA to conform to the SEC's recent guidance on non-GAAP financial measures. We will continue to provide transparency around these investments on a go-forward basis.

For clarity, we want to define gross profit and adjusted EBITDA before we begin the call. We've replaced network contribution with GAAP gross profit. Gross profit is total revenues, less medical services expense and other medical expenses, which include a portion of geography entry costs. Adjusted EBITDA now includes total geography entry costs, which was $12 million in the quarter. This includes the portion of geography entry costs within our other medical expenses and geography entry costs within our G&A expenses.

With that, I'll turn the call over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Tim. Good evening, and thank you for joining us. We've had a very successful start to the year, and we are making rapid progress against our vision to transform health care in 100-plus communities by empowering primary care doctors.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 661**

We are hosting today's call from the Twin Cities in Minnesota, where we recently launched our partnership with 2 leading physician groups, Entira Family Clinics and Richfield Medical Group. Entira and Richfield are highly respected with a deep history and connectivity across the region. Through our partnership, we have introduced a new model for senior care in Minnesota with a multi-payer, full-risk platform. We see significant opportunities for growth in the Twin Cities as physicians have a strong history of participating in early value-based care models. Primary care is largely fragmented outside of several large health systems. And our partnership with Entira and Richfield is serving as a catalyst for other physicians to make a similar choice and move to full risk for their senior patients.

As discussed at our Investor Day, once the infrastructure for full risk is established in a community, other doctors can easily join our network and access a new and sustainable model for primary care. The associated long-term growth opportunity or in-market TAM in the 14 states and 32 communities we serve is now 10.5 million seniors and 33,000 primary care doctors. We are excited for more of these doctors and their senior patients to join our platform in the Twin Cities and throughout the entire agilon network.

Now to our performance in the first quarter. Our overall momentum remains strong entering 2023. During the quarter, our MA membership grew 61% to 402,000 members and revenues grew 74% to $1.14 billion. This was above our guidance ranges and supported by faster standup of new primary care doctors and pull-through of members in new markets. Our ability to pull through more members in 2023 supports our long-term earnings power as we improve the quality and efficiency of care for those senior patients over time.

At the same time, our profitability continues to inflect higher, with first quarter medical margin up 88% to $162 million and adjusted EBITDA more than tripling to $24 million. Our growth in medical margin and adjusted EBITDA was especially impressive given a modest net headwind from prior year claims and revenue. Even with our stronger membership growth, our medical margin increased 17% on a per member per month basis to $135 and by 110 basis points to 14.3% of revenues. This was primarily supported by strong performance in our maturing partner markets. Our ability to expand margins while driving higher membership growth remains very distinctive, reflecting the power of our partnership model, platform and scale.

With our strong start to the year, we are maintaining the full year adjusted EBITDA outlook we provided in March. Under the revised presentation that Tim outlined at the top of the call, our adjusted EBITDA outlook ranges from a loss of $3 million to a gain of $25 million, which includes $78 million to $65 million of geographic entry costs. Our guidance also reflects faster pull-through of members in our new markets and increasing confidence in the contribution from REACH based on higher than initially projected outperformance against national cost benchmarks.

We are also encouraged with the progress we are seeing with enrollment in our clinical programs targeted at the most complex and high-cost patients. These programs such as renal and palliative care leverage our deep alignment with primary care doctors while driving continuous improvement to patient experience, quality and cost.

I'm especially proud of our performance given the magnitude of the growth we are driving across different partners, markets and payers. During the first quarter, we added 130,000-plus new Medicare Advantage lives, 8 new markets, 4 new states and 9 additional payers. With this growth, we are now operating close to 100 distinct full-risk contracts with nearly 30 payer partners, including national and regional plans.

When you consider that most of our payer partners have never done full risk, our ability to be first in the market and build the infrastructure for risk-based care that all physicians can access is a significant competitive advantage and requires the management of complex data flows such as member and financial data reconciliations. Increasingly, we believe agilon is differentiated in our ability to move new markets to risk and successfully work with a broad diversity of payers.

Before updating you on our future growth opportunities, I wanted to say a few words on our revised non-GAAP measures. The most important change is we are now including geographic entry costs within our adjusted EBITDA calculation. I want to stress that our revised presentation does not impact how we think about our business, our cash flow or returns on capital. Ultimately, our goal is to get members on the

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

platform, improve access, quality and efficiency of care delivery and develop medical margins over the long term.

Geographic entry costs are investments we make to set up our partnership; establish processes that enable primary care doctors to be successful in value-based care, especially around patient access and quality; and expand overall primary care capacity. Because we partner with existing physician organizations, the efficiency and returns we generate on our geographic entry costs are very compelling. As we have discussed with you in the past, member acquisition costs have consistently remained in the range of $400 to $600 per member. They generate an LTV to CAC of greater than 10:1, and these costs only grow on an absolute basis as the number of new members increases.

Now for an update on our 2024 partners and some early observations for 2025. As we shared with you in March, we expect 2024 will be another record year of growth. We are currently implementing over 100,000 Medicare Advantage lives across 6 new partner groups, which include primary care only groups, multi-specialty, scaled networks and health systems. Our implementation work is progressing well supported by a recently completed acquisition of mphrX and our established infrastructure in existing states and markets.

Additionally, our early engagement with payers has been encouraging. We are optimistic that the combination of new and existing partner growth could pull through greater than 145,000 total new MA members for 2024, which would be similar to our experience of increasing expectations for final expected membership for 2023.

Our business development team is now shifting their focus to 2025. While it's very early, we are seeing significant opportunities across diverse partner types and geographies, including new markets and large physician organizations in existing markets. Similar to last year, we are encouraged with the quality of the dialogue this early in the cycle, which should translate into longer implementation periods. In fact, we expect to begin implementing several new partners for the class of 2025 during the second half of the year.

As I've said in the past, the inflection in demand among physician groups for a sustainable primary care model reflects both structural factors from all payers pushing for value and the level of success that our partner groups are seeing on the platform.

I wanted to close by offering a few comments on the 2024 rate notice and recent policy developments. We are encouraged and supportive of the risk adjustment model changes included in the 2024 rate notice, including the 3-year phase-in. We believe the phased approach will limit industry disruption, especially for health plans and at-risk provider organizations that serve high-risk populations. Operationally, we are already implementing the necessary changes for the 2024 notice.

As I mentioned on the last call, we believe the rate notice is very manageable for agilon. This reflects our combined power and nimbleness from centralized operations paired with local teams tightly integrated with primary care doctors as well as our focus on historically unmanaged fee-for-service markets that serve the entire Medicare Advantage population and yield relatively lower risk adjustment levels.

In addition, the distinctive levers in our business provides the ability to manage through disruption, levers such as getting more members on the platform early, delivering a more effective and longer implementation for new partners and accelerating quality and medical cost performance in mature markets.

The 3-year phase-in of the risk model change removes uncertainty and reinforces our confidence in our ability to continue to inflect adjusted EBITDA in 2024 and beyond. From a macro perspective, the rate notice, along with the RADV rule, reinforces the central role of primary care doctors in our health care system, which is very positive for agilon and our partners.

With these changes, health plans will need even closer alignment with PCPs to drive better cost and quality outcomes and support competitive benefits, while doctors will need infrastructure, resources and technology to succeed in value-based care and meet the demands from all payers, including CMS.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 663

agilon's partnership and platform is the solution for existing doctors to move into full risk and the success of our growing network continues to demonstrate the critical role we and our partners are playing in transforming the overall health care system.

With that, let me turn things over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve, and good evening, everyone. I'll review highlights from our financial statements to provide some additional details on our guidance for 2023.

Starting with our membership for the first quarter. Total members live on the agilon platform increased to 491,000, including both Medicare Advantage members and ACO REACH beneficiaries. Our consolidated Medicare Advantage membership increased 61% to 402,000. This was above our guidance range of 385,000 to 390,000 driven by retro membership from 4Q and the faster pull-through of members in new markets, including better-than-expected payer contracting and attribution.

Revenues increased 74% on a year-over-year basis to $1.14 billion during the first quarter, which was also above our guidance range of $1.07 billion to $1.09 billion. Revenue growth was primarily driven by membership gains in new and existing geographies. On a per member per month basis, or PMPM, revenue increased 8% during the first quarter. This was primarily driven by benchmark updates and membership mix, including higher benchmarks in several new markets.

Medical margin increased 88% year-over-year to $162 million during the first quarter. Medical margin increased both as a percentage of revenue and on a PMPM basis, even while accounting for the dilution of our membership growth. Membership margin was 14.3% of revenue during the first quarter compared to 13.2% last year, and medical margin PMPM increased 17% to $135 compared to $116 last year.

Medical margin benefited from the maturation of older markets and member cohorts which continue to offset dilution from our year 1 numbers. Medical margins for our year 2 plus partners, which excludes the dilution from year 1 markets, increased 72% during the first quarter on a dollar basis and by 47% on a PMPM basis. As we've discussed with you in the past, medical margin growth in our year 2 plus partners drives the majority of our adjusted EBITDA gains.

Our medical margins for the quarter included a net headwind of $12 million from prior year revenue and claims. This was primarily a function of true-ups with health plans, including new contracts, which includes both prior year claims and revenues, a number of smaller, older high-cost claims and some retro members, which also include both prior year claims and revenue.

Gross profit, which is replacing network contribution, increased 82% to $77 million during the first quarter and includes $2 million in geography entry costs. The year-over-year increase in gross profit reflects our strong medical margin as well as the relative contribution of medical margin across geographies.

Platform support costs, which include market and enterprise level G&A, increased 41% to $48 million. Growth in our platform support cost continues to run well below our revenue growth and highlights the light overhead structure of our partnership model. As a percentage of revenue, platform support cost declined to 4.2% during the first quarter compared to 5.2% last year.

Adjusted EBITDA was $24 million in the quarter, which is a threefold increase from $8 million last year. Adjusted EBITDA now includes geography entry costs, which was $12 million in the first quarter of 2023 and $4 million in the first quarter of 2022. The increase to adjusted EBITDA reflects the gains in medical margin and gross profit, along with leverage against platform support costs. Adjusted EBITDA contribution from Direct Contracting was $3 million in the first quarter, similar to last year.

Turning to our balance sheet and cash flow. As of March 31, we have over $800 million of cash and marketable securities. Cash flow from operations was negative $61 million for the quarter, which was in line with our expectations.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 664**

In February, we completed the previously announced acquisition of mphrX, a leading provider of value-based care technology and interoperability solutions, for a cash consideration of $44 million. agilon remains well capitalized. And given our efficient partnership model, we do not anticipate needing any external capital to drive our future growth.

Turning now to our financial guidance for the second quarter and full year 2023. For the second quarter, we expect ending membership live on the agilon platform will grow to a range of 488,000 to 495,000, including 55% growth in MA membership to 403,000 to 405,000, and ACO REACH membership at 85,000 to 90,000.

We expect revenue in a range of $1.105 billion to $1.115 billion or 66% growth at the midpoint. We expect medical margin in the range of $138 million to $148 million, representing 74% growth, and adjusted EBITDA of $2 million to $10 million compared to negative $3 million in the prior year. Our adjusted EBITDA outlook for the second quarter now includes $19 million to $16 million in geographic entry costs.

For the full year 2023, we expect total membership live on the agilon platform will grow to 490,000 to 500,000 members. This includes higher MA membership outlook of 405,000 to 410,000, representing growth of approximately 51% at the midpoint, and ACO REACH membership unchanged at 85,000 to 90,000 members.

Revenue growth is now expected to increase 63% at the midpoint to a range of $4.41 billion to $4.44 billion. We anticipate medical margin in a range of $535 million to $560 million and adjusted EBITDA in the range of negative $3 million to positive $25 million. Our adjusted EBITDA outlook for the full year 2023 now includes $78 million to $65 million in geography entry costs. Finally, our adjusted EBITDA outlook includes $5 million to $10 million in contribution from REACH, but we now have increased confidence in the higher end of that range.

With that, we're now ready to take your questions. Operator?

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 665**

# Question and Answer

**Operator**

[Operator Instructions] We have the first question from Lisa Gill of JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Congratulations on a great quarter. Steve, I want to go back to the comments that you made about the 2024 class. And there's just so many things that are changing right now, and I understand what you're saying around the risk model changes and your ability to absorb that. But we also have changes coming for many of the plans when it comes to STARS. We do have rates that are not as robust as they've been in the last few years.

I'm just curious about the conversations that you're having with the physician groups. One, is that helping to maybe accelerate some things as we think about you're now talking about this 2025 class already here and we're only in the first quarter or second quarter here of 2023? Just curious around, one, those conversations that you're having. And two, is there any more detail that you can give us to really give us the comfort going into 2024 when we think about margins and the potential impact of all these changes?

**Steven Jackson Sell**
*President, CEO & Director*

Sure. Thanks, Lisa. Great, great question. I think for the class of '24 and even as I shared with the class of '25, we're very encouraged by the conversations. I think never has the case been stronger for physician groups to make the move to value. And that's really a macro thing. Structurally, more payers are pushing for value. In the constrained world, you talked about the benefits of better quality, the benefits of better experience, the way Medicare pays for that, all rewards a total care type relationship between the primary care doctor and their patients. And so I think that is really at the heart.

The second thing I would say is the fee-for-service challenge has just become that much more dramatic. Rising labor costs for doctors, compressed primary care rates with the Medicare fee schedule, all of that makes the status quo that much more difficult. And so the combination of those structural factors are really pushing these groups forward. The payer conversations are extremely constructive. Payers are looking for us to go to new markets, bring on new members. The pull-through that Tim talked about is accelerating. We continue to bring on new members faster, and early growth is really impactful. That will benefit us in '24, to your forward question.

And I think the maturation in our mature partner markets, coupled with a rate notice that, as I said, is really very manageable, and we're implementing that right now, and that's going very well, I think that all leads to a very strong picture for us, not just in '23 but in '24 and beyond. And we are becoming the partner of choice for physicians, and we're moving more and more markets to value for the first time.

**Operator**

We now have George Hill of Deutsche Bank.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

Yes. Steve, kind of a popular topic that we're hearing a lot about these days is the changes in insulin drug pricing. You would think insulin could be a meaningful cost contributor in a diabetic population as it relates to Medicare Advantage. I guess my question was just really, are the changes in insulin prices big enough to be needle movers as you guys think about medical costs and kind of the cost that your provider partners face?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 666**

Yes. No, thanks, George. I really appreciate it. I mean diabetics represent 25% to 30% of the senior population. As we shared with you at our Investor Day, we do an exceptionally good job of managing that diabetic population and controlling blood glucose levels and showing improvements in cost and keeping people out of the hospital at a magnitude of 2 to 3x better than the overall Medicare Advantage population. Insulin is a component of that. I don't think the changes that are contemplated would be a massive game changer for us. And each year, there are things that move up and down, and we believe we'd be able to manage that within the context of our overall outlook.

**Operator**

We now have Ryan Daniels with William Blair.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

I'll echo the congrats on the strong start to the year. My question relates to the acceleration you saw in same-store growth in Q1 being up 14%, up from Q4 despite what appears to be kind of slower overall MA growth. Is there any nuances there to explain it? You talked about bringing on members more quickly, but I assume you've also got novel payer partners, some providers joining, maybe some share gains. Just what explains the relative strength versus the market, which is an even bigger delta than what we've seen in the past?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks, Ryan. I mean we typically outperform above the market growth rate. We shoot for 1.5 to up to 2x that. Same geography growth has continued to be a really strong area for us. I think if you would ask what's really different on that is that our doctors continue to win in a really meaningful way and other doctors are wanting to join us in bringing new patients with them. We also have got tighter pull-through with our health plans, as Tim kind of dimensioned, which is really resulting in a faster acceleration of that same geography growth.

But Tim, would you add on it?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Just a couple of other things, George (sic) [ Ryan ]. One is we did mention in our comments that we had a little bit of retro membership coming through from last year. So that's going to help our Q1, and that's going to look like better same geography growth as well. And then the second thing is, if you remember back last year, we did have a chunk of retro membership that came in Q2. And so that actually depressed our Q1 same geography overlap a little bit, and we had a very, very strong Q2. We still think for the full year this year, our overall same geography growth is going to be around that double-digit range, just to kind of refer back to the guidance that we provided at Investor Day.

**Operator**

We now have Justin Lake of Wolfe Research.

**Justin Lake**
*Wolfe Research, LLC*

First, I wanted to say I appreciate the increased transparency on the new market cost. I think it's really helpful. A lot of questions around cost trends, so maybe you can talk to us about the first quarter and how it shaped up first? What drove the PYD? How do you see it trend in the quarter? I mean there's a fair amount of PYD. What went well in the quarter to offset it and still allow you to kind of get the numbers?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 667**

Yes. Thanks, Justin. I'll start with what I said in my prepared remarks. I mean the Q1 performance was really strong, membership growth, revenue growth. Membership up 61%. We were able to drive that inflection in medical margin of 110 basis points year-over-year, even inclusive of that higher growth, and it's a net $12 million of prior period development, both from a revenue and a cost perspective. And Tim can kind of dimension that for you.

I think part of it, Justin, is really a function of the true-ups that we've got. I called out we're up to almost 100 risk contracts with payers. Last year, it was at 60 across 20 different organizations. Many of those organizations were doing it for the first time. And so there's a lot of data flowing back and forth. And we need to have credible information to the point at which we can book revenue and cost. And that was a big part of the period.

The utilization was very much in line with what we would expect. But I think the power of our clinical programs that I talked about, the power of the primary care physician touch points were really strong in the quarter. We enrolled thousands of seniors within those complex medical programs I talked about, things like palliative care and renal care, they had an impact in the quarter, Justin, but the impact is going to be far greater on a forward basis. So those were the things that I would dimension.

Tim?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. The only thing, Steve, that I would say just first before I jump into is, Justin, thanks for the comment on the transparency on the geo entry. Although I would say I think we've been very transparent all along on what those costs are. But yes, we're going to continue now to report it under this new presentation. So thanks for that comment.

The only other thing I would add to what Steve said around drivers in the first quarter is we also did have obviously incremental membership that helped drive some incremental medical margin, that helped the quarter as well, both retro and just overall higher membership than we expected. As Steve said, we've got a very complex model. We are bringing a lot of new payers and a lot of new markets to risk for the first time, and that's going to result over time, and it's having some true-ups. As we move along, we, of course, really are committed to try and have the most accurate accruals for revenue and cost that we can. And so we want those true-ups to be, obviously, in a manageable level. And I think for the first quarter, a $12 million net number between revenue was actually quite manageable for us.

And when you look at the factors that drive it, they are the factors that kind of come out of that complexity, just some true-ups around both revenue across a number of payers as we got more data after we'd already reported the fourth quarter. We had a couple of old very high-cost claims that were kind of spread out through the year that we got visibility to after we closed Q4. And then we also talked about we had some retro members that came in and those members come with, of course, as I mentioned in my prepared comments, both revenue and claims as well. So there's going to be those kinds of true-ups. But again, we want to try to keep that as accurate as possible and obviously, within a manageable range, which I think it was for the first quarter.

**Operator**

We now have Stephen Baxter of Wells Fargo Securities.

**Carol Wong**
*Wells Fargo Securities, LLC, Research Division*

This is Carol on for Steve. So we've seen the 10-Q and your payer disclosure that it looks like a lot of your growth this year is coming outside of your top 2 payers, despite both of these plans putting up membership that's probably above industry as a whole. Can you maybe talk a little bit more about what trends you're seeing across the payers and whether these top payers could be looking into members towards internal primary care assets? Any color there would be helpful.

**Steven Jackson Sell**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*President, CEO & Director*

Thanks for the question. I think the payer dynamic is increasingly favorable for us. We consider our payer partners to be great partners. And as I said, we added 9 payers this year. So we continue to expand the number of payers that we're working with. I think it reflects the fact that more payers want to be in value in a much larger way. It also reflects that we're going to new markets that have been 100% fee-for-service, and we're moving the market and these payers into that. And so we'll continue to diversify. We'll continue to add new payers as we expand to new markets.

Our large national payers continue to be very strong partners, and we work with them very closely through quarterly joint operating committees. We are collaborating very closely on next year as they work through benefit designs and what they want to do around that. And also just the clinical programs and the quality performance that I talked about is very advantageous to them. So I think all of that leads to a very constructive environment for payers and one that we think is just strengthening.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I think the only thing I would add is, when you're referring to the numbers in the Q and when you see the shift in mix amongst payers, especially in 2 of our biggest markets that we just went live with, we have pretty good regional payer representation in those markets. So you're going to naturally see a shift in that direction. I would add large markets like Maine and the physicians in the Detroit area that have a very large representation of regional payers. To Steve's point, when we go into a market, we're essentially contracting across all payers in the market. So I think that shift to markets that have very big regional payer presence is what's driving some of that mix shift that you're seeing in the Q reporting.

**Operator**

We now have Jailendra Singh from Truist.

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

This is Jailendra Singh from Truist. I want to better understand your 2023 medical margin outlook. I know it's unchanged. But There seems some moving parts there. Now it has PYD from Q1, and then it looks like utilization is probably trending maybe favorable to your expectation. Maybe talk about some puts and takes, which are now in the guidance, given that you're coming in at the revenue membership higher than what you previously thought. Just some color there in the guidance.

**Steven Jackson Sell**
*President, CEO & Director*

Sure. I'll start, Tim, and then you can fill in. I mean I think it starts, Jailendra, with our Q1 performance was really strong and you've got that inflection in medical margin and adjusted EBITDA even with the PYD. So I think that the run rate out of the first quarter is extremely strong. I think if you look at sort of the rest of year and reaffirming that guide, it would have us within that 80 to 150 basis point improvement. And we just had a run rate that was north of 200 in the first quarter ex that PPD. We're able to digest sort of additional members coming on, which are going to be, obviously, at lower medical margin. The maturation of our year 2 market was strong in Q1, and that continues within the balance of the year and then just the power from our clinical programs.

With that, Tim, what else would you add?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, I think you nailed it, Steve, I think those are all the primary components driving it. I think that pointing out that coming off of a strong Q1 and absorbing the $12 million of prior period development. And then looking, going forward, I think that range that Steve was quoting of, say, 80 or 90 to 150 basis points improvement is kind of right on the trend that we showed in the first quarter.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 669

**Operator**

We now have Adam Ron of Bank of America.

**Adam Matan Ron**
*BofA Securities, Research Division*

If I could go back to the 2024 rate model revision maybe from a different angle, on the Q1 earnings call from Humana, they were kind of touching on it. And they were saying that they think it would be a net headwind even when contemplating benefit changes, and they would look for mitigants over time. But it sounds like you're saying it's going to be a little bit more manageable than how they're painting it. And you did touch on geographic differences. They are more exposed to Florida where value-based care is more penetrated and risk scores are higher. But on the other hand, being in a new market, you would probably be more of an outlier as a new entrant, and so that would make it harder to overcome benefit changes. And so just wondering how you would frame your characterization versus maybe Humana and what differences you see between the 2 organizations.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks, Adam. I really appreciate the question. I mean I think I'd start with the headline of there are real differences between our partnership model and payers. It is a very different model. I think that the risk adjustment changes really have emphasized the importance of the primary care physician, patient relationship. And that's our bread and butter. What do we focus on? We focus on increasing touch points, identifying the most complex patients, getting them enrolled in the clinical programs. And that's what we saw within the quarter and what gives us sort of confidence not just in '23 but in '24.

I think, as I said, we're encouraged by the risk model changes and the phase-in. We've started implementing them and continue to see it as very manageable. I think it's a function of that patient-physician relationship and the proximity there, but also what you said, which is we are in markets that are 100% fee-for-service and lower overall.

But I think the last thing I would say is the levers in our business, and this is a big difference versus a payer, is the value of really getting members on the platform earlier in a long-term subscription model, the ability to have these longer implementation periods, so our year 1 members are going to start in a higher place; and then the ability to show this maturation, which we saw again Q1-to-Q1 in mature markets, that just continues as you move going forward. So all of that is leading to our ability to say it's very manageable.

**Operator**

We now have Sean Dodge of RBC Capital Markets.

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

Maybe just going back to medical margins again, you've historically talked about year 1 being in the $30 to $60 PMPM range. When we look at the class of 2024, is there anything different about composition, the geographies, the fact that you have a little bit longer lead time on implementation than you've had in the past, I guess the capabilities from the mphrX acquisition that would cause? You want medical margins for 2024 to be a bit different than they've been in the past. And I guess, directionally, where I'm heading is, could they be higher than that or at least towards the higher end of that range?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, Sean, I think you answered the question there. I think all 3 of those things. One thing that can impact it, just as a starting point, is what's sort of the level of sophistication of the partners that we're starting with. And I think we have a pretty high level there going into the class of '24. So that gets us to a little bit of a starting point.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 670**

The second thing is, as we have talked about and you pointed out, we definitely have a longer implementation cycle for these members coming onboard, and that's going to help us as well. And now with the acquisition and the implementation of mphrX, we really are prioritizing that against getting up to speed faster with data that will help us also move that forward and will allow us to impact both the revenue side as well as getting markets up and started on some of our clinical programs earlier than they would otherwise. So I think all 3 of those are contributors.

And because of that, we did say we're normally in that $30 to $60 range. The class of '23 looks like it's dead center, in that range, more or less. And we do think that the class of '24, and as we talked about on our Investor Day, it's going to be at or above the high end of that range.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And Sean, there's one more thing I'd love Steve to hit on this. It would just be when you're adding groups where you have existing infrastructure, there is a little bit of a different dynamic. So Steve, if you could...

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So the class of '24, Sean, is really the first class in which you start to see really scaled new partners across multiple markets coming on in existing geographies in which we've got a team, we've got existing payer contracts, we've got existing clinical programs, and they are able to take advantage of all of that as they go through their implementation, which can be longer, as Tim said, for this class of 2024. So you put that as an added sort of modifier on top of it, and it leads you to the really strong potential year 1 performance.

**Operator**

We now have Ben Mayo of SVB Securities.

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

Tim, sorry, I'm just a little confused on the reserve development. The net $12 million, that's net of the retro payment, and the 10-Q has the $28 million reserve development. I'm just trying to make sure I get these numbers right, sorry.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So if you break down components, we want to make sure that, for all the reasons that we talked about, and we do have some of these variations that are going to happen versus our original estimates after we've already reported and that's just going to be driven by all the factors that we talked about, that can happen on both the revenue and the claims side. Of course, in the 10-Q, in that section, we do have to report out what the claims development was, which was a little over $28 million. We have about $16 million of revenue prior period that goes against that, of positive prior periods. So when you net those 2, it's about $12 million impact to the P&L in Q1 from all in prior periods.

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

Okay. No, sorry. That's helpful. And just looking at your planned partners, are you seeing any changes with the payers to speed up the attribution process? I'm just wondering if there's anything that you're seeing that's enhancing your visibility on that process going forward.

**Steven Jackson Sell**
*President, CEO & Director*

With our longer-term partners, absolutely with. We are working particularly with some of the larger nationals, accelerating or shortening the period to get a member attributed, and getting them into a total

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 671

care relationship is a goal of both of our organizations, agilon and the payers. So that is definitely true. We added 9 payers this year, the vast majority of which had never done risk before. They don't even have an attribution process. So we start from zero and we kind of work through. That's part of what we're doing is we're moving these markets to risk for the first time. It's just not the groups and the patients. It's also the health plans. And so we've got sort of folks across the spectrum in terms of where they're at on this process, but we continually work to improve across all of those payers.

**Operator**

We now have Jamie Perse of Goldman Sachs.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

Just a longer-term question, you guys just gave guidance for 2026 adjusted EBITDA of over $600 million. I'm wondering if you can help us bridge that given the new presentation structure and any longer-term considerations for geography entry costs as we start to kind of tease those pieces apart a little bit more?

**Steven Jackson Sell**
*President, CEO & Director*

Sure, Jamie. So just to kind of reiterate, the geographic entry costs, they've been there all along. They're part of our business. They're really important for getting these physicians and partners into value for the first time and allows us to get patients in and start at a really good standing point. This is really just a reporting change. So we're just moving, no pun intended, the geography of these costs within our financial statements, so they're part of the adjusted EBITDA calculation. They're super predictable.

And so it should be relatively easy to do the math. It's in that range of $400 to $600 per patient that will be added for the coming year. And so they only grow in absolute dollars when that membership grows. The return on them continues to be extremely strong. The LTV to CAC is greater than 10:1. And our commitment is to continue to dimension this for you, so that we've given you guidance for next quarter, we've given you guidance for the full year, and we'll continue to do that on a go-forward basis.

And then, Tim?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. No, Steve, I think that's right. So if you try to dimension it specifically, we just said that we're going to do about $65 million to $78 million of geography entry costs this year, and that's going to support about 145,000 member growth that we've guided to for 2024 because the cost, obviously, the investment in growth, kind of is supporting that membership the year before they go live or the year before we can get them attributed or go live. And if you look forward into kind of the '24 to '26 period, we said we'd continue to add about 150,000 members a year to get to 2026.

So that would say that if you use that same range of $400, $600, geography entry costs will be in the same dollar range. Obviously, it will be a much smaller percentage of our overall EBITDA. EBITDA is growing to a larger number out at that point. And to Steve's point, one of the reasons why EBITDA is growing to a larger number is because we're making these investments in growth each year. And yes, the return on investment in these are a phenomenon. Steve quoted the lifetime value to customer acquisition cost ratio. I mean another way to look at it is we're typically paying those costs back in certainly less than 2 years, usually closer to an average of about 1 year or so. We'll continue to make those investments. But I think to Steve's point, if you look at the membership that we said we're going to grow, you use that $400 to $600 per member range, that's going to be about right.

**Operator**

We now have Gary Taylor of Cowen.

**Gary Paul Taylor**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

*TD Cowen, Research Division*

I think this is pretty clear, but I just want to, I guess, reiterate. So if we look at the net development of $12 million and $35 million of EBITDA, under the old presentation, really, from your view, this was a $47 million EBITDA quarter versus your guide of $32 million to $37 million. That's how you're looking at this on a net basis, right?

**Timothy S. Bensley**
*Chief Financial Officer*

No. So Gary, the $12 million of net development would be medical margin, not EBITDA. You're saying you wouldn't add that to our EBITDA, is that what you're asking?

**Gary Paul Taylor**
*TD Cowen, Research Division*

Yes, under the old report.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Under any reporting, we haven't changed medical margin definition. The $12 million would have been incremental to medical margin had we not had that prior period development. Typically, about half of that incremental medical margin dollars flows through to EBITDA, so it would be about half that number. Does that make sense?

**Gary Paul Taylor**
*TD Cowen, Research Division*

Yes.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Gary, why don't you go ahead just because I know it was a numbers question. So go for it, then we'll move on.

**Gary Paul Taylor**
*TD Cowen, Research Division*

For those of us that are trying to follow and make sense of the claims payable and the receivables, I mean both of those approximately doubled sequentially versus like 65% revenue growth sequentially. I think that's just a function of new markets, new contracts, new payers and nothing is actually going to settle out until the year progresses. Is that the right way to think about both those balance sheet numbers being up?

**Timothy S. Bensley**
*Chief Financial Officer*

It is, Gary. That's right. You're always going to see a sequential increase for our DCP, for instance, between Q4 and Q1 driven by exactly the phenomena that you're talking about. And as we move through this year and we get more and more visibility to pay claims with our new payer partners and our new markets, by the time we get to Q4, you'll see that number moderate back down again as it has in the previous couple of years.

**Operator**

Our next question comes from David Larsen from BTIG.

**David Michael Larsen**
*BTIG, LLC, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 673

I think you announced 5 new 2024 partnership wins, which seems like a lot to me. I'm assuming you're on track for 670,000 lives for fiscal '24. How far along are you in that life sort of count add guide with these 5 wins that you've announced? Are you like halfway there?

**Steven Jackson Sell**
*President, CEO & Director*

So we have announced 5 of 6 new partners, David, for the class of 2024. And what we said in our remarks is that we are at 145,000. But just like with '23 member growth, there is the potential for that number to go higher through a variety of factors. And then we're already on to the class of '25. And so what I also said in my prepared remarks is that we will begin implementing 2 partners for the of class of '25 in the second half of this year. So you continue to see this faster sales cycle. You continue to see longer implementation periods. And while there's opportunity in '24 member growth, we're on to '25 in terms of new partners and the work that we're doing there.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And David, I would just add that the sixth one will be announced when we're ready to announce them. We're just thoughtful about the timing around that.

**Operator**

We now have Brian Tanquilut of Jefferies.

**Brian Gil Tanquilut**
*Jefferies LLC, Research Division*

Just a quick question. As I think about your comment about 2025 development, and that's a focus area now, and how '24 is really your bunch of scaled ones, how are those conversations changing in terms of like trying to pitch potential new partners? And then in terms of like market competition for deals, it seems like there's more money chasing, more money or more practices looking to shift to value-based, so just curious what the competitive market looks like.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I think the power of our network is really sort of helping us within these conversations. When you think about the fact, Brian, that we've got 30-plus markets with leading groups. We're approaching 1.5% of the primary care doctors in the country on our platform, and they're bringing their senior patients with them. And then we've got national scale, like things in the clinical programs that I talked about. The track record of the success that our partners are having, in addition to the push for more value from payers that I talked about, it's accelerating. I mean the sales cycle is shortening. We are already talking to 2 partners about implementing them starting in the back half of this year. And as I said in my remarks, we're really extremely encouraged.

The breadth of the types of partners that we're serving, we're now working with virtually every type of physician organization in the country. So any group that wants to talk to us, that is thinking about making the move to value, not only can we say here's our overall track record but here's a group that looks like you, thinks like you and here has been their experience. And that's the best track record that you can have in groups that are thinking about making those types of decisions.

**Operator**

We have no further questions in the queue. So I'd like to hand it back to Steve Sell for any final remarks.

**Steven Jackson Sell**
*President, CEO & Director*

All right. Thank you, operator. In closing, I'd just like to say we've had a really strong start to the year, and we're making great progress against our vision.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 674

I do want to thank our physician partners for the trust they place on agilon. I want to thank my colleagues here at agilon for their hard work and dedication in supporting senior patients and physician partners.

And we're excited about where we're going. We look forward to updating you on our progress in future calls. And I hope everyone has a great evening. Thank you .

**Operator**
Thank you all for joining our conference. That does conclude today's call. Please have a lovely rest of your day, and you may now disconnect your lines.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 675**

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.

# EXHIBIT 15

APP 677

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 09, 2023**

---

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

---

| Delaware | 001-40332 | 37-1915147 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| **6210 E Hwy 290, Suite 450** | |
|---|---|
| **Austin, Texas** | **78723** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On May 9, 2023, agilon health, inc., a Delaware corporation, issued a press release setting forth its financial results for the quarter ended March 31, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated May 9, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:    May 9, 2023                    By:    /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

**APP 680**

**Exhibit 99.1**



# agilon health Reports First Quarter 2023 Results

*Revenue increased 74% to $1.14 billion and Medicare Advantage membership increased 61% to 402,200*

*Total members live on the agilon platform grew to 490,900, including 402,200 Medicare Advantage members and 88,700 ACO REACH beneficiaries*

*Continued gains in profitability driven by strong performance across partner markets, inclusive of higher membership growth*

**AUSTIN, T.X., May 9, 2023** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the first quarter ended March 31, 2023.

"Our successful start to 2023 reflects the dedication of our physician partners and the power of our network to consistently improve patient outcomes," said Steve Sell, chief executive officer. "Our physician-centric model was designed to rapidly and efficiently scale across diverse partner organizations and we are excited to bring a sustainable model for primary care to more communities in 2024 and beyond."

Total revenue of $1.14 billion in the first quarter 2023, compared to $653 million in the first quarter 2022. Gross Profit of $77 million in the first quarter 2023, compared to $42 million in the first quarter 2022. Net income of $16 million in the first quarter 2023, compared to $1 million in first quarter 2022.

## Revised Presentation of Adjusted EBITDA and Network Contribution

agilon health has revised its presentation of Adjusted EBITDA and Network Contribution. The company determined the revised presentation is necessary to conform to the SEC's recent guidance on Non-GAAP Financial Measures. Network Contribution is replaced by Gross Profit, which now incorporates other operating revenue and geography entry costs included in other medical expenses. Adjusted EBITDA now incorporates geography entry costs included in other medical expenses and G&A.

### *Revised Presentation of Adjusted EBITDA*

|  | Three Months Ended March 31, | | Fiscal Year Ended December 31, | |
| --- | --- | --- | --- | --- |
|  | 2023 | 2022 | 2022 | 2021 |
| Adjusted EBITDA – Prior Presentation ($M) | $35 | $12 | $4 | ($39) |
| Geography Entry Costs ($M) | ($12) | ($4) | ($68) | ($33) |
| Adjusted EBITDA ($M) | $24 | $8 | ($63) | ($71) |

Tables with the revised reconciliation of Gross Profit and Adjusted EBITDA to the most comparable GAAP measure are included in this press release, including historical periods.

## First Quarter 2023 Results:

- Total members live on the agilon platform increased to 490,900 as of March 31, 2023, including 402,200 Medicare Advantage members and 88,700 ACO REACH beneficiaries. Medicare Advantage membership increased 61%, with 14% growth in same geographies.

- Total revenue of $1.14 billion increased 74% during the first quarter 2023 compared to $653 million in the first quarter 2022.
- Medical Margin of $162 million increased 88% during the first quarter 2023 compared to $86 million in the first quarter 2022. Medical Margin represented 14.3% of revenue during the first quarter 2023 compared to 13.2% in the first quarter 2022.
- Adjusted EBITDA of $24 million in the first quarter 2023 compared to $8 million in the first quarter 2022. Adjusted EBITDA included $12 million and $4 million of geography entry costs in the first quarter 2023 and first quarter 2022, respectively.

**Key Financial and Operating Metrics:**

| | Three Months Ended March 31, | | Change |
|---|---|---|---|
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members | 402,200 | 250,300 | 61% |
| ACO REACH Members | 88,700 | 91,800 | (3%) |
| Total Members Live on Platform | 490,900 | 342,000 | 44% |
| Avg. Medicare Advantage Members | 399,800 | 248,000 | 61% |
| Total revenues ($M) | $1,136 | $653 | 74% |
| Gross Profit ($M) | $77 | $42 | 82% |
| Medical Margin ($M) | $162 | $86 | 88% |
| Net Income ($M) | $16 | $1 | 1282% |
| Adjusted EBITDA ($M) | $24 | $8 | 197% |
| Geography Entry Costs ($M) | $12 | $4 | 191% |

Adjusted EBITDA contribution from ACO REACH was $3 million during the first quarter 2023 and $3 million in the first quarter 2022.

Membership reflects end of period results, unless otherwise stated.  agilon's partnered ACO REACH Entities are not consolidated within its financial results.

**Class of 2024 New Partnership Announcements:**

Lexington Clinic and agilon health announced the formation of a long-term partnership on February 9, 2023.  Lexington Clinic is the largest and oldest multi-specialty medical group in Central Kentucky with 25 locations across the region.

Family Practice Center and agilon health announced the formation of a long-term partnership on February 28, 2023.  Family Practice Center is Central Pennsylvania's largest independent primary care physician group with 42 locations in 12 counties.

Premier Health and agilon health announced the formation of a long-term partnership on March 30, 2023.  Premier Health is one of Ohio's largest, nonprofit, comprehensive health care systems, with more than 100 locations across seven counties, including acute care hospitals and outpatient facilities, physician practices, long-term care facilities, and home health.

Holland PHO, a Physician-Hospital Organization, and agilon health announced the formation of a long-term partnership on March 30, 2023. Holland PHO is a partnership between community physician groups and Holland Hospital serving the West Michigan Lakeshore region.

Catalyst Health Network and agilon health announced the formation of a long-term partnership on April 2, 2023. Catalyst Health Network is the largest clinically integrated network for independent primary care providers in Texas.

***Capital Position and Balance Sheet:***

The company's balance sheet as of March 31, 2023 included cash, cash equivalents and marketable securities of $817 million and total debt of $42 million.

On February 28, 2023, agilon health completed the previously announced acquisition of mphrX, a leading provider of value-based care technology and interoperability solutions, for cash consideration of $44 million, net of cash acquired.

<u>**Outlook for Second Quarter and Fiscal Year 2023:**</u>

|  | Quarter Ended June 30, 2023 | | Year Ended December 31, 2023 | |
| --- | --- | --- | --- | --- |
|  | Low | High | Low | High |
| Medicare Advantage Members | 403,000 | 405,000 | 405,000 | 410,000 |
| ACO REACH Members | 85,000 | 90,000 | 85,000 | 90,000 |
| Total Members Live on Platform | 488,000 | 495,000 | 490,000 | 500,000 |
| Avg. Medicare Advantage Members | 407,000 | 409,000 | 405,000 | 407,000 |
| Total Revenues ($M) | $1,105 | $1,115 | $4,410 | $4,440 |
| Medical Margin ($M) | $138 | $148 | $535 | $560 |
| Adjusted EBITDA ($M) | $2 | $10 | ($3) | $25 |
| Geography Entry Costs ($M) | $19 | $16 | $78 | $65 |

Adjusted EBITDA contribution from ACO REACH is expected in a range of $5 million to $10 million for 2023.

Membership reflects management's outlook for end of period, unless otherwise stated. agilon's partnered ACO REACH Entities are not consolidated within its financial results.

We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss first quarter 2023 results on Tuesday, May 9, 2023, at 4:30 PM Eastern Time. The conference call can be accessed by dialing (833) 470-1428 for U.S. participants and (929) 526-1599 for international participants and referencing participant code 763252. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups transition to a value-based Total Care Model for senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,700+ PCPs that allow physician groups to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its

physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue and net income, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions.  Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to, those factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

# agilon health, inc.
## Consolidated Balance Sheets
### In thousands, except per share data

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 394,190 | $ 497,070 |
| Restricted cash and equivalents | 10,204 | 10,610 |
| Marketable securities | 422,492 | 411,901 |
| Receivables, net | 1,004,856 | 497,574 |
| Prepaid expenses and other current assets, net | 44,697 | 34,119 |
| Total current assets | 1,876,439 | 1,451,274 |
| Property and equipment, net | 22,132 | 20,050 |
| Intangible assets, net | 92,712 | 67,680 |
| Goodwill | 62,140 | 41,540 |
| Other assets, net | 116,846 | 116,924 |
| Total assets | $ 2,170,269 | $ 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 745,557 | $ 346,727 |
| Accounts payable and accrued expenses | 222,052 | 183,364 |
| Current portion of long-term debt | 5,000 | 5,000 |
| Total current liabilities | 972,609 | 535,091 |
| Long-term debt, net of current portion | 37,249 | 38,482 |
| Other liabilities | 78,571 | 83,286 |
| Total liabilities | 1,088,429 | 656,859 |
| Commitments and contingencies | | |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 414,465 and 412,385 shares issued and outstanding, respectively | 4,145 | 4,124 |
| Additional paid-in capital | 2,130,126 | 2,106,886 |
| Accumulated deficit | (1,048,208 ) | (1,064,230 ) |
| Accumulated other comprehensive income (loss) | (3,549 ) | (5,560 ) |
| Total agilon health, inc. stockholders' equity (deficit) | 1,082,514 | 1,041,220 |
| Noncontrolling interests | (674 ) | (611 ) |
| Total stockholders' equity (deficit) | 1,081,840 | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ 2,170,269 | $ 1,697,468 |

# agilon health, inc.
### Consolidated Statements of Operations
### In thousands, except per share data
### (unaudited)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2023 | 2022 |
| **Revenues:** | | |
| Medical services revenue | $ 1,134,830 | $ 652,423 |
| Other operating revenue | 1,317 | 1,022 |
| Total revenues | 1,136,147 | 653,445 |
| **Expenses:** | | |
| Medical services expense | 972,827 | 566,208 |
| Other medical expenses | 86,024 | 44,773 |
| General and administrative (including noncash stock-based compensation expense of $13,672, and $3,970, respectively) | 66,846 | 39,834 |
| Depreciation and amortization | 4,189 | 3,373 |
| Total expenses | 1,129,886 | 654,188 |
| **Income (loss) from operations** | 6,261 | (743) |
| **Other income (expense):** | | |
| Other income (expense), net | 9,472 | 2,269 |
| Interest expense | (1,533) | (871) |
| **Income (loss) before income taxes** | 14,200 | 655 |
| Income tax benefit (expense) | 1,759 | 71 |
| **Income (loss) from continuing operations** | 15,959 | 726 |
| Total discontinued operations | — | 429 |
| **Net income (loss)** | 15,959 | 1,155 |
| Noncontrolling interests' share in (earnings) loss | 63 | 75 |
| **Net income (loss) attributable to common shares** | $ 16,022 | $ 1,230 |
| | | |
| **Net income (loss) per common share, basic and diluted** | | |
| Continuing operations | $ 0.04 | $ — |
| Discontinued operations | $ — | $ — |
| **Weighted average shares outstanding** | | |
| Basic | 413,136 | 401,964 |
| Diluted | 426,586 | 424,065 |

# agilon health, inc.
**Consolidated Statements of Cash Flows**
**In thousands**
**(unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 15,959 | $ 1,155 |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 4,189 | 3,373 |
| Stock-based compensation expense | 13,672 | 3,970 |
| Loss (income) from equity method investments | (1,376) | (2,033) |
| Other non-cash items | (1,785) | 556 |
| Changes in operating assets and liabilities | (91,470) | (30,254) |
| Net cash provided by (used in) operating activities | (60,811) | (23,233) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (3,717) | (4,049) |
| Purchase of intangible assets | — | (1,000) |
| Investment in loans receivable and other | (1,301) | (4,503) |
| Investments in marketable securities | (29,969) | — |
| Proceeds from maturities and sales of marketable securities and other | 28,540 | 683 |
| Net cash paid in business combination | (44,367) | — |
| Net cash provided by (used in) investing activities | (50,814) | (8,869) |
| **Cash flows from financing activities:** | | |
| Proceeds from other equity issuances, net | 9,589 | 14,756 |
| Repayments of long-term debt | (1,250) | (1,250) |
| Net cash provided by (used in) financing activities | 8,339 | 13,506 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (103,286) | (18,596) |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 507,680 | 1,054,820 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 404,394 | $ 1,036,224 |

**APP 687**

**agilon health, inc.**
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*GROSS PROFIT*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Total revenues | $ 1,136,147 | $ 653,445 |
| Medical services expense | (972,827) | (566,208) |
| Other medical expenses[1] | (86,024) | (44,773) |
| Gross profit | $ 77,296 | $ 42,464 |

(1)  Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended March 31, 2023 and 2022, costs incurred in implementing geographies were $2.3 million and $0.2 million, respectively.

Effective 2023, Network Contribution is replaced by Gross Profit, which now incorporates other operating revenue and geography entry costs included in other medical expenses. The following table sets forth Gross Profit for the periods indicated:

| | Three Months Ended During 2022 | | | | Year Ended December 31, 2022 |
| --- | --- | --- | --- | --- | --- |
| | March 31, | June 30, | September 30, | December 31, | |
| Total revenues | $ 653,445 | $ 670,134 | $ 694,858 | $ 689,774 | $ 2,708,211 |
| Medical services expense | (566,208) | $ (587,140) | (618,287) | (628,163) | (2,399,798) |
| Other medical expenses[1] | (44,773) | (49,080) | (50,659) | (51,615) | (196,127) |
| Gross profit | $ 42,464 | $ 33,914 | $ 25,912 | $ 9,996 | $ 112,286 |

(1)  Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended March 31, June 30, September 30, and December 31, 2022, costs incurred in implementing geographies were $0.2 million, $3.5 million, $7.2 million, and $13.0 million, respectively. For the year ended December 31, 2022, costs incurred in implementing geographies were $23.9 million.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Platform support costs | $ 47,678 | $ 33,813 |
| Geography entry costs[1] | 9,250 | 3,804 |
| Severance and related costs | 188 | 1,702 |
| Stock-based compensation expense | 13,672 | 3,970 |
| Other[2] | (3,942) | (3,455) |
| General and administrative | $ 66,846 | $ 39,834 |

(1)  Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets.

(2)  Includes non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

**APP 688**

# agilon health, inc.
## Non-GAAP Financial Measures
### In thousands
### (unaudited)

*MEDICAL MARGIN*

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2023** | | **2022** | |
| Gross profit[1] | $ | 77,296 | $ | 42,464 |
| Other operating revenue | | (1,317) | | (1,022) |
| Other medical expenses | | 86,024 | | 44,773 |
| Medical margin | $ | 162,003 | $ | 86,215 |

(1)    Gross profit is defined as total revenues less medical services expenses and other medical expense.

*ADJUSTED EBITDA*

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2023** | | **2022** | |
| Net income (loss)[1] | $ | 15,959 | $ | 1,155 |
| (Income) loss from discontinued operations, net of income taxes | | — | | (429) |
| Interest expense | | 1,533 | | 871 |
| Income tax expense (benefit) | | (1,759) | | (71) |
| Depreciation and amortization | | 4,189 | | 3,373 |
| Severance and related costs[2] | | 188 | | 1,702 |
| Stock-based compensation expense | | 13,672 | | 3,970 |
| EBITDA adjustments related to equity method investments | | 1,967 | | 1,171 |
| Other[3] | | (11,889) | | (3,697) |
| Adjusted EBITDA | $ | 23,860 | $ | 8,045 |

(1)    Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended March 31, 2023 and 2022, (i) $2.3 million and $0.2 million, respectively, are included in other medical expenses and (ii) $9.3 million and $3.8 million, respectively, are included in general and administrative expenses.

(2)    For the three months ended March 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $1.2 million.

(3)    Includes interest income and non-cash accruals for unasserted claims and contingent liabilities.

Effective 2023, we no longer exclude geography entry costs from our computation of Adjusted EBITDA. Adjusted EBITDA for prior periods has been revised to the current period computation methodology. The following table sets forth a reconciliation of net income (loss) to Adjusted EBITDA using data derived from our consolidated financial statements for the periods indicated:

| | Three Months Ended During 2022 | | | | Year Ended December 31, 2022 |
| | March 31, | June 30, | September 30, | December 31, | |
|---|---|---|---|---|---|
| Net income (loss)[1] | $ 1,155 | $ (20,731) | $ (30,739) | $ (56,549) | $ (106,864) |
| (Income) loss from discontinued operations, net of income taxes | (429) | (307) | 236 | 35 | (465) |
| Interest expense | 871 | 945 | 1,000 | 1,709 | 4,525 |
| Income tax expense (benefit) | (71) | 580 | 559 | 572 | 1,640 |
| Depreciation and amortization | 3,373 | 3,042 | 3,450 | 3,907 | 13,772 |
| (Gain) loss on lease terminations | — | 5,458 | — | — | 5,458 |
| Severance and related costs | 1,702 | 256 | 512 | — | 2,470 |
| Stock-based compensation expense | 3,970 | 6,553 | 7,907 | 9,951 | 28,381 |
| EBITDA adjustments related to equity method investments | 1,171 | 492 | 1,325 | 749 | 3,737 |
| Other | (3,697) | 1,033 | (10,089) | (3,391) | (16,144) |
| Adjusted EBITDA | $ 8,045 | $ (2,679) | $ (25,839) | $ (43,017) | $ (63,490) |

(1)    Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended March 31, June 30, September 30, and December 31, 2022, costs included in other medical expenses were $0.2 million, $3.5 million, $7.2 million, and $13.0 million, respectively. For the year ended December 31, 2022, included in other medical expenses were $23.9 million. For the three months ended March 31, June 30, September 30, and December 31, 2022, costs included general and administrative expenses were $3.8 million, $6.6 million, $14.1 million, and $19.4 million, respectively. For the year ended December 31, 2022, included in general and administrative expenses were $43.9 million.

In addition to providing results that are determined in accordance with GAAP, we present medical margin and Adjusted EBITDA, which are non-GAAP financial measures.

We define medical margin as medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to medical margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health

# EXHIBIT 16

**Filed Pursuant to Rule 424(b)(7)**
**Registration No. 333-271936**

**PROSPECTUS SUPPLEMENT**
**To Prospectus dated May 15, 2023**

# 86,884,353 Shares



# agilon health, inc.

## Common Stock

———————

The selling stockholders identified in this prospectus supplement are offering 86,884,353 shares of common stock of agilon health, inc. We will not receive any of the proceeds of the sale of our common stock being sold in this offering, including any shares that the selling stockholders may sell pursuant to the underwriters' option to purchase additional shares of our common stock. To the extent the underwriters sell more than 86,884,353 shares of common stock, the underwriters have the option to purchase up to an additional 7,726,955 shares from certain of the selling stockholders on the same terms and conditions noted below within 30 days of the date of this prospectus supplement.

Our common stock is listed on the New York Stock Exchange (the "NYSE") under the symbol "AGL." The last reported sale price of our common stock on May 12, 2023 was $24.15 per share.

*Investing in our common stock involves risks. See "Risk Factors" beginning on page S-10 of this prospectus supplement, as well as the other information included or incorporated or deemed incorporated by reference herein.*

Subject to completion of this offering, we have agreed to purchase from the underwriters 9,614,806 shares of our common stock that are the subject of this offering at a price per share equal to the price at which the underwriters will purchase the shares from the selling stockholders in this offering (the "Repurchase"). The underwriters will not receive any compensation for the shares of common stock being purchased by us. See "The Repurchase."

|  | Per Share | Total |
|---|---|---|
| Public offering price[1] | $ 21.50000 | $ 1,661,295,260.50 |
| Underwriting discounts and commissions[2] | $ 0.69875 | $ 53,992,095.97 |
| Proceeds, before expenses, to the selling stockholders[3] | $ 20.80125 | $ 1,807,303,147.84 |

(1)  Total public offering price does not include the 9,614,806 shares of common stock sold by the selling stockholders and purchased by us from the underwriters.
(2)  See "Underwriting" for a description of the compensation payable to the underwriters.
(3)  Includes the 9,614,806 shares of common stock sold by the selling stockholders, and purchased by us from the underwriters for which no underwriting discount was paid.

**Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus supplement or the accompanying prospectus. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares to purchasers on or about May 18, 2023.

———————

**J.P. Morgan**      **Goldman Sachs & Co. LLC**      **BofA Securities**

**Wells Fargo Securities**                **Deutsche Bank Securities**

**TD Cowen**      **Wolfe | Nomura Alliance**      **RBC Capital Markets**

**SVB Securities**      **Truist Securities**      **William Blair**

**Academy Securities**   **R. Seelaus & Co., LLC**   **Ramirez & Co., Inc.**   **Siebert Williams Shank**

**The date of this prospectus supplement is May 15, 2023.**

**APP 693**

Table of Contents

**RISK FACTORS**

*Investing in our common stock involves a high degree of risk. Our reputation, business, financial position, results of operations and cash flows are subject to various risks. You should consider and read carefully all of the risks and uncertainties described below, as well as other information included in this prospectus supplement, the accompanying prospectus or incorporated by reference herein and therein, including the risks and uncertainties discussed under the heading "Risk Factors" in the accompanying prospectus and under the headings "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the year ended December 31, 2022 and our subsequent Quarterly Report on Form 10-Q and our audited and unaudited consolidated financial statements and related notes incorporated by reference in this prospectus supplement and the accompanying prospectus, before making an investment decision. The occurrence of any of the following risks or additional risks and uncertainties not presently known to us could materially and adversely affect our reputation, business, financial position, results of operations or cash flows. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment. This prospectus supplement also contains forward-looking statements and estimates that involve risks and uncertainties. See "Cautionary Note Regarding Forward-Looking Statements." Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks and uncertainties described below.*

**Risks Related to Our Common Stock and This Offering**

*agilon is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.*

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon health management, inc. ("agilon management") and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the year ended December 31, 2022 and our subsequent Quarterly Report on Form 10-Q. To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography. In addition, the agreements governing the approximately $42.5 million of total long-term consolidated indebtedness outstanding as of March 31, 2023 under our secured credit agreement, dated as of February 18, 2021 (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021) governing the term loan and revolving credit facilities (the "Credit Facilities") significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

APP 694

Table of Contents

***The market price of our common stock may be volatile and could decline after this offering.***

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. The market price of our common stock has in the past and may in the future fluctuate significantly. Among the factors that could affect our stock price are:

- industry, regulatory or general market conditions;

- domestic and international economic factors unrelated to our performance;

- changes in our physician partners' or their patients' preferences;

- new regulatory pronouncements and changes in regulatory guidelines;

- lawsuits, enforcement actions and other claims by third parties or governmental authorities;

- actual or anticipated fluctuations in our quarterly operating results;

- lack of research coverage and reports by industry analysts or changes in any securities analysts' estimates of our financial performance;

- action by institutional stockholders or other large stockholders, including future sales of our common stock;

- failure to meet any guidance given by us or any change in any guidance given by us, or changes by us in our guidance practices;

- announcements by us of significant impairment charges;

- speculation in the press or investment community;

- investor perception of us and our industry;

- changes in market valuations or earnings of similar companies;

- the impact of short selling or the impact of a potential "short squeeze" resulting from a sudden increase in demand for our common stock;

- announcements by us or our competitors of significant contracts, acquisitions, dispositions or strategic partnerships;

- war, terrorist acts and epidemic disease, including COVID-19;

- any future sales of our common stock or other securities;

- additions or departures of key personnel; and

- misconduct or other improper actions of our employees.

In particular, we cannot assure you that you will be able to resell your shares at or above the public offering price. Stock markets have experienced extreme volatility in recent years that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against the affected company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***An active, liquid trading market for our common stock may not be sustained.***

Although our common stock is currently listed on the NYSE under the symbol "AGL," an active trading market for our shares may not be sustained. Accordingly, if an active trading market for our common stock is not maintained, the liquidity of our common stock, your ability to sell your shares of our common stock when desired and the prices that you may obtain for your shares of common stock will be adversely affected.

S-11

**APP 695**

Table of Contents

***Future sales of shares by us or our existing stockholders could cause our stock price to decline.***

Sales of substantial amounts of our common stock in the public market following this offering and the Repurchase, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

Upon the completion of this offering and the Repurchase, we will have 405,218,203 outstanding shares of common stock. A significant portion of these shares, including all of the 73,140,000 shares of common stock sold in our IPO and by selling stockholders in secondary offerings, and the 77,269,547 shares of common stock to be sold in this offering and not purchased by us in the Repurchase, will be immediately tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any shares held by "affiliates," as that term is defined in Rule 144 under the Securities Act ("Rule 144"). On April 14, 2021, we filed a registration statement on Form S-8 under the Securities Act to register the shares of common stock to be issued under our equity compensation plans and, as a result, all shares of common stock acquired upon exercise of stock options granted under our plan will also be freely tradable under the Securities Act, subject to the terms of the lock-up agreements, unless purchased by our affiliates. As of May 1, 2023, there were stock options outstanding to purchase a total of 18,015,908 shares of our common stock, of which 12,212,598 options will be exercisable after consummation of this offering and the Repurchase.

In connection with this offering, certain of our officers and directors have entered into lock-up agreements under which they have agreed not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, for a period of 90 days after the date of this prospectus supplement.

The CD&R Investor has also entered into a lock-up agreement under which the CD&R Investor has agreed not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, for the following periods: (i) with respect to 100 million shares of our common stock, for a period of 900 days after the date of this prospectus supplement; and (ii) with respect any shares of our common stock in excess of 100 million shares owned by the CD&R Investor after giving effect to this offering, for a period of 90 days after the date of this prospectus supplement.

Following the expiration of the applicable lock-up periods, 107,726,955 shares of our common stock (or 100,000,000 shares of our common stock if the underwriters' option to purchase additional shares of our common stock is exercised in full) held by the CD&R Investor and 4,244,834 shares of our common stock held by our directors and executive officers (as of March 31, 2023) will be eligible for future sale, subject to the applicable volume, manner of sale, holding period and other limitations of Rule 144 or pursuant to an exemption from registration under Rule 701. In addition, our significant stockholders may distribute shares that they hold to their investors who themselves may then sell into the public market following the expiration of the lock-up periods. Such sales may not be subject to the volume, manner of sale, holding period and other limitations of Rule 144. The CD&R Investor has the right to require us to register shares of common stock for resale in certain circumstances. As resale restrictions end, the market price of our common stock could decline if the holders of those shares sell them or are perceived by the market as intending to sell them.

In the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic

S-12

**APP 696**

Table of Contents

investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

*If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our common stock price and trading volume could decline.*

The trading market for our common stock depends in part on the research and reports that securities or industry analysts may publish about us or our business. If one or more of the analysts that covers our common stock downgrades our stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of the analysts ceases coverage of our common stock or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our common stock price or trading volume to decline.

*We have identified material weaknesses in our internal control over financial reporting. If we are unable to remediate these material weaknesses, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial results, in which case our business may be harmed, investors may lose confidence in the accuracy and completeness of our financial reports and, as a result, our common stock price may be adversely affected and we may be unable to maintain compliance with NYSE listing requirements.*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on our system of internal control. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. As a public company, we are required to comply with the Sarbanes-Oxley Act and other rules that govern public companies. In particular, we are required to certify our compliance with Section 404 of the Sarbanes-Oxley Act, which requires us to furnish annually a report by management on the effectiveness of our internal control over financial reporting. In addition, our independent registered public accounting firm is required to report on the effectiveness of our internal control over financial reporting.

In connection with our year-end assessment of internal control over financial reporting, we identified material weaknesses in our internal control over financial reporting as of December 31, 2022. For a discussion of our internal control over financial reporting and a description of the identified material weaknesses, see our Annual Report on Form 10-K for the year ended December 31, 2022 and our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023.

As further described in our Annual Report on Form 10-K for the year ended December 31, 2022 and our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023, we are undertaking steps to improve our internal control over financial reporting. We expect that we will need to improve existing operational and financial systems, procedures and controls, and implement new ones, to manage our future business effectively. However, we may not be successful in making the improvements necessary to remediate the material weaknesses identified by management or be able to do so in a timely manner, or be able to identify and remediate additional control deficiencies or material weaknesses in the future. Any implementation delays, or disruption in the transition to new or enhanced systems, procedures or controls, could harm our ability record and report financial and management information on a timely and accurate basis. If our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us.

*Following the completion of this offering and the Repurchase, the CD&R Investor will continue to hold a significant percentage of our common stock, and may have conflicts of interest with other stockholders.*

Following the completion of this offering and the Repurchase, the CD&R Investor will own approximately 26.6% of the outstanding shares of our common stock (or approximately 24.7% if the underwriters exercise in

APP 697

Table of Contents

full their option to purchase additional shares). Even though we are no longer a controlled company, for so long as the CD&R Investor continues to own a significant percentage of our common stock, it will still be able to significantly influence the composition of our board of directors and the approval of actions requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which could reduce the market price of our common stock.

Following the completion of this offering and the Repurchase, the CD&R Investor will continue to have the right to designate for nomination for election at least 20% of the total number of our directors and to designate the Chair of our board of directors as long as the CD&R Investor beneficially owns at least 20% and 25%, respectively, of the outstanding shares of our common stock.

Because the CD&R Investor's interests may differ from your interests, actions the CD&R Investor takes as a significant stockholder may not be favorable to you. For example, the concentration of ownership held by the CD&R Investor could delay, defer or prevent a change of control of us or impede a merger, takeover or other business combination that another stockholder may otherwise view favorably. Other potential conflicts could arise, for example, over matters such as employee retention or recruiting, or our dividend policy.

*Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities.*

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation address potential conflicts of interest between agilon, on the one hand, and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

*Future offerings of debt, common stock, equity securities which would rank senior to our common stock or other securities convertible or exchangeable into common or preferred stock, in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise, may result in dilution to owners of our common stock and/or may adversely affect the market price of our common stock.*

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Issuing additional shares of our common stock or other equity securities or securities convertible into equity may dilute the economic and voting rights of our stockholders or reduce the market price of our common stock. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock and may result in dilution to owners of our common stock. Debt securities convertible into equity could be subject to adjustments in the conversion ratio pursuant to which certain events may increase the number of equity securities issuable upon conversion. Preferred stock, if issued, could have a preference with respect to liquidating distributions or a preference with respect to dividend payments that could limit our ability to pay dividends to the holders of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors outside our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings, reducing the market price of our common stock or diluting the value of their stock holdings in us.

S-14

Table of Contents

In addition, in the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

***Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.***

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;

- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;

- limit the ability of stockholders to remove directors;

- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;

- prohibit stockholders from calling special meetings of stockholders;

- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders;

- opt out of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;

- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future.

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor will continue to own following this offering and the Repurchase, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

APP 699

Table of Contents

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***We are no longer a "controlled company" within the meaning of the NYSE rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

From August 12, 2022, CD&R Investor no longer controlled a majority of the voting power of our outstanding common stock, and we ceased to be a "controlled company" within the meaning of the NYSE corporate governance standards. As a result, the NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualified as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualified as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules and we presently do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations during the transition period. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance rules and requirements of the NYSE discussed herewith. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and

S-16

Table of Contents

exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the DGCL, or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows and results of operations.

*A new 1% U.S. federal excise tax could be imposed on us in connection with the Repurchase and future redemptions by us of our shares.*

On August 16, 2022, the Inflation Reduction Act of 2022 (the "IR Act") was signed into federal law. The IR Act provides for, among other things, a new non-deductible U.S. federal 1% excise tax on certain repurchases (including redemptions) of stock by publicly traded domestic corporations and certain domestic subsidiaries of publicly traded foreign corporations. The excise tax is imposed on the repurchasing corporation itself, not its stockholders from which shares are repurchased. The amount of the excise tax is generally 1% of the fair market value of the shares repurchased at the time of the repurchase. However, for purposes of calculating the excise tax, repurchasing corporations are permitted to net the fair market value of certain new stock issuances against the fair market value of stock repurchases during the same taxable year. In addition, certain exceptions apply to the excise tax. The U.S. Department of the Treasury has been given authority to provide regulations and other guidance to carry out and prevent the abuse or avoidance of the excise tax. It is unclear at this time how and to what extent it will apply to future redemption of public shares.

S-17

Table of Contents

**SELLING STOCKHOLDERS**

The following table sets forth information as of May 1, 2023 with respect to the beneficial ownership of our common stock by the selling stockholders. The amounts and percentages of shares beneficially owned are reported on the basis of SEC regulations governing the determination of beneficial ownership of securities. Under SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days of the determination date. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest.

The beneficial ownership percentages are based on 414,833,009 shares of our common stock outstanding as of May 1, 2023 and 405,218,203 shares of our common stock outstanding following the completion of this offering and the Repurchase.

Except as otherwise indicated in the footnotes to this table, the beneficial owner listed has, to our knowledge, sole voting and investment power with respect to the indicated shares of common stock.

| | Common stock | | | | | | | |
| | Beneficially Owned Before the Offering and the Repurchase | | Shares Offered, Assuming Underwriters' Option is Not Exercised | Beneficially Owned After the Offering and the Repurchase, Assuming Underwriters' Option is Not Exercised | | Shares Offered, Assuming Underwriters' Option is Exercised in Full | Beneficially Owned After the Offering and the Repurchase, Assuming Underwriters' Option is Exercised in Full | |
| Name of Beneficial Owner | Number | % | Number | Number | % | Number | Number | % |
|---|---|---|---|---|---|---|---|---|
| CD&R Vector Holdings, L.P.(1)(2) | 194,173,804 | 46.8% | 86,446,849 | 107,726,955 | 26.6% | 94,173,804 | 100,000,000 | 24.7% |
| National Philanthropic Trust(3)(4) | 307,695 | * | 307,695 | — | * | 307,695 | — | * |
| Fidelity Investments Charitable Gift Fund(3)(5) | 129,809 | * | 129,809 | — | * | 129,809 | — | * |

\*    Less than one percent

(1)    The shares are held directly by CD&R Vector Holdings, L.P. and may be deemed to be beneficially owned by CD&R Investment Associates IX, Ltd., as the general partner of CD&R Vector Holdings, L.P. CD&R Investment Associates IX, Ltd. expressly disclaims beneficial ownership of shares directly held by CD&R Vector Holdings, L.P. Investment and voting decisions with respect to the shares held by CD&R Vector Holdings, L.P. are made by an investment committee of limited partners of CD&R Associates IX, L.P., currently consisting of more than ten individuals, each of whom is also an investment professional of Clayton, Dubilier & Rice, LLC (the "Investment Committee"). All members of the Investment Committee expressly disclaim beneficial ownership of the shares directly held by CD&R Vector Holdings, L.P. CD&R Investment Associates IX, Ltd. is managed by two directors, Donald J. Gogel and Nathan K. Sleeper, who may be deemed to share beneficial ownership of the shares of common stock directly held by CD&R Vector Holdings, L.P. Such persons expressly disclaim such beneficial ownership. The mailing address for each of these entities is c/o Clayton, Dubilier & Rice, LLC, 375 Park Avenue, New York, New York 10152.

(2)    For information regarding certain material relationships between the CD&R Investor and the Company, see "Certain Relationships and Related Party Transactions" included in our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 14, 2023, portions of which are incorporated by reference in this prospectus supplement.

(3)    Represents shares received by such entity as a charitable contribution from certain CD&R investment professionals on May 15, 2023. These charities will be selling stockholders with respect to this offering,

S-24

Table of Contents

but not participate in the exercise of the underwriters' option to purchase additional shares.

(4)    The address of National Philanthropic Trust is 165 Township Line Road, Suite 1200, Jenkintown, PA 19046.

(5)    The address of Fidelity Investments Charitable Gift Fund is 245 Summer Street, NM43A, Boston, Massachusetts 02210.

S-25

**Table of Contents**

## INCORPORATION BY REFERENCE

The SEC allows us to "incorporate by reference" into this prospectus supplement and the accompanying prospectus the information we file with the SEC in other documents. This means that we can disclose important information to you by referring to another document we have filed with the SEC. The information relating to us contained in this prospectus supplement and the accompanying prospectus should be read together with the information in the documents incorporated by reference.

We incorporate by reference, as of their respective dates of filing, the documents listed below and any future filings we make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act from the date of this prospectus supplement and until any offering of securities pursuant to this prospectus supplement and the accompanying prospectus is completed or otherwise terminated (excluding any portions of such documents that have been "furnished" but not "filed" for purposes of the Exchange Act):

- our Annual Report on Form 10-K for the year ended December 31, 2022, filed with the SEC on March 1, 2023;

- our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023;

- our Current Report on Form 8-K filed with the SEC on February 22, 2023;

- our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 14, 2023, as supplemented and amended by the Definitive Additional Materials on Schedule 14A filed with the SEC on May 12, 2023, (solely to the extent incorporated by reference into Part III of our Annual Report on Form 10-K for the year ended December 31, 2022); and

- the description of capital stock contained in the Registration Statement on Form 8-A, as filed with the SEC on April 14, 2021, as supplemented by the "Description of Capital Stock" found on page 9 of the accompanying prospectus, and as amended by any amendments or reports filed for the purpose of updating such description.

Any statement contained in a document that is incorporated by reference will be modified or superseded for all purposes to the extent that a statement contained in this prospectus supplement or the accompanying prospectus (or in any other document that is subsequently filed with the SEC and incorporated by reference) modifies or is contrary to that previous statement. Any statement so modified or superseded will not be deemed a part of this prospectus supplement and the accompanying prospectus except as so modified or superseded. In addition, upon request, we will provide to each person, including any beneficial owner, to whom a prospectus supplement and the accompanying prospectus is delivered, a copy of any or all of the reports or documents that have been incorporated by reference in the prospectus supplement or the accompanying prospectus contained in the registration statement, but not delivered with the prospectus supplement and the accompanying prospectus. You may request a copy of these filings (other than an exhibit to a filing unless that exhibit is specifically incorporated by reference into that filing) at no cost, by writing to or telephoning us at the following address or telephone number:

agilon health, inc.
Attn: Corporate Secretary
6210 E Hwy 290, Suite 450
Austin, Texas 78723
(562) 256-3800

S-41

**Table of Contents**

**PROSPECTUS**



# agilon health, inc.

## Common Stock

---

The selling stockholder named in this prospectus may offer and sell up to 194,611,308 shares of common stock of agilon health, inc. from time to time in amounts, at prices and on terms that will be determined at the time of the offering.

This prospectus describes some of the general terms that may apply to these securities and the general manner in which they may be offered. If required by applicable law, each time the selling stockholder uses this prospectus to offer securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering, including specific amounts, prices and terms of the securities offered. If required, the prospectus supplement may also add to, update or change the information contained in this prospectus. If there is any inconsistency between the information in this prospectus and any prospectus supplement, you should rely on the information in the prospectus supplement. The selling stockholder may elect to sell the shares of common stock described in this prospectus in a number of different ways and at varying prices. We provide more information about how, and the prices at which, the selling stockholder may elect to sell their shares of common stock in the section titled "Plan of Distribution" on page 16 of this prospectus. We and the selling stockholder named in this prospectus are parties to a registration rights agreement with respect to the shares of our common stock held by the selling stockholder. We will not receive any proceeds from any sale of shares of common stock by the selling stockholder. We will bear certain expenses of any offering of common stock, and the selling stockholder will pay any applicable underwriting discounts, selling commissions and transfer taxes.

You should carefully read this prospectus, any applicable prospectus supplement and any related free writing prospectus, as well as any documents incorporated by reference, before you invest in our common stock.

---

**Investing in our common stock involves risks. See the section entitled "Risk Factors" on page 7 of this prospectus and any risk factors described in any applicable prospectus supplement and in the documents we incorporate by reference herein and therein.**

The common stock of agilon health, inc. is listed on the New York Stock Exchange under the symbol "AGL". The last reported sale price of our common stock on May 12, 2023 was $24.15 per share.

**Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

**The date of this prospectus is May 15, 2023.**

**Table of Contents**

**TABLE OF CONTENTS**

| | |
|---|---:|
| ABOUT THIS PROSPECTUS | 1 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION | 2 |
| OUR COMPANY | 6 |
| RISK FACTORS | 7 |
| USE OF PROCEEDS | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| SELLING STOCKHOLDER | 15 |
| PLAN OF DISTRIBUTION | 16 |
| LEGAL MATTERS | 19 |
| EXPERTS | 20 |
| WHERE YOU CAN FIND MORE INFORMATION | 21 |
| INCORPORATION OF CERTAIN INFORMATION BY REFERENCE | 22 |

i

**APP 706**

**Table of Contents**

**ABOUT THIS PROSPECTUS**

*Unless the context otherwise requires, references in this prospectus to the "Company", "AGL","agilon", "we", "us" and "our" mean agilon health, inc.*

This prospectus is part of an "automatic shelf" registration statement on Form S-3 that we filed with the SEC as a "well-known seasoned issuer" as defined in Rule 405 under the Securities Act of 1933, as amended (the "Securities Act"), utilizing a "shelf" registration process. Under this shelf registration process, the selling stockholder may offer and sell shares of our common stock from time to time in one or more offerings or resales. This prospectus provides you with a general description of the shares of common stock the selling stockholder may offer. If required by applicable law, each time the selling stockholder sells shares of common stock, we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement and any free writing prospectus may also add to, update, supplement or clarify information contained or incorporated by reference in this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a prospectus supplement.

The rules of the SEC allow us to incorporate information by reference into this prospectus. This information incorporated by reference is considered to be part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. See "Incorporation of Certain Information by Reference." You should read both this prospectus and any prospectus supplement together with additional information described under the heading "Where You Can Find More Information."

**Neither we, the selling stockholder nor any underwriters have authorized anyone to provide you with different information or to make any representations other than those contained or incorporated by reference into this prospectus, any applicable prospectus supplement, or in any free writing prospectuses we have prepared. If anyone provides you with different or inconsistent information, you should not rely on it. This prospectus does not constitute an offer to sell, or a solicitation of an offer to purchase, the securities offered by this prospectus in any jurisdiction in which it is unlawful to make such offer or solicitation.**

**You should not assume that the information incorporated by reference or provided in this prospectus or any applicable prospectus supplement or any free writing prospectus prepared by us is accurate as of any date other than the date on the front cover of those documents. Our business, financial condition, results of operations and prospects may have changed since that date.**

1

**APP 707**

Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION

This prospectus, the accompanying prospectus supplements and the documents incorporated by reference herein and therein contain forward-looking statements and cautionary statements within the meaning of the Private Securities Litigation Reform Act of 1995 that are based on management's beliefs and assumptions and information currently available to management. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this prospectus, the applicable prospectus supplement or in the documents incorporated by reference herein or therein and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be beyond our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this prospectus, the applicable prospectus supplement and the documents incorporated by reference herein or therein. In addition, even if our results of operations, financial condition and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this prospectus, the applicable prospectus supplement and the documents incorporated by reference herein or therein, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under the caption "Risk Factors" in this prospectus, the applicable prospectus supplement and those described from time to time in our other filings with the SEC, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus, the applicable prospectus supplement and the documents incorporated by reference herein or therein. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;

- our ability to identify and develop successful new geographies, physician partners and health plan payors, and to execute upon our growth initiatives and achieve required operational scale;

- our ability to execute our operating strategies or to achieve results consistent with our historical performance;

- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;

- our ability to secure contracts with Medicare Advantage ("MA") payors and to ensure such contracts are on financial terms sufficient to meet our financial targets;

- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;

- our ability to obtain additional capital needed to support our business;

- significant reductions in our membership;

- challenges for our physician partners in the transition to our "Total Care Model";

2

Table of Contents

- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;

- the spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics, and the inability to predict the ultimate impact of pandemics on us;

- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings under payor contracts;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities (each, an "RBE") within certain geographies in the future;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;

- our ability to retain our management team and key employees or attract qualified personnel in the future;

- our ability to realize the full value of our intangible assets and any negative impact from impairment charges we may record;

- security breaches, loss of data and other disruptions to our data platforms could adversely impact us;

- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;

- our responsibility for certain liabilities in connection with the disposition of our California operations;

- our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses;

- our dependence on a limited number of key health plan payors;

- our contracts with our payors are for limited terms and may not be renewed upon their expiration;

- our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment;

- our dependence on physician partners and other providers to effectively manage the quality and cost of care, and perform obligations under payor contracts;

- difficulties in obtaining accurate and complete diagnosis data;

- our dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate or incorrect;

- we rely on third party software and data to operate our business and restrictions on the use of third-party resources could adversely affect us;

- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;

- consolidation in our industry could adversely impact us;

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;

- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, including as a result of an inability or failure by the U.S. federal government to fund Medicare;

3

**APP 709**

- our ability to compete in our industry;

- the impact of government performance standards and benchmarks on our compensation and reputation;

- statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements;

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;

- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;

- regulatory inquiries and corrective action plans imposed by our health plan payors;

- repayment obligations arising out of payor audits;

- the impact on our revenue of Centers for Medicare & Medicaid Services' ("CMS") modifying the methodology used to determine the revenue associated with MA members;

- negative publicity regarding the managed healthcare industry;

- the extensive regulation of the healthcare industry at the federal, state, and local levels;

- if our physician alignment strategies with our physician partners, including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements, are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties;

- our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and the use of protected health information;

- our physician partners are subject to federal and state healthcare fraud and abuse regulations;

- our use, disclosure and processing of personally identifiable information, personal health information, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could adversely impact us;

- our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could adversely impact us;

- laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could adversely impact us;

- if we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions;

- we may face litigation not covered by insurance;

- our indebtedness and the potential that we may incur additional substantial indebtedness;

- the agreements and instruments governing our indebtedness contain restrictions and limitations that could adversely impact us;

- agilon is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses;

4

APP 710

**Table of Contents**

- under our amended and restated certificate of incorporation, CD&R Vector Holdings, L.P. (the "CD&R Investor") and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities;

- anti-takeover provisions in our amended and restated certificate of incorporation and amended and restated by-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock;

- we do not intend to pay dividends on our common stock for the foreseeable future and, consequently, a shareholder's return on investment depends on appreciation in the price of our common stock;

- we are no longer a controlled company within the meaning of the New York Stock Exchange ("NYSE") rules; however, we expect to continue to rely on exemptions from certain corporate governance requirements during a one-year transition period;

- our amended and restated certificate of incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders;

- we identified material weaknesses in our internal control over financial reporting and, if our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us; and

- other risks and factors included under "Risk Factors" and elsewhere in this prospectus, the applicable prospectus supplement and the documents incorporated by reference herein or therein.

You should read this prospectus, the applicable prospectus supplement, including the uncertainties and factors discussed under "Risk Factors," and the documents incorporated by reference herein and therein completely and with the understanding that actual future results may be materially different from expectations. All forward-looking statements attributable to us or persons acting on our behalf that are made in this prospectus, the applicable prospectus supplement and the documents incorporated by reference herein or therein are qualified in their entirety by these cautionary statements. These forward-looking statements are made only as of the date presented, and we do not undertake any obligation, other than as may be required by law, to update or revise any forward-looking or cautionary statements to reflect changes in assumptions, the occurrence of events, unanticipated or otherwise, and changes in future operating results over time or otherwise.

Comparisons of results between current and prior periods are not intended to express any future trends, or indications of future performance, unless expressed as such, and should only be viewed as historical data.

5

**APP 711**

**Table of Contents**

## OUR COMPANY

Our business is transforming healthcare by empowering the primary care physicians ("PCPs") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

Our principal executive offices are located at 6210 E. Highway 290, Suite 450, Austin, Texas 78723, and our telephone number is (562) 256-3800.

6

**APP 712**

Table of Contents

**RISK FACTORS**

Investing in our common stock involves a high degree of risk. Before you make your investment decision, you should carefully consider all the information contained or incorporated by reference in this prospectus and any accompanying prospectus supplement. In particular, we urge you to consider carefully the risks and uncertainties discussed in "Part I—Item 1A—Risk Factors" of our Annual Report on Form 10-K for the year ended December 31, 2022, as such risk factors may be updated by our annual, quarterly and current reports that we may file with the SEC after the date of this prospectus and that are incorporated by reference in this prospectus and any accompanying prospectus supplement.

7

**Table of Contents**

## SELLING STOCKHOLDER

The following table sets forth information as of May 1, 2023 with respect to the beneficial ownership of our common stock by the selling stockholder. The amounts and percentages of shares beneficially owned are reported on the basis of SEC regulations governing the determination of beneficial ownership of securities. Under SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days of the determination date. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest.

The beneficial ownership percentages are based on 414,833,009 shares of our common stock outstanding as of May 1, 2023.

Except as otherwise indicated in the footnotes to this table, the beneficial owner listed has, to our knowledge, sole voting and investment power with respect to the indicated shares of common stock. Assuming that the selling stockholder sells all of their shares of common stock subject to resale pursuant to this prospectus, the selling stockholder will not hold 1% or more of our common stock.

| Name and address of beneficial owner | Number of Shares Owned | Percent of Voting Power (%) |
|---|---|---|
| CD&R Vector Holdings, L.P.[1][2] | 194,611,308 | 46.9% |

(1)    The shares are held directly by CD&R Vector Holdings, L.P. and may be deemed to be beneficially owned by CD&R Investment Associates IX, Ltd., as the general partner of CD&R Vector Holdings, L.P. CD&R Investment Associates IX, Ltd. expressly disclaims beneficial ownership of shares directly held by CD&R Vector Holdings, L.P. Investment and voting decisions with respect to the shares held by CD&R Vector Holdings, L.P. are made by an investment committee of limited partners of CD&R Associates IX, L.P., currently consisting of more than ten individuals, each of whom is also an investment professional of Clayton, Dubilier & Rice, LLC (the "Investment Committee"). All members of the Investment Committee expressly disclaim beneficial ownership of the shares directly held by CD&R Vector Holdings, L.P. CD&R Investment Associates IX, Ltd. is managed by two directors, Donald J. Gogel and Nathan K. Sleeper, who may be deemed to share beneficial ownership of the shares of common stock directly held by CD&R Vector Holdings, L.P. Such persons expressly disclaim such beneficial ownership. The mailing address for each of these entities is c/o Clayton, Dubilier & Rice, LLC, 375 Park Avenue, New York, New York 10152.

(2)    For information regarding certain material relationships between the selling stockholder and the Company, see "Certain Relationships and Related Party Transactions" included in our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 14, 2023, portions of which are incorporated by reference in this prospectus.

15

**APP 714**

**Table of Contents**

## PLAN OF DISTRIBUTION

**General**

The selling stockholder may sell the shares of our common stock covered by this prospectus using one or more of the following methods:

- underwriters in a public offering;

- "at the market" to or through market makers or into an existing market for the securities;

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the securities as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- privately negotiated transactions;

- short sales (including short sales "against the box");

- through the writing or settlement of standardized or over-the-counter options or other hedging or derivative transactions, whether through an options exchange or otherwise;

- by pledge to secure debts and other obligations;

- in other ways not involving market makers or established trading markets, including direct sales to purchasers or sales effected through agents;

- through the distribution by any selling stockholder to its partners, members or shareholders;

- a combination of any such methods; and

- any other method permitted pursuant to applicable law.

Registration of shares of our common stock covered by this prospectus does not mean that those securities necessarily will be offered or sold.

To the extent required by law, this prospectus may be amended or supplemented from time to time to describe a specific plan of distribution. Any prospectus supplement relating to a particular offering of our common stock may include the following information to the extent required by law:

- the name or names of the selling stockholders and the amounts to be sold;

- the terms of the offering;

- the names of any underwriters or agents;

- the purchase price of the securities;

- any delayed delivery arrangements;

- any underwriting discounts and other items constituting underwriters' compensation;

- any initial public offering price; and

- any discounts or concessions allowed or reallowed or paid to dealers.

The selling stockholder may offer our common stock to the public through underwriting syndicates represented by managing underwriters or through underwriters without an underwriting syndicate. If underwriters are used for the sale of our common stock, the securities will be acquired by the underwriters for their own account. The underwriters may resell the common stock in one or more transactions, including in negotiated transactions at a

16

**APP 715**

**Table of Contents**

fixed public offering price or at varying prices determined at the time of sale. In connection with any such underwritten sale of common stock, underwriters may receive compensation from the selling stockholder, for whom they may act as agents, in the form of discounts, concessions or commissions. Underwriters may sell common stock to or through dealers, and the dealers may receive compensation in the form of discounts, concessions or commissions from the underwriters and/or commissions from the purchasers for whom they may act as agents. Such compensation may be in excess of customary discounts, concessions or commissions.

If the selling stockholder uses an underwriter or underwriters to effectuate the sale of common stock, we and/or they will execute an underwriting agreement with those underwriters at the time of sale of those securities. To the extent required by law, the names of the underwriters will be set forth in the prospectus supplement used by the underwriters to sell those securities. Unless otherwise indicated in the prospectus supplement relating to a particular offering of common stock, the obligations of the underwriters to purchase the securities will be subject to customary conditions precedent and the underwriters will be obligated to purchase all of the securities offered if any of the securities are purchased.

In effecting sales, brokers or dealers engaged by the selling stockholder may arrange for other brokers or dealers to participate. Broker-dealers may receive discounts, concessions or commissions from the selling stockholder (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated. Such compensation may be in excess of customary discounts, concessions or commissions. If dealers are utilized in the sale of securities, the names of the dealers and the terms of the transaction will be set forth in a prospectus supplement, if required.

The selling stockholder may also sell shares of our common stock from time to time through agents. We will name any agent involved in the offer or sale of such shares and will list commissions payable to these agents in a prospectus supplement, if required. These agents will be acting on a best efforts basis to solicit purchases for the period of their appointment, unless we state otherwise in any required prospectus supplement.

The selling stockholder may sell shares of our common stock directly to purchasers. In this case, they may not engage underwriters or agents in the offer and sale of such shares.

Any underwriters, broker-dealers or agents that participate in the sale of the selling stockholder's shares of common stock or interests therein may be "underwriters" within the meaning of the Securities Act. Any discounts, commissions, concessions or profit they earn on any resale of the shares may be underwriting discounts and commissions under the Securities Act. A selling stockholder who is an "underwriter" within the meaning of the Securities Act will be subject to the prospectus delivery requirements of the Securities Act. We will make copies of this prospectus available to the selling stockholder for the purpose of satisfying the prospectus delivery requirements of the Securities Act, if applicable. If any entity is deemed an underwriter or any amounts deemed underwriting discounts and commissions, the prospectus supplement will identify the underwriter or agent and describe the compensation received from the selling stockholder.

Certain of the underwriters, broker-dealers or agents who may become involved in the sale of the shares of common stock may engage in transactions with and perform other services for us in the ordinary course of their business for which they will receive ordinary compensation.

We are not aware of any plans, arrangements or understandings between any of the selling stockholder and any underwriter, broker-dealer or agent regarding the sale of the shares of our common stock by the selling stockholder. We cannot assure you that the selling stockholder will sell any or all of the shares of our common stock offered by them pursuant to this prospectus. In addition, we cannot assure you that the selling stockholder will not transfer, devise or gift the shares of our common stock by other means not described in this prospectus. Moreover, shares of common stock covered by this prospectus that qualify for sale pursuant to Rule 144 under the Securities Act may be sold under Rule 144 rather than pursuant to this prospectus.

17

Table of Contents

From time to time, the selling stockholder may pledge, hypothecate or grant a security interest in some or all of the shares it owns. The pledgees, secured parties or persons to whom the shares have been hypothecated will, upon foreclosure, be deemed to be the selling stockholder. The number of the selling stockholder's shares offered under this prospectus will decrease as and when it takes such actions. The plan of distribution for the selling stockholder's shares will otherwise remain unchanged. In addition, the selling stockholder may, from time to time, sell the shares short, and, in those instances, this prospectus may be delivered in connection with the short sales and the shares offered under this prospectus may be used to cover short sales.

The selling stockholder may enter into hedging transactions with broker-dealers and the broker-dealers may engage in short sales of the shares in the course of hedging the positions they assume with such selling stockholder, including, without limitation, in connection with distributions of the shares by those broker-dealers. The selling stockholder may enter into option or other transactions with broker-dealers that involve the delivery of the shares offered hereby to the broker-dealers, who may then resell or otherwise transfer those securities.

The selling stockholder may elect to make a pro rata in-kind distribution of the shares of common stock to its members, partners or shareholders. In such event, we may file a prospectus supplement to the extent required by law in order to permit the distributees to use the prospectus to resell the common stock acquired in the distribution.

**Indemnification**

We and the selling stockholder may enter into agreements under which underwriters, dealers and agents who participate in the distribution of our common stock may be entitled to indemnification by us and/or the selling stockholder against various liabilities, including liabilities under the Securities Act, and to contribution with respect to payments which the underwriters, dealers or agents may be required to make.

**Price Stabilization and Short Positions**

If underwriters or dealers are used in the sale of shares of our common stock, until the distribution of the shares is completed, rules of the SEC may limit the ability of any underwriters to bid for and purchase our common stock. As an exception to these rules, representatives of any underwriters are permitted to engage in transactions that stabilize the price of our common stock. These transactions may consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of our common stock. If the underwriters create a short position in shares of our common stock in connection with an offering (that is, if they sell more shares than are set forth on the cover page of the applicable prospectus supplement) the representatives of the underwriters may reduce that short position by purchasing shares in the open market.

We make no representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of our common stock. In addition, we make no representation that the representatives of any underwriters will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

18

**APP 717**

# EXHIBIT 17

APP 718

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported):  **June 21, 2023**

# agilon health, inc.

(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **001-40332** | **37-1915147** |
|:---:|:---:|:---:|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **6210 E Hwy 290, Suite 450** **Austin, Texas** | **78723** |
|:---:|:---:|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(562) 256-3800**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**APP 719**

**Item 5.02.**    **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

**Director Resignations**

On June 21, 2023, each of Richard Schnall, Clay Richards and Derek L. Strum tendered letters of resignation from the Board of Directors (the "Board") of agilon health, inc. (the "Company"), which resignations were effective on June 22, 2023.

Such resignations were not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

Instead, the resignations occurred in connection with the Company's transition to a Board composed of a majority of independent Directors, which satisfies the New York Stock Exchange's (the "NYSE") rules regarding director independence. The Company previously qualified as a "controlled company" for purposes of the NYSE rules, which exempted the Company from certain of the NYSE's rules regarding director independence because at least 50% of the voting power for the election of Directors was held by CD&R Vector Holdings, L.P. ("CD&R"). As of August 11, 2022, CD&R no longer held more than 50% of the voting power for the election of Directors in the Company and, given that no more than 50% of the voting power for the election of Directors in the Company is held by any individual, group or other entity, since August 11, 2022, the Company no longer qualifies as a "controlled company". Although the NYSE rules regarding director independence provide the Company until August 11, 2023 to fully comply with the NYSE director independence requirements, following the June 22, 2023 Director resignations and the new Director appointment disclosed below, the Board is now composed of a majority of independent Directors.

**Director Appointment**

On June 22, 2023, the Board, upon the recommendation of the Nominating and Governance Committee, appointed Silvana Battaglia as an independent Class I Director in accordance with the Company's Amended and Restated Certificate of Incorporation, to fill the vacancy on the Board created by Mr. Richard's resignation from the Board. As a Class I Director, Ms. Battaglia will serve until the Company's 2025 annual meeting of stockholders, when she will be subject to re-election to the Board by a vote of the Company's stockholders, or until Ms. Battaglia's earlier resignation or removal. The Board also appointed Ms. Battaglia to the Compensation and Human Capital Committee of the Board.

Silvana Battaglia, age 55, is Executive Vice President and Chief Human Resources Officer for AmerisourceBergen, a leading global healthcare solutions company. Ms. Battaglia brings over 25 years of business leadership experience in global human resources organizations, shaping high-performance cultures, talent and succession management and driving organization transformation within the pharmaceutical and business services sectors. Prior to being named to her current role in January 2019, Ms. Battaglia served as Senior Vice President of Global Compensation, Benefits and Labor Relations and SVP of Global Human Resources at Aramark from 2011 to 2019. Ms. Battaglia served as the CHRO of Day & Zimmerman from 2008 to 2011 and held increasingly responsible leadership positions with Merck from 1998 to 2008. Her early career included positions at Wyeth Pharmaceuticals and Colorcon, a Division of Berwind Pharmaceuticals.

Ms. Battaglia, a National Association of Corporate Directors (NACD) certified professional Director, graduated from Temple University with a Bachelor of Arts in Marketing and her Masters of Science in Human Resources from Widener University. She has also served as an adjunct faculty member at St. Joseph's University in Philadelphia.

There are no arrangements or understandings between Ms. Battaglia and any other persons pursuant to which Ms. Battaglia was selected as a Director. There are no transactions, arrangements or relationships between the Company or its subsidiaries, on the one hand, and Ms. Battaglia, on the other hand, which would require disclosure pursuant to Item 404(a) of Regulation S-K.

In connection with Ms. Battaglia's appointment to the Board, on June 22, 2023, Ms. Battaglia was granted options to purchase common stock of the Company with a value of $185,000 at an exercise price of $16.74, which options will vest in three equal installments on each anniversary of June 22, 2023, and a restricted stock unit grant with an aggregate value of $185,000 prorated for Ms. Battaglia's term of service during 2023, which restricted stock units will vest in full one year from the date of grant, subject to continued service as a Director.

A copy of the press release announcing the appointment of Ms. Battaglia is furnished as Exhibit 99.1 to this Current Report and incorporated herein by reference.

**Item 8.01**      **Other Events.**

In connection with the Director appointment and Director resignations disclosed under Item 5.02 of this Current Report, effective June 22, 2023, the Board changed the composition of its Compensation and Human Capital, Nominating and Governance and Compliance and Quality Committees, such that each of its Compensation and Human Capital, Nominating and Governance and Audit Committee consists entirely of independent directors as of June 22, 2023. The Chairs and Members of each committee as of June 22, 2023 are:

| Committee | Director Name |
|---|---|
| Compensation and Human Capital: | Jeffrey A. Schwaneke (Chair) |
| | Diana McKenzie |
| | Karen McLoughlin |
| | Silvana Battaglia |
| | |
| Nominating and Governance: | Sharad Mansukani, M.D. (Chair) |
| | Jeffrey A. Schwaneke |
| | Karen McLoughlin |
| | |
| Audit: | Karen McLoughlin (Chair) |
| | Diana McKenzie |
| | Jeffrey A. Schwaneke |
| | |
| Compliance and Quality: | William Wulf, M.D. (Chair) |
| | Steven Sell |
| | Sharad Mansukani, M.D. |
| | Ravi Sachdev |

**Item 9.01.**      **Financial Statements and Exhibits.**

(d)      Exhibits:

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release issued by agilon health, inc. dated June 26, 2023 |
| 104 | Cover Page to this Current Report on Form 8-K in Inline XBRL. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date: June 26, 2023

By: /s/ Timothy Bensley
Timothy Bensley
Chief Financial Officer

Exhibit 99.1



# agilon health Names Silvana Battaglia to Board of Directors

### Longtime Human Resources Executive Brings Significant Business Leadership Experience to Role as Independent Member of agilon's Board

Austin, TX, June 26, 2023- agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, today announced that Silvana Battaglia has been named as an independent board director. Battaglia brings more than two decades of business leadership experience in global human resources, shaping high-performance cultures, talent, and succession management, and driving organizational transformation within the pharmaceutical, healthcare and business services sectors.

"We are pleased to welcome Silvana to the agilon health board," said Ron Williams, board chairman. "Silvana's extensive human resources experience within the healthcare industry will provide important insights to further our mission to be the trusted long-term partner of community-based physicians while shaping a positive and effective organizational culture for our best-in-class teams."

"Silvana is a proven leader, leading both domestic and international human resources organizations where she has delivered exceptional results," said Steve Sell, chief executive officer, agilon health. "agilon is growing and, as we do, Silvana will play a pivotal role in helping our company push toward a more sustainable primary care model for physicians that enables better health outcomes for senior patients."

"agilon health is transforming health care by enabling primary care physicians to move away from the fee-for-service treadmill," said Silvana Battaglia, board member, agilon health. "Value-based primary care is the key to ensuring senior patients have access to the care that they deserve, and I look forward to working with my fellow board members to advance agilon's mission and support their growing workforce."

Battaglia currently serves as executive vice president and chief human resources officer for AmerisourceBergen, a leading global healthcare company that fosters a positive impact on the health of people and communities around the world by advancing the development and delivery of pharmaceutical and healthcare products.

Prior to her current role, Battaglia worked at Aramark, most recently as senior vice president of global compensation, benefits, labor relations, and HR services; previously, she was senior vice president of global human resources. Battaglia has also served as chief human resources officer for Day & Zimmerman, and held leadership roles of increasing responsibility at Merck. She gained early human resources experience at Wyeth Pharmaceutical and Colorcon, a division of Berwind Pharmaceuticals.

Battaglia graduated from Temple University with a B.A. in Marketing and received an M.S. in Human Resources from Widener University. Battaglia has also served as adjunct faculty member at St. Joseph's University in Philadelphia.

**APP 723**



**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups transition to a value-based Total Care Model for senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,700+ PCPs that allow physician groups to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information about agilon health, visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

**Contacts:**

**Investor Contact**
Matt Gillmor
Vice President, Investor Relations
investors@agilonhealth.com

**Media Contact**
Megan Strothman
Director, Communications & Public Affairs
media@agilonhealth.com

---

# EXHIBIT 18

APP 725

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ2 2023 Earnings Call Transcripts

## Thursday, August 03, 2023 8:30 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ2 2023- | | | -FQ3 2023- | -FY 2023- | -FY 2024- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | 0.00 | (0.04) | NM | (0.02) | (0.03) | 0.18 |
| Revenue (mm) | 1110.57 | 1149.05 | ▲3.46 | 1102.26 | 4430.87 | 5940.14 |

Currency: USD
Consensus as of  Aug-01-2023 10:25 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

| - EPS NORMALIZED - | | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| FQ3 2022 | (0.04) | (0.02) | NM |
| FQ4 2022 | (0.05) | (0.06) | NM |
| FQ1 2023 | 0.06 | 0.04 | ▼(33.33 %) |
| FQ2 2023 | 0.00 | (0.04) | NM |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 726**

Contents

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................................ | 3 |
| Presentation | ................................................................................ | 4 |
| Question and Answer | ................................................................................ | 9 |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 727**

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Adam Matan Ron**
*BofA Securities, Research Division*

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

**David Michael Larsen**
*BTIG, LLC, Research Division*

**Elizabeth Anderson**

**Gary Paul Taylor**
*TD Cowen, Research Division*

**George Robert Hill**
*Deutsche Bank AG, Research Division*

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Sandy Draper**

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

**Unknown Analyst**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 728

# Presentation

**Operator**

Welcome to the agilon health Second Quarter 2023 Earnings Conference. My name is Terry, and I am the conference operator for today's call. [Operator Instructions] I would now like to hand the call over to Matthew Gillmor, Vice President of Investor Relations, to begin. Please go ahead.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good afternoon, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley. Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

Following prepared remarks from Steve and Tim, we will conduct a Q&A session. During the Q&A session, we would ask everyone to please limit themselves to 1 question so we can get through the full queue in a timely fashion. With that, I'll turn the call over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good evening, everyone, and thank you for joining us. We've had a very successful first half of 2023, and we continue to make rapid progress against our vision to transform health care in 100-plus communities by empowering primary care doctors.

Our progress is made possible because of the trust our growing network of partners have placed on agilon. I want to thank our 2,700-plus physician partners, and I want to thank my colleagues for their hard work and dedication to supporting our partners and their patients. I'll start with a few highlights from the quarter and year-to-date performance. Our overall momentum remains strong. Performance across our key financial metrics was in line or above our guidance ranges and further demonstrates the unique power of our model to inflect profitability while driving significant growth in membership and revenue.

During the quarter, our MA membership grew 57% to 409,000 members, and revenues grew 71% to $1.15 billion. This was above our guidance and was once again supported by the successful onboarding of new PCPs and faster pull-through of members in new markets.

Even with our impressive membership growth, our profitability continues to inflect with adjusted EBITDA up sixfold on a year-to-date basis and coming in above the high end of our outlook for the quarter. This quarter's EBITDA performance was driven by the strength of our Medicare business across Medicare Advantage and ACO REACH.

For MA, medical margins increased 69% to $138 million, while ACO REACH was even stronger with medical margins increasing 82% to $39 million. It should be noted that our medical margin for MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA, making our profitability gains even more outsized on an underlying basis.

The quarter and year-to-date results also reflect our growing confidence with the ACO REACH program in terms of the predictability of agilon's relative and absolute performance. Now in its third year, the

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 729**

program has reached a frequency and consistency of the data provided to better calculate and understand performance. This level of transparency is new as of 2023 and has confirmed that agilon has differentially managed utilization.

Our cost performance in REACH is more than 300 basis points better year-to-date versus the national benchmark, which all participants are measured against. Now looking forward from a guidance perspective, we have raised our membership revenue and adjusted EBITDA outlook for 2023.

Importantly, the magnitude of the outperformance within REACH and underlying margin progressing across our partner MA markets has allowed us to both absorb the negative prior year adjustment from 2022 and strengthen our MA reserving approach in 2023. This will set a strong foundation for our performance in 2024 and is intentionally reflected in our updated medical margin outlook for MA.

One theme I would like to drive home, given all of the speculation on utilization trends is that different models will yield different outcomes. Agilon's model is distinctively different and more durable and predictable in driving cost and quality results compared to the broad fee-for-service system, which predominates across health care today.

Let me highlight how we are producing such strong and predictable results and what drives our forward confidence in the business. First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care. We do not take risk on a broad set of patients in an unmanaged fee-for-service system. Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.

While our platform provides doctors with a consistent set of clinical resources like care managers, social workers and pharmacists, supported by technology and data insights. This allows our network to deliver consistent results across 500,000 attributed senior patients while our physician partners focus on the most complex 20% of patients that are driving 70% to 80% of total costs.

We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization.

Second point on differentiation. For our members, our year-to-date composite utilization trend is in line or better than our expectations. Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range. Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.

All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date.

Third, our model has natural advantages in terms of leading indicators and visibility. From an operational standpoint, we are not just receivers of macro utilization trends. Our teams are actively managing utilization on the ground every day. This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers. Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete. We have not seen any meaningful change in our expected cost trend, including outpatient procedures.

Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down. As a result, we are able to guide to relatively tight ranges on medical margin and adjusted EBITDA and absorb puts and takes that may arise during a given period.

Ultimately, the durability and predictability of our model has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, even as some health plans with broad fee-

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 730**

for-service networks are seeing pockets of higher costs. Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability.

As we have discussed previously, we operate in a very forward-looking model. And our visibility on the key levers for driving next year's performance is quite high. As an example, the class of 2024 implementation of 6 new partners and 100,000-plus MA patients is going extremely well and we will have another year of record membership growth with at least 145,000 new MA patients and 25,000 new REACH patients.

This class will benefit from multiple advantages as they come on our platform, including a 12-month implementation period, our newly acquired Minerva platform that shortens the period for integrating multiple EMRs and the local value-based care infrastructure we have already built in multiple existing markets and states that several of these partners will leverage immediately.

As a result, this class should have a higher starting point for medical margins in both Medicare Advantage and REACH and contribute to our adjusted EBITDA when we go live in January.

Looking further ahead, we are making strong progress with the class of 2025 pipeline, with several partners already signed and beginning implementation and others progressing well. This class promises to be another strong mix of diverse physician organization types across both new and existing markets. Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023. This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.

On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations. This is obviously important as you think about the stepping off point for 2024.

Finally, we are increasingly confident in our ability to manage the new risk adjustment model starting next year. This is a function of our implementation work over the past few months and recent conversations with our health plan partners. We now expect most health plans in our markets will be disciplined and moderate their supplemental benefit offerings in 2024, which ultimately impacts our cost profile.

This is not something we had previously factored into our calculus on our ability to successfully manage the new risk model changes and this new information further underscores our confidence in 2024 and beyond.

With that, let me turn it over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve, and good evening, everyone. I'll now review highlights from our second quarter results and our updated outlook for 2023.

Starting with our membership for the second quarter. Total members live on the agilon platform increased to approximately 496,000 including both Medicare Advantage and ACO REACH.

Our consolidated Medicare Advantage membership increased 57% to 409,000, driven by the addition of new partner geographies and 9% growth with our same geographies. Our same geography growth within our partner markets was 12%. Revenues increased 71% on a year-over-year basis to $1.15 billion during the second quarter. Year-to-date, revenues increased 73% to $2.29 billion. Revenue growth was primarily driven by membership gains in new and existing geographies. On a per member per month basis or PMPM, revenue increased 11% during the second quarter. This was primarily driven by benchmark updates and membership mix, including higher benchmarks in several new markets.

Our Medicare Advantage medical margin increased 69% year-over-year to $138 million during the second quarter. Year-to-date, medical margin increased 78% to $300 million. Medical margin increased on a PMPM basis driven by the ongoing maturation of our markets and member cohorts even while accounting for the dilution from our strong membership growth and negative prior year development.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

During the second quarter, medical margin PMPM increased 9% to $113 compared to $103 last year. Year-to-date, medical margin for our year 2 plus partners, which excludes the dilution from year 1 markets, increased 60% on a dollar basis and by 42% on a PMPM basis to $166.

Our medical margin for the quarter included $7 million of net headwind from prior year claims and revenue, including $16 million from prior year claims, offset by $9 million of prior year revenue. The prior year revenue we recognized in the second quarter relates to final risk adjustment settlements across several payers. Prior year claims were primarily driven by 2 payers, including 1 payer that changed how they processed post-acute claims last year, which resulted in a true-up during the second quarter of 2023.

We are taking specific actions to minimize the risk of prior year claims development in 2024, which I will discuss in a few moments.

Platform support costs increased 29% to $47 million. On a year-to-date basis, platform support costs increased 35% to $95 million. Growth in our platform support cost continues to run well below our revenue growth. As a percentage of revenue, platform support costs declined to 4.1% during the second quarter compared to 5.4% last year.

Our adjusted EBITDA was $10.3 million in the quarter compared with negative $2.7 million last year. On a year-to-date basis, adjusted EBITDA was $34.1 million compared to $5.4 million last year. As a reminder, our adjusted EBITDA includes geography entry costs primarily associated with new partners that will generate revenue in 2024. The increase to adjusted EBITDA reflects the gain in medical margin, platform support leverage and contributions from ACO REACH. Adjusted EBITDA contribution from ACO REACH, which is included in other income on our P&L was $11.2 million in the second quarter compared to $6.2 million last year.

Year-to-date, ACO REACH has contributed $14.5 million to adjusted EBITDA compared to $9.4 million last year. It's important to remember that the contribution from ACO REACH doesn't fully include allocation of corporate overhead and our MA business drove approximately 70% of the year-over-year gain in adjusted EBITDA during the quarter and about 90% of our adjusted EBITDA gain year-to-date.

As Steve referenced, we are very encouraged with the performance of our ACO REACH business. Our underlying cost performance continues to meaningfully beat the national benchmarks and improve data sharing from CMS allows us to assess our performance in a much more predictable manner.

If you look at the combined performance of MA and REACH, which is how we operate the business, medical margin profitability is ahead of our internal expectations and roughly comparable on a PMPM basis. We are increasingly optimistic the strength and predictability of REACH will be sustainable on a go-forward basis, which is reflected in our updated 2023 guidance.

Before turning to our balance sheet, I wanted to discuss our reserving approach in MA and actions we are taking to minimize the possibility of negative development in 2024. A key driver in prior year development we have recognized this year has been associated with the breadth and complexity of our health plan relationships.

As we mentioned in the last call, we currently work with 30 health plans across approximately 100 different contracts and this will continue to increase in future years. Our ability to work with these payers and meet them where they are is very strategic and allows us to unlock historically unmanaged markets as a first mover.

To support our growing scale, we are making proactive investments and we recently hired a new SVP of Data Solutions. This role will enhance our data capabilities and improve how we utilize data to support our operations and financial reporting. Additionally, with the support of stronger REACH performance, we are strengthening our IBNR reserves on a go-forward basis, which will significantly reduce the potential of negative claims development next year.

We are very pleased that the strength and durability of our business model has enabled us to both improve our adjusted EBITDA outlook for 2023 and set a strong foundation for performance in future years.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 732

Turning to our balance sheet and cash flow. As of June 30, agilon had approximately $590 million of cash and marketable securities and total debt of $41 million. Cash flow from operations was negative $21 million for the quarter, which was in line with our expectations. As a reminder, our cash flow generally lags adjusted EBITDA because of the timing of final settlements with payers, which are typically 9 to 12 months after the year-end. Agilon remains extremely well capitalized and we do not anticipate needing any external capital to drive our future growth.

During the second quarter, agilon repurchased approximately 9.6 million shares for $200 million in conjunction with the secondary offering by our founding equity sponsor. We were pleased to complete the transaction, which creates strong long-term alignment between our key stakeholders.

Turning now to our updated outlook for full year 2023. We have raised our membership and revenue ranges as well as our adjusted EBITDA outlook to a range of $0 to $23 million. At the same time, we have moderated our medical margin outlook by approximately $30 million to a range of $500 million to $530 million. Our updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend. This was more than offset by stronger ACO REACH results and performance in our partner markets, and we expect our updated approach to MA reserving will support our performance in future years.

We now project ACO REACH will contribute $30 million to $35 million to our adjusted EBITDA in 2023, up from $5 million to $10 million previously. Full details on our third quarter and full year guidance can be found in the earnings press release.

With that, let me turn the call back to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Tim. Before opening up the lines for Q&A, I want to emphasize 3 key points. First, the durability of our partnership model is driving predictable performance in terms of patient care, reinvestment in our partners and earnings to agilon.

Second, our year-to-date performance is in line or ahead for our partner markets in MA and ACO REACH which has enabled us to improve our outlook for adjusted EBITDA in 2023 while setting a strong foundation for 2024. And third, we remain very confident in the sustainable long-term trajectory of our business, including our execution against the key drivers for 2024 and beyond.
With that, we are now ready to take your questions. Operator, please start the Q&A session.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 733

# Question and Answer

**Operator**

[Operator Instructions] The first question on the line comes from Lisa Gill of JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Just a couple of clarifications. I just want to make sure I understand this. So first, when I heard, Tim, you talked about strengthening the reserves. And if I think about your medical cost margin in the back half coming down on the revised guidance. How much of that do I think of that as being reserved versus your expectation for trend. I heard both you and Steve say multiple times that trend was in line with what your expectations were. So I just want to understand that one.

And then just to clarify on the sustainability of the REACH's results. You said that it was -- you expect a modest improvement in '24, '25. Is that off of this new base? Are you thinking about the growth rate differently than that prior expectation that it would modestly improve in '24, '25.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Lisa, this is Tim. That's a great question, thanks. Just real directly on the first question. What we tried to do for the second half of the year is -- and especially, by the way, related to your second question, given the strength of our ACO REACH performance, is take the opportunity to essentially modify or moderate our medical margin outlook for the year by strengthening our reserves to sort of cover a range of potential outcomes.

So rather than saying, hey, this percentage of this is for this or this is for that, we've looked at the range of potential outcomes that can happen in the second half. Want to make sure that we've got enough reserve to minimize the probability of any prior period development going into next year, and that would include things like being respectful of the fact that there could be a change, for instance, in utilization trends in the second half. So I don't want to quantify it and break it out into components other than to say, we've tried to increase the strength of the reserves to cover that sort of range of outcomes.

**Steven Jackson Sell**
*President, CEO & Director*

And Lisa, I guess what I -- yes. So on ACO REACH side, obviously really great results. This program is all about beating the in-year cost trends of that national benchmark. We're now 300-plus basis points better than that benchmark. Last time we talked to you was about 110. That's a function of our being able to maintain consistent utilization trends while that fee-for-service benchmark went up pretty appreciably over the course of the last quarter.

I think it comes back to the really unique levers that we have with our primary care physicians and the ability to really impact those most complex patients like we talked about. And in terms of the sustainability -- there's a new level of transparency around the information that we're getting, particularly around this retro trend adjustment. We always knew what our trend was. We didn't know what that national benchmark was. But now every month, Tim and the team are getting that which gives us a lot of confidence.

The way the mechanics work in the program is that basically your baseline savings that we will end '23 with, kind of carry forward. And then what happens in '24 is if you're in line with the benchmark, you probably deliver about the same performance you did in '23. If you're better than the benchmark, those numbers would go up. So I think you do have a meaningful step-up in terms of the baseline performance in REACH that has allowed us to raise our guide for '23 and take the reserving actions that Tim talked about for any sort of adverse consequences, which gives us that really strong run rate as we step into '24.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 734**

**Operator**

The next question comes from Ryan Daniels of William Blair.

**Unknown Analyst**

This is Jack on for Ryan Daniels. Congrats on the quarter. I just kind of want to go back to something previously. And this is actually from one of the partnership announcements that you guys had, but for one of the partnerships that you mentioned in 2024, previously, you noted that there was going to be 32 physician groups. And the most recent one, it looked like there was 31 physician groups. I just want to make sure I'm reading that right. Is there anything to call out with the loss of that 1 group? Did a physician group just kind of get to...

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Yes. I think you might be confusing physician groups with geographies. It's -- what we've announced is still 32 physician groups. We've never lost a partner group.

**Steven Jackson Sell**
*President, CEO & Director*

And it's the 6 groups that we've announced, it's the 100,000 incremental patients for next year. So that's very much in line. I think what we're seeing for the class of '24 and for this pipeline in the class of '25 is that our differentiated performance on cost and quality is making us that much more attractive to groups who are thinking about making the move to value.

One data point I'll just give you about the class of '25 is I believe this is the first class in which we have signed up a partner medical group that previously was aligned with what we would consider to be a competitor. And what we heard from them was they were not getting the performance via that relationship and so they decided to end it. And so I think all of this ties together back to this flywheel, the better we perform, the better our partners do, the more other physicians want to join. So it's in line with what we've communicated before, and the pipeline is getting stronger based on that dynamic.

**Timothy S. Bensley**
*Chief Financial Officer*

Steve, the only thing that I would add just to make sure we're perfectly clear is the 6 new partners going to 32 partners and 100,000 at least members coming from those new partners are total membership projection. We're going to add like a 145,000 members next year when you -- the same geography growth, and that will be our largest new class, if you want to look at that combined.

And just to tag on real quickly because it relates to this question and back to Lisa's question, in addition to that, one of the reasons why we really continue to be more bullish on ACO REACH is we're also going to increase our ACO REACH membership next year for the first time. So we'll bring in several new ACO REACH markets as well with at least 25,000 new ACO REACH members coming in. So between the 2 of those, next year is a really big year for membership.

**Operator**

The next question on the line comes from Jailendra Singh of Truist Securities.

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

I want to go back to the medical margin guidance change topic. Just wanted to better understand like how are you going about updating these estimates on these new reserves. Just trying to get your comfort around the reserves if it's announced. Is it all driven by your ACO REACH experience, which gives you good visibility and have you captured some other data points? And as we think about 2024 and any potential prolonged utilization uptick, what levers do you have to go back to payer contracts, to renegotiate, anything there would be helpful.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Well, let me start on the guide and Tim can comment on that. I mean, I think the objectives we are trying to achieve is that we wanted to beat our '23 adjusted EBITDA, and we are highly confident about that. That is driven both from the REACH outperformance that we've talked about in which we are meaningfully beating that national benchmark and the differences in our model.

But then to Jailendra, our partner MA markets ex PPD, are performing extremely well. And so that is really a powerful part of what we're trying to do. As we talk about sort of the strengthening of reserves that Tim laid out, there's kind of 3 things that I think we look at this year that we want to make sure we accounted for in any sort of adverse scenario.

One is the PPD. We want to eliminate the likelihood of that in 2024. And so that was our first objective. Second is the supplemental benefits from payers is an area where we have seen higher costs than what we projected and what our payer partners had projected. We know from our conversations, those are going to correct for '24, but we want to make sure in the back half of '23, before they go away or substantially reduced that were covered around that. And then the one area that we see the type of elevated utilization that some of the health plans have talked about is in our 1 non-partner market of Hawaii, which is a broad fee-for-service network, and we are seeing higher utilization. So we wanted to make sure that we covered all of that from a guide perspective.

And then I think you asked just about '24. What we try o communicate is our confidence on '24 is even higher than the last time that we talked to you. One is this run rate performance that we laid out. Two is our clinical programs that are driving these results. We're in 1/3 of our existing MA markets. We're in 2/3 of our existing REACH markets. So we have a lot further to go.

By the end of '24, we'll have a full suite of clinical programs in every single one of our markets from the class of '24 and earlier. That should provide a meaningful step up in terms of cost and quality management. The benefit changes, that's new information for us that we were not previously factoring.

And then finally, this implementation on the class of '24 is going extremely well. This is the first class that's able to leverage that Minerva platform that we talked about earlier as part of our acquisition. And so all of that leads to us to be -- feel very good about '24 and then the forward application from that.

**Operator**

The next question comes from Stephen Baxter of Wells Fargo Securities.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

I was hoping that you could maybe be as specific as possible about what your level of claims visibility is for the second quarter. I guess first, how closely is ACO REACH claims data track with your actual MA claims experience. I guess how complete would you judge the ACO claims data to be for April and May at this point? And just to make sure I understand the actual guidance change for medical margin, is your underlying estimate before making this reserve change changing in any way? Or would you say the entire change in your medical margin guidance ex the prior year item is related to your reserving change, whether that's assuming a higher margin for adverse development or something of that nature?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Why don't -- I'll start on visibility and Tim, he can talk about reserves. So I think our visibility is extremely strong, Stephen, and we have high confidence. I think it's a function of our model, which is very different, right? We are on the ground with PCPs every day, we are managing those most complex patients. And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 736**

The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER. And we put that together, we're able to drive the type of results that I talked about with inpatient down in the flat to down in the mid-single-digit range.

From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims. And so there is incredibly high visibility. There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis.

But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. And so we feel like we have an incredible level of visibility on that. And I think the last thing I would just say is, I think we've demonstrated that our model really stands out in higher utilization periods that broader fee-for-service markets are seeing.

Our ACO REACH performance being 300 basis points better. What we're seeing in our partner markets versus our Hawaii market, our medical margins are 3x greater in our partner markets than we're finding in Hawaii. And so I think the power of that model is really driving exceptional results.

And the last data point I'll give you is just we walked a lot through our clinical programs at our Investor Day. But one of the ones we talked about was the importance of our high-risk patients and the 2-day follow-up when they're discharged from the hospital.

Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year. It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range. So I think this is an area where we feel like we have incredible confidence. The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, that's right, Steve. So the only other thing I would say about ACO REACH to lead into how we're handling MA is on the ACO REACH side, CMS has always been our best payer in terms of currency and accuracy of the claims data they gave us. And since the beginning of the program, we've always been very tight in a very good shape on our IBNR claims estimation for the DC, now ACO REACH business.

The issue on ACO REACH has always been around the revenue side, and CMS has been tremendously helpful now in providing us better information over the last 6 to 9 months and how we're looking at that. The combination of those 2 things give us tremendous confidence in our projections for ACO REACH going forward.

How that applies back to MA, of course, on the MA side, it's a much more complex situation of payers. We talked about those statistics a couple of times already on this call. And so that complexity makes it more difficult to do your IBNR estimation. Some of the blind spots that have come out of that have, of course, resulted in some prior period development that we talked about this year, both on the revenue positively and on the claims side negatively. Those are the things that we want to eliminate. So we have taken a couple of actions that we talked about.

One is we brought in some incremental expertise, a new Senior Vice President of Data Solutions that has a lot of experience in this area that's going to help us both work with the payers to eliminate some of those blind spots as well as just work with the data we're getting to better understanding where we should be reserving.

And when we talk about then the strengthening of our reserves that are in our guidance, we've essentially said, hey, with the understanding that our reserve should probably be stronger in terms of the range of potential reserves that we could build, both because of those potential blind spots and also just to cover for the possibility and be respectful of the fact that there may be some change and utilization in the back half of the year.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 737**

We feel like the strengthening of the reserves that we built into Q2 and into the balance of the year guidance are adequate to cover really that range of outcomes of -- be a little bit stronger in terms of any blind spots that we may not see to make sure that we're not getting prior period development as well as cover the possibility of any possible increase in -- or some possible increase in utilization.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, Steve, thanks very much. We appreciate it. Operator, can we move to the next one?

**Operator**

The next question comes from Gary Taylor of Cowen.

**Gary Paul Taylor**
*TD Cowen, Research Division*

I'm just going to continue to work on the ACO REACH for a moment. I think that peaks, we're all trying to understand. My 2 questions are -- if we look at the Q, the ACO, MLR was down about 600 basis points year-over-year. So I just wondered if there was any reserve release out of ACO REACH in the quarter?

And then my second one is just trying to understand, I know -- I think originally going back to IPO, I thought we were looking at maybe $60 million of EBITDA and $25 million from ACO. But at the March Investor Day, you cut that in half, and now we're a few months later, now we're going to do that number or the high end would be doing that number in '23. So just trying to understand like what has happened in the last few months that has changed that outlook fairly quickly?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I think for the first part of the question, which is why is our MLR improvement -- or what's driving the MLR improvement, both in -- particularly in the second quarter, but now also year-to-date. When we entered the year, and this is one of the reasons why we talked about ACO REACH the way we did during Investor Day, because we are being very cautious on the components that build to revenue for ACO REACH.

So it's not really about claims release or about the IBNR side. We've been very tight on that for really the first 3 years or 2.5 years now of the program. But it was really around -- being cautious around how is the -- primarily that retro trend adjustment going to work and what's the real trend going to be? We stayed pretty conservative on that in Q1. We are getting more and more data now as we move through the year, and we're seeing that retro spend adjustment be more positive.

We've now built that into our year-to-date results as well as projected it forward. So I think our increasing confidence in what that revenue number is going to be and are increasing now visibility to the fact that we are significantly beating that fee-for-service benchmark that's driving that revenue number with our own costs or -- is how we built that number back up to now $30 million to $35 million for the year.

So I think it's the removal of some of that very high level of conservatives that we had going into the year now that we're seeing how the model is actually working.

**Steven Jackson Sell**
*President, CEO & Director*

And Gary, what I would just reiterate is the big change is not so much in our visibility to our trend. It's in this monthly update on the national trend. And so as you've been on the calls, people have talked about fee-for-service utilization trending up. That's what's happened in this national reference population. And that's where we're seeing the gap between what we're managing to and what's happening with that growing and that's the way the program really rewards you.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 738**

So I think going back to sort of the unique levers in our business, and the fact that the clinical programs we shared in March being ahead of where we expected them to be, we are really effectively managing that inpatient, that ER and the gap relative to the benchmark is growing, which is driving the strong result.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, Gary. Thanks very much. Operator, why don't we move to the next question, please.

**Operator**

Of course, the next question comes from Whit Mayo of Leerink Partners.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

As you guys look at 2024, you've mentioned a lot of optimism around your ability to grow. Are there any operational or clinical changes you're thinking about for next year, either how you're approaching coding, engaging with the panel, changing the panel, the physician workflow, just anything as you kind of look out over the next 3 years with the risk adjustment changes. And I hear you a lot on the clinical programs having a positive impact, but just maybe operationally, how you're modifying things for next year.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So thanks, Whit. So operationally, everything we do -- we think about burden of illness, which is determining the acuity of the patient as a clinical program. It feeds our quality programs, it feeds our clinical programs. And so we are doing a much better job of identifying those most complex patients.

The acquisition that we made of this Minerva platform that we shared with you back in March, allows us to get data to our partners earlier about those patients and to get them enrolled in those programs. So that's really meaningful on the cost and on the quality side. I think what we're finding in terms of our implementation of the new risk model is that, that is executing very well. Our metrics are tracking well. Our centralized physician medical record review is reviewing more of those charts and better providing almost a peer review basis for our physicians as they are having those assessment visits with their patients.

And so all of that is telling us it's very manageable from the risk model change, the payer conversations on the benefit change is something we had not factored before. And then being ahead on the clinical programs and getting more patients identified with the changes that I talked about should flow through very well. And so as we look at '24, the expansion of those programs, the better the identification, I think we are quite confident about it.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Operator, why don't we move to the next question, please.

**Operator**

We have a question from Adam Ron of Bank of America.

**Adam Matan Ron**
*BofA Securities, Research Division*

I think at one point, you mentioned that you think because of the new implementation cycle that you're being on the 2024 cohort, you think that they would have a higher starting point for medical markets and I think at the Investor Day, the number you pointed to for 2023 was $46. So would it be upside to that specifically? And like any help presenting like the quantification of how significant it could be.

**Timothy S. Bensley**
*Chief Financial Officer*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, Adam, that's a great question. Thanks. So you're exactly correct. Typically, during the year, our new class comes in somewhere between $30 and $60 MA medical margin PMPM. This year is probably right around the middle of that. By the way, the middle of that range is about where we break even in the first year from an adjusted EBITDA standpoint.

Next year, we actually expect that the new class will come in at average, actually above the $60 range. So that's really positive for us, particularly in the year with the advanced notice coming in where it is. We've got a really big class, a really strong class and that they're going to come in probably in the first year above that $60 range, which means they are going to be generating positive EBITDA as a new class in the first year in 2024.

**Adam Matan Ron**
*BofA Securities, Research Division*

[indiscernible] sustainable go forward?

**Timothy S. Bensley**
*Chief Financial Officer*

Sustainable like in classes in the future?

**Adam Matan Ron**
*BofA Securities, Research Division*

Yes. Like should we just [indiscernible] as a starting point?

**Timothy S. Bensley**
*Chief Financial Officer*

Each year is going to be different depending on the mix. So we're pretty well along with the class of '25. We'll know in the next few months what we think that might look like. One of the keys to doing this is how much -- how quickly can we get the new partners signed up, and therefore, how long of an implementation cycle we have. We're in really good shape with the Class of '24. Some of the larger partners have actually been implementing for more than a full year or will have been implementing for more than a full year.

Class of '25 is looking pretty good. So I don't want to guide to a number specifically, but I think we'll get the benefit of the long implementation cycle for that as well.

The second thing is we just made this investment in mphrX, which allows us to more quickly integrate with the EMRs and our new partners, which is where a lot of the data comes from that helps us drive the year 0 performance that will get us into that first year. So new tools and capability, continue to sign partners on early to get a long implementation cycle should all point to us being able to perform better in year 1 medical margin PMPM, short of actually giving guidance for 2025 or 2026 on this yet.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right. Thanks, Adam. Operator, why don't we move on to the next question, please.

**Operator**

Of course, the next question comes from George Hill of Deutsche Bank.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

Steve, you kind of touched on this a couple times about orders. If I could get you to dive in a little more detail where you're expecting a lot of your payer partners to rationalize supplemental benefits in '24 as a result of reimbursement changes and plan changes. I imagine that's going to lower your cost to serve your

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 740

beneficiaries. I guess, can you talk about the moving pieces there, kind of where you expect it to, I guess, most frequently impact costs on your side?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, George. I mean I -- so we have a great relationship with our payers. We're now working with north of 30 payers. We work with 5 nationals and have really in-depth joint operating committee discussions. And I guess I would start by saying the tone and tenor of those is as productive as I've ever heard them. And I think that the value that we are providing to these payers is really enhanced in an era in which fee-for-service utilization is up.

And so maybe they're challenged across a broad fee-for-service network. They'd like to get more patients into a model like the agilon partnership. And the risk model changes are making things tougher. And so the fact that we're able to deliver 4-plus star quality in all of our year 2 plus markets, the fact that we're able to really better identify these patients and sign them with [indiscernible], I think, is really important to them. And so that is really an opportunity that we see.

In terms of the specifics, each one of them is tweaking different benefits. We have great sight line and they do too in terms of how some of these benefits are running. I think, in particular, some of these cash cards associated with dental or OTC are probably the areas where you're seeing some of the benefits going away altogether are dramatically sort of reducing those as we go towards next year. But it really is in a variety of areas that you're going to see the MACVAT come down, in some cases, pretty meaningfully.

So George, hopefully, that gives you context on kind of where we're at. But we're encouraged by it. We were not factoring this as we thought about '24. We knew there would be some changes, but we just sort of held it constant until we got to the place where we had good visibility, and that's been encouraging.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, George. Thanks very much, appreciate it. Operator, why don't you move to the next one, please.

**Operator**

The next question comes from Justin Lake of Wolfe Research.

**Unknown Analyst**

This is Austin on for Justin. Just to follow up on George's question there. Just thinking through the magnitude of the impact of '24, do you feel like the reception from the payers on the supplemental benefits is enough to offset like almost totally, any risk model impact? Or how should we be thinking of that stepping into next year?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean I'm not sure I would characterize it that way. I think we've sort of said, hey, it's very manageable for us in that kind of before any sort of supplemental changes in that kind of 2% to 3% range. I think that there is some relief coming from that. And I think as we've done implementation, maybe that there's some modification around that. But it kind of varies by payer and it kind of -- it varies based on their market strategy and sort of the relative changes they're looking at. But I guess my point is on the composites, there will be some relief.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, Austin. Thanks very much. Operator, why don't we move to the next one, please.

**Operator**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 741**

The next question comes from Sandy Draper of Guggenheim Securities.

**Sandy Draper**

Tim, just trying to -- I think I understand the higher reserves impacting the MLR for the back half of the year. But I was just trying to think about the cash flow. I noticed that there was a step-up in other working capital items. Was there any impact in the second quarter in that -- in terms of being true up? And I guess maybe the simple thing I'm trying to ask is, as you basically have these higher, more conservative reserves going forward, does that lower your conversion rate of EBITDA to free cash flow? Or is there sort of a onetime catch-up and then it normalizes.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I think it would be more -- to answer the second part of your question first, the way the math would work is the way you described it, it's more of a onetime catch-up and then normalize going forward. You have to be a little bit careful looking at the big working capital metrics, realize that the way that -- when you look at receivables and payables on our balance sheet, we don't pay the claims, and we don't actually receive the full cash of the revenue. Ultimately, what we do is settle up -- we get some payments as we move along and then finally settle up 9 to 12 months later for the full surplus between those 2 numbers, between the capitated revenue and the claims.

So when you look at our balance sheet and we are breaking it out and showing that virtual balance sheet of when you can look at days claims payable as an example, or day sales outstanding, it's not -- those numbers will move more based on the timing of information that we get from the payers about what claims have actually been paid, so we can count which ones are paid versus really having a direct impact on our cash flow.

Now having said that, if our medical margin obviously is going to be lower in the second half because we're shrinking our reserves, I mean, that will have a onetime obviously impact on EBITDA and a onetime impact on cash flow that will then be essentially stable after that. I don't know if that makes sense or not, but...

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, Sandy. Thanks very much. We appreciate it. Operator, why don't we move to the next one, please.

**Operator**

The next question on the line comes from Jamie Perse of Goldman Sachs.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

So I think by year-end, the average time on the platform is going to be around 3.25 years or so. I guess just what is the typical progression for cohort at that level of maturity in terms of expense PMPM? I'm just trying to understand what the existing cohorts might look like from, again, the expense side in a typical progression from, call it, year 3 to 4, and then we can obviously layer on the new markets on top of that.

**Timothy S. Bensley**
*Chief Financial Officer*

I don't -- you want to jump in first?

**Steven Jackson Sell**
*President, CEO & Director*

So I was going to say, I mean, we typically talk about it, Jamie, from a med margin PMPM because you have very different benchmarks and cost base lines depending upon the markets in which you operate.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

And so I mean, you could have a difference between a baseline of $725 of cost to $850 cost. And so it's really to give you a number on the cost side, it's really the relationship between the revenue PMPM and the medical cost PMPM. And on year 3 specifically.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, I was going to say that exactly the same thing, which is each market is going to look different in terms of what their mix of members look like from how they're risk adjusted versus what their claims are, hopefully those things go together. That's the whole idea of risk adjustment.

So medical margin, we think, is a much better number. I can't really quote a specific one or the other for -- because they're going to be different for every market. And I think the information that we put out at Investor Day that shows the progression of each of our market cohorts over time is really a good indicator of exactly where we expect them to be from a medical margin standpoint. And so you can see each cohort and where each of them was at the 3-year point as we show you the progression over time.

There's going to be a little variability between them from market to market, but generally speaking, they're pretty well progressing on the same curve.

**Steven Jackson Sell**
*President, CEO & Director*

And Jamie, I guess I'll just close by saying, I think we've demonstrated our ability to go to a diverse set of markets with a diverse set of physician group types and drive consistent performance across time. So I think what Tim talked about in terms of referencing back to that is a very good comparison set in terms of what that progression looks like, which will be a combination of how that revenue and costs are reflected.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right. Thanks, Jamie. We appreciate it. Operator, why don't you move to the next one, please.

**Operator**

The next question comes from Elizabeth Anderson of Evercore ISI.

**Elizabeth Anderson**

Going back to the earlier question, I noticed you talked about sort of your first competitive win there. Does that kind of business come through at like a better initial MLR since they've had some improvement perhaps in there, but obviously not enough to cause them to stay with their prior arrangement. And then secondly, if you hired the SVP of Data Solutions, so is that sort of -- what sort of his, that sort of -- the focus of that new position in terms of is it sort of integration with claims data? Is it -- is there something else that you guys are working on in terms of how the offering and programs that you're offering to your doctors and patients as well?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks for the question. I'll take the first one, Tim can take the second. I think that the reason that they made the change, at least what they're talking to us about is they have not been able to sort of drive the performance that they were looking at previously. And so how that translates over in terms of do they start in a better place than others, I'm not sure I would necessarily say that.

I think the factors that are driving better year 1 performance are the things that we've talked about, which is a longer implementation period that they'll get. This Minerva platform that's going to get data earlier and the ability to identify those most complex patients and get them enrolled in clinical programs, which we should have in place as they go live. I think those things enable a better stepping-off point versus maybe what they were doing previously. And then on the new position, Tim?

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 743**

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, I think the idea was to bring in a very talented and experienced executive and build a group underneath them that are really looking at the whole pipeline of data for us, beginning with what data are we getting from each payer, what's the quality of data, what's the timeliness of the data, and how can we continue to work to improve that. How is that data ingested and conditioned? And then how is that ultimately used both from an operational standpoint to drive performance as well as from a financial standpoint to drive our accruals in our financial reporting. So it's a pretty holistic approach, I think it's a really important step for us to take given the size and breadth of the data and the number of payers that we're talking about.

And so I think it will help us across all of those fronts. It should certainly help us in improving our ability to continue to sort of improve the quality of our reserves to make sure that we're not minimizing the probability of prior period development next year. But on a much bigger scale, it's also going to help us tremendously with how we use data to drive operational outcome.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right. Thanks, Elizabeth. Operator, I think we've got one last question.

**Operator**

The final question comes from David Larsen of BTIG.

**David Michael Larsen**
*BTIG, LLC, Research Division*

Congrats on a good quarter. Can you provide an update on your expectations for fiscal '26 EBITDA based on sort of the new methodology. I mean can we sort of estimate 150,000 new MA lives at $500 each, that's about $75 million of market entry cost, which means you should be at about, let's call it, at least $500 million of EBITDA for fiscal '26.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So we're not -- we haven't updated our guidance specifically for the new methodology. But the math that you're using, which is we would expect that geography entry costs would continue to be about $500 per member for the following year. So the idea is that the geography entry cost in 2026 will be about $500 a member for those members that were adding in 2027, the geography entry cost in 2025 would be about $500 per member for those that who're adding in 2026. So just kind of be aware of that -- those geography entry costs are kind of 1 year offset from the member growth that they're driving.

But your overall -- the underlying EBITDA performance that we projected before the change to include geography entry cost is -- we're still very confident in those numbers. How we basically project that through -- next time we give an update, obviously, for our long-term plan, we'll include that. But the math and the logic that you're using is the right one.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And Dave, you can obviously get some sense for our geography entry costs for this year? David, do you have a quick follow-up?

**David Michael Larsen**
*BTIG, LLC, Research Division*

No, just thanks. Congrats on a good quarter.

**Steven Jackson Sell**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 744

*President, CEO & Director*

All right. Thank you, everyone. We really appreciate your interest and your questions. And I think you can hear that we're excited about the progress we've made to date and the future ahead. So look forward to updating you on future calls. Thanks, everybody.

**Operator**

This concludes today's conference call. Thank you all for joining. You may now disconnect your lines.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.

# EXHIBIT 19

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): August 3, 2023**

## agilon health, inc.
(Exact name of Registrant as Specified in Its Charter)

| | | |
|---|---|---|
| **Delaware** | **001-40332** | **37-1915147** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |
| **6210 E Hwy 290, Suite 450** | | |
| **Austin, TX** | | **78723** |
| (Address of Principal Executive Offices) | | (Zip Code) |

Registrant's Telephone Number, Including Area Code: 562 256-3800

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**APP 748**

**Item 2.02 Results of Operations and Financial Condition.**

On August 3, 2023, agilon health, inc., a Delaware corporation, issued a press release setting forth its financial results for the three and six months ended June 30, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated August 3, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 749**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:    August 3, 2023                                By:    /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

**Exhibit 99.1**



**agilon health Reports Second Quarter 2023 Results**

*Revenue increased 71% to $1.15 billion, Medicare Advantage membership increased 57% to 408,900, and total members live on the agilon platform grew to 495,900*

*Durability of agilon partnership model driving continued gains in profitability across Medicare Advantage and ACO REACH, inclusive of higher membership*

*Updating outlook for 2023 and setting a strong foundation for 2024*

AUSTIN, T.X., August 3, 2023 – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the second quarter ended June 30, 2023.

"The durability and predictability of our partnership model enabled agilon to deliver strong performance during the second quarter and first half of 2023," said Steve Sell, chief executive officer. "Our execution this year establishes a strong foundation for success in 2024 and beyond, benefiting our physician partners, their patients, and the communities we serve."

<u>Second Quarter 2023 Results:</u>

- Total members live on the agilon platform increased to 495,900 as of June 30, 2023, including 408,900 Medicare Advantage members and 87,000 ACO REACH beneficiaries. Medicare Advantage membership increased 57%, with 9% growth in same geographies.

- Total revenue of $1.15 billion increased 71% during the second quarter 2023 compared to $670 million in the second quarter 2022. Gross Profit of $57 million in the second quarter 2023, compared to $34 million in the second quarter 2022. Net loss of $17 million in the second quarter 2023, compared to a net loss of $21 million in second quarter 2022.

- Medical Margin of $138 million increased 69% during the second quarter 2023 compared to $82 million in the second quarter 2022. Medical Margin for the second quarter 2023 included a negative $7 million net impact from prior year claims and revenue, consisting of $16 million in prior year claims and $9 million in prior year revenue.

- Adjusted EBITDA of $10 million in the second quarter 2023 compared to an Adjusted EBITDA loss of $3 million in the second quarter 2022. Adjusted EBITDA included $19 million in geography entry costs in the second quarter 2023, compared to $10 million in the second quarter 2022. ACO REACH contributed $11 million to Adjusted EBITDA during the second quarter 2023, compared to $6 million in the second quarter 2022.



*Key Financial and Operating Metrics:*

| | Three Months Ended June 30, | | Change |
|---|---|---|---|
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members | 408,900 | 261,200 | 57% |
| ACO REACH Members | 87,000 | 90,500 | (4%) |
| Total Members Live on Platform | 495,900 | 351,700 | 41% |
| Avg. Medicare Advantage Members | 409,700 | 265,400 | 54% |
| Total revenues ($M) | $1,149 | $670 | 71% |
| Gross Profit ($M) | $57 | $34 | 69% |
| Medical Margin ($M) | $138 | $82 | 69% |
| Net Income ($M) | ($17) | ($21) | 19% |
| Adjusted EBITDA ($M) | $10 | ($3) | NM |
| Geography Entry Costs ($M) | $19 | $10 | 87% |

Membership reflects end of period results, unless otherwise stated. agilon's partnered ACO REACH entities are not consolidated within its financial results.

*Class of 2024 New Partnership Announcements:*

Center for Primary Care (CPC) and agilon health announced the formation of a long-term partnership on May 31, 2023. CPC is an independent primary care practice operating 8 locations in the Central Savannah River Area, which includes communities in Eastern Georgia and Western South Carolina.

*Capital Position and Balance Sheet:*

agilon health's balance sheet as of June 30, 2023 included cash, cash equivalents and marketable securities of $590 million and total debt of $41 million. On May 18, 2023, in connection with an underwritten secondary offering by certain selling shareholders, agilon health repurchased 9.6 million shares of common stock for approximately $200 million.

**Outlook for Fiscal Year 2023:**

| | Year Ended December 31, 2023 | | | |
|---|---|---|---|---|
| | Updated Guidance | | Previous Guidance | |
| | Low | High | Low | High |
| Medicare Advantage Members | 412,000 | 415,000 | 405,000 | 410,000 |
| ACO REACH Members | 85,000 | 90,000 | 85,000 | 90,000 |
| Total Members Live on Platform | 497,000 | 505,000 | 490,000 | 500,000 |
| Avg. Medicare Advantage Members | 409,000 | 410,000 | 405,000 | 407,000 |
| Total Revenues ($M) | $4,525 | $4,540 | $4,410 | $4,440 |
| Medical Margin ($M) | $500 | $530 | $535 | $560 |
| Adjusted EBITDA ($M) | $0 | $23 | ($3) | $25 |
| Geography Entry Costs ($M) | $75 | $68 | $78 | $65 |

**APP 752**

**Outlook for Third Quarter 2023:**

|  | Quarter Ended September 30, 2023 | |
| --- | --- | --- |
|  | Low | High |
| Medicare Advantage Members | 410,000 | 413,000 |
| ACO REACH Members | 85,000 | 90,000 |
| Total Members Live on Platform | 495,000 | 503,000 |
| Avg. Medicare Advantage Members | 413,000 | 416,000 |
| Total Revenues ($M) | $1,130 | $1,140 |
| Medical Margin ($M) | $110 | $125 |
| Adjusted EBITDA ($M) | ($8) | $0 |
| Geography Entry Costs ($M) | $22 | $20 |

Adjusted EBITDA contribution from ACO REACH is now expected in a range of $30 million to $35 million for fiscal year 2023. Management's previous outlook for Adjusted EBITDA contribution from ACO REACH was $5 million to $10 million for fiscal year 2023.

Membership reflects management's outlook for end of period, unless otherwise stated. agilon's partnered ACO REACH entities are not consolidated within its financial results. Management's outlook for Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss second quarter 2023 results on Thursday, August 3, 2023, at 4:30 PM Eastern Time. The conference call can be accessed by dialing (833) 470-1428 for U.S. participants and +44 (208) 068-2558 for international participants and referencing participant code 946264. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups transition to a value-based Total Care Model for senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,700+ PCPs that allow physician groups to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue and net income, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to, those factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**APP 754**

**agilon health, inc.**
Consolidated Balance Sheets
In thousands, except per share data

| | June 30, 2023 | December 31, 2022 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 190,981 | $ 497,070 |
| Restricted cash and equivalents | 10,204 | 10,610 |
| Marketable securities | 389,046 | 411,901 |
| Receivables, net | 1,417,052 | 497,574 |
| Prepaid expenses and other current assets, net | 37,560 | 34,119 |
| Total current assets | 2,044,843 | 1,451,274 |
| Property and equipment, net | 24,407 | 20,050 |
| Intangible assets, net | 94,185 | 67,680 |
| Goodwill | 62,140 | 41,540 |
| Other assets, net | 127,346 | 116,924 |
| Total assets | $ 2,352,921 | $ 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 1,099,533 | $ 346,727 |
| Accounts payable and accrued expenses | 257,819 | 183,364 |
| Current portion of long-term debt | 5,000 | 5,000 |
| Total current liabilities | 1,362,352 | 535,091 |
| Long-term debt, net of current portion | 36,017 | 38,482 |
| Other liabilities | 75,106 | 83,286 |
| Total liabilities | 1,473,475 | 656,859 |
| Commitments and contingencies | | |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value; 2,000,000 shares authorized; 405,427 and 412,385 shares issued and outstanding, respectively | 4,054 | 4,124 |
| Additional paid-in capital | 1,947,438 | 2,106,886 |
| Accumulated deficit | (1,064,957) | (1,064,230) |
| Accumulated other comprehensive income (loss) | (6,369) | (5,560) |
| Total agilon health, inc. stockholders' equity (deficit) | 880,166 | 1,041,220 |
| Noncontrolling interests | (720) | (611) |
| Total stockholders' equity (deficit) | 879,446 | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ 2,352,921 | $ 1,697,468 |

**APP 755**

**agilon health, inc.**
**Consolidated Statements of Operations**
**In thousands, except per share data**
**(unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,147,044 | $ 669,184 | $ 2,281,874 | $ 1,321,607 |
| Other operating revenue | 2,008 | 950 | 3,325 | 1,972 |
| Total revenues | 1,149,052 | 670,134 | 2,285,199 | 1,323,579 |
| **Expenses:** | | | | |
| Medical services expense | 1,008,734 | 587,140 | 1,981,561 | 1,153,348 |
| Other medical expenses | 83,125 | 49,080 | 169,149 | 93,853 |
| General and administrative (including noncash stock-based compensation expense of $19,572, $6,553, $33,244 and $10,523, respectively) | 81,499 | 51,924 | 148,345 | 91,758 |
| Depreciation and amortization | 5,515 | 3,042 | 9,704 | 6,415 |
| Total expenses | 1,178,873 | 691,186 | 2,308,759 | 1,345,374 |
| **Income (loss) from operations** | (29,821) | (21,052) | (23,560) | (21,795) |
| **Other income (expense):** | | | | |
| Other income (expense), net | 15,687 | 6,997 | 25,159 | 9,266 |
| Gain (loss) on lease terminations | — | (5,458) | — | (5,458) |
| Interest expense | (1,588) | (945) | (3,121) | (1,816) |
| **Income (loss) before income taxes** | (15,722) | (20,458) | (1,522) | (19,803) |
| Income tax benefit (expense) | (1,073) | (580) | 686 | (509) |
| **Income (loss) from continuing operations** | (16,795) | (21,038) | (836) | (20,312) |
| Discontinued operations: | | | | |
| Income (loss) before income taxes | — | 321 | — | 750 |
| Income tax benefit (expense) | — | (14) | — | (14) |
| **Total discontinued operations** | — | 307 | — | 736 |
| **Net income (loss)** | (16,795) | (20,731) | (836) | (19,576) |
| Noncontrolling interests' share in (earnings) loss | 46 | 82 | 109 | 157 |
| **Net income (loss) attributable to common shares** | $ (16,749) | $ (20,649) | $ (727) | $ (19,419) |
| | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | |
| Continuing operations | $ (0.04) | $ (0.05) | $ — | $ (0.05) |
| Discontinued operations | $ — | $ — | $ — | $ — |
| **Weighted average shares outstanding** | | | | |
| Basic | 410,338 | 407,339 | 411,748 | 404,666 |
| Diluted | 410,338 | 407,339 | 411,748 | 404,666 |

**APP 756**

**agilon health, inc.**
**Consolidated Statements of Cash Flows**
**In thousands**
**(unaudited)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | **2023** | **2022** |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (836) | $ (19,576) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 9,704 | 6,415 |
| Stock-based compensation expense | 33,244 | 10,523 |
| Loss (income) from equity method investments | (9,848) | (7,787) |
| Other noncash items | (2,322) | 3,497 |
| Changes in operating assets and liabilities | (111,957) | (76,568) |
| Net cash provided by (used in) operating activities | (82,015) | (83,496) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (7,811) | (8,504) |
| Purchase of intangible assets | (1,837) | (12,168) |
| Investment in loans receivable and other | (8,468) | (4,510) |
| Investments in marketable securities | (65,568) | (285,077) |
| Proceeds from maturities and sales of marketable securities and other | 97,269 | 4,279 |
| Net cash paid in business combination | (44,367) | — |
| Proceeds from sale of business and property, net of cash divested | — | 500 |
| Net cash provided by (used in) investing activities | (30,782) | (305,480) |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | 8,802 | 20,315 |
| Common stock repurchase | (200,000) | — |
| Repayments of long-term debt | (2,500) | (2,500) |
| Net cash provided by (used in) financing activities | (193,698) | 17,815 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (306,495) | (371,161) |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 507,680 | 1,054,820 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 201,185 | $ 683,659 |

**agilon health, inc.**
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*GROSS PROFIT*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Total revenues | $ | 1,149,052 | $ | 670,134 | $ | 2,285,199 | $ | 1,323,579 |
| Medical services expense | | (1,008,734) | | (587,140) | | (1,981,561) | | (1,153,348) |
| Other medical expenses[1] | | (83,125) | | (49,080) | | (169,149) | | (93,853) |
| Gross profit | $ | 57,193 | $ | 33,914 | $ | 134,489 | $ | 76,378 |

(1)    Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended June 30, 2023 and 2022, costs incurred in implementing geographies were $7.7 million and $3.6 million, respectively. For the six months ended June 30, 2023 and 2022, costs incurred in implementing geographies were $10.0 million and $3.7 million, respectively.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Platform support costs | $ | 46,869 | $ | 36,291 | $ | 94,547 | $ | 70,104 |
| Geography entry costs[1] | | 11,306 | | 6,618 | | 20,556 | | 10,422 |
| Severance and related costs | | — | | 256 | | 188 | | 1,958 |
| Stock-based compensation expense | | 19,572 | | 6,553 | | 33,244 | | 10,523 |
| Other[2] | | 3,752 | | 2,206 | | (190) | | (1,249) |
| General and administrative | $ | 81,499 | $ | 51,924 | $ | 148,345 | $ | 91,758 |

(1)    Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets.

(2)    Includes interest income, non-cash accruals for unasserted claims and contingent liabilities, and transaction-related costs..

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

**agilon health, inc.**
**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Gross profit[1] | $ | 57,193 | $ | 33,914 | $ | 134,489 | $ | 76,378 |
| Other operating revenue | | (2,008) | | (950) | | (3,325) | | (1,972) |
| Other medical expenses | | 83,125 | | 49,080 | | 169,149 | | 93,853 |
| Medical margin | $ | 138,310 | $ | 82,044 | $ | 300,313 | $ | 168,259 |

(1)    Gross profit is defined as total revenues less medical services expense and other medical expenses.

*ADJUSTED EBITDA*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Net income (loss)[1] | $ | (16,795) | $ | (20,731) | $ | (836) | $ | (19,576) |
| (Income) loss from discontinued operations, net of income taxes | | — | | (307) | | — | | (736) |
| Interest expense | | 1,588 | | 945 | | 3,121 | | 1,816 |
| Income tax expense (benefit) | | 1,073 | | 580 | | (686) | | 509 |
| Depreciation and amortization | | 5,515 | | 3,042 | | 9,704 | | 6,415 |
| (Gain) loss on lease terminations | | — | | 5,458 | | — | | 5,458 |
| Severance and related costs[2] | | — | | 256 | | 188 | | 1,958 |
| Stock-based compensation expense | | 19,572 | | 6,553 | | 33,244 | | 10,523 |
| EBITDA adjustments related to equity method investments | | 2,757 | | 492 | | 4,724 | | 1,663 |
| Other[3] | | (3,451) | | 1,033 | | (15,340) | | (2,664) |
| Adjusted EBITDA[3] | $ | 10,259 | $ | (2,679) | $ | 34,119 | $ | 5,366 |

(1)    Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended June 30, 2023 and 2022, (i) $7.7 million and $3.6 million, respectively, are included in other medical expenses and (ii) $11.3 million and $6.6 million, respectively, are included in general and administrative expenses. For the six months ended June 30, 2023 and 2022, (i) $10.0 million and $3.7 million, respectively, are included in other medical expenses and (ii) $20.6 million and $10.4 million, respectively, are included in general and administrative expenses.

(2)    For the three and six months ended June 30, 2022, includes taxes and related costs on stock option exercises for departed executives of $0.2 million and $1.4 million.

(3)    Includes interest income, non-cash accruals for unasserted claims and contingent liabilities, and transaction-related costs.

**APP 759**

In addition to providing results that are determined in accordance with GAAP, we present medical margin and Adjusted EBITDA, which are non-GAAP financial measures.

We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to medical margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health

**APP 760**

# EXHIBIT 20

APP 761

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-Q

_____

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended June 30, 2023**
**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number 001-40332**

_____

# agilon health, inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **37-1915147** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**6210 E Hwy 290, Suite 450**
**Austin, TX 78723**
(Address of principal executive offices)
**(562) 256-3800**
(Registrant's telephone number, including area code)
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | AGL | New York Stock Exchange |

_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) YES ☐ NO ☒

At July 31, 2023, there were 405,482,131 shares of the registrant's $0.01 par value common stock outstanding.

Table of Contents

**agilon health, inc.**

**INDEX**

**PART I. FINANCIAL INFORMATION**

| | | |
|---|---|---|
| Item 1. | Financial Statements: | |
| | Condensed Consolidated Balance Sheets as of June 30, 2023 and December 31, 2022 | 3 |
| | Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2023 and 2022 | 4 |
| | Condensed Consolidated Statements of Comprehensive Income (Loss) for the Three and Six Months Ended June 30, 2023 and 2022 | 5 |
| | Condensed Consolidated Statements of Stockholders' Equity (Deficit) for the Three and Six Months Ended June 30, 2023 and 2022 | 6 |
| | Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2023 and 2022 | 8 |
| | Notes to the Condensed Consolidated Financial Statements | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 4. | Controls and Procedures | 37 |

**PART II. OTHER INFORMATION**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 38 |
| Item 1A. | Risk Factors | 38 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 38 |
| Item 6. | Exhibits | 39 |
| Signatures | | 40 |

2

APP 763

Table of Contents

## PART I. FINANCIAL INFORMATION

**Item 1. Financial Statements**
**agilon health, inc.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share data)

| | | June 30, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| | | (unaudited) | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 190,981 | $ | 497,070 |
| Restricted cash and equivalents | | 10,204 | | 10,610 |
| Marketable securities | | 389,046 | | 411,901 |
| Receivables, net | | 1,417,052 | | 497,574 |
| Prepaid expenses and other current assets, net | | 37,560 | | 34,119 |
| Total current assets | | 2,044,843 | | 1,451,274 |
| Property and equipment, net | | 24,407 | | 20,050 |
| Intangible assets, net | | 94,185 | | 67,680 |
| Goodwill | | 62,140 | | 41,540 |
| Other assets, net | | 127,346 | | 116,924 |
| Total assets | $ | 2,352,921 | $ | 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Current liabilities: | | | | |
| Medical claims and related payables | $ | 1,099,533 | $ | 346,727 |
| Accounts payable and accrued expenses | | 257,819 | | 183,364 |
| Current portion of long-term debt | | 5,000 | | 5,000 |
| Total current liabilities | | 1,362,352 | | 535,091 |
| Long-term debt, net of current portion | | 36,017 | | 38,482 |
| Other liabilities | | 75,106 | | 83,286 |
| Total liabilities | | 1,473,475 | | 656,859 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Stockholders' equity (deficit): | | | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 405,427 and 412,385 shares issued and outstanding, respectively | | 4,054 | | 4,124 |
| Additional paid-in capital | | 1,947,438 | | 2,106,886 |
| Accumulated deficit | | (1,064,957) | | (1,064,230) |
| Accumulated other comprehensive income (loss) | | (6,369) | | (5,560) |
| Total agilon health, inc. stockholders' equity (deficit) | | 880,166 | | 1,041,220 |
| Noncontrolling interests | | (720) | | (611) |
| Total stockholders' equity (deficit) | | 879,446 | | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ | 2,352,921 | $ | 1,697,468 |

The condensed consolidated balance sheets include assets and liabilities of consolidated variable interest entities ("VIEs") as agilon health, inc., together with its consolidated subsidiaries and variable interest entities (the "Company"), is the primary beneficiary of these VIEs. The condensed consolidated balance sheets include total assets that can only be used to settle obligations of the Company's consolidated VIEs totaling $1.56 billion and $703.3 million as of June 30, 2023 and December 31, 2022, respectively, and total liabilities of the Company's consolidated VIEs for which creditors do not have recourse to the general credit of the primary beneficiary of $1.30 billion and $462.4 million as of June 30, 2023 and December 31, 2022, respectively. See Note 14 for additional details.

See accompanying Notes to the Condensed Consolidated Financial Statements.

APP 764

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,147,044 | $ 669,184 | $ 2,281,874 | $ 1,321,607 |
| Other operating revenue | 2,008 | 950 | 3,325 | 1,972 |
| Total revenues | 1,149,052 | 670,134 | 2,285,199 | 1,323,579 |
| **Expenses:** | | | | |
| Medical services expense | 1,008,734 | 587,140 | 1,981,561 | 1,153,348 |
| Other medical expenses | 83,125 | 49,080 | 169,149 | 93,853 |
| General and administrative (including noncash stock-based compensation expense of $19,572, $6,553, $33,244 and $10,523, respectively) | 81,499 | 51,924 | 148,345 | 91,758 |
| Depreciation and amortization | 5,515 | 3,042 | 9,704 | 6,415 |
| Total expenses | 1,178,873 | 691,186 | 2,308,759 | 1,345,374 |
| **Income (loss) from operations** | (29,821) | (21,052) | (23,560) | (21,795) |
| **Other income (expense):** | | | | |
| Other income (expense), net | 15,687 | 6,997 | 25,159 | 9,266 |
| Gain (loss) on lease terminations | - | (5,458) | - | (5,458) |
| Interest expense | (1,588) | (945) | (3,121) | (1,816) |
| **Income (loss) before income taxes** | (15,722) | (20,458) | (1,522) | (19,803) |
| Income tax benefit (expense) | (1,073) | (580) | 686 | (509) |
| **Income (loss) from continuing operations** | (16,795) | (21,038) | (836) | (20,312) |
| **Discontinued operations:** | | | | |
| Income (loss) before income taxes | - | 321 | - | 750 |
| Income tax benefit (expense) | - | (14) | - | (14) |
| **Total discontinued operations** | - | 307 | - | 736 |
| **Net income (loss)** | (16,795) | (20,731) | (836) | (19,576) |
| Noncontrolling interests' share in (earnings) loss | 46 | 82 | 109 | 157 |
| **Net income (loss) attributable to common shares** | $ (16,749) | $ (20,649) | $ (727) | $ (19,419) |
| | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | |
| Continuing operations | $ (0.04) | $ (0.05) | $ - | $ (0.05) |
| Discontinued operations | $ - | $ - | $ - | $ - |
| **Weighted average shares outstanding** | | | | |
| Basic | 410,338 | 407,339 | 411,748 | 404,666 |
| Diluted | 410,338 | 407,339 | 411,748 | 404,666 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

4

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
(in thousands)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Net income (loss) | $ (16,795) | $ (20,731) | $ (836) | $ (19,576) |
| Other comprehensive income (loss): | | | | |
| Net unrealized gain (loss) on marketable securities, net of tax | (2,768) | 513 | (872) | 513 |
| Foreign currency translation adjustment | (52) | - | 63 | - |
| Total comprehensive income (loss) | (19,615) | (20,218) | (1,645) | (19,063) |
| Comprehensive (income) loss attributable to noncontrolling interests | 46 | 82 | 109 | 157 |
| Total comprehensive income (loss) attributable to agilon health, inc. | $ (19,569) | $ (20,136) | $ (1,536) | $ (18,906) |

See accompanying Notes to the Condensed Consolidated Financial Statements.

5

**APP 766**

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)
(unaudited)

For the three months ended June 30, 2023:

| | Common Stock Shares | Amount | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| **April 1, 2023** | 414,465 $ | 4,145 $ | 2,130,126 $ | (1,048,208) $ | (3,549) $ | (674) $ | 1,081,840 |
| Net income (loss) | - | - | - | (16,749) | - | (46) | (16,795) |
| Other comprehensive income (loss) | - | - | - | - | (2,820) | - | (2,820) |
| Exercise of stock options | 265 | 2 | 926 | - | - | - | 928 |
| Vesting of restricted stock units | 373 | 4 | (4) | - | - | - | - |
| Shares withheld related to net share settlement | (61) | (1) | (1,714) | - | - | - | (1,715) |
| Common stock repurchase | (9,615) | (96) | (201,468) | - | - | - | (201,564) |
| Stock-based compensation expense | - | - | 19,572 | - | - | - | 19,572 |
| **June 30, 2023** | 405,427 $ | 4,054 $ | 1,947,438 $ | (1,064,957) $ | (6,369) $ | (720) $ | 879,446 |

For the three months ended June 30, 2022:

| | Common Stock Shares | Amount | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| **April 1, 2022** | 405,727 $ | 4,057 $ | 2,064,242 $ | (956,447) $ | - $ | (375) $ | 1,111,477 |
| Net income (loss) | - | - | - | (20,649) | - | (82) | (20,731) |
| Other comprehensive income (loss) | - | - | - | - | 513 | - | 513 |
| Exercise of stock options | 2,370 | 24 | 6,293 | - | - | - | 6,317 |
| Vesting of restricted stock units | 140 | 1 | (1) | - | - | - | - |
| Shares withheld related to net share settlement | (33) | - | (758) | - | - | - | (758) |
| Stock-based compensation expense | - | - | 6,553 | - | - | - | 6,553 |
| **June 30, 2022** | 408,204 $ | 4,082 $ | 2,076,329 $ | (977,096) $ | 513 $ | (457) $ | 1,103,371 |

6

**APP 767**

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)
(unaudited)

For the six months ended June 30, 2023:

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **January 1, 2023** | 412,385 | $ 4,124 | $ 2,106,886 | $ (1,064,230) | $ (5,560) | $ (611) | $ 1,040,609 |
| Net income (loss) | - | - | - | (727) | - | (109) | (836) |
| Other comprehensive income (loss) | - | - | - | - | (809) | - | (809) |
| Exercise of stock options | 2,267 | 22 | 10,523 | - | - | - | 10,545 |
| Vesting of restricted stock units | 452 | 5 | (5) | - | - | - | - |
| Shares withheld related to net share settlement | (62) | (1) | (1,742) | - | - | - | (1,743) |
| Common stock repurchase | (9,615) | (96) | (201,468) | - | - | - | (201,564) |
| Stock-based compensation expense | - | - | 33,244 | - | - | - | 33,244 |
| **June 30, 2023** | 405,427 | $ 4,054 | $ 1,947,438 | $ (1,064,957) | $ (6,369) | $ (720) | $ 879,446 |

For the six months ended June 30, 2022:

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interests | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **January 1, 2022** | 400,095 | $ 4,001 | $ 2,045,572 | $ (957,677) | $ - | $ (300) | $ 1,091,596 |
| Net income (loss) | - | - | - | (19,419) | - | (157) | (19,576) |
| Other comprehensive income (loss) | - | - | - | - | 513 | - | 513 |
| Exercise of stock options | 8,002 | 80 | 20,993 | - | | - | 21,073 |
| Vesting of restricted stock units | 140 | 1 | (1) | - | - | - | - |
| Shares withheld related to net share settlement | (33) | - | (758) | - | - | - | (758) |
| Stock-based compensation expense | - | - | 10,523 | - | - | - | 10,523 |
| **June 30, 2022** | 408,204 | $ 4,082 | $ 2,076,329 | $ (977,096) | $ 513 | $ (457) | $ 1,103,371 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

7

APP 768

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)
(unaudited)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (836) | $ (19,576) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 9,704 | 6,415 |
| Stock-based compensation expense | 33,244 | 10,523 |
| Loss (income) from equity method investments | (9,848) | (7,787) |
| Other noncash items | (2,322) | 3,497 |
| Changes in operating assets and liabilities | (111,957) | (76,568) |
| Net cash provided by (used in) operating activities | (82,015) | (83,496) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (7,811) | (8,504) |
| Purchase of intangible assets | (1,837) | (12,168) |
| Investment in loans receivable and other | (8,468) | (4,510) |
| Investments in marketable securities | (65,568) | (285,077) |
| Proceeds from maturities and sales of marketable securities and other | 97,269 | 4,279 |
| Net cash paid in business combination | (44,367) | - |
| Proceeds from sale of business and property, net of cash divested | - | 500 |
| Net cash provided by (used in) investing activities | (30,782) | (305,480) |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | 8,802 | 20,315 |
| Common stock repurchase | (200,000) | - |
| Repayments of long-term debt | (2,500) | (2,500) |
| Net cash provided by (used in) financing activities | (193,698) | 17,815 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (306,495) | (371,161) |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 507,680 | 1,054,820 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 201,185 | $ 683,659 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

8

**APP 769**

Table of Contents

**agilon health, inc.**
**NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(Unaudited)

## NOTE 1. Business

*Description of Business*

agilon health, inc., through its partnerships and platform, provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. As of June 30, 2023, the Company, through its contracted physician networks, provided care to approximately 408,900 Medicare Advantage members enrolled with private health plans. Beginning January 1, 2023, the Company expanded its operations into: (i) Portland, Maine, (ii) St. Paul, Minnesota, (iii) Detroit, Michigan, (iv) Charleston, South Carolina; (v) Statesville, North Carolina; and (vi) Jackson, Tennessee, along with additional partnerships in the Company's existing Texas markets.

See Note 14 for additional discussions related to the Company's involvement with VIEs.

The Company's largest shareholder is an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm. All funds affiliated with CD&R are considered related parties.

## NOTE 2. Summary of Significant Accounting Policies

**Basis of Presentation**

The accompanying condensed consolidated financial statements have been prepared by management in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The condensed consolidated financial statements include the accounts of agilon health, inc., its wholly-owned subsidiaries, and both joint ventures and VIEs that it controls through voting rights or other means. Intercompany transactions and balances have been eliminated upon consolidation. All adjustments (consisting of normal recurring adjustments unless otherwise indicated), which the Company considers necessary to present fairly its financial position, results of operations, and cash flows, have been included. Operating results for the three and six months ended June 30, 2023 are not necessarily indicative of the results that may be expected for the year ending December 31, 2023. The accompanying condensed consolidated financial information should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2022 included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission.

**Use of Estimates**

Management is required to make estimates and assumptions in the preparation of financial statements. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates can include, among other things, those used to determine revenues and related receivables from risk adjustments, medical services expense and related payables (including the reserve for incurred but not reported ("IBNR") claims), and valuation of long-lived assets, goodwill and intangible assets (acquired in business combinations and analysis of impairment). Management's estimates for revenue recognition, medical services expense, and other estimates, judgments, and assumptions, may be materially and adversely different from actual results. These estimates are based on knowledge of current events and anticipated future events, and accordingly, actual results may ultimately differ materially from those estimates.

**Property and Equipment**

As of June 30, 2023 and December 31, 2022, the Company's gross carrying amount of property and equipment was $35.3 million and $29.5 million, with accumulated depreciation of $10.9 million and $9.4 million, respectively. For the three months ended June 30, 2023 and 2022, the Company recognized $1.8 million and $0.6 million, respectively, in depreciation expense, which is included in depreciation and amortization expense in the condensed consolidated statements of operations. For the six months ended June 30, 2023 and 2022, the Company recognized $3.5 million and $1.3 million, respectively, in depreciation expense, which is included in depreciation and amortization expense in the condensed consolidated statements of operations.

9

Table of Contents

**Income Taxes**

The Company determined the income tax provision for interim periods using an estimate of the Company's annual effective tax rate, applied to year-to-date results, adjusted for discrete items arising in that quarter. In each quarter, the Company updates its estimated annual effective tax rate, and if the estimated annual effective tax rate changes, a cumulative catch-up adjustment is recorded in that quarter. The Company applied the intra-period tax allocation rules to allocate income taxes between continuing operations and discontinued operations as prescribed in U.S. GAAP, where the tax effect of income (loss) before income taxes from continuing operations is computed without regard to the tax effects of income (loss) before income taxes from the other categories.

**NOTE 3. Revenue, Receivables, and Concentration of Credit Risk**

*Medical Services Revenue*

Medical services revenue consists of capitation fees under contracts with various Medicare Advantage payors ("payors"). Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members ("members") attributed to the Company's contracted primary care physicians. PMPM fees are determined as a percent of the premium payors receive from the Centers for Medicare & Medicaid Services' ("CMS") for these members. The Company generally accepts full financial risk for members attributed to its contracted primary care physicians and therefore is responsible for the cost of all healthcare services required by those members. Fees are generally recorded gross in revenue because the Company is acting as a principal in coordinating and controlling the range of services provided (other than clinical decisions) under its capitation contracts with payors. Capitation contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by Accounting Standards Codification ("ASC") 606, *Revenue From Contracts With Customers* ("ASC 606"), to stand ready on a monthly basis to provide all aspects of necessary medical care to members for the contracted period. The Company recognizes revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for the Company's capitation contracts is variable, as the PMPM fees to which the Company is entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. The Company and healthcare providers collect and submit the necessary and available diagnosis data to payors and such data is utilized by the Company to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in the Company's contracts with payors. The Company recognizes incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

*Receivables*

Receivables primarily consist of amounts due under capitation contracts with various payors. Receivables due under capitation contracts are recorded monthly based on reports received from payors and management's estimate of risk adjustment payments to be received in subsequent periods for open performance years. Receivables are recorded at the amount expected to be realized.

*Concentration*

The Company contracts with various payors whereby the Company is entitled to monthly PMPM fees to provide a defined range of healthcare services for members attributed to its contracted primary care physicians. The Company generally accepts full financial risk for such members and therefore is responsible for the cost of all healthcare services required by them. Substantially all of the Company's receivable balances are from a small number of payors. Revenue from Medicare Advantage payors constitutes substantially all of the Company's total revenue for the three and six months ended June 30, 2023 and 2022.

10

Table of Contents

The following table provides the Company's revenue concentration with respect to major payors as a percentage of the Company's total revenues:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Payor A | 25 % | 24 % | 24 % | 25 % |
| Payor B | 14 % | 19 % | 15 % | 19 % |
| Payor C | 16 % | 13 % | 16 % | 14 % |
| Payor D | * | 11 % | * | 10 % |

_____

\*     Less than 10% of total revenues.

The following table provides the Company's concentration of credit risk with respect to major payors as a percentage of receivables, net:

| | June 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| Payor A | 14 % | 13 % |
| Payor B | 14 % | 20 % |
| Payor C | 15 % | 10 % |
| Payor D | * | 10 % |
| Payor E | * | 11 % |
| Payor F | 17 % | * |

_____

\*     Less than 10% of total receivables.

## NOTE 4. Marketable Securities and Fair Value Measurements

*Marketable Securities*

The following table summarizes the Company's marketable securities (in thousands):

| | June 30, 2023 | | | | December 31, 2022 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| **Marketable securities:** | | | | | | | | |
| Corporate debt securities | $ 234,436 | $ 15 | $ (3,642) | $ 230,809 | $ 255,613 | $ 60 | $ (3,240) | $ 252,433 |
| U.S. Treasury notes | 151,042 | - | (2,798) | 148,244 | 151,873 | - | (2,306) | 149,567 |
| Other | 10,000 | - | (7) | 9,993 | 9,975 | - | (74) | 9,901 |
| | $ 395,478 | $ 15 | $ (6,447) | $ 389,046 | $ 417,461 | $ 60 | $ (5,620) | $ 411,901 |

At June 30, 2023 and December 31, 2022, marketable securities of $384.6 million and $407.4 million, respectively, were in an unrealized loss position for less than twelve months. The Company's unrealized losses from marketable securities as of June 30, 2023 and December 31, 2022 were caused primarily by interest rate increases. The Company does not intend to sell marketable securities that are in an unrealized loss position, and it is not more likely than not that the Company will be required to sell the investments before recovery of their amortized cost bases, which may be at maturity. Therefore, the Company believes these losses to be temporary. There was no allowance for credit losses on available-for-sale marketable securities at June 30, 2023 and December 31, 2022.

11

Table of Contents

The following table summarizes the Company's marketable securities maturity as of June 30, 2023 (in thousands):

| Year | Amortized Cost | Fair Value |
|---|---|---|
| 2023 | $ 63,765 | $ 63,474 |
| 2024 | 137,470 | 135,271 |
| 2025 | 170,573 | 166,946 |
| 2026 | 23,670 | 23,355 |
| | $ 395,478 | $ 389,046 |

*Fair Value Measurements*

The Company's financial instruments consist of cash and cash equivalents, restricted cash and cash equivalents, marketable securities, receivables, other liabilities, accounts payable, certain accrued expenses, and borrowings which consist of a term loan and a revolving credit facility. The carrying values of the financial instruments classified as current in the consolidated balance sheets approximate their fair values due to their short-term maturities. The Company's cash and cash equivalents are classified within Level 1 of the fair value hierarchy. The Company may be required, from time to time, to measure its loans to physician partner groups, primarily in connection with taxes payable on shares distributed to them upon completion of the initial public offering ("IPO"), at fair value on a nonrecurring basis. Such measurements are classified within Level 2 of the fair value hierarchy. The carrying values of the term loan and revolving credit facility are a reasonable estimate of fair value because the interest rates on such borrowings approximate market rates as of the reporting date. Such borrowings are classified within Level 2 of the fair value hierarchy. During the three and six months ended June 30, 2023 and 2022, there were no material transfers of financial assets or liabilities within the fair value hierarchy.

The Company measures and discloses the fair value of nonfinancial and financial assets and liabilities utilizing a hierarchy of valuation techniques based on whether the inputs to a fair value measurement are considered to be observable or unobservable in a marketplace. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect the Company's market assumptions. This hierarchy requires the use of observable market data when available. These inputs have created the following fair value hierarchy:

- Level 1-quoted prices for identical instruments in active markets;

- Level 2-quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which significant inputs and significant value drivers are observable in active markets; and

- Level 3-fair value measurements derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable.

The table below summarizes the Company's financial instruments measured at fair value on a recurring basis (in thousands):

| | June 30, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Level 1 | Level 2 | Level 3 |
| **Marketable securities:** | | | | | | |
| Corporate debt securities | $ - | $ 230,809 | $ - | $ - | $ 252,433 | $ - |
| U.S. Treasury notes | 148,244 | - | - | 149,567 | - | - |
| Other | 9,993 | - | - | 9,901 | - | - |
| | $ 158,237 | $ 230,809 | $ - | $ 159,468 | $ 252,433 | $ - |

12

Table of Contents

**NOTE 5. Other Assets, net**

The following table summarizes the Company's other assets, net (in thousands):

| | June 30, 2023 | | December 31, 2022 |
|---|---|---|---|
| Loans to physician partners | $ | 71,079 | $ | 69,383 |
| Health plan deposits | | 12,051 | | 11,728 |
| Equity method investments[1] | | 26,709 | | 17,352 |
| Right-of-use lease assets | | 13,087 | | 13,029 |
| Other | | 4,420 | | 5,432 |
| | $ | 127,346 | $ | 116,924 |

_____
(1)    See Note 14 for additional discussion related to the Company's equity method investments.

*Loans to Physician Partners*

Loans to physician partners primarily represent loans in connection with taxes payable on shares distributed to them in connection with the IPO. These loans mature between 2026 and 2031 with nominal interest compounding annually and no prepayment penalties. Such loans are stated at the amount expected to be collected.

**NOTE 6. Medical Claims and Related Payables**

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which the Company is financially responsible and that are paid either directly by the Company or by payors with whom the Company has contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported.

Such estimates are developed using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions including medical service utilization trends, changes in membership, observed medical cost trends, historical claim payment patterns and other factors. Generally, for the most recent months, the Company estimates claim costs incurred by applying observed medical cost trend factors to the average PMPM medical costs incurred in prior months for which more complete claims data are available.

Each period, the Company re-examines previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances. As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates in the period in which the change is identified. The difference between the estimated liability and the actual settlements of claims is recognized in the period the claims are settled. The Company's medical claims payable balance represents management's best estimate of its liability for unpaid medical costs as of June 30, 2023 and 2022. The Company uses judgment to determine the appropriate assumptions for developing the required estimates.

13

Table of Contents

The following table presents the components of changes in medical claims and related payables (in thousands):

| | June 30, | |
| | 2023 | 2022 |
|---|---|---|
| **Medical claims and related payables, beginning of the year** | $ 339,748 | $ 239,014 |
| Components of incurred costs related to: | | |
|    Current year | 1,937,219 | 1,140,375 |
|    Prior years | 44,342 | 12,973 |
|    Discontinued operations - prior years | - | (229) |
| | 1,981,561 | 1,153,119 |
| Claims paid related to: | | |
|    Current year | (882,649) | (706,478) |
|    Prior years | (351,700) | (227,777) |
|    Discontinued operations - prior years | - | 160 |
| | (1,234,349) | (934,095) |
| **Medical claims and related payables, end of the period** | $ 1,086,960 | $ 458,038 |

Medical claims and related payables also include $12.6 million and $7.0 million, as of June 30, 2023 and December 31, 2022, respectively, that is recoverable from other parties under risk sharing arrangements and is presented as prepaid expenses and other current assets, net in the condensed consolidated balance sheets. Medical claims and related payables presented in the periods above include immaterial balances related to claims liabilities associated with certain divested California businesses for which the Company has retained the liability for claims incurred prior to the date of divestiture.

## NOTE 7. Other Liabilities

The following table summarizes the Company's other liabilities (in thousands):

| | June 30, 2023 | December 31, 2022 |
|---|---|---|
| Other long-term contingencies | $ 52,723 | $ 62,931 |
| Lease liabilities, long-term | 9,950 | 9,885 |
| Equity method liabilities - ACO REACH | 2,198 | 4,657 |
| Other | 10,235 | 5,813 |
| | $ 75,106 | $ 83,286 |

As of June 30, 2023 and December 31, 2022, the Company's accruals for contingent liabilities related to unasserted claims were $52.7 million and $62.9 million, respectively. The accrued amounts represent the Company's estimate of probable losses in accordance with ASC Topic 450, *Contingencies*. The Company's estimate of the range of reasonably possible losses in excess of such accruals was $0 to $63.5 million as of June 30, 2023.

See Note 14 for equity method liabilities related to the Company's ACO REACH investments.

## NOTE 8. Debt

On February 18, 2021, the Company executed a credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021 and the Second Amendment to Credit Agreement, dated as of May 25, 2023, the "Credit Facilities"). The Credit Facilities include: (i) a $100.0 million secured term loan (the "Secured Term Loan Facility") and (ii) a $100.0 million senior secured revolving credit facility (the "Secured Revolving Facility") with a capacity to issue standby letters of credit in certain circumstances up to a maximum of $100.0 million. Subject to specified conditions and receipt of commitments, the Secured Term Loan Facility may be expanded (or a new term loan facility, revolving credit facility or letter of credit facility added) by up to (i) $50.0 million plus (ii) an additional amount

14

**APP 775**

Table of Contents

determined in accordance with a formula tied to repayment of certain of the Company's indebtedness. The maturity date of the Credit Facilities is February 18, 2026.

As of June 30, 2023, the Company had $41.3 million outstanding under the Secured Term Loan Facility and availability under the Secured Revolving Facility was $39.4 million, as the Company had outstanding letters of credit totaling $60.6 million, of which $37.2 million was for the Company's ACO REACH investments. The standby letters of credit are automatically extended without amendment for one-year periods, unless the Company notifies the institution in advance of the expiration date that the letter will be terminated. No amounts have been drawn on the outstanding letters of credit as of June 30, 2023.

Effective with the Second Amendment to Credit Agreement on May 25, 2023, the Company transitioned to the Secured Overnight Financing Rate ("SOFR") as a benchmark interest rate used in the Credit Agreement. At the Company's option, borrowings under the agreement can be either: (i) SOFR Rate Loans, (ii) Daily Simple SOFR Rate Loans, or (iii) Base Rate Loans. Daily Simple SOFR Rate Loans and SOFR Rate Loans bear interest at a rate equal to the sum of 4.00% (stepping down to 3.50% on and following October 1, 2023) and the higher of (a) SOFR, as defined in the credit agreement, and (b) 0%. Base Rate Loans bear interest at a rate equal to the sum of 3.00% (stepping down to 2.50% on and following October 1, 2023) and the highest of: (a) 0.50% in excess of the overnight federal funds rate, (b) the prime rate established by the administrative agent from time to time, (c) the one-month LIBO rate (adjusted for maximum reserves) plus 1.00% and (d) 0%. Additionally, the Company pays a commitment fee on the unfunded 2021 Revolving Credit Facility amount of 0.50% (stepping down to 0.375% on and following October 1, 2023). The Company must also pay customary letter of credit fees. As of June 30, 2023, the effective interest rate on the Secured Term Loan Facility was 9.645%.

The Credit Facilities are guaranteed by certain of the Company's subsidiaries, including those identified as VIEs, and contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios. Failure to meet any of these covenants could result in an event of default under the agreement. If an event of default occurs, the lenders could elect to declare all amounts outstanding under the agreement to be immediately due and payable. As of June 30, 2023, the Company was in compliance with all covenants under the Credit Facilities.

## NOTE 9. Commitments and Contingencies

*Legal Proceedings*

From time to time, the Company is a party to, or has a significant relationship to, legal proceedings, lawsuits, and other claims. The Company is not aware of any legal proceedings or claims that it believes may have, individually or taken together, a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's policy is to expense legal costs as they are incurred.

## NOTE 10. Common Stock

*Common Stock*

*2023*. During the three months ended June 30, 2023, the Company issued approximately 0.6 million shares of common stock primarily in connection with exercises and vesting of stock-based awards. During the six months ended June 30, 2023, the Company issued approximately 2.7 million shares of common stock primarily in connection with exercises and vesting of stock-based awards.

On May 18, 2023, the Company repurchased and retired 9.6 million shares of common stock pursuant to an underwritten secondary public offering of 94.6 million shares of its common stock by CD&R. The Company paid approximately $20.80 per share, which is the same per share price paid by the underwriters to CD&R in the offering.

*2022*. During the three months ended June 30, 2022, the Company issued approximately 2.5 million shares of common stock primarily in connection with exercises and vesting of stock-based awards. During the six months ended June 30, 2022, the Company issued approximately 8.1 million shares of common stock primarily in connection with exercises and vesting of stock-based awards.

15

**APP 776**

Table of Contents

**NOTE 11. Net Income (Loss) Per Common Share**

Basic net income (loss) per common share ("EPS") is computed based upon the weighted average number of common shares outstanding. Diluted net income (loss) per common share is computed based upon the weighted average number of common shares outstanding plus the impact of common shares issuable from the assumed conversion of stock options, certain performance restricted stock units, and unvested restricted stock units. Only those instruments having a dilutive impact on basic net income (loss) per share are included in diluted net income (loss) per share during the periods presented.

The following table illustrates the computation of basic and diluted EPS (in thousands, except per share amounts):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Numerator** | | | | |
| Income (loss) from continuing operations | $ (16,795) | $ (21,038) | $ (836) | $ (20,312) |
| Noncontrolling interests' share in (earnings) loss from continuing operations | 46 | 82 | 109 | 157 |
| Net income (loss) attributable to common stockholders before discontinued operations | (16,749) | (20,956) | (727) | (20,155) |
| Income (loss) from discontinued operations | - | 307 | - | 736 |
| Net income (loss) attributable to common stockholders | $ (16,749) | $ (20,649) | $ (727) | $ (19,419) |
| **Denominator** | | | | |
| Weighted average shares outstanding - basic | 410,338 | 407,339 | 411,748 | 404,666 |
| Weighted average shares outstanding - diluted | 410,338 | 407,339 | 411,748 | 404,666 |
| **Net income (loss) per share attributable to common stockholders** | | | | |
| Net income (loss) per common share from continuing operations, basic and diluted | $ (0.04) | $ (0.05) | $ - | $ (0.05) |
| Net income (loss) per common share from discontinued operations, basic and diluted | $ - | $ - | $ - | $ - |

The following table provides the weighted-average potential shares of common stock that were excluded from the calculation of diluted net income (loss) per share attributable to common stockholders because their effect would have been anti-dilutive (in thousands):

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Stock options | 17,865 | 23,903 |
| Restricted stock units | 9,021 | 1,260 |

**NOTE 12. Goodwill and Amortizable Intangible Assets**

As of June 30, 2023 and December 31, 2022, the Company's goodwill balance was $62.1 million and $41.5 million, respectively, of which $39.0 million was allocated to the Company's Hawaii reporting unit. The carrying value of the Hawaii reporting unit was positive as of June 30, 2023 and negative as of December 31, 2022. There were no events or circumstances that warranted an interim impairment test for goodwill during the three and six months ended June 30, 2023.

As of June 30, 2023 and December 31, 2022, the Company's gross carrying amount of amortizable intangible assets was $163.5 million and $130.8 million, with accumulated amortization of $69.3 million and $63.1 million, respectively. For the three months ended June 30, 2023 and 2022, the Company recognized $3.7 million and $2.4 million, respectively, in amortization expense, which is included in depreciation and amortization expense in the condensed

16

**APP 777**

Table of Contents

consolidated statements of operations. For the six months ended June 30, 2023 and 2022, the Company recognized $6.2 million and $5.1 million, respectively, in amortization expense, which is included in depreciation and amortization expense in the condensed consolidated statements of operations.

*Acquisition*

On February 28, 2023, the Company completed the acquisition of My Personal Health Record Express, Inc. (the "Acquisition"), a leading provider of value-based care technology and interoperability solutions for cash consideration of $44.4 million, net of cash acquired and subject to certain post-closing adjustments. The Company accounted for the Acquisition utilizing the acquisition method of accounting, which requires assets and liabilities to be recognized based on estimates of their acquisition date fair values. The determination of the values of the acquired assets and assumed liabilities, including other intangible assets and deferred taxes, requires significant judgment. While the Company uses its best estimates and assumptions to accurately value assets acquired and liabilities assumed at the acquisition date, the Company estimates are inherently uncertain and subject to refinement. As a result, during the measurement period, which may be up to one year from the acquisition date, the Company may record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. Measurement period adjustments are recorded in the period in which they are determined, as if they had been completed at the acquisition date. Upon the conclusion of the final determination of the values of assets acquired or liabilities assumed, or one year after the date of acquisition, whichever comes first, any subsequent adjustments are recorded within the Company's consolidated results of operations. The following preliminary allocation of the purchase price related to the Acquisition based upon the fair value of assets and liabilities assumed included developed technology intangible assets of $25.6 million, customer relationship intangible assets of $1.9 million, and assumed net liabilities of $3.7 million, with the residual amount being recorded as goodwill of $20.6 million. The intangible assets acquired have a weighted-average life of 10 years.

## NOTE 13. Supplemental Cash Flow Information

The following table provides supplemental cash flow information (in thousands):

| | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2023 | | 2022 | |
| *Supplemental cash flow information:* | | | | |
| Interest paid | $ | 3,174 | $ | 1,950 |
| Income taxes paid | | 1,653 | | 566 |
| *Supplemental disclosure of non-cash investing and financing activities:* | | | | |
| Right-of-use asset obtained in exchange for new operating lease liability | | 435 | | 7,288 |
| Non-cash investment in unconsolidated subsidiaries | | - | | 190 |

The following table summarizes cash, cash equivalents and restricted cash equivalents from continuing operations (in thousands):

| | June 30, 2023 | | December 31, 2022 | |
| --- | --- | --- | --- | --- |
| Cash and cash equivalents | $ | 190,981 | $ | 497,070 |
| Restricted cash and equivalents[1] | | 10,204 | | 10,610 |
| Cash, cash equivalents and restricted cash equivalents | $ | 201,185 | $ | 507,680 |

_____
(1)      Restricted cash and equivalents primarily consist of amounts used as collateral to secure letters of credit that the Company is required to maintain pursuant to contracts with payors.

17

**APP 778**

Table of Contents

**NOTE 14. Variable Interest Entities**

*Consolidated Variable Interest Entities*

agilon health, inc.'s consolidated assets and liabilities as of June 30, 2023 and December 31, 2022 include certain assets of VIEs that can only be used to settle the liabilities of the related VIE. The VIE creditors do not have recourse to agilon health, inc.

agilon health, inc.'s consolidated assets and liabilities include VIE assets and liabilities as follows (in thousands):

| | June 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 96,190 | $ 155,819 |
| Restricted cash equivalents | 10,202 | 10,610 |
| Receivables, net | 1,397,387 | 492,077 |
| Prepaid expenses and other current assets, net | 21,289 | 15,515 |
| Property and equipment, net | 1,635 | 1,567 |
| Intangible assets, net | 19,545 | 17,347 |
| Other assets, net | 10,204 | 10,371 |
| **Liabilities** | | |
| Medical claims and related payables | 1,057,738 | 300,798 |
| Accounts payable and accrued expenses | 233,645 | 159,526 |
| Other liabilities | 4,147 | 2,059 |

*Risk-bearing Entities.* At June 30, 2023, the Company operates 29 wholly-owned risk-bearing entities ("RBEs") for the purpose of entering into risk-bearing contracts with payors. Each RBE's equity at risk is considered insufficient to finance its activities without additional support, and, therefore, each RBE is considered a VIE. The Company consolidates the RBEs as it has determined that it is the primary beneficiary because it has: (i) the ability to control the activities that most significantly impact the RBEs' economic performance; and (ii) the obligation to absorb losses or right to receive benefits that could potentially be significant to the RBEs. Specifically, the Company has the unilateral ability and authority, through the RBE governance and management agreements, to make significant decisions about strategic and operating activities of the RBEs, including negotiating and entering into risk-bearing contracts with payors, and approving the RBEs' annual operating budgets. The Company also has the obligation to fund losses of the RBEs and the right to receive a significant percentage of any financial surplus generated by the RBEs. The assets of the RBEs primarily consist of cash and cash equivalents, receivables, net, intangible assets, net, and other assets, net; its obligations primarily consist of medical claims and related payables as well as operating expenses of the RBEs (accounts payable and accrued expenses), including incentive compensation obligations to the Company's physician partners. On February 18, 2021, the Company executed the Credit Facilities, which are guaranteed by certain of the Company's VIEs. Assets generated by the RBEs (primarily from medical services revenues) may be used, in certain limited circumstances, to settle the Company's contractual debt obligations.

*Unconsolidated Variable Interest Entities*

As of June 30, 2023, the Company had nine equity method investments (liabilities) that were deemed to be VIEs. The Company has determined that the activities that most significantly impact the performance of these VIEs consist of the allocation of resources to and other decisions related to clinical activities and provider contracting decisions. Because the Company does not have the ability to control these activities due to another party's control of the VIEs' board of directors, the Company has determined that it is not the primary beneficiary of and therefore does not consolidate these VIEs. The Company's maximum loss exposure as a result of the Company's involvement with the VIEs cannot be quantified as the Company has the obligation to provide ongoing operational support to the unconsolidated VIEs, as needed.

18

**APP 779**

Table of Contents

*Equity Method Investments*

The following table summarizes the Company's equity method investments (in thousands):

| | June 30, 2023 | December 31, 2022 |
|---|---|---|
| Equity method investments - Other[1] | $ 9,083 | $ 8,329 |
| Equity method investments - ACO REACH[1] | 17,626 | 9,023 |
| Equity method liabilities - ACO REACH[2] | (2,198) | (4,657) |

_____

(1)  Included in Other assets, net in the condensed consolidated balance sheets.
(2)  Included in Other liabilities in the condensed consolidated balance sheets.

The Company is a partner in eight wholly-owned ACO REACH entities in collaboration with 12 of its physician group partners operating in 10 geographies. The combined summarized operating results of the Company's ACO REACH entities are as follows (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Medical services revenue | $ 280,820 | $ 277,050 | $ 561,349 | $ 544,763 |
| Medical services expense | (241,844) | (255,663) | (499,321) | (504,014) |
| Other medical expenses[1] | (23,424) | (12,160) | (39,168) | (24,804) |
| Income (loss) from operations | 11,184 | 6,185 | 13,185 | 9,368 |
| Net income (loss)[2] | 8,426 | 5,694 | 9,760 | 7,706 |

_____

(1)  For the three months ended June 30, 2023 and 2022, includes physician incentive expenses of $16.6 million and $5.9 million, respectively. For the six months ended June 30, 2023 and 2022, includes physician incentive expenses of $26.3 million and $12.1 million, respectively.
(2)  Included in Other income (expense) in the condensed consolidated statements of operations.

The combined summarized balance sheet of the Company's ACO REACH entities are as follows (in thousands):

| | June 30, 2023 | December 31, 2022 |
|---|---|---|
| Current assets | $ 92,929 | $ 70,625 |
| Noncurrent assets | 130 | - |
| Total assets | 93,059 | 70,625 |
| Current and total liabilities | 78,584 | 67,343 |

19

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*All references in this report to "agilon," "the Company", "we," "us" or "our" mean agilon health, inc., together with its consolidated subsidiaries. Unless the context suggests otherwise, references to "agilon health, inc." mean the parent company without its subsidiaries.*

**Cautionary Language Regarding Forward-Looking Statements**

Statements in this Quarterly Report on Form 10-Q (the "Report") that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this Report and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results of operations, financial condition, and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under Part I, Item 1A. "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. As explained in greater detail under Item 9A. "Controls and Procedures" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, we are undertaking a broad range of remedial procedures to address the material weaknesses in our internal control over financial reporting identified as of December 31, 2022. Our efforts to improve our internal controls are ongoing. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Report. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and health plan payors, and to execute upon our growth initiatives and achieve required operational scale;
- our ability to execute our operating strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with Medicare Advantage ("MA") payors and to ensure such contracts are on financial terms sufficient to meet our financial targets;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to our "Total Care Model";
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;

20

Table of Contents

- the spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics, and the inability to predict the ultimate impact of pandemics on us;

- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings under payor contracts;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities (each, an "RBE") within certain geographies in the future;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;

- our ability to retain our management team and key employees or attract qualified personnel in the future;

- our ability to realize the full value of our intangible assets and any negative impact from impairment charges we may record;

- security breaches, loss of data and other disruptions to our data platforms could adversely impact us;

- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;

- our responsibility for certain liabilities in connection with the disposition of our California operations;

- our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses;

- our dependence on a limited number of key health plan payors;

- our contracts with our payors are for limited terms and may not be renewed upon their expiration;

- our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment;

- our dependence on physician partners and other providers to effectively manage the quality and cost of care, and perform obligations under payor contracts;

- difficulties in obtaining accurate and complete diagnosis data;

- our dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate or incorrect;

- we rely on third party software and data to operate our business and restrictions on the use of third-party resources could adversely affect us;

- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;

- consolidation in our industry could adversely impact us;

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;

- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, including as a result of an inability or failure by the U.S. federal government to fund Medicare;

- our ability to compete in our industry;

- the impact of government performance standards and benchmarks on our compensation and reputation;

- statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements;

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;

21

APP 782

Table of Contents

- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;

- regulatory inquiries and corrective action plans imposed by our health plan payors;

- repayment obligations arising out of payor audits;

- the impact on our revenue of Centers for Medicare & Medicaid Services' ("CMS") modifying the methodology used to determine the revenue associated with MA members;

- negative publicity regarding the managed healthcare industry;

- the extensive regulation of the healthcare industry at the federal, state, and local levels;

- if our physician alignment strategies with our physician partners, including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements, are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties;

- our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and the use of protected health information;

- our physician partners are subject to federal and state healthcare fraud and abuse regulations;

- our use, disclosure and processing of personally identifiable information, personal health information, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could adversely impact us;

- our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could adversely impact us;

- laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could adversely impact us;

- if we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions;

- we may face litigation not covered by insurance;

- our indebtedness and the potential that we may incur additional substantial indebtedness;

- the agreements and instruments governing our indebtedness contain restrictions and limitations that could adversely impact us;

- agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses;

- under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities;

- anti-takeover provisions in our certificate of incorporation and by-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock;

- we do not intend to pay dividends on our common stock for the foreseeable future and, consequently, a shareholder's return on investment depends on appreciation in the price of our common stock;

- our certificate of incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders;

- we identified material weaknesses in our internal control over financial reporting and, if our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us; and

22

**APP 783**

Table of Contents

- risks related to other factors discussed under "Risk Factors" in Annual Report on Form 10-K for the fiscal year ended December 31, 2022.

Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

The information set forth in this Item 2 is intended to provide readers with an understanding of our financial condition, changes in financial condition, and results of operations. We will discuss and provide our analysis in the following order:

- Overview and Recent Developments
- Key Financial and Operating Metrics
- Key Components of Our Results of Operations
- Results of Operations
- Non-GAAP Financial Measures
- Liquidity and Capital Resources
- Critical Accounting Policies and Estimates
- Recent Accounting Pronouncements

**Overview and Recent Developments**

Our business is transforming healthcare by empowering the primary care physicians ("PCPs") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost, and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

***Second Quarter 2023 Results:***

- Medicare Advantage members of approximately 408,900 as of June 30, 2023 increased 57% from June 30, 2022.
- ACO REACH attributed beneficiaries of approximately 87,000 as of June 30, 2023 decreased 4% from June 30, 2022.
- Total revenue of $1.15 billion increased 71% from the second quarter of 2022.
- Gross profit of $57 million, compared to $34 million in the second quarter of 2022.
- Medical margin of $138 million, compared to $82 million in the second quarter of 2022.
- Net loss of $17 million, compared to $21 million in the second quarter of 2022.
- Adjusted EBITDA of $10 million in the second quarter compared to an Adjusted EBITDA loss of $3 million in the second quarter 2022.

23

APP 784

Table of Contents

*Year to Date 2023 Results:*

- Total revenue of $2.29 billion increased 73% from the first half of 2022.

- Gross profit of $134 million, compared to $76 million in the first half of 2022.

- Medical margin of $300 million, compared to $168 million in the first half of 2022.

- Net loss of $1 million, compared to $20 million in the first half of 2022.

- Adjusted EBITDA of $34 million compared to $5 million in the first half of 2022.

*Membership Details*

Medicare Advantage members increased 57% from June 30, 2023, which includes contributions from new geographies and growth within geographies existing prior to 2023. Total members live on the platform includes 408,900 Medicare Advantage members and 87,000 attributed ACO REACH beneficiaries.

Average Medicare Advantage membership was 409,700 during the second quarter of 2023.

**Key Financial and Operating Metrics**

*All of our key metrics exclude historical results from our California operations (which are included as discontinued operations in our condensed consolidated financial statements).*

We monitor the following key financial and operating metrics to help us evaluate our business, identify trends affecting our business, formulate business plans and make strategic decisions. We believe the following key metrics are useful in evaluating our business (dollars in thousands):

| | As of and For the Three Months Ended June 30, | | | As of and For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| MA members | 408,900 | 261,200 | 57 | 408,900 | 261,200 | 57 |
| Medical services revenue | $ 1,147,044 | $ 669,184 | 71 | $ 2,281,874 | $ 1,321,607 | 73 |
| Gross profit | $ 57,193 | $ 33,914 | 69 | $ 134,489 | $ 76,378 | 76 |
| Medical margin[1] | $ 138,310 | $ 82,044 | 69 | $ 300,313 | $ 168,259 | 78 |
| Platform support costs | $ 46,869 | $ 36,291 | 29 | $ 94,547 | $ 70,104 | 35 |
| Net income (loss) | $ (16,795) | $ (20,731) | 19 | $ (836) | $ (19,576) | 96 |
| Adjusted EBITDA[1] | $ 10,259 | $ (2,679) | 483 | $ 34,119 | $ 5,366 | 536 |

_____

(1)    Medical margin and Adjusted EBITDA are non-GAAP financial measures. Gross profit is the most directly comparable financial measure calculated in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") to medical margin. Net income (loss) is the most directly comparable financial measure calculated in accordance with U.S. GAAP to Adjusted EBITDA. See "-Non-GAAP Financial Measures" for additional information.

*Medicare Advantage Members*

Our MA members include all individuals enrolled in an MA plan that are attributed to the PCPs on our platform at the end of a given period.

*Medical Services Revenue*

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to per member per month ("PMPM") fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium that payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

24

**APP 785**

Table of Contents

### Gross Profit

Gross profit represents the amount earned from total revenues less medical services expense and other medical expenses. Total revenues include medical services revenue and other operating revenue. The Company's costs of revenues consist of medical services expense and other medical expenses, which represents the costs that are directly related to providing the services that generate revenue.

The following table presents our gross profit (dollars in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Total revenues | $ 1,149,052 | $ 670,134 | $ 2,285,199 | $ 1,323,579 |
| Medical services expense | (1,008,734) | (587,140) | (1,981,561) | (1,153,348) |
| Other medical expenses[1] | (83,125) | (49,080) | (169,149) | (93,853) |
| Gross profit | $ 57,193 | $ 33,914 | $ 134,489 | $ 76,378 |

_____

(1)    Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended June 30, 2023 and 2022, costs incurred in implementing geographies were $7.7 million and $3.6 million, respectively. For the six months ended June 30, 2023 and 2022, costs incurred in implementing geographies were $10.0 million and $3.7 million, respectively.

### Medical Margin

We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin PMPM may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

See "-Non-GAAP Financial Measures" for information regarding our use of medical margin and a reconciliation of gross profit to medical margin.

### Platform Support Costs

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance, and legal functions.

The table below represents costs to support our live geographies and enterprise functions, which are included in general and administrative expenses (dollars in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Platform support costs | $ 46,869 | $ 36,291 | $ 94,547 | $ 70,104 |
| % of Revenue | 4% | 5% | 4% | 5% |

### Net Income (Loss) and Adjusted EBITDA

Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of

25

APP 786

Table of Contents

ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

See "-Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

**Key Components of Our Results of Operations**

***Revenues***

*Medical Services Revenue*

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to PMPM fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium that payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

Medical services revenue constitutes substantially all of our total revenue for the three and six months ended June 30, 2023 and 2022.

***Operating Expenses***

*Medical Services Expense*

In each of our geographies, a network of physicians, hospitals, and other healthcare providers provide care to our members. Medical services expense represents costs incurred for medical services provided to our members. Our medical services expense trends primarily relate to changes in per visit costs incurred by our members, along with changes in health system and provider utilization of services. Medical services expenses are recognized in the period in which services are provided and include estimates of our obligations for medical services that have been rendered by third parties but for which claims have either not yet been received, processed, or paid.

*Other Medical Expenses*

Other medical expenses include: (i) partner physician compensation expense and (ii) other provider costs. Partner physician compensation expense represents obligations to our physician partners corresponding to a portion of the surplus generated in our geographies, which is a function of medical services revenues less the sum of medical services expenses, other provider costs and market operating costs, for the respective geography. Physician payment obligations are reconciled quarterly, and settlement payments are typically issued to providers on an annual basis in arrears, with interim payments issued periodically. Other provider costs include payments to support physician-patient engagement, certain other medical costs, and other care management expenses that help to create medical cost efficiency. Other provider costs include costs incurred for geographies that are in implementation and are not yet generating revenue.

*General and Administrative*

General and administrative expenses consist of market-based support personnel and other operating costs to support our geographies, personnel and other operating costs to support our enterprise functions, and investments to support development and expansion of our physician partners. Our enterprise functions include salaries and related expenses, stock-based compensation (including shares issued under partner physician group equity agreements), operational support expenses, technology infrastructure, finance, and legal, as well as other costs associated with the continued growth of our platform. For the purposes of calculating physician partner incentive expense, we allocate a portion of our enterprise general and administrative expenses to our geographies. General and administrative expenses also include severance and accruals for unasserted claims.

*Depreciation and Amortization*

Depreciation and amortization expenses are associated with our property and equipment and acquired intangible assets. Depreciation includes expenses associated with buildings, computer equipment and software, furniture and fixtures, and leasehold improvements. Amortization primarily includes expenses associated with acquired intangible assets.

26

**APP 787**

Table of Contents

***Other Income (Expense)***

*Other Income (Expense), Net*

Other income (expense), net includes the following items:

- Equity income (loss) from unconsolidated joint ventures; and
- Interest income, which consists primarily of interest earned on our cash and cash equivalents, restricted cash and cash equivalents, and marketable securities, including amortization/accretion of discount/premium.

*Interest Expense*

Interest expense consists primarily of interest expense associated with our outstanding debt, including amortization of debt discounts and costs.

***Income Tax Benefit (Expense)***

We are subject to corporate U.S. federal, state, and local income taxation. Deferred tax assets are reduced by a valuation allowance to the extent management believes it is not more likely than not to be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income. Management makes estimates and judgments about future taxable income based on assumptions that are consistent with our plans and estimates.

27

**APP 788**

Table of Contents

**Results of Operations**

The following table summarizes key components of our results of operations (dollars in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,147,044 | $ 669,184 | $ 2,281,874 | $ 1,321,607 |
| Other operating revenue | 2,008 | 950 | 3,325 | 1,972 |
| Total revenues | 1,149,052 | 670,134 | 2,285,199 | 1,323,579 |
| **Expenses:** | | | | |
| Medical services expense | 1,008,734 | 587,140 | 1,981,561 | 1,153,348 |
| Other medical expenses | 83,125 | 49,080 | 169,149 | 93,853 |
| General and administrative (including noncash stock-based compensation expense of $19,572, $6,553, $33,244 and $10,523, respectively) | 81,499 | 51,924 | 148,345 | 91,758 |
| Depreciation and amortization | 5,515 | 3,042 | 9,704 | 6,415 |
| Total expenses | 1,178,873 | 691,186 | 2,308,759 | 1,345,374 |
| **Income (loss) from operations** | (29,821) | (21,052) | (23,560) | (21,795) |
| **Other income (expense):** | | | | |
| Other income (expense), net | 15,687 | 6,997 | 25,159 | 9,266 |
| Gain (loss) on lease terminations | - | (5,458) | - | (5,458) |
| Interest expense | (1,588) | (945) | (3,121) | (1,816) |
| **Income (loss) before income taxes** | (15,722) | (20,458) | (1,522) | (19,803) |
| Income tax benefit (expense) | (1,073) | (580) | 686 | (509) |
| **Income (loss) from continuing operations** | (16,795) | (21,038) | (836) | (20,312) |
| **Discontinued operations:** | | | | |
| Income (loss) before income taxes | - | 321 | - | 750 |
| Income tax benefit (expense) | - | (14) | - | (14) |
| **Total discontinued operations** | - | 307 | - | 736 |
| **Net income (loss)** | (16,795) | (20,731) | (836) | (19,576) |
| Noncontrolling interests' share in (earnings) loss | 46 | 82 | 109 | 157 |
| **Net income (loss) attributable to common shares** | $ (16,749) | $ (20,649) | $ (727) | $ (19,419) |

28

**APP 789**

Table of Contents

The following table summarizes our results of operations as a percentage of total revenues:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2023** | **2022** | **2023** | **2022** |
| **Revenues:** | | | | |
| Medical services revenue | 100% | 100% | 100% | 100% |
| Other operating revenue | - | - | - | - |
| Total revenues | 100 | 100 | 100 | 100 |
| **Expenses:** | | | | |
| Medical services expense | 88 | 88 | 87 | 87 |
| Other medical expenses | 7 | 7 | 7 | 7 |
| General and administrative (including noncash stock-based compensation expense of 2%, 1%, 1% and 1%, respectively) | 7 | 8 | 6 | 7 |
| Depreciation and amortization | - | - | - | - |
| Total expenses | 103 | 103 | 101 | 102 |
| **Income (loss) from operations** | (3) | (3) | (1) | (2) |
| **Other income (expense):** | | | | |
| Other income (expense), net | 1 | 1 | 1 | 1 |
| Gain (loss) on lease terminations | - | (1) | - | - |
| Interest expense | - | - | - | - |
| **Income (loss) before income taxes** | (1) | (3) | - | (1) |
| Income tax benefit (expense) | - | - | - | - |
| **Income (loss) from continuing operations** | (1) | (3) | - | (1) |
| Discontinued operations: | | | | |
| Income (loss) before income taxes | - | - | - | - |
| Income tax benefit (expense) | - | - | - | - |
| Total discontinued operations | - | - | - | - |
| **Net income (loss)** | (1) | (3) | - | (1) |
| Noncontrolling interests' share in (earnings) loss | - | - | - | - |
| **Net income (loss) attributable to common shares** | (1)% | (3)% | -% | (1)% |

***Comparison of the Three and Six Months Ended June 30, 2023 to the Three and Six Months Ended June 30, 2022***

***Medical Services Revenue***

| | Three Months Ended June 30, | | Change | |
| --- | --- | --- | --- | --- |
| *(dollars in thousands)* | **2023** | **2022** | **$** | **%** |
| Medical services revenue | $ 1,147,044 | $ 669,184 | $ 477,860 | 71% |
| *% of total revenues* | *100%* | *100%* | | |

Medical services revenue increased for the three months ended June 30, 2023 due primarily to growth in average membership of 54%, which was attributable to eight new geographies that began to generate revenue in 2023 and growth in

29

**APP 790**

Table of Contents

our existing geographies. The increase in medical services revenue for the three months ended June 30, 2023 was also driven, to a lesser extent, by an increase in PMPM capitation rates of 11%.

| (dollars in thousands) | Six Months Ended June 30, | | | | Change | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | $ | | % | |
| Medical services revenue | $ | 2,281,874 | $ | 1,321,607 | $ | 960,267 | | 73% |
| % of total revenues | | 100% | | 100% | | | | |

Medical services revenue increased for the six months ended June 30, 2023 due primarily to growth in average membership of 58%, which was attributable to eight new geographies that began to generate revenue in 2023 and growth in our existing geographies. The increase in medical services revenue for the six months ended June 30, 2023 was also driven, to a lesser extent, by an increase in PMPM capitation rates of 10%.

### Medical Services Expense

| (dollars in thousands) | Three Months Ended June 30, | | | | Change | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | $ | | % | |
| Medical services expense | $ | 1,008,734 | $ | 587,140 | $ | 421,594 | | 72% |
| % of total revenues | | 88% | | 88% | | | | |

Medical services expense increased for the three months ended June 30, 2023 due primarily to growth in average membership of 54%, which was attributable to eight new geographies that became operational in 2023 and growth in our existing geographies. The increase in medical services expense for the three months ended June 30, 2023 was also driven, to a lesser extent, by an increase in average medical services expense per member of 11%.

| (dollars in thousands) | Six Months Ended June 30, | | | | Change | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | $ | | % | |
| Medical services expense | $ | 1,981,561 | $ | 1,153,348 | $ | 828,213 | | 72% |
| % of total revenues | | 87% | | 87% | | | | |

Medical services expense increased for the six months ended June 30, 2023 due primarily to growth in average membership of 58%, which was attributable to eight new geographies that became operational in 2023 and growth in our existing geographies. The increase in medical services expense for the six months ended June 30, 2023 was also driven, to a lesser extent, by an increase in average medical services expense per member of 9%.

### Other Medical Expenses

| (dollars in thousands) | Three Months Ended June 30, | | | | Change | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | $ | | % | |
| Other medical expenses | $ | 83,125 | $ | 49,080 | $ | 34,045 | | 69% |
| % of total revenues | | 7% | | 7% | | | | |

Other medical expenses increased by $34.0 million, or 69%, for the three months ended June 30, 2023 compared to 2022. Partner physician incentive expense increased by $18.3 million to $44.7 million in 2023 compared to $26.4 million in 2022. Other provider costs increased by $15.7 million to $38.4 million in 2023 compared to $22.7 million in 2022, resulting from the increase in the number of geographies and members on our platform. Other provider costs for the three months ended June 30, 2023 include $7.7 million of costs related to geographies that will become operational in January 2024, while other provider costs for the three months ended June 30, 2022 include $3.6 million of costs related to geographies that became operational in 2023.

30

Table of Contents

| (dollars in thousands) | Six Months Ended June 30, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| Other medical expenses | $ 169,149 | $ 93,853 | $ 75,296 | 80% |
| *% of total revenues* | *7%* | *7%* | | |

Other medical expenses increased by $75.3 million, or 80%, for the six months ended June 30, 2023 compared to 2022. Partner physician incentive expense increased by $48.6 million to $102.4 million in 2023 compared to $53.8 million in 2022. Other provider costs increased by $26.7 million to $66.8 million in 2023 compared to $40.1 million in 2022, resulting from the increase in the number of geographies and members on our platform. Other provider costs for the six months ended June 30, 2023 include $10.0 million of costs related to geographies that will become operational in January 2024, while other provider costs for the six months ended June 30, 2022 include $3.7 million of costs related to geographies that became operational in 2023.

### General and Administrative

| (dollars in thousands) | Three Months Ended June 30, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| General and administrative | $ 81,499 | $ 51,924 | $ 29,575 | 57% |
| *% of total revenues* | *7%* | *8%* | | |

General and administrative expenses increased $29.6 million, or 57%, for the three months ended June 30, 2023 compared to 2022. Operating costs to support our live geographies and enterprise functions (platform support costs) increased by $10.6 million to $46.9 million in 2023 compared to $36.3 million in 2022 due primarily to growth in operating costs incurred to support geographies that became operational in 2023. Operating costs to support our live geographies and enterprise functions as a percentage of revenue decreased to 4% for the three months ended June 30, 2023 compared to 5% for the same period in 2022. Investments to support geography entry increased to $11.3 million in 2023, compared to $6.6 million in 2022 due to increased costs associated with our geographies that become operational in the following calendar year and expansion into existing geographies. Stock-based compensation expense increased $13.0 million in 2023 primarily due to the granting of certain stock-based instruments to third parties after the second quarter of 2022.

| (dollars in thousands) | Six Months Ended June 30, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| General and administrative | $ 148,345 | $ 91,758 | $ 56,587 | 62% |
| *% of total revenues* | *6%* | *7%* | | |

General and administrative expenses increased $56.6 million, or 62%, for the six months ended June 30, 2023 compared to 2022. Operating costs to support our live geographies and enterprise functions (platform support costs) increased by $24.4 million to $94.5 million in 2023 compared to $70.1 million in 2022 due primarily to growth in operating costs incurred to support geographies that became operational in 2023. Operating costs to support our live geographies and enterprise functions as a percentage of revenue decreased to 4% for the six months ended June 30, 2023 compared to 5% for the same period in 2022. Investments to support geography entry increased to $20.6 million in 2023, compared to $10.4 million in 2022 due to increased costs associated with our geographies that become operational in the following calendar year and expansion into existing geographies. Stock-based compensation expense increased $22.7 million in 2023 primarily due to the granting of certain stock-based instruments to third parties after the second quarter of 2022.

31

Table of Contents

*Other income (expense), net*

| (dollars in thousands) | Three Months Ended June 30, | | | | Change | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | $ | | % | |
| Other income (expense), net | $ | 15,687 | $ | 6,997 | $ | 8,690 | | 124% |
| *% of total revenues* | | *1%* | | *1%* | | | | |

Other income (expense), net increased $8.7 million, or 124%, for the three months ended June 30, 2023 compared to 2022 primarily from interest income as a result of our marketable securities investments, which were made at the end of the second quarter of 2022, and equity income from our ACO REACH equity investments as a result of stronger performance during 2023 compared to 2022.

| (dollars in thousands) | Six Months Ended June 30, | | | | Change | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | $ | | % | |
| Other income (expense), net | $ | 25,159 | $ | 9,266 | $ | 15,893 | | 172% |
| *% of total revenues* | | *1%* | | *1%* | | | | |

Other income (expense), net increased $15.9 million, or 172%, for the six months ended June 30, 2023 compared to 2022 primarily from interest income as a result of our marketable securities investments, which were made at the end of the second quarter of 2022, and equity income from our ACO REACH equity investments as a result of stronger performance during 2023 compared to 2022.

**Non-GAAP Financial Measures**

In addition to providing results that are determined in accordance with U.S. GAAP, we present medical margin and Adjusted EBITDA, which are non-GAAP financial measures.

We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin PMPM may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to medical margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted

32

Table of Contents

EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

Adjusted EBITDA is not considered a measure of financial performance under U.S. GAAP, and the items excluded therefrom are significant components in understanding and assessing our financial performance. Adjusted EBITDA has limitations as an analytical tool and should not be considered in isolation or as an alternative to such U.S. GAAP measures as net income (loss), cash flows provided by or used in operating, investing, or financing activities or other financial statement data presented in our consolidated financial statements as an indicator of financial performance or liquidity. Some of these limitations are:

- Adjusted EBITDA does not reflect changes in, or cash requirements for, working capital needs;

- Adjusted EBITDA does not reflect interest expense or the requirements necessary to service interest or principal payments on debt;

- Adjusted EBITDA does not reflect income tax expense (benefit) or the cash requirements to pay taxes;

- Adjusted EBITDA does not reflect historical cash expenditures or future requirements for capital expenditures or contractual commitments;

- Although depreciation and amortization charges are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and Adjusted EBITDA does not reflect any cash requirements for such replacements; and

- The expenses and other items that we exclude in our calculation of Adjusted EBITDA may differ from the expenses and other items, if any, that other companies may exclude from similarly titled non-GAAP financial measures.

The following table sets forth a reconciliation of gross profit to medical margin using data derived from our condensed consolidated financial statements for the periods indicated (dollars in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2023 | 2022 | 2023 | 2022 |
|---|---|---|---|---|
| Gross profit[1] | $ 57,193 | $ 33,914 | $ 134,489 | $ 76,378 |
| Other operating revenue | (2,008) | (950) | (3,325) | (1,972) |
| Other medical expenses | 83,125 | 49,080 | 169,149 | 93,853 |
| Medical margin | $ 138,310 | $ 82,044 | $ 300,313 | $ 168,259 |

_____

(1)    Gross profit is defined as total revenues less medical services expense and other medical expenses.

33

**APP 794**

Table of Contents

The following table sets forth a reconciliation of net income (loss) to Adjusted EBITDA using data derived from our condensed consolidated financial statements for the periods indicated (dollars in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Net income (loss) | $ (16,795) | $ (20,731) | $ (836) | $ (19,576) |
| (Income) loss from discontinued operations, net of income taxes | - | (307) | - | (736) |
| Interest expense | 1,588 | 945 | 3,121 | 1,816 |
| Income tax expense (benefit) | 1,073 | 580 | (686) | 509 |
| Depreciation and amortization | 5,515 | 3,042 | 9,704 | 6,415 |
| (Gain) loss on lease terminations | - | 5,458 | - | 5,458 |
| Severance and related costs[1] | - | 256 | 188 | 1,958 |
| Stock-based compensation expense | 19,572 | 6,553 | 33,244 | 10,523 |
| EBITDA adjustments related to equity method investments | 2,757 | 492 | 4,724 | 1,663 |
| Other[2] | (3,451) | 1,033 | (15,340) | (2,664) |
| Adjusted EBITDA[3] | $ 10,259 | $ (2,679) | $ 34,119 | $ 5,366 |

_____

(1)    For the three and six months ended June 30, 2022, includes taxes and related costs on stock option exercises for departed executives of $0.2 million and $1.4 million.

(2)    Includes interest income, non-cash accruals for unasserted claims and contingent liabilities, and transaction-related costs.

(3)    Effective 2023, we no longer exclude geography entry costs from our computation of Adjusted EBITDA. Adjusted EBITDA for the prior period presented has been restated to the current period computation methodology.

**Liquidity and Capital Resources**

We have historically financed our operations primarily through funds generated from our capitation arrangements with payors, issuances of equity securities, and borrowings under credit agreements. We generally invest any excess cash in money market accounts, which are classified as cash equivalents, and marketable securities. Our investment strategies are designed to provide safety and preservation of capital, sufficient liquidity to meet the cash flow needs of our business operations, and attainment of a competitive return. As of June 30, 2023, we had cash and cash equivalents and restricted cash and equivalents of $201.2 million and investments in marketable securities of $389.0 million.

We expect to continue to incur operating losses and generate negative cash flows from operations for the foreseeable future due to the investments we intend to continue to make in expanding our business and additional general and administrative costs we expect to incur related to our operation as a public company. As a result, we may require additional capital resources in the future to execute strategic initiatives to grow our business.

Our primary uses of cash include payments for medical claims and other medical expenses, general and administrative expenses, costs associated with the development of new geographies and expansion of existing geographies, debt service, and capital expenditures. Final reconciliation and receipt of amounts due from payors are typically settled in arrears, following completion of the contractual program year.

Based on our planned operations, we believe that our existing cash and cash equivalents, investments in marketable securities, as well as available borrowing capacity under the credit facilities, will be sufficient to meet our working capital and capital expenditure needs over at least the next 12 months, though we may require additional capital resources in the future. We have based these estimates on assumptions that may prove to be wrong and we could utilize our available capital resources sooner than we expect.

We may require additional financing in the future to fund working capital and pay our obligations. We may seek to raise any necessary additional capital through a combination of public or private equity offerings and/or debt financings. There can be no assurance that we will be successful in acquiring additional funding at levels sufficient to fund our operations or on terms favorable to us, if at all. If adequate funds are not available on acceptable terms when needed, we may be required to significantly reduce operating expenses, which may have a material adverse effect on our business,

Table of Contents

financial condition, cash flows, and results of operations. If we do raise additional capital through public or private equity, the ownership interest of our existing stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our existing stockholders' rights. If we raise additional capital through debt financing, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures, or declaring dividends.

Our ability to pay dividends to holders of our common stock is significantly limited as a practical matter by our growth plans as well as our credit facilities insofar as we may seek to pay dividends out of funds made available to us by agilon health management, inc. ("agilon management") or its subsidiaries because our credit facilities restrict agilon management's ability to pay dividends or make loans to us. The borrower on our credit facilities is agilon management, our wholly-owned subsidiary. Our credit facilities are guaranteed by certain of our subsidiaries, including those identified as variable interest entities, and contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

### Cash Flows

The following summary discussion of our cash flows is based on the condensed consolidated statements of cash flows. The following table sets forth changes in cash flows (dollars in thousands):

| | Six Months Ended June 30, | | |
| | 2023 | 2022 | Change |
| --- | --- | --- | --- |
| Net cash provided by (used in) operating activities | $ (82,015) | $ (83,496) | $ 1,481 |
| Net cash provided by (used in) investing activities | (30,782) | (305,480) | 274,698 |
| Net cash provided by (used in) financing activities | (193,698) | 17,815 | (211,513) |

### Net Cash Provided By (Used In) Operating Activities

Net cash used in operating activities was $82.0 million for the six months ended June 30, 2023 compared to $83.5 million for the six months ended June 30, 2022. Net cash used in operating activities in 2023 was flat compared to 2022 primarily resulting from the timing of settlements with payors from new and existing geographies. Our cash flow from operations is dependent upon the number of members on our platform, the timing of settlements with payors, and the level of operating and general and administrative expenses necessary to operate and grow our business, among other factors.

### Net Cash Provided By (Used In) Investing Activities

Net cash used in investing activities was $30.8 million for the six months ended June 30, 2023 compared to $305.5 million for the six months ended June 30, 2022. During the six months ended June 30, 2023, we completed the acquisition of My Personal Health Record Express, Inc. for $44.4 million and made investments in marketable securities of $65.6 million, which were partially offset by proceeds from the maturity of marketable securities of $97.3 million. During the six months ended June 30, 2022, we made investments in marketable securities of $285.1 million.

### Net Cash Provided By (Used In) Financing Activities

Net cash used in financing activities was $193.7 million for the six months ended June 30, 2023 compared to net cash provided by financing activities of $17.8 million for the six months ended June 30, 2022. During the six months ended June 30, 2023, we used $200.0 million to repurchase common stock. During the six months ended June 30, 2023, we received net proceeds of $8.8 million from the exercise of stock options compared to $20.3 million for the six months ended June 30, 2022.

### Debt Obligations

On February 18, 2021, we executed a credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021 and the Second Amendment to Credit Agreement, dated as of May 25, 2023, the "Credit Facilities"). The Credit Facilities include: (i) a $100.0 million senior secured term loan (the "Secured Term Loan Facility") and (ii) a $100.0 million senior secured revolving credit facility (the "Secured Revolving Facility") with a capacity to issue standby letters of credit in certain circumstances up to a maximum of $100.0 million. Subject to specified conditions and receipt of commitments, the Secured Term Loan Facility may be expanded (or a new term loan facility,

APP 796

Table of Contents

revolving credit facility or letter of credit facility added) by up to (i) $50.0 million plus (ii) an additional amount determined in accordance with a formula tied to repayment of certain of our indebtedness. The maturity date of the Credit Facilities was extended to February 18, 2026.

Effective with the Second Amendment to Credit Agreement on May 25, 2023, we transitioned to the Secured Overnight Financing Rate ("SOFR") as a benchmark interest rate used in the Credit Agreement. At our option, borrowings under the Credit Facilities, as defined in the credit agreement, can be either: (i) SOFR Rate Loans, (ii) Daily Simple SOFR Rate Loans, or (iii) Base Rate Loans. Daily Simple SOFR Rate Loans and SOFR Rate Loans bear interest at a rate equal to the sum of 4.00% (stepping down to 3.50% on and following October 1, 2023) and the higher of (a) SOFR, as defined in the credit agreement, and (b) 0%. Base Rate Loans bear interest at a rate equal to the sum of 3.00% (stepping down to 2.50% on and following October 1, 2023) and the highest of: (a) 0.50% in excess of the overnight federal funds rate, (b) the prime rate established by the administrative agent from time to time, (c) the one-month SOFR rate (adjusted for maximum reserves) plus 1.00% and (d) 0%. Additionally, we pay a commitment fee on the unfunded 2021 Revolving Credit Facility amount of 0.50% (stepping down to 0.375% on and following October 1, 2023). We must also pay customary letter of credit fees.

The Credit Facilities contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

For additional discussion on our debt obligations, see Note 8 to the Condensed Consolidated Financial Statements for additional information about our outstanding debt.

### *Equity*

As of June 30, 2023, we had 405.4 million shares of common stock outstanding. See Note 10 to the Condensed Consolidated Financial Statements for additional information about our equity transactions.

### Critical Accounting Policies and Estimates

Management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires us to use judgment in the application of accounting policies, including making estimates and assumptions. We base estimates on the best information available to us at the time, our historical experience, known trends and events, and various other assumptions that we believe are reasonable under the circumstances. These estimates affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting periods. If our judgment or interpretation of the facts and circumstances relating to various transactions or other matters had been different, it is possible that different accounting would have been applied, resulting in a different presentation of our condensed consolidated financial statements. From time to time, we re-evaluate our estimates and assumptions. In the event estimates or assumptions prove to be different from actual results, adjustments are made in subsequent periods to reflect more current estimates and assumptions about matters that are inherently uncertain. A summary of our critical accounting policies is included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022 in "Management's Discussion and Analysis of Financial Conditions and Results of Operations - Critical Accounting Policies" and Note 2 to the Condensed Consolidated Financial Statements. There have been no significant changes to our critical accounting policies during 2023.

### Recent Accounting Pronouncements

There are no new accounting standards that have been issued and we have not adopted that are material to us as of June 30, 2023.

### Item 3. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to various market risks, including the potential loss arising from adverse changes in interest rates. We do not use derivative financial instruments in the normal course of business or for speculative or trading purposes.

APP 797

Table of Contents

Our exposures to market risk for changes in interest expense relate primarily to the Credit Facilities. Indebtedness under the Credit Facilities is floating rate debt and is carried at amortized cost. Therefore, fluctuations in interest rates will impact our consolidated financial statements. A rising interest rate environment will increase the amount of interest paid on this debt. A hypothetical 100 basis point change in interest rates would not have a material impact on our interest expense.

We held cash, cash equivalents, restricted cash equivalents, and marketable securities of $590.2 million and $919.6 million as of June 30, 2023 and December 31, 2022, respectively, consisting of bank deposits, certificates of deposits, money market funds, U.S. Treasury notes, and corporate debt securities. Such interest-earning instruments carry a degree of interest rate risk. A hypothetical 100 basis point change in interest rates would not have a material impact on the fair value of our marketable securities. Declines in interest rates over time will reduce our investment income. The goals of our investment policy are liquidity and capital preservation. We do not enter into investments for trading or speculative purposes.

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures.* Our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), with the assistance of other members of management, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Our disclosure controls and procedures are intended to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms and (2) accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Based on this review, although we continue to work to remediate the material weaknesses in internal control over financial reporting as described in our Annual Report on Form 10-K for the year ended December 31, 2022, and progress has been made to date, our CEO and CFO have concluded that the disclosure controls and procedures related to these material weaknesses were not effective as of June 30, 2023.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect every misstatement. An evaluation of effectiveness is subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may decrease over time,

*Changes in Internal Control Over Financial Reporting.* Under applicable SEC rules (Exchange Act Rules 13a-15(d) and 15d-15(d)), management is required to evaluate any change in internal control over financial reporting that occurred during each fiscal quarter that had materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

As explained in greater detail under Part II, Item 9A. "Controls and Procedures" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, we are undertaking a broad range of remedial procedures to address the material weaknesses in our internal control over financial reporting identified as of December 31, 2022. Our efforts to improve our internal controls are ongoing. Therefore, while we determined, with the participation of our CEO and CFO, that there have been no changes in our internal control over financial reporting in the three-month period ended June 30, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, we continue to monitor the operation of these remedial measures through the date of this report.

APP 798

# EXHIBIT 21

APP 799

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ3 2023 Earnings Call Transcripts

## Thursday, November 02, 2023 8:30 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ3 2023- | | | -FQ4 2023- | -FY 2023- | -FY 2024- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | (0.04) | (0.08) | NM | (0.07) | (0.07) | 0.17 |
| Revenue  (mm) | 1136.78 | 1215.66 | ▲6.42 | 1117.96 | 4539.94 | 6112.41 |

Currency: USD
Consensus as of  Nov-02-2023 5:00 AM GMT



| - EPS NORMALIZED - | | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| FQ4 2022 | (0.05) | (0.06) | NM |
| FQ1 2023 | 0.06 | 0.04 | ▼(33.33 %) |
| FQ2 2023 | 0.00 | (0.04) | NM |
| FQ3 2023 | (0.04) | (0.08) | NM |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 800**

Case 1:24-cv-00297-DAE     Document 52     Filed 11/08/24     Page 804 of 1067

# Table of Contents

Call Participants ................................................................................... 3

Presentation ................................................................................... 4

Question and Answer ................................................................................... 9

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 801**

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Adam Matan Ron**
*BofA Securities, Research Division*

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

**Elizabeth Anderson**

**Gary Paul Taylor**
*TD Cowen, Research Division*

**George Robert Hill**
*Deutsche Bank AG, Research Division*

**Jack Wallace**

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

**Unknown Analyst**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 802

# Presentation

**Operator**

Hello, everyone, and welcome to the agilon health Third Quarter 2023 Earnings Conference Call. My name is Carla, and I will be your operator for today's call. [Operator Instructions]

I will now hand you over to your host, Matthew Gillmor, Vice President of Investor Relations. Matthew, please go ahead.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thanks, operator. Good afternoon, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley.

Before we begin, we'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K.

Following prepared remarks from Steve and Tim, we'll conduct a Q&A session. During the Q&A session, we'd ask everyone to please limit themselves to one question so we can get through as many questions as possible.

With that, I'll turn things over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good evening, and thank you for joining us. Momentum across our business remains strong, and we are making rapid progress against our vision to transform health care in 100-plus communities by empowering primary care doctors.

As an indicator of our success, this year we are on track to reinvest more than $250 million into local primary care based on the high-quality cost-effective care being delivered by our partners. These results are enabling our partner groups to expand access to preventative services, improve quality outcomes and drive value for the communities they serve. I want to thank my agilon colleagues and our partners for their trust in each other and their belief and support in a network that is shaping a better health care system for our country.

Before discussing our performance for the quarter, I wanted to take a few moments to highlight our decision to sell our Hawaii business. As we have discussed with you, Hawaii operates very differently compared to our core partner markets in the Continental U.S. In our core partner markets, we leverage a common operating structure. This operating structure is centered around a long-term joint venture with a scaled physician group and non-delegated multi-payer relationships with health plans and CMS.

The key differences in Hawaii's operations, namely the lack of a joint venture partnership with a large physician group, a much smaller senior patient physician panel size and Hawaii's delegated MSO infrastructure made our Hawaii business increasingly less strategic to agilon and created a drag on our financial results.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 803**

We are pleased to transition MDX Hawaii to a new owner that is better positioned to invest into the business and optimize its delegated infrastructure, which should benefit patients and the community at large. The sale of Hawaii will enhance our ability to focus even more specifically on our partner markets at a point in time when we are driving increasing success across a PCP's entire senior panel.

This quarter and going forward, you will hear us consistently highlight the power and importance of our integrated senior business across Medicare Advantage and the traditional Medicare populations. Our ability to generate successful outcomes for patients, PCPs and the system in a multi-payer full risk model is increasingly unique. Our focus on this opportunity will pay dividends in the years to come.

Turning now to the quarter. Partner market performance was again extremely strong across both MA and ACO REACH. All of our key financial metrics were generally in line or above our guidance ranges, especially on an underlying basis. Our results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth.

During the quarter, our total membership on the platform increased 43% to 508,000 members, and revenues increased 75% to $1.2 billion. This was above our guidance and was supported by the successful onboarding of new PCPs and faster pull-through of members, particularly in new markets.

Adjusted for the sale of MDX Hawaii, our partner market growth was even stronger with total membership up 49% and revenue up 85%. Even with our faster membership growth, adjusted EBITDA continues to inflect higher, increasing more than $20 million year-over-year to a loss of $6 million for the quarter. This was in line with our outlook and supported by strong medical margin gains in our partner markets across MA and REACH.

Adjusted for Hawaii, our partner market EBITDA was positive $6 million for the quarter, well above our outlook. And it was even stronger on an underlying basis as our results included some net negative development from 2022. Our combined medical margin across MA partner markets and REACH was strong in the quarter, with MA generating $111 million and REACH generating $55 million. These results demonstrate the power of a PCP focusing on the most complex patients across their entire senior panel with differentiated information and care team resources.

As an example, our year 2 plus partner markets in MA and REACH both generated over $130 per member per month in medical margins year-to-date. Think about the value delivery to our PCP partners and the health system when we generate this magnitude of savings across an average panel size of 400 to 500 senior patients.

From a guidance perspective, we have raised our membership revenue and adjusted EBITDA outlook for 2023. This was supported by the growth and margin progression in our MA partner markets, including REACH and the sale of MDX Hawaii.

We also plan to maintain a more conservative reserving approach as we exit 2023. And this is intentionally reflected in our medical margin outlook for MA and will support our future performance in 2024. Our ability to execute against our adjusted EBITDA targets during 2023 and enhance our visibility to 2024 continues to reflect the strength and durability of our model.

As I have discussed with you previously, the key differences in our model are driving differentiated clinical and financial performance. Unlike the traditional fee-for-service system, which predominates across health care, all patients in our model have a fully aligned or attributed relationship with their primary care doctor. And through agilon's platform, our PCP partners have the data and resources to proactively impact patient care. This translates into specific differences in the way health care is utilized and managed, and this shows up in our business in very tangible ways.

For example, we continue to have outstanding results in the standardized star ratings measures. For 2024 stars, the percentage of our membership in 4+ star plans will increase modestly to approximately 84%. However, as most of you know, plan-level star ratings also include the performance of non-agilon providers.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 804

For our year 2 plus partners agilon's specific performance is 4.3 stars and increased nicely year-over-year. This was despite more stringent cut points and relatively flat star ratings industry-wide. We continue to excel in areas like preventative cancer screens, diabetes control and medication adherence. Our quality results will drive meaningful value to our patients and the health care system in the years ahead. And because of our high member retention, agilon and our physician partners will share in this value over the long term.

Additionally, our ability to drive differentiated cost performance was clearly evident in the recently released ACO REACH results for 2022. This data allows agilon to compare our performance against the unmanaged fee-for-service system as well as other value-based care models. During 2022, our Reach ACOs drove nearly 10% savings relative to the Medicare benchmark. This was more than 2.5x better than the program average and our results included more than 90,000 beneficiaries in diverse markets.

agilon also returned nearly $30 million in guaranteed savings to the Medicare Trust Fund last year. As you can see from our REACH results this quarter, our differentiated cost performance has carried into 2023.

Looking forward, we believe our leadership position as the platform and network moving physicians to full risk has grown considerably. This is a function of the magnitude of savings we are generating across the entire senior panel of a primary care doctor.

Our timing is also important. As primary care physicians and the broader system increasingly need a scalable solution for multi-payer full risk. This dynamic is driving the ongoing inflection we are seeing from a demand perspective among both physician groups and health systems.

For the class of 2024 new partners, we now expect 25,000 new ACO REACH members, and we are increasing our expectation from 100,000 to 110,000 new MA members. At this point in the year, we are nearly complete with our payer contracted cycle, which gives us better visibility into the membership pull-through. We also now have a clear line of sight to a very strong class of 2025 with multiple new partners signed, including independent groups and health systems. Implementation for this class has already begun, which should bode well for future performance.

Before turning the call over to Tim, I wanted to offer a few comments on 2024. We remain highly confident in the trajectory of our adjusted EBITDA inflection and expect to share an initial view in early January. As we have discussed previously, we operate in a very forward-looking model, and our visibility into the key drivers for next year's performance are quite high.

First, we have a large and growing class of 2024 new partners with an attractive margin profile that should be meaningfully accretive to adjusted EBITDA. This is a function of the longer implementation cycle for this class and targeted investments we have made around technology and centralizing key processes.

Next, the combined strength of our 2023 run rate margins across our integrated senior business will have key positive implications for 2024. First, our REACH performance will carry forward, driven by our ability to maintain the cost differential compared to the benchmark. And second, the reserve actions we have taken in Medicare Advantage should reduce the risk of negative claims development next year.

Finally, we remain very confident in our ability to manage the new risk adjustment model starting in 2024. The impact to agilon from the V28 model change is relatively modest. And given the limited maturity of our partner markets and senior membership, our ability to mitigate this impact is very high.

With that, let me turn things over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve, and good evening, everyone. I'll now review highlights from our third quarter results and our updated outlook for 2023.

Starting with our membership for the third quarter, total members live on the agilon platform increased to approximately 508,000 including both Medicare Advantage and ACO REACH. Our consolidated Medicare Advantage membership increased 58% to 420,000, driven by the addition of new partner geographies and

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 805**

9% growth with our same geographies. Adjusted for Hawaii, MA membership in our core partner markets grew 69% to $384,000 and our same geography growth was 12%.

Reported revenues increased 75% on a year-over-year basis to $1.2 billion during the third quarter. Year-to-date, revenues increased 73% to $3.5 billion. Revenue growth was primarily driven by membership gains in new and existing geographies.

On a per member per month basis or PMPM, third quarter revenue increased 11%. This was primarily driven by benchmark updates and membership mix, including higher benchmarks in several new markets. Adjusted for Hawaii, revenues increased 85% to $1.1 billion and revenue PMPM increased 10% during the third quarter.

For our MA business, medical margin on a reported basis increased 42% year-over-year to $108 million during the third quarter. Year-to-date, medical margin increased 67% to $408 million. While this was below our outlook for the quarter, the difference was primarily driven by performance in Hawaii.

Adjusted for Hawaii, medical margins increased 46% year-over-year to $111 million for the third quarter and was in line with our expectation, even with approximately $6 million of net negative development. On a per member per month basis, medical margins across our core partner markets increased by 4% year-to-date to $119, driven by the maturation of markets and member cohorts. For our year 2 plus partner markets, medical margin PMPM increased 17% to $134 on a year-to-date basis.

MA medical margins for the quarter included a net $8 million in negative development, including $9 million in prior year claims, offset by $1 million in prior year revenue, $2 million of the net development was attributed to Hawaii and the remaining $6 million was attributed to our core partner markets. The negative claims development this quarter was almost entirely isolated to system issues with a single payer related to supplemental benefit costs. As we discussed last quarter, we are making focused investments to improve our visibility into data gaps with payers.

Excluding the year-to-date development, MA Medical margins would have been approximately $125 PMPM in our partner markets and $143 PMPM in our year 2 plus partner markets. We think this is an important metric as it better reflects the year-to-date run rate performance of our MA business in light of the sale of MDX Hawaii and the actions we have taken to minimize the risk of negative development in 2024.

For our ACO REACH business, we continue to be very encouraged with the performance, which again outperformed our guidance this quarter. REACH generated $55 million of medical margin in the quarter and $117 million year-to-date, which is a twofold increase from last year. Additionally, on a per member per month basis, REACH profitability this year is roughly comparable to the year 2 plus MA partner markets. This level of performance is encouraging and underscores the power of our multi-payer full risk platform.

While REACH is not consolidated in our financial results, we do think it is relevant to think about our medical margin performance on a combined basis across our MA partner markets and REACH. This is because our combined MA and REACH performance is what drives our key profitability metric, adjusted EBITDA.

For 2023, our combined medical margins for MA partners and REACH are consistent with our original guidance expectations. As Steve mentioned, this sets a strong foundation for performance in 2024. Our adjusted EBITDA on a reported basis was negative $6 million in the quarter compared to negative $26 million last year.

On a year-to-date basis, adjusted EBITDA was positive $28 million compared to negative $20 million last year. As a reminder, adjusted EBITDA includes geography entry costs primarily associated with new partners that would generate revenue in 2024. The year-over-year gain in adjusted EBITDA reflects the increase to our medical margins across both MA and REACH as well as platform support leverage, partially offset by performance in Hawaii and the net negative development.

Excluding Hawaii, our adjusted EBITDA would have been positive $6 million for the quarter and $42 million on a year-to-date basis. From a utilization standpoint, composite utilization across MA and REACH was

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 806

generally in line with expectations. For MA, we did observe an increase in utilization during May and early June, which resulted in some in-period development that we recognized during the third quarter. This was contemplated in our guidance, and trends moderated back towards normalized levels during the third quarter.

For REACH, utilization during the first half of 2023 developed favorably relative to our expectation. As a reminder, our results in REACH better reflect our real-time performance against the unmanaged fee-for-service system because of how the benchmark mechanics work.

Turning now to our outlook for full year 2023. Please note that our updated guidance excludes MDX Hawaii for the full year. We have raised and narrowed our adjusted EBITDA outlook to a range of $6 million to $18 million from a prior range of $0 to $23 million. We have also updated our membership and revenue outlook, which are both higher on an underlying basis, excluding MDX Hawaii.

From a medical margin perspective, our revised outlook is $455 million to $470 million and is approximately $50 million lower than our prior range. This reflects two factors: First, the removal of Hawaii represents about $20 million of this change; second, one of our primary goals is to exit 2023 with appropriately conservative reserving posture in MA. In light of this, we continue to proactively refine our model to account for utilization trends as well as any potential blind spots with health plans.

We have assumed utilization will not moderate any further from recent levels, which accounts for $30 million of the change to our MA medical margins. We think this is a prudent approach and is informed by our decision to maintain a more conservative reserving posture. We are pleased to make these decisions, which provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance. Full details on our fourth quarter and full year guidance can be found in the earnings press release.

With that, let me turn the call back to Steve for some brief closing comments.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks, Tim. Before opening up the lines, I want to emphasize three key points. First, the sale of our Hawaii business enhances our ability to focus even more specifically on our differentiated core partner business and positions us for continued success in '24 and beyond. Second, our leadership position as the platform and network, moving physicians to full risk has grown considerably, and you can see it in the clinical and financial results we are driving and in the accelerating demand from physicians in independent groups and health systems. And third, with access to better data, resources and incentives, our primary care doctors are actively managing the way health care is utilized across their entire senior panel, which is yielding meaningfully better outcomes for doctors, patients in agilon.
With that, we are now ready to take your questions.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 807

# Question and Answer

**Operator**

[Operator Instructions] We will now take our first question, which comes from Lisa Gill from JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Congratulations on the sale of Hawaii. Wanted to just follow up on the medical cost side. So Tim, you talked about system issue with a single payer, data gaps with that payer. If I remember last quarter, you also talked about increasing reserves to try to account for some of this going into the back half of the year and then we saw that the prior period development here in this quarter. Can you just talk about where you are on that data gap, the systems issue? Do you feel like that's one fully behind you?

And then secondly, when talking about utilization, you said in line, you saw a little bit of a bump in May and June. What we saw with some of the Medicare Advantage players in the most recent quarter is that in the quarter, they actually saw higher costs than we're projecting even beyond May and June. And one of the largest players talked about some COVID hospitalizations that they saw towards the end of the September quarter. So just want to really understand what you saw, what your expectations were and if you have anything on the COVID side or if you've seen anything on the COVID side?

**Steven Jackson Sell**
*President, CEO & Director*

So Lisa, I'll start, and Tim can chime in. I mean, I think I'll start with we raised EBITDA guide on the year because of the strong overall performance across MA and REACH across nearly 500,000 senior patients, and that really sets a strong foundation for '24.

From a utilization perspective, composite utilization was in line with our overall expectations. As Tim kind of outlined, we did see a step-up in Q2 utilization in MA and REACH. The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period. In Q3, we've seen a deceleration. And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [ posture ] that Tim talked about in terms of an extra $3 million. But Tim, you want to talk about?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Lisa, just a couple of things specifically to your question. First of all, on the prior period development, I think we have made a lot of progress this year in partnering with the payers out there to try to close some of these gaps. Essentially, some of these information issues are caused by just the complexity of our model, and that's also -- it's also a feature of the model, right? We've got over 30 payers, over 100 payer contract combinations in our markets.

But having said that, I think we made good progress. The issue in this quarter was a very specific issue with just 1 payer. Hopefully, that was a lingering issue that we've now figured out where the gap was and should be okay with that going forward.

In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward. As it turned out, as we just reported, we did see some increased utilization in May that was -- greatly started to moderate in June. And as we've seen so far, started to -- continued to moderate in early Q3 as well.

I'm not completely surprised by that. Compared to some of the comments that I've made from some of the big payers, I mean I think our model and even some of them have said should be performing better

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 808**

than the average out there. So the fact that we saw a spike up and some moderation down is probably just a factor also of the strength of our model.

On COVID specifically, we're actually seeing -- if you go back to last year, which is -- you might want to think about that as the first really sort of post big COVID year. We did actually see some seasonality with COVID start to spike up last year in kind of the August and September time frame in terms of utilization. We did see some of that again this year, although actually lower spike up in COVID this year than even what we saw last year. And the overall magnitude of hospitalization from COVID in terms of a spike up versus the baseline is not really material and not causing any material change in our medical margin performance or our medical margin outlook.

**Operator**

We will now take our next question from Justin Lake from Wolfe Research.

**Justin Lake**
*Wolfe Research, LLC*

I wanted to start off -- I've got a couple of questions, but want to start off on the REACH performance. So you said it was $55 million of medical margin. So give or take half your medical margin in the quarter, what were you expecting it to be in the original guide?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Justin, just real quick before -- we can obviously talk a lot about the performance of REACH was just really -- continue to be really positive in the quarter as it had kind of year-to-date so far, but the $55 million of medical margin that we talked about for REACH is not part of our consolidated results. So the $108 million of medical margin that we reported, which does include Hawaii. In addition to that, if you look at the footnote showing the unconsolidated ACO REACH entities, we had $55 million there and about $18 million of EBITDA [indiscernible].

**Justin Lake**
*Wolfe Research, LLC*

And I apologize, that's a very [indiscernible].

**Steven Jackson Sell**
*President, CEO & Director*

Justin, if I can just -- if I can just add to that, Justin. I mean I think we're driving really strong medical margin performance across the entire physician panel across both REACH and MA. And so the $55 million that Tim talked about is driven by beating that national benchmark by more than 300 basis points. In my remarks, I talked about the '22 results. You're seeing that in '23. But the same things that are driving success in REACH are driving success in MA, and our partner market medical margins came in at $111 million in MA which is sort of in our guide. And when you adjust for that PPD, it's actually at the high end of our guide. And I think it's just a function of this model that we've got around high touch and our ability to drive better access cost and quality outcomes. So that's what I'd highlight.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I mean the ACO REACH population has been more traditionally an unmanaged population. So there is a big opportunity for us there. We tended to be even as we move through this year. We have very good current data from CMS on our members and we tended to be a little bit conservative. So we actually saw even positive development as we moved into Q3. We had guided about a $12 million EBITDA flow-through for ACO REACH. We ended up with some positive development flowing through from the previous quarter -- $18 million overall, so far during the year. The way you make money in ACO REACH is -- the way you perform well in ACO REACH is essentially you just outperform the Medicare fee-for-service reference

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 809**

population on cost performance, and we're outperforming that on a year-to-date basis by over 300 basis points. So the model really is starting to prove to be very valuable on the ACO REACH side.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And then Justin, what was your real question? Sorry.

**Justin Lake**
*Wolfe Research, LLC*

Well, the other question I was going to ask on ACO REACH, and again, I could be -- it's been a long couple of days, I might be off again. But my recollection of the Investor Day was that you guys actually kind of titrated lower your expectations for ACO REACH. I think I was looking at it and you would expect that, I think, in 2026 to be at -- am I recalling the number right, $35 million of profitability?

**Steven Jackson Sell**
*President, CEO & Director*

That's right.

**Justin Lake**
*Wolfe Research, LLC*

Okay. So it sounded like you had kind of gotten more conservative or is the thought process there like, hey, let's take that number down a bit. So 6 months later, you're running at that run rate already looks like. Is that a number that you think we should be looking at differently than from the Investor Day? Are you thinking about that business differently?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, absolutely. I mean our emphasizing the power across the entire senior panel is hopefully one of the big takeaways that you're going to have. The way the mechanics and the ACO REACH model work is you carry forward your performance, and you need to beat that underlying benchmark, which we would expect we're going to do again next year. And so I think we feel like we're going to have much stronger performance going forward. We've already seen it this year-to-date. And it's -- we have much more valuable and readily available and consistent information, which is giving us high confidence in that.

**Operator**

We will now take our next question from Stephen Baxter from Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

I just wanted to try to clarify the discussion a little bit on the revisions to the medical margin guidance. So I think I'm following you that you're saying $20 million of the lower $50 million to $55 million revision on medical margins related to pulling Hawaii out. So I guess that leaves, call it, the $30 million for the continuing partner markets. I'm just trying to understand kind of the $30 million in the context of the quarter you just had. It does look like including -- I guess, I wanted to strip out the Hawaii results out of the quarter. It doesn't really look like you were kind of off your medical margin guidance that you provided for the third quarter. So just trying to understand why you have $30 million lower medical margin on a core basis if the quarter was relatively in line. Ex Hawaii, it kind of implies that it's primarily related to the fourth quarter. Just trying to correct my understanding of that, hopefully, if that made sense.

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 810**

I mean I think a key goal for us was to raise and be adjusted EBITDA in the year. We were able to do that based on the strong performance across REACH and across MA. To your point, in those partner markets, they were very strong.

The second goal was to really put ourselves in a position from a reserving standpoint in which we could significantly mitigate the chance of any negative development into 2024. And so I think that, coupled with this utilization outlook, which we think is prudent that the deceleration we're seeing in Q3 will not necessarily continue. That's what puts that $30 million on top of the $20 million that you take out for Hawaii. So that's really the logic around it.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, I think that's right. I mean we -- as we close Q3, if you put the prior period development aside and you take the Hawaii, which was -- did perform below our expectation for the quarter out of it, our overall medical margin PMPM did perform well within the range that we had guided to. So we were very happy with that.

On the other hand, that was a combination of higher revenue as we synced up our final -- got all the mid-years in and synced up our final or the next round of our rev estimates for the year as well as some higher medical expenses that flowed through from that May and early June spike that we saw.

So we just looked at the rest of the year and said, hey, if we just assume that there's not really any further moderation, and we want to continue to make sure that we minimize the possibility of any prior period development bleeding over into 2024, that's an additional $30 million of just medical expense versus what we had in our previous guidance. And we were able to do all that in addition with the strength of the ACO REACH business and the other actions that we just identified. We're on top of that in a position to essentially slightly increase our overall adjusted EBITDA guidance for the year.

**Operator**

We will now take our next question from Gary Taylor from Cowen.

**Gary Paul Taylor**
*TD Cowen, Research Division*

A couple of questions. The first one, just on Hawaii. Why was that -- I think I'm talking at the EBITDA line, if I wrote it down correctly. But why was that an $11 million drag in the third quarter when I think in the first half, it was only a $2.5 million drag? Like and all those sort of metrics on Hawaii got quite a bit worse in the third quarter.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I mean, generally speaking, as we move through the year, there is a -- seasonally, our medical margin does drop down. In Hawaii and particularly, that drives some pretty big deleverage because it's a delegated model, we have a higher cost basis there. And so in the third quarter, without any acceleration of medical margin, you would see a bigger and bigger drag on EBITDA as we move through. And your math is correct, the absolute drag of Hawaii in the quarter was about $12 million on the EBITDA line.

**Gary Paul Taylor**
*TD Cowen, Research Division*

Got it. So just normal seasonality. The second one was, I guess, I'm kind of probably not the only one struggling a little bit with the negative PYD that keeps showing up, but the concept also that you've been building reserves. But net-net, how do we think about carrying?

End of the day, the PYD says the prior year's cohort medical margin wasn't as good as you originally thought. The boosting of reserves says this year, medical margin won't be as high. How do we think about

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 811

carrying that in over the next couple of years? Like how does this development reserve building impact how you're thinking about modeling the cohort medical margin development?

**Steven Jackson Sell**
*President, CEO & Director*

I can start, Tim, and you can jump in. I mean, Gary, I think the thought process is we've been building this year to remove the issue for next year. And so this year, we have the impact of the negative PPD in our results.

We also have the impact of the build, which is there to try and put us in a position where we don't have it going forward to next year. So I think you step off with a very strong run rate across REACH and MA. I think we have a plan to not have PPD recurring, which we've had in the last couple of years. So that should really help as we do that.

And then we have a really strong class coming in for '24 that we just told you is larger than we had previously told you. And the performance of that class we expect to be at the very high end of our typical margin range. And so all of those things, I think as you look towards '24, are real positives for us. And that's been our goal, our goal has been to deliver on the EBITDA for this year and to try and take this issue around negative PPD off the table. And we've had the ability to do that because of the strong performance.

**Operator**

We will now take our next question from Jailendra Singh from Truist Securities.

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

One quick clarification if you're willing to share, who was the buyer for Hawaii asset? Was it a related party? And then my main question is on the topic of utilization trends. Like one of your fair partners, Humana, talked about recently -- about having higher MLR from their PPO book of business, which I believe is like almost more than half of your membership, curious what you are seeing in terms of utilization trends among PPO members versus HMO members.

And one more kind of same topic, like some payers have talked about offering Flex cards and OTC benefits as they view this as an advantage next year, how have been your discussions with them about getting reimbursed for this pressure as you are effectively taking on for them?

**Steven Jackson Sell**
*President, CEO & Director*

So that's 3 questions in one. I'll go down -- so the buyer is an experienced California-based organization that's really strong in delegated model services, so really strong in claims, very strong in customer service. And we think they're a great match with MDX Hawaii. So that's the first point.

In terms of our PPO experience, we've talked about this before. We are probably the largest risk-based player in terms of PPO in the country. Our PPO business is just over 50% of our membership, it's also the fastest-growing component. And our PPO business is -- performance is in line with our HMO business.

And I think the reason for that is the differences in our model. a large payer with a broad network versus our high-touch PCP patient model, which has the ability to guide that patient on where they're going to go for specialty care. At our Investor Day, we shared over 90% of specialty referrals come through that primary care physician even in a PPO model, that is allowing us to really deliver cost-effective care. And so our PPO experience is very strong.

And then just on the -- I think your question is on the Flex card side, our conversations with folks is that on an aggregate basis, we're probably seeing a reduction in those year-over-year in terms of the total dollars across our population that will be out on those.

**Operator**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 812

Our next question comes from George Hill from Deutsche Bank.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

One is actually pretty similar to Jailendra's that I want to ask at a higher level, that I know that kind of going into the back half of the year, we were looking at a lot of the Medicare Advantage ACOs to ratchet back on benefit design given the kind of the poor rate environment for '24 and the changes to the risk model. But it looks like most of them preserved benefits despite kind of the tough rate environment. I was wondering if you could -- and you kind of communicated that the negative rate environment would flow through to their risk-bearing care providers. So I guess maybe just walk us through at a high level how you guys are thinking about what looks like a preservation of benefits and what looks like a tougher revenue environment? And just kind of how you're thinking about that with respect to medical margin and EBITDA margin?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So I mean, George, I think our outlook on '24 is strong for the reasons I talked about strong run rate, strong class coming in for '24 being able to manage that new risk adjustment model very well.

I think our view on aggregate supplemental benefits is that there will be a net pullback on those for the markets that we're in. It's a market by market basis, we don't have a lot of D-SNP in our markets. And so that's kind of the view. And so that would be neutral to a net tailwind, meaning the supplemental benefit experience from '23 to '24. But the big drivers are really the step-off in the run rate, the strong class of '24 and then just our ability to drive kind of medical margin maturation year-over-year.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And George, I'd add one thing. I think when you look at our geographic exposures relative to some of the companies you were referring to, we've got a very different geographic exposure and a very different patient population that we serve. And it -- that's what really drives our view that the changes that you talked about are very manageable for agilon.

**Operator**

Our next question comes from Whit Mayo from Leerink Partners.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

Yes, I've got just two really quick ones. But Steve, you've talked about the investments you guys are making, the 60s blind spots on trend. Is there any update or anything you can share that gives you confidence that you're seeing some of these gaps begin to be improved here. And I just want to be clear, I'm a little confused here on the guidance here. But I think it was last quarter, you guided to a $30 million increase in the reserves within the third quarter range. And so are you saying there's another $30 million now on top of the previously contemplated $30 million? Sorry, I'm just -- I think some of us are a little confused.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So maybe we can start with the guidance. I think last time we talked about a total of $60 million in Q3. And what we are saying is there's another $30 million in Q4. So that is the combination of those two. I think it's -- and we're able to do that because of the strong overall performance across.

In terms of the investments that we're making, I do think we're making progress with our payer partners on the data submission, I think it's really in terms of getting that information from there where we're getting it in a faster way. But the other thing I would tell you is that our REACH real-time data tells us

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 813**

that we're tracking pretty well with that. And that we're able to manage things within kind of the ranges that we expected. Inpatient continues to be down, outpatient is up, but we will take that trade kind of all day long. And that's true across MA and across REACH. But those investments we made and the new data officer we brought in is making us better for that. And we are building reserves so that we make sure we're adequately reserved if development does come through.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

So can I ask just one -- sorry, I'm confused on this point. So does the guidance -- is it 60 total? Or is it 90 now?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So when we came through the second quarter and said, hey, we're going to basically increase our outlook for reserves because we didn't feel like we had clear visibility to some of the increases in utilization that the big payers were putting out there. So now we've actually seen that. We did see that spike up in May, moderated a lot in June came back down, continued to come down in July. So we've now accounted for that, and that was part of our increase on a rate basis the $60 million of medical expense that we had forecast or that we had guided through coming out of the second quarter. And we've accounted for that all now in the third quarter results that we just published.

As we look forward now to the fourth quarter, we've assumed that even though the spike in May clearly has moderated down some that we're not going to forecast that it's going to moderate any further our guidance has then anticipated, it's going to moderate any further, and that would essentially represent an additional $30 million that we've put into our medical margin or medical expense forecast for the second half and is the second reason why our medical margin forecast for MA has come down.

So if an additional $30 million makes this assumption that we don't see any further moderation in claims and puts us, we believe, in a strong position to minimize the possibility that they'll be negative development bleeding through into 2023. And we're able to do that at the same time maintaining and actually slightly raising the midpoint of our overall EBITDA guidance for the year.

**Operator**

We will now take our next question from Adam Ron from Bank of America.

**Adam Matan Ron**
*BofA Securities, Research Division*

I have a quick one on cash flow. It seems like adjusted EBITDA is up $50 million year-to-date year-over-year, but cash flow from operations is actually down. It looks like working capital used to -- like doubled year-over-year. Just wondering what's driving that if it's a timing thing, if we should expect a step-up in Q4 and just generally, how we should think about EBITDA flow through into cash flow?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Adam, thanks for the question. It's always a timing thing with cash flow. Our cash flow when you think about what our final payments and our big payments come in from payers when years are settled up and our surplus has settled up, we typically do have a lag of when EBITDA is generated versus when we actually see the cash for that. So the fact that we have a large number of new payers and a large number of new markets this year, I think something like 34% of our members are actually from this year or on the MA side are actually from our new markets, that just exacerbates that delay essentially.

So we always say that the EBITDA that we're generating this year, we would primarily see transitioning into improved cash flow in the next year. So a little bit in the third quarter, we also have just with the sheer number of new payers and new markets we have, a little bit of a timing issue even when we would normally get some of that settled up. And so we've got maybe a little bit less cash payments that came

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 814

in, in Q3 that will come in through the rest of the year. But yes, we always do have a timing disconnect between the EBITDA we're generating and the cash that we receive for that performance.

**Operator**

Our next question comes from Jamie Perse from Goldman Sachs.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

First one, quick clarification on the $60 million medical margin reduction year-to-date. How much of that is from changes in utilization patterns that you've seen and how much of that is from insulation from future prior period development?

And then my second question, just on new membership for next year, the 25,000 from ACO REACH, 110,000 from MA. You guys have previously said a higher starting point on medical margin per member per month next year. I think you've given above 60 for that on the MA side. How should we think about that in light of what you're seeing in utilization and the new reserving policies? And a similar question on ACO REACH. Just do you think the 300 basis point delta versus the benchmark can hold next year?

**Steven Jackson Sell**
*President, CEO & Director*

So maybe I'll take the second one first. So I think that -- we think we're going to be really strong with this class of '24 next year and above that $60 PMPM range. And our implementation has gone extremely well around that. It's part of our investments in technology, it's part of a faster sales cycle. So there's a longer implementation period. So that's on the MA side.

On the REACH side, we believe our performance is going to carry forward for us. It's always in relation to sort of the net or the macro utilization across the entire Medicare book overall. But every year, we've been positive relative to that. Anywhere from 100 to 300 plus basis points. So I think we would expect for all the reasons we talked about earlier, that would continue for us on a go-forward basis.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And just to follow on then back to the beginning of the question, just to follow on the REACH question. I mean one of the things that we've talked about is, of course, REACH, the revenue benchmark, what we're going to get paid basically moderates within the year based on utilization. So as long as we continue to do a good job, which we have been doing of outperforming the Medicare fee-for-service benchmark performance, then we'll continue to drive really good performance on REACH. And as I said this year, we're outperforming that fee-for-service population with our population by over 300 basis points.

So our model is really having a very positive impact. You really see the power of the model on that. It was previously largely unmanaged population. In terms of the guidance that we put out for medical expense in the fourth quarter, we basically -- just to reiterate what I said before, looked at it and said, hey, let's kind of take a viewpoint that the spike up in May that moderated down somewhat in June and July is not going to moderate down further. And based on that, we're putting a full another $30 million into our medical expense forecast and therefore, medical margin forecast for the fourth quarter.

We think that, that puts us in a good position to meet one of our key objectives, which is let's be appropriately reserved to not have any prior period development bleed over into 2024. So I don't really want to divide it into categories as much as to say, we've looked at the expense trend and tried to be appropriately conservative to try to make sure that we're preventing or at least minimizing the possibility of that happening again next year.

**Operator**

We will now take our next question from Elizabeth Anderson from Evercore ISI.

**Elizabeth Anderson**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

One, I was hoping you could speak sort of qualitatively on -- I know you've talked about how you're doing like additional reserving and et cetera to help sort of manage the utilization as we go into 2024. I think you also mentioned in your prepared remarks that you're also making some qualitative changes on that. So just wondering how you're sort of thinking about that in terms of the claim management. And then secondarily, I was just wondering if you could comment a little bit further on the change in trajectory of geographic entry costs and how that has sort of trended versus your initial expectations given the large size of the class.

**Steven Jackson Sell**
*President, CEO & Director*

So I think Elizabeth on your first one, Tim walked through the math on the reserves. I think maybe what you're speaking to is we have added an SVP of Data Solutions and we are working much more closely with payer partners to make sure that we're getting data in a consistent and more ready fashion around that. So we're making progress on that. Do you want to talk about geo entry cost?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And I was just going to say to add to that, I wasn't quite -- sorry, Elizabeth. I wasn't quite sure what the premise of the first question, but if it's along those lines. The other thing I would say is on prior period development is, obviously, we did have some key partner market prior period development in this quarter that we just reported. But the good news is I think we have made a lot of progress across our broad payer platform with improving the quality and the timeliness of information we're getting from them. And if there's a silver lining in this quarter, it was really a very specific limited issue with one payer. So hopefully, the investments we're making there, the investments and more expertise that we brought in is going to really pay some dividends going forward. So we're feeling better about that.

On geographic entry costs, we were a little bit better in the quarter than what we had forecast. We're trying to make sure that we're -- since that's a new way that we're essentially reporting our adjusted EBITDA this year that were a little bit conservative in that number, but we were a little bit better. But I think overall, going forward, our all-in geographic entry cost, we still expect to be in the $400 to $600 range per new member that we're implementing for the next year. So I don't think we're going to see a lot of movement and we'll probably continue to stay within that range.

**Operator**

Our next question comes from Sean Dodge from RBC Capital Markets.

**Unknown Analyst**

This is Thomas Keller on for Sean. Just one on the higher acuity clinical programs you'll have. With your capabilities already fully implemented across your -- the older cohorts 2018, 2019, I guess, during '22. And so I guess what I'm looking to understand is kind of your latest thoughts on the upside from the rollout of these capabilities for those cohorts that are already generating medical margin PMPMs kind of north of 200.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks for the question. I mean I think one of the distinctive parts of our model is that we've got these programs around renal, around palliative, around high risk managements, that are part of the care team around that PCP. We get much better enrollment rates and much better impact. That's how we're able to drive things like negative inpatient trends.

To date, we're about 60% implemented across all of our markets. Our earliest markets do have those rolled out. By the end of '24, we will have them across all markets, including the '24 markets. So I think we do believe that there's upside from these clinical programs as we get them more fully rolled out.

**Operator**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question is from Jack Wallace from Guggenheim.

**Jack Wallace**

Just to follow up on the cash flow question from earlier. And just given the moving pieces this year, so Hawaii larger than normal, new class for next year, the incremental reserves. You do think that it's reasonable to expect the free cash flow positive next year? Is that maybe more realistic for '25 time line?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, we're still -- and one of the things I said before is we had a very big class coming this year. Actually, that class is performing really well. I think that 2020, cut to 2024 is going to be even a stronger performing class, but we're really pleased with the large class that we brought in this year and where they're performing. As all of the incremental EBITDA that we're generating this year kind of flows into next year, that's going to be a big supporter of our ability to generate positive free cash flow this year.

So for now, we're still on track to do that. Obviously, we'll keep you updated as things move through next year. But we're -- at this point, we're still feeling pretty good about next year being kind of a transition year into positive free cash flow.

**Operator**

We have no time for further questions. So with that, I will hand back to Steve Sell, CEO, for final remarks.

**Steven Jackson Sell**
*President, CEO & Director*

Thank you, everyone. We appreciate your interest in our company, and we look forward to updating you on future calls. So we will talk to you soon.

**Operator**
This concludes today's call. Thank you all for your participation. You may now disconnect your lines.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.

**APP 818**

# EXHIBIT 22

APP 819

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): November 14, 2023**

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

| | | |
|---|---|---|
| **Delaware** | **001-40332** | **37-1915147** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **6210 E Hwy 290, Suite 450** | |
| **Austin, TX** | **78723** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**APP 820**

**Item 7.01 Regulation FD Disclosure.**

Attached hereto as Exhibit 99.1 is a slide presentation being presented to investors by agilon health, inc.

The information set forth in this Item 7.01 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Investor Presentation Slides dated November 14, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 821**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:        November 14, 2023                                    By:    /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

**APP 822**



# Disclaimers and Forward-Looking Statements

**FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION**

Statements in this presentation that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions and the realization of expected benefits of the sale of our Hawaii operations.  Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to, those factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.'

**NON-GAAP**

This presentation includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements.  We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**TRADEMARKS**

All rights to the trademarks included herein, other than the Company's trademarks, belong to their respective owners and our use hereof does not imply any endorsement by the owners of these trademarks.



Copyright © 2023 agilon health

APP 824

# Empowering Doctors and Transforming Senior Care

- **Improving patient experiences and outcomes**
- **Our model is resonating with PCPs, patients, and payors**



Note: Primary Care Doctors and Patients exclude Hawaii

agilon health

# Our Financial Model and Longer-Term Commitments

## Reiterating 2026 Adjusted EBITDA Target

**Guidance With Geo Entry**
(Per revised SEC guidance)
>$530M

**Geography Entry Costs**
(Expected annual amount)
~$70M

**2023 IR Day Presentation**
(Presentation prior to subsequent SEC guidance)
>$600M

Notes: Adjusted EBITDA target for 2026 included $17M contribution from MDX Hawaii and $30M contribution from ACO REACH.

## Adjusted EBITDA Drivers and Performance

**Membership** – *meaningfully ahead*

**Medical Margins** – *slightly behind*

**ACO REACH** – *modestly ahead*

agilon health

4

# How Medical Margin Differed From Expectations in 2023



Note: The average membership in the Original Guidance excl. Hawaii was 360K compared to the Current Guidance mid-point of 377K.

agilon health

5

**APP 827**

# Claims Trend Assumptions for Remainder of Year (Aug-Dec 2023)

- **Full year cost trend guidance is $90M higher than our initial expectation**
- **May/June/July costs were $30M higher than expected but moderating**



| | |
|---|---|
| May | $19M |
| June | $8M |
| July | $3M |

- **Guidance now assumes $50M of higher costs, $10M/month for Aug-Dec**
- **PY development represented an additional $10M in costs during 3Q**

Note: May/June/July estimate for excess cost above initial expectation based on a subset of payors with more current claims data

agilon health

6

# Levers To Improve Performance in 2024 and Beyond

- **Expanding programs to control medical costs**
  - *High-risk/Complex Patients:* Expanding foundational clinical programs to 100% of markets by year-end 2024 (e.g., renal, palliative, high-risk management): +$30 PMPM opportunity
    - 1,000 Senior patients enrolled in palliative care study saw 39% fewer hospitalizations, 48% less ICU days, and 21% fewer ER visits.
  - *High-cost settings*: New real-time inpatient data capability - across all markets in Q1 2024, lower-cost ambulatory surgery center alternatives in select markets.
  - *Practice variability:* For PCPs, bottom quartile to median performance
- **Engaging with health plans decreases supplemental benefit exposure**
  - Improve data collaboration and future contract structures
- **Implemented strategy to address prior year development**
  - Continue to close visibility and data gaps with payor partners
  - Reserve in upper end of actuarial estimation range exiting 2023

agilon health

7

# We Are Ahead on Membership Growth & ACO Reach

## Membership Growth



**New Partner MA Adds:**
'18-'20: ~25K per year
'21-'22: ~45K per year
'23-'24: ~100K+ per year

## ACO REACH Performance

- **2023 Adjusted EBITDA contribution of $39M is ahead of initial guidance and 2026 target**

- **Similar medical margin savings (>$130 PMPM) as Medicare Advantage in 2023**

- **Important to our network: meaningful risk-based enrollment across PCP's entire Medicare panel**

agilon health

8

**APP 830**

# Divested Hawaii Due to Lack of Strategic and Financial Fit

## Sale enables agilon to focus on 31 core partner markets

- **Closed on October 31.  Proceeds are immaterial.  agilon does not retain any liabilities.**

- **Hawaii was agilon's only non-partner market.  The market ran lower Medical Margin, higher local opex, and represented drag to Adjusted EBITDA.**

- **agilon is focused on markets with scaled, long-term JV partner and multi-payor contracts.**

**MDX Hawaii Financials (2023 - Initial Guide)**

- Revenue: $313M
- Medical Margin: $25M
- Adjusted EBITDA: ($4)

**MDX Hawaii Financials (3Q23 YTD)**

- Revenue: $241M
- Medical Margin: $8M
- Adjusted EBITDA: ($14)

Notes: Non-GAAP reconciliations provided in tables to Form-8K furnished on November 2, 2023

agilon health

9

**APP 831**

# Adjusted EBITDA Drivers for 2024

- ## Medical margin growth in 2023 is modestly lower than initial guidance
  - Medical margin for Year 2+ market classes still up 23% for the full year 2023
  - These ~255K MA members expected to increase Medical Margin further in 2024
  - Same geography membership expected to grow above market in 2024

- ## Large Year 1-2 Classes contribute meaningfully
  - Class of 2023 (>130K MA members) ramping Medical Margin in 2024
  - Class of 2024 (>110K MA members) starting >$60 Medical Margin PMPM

- ## Expect to build on 2023 ACO REACH performance into 2024

agilon health

10

**APP 832**

# EXHIBIT 23

APP 834

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Guidance/Update Call

Friday, January 05, 2024 1:00 PM GMT

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 835**

Case 1:24-cv-00297-DAE     Document 52     Filed 11/08/24     Page 839 of 1067

# Table of Contents

Call Participants ................................................................................ 3

Presentation ...................................................................................... 4

Question and Answer ........................................................................ 8

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 836**

# Call Participants

## EXECUTIVES

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

## ANALYSTS

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

**David Michael Larsen**
*BTIG, LLC, Research Division*

**Elizabeth Anderson**

**Gary Paul Taylor**
*TD Cowen, Research Division*

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Shailendra Singh**
*The Trust Company Limited*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 837

# Presentation

**Operator**

Hi and welcome to agilon health guidance update. I will now hand over to Matthew Gillmor.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good morning, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley.

Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements, due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss in this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results, and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

Following prepared remarks from Steve, Tim will join us for a Q&A session. With that, I'll turn things over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good morning, and thank you for joining us on short notice. Our call this morning is intended to provide an update on how 2023 is finishing and our first look at 2024.

As called out in our press release, a significant increase in medical and nonmedical costs during 2023 has had a material impact on our full year results. I will walk you through what has changed since our last update, why our confidence in our business model remains high and how these factors impact our revised guide for '23 and our initial guide for '24.

My comments this morning will follow the presentation found on our Investor Relations website. Before I dive in, let me give you 3 framing thoughts. First, we are clearly living in an elevated utilization environment that is challenging, and we assume that environment will persist through 2024.

Second, our 2023 underperformance was largely driven by 2 issues: a forecast that failed to recognize these elevated cost trends and a data and analytics gap that led to our being late in both recognizing the magnitude and source of the utilization shifts. We can do better on both of these items and in fact, have made significant strides in the last few weeks.

Finally, growth has been a source of differentiation, as we have become the destination for primary care doctors looking to move to value. But one aspect that we failed to appreciate was that material growth in mature markets has brought a significant number of new primary care doctors, and there is a low-hanging fruit opportunity to do a better job in terms of onboarding and educating these newer doctors, so they fully understand and can perform well in our model.

Now as we turn to Slide 3 in the presentation. We are lowering our 2023 guidance for medical margin to a midpoint of $350 million and adjusted EBITDA to a midpoint loss of $62 million. Higher cost trends became visible to us starting in mid-December, as we closed our November results. We recognized at that time that we were seeing cost trends that were 2 to 3x higher what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 838**

In the face of this change, we made a proactive decision to both adjust our Q2 and Q3 completion factors and increase our Q4 utilization assumption. We are carrying the higher utilization assumption into our initial 2024 adjusted EBITDA guidance of $40 million to $60 million.

Given the lower baseline and the elevated utilization assumption for 2024, we have made the decision to withdraw our 2026 outlook. While 2023 has not played out as we expected, we continue to drive value for primary care doctors. In fact, this year, we have reinvested over $200 million back into local primary care, which is up $40 million from last year.

It is very clear to us that we have a lot of work to do. We have identified a targeted set of actions we believe will drive performance in 2024. These include boosting our operating efficiency, leveraging our strong payor relationships, addressing our data visibility gaps and expanding support for our new primary care doctors.

On Slide 4, this is a chart that we showed you in November. Let me show you what has changed here in terms of medical margins. The most significant change has been in core medical performance, which is $110 million lower than our previous projections. $90 million is from higher costs, and you can see from the callout box, how that falls across the quarters. These are the elevated costs I just spoke to in terms of specialists, outpatient surgeries and Part B drugs.

$20 million of the core medical change is from negative revenue revisions tied to 2 year 1 payors, which provided updated data to us in December. The other change is an adjustment in terms of net prior year development, which resulted in a $3 million of lower revenue from Part D settlements.

On Slide 5, you can see how utilization has accelerated from 2022 to 2023. When we talk about areas in which our business model is working well, I would point out significant progress in terms of hospital inpatient costs. In fact, the clinical programs for renal, palliative and high risk management that we shared with you on our Investor Day, have driven a net decrease of 2.6% in terms of Inpatient Medical, which is roughly 10% of our total costs. This was not enough to offset a significant step-up in terms of utilization in key areas like specialists, Part B drugs and outpatient surgeries, which are running 2 to 3x higher than last year.

Our new projections assume these trends will persist through 2024. In fact, when we look at outpatient surgeries like hips and knees, we believe we are about 60% of the way through a backlog of pent-up demand from COVID.

On Page 6, you can see that despite the 2023 headwinds, we have made significant progress against our mission to increase value for primary care doctors. On this slide, we show you our Year 2+ partners, which enables you to see our performance on what is essentially a same-store basis across Medicare Advantage and REACH. By taking better care of patients, we have increased our combined medical margins by 19% and generated 22% better economics for our partners despite the difficult year. That yielded a 13% increase in terms of gross profit for agilon on a same-store basis across our Year 2+ partners. While this was below our expectations for 2023, it demonstrates the power and leverage inherent in our model.

At our company, we are constantly looking to adjust our people, processes and technology to changing market dynamics. For 2024, we have identified a clear set of actions to improve performance, balance risk sharing and enhance predictability.

For operating efficiency, you will see that our OpEx leverage has improved from 4% in 2023 to 3% in 2024, due to our ability to leverage both corporate and market investments that drive our efficiency and performance in 2024.

From a payor perspective, our relationships have never been stronger. We have found our payor partners willing to work with us to more economically manage the elevated utilization environment and to adjust for excess supplemental benefit costs. It's important to our payors they have a very successful delivery system, and in particular, a strong primary care delivery system.

And through an alignment of mutual need, our recent conversations have reflected that reality.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 839

Better data visibility and analytics is a real opportunity for us, and we have executed changes in terms of our internal and external data and actuarial teams and externally created much better alignment with payor partners.

Finally, there is a real opportunity to better onboard and educate new physicians in our existing markets and reduce performance variability.

Turning to Page 8. When we talk about opportunities in our mature markets, this market is a great example. This market has seen 40% growth in primary care doctors and 75% growth in [indiscernible]. In addition to opportunities with payors and a new value-based care partnership, the big opportunity in this market is to focus on the 30% of primary care doctors that have joined post the market implementation. If we do this right, we should be able to move these new 76 PCPs from $34 PMPM of medical margin, up to the $161 PMPM level that our veteran PCP partners are seeing.

On Page 9, we have outlined our revised guidance update for 2023 based on the macro utilization trends that we are projecting through Q4, we are lowering our 2023 medical margin outlook to a midpoint of $350 million, and our adjusted EBITDA outlook to a midpoint of negative $62 million.

Our '23 revised outlook also reflects substantial investments that allowed us to add 270,000 members and 1,200 PCPs on the platform via the classes of '23 and '24.

On Page 10, our 2024 guidance assumes another year of high medical costs, with a 5% medical trend that matches what we have seen in 2023. This year, one key area of step-up will be a combined $150 million of incremental medical margin from those large new 2023 and 2024 classes.

Operating leverage acceleration from technology investments and centralized activities will yield $20 million of incremental improvement.

Page 11 shows you a straightforward medical margin bridge. From a $375 million incurred medical margin starting point, you can see the impact of our Year 2+ classes, with a $228 million revenue, a $141 million offset from a 5% medical cost trend less the impact of our clinical initiatives and $20 million in nonmedical supplemental benefit costs.

Finally, you see the $127 million lift from the class of '24, which is an all-time high level of $176 per member per month.

A few call-outs on the impact of this class. First, it reflects our entry into a very mature managed care and value-based care market of Dallas, Texas. This is important in that it both expands our TAM beyond 100% fee-for-service markets, and it also provides a much higher year 1 starting point for this group.

Second, this class also reflects our addition of 2 health system partners in Dayton, Ohio and Western Michigan that are coming on in existing markets and leveraging existed in infrastructure and contracts, which is also yielding a higher than average year 1 starting point. The output is a midpoint medical margin forecast of $580 million for 2024.

So in conclusion, we have had a challenging year, driven by a forecasting miss in an evolving environment, coupled with our data visibility issues. We are going to manage through these higher utilization levels via our initial 2024 guide and our action plans, but these headwinds have created a delay in our market cohort maturation. But when we look at the power of our business model, there is a clear long-term opportunity built around the following key factors: first, the demand for a new primary care model that rewards patient outcomes has never been higher, and the continuing pain of the fee-for-service system only accelerates that demand.

Second, the agilon platform is driving more value each year to our existing primary care doctors, making the case even stronger for prospective PCPs looking for an alternative.

Third, membership growth continues to accelerate, creating long-term value, with the addition of 270,000 members in the classes of 2023 and 2024.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 840

And finally, as we talked about in our mature markets, variability in the system is our opportunity. And in fact, it's a central reason the company was created and the value proposition is so compelling that primary care doctors in every kind of medical group in the country are joining our network.

We will now go to questions.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 841

# Question and Answer

**Operator**

Welcome to the Q&A portion of the call. [Operator Instructions] The first question comes from Justin Lake from Wolfe.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Justin, are you there?? Operator, we can't hear Justin.

**Operator**

I will move to our next question, and then I'll come back to Justin and see if the line is working okay for him then. Give me a few minutes. Okay. Our next question is from Lisa Gill from JP Morgan. If you could unmute your line and ask your questions.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Operator, do the participants need instructions that to unmute their line, is there a button they need to hit? .

**Operator**

No, they should be able to speak. Do you see if you could ask your question, Lisa?

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

I'm on the line. Can you hear me?

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

There you go. [indiscernible]

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

All right. Figured out something correct today. First off, thank you for doing this instead of next week. So I appreciate that for my end.

Just really want to understand something a little bit better. And you talk about the visibility going into 2024 and addressing data visibility. Just given the number of revisions in 2023, what are some of the differences of the level of visibility you now have going into 2024? And I appreciate your comments around elevated utilization trends, we have been seeing that. But really, it's more on the visibility side and the data that you're getting, for example, from the payors, et cetera, like how do we get more comfort that you do have that level of visibility going into '24?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks for the question, Lisa. I mean I think when we look at this year, we've got this macro utilization that's up, but from our perspective, it's a forecasting issue and then there's visibility on a data lag.

To your question about what's changed is we've really worked intensively with our payor partners to be getting claims data information in faster. And so we've got payors that a year ago would have been a 2-

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

month lag that are moving to a 1-month lag, we're getting it earlier in a monthly cycle. So those things are very powerful for us.

We also have really, as I said in my prepared remarks, kind of overhauled our data and actuarial teams, both in terms of internal and external resources leases. So we've got a lot of external data points from a few firms that we're laying in with the payors. And then Tim and I and our data team are spending a lot more time with the leadership and the plans talking about exactly what we're seeing and what that means for us. And so I think it's a combination of those things that has given us better visibility, that's led us to the actions that we've taken in terms of revising the guidance and increasing the trend assumption for '23 and then the projection out to '24, basically maintaining it at these higher levels.

So more wood to chop on that. I mean this is a key area for us. But I think the combination of how we're forecasting to incorporate that and these other data points as well as the work to improve it is a key part of that.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Steve, just as a follow-up to that. Like if I think about the comments that you made around physician interest in agilon and these types of platforms, is the reduction in your guidance, is that hurting you in any way in attracting or retaining physicians? Because my guess would be right that the payment to them, the maturation time line is longer. So is that having any impact when we think about the outer years of attracting new physicians?

**Steven Jackson Sell**
*President, CEO & Director*

So Lisa, I mean, I think there's great alignment between our physician partners and us. Both of us are very motivated in terms of driving improvements in medical margin by delivering great patient care. What we tried to show you in the presentation was that even in a difficult 2023 year, we showed a 22% increase in terms of the physician economics and a 13% increase in our agilon gross profit.

So we're making progress year-over-year. It's not at the level that we had initially projected. And then I'll just say what I ended with my comments with the alternative in fee-for-service is just so difficult for these docs, that I think the fact that we continue to show improvement, there's alignment around how can we get better. For example, this onboarding of PCPs in these existing markets so we can really narrow that gap relative to their veteran partners, we have the benefits of that learning when we [indiscernible] their markets. I think there are all things that we can do to address that.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Lisa, this is Matt. One thing I might add to this answer is the value prop that we offer physicians is really, really compelling and the magnitude is really impressive. So we're obviously disappointed that we're not achieving our expectations this year, but the value prop is still highly differentiated and very sizable. So just to throw that out.

**Timothy S. Bensley**
*Chief Financial Officer*

And Lisa, maybe just to [indiscernible] Steve talked about the 22% increase for that all of our partners have been here since '22 or before in terms of what is being pushed back to them for what they're being reinvested, that number is over $200 million now. So it's a very large number as well that we're essentially sharing back to the partners of reinvesting in our PCP groups.

**Operator**

The next question, we'll go back to Justin Lake, if you could ask your question as we see if we can hear you then.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Justin Lake**
*Wolfe Research, LLC*

Just working now.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

We got you, Justin.

**Justin Lake**
*Wolfe Research, LLC*

All right. Thanks for the question and bearing with me. The -- so just to follow up a little bit on Lisa's question around the docs. I'd like to go backwards. And when you look at your doc groups now, some of the -- obviously, the year 1 docs are a much lower margin, but are there any doctors that aren't seeing profitability that are out beyond year 1? Are there any kind of one-offs, two-off? Are there any that just aren't making it through the process of kind of ramping?

**Steven Jackson Sell**
*President, CEO & Director*

So we do have markets that are off of our projecting, Justin, in terms of these mature markets that are below sort of the levels that we obviously forecasted that. In terms of year 2+ markets that are running negative relative to where we're at today.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, Justin, you are asking about are there individual doctors in those year 2+ markets that aren't getting any -- that aren't generating any profitability?

**Justin Lake**
*Wolfe Research, LLC*

Yes. Start there, just like, I guess, individual docs deals a little bit could be pretty variable. I was actually asking more about individual markets. Are there individual markets that are losing money overall? Is there anybody that you're actually having to take a loss on?

**Steven Jackson Sell**
*President, CEO & Director*

So yes, at the market level, we do have some groups with our revised utilization assumption that would run at a loss for 2023. So that they're off the trajectory that we would be laying out for those. So that only one market.

**Timothy S. Bensley**
*Chief Financial Officer*

We had one market that gets below breakeven market EBITDA in 2023 with these revised -- with these revisions.

**Justin Lake**
*Wolfe Research, LLC*

Got it. And what happens there? Do the docs start -- do you start thinking about saying it's just not going to work in this market or what has been some of the issues in that market specifically?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 844**

So in that market specifically, I mean, it's in some of the categories we're seeing nationally, but they're more exaggerated. So supplemental benefits has been an issue, in which there was a material change in that. And we saw the impact of that nationally, we ran $24 million over our expected budget for the year and supplemental benefits. But proportionally, this market was higher around that.

We've seen some of these outpatient surgeries running heavier than what we expected and the cost of those surgeries. So this opportunity for alternative sites of care for that surgery delivery is another opportunity which is there.

In terms of the things to do around that, Justin, I talked about the work we're doing with payor partners, and that's one of the markets where we're pretty actively engaged around the economics and the magnitude of the change from 1 year to another. And the ability to sort of have an economic arrangement that works for the payors and works for us so we can have kind of a sustainable delivery.

And as I said, I think there's pretty good alignment around that. Primary care doctors and health plans have this mutual interest and the health plans need a really strong primary care delivery system. So that -- those are the things that we're working on.

**Justin Lake**
*Wolfe Research, LLC*

Okay. And then I apologize if I missed it, but did you give a cash flow number associated with the 2024 guidance?

**Timothy S. Bensley**
*Chief Financial Officer*

We did not. But at this point, what we're saying is due to the much lower 2023 guidance that we just put out, our projection of getting to positive cash flow in 2024 is going to be pushed out to 2025.

**Justin Lake**
*Wolfe Research, LLC*

Okay. So the -- how much revision is there in '23? And how much do you burn in '24? What's the updated '23 cash flow number now? And what's the '24 cash flow number?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So right now, we would expect to end 2023 with over $500 million of cash on hand -- unrestricted cash on hand. That's about $150 million cash burn year-over-year from '22, and that number will be approximately cut in half in 2024 and then bring it to -- the burn cut in half '24. I'm sorry, not the cash but the burn from $150 million [indiscernible].

**Justin Lake**
*Wolfe Research, LLC*

[indiscernible]

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And then 2025, we would expect that to then turn back to positive cash generation.

**Operator**

Next question comes from Shailendra Singh from Truist.

**Shailendra Singh**
*The Trust Company Limited*

Can you guys hear me?

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 845**

**Steven Jackson Sell**
*President, CEO & Director*

We can hear you.

**Shailendra Singh**
*The Trust Company Limited*

Okay. Yes. Okay. So my first question, the medical margin guidance reduction of $105 to $110 million in '23, can you provide more color around like how much of that have you already experienced or observed, and how much is your estimate? What I'm trying to understand is, and I know this is not a traditional approach, but are you building any cushion in your '24 guidance for any negative PYD?

**Steven Jackson Sell**
*President, CEO & Director*

So thanks for the question, Shailendra. I mean I think we laid out proportionally where this extra $110 million sort of breaks out across that -- $90 million of cost breaks out across the quarters, $18 million in Q2, $31 million in Q3 and $41 million in Q4. And so you can see sort of the progression across time and what our expectation is as we go into Q4. We are at a, like I said, a 5% overall utilization expectation, and we think that's prudent. But the goal here is to really set a strong foundation to step off from '23 as we go into '24, and to make sure that we have really appropriate expense assumptions around that.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And Steve, the only thing I would add is, and Steve talked about this business in prepared comments but the changes that we have made to -- particularly as we closed November now as we're approaching December to work with payors to get better data, to get some accelerated additional information about what we think has happened to utilization.

Obviously, it was a big part of what led to this adjustment to our medical margin and medical expense outlook. But what that also does is just gives us greater confidence as we're closing out the year [indiscernible], we're closing the reserves that are now appropriate, and we're not building in or anticipating prior year development continuing into 2024 as it did in 2023.

**Shailendra Singh**
*The Trust Company Limited*

Just a quick clarification there. Steve, so how much complete data do you have? Is it through August or September?

**Timothy S. Bensley**
*Chief Financial Officer*

What our completion rates are?

**Shailendra Singh**
*The Trust Company Limited*

Yes.

**Steven Jackson Sell**
*President, CEO & Director*

[indiscernible]

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So at this point, we would be highly -- it takes a while to get to 100% complete, obviously, in any quarter, but we are highly complete for Q2. I don't want to put a specific average depletion factor for

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 846

Q3, but obviously less. And then for Q4, I'd say we have very good visibility in October, now some better visibility into November than we would have had because of some of the accelerated information we have from payors. And then December obviously is still largely incomplete.

**Shailendra Singh**
*The Trust Company Limited*

Okay. And then my follow-up was around like your decision to withdraw your long-term outlook. I understand, recent trends are creating uncertainty. But are you assuming these trends are more permanent in nature than temporary? And it clearly looks like your margin ramp assumption you've shared in the past to getting to like 200-plus PMPM no longer a good reference point. I'm just trying to understand your confidence in the long-term earnings power. I know in the first couple of questions, we spent time on the long-term thesis around kind of attracting provider growth. But earnings power, like how should investor growth or us get comfortable around that on the viability of this business model from a long-term earnings power point of view.

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think that the thesis remains intact. I mean what I said is I think this is a timing issue, and our cohort maturation is off. The decision to pull the '26 guide is really based on this utilization being elevated. It's a pretty material change in '23, north of 5%, projecting 5% again in 2024. And given that uncertainty, that was kind of that key driver around that.

And so I think that becomes the key part of us as we look at this maturation. We believe we can drive them up. The question is, will it be at that same slope that we had looked at historically? And that utilization piece is a critical element around that.

**Timothy S. Bensley**
*Chief Financial Officer*

Shailendra, just to go back to the previous question because the other [indiscernible] as a support and not just what we're assuming for completion factors. But what are we assuming for the actual utilization rates that we're building to our overall outlook. And just to reinforce what I think as Steve said earlier, and one of the other things that gives us more confidence, we are actually projecting, as we flow through the year now that Q4 utilization rates will be at the same elevated levels as they were in Q3 and before.

So previously when we gave guidance in Q3, we thought we're seeing moderating those ranges. We're no longer projecting that. So even though we have a lower completion factor in Q4, obviously, from the visibility that we have from real claims coming in. We are projecting is that when those plans are complete that they're going to be at the higher utilization rate than we've seen coming through Q3 now.

**Operator**

Next question comes from Whit Mayo from Leerink.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

Steve, can you maybe spend some time addressing the steps that you're taking to improve the physician variability, what you're doing, how you're holding the team, the physicians accountable for these changes. And given the rapid physician growth that you've had in some of your legacy markets, do you feel at some point that some of these physicians may not be an appropriate fit within your model?

**Steven Jackson Sell**
*President, CEO & Director*

Thanks for the question, Whit. So I think there's a real opportunity for us, agilon, to do a better job in terms of onboarding and educating our physician partners. We've done an extremely good job in our new markets, new partners. I just talked about adding 1,200 PCPs in the class of '23 and '24.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

But we are also growing significantly in our existing markets as other docs want to join in. But we've -- the example I gave in this one market and the presentation was 30% of those docs have not had that onboarding and orientation. So we're taking the same team, the physicians who've been working with new folks, to go back and literally go through kind of the basics of the agilon partnership, what are the key things they need to be doing around access and quality and cost management, how they leverage the care teams that are around them and the resources that are there.

And so when I showed you this example in here and the opportunity of improvement, $161 PMPM for those veteran PCPs, $34 for the newer PCPs. That's a real opportunity for us to improve as we move those new PCPs up and they understand sort of what are the key things that can drive success in the model for themselves and for us. And so we work with our partners always and they are the ones who are really sort of clear eyed about who fits within this model. And so we operate at 50-50 within a partnership. So they're the ones that are only making those calls, and they've done a pretty good job on that. So I think this is more an issue of this gap, there's enough opportunity for us to do onboarding here and work and educate these newer PCPs.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

Okay. And maybe just one other question. I've had a few emails here. People trying to understand the new markets, Dallas, Dayton, Western Michigan. What specifically makes these groups come in at a higher starting point? I mean I know you said that they were mature, you cited some infrastructure. But maybe just unpack that comment a little bit to give us the confidence on the medical margin for next year or this year.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So this class comes in at $76 PMPM by far, the best that we've seen to date, and it's obviously a very large class. I mean I think the significance is where these markets are at, in terms of sort of value-based care infrastructure and maturation. And in Dallas, this is a market that has seen a lot of progression. And our partner Catalyst, really outstanding group, has got a tremendous amount of experience around this. And so they come into a market with some existing infrastructure. They're a scale player, and then our partnership together should really sort of turbocharge that. So that's -- it's sort of the market and where that is at and our partner and kind of what they've done historically.

In these markets in Western Michigan and Dayton, Ohio, we're the one that's there. We're the one that changed the market. We have existing partners that are there. Two health systems are joining one in each one of these markets, but they take advantage of existing contracts, existing infrastructure, existing teams that are there, and they've got a very full and robust implementation we've talked about class of '24 having a very full longer period than any class we've had historically.

And so I think with the combination of those things, those markets will start higher than an average year 1 starting point, and they're all large groups. So that's really the combination of those things is what drives that.

**Operator**

The next caller is Stephen Baxter from Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

A couple of questions for you guys. So wanted to ask on the 2023 cohort assumptions and the guidance for 2024. It seems like you're not really expecting a whole lot of improvement there on a PMPM basis, usually that would be a pretty big step up in the second year. So just trying to understand is that totally offset by the higher trend? And I guess just broadly, where should we look at the 2023 cohort contribution expecting to come in for 2023? And then a couple of follow-ups.

**Steven Jackson Sell**

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*President, CEO & Director*

So Stephen, we've called out in the medical margin bridge sort of the year 2+ step-up that you would see from '23 to '24. Obviously, strong revenue year-over-year, offset by the higher cost trend in the supplemental benefits. So that will be an important part of the step up. But within that, sits this class of '23 that takes a very meaningful step up year-over-year. And so the class of '23, taking that step from year 1 to year 2 is a very meaningful part of that. And then obviously, this class of '24 coming in.

The class of '23 adds 130,000 members and $23 million of that incremental medical margin that we show you in the bridge for those year 2+ markets.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Stephen, Steve gave the PMPM for the class of 2024. Tim is going to provide the PMPM for the class of 2023 in just a second. So we'll give it to you.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Okay. Got it. Yes, I was thinking it was like 15 PMPM. And I think historically when you think about the curves, it felt like there was something steeper than that typically factored in. But it sounds like one of the higher trend is part of the answer there.

So just the other couple of questions I had. Anything different about ACO REACH contribution either in 2023 or in 2024 that you wanted to flag? And then just last question would be, I assume the answer is probably not. But can you talk about whether the financial results you're seeing this year compel you to think about growth in any different way? Is there any thought to growing more slowly or maybe approaching market selection differently to hone in on more markets that potentially look like Dallas contribute early on with those partners are expected to?

And then I guess, just finally, what's the messaging going to be to the physician groups about the challenges you've seen this year? And do you think this is going to create any challenges as you look forward to adding future classes, some of the performance in 2023?

**Steven Jackson Sell**
*President, CEO & Director*

There's a lot of those questions. So first question, the ACO REACH contribution this year will be in line with what we expected, I think coming in at $39 million. Next year, roughly in line with that. So that -- that's point one.

New markets that we're looking at, I mean, we're working the class of '25, the class of '26. I think this opportunity to grow in existing states and existing infrastructure is one that continues to be a part of that, Stephen, because it's not just Dallas, but in Dayton and Western Michigan, you're getting that benefit of a new partner coming in with the existing geography. So that's the key part of it and making sure you get the right partner around it.

And then...

**Timothy S. Bensley**
*Chief Financial Officer*

Did you want to sort of [indiscernible]?

**Steven Jackson Sell**
*President, CEO & Director*

Well, let me do the messaging one, and then we'll come back. And then the messaging to our partners is our business is strong, we're aligned around driving medical margin across time. We showed you in here, even in a very difficult year, the progression that our year 2+ markets are seeing across their entire

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 849**

panel. And so the message is we're aligned to really go drive it. What are the areas that are driving the differences and how can we better work around that.

We're taking agilon this responsibility on really working this onboarding and education with the PCPs that are newer, and there's a better opportunity to drive performance there.

And then we're working extensively with payor partners, what's the site of service for hips and knees. And so we're doing it in partnership with them. I think they are very aligned and feeling good about where we're at. But we talked with them regularly about that, and I've got a great advisory board that gives us feedback around.

Tim, you want to add?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And Steve, I think your math was right, but just to quantify it in terms of PMPM that class of '23 over the year, we're going to run about $39 PMPM this year, which is just a little bit below what our original expectations were, and that should get us to about $54 next year, $54 is the assumption that we have in our bill for next year, about a $15 increase PMPM year-over-year across those 130,000 members.

**Operator**

Our next question comes from Gary Taylor from Cohen.

**Gary Paul Taylor**
*TD Cowen, Research Division*

Just had a few additional at this point. I guess, one, maybe just a little request. But I know at the last Investor Day, we had that cohort update, I think, for multiple classes. And I guess I'll just register a hope or a request that we could see that again, either at year-end or maybe at next Investor Day just to understand it could just trying to model all the cohort development would be easier with the update. So I'll just register that. I appreciate the '23 information just shared.

I wanted to make sure I understood. You're talking about is the difference between the 7.6% trend you're showing on Slide 8 for '23 and the 5% you're talking about carrying to '24, the 5% is just year 2 trend and the 7.6% is the overall company trend. Is that right?

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Gary, the 7.6% was a specific mature market.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. The 5% is across our entire network. This was an example of mature markets, and we've got a lot of new docs that we can go educate. But we showed you, this market ran an even higher trend than our network average and what the things that were driving that was the PCP variability issue that we talked about, but also outpatient surgery running at higher trends than what we saw across our network and then supplemental benefit costs. So it was a market example, but the right number is, is that 5% trend across the network.

**Gary Paul Taylor**
*TD Cowen, Research Division*

Okay. Got you. Yes, I see the subtitle there now. My other question would be, unless I missed it, what about ACO REACH. Is there -- is all of this cost issue that you're describing today really in the MA book and ACO REACH is still performing better as it had through the first 3 quarters? Or is there anything significant to say there?

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 850

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, Gary. The -- our expectation for ACO REACH as we closed out the year is just right in line with what we said at the end of Q3. I would say we are seeing some additional cost pick up in ACO REACH as well. The only thing I would say is it's not going to be as dramatic a pickup versus a less expectation [indiscernible] we just have really more complete, more current information from CMS. So we're able to stay up with it pretty well.

The other thing is even as we're seeing some increased costs, there's also increased costs overall in the reference population that will make the [indiscernible] less punitive than we would have assumed. So some incremental cost, somewhat offset by some lower or less punitive [indiscernible] trend adjustment, and we believe ACO REACH will be pretty much in line with what we said at the end of Q3.

**Gary Paul Taylor**
*TD Cowen, Research Division*

And then just one more for me, I appreciate it. I know you -- I mean, so much of -- I mean, the majority of the medical margin improvement you're expecting in '24 is coming from this class of '24, I think 2 other analysts have sort of tried to delve into more detail on that. I guess mine would just be, is it -- I mean really does this -- how much of this comes down to that there's particular reasons why this group of physicians and patients are going to be at a more advanced coding level than you might initially see in initial class? Is that a big part of this initial -- this year 1 per member per month expectation?

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think it's -- the 3 partners I talked about that are coming on in markets where we have more advanced infrastructure and they get to take advantage of that. In the case of Dallas, they've actually got a great track record around that. The revenue that you come on with is a component of that, Gary, but also just knowledge and savviness around managing the cost of care side.

So it is both of those things, but it's really a function of you're in a market in which you got a lot of infrastructure, you've got a partner who's pretty savvy on that. And then the last thing, as I said earlier, is we've had a full 12-month implementation that gives us a lot of visibility and comfort around that.

**Operator**

The next question comes from Elizabeth Anderson.

**Elizabeth Anderson**

I have a question on a couple of sort of cleanup things. With the $20 million negative revenue revision from those 2 plans, can you talk a little bit more about that? And is that something that just along with your sort of data and visibility improvements you don't expect to happen again? Or just sort of help us think about that.

And then if we think about the new geography cost being up for $2 million to $4 million for 2023 versus your prior expectations, is that what you're talking about in terms of like additional onboarding for physicians going forward? But more color on both of those will be helpful.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. On the first question, it really was to data update issues for 2 new regional payors in 2 of our new markets. So we've worked with a few payors on that. We understand what the -- what the change was and why it was, so that should not be a recurring issue on that $20 million revenue revision. I think we understand what was causing it, and we work with those payors to make sure that doesn't repeat.

On the second part of the question was your...

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 851

**Steven Jackson Sell**
*President, CEO & Director*

So the higher new GO costs, Elizabeth, is really a result of a larger class of '24 and the onboarding to use your ward expenses that occur in that year 0 of implementation, incentives around any wellness visits. The things that you want to do to get patients in, so you have an appropriate baseline. And as you move to January 1, then you're in a good position to really manage that population. So that's really the driver.

**Operator**

Next question comes from Jack Slevin. Please ask your question.

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

Two more for you, a lot of the ones that I wanted to touch on have already been asked. One, just on the revenue PMPM side for year 2+, trying to get an understanding of the shift in language there. Using the bridge on Slide 11, I'm computing something like a 5% step-up in rev PMPM for year 2+ versus, I think the last commentary you had said 1% to 2% positive for '24. Just trying to understand the gap there and get the commentary on some variability in PCPs and some new PCPs in existing markets, but struggling a little bit to understand why that wouldn't have been known. So any color there would be helpful.

And then the second piece, a little surprised it hasn't been touched on yet. But first, Tim, best wishes and good luck in retirement. And just sort of curious to hear high-level thoughts on what you might be looking for in the profile of the new CFO.

**Steven Jackson Sell**
*President, CEO & Director*

Sure. So the question on the revenue assumptions for the year 2+ markets, I think what we said was it'd be at least 2%, and we're obviously doing better than that.

Jack, one of the big things we invested in, in '23 that's really working very well for us across all of our markets is a centralized physician medical record review process that gets better information to all of our docs across the markets for the visits, with the patients, and they have the ability to acknowledge and understand the conditions of the disease burden that various patients might have.

And so new programs set up for us working very well, you understand how [ RAF ] works. I mean the work that gets done in '23 drives what happens in '24. We have shared that we had like 6x the level of chart reviews in '23 that we did in '22. That's tied around some of these centralized, standardized resources, and so we're getting some real economies of scale and efficiency, but we're getting some real performance out of that. So that's the piece around that.

I mean, we did put out the announcement on Tim and I just -- I want to thank him for everything he's done. He's not leaving. I mean, he's here for the next 9 months, and we're working through a search right now. But he's been really impactful, helped to build and scale our finance function and take our company public. So huge thanks to him.

In terms of a new CFO, I think you need to really understand this business. This is a risk business. It's complex. Understanding health plans, understanding risk contracting, understanding reserving are all key elements of that understanding physicians and how you work with different physician entities, I think, is really important. But those are the things that we've talked about as we look at this, and we expect to have a good search.

**Operator**

Our final question comes from David Larsen from BTG.

**David Michael Larsen**
*BTIG, LLC, Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Can you talk a little bit about the utilization you're seeing with the specialists and the part B drugs. Are those -- is that oncology services? Or is it obesity and diabetes management? Any detail there would be very helpful.

And then also, like, do you enter into new markets where agilon is bearing 100% risk. So if you're an oncology specialist your cash is based on cost plus initially at least. So like can you maybe talk about the incentives that are in place, especially in the early years for the specialists to use lower-cost Part B drugs. So thanks very much, appreciate it.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So David, thanks. So taking the -- yes about Part B drug and the [indiscernible]. So in our markets, Part B drug, 40%, 50%, 60%, sometimes even more percent of that spend is oncology, and it is oncology infusions. And so there's a site of care opportunity that you've got that can reduce that cost. The changes in the 340b rates that occurred back at the beginning of last year, definitely have an impact and show up in that Part B drug spend. We talk about sort of the collaboration, the relationship we have with our payer partners. This is one that we're kind of working together on this, because it's a really meaningful change across the system in terms of those costs and kind of united, we have the opportunity to potentially move some of those sites of service.

In terms of specialist costs, the specialist costs are kind of associated with the activities we talk about. So ortho specialist costs tied to hips, knees, et cetera, is definitely an area of opportunity for us. I think site of service is a big one. We talked about that market examples that we gave you, the tour market that's grown a lot. There, we've entered into a value-based care partnership with a partner to take some risk around that and to help us guide to lower cost settings, and that's the benefit that we have with our primary care doctors is we can really guide referrals to those specialists.

So those are examples of the types of things that we're working on. The incentive is we've got the total cost of care. We've got partners that are oriented to working through that, and we are trying to guide for the most cost-effective specialists. Many of our groups have specialists within them. And so they're incented and aligned with us in terms of managing that. And so that's how [indiscernible].

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, operator, are there any further questions?

**Operator**

We have no further questions, I would like to pass back to Mr. Sell for final remarks.

**Steven Jackson Sell**
*President, CEO & Director*

All right. Thank you all for joining us. I just want to close by saying it's been a challenging 2023, but I think we see really a great long-term opportunity in our business and the thesis remains intact. And I think you can see it in terms of the physicians that are joining us, what we're doing for them and just this opportunity around variability over the long haul.
So thanks, everyone. Talk soon.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 853**

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.

APP 854

# EXHIBIT 24

APP 855

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): January 5, 2024**

---

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

---

| | | |
|---|---|---|
| **Delaware** | **001-40332** | **37-1915147** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **6210 E Hwy 290, Suite 450** | |
| **Austin, TX** | **78723** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On January 5, 2024, agilon health, inc. ("agilon health") issued a press release updating its full year 2023 guidance, providing its initial outlook for 2024 and withdrawing its 2026 outlook. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

**Item 7.01 Regulation FD Disclosure.**

agilon health will host a conference call on Friday, January 5, 2024 at 8:00 AM Eastern Time with management remarks and a question and answer session. The conference call can be accessed by dialing (800) 590-8290 for U.S. participants and +1 (240) 690-8800 for international participants and referencing participant code AGL2024. A simultaneous webcast may be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call. A copy of the investor presentation that will be used during the conference call is furnished herewith as Exhibit 99.2 and is incorporated by reference herein.

The information set forth in Items 2.02 and 7.01 of this Current Report on Form 8-K and the related information in Exhibit 99.1 and Exhibit 99.2 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated January 5, 2024. |
| 99.2 | Investor Presentation dated January 5, 2024. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 857**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:        January 5, 2024                    By:    /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

**agilon health**

**Exhibit 99.1**

**agilon health Provides 2023 Guidance Update, Initial 2024 View**

*Revised 2023 expectations and early outlook for 2024 reflect higher medical
and non-medical costs*

*Company is taking targeted actions to improve visibility, balance risk-sharing, and improve predictability of results in 2024 and over the long term*

*agilon health to host conference call at 8:00 AM Eastern Time today*

**AUSTIN, T.X., January 5, 2024** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced revised guidance expectations for 2023, reflecting higher-than-expected costs, and provided an initial outlook for 2024.

During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions. While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

"Higher-than-expected costs became visible to us in mid-December during the November close process given updated data from health plans and will impact our FY2023 medical margins. As a result, while Medicare Advantage membership growth and ACO REACH performance are in line with prior guidance, we are lowering Medicare Advantage medical margin guidance for 2023," said Steve Sell, chief executive officer, agilon health.

agilon's revised 2023 medical margin expectation is $340 million to $360 million, approximately $110 million below the previous guidance range. The reduction in core medical performance is due to $90 million in higher-than-expected medical costs, as well as $20 million of negative revenue revision with two regional health plans in new geographies.

Sell continued, "We have implemented a number of initiatives which we believe will enhance operating performance and improve the predictability of financial results in 2024 and beyond including accelerating operating efficiency, refining payor partnerships, improving data visibility and analytics, and expanding onboarding support for newer PCPs in mature markets. Taken together we believe these changes support Adjusted EBITDA growth in 2024 and beyond."

Given the lower-than-expected baseline now projected for 2023, agilon is withdrawing its previously issued target for 2026.

**agilon health**

**Revised Outlook for Fiscal Year 2023 ($M)**[1]**:**

| | Year Ended December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Updated Guidance[1] | | Previous Guidance | |
| | Low | High | Low | High |
| Medicare Advantage (MA) Members[2] | 386,000 | 387,000 | 384,000 | 386,000 |
| Total Revenues | $4,295 | $4,305 | $4,310 | $4,320 |
| Medical Margin | $340 | $360 | $455 | $470 |
| Adjusted EBITDA[3] | ($69) | ($55) | $6 | $18 |
| Geography Entry Costs[4] | $71 | $71 | $69 | $67 |

1. Guidance for the fiscal year 2023 excludes MDX Hawaii.
2. Membership reflects management's outlook for end of period.
3. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $39 million for 2023.
4. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and we have not provided forward-looking guidance for net income (loss) because such reconciliation is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Initial Outlook for 2024 ($M):**

| | Year Ended December 31, 2024 | |
| --- | --- | --- |
| | Low | High |
| Medicare Advantage (MA) Members[1] | 548,000 | 553,000 |
| Total Revenues | $6,350 | $6,420 |
| Medical Margin | $560 | $600 |
| Adjusted EBITDA[2] | $40 | $60 |
| Geography Entry Costs[3] | $70 | $70 |

1. Membership reflects management's outlook for end of period.
2. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $39 million for 2024.
3. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and we have not provided forward-looking guidance for net income (loss) because such reconciliation is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**APP 860**

**Webcast and Conference Call:**

agilon health will host a conference call to discuss the company's updated guidance for 2023 and initial 2024 outlook on Friday, January 5, 2024 at 8:00 AM Eastern Time. The conference call can be accessed by dialing (800) 590-8290 for U.S. participants and +1 (240) 690-8800 for international participants and referencing participant code AGL2024. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups and health systems transition to a value-based Total Care Model for their senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,400+ primary care physicians that allows its physician partners to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is a trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Instagram, LinkedIn, X and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our management's intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding our ability to enhance operating performance and improve the predictability of our financial results, including our ability to accelerate operating efficiency, refine payor strategies, enhance data intake and analysis capabilities, and expand onboarding support for newer PCPs, particularly in early market classes, expected revenue, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs, patients, market class and other financial projections and assumptions and the realization of expected benefits of the sale of our Hawaii operations. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses; our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies and physician partners and health plan payors; our ability to execute upon our growth initiatives and operating strategies, achieve required

**APP 861**

operational scale and achieve results consistent with our historical performance; our expectation that our expenses will increase in the future; medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors and to ensure such contracts are on financial terms sufficient to meet our financial targets; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; our ability to obtain additional capital; significant reductions in our membership; challenges for our physician partners in the transition to our "Total Care Model"; inaccuracies in our estimates and assumptions due to unknown factors at the time such estimates or assumptions were developed; the impacts of COVID-19 or other future pandemics or epidemics; restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities within certain geographies in the future or may subject us to investigations or litigation; our ability to retain our management team and key employees or attract qualified personnel in the future; our ability to realize the full value of our intangible assets; any impairment charges we may record; security breaches, loss of data and other disruptions to our data platforms; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; our subsidiaries' lack of performance or ability to fund their operations; our dependence on a limited number of key health plan payors; our ability to renew contracts with our payors; our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment; our dependence on physician partners and other providers; difficulties in obtaining accurate and complete diagnosis data; our reliance on third-party software and data to operate our business and provide services to our members and physician partners; consolidation in our industry; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs; uncertain or adverse economic conditions, including a downturn or decrease in government expenditures; our ability to compete in our industry; the impact of government performance standards and benchmarks on our compensation and reputation; statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; federal or state investigations, audits and enforcement actions; regulatory inquiries and corrective action plans imposed by our health plan payors; repayment obligations arising out of payor audits; actions by Centers for Medicare & Medicaid Services' to modify the methodology to determine revenue; negative publicity regarding the managed healthcare industry; our and our physician partners' ability to comply with federal, state, and local laws and regulations and any penalties or sanctions resulting from failure to comply with such laws and regulations; our ability to comply with HIPAA and state patient confidentiality laws; our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors; we may face litigation not covered by insurance; our indebtedness and the potential that we may incur additional substantial indebtedness; our dependence on our subsidiaries for cash to fund all of our operations and expenses; our governance structure and ability to comply with corporate governance requirements; the material weaknesses in our internal control over financial reporting; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, and in our subsequent interim reports on Form 10-Q, all of which can be found at the SEC's website at www.sec.gov. Except as

**APP 862**

required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**NON-GAAP FINANCIAL MEASURES**

This release includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe Medical Margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of Medical Margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures. Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements. Information reconciling guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and information regarding forward-looking guidance for net income (loss) is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation. For these reasons, we are unable to compute the probable significance of the unavailable information, which could have a potentially unpredictable and potentially significant impact on our future GAAP financial results.

**Contacts**

Investor Contact
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

Media Contact
David Tauchen
Senior Director, Communications
media@agilonhealth.com

Source: agilon health

**APP 863**



Copyright © 2023 agilon health. Confidential internal document containing proprietary information. Do not distribute.

# Disclaimers and Forward-Looking Statements

**FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION**

Statements in this presentation that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our management's intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities, business strategies, including our action plan and its expected milestones, and strategic growth plans, expected revenue, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs, patients, market class and other financial projections and assumptions and the realization of expected benefits of the sale of our Hawaii operations. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses; our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies and physician partners and health plan payors; our ability to execute upon our growth initiatives and operating strategies, achieve required operational scale and achieve results consistent with our historical performance; our expectation that our expenses will increase in the future; medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors and to ensure such contracts are on financial terms sufficient to meet our financial targets; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; our ability to obtain additional capital; significant reductions in our membership; challenges for our physician partners in the transition to our "Total Care Model"; inaccuracies in our estimates and assumptions due to unknown factors at the time such estimates or assumptions were developed; the impacts of COVID-19 or other future pandemics or epidemics; restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities within certain geographies in the future or may subject us to investigations or litigation; our ability to retain our management team and key employees or attract qualified personnel in the future; our ability to realize the full value of our intangible assets; any impairment charges we may record; security breaches, loss of data and other disruptions to our data platforms; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; our subsidiaries' lack of performance or ability to fund their operations; our dependence on a limited number of key health plan payors; our ability to renew contracts with our payors; our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment; our dependence on physician partners and other providers; difficulties in obtaining accurate and complete diagnosis data; our reliance on third-party software and data to operate our business and provide services to our members and physician partners; consolidation in our industry; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs; uncertain or adverse economic conditions, including a downturn or decrease in government expenditures; our ability to compete in our industry; the impact of government performance standards and benchmarks on our compensation and reputation; statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; federal or state investigations, audits and enforcement actions; regulatory inquiries and corrective action plans imposed by our health plan payors; repayment obligations arising out of payor audits; actions by Centers for Medicare & Medicaid Services' to modify the methodology to determine revenue; negative publicity regarding the managed healthcare industry; our and our physician partners' ability to comply with federal, state, and local laws and regulations and any penalties or sanctions resulting from failure to comply with such laws and regulations; our ability to comply with HIPAA and state patient confidentiality laws; our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors; we may face litigation not covered by insurance; our indebtedness and the potential that we may incur additional substantial indebtedness; our dependence on our subsidiaries for cash to fund all of our operations and expenses; our governance structure and ability to comply with corporate governance requirements; the material weaknesses in our internal control over financial reporting; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, and in our subsequent interim reports on Form 10-Q, all of which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**NON-GAAP FINANCIAL MEASURES**

This presentation includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures. Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements. Information reconciling guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and information regarding forward-looking guidance for net income (loss) is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation. For these reasons, we are unable to compute the probable significance of the unavailable information, which could have a potentially unpredictable and potentially significant impact on our future GAAP financial results.



2

# Key Updates

## Lowering 2023 guidance due to higher costs and increased utilization assumptions

- Updated 2023 guidance for **Medical Margin to $340M-$360M and Adjusted EBITDA to loss of $69M-$55M.**

- Higher costs occurred in Q2-Q4 and became visible in mid-December during the November close process given updated data from health plans.  Guidance assumes utilization continued at elevated levels.

- Reflects a utilization trend ~2-3x vs 2022 in select core medical (Specialist, Part B drugs, OP surgeries) and non-medical (supplemental benefits) categories.

## Withdrawing 2026 outlook, providing initial 2024 Adjusted EBITDA guidance of $40M-$60M

## Increasing value for PCPs and agilon despite macro headwinds

- Reinvested greater than $200M into local primary care partners, an increase of $40M.

## Targeted actions and large new markets to drive performance in 2024+

- Accelerated operating efficiency, leveraging payor relationships, addressing data visibility, and expanded support for newer PCPs in existing markets.

agilon health

3

**APP 866**

# How Medical Margin Differed From Expectations





# Despite 2023 Headwinds, Increasing Value for PCPs and agilon



**Success of Year 2+ Markets Drives Model**

- Year 2+ markets at 4+ Stars
- IP medical utilization trend (2.6%)
- >$200M of reinvestment back into local primary care during 2023
- ACO REACH performance is expanding value of platform to PCPs

Note: Gross Profit for 2023E includes ~$15M impact from prior year development, net

6

**APP 869**

# Actions to Improve Performance, Balance Risk Sharing, and Enhance Predictability

Enhancing processes and systems to address market dynamics and drive accelerated performance in 2024 and beyond

| Action | Timing | Details / Milestones |
|---|---|---|
| **Operating Efficiency** | Executed for 2024 | ▪ Accelerated platform support efficiency, reduce to 3% of revenues in 2024<br>▪ Leveraging corporate and market investments from 2023 |
| **Payor Partnerships** | Executed & In-Process for 2024+ | ▪ Tangible progress on strengthening relationships and outcomes |
| **Data Visibility & Analytics** | Executed & In-Process for 2024+ | ▪ Executed changes to internal and external teams - new actuary and Milliman relationship<br>▪ Created better alignment with payor partners |
| **Physician Onboarding & Continuous Education** | In-Process for 2024-2025+ | ▪ Reducing performance variability, especially for new PCPs in existing markets<br>▪ Accelerating and expanding clinical programs |

agilon health

7

APP 870

# Mature Market Challenges and Action Plan

## Select market with significant PCP and membership growth





- High PCP variability driven by new doctors
- OP surgery: +11% driven by orthopedic
- Supplemental benefit costs

### Opportunity in 2024+

- Targeting PCP variability (see above)
- Improving payor contract terms
- VBC partnership with large ortho group

 agilon health

Note: PCP-level performance estimate based on incurred YTD results

8

APP 871

# Guidance Update for 2023

- Lowering 2023 medical margin outlook and assuming higher utilization
- 2023 reflects investments to drive future performance
- Added 270K members and 1,200+ PCPs with class of 2023 and 2024

| 2023 Full Year Guidance | Updated Guidance (as of 1/5/24) | Previous Guidance (as of 11/4/23) |
|---|---|---|
| Medicare Advantage Members, Ending | 386,000-387,000 | 384,000-386,000 |
| Total Revenues ($M) | $4,295-$4,305 | $4,310-$4,320 |
| Medical Margin ($M) | $340-$360 | $455-$470 |
| Adjusted EBITDA ($M) | ($69)-($55) | $6-$18 |
| Geography Entry Costs ($M) | $71 | $69-$67 |

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

 agilon health

9

# Initial Outlook for 2024

- ## Key Assumptions for 2024
  - Year 2+ markets: 5% cost trend assumption matches 2023.
  - Class of 2023 (130K members) adds $23M of incremental medical margin.
  - Class of 2024 (140K members) generates $127M of medical margin ($76 PMPM).
  - Operating leverage creates $20M of incremental improvement

| 2024 Full Year Guidance | Initial Guidance (as of 1/5/24) |
|---|---|
| Medicare Advantage Members, Ending | 548,000-553,000 |
| Total Revenues ($M) | $6,350-$6,420 |
| Medical Margin ($M) | $560-$600 |
| Adjusted EBITDA ($M) | $40-$60 |
| Geography Entry Costs ($M) | ~$70 |

 agilon health

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.   10

# 2024 Medical Margin Bridge



Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

agilon health

11

# Conclusion

| Near-term Headwinds | Clear Long-term Value Opportunity |
|---|---|

**Near-term Headwinds**

- Forecasting miss driven by:
  - Higher-than-expected medical and non-medical utilization
  - Data visibility issues

- Delay in cohort maturation

**Clear Long-term Value Opportunity**

- Demand from PCPs is structurally higher

- agilon platform driving more value to PCPs, patients, and payors

- Accelerating membership growth in 2023-2024

- Variability in healthcare delivery system creates opportunity

agilon health

12

**APP 876**

# EXHIBIT 25

APP 877

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 27, 2024**

---

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

---

| **Delaware** | **001-40332** | **37-1915147** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **6210 E Hwy 290, Suite 450** | |
|---|---|
| **Austin, TX** | **78723** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On February 27, 2024, agilon health, inc. ("agilon" or the "Company"), a Delaware corporation, issued a press release setting forth its financial results for the three and twelve months ended December 31, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

**Item 7.01 Regulation FD Disclosure.**

On February 27, 2024, the Company issued an investor presentation regarding the Company's financial results for the three and twelve months ended December 31, 2023. A copy of the investor presentation is furnished herewith.

The information set forth in Items 2.02 and 7.01 of this Current Report on Form 8-K and the related information in Exhibits 99.1 and 99.2 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated February 27, 2024. |
| 99.2 | Investor Presentation dated February 27, 2024. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 879**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:         February 27, 2024                                      By:        /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

**APP 880**

**Exhibit 99.1**



**agilon health Reports Fourth Quarter 2023 Results**

*Revenue increased 72% to $1.06 billion in the fourth quarter 2023, Medicare Advantage membership increased 68% to 388,400, and total members on the agilon platform grew to 477,700 as of December 31, 2023*

*2023 performance impacted by acceleration in medical costs due to macro dynamics, revised 2024 guidance assumes continuation of higher medical cost trends*

*Executing targeted action plan with focus on measured growth, Class of 2025 expected to add at least 60,000 Medicare Advantage members across 5 physician groups*

**AUSTIN, T.X., February 27, 2024** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the fourth quarter and fiscal year ended December 31, 2023.

"agilon is navigating through a complex transition period for the Medicare Advantage industry and for our company, and we are taking significant actions to help mitigate the impact of this evolving environment and strengthening our reserves," said Steve Sell, chief executive officer. "While near-term dynamics are negatively affecting our financial results, demand for our platform and the fundamental drivers of our business remain strong as we continue to deliver significant value to patients, payors, and our PCP partners. We believe we are well positioned to accelerate performance over the medium and long-term."

**Fourth Quarter and Fiscal Year 2023 Results:**

- Total members on the agilon platform increased to 477,700 as of December 31, 2023, including 388,400 Medicare Advantage members and 89,300 ACO REACH beneficiaries. Medicare Advantage membership increased 68%, with 11% growth in same geographies.

- Total revenue of $1.06 billion in the fourth quarter 2023 increased 72% compared to $615 million in the fourth quarter 2022. For the fiscal year 2023, total revenue of $4.32 billion increased 81% compared to $2.39 billion in 2022.

- Gross profit of negative $95 million in the fourth quarter 2023 compared to $16 million in the fourth quarter 2022. For the fiscal year 2023, gross profit of $70 million compared to $111 million in 2022. Net loss of $230 million in the fourth quarter 2023 compared to a loss of $57 million in the fourth quarter 2022. For the fiscal year 2023, net loss of $263 million compared to a loss of $107 million in 2022.

- Medical margin of negative $102 million during the fourth quarter 2023, compared to $63 million in the fourth quarter 2022. For the fiscal year 2023, Medical Margin of $299 million, compared to $291 million in 2022. Medical Margin during the fourth quarter 2023 was negatively impacted by accelerating medical costs including prior period development from previous quarters.

- Adjusted EBITDA loss of $137 million in the fourth quarter 2023, compared to an Adjusted EBITDA loss of $32 million in the fourth quarter 2022. For the fiscal year 2023, Adjusted EBITDA loss of $95 million, compared to an Adjusted EBITDA loss of $45 million in the fiscal year 2022.

***Key Financial and Operating Metrics ($M):***
*(Fourth Quarter 2023 vs. 2022)*

| | Three Months Ended December 31, | | Change |
| --- | --- | --- | --- |
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members[1] | 388,400 | 230,800 | 68% |
| ACO REACH Members[1,2] | 89,300 | 89,000 | —% |
| Total Members Live on Platform[1,2] | 477,700 | 319,800 | 49% |
| Avg. Medicare Advantage Members | 391,700 | 233,300 | 68% |
| Total revenues | $1,056 | $615 | 72% |
| Gross Profit | ($95) | $16 | NM |
| Medical Margin | ($102) | $63 | NM |
| Net Loss | ($230) | ($57) | NM |
| Adjusted EBITDA[3] | ($137) | ($32) | NM |
| Geography Entry Costs | $26 | $32 | (19%) |

1.  Membership metrics reflect end of period results.
2.  agilon's ACO REACH entities are not included within its consolidated financial results.
3.  agilon's ACO REACH entities contributed $6 million and $8 million to Adjusted EBITDA during the fourth quarter 2023 and fourth quarter 2022, respectively.

***Key Financial and Operating Metrics ($M):***
*(Fiscal Year 2023 vs. 2022)*

| | Twelve Months Ended December 31, | | Change |
| --- | --- | --- | --- |
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members[1] | 388,400 | 230,800 | 68% |
| ACO REACH Members[1,2] | 89,300 | 89,000 | —% |
| Total Members Live on Platform[1,2] | 477,700 | 319,800 | 49% |
| Avg. Medicare Advantage Members | 379,400 | 225,100 | 69% |
| Total revenues | $4,316 | $2,388 | 81% |
| Gross Profit | $70 | $111 | (37%) |
| Medical Margin | $299 | $291 | 3% |
| Net Loss | ($263) | ($107) | NM |
| Adjusted EBITDA[3] | ($95) | ($45) | NM |
| Geography Entry Costs | $75 | $68 | 10% |

1.  Membership metrics reflect end of period results.
2.  agilon's ACO REACH entities are not included within its consolidated financial results.
3.  agilon's ACO REACH entities contributed $39 million and $14 million to Adjusted EBITDA during the fiscal year 2023 and fiscal year 2022, respectively.

**APP 882**

***Medical Margin Performance Details***

For the fiscal year 2023, Medical Margin of $299 million was approximately $51 million below the midpoint of the company's guidance of range of $340 million to $360 million provided on January 5, 2024. The company estimates approximately $38 million of the lower Medical Margin is from costs and revenue attributable to the fourth quarter and $13 million of the lower Medical Margin is attributable to costs and revenue attributable previous periods.

Relative to the company's previous guidance, the lower Medical Margin was primarily driven by two factors. First, as the company completed the financial closing process in February, it received updated data including relatively complete claims data from its largest payors, and additional information such as seasonality factors and census data. The company completed its analysis of this data in mid-February, with support from internal and external actuaries, which indicated medical claims were higher than the company's previous estimate. Second, in light of this new information and the dynamic utilization environment, the company strengthened its reserve position for incurred but not reported medical claims. A range of reserve scenarios were developed and the company has reserved at the high-end of its estimates. The company believes this is a prudent approach given the environment.

***Performance Action Plan***

On January 5, 2024 agilon health announced a targeted action plan to improve performance. This plan includes expanding onboarding support for newer primary care physicians (PCPs) in mature markets, refining payor partnerships, improving data visibility and analytics, and accelerating operating efficiency. Management anticipates these actions will support growth in Adjusted EBITDA in 2024 and beyond.

The company has made solid progress on the targeted action plan. Progress to date includes physician trainings in mature markets with 90% of new physicians in those markets to be trained during the first half of 2024; increased data visibility from most all national and large regional payors as well as targeted changes to our percentage of premium rates in key markets; onboarding of payor data into the company's new financial pipeline with over 55% of membership data expected in the first quarter and over 75% of membership data during the second quarter; and a reduction in platform support to 3% of revenue in 2024.

***Class of 2025 New Partners***

agilon health anticipates the Class of 2025 new partners will include at least 5 physician groups with more than 60,000 new Medicare Advantage (MA) members. Beginning in 2025, the agilon health physician network will expand to at least 36 physician groups and 3,000 primary care physicians.

agilon health now anticipates geographic entry costs will be in the range of $55 million to $65 million, down from the company's previous expectation of ~$70 million. Given the current environment, agilon health is taking a measured approach to growth for the Class of 2025.

***Capital Position and Balance Sheet***

agilon health's balance sheet as of December 31, 2023 included cash, cash equivalents and marketable securities of $495 million and total debt of $39 million. In addition, agilon health has $22 million of cash associated with the company's unconsolidated ACO REACH entities.

**APP 883**

**Outlook for Fiscal Year 2024 ($M):**

agilon health's updated guidance assumes that the higher medical cost trend from 2023 will continue in 2024. Revised guidance assumes a medical cost trend of approximately 6.6% in 2024 for Year 2+ markets, which is 250 bps above the company's prior expectation and compares to the 7.0% medical cost trend observed in 2023. Medical cost trend includes the impact of the company's clinical programs and excludes the impact from non-medical costs (e.g., supplemental benefits), which is expected to drive less impact to cost trend in 2024 compared to 2023.

| | Year Ended December 31, 2024 | | | |
| --- | --- | --- | --- | --- |
| | Updated Guidance[1] | | Previous Guidance | |
| | Low | High | Low | High |
| Medicare Advantage Members[1] | 540,000 | 550,000 | 548,000 | 553,000 |
| ACO REACH Members[1,2] | 120,000 | 125,000 | N/A | N/A |
| Total Members Live on Platform[1] | 660,000 | 675,000 | N/A | N/A |
| Avg. Medicare Advantage Members | 527,000 | 536,000 | N/A | N/A |
| Total Revenues | $6,350 | $6,465 | $6,350 | $6,420 |
| Medical Margin | $400 | $450 | $560 | $600 |
| Adjusted EBITDA[3] | ($60) | ($15) | $40 | $60 |
| Geography Entry Costs[4] | $65 | $55 | $70 | $70 |

1. Membership reflects management's outlook for end of period.
2. agilon's partnered ACO REACH entities are not consolidated within its financial results.
3. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $40 million for fiscal year 2024.
4. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

**Outlook for First Quarter 2024 ($M):**

| | Quarter Ended March 31, 2024 | |
| --- | --- | --- |
| | Low | High |
| Medicare Advantage Members[1] | 520,000 | 530,000 |
| ACO REACH Members[1,2] | 125,000 | 130,000 |
| Total Members Live on Platform[1] | 645,000 | 660,000 |
| Avg. Medicare Advantage Members | 516,000 | 525,000 |
| Total Revenues | $1,605 | $1,630 |
| Medical Margin | $155 | $170 |
| Adjusted EBITDA[3] | $15 | $25 |
| Geography Entry Costs[4] | $23 | $20 |

1. Membership reflects management's outlook for end of period.
2. agilon's partnered ACO REACH entities are not consolidated within its financial results.
3. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $14 million for the first quarter 2024.
4. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking

guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss fourth quarter and fiscal year 2023 results on Tuesday, February 27, 2024 at 4:30 PM Eastern Time. The conference call can be accessed by dialing (833) 470-1428 for U.S. participants and +1 (929) 526-1599 for international participants and referencing participant code 615568. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups and health systems transition to a value-based Total Care Model for their senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,400+ PCPs that allow its physician partners to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on X, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue, medical costs, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions, including our fiscal year and first quarter 2024 guidance. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses and the expectation that our expenses will increase in the future; failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives; success in executing our operating strategies or achieving results consistent with our historical performance; medical expenses incurred on behalf of our members may exceed revenues we receive; our ability to secure contracts with Medicare Advantage payors; our ability to grow new physician partner relationships sufficient to recover startup costs; availability of additional capital, on acceptable terms or at all, to support our business in the future; significant reduction in our membership; transition to a Total Care Model may be challenging for physician partners; public health crises, such as COVID-19, could adversely affect us; inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts; the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners; our to hire and retain qualified personnel; our ability

**APP 885**

to realize the full value of our intangible assets; security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; reliance on our subsidiaries; Environmental, Social, and Governance issues; reliance on a limited number of key payors; the limited terms of contracts with our payors and our ability to renew them upon expiration; reliance on our payors, physician partners and other providers to operate our business; our ability to obtain accurate and complete diagnosis data; reliance on third-party software, data, infrastructure and bandwidth; consolidation and competition in the healthcare industry; the impact of changes to, and dependence on, federal government healthcare programs; uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures; regulation of the healthcare industry and our and our physician partners' ability to comply such laws and regulations; federal and state investigations, audits and enforcement actions; repayment obligations arising out of payor audits; negative publicity regarding the managed healthcare industry generally; our use, disclosure and processing of personally identifiable information, protected health information, and de-identified data; failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization; lawsuits not covered by insurance; changes in tax laws and regulations, or changes in related judgments or assumptions; our indebtedness and our potential to incur more debt; dependence on our subsidiaries for cash to fund all of our operations and expenses; provisions in our governing documents; ability to achieve a return on your investment depends on appreciation in the price of our common stock; the material weakness in our internal control over financial reporting and our ability to remediate such material weakness; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**APP 886**

**agilon health, inc.**
**Consolidated Balance Sheets**
**In thousands, except per share data**

| | | December 31, | | |
|---|---|---|---|---|
| | | 2023 | | 2022 |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 107,570 | $ | 465,302 |
| Restricted cash and equivalents | | 6,759 | | 10,610 |
| Marketable securities | | 380,773 | | 411,901 |
| Receivables, net | | 942,461 | | 492,364 |
| Prepaid expenses and other current assets, net | | 42,513 | | 31,572 |
| Current assets of discontinued operations | | — | | 39,525 |
| Total current assets | | 1,480,076 | | 1,451,274 |
| Property and equipment, net | | 27,576 | | 19,937 |
| Intangible assets, net | | 63,769 | | 18,448 |
| Goodwill | | 24,133 | | 2,513 |
| Other assets, net | | 145,312 | | 105,861 |
| Non-current assets of discontinued operations | | — | | 99,435 |
| Total assets | $ | 1,740,866 | $ | 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Current liabilities: | | | | |
| Medical claims and related payables | $ | 737,724 | $ | 300,798 |
| Accounts payable and accrued expenses | | 233,182 | | 177,428 |
| Current portion of long-term debt | | 6,250 | | 5,000 |
| Current liabilities of discontinued operations | | — | | 51,865 |
| Total current liabilities | | 977,156 | | 535,091 |
| Long-term debt, net of current portion | | 32,308 | | 38,482 |
| Other liabilities | | 70,381 | | 82,492 |
| Non-current liabilities of discontinued operations | | — | | 794 |
| Total liabilities | | 1,079,845 | | 656,859 |
| Commitments and contingencies | | | | |
| Stockholders' equity (deficit): | | | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 406,387 and 412,385 shares issued and outstanding, respectively | | 4,064 | | 4,124 |
| Additional paid-in capital | | 1,986,899 | | 2,106,886 |
| Accumulated deficit | | (1,326,826) | | (1,064,230) |
| Accumulated other comprehensive income (loss) | | (2,298) | | (5,560) |
| Total agilon health, inc. stockholders' equity (deficit) | | 661,839 | | 1,041,220 |
| Noncontrolling interests | | (818) | | (611) |
| Total stockholders' equity (deficit) | | 661,021 | | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ | 1,740,866 | $ | 1,697,468 |

**APP 887**

**agilon health, inc.**
**Consolidated Statements of Operations**
**In thousands, except per share data**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| | (unaudited) | | | |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,053,540 | $ 613,883 | $ 4,307,350 | $ 2,384,889 |
| Other operating revenue | 2,533 | 800 | 9,013 | 3,331 |
| Total revenues | 1,056,073 | 614,683 | 4,316,363 | 2,388,220 |
| **Expenses:** | | | | |
| Medical services expense | 1,155,393 | 551,133 | 4,008,659 | 2,093,860 |
| Other medical expenses | (4,452) | 47,659 | 238,034 | 183,000 |
| General and administrative (including noncash stock-based compensation expense of $15,676, $9,873, $69,326 and $28,069, respectively) | 64,696 | 70,228 | 285,760 | 207,789 |
| Depreciation and amortization | 4,735 | 2,686 | 16,043 | 8,949 |
| Total expenses | 1,220,372 | 671,706 | 4,548,496 | 2,493,598 |
| **Income (loss) from operations** | (164,299) | (57,023) | (232,133) | (105,378) |
| Other income (expense): | | | | |
| Income (loss) from equity method investments | (8,018) | 7,247 | 16,489 | 10,720 |
| Other income (expense), net | 7,438 | 7,613 | 27,840 | 13,930 |
| Gain (loss) on lease terminations | — | — | — | (5,458) |
| Interest expense | (1,993) | (1,668) | (6,658) | (4,484) |
| **Income (loss) before income taxes** | (166,872) | (43,831) | (194,462) | (90,670) |
| Income tax benefit (expense) | (267) | (572) | (791) | (1,640) |
| **Income (loss) from continuing operations** | (167,139) | (44,403) | (195,253) | (92,310) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | (15,797) | (12,146) | (20,002) | (14,528) |
| Gain (loss) on sales of assets, net | (47,548) | — | (47,548) | — |
| Income tax benefit (expense) | — | — | — | (26) |
| **Total discontinued operations** | (63,345) | (12,146) | (67,550) | (14,554) |
| **Net income (loss)** | (230,484) | (56,549) | (262,803) | (106,864) |
| Noncontrolling interests' share in (earnings) loss | 51 | 83 | 207 | 311 |
| **Net income (loss) attributable to common shares** | $ (230,433) | $ (56,466) | $ (262,596) | $ (106,553) |
| | | | | |
| **Net income (loss) per common share, basic and diluted:** | | | | |
| Continuing operations | $ (0.41) | $ (0.11) | $ (0.48) | $ (0.22) |
| Discontinued operations | $ (0.16) | $ (0.03) | $ (0.16) | $ (0.04) |
| **Weighted average shares outstanding, basic and diluted** | 406,477 | 412,103 | 408,917 | 408,154 |

**agilon health, inc.**
**Consolidated Statements of Cash Flows**
**In thousands**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (262,803) | $ (106,864) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 20,161 | 13,772 |
| Stock-based compensation expense | 69,495 | 28,381 |
| Loss (income) from equity method investments | (16,489) | (10,720) |
| Deferred income taxes and uncertain tax positions | — | 532 |
| Release of indemnification assets | — | 553 |
| (Gain) loss on sale of assets, net | 47,548 | — |
| Other noncash items | (4,044) | 2,973 |
| Changes in operating assets and liabilities: | | |
| Receivables, net | (460,365) | (204,167) |
| Prepaid expense and other current assets | (6,120) | (16,620) |
| Other assets | (397) | (205) |
| Medical claims and related payables | 441,500 | 107,713 |
| Accounts payable and accrued expenses | 32,111 | 65,736 |
| Other liabilities | (16,796) | (11,892) |
| Net cash provided by (used in) operating activities | (156,199) | (130,808) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (15,830) | (15,426) |
| Purchase of intangible assets | (14,985) | (17,235) |
| Investment in loans receivable and other | (19,528) | (6,510) |
| Investments in marketable securities | (114,657) | (458,265) |
| Proceeds from maturities and sales of marketable securities and other | 164,040 | 52,548 |
| Net cash paid in business combination | (45,252) | — |
| Proceeds from sale of business and property, net of cash divested | 2,193 | 500 |
| Net cash provided by (used in) investing activities | (44,019) | (444,388) |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | 11,867 | 33,056 |
| Common stock repurchase | (200,000) | — |
| Repayments of long-term debt | (5,000) | (5,000) |
| Net cash provided by (used in) financing activities | (193,133) | 28,056 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (393,351) | (547,140) |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of year | 475,912 | 1,049,373 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of year | 31,768 | 5,447 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of year** | 507,680 | 1,054,820 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of year | 114,329 | 475,912 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of year | — | 31,768 |
| **Cash, cash equivalents and restricted cash and equivalents, end of year** | $ 114,329 | $ 507,680 |

**APP 889**

**agilon health, inc.**
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*GROSS PROFIT*

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Total revenues | $ 1,056,073 | $ 614,683 | $ 4,316,363 | $ 2,388,220 |
| Medical services expense | (1,155,393) | (551,133) | (4,008,659) | (2,093,860) |
| Other medical expenses[1] | 4,452 | (47,659) | (238,034) | (183,000) |
| Gross profit | $ (94,868) | $ 15,891 | $ 69,670 | $ 111,360 |

(1)    Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended December 31, 2023 and 2022, costs incurred in implementing geographies were $13.5 million and $13.0 million, respectively. For the twelve months ended December 31, 2023 and 2022, costs incurred in implementing geographies were $33.7 million and $23.9 million, respectively.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Platform support costs | $ 36,729 | $ 40,921 | $ 163,652 | $ 127,458 |
| Geography entry costs[1] | 12,192 | 19,434 | 40,812 | 43,890 |
| Severance and related costs | — | — | 188 | 2,470 |
| Stock-based compensation expense | 15,676 | 9,873 | 69,326 | 28,069 |
| Other[2] | 99 | — | 11,782 | 5,902 |
| General and administrative | $ 64,696 | $ 70,228 | $ 285,760 | $ 207,789 |

(1)    Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets.

(2)    Includes transaction-related costs.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

**agilon health, inc.**
**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

| | Three Months Ended December 31, | | | | Twelve Months Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Gross profit[1] | $ | (94,868) | $ | 15,891 | $ | 69,670 | $ | 111,360 |
| Other operating revenue | | (2,533) | | (800) | | (9,013) | | (3,331) |
| Other medical expenses | | (4,452) | | 47,659 | | 238,034 | | 183,000 |
| Medical margin | $ | (101,853) | $ | 62,750 | $ | 298,691 | $ | 291,029 |

_____

(1)    Gross profit is defined as total revenues less medical services expense and other medical expenses.

*ADJUSTED EBITDA*

| | Three Months Ended December 31, | | | | Twelve Months Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Net income (loss)[1] | $ | (230,484) | $ | (56,549) | $ | (262,803) | $ | (106,864) |
| (Income) loss from discontinued operations, net of income taxes | | 63,345 | | 12,146 | | 67,550 | | 14,554 |
| Interest expense | | 1,993 | | 1,668 | | 6,658 | | 4,484 |
| Income tax expense (benefit) | | 267 | | 572 | | 791 | | 1,640 |
| Depreciation and amortization | | 4,735 | | 2,686 | | 16,043 | | 8,949 |
| (Gain) loss on lease terminations | | — | | — | | — | | 5,458 |
| Severance and related costs[2] | | — | | — | | 188 | | 2,470 |
| Stock-based compensation expense | | 15,676 | | 9,873 | | 69,326 | | 28,069 |
| EBITDA adjustments related to equity method investments[3] | | 14,268 | | 749 | | 22,694 | | 3,737 |
| Other[4] | | (6,861) | | (3,381) | | (15,448) | | (7,967) |
| Adjusted EBITDA | $ | (137,061) | $ | (32,236) | $ | (95,001) | $ | (45,470) |

_____

(1)    Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended December 31, 2023 and 2022, (i) $13.5 million and $13.0 million, respectively, are included in other medical expenses and (ii) $12.2 million and $19.4 million, respectively, are included in general and administrative expenses. For the twelve months ended December 31, 2023 and 2022, (i) $33.7 million and $23.9 million, respectively, are included in other medical expenses and (ii) $40.8 million and $43.9 million, respectively, are included in general and administrative expenses.

(2)    For the year ended December 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $2.0 million.

(3)    The three and twelve months ended December 31, 2023 includes $15.2 million of physician compensation expenses to reduce the physician partners' compensation percentage in current and future years in exchange for the Company's common stock.

(4)    Includes interest income and transaction-related costs.

**agilon health, inc.**
Supplemental Financial Information
In thousands
(unaudited)

| | Three Months Ended December 31, 2023 | | Twelve Months Ended December 31, 2023 | |
| | Medicare Advantage (Consolidated) | ACO REACH (Unconsolidated) | Medicare Advantage (Consolidated) | ACO REACH (Unconsolidated) |
|---|---|---|---|---|
| Medical services revenue | $ 1,053,540 | $ 302,692 | $ 4,307,350 | $ 1,160,978 |
| Other operating revenue | 2,533 | — | 9,013 | — |
| **Total revenues** | 1,056,073 | 302,692 | 4,316,363 | 1,160,978 |
| Medical services expense | (1,155,393) | (282,716) | (4,008,659) | (1,024,468) |
| Other medical expenses | 4,452 | (25,016) | (238,034) | (96,154) |
| **Gross profit** | (94,868) | (5,040) | 69,670 | 40,356 |
| Other operating revenue | (2,533) | — | (9,013) | — |
| Other medical expenses | (4,452) | 25,016 | 238,034 | 96,154 |
| **Medical margin** | $ (101,853) | $ 19,976 | $ 298,691 | $ 136,510 |

_____

Certain of our operations are not consolidated for the period presented because we do not have the ability to control certain activities due to another party's control of the entities' board of directors. Although revenues of the unconsolidated operations are not recorded as revenues by us, income (loss) from equity method investments is nonetheless a significant portion of our overall earnings. See Note 18 to the Consolidated Financial Statements in the Annual Report on Form 10-K for the period ending December 31, 2023 for additional discussion on our equity method investments.

In addition to providing results that are determined in accordance with GAAP, we present Medical Margin and Adjusted EBITDA, which are non-GAAP financial measures.

We define Medical Margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect Medical Margin to increase in absolute dollars. However, Medical Margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to Medical Margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to Medical Margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe Medical Margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe Medical Margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of Medical Margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**APP 892**

**agilon health, inc.**

**2023 Quarterly Consolidated Statements of Operations**
**In thousands, except per share data**
**(unaudited)**

| | Three Months Ended 2023 | | | |
| | March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Medical services revenue | $ 1,053,119 | $ 1,067,234 | $ 1,133,457 | $ 1,053,540 |
| Other operating revenue | 1,193 | 1,881 | 3,406 | 2,533 |
| Total revenues | 1,054,312 | 1,069,115 | 1,136,863 | 1,056,073 |
| **Expenses:** | | | | |
| Medical services expense | 897,572 | 932,823 | 1,022,871 | 1,155,393 |
| Other medical expenses | 83,617 | 81,716 | 77,153 | (4,452) |
| General and administrative | 69,752 | 79,254 | 72,058 | 64,696 |
| Depreciation and amortization | 2,954 | 4,279 | 4,075 | 4,735 |
| Total expenses | 1,053,895 | 1,098,072 | 1,176,157 | 1,220,372 |
| **Income (loss) from operations** | 417 | (28,957) | (39,294) | (164,299) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | 1,376 | 8,472 | 14,659 | (8,018) |
| Other income (expense), net | 7,892 | 7,087 | 5,423 | 7,438 |
| Interest expense | (1,493) | (1,555) | (1,617) | (1,993) |
| **Income (loss) before income taxes** | 8,192 | (14,953) | (20,829) | (166,872) |
| Income tax benefit (expense) | 1,759 | (1,073) | (1,210) | (267) |
| **Income (loss) from continuing operations** | 9,951 | (16,026) | (22,039) | (167,139) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | 6,008 | (769) | (9,444) | (15,797) |
| Gain (loss) on sales of assets, net | — | — | — | (47,548) |
| **Total discontinued operations** | 6,008 | (769) | (9,444) | (63,345) |
| **Net income (loss)** | 15,959 | (16,795) | (31,483) | (230,484) |
| Noncontrolling interests' share in (earnings) loss | 63 | 46 | 47 | 51 |
| **Net income (loss) attributable to common shares** | $ 16,022 | $ (16,749) | $ (31,436) | $ (230,433) |
| **Net income (loss) per common share, basic and diluted:** | | | | |
| Continuing operations | $ 0.02 | $ (0.04) | $ (0.05) | $ (0.41) |
| Discontinued operations | $ 0.01 | $ — | $ (0.02) | $ (0.16) |
| **Weighted average shares outstanding:** | | | | |
| Basic | 413,136 | 410,338 | 405,787 | 406,477 |
| Diluted | 426,586 | 410,338 | 405,787 | 406,477 |

**APP 893**

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health



# Disclaimers and Forward-Looking Statements

**FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION**

Statements in this presentation that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue and net income, including our guidance for the fiscal year and first quarter 2024, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses and the expectation that our expenses will increase in the future; failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives; success in executing our operating strategies or achieving results consistent with our historical performance; medical expenses incurred on behalf of our members may exceed revenues we receive; our ability to secure contracts with Medicare Advantage payors; our ability to grow new physician partner relationships sufficient to recover startup costs; availability of additional capital, on acceptable terms or at all, to support our business in the future; significant reduction in our membership; transition to a Total Care Model may be challenging for physician partners; public health crises, such as COVID-19, could adversely affect us; inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts; the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners; our to hire and retain qualified personnel; our ability to realize the full value of our intangible assets; security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; reliance on our subsidiaries; Environmental, Social, and Governance issues; reliance on a limited number of key payors; the limited terms of contracts with our payors and our ability to renew them upon expiration; reliance on our payors, physician partners and other providers to operate our business; our ability to obtain accurate and complete diagnosis data; reliance on third-party software, data, infrastructure and bandwidth; consolidation and competition in the healthcare industry; the impact of changes to, and dependence on, federal government healthcare programs; uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures; regulation of the healthcare industry and our and our physician partners' ability to comply such laws and regulations; federal and state investigations, audits and enforcement actions; repayment obligations arising out of payor audits; negative publicity regarding the managed healthcare industry generally; our use, disclosure and processing of personally identifiable information, protected health information, and de-identified data; failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization; lawsuits not covered by insurance; changes in tax laws and regulations, or changes in related judgments or assumptions; our indebtedness and our potential to incur more debt; dependence on our subsidiaries for cash to fund all of our operations and expenses; provisions in our governing documents; ability to achieve a return on your investment depends on appreciation in the price of our common stock; the material weakness in our internal control over financial reporting and our ability to remediate such material weakness; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**NON-GAAP FINANCIAL MEASURES**

This presentation includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures. Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements. Information reconciling guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and information regarding forward-looking guidance for net income (loss) is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation. For these reasons, we are unable to compute the probable significance of the unavailable information, which could have a potentially unpredictable and potentially significant impact on our future GAAP financial results.

 agilon health

# Key Messages

## 2023 Results and 2024 Guidance Impacted by Acceleration in Medical Costs

- Completed analysis of updated payor data in mid-February, including relatively complete data from largest payors.  Analysis indicated medical costs for our members were higher than previous estimates.
- Strengthened reserves to high-end of internal estimates.  Prudent approach given environment.
- Revised 2024 guidance assumes higher cost trends continue.

## Targeted Action Plan on Track and Business Model is Working

- Executing action plan discussed on January 5.
- Demand for platform among PCPs remains strong.
- Driving 4+ Star quality performance across Year 2+ market classes.
- Strong balance sheet with ~$500M in cash and short-term investments.

## Member Cohort and Market Class Medical Margin PMPM Progression

- Member cohort margins progressing or sustaining near ~$150 PMPM range despite elevated medical cost environment during 2023 relative to revenue benchmarks.
- Market class medical margins also impacted by dilution from membership and PCP growth.

agilon health

3

# 2023 Medical Margin Bridge - Change from Jan 5 Guidance



# 2024 Medical Margin Bridge



Market Classes of 2018-2023 (Yr 2+)

- Medical cost PMPM now assumes 6.6% trend including clinical program impact (7.9% before programs), compared to assumed trend in prior guidance of 4.1% including clinical program impact (5.3% before programs)
- Revenue PMPM trend of 6.0% benefiting from stronger performance on BOI documentation efforts during 2H23

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

agilon health

5

APP 899

# 2022 - 2024 Adjusted EBITDA Bridge



Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

# Class of 2023 and Class of 2024 Details

Year 1 Class Performance Expected to Significantly Improve in 2024

| Class of 2023 (2023 Results) | Class of 2024 (2024 Guidance) |
|---|---|
| • **Performance driven by:**<br>  ▪ Shorter implementation<br>  ▪ Partner mix/less VBC experience<br>  ▪ Macro environment<br>• **MA Membership: 132K**<br>• **Medical Margin PMPM: $21**<br>• **Market EBITDA: Loss of ($32)M** | • **Performance driven by:**<br>  ▪ Longer implementation<br>  ▪ Historical VBC experience of partners<br>  ▪ Macro environment<br>• **MA Membership: ~145K**<br>• **Medical Margin PMPM: ~$52**<br>  ▪ Compares prior estimate of ~$76<br>• **Market EBITDA: Positive ~$9M** |

agilon health

7

# Actions to Improve Performance, Balance Risk Sharing, and Enhance Predictability

Enhancing processes and systems to address market dynamics and drive accelerated performance in 2024 and beyond

| Action | Timing | Details / Milestones |
|---|---|---|
| **Physician Onboarding & Continuous Education** | In-Process for 2024-2025+ | ▪ Reducing performance variability, especially for new PCPs in existing markets<br>▪ Accelerating and expanding clinical programs |
| **Payor Partnerships** | Executed & In-Process for 2024+ | ▪ Tangible progress on strengthening relationships and outcomes |
| **Data Visibility & Analytics** | Executed & In-Process for 2024+ | ▪ Executed changes to internal and external teams - new actuary and Milliman relationship<br>▪ Created better alignment with payor partners |
| **Operating Efficiency** | Executed for 2024 | ▪ Accelerated platform support efficiency, reduce to 3% of revenues in 2024<br>▪ Leveraging corporate and market investments from 2023 |

agilon health

8

**APP 902**

# Member Cohort and Market Class Margin Progression

## Member Cohorts Drive Long-term Earnings and Cash Flow Trajectory

### 2023 Member Cohort and Market Class Margin Progression Impacted by Elevated Costs

- Medical cost trends were above revenue benchmarks during 2023 and this is expected to continue in 2024.
- Medicare Advantage program is designed to adjust to changes in utilization over time.

### _Member Cohort_ Medical Margin PMPM Progressing or Sustaining Near $150+ (Slide 9-10)

- Member cohort analysis shows medical margin PMPMs for the same members over time, which **_eliminates_** the dilutive impact from membership and PCP growth.
- Progressing or sustaining member cohort medical margin PMPMs at/towards the ~$150 range despite the higher utilization environment and payor benefit changes relative to revenue benchmarks.

### _Market Class_ Medical Margin PMPM Progression Details (Slides 11-13)

- Market class analysis shows medical margin PMPMs across entire market classes, which **_includes_** the dilutive impact from membership and PCP growth.
- Market class margins showing less progression in 2023, reflecting the dilutive impact from member and PCP growth combined with the higher utilization environment relative to revenue benchmarks.

agilon health

9

APP 903



# Member Cohort Progression (Incurred Results)

## Medical Margin PMPM by Member Cohorts

Note 1: Reflects incurred results; Note 2: 2020 reflects COVID-19 impact; Note 3: Reflects full allocation of costs to member-level cohorts, including Part D and other (other risk pool, certain health plans with limited data)

agilon health

Copyright © 2023 agilon health

10

**APP 904**

# Market Class Margin Progression Details

### *Market Class* Medical Margin Progression Includes Dilutive Impact from Growth:

- Over the past 6 years we have added >400 providers and >100,000 MA members to existing markets. New PCPs and members are typically dilutive in Year 1-2 and take time to mature on the platform.

- Medical Margin PMPM dilution from growth represents difference between margin performance of initial cohort compared to market class Medical Margin PMPM in 2023**

| Market Class | Membership CAGR Since Go-Live | Provider Adds Since Go-Live (PCPs and APPs) | Market Vintage | Member Vintage | Est. Medical Margin PMPM Dilution from Growth** |
|---|---|---|---|---|---|
| 2018 | 12% | 125 (43% of total) | 6 Years | 4.01 Years | ($36) PMPM |
| 2019 | 24% | 116 (40% of total) | 5 Years | 2.88 Years | ($86) PMPM |
| 2020 | 15% | 78 (31% of total) | 4 Years | 2.94 Years | ($44) PMPM |
| 2021 | 11% | 39 (20% of total) | 3 Years | 2.54 Years | ($55) PMPM |
| 2022 | 14% | 72 (15% of total) | 2 Years | 1.84 Years | ($8) PMPM |

agilon health

11

**APP 905**



# Market Class Progression (Incurred Results)
## Medical Margin PMPM by Market Class

Note 1: Reflects incurred results; Note 2: 2020 reflects COVID-19 impact; Note 3: Reflects full allocation of costs to member-level cohorts, including Part D and other (other risk pool, certain health plans with limited data)

agilon health

Copyright © 2023 agilon health

12

**APP 906**



APP 907

# Financial Outlook for Fiscal Year 2024

|  | Year Ending<br>December 31, 2024 |
|---|---|
| **Medicare Advantage Members** | 540,000 – 550,000 |
| **ACO REACH Members** | 120,000 – 125,000 |
| **Total Members Live on Platform** | 660,000 – 675,000 |
| **Avg. Medicare Advantage Members** | 527,000 – 536,000 |
| **Total Revenues ($M)** | $6,350 – $6,465 |
| **Medical Margin ($M)** | $400 – $450 |
| **Adjusted EBITDA ($M)** | ($60) – ($15) |
| **Geography Entry Costs ($M)** | $65 – $55 |

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

 agilon health

14

# Financial Outlook for Q1 2024

|  | Quarter Ending March 31, 2024 |
|---|---|
| Medicare Advantage Members | 520,000 − 530,000 |
| ACO REACH Members | 125,000 − 130,000 |
| Total Members Live on Platform | 645,000 − 660,000 |
| Avg. Medicare Advantage Members | 516,000 − 525,000 |
| Total Revenues ($M) | $1,605 − $1,630 |
| Medical Margin ($M) | $155 − $170 |
| Adjusted EBITDA ($M) | $15 − $25 |
| Geography Entry Costs ($M) | $23 − $20 |

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

 agilon health

15



# Non-GAAP Reconciliations

# Non-GAAP Reconciliations

APP 911

## Medical Margin

| (Dollars in thousands) | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Gross profit[1] | $ 69,670 | $ 111,360 |
| Other operating revenue | (9,013) | (3,331) |
| Other medical expenses | 238,034 | 183,000 |
| Medical margin | 298,691 | 291,029 |

1)     Gross profit is defined as total revenues less medical services expenses and other medical expense.

 agilon health

17

APP 911

# Non-GAAP Reconciliations

## Adjusted EBITDA

| (Dollars in thousands) | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Net income (loss)[1] | $ (262,803) | $ (106,864) |
| (Income) loss from discontinued operations, net of income taxes | 67,550 | 14,554 |
| Interest expense | 6,658 | 4,484 |
| Income tax expense (benefit) | 791 | 1,640 |
| Depreciation and amortization | 16,043 | 8,949 |
| (Gain) loss on lease terminations | — | 5,458 |
| Severance and related costs[2] | 188 | 2,470 |
| Stock-based compensation expense | 69,326 | 28,069 |
| EBITDA adjustment related to equity method investments[3] | 22,694 | 3,737 |
| Other[4] | (15,448) | (7,967) |
| Adjusted EBITDA | $ (95,001) | $ (45,470) |

1) Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended December 31, 2023 and 2022, (i) $13.5 million and $13.0 million, respectively, are included in other medical expenses and (ii) $12.2 million and $19.4 million, respectively, are included in general and administrative expenses. For the twelve months ended December 31, 2023 and 2022, (i) $33.7 million and $23.9 million, respectively, are included in other medical expenses and (ii) $40.8 million and $43.9 million, respectively, are included in general and administrative expenses.

2) For the year ended December 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $2.0 million.

3) The three and twelve months ended December 31, 2023 includes $15.2 million of physician compensation expenses to reduce the physician partners' compensation percentage in current and future years in exchange for the Company's common stock.

4) Includes interest income and transaction-related costs.



18

**APP 913**

# EXHIBIT 26

APP 914

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the fiscal year ended December 31, 2023**

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-40332**

_____

# agilon health, inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **37-1915147** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **6210 E Hwy 290, Suite 450** **Austin, Texas** | **78723** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(562) 256-3800**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value | AGL | The New York Stock Exchange |

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant; (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐          Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act.) Yes ☐ No ☒

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $5.2 billion.

As of February 24, 2024, there were 409,541,664 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the registrant's 2024 Annual Meeting of Stockholders have been incorporated by reference into Part III of this Report.

Table of Contents

**agilon health, inc.**
Form 10-K
For the Fiscal Year Ended December 31, 2023

**Table of Contents**

| | | |
|---|---|---|
| **Cautionary Language Regarding Forward-Looking Statements** | | 1 |
| **Part I** | | **3** |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 49 |
| Item 1C. | Cybersecurity | 49 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| | | |
| **Part II** | | **52** |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | [Reserved] | 53 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 54 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 70 |
| Item 8. | Financial Statements and Supplementary Data | 71 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 76 |
| Item 9A. | Controls and Procedures | 76 |
| Item 9B. | Other Information | 79 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 79 |
| | | |
| **Part III** | | **80** |
| Item 10. | Directors, Executive Officers and Corporate Governance | 80 |
| Item 11. | Executive Compensation | 80 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 80 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 80 |
| Item 14. | Principal Accounting Fees and Services | 80 |
| | | |
| **Part IV** | | **81** |
| Item 15. | Exhibits and Financial Statement Schedules | 81 |
| Item 16. | Form 10-K Summary | 83 |
| | Signatures | 84 |

**APP 916**

Table of Contents

*All references in this report to "agilon," "the Company", "we," "us" or "our" mean agilon health, inc., together with its consolidated subsidiaries. Unless the context suggests otherwise, references to "agilon health, inc." mean the parent company without its subsidiaries.*

**Cautionary Language Regarding Forward-Looking Statements**

Statements in this Annual Report on Form 10-K (the "Report") that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in several places throughout this Report and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results of operations, financial condition, and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under "Item 1A, Risk Factors" in this Report, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Report. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- medical expenses incurred on behalf of our members may exceed revenues we receive;
- our ability to secure contracts with Medicare Advantage ("MA") payors;
- our ability to grow new physician partner relationships sufficient to recover startup costs;
- availability of additional capital, on acceptable terms or at all, to support our business in the future;
- significant reduction in our membership;
- transition to a Total Care Model may be challenging for physician partners;
- public health crises, such as COVID-19, could adversely affect us;
- inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts;
- the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners;
- our ability to hire and retain qualified personnel;
- our ability to realize the full value of our intangible assets;
- security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;

1

APP 917

Table of Contents

- reliance on our subsidiaries;

- Environmental, Social, and Governance ("ESG") issues;

- reliance on a limited number of key payors;

- the limited terms of contracts with our payors and our ability to renew them upon expiration;

- reliance on our payors, physician partners and other providers to operate our business;

- our ability to obtain accurate and complete diagnosis data;

- reliance on third-party software, data, infrastructure and bandwidth;

- consolidation and competition in the healthcare industry;

- the impact of changes to, and dependence on, federal government healthcare programs;

- uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures;

- regulation of the healthcare industry and our physician partners' ability to comply with such laws and regulations;

- federal and state investigations, audits and enforcement actions;

- repayment obligations arising out of payor audits;

- negative publicity regarding the managed healthcare industry generally;

- our use, disclosure and processing of personally identifiable information, protected health information ("PHI"), and de-identified data;

- failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization;

- lawsuits not covered by insurance;

- changes in tax laws and regulations, or changes in related judgments or assumptions;

- our indebtedness and our potential to incur more debt;

- dependence on our subsidiaries for cash to fund all of our operations and expenses;

- provisions in our governing documents;

- ability to achieve a return on investment depends on appreciation in the price of our common stock; and

- the material weakness in our internal control over financial reporting and our ability to remediate such material weakness.

Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

2

**APP 918**

Table of Contents

**PART I**

**ITEM 1. Business**

**Overview**

Our business is transforming healthcare by empowering the primary care physicians ("PCP") to be the agents for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we believe we are poised to revolutionize healthcare for seniors across communities throughout the United States ("U.S."). We believe our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by primarily forming risk-bearing entities ("RBEs") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 25 anchor physician groups and 24 geographies as of December 31, 2023. Our platform has enabled us to grow our total membership by 68% and revenue by 81% from December 31, 2022 to December 31, 2023. As of December 31, 2023, the PCPs on our platform serve approximately 388,400 MA members and 89,300 Medicare fee-for-service ("FFS") beneficiaries through eight Accountable Care Organizations ("ACOs") through our participation in the Centers for Medicare & Medicaid Services' ("CMS") Accountable Care Organization Realizing Equity, Access, and Community Health ("ACO REACH") Model. The ACO REACH Model was formerly known as the CMS Innovation Center Direct Contracting Model and was redesigned and renamed the ACO REACH Model on January 1, 2023.

For a description of our significant activities during 2023, see "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations-2023 Results" in this Report.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

*The agilon Platform*: The agilon platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital. Our purpose-built platform is comprised of an integrated set of capabilities designed to continuously improve. Our platform is delivered to our anchor physician groups through a long-term partnership model to support the adoption and success of a Medicare-centric, globally capitated line of business.

*agilon's Long-term Physician Partner Model*: We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Through this partnership, our physician partners' existing MA patient panels are attributed to our platform through our subscription-like per-member per-month ("PMPM") agreements with payors. The combination of these subscription-like agreements, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue. As earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings with our anchor physician groups.

*agilon's Network*: Enhancing the power and growth of the agilon platform is the rapidly expanding group of leading community-based physician partners, functioning as a collaborative group through the agilon network. We believe the value of this network is demonstrated by our ability to add new physician partners and to attract additional PCPs to our physician partners. The ability to share best practices, influence the development of the platform, compare notes on the

3

**APP 919**

Table of Contents

transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians. We believe this like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

## Reimbursement Model and Organization

Under a traditional FFS reimbursement model, physicians are paid a fixed amount for services provided during a patient visit, regardless of a patient's medical need or health outcome. As a result, physician reimbursement is solely related to the volume of patient visits and procedures performed, thereby offering limited financial incentive to focus on preventative care and cost containment. Value-based care models offer alternative reimbursement models, which typically incentivize physicians for improving the cost and quality of healthcare provided for an attributed patient population. Various types of value-based care reimbursement models exist, including capitation, bundled payments, or payments for attainment of improved quality metrics or medical cost efficiency.

Under our Total Care Model, which is a type of value-based care reimbursement model, we are responsible for managing the medical costs associated with our attributed members. This structure empowers physicians to focus on the improvement of the quality of care provided, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care. Under such a structure, physicians are incentivized to improve the quality and efficiency of care as well as health outcomes for their patients.

### *Physician and Payor Contractual Relationships*

*Physicians*

Our business model combines the agilon platform, a network of like-minded physicians and a long-term partnership model in order to provide physician groups with the necessary capabilities, capital and business model to create a Medicare-centric, globally capitated line of business. We believe that failing to empower PCPs to drive meaningful change in quality, cost and patient experience has historically fostered waste, unnecessary variability in care and poor patient experience and health outcomes. We seek to partner with leading community-based physician groups under a Total Care Model. We have formed long-term partnerships with diverse leading community-based physician groups in geographies such as Ohio, Connecticut, Maine, Michigan, Minnesota, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, and Texas. By providing technology, people, process and capital, we aim to improve the quality and cost of healthcare and drive long-term growth while creating a sustainable business model for our physician partners.

Under the Total Care Model, we typically operate by forming RBEs within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more partner primary care or multi-specialty physician groups. We refer to these groups as our "anchor physician groups." Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. We have entered into long-term professional services agreements with our anchor physician groups, which typically have a contractual duration of 20 years. In accordance with relevant accounting guidance, each of these RBEs is determined to be a variable interest entity consolidated by agilon, as we have: (i) the ability, through the management services and governance arrangements, to direct the activities (excluding clinical decisions) that most significantly affect the RBE's economic performance; and (ii) the obligation to absorb losses of or the right to receive benefits that could be potentially significant to the RBE.

Through incentive compensation arrangements, we share a portion of the RBE's savings from successfully improving the quality of care and reducing costs with our anchor physician groups. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. This base compensation is initially negotiated with the RBE for the first ten years of each agreement, subject to annual increases based on current market rates and other agreed upon adjustment factors, after which it is subject to renegotiation.

4

Table of Contents

Although our RBEs are wholly-owned subsidiaries of agilon, our anchor physician groups participate in each RBE's governance, with individuals designated or nominated by the applicable anchor physician groups having representation on each RBE's board of directors. Most of our contracts with our anchor physician groups contain exclusivity or other provisions intended to promote interconnectedness with our physician partners for applicable lines of business in order to facilitate the longevity and stability of the partnership. Typically, these contracts provide for termination rights that are triggered upon certain events, subject to applicable cure periods, including bankruptcy or insolvency events, exclusion, suspension or debarment from state or federal government programs and the occurrence of government action that can be reasonably expected to negatively influence our business. We have historically issued certain stock-based instruments, which we refer to as "partner physician group equity agreements," to our anchor physician groups pursuant to which they are entitled to receive equity of their local RBE or agilon health, respectively, in the future only upon the occurrence of certain events deemed a "change of control" of the RBE. For additional discussion related the agilon health related instruments, see "Critical Accounting Estimates - Stock-Based Compensation."

In addition to our contractual arrangements with our physician partners, we also maintain relationships with other providers who care for our members, including hospitals, specialists and ancillary providers. Such providers either contract with agilon or directly with payors. We and our physician partners maintain effective working relationships with the majority of the higher-volume providers in our geographies in order to retain insight into the provision of care to our members and ensure care is rendered effectively and in a manner which supports the achievement of appropriate clinical outcomes.

*Health Plan Payors*

We enter into contractual agreements with health plan payors in each of our geographies, under which we are financially responsible for our physician partners' provision of a defined spectrum of healthcare services to our members, in exchange for a defined PMPM fee for each of our members (which is also referred to as "global capitation"). The healthcare services for which we are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services costs. In certain of our payor arrangements, we are also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members. Through these payor agreements, we help to create access for our physician partners to value-based care reimbursement structures through our Total Care Model, which allow our physician partners to focus on the improvement of the quality of care provided to their patients, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care and certain operating costs.

The global capitation fees we are entitled to receive from our health plan payor contracts are typically based on a defined percentage of the corresponding monthly premium payments which the payor receives from CMS for members attributed to our PCPs and covered under such contracts. The premium payments to payors are based on county-level benchmark rates established by CMS and payors' annual bid of amounts necessary to cover the cost of a standard MA patient, and are influenced by several factors, including, but not limited to, the applicable MA plan's STAR rating and CMS' risk-adjustment model, which compensates payors based on the health status (acuity) of each individual patient in the preceding calendar year. For agreements where the payor retains responsibility for paying claims on our behalf, as is the case today in the majority of our payor agreements, funding under the applicable agreement is utilized by the payor to pay such claims, and we receive surplus distributions on a monthly or quarterly basis. In these arrangements, the payor maintains the responsibility for entering into contractual agreements with network hospitals, network specialty physicians, and ancillary or other providers. Additionally, certain of our contracts with payors incorporate provisions in which we are eligible to earn additional payments on top of our capitation payments based upon the attainment of defined quality performance criteria correlated to applicable STAR ratings criteria. Premiums received may be subject to future adjustment.

We have developed local contracts across multiple payors, along with national form contracts with certain key payors, which provide a consistency of non-financial contract terms, data sharing, operational processes and governance structures and support portability of the agilon platform. We typically maintain various contracts with a single national payor in order to reflect varying economic terms across our geographies, and to provide for distinct subsidiary entities of our company and a national payor as parties to these contracts. As of January 1, 2024, we have relationships with 29 health plan payors across 32 geographies. Payors with which we contract include large national health plans as well as smaller local and regional insurers. We believe our ability to offer multiple MA plans and products to our physician partners in each geography creates significant value for our physician partners and the members that they serve. Members are able to select the plan and benefit design that meets their individual needs while our platform enables a seamless experience regardless of plan or product for all patients and physician groups.

5

Table of Contents

The agreements with our payors outline the range of healthcare services for which we are financially responsible and at risk, the services for which we are contracted to perform on the payor's behalf and the key financial terms. Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit, surety bonds, or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography, but typically averages between 1.0-3.0% of projected annual gross revenue attributable to the corresponding agreement.

Our payor agreements also typically incorporate various termination rights, which are negotiated based on the scope of the market-facing solutions that the payor has adopted and the duration of the contract. Most of our contracts include cure periods during which time we may attempt to resolve any issues that would trigger a payor's ability to terminate the contract. However, certain of our contracts are also terminable immediately upon the occurrence of certain events. For example, some of our contracts may be terminated immediately by the payor if we lose applicable licenses, go bankrupt, lose our liability insurance or receive an exclusion, suspension or debarment from state or federal government authorities.

The contracts with our payors impose other obligations on us. For example, we typically agree that all services provided under our contract and all employees, including affiliated and contracted providers, providing such services will comply with such payor's policies and procedures. We also typically agree to indemnify our payors against certain third-party claims.

*ACO REACH*

agilon, in conjunction with some of our physician partners, participated in the ACO REACH Model in certain geographies, through eight approved ACOs. The ACO REACH Model is a voluntary payment model option aimed at reducing expenditures and preserving or enhancing quality of care for beneficiaries in traditional Medicare FFS established by the CMS Innovation Center.

Under the ACO REACH Model, CMS contracts directly with each ACO pursuant to participation agreements, in which such ACO selects risk-sharing and fee payment options. The participation agreements included various terms and conditions each ACO must comply with, including meeting certain operational requirements. Each of the ACOs selected the Global risk-sharing option, in which the ACO assumes accountability for the total cost of care of the FFS beneficiaries aligned to such ACO. In addition, each of our ACOs selected the Primary Care Capitation Payment (the "PCC") option. The participation agreements between our ACOs and CMS expire two years after the "Model Performance Period" established by CMS, which lasts from April 1, 2021 through December 31, 2026. The ACO may terminate its participation agreement with CMS at any time upon advance written notice. CMS has certain additional termination rights, including in connection with the termination of the ACO REACH Model or non-compliance of the ACO. Additionally, CMS has the right to amend a participation agreement without the consent of the ACO for good cause, or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules.

The ACOs operate in partnership pursuant to participating medical group agreements with one or more of our physician partners in certain geographies. Our contracted physician partners provide Medicare services to their aligned beneficiaries, and bill CMS on a FFS basis for such services. In turn, in accordance with the PCC option, CMS compensates each physician partner for a portion of their billed services based on the applicable rate, and the remaining portion is paid to each ACO on a per Medicare beneficiary per month ("PBPM") basis based on a prospective estimate of such remaining portion of billed services. By 2025, CMS will no longer pay any portion to such physician partner based on FFS compensation rates, and will transition to compensating physician partners through their applicable ACO on a PBPM basis. Each ACO then remits payment out of the PBPM payments from CMS to its contracted physician partners on a monthly or quarterly basis pursuant to the applicable participating medical group agreement, which agreement also includes incentive compensation tied to the ACO's net profits received for aligned beneficiaries. Our ACOs' participating medical group agreements provide for mutual indemnification rights, and have an initial term through December 31, 2026, unless earlier terminated.

All ACOs are subject to the following requirements: (i) to develop and implement a robust health equity plan to identify and better serve underserved communities; (ii) 75% control of each ACO's governing body must be held by participating providers or their designated representatives and (iii) each ACO must have at least two beneficiary representatives on its governing board (at least one Medicare beneficiary and at least one consumer advocate), both of

6

Table of Contents

whom must hold voting rights. agilon implemented these changes for the 2023 performance year with minimal disruption. In addition, the CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations, and the adjustments will continue into 2024. The overall effect of these changes on our ACO's benchmarks has been minimal. The ACO REACH model, which formally launched on January 1, 2023, is largely the same as its predecessor model, Direct Contracting Model or Global and Professional Direct Contracting Model, which we participated in since April 2021.

### Marketing and Distribution

In accordance with Medicare marketing guidelines, health plan payors are responsible for marketing directly to patients. Our focus is on outreach to existing community-based physician groups to join our platform, establishing and maintaining our local branding and strategies to support education for our Medicare-eligible members in evaluating their Medicare options.

Through our long-term partnership model, we partner with leading community-based physician groups in our existing geographies and aim to expand our geographic reach by partnering with community-based physician groups in new geographies, across the United States. Our growth strategy is supported by a dedicated business development team that works closely with physician groups, senior management and key stakeholders to identify potential physician groups to partner with and integrate onto our platform and into our network. Additionally, we believe our network of like-minded physician partners also attracts new physicians to join, as access to cross-market know-how and best practices encourages success in a Total Care Model.

Our enterprise marketing team develops branding strategies and identities in our geographies and supports the development of communication and branding materials to support the local growth of our physician partners and their Medicare patient population. This begins with our entry into a new geography. We create a local brand that embodies the value of the Total Care Model for patients as well as the history and culture of our physician partner. Each geography includes the anchor partner's name and "Senior Health Connect" as part of the naming convention to help reinforce the value of our national network to payors, policy makers and other industry constituents. To empower patients to make informed decisions about their coverage options, educational opportunities and materials are offered throughout the year, including educational physician presentations, monthly "Medicare 101" sessions across every geography, on-line resources, in-office materials that explain the difference between traditional Medicare and MA, and patient communications that highlight Medicare election coverage windows.

### Competition

The healthcare industry is highly competitive and fragmented. We currently face competition in every aspect of our business, including in offering a favorable reimbursement structure for existing physician partners and attracting health plan payors and physician partners who are not contracted with us, from a range of companies that provide care under a variety of models that could attract patients, providers and payors. We compete against other entities that provider value-based care services, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed care services tools and may provide these services to their physicians and patients at discounted prices or may seek to expand their relationships with additional competing physicians or physician networks. Other organizations may also seek to apply specialized services or programs, including providing data analytics or disease-based programs, designed to enable physicians or payors to operate successfully under value-based care arrangements. Although some of our competitors utilize elements of our MA multi-payor, globally capitated risk model deployed with community-based physician groups, including in certain of the geographies we serve, we do not believe any of our competitors offer a model that captures all elements of the agilon model. Our competitors typically vary by geography, and we may also encounter competition in the future from other new entrants. Our growth strategy and our business could be adversely affected if we are not able to continue to access existing geographies, successfully expand into new geographies or maintain or establish new relationships with payors and physician partners.

The competitive factors in our business include the nature and caliber of relationships with physicians; patient healthcare quality, outcomes and cost; the strength of relationships with payors; the quality of the physician experience; local geography leadership position; and the strength of the underlying economic model. We believe our first-of-its-kind platform, partnership and network model enables us to compete favorably.

Table of Contents

**Intellectual Property**

We rely on a combination of international and U.S. trademark law as well as confidentiality procedures and contractual provisions to protect our trade secrets, including proprietary technology, databases and our brand.

We have registered "agilon" and our logo as trademarks in the U.S. We also have filed other trademark applications that are meaningful to our business in the U.S. across various states and local jurisdictions, including for the use of the local brand created within each of our geographies, and will pursue additional trademark registrations to the extent we believe it would be beneficial and cost-effective.

We are the registered holder of a variety of domain names that include "agilon" and similar variations.

We have developed proprietary technology and processes that support our operational programs and clinical insights, including our "CORE" technology platform and HCC Manager risk adjustment software application, both of which are proprietary systems that aid in the aggregation and analysis of third-party data we collect. Our internally developed technology is continuously refined to support the needs of our platform and partners. Although we do not currently hold a patent for CORE or HCC Manager, we continually assess the most appropriate methods of protecting our intellectual property and may decide to pursue available protections in the future.

We maintain our intellectual property and confidential business information in a number of ways. For instance, all employees and consultants sign agreements and/or acknowledgments reminding them of their confidentiality obligations upon the commencement of an employment or consulting relationship with us. In addition, we have a policy of requiring individuals and entities with which we discuss potential business relationships to sign non-disclosure agreements. Lastly, our agreements with physician partners include confidentiality and non-disclosure provisions.

We may be unable to obtain, maintain and enforce our intellectual property rights, and assertions by third parties that we violate their intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

**Human Capital**

*Overview*

People join agilon because of our vision: To transform the future of healthcare in communities across the country by empowering exceptional patient-physician relationships. Together with our employees and physician partners, we have defined our company values and commitments to guide our everyday actions in executing our mission:

- Partnership and Collaboration: We are One Team. We collaborate deeply. We embrace diversity. Together with our physician partners, we empower the care that our families and friends deserve.

- Innovation: We rapidly adapt to our changing world and embrace the creativity of our physician partners and each other.

- Quality and Service Excellence: We value results, not activity. We serve others with passion and humility.

- Continuous Improvement: We are agile and move fast. We actively seek out and share feedback. We learn and improve every day.

- Expertise: We are curious. We aspire to be experts and share our knowledge.

- Accountability and Integrity: We celebrate our successes. We take ownership in everything we do.

Our human capital efforts are supported by our dedicated human resources team. This team supports the business in identifying and recruiting top talent, supporting the onboarding and orientation of new hires through a comprehensive new employee orientation, a manager's toolkit and resources to support onboarding, goal setting, and in-year management, as well as a comprehensive semi-annual review process that ties to our company values and supports continuous learning and improvement. Our efforts to promote a positive employee experience and build culture are further supported and enhanced by local and national in-person and virtual events, including town halls, in-office and/or virtual celebrations, employee activity committees and recognition awards, meant to champion our employees and create a sense of community. We conduct annual employee engagement surveys to solicit feedback and help guide annual planning on efforts and initiatives to support our team members.

8

Table of Contents

*Total Rewards*

We recognize how vital our employees are to our success and strive to offer comprehensive and competitive compensation and benefits to meet the varying needs of our employees. Our Total Rewards programs include short-term and long-term incentives, recognition programs, a 401(k) plan, health and welfare insurance benefits, unlimited paid time off for exempt employees and accrued paid time off for hourly employees, flexible work schedules, and family leave, among many others, depending on eligibility.

As part of our efforts to promote pay equity, we have implemented measures in our U.S. offices such as routinely benchmarking roles against market comparables, increasing pay transparency for applicants and associates, setting pay ranges based on role and experience, applying consistent processes for annual merit increases and bonuses and driving additional ongoing and future improvements.

*Diversity, Equity, Inclusion & Belonging ("DEIB")*

We believe a great workplace fosters an environment where all employees can thrive and grow, and where differences are both encouraged and celebrated. We aim to attract, develop, retain and support a diverse workforce that reflects the many members, physician partners, and communities we serve. Under our DEIB Senior Executive Council each direct report to our CEO is responsible for supporting strategic direction and championing efforts and funding for programs and initiatives connected to one of the four pillars of our DEIB strategy. Our DEIB programs include a leadership development workshop and coaching program for high potential employees including those who have not previously had opportunities to develop leadership skills, employee resource groups to foster sense of community and inclusion, an unconscious bias curriculum, and other community-building events to deepen understanding and appreciation of our global workforce.

*Training and Development*

We prioritize and invest in creating opportunities to help employees grow and build their careers through a multitude of training and development programs. These programs, in addition to focusing on career development, and professional development, reinforce the importance of compliance and ethical behavior embodied in our Code of Conduct and related policies and training, which all employees must complete upon hire and annually thereafter. We also include online courses designed to strengthen technical and hard-skills and enhance leadership development. We support career coaching, mentorship and accelerated leadership development programs to ensure mobility and advancement for our employees. Our employees are also encouraged to participate in mentoring programs with people of various backgrounds and cultures. We view mentoring as an essential development tool for sharing skills and knowledge so we can all succeed. Our commitment to mentoring feeds the successful future of our company.

*Health & Safety*

The health, safety, and wellness of our employees are vital to our success. We have a strong commitment to providing a safe working environment.

As of December 31, 2023, agilon and its subsidiaries had 1,117 employees; substantially all were full-time. None of our employees are members of a labor union, and we have not experienced a work stoppage. Our employees do not include our physician partners, whom we do not directly employ.

**Healthcare and Other Applicable Regulatory Matters**

The healthcare industry is highly regulated under state, federal, and international laws and regulations. Our operations and relationships with healthcare plans and providers are also subject to extensive and increasing regulation by numerous federal, state, and local government agencies including the Office of Inspector General ("OIG"), the Department of Justice ("DOJ"), CMS, the Office of Civil Rights ("OCR"), and various other authorities. Healthcare laws and regulations change frequently. Regulatory agencies have broad discretion to issue new regulations and enforce the laws and regulations and have been increasingly active in enforcing the laws and regulations against healthcare companies, including companies that provide managed care.

*Corporate Practice of Medicine*

Some states in which we operate have laws prohibiting the corporate practice of medicine ("CPOM"); such laws generally prohibit business entities with non-physician owners, such as agilon and certain of its subsidiaries, from practicing medicine. States with CPOM laws limit the practice of medicine to licensed individuals or professional

9

Table of Contents

organizations comprising licensed individuals; therefore, non-medical professional entities are prohibited from employing or contracting with physicians (unless the entity satisfies limited exceptions), exercising control over medical decisions, or engaging in certain arrangements with other physicians, such as fee-splitting. These laws vary from state to state and change frequently based on new case law, opinions from state attorneys general and regulations promulgated by medical boards. A majority of states have adopted express corporate practice of medicine prohibitions, and several states that have not explicitly adopted the doctrine, nonetheless, have regulations that echo CPOM principles. A violation of the CPOM prohibition constitutes the unlawful practice of medicine, which is a public offense punishable by fines or criminal penalties. A violation could also result in civil penalties or damages. In addition, any medical professional who participates in a scheme that violates a state's CPOM prohibition may be subject to disciplinary action, license revocation, or potential forfeiture of revenues from payors for services rendered or may be punished for aiding and abetting a non-medical professional entity in the unlawful practice of medicine. We typically operate by forming RBEs that contract with payors on the one hand and provide professional services through contractual relationships with PCPs on the other hand. While we believe that our practices are in substantial compliance with the CPOM laws to which we are subject, if a state determines that we are not in compliance that may result in a material adverse effect on our business, results of operations or financial condition.

### Fee-Splitting Prohibitions

The laws of some states prohibit medical professionals from splitting with anyone, other than providers who are part of the same group practice, any professional fee, commission, rebate or other form of compensation for any services not actually and personally rendered. Fee-splitting laws and their interpretations vary and are enforced by state courts and regulatory authorities that have broad discretion in their enforcement. Courts in some states have interpreted fee-splitting statutes as prohibiting all percentage of gross revenue and percentage of net profit fee arrangements, despite the performance of legitimate services. In addition, courts have refused to enforce contracts found to violate state fee-splitting prohibitions. Further, fee-splitting arrangements could implicate other laws applicable to our business, such as anti-kickback and CPOM laws and regulations.

While we believe we are in substantial compliance with fee-splitting laws in the states in which we operate, if we are found to be non-compliant, penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary action against our affiliated providers. It could also result in monetary damages and penalties.

### False Claims Acts

We are subject to numerous federal and state laws that prohibit the presentation of false information, or the failure to disclose information, in connection with the submission and payment of medical claims for reimbursement.

The federal civil and criminal false claims laws and civil monetary penalties laws, such as the federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), impose civil liability on individuals or entities that submit false or fraudulent claims for payment to the federal government. The FCA provides, in part, that the federal government may bring a lawsuit against any person whom it believes has knowingly or recklessly: presented, or caused to be presented, a false or fraudulent claim for payment or approval to the federal government; made, used or caused to be made or used a false statement or a false record to get a claim for payment approved, including a false or fraudulent claim; concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money or property to the federal government; or conspired to commit any of the foregoing. The government may deem entities to have "caused" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information, billing for services not rendered, billing services at a higher payment rate than appropriate and billing for care that is not considered medically necessary. Suits filed under the FCA are also known as "qui tam" actions. They are frequently brought by individuals known as "relators" or "whistleblowers," who may file a FCA lawsuit on behalf of the government. Relators and whistleblowers are incentivized to file such lawsuits because they may share in a percentage of any recovery.

Healthcare-related fraud continues to be the leading source of recoveries in FCA settlements and judgments.

The federal government has used the FCA to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare and other federal healthcare programs. The federal government, including as a result of the passage of the ACA, and a number of courts have taken the position that claims presented in violation of certain other statutes, including the federal Anti-Kickback Statute ("AKS") or the federal physician referral law, 42 U.S.C. 1395nn (the "Stark Law"), are a violation of the FCA. Some government healthcare programs, including, but not limited to,

10

Table of Contents

the MA program, use a risk-adjustment model that adjusts premiums paid to contracted payors to reflect the specific characteristics of each enrolled member (including demographics, government program eligibility and health status). Many payors and government healthcare programs have set forth specific documentation rules that must be followed in compliantly selecting allowable codes. We rely on physician partners to follow the CMS documentation rules and code their claim submissions with accurate and substantially documented diagnoses, which we send to the payors, some of whom, in turn, submit the data to government healthcare agencies including CMS.

In recent years, the DOJ has brought a number of investigations and actions under the federal FCA against both payors and providers for alleged upcoding or improper coding of diagnosis coding under the risk-adjustment methodology. The FCA and Social Security Act also prohibits the knowing retention of identified overpayments (known as "reverse false claims"). A number of states have enacted laws that are similar to the federal FCA. Under Section 6031 of the Deficit Reduction Act of 2005, as amended, if a state enacts a false claims act that is at least as stringent as the federal statute and that also meets certain other requirements, the state will be eligible to receive a greater share of any monetary recovery obtained pursuant to certain actions brought under the state's FCA. As a result, more states are expected to enact laws that are similar to the federal FCA in the future along with a corresponding increase in state false claims enforcement efforts.

Penalties for violations of the federal and state FCAs are severe. For example, if an entity violates the federal FCA, the government may seek up to three times the actual damages (known as "treble damages"), plus substantial penalties for each false claim. Exclusion from federal healthcare programs is also possible. Violations of federal and state fraud and abuse laws may be punishable by criminal and/or civil sanctions, including significant penalties, fines, disgorgement, additional reporting requirements and oversight under a corporate integrity agreement or similar agreement to resolve allegations of noncompliance with these laws, and/or exclusion or suspension from federal healthcare programs, such as Medicare, and debarment from contracting with the U.S. government. In addition to the provisions of the FCA, which provide for civil enforcement, the federal government also can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims to the government for payments.

***Federal and State Anti-Kickback Statutes***

The AKS, set forth in Section 1128B of the Social Security Act, is a criminal statute that prohibits the knowing and willful offer, payment, solicitation or receipt of any form of remuneration in return for, or to induce, (i) the referral of a person for items or services reimbursable under federal healthcare programs, (ii) the furnishing or arranging for the furnishing of items or services reimbursable under federal healthcare programs or (iii) the purchase, lease or order or arranging or recommending purchasing, leasing or ordering of any item or service reimbursable under federal healthcare programs. The core of a violation of the AKS is an "inducement" to refer patients for services or items that are reimbursed under a federal healthcare program, such as Medicare, Medicaid, or Tricare (which covers military personnel). The AKS is based on the theory that kickbacks undermine the integrity of federal healthcare programs by tainting medical decision-making, increasing healthcare costs and negatively impacting competition. The ACA amended the AKS to make it clear that a person need not have actual knowledge of the statute, or specific intent to violate the statute, as a predicate for a violation. Court cases have resulted in the interpretation that a violation may occur even when only one of many purposes of the remuneration is to induce or reward referrals, and the OIG, which has the authority to impose administrative sanctions for violation of the statute, has adopted a similar standard.

There are certain AKS "safe harbors" which, if the respective requirements are met, would afford protection from the AKS. Failure to meet all requirements of an AKS safe harbor does not necessarily mean the arrangement violates the AKS, but it may be subject to scrutiny by legal authorities, in light of the parties' intent and arrangements. In other words, if an arrangement does not fit within a safe harbor, it does not necessarily mean that the arrangement is *per se* illegal-only that it is not shielded from regulatory scrutiny. The federal AKS provides criminal penalties for individuals or entities that knowingly and willfully solicit or receive any remuneration. A violation of the AKS is punishable by imprisonment of up to ten years, fines of up to $100,000 per offense, or both. Violation can also give rise to federal healthcare program exclusion, liability under the FCA and civil penalties, which may include monetary penalties of up to $100,000 per offense, repayments of up to three times the total payments between the parties to the arrangement and suspension from future participation in Medicare and Medicaid.

We have endeavored to structure our business arrangements with healthcare providers to comply with the AKS or fit within an AKS safe harbor. For example, a key managed care safe harbor under the AKS upon which we regularly rely allows for payments to providers for "healthcare services and items," but does not allow incentive payments for marketing or to encourage member enrollment. We therefore carefully analyze all payment structures to ensure that they

11

Table of Contents

constitute "services and items" that fall within this safe harbor or are otherwise in compliance with the AKS. We similarly analyze other financial arrangements with healthcare providers to seek to comply with the AKS, including through application of other safe harbors and assessment of whether the arrangement reflects fair market value for the value of services provided without regard for the volume or value of referrals generated between the parties.

Additionally, some states have enacted statutes and regulations similar to the AKS, but which may be applicable regardless of the payor source for the patient. These state laws may contain exceptions and safe harbors that are different from and/or more limited than those of federal law and that may vary from state to state.

To help accelerate the U.S. healthcare system's transition from a FFS to a value-based system, the U.S. Department of Health and Human Services ("HHS") launched the "Regulatory Sprint to Coordinated Care" initiative ("Regulatory Sprint") in 2018, which aims to change the manner in which the healthcare regulatory framework has traditionally been applied to stakeholder arrangements. In connection with the Regulatory Sprint, the OIG issued final rules amending the AKS by adding new safe harbors and modifying existing safe harbors that protect certain payment practices and business arrangements from sanctions under the AKS in order to remove potential barriers to more effective coordination and management of patient care and delivery of value-based care. Among other changes, the new regulations contain safe harbors for value-based arrangements centering around value-based enterprises, which are enterprises composed of participants collaborating to achieve one or more value-based purposes, including coordinating and managing the care of a target patient population and coordinating and managing the care of a target population. These new final rules provide additional protections to our payment models with providers.

We have also endeavored to structure our participation in the ACO REACH Model to comply with waivers of the AKS issued by the Secretary of HHS. The conditions of such waivers are to ensure that protected arrangements: (i) are consistent with the quality, care coordination, and cost-reduction goals of the ACO REACH Model, (ii) are subject to safeguards designed to mitigate the risk of fraud and abuse; and (iii) can be readily monitored and audited.

*Stark Law*

The Stark Law generally prohibits a physician from referring Medicare and Medicaid patients to an entity providing designated health services ("DHS") if such physician, or a member of the physician's immediate family, has a financial relationship with the entity, unless a specific exception applies. DHS is defined to mean any of the following enumerated items or services: clinical laboratory services; physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; and outpatient speech-language pathology services. The types of financial arrangements between the referring physician and an entity providing DHS that trigger the Stark Law are broad, including direct and indirect ownership and investment interests, and compensation arrangements. The Stark Law also prohibits any entity providing DHS and receiving a prohibited referral from presenting, or causing to be presented, a claim or billing for the services arising out of the prohibited referral. Similarly, the Stark Law prohibits an entity from "furnishing" a DHS to another entity in which it has a financial relationship when that entity bills for the service. The Stark Law also prohibits self-referrals within an organization by its own physicians, although broad exceptions exist that cover employed physicians and those referring DHS that are ancillary to the physician's practice to the physician group. The prohibition applies regardless of the reasons for the financial relationship and the referral; intent to induce referrals is not required.

Like the federal AKS, the federal Stark Law contains statutory and regulatory exceptions intended to protect certain types of transactions and arrangements. If the Stark Law is implicated, the financial relationship must fully satisfy a Stark Law exception; if an exception is not satisfied, then the parties to the arrangement could be subject to sanctions. Sanctions for violation of the Stark Law include denial of payment for claims for services provided in violation of the prohibition, refunds of amounts collected in violation of the prohibition, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law prohibition, civil assessment of up to three times the amount claimed, and potential exclusion from the federal healthcare programs, including Medicare and Medicaid. Amounts collected on claims related to prohibited referrals must be reported and refunded generally within sixty (60) days after the date on which the overpayment was identified. Furthermore, Stark Law violations and failure to return overpayments in a timely manner can form the basis for FCA liability, as further discussed herein. Additionally, several states have enacted physician self-referral laws.

12

Table of Contents

Notably, compensation pursuant to a risk-sharing arrangement between a managed care organization or an independent practice association and a physician (either directly or indirectly through a contractor) for services provided to enrollees of a health plan (an MA plan, for example) does not constitute a financial arrangement for Stark purposes. Further, physician incentive plans ("PIPs") are allowable provided that (i) the compensation is not determined in any manner (withhold, capitation, bonus, or otherwise) that takes into account, directly or indirectly, volume or value of referrals and (ii) the PIP does not induce the reduction of medically necessary care to individual patients and does not place the physician at substantial financial risk for services not provided by the physician.

As part of the Regulatory Sprint, CMS also issued a sweeping set of regulations that introduce significant new value-based terminology and exceptions to the Stark Law. CMS has implemented new exceptions for certain remuneration exchanged between or among eligible participants in value-based arrangements. These exceptions and their various requirements apply based on the level of risk assumed by the arrangement's participants. These new regulations purport to ease the compliance burden for healthcare providers across the industry while maintaining strong safeguards to protect patients and programs from fraud and abuse. These or other changes may change the parameters of the Stark Law exceptions that we rely upon and impact our business, results of operations and financial condition.

### Section 1876 of the Social Security Act

Section 1876 of the Social Security Act prohibits MA plans and their downstream entities from entering into compensation arrangements with physicians that may directly or indirectly have an effect of reducing or limiting services to individual members. We have sought to structure our compensation arrangements with physicians to ensure compliance with this requirement.

### Health Care Fraud Statute

The Health Care Fraud Statute, 18 U.S.C. § 1347, is a criminal statute that prohibits any person from knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, which can be either a government or private payor plan. Violation of this statute, even in the absence of actual knowledge of or specific intent to violate the statute, may be charged as a felony offense and may result in imprisonment, fines or both. The False Statement Statute, 18 U.S.C. § 1035, prohibits, in any matter involving a federal healthcare program, anyone from knowingly and willfully falsifying, concealing or covering up, by any trick, scheme or device, a material fact, or making any materially false, fictitious, or fraudulent statement or representation, or making or using any materially false writing or document knowing that it contains a materially false or fraudulent statement. A violation of this statute may be charged as a felony offense and may result in imprisonment, fines, or both. Other federal criminal statutes similarly apply to healthcare, including Mail Fraud, 18 U.S.C. § 1341 and Wire Fraud, 18 U.S.C. § 1343. A violation of these statutes may be charged as a felony offense and may result in imprisonment, fines or both.

### Civil Monetary Penalties Statute

The Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. § 1320a-7a, authorizes the imposition of civil monetary penalties, assessments, and exclusions against an individual or entity based on a variety of prohibited conduct, including, but not limited to: (i) presenting, or causing to be presented, claims for payment to Medicare, Medicaid, or other third-party payors that the individual or entity knows or should know are for an item or service that was not provided as claimed or is false or fraudulent; (ii) offering remuneration to a federal healthcare program beneficiary that the individual or entity knows or should know is likely to influence the beneficiary to order or receive healthcare items or services from a particular provider; (iii) arranging contracts with an entity or individual excluded from participation in a federal healthcare program; (iv) violating the federal AKS; (v) making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a federal healthcare program; (vi) making, using, or causing to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a federal healthcare program; and (vii) failing to report and return an overpayment owed to the federal government. We could be exposed to a wide range of allegations to which the federal CMPL would apply. We perform monthly checks on our employees, affiliated providers and certain affiliates and vendors using government databases to confirm that these individuals have not been excluded from federal programs. However, should an individual become excluded, and we fail to detect it, a federal agency could require us to refund amounts attributable to all claims or services performed or sufficiently linked to an excluded individual. Thus, we cannot foreclose the possibility that we will face allegations subject to the CMPL with the potential for a material adverse impact on our business, results of operations and financial condition. Substantial civil monetary penalties may be imposed under the federal Civil Monetary Penalty Statute and may vary, depending on the

13

Table of Contents

underlying violation. In addition, an assessment of not more than three (3) times the total amount claimed for each item or service may also apply, and a violator may be subject to exclusion from federal and state healthcare programs.

### Federal and State Insurance and Managed Care Laws

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. Some states require downstream entities and RBEs to obtain an insurance license, a certificate of authority, or an equivalent authorization, in order to participate in downstream risk-sharing arrangements with payors. In some states, statutes, regulations and/or formal guidance explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity. However, the majority of states do not explicitly address the issue, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements, as well as reporting obligations. Further, state regulatory stances regarding downstream risk-sharing arrangements can change rapidly and codified provisions may not keep pace with evolving risk-sharing mechanisms.

### Healthcare Reform

In March 2010, the Patient Protection and Affordable Care Act (the "ACA") and the accompanying Health Care and Education Affordability Reconciliation Act, collectively referred to as the ACA, were enacted. The ACA includes a variety of healthcare reform provisions and requirements, which continue to be implemented and substantially changed the way healthcare is financed by both governmental and private insurers.

However, due to government action over the last several years, a number of changes have been made to the provisions of the ACA since 2010, including reduced funding. Looking forward, the future of the ACA and its underlying programs are subject to continuing and substantial uncertainty, making long-term business planning exceedingly difficult. Because of the continued uncertainty about the implementation of the ACA, including the timing of and potential for further legal challenges, repeal or amendment of that legislation and the future of the health insurance exchanges, we cannot quantify or predict with any certainty the likely impact of the ACA on our business, financial condition, operating results and prospects.

The CMS Innovation Center continues to test an array of alternative payment models, including the ACO REACH Model, to allow ACOs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. State regulation of ACOs will likely be variable. For example, certain states may require ACOs to obtain specific licensure to participate in the ACO REACH Model and assume risk directly from CMS. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare. Further, CMS also routinely adjusts the risk adjustment factor which is central to payment under the MA program. The monetary "coefficient" values associated with diseases that we manage in our population are subject to change by CMS. Such changes could have a material adverse effect on our financial condition.

### Federal, State, and International Privacy and Security Requirements

We are subject to various federal, state and local laws and rules regarding the use, security and disclosure of PHI, personally identifiable information, de-identified data and other categories of confidential or legally protected data that our businesses may handle. Such laws and rules include, without limitation, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") and the California Consumer Privacy Act, the California Privacy Rights Act, and other applicable state and international privacy and security laws, including Brazil and India. Privacy and security laws and regulations often change due to new or amended legislation, regulations or administrative interpretation. We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We also utilize third-party service providers for important aspects of the collection, storage and transmission of such sensitive information.

Congress enacted HIPAA, in part, to combat healthcare fraud and to protect the privacy and security of patients' individually identifiable healthcare information. Among other things, HIPAA requires healthcare providers and their business associates to maintain the privacy and security of individually identifiable PHI. The HIPAA Security Rule requires both covered entities and business associates to develop and maintain policies and procedures with respect to PHI, including adherence to HIPAA's security standards through the implementation of administrative, physical and technical

14

Table of Contents

safeguards to protect PHI. Additionally, the Privacy Rule contains requirements with respect to the use and disclosure of individuals' PHI, including a prohibition on a covered entity or business associate using or disclosing an individual's PHI unless the use or disclosure is authorized by the individual or is specifically required or permitted under the Privacy Rule. The Health Information Technology for Economic and Clinical Health of 2009 ("HITECH") dramatically expanded, among other things, (1) the scope of HIPAA to now apply directly to "business associates," or independent contractors who receive, create, maintain or obtain PHI in connection with providing a service to a covered entity or another business associate, (2) substantive security and privacy obligations, including a new federal security breach notification requirement that unauthorized acquisitions, access, use or disclosure of unsecured PHI that compromise the security or privacy of the PHI be reported to, depending on the number of people affected and their location, affected individuals, the Department of Health and Human Services and local media outlets, (3) restrictions on certain marketing communications, a prohibition on business associates from receiving remuneration in exchange for PHI, and a prohibition on covered entities from receiving remuneration in exchange for PHI without express patient authorization or applicable exception and (4) the civil and criminal penalties that may be imposed for HIPAA violations. Pursuant to HIPAA, as amended by HITECH, we are required to report breaches of unsecured PHI to our covered entity clients, such as our physician group partners, within the time period specified in our applicable business associate agreement, but in no case later than 60 days from the discovery of the breach, and notify certain agencies and potentially the media in accordance with clause (2) above. We have experienced cybersecurity incidents in the past and may experience them in the future. Any interruption in access to member information, unauthorized use of or access to information, improper disclosure or other loss of information could result in, among other things, federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties.

HIPAA mandates that the Secretary of HHS conduct periodic audits of covered entities and business associates for compliance with the HIPAA Privacy and Security Rules. HIPAA imposes penalties for certain violations, subject to a cap of $1.5 million for violations of the same standard in a single calendar year. A single data privacy or data security incident can, in the view of HHS, result in violations of multiple standards. HIPAA, as amended by the HITECH Act, also authorizes state attorneys general to file suit on behalf of their states' residents. While HIPAA does not create a private right of action allowing individuals to sue us in federal court for violations of HIPAA, its standards have been used as a basis for establishing a duty of care in state-law civil suits alleging negligence or recklessness for the misuse of PHI. A finding of liability under HIPAA could have a material adverse effect on our business, financial condition and results of operations. In order to ensure compliance, we encrypt and back up data, maintain company-wide security awareness training, enter into business associate agreements with our partners and vendors, as well as ensure our partners and vendors have implemented physical security and safeguards at the data centers where our data is stored and conduct regular security audits. Although we employ administrative, physical and technological safeguards to help protect confidential and other sensitive information from unauthorized access, use or disclosure, our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to attacks by hackers or viruses, failures or breaches due to third-party action and employee (including contractor) negligence, error or malfeasance.

Additionally, many states and foreign jurisdictions have also enacted laws that protect the privacy and security of confidential, personal and health information, which may be even more stringent than HIPAA and may add additional compliance costs and legal risks to our operations. Some state privacy and security laws overlap with federal law, some of which are preempted, in part, by federal laws, whereas others are not. States have also passed privacy and security laws and regulations that apply across sectors and go beyond federal law, such as data security laws, secure destruction, Social Security number privacy, online privacy, biometric information privacy, data breach notification laws. Some of these state and international laws may impose fines and penalties on violators and may afford private rights of action to individuals who believe their personal information has been misused.

We are also subject to a provision of the federal 21st Century Cures Act that is intended to facilitate the appropriate exchange of health information. In May 2020, the U.S. Department of Health and Human Services Office of the National Coordinator for Health Information Technology and CMS issued complementary new rules that are intended to clarify provisions of the 21st Century Cures Act. The rules, intended to enhance interoperability and prevent information blocking, create significant new requirements for healthcare industry participants, including requirements to (i) provide patients with convenient access to health care information, (ii) support electronic exchange of data for transitions of care and (iii) require participation in trust networks to improve interoperability. The 21st Century Cures Act authorizes civil monetary penalties up to $1 million per information blocking "violation." It is unclear what the costs of compliance with the rules will be, and what additional risks there may be to our business. It is possible that the American Data Privacy and Protection Act ("ADPPA"), a landmark federal privacy bill with significant bipartisan support, may gain traction. Although ADPPA would not apply to health data covered by HIPAA, it would apply to other health data, such as health data controlled by certain entities in the digital health space. Various other federal, state and foreign laws may apply that restrict the use and protect the privacy and security of individually identifiable information, as well as employee personal

15

Table of Contents

information, including laws modeled to some extent on the European Union's GDPR. Federal and state consumer protection laws, including laws that do not, on their face, specifically address data privacy or security, have been applied to data privacy and security matters by a range of government agencies and courts.

### Consumer Protection Laws

agilon may be subject to the Telephone Consumer Protection Act ("TCPA"), which regulates the manner in which a business may advertise its products and services to consumers by phone, text and fax. The TCPA was enacted by Congress to combat aggressive telemarketing and fax advertising practices believed to invade consumer privacy. The TCPA also regulates the use of automated equipment to deliver calls or text messages to mobile phones without prior express consent. Congress empowered the FCC to interpret the TCPA through rules, regulations and declaratory rulings. A 2015 order from the FCC clarified that calls or text messages that have an express healthcare-related purpose-such as treatment follow-up, appointment confirmations and reminders or pre-operative instructions-are exempt from the TCPA. In these instances, providers are not required to receive prior express consent from patients before reaching out by phone or text. As healthcare companies, such as ourselves, increasingly rely on mobile delivery platforms and other technologies to communicate with patients about appointments, billing and other issues, the potential for legal exposure under the TCPA also increases. Each call or text made in violation of the TCPA can cost up to $1,500 per instance in fines and damages. Because there is no cap on statutory damages, violations can result in millions of dollars in penalties.

### Competition and Antitrust Laws

We are subject to numerous statutes that govern competition in our industry, including the Sherman Act, the FTC Act and the Clayton Act. The Sherman Act, 15 U.S.C. §§ 1-7, outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." The penalties for violating the Sherman Act can be severe. Most enforcement actions are civil, but individuals and businesses that violate the Sherman Act may be prosecuted criminally by the DOJ. Criminal prosecutions are typically limited to clear violations, such as when competitors fix prices, allocate markets or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a corporation and $1 million for an individual, along with up to 10 years in prison. Under federal law, the maximum fine may be increased to twice the amount the conspirators gained from the illegal acts or twice the money lost by the victims of the crime, if either of those amounts is more than $100 million.

The FTC Act, 15 U.S.C. §§ 41-58, bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said that all violations of the Sherman Act also violate the FTC Act. Thus, although the FTC does not technically enforce the Sherman Act, it can bring cases under the FTC Act against the same kinds of activities that violate the Sherman Act. The FTC Act also reaches other practices that harm competition, but that may not fit neatly into categories of conduct formally prohibited by the Sherman Act. Only the FTC brings cases under the FTC Act.

The Clayton Act, 15 U.S.C. §§ 12-27, addresses specific practices that the Sherman Act does not clearly prohibit, such as mergers and interlocking directorates (that is, the same person serving as an officer or director of two competing companies). Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, 15 U.S.C. § 13, the Clayton Act also bans certain discriminatory prices, services and allowances in dealings between merchants. The Clayton Act was amended again in 1976 by the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, to require companies planning large mergers or acquisitions to notify the government of their plans in advance. The Clayton Act also authorizes private parties to sue for treble damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the alleged anticompetitive practice in the future.

In addition to these federal statutes, most states have antitrust laws that are enforced by state attorneys general or private plaintiffs. Many state statutory provisions are based on federal antitrust law, namely, Sections 1 and 2 of the Sherman Act, and Sections 3 and 7 of the Clayton Act. Further complicating matters, state lawmakers are increasingly seeking to exercise oversight over healthcare transactions and allow state agencies to analyze potential anticompetitive effects of healthcare consolidation, including smaller transactions that do not meet federal reporting thresholds. Private parties may also bring lawsuits to enforce antitrust laws.

As the healthcare industry has continued to evolve in response to consumer demand and competition in the marketplace, the effect of the antitrust laws in healthcare is also changing. We have expanded our operations significantly since our inception, organically as well as through acquisitions. Such growth, and our long-term contracts with physician

16

Table of Contents

partners, could expose us to risks related to antitrust investigations and litigation. Competition and antitrust law inquiries often continue for several years and, if violations are found, can result in substantial financial exposure.

### *U.S. Foreign Corrupt Practices Act of 1977 and Various Anticorruption Laws*

agilon is subject to the U.S. Foreign Corrupt Practices Act, as amended, 15 U.S.C. §§ 78dd-1, et seq. ("FCPA"). The FCPA prohibits offering, promising, providing or authorizing others to give anything of value to a foreign government official to obtain or retain business or otherwise secure a business advantage. The FCPA also requires public companies like aglion to maintain sufficient internal controls to prevent and detect FCPA violations and to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company. Violations of the FCPA can result in imprisonment, significant criminal and civil fines and penalties, and ongoing government supervision such as a monitorship. In addition, agilon is subject to various foreign anticorruption laws in locations in which it operates, including Brazil's Clean Companies Act and India's Prevention of Corruption Act, 1988.

### *Other Laws and Regulations*

Some states in which we operate require licensing or registration for operations related to, among others, utilization review on behalf of payors, including reviewing medical necessity and appropriateness of healthcare services, or processing claims in connection with insurance or managed care products. Such laws vary from state to state, and our operations may be subject to exemption in certain states.

Additionally, our physician partners are subject to numerous federal, state and local licensing laws and regulations, relating to, among other things, professional credentialing and professional ethics. Our physician partners, as well as their nurse practitioners and physician assistants, must satisfy and maintain their individual professional licensing in each state where they practice medicine.

Further, organizations that receive reimbursement from a federal or state government payor are expected by the federal government to have a compliance program. For those organizations that do not receive reimbursement from any federal or state government payors, a compliance program is not mandatory but is considered best practice. As a result, we maintain a program to monitor compliance with federal and state laws and regulations applicable to healthcare entities. We have a compliance department that is charged with implementing and supervising our compliance program, which includes the adoption of (i) a Code of Conduct for our employees and affiliates and (ii) a process that specifies how employees, affiliates and others may report regulatory or ethical concerns to our compliance officer. We believe that our compliance program meets the relevant standards provided by the OIG of the Department of Health and Human Services. An important part of our compliance program consists of conducting periodic audits of various aspects of our operations. We also conduct mandatory educational programs designed to familiarize our employees with the regulatory requirements and specific elements of our compliance program.

We are also impacted by federal and state laws and policies that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in its operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare.

### Available Information

Our website address is www.agilonhealth.com. We use our website as a routine channel for distribution of information that may be material to investors, including news releases, financial information, presentations and corporate governance information. Information contained or connected to our website is not incorporated by reference in this Report unless expressly noted. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available on our website, free of charge, as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the U.S. Securities and Exchange Commission ("SEC"). Additionally, the SEC maintains a website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us, at www.sec.gov.

17

Table of Contents

**ITEM 1A. Risk Factors**

*Summary Risk Factors.* Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows, and results of operations that you should consider before making a decision to invest in our common stock. These risks include, but are not limited to, the following:

*Risks Related to Our Business*

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- medical expenses incurred on behalf of our members may exceed revenues we receive;
- inability to secure contracts with MA payors;
- inability to grow new physician partner relationships sufficient to recover startup costs;
- availability of additional capital, on acceptable terms or at all, to support our business in the future;
- significant reduction in our membership;
- transition to a Total Care Model may be challenging for physician partners;
- public health crises, such as COVID-19, could adversely affect us;
- inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts;
- the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners;
- inability to hire and retain qualified personnel;
- ability to realize the full value of our intangible assets;
- security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems;
- ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- reliance on our subsidiaries;
- ESG issues;

*Risks Related to Our Reliance on Third Parties*

- reliance on a limited number of key payors;
- the limited terms of contracts with our payors and our ability to renew them upon expiration;
- reliance on payors for membership attribution and assignment, timely data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- ability to obtain accurate and complete diagnosis data;
- dependence on physician partners to document their services and any inaccuracies could result in overpayments, recoupments or liability under the federal FCA or through RADV audits (defined below);
- reliance on third-party software, data, infrastructure and bandwidth;

18

APP 934

Table of Contents

*Risks Related to Our Industry and Government Programs*

- consolidation in the healthcare industry;

- discontinuance or reductions in federal government healthcare programs' reimbursement rates or methodologies applied to derive reimbursement;

- uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures;

- competition in our industry;

- dependence on government performance standards and benchmarks;

- government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions;

- regulatory proposals directed at containing or lowering the cost of healthcare, including the ACO REACH Model, and our participation, voluntary or otherwise, in such proposed models;

- federal and state investigations, audits and enforcement actions;

- regulatory inquiries and corrective action plans imposed by our payors;

- repayment obligations arising out of payor audits;

- modification the methodology utilized to determine revenue associated with MA members;

- negative publicity regarding the managed healthcare industry generally;

*Legal and Regulatory Risks*

- regulation of the healthcare industry at the federal, state and local levels and our ability to comply with applicable laws or regulations;

- our and our physician partners' ability to comply with federal and state fraud and abuse laws, including physician incentive plan laws and regulations;

- implication of laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information;

- our use, disclosure and processing of personally identifiable information, PHI, and de-identified data is subject to HIPAA and state patient confidentiality laws;

- failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization;

- regulation of the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations;

- inadvertent employment or contract with an excluded person by us or our physician partners;

- lawsuits not covered by insurance;

- changes in tax laws and regulations, or changes in related judgments or assumptions;

*Risks Related to Our Indebtedness*

- incurrence of substantially more indebtedness, which could increase the risks created by our indebtedness;

- restrictions and limitations in our agreements and instruments governing our indebtedness;

19

Table of Contents

*Risks Related to Our Common Stock*

- dependence on our subsidiaries for cash to fund all of our operations and expenses;

- our Certificate of Incorporation, Clayton, Dubilier & Rice, LLC ("CD&R") and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of CD&R and its affiliates, have no obligation to offer us corporate opportunities;

- anti-takeover provisions in our Certificate of Incorporation and By-laws;

- ability to achieve a return on your investment depends on appreciation in the price of our common stock;

- exclusive forum provisions in our Certificate of Incorporation; and

- material weakness in our internal control over financial reporting and our ability to remediate such material weakness.

You should carefully consider each of the following risk factors and all of the other information set forth in this report. The risk factors generally have been separated into five groups: risks related to our business, risks related to our reliance on third parties, risks related to our industry and government programs, risks related to our indebtedness, and risks related to our common stock. Based on the information currently known to us, we believe that the following information identifies the most significant risk factors affecting our company in each of these categories of risks. However, the risks and uncertainties we face are not limited to those set forth in the risk factors described below. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business. In addition, past financial performance may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods.

If any of the following risks and uncertainties develop into actual events, these events could have a material adverse effect on our business, financial condition or results of operations. In such a case, the trading price of our common stock could decline.

**Risks Related to Our Business**

*We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability.*

We have incurred significant net losses in prior years and have a substantial accumulated deficit. We expect that our expenses will increase substantially in the foreseeable future and our losses may continue, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

*Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives and achieve required operational scale to support our growth may have a material adverse effect on our business, financial condition, cash flows, and results of operations.*

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely

20

Table of Contents

meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As a young and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures to ensure compliance with requirements to which we may become subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has significantly increased the demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls and management and mitigation of enterprise and operational risks. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations, maintaining adequate financial and operating systems and controls, executing upon our growth initiatives and achieving required operational scale to support our growth. If we do not successfully manage these processes, our business, financial condition, cash flows, and results of operations could be harmed.

***We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.***

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost while sufficient to achieve expected profitability, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing these strategies, or we may fail to implement such strategies in future markets as effectively as with our current markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses or achievement of profitability levels that do not meet expectations, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, as a young and rapidly growing company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance, market adoption and profitability. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth and profitability of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. We believe our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows, and results of operations could be harmed.

21

Table of Contents

***Amounts of medical expenses that are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.***

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses or profitability that does not meet expectations and adversely impact our business, financial condition, cash flows, and results of operations.

Additionally, factors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:

• Changes to the Medicare fee schedule or other rate schedules that serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

• Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;

• The utilization rates of healthcare services, including inpatient hospitalization, outpatient procedures, high risk and chronic conditions and other services that result in medical expenses, by our members;

• Changes to member benefit types, categories, and levels established and otherwise offered  by payors; and

• The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows, and results of operations.

***As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.***

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and, therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or that are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

***We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.***

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. Similarly, if physicians join a physician partner following the initial implementation period for a new partner market and we are unable to manage the integration of such new physician into our Total Care Model, the new physician may not achieve expected improvements in patient outcomes and related

22

Table of Contents

profitability. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model throughout our markets or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

*We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.*

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced significant volatility and disruption. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021 and the Second Amendment to Credit Agreement, dated as of May 25, 2023, the "Credit Facility").

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable timeframe, or at all. Financing, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

*Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows, and results of operations.*

A significant reduction in membership could adversely affect our business, financial condition, cash flows, and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:

- failure to obtain new physician partners or members or to retain existing physician partners or members;

- decision by a payor not to renew the existing contractual agreement upon termination of such contract;

- low quality of care by our physician partners, including as a result of our failure to provide sufficient implementation in our Total Care Model, tools and information to deliver high-quality care;

- alternative care opportunities that are more attractive than those provided by our physician partners;

23

Table of Contents

- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;

- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and

- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners with sufficient implementation in our Total Care Model, as well as other tools and information to provide high-quality care.

### *The transition to a Total Care Model may be challenging for physician partners.*

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. Similarly, if physicians join a physician partner following the initial implementation period for a new partner market and we are unable to manage the integration of such new physician into our Total Care Model, the new physician may not achieve expected improvements in patient outcomes and related profitability. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

### *Public health crises, such as COVID-19, could adversely affect us.*

Public health crises (such as the COVID-19 pandemic) could cause unexpected changes in utilization of healthcare services, which could impact our business, results of operations, financial condition, liquidity and cash flows.  In particular, we have experienced, and may in the future experience, financial or operational impacts as a result of COVID-19 or other public health crises which may be material, including: impacts on our medical costs and medical services revenue, therefor affecting our total cost of care; increased delayed costs as a result of our enrolled members being unable to see their PCPs or long term complications of COVID-19; labor shortages; complete or partial closure of partner medical care facilities; and inability to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. Additionally, COVID-19 has impacted and could continue to impact our ability to accurately project medical cost trends.

The impact of COVID-19 on the worldwide economy and the healthcare industry underscores risks we face related to public health crises and pandemics. Additionally, future public health crises or pandemics may increase the clinical disease burdens of our members over time, reduce preventative care to manage their existing clinical conditions and cause members to defer other care and elective procedures into future periods resulting in unexpected increased medical expense in such future periods, all of which may materially and adversely impact our business, financial condition, cash flows, and results of operations. The magnitude and duration of any pandemic and its ultimate impact on us are uncertain, but such impacts could be material to our business, financial condition, cash flows, and results of operations.

### *Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts could be inaccurate.*

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical

APP 940

Table of Contents

assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant or forecasted periods to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services that have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, the timing of the receipt and accuracy of claims data and other information from our payors, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period, including for forecasted periods, could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter, annual period or forecasted periods could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period or for forecasted periods. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results of operations for completed periods or forecasted periods.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

***Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.***

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows, and results of operations to be harmed.

***Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.***

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions that would adversely affect our business, financial condition, cash flows, and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

25

Table of Contents

***We rely on our management team and key employees, and our business, financial condition, cash flows, and results of operations could be harmed if we are unable to hire and retain qualified personnel.***

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. Our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. In order to hire, retain, and motivate valuable employees, in addition to salary and cash incentives, we provide stock options and restricted stock units that either vest over time or are based on the performance against predetermined financial targets. The value to employees of these stock options is significantly affected by movements in our stock price that are substantially outside our control. The compensation and benefits we provide to our employees, together with the value of stock options and restricted stock units that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows, and results of operations. In such an event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. Continued increased competition for, or a shortage of, qualified personnel due to pandemics, general labor market conditions, low levels of unemployment, or general inflationary pressures, may require that we enhance our pay and benefits package to compete effectively for such personnel. Additionally, new hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain, train or integrate sufficient numbers of qualified individuals. Further, if we are unable to develop and maintain our desired corporate culture, we may be unable to attract and retain qualified and key personnel. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows, and results of operations will be harmed.

***We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.***

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.***

We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems. We are highly dependent on information technology networks and systems, including the internet, to securely access, process, transmit and store this information. We utilize third-party service providers for important aspects of the access, collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers access, collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error

26

Table of Contents

or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include, but are not limited to, ransomware, phishing, business email compromise and credential stuffing. Additionally, cyber threats and the techniques used in cyberattacks change, develop and evolve rapidly, including from emerging technologies, such as advanced forms of AI and quantum computing.

The risk of cyberattacks has also increased and will continue to increase in connection with Russia's invasion of Ukraine. In light of the Ukraine war and other geopolitical events and dynamics, including ongoing tensions with North Korea, Iran and other states, state-sponsored parties or their supporters may launch retaliatory cyberattacks or carry out other geopolitically motivated retaliatory actions that may adversely disrupt or degrade our operations and may result in data compromise. State-sponsored parties have, and will continue, to conduct cyberattacks to achieve their goals that may include espionage, monetary gain, disruption, and destruction.

We are subject to cybersecurity attacks and may experience cybersecurity incidents in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee, vendor or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized access, use, disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal, state, or foreign government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Privacy and Security Requirements" in Item 1 above. Although we have implemented preventative measures, as described in Item 1C of this Annual Report, such measures may not be sufficient to prevent, mitigate or offset a cyber incident. Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information, know-how and brand, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the U.S. are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Further, we have registered trademarks and filed other trademark applications that are meaningful to our business and brand. Our failure to protect the confidentiality of our know-how, brand and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

27

Table of Contents

### *Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.*

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may subject to allegations of breach of their payor contracts or may incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *ESG issues may impact our business, our financial outcomes, and our reputation.*

Various stakeholders, including regulators, investors, physician partners, payors, and employees are increasingly concerned with ESG issues, including climate change and sustainability; diversity, equity, and inclusion; data privacy and security; and human capital management. Our actions and disclosures related to these and other ESG issues may impact our reputation and relationships with various stakeholder groups. Further, current and future mandated reporting requirements on ESG topics, including climate-related disclosures, may impact our reporting and compliance costs, and require a significant time investment.   Our failure to fulfill ESG disclosure requirements and to meet current and future commitments may result in litigation, liability, negative financial outcomes, and reputational damage.

## Risks Related to Our Reliance on Third Parties

### *We are economically dependent on maintaining our contracts with a limited number of key payors.*

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our Consolidated Financial Statements included elsewhere in this Report. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

### *Our contracts with our payors are for limited terms and may not be renewed upon their expiration.*

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors with respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions with respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. With respect to certain of our discontinued operations, we may recognize impairment charges for such terminations.

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own

28

Table of Contents

health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *We rely on our payors for membership attribution and assignment, timely data and reporting accuracy and claims payment.*

We rely on our payors for membership attribution and assignment, timely data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business and forecast our expected profitability. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with timely, complete or accurate data related to our members, or if we are unable to effectively ingest the information that payors provide to us, we and our physician partners may not be able to effectively ensure our members' disease burdens are identified and may not be able to effectively operate our business or forecast our expected profitability.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows, and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we do not employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform sufficiently to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists, ancillary, and other providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive

Table of Contents

poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses or otherwise impair our profitability.

### *Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

### *We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and possible liability under the federal FCA or through RADV audits.*

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business-Healthcare and Other Applicable Regulatory Matters-Health Care Fraud Statute."

30

Table of Contents

In addition, CMS and the HHS Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments and other monetary penalties from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

The DOJ has brought a number of investigations and actions under the federal FCA against both physicians and payors, including MA plans, for alleged falsification of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues. Furthermore, in some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other fraud and abuse laws, such as the federal Anti-Kickback Statute. While we believe that our data recordation practices and relationships with providers comply with applicable laws and regulations, such arrangements may be subject to audits, reviews and investigation, and the government may disagree with our position. Furthermore, an audit, review or investigation may result in substantial costs and may divert management's attention and resources.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for substantial penalties to the government under the FCA for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows, and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or

APP 947

Table of Contents

provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.

*We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.*

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;

- communications failures;

- software and hardware errors, failures and crashes;

- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and

- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

### Risks Related to Our Industry and Government Programs

*Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows, and results of operations.*

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon

32

Table of Contents

which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally, consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows, and results of operations.***

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for substantially all of our revenues for our immediately preceding fiscal years. While the ACO's are not consolidated, they still have an impact on our profitability.

The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows, and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

The financial aspects of the ACO REACH Model are set forth in an agreement between the ACO and CMS. CMS has the right to amend the agreement without the consent of the ACO for good cause or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules. We cannot predict whether CMS will amend such agreements and, if CMS amends such agreements, the impact such amendments may have on the financial aspects of our participation in the model, including, but not limited to, risk adjustment models used to set benchmarks, the rate book, capitation payment mechanisms and the calculation of shared savings and losses. Furthermore, changes to Medicare (including the ACO REACH Model) or MA, such as if CMS were to scale back models or cut MA payments, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

***Uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as

33

Table of Contents

Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

In addition, the current macroeconomic environment is characterized by high inflation, supply chain challenges, labor shortages, high interest rates, foreign currency exchange volatility and volatility in global capital markets. Such adverse macroeconomic conditions may also affect our physician partners' or payors' operations and financial condition, which may in turn cause our physician partners or payors to elect not to renew their services agreements or affect their ability to pay amounts owed to us in a timely manner or at all, or adversely affect prospective partners' or payors' ability or willingness to enter into services agreements with us.

*We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows, and results of operations will be harmed.*

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

We compete against other providers of value-based care, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

*Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.*

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as

34

Table of Contents

part of the ACA, the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. Further, on April 12, 2023 CMS published a Final Rule (the "2023 Final Rule") that sets forth several provisions that would, among other things, impact the STAR ratings program, including: (i) developing a health equity index to reward contracts that obtain a high measure-level score for the subset of enrollees with specified social risk factors, (ii) reducing the weight of patient experience/complaints and access measures, and (iii) removing select measures. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows, and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low-quality rating for three consecutive years. Low-quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations.

*Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.*

The healthcare industry in the U.S. is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past resulted, and could in the future result, in substantial reductions in our revenue and operating margins.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business, particularly in recent years, as MA payment rates have been subjected to increased scrutiny. We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

35

Table of Contents

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the ACO REACH Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the ACO REACH Model to allow a variety of different organizations called ACOs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. We, in conjunction with some of our physician partners, began participating in the ACO REACH Model in certain geographies in 2023. The ACO REACH Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has been built upon CMS' experience with other programs, including MA and the Medicare Shared Savings Program, but also has new elements, such as a risk adjustment model developed specifically for use in the ACO REACH Model. Likewise, the ACO REACH Model rate book is based on the same methodology used for the MA rate book but has been modified in light of the characteristics of the ACO REACH Model. Because the ACO REACH Model is a new and evolving program, we are unable to determine how the ACO REACH Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the ACO REACH Model, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

We are unable to predict how states will regulate ACOs and our participation in the ACO REACH Model. For example, certain states in which we operate may require ACOs to obtain specific licensure to participate in the ACO REACH Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. Alternatively, CMS may choose to limit additional new ACO entrants in future years to those who attend to underserved communities or are controlled by provider entities.

There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations, including with respect to our contractual relationships with providers and payors.

***We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.***

Federal, state and payor enforcement activity could adversely affect our business, financial condition*,* cash flows, and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which

36

APP 952

Table of Contents

can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions, exclusion, or may be required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

***We may be subject to regulatory inquiries and corrective action plans imposed by our payors and may be required to contribute a material amount of risk-bearing capital to our local operating subsidiaries.***

We may be subject to regulatory inquiries and corrective action plans imposed by our payors and we may be audited by payors and regulatory bodies. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. There is also a risk that such risk-bearing capital amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

***Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.***

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under a RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

***CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.***

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues. Our revenues could be further reduced by budget reconciliation bills, which could increase the MA coding intensity adjustment.

37

Table of Contents

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;

- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;

- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or

- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

## Legal and Regulatory Risks

***The healthcare industry is heavily regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our prior or current conduct, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law. Further, it is unknown, whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows, and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the fraud and abuse laws such as the FCA and Health Care Fraud Statute, which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;

- Federal and state anti-kickback laws, and related regulations, which generally prohibit arrangements intended to induce or reward referrals for items or services reimbursable by a healthcare program;

- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing certain DHS if the physician (or his/her immediate family member) has a financial relationship with that entity;

- Provisions of, and regulations enacted pursuant to, HIPAA, as amended, HITECH, and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;

- Provisions of, and regulations enacted pursuant to, the 21st Century Cures Act, regarding interoperability and prohibitions against information blocking;

- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer

38

Table of Contents

these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;

- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;

- State laws that govern the activities of third-party administrators and utilization review agents;

- Laws relating to competition and anticorruption; and

- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business-Healthcare and Other Applicable Regulatory Matters" in Item 1.

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may in the future be a party to various and material lawsuits, demands, claims, *qui tam* suits, government investigations and audits or government enforcement actions, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in federal or state health care programs;

- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal FCA, Healthcare Fraud Statutes, CMPL, Anti-Kickback Statute and Stark Law;

- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;

- enforcement actions by governmental agencies or monetary penalties for violations of the 21st Century Cures Act;

- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;

- mandated changes to our practices or procedures that materially increase operating expenses;

- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;

- termination of various relationships or contracts related to our business; and

- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters may require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we

Table of Contents

provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly, any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

*If our physician alignment strategies with our physician partners-including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements-are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.*

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to increase the quality of care while appropriately managing overall costs and participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Anti-Kickback Statutes" and "Business-Healthcare and Other Applicable Regulatory Matters-Stark Law" in Item 1.

The laws and regulations are complex and the interpretations of those laws continue to expand and evolve. We may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows, and results of operations.

*Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.*

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. Notably, the 2023 Final Rule includes, among other things, significant new MA marketing requirements and modifications. The 2023 Final Rule provisions are a response to increased congressional and press attention to MA marketing practices, including a 2022 U.S. Senate Finance Committee report that detailed deceptive marketing practices by MA plans; the report urged CMS to take action to protect Medicare beneficiaries. The 2023 Final Rule includes distinct changes to the marketing regulations as well as broad-ranging provisions that address potentially misleading advertising and require heightened broker oversight. In addition, through our participation in the CMS ACO REACH Model, we (either as an ACO or as a service provider to our physician partners who are participating in the model) must comply with provisions in the participation agreements with CMS regarding marketing and outreach activities. For example, ACOs must have their plans for marketing activities approved by CMS and are prohibited from engaging in some forms of marketing activities such as door-to-door solicitation. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

40

Table of Contents

Marketing and outreach activities undertaken in the healthcare industry-whether undertaken by or on behalf of providers and payors-are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Anti-Kickback Statutes" and "Business-Healthcare and Other Applicable Regulatory Matters-Civil Monetary Penalties Statute" in Item 1. Our physician partners and the payors with which we contract risk violating applicable state and federal fraud and abuse laws-including the Anti-Kickback Statute and CMPL-and laws governing marketing and member outreach (e.g., the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Our business development and member engagement activities may implicate the TCPA, related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business-Healthcare and Other Applicable Regulatory Matters-Consumer Protection Laws" in Item 1. A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows, and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's PHI in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

### *Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.*

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and FCA and analogous state laws. See "Business-Healthcare and Other Applicable Regulatory Matters" in Item 1. Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs, as well as significant potential monetary liabilities. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business-Healthcare and Other Applicable Regulatory Matters-Other Laws and Regulations" in Item 1. If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows, and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

41

**APP 957**

Table of Contents

***Our use, disclosure and processing of personally identifiable information, PHI, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members, revenue, and operations.***

Numerous state, federal, and international laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, several states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Privacy and Security Requirements" in Item 1. These and other laws and regulations affecting data security and data privacy, including international laws and regulations relevant to our business, are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be directly liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time-to-time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Additionally, on December 1, 2022, HHS OCR issued guidance on the use of tracking technologies on websites and mobile applications, indicating that certain information collected from websites and applications may implicate HIPAA. Although HIPAA does not itself provide a private right of action, it is commonly cited in consumer actions that allege improper use and disclosure of sensitive patient data: use of tracking technologies, such as cookies, web beacons, and pixels, by covered entities or their business associates has recently been subject to class action lawsuits alleging improper disclosure of patient

42

APP 958

Table of Contents

information. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows, and results of operations. Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. For example, we note that in 2019, the Office of Civil Rights announced the creation of its Right of Access Initiative, intended to support individuals' right of timely access to their health records. Since the creation of the Right of Access Initiative, there has been substantial enforcement activity related to covered entities' alleged failures to provide individuals with timely access to their health records. To the extent the physician partners' non-compliance with HIPAA rules and regulations impacts members who are attributed to our RBEs (*e.g.*, through the loss of PHI or failure to provide timely access to health records), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows, and results of operations.

*Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.*

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Insurance and Managed Care Laws" in Item 1. We therefore expect uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

*Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.*

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a non-medical professional entity may violate the corporate practice of medicine doctrine. See "Business-Healthcare and Other Applicable Regulatory Matters-Corporate Practice of Medicine" in Item 1. A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or acceptable to our partners and may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We have been the subject of regulatory inquiries

43

Table of Contents

regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.*

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person who could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

### *We may face lawsuits not covered by insurance and related expenses may be material. The costs to defend and pay any judgment or settlement could negatively impact our business, financial condition, cash flows, and results of operations.*

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert executives and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims.

44

APP 960

Table of Contents

All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

*Changes in tax laws and regulations, or changes in related judgments or assumptions could materially impact our financial condition and results of operation.*

We are subject to federal and state taxes in the U.S. and other countries in which we conduct business, and such laws and rates vary by jurisdiction. Although we believe our tax practices and provisions are reasonable, the final determination of tax audits and any related litigation, changes in the taxation of our activities and proposed changes in tax laws and regulations could cause the ultimate settlement of our tax liabilities to be materially different from our historical tax practices, provisions and accruals. If we receive an adverse ruling as a result of an audit, or we unilaterally determine that we have misinterpreted provisions of the tax regulations to which we are subject, there could be a material effect on our tax provision, net income or cash flows in the period or periods for which that determination is made, which could materially impact our financial results. Further, any changes in the taxation of our activities, including certain proposed changes in U.S. tax laws, may increase our effective tax rate and adversely affect our financial position and results of operations. In addition, liabilities associated with taxes are often subject to an extended or indefinite statute of limitations period. Therefore, we may be subject to additional tax liability, including penalties and interest for a particular year for extended periods of time.

**Risks Related to Our Indebtedness**

*Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.*

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of our Credit Facility do not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the Credit Facility, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the Credit Facility may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

*The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.*

Our Credit Facility contains covenants that, among other things, restrict the ability of our subsidiary agilon health management, inc. ("agilon management") and its subsidiaries to:

- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;
- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and

45

**APP 961**

Table of Contents

- enter into lines of business.

agilon management and its subsidiaries account for substantially all of our assets and total liabilities. Consequently, the restrictions in the Credit Facility may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the Credit Facility may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the Credit Facility, could proceed against the collateral securing the indebtedness. This could materially and adversely affect our business, financial condition, cash flows, and results of operations, and could cause us to become bankrupt or insolvent.

### Risks Related to Our Common Stock

*agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.*

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows, and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit, surety bonds, or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography. In addition, the agreements governing the Credit Facility significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facility to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our business, financial condition, cash flows and results of operations could be materially and adversely affected.

*Under our Certificate of Incorporation, CD&R and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of CD&R and its affiliates, have no obligation to offer us corporate opportunities.*

The policies relating to corporate opportunities and transactions with CD&R set forth in our Certificate of Incorporation address potential conflicts of interest between agilon health, on the one hand, and CD&R and its officers, directors, employees, members or partners who are directors of our company, on the other hand. In accordance with those policies, CD&R may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and CD&R and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

46

Table of Contents

***Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.***

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:

- authorize the issuance of "blank check" preferred stock that could be issued by the Board of Directors (the "Board of Directors") to thwart a takeover attempt;

- provide for a classified board of directors, which divides the Board of Directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;

- limit the ability of stockholders to remove directors if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- provide that vacancies on the Board of Directors, including vacancies resulting from an enlargement of the Board of Directors, may be filled only by a majority vote of directors then in office;

- prohibit stockholders from calling special meetings of stockholders if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- opt out of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until CD&R ceases to beneficially own at least 5% of the outstanding shares of our common stock;

- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and Board of Directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future.

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that CD&R owns, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of the Board of Directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or

47

**APP 963**

Table of Contents

by our subsidiaries to us, and such other factors as the Board of Directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facility significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the DGCL, or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the U.S. federal district courts will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows, and results of operations.

***We have identified a material weakness in our internal control over financial reporting. If we are unable to remediate this material weakness, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial results, in which case our business may be harmed, investors may lose confidence in the accuracy and completeness of our financial reports and, as a result, our common stock price may be adversely affected and we may be unable to maintain compliance with NYSE listing requirements.***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on our system of internal control. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. As a public company, we are required to comply with the Sarbanes-Oxley Act and other rules that govern public companies. In particular, we are required to certify our compliance with Section 404 of the Sarbanes-Oxley Act, which requires us to furnish annually a report by management on the effectiveness of our internal control over financial reporting. In addition, our independent registered public accounting firm is required to report on the effectiveness of our internal control over financial reporting.

In connection with our year-end assessment of internal control over financial reporting, we identified a material weakness in our internal control over financial reporting as of December 31, 2023. For a discussion of our internal control over financial reporting and a description of the identified material weakness, see Part II, Item 9A, "Controls and Procedures."

48

**APP 964**

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: February 27, 2024

agilon health, inc. (Registrant)

/s/ STEVEN J. SELL

Steven J. Sell,
*Chief Executive Officer and President*
*(Principal Executive Officer)*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ STEVEN J. SELL<br>Steven J. Sell | Chief Executive Officer and President<br>(Principal Executive Officer), Director | February 27, 2024 |
| /s/ TIMOTHY S. BENSLEY<br>Timothy S. Bensley | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | February 27, 2024 |
| /s/ TIMOTHY GERTSCH<br>Timothy Gertsch | Chief Accounting Officer<br>(Principal Accounting Officer) | February 27, 2024 |
| /s/ RONALD A. WILLIAMS<br>Ronald A. Williams | Chairman of the Board | February 27, 2024 |
| /s/ RAVI SACHDEV<br>Ravi Sachdev | Vice Chairman of the Board | February 27, 2024 |
| /s/ SHARAD MANSUKANI, M.D.<br>Sharad Mansukani, M.D. | Director | February 27, 2024 |
| /s/ JEFFREY A. SCHWANEKE<br>Jeffrey A. Schwaneke | Director | February 27, 2024 |
| /s/ WILLIAM WULF, M.D.<br>William Wulf, M.D. | Director | February 27, 2024 |

84

**APP 965**

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ KAREN MCLOUGHLIN<br>Karen McLoughlin | Director | February 27, 2024 |
| /s/ DIANA L. MCKENZIE<br>Diana L. McKenzie | Director | February 27, 2024 |
| /s/ SILVANA BATTAGLIA<br>Silvana Battaglia | Director | February 27, 2024 |

85

**APP 966**

# EXHIBIT 27

**agilon health | PHYSICIAN NETWORK**

May 29, 2024

The Honorable Chiquita Brooks-LaSure
Administrator
Centers for Medicare and Medicaid Services
200 Independence Avenue, SW
Washington, DC 20201

RE: Medicare Program; Request for Information on Medicare Advantage Data

Dear Administrator Brooks La-Sure:

Thank you for the opportunity to provide comments in response to CMS' request for information (RFI) on Medicare Advantage (MA) data. We applaud CMS for its attention to this important topic, particularly the ways in which MA data supports and interacts with value-based care arrangements between providers and MA plans. As MA enrollment grows, there is significant opportunity to leverage the program toward CMS' accountable care goals by improving the context in which risk-bearing providers and MA plans work together.

## About the agilon health Physician Network

The agilon health Physician Network is comprised of 2,400+ primary care physicians providing care for nearly 650,000 Medicare patients in 30+ rural and urban communities across 13 states. Our network includes independent primary care physician practices, multi-specialty practices, practice associations, hospital physician groups, and hospital systems.

We believe our nation's fee-for service (FFS) healthcare system is broken, and that fixing it is a social and moral imperative. Individually and as a Network, we are deeply committed to delivering patient-centered care resulting in better outcomes and a more satisfying experience for patients and providers. We believe that value-based care is the best path to achieving these goals. That's why, together with agilon health, we have invested in a Total Care Model that puts our partnership at 100% upside/downside risk (full-risk) for the total cost and quality of care for our entire Medicare population across Medicare Advantage (MA) and the ACO REACH Model. We also participate in the highest risk track of the Medicare Shared Savings Program (MSSP).

In 2022, our Network collectively achieved a 99.8% quality score and returned $24 million in savings to the Medicare Trust Fund through our participation in ACO REACH. In 2023, through our full-risk, shared savings agreements with Medicare Advantage plans and in combination with shared savings realized through REACH, our Network reinvested $200+ million into local primary care within the communities we serve. Since 2018, we've reinvested more than $550+ million in total. These figures collectively demonstrate our commitment to improving quality, bending the cost curve, and sustaining the primary care profession.

1

APP 968



## Background

Each of our Network partners, most of whom are independent primary care practices, have taken the leap into full-risk accountable care. As you know, accountable care is associated with lower costs to patients and the health care system as well as better coordinated, higher quality care. In accountable care relationships like ours, our most vulnerable patients are prioritized and closely managed by their doctor to ensure their health is protected. We provide them with wrap-around care which can include house calls, addressing social determinants of health (SDOH), and including family care givers in care plans. Moreover, we are enabled to coordinate the right care, at the right time, in the right setting, which protects our patients from unnecessary and expensive services that do not improve their health.

The agilon health Physician Network fully supports CMS' goal of ensuring that by 2030, 100% of Medicare enrollees have an accountable care relationship with a health care provider. As our health care system subsequently becomes more focused on person-centered, accountable care, the demand for and use of comprehensive patient data increases exponentially. Thanks to the many efforts at CMS and its sister agencies, providers have begun to leverage multiple data sources to build an ongoing, longitudinal understanding of their patients' health status, health care encounters and opportunities to improve outcomes and lower costs. These tools, coupled with the financial incentives inherent to value-based, accountable care arrangements empower providers to accept risk and reallocate resources to focus on individual patient needs. However, there are significant data gaps, particularly in MA, that should be addressed.

## Executive Summary

Comprehensive, actionable data is crucial to success in value-based care arrangements, particularly those involving full-risk for the total cost and quality of care. Providers like those in the agilon health Physician Network taking sub-capitated risk from MA plans carry the same risk for their attributed patient population that the MA plans do. Yet, the granular data available to CMS and the plans is not shared with those risk-bearing providers, disrupting their ability to make real-time care decisions as well as accurately project current and future utilization and cost trends.

**Recommendation: CMS should require MA plans to provide existing, complete data sets to downstream, risk-bearing providers for the patient population attributed to them.**
- These files should not be altered or masked, only filtered to include information for attributed patients.
- They should not be delayed more than two weeks from the time the data is sent to or received from CMS.

## Comments

The Medicare program holds great potential to achieve even greater quality, cost and outcomes improvement by equipping risk-bearing providers with more complete and timely data. The prospect of real-time or near-real-time data feeds to inform care decisions, clinical interventions and clinically appropriate diversion from high to low-cost settings is exciting. Some of this is possible through existing admission, discharge, transfer (ADT) feeds and health information

2



exchange (HIE) relationships, though neither hold comprehensive, ongoing data sets for patient encounters at all the various entry points in health care.

### *Data Access in MA VBC Arrangements*

For providers like those in our Network who are committed to accountable care and have, as a demonstration of that commitment, taken full risk for Medicare Parts A & B from MA plans, the chief enabler for success is **predictability**. Through our partnership with agilon health, we can view a streamlined dashboard comprised of data from disparate sources to better understand who our most vulnerable patients are and when they are utilizing health care benefits through Medicare. To remain viable as a business model, we employ sophisticated forecasting techniques to help us predict utilization and cost trends to manage our financial risk for the total cost and quality of care for our attributed patients. Predictability allows us the confidence to remain engaged in total cost of care risk and make significant investments in practice transformation to better care for our patients.

However, such forecasting is predicated on comprehensive data access; claims, cost, coverage and risk data for each attributed patient becomes essential for VBC models like ours to thrive and self-sustain. This data is provided directly from CMS to risk-bearing providers in various Traditional Medicare ACO programs, and it works very well. Yet, in Medicare Advantage, MA plans offload financial risk to providers but are not required to – and therefore do not – share the comprehensive data necessary to manage that risk. Further, MA plans make independent decisions about their benefit structures, pricing/bids, utilization, cost-sharing, etc., which flow through to our costs as our attributed patients utilize their health benefits, but the specifics of those decisions are not visible in the data sets we receive from them.

By contrast, CMS and MA plans exchange very detailed, standardized data files outlining payment data, patient encounter data including detailed cost information (e.g., per-unit costs, cost-sharing, allowable amount, paid amount, etc.), and diagnosis codes related to risk adjustment. Rather than sharing these existing, standardized, comprehensive files with us, we instead receive significantly altered and often delayed, non-standard data files that vary in format and quality, with several fields masked, combined or otherwise distorted. These distortions, coupled with lags of up to three months, prevent us from understanding real-time developments and accurately forecasting future developments.

**Without complete and timely data, risk-bearing providers are challenged to manage the same risk that the plans manage for the same set of attributed patients, impacting our ability to drive value in Medicare.**

### *MA Data Files*

The data files containing the information we need to appropriately manage the risk we carry for our attributed patients are comprised of the following file formats, which are exchanged between CMS and MA plans today. The data fields in these files are not masked or altered in any way, avoiding the challenges we currently have with distortions, and are presented in a standard format across all

3

**agilon health** | PHYSICIAN NETWORK

payors. Moreover, they are exchanged at a regular, timely cadence, shortening the lag time between a patient encounter and data delivery.

1. Monthly Membership Report (MMR)
   - Purpose: Provides payment and enrollment data from CMS to MA plans for all members.
   - Use to risk-bearing providers: Ensures we know who the plan has attributed to us, which programs patients are associated with, and the current risk score of each attributed patient. This information is critical for sub-capitated models like ours.
2. Model Output Report (MOR)
   - Purpose: Reports condition codes (HCCs) included in a beneficiary's risk score.
   - Use to risk-bearing providers: Ensures conditions are correctly accounted for (including codes we have voided/deleted) and, if not, triggers an investigation of the data gap.
3. CMS Daily Transaction Reply Report (DTRR)
   - Purpose: Provides detailed information to help drive valuable clinical programs, such as hospice, kidney care, and important program dates.
4. Medicare Advantage Organization (MAO)-004
   - Purpose: Informs MA plans about the risk adjustment eligibility of diagnoses submitted on encounter data and chart review records.
   - Use to risk-bearing providers: Allows for a reconciliation of diagnosis codes evaluated by providers to what has been accepted by CMS for risk adjustment.
5. Prescription Drug Event (PDE)
   - Purpose: Reports standard fields summarizing prescription drug cost and payment data for Part D claims.
   - Use to risk-bearing providers: Helps us understand the cost of Part D drug benefits for MA contracts in which we take Part D risk.
   - Use to risk-bearing providers: Provides real-time information on our patients and the transactions initiated by the MA plan.
6. Encounter Data in 837 EDI Format
   - Purpose: Plans send claims encounters and chart review records (CRRs) to CMS in this format, as required.
   - Use to risk-bearing providers: This data, as sent to CMS, would provide us with a fuller picture and deeper understanding of utilization activity for our attributed patients. Access to the same file and format sent to CMS could replace the variety of files and formats we currently receive from MA plans.

## Recommendation

**The agilon health Physician Network recommends that CMS require MA plans to provide these complete data sets to downstream, risk-bearing providers for the patient population attributed to them.**

- These files should not be altered or masked, only filtered to include information for attributed patients.

4

**APP 971**

**agilon health** | PHYSICIAN NETWORK

- They should not be delayed more than two weeks from the time the data is sent to or received from CMS.

We understand that MA plans may believe some of the data in these files is proprietary, and in the context of fee schedule contracting that may be sensible. However, when contracting to offload risk and share savings, downstream providers require this data to perform against the contract and ultimately drive value for each patient and the Medicare program.

*Sub-capitated Arrangements with MA Plans*
To better illuminate how these value-based arrangements with MA plans work, we include modified excerpts from agilon health's S-1 form filed with the Securities and Exchange Commission (SEC) in Addendum 1. We understand there is an interest among policymakers in the mechanics of sub-capitated agreements between providers and MA plan. We hope this information is useful.

## Conclusion

The agilon health Physician Network remains steadfast in its commitment to driving value and improved outcomes through full-risk, accountable care across Medicare programs. We believe we are among the vanguard of providers advancing primary care-led accountable care models, in partnership with CMS and MA plans. We again urge CMS to consider ways in which it can leverage its authority to compel or require MA plans to provide comprehensive data necessary for VBC providers.

Thank you for your consideration. We stand ready as a resource, should any questions arise. Please do not hesitate to contact Claire Mulhearn, Chief Communications & Public Affairs Officer, at Claire.Mulhearn@agilonhealth.com  or Katie Boyer, Director of Policy & Government Affairs, at Katie.Boyer@agilonhealth.com.

Sincerely,

**Anas Daghestani, MD**
President & Chief Executive Officer
Austin Regional Clinic
Texas

**Frank Civitarese, DO**
President
Preferred Primary Care Physicians, Inc.
Pennsylvania

**Victoria DiGennaro, DO**
President & Family Physician
Pioneer Physician Network
Founding Member, agilon health Women
Physicians Leadership Council
Ohio

**Brady Steineck, MD, MBA**
President & CEO
Community Health Care, Inc.
Ohio

5

**agilon health** | PHYSICIAN NETWORK

**Benjamin Williard, CPA, MBA**
Chief Executive Officer & Chief Financial Officer
Family Practice Center, PC
Pennsylvania

**Christopher Crow, MD**
Chief Executive Officer & Co-Founder
Catalyst Health Group
Texas

**Larry Sapetti, MD**
Medical Director & Partner
Springfield Clinic
Illinois

**Randy Farrow, MBA**
Chief Executive Officer
Mankato Clinic
Minnesota

**Kurt Lindberg, MD**
President & Medical Director
Holland Physician/Hospital Organization
Michigan

**Todd Lisy, MD**
Vice President/Medical Director
Pioneer Physicians Network
Ohio

**Peter Christensen, D.O., FAAFP**
Associate Medical Director, Holland PHO
Holland Hospital Medical Group
Michigan

**Craig T. Kopecky, MD**
Internal Medicine Physician
Millennium-Texas/Premier Physicians
Texas

**David Sharkis, MD**
Central Ohio Primary Care
Ohio

**Jerry P. Roy, MD, MBA**
Board Chair
Graves-Gilbert Clinic
Kentucky

**Kathleen W. Harris, MD**
Internal Medicine
Diagnostic Clinic of Longview
Texas

**David Lieuwen, MD**
Grand Valley Medical Specialists
Answer Health
Michigan

**Stephen R. Buksh, MD**
Vice President
Catalyst Physicians Group
Texas

**Wendy Rissinger, MD**
Medical Director/Physician Owner
Family Practice Center, PC
Pennsylvania

**Justin Golden, MD**
Partner and Co-owner
Richfield Medical Group
Minnesota

**Richard Gadd, BBA**
President
Catalyst Health Group
Texas

**Gurneet Kohli, MD**
Chief Medical Officer
Premier Family Physicians, PLLC
Texas

**Patrick D. Goggin, MD, FACP**
Medical Director
Physicians Group of Southeastern Ohio
Ohio

6

**APP 973**

**agilon health | PHYSICIAN NETWORK**

**Keith Eppich, MD**
Vice President, Village Health Partners
Regional Physician Lead, Catalyst Physician
Group
Texas

**Michael J. App, MD, MPH**
President
Answer Health
Michigan

**Stephen J. Behnke, MD**
Chief Executive Officer
Lexington Clinic
Kentucky

**James DomDera, MD, FAAFP**
Vice President of Professional Standards and
Governance
Pioneer Physicians Network
Ohio

**Jennifer Szurgot, MD**
Medical Director
Pinehurst Medical Clinic, Inc
North Carolina

**Brandon Enfinger, MBA**
Chief Executive Officer
Pinehurst Medical Clinic, Inc
North Carolina

**L. David Nave Jr., MD**
Family Practice Section
Pinehurst Medical Clinic, Inc.
North Carolina

**Kevin Nelson, MD**
President
Richfield Medical Group
Minnesota

**Alan Keister, MD, FACP**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Michael W. Morris, MD**
Vice President
Diagnostic Clinic of Longview
Texas

**Liam Fry, MD, CMD, FACP**
Chief Medical Officer
Austin Geriatric Specialists, PLLC
Texas

**Kristin Oaks DO**
Medical Director, Value Based Care
Central Ohio Primary Care
Ohio

**Robert Zielinski, MD**
Associate Medical Director
Buffalo Medical Group
New York

**Jan Froehlich, MD**
President
PriMED Physicians
Ohio

**Joseph Moran, MD**
Chairman, Primary Care Medical Director
Piedmont Health Care
North Carolina

**Ako Bradford, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Christopher Gulley, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Joanna Wilson, DO**
Amarillo Medical Specialists
Catalyst Health Group
Texas

7

agilon health | PHYSICIAN NETWORK

**Kaylee Shepherd, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Nam Do, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Nibras Talib Mamury, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Ryan Smithee, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Steven Norris, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Susan Neese, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Don Deep, MD**
Chief Executive Officer
Central Ohio Primary Care Physicians
Ohio

**Steve Hatkin**
Chief Financial Officer
Mankato Clinic
Minnesota

**Christopher Russo, MD**
Chief of Surgery
Starling Physicians
Connecticut

**Michael D'Angelo MD, FACC**
Chairman, Board of Directors
Chair, Department of Cardiology
Buffalo Medical Group
New York

**Henry Naddaf, MD**
President
Toledo Clinic
Ohio

**Daniel J. Scully**
CEO
Buffalo Medical Group
New York

**Moshir Jacob, MD, CPE, CMD**
Chief Medical Officer
Toledo Clinic
Ohio

**Sandra Beulke, MD**
Medical Director
Lakeview Clinic
Minnesota

**Britt Kauffman, CPA, MPA**
Board Member
Premier Family Physicians
Texas

**Jeffrey W. Smith, CPA, MBA, FACMPE, CGMA**
Chief Executive Officer
Piedmont HealthCare
North Carolina

**Bryan Albracht, DO**
Springfield Clinic
Illinois

**David Lieuwen, MD**
Associate Medical Director
Grand Valley Medical Specialists
Answer Health
Michigan

**APP 975**

agilon health | PHYSICIAN NETWORK

**Paul Clippinger, MPA, MHA, FACHE**
Executive Director
Holland PHO
Michigan

**Jonathan Copeland, MD**
Director, Clinical Quality
Arcturus Healthcare, PLLC
United Physicians
Michigan

**Richard Cook II, MD**
Board Member, Associate Medical Director
Preferred Primary Care Physicians, Inc.
Pennsylvania

**Michael B. Daley, MD**
Internist & Medical Director
Pinehurst Medical Clinic
North Carolina

**Tim Hernandez, MD**
Chief Executive Officer
Entira Family Clinics
Minnesota

**Rishin Patel, MD**
Chief Medical Officer
Community Health Care, Inc
Ohio

**Amanda K Williams, DO, CMD**
Medical Director
Physicians Group of Southeastern Ohio
Founding Member, agilon health Women
Physicians Leadership Council
Ohio

**Michael J. App, MD, MPH**
President
Answer Health
Michigan

**Michael Williams, MD**
President & CEO
United Physicians
Michigan

**Mitchell Brodey, MD**
President & CEO
FamilyCare Medical Group
New York

**Michael E. D'Eramo, DHA**
Chief Executive Officer
Graves Gilbert Clinic
Kentucky

**Thomas Janda, JD, MBA**
Chief Operating Officer
Answer Health
Michigan

**Karen Kerkering, MPH**
ACO REACH Consumer Advocate
Texas

**Pamela Zelasko, MD**
West Michigan Family Health
Answer Health
Michigan

**Diane L. Pleiman, MBA, FACHE**
President & CEO
Premier Physician Network
Ohio

**Mary Elsa Theobald, MS, FNP-C**
Medical Director of Advanced Practice
Providers
Waldo County General Hospital/ Maine
Health
Maine

**Mike Cosper, CPA**
Chief Executive Officer
Center for Primary Care
Georgia, South Carolina

**David Jester, MD**
Physician – CPC North Augusta
Center for Primary Care
Georgia, South Carolina

9

**agilon health** | PHYSICIAN NETWORK

**John C. Notaro, MD**
Medical Director
Buffalo Medical Group
New York

**Jessica Pagana-DeFazio, DO**
Family Practice Center
Pennsylvania

**Gary Pinta, MD**
President, Ohio Independent Collaborative
Vice President, Pioneer Physicians Network
Ohio

**Bert Ratay**
Chief Executive Officer
Diagnostic Clinic of Longview

**Mai Yousef, M.D**
Preferred Primary Care Physicians, INC
Member, agilon health Women Physician
Leadership Council

**Wendy McNeill, MD**
Medical Director
Eagle Physicians & Associates
North Carolina

**Bobby Maynor, MD**
Pinehurst Medical Clinic
North Carolina

10

**APP 977**



## Addendum 1

*Sub-capitated Arrangements with MA Plans*

agilon health (agilon) enters into contractual agreements with payors in each of its geographies, under which agilon is financially responsible for the agilon health Physician Network partners' provision of a defined spectrum of healthcare services to attributed patients, in exchange for a defined PMPM fee for each of our members (which is also referred to as "global capitation"). The healthcare services for which agilon and the Physician Network are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services cost. In certain payor arrangements, agilon is also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members.

The global capitation fees agilon is entitled to receive from payor contracts are typically based on a defined percentage of the corresponding monthly premium payments which the payor receives from CMS for members attributed to PCPs within the Physician Network and covered under such contracts. Certain contracts between agilon and payors incorporate provisions in which agilon and its Physician Network are eligible to earn quality bonus payments based upon the attainment of defined quality performance criteria correlated to applicable STAR ratings criteria.

agilon has developed local contracts across multiple payors, along with national form contracts with certain key payors. As of December 31, 2023, agilon has relationships with 26 payors, including large national health plans as well as smaller local and regional insurers. Patients are able to select the plan and benefit design that meets their individual needs while the agilon platform enables a seamless experience regardless of plan or product for all patients and Physician Network partners.

Payors retain responsibility for paying claims. Funding under the applicable agreement is utilized by the payor to pay such claims, and agilon receives surplus distributions on a monthly or quarterly basis. In these arrangements, the payor maintains the responsibility for entering into contractual agreements with network hospitals, network specialty physicians, and ancillary or other providers. The agreements with payors outline the range of healthcare services for which agilon is financially responsible and at risk, the services for which we are contracted to perform on the payor's behalf and the key financial terms.

The majority of agilon's contracts are for terms ranging from one to three years and contain automatic annual renewal provisions. When agilon enters into a new payor contract, there are typically requirements by the payor for agilon to contribute risk-bearing capital to the local operating subsidiary or risk-bearing entity (RBE). This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography, but typically averages between 1.5-2.0% of projected annual gross revenue attributable to the corresponding agreement.

11

agilon health | PHYSICIAN NETWORK

12

**APP 979**

# EXHIBIT 28

**APP 980**

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 16 2001

CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| SOUTHLAND SECURITIES CORPORATION, et al., On Behalf of Themselves and All Others Similarly Situated, ) | No. 4:00-CV-355y (Consolidated with Nos. 7:99-CV-0248 and 7:00-CV-001) |
| Plaintiffs, ) | CLASS ACTION |
| vs. ) | FIRST AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1934 |
| INSPIRE INSURANCE SOLUTIONS, INC., et al., ) | |
| Defendants. ) | **PLAINTIFFS DEMAND A JURY TRIAL** |

APP 981

## SUMMARY OF ACTION

1.      This is a securities fraud class action on behalf of persons who purchased or otherwise acquired the common stock of INSpire Insurance Solutions, Inc. ("INSpire" or the "Company") between January 28, 1998 and October 14, 1999 (the "Class Period") against INSpire, its senior officers and directors and its largest shareholder and customer to recover damages caused by defendants' fraudulent scheme which was designed to and did inflate the price of INSpire stock. As a result of this inflation, INSpire was able to complete a $77 million secondary stock offering and the defendants were able to sell 1.5 million[1] shares of their own stock for proceeds of close to $34 million.

2.      INSpire provides policy and claims administration to the property and casualty insurance industry and offers comprehensive outsourcing services, software and software services. Formerly known as Milirisk, Inc., INSpire was a subsidiary of defendant Millers Mutual Fire Insurance Company ("Millers" or "Millers Mutual") until August 1997 when Millers Mutual spun-off INSpire through an initial public offering ("IPO") of 8.25 million shares wherein Millers Mutual retained 43.7% of the outstanding stock. Although the IPO was successful at $8 per share and the stock immediately went to $12, INSpire's stock did not appreciate much after that through the end of 1997. While the insurance industry was growing, defendants knew this growth was not translating into new revenue for INSpire. Thus, INSpire's largest customer continued to be its largest shareholder, Millers Mutual. Defendants sought to cause INSpire's stock price to increase substantially so they could sell hundreds of thousands of shares and reap millions of dollars in proceeds.

3.      Defendants thus began to make materially false or misleading statements about the new contracts INSpire was signing and the recurring revenue and increased earnings these contracts were providing, and to represent that the Company would enjoy strong growth in 1999 and 2000 due to strong demand for its products and due to weak competition. Defendants represented to the market that due to an acceleration in orders in its services/outsourcing business, an overseas

---

[1]      All share and per-share amounts are adjusted to reflect INSpire's 3-for-2 stock split in August 1998.

- 1 -

APP 982

expansion and a broader product portfolio, including software, INSpire would report EPS of $0.86 and $1.20+ in 1999 and 2000, respectively.

4.      Defendants represented that INSpire's new contracts would provide significant "recurring" revenue when, in fact, the revenues from the contracts were generally contingent on the profitability of its customers.  Defendants also knew that continued revenue from heralded contracts with customers such as Island Insurance Company, Ltd. ("Island Insurance") and The Robert Plan Corporation ("Robert Plan") would never materialize because defendants promised these customers product specifications and implementation schedules that defendants knew were impossible to meet. Defendants also knew that the software programs INSpire intended to use in these contracts *did not work* and in fact were nothing more than test products that remained technologically unfeasible.  In fact, during a meeting with INSpire employees in June 2000, defendant Jeffrey W. Robinson admitted that he and INSpire management *knew* that the integration plan promised to The Robert Plan Corporation under that outsourcing contract announced on March 29, 1999, *could not be achieved*.  Robinson told employees in this meeting that INSpire had nevertheless made the promise regarding timing of integration to The Robert Plan Corporation so that INSpire could "get the business."  Despite this knowledge, defendants nevertheless continued to mislead the market with blatantly false assurances that contracts such as Robert Plan were progressing "on track."  John Pergande, the new CEO of INSpire, has now admitted that in 1999 revenue failed to materialize "largely because *the company didn't have the resources to execute the contracts it signed*." Pergande further admitted, "I believe that in the past *when a customer said they wanted something by a certain date, it was promised whether it was feasible or not*.  We're not going to do that any more ...."  Both Island Insurance and Robert Plan subsequently terminated their contracts with INSpire due to INSpire's numerous breaches.  Several other INSpire customers have *sued* INSpire for breach of contract.

5.      One of the largest agreements INSpire had announced at the beginning of the Class Period was with Sul America, a South American company.  Defendants claimed that under the Sul America contract, INSpire would provide a complete policy and claims administration software system that would automate the processing of one-half billion dollars worth of policies.  INSpire

- 2 -

APP 983

further claimed that the contract would open new markets to INSpire and its state-of-the-art technology. Defendants, however, failed to disclose that Windows for Property Casualty ("WPC"), the software system INSpire intended to use under the contract, was designed only for small companies, *not* for companies as large as Sul America. Defendants knew that the volume at large companies such as Sul America was simply too much for the WPC system to handle. Senior installers told defendants that what INSpire was attempting with WPC at Sul America was an impossibility. Nor did INSpire reveal that its own information and technology ("IT") personnel told INSpire management repeatedly that it was, in effect, installing nothing more than a test product at Sul America. Defendants thus knew that Sul America would be dissatisfied and that completion of all phases of the contract would not materialize. Ultimately, Sul America terminated its contract with INSpire and demanded payment under the performance bond due to INSpire's default under the contract.

6.    INSpire also blatantly misrepresented the capabilities of its two premier software products, EmPower and WPC. In fact, the phrase "smoke and mirrors" was used frequently by INSpire personnel in reference to the Company's software products. Throughout the Class Period, employees responsible for programming, employees in the IT department, managers and even defendant Terry G. Gaines repeatedly used the phrase "smoke and mirrors" to describe the Company's software products. Contrary to INSpire's representations, EmPower never worked. EmPower was meant to allow an insurance company to function as a "paperless office." EmPower, however, was nowhere near ready for sale and was of little use in outsourcing because the scanning/imaging aspect of EmPower – which was crucial to meeting the promise of a paperless insurance office – never worked. Defendant Ronald O. Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower didn't work, INSpire would be sued. The "smoke and mirrors" at INSpire went so far that at least one INSpire officer directed the *faking* of demonstrations of the Company's products to customers. For example, INSpire would demonstrate its EmPower product on two computer monitors. One application of the program would appear on one monitor, while another application appeared on a separate monitor. Although the customer was given the impression that EmPower was

- 3 -

APP 984

processing on a single system, it was not. In fact, EmPower did not work and was incapable of performing both functions from a single system. Efforts by INSpire tech writers to fix the EmPower system yielded unsatisfactory results. The unsuccessful attempts to fix the product were known throughout INSpire management.

7.    In order to continue to report favorable and growing revenue and earnings, the defendants caused INSpire to report false financial results which were in line with defendants' own favorable forecasts to analysts. Immediately prior to its IPO, INSpire had acquired Strategic Data Systems, Inc. ("SDS") which made software for the property and casualty ("P&C") industry. Defendants asserted that this $18 million acquisition would allow INSpire to offer complete policy and claims administration software solutions. However, by the beginning of the Class Period, the individual defendants knew that the software side of INSpire's business was not growing. To conceal and minimize this problem, INSpire reported growing revenues and earnings from the software business by recording revenues it had not yet earned, capitalizing, instead of expensing, research and development expenses and by failing to record the impairment loss of its investment in SDS.

8.    INSpire also inflated its revenues and earnings by manipulating the rates it charged Millers Mutual. For instance, whenever INSpire's actual revenues were short of expectations, the Company went back two months and charged Millers Mutual $90 for each report INSpire had generated during that time, thus allowing INSpire to report tens of thousands of dollars in additional revenues.

9.    As a result of defendants' false or misleading statements, INSpire's stock traded at inflated levels during the Class Period. Defendants took advantage of this inflation, completing a secondary public offering of 3.9 million shares in March 1998. In the secondary offering, INSpire sold 2.7 million shares for $54 million, Millers Mutual, INSpire's largest shareholder (and largest customer), sold 975,000 shares for $19.2 million and INSpire's CEO sold 157,000 shares for $3.3 million.

10.    INSpire used part of the $54 million it received from the secondary offering to purchase another software vendor, Paragon Interface, Inc. ("Paragon"). Nonetheless, INSpire's

- 4 -

APP 985

software revenues continued to deteriorate.  In November 1998, Paragon entered into a large outsourcing agreement with Arrowhead General Insurance Agency, Inc. ("Arrowhead"). Defendants told the market this transaction was a "major leap forward" for INSpire that would generate $35 million in revenue in year one,  allow INSpire to expand geographically into California, and add $0.05 to 1999 earnings.

11.     As a result of these statements, INSpire's stock immediately increased to more than $30 per share.  Several of the defendants immediately took advantage of this inflation, selling 106,150 of their INSpire shares for $3.2 million.

12.     Then on December 11, 1998, INSpire revealed a decline in the growth rate of its earnings and disclosed that the Arrowhead agreement would not provide the earnings previously represented, and the price of INSpire stock fell to pre-Arrowhead levels.  However, defendants still failed to disclose the severe problems in INSpire's business, including the technological unfeasibility of its software products, the blatant lies to customers, its inability to grow its software business and its overvalued assets.

13.     Finally, on October 15, 1999, INSpire revealed the horrible state of its business, including the write-off of nearly all of its assets associated with software and lower operating earnings from outsourcing.  Analysts immediately lowered their projections to reflect that INSpire would have EPS of only $0.32 per share in 1999 (before charges) and just $0.17 in 2000 compared to Class Period forecasts of $0.86 and $1.20, respectively.  Upon these disclosures, the price of INSpire stock dropped to less than $4 per share, and has not recovered since.  The stock currently trades at less than $1 per share.  Following the disclosures of October 1999, former INSpire customers have come forward in droves to sue the company for breach of contract arising from defendants' misrepresentations about the capabilities of INSpire's software products and INSpire's outsourcing services.  Finally, most of INSpire's top management have been forced out or have fled. On May 3, 2000, INSpire announced the immediate resignation of its CEO and Chairman, defendant F. George Dunham, III.  Defendant William J. Smith, III resigned effective January 7, 2000, CFO Kenneth Meister resigned effective March 31, 2000, another executive, Eric Yerina, announced his

APP 986

resignation effective immediately, and defendant Jeffrey W. Robinson was fired by INSpire and has sued the Company.

14.    While the Class has suffered millions in damages, Dunham and the other defendants have received substantial benefits from their misdeeds by personally profiting from the artificial inflation in INSpire's stock. In addition to living a lavish lifestyle at the Company's – and ultimately shareholder's – expense, including the use of not one, but *two* jets, defendants netted millions in illegal insider trading proceeds. As the price of INSpire stock soared to as high as $35-3/8, the defendants sold more than 1.5 million shares of their INSpire stock for proceeds of nearly *$34 million*:

| Defendant | Shares Sold | Proceeds |
|---|---|---|
| Agazzi | 38,750 | $ 1,013,388 |
| Dunham | 245,400 | $ 5,872,590 |
| Gaines | 10,000 | $   304,700 |
| Lynn | 47,000 | $ 1,140,000 |
| Millers Mutual | 1,192,500 | $24,377,013 |
| Robinson | 55,000 | $ 1,267,500 |
| Totals | 1,588,650 | $33,975,191 |

15.    The following chart illustrates the price action of INSpire stock caused by defendants' false statements and subsequent disclosures, as well as defendants' insider selling during the time the stock was inflated:

- 6 -

APP 987



**INSPIRE INSURANCE SOLUTIONS INCORPORATED**

Insider Sales
Daily Prices From: 10/20/1997 to 11/17/1999

## JURISDICTION AND VENUE

16.    Jurisdiction exists pursuant 15 U.S.C. §78aa. Defendants used the instrumentalities of interstate commerce. The claims arise under 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Venue is proper as the acts giving rise to the violations occurred here.

## THE PARTIES

17.    Plaintiffs Jeffrey A. Fielkow, Rick Taylor, William Wares, Ron Rumpler and William White, who were appointed lead plaintiffs in these consolidated actions by Order dated May 8, 2000, each purchased shares of INSpire stock during the Class Period and were damaged thereby.

18.    Plaintiffs Southland Securities Corporation, Stacy B. and Ronda K. Loftin, Larry Altobell, and Lawrence J. Miller, named plaintiffs in these consolidated actions, also purchased shares of INSpire stock during the Class Period and were damaged thereby.

19.    Defendant INSpire is headquartered in Fort Worth, Texas. During the Class Period, INSpire stock traded in an efficient market on the NASDAQ National Market System. INSpire was

- 7 -

APP 988

established in April 1995, as a wholly owned subsidiary of Millers Mutual and Millers Casualty. INSpire became a public company in August 1997. It provides policy and claims administration outsourcing and software services to the P&C insurance industry. INSpire's outsourcing services, which generally are provided on a percentage of premiums written or claims paid basis, include application of underwriting and rating criteria defined by the insurer, policy issuance, policyholder mailings, customer service, billing and collections, claims adjusting and processing, and IT services. INSpire also provides software and software services to the P&C insurance industry. These products include policy and claims administration systems, as well as systems that are supposed to increase the productivity of insurers by automating certain functions, such as workflow management, underwriting rules and guidelines, document production, and rating algorithms.

20.    (a)    Defendant F. George Dunham, III ("Dunham") was President, Chief Executive Officer and Chairman of the Board of INSpire during the Class Period. He has since resigned from the Company. Based on inside information, Dunham sold 245,400 shares of his INSpire stock during the Class Period at as high as $31 per share for illegal insider trading proceeds of $5,872,590. In his capacities as President, Chief Executive Officer and Chairman of the Board of INSpire, Dunham participated in the day to day control of the Company and orchestrated the fraud alleged herein. Dunham was primarily responsible for INSpire's communications to securities analysts and was actively involved in INSpire's software and outsourcing marketing efforts throughout the United States. Dunham was also actively involved in preparing, reviewing and authorizing INSpire's publicly reported financial statements throughout the Class Period, the Company's reports on Form 10-K and 10-Q, and its Annual Reports, financial press releases and other corporate reports. As part of, and in furtherance of, defendants' scheme to manipulate the market price of INSpire common stock, defendant Dunham:

(i)    caused the Company to falsely report its results for the quarters ended December 31, 1997, March 31, 1998, June 30, 1998, September 30, 1998, December 31, 1998, March 31, 1999 and June 30, 1999 through its improper recognition of revenues, the failure to properly report the value of its assets, including goodwill associated with the acquisition of SDS, software development costs and accounts receivable;

- 8 -

APP 989

(ii) made statements in press releases and conference calls announcing INSpire's quarterly or yearly revenues and earnings and participated in preparing the Company's reports on Forms 10-K and 10-Q filed with the SEC, and the false financial statements contained in those SEC filings; and

(iii) reviewed, signed and thereby falsely endorsed as accurate INSpire's reports on Form 10-K for fiscal years 1997 and 1998 and INSpire's reports on Form 10-Q for the quarters ended December 31, 1997, March 31, 1998, June 30, 1998, September 30, 1998, December 31, 1998, March 31, 1999 and June 30, 1999, which contained the Company's falsely inflated financial statements.

(b) Defendant Ronald O. Lynn ("Lynn") served as Executive Vice President and Chief Information Officer of INSpire during the Class Period. Based on inside information, Lynn sold 47,000 shares of his INSpire stock during the Class Period at as high as $30 per share for illegal insider trading proceeds of $1,140,000. Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower did not work, INSpire would be sued.

(c) Defendant Terry G. Gaines ("Gaines") was Executive Vice President, Chief Financial Officer and Treasurer of INSpire from October 1997 until his resignation on January 13, 1999. Based on inside information, Gaines sold 10,000 shares of his INSpire stock during the Class Period at as high as $30.50 per share for illegal insider trading proceeds of $304,700. Gaines made statements in press releases and conference calls announcing INSpire's quarterly revenues and earnings and participated in preparing the Company's reports on Forms 10-K and 10-Q filed with the SEC, and the false financial statements contained in those SEC filings. Gaines also reviewed, signed and thereby falsely endorsed as accurate INSpire's reports on Form 10-K for fiscal year 1997 and INSpire's reports on Form 10-Q for the quarters ended December 31, 1997, March 31, 1998, June 30, 1998, and September 30, 1998, which contained the Company's falsely inflated financial statements. Gaines frequently used the phrase "smoke and mirrors" to describe INSpire's software products.

- 9 -

(d)    Defendant Robert K. Agazzi ("Agazzi") served as Executive Vice President-Software and Systems of INSpire during the Class Period. Based on inside information, Agazzi sold 38,750 shares of his INSpire stock during the Class Period at as high as $26.25 per share for illegal insider trading proceeds of $1,013,388.

(e)    Defendant Jeffrey W. Robinson ("Robinson") served as Executive Vice President-Outsourcing and later, as President and Chief Operating Officer of INSpire. He was fired by the Company and has sued INSpire for violation of his employment agreement. Based on inside information, Robinson sold 55,000 shares of his INSpire stock during the Class Period at as high as $30 per share for illegal insider trading proceeds of $1,267,500. Robinson admitted lying to outsourcing customer The Robert Plan Corporation so that INSpire "could get the business." The Robert Plan Corporation subsequently terminated its contract with INSpire due to INSpire's numerous breaches under the contract.

(f)    Defendant William J. Smith, III ("Smith") served as President and Chief Operating Officer from May 1, 1998 until his resignation on January 7, 2000. As part of and in furtherance of defendants' scheme to manipulate the market price of INSpire common stock, defendant Smith made statements in press releases and conference calls announcing INSpire's quarterly or yearly revenues and earnings and participated in preparing the Company's reports on Forms 10-K and 10-Q filed with the SEC and the false financial statements contained in those SEC filings. Smith also reviewed, signed and thereby falsely endorsed as accurate INSpire's report on Form 10-K for fiscal year ended December 31, 1998.

21.    The defendants in ¶20(a)-(f) are the "Individual Defendants." They each controlled the contents of and participated in writing INSpire's SEC filings, reports and releases, alleged at ¶¶39-40, 46, 52-53, 56, 58-59, 61-62, 64-66, 70, 73-76, 87-88, 92-94, 96, 98-99, 104-05, 107-08 and are responsible for them.

22.    Defendant Millers Mutual is the parent company and largest shareholder of INSpire. Until June 1997, Dunham was the President and CEO of Millers Mutual. From June 1997 to September 1999, Dunham's father was CEO of Millers Mutual. Effective September 13, 1999, Dunham again became CEO of Millers Mutual. In 1998, Millers Mutual accounted for

- 10 -

APP 991

approximately 32% of INSpire's revenue and owned 25% of the Company.  As of December 31, 1999, Millers owned approximately 24% of the outstanding common stock of INSpire.  Based on inside information, Millers Mutual sold 1,192,500 shares of its INSpire stock during the Class Period at as high as $25.37 per share for illegal insider trading proceeds of $24,377,013.

23.    Defendant Dunham, via his executive positions at both INSpire and Millers Mutual, Board membership and INSpire stock ownership, was a controlling person of INSpire within the meaning of §20(a) of the Securities Exchange Act of 1934 ("1934 Act"), and had the power and influence, and exercised the same, to cause INSpire to engage in the conduct complained of herein. By placing its representatives (*e.g.*, defendant Dunham, defendant Robinson, and defendant Lynn), on INSpire's Board and through its stock ownership, Millers Mutual controlled INSpire within the meaning of §20(a) of the 1934 Act, and had the power and influence, and exercised the same, to cause INSpire to engage in the conduct complained of herein.  Furthermore, during most of the Class Period, Dunham's father was CEO of Millers Mutual.  INSpire, in turn, controlled each of the Individual Defendants.

## SCIENTER AND SCHEME ALLEGATIONS

24.    Each defendant is liable for making false statements and concealing adverse facts in furtherance of a fraudulent scheme which was designed to and did permit INSpire to complete a $77 million secondary stock offering in March 1998, in which the Company sold 2.7 million shares and certain shareholders of the Company, including Millers Mutual, sold 975,000 shares.  The artificial inflation also permitted defendants to sell nearly $34 million of their INSpire stock at artificially inflated prices.

25.    The Individual Defendants were the top executives of INSpire.  They ran INSpire as "hands-on" managers, dealing with important issues facing INSpire's business, *i.e.*, acquisitions, new contracts, development of the software business, and the growth of the insurance claims administration outsourcing market upon which INSpire's business depended.

26.    Defendants constantly monitored each of these key factors affecting INSpire's business.  Due to their top executive positions with INSpire and involvement in the day-to-day management of its business, each Individual Defendant actually knew from internal corporate

- 11 -

APP 992

documents and conversations with other corporate officers and employees and their attendance at management and Board meetings, the adverse non-public information about the deteriorating financial condition of INSpire, the problems in growing INSpire's software business, and INSpire's worsening earnings prospects. Defendants attended INSpire's quarterly employee meetings, another source of information of INSpire's chronic problems. The meetings, described by George Dunham on October 12, 1998 to The Fort Worth Star Telegram, as "TownHall-type" meetings, consisted of a review of financial reports, followed by discussion of operational and policy issues. Employees were then given an opportunity to ask questions, answered by upper management. Newsletters and e-mail communications directly from employees of all levels to upper management, including the Individual Defendants, also insured a distribution of information to defendants. Each defendant actually knew or recklessly disregarded that the public statements about INSpire pleaded at ¶¶39-40, 46, 52-53, 56, 58-59, 61-62, 64-66, 70, 73-76, 87-88, 92-94, 96, 98-99, 104-05, 107-08 were false or misleading when made.

27.     The growth and success of INSpire's core business – providing complete policy and claims administration solutions for insurers – was dependent on successfully developing a strong software business which had higher margins than the Company's traditional outsourcing services and which would also lead to more outsourcing agreements. Thus, in May 1997, immediately before the IPO, the Company acquired SDS. However, by late 1997, defendants realized from their involvement in the business that the Company's software business was not attracting customers and its software products were not technologically or economically feasible. This was partially attributable to a staggering 30% turnover in employees in INSpire's information technology department during 1996-1998. It was common knowledge at INSpire that the Company's software products were not technologically or economically feasible. INSpire IT personnel who repeatedly told defendant Robinson that INSpire products did not and could not work were told by Robinson to "get with the program or get out the door." In fact, the phrase "smoke and mirrors" was used frequently by INSpire personnel in reference to the Company's software products. Throughout the Class Period, employees responsible for programming, employees in the information technology

APP 993

department, managers and even Gaines repeatedly used the phrase "smoke and mirrors" to describe the Company's software products.

28.     The "smoke and mirrors" at INSpire went so far that at least one INSpire officer directed the *faking* of demonstrations of the Company's software products to customers. On more than one instance, INSpire demonstrated its EmPower product on two computer monitors. One application of the program would appear on one monitor, while another application appeared on a separate monitor. Although the customer was given the impression that EmPower was processing on a single system, it was not. In fact, EmPower did not work and was incapable of performing both functions from a single system. Efforts by INSpire tech writers to fix the EmPower system yielded unsatisfactory results. The unsuccessful attempts to fix the product were known throughout INSpire management, including defendants.

29.     Although INSpire's goal with its EmPower software product was simply to sell it outright to customers, this became impossible because EmPower never worked effectively. In fact, EmPower was so ineffective that when it was added to the INSpire network in 1997, it killed the network and INSpire was forced to spend six months and $300,000 to get its own network running properly. Thus, the EmPower product was nowhere near ready for sale and was of little use in outsourcing. EmPower was sold to insurance companies as a "paperless office" solution.[2] EmPower was intended to image documents, scan the imaged documents optically to extract the text from the documents, and then automatically send them to the Policy and Claims Administration system to be processed. EmPower, however, never scanned the documents correctly due to a problem with the optical character recognition function. The software would not correctly recognize or record the characters that were written on a document that was imaged. EmPower would image a piece of paper but then send the image to the wrong place or simply lose the image entirely. Images were

_____

[2]     EmPower is an imaging and workflow management application. It was designed to allow a user to create an electronic image of an insurance application or some other document. EmPower was then supposed to send the image through the computer system to whatever department needed a copy of the document. The image would thus be sent from department to department via computer, without the need for a hard copy. EmPower was to be used in conjunction with a policy and claims administration system. The first policy and claims administration system used by INSpire was called Policy and Claims Administration ("PCA") and ran on the AS400 platform. The later system was called Windows for Property Casualty ("WPC") and ran on a Windows client/server platform.

- 13 -

APP 994

scanned but then stored with the wrong numbers. EmPower also took too long to retrieve the images, especially images stored on optical disk. EmPower was designed – unsuccessfully – for use with the PCA system on an AS400 platform. EmPower was later redesigned – again, unsuccessfully – to try to make it compatible with the WPC system. The interface between EmPower and the PCA system did not work, which caused problems in transferring information from EmPower to PCA and back again. Because the interface application did not work properly, if a person was using WPC or some other application on his computer and he wanted to use EmPower, he had to close the application he was using and open EmPower. Then, if he wanted to go back to the application he was using, he had to exit out of EmPower. Because of this problem, many people used two computers at the same time, one to run EmPower, and one to do everything else. Originally, EmPower failed to correctly read either typed or handwritten information on a document. Eventually, the software was fixed so that it could recognize typewritten characters. However, INSpire could never get EmPower to correctly scan a document that had handwriting on it. For example, if a potential policyholder filled out an application by handwriting as opposed to typing, EmPower could not scan the application for character recognition. This was a critical flaw since most applications were, in fact, handwritten.

30.     Although EmPower was represented to investors and customers alike as a turnkey solution to processing, defendants knew that the product could never work. Defendants knew EmPower did not work when INSpire bought it. Defendant Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower didn't work, INSpire would be sued. After two years, INSpire IT personnel were still "band-aiding" the imaging aspect of EmPower and still never corrected this aspect of EmPower. Between one to three times per week, there were phone conferences between key INSpire executives in Fort Worth, Texas and Sheboygan, Wisconsin to discuss the chronic problems with EmPower. Furthermore, EmPower was not designed for use with large third-party administrative work, although that is how INSpire marketed it. It was originally designed for small regional insurance companies. The original designer and developer of EmPower, SDS, designed the product for small networks only. INSpire therefore knew before the purchase of the EmPower system that EmPower

- 14 -

was not designed for high volume networks and INSpire would have to modify the program to accommodate large users. This never happened. INSpire insiders, including, but not limited to, defendants Lynn, Robinson, and Dunham, were told repeatedly by INSpire programmers and developers that EmPower would never work as defendants had represented it to work.

31.    Defendants represented throughout the Class Period that EmPower was an automated workflow management system which interfaced with other vendors' systems or insurers' proprietary systems to provide imaging and workflow management technology. Defendants, however, knew that EmPower was incapable of interfacing with other vendors' systems or insurers' proprietary systems.

32.    Contrary to their representations to investors, defendants also knew that continued revenue from heralded contracts with customers such as Island Insurance Co. and The Robert Plan Corporation was not going to materialize because defendants promised these customers product specifications and implementation schedules that defendants knew were impossible to meet. Defendants also knew that the software programs INSpire intended to use in their contracts *did not work* and in fact were nothing more than test products that remained technologically unfeasible. In fact, during a meeting with INSpire employees in June 2000, defendant Robinson *admitted* that he and INSpire management knew that the integration plan promised to The Robert Plan Corporation under that outsourcing contract announced on March 29, 1999 *could not be achieved*. Robinson told employees in this meeting that INSpire had nevertheless made the promise to The Robert Plan Corporation regarding timing of integration so that INSpire could "get the business." Defendants knew their house of cards would collapse but nevertheless claimed these contracts would guarantee millions of dollars. Both Island Insurance Co. and The Robert Plan Corporation have terminated their contracts with INSpire due to INSpire's failure to perform. Commenting upon the Company's "stumbles," INSpire's new CEO, John Pergande, admitted that in 1999 revenue failed to materialize "largely because *the company didn't have the resources to execute the contracts it signed*." Pergande further admitted, "I believe that in the past *when a customer said they wanted something by a certain date, it was promised whether it was feasible or not*. We're not going to do that any more ...."

- 15 -

33.     The defendants closely monitored the performance of INSpire's business via reports which INSpire's Finance Department generated on a weekly and monthly basis. There were "sales order," "backlog," and accounts receivable aging reports. The Finance Department also distributed monthly financial reports comparing INSpire's *actual* financial results to *projected* results. Thus, each defendant was apprised of the status of sales, costs, profitability and new contracts so that each knew the status of INSpire's growth as well as INSpire's actual results compared to budget. As a result, defendants were constantly aware of INSpire's current growth rate, knew that INSpire's goodwill, software development costs and receivables were overstated and its financial condition was deteriorating, and knew that INSpire's 1999-2000 earnings forecasts could not and would not be achieved.

## BACKGROUND

34.     INSpire provides policy and claims administration to the P&C industry and offers comprehensive outsourcing services, software and software services. Technology is a critical element in an insurance company's ability to compete. Insurance companies use technology and information systems as management tools to compete more effectively by improving efficiency, managing costs and increasing customer satisfaction. In order to meet the unique needs of property and casualty insurers to manage and process large amounts of policyholder data, a highly technical industry evolved. Insurers shifted their focus from finding more efficient means of storing information toward more efficient ways of processing information. Formerly known as Milirisk, Inc., INSpire was a subsidiary of Millers Mutual until August 1997 when Millers Mutual spun-off INSpire through an IPO of 8.25 million shares wherein Millers Mutual retained 43.7% of the outstanding stock. Although all IPO shares were sold at $8 per share, and initially the market price of INSpire rose to $12, INSpire's stock did not appreciate much between the IPO and the end of 1997. While the insurance industry was growing, defendants knew this growth was not translating into new revenue for INSpire. Thus, INSpire's largest customer continued to be its largest shareholder, Millers Mutual. Defendants sought to cause INSpire's stock price to increase substantially so they could sell hundreds of thousands of shares and reap millions of dollars in proceeds.

- 16 -

APP 997

35.     Immediately after the IPO, INSpire began planning a secondary offering so that INSpire, Millers Mutual and defendant Dunham could sell additional shares of INSpire common stock to the public.  To make this secondary offering successful and lucrative, defendants began to misrepresent the growth in new business that INSpire would realize from new contracts.

36.     On October 30, 1997, INSpire announced its September 30, 1997 results. The release stated:

> INSpire Insurance Solutions (NASDAQ:NSPR) reported record revenues for the three months and nine months ended Sept. 30, 1997, and record earnings for the third quarter.

*     *     *

> "INSpire is experiencing exciting growth and even greater potential since going public in August," said F. George Dunham III, president, chairman and chief executive officer.  "Property and casualty companies are recognizing that we represent a unique resource within the industry."

Dunham and Gaines are each listed as contact persons on this press release.

37.     Based on these favorable results, defendants hoped to stimulate sufficient investor interest to drive up INSpire's stock price and sell hundreds of thousands of shares before it was revealed that INSpire was having difficulty generating new profitable business that would provide strong earnings growth in future years.

38.     On November 12, 1997, INSpire announced a software licensing and services support agreement with Cover-All Technologies, Inc. ("Cover-All").  Like many other INSpire customers, such as Medical Mutual Insurance Company of North Carolina and Zurich American Insurance Company, Cover-All later sued INSpire for breach of contract.  As they did to many other INSpire customers, defendants made promises to Cover-All which they knew INSpire could not keep.

### FALSE AND MISLEADING STATEMENTS

39.     On January 28, 1998, INSpire issued its results for the 4thQ and year ended December 31, 1997, including 4thQ revenues of $18.1 million and EPS of $0.19.  The release also stated:

> Revenues rose to $18.1 million vs. $4.5 million in the 1996 fourth quarter, and net earnings were $2.1 million, or $.19 per diluted share ($.21 per basic share), compared to a loss of $297,000, or $.04 per diluted share ($.04 per basic share), for the comparable quarter last year.

- 17 -

APP 998

Revenues for the year were a record $56.6 million compared to $13.7 million in 1996. INSpire's profit for the year was $1.7 million, or $.20 per diluted share ($.21 per basic share), compared to a loss of $515,000, or $.07 per diluted share ($.07 per basic share), for the same period in 1996. Included is the sale of a subsidiary, Applied Quoting Systems, Inc. (AQS), and the writeoff of purchased research and development and deferred compensation of $3.4 million, net of tax. Excluding those items, net earnings for the year would have been $5.1 million, or $.58 per diluted share ($.62 per basic share).

Outsourcing revenues of $9.9 million for the quarter were up 121 percent over the same period last year, and were $32.5 million for the year, up 138 percent from 1996. Software and software systems revenues of $8.2 million for the three months and $24.1 million for the year are the result of INSpire's purchase in March 1997 of Strategic Data Systems, Inc.

"Our successful public offering in August helped generate additional market interest in the array of solutions we provide," said F. George Dunham III, INSpire's president, chairman and chief executive officer.

Dunham and Gaines are each listed as contact persons on this press release.

40.    Subsequent to the release of its December 31, 1997 results, INSpire held a telephonic conference call for securities analysts, money and portfolio managers, institutional investors, large shareholders, brokers and stock traders to discuss INSpire's results, its business and its prospects. During the call, Dunham and Gaines made presentations and answered questions. During the call – and in follow-up conversations with participants – they directly disseminated important information to the market by stating:

•    Since the IPO, INSpire had signed five new outsourcing contracts and seven new software contracts and had bids out on contracts that would generate $71.5 million in annual revenue.

•    The insurance industry was entering a new phase of competition which would require more and more of INSpire's products and services.

•    The contract wins so far demonstrated demand was strong and provided increased visibility as to future revenues and earnings.

•    The new contract wins translated into revenues of $46 million for 1998 and other contracts would add to this amount.

•    INSpire was on track to report EPS of $0.60 and $0.86 in 1998 and 1999, respectively.

41.    In response to defendants' positive announcement, INSpire's stock price rose from $14-53/64 on January 27, 1998 to $17-21/64 on January 29, 1998.

- 18 -

APP 999

42.    On January 30, 1998, Raymond James & Associates issued a report on INSpire by R. X. Bove, which was based on and repeated information provided to Bove by defendants in the 4thQ conference call and in follow-up conversations with Dunham or Gaines.  The report forecast 1998 and 1999 EPS of $0.60 and $0.87, a 40% three- to five-year growth rate and the following quarterly 1998 and 1999 EPS for INSpire:

|       | 1998   | 1999   |
|-------|--------|--------|
| Q1    | $0.13  | $0.19  |
| Q2    | $0.15  | $0.21  |
| Q3    | $0.15  | $0.22  |
| Q4    | $0.17  | $0.25  |
| Year  | $0.60  | $0.87  |

43.    The January 30, 1998 Raymond James report also stated:

* INSpire had its initial public offering on August 22, 1997 at $12 per share. Since that time the company has signed five new outsourcing contracts and seven new software contracts, surpassing our expectations at the time of the offering.

* The company now has bids out on contracts that could generate $71.5 million in revenue per year.  While INSpire is not expected to win all or even half of this business, any contract wins would lead us to raise our earnings estimates for both 1998 and 1999.  This company is a leader in a newly formed industry and is expected to grow rapidly (40%) in future years.

*    *    *

Since going public on August 22, 1997, INSpire has had an unusually productive beginning.  A listing of its new contract wins is shown below.

| Announced contracts | Product | Est Value |
|---------------------|---------|-----------|
| Outsourcing<br>Company A operating under Florida Homeowner Joint Underwriting Agreement (3 year) | | $30,000,000 |
| Company B operating under Florida Homeowner Joint Underwriting Agreement (5 year) | | $10,000,000 |

*    *    *

| Sales &<br>Terminations<br>Applied<br>Quoting<br>Systems | Commercial P&C | $1,600,000 |

Compelling forces are driving the growth of this company.  The insurance industry has entered into a new phase of competition.  Banks are about to sell the product and a sizable number of virtual companies with insurance offerings have developed.  These new entrants are attempting to buy market share with aggressive

- 19 -

APP 1000

price cutting.  In order to succeed, these entrants need the backing of outsourcers with superior software capability.  In order to fend off the new entrants, existing insurance companies need the same assistance.

Thus, a new industry is developing that has the potential to double in size in the next few years, adding $12 billion to $15 billion in revenue.  INSpire is one of a small number of companies positioned to benefit from this trend.  Its contract wins to this point demonstrate that it has been successful and has great potential for the future.  The table below indicates the number of new projects that the company is bidding on.

| Type of Project | Final Negotiation | Final | Proposal Stage Preliminary | New | Annual Revenue |
|---|---|---|---|---|---|
| Outsourcing Information | | | | | |
| Technology | | 1 | 1 | 1 | $5,500,000 |
| Claims Processing | 1 | | | 2 | $6,500,000 |
| Policy administration | | | 1 | 1 | $5,500,000 |
| Policy & Claims | 2 | 1 | | 2 | $11,000,000 |
| As yet undefined | | | | 2 | |
| Total outsourcing | 3 | 2 | 2 | 8 | $28,500,000 |
| One contract not included in the dollar values listed above would generate a minimum annually of. | | | | | $20,000,000 |
| Software | 10 | 7 | | 75 | $23,000,000 |
| Total proposals | 13 | 9 | 2 | 83 | $51,500,000 |

* * *

In 1998, the company's contract wins suggest that it will record outsourcing revenues of $46 million.  Software revenues are expected to be $31 million.  Thus, the $0.90 per share for the year seems to be relatively set as a result of in-hand

- 20 -

APP 1001

business. This means that successes in winning any of the larger bids listed above will result in a meaningful change in the current earnings estimates. Management does not want the estimate raised until these wins are announced.

44. On January 30, 1998, Southwest Securities issued a report on INSpire by Gene B. Ramirez, which was based on and repeated information provided to Ramirez by defendants in the 4thQ conference call and in follow-up conversations with Dunham or Gaines. The report rated INSpire a "Buy," forecast 1998 EPS of $0.59 and a 40% three- to five-year growth rate. It also stated:

- **Broader product offering fueling top-line growth**: Driving the strong performance in 4Q97 was revenue growth of 64.0% (including SDS), well in excess of our estimate of 45.1% growth. Outsourcing services revenue grew 120.7% year-over-year to $9.9 million from $4.5 million in the year-ago quarter. Software and software services revenue increased 39.5% year-over-year, from $4.9 million in 4Q96 to $6.8 million in 4Q97. It is becoming quite apparent the company's successful IPO has significantly enhanced its position in the marketplace as customers recognize INSpire as a leading provider of services and software to the Property & Casualty (P&C) business. In 4Q97, the company signed several outsourcing and software contracts, and signed a "private label" contract with Cover All Systems to offset the sale of AQS.

\* \* \*

- **New sales and marketing strategy**: We believe the addition of Jim Strickland from Continuum, a subsidiary of Computer Science Corporation, to head the Outsourcing Group and Scott Lewis leading the Software Group, should position the company for increased sales momentum as new salespeople are hired to target larger contracts ($3 million-$20 million). Also, the company will increasingly seek to cross-sell their products and services to existing clients. We believe by the end of 1Q98, the company should have its direct sales team for outsourcing in place and a new sales plan completed. Overall, the pipeline for FY98 appears solid with over 14 deals under tracking and 10 deals under the company's "A" prospect list (final stages).

- **We are maintaining our BUY recommendation and raising our price target**: Based on strong quarter and favorable outlook, we are maintaining our BUY recommendation and raising both our FY98 EPS estimate to [$0.59] per share from [$0.57] per share and FY99 estimate to [$0.83] from [$0.78]. We are raising our price target to $35, since we are now pricing the stock off a 40 P/E multiple applied to our FY98 estimate of [$0.59] per share. Over the next several quarters we anticipate the company will begin to realize the economies of scale inherent in its business model as deal flow accelerates. We remain optimistic about the company's prospect for 1Q98 and for FY98. The company is ahead of some very strong business trends, which we believe will continue to drive revenue growth over 30%. We believe this growth rate will be driven by a combination of new markets, larger P&C contracts, and a broader acceptance of products/services to fuel top and bottom-line growth.

- 21 -

**APP 1002**

45.      On February 12, 1998, *Investor's Business Daily* published an article on INSpire based on statements made to the publication by Dunham.  According to the article, INSpire had recently begun using its own sales force to target potential customers with direct phone calls, changing from its former practice of marketing its outsourcing services through insurance brokers and consultants.  INSpire expected its revenue from outsourcing to increase to about 60% to 70% from its current rate of 55%.  Dunham said that money that the insurance industry currently spent on processing and policy administration would soon flow into outsourcing.

46.      On February 24, 1998, INSpire issued a press release announcing a new contract, its largest to date.  The release stated:

> INSpire has been selected by Sul America, Brazil's largest property and casualty insurance provider, to provide a complete policy and claims administration software system for all of its non-auto business that will automate the processing of one-half billion dollars worth of policies.
>
> INSpire will install its PC-based software system, Windows into Property and Casualty System (WPC), in 16 Sul America branch locations throughout Brazil over a 12-month period.  The majority of the installation process will be coordinated by INSpire's branch office in Columbia, S.C., and Sul America's home office in Rio de Janeiro.  The joint installation team will work closely with INSpire's in-house software development team, who created a special version of WPC in Portuguese, the national language of Brazil.
>
> "We are thrilled to enter the South American market with such a prestigious partnership.  The value of state-of-the-art technology that reduces costs, increases efficiency and is able to respond quickly to market changes is universal.  These benefits speak to any insurer in any country and in any language," said F. George Dunham III, president, chairman and CEO, INSpire Insurance Solutions.
>
> *      *      *
>
> "We are committed to improve and expand the capabilities of our software products and systems through research and development to meet the needs of insurance providers of all sizes.  The successful launch of WPC in South America should open up a new market for our products and services," said [Robert] Agazzi.

Dunham is listed as the contact person on this press release.

47.      INSpire described WPC as a Windows-based system designed to meet daily information processing demands, including submission tracking, policy and claims administration, and management and bureau reporting.  WPC runs on a PC platform in a client/server environment and on most major PC network operating systems, including Novell Netware and Microsoft Windows NT.

- 22 -

APP 1003

48. In fact, defendants omitted crucial details about INSpire's Sul America contract which would have significantly affected the market's perception of the contract. The Company was required to arrange a surety to provide Sul America with a performance bond in the amount of $3.7 million, the proceeds of which could be used in the event that the Company did not fulfill its obligations under the contract. Thus, INSpire's ability to complete the contract was in so much doubt that it had to post a surety bond to guarantee its performance. The contract was also segregated into three phases, the first two of which were only worth $2.5 million each. INSpire also failed to disclose that WPC was designed only for small companies, *not* for companies as large as Sul America. Defendants knew that the volume at large companies was simply too much for the WPC system to handle. Senior installers told defendants that what INSpire was attempting with WPC at Sul America was an impossibility. Nor did INSpire reveal that its own IT personnel told INSpire management repeatedly that it was, in effect, installing nothing more than a test product at Sul America. Defendants thus knew that Sul America would be dissatisfied and that completion of all phases of the contract would not materialize. Ultimately, Sul America terminated its contract with INSpire and demanded payment under the performance bond due to INSpire's default under the contract.

49. Following this February 24, 1998 announcement, the market price of INSpire common stock immediately increased to nearly $20 per share, its highest level to date.

50. On March 6, 1998, INSpire announced the filing of a registration statement with the SEC for a secondary follow-on public offering of 2,000,000 shares of its common stock. Dunham is listed as the contact person on this press release.

51. On March 16, 1998, Raymond James & Associates issued a report on its 19th Annual Institutional Investors' conference. The report included a synopsis of each participating company's presentation. As to INSpire, Raymond James reported the following:

> Inspire's vision is to become a leading provider of comprehensive policy and claims administration solutions to the P&C insurance industry. The P&C market is virtually untapped leaving a significant market opportunity. Inspire's strategies are: (1) accelerate outsourcing direct sales; (2) enhance product capabilities; (3) penetrate new markets; and (4) pursue strategic acquisitions. Inspire currently has 12 deals in final negotiations and seven deals in preliminary proposals.

APP 1004

52.    On March 23, 1998, INSpire filed its SEC Form 10-K for the fiscal year ended March 31, 1997. This 10-K included the financial results previously reported and was signed by defendants Dunham and Gaines.

53.    On March 26, 1998, INSpire filed its Prospectus/Registration Statement pursuant to the offering of 3.9 million shares at $21 per share. The Prospectus/Registration Statement included the financial results previously reported, including 1997 revenues of $56.6 million and net income of $1.7 million, and also stated:

> The Company's objective is to become the leading provider of policy and claims administration solutions to the P&C insurance industry. The Company's strategy to achieve this objective involves the following elements:
>
> -    Offer a Comprehensive Choice of Solutions. The Company offers an "a la carte" menu of services and products that is attractive to a wide variety of potential customers. This comprehensive and flexible approach enhances customer stability and increases opportunities for new sales by allowing the Company to sell multiple services and products to both existing and new customers.
>
> -    Focus Sales Efforts. The Company believes that specialized sales teams dedicated to the Company's principal markets of outsourcing services and software and systems sales can most effectively relate to each type of customer. The Company's outsourcing marketing group concentrates on marketing the Company's claims administration, policy administration and IT services to established P&C insurance companies as well as new entrants in the P&C industry, such as banks, credit unions and other financial services companies. The Company's software and systems marketing group uses dedicated sales teams to focus on larger accounts (generally defined as insurance companies with annual premiums in excess of $250 million) as well as certain of the Company's outsourcing customers. The Company believes that this sales strategy allows the Company to capitalize on its ability to offer a comprehensive choice of solutions to a wide variety of customers.
>
> -    General Recurring Revenues. The Company's services and products are structured to generate revenues based on events that occur in the normal course of a customer's business. Policy administration and IT services generate recurring revenues because the Company earns a percentage of each premium received by the insurance company. Claims administration services generate recurring revenues because the Company earns a percentage of either each claim paid or each premium received by the insurance company. Software licensing generates recurring revenues because most of the Company's customers enter into systems support, maintenance or enhancement agreements to purchase additional services and software enhancements throughout the life of their systems.
>
> -    Penetrate New Markets. Prior to the SDS Acquisition, SDS traditionally marketed its software products and services to small to mid-size domestic insurance companies. Utilizing the combined resources of the merged companies, the Company intends to pursue sales opportunities with larger insurance companies both domestically and internationally. For example, the company recently executed an agreement with Sul America Cia Nacional de Seguros ("Sul America"), the largest P&C insurance company in Brazil, pursuant to which the Company will install and

- 24 -

APP 1005

implement WPC (as hereinafter defined) and certain software productivity tools and customize WPC to Sul America's specifications.

54.    INSpire's offering was successful and the Company was able to sell 2.7 million shares at $21 in a $77 million public offering.  The sale, led by Raymond James, raised $53.2 million for the Company and $23.7 million for selling shareholders after fees.

55.    On March 31, 1998, Southwest Securities issued a report on INSpire by Gene Ramirez, which was based on and repeated information provided to Ramirez in conversations with INSpire management.  The report forecast 1998 and 1999 EPS of $0.59 and $0.83, and a 40% three- to five-year growth rate.  It also stated:

> We believe NSPR will likely continue to exceed expectations for the next several quarters helped by robust outsourcing/software sales, additional financial resources from its recent secondary offering to pursue strategic acquisitions and increased visibility based on a substantial increase in backlog at the end of FY97.  The company is enjoying a sweet spot in demand because of (1) weak competition, (2) an acceleration in order growth in the services/outsourcing area, (3) expansion overseas, and (4) broader product portfolio which continues to strengthen versus its competitors.

56.    On or about April 2, 1998, INSpire sent out its Annual Report to Shareholders. Included in the report was a letter to shareholders from Dunham.  Dunham's letter stated in part:

> *We enter 1998 with a great deal of momentum*.  In the fourth quarter of 1997 we signed three significant outsourcing contracts, one of which was in production in December 1997 and the other two staged to start late in the first quarter of 1998.  We are seeing an increasing amount of interest in and industry knowledge of our out- sourcing services, and we anticipate additional contract additions in 1998. Opportunities to this point have come to us through strategic alliances with reinsurance brokers and through customer referrals.  *We have now assembled an exceptional group of outsourcing sales professionals who will add a dedicated direct sales effort.*
>
> On the software and systems front, the acceptance and interest in our client server system (WPC) and productivity tools such as EmPower and the Underwriting Expert System have been accelerating through 1996 and 1997 and into 1998. *Additionally, we were awarded a significant contract to provide all of the automation for a major Brazilian company.*  This is our first significant international sale, and successful implementation may lead to other Latin American software sales opportunities.
>
> INSpire expects to achieve substantial growth in 1998.  Our challenges are to continue to increase our visibility in the property and casualty industry, to hire, train and assimilate many new people required to support the growth, to build a successful outsourcing direct sales team, and to continue to invest in product offerings development that anticipates the strategic needs of our customers in this evolving industry.  *We have planned extensively for and are ready to meet each of these challenges*.

- 25 -

APP 1006

57.     Each of the positive statements about INSpire's business made during the Class Period between January 28, 1998-April 2, 1998, as set forth in ¶¶39-56, was false when issued. Each such statement failed to disclose the following information about adverse conditions in and then impacting INSpire's business, disclosure of which was required to make the statements made not misleading, and which information was then known only to defendants due to their access to internal INSpire data:

(a)     INSpire omitted crucial details about the Sul America contract which would have significantly affected the market's perception of the contract:

- The Company was required to arrange a surety to provide Sul America with a performance bond in the amount of $3.7 million, the proceeds of which could be used in the event that the Company did not fulfill its obligations under the contract. Thus, INSpire's ability to complete the contract was in so much doubt that it had to post a surety bond to guarantee its performance. Ultimately, Sul America terminated its contract with INSpire and demanded payment under the performance bond due to INSpire's default under the contract.

- INSpire also failed to disclose that WPC, the program to be used at Sul America, was designed only for small companies, **not** for companies as large as Sul America.[3] Defendants knew that the volume at large companies was simply too much for the WPC system to handle. Senior installers told defendants that what INSpire was attempting with WPC at Sul America was an impossibility. Nor did INSpire reveal that its own IT personnel told INSpire management repeatedly that it was, in effect, installing nothing more than a test product at Sul America.

- INSpire agreed to underwrite all of the installation costs on the Sul America contract so that it could say it had an international sale and installation of its WPC software.

- The contract was also segregated into three phases, the first two of which were only worth $2.5 million each. Because defendants knew that WPC was not designed for a company the size of Sul America, defendants knew that Sul America would be dissatisfied and that completion of all phases of the contract would not materialize.

(b)     It was common knowledge at INSpire that the Company's software products were not technologically or economically feasible. This was partially attributable to a staggering 30% turnover in employees in INSpire's IT department during 1996-1998. INSpire IT personnel

---

[3]     WPC is a policy and claims administration system that runs on a Windows client/server platform. It was first developed solely as an administration system for personal lines of homeowners auto insurance. It was not designed to be used with any other type of insurance. INSpire was attempting to expand WPC to handle other types of personal lines of insurance and also commercial lines. Although defendants sold WPC as a complete solution for the administration of both personal and commercial insurance lines, WPC had only been designed for personal auto insurance and was not yet capable of processing commercial lines.

- 26 -

APP 1007

who repeatedly told defendant Robinson that the INSpire products did not work were told by Robinson to "get with the program or get out the door." The chronic technological problems with INSpire's software products were so renowned that the phrase "smoke and mirrors" was commonly used by INSpire personnel in reference to the Company's software products. Throughout the Class Period, employees responsible for programming, employees in the IT department, managers and even defendant Gaines repeatedly used the phrase "smoke and mirrors" to describe the Company's software products.

(c)    INSpire engineers regularly read INSpire press releases detailing the Company's WPC and EmPower products and servicing capabilities and joked to one another, "I didn't know it could do that." In fact, the Company's products could *not* perform the tasks described in the press releases and defendants knew it. IT personnel at INSpire described the software side of INSpire's business as "a debacle since the beginning."

(d)    The "smoke and mirrors" at INSpire went so far that at least one INSpire officer directed the *faking* of demonstrations of the Company's software products to customers. On more than one instance, INSpire demonstrated its EmPower product on two computer monitors. One application of the program would appear on one monitor, while another application appeared on a separate monitor. Although the customer was given the impression that EmPower was processing on a single system, it was not. In fact, EmPower did not work and was incapable of performing both functions from a single system. Efforts by INSpire tech writers to fix the EmPower system yielded unsatisfactory results. The unsuccessful attempts to fix the product were known throughout INSpire management, including defendants.

(e)    Although INSpire's goal with its EmPower software product was simply to sell it outright to customers, this became impossible because EmPower never worked effectively. In fact, EmPower was so ineffective that when it was added to the INSpire network in 1997, it killed the network and INSpire was forced to spend six months and $300,000 to get its own network running properly. Thus, the EmPower product was nowhere near ready for sale and was of little use in outsourcing. EmPower was sold to insurance companies as a "paperless office" solution. EmPower was intended to image documents, scan the imaged documents optically to extract the text

- 27 -

APP 1008

from the documents, and then automatically send them to the PCA system to be processed. EmPower, however, never scanned the documents correctly due to a problem with the optical character recognition function. The software would not correctly recognize or record the characters that were written on a document that was imaged. EmPower would image a piece of paper but then send the image to the wrong place or simply lose the image entirely. Images were scanned but then stored with the wrong numbers. EmPower also took too long to retrieve the images, especially images stored on optical disk. EmPower was designed – unsuccessfully – for use with the PCA system on an AS400 platform. EmPower was later redesigned – again, unsuccessfully – to try to make it compatible with the WPC system. The interface between EmPower and the PCA system did not work, which caused problems in transferring information from EmPower to PCA and back again. Because the interface application did not work properly, if a person was using WPC or some other application on his computer and he wanted to use EmPower, he had to close the application he was using and open EmPower. Then, if he wanted to go back to the application he was using, he had to exit out of EmPower. Because of this problem, many people used two computers at the same time, one to run EmPower and one to do everything else. Originally, EmPower failed to correctly read either typed or handwritten information on a document. Eventually, the software was fixed so that it could recognize typewritten characters. However, INSpire could never get EmPower to correctly scan a document that had handwriting on it. For example, if a potential policyholder filled out an application by handwriting as opposed to typing, EmPower could not scan the application for character recognition. This was a critical flaw since most applications were, in fact, handwritten.

(f)    Although EmPower was represented to investors and customers alike as a turnkey solution to processing, defendants knew that the product could never work. Defendants knew EmPower did not work when INSpire bought it. Defendant Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower didn't work, INSpire would be sued. After two years, INSpire IT personnel were still "band-aiding" the character recognition function of EmPower and still never corrected this aspect of EmPower. Between one to three times per week, there were phone conferences between key INSpire executives in Fort Worth, Texas and Sheboygan, Wisconsin to discuss the chronic

- 28 -

APP 1009

problems with EmPower. Furthermore, EmPower was not designed for use with large third-party administrative work, although that is how INSpire marketed it. It was originally designed for small regional insurance companies. The original designer and developer of EmPower, SDS, designed the product for small networks only. INSpire therefore knew before the purchase of the EmPower system that EmPower was not designed for high volume networks and INSpire would have to modify the program to accommodate large users. This never happened. INSpire insiders, including, but not limited to, defendants Lynn, Robinson, and Dunham, were told repeatedly by INSpire programmers and developers that EmPower would never work as defendants had represented it to work.

(g)    Defendants represented throughout the Class Period that EmPower was an automated workflow management system which interfaced with other vendors' systems or insurers' proprietary systems to provide imaging and workflow management technology. Defendants, however, knew that EmPower was incapable of interfacing with other vendors' systems or insurers' proprietary systems.

(h)    INSpire's revenue growth was not indicative of strong demand for its products and services as revenue growth excluding sales to Millers Mutual was poor. INSpire was manipulating the amounts charged to Millers to improve INSpire's reported results. Sales to Millers Mutual were not indicative of demand for INSpire's products or services because Millers Mutual was motivated to help INSpire report as much revenue as possible to make Millers Mutual's investment in INSpire pay off.

(i)    Contrary to INSpire's representations, the increased competition in the insurance industry was not necessarily a positive for INSpire as it drove down premiums and profits for INSpire's customers which adversely affected INSpire.

(j)    INSpire's financial situation was deteriorating rather than improving as some of its large outsourcing agreements required significant investments in capacity to enable INSpire to provide the services required by the agreements. Moreover, revenues and earnings to be derived from new outsourcing contracts were highly uncertain due to INSpire's need to make substantial

- 29 -

APP 1010

capital investment in new capacity. At best, this need for substantial investment in new capacity reduced INSpire's visibility into future earnings.

(k)     INSpire's reported revenues and earnings were materially overstated due to improper revenue recognition, failure to write off uncollectible receivables, improper capitalization of software development costs and failure to write down SDS goodwill in violation of Generally Accepted Accounting Principles ("GAAP") as described in ¶¶119-42.

(l)     INSpire's new contracts would not provide increased revenue or earnings visibility as those new contracts provided that INSpire's compensation was based solely on its customers' profitability, which made any revenue or earnings to be derived from these new agreements uncertain at best.

(m)     Software and software services would be responsible for an increasing portion of future earnings as outsourcing profits were uncertain, and because software sales were very uncertain INSpire could not and did not have increasing visibility into future earnings. Furthermore, because INSpire's software products consisted of little more than "smoke and mirrors," defendants knew that future software sales were unlikely to materialize.

(n)     As a result of the aforementioned factors, the defendants actually knew that their forecasts of 40% earnings growth in 1999 to $0.86 were in fact unreasonable and false.

58.     On April 22, 1998, INSpire reported record earnings for its 1stQ98. The release also stated:

> Revenues rose to $18.4 million vs. $8.2 million in the 1997 first quarter. Net earnings were $2.3 million, or $.20 per diluted share ($.22 per basic share), compared to a loss of $3.5 million, or $.50 per diluted share ($.50 per basic share), for the comparable quarter last year.
>
> *   *   *
>
> "The first quarter of 1998 was extremely significant for INSpire Insurance Solutions," said F. George Dunham III, president, chairman and chief executive officer, INSpire Insurance Solutions.
>
> "We signed the company's largest software contract to date, with Sul America, the largest property and casualty insurance company in Brazil, and completed a successful follow-on public offering that raised $44 million."

Dunham and Gaines are each listed as contact persons on this press release.

APP 1011

59.     On April 23, 1998, subsequent to the release of its 1stQ98 results, INSpire held a conference call for analysts, money and portfolio managers, institutional investors and large INSpire shareholders to discuss INSpire's 1stQ results, its business and its prospects. During the call – and in follow-up conversations with analysts – Dunham and/or Gaines stated:

•     Outsourcing revenues continued to gain momentum and the pipeline for new outsourcing contracts was healthy with 44 prospects worth $4 million in annual revenues.

•     Software sales were also increasing dramatically and the Company had 80 prospects including five in the latter stages of negotiation. These five alone represented about $26 million in annual revenues.

•     The Paragon acquisition had been successfully completed, and with funds from the offering, INSpire was going to make other acquisitions.

•     The transition to more direct sales had been completed and would begin to contribute successfully to results in the near term.

•     INSpire was on track to report EPS of $0.59 and $0.83 in 1998 and 1999, respectively.

60.     On April 24, 1998, Southwest Securities issued a report on INSpire by Brett Pope, which was based on and repeated information provided to Pope by the 1stQ conference call and in follow-up conversations with Dunham or Gaines. The report forecast 1998 and 1999 EPS of $0.59 and $0.83. It also stated:

Outsourcing revenue increased 50% to $10.1MM with gross margin increasing approximately 140 basis points sequentially to 44.4%. The pipeline for outsourcing prospects looks healthy with a total of 44 prospects worth about $44MM in annual revenue. Four of these prospects are in the final stages of negotiation.

Software revenue increased over 600% to $7.6MM with gross margins declining about 270 basis points to 46.5%. The decline in gross margins appears to be a result of the company's startup of the Sul America contract in Brazil. Management expects the margins to return back closer to Q497 levels in the next few quarters. The number of software prospects is 80 with five in the latter stages of negotiation. These five prospects represent about $26MM in annual revenues.

The company appears to be on target for continued revenue and earnings growth. The direct sales team has been completed and should begin producing results shortly. In addition, the company's Paragon Interface acquisition has been completed. We believe the company is on the hunt for some additional acquisitions to further bolster growth. The company had $28MM in cash at the end of Q1, and is due an additional $44MM from its recent offering.

APP 1012

61.     On May 14, 1998, INSpire filed its SEC Form 10-Q for the 1stQ98, the quarter ended March 31, 1998.  This 10-Q included the financial results previously reported and was signed by defendants Dunham and Gaines.

62.     On May 18, 1998, INSpire announced in a press release an agreement with the Kemper Insurance Companies for policy and claims administration services, adding to INSpire's growing outsourcing customer base for personal lines insurance.  The release stated:

> INSpire will provide information technology, policy administration and claims processing services in support of this venture.  Utilizing INSpire's PCA and EmPower software, which automate image/workflow and rating/issuance functions, Kemper Enterprise Group will significantly lower the cost of personal lines insurance to its customers and agents.
>
> "Partnering with the premier insurance company such as Kemper is an excellent step in the continued expansion of INSpire's outsourcing business," said Bill Smith, president and chief operating officer, INSpire Insurance Solutions.

Smith is listed as the contact person on this press release.

63.     On May 19, 1998, Raymond James issued a report on INSpire written by Bove which was based on and repeated statements made to Bove by INSpire management.  The report rated INSpire a "Buy" and stated:

> •     INSpire Insurance Solutions announced a new agreement with Kemper Insurance Companies.  It appears that Kemper will establish a new direct response insurance division and INSpire will do the outsourcing for this business.
>
> •     We believe the contract may ultimately be worth $10 million in revenue over a three-year period.  At the moment, the earnings estimate for INSpire will not be adjusted.
>
> •     This contract win represents a major success for INSpire.  The competition was stringent and Kemper may be the largest client that INSpire has attracted to date.  INSpire's stock is rated BUY (1).

64.     On June 5, 1998, INSpire announced in a press release an agreement with Orlando-based Atlantic Preferred Insurance Company for policy and claims administration services.  The release stated:

> INSpire will provide outsourcing solutions, including integrated policy and claims administration services, to administer policies that were taken out of the Florida Residential Property and Casualty Joint Underwriting Association (FRPCJUA) by Atlantic Preferred.

*   *   *

- 32 -

APP 1013

> "Atlantic Preferred's long-term strategy of expanding beyond the FRPCJUA business makes them a natural partner for INSpire," said Bill Smith, president and COO of INSpire Insurance Solutions. "This agreement underscores our commitment to being the preferred provider of policy and claims administration outsourcing services to the property and casualty industry."

Smith is listed as the contact person on this press release.

65.     On July 22, 1998, INSpire announced new agreements with Harbor Insurance, Orion Capital Companies and Patterson Insurance Company.

> "Our value to Harbor is our knowledge of their business and our ability to react to their timetable. *Meeting our commitments is our first priority*," said Jeff Robinson, executive vice president of outsourcing, INSpire Insurance Solutions.

> "We are extremely pleased to be chosen by Harbor Insurance Group as their outsourcing partner in providing policy and claims administration. This agreement underscores INSpire's ability to enable insurance companies like Harbor to capitalize quickly on new market opportunities," said Bill Smith, president and COO, INSpire Insurance Solutions.

> \* \* \*

> "INSpire's ability to help businesses move quickly into new markets is one of the greatest values to businesses like Patterson Insurance. *We meet our commitments to customers so that they can focus on their strategic plans*," said Bill Smith, president and COO of INSpire Insurance Solutions.

Smith is listed as the contact person on these press releases.

66.     On July 22, 1998, INSpire announced "record" results for the 2ndQ98 in a press release which stated:

> Revenues rose to a record $21.0 million vs. $15.1 million in the 1997 second quarter. Net earnings were $1.1 million, or $.08 per diluted share ($.09 per basic share), compared to earnings of $639,000, or $.08 per diluted share ($.09 per basic share), for the comparable quarter last year. Included in this year's quarter is a $2.0 million write-off of purchased research and development associated with the purchase of Paragon Interface, Inc. in April 1998. Excluding the effect of this write-off, for which there is no tax effect, earnings would have been a record $3.1 million, or a $.23 per diluted share ($.25 per basic share).

> \* \* \*

> "We made several strategic moves this quarter that position INSpire for continued success. Acquiring Paragon Interface has expanded INSpire's technological capabilities to include data translation. The addition of Bill Smith as INSpire's new president and COO improves our operational, marketing and strategic capabilities. Several new outsourcing contracts which closed this quarter continue to validate the insurance market's need to reduce costs and improve efficiency through third-party administration," said F. George Dunham III, chairman and chief executive officer, INSpire Insurance Solutions.

- 33 -

APP 1014

67.     On August 4, 1998, *Investor's Business Daily* published an article on INSpire authored by Alan R. Elliott.  The article stated in part:

> [N]ew companies are crowding into a field already packed with 2,500 players.  And that's forced established insurers to find new ways to stay competitive.
>
> Both sides of the battle are slashing premium prices.  Both sides are clamoring for software and services like those provided by Inspire.
>
> "The price cutting going on in the industry is just staggering," said analyst Richard Bove of Raymond James & Associates.  "We're not talking about 3% or 4%; we're talking about 30%."
>
> Flush with capital, established insurers are investing in divisions that often sell only one high-risk line of insurance.  As these "mono-line" operations fan out state-to-state, insurers are automating to keep costs down.
>
> "We are seeing tremendous segmentation within the insurance companies," Bove said.  "That is creating demand for outsourcing services that never existed before in this business."
>
> One indication of the demand is Inspire's revenue, which shot up 307% last year to $57 million.  Analysts expect revenue to climb another 51% to $86 million in '98.
>
> Still, the untapped opportunity is huge.  U.S. banks, for instance, spend about 11% of annual revenue on technology.  In contrast, technology spending among insurance firms is only about 3% of annual premium revenues, or $12 billion in '97.
>
> But insurers are catching on, Bove says.  Technology investment should top $27 billion by '01.
>
> "What that means is every company that sells technology to insurance companies has got more business than it can handle," he said.
>
> Inspire handles everything from policy and claims administration to customer and information-technology services.  It assesses risk, fields loss claims and even investigates fraud.
>
> Inspire went public in August '97.  It started out as a highly automated unit of Millers Mutual Fire Insurance Co.  The company entered the software and systems business in March '97, when it bought Strategic Data Systems Inc. for $18 million.
>
> Dunham, former president of Millers, saw an industry need for such services.  "There is no top-line growth in the property and casualty industry right now," he said.  "So there is a real inward focus on cutting costs."
>
> *   *   *
>
> To meet increasing demand, Inspire is turning to acquisitions.
>
> It bought Paragon Interface Inc. in April for $4.3 million.  Paragon lets insurers and their agents transfer documents electronically.  Sounds simple, but most insurers have yet to take the step, Dunham says.

- 34 -

APP 1015

More important, Paragon helps Inspire convert clients' legacy systems quickly.

"Companies are afraid of disrupting their business," Dunham said. "If you can say the transition is going to be a three-month process, not a nine-month process, your likelihood of selling goes up astronomically."

Inspire's main rival is Policy Management Systems Corp., which had $582 million in '97 sales. Other competitors include Lindsey Morden Claims Services Inc. and Crawford & Co.

Inspire relies on its insurance industry roots to win contracts, Dunham says. "The biggest advantage we have is that we go up against people who are first and foremost technologists," he said. "We approach all our business opportunities as insurance people."

In the second quarter, Inspire signed deals with Harbor Insurance Group, Patterson Insurance and the Guaranty National unit of Orion Capital Corp.

The company's second-quarter earnings rose 44% to 23 cents a share. Revenue climbed 39% to $20.9 million.

Analysts expect earnings to rise 59% to 92 cents a share in '98 and another 37% to $1.26 in '99, First Call says. Inspire trades as NSPR near 35.

68. On August 14, 1998, INSpire filed its SEC Form 10-Q for the 2ndQ98, the quarter ended June 30, 1998. This 10-Q included the financial results previously reported and was signed by defendants Dunham and Gaines.

69. Each of the positive statements about INSpire's business made during the Class Period between April 22, 1998-August 14, 1998, as set forth in ¶¶58-68, was false when issued. Each such statement failed to disclose the following information about adverse conditions in and then impacting INSpire's business, disclosure of which was required to make those statements made not misleading, and which information was then known only to defendants due to their access to internal INSpire data:

(a) INSpire omitted crucial details about the Sul America contract which would have significantly affected the market's perception of the contract:

- The Company was required to arrange a surety to provide Sul America with a performance bond in the amount of $3.7 million, the proceeds of which could be used in the event that the Company did not fulfill its obligations under the contract. Thus, INSpire's ability to complete the contract was in so much doubt that it had to post a surety bond to guarantee its performance. Ultimately, Sul America terminated its contract with INSpire and demanded payment under the performance bond due to INSpire's default under the contract.

- 35 -

APP 1016

- INSpire also failed to disclose that WPC was designed only for small companies *not* for companies as large as Sul America. Defendants knew that the volume at large companies was simply too much for the WPC system to handle. Senior installers told defendants that what INSpire was attempting with WPC at Sul America was an impossibility. Nor did INSpire reveal that its own IT personnel told INSpire management repeatedly that it was, in effect, installing nothing more than a test product at Sul America.

- INSpire agreed to underwrite all of the installation costs on the Sul America contract so that it could say it had an international sale and installation of its WPC software.

- The contract was also segregated into three phases, the first two of which were only worth $2.5 million each. Because defendants knew that WPC was not designed for a company the size of Sul America, defendants knew that Sul America would be dissatisfied and that completion of all phases of the contract would not materialize.

(b)      It was common knowledge at INSpire that the Company's software products were not technologically or economically feasible. This was partially attributable to a staggering 30% turnover in employees in INSpire's IT department during 1996-1998. INSpire IT personnel who repeatedly told defendant Robinson that the INSpire products did not work were told by Robinson to "get with the program or get out the door." The chronic technological problems with INSpire's software products were so renowned that the phrase "smoke and mirrors" was commonly used by INSpire personnel in reference to the Company's software products. Throughout the Class Period, employees responsible for programming, employees in the IT department, managers and even defendant Gaines repeatedly used the phrase "smoke and mirrors" to describe the Company's software products.

(c)      INSpire engineers regularly read INSpire press releases detailing the Company's WPC and EmPower products and servicing capabilities and joked to one another, "I didn't know it could do that." In fact, the Company's products could *not* perform the tasks described in the press releases and defendants knew it. IT personnel at INSpire described the software side of INSpire's business as "a debacle since the beginning."

(d)      The "smoke and mirrors" at INSpire went so far that at least one INSpire officer directed the *faking* of demonstrations of the Company's software products to customers. On more than one instance, INSpire demonstrated its EmPower product on two computer monitors. One application of the program would appear on one monitor, while another application appeared on a separate monitor. Although the customer was given the impression that EmPower was processing

- 36 -

APP 1017

on a single system, it was not. In fact, EmPower did not work and was incapable of performing both functions from a single system. Efforts by INSpire tech writers to fix the EmPower system yielded unsatisfactory results. The unsuccessful attempts to fix the product were known throughout INSpire management, including defendants.

(e)     Although INSpire's goal with its EmPower software product was simply to sell it outright to customers, this became impossible because EmPower never worked effectively. In fact, EmPower was so ineffective that when it was added to the INSpire network in 1997, it killed the network and INSpire was forced to spend six months and $300,000 to get its own network running properly. Thus, the EmPower product was nowhere near ready for sale and was of little use in outsourcing. EmPower was sold to insurance companies as a "paperless office" solution. EmPower was intended to image documents, scan the imaged documents optically to extract the text from the documents, and then automatically send them to the PCA system to be processed. EmPower, however, never scanned the documents correctly due to a problem with the optical character recognition function. The software would not correctly recognize or record the characters that were written on a document that was imaged. EmPower would image a piece of paper but then send the image to the wrong place or simply lose the image entirely. Images were scanned but then stored with the wrong numbers. EmPower also took too long to retrieve the images, especially images stored on optical disk. EmPower was designed – unsuccessfully – for use with the PCA system on an AS400 platform. EmPower was later redesigned – again, unsuccessfully – to try to make it compatible with the WPC system. The interface between EmPower and the PCA system did not work, which caused problems in transferring information from EmPower to PCA and back again. Because the interface application did not work properly, if a person was using WPC or some other application on his computer and he wanted to use EmPower, he had to close the application he was using and open EmPower. Then, if he wanted to go back to the application he was using, he had to exit out of EmPower. Because of this problem, many people used two computers at the same time, one to run EmPower and one to do everything else. Originally, EmPower failed to correctly read either typed or handwritten information on a document. Eventually, the software was fixed so that it could recognize typewritten characters. However, INSpire could never get EmPower to

APP 1018

correctly scan a document that had handwriting on it. For example, if a potential policyholder filled out an application by handwriting as opposed to typing, EmPower could not scan the application for character recognition. This was a critical flaw since most applications were, in fact, handwritten.

(f)    Although EmPower was represented to investors and customers alike as a turnkey solution to processing, defendants knew that the product could never work. Defendants knew EmPower did not work when INSpire bought it. Defendant Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower didn't work, INSpire would be sued. After two years, INSpire IT personnel were still "band-aiding" the character recognition function of EmPower and still never corrected this aspect of EmPower. Between one to three times per week, there were phone conferences between key INSpire executives in Fort Worth, Texas and Sheboygan, Wisconsin to discuss the chronic problems with EmPower. Furthermore, EmPower was not designed for use with large third-party administrative work, although that is how INSpire marketed it. It was originally designed for small regional insurance companies. The original designer and developer of EmPower, SDS, designed the product for small networks only. INSpire therefore knew before the purchase of the EmPower system that EmPower was not designed for high volume networks and INSpire would have to modify the program to accommodate large users. This never happened. INSpire insiders, including, but not limited to, defendants Lynn, Robinson, and Dunham, were told repeatedly by INSpire programmers and developers that EmPower would never work as defendants had represented it to work.

(g)    Defendants represented throughout the Class Period that EmPower was an automated workflow management system which interfaced with other vendors' systems or insurers' proprietary systems to provide imaging and workflow management technology. Defendants, however, knew that EmPower was incapable of interfacing with other vendors' systems or insurers' proprietary systems.

(h)    INSpire's revenue growth was not indicative of strong demand for its products and services as revenue growth excluding sales to Millers Mutual was poor. INSpire was manipulating the amounts charged to Millers to improve INSpire's reported results. Sales to Millers

- 38 -

APP 1019

Mutual were not indicative of demand for INSpire's products or services because Millers Mutual was motivated to help INSpire report as much revenue as possible to make Millers Mutual's investment in INSpire pay off.

(i)     Contrary to INSpire's representations, the increased competition in the insurance industry was not necessarily a positive for INSpire as it drove down premiums and profits for INSpire's customers which adversely affected INSpire.

(j)     INSpire's financial situation was deteriorating rather than improving as some of its large outsourcing agreements required significant investments in capacity to enable INSpire to provide the services required by the agreements.  Moreover, revenues and earnings to be derived from new outsourcing contracts were highly uncertain due to INSpire's need to make substantial capital investment in new capacity.  At best, this need for substantial investment in new capacity reduced INSpire's visibility into future earnings.

(k)     INSpire's reported revenues and earnings were materially overstated due to improper revenue recognition, failure to write off uncollectible receivables, improper capitalization of software development costs and failure to write down SDS goodwill in violation of GAAP as described in ¶¶119-42.

(l)     INSpire's new contracts would not provide increased revenue or earnings visibility as those new contracts provided that INSpire's compensation was based solely on its customers' profitability, which made any revenue or earnings to be derived from these new agreements uncertain at best.

(m)     Software and software services would be responsible for an increasing portion of future earnings as outsourcing profits were uncertain, and because software sales were very uncertain INSpire could not and did not have increasing visibility into future earnings.  Furthermore, because INSpire's software products consisted of little more than "smoke and mirrors," defendants knew that future software sales were unlikely to materialize.

(n)     INSpire had taken an excessive charge for purchased research and development in connection with its acquisition of Paragon, writing off $2 million rather than the

- 39 -

APP 1020

$400,000 which should have been recognized. Thus, INSpire was understating the goodwill amortization charge which should have been expensed in every quarter after the acquisition.

(o)    As a result of the aforementioned factors, the defendants actually knew that their forecasts of 40% earnings growth in 1999 to $0.86 were in fact unreasonable and false.

70.    On September 28, 1998, INSpire announced two new software sales contracts with Minnesota Property Insurance Placement Facility and an unnamed national property and casualty insurance company.

71.    Also on September 28, 1998, Donaldson Lufkin & Jenrette initiated a "Buy" rating for INSpire. A 12-month target price was set at $28. The report, which was based on analyst Steven Ossad's conversations with INSpire management, stated that INSpire would benefit from an anticipated 25% annual growth in outsourcing within parts of the insurance industry.

72.    In a September 29, 1998 report, analyst Sean C. Davis of Ferris Baker Watts, Inc. concluded, "a recent conversation with management supports our confidence in the company's 3Q performance, and a longer term prospect for INSpire. As such, we would use the stocks' recent weakness as a buying opportunity."

73.    On October 21, 1998, INSpire issued a press release announcing its September 30, 1998 quarterly results:

> INSpire Insurance Solutions, Inc. (Nasdaq:NSPR) reported today record revenues and profits for the third quarter ended September 30, 1998.
>
> Revenues rose to a record $22.1 million for the 1998 third quarter vs. $15.2 million for the 1997 third quarter. Net earnings were a record $3.2 million, or $.16 per diluted share ($.18 per basic share), compared to earnings of $2.5 million, or $.18 per diluted share ($.20 per basic share), for  the comparable quarter last year....
>
> *   *   *
>
> "The third quarter of 1998 demonstrates the continuing success and strong acceptance of INSpire Insurance Solutions. In addition to our record revenues and earnings, the period was highlighted by the announcement of our largest software contract to date, the implementation of several new outsourcing customers and the addition of John Aldredge as our new senior vice president of research and development," said F. George Dunham III, chairman and chief executive officer, INSpire Insurance Solutions.

- 40 -

APP 1021

74.    INSpire also announced a new agreement with Pembroke Management Agents for policy and claims administration services.

75.    On November 1, 1998, INSpire announced the Company had entered into a 10-year outsourcing agreement with California-based Arrowhead:

> Under this agreement, Arrowhead General Insurance Agency, Inc. and Arrow Claims Management, Inc. will receive INSpire's complete policy and claims administration services *for more than $200 million in direct written premium*. At the center of the outsourcing agreement is the integrated technology developed by INSpire. The technology enables a paperless environment for companies that choose INSpire as an outsourcing partner.
>
> To ensure a seamless transition and continued focus on service, Arrowhead will transfer approximately 500 employees along with the assets of Arrow Claims Management, Inc. to INSpire. The Arrowhead facility, located in *San Diego, Calif., will become the INSpire West Coast Processing Center*.
>
> As a result of this fundamentally innovative decision by Arrowhead, the company's operations will be handled by INSpire, whose technology and expert processes will afford enhancements and efficiencies to existing service levels. Arrowhead now will turn its complete focus to product development, marketing and building new relationships.
>
> *    *    *
>
> "One of the real benefits for INSpire in this alliance is the addition of 500 skilled insurance professionals who will greatly enhance the depth and range of resources within our organization. We fully intend to become the leading provider of outsourcing services to the property and casualty industry, and will achieve this by continuing to add to the talent and knowledge base of INSpire," said Bill Smith, president and chief operating officer, INSpire Insurance Solutions.

Dunham is listed as the contact person on this press release.

76.    In connection with the release announcing the agreement with Arrowhead, defendants Dunham and Smith spoke to securities analysts, money and portfolio managers, institutional investors, large shareholders, brokers and stock traders to discuss the merger and INSpire's business and prospects. During these conversations with analysts, Dunham and Smith directly disseminated important information into the market, stating:

•    The deal would add $0.05 per share to 1999 earnings and beyond that so that the Company would be on track to report EPS of $1.20 in 2000.

•    The cost to INSpire for the Arrowhead operations would be $28 million in cash and stock options which operations would generate $35 million in year one revenues.

•    It would allow INSpire to expand geographically into California.

- 41 -

APP 1022

•    The deal would help attract other similar large deals which would allow the Company to grow even faster.

•    The deal would be accretive to 1999 earnings.

•    The deal was INSpire's largest, in terms of direct premiums written ("DPW").

•    SDS operations were improving due to organizational changes and cost control efforts.

77.    On November 2, 1998, Raymond James issued a report on INSpire written by Bove, which was based on and repeated information provided to Bove in conversations with Dunham or Smith.  The report forecast 1999 and 2000 EPS of $0.90 and $1.20, and a 40% three- to five-year growth rate.  It also stated:

> •    INSpire Insurance Solutions announced today that it had signed a 10-year outsourcing agreement with the Arrowhead Group of Companies.  This deal could add $0.05 per share to earnings in 1999 and beyond so we increased the 1999 estimate to $0.90 per share.  Preliminarily, we believe this company can earn $1.20 per share in the year 2000.
>
> •    The outsourcing deal will create a number of impact on INSpire's revenues. It will add $20 million in net revenues in 1999.  It will result in the lower margins across the board since INSpire will now be operating a new facility in San Diego.

*    *    *

> Overall, the Arrowhead contract represents a major leap forward for INSpire. The company is now a true outsourcer with facilities management capability. INSpire's management continues to demonstrate that it has the ability to operate a fast growing company that will take advantage of the substantial opportunities in its sector.

78.    On November 3, 1998, Southwest Securities issued a report on INSpire written by Manuel Royo, which was based on and repeated information provided to Royo in conversations with Dunham or Smith.  The report forecast 1999 EPS of $0.82 and a 50% three- to five-year growth rate. It also stated:

> INSpire announced yesterday the company has entered into an agreement with California-based Arrowhead Group that includes a 10-year outsourcing contract and the acquisition of certain claims and policy administration operating assets. With more than $200 million in direct written premiums (DWP) per year, Arrowhead Group is one of the nation's largest privately held insurance general agencies.  Some financial highlights disclosed:
>
> •    INSpire to pay an estimated $28 million in cash and stock options: The company acquires Arrowhead's claims administration assets and a portion of its policy administration operations. Also, INSpire will create its West Coast Processing Center to be staffed by the 500 San Diego-based Arrowhead employees transferred

- 42 -

APP 1023

to INSpire. The deal will be treated as a purchase, which creates a goodwill asset in INSpire's balance sheet.

- Outsourcing contract to generate close to $35 million in revenue in Year 1: INSpire typically generates 15% per year of its customer's DWP base from IT outsourcing. The 10-year contract allows INSpire to expand geographically into the West Coast, specifically into the attractive California market.

* * *

- Key step as INSpire targets insurance carriers: Arrowhead represents by far the company's largest IT outsourcing customer in terms of DWP base. As INSpire focuses its marketing efforts on larger insurers, we believe large long-term outsourcing contracts such as the Arrowhead deal could follow near-term.

79. On November 16, 1998, Ferris Baker Watts issued a report on INSpire written by S.C. Davis, which was based on and repeated information provided to Davis in conversations with Dunham or Smith. The report forecast 1999 and 2000 EPS of $0.91 and $1.23, and a 35% three- to five-year growth rate. It also stated:

- Arrowhead announcement strengthens our confidence level in outsourcing efforts. This contract, which represents NSPR's largest outsourcing deal to date, could represent between $400 to $700 million in additional revenues for NSPR over the 10 year life of the contract. For this reason we raised our CY99 estimate $0.07 to $0.91 in an earlier note.

- Efforts to improve the efficiency of its core software and software services business are continuing. Organizational changes and expense controls are currently in place at the former SDS operation, the base of NSPR's IT operation. Productivity rates are likely to improve.

- Prospects for CY99 and CY00 look strong. We believe continued internal and external growth will fuel our projected top and bottom-line growth rates of 35%. Our forecast calls for slight margin expansion in CY00 over CY99. We are initiating a CY00 EPS estimate of $1.23.

- Reiterate buy recommendation. Earnings estimates for CY98 and CY99 remain $0.62 and $0.91, respectively. We believe our CY99 and CY00 estimates could prove to be conservative given the company's robust client pipeline. We are raising our 18 month price objective to $40. This target is based on the stock trading at 32x our CY00 estimate, a multiple consistent with our estimated revenue and EPS growth estimates.

* * *

We view this announcement as an extraordinary development for NSPR. Assuming no or little growth at Arrowhead, we anticipate the revenue contribution of this relationship to approximate $400 million over the 10 year life of the contract. Factoring in a 15% growth rate, revenues could expand to $700 million. This is a dramatic addition to NSPR's existing revenue base.

* * *

- 43 -

APP 1024

During recent investor meetings that we sponsored, management addressed efficiency gains that can be anticipated with this venture. The 500 Arrowhead employees being transferred to NSPR process $200 million a year in policies and claims. We compare this with NSPR's Ft. Worth, TX operation where 200 employees process $700 million in policies and claims. Although it is likely NSPR will eliminate some of the overhead that exists at Arrowhead, management believes it will be able to leverage much of Arrowhead's existing infrastructure as the business expands.

80. Based on defendants' statements, INSpire's stock price increased to as high as $35-3/8. Defendants Dunham, Gaines, Lynn and Robinson took advantage of this inflation, selling 106,150 shares of their stock for $3.2 million.

81. Each of the positive statements about INSpire's business made during the Class Period between September 28, 1998-November 16, 1998, as set forth in ¶¶70-80, was false when issued. Each such statement failed to disclose the following information about adverse conditions in and then impacting INSpire's business, disclosure of which was required to make the statements made not misleading, and which information was then known only to defendants due to their access to internal INSpire data:

(a) INSpire omitted crucial details about the Sul America contract which would have significantly affected the market's perception of the contract:

- The Company was required to arrange a surety to provide Sul America with a performance bond in the amount of $3.7 million, the proceeds of which could be used in the event that the Company did not fulfill its obligations under the contract. Thus, INSpire's ability to complete the contract was in so much doubt that it had to post a surety bond to guarantee its performance. Ultimately, Sul America terminated its contract with INSpire and demanded payment under the performance bond due to INSpire's default under the contract.

- INSpire also failed to disclose that WPC was designed only for small companies, **not** for companies as large as Sul America. Defendants knew that the volume at large companies was simply too much for the WPC system to handle. Senior installers told defendants that what INSpire was attempting with WPC at Sul America was an impossibility. Nor did INSpire reveal that its own IT personnel told INSpire management repeatedly that it was, in effect, installing nothing more than a test product at Sul America.

- INSpire agreed to underwrite all of the installation costs on the Sul America contract so that it could say it had an international sale and installation of its WPC software.

- The contract was also segregated into three phases, the first two of which were only worth $2.5 million each. Because defendants knew that WPC was not designed for a company the size of Sul America, defendants knew that Sul America would be dissatisfied and that completion of all phases of the contract would not materialize.

- 44 -

APP 1025

(b)    It was common knowledge at INSpire that the Company's software products were not technologically or economically feasible. This was partially attributable to a staggering 30% turnover in employees in INSpire's IT department during 1996-1998. INSpire IT personnel who repeatedly told defendant Robinson that the INSpire products did not work were told by Robinson to "get with the program or get out the door." The chronic technological problems with INSpire's software products were so renowned that the phrase "smoke and mirrors" was commonly used by INSpire personnel in reference to the Company's software products. Throughout the Class Period, employees responsible for programming, employees in the IT department, managers and even defendant Gaines repeatedly used the phrase "smoke and mirrors" to describe the Company's software products.

(c)    INSpire engineers regularly read INSpire press releases detailing the Company's WPC and EmPower products and servicing capabilities and joked to one another, "I didn't know it could do that." In fact, the Company's products could *not* perform the tasks described in the press releases and defendants knew it. IT personnel at INSpire described the software side of INSpire's business as "a debacle since the beginning."

(d)    The "smoke and mirrors" at INSpire went so far that at least one INSpire officer directed the *faking* of demonstrations of the Company's software products to customers. On more than one instance, INSpire demonstrated its EmPower product on two computer monitors. One application of the program would appear on one monitor, while another application appeared on a separate monitor. Although the customer was given the impression that EmPower was processing on a single system, it was not. In fact, EmPower did not work and was incapable of performing both functions from a single system. Efforts by INSpire tech writers to fix the EmPower system yielded unsatisfactory results. The unsuccessful attempts to fix the product were known throughout INSpire management, including defendants.

(e)    Although INSpire's goal with its EmPower software product was simply to sell it outright to customers, this became impossible because EmPower never worked effectively. In fact, EmPower was so ineffective that when it was added to the INSpire network in 1997, it killed the network and INSpire was forced to spend six months and $300,000 to get its own network

- 45 -

APP 1026

running properly. Thus, the EmPower product was nowhere near ready for sale and was of little use in outsourcing. EmPower was sold to insurance companies as a "paperless office" solution. EmPower was intended to image documents, scan the imaged documents optically to extract the text from the documents, and then automatically send them to the PCA system to be processed. EmPower, however, never scanned the documents correctly due to a problem with the optical character recognition function. The software would not correctly recognize or record the characters that were written on a document that was imaged. EmPower would image a piece of paper but then send the image to the wrong place or simply lose the image entirely. Images were scanned but then stored with the wrong numbers. EmPower also took too long to retrieve the images, especially images stored on optical disk. EmPower was designed – unsuccessfully – for use with the PCA system on an AS400 platform. EmPower was later redesigned – again, unsuccessfully – to try to make it compatible with the WPC system. The interface between EmPower and the PCA system did not work, which caused problems in transferring information from EmPower to PCA and back again. Because the interface application did not work properly, if a person was using WPC or some other application on his computer and he wanted to use EmPower, he had to close the application he was using and open EmPower. Then, if he wanted to go back to the application he was using, he had to exit out of EmPower. Because of this problem, many people used two computers at the same time, one to run EmPower, and one to do everything else. Originally, EmPower failed to correctly read either typed or handwritten information on a document. Eventually, the software was fixed so that it could recognize typewritten characters. However, INSpire could never get EmPower to correctly scan a document that had handwriting on it. For example, if a potential policyholder filled out an application by handwriting as opposed to typing, EmPower could not scan the application for character recognition. This was a critical flaw since most applications were, in fact, handwritten.

(f)    Although EmPower was represented to investors and customers alike as a turnkey solution to processing, defendants knew that the product could never work. Defendants knew EmPower did not work when INSpire bought it. Defendant Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower didn't work, INSpire would be sued. After two years, INSpire IT personnel

- 46 -

APP 1027

were still "band-aiding" the character recognition function of EmPower and still never corrected this aspect of EmPower. Between one to three times per week, there were phone conferences between key INSpire executives in Fort Worth, Texas and Sheboygan, Wisconsin to discuss the chronic problems with EmPower. Furthermore, EmPower was not designed for use with large third-party administrative work, although that is how INSpire marketed it. It was originally designed for small regional insurance companies. The original designer and developer of EmPower, SDS, designed the product for small networks only. INSpire therefore knew before the purchase of the EmPower system that EmPower was not designed for high volume networks and INSpire would have to modify the program to accommodate large users. This never happened. INSpire insiders, including, but not limited to, defendants Lynn, Robinson, and Dunham, were told repeatedly by INSpire programmers and developers that EmPower would never work as defendants had represented it to work.

(g)    Defendants represented throughout the Class Period that EmPower was an automated workflow management system which interfaced with other vendors' systems or insurers' proprietary systems to provide imaging and workflow management technology. Defendants, however, knew that EmPower was incapable of interfacing with other vendors' systems or insurers' proprietary systems.

(h)    INSpire's revenue growth was not indicative of strong demand for its products and services as revenue growth excluding sales to Millers Mutual was poor. INSpire was manipulating the amounts charged to Millers to improve INSpire's reported results. Sales to Millers Mutual were not indicative of demand for INSpire's products or services because Millers Mutual was motivated to help INSpire report as much revenue as possible to make Millers Mutual's investment in INSpire pay off.

(i)    Contrary to INSpire's representations, the increased competition in the insurance industry was not necessarily a positive for INSpire as it drove down premiums and profits for INSpire's customers which adversely affected INSpire.

(j)    INSpire's financial situation was deteriorating rather than improving as some of its large outsourcing agreements required significant investments in capacity to enable INSpire

- 47 -

to provide the services required by the agreements. Moreover, revenues and earnings to be derived from new outsourcing contracts were highly uncertain due to INSpire's need to make substantial capital investment in new capacity. At best, this need for substantial investment in new capacity reduced INSpire's visibility into future earnings.

(k)     INSpire's reported revenues and earnings were materially overstated due to improper revenue recognition, failure to write off uncollectible receivables, improper capitalization of software development costs and failure to write down SDS goodwill in violation of GAAP as described in ¶¶119-42.

(l)     INSpire's new contracts would not provide increased revenue or earnings visibility as those new contracts provided that INSpire's compensation was based solely on its customers' profitability, which made any revenue or earnings to be derived from these new agreements uncertain at best.

(m)     Software and software services would be responsible for an increasing portion of future earnings as outsourcing profits were uncertain, and because software sales were very uncertain INSpire could not and did not have increasing visibility into future earnings. Furthermore, because INSpire's software products consisted of little more than "smoke and mirrors," defendants knew that future software sales were unlikely to materialize.

(n)     INSpire had taken an excessive charge for purchased research and development in connection with its acquisition of Paragon, writing off $2 million rather than the $400,000 which should have been recognized. Thus, INSpire was understating the goodwill amortization charge which should have been expensed in every quarter after the acquisition.

(o)     The Arrowhead deal would require a major infusion of money to make it profitable and would not provide earnings to INSpire for at least a year.

(p)     Arrowhead was not servicing enough policies to generate anywhere close to $35 million in revenue in year one under the contract. There were approximately 20,000 policies involved with the Arrowhead deal and this number of policies could not possibly generate $35 million in revenue for INSpire.

- 48 -

APP 1029

(q)    INSpire was completely unprepared to handle a project as large as Arrowhead. INSpire did not have employees qualified to install a product for a company such as Arrowhead. Furthermore, the products sold to Arrowhead were not designed to service a company of Arrowhead's size.

(r)    Ultimately, INSpire was forced to lay off close to 10% of its workers due to INSpire's need to discontinue its efforts to develop licensed software packages. The Company's software services and licensing business deteriorated until this layoff became necessary.

(s)    As a result of the aforementioned factors, the defendants actually knew that their forecasts of 40% earnings growth in 1999 to $0.86 and in 2000 to $1.20+ were in fact unreasonable and false.

82.    On December 11, 1998, INSpire issued a release revising downward its earnings estimates:

INSpire Insurance Solutions, Inc. (Nasdaq:NSPR) announced today that the company has revised the earnings guidance provided to analysts for 1999 from $0.90 per share to $0.84 per share. Earnings estimates have been reduced due to lower than originally expected margins on an outsourcing agreement recently entered into with the California-based Arrowhead Group of Companies, as well as a decrease in anticipated revenues from another outsourcing contract.

The company does not anticipate any other changes in operations that would have a material adverse effect on earnings.

83.    On December 21, 1998, Raymond James & Associates issued a report on INSpire by Bove, which was based on and repeated information provided to Bove by defendants in conference calls and follow-up conversations with INSpire management. The report stated:

•    There are some relatively high conversion/set-up costs associated with new contract wins, and that

•    It may take some time for a new contract to mature to the point where it becomes a meaningful profit contributor.

Further, investors may have failed to grasp that the business is dynamic. In essence, the competition in the insurance sector is so intense that INSpire's customers can lose business as well as gain it. When they lose business, INSpire loses revenues. This is because in virtually all INSpire contracts the payment to INSpire is based on a percentage of client revenues.

Failure to grasp these concepts led to a belief that the company would post significantly higher earnings (not higher expenses) every time a new contract is signed.

- 49 -

APP 1030

84. Following these disclosures, INSpire's stock price declined from $30-13/16 on December 10, 1998 to $17-5/8 on December 11, 1998 on huge volume of 5.3 million shares. However, defendants' partial disclosures were still false or misleading, as defendants failed to reveal that INSpire's financials were materially overstated and that INSpire's software products were not technologically or economically feasible and, as a result, defendants knew their forecasts of INSpire's 1999 earnings were false when made.

85. *The Wall Street Journal*, on January 6, 1999, described the situation as follows:

> Until four weeks ago, shares of the Fort Worth provider of claims-processing services for property-and-casualty insurers had proved to be one of the state's best investments. During the 15 months after the company's August 1997 initial public offering, its stock more than tripled, fueled by soaring demand from cost-conscious property-and-casualty insurers looking to outsource their administrative tasks.

> But shareholders who bought at the beginning saw most of their gains wiped away in a single day on Dec. 11, in one of the more glaring recent examples of how not to handle communications with investors.

> That day, analysts who had spoken with Inspire executives disclosed that the company didn't expect a 10-year outsourcing contract it announced in November to add anything to its 1999 earnings, citing higher-than-anticipated start-up costs. By contrast, when Inspire announced the contract, the company told investors it believed the deal with Arrowhead Group, a closely held San Diego insurance agency, would add six cents to its per-share earnings this year, raising 1999 earnings estimates to 90 cents a diluted share.

> Feeling burned, investors fled the stock, which plummeted 43% on the news to $17.625 and has yet to recover, trading now at $17.50.

> But amid the rubble, some contrarians say they smell a bargain in Inspire, whose market value now is about $363 million.

> Here is the bulls' case: Immediately before the Arrowhead contract was announced Nov. 1, when analysts were projecting the company would earn 84 cents a share in operating earnings for 1999, the stock traded for $25. Today it trades for $17.50, but the earnings estimate for 1999 is still 84 cents a share. And analysts say that 85% of those projected profits are locked up by long-term contracts. Meanwhile, the Arrowhead contract should still add to earnings after this year.

> \* \* \*

> "This is not a problem of revenue growth or pricing or competitive action or margin erosion or a deteriorating balance sheet," says Wilson Jaeggli, manager of Southwell Partners, a Dallas-based hedge fund, who started accumulating shares of Inspire the week after the bad news came out; his fund holds a less than 1% stake in the company. "They were just overly optimistic about the timing of the earnings from this one contract."

APP 1031

Adds Sean Davis of Ferris Baker Watts in Richmond, Va.: "It's trading for much lower than it was when the fundamentals weren't as sound {before the Arrowhead contract}, and there's far more business in the pipeline now than they had a year ago. For the company to lose almost half its market value I just thought was clearly overdone." Mr. Davis maintains a "buy" rating on the stock and a $30 12-month price target.

In retrospect, it appears the crash in Inspire shares wasn't fueled by the significance of the announcement as much as it was by the manner in which *the news was handled. Executives began dribbling the news out slowly, one analyst and institutional investor at a time beginning Dec. 10, the day before the crash, according to portfolio managers and analysts. And the uneven flow of information resulted in a backlash.*

The morning of Dec. 11, Inspire executives discussed the earnings news in a conference call hosted by one of the company's underwriters, Raymond James & Associates of St. Petersburg, Fla. Yet many institutional holders and analysts following the stock complain they weren't invited to listen in and didn't learn about the call until well after it was over.

86. *Dow Jones Business News* noted the stark discrepancies between what INSpire said when it announced the Arrowhead contract compared to the mixed messages given in December 1998 as follows:

In December, Inspire Insurance angered investors when it offered mixed information about 1999 earnings projections. Analysts who had spoken with Inspire executives disclosed that the company didn't expect a 10-year outsourcing contract it announced in November to add anything to its 1999 earnings, citing higher-than-anticipated start-up costs.

By contrast, when Inspire Insurance announced the contract, the company told investors it believed the deal with Arrowhead group, a closely held San Diego insurance agency, would add six cents to its per-share earnings this year, raising 1999 earnings estimates to 90 cents a diluted share. Feeling burned, investors fled the stock, which plummeted 43% on the news to $17.625 and has yet to recover.

87. On January 26, 1999, INSpire issued a release announcing its 4thQ98 and 1998 results. The release stated:

INSpire Insurance Solutions, Inc. (Nasdaq:NSPR) reported today record revenues and profits for the fourth quarter ended Dec. 31, 1998. Revenues rose to a record $25.8 million for the 1998 fourth quarter versus $18.1 million for the 1997 fourth quarter. Net earnings were a record $3.4 million, or $.17 per diluted share ($.19 per basic share) compared to earnings of $2.1 million, or $.12 per diluted share ($.14 per basic share) for the comparable quarter last year.

For the year ended Dec. 31, 1998, record revenues were $87.2 million versus $56.6 million in the comparable period last year, an increase of 54 percent. Net earnings for the same period were a record $10.1 million, or $.51 per diluted share ($.56 per basic share) compared to net earnings of $1.7 million, or $.13 per diluted share ($.14 per basic share) for the comparable period last year.

APP 1032

\*   \*   \*

"These outstanding fourth-quarter results demonstrate the continuing success and strong acceptance of INSpire Insurance Solutions. In addition to record revenues and earnings, the period was highlighted by the announcement of our largest outsourcing contract to date and the addition of Kenneth J. Meister earlier this month as our new executive vice president and chief financial officer," said F. George Dunham III, chairman and chief executive officer, INSpire Insurance Solutions.

88.    Subsequent to the release of its 4thQ98 results, INSpire held a conference call for analysts, money and portfolio managers, institutional investors and large INSpire shareholders to discuss INSpire's 4thQ results, its business and its prospects. During the call – and in follow-up conversations with analysts – Dunham and Smith stated:

•    INSpire had signed five new software contracts which was a strong endorsement of its products and margins were improving in the software business.

•    Organizational changes had been made at SDS to strengthen the software side of the business.

•    Outsourcing business was continuing to grow and although margins in the near term would be lower due to this trend, INSpire would be increasing productivity to improve margins over the longer term.

•    The pipeline for new deals was healthy and strong and would provide revenue growth in 1999 and 2000.

•    During 1998, INSpire had successfully upgraded its sales efforts, improved its software business and upgraded senior management which would lead to improved results in 1999 and 2000.

•    The new contracts demonstrated that INSpire was offering solutions which were in demand in the insurance industry.

•    INSpire was on track to report EPS of $0.76+ and $1+ in 1999 and 2000, respectively.

89.    On January 28, 1999, DLJ Securities issued a report on INSpire written by Ossad, which was based on and repeated information provided to Ossad by defendants in the conference call and follow-up conversations with Dunham or Smith. The report forecast 1999 and 2000 EPS of $0.78 and $0.98 and a 28% three- to five-year growth rate. It also stated:

We are upgrading NSPR from Market Perform to BUY with a price target of $25. INSpire Insurance Solutions reported record 4th quarter and year end results. Revenue and earnings for the quarter of $25.8 million and $0.17, respectively, were in line with our estimates as well as consensus estimates. For the full year, revenue was up 54% and EPS was up 69%. In the fourth quarter, EPS advanced 42% on a revenue gain of 17%. We are lowering our 1999 EPS estimate to $0.78 from $0.84 in line with the newly appointed CFO's recently completed "bottoms up" analysis of

- 52 -

APP 1033

the current business. This estimate no longer includes the assumption of another large displacement contract (like the Arrowhead award) and reflects the new CFO's more conservative approach, as well as the recognition that future large, new contracts must be assessed on an individual basis. We still believe there is a good chance NSPR will sign another large displacement deal in 1999, and that the pipeline in the other product areas could lead to positive surprises. The uncertainties surrounding the recent volatility have been addressed. Looking over a two year horizon, we think NSPR should sell at an average multiple close to the projected 25-30% earnings growth rate. Our target price of $25 represents an average multiple over the next two years of about 29 times--at the high end of the forecasted growth rate over the next 3-5 years. Our rating is BUY.

90.     On January 28, 1999, Hanifen Imhoff issued a report on INSpire written by Brown, which was based on and repeated information provided to Brown by defendants in the 4thQ conference call and in follow-up conversations with Dunham or Smith. The report forecast 1999 and 2000 EPS of $0.78 and $1 and a 28% three- to five-year growth rate. It also stated:

> 5 New software agreements announced today increase our visibility of the Software & Software Services segment, which is 30% of revenues and 35% of operating income in 1999. INSpire's software backlog increased from $6.5 million at the end of the 3Q to $7.6 million. Since the end of the quarter, INSpire announced five new software contracts, which are included in this backlog. This helps negate some of our previous concerns over the visibility of this operating segment.
>
> []     Contract pipeline continues to be strong with two large displacement deals possible in 1999. INSpire's contract pipeline for both outsourcing and software continues to build. Although we have taken the impact of one displacement deal out of our model, these deals have not gone cold. INSpire continues to be actively working on two of these agreements, which could be signed during 1999. We believe the company is adamantly opposed to signing any large outsourcing deals that would be dilutive to our forecast.
>
> []     The probability of current estimates being met or exceeded has risen dramatically. We have reduced the profitability forecast in both 1999 and 2000 by delaying the impact of existing and future contracts. In our opinion, this puts the company in a much stronger position to meet or exceed our forecast. There is clearly execution risk to this story. However, additional guidance on cost and margins from the company's new CFO increases our confidence in our model. Furthermore, we are now projecting Arrowhead to break-even in 1999, although there is a possibility it could be additive.
>
> []     We believe INSpire is one of the best positioned companies ahead of a ripe outsourcing market. Although the end of 1998 was a tumultuous time for the company, INSpire's solutions were clearly validated in the marketplace. Within Outsourcing, the addition of many new contracts, none of which stem from its incestuous relationship with Millers Mutual, demonstrates INSpire is offering a solution the insurance industry wants. The Arrowhead contract, which could potentially generate $350 million in revenues for INSpire over its 10 year life, is a resounding endorsement of INSpire's offering. Within Software, INSpire also signed several large licensing and services agreements. Software revenues grew by over 30% in 1998.

APP 1034

91.     On January 28, 1999, Ferris Baker Watts issued a report on INSpire written by Davis, which was based on and repeated information provided to Davis by defendants in the 4thQ conference call and in follow-up conversations with Dunham or Smith. The report forecast 1999 and 2000 EPS of $0.76 and $1.05 and a 30% three- to five-year growth rate. It also stated:

> Outsourcing: In our opinion, the fourth quarter announcement of Arrowhead was a tremendous validation of the outsourcing model NSPR has constructed. The one month integration of this deal did, however, negatively impact the outsourcing gross margin. This figure fell to 43.3% in the fourth quarter from 57.2% in the third quarter. This reduction can be attributed to employee and technological expenses.

> Software and Software Services: During the third quarter NSPR undertook measures to remedy the shortfall in its software and software services business. The implementation of expense controls and organizational changes related to its SDS acquisition (the software side of its business) proved successful in the fourth quarter with margins rebounding from 34.6% in Q398 to 48% in Q498. We believe efficiency gains will continue as the company hires an experienced and dedicated senior vice president to oversee these efforts. Furthermore, NSPR is in the process of upgrading its internal project management software to better analyze employee performance.

> The company also announced that it has entered into five software licensing agreements. These agreements were signed with a diverse group of insurers representing various lines of business. We believe this serves as a strong endorsement for NSPR's products. Included in this group is Philadelphia Consolidated, a company that we recognize as a skilled, aggressive and savvy insurer. Total backlog from these contracts is $7.6 million.

92.     On March 24, 1999, INSpire filed its SEC Form 10-Q for the 3rdQ98, the quarter ended September 30, 1998. This 10-Q included the financial results previously reported and was signed by defendant Dunham.

93.     On March 25, 1999, INSpire filed its SEC Form 10-K for the fiscal year ended December 31, 1998. This 10-K included the financial results previously reported and was signed by defendants Dunham and Smith.

94.     On March 29, 1999, INSpire announced that it had entered into a ten year functional outsourcing agreement with The Robert Plan Corporation, a private passenger and commercial auto insurance provider. The announcement stated,

> Under this agreement, The Robert Plan Corporation will outsource all voluntary policy administration, first notice of loss and claims support services, and many "back-office" operations to INSpire. The Robert Plan's voluntary markets, primarily urban environments, offer substantial market opportunities to the parties' vision of growth substantially in under-served demographic and geographic communities. RPC's strategy of aggressively evolving new products, programs, and

- 54 -

APP 1035

distribution methodologies, is based upon the market-leading integrated technology developed by INSpire. RPC will maintain its highly acknowledged edge through innovation, and retain its technical claims administration settlement and adjudication experts and staff.

*   *   *

After the initial transition period estimated at 15 months, INSpire will have at its disposal an experienced team of professionals to support its national growth aspirations.

*   *   *

"We are very happy to enter into such a significant long-term relationship with The Robert Plan," said F. George Dunham, III, chairman and chief executive officer, INSpire Insurance Solutions. Dunham continued, "*Our agreement with Robert Plan* and the establishment of a Northeast processing center *further validates insurance companies' confidence in INSpire* to reduce costs, enter new markets quickly and focus on core competencies."

95.     On March 30, 1999, analyst Sean C. Davis of Ferris Baker Watts, Inc. noted INSpire's announcement of its ten year outsourcing agreement with The Robert Plan Company. Davis concluded, "[w]e ... view this announcement as a success for INSpire in that it helps to validate the unique business model it has assembled."

96.     On March 31, 1999, INSpire held an investor and analyst conference at its Forth Worth headquarters. On April 1, 1999, DLJ Securities issued a report on INSpire written by Ossad entitled "Analyst Meeting Inspires Confidence." The report also stated:

> •       NSPR's presentation demonstrated the business is strong and proved their ability to execute the expansion of the management team as well as continue to sign large displacement outsourcing deals. The CEO of RPC, Robert Wallach presented at the meeting and confirmed that the P&C industry is in great need of NSPR's services. RPC is a leading service provider and underwriter of private passenger and commercial automobile insurance, specializing in urban markets. RPC has aggressive growth plans for their voluntary book of business, with NSPR being a key means to achieve this growth. RPC is currently utilizing 7 separate systems to process their policy and claims administration. By consolidating the business on NSPR's single solution, not only will they reduce costs dramatically and become more efficient, they will be able to focus on targeting new markets. RPC will now be able to reduce their fixed costs and have their expenses more directly tied to their revenues.
>
> •       NSPR's 10-year outsourcing agreement with The Robert Plan Corporation (RPC) is to provide "total virtual company support" for all voluntary policy administration, first notice of loss, claims support services and many "back-office" operations for a $170 million book of business. Assuming no growth, the contract will add $175 million in revenue over ten years. The contract should provide $4.5-5.0 million per quarter in revenues starting in the second quarter 1999 and is expected to be breakeven to slightly profitable for fiscal 1999. As part of the 10-year

- 55 -

APP 1036

outsourcing contract, NSPR will take over employment of approximately 300 employees, and acquire some of the assets of RPC for approximately $12 million in cash. In addition, the RPC facility will become NSPR's Northeast Processing Center, supporting its national efforts. NSPR's goal is to quickly add new business to this facility after the installation is complete in order to get to the Company's overall target margins.

97.     Ossad concluded that, based upon the signing of the Robert Plan contract, INSpire was well positioned to capitalize on enormous opportunities in the P&C industry.

98.     On April 21, 1999, INSpire announced its 1stQ99 results in a press release which stated:

> INSpire Insurance Solutions, Inc. (Nasdaq:NSPR) reported today record revenues for the first quarter ended March 31, 1999. Revenues rose to $31.4 million for the 1999 first quarter vs. $18.4 million for the 1998 first quarter, an increase of 70%. Net earnings were $3.4 million, or $.17 per diluted share ($.18 per basic share), compared to earnings of $2.3 million, or $.13 per diluted share ($.15 per basic share), for the comparable quarter last year an increase of 30%.

* * *

> ***"In addition to our outstanding financial performance, the period was highlighted by the execution of a ten-year functional outsourcing agreement with The Robert Plan Corporation,"*** said F. George Dunham III, chairman and chief executive officer. "We also strategically positioned ourselves for continued success with the addition of key members to INSpire's executive management team."

99.     Subsequent to the release of its 1stQ99 results, INSpire held a conference call for analysts, money and portfolio managers, institutional investors and large INSpire shareholders to discuss INSpire's 1stQ results, its business and its prospects. During the call – and in follow-up conversations with analysts – Dunham and Smith stated:

- The pipeline for outsourcing as well as software and services remained strong as P&C companies were increasingly looking to outsource.

- INSpire had signed a new contract with The Robert Plan Corporation which demonstrated INSpire's ability to sign large displacement deals. This deal alone would provide $175 million in revenue over ten years.

- Arrowhead had begun to contribute and INSpire was converting more of Arrowhead's business to INSpire's systems which would cause margins to improve in future quarters.

- Software and services continued to show signs of improvement and INSpire's efforts to increase efficiency and productivity in the unit were showing results.

- INSpire had signed a new software agreement with USF Insurance which demonstrated continued demand for INSpire's software.

- INSpire was on track to report EPS of $0.76 and $1+ in 1999 and 2000, respectively.

- 56 -

APP 1037

100.    On April 23, 1999, DLJ Securities issued a report on INSpire written by Ossad, which was based on and repeated information provided to Ossad by defendants in the 1stQ conference call and in follow-up conversations with Dunham or Smith. The report forecast 1999 and 2000 EPS of $0.78 and $0.98 and a 28% three- to five-year growth rate. It also stated:

> The signing of the RPC contract along with the hiring of two senior managers supports our belief that NSPR is well-positioned to capitalize on the enormous opportunities in the P&C industry. NSPR is quickly gaining the critical mass and necessary infrastructure to deliver strong growth.

101.    On April 23, 1999, Ferris Baker Watts issued a report on INSpire written by Davis, which was based on and repeated information provided to Davis by defendants in the 1stQ conference call and in follow-up conversations with Dunham or Smith. The report forecast 1999 and 2000 EPS of $0.76 and $1.05 and a 30% three- to five-year growth rate. It also stated:

> •    Software and software services business continues to show signs of improvement. An area of focus for management at NSPR has been the improvement of efficiency rates and productivity levels in this segment. We believe these efforts are beginning to bear fruit as the gross margin from this segment rose an impressive 280 basis points over the results of Q498 to 50.8%, and topped our estimate for the quarter of 48.5%.

102.    On April 23, 1999, Hanifen Imhoff issued a report on INSpire written by Joseph Magner, which was based on and repeated information provided to Magner by defendants in the 1stQ conference call and in follow-up conversations with Smith or Dunham. The report forecast 1999 and 2000 EPS of $0.78 and $1 and a 28% three- to five-year growth rate. It also stated:

> The Robert Plan outsourcing deal which was announced late in 1Q99 should start to contribute to results beginning in 2Q99. This contract is a 10 year functional outsourcing agreement and should generate $4.5 to $5.0 million per quarter over the life of the contract, assuming the amount of underlying premiums remains unchanged. We would note that this deal will allow management of The Robert Plan to increase their focus on entering new insurance markets and increasing written premiums. Guidance for this contract, similar to Arrowhead, has been for breakeven results throughout the system integration. The facility will take 15 to 18 months to integrate and will add significant outsourcing capacity once it is on line. Software and software services fundamentals continue to improve.

103.    Analysts increased estimates after defendants' representations about the revenues to be generated from The Robert Plan Corporation contract. Specifically, INSpire told analysts that over the ten year life of the Robert Plan contract, INSpire expected to realize $175 million in total revenue. On May 10, 1999, analyst Steven L. Ossad of DLJ Securities concluded, "*[a]fter speaking*

APP 1038

*with management, we have slightly revised our earnings model, taking into account the full effects of the contract with The Robert Plan Corporation.*" Ossad continued, "*[w]e expect margins to gradually trend upwards, as ... the ... RPC contracts become more profitable.*"

104. On May 14, 1999, INSpire filed its SEC Form 10-Q for the 1stQ99, the quarter ended March 31, 1999. This 10-Q included the financial results previously reported and was signed by defendant Dunham.

105. On June 17, 1999, INSpire announced that it had entered into a ten-year functioning outsourcing agreement with Island Insurance Company, Ltd. of Honolulu, Hawaii. The press release stated:

> Under this agreement, Island Insurance will receive INSpire's complete policy administration services and first notice of loss for claims. At the center of the outsourcing agreement is the integrated client/server technology developed by INSpire. The technology enables the paperless environment for companies who choose INSpire as an outsourcing partner....
>
> \*   \*   \*
>
> Our relationship with Island will produce many positive results for both companies," said Bill Smith, president and CEO, INSpire Insurance Solutions.

106. In a June 18, 1999 report, analyst Sean C. Davis of Ferris Baker Watts, Inc. noted INSpire's announcement that it had entered into a third displacement style transaction by signing a ten-year outsourcing agreement with Island Insurance. INSpire stated that the agreement expected to add $95 million in revenue over the life of the contract. Based upon this announcement, Davis concluded, "[w]e believe this announcement helps validate the unique business model NSPR has built to address the needs of the property and casualty marketplace." Davis' report also states, "*[c]onversations with management indicate that Arrowhead and Robert Plan are progressing on-track.*"

107. On July 21, 1999, INSpire announced its "record" 2ndQ99 results in a press release which stated:

> INSpire Insurance Solutions, Inc. (Nasdaq: NSPR) reported today record revenues for the quarter ended June 30, 1999. Revenues rose to $36.3 million for the 1999 second quarter vs. $21.0 million for the 1998 second quarter, an increase of 73%. Net earnings were $2.9 million, or $.14 per diluted share ($.15 per basic share), compared to earnings of $2.6 million, or $.13 per diluted share ($.14 per basic share), for the comparable quarter last year, an increase of 12%.

- 58 -

APP 1039

108.   On August 16, 1999, INSpire filed its SEC Form 10-Q for the 2ndQ99, the quarter ended June 30, 1999. This 10-Q contained the financial results previously reported and was signed by defendant Dunham.

109.   Each of the positive statements about INSpire's business made during the Class Period between December 11, 1998-August 16, 1999, as set forth in ¶¶82-108, was false when issued. Each of them also failed to disclose the following information about adverse conditions in and then impacting INSpire's business, disclosure of which was required to make the statements made not misleading, and which information was then known only to defendants due to their access to internal INSpire data:

(a)   It was common knowledge at INSpire that the Company's software products were not technologically or economically feasible. This was partially attributable to a staggering 30% turnover in employees in INSpire's IT department during 1996-1998. INSpire IT personnel who repeatedly told defendant Robinson that the INSpire products did not work were told by Robinson to "get with the program or get out the door." The chronic technological problems with INSpire's software products were so renowned that the phrase "smoke and mirrors" was commonly used by INSpire personnel in reference to the Company's software products. Throughout the Class Period, employees responsible for programming, employees in the IT department, managers and even defendant Gaines repeatedly used the phrase "smoke and mirrors" to describe the Company's software products.

(b)   INSpire engineers regularly read INSpire press releases detailing the Company's WPC and EmPower products and servicing capabilities and joked to one another, "I didn't know it could do that." In fact, the Company's products could *not* perform the tasks described in the press releases and defendants knew it. IT personnel at INSpire described the software side of INSpire's business as "a debacle since the beginning."

(c)   The "smoke and mirrors" at INSpire went so far that at least one INSpire officer directed the *faking* of demonstrations of the Company's software products to customers. On more than one instance, INSpire demonstrated its EmPower product on two computer monitors. One application of the program would appear on one monitor, while another application appeared on a

- 59 -

APP 1040

separate monitor.  Although the customer was given the impression that EmPower was processing on a single system, it was not.  In fact, EmPower did not work and was incapable of performing both functions from a single system.  Efforts by INSpire tech writers to fix the EmPower system yielded unsatisfactory results.  The unsuccessful attempts to fix the product were known throughout INSpire management, including defendants.

(d)     Although INSpire's goal with its EmPower software product was simply to sell it outright to customers, this became impossible because EmPower never worked effectively.  In fact, EmPower was so ineffective that when it was added to the INSpire network in 1997, it killed the network and INSpire was forced to spend six months and $300,000 to get its own network running properly.  Thus, the EmPower product was nowhere near ready for sale and was of little use in outsourcing.  EmPower was sold to insurance companies as a "paperless office" solution.  EmPower was intended to image documents, scan the imaged documents optically to extract the text from the documents, and then automatically send them to the PCA system to be processed.  EmPower, however, never scanned the documents correctly due to a problem with the optical character recognition function.  The software would not correctly recognize or record the characters that were written on a document that was imaged.  EmPower would image a piece of paper but then send the image to the wrong place or simply lose the image entirely.  Images were scanned but then stored with the wrong numbers.  EmPower also took too long to retrieve the images, especially images stored on optical disk.  EmPower was designed – unsuccessfully – for use with the PCA system on an AS400 platform.  EmPower was later redesigned – again, unsuccessfully – to try to make it compatible with the WPC system.  The interface between EmPower and the PCA system did not work, which caused problems in transferring information from EmPower to PCA and back again.  Because the interface application did not work properly, if a person was using WPC or some other application on his computer and he wanted to use EmPower, he had to close the application he was using and open EmPower.  Then, if he wanted to go back to the application he was using, he had to exit out of EmPower.  Because of this problem, many people used two computers at the same time, one to run EmPower and one to do everything else.  Originally, EmPower failed to correctly read either typed or handwritten information on a document.  Eventually, the software was fixed so

- 60 -

APP 1041

that it could recognize typewritten characters. However, INSpire could never get EmPower to correctly scan a document that had handwriting on it. For example, if a potential policyholder filled out an application by handwriting as opposed to typing, EmPower could not scan the application for character recognition. This was a critical flaw since most applications were, in fact, handwritten.

(e)     Although EmPower was represented to investors and customers alike as a turnkey solution to processing, defendants knew that the product could never work. Defendants knew EmPower did not work when INSpire bought it. Defendant Lynn repeatedly said in meetings with upper management that EmPower did not work and commented that if INSpire customers learned that EmPower didn't work, INSpire would be sued. After two years, INSpire IT personnel were still "band-aiding" the character recognition function of EmPower and still never corrected this aspect of EmPower. Between one to three times per week, there were phone conferences between key INSpire executives in Fort Worth, Texas and Sheboygan, Wisconsin to discuss the chronic problems with EmPower. Furthermore, EmPower was not designed for use with large third-party administrative work, although that is how INSpire marketed it. It was originally designed for small regional insurance companies. The original designer and developer of EmPower, SDS, designed the product for small networks only. INSpire therefore knew before the purchase of the EmPower system that EmPower was not designed for high volume networks and INSpire would have to modify the program to accommodate large users. This never happened. INSpire insiders, including, but not limited to, defendants Lynn, Robinson, and Dunham, were told repeatedly by INSpire programmers and developers that EmPower would never work as defendants had represented it to work.

(f)     Defendants represented throughout the Class Period that EmPower was an automated workflow management system which interfaced with other vendors' systems or insurers' proprietary systems to provide imaging and workflow management technology. Defendants, however, knew that EmPower was incapable of interfacing with other vendors' systems or insurers' proprietary systems.

(g)     When negotiations began with The Robert Plan Corporation to use the new EmPower program with their outsourcing, EmPower still was not close to functioning. The

APP 1042

workflow processing capabilities were not working and many of the technical problems outlined above remained.  INSpire programmers had many conversations with defendants Robinson and Lynn, telling them explicitly that EmPower was not ready to be used with the Robert Plan contract.

(h)    Also, as occurred with Sul America, WPC was not designed to handle processing for large insurance companies such as Robert Plan.  WPC was designed for insurance companies that processed approximately $20-$80 million in policies per year as opposed to the Robert Plan which processed more than $100 million in policies per year.  Because WPC was designed for smaller insurance companies, it had limited processing power and speed.  WPC was designed to run a processing cycle each night.  During that cycle, the system goes through all of the policies.  Because of its design, WPC could only process a limited number of policies a night.  Because Robert Plan had so many policies, however, WPC did not have the capability to process all of Robert Plan's policies every night.  Although the contract between INSpire and Robert Plan called for full implementation of WPC within a twelve-month period, defendants knew that this was totally unrealistic.  Defendants knew that it would take a year just to perform a requirements study and to test the system.

(i)    In a June 2000 meeting, defendant Robinson told attendees at the INSpire Senior Staff Meeting that INSpire knew when it signed the Robert Plan contract that it could not meet the implementation schedule, but that INSpire signed the contract anyway "to get the business."

(j)    In a January 7, 2001 article in The Fort Worth Star-Telegram, John Pergande, the new CEO of INSpire, admitted that in 1999 revenue failed to materialize and projects lagged "largely because *the company didn't have the resources to execute the contracts it signed*."  In a January 14, 2001 article in the Sheboygan Press, authored by Martha H. Shad, Pergande discussed the INSpire business model and Pergande admitted, "I believe that in the past *when a customer said they wanted something by a certain date, it was promised whether it was feasible or not*.  We're not going to do that any more ...."

(k)    After all of the failures enumerated above, INSpire then tried to make EmPower work with WPC.  INSpire first tried this with customer Arrowhead Insurance, then at

- 62 -

APP 1043

Island Insurance and Robert Plan. Although INSpire was promising workflow solutions to these clients, EmPower was not even close to functioning with WPC.

(l)     Defendants told Island Insurance that WPC could be used for policy and claims administration of both their personal and business lines of insurance. However, WPC was not functional on administration of business lines of insurance. The inability of WPC to handle commercial processing is the reason that Island Insurance terminated their contract with INSpire. Jim Strickland, Vice President of Sales and Marketing, at the instruction of Dunham, told Island Insurance that WPC could rate commercial properties. This promise was made even though WPC was not in fact capable of rating commercial lines and was not designed to rate commercial lines and Dunham knew it.

(m)     INSpire's revenue growth was not indicative of strong demand for its products and services as revenue growth excluding sales to Millers Mutual was poor. INSpire was manipulating the amounts charged to Millers to improve INSpire's reported results. Sales to Millers Mutual were not indicative of demand for INSpire's products or services because Millers Mutual was motivated to help INSpire report as much revenue as possible to make Millers Mutual's investment in INSpire pay off.

(n)     Contrary to INSpire's representations, the increased competition in the insurance industry was not necessarily a positive for INSpire as it drove down premiums and profits for INSpire's customers which adversely affected INSpire.

(o)     INSpire's financial situation was deteriorating rather than improving as some of its large outsourcing agreements required significant investments in capacity to enable INSpire to provide the services required by the agreements. Moreover, revenues and earnings to be derived from new outsourcing contracts were highly uncertain as INSpire had to make substantial capital investment in new capacity in order to enable INSpire to meet the requirements of those new contracts, which investment, at best, reduced INSpire's visibility into future earnings.

(p)     INSpire's reported revenues and earnings were materially overstated due to improper revenue recognition, failure to write off uncollectible receivables, improper capitalization

- 63 -

APP 1044

of software development costs and failure to write down SDS goodwill in violation of GAAP as described in ¶¶119-42.

(q)     INSpire's new contracts would not provide increased revenue or earnings visibility as those new contracts provided that INSpire's compensation was based solely on its customers' profitability, which made any revenue or earnings to be derived from these new agreements uncertain at best.

(r)     Software and software services would be responsible for an increasing portion of future earnings as outsourcing profits were uncertain, and because software sales were very uncertain INSpire could not and did not have increasing visibility into future earnings. Furthermore, because INSpire's software products consisted of little more than "smoke and mirrors," defendants knew that future software sales were unlikely to materialize.

(s)     The Arrowhead deal would require a major infusion of money to make it profitable and would not provide earnings to INSpire for at least a year.

(t)     INSpire was completely unprepared to handle a project as large as Arrowhead. INSpire did not have employees qualified to install a product for a company such as Arrowhead. Furthermore, the products sold to Arrowhead were not designed to service a company of Arrowhead's size.

(u)     Ultimately, INSpire was forced to lay off close to 10% of its workers due to INSpire's need to discontinue its efforts to develop licensed software packages. The Company's software services and licensing business deteriorated until this layoff became necessary.

(v)     As a result of the aforementioned factors, the defendants actually knew that their forecasts of 40% earnings growth in 1999 to $0.86 and in 2000 to $1.20+ were in fact unreasonable and false.

## THE TRUTH IS REVEALED

110.    Then on October 15, 1999, INSpire stunned the market when it revealed huge write-offs and disappointing 3rdQ99 results. The release stated:

> INSpire Insurance Solutions, Inc. (Nasdaq: NSPR) reported today that it anticipates financial results for the third quarter ended September 30, 1999 to be below analysts' expectations. Based on preliminary estimates, the company expects

- 64 -

a net loss of $0.02 to $0.06 per diluted share before special charges discussed below, on revenues of approximately $37 million. Outsourcing revenues are expected to be approximately $31 million or an increase of 140% over the third quarter of 1998, while software revenues are expected to be approximately $5.6 million or a decrease of 35% over the prior year quarter. INSpire plans to announce final results for the quarter on October 20, 1999.

The company attributes the earnings shortfall to lower software revenues, and higher than expected expenses due to Y2K remediation costs and various employee costs related primarily to newly acquired outsourcing facilities. Software sales continued to be impacted by several factors, including longer than expected sales cycles as well as widespread market softness resulting from the negative impact of Y2K issues on technology spending. Reduced license sales contributed to lower license fees as well as lower installation services revenue.

The company also expects to record a third quarter pre-tax charge of approximately $30 million after assessing various assets primarily relating to the company's software operations. These charges include approximately $17 million associated with the impairment of intangible assets and capitalized software costs, and $12 million associated with increased reserves for accounts receivables and litigation expenses.

111.    Analysts reacted harshly to this news, cutting 1999 and 2000 EPS estimates to $0.27 and $0.40, respectively. On October 27, 1999, analysts Gary F. Prestopino and John D. Hall, of Tucker Cleary concluded:

We believe business fundamentals in outsourcing remain intact as the segment continues to perform in-line with our expectations. However, fundamentals in software and licensing continue to deteriorate which has led us to further reduce our EPS expectations for 2000. As a result, we are reducing our EPS estimate for 2000 from $0.37 to $0.17, with a $0.29 EPS estimate for 1999. We continue our #3-Hold rating.

*   *   *

The impairment of intangible asset charge of $16.8 million effectively wrote down the value of software licensing and services to zero.

Prestopino and Hall further concluded, "[d]ue to deteriorating fundamentals in software and licensing services, we have become skeptical of the long-term viability of software operations for NSPR."

112.    On October 21, 1999, analyst Manuel Royo of Southwest Securities stated: "The company has typically capitalized 30% to 35% of software development expenses even though INSpire's software business has been weak for the past five quarters."

113.    Upon this news, INSpire's stock dropped below $4 per share, some 87% below the Class Period high. When INSpire filed its Form 10-Q on November 15, 1999, it disclosed that Sul

- 65 -

APP 1046

America had filed claims against INSpire for INSpire's failure to perform the contract it announced on February 24, 1998. INSpire's stock has never recovered and currently trades at less than $1 per share. In December 1999, the Board of Directors repriced the exercise price of INSpire's officers' stock options from $22 to $4.11 per option. In May 2000, Dunham resigned as Chairman and CEO effective immediately. The following graph shows how horribly INSpire has performed relative to the market according to data in INSpire's 2000 proxy:



## SUBSEQUENT REVELATIONS

114. Following the disclosures of October 1999, additional information exposing defendants' fraud has been reported. Former INSpire customers have come forward in droves to sue the Company for breach of contract arising from defendants' misrepresentations about the capabilities of INSpire's software products and INSpire's outsourcing capabilities. For example, on June 23, 1999, in the United States District Court for the Eastern District of North Carolina, Medical Mutual Insurance Company of North Carolina, a former customer of INSpire, sued INSpire seeking recovery of $696,000 previously paid to INSpire, damages in excess of $1 million, a declaratory judgment that approximately $1.1 million invoiced to Medical Mutual Insurance Company is not owed, treble damages and attorney fees. (*See Medical Mutual Ins. Co. of No. Carolina v. INSpire*

- 66 -

APP 1047

*Ins. Solutions, Inc.*, Case No. 5-99 CV-416-F3.) On November 9, 1999, in the United States District Court for the Northern District of Illinois, Zurich American Insurance Company, a former customer of INSpire, sued INSpire seeking a recovery of $4.3 million previously paid to INSpire, a declaratory judgment that approximately $2 million invoiced to Zurich is not owed and damages to compensate Zurich for INSpire's breaches of contract. (*See Zurich American Ins. Co. v. INSpire Ins. Solutions, Inc.*, Case No. 99C-7288.) INSpire's former customer Cover-All has also sued INSpire for breach of contract.

115.    On September 1, 2000, INSpire announced that Island Insurance had terminated its outsourcing contract. On September 6, 2000, INSpire announced that Island Insurance's termination of the policy and claims outsourcing agreement with INSpire would cost INSpire at least $13 million in third quarter writeoffs and $9 million in annual revenue.

116.    On October 19, 2000, Robert Plan provided written notice to INSpire of numerous breaches by INSpire of its obligations under the policy and claims services agreement it had entered into with Robert Plan in March 1999. These breaches included INSpire's failure to complete the implementation of INSpire's technology and conversion of data by the specified deadline and failure to achieve and maintain service levels required by the agreement. Robert Plan warned INSpire that in the event the numerous breaches were not cured within a specified period, Robert Plan intended to terminate the agreement. On December 27, 2000, INSpire announced that Robert Plan had terminated its policy and claim services contract with INSpire, effective immediately and INSpire confessed that it would record a charge for the termination. As a result of this termination, INSpire recorded approximately $17.7 million of impairment charges related to intangibles and other assets associated with the Robert Plan agreement. For the year ended December 31, 2000 alone, the Company had reported $25.7 million of revenue associated with the Robert Plan agreement that will no longer continue.

117.    In INSpire's 1998 10-K (filed on March 26, 1999), INSpire described EmPower as follows:

> EmPower is an automated workflow management system designed for the personal lines policy administration needs of P&C insurers. EmPower interfaces with PCA, other vendors' systems or insurers' proprietary systems to provide imaging and

- 67 -

APP 1048

workflow management technology. EmPower automatically processes the flow of information in a paperless environment, substantially reducing manual activities through the integration of voice, data, image and text into one system. EmPower was introduced in 1996 and operates in a client/server environment using Microsoft Windows. INSpire plans to enhance EmPower to support claims administration and commercial lines policy administration software and to interface EmPower with WPC client/server based policy and claims administration systems.

After the end of the class period, however, in the 1999 Form 10-K (filed March 9, 2000), INSpire's description of EmPower excludes any description of other systems with which EmPower supposedly interfaced, a tacit admission that EmPower's interfacing function *never worked*. In its 1999 Form 10-K filed March 9, 2000, INSpire described EmPower as follows:

EmPower is an automated workflow management system designed for the personal lines policy administration needs of P& C insurers. EmPower interfaces with PCA to provide imaging and workflow management technology. EmPower automatically processes the flow of information in a paperless environment, substantially reducing manual activities through the integration of voice, data, image and text into one system. EmPower operates in a client/server environment using Microsoft Windows.

118. Furthermore, in January 2000, INSpire reported its financial results for the fourth quarter and year ended December 31, 1999. While INSpire's revenues rose to $35.6 million for 4thQ99 from $25.8 million for 4thQ98, INSpire reported a net loss in 4thQ99 of $5.6 million, or $0.30 per share, compared to net earnings of $3.4 million, or $0.17 per share for 4thQ98. INSpire's results for 4thQ99 include pre-tax charges of $1.5 million for staff reductions and executive resignations occurring at the end of 1999. For the year ending December 31, 1999, INSpire's reported revenues increased 61% to $140.6 million from $87.2 million for FY98. However, INSpire reported a net loss of $19.7 million or $1.04 per share for FY99 compared to net earnings of $11.6 million or $0.58 per share for the prior year. FY99's results include pre-tax charges totaling $31.5 million, consisting of a $29.6 million charge taken in 3rdQ99 following the Company's reassessment of assets used in its software business, the $1.5 million charge taken in 4thQ99 discussed above and $0.4 million of other charges. Moreover, on December 31, 1999, the Company laid off 100 workers as part of its plan to discontinue licensed software packages. Subsequently, the Island Insurance and Robert Plan contracts have been cancelled, the Company has continued to report losses, the Company has announced additional layoffs and the Company's stock price has dropped below $1 per share.

- 68 -

APP 1049

119.    Finally, INSpire President and defendant William J. Smith, III resigned effective January 7, 2000, CFO Kenneth Meister resigned effective March 31, 2000, another executive, Eric Yerina, announced his resignation effective immediately, and defendant Robinson was fired by INSpire and has sued the Company.

### INSPIRE'S FALSE FINANCIAL
### REPORTING DURING THE CLASS PERIOD

120.    In order to inflate the price of INSpire stock, defendants caused the Company to falsely report its results for the quarters ended December 31, 1997, March 31, 1998, June 30, 1998, September 30, 1998, December 31, 1998, March 31, 1999 and June 30, 1999 through its improper recognition of revenues, the failure to properly report the value of its assets, including goodwill associated with the acquisition of SDS, software development costs and accounts receivable. This caused INSpire's earnings and assets to be overstated throughout the Class Period.

121.    In fact, during 1998, Dunham once threw a financial report back at Gaines because Dunham did not like the numbers reflected in that report. Gaines informed an employee who had witnessed the incident that when Dunham did not like the numbers reflected in a financial report, Dunham would insist that Gaines change those numbers. Referring to George Dunham, Gaines told one INSpire employee, "He wants me to write down numbers that don't exist." Dunham also instructed financial reporting managers to back-date contracts in order to inflate INSpire revenues for specified periods.

122.    INSpire reported the following quarterly results during the Class Period:

|  | 12/31/97 | 3/31/98 | 6/30/98 | 9/30/98 |
|---|---|---|---|---|
| Revenues | $18.1M | $18.4M | $21.0M | $22.1M |
| Net Income | $ 2.1M | $ 2.3M | $ 1.1M | $ 3.2M |
| EPS | $0.13 | $0.14 | $0.09 | $0.18 |

- 69 -

APP 1050

|              | 12/31/98  | 3/31/99   | 6/30/99   |
|--------------|-----------|-----------|-----------|
| Revenues     | $25.8M    | $31.4M    | $36.3M    |
| Net Income   | $ 3.4M    | $ 3.4M    | $ 2.9M    |
| EPS          | $0 .17    | $0.17     | $0.14     |

123.    INSpire included its interim results in Form 10-Q's, and its annual results in its Form 10-K's for 1997 and 1998, which were filed with the SEC and signed by defendants. With regard to the financial information included in the SEC filings, INSpire represented that the financial information was prepared in accordance with GAAP.

124.    These representations were false and misleading when made, as INSpire's financial results reported during the Class Period did not present fairly INSpire's results, and which results were presented in violation of GAAP and SEC rules.

125.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

126.    The Individual Defendants caused INSpire to falsify its reported financial results through its improper revenue recognition and improper accounting for the valuation of its assets including goodwill associated with the SDS acquisition, its software development costs and its accounts receivable.

**Revenue Recognition**

127.    GAAP, as set forth in FASB Statement of Concepts No. 5, provides the basic requirements for revenue to be recognizable: (1) revenue must have been earned; and (2) revenue must be realizable (collectible). *See* Concepts No. 5, ¶83. "If collectibility ... is doubtful, revenues and gains may be recognized on the basis of cash received." Concepts No. 5, ¶84g. In order to

- 70 -

APP 1051

report favorable revenues and earnings during the Class Period, defendants caused INSpire to accelerate revenue recognition on software sales in violation of GAAP and SEC rules. In fact, much of the revenue recognized by INSpire during the Class Period was improper and not collectible. In its Form 10-K for fiscal year ended December 31, 1999, filed with the SEC on March 9, 2000, INSpire had to write off some $10 million in uncollectible receivables, equivalent to nearly one-third of the billed and unbilled receivable balance as of June 30, 1999.

128. As a result of INSpire's improper revenue recognition, its collection of receivables deteriorated during the Class Period as customers either could not or would not pay the Company. Days Sales Outstanding ("DSO" or the average time it took INSpire to collect its receivables) increased from less than 54 days in the quarter ended September 30, 1997 to 65 days by December 31, 1998 to 93 days by June 30, 1999. Much of this growth was the result of INSpire's ever increasing use of its "Unbilled Receivables" account. This account was used for revenue recognized in advance of billings. INSpire attributed the reason for this situation to "timing differences related to billing schedules specified in contracts." In fact, however, this account was growing disproportionately to other receivables as INSpire recognized increasing amounts of revenue it had not earned and which were not collectible. Note the trend in the Unbilled Receivables account:

|  | 12/31/96 | 12/31/97 | 12/31/98 | 6/30/99 |
|---|---|---|---|---|
| Unbilled Receivables | $ -0- | $1.1 M | $5.9 M | $8.9M |

129. Thus, unbilled receivables increased 436% from December 31, 1997 to December 31, 1998, while quarterly revenues increased only 42% over the same period. Such a disproportionate increase is not consistent with INSpire's business but, in fact, was the result of a deliberate manipulation of INSpire's revenues and earnings.

130. INSpire also overstated its revenues and earnings by manipulating the amount it charged Millers Mutual for services. Because Millers Mutual owned INSpire stock, and because Dunham also controlled Millers Mutual, it was possible for INSpire to charge Millers Mutual whatever the Individual Defendants wanted in order to meet INSpire's revenue goals. When INSpire's actual results were short of internal expectations, Dunham would cause INSpire to revise

- 71 -

the amount INSpire had charged Millers Mutual over the preceding few months to invent the desired revenues and earnings for INSpire. This income recognition by INSpire was improper and a violation of GAAP as INSpire had not earned the revenue, or done what it must do to be entitled to the revenues.

**INSpire's Improper Accounting for Goodwill**

131. GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 17, states that goodwill (the difference between the purchase price of an acquisition and the value of the net assets acquired) be amortized over the period expected to be benefitted by the acquisition. GAAP, as set forth in Statement of Financial Accounting Standard ("SFAS") No. 121, requires that companies evaluate the value of goodwill and immediately write-off any impairment.

132. In order to report favorable earnings during the Class Period, the defendants caused INSpire to not take required write-downs of goodwill associated with both the SDS acquisition and the Paragon acquisition even as events subsequent to the acquisitions indicated that the goodwill was impaired. INSpire ultimately could not ignore the problems with these acquisitions and has written off nearly the entire amount of unamortized goodwill arising from the acquisitions.

133. SDS was acquired in March 1997 for $18 million with $9.3 million of the purchase price being ascribed to goodwill. SDS provided INSpire with a software element of its business which it did not have prior to the acquisition. Thus, with SDS, INSpire would be able to offer a comprehensive choice of solutions to the P&C industry. Unfortunately, INSpire was never able to get the software business on track. In the first quarter after SDS was acquired (June 30, 1997), INSpire reported $7.56 million in software revenues. Nine months later, in the quarter ended March 31, 1998, software sales had barely increased at all, to $7.63 million. Moreover, the gross profit on software sales was deteriorating, from gross profit of $4.6 million in the 2ndQ97 to only $4.4 million in the 4thQ98. Thus, there were multiple indications that goodwill from SDS was impaired. Nevertheless, INSpire failed to write down goodwill associated with SDS in order to avoid a charge to earnings and also to avoid the implication that the foray into software had been a complete failure. In fact, as the management of INSpire knew, but the public did not, the key product of SDS did not work and was only sold to customers using "smoke and mirrors." Thus, the

- 72 -

insiders knew that the key long-term benefit of SDS – its technology – did not work and the investment was impaired.

134.    On April 20, 1998, INSpire acquired Paragon for $4.25 million and allocated $1.23 million of the purchase price to goodwill and $2 million to purchased research and development.  Paragon provided software solutions.  As described above, INSpire had no success growing the software sales side of its business and Paragon was not providing the benefits anticipated when it was acquired.  Thus, the goodwill was not as valuable as INSpire had previously envisioned when INSpire made the acquisition, but INSpire failed to take the required write-down until the 3rdQ99 when Paragon goodwill was part of a $16.8 million write-off.  Moreover, at the time of acquisition, the charge for purchased research and development should have been only $500,000 instead of $2 million.  Defendants inflated the charge because they knew analysts and investors typically ignore these acquisition-related charges and by inflating the charge, future goodwill amortization expense would be lower.  Subsequently, on March 26, 1999 INSpire announced that its auditors had caused the Company to revise the in-process research and development charge relating to the second quarter acquisition of Paragon from $2 million to $500,000.  This adjustment would increase the quarterly intangible amortization by approximately $58,000.

**Software Development Costs**

135.    GAAP, as set forth in SFAS No. 86, states that software development costs should only be capitalized when technological feasibility has been established.  Otherwise the costs to achieve technological feasibility should be charged as an expense.

136.    In violation of GAAP, INSpire was capitalizing software costs which were not for products which were technologically or economically feasible.  According to an October 21, 1999 Southwest Securities report:

> The company has typically capitalized 30% to 35% of software development expenses even though INSpire's software business has been weak for the past five quarters.

137.    INSpire's capitalized research and development software costs grew from less than $800,000 as of December 31, 1997 to more than $2.5 million at December 31, 1998.  Additionally,

- 73 -

APP 1054

INSpire had some $5 million in software development costs it had obtained through acquisitions. In fact, technological feasibility was never established on INSpire's key software, including EmPower. EmPower was based on certain software that was not even Y2K-compliant. The product never worked. Thus, any capitalization of development costs associated with this software was improper and a violation of GAAP as set forth in SFAS No. 86. In order to avoid adverse earnings impacts, INSpire failed to write down these assets which had no future economic benefits. These costs have now been entirely written off as part of a $16.8 million charge which effectively writes off INSpire's software business.

**Failure to Record Losses for Uncollectible Receivables**

138.    GAAP, as set forth in SFAS No. 5, requires that a loss be recognized for the uncollectible portion of receivables or groups of receivables where it is probable a receivable is uncollectible and the amount of loss can be reasonably estimated.

139.    Even as INSpire's receivables skyrocketed, as described above, INSpire failed to make adequate accrual for uncollectible receivables. As of December 31, 1998, INSpire's allowance for doubtful accounts was only $494,000 compared to $302,000 at December 31, 1997.

140.    In its Form 10-K for fiscal year ended December 31, 1999, filed with the SEC on March 9, 2000, INSpire took a $10.2 million write-off of one receivable which it admits was very past due (*i.e.*, it had been on INSpire's books for a long time). Had INSpire been accruing a reserve for doubtful accounts during the Class Period as required by GAAP, such a large one-time write-off would have been unnecessary.

**GAAP Violations**

141.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

- 74 -

APP 1055

(b)      The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered

- 75 -

APP 1056

was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

142.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' ILLEGAL INSIDER TRADING

143.    During the Class Period, while INSpire's insiders were issuing false and misleading statements about INSpire, the defendants sold over 1.5 million shares of INSpire stock for proceeds of nearly $34 million to profit from the artificial inflation in INSpire's stock price their violation of law had created before INSpire's stock price crashed, notwithstanding their awareness of material non-public information.

144.    The details of those stock sales are shown below:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| Agazzi | 8/18/98 | 5,000 | $26.000 | $    130,000 |
|  | 8/18/98 | 5,000 | $26.250 | $    131,250 |
|  | 8/19/98 | 5,000 | $26.130 | $    130,650 |
|  | 8/19/98 | 5,000 | $26.140 | $    130,700 |
|  | 8/19/98 | 5,000 | $26.250 | $    131,250 |
|  | 8/19/98 | 5,000 | $25.180 | $    130,900 |
|  | 8/20/98 | 8,750 | $26.130 | $    228,638 |
|  | Totals | 38,750 |  | $ 1,013,388 |
| Dunham | 3/26/98 | 157,500 | $21.000 | $ 3,307,500 |
|  | 7/27/98 | 3,750 | $24.333 | $      91,250 |
|  | 7/28/98 | 15,000 | $24.087 | $    361,300 |
|  | 11/4/98 | 45,000 | $30.380 | $ 1,367,100 |
|  | 11/5/98 | 150 | $31.000 | $       4,650 |
|  | 11/5/98 | 500 | $30.500 | $      15,250 |
|  | 11/5/98 | 2,000 | $30.810 | $      61,620 |
|  | 11/5/98 | 21,500 | $30.880 | $    663,920 |
|  | Totals | 245,400 |  | $ 5,872,590 |
| Gaines | 11/3/98 | 2,500 | $30.380 | $      75,950 |
|  | 11/3/98 | 7,500 | $30.500 | $    228,750 |
|  | Totals | 10,000 |  | $    304,700 |

- 76 -

APP 1057

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| Lynn | 3/26/98 | 30,000 | $21.000 | $    630,000 |
|  | 11/4/98 | 17,000 | $30.000 | $    510,000 |
|  | Totals | 47,000 |  | $ 1,140,000 |
| Millers Mutual | 3/26/98 | 975,000 | $19.740 | $19,246,500 |
|  | 4/14/98 | 67,500 | $19.740 | $ 1,332,450 |
|  | 8/24/98 | 42,500 | $25.370 | $ 1,078,098 |
|  | 8/25/98 | 107,500 | $25.302 | $ 2,719,965 |
|  | Totals | 1,192,500 |  | $24,377,013 |
| Robinson | 3/26/98 | 37,500 | $21.000 | $    787,500 |
|  | 7/30/98 | 4,800 | $24.000 | $    115,200 |
|  | 8/5/98 | 2,700 | $24.000 | $     64,800 |
|  | 11/9/98 | 10,000 | $30.000 | $    300,000 |
|  | Totals | 55,000 |  | $ 1,267,500 |
|  | Totals: | 1,588,650 |  | $33,975,191 |

145.    These sales represented a substantial percentage of defendants' holdings, as reflected in the following chart:

| NAME | 1998 HOLDINGS | CLASS PERIOD SALES | % SOLD BASED ON 1998 HOLDINGS |
|---|---|---|---|
| Agazzi | 120,608 | 38,750 | 32.13% |
| Dunham | 596,501 | 245,400 | 41.14% |
| Gaines | 67,234 | 10,000 | 14.87% |
| Lynn | 112,716 | 47,000 | 41.70% |
| Miller Mutual | 5,799,375 | 1,192,500 | 20.56% |
| Robinson | 112,716 | 55,000 | 48.80% |

In contrast, from the time of INSpire's IPO until the beginning of the Class Period, defendants sold no stock.

## NONAPPLICABILITY OF SAFE HARBOR

146.    The statutory safe harbor provided for forward-looking statements ("FLS") does not apply to the false FLS pleaded. The safe harbor does not apply to INSpire's allegedly false financial statements. The FLS pleaded herein were not specifically identified as "forward-looking statements" when made, it was not stated that actual results "could differ materially from those projected," nor did meaningful cautionary statements identifying important factors that could cause actual results

- 77 -

APP 1058

to differ materially from those in the FLS accompany those FLS. None of the *particular* oral FLS in INSpire's January 1998, April 1998, November 1998, January 1999 and April 1999 conference calls, or other oral presentations pleaded, were so identified as required. The defendants are liable for the false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of INSpire who knew that the FLS was false. None of the historic or present-tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

147.    Plaintiffs bring this action on their own behalf and as a class action, pursuant to Fed. R. Civ. P. 23, on behalf of the Class of all persons who purchased INSpire common stock during the Class Period. Excluded from the Class are defendants, the executive officers and directors of INSpire, their heirs, successors and assigns and the members of the Individual Defendants' immediate families.

148.    Members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, INSpire common stock was traded daily over the counter on the NASDAQ Stock Market, an efficient securities market.

149.    Plaintiffs' claims are typical of those of the Class. Plaintiffs and their counsel will adequately protect the interests of the Class. Plaintiffs have no interests contrary to or in conflict with those of the Class they seek to represent. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

150.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    Whether defendants violated the federal securities laws as alleged herein;

- 78 -

APP 1059

(b)     Whether defendants participated in and pursued the common course of conduct complained of; and

(c)     Whether plaintiffs and the other members of the Class have sustained damages and the appropriate measure thereof.

## CLAIM FOR RELIEF I

### For Violation of §10(b) of the
### 1934 Act and Rule 10b-5 Against All Defendants Except Millers

151.    Plaintiffs incorporate by reference ¶¶1-150 by reference.

152.    Each of the defendants: (a) knew or had access to the material adverse non-public information about INSpire's financial results and then-existing business conditions which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about INSpire.

153.    During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases or acquisitions of INSpire common stock during the Class Period.

155.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for INSpire stock. Plaintiffs and the Class would not have purchased or acquired INSpire stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

- 79 -

APP 1060

## CLAIM FOR RELIEF II

### For Violation of §20(a) of the
### 1934 Act Against Defendants Dunham, INSpire and Millers Mutual

156.     Plaintiffs incorporate ¶¶1-155 by reference.

157.     Defendant Dunham acted as a controlling person of INSpire within the meaning of §20(a) of the 1934 Act.  By reason of his position as a director and officer of INSpire, he had the power and authority to cause INSpire to engage in the wrongful conduct complained of herein. INSpire controlled each of the Individual Defendants and all of its employees.

158.     By placing its representatives (*e.g.*, defendant Dunham, defendant Robinson, and defendant Lynn) on INSpire's Board and through its stock ownership, Millers Mutual controlled INSpire within the meaning of §20(a) of the 1934 Act, and had the power and influence, and exercised the same, to cause INSpire to engage in the conduct complained of herein.

159.     By reason of such wrongful conduct, Dunham, Millers Mutual and INSpire are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of INSpire common stock during the Class Period.

### PRAYER

WHEREFORE, plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

### JURY DEMAND

Plaintiffs demand a jury trial.

DATED:  May 15, 2001                    STANLEY, MANDEL & IOLA, L.L.P.
                                        MARC R. STANLEY
                                        Texas State Bar No. 19046500


                                        _____
                                        MARC R. STANLEY


- 80 -

APP 1061

3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone:  214/443-4300

Liaison Counsel for Plaintiffs

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
HELEN J. HODGES
KAREN L. THOMAS
ALEXANDRA S. BERNAY
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

BARRACK, RODOS & BACINE
EDWARD M. GERGOSIAN
402 West Broadway, Suite 850
San Diego, CA  92101
Telephone:  619/230-0800

Co-Lead Counsel for Plaintiffs

N.\CASES\INSpire\RDM80964.cpt

- 81 -

APP 1062

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.      That on May 15, 2001, declarant served the FIRST AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1934 by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of May, 2001, at San Diego, California.

                                        _Renee Morrison_
                                        RENEE MORRISON

APP 1063

INSPIRE
Service List - 05/15/01
Page   1


COUNSEL FOR PLAINTIFF(S)

Roger F. Claxton
CLAXTON & HILL, PLLC
700 McKinney Place
3131 McKinney Avenue, LB-103
Dallas, TX   75204-2471
   214/969-9099
   214/953-0133 (fax)

Marc R. Stanley
STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue
Suite 750
Dallas, TX   75205
   214/443-4301
   214/443-0358 (fax)

Daniel J. Petroski, Jr.
VAHLDIEK, CANO, GRAYSON,
   HOVENKAMP & PETROSKI
3850 One Houston Center
1221 McKinney
Houston, TX   77010

William S. Lerach
Helen J. Hodges
Karen L. Thomas
MILBERG WEISS BERSHAD HYNES &
   LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA   92101-5050
   619/231-1058
   619/231-7423 (fax)

Bruce G. Murphy
LAW OFFICES OF BRUCE G. MURPHY
265 Llwyds Lane
Vero Beach, FL   32963
   561/231-4202
   561/231-4042 (fax)

Paul J. Geller
CAULEY, GELLER, BOWMAN &
   COATES, LLP
2255 Glades Road, Suite 421A
Boca Raton, FL   33431
   561/750-3000
   561/750-3364 (fax)

Edward M. Gergosian
BARRACK, RODOS & BACINE
402 West Broadway, Suite 850
San Diego, CA   92101
   619/230-0800
   619/230-1874 (fax)

Glen DeValerio
Michael G. Lange
BERMAN, DEVALERIO & PEASE LLP
One Liberty Square
Boston, MA   02109
   617/542-8300
   617/542-1194 (fax)


COUNSEL FOR DEFENDANTS

*Edward S. Koppman
Stephanie A. Burris
Susan Hays
AKIN, GUMP, STRAUSS, HAUER &
   FELD, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, TX   75201-4618
   214/969-2800
   214/969-4343 (fax)

*Kleber C. Miller
Christopher G. Lyster
SHANNON, GRACEY, RATLIFF &
   MILLER, L.L.P.
1500 UPR Plaza, 777 Main Syreet
Fort Worth, TX   76102
   817/336-9333
   817/336-3735 (fax)


* Denotes service via overnight mail.

APP 1064