UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

---

IN RE AGILON HEALTH, INC. SECURITIES
LITIGATION

Case No. 1:24-cv-00297-DAE

---

**THE CD&R DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED COMPLAINT**

Santosh Aravind
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300

Maeve L. O'Connor
Elliot Greenfield
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Defendants Clayton, Dubilier &
Rice, LLC, CD&R Vector Holdings, L.P.,
CD&R Investment Associates IX, Ltd., CD&R
Associates IX, L.P., Clay Richards, Ravi
Sachdev, Richard J. Schnall, Derek L. Strum,
and Ronald A. Williams*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 4

I.    THE CD&R DEFENDANTS. ......................................................................................... 4

    A.    The CD&R Entities. ............................................................................................. 4

    B.    The CD&R Individuals. ....................................................................................... 5

II.   VECTOR'S OWNERSHIP AND SALE OF AGILON STOCK. ..................................... 5

III.  THE STOCKHOLDERS AGREEMENT .......................................................................... 6

IV.   AGILON HEALTH, INC. ............................................................................................. 7

    A.    agilon's IPO and Risk Disclosures. ...................................................................... 7

    B.    The Increase in Healthcare Utilization Rates. ........................................................ 8

ARGUMENT ...................................................................................................................... 9

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 11. ........................... 10

II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15. ........................... 12

III.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a). ....................... 13

    A.    Plaintiffs Fail to Plead Control Based on Vector's Stock Ownership. ................. 14

    B.    Plaintiffs Fail to Plead that Vector Controlled Statements by Officers. .............. 16

    C.    Plaintiffs Fail to Plead a Primary Violation of Section 10(b). ............................ 17

IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20A. ........................ 18

    A.    Plaintiffs Fail to Allege that CD&R LLC, CD&R Associates, or CD&R
        Investment Associates Purchased or Sold agilon Stock. ...................................... 19

    B.    Plaintiffs Fail to Plead a Predicate Violation of the Exchange Act By
        Vector. .............................................................................................................. 19

        1.    Plaintiffs Fail to Plead a Violation of Section 10(b) Against
            Vector. ..................................................................................................... 20

        2.    The Section 20(a) Claim Cannot Serve as a Predicate Violation. ............ 22

C.      Plaintiffs Fail to Plead Possession of Material Non-Public Information. ............. 23

CONCLUSION ........................................................................................................................ 24

# TABLE OF AUTHORITIES

**CASES**

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) .................................................................................17

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
    915 F.3d 975 (5th Cir. 2019) ............................................................................20, 21

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008)....................................................22, 23

*Carlton v. Cannon*,
    2016 WL 3959164 (S.D. Tex. July 22, 2016)...................................................14, 16

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..................................................................................17

*City of Pontiac Gen. Emps.' Ret. Sys. v. Hanger, Inc.*,
    2017 WL 384072 (W.D. Tex. Jan. 26, 2017) .......................................................17

*Coggins v. Camber Energy Inc.*,
    693 F. Supp. 3d 736 (S.D. Tex. 2023) ............................................................19, 20

*Del Castillo v. PMI Holdings North America Inc.*,
    2015 WL 3833447 (S.D. Tex. June 22, 2015)........................................................9

*Dennis v. Gen. Imaging, Inc.*,
    918 F.2d 496 (5th Cir. 1980) ................................................................................14

*Heck v. Triche*,
    775 F.3d 265 (5th Cir. 2014) ................................................................................16

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    2017 WL 2599327 (S.D. Tex. 2017) .....................................................................21

*In re Dell Inc., Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)..................................................................20

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    2016 WL 4095973 (S.D. Tex. 2016) .....................................................................23

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................................20

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ..................................................................21

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    610 F. Supp. 2d 600 (S.D. Tex. 2009) ...................................................................19

*In re Envision Healthcare Corp. Sec. Litig.*,
    2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) .........................................15, 22, 24

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) ..............................................................11, 14

*In re Kosmos Energy Ltd. Sec. Litig.*,
    955 F. Supp. 2d 658 (N.D. Tex. 2013) ..............................................................14, 15

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ...........................................................24

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018) .....................................................................12

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ......................................................................22

*In re Sec. Litig. BMC Software, Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) .....................................................................24

*Knox v. Rosenberg*,
    1999 WL 35233291 (S.D. Tex. Sept. 28, 1999) .........................................................4

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991)..................................................................................................23

*Li v. Eqonex Ltd.*,
    2024 WL 4241951 (S.D.N.Y. Sept. 18, 2024) ..........................................................16

*LLDVF, L.P. v. Dinicola*,
    2010 WL 3210613 (D.N.J. Aug. 12, 2010) ...............................................................15

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) .....................................................................................4

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    2008 WL 2178150 (N.D. Ill. May 22, 2008) ............................................................23

*Markman v. Whole Foods Mkt., Inc.*,
    2016 WL 10567194 (W.D. Tex. Aug. 19, 2016).......................................................18

*McCloskey v. Match Grp., Inc.*,
    2018 WL 4053362 (N.D. Tex. Aug. 24, 2018) ..........................................................12

*Melder v. Morris*,
    27 F.3d 1097 (5th Cir. 1994) ......................................................................11

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ......................................................................10

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ......................................................................17

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
    940 F. Supp. 1101 (W.D. Mich. 1996) ......................................................15

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ......................................................................10

*Shah v. Zimmer Biomet Holdings, Inc.*,
    348 F. Supp. 3d 821 (N.D. Ind. 2018) ......................................................24

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................................9, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................20, 22

*U.S. v. Bell Helicopter Textron Inc.*,
    417 F.3d 450 (5th Cir. 2005) ......................................................................19

*Winder v. Gallardo*,
    118 F.4th 638 (5th Cir. 2024) .......................................................................4

*Zishka v. Am. Pad & Paper Co.*,
    2001 WL 1748741 (N.D. Tex. Sept. 28, 2001).......................................14, 16

**STATUTES**

15 U.S.C. § 77k(a) ...........................................................................................10

15 U.S.C. § 78t-1(a) .........................................................................................19

15 U.S.C. § 78u-4(b)(2) ..............................................................................19, 20

15 U.S.C. § 78u-5(c)(1)(A)(i)..........................................................................18

Defendants Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R

Investment Associates IX, Ltd., and CD&R Associates IX, L.P. (the "CD&R Entities") and Clay

Richards, Ravi Sachdev, Richard J. Schnall, Derek L. Strum, and Ronald A. Williams (the

"CD&R Individuals" and, together with the CD&R Entities, the "CD&R Defendants") file this

motion to dismiss the Consolidated Complaint ("CC") pursuant to Federal Rules of Civil

Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C.

