UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § § § § § § § | Master File No. 1:24-cv-00297-DAE<br><br>CLASS ACTION |
| This Document Relates To:<br><br>    ALL ACTIONS. | | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE COMPLAINT**

4918-7945-2427.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND.............................................................................4

  A.    agilon Seeks to Profit by Cutting Medical Care to Patients....................................4

  B.    agilon Raises $1.2 Billion from Public Investors in the April 2021 Offering...................................................................................................5

  C.    Defendants Misled Investors About agilon's Business ...........................................6

      1.    Defendants' Claims that agilon's Cost-Controlling Business Model Provided Visibility and Predictability of Medical Costs and Medical Margin Were False and Misleading................................7

      2.    Defendants Failed to Disclose Material Deficiencies with agilon's Growth Model and Onboarding for New Physicians..................8

      3.    Defendants Failed to Disclose Material Adverse Facts Concerning agilon's Collection, Tracking, and Integration of Payor Data ....................8

  D.    CD&R Cashes Out and the Fraud Unravels ...........................................................10

III.  LEGAL STANDARD ON A MOTION TO DISMISS.......................................11

IV.   PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE SECURITIES ACT............................................................................................11

  A.    Plaintiffs Adequately Plead §11 Claims ................................................................12

      1.    The IPO and September 2021 Offering ......................................................14

      2.    The May 2023 Offering ..............................................................................20

  B.    Plaintiffs Adequately Plead §12(a)(2) Claims Against the Underwriters..............21

  C.    Plaintiffs' Securities Act Claims Based on the April 2021 Offering Are Timely .....................................................................................................................24

      1.    The Complaint Relates Back Under Rule 15(c) to the Original Complaints ..................................................................................................25

      2.    Plaintiffs' §§11 and 12(a)(2) Claims Based on the April 2021 Offering Are Timely ..................................................................................29

V.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF §10(b) OF THE EXCHANGE ACT.......................................................................................32

4918-7945-2427.v1

**Page**

A.    Defendants' Materially False and Misleading Statements......................................33

    1.    Defendants Misleadingly Assured Investors that Agilon's "High-Touch," Cost-Controlling Model Provided Visibility and Predictability of Medical Costs.....................................................33

    2.    Defendants Concealed Material Facts Regarding the Existence and Impact of Systemic Deficiencies with Agilon's Collection, Tracking, and Integration of Payor Data...................................................42

    3.    Defendants Concealed Material Deficiencies with agilon's Growth Model and Onboarding for New Physicians.............................................45

    4.    agilon's Overstated 2Q23 and 3Q23 Financial Results and FY23 Financial Guidance Are Actionable...........................................................46

B.    Plaintiffs Plead a Strong Inference of Scienter for Each of the Exchange Act Defendants............................................................................................51

    1.    Defendants Knew or Recklessly Disregarded the Alleged Deficiencies with agilon's Business Model.................................................53

    2.    Defendants' Numerous Public Statements During the Class Period Contribute to a Strong Inference of Scienter .............................................55

    3.    The Divergence Between agilon's Internal Information and External Statements is Further Confirmation of Defendants' Scienter ...............................................................................................61

    4.    Defendants' Billions of Dollars of Insider Trading Support Scienter ...............................................................................................65

    5.    Defendants' Motivation to Attract and Retain Existing Physician Partners by Concealing Agilon's Deficiencies Bolsters Scienter.............67

    6.    Plaintiffs' Other Allegations Support a Strong Inference of Scienter ...............................................................................................68

    7.    The Exchange Act Defendants' Claims of "Benign" Inferences Fail........71

VI.    PLAINTIFFS ADEQUATELY PLEAD CONTROL-PERSON CLAIMS UNDER §§15 AND 20..................................................................................................73

A.    Plaintiffs' §15 Claims Are Well Pled ...................................................74

B.    Plaintiffs' §20(a) Claims Are Well Pled................................................77

4918-7945-2427.v1

**Page**

VII.    PLAINTIFFS' §20A CLAIMS AGAINST CD&R AND SELL ARE ADEQUATELY PLED ................................................................................80

VIII.   CONCLUSION.................................................................................85

4918-7945-2427.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ..................................................................................70, 71

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) ........................................................................................59

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ...............................................................75

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................11

*Aubrey v. Barlin*,
2011 WL 675068 (W.D. Tex. Feb. 16, 2011)...............................................................73

*Bach v. Amedisys, Inc.*,
2016 WL 4443177 (M.D. La. Aug. 19, 2016) .........................................................38, 45

*Basile v. Valeant Pharm. Int'l, Inc.*,
2015 WL 7352005 (C.D. Cal. Nov. 9, 2015)................................................................85

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008).................................................................84

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................11, 33

*Bensinger v. Denbury Res. Inc.*,
31 F. Supp. 3d 503 (E.D.N.Y. 2014) .......................................................................28, 31

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................73

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)........................................................................33

*Bridges v. Dep't of Md. State Police*,
441 F.3d 197 (4th Cir. 2006) ........................................................................................26

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)........................................................34, 65

*Broll v. Nat'l Asset Servs., Inc.*,
2018 WL 11400095 (W.D. Tex. Apr. 13, 2018)............................................................31

4918-7945-2427.v1

**Page**

*Cal. Pub. Ret. Sys. v. ANZ Sec., Inc.*,
    582 U.S. 497 (2017)..................................................................................................25, 26, 27

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
    2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) .............................................................33, 73, 76

*Campton v. Ignite Rest. Grp., Inc.*,
    2014 WL 61199 (S.D. Tex. Jan. 7, 2014) .................................................................12, 16, 38

*Carlton v. Canon*,
    2016 WL 3959164 (S.D. Tex. July 22, 2016)..................................................................78, 80

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
    497 F.3d 546 (5th Cir. 2007) ..........................................................................................66

*Chiarella v. United States*,
    445 U.S. 222 (1980).......................................................................................................81

*China Agritech v. Resh*,
    584 U.S. 732 (2018).......................................................................................................29

*City of Pontiac Gen. Emps.' Ret. Sys. v. Hanger, Inc.*,
    2017 WL 384072 (W.D. Tex. Jan. 26, 2017), *aff'd sub nom. Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175 (5th Cir. 2019).......................................................................41

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)...........................................................................................41

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
    504 F. Supp. 2d 151 (N.D. Tex. 2007) .............................................................................23

*Crutchfield v. Match Grp., Inc.*,
    529 F. Supp. 3d 570 (N.D. Tex. 2021) .............................................................................61

*Cunningham v. Circle 8 Crane Servs., LLC*,
    2021 WL 1615581 (W.D. Tex. Jan. 25, 2021) ..................................................................24

*Dartley v. ErgoBilt Inc.*,
    2001 WL 313964 (N.D. Tex. Mar. 29, 2001).....................................................................23

*Del Castillo v. PMI Holdings N. Am. Inc.*,
    2015 WL 3833447 (S.D. Tex. June 22, 2015)....................................................................79

*Del Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2024 WL 83503 (S.D. Tex. Jan. 8, 2024).............................................................19, 34, 49

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    620 F. Supp. 3d 603 (S.D. Tex. 2022) ..............................................................................66

- v -

**Page**

*Dennis v. Gen. Imaging, Inc.*,
918 F.2d 496 (5th Cir. 1990) ....................................................................................78

*Dusek v. JPMorgan Chase & Co.*,
832 F.3d 1243 (11th Cir. 2016) ................................................................................28

*Eastwood Enters., LLC v. Farha*,
2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)................................................84, 85

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
905 F.3d 892 (5th Cir. 2018) ..............................................................................19, 43

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................................................................................................32

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ....................................................................................70

*Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.*,
291 F. Supp. 3d 364 (S.D.N.Y. 2018)................................................................ *passim*

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)........................................................................................47

*Fener v. Belo Corp.*,
425 F. Supp. 2d 788 (N.D. Tex. 2006) ....................................................................66

*Ferguson v. Bank of New York Mellon Corp.*,
802 F.3d 777 (5th Cir. 2015) ....................................................................................69

*Firefighters' Ret. Sys. v. Citco Grp. Ltd.*,
2019 WL 13194025 (M.D. La. Jan. 9, 2019),
*aff'd*, 855 F. App'x 902 (5th Cir. 2021)..................................................................24

*Fitzpatrick v. Uni-Pixel, Inc.*,
35 F. Supp. 3d 813 (S.D. Tex. 2014) ............................................................71, 72, 73

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ....................................................................................55

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................17

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................55, 63

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ......................................................................63

4918-7945-2427.v1

**Page**

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ..........................................................................................43

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591 (E.D.N.Y. July 26, 2016) ................................................................63

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) .........................................................................................34

*Guajardo v. Freddie Recs., Inc.*,
  2015 WL 5674826 (S.D. Tex. Sept. 25, 2015) .........................................................29, 30

*Hall v. Rent-A-Ctr., Inc.*,
  2017 WL 10619820 (E.D. Tex. Oct. 16, 2017) .............................................................61

*Hall v. Rent-A-Ctr., Inc.*,
  2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ...............................................................68

*Heck v. Triche*,
  775 F.3d 265 (5th Cir. 2014) .........................................................................................80

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...............................................................56

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) .......................................................................................................12

*Hill v. State St. Corp.*,
  2011 WL 3420439 (D. Mass. Aug. 3, 2011) .................................................................23

*Hines v. Liberty Life Ins. Co.*,
  2013 WL 310320 (W.D. Tex. Jan. 25, 2013) ................................................................47

*Hiser v. NZone Guidance, LLC*,
  2019 WL 2098091 (W.D. Tex. Mar. 27, 2019) .............................................................47

*Hodge v. Engleman*,
  90 F.4th 840 (5th Cir. 2024) ..........................................................................................11

*Hogan v. Pilgrim's Pride Corp.*,
  73 F.4th 1150 (10th Cir. 2023) .................................................................................27, 28

*Holzwasser v. Staktek Holdings, Inc.*,
  2006 WL 897746 (W.D. Tex. Mar. 30, 2006) ...............................................................53

4918-7945-2427.v1

**Page**

*Huddleston v. Herman & MacLean*,
640 F.2d 534 (5th Cir. 1981),
*aff'd in part and rev'd in part on other grounds*,
459 U.S. 375 (1983) ......................................................................................................21, 32, 35

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ..............................................................................69

*In re Am. Hous. Found.*,
543 B.R. 245 (Bankr. N.D. Tex. 2015) ............................................................................26

*In re Apache Corp. Sec. Litig.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) ................................................... *passim*

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................................68

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ............................................................43, 46, 72, 85

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) .................................................................57

*In re Cassava Scis., Inc. Sec. Litig.*,
2023 WL 3442087 (W.D. Tex. May 11, 2023) ...........................................................60, 61

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ...................................................... *passim*

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2017 WL 2599327 (S.D. Tex. June 16, 2017) ............................................................81, 85

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) ..................................................................23

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) .........................................................27, 31, 73, 75

*In re Enron Corp.*,
2005 WL 1638039 (S.D. Tex. June 21, 2005) ..................................................................31

*In re Enron Corp. Sec.*,
465 F. Supp. 2d 687 (S.D. Tex. 2006) .........................................................................30, 31

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
2016 WL 4095973 (S.D. Tex. Aug. 2, 2016),
*aff'd sub nom. Giancarlo v. UBS Fin. Servs., Inc.*,
725 F. App'x 278 (5th Cir. 2018) ....................................................................................84

4918-7945-2427.v1

**Page**

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ................................................................24

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................. *passim*

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ...............................................74, 79, 83

*In re Envision Healthcare Corp. Sec. Litig.*,
2022 WL 4551876 (M.D. Tenn. Sept. 29, 2022) ............................................................27

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015) .....................................................................37

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
2005 WL 1869289 (N.D. Cal. Aug. 5, 2005) .................................................................14

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)..........................................................................65

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
2004 WL 5278716 (E.D. Tex. June 16, 2004)...........................................................23, 33

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D. Tex. 2011),
*aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*,
464 F. App'x 334 (5th Cir. 2012) .............................................................................16, 78

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) .........................................................................................49

*In re HRB Winddown Inc.*,
2024 WL 1099724 (Bankr. D. Del. Mar. 13, 2024)........................................................77

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020).............................................................50, 71

*In re Kosmos Energy Ltd. Sec. Litig.*,
955 F. Supp. 2d 658 (N.D. Tex. 2013) ......................................................................78, 84

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011).............................................................................23

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
2021 WL 5530949 (D. Or. Nov. 24, 2021)............................................................27, 28, 30

4918-7945-2427.v1

**Page**

*In re Marvell Tech. Grp. Ltd. Sec. Litig.*,
  2008 WL 4544439 (N.D. Cal. Sept. 29, 2008) ........................................................................28

*In re NationsMart Corp. Sec. Litig.*,
  130 F.3d 309 (8th Cir. 1997) ...................................................................................................14

*In re Nio, Inc. Sec. Litig.*,
  2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023).............................................................................29

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014).........................................................................................68

*In re Petco Animal Supplies Inc. Sec. Litig.*,
  2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ...........................................................................84

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  307 F. Supp. 3d 583 (S.D. Tex. 2018) ............................................................................. *passim*

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................................................84

*In re Res. Am. Sec. Litig.*,
  2000 WL 1053861 (E.D. Pa. July 26, 2000).............................................................................68

*In re Sec. Litig. BMC Software, Inc.*,
  183 F. Supp. 2d 860 (S.D. Tex. 2001) .....................................................................................83

*In re SolarWinds Corp. Sec. Litig.*,
  595 F. Supp. 3d 573 (W.D. Tex. 2022)........................................................................19, 42, 75

*In re Spear & Jackson Sec. Litig.*,
  399 F. Supp. 2d 1350 (S.D. Fla. 2005) ....................................................................................66

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) .......................................................................................62

*In re Superior Offshore Int'l Inc. Sec. Litig.*,
  2009 WL 82064 (S.D. Tex. Jan. 12, 2009)..........................................................12, 17, 18, 19

*In re Tex. E&P Operating, Inc.*,
  2023 WL 3012268 (Bankr. N.D. Tex. Apr. 19, 2023)..............................................................26

*In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) .....................................................................................64

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
  2019 WL 2724075 (D.N.J. June 30, 2019)................................................................................83

4918-7945-2427.v1

**Page**

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) .................................................................13, 23, 73, 77

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009) ...................................................................................23

*In re WebSecure, Inc. Sec. Litig.*,
182 F.R.D. 364 (D. Mass. 1998)..........................................................................................23

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)................................................................................................55

*Isquith ex. rel. Isquith v. Middle S. Utils.*,
847 F.2d 186 (5th Cir. 1988) ..............................................................................................12

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
712 F.3d 185 (5th Cir. 2013) ..............................................................................................26

*Joaquin v. Coliseum Inc.*,
2016 WL 3906820 (W.D. Tex. July 13, 2016) ...................................................................24

*Johnson v. Aljian*,
257 F.R.D. 587 (C.D. Cal. 2009)........................................................................................85

*Johnson v. Aljian*,
490 F.3d 778 (9th Cir. 2007) ..............................................................................................85

*Kaltman v. Key Energy Servs., Inc.*,
447 F. Supp. 2d 648 (W.D. Tex. 2006)...............................................................................50

*Kurtzman v. Compaq Comput. Corp.*,
2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)..................................................................32

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) ..................................................................50

*Lee v. Active Power, Inc.*,
29 F. Supp. 3d 876 (W.D. Tex. 2014)......................................................................52, 67, 78

*Li v. Eqonex Ltd.*,
2024 WL 4241951 (S.D.N.Y. Sept. 18, 2024).....................................................................80

*LLDVF, L.P. v. Dinicola*,
2010 WL 3210613 (D.N.J. Aug. 12, 2010) ..................................................................80, 84

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund. v. Diodes, Inc.*,
810 F.3d 951 (5th Cir. 2016) ....................................................................................59, 60, 61

4918-7945-2427.v1

**Page**

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) ......................................................................................12

*Loritz v. Exide Techs.*,
  2014 WL 4058752 (C.D. Cal. Aug. 7, 2014).............................................................56

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................................ *passim*

*Lucas v. BMS Enters., Inc.*,
  2010 WL 2671305 (N.D. Tex. July 1, 2010).............................................................24

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006),
  *vacated and remanded on other grounds*,
  551 U.S. 308 (2007).................................................................................................34

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .....................................................................................68

*Marcus v. J.C. Penney Co. Inc.*,
  2015 WL 5766870 (E.D. Tex. Sept. 29, 2015)....................................................50, 51

*Markman v. Whole Foods Mkt., Inc.*,
  2016 WL 10567194 (W.D. Tex. Aug. 19, 2016).......................................................34

*Marquez v. Bright Health Grp. Inc.*,
  2024 WL 4654137 (E.D.N.Y. Nov. 1, 2024).......................................................18, 44

*Martin v. Altisource Residential Corp.*,
  2019 WL 2762923 (D.V.I. July 2, 2019)..............................................................28, 30

*McCloskey v. Match Grp., Inc.*,
  2018 WL 4053362 (N.D. Tex. Aug. 24, 2018)..........................................................16

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir. 1994) .....................................................................................17

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
  319 F.R.D. 468 (S.D.N.Y. 2017) ...............................................................................29

*Miller v. Nationwide Life Ins. Co.*,
  2008 WL 3086783 (5th Cir. Aug. 6, 2008)..........................................................42, 43

*Murray v. EarthLink Holdings Corp.*,
  2023 WL 4295600 (E.D. Ark. June 30, 2023)...........................................................27

4918-7945-2427.v1

**Page**

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ..................................................................19, 52, 53

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) .........................................................................59, 60

*New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
122 F.4th 28 (2d Cir. 2023) ...................................................................................22

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) .............................................................................55

*Northumberland Cnty. Ret. Sys. v. Kenworthy*,
2013 WL 5230000 (W.D. Okla. Sept. 16, 2013) ..................................................22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)............................................................................55, 71

*Nykredit Portefølje Admin. A/S v. Propetro Holding Corp.*,
2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)......................................................31

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ................................................................51, 60, 61, 62

*Ollila v. Babcock & Wilson Enters., Inc.*,
2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .....................................................17, 44

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................................16, 39, 40

*One Longhorn Land I, L.P. v. FF Arabian, LLC*,
2015 WL 7432360 (E.D. Tex. Nov. 23, 2015) ...........................................74, 77, 78

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ...............................................................41, 67, 73

*Paez v. Wal-Mart Stores Tex., LLC.*,
2022 WL 3216343 (W.D. Tex. Aug. 9, 2022)........................................................46

*Pang v. Levitt*,
2023 WL 11643704 (W.D. Tex. Dec. 20, 2023) ..............................................13, 17

*Pang v. Levitt*,
No. 1:22-cv-1191 (W.D. Tex.) (ECF 62)...............................................................13

*Pappas v. Qutoutiao Inc.*,
2024 WL 4588491 (2d Cir. Oct. 28, 2024).............................................................14

4918-7945-2427.v1

**Page**

*Perry v. Duoyuan Printing, Inc.*,
2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) ........................................................................23

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) .....................................................................................68

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
940 F. Supp. 1101 (W.D. Mich. 1996) ...................................................................................79

*Pinter v. Dahl*,
486 U.S. 622 (1988).....................................................................................................21, 22, 24

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ..................................................................................................53

*Police & Fire Ret. Sys. of Detroit v. Crane*,
87 F. Supp. 3d 1075 (N.D. Cal. 2015) ...................................................................................37

*Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*,
721 F.3d 95 (2d Cir. 2013).....................................................................................................28

*R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*,
205 F.3d 165 (5th Cir. 2000) ......................................................................................32, 42, 44

*Roberti v. OSI Sys., Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...................................................................57, 58

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ......................................................................................19, 22, 24

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019).......................................................35, 40, 41, 53

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ...............................................................................................38, 65

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024).....................................................................................69

*Schuler Drilling Co., Inc. v. Disiere Partners, LLC*,
2024 WL 848961 (N.D. Tex. Feb. 28, 2024)..........................................................................26

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
12 F.4th 337 (3d Cir. 2021) ...............................................................................26, 27, 28, 29

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ....................................................................................57

**Page**

*SEC v. Contorinis*,
743 F.3d 296 (2d Cir. 2014)...................................................................................................85

*SEC v. Jantzen*,
2012 WL 13032919 (W.D. Tex. Feb. 29, 2012).....................................................................81

*SEC v. Pardue*,
2005 WL 736884 (E.D. Pa. Apr. 1, 2005) .............................................................................83

*SEC v. Powell*,
2012 WL 13032952 (W.D. Tex. Jan. 25, 2012) .....................................................................81

*SEC v. SBB Rsch. Grp., LLC*,
2020 WL 6075873 (N.D. Ill. Oct. 15, 2020)..........................................................................44

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) ...................................................................................84

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
2021 WL 4864421 (N.D. Cal. Oct. 19, 2021)...................................................................17, 68

*Shen v. Exela Techs., Inc.*,
2022 WL 198402 (N.D. Tex. Jan. 21, 2022) ....................................................................35, 36

*Singh v. 21Vianet Grp., Inc.*,
2017 WL 4322483 (E.D. Tex. Sept. 13, 2017),
*report and recommendation adopted*,
2017 WL 4310154 (E.D. Tex. Sept. 28, 2017).......................................................................55

*SMS Fin., Ltd.Liab. Co. v. ABCO Homes, Inc.*,
167 F.3d 235 (5th Cir. 1999) ..................................................................................................29

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) .....................................................................................34, 49, 79

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .......................................................................................48, 68, 71, 72

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)........................................................................35, 49

*Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*,
821 F.3d 780 (6th Cir. 2016) ..................................................................................................28

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014).....................................................................................52

**Page**

*Taylor v. Trevino*,
  569 F. Supp. 3d 414 (N.D. Tex. 2021) ...................................................................26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................... *passim*

*The Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*,
  2023 WL 2717968 (W.D. Tex. Jan. 31, 2023) .......................................................46

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020) .....................................................................33

*Tran v. XBiotech Inc.*,
  2016 WL 5408382 (W.D. Tex. Sept. 23, 2016)......................................................67

*Trendsetter Invs., LLC v. Hyperdynamics Corp.*,
  2007 WL 172627 (S.D. Tex. Jan. 18, 2007).....................................................74, 77

*United Food & Com. Workers Union v. Chesapeake Energy Corp.*,
  2010 WL 3527596 (W.D. Okla. Sept. 2, 2010) ......................................................23

*United States ex rel. Carter v. Halliburton Co.*,
  315 F.R.D. 56 (E.D. Va. 2016),
  *aff'd*, 866 F.3d 299 (4th Cir. 2017) ......................................................................25

*United States v. Causey*,
  2005 WL 3560632 (S.D. Tex. Dec. 29, 2005)........................................................81

*United States v. O'Hagan*,
  521 U.S. 642 (1997)................................................................................................81

*United States v. Peterson*,
  101 F.3d 375 (5th Cir. 1996) ..................................................................................32

*United States v. Sneed*,
  2022 WL 35801 (N.D. Tex. Jan. 4, 2022) ..............................................................38

*Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) .....................................................................56

*Voigt v. Metcalf*,
  2020 WL 624999 (Del. Ch. Feb. 10, 2020) ............................................................79

*Walker v. Rent-A-Ctr.*,
  2005 WL 8161388 (E.D. Tex. July 25, 2005) ...................................................13, 14

*Wieland v. Stone Energy Corp.*,
  2007 WL 2903178 (W.D. La. Aug. 17, 2007)........................................................43

4918-7945-2427.v1

**Page**

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ..........................................................41, 42, 46

*York Cnty. ex rel. York Ret. Fund v. HP Inc.*,
  __ F. Supp. 3d __, 2024 WL 1327247
  (N.D. Cal. Mar. 27, 2024) ................................................................................................25, 26

*Yoshikawa v. Exxon Mobil Corp.*,
  2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)................................................................59, 61

*Zishka v. Am. Pad & Paper Co.*,
  2001 WL 1748741 (N.D. Tex. Sept. 28, 2001),
  *aff'd*, 72 F. App'x 130 (5th Cir. 2003)..........................................................................78, 80

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
  §78j(b).......................................................................................................... *passim*
  §77k.............................................................................................................. *passim*
  §77k(a) ................................................................................................................12
  §77l ..............................................................................................................24, 31
  §77l(a)(2) .................................................................................................... *passim*
  §77m .................................................................................................................26
  §77n(a) ..............................................................................................................31
  §77o............................................................................................................ *passim*
  §77o(a) ..............................................................................................................74
  §78t-1 .............................................................................................80, 81, 84, 85
  §78t-1(a)............................................................................................................80
  §78t(a) ....................................................................................................... *passim*
  §78u-4(b)(1) ......................................................................................................33
  §78u-4(b)(1)-(2) ...............................................................................................33
  §78u 4(b)(2)(A) ................................................................................................51
  §78u-5 ...............................................................................................................49

Federal Rules of Civil Procedure
  Rule 8 .......................................................................................................... *passim*
  Rule 8(a)......................................................................................................14, 33
  Rule 9(b) ..................................................................................................... *passim*
  Rule 10(b) ..........................................................................................................19
  Rule 10b-5........................................................................................................72, 81
  Rule 10b5-1.......................................................................................................81
  Rule 12(b)(6).....................................................................................................42
  Rule 15(c)................................................................................................... *passim*
  Rule 24...............................................................................................................28

**Page**

17 C.F.R.
    §230.405................................................................................................73, 74, 75, 78
    §240.10b5-1 ....................................................................................................81, 85
    §240.10b5-1(b)......................................................................................................80

Local Rule CV-7(c)(1)....................................................................................................46

## SECONDARY AUTHORITIES

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,151 (1999)............................................47

Plaintiffs respectfully submit this omnibus memorandum of law in opposition to defendants' three separate motions to dismiss. *See* ECF 51 ("agilon"); ECF 53 ("UW"); and ECF 54 ("CD&R").[1]

## I.  INTRODUCTION

In April 2021, New York-based private equity firm Clayton, Dubilier & Rice, LLC ("CD&R") joined together with agilon, its senior insiders and a syndicate of investment banks to complete agilon's $1.2 billion initial public offering (the "IPO"). To drum up investor interest, defendants marketed agilon as a revolutionary company uniquely equipped to profit from Medicare Advantage by delivering healthcare to seniors at significantly lower costs. Defendants claimed agilon's "Total Care Model" was able to generate these profits by leveraging the Company's: (1) unrivaled data and analytics capabilities which provided "tremendous" and "extremely strong" visibility into patient medical history and costs; (2) strong growth in mature markets; and (3) immunity from utilization spikes that other healthcare providers were experiencing due to pent-up healthcare demand from the COVID-19 pandemic.

