**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | |
|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION | Master File No.: 1:24-cv-00297-DAE |

**<u>AGILON DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

**<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

**Table of Contents**

I.      INTRODUCTION ...................................................................................................... 1

II.     ARGUMENTS AND AUTHORITIES.................................................................... 3

   A.   Plaintiffs' Section 11 Claims Fail ........................................................................ 3

      1.   Plaintiffs fail to comply with the relevant pleading standard .......................... 4

      2.   Plaintiffs' claims fail in light of agilon's risk disclosures .............................. 5

      3.   Plaintiffs fail to plead falsity as to statements about visibility ....................... 6

      4.   Plaintiffs fail to plead falsity as to statements about data integration and
           management ...................................................................................................... 8

   B.   Plaintiffs' Section 10(b) Claims Fail on Scienter Grounds ............................... 9

      1.   Plaintiffs' motive allegations are insufficient ................................................ 10

      2.   Plaintiffs' chronology allegations are insufficient.......................................... 11

      3.   Plaintiffs' allegations about executive departures are insufficient ............... 13

      4.   The CMS letter does not establish scienter..................................................... 14

      5.   Plaintiffs' remaining allegations simply restate the components of any fraud claim .... 14

   C.   Plaintiffs' Section 10(b) Claims Fail on Falsity Grounds................................. 17

      1.   Plaintiffs fail to allege falsity as to agilon's guidance .................................. 18

      2.   Plaintiffs fail to allege falsity as to agilon's statements about its business model,
           including statements about visibility and predictability ................................. 19

      3.   Plaintiffs fail to allege falsity as to statements purportedly concealing "pent-up
           demand" for medical services......................................................................... 23

      4.   Plaintiffs fail to allege falsity as to agilon's statements about data integration............. 26

      5.   Plaintiffs fail to allege falsity as to agilon's statements about growth and
           onboarding ...................................................................................................... 27

III.    CONCLUSION........................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Decisions**

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) ...................................................................................................10

*In re Alamosa Holdings, Inc.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ....................................................................................11

*In re Browning-Ferris Indus. Inc. Sec. Litig.*,
   876 F. Supp. 870 (S.D. Tex. 1995) ..........................................................................................12

*In re Capstead Mortg. Corp. Sec. Litig.*,
   258 F. Supp. 2d 533 (N.D. Tex. 2003) ......................................................................................9

*Carlton v. Cannon*,
   184 F. Supp. 3d 428 (S.D. Tex. 2016) .......................................................................................7

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) ...................................................................................................10

*Gambrill v. CS Disco, Inc.*,
   2025 WL 388828 (W.D. Tex. Jan. 30, 2025) ...........................................................6, 11, 22, 23

*In re Great Lakes Dredge & Dock Co. LLC*,
   624 F.3d 201 (5th Cir. 2010) .....................................................................................................9

*Heck v. Orion Grp. Holdings, Inc.*,
   468 F. Supp. 3d 828 (S.D. Tex. 2020) .....................................................................................19

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*, Inc.,
   537 F.3d 527 (5th Cir. 2008) .............................................................................................10, 17

*Linenweber v. Sw. Airlines Co.*,
   693 F. Supp. 3d 661 (N.D. Tex. 2023) ....................................................................................22

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) .............................................................................................15, 16

*Marquez v. Bright Health Group, Inc.*
   2024 WL 4654137 (E.D.N.Y. Nov. 1, 2024)..............................................................................7

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ...................................................................................................10

*Neiman v. Bulmahn*,
   854 F.3d 741 (5th Cir. 2017) .............................................................................................11, 15

ii

*Oklahoma Firefighters Pension and Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ...................................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................................20, 23, 24, 25

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ...............................................................................................9, 15

*In re Plains All American Pipeline, L.P. Sec. Litig.*,
  307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019) ...............5, 24

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
  777 F. App'x 726 (5th Cir. 2019) ...............................................................................................4

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  732 F. Supp. 3d 300 (S.D.N.Y. 2024).......................................................................................13

*In re SolarWinds Corp. Sec. Litig.*,
  595 F. Supp. 3d 573 (W.D. Tex. 2022)........................................................................................7

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
  365 F.3d 353 (5th Cir. 2004) ...............................................................................................7, 18

*Walker v. Rent-a-Center*,
  2005 WL 8161388 (E.D. Tex. July 25, 2005) ............................................................................5

**Statutes**

15 U.S.C. §78u-5(c)(1)(B)...........................................................................................................18

I.      **INTRODUCTION**

Plaintiffs' opposition brief is an arduous read, but it does not address the most critical points in the agilon Defendants' motion.

First, Plaintiffs cannot identify any factual allegations showing contemporaneous knowledge or even existence of the issues agilon discovered and disclosed in late 2023 and early 2024. Plaintiffs simply back-cast agilon's later reports to the time of the challenged statements— with no facts connecting the two time periods—and then call the later statements "admissions" of falsity or fraud. They are no such things. Plaintiffs complain that "hindsight" is a stale refrain, but the concept of fraud by hindsight was created to characterize exactly this kind of maneuver.

Second, Plaintiffs ignore the most critical aspects of agilon's business, which the Company disclosed in statements Plaintiffs do not dispute. agilon's business and financial reporting are necessarily based on estimates, given the lag between when patients receive treatment, when payors are charged, and when agilon receives information. This is at the heart of the Company's business and disclosures—and it completely undermines Plaintiffs' narrative that Defendants willfully withheld information about a known spike in utilization. Plaintiffs' only response is to say that all businesses use estimates. That flippant observation does not undo agilon's careful and unchallenged disclosures, which constitute the context in which it made the challenged statements.

Third, Plaintiffs seek to paper over the fact that agilon met or exceeded guidance for two years. This gave agilon a basis for its 2023 guidance, and shows that its statements about the predictive abilities of its model were true when made. Plaintiffs seek to brush this aside by claiming that agilon's two years of success were the product of financial statement fraud. That contention is entirely refuted by agilon's unchallenged descriptions of its actuarial approach to revenue recognition—not to mention the fact that the Company's auditors have never required a restatement. No responsible professional has ever concluded that agilon misstated its financial

1

statements. Only Plaintiffs say this—because without it their theory of fraud collapses.

Within the context of its business, agilon was confident, with good reason, in its novel approach to controlling runaway costs of traditional fee-for-service medicine—prioritizing preventative care and patients' relationships with primary care physicians. The Company spoke positively about this model, often using the type of optimistic language that courts have consistently characterized as non-actionable corporate cheerleading. But agilon was also upfront with investors about the limitations and risks of its model, emphasizing not only its reliance on estimates but the unpredictability of the healthcare landscape in the wake of COVID. agilon did not accurately predict the late-2023 impact of pent-up demand on its business, which—as Plaintiffs themselves allege—caused its financial performance to diverge sharply from guidance. But once agilon learned of the phenomenon, the Company disclosed it to investors. That is not fraud.

As a legal matter, Plaintiffs' claims fail on the elements of falsity and scienter.

