IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Master File No. 1:24-CV-297-DAE<br><br>CLASS ACTION |
| This Document Relates to:<br><br>ALL ACTIONS.<br>_____ | | |

ORDER: (1) GRANTING IN PART AND DENYING IN PART AGILON
DEFENDANTS' MOTION TO DISMISS; (2) GRANTING UNDERWRITER
DEFENDANTS' MOTION TO DISMISS; AND (3) GRANTING IN PART AND
DENYING IN PART CD&R DEFENDANTS' MOTION TO DISMISS

Before the Court are: (1) Defendants agilon health, inc. ("agilon" or

the "Company"), Steven Sell, Timothy Bensley, Girish Venkatachaliah, and Heidi

Hittner ("Exchange Act Individual Defendants"), and Glenn Sobotka, Priscilla

Kasenchak, Michelle Gourdine, Michael Smith, Sharad Mansukani, Diana

McKenzie, Karen McLoughlin, Jeffrey Schwaneke, and William Wulf's

("Securities Act Individual Defendants") (collectively, "agilon Defendants")

Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. # 51);

(2) Defendants J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, BofA

Securities, Inc., Wells Fargo Securities, LLC, Deutsche Bank Securities Inc.,

Cowen and Company, LLC, Nomura Securities International, Inc., RBC Capital

Markets, LLC, Leerink Partners LLC f/k/a SVB Securities LLC, Truist Securities,

1

Inc., William Blair & Company, L.L.C., Academy Securities, Inc., R. Seelaus & Co., LLC, Samuel A. Ramirez & Company, Inc., Siebert Williams Shank & Co., LLC, and WR Securities, LLC's (collectively, "Underwriter Defendants") Motion to Dismiss Consolidated Complaint (Dkt. # 53); and (3) Defendants Clayton, Dubilier & Rice, LLC ("CD&R"), CD&R Vector Holdings, L.P. ("Vector"), CD&R Investment Associates IX, Ltd., and Entities and Clay Richards, Ravi Sachdev, Richard J. Schnall, Derek L. Strum, and Ronald A. Williams's ("CD&R Individual Defendants") (collectively, "CD&R Defendants") Motion to Dismiss Consolidated Complaint (Dkt. # 54).  The Court finds a hearing on these matters is not necessary.  After careful consideration of the memoranda filed in support of and in opposition to the motions, the Court, for the reasons below, (1) **GRANTS IN PART** and **DENIES IN PART** the agilon Defendants' motion; (2) **GRANTS** the Underwriter Defendants' motion; and (3) **GRANTS IN PART** and **DENIES IN PART** the CD&R Defendants' motion.

BACKGROUND

This case arises from three securities class action lawsuits brought against: (1) agilon Defendants, (2) Underwriter Defendants, and (3) CD&R Defendants.  After this Court consolidated the cases into a single action (Dkt. # 14), on September 6, 2024, Lead Plaintiff Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina

2

Department of State Treasurer and the North Carolina Supplemental Retirement

Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans,

Indiana Public Retirement System, and the North Atlantic States Carpenters

Pension Fund and Guaranteed Annuity Fund (collectively the "Retirement

Systems" or "Plaintiffs") filed a Consolidated Complaint on behalf of those who

purchased agilon common stock between April 15, 2021, and February 27, 2024,

inclusive (the "Class Period") and were damaged thereby (the "Class"), including

those who purchased agilon common stock traceable to registration statements

used in connection with agilon's April 16, 2021, September 13, 2021, and May 17,

2023 public offerings.  (Dkt. # 36.)

Plaintiffs allege securities fraud claims against agilon and the

Securities Act Individual Defendants, and CD&R Defendants under Sections

10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange

Act"), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Id.)  Plaintiffs also bring

strict liability claims for violation of Sections 11, 12(a)(2), and 15 of the Securities

Act of 1933 (the "Securities Act") against the Securities Act Individual

Defendants, CD&R Defendants, and the Underwriter Defendants.  (Id.)

I.     The Company

According to the complaint, agilon was formed in July 2016 by

CD&R, a New York-based private equity firm "to take advantage of the billions of

3

dollars paid each year by Medicare and Medicaid in connection with the provision of medical services to senior citizens." (Dkt. # 36 at 6.) Using its "Total Care Model," Plaintiffs contend that agilon acts as a "middleman" in contracting with Medicare Advantage ("MA") health plans (or "payors") and agrees to accept 100% of the financial risk of the medical costs associated with the payors' provision of medical services to Medicare Advantage patients. (Id.) In exchange, a payor gives agilon a portion of the funds the payor receives from the federal government's Center for Medicare and Medicaid Services ("CMS"). (Id.) The complaint alleges that, "[i]n this way, payors offload to agilon the full financial risk of their patients' medical costs, while retaining a small portion of the monies paid by CMS." (Id.)

Plaintiffs contend that actual delivery of the medical services to patients requires agilon, in addition to the payor agreements above, to enter into multi-decade agreements with physician practice groups in the same geographic areas as the payors. (Dkt. # 36 at 7.) Under the agreements with the physical practice groups, physicians provide medical care to agilon's patients, and agilon splits 50/50 with the physician partners any unexpected "capitation" revenue its receives from payors. (Id.) Plaintiffs allege that "[i]n order to turn a profit, agilon and its physician partners must spend less on medical care for Medicare Advantage patients that they receive from payors," a term referred to a "medical margin." (Id.)

4

According to Plaintiffs, by 2020 agilon was responsible for the "full risk" of 131,000 Medicare Advantage members.  (Dkt. # 36 at 7.)  Thereafter, Plaintiffs allege that when the COVID-19 pandemic happened in early 2020, utilization of "non-essential" healthcare services declined significantly, as did the medical costs for which agilon was responsible under its Total Care Model payor agreements.  (Id.)  Plaintiffs argue this "temporary suppression of medical procedures buoyed agilon's financial results," and that patient utilization "remained suppressed even as the country reopened, further boosting agilon's bottom line."  (Id.)

Plaintiffs further allege that to CD&R and agilon, the decline in medical services and procedures associated with the pandemic "spawned not just a temporary windfall," but "also presented a unique opportunity to take agilon public." (Dkt. # 36 at 7.)  According to Plaintiffs, CD&R owned 69% of agilon's shares at the beginning of 2021, and through a stockholder agreement had the power to appoint the Chairman of agilon's Board of Directors ("Board") and other Board members, approve corporate transactions, and maintain CD&R's unlimited access to agilon's non-public, financial, operational, and business information. (Id.)  Plaintiffs contend that "[u]sing its control over agilon, CD&R orchestrated its plan to capitalize on the pandemic and monetize its substantial equity in agilon via an initial public share offering [("IPO")]."  (Id. at 7–8.)

II.   The Class Period

Plaintiffs allege that agilon has historically operated at a loss, but to successfully accommodate a public offering, agilon needed to first convince investors that it could operate profitably.  (Dkt. # 36 at 8.)  Among others, Plaintiffs contend that agilon needed to persuade its analysts and investors that its "first-of-its-kind" business model could generate growth, medical savings, and profits.  (Id.)  According to Plaintiffs, during the first quarter of 2021, CD&R worked with agilon and its senior insiders to prepare drafts of a registration statement which discussed agilon's operations and strength of its operating prospects.  (Id.)  Its April 2021 Registration Statement used to complete the IPO assured investors that agilon's Total Care Model was different from other medical providers, which Plaintiffs allege allowed agilon to avoid upticks in patient utilization and medical costs.  (Id.)  Plaintiffs contend the April 2021 Registration Statement highlighted the Company's "ability to accurately predict and effectively manage our medical margin," providing "significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups."  (Id.)

On April 16, 2021, Plaintiffs allege the Defendants completed the IPO ("April 2021 Offering") and sold over 53 million agilon shares at $23 per share, raising almost $1.2 billion from Plaintiffs and other members of the Class.  (Dkt.

# 36 at 8.) According to Plaintiffs, however, Defendants' representations in connection with the April 2021 Offering and thereafter during the Class Period about agilon's Total Care Model and the Company's ability to manage its medical margins were materially false and misleading. (Id. at 8–9.) Plaintiffs assert that agilon suffered from systemic data and analytics gaps and that it was concealed that agilon was unable to effectively integrate payor systems and payor data with its platform, as well as lacking the ability to reliably track, report, and forecast medical expenses. (Id. at 9.) Plaintiffs allege that these and other issues caused agilon to underreport medical expenses and post inflated medical margins. (Id.)

Plaintiffs further contend that while concealing the truth about agilon and its defective business model, "agilon's insiders cashed in, selling billions of dollars' worth of stock at artificially inflated prices as high as $ 28.98 per share." (Dkt. # 36 at 9.) Plaintiffs assert that, among others, CD&R used its control over agilon to force agilon to use more than $200 million of the Company's own cash to buy directly from CD&R 9.6 million of the shares CD&R sold. (Id.)

According to Plaintiffs, the truth surfaced after CD&R's final insider sale in May 2023. (Dkt. # 36 at 9.) On November 2, 2023, agilon cut its fiscal year ("FY") 2023 outlook, which revealed a deterioration in key profit metrics, and that agilon had suffered an undisclosed spike in patient utilization beginning

around May 2023.  (Id. at 9–10.)  In response, agilon's stock price declined 13%. (Id. at 10.)

On January 5, 2024, Plaintiffs assert that agilon lowered its FY23 outlook for the second time in nine weeks and announced the retirement of its Chief Financial Officer ("CFO"), "stunning" the market.  (Dkt. # 36 at 10.) Plaintiffs contend agilon revealed: (1) that its FY23 utilization rates were up 350% over FY22 utilization rates; (2) it had a "backlog of pent-up demand from COVID"; (3) the surge in patient utilization agilon had previously denied would persist through FY24; and (4) it would not generate positive cashflow in FY24. (Id.)  On this news, Plaintiffs allege the Company's stock price dropped another 29% as the revelations "fuel[ed] investor concern[] around sustainability of the AGL model."  (Id.)

On February 27, 2024, Plaintiffs contend that agilon disclosed it had missed the FY23 profit forecast provided several weeks earlier on January 5, 2024, and that it had overstated historical medical margins for multiple market classes, was slowing down its membership growth rate, and was cutting its FY24 guidance. (Dkt. # 36 at 10.)  By March 1, 2024, agilon's stock price declined another 7% and by the end of the Class Period, the Company's stock price had plummeted 85% from its Class Period high of over $44 per share to less than $6.50, or a decline of over $38 per share.  (Id. at 10–11.)

8

On March 19, 2024, the original complaint in this case was filed in this Court.  (Dkt. # 1.)  On September 6, 2024, Plaintiffs filed their amended complaint.  (Dkt. # 36.)  On November 8, 2024, agilon Defendants, Underwriter Defendants, and CD&R Defendants all filed separate motions to dismiss.  (Dkts. ## 51, 53, 54.)  On January 7, 2025, Plaintiffs filed an Omnibus Opposition to Defendants' motions to dismiss.  (Dkt. # 55.)  On February 20, 2025, the Defendants filed separate replies to their motions.  (Dkts. ## 57, 58, 60.)  The Court will address each motion below.

LEGAL STANDARDS

I.      Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  Under Rule 12(b)(1), a claim is properly dismissed for lack of subject matter jurisdiction when a court lacks statutory or constitutional authority to adjudicate the claim.  Home Builders Assoc. of Mississippi, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998).  When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, courts should consider the "jurisdictional attack before addressing any attack on the merits."  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).  The Court must first address subject matter jurisdiction because, without it, the case can proceed no further.

9

Ruhrgas Ag v. Marathon Oil Co., 526 U.S. 574, 583 (1999); Ramming, 281 F.3d at 161.

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 424 (5th Cir. 2001) (citation omitted).

## II.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

10

inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

III.     Rule 9(b) and the Private Securities Litigation Reform Act

When "the complaint involves an allegation of fraud," Rule 9(b) requires the complaint to plead "with particularity the circumstances constituting fraud." Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 956 (5th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)). The Private Securities Litigation Reform Act ("PLSRA") "has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." Id. (citing Ind. Elec. Workers' Pension Tr. Fund. IBEW v. Shaw Grp., Inc., 537 F.3d 527, 533 (5th Cir. 2008)). "First the plaintiff must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." Id. (quotation omitted). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." Id. (quotation omitted).

## DISCUSSION

The Court will consider each of the pending motions to dismiss below.

11

I.    The agilon Defendants' Motion to Dismiss

The agilon Defendants move to dismiss the claims against them on the basis that Plaintiffs: (1) cannot meet the heightened pleading standard under Rule 9(b) for its claims under Section 11 of the Securities Act, nor the plausibility standard under Rule 12(b)(6); and (2) cannot meet the pleading standard under the PSLRA for their Section 10(b) claims under the Exchange Act.  (Dkt. # 51 at 9.)