§ 78u-4 ("PSLRA").

## PRELIMINARY STATEMENT

This lawsuit asserts a classic case of "fraud by hindsight" and should be dismissed:

agilon's alleged inability to predict a sharp increase in demand for medical services years after

the onset of the COVID-19 pandemic does not amount to securities fraud.  Indeed, agilon

repeatedly warned investors about its inability to predict the impact of the pandemic on its

business and, in particular, the long-term impact of the deferral of healthcare service during the

pandemic.  Plaintiffs are unable to identify any actionable misstatements by agilon, relying

instead on broad expressions of corporate optimism, forward-looking financial projections, and

true statements of historical fact, none of which are sufficient to state a claim under the federal

securities laws.

Plaintiffs' attempt to hold the CD&R Defendants liable is even weaker, as only one

CD&R Entity – CD&R Vector Holdings, L.P. ("Vector") – ever held agilon stock, and any

purported control Vector had as a result of that stock ownership ended well before the key events

on which Plaintiffs' claims are based.  Fundamentally, this case is about agilon's identification

and reporting, beginning in November 2023, of a post-pandemic surge in medical costs and the

impact of those increased costs on the Company's financial performance, which Plaintiffs allege

caused the stock price to decline in late 2023 and early 2024.  But Vector cannot be deemed to

have controlled agilon during that period, as its ownership of agilon stock had fallen below 50% in August 2022 and below 25% in May 2023.  Plaintiffs' other claims against the CD&R Defendants are equally baseless and should be dismissed in their entirety.

As a threshold matter, although the Complaint names four separate and distinct CD&R Entities as defendants, Plaintiffs simply lump all of the CD&R Entities together as "CD&R" and make no attempt to meet their burden of alleging facts specific to each of them.  In fact, the CD&R Entities differ in important ways:

- The Limited Partnership:  Vector is the *only* CD&R Entity that held any stock in agilon.

- The General Partners:  CD&R Investment Associates IX, Ltd. ("CD&R Investment Associates") is the general partner of Vector, and CD&R Associates IX, L.P. ("CD&R Associates") is the general partner of funds that own Vector.  Those two entities *never* held any shares of agilon stock.

- The Investment Advisor:  Clayton, Dubilier & Rice, LLC ("CD&R LLC") is a registered investment advisor.  CD&R LLC *never* held any shares of agilon stock.

These differences among the CD&R Entities are crucial to the claims asserted against them.

The Complaint should be dismissed as against the CD&R Defendants for failure to state a claim.  *First*, Plaintiffs fail to state a claim under Section 11 against the CD&R Individuals because Plaintiffs do not identify any statements in agilon's registration statements – the only filings relevant to the Section 11 claim – that were false or misleading when made.  Although the Complaint is over 100 pages long, it devotes only *seven paragraphs* to alleged misstatements in the registration statements (CC ¶¶ 267-71, 273-74) and relies entirely on a handful of generic statements concerning agilon's business model, financial trajectory and data management capabilities.  Those statements constitute puffery – expressions of corporate optimism that are not actionable as a matter of law – or true statements of fact.

*Second*, Plaintiffs fail to state a claim for control person liability under Section 15 because they do not adequately plead an underlying violation of Section 11 or control by the

three CD&R Entities that did not even own any agilon stock: CD&R LLC, CD&R Investment Associates, and CD&R Associates.

*Third*, Plaintiffs' claim for control person liability under Section 20(a) against the CD&R Entities fails for similar reasons. In addition to Plaintiffs' failure to plead an underlying violation of Section 10(b) by agilon or its executives, Plaintiffs' allegations of control are plainly inadequate. By May 2023, Vector owned less than 25% of agilon stock, and by June 2023, its designees held only two of nine seats on agilon's board of directors. All of this occurred well before the core events underlying Plaintiffs' Section 10(b) claim – *i.e.*, statements made beginning in August 2023 regarding increased medical services utilization. Nor did Vector have control – at any time – over the oral statements made by agilon's CEO and CFO on conference calls with analysts and elsewhere, which make up the bulk of the alleged misstatements in the Complaint.

*Fourth*, Plaintiffs fail to state a claim for insider trading under Section 20A against CD&R LLC, CD&R Investment Associates and CD&R Associates because, again, none of those entities is alleged to have ever held or traded any shares of agilon stock. Plaintiffs' Section 20A claim against Vector fails because Plaintiffs do not plead any predicate violation of the Exchange Act by Vector in connection with its sale of agilon stock, as required by the statute, or particularized facts showing that Vector possessed material, nonpublic information at the time of its sales. The mere allegation that Vector sold agilon stock is not sufficient to state a claim under Section 20A. Nor is there anything unusual or suspicious about those sales, as private equity funds are in the business of taking companies public and then selling their holdings.

The Court should dismiss the claims against the CD&R Defendants in their entirety, with prejudice.

## STATEMENT OF FACTS

The factual allegations in the Complaint are taken as true solely for the purposes of this motion, except where those allegations are contradicted by SEC filings that are subject to judicial notice.[1] *See Knox v. Rosenberg*, 1999 WL 35233291, at *6 (S.D. Tex. Sept. 28, 1999) ("In the Rule 12(b)(6) context, a court may consider judicially noticeable facts and need not accept the allegations of a complaint as true to the extent that the allegations conflict with such facts.") (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)).  The Court should not accept as true Plaintiffs' "conclusory statements" or "naked assertions devoid of further factual enhancement." *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024).

## I.    THE CD&R DEFENDANTS.

### A.    The CD&R Entities.

Although the four CD&R Entities are separate and distinct legal entities, Plaintiffs lump them into the defined term "CD&R" and fail to allege facts specific to each entity.  (CC ¶ 54.)