Subsequent to the IPO, defendants continued to repeatedly tell investors that agilon's unique business model was delivering concrete results, reiterating that agilon's "high-touch" approach was driving medical costs down, its data analytics were providing the visibility and predictability on which agilon's business relied, its closely-followed medical margin metric was growing, and patient utilization remained low.

Defendants' messaging had the intended effect. With the country emerging from the COVID-19 pandemic, the investing public perceived agilon as "safer" than its competitors, and

---

[1]     Unless otherwise noted, citations are omitted, emphasis is added, capitalized terms not otherwise defined have the same meaning as set forth in the Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 36) (the "Complaint"), and all "¶__" or "¶¶__" citations herein refer to the Complaint.

rewarded agilon's stock price with a premium valuation.  CD&R (the private equity firm that founded agilon), along with the Company's CEO, capitalized on defendants' misrepresentations and the artificial inflation they caused in agilon's stock price by selling *$2.7 billion* of their own agilon stock at prices as high as $28 per share.

In reality, defendants were affirmatively misrepresenting the integrity of agilon's business model, masking the Company's lack of visibility into members' medical costs and agilon's medical margin (the Company's "main margin metric"), and concealing extensive pent-up demand from COVID-19.  In fact, the Company had been experiencing a massive jump in utilization rates during FY23, driven largely by the pent-up COVID-19 demand defendants had been concealing.

As industry utilization rates rose following the COVID-19 lockdowns, defendants reassured the market that agilon's "high touch" model had "prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization."  Then, in November 2023, agilon admitted it had been experiencing much higher patient utilization, and was forced to take an additional $30 million reserve, as a result.  The news shocked financial analysts, who expressed "confusion" and "concern" that agilon's disclosures "***contradict[ed]***" its prior statements, and caused agilon's stock price to drop 13% in a single day.  Additional disclosures followed in January and February 2024, including that the Company's previously reported medical margins had been overstated by over 40%, that members' FY23 medical costs and utilization rates were as much as 350% of FY22 rates, that agilon's adjusted EBITDA had flipped from positive $4 million in FY22 to negative $95 million in FY23, and that agilon was only 60% through its backlog of pent-up COVID-19 demand.  The news caused agilon's stock to continue to fall further, eventually collapsing 85% from its Class Period high and inflicting massive losses on Plaintiffs and the Class.  agilon's shares, which sold for nearly $45 per share during the Class Period, have now fallen more than 95% to below $2 per share.

- 2 -

4918-7945-2427.v1

In response to the Complaint's well pled allegations, defendants' three motions to dismiss (spanning over 1,000 pages of arguments and exhibits) resort to misstating legal standards, disputing Plaintiffs' factual allegations, inventing counter-facts, and improperly rewriting Plaintiffs' alleged misleading statements as defendants would prefer them to be. None of defendants' arguments supports dismissal.

*First*, defendants' dismissal arguments regarding Plaintiffs' strict liability and negligence-based claims under the Securities Act lack merit. Defendants utilized three Registration Statements in three public Offerings completed during the Class Period to sell over 155 million shares for more than $3.5 billion. Each Registration Statement contained untrue statements of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. The Company and the Securities Act Defendants face virtually absolute liability as a result. Plaintiffs' Securities Act claims are subject to the pleading standard embodied in Rule 8 of the Federal Rules of Civil Procedure as they are separately pled and expressly exclude any allegation of fraud. Plaintiffs' Securities Act claims are also timely as they all relate back to the first complaints filed and consolidated into this action. Plaintiffs adequately allege §12(a)(2) claims, as the Underwriter Defendants ("Underwriters") were statutory sellers. Plaintiffs' control person claims against CD&R and the other controlling defendants are likewise adequately alleged.

*Second*, defendants' three motions to dismiss challenge only two elements of Plaintiffs' §10(b) claims: falsity and scienter. Defendants do not even attempt to contest loss causation, as it is indisputable that the revelation of the truth regarding defendants' misstatements and omissions caused significant declines in agilon stock and thus Plaintiffs' damages. Defendants' arguments that their Class Period statements were not false or misleading are meritless. For instance, defendants challenge verifiably false statements as "opinions," and baselessly assert that agilon's April 2021 "risk disclosures" somehow shield almost every subsequent misstatement alleged in the Complaint.

- 3 -

Defendants' puffery arguments are weak, while their safe harbor argument, confined to agilon's

FY23 guidance, also fails.  Defendants' well-worn hindsight arguments, along with defendants'

protests that their misleading statements were literally true, fare no better.

*Third*, defendants' assertion that the Complaint fails to adequately allege scienter is wrong.

Defendants' fraud centered on agilon's lifeblood – its Medicare Advantage ("MA") "Total Care

Model."  Defendants repeatedly assured investors of agilon's real-time data and laser-focus on

patients' medical costs and utilization rates.  Defendants even concede agilon's data deficiencies,

although hidden from the market, were well known within the Company.  The Complaint further

alleges – and defendants have effectively admitted – defendants withheld material facts from the

market.  Defendants also seemingly ignore the billions of dollars of insider trading, as well as

Plaintiffs' other motive allegations specific to agilon's partnership-dependent model, which bolster

an already strong inference that defendants knew or recklessly disregarded the falsity of their

statements.  Whether viewed individually or holistically, Plaintiffs' allegations support a strong

inference of scienter for each of the Exchange Act Defendants.

Defendants' motions should be denied in their entirety.

## II.    FACTUAL BACKGROUND

### A.    agilon Seeks to Profit by Cutting Medical Care to Patients

agilon is a middleman in the provision of medical care to senior citizens.  ¶¶3, 7.  The

Company contracts with Medicare Advantage health plans (or "payors") to accept 100% of the

financial risk of the medical costs associated with the payors' Medicare Advantage patients. ¶3.  In

exchange for offloading that risk onto agilon, payors submit "capitation" payments to agilon, using

funds derived from the federal government's Medicare program.  ¶¶3-4.  To deliver the actual

medical services to patients, agilon enters into long-term partnership agreements with physician

- 4 -

groups.  ¶4.  agilon shares any unspent "capitation" funds from payors 50/50 with its physician partners.  *Id.*

Under this incentive structure, agilon must spend less on its patients' medical care than agilon receives from its payors – a term agilon refers to as "medical margin."  *Id.*  If patients' medical expenses and/or utilization rates increase, agilon's medical margin shrinks.  *Id.*  Conversely, agilon increases its reported medical margin by deferring utilization of healthcare, and the medical costs associated with providing that medical care, until future periods or the patient no longer needs the care.

### B.     agilon Raises $1.2 Billion from Public Investors in the April 2021 Offering

The COVID-19 pandemic struck the United States in early 2020, causing sharp declines in non-essential healthcare utilization and medical costs, boosting agilon's financial results.  ¶¶5, 59.  agilon and its founding private equity firm, CD&R, seized on this windfall by preparing to take agilon public.  ¶59.

To consummate a successful public offering, agilon needed to convince investors that agilon possessed a viable model for profiting from Medicare.  ¶60.  agilon also needed to persuade the market that agilon's first-of-its-kind business model could generate predictable and sustainable medical cost savings, as well as grow efficiently and sustainably by integrating new physicians into agilon's novel "partnership model."  ¶¶60, 64.  Further, the Company had to show investors that agilon and its physician partners were treating agilon's senior patients in a cost-effective manner, utilizing accurate, comprehensive, reliable, and timely data to do so.  ¶60.  With this in mind, defendants prepared the April 2021 Registration Statement, emphasizing the purported strategic advantages of agilon's Total Care business model, including agilon's:

- sophisticated and data-rich "purpose-built model," which "provides the necessary capabilities" and "extracts needed financial, clinical and social determinants data and

- 5 -

organizes this disparate data to enable easy consumption by physicians in order to improve . . . cost[s]";

- "Data Integration and Management" capabilities, which "enables ease of integration with payor systems";

- "ability to accurately predict and effectively manage our medical margin," and "effectively managing costs"; which purportedly yielded "significant visibility into the near-term and long-term financial trajectory";

- "[c]ritical" "ability to deliver actionable insight at the patient and physician level" which "enhance our ability to improve medical margin";

- significant growth potential in its mature markets, which included agilon's "ability to add new physician partners and to attract additional PCPs to our physician partners."

¶¶61-62.  agilon successfully completed its initial public offering on April 16, 2021, raising $1.2 billion from public investors.  ¶63.

### C.    Defendants Misled Investors About agilon's Business

Following the April 2021 Offering, the Exchange Act Defendants emphasized the foundational elements of agilon's business model, including in offering materials utilized in connection with agilon's $510 million September 13, 2021 public offering ("September 2021 Offering") and its $1.66 billion May 17, 2023 public offering (the "May 2023 Offering"), Annual Reports on Form 10-K, quarterly Reports on Form 10-Q, and quarterly earnings releases filed with the SEC, and investor earnings calls.  While publicly assuring investors of agilon's effective management of patient medical costs and utilization, defendants' statements concealed the existence and adverse impact of fundamental deficiencies in agilon's: (1) payor data; (2) ability to accurately track medical expenses and medical margin; (3) incorporation of new physicians to its Total Care Model; and (4) reporting of accurate historical financial results.  ¶¶64-85.

- 6 -

1.      **Defendants' Claims that agilon's Cost-Controlling Business
        Model Provided Visibility and Predictability of Medical Costs
        and Medical Margin Were False and Misleading**

Defendants repeatedly emphasized to the market during the Class Period that agilon's "high touch" business model enabled the Company to effectively manage medical costs and member utilization. *E.g.*, ¶¶64, 66, 113, 164, 166, 176-177. Defendants also assured investors that agilon's business model provided defendants with "visibility" into agilon's historical and near-term medical costs and medical margin, that was nothing short of "incredible," "tremendous[]," "really strong," and "extremely strong," which in turn yielded significant "predictability" as to agilon's financial results. *E.g.*, ¶¶62, 67-68, 100, 120, 131, 155, 158, 163, 165, 169. For instance, Sell reassured investors that agilon knows on "day one, year one" what the "revenues" and "cost structure looks like" for its new physician partners. ¶¶68, 129. agilon also confirmed that its "visibility" gave it access to "*all*" of agilon's patients' data from "*all*" of agilon's MA payors (¶¶83, 127), and was so far-reaching that "long before we go live, we have really, really strong visibility into exactly what's happening," and "what the economics . . . look like." ¶¶68, 155.

In reality, agilon was affirmatively misrepresenting the Company's results and cost trends, while concealing agilon's lack of visibility into members' medical costs and agilon's medical margin. *E.g.*, ¶¶72, 112, 137, 157, 173, 175, 188. As concerns over industry-wide utilization and cost trends mounted in early 2023, Sell doubled-down, assuring investors in August 2023 that agilon and its business model stood apart as "different models will yield different outcomes," and agilon's "high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization." ¶¶71, 161. agilon also contended its 2Q23 record medical margin results and year-over-year growth validated the strength and durability of agilon's business model, and bolstered agilon's "conservative" FY23 medical margin and adjusted EBITDA guidance. ¶¶158, 177, 182. In truth, the Company was sitting on a massive "backlog" of pent-up COVID-19 demand.

¶¶13, 72, 86, 89, 203, 218-219.  And, while concealing soaring rates in patient utilization and medical costs, defendants continued to tout the impact from "*lower*[] utilization" on patients' medical costs.  *E.g.*, ¶¶149, 157, 161-162, 167-168, 171-172, 179-181.

### 2. Defendants Failed to Disclose Material Deficiencies with agilon's Growth Model and Onboarding for New Physicians

Defendants repeatedly billed agilon's model of adding new physicians in mature markets as a "highly efficient" and "sustainable" engine of growth.  *E.g.*, ¶¶75, 100-102, 105, 110.  Defendants also assured the market concerning agilon's robust onboarding and integration processes for new physicians, which ostensibly enhanced agilon's visibility into its members' medical costs and the predictability of agilon's financial results.  ¶78.

But, while adding new physicians in mature markets drove a substantial portion of agilon's growth, agilon concealed that it was not providing its new physicians with the basic onboarding and education they needed to integrate into the agilon partnership.  ¶¶79, 112, 137, 157, 173, 188.  Thus, agilon packed its mature markets with scores of new physicians without educating them on such topics as the basics of the agilon-physician partnership, or providing them with the key training they needed to manage patient medical costs, causing those physicians to perform poorly, directly impacting agilon's medical margins.  ¶¶78-79.  agilon concealed that its own failure to onboard and educate new physicians was a root cause of agilon's drastic underperformance.  ¶79.  As agilon eventually revealed, agilon's failure to provide basic onboarding and orientation to new doctors was causing these new physicians to generate medical margins *80%* lower on average than the medical margins posted by physicians who had received the necessary training.  *Id.*

### 3. Defendants Failed to Disclose Material Adverse Facts Concerning agilon's Collection, Tracking, and Integration of Payor Data

Defendants emphasized that agilon's ability to effectively and accurately collect, integrate, and analyze payor data validated agilon's full-risk business model and enabled agilon's partners to

- 8 -

effectively manage agilon's full-risk. *E.g.*, ¶¶80, 103, 107, 119, 122-127, 139, 145. Defendants also repeatedly asserted that agilon and its physician partners were utilizing accurate, comprehensive, standardized, and timely payor data, and that the physician partners fully trusted agilon's data. *E.g.*, ¶¶80-83, 122, 124. Defendants assured investors that these data capabilities provided agilon tremendous visibility into the Company's historical, near-term and long-term financial trajectory and medical costs, which was a key pillar of agilon's business model.

These statements were untrue. The reality was systemic data and analytics deficiencies rendered agilon incapable of reliably and accurately tracking, reporting and forecasting patient medical expenses. agilon lacked critical systems required to reliably track and analyze the member-level data received from payors, and to accurately track and forecast medical costs and medical margin. ¶84. Further, the payor data agilon received was incomplete, delayed, and so heterogeneous that agilon was forced to ultimately establish an entirely new "data pipeline" to enable agilon to actually view and analyze payor data in a consistent and standardized format. *E.g.*, ¶¶84, 112, 137, 157, 173, 188.

agilon's data deficiencies directly harmed agilon's physician partners, who relied on agilon for the data they needed in order to manage agilon's full-risk. ¶85. The gaps in payor data were so fundamental that approximately 80 high-ranking representatives of over a dozen of agilon's partners later confirmed to CMS that agilon's partners lacked the comprehensive data necessary to manage the full risk of agilon's members, and instead had been relying on altered, delayed, and/ or non-standard data files to manage agilon's patients. ¶¶85, 241-246. Furthermore, agilon's partners acknowledged they continued to lack the information they needed to appropriately manage the risk they carried for agilon's patients. *Id.*

4918-7945-2427.v1

### D.   CD&R Cashes Out and the Fraud Unravels

By May 2023, CD&R had finished offloading billions of dollars in agilon stock at prices as high as $28 per share.  ¶¶328-329.  And, although agilon was not yet profitable and was burning through cash, in May 2023 CD&R used its control over agilon to force the Company to purchase 9.6 million of CD&R's own agilon shares for $200 million – transferring to CD&R half of agilon's remaining cash and cash equivalents.  ¶215.

In November 2023, the truth about agilon's business began to be revealed.  Notwithstanding the Exchange Act Defendants' repeated claims to the contrary, agilon's business model was not capable of delivering the "predictable" cost savings and profits defendants represented, as agilon had been suffering the same dramatic uptick in healthcare utilization and medical claims as other Medicare Advantage providers.  ¶¶86-88.  Defendants also began to reveal the existence and impact of the systemic deficiencies with agilon's data and analytics that had rendered agilon incapable of accurately and reliably tracking and reporting members' medical costs and medical margin.  ¶¶86-88.

Specifically, on November 2, 2023, defendants disclosed that – contrary to their prior statements at late as August and September – agilon had suffered an undisclosed spike in patient utilization beginning by at least May 2023.  ¶¶88, 175-176, 179-180, 195.  agilon also cut its FY23 outlook for medical margin and adjusted EBITDA, revealing a significant deterioration in key profit metrics.  ¶¶174, 195.  agilon's admissions shocked the market, sending agilon's stock price down 13%.  ¶¶88, 196-197.

On January 5, 2024, agilon stunned the market again when it announced Bensley's "retirement" as CFO, revealed that agilon's previously reported 3Q23 medical margin of $108 million had been overstated by at least *40%*, and cut agilon's FY23 outlook it had provided just weeks before.  ¶¶89, 198-200.  agilon also revealed that its FY23 utilization rates were actually up to

*350%* of FY22 rates, and that the soaring utilization agilon had previously concealed from investors would persist through 2024. ¶¶89, 203. agilon disclosed that it was only 60% of the way through the backlog of pent-up demand from COVID-19 – the "pent-up demand" whose existence defendants had previously concealed. ¶¶86, 89, 218. Finally, agilon revealed it had failed to onboard hundreds of physicians it had added in mature markets, and that this issue had been significantly adversely impacting medical margins. ¶¶89, 198, 202, 231. agilon's disclosures tanked the Company's stock price by 29%. ¶¶90, 204-205.

On February 27, 2024, agilon announced it had widely missed its January FY23 forecast and was cutting its FY24 guidance. ¶¶91, 232. The Company also disclosed a previously concealed material weakness in the Company's ICFR, and acknowledged that agilon had reported inaccurate medical margins for several prior years. ¶¶91, 207. The news caused a further 7% decline in agilon's stock price. ¶¶91, 211.

## III.    LEGAL STANDARD ON A MOTION TO DISMISS

To withstand a motion to dismiss, a pleading need only allege a claim that is "plausible on its face" (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). In the Fifth Circuit, motions to dismiss are viewed with disfavor and rarely granted. *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024); *Lormand*, 565 F.3d at 232 (same).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE SECURITIES ACT

Plaintiffs allege claims under §§11, 12(a)(2), and 15 of the Securities Act against agilon and the Securities Act Defendants for using false and misleading Registration Statements to raise over

- 11 -

$3.5 billion from investors via three securities Offerings: the April 2021 Offering, the September 2021 Offering, and the May 2023 Offering.  ¶¶1, 63, 106, 153, 256-309; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983).

### A.      Plaintiffs Adequately Plead §11 Claims

Section 11 of the Securities Act allows purchasers of stock to recover damages when a registration statement either "contain[s] an untrue statement of a material fact or omit[s] to state a material fact . . . necessary to make the statements therein not misleading."  15 U.S.C. §77k(a). Liability for violations of §11 is "virtually absolute even for innocent misstatements." *Herman*, 459 U.S. at 382.  "The burden on a Section 11 plaintiff is relatively light since that section encompasses a strict liability standard." *Campton v. Ignite Rest. Grp., Inc.*, 2014 WL 61199, at *5 (S.D. Tex. Jan. 7, 2014); *Herman*, 459 U.S. at 382 (plaintiff's burden is "relatively minimal").  To satisfy §11, a plaintiff "need only show a material misstatement or omission to establish his *prima facie* case." *Herman*, 459 U.S. at 382.  Claims under the Securities Act do not require allegations of reliance, causation, or scienter, and a plaintiff need not allege any intent to deceive or defraud.  *Campton*, 2014 WL 61199, at *5.  "[D]etermining whether information has been adequately disclosed is a mixed question of fact and law and, therefore, is a question for a jury." *Isquith ex. rel. Isquith v. Middle S. Utils.*, 847 F.2d 186, 208 (5th Cir. 1988).

"Section 11 generally requires only notice pleading under Rule 8 of the Federal Rules of Civil Procedure, not the detailed pleading required by Rule 9(b) or by the [Private Securities Litigation Reform Act of 1995 ("PSLRA")]." *In re Superior Offshore Int'l Inc. Sec. Litig.*, 2009 WL 82064, at *2 (S.D. Tex. Jan. 12, 2009).  This is so regardless of whether the Complaint also contains Exchange Act claims, as long as the Securities Act claims "'disavow[] and disclaim[] any allegation of fraud.'"  *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (holding Rule 8 applies to Securities Act claims in which plaintiff "'does not assert that defendants

- 12 -

are liable for fraudulent or intentional conduct'"). Here, in addition to specifically disavowing fraud, Plaintiffs *make no reference to fraud or scienter allegations* in support of their Securities Act claims. *See also* ¶257 ("This [§11] claim is based on strict liability and does not sound in fraud. Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct."); ¶256 ("Plaintiffs repeat and reallege the allegations contained in ¶¶16-22, 28-56 [*omitting reference to "Additional Scienter Allegations"*], ¶¶250-254(a), [*omitting reference to scienter*, ¶¶254(c)], 254(d), 255 as if fully set forth herein" and *excluded references to §10(b) liability count*, ¶¶310-315); ¶¶280-281 (same for §12(a)(2) claims); ¶¶293-294 (same for §15 claims).[2] The Complaint also entirely separates the alleged false and misleading statements in the Offering Materials and the reasons they were false pursuant to the Securities Act from the Complaint's Exchange Act allegations. ¶¶267-279. Because the Complaint provides plain notice to defendants that Securities Act claims are not premised on fraudulent or intentional conduct, those claims do not "sound in fraud" and Rule 8's pleading standard applies.[3] The Complaint's allegations satisfy these legal standards and adequately plead §11 claims against agilon and the Securities Act Defendants.[4]

---

[2]    Relying on inapposite cases, defendants incorrectly contend that Plaintiffs' Securities Act and Exchange Act allegations are "'substantively identical.'" *See* agilon at 13 n.7. Unlike here, the plaintiffs in *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018) alleged that the §11 statements were false or misleading for the "same reasons" that allegedly showed "both falsity and scienter" under the Exchange Act. *Id.* at 643. Defendants' reliance on *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624 (S.D. Tex. 2021), fares no better. There the plaintiffs' §§11 and 10(b) claims relied on the same falsity and scienter allegations. *Id.* at 669. Here, the Complaint meticulously separates the §11 allegations from the Exchange Act claims, such that the §11 claim "stand[s] alone." *See Walker v. Rent-A-Ctr.*, 2005 WL 8161388, at *18 (E.D. Tex. July 25, 2005).

[3]    Defendants fail to cite the Court's holding in *Pang v. Levitt*, 2023 WL 11643704, at *9-*10 (W.D. Tex. Dec. 20, 2023) on this issue. The Securities Act claims in *Pang* "repeat and reallege each and every allegation contained above as if fully set forth herein" and did not explicitly exclude the allegations of fraud or separately allege which statements were the subject of Securities Act claims, as Plaintiffs have done here. *See Pang v. Levitt*, No. 1:22-cv-1191 (W.D. Tex.) (ECF 62).

[4]    Even if Plaintiffs' Securities Act and Exchange Act allegations could be construed as identical (which they are not), courts still apply Rule 8 where plaintiffs make it "sufficiently clear"

- 13 -

### 1.      The IPO and September 2021 Offering

Defendants conducted the Company's April IPO and September 2021 Offerings using the April 2021 Registration Statement and September 2021 Registration Statement, both of which contained identical false and misleading statements regarding fundamental aspects of agilon's business model and purported ability to cost-effectively manage agilon's patients. ¶¶267-272.  For example, the 2021 Registration Statements contained misleading statements concerning agilon's "Data Integration and Management" capabilities, claiming:

> Our purpose-built and flexible platform enables ease of integration with payor systems, physician EMR systems, labs pharmacies and other third-party platforms, encompassing millions of data records each month.  The agilon platform extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience.

¶268.  Yet, the April 2021 Registration Statement and the September 2021 Registration Statement each omitted that from the start of the Class Period systemic data and analytics gaps prevented the Company from accurately tracking and effectively managing medical margin and members' medical costs, which rendered statements made in the Registration Statements misleading.  ¶¶80-85; 272(a)-(c).  The Registration Statements also omitted that agilon relied on substantially incomplete, non-standardized and significantly delayed payor data, and that agilon's inability to timely obtain and

---

that they "inten[d]" to "assert two alternative theories of liability." *See In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289, at *12 (N.D. Cal. Aug. 5, 2005) (applying Rule 8 to §11 claims where the §§11 and 10(b) claims were "based on the same conduct" but alleged "differing states of mind"); *Walker*, 2005 WL 8161388, at *18 (applying Rule 8 to §11 claims because, even though the complaint's §11 claims "'repeat[ed] and realleg[ed] each and every allegation [including Exchange Act claims],'" "plaintiffs' standalone 1933 Act claims . . . expressly do not claim defendants are liable for fraudulent or intentional conduct").  As courts reason, "'[t]o require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments . . . would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a).'" *See Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024) (some alteration in original).  *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315-16 (8th Cir. 1997) (where complaint alleged both Securities and Exchange Act claims, holding Rule 8(a) applies to the Securities Act claims).