***Plaintiffs' Section 11 claims fail on falsity grounds.*** The agilon Defendants showed in their opening brief that Plaintiffs' Section 11 claims fail because (1) Plaintiffs cannot establish falsity in light of agilon's extensive risk disclosures, which revealed the information Plaintiffs claim was omitted, and (2) most of the challenged statements are non-actionable expressions of corporate optimism. These defects doom Plaintiffs' complaint regardless of the applicable pleading standard. Plaintiffs do not meaningfully engage with the risk disclosures and cannot escape the law holding that statements of corporate optimism are not actionable.

Plaintiffs' claims are doubly defective under the heightened particularity requirement of Rule 9(b), which Plaintiffs do not seriously contend they have satisfied. Plaintiffs argue that they are not required to plead with particularity because they have "disclaimed" fraud, but Fifth Circuit law states otherwise. Courts reject boilerplate disclaimers of fraud when Section 11 claims rest on

2

the same factual basis as Section 10(b) claims.  That is the case here.

***Plaintiffs' Section 10(b) claims fail on scienter as well as falsity grounds.***  Plaintiffs' opposition cannot cure the most striking defect in their Section 10(b) claim—the absence of any particularized facts supporting the required strong inference of scienter.  We address scienter before falsity below not to suggest that Plaintiffs' falsity allegations are adequate but because Plaintiffs' scienter shortfall is so obvious.  Plaintiffs allege no facts suggesting that any individual Defendant deliberately defrauded investors—no former employees or contemporaneous documents that would illuminate the individual Defendants' states of mind.  Rather than facts, Plaintiffs rely on truisms common to any fraud complaint—that the defendants talked to investors about important aspects of the company's business, and that their statements purportedly diverged from reality.  Those are not particularized facts about the individual Defendants' states of mind.  Plaintiffs also again depend on hindsight, simply pretending that the circumstances agilon reported when it revised guidance in late 2023 and early 2024 had existed since 2021.

Plaintiffs' Section 10(b) claims fail on falsity grounds for related reasons.  Plaintiffs sweep aside chronology and ignore the business realities—fully disclosed—that constitute the context of the challenged statements:  agilon's history of successful forecasting, its reliance on actuarial analysis in financial reporting, and healthcare industry-wide disruption and uncertainty in the wake of the COVID pandemic.  The Court should dismiss the complaint with prejudice.

## II.      ARGUMENTS AND AUTHORITIES

### A.      Plaintiffs' Section 11 Claims Fail

The agilon Defendants showed in their opening brief that Plaintiffs have failed to allege falsity as to each of the three categories of statements they challenge under Section 11—statements about agilon's (1) business model, (2) visibility into its financial trajectory, and (3) data integration and management. Mot. 13-14.  Plaintiffs largely ignore the first category in their opposition brief,

3

thereby conceding that they have failed to state a claim.[1]  Their arguments regarding the second and third categories fail for the reasons below.

1.    **Plaintiffs fail to comply with the relevant pleading standard**

Plaintiffs argue that Rule 9(b) does not apply because they have "disclaimed" fraud in connection with their Section 11 claims.  Plaintiffs are wrong.  When a Securities Act claim "is based on the same underlying facts and allegations as a securities fraud claim under the Exchange Act, then the claim is subject to the standard in Rule 9(b)."  *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019).  That is the case here.  Plaintiffs challenge the same statements under Section 11 as under Section 10(b), and on the same bases.  ¶ 310.[2]  They even allege scienter in connection with their Section 11 claims.  ¶¶ 98, 112, 157 (the "true facts . . . were then known to or recklessly disregarded by defendants").  Plaintiffs do the same in their brief, arguing that their Section 11 claim is grounded in allegations of "deception," and cross-referencing between their Section 11 and Section 10(b) arguments.  Opp. 17, 18 n.8, 19.  Plaintiffs' core theory is that Defendants sold stock on the public markets in furtherance of alleged fraud.  ¶¶ 10-11.

When fraud and purported non-fraud allegations overlap in this way, Rule 9(b) applies.  Mot. 13 & n.7 (citing authorities).  Plaintiffs seek to distinguish Defendants' authorities on the

---

[1] Plaintiffs mention only one statement in this category: that agilon had the "ability to add new physician partners and to attract additional PCPs to our physician partners."  Plaintiffs argue that this statement was misleading because agilon purportedly failed to properly train new physicians. Opp. 15, 20.  But as the agilon Defendants have shown, Plaintiffs do not dispute that agilon was growing precisely as it described; the alleged "truth" does not contradict the challenged statements. Mot. 15.  Plaintiffs also fail to plead facts showing that the alleged training shortfall occurred at the time of the challenged statements.  Plaintiffs do not address either of these fatal defects.

[2] "¶_" citations in this brief refer to the paragraphs of the Consolidated Complaint."  "Ex. _" and "Supp. Ex. _" citations refer to exhibits to the Appendix and Supplemental Appendix respectively. The agilon Defendants join the briefs filed by the Underwriter and CD&R Defendants.

4

ground that the plaintiffs in those cases (some represented by the same counsel as Plaintiffs here) did not "meticulously separate[]" the Section 11 and Section 10(b) claims. Opp. at 13 n.2 (citing, among others, *In re Plains All American Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019)). Plaintiffs are missing the point. Formal separation of claims is not what matters; substantive overlap is what matters. The single decision Plaintiffs cite in which a court declined to apply Rule 9(b) to Section 11 claims does not control here. The court in *Walker v. Rent-a-Center* concluded that the plaintiffs' 1933 Act claims were "not based on the same fraud allegations as their 1934 Act claims." 2005 WL 8161388, at *18 (E.D. Tex. July 25, 2005). Here, of course, the 1933 Act and 1934 Act claims do overlap—as to challenged statements, reasons for falsity, and even state of mind.

Plaintiffs do not seriously contend that they have complied with Rule 9(b). Nor could they. They plead virtually no facts relevant to the period of the 2021 offerings, and no fact about business or market circumstances in May 2023 that contradicts any challenged statements. The Court can dismiss Plaintiffs' Section 11 claims for this reason alone.

### 2.    **Plaintiffs' claims fail in light of agilon's risk disclosures**

At the outset, Plaintiffs' claims fail in their entirety because the purportedly omitted information was disclosed. Plaintiffs rely largely on an omission theory, but agilon's risk disclosures speak directly to the information allegedly omitted:

| Alleged Omission | Risks Disclosed |
|---|---|
| "agilon was not capable of providing its physicians with the comprehensive, standardized, timely payor data they needed to manage patients' medical costs or medical margin" Opp. 15. | agilon has "experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data . . . [and] may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems." Ex. 1 at 49. |

| | |
|---|---|
| "the Company lacked the systems, data, personnel and resources necessary to effectively track and forecast patients' medical expenses and medical margin" Opp. 15. | "[w]e rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions . . . we may not receive complete and accurate information necessary to effectively manage our business." Ex. 1 at 48. |
| "agilon was not providing new physicians in mature markets with the basic onboarding and education necessary to integrate into agilon's novel business model, which had materially adversely impacted medical margin" Opp. 15. | "Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows and results of operations." Ex. 1 at 36. |

Risk disclosures form a critical aspect of the context courts must consider in assessing statements challenged under the securities laws. *Gambrill v. CS Disco, Inc.*, 2025 WL 388828, at *5 (W.D. Tex. Jan. 30, 2025) ("To determine whether a statement constitutes a misrepresentation, the Court must view the statement in the context in which it was made."). The detailed and on-point disclosures here doom Plaintiffs' omission theory.