A.    The Securities Act

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)).  The statute provides a cause of action against the issuer of the security and its underwriters.  Id.

To state a claim under Section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  Id. at 358–59 (quoting 15 U.S.C. § 77k(a)).

As with 10(b) claims, a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.  Basic Inc. v. Levinson, 485 U.S. 224, 234 (1988).  For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  Id.  Thus, this Court must determine whether "the information allegedly omitted or misrepresented in the [registration statement] was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the [registration statement] as a whole."  Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1445 (5th Cir. 1993).  Scienter, or actual knowledge of the falsity, is not an element of the Section 11 claim.  Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

Plaintiffs challenge three groups of statements made by agilon in its IPO and two subsequent ("SPO") offering documents: (1) agilon's business model; (2) visibility into its financial trajectory; and (3) data integration and management. (Dkt. # 36 at 89–95.)  agilon Defendants' motion to dismiss challenges these statements on the basis that Plaintiffs fail to plead with particularity facts showing that the statements were materially false or misleading.  (Dkt. # 51 at 19.)

13

1.    Whether Rule 9(b) applies

As an initial matter, the parties dispute whether Rule 9(b)'s heightened pleading standard applies to Plaintiffs' claims under Section 11. agilon Defendants assert that because the Section 11 claim sounds in fraud, Plaintiffs must satisfy Rule 9(b)'s particularity standard. (Dkt. # 51 at 18.) In response, Plaintiffs maintain they have specifically disavowed fraud and have made no reference to fraud or scienter allegations in support of their Securities Act claims. (Dkt. # 55 at 32.) Plaintiffs assert that the complaint entirely separates the alleged false and misleading statements in the Offering Materials and the reasons they were false pursuant to the Securities Act from the complaint's Exchange Act claims. (Id.) For this reason, Plaintiffs argue that only Rule 8's pleading standard applies to their Section 11 claims. (Id.)

A complaint alleging claims under the Securities Act is generally only required to comply with the pleading requirements of Rule 8, without needing to satisfy the more stringent standards required by Rule 9(b) and the PSLRA. See Kapps v. Torch Offshore, Inc., 379 F.3d 207, 210 (5th Cir. 2004) (citations omitted). But the heightened pleading standard under Rule 9(b) continues to apply to any claims of fraud under the Securities Act. Lone Star Ladies Investment Club v. Schlotzsky's Inc., 238 F.3d 363, 368 (5th Cir. 2001); see also Kurtzman v. Compaq Computer Corp., 2002 WL 32442832, *24 (S.D. Tex.). Importantly,

14

"[b]oilerplate disavowals of an intent to allege fraud do not change the analysis." In re Plains All American Pipeline, L.P. Sec. Litig., 307 F. Supp. 3d 583, 619 (S.D. Tex. 2018).  "When the plaintiff's Securities Act allegations are substantively identical to the Exchange Act allegations, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity."  Id.

The very language of Section 10(b)—"manipulative," "deceptive," "contrivance"—establishes that a violation of that section, and the allegations of that violation, will sound in fraud.  This stands in stark contrast to the language of Section 11, which involves "untrue statement" or "omitted statement" and "misleading."  Under Section 11, a defendant is not required to have known that the statement was untrue or misleading when made.  Section 10(b) liability looks to the intent of the defendant in making a false statement; Section 11 makes no inquiry into the defendant's state of mind.  Thus, by the very language, a Section 11 claim does not sound in fraud.

In their complaint Plaintiffs allege the following for their Securities Act claim against agilon and the Securities Act Individual Defendants:

257.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, against agilon, the Securities Act Individual Defendants, and the Underwriter Defendants.  This claim is based on strict liability and does not sound in fraud.  Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct as part of this Count.

15

(Dkt. # 36 at 89.)  This boilerplate language, however, is not sufficient by itself to consider the allegations only pursuant to Rule 8.  See In re Plains, 307 F. Supp. 3d at 619.  Instead, the Court will also review whether the Securities Act claim is based on the same underlying facts and allegations as the fraud allegations under the Exchange Act, which requires a heightened pleading standard under Rule 9(b).  See Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363, 368 (5th Cir. 2001).  "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not."  Id.

Upon careful review, the Court finds that Plaintiffs have separately parsed out their fraud allegations in support of their Exchange Act claims from the allegations in the Securities Act claims.  While Plaintiffs have alleged that agilon made overlapping untrue statements in the IPO and SPO for both its Securities Act claims and the Exchange Act claims, they have not specifically alleged any fraud in regard to their Securities Act claims.  Plaintiffs make no reference to fraud or scienter in support of those claims and specifically carve out allegations in their complaint that contain such elements.  (Compare Dkt. # 36 at ¶¶ 256, 250–54(a), 254(d), 255, with ¶¶ 254(c), 310–315.)  Accordingly, because they are not grounded in fraud, the Court will not apply Rule 9(b)'s heightened pleading standard to Plaintiffs' Section 11 claims under the Securities Act.

16

2.    Statements about agilon's Business Model

Regarding agilon's statements about its business model, Plaintiff alleges the following statements, among other similar statements in each of the Company's' three public offerings, were false or misleading:

93.    The April 2021 Registration Statement stated that agilon's "differentiated," full-risk model was "transforming healthcare by empowering [physicians] to be the agents for change." The April 2021 Registration Statement went on to state that agilon provided such a model for "*successfully improving quality of care and reducing costs*" and that "[o]ur purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business."

(Dkt. # 36 at ¶¶ 93, 117, 267, 273.)  Plaintiffs contend these statements were false and misleading because none of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that these statements are true and without omissions of any material facts and were not misleading.  (Id. at 91.)

agilon Defendants maintain that Plaintiffs fail to plead facts showing these statements were materially false or misleading.  (Dkt. # 51 at 19.) (Dkt. # 51 at 19.)  They maintain these statements drew a distinction between agilon's value-based care model and a "traditional fee-for-service medicine."  (Id.) The agilon Defendants further contend that its positive outlook statements on its value-based care and its statements about its growth also do not provide a basis for liability because they are generalized statements of optimism.  (Id.)

17

The Court agrees with the agilon Defendants regarding Plaintiffs' allegations about the Company's business model.  Plaintiffs have not plausibly alleged that the Company's registration statements "contained an untrue statement of material fact."  15 U.S.C. § 77k(a).  Instead, the statements appear to differentiate agilon's business model from that of traditional services, and the Company's remaining statements appear to be "generalized, positive statements about the company's competitive strengths," and "future prospects" which are "not actionable because they are immaterial."  Rosenzweig v. Azurix Corp., 332 F.3d 854, 869 (5th Cir. 2003).  And, regarding agilon's statements about its growth and its "ability to add new physician partners and to attract additional PCPs to [its] physician partners," or the business model's ability to "transform[] healthcare by empowering the primary physicians ('PCPs') to be the agents for change," the Court finds these too to be a generalized expressions of optimism or puffery.  The Court therefore dismisses Plaintiffs' Section 11 claim based on the theory that Defendants made a materially false or misleading statement concerning agilon's business model.

        3.      Statements about agilon's Visibility

Regarding agilon's statements about its visibility, Plaintiff alleges the following statements, and other similar statements, were false or misleading:

18

95. The April 2021 Registration Statement stated that agilon's model "provides *significant visibility into the near-term and long-term financial trajectory* for both agilon and our anchor physician groups."

(Dkt. # 36 at ¶¶ 95, 120, 269, 274.)  According to Plaintiffs, this statement and others were materially false or misleading because agilon was unable to "accurately track[], manag[e] and forecast[] members' medical costs and medical margin."  (Id. at 35.)

The agilon Defendants argue that when viewed in context, the statement fails on falsity and materiality grounds because agilon "repeatedly explained and extensively cautioned investors about the limits inherent in its financial reporting and estimation processes."  (Dkt. # 51 at 21.)  Among others, agilon Defendants contend that the Company told investors that it relies on estimates "to determine revenues and related receivables from risk adjustment [and] medical services expense and related payables[.]"  (Id. at 22 (citing Dkt. # 52 at 109).)  And further, that "Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period."  (Id. (citing Dkt. # 52 at 147).)  Additionally, agilon warned its investors in the context of the then-ongoing pandemic that "[m]anagement's estimates for revenue recognition, medical service expense and other estimates,

19

judgments and assumptions may be materially and adversely different from actual results as a result of the COVID-19 pandemic, among other things."  (Id. (citing Dkt. # 52 at 109).)

In response, Plaintiffs assert that agilon's statements about future visibility specifically relate to the Company's then-current ability to generate medical margin by collection and integrating payor data for physicians and that it is not some general statement of optimism.  (Dkt. # 55 at 38.)  And, regarding its risk disclosures, Plaintiffs contend agilon alerted its investors to the same risks every quarter and therefore are meaningless.  (Id.)

The Court agrees with the agilon Defendants and does not find the Company's statements to be actionable regarding its visibility.  First, Plaintiffs do not allege sufficient facts which suggest that the statements were false when made. For instance, Plaintiffs fail to allege facts which indicate that agilon knew, or should have known, that its business model was defective at the time of the IPO in April 2021, or any of the public offerings thereafter.  Additionally, the Court finds that agilon discussed and disclosed the nature of its reporting and estimation process and that it relies on estimates, warning its investors that "[g]iven the numerous uncertainties in such estimates," its "medical claims for liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period."  (Dkt. # 52 at 147.)  The

20

Company also included a disclosure concerning the potential impact the COVID-19 pandemic might have on its estimates and that the "judgments and assumptions may be materially and adversely different from actual results." (Id. at 109.)

"[A]lleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Truk Intern. Fund LP v. Wehlmann, 737 F. Supp. 2d 611, 624 (N.D. Tex. Dec. 3, 2009) (citing Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004)). Given agilon's risk disclosures, a reasonable investor would have recognized the speculative and uncertain nature of the formulation of the Company's estimates especially considering the circumstances and uncertainty in the healthcare industry around the time of the COVID-19 pandemic. And, that these disclosures were repeated in other quarters does not render them meaningless. See Carlton v. Carlton, 184 F. Supp. 3d 428, 490–91 (S.D. Tex. 2016) ("[C]ourts have found language meaningfully cautionary even when the statements repeated earlier disclosures." (citing In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832, 845 (N.D. Tex. 2005)). The Court thus concludes that agilon's statements regarding its visibility are not actionable under Section 11.

21

4.    Statements about Data and Data Management

Regarding agilon's statements about its data and data management, Plaintiff alleges the following statements and other similar statements were false or misleading:

94.    The April 2021 Registration Statement emphasized the strengths and benefits of agilon's "Data Integration and Management" capabilities, stating:

> Our purpose-built and flexible platform enables ease of integration with payor systems, physician EMR systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month. The agilon platform extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience.

(Dkt. # 36 at ¶¶ 94, 267–70.)  Additionally, Plaintiffs allege the following:

96.    As to agilon's ability to "deliver actionable insight at the patient and physician level" the April 2021 Registration Statement specifically stated:

> Two critical factors that enhance our ability to improve medical margin over a long period of time that we believe are unique to our model are . . . (ii) our ability to deliver actionable insight at the patient and physician level through our aligned partnership model with peer-to-peer physician feedback driving accountability and accelerating the pace of change to a Total Care Model.

(Id. at ¶ 96.)  Plaintiffs contend that the IPO and SPO omitted that systemic data and analytics gaps prevented the Company from accurately tracking and effectively managing medical margin and members' medical costs, rendering the statements above misleading.  (Id. at 29.)  Plaintiffs also allege that agilon's undisclosed data analytics issues directly affected its physician partners because the physicians relied on agilon to "collect, synthesize and analyze data from payors

22

as parts of agilon's full-risk model, while agilon relied on its physician partners to help drive down medical costs and utilization." (Id. at 30.)

In support of its claim, Plaintiffs also reference a May 2024 letter sent by agilon and some of its physician partners to CMS which suggests that "the physician partners were not provided with the data necessary to effectively manage patients' medical costs, which compromised the viability and sustainability of the Company's full-risk model." (Dkt. # 36 at 92.) Plaintiffs allege that the physician partners later confirmed with CMS that "they *historically* had not been provided that data necessary to accurately manage members' medical costs, including standardized and comprehensive payor data corresponding to the claims, costs and risk of agilon's patients." (Id. (emphasis added).) Plaintiffs claim the physician partners received altered and delayed data files that varied in format and quality, preventing them from accurately managing patients' medical costs. (Id.)

The agilon Defendants contend that Plaintiffs have alleged no facts suggesting that these statements were materially false or misleading when the Company made them in the IPO and SPO in 2021. (Dkt. # 51 at 23.) agilon Defendants argue that the statements are corporate optimism and they are qualified by risk disclosures, warning investors that the Company depended on third parties to provide data, specifically relying on the private health insurers it contracted with capitation agreements. (Id.) agilon Defendants cite its disclosure that "[w]e rely

23

on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business." (Dkt. # 52 at 51.)