Vector is a limited partnership that owned shares of agilon stock and is itself owned by three private equity funds.  Vector is the *only* CD&R Entity that owned agilon stock or was a party to a stockholder agreement (the "Stockholders Agreement").  (CC ¶¶ 51, 302.)  Each registration statement defined Vector as "the CD&R Investor" and identified it as the "selling stockholder."  (Ex. 1 at 28-29; Ex. 5 at 243-44, 299; Ex. 16 at 696-97, 702, 714; Ex. 3 at 192.)

CD&R Investment Associates is the general partner of Vector, and CD&R Associates is the general partner of private equity funds that own Vector.  (CC ¶¶ 52-53.)

---

[1]    On a motion to dismiss, the Court may consider any documents "attached to or incorporated in the complaint." *Lovelace*, 78 F.3d at 1017.  In a securities lawsuit, the Court may also "consider the contents of relevant public disclosure documents" that are "filed with the SEC." *Id.* at 1018.  Such documents are included as exhibits to the Declaration of D. Mason Parham and referred to herein as "Ex. [  ]."

CD&R LLC, an investment advisor, is a legal entity separate and independent from the other CD&R Entities.  Although Plaintiffs assert that CD&R "was agilon's controlling shareholder during the Class Period and the owner of agilon stock sold in the September 2021 Offering and May 2023 Offering" (CC ¶ 50), that assertion is contradicted by other allegations in the Complaint as well as the underlying SEC filings, which clearly state that *Vector* – not CD&R LLC – owned shares of agilon stock.  (CC ¶¶ 51, 302; Ex. 1 at 28; Ex. 5 at 243, 299; Ex. 16 at 696, 702, 714.)

### B.    The CD&R Individuals.

Plaintiffs also name as defendants five individuals affiliated with CD&R LLC:  Clay Richards, Ravi Sachdev, Richard J. Schnall, Derek L. Strum, and Ronald A. Williams.  (CC ¶¶ 33, 37-39, 41.)  Each of these individuals served on agilon's Board of Directors (the "Board") for varying durations during the alleged class period.  (*Id.*)  Richards, Schnall, and Strum left the Board in June 2023.  (CC ¶ 308; Ex. 17 at 720.)

## II.    VECTOR'S OWNERSHIP AND SALE OF AGILON STOCK.

Vector's ownership of agilon stock declined significantly over the course of the alleged class period.  Following agilon's initial public offering in April 2021, Vector owned approximately 58% of the Company's stock.  (CC ¶ 55.)  From 2021 to 2023, Vector sold agilon stock as follows:

- On September 14, 2021, Vector reduced its holdings from 58.5% to 52.6%.

- On August 11, 2022, Vector reduced its holdings from 52.6% to 47.3%.

- On May 18, 2023, Vector reduced its holdings from 47.3% to 24.7%.

(CC ¶ 55.)  Upon the completion of the sale in August 2022, agilon no longer qualified as a "controlled company" under New York Stock Exchange corporate governance standards.  (Ex.

17 at 720.)  Plaintiffs' allegation that agilon "acknowledged" it was a "controlled company" until June 2023 is contrary to the actual language of agilon's statement.  (CC ¶ 308; Ex. 17 at 720.)

All of these stock sales took place between 6 to 26 months before the first alleged stock price decline in November 2023.  (CC ¶¶ 57, 196.)  The last of the sales also was subject to a lock-up agreement pursuant to which Vector agreed not to sell its remaining 100 million shares of agilon stock for *900 days* – far longer than any standard lock-up period and wholly inconsistent with any suggestion that it expected agilon's performance to decline.  (Ex. 16 at 696.)  Plaintiffs do not allege anything suspicious or unusual about a private equity company reducing its stock holdings following an initial public offering.

### III.    THE STOCKHOLDERS AGREEMENT.

In connection with the initial public offering, agilon and Vector entered into a Stockholders Agreement.  Under the agreement, Vector had the right to designate individuals for the agilon Board (the number of which depended on the amount of stock held by Vector) and could request certain information concerning the Company's financial performance.  (Ex. 3 at 196-99 (§§ 2.1-2.3).)

Vector's designees never comprised a majority of the agilon Board.  (Ex. 8 at 468-69; Ex. 11 at 614-15; Ex. 26 at 965-66.)  For most of agilon's history as a public company, its Board had eleven seats; Vector's designees never filled more than five.  (CC ¶ 303.)  The Board was reduced to nine seats in June 2023, at which time Richards, Schnall, and Strum resigned.  (CC ¶ 240; Ex. 17 at 720.)  Since June 2023, Vector's designees have held only two of the nine seats. (Ex. 17 at 720-21.)

Plaintiffs do not allege that Vector ever exercised the informational rights contained within the Stockholders Agreement, much less that it was in possession of any material, non-

public information when it sold stock in the public offerings at issue.  The Stockholders

Agreement required Vector to make a "written request" before the Company would provide

information to it.  (Ex. 3 at 198-99 (§ 2.2).)  Plaintiffs do not allege that Vector ever made any

such requests and do not identify what, if any, information it received.

## IV.    AGILON HEALTH, INC.

The Company was founded in 2016 to assist in the delivery of medical care by partnering

with physicians and Medicare Advantage health plans.  (CC ¶¶ 3-4.)  Under its business model,

agilon accepts 100% of the financial risk related to providing medical care, and splits with its

physician partners revenue resulting from the difference between the cost of the healthcare

provided and the amount it receives from health insurers to take on this risk.  (*Id.*)

### A.    agilon's IPO and Risk Disclosures.

The Company went public in April 2021, about a year into the COVID-19 pandemic, at

which time it filed a registration statement that explained in detail agilon's business model and

the associated risks.  The Company explained that numerous factors impact its costs and that

actual liabilities therefore "could differ significantly from the amounts estimated and reserved for

that quarter or period."  (Ex. 1 at 42.)