- 14 -

analyze payor data prevented agilon from reliably tracking medical margin and members' medical costs. *Id.*

The Registration Statements also represented that the Company possessed "***significant visibility into the near-term and long-term financial trajectory*** for both agilon and our anchor physician groups" as well as the "ability to improve medical margin" by "deliver[ing] actionable insight at the patient and physician level." ¶¶268-270. It did not. Further, the Registration Statements misleadingly touted agilon's significant growth potential in mature markets through agilon's "ability to add new physician partners and to attract additional PCPs to our physician partners." ¶271. The Complaint plausibly alleges these were untrue statements of material fact and/or omitted facts which rendered the statements made materially misleading, as: (1) agilon was not capable of providing its physicians with the comprehensive, standardized, timely payor data they needed to manage patients' medical costs or medical margin; (2) the Company lacked the systems, data, personnel and resources necessary to effectively track and forecast patients' medical expenses and medical margin; and (3) agilon was not providing new physicians in mature markets with the basic onboarding and education necessary to integrate into agilon's novel business model, which had materially adversely impacted medical margin. ¶272.

Defendants challenge falsity on several grounds. Their challenges fail. agilon at 14-19; UW at 3-7. ***First***, defendants contend the Registration Statements "risk disclosures" regarding "rel[iance] on . . . payors" rendered agilon's data and data management statements immaterial as a matter of law. agilon at 18 (citing Def. Ex. 1 at 48 (stating agilon "rel[ies] on our payors for membership attribution and assignment, data and reporting accuracy and claims payment and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business")); UW at 6-7; CD&R at 12. "Yet, defendants know that '"[g]eneral cautionary language [such as agilon's]

- 15 -

4918-7945-2427.v1

fails to excuse a failure to reveal known, material, adverse facts.'" *Campton*, 2014 WL 61199, at \*8 (holding overly broad, boiler-plate cautionary language insufficient to render misrepresentations immaterial as a matter of law).  Here, agilon's boiler-plate "risk disclosure" that the Company "rel[ies] on payors" and if those payors do not adequately fulfill the relevant functions, agilon may not receive "complete and accurate information," in no way reveals the complained of omitted facts, including that at the time the Registration Statements were declared effective agilon was unable to collect and integrate comprehensive and timely payor data, and that these facts rendered agilon unable to reliably manage member medical costs and medical margin.[5]

Defendants' reliance on this same vague risk disclosure in dismissing their physician partners' pleas to CMS likewise fails.  agilon at 18-19; UW at 6-7.  In a candid letter to the Administrator of CMS, approximately 80 representatives of agilon's partners confirmed that they had not been receiving the data necessary to manage the risk of agilon's members, that agilon's partners have been relying on "altered and often delayed, non-standard [payor] data files," and that into 2024 agilon remained unable to generate the data its partners needed "to appropriately manage the risk [they] carry for [their] attributed patients."  ¶¶85, 244, 246.  Contrary to defendants' factual arguments, the letter supports Plaintiffs' allegations that throughout the Class Period, in describing

---

[5]      While CD&R accuses Plaintiffs of alleging agilon failed to "accurately predict[]" future events, CD&R at 11-12, CD&R's revisionist argument is wrong and its authorities off point.  Unlike here, the plaintiffs in *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) failed to allege a "reason or reasons why the [defendant's bank reserve] statement was misleading" when made.  *Id.* at 386 (fact that various factors caused bank to collapse was insufficient to show the bank was not previously adequately reserved, particularly where the government found the bank had been adequately reserved).  *Plains* is also inapposite: unlike the statements of fact alleged here, *Plains* featured "legal-compliance" opinion statements that were inactionable under *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).  *Plains*, 307 F. Supp. 3d at 635.  Notably, in both *Franklin Bank* and *Plains*, the courts analyzed the alleged false statements under Rule 9(b) and the PSLRA's heightened pleading standards, not Rule 8 notice pleading.  Further, the plaintiffs in *McCloskey v. Match Grp., Inc.*, 2018 WL 4053362 (N.D. Tex. Aug. 24, 2018), unlike here, alleged violations of Item 503 of Regulation S-K.  *Id.* at \*7 (finding company did not violate Item 503 by omitting the "'most significant factors'" that made the offering "'risky'").

agilon's "ease of [payor system data] integration" and "extract[ion of] needed financial [and] clinical" data, defendants misrepresented agilon's data capabilities while omitting its failure to obtain the critical data. ¶268; *see also Tellabs*, 551 U.S. at 322-23.[6] agilon's systemic data processing deficiencies were ongoing at the time the Registration Statements were declared effective. Thus, defendants' (mis)representations about the foundation of agilon's business model cannot be dismissed as honest "mismanagement" or practices that "might have been more cautious." *Melder v. Morris*, 27 F.3d 1097, 1101 n.8 (5th Cir. 1994).[7] Like the Fifth Circuit, courts around the country recognize that "[d]eception concerning mismanagement is actionable." *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021). Because Plaintiffs plausibly allege material facts "regarding the condition of [agilon]'s business and business practices at the time of the IPO were omitted from the Registration Statements," the Complaint's §11 claims should be upheld. *Superior Offshore*, 2009 WL 82064, at *4 (upholding §11 claims despite defendant's argument that it "advised potential investors of the

---

[6]    Defendants' contention that the Complaint does not allege falsity **at the time of the Offerings** is wrong. UW at 6; CD&R at 10. As described above, the CMS letter directly contradicted defendants' statements, confirming that agilon's partners never possessed "the comprehensive data necessary to manage th[e] risk" of agilon's members, or "standardized, comprehensive" payor data. ¶244. *Pang*, 2023 WL 11643704, does not support dismissal here. *Pang* dismissed statements regarding the company's "future pricing strategy" where, *inter alia*, plaintiffs "fail[ed] to bridge an analytical gap between the stated disclosure and what should have been said." *Id.* at *4-*5. Notably, *Pang* upheld statements where, as is the case here, "Plaintiffs have claimed that there were facts available to the company about the nature of its business going forward that should have been disclosed to protect investors from future risks that may occur. This is especially the case when fixed pricing was central to Core's success as a company." *Id.* at *7.

[7]    CD&R ignores the distinction between mere "mismanagement," and misstating material facts about one's business. CD&R at 11 (citing *Melder*, 27 F.3d at 1101 n.8); *e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192-93 (S.D.N.Y. 2010) ("it is alleged not that Defendants merely made bad business decisions or mismanaged the Company, but rather that Defendants misled the public about E\*TRADE's business, [and] operations"); *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *6 (W.D.N.C. Feb. 8, 2018) (pleading misstatements "raises a claim above internal mismanagement").

- 17 -

risks involved in its business" and peppered the registration statement with an "array of warnings about potential future risks").

Nor does a risk disclosure that agilon relies on "estimates" "to determine revenues and receivables" shield defendants from liability for claiming that agilon possessed "significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups" by "deliver[ing] actionable insight at the patient and physician level." ¶¶268-270; agilon at 16, 18. Defendants overlook that virtually every public company relies to some extent on estimates for revenues and receivables. agilon's boilerplate disclosures that the Company "relies on estimates" do not somehow render agilon's claim that it had "'significant visibility'" into its "the near-term and long-term financial trajectory" immaterial as a matter of law. *Id.* at 16-18. Defendants' argument is particularly inapt given that the untrue statements concern material facts that existed at the time of the IPO and went to the heart of agilon's business model. *Superior Offshore*, 2009 WL 82064, at *4 ("Plaintiffs do not challenge the accuracy of future predictions, but instead challenge the accuracy and completeness of the information regarding Superior's current condition at the time of the IPO.").[8]

***Second***, defendants' challenge to certain statements as "generalized expressions of corporate optimism" also fails. agilon at 14-15; CD&R at 10. The Registration Statements affirmatively

---

[8]    *Marquez v. Bright Health Grp. Inc.*, 2024 WL 4654137, at *8 (E.D.N.Y. Nov. 1, 2024) is inapposite. agilon at 17, 28. The plaintiffs in *Marquez* alleged – based on the "anecdotal experiences" of three low-level, tangential, former employees – that the "risks" Bright Health disclosed in its initial public offering documents had "materialized" by the IPO date "or predictably would" in the future. 2024 WL 4654137, at *6-*7. The court found plaintiffs' allegations failed to "support even an inference that any of these employees occupied a position to possess the information alleged." *Id.* ("Even if the Court assumed . . . that these confidential witnesses were well-positioned . . . the allegations attributable to these witnesses do not support an inference that the wide-spread operational issues alleged in the Amended Complaint existed at the time of the IPO in June 2021."). Here, unlike in *Marquez*, defendants themselves have admitted that "agilon knew about" "the flaws in the data" while over 80 top-level representatives of agilon's partners thereafter corroborate Plaintiffs' well pled allegations of data deficiencies throughout the Class Period. agilon at 38; ¶¶241-246.

assured investors that agilon possessed "significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups," as well as the "ability to improve medical margin" by "deliver[ing] actionable insight at the patient and physician level." ¶¶268-270.  These are specific statements regarding agilon's current ability to generate medical margin by collecting and integrating payor data for physicians, not some general statement of optimism.  *See In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) (holding that statements such as the company "'maintains a written Information Security policy,'" "'[e]mployees are provided with security training,'" and "'employees adhered to a password policy'" were "not 'subjective opinions' or corporate puffery – they are specific statements of fact" and therefore actionable even under Rule 9(b)); *Superior Offshore*, 2009 WL 82064, at *4 ("Plaintiffs do not base their Section 11 claim on statements of corporate optimism, but on misstatements regarding Superior's current condition.").[9]  Further, contrary to defendants' assertion, courts regularly find that statements describing "visibility" into financial performance are actionable.  agilon at 18; *see infra* §V.A.1.

---

[9]    Defendants' reliance on *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001), *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003), and *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 896-98, 902 (5th Cir. 2018) is misplaced.  CD&R at 10; agilon at 14-15. First, each case analyzed the alleged false statements under Rule 9(b) and heightened pleading standards of the PSLRA, not Rule 8.  In *Nathenson*, the pleading was insufficient because it lacked the "required specificity" for a Rule 10(b) claim, as it was unable to pinpoint any "particular misleading statement" or identify "with any degree of detail how [the concealed facts] impacted the [company's clinical] trials."  267 F.3d at 419.  Regardless, the statements in those cases bear no resemblance to those alleged here.  In *Azurix*, the alleged false statements were too general and stated that the company "'anticipate[d] funding capital expenditures,'" while disclosing the risk that those financing arrangements might not be successful.  332 F.3d at 869.  Similarly, in *Whole Foods*, investors could not rely on statements about a company's general standards for "transparency, quality, and responsibility."  905 F.3d at 902.  By contrast here, agilon went beyond merely making "positive statements" about its "competitive strengths," affirmatively assuring investors that it had "visibility into the near-term and long-term financial trajectory" which was objectively false.  ¶269.

- 19 -

4918-7945-2427.v1

### 2.    The May 2023 Offering

In May 2023, defendants sold almost $2 billion in agilon common stock to Plaintiffs and the Class at $20.80 per share.  ¶153.  The May 2023 Registration Statement repeated many of the statements included in the April and September 2021 Registration Statements, including that agilon's business model "provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups," and enables agilon "to add new physician partners and to attract additional PCPs to our physician partners."  ¶¶273-275.

The May 2023 Registration Statement omitted entirely that agilon was then suffering the effects of its flawed business model.  By May 2023, pent-up COVID-19 demand had driven agilon's patient utilization dramatically higher, including specialist utilization rates up to 350% of FY22 rates, Part B drug utilization rates to 300% of FY22 rates, and outpatient surgeries 90% above FY22 rates, resulting in tens of millions of dollars in excess medical costs.  ¶275(e).  The impact of the undisclosed systemic deficiencies with agilon's business model, including the data deficiencies that had rendered agilon incapable of accurately and reliably tracking and reporting members' medical costs and medical margin, and deficiencies in collecting, analyzing, and integrating payor data had negatively impacted agilon's financial reporting and forecasts.  ¶275(c)-(f).  The May 2023 Registration Statement also failed to disclose that agilon's medical margin was being negatively impacted as a result of agilon failing to provide new physicians in mature markets with the basic onboarding and education required to integrate into the agilon partnership, which also rendered the Registration Statements materially false and misleading.  ¶275(a)-(b).

Defendants again argue that by using recycled risk disclosures, they somehow magically insulated themselves from liability for the May 2023 Offering.  UW at 7-8; CD&R at 11-12.  For example, defendants claim they "warned" investors that agilon could not "accurately estimate" COVID-19's "impact" (*id.* at 12), while ignoring entirely that the very "risk" they purport to have

- 20 -

warned of had already materialized.  In so arguing, they disregard the Fifth Circuit's admonition issued more than four decades ago: "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983); *see also Lormand*, 565 F.3d at 249.  As the Complaint clearly alleges, by the time of the May 2023 Offering, agilon was saddled with a massive backlog of COVID-19 demand, which had already caused agilon's patient utilization rates to soar.  ¶275(e).  agilon's "risk disclosure" does not insulate defendants from liability.  Quite the opposite.

### B.    Plaintiffs Adequately Plead §12(a)(2) Claims Against the Underwriters

To state a claim under §12(a)(2), a plaintiff must allege: (1) a material misstatement or omission in an offering prospectus; and (2) the defendant "offer[ed] or s[old] [the] security" at issue, *i.e.*, was a "statutory seller."  15 U.S.C. §77l(a)(2); *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).  A "statutory seller" includes one who: (1) "passed title, or other interest in the security, to the buyer for value"; *or* (2) "successfully solicit[ed] the purchase [of the security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Pinter*, 486 U.S. at 642, 647.  Plaintiffs sufficiently allege both elements of their §12(a)(2) claim.[10]  First, the Offering prospectuses contained material misstatements and omissions.  *See supra* §IV.A.  Second, as explained below, the Underwriters are "statutory sellers."

The Underwriters claim the Complaint fails to allege they were statutory sellers, arguing the Complaint "fails to allege that any specific Underwriter Defendant sold agilon Offering shares to any

---

[10]    Although Plaintiffs' Securities Act claims are properly reviewed pursuant to Rule 8's notice pleading standard, *see supra* at 12-13, the Underwriters seek dismissal pursuant to Rule 9(b).  UW at 1.  Regardless, Plaintiffs' Securities Act claims are adequately pled.

specific Plaintiff." UW at 13. The Underwriters are wrong. Plaintiffs clearly allege the Underwriters were statutory sellers by having "passed title" to Plaintiffs. *Pinter*, 486 U.S. at 642. For example, the Complaint unequivocally alleges "***the Underwriter Defendants sold agilon common stock to Plaintiffs and other members of the Class***." ¶282; *see also* ¶283 (Plaintiffs purchased agilon common stock pursuant to each of the Prospectuses ***from the Underwriters***); ¶259 ("Plaintiffs . . . purchased shares . . . ***in*** the [September 2021 and May 2023] Offering[s]."). Plaintiffs supplement these unambiguous allegations by further alleging: (1) the precise number of shares Plaintiffs purchased from the Underwriters; and (2) that the prices Plaintiffs paid for their shares matched exactly the prices at which the Underwriters sold agilon shares in the Offerings. ¶¶47-49, 283.

Unable to credibly dispute that they passed title to Plaintiffs and the Class in firm commitment offerings,[11] the Underwriters instead quibble that Plaintiffs "do not identify the underwriters from whom each Lead Plaintiff purchased in the offerings." UW at 14. Courts have widely rejected this argument. *See, e.g.*, *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *10 (S.D. Tex. Jan. 19, 2016) (upholding §12(a)(2) claims against over a dozen underwriters where plaintiffs alleged they purchased shares "from the Underwriter Defendants in the public offerings, rather than on a secondary market"); *Northumberland Cnty. Ret. Sys. v. Kenworthy*, 2013 WL 5230000, at *7 (W.D. Okla. Sept. 16, 2013) ("Courts examining allegations against underwriters for Section 12(a)(2) standing requirements have held that a plaintiff need not identify the specific underwriter from whom he purchased the security."); *New Eng. Carpenters Guaranteed*

---

[11] All three Offerings were "firm commitment" offerings, in which investors (including Plaintiffs) purchase directly from the underwriters. *See Azurix*, 332 F.3d at 871 ("'in a firm commitment underwriting . . . the public purchases from the underwriters'"); Def. Ex. 2 at 185 ("[t]he underwriters are committed to purchase all the common shares offered by [agilon] if they purchase any shares").

4918-7945-2427.v1

*Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, at *51 (2d Cir. 2023) (plaintiffs need not "identify which underwriter sold" plaintiffs its shares).[12]

Defendants' reliance on *Venator*, 547 F. Supp. 3d at 669 is severely misplaced. UW at 13. Unlike here, the plaintiffs in *Venator* brought §12(a)(2) claims against not just the underwriters, but also against the issuing corporation and several of its shareholders. 547 F. Supp. 3d at 669. The complaint in *Venator* failed to allege that "***any*** of [the §12(a)(2) defendants] actually passed title to Plaintiffs or solicited their purchases through direct communications," and instead "***only*** allege[d] that [Plaintiffs] purchased Venator common stock 'traceable to' the IPO and SPO." *Id. In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *50-*51 (E.D. Tex. June 16, 2004), is also inapposite. UW at 15. *Fleming* held allegations that defendants "'offered for sale and sold the securities purchased by plaintiffs'" was ambiguous as to whether the underwriters sold directly to plaintiffs, or sold to an intermediate seller who ***then*** sold to plaintiffs. 2004 WL 5278716, at *51.[13]

---

[12]   *See also Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *12 (S.D.N.Y. Aug. 22, 2013) (rejecting argument that plaintiffs must "identify the specific underwriter from which it purchased shares"); *United Food & Com. Workers Union v. Chesapeake Energy Corp.*, 2010 WL 3527596, at *7 (W.D. Okla. Sept. 2, 2010) ("[a] plaintiff is not, at the pleading stage, 'required to prove it purchased specific common units from specific underwriters'"); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) (rejecting underwriter's standing argument where plaintiff alleged it purchased securities "'pursuant to' the pertinent offering documents"); *Hill v. State St. Corp.*, 2011 WL 3420439, at *27 (D. Mass. Aug. 3, 2011) (allegations that plaintiffs "purchased securities in a public offering pursuant to a false or misleading prospectus" are sufficient to allege standing under §12(a)(2)); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) ("[p]laintiffs need not allege 'which underwriter sold securities to each plaintiff' to state a claim under §12(a)(2)"); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *20 (C.D. Cal. July 21, 2005) (rejecting argument that plaintiffs must plead which particular underwriter sold them the issuer's stock).

[13]   *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 159 (N.D. Tex. 2007) is inapposite given the plaintiffs admitted they lacked standing under §§11 and 12(a)(2). The Underwriters' reliance on *Dartley v. ErgoBilt Inc.*, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001) (alleging that only one lead plaintiff "purchased shares 'pursuant to and traceable to' the Prospectus," but without pleading that the underwriters sold those shares) fares no better. UW at 14. Notably, Judge Lynn's decision in *Dartley*, 2001 WL 313964, at *2 cited approvingly to *In re WebSecure, Inc. Sec. Litig.*, 182 F.R.D. 364 (D. Mass. 1998). *See also WebSecure*, 182 F.R.D. at 369 (allegations that underwriters sold "'directly to ***plaintiffs***'" sufficient).

- 23 -

By contrast, Plaintiffs here expressly allege they purchased agilon stock in the Offerings and directly from the Underwriters.[14]

Although Plaintiffs need not also satisfy the "solicitation" prong, the Complaint easily does so, alleging the Underwriters – "motivated at least in part by a desire to serve [their] own financial interests," not "solely to benefit the buyer[s]" – participated in preparing and disseminating the Offering materials, soliciting investors for the Offerings, and splitting over $139 million in underwriting fees. *Compare* ¶¶287, 289, *with Pinter*, 486 U.S. at 647. Further, because Plaintiffs' §12(a)(2) claim is limited to the Underwriters, the concern in *Azurix* over extending §12 liability to "'collateral participants'" – *i.e.*, the corporate issuer and its officers and directors – is entirely absent here. 332 F.3d at 871 (quoting *Pinter*, 486 U.S. at 650). Plaintiffs' §12(a)(2) claim is adequately pled.

### C. Plaintiffs' Securities Act Claims Based on the April 2021 Offering Are Timely

The Underwriters argue that Plaintiffs' Securities Act claims based on the April 2021 Offering are barred by the statute of repose. UW at 8-13. They are wrong. Plaintiffs' claims are timely as: (1) the Complaint merely consolidates and amends timely filed complaints consolidated into action; (2) Rule 15(c)'s relation back doctrine applies to the Securities Act statute of repose; and

---

[14] The Underwriters' reliance on Fair Labor Standards Act collective suits in challenging §12(a)(2) standing is off point. UW at 15 n.15 (citing *Cunningham v. Circle 8 Crane Servs., LLC*, 2021 WL 1615581, at *3 (W.D. Tex. Jan. 25, 2021) (defendants claimed they had not "employed" the plaintiff and therefore were not liable under the FSLA); *Joaquin v. Coliseum Inc.*, 2016 WL 3906820, at *2 (W.D. Tex. July 13, 2016) (defendants disputing they qualified as "employers" under FLSA); *Lucas v. BMS Enters., Inc.*, 2010 WL 2671305, at *2 (N.D. Tex. July 1, 2010) (FLSA employment dispute)). The Underwriters' reliance on *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2004 WL 405886, at *1, *32 (S.D. Tex. Feb. 25, 2004) (proposed intervenor, who purchased one type of foreign debt securities listed and traded in Luxembourg, sought to serve as class representative for purchasers of the other eight types of foreign debt securities) and *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 2019 WL 13194025, at *5 (M.D. La. Jan. 9, 2019), *aff'd*, 855 F. App'x 902 (5th Cir. 2021) (rejecting "substantial factor liability" theory against corporate defendants, none of whom passed title) is also misplaced.

(3) the April 2021 Securities Act claims, which arise out of *the same* factual basis set forth in the original pleadings, relate back to the original complaints.[15]

The *New England* Complaint was filed on March 19, 2024, and alleged Securities Act claims under §§11 and 12(a)(2) against all of the Underwriters, based on agilon's false and/or misleading May 2023 Offering materials. *See* ECF 1 ("*New England* Complaint"). The *Indiana* Complaint was filed on April 2, 2024, and alleged §11 claims based on agilon's false and/or misleading April 2021 Offering materials, against underwriters J.P. Morgan, Goldman Sachs, and Bank of America Securities. *See Indiana Public Retirement System v. agilon health, inc.*, No. 1:24-cv-00544 (W.D. Tex.), ECF 1 ("*Indiana* Complaint"), ¶¶1, 5, 24, 146-153.[16] On September 6, 2024, Plaintiffs filed the Complaint.

### 1. The Complaint Relates Back Under Rule 15(c) to the Original Complaints

Based on their gross misconstruction of *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497 (2017) ("*ANZ*"), the Underwriters contend Rule 15(c)'s relation back doctrine does not apply to the Securities Act's statute of repose. UW at 8-10. Their "illogical" argument "defies precedent." *See York Cnty. ex rel. York Ret. Fund v. HP Inc.*, __ F. Supp. 3d __, 2024 WL 1327247, at *6 (N.D. Cal. Mar. 27, 2024) (rejecting same argument).[17] The Securities Act's statute of repose

---

[15] On June 6, 2024, the Court appointed the North Carolina Funds, Indiana, and North Atlantic Carpenters Funds as lead plaintiffs and consolidated *New England Teamsters Pension Fund v. agilon health, inc.*, No. 1:24-cv-00297 (W.D. Tex.) ("*New England*"); *Hope v. agilon health, inc.*, No. 1:24-cv-00305 (W.D. Tex.); and *Indiana Public Retirement System v. agilon health, inc.*, No. 1:24-cv-00544 (W.D. Tex.) ("*Indiana*") into the current action. *See* ECF 14.

[16] The *Indiana* Complaint also alleged Exchange Act claims, including based on statements in the offering materials for agilon's three Class Period Offerings. *Indiana* Complaint, ¶¶1-2, 50, 57, 91-93. The *New England* Complaint likewise asserted Exchange Act claims. *New England* Complaint, ¶¶1, 12.

[17] While the Underwriters contend Rule 15(c) does not mention statutes of repose, as other courts have found in rejecting the Underwriters' argument, "the absence of limiting language within Rule 15(c) indicates that it applies to statutes of limitations and repose alike." *United States ex rel.*

- 25 -

states that no "action" shall be "brought" to enforce liability under §11 "more than three years after the security was bona fide offered to the public," or under §12(a)(2) "more than three years after the sale." 15 U.S.C. §77m. As the Supreme Court unequivocally explained in *ANZ*, an "action" (for purposes of the Securities Act's statute of repose) refers to a "judicial 'proceeding,' or . . . to a 'suit' – not to the general content of claims." 582 U.S. at 514.[18]

Here, there is only one "action" – this consolidated action in which *New England* and *Indiana* timely filed their complaints and thereafter Plaintiffs filed this Complaint.[19] Defendants' contention that a consolidated class complaint constitutes a new "action" for repose purposes is legally baseless and widely rejected. *See, e.g., HP*, 2024 WL 1327247, at *6 (finding court appointed lead plaintiff's consolidated complaint timely, even though filed past the period of repose,

---

*Carter v. Halliburton Co.*, 315 F.R.D. 56, 64 (E.D. Va. 2016) (citing cases), *aff'd*, 866 F.3d 299 (4th Cir. 2017); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 350 (3d Cir. 2021) ("*SEPTA*") (rejecting identical "argu[ment] that Rule 15(c) expressly applies to statutes of limitations only"). The Underwriters' cases are off point. *See* UW at 9-11 (citing *Schuler Drilling Co., Inc. v. Disiere Partners, LLC*, 2024 WL 848961, at *3-*4 (N.D. Tex. Feb. 28, 2024) (applying state law to Texas Uniform Fraudulent Transfers Act (TUFTA) claim); *Taylor v. Trevino*, 569 F. Supp. 3d 414, 431 (N.D. Tex. 2021) (TUFTA claims untimely under state law); *In re Tex. E&P Operating, Inc.*, 2023 WL 3012268, at *12 (Bankr. N.D. Tex. Apr. 19, 2023) (same); *In re Am. Hous. Found.*, 543 B.R. 245, 258-59 (Bankr. N.D. Tex. 2015) (applying state law to TUFTA claim, while recognizing that the state court's ruling was "difficult to reconcile with the Fifth Circuit's ruling a ***few months prior*** in *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 193-96 (5th Cir. 2013)") (emphasis in original)); *Bridges v. Dep't of Md. State Police*, 441 F.3d 197, 209 (4th Cir. 2006) (finding non-parties with racial discrimination claims arising from police stops could not intervene to cure defects under statute of limitations, applying Maryland law).