### 3.    **Plaintiffs fail to plead falsity as to statements about visibility**

Plaintiffs' attack on the Company's "visibility" statements fails because Plaintiffs allege no contrary facts, because the challenged statements are too vague to be actionable, and because agilon revealed the purportedly omitted facts through its risk disclosures. Mot. 16-18.

Plaintiffs remain unable to identify contrary facts. They argue that agilon's 2023 projections failed, but that does not show that any statement was false when made. At the time of the two 2021 offerings, of course, agilon had not even issued its 2023 guidance. agilon made its third offering in May 2023, and Plaintiffs allege nothing suggesting that the guidance was out of reach at that time. Plaintiffs rely heavily on a purportedly undisclosed May 2023 "spike" in utilization, but that does not contradict what agilon said about visibility—which was simply that

its model provided it with "significant visibility" into both the short-term and long-term financial trajectory of its business and that of its physician partners.  ¶¶ 95, 120, 269, 274.

On puffery, Plaintiffs seek to distinguish the case law, in particular *Southland*, in which they argue the statements at issue were forward-looking.  Opp. 34 n.32 (citing *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353 (5th Cir. 2004)).  Even if that were a distinguishing feature (it is not), whether statements are forward-looking is distinct from whether they are too generalized to be actionable.  The statements here fall into the latter category.[3]

Plaintiffs finally seek to brush aside agilon's on-point risk disclosures by noting that the Company alerted investors to the same risks quarter after quarter.  But that does not disqualify the disclosures.  If the same risks persist over time, companies appropriately continue to warn investors of them.  Repeated warnings do not cease to be meaningful.  *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 490-91 (S.D. Tex. 2016).  The court in *Marquez v. Bright Health Group, Inc.* recently dismissed claims against a healthcare company based on similar disclosures about the difficulties in forecasting medical liabilities against the background of COVID, and Plaintiffs do not meaningfully distinguish that case.  2024 WL 4654137, at *8 (E.D.N.Y. Nov. 1, 2024); Mot. 17.  They note that the complaint there included confidential witness allegations the court found to be unreliable, Opp. 18 n.8, but that has nothing to do with the risk disclosures—and of course Plaintiffs here have no confidential witnesses at all.  Plaintiffs argue that they have something better in the form of "admissions" from Defendants, but that is pure fiction.  *Infra* at 12-13, 17, 21.

---

[3] Plaintiffs also contend that agilon's statements resemble statements that survived dismissal in *In re SolarWinds Corp. Securities Litigation,* 595 F. Supp. 3d 573 (W.D. Tex. 2022).  Opp. 19.  The issuer there stated that it "maintains a written Information Security policy," and that "employees adhered to a password policy."  The court held that these statements were not puffery in light of well-pled allegations that the policies did not exist at all.  *Id.* at 587.  That is not the case here. Plaintiffs are not alleging that agilon had *no* visibility or insight into the trajectory of its business.

7

4.      **Plaintiffs fail to plead falsity as to statements about data integration and management**

Plaintiffs do not argue that agilon's statements about data integration were false.  Opp. 14.

They say the statements were misleading because agilon purportedly omitted information about "analytics gaps" that "prevented [it] from reliably tracking medical margin and members' medical costs."  Opp. 15.  But here again, the information was not omitted.  agilon warned investors that it "often do[es] not have access to reliable historical data"; that it relies on data from payors and "may not receive complete and accurate information necessary to effectively manage our business"; that if payors do not provide "complete or accurate data sets . . . we and our physician partners may not be able to effective[ly] operate our business"; and that "[d]ifficulties in obtaining accurate and complete diagnosis data could have adverse consequences."  Ex. 1 at 40, 48-49.  The Company also told investors "[w]e have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems."  *Id.* at 49.

Plaintiffs argue that these disclosures were insufficient in light of a letter agilon's physician partners sent to the Centers for Medicare & Medicaid Services in 2024.  Opp. 16.  Plaintiffs' argument is puzzling.  The issues identified in that letter are the same as the issues agilon disclosed in its offering documents.  If Plaintiffs' point is that the letter shows that what agilon described as risks had already materialized, that argument founders on chronology.  The 2024 letter does not show that difficulties in obtaining data from payors prevented agilon from accurately tracking and predicting medical margin at the time of the 2021 and 2023 offerings.  Plaintiffs do not allege even that the signatories to the letter were affiliated with agilon at the time of the challenged statements.  Plaintiffs have no answer to this fatal chronological disconnect.  They wishfully assert that the conditions described in the 2024 letter existed throughout the purported class period, *e.g.*, Opp. 17

8

n.6, but identify no supporting facts. Their conclusory assertions are inadequate as a matter of law, under any pleading standard. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) ("We do not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'"). Because chronology dooms Plaintiffs' allegations, because agilon disclosed the purportedly omitted risks, and because the challenged statements are non-actionable expressions of optimism, the Court should dismiss Plaintiffs' Section 11 claims.

B.      **Plaintiffs' Section 10(b) Claims Fail on Scienter Grounds**

As the agilon Defendants have noted, Plaintiffs' scienter allegations are most notable for what they lack—any *facts* bearing on the individual Defendants' states of mind, as opposed to truisms about the securities markets and securities fraud claims generally, *e.g.*, that corporate executives are knowledgeable about and repeatedly discuss important aspects of a company's business with investors, and that the allegedly true state of affairs differs from their statements. Mot. 34. The absence of facts in the form of confidential witness allegations or internal documents profoundly impairs Plaintiffs' ability to create the required strong inference of intentional deceit. *Owens v. Jastrow*, 789 F.3d 529, 545 (5th Cir. 2015) (affirming dismissal where plaintiffs "did not allege that [the defendant executive] was ever informed of internal disagreements or warnings regarding" subject of purported fraud, and "received [no] communications from any . . . confidential witnesses"); *see also, e.g.*, *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 565 (N.D. Tex. 2003) (where plaintiffs "do not specifically identify any one particular internal document containing the alleged 'adverse information,'" the complaint "provides no adequate basis for believing that Defendants' statements . . . were false or misleading.").

Plaintiffs have little to say about the yawning gaps in their allegations. They argue that confidential witness allegations are not necessary because the substantive scienter standard includes severe recklessness. Opp. 52. That is a non sequitur. Recklessness, like knowledge, is

9

a state of mind concerned with deception.  As a substantive matter, Section 10(b) defendants must have made statements with severely reckless disregard about the risk of deceiving investors. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (defendant must disregard a "danger of misleading buyers or sellers which is either known . . . or is so obvious that the defendant must have been aware of it.").  As a procedural matter, Plaintiffs must create a strong inference by means of particularized facts about each speaker's state of mind.  The severe recklessness standard does not excuse them from this.