Regarding the May 2024 letter to CMS, agilon Defendants argue that the Company appropriately warned its investors of the risks and that the letter was sent more than three years after the challenged statements in the IPO. (Dkt. # 51 at 24.) agilon Defendants further assert that the letter is from its physician partners seeking CMS's help in obtaining "more complete and timely data" from private health insurers, confirming what the Company told investors—"that it relies on third parties to run its business and to generate financial reports, and that when third parties do not provide data as they should, agilon's ability to manage certain aspects of its business may suffer." (Id. (citing Dkt. # 52 at 972–75).) Additionally, agilon Defendants cite the physician partners' statements in the letter which corroborate its statements in the IPO, including that their partnership with agilon enables them to "view a streamlined dashboard comprised of data from disparate sources" and thus they are able to "better understand who [their] most vulnerable patients are and when they are utilizing health care benefits through Medicare." (Id. (citing Dkt. # 52 at 973).)

24

In response, Plaintiffs argue that agilon's "boilerplate" risk disclosure statement does not reveal omitted facts and that at the time of the IPO, agilon was unable to collect and integrate comprehensive and timely payor data, rendering agilon unable to reliably manage member costs and medical margin. (Dkt. # 55 at 35.) Plaintiffs contend that "agilon's systemic data processing deficiencies were ongoing at the time the Registration Statements were declared effective" and thus this information was omitted and therefore the statement in the IPO was misleading. (Id. at 36.)

The Court agrees with agilon Defendants that the IPO contains an array of warnings about potential future risks in data integration and management. Among others, agilon warned that:

We often do not have access to reliable historical data regarding the size, revenue or medical expense levels of our target geographies or potential physician partners. As a result, our market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size and expected growth of the market for our services and the estimates of our market opportunity may prove to be inaccurate.

(Dkt. # 52 at 145.) Additionally, agilon discussed that:

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information which payors provide to us, we and our physician partners may not be able to effectively ensure our members disease burdens are identified and may not be able to effective operate our business.

(Id. at 153.) agilon also disclosed that:

25

We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

(Id. at 154.)  Regarding the 2024 letter agilon's physician partners sent to CMS, the Court finds the concerns addressed to CMS are those disclosed in the warnings above regarding data collection and integration and therefore do not demonstrate any false or misleading statements in the IPO or SPO.  Nor do Plaintiffs allege any specific facts which show that the statements were false when made.  For instance, Plaintiffs have not alleged any supporting facts demonstrating that there was material information known to agilon regarding data and data management at the time of the IPO that was not included in the Registration Statement.  The Court thus concludes that agilon's statements regarding its data and data management are not actionable under Section 11.

Given the foregoing, the Court finds that Plaintiffs have failed to state an actionable claim under Section 11 of the Securities Act against agilon and the Securities Act Individual Defendants and the claim will be dismissed.

5.    Section 15

Plaintiffs also allege a claim for "controlling person" liability under Section 15 of the Securities Act against the Securities Act Individual Defendants. (Dkt. # 36 at 98.) This Section provides that any person who "controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and

severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 77o. Because Plaintiffs have failed to adequately plead the violations alleged under the Securities Act, the Court will also dismiss the Section 15 claim against the Securities Act Individual Defendants for failure to adequately allege a primary violation. See Rosenzweig, 332 F.3d at 863.

B.    The Exchange Act

Plaintiffs allege a claim pursuant to the Exchange Act against agilon and the Exchange Act Individual Defendants. (Dkt. # 36 at 102.) agilon Defendants move to dismiss these claims against agilon and the Exchange Act Individual Defendants on the basis that Plaintiffs failed to plead any falsity or a strong inference of scienter pursuant to the PSLRA's heightened pleading standard to support the claim. (Dkt. # 51 at 25.)

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b)

27

by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."  17 C.F.R § 240.10b–5(b).  While providing a cause of action to securities purchasers or sellers injured by statutory and rule violations, Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), "these latter actions [are] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005).

To state a claim under § 10(b), a plaintiff must allege facts sufficient to show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  R2 Invs. LDC v. Phillips, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted); see also Dura Pharm., 544 U.S. at 338 (citing 15 U.S.C. § 78u–4(b)(4)).  The Fifth Circuit has explained that: a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and [the Private Securities Litigation Reform Act]:

> (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and

28

where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the representation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

Neiman v. Bulmahn, 854 F.3d 741, 746 (5th Cir. 2017) (alterations omitted) (quoting Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003)).

The agilon Defendants move to dismiss on the basis that Plaintiffs have not properly alleged the first two elements to support an Exchange Act claim. (Dkt. # 51.)

A.      Actionable Misstatements or Omissions

To be actionable, a misrepresentation or omission of a fact must be objectively material.  See Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 568 U.S. 455, 467 (2013) ("[T]he question of materiality . . . is an objective one[.]" (internal quotation marks omitted)).  "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  Basic v. Levinson, 485 U.S. 224, 231–32, 194 (1988) (quoting TSC Inds., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); see also Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 362 (5th Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual

29

significance in the deliberations of the reasonable shareholder." (internal quotation marks omitted)).  The "total mix" of information includes information that is readily available to the general public and facts known or reasonably available to shareholders.  Kapps v. Torch Offshore, Inc., 379 F.3d 207, 216 (5th Cir. 2004).

The Supreme Court has been "careful not to set too low a standard of materiality for fear that management would bury the shareholders in an avalanche of trivial information."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011) (internal quotation marks omitted).  "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."  Lormand v. US Unwired, Inc., 565 F.3d 228, 248 (5th Cir. 2009).  There is no bright-line rule for determining whether information withheld from a company's public disclosures is, or is not, material.  See Matrixx Initiatives, 563 U.S. at 49.  Instead, determining materiality is a "fact-specific inquiry . . . that requires consideration of the source, content, and context of the allegedly omitted information."  Id. at 44 (internal quotation marks and citation omitted); see also Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir.b1994).  ("[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." (internal quotation marks and footnote omitted)).

Here, Plaintiffs challenge six groups of statements made in earnings calls and at investor conferences during the Class Period: (1) agilon's medical

30

margin guidance and the bases of its financial projections; (2) agilon's business model; (3) agilon's data integration; (4) agilon's growth strategy; (5) healthcare utilization trends; and (6) agilon's reported financial results.  (Dkt. # 36 at 102.)

### 1.    agilon's Guidance and Financial Projections

Plaintiffs' complaint alleges that on March 1, 2023, agilon announced its results for the fourth quarter and year ending December 31, 2022 (the "FY2022 Release"), which included FY23 medical margin guidance and adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") guidance, and revised aspects of that guidance in August 2023, November 2023, January 2024, and February 2024.  (Dkt. # 36 at ¶ 140–41, 143–44, 146, 156, 159, 178, 189–90.) Plaintiffs allege the following statements which either contain or explain the guidance itself are materially false or misleading:

140.    On March 1, 2023, agilon announced its results for the fourth quarter and full year ending December 31, 2022 (the "FY22 Release"), which included FY23 medical margin guidance of $535-$560 million and $75-$90 million adjusted EBITDA, respectively.  The same day, Sell and Bensley convened an investor call to discuss agilon's 4Q22 and FY22 financial results, during which Sell stated agilon was on track to post FY23 medical margin of nearly $550 million (compared to $304 million in FY22), explaining:

> Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally.

141.    Sell further stated the maturation of agilon's member cohorts was driving sustained earnings growth:

> Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year.

31

. . .

143.    On March 30, 2023, Sell, Bensley and Hittner participated in agilon's 2023 Investor Day, during which Sell highlighted that agilon was on track to post FY23 medical margin of $550 million. During the call, Bensley again emphasized agilon's accelerated growth in medical margin and adjusted EBITDA, stating:

> Adjusted EBITDA at agilon is inflecting in a positive way. That's driven by a – that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage. All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability. . . . We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond.

> *                *                *

> So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million.

> *                *                *

> Medical margins growing at even a faster rate with a 60% CAGR over that same time period. And we expect medical margin dollars to inflect up to about $550 million in 2023. That's an 80% year-over-year increase from what we just reported for 2022. And I think *that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership*.

(Dkt. # 36 at 47–48.)

Plaintiffs also challenge a slide published by agilon which purports to show the medical margin per-member-per-month ("PMPM") figures from 2018–23. (Id. at 48.) Plaintiffs contend that Bensley "underscored agilon's purportedly '*great visibility*' into the underlying drivers of agilon's medical margin." (Id. (emphasis in original).)

32

Plaintiffs also challenge:

1.     a June 7, 2023 conference call where near the end of the call, Sell stated that agilon had a "really strong start this year," and added that "I don't know how many businesses that show an 88% step-up in their main margin metric [medical margin].  We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent."  (Dkt. # 36 at 51.)

2.     agilon's August 3, 2023 financial results for the quarter ending June 30, 2023 ("2Q23 Release"), in which Sell stated that "[t]he durability and predictability of our partnership model enable agilon to deliver strong performance during the second quarter and first half of 2023."  (Id. at 54.)

3.     a November 2, 2023 call wherein Bensley emphasized that for the quarter ending September 30, 2023 ("3Q23"), the medical margin had "*increased 42% year-over-year*."  (Id. at 63 (emphasis in original).)

4.     a January 5, 2024 investor call by Sell and Bensley discussing agilon's revised and withdrawn forecasts, and in response to a question asking whether any of agilon's "individual markets" were "losing money," Sell stated that only one market "would run at a loss for 2023," to which Bensley stated "one market . . . gets below breakeven market EBITDA in 2023."  (Id. at 68.)

Additionally, Plaintiffs allege agilon's following statements about its ability to forecast its financial performance are false and misleading:

33

100.    On May 27, 2021, defendants Sell and Bensley convened a conference call with investors to discuss agilon's 1Q21 financial results, during which Sell emphasized his "**high degree of visibility** into future revenues and margin progression," as well as agilon's "growth strategy, both with our existing partners and current geographies and with new partners in new markets." Sell also underscored agilon's "[s]ame geography membership growth" as "a key differentiator in our model."

And, during an August 3, 2023 investor call,

164.    Sell also claimed that agilon's unique business model "buffers our financial results up and down":

> Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down. As a result, *we are able to guide to relatively tight ranges* on medical margin and adjusted EBITDA *and absorb puts and takes* that may arise during a given period.

(Id. at 56.)

Plaintiffs also allege that

169.    In response to a Wells Fargo analyst's question regarding "how closely is ACO REACH claims data track with your actual [Medicare Advantage] claims experience," and corresponding request that Sell and Bensley "be as specific as possible about what your level of claims visibility is for [2Q23]," Sell assured that agilon possessed "incredible" visibility into its members' medical costs and utilization, stating:

34

So I think *our visibility is extremely strong,* Stephen, and we have high confidence. I think *it's a function of our model, which is very different,* right? We are on the ground with PCPs every day, we are managing those most complex patients. And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs.

The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER. And we put that together, we're able to drive the type

of results that I talked about with inpatient down in the flat to down in the mid-single-digit range.

From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims. And so *there is incredibly high visibility.* There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis.

But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. *And so we feel like we have an incredible level of visibility on that.* And I think the last thing I would just say is, I think we've demonstrated that *our model really stands out in higher utilization periods that broader fee-for-service markets are seeing.*

\*       \*       \*

Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year. It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range. So I think this is an area where we feel like we have incredible confidence. The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators.

170.    Also on <u>August 3, 2023,</u> agilon filed its Report on Form 10-Q ("2Q23 Report on Form 10-Q"), which was signed by Bensley, included the medical margin and adjusted EBITDA results provided in the 2Q23 Release, and claimed that agilon's 2Q23 medical margin increased 69% compared to 2Q22. The 2Q23 Report on Form 10-Q also repeated the statements set forth in ¶¶117-118.

(Dkt. # 36 at 57–58.)

35

And, Plaintiffs allege that during a November 2, 2023 call, Sell told investors that agilon's "more conservative reserving approach" was

"intentionally reflected in [its] medical margin outlook for [Medicare Advantage] and will support [its] future performance in 2024," and agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model." Sell also reassured investors that he "remain[s] highly confident in the trajectory of our adjusted EBITDA," adding "our visibility into the key drivers for next year's performance are quite high."

(Id. at 63.) Plaintiffs further contend that during this call, Bensley assured investors that agilon's increased reserves simply reflected a "more conservative reserving posture," rather than any fundamental deterioration in the business, and would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance." (Id. at 64.)