In particular, agilon provided lengthy and detailed warnings regarding the COVID-19

pandemic and its impact on the Company's ability to forecast costs, as the pandemic had

suppressed the demand for non-essential medical services.  (CC ¶ 5; *see*, *e.g.*, Ex. 1 at 27-28, 40-

42.)  In light of this "utilization avoidance," the Company emphasized that it could not

"accurately estimate the net ultimate impact to medical services expense at this time."  (Ex. 1 at

27, 89.)  In a separate section entitled "Impact of COVID-19," the Company stated that the

reduction in "medical services expenses" incurred throughout most of 2020 "was impacted by

the temporary deferral of non-essential care amid the COVID-19 pandemic and improved medical cost management, among other factors." (*Id.* at 90-91.) It warned that those "costs may be incurred at future points in time, and it is possible that the deferral of healthcare services . . . could increase our costs in the future." (*Id.*) It emphasized: "We cannot accurately estimate the net ultimate impact, positive or negative, to medical services expense at this time." (*Id.*)

These same disclosures were included in the Company's registration statement for the September 2021 offering, and agilon continued to update its disclosures and warnings regarding COVID-19 throughout the alleged class period. (*See, e.g.*, Ex. 5 at 254-55, 297-98; Ex. 8 at 407, 433-34, 467; Ex. 11 at 538, 565-66; Ex. 26 at 917, 940-41.) In its Form 10-K for 2022 (incorporated in the May 2023 registration statement), agilon warned that "future developments," including "consumer behavior and health care utilization patterns" could "introduce new uncertainties to care patterns and our business," and that "[f]uture patterns and acuity may temporarily rise due to missed regular care" during prior years. (Ex. 11 at 596; Ex. 16 at 704.) The Company cautioned that "[t]he magnitude and duration of any pandemic and its ultimate impact on us are uncertain, but such impacts could be material to our business, financial condition, cash flows, and results of operations." (Ex. 11 at 565.)

## B.    The Increase in Healthcare Utilization Rates.

The events pertaining to Plaintiffs' claims did not occur until more than two years after the Company's initial public offering. In August 2023, three months after Vector's stock holdings fell to 24.7% and two months after three of its nominees resigned from the Board, agilon's CEO and CFO participated in an investor call to discuss agilon's Q2 2023 financial results. (CC ¶ 160.) During his opening remarks, although the CEO noted that certain Medicare Advantage claims data was lagging, he explained that, based on the data agilon had at that point,

"[w]e have not seen any meaningful change in our expected cost trend." (Ex. 18 at 730.) As the additional Medicare Advantage data rolled in during the following months, the Company allegedly discovered that there had in fact been an increase in utilization rates starting in May 2023. (CC ¶ 175.) During agilon's Q3 2023 earnings call on November 2, 2023, the CFO stated that there had been "an increase in utilization during May and early June" related to Medicare Advantage claims, and he explained that during the prior earnings call in August, "[w]e didn't have enough information from May or June" to see that increase. (Ex. 21 at 805, 809.) The Company continued to report higher-than-expected costs and utilization rates in January and February 2024. (CC ¶¶ 198-211.) Plaintiffs do not allege that Vector played any role in these earnings calls or disclosures.

## ARGUMENT[2]

Plaintiffs' claims against the CD&R Defendants should be dismissed for failure to state a claim. As a threshold matter, Plaintiffs improperly lump all of the CD&R Entities together as "CD&R." (CC ¶¶ 55, 57, 59, 63, 106, 153, 213-15, 307.) Adding to the confusion, Plaintiffs also separately define "CD&R" to refer specifically to CD&R LLC, making many of their allegations incoherent. (CC ¶¶ 3, 54.) "A complaint does not satisfy the requirements of *Iqbal* and *Twombly* by lumping together all defendants, while providing no factual basis to distinguish their conduct." *Del Castillo v. PMI Holdings North America Inc.*, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015). Such "group pleading" also "conflicts" with the strict pleading standard set forth in the PSLRA. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004).

---

[2]    The CD&R Defendants incorporate by reference the arguments set forth in the motions to dismiss filed by the agilon Defendants and the Underwriter Defendants.

# I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 11.

Plaintiffs fail to state a claim under Section 11 against the CD&R Individuals because they do not adequately plead that agilon's registration statements "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 861 (5th Cir. 2003); 15 U.S.C. § 77k(a).  Plaintiffs' allegations pertaining to their Section 11 claim appear to be an afterthought, focusing entirely on a handful of generic statements about agilon's business model, financial trajectory and data management capabilities.  (CC ¶¶ 267-71, 273-74.) The agilon Defendants' motion explains in detail why those statements are not actionable under the securities laws.  The CD&R Defendants write separately to emphasize three points.

*First*, all of the alleged misstatements in the registration statements are broad, optimistic statements about agilon's business that amount to nothing more than corporate puffery.  The description of agilon's business model as "differentiated," "transforming healthcare," "successfully improving quality of care," and able to "deliver actionable insight at the patient and physician level" (CC ¶¶ 267, 270, 273) are precisely the type of "optimistic generalizations" that courts consistently find inactionable as a matter of law.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) ("It is well-established that generalized positive statements about a company's progress are not a basis for liability.").  The same is true of statements concerning the "purpose-built" nature of its platform, the "ease of integration" with other systems, the "ability to add new physician partners," and the platform's ability to provide "significant" visibility and organize disparate data "to enable easy consumption by physicians."  (CC ¶¶ 268, 269, 27.)

*Second*, Plaintiffs' attempt to identify something false or misleading about these statements clearly demonstrates that, fundamentally, their claims amount to nothing more than complaints about alleged mismanagement – not a violation of the securities laws – and "boil

down to [an] attempt to chastise as fraud business practices that, in hindsight, might have been more cautious." *Melder v. Morris*, 27 F.3d 1097, 1101 n.8 (5th Cir. 1994). The Company allegedly relied on "delayed" and "incomplete" payor data and "lacked the systems and actuarial personnel and resources necessary to accurately track and forecast medical expenses." (CC ¶ 272(b).) The physicians within agilon's network allegedly "were not provided with the data necessary to effectively manage patients' medical costs" because the data they were provided was "altered," "non-standard" and "varied in format and quality." (CC ¶ 272(a).) And as new physicians were added to the network, some allegedly did not receive "the basic onboarding and education needed to integrate into the agilon partnership." (CC ¶ 272(d).) Criticism of management's operation of the business does not state a claim under the securities laws.