[18]    Unlike here, *ANZ* dealt with two separate actions: a putative class of investors who reached a settlement with defendants and a separate action brought by CalPERS, "apparently convinced it could obtain a more favorable recovery in its separate suit, opted out of the class." 582 U.S. at 503; *see also SEPTA*, 12 F.4th at 349, 352 (*ANZ* "however, does not help Defendants [because] the tolling at issue there would have been a true exception to the statute of repose . . . a defendant does not have a substantive right to repose when – as here – a plaintiff brings an action against the defendant containing the claims at issue within the repose period").

[19]    The Underwriters do not dispute (nor could they) that the *New England* and *Indiana* complaints – including the Securities Act claims asserted therein arising from agilon's stock Offerings – were timely filed.

- 26 -

reasoning "'even though the Plaintiffs have changed'" "by every measure and by the common understanding of the term 'civil action,' this action was commenced on [date of initial complaint]" and "from the outset, *[defendant] HP anticipated an amended complaint would be filed*"); *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *18 (D. Or. Nov. 24, 2021) (permitting lead plaintiff to proceed with §11 claims in amended complaint filed after the repose period expired, reasoning that "[defendant] Lexin does not cite *any authority* for the proposition that the appointment of a lead plaintiff in a putative class action turns the case into one so separate from the original that the lead plaintiff may not rely on the originally brought claims to satisfy the statute of repose," and "*nothing in [ANZ] supports that argument*").[20]  Accordingly, the Underwriters' policy argument that the statute of repose is "'absolute,'" "'admits of no exception'" and "'forecloses the extension of the statutory period based on equitable principles,'" should be rejected.  UW at 8.

Courts (including in the Fifth Circuit) regularly apply Rule 15(c)'s relation back doctrine, even where the later pleading is filed after the statute of repose has expired.  *E.g.*, *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 841 (S.D. Tex. 2004); *Envision*, 2022 WL 4551876, at *5 (finding that the statute of repose does not "foreclose relation back under Rule 15(c)"); *SEPTA*, 12 F.4th at 648-49; *Hogan*, 73 F.4th at 1158 ("[I]t is *well settled* that an amendment that relates back to an

---

[20]    *See also SEPTA*, 12 F.4th at 351 (finding that lead plaintiff's amended complaint, *filed nine years past the period of repose*, was not time-barred because "statutes of repose create a deadline for *filing actions, rather than resolving them*"); *Murray v. EarthLink Holdings Corp.*, 2023 WL 4295600, at *3 (E.D. Ark. June 30, 2023) (same) (applying the Third Circuit's ruling in *SEPTA*, 12 F.4th at 341); *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1161 (10th Cir. 2023) ("*[ANZ]* . . . do[es] not alter this analysis because tolling pertains to the time within which a plaintiff must first bring a suit or a claim and, as we have explained, *filing the SAC did not constitute bringing a claim*."); *In re Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *4 (M.D. Tenn. Sept. 29, 2022) ("The Court is not persuaded that by adding additional alleged misstatements to an existing cause of action in an existing case, [Lead] Plaintiffs have 'brought' an 'action' within the meaning of [a statute of repose,] . . . "[c]onsequently, the Court is also not persuaded that allowing Plaintiffs to proceed with the allegations in the ACC would enlarge or modify a substantive right afford[ed] by the statute of repose . . . .").

- 27 -

earlier timely pleading is **not barred by [the] statute of limitations . . . . We can think of no reason why a statute of repose should be treated otherwise**.").

Recognizing the weakness of their argument, the Underwriters next contend that "even if the relation back doctrine applie[s]" here, the North Carolina Funds cannot assert Securities Act claims based on the April 2021 Offering because they did not timely file a complaint. UW at 10.[21] Defendants again offer no compelling authority for their assertion that Plaintiffs' Complaint constitutes a new "action," and several courts have specifically held otherwise. *E.g.*, *LexinFintech*, 2021 WL 5530949, at *17; *Martin v. Altisource Residential Corp.*, 2019 WL 2762923, at *6 (D.V.I. July 2, 2019) (rejecting defendants' argument that a lead plaintiff's complaint is barred by the statute of repose, holding that "[b]y any reasonable understanding, we are in the same action (or suit, or proceeding) that was brought [by the initial plaintiff], even though the [p]laintiffs have changed"); *see also In re Marvell Tech. Grp. Ltd. Sec. Litig.*, 2008 WL 4544439, at *2, *11 (N.D. Cal. Sept. 29, 2008) (basing repose analysis in securities class action on the "first of the consolidated complaints").[22]

---

[21]     The very cases on which the Underwriters rely (*SEPTA*, 12 F.4th 337 and *Hogan*, 73 F.4th 1150) are both post-*ANZ* federal securities cases applying relation-back to statutes of repose. *See* UW at 10 n.11.

[22]     Eschewing relevant case law, the Underwriters instead rely on cases featuring attempts to use tolling to save dismissed or untimely claims. *See* UW at 9-12; *Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 101 (2d Cir. 2013) ("[A]bsent circumstances that would render the newly asserted claims . . . timely, neither Federal Rule of Civil Procedure 24 nor the Rule 15(c) 'relation back' doctrine permits members of a putative class, who are not named parties, to intervene in the class action as named parties in order to revive claims that were dismissed from the class complaint for want of jurisdiction."); *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 792 (6th Cir. 2016) (original complaint filed after the statute of repose had expired could not be saved through tolling); *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1245-46, 1248 (11th Cir. 2016) (declining to toll a statute of repose); *Bensinger v. Denbury Res. Inc.*, 31 F. Supp. 3d 503, 512 (E.D.N.Y. 2014) (same).

Moreover, the Underwriter's proposed rule – that a consolidated complaint constitutes a new "action" for purposes of Rule 15(c)'s relation back doctrine – "would present enormous practical difficulties" and frustrate the purpose of the PSLRA. *SEPTA*, 12 F.4th at 346.

> Under Defendants' approach, either plaintiffs bringing putative class actions would be obligated to file [months before the expiry of the statute of repose] to guarantee sufficient time to conduct [the PSLRA-mandated lead-plaintiff process] or all unnamed class members who would otherwise simply participate as class members would be forced to file individual cases to preserve their claims.

*In re Nio, Inc. Sec. Litig.*, 2023 WL 5048615, at *4 (E.D.N.Y. Aug. 8, 2023). Such a rule flies in the face of the PSLRA and defies both logic and common sense.[23]

### 2. Plaintiffs' §§11 and 12(a)(2) Claims Based on the April 2021 Offering Are Timely

Applying Rule 15(c)'s relation back doctrine, Plaintiffs' Securities Act claims based on the April 2021 Offering are timely. As an initial matter, because the Underwriters effectively concede the Securities Act claims based on the April 2021 Offering are timely as to underwriters J.P. Morgan, Goldman Sachs, and Bank of America Securities, those claims should proceed. UW at 12, 13 n.13. Although the Underwriters contend the North Carolina Funds must show a "mistake concerning their [own] identity" to seek relation back under Rule 15(c), Rule 15(c) actually states that the "mistake" criteria applies where the new "party" will be "***defending*** [a claim] on the merits." *See* Rule 15(c); UW at 11-12.[24]

---

[23]    The lead plaintiff process expressly calls for plaintiffs to "apply for the role" of lead plaintiff "in the first-filed class action," demonstrating that being appointed lead plaintiff is tantamount to assuming a "role" in an existing action, not starting an entirely new action. *See China Agritech v. Resh*, 584 U.S. 732, 742 n.3, 750 (2018).

[24]    The Underwriters' contention is poorly supported. UW at 11-12. For instance, *Merryman v. J.P. Morgan Chase Bank, N.A.*, 319 F.R.D. 468, 473 (S.D.N.Y. 2017) noted that several courts "have not required mistake in order to relate back the claims of newly added plaintiffs." *SMS Fin., Ltd.Liab. Co. v. ABCO Homes, Inc.*, 167 F.3d 235, 244 (5th Cir. 1999) merely held a plaintiff could amend its complaint to correct an error in plaintiff's name – *SMS* did not hold that relation back must always include a "mistake [of plaintiff's] identify." *Guajardo v. Freddie Recs., Inc.*, 2015 WL 5674826 (S.D. Tex. Sept. 25, 2015), where plaintiffs "admitted that relation-back would be an issue"

- 29 -

Applying Rule 15's plain language, multiple courts have allowed new plaintiffs to relate back their federal securities claims – without showing "mistake" – to complaints filed before the repose period's expiration. *See, e.g.*, *Martin*, 2019 WL 2762923, at *6 (finding that "even though the [p]laintiffs have changed" new plaintiff's claims were not time-barred because original plaintiff timely asserted claims and "[d]efendants' interpretation . . . would disallow amendments to the complaint that add new plaintiffs after the period of repose has concluded . . . [and] add conceptual difficulties[]"); *see also LexinFintech*, 2021 WL 5530949, at *17. Further, because all of the Underwriters were already defendants in this action by March 2024, Rule 15(c)'s "mistake" analysis does not apply to them either. UW at 13 n.13.

Further, courts have allowed new plaintiffs to relate claims back when: (1) adequate notice of the claims was given in the original complaint(s); (2) relation back does not unfairly prejudice the defendant; and (3) the original and new plaintiffs have an identity of interests. *E.g.*, *In re Enron Corp. Sec.*, 465 F. Supp. 2d 687, 723 (S.D. Tex. 2006). Here, the Underwriters received more than "adequate notice" of the April 2021 Offering claims, and relation back would cause no unfair prejudice. By April 2, 2024, all of the Underwriters were defendants in this action featuring Securities Act claims based on the April 2021 Offering materials. Moreover, the offering materials for all three of agilon's Offerings featured virtually identical alleged misstatements and omissions. ¶¶267-271, 273-274. Given these facts, the Underwriters were "on notice" of the April 2021 Offering claims as they had already been sued in this action, and reasonably anticipated that the Complaint would include the Underwriters as defendants on the April 2021 Offering. UW at 13 n.13. Finally, there is an identity of interests between the North Carolina Funds and *Indiana*, court-appointed Lead Plaintiffs that purchased agilon shares at artificially inflated prices, incurred

---

while requesting leave to amend fifth amended complaint to add heirs' individual claims in estate case, is also far afield. *Id.* at *5.

4918-7945-2427.v1

significant losses as a result of defendants' violations, and seek redress against the defendants under the federal securities laws.[25] Thus, the April 2021 Securities Act claims relate back against all of the Underwriters.

Although the Underwriters quibble that the *Indiana* Complaint "did not assert a Section 12" claim (UW at 12), the *New England* Complaint did, against all of the Underwriters. In any event, the April 2021 Offering §12(a)(2) claim is timely because it "share[s] the same factual basis as the claims asserted in the original complaints." *See Dynegy*, 339 F. Supp. 2d at 840-44 (applying relation back where previously-asserted §10(b) claims and newly-added §11 claims were both based on transactions in common stock, concerned the same relevant time period, "share[d] the same factual basis," the original pleadings "brought that factual basis to the [defendants'] attention," and the §11 claims were brought against existing defendants); *In re Enron Corp.*, 2005 WL 1638039, at *6 (S.D. Tex. June 21, 2005) (collecting cases) ("In a securities fraud action, courts examine whether the allegations 'relate to the same statements and/or documents referenced in the original complaint.'"). The Complaint's §12(a)(2) claim, and the *Indiana* Complaint's §11 claim, feature strict liability claims based on the same April 2021 Offering materials.[26] Accordingly, the §12(a)(2) claim based on the April 2021 Offering is timely.[27]

---

[25]   *Enron*, 465 F. Supp. 2d at 723; ECF 11-5 at 2; ECF 14 at 3.

[26]   ¶¶280-292; *Indiana* Complaint, ¶¶146-153.

[27]   *Nykredit Portefølje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) supports relation back. *Nykredit* held claims based on a securities transaction were not timely because the transaction was not "referenced" in a complaint until after the repose period had ended. *Id.* at *31 ("It was not until July 30, 2020, that Plaintiffs referenced the PT Petroleum transactions in their Third Amended Complaint") (UW at 12). Here, the *Indiana* and *New England* complaints both referenced the April 2021 Offering, and the former asserted §11 claims based on that offering. *Broll v. Nat'l Asset Servs., Inc.*, 2018 WL 11400095, at *4-*5 (W.D. Tex. Apr. 13, 2018) (Ezra, J.) is distinguishable – there, the plaintiff could not introduce federal securities claims to its breach of contract case to establish subject matter jurisdiction because in *Broll* – unlike here – **no** plaintiff had ever asserted securities claims before the statute of repose had expired. UW at 12. Defendants other cases are distinguishable. *Bensinger*, 31 F. Supp. 3d at 510 (§14(a) claim

- 31 -

## V.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF §10(b) OF THE EXCHANGE ACT

To state a *prima facie* claim under §10(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011); *Lormand*, 565 F.3d at 238.  Defendants challenge the first two elements.

"A statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."  *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000).[28]  Materiality cannot be resolved on a motion to dismiss unless the misstated or omitted facts "are so obviously . . . unimportant . . . to an investor that reasonable minds cannot differ on the question of materiality." *Huddleston*, 640 F.2d at 544 n.14.[29]  Because it presents a mixed question of law and fact, materiality is "usually left for the jury" to decide.  *Peterson*, 101 F.3d at 380.

A plaintiff satisfies Rule 9(b)'s pleading standard by "stat[ing] with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading," and

---

previously dismissed for lack of standing could not be reasserted for the first time after the repose period had ended); *Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.*, 291 F. Supp. 3d 364, 370 (S.D.N.Y. 2018) (finding §12(a)(2) claim time barred where the FDIC did not "'pursue'" the claim until after the repose period had expired).

[28]    *See also United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996) ("An omitted or misrepresented fact is material . . . if there is a substantial likelihood that a reasonable investor would have viewed it as significantly altering the mix of information available.").

[29]    *See also Kurtzman v. Compaq Comput. Corp.*, 2000 WL 34292632, at *39 (S.D. Tex. Dec. 12, 2000) (dismissal inappropriate where reasonable minds could differ on the importance of the omitted facts).

- 32 -

"state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1)-(2). All other allegations are subject to *Twombly*, 550 U.S. 544 and Rule 8(a). *See* 15 U.S.C. §78u-4(b)(1)-(2); *Lormand*, 565 F.3d at 239, 257-58. "[T]he particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession." *Fleming*, 2004 WL 5278716, at *6.[30]

### A. Defendants' Materially False and Misleading Statements

The Complaint contains detailed allegations that, accepted as true, plausibly allege that defendants made untrue statements of a material fact and omitted to state facts necessary in order to make their statements made not misleading. Defendants' challenges to falsity fail.

### 1. Defendants Misleadingly Assured Investors that Agilon's "High-Touch," Cost-Controlling Model Provided Visibility and Predictability of Medical Costs

*First*, defendants' challenge to their present-tense statements about the "visibility" and "predictability" inherent in agilon's "high-touch" model fails. agilon at 24-26. Remarkably, after years of repeatedly emphasizing agilon's "tremendous," "really, really strong," and "extremely strong" visibility into patients' medical costs and other key metrics, defendants now reverse course and feign surprise, claiming that no reasonable investor would have cared about this "natural advantage[]" and "big differentiator" of agilon's "model." *Compare* ¶¶129, 163, *with* agilon at 25-26. Defendants argue that their false and misleading statements are merely "corporate optimism" or "puffery." agilon at 25-26. To evade liability for their misstatements, however, defendants must

---

[30]     *See also Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at *9 (S.D. Tex. Apr. 14, 2021) ("The PSLRA 'was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims . . . must be routinely dismissed . . . .'"); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022) (PSLRA's "pleading standards are still *pleading* standards – not evidentiary ones"). There is no requirement that a plaintiff in a securities fraud action support its allegations with information attributed to confidential witnesses. *See Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 (E.D. Pa. 2020).

- 33 -

show their statements contained no concrete factual or material misrepresentations or omissions.[31] This they cannot do.  Here, defendants' visibility into agilon's current and historical performance was so critical that they repeatedly emphasized it in their communications with investors and, in turn, securities analysts likewise counted on agilon's "visibility" in valuing agilon stock.[32] Defendants' attack on their **direct** responses to analysts' inquiries as "puffery" is especially weak. *E.g.*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) ("the challenged statements were made in response to specific questions asked by financial analysts. Given this context, the statements cannot be discounted as mere 'puffery'"); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statements in "direct response to an analyst's inquiry" are not puffery), *vacated and remanded on other grounds*, 551 U.S. 308 (2007).[33]

Defendants also contend agilon's 2021 "risk disclosures" granted them immunity prospectively from all subsequent misrepresentations.  agilon at 25 (citing *id.* at 8-9).  Not so. Defendants ignore that agilon's recycled "risk disclosures" actually **support** falsity where – as here –

---

[31]     *See Del Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2024 WL 83503, at \*12 (S.D. Tex. Jan. 8, 2024); *Lormand*, 565 F.3d at 249 n.14 (rejecting "'puffery'" argument where "plaintiff alleges concrete factual and material misrepresentations and omissions"); *Brody v. Zix Corp.*, 2006 WL 2739352, at \*4 (N.D. Tex. Sept. 26, 2006) (rejecting puffery argument where statements were "more than vague or optimistic; they contain concrete factual information Defendants could be found to have misrepresented").

[32]     *E.g.*, ¶69 (Truist reporting on agilon's "visibility around trends" and "cost/medical margin predictability"); ¶169 (Wells Fargo probing agilon's "visibility"); ¶205 (TD Cowen cutting price due to agilon's "lack of visibility"); ¶210 (citing "AGL's lack of visibility").  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372-73 (5th Cir. 2004) (statements issued on unspecified dates by "analysts and brokers" – not the company – featuring forward-looking "**predictions** of **future** earnings and revenues") is readily distinguishable.  agilon's statements concerned its current visibility into historical results, omitted then-existing facts, and mattered to the market.  ¶¶69, 169, 205, 210.

[33]     *See* CD&R at 18 (challenging as puffery responses to analyst inquiries, including in ¶¶110, 129, 134, 169, and 171).  Given the alleged statements concerned agilon's key financial metrics, CD&R's citation to *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194 (W.D. Tex. Aug. 19, 2016) which instead featured "[a]spirational [s]tatements" about "Whole Foods' commitment to quality" and "'ethically sourced, high-quality products,'" is inapplicable.  *Id.* at \*6-\*7 (CD&R at 18).

- 34 -

the so-called "risks" had already manifested. *See Lormand*, 565 F.3d at 249; *Huddleston*, 640 F.2d at 544.[34]  For example, telling investors that agilon could not "predict" COVID-19's "impact" did nothing to disclose that agilon was already saddled with a "backlog" of demand from COVID-19, or that this "backlog" was driving an undisclosed spike in patient utilization.  ¶¶13, 72, 86, 89, 203, 218-219.  Or warning that agilon relies on data provided by payors in no way reveals that agilon and its partners were relying on substantially incomplete, non-standardized, and delayed payor data to manage agilon's full-risk. *E.g.*, ¶¶244-246.[35]

Defendants also disregard that agilon and the Exchange Act Defendants emphatically claimed agilon's "visibility" included access to "*all*" of agilon's patient data from "*all*" of agilon's MA payors, and was so far-reaching that "long before we go live, we have really, really strong visibility into exactly what's happening," and "what the economics . . . look like."  ¶¶68, 83, 127, 155.  Finally, because the challenged statements were statements of existing fact – not "forward-looking statements" – agilon's "risk disclosures" for "forward-looking statements" do not insulate agilon's statements.[36]

---

[34]    *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *3 (S.D.N.Y. Feb. 5, 2024) ("But [plaintiff's] allegation is that the risk had already become reality.  Because the cautionary language here was 'misleading in light of historical fact,' it 'cannot be meaningful.'"); agilon at 10 (stating that agilon's May 2023 offering materials included agilon's risk factors from the April 2021 Registration Statement).

[35]    *See also Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) (finding "detailed risk factors" no shield to liability where "[d]efendants' statements projected a promising picture . . . while omitting material information").

[36]    *See* agilon at 24 (failing to argue the "predictability and visibility" statements are forward-looking); *Shen v. Exela Techs., Inc.*, 2022 WL 198402, at *2 n.3 (N.D. Tex. Jan. 21, 2022) (finding defendants' reliance on cautionary language "misplaced" where statements such as "'[w]e have a high degree of revenue visibility'" and "'we have good visibility'" were not forward-looking) (alteration in original); *Stadium Cap.*, 2024 WL 456745, at *3 (statements about "near term visibility" are "simply not forward-looking").

- 35 -

4918-7945-2427.v1

Nor did agilon's vague August 3, 2023 reference to "*potential* blind spots" ameliorate defendants' deception. agilon at 11-12; ¶168. Not only did defendants provide few if any details regarding agilon's "potential blind spots" (*id.*), Sell reassured investors that agilon had an "incredible level of visibility" into agilon's MA medical expenses. *See* ¶169 (Sell touting the favorable comparison of agilon's MA data with "90% complete" ACO Reach data); ¶197 n.10 (in November 2023, Wells Fargo recounted agilon's August 2023 assurances of "high visibility into Q2 costs given ACO Reach claims data (claimed May ~90% visible), which [agilon] said had tracked well against its MA claims data").

Finally, defendants attempt to justify their statements by claiming that agilon "met its 2021 and 2022 guidance for medical margin and EBITDA." agilon at 25. But this is untrue – agilon **excluded** reporting medical margin from its FY21 outlook in each of agilon's 2021 quarterly earnings releases.[37] Moreover, to create the appearance agilon "met" its FY22 guidance, the Company deferred $50 million in FY22 medical expenses, simply pushing them into FY23. ¶¶225-227.[38] Defendants structure their flawed scienter arguments on this false narrative as well.[39] At bottom, the Exchange Act Defendants' present-tense statements extolling their "visibility" into agilon's business and key metrics were highly misleading in light of the omitted facts, particularly given agilon's billions of dollars in financial exposure under its full-risk model. *Shen*, 2022 WL

---

[37]     *Compare* Def. Ex. 4 at 211 (May 26, 2021 1Q21 Release: excluding medical margin from "Outlook" for "Fiscal Year 2021"), Plfs. Ex. A (August 4, 2021 2Q21 Form 8-K: same), and Plfs. Ex. B (October 28, 2021 3Q21 Form 8-K: same), *with* Def. Ex. 7 at 395 (March 3, 2022 4Q21 Form 8-K: forecasting medical margin for FY22).

[38]     agilon also notes it surpassed its membership guidance, but ignores that agilon reported huge FY23 losses despite membership gains. agilon at 9; ¶206. The Underwriters' opinion that "agilon's business was doing well" through May 2023 is as vague as it is irrelevant. UW at 6.

[39]     agilon at 3 (claiming for "two years [agilon] me[t] or exceed[ed][issued] annual medical margin guidance"); *id.* at 42 ("agilon successfully predicted medical margin"); *id.* at 43 (agilon's issued medical margin forecasts were "accurate"); *id.* at 44 ("agilon's successful forecasting").

- 36 -

198402, at *2 n.3 (alteration in original) (upholding statements that "'[w]e have a high degree of revenue visibility,'" and "'we have good visibility into our revenue'"); *see also In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *14 (D.N.J. Dec. 15, 2015) (finding statements touting the company's "'good visibility' on sales" were not puffery, and rejecting the argument that the statements were not misleading because the company "met its [financial] projections"); *Police & Fire Ret. Sys. of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1083 n.1 (N.D. Cal. 2015) (upholding statements touting "visibility into future quarters' revenue").

***Second***, Exchange Act Defendants challenge the falsity of certain statements, which emphasized the benefits of agilon's "high touch" business model.  agilon at 26-27.  Defendants' contentions are twofold: (1) their statements were literally true because they accurately described agilon's model as "value-based"; and (2) Plaintiffs' "real complaint" is that agilon's model yielded insufficient "cost savings."  *Id.*  Tellingly***, defendants cite no legal authority*** whatsoever for these arguments.  Regardless, Exchange Act Defendants' contentions are red herrings – no one disputes that agilon purported to focus on "value-based" care, or reported some "cost savings" as "medical margin."

The issue Exchange Act Defendants artfully evade is that they misrepresented the model's supposed ***impact*** on the Company.  For example, Exchange Act Defendants falsely claimed in August 2023 that agilon's model had "insulated" agilon from "spikes" in utilization rates, when in fact patient utilization rates had ***already*** spiked months earlier.  ¶161.  Defendants also falsely asserted that agilon's model had prevented "pent-up demand for care," when in truth agilon was sitting on a massive "backlog" of demand from COVID-19.  ¶¶161, 173.  Further, by claiming that agilon's "model" yielded "predictable" results and "extremely strong" visibility into patients' medical costs – while allegedly concealing agilon's pervasive struggles with tracking agilon's

- 37 -

medical costs and margins – Exchange Act Defendants misled investors.  ¶¶134, 169.[40]  Having

chosen to attribute specific benefits to agilon's "high-touch" model, Exchange Act Defendants were

obligated to speak the full truth.[41]  They did not.