Plaintiffs plead no such facts here.  Their case-specific allegations are few and far between. They concern one agilon executive's single stock sale, purported "temporal proximity" between challenged statements and corporate setbacks, executive departures, and the CMS letter discussed above.  Plaintiffs' other scienter allegations are broadly applicable to any company.  In no case do they substitute for the missing facts about what each individual Defendant knew and intended.

### 1.    **Plaintiffs' motive allegations are insufficient**

Plaintiffs' principal motive allegation is that Sell sold stock in September 2021.  The Fifth Circuit has recognized that because corporate executives are generally compensated with stock and options, they will naturally "trade those securities in the normal course of events"—and hence that it is inappropriate to "infer fraudulent intent from the mere fact that some officers sold stock." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*, Inc., 537 F.3d 527, 543 (5th Cir. 2008).  Plaintiffs must therefore show that stock sales were suspicious in timing or amount. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552–53 (5th Cir. 2007). Plaintiffs have not done so here.  They allege in conclusory terms that Sell's sale was "unusually large" and "calculated to maximize [his] personal benefit," but plead no facts comparing it to other sales.  Moreover, sales by a single officer are rarely sufficient to support a strong inference of deliberate fraud.  Mot. 36 (citing authority); *see also, e.g., Nathenson v. Zonagen Inc.*, 267 F.3d

10

400, 421 (5th Cir. 2001) ("[T]he fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim.").[4]

As significantly, the scienter requirement is statement-specific.    Under the PSLRA, plaintiffs must not only identify every purportedly false statement but must also plead in each instance "what the person making the representation obtained" by doing so.  *Disco*, 2025 WL 388828, at *4 (citing authorities).  Plaintiffs obviously cannot do so here, and do not even try.  The vast majority of the statements challenged under Section 10(b) were made *after* Sell's single September 2021 sale, and Plaintiffs allege no stock-sale related motive for any of those statements.

In addition to stock sales, Plaintiffs argue that agilon was motivated to grow—to "attract and retain physicians" and increase revenue.  ¶ 235.  Because such growth allegations can be made across corporate America, courts reject them.  Mot. 37 (citing authorities).  Plaintiffs argue that their allegations are company-specific because "agilon uniquely depended on attracting and retaining physician partners that agilon's competitors could simply hire and pay as employees." Opp. 67 n.94.  But every company grows in its own way, and unique features of a business do not warrant ignoring the well-established rule that a desire to grow does not support an inference of scienter. *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("desirability for growth is too universal a corporate goal to constitute a basis for scienter").

Because Plaintiffs have no colorable motive allegations, their other scienter allegations must be stronger.  *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017).  They are not.

2.    **Plaintiffs' chronology allegations are insufficient**

Plaintiffs make two chronological arguments.    The first is what they call "temporal

---

[4] Plaintiffs argue that the CD&R Defendants made stock sales but have alleged no facts suggesting that those defendants made any challenged statements.  The CD&R Defendants further discuss their role at agilon in their separate reply.

proximity"—that the Court should infer deliberate fraud because the alleged corrective disclosures purportedly followed closely on the challenged statements. As the agilon Defendants have discussed, that contention is self-defeating in the context of a three-year class period. Mot. 40-41. Plaintiffs do not respond to this obvious point. They cite an analyst report noting that agilon's statements on its November 2, 2023, third-quarter earnings call were supposedly inconsistent with statements on its August 3, 2023, second-quarter call. Opp. at 70. That is not temporal proximity. It is the difference between agilon's experience and visibility from one quarter to the next.[5]

Plaintiffs' second argument is that agilon admitted that the purportedly omitted facts existed at the time of the challenged statements when it referred to a May 2023 "spike" during its November 2023 earnings call. Sell said the following:

> In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. . . . As it turned out, as we just reported, we did see some increased utilization in May that was—greatly started to moderate in June. And as we've seen so far, started to—continued to moderate in early Q3 as well.

Ex. 21 at 808. Based on this language, Plaintiffs repeatedly argue that agilon admitted that it saw a spike in May. But Sell plainly said just the opposite—that even in August ("remember last quarter") agilon had *not* yet seen a spike. On the November call—"as we just reported"—Sell noted that agilon did experience "some increased utilization in May." This is not an admission that agilon saw *in May* that utilization had spiked that month. It is a statement that agilon saw *in November* that utilization had increased in May. Plaintiffs ignore the plain meaning of Sell's

---

[5] The fact that a purported corrective disclosure may come even less than a quarter after the challenged statements does not show fraud in any event. *In re Browning-Ferris Indus. Inc. Sec. Litig.*, 876 F. Supp. 870, 908 (S.D. Tex. 1995) (no inference of fraud in case of six-week gap; citing authority). Notably, moreover, Plaintiffs cite no Fifth Circuit law in support of their proximity argument—only a pre-PSLRA decision from outside the Circuit. Opp. 70 n.97.

statement and resort to fiction with their repeated claim that agilon "admitted" to having seen a "spike" in May or even "admitted concealment of spiking medical costs." *E.g.*, Opp. 41, 62, 72. There was no such admission.

### 3. Plaintiffs' allegations about executive departures are insufficient

Under controlling law, executive departures are generally insufficient to support an inference of deliberate fraud. Mot. 41 (citing authorities). Plaintiffs argue that an exception should be made for Bensley's retirement—which agilon announced on January 5, 2024—claiming that the facts support an inference that he was "forced out" as a result of the alleged fraud. Opp. 69. That is fanciful. Bensley continued to work for agilon for several months after the announcement; he was still CFO when he signed agilon's May 2024 Form 10-Q. Supp. Ex. 29 at 1110.[6] That is not how companies treat known or suspected fraudsters.[7]

As to the CAOs, Plaintiffs do nothing more than allege that these officers left during the class period. That is insufficient. Mot. 41 (citing authorities). And as to directors, CD&R's board designees resigned in June 2023 because CD&R ceased to own 50% of agilon's common stock in August 2022. *Id.* 42. Plaintiffs suggest something sinister in this nine-month lag, but New York Stock Exchange Rules give directors *twelve* months to resign in these circumstances. Ex. 17 at 720. Plaintiffs' effort to turn this into something indicative of fraud is specious.

---

[6] This supplemental exhibit is properly before the Court. *See* Mot. 8 n.2.

[7] Plaintiffs suggest that loss of compensation suggests wrongdoing, citing *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300 (S.D.N.Y. 2024). The CFO there departed in the wake of an internal investigation, and the company left open the possibility that he was terminated for cause, in which case he would forego $11 million in compensation. *Id.* at 318. *Dentsply* illustrates the kinds of facts that suggest a departure may be linked to fraud. Plaintiffs allege no such facts here.