Plaintiffs argue that agilon's statements above vastly overstate the Company's actual performance and concealed that agilon's reported results rested on grossly unreliable data. (Dkt. # 55 at 65.) Plaintiffs assert that "agilon's guidance statements masked the adverse impact unreliable payor data, soaring patient utilization rates and medical expenses, and massive pent-up demand from COVID-19 were then having on the company." (Id.)

agilon Defendants move to dismiss on the basis that Plaintiffs fail to adequately allege that any of the statements above were false or misleading when

36

they were made, and that the guidance itself falls within the PSLRA's safe harbors

for forward looking statements.  (Dkt. # 51 at 26 (citing 15 U.S.C. § 78u-

5(i)(1)(C)).)  agilon Defendants contend that two safe harbors apply: (1) any

statement identified as forward looking and accompanied by "meaningful

cautionary statements identifying important factors that could cause actual results

to differ," 15 U.S.C. § 78u-5(c)(1)(A); and (2) any statement made without "actual

knowledge by [the speaker] that [it] was false or misleading," id. § 78u-5(c)(1)(B).

(Dkt. # 51 at 26.)

### a.    Meaningful Cautionary Language

agilon Defendants first argue that when the Company provided the

challenged March 1, 2023 guidance and its adjustments to that guidance, it

specifically told investors it was making forward-looking statements.  (Dkt. # 51 at

26 (citing Dkt. # 52 at 642).)  For instance, during the March 1, May 9, August 3,

and November 2, 2023 calls, agilon stated the following:

> Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

(Dkt. # 52 at 642, 664, 732, 805.)

agilon Defendants also point out the following risk disclosures it gave

to investors in its Form 10-K for the fiscal year ending December 31, 2022: (1) that

medical expenses are subject to "utilization rates of healthcare services, including

inpatient hospitalization, by our members," and the "utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members" (id. at 565); (2) that "the spread of COVID-19 and its impact on the worldwide economy and the healthcare industry underscores risks [agilon] face[s]," and the "rapid development and fluidity of COVID-19 precludes any prediction as to the ultimate impact on us of COVID-19" (id. at 568); (3) that "COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members" (id.); and (4) "[g]iven the numerous uncertainties inherent in such estimates, [the Company's] actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period," and that "actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served" (id. at 569).

Given these disclosures, agilon Defendants argue they warned investors of its dependence on estimates and the vulnerability of those estimates on changes in the medical landscape because of COVID-19.  (Dkt. # 51 at 27.)  They argue its investors knew the estimates the Company relied on were subject to error

and the risk was greater when agilon sought to project its performance in future periods.  (Id.)

Under the Safe Harbor clause, a forward–looking statement is not actionable if: (1) it is identified as forward–looking and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" (2) it is immaterial; or (3) the plaintiff fails to plead that the forward–looking statement was made with actual knowledge that it was false or misleading.  See Lormand, 565 F.3d at 243 (citing 15 U.S.C. § 78u–5(c)(1)(A), (B)); Southland Sec. Corp., 365 F.3d at 371–72).  "Whether or not a statement is forward–looking is governed by the nature of the statement, not a litigant's allegations about the statement."  KB Partners I, L.P. v. Pain Therapeutics, Inc., 2015 WL 7760201, *10 (W.D. Tex. Dec. 1, 2015).

Many courts have held that the Safe Harbor clause does not protect statements when the plaintiff adequately alleges that the defendant knew his statements were misleading when made.  See, e.g., Lormand, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."); Marcus v. J.C. Penney Co., Inc., 2015 WL 5766870, *2 (E.D. Tex. Sept. 29, 2015).  Plaintiffs in this case allege that Sell and Bensley were aware of adverse facts that seriously

39

undermined the reliability of agilon's FY23 guidance and its underlying data.  For

instance, Plaintiffs allege that when it issued the FY23 guidance, agilon was not

accurately tracking or forecasting patients' medical costs, there was elevated

patient utilization rates, and pent-up demand, that the guidance omitted millions of

dollars in historical medical costs at the time it was issued.  (Dkt. # 36 at

¶¶ 173(e), 173 (g)–(h), 188(c), 188(e)–(f), 191(a).)  Given this, to the extent

Plaintiffs' allegation that the agilon Defendants knew that the statements were

misleading precludes application of the Safe Harbor clause, the Court agrees.

Still, the Safe Harbor clause applies when the alleged

misrepresentations are accompanied by "meaningful cautionary language."  See

Lormand, 565 F.3d at 244 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)).  "When risks

have already begun to materialize, it is no longer sufficient to generally warn of the

possibility of these risks in the future."  Marcus, 2015 WL 5766870 at *3.  "When

cautionary language is glossed over as a future risk rather than the certain dangers

that had already begun to materialize then the warnings are no longer meaningful."

Id. (internal quotations and ellipsis omitted).  Here, the agilon Defendants argue

that any alleged misrepresentations included proper cautionary language warning

that certain factors, including COVID-19, could result in outcomes very different

from any forward-looking statement in the FY23 guidance.  (Dkt. # 51 at 27.)

40

As stated above, however, Plaintiffs allege that by the time Sell and Bensley made the statements at issue, these Defendants already knew of adverse facts that would seriously undermine the reliability of agilon's FY23 guidance. (Dkt. # 36 at ¶¶ 173(e), 173 (g)–(h), 188(c), 188(e)–(f), 191(a).)  Therefore, Plaintiffs allege the risks had already begun to materialize when agilon made the cautionary statements and risk disclosures.  Additionally, the general cautionary statement at the beginning of the earnings calls are too "generic to constitute meaningful cautionary language," because they are a classic boilerplate caution, unattached to an individual forward-looking statement.  Okla. Firefighters Pension and Ret. Sys. V. Six Flags Entm't, 58 F.4th 195, 210 (5th Cir. 2023).  Although not protected by meaningful cautionary language, agilon Defendants' forward-looking statements may still qualify for safe harbor protection if Plaintiffs fail to plead facts demonstrating the statements were made with "actual knowledge" that they were misleading.  § 78u-5(c)(1)(B); Southland, 365 F.3d at 371.

### b.    Actual Knowledge

Under the second prong, a defendant avoids liability if the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u–5(c)(1)(B).  Because the second-prong places the burden of proof on the plaintiff, the PSLRA effectively requires plaintiffs to prove actual knowledge—not just recklessness—in the case of every

41

forward-looking statement.  See In re Anadarko, 957 F. Supp. 2d 806, 831 n.13 (S.D. Tex. 2013) ("If the statements are covered by the statutory 'safe harbor' provision, Plaintiffs would be required to show intent to deceive, and not merely recklessness.") (citing Nathenson v. Zonagen Inc., 267 F.3d 400, 409 (5th Cir. 2001)).  Accordingly, for each predictive statement, Plaintiffs must plead specific facts giving rise to a strong inference that the defendant responsible for the forward-looking statement actually knew that the prediction was false.  See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) ("Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'").

Regarding agilon's statements about predictability and visibility, the agilon Defendants argue that Plaintiffs have pled no facts which show any of the statements were false or misleading when made, let alone with a deliberate intent to defraud.  (Dkt. # 51 at 29.)  They assert that Plaintiffs fail to plead any facts showing that Sell or Bensley actually knew the newly issued guidance was false or misleading.  (Id.)  The agilon Defendants also contend that Plaintiffs ignore the Company's history of successful forecasting and that it met its 2021 and 2022 guidance for medical margin and EBITDA.  (Id. at 30.)  They also point out Bensley's disclosure in August 2023 in which he informed investors that estimation is "complex" and "difficult" for Medicare Advantage patients.  (Id.)

42

Finally, the agilon Defendants argue that the statements above are inactionable because they are corporate optimism.  (Id. at 30–31.)

Despite the agilon Defendants' arguments, the Court finds that Plaintiffs have adequately pled that the statements above were made with actual knowledge at the time they were made.  For instance, the complaint alleges that Sell and Bensley were aware of adverse facts which undermined the reliability of agilon's FY23 guidance and its data in support.  (See Dkt. # 36 at 52.)  Plaintiffs specifically allege that Sell, Bensley, and Hittner knew that at the time agilon issued its FY23 guidance, it omitted that the Company was not accurately tracking or forecasting patients' medical costs, was experiencing elevated patient utilization rates, and had large pent-up demand.  (Id. at ¶¶ 157(c)–(j), 173(a)–(f), 188(a)–(g), (j)–(k), 191(a)–(f), (h).)  And, although the agilon Defendants dispute knowledge of a 2023 "May-June spike" in March 2023, Plaintiffs have sufficiently alleged their knowledge of it in and after May 2023 at the time of the FY23 guidance.  (Id. at ¶¶ 217–222.)  The Court thus finds that the safe harbor does not protect the agilon Defendants' statements above.  See Lormand, 565 F.3d at 244 (Safe harbor would apply only if "the plaintiff fails to [plead] that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading."); Southland,

43

365 F.3d at 371 ("To avoid safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity"); Nathenson v. Zonagen, Inc., 267 F.3d 400, 409 (5th Cir. 2001).

### 2.    agilon's Business Model

Plaintiffs' complaint alleges that on October 28, 2021, agilon announced its results for the period ending September 30, 2021 (the "3Q21 Release"), in which Sell praised agilon's "high-visibility partnership model" which would "deliver predictable, quality outcomes." (Dkt. # 36 at ¶ 108.) Plaintiffs contend this and other statements made were false or misleading, including:

109.   On October 29, 2021, Sell and Bensley convened a conference call with investors to discuss agilon's 3Q21 financial results. During the call, Sell touted agilon's full-risk model, claiming its ability to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." Sell also boasted of agilon's ability to "*drive sustainably lower cost[s]*."

113.   On January 10, 2022, Sell presented at the JP Morgan Healthcare Conference, during which he boasted of agilon's "distinguish[ed]," "high-touch" model and its ability to "manage costs" and deliver "predicable results" through "multiple surges" in utilization:

> *I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver predictable results through each one of these surges.* We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.

44

\*     \*     \*

> [T]he quality of our economic model has allowed us and will continue to allow us to *deliver predictable results in periods of volatility.* No one can predict exactly what the future is with this pandemic, but *we know that we can deliver predictable results.* New government programs evolve over time, but *we can deliver predictable results.*"

(Id. at ¶¶ 108, 109, 113.)  Plaintiffs also challenge several other statements made about the Company's business model.  (Id. at ¶¶ 116, 129, 134, 136, 151, 158, 163, 166–67, 176–77.)

Plaintiffs argue that the statements above misrepresent the business model's alleged impact on the Company.  (Dkt. # 55 at 56.)  For instance, Plaintiffs contend that agilon's statements about the model concealed the Company's "pervasive struggles with tracking agilon's medical costs and margins," which misled investors.  (Id. at 56–57.)  Additionally, Plaintiffs argue that "[h]aving chosen to attribute specific benefits to agilon's 'high-touch' model, Exchange Act Defendants were obligated to speak the full truth," but did not.  (Id. at 57.)

The agilon Defendants move to dismiss on the basis that Plaintiffs have not pled facts that show these statements were false or misleading.  (Dkt. # 51 at 31.)  The agilon Defendants contend that the terms "high touch," "differentiated," and "high-visibility partnership model" refer to value-based care where primary-care physicians see patients more often to improve health outcomes and manage healthcare costs.  (Id.)  They argue that these statements are simply

45

aspirational and there is nothing false about them.  (Id. at 32.)  Additionally, agilon

Defendants assert they did see medical margin from cost savings from its model

and thus Plaintiffs' argument that agilon did not save as much as it predicted is

different than arguing its model failed to produce costs savings at all.  (Id.)  The

agilon Defendants further maintain that these statements also constitute corporate

optimism.  (Id.)

At this stage of the proceedings, the Court finds that Plaintiffs have

plausibly alleged a claim based on agilon's statements above about its business

model.  The Company's statements above do not appear to be mere puffery

because they were not "of the vague and optimistic type."  Southland, 365 F.3d at

372.  Instead, they underscored and detailed the "very specific benefits" of agilon's

business model.  See Lormand, 565 F.3d at 249 n.14.  Thus, the Court concludes

that Plaintiffs have sufficiently alleged that agilon Defendants knew these

statements were false and misleading when they were made.

3.    agilon's Data Integration

Plaintiffs also challenge several statements made about agilon's

processes of integrating data for physicians to use.  (Dkt. # 51 at 32.)  For instance,

Plaintiffs allege:

46

122.    On <u>March 11, 2022</u>, Sell, Bensley, Hittner and Venkatachaliah participated in agilon's 2022 Investor Day.  During the call, Sell boasted of agilon's ability to utilize "standard data formats" as part of its "integration . . . with our largest payers," stating:

> But that national scale gives us tremendous benefit with payers, right?  *The integration that we're seeing with our largest payers, the joint operating committees, we have standard data formats with them.*  We are talking about expanding into other geographies.  We have the ability to bring a national payer into a market literally within 6 to 8 weeks like we did in Buffalo with a couple of national payers.