*Third*, Plaintiffs point to statements concerning agilon's "significant" visibility into its "near-term and long-term financial trajectory" (CC ¶¶ 269, 274) and inappropriately fault agilon for not accurately predicting the increase in medical utilization rates in late 2023, ignoring that agilon's registration statements repeatedly warned that it could not do so. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 386 (S.D. Tex. 2011) ("generalized allegations" that statements "regarding adequate capitalization and reserves were false *because* the Bank subsequently collapsed do not stand as allegations that the statements were false when made"). Contrary to the allegations in the Complaint, agilon never represented that it could "accurately predict and effectively manage medical margin" in all circumstances; instead, it cautioned that its "profitability depends to a significant degree on [its] ability to accurately predict and effectively manage our medical margin." (CC ¶ 272(b); Ex. 1 at 87.)

Moreover, any suggestion that agilon represented that it could predict the impact of COVID-19 and, in particular, the increase in utilization rates in the second half of 2023 is

undermined by agilon's clear statements to the contrary.  As discussed above, agilon's registration statements contained robust risk disclosures warning about the impact of COVID-19 on agilon's business and the uncertainties it created.  The Company specifically warned that the COVID-19 pandemic had caused a "deferral" of medical costs, that those costs "may be incurred at future points in time," and that it "cannot accurately estimate the net ultimate impact, positive or negative, to medical services expense at this time."  (Ex. 1 at 90; Ex. 5 at 242, 297; Ex. 8 at 433-34, 467; Ex. 16 at 704.)  Plaintiffs ignore these disclosures, but "[r]easonable investors understand information in required SEC filings in light of their surrounding text, including hedges, disclaimers, and apparently conflicting information."  *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 635 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019).

The Company likewise never warranted that it had access to perfect data; to the contrary, it warned that it may not be able to obtain complete and accurate data because it relied on insurance companies to provide the data in a complete and usable format.  The registration statements expressly warned that the Company had "experienced, and may in the future experience, challenges in obtaining complete and accurate" data "due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions."  (Ex. 1 at 49.)  These are the very same things Plaintiffs complain about.  (CC ¶¶ 272, 275.)  *See McCloskey v. Match Grp., Inc.*, 2018 WL 4053362, at *7 (N.D. Tex. Aug. 24, 2018) (dismissing claims where "the risk that actually occurred . . . was expressly disclosed to investors").

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15.

Plaintiffs' control person claim under Section 15 against the CD&R Defendants must be dismissed.  *First*, as set forth above, Plaintiffs fail to plead a violation of the Securities Act.  *See*

*Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation.").

*Second*, Plaintiffs' Section 15 claim should be dismissed as against the CD&R Entities that did not own agilon stock because they cannot plausibly be deemed to have controlled agilon, much less the content of agilon's registration statements.  The Complaint and underlying SEC filings make clear that only Vector – not CD&R LLC, CD&R Investment Associates or CD&R Associates – owned agilon stock.  (Ex. 1 at 28-29, 100; Ex. 5 at 243, 299; Ex. 16 at 702, 714.)

Plaintiffs' claim against CD&R LLC is particularly weak, as that entity is an investment advisor, and Plaintiffs allege that CD&R Investment Associates or CD&R Associates – not CD&R LLC – made investment or voting decisions on behalf of Vector.  (CC ¶ 53.)  Plaintiffs thus allege no facts showing that CD&R LLC even controlled Vector, let alone agilon.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a).

Plaintiffs' Section 20(a) claim fails for the same reasons that their Section 15 claim fails. Plaintiffs do not adequately plead a primary violation of the Exchange Act, or that any of the CD&R Entities were controlling persons for purposes of the Section 10(b) claim.  *See Southland*, 365 F.3d at 383.  The Section 20(a) claim fails as to CD&R LLC, CD&R Investment Associates and CD&R Associates for the same reason discussed above with respect to the Section 15 claim.

As to Vector, Plaintiffs' Section 20(a) claim fails because (*i*) at the time of the key events on which Plaintiffs' Section 10(b) claim depends, Vector's ownership of agilon was less than 25% and its designees filled only two of nine seats on the Board, and (*ii*) at no point did Vector have control over agilon's officers such that it could dictate what those individuals said on earnings calls or other presentations to investors.

A. **Plaintiffs Fail to Plead Control Based on Vector's Stock Ownership.**

Plaintiffs' allegations regarding Vector's ownership of agilon stock, which declined dramatically over the course of the relevant period, are insufficient to plead control.

As a threshold matter, the law is clear that mere status as a stockholder does not make one a control person under the securities laws. *See Carlton v. Cannon*, 2016 WL 3959164, at *4-5 (S.D. Tex. July 22, 2016) ("status alone will not automatically cause [a defendant] to be deemed a . . . controlling person") (quoting *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1980)). Plaintiffs instead must "allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d at 380; *Zishka v. Am. Pad & Paper Co.*, 2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001) ("Status alone as to persons not involved in day to day management is legally insufficient to support a Section 20(a) claim.").

Vector did not control agilon during the period relevant to the Section 10(b) claim. At no point did Vector's designated directors constitute a majority of the Board and, as Plaintiffs acknowledge, Vector's stock ownership fell below 50% in August 2022, at which point agilon stated that it was no longer a controlled company under NYSE rules. (CC ¶ 55; Ex. 17 at 720.) By May 2023, Vector's ownership of agilon stock fell *below 25%*, and three of its designated directors resigned from the Board in June 2023. (CC ¶ 55; Ex. 17 at 720.) At that point, its designees filled *only two of nine* seats on the Board. At least as of August 2022 – and certainly by May 2023 – Vector cannot be deemed to have controlled agilon. *See In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 674, 677 (N.D. Tex. 2013) (allegations that private equity firms owned 37% and 45% of the company, respectively, and designated directors were insufficient to plead "the requisite power to directly or indirectly control or influence [the company's] corporate policy"); *Zishka*, 2001 WL 1748741, at *1 (dismissing control person

claim against funds that owned 38%-50% of the company's stock and had power to appoint three of eight board members).[3]

This decrease in stock ownership and board representation is dispositive because the crux of Plaintiffs' Section 10(b) claim relates to statements made from August 2023 through early 2024 regarding increased utilization. Although Plaintiffs seek to obscure this fact by citing numerous statements going back to 2021, Plaintiffs' central claim is that – "[b]eginning in late 2023" – agilon identified and reported a surge in medical services utilization and its expected impact on the Company's financial performance. (CC ¶¶ 86-91.) Plaintiffs claim that on November 2, 2023, agilon revealed an increase in utilization that allegedly contradicted an August 3, 2023 statement by agilon's CEO that the Company was not seeing a meaningful change in costs. (CC ¶¶ 12, 163, 195-97.) In January and February 2024, agilon disclosed a continued increase in utilization based on a "backlog of pent-up demand from COVID." (CC ¶¶ 13, 15, 198-208.) Plaintiffs allege no facts demonstrating control by Vector during that time period. *See In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *31 (M.D. Tenn. Nov. 19, 2019) (dismissing claims against CD&R entities because plaintiffs failed to plausibly allege "that any of the CD&R defendants were controlling persons of Envision at the time of the issuance of the [registration statement]"); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1136 (W.D. Mich. 1996) ("formal means of control which have terminated in the past do not constitute a basis for alleging current control").