Moreover, defendants' entirely unsupported puffery argument fails to show the allegedly

omitted facts "'are so obviously unimportant to an investor that reasonable minds cannot differ on

the question of materiality.'"  *Campton*, 2014 WL 61199, at *7; agilon at 27.  Here, as defendants

intended to foster via their public statements, the market perceived the Company as "safer" in light

of the concrete benefits agilon's model supposedly yielded.  *See* ¶¶69-70, 161 (Sell stated:

"[D]ifferent models will yield different outcomes.  agilon's model is distinctively different . . . .");

¶197 n.10 (Wells Fargo report: "[agilon] emphasized how different their model is").  Defendants'

cursory puffery challenge should be rejected at this stage.[42]

***Third***, defendants challenge, as inactionable, certain statements concerning agilon's pent-up

demand and patient utilization.  agilon at 29-31.  As set forth below, each of their challenges fail.[43]

---

[40]  *E.g.*, ¶134 (agilon's "high-touch" model "allows us to deliver really predictable costs kind of quarter in, quarter out"); ¶161 ("agilon's model is distinctively . . . predictable in driving cost").  *See also* ¶165 (Sell contrasting the "durability and predictability of our model" with other "health plans" that "are seeing pockets of higher costs"); ¶149 (touting agilon's "touch points" while concealing spiking utilization); ¶129 (crediting agilon's "high-touch" model with preventing "a huge step-up in . . . pent-up demand").

[41]  *See Lormand*, 565 F.3d at 248-49; *see also Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) (duty to speak the full truth arises when defendant undertakes "'a duty to say anything'").

[42]  *See Bach v. Amedisys, Inc.*, 2016 WL 4443177, at *10 (M.D. La. Aug. 19, 2016) (quoting *Lormand*, 565 F.3d at 249 n.14) (statements touting "specific benefits" of compliance program not puffery); *United States v. Sneed*, 2022 WL 35801, at *8 (N.D. Tex. Jan. 4, 2022) ("[d]eterminations about puffery and opinions are generally left for the jury to decide").

[43]  Although listed at the bottom of page 29 of agilon's brief, defendants do not even attempt to explain why the statements in ¶¶179, 180-181 (from November 2, 2023), and ¶¶185-186 (from November 14, 2023), are inactionable.  agilon at 29.

- 38 -

***January 10, 2022 statement***: defendants contend Sell's response to an analyst's inquiry in January 2022 about "pent-up demand" is not actionable because: (1) Plaintiffs have not alleged that any pent-up demand existed as of January 2022; and (2) Sell's statement is an inactionable opinion. ¶114; agilon at 30.[44]  Both arguments fail.  First, the Complaint plausibly alleges pent-up demand existed as of January 10, 2022.  *E.g.*, ¶5 ("COVID-19 pandemic struck in early 2020"), ¶137(d) (alleging "a significant backlog of pent-up demand from COVID").  Sell also admitted that agilon's "backlog of pent-up demand [is] from COVID."  ¶¶203, 218, 219.[45]

Second, although couched as a "belie[f]," Sell's response regarding whether agilon ***presently*** has "any pent-up demand around things like elective surgeries" among agilon's patients was a statement of fact.[46]  Moreover, the statement was easily verifiable given agilon closely monitored and quantified its COVID-19 related backlog.  ¶218.  Even if it could be characterized as a pure statement of opinion – which it was not – an opinion is actionable if it: (1) conveys false "embedded" facts; (2) omits "material" facts; or (3) is not believed by the speaker.  *Omnicare*, 575 U.S. at 185, 194; *In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022) (quoting *Omnicare*, 575 U.S. at 189).  Sell's statement fulfills all three prongs: Sell omitted material facts, including that agilon was saddled with pent-up demand from COVID-19, and that agilon's "model" had not staved off this pent-up demand (*e.g.*, ¶¶72, 114, 137(d), 218-19); Sell conveyed false embedded facts, including that agilon's "touchpoints" prevented "a massive set of pent-up demand" among agilon's patients (*id.*); and Sell plausibly did not believe that agilon was free of

---

[44]    Defendants incorrectly claim Sell made this statement in June 2022.  agilon at 30.

[45]    *See also* ¶218 (Sell describing agilon's "backlog of delayed outpatient procedures for things like hips and knees that maybe someone got a referral ***during COVID***"); ¶129 (in early 2022, Sell referring to "COVID" as a historical event).

[46]    *Omnicare*, 575 U.S. at 193 (prefacing a statement with "'we believe'" does not transform it into an opinion).

- 39 -

4918-7945-2427.v1

massive pent-up demand when he spoke (*e.g.*, ¶¶72, 218-219).[47]  *Apache*, 2022 WL 4277350, at *5-*6 (finding statements actionable under *Omnicare* where defendants purportedly concealed material facts); *Rougier*, 2019 WL 6111516, at *10 (same).

*May 9, 2023 statement*: defendants contend Sell's statement in ¶149 regarding patient utilization was not misleading because Sell was "addressing [1Q23] results" only.  agilon at 30.  But defendants ignore that Sell had a duty to disclose those facts necessary to make his statement not misleading, including facts about spiking 2Q23 patient utilization.  Defendants also overlook that Sell did ***not*** limit his statement in ¶149 to 1Q23, that Sell discussed 2Q23 during the May 9 call, and that analysts probed him about 2Q23 as well.[48]  Defendants' post-hoc excuse for Sell's material omission fails.

*August 3, 2023 statements*: While defendants ***characterize*** various statements from August 3, 2023, they really challenge only one: "'We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization.'"  agilon at 31 (citing ¶161).  Similar to ¶149, Sell's August 3, 2023 assertion was a statement of fact: agilon's model "***has prevented***" pent-up demand for care and "***has . . . insulated***" agilon from spikes in utilization.  ¶161.  These were verifiably false statements of fact.  Even crediting defendants' thin *Omnicare* argument, Sell's statement falls squarely within ***each*** of *Omnicare*'s three prongs.  agilon at 31.  agilon's model had not "prevented a pent-up demand for care" – in fact, agilon was actively monitoring its massive "backlog" of pent-up demand, which had caused agilon's patient utilization and medical costs to soar by at least May 2023.  ¶¶72, 218-219.  Nor was agilon "insulated . . . from any associated spikes in utilization."  ¶161.  agilon's patient utilization rates had already spiked.

---

[47]    *See, e.g.*, ¶218 (alleging agilon closely monitored and quantified its backlog of demand from COVID-19).

[48]    *See* Def. Ex. 14 at 668 (Sell addressing utilization "on a forward basis"); *see also id.* at 662-63, 666, 671 (addressing post-1Q23 matters during the May 9, 2023 call).

¶¶12, 72, 88, 173(a)-(c), (e)-(f), and (k).  And, given agilon's huge demand backlog and spiking utilization rates, among other facts, the Complaint plausibly alleges Sell did not believe his statement.  *Id.*

Defendants' challenge to falsity is particularly insincere given Sell's and Bensley's admissions in November 2023 to having witnessed a utilization spike in May-June 2023: "***we did see some increased utilization in May***."  ¶¶72, 179, 180 ("we did see a step-up in Q2 utilization"); ¶180 ("***we saw a spike up***").[49]  Analysts were understandably floored by these admissions.  ¶197 (Wells Fargo: defendants' statements "contradict[ed]" one another); *id.* (J.P. Morgan: "confusion" over agilon's shifting narrative); *id.* (Jefferies: "significant confusion").  Defendants' false and misleading August 3, 2023 statements – as well as the other misstatements – should be upheld.

Rather than accept Plaintiffs' allegations as true and address them, defendants construct their own counter-narrative about what "agilon determined" and why it acted as it did.  agilon at 31; *id.* at 2 (claiming agilon's 2023 utilization surge was "unexpected[]")).  CD&R employs similar gimmicks, such as attacking as "hindsight" the strawman "theory" that Plaintiffs complain that "agilon should have predicted [COVID-19's impact] on its business."  CD&R at 17.[50]  Contrary to CD&R's mischaracterization of the Complaint, this case centers on the omission of existing facts, not a failure to "predict" "future events."  CD&R at 17; *Yannes v. SCWorx Corp.*, 2021 WL

---

[49]     Defendants incorrectly contend that Bensley referenced "increased utilization in May" on August 3, 2023.  *See* agilon at 30 (citing ¶180).

[50]     CD&R supports its attack on this concocted "theory" with factually inapposite cases.  *See* CD&R at 17 (*City of Pontiac Gen. Emps.' Ret. Sys. v. Hanger, Inc.*, 2017 WL 384072, at \*12 (W.D. Tex. Jan. 26, 2017) (complaint contained zero "allegations or facts suggesting Defendants should have known Hanger's reserves were possibly inadequate" under Generally Accepted Accounting Principles), *aff'd sub nom. Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175 (5th Cir. 2019); *Owens v. Jastrow*, 789 F.3d 529, 545 (5th Cir. 2015) (fact that subprime MBS market subsequently collapsed was not enough to show defendants' reliance on complex valuations of AAA-rated mortgage-backed securities was fraudulent); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014) (same).

- 41 -

2555437, at *4 (S.D.N.Y. June 21, 2021) (finding similar "failure to predict" argument "unpersuasive" where plaintiffs did not "merely allege that the defendants should have predicted ProMedical defaulting on the Supply Agreement"). Defendants' premature factual arguments are improper at the pleadings stage.[51]

### 2.     Defendants Concealed Material Facts Regarding the Existence and Impact of Systemic Deficiencies with Agilon's Collection, Tracking, and Integration of Payor Data

Defendants frequently touted agilon's data-rich platform and unrivaled capabilities in collecting, integrating, and analyzing MA payor data. *E.g.*, ¶¶80-81. They also emphasized that agilon and its physician partners had access to and utilized accurate, comprehensive, standardized, and timely data which enabled agilon's physicians to effectively manage patients' full-risk while driving down medical costs, and validated agilon's full-risk business model. *Id.* Defendants' statements were misleading, as they concealed from investors that agilon, *inter alia*: (1) suffered from systemic data deficiencies that prevented agilon from accurately tracking, managing, reporting, and forecasting medical margin and patients' medical costs; (2) was unable to provide its physicians with the data they needed to effectively manage members' medical costs and utilization; and (3) lacked the systems and actuarial personnel and resources necessary to reliably track, report, and forecast medical expenses. *E.g.*, ¶¶10, 84-85, 98(a)-(c), 112(a)-(c), 137(a)-(b), 157(c)-(f), (h), 173(d), 188(j), 191(c). These omitted facts were not just material, they were fundamental. *R&W Tech.*, 205 F.3d at 169.

---

[51]     *Miller v. Nationwide Life Ins. Co.*, 2008 WL 3086783, at *3 (5th Cir. Aug. 6, 2008) (resolution of a factual dispute is improper under a Rule 12(b)(6) inquiry); *SolarWinds*, 595 F. Supp. 3d at 588 (same).

4918-7945-2427.v1

Plaintiffs allege that defendants concealed material facts while affirmatively misstating agilon's data capabilities.[52] For instance, in 2022, Hittner affirmatively emphasized the Company's access to "*all*" of its patients' data from "*all*" of agilon's MA payors. ¶¶83, 127. Sell likewise assured investors agilon's physicians possessed all the data they needed. ¶130. The Company also frequently boasted about agilon's real-time patient data and standard payor data formats.[53] *See, e.g.*, ¶¶82-83. Similar to above (§V.A.1), agilon's stale 2021 "risk disclosures" could not possibly have rectified the false narrative defendants created via their Class Period statements about agilon's data capabilities.[54] Nor did Sell's vague reference on August 3, 2023 to "a lag on MA claims" come anywhere close to revealing the extent or impact of agilon's data deficiencies on its business.[55] agilon at 28 (citing ¶¶163, 169); *see supra* at 36.

Accepting Plaintiffs' allegations as true, defendants come nowhere close to showing they disclosed the omitted truth.[56] Indeed, the Complaint plausibly alleges that defendants misled the

---

[52]     agilon's contention that it "did not conceal the issues it faced" is not only wrong, it contradicts the Complaint's allegations to the contrary. *Compare* agilon at 28, *with* ¶¶241-246; *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 773 (S.D. Tex. 2012).

[53]     *See* ¶122. Relying on *Whole Foods*, 905 F.3d at 901 (finding plaintiffs failed to allege Whole Foods' prices were "uncompetitive" where plaintiffs did not provide "any point of comparison" to competitors' prices), defendants point out that they never said agilon "had perfect access to data." agilon at 28. But *Whole Foods* does not support the proposition that agilon had to claim "perfect access" in order to mislead the market. Defendants ignore their public statements assuring investors that agilon's partners possessed all the data they needed. *E.g.*, ¶130.

[54]     *See* agilon at 28 (citing the same six "risk disclosures" from agilon's April 2021 Registration Statement, only two of which even mention "data," in arguing agilon "disclosed" the "issues" described in the CMS Letter).

[55]     Defendants' assertion that this "lag" was "well-known" to the market contradicts the Complaint's allegations and presents yet another premature factual argument. agilon at 30; *see Miller*, 2008 WL 3086783, at *3.

[56]     *See also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007) (finding issue of "whether the full extent and effect of [the

- 43 -

market into 2024. ¶205. For instance, defendants deceived analysts at TD Cowen, who cut agilon's price target in January 2024 in response to agilon's "lag of claims trend data" and "lack of visibility." *Id.*

Defendants' shopworn "hindsight" argument, primarily aimed at agilon's partners' statements to CMS, also fails to withstand scrutiny as "[t]he incantation of fraud-by-hindsight . . . will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *SEC v. SBB Rsch. Grp., LLC*, 2020 WL 6075873, at \*5 (N.D. Ill. Oct. 15, 2020); agilon at 28.[57] Approximately 80 representatives of agilon's partners reached out to CMS regarding the significant limitations they continued to face in managing agilon's patients. ¶¶85, 241-246.[58]  Among other things, agilon's partners confirmed agilon had not implemented "the comprehensive data necessary to manage th[e] risk" of agilon's members, relied on "altered and often delayed, non-standard data files" to manage agilon's members, and continued to lack the data they "need to appropriately manage the risk [they] carry for [their] attributed patients." ¶¶85, 244, 246. Although defendants attempt to spin what the "[CMS] letter shows," they find no support in the CMS Letter itself, which confirmed that MA plans "are not required to – and therefore do not – share the comprehensive data necessary [for agilon] to manage" its full risk. agilon at 28; Def. Ex. 27 at 970. The partners' statements to CMS fully support the Complaint's allegations that during the Class Period defendants concealed material facts regarding agilon's deficient data.

---

company's] problems was [publicly] known" presented "a fact-specific inquiry, which is not appropriately disposed of on a motion to dismiss").

[57]    *See also Ollila*, 2018 WL 792069, at \*4 (rejecting "fraud by hindsight" argument where plaintiff "alleged that statements were misleading due to then-existing material facts," including "significant, undisclosed problems" with projects managed by one of the company's three segments).

[58]    As explained *supra* at n.8, *Marquez*, 2024 WL 4654137 (agilon at 28) is inapposite.

4918-7945-2427.v1

### 3.    Defendants Concealed Material Deficiencies with agilon's Growth Model and Onboarding for New Physicians

Defendants repeatedly touted agilon's growth through incorporating new physicians in mature markets as "highly efficient" and "sustainable." *E.g.*, ¶¶101, 105, 110. Defendants also asserted that agilon's robust onboarding and implementation period for new physicians enhanced agilon's visibility into its members' healthcare needs and costs, as well as the predictability of agilon's financial results. ¶78.

Without citing a single case, defendants principally contend their statements were literally true because "agilon was in fact growing" in mature markets. agilon at 29. Yet, "the disclosure required by the securities laws is measured not by literal truth, but [rather] by the ability of the statements to accurately inform rather than mislead." *Lormand*, 565 F.3d at 248-49; *Apache*, 2022 WL 4277350, at *5 (same). While agilon did add hundreds of new physicians in mature markets, defendants' statements about these issues omitted that agilon did so while failing to provide the physicians with the basic onboarding and education necessary to integrate into the agilon partnership, and that this was adversely impacting agilon's medical margins. ¶¶13, 78-79. These omitted facts were highly relevant to the market as agilon not only repeatedly emphasized mature markets as a primary driver of revenue growth, but also depended on successfully integrating new physicians into agilon's partnership model. ¶¶76-77. Plaintiffs plausibly allege that defendants' statements touting agilon's growth model, while concealing the alleged facts, were materially misleading. *E.g.*, ¶205 (analyst cutting agilon's price target in response to agilon's "newly cited lapse of training/onboarding").[59]

Further, because the Complaint plausibly alleges the allegedly concealed facts existed throughout the Class Period, defendants' "hindsight" argument fails. agilon at 29. That agilon first

---

[59]    *See Amedisys*, 2016 WL 4443177, at *9 (when a person chooses to speak, they must speak "'complete[ly] and accurate[ly]'").

- 45 -

disclosed its onboarding problem in January 2024, along with a proposed plan to address it, supports

Plaintiffs' allegations that the problem had festered unresolved for years.[60]  *Lormand*, 565 F.3d at

254 ("reliance on alleged facts dating from the post-class period does not amount to 'fraud by

hindsight'"); *Yannes*, 2021 WL 2555437, at \*4 ("plaintiffs may rely on post-class period data to

confirm what a defendant should have known during the class period").

### 4.    agilon's Overstated 2Q23 and 3Q23 Financial Results and FY23 Financial Guidance Are Actionable

Defendants claimed agilon's record medical margin results in 2Q23 and 3Q23 (reported on

August 3, 2023 and November 2, 2023, respectively) and substantial year-over-year margin growth

validated agilon's full-risk model and bolstered agilon's FY23 forecasts.  *E.g.*, ¶¶158, 160, 166, 174,

176, 178, 183.  Yet, these statements vastly overstated agilon's actual performance and concealed

that agilon's reported results rested on grossly unreliable data.  Moreover, agilon's guidance

statements masked the adverse impact unreliable payor data, soaring patient utilization rates and

medical expenses, and massive pent-up demand from COVID-19 were then having on the Company.

*E.g.*, ¶¶13, 173(e), 188(e), 199.

Defendants first assert that agilon's reported results were not "inaccurate" and thus not

"false."  agilon at 32-33.[61]  Yet they do so after agilon has already *admitted* it overstated its *true*

---

[60]    Defendants counter factual argue that agilon merely "'failed to appreciate'" its problems with "onboarding and educating" new physicians.  *See* agilon at 29.  Defendants' factual argument is ambiguous, irrelevant, and "inappropriate for disposition on a motion to dismiss."  *BP*, 843 F. Supp. 2d at 773.

[61]    Defendants' failure to cite supporting case law for this and other arguments is telling.  *See also, e.g.*, *supra* at 37 and 45 and *infra* at 48.  They either lack any legal support at all for their contentions or worse they plan to engage in litigation by ambush by introducing the legal support for their contentions on reply, in contravention of this District's Civil Local Rule CV-7(c)(1).  *See id.* ("All ***motions must . . . cite any applicable rule, statute, or other authority, justifying the relief sought***."); *see also The Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*, 2023 WL 2717968, at \*8 (W.D. Tex. Jan. 31, 2023) ("Defendants failed to cite any cases supporting these points in their motion.  Citing authority in a reply brief is not sufficient. . . .  Accordingly, their motion is denied as to this claim."); *Paez v. Wal-Mart Stores Tex., LLC.*, 2022 WL 3216343, at \*2 (W.D. Tex. Aug. 9,

- 46 -

4918-7945-2427.v1

medical margin by over 40% in 2Q23 and 3Q23.  ¶¶13, 89, 173(e), 199.[62]  In addition, by reporting

materially inflated results, agilon prevented the market from, *inter alia*, understanding agilon's

***actual*** performance in 2Q23 and 3Q23, comparing agilon's actual performance in 2Q23 and 3Q23

with other reporting periods, or reliably assessing agilon's FY23 financial guidance statements in the

context of agilon's true performance.  ¶222.  Moreover, the significant overstatements were designed

to and did create the false appearance of ***up to 69%*** year-over-year medical margin growth, when in

fact agilon's medical margin in 2Q23 and 3Q23 had remained relatively flat compared to the prior

year.  ¶¶173(h), 188(f), 199.[63]  Plaintiffs' allegations of agilon's massive overstatements of agilon's

"main margin metric" are adequately pled.  ¶156.

Next, defendants contend it was "well-understood" agilon "uses estimates and assumptions"

in its financial reporting.  agilon at 32-33.  But so does nearly every other public company, and

agilon fails to show why it deserves special treatment under the securities laws.  Moreover,

defendants overlook an important point – agilon presented its results as statements of fact, ***not***

"estimates."  Defendants do not claim the results were themselves "estimates" (they were not), and

even if defendants had raised this argument, the results would remain actionable.  *E.g.*, *Apache*, 2022

---

2022) (emphasis in original) ("When a party submits arguments that are bereft of legal authority . . . it has failed to develop those arguments . . . [and] explain ***why*** a court should rule in its favor."); *Hiser v. NZone Guidance, LLC*, 2019 WL 2098091, at *1 (W.D. Tex. Mar. 27, 2019) (finding failure to provide authority "contrary to this Court's local rules"); *Hines v. Liberty Life Ins. Co.*, 2013 WL 310320, at *9 (W.D. Tex. Jan. 25, 2013) (refusing to evaluate arguments "[un]supported by even a single citation to legal authority").  Regardless of defendants' approach, their arguments should be rejected.

[62]     agilon's overstatements vastly exceeded the SEC's five percent "numerical threshold" for materiality.  SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,151 (1999) (misstatements exceeding 5% may be presumed material) ("SAB No. 99"); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 147 (2d Cir. 2017) ("SEC administrative guidance, which we have repeatedly cited with approval, counsels that 5% falsity for statements in offering documents may provide 'a preliminary assumption' of materiality").

[63]     SAB No. 99 (qualitative factors for assessing materiality include "[w]hether the misstatement masks a change in earnings or other trends").

- 47 -

WL 4277350, at *5-*6 (financial "estimates" are actionable). Nor do defendants cite *any* case law for the proposition that historical results prepared "us[ing] estimates" are incapable of misleading investors. Meanwhile, defendants claim that agilon utilized "'the best information [that was] available'" when it reported its results. agilon at 32. This presents another factual argument inappropriate at this stage of the proceedings. Finally, defendants' contention that agilon never "restate[d]" its results is sophistry. Word games cannot alter the fact that agilon has acknowledged its previously reported results were not accurate. agilon corrected its previously reported 2Q23 and 3Q23 results, and in February 2024, revised multiple years' worth of overstated medical margin figures.[64] agilon's unsupported position that an overstatement of medical margin – agilon's "main margin metric" and "key metric for [agilon's] business" that defendants repeatedly touted to the market – no matter the size, could never be material to investors is nonsensical and should be rejected. ¶222.

agilon's FY23 medical margin and adjusted EBITDA guidance are also actionable.[65] Although defendants claim the PSLRA safe harbor shields "the guidance itself," they are wrong. *See* agilon at 21; CD&R at 18.[66] The safe harbor is limited to "forward-looking statements" that are

---

[64]    *See* ¶208 (revising in February 2024 overstated medical margin figures "by 8%-23% for FY21 and 23%-26% for FY22" after having touted those figures in August 2023); agilon at 32.

[65]    The Complaint alleges nine dates on which agilon issued or affirmed FY23 guidance during investor calls: March 1 and 30, May 9, June 7, August 3, September 12, November 2 and 14, 2023, and January 5, 2024. *E.g.*, ¶¶140, 143, 146, 155, 159, 166, 172, 174, 185, 189-190. Defendants fail to contend they "identified" any statements as "forward-looking" during the calls on March 30, June 7, September 12, and November 14. *See* agilon at 21-24 (agilon asserting it identified its "guidance" as "forward-looking" on five dates) (citing Def. Exs. 13-14, 18, 21, and 23).

[66]    By restricting their safe harbor challenge to the guidance numbers themselves, defendants concede – as they must – that the remaining portions of the challenged statements (including the portions pertaining to current or historical fact) are not protected. agilon at 21; *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014); *Apache*, 2022 WL 4277350, at *4 ("[t]o the extent some of the alleged misstatements contain forward-looking elements, many of them incorporate factual assertions, rendering the safe harbor inapplicable").

- 48 -

"identified as . . . forward-looking statement[s]" and are "accompanied by meaningful cautionary [language]." 15 U.S.C. §78u-5. Cautionary language that is boilerplate or that warns of risks that have already "materialized," is not "meaningful." *Lormand*, 565 F.3d at 247-49.[67] Tellingly, defendants cite just a single case to bolster their "safe harbor" arguments, which fail as set forth below.[68]

First, the safe harbor is inapplicable because the challenged statements were not accompanied by "meaningful cautionary [language]." 15 U.S.C. §78u-5. Instead, each of the "risk disclosures" identified in agilon's 2023 10-K were vague, uninformative, and/or warned of risks that had already materialized.[69] Moreover, although "cautionary language must be tailored to the forward-looking statement that it accompanies," during the Class Period agilon repeated the same risk disclosures it had issued in early 2021. *See Harman*, 791 F.3d at 102, 108.[70] agilon cannot credibly contend that it "tailored" its "risk disclosures" to be "meaningful cautionary [language]" when the Company recycled the same risk disclosures year after year. *See Harman*, 791 F.3d at 101 (safe harbor

---

[67]    *See also Cabot Oil*, 2024 WL 83503, at *12 ("rais[ing] the specter of regulatory compliance issues when specific regulatory action had already begun affecting Cabot's production" was not "meaningful"); *Apache*, 2022 WL 4277350, at *5 ("'[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future'").