4.    **The CMS letter does not establish scienter**

Plaintiffs argue the CMS letter shows that physicians "never" had the "comprehensive" data" they needed to manage risk.  Opp. 63-64.  Plaintiffs mischaracterize the letter.  As noted, it is dated May 2024.  It does not speak to the data physicians had—or critically, whether those data were sufficient for their purposes—at the time of the challenged statements.  It certainly does not show that Sell or Bensley knew that data were insufficient or discussed physicians' use of data intending to deceive investors (or recklessly disregarding the risk of deceit).  agilon knew that its data were imperfect, and by May 2024 had repeatedly reported to investors that these and other issues had led to guidance misses.  Mot. 10-12.

Plaintiffs also mischaracterize the statements purportedly contradicted by the letter.  agilon did not say that it had "comprehensive" data.  agilon used the term "comprehensive" in describing its model—the model was designed "to create a comprehensive picture of each patient's needs and gaps in care."  ¶ 139.  That is not as a representation that agilon received comprehensive information from payors.  Plaintiffs similarly contend in both the complaint and their brief that agilon claimed to have a "surveillance system" that could track member utilization in real time. Opp. 70.  But they point to no such statement.  Plaintiffs finally argue that agilon told investors that it had access to "real-time" data, *id.*, but that term was used by an analyst—not agilon.  ¶ 81 n.6.  The CMS letter does not contradict the statements agilon actually made.  It certainly does not show that any individual Defendant made statements intending to defraud investors (or recklessly disregarding the risk of deceit).

5.    **Plaintiffs' remaining allegations simply restate the components of any fraud claim**

Plaintiffs' remaining scienter allegations simply restate the components of any fraud claim. Plaintiffs allege that (1) the subject of the challenged statements was important to agilon and

14

investors (Opp. 53-55), (2) Defendants spoke about the business and its model on multiple occasions (as expected given a three-year class period) (*id.* 55-61), and (3) the challenged statements "diverged" from the purported truth (*id.* 61-65).  None of this is sufficient.

***Allegations about "foundational elements" do not establish scienter.***  Plaintiffs urge the Court to infer scienter because "the alleged fraud centered on foundational elements of agilon's business model."  Opp. 53.  But the PSLRA does not relax Plaintiffs' pleading burden when a company addresses important aspects of its business—which of course every company must do.

Plaintiffs' invocation of "foundational elements" is nothing more than a "core operations" argument.  As discussed, the core operations inference in the Fifth Circuit is "extremely narrow." Mot. 38-40 (citing authorities).  The inference applies principally in the case of very small companies.  *Id.*[8]  Plaintiffs barely address the controlling decision, *Diodes*, which sets forth a four-part test applicable to the inference, and which the agilon Defendants discussed extensively in their opening brief.  *Id.*; *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016).  In a footnote in a section of their brief addressing a minor defendant—Venkatachaliah—Plaintiffs note that *Diodes* involved an off-shore facility.  Opp. 60 n.85.  Here as in many other instances, the factual difference Plaintiffs emphasize does not make the legal principle articulated in the decision inapplicable.[9]

---

[8] Plaintiffs quibble that agilon had 550 employees in 2021, without disputing that it had over 1000 later on.  The difference is immaterial.  The informal threshold in the Fifth Circuit is 60 employees. *Neiman*, 854 F.3d at 750.

[9] In the same vein, Plaintiffs argue that *Owens v. Jastrow* has no bearing here because the case involved the valuation of mortgage-backed securities, the accounting for which requires subjective GAAP valuations.  Opp. 73 n.100.  But the predictions and actuarial assumptions inherent in agilon's financial reporting are also subjective and judgment based.  Mot. 32-33.  The same principle applies here as in *Owens*:  Different choices among a range of permissible judgments do not equate to fraud.  789 F.3d at 543.  That principle applies regardless of industry.

Plaintiffs' cursory discussion of *Diodes*' prongs does not redeem their allegations. Plaintiffs state that medical costs are important to agilon's business, but that cannot be a basis to infer scienter.  Plaintiffs also state in conclusory fashion that "soaring utilization and medical costs" were "readily apparent."  Opp. 60.  But for most the alleged class period, utilization undisputedly did *not* soar.  Plaintiffs themselves alleged that it was depressed as a result of COVID.  Opp. 82.  Utilization picked up in the second half of 2023, but this was not "readily apparent."  agilon's business was highly complex, as Plaintiffs themselves contend.  Opp. 61 n.87 ("extraordinarily complicated").  Because of built-in lags, agilon learned about utilization rates only months after patients received treatment.  Mot. 8.

As to the last of *Diodes*' four prongs, Plaintiffs argue that agilon made internally inconsistent statements; they say that agilon's conceded "backlog" of medical claims showed that it was not insulated from "spikes" in demand.  As discussed, Plaintiffs are deliberately collapsing distinct time periods, inviting the Court to subscribe to the fiction that everything happened all at once.  In reality, agilon identified and disclosed a backlog of pent-up demand in January 2024.  ¶ 203.  That does not show that Bensley or Sell knew at the time of the challenged statements that the Company's predictions would not accurately capture patterns of use unique to the COVID pandemic.  *Diodes*' prongs do not support a strong inference of scienter.[10]

***Repeated statements by knowledgeable executives do not establish scienter.***  Plaintiffs' contention that agilon made statements about its business "repeatedly" does not show that the

---

[10] Plaintiffs cite *Six Flags*, in which the court applied the same prongs and concluded that the plaintiffs' core operations allegations were insufficient in themselves but could contribute to an inference of scienter.  *Oklahoma Firefighters Pension and Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023).  But in that case, the company's problems were "readily apparent" to the executives because they had performed a "comprehensive review" of the relevant facts.  *Id*.  That is not the case here.

individual Defendants intended to deceive investors.  It is simply an artifact of Plaintiffs' choice to allege a three-year class period.  The fact that Sell and Bensley were knowledgeable about agilon's business cannot support an inference of knowing fraud either.  Executives who are not knowledgeable are not doing their jobs.  *See, e.g.*, *Indiana Elec.,* 537 F.3d at 535 (no inference of scienter where CEO stated "there is nothing in this company that I don't know").

*Plaintiffs fail to allege contemporaneous knowledge inconsistent with challenged statements.*  For similar reasons, Plaintiffs fail to establish an inference of scienter based on a divergence between the challenged statements and agilon's internal information.  Plaintiffs take statements agilon made after it had determined that guidance was unachievable—such as the January 2024 statement acknowledging backlog—and label these "admissions" of falsity.  Opp. 39.  They are no such thing, and only Plaintiffs' willful refusal to acknowledge the passage of time allows them to argue otherwise.

Taken separately or together, Plaintiffs' allegations do not create the required strong inference of deceit.  Plaintiffs argue that the agilon Defendants "offer no coherent competing inference," but that is wishful thinking.  agilon discussed the obvious inference—that its predictive machinery did not keep up with post-COVID developments—in its opening brief.  Mot. 43-45.  Plaintiffs deride this as "baseless factual assertions," but in in each instance agilon has identified supporting facts properly before the Court in documents relied on and incorporated by reference into the complaint.  Plaintiffs have not objected to any of the materials in the Defendants' appendix.  Their selective retreat to unidentified factual disputes cannot save their hollow scienter allegations.