. . .

130.    Commenting on agilon's "high-touch" model, Sell assured that agilon "make[s] sure [its physician partners] have the data they need" in managing members' medical costs:

> It has a dramatic impact on the cost areas that I just talked about, but *it really goes back to that high-touch relationship* between the physician and patient and *making sure they have the data they need* and they have the team around them that gives them the time to spend with those most complex patients.

(Dkt. # 36 at ¶¶ 122, 130.)  Plaintiffs also make several similar allegations in their complaint.  (<u>Id.</u> at ¶¶ 103, 123, 124, 126, 139, 145, 184.)  Plaintiffs allege these statements were false and misleading when made because they concealed from investors that agilon suffered from systemic data deficiencies that prevented the Company from accurately tracking, managing, reporting and forecasting medical margin and patients' medical costs.  (<u>Id.</u> at ¶ 112.)  Additionally, Plaintiffs maintain the statements did not reveal that agilon was unable to provide its physicians with the data they needed to effectively manage members' medical costs and utilization, and that the Company lacked the systems and actuarial

personnel and resources necessary to reliably track, report, and forecast medical expenses.  (Id.)  In further support, Plaintiffs again rely on the May 2024 letter sent by agilon and some of its physician partners to CMS which discusses the physicians' frustration at times by the failure of private health insurers to provide timely, complete, and well-organized data.  (Dkt. # 36 at ¶272(a).)

The agilon Defendants move to dismiss on the basis that they had disclosed these vulnerabilities to its investors during the putative class period and did not conceal them.  (Dkt. # 51 at 33.)  They contend that the Company readily admitted to investors that it did not have access to perfect data.  (Id.)  Regarding the CMS letter, agilon Defendants argue that it does not show any fraud and that it demonstrates that it did not conceal any of the issues the Company faced in obtaining data from private insurers.  (Id.)

Upon careful consideration of the statements above, the Court finds that these comments about agilon's data integration do not appear to be false or misleading, and Plaintiffs have failed to sufficiently allege facts in support of such. As previously discussed, agilon disclosed its vulnerabilities regarding data integration and the statements above to do not appear to be anything more than information regarding its data and processes and descriptions of its reliance on data

from physicians.[1]  Likewise, the CMS letter does not support any fraud in the statements and instead shows the physicians' frustration by the failure of private health insurers to provide timely and organized data.

    4.   <u>agilon's Growth</u>

Plaintiffs also challenge certain of agilon's statements about its growth.  Plaintiffs argue that some of agilon's statements were false or misleading when it told investors that the Company grew by adding new physicians to geographical areas and practice groups in which agilon-affiliated physicians were already operating which they referred to as "mature" markets.  (Dkt. # 36 at ¶¶ 100–02, 105, 110–11, 133, 144.)  For instance, agilon told investors:

> ***We have a very predictable and highly visible growth algorithm***.  We grow in new geographies and we grow in same geographies. . . .  Once we're in a geography, we're able to consistently deliver growth rates in the low to mid-teens.  That comes, both from an organic perspective of patients in the practice . . . and adding additional physicians.

…

> As discussed at our Investor Day, once the infrastructure for full risk is established in a community, other doctors can easily join our network and access a new and ***sustainable*** model for primary care.

---

[1] For this reason, the Court will dismiss without prejudice Plaintiffs' claims against Hittner, agilon's Chief Experience Officer, and Venkatachaliah, agilon's Chief Technology Officer, as Plaintiffs' claims against these Exchange Act Defendants rely only on their statements as to data capabilities and data integration.  (<u>Id.</u> at ¶¶ 123–25, 127, 139, 145.)

(Id. at ¶ 115, 147.)  Plaintiffs contend these statements were false and misleading because although agilon did add hundreds of new physicians in mature markets, they failed to disclose that it did so without providing the physicians with the basic onboarding and education necessary to integrate into the agilon partnership, which adversely impacted the Company's medical margins.   (Id. at ¶¶ 13, 78–79.) Plaintiffs argue these omitted facts were highly relevant to the market because agilon repeatedly emphasized mature markets as the driver of its revenue growth. (Id. at ¶ 76–77.)

The agilon Defendants move to dismiss on the basis that Plaintiffs rely on hindsight to support their claims and that they have "pluck[ed] information from agilon's 2024 disclosures and assume without support that the conditions agilon identified at that time had existed for three prior years—and that agilon knew about this and deliberately concealed it from investors." (Dkt. # 51 at 34.) The agilon Defendants argue that it told investors on January 5, 2024, that it "had failed to appreciate" issues arising from when new physicians are added to the market and admitted it needed to do a better onboarding job.  (Id.)  The agilon Defendants contend Plaintiffs cannot allege or show fraud in any of the statements about the Company's growth.  (Id.)

Although Plaintiffs have alleged that the problem with onboarding and education of new physicians may have existed for years, Plaintiffs have not

50

sufficiently pled fraud in regard to the statements above about agilon's growth. Plaintiffs admit that agilon did add new physicians to its market but have not sufficiently alleged any statements identified in the complaint were false or misleading when made to support a claim, especially where the statements do not suggest any particular onboarding or education strategy for its new physicians.

5.  agilon's Utilization Trends

Plaintiffs challenge agilon's statements about its utilization trends such as statements about what the Company's data showed regarding utilization and industry commentary.  (Dkt. # 36 at ¶¶ 114, 149, 161, 162, 167–68, 171, 172, 179, 180–81, 185, 186.)  Among others, Plaintiffs challenge the following statements:

149.    When asked by an analyst to discuss the cost trends agilon was seeing, Sell assured that "utilization was very much in line with what we would expect," while adding "the power of the primary care physician touch points were really strong in the quarter."

. . .

161.    During the call, Sell dismissed concerns that higher industry utilization rates were impacting agilon, asserting that agilon's model "insulated" agilon from "spikes" in utilization rates:

One theme I would like to drive home, given all of the speculation on utilization trends is that ***different models will yield different outcomes***. ***agilon's model is distinctively different and more durable and predictable in driving cost and quality results*** compared to the broad fee-for-service system, which predominates across health care today.

Let me highlight how we are producing such ***strong and predictable results*** and what drives our forward confidence in the business. First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care. We do not take risk on a broad set of patients in an unmanaged fee-for-service system. Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.

\*      \*      \*

***We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization***.

162.    Sell further sought to quell concerns about utilization rates by assuring investors that agilon was actually "tracking ahead" of its expected utilization rates, stating:

Second point on differentiation. For our members, our year-to-date ***composite utilization trend is in line or better than our expectations***. Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range. Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.

All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date.

(Id. at ¶¶ 149, 161, 162.) Additionally, Plaintiffs challenge the following

statement:

52

171.    On September 6, 2023, Bensley participated in a conference call as part of the Wells Fargo Healthcare Conference. During the call, an analyst observed that "utilization has been a huge area of focus" and asked Bensley "what you're seeing on the utilization front." Concealing the significant utilization spike in May-June 2023, Bensley responded that agilon's "power[ful]" model was "*driv[ing] utilization down*," noting:

> [O]bviously, there has been a lot of focus on utilization coming through the first half of the year. And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model. I know that sounds like it's simple, but *our model is essentially designed to have a more efficient and really more*
>
> *consistent impact on utilization than probably just any other model out there*, just certainly the normal fee-for-service environment.
>
> . . . But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients that then essentially over time does have that kind of leveling impact on utilization.
>
> It also helps us *drive utilization down* below what the overall, I think, fee-for-service environment would be. . . .
>
> What we have much better continuity of care. We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen. I think that has the impact of both *lowering utilization* as well as having *more consistent utilization* over time. It may even have a positive impact on *avoiding some of the pent-up demand issues that came out of post-COVID*.
>
> Having said that, you can see the results in our numbers. So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side. And by the way, of course, inpatient is by far the largest part of our cost basis. We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2.
>
> Now at the same time, of course, we have been seeing pretty large increases in outpatient. *That's a smaller portion of the overall cost pie. And so the inpatient decrease is more than offsetting that*.

(Id. at ¶ 171.)   Plaintiffs argue these statements are false and misleading because agilon knew the pent-up demand existed as of January 10, 2022, and the Company

also knew a significant backlog of this demand was due to COVID-19.  (Id. at ¶¶ 5, 203, 218, 219.)  Additionally, Plaintiffs plead allegations that agilon was actively monitoring its "backlog" of demand, which had caused a spike in patient utilization in May 2023 and that agilon was not "insulated" from any associated spikes in utilization.  (Id. at ¶ 72, 161, 218–19.)  Plaintiffs further allege that Sell and Bensley's statements in November 2023 acknowledge that they did in fact know of the May 2023 utilization spike which confused and frustrated investors.  (Id. at ¶¶ 72, 179, 180, 197.)

The agilon Defendants argue that Plaintiffs fail to plead facts that the pent-up demand existed at the time it made its January 2022 statements and that other statements were merely an expression of opinion which are inactionable pursuant to Supreme Court precedent.  (Dkt. # 51 at 35.)  Regarding the August 2023 statement in an earnings call, the agilon Defendants assert that Sell expressed his opinion on utilization trends, but Plaintiffs have failed to allege that Sell disbelieved his own opinion or omitted material facts when he made the statement.  (Id. at 36.)  The agilon Defendants contend that Plaintiffs have failed to plead that the Company concealed any bad news and that when the Company saw "peril," it told investors of these problems at least three times over a period of four months.  (Id.)

As discussed above, § 10(b) liability follows only from an "untrue statement" or "omi[ssion]" of "material fact," 15 U.S.C. § 78u-4(b)(1)(A–B). The agilon Defendants contend that statements of opinion are not actionable under federal securities laws simply because they allegedly "turned out to be wrong." See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015).  Still, "certain opinion statements can be actionable as well, since 'the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.'"  Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P., 777 F. App'x 726, 730 (5th Cir. 2019) (quoting Lormand, 565 F.3d at 248); see also Omnicare, 575 U.S. at 193 ("[T]he phrases 'we believe' or 'we think' . . . can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors").  The Supreme Court's Omnicare opinion "clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion."  Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp., 620 F. Supp. 3d 603, 621 (S.D. Tex. 2022).  Pursuant to Omnicare, opinion statements are actionable if the speaker did not sincerely hold that opinion, or if the plaintiffs allege that "(i) the speaker 'omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor

55

would take from the statement itself.'"  In re BP p.l.c. Sec. Litig., No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (quoting Omnicare, 575 U.S. at 189).

Upon review of the statements cited in the complaint, the Court finds that contrary to the agilon Defendants' contention, not all of the Company's statements are inactionable opinions.  Still, even if they and the remaining statements are in fact opinions on patient utilization, they are nonetheless actionable pursuant to the Supreme Court's guidance in Omnicare.  Under Omnicare, each of these alleged misstatements is actionable because Plaintiffs have sufficiently alleged that the agilon Defendants purportedly concealed material facts, including that the Company knew pent-up demand existed at least as early as January 2022 as a result of the COVID-19 pandemic, and that a spike in patient utilization had occurred in May 2023.  Given Plaintiffs' allegations that agilon had a large demand backlog and that utilization rates were spiking, the Court concludes that Plaintiffs have sufficiently alleged that the agilon Defendants omitted material factual information that would render their statements misleading to a reasonable investor under the Omnicare rubric.

56

### 6. agilon's Historical Financial Reporting

Plaintiffs finally contend that agilon's historical reporting for the second and third quarters of 2023 were inaccurate. For instance, Plaintiffs allege that in a June 7, 2023 conference call:

> 156. Near the end of the call, Sell reiterated agilon's "really strong start this year," adding "I don't know many businesses that show an 88% step-up in their main margin metric [medical margin]. We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent."

(Dkt. # 36 at ¶ 156.) And in an August 2, 2023 investor call:

> 160. That same day, Sell and Bensley convened an investor call to discuss agilon's 2Q23 results. During the call, Sell highlighted agilon's 69% year-over-year growth in medical margin, emphasizing that agilon's "profitability gains [were] even more outsized on an underlying basis" given "MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA."

(Id. at ¶ 160.) Additionally, Plaintiffs plead that agilon overstated its second and third-quarter medical margins by over $31 million. (Id. at ¶¶ 173(e), 188(e).) Plaintiffs argue that these statements were false and misleading because not only did they overstate the Company's performance, but they also concealed that agilon's reported results rested on grossly unreliable data. (Dkt. # 55 at 65.) Additionally, Plaintiffs allege that agilon's guidance statements masked the adverse impact unreliable payor data, soaring patient utilization rates and medical

expenses, as well as pent-up demand from COVID-19 were having on the Company.  (Dkt. # 36 at ¶¶ 13, 173(e), 188(e), 199.)