---

[3]    Nor is there any basis to conclude that the individuals Vector designated for nomination to the Board acted on behalf of Vector rather than agilon. (CC ¶ 301.) *See In re Kosmos Energy*, 955 F. Supp. 2d at 675-76 (refusing to "assume that [defendants'] designees on the Kosmos Board of Directors were acting on behalf of [defendants] in their capacity as Kosmos directors"); *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *13 (D.N.J. Aug. 12, 2010) (no control based on "conclusory allegation" that defendants controlled designated directors without "factual allegations supporting [that] general statement").

## B.    Plaintiffs Fail to Plead that Vector Controlled Statements by Officers.

Plaintiffs also fail to plead control by Vector – at any time – over oral statements made by agilon officers during earnings calls and other investor presentations, which make up the vast majority of the statements Plaintiffs challenge under Section 10(b).  (CC ¶¶ 100-03, 105, 109-15, 122-27, 129-31, 133-34, 136-41, 143-49, 151, 155-56, 160-69, 171-72, 175-82, 184-87, 190.) The Fifth Circuit has made clear that a plaintiff must show "that the defendant had an ability to control *the specific transaction or activity* upon which the primary violation is based."  *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) (emphasis added); *see also Zishka*, 2001 WL 178741, at *1 (plaintiff must show "exercise of power and control . . . as to the challenged acts"); *Carlton*, 2016 WL 3959164, at *7 (generalized allegations "are insufficient to allege the ability to control the 'specific' transaction identified as the basis for primary liability").

Here, Plaintiffs do not allege any facts demonstrating that Vector had any input whatsoever – much less control – over comments by agilon officers, including its CEO and CFO, on earnings calls, in answering questions from analysts, or at investor conferences.  Those statements cannot support the assertion of a Section 20(a) claim against Vector.[4]  *See Carlton*, 2016 WL 3959164, at *7 (dismissing Section 20(a) claim against CFO because the plaintiffs failed to allege facts showing that he "had the ability to control what KiOR, acting through its agents, said in press releases or on earnings calls"); *Li v. Eqonex Ltd.*, 2024 WL 4241951, at *17 (S.D.N.Y. Sept. 18, 2024) (dismissing section 20(a) claim where plaintiffs failed to allege that directors, one of whom was also CEO, had "control over anyone involved with the March 7 and 17 Press Releases with any particularity").

---

[4]    Plaintiffs' Section 10(b) claim also relies on the same statements in agilon's registration statements that form the basis of their Section 11 claim, which are not actionable for the reasons discussed in Section I above.  (CC ¶¶ 93-97, 106-07, 152-54.)

### C.       Plaintiffs Fail to Plead a Primary Violation of Section 10(b).

Plaintiffs' control person claim also fails because they do not adequately plead a primary

violation of Section 10(b) by agilon or its officers for the reasons set forth in agilon's motion to

dismiss.  The CD&R Defendants highlight three points.

*First*, Plaintiffs' theory of fraud improperly rests entirely on hindsight.  Plaintiffs' claims

boil down to the faulty suggestion that agilon should have predicted the impact of the COVID-19

pandemic on its business and, in particular, foreseen the impact of increased medical care

utilization more than three years after the pandemic began.  But the securities laws do not require

companies to be fortune tellers:  "company officials should not be held responsible for failure to

foresee future events."  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002).  That is

particularly true here, as agilon operates in an industry that was heavily impacted by the COVID-

19 pandemic, and no one could predict what course the pandemic would take or how it might

impact future demand for medical services and costs.  Plaintiffs do not identify information

known to agilon that contradicted its public statements.  Instead, they work backwards from

agilon's identification and disclosure in late 2023 of a surge in utilization and assert – without

any factual support – that agilon committed securities fraud by not predicting it earlier.  The law

is clear:  courts "do not recognize allegations of fraud by hindsight."  *Owens v. Jastrow*, 789

F.3d 529, 545 (5th Cir. 2015) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS

AG*, 752 F.3d 173, 187 (2d Cir. 2014)); *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Hanger,

Inc.*, 2017 WL 384072, at *11 (W.D. Tex. Jan. 26, 2017) (dismissing Section 10(b) claims and

stating that "Plaintiff's allegations amount to an example of fraud by hindsight: because the

Medicare audits turned out badly and Defendants did not plan for such a problem, Plaintiff

alleges the Defendants acted with scienter"), *aff'd*, 768 F. App'x 175 (5th Cir. 2019).

*Second*, Plaintiffs rely on many of the same broad optimistic statements discussed above that characterize agilon's business model as one that "successfully improv[es] quality of care and reduc[es] costs," can "deliver actionable insight" and "significant visibility," was "sustainable," included a "distinctive and highly efficient" approach to growth, "deliver[s] predictable results," and is "differentiated" because of its "high-touch nature." (*See, e.g.*, CC ¶¶ 95-96, 105, 108, 109-11, 129, 134, 143, 155, 161, 169, 171.)  Broad statements of this type regarding the strength, sustainability, and efficiency of agilon's business are exactly the "kind of rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace," such that "no reasonable investor could find them important." *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *6 (W.D. Tex. Aug. 19, 2016).