[68]    agilon at 21-24 (citing *Southland*, 365 F.3d at 371-72); CD&R at 18; *Southland*, however, provides little more than quotations from the safe harbor. *Id.*

[69]    *See Lormand*, 565 F.3d at 249; *Stadium Cap.*, 2024 WL 456745, at *2 ("if a company is warning investors about future risks . . . a reasonable investor would infer that those risks have not yet happened," and "[i]f the 'risk' has already happened or is then happening, the company has a duty to say so"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 108 (D.C. Cir. 2015) (rejecting contention that the "safe harbor [affords] protection based on a statement that risk could come to fruition where that risk has already begun to materialize").

[70]    The four disclosures listed on page 22 of agilon's brief (each taken from agilon's March 1, 2023 10-K) appear verbatim or near-verbatim in agilon's March 18, 2021 Form S-1. *Compare* bullet numbers 1-4 of agilon at 22, *with* Def. Ex. 1 at 037-38, 040-041, 042, and 042, respectively. While at least one of the four risk disclosures at least mentions "estimates," it effectively "warns" that actual results "could differ" from estimates. agilon at 22.

- 49 -

unavailable where cautionary statements remained unchanged despite passage of time); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *18 (E.D. Pa. Mar. 25, 2020) ("[T]he cautionary language . . . did not change from 2014 to 2016. Therefore, the Court finds that the [safe harbor] does not apply."). The market's shock upon learning the truth about defendants' fraud further demonstrates the inadequacy of agilon's stale risk disclosures. *See* ¶¶195-211.[71]

Furthermore, the safe harbor is inapplicable where "defendants were aware of undisclosed facts that would tend to seriously undermine the accuracy of th[eir] forward-looking statements."[72] Here, the Complaint alleges that Sell and Bensley were aware of adverse facts that seriously undermined the reliability of agilon's FY23 guidance and the data underpinning it. Further, agilon issued its FY23 guidance while omitting that agilon was not accurately tracking or forecasting patients' medical costs, elevated patient utilization rates, and massive pent-up demand. *E.g.*, ¶¶157(c)-(j), 173(a)-(f), (i), (k), 188(a)-(g), (j)-(k), 191(a)-(f), (h). Moreover, agilon's guidance omitted tens of millions of dollars in historical medical costs at the time the guidance was issued in 2023 and early 2024. *E.g.*, ¶¶173(e), 173(g)-(h), 188(c), 188(e)-(f), 191(a). By issuing guidance while concealing facts that seriously undermined the reliability of that guidance, agilon created the false impression that the guidance was "conservative" and grounded on reliable data. ¶¶177, 182;

---

[71]    *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *11 (S.D. Ohio Sept. 27, 2021) (alteration in original) ("The inadequacy of Defendants' cautionary language is demonstrated by the fact that, when investors learned the truth about the negative impact Cordis was having on Cardinal's earnings, they were surprised and disappointed by Defendants' 'lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment [for Cordis].'"

[72]    *Marcus v. J.C. Penney Co. Inc.*, 2015 WL 5766870, at *5 (E.D. Tex. Sept. 29, 2015); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 663 (W.D. Tex. 2006) (finding safe harbor inapplicable to forward-looking statements that the defendant "knew, or was severely reckless in not knowing," were false); agilon at 23.

- 50 -

*see also* ¶184 (agilon disclaiming any broad, pervasive problems with payor data).[73]   Defendants

challenge their "actual knowledge" for only their March 2023 statements, reasoning agilon "could

not have known about a May-June 'spike'" in March 2023.  agilon at 23.  In doing so, defendants

concede actual knowledge of the "spike" at the time agilon issued FY23 guidance in and after May

2023.  For good reason.  As Plaintiffs allege in ¶¶217-222, defendants were well aware of the spike.

Moreover, defendants' argument fails entirely to address the several reasons independent of the

"spike" that rendered agilon's guidance statements misleading.  ¶¶157, 173, 188, 191.  Because

Plaintiffs plausibly allege that agilon's FY23 guidance was knowingly false or misleading when

made, the Safe Harbor does not immunize defendants' false and misleading FY23 guidance.

## B.      Plaintiffs Plead a Strong Inference of Scienter for Each of the Exchange Act Defendants

A complaint pleads scienter by "stat[ing] with particularity facts giving rise to a strong

inference that the defendant[s] acted with the required state of mind."  15 U.S.C. §78u 4(b)(2)(A).

Either an "'intent to deceive'" or "'severe recklessness'" satisfies the "'required state of mind.'"

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214, 219 (5th Cir.

2023).  A "'strong inference'" of scienter is "cogent and at least as compelling as any opposing

inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Where inferences

compete, a "'tie favors the plaintiff.'"  *Six Flags*, 58 F.4th at 214.

The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even

the 'most plausible of competing inferences,'" and allegations of motive are not required.  *Tellabs*,

551 U.S. at 324-35.  A complaint plausibly alleges scienter if "a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw

---

[73]     *Marcus*, 2015 WL 5766870, at *5-*6 (safe harbor unavailable where "reasonable minds could disagree as to whether the overall understanding of the statements and warnings is misleading").

4918-7945-2427.v1

from the facts alleged." *Id.* at 324. Courts analyze scienter holistically: "whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, 565 F.3d at 251.

Defendants' contention that a complaint must contain "confidential witness allegations [and] references to internal documents bearing on the individual defendants state of mind" misstates the law. agilon at 34. In the Fifth Circuit, "[a]ctual knowledge . . . is not required to create a strong inference of scienter. Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b)." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599-600 (W.D. Tex. 2014) (citing *Nathenson*, 267 F.3d 400); *see also Lormand*, 565 F.3d at 251 ("'Allegations of circumstantial evidence justifying a strong inference of scienter will suffice.'"); *Apache*, 2022 WL 4277350, at *6 ("Because 'there will rarely be direct evidence of intent to defraud,' . . . a plaintiff may allege scienter 'by pleading facts giving rise to a strong inference of recklessness or conscious misconduct.'").

The Complaint presents specific allegations regarding: (1) what each Exchange Act Defendant knew or recklessly disregarded at the time of his or her false and misleading statements or omissions; (2) the motivation of each Exchange Act Defendant to misstate or omit facts; and (3) other facts supporting knowledge or recklessness. Taken together, Plaintiffs' allegations raise a strong inference that agilon and each of the Exchange Act Defendants acted with scienter in concealing the Company's systemic deficiencies and their impact on agilon, and in making each of the misrepresentations and omissions described in the Complaint.[74]

---

[74]    Each of the Exchange Act Defendants' scienter is imputed to agilon. *E.g.*, *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 881-84 (W.D. Tex. 2014).

4918-7945-2427.v1

### 1.    Defendants Knew or Recklessly Disregarded the Alleged Deficiencies with agilon's Business Model

Defendants' scienter may be strongly inferred because the alleged fraud centered on the foundational elements of agilon's business model. *Holzwasser v. Staktek Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006)* (misstatements that "pertained to [company's] core business" supported scienter). "'The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false.'"[75]

This is not a case in which the alleged fraud concerned a low-level division, an overseas entity, or a small slice of a large conglomerate's revenue. Here, the fraud centered on agilon's only "product" – its Medicare Advantage "Total Care Model." ¶¶3, 5, 8-9. agilon's Medicare Advantage business provided virtually 100% of agilon's consolidated revenue,[76] and because agilon historically operated at a net loss, presented agilon's only real chance of eventually turning a profit. ¶¶4, 7.

Further, the fraud centered on medical margin, agilon's most closely-followed publicly-reported metric. Medical margin presented the difference between agilon's capitation revenue and its patients' medical expenses. ¶4. Each of the Exchange Act Defendants knew that medical margin represented agilon's "main margin metric," and that investors and analysts relied on agilon's reported medical margin to gauge the Company's performance and the viability of agilon's full-risk

---

[75]    *Rougier*, 2019 WL 6111516, at *12; *see also Nathenson*, 267 F.3d at 425-26 (finding strong evidence of scienter where Zonagen was essentially a one-product company, the company's prospects were substantially dependent on that product, and the alleged misstatements concerned that product); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) ("It is reasonable to assume, given the importance of these deals to the company, that IPaxess would have familiarized itself with the financial condition of Lynxus/AGNI and would have discovered details about their poor financial condition . . . .").

[76]    Def. Ex. 8 at 444 ("[Medicare Advantage] program accounted for approximately 100%" of agilon's "total revenues" in 2020 and 2021). agilon excluded ACO REACH from its consolidated financial results. Def. Ex. 19 at 753; ¶220.

model.[77] Sell and Bensley personally emphasized the critical role that medical margin, as well as patients' medical costs and utilization rates – two key inputs to medical margin – played in agilon's success.[78] Defendants also knew that if patients' medical expenses and/or utilization rates increased, then agilon's medical margin would shrink or disappear. ¶4. Further, given that agilon bore 100% of the risk of its patients' medical expenses, the potential losses agilon faced under its full-risk model were severe. ¶¶3-4, 10.

The fraud also implicated agilon's data capabilities, which agilon touted as a key pillar of its business model, and which served an integral role at the Company. *E.g.*, ¶¶8, 80-82, 139, 217. First, agilon relied on payor data to track patients' historical medical expenses and agilon's historical medical margin, as well as forecast those same key metrics. *E.g.*, ¶¶80-84. Second, under agilon's unique "partnership model," agilon's physicians depended on agilon to collect, synthesize and analyze payor data, while agilon relied on its physicians to help drive down medical costs and utilization. ¶¶85, 103, 122-124, 127, 139. Given this interdependence, the Exchange Act Defendants are alleged to have plausibly known, or recklessly disregarded, that the alleged data deficiencies significantly impacted the Company *and* its physician partners. Indeed, agilon's partners described a direct link between agilon's data deficiencies and the partners' inability to, *inter alia*, "appropriately manage the risk" of agilon's patients, "perform against the [partners'] contract[s]," and "understand[] real-time developments and accurately forecast[] future developments" with respect to their patients. ¶¶244-246.

---

[77]    *See* ¶¶221-222 ("'***key*** metric for our business'"); ¶156 (agilon's "'***main*** margin metric[.]').

[78]    *See, e.g.*, ¶143 (Sell emphasizing agilon's "ability to grow medical margin"); ¶109 (Sell touting agilon's ability to "drive medical margin improvements" and "'***drive sustainably lower cost[s]***.'"); ¶144 (Bensley describing the underlying drivers of agilon's medical margin); ¶156 (Sell describing medical margin as agilon's main margin metric), ¶166 (Bensley highlighting agilon's 69% year-over-year medical margin growth as evidence of "the strength and durability of [agilon's] business model.").

Sell and Bensley also frequently detailed agilon's business model, key metrics, and data platform in responding to analysts' questions on the subjects. *E.g.*, ¶¶102, 110, 114, 129, 133, 136, 167, 169, 172, 179, 187, 190. And, the fact that analysts regularly inquired about these matters further demonstrates the importance of these subjects to the Company, and "further reinforces the inference of scienter." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) ("[defendants] had reason to focus on Celestica's inventory levels: inventory . . . was key to measuring Celestica's financial performance and was a subject about which investors and analysts often inquired"). Plaintiffs have plausibly alleged that the statements made by senior agilon executives named as Exchange Act Defendants about agilon's business model and data capabilities were made with knowledge of their falsity or severe recklessness in not knowing they were false.[79]

### 2.    Defendants' Numerous Public Statements During the Class Period Contribute to a Strong Inference of Scienter

A strong inference of defendants' scienter is further satisfied by allegations showing the defendants frequently presented on, monitored, represented themselves as highly knowledgeable about, and demonstrated their direct involvement in, the subject matters on which the market was misled. *See, e.g.*, *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("the most powerful evidence of scienter is the content and context of [defendant's] statements themselves");

---

[79]    *See Singh v. 21Vianet Grp., Inc.*, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) ("given the positions of the individual Defendants within [the company], the Court finds it difficult to see any inference as strong as the inference that Defendants had 'a mental state embracing intent to deceive, manipulate, or defraud' through its alleged . . . practices"), *report and recommendation adopted*, 2017 WL 4310154 (E.D. Tex. Sept. 28, 2017); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (a strong inference of scienter may arise when defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

4918-7945-2427.v1

*Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at \*13 (N.D. Ill. Aug. 11, 2021) ("The Court may 'readily and reasonabl[y] infer' from their repeated references to the sustainability of cost-cutting from synergies and post-merger efficiencies that they 'made it [their] business to look into' these issues.") (alterations in original).[80]  The Exchange Act Defendants' repeated statements to the market during the Class Period demonstrate knowledge of the topics on which they directly spoke, including agilon's "high-touch" cost-cutting business model, critical reporting metrics (*e.g.*, medical margin, patients' utilization and medical expenses), data platform and capabilities, and growth model in mature markets.

**Defendant Sell**: Sell's repeated statements about agilon's business, data capabilities, and growth model support a strong inference that he acted with knowledge or severe recklessness. Informed by his extensive "experience" from "running [a] payor for 20 years," Sell assured investors that agilon's model provided tremendous visibility into patients' historical and near-term medical costs and agilon's medical margin, significantly predictable medical margin, and a unique ability to effectively manage medical costs, patient utilization, and medical margin.  *See* ¶¶8, 23, 62, 67, 95, 100, 120, 158, 163, 165, 169.

Sell also held himself out as an authority on the concrete benefits agilon's "high-touch" model yielded.  For example, Sell stressed that agilon's "high-touch" model enabled agilon and its partners to "manage costs and deliver predictable results" (¶113), as well as effectively drive down

---

[80]     *See also Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (defendants' responses "[i]n the context of [analysts'] specific inquiries about pricing and sales" supported scienter); *Loritz v. Exide Techs.*, 2014 WL 4058752, at \*12 (C.D. Cal. Aug. 7, 2014) (that defendants allegedly discussed environmental issues during investor calls "show[ed] that management was aware of, and involved in environmental compliance issues at Vernon, making it even less likely that Defendants were not aware of Vernon's contamination issues").

- 56 -

4918-7945-2427.v1

medical costs and manage patient utilization.[81]  Sell also monitored and publicly reported on agilon's patients' medical costs and utilization.  *E.g.*, ¶149 (in May 2023, Sell discussing agilon's actual utilization versus expected utilization); ¶151 ("***our costs continue to just go***" down); ¶162 (reporting patients' "***year-to-date***" utilization); ¶169 (same).[82]  Sell also assured in August 2023, based on his insight, that agilon's model "has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization."  ¶161; *see, e.g.*, ¶¶66, 134, 181.

Sell also showcased his extensive knowledge of agilon's data capabilities.  For example, Sell: (1) described in detail agilon's collection, analysis and integration of payor data; (2) catalogued the strengths of agilon's data platform; (3) identified the sources, quality, and standardization of agilon's payor data; and (4) indicated that he monitored the completeness of agilon's payor data.[83]  Sell assured investors that he not only understood which data agilon's partners "need," but also "make[s] sure" they "have the data they need."  ¶130.  Sell's public statements strongly infer he "had intimate knowledge of the data" deficiencies alleged in the Complaint.  *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018); *see also CarLotz*, 2024 WL 1348749, at *15 (finding CEO's statements about inventory "suggest[ed] that he had access to contemporaneous information about" Carlotz's inventory); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("an inference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements").

---

[81]    *E.g.*, ¶114 (dismissing analyst's concern over pent-up demand while referring back to agilon's "high-touch" model); ¶129 (assuring in May of 2022 that "we have great visibility from a cost perspective . . . ***that visibility and that continuity is a big differentiator***").

[82]    *See In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024) (reasoning defendants' statements about inventory levels "'to date'" "indicate that [the CEO and CFO] were in fact monitoring contemporaneous statistics").

[83]    *E.g.*, ¶103 (Sell assuring that agilon's partners receive "clean and actionable data"); ¶122 (Sell boasting of agilon's "standard [payor] data formats"); ¶¶163, 169 (Sell describing payor data).

4918-7945-2427.v1

Further, Sell emphasized his personal knowledge of agilon's growth through adding new physicians in mature markets, including his knowledge of: (1) which (and when) specific physician groups were joining agilon; (2) which (and when) physician groups had commenced "implementation" with agilon; and (3) agilon's specific physician growth metrics and trends. *E.g.*, ¶¶100, 105, 110. Moreover, by assuring that agilon's growth was "very predictable" and "highly visible," and that new physicians could easily join mature markets, Sell indicated that he closely monitored agilon's growth in mature markets and understood the steps involved with adding new physicians in mature markets (*e.g.*, ¶¶115, 147), thereby confirming that Sell knew of or recklessly disregarded agilon's policy of failing to onboard new physicians in mature markets.

**_Defendant Bensley_**: agilon's CFO since January 2021, Bensley was laser-focused on agilon's medical margin and patients' medical costs. *E.g.*, ¶68 (Bensley assuring in June 2023 that "long before we go live, we have really, really strong visibility into exactly what's happening," and "what the economics . . . look like."), ¶144 (Bensley touting his "***great visibility***" into the drivers of medical margin); ¶131 ("***[w]e have tremendous visibility*** into both growth and embedded margins in our existing PCP groups"). Bensley also monitored and publicly reported on agilon's patient utilization and medical expense trends. *E.g.*, ¶172 (describing the utilization "we're seeing"); *id.* (claiming he "hadn't seen" a spike in utilization); *id.* (stating inpatient costs were trending down, which was "obviously . . . offsetting" increases in outpatient medical costs); ¶185 (assuring patient utilization has "moderated back down"). Moreover, Bensley issued specific statements about the reasons for increased medical expenses in specific quarters, including with claim-level details. ¶148 (assuring increased medical expenses in one quarter were due to "a couple of old" claims).

**_Defendant Hittner_**: As agilon's Chief Experience Officer, Hittner publicly described the scope and quality of the data agilon provided to its physician partners, including the types of data, the sources from which agilon received the data, and how agilon used payor data to run its business.

- 58 -

¶¶139, 145.  For instance, Hittner explained in May 2022 that agilon supplied its physician partners with "all of [the] data about [their] senior population" from "all of [their patients'] [Medicare Advantage] plans."  ¶¶127, 145.  Given her statements, what is **im**plausible, is that Hittner lacked knowledge of agilon's payor data deficiencies.

 ***Defendant Venkatachaliah***: As agilon's CTO, Venkatachaliah publicly described agilon's data collection and processing capabilities, and assured investors about the quality and comprehensiveness of agilon's data.  Venkatachaliah also claimed that agilon "correct[ed]" any issues with payor data, that agilon recieved feedback from agilon's physician partners regarding the patient data, and that agilon's partners "trust the data" agilon provided.  ¶¶123-125.

 Defendants' repeated statements regarding these topics, and defendants' direct involvement in monitoring and directly reporting on these issues, support the inference that at the time they spoke, they knew or recklessly disregarded facts that rendered their statements false and misleading. Laboring to characterize the Complaint as pleading scienter "based on [the defendants'] positions within [the] company," the Exchange Act Defendants ignore the Complaint's allegations.  agilon at 39 (challenging whether the "core operations" doctrine applies).  As opposed to merely relying on defendants' positions to plead scienter, the Complaint contains particularized allegations (including those highlighted above) which plausibly show that defendants acted knowingly or recklessly when they issued their alleged misstatements.[84]

---

[84]  Because the Complaint does not rely on the defendants' positions alone in alleging scienter, defendants' cases are inapposite.  agilon at 38-40 (citing *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund. v. Diodes, Inc.*, 810 F.3d 951, 958-59 (5th Cir. 2016) (plaintiffs arguing "scienter can be drawn simply" because "from their top executive positions, [Diodes' CEO and CFO] must or should have known about" "the magnitude of disruption caused by the company's labor policies"); *Neiman v. Bulmahn*, 854 F.3d 741, 749 (5th Cir. 2017) (assessing whether to infer scienter based on the "defendant's position in the company"); *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 985 (5th Cir. 2019) ("Plaintiffs invoke [defendant's] position as an inventor of the FracMax technology as sufficient to 'permit a plaintiff to plead scienter.'"); *Yoshikawa v. Exxon*

Although Plaintiffs already allege a strong inference of scienter, contrary to defendants' argument, the "core operations" inference supports scienter as well. *Six Flags*, 58 F.4th at 219 (listing the four factors or "considerations"). ***First***, unlike defendants' citation to *Six Flags*, where the subject of the alleged misconduct was "not critical to Six Flags' survival," here, according to defendants themselves the success of agilon's MA business model was mission critical to the Company's viability and consolidated results.[85] *Compare* ¶¶3-4, *with Six Flags*, 58 F.4th at 219 (explaining that although Six Flags' "China parks were just '3% of Six Flags' revenue'" and "were not critical to Six Flags' survival, . . . they were an important aspect of future growth prospects and EBITDA").[86] ***Second***, Plaintiffs plead that agilon's data deficits and soaring utilization and medical costs were "readily apparent" to defendants, who frequently illustrated their in-depth knowledge of agilon's business model, monitoring of key metrics such as patients' utilization rates and medical costs, and familiarity with agilon's data capabilities. *See supra* at 56-59; *see also* agilon at 30 (defendants admitting "agilon knew about" "the flaws in the data").[87] ***Third***, agilon issued internally

---

*Mobil Corp.*, 2022 WL 4677621, at \*4 (N.D. Tex. Sept. 29, 2022) (refusing to infer scienter solely based on ExxonMobil executives' positions)).

[85]    Defendants' reliance on *Diodes*, 810 F.3d 951 is severely misplaced. There, the plaintiffs claimed the Texas-based company's CEO and CFO concealed the impact of a Shanghai facility's labor policies on that facility's labor shortage. *Diodes* found the plaintiffs had failed to allege how the facility's labor policies had caused its labor shortage, or how Diodes' Dallas-based executives "would have been aware of labor policies at the Shanghai facility" or their impact on the facility's employees. *Id.* at 958-59 (plaintiffs failed to allege how a "labor shortage, whatever its cause," at a Shanghai facility "jeopardized the . . . existence" of a Dallas-based company with "4,000 employees at locations across the world"). Contrary to agilon's contention, the law does not require Plaintiffs to allege that the subject of the challenged statements "'jeopardized the company's existence.'" agilon at 39. *See Six Flags*, 58 F.4th at 219 (distinguishing *Diodes*, 810 F.3d at 959).

[86]    *Neiman*, 854 F.3d at 750 (factor not met where disputed oil well – one of 104 in the Gulf of Mexico – comprised only 22.5% of company's total output).

[87]    *Six Flags*, 58 F.4th at 219 (finding U.S.-based executives' misrepresentations regarding theme parks in China would be "'readily apparent'" where defendants' earnings call statements implied they knew details about the parks); *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at \*11 (W.D. Tex. May 11, 2023) (Ezra, J.) (finding CEO's statements "would have been readily

- 60 -

inconsistent statements, including (1) falsely claiming agilon's model had "insulated" agilon from utilization "spikes" and prevented "pent-up demand for care," when in fact utilization rates had spiked months earlier, and agilon was combatting a massive "backlog" of pent-up demand from COVID-19; and (2) misleadingly contending that agilon maintained access to "*all*" of its patients' data from "*all*" of agilon's MA payors, when in fact the payor data agilon received was substantially incomplete, altered, distorted, non-standardized, and often delayed by up to three months. ¶¶244-246.[88]  Analysts also noted that agilon's statements were "contradict[ory]." ¶197.  **Fourth**, agilon employed only 550 people at the start of the Class Period.  ¶16.[89]  These "core operations" considerations strongly support scienter.

### 3. The Divergence Between agilon's Internal Information and External Statements is Further Confirmation of Defendants' Scienter

Plaintiffs allege that defendants concealed (1) spiking patient utilization and medical costs, as well as substantial pent-up demand for healthcare; and (2) systemic deficiencies with agilon's data capabilities, both of which directly contradicted the Exchange Act Defendants assurances to the contrary.  These allegations confirm the Exchange Act Defendants' scienter.  *Cassava*, 2023 WL

---

apparent [even though CEO did not have science background] given the importance of these results to Cassava").  Defendants argue that agilon's business is "extraordinarily complicated" because "agilon must analyze a large quantity of data" for even "a single patient."  agilon at 40.  This simply underscores the importance to investors of defendants' assurances about agilon's data platform, and how the alleged data deficiencies rendered defendants' statements misleading.

[88]    agilon at 40 (citing *Exxon*, 2022 WL 4677621, at *4 (factor lacking where plaintiffs did not "plead[] that any of Defendant's statements were internally inconsistent")).

[89]    While defendants contend agilon *currently* employs over 1,000 employees (agilon at 39), agilon employed far fewer persons during the Class Period.  This distinguishes this case from *Diodes*, 810 F.3d at 959 ("4,000 employees at locations across the world"), *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 10619820, at *33 (E.D. Tex. Oct. 16, 2017) (21,600 employees), *Exxon*, 2022 WL 4677621, at *4 ("ExxonMobil is not a small company"), and *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 603 (N.D. Tex. 2021) (1,400-1,700 employees worldwide).  Regardless, employee-count is not dispositive, and plaintiffs need only allege "some combination of [the] four considerations." *Diodes*, 810 F.3d at 959; *Six Flags*, 58 F.4th at 219.

4918-7945-2427.v1

3442087, at *9 ("Selective reporting supports an inference of scienter."); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 899 (D. Minn. 2011) (allegations that "undisclosed internal numbers contradicted what Defendants were telling the public . . . plainly support the 'strong inference of scienter'").