C.    **Plaintiffs' Section 10(b) Claims Fail on Falsity Grounds**

Plaintiffs' failure to allege falsity is only slightly less obvious than their inability to allege scienter.  The defects are similar:  Plaintiffs simply transplant the facts agilon reported in the latter part of 2023, asserting without basis that the circumstances that existed then also existed

17

throughout the purported class period.  That technique works no better for falsity than for scienter.

### 1.   **Plaintiffs fail to allege falsity as to agilon's guidance**

As discussed, agilon's financial predictions are protected by the PSLRA's two safe harbors.  Plaintiffs' response is to misstate the law and mischaracterize agilon's risk disclosures.  Mot. 21-24.  Plaintiffs contend that the cautionary statements safe harbor does not apply if a defendant knows of facts inconsistent with the challenged statements, or even recklessly disregards the purported falsity of a statement.  Opp. 50 & n.72.  That is plainly wrong under controlling law.  The cautionary statement and actual knowledge safe harbors are disjunctive; statements are protected if they fall into either one.  *Southland*, 365 F.3d at 371-72.  And the standard under the actual knowledge safe harbor is actual knowledge—not recklessness.  15 U.S.C. §78u-5(c)(1)(B).

The actual knowledge safe harbor applies here.  Plaintiffs' only counterargument is that "defendants concede actual knowledge of the 'spike' at the time agilon issued FY 23 guidance."  Opp. 51.  As discussed above, that is fiction.

The cautionary statement safe harbor applies too.  On this point, Plaintiffs argue that agilon's risk disclosures are without effect because they did not vary from one quarter to the next.  *Id.* 49.  As discussed, that is wrong.  *Supra* at 7.

Plaintiffs finally suggest that the guidance is actionable because it was built on "grossly unreliable data."  Opp. 46.  But they cite no law holding that the safe harbors fall away when a forward-looking statement is purportedly based on bad data.  The argument fails as a legal matter.

It also fails on the facts properly before the Court.  Here and elsewhere, Plaintiffs rely heavily on the contention that agilon missed previous estimates—and misstated historical financial results—because it adjusted certain financial metrics in later periods, when it was able to replace estimates with actual results.  As the agilon Defendants have explained, this is not fraud.  It is a clearly disclosed feature of the Company's financial reporting, stemming from the lag inherent in

18

a healthcare business in which a company learns about the medical treatments covered patients receive long after the fact. Mot. at 8, 32-33. agilon disclosed this to investors quarter after quarter. And critically, Plaintiffs do not allege that either regulators or auditors have ever questioned agilon's financial reporting or suggested that a restatement is required. Plaintiffs seek to brush aside this damning fact as "sophistry," but as a practical and legal matter, it dooms their financial statement fraud theory—and with it Plaintiffs' argument that agilon's 2021 and 2022 predictions were inaccurate. *E.g.*, *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 848 (S.D. Tex. 2020) (falsity allegations fail where plaintiffs cannot allege that the company "restated its financial results, reported accounting irregularities, suffered a liquidity crisis, or received a qualified audit opinion on its financial reports").[11] Thus even if an attack on the basis of a prediction could take it out of the PSLRA's safe harbors—and it cannot—Plaintiffs' argument would fail.

2. **Plaintiffs fail to allege falsity as to agilon's statements about its business model, including statements about visibility and predictability**

Plaintiffs fail to identify facts inconsistent with agilon's description of its business model— a model of value-based care (as opposed to fee-for-service) that foregrounds preventative care and "high-touch" relationships between patients and their primary care physicians. Plaintiffs now concede the accuracy of this description, calling agilon's arguments "red herrings" and clarifying that "no one disputes" agilon's focus on value-based care. Opp. 37. Plaintiffs explain that their quarrel is instead with what agilon said about the *impact* of its model, which they illustrate by

---

[11] Further seeking to undermine agilon's financial reporting, Plaintiffs argue that while the Company disclosed that it used estimates, "Defendants do not claim the results were themselves 'estimates' (they were not)." Opp. 47. But that is exactly what agilon disclosed. *E.g.*, Ex. 11 at 621 ("Medical services expenses . . . include estimates of claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported").

19

reference to the Company's August 3, 2023, statements. *Id.*

In the challenged statements, however, agilon offered only an opinion on the impact of its model on utilization. In seeking to account for why agilon had not seen the same utilization spike others in the marketplace had observed, Sell said, "We *believe* this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization." ¶ 161. As the agilon Defendants have shown, Plaintiffs have not come within any of *Omnicare*'s three narrow channels for challenging this opinion statement. Mot. 30-31.

Plaintiffs respond with another non sequitur, arguing that the challenged statement is not an opinion because it represented "presently" existing facts. Opp. 39. But opinion statements about such facts do not cease to be opinions—although they may fall outside the safe harbors for forward-looking statements. Issuers may qualify statements about presently-existing facts just as they may qualify any other statement. Issuers do so to signal to investors that they should not regard a statement as conveying certainty. A key teaching of *Omnicare*—which Plaintiffs ignore—is that the market understands "hedging" words such as "we think," or "we believe," and that reasonable investors discount statements qualified by such words accordingly. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187–88, 190 (2015) (investors "distinguish[] between the sentences 'we believe X is true' and 'X is true.'"). agilon used those signals here: Sell said, "We believe." Plaintiffs cannot escape *Omnicare*.

As a fallback, Plaintiffs argue that they have come within each of *Omnicare*'s three prongs, but they plainly have not. We discuss this at page 24 below, in connection with challenged statements about "pent-up" demand.

Plaintiffs next contend that agilon misled investors by suggesting that its model provided predictability and visibility. Here as elsewhere, Plaintiffs do not distinguish between different

20

time periods. They simply argue that all statements "extolling [the Company's] 'visibility' into agilon's business and key metrics were highly misleading," because agilon purportedly "lack[ed] visibility into members' medical expenses and agilon's medical margin, which compromised the predictability of agilon's financial results." Opp. 36; ¶ 137(b). That is insufficient.

Plaintiffs also once again fail to reckon with agilon's warnings to investors that it could not predict future medical costs. Ex. 1 at 42 ("[G]iven the numerous uncertainties inherent in [medical margin] estimates, [the Company's] actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period . . . particularly in times of significant changes in utilization, medical cost trends and populations and geographies served."); *see also* CD&R Reply at 4-5 (citing additional disclosures). With this language, agilon notified investors of significant gaps in visibility.

In seeking to discount the risk disclosures, Plaintiffs argue that the risk had already come to pass. But this depends on a demonstrably false chronology. As discussed, Plaintiffs deliberately misread Sell's November 2023 reference to a May spike in utilization as an "admission" that agilon *saw* the spike in May. But that is the opposite of what Sell said. *Supra* at 12-13. Much the same is true of Plaintiffs' discussion of agilon's purported "backlog" admissions. agilon referred to a "backlog of pent-up demand" for the first time on January 5, 2024. ¶ 89. The Company did not suggest that it was aware of a backlog at the time of the challenged statements.