In moving to dismiss these statements, agilon Defendants assert that none of the statements were inaccurate and that the Company consistently advised its investors that it uses estimates and assumptions in reporting its financial results, and that estimates were based on "the best available information at the time . . . historical experience, known trends and events, and various other assumptions that we believe are reasonable under the circumstances."  (Dkt. # 51 at 37 (citing Dkt. # 52 at 800).)  The agilon Defendants argue that the Company was very clear regarding what happens if later events show that its estimates used to generate already-reported financial results prove to be inaccurate.  (Id.)  The agilon Defendants maintain that any variance for the second and third quarters of 2023 between estimates and actual results does not show that the statements cited in the complaint were false and that variance is "part of the Company's business and financial reporting, and investors understood this."  (Id. at 38.)

Upon review of the statements above and cited in Plaintiffs' complaint regarding agilon's historical financial reporting, the Court finds that Plaintiffs have plausibly alleged that these statements were false or misleading when made. Plaintiffs have alleged that these statements greatly overstate agilon's actual performance and conceal that the Company's reported results were supported by

known unreliable data.  Plaintiffs further alleged that agilon's reporting of materially inflated results prevented the market from understanding agilon's actual performance in 2Q23 and 3Q23, comparing its performance during those times with other reporting periods, and reliability assessing agilon's FY23 financial guidance statements in comparison with its true performance.  (Dkt. # 36 at ¶ 222.) The Court thus concludes the Court concludes that Plaintiffs have sufficiently alleged that the agilon Defendants made false or misleading statements regarding the Company's historical financial reporting to survive dismissal.

Thus, upon review of the six categories of allegations, the Court will dismiss the Exchange Act claims based on agilon's data integration and its growth strategy.  The Court will consider Plaintiffs' scienter allegations regarding the four remaining categories of statements.

B.    Scienter

The agilon Defendants next assert that Plaintiffs have not alleged specific facts that give rise to a strong inference of scienter.  (Dkt. # 51 at 38.)  The PSLRA specifically requires that a complaint in a securities case support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). "'Scienter' is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003).  For purposes of

59

10(b) liability, a defendant must have acted with, at minimum, severe recklessness. Warren v. Reserve Fund, Inc., 728 F.2d 741, 745 (5th Cir. 1984).

To evaluate scienter in a securities-fraud case, a court must (1) take the well-pleaded allegations as true; (2) evaluate the facts collectively, including facts contained in "documents incorporated in the complaint by reference and matters subject to judicial notice," "to determine whether a strong inference of scienter has been pled"; and (3) "take into account plausible inferences opposing as well as supporting a strong inference of scienter." Alaska Elec. Pension Fund v. Flotek Indus., Inc., 915 F.3d 982 (5th Cir. 2019). To withstand a motion to dismiss, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. (citing Tellabs, 551 U.S. at 314). Scienter must be alleged with respect to "the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." Alaska Elec. Pension Fund, 915 F.3d at 982 (quotation marks omitted).

The agilon Defendants assert that Plaintiffs have not alleged specific facts identifying a person inside or outside the Company who: (1) believed any

challenged statement was false or misleading, (2) raised concerns about any statement to agilon's executives, or (3) cast doubt in any way on the executives' own beliefs that they were speaking truthfully.  (Dkt. # 51 at 39.)  Additionally, the agilon Defendants contend that Plaintiffs' motive allegations are deficient, Plaintiffs' references to the May 2024 CMS letter do not support an inference of scienter, Plaintiffs' core operations allegations are deficient, and Plaintiffs' additional scienter allegations are too speculative or conclusory.  (Id. at 39–45.)

　　　　　1.　　　Motive Allegations

　　　　The agilon Defendants first argue that Plaintiffs' allegations of motive are deficient.  (Dkt. # 51 at 40.)  "An important aspect of pleading scienter is establishing motive."  Six Flags Ent. Corp., 58 F. 4th at 215.  "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 543 (5th Cir. 2008).

　　　　　First to the extent Plaintiffs allege that Defendants were motivated by stock sales by Sell in September 2021 (Dkt. # 36 at ¶ 213), the Court finds this is insufficient to support motive.  While an executive's stock sale "can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts," Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc., 497 F.3d

546, 552–53 (5th Cir. 2007), "[s]uspicious" in this context generally means that the "sales are out of line with prior trading practices or at times calculated to maximize personal profit." Abrams v. Baker Hughes Inc., 292 F.3d 424, 435 (5th Cir.2002). Such trading alone cannot create a strong inference of scienter, but it "may meaningfully enhance the strength of the inference of scienter." Southland, 365 F.3d at 368.  Here, Sell's sale of stock predates the challenged guidance by at least a year-and-a-half and prior to the May 2023 "spike."  Plaintiffs' allegations on this sale do not create a strong inference of scienter.

On the other hand, Plaintiffs have alleged that the timing of CD&R's sales of over 123 million shares of agilon stock during the Class Period was suspicious.  For instance, Plaintiffs have alleged that CD&R sold $518 million and $276 million in September 2021 and August 2022, respectively, and then $1.95 *billion* in the May 2023 Offering.  (Dkt. # 36 at ¶ 214 (emphasis added).)  Plaintiffs further allege that the May 2023 insider sales were particularly suspicious given its very large size and timing, and that the sale closed just months before the Company disclosed the May 2023 spike in utilization.  (Id. at ¶ 214–15.)  Given these allegations, the Court finds that Plaintiffs have sufficiently alleged that agilon had motive based on CD&R's insider sales, thus supporting a strong inference of scienter.

62

As for Plaintiffs' remaining allegations used to establish motive, the Court finds they are not sufficient.  First, to the extent Plaintiffs allege that agilon was motivated on the basis that the Company desired to maintain the stock price to facilitate growth by adding and retaining new physicians or groups (Dkt. # 36 at ¶¶ 234–37), this is too general of an allegation because, as agilon Defendants argue, any company and its executives would be likewise motivated.  (See Dkt. # 51 at 41–42.)  See In re Alamosa, 382 F. Supp. 2d at 858 ("desirability for growth is too universal a corporate goal to constitute a basis for scienter").

2.    CMS Letter

Plaintiffs also rely on the May 2024 CMS Letter to support scienter. (Dkt. # 36 at 84.)  Among others, Plaintiffs allege that agilon partners made several representations in the letter that directly contradict the Exchange Act Defendants' statements to investors during the Class Period.  (Id. at ¶ 243.)  Plaintiffs contend the letter demonstrates that the physician partners never had "the comprehensive data necessary to manage th[e] risk" of agilon's members, or "standardized, comprehensive" payor data.  (Id. at ¶ 244.)  Plaintiffs allege the letter demonstrates the representatives received altered and delayed non-standard data files and prevented them "from understanding real-time developments and accurately forecasting future developments" for their patients.  (Id.)  Plaintiffs maintain that

63

the truth was that agilon's partners lacked information which would allow them to "[e]nsure we know who the plan has attributed to us," among others.  (Id. at ¶ 245.)

The agilon Defendants argue that the May 2024 CMS Letter fails to show any intent to deliberately deceive the Company's investors, much less scienter.  (Dkt. # 51 at 42.)  The Court agrees.  First, the letter post-dates both the Class Period by several months and the challenged 2023 guidance by more than one year.  The letter does not detail the specifics of when the data issues began or when the physician partners first became aware of the issues.  Moreover, upon the Court's review, the letter does not indicate that agilon concealed—actively or otherwise—any issues with the data.  Instead, the Company had alerted its investors to those issues on several occasions as discussed above.  The Court thus finds that the May 2024 CMS Letter fails to establish scienter.

3.      Core Operations Allegations

Plaintiffs also allege scienter on the basis that agilon's "alleged misstatements and omissions addressed core issues of agilon's business—including agilon's two key profit metrics (medical margin and adjusted EBITDA), and members' medical costs and utilization rates."  (Dkt. # 36 at ¶ 221.)  Specifically, Plaintiffs allege:

64

222.    Defendants Sell and Bensley knew that medical margin and adjusted EBITDA, as well as members' medical costs and utilization rates, were central to agilon's core business.  They were also well aware that their public statements regarding those metrics were critically important to agilon's investors and analysts.  Throughout the Class Period, defendants agilon, Sell and Bensley repeatedly described medical margin as a "key metric for our business" and agilon's "main margin metric," and acknowledged that investors, analysts, and other stakeholders widely used medical margin to evaluate agilon's financial performance, identify trends in agilon's business, and compare agilon's results over multiple periods.

(Id. at ¶ 222.)  Plaintiffs contend that this raises a strong inference that the Exchange Act Defendants knowingly or recklessly withheld information that was material to investors.  (Id.)

Plaintiffs' allegations invoke the "core operations" or "special circumstances" doctrine.  The Fifth Circuit recognizes core operations as indicative of scienter in cases which exhibit some combination of the following four considerations that might tip the scales in favor of an inference of scienter: (1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality;" (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent.  Nathenson v. Zonagen Inc., 267 F.3d 400, 425 (5th Cir. 2001).

65

The "core operations" doctrine is an extremely narrow exception to the rule that "scienter may not rest on the inference that defendants must have been aware of" the alleged misconduct "based on their positions within the company." Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432 (5th Cir. 2002) (affirming trial court's dismissal of plaintiffs' securities fraud class action for failure to adequately plead scienter).  Under the narrow exception, if a business unit or product is effectively the only product of a small-scale company, and certain other "special circumstances" apply, knowledge of that business unit or product might be sufficient to support an inference that executives must have known certain facts. See Nathenson, 267 F.3d at 422, 424–25 (plaintiffs "barely" pleaded scienter where a single-product company with less than 40 employees devoted "substantially all" of its resources to its patented product and had "ample opportunity to become familiar with" a patent it falsely represented as covering the product).

Here, agilon is a large company with over 1,000 employees.[2]  (Dkt. # 52 at 928.)  This weighs against the first factor as it is likely Sell and Bensley would be less familiar with day-to-day transactions of front-line employees in such a large company.  See Neiman v. Bulmahn, 854 F.3d 741, 750 (5th Cir. 2017)

---

[2] Plaintiffs plead that agilon had only 550 employed at the beginning of the Class Period.  (Dkt. # 36 at ¶ 16.)  Even if true, this would not change the Court's analysis of this factor.

(holding 60 employees was too large to support a "special circumstance" for this factor) (citing Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 957 (5th Cir. 2016)).

The second factor considers whether the success of agilon's MA business model was "critical to the company's continued vitality." Diodes, 810 F.3d at 959. agilon Defendants argue that Plaintiffs' claim concerns routine parts of business and that most public companies issue financial forecasts. (Dkt. # 51 at 44.) The Court disagrees—the success of agilon's business model was indisputably critical to the Company's success and was "an important aspect of future growth prospects and EBITDA." Six Flags Enter. Corp., 58 F.4th at 219. Without a successful business model, the Company's existence would be "jeopardized." Diodes, 810 F.3d at 959.

Third, the Court finds that Plaintiffs have adequately pled that the misrepresented information was "readily apparent to the speaker." Id. For instance, Plaintiffs have alleged among others that Sell, as CEO, held himself out as an authority on the benefits agilon's "high-touch" model yielded and that he had extensive knowledge of agilon's data capabilities as well as knowledge of agilon's growth in mature markets. (Dkt. # 36 at ¶¶ 100, 105, 110, 113, 130.) Likewise, Plaintiffs have alleged that Bensley, as agilon's CFO, intimately knew the Company's medical margin and patients' medical costs. (Id. at ¶¶ 68, 172.)

67

Finally, Plaintiffs have sufficiently alleged among others that agilon issued internally inconsistent statements that: (1) falsely claimed agilon's model was insulated from utilization spikes and pent-up demand for care; and (2) misrepresented that they had access to all its patients' data from MA payors when it knew data was incomplete or inaccurate.  (Dkt. # 36 at ¶¶ 244–46.)

Upon the Court's careful consideration, the Court finds that the "core operations" allegations here are not adequate on their own, but contribute to the inference of scienter, because a court considers "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  See Tellabs, 551 U.S. at 323 (emphasis in original).  Specifically, Plaintiffs' allegations concerning motive and core operations are sufficient for the Court to find a strong inference of scienter.

Thus, accepting the factual allegations as true, and considering the inferences supporting as well as opposing scienter, the Court finds that Plaintiffs have adequately alleged scienter as to each Exchange Act Defendant.[3]  The Court concludes "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

---

[3] For this reason, the Court finds no need to separately consider Plaintiffs' other allegations supporting scienter but finds the allegations in total support a strong inference of scienter.

alleged." See id. at 324.  The Court however recognizes that additional evidence at later stages of the proceedings may confirm or undermine Plaintiffs' factual propositions and will consider the merits at a later stage of this case.