*Third*, agilon's predictions of its expected future financial performance are protected by the PSLRA's safe harbor for forward-looking statements. (*See, e.g.*, CC ¶ 140, 146, 159.)  When agilon made each of these statements, it identified them as forward-looking and accompanied them with meaningful cautionary language – "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). For example, agilon's August 3, 2023 earnings release noted that any financial projections reflected the Company's "current expectations and views about future events" but that the projections were "subject to risks and uncertainties that could significantly affect our future financial condition." (Ex. 19 at 754.)  Investors were then directed to the Company's SEC filings for an explanation of those risks and uncertainties. (*Id.*)

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20A.

Plaintiffs fail to state a claim under Section 20A, the so-called "insider trading" provision, because they do not plead that any of the CD&R Entities (*i*) committed "a requisite independent, predicate violation of the Exchange Act (or its rules and regulations), *e.g.*, §10(b),"

by (*ii*) selling agilon stock while in possession of material, nonpublic information. *Coggins v. Camber Energy Inc.*, 693 F. Supp. 3d 736, 756 (S.D. Tex. 2023); 15 U.S.C. § 78t-1(a).

Section 20A claims "sound in fraud" and therefore must be pleaded with particularity under Rule 9(b). *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 610 F. Supp. 2d 600, 650 n.56 (S.D. Tex. 2009). Plaintiffs must specifically identify "the person who traded" and "what material non-public information he had." *Id.* at 651; *see also U.S. v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (Rule 9(b) requires that a plaintiff "set forth the who, what, when, where and how of the alleged fraud.").

Moreover, as to any predicate violation of the Exchange Act, Plaintiffs must satisfy the PSLRA's heightened pleading standards, which include alleging particularized facts giving rise to a "strong inference" that the defendant acted with scienter – *i.e.*, fraudulent intent. 15 U.S.C. § 78u-4(b)(2). Plaintiffs' conclusory allegations utterly fail to meet these stringent standards.

### A. Plaintiffs Fail to Allege that CD&R LLC, CD&R Associates, or CD&R Investment Associates Purchased or Sold agilon Stock.

As a threshold matter, Plaintiffs' Section 20A claim must be dismissed as against CD&R LLC, CD&R Associates, and CD&R Investment Associates because Plaintiffs do not – and cannot – plausibly allege that any of those entities sold agilon stock. (CC ¶ 51; Ex. 6 at 327; Ex. 16 at 714.) The statute indisputably requires such a sale, as it limits liability to those who violate the Exchange Act "by *purchasing or selling a security*." 15 U.S.C. § 78t-1(a) (emphasis added). There can be no "insider trading" without trading.

### B. Plaintiffs Fail to Plead a Predicate Violation of the Exchange Act By Vector.

Plaintiffs fail to state a claim under Section 20A because they do not assert, much less adequately plead, an independent violation of the Exchange Act against Vector. "[L]iability under § 20A is derivative and requires proof of a separate underlying violation of the Act, such

as a violation of § 10(b) and Rule 10b-5." *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F.

Supp. 2d 549, 595 n.34 (S.D. Tex. 2002); *Coggins*, 693 F. Supp. 3d at 756 (Section 20A requires

an "independent, predicate violation of the Exchange Act"); *In re Dell Inc., Sec. Litig.*, 591 F.

Supp. 2d 877, 912 (W.D. Tex. 2008) (dismissing Section 20A claims against individuals because

"Plaintiffs have failed to state an Exchange Act violation as to any of the Individual

Defendants").

### 1.    Plaintiffs Fail to Plead a Violation of Section 10(b) Against Vector.

Although insider trading typically is alleged under Section 10(b), Plaintiffs do not assert a

Section 10(b) claim against Vector or make any attempt to plead a core element of such a claim:

scienter. *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019)

(holding that plaintiffs must allege scienter to "state a viable securities-fraud claim under Section

10(b)"). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Id.*

(internal quotations omitted). The Fifth Circuit has held that in the context of securities fraud,

scienter means "a defendant must have acted with, at minimum, severe recklessness," which is

defined to mean an "extreme departure from the standards of ordinary care." *Id.*

Under the PSLRA, Plaintiffs must "*state with particularity facts* giving rise to a *strong*

*inference* that the defendant acted with the requisite state of mind," a standard that Plaintiffs

utterly fail to meet. 15 U.S.C. § 78u-4(b)(2) (emphasis added). "To qualify as 'strong' . . . an

inference of scienter must be more than merely plausible or reasonable – it must be cogent and at

least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The Court therefore must "engage in a

comparative evaluation," considering "not only inferences urged by the plaintiff . . . but also

competing inferences rationally drawn from the facts alleged." *Id.* "Actual knowledge that

public statements are false, based on actual knowledge of material, non-public information, will

establish scienter for purposes of an insider trading claim." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *3 (S.D. Tex. 2017). Plaintiffs fail to allege any facts that support an inference of scienter – much less the required *strong inference* – as to Vector.

The few paragraphs of the Complaint that even mention Vector or "CD&R" do not come close to pleading a strong inference of scienter. *First*, Plaintiffs' speculation that CD&R sought to "capitalize on the pandemic" by taking agilon public is unsupported by any facts and makes no sense: the IPO did not occur until more than a year after the pandemic began, and Plaintiffs do not allege that Vector sold any of its agilon stock in that offering.

*Second*, Plaintiffs do not allege facts creating a strong inference that Vector was in possession of material, non-public information when it sold agilon stock, much less material, non-public information regarding an increase in medical utilization rates in late 2023. Plaintiffs' conclusory assertions are not "well-pleaded facts for purposes of evaluating a complaint," *Alaska Elec. Pension Fund*, 915 F.3d at 981, and they do nothing to bolster an inference of scienter. (CC ¶¶ 11, 324, 327.) Nor are allegations that, under the Stockholders Agreement, Vector had *access* to certain financial and business information sufficient to plead with particularity *actual possession* of material, nonpublic information. (CC ¶¶ 305, 307, 326.) *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 633 (S.D. Tex. 2003) (holding that "vague generalities" regarding "access to the adverse non-public information" do not satisfy "the heightened pleading standards . . . for pleading scienter under § 10(b)"). Under the PSLRA and Rule 9(b), Plaintiffs must identify the specific information obtained, when and how it was obtained, and from whom it was obtained. Here, Plaintiffs do not even allege facts showing that that *agilon* was aware – in May 2023 or earlier – of an increase in medical utilization rates, much less that any material, non-public information about such an increase was provided to Vector.