***First***, the Exchange Act Defendants do not (and cannot) seriously dispute that their statements concealing spiking utilization and medical costs were false and misleading when made. In August 2023, Sell falsely claimed that agilon's "high touch" model had "***prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization***." ¶161.  The next month, Bensley reassured investors that agilon's model was actually "driv[ing] utilization ***down***," and that agilon had no reason to believe its patients' utilization rates had spiked.[90]  Less than two months later, on November 2, 2023, Sell and Bensley admitted their earlier statements were untrue: agilon ***had*** in fact seen a spike in patient utilization and medical costs ***beginning in May 2023***. ¶180 ("***we did see some increased utilization in May***"); ¶179 ("***we did see a step-up in Q2 utilization***"); ¶180 ("***we saw a spike up***").  The Exchange Act Defendants' admissions that not only were they closely monitoring agilon's utilization levels, but actually "saw [utilization] spike up" in May and concealed that fact from investors, directly show the Exchange Act Defendants' scienter.  *Id.*

The Exchange Act Defendants' concealment of agilon's pent-up demand from the COVID-19 pandemic also supports scienter.  Sell assured investors that agilon's high-touch model "***has prevented a pent-up demand for care***."  ¶161.  Sell later admitted this too was untrue, that agilon had been saddled with a massive backlog of pent-up demand from COVID-19, that this backlog had largely caused agilon's surging utilization in 2023, and that by the end of the Class

---

[90]    *E.g.*, ¶171 (Bensley touting the model's "positive impact on ***avoiding some of the pent-up demand issues that came out of post-COVID***"); ¶172 ("***we're seeing . . . an absolute decrease in patient utilization***"); *id.* ("***if we do that at some point, see that, that – there was some kind of a spike up or an increase in utilization*** that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there").

Period agilon was only 60% through its backlog of pent-up demand. ¶218. These allegations support a strong inference of scienter. *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 955 (S.D. Tex. 2021) (scienter pled by alleging that "material facts were being concealed from investors").

The sharp divergence between agilon's reported medical margin for 2Q23 and 3Q23, and agilon's true performance during those quarters, also supports scienter. Plaintiffs allege that agilon overstated its publicly reported medical margin for 2Q23 and 3Q23 by at least 48% and 40%, respectively. ¶¶13, 89, 173(e), 188(e), 199. These were not trivial amounts – they represented material overstatements of a key metric that defendants told the market to focus on and knew the market closely followed. ¶¶156, 221-222. These overstatements also disguised negative trends in agilon's performance, by creating the illusion of up to 69% year-over-year medical margin growth when in fact medical margin had remained relatively flat. ¶¶173(h), 188(f), 199. Moreover, while publicly concealing the systemic defects in agilon's business model, the Company issued wildly overstated and unreliable FY23 medical margin and adjusted EBITDA forecasts. The sheer magnitude of agilon's overstatements provides further confirmation of scienter. *E.g.*, *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2-*3 (E.D.N.Y. July 26, 2016); *comScore*, 268 F. Supp. 3d at 553 ("the size of the purported fraud" can support scienter).

***Second***, the letter from 80 representatives of agilon's physician partners – including more than a dozen that the Exchange Act Defendants specifically discussed in their Class Period statements – to CMS further demonstrates that defendants knew their claims that agilon's physician partners: (1) "trust the data" they were receiving from agilon; (2) were provided the data they needed in order to manage medical costs and patient utilization; and (3) "know exactly who they are accountable for" were false and misleading. ¶¶241-243. The letter to CMS directly contradicted defendants' statements, confirming that the partners never had "the comprehensive data necessary to

- 63 -

manage th[e] risk" of agilon's members, or "standardized, comprehensive" payor data. ¶244. These representatives confirmed they received "altered and often delayed, non-standard data files that vary in format and quality, with several fields masked, combined or otherwise distorted," which prevented them "from understanding real-time developments and accurately forecasting future developments" for their patents, and lack the information they "need to appropriately manage the risk [they] carry for [their] attributed patients." *Id.* The truth was agilon's partners had lacked information which would allow them to "[e]nsure[] we know who the plan has attributed to us" and that agilon's patients' "conditions are correctly accounted for," as well as "[p]rovide[] real-time information on our patients and the transactions initiated by [payors]." ¶245.

Contrary to defendants' argument, neither the April 2021 Registration Statement nor the Company's comments from August 2, 2023 "alerted investors" to the "data issues [agilon's partners] identify" in the CMS letter. *See* agilon at 38 (referring to page 25 for agilon's "extensive risk disclosures" from April 2021). Further, given that *over 80* high-level representatives of agilon's partners knew of the deficiencies they personally catalogued to CMS, the *only* plausible inference is that the Exchange Act Defendants knew of those deficiencies throughout the Class Period as well.[91] The CMS letter's confirmation that agilon's partners consistently failed to receive the data they needed the same data that the Exchange Act Defendants repeatedly assured Plaintiffs and the Class agilon received – overwhelmingly confirms that the Exchange Act Defendants were aware their Class Period assurances about agilon's platform and full-risk model were false and misleading.

---

[91]    *In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (finding unpersuasive the competing inference that defendants "were essentially clueless as to the major problems existing within the company").

- 64 -

### 4. Defendants' Billions of Dollars of Insider Trading Support Scienter

"Insider trading in suspicious amounts or at suspicious times is . . . presumptively probative of bad faith and scienter." *Collins*, 20 F.3d at 169. "[F]inancial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Here it does so in spades, as "defendants made suspicious sales at suspicious times, and profited greatly thereby, such facts are probative of the defendants' intent to inflate the price of their company's stock in order to make a personal profit from their insider sales." *Brody*, 2006 WL 2739352, at \*6.

During the Class Period, CD&R sold an astounding $2.75 **b**illion in agilon stock. The timing and amounts of CD&R's sales were highly suspicious. CD&R sold $518 million in the September 2021 Offering, $276 million on August 11, 2022, and then another $1.95 **b**illion in the May 2023 Offering as the wheels were coming off at agilon. ¶214. CD&R's insider sales in May 2023 were particularly unusual in size and timing. ¶¶214-215. CD&R sold 8 times as many shares (for 7 times the proceeds in a single day) on May 18, 2023, as it had sold during all of 2022 – $1.95 billion versus $276 million. ¶214. Moreover, CD&R's $1.95 billion sale closed just months before the Company disclosed agilon's spike in patient utilization and medical costs that defendants were concealing from the public, and resulted in a sharp decline in agilon's stock price. Defendants' monstrous sale of nearly $2 billion in stock just before an announcement of such negative news is quintessential evidence of scienter.[92]

Defendants' argument that CD&R's sales "have no bearing on the state of mind of agilon's executives" because "Plaintiffs do not allege [CD&R] played any role behind the scenes" is simply wrong.   agilon at 36.   The Complaint details at length CD&R's control of agilon and its

---

[92]   *E.g.*, *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 600 (N.D. Ohio 2004) (plaintiffs showed an inference of scienter by alleging that the defendants "had committed suspicious insider trading" at an opportunistic time).

- 65 -

management, including through CD&R's substantial stock ownership, its ability to appoint a majority of agilon's Board of Directors (including the Chairman and Vice Chairman), and unlimited access to agilon's non-public financial, operational, and other information.  ¶¶300-306.  The Exchange Act Defendants were motivated to boost the stock price for the benefit of CD&R, which for years commanded near total control of the Company and its employees, and which used that control to not just sell billions of dollars of shares at inflated prices but also extract $200 million from agilon's own limited cash reserves.  ¶307.  "'[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter . . . .'"  *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 620 (S.D. Tex. 2022); *see also In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359 (S.D. Fla. 2005) (although defendant CEO's conduct "alone may not rise to 'severe' recklessness, factoring in [his] clear motive and opportunity to mislead investors creates sufficient severity").

Sell's $3 million stock sale – four times his 2021 salary – was unusually large, executed before the alleged partial disclosures, and calculated to maximize Sell's personal benefit from undisclosed inside information.  ¶216.  Sell's onetime $3 million stock sale supports his scienter. ¶¶72, 216; *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553, 554 n.4 (5th Cir. 2007) (finding a onetime sale of $1.44 million during the class period suspicious even though the sale was subject to a 10b5-1 plan, which would typically "raise an inference that the sales were pre-scheduled and not suspicious," reasoning that defendants failed to provide a response to plaintiff's argument that the sale was suspicious because it occurred during the class period).[93]

---

[93]    Although defendants assert that "'sales by one insider'" do not show scienter, the Complaint alleges $2.7 billion in stock sales by the CEO and the CD&R Defendants (*Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 812 (N.D. Tex. 2006)); *see* agilon at 36 (citing *Fener*, 425 F. Supp. 2d at 813); ¶¶213-216.

4918-7945-2427.v1

### 5.    Defendants' Motivation to Attract and Retain Existing Physician Partners by Concealing Agilon's Deficiencies Bolsters Scienter

Defendants' motivation to conceal agilon's array of deficiencies supports scienter. *Lee*, 29 F. Supp. 3d at 888 (allegations that officers were motivated to conceal adverse information regarding the company supported scienter). Under its partnership-based model, agilon compensated its physician partners by splitting cost savings 50/50. ¶¶4, 236. The Company used agilon stock to attract and retain its physician partners in the highly competitive physician group market, including in April 2021 when agilon granted ***$268 million*** of agilon common stock to agilon's partners. ¶¶234-235.[94]

The Exchange Act Defendants knew that, in order for agilon to grow its revenue base, the Company had to convince thousands of prospective physicians (as well as agilon's current partners) that agilon's full-risk business model was both viable and sustainable, particularly given that agilon sought to enter multi-decade profit-sharing agreements with its physicians. ¶¶234-237; Def. Ex. 9 at 475 (in March 2022, agilon discussing "goal of 10,000 primary care physicians on the platform"). The Exchange Act Defendants also knew that agilon's undisclosed deficiencies, including the inability to track and control medical costs, imperiled agilon's chances of attracting the thousands of new physicians that the Company needed to meet expectations. The Company's heavy reliance on profit-sharing and using agilon stock to attract and retain physician partners provided further

---

[94]    Defendants contend this motive could apply to "any company" (agilon at 37), but agilon uniquely depended on attracting and retaining physician partners that agilon's competitors could simply hire and pay as employees. ¶77. Defendants were thus exceptionally motivated to conceal agilon's deficiencies, in order to keep the trading price of the Company's stock price inflated and thereby ensure the currency it was using to attract and retain physician partners remained a valuable inducement. agilon's authority supports Plaintiffs. agilon at 37. Whereas *Owens*, 789 F.3d at 539, found plaintiffs' "motive allegations contribute to a finding of scienter" where the fraud touched on "no more than 22% of Guaranty's total assets," the fraud here affected agilon's Medicare Advantage business model, which provided ***100%*** of agilon's consolidated revenue. *Id.* at 540; *supra* at n.76. *Tran v. XBiotech Inc.*, 2016 WL 5408382, at *8 (W.D. Tex. Sept. 23, 2016), is inapposite because Plaintiffs' motive allegations are specific to agilon's partnership-based, profit-sharing model.

- 67 -

motivation to conceal the allegedly omitted facts. ¶¶234-235.  Plaintiffs' motive allegations, coupled with Plaintiffs' other scienter allegations, adequately plead scienter.  *Bayer*, 2021 WL 4864421, at *5 (motive to remain competitive in the agrochemical business, in conjunction with alleged misstatements, adequately plead scienter); *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *8 (E.D. Pa. July 26, 2000) (alleged motive to remain competitive by retaining existing clients gave rise to a strong inference of scienter).[95]

### 6.    Plaintiffs' Other Allegations Support a Strong Inference of Scienter

*Officer and Director Departures*.  The departures of three agilon officers and three CD&R insiders support scienter.  ¶¶238-240; *see Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *33-*34 (E.D. Tex. Oct. 19, 2017) (holding sudden executive departures bolstered scienter inference); *see also Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 893-94 (N.D. Ill. 2023) (executive departures that are "uncharacteristic" supported scienter).[96]  Bensley's abrupt "retirement," disclosed on the same day that agilon revealed an array of previously-concealed facts, supports scienter.  ¶238; *see also In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (holding "resignations" that occurred around the time of an adverse tax announcement "suggest[ed] that both defendants were 'terminated in relation to the undisclosed tax issue'").  Here, Bensley

---

[95]    Although agilon argues it "had nothing to gain" from "highlight[ing] visibility . . . it knew . . . was poor" (agilon at 35), agilon's argument "confuses expected with realized benefits." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Explaining defendant "may have thought that there was a chance that the situation . . . would right itself.  If so, the benefits of concealment might exceed the costs.").  "The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Id.*; *see also Spitzberg*, 758 F.3d at 686 (citing *Tellabs*, 513 F.3d at 710).

[96]    Although defendants argue that resignations alone "do not show fraud," the Complaint's scienter allegations are not limited to executive departures.  agilon at 41 (quoting *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724-25 (W.D. Tex. 2010) (resignations "in and of itself" are not "proof of the commission of fraud")).

- 68 -

"retired" without any advanced public notice, and without anyone to take his place, foregoing millions in future compensation. ¶¶202, 238. agilon, meanwhile, took until July 2024 (two fiscal quarters later) to identify Bensley's successor. ¶40. Although defendants claim that Bensley simply retired because "he chose to do so" (agilon at 41), defendants cannot slant the allegations so favorably. *See Lormand*, 565 F.3d at 232 (courts must "draw all reasonable inferences in the plaintiff's favor"); *see also Ferguson v. Bank of New York Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015) (courts may only consider "'the facts stated in the complaint and the documents either attached to or incorporated in the complaint'"). The most plausible inference to be drawn at this stage is that Bensley was spontaneously forced out as a result of the alleged conduct. ¶238; *see In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (finding CFO's resignation without a named replacement supported scienter); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024) (finding defendant's departure without payment of potential compensation supported scienter).

agilon's struggles with keeping CAOs also support scienter. Sobotka's abrupt departure left agilon without a CAO for four months. ¶239. Kasenchak took the position in September 2022, only to exit eleven months later, while agilon was concealing spiking utilization and tens of millions of dollars in medical costs. *Id.* CD&R insiders Richards, Schnall, and Strum also abruptly left in June 2023, during agilon's concealed utilization spike and within weeks of CD&R's $1.95 billion stock sale. ¶¶214, 240. Although defendants argue these three insiders left because "CD&R's voting power dropped below 50%," that "drop" occurred nearly a year earlier in August 2022. *See* agilon at 42; ¶55 (CD&R's stake dropped to 47.3% in August 2022). These three CD&R insiders remained on the Board for almost another year, and not coincidently, just long enough for CD&R to rake in nearly $2 billion in agilon stock sales, including $200 million taken from agilon's coffers. ¶¶215, 240, 307. Taken together, the alleged departures contribute to a strong inference of scienter. Like

- 69 -

all of defendants' factual arguments, their implausible narrative of defending these multiple departures of senior executives as run-of-the-mill turnover must await trial.

***Temporal Proximity***.  The close proximity between alleged misstatements and corrective disclosures also supports scienter.  ¶¶228-233.  Although defendants challenge this allegation as "speculative," analysts were plainly bewildered by defendants' "contradict[ory]" statements issued so close to one another.    agilon at 39; ¶197 & n.10 (Wells Fargo: agilon's statements "***downplaying . . . cost pressures . . . has strained trust and credibility***").  Moreover, although agilon now claims that it "struggl[ed] with the limitations of its forecasting process" during the Class Period, agilon at 41, the Company assured investors in November 2023 that agilon's guidance reflected a "***decent amount of conservatism***," and that agilon was "confident in its ability to capture payor data and build its accruals based on that data."  ¶¶182, 184, 186.  Plaintiffs' proximity allegations support scienter.[97]

***agilon's "surveillance system" and real-time data***: As set forth in §V.B.2 and ¶¶81-82, 217, defendants Sell and Bensley frequently touted agilon's data-driven "surveillance" over all of agilon's patients, real-time and near real-time data on patient utilization, and other data capabilities.  Rather than address these detailed allegations, defendants instead incorrectly claim that Plaintiffs must "show[] that Sell or Bensley . . . reviewed [agilon's] raw data" and "***belie[ved]***" that the data "rendered [defendants'] statements" misleading.  agilon at 42 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)).[98]  This is not the law: Plaintiffs do not need to show that

---

[97]     *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) ("shortness of time [between alleged statement and subsequent event] is circumstantial evidence" of fraud).

[98]     Defendants misinterpret *Baker Hughes*, which held statements must be "reasonably consistent with reasonably ***available*** data"; *Baker Hughes* did not require allegations that defendants actually examined the information available to them.  292 F.3d at 431-33 (holding "scienter may not rest" solely on a "[defendant's] position[]" where plaintiffs argued defendants "should have known" of "unidentified . . . reports" merely based on defendants' positions at the company) .  Further, *Baker*

4918-7945-2427.v1

defendants "reviewed [agilon's] raw data" or "belie[ved]" their statements were false in order to allege scienter. *E.g.*, *Spitzberg*, 758 F.3d at 686 ("Whether [d]efendants . . . actually believed that oil could be found . . . is irrelevant to whether [d]efendants . . . were severely reckless when they allegedly misled investors . . . ."); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 832 (S.D. Tex. 2014) ("Whether defendants actually believed that Uni-Pixel could solve the manufacturing problems . . . is irrelevant . . . The issue is whether . . . defendants were severely reckless when they allegedly misled investors . . . ."); *Innocoll*, 2020 WL 1479128, at *12 (emphasis in original) (quoting *Novak*, 216 F.3d at 308) ("[R]ecklessness can be alleged based on the [defendants'] mere '*access to information*' . . . . It is unnecessary to read in an additional requirement that Plaintiffs must explicitly plead that Defendants examined or considered the information available to them.").

In any event, the Complaint pleads far more than defendants' "positions" (*Baker Hughes*, 292 F.3d at 431-32), including details of agilon's data deficiencies, defendants' responsibility for monitoring and reporting on agilon's data capabilities (*see supra* §V.B.2.), and the Exchange Act Defendants' statements misrepresenting the quality, timing, and reliability of agilon's data (*id.*). agilon's weak scienter argument, contradicted by agilon's other arguments, fails. agilon at 30, 38 (arguing "agilon knew about" "the flaws in the data," and that agilon's issues with payor data were "well-known").

### 7. The Exchange Act Defendants' Claims of "Benign" Inferences Fail

Defendants offer no coherent competing inference, let alone a more compelling inference – as they must do under *Tellabs*, 551 U.S. at 324 – than the strong inference of scienter alleged in the Complaint. Instead, defendants propose that the Court ignore the Complaint's factual allegations and instead adopt their counter-factual explanations, including that: (1) "agilon's internal processes

---

*Hughes* cited approvingly to *Novak*, 216 F.3d 300 which held "access to information" is sufficient to allege recklessness. *See Novak*, 216 F.3d at 308-09.

4918-7945-2427.v1

produced accurate forecasts for 2021 and 2022" and the Company only "came to see" in 4Q23 "that

its guidance for [2023] was out of reach" (agilon at 43); (2) that the Company "previously believed"

the "post-COVID surge in utilization . . . [ ] would not significantly impact its patient population"

(*id.* at 43-44); and (3) because the Company's financial projections involve a "degree of judgment,"

and because agilon "had a solid basis for believing its forecasting," agilon could not have engaged in

intentional fraud. *Id.* at 44.

But what defendants "came to see," "believed," and "had a solid basis for believing" present

baseless factual assertions that are directly contradicted by the Complaints' well pled allegations, not

a "cogent and compelling inference" based on the alleged facts. *See also Tellabs*, 551 U.S. at 324;

*Lormand*, 565 F.3d at 232 (at the pleading stage, courts must "accept all factual allegations in the

complaint as true" and "must also draw all reasonable inferences in the plaintiff's favor"); *BP*, 843

F. Supp. 2d at 783 ("[t]he competing inference [of scienter – that [defendant director] professed to be

focused on process safety but remained unaware of actual process safety concerns in [the

company's] operations on the ground – is far less compelling").[99]  Moreover, defendants' factual

assertions regarding what they "believed" (agilon at 43-44) are "irrelevant to whether defendants . . .

were severely reckless" when they spoke. *Spitzberg*, 758 F.3d at 686; *Fitzpatrick*, 35 F. Supp. 3d at

832 ("Whether defendants actually believed that Uni-Pixel could solve the manufacturing problems .

. . and, if so, whether that belief was reasonably, is irrelevant at this stage of an action under Rule

10b-5 and the PSLRA.").  Nor can defendants reconcile their "benign" inference with agilon's

conduct, including its admitted concealment of spiking medical costs and patient utilization. *E.g.*,

¶¶72, 179, 180.

---

[99]     *See also Spitzberg*, 758 F.3d at 686 (whether defendants "actually believed" their statements
were false or misleading "is irrelevant to whether [d]efendants . . . were severely reckless" when
they spoke); *Fitzpatrick*, 35 F. Supp. 3d at 832 (same).

At bottom, defendants' factual assumptions and conjecture fail to conjure a coherent competing inference, let alone one that outweighs the Complaint's strong inference of scienter. *Fitzpatrick*, 35 F. Supp. 3d at 833 ("Even if defendants' subjective beliefs support a strong inference as to a lack of scienter, . . . the competing inference of severe recklessness is at least as cogent and compelling."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one").[100]

## VI.    PLAINTIFFS ADEQUATELY PLEAD CONTROL-PERSON CLAIMS UNDER §§15 AND 20

The two elements for a control-person claim are: "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant." *Alta Mesa*, 2021 WL 1416025, at *10. "Although worded differently, the control person liability provisions of §15 of the 1933 Act and §20(a) of the 1934 Act are interpreted in the same manner." *Dynegy*, 339 F. Supp. 2d at 828; *Venator*, 547 F. Supp. 3d at 654 ("the Fifth Circuit construes the control-person provisions" of §15 and §20(a) "in the same manner"). Courts generally apply the SEC's definition of "control": "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405.

Fifth Circuit courts do not require that the controlling person "participat[ed] in the wrongful transaction,'" or even ***exercised*** actual control over the primary violator. *Aubrey v. Barlin*, 2011 WL

---

[100]    Defendants' reliance on *Owens*, 789 F.3d at 543-45 (allegations that bank's mortgage-back securities ("MBS") valuation model yielded figures that violated Generally Accepted Accounting Principles ("GAAP") were insufficient to allege scienter) is unavailing. agilon at 44. *Owens* held defendants' reliance on the bank's MBS valuations was not unreasonable, given that GAAP "involves subjective determinations" and that the defendant bank (and its regulator) relied on AAA ratings of the bank's MBS issued by outside rating agencies. *Owens*, 789 F.3d at 543-45. In contrast, Plaintiffs do not merely rely on GAAP violations in alleging defendants' objectively false and misleading statements were made with scienter.

675068, at *5 (W.D. Tex. Feb. 16, 2011); *see One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, at *3 (E.D. Tex. Nov. 23, 2015) ("a plaintiff need only allege that [the controlling person] possessed the power to control the primary violator, not that control was exercised"); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 621 (S.D. Tex. 2003) (plaintiffs need not allege the controlling persons were culpable participants in the alleged conduct). Rule 8's notice pleading standard applies to allegations of control. *Trendsetter Invs., LLC v. Hyperdynamics Corp.*, 2007 WL 172627, at *15 (S.D. Tex. Jan. 18, 2007) (applying Rule 8 to §20(a) claims). Control "is normally a question of fact that cannot be determined at the pleading stage." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *30 (M.D. Tenn. Nov. 19, 2019); *Cobalt*, 2016 WL 215476, at *11 (control "is an intensely factual question").

## A.      Plaintiffs' §15 Claims Are Well Pled

Plaintiffs sufficiently allege both elements of their §15 claim. 15 U.S.C. §77o(a). First, Plaintiffs allege primary violations of §11. *Supra* §IV. Second, the Complaint alleges the named defendants possessed "direct or indirect . . . power to direct or cause the direction of the management and policies of a [primary violator], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405; ¶¶293-308.

Here, the named Individual Defendants do not dispute §15's "control" element (agilon at 20), and the Complaint plausibly alleges the CD&R Defendants had the power to control a primary violator of §11, including agilon and the CD&R insiders whom CD&R nominated to agilon's Board. ¶¶301-308.[101] For one, the Stockholder Agreement entitled CD&R to appoint a majority of agilon's Board, and CD&R in fact appointed five CD&R insiders (Williams, Richards, Sachdev, Schnall, and

---

[101]     Because the CD&R Defendants' alleged control over CD&R insiders Williams, Richards, Sachdev, Schnall, and Strum (*see* ¶301) is largely uncontested, Plaintiffs focus their response in §VI on the CD&R Defendants' alleged control over agilon and the other §§15 and 20(a) defendants. *See* CD&R at 15 n.3 (questioning Vector's influence over CD&R insiders).

- 74 -

Strum) to agilon's Board, including its Chairman and Vice Chairman. ¶¶301-302.[102] In turn, these five CD&R insiders used their positions within agilon to protect CD&R's ownership interest and maintain significant influence over agilon's corporate policies. ¶301. Wielding this control, the CD&R Defendants extracted $200 million from agilon – 50% of its cash and cash equivalents – in May 2023, in exchange for 9.6 million shares that agilon promptly "retired." ¶¶215, 307. The CD&R Defendants also caused agilon to enter into preferential agreements with CD&R, granting CD&R with exceedingly broad powers including unlimited access to agilon's non-public financial and other coveted information. ¶¶305-306.