Consistent with the transparency of its risk disclosures, agilon alerted investors to enhanced risks during the latter part of 2023, identifying "potential blind spots" in its claims data. Opp. 36. Plaintiffs argue that these disclosures cannot "ameliorate defendants' deception" because agilon purportedly provided "few if any details" and otherwise "reassured investors that agilon had an 'incredible level of visibility.'" *Id.* Plaintiffs once again misread the challenged statements. As

21

the agilon Defendants explained in their opening brief, Sell *contrasted* the lag in its Medicare Advantage business with the "incredibly high visibility" in its ACO Reach business—which accounted for only a small number of patients, and which Plaintiffs have never alleged suffered from the issues that arose in the Medicare Advantage business. Mot. 25. After making that contrast, Sell went on to offer an opinion correlating certain aspects of visibility between the two parts of the business: "But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. And so *we feel* like we have an incredible level of visibility *on that*." ¶ 169. After Sell made the comment, Bensley again stated that the "much more complex situation of payers" for Medicare Advantage "makes it more difficult to do your IBNR estimation" and that "blind spots . . . have come out of that[.]" Ex. 18 at 737. Read together, agilon's statements about the issue show that the Company was alerting investors to gaps in visibility—not "reassuring" them that no such gaps existed.

Many of the challenged statements about visibility and predictability are also expressions of corporate optimism, which the Fifth Circuit has held cannot give rise to securities claims. Mot. 14-15, 26. Plaintiffs respond that certain statements are necessarily "material"—and not puffery— because the statements were responses to analysts' question. Opp. 34. But that is not the law. *See Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 676 (N.D. Tex. 2023) (puffery where challenged statement was made "in response to a[n] [investor's] question" that was "vague and difficult to falsify"). A statement may be an immaterial expression of optimism whether or not it is made in response to a question, just as it may be an expression of opinion whether it relates to the present or the future. [12] Both the question of puffery and the analysis of opinion statements,

---

[12] Plaintiffs also argue that statements including the word "visibility" are not puffery. Opp. 33-34. This Court's recent ruling in *Disco* is contrary. In response to an analyst's question about the company's "level of visibility . . . into annual revenues at the beginning of any year," the CEO

moreover, require legal determinations, to be made at the pleading stage. Plaintiffs seek to avoid this: They suggest that these are jury questions, and in support cite a decision from a *criminal* case. Opp. 38, n.42. But criminal cases are not subject to the PSLRA's pleading standards. The Court can and should rule on the puffery and opinion issues now—in Defendants' favor.

3. **Plaintiffs fail to allege falsity as to statements purportedly concealing "pent-up demand" for medical services**

Plaintiffs group together three statements, from disparate points in the putative class period, in which they claim agilon misled the market about "pent-up" demand—demand that mounted as a result of the unique circumstances of the pandemic, when patients avoided hospitals and doctors' offices. Plaintiffs fall short of applicable pleading requirements—particularly those imposed by *Omnicare*—as to all three statements.

***January 10, 2022.*** Plaintiffs first spotlight Sell's statement "I don't know that we believe there's a massive set of pent-up demand, particularly in our model, because we've got those touchpoints." ¶ 114. Sell made this statement of opinion more than a year before the purported May 2023 utilization spike that Plaintiffs claim revealed pent-up demand. The statement is heavily qualified—Sell *didn't know* that agilon *believed* that "massive" pent-up demand exists.

As with the August 2023 statement, Plaintiffs first dispute that *Omnicare* applies to statements of presently existing and "verifiable" facts. As discussed, *Omnicare* applies to all opinion statements, whether or not related to present circumstances. *Supra* at 20. The same is true of "verifiable." The statement at issue in *Omnicare*—which the Supreme Court analyzed as an

---

cited to historical data and said "we feel really good about our kind of annualized. [sic] I've been here for almost four years and our ability to project on an annualized basis is actually really, really good." 2025 WL 388828, at *9. The Court held both that the statements "can be classified as generalized, positive statements about Disco's future prospects and are thus inactionable." *Id.* at *11.

opinion—was that the issuer believed its contracts complied with applicable law. 575 U.S. at 179–80. Legal compliance was a presently-existing, verifiable fact—but that did not keep the statement from being an opinion. *Id.*; *see also id.* at 183-84 (statement that CEO believes company's televisions have the highest resolution of any on the market is both an opinion and truthful even if the televisions do *not* have the highest resolution—so long as the CEO believes they do).

Plaintiffs argue in a single conclusory sentence that even if *Omnicare* applies, Sell's statement comes within each of its three narrow channels. Opp. 39; Mot. 30 (discussing three channels). Plaintiffs are wrong. *Omnicare*'s subjective belief prong does not apply: Plaintiffs allege no fact suggesting that Sell believed that agilon was facing "massive" pent-up demand in January 2022. *Omnicare*'s omission prong does not apply either. Under that prong, plaintiffs must identify with particularity omitted facts about the basis for the stated belief—that is, the inquiry or knowledge underlying the belief—that differ from reasonable expectations. 575 U.S. at 194. Plaintiffs have alleged nothing at all about the basis for Sell's belief, which is fatal.[13] Finally, Plaintiffs do not identify a false embedded fact in Sell's statement. *Omnicare*'s hypothetical is again illustrative—the CEO says she believes the company's televisions have the highest resolution available on the market because the company uses a patented technology unavailable to its competitors, but in fact has no patented technology. *Id.* at 185. Plaintiffs identify no such embedded facts here.[14] Because the challenged January 2022 statement is an opinion, and

---

[13] *See, e.g.*, *Plains*, 307 F. Supp. 3d at 617 ("The *Omnicare* Court emphasized that this avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a § 10(b) claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose 'some fact cutting the other way.'").

[14] Plaintiffs argue that agilon's reference to "touchpoints" is such a fact. Opp. 39; ¶¶ 113-14. But they do not and cannot dispute that a key facet of agilon's model is such "touchpoints," *i.e.*, the "high touch" between patients and primary care physicians.

because Plaintiffs cannot come within any of *Omnicare*'s three prongs, Plaintiffs' attack fails.

**May 9, 2023.**  Plaintiffs next target Sell's statement during agilon's first-quarter earnings call that "utilization was very much in line with what we would expect" and that "the power of the primary care physician touch points were really strong in the quarter." Opp. 40; ¶ 149.  Plaintiffs re-run their flawed contention that agilon admitted to seeing a May spike in utilization in May 2023, ignoring the plain meaning of Sell's statement—which is that the Company became aware of a May spike in utilization in November 2023.  In this context, the contention is not only flawed but absurd.  On its May 2023 earnings call, agilon was reporting on the first quarter of 2023, ended March 31—not on developments in May.  Mot. 30.  Plaintiffs respond that agilon "had a duty to disclose" facts about May utilization whether or not it was addressing developments in that quarter. Opp. 40.  There is perhaps no better illustration in Plaintiffs' brief of their willful misunderstanding of agilon's business.  Plaintiffs are suggesting that if patients saw their doctors at a higher than usual rate in the first eight days of May, agilon would have known about this by May 9 and incurred a duty to disclose it.  That is not how agilon's business works, Mot. 32-33, and Plaintiffs know it.