C.      Conclusion

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the agilon Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. # 51).  The motion is **GRANTED** as to Plaintiffs' claims under: (1) Section 11 of the Securities Act against agilon and the Securities Act Individual Defendants; (2) Section 15 of the Securities Act against the Securities Act Individual Defendants; (3) Section 10(b) of the Securities Exchange Act as to statements made relating to agilon's data integration and growth strategy; and (4) Section 10(b) of the Securities Exchange Act as to Defendants Hittner and Venkatachaliah, and these claims are all **DISMISSED WITHOUT PREJUDICE**.  The motion is **DENIED** as to all other matters.

II.     The Underwriter Defendants' Motion to Dismiss

The Underwriter Defendants move to dismiss the claims against them on the basis that: (1) Plaintiffs have failed to plead falsity in regard to agilon's three offerings; (2) the IPO claims are time-barred; and (3) lack of standing.  (Dkt. # 53.)  Because it is jurisdictional, the Court will first address standing before turning to the other arguments.

A.      Standing

The Underwriter Defendants argue that Plaintiffs' Section 12(a)(2) claim under the Securities Act fails because Plaintiffs have failed to plead that any Underwriter Defendant was a statutory seller.  (Dkt. # 53 at 19.)  Section 12(a)(2) imposes liability on anyone who "offers or sells a security. . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact."  15 U.S.C. § 77l.  Only persons who "directly purchase securities from the defendant in a public offering, rather than on the secondary market," have standing to assert a claim under § 12(a)(2).  See Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578 (1995).

Regarding the Underwriter Defendants, Plaintiffs' complaint alleges that: (1) they "sold agilon common stock to Plaintiffs and other members of the Class"; and (2) "Plaintiffs purchased agilon common stock pursuant to each of the Prospectuses from the Underwriter Defendants."  (Dkt. # 36 at ¶¶ 282, 283.)  Additionally, Plaintiffs allege the precise number of shares Plaintiffs purchased from the Underwriter Defendants, and the prices they paid for their shares which matched the prices at which the Underwriter Defendants sold agilon shares in the offerings.  (Id. at ¶ 47–49, 283.)

70

Given the above allegations, the Court finds that Plaintiffs have alleged that the Underwriter Defendants sold the stock at issue in the complaint in a public offering.  Although the Underwriter Defendants argue that Plaintiffs have failed to identify the specific Underwriter Defendant from whom each Lead Plaintiff purchased agilon stock, the Court finds this argument without merit. Courts in this circuit have rejected similar arguments.  See, e.g., In re Kosmos Energy Ltd. Sec. Litig., 955 F. Supp. 2d 658, 673–74 (N.D. Tex. 2013) (citing In re Westinghouse Secs. Litig., 90 F.3d 696, 718 (3d Cir. 1996) (finding the Supreme Court's decision in Pinter v. Dahl, 486 U.S. 622, 623 (1988) did not hold that plaintiffs are required to allege which underwriter sold securities to each plaintiff)). As a result, the Court finds that Plaintiffs have standing and dismissal of Plaintiffs' § 12(a)(2) claim against the Underwriter Defendants on this basis is not appropriate.

B.    Falsity

The Underwriter Defendants argue that Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act fail because Plaintiffs have failed to plead any false or misleading statement in the offering documents.  (Dkt. # 53 at 9.)  The Underwriter Defendants contend that claims under the Securities Act are narrowly based on the challenged offering documents and Plaintiffs must plead a

71

statement that was false or misleading at the time of the offering and in the full

context of what was disclosed to investors and they have failed to do so.  (Id.)

"Section 11 of the Securities Act prohibits materially misleading

statements or omissions in registration statements filed with the SEC."  In re

Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citing 15

U.S.C. § 77k(a)).  The statute provides a cause of action against the issuer of

security and its underwriters.  Id.

To state a claim under Section 11, the plaintiff must allege that:

(1) she purchased a registered security, either directly from the issuer or in the

aftermarket following the offering; (2) the defendant participated in the offering in

a manner sufficient to give rise to liability under section 11; and (3) the registration

statement "contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements

therein not misleading."  Id. at 358–59 (quoting 15 U.S.C. § 77k(a)).

Under § 12 of the Securities Act, any person who sells a security on

the basis of a prospectus that included a material misstatement or omission shall be

liable "to the person purchasing such security from him."  15 U.S.C. § 77l(a);

Rosenzweig, 332 F.3d at 870–71 (5th Cir. 2003) (quoting statute).  As explained

by Rosenzweig, the Supreme Court interpreted this language to mean that a § 12(a)

seller "includes either the person who actually passes the title to the buyer, or 'the

72

person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' e.g., a broker." 332 F.3d at 871 (quoting Pinter, 486 U.S. at 647).

A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. Basic Inc. v. Levinson, 485 U.S. 224, 234 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. Id. Thus, this Court must determine whether "the information allegedly omitted or misrepresented in the [registration statement or prospectus] was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the [registration statement] as a whole." Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1445 (5th Cir. 1993). Scienter, or actual knowledge of the falsity, is not an element of the Section 11 claim. Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

In moving to dismiss these claims against them, the Underwriter Defendants rely on the same arguments as the agilon Defendants and the CD&R Defendants. For the same reasons discussed by the Court above and below in

73

considering those arguments, the Court here will dismiss Plaintiffs' § 11 and § 12(a)(2) claims against the Underwriter Defendants.[4]

C.    Conclusion

For the reasons stated above, the Court **GRANTS** the Underwriter Defendants' Motion to Dismiss Consolidated Complaint (Dkt. # 53), and Plaintiffs' claims against the Underwriter Defendants pursuant to Sections 11 and 12(a)(2) are **DISMISSED WITHOUT PREJUDICE**.

III.    CD&R Defendants' Motion to Dismiss

CD&R Defendants move to dismiss Plaintiffs' claims against them on the basis that: (1) Plaintiffs fail to state a Section 11 claim against the CD&R Individual Defendants because they fail to identify any statements in agilon's registration statements that were false and misleading when made; (2) Plaintiffs fail to state a claim under Section 15 because they have not adequately pled a claim under Section 11; (3) Plaintiffs Section 20(a) claims fail because Plaintiffs have failed to plead an underlying violation of Section 10(b) by agilon or its executives; and (4) Plaintiffs fail to state a claim for insider trading under Section 20A against

---

[4] Plaintiffs' section 12(a)(2) claim against the Underwriter Defendants relies on the same allegations as Plaintiffs' claim pursuant to section 11.  (See Dkt. # 36 at ¶ 280.)  Additionally, because the Court has already dismissed the Sections 11 and 12(a)(2) claims against the Underwriter Defendants as stated above, the Court finds no need to consider their argument for dismissal based on the statute of repose.  (See Dkt. # 53 at 14.)

three of the CD&R Defendants because none of those entities is alleged to have ever held or traded any shares of agilon stock.  (Dkt. # 54.)

A.    Vector

As an initial matter, the CD&R Defendants assert that Plaintiffs have incorrectly lumped them altogether, but they are in fact four separate and distinct legal entities.  (Dkt. # 54 at 10.)  According to CD&R Defendants, Vector is the only entity to ever hold agilon stock or be a party to a stockholder agreement (the "Stockholders Agreement").  (Id.)  The CD&R Defendants contend that Vector's ownership of agilon stock declined significantly over the course of the Class Period.  (Id. at 11.)  They argue that at agilon's IPO, Vector owned 58% of the stock but gradually reduced its holdings to an eventual 24.7% ownership in May 2023.  (Id.)  The CD&R Defendants maintain that all its stock sales took place at least six months prior to the price decline in November 2023.  (Id. at 12.)

The CD&R Defendants further contend that in connection with the IPO, agilon and Vector entered into a Stockholders Agreement under which Vector had the right to designate individuals for agilon's Board and could request information about the Company's financial performance.  (Dkt. # 54 at 12.) According to CD&R Defendants however, Vector designees never comprised a majority of the Board, and was never in possession of any material, non-public

75

information about agilon and that it would have to make a "written request" before the Company provided information to it.  (Id.)

B.      Section 11 Claims

The CD&R Defendants first contend that Plaintiffs fail to state a claim under Section 11 against the CD&R Individual Defendants because they have not adequately pled that agilon's registration statements contained any false or misleading statements.  (Dkt. # 54 at 16.)  The CD&R Defendants rely on and incorporate the agilon Defendants arguments addressed above in moving to dismiss these claims, but emphasize three points: (1) the alleged misrepresentations in the registration statements are broad, optimistic statements that amount to nothing more than puffery; (2) Plaintiffs' complaints amount to nothing more than complaints about alleged mismanagement, but not violation of the securities laws; and (3) agilon's registration statements repeatedly warned that it could not accurately predict any increase in medical utilization costs especially in light of the COVID-19 pandemic.

To state a claim under Section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a

76

material fact required to be stated therein or necessary to make the statements therein not misleading." Id. at 358–59 (quoting 15 U.S.C. § 77k(a)).

The Court has carefully considered the arguments above in the agilon Defendants' motion to dismiss Plaintiffs' Section 11 claims, and for the same reasons discussed above, the Court here will also dismiss Plaintiffs' Section 11 claims against the CD&R Individual Defendants.

C.     Section 15 Claim

Plaintiffs also allege a claim for "controlling person" liability under Section 15 of the Securities Act against the CD&R Defendants. (Dkt. # 36 at 98.) This Section provides that any person who "controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 77o. Because Plaintiffs have failed to adequately plead the violations alleged under the Securities Act, the Court will also dismiss the Section 15 claim against the CD&R Defendants for failure to adequately allege a primary violation. See Rosenzweig, 332 F.3d at 863.

D.     Section 20(a) Claim

CD&R Defendants next argue that Plaintiffs' claim under Section 20(a) of the Exchange Act fails because Plaintiffs have not pled a primary violation of the Exchange Act, or that any of the CD&R entities were controlling persons for

purposes of the Section 10(b) claim.  (Dkt. # 54 at 19.)  Regarding Vector, the

CD&R Defendants contend that the Section 20(a) claim fails because at the time of

the key events alleged in the complaint, Vector owned only 25% and its designees

filled only two of nine seats on the Board.  (Id.)  Additionally, they assert that

Vector did not have any control over agilon's officers at any point and could not

therefore dictate what those individuals said on earnings calls or other

presentations to investors.  (Id.)

> Section 20(a) provides:
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  A control-person claim requires sufficient factual allegations

that a "controlled" individual or entity violated the securities laws and that the

defendant had the power to "control" that individual or entity.  "Control person"

liability under § 20(a) is derivative, predicated on the existence of an independent

violation of the securities laws.  See Emp. Retirement Sys. v. Whole Foods Mkt.,

Inc., 905 F.3d 92, 905 (5th Cir. 2018).

78

Control person liability does not require participation in the fraudulent transaction. G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 958 (5th Cir.1981). But a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." Meek v. Howard, Weil, Laboisse, Friedrichs, Inc., 95 F.3d 45, at *3 (5th Cir.1996) (unpublished decision) (citing Abbott v. Equity Group, Inc., 2 F.3d 613, 619–20 (5th Cir.1993)).  Whether a person is a controlling person is normally a question of fact that cannot be determined at the pleading stage. Beach v. Healthways, Inc., No. 3:08-0569, 2009 WL 650408, at * 6 (M.D. Tenn. Mar. 9, 2009).

As the Court has already considered above, Plaintiffs' complaint adequately alleges claims pursuant to Section 10(b) of the Securities Exchange Act as to statements made relating to: (1) agilon's medical margin guidance and the bases of its financial projections; (2) agilon's business model; (3) healthcare utilization trends; and (4) agilon's reported financial results.

Regarding Vector, CD&R Defendants argue that Plaintiffs have failed to plead control based on Vector's stock ownership or that Vector controlled statements by its Officers.  (Dkt. # 54 at 20, 22.)  They assert that Vector did not control agilon during the period relevant to the Section 10(b) claim because its designated directors did not constitute a majority of the Board and Vector's stock ownership fell below 50% in August 2022 at which point agilon stated that it was

79

no longer a controlled company under NYSE rules.  (Id.)  Thereafter, CD&R

Defendants maintain their stock ownership fell below 25% in May 2023, and three

of its designated directors resigned from the Board.  (Id.)  Additionally, CD&R

Defendants argue that the crux of Plaintiffs' Section 10(b) claim relates to

statements made from August 2023 through early 2024, and it is clear that Vector

had a limited role in agilon during this period.  (Id. at 21.)