*Third*, the size and timing of Vector's stock sales does not give rise to an inference of scienter.  As another court noted in a closely related case involving a different CD&R portfolio company, "stock sales in and of themselves do not raise a strong inference that CD&R was in possession of material nonpublic information."  *In re Envision*, 2019 WL 6168254, at *26.  The *Envision* court rejected the same arguments Plaintiffs assert here, stating:  "CD&R is a private equity fund whose sole purpose is to invest in companies and ultimately sell them.  It is, therefore, not suspicious that it would divest itself of stock in large sales."  *Id.*  Furthermore, although Plaintiffs note the size of Vector's May 2023 sale of agilon stock, that sale occurred six months before the first alleged stock drop.  (CC ¶¶ 215, 195-96.)  That timing "temper[s] any implication that CD&R had material nonpublic information that would cause a decline in stock price."  *In re Envision*, 2019 WL 6168254, at *26.

Considered individually or collectively, Plaintiffs' sparse allegations regarding "CD&R" fall far short of giving rise to the "strong inference" of scienter required by the PSLRA.  The Complaint is devoid of any particularized facts regarding what Vector knew or believed at the time of its stock sales, which were entirely consistent with its role as a private equity fund.  The "opposing inference of nonfraudulent intent" is far more compelling.  *Tellabs*, 551 U.S. at 314.

## 2.    The Section 20(a) Claim Cannot Serve as a Predicate Violation.

Plaintiffs' Section 20(a) claim against the CD&R Entities – even if it were adequately pleaded – cannot serve as a predicate violation for purposes of a Section 20A claim because the Section 20(a) claim in this case does not involve insider trading, as required by the text of Section 20A.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 664 (S.D.N.Y. 2007) ("Not all violations of the Exchange Act can serve as predicate violations for purposes of § 20A; the predicate violation must be an act of insider trading."); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *27 (C.D. Cal. July 1, 2008) (Section 20(a) may serve as a predicate for Section

20A "only where the claim for control person liability relates to insider trading."). As the Supreme Court stated, "[t]he language of § 20A makes clear that the 100th Congress sought to alter the remedies available in insider trading cases, and *only* in insider trading cases." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991).

Here, the Section 20(a) claim against the CD&R Entities is based on their alleged control of "agilon and the Exchange Act Individual Defendants" with respect to alleged misstatements, not insider trading. (CC ¶ 320.) The Section 20(a) claim therefore cannot serve as the predicate for a Section 20A claim. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2008 WL 2178150, at *2 (N.D. Ill. May 22, 2008) (dismissing Section 20A claim where defendant was "not alleged to have violated Section 20(a) *by* engaging in insider trading (or by controlling someone who did)"); *Batwin*, 2008 WL 2676364, at *27 (dismissing Section 20A claim where Section 20(a) claim related to defendants who were not "alleged to have engaged in insider trading").

### C. Plaintiffs Fail to Plead Possession of Material Non-Public Information.

The Section 20A claim also fails because, as discussed above, Plaintiffs do not allege *facts* showing that Vector possessed material, nonpublic information – much less information regarding an increase in medical services utilization – at the time of its stock sales. Plaintiffs instead rely on generalized, conclusory assertions that, in light of the Stockholders Agreement between Vector and agilon, "CD&R" had "access" to unspecified "non-public financial, operational, and business information" about agilon. (CC ¶ 6; *see also id.* ¶¶ 305, 307, 325-26.) Such assertions are plainly inadequate: the ability to request access to non-public information is not sufficient to plead possession, let alone use, of such information. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 2016 WL 4095973 at *38, 42 (S.D. Tex. 2016) (dismissing Section 20A claim because plaintiffs "fail to plead with specificity what material nonpublic information was ever possessed" by defendants or that "this information motivated the trading decisions" of

defendants); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 916 (S.D. Tex. 2001) (dismissing Section 20A claim where there was "no specific allegation of what nonpublic information was used by Defendants to trade and how they knew such information was material or nonpublic, other than the unacceptable assertion that they knew by virtue of their positions and day-to-day business activities").

Nor does Vector's designation of directors to the agilon Board show that Vector possessed material, non-public information. *See In re Envision*, 2019 WL 6168254, at *25 (dismissing Section 20A claim because plaintiffs alleged no facts "suggesting the CD&R nominated directors communicated information" about the alleged wrongdoing "to CD&R"); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 849 (N.D. Ind. 2018) (dismissing Section 20A claim against private equity funds, despite the presence of designated directors on the company's board and information rights, because the allegations show "nothing more than that [funds] had *potential* access to insider information" and "[a]ccess to information is not the same as actually possessing the specific information and knowing it") (emphasis in original); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *36 (S.D. Cal. Aug. 1, 2006) (dismissing Section 20A claim against private equity funds, notwithstanding the presence of two designated directors, where allegations of knowledge by funds of non-public information regarding alleged accounting problems were "conclusory" and "not supported by facts").

## **CONCLUSION**

The Court should dismiss the claims against the CD&R Defendants.

Respectfully submitted,

Dated:  November 8, 2024          /s/ Elliot Greenfield

Maeve L. O'Connor (admitted *pro hac vice*)
Elliot Greenfield (admitted *pro hac vice*)
Brandon Fetzer (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
*mloconnor@debevoise.com*
*egreenfield@debevoise.com*
*bfetzer@debevoise.com@debevoise.com*

Santosh Aravind (Texas Bar No. 24095052)
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300
*saravind@scottdoug.com*

*Attorneys for Defendants Clayton, Dubilier & Rice,*
*LLC, CD&R Vector Holdings, L.P., CD&R*
*Investment Associates IX, Ltd., CD&R Associates IX,*
*L.P., Clay Richards, Ravi Sachdev, Richard J.*
*Schnall, Derek L. Strum, and Ronald A. Williams*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am counsel for Defendants Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., CD&R Associates IX, L.P., Clay Richards, Ravi Sachdev, Richard J. Schnall, Derek L. Strum, and Ronald A. Williams in this action and that on November 8, 2024 I caused a copy of the foregoing to be filed with the Court's ECF system, which will cause notice of its filing to be served electronically upon all counsel who have appeared in this action.

<u>/s/ Santosh Aravind</u>