CD&R begins its attack with a sleight of hand, arguing that "because . . . Vector – not CD&R LLC, CD&R Investment Associates or CD&R Associates – owned agilon stock," only Vector could have controlled agilon. CD&R at 13. Besides lacking legal authority, CD&R's factual contention contradicts the Complaint's well pled allegations. *E.g.*, ¶50 (alleging CD&R LLC owned the agilon stock); *Lormand*, 565 F.3d at 232. Defendants' argument also raises a host of factual issues that cannot be resolved at this stage, including whether the CD&R entities "owned" Vector and/or its agilon holdings. CD&R at 13.[103] Further, SEC regulations and courts within this Circuit hold that "direct" *or "indirect"* control over the primary violator is sufficient. 17 C.F.R. §230.405; *Dynegy*, 339 F. Supp. 2d at 828. Thus, CD&R's factual assertions are not dispositive of whether CD&R

---

[102]    *Enron*, 258 F. Supp. 2d at 649 ("it cannot be ignored that Alliance [Enron's largest institutional shareholder] was Savage's employer, and, even more significantly, as Alliance's chairman, Savage additionally had a duty of loyalty to Alliance"); *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *15 (N.D. Ill. Feb. 10, 2023) (finding private equity firms that collectively could nominate six out of twelve board members were control persons under §§15 and 20(a)); *SolarWinds*, 595 F. Supp. 3d at 592-94 (finding private equity firms with significant stock holdings and ability to appoint a portion of SolarWinds' board members were control persons under §20(a)).

[103]    agilon's SEC filings represent that CD&R's agilon stock "ownership" was "share[d]." *E.g.*, Def. Ex. 6 at 381 ("CD&R Investment Associates IX, Ltd. . . . . as the general partner of [Vector], may be deemed to beneficially own the [agilon] shares"); *id.* ("Donald J. Gogel and Nathan K. Sleeper," CD&R LLC's Chairman and CEO, respectively (*see* ¶¶52, 54), "may be deemed to share beneficial ownership of the [agilon] shares" held by Vector); *see also* Def. Ex. 16 at 702.

- 75 -

directly or indirectly controlled agilon.[104]  Finally, because courts in this Circuit do not require active

participation in the primary violation (*Enron*, 258 F. Supp. 2d at 621), CD&R's speculation over

which CD&R entities "controlled the content of agilon's registration statements" (CD&R at 13)

matters not to whether those entities had the "direct or indirect" "'power to control'" agilon.[105]

While CD&R notes that CD&R LLC (agilon's founder) is an "investment advisor," it fails to

show how this negates control.  CD&R at 13.[106]  Here, CD&R LLC staffed its other CD&R entities

– as well as agilon's Board and committees thereof – with employees of CD&R LLC.  *E.g.*, ¶¶32-33,

37-39, 41, 302-303, 306 n.12.  Plaintiffs plausibly allege that CD&R LLC possessed the "'power

to . . . influence'" the activities of agilon and the Securities Act Individual Defendants, including the

five CD&R LLC executives who occupied agilon's Board while maintaining "a duty of loyalty to

[CD&R]."  *Enron*, 258 F. Supp. 2d at 645, 648-49 (upholding §15 claim against Alliance, Enron's

largest shareholder, based on Alliance's alleged control over its employee who sat on Enron's board

and signed Enron's registration statement).  agilon itself even acknowledged the CD&R Board-

appointees' "conflicts of interest" with agilon given their attachment to CD&R.  Def. Ex. 16 at

---

[104]  For instance, the Complaint alleges that CD&R controlled its employees on agilon's Board.
¶¶300-301.  Further, the Complaint alleges that three of the CD&R entities "shared voting and
dispositive power" over the agilon shares.  ¶53.  Defendants own submissions are in accord.  *See*
Def. Ex. 1 at 028 ("[Vector] is owned by investment funds managed by, or affiliated with, CD&R
[LLC]"); Def. Ex. 6 at 373 ("the CD&R Investor will continue to control us" following the
September 2021 Offering); Def. Ex. 16 at 698 (describing Vector's "significant[] influence" over
agilon following the May 2023 Offering).

[105]  *See supra* §VI; *see also Alta Mesa*, 2021 WL 1416025, at *10; *Cobalt*, 2016 WL 215476, at
*11 (control comes in many forms, including stock ownership, "'business relationships, interlocking
directors, family relations, or the power to influence and control the activities of another'").

[106]  Contrary to CD&R's brief, the Complaint does not allege that CD&R LLC did "not"
participate in investment and voting decisions involving agilon.  CD&R at 13; *see* ¶¶50-54 (alleging
CD&R LLC executives ran the other CD&R entities).

698.[107]  CD&R's factual arguments on the "intensely factual" issue of control should be rejected. *Cobalt*, 2016 WL 215476, at *11.

### B.    Plaintiffs' §20(a) Claims Are Well Pled

Section 20(a) establishes liability for any person who "directly or indirectly controls any person liable" under the Exchange Act.  15 U.S.C. §78t(a).[108]  "[P]rimary liability by the controlling person is not a necessary predicate to a Section 20(a) claim."  *Trendsetter*, 2007 WL 172627, at *15. Neither Rule 9(b) nor the PSLRA apply to Plaintiffs' §20(a) claim.  *See Arabian*, 2015 WL 7432360, at *3; *Trendsetter*, 2007 WL 172627, at *15 (applying Rule 8 to §20(a) claims); *Venator*, 547 F. Supp. 3d at 651 (same).  The Complaint plausibly alleges primary violations of §10(b).  *Supra* §V. The Exchange Act Individual Defendants do not dispute §20(a)'s "control" element.  agilon at 45 n.14.  As set forth in §VI, the CD&R Defendants had the power to control agilon throughout the Class Period.  The CD&R Defendants' challenges to the §20(a) claim all fail, and the 20(a) claims should be upheld.

First, the CD&R Defendants contend that stock ownership alone is insufficient to plead control.  CD&R at 14-15.  But they conceded this very point by not challenging the §15 claim against Vector on the basis it "owned agilon stock."  CD&R at 13.  Moreover, CD&R's 47%-69% stake in agilon until May 2023 provided CD&R with significant influence over agilon, including, *inter alia*, "determin[ing] the outcome of corporate actions requiring stockholder approval," appointing a slate of agilon's directors, and designating the Board's Chairman and Vice Chairman.

---

[107]    *See also In re HRB Winddown Inc.*, 2024 WL 1099724, at *15-*17 (Bankr. D. Del. Mar. 13, 2024) (explaining the "factual allegations from which the Court can infer that CD&R controlled HRB Co." include CD&R's stock ownership, appointment of company directors, and consulting agreement with the company).

[108]    "Control-person liability under §20(a) . . . can encompass any person who possess the power to influence the operations and activities of the primary violator."  *Trendsetter*, 2007 WL 172627, at *26.

¶¶302, 304. These are the textbook definitions of corporate control. Following the May 2023 Offering, CD&R remained agilon's largest stockholder, wielding a massive 24.7% stake in the Company. ¶55. Sell even admitted the Company remained "a controlled company" until June 2023, when three of CD&R's insiders resigned from the Board.[109] CD&R's large ownership stake is sufficient to plead control. *See* 17 C.F.R. §230.405; *Enron*, 258 F. Supp. 2d at 649 (finding a defendant's large equity stake in Enron was "clearly a basis for power to control Enron").[110] Ignoring the obvious – that CD&R designees served as Chairman, Vice Chairman, and three other seats on the Board and thus really controlled every decision agilon made, CD&R nonetheless contends it never "appointed" a majority of agilon's Board. Yet, CD&R had the ***power*** to do so, which in itself is sufficient to demonstrate control. *See* CD&R at 14; *Arabian*, 2015 WL 7432360, at *3 (plaintiffs need not allege that control was actually exercised).

CD&R argues that Plaintiffs have failed to allege control by improperly "lump[ing] all of the CD&R Entities together as 'CD&R.'" CD&R at 2, 9, 12-13. But, as the Complaint details, each of the other CD&R entities were intermingled with CD&R Vector, conferring CD&R Vector's control with each of the CD&R entities. *See, e.g.*, ¶¶51-54. And it is not just Plaintiffs. Faced with similar allegations of control against the "CD&R private equity complex," courts treat various CD&R

---

[109]   *See* ¶308. CD&R ignores Sell's admission on this issue. CD&R at 6 (citing ¶308); Plfs. Ex. C (Sell stating that agilon moved from being a controlled company ***after*** "the transition of three board members [Richards, Schnall, and Strum] off our board last year [June 2023]").

[110]   In arguing "status alone" is insufficient, CD&R cites to cases in which the "status" was an individual's position as an officer or director, not a large shareholder wielding the power to fill half the board of directors. CD&R at 14 (citing *Carlton v. Canon*, 2016 WL 3959164, at *4-*5 (S.D. Tex. July 22, 2016); *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990); *Franklin Bank*, 782 F. Supp. 2d at 380). CD&R's reliance on *Zishka v. Am. Pad & Paper Co.*, 2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001), *aff'd*, 72 F. App'x 130 (5th Cir. 2003) and *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 674, 677 (N.D. Tex. 2013) (CD&R at 14) are also unavailing because CD&R owned more than 50% of agilon's stock until August 2022, had access to inside company information, and used its control to force the Company to surrender $200 million of its own limited cash to CD&R. ¶215.

- 78 -

entities collectively as "CD&R" given the "common control of CD&R's principals" over the CD&R entities. *Voigt v. Metcalf*, 2020 WL 624999, at *5 n.2 (Del. Ch. Feb. 10, 2020) (finding CD&R's stockholder agreement, ownership stake, and director appointments presented indicia of corporate control).[111]

The CD&R Defendants also challenge their control at the time of the three corrective disclosures in November 2023 to February 2024. CD&R at 15. But the relevant inquiry under 20(a) is whether the power to control existed at the time the alleged misstatements and omissions were issued, ***not*** when they were corrected.[112] Moreover, CD&R retained a 24.7% position in the Company after the May 2023 Offering through the end of the Class Period. In the context of the §15 claim, CD&R Defendants did not dispute that Vector had control through the May 2023 Offering, the relevant period for Plaintiffs' Securities Act claims.

Here, CD&R cannot contest its control over its five Board appointees, or Vector's control over the contents of agilon's Registration Statements. CD&R at 13. Instead, CD&R disputes whether it had "control . . . over [the] ***oral*** statements made by agilon officers." *Id.* at 16. But

---

[111] CD&R's reliance on *Del Castillo v. PMI Holdings N. Am. Inc.*, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015) is misguided. There, the plaintiffs did not mention three, disparate defendants in the body of the complaint, directed their allegations at all 28 defendants, and alleged "no facts to show the relationship of these [28] Defendants to the refinery, or to one another." *Id.*; CD&R at 9. Defendants also misapply *Southland*, which addresses allegations of individual defendants within a company, finding no presumption that "'prospectuses, registration statements, annual reports, press releases, or other group-published information'" were the "'collective work'" of those individual defendants. 365 F.3d at 363. In sharp contrast, Plaintiffs here have brought claims against affiliates of the same company, and Plaintiffs have detailed how the CD&R-affiliates possessed intertwined ownership and management. ¶¶50-54.

[112] *Envision*, 2019 WL 6168254, at *31 (finding plaintiffs failed to allege "the CD&R defendants were controlling persons of Envision at the time of the [June 15, 2016] Registration Statement" where the CD&R defendants sold their last Envision shares in March 2015) is thus distinguishable. So is *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1135 (W.D. Mich. 1996), in which the stockholder agreement that had once entitled the §20(a) "Hillman defendants" to appoint Perrigo's directors, expired years before the Class Period began, and the two outside directors the §20(a) defendants supposedly controlled "left the employ of Hillman-related entities" before the alleged stock offering. CD&R at 15.

- 79 -

CD&R's authorities do not support the proposition that CD&R had to control the officers' specific "comments" in order to violate 20(a).[113]  Moreover, this argument implicitly concedes CD&R controlled agilon's releases and SEC filings – which it did.  *See* ¶¶206-208, 116-121, 128, 132, 139-142, 150, 152-159, 170, 174, 183, 189.  Here, the Complaint plausibly alleges that CD&R had the ability to "direct or cause the direction of the management and policies of [agilon]" through CD&R's massive equity stake, including through its control over agilon's Board members and officers. CD&R at 16; ¶¶50-57.  Plaintiffs need not also show that CD&R dictated exactly what agilon's officers said during earnings calls to plead a §20(a) claim.[114]

## VII.    PLAINTIFFS' §20A CLAIMS AGAINST CD&R AND SELL ARE ADEQUATELY PLED

Plaintiffs adequately allege that CD&R and Sell violated §20A through insider trading. Section 20A imposes liability on any "person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information."  *See* 15 U.S.C. §78t-1(a).  Thus, to state a claim under §20A, a plaintiff must: (1) allege a requisite independent, predicate violation of the Exchange Act (or its rules and regulations); and (2) show that he traded contemporaneously with the defendant.  *Id.*[115]

A plaintiff states a *prima facie* claim for insider trading under §20A by alleging the defendant was "'aware of . . . material nonpublic information' when he made the purchase or sale of the securities.'"  *Enron*, 258 F. Supp. 2d at 592 (emphasis in original) (quoting 17 C.F.R. §240.10b5-

---

[113]    CD&R at 16 (citing *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) ("[c]ontrol person liability does not require participation in the fraudulent transaction"); *Carlton*, 2016 WL 3959164, at *4 (same); *Zishka*, 2001 WL 1748741, at *1 (not requiring a showing of control over officers)).

[114]    Defendants' citations to *Li v. Eqonex Ltd.*, 2024 WL 4241951, at *17 (S.D.N.Y. Sept. 18, 2024) and *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *13 (D.N.J. Aug. 12, 2010) are inapposite because the Second Circuit (unlike the Fifth) requires "culpable participation" in the fraud.  CD&R at 15-16; *Enron*, 258 F. Supp. 2d at 621.

[115]    Defendants do not challenge the "contemporaneous" trading requirement.  CD&R at 19.

1(b)); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *3 (S.D. Tex. June 16, 2017) (same).  Plaintiffs need not allege that defendants "used [inside] information in trading."[116]

Corporate insiders have a duty to refrain from trading stock if they are aware of material, non-public information. *SEC v. Powell*, 2012 WL 13032952, at *5 (W.D. Tex. Jan. 25, 2012) (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  Failure to publicly disclose such information constitutes a violation of the Exchange Act that can serve as a predicate for a §20A claim.[117]  As set forth below, Plaintiffs have adequately alleged predicate violations as to the CD&R Defendants and Sell.

Plaintiffs raise a strong inference that CD&R was aware of material, non-public information when it sold agilon shares during the Class Period.  ¶328.  First, CD&R took advantage of its controlling ownership stake in agilon by stacking the Board with five CD&R insiders who remained privy to material, non-public information about agilon.  ¶¶6, 301-307.  The terms of CD&R's Stockholder Agreement supplied CD&R with further unlimited access to agilon's non-public books and records, financial statements, business plans, budgets, projections, and other material

---

[116]    *See United States v. Causey*, 2005 WL 3560632, at *14 (S.D. Tex. Dec. 29, 2005) ("Rule 10b5-1 creates an Adler-type presumption that a defendant is liable for insider trading upon proof that he or she was aware of the material, nonpublic information when the securities trade at issue occurred that can be rebutted by evidence that the material, nonpublic information was not a factor in the defendant's decision to trade.") (citing 17 C.F.R. §240.10b5-1 (a stock sale "is on the basis of material nonpublic information for purposes of §10(b) and Rule 10b-5 if the person making the . . . sale was **aware** of the material nonpublic information when the person made the [sale]")).  While *Cobalt* observed that "'[a]ctual knowledge'" of falsity results from having material, nonpublic information, *Cobalt* acknowledged that "aware[ness]" of material, nonpublic information presents the relevant inquiry.  CD&R at 20-21 (quoting *Cobalt*, 2017 WL 2599327, at *3); *SEC v. Jantzen*, 2012 WL 13032919, at *5 (W.D. Tex. Feb. 29, 2012) (emphasis in original) ("In an insider trading case, the 'knowing possession' element, or **scienter**, is established by showing that the defendant . . . had actual knowledge of the material, nonpublic information.").

[117]    *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("[t]rading on [material, non-public] information qualifies as a 'deceptive device' under § 10(b)"); *Enron*, 258 F. Supp. 2d at 598 ("[a]s an alternative to constituting a primary violation of § 10(b) as a 'deceptive device' . . . or a basis for raising a strong inference of scienter for a §10(b) claim, insider trading can also constitute a derivative violation under § 20A").

- 81 -

information.  *Id.*  The unprecedented size and suspicious timing of CD&R's Class Period sales – each of which occurred before agilon disclosed the alleged truth – further bolsters the strong inference against CD&R.  Here, CD&R liquidated over $2.7 billion of agilon stock during the Class Period, through carefully structured and timed offerings.  CD&R's May 2023 sale was particularly unusual.  While agilon was concealing spiking utilization rates, CD&R sold over three times the shares on May 18, 2023, than it had sold during all of 2021 and 2022 combined.  ¶¶214, 328 (94.1 million for $1.95 billion, versus 29.2 million shares for $794 million).

CD&R's assertion that Plaintiffs have not shown that CD&R was aware of "an increase in medical utilization rates" before the May 2023 Offering (CD&R at 21), conveniently ignores that CD&R was provided access to "agilon's monthly financial statements (including balance sheets, statements of operations, income, cash flows, retained earnings, and stockholders' equity), together with a detailed comparison to agilon's Board-approved business plan" and "agilon's annual budgets, business plans, financial forecasts, and projections, along with the assumptions upon which the budgets and projection were based," throughout the Class Period, so they had access to all the material facts agilon allegedly was concealing, including increased utilization rates, widespread payor data deficiencies, a defective growth model, and massive pent-up demand from COVID-19. ¶¶300-307.  Moreover, given agilon's statements that it actively managed patient utilization, tracked "***leading*** indicators" of healthcare utilization, and constantly monitored its massive backlog of demand from COVID-19, and that CD&R agents and representatives were the human beings who, as board members of agilon, had access to the adverse information detailed in this paragraph, CD&R was aware of material, non-public facts about utilization when CD&R dumped an unprecedented $1.95 billion in agilon stock on May 18, 2023.[118]  The most plausible inference is that CD&R rushed to liquidate a massive block of its holdings before the Company publicly revealed the non-public

---

[118]    *See* ¶¶82, 163, 218 (Sell boasting of agilon's "leading indicators" of patient utilization).

- 82 -

information CD&R possessed.[119]   Plaintiffs have therefore adequately pleaded the elements necessary to state a claim that CD&R committed a predicate violation of the Exchange Act.[120]

CD&R also posits that "access" to non-public information under the Stockholder Agreement is insufficient to show "use" of that information.  CD&R at 23.  But CD&R wrongly insists that Plaintiffs must show at the pleadings stage that inside "information was [actually] used."  CD&R at 24 (quoting *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 916 (S.D. Tex. 2001)).  Plaintiffs need not allege "use," "aware[ness]" suffices.  *Supra* at 80-81.  In any event, the Complaint alleges more than the Stockholder Agreement itself, including CD&R's founding relationship with the Company, and placement of five CD&R executives to agilon's Board, each of whom maintained their allegiance to CD&R by retaining their lucrative positions at CD&R LLC during the Class Period.[121]  Accepting the allegations as true, it is implausible that CD&R lacked awareness of ***any*** of the material non-public facts alleged in the Complaint.[122]  *E.g.*, *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at \*7 (D.N.J. June 30, 2019) (rejecting investment advisor's argument that "'access to material nonpublic information is very different from actually

---

[119]   *Envision*, 2019 WL 6168254 (CD&R at 22) is inapposite – there, CD&R sold ***all*** of its Envision shares by March 2015, approximately 13 months into the 45-month Class Period, in sales that took place 7 to 20 months before the first stock drop. *Envision*, 2019 WL 6168254, at \*3, \*26.

[120]   Although CD&R disputes "capitaliz[ing] on the pandemic," CD&R at 21, the initial public offering enabled CD&R to offload billions of dollars in inflated agilon shares on the public.  ¶¶63, 214.  Further, CD&R's purported 900-day "lock-up agreement" from mid-2023 (CD&R at 6), which contains various "exceptions" and exclusions available upon written consent does nothing to negate scienter.  *Id.* (citing Def. Ex. 16 at 696).

[121]   Although direct evidence of the transmission of material, non-public information is not necessary to establish CD&R's insider trading (*SEC v. Pardue*, 2005 WL 736884, at \*5 (E.D. Pa. Apr. 1, 2005)), CD&R's assertion that the Complaint alleges "no facts 'suggesting the CD&R[-appointed directors] communicated information" to CD&R is wrong.  CD&R at 24 (citing *Envision*, 2019 WL 6168254, at \*25).

[122]   And if they did so ignore all this information in their possession and control, it is de facto admission of their recklessness.

- 83 -

4918-7945-2427.v1

possessing it'" where an officer of the investment advisor allegedly received material non-public information while serving on Valeant's Board of Directors).[123]

Although CD&R contends a §20(a) claim cannot serve as a predicate violation of §20A, this is not true where – as here – Plaintiffs adequately allege that Sell, who was fully controlled by CD&R, traded while in possession of material, non-public information. ¶320.[124] The §20(a) claim against CD&R thus serves as a predicate violation of §20A.[125] Finally, CD&R argues that three of the four CD&R Defendants are immune from §20A liability because only "Vector" "sold" agilon shares. CD&R at 19. This argument does not reflect the law, and courts reject attempts to skirt

---

[123]   Among other distinctions, defendants' cases did not feature facts where the controlling defendants sold billions of dollars in agilon stock at artificially inflated prices of which the controlled company was forced to surrender half of its cash to the controlling defendants while those defendants' executives occupied the controlled company's board. CD&R at 15 n.3, 23-24 (citing *Kosmos*, 955 F. Supp. 2d at 675-76; *LLDVF*, 2010 WL 3210613, at *13 (no allegations that minority shareholder firms controlled their non-employee director appointees and no alleged voting agreement between shareholder firms); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *35 (S.D. Cal. Aug. 1, 2006) (insider sale preceded the first accounting-related misstatement, and plaintiffs "[did] not identif[y] how [corporate defendants] would have had access to . . . internal communications"); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 833 (N.D. Ind. 2018) (no allegations as to how §20A defendants "would . . . have access to . . . potential insider information" other than through two board appointees); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 2016 WL 4095973, at *27 n.37 (S.D. Tex. Aug. 2, 2016) (finding "Plaintiffs' quotation from news clippings about a bond analyst fired from some other financial institution" insufficient under §20A), *aff'd sub nom. Giancarlo v. UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018)).

[124]   As agilon's CEO, President and Board member, Sell was required to possess non-public information regarding agilon's Medicare Advantage business, financial results and operations. Indeed, Sell repeatedly assured investors of his awareness of non-public details regarding the Company's financial performance, payor data capabilities, "high-touch" business model, and growth in mature markets. *See supra* §V.B. Having this insider knowledge, Sell acted with the requisite scienter by offloading nearly $3 million in agilon stock.

[125]   CD&R's authorities advance Plaintiffs' position. CD&R at 22-23 (citing, *e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 666 (S.D.N.Y. 2007) (upholding §20A claim predicated on §20(a) violation, finding "no authority or rationale for the proposition that § 20A liability cannot be predicated on a control-person insider trading violation"); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *27 (C.D. Cal. July 1, 2008) (a §20(a) claim that "relates to insider trading" can serve as a predicate violation of §20A); *see also Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *5 (M.D. Fla. Sept. 28, 2009) (§20(a) violation could serve as predicate violation to §20A claim)).

§20A liability where a defendant funnels its trades though another vehicle.[126] Furthermore, CD&R's contention it did not participate in "making" the $2.7 billion in sales implicates disputed factual issues not properly evidenced at this stage of the case. *BP*, 843 F. Supp. 2d at 773; 17 C.F.R. §240.10b5-1.[127]

## VIII.   CONCLUSION

Plaintiffs have satisfied their burden of pleading the required elements of each claim, and respectfully request that the Court deny the motions to dismiss in their entirety.

DATED:  January 7, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS
CHRISTOPHER D. STEWART

s/ Lucas F. Olts
LUCAS F. OLTS

---

[126]   *See SEC v. Contorinis*, 743 F.3d 296, 304 (2d Cir. 2014) ("[o]ur conclusion prevents insider traders from evading liability by operating through or on behalf of third parties"); *Basile v. Valeant Pharm. Int'l, Inc.*, 2015 WL 7352005, at *6 (C.D. Cal. Nov. 9, 2015) ("individuals and entities should not be permitted to use third parties in order to avoid liability under the insider trading laws"); *Johnson v. Aljian*, 257 F.R.D. 587, 593 (C.D. Cal. 2009) ("'if Defendants' argument were adopted as law, then all a person would need to do to avoid liability under § 20A would be to [f]unnel sales of shares through a broker").

[127]   That Plaintiffs did not separately bring a §10(b) claim against CD&R does not preclude Plaintiffs from relying on CD&R's violation of its duty to disclose material, non-public information when conducting an insider sale, as the predicate for a §20A claim. *See, e.g.*, *Johnson v. Aljian*, 490 F.3d 778, 785 (9th Cir. 2007) ("to maintain a claim under §20A, a plaintiff need not plead an actionable predicate violation"); *Cobalt*, 2017 WL 2599327, at *2-*4 (finding plaintiffs sufficiently alleged §20A claims against defendant entities, without having separately named the same entities as defendants under plaintiffs' §10(b) count); *Eastwood*, 2009 WL 3157668, at *5.

- 85 -

4918-7945-2427.v1

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
cstewart@rgrdlaw.com

Lead Counsel for Lead Plaintiff

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel

- 86 -