**August 3, 2023.**  The defects in Plaintiffs' attack on agilon's August 3 statements are familiar.  Plaintiffs argue that agilon told investors that its business model "ha[d] . . . insulated" the Company from the impact of pent-up demand. Opp. 40.  As discussed above, this was an opinion statement, in which Sell discussed with investors the possible reasons it had not seen the same surge in demand that others in the market had identified.  *Supra* at 20.  To challenge the statement, Plaintiffs must demonstrate that the statement comes within one of *Omnicare*'s three prongs—notwithstanding their contention that it was a "verifiable" statement of "presently" existing fact. Mot. 30.  But none of the three prongs applies.  First, Plaintiffs have not shown that Sell subjectively disbelieved the possibility that agilon's model had protected the Company from

25

post-COVID surges.  Second, Plaintiffs plead no facts at all about the bases of Sell's opinion, let alone material undisclosed facts that differ from what reasonable investors would expect.  And third, Plaintiffs identify no false or misleading embedded facts.

Plaintiffs complain that agilon's defense of this statement is "particularly insincere given [its] admissions in November 2023 to having witnessed a utilization spike in May-June 2023."  Opp. 41.  As discussed, agilon made no such "admissions."  agilon did not say that it had observed a May spike in May; nor could it have, given the lag inherent in its business.  *Supra* at 12-13.

### 4.    Plaintiffs fail to allege falsity as to agilon's statements about data integration

The agilon Defendants established in their opening brief that Plaintiffs have failed to allege falsity as to challenged statements about data integration. Mot. 27-28.  Plaintiffs respond with characterizations of the statements that differ from their actual content.  Plaintiffs argue that agilon misled investors into believing the Company had access to "accurate, comprehensive, standardized, and timely data."  Opp. 42.  As discussed, "comprehensive" is Plaintiffs' term, not agilon's. *Supra* at 14.  As to "timely" and "accurate," agilon warned investors throughout the class period of lag times and possible inaccuracies.  Mot. 8-9, 25.  The Company specifically told investors in May 2023, August 2023, and November 2023 that there were gaps in its data.  Ex. 14 at 668 (May 2023); Ex. 18 at 730 (August 2023); Ex. 21 at 806 (November 2023).

In seeking to identify facts that contradict the challenged statements, Plaintiffs further mischaracterize them.  In the complaint, Plaintiffs quote an Investor Day statement by Hittner, the Chief Experience Officer:

> Imagine you're getting all of your data about your senior population now from all of your MA plans in one spot, you combine that with your EMR data . . . Now you have the ability to see a view of your senior panel and their holistic journey, you never had access to before.  And it's simple.  It's all in one spot that you can access that.

26

¶ 83.  In their brief, Plaintiffs strip out context.  They misleadingly state that Hittner "affirmatively emphasized the Company's access to *'all'* of its patient's data from *'all'* of agilon's MA payors." Opp. 43.  That is not what Hittner said.  Hittner discussed centralizing and organizing all the data its physician partners already had—not obtaining complete data from payors.  Venkatachaliah made the same point in the same Investor Day presentation: "Most people don't realize how varied the information is that they get from payers.  *The fact that we threaded together and we are consistent*, and they know exactly the same place to look for chronic conditions, the same place to look for a med list, same place to look for a problem list makes it so much easier for them."  ¶ 123 (emphasis added).  Indeed, the same point is made in the post-class period CMS Letter on which Plaintiffs rely so heavily: "Through our partnership with agilon health, we can view a streamlined dashboard comprised of data from disparate sources to better understand who our most vulnerable patients are and when they are utilizing health benefits through Medicare."  In none of these instances did agilon or its partners claim to be receiving all data from payors.

When Plaintiffs do not mischaracterize the challenged statements, they point to a purported contradiction between statements and allegedly omitted information that is no contradiction at all. They challenge Sell's May 2022 reference to the "high-touch relationship between the physician and patient and making sure they have the data they need and they have the team around them that gives them the time to spend with those most complex patients."  ¶ 130; Opp. 42.  Plaintiffs say this statement misleadingly concealed the purported fact that data deficiencies prevented agilon from accurately forecasting costs.  But the statement has nothing to do with costs or forecasting. It is about patient service.  Plaintiffs' omission theory cannot stand in the face of that disconnect.

5.    **Plaintiffs fail to allege falsity as to agilon's statements about growth and onboarding**

As the agilon Defendants have shown, Plaintiffs allege no facts contradicting agilon's

27

statements that it grew by adding physicians in established geographies. Mot. 29, 46. In response, Plaintiffs simply repeat their allegations, arguing that the statements were misleading by omission because problems later emerged with the way new physicians had been brought on board. Opp. 45. As in the Complaint, Plaintiffs identify no facts showing that these problems existed at the time of the challenged statements. Plaintiffs say only that agilon itself reported the problems in January 2024. Plaintiffs' claim again founders on the mismatch between challenged statements and purportedly omitted information. The challenged statements contain no information suggesting to investors that agilon used any particular onboarding strategy.

III.    **CONCLUSION**

Plaintiffs' defense of their complaint depends, again and again, on obscuring chronology, ignoring context, and deliberately misreading the Company's late 2023/early 2024 statements as "admissions" of earlier knowledge or wrongdoing. Not content with unfairly accusing agilon and its executives of dishonesty in their dealing with investors, Plaintiffs say that the Company harms patients—that it "seeks to profit by cutting medical care to patients." Opp. 4. Plaintiffs know this is false, and that agilon's business is focused on reducing costs, not cutting care. A key innovation in agilon's model is to increase the care provided by primary care physicians, in order to avoid poor health outcomes and more expensive procedures down the line. Plaintiffs' effort to smear the business in which they chose to invest attests only to their own desperation to salvage a complaint that comes nowhere close to stating a claim.

Plaintiffs have failed in every instance to meet the applicable pleading standards. The Court should dismiss the complaint in its entirety with prejudice.

28

DATED:  February 20, 2025

*/s/ Yolanda C. Garcia*
YOLANDA C. GARCIA
ygarcia@sidley.com
State Bar No. 24012457
MASON PARHAM
mparham@sidley.com
BARRET V. ARMBRUSTER
barmbruster@sidley.com
**SIDLEY AUSTIN LLP**
2021 McKinney Avenue, Suite 2000
Dallas, TX  75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

ROBIN WECHKIN (*pro hac vice* app. forthcoming)
rwechkin@sidley.com
**SIDLEY AUSTIN LLP**
8426 316th Place Southeast
Issaquah, WA 98027
Telephone: (415) 439-1799

*Attorneys for Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, Heidi Hittner, Glenn Sobotka, Sharad Mansukani, Michelle A. Gourdine, Michael L. Smith, Priscilla Kasenchak, Diana L. McKensie, Karen McLoughlin, Jeffrey A. Schwaneke and William Wulf*

## CERTIFICATE OF SERVICE

I certify that on February 20, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Yolanda C. Garcia*
Yolanda C. Garcia

29