> Plaintiffs' complaint alleges that:

> 301.    The CD&R Defendants had the power and authority to control, and did control, agilon during the Class Period, including through: (i) its substantial ownership stake in agilon common stock; (ii) its ability to appoint various CD&R insiders to the Board (including the Chairman); (iii) its significant influence over agilon's management; (iv) its historical relationship with agilon, which CD&R founded in 2016; and (v) through the various preferential agreements that CD&R Defendants had caused agilon to enter into around the April 2021 Offering.  CD&R also controlled Williams, Richards, Sachdev, Schnall, and Strum, the CD&R insiders whom CD&R had nominated to agilon's Board.

(Dkt. # 36 at ¶ 301.)  Additionally, Plaintiffs allege:

80

302.    The CD&R Defendants leveraged their controlling share ownership to appoint CD&R insiders to agilon's Board.  In connection with the April 2021 Offering, agilon entered into a Stockholder Agreement with CD&R Vector, which entitled CD&R Vector to designate for nomination: (i) a majority of agilon's directors while it beneficially owned at least 50% of agilon's outstanding shares; and (ii) fewer than a majority of agilon's directors so long as it beneficially owned at least 5% of agilon's outstanding shares.  Additionally, the Stockholder Agreement provided that a CD&R designee would serve as the Chairman of the Board so long as CD&R Vector beneficially owned at least 25% of agilon's common stock.

(Id. at ¶ 302.)

Despite Plaintiffs' pleadings, in reviewing their Section 10(b) claims above, the Court agrees with the CD&R Defendants that the majority of the alleged false and misleading statements occurred after May 2023, when Vector owned less than 25% stock ownership in agilon and its designees filled only two of nine seats on agilon's Board.  "In determining whether a plaintiff has made a prima facie showing of 'control,' it is well-established that a plaintiff must plead facts indicating that the defendant 'had the requisite power to directly or indirectly control or influence corporate policy.'"  Kunzweiler v. Zero.Net, Inc., 2002 WL 1461732, at *13 (N.D. Tex. July 3, 2002) (Solis, J.) (quoting G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 958 (5th Cir. Feb. 1981)).  This includes facts that demonstrate that "the defendant had an ability to control the specific transaction or activity upon which the primary violation is based."  Meek v. Howard, Weil,

Laboisse, Friedrichs, Inc., 95 F.3d 45, 1996 WL 405436, at *3 (5th Cir. June 25, 1996) (per curiam) (unpublished table decision) (citing Abbott v. Equity Group, Inc., 2 F.3d 613, 620 (5th Cir. 1993)).  Plaintiffs have failed to allege specific facts demonstrating control by Vector at the time the false or misleading statements were made "[b]eginning in late 2023," when Plaintiffs allege that agilon identified and reported a surge in medical services which was expected to impact the Company's performance.  (Dkt. # 36 at ¶¶ 86–91.)  See Heck v. Triche, 75 f3d 265, 283 (5th Cir. 2014).  Instead, the allegations do not show that at the time those statements were made, Vector had the power to control the statements alleged to be misleading nor the specific statements that give rise to the agilon Defendants' alleged § 10(b) liability.

On the other hand, the Court finds that Plaintiffs have sufficiently alleged that any false or misleading statements made prior to the time CD&R reduced its ownership to less than 25%, the CD&R Defendants and/or Vector, had control given their percentage of ownership and influence on the Board.  Given this, the Court first concludes that Plaintiffs have failed to sufficiently allege a basis to impose control-person liability on Vector or any other CD&R Defendant for any statements made after May 2023, but has sufficiently alleged control-person liability for any false or misleading statements made in or prior to that time. Accordingly, the Section 20(a) claim against the CD&R Defendants will be

82

dismissed without prejudice for the false and misleading statements made after May 2023, but will not be dismissed for the false and misleading statements made in or before that time.

     E.     <u>Section 20A Claim</u>

The CD&R Defendants also move to dismiss the "insider trading" claim pursuant to Section 20A. (Dkt. # 54 at 24.) They assert that Plaintiffs have failed to allege that CD&R Defendants committed an independent, predicate violation of the Exchange Act by selling agilon stock while in possession of material, nonpublic information. (<u>Id.</u> at 24–25.)

Section 20A of the Exchange Act imposes liability for "insider trading," providing specifically that:

> Any person who violates any provision of this chapter or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t–1(a). Plaintiffs allege that CD&R and Sell engaged in insider trading by violating Section 10(b) and Rule 10b–5 when they sold shares of agilon stock while in possession of material, non-public information. (Dkt. # 36 at 104.) Plaintiffs allege also that the sale of agilon's stock shares was made contemporaneously with certain of Plaintiffs' purchases of the stock. (<u>Id.</u> at 105.)

Plaintiffs base their Section 20A claim on an alleged violation of Section 10(b) of the Exchange Act. Scienter is an element of a Section 10(b) claim. The PSLRA requires a plaintiff to allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." See 15 U.S.C. § 78u–4(b)(2). To satisfy the pleading standard for the required "strong inference" of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." Owens v. Jastrow, 789 F.3d 529, 536 (5th Cir. 2015) (quoting Tellabs, 551 U.S. at 324). "[A] tie favors the plaintiff." Id. (quoting Lormand, 565 F.3d at 254). "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." Id. (quoting Tellabs, 551 U.S. at 326).

A plaintiff makes a prima facie case that a defendant is liable for insider trading under Section 20A by showing that the defendant was 'aware of the material nonpublic information' when he made the purchase or sale of the securities." In re Enron Corp. Sec., Derivative & ERISA Litig., 258 F. Supp. 2d 576, 592 (S.D. Tex. 2003) (quoting 17 C.F.R. § 240.10b5–1(b)). Actual knowledge that public statements are false, based on actual knowledge of material, non-public information, will establish scienter for purposes of an insider trading claim. See S.E.C. v. Pardue, 2005 WL 736884, *6 (E.D. Pa. Apr. 1, 2005); see

84

also In re Am. Italian Pasta Co. Sec. Litig., 2006 WL 1715168, *3 (W.D. Mo. June 19, 2006); S.E.C. v. Bunrock, 2004 WL 1179423, *13 (N.D. Ill. May 25, 2004).

Plaintiffs allege the following in their complaint:

324.    During the Class Period, Sell and CD&R Defendants were in possession of material, non-public information concerning agilon. As alleged herein, Sell was the CEO, President, and a director of agilon throughout the Class Period, signed agilon's annual Reports on Forms 10-K and Registration Statements, executed SOX certifications, and displayed his extensive knowledge of agilon's operations and financial performance while interfacing with analysts during agilon's quarterly earnings calls and investor conferences.

(Dkt. # 36 at ¶ 324.)  Additionally, they allege:

325.    Like Sell, CD&R Defendants had unlimited access to agilon's material, non-public information throughout the Class Period. As agilon's founder and controlling shareholder, CD&R filled several Board seats (including the Chairman's and Vice Chairman's) with CD&R insiders.

326.    As set forth in ¶¶301-305, the Stockholder Agreement also supplied CD&R with virtually unlimited and timely access to material, non-public information about agilon. The Stockholder Agreement included deadlines by which non-public information about agilon was required to be provided to CD&R Defendants, ensuring that CD&R Defendants maintained access to non-public information about agilon before it was widely published (if at all).

(Id. at ¶¶ 325–26.)  Furthermore, Plaintiffs allege that CD&R Defendants and Sell made the following sales of agilon common stock contemporaneously with the following purchases by Plaintiff:

| CD&R Defendants' Sales | | | | Plaintiffs' Purchases | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Price | Shares | Proceeds | Plaintiff | Date | Price | Shares | Cost |
| 9/14/2021 | $28.98 | 17,904,257 | $518,865,368 | Indiana | 9/17/2021 | $29.01 | 2,560 | $74,266 |
| | | | | NCRS | 9/17/2021 | $29.01 | 6,400 | $185,664 |
| 8/11/2022 | $24.35 | 11,337,500 | $276,068,125 | NCRS | 8/16/2022 | $22.45 | 50 | $1,123 |
| 5/18/2023 | $20.80 | 94,173,804 | $1,958,815,123 | NCRS | 5/18/2023 | $22.39 | 31,210 | $698,792 |
| | | | | NASCGAF | 5/19/2023 | $21.86 | 1,843 | $40,288 |
| | | | | NASCPF | 5/19/2023 | $21.86 | 1,774 | $38,780 |
| | | | | NASCGAF | 5/25/2023 | $19.99 | 977 | $19,530 |
| | | | | NASCGAF | 5/25/2023 | $20.07 | 1,946 | $39,056 |
| | | | | NASCPF | 5/25/2023 | $19.99 | 940 | $18,791 |
| | | | | NASCPF | 5/25/2023 | $19.99 | 1,875 | $37,481 |
| | | | | NASCGAF | 5/26/2023 | $20.25 | 1,006 | $20,372 |

| CD&R Defendants' Sales | Plaintiffs' Purchases | | | | |
|---|---|---|---|---|---|
| | NASCPF | 5/26/2023 | $20.25 | 968 | $19,602 |

| Sell's Sales | | | | Plaintiffs' Purchases | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Price | Shares | Proceeds | Plaintiff | Date | Price | Shares | Cost |
| 9/14/2021 | $28.98 | 100,000 | $2,898,000 | Indiana | 9/17/2021 | $29.01 | 2,560 | $74,266 |
| | | | | NCRS | 9/17/2021 | $29.01 | 6,400 | $185,664 |

(Id. at ¶¶ 328–29.)

Given the above allegations, the Court disagrees with the CD&R

Defendants that Plaintiff has failed to allege Vector or any of the CD&R entities

was in possession of material, non-public information when it sold agilon stock.

(See Dkt. # 54 at 27.)  Although the Court has determined that Plaintiffs have

failed to sufficiently plead control person liability, the Court does however find

that Plaintiffs have sufficiently alleged that the Stockholders Agreement supplied

CD&R with access to agilon's non-public books and records, financial statements,

business plans, budgets, projections, and other material information.  (Dkt. # 36 at ¶6, 305.)  Furthermore, the timing and size of the sale of CD&R's stock on May 18, 2023, of close to $2 *billion* in stock in combination with Plaintiffs' allegations that agilon was concealing a utilization spike—supports that CD&R Defendants acted with the requisite scienter when they sold agilon stock while in possession of material, undisclosed information regarding an increase in medical utilization rates, among others.  Given this finding, the Court finds that Plaintiffs have adequately pleaded the elements necessary to state a claim that CD&R committed a predicate violation of the Exchange Act to support their Section 20A insider trading claim. Therefore, the Court declines to dismiss this claim.

F.    Conclusion

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** the CD&R Defendants motion to dismiss.  The motion is **GRANTED** as to Plaintiffs' claims under: (1) Section 11 of the Securities Act against the CD&R Individual Defendants; (2) Section 15 of the Securities Act against the CD&R Defendants; and (3) Section 20(a) of the Exchange Act for any false or misleading statements made after May 2023, and these claims are all **DISMISSED WITHOUT PREJUDICE**.  The motion is **DENIED** as to Plaintiffs' claims against: (1) the CD&R Defendants for violations of Section 20(a) of the Exchange

Act for any false or misleading statements made in or prior to May 2023, and (2) CD&R and Sell for violations of Section 20A of the Exchange Act.

CONCLUSION

For the reasons stated above, the Court:

(1) **GRANTS IN PART** and **DENIES IN PART** the agilon Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. # 51). The motion is **GRANTED** as to Plaintiffs' claims under: (1) Section 11 of the Securities Act against agilon and the Securities Act Individual Defendants; (2) Section 15 of the Securities Act against the Securities Act Individual Defendants; (3) Section 10(b) of the Securities Exchange Act as to statements made relating to agilon's data integration and growth strategy; and (4) Section 10(b) of the Securities Exchange Act as to Defendants Hittner and Venkatachaliah, and these claims are all **DISMISSED WITHOUT PREJUDICE**.  The motion is **DENIED** as to all other matters.

(2) **GRANTS** the Underwriter Defendants' Motion to Dismiss Consolidated Complaint (Dkt. # 53), and Plaintiffs' claims against the Underwriter Defendants pursuant to Sections 11 and 12(a)(2) are **DISMISSED WITHOUT PREJUDICE**.

(3) **GRANTS IN PART** and **DENIES IN PART** the CD&R Defendants motion to dismiss.  The motion is **GRANTED** as to Plaintiffs' claims under: (1) Section 11 of the Securities Act against the CD&R Individual Defendants;

88

(2) Section 15 of the Securities Act against the CD&R Defendants; and (3) Section 20(a) of the Exchange Act for any false or misleading statements made after May 2023, and these claims are all **DISMISSED WITHOUT PREJUDICE**.  The motion is **DENIED** as to Plaintiffs' claims against: (1) the CD&R Defendants for violations of Section 20(a) of the Exchange Act for any false or misleading statements made in or prior to May 2023, and (2) CD&R and Sell for violations of Section 20A of the Exchange Act.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, August 15, 2025.

_____
David Alan Ezra
Senior United States District Judge

89