UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § § § § § § § | Master File No. 1:24-cv-00297-DAE <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br>     ALL ACTIONS. | | |

**JOINT MOTION FOR ENTRY OF A CONFIDENTIALITY
AND PROTECTIVE ORDER**

4936-5657-1782.v1

Lead Plaintiffs Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans, Indiana Public Retirement System, and the North Atlantic States Carpenters Pension Fund and Guaranteed Annuity Fund ("Plaintiffs") and Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, Heidi Hittner, Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., and CD&R Associates IX, L.P. ("Defendants") (collectively, the "Parties") respectfully submit this joint motion for entry of a Confidentiality and Protective Order.

The Parties have conferred in good faith and reached agreement on all terms of a [Proposed] Confidentiality and Protective Order except for one discrete issue concerning the use of generative artificial intelligence to process information designated as Protected Information. The Parties' proposed competing language for Section 4 of the attached Exhibit A is set forth below, followed by the Parties' respective position statements.

**Plaintiffs' Proposed Language**: "Protected Information shall not be processed using generative artificial intelligence available to the public where the protected information is used to train the generative artificial intelligence model or is retained beyond the conclusion of the litigation."

**Defendants' Proposed Language**: "Protected Information shall not be processed using generative artificial intelligence except as specifically agreed to by the producing party."

## I.    PLAINTIFFS' STATEMENT

Defendants' proposed language preventing Plaintiffs from utilizing any generative AI tools in the prosecution of this litigation unless Defendants preapprove them is unnecessary and unreasonable. The generative AI tools now in wide use across the legal industry are designed

- 1 -

4936-5657-1782.v1

specifically for litigation purposes to function within the same confidentiality framework that has long governed electronic discovery providers and review platforms: ***they do not place discovery materials into the hands of unbound third parties***.  In short, these AI tools safeguard confidential information.  Defendants' proposal intrudes into Plaintiffs' counsel's internal litigation strategy and choice of tools – matters traditionally left to counsel's professional judgment and ethical obligations. The possible precedential effect of Defendants' language – requiring one party to seek leave of another before utilizing these litigation support services – could result in severe prejudice and confusion across the legal profession.

### A.    Generative AI is Commonly Used In the Legal Industry

The use of generative AI tools to assist attorneys with reviewing, organizing, and analyzing documents and data has become common place in the legal industry.  *See* Ex. B at 2; Ex. C at 790 (generative AI has been adopted to "improve efficiencies in the discovery process").  Virtually all modern electronic discovery platforms now offer advanced analytics and, increasingly, generative AI-enabled features.  *See* Ex. B at 2; Ex. D at 8 ("In the ediscovery world, I see a lot of value coming down the pike with ediscovery vendors now embedding AI tools.").

Electronic discovery platforms and tools routinely used in litigation and which utilize generative AI include Relativity aiR, Harvey, Syllo, Fileread, Everlaw, and CoCounsel.  For example, Relativity aiR uses generative AI to help attorneys identify key documents.  *See* Ex. E. Harvey utilizes Generative AI to allow practitioners to "[a]nalyze large document sets to identify key evidence and generate insights in a structured tabular format."  *See* Ex. F at 9.  Everlaw's AI Assistant can summarize topics in a received production, provide suggestions on issue coding, and even help propose deposition questions.  *See* Ex. G.  Moreover, attorneys specializing in electronic discovery and information governance, who traditionally represent producing parties, have affirmatively stated that "lawyers are duty bound to look for ways to leverage Generative AI and

- 2 -

other new technologies to either make discovery cheaper or to enhance counsel's ability to understand the facts and evidence of their cases." *See* Ex. H at 1.

Reflecting this reality, courts have specifically allowed receiving parties to use generative AI tools for their internal review and analysis of discovery materials without obtaining the other parties' preapproval of those AI tools so long as industry standard precautions are taken. *In re Facebook, Inc. Sec. Litig.*, No. 5:18-cv-01725-EJD, ECF 211 at 10-11 (N.D. Cal. Mar. 21, 2025) (Ex. I at 10-11); *State of Ark. ex rel. Griffin v. Gen. Motors LLC,* No. 54CV-25-77, Stipulated Protective Order at 22 (Ark. Cir. Ct. Phillips Cnty., Second Div. June 2, 2025) (Ex. J at 22) (expressly permitting use of "closed, enterprise Generative AI tool[s]"); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 1:17-cv-01545-LAK, ECF 256 at 12 (S.D.N.Y. Oct. 20, 2025) (Ex. K at 12) (court-entered ESI order permitting use of generative AI tools).[1]  In fact, courts have resolved disputes over language in a discovery protocol regarding the use of generative AI so that it does not conflict with the use of electronic discovery AI platforms. *EEOC v. Mile Hi Foods, Co.*, No. 1:24-cv-02703-DDD, ECF 99 at 2, 13 (D. Col. July 23, 2025).

## B.  Plaintiffs' Proposed Language Adequately Protects Confidential Information

Critically, as generative AI tools are designed specifically for use by law firms and for litigation purposes, safeguarding confidential information is paramount.  Generative AI tools routinely used by electronic discovery providers are designed to function within the same confidentiality framework that has long governed electronic discovery providers and review platforms: they do not place discovery materials into the hands of unbound third parties, nor do they

---

[1]  *See also* Ex. H at 2-3 (recommending provisions that prohibit "the use of ***public*** Generative AI tools to analyze any confidential information," that require the receiving party "to take reasonable steps to ensure that any non-public Generative AI tool used will not disclose information to any other user unrelated to the specific matter," and that the "Receiving Party shall make reasonably sure that it can delete all produced information from the tool at the close of the Matter").

- 3 -

use that data to train or populate publicly accessible models, and are able to ensure deletion of that data when the litigation ends. Generative AI features within electronic discovery platforms are generally subject to the same privacy, security, and confidentiality terms as any data hosted within those platforms.[2]

Robbins Geller, the Court-appointed Lead Counsel, a leading complex class action law firm and one of the largest plaintiffs' firms in the world, has extensive experience in handling large document productions and is under strict legal and ethical obligations to comply with all protective orders. As Lead Counsel represented in the meet and confer process, all generative AI tools used by Lead Counsel safeguard confidential information produced in discovery, and are vetted and approved by Lead Counsel's litigation support and information security teams before any and all use to insure, *inter alia*:

- The vetted AI tools maintain industry-recognized security audits and certifications and comply with HIPAA requirements.

- The data sent to the AI tools is not used to train or fine-tune the underlying models.

- The AI products employ closed models, and that access is limited to only authorized individuals.

- All data is capable of being fully deleted upon case close. *See*, Exs. N and O.

Plaintiffs do not dispute that there may be legitimate concerns with submitting confidential data to some generative AI, especially free, public, open generative AI (*e.g.*, ChatGPT.com, Google's Gemini). Accordingly, Plaintiffs' proposed language affirmatively safeguards confidentiality by prohibiting the use of confidential information by public generative AI tools, and

---

[2]    *See e.g.*, Ex. L at 3 (indicating that the case materials submitted to Everlaw AI Assistant are subject to any applicable privacy law, confidentiality requirements as stated in the customer agreement with Everlaw); Ex. E at 4 (security is built into Relativity aiR with security controls and compliance standards, which include "ISO 27001, SOC 2 Type II, and FedRAMP certifications"); Ex. M at 3 (security is also embedded into Harvey with its compliance with industry standards, including SOC 2 Type II, CCPA, ISO 27001, GDPR, and DPF).

where it is used to train generative AI models and where Plaintiffs are unable to ensure that discovery data can be deleted upon conclusion of the matter. In addition, Plaintiffs invited Defendants to specify any other concerns or request other reasonable precautions. They were unable to do so. Plaintiffs' proposed language adequately addresses the key considerations for specifically assessing whether generative AI tools pose a risk to confidentiality.

### C.    Defendants' Language is Unnecessary and Prejudicial to Plaintiffs

Defendants fail to carry their burden of showing that their proposed language is necessary and supported by good cause. *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 698 (5th Cir. 2017) (the party seeking protection must show that the protective order it seeks is necessary by "'a particular and specific demonstration of fact'").

During the meet and confer process, Defendants failed to explain why the assurances described above were insufficient, articulate any specific unaddressed concern, or disclose any specific safeguards Defendants would require in order to authorize Plaintiffs' use of generative AI. *See* Ex. P. Defendants' position rests on an incorrect premise – that any use of generative AI necessarily places protected information into the hands of unbound third parties. That premise is false. As explained above, the generative AI tools Plaintiffs would utilize are purpose-built for litigation, would be vetted by Lead Counsel's litigation support and information security teams, and are subject to strict security and confidentiality requirements. Treating such litigation-specific tools as presumptively inappropriate for handling confidential information would call into question decades of accepted practice involving vendor-hosted review platforms, analytics engines, and technology-assisted review systems.

Defendants' proposed language should be rejected for several reasons. ***First,*** Defendants' proposed language would unduly prejudice Plaintiffs by restricting their access to reputable tools that are designed specifically for efficient processing and analyzing of discovery, while retaining

4936-5657-1782.v1

Defendants' own unilateral discretion over their own internal tools – a one-sided restriction with no reciprocal obligation. **Second**, Defendants' proposed language is vague, arbitrary, and prone to abuse. Defendants have refused to disclose the requirements Plaintiffs' tools would need to meet in order to win Defendants' approval. This would allow Defendants to withhold approval of a litigation tool for any reason, or no reason at all. This case may go on for years, during which time Lead Counsel may choose to change litigation tools or vendors, for which Plaintiffs would need Defendants' approval. Defendants should not be allowed to choose or to limit Plaintiffs' litigation tools used to analyze document productions so long as Plaintiffs exert all reasonable efforts to ensure that confidential data is not provided to unauthorized users. **Third**, the precedential effect of Defendants' proposed language is potentially vast. Permitting every party veto power of its opponents' litigation support tools would be entirely unmanageable, potentially highly prejudicial, and result in yet another litigation issue to burden the Court.

Plaintiffs respectfully request that the Court enter their proposed language, which aligns with prevailing practice, protects confidentiality, and avoids unnecessary interference with Lead Counsel's ability to litigate this matter efficiently.

## II.    DEFENDANTS' STATEMENT

Defendants object to the use of undisclosed and unvetted Generative Artificial Intelligence ("AI") tools to process their confidential information in light of the risk that the information will be used and/or disclosed in a manner that violates other terms of the proposed protective order, including those prohibiting the disclosure of confidential information to third parties and requiring heightened protections for documents designated "Highly Confidential." Generative AI tools are being developed at such a fast pace that the true risks associated with their use are unknown. They also vary materially depending on the tool, hosting model, and configuration, and they cannot be evaluated absent disclosure of the specific tool(s) and their data-handling terms. Defendants should

- 6 -

4936-5657-1782.v1

not be forced to put their most sensitive documents and information at risk merely because they have been named as parties to this lawsuit or for the convenience of Plaintiffs.  Parties have successfully engaged in discovery for decades without the use of AI.  Accordingly, Defendants propose that the protective order include the following sentence:  "Protected information shall not be processed using generative artificial intelligence except as specifically agreed to by the producing party." Defendants' proposed language is narrow and reciprocal: it applies equally to all Parties and restricts only the processing of information designated as protected information.  It does not restrict any Party's use of generative AI on public information or on that Party's own non-protected materials, and it leaves open the possibility that the parties will reach agreement on the use of particular generative AI platforms.

The potential risks presented by generative AI are not hypothetical.  The ABA has cautioned that lawyers should extensively diligence generative AI tools before inputting client information: "Because of the uncertainty surrounding GAI [generative AI] tools' ability to protect such information and the uncertainty about what happens to information both at input and output, it will be difficult to evaluate the risk that information relating to the representation will either be disclosed to or accessed by others inside the firm to whom it should not be disclosed as well as to others outside the firm." *See* ABA Formal Op. 512 (July 29, 2024).  Even the sources cited by Plaintiffs acknowledge these risks.  *See*, *e.g.*, Judge Xavier Rodriguez, Artificial Intelligence (Ai) and the Practice of Law, 24 Sedona Conf. J. 783, 783-84 (2023) (noting that AI presents "unique challenges" and "will require attorneys to evaluate whether to use such products, and the risks associated with any use"); David Kessler and Andrea D'Ambra, *Enhancing Protective Orders To Address Generative AI*, ALM Law.com Legaltech news (April 1, 2024) (noting that "Generative AI is still new and clients and lawyers are still learning how it works and what these tools do with the data

these tools ingest and process," and that "[i]n most cases, a lawyer has no idea how sophisticated their opponent or their opponent's lawyer is regarding the use of Generative AI").

Here, Plaintiffs repeatedly refused to disclose even the names of the generative AI tools they seek to use to process Defendants' documents, citing "work product" as the basis for their refusal.[3] This only heightens Defendants' concerns and robs Defendants of the ability to diligence the way in which the tools may use, retain and disclose data, and the extent to which any promises about data privacy and security can be trusted. Despite numerous requests for the names of the specific AI tools at issue, Plaintiffs have offered only high-level representations concerning the way in which "[v]irtually all modern electronic discovery platforms" utilizing generative AI supposedly function. Such representations are inadequate and provide Defendants little comfort, as Defendants have no ability to independently test the veracity of those representations or assess the trustworthiness of the source. Unlike electronic discovery platforms, which have been used for decades, the novelty of Generative AI technology and the myriad ways in which it may use or disclose information is difficult to discern such that Defendants should not be required to rely entirely on Plaintiffs' counsel's say so.

The language proposed by Defendants contemplates that the parties would meet and confer regarding any proposed AI tool, and each producing party can determine whether the risks are acceptable to it. This is precisely why protective orders exist – to ensure that a producing party's documents are not exposed beyond what is actually necessary to litigate the case. That the parties in a few cases cited by Plaintiffs appear to have agreed on the use of AI does not mean that Defendants should be required to do so here. Different parties have different risk tolerances with respect to the

---

[3]    Identifying the third-party system that will receive and process an adversary's protected information is a threshold confidentiality and compliance issue—not a disclosure of litigation strategy—and it is information necessary for a producing party to evaluate whether its protected information will be disclosed, retained, or repurposed.

documents they produce in a specific litigation. Furthermore, although a client might, in some circumstances, trust its own outside counsel to responsibly use known AI tools for its own information, it is another thing entirely to require a party to place the same trust in an adversary in a lawsuit, with no oversight as to how AI is being used (or even which AI platform is being used). The AI provision at issue impacts only the parties in this litigation; Plaintiffs' assertion that Defendants' proposed language "could result in severe prejudice and confusion across the legal profession" is nonsensical.

Plaintiffs' proposed language is also vague, underinclusive, and would be practically impossible to administer. It turns permissibility on facts (*e.g.*, whether a model is "trained," what is "retained," and whether a tool is "available to the public") that depend on vendor-specific terms, changing product settings, and opaque technical practices—yet Plaintiffs refuse to identify the tool(s) they intend to use.

In addition to the risk of disclosure to third parties, the use of AI tools risk undermining the heightened protections required for documents designated "Highly Confidential." Pursuant to Section 2(a), the disclosure of "Highly Confidential Information" is limited to the parties' outside counsel and certain other individuals, and it cannot be shared with other parties. The use of AI tools could risk the intermingling of information derived from "Highly Confidential" documents with other information, such that "Highly Confidential" information is improperly disclosed to parties beyond those listed in Section 2(a). For example, a document designated by a Defendant as "Highly Confidential" cannot be disclosed to the Plaintiff or to other Defendants; the use of an AI tool to review documents and draft a court filing or a deposition outline would risk improper disclosure of "Highly Confidential" information to those other parties. Because GenAI workflows often generate summaries, extracted facts, or other derivative work product from protected information, the risk is

- 9 -

4936-5657-1782.v1

not limited to the initial upload: later outputs can inadvertently incorporate Highly Confidential

content and then be stored, circulated, or reused in ways that are difficult to audit or unwind.

For these reasons, the Court should adopt Defendants' proposed language, which allows the

parties to otherwise move forward with discovery while meeting and conferring about the potential

use of generative AI.

DATED:  January 6, 2026                    Respectfully submitted,

                                           ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           LUCAS F. OLTS
                                           (admitted *pro hac vice*)
                                           CHRISTOPHER D. STEWART
                                           (admitted *pro hac vice*)
                                           EVELYN SANCHEZ GONZALEZ
                                           (admitted *pro hac vice*)


                                                   s/ Lucas F. Olts
                                           LUCAS F. OLTS

                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)
                                           lolts@rgrdlaw.com
                                           cstewart@rgrdlaw.com
                                           egonzalez@rgrdlaw.com

                                           Lead Counsel for Lead Plaintiffs


                                           KENDALL LAW GROUP, PLLC
                                           JOE KENDALL (Texas Bar No. 11260700)
                                           3811 Turtle Creek Blvd., Suite 825
                                           Dallas, TX  75219
                                           Telephone:  214/744-3000
                                           214/744-3015 (fax)
                                           jkendall@kendalllawgroup.com

                                           Local Counsel

- 10 -

4936-5657-1782.v1

DATED:  January 6, 2026

SIDLEY AUSTIN LLP
YOLANDA C. GARCIA
MASON PARHAM
BARRET V. ARMBRUSTER


s/ Mason Parham

MASON PARHAM

2021 McKinney Avenue, Suite 2000
Dallas, TX  75201
Telephone:  214/981-3300
214/981-3400 (fax)
ygarcia@sidley.com
mparham@sidley.com
barmbruster@sidley.com

Attorneys for Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Girish Venkatachaliah, Heidi Hittner

DATED:  January 6, 2026

DEBEVOISE & PLIMPTON LLP
MAEVE L. O'CONNOR (admitted *pro hac vice)*
ELLIOT GREENFIELD (admitted *pro hac vice)*
BRANDON FETZER (admitted *pro had vice*)


s/ Maeve L. O'Connor

MAEVE L. O'CONNOR

66 Hudson Boulevard
New York, NY  10001
Telephone:  212/909-6000
mloconnor@debevoise.com
egreenfield@debevoise.com
bfetzer@debevoise.com

SCOTT DOUGLASS & MCCONNICO LLP
SANTOSH ARAVIND
303 Colorado Street, Suite 2400
Austin, TX  78701
Telephone:  512/495-6300

Attorneys for Defendants Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., CD&R Associates IX, L.P.

- 11 -

4936-5657-1782.v1

# EXHIBIT A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § § § § § § § | Master File No. 1:24-cv-00297-DAE<br><br>CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS. | | |

[PROPOSED] CONFIDENTIALITY AND PROTECTIVE ORDER

4935-6285-1206.v1

Before the Court is the Joint Motion of the Parties for the Entry of a Confidentiality and Protective Order ("Protective Order").[1] Disclosure and discovery activity in this action may involve production of confidential, sensitive, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation would be warranted. Accordingly, a protective order for such information is justified in this matter.

This Protective Order does not confer blanket protections on all disclosures of responses to discovery, and the protection it affords extends only to the information or items that are entitled under the applicable legal principles to be treated as confidential. By seeking entry of this Protective Order, neither party concedes that any document produced in this litigation qualifies as Protected Information, as defined herein.

After careful consideration, it is ORDERED that the motion is granted, and the Court ORDERS the following:

## 1.    Protected Information

"Protected Information" means any information of any type, kind, or character that is designated as "Confidential Information" or "Highly Confidential Information" whether it be a document, information contained in a document, information revealed during discovery, or otherwise as provided for in this Protective Order. All documents or discovery responses designated by the producing party as "Confidential" or "Highly Confidential," and which are disclosed or

---

[1]    The "Parties" refers to Plaintiffs Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans, Indiana Public Retirement System, and the North Atlantic States Carpenters Pension Fund and Guaranteed Annuity Fund (together, "Plaintiffs") and Defendants agilon health, inc., Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah, and Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., and CD&R Associates IX, L.P. (together, "Defendants").

- 1 -

produced to the attorneys for the other parties to this litigation are Protected Information and are entitled to confidential treatment as described below.

The protections conferred by this Protective Order cover not only "Protected Information" (as defined above), but also: (1) any information copied or extracted from Protected Information; (2) all copies, excerpts, summaries, or compilations of Protected Information; and (3) any testimony, conversations, or presentations by Parties or their counsel that reveal Protected Information.

2.    **Qualified Persons**

**"Qualified Persons" means:**

a.    For Highly Confidential Information:

i.    retained counsel for the Parties in this litigation and their respective staff;

ii.   actual or potential independent experts or consultants (and their administrative or clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, or members of parties);[2]

iii.  this court and its staff and any other tribunal, special master, or dispute resolution officer duly appointed or assigned in connection with this litigation;

iv.   litigation vendors, court reporters, video camera operators, translators, and other litigation support personnel; and

v.    any mediator, arbitrator, or other similar party engaged by the Parties in connection with the litigation and any persons employed by such mediator or arbitrator;

---

[2] Designation of an expert or consultant under this provision is not a waiver of such person's status as a consulting only expert or of any otherwise exiting protection against discovery of such person's work or opinions.

4935-6285-1206.v1

b.  For Confidential Information:

    i.  the persons identified in subparagraph 2(a);

    ii.  a party, if a natural person;

    iii.  if the party is an entity, such officers or employees of the party who are necessary to assist in the litigation;

    iv.  jury and trial consultants and their staff and mock jurors;

    v.  any person who was an author, addressee, or intended or authorized recipient of the Protected Information, or a custodian or other person who otherwise possessed, reviewed or knew the information;

    vi.  during their depositions, witnesses in the action to whom disclosure is reasonably necessary; such witnesses shall not retain a copy of documents containing Protected Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with the review of the transcripts;

    vi.  insurance carriers providing coverage in this matter.

c.  Such other persons as this Court may designate after notice and an opportunity to be heard.

d.  *Acknowledgements*.  For purposes of subparagraphs 2(a)(ii) and 2(b)(iv), Protected Information may be provided to such persons only after he or she has signed an Acknowledgement in the form attached hereto as Exhibit A.  If Highly Confidential Information is provided to such persons under the terms of this paragraph, counsel providing such information will take reasonable steps to ensure that the person receiving it retains it only for as long as necessary for the purpose for which it was provided.

4935-6285-1206.v1

3.    **Designation Criteria**

a.    ***Non-Protected Information***.  Protected Information shall not include information that either:

i.      is in the public domain at the time of disclosure, as evidenced by a written document;

ii.     becomes part of the public domain through no fault of the recipient, as evidenced by a written document;

iii.    the receiving party can show by written document was in its rightful and lawful possession at the time of disclosure; or

iv.     lawfully comes into the recipient's possession subsequent to the time of disclosure from another source without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

b.    ***Protected Information***. A party shall designate as Protected Information only such information that the party in good faith believes in fact is confidential.  Information that is generally available to the public, such as public filings, catalogues, advertising materials, and the like, shall not be designated as Protected Information.  Information and documents that may be designated as Protected Information include, but are not limited to, trade secrets, confidential or proprietary financial information, operational data, business plans, and competitive analyses, personnel files, personal information that is protected by law, and other sensitive information that, if not restricted as set forth in this order, may subject the producing or disclosing person to competitive or financial injury or potential legal liability to third parties.  Correspondence and other communications between the Parties or with nonparties may be designated as Protected Information if the communication was made with the understanding or

- 4 -

4935-6285-1206.v1

reasonable expectation that the information would not become generally available to the public.

c.   ***Highly Confidential***. The designation "***Highly Confidential***" shall be reserved for information that the party believes, after reviewing the information, is highly sensitive information, the disclosure of which would create a substantial risk of competitive or business injury.  For purposes of this order, so-designated information may include, but is not limited to, product formula information, design information, nonpublic financial information, pricing information, customer identification data, and certain study methodologies.

d.   ***Protected Health Information***. Protected Information designated as "Confidential" or "Highly Confidential" may contain Protected Health Information ("PHI") as defined by 45 C.F.R. § 160.103. In accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), codified at 42 U.S.C. §§ 1320d *et seq.*, and implemented at 45 C.F.R. §§ 160, 164, this Protective Order specifically prevents any receiving party from using or disclosing PHI for any purpose other than prosecuting, defending or settling the claims in this litigation. *See* 45 C.F.R. § 164.512(e)(1)(v)(A). The Parties further agree that PHI that is unrelated to the claims in this litigation may be redacted.

**4.   Use of and Access to Protected Information**

All Protected Information provided by any Party or nonparty in the course of this litigation shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose, and shall not be disclosed except in accordance with the terms of this Order.

4935-6285-1206.v1

Protected Information must be stored and maintained by a receiving Party at a location and in a secure manner that reasonably ensures that access is limited to the persons authorized under this Order.

**Plaintiffs' Proposed Language**:

Protected Information shall not be processed using generative artificial intelligence available to the public where the protected information is used to train the generative artificial intelligence model or is retained beyond the conclusion of the litigation.

**Defendants' Proposed Language**:

Protected Information shall not be processed using generative artificial intelligence except as specifically agreed to by the producing party.

5.      **Marking of Documents**

Documents provided in this litigation may be designated by the producing person or by any party as Protected Information by marking each page of the documents so designated with a stamp indicating that the information is "Confidential" or "Highly Confidential – Attorney Eyes Only." The designation should be made in a fashion or form that is conspicuous yet allows the Protected Information to remain legible.  In lieu of marking the original of a document, if the original is not provided, the designating party may mark the copies that are provided.  Originals shall be preserved for inspection.  For documents produced in native format, the marking shall be affixed to the placeholder bates numbered TIFF image that accompanies the native file.

6.      **Disclosure at Depositions**

Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents, consultants, representatives, or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a nonparty may be designated by any party

- 6 -

or non-party as Protected Information by indicating on the record at the deposition that the testimony is "Confidential" or "Highly Confidential."

Any party also may designate information disclosed at a deposition as Protected Information by notifying all Parties in writing no later than 30 days following receipt of the final transcript of the specific pages and lines of the transcript that should be treated as Protected Information thereafter. Any deposition transcript that is prepared prior to the expiration of the 30-day period for designation shall be treated as Highly Confidential Information in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated as actually designated.

Counsel for a Party or a nonparty witness shall have the right to exclude from depositions any person who is not authorized to receive Protected Information pursuant to this Protective Order, but such right of exclusion shall be applicable only during periods of examination or testimony during which Protected Information is being used or discussed.

**7.    Disclosure to Qualified Persons**

    a.   Protected Information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except as necessary to comply with applicable law or the valid order of a court of competent jurisdiction. Protected Information designated as "Highly Confidential" shall not be disclosed or made available by the receiving Party to persons other than Qualified Persons within the scope of Paragraph (2)(a)(i) through (v) except as necessary to comply with applicable law or the valid order of a court of competent jurisdiction. But if a disclosure is compelled by law, subpoena or court order, the receiving party will notify the producing party as promptly as practicable (if at all possible, before making such disclosure). The receiving party shall seek a protective order or confidential treatment of such information or cooperate with the producing party

4935-6285-1206.v1

to protect the information. Information designated as Highly Confidential shall be restricted in circulation to Qualified Persons described in subparagraph 2(a).

b. *Retention of Copies During This Litigation*. Copies of Highly Confidential Information shall be maintained only in the offices of outside counsel for the receiving party and, to the extent supplied to experts described in subparagraph 2(a)(ii), in the offices of those experts. Any documents produced in this litigation, regardless of classification, that are provided to Qualified Persons shall be maintained only at the office of such Qualified Person and only necessary working copies of any such documents shall be made. Copies of documents and exhibits containing Protected Information may be prepared by independent copy services, printers, or illustrators for the purpose of this litigation.

**8.     Unintentional Disclosures**

Documents unintentionally produced without designation as Protected Information shall not constitute a waiver of the right to designate such document or information as Protected Information. If so designated, the document or information shall be treated as Protected Information from the date written notice of the designation is provided to the receiving party.

If a receiving party learns of any unauthorized disclosure of Protected Information, the party shall (i) immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure, (ii) make reasonable efforts to prevent disclosure by each unauthorized person who received such information, and (iii) take appropriate measures to rectify the breach, including through the retrieval and destruction of any improperly disclosed information.

**9.     Documents Produced for Inspection Prior to Designation**

In the event documents are produced for inspection prior to designation, the documents shall be treated as Highly Confidential during inspection.  At the time of copying for the receiving parties,

- 8 -

4935-6285-1206.v1

Protected Information shall be marked prominently "Confidential" or "Highly Confidential" by the producing party.

**10.      Consent to Disclosure**

Nothing in this order shall prevent disclosure beyond the terms of this order if each party designating the information as Protected Information consents to such disclosure or if the Court, after notice to all affected parties and nonparties, orders such disclosure.  Nor shall anything in this order prevent any counsel of record from utilizing Protected Information in the examination or cross-examination of any person who is indicated on the document as being an author, source, or recipient of the Protected Information, irrespective of which party produced such information.

**11.      Challenging the Designation**

A party shall not be obligated to challenge the propriety of a designation of Protected Information at the time such designation is made, and a failure to do so shall not preclude a subsequent challenge to the designation.  In the event that any party to this litigation disagrees at any stage of these proceedings with the designation of any information as Protected Information, the Parties shall first try to resolve the dispute in good faith on an informal basis, such as by production of redacted copies.  If the dispute cannot be resolved informally within fourteen (14) business days, the objecting party may invoke this Protective Order by objecting in writing to the party who designated the document or information as Protected Information. The designating party shall then have 14 days to move the court for an order preserving the designated status of the disputed information.  The disputed information shall remain Protected Information unless the Court orders otherwise.  Failure to move for an order shall constitute a termination of the status of such item as Protected Information.

4935-6285-1206.v1

**12.    Manner of Use in Proceedings**

In the event a party wishes to use any Protected Information in affidavits, declarations, briefs, memoranda of law, or other papers filed in this litigation, the party shall do one of the following: (1) with the consent of the producing party, file only a redacted copy of the information; (2) where appropriate (*e.g.*, in connection with discovery and evidentiary motions) provide the information solely for *in camera* review; or (3) file such information under seal with the Court consistent with the sealing requirements of the Court.

Nothing in this Order shall limit the Parties' rights or ability to offer evidence or other information (including Protected Information) at a hearing or trial.  The manner of using any Protected Information at a hearing or trial and the status of Protected Information resulting from any such use will be determined by the Court.

**13.    Filing Under Seal**

A party that seeks to file under seal any Protected Information shall comply with Local Civil Rule CV-5.2 for the Western District of Texas.  In instances where materials submitted to the Court by one party were designated as Protected Information by another party, the filing party shall comply with Local Civil Rule CV-5.2 for the Western District of Texas, but indicate in its motion for permission to file under seal that the confidentiality designation was made by another party or non-party.  The burden of demonstrating that any materials designated as Protected Information submitted to the Court are entitled to be filed under seal shall remain with the designating party.

**14.    Return of Documents**

Not later than 120 days of the conclusion of this litigation and any appeal related to it, any Protected Information, all reproductions of such information, and any notes, summaries, or descriptions of such information, shall be returned to the producing Party or destroyed, except as this court may otherwise order or to the extent such information has been used as evidence at any trial or

hearing.  To the extent that Protected Information contains PHI, counsel for the receiving party shall ensure that such materials are destroyed using a methodology specified by the U.S. Secretary of Health and Human Services pursuant to Section 13402(h)(2) of Public Law 111-5 that renders the PHI unusable, unreadable, or indecipherable.  Notwithstanding this obligation to return or destroy information, counsel may retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Information.  Any such archival copies that contain Protected Information remain subject to this Protective Order.

## 15.    Ongoing Obligations

Insofar as the provisions of this Protective Order, or any other protective orders entered in this litigation, restrict the communication and use of the information protected by it, such provisions shall continue to be binding after the conclusion of this litigation, except that (a) there shall be no restriction on documents that are used as exhibits in open court unless such exhibits were filed under seal, and (b) a party may seek the written permission of the producing party or order of the Court with respect to dissolution or modification of this, or any other, protective order.

## 16.    Duty to Ensure Compliance

Any party designating any person as a Qualified Person shall have the duty to reasonably ensure that such person observes the terms of this Protective Order and shall be responsible upon breach of such duty for the failure of such person to observe the terms of this Protective Order, unless the designating party can show that it took reasonable steps to ensure that such person observed the terms of the Protective Order.

17.    **Waiver**

Pursuant to Federal Rule of Evidence 502, the production of privileged or work-product Protected Information, whether inadvertent or otherwise, shall not constitute a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

18.    **Modifications and Exceptions**

The Parties may, by stipulation, provide for exceptions to this order and any party may seek an order of this Court modifying this Protective Order. For avoidance of doubt, the terms of this Protective Order shall not apply to and shall not otherwise limit a producing party's use or disclosure of its own Protected Information for any purpose.

19.    **Immediate and Containing Effect**

This Protective Order shall become effective among the Parties immediately upon its agreement, even if not yet entered by the Court.

20.    **No Prejudice**

Producing or receiving Protected Information, or otherwise complying with the terms of this Protective Order, will not: (a) operate as an admission by any party that any particular Protected Information contains or reflects trade secrets or any other type of confidential or proprietary information; (b) prejudice the rights of a party to object to the production of information or material that the party does not consider to be admissible or within the scope of discovery; (c) prejudice the rights of a party to seek a determination by the presiding judge that particular materials be produced; (d) prejudice the rights of a party to apply to the presiding judge for further protective orders; or (e) prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for in this Protective Order with respect to any particular information or material.

4935-6285-1206.v1

- 13 -

**21.    Nonparty Protected Information**

The terms of this Protective Order are applicable to information produced by a nonparty in this action and designated as Protected Information. Such information produced by nonparties in connection with this litigation is protected by the remedies and relief provided by this order. Nothing in this Protective Order prohibits a nonparty from seeking additional protections for its Protected Information. Any party issuing a subpoena to a nonparty will enclose a copy of this Protective Order. Any party also may designate information produced by a nonparty as Protected Information by notifying all parties in writing no later than 30 days following receipt of the nonparty production of the specific documents that should be treated as Protected Information thereafter. Nonparty documents produced prior to the expiration of the 30-day period for designation shall be treated as Highly Confidential Information unless otherwise agreed.  After the expiration of that period, the documents shall be treated as actually designated.

IT IS SO ORDERED.

DATED:  _____

_____
THE HONORABLE DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE

4935-6285-1206.v1

**EXHIBIT A**

**CONFIDENTIALITY AGREEMENT**

I, _____, do hereby acknowledge and agree, under penalty of perjury, as follows:

I have read the Confidentiality and Protective Order ("the Protective Order") entered in *In re AGILON HEALTH, INC. SECURITIES LITIGATION*, No. 1:24-cv-00297-DAE prior to receiving any Protected Information as defined therein.

I understand the terms and effect of the Protective Order and agree to be bound by its terms. I further agree to submit to the jurisdiction of the United States District Court for the Western District of Texas for purposes of enforcing compliance with this Order.

I have been informed by counsel that certain documents or information to be disclosed to me in connection with this litigation have been designated as Confidential or Highly Confidential. I have been informed that any such documents or information labeled "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY" are confidential by the terms and effect of the Protective Order. I hereby agree that I will not disclose any information contained in such documents to any other person, and I agree to be bound by the Protective Order's terms. I further agree not to use any such information for any purpose other than this litigation.

DATED: _____

_____
[INSERT]

# EXHIBIT B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § § | Master File No. 1:24-cv-00297-DAE |
| | § | CLASS ACTION |
| This Document Relates To: | § § § | |
| ALL ACTIONS. | § § § | |

DECLARATION OF JEFF JOHNSON

4921-4006-4390.v1

I, Jeff Johnson, declare as follows:

## I.    RELEVANT PROFESSIONAL EXPERIENCE

I am the Chief Innovation Officer for Purpose Legal ("Purpose").  As Chief Innovation Officer, I am responsible for Artificial Intelligence (AI) product selection, vetting, testing, and deployment. Additionally, I lead Purpose's eDiscovery AI and Analytics delivery team. I have been in the litigation technology field since 2001 and have extensive experience in all phases of e-discovery.  I have consulted on and/or managed the e-discovery process on hundreds of matters. For more than fifteen years, my focus has been document-intensive matters and the application of technology to effectively and appropriately reduce the effort and budget associated with attorney document review.  I have designed and developed proprietary Technology/AI Assisted Review (TAR) solutions and have personally executed (or led the execution of) many AI assisted review projects, utilizing broadly available Machine Learning and Generative AI (GenAI) technologies. Further, I have developed the protocols and validation procedures to facilitate and demonstrate the effective use of these technologies.  Moreover, I have assisted clients in negotiating these protocols with opposing parties and government agencies (such as the Department of Justice and the Federal Trade Commission).  I have also presented multiple Continuing Legal Education (CLE) seminars, panel discussions, and guest lectures discussing the use of AI in litigation and investigations.

## II.    PURPOSE LEGAL

Purpose is an e-discovery vendor that provides end-to-end legal services and technology solutions to assist the processing, review, and production of electronically stored information ("ESI").  Purpose's services include, among other things, the application of GenAI in data collection/production analysis and document review workflows.

- 1 -

4921-4006-4390.v1

Purpose's experience in managing AI utilization, including the solutions we select and deploy, on our clients' behalf, helps ensure that AI is working effectively and maintaining appropriate control of sensitive and confidential data.

## III. GENERAL AVAILABILITY AND WIDESPREAD USE OF GENERATIVE AI IN EDISCOVERY

GenAI tools are now widely available and increasingly utilized within the legal industry, particularly in the field of eDiscovery.

Most reputable eDiscovery review platform providers (including Relativity, Everlaw, DISCO, and Reveal) have had GenAI solutions, widely available, specifically for use in eDiscovery document review, since at least 2024.

Responsible legal professionals, including Purpose clients, are adopting these technologies to automate and enhance various tasks, including document review, data analysis, and case strategy development.

This adoption is driven by significant efficiency gains, cost reduction, and improved accuracy in handling large volumes of electronically stored information (ESI).

In 2024 and 2025, we have seen a substantial increase in the use of GenAI by both law firms and corporate legal departments, in legal services generally, and eDiscovery specifically.

## IV. SPECIALIZED GENAI TOOLS FOR EDISCOVERY

GenAI tools designed specifically for eDiscovery differ fundamentally from free, publicly available utilities like ChatGPT.

Providers of these dedicated systems design them with the specific requirements of the legal profession in mind, offering greater control, transparency, and reliability.

A key distinction lies in data handling and security. Free and open-source models may present risks of data leakage, as user inputs can be incorporated into the model's training data, potentially exposing confidential information to unauthorized users.

- 2 -

4921-4006-4390.v1

In contrast, proprietary legal AI platforms are typically hosted in secure, private cloud environments and are contractually obligated to maintain the confidentiality of user data.

## V. PROTECTION AGAINST DISCLOSURE OF CONFIDENTIAL INFORMATION:

Unlike open models where data may be used for retraining, these specialized/closed platforms must ensure that client data remains isolated, is NOT mingled with other client data, is NOT accessible by unauthorized individuals, and is NOT used to train, fine-tune, or otherwise modify any underlying AI models.

Access to these systems can be restricted to authorized individuals, and data is processed solely to generate outputs for those users. Various GenAI tools available for eDiscovery work differently, but these are the key elements in ensuring that discovery material is not accessible by unauthorized persons.

## VI. VETTING OF GENAI TOOLS

Purpose, in conjunction with the technology teams at our law firm and corporate clients, including Robbins Geller Rudman and Dowd LLP (RGRD), vets any eDiscovery AI solutions, prior to their deployment on any matter, analysis, or review.

In selecting GenAI tools for eDiscovery, Purpose verifies that the solutions' providers (both technically and contractually) appropriately align with the following key considerations. They are key in any determination that a GenAI solution adequately protects sensitive and confidential information within potentially discoverable material we analyze with it:

1.     Maintain industry-recognized security audits and certifications, including ISO 270001 and SOC 2 Type II. These audits, successfully completed, demonstrate and provide independent verification of a commitment to comprehensive information security.

2.     Design their solutions to protect confidential data.

- 3 -

- 4 -

3.    Do NOT use client data to train, fine-tune or otherwise modify the underlying models or affect model weights (employ closed models).

4.    Use client input solely to generate output for authorized users.

5.    Limit access to authorized individuals only.

6.    Do not maintain client data outside of the secured review environment or mingle it with data from other parties.

7.    Fully delete all case data, upon case closure.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 6, 2026

Signed by:

*Jeff Johnson*

58447EA7F418468...

_____

JEFF JOHNSON

- 4 -

# EXHIBIT C

## The Sedona Conference Journal

| Volume 24 | Forthcoming 2023 |

# Artificial Intelligence (AI) and the Practice of Law

Hon. Xavier Rodriguez



September 2023

Recommended Citation:

Hon. Xavier Rodriguez, *Artificial Intelligence (AI) and the Practice of Law*, 24 SEDONA CONF. J. 783 (forthcoming 2023), https://thesedonaconference.org/sites/default/files/announcements/Artificial-Intelligence-and-the-Practice-of-Law-Xavier-Rodriguez.pdf.

Copyright 2023, The Sedona Conference

For this and additional publications see: https://thesedonaconference.org/publications.

# ARTIFICIAL INTELLIGENCE (AI) AND THE PRACTICE OF LAW

*Judge Xavier Rodriguez\**

From quill pens to mobile devices, how to practice law is constantly evolving. "To maintain the requisite knowledge and skill, a lawyer should keep abreast of changes in the law and its practice, including the benefits and risks associated with relevant technology . . . ."[1] The growth of artificial intelligence ("AI") applications is just the latest incarnation of these developments. As lawyers have been required to adapt to these developments, the adaptable lawyer will need to determine when and if to incorporate AI into his or her practice. Such incorporation could help reduce the costs of legal services while increasing quality, expand the availability of legal services, and allow lawyers to get more done in less time. By automating repetitive and mundane processes, those lawyers particularly skilled in using AI to their advantage will be able to spend more time on case analysis and crafting legal arguments. AI is poised to reshape the legal profession. But AI will require courts, rules committees, and ethics bodies to consider some of the unique

---

\* Xavier Rodriguez is a U.S. District Judge in the Western District of Texas. Special thanks are extended to Prof. Josh Blackman, South Texas College of Law; Tara Emory of Redgrave Data; Prof. Maura Grossman of the Univ. of Waterloo; Chris Davis of Gray Reed & McGraw LLP; Prof. Marissa J. Moran of CUNY-New York City College of Technology; Ron Hedges (U.S.M.J. ret.); Jeremy Pickens of Redgrave Data; and Jackie Schafer for their review and comments of earlier drafts of this article or providing resource materials to consider. Thanks are extended to Emily Formica, a student at the St. Mary's Univ. School of Law, for her research assistance, comments, and edits to this article.

1. MODEL RULE PROF'L CONDUCT r. 1.01 cmt. 8 (AM. BAR ASS'N).

challenges that AI presents. It will require attorneys to evaluate whether to use such products, and the risks associated with any use. Attorneys using AI tools without checking on the accuracy of their output are responsible for the consequences of incorporating inaccurate information into their work product.[2] This article seeks to provide attorneys with a baseline understanding of AI technology and recommends areas where state bars, courts, rules committees, and attorneys may wish to undertake further study and potential rule changes.

Although AI tools are rapidly developing, no doubt there will be future governmental scrutiny and consumer input into this technology. In July 2023, the Federal Trade Commission began to investigate OpenAI, creator of ChatGPT,[3] to determine whether the tool has harmed consumers through its collection of data and how personal data is used.[4] The Securities and Exchange Commission has likewise begun to propose new regulatory requirements to address risks associated with the use of

---

2. *See, e.g.*, Michael Loy, *Legal Liability for Artificially Intelligent Robot Lawyers*, 26 LEWIS & CLARK L. REV. 951, 957–58 (2022) (discussing how attorneys have a duty to accept ultimate responsibility for the use of robot lawyers as software tools).

3. This article makes several references to ChatGPT because it was one of the first developers to garner significant publicity. But there are several other text generators in this space (*e.g.*, Claude 2, Google Bard AI, Bing AI Chat, Perplexity AI, and others), as well as many other AI tools now on the market. In addition to these commercial products, some law firms (*e.g.*, Dentons) have now launched their own versions of a large language model (LLM). This article should not be interpreted as making any type of endorsement or nonendorsement of any product or law firm.

4. Cat Zakrzewski, *FTC investigates OpenAI over data lead and ChatGPT's inaccuracy*, WASH. POST (July 13, 2023), https://www.washingtonpost.com/technology/2023/07/13/ftc-openai-chatgpt-sam-altman-lina-khan (discussing how analysts have called OpenAI's ChatGPT the fastest-growing consumer app in history).

AI.[5] ChatGPT's co-founder recently testified before Congress. requesting that Congress enact regulatory policy in these areas, partly to avoid navigating a patchwork of state laws.[6] Indeed, some commentators question whether generative AI tools will ever gravitate to the necessary level of accuracy, so as to justify their use.[7] As global entities and states in the United States consider whether to restrict the harvesting of certain data that is ingested into AI tools for training purposes, it is uncertain how any such restrictions may affect the ability of AI tools to produce results with accuracy. If AI tools ingest generative AI results, some experts in the field question whether "data inbreeding" may result that may produce inaccurate results.[8] It is important for practitioners to monitor this rapidly changing landscape.

This article, however, does not undertake to make any comment on the larger policy issues surrounding artificial intelligence. For example, the American Bar Association in 2023 adopted Resolution 604 that sets forth guidelines requiring AI

---

5.   Press Release, U.S. Sec. Exch. Comm'n, SEC Proposes New Requirements to Address Risks to Investors From Conflicts of Interest Associated With the Use of Predictive Data Analytics by Broker-Dealers and Investment Advisers (July 26, 2023) (on file with the U.S. Sec. Exch. Comm'n), https://www.sec.gov/news/press-release/2023-140.

6.   Cecilia Kang & Cade Metz, *F.T.C. Opens Investigation into ChatGPT Maker Over Technology's Potential Harms*, N.Y. TIMES (July 13, 2023), https://www.nytimes.com/2023/07/13/technology/chatgpt-investigation-ftc-openai.html.

7.   *See* Ted Chiang, *ChatGPT is a blurry Jpeg of the Web*, THE NEW YORKER (Feb. 9, 2023), https://www.newyorker.com/tech/annals-of-technology/chatgpt-is-a-blurry-jpeg-of-the-web (analogizing what generative AI does to compressing data as akin to what happens when a file is compressed to a jpeg and loses certain attributes—known as lossy compression).

8*.   See* Maggie Harrison, *When AI Is Trained on AI-Generated Data, Strange Things Start to Happen*, FUTURISM (Aug. 2, 2023), https://futurism.com/ai-trained-ai-generated-data-interview?ref=refind (interview with Richard G. Baraniuk, Sina Alemohammad & Josue Casco-Rodriguez).

developers to ensure their products are subject to human over-sight and are transparent. This article assumes that policymak-ers will in the future enact regulatory or statutory requirements in this area,[9] and accordingly this article will focus on issues practicing attorneys are likely to encounter and steps state bars and related entities should consider.

## Some AI issues are raised only briefly here and will require resolution from legislative bodies, courts, and governmental agencies

AI implicates several intellectual property and other consid-erations that are important for lawyers to be aware of in order to advise clients. For example, to "what extent should AI be con-sidered a legal person and for what purposes?"[10] Who (if

---

9. *See, e.g.*, *Blueprint for an AI Bill of Rights: Making Automated Systems Work for the American People*, THE WHITE HOUSE OFFICE OF SCI. AND TECH. POL'Y (Oct. 2022) [hereinafter *Blueprint for an AI Bill of Rights*], https://www.white house.gov/ostp/ai-bill-of-rights/; ARTIFICIAL INTELLI-GENCE RISK MANAGEMENT FRAMEWORK (AI RMF 1.0), THE NAT'L INST. OF STANDARDS AND TECH. (NIST) (Jan. 2023), https://doi.org/10.6028/NIST. AI.100-1 (a set of standards for the design, development, use, and evaluation of AI products); *Adverse action notification requirements in connection with credit decisions based on complex algorithms*, CONSUMER FIN. PROT. BUREAU, Circular 2022-03 (May 26, 2022), https://files.consumerfinance.gov/f/documents/ cfpb_2022-03_circular_2022-05.pdf (The Consumer Financial Protection Bu-reau (CFPB) May 2022 guidance to financial institutions regarding algorith-mic credit decisions and creditor reporting obligations). *See also* Gibson Dunn, *Artificial Intelligence and Automated Systems 2022 Legal Review* (January 25, 2023), https://www.gibsondunn.com/artificial-intelligence-and-automat ed-systems-2022-legal-review/ (summarizing U.S. state and federal legisla-tive, regulatory and policy developments).

10. Fredric I. Lederer, *Here there be Dragons: The Likely Interaction of Judges with the Artificial Intelligence Ecosystem*, 59 THE JUDGES' J. 12 (Feb. 3, 2020). *See also* Copyright Registration Guidance: Works Containing Material Gener-ated by Artificial Intelligence, 88 Fed. Reg. 16190 (Mar. 16, 2023), https://www.federalregister.gov/documents/2023/03/16/2023-05321/copyrig

anyone) owns a patent for a device designed by AI?[11] Who is liable in tort for damages caused by an AI system?[12] Will the ubiquitous use of AI facial recognition devices on public streets trigger a violation of the Fourth Amendment?[13] Does the "scraping" of data from the internet and other sources violate any copyright works?[14] Can an AI company be sued for defamation if its product manufactures a defamatory statement about a person or entity?[15] This article merely references the likelihood of these developments and defers on these issues for consideration at a later date by courts and governmental agencies.

---

ht-registration-guidance-works-containing-material-generated-by-artificial-intelligence (the U.S. Copyright office has taken the position that AI-generated works cannot be copyrighted); Franklin Graves, *DC Court Says No Copyright Registration for Works Created by Generative AI*, IPWATCHDOG (Aug. 19, 2023), https://ipwatchdog.com/2023/08/19/copyright-registration-works-created-by-generative-ai/id=165444/ (J. Beryl Howell agreed, stating in an August 2023 opinion that "[h]uman authorship is a bedrock requirement of copyright").

11.   U.S. Patent Application No. 16/524,350, Unpublished (filed July 29, 2019) (DABUS, applicant). *See also* Thaler v. Vidal, 43 F.4th 1207 (Fed. Cir. 2022); Thaler v. Perlmutter, No. 1:22-cv-1564, 2023 WL 5333236 (D.D.C. Aug. 18, 2023) (AI-generated works cannot be copyrighted); U.S. Patent and Trademark Office, *Artificial Intelligence*, https://www.uspto.gov/initiatives/artificial-intelligence.

12.   Lederer, *supra* note 10.

13.   *Id.*

14.   Winston Cho, *Scraping or Stealing? A Legal Reckoning Over AI Looms*, THE HOLLYWOOD REP. (Aug. 22, 2023), https://www.hollywoodreporter.com/business/business-news/ai-scraping-stealing-copyright-law-1235571501/ (AI companies contend that their practice of inputting data from the internet and other sources constitutes "fair use" under copyright law).

15.   Ryan Tracy, *Some of the Thorniest Questions About AI Will be Answered in Court* , WALL ST. J. (Aug. 23, 2023), https://www.wsj.com/tech/ai/some-of-the-thorniest-questions-about-ai-will-be-answered-in-court-e7fd444b   (also mentioning issues such as can AI be used by healthcare insurance carriers to review claims and whether AI tools violate privacy laws).

**An Introduction to AI**

AI is ubiquitous and already in devices we use daily, including our smartphones and cars. "We routinely rely on AI-enriched applications, whether searching for a new restaurant, navigating traffic, selecting a movie, or getting customer service over the phone or online."[16] To remain proficient and competent in the practice of law, lawyers must have a basic understanding of the technology and terminology used in AI.

AI "refers to computer systems and applications that are capable of performing functions normally associated with human intelligence, such as abstracting, reasoning, problem solving, learning, etc."[17] "AI applications employ algorithmic models that receive and process large amounts of data and are trained to recognize patterns, thus enabling the applications to automate repetitive functions as well as make judgments and predictions."[18] "Machine learning is a subset of AI. It refers to humans training machines to learn based on data input . . . . [M]achine learning looks for patterns in data to draw conclusions. Once the machine learns to draw one correct conclusion,

---

16. FINAL REPORT, NATIONAL SECURITY COMMISSION ON ARTIFICIAL INTELLIGENCE at 33 (2021), https://www.nscai.gov/wp-content/uploads/2021/03/Full-Report-Digital-1.pdf.

17. CYNTHIA CWIK, PAUL W. GRIMM, MAURA GROSSMAN & TOBY WALSH, ARTIFICIAL INTELLIGENCE AND THE COURTS: MATERIAL FOR JUDGES, ARTIFICIAL INTELLIGENCE, TRUSTWORTHINESS, AND LITIGATION, AM. ASS'N FOR THE ADVANCEMENT OF SCI. (Sept. 2022), *available at* https://doi.org/10.1126/aaas.adf0786.

18. Leslie F. Spasser, Denver K. Ellison & Brennan Carmody, *Artificial Intelligence Law and Policy Roundup*, LEGALTECH NEWS (Mar. 1, 2023), https://www.law.com/legaltechnews/2023/03/01/artificial-intelligence-law-and-policy-roundup/ (Mar. 1, 2023).

it can apply those conclusions to new data."[19] "Natural language processing (NLP) is another subfield of AI . . . . NLP enables computers to read text or hear speech and then understand, interpret, and manipulate that natural language . . . . Using NLP, computers are able to analyze large volumes of text data . . . to identify patterns and relationships . . . . This type of AI in law can be applied to help complete tasks like document analysis, eDiscovery, contract review, and legal research."[20] The models powering platforms used for generating text are called large language models, or LLMs.

Much attention has recently been focused on ChatGPT, an AI chatbot created by OpenAI, powered by an LLM trained on a massive dataset to generate human-like responses. But ChatGPT and similar models are only one type of AI, commonly referred to as "generative AI." "Generative AI is a specific subset of AI used to create new content based on training on existing data taken from massive data sources in response to a user's prompt, or to replicate a style used as input. The prompt and the new content may consist of text, images, audio, or video."[21]

Indeed, as one example, electronic research platforms such as Westlaw and LexisNexis are incorporating generative AI capabilities into their platforms.[22] Some eDiscovery vendors have likewise begun to incorporate generative AI into their

---

19. *AI for Lawyers: What is AI and How Can Law Firms Use It*? CLIO, https://www.clio.com/resources/ai-for-lawyers/lawyer-ai/ (last visited Sept. 26, 2023).

20. *Id*.

21. Maura Grossman, Paul Grimm, Daniel Brown & Molly Xu, *The GPT Judge: Justine in a Generative AI World*, 23 DUKE LAW & TECH. REV. 8 (forthcoming Oct. 2023), *available at* https://ssrn.com/abstract=4460184.

22. *See* Westlaw Precision, https://legal.thomsonreuters.com/en/products/westlaw-precision (last visited Sept. 26, 2023), and Lexis+, https://www.lexisnexis.com/en-us/products/lexis-plus.page (last visited Sept. 26, 2023).

platforms, aiming to improve efficiencies in the discovery process.[23] Still, the current state of developments is a work in progress, and there have been conspicuous examples of the technology failing to work properly.[24] AI platforms have also been developed for legal writing,[25] contract management, due diligence reviews, litigation forecasting, predictions of judicial rulings, and juror screening,[26] and nonprofit legal organizations have been experimenting with how to implement bots to

---

23. It may be possible within a short timeframe for eDiscovery platforms to use generative AI to help locate potential sources of relevant information, and assist with the preservation, collection, and review of relevant data. *See From Bleeding Edge to Leading Edge: GAI and Reciprocal Intelligence in eDiscovery*, COMPLEXDISCOVERY (Aug. 20, 2023), https://complexdiscovery.com/from-bleeding-edge-to-leading-edge-gai-and-reciprocal-intelligence-in-ediscovery/. But cost savings in these areas may need to be offset by the need for additional quality control and validation of results. *See Even FLOE? A Strategic Framework for Considering AI in eDiscovery*, COMPLEXDISCOVERY (Aug. 10, 2023), https://complexdiscovery.com/even-floe-a-strategic-framework-for-considering-ai-in-ediscovery/.

24. In perhaps the most notable example, a ChatGPT-generated legal brief included six fictitious cases. The lawyers who submitted the brief were sanctioned as a result. *See* Sara Merken, *New York Lawyers Sanctioned for Using Fake ChatGPT Cases in Legal Brief*, REUTERS (June 26, 2023), https://www.reuters.com/legal/new-york-lawyers-sanctioned-using-fake-chatgpt-cases-legal-brief-2023-06-22/.

25. For example, Clearbrief claims to strengthen legal writing in Microsoft Word by using AI to examine discovery, exhibits, pleadings, and other documents and displaying the citations to the source documents. It also claims to create a hyperlinked timeline. *See* Bob Ambrogi, *New AI Features in Clearbrief Create Hyperlinked Timelines and Allow Users To Query Their Documents*, LAWSITES (Aug. 15, 2023), https://www.lawnext.com/2023/08/exclusive-new-ai-features-in-clearbrief-create-hyperlinked-timelines-and-allow-users-to-query-their-documents.html.

26. *See* Voltaire Uses AI and Big Data to Help Pick Your Jury, ARTIFICIAL LAWYER (April 26, 2017), https://www.artificiallawyer.com/2017/04/26/voltaire-uses-ai-and-big-data-to-help-pick-your-jury/.

complete legal forms.[27] Sullivan & Cromwell has recently announced that it has been investing in LAER.AI to develop an AI Discovery Assistant. The intent is to bring an AI product to market that will accompany an attorney to depositions and trials, having already "digested" the case, "listened" to the testimony, and then suggests questions. One of the products already put in use, AIDA (AI Discovery Assistant), conducts document review.[28]

AI developments have taken place at a rapid pace not anticipated by the legal community.[29] While these developments have been impressive, there is a need for education in the legal community to understand errors or "hallucinations" that may occur in the output of the LLMs powering these platforms. Attorneys and courts need to be aware of both the benefits and limitations that these AI platforms present.

**Potential Limitations of Current Generative AI Platforms**

Depending on the AI platform, several potential limitations should be considered. Issues to be considered include, but are not limited to, the following: "Was the data used to train the system skewed or complete? Is it representative of the target

---

27.   *See* Paul W. Grimm, Maura R. Grossman & Gordan V. Cormack, *Artificial Intelligence as Evidence*, 19 Nw. J. TECH. & INTELL. PROP. 9, 34–35 (2021). This article is also very useful for a more detailed discussion of what is AI and its historical development.

28*.   See* Patrick Smith, *Sullivan & Cromwell's Investments in AI Lead to Discovery, Deposition 'Assistants,'* THE AM. LAWYER (Aug. 21, 2023).

29.   It has been widely reported that ChatGPT 3.5, which was introduced in March 2022, scored about the bottom 10th percentile on a simulated bar exam, but GPT4, introduced in March 2023, scored at the 90th percentile on the same exam. *See* Barry Dynkin & Benjamin Dynkin, *AI Hallucinations in the Courtroom: A Wake-Up Call for the Legal Profession*, N.Y. LAW J. (June 14, 2023)   https://www.law.com/newyorklawjournal/2023/06/14/ai-hallucinations-in-the-courtroom-a-wake-up-call-for-the-legal-profession/.

population on which the system will be used? If the AI system was trained with historical data that reflects systemic discrimination, how was this addressed? Were variables incorporated that are proxies for impermissible characteristics (e.g., zip code or arrest records, which may correlate with and therefore incorporate race)? What assumptions, norms, rules, or values were used to develop the system? Were the people who did the programming themselves sufficiently qualified, experienced and/or diverse to ensure that there was not inadvertent bias that could impact the output of the system? Did the programmers give due consideration to the population that will be affected by the performance of the system?"[30] Most importantly, was the AI system specifically designed to be used by lawyers and the legal profession?

As noted by John Naughton, certain large language models "crawled" or "harvested" an enormous amount of data on which the model could be trained.[31] The LLM then "learned" from the dataset through neural networks.[32] This allows the LLM to compose text "by making statistical predictions of what is the most likely word to occur next in the sentence that they are constructing."[33] But "[o]ne of the oldest principles in computing is GIGO – garbage in, garbage out. It applies in spades

---

30.   CWIK ET AL., *supra* note 17, at 20.

31.   John Naughton, *The World has a big Appetite for AI – but we Really Need to Know the Ingredients*, THE GUARDIAN (Aug. 21, 2023), https://www.the guardian.com/commentisfree/2023/aug/19/the-world-has-a-big-appetite-for -ai-but-we-really-need-to-know-the-ingredients.

32*.   See also* Timothy B. Lee & Sean Trott, *A jargon-free explanation of how AI large language models work*, ARS TECHNICA (July 31, 2023), https://arstech-nica.com/science/2023/07/a-jargon-free-explanation-of-how-ai-large-langua ge-models-work/.

33.   Naughton, *supra* note 31.

to LLMs, in that they are only as good as the data on which they have been trained."[34]

The above questions require exploration because of the potential for bias in AI systems. "[M]achine-learning algorithms are trained using historical data, [thus] they can serve to perpetuate the very biases they are often intended to prevent. Bias in training data can occur because the training data is not representative of a target population to which the AI system will later be applied."[35] This may or may not be as great a concern in the context of generative AI platforms like ChatGPT, but in the context of lawyers or clients using AI for hiring decisions or judges using AI platforms for bail decisions, bias in the underlying data set is an issue that requires scrutiny. Some researchers are focusing on ways to mitigate such biased models.[36] The American Bar Association, among other groups,[37] has suggested that lawyers might violate ABA Model Rule of Professional Conduct 8.4's prohibition against engaging in discriminatory conduct using biased AI platforms. It is uncertain whether mere use of AI tools that subsequently are shown to be flawed would violate certain state-specific Rules of Professional Conduct.

Another concern with certain AI algorithms and their outputs may be the lack of proper testing for reliability for use in

---

34. *Id.*

35. *See* Grimm, Grossman & Cormack, *supra* note 27, at 42–47.

36. Hammaad Adam, Aparna Balagopalan, Emily Alsentzer, Fontini Christia & Marzyeh Ghassemi, *Mitigating the impact of biased artificial intelligence in emergency decision-making*, COMMUN. MED. 2, 149 (2022), *available at* https://doi.org/10.1038/s43856-022-00214-4.

37. *See* Julia Brickell, Jeanna Matthews, Denia Psarrou & Shelley Podolny, *AI, Pursuit of Justice & Questions Lawyers Should Ask*, BLOOMBERG LAW (Apr. 2022), https://www.bloomberglaw.com/external/document/X3T91GR80000 00/tech-telecom-professional-perspective-ai-pursuit-of-justice-ques.

the legal profession.[38] Attorneys should also be cautious about using an AI platform that was originally intended for a certain use and applying it for another use without adequate testing for validity—this is sometimes known as "function creep," the widening of a technology or system beyond its original intended use.[39]

Finally, current pricing may pose a temporary obstacle to widespread adoption. As of August 2023, pricing for the largest GPT-4 model is $.06 for every 1,000 tokens (about 750 words) input. And $.12 for every thousand tokens output.[40] If entire case files were inputted, costs could be significant. As with all technology, as the technology improves and competition grows, these costs are likely to decline.

It should be noted, however, that many concerns over AI have been based on earlier versions. "When OpenAI launched its first large language model, known as GPT-1 in 2018, it had 117 million parameters—a measure of the system's scale and complexity. Five years later, the company's fourth-generation model, GPT-4, is thought to have over a trillion."[41] As these tools mature, their accuracy will likely greatly improve.

---

38.  *See* Grimm, Grossman & Cormack, *supra* note 27, at 48–51.

39.  *See id*. at 51.

40.  Dan Diette, *What will Generative AI and LLMs mean for eDiscovery?*, COMPLETE DISCOVERY SOURCE (Aug. 10, 2023) https://cdslegal.com/insights/ai/what-will-generative-ai-and-llms-mean-for-ediscovery/.

41.  Ian Bremmer & Mustafa Suleyman, *The AI Power Paradox, Can States Learn to Govern Artificial Intelligence— Before it's Too Late?* FOREIGN AFFAIRS (Aug. 16, 2023) (also noting that "AI could be used to generate and spread toxic misinformation, eroding social trust and democracy; to surveil, manipulate, and subdue citizens, undermining individual and collective freedom; or to create powerful digital or physical weapons that threaten human lives. AI could also destroy millions of jobs, worsening existing inequalities and creating new ones; entrench discriminatory patterns and distort decision-making by amplifying information feedback loops; or spark unintended and

## Potential Opportunities That AI may Offer the Legal Industry

Many law firms share the same challenges—rising overhead costs (particularly wages), increasingly complex cases, and the historical reliance on manual processes that are inefficient, reduce productivity, and result in increased costs largely absorbed by clients. AI tools offer the prospect to automate and possibly improve several operations, including legal research, document review, and client communication. The use of AI could also free lawyers to work on issues of strategic importance—both improving the experience of practicing law while at the same time providing more value to the client. In addition, AI's ability to analyze large amounts of data can reduce the risk of human error and increase confidence in the accuracy of the results produced.

But large language models, such as ChatGPT, have recently exposed a weakness—hallucinations or errors. Although why errors occur is not fully understood, generally the LLMs hallucinate because the underlying language model compresses the language it is trained on and reduces/conflates concepts that ofttimes should be kept separate. Ultimately, the LLM is a probabilistic model and generates text, as opposed to true or false answers.[42] New models, however, are being developed that are being built on archives of legal documents to improve the accuracy of an answer. These new generative AI programs designed for the legal industry may improve accuracy to queries posed; quickly review thousands of pages of documents, expediting due diligence tasks and early case assessment of litigation; and

---

uncontrollable military escalations that lead to war . . . . AGI could become self-directed, self-replicating, and self-improving beyond human control.").

42. *How Chatbots and Large Language Models Work*, CODE.ORG (Aug. 15, 2023), https://www.youtube.com/watch?v=X-AWdfSFCHQ (A video on how LLMs work and further explaining hallucinations).

draft summaries or contract language. In sum, the potential exists to reduce legal costs. That said, lawyers will still have to verify output and provide "human judgment" to the issue at hand.

It is expected that AI tools will be able to: (1) facilitate alternative dispute resolution (ADR) by providing early insights into disputes, (2) predict case outcomes, (3) engage in scenario planning and predict negative outcomes, (4) assist with case management and calendaring/deadlines, (5) conduct contract review and due diligence tasks, (6) automate the creation of forms and other legal documents, (7) assist with discovery review and production, (8) assist with the ability to detect personal identifying information, confidential health information, or proprietary or trade secret information, (9) enhance marketing and social media presence, (10) translate data into another language, (11) automate billing, and (12) expedite and lower the cost of legal research and regulatory compliance. In addition, counsel may be able to use AI tools to engage in strategic planning with their clients by running analyses of the client's financial statements and other data.[43] That said, many other non-AI tools can assist with these tasks. Ultimately, attorneys and clients will need to evaluate whether the benefits of this new technology outweigh any costs or privacy or security concerns.

As lawyers contemplate how they may incorporate AI tools into their practice, the following concerns should be addressed:

## Duty to Protect Client Confidential Information and use of AI Tools

ABA Model Rule of Professional Conduct 1.6 provides that an attorney generally may not reveal confidential information.

---

43. CLIENT COLLABORATION: THE EVOLUTION IN LAW FIRMS, THOMSON REUTERS (2023), *available at* https://legal.thomsonreuters.com/content/dam/ewp-m/documents/legal/en/pdf/white-papers/client-collaboration-white-paper-the-evolution-in-law-firms-us-tr3462238.pdf.

Protective orders issued by individual courts impose even more stringent requirements—including, for instance, that attorneys verify the permanent destruction of discovery materials at the end of a case. Attorneys considering using AI platforms should take care not to disclose confidential information inadvertently by inputting such information into a prompt or uploading confidential information into the AI platform for processing, particularly when the AI system is open source, such as the free version of ChatGPT, and the terms of service may not guarantee confidentiality.

Some AI platforms may save data, such as query history, to train and improve their models. Individuals working for those "free" platforms could potentially be viewing sensitive client data or attorney work product. Other AI platforms may not use prompts or inputted data to train. If using paid subscription services, an argument exists that such confidentiality concerns are mitigated due to the terms of service agreements entered with those paid commercial providers.[44] Another concern, however, is the concern that exists with any third-party provider—that is the potential that the AI provider is itself hacked in a cybersecurity incident and client data is taken. As always, due diligence must be exercised to satisfy that reasonable security measures are in place with any third-party provider. Further, sometimes additional requirements are imposed on the lawyer, such as an obligation to destroy information upon the conclusion of a matter. Sometimes that obligation is mandated contractually or

---

44. *See* John Tredennick & William Webster, *Attorneys using AI shouldn't worry about waiving privilege*, LAW360 (Aug. 22, 2023), https://www.law360.com/articles/1706972/attorneys-using-ai-shouldn-t-worry-about-waiving-privilege (arguing that paid commercial licensed products generally contain nondisclosure and nonuse provisions in their terms of use and the expectation of privacy in those products is as strong as those contained in Microsoft 365 licenses).

sometimes included in a protective order or other discovery stipulation or protocol. A lawyer uploading documents into an AI tool may be unable to certify that the information was destroyed unless it confirms that this is covered by the platform's terms of service.

On the other hand, AI can be used to secure information sharing and address privacy concerns. AI-powered redaction tools could possibly automatically identify personally identifiable information (PII) and redact that material from large data sets.[45] AI-powered redaction tools reduce the risk of accidentally disclosing sensitive data because of human error. An attorney using AI platforms and redaction tools must weigh the benefits and risks associated with both.

## Law Firm (and Corporate) Policies

Law firms (and corporations) should consider implementing an AI policy to provide guidance to their employees on the usage of AI. At the end of the spectrum, some firms may completely ban the use of AI platforms. As discussed in this article, this approach may be largely unworkable and fail to prepare the law firm for the realities of the modern practice of law. A better approach may be to instruct employees that they are responsible for checking any AI's output for accuracy, they should consider whether the output of any AI platform is biased, that all appropriate laws be complied with, and they evaluate the security of

---

45. Sriharsha M S, *Detecting and redacting PII using Amazon Comprehend*, AWS MACHINE LEARNING BLOG (Sept. 17, 2020), https://aws.amazon.com/blogs/machine-learning/detecting-and-redacting-pii-using-amazon-comprehend (This early customer use case breaks down a real-time analysis of how Amazon Comprehend automatically identifies and redacts PII).

any AI platforms used before inputting any confidential information.[46]

## Use of AI-generated motions or briefs for court use

Although AI tools are vastly improving, attorneys should never file any AI-generated document without reviewing it for accuracy. This includes not only checking to ensure that the facts stated are correct and that legal authorities cited are accurate, but that the quality of analysis reflects good advocacy. Federal Rule of Civil Procedure 11 provides: "By presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable . . . (1) it is not being presented for any improper purpose, . . . (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ." ABA Model Rule of Professional Conduct 3.3 states a "lawyer shall not knowingly (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; [or]

---

46. *See* Task Force on Responsible Use of Generative AI for Law (June 2, 2023), COMPUTATIONAL LAW, https://law.mit.edu/ai (lawyers should adhere to the following principles in all usage of AI applications: Duty of Confidentiality to the client, Duty of Fiduciary Care, Duty of Client Notice and Consent, Duty of Competence in the usage and understanding of AI applications, Duty of Fiduciary Loyalty to the client, Duty of Regulatory Compliance and respect for the rights of third parties, and Duty of Accountability and Supervision to maintain human oversight over all usage and outputs of AI applications); Shanq Simmons, *A Chief Legal Officer's Guide to building a corporate AI Policy*, EVERLAW (Aug. 11, 2023), https://www.lexology.com/library/detail.aspx?g=c5f2bb0c-c09c-4908-aff0-46efedc69755.

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . ." As a result, if lawyers are already required to make a reasonable inquiry, it is likely unnecessary for judges to issue additional standing orders requiring lawyers to declare whether they have used AI tools in preparing documents and certifying that they have checked the filing for accuracy.

What remains unclear is whether AI platforms are equivalent to a nonlawyer requiring supervision, as contemplated by ABA Model Rule of Professional Conduct 5.3. It is also uncertain whether negligent reliance on AI tools can establish a violation of these rules, and whether lawyers must exercise "supervisory authority" over the AI platform, such that the lawyer must make "reasonable efforts" to ensure that the AI platform's output is compatible with the attorney's professional obligations. Rules Committees and Committees on Professional Ethics may wish to consider strengthening the language of their rules to clarify their scope.

While there has already been substantial publicity about inaccurate ChatGPT outputs and why attorneys must always verify any draft generated by any AI platform,[47] the bar must also consider the impact of the technology on pro se litigants who use the technology to draft and file motions and briefs.[48] No

---

47.  *See, e.g.*, Mata v. Avianca, No. 22-cv-01461, 2023 WL 3698914 (S.D.N.Y. May 26, 2023) (lawyers sanctioned for citing to nonexistent cases that were "hallucinated" by ChatGPT and the brief was not verified by the attorney before filing).

48.  *See* Berman v. Matteucci, No. 6:23-cv-00660 (D. Or. July 10, 2023) (a pro se prisoner filed a belated habeas petition arguing that his use of ChatGPT helped him discover new arguments to advance. The Court denied the application for habeas, not because of any error in the ChatGPT results, but because the petitioner did not understand how his claim was still untimely).

doubt pro se litigants have turned to forms and unreliable internet material for their past filings, but ChatGPT and other such platforms may give pro se litigants unmerited confidence in the strength of their filings and cases, create an increased drain on system resources related to false information and nonexistent citations, and result in an increased volume of litigation filings that courts may be unprepared to handle.

**Evidentiary Issues in Litigation**

Generally, relevant evidence is admissible.[49] Lawyers who intend to offer AI evidence, however, may encounter a challenge to admissibility with an argument that the AI evidence fails the requisite authenticity threshold,[50] or should be precluded by Rule 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").[51]

Although the current version of the Rules of Evidence may be flexible enough and sufficient to address challenges to the introduction of AI-created evidence, the rules of procedure or scheduling orders should ensure that adequate deadlines are set for any *Daubert* hearing. "[J]udges should use Fed. R Evid. 702 and the *Daubert* factors to evaluate the validity and reliability of the challenged evidence and then make a careful assessment of the unfair prejudice that can accompany the introduction of inaccurate or unreliable technical evidence."[52]

---

49.  *See* FED. R. EVID. 402.

50.  *See* FED. R. EVID. 901(a).

51.  *See* FED. R. EVID. 403.

52.  Grossman, Grimm, Brown & Xu, *supra* note 21 (offering "practical, step-by- step recommendations for courts and attorneys to follow in meeting the evidentiary challenges posed by GenAI").

AI evidence may require that the offering party disclose any training data used by the AI platform to generate the exhibit. If a proprietary AI platform is used, the company may refuse to disclose its training methodology, or a protective order may be required. Courts are currently split on how to treat platforms using proprietary algorithms. In a case out of Wisconsin, a sentencing judge used a software tool called Correctional Offender Management Profiling for Alternative Sanctions (COMPAS), which uses a proprietary algorithm, to sentence a criminal defendant to the maximum sentence.[53] In that case, the Supreme Court of Wisconsin held that the circuit court's consideration of a COMPAS risk assessment at sentencing did not violate a defendant's right to due process because the circuit court explained that its consideration of the COMPAS risk scores was supported by other *independent factors*, and its use was *not determinative* in deciding whether the defendant could be supervised safely and effectively in the community.[54] Coming to the opposite conclusion, a district court in Texas held that Houston Independent School District's value-added appraisal system for teachers posed a realistic threat to protected property interests because teachers were denied access to the computer algorithms and data necessary to verify the accuracy of their scores, which was enough to withstand summary judgment on their claim for injunctive relief under the Fourteenth Amendment.[55] These cases demonstrate how the latter is the better approach. AI evidence requires a balancing between protecting the secrecy of proprietary algorithms developed by private commercial enterprises and due process protections against substantively unfair or mistaken deprivations of life, liberty, or property.

---

53.   State v. Loomis, 881 N.W.2d 749 (Wis. 2016).

54.   *Id.*

55.   Hous. Fed'n of Teachers, Local 2415 v. Hous. Indep. Sch. Dist., 251 F. Supp. 3d 1168 (S.D. Tex. 2017).

Further, a pretrial hearing will likely be required for a trial court to assess the degree of accuracy with which the AI system "correctly measures what it purports to measure" or otherwise "demonstrates its validity and reliability."[56] One obstacle that may be encountered is "explainability." That is how one explains how the AI model generated its output. "[M]ore sophisticated AI methods called deep neural networks [are] composed of computational nodes. The nodes are arranged in layers, with one or more layers sandwiched between the input and the output. Training these networks—a process called deep learning—involves iteratively adjusting the weights, or the strength of the connections between the nodes, until the network produces an acceptably accurate output for a given input. This also makes deep networks opaque. For example, whatever ChatGPT has learned is encoded in hundreds of billions of internal weights, and it's impossible to make sense of the AI's decision-making by simply examining those weights."[57] Simply put, this is the so-called "black box" phenomenon. "The selection of training data, as well as other training decisions, is [initially] human controlled. However, as AI becomes more sophisticated, the computer itself becomes capable of processing and evaluating data beyond programmed algorithms through contextualized inference, creating a 'black box' effect where programmers may not have visibility into the rationale of AI output or the data components that contributed to that output."[58] The above statement is not without controversy. Some argue that AI platforms cannot go beyond their programmed algorithms. Even AI tools that have been programmed to modify themselves can only do so

---

56.   CWIK ET AL., *supra* note 17, at 12.

57.   Stephen Ornes, *Peering into the Black Box of AI*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (PNAS) (May 24, 2023), https://doi.org/10.1073/pnas.2307432120.

58.   Spasser, Ellison & Carmody, *supra* note 18.

within the original parameters programmers set up. "Deep Learning" tools may differ from AI tools that are considered "Machine Learning." Nevertheless, Federal Rule of Evidence 702 requires that the introduction of evidence dealing with scientific, technical, or specialized knowledge that is beyond the understanding of lay jurors be based on sufficient facts or data and reliable methodology that has been applied reliably to the facts of the particular case.[59] "Neural networks develop their behavior in extremely complicated ways—even their creators struggle to understand their actions. Lack of interpretability makes it extremely difficult to troubleshoot errors and fix mistakes in deep-learning algorithms."[60]

The AI developers may be unable to explain fully what the platform did after the algorithm was first created, but they may be able to explain how they verified the final output for accuracy. But AI models may be dynamic if they are updated with new training data, so even if a specific model can be tested and validated at one point in time, later versions of the model and its results may be significantly different.

An immediate evidentiary concern emerges from "deepfakes." Using certain AI platforms, one can alter existing audio or video. Generally, the media is altered to give the appearance that an individual said or did something they did not.[61] The

---

59. Grimm, Grossman & Cormack, *supra* note 27, at 95–97. *See also* FED. R. EVID. 702 (b)-(d).

60. Ben Dickson, *What is Deep Learning?* PCMAG (May 18, 2023), https://www.pcmag.com/news/what-is-deep-learning.

61. *See* John M. McNichols, *How Real are Deepfakes?*, AMERICAN BAR ASSOCIATION (Aug. 23, 2023), https://www.americanbar.org/groups/litigation/publications/litigation-news/technology/how-real-are-deepfakes/ (noting that the Congressional Research Service warned of deepfakes' potential to access classified information, falsely depict public figures as making inappropriate statements, or influencing elections and the failure of Congress to pass legislation criminalizing their use).

technology has been improving rapidly. "What is more, even in cases that do not involve fake videos, the very existence of deep-fakes will complicate the task of authenticating real evidence. The opponent of an authentic video may allege that it is a deep-fake to try to exclude it from evidence or at least sow doubt in the jury's minds. Eventually, courts may see a 'reverse CSI effect' among jurors. In the age of deepfakes, jurors may start expecting the proponent of a video to use sophisticated technology to prove to their satisfaction that the video is not fake. More broadly, if juries—entrusted with the crucial role of finders of fact—start to doubt that it is possible to know what is real, their skepticism could undermine the justice system as a whole."[62]

Although technology is now being created to detect deep-fakes (with varying degrees of accuracy),[63] and government regulation and consumer warnings may help,[64] no doubt if evidence is challenged as a deepfake, significant costs will be expended in proving or disproving the authenticity of the

---

62. Riana Pfefferkorn, *'Deepfakes' in the Courtroom*, 29 B.U. PUB. INT. L. J. 245 (2020).

63. *Id.* at 268. ("So-called 'verified media capture technology' can help 'to ensure that the evidence [users] are recording . . . is trusted and admissible to courts of law.' For example, an app called eyeWitness to Atrocities, 'allows photos and videos to be captured with information that can firstly verify when and where the footage was taken, and secondly can confirm that the footage was not altered,' all while the company's 'transmission protocols and secure server system . . . create[] a chain of custody that allows this information to be presented in court.'").

64. Top technology firms including Google, Amazon, Microsoft, Meta, and ChatGPT-maker OpenAI recently signed a White House pledge to develop "tools to alert the public when an image, video or text is created by artificial intelligence, a method know as 'watermarking.'" *See also* Cat Yakrzewski, *Top tech firms sign White House pledge to identify AI-generated images*, WASH. POST (July 21, 2023), https://www.washingtonpost.com/technology/2023/07/21/ai-white-house-pledge-openai-google-meta.

exhibit through expert testimony.[65] "The proposed changes to Fed. R. Evid. 702, which become effective on December 1, 2023, make clear that highly technical evidence, such as that involving GenAI and deepfakes, create an enhanced need for trial judges to fulfill their obligation to serve as gatekeepers under Fed. R. Evid. 104(a), to ensure that only sufficiently authentic, valid, reliable—and not unfairly or excessively prejudicial—technical evidence is admitted."[66]

## AI in Law Enforcement

If not already implemented by law enforcement agencies, the probability that AI platforms will be used to track, assess, and predict criminal behavior is probable.[67] By collecting data on movements, occurrences, time of incidents, and locations, AI tools can flag aberrations to law enforcement officials. Such analyses can allow law enforcement agencies to predict crimes, predict offenders, and predict victims of crimes.[68] Criminal defense attorneys encountering situations where their clients have been arrested because of AI tools will need to evaluate whether any due process or Fourth Amendment violations can be asserted in this context.

---

65.  Pfefferkorn, *supra* note 62, at 267 ("We can foresee that evidentiary challenges to suspected deepfakes will add significantly to case timelines, and also 'will likely increase the cost of litigation because new forensic techniques and expert witnesses aren't cheap.' Litigators will have to manage their clients' expectations accordingly.").

66.  Grossman, Grimm, Brown & Xu, *supra* note 21, at 18.

67.  *See* Grimm, Grossman & Cormack, *supra* note 27, at 36–41.

68. *See* HIMANSHU ARORA, ARTIFICIAL INTELLIGENCE IN LAW ENFORCEMENT: USE-CASES, IMPACT ON FUNDAMENTAL RIGHTS AND ETHICAL REFLECTIONS (2023).

**AI and the Criminal Justice System**

Some benefits and risks associated with AI adoption in the criminal justice system are apparent. Early adopters, for instance, are using AI-powered document processing systems to improve case management. A new system in Los Angeles recently helped a public defender help a client avoid arrest after the attorney was alerted by the system to a probation violation and warrant.[69] Lawyers involved in the California Innocence Project are using Casetext's CoCounsel, an AI tool, to identify inconsistencies in witness testimony.[70]

Already tools have been produced that assist courts with bail evaluation and sentencing decisions. However, past platforms of these types have been the subject of some immense scrutiny as being unreliable and biased.[71] Racial bias has seeped into some earlier programs because of inputs such as home residence being used in the algorithms.[72] Given the presence of racially segregated neighborhoods, these algorithms produced bail recommendations that were unintentionally biased. The effect of implementing AI in place of human-decision making was

---

69.   Keely Quinlan, *L.A. County's Public Defender Uses AI to Improve Client Management*, STATESCOOP (July 12, 2023), https://statescoop.com/la-county-public-defender-ai-aws.

70.   Matt Reynolds, *California Innocence Project harnesses generative AI for work to free wrongfully convicted*, ABAJOURNAL (Aug. 14, 2023), https://www.abajournal.com/web/article/california-innocence-project-harnesses-generative-ai-for-work-to-free-wrongfully-convicted.

71.   *See also* Jeff Larson, Surya Mattu, Lauren Kirchner & Julia Angwin, *How We Analyzed the COMPAS Recidivism Algorithm*, PROPUBLICA (May 23, 2016), https://www.propublica.org/article/how-we-analyzed-the-compas-recidivism-algorithm; Julia Dressel & Hany Farid, *The accuracy, fairness, and limits of predicting recidivism*, SCIENCEADVANCES (Jan. 17, 2018), https://www.science.org/doi/10.1126/sciadv.aao5580. *But see* State v. Loomis, 881 N.W.2d 749 (Wis. 2016).

72.   *See, e.g.*, *Loomis*, 881 N.W.2d 749 (Wis. 2016).

recently studied by a group of researchers. The surprising results showed that models trained using common data-collection techniques judge rule violations more harshly than humans would. "If a descriptive model is used to make decisions about whether an individual is likely to reoffend, the researchers' findings suggest it may cast stricter judgements than a human would, which could lead to higher bail amounts or longer criminal sentences."[73] Another study found that participants who were *not* inherently biased were nevertheless strongly influenced by advice from biased models when that advice was given prescriptively (i.e., "you should do X") versus when the advice was framed in a descriptive manner (i.e., without recommending a specific action).[74]

Courts and probation offices that are considering adopting these platforms should inquire into how the platform was built, what factors are being considered in producing the result, and how bias has been mitigated.[75] Further, if such platforms are used in the bail consideration or sentencing process, they should be used only as a nonbinding recommendation given the complexity and impact of such decisions.

---

73. Adam Zewe, *Study: AI models fail to reproduce human judgements about rule violations*, MIT NEWS (May 10, 2023), https://news.mit.edu/2023/study-ai-models-harsher-judgements-0510. *See also* Aparna Balagopalan, et al., *Judging fact, judging norms: Training machine learning models to judge humans requires a modified approach to labeling data*, 9 SCIENCE ADVANCES (May 10, 2023), https://doi.org/10.1126/sciadv.abq0701.

74. Adam et al., *supra* note 36. ("Crucially, using descriptive flags rather than prescriptive recommendations allows respondents to retain their original, unbiased decision-making.")

75. *Id.*

## AI and Employment Law

Some AI platforms contend that the use of their products could accelerate the hiring process and reduce the potential for discrimination allegations.[76] Law firms or clients seeking to use these AI platforms should understand that such platforms should be vetted for bias and accuracy. Attorneys counseling employers also need to be aware of the limitations of any such platforms. Efforts should be made to ensure that "explainability" of the platform's results can be produced. As with all tools that are used to monitor or measure employee actions and performance, privacy and discrimination concerns should be considered.[77] If law firms or clients use third parties to handle their human resource needs, a review of what, if any, AI platforms are used and how should be made. In addition, lawyers working in this area should monitor developments in this field, such as guidance being developed by the Equal Employment Opportunity Commission[78] and the National Labor Relations Board.[79]

---

76. *See, e.g.*, Keith E. Sonderling, Bradford J. Kelley & Lance Casimir, *The Promise and The Peril: Artificial Intelligence and Employment Discrimination*, 77 U. MIA. L. REV. 1, 4 (2022). This paper also provides an excellent summary on how Title VII, Americans with Disabilities Act, and Age Discrimination in Employment Act claims may arise in the AI context.

77. *See* Annelise Gilbert, *EEOC Settles First-of-Its-Kind AI Bias in Hiring Lawsuit*, BLOOMBERG LAW (Aug. 10, 2023), https://news.bloomberglaw.com/daily-labor-report/eeoc-settles-first-of-its-kind-ai-bias-lawsuit-for-365-000, (allegations that employers' AI tools rejected older applicants in violation of the Age Discrimination in Employment Act).

78. *See* U.S. Equal Emp't Opportunity Comm'n, *Artificial Intelligence and Algorithmic Fairness Initiative*, https://www.eeoc.gov/ai (last visited Sept. 25, 2023).

79. *See* NLRB General Counsel Memo GC 23-02, Electronic Monitoring and Algorithmic Management of Employees Interfering with the Exercise of Section 7 Rights (Oct. 31, 2022), https://www.nlrb.gov/guidance/memos-research/general-counsel-memos (warning that AI tools that conduct

A recent example is a New York City law requiring transparency and algorithmic audits for bias. New York City Local Law 144 of 2021 regarding automated employment decision tools prohibits employers and employment agencies from using an automated employment decision tool unless the tool has undergone a bias audit within one year of the use of the tool, information about the bias audit is publicly available, and certain notices have been provided to employees or job candidates.[80]

## AI and eDiscovery

How generative AI and LLMs will be incorporated into eDiscovery remains uncertain. Discovery is generally conducted by implementing a legal hold when the duty to preserve evidence has been triggered. Later, key players and other data custodians are interviewed to determine what, if any, relevant evidence the custodian or source (e.g., email server) may possess. Then relevant data is gathered and usually sent to a vendor for processing and uploading onto a platform where the documents can be reviewed and tagged for relevance, privilege, or both. Usually, parties agree to search terms to ensure that relevant documents are procured and produced. In larger cases, parties may opt to use technology-assisted review (TAR) platforms where a "seed set" is reviewed by a person knowledgeable on the file, and then the TAR platform "learns" from the "seed set" and

---

workplace surveillance might interfere with worker rights protected under the NLRA). *See also* New York City Automated Employment Decision Tools law, N.Y. CITY LOCAL LAW 144 (2021) (requiring candidate notice before AI tool use for employment purposes, and annual bias audit); Illinois Artificial Intelligence Video Interview Act (AIVIA), 820 ILL. COMP. STAT. 101-260 (2020) (providing interviewee rights for AI use in video interviews); MD. H.B. 1202 (2023) (requiring notice and consent for facial recognition services in pre-employment interviews).

80.   N.Y. CITY LOCAL LAW 144 (2021).

automatically reviews the remaining documents for relevancy and privilege without human input.

It is expected that the natural language search capabilities of LLMs will be incorporated into eDiscovery platforms at some point. This will allow AI to recognize patterns and identify relevant documents. Unstructured data (e.g., social media and collaborative platforms like Slack or Teams) can be reviewed by the AI tool. Theoretically, collection and review costs could be dramatically lessened, and attorney fees reduced. Another possibility is that AI will be used to augment the document gathering and review process, as well as assist with privilege review. For example, the Clearbrief platform, among others, is already being used for this purpose, with the underlying source documents visible in Microsoft Word so the user can verify the AI suggestions of documents. Users can then share a hyperlinked version of their analysis with the cited sources visible so the recipient can also verify the relevance of the source document.

### AI and Health Care Law

It is widely expected that AI tools will be more routinely deployed in the diagnosis of diseases and treatment. Lawyers practicing in the healthcare industry will need to consider issues of bias in the AI tool's seed set that may lead to accuracy problems.[81] They will also need to understand how these tools can be employed in a way that complies with healthcare-specific regulatory requirements—in particular privacy requirements imposed by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). As with other issues raised above, liability for any misdiagnosis or treatment resulting from the use of an AI tool will require future judicial resolution.

---

81.   *See, e.g.*, Starre Vartan, *Racial Bias Found in a Major Health Care Risk Algorithm*, SCIENTIFIC AMERICAN (Oct. 24, 2019), https://www.scientificamerican.com/article/racial-bias-found-in-a-major-health-care-risk-algorithm/.

### AI and Immigration Law

AI tools have already been implemented by immigration law practitioners in completing U.S. Citizenship forms and tracking their status.[82] AI tools have been helpful in this area, where often the same data must be filled in multiple forms. Again, as with all forms that are generated, it is still the responsibility of the attorney to review for accuracy any forms completed by an AI tool.

### The Need for Attorneys to Monitor Regulatory and Statutory AI Developments

To adequately counsel clients, attorneys will need to keep abreast of regulatory and statutory developments in this area. Some states have already passed legislation related to employing AI.[83] In addition, the Equal Employment Opportunity Commission,[84] the Federal Trade Commission, and the White House Office of Science and Technology Policy[85] have all issued guidelines on the use of AI.[86] In April 2021, the European Commission proposed the first EU regulatory framework for AI. The Consumer Financial Protection Bureau issued interpretative guidelines that require lending companies to provide notices to credit applicants of the specific reasons they were denied credit, to

---

82.  *Immigration Law Enhanced with AI*, FILEVINE, https://www.filevine.com/platform/immigrationai/ (last visited Sept. 26, 2023). *See also* Visalaw.ai (last visited Sept. 26, 2023).

83.  The Electronic Privacy Information Center summarizes state AI laws and legislation. *See* AI Policy, https://epic.org/issues/ai/ai-policy/ (last visited Sept. 26, 2023).

84.  Artificial Intelligence and Algorithmic Fairness Initiative, *supra* note 78.

85.  Blueprint for an AI Bill of Rights, *supra* note 9.

86.  *See, e.g.*, Spasser, Ellison & Carmody, *supra* note 18. *See also* Blueprint for an AI Bill of Rights, *supra* note 9.

include arguably whether AI was used in that decision making process.[87] The EU Artificial Intelligence Act sets forth the world's first rules on AI and is anticipated to go into effect by the end of 2023.[88]

## AI and the Impact on Individual Privacy

As more states enact privacy statutes, attorneys should know about how such statutes may affect the ability of their clients to sell data they collect and how such statutes may impact what data they are even allowed to store or process. AI algorithms require large sets of data to confidently produce their results. This data is scraped from many sources, and questions are being raised as to whether consumers have provided informed consent to the storage, use, and resale of any data collected[89] regarding their purchases, internet viewing, medical data, etc.[90] Companies may also need to be able to quickly respond to consumer requests about data collected, as well as requests to delete the data. For attorneys with clients gathering data from

---

87. *Adverse action notification requirements in connection with credit decisions based on complex algorithms*, *supra* note 9.

88. *EU AI Act: first regulation on artificial intelligence*, EUROPEAN PARLIAMENT (June 08, 2023), https://www.europarl.europa.eu/news/en/head lines/society/20230601STO93804/eu-ai-act-first-regulation-on-artificial-intell igence.

89. At least one lawsuit has been filed in federal court arguing that Google's BARD AI product is "secretly stealing everything ever created and shared on the internet by hundreds of millions of Americans" and "putting the world at peril with untested and volatile AI." *See* J.L. et al. v. Alphabet Inc., et al., No. 23-cv-0344078 (N.D. Cal. July 11, 2023) (putative class action on behalf of all persons whose personal information was used as training data).

90. *See* Grimm, Grossman & Cormack, *supra* note 27, at 53–57.

overseas, the European Union General Data Protection Regulation[91] and the E.U. Artificial Intelligence Act[92] should be considered given that any data privacy violations could result in large fines.[93]

**AI and Use by Pro Bono and Nonattorney Providers**

AI platforms offer the possibility of expanding the ability of pro bono providers to provide legal resources to those otherwise unable to afford an attorney. Relativity, an eDiscovery provider, has been providing an AI product, Translate, to legal aid organizations. The advantages provided by AI in helping to close the access-to-justice gap, however, need to be weighed by pro bono providers. AI tools cannot replace human interaction, evoke empathy, or adequately address nuances that may not be adequately expressed by a nonlawyer using the AI tool. Pro Bono providers will need to exercise care that any advice or work product generated by the AI tool is vetted for accuracy

---

91.   Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the Protection of Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data, and Repealing Directive 95/46/EC (General Data Protection Regulation), 2016 O.J. (L 119/1), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32016R0679#PP3Contents.

92.   Artificial Intelligence Act, Amendments adopted by European Parliament on June 14, 2023, on the proposal for a regulation of the European Parliament and of the Council on laying down harmonised rules on artificial intelligence (Artificial Intelligence Act) and amending certain Union legislative acts (COM(2021)0206-C9-0146.2021-2021/0106(COD))), https://www.europarl.europa.eu/doceo/document/TA-9-2023-0236_EN.html.

93.   *Id.* (administrative fines of up to €30 million or 6 percent of the total worldwide annual turnover depending on the severity of the infringement are set as sanctions for noncompliance with the AI act). *See also* General Data Protection Regulation, *supra* note 91, art. 83 (administrative fines up to €20 million or up to 4 percent of the total worldwide annual turnover of the preceding financial year, whichever is higher).

prior to being delivered to the client. Attorneys using AI tools without checking on the accuracy of their output may ultimately bear sole or joint liability with the AI provider.[94] This article expresses no comment on whether AI tools used without attorney oversight could be construed as engaging in the unauthorized practice of law.[95] Further, any liability for advice or filings generated by a "robot lawyer" will need to be adjudicated by the courts. An example of a so-called "robot lawyer" could be DoNotPay, a platform that uses a chatbot to help contest parking tickets.[96]

**AI and ADR**

Largely because of the COVID pandemic, many mediators and arbitrators shifted to an online platform to conduct mediations and arbitrations (so-called ODR or online dispute resolution). AI tools might help improve accessibility to the alternative dispute resolution (ADR) process in both the physical (live) and ODR sessions. Arbitrators could benefit from AI tools to help summarize large data sets and generate insights. Without the parties' consent, an issue exists as to whether this would

---

94. *See, e.g.*, Michael Loy, *Legal Liability for Artificially Intelligent Robot Lawyers*, 26 LEWIS & CLARK L. REV. 951, 957–58 (2022).

95. *See* Unauthorized Prac. of L. Comm. v. Parsons Tech., Inc., 179 F.3d 956 (5th Cir. 1999) (sale and distribution of Quicken Family Lawyer product was found by the trial court to constitute unauthorized practice of law but vacated by the Fifth Circuit because of the amendment to Texas Government Code Annotated § 81.101: "the 'practice of law' does not include the design, creation, publication, distribution, display, or sale . . . [of] computer software, or similar products if the products clearly and conspicuously state that the products are not a substitute for the advice of an attorney").

96. *See* Sara Merken, *Lawsuit pits class action firm against 'robot lawyer' DoNotPay*, REUTERS (Mar. 9, 2023), https://www.reuters.com/legal/lawsuit-pits-class-action-firm-against-robot-lawyer-donotpay-2023-03-09/. *See also* Faridian v. DoNotPay, Inc., No. CGC-23-604987 (Cal. filed Mar. 3, 2023).

constitute some ethically impermissible ex parte communication, or an inappropriate review of material not submitted in the arbitration proceeding itself. Mediators, however, in some cases could use such AI tools to help guide the parties to an understanding of any weakness in their case. Some mediation platforms have been developed already that offer asynchronous, virtual mediation. Maintaining confidentiality and security of any documents posted to such sites will be essential. As discussed below in the discussion of virtual courts, at present the efficacy of an entirely online ODR session driven by an AI tool without a human neutral does not seem to be an option that would effectively resolve most disputes. In any event, its value in small claims court and other cases with a small monetary amount in controversy should be explored.

In 2016, British Columbia launched the Civil Resolution Tribunal ("CRT"), the first online tribunal to implement ODR mechanisms in Canada. CRT is part of the British Columbia public justice system and aims to provide an accessible and affordable way of resolving civil disputes. In July 2023, CRT closed 51 Strada property claims, 287 small claims, 56 motor vehicle injury/accident benefits/accident responsibility claims, and four miscellaneous cases.[97] There is little independent research on the effectiveness of the CRT, but the aggregate participant satisfaction survey results for 2022/23 show 78 percent of the participants who responded would recommend the CRT to others.[98] For low-value matters in particular, the benefits of a speedy resolution may outweigh the risks.

---

97. CRT Key Statistics, CIVIL RESOLUTION TRIBUNAL (Aug. 3, 2023), https://civilresolutionbc.ca/blog/crt-key-statistics-july-2023/.

98. CIVIL RESOLUTION TRIBUNAL, https://civilresolutionbc.ca/ (last visited Sept. 26, 2023).

### AI and Use in Law Firm Marketing

AI platforms can offer instructions on how to create or improve websites, and build content on the site, as well as generate ideas for advertisements, marketing materials, and social media postings. Smaller law firms who do not have the resources of a marketing person might benefit from this assistance, so long as any content is proofed and verified to comply with existing attorney advertising regulations.[99] Chatbots could assist with client communications, onboarding, and responding to routine questions. That said, care should be exercised to ensure that an improper attorney-client relationship has not been established and that confidentiality is maintained. Answering substantive queries from clients using a chatbot is not advised. But since failure to keep clients informed about the status of their matter is often an item of grievance, chatbots could assist in this regard.

In addition, the development of image-generating AI (e.g., Dall-E 2) may offer law firms the ability to generate unique graphics[100] that otherwise would have been too expensive for inclusion in their marketing.

### Additional Training or Skillsets Required

If AI tools are used, AI should be used to complement human judgment. Lawyers and legal professionals should contemplate how to leverage this collaboration effectively and

---

99.   MODEL RULES PROF'L CONDUCT r. 7.1-3 (AM. BAR ASS'N).

100.   This article does not opine as to whether any AI-generated graphic may be entitled to trademark or copyright protection, as that issue will need to be resolved through the intellectual property regulatory and litigation process. *See also* Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence, *supra* note 10 (the U.S. Copyright office has taken the position that AI-generated works cannot be copyrighted); Graves, *supra* note 10 (J. Beryl Howell agreed, stating in an August 2023 opinion that "[h]uman authorship is a bedrock requirement of copyright").

efficiently.[101] Prior to using any AI tool, lawyers should consider what processes currently used could be improved through AI technology. If AI tools are adopted, personnel will likely require training on how to properly construct prompts/queries and how to evaluate any results. Akin to Boolean searches that require some knowledge of how to construct a "good" search, AI tools require "good" prompts.[102] One advantage of generative AI prompts and responses is that the tool has "thread" conversations. A person can ask clarifying questions. Users can ask the AI tool to clarify previous responses or ask the AI tool to customize the tone or persona of the response. Personnel will also need training on compliance with confidentiality concerns, as well as considerations involving bias. Some commentators envision a new category of employee being trained – a "prompt engineer."

## AI and Cybersecurity Concerns

AI will likely be used by bad actors to penetrate law firm and client IT systems. As noted by Bloomberg Law News, even before the advent of AI, financial fraud scams have proliferated. Concerns now have arisen that AI voice-synthesizing tools

---

101.   *See* Barclay T. Blair et al., *Law Firms of the Future Will be Different in Three Critical Ways*, U.S. LAW WEEK (Aug. 21, 2023), https://news.bloomberglaw.com/us-law-week/law-firms-of-the-future-will-be-different-in-three-critical-ways (arguing that AI will augment the work attorneys perform and be woven into daily tasks such as word processing, timekeeping, and communication platforms. Secondly, AI will assist in the review of evidence and drafting of briefs. Because these transformative processes will displace routine tasks and the billings associated with these tasks, lawyers will need to focus on complex problem solving and strategic thinking).

102.   *See, e.g.*, MAXWELL TIMOTHY, UNLOCKING THE POTENTIAL OF CHATGPT, ADVANCED PROMPTING TECHNIQUES TO GET MORE OUT OF CHATGPT (2023) (ebook), *available at* https://www.makeuseof.com/unlock-secrets-of-chatgpt-with-free-ebook-unlocking-the-potential-of-chatgpt/.

could allow scammers to download short voice samples of individuals from social media, voicemail messages, or videos and create new content that would enable a false transaction to occur.[103] To counter these threats, some banks have deployed suspicious transaction detection systems using NLP models.[104] Though adoption of AI by threat actors is currently still limited to social engineering, AI has the potential to affect the threat landscape in two key aspects: "the efficient scaling of activity beyond the actors' inherent means; and their ability to produce realistic fabricated content toward deceptive ends."[105] On August 9, 2023, the Biden Administration together with the Defense Advanced Research Projects Agency launched a two-year $20 million "AI Cyber Challenge" to identify and fix software vulnerabilities using AI.[106] Law firms should adopt a "proactive approach to breach preparedness by understanding the full scope of costs, conducting simulations, involving key stakeholders, and implementing the right technology solutions."[107] To this end, the National Institute of Standards and Technology

---

103.    Nabila Ahmed, et al., *Deepfakes are Driving a Whole New Era of Financial Crime*, BLOOMBERG LAW (Aug. 23, 2023), https://news.bloomberglaw.com/privacy-and-data-security/deepfakes-are-driving-a-whole-new-era-of-financial-crime.

104*.    Id.*

105.    Michelle Cantos, Sam Riddell & Alice Revelli, *Threat Actors are Interested in Generative AI, but Use Remains Limited*, MANDIANT (Aug. 17, 2023), https://www.mandiant.com/resources/blog/threat-actors-generative-ai-limited (Google's Mandiant has tracked treat actors' use of AI since 2019).

106.    *Biden-Harris Administration Launches Artificial Intelligence Cyber Challenge to Protect America's Critical Software*, THE WHITE HOUSE (Aug. 9, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/08/09/biden-harris-administration-launches-artificial-intelligence-cyber-challenge-to-protect-americas-critical-software.

107.    *Understanding the economic impact of a breach*, CYBERSCOOP (July 31, 2023), https://cyberscoop.com/video/understanding-the-economic-impact-of-a-breach/.

(NIST) released the AI Risk Management Framework (AI RMF 1.0) to better manage risks to individuals, organizations, and society. The Framework was published on January 26, 2023, along with a companion NIST AI RMF Playbook, AI RMF Explainer Video, an AI RMF Roadmap, AI RMF Crosswalk, and various Perspectives.[108] Attorneys and law firms can use the Framework to develop their own best practices and standards for using AI systems and managing the many risks of AI technologies.

### Ethical Implications of Billing Practices and AI

How should attorneys bill for the use of AI? It is anticipated that law firms will need to hire staff with a greater understanding of technology and data. How does that overhead get absorbed? How does a court determine what is a "reasonable fee" if AI is employed? If a firm makes an investment in AI and then employs that tool to provide value for the client, should the law firm be able to charge for that? State ethic opinion letters are needed to provide guidance in this area, as well as the use of technology generally.

### Minimum Continuing Legal Education—Technology Hour Component

Florida and North Carolina have amended their MCLE requirements to add a requirement that attorneys complete some hours of continuing education dedicated to technology concerns. Cybersecurity, privacy concerns, and AI concerns should also lead other states to consider amending their MCLE requirements. In addition, many state CLE regulatory bodies restrict granting MCLE credit for technology courses under the assumption they are not substantive "legal" content. This

---

108. NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, AI RISK MANAGEMENT FRAMEWORK (AI RMF 1.0) (Jan. 2023), *available at* https://www.nist.gov/itl/ai-risk-management-framework.

restriction should also be reviewed, since the demarcation be-
tween substantive legal education, ethics, and use of technology
are now blurred. The state of New York now requires continu-
ing legal education credits to be obtained regarding cybersecu-
rity, privacy issues, and data protection.[109]

**Law Schools**

In many respects, the learning needs for the provision of
technologically enhanced legal services mirror the "21st century
skills" seen in other professions, such as data-oriented and agile
thinking, but law students are traditionally not educated in
these skills or the field of digital technology in general.[110]

Given that technology will play a more prominent role in the
practice of law, law schools should consider adding to the
course offerings additional classes centered on technological
and data literacy.[111] Law schools should prioritize allowing law
students access to AI tools and the ability to practice using them
in a guided classroom setting. Additionally, law schools should
create clear guidelines and update their university policies to
include permitted and prohibited uses of generative AI for both
staff and students. It is likely that many high school and college
students will become dependent on generative AI, and so

---

109.    New York State CLE Program Rules, 22 NYCRR § 1500.2(h), *available
at* https://www.nycourts.gov/LegacyPDFS/attorneys/cle/17a-Rules-1500-2h-
Cybersecurity-Definition.pdf.

110.    Václav Janeček, Rebecca Williams & Ewart Keep, *Education for the pro-
vision of technologically enhanced legal services*, 40 COMPUT. LAW & SEC. REV.
(Apr. 2021), https://doi.org/10.1016/j.clsr.2020.105519.

111.    *See, e.g.*, Tammy Pettinato Oltz, *Educating Robot-Proof Attorneys*, 97
N.D. L. REV. 185 (2022) (discussing the introductory technology course intro-
duced at University of North Dakota School of Law).; JOSEPH E. AOUN,
ROBOT-PROOF: HIGHER EDUCATION IN THE AGE OF ARTIFICIAL INTELLIGENCE
(2017) (discussing the need for universities to broaden their technology of-
ferings and the need for students to better understand technology).

practical and legal reasoning skill sets may require reinforcement in law school. Law schools will need to reflect on how to react to this challenge.

## AI Impact on the Judiciary and Judicial Training

As discussed above, AI issues will inevitably appear before judges, and judicial officers should be cognizant of the fundamentals.

Some judges (primarily federal) have entered orders requiring attorneys to disclose whether they have used AI tools in any motions or briefs that have been filed. This development first occurred because an attorney in New York submitted a ChatGPT-generated brief to the court without first ensuring its correctness. The ChatGPT brief contained several hallucinations and generated citations to nonexisting cases. In response, some judges have required the disclosure of any AI that the attorney has used. As noted above, that is very problematic considering how ubiquitous AI tools have become. Likely these judges meant to address whether any generative AI tool had been used in preparing a motion or brief. That said, if any order or directive is given by a court, it should merely state that attorneys are responsible for the accuracy of their filings. Otherwise, judges may inadvertently be requiring lawyers to disclose that they used a Westlaw or Lexis platform, Grammarly for editing, or an AI translation tool.[112]

---

112. *See* Maura R. Grossman, Paul W. Grimm & Daniel G. Brown, *Is Disclosure and Certification of the Use of Generative AI Really Necessary*, 107 JUDICATURE (forthcoming Oct. 2023) (arguing that Federal Rules of Civil Procedure 11 and 26(g) are sufficient and that individualized standing orders are unnecessary and deter the legitimate use of GenAI applications); Isha Marathe, *4 Generative AI Issues That Are Likely Keeping Judges Up At Night*, LEGALTECH NEWS (Aug. 10, 2023), https://www.law.com/legaltechnews/2023/08/10/4-generative-ai-issues-that-are-likely-keeping-judges-up-at-night/.

In addition, for the reasons discussed above, judges and law clerks should be cautious in using generative AI tools in rendering decisions and drafting opinions. At least two foreign judges have acknowledged using ChatGPT to verify their work.[113] In some state court systems, judges are not provided with law clerks. The temptation to augment their staff with an AI tool may exist. The ABA Model Code of Judicial Conduct is written using broad language. Arguably a judge relying solely on an AI tool, with no subsequent verification, could violate Canon 1 (Upholding the integrity and independence of the Judiciary), but the Code is remarkably silent about principles of impartiality, integrity, transparency, avoiding advocacy, and considering diverse perspectives and interpretations of the law. State Commissions on Judicial Conduct may wish to consider whether to amend their codes considering generative AI developments.

Another concern raised about using AI in adjudicative systems is the possibility that AI adjudication will make the "legal system more incomprehensible, data-based, alienating, and disillusioning."[114] Historically, the law has valued explicit reasoning stated in a judicial opinion. But AI may adjudicate based on

---

113.    *See Colombian judge uses ChatGPT in ruling on child's medical rights case*, CBS NEWS (Feb. 2, 2023), https://www.cbsnews.com/news/colombian-judge-uses-chatgpt-in-ruling-on-childs-medical-rights-case/ ("In this case, [Judge] Padilla said he asked the bot: "Is autistic minor exonerated from paying fees for their therapies?" among other questions. It answered: "Yes, this is correct. According to the regulations in Colombia, minors diagnosed with autism are exempt from paying fees for their therapies."). *See also* Aman Gupta, *This Indian court has used ChatGPT on a criminal* case, MINT (Mar. 29, 2023), https://www.livemint.com/news/india/this-indian-court-has-used-chatgpt-on-a-criminal-case-11679977632552.html (prompting ChatGPT "What is the jurisprudence on bail when the assailants assaulted with cruelty?" and then denying the defendant's application for bail).

114.    Richard M. Re & Alicia Solow-Niederman, *Developing Artificially Intelligent Justice*, 22 STAN. TECH. L. REV. 242 (2019).

the analysis of a vast amount of data without constructing any explanation.[115] Nonquantifiable values like mercy presumably would not be considered by the AI tool.[116] No doubt "human judging" has its flaws and biases. Unlike humans, computers never get tired or sick or have a bad day. Data-driven decision-making is consistent and predictable. But, as thought is given as to how far AI adjudicative models should be deployed, there will be a tension and tradeoff between the AI's capacity for efficiency and mass deployment and the desire for procedural due process and transparency.[117] Courts probably will not wish to pursue a "smart court" model of justice now being implemented in some Chinese cities. In the latter model, AI tools generate pleadings for litigants, analyze the litigation risk and issue a judgment—all done virtually.[118]

---

115. *Id.* at 246.

116. *Id.* at 247. *See also* Charles Lew, *The AI Judge: Should Code Decide Your Fate?* FORBES (Aug. 22, 2023), https://www.forbes.com/sites/forbesbusinesscouncil/2023/08/22/the-ai-judge-should-code-decide-your-fate/?sh=13543c654597 (arguing that AI may be fair but would lack the "intangible human qualities of empathy, sensory perception and comprehension of contexts such as cultural, historical and social factors that influence and impact critical decision making." At the same time, the author promotes the use of prudent AI tools to counter the public perception that our current court system no longer delivers impartial or nonbiased rulings).

117. Re & Solow-Niederman, *supra* note 114, at 255–69.

118. *See, e.g.,* Ummey Sharaban Tahura & Niloufer Selvadurai, *The Use of Artificial Intelligence in Judicial Decision-Making: The Example of China*, https://www.ijlet.org/wp-content/uploads/2023/03/2022-3-1-20.pdf (last visited Sept. 26, 2023) (discussing the pros and cons of "smart courts"—human judges are more inconsistent than AI systems because of personal values and "irrelevant extraneous factors." AI tools, however, reflect the mindset of the code writer and how the tool was trained, leading to bias concerns). *See also* Council of Bars and Law Societies of Europe, CCBE Statement on the Use of AI in the Justice System and Law Enforcement (May 25, 2023) ("The CCBE is convinced that effective human oversight of the use of AI tools in the field of justice is a precondition of a justice system governed by the rule of law and

The Federal Judicial Center and corresponding state agencies should consider providing additional training and resources to judicial officers regarding AI.[119]

## Concluding Remarks

AI platforms will probably not replace lawyers any time soon. Through gains in efficiencies there may, however, be fewer attorneys and paralegals needed in the long term.[120] It is likely that lawyers and paralegals will be able to identify and retrieve relevant information from large data volumes more readily. Initial drafts of contracts and pleadings produced by AI platforms may result in time efficiencies but will still require

---

stresses that the decision-making process must remain a human driven activity. In particular, human judges must be required to take full responsibility for all decisions and a right to a human judge should be guaranteed at all stages of the proceedings."). *But see* Frederick Pinto, *Can AI Improve the Justice System?*, THE ATLANTIC (Feb. 13, 2023) ("Judges who are free from external meddling are nevertheless subject to a series of *internal* threats in the form of political prejudice, inaccurate prediction, and cognitive error . . . . In such cases—and many more—less humanity could lead to more fairness . . . . Justice may be blind, but human beings are fallible. Our thinking is clouded by more prejudices than we can count, not to mention an excessive confidence in our judgment. A fairer legal system may need to be a little less human.").

119.   The United Nations Educational, Scientific and Cultural Organization (UNESCO) has recently established a massive online open course (MOOC) that explores admissibility of AI-generated evidence and virtual and augmented reality in courts. *See* AI and the Rule of Law: Capacity Building for Judicial Systems, UNESCO (Aug. 2, 2023), https://www.unesco.org/en/artificial-intelligence/rule-law/mooc-judges.

120*.   But see* David Runciman, *The end of work: which jobs will survive the AI revolution?*, THE GUARDIAN (Aug. 19, 2023), https://www.theguardian.com/books/2023/aug/19/the-end-of-work-which-jobs-will-survive-the-ai-revolution?mc_cid=b8afd98c13&mc_eid=a950705c7a ("[w]orries about automation displacing human workers are as old as the idea of the job itself." Yet also acknowledging that the "experience of work is far more likely to involve a portfolio of different occupations . . . .").

attorney review and validation. Still, the overall result may lessen costs to the client and make justice more accessible to unrepresented parties. It is likely that because of this increase in automation, lawyers will need to focus on "strategic and other higher-value work."[121]

---

121.   Natalie A. Pierce & Stephanie L. Goutos, *Why Law Firms Must Responsibly Embrace Generative AI*, at 22 (June 14, 2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4477704.

# EXHIBIT D

# Responsibly Diving into Generative AI with Judge Xavier Rodriguez

by Justin Smith

**Reading Time — 10 minutes**

**May 21, 2024**

  

As generative AI promises to become more ingrained in the legal system and the daily practices of attorneys, judges are playing a prominent role in ensuring their courtroom remains a level playing field.

And while we've already seen some judges try to guarantee this through standing orders restricting generative AI's use, there have also been judges championing its potential.

Judge Xavier Rodriguez is a U.S. District Court Judge for the Western District of Texas, and one of those advocating for a legal system where

generative AI is a tool that attorneys, pro se litigants, and even judges can responsibly take advantage of.

It's a topic he cared enough about that he sat down to speak with Everlaw during a brief recess in an ongoing trial.



JUDGE XAVIER RODRIGUEZ

You've become one of the more prominent judges when it comes to speaking about AI and legal technology generally. What drew you toward those areas, and how you became interested in them?

Some of the geekiness runs in the DNA. I have an identical twin who just retired as a chief technology officer for a hospital chain in Ohio, and so I think some of my interest in technology is that shared DNA geekiness rubbing off.

The other part of my interest is the real world experience I've gained, where I've seen how important technology can be.

For example, back around 2001 when I was still practicing as a lawyer, we had a case where there was an email that our client claimed contained proof that the other side had consented to a contractual arrangement.

Long story short, at the end of the day, we could never find that email.

And I thought, there's just got to be some better way to find this sort of stuff, since this is going to be the wave of the future. Even back then, people were creating and agreeing to huge deals over email. This case in particular was worth several million dollars, and people were communicating about it through email.

That experience helped me realize that technology was going to be something we were all going to have to learn more about.

## And with generative AI specifically, was it that same initial interest in technology that sparked your intrigue?

It was. I keep my own little notes about different types of cases and developments. And once generative AI started taking off, I went back through my old notes and thought, "How did I miss this?"

I found something in my notes from about four years ago that mentioned generative AI, but of course, I didn't pay any attention to it because then it was sort of this pie in the sky-type idea. No one thought it would go anywhere that fast, so I disregarded it. And like everybody else, it just sort of took off, and it caught me completely by surprise.

Then the president of the State Bar of Texas asked me to be on the AI Task Force, and I went all in.

I also wanted to touch on your paper for *The Sedona Conference Journal*, which I'm sure you've talked a lot about. I was curious what compelled you to write the paper, and what you made of the recognition it received?

*[Editor's note: In this paper, Judge Rodriguez presents a comprehensive examination of how the rapid growth of artificial intelligence is poised to reshape the legal profession. Read it here.]*

Of course, I didn't write it for recognition, but I've been glad to see people engage with it. The genesis of the paper was the notes I started taking when I got appointed to this task force. Initially, it was all just research.

Our AI task force has been a little on the slow side. So frankly, when I got a little frustrated by how slow we were going, I decided to go off on my own. I took all my notes that were already heavily annotated, and that was the birth of the Sedona paper.

In the paper, you discussed generative AI and how it will help with access to justice and pro bono attorneys who are under-resourced. Could talk a little more in-depth about that, and what you see as the advantages and disadvantages technology can have on access to justice?

I want to put out some qualifiers that generative AI won't just magically help with access to justice issues. There are a whole bunch of other issues that are going to have to happen along the way in tandem with the technology to really affect change.

For example, the ethics committees of state bars all across the country are going to have to figure out and give guidance to pro bono

providers about how to use chatbots as an auxiliary to their provision of legal services.

> "I'm all in. I think the use of AI as a tool, as a first draft that needs to be verified, can potentially offer a lot of cost savings."

SHARE THIS QUOTE:

I do see a lot of value here. For example, legal aid providers are given a whole bunch of work with limited resources, so they need to augment their work with technology.

Now, it's going to become an issue whether or not this technology can be used in the way someone like me is envisioning it. I'm envisioning that we're going to have legal aid providers use generative AI for things like answering basic preliminary questions through chatbots. I think there'll be a lot of value in using the technology just to keep clients informed.

Going down the spectrum of legal services, using chatbots might not always be the answer for providing initial quasi-legal advice to people for different situations. That's where it can get a little more problematic. Is the bot engaged in the unauthorized practice of law? Are any statements made by the bot attributable to the legal aid provider? How is that going to be monitored for accuracy? Are attorney-client relationships being formed through those interactions?

We have a lot of legal ethics issues to work through in tandem with the technology issues.

When it comes to the potential of pro se litigants or pro-bono attorneys actually using the technology in

the courtroom, courts might not have all the resources needed to deal with that. What do you see as an immediate need from the court's perspective in being able to handle someone like a pro se litigant using generative AI in the courtroom?

Two things there. One, clerks courts, either federal courts or state courts, ought to consider whether there's any way to provide procedural steps for pro se litigants.

Courts and clerks offices try to be user-friendly with having information on their websites, but a lot of that stuff pro se litigants may or may not be able to read and understand it. That's an instance where having a conversant chatbot deliver that same kind of information would be really helpful.

Clerks offices need to start exploring that kind of availability.

Now, the second part of the question is, what are we going to expect pro se litigants to do now in terms of filings? I fully expect that pro se litigants are going to go use ChatGPT or some other AI tool in drafting their complaints, petitions, motions, and briefs.

And that could be good. It might be better than the scribble that we get sometimes. Maybe it'll make what they're trying to allege more understandable.

There could be a lot of value in pro se litigants using this technology, but clerks offices and courts are going to need to advise about how to use it. They need to learn how to check the accuracy of the product. You can't just type in a prompt, get a response, and paste it into a motion and file it, because it may not be accurate.

But we're in a circular world here, right? So, how does a pro se litigant check the accuracy? And maybe we need to be providing more resources in clerks' offices about where to check the accuracy of the cases the AI tool has given. I think we're going to have to do some extra hand holding.

The other concern I have about pro se litigants using AI tools is it may give them an overinflated idea of the strength of their case. And that might be problematic.

With ediscovery software companies like Everlaw starting to implement their own generative AI tools, do you think these types of legal-focused models that really stick to the document will encourage more responsible use of this technology, at least on the part of attorneys?

Let's talk about attorneys. You'd think by now that we would all know we can't just take whatever our associate or our intern or our law clerk drafts and send it to a court for filing, as is, without checking it. And somehow, when it comes to these AI tools, it's taken at least a dozen mistakes on the part of attorneys before the message seems to get across. We really need to use these things as tools. They're not final products.

I'm all in. I think the use of AI as a tool, as a first draft that needs to be verified, can potentially offer a lot of cost savings.

It can get us to be a little more creative and think outside the box.

"Lawyers are only going to be able to be cautious for so long, because I think at some point they're going to find themselves at a competitive disadvantage if they don't adopt it."

SHARE THIS QUOTE:

We could use these AI tools and prompt them to act in a different character, like in the character of the judge or opposing counsel and get some different viewpoints that we may not have considered. And then when we start editing the draft that the AI tools provided, we might have some more wholesome material out there.

So I see a lot of value. It just comes down to using it responsibly.

In the ediscovery world, I see a lot of value coming down the pike with ediscovery vendors now embedding AI tools.

In the world I would like to see, and I'm not sure we're there yet, we would have two phases of discovery. We would have an initial mandatory disclosure of relevant non-privileged hot documents, and we would share those with the opposing side. And if the case can't resolve at that point, we'd do a more traditional discovery subject to 26(g) and subject to proportionality and all the other factors.

I see AI and ediscovery as a way that we can find responsive documents faster and get them produced faster and do early case assessments and potential settlement discussions earlier on. That's my dream world.

For organizations that have banned the use of generative AI among their attorneys, do you think those attorneys are now at a disadvantage compared to the firms that are encouraging its use and embracing it?

I'm not going to criticize them. I understand the caution. We as lawyers are just cautious. These lawyers and law firms and organizations that are banning it, I think they more fully want to understand where their data is being kept, how it's being safeguarded, what's happening to their prompts. I think AI tool providers need to be offering a lot clearer answers to bring down the anxiety levels that some might be feeling and adopting.

Going back to state bars and their ethics officials, we need to have a lot more ethics guidance about permissibility under these parameters. I think once we start getting there, we're going to see a lot more adoption.

Lawyers are only going to be able to be cautious for so long, because I think at some point they're going to find themselves at a competitive disadvantage if they don't adopt it.

Transitioning to the court side of things, a number of courts have either proposed rule changes or have issued standing orders about the use of AI in filings and documents prepared for the court. What do you think about these, and how do you see those orders affecting the use of AI among attorneys?

Those orders aren't very helpful. I think a lot of the orders are kind of inarticulate. They talk about artificial intelligence. They mention AI.

AI is embedded in a lot of things already. It's embedded in Westlaw's new tool, Lexis's new tool, Grammarly, and I can go down the list. Do we really want to be notified every time somebody uses Westlaw Precision, for example? That's probably unnecessary and unhelpful to have a mandatory disclosure about that.

"High school and college educators especially are becoming very concerned about AI tools and whether our kids are going to learn anything or are just going to default to these tools. I take the attitude that this is going to

be part of their future practice as lawyers. They're going to need exposure to AI."

SHARE THIS QUOTE:

Prohibiting the use of AI is even worse, and some judges are doing that. And then one judge has gone even further than everybody else and is requiring prompts to be saved. That's really putting the cart before the horse there.

When I talk to my fellow colleagues, I generally tell them this is inadvisable.

You're unnecessarily chilling the use of practicing and experimenting with these tools. And what I've been recommending is if courts are going to do anything, it ought to be something generic like declaring that all litigants, both lawyers and pro se litigants, have a responsibility to ensure the accuracy of their filings and leave it tech agnostic. That's been my recommendation.

We've talked a lot about AI and attorneys. Do you think there are ways that judges can incorporate it into the courtroom or use it to benefit their own day-to-day legal work?

Apparently judges are already doing it.

I spoke to about 200 state judges in Texas three weeks ago, and I asked the question, "How many of you have been using or experimenting with an AI tool?" I was astonished to see the number of hands that went up, probably three-quarters of the group. Now, I didn't ask them how they're using it. But judges were out there already experimenting.

There's some value there, especially for the state judges. Many state judges across the country are not even given a law clerk as a resource.

So this is a tool, not a final product, but a tool in assisting with the drafting process that could be very valuable.

I hope we start seeing RAG [Retrieval Augmented Generation] legal specific AI tools being rolled out so we can have a lot more confidence in the verifiability and accuracy of the prompt response. Westlaw and Lexis, for example, are coming out with RAG legal specific tools. I think that's going to be a big help.

There's a tool out there that will help us identify non-existent cases, but money is an issue. Our budgets are all tight. We're not given a lot of money to pay for subscriptions to these devices or tools. That's going to be an issue. I think ultimately we have to be adopters too. And we're going to need funding to get these tools.

Switching gears a bit, you're a faculty member at St. Mary's University School of Law. What are you teaching students about using AI and legal technology overall, and do you think more law schools should have courses on this technology in their curriculum?

High school and college educators especially are becoming very concerned about AI tools and whether our kids are going to learn anything or are just going to default to these tools. I take the attitude that this is going to be part of their future practice as lawyers. They're going to need exposure to AI.

I tell my students they're allowed to use an AI tool in my course in response to any of the written assignments I give.

But I have the expectation that it's going to be used as a tool for a first draft, and then strengthened with references to cases we've talked about either in lectures or the materials. That's how I'm making them ensure they have an understanding of the material as opposed to just a wholesale lifting of an AI prompt response.

This is going to be the world they live in.

Clients are going to have the expectation of lawyers to use these tools to lower costs. We're going to have to expand the discussion of AI in our classrooms in law schools. <u>Corporate attorneys now have to be aware</u> that AI tools are being used for due diligence work, like identifying inconsistencies or aberrations between various clauses and contracts.

This is going to be the world for litigators and corporate attorneys. And we need to be teaching our kids this.

## What's something you think this next generation of attorneys and judges can do to best educate themselves on AI and its future impact on the legal system?

It's just a matter of diving in. I keep telling everybody, "Come on in, the water's fine."

You just have to get in there and play with the tools. I'm lucky enough that I teach an ediscovery class and vendors such as Everlaw and others have donated their tools to my class to use. I give my students a real world response for production exercises they complete in my ediscovery class. You just have to dive in.

 Justin Smith is a Senior Content Marketing Manager at Everlaw. He focuses on the ways AI is transforming the practice of law, the future of ediscovery, and how legal teams are adapting to a rapidly changing industry. <u>See more articles from this author.</u>

# EXHIBIT E

 **Relativity**®

Relativity aiR for Review Awarded for Excellence in Artificial Intelligence

**Learn More**

 for Review

# Find what matters, faster than ever

Get more efficient, consistent, and higher-quality results with generative AI-powered document review, right in RelativityOne.

**Get a Demo**



# Accelerate Your Document Review with AI

aiR for Review helps legal teams, from law firms to corporate legal departments, identify key content across hundreds, thousands, or even millions of documents – with transparent rationale.



## Relevance Review

Predict relevant documents for productions, or QC results from a traditional review before it goes out the door.



## Issues Review

Locate material related to various legal issues that are important to your case strategy.



## Key Document Identification

Find hot documents right at the start of your case — including important material that is often found late or even missed.

# Deliver Faster Results with Speed & Confidence

### ✔ Review in hours, not days

Breeze through projects with artificial intelligence that follows your instructions but never gets tired.

### ✔ Trust every prediction

Clear explanations and citations help you trust the output — and spot valuable insights you might have missed.

### ✔ Get consistency you can count on

aiR for Review's decisions keep your team aligned — meaning reduced errors, faster outcomes, and no second guessing.

### ✔ Agentic AI that you control

aiR for Review uses your natural language input to understand your objectives, conduct multi-step reasoning, and make decisions that you can validate and defend.

### ✔ Security and transparency where you need it most

aiR is built directly into RelativityOne, inheriting its advanced security controls and compliance standards — including ISO 27001, SOC 2 Type II, and FedRAMP certifications.

> "Relativity aiR for Review enabled a defensible and comprehensive review under a tight disclosure deadline, in total

saving 25+ days and reducing costs by 85%. With SMEs leading the process, we uncovered several unanticipated findings that drove organisational change."

**Roman Barbera**
Executive Director, Forensic at KordaMentha

**KordaMentha**

# Legal Teams Worldwide Are Cutting Time & Costs with aiR for Review

Explore what's possible – read the stories behind the wins

 purpose

## $70k+
savings on a single project

Learn how Purpose Legal reviewed 300,000+ documents, all in one week

Learn More



# 250+

hours of review saved

Read how aiR for Review didn't miss a single thing

Learn More



# 96%

recall on multiple analyses

See how JND saw success, on repeat

Learn More

Teneo
The Global CEO Advisory Firm

# 1M

documents in 18 days

Learn how Teneo did it all with one reviewer

**Learn More**

 Morae

# 75%

of costs cut

Read how Morae met their 1-week deadline, with time to spare

**Learn More**

KordaMentha

# 25+

days of project time saved

Learn about the strategic insights that came with these savings

**Learn More**

DOCUMENT REVIEW AI EVOLUTION PRIMER

# From Beginning to Breakthrough: Navigating Document Review's AI Evolution

Learn how generative AI drives greater efficiency with familiar concepts.

**View Our Guide**

# Dive Deeper into aiR for Review

## Generative AI in Legal: How Relativity aiR Reshapes Review

Learn how aiR for Review responsibly incorporates generative AI and how you can transform your document review workflows to deliver better results.

**Read the Paper**

## Defensible Generative AI for Scaled Document Review

Learn how aiR for Review's validation workflow delivers measurable accuracy. With key metrics in hand, you can demonstrate defensibility, reduce rework, and scale generative AI confidently across your review projects.

**Read the Blog Post**

## Agentic AI is in the aiR

Cut through the noise to learn what agentic AI really is and how Relativity is building innovative, reliable, and high-performing solutions with this technology at the core.

**Read the Blog Post**

# Experience Relativity aiR for Yourself

See how generative AI can speed up your next document review. Join the teams already cutting time, costs, and risk with aiR for Review.

**Get a Demo**



1-312-263-1177

231 South LaSalle St.
20th Floor
Chicago, IL 60604



© 2025 Relativity ODA LLC     Privacy and Cookies     Terms of Use     Sitemap
Do Not Sell My Personal Information

# EXHIBIT F

For Litigation Work

# Reclaim Time for Strategic Litigation

Harvey enables litigators to reduce manual work, redirect time to decision-making, and confidently deliver more favorable client outcomes.

**Request a Demo**

Built by and for Industry Leaders

## Uncover Critical Details

Leave no stone unturned by quickly extracting key insights from thousands of documents.

## Automate Away the Tedium

Delegate repetitive tasks and
cumbersome workflows to Harvey so
you can stay focused on what matters.

## Accelerate Legal Writing

Overcome the blank page problem by
moving quickly from first draft to
polished legal prose.

# How Litigation Teams Use Harvey

## Query

I am an associate at a defense-side litigation firm in San Francisco. My client, Twitter, Inc., was just served with the attached Complaint. Please analyze this Complaint and prepare a four-part memorandum, which Show more ⌄

## Memorandum: Analysis of Securities Class Action Complaint Against Twitter, Inc.

### I. Summary of the Complaint

The Complaint, filed by Doris Shenwick as Trustee for the Doris Shenwick Trust, is a securities class action against Twitter, Inc., and its officers, Richard Costolo and Anthony Noto.

## Case Assessment

Swiftly evaluate complaints, create chronologies, and identify gaps in factual and legal analysis.

Vault /

# Extracting Details from Deposition Transcripts

[ Filter ]   [ Add file ]   [ Column builder ]

| | File Name | Deponent |
|---|---|---|
| 1 | Corbin Potter Depo | Corbin Potter |
| 2 | Christopher Dry Depo | Christopher D |
| 3 | David Miller Depo | David Miller |
| 4 | Emily Chin Depo | Emily Chin |

## Discovery

Review and categorize large volumes of documents, analyze expert work and deposition transcripts, and organize discovery materials efficiently.

## Query

Based on the attached decisions, what is the test under Illinois law on whether the owner of premises breached its duty of care by failing to maintain the premises in a rea... Show more ⌄

📄 Thompson v. Economy Su...

## Test for Breach of Duty of Care in Illinois for Slip and Fall Cases

Under Illinois law, as illustrated by the decisions in Olinger v. Great Atlantic and Pacific Tea Company and Thompson v. Economy Super Marts, Inc., the test for determining whether the

## Analysis

Conduct comprehensive analysis more quickly by using Harvey to synthesize legal principles across multiple cases.

Assistant  /

# Memorandum on Motion to Change Venue

Initial draft           Revise draft

To: [Name of requester] From: [Name of writer] Date: [Date of memorandum] Re: Motion to transfer venue in Cub Club Investment, LLC v. Apple Inc.

Summary:

This memorandum analyzes the motion to transfer venue filed by Apple Inc. ("Apple") in

## Drafting

Instantly generate first drafts, enabling more concise and persuasive pleadings, motions, legal briefs, and client memos.

## Sources

 19-03-13 ACME Securities L...

Based on the attached document, the following are three proposed motions in limine we should propose filing with the Court prior to trial:

Motion in limine to exclude any testimony or evidence regarding Dr. Farsai's opinions on ACME's user engagement, user growth, and revenue generation.

## Trial Preparation

Optimize trial strategy by analyzing opposing counsel's case and identifying ways to address gaps, such as refining legal arguments and filing additional pre-trial motions.

## Query

I am counsel for the Plaintiffs in the attached judgment by the US District Court. The Defendants, American Airlines and JetBlue Airways, have appealed this decision to the US Court of Appeals. What are th... Show more ⌄

## Key Arguments for Plaintiffs/Appellees to Uphold the District Court's Decision

### I. Substantial Anticompetitive Harm

The Plaintiffs should emphasize the District Court's findings of substantial anticompetitive harm caused by the Northeast Alliance (NEA). 1 The court found that the NEA

## Strategic Advice

Draft post-judgment communications and strategize grounds for appeal by analyzing court decisions and generating compelling arguments.

# Everything Your Team Needs in One Platform



## Vault

Analyze large document sets to identify key evidence and generate insights in a structured tabular format.



## Assistant

Summarize complaints, draft legal arguments, and refine case strategies in seconds.



## Workflows

Accelerate common processes—like translation, review of court filings, and drafting legal research memos—in just a few clicks.



## Knowledge

Leverage internal knowledge and precedents and external case law sources to ground your work in trusted materials.



## Word Add-in

Draft and edit litigation documents with Harvey's
domain-specific AI – without leaving Microsoft Word.

Case 1:24-cv-00297-DAE    Document 87    Filed 01/06/26    Page 115 of 224

# Enterprise-Grade Security

Harvey is built with robust safeguards to protect your data and ensure compliance with your organization's security standards.

Learn More ↗



# What Our Customers Are Saying

# EXHIBIT G

 **Everlaw**

Sign In

Knowledge Base > Everlaw AI Assistant > Getting started and FAQs

🔍 What are you interested in?

# Leveraging Everlaw AI Assistant in common workflows

**[System] Everlaw Support**
October 22, 2025 at 10:20 AM

Looking to boost your team's review efficiency? Hoping to get to strategic case insights faster? Everlaw AI Assistant can help. Below are some scenarios that commonly arise in a case, with tips on how to leverage Everlaw AI to tackle them more effectively. These examples are not meant to be exhaustive; instead, think of them as templates for how Everlaw AI can be adapted to your unique needs.

- I received a document set (for example, a production or assignment) and need to figure out what's in it ASAP.
- My team is getting bogged down with a lot of long and dense documents.
- I'm preparing to depose someone and need to analyze some related documents in the process of creating my depo strategy and questions.

### Table of contents

I received a document set (for example, a production or assignment) and need to figure out what's in it ASAP.

My team is getting bogged down with a lot of long and dense documents.

I'm preparing to depose someone and need to analyze some related documents in the process of creating my depo strategy and questions.

Related articles

(Back to top)

# I received a document set (for example, a production or assignment) and need to figure out what's in it ASAP.

When you receive a new assignment or production, your team will be eager to know what's in it. Are there interesting documents or insights in this new set of documents? Is everything we expected to be produced in this set?

Prior to Everlaw AI Assistant, reviewing and profiling a document set was a manual process, requiring people to devote hours – if not days – to reading the documents, tagging them, and annotating them with notes or summaries. With Everlaw AI Assistant, you can:

- Kick off a *batch summarization or topic analysis* of the documents and review the results right in the results table. This is a much shorter path

to understanding what's in a document set. You'll free up time to do

more strategic analysis of the documents and can better allocate your efforts to only the important and interesting evidence. To learn more about summarization and topics, please see this article.



- Get *coding suggestions* for documents in the set. You can create annotated issue codes or codes representing topics requested in a RFP, and use the coding assistant to automatically analyze which codes should be applied to which documents. Based on the suggestion patterns, you can quickly diagnose which aspects of your case the documents are relevant to, and whether there are expected topics that are missing. To learn more about coding suggestions, please see this article.



# My team is getting bogged down with a lot of long and dense documents.

Effectively reviewing long and dense documents can be a challenge, even for seasoned reviewers. Sometimes you need to know a document backwards and forwards; other times you might only need the gist of the contents or are on the hunt for a specific piece of information. Regardless, you're stuck either devoting a lot of time carefully poring over a document or quickly skimming through at the risk of missing something interesting or important.

With Everlaw AI Assistant, you have access to a diligent helper who can:

- Create *condensed, yet thorough summaries, extract and summarize topics, and answer any question you might have* about the document, all with references back to supporting areas within the document. This allows your reviewers to get through longer documents faster, without sacrificing thoroughness.
- AI insights can also be used *as a starter for notes* created by reviewers, saving additional time and making it easier to preserve key insights for future reference by the team.

Your reviewers are empowered to use these tools ad hoc in the review window, when they need it. Just make sure they know where these tools live and how to use them.

Or you can *prepare a set of documents beforehand* by running some tasks in batch. This ensures that the insights are available right away when a reviewer goes to look at documents instead of relying on them to remember to kick of tasks in the moment.

For example, to run the topics task in batch for documents that are more than 50 pages in length:

- Open the document set and use the page filter and filter to documents that are more than 50 pages in length



- Kick off a batch topics task from the batch options on the results table



To learn more about the various review-oriented tasks, please see this article.

## I'm preparing to depose someone and need to analyze some related documents in the process of creating my depo strategy and questions.

The core of review is document-level analysis and classification. But, once you get to more strategic aspects of your litigation – like deposition prep – cross-document analysis becomes extremely important. This includes things like extracting facts, analyzing factual patterns and gaps, and brainstorming questions and strategy.

This is work driven by human judgment, expertise, and intuition. But Everlaw AI can be a partner for you through this process, helping to streamline more manual research and analysis tasks and suggesting interesting ways to analyze or narrate your facts. Instead of spending hours organizing and cross-referencing information across dozens of documents, you can leverage Everlaw AI to *create usable analysis in a matter of minutes, keeping you in a productive flow and saving time and energy for higher-value, strategic work.*

The key to effective use of Everlaw AI Writing Assistant is curating a set of documents to work off of (and Review Assistant can help with that - see above!). For example, with a deposition, you'll often have a few dozen documents related to a deponent identified over the course of review. Add these documents to a Storybuilder Draft so that they can be easily referenced

by the Writing Assistant. To learn more about adding documents to a draft, see this article.

Now, you can use the Writing Assistant to analyze these documents in ways that are helpful to you. Create a memo to analyze a specific aspect of your evidence. Compile a timeline of events or facts from across your compiled documents. Brainstorm questions that could be asked during the depo. Here are some example prompts:

- You can ask the Assistant to come up with potential lines of questioning based on the available documents with a prompt like this:
  - Form: List
  - Where each item is a unique: "question that would be appropriate to ask at a deposition of a pharmacy manager with responsibilities to ensure compliance with controlled substances"
  - For each item, include information about: "what evidence I should consider using as exhibits for the question and why"



- Or, ask it for areas where there are gaps in the evidence that testimony should be elicited about using a prompt like this:
  - Form: Memo that analyzes
  - "the potential gaps in the provided evidence that would be useful to elicit testimony about given that our argument is that CVS did not adequately monitor or control opioids. As background, I am about to depose a manager at CVS about their policies around

the monitoring and control of opioids in their pharmacy system, including any potential gaps or issues in that process."



To learn more about Writing Assistant, please see Storybuilder and Writing Assistant (Everlaw AI Assistant).

# Related articles

Getting started with Everlaw AI Assistant

Storybuilder and Writing Assistant

Everlaw AI Coding Suggestions

Delete, Suspend, and Export Projects and Databases

Data Visualizer

Was this article helpful?   👍   👎   0 out of 0 found this helpful

Do you have feedback about this article? Let us know

MORE QUESTIONS?

support@everlaw.com

ABOUT US

Everlaw home

PRIVACY POLICIES

Privacy notice

# EXHIBIT H

# ALM | LAW.COM

## Legaltech© news

# Enhancing Protective Orders To Address Generative AI

**By David Kessler and Andrea D'Ambra**

April 01, 2024

Artificial Intelligence may be the hottest two words in business right now and that is as true in law, litigation and discovery as well. While there may be more hype than substance at the moment, it is clear that the possibilities of using Generative AI in e-discovery to understand your own documents *and that of your opponents* is tantalizing.

Because your opponent may want to analyze your data using their Generative AI tool, as explained in more detail below, you should consider enhancing your protective orders to ensure such use does not unreasonably expose and unintentionally disseminate your client's confidential information.

Even though the evidence is not yet in that Generative AI currently enhances a party's ability to produce documents by making it faster, cheaper, or more defensible, clients and lawyers need to anticipate that their opponents may use it to analyze documents produced to them in discovery. In other words, a party should assume that their opponents are feeding the documents the party has produced into a Generative AI tool to analyze the party's production.



There is nothing inherently wrong with using emerging technology to attempt to make discovery faster and cheaper. In fact, one could argue, that lawyers are duty bound to look for ways to leverage Generative AI and other new technologies to either make discovery cheaper or to enhance counsel's ability to understand the facts and evidence of their cases.

Moreover, even if lawyers are not obligated to do so, those lawyers who do not take advantage of such tools will quickly find themselves at a competitive disadvantage as compared to their more technologically facile brethren and clients

will naturally migrate to lawyers who do leverage these tools (assuming that they are used well and actually provide measurable benefits).

Clients and lawyers, however, need to anticipate their opponent's use and protect themselves from two possible consequences: (1) inadvertent disclosure of confidential information to unauthorized persons; and (2) the practical inability to delete produced documents at the end of a matter.

The purpose of a confidentiality order is to prohibit parties from disclosing the confidential information they receive in discovery to third parties outside the parameters detailed in the order. Likewise, most protective orders require a party to delete their opponent's documents received in discovery when the case terminates (which is meant to protect the producing party's confidential information from inadvertent use, disclosure, and data breach, as well as to protect the private information of employees and other persons whose information is also sometimes commingled with information relevant to the matter).

Given that these protections are already embedded in most protective orders (and it should be in all), why do parties need to make any changes given the growth of Generative AI? The answer is a combination of "honest mistakes" and the inability to "un-ring the bell."

Generative AI is still new and clients and lawyers are still learning how it works and what these tools do with the data these tools ingest and process. In most cases, a lawyer has no idea how sophisticated their opponent or their opponent's lawyer is regarding the use of Generative AI.

While it may be obvious to many that feeding confidential information into a public Generative AI tool, like ChatGPT, would potentially make that data public and risk it being disclosed to anyone using the tool, do parties and lawyers want to take that risk? Yes, the average protective order's prohibition against disclosing confidential information prohibits the use of such public tools, but that does a party no good if it learns that its opponent used such a tool out of ignorance. You cannot realistically "unring" that bell.

As such, we would recommend including specific provisions prohibiting the use of public Generative AI tools to analyze any confidential information contained in a production. You may also want to require a party to take reasonable steps to ensure that any non-public Generative AI tool used will not disclose information to any other user unrelated to the specific matter. One possible clause could read:

Protected Information shall not be submitted to any *open* Generative AI tool (i.e. ChatGTP) or any substantially similar tool that is available to the public. Providing Protected Information to an *open* tool is considered disclosure to a third party.

Likewise, one of the features of many Generative AI tools is that their algorithms improve and transform based on the information they ingest and the prompts that are used to analyze the document corpus.

For certain tools and in certain configurations, the underlying documents may become a resource that the tool uses to better analyze the next set of documents it ingests and processes. The question is whether these tools can disentangle and delete these documents when a matter ends and the opponent has to certify that it has deleted all an opponent's documents as required under the protective order.

April 01, 2024

Once again, it does a lawyer no good to learn that their opponent has made an honest mistake and did not realize that its Generative AI tool cannot delete data provided in discovery. Yes, they have violated the protective order, but what is the realistic recourse? It is far better to call out the issue early in the matter and level set everyone's expectations than have to clean up a preventable mess after the fact. One clause that could address this is:

Within ninety (90) days after the last of a Party's case is terminated (including all appeals), or such other time as the Designating Party may agree in writing, the Receiving Party shall use commercially reasonable efforts to either return or destroy all documents, objects and other materials produced, including all reproductions thereof, including but not limited to that given to experts and inside counsel. Counsel responsible for the destruction shall certify to counsel for the Designating Party that all such materials have been destroyed to the extent practical. *Before Receiving Party submits Designating Party's Protected Information to a closed Generative AI tool, Receiving Party shall make reasonably sure that it can delete all produced information from the tool at the close of the Matter. Receiving Party will be responsible for destroying such produced information from such tools at the end of the Matter.*

Of course, it goes without saying that what is good the goose, is good for gander. Before one analyzes their opponent's data (or their client's data) with a brand new shiny Generative AI tool, a lawyer should make sure it can be done in compliance with whatever protective orders are in place (whether Generative AI is explicitly addressed or not) and their own duties of confidentiality and privilege.

Generative AI holds a great deal of promise in the e-discovery space and eventually could help significantly reduce the cost of interrogating not only your opponents' production, but your own data. We just need to use it carefully; protecting the confidentiality of both one's client's and opponents' data.

**David Kessler** *is a partner at Norton Rose Fulbright and the firm's global head of eDiscovery and information governance and U.S. head of privacy.* **Andrea D'Ambra** *is also a partner at the firm and is its US head of technology and U.S. head of eDiscovery and information governance.*

Reprinted with permission from the April 01, 2024 edition of the LEGALTECH NEWS © 2024 ALM Global Properties, LLC. All rights reserved. Further duplication without permission is prohibited, contact 877-256-2472 or asset-and-logo-licensing@alm.com. # LTN-4052024-55661

# EXHIBIT I

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**STIPULATED PROTECTIVE ORDER**<br><br>Date First Action Filed:  March 20, 2018 |

Gibson, Dunn &
Crutcher LLP

## 1. **PURPOSES AND LIMITATIONS**

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted.  Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order.  The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

## 2. **DEFINITIONS**

2.1     Challenging Party:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.2     "CONFIDENTIAL" Information or Items:  information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3     Counsel (without qualifier):  Outside Counsel of Record and House Counsel (as well as their support staff).

2.4     Designating Party:  a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

2.5     Disclosure or Discovery Material:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.6     Expert:  a person with specialized knowledge or experience in a matter pertinent to the

Gibson, Dunn &
Crutcher LLP

1

litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.7     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "CONFIDENTIAL" Information or Items, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.8     House Counsel:  attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.9     Non-Party:  any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.10     Outside Counsel of Record:  attorneys, as well as their support staff to whom it is reasonably necessary to disclose the information for this litigation (including but not limited to attorneys, paralegals, secretaries, law clerks, and investigators) who are not employees of a Party to this action but are retained to represent or advise a Party to this action, and any attorney outside the United States advising a Party regarding this action who has signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

2.11     Party:  any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.12     Producing Party:  a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.13     Professional Vendors:  persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.14     Protected Material:  any Disclosure or Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

2.15     Receiving Party:  a Party that receives Disclosure or Discovery Material from a Producing Party.

2

STIPULATED PROTECTIVE ORDER
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

3.  **SCOPE**

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information learned, copied, or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

However, the protections conferred by this Stipulation and Order do not cover the following information:

(a)  any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order or another court's protective order, including becoming part of the public record through trial or otherwise; and

(b)  any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.  **DURATION**

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.  **DESIGNATING PROTECTED MATERIAL**

5.1.  <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party, to the extent practicable, must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the

Gibson, Dunn &
Crutcher LLP

3

material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order. In situations where it is not practicable to designate only those parts of material, documents, items, or oral or written communications that qualify for protection under this Order, the Designating Party is not relieved from the obligation under Section 5.2 (as qualified by Section 5.2(a)) to designate before disclosure or production of the material, documents, items, or oral or written communications that portions of those qualify for protection under this Order. Absent such a designation, the Receiving Party shall have no obligation to treat the disclosed material, documents, items, or oral or written communications as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" unless and until notified pursuant to Section 5.3 of an inadvertent failure to designate.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2.   <u>Manner and Timing of Designations</u>.  Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)   for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).  A Party or Non-

Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY") to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b)     for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony. For testimony given in deposition, that the Designating Party designate any testimony or exhibits "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" either on the record before the close of the deposition or in writing on or before the later of thirty (30) days after receipt of the final transcript or the date by which any review by the witness and corrections to the transcript are to be completed under Federal Rule of Civil Procedure 30. If any portion of a deposition is designated, the transcript shall be labeled with the appropriate legend. If any portion of a videotaped deposition is designated, the original and all copies of any videotape, DVD, or other media container shall be labeled with the appropriate legend. Pending designation as set forth above, the entire transcript, including exhibits, shall be deemed "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." If no designation is made within the time period above, the transcript shall be considered not to contain any "CONFIDENTIAL" information.

5.3.     Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Order, along with the transcript pages and videotape of the deposition testimony dealing with such Protected Material. Counsel for any Producing Party shall have the right to exclude

from oral depositions, other than the deponent and deponent's counsel, any person who is not authorized by this Order to receive or access Protected Material based on the designation of such Protected Material. Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

(a)     for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.4.    Inadvertent Failures to Designate.   An inadvertent failure to designate qualified information or items does not waive the Designating Party's right to timely secure protection under this Order for such material.

In the event that any document, material, or testimony that is subject to a "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" designation is inadvertently produced without such designation, the Producing Party that inadvertently produced the document shall give written notice of such inadvertent production, together with a further copy of the subject document, material, or testimony designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY" (the "Inadvertent Production Notice"). Upon receipt of such Inadvertent Production Notice, the Party that received the inadvertently produced document, material, or testimony shall promptly destroy the inadvertently produced document, material, or testimony and all copies thereof, or, at the expense of the Producing Party, return such together with all copies of such documents, material, or testimony to counsel for the Producing Party and shall retain only the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" designated documents, material, or testimony. Should the Receiving Party choose to destroy such inadvertently produced document, material, or testimony, the Receiving Party shall notify the Producing Party in writing of such destruction within 14 days of receipt of written notice of the inadvertent production.

This provision is not intended to apply to any inadvertent production of any document, material, or testimony protected by attorney-client or work product privileges.

## 6.   <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1   <u>Timing of Challenges</u>.  Any Party or Non-Party may challenge a designation of confidentiality at any time.  Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2   <u>Meet and Confer</u>.  The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3   <u>Judicial Intervention</u>.  If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in

the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

## 7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

(a) Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 Data Security of Protected Material. Any Receiving Party or any person in possession of or transmitting another Party's Protected Material must maintain an information security program that includes reasonable administrative, technical, and physical safeguards designed to protect and secure the Protected Material from loss, misuse, unauthorized access and disclosure, and protect against any reasonably anticipated threats or hazards to the security of the Protected Material. Reasonable administrative, technical, and physical safeguards may include, by way of example and without

Gibson, Dunn &
Crutcher LLP

8
STIPULATED PROTECTIVE ORDER
CASE NO. 5:18-CV-01725-EJD

imposing any specific obligations or requirements on any party: utilization of Secure File Transfer Protocol (SFTP), Secure Sockets Layer (SSL), or Virtual Private Network (VPN) technologies when transferring files; encryption of the data when data is being transferred to or stored by the Receiving Party; an audit trail that maintains a record of all activity by both system and application processes and by user activity with any operating system(s), application(s), file system(s), or file(s) that stores or interacts with the Protected Material; access rights management; physical space and device access and usage controls; or where applicable, incorporation of statutory or sectoral standards and specifications.

7.3     To the extent the Receiving Party or any person in possession of or transmitting another Party's Protected Material does not have an information security program, the Receiving Party may comply with this Data Security provision by having Protected Material maintained by and/or stored with a secure eDiscovery/litigation support site(s) or claims administrator that maintains an information security program that complies with the requirements above or otherwise aligns with standard industry practices regarding data security.

Any Protected Material in paper format must be maintained in a secure location with access limited to persons entitled to access the Protected Material under this Stipulated Protective Order.

If a Receiving Party or any person in possession of or transmitting another Party's Protected Material discovers any loss of Protected Material or a breach of security, including any actual or suspected unauthorized access, relating to another Party's Protected Material, the Receiving Party or any person in possession of or transmitting another Party's Protected Material shall: (1) promptly provide written notice to the Designating Party of such breach; (2) investigate and make reasonable efforts to remediate the effects of the breach, and provide Designating Party with assurances reasonably satisfactory to Designating Party that such breach will not reoccur; and (3) provide sufficient information about the breach that the Designating Party can reasonably ascertain the size and scope of the breach. In any event, the Receiving Party or any person in possession of or transmitting any Protected Material shall promptly take all necessary and appropriate corrective action to terminate the unauthorized access.

The Receiving Party shall not load, import, submit, or otherwise transfer Protected Material produced by the Producing Party to an open Large Language Model ("LLM") or other open Generative

Gibson, Dunn & Crutcher LLP

Artificial Intelligence ("AI") platform, nor may the Receiving Party utilize any closed LLM or AI platforms where the Producing Party's Protected Material may be used to train open models or otherwise made accessible to other users of the LLM or AI platform not authorized to receive Protected Material under this Order. Before the Receiving Party transfers any of the Producing party's Protected Material to a closed LLM or AI platform, the Receiving Party shall make reasonably sure that it can delete all such Protected Material from the platform at the final disposition of this action, as defined in paragraph 4. The Receiving Party will be responsible for destroying such produced information from such tools at the end of the Matter.

7.4    Export Control and Foreign Discovery. The Protected Material disclosed by the Producing Party may contain technical data subject to export control laws and therefore the release of such technical data to foreign persons or nationals in the United States or elsewhere may be restricted. The Receiving Party shall take measures necessary to ensure compliance with applicable export control laws, including confirming that no unauthorized foreign person has access to such technical data.

No Protected Material may leave the territorial boundaries of the United States of America unless reasonably necessary in connection with the prosecution of the litigation, including for example obtaining discovery or taking depositions or examinations in a foreign country or any procedures required to effect such discovery, depositions or examinations. Without limitation, this prohibition extends to Protected Material (including copies) in physical and electronic form. The viewing of Protected Material through electronic means outside the territorial limits of the United States of America is similarly prohibited unless reasonably necessary in connection with the prosecution of the litigation, including for example obtaining discovery or taking depositions or examinations in a foreign country or any procedures required to effect such discovery, depositions or examinations. Any Receiving Party who anticipates a potential need for Protected Material to leave or be viewed outside of the territorial boundaries of the United States of America in connection with the prosecution of the litigation, including for example obtaining discovery or taking depositions or examinations in a foreign country, will give the Designating Party at least thirty (30) days advance notice and the Parties will meet and confer. Any unresolved dispute will be raised with the Court in

Gibson, Dunn &
Crutcher LLP

10

a timely manner.  The restrictions contained within this paragraph may be amended through the express written consent of the Producing Party to the extent that such agreed to procedures conform with applicable export control laws and regulations.  Nothing in this paragraph is intended to remove any obligation that may otherwise exist to produce documents currently located in a foreign country or restrict in any way the parties' ability to take discovery from or in any foreign country.

7.5     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)     the Receiving Party's Outside Counsel;

(b)     the officers, directors, and employees (including House Counsel) of the Receiving Party and, with respect to the Public Employees' Retirement System of Mississippi, the Attorney General of the State of Mississippi and any attorneys or employees therefrom directly involved in supervising the oversight of this litigation to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)     Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)     the court and its personnel;

(e)     court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f)     during their depositions, witnesses in the action who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court.  If a witness refuses to sign, the noticing party has the right to adjourn the deposition and raise the matter with the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may not be disclosed to anyone except as permitted under this Stipulated Protective Order;

Gibson, Dunn & Crutcher LLP

11

STIPULATED PROTECTIVE ORDER
CASE NO. 5:18-CV-01725-EJD

(g)    the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(h)    any mediator who is assigned to hear this matter, and his or her staff, who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A).

7.6    Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items.  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a)    the Receiving Party's Outside Counsel of Record;

(b)    up to three (3) designated representatives from each of the Lead Plaintiffs, all of whom must have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(c)    an Expert of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)    the Receiving Party's House Counsel and the paralegal, clerical, secretarial, or e-Discovery personnel who work for House Counsel to whom disclosure is reasonably necessary for this litigation;

(e)    the Court and its personnel;

(f)    court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g)    the named individual defendants in the action;

(h)    during their depositions, witnesses in the action who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless a specific objection is raised by the Designating Party at least ten (10) days before the deposition and the parties cannot resolve the dispute.  If a witness refuses to sign, the noticing party has the right to adjourn the deposition and raise the matter with the court.  Pages of transcribed deposition

testimony or exhibits to depositions that reveal Protected Material may not be disclosed to anyone except as permitted under this Stipulated Protective Order;

(i) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(j) any mediator who is assigned to hear this matter, and his or her staff, who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A).

## 8. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," that Party must:

(a) promptly notify in writing the Designating Party, including a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

## 9. A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

9.1 The terms of this Order are applicable to information produced by a Non-Party in this

action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

9.2    In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(a)    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(b)    promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(c)    make the information requested available for inspection by the Non-Party.

9.3    If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10. **UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately:

(a)    notify in writing the Designating Party of the unauthorized disclosures;

(b)    use its best efforts to retrieve all unauthorized copies of the Protected Material;

(c)    inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and

(d)    request such person or persons to execute the "Acknowledgment and Agreement to

14

Gibson, Dunn & Crutcher LLP

Be Bound" that is attached hereto as Exhibit A.

## 11. **PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL**

11.1    <u>Purpose</u>.  Pursuant to Federal Rules of Evidence 502(d) and 502(e), the production or disclosure of any attorney-client privileged or work-product-protected Documents in this litigation shall not result in the waiver of, or an estoppel as to, any claim of attorney-client privilege or attorney work product protection associated with such Documents as to the Receiving Party or any third parties in this or in any other state or federal proceeding, regardless of the circumstances of such production or disclosure.  This Section shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d) with regard to Documents. The parties agree that, unless expressly provided for herein, Fed. R. Evid. 502(b) shall not apply to any disputes regarding privileged or work-product-protected Documents that are produced in this litigation; instead, this Section shall provide protection for, apply to any disputes regarding, and govern the handling of privileged or work-product-protected Documents that are produced in this litigation.

11.2    Notwithstanding the foregoing, this Stipulation does not preclude a party from intentionally waiving a claim of privilege or work-product protection through affirmative use of Documents subject to such privilege or protection to support such party's claims or defenses in this action or in any other state or federal proceeding.  Defendants reserve all rights with respect to Documents produced under compulsion or pursuant to a non-waiver order in this action or in any other state or federal proceeding.  When a party has intentionally waived the privilege or protection as to certain Documents, whether the waiver extends to other, undisclosed Documents will be determined under Fed. R. Evid. 502(a).

11.3    <u>Clawback Notice</u>.  In the event that a Producing Party discovers that it produced a Document subject to a claim of attorney-client privilege or work-product protection, it shall, within 30 calendar days of discovering the inadvertent production of the Document, provide written notice of the claim to the Receiving Party (a "Clawback Notice"), identifying the subject Document(s). The Clawback Notice shall include the Bates range of (or, in the event the Document is not Bates-numbered, information sufficient to identify) each Document the Producing Party seeks to clawback and specify the factual basis for the privilege or protection asserted in sufficient detail to permit the

Gibson, Dunn & Crutcher LLP

15

Receiving Party to assess the claim. As soon as practicable after providing the Clawback Notice, the Producing Party shall provide (i) if only a portion of the document contains privileged or work-product-protected material, a new copy of the document utilizing the same Bates number(s) as the original that has been redacted to protect the privilege or protected material; or (ii) if the entire document is privileged or work-product-protected, a slip sheet utilizing the same Bates number(s) as the original noting that the document has been withheld. Any document that is the subject of a Clawback Notice shall be included on a privilege log if and as required by the privilege logging procedures agreed to by the parties or ordered by the Court (including, without limitation, the procedures governing the format of the privilege log and the timing of privilege-log production).

11.4    Procedures Following Clawback Notice.  Immediately upon receipt of a Clawback Notice, the Receiving Party shall: (i) sequester the Document(s) identified in the Clawback Notice, all copies thereof, and any notes that reproduce, copy, or otherwise disclose the substance of the information for which privilege or protection is claimed; and (ii) refrain from making any use of the Document(s) identified in the Clawback Notice.

11.5    If the Receiving Party does not challenge a claim that a Document specified in a Clawback Notice is privileged or work-product protected, within fifteen calendar days of receipt of the Clawback Notice, the Receiving Party must: (i) return and/or certify destruction of the Document(s), all copies thereof, and any notes that reproduce, copy, or otherwise disclose the substance of the information for which privilege is claimed; and (ii) notify the Producing Party in writing when this is complete. Thereafter, the Receiving Party may not use the Documents for any purpose in this action, in any other action or proceeding, or otherwise.

11.6    If a Receiving Party challenges a claim that a Document specified in a Clawback Notice is privileged or work-product-protected, the Receiving Party shall notify the Producing Party of its challenge (and the reasons therefor) within fifteen calendar days of receiving the Clawback Notice asserting the claim.[1] The Receiving Party shall sequester the challenged Document(s) as described in Paragraph 3.A until its challenge has been resolved. Within four business days of the

---

[1] The parties agree to meet and confer in good faith about extending this deadline in the event a Producing Party seeks to clawback more than 50 documents within a 14-calendar-day period.

STIPULATED PROTECTIVE ORDER
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn & Crutcher LLP

Producing Party's receiving notification of the challenge, the parties shall meet and confer in an effort to resolve their disagreement. If the parties are unable to reach agreement, the parties shall present their dispute to the Court as a discovery dispute.

11.7    Either party may submit the issue to the Court for a determination. The parties' briefs shall focus on the legal arguments for why the Document(s) are or are not privileged, and shall not otherwise discuss the substance of the Document(s) but the parties may describe the general nature of the Document(s) in support of their arguments so long as the parties do not disclose legal advice, requests for legal advice, or attorney work-product in describing the Document(s). Simultaneously with the filing of the parties' briefs, the Producing Party shall submit the Document(s) at issue for *in camera* review by delivering the Document(s) in a sealed envelope to the undersigned Judge's chambers.

11.8    Except as provided for herein, the Document(s) listed in the Clawback Notice shall not be used or disclosed by the Receiving Party during the time in which the parties are meeting and conferring about the privileged nature of the Document(s) or during the time in which the challenge is before the Court for determination, unless otherwise agreed in writing by the parties or ordered by the Court. The Producing Party shall bear the burden of establishing the privileged or protected nature of the Document(s).

11.9    If the Court determines that the challenged documents are privileged and/or work-product protected, within four business days after that determination, the Receiving Party must: (i) return and/or certify destruction of the Document(s), all copies thereof, and any notes that reproduce, copy, or otherwise disclose the substance of the information for which privilege is claimed; and (ii) notify the Producing Party in writing when this is complete. Thereafter, the Receiving Party may not use the Documents for any purpose in this action, any other action or proceeding, or otherwise.

11.10    Procedures During Depositions And Hearings.  If, during a deposition, a Producing Party claims that a document being used in the deposition (e.g., marked as an exhibit, shown to the witness, or made the subject of examination) contains material that is privileged or protected work product, the Producing Party may, in its sole discretion, do one or more of the following: (a) allow the document to be used during the deposition without waiver of any claim of privilege or other

Gibson, Dunn &
Crutcher LLP

protection; (b) allow questioning about the document but instruct the witness not to answer questions concerning the parts of the document containing privileged or protected material; or (c) object to the use of the document at the deposition, in which case no questions may be asked and no testimony may be given relating to the document or the privileged or work-product-protected portion of the document until the matter has been resolved by agreement or by the Court. In all events, once the document is no longer in use at the deposition, the Receiving Party shall promptly sequester all copies of the document under Paragraph 3.A. As to any testimony subject to a claim of privilege or work-product protection, the Producing Party shall serve a Clawback Notice by no later than four business days after the final transcript becomes available, after which the parties shall follow the procedures set forth in Sections 2 and 3, as applicable. Pending determination of the clawback dispute, all parties with access to the deposition transcript shall treat the relevant testimony in accordance with Section 3. In the event the Court decides the clawback dispute in the Receiving Party's favor and the Receiving Party was denied the opportunity to examine a witness as to the materials at issue, the witness shall be made available as soon as practicable after the Court's decision.

11.11   If a Receiving Party uses discovery materials in a brief, as part of an expert report, or at a hearing, and the Producing Party has not served a Clawback Notice in advance of the briefing event, service of an expert report, or hearing, the Producing Party shall serve a Clawback Notice within fifteen (15) calendar days of the briefing event, service of expert report, or hearing. Thereafter, the procedures set forth above shall apply

11.12   <u>Prohibition On Use Of Privileged Information</u>.  In the event that a Receiving Party discovers that a Producing Party has included information or Document(s) that are or may be subject to a claim of attorney-client privilege or work-product protection in its productions and were or may have been inadvertently produced, the Receiving Party shall promptly (i) sequester the documents under Paragraph 3.A and (ii) serve on the Producing Party a written notice of the possible inadvertent production by identifying the Bates range(s) of (or, in the event the Document is not Bates-numbered, information sufficient to identify) the Document(s) the Receiving Party believes are or may be privileged or work-product protected, and were or may have been inadvertently produced (an "Inadvertent Production Notice").

11.13   Upon the Producing Party's receiving an Inadvertent Production Notice, if the Producing Party determines that the subject Documents are privileged or work-product-protected, the Producing Party shall provide the Receiving Party with a Clawback Notice within 30 calendar days of the date of the Inadvertent Production Notice. If the Producing Party determines that the subject Documents are not privileged or work-product-protected, the Producing Party shall, within fifteen calendar days of the date of the Inadvertent Production Notice, inform the Receiving Party in writing that the subject Documents are not privileged or protected and may be released from sequestration.

11.14   Privilege Review.  Nothing in this Stipulation is intended to excuse a Producing Party from conducting a privilege review prior to the production of Documents in this matter. It is the intent of the parties that each side conduct a privilege review prior to the production of Documents to the other.

11.15   Reservation Of Rights.  A Producing Party may not rely solely on its own production or disclosure of privileged or work product materials as a basis to seek disqualification of a Receiving Party's counsel. Nothing in this Stipulation modifies any party's right to seek disqualification of a Receiving Party's counsel based on misuse of privileged or work-product-protected materials.

11.16   In the event a Producing Party serves a Clawback Notice any later than fifteen calendar days after the parties' exchange of initial trial exhibit lists (or, in the event that any Document subject to a Clawback Notice is included for the first time on a supplemental trial exhibit list, fifteen calendar days after service of such supplemental trial exhibit list), the Receiving Party reserves its rights to challenge the Producing Party's clawback under Fed. R. Evid. 502(b).

## 12. MISCELLANEOUS

12.1   Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2   Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

Gibson, Dunn & Crutcher LLP

STIPULATED PROTECTIVE ORDER
CASE NO. 5:18-CV-01725-EJD

12.3    <u>Filing Protected Material</u>. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(d) is denied by the court, then the Receiving Party may file the information in the public record pursuant to Civil Local Rule 79-5(e) unless otherwise instructed by the court.

## 13. **FINAL DISPOSITION**

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

Gibson, Dunn & Crutcher LLP

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.


DATED: March 13, 2025        /s/ Jeremy P. Robinson

                             Attorney for Plaintiffs




DATED: March 13, 2025        /s/ Brian M. Lutz

                             Attorney for Defendants




PURSUANT TO STIPULATION, IT IS SO ORDERED.


DATED:  March 21, 2025

                             _____

                             Unit                        Judge

                             GRANTED

                             Judge Nathanael M. Cousins

STIPULATED PROTECTIVE ORDER
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____, declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California in the case of *In re Facebook, Inc. Securities Litigation*, Case No. 5-18-CV-01725-EJD.  I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt.  I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

Printed name: _____

Title: _____

Address: _____

Signature: _____

Date: _____

Gibson, Dunn &
Crutcher LLP

## ATTESTATION (CIVIL LOCAL RULE 5-1(i)(3))

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatories.

Dated: March 13, 2025

GIBSON, DUNN & CRUTCHER LLP

*/s/ Brian M. Lutz*
Brian M. Lutz

# EXHIBIT J

ELECTRONICALLY FILED
Phillips County Circuit Court
Tamekia L. Franklin, Circuit Clerk
2025-Jun-02  16:21:05
54CV-25-77
C01D02 : 28 Pages

## IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS
## SECOND DIVISION

**STATE OF ARKANSAS,** *ex rel.*
**TIM GRIFFIN, ATTORNEY GENERAL**                                    **PLAINTIFF**

**v.**                                    **CASE NO. 54CV-25-77**

**GENERAL MOTORS LLC; and**
**ONSTAR, LLC**                                    **DEFENDANTS**

### STIPULATED PROTECTIVE ORDER

The parties have agreed to the terms of this Protective Order; accordingly, after review by the Court, and pursuant to Rule 26(c) of the Arkansas Rules of Civil Procedure, it is ORDERED:

**I.    PURPOSES AND LIMITATIONS**

A.    Disclosure and discovery in this action may involve production of confidential, proprietary, or personally identifiable information ("PII") for which special protection from public disclosure and from use for purposes other than prosecuting or defending this litigation may be warranted.  Accordingly, the parties hereby stipulate to and petition the Court to enter this Stipulated Protective Order ("Order" and "Protective Order" are used interchangeably).  The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under this Order.

## II.    DEFINITIONS

A.    "**Action**" means the above-styled case, *State of Arkansas, ex rel. Tim Griffin, Attorney General v. General Motors LLC and OnStar LLC*, Case No. 54CV-25-77.

B.    "**Confidential Information**" means non-public sensitive information, including, but not limited to, trade secrets, research, design, development, financial, technical, marketing, planning, PII, customer information, or any other material that is confidential pursuant to applicable law.

C.    "**Designating Party**" or "Producing Party" means the party or non-party that designates any discovery material produced in this Action as Protected Material.

D.    "**Highly Confidential Information**" means Confidential Information that a party reasonably believes constitutes or contains highly sensitive information the unauthorized disclosure of which would result in competitive, commercial, or financial harm to the Producing or Designating Party. Highly Confidential Information may include, but is not limited to, financial, regulatory, or strategic information (including information regarding business plans, technical data, and non-public product designs).

E.    "**Confidential – Security Sensitive Information**" means information concerning corporate network security, data security, and/or other information the disclosure of which to another party or non-party creates a substantial risk of serious harm in the form of a data security threat that could not be avoided by less restrictive means.

F.    "**Personally Identifiable Information**" (PII), for purposes of this Order, includes, but is not limited to, payment card numbers, financial account numbers, Social Security numbers, addresses, phone numbers, e-mail addresses, driver's license numbers, or other state identification numbers, employer identification numbers,

tax identification numbers, passport numbers, or a foreign government equivalent of any of these numbers or identifiers.

G.    "**Privileged Material**" means any document or information that is, or that the Producing Party asserts is, protected from disclosure by a privilege, protection, or other immunity from discovery, including, without limitation, the attorney-client privilege, the work product immunity, or the joint defense or common interest privilege.

H.    "**Protected Material**" means any non-public document or information which has been designated as Confidential or Highly Confidential pursuant to this Protective Order. Documents that quote, summarize, or contain Confidential or Highly Confidential Information (*e.g.*, discovery responses, transcripts, and court filings) may be accorded status as Protected Material, but, to the extent reasonably feasible, shall be prepared in such a manner that the Confidential or Highly Confidential Information shall be provided separately from that not entitled to protection.

I.    "**Receiving Party**" means the party or non-party that received the Protected Material.

## III.  DESIGNATING PROTECTED MATERIAL

A.    The Designating Party has an obligation to stamp documents (or slip sheets for native documents) "Confidential" or "Highly Confidential" in good faith and must take care to limit any such designation to specific material that qualifies under the appropriate standards. Any such designation may be withdrawn by the Designating Party.

B.    The Designating Party must designate for protection only those items that qualify. If it comes to a Designating Party's attention that Protected Material does not

3

qualify for protection at all or for the level of protection claimed, the Designating Party must promptly notify all other parties that it is withdrawing or otherwise changing the designation.

C.      Non-parties producing documents or other discovery information may also designate documents pursuant to the terms of this Protective Order and, among other things, have the right to designate documents as Confidential or Highly Confidential, subject to the same protections, obligations, and constraints as the parties to the Action. Going forward, a copy of this Protective Order shall be served along with any subpoena or document request served on non-parties in connection with this Action.  All documents produced by non-parties shall be treated as Highly Confidential for a period of fourteen (14) calendar days from the date of their receipt, and during that period any party or non-party may designate such documents as Confidential or Highly Confidential pursuant to the terms of the Protective Order.

## IV.    SCOPE

A.      The protections conferred by this Protective Order cover not only Protected Material, but also: (1) any information copied or extracted from Protected Material; (2) all copies, derivations, abstracts, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations or presentations by parties or their counsel that might reveal Protected Material.

B.      Protected Material does not include, and this Protective Order does not apply to, information that: (i) is already independently in the knowledge or possession of the Receiving Party and the Receiving Party is not bound by applicable law or agreement not to disclose such information; (ii) is public or has already been

4

publicly disclosed; or (iii) information that was submitted to a governmental entity without request for confidential treatment.

C.     The Parties shall meet and confer concerning a separate agreement to govern the use of Protected Material at trial or at any hearing in this litigation, subject to approval of the Court in the Action.

D.     The Parties agree to meet and confer regarding the need for a specific level of protection for Confidential – Security Sensitive Information if a Producing Party in good faith believes that a discovery request seeks such information and further agree that any restrictions placed on Confidential – Security Sensitive Information should be the least restrictive possible under the circumstances and should not unreasonably frustrate the Receiving Party's ability to access and use such information for purposes of the Action.

## V.     NON-DISCLOSURE OF PROTECTED MATERIAL

A.     Except with the prior written consent of the Producing Party, as provided for in this Order, or as may be ordered by this Court or other judicial tribunal, Protected Material may not be disclosed by a Receiving Party to any person except as described below.

B.     Protected Material designated as **CONFIDENTIAL** may be disclosed by a Receiving Party only to:

(i)     The Parties, their officers, directors, employees, and counsel, only to the extent reasonably necessary to provide assistance with the Action, including but not limited to, work related to actual or contemplated settlement or strategy assessments regarding the Action;

(ii)   Counsel for all Parties in the Action, including any partners, associates, contract attorneys, secretaries, paralegal assistants, and employees working at the direction of such counsel but only to the extent reasonably necessary for purposes of this Action;

(iii)   Judges, court reporters, court personnel, and videographers present at hearings, arguments, depositions, and any other judicial proceedings held in this litigation;

(iv)   The Designating Party and its employees, the author or recipient of a document containing the information or a custodian, or other person, who otherwise possessed or knew all of the information in the Designated Material;

(v)   Witnesses or potential witnesses in the Action, during or in preparation for deposition or trial testimony, to whom disclosure is reasonably necessary, so long as they are not permitted to retain copies of Confidential Information;

(vi)   Other persons who may be designated by written consent of the Designating Party or pursuant to Court order;

(vii)   Mediators, special masters, or other non-party alternative dispute resolution practitioner retained by one or both Parties, and their staff;

(viii)   Any consultant or expert to whom it is reasonably necessary to disclose Confidential Information for purposes of this Action, whether formally retained or otherwise, provided that consultants or experts may not use Confidential Information for any purpose that does not relate to the Action.

Prior to the disclosure of *any* Confidential Information to such consultant or expert (regardless of the source(s) of the Confidential Information), the consultant or expert must execute the Acknowledgement, and the consultant or expert may not be a current employee of a competitor of a party and may not, at the time of retention, have agreed to become an employee of a competitor of a party;  and

(ix)    Professional jury or trial consultants and mock jurors who have signed the Acknowledgment; and

(x)    External electronic discovery or other litigation support vendors retained specifically for use in the Action and that have previously executed the Acknowledgment.

C.    Protected Material designated as **HIGHLY CONFIDENTIAL** may be disclosed by a Receiving Party only to Persons designated below;

(i)    Directors, officers, employees, and other leadership of the parties responsible for developing, evaluating, and making recommendations or decisions in connection with actual or contemplated settlement or litigation strategy;

(ii)    Persons designated in paragraphs B(ii), (iii), (iv), and (vi);

(iii)    Witnesses in the Action, during deposition testimony, to whom disclosure is reasonably necessary, after they have been asked to sign the Acknowledgement; and

7

      (iv)    Persons designated in paragraphs B(vii)-(x), after they have signed the Acknowledgement and only to the extent it is reasonably necessary and only for purposes of this Action (and for no other purpose).

D.    A recipient of Protected Material shall exercise due care to restrict access to those persons described above.

E.    Any copies, excerpts, or compilations of Protected Material, whether in oral or written form, shall be subject to this Order to the same extent as the Protected Material itself, and, if in written form, must be labeled as "Confidential" or "Highly Confidential." A recipient shall not duplicate any Protected Material except for use as working copies and for filing in this Court.

F.    Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons described and authorized under this Order. A Receiving Party shall exercise at least the same degree of care in the storage, custody, or use of Protected Material as it would apply to its own material of the same or comparable confidentiality and sensitivity but no less than a reasonable degree of care.

G.    If a data breach that includes Protected Material occurs, or a Receiving Party reasonably believes such a breach may have occurred, the Receiving Party shall immediately report such incident to the Producing Party, describe the Protected Material accessed, and use best efforts to return to the Producing Party the Protected Material accessed. In no event does a Producing Party cede notification or remedial rights in the event of a breach.

## VI.    DE-DESIGNATION AND CHALLENGING OF PROTECTED MATERIAL

A.    Any party may request a change in the designation of Protected Material.  Any Protected Material shall be treated as designated until the change is completed.  If the requested change in designation is not agreed to, the party asserting that the material in question is properly designated shall have the burden of proving it qualifies for protection afforded under this Order and Arkansas law.

B.    Any party may challenge a confidentiality designation at any time.

C.    The party challenging a confidentiality designation shall identify each challenged document by Bates number or otherwise specifically describe the challenged document, as well as the basis for why the party contends the confidentiality designation is not appropriate.

D.    Within seven calendar days of a challenge to a confidentiality designation, counsel for the challenging party and the Designating Party shall meet and confer for purposes of resolving or limiting any need for judicial intervention.   The Designating Party asserting confidentiality and the challenging party may extend the deadlines set forth in this paragraph by mutual agreement.

E.    If the parties are unable to resolve the challenge by agreement, the Designating Party shall file and serve a motion to retain confidentiality within 21 calendar days of the initial notice of challenge or within 7 calendar days of the parties agreeing that the meet and confer process will not resolve their dispute.

F.    All parties shall afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Court rules on the challenge.

9

**VII.    PROTECTED MATERIAL IN DEPOSITIONS**

A.    If a non-party is subpoenaed for deposition, the counsel issuing the subpoena is responsible for providing a copy of this Order to the witness and requesting that the witness execute an Acknowledgment, to the extent that (i) counsel reasonably anticipates that it will use another party's Protected Material in the deposition and (ii) the non-party does not otherwise have possession and/or knowledge of the Protected Material or the right and/or ability to do so.

B.    The parties and deponents may, within thirty (30) calendar days after receiving the completed deposition transcript from the court reporter, designate pages and lines of the transcript (and exhibits thereto) as Confidential or Highly Confidential by underlining or otherwise designating the portions of the pages that are confidential. (Documents marked as deposition exhibits that have been previously designated under this Order do not need to be re-designated to maintain their designation.). The parties and the court reporter shall thereafter mark such pages in all copies of the transcript with the legend, "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" and will include on the cover page of any such deposition the following legend: "Certain Designated Pages of this Deposition are Confidential and Subject to a Protective Order."  Until expiration of the 30-day period, the entire deposition transcript will be treated as Confidential Information pursuant to this Protective Order.

C.    During any deposition each party shall restrict the display of Protected Material to only those documents that are directly necessary for the purpose of examination at hand.

D.   Paper copies of material designated as Highly Confidential that are brought to the deposition shall be returned to the Producing Party or securely destroyed in a timely manner following the deposition.  During the time period that any witness is being examined on Highly Confidential material, attendance at the deposition shall be limited to only those individuals otherwise permitted to view Highly Confidential material as provided in this Order and counsel for the witness being examined.

VIII.  **SUBPOENAS OR LEGAL PROCESS CALLING FOR DISCLOSURE OF PROTECTED MATERIAL**

A.   Except as otherwise provided in Section IX below, any Receiving Party that is served with a subpoena or other legal process which calls for disclosure of any Protected Material produced or otherwise provided by another party shall, within the shorter of five (5) calendar days or the time specified in the subpoena or legal process for performance, provide written notice (including a copy of such subpoena or other legal process) to counsel for the Designating Party.  Upon receiving notice, the Designating Party shall bear the burden of opposing, if it deems appropriate, the subpoena or process on grounds of confidentiality.  If the Designating Party raises such an objection in judicial tribunal with jurisdiction over the dispute, the Receiving Party shall not disclose the Protected Material until twenty-one (21) calendar days after providing notice to the Designating Party, unless a court orders otherwise.

IX.  **PROTECTED MATERIAL SUBJECT TO FREEDOM OF INFORMATION ACT OR PUBLIC RECORDS STATUTE**

A.   Compliance with Federal and State Law.  Nothing contained herein shall alter either Party's obligations to maintain and protect information that is privileged or otherwise protected under state, federal, or common law or to alter the State's

11

obligations under the Arkansas Freedom of Information Act. The State shall not make any disclosures of Protected Material outside of those addressed elsewhere in this Order unless such a disclosure is required by law and will provide as much notice of such disclosure as is practicable and permitted under the law.

B.    Compliance with Court Orders. Nothing contained herein shall require any Party to violate any court order regarding the disclosure of Protected Material.

## X.    FILING AND USE OF PROTECTED MATERIAL FOR PRETRIAL PURPOSES

A.    Without written permission from the Designating Party or a Court order secured after appropriate notice to all interested persons, a party may not publicly file any Protected Material.

B.    A party that seeks to file under seal any Protected Material must comply with applicable law, including Rule 5(c)(2) of the Arkansas Rules of Civil Procedure and Administrative Order No. 19, or any Court order authorizing the sealing of the specific Protected Material at issue. If the Court in the Action determines, on a motion or otherwise, that Protected Material may not be filed under seal, then any party may file the applicable information in the public record unless otherwise instructed by the Court.

## XI.    PROPER USE OF PROTECTED MATERIAL

A.    Persons with access to Protected Material pursuant to this Protective Order shall use the information only in connection with this Action – including appeals and retrials – and shall not use such information for any other purpose, including business, governmental, or commercial purposes, or in connection with other administrative or judicial proceedings unless otherwise required or authorized by applicable law or court order.

12

## XII.   NON-TERMINATION

A.    The provisions of this Protective Order shall not terminate at the conclusion of this Action. Within ninety (90) calendar days after final disposition of this or any related litigation, a Designating Party may request in writing that its Protected Material and all copies of same (other than exhibits of record) shall be returned to the Designating Party or destroyed in accordance with any applicable law. Final disposition, for purposes of this Order, is the later of: (1) dismissal of all claims and defenses in this Action, with prejudice; or (2) final judgment after the completion and exhaustion of all appeals, rehearing, remands, trials, or reviews of this action, inclusive of the time limits for filing any motions or applications for extension of time pursuant to applicable law. Notwithstanding the foregoing, each counsel of record for each party may keep any transcripts, pleadings, exhibits, and attorney work-product containing Protected Information and shall maintain them in confidence.  Upon written request, all counsel of record shall certify compliance via email to counsel for the Designating Party not more than 100 days after Final Disposition.[1]

## XIII.   NON-WAIVER OF PRIVILEGES

A.    The parties agree that, to the extent it is explicitly covered herein, this Protective Order will control and that Ark. R. Civ. P. 26(b)(5) and Arkansas Rule of Evidence 502(e) shall not govern a claim of privilege or protection by a Producing Party after

---

[1]   Copies of Protected Material or Privileged Material that have been stored on electronic media that are not reasonably accessible, such as disaster recovery backup media, are adequately destroyed as long as they are not restored.  If such data is restored, the Receiving Party must take steps to return or destroy the restored Protected Material or Privileged Material.

13

production of documents or information (collectively, Discovery Material) in this Action other than for a Used Document as defined in Section XIV.G. below.

B.   Any production or disclosure of Privileged or Protected Material other than a Used Document as defined in Section XIV.G. below shall not be deemed to waive any applicable protection, privilege, or immunity (including, without limitation, the attorney-client privilege, the work product immunity and the joint defense or common interest privilege) in this litigation.

C.   Except for a Used Document as defined in Section XIV.G. below, a party shall not make any arguments or file any motions asserting that the Producing Party has intentionally waived a privilege or protection with respect to Privileged Material as a result of its disclosure in this action, regardless of the procedures used to identify Privileged Material prior to production.

D.   If a Party identifies Discovery Material that appears on its face to be Privileged Material belonging to another Party or non-party, the identifying Party is under a good-faith obligation to notify that other Party or non-party promptly. Such notification shall not waive the identifying Party's ability to subsequently contest any assertion of privilege or protection with respect to the identified discovery material.  If the Party or non-party to which the disclosed Privileged Material belongs wishes to assert a claim of privilege or protection, that Party or non-party shall notify the Receiving Party of its assertion of privilege within 7 calendar days of receiving the identifying party's notification of potentially Privileged Material and promptly thereafter produce a privilege log reflecting the privilege assertion and an overlay file addressing the same.  Nothing in this Stipulated Protective Order

14

limits or otherwise modifies an attorney's ethical responsibilities to refrain from examining or disclosing materials that the attorney knows or reasonably should know to be Privileged Material and to inform the disclosing Party that such Privileged Material has been produced.  The Parties may stipulate without the need for Court approval to narrow or extend the time periods specified in this Stipulated Protective Order.

## XIV.   CLAWBACK OF DISCLOSURE

A.     A Producing Party that determines that it produced or disclosed Protected Material without proper designation, or produced Privileged Material in this Action, shall promptly notify the Receiving Party following discovery thereof, and the Receiving Party shall:

(i)     In the case of Privileged Material, immediately cease the review and use of the disclosed document or information.  If the Receiving Party does not challenge the assertion, the Receiving Party must promptly return or destroy the disclosed document or information, as well as all copies thereof within seven (7) calendar days as well use their best efforts to destroy any references to the disclosed document or information, to the extent such references exist in other materials prepared by the Receiving Party.

(ii)    In the case of Protected Material, treat it and all copies "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER," as applicable, under the terms of this Order.  Within five (5) days of the Producing Party's notification, the Producing Party shall provide an overlay file with replacement documents,

15

image files, or other materials reflecting the new level of designation in accordance with the terms of this Protective Order.

B.    Except in the case of a Used Document as defined in Section XIV.G. below, in the case of Privileged Material and Protected Material that has been filed on a court docket or in other public records, the Party that filed or submitted Privileged Material and Protected Material shall immediately request the withdrawal and removal of any such material from where it was previously filed or submitted.

C.    Upon request of the Producing Party, the Receiving Party must provide to the Producing Party a certification of counsel via email that all the disclosed Discovery Material has been returned, sequestered, or destroyed subject to the terms of this Protective Order. The Receiving Party must sequester any discovery item claimed to be Privileged Material if the Receiving Party intends to move the Court for a ruling that the document was never privileged or protected, unless and until the Court determines the document is privileged or protected.[2]

D.    If any produced Privileged Material or Protected Material has been provided to a non-party by a Receiving Party, the Receiving Party will use all reasonable efforts to secure the return of the Privileged Material (and the destruction of any references thereto) or proper designation of the Protected Material, including reminding the non-party of its obligation to adhere to the terms of this Protective Order.

E.    Notice of disclosure shall apply to all copies of the document disclosed.

---

[2]    Copies of Protected Material or Privileged Material that have been stored on electronic media that are not reasonably accessible, such as disaster recovery backup media, are adequately sequestered as long as they are not restored. If such data is restored, the Receiving Party must take steps to return, destroy, or re-sequester the restored Protected Material or Privileged Material.

F.     Within five (5) business days after a Producing Party initiates the clawback procedures for Privileged Material set forth herein, it shall provide a privilege log for the subject materials in accordance with the privilege log requirements set forth below. If a Receiving Party disputes the Producing Party's privilege claim, the Receiving Party shall notify the Producing Party of the dispute and the basis therefore in writing no later than fourteen (14) calendar days following the receipt of the clawback request providing notice of the production of Privileged Information. No later than seven (7) calendar days after the Receiving Party has provided notice of its intent to dispute the Producing Party's privilege claim, the Parties shall meet and confer in good faith concerning the dispute. In the event that the Producing Party and Receiving Party do not resolve their dispute, the Party claiming privilege must bring a motion for a determination of whether a privilege applies within ten days of the determination that no resolution will be achieved.

G.     A Party is not precluded by this Protective Order from arguing that a privilege or protection has been waived for reasons other than the production of a document or information subsequently clawed back in accordance with the terms of this Protective Order.

H.     Notwithstanding the foregoing, the Parties agree that any document used by any Party in a deposition, expert report, or court filing in this action (with the exception of a motion pursuant to Section XIV.E. of this Order) that a Producing Party does not claw back within 10 days of its use ("Used Document"), shall not be eligible for clawback of that document under Sections XIII A, B and C of this Stipulated Protective Order. The Producing Party reserves its rights to utilize Arkansas Rule

17

of Civil Procedure 26(b) and Arkansas Rule of Evidence 502(e), including but not limited to establishing whether and to what extent a court order recognizing waiver of privilege with respect to a document effects a subject matter waiver.

## XV.    PRIVILEGE LOGS & REDACTIONS

A.    The Producing Party may redact from produced documents, materials, or other things in the following instances and using the following procedures:

(i)    When redacting qualified information, the Producing Party shall clearly indicate the basis for redaction in a redaction box on the face of the document.

(ii)    Information protected from disclosure by the attorney-client privilege and/or attorney work product doctrine will be clearly indicated on the face of the document in the redaction box.  Where a document contains both privileged and non-privileged responsive content, the Producing Party shall redact the privileged material and produce the remainder of the document. The Parties agree to provide metadata identifying all produced documents redacted for privilege by Bates number with each production. Where a document contains only privileged content and otherwise non-responsive content, the Producing Party shall identify the document in a privilege log.

(iii)    If a Receiving Party does not agree that the grounds for redaction are apparent from the face of the document, the Receiving Party can make reasonable requests for additional information from the Producing Party concerning the basis for such redactions.  The Producing Party shall provide such information within ten (10) calendar days after receiving the request.

18

(iv)    Privilege Logs.

For documents and ESI that have been withheld or redacted as privileged, the withholding or redacting Party shall provide an Excel privilege log of such documents and ESI, providing the following objective metadata to the extent reasonably available: created dates; last modified dates, sent date, author(s)/From, custodian(s), recipient(s) (separated out by To, CC, BCC fields), file type, Subject, and filename (to the extent they do not reveal protected content). In addition, the withholding Party shall also indicate for each document on their privilege log the privilege being asserted (e.g., "ACP" for attorney-client privilege, "WP" for work product); and other information necessary to assess the basis for the specific privilege being claimed; the Bates numbers for redacted documents; and a unique document number/identifier, which need not be formatted as, or consecutive with, Bates numbers of produced documents (*e.g.*, "Def_Priv_00001"). In lieu of a document-by-document description of the nature of the withheld or redacted document sufficient for an opposing party to assess the privilege, the parties agree that in the first instance, a party can satisfy its obligations to provide a privilege log by providing a log containing the metadata described in this section. A party receiving a log can make reasonable requests for additional information sufficient to substantiate claims of privilege for specific entries.

19

B. The obligation to provide a log of privileged or work-product materials presumptively shall not apply to:

(i) Communications between a Party and its Outside Counsel transmitted on or after the March 11, 2024 New York Times article titled Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies.

(ii) Attorney-client privileged communications between a Party and its In-House Counsel, paralegals and legal assistants, investigators, and other staff, of the Arkansas Attorney General or attorney work-product generated by In-House Counsel or other staff of the Arkansas Attorney General on or after the March 11, 2024 New York Times article titled Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies.

(iii) Attorney work-product created by Outside Counsel for the Parties on or after the March 11, 2024 New York Times article titled Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies.

(iv) Internal communications within Outside Counsel and In-House Counsel for the parties occurring on or after the March 11, 2024 New York Times article titled Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies.

(v) Communications between a Party or its Outside Counsel and/or In-House Counsel and any expert or consultant retained or consulted with relating to this Action sent on or after the March 11, 2024 New York Times article titled

20

Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies.

(vi) Attorney-client privileged communications transmitted, or attorney work product generated, after June 30, 2024.

(vii) The Producing Party will provide a privilege log for documents and other information withheld from a production on privilege grounds on a rolling basis within 21 calendar days after the production.  Notwithstanding the foregoing, the parties agree to meet-and-confer regarding the amount of time that is reasonably necessary for the Producing Party to provide a privilege log for any particular production if more time is needed.  However, a Producing Party must provide a privilege log for documents and information withheld from discovery on or before any deadline for substantial completion of production of documents set forth in an applicable scheduling order or within 21 calendar days of that deadline. In all respects, the parties will provide privilege logs sufficiently in advance of the close of fact discovery in consideration of the need to resolve disputes in a timely fashion prior to proceeding with depositions and expert discovery.

(viii) Within seven (7) days of receiving written notice of a disputed privilege claim, the Producing Party and Receiving Party shall initiate the meet and confer process in good faith. If the parties cannot resolve their privilege dispute, then the producing party must move the Court for relief within fourteen (14) calendar days of an impasse as to the documents at issue. The parties may extend the deadlines set forth in this paragraph by mutual

21

agreement and shall meet and confer to discuss the procedures and format for bringing any privilege disputes to the Court's attention.

## XVI.   ARTIFICIAL INTELLIGENCE

A.   Protected Material shall not be submitted to any open Generative AI tool that is available to the public. Before any Receiving Party submits any Protected Material to a closed, enterprise Generative AI tool, the Receiving Party shall confirm that it can delete all such Protected Material from the Generative AI tool at the conclusion of this Action, including any derivative information.  Within ninety (90) calendar days after the last of a party's case is terminated (including all appeals), or such other time as the Designating Party may agree in writing, the Receiving Party shall be responsible for destroying such Protected Material from such tools as required herein.  Consistent with Section XI above, a Receiving Party shall provide written confirmation of such deletion or destruction of any information from a Generative AI tool to counsel for the Designating Party.

## XVII.  MODIFICATION PERMITTED

A.   Any party for good cause shown may apply to the Court for modification of this Protective Order.  This Protective Order shall remain in full force and effect and each person subject to this Order shall continue to be subject to the jurisdiction of this Court, for the purposes of this Order, in perpetuity, and the Court shall not be divested of jurisdiction of any person or of the subject matter of this Order by the occurrence of conclusion of this case, or by the filing of a notice of appeal, or other pleading which would have the effect of divesting this Court of jurisdiction of this matter generally.

22

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD, WHO AGREE TO THE FORM OF THIS ORDER.**

**IT IS SO ORDERED BY THE COURT**

DATED: This _____ day of _____, 2025.


_____

Judge Danny Glover

ENTRY REQUESTED BY:

Steven W. Quattlebaum (Ark. Bar No. 84127)
Sarah Keith-Bolden (Ark. Bar No. 2007235)
J. Houston M. Downes (Ark. Bar No. 2023149)
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
quattlebaum@qgtlaw.com
sbolden@qgtlaw.com
hdownes@qgtlaw.com

By: */s/ Steven Quattlebaum*

*Attorneys for General Motors LLC and OnStar, LLC*

**TIM GRIFFIN**
**ATTORNEY GENERAL**

Christine A. Cryer, ABN 2001082
Deputy Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-2029
Facsimile: (501) 682-8118
Christine.Cryer@ArkansasAG.gov

Matthew M. Ford, ABN 2013180
Senior Assistant Attorney General
Telephone: (501) 320-3069
Facsimile: (501) 682-8118
Matthew.Ford@ArkansasAG.gov

By: */s/ Matthew M. Ford*

REDDICK LAW, PLLC
Brian Reddick (94057)
Matthew Swindle (2012168)
Heather Zachary (2004216)
One Information Way, Suite 105
Little Rock, AR  72202
Telephone: (501) 943-1456
Facsimile: (501) 907-7793

24

brian@reddicklawfirm.com
matthew@reddicklawfirm.com
hzachary@reddicklawfirm.com

THE LANIER LAW FIRM
W. Mark Lanier*
Alex J. Brown*
Zeke DeRose III*
10940 West Sam Houston Parkway North, Ste. 100
Houston, TX  77064
Telephone: (713) 659-5200
Fascimile (713) 659-2204
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com
zeke.derose@lanierlawfirm.com

ROBBINS GELLER RUDMAN & DOWD LLP
Stuart A. Davidson (pro hac vice admitted)
Alexander C. Cohen (pro hac vice admitted)
Facundo M. Scialpi (pro hac vice admitted)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
sdavidson@rgrdlaw.com
acohen@rgrdlaw.com
fscialpi@rgrdlaw.com

* *Pro hac vice* forthcoming

*Attorneys for the State of Arkansas*

25

ATTACHMENT A

## IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS
## SECOND DIVISION

**STATE OF ARKANSAS,** *ex rel.*
**TIM GRIFFIN, ATTORNEY GENERAL**                                   **PLAINTIFF**

**v.**                                **CASE NO. 54CV-25-77**

**GENERAL MOTORS LLC; and**
**ONSTAR, LLC**                                                      **DEFENDANTS**

## ACKNOWLEDGMENT OF CONFIDENTIALITY DESIGNATIONS AND AGREEMENT TO BE BOUND BY TERMS OF COURT ORDER

I, _____ declare that: I reside at _____ in the City of _____, County of _____, State of _____. My telephone number is _____ and my email address is _____.

I am currently employed by _____, located at _____, and my current job title is _____.

I have read and understand the terms of the Stipulated Protective Order filed in the above-styled action currently pending in the Circuit Court of Phillips County, Arkansas, Civil Division. I agree to comply with and be bound by the provisions of the Stipulated Protective Order. I understand that any violation of the Stipulated Protective Order may subject me to sanctions by the Court.

I shall not divulge any documents, or copies of documents, designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" obtained pursuant to such Protective Order, or the contents of such documents, to any person other than those specifically authorized by the Stipulated Protective

1

**ATTACHMENT A**

Order. I shall not copy or use such documents except for the purposes of this action and pursuant to the terms of the Stipulated Protective Order.

As soon as practical, but no later than 30 days after final termination of this action, I shall return to the attorney from whom I have received any documents in my possession designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" and all copies, excerpts, summaries, notes, digests, abstracts, and indices that contain "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" Information.

I submit myself to the jurisdiction of the Circuit Court of Phillips County, Arkansas, Civil Division for the purpose of enforcing or otherwise providing relief relating to the Stipulated Protective Order.

This _____ day of _____, 20____.

_____
Signature

_____
Printed Name

2



**Case Title:**       STATE OF ARKANSAS TIM GRIFFIN V GENERAL MOTORS LLC

**Case Number:**   54CV-25-77

**Type:**             ORDER PROTECTIVE ORDER

So Ordered

_____

Danny W. Glover, 1sl Circuit, Divison 2, Judge

Electronically signed by DWGLOVER on 2025-06-02     page 28 of 28

# EXHIBIT K

Case 1:17-cv-01545-LAK   Document 257   Filed 10/20/25   Page 184 of 224

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 10-20-25

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. SECURITIES LITIGATION | Case No. 1:17-cv-01545-LAK |

## JOINT STIPULATION AND ~~[PROPOSED]~~ ORDER
## CONCERNING ELECTRONICALLY STORED INFORMATION

Having met and conferred, the Parties hereby stipulate and agree that electronically stored information ("ESI") will be produced and used in the following form and manner in this litigation:

1. **ESI to be preserved.** The parties will take reasonable steps to preserve relevant information. Proportionality will be considered assessing the reasonableness of those steps. The parties will meet and confer regarding the scope of preservation, including custodians, data sources, date ranges, and categories of information that have been or should be preserved in connection with this litigation. If applicable, the parties will endeavor to disclose categories or sources of responsive information that they have reason to believe have not been preserved or should not be preserved. Preservation obligations include the metadata specified in Exhibit A to the extent they exist as stored in the usual course of business.

This preservation obligation shall not extend to the following forms of data, except on the showing of good cause:

    (1)    temporary data stored in a computer's random-access memory (RAM);

    (2)    common operating system and program files (for the avoidance of doubt, this does not include user created Documents stored in system and shared folders; rather, this refers to software files needed to run and open systems and programs);

(3)    slack, fragmented, unallocated data, or data that no longer has a file marker on computer or server hard drives;

(4)    backup data that is duplicative of data that is preserved in a more accessible format;

(5)    information from handsets, mobile devices, personal digital assistants, iPads, and tablets that is duplicative of data that is preserved in a more accessible format (e.g., email accessed on a mobile device but stored on a company server);

(6)    on-line access data such as temporary internet files, history, cache, and cookies;

(7)    systems and backup media of systems no longer in use that cannot be accessed or restored;

(8)    Any other category of ESI that, after the entry of this Order, the Parties mutually agree or the Court orders need not be preserved.

2.    **Scope of Collection, Search, and Review:** The Parties will negotiate in good faith the scope of documents, including document custodians (including job title and dates of employment), and custodial and non-custodial sources to be collected as well as the methodologies or protocols for the search and review of electronically stored information. The parties retain the right, upon good cause shown, to request that files from additional custodians or additional custodial and non-custodial sources be searched and will meet and confer regarding such request.

(1)    **Sources.** The parties will identify and describe the custodial and non-custodial data sources likely to contain responsive information. As part of the conferral process, if applicable, the parties will promptly notify each

2

other of any known retention policies and practices (or deviations from those policies and practices) that are impacting or have impacted the production of relevant information, for example, the use of auto-delete functions, the deletion of information by custodians upon their departure from the company, and whether any routine functions concerning this data has caused the deletion or destruction of relevant ESI.

(2) **Targeted Responsive Documents.** Documents and categories of documents that are relevant to this action and responsive to a party's document requests, and that are regularly maintained in a known location, or in a location that is knowable upon reasonable inquiry of those with knowledge about a party's document management, shall be collected without the use of search terms or other agreed-upon advanced search methodology (e.g., analytics, predictive coding, technology-assisted review). As necessary or appropriate, or upon request, the producing party will indicate which categories of documents and data sources will be produced with and without the use of search terms or other advanced search methodology.

(3) **Search Terms.** Where the parties agree that potentially responsive ESI shall be searched through the use of search terms, the parties shall use the process identified below and shall meet and confer regarding any proposed deviation. The producing party shall provide a list of proposed search terms, which shall contain all search terms that it believes would lead to the identification of relevant documents. To the extent reasonably

3

possible, search terms will be crafted with input from the custodians in order to identify appropriate nomenclature, code words, etc. Upon receipt of the proposed search terms, the receiving party shall provide any additional search terms that it believes are necessary to identify responsive documents. Upon receipt of the additional search terms, the producing party will provide a search term hit list or hit report after global de-duplication (including the number of documents that hit on each term, the number of unique documents that hit on each term (documents that hit on a particular term and no other term on the list), and the total number of documents that would be returned by using the proposed search term list, with and without families). The parties shall meet and confer regarding the proposed search terms within a reasonable period of time after receipt of the search term hit list to agree on a set of search terms.

(4) **Short Message Communications** The parties shall meet and confer regarding the search methodology used for short message format communications such as those from mobile devices or collaborative tools (*e.g.*, text messages, WhatsApp, Slack, Teams, G-Chat, etc.).

(5) **Technology-Assisted Review/Generative AI.** No party shall use predictive coding/technology-assisted review or artificial intelligence for the purpose of culling the documents to be reviewed or produced without notifying the opposing party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

4

3. **General Format of Production:** With the exception of spreadsheet files (*.xls, *.xlsx), presentation files, database files (*.mdb), various multi-media files (audio and video), and other non-standard files (transactional data, proprietary applications) that do not require redaction, which will be produced in native file format, all documents that originally existed in hard-copy or native electronic form shall be produced in electronic image format with accompanying text and metadata files in the manner provided herein, at the producing Party's own expense. Spreadsheet files that require redaction to protect privileged or other objectionable information (*e.g.*, PII) shall be produced in native format with privileged information redacted. Each document's electronic image shall convey the same information and image as the original document and will show any and all text, hidden content, comments, and images. ESI files without standard pagination that require redaction to protect privileged or otherwise protected information will be produced as TIFF/JPG images in accordance with Paragraph 4 below (or in some other format as may be agreed upon by the Parties on a case-by-case basis, if production in TIFF/JPG format would render the ESI unreadable or unusable). The parties will meet and confer regarding the format of production for short message communications (*e.g.*, text messages, WhatsApp, Slack, iMessage, Teams, G-Chat, Bloomberg, etc.) but will be produced in RSMF when available with all available metadata and attachments. To the extent a response to discovery requires production of electronic information stored in a database, the parties will meet and confer regarding methods of production. The parties will consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file. The Parties shall meet and confer to attempt to resolve any problems related to the imaging or formatting of produced documents. To the

extent exceptions to the foregoing are required, the Parties will meet and confer to discuss alternative production requirements, concerns, or formats.

4.    **Document Image Format:** Except as provided in Paragraph 3 and Paragraph 14 herein, all production document images will be provided in a single-page, 300 DPI, Group IV TIFF format for black & white documents and single-page, 300 DPI JPG images with JPG compression and with a high quality setting as to not degrade the original image for color images, along with a load file.  Load files should be produced in an agreed-upon database format (*i.e.*, Concordance *.dat format), with an agreed-upon image format (*i.e.*, Opticon *.opt) cross-reference file, together with the TIFF/JPG image.  The file name of each TIFF/JPG image file shall be the corresponding Bates number of the page of the document portrayed, followed by the extension ".TIF" or "JPG."

5.    **Hard-Copy Document Unitization:** Each page of a responsive hard-copy document shall be scanned or electronically saved into an image in accordance with Paragraph 4.  If any original hard-copy document has notes affixed thereto or attachments, the Parties will scan and produce copies of the notes or attachments, unless privileged or otherwise protected, in the same manner as other documents.  If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be reflected in the load file referenced above in the Bates number fields set out in Exhibit A to the extent reasonably practicable.

6.    **Bates Numbering and Native File Production:** Each page of a produced electronic document shall be sequentially marked with a legible Bates number in the lower-right corner.  "Confidential" designations, if needed or required in accordance with a Protective Order described in Paragraph 22 below, shall be marked in the lower-left on each

6

page of produced documents.    Neither the Bates numbering nor the confidentiality designation shall cover, obliterate, or obscure any other information on the document.    For native files, a placeholder TIFF image marked with the Bates number and "Confidential" designation and stating "File Produced Natively" shall be produced.    The file name of each document produced in native file format shall be the corresponding Bates number (*e.g.*, ABC-00000001.xls) and may also be named to include any confidentiality designation as a suffix to the Bates number (*e.g.*, ABC-00000001-CONFIDENTIAL.xls).    For the avoidance of doubt, native files are not required to include a confidentiality designation in their file names to preserve the confidentiality of the native file.    One single set of initial Bates prefixes will apply to all documents produced by each Party in the Action.    Bates numbers shall contain only alphanumeric characters, underscores, and hyphens; spaces and other characters shall not be utilized.    The numeric portion of each Bates number shall be front padded with zeros to provide placeholders for eight digits.

7.    **Document Production:** Documents produced in this Action will be produced or provided via a secure encrypted electronic file transfer or file sharing system (e.g., FTP site) within a password-protected container file (e.g., *.zip).    To the extent it is not practicable to produce or provide documents via secure electronic file transfer system, documents will be produced or provided in encrypted format on a portable hard drive or thumb drive.    If a drive is used, the media will have a label containing the case name, the name of the party making the production, the range of Bates numbers for the documents contained in that production, the volume number of the production, and the date of the production.    The password necessary to access the production volume shall be transmitted separately from the file transfer notification or physical media.

8.    **Metadata:** The Parties will extract and provide the metadata corresponding to the fields set forth in Exhibit A, where they exist as they are stored in the usual course of business and not subject to a claim of privilege, in the accompanying Load File. The Parties are not obligated to populate manually any of the fields in Exhibit A except to the extent they can be populated in an automated manner. ESI items will be processed in a manner that preserves the source native file and metadata without modification, including time and date. ESI items will be processed in a manner that maintains and displays hidden columns or rows, hidden text or worksheets, speaker notes, tracked changes and comments. For the avoidance of doubt, the Parties shall not be required to provide metadata for documents withheld in full on the basis of the attorney-client privilege, work product doctrine, or any other applicable privilege or protection where the metadata contains privileged or protected information.

9.    **OCR/Extracted Text:** Each party shall produce corresponding Extracted text files for all documents. If extracted text does not exist as stored in the usual course of business, or if the document has been redacted, then Optical Character Recognition ("OCR") will be produced. The OCR/extracted text files shall be provided in a manner suitable for importing the information into commercially available document management or litigation support software such as Relativity, Summation or Concordance. OCR/extracted text files shall be provided in Text file format with individual files corresponding to each document. The file name of each extracted OCR text file shall be the Bates number of the image of the first page of the corresponding document, followed by the extension ".txt."

10.    **Color:** With the exception of any documents described in Paragraph 14, all documents are to be produced in black and white. With respect to any documents that

contain color, however, each party shall honor reasonable and specific requests for the production of color image(s) of such documents.

11.   **Duplicates:** The Parties shall globally de-duplicate stand-alone documents or entire document families globally using MD5, SHA-1, or Relativity's Deduplication Hash value matching, or other de-duplication processes to which the Parties may mutually agree. Standalone documents should not be de-duplicated against email attachments. The custodian associated with the first processed copy of an email or non-email document family will be considered the primary custodian for that document (*i.e.*, the custodian who will be used as the basis for determining which other collected documents are duplicative).  To the extent that multiple individuals possessed copies of a duplicate email or other electronic document, all such individuals will be identified in a separate "All Custodians" metadata field and folder path for each document will be identified in a "File Path All" metadata field.  To the extent emails or other electronic documents are de-duplicated, the Parties agree to preserve the source location information for each file, to the extent such information is reasonably accessible or available, for each custodian in whose files the duplicate document originally resided, and that such information will be securely retained and made available for inspection upon reasonable request.  For the avoidance of doubt, Paragraph 11 is intended only to minimize the review burden on all Parties by allowing for the removal of exact duplicates within a Party's collections; nothing in this paragraph will be interpreted to authorize the removal of non-duplicative documents from the universe of documents that should be reviewed pursuant to the Parties' respective search protocols.

12.   **Production of Email Threads:** Non-inclusive emails (*i.e.*, any email the text and attachments of which are fully contained within another email in the document population)

9

may be excluded from review so long as the non-inclusive emails are produced or logged separately.

13.    **Use of Documents:** When any document produced in accordance with this Stipulation is to be used in any proceeding, hearing or deposition, the production image copy of the document shall be the copy used, except for documents produced solely in native format.  OCR versions or extracted text may not be used alone as a substitute for the full image of any document, although any party may use or present accurate excerpts of any document for demonstrative purposes.

14.    **Oversized Documents:** Documents that cannot for technical or other reasons be legibly produced in the manner described in Paragraph 3 above (*e.g.*, documents having a size larger than 11 x 17 inches) shall be produced by scanning a representative identifying portion of the document as a place holder (*e.g.*, a map or drawing legend) and numbering it as described in Paragraph 3 above.    The placeholder shall bear a legend stating that the document is an excerpt and that the full version is available in another format.   A paper copy (in color, if applicable) of the entire document shall then be made and numbered with the Bates number corresponding to the place holder and stamped with any applicable "Confidential" or "Redacted" notations unless the full version can be produced in native form, in such case no paper copy should be required. This paper copy or native file shall be produced along with the electronic production.

15.    **Non-Convertible Files:** Certain types of files, such as system, executable, and program files do not contain substantive information and are not amenable to conversion into TIFF format.  In general, these types of files, including any items matching hash value in the current NIST National Software Reference Library, will not be processed for review or

production. Compressed file types (e.g., .CAB, .GZ, .TAR. .ZIP) will be decompressed in a reiterative manner to ensure that a compressed file within a compressed file is decompressed into the lowest possible compression resulting in individual files. The Parties shall, upon a showing of good cause by the opposing party, produce an Exception Report reflecting such non-convertible files.

16.    **Privilege Logs.** The Parties agree to provide privilege logs in accordance with Fed. R. Civ. P. 26(b)(5)(A) and Local Rule 26.2. The parties will meet and confer regarding the appropriate format and timing of production of the privilege logs. Documents redacted for privilege need not be listed on the privilege log if the purpose of the redaction (Attorney-Client or Work Product) is evident on the face of the document and provided in the load file and the redactions have been implemented in a manner that allows the receiving party to understand the subject matter of the document, the date of the document, the parties to the document and assess the claim of privilege from what is visible on the face of the document. The Parties are not required to include on a privilege log any attorney work product or attorney client communications discussing litigation strategy with, or seeking legal advice from, outside counsel regarding this Action. Logs will be produced in PDF format and shall be accompanied by a Microsoft Excel copy of the log.

17.    **Obligation to Meet and Confer.** The Parties shall meet and confer regarding the production of any type of data that is not addressed in this Stipulation.

18.    **Technology Assisted Review.** If a party elects to use technology assisted review or any other form of machine learning in lieu of or in conjunction with search terms or keywords (collectively, "TAR") for the purpose of culling ESI potentially responsive to a discovery request, the Parties shall meet and confer regarding how the technology will be

11

implemented prior to the use of such TAR. The Parties will meet and confer regarding any TAR issues that arise. For the avoidance of doubt, the Parties may use TAR to assist with the prioritization of documents. If the Parties cannot reach resolution, the matter may be submitted to the Court. By agreeing to use TAR in this Action, the Parties do not acknowledge or concede that they are obligated to use TAR in any other matter, including, without limitation, matters pending in any state or federal courts. Moreover, by agreeing to use TAR in this Litigation, the Parties do not intend to waive and do reserve any rights or protections pursuant to privacy, confidentiality, attorney-client privilege, work product, and any other privileges, protections, or objections to discovery. **Use of Generative AI.** All participants in this litigation are prohibited from using any automated document review platform or tool that incorporates or relies on any generative artificial intelligence (hereinafter defined as a "Gen AI Tool") for the purposes of identifying documents for production. To the extent a Gen AI Tool is used to identify or analyze documents for other internal purposes, such documents shall not be submitted to any open or publicly available Gen AI Tool. Prior to submitting any documents to a Gen AI Tool, the Receiving Party shall confirm that the Gen AI Tool does not use submitted data to train its large language model ("LLM") and that it provides the capability to delete all submitted documents and any derivative information at the conclusion of this Action.

19. **Parent-Child Relationships.** Parent-child relationships (*i.e.*, the association between an attachment and its parent document or between embedded documents and their parent) must be preserved. For example, electronic documents attached to an email are to be produced with contemporaneous and sequential Bates numbers, immediately following those of the parent document. Based upon a reasonable inquiry, the parties did not utilize

12

hyperlinks within emails or other communications to share documents. To the extent the parties identify hyperlinks in the collection or production, the parties will meet and confer regarding the feasibility of the collection of hyperlinked documents (as well as the version of hyperlinked documents available for collection) and the feasibility of producing the hyperlinked documents in a way that maintains the relationship between documents.

20.    **Partially Withheld Families.** If a portion of a responsive email family is privileged, only the non-privileged portion of that document family will be produced. Where an attachment or attachments must be withheld in their entirety for privilege, and another document or documents in the family must be produced, the privileged attachment(s) will be produced as a slip sheet bearing only a Bates number, confidentiality designation, and statement that the document is withheld as privileged. If the only responsive documents in a document family are privileged, the non-responsive document(s) need not be produced.

21.    **Protective Order.** The Parties previously submitted a proposed Protective Order, which the Court entered with revisions. *See* Dkt. 215 (the "Protective Order"). The Parties incorporate the provisions of the Protective Order. For the avoidance of doubt, nothing herein will contradict the Parties' rights and obligations with respect to any information designated with a confidentiality designation pursuant to the terms of the Protective Order.

22.    **Reservation of Rights.** Nothing in this Stipulation establishes any agreement regarding the subject matter or scope of discovery in this Action, or the relevance, authenticity or admissibility of any data. The Parties do not waive any objections to the production, discoverability, or confidentiality of any material produced, including, without limitation, objections regarding the burden, overbreadth or relevance of document requests.

13

Nor will anything in this Stipulation be interpreted to require disclosure of relevant information or data that is protected by the attorney-client privilege, the common interest privilege, or the work-product doctrine, or that is prohibited from disclosure under any similar law, regulation, rule, court order, or any other applicable privilege or protection.

DATED:  October 17, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP

*/s/ David A. Rosenfeld*

Samuel H. Rudman
srudman@rgrdlaw.com
David A. Rosenfeld
drosenfeld@rgrdlaw.com
Robert D. Gerson
rgerson@rgrdlaw.com
Natalie C. Arenella
narenella@rgrdlaw.com
Joshua D. Forgy
jforgy@rgrdlaw.com

58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

*Lead Counsel for Plaintiffs*

POMERANTZ LLP
Jeremy A. Lieberman
jalieberman@pomlaw.com
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665

WILLIAMS & CONNOLLY LLP

*/s/ Steven M. Farina*

Steven M. Farina (*pro hac vice*)
sfarina@wc.com
Amanda M. MacDonald (*pro hac vice*)
amacdonald@wc.com

680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029

George A. Borden, Esq.
gborden@wc.com

650 Fifth Avenue, Suite 1500
New York, NY 10019
Tel: (646) 949-2800
Fax: (646) 949-2801

*Attorneys for Defendants AmTrust Financial Services, Inc., Barry D. Zyskind, Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, Jay J. Miller, and Kristin Pipoly, as executrix of the Estate of Ronald E. Pipoly Jr.*

BRONSTEIN, GERWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
peretz@bgandg.com
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296

*Additional Counsel for Plaintiffs*

MCDERMOTT WILL & EMERY LLP

/s/ *Timothy E. Hoeffner*
Timothy E. Hoeffner
thoeffner@mwe.com
Jason Gerstein
jgerstein@mwe.com
One Vanderbilt Avenue
New York, New York 10017
Tel: (212) 547-5400

*Attorneys for Defendant BDO USA, P.C.*

ROPES & GRAY LLP
/s/ *Gregg L. Weiner*
Gregg L. Weiner
gregg.weiner@ropesgray.com
C. Thomas Brown
thomas.brown@ropesgray.com
1211 Avenue of the Americas
Tel: (212) 596-9000
Fax: (212) 596-9090

*Counsel for Defendants Citigroup Global
Markets Inc., Keefe, Brueytte & Woods, Inc.,
Morgan Stanley & Co. LLC, RBC Capital
Markets, LLC, and UBS Securities LLC*

IT IS SO ORDERED.

DATED: ____10/20/25____

_____
THE HONORABLE LEWIS A. KAPLAN
UNITED STATES DISTRICT JUDGE

## Exhibit A

For ESI other than email and e-docs that do not conform to the metadata listed in Exhibit A, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, Google Docs, etc., the parties should meet and confer as to the appropriate metadata fields to be produced.

### REQUESTED METADATA FIELDS FOR ESI

| FIELD NAME | TYPE | DESCRIPTION | EXAMPLE / FORMAT |
|---|---|---|---|
| PRODBEGBATES | All | The production Bates number associated with the first page of a document. | ABC00000001 |
| PRODENDBATES | All | The production Bates number associated with last page of a document. | ABC00000003 |
| PRODBEGATTACH | All | The production Bates number associated with the first page of the parent document. | ABC00000001 |
| PRODENDATTACH | All | The production Bates number associated with the last page of the last attachment in the document family. | ABC00000008 |
| PRODVOLID | All | Production volume name. | ABC-VOL-001 |
| PGCOUNT | All | Total number of pages for a document. Slipsheets will indicate one (1) page. | 25 |
| CUSTODIAN | All | The name of the first-processed custodian or data source the files belong to.  For persons, this field should be populated as last name, first name. | Doe, John |
| CUSTODIANS_ALL | All | All custodians who were in possession of a de-duplicated document.  This field should be populated as last name, first name and separated by semicolons for additional Custodians. | Doe, John; Doe, Jane |
| RECORD_TYPE | All | The record typing indicating whether the document is an email, email attachment, email attachment (email) [for attachments that are emails], E-Doc, or E-Doc Attachment, Hard Copy, or similar designations. | Email |
| FILE_EXTENTION | All | The file extension of a document. | docx |
| FILE_NAME | All | The file name of a document. | Document_Name.xls |
| EMAIL_SUBJECT | Email | The subject of an email. | Re: resume |
| DOC_TITLE | E-Files | The extracted document title for a loose file or attachment. | Resume.docx |

| DOC_AUTHOR | E-Files | The author of a document from entered metadata. | John Doe |
|---|---|---|---|
| LAST AUTHOR | E-Files | The name of the last author of the document from extracted metadata. | JSmith |
| EMAIL_FROM | Email | The email address and name of the person sender in the FROM field of every email metadata. | John Doe <jdoe@acme.com> |
| EMAIL_TO | Email | The email addresses and names of the recipients in the TO field of the email. Multiple email addresses and names should be separated by semicolons. | Jane Smith <jsmith@acme.com |
| EMAIL_CC | Email | The email addresses and names of the recipients in the CC field. Multiple email addresses and names should be separated by semicolons. | Bob Johnson <bjohnson@acme.com>; Sally May <smay@acme.com> |
| EMAIL_BCC | Email | The email addresses and names of the recipients in the BCC field. Multiple email addresses and names should be separated by semicolons. | John Doe <jdoe@acme.com> |
| DATESENT | Email | The date when an email was sent. | MM/DD/YYYY |
| DATESENT_TIME | Email | The time an email was sent. | HH:MM:SS |
| DATERECEIVED | Email | The date an email was received. | MM/DD/YYYY |
| DATERECEIVED_TIME | Email | The time an email was received. | HH:MM:SS |
| DATELASTMOD | E-Files | The date a document was last modified. | MM/DD/YYYY |
| DATELASTMOD_TIME | E-Files | The time the document was last modified. | HH:MM:SS |
| DATECREATED | E-Files | The date the document was created. | MM/DD/YYYY |
| DATECREATED_TIME | E-Files | The time the document was created. | HH:MM:SS |
| FILESIZE | All | The size of the file in kilobytes (KB) including embedded attachments. | 125256 |
| TIMEZONE | All | The time zone the document was processed in. | PST, CST, EST, etc. |
| FILEPATH | All | The original file path to the source location of the native file in original environment (e.g., local folder, network folder, email folder, or files and/or mail store, etc.). The file path should be prepended with the Custodian name. | \Doe_Jane\My_docs\resume.docx |

17

| FILEPATH_ALL | | The file paths from the locations from which the items were stored in the usual course of business. This field should be populated for both e-mail and e-files and separated by semicolons. | ./JSmith.pst / lnbox; /JSmith.pst /Deleted Items / Network Share/ Accounting/ …; / JSmithPC/U sers/JSmith/ My Documents/ … |
|---|---|---|---|
| HASH | All | The MD5, SHA, or similar "de-duplication key" hash value assigned to a document during processing. | 9CE469B8DF AD1058C3B1 E745001158E A |
| REDACTED | All | Identifies whether a document is redacted. | Yes or Blank |
| CONFIDENTIALITY | All | Identifies a document's confidentiality designation. | Highly Confidential |
| NATIVELINK | All | The relative path to a native copy of a document. The native file should be named per the control number or Bates number, if the document is produced. | \NATIVES\00 1\ABC000000 01.xlsx |
| TEXTLINK | All | The relative path to a text file containing extracted OR OCR text of the document. The Text file should be named per the control number or Bates number, if the document is produced. | \TEXT\001\A BC00000001.t xt |

# EXHIBIT L

 **Everlaw**



Knowledge Base  >  Everlaw AI Assistant  >  Getting started and FAQs

🔍 What are you interested in?

# Everlaw AI Assistant FAQs

 **[System] Everlaw Support**
October 22, 2025 at 8:18 AM

Last Updated: August 12, 2025

## Table of Contents

- How does my organization get Everlaw AI Assistant?
- What was the approach to building Everlaw AI Assistant?
- How does Everlaw AI Assistant work?
- How should I use Everlaw AI Assistant?
- Which sub-processors are being used by Everlaw AI Assistant?
- How does Everlaw select its LLMs?
- Do the Everlaw Terms of Service governing my use of Everlaw today also apply to my use of Everlaw AI Assistant?
- What about the privacy and confidentiality of my data?
- Does my data leave Everlaw when I use Everlaw AI Assistant?
- Do the LLMs use Everlaw customer data to train their models?
- Do the LLMs store Everlaw customer data?
- Is my data from using Everlaw AI Assistant used to serve other customers?
- Will output from Everlaw AI Assistant contain bias or toxic content?
- Does Everlaw AI Assistant impact my compliance with GDPR and CCPA?

## How does my organization get Everlaw AI Assistant?

To get Everlaw AI Assistant for your organization, please reach out to your Customer Success Manager or request a call.

## What was the approach to building Everlaw AI Assistant?

Everlaw AI Assistant brings the power of generative AI (genAI) into the world's most advanced ediscovery software to speed up legal document review and

### Table of contents

How does my organization get Everlaw AI Assistant?

What was the approach to building Everlaw AI Assistant?

How does Everlaw AI Assistant work?

How should I use Everlaw AI Assistant?

Which sub-processors are being used by Everlaw AI Assistant?

How does Everlaw select its LLMs?

Do the Everlaw Terms of Service governing my use of Everlaw today also apply to my use of Everlaw AI Assistant?

What about the privacy and confidentiality of my data?

Does my data leave Everlaw when I use Everlaw AI Assistant?

Do the LLMs use Everlaw customer data to train their models?

Do the LLMs store Everlaw customer data?

Is my data from using Everlaw AI Assistant used to serve other customers?

Will output from Everlaw AI Assistant contain bias or toxic content?

Does Everlaw AI Assistant impact my compliance with GDPR and CCPA?

Related articles

(Back to top)

evidence-based writing. All of the work we do is guided by our Generative AI Principles, which focus on (1) Control, (2) Confidence, and (3) Transparency, Privacy, and Security. These key principles guide us to deliver responsible genAI to our customers.

## How does Everlaw AI Assistant work?

Everlaw AI Assistant combines large language models (LLMs) developed by highly reputable AI service providers with the data inside Everlaw's purpose-built platform. Everlaw AI Assistant provides a native AI experience that is relevant to your teams and your legal and investigation use cases, all in a way that respects the privacy of your data. Visit the Everlaw AI Assistant page to learn more.

## How should I use Everlaw AI Assistant?

LLMs are systems trained on huge corpuses of text. Based on this training, these models are adept at predicting the next word given a sequence of preceding words. This is the core capability of LLMs.

While some compelling functionality can be built off of this core capability, it is important to remember that LLMs are probabilistic language machines with no notion of things like truthfulness, accuracy, or intent. LLMs are trained to produce fluid text, not accurate responses. When using any feature backed by a LLM, it is important to remember that these systems can and do produce inaccurate, false, and/or misleading statements, even when there are additional guardrails put in place.

When using Everlaw AI Assistant features, we encourage you to exercise your own judgment and expertise to validate responses. Human validation is particularly important when you are using the system to create factual claims about people or events, or work product you intend to share with others. For more information, check out our Knowledge Base.

## Which sub-processors are being used by Everlaw AI Assistant?

Click here for a complete list of sub-processors used by Everlaw, including for Everlaw AI Assistant. We continually evaluate advancements in foundation models to ensure we deliver the best outcomes for our customers. As part of this effort, we may engage new sub-processors from time to time and will notify customers accordingly.

## How does Everlaw select its LLMs?

Everlaw thoroughly vets all of its sub-processors, including each LLM, with the appropriate internal teams. Everlaw chooses technology due to the quality of the foundation models and commitments to allow Everlaw to uphold its data privacy and security commitments to its customers.

## Do the Everlaw Terms of Service governing my use of Everlaw today also apply to my use of Everlaw AI Assistant?

Yes, Everlaw AI Assistant is covered by the Everlaw Terms of Service that governs your use of the Everlaw service today. If you signed an offline variant of our terms of service for use of the Service, then Everlaw may need to update your agreement with relevant legal and business terms before you can start using Everlaw AI Assistant.

## What about the privacy and confidentiality of my data?

To the extent the Case Materials you submit to Everlaw AI Assistant are subject to any applicable privacy law, the terms of the Data Processing Addendum (or if applicable, the data processing addendum applicable to your account) apply. In addition, your data is subject to the same confidentiality requirements as stated in your agreement with Everlaw.

## Does my data leave Everlaw when I use Everlaw AI Assistant?

Yes, when you use Everlaw AI Assistant, each data request is sent to one of our LLMs, individually, over an SSL encrypted service, to process and send back to Everlaw. For Everlaw clients in our EU and UK environments, tasks for Everlaw AI Assistant are processed in the EU region. For all other clients using Everlaw AI Assistant, data is sent to servers in the US.

## Do the LLMs use Everlaw customer data to train their models?

No. Rest assured that th data you submit and the responses you receive via Everlaw AI Assistant are not used to fine-tune or improve any of our LLM's models.

## Do the LLMs store Everlaw customer data?

No, none of the LLMs store the data you submit or the responses you receive.

# Is my data from using Everlaw AI Assistant used to serve other customers?

The data you submit and the responses you receive are not used to train models across customers or shared between customers.

# Will output from Everlaw AI Assistant contain bias or toxic content?

We designed EverlawAI Assistant to prioritize accuracy in our output. If the case materials contain bias or toxicity, that may be reflected in output. We have also taken steps to reduce hallucinations.

# Does Everlaw AI Assistant impact my compliance with GDPR and CCPA?

Everlaw supports our customers' compliance with the GDPR and the CCPA. We will process and transmit data for Everlaw AI Assistant in accordance with our Data Processing Addendum, as supplemented by your agreement with Everlaw for use of the Service.

# Related articles

Getting started with Everlaw AI Assistant

The Technology Behind Everlaw AI

Document summaries, topic analysis, custom extractions, and Q&A

Leveraging Everlaw AI Assistant in common workflows

Delete, Suspend, and Export Projects and Databases

---

Was this article helpful?   1 out of 2 found this helpful

Do you have feedback about this article? Let us know

MORE QUESTIONS?

support@everlaw.com

(844) 383 7529

ABOUT US

Everlaw home

Professional services

PRIVACY POLICIES

Privacy notice

California privacy notice

# EXHIBIT M

Security

# For the Most Sensitive Matters

Harvey keeps your client data safe with world-class security and data privacy measures.

**Request a Demo**

Explore Security Portal ↗

# Enterprise-Grade Protection

## Dedicated Security Expertise

Harvey's in-house security team spans infrastructure, product, and operations. We implement robust security protections across the stack, with 24/7 coverage and end-to-end monitoring.

## Data Sovereignty and Control

With Harvey, you retain full control over your data. Decide which data to upload, set retention policies, delete data anytime, and keep everything in-region—EU, US, or Australia.

## No Model Training

Harvey contractually guarantees through our Security Addendum that your data stays yours. We don't use inputs, outputs, or uploaded documents to train underlying models.

## Enterprise-grade Features

Harvey includes default controls that enterprise teams expect: SAML SSO, audit logs, IP allow-listing, data lifecycle management, and more.

## Enforceable Contractual Commitments

Harvey's Security Addendum includes binding terms on data protection, data access, incident response SLAs, and other controls aligned with SOC 2, ISO, GDPR and other standards. Our commitments are auditable, enforceable, and built to exceed standard vendor terms.

## Independently Tested

Harvey partners with top-tier security firms, including Schellman, NCC Group and Bishop Fox, to perform in-depth audits. This offers external validation that Harvey meets the highest standards of resilience.

# Compliant with Industry Standards



## SOC2 TYPE II
Details ↗

## CCPA
Details ↗



## ISO 27001
Details ↗

## GDPR
Details ↗

## DPF
Details ↗

## Security is Fundamental to Everything We Do

We've built a comprehensive system that protects data at every level-from robust user authentication to vigilant network monitoring. Our approach combines cutting-edge technology with rigorous protocols, ensuring that

information remains secure in an ever-changing digital landscape. We constantly test and improve our defenses, staying ahead of potential threats to maintain the trust our clients place in us.

Explore Security Portal ↗

# Frequently Asked Questions

How does Harvey define customer data?

How does Harvey keep my data private and secure?

Where is my data hosted and processed?

How do you respect access controls for client data?

How does Harvey ensure no one is training on my data?

Can my firm use our client data for model training?

How often do you perform security audits and vulnerability assessments?

# Secured by a World-Class Team



**Security by Design:**
How Harvey Engineered
Trust from Day One

Harvey

May 29, 2025

## Security by Design: How Harvey Engineered Trust from Day One

 Multiple Authors



August 19, 2025

## How Harvey's Building a Culture of Privacy

Anita Gorney

# EXHIBIT N

**Robbins Geller Rudman & Dowd** LLP

| | Chicago | Melville | Nashville | San Diego | Wilmington |
|---|---|---|---|---|---|
| | Boca Raton | Manhattan | Philadelphia | San Francisco | Washington, D.C. |

Lucas F. Olts
lolts@rgrdlaw.com

December 8, 2025

<u>VIA EMAIL</u>

Mason Parham
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, IL  60603

Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY  10001

Re:    *In re agilon health, inc. Securities Litigation*,
No. 1:24-cv-00297 (W.D. Tex.)

Dear Counsel:

I write following our call on December 5, 2025 regarding Defendants' revised drafts of the ESI Agreement and Confidentiality and Protective Order sent to Plaintiffs that same day.

Our understanding from the call is as follows:

**Personally Identifiable Information ("PII") Redactions (*See* ESI Agreement §V.I.)**: The parties discussed Defendants' addition of "Redacted-PII" as an example of a reason for a redaction within a document.  Defendants conceded that they have not provided a definition of PII in any documents to date, however, they believe that the term does not need to be defined.  We understand PII refers to personally identifiable information, or information that can be used to identify persons, such as Social Security numbers, drivers' licenses, passport number, email address, phone number, physical address, or biometric data.  On the call, the parties agreed on whether two examples of information would require protection through being redacted as PII.  First, the parties agreed that social security numbers are an item that would potentially require protection as PII.  Second, the parties agreed that email addresses utilized to do company-related business would not need protection as PII.  Using those definitions of PII, we are agreeable to your edit.  Please confirm, hopeful that the parties can now sign off on the ESI Agreement.

**Generative Artificial Intelligence ("AI") (*See* Confidentiality and Protective Order §4.)**: On the call, Defendants represented that their primary concern is that they do not want any of their clients' protected data being used to train publicly available generative AI models.  As we explained on the call, Plaintiffs proposed language specifically prohibits the use of any generative AI models that would be available to anyone prohibited from accessing the data by the terms of the protective order, and thus adequately addresses Defendants' concern.  We represented that we

655 West Broadway, Suite 1900    San Diego, CA  92101    Tel 619-231-1058    Fax 619-231-7423    rgrdlaw.com

**Robbins Geller**
**Rudman & Dowd** LLP

Mason Parham
SIDLEY AUSTIN LLP
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
December 8, 2025
Page 2

would not (nor could we under the protective order's terms) use any type of publically available generative AI that uses data to train its model (such as the free version of ChatGPT or Google Gemini) to process Defendants' protected data. We merely want the option to use eDiscovery platforms and tools that utilize generative AI specifically designed for litigation where confidential information has been exchanged.

The use of generative AI tools to assist in data review and processing for litigation has become common place. EDiscovery platforms and tools that utilize generative AI such as Relativity aiR, Harvey, Syllo, Fileread, Everlaw, and CoCounsel are all used in litigation. Judge Xavier Rodriguez specifically called this use case out last year stating that: "In the ediscovery world, I see a lot of value coming down the pike with ediscovery vendors now embedding AI tools." Justin Smith, *Responsibly Diving into Generative AI with Judge Xavier Rodriguez*, EVERLAW (May 21, 2024), https://www.everlaw.com/blog/ai-and-law/responsibly-diving-into-generative-ai-with-judge-xavier-rodriguez/. Your own firms use generative AI in your litigation practices. *See* Colleen M. Kenney, Matt S. Jackson, Robert D. Keeling, *Replacing Attorney Review? Sidley's Experimental Assessment of GPT-4's Performance in Document Review*, THE AMERICAN LAWYER ONLINE (Dec. 13, 2023), https://plus.lexis.com/api/permalink/69dbddd1-13d3-4136-bbc2-935c99d06272/?context=1530671; *Sidley's New Associates Compete in Inaugural Generative AI Hackathon Event*, SIDLEY AUSTIN LLP (Jan. 16, 2025), https://www.sidley.com/en/newslanding/newsannouncements/2025/01/sidley-new-associates-compete-in-inaugural-generative-ai-hackathon-event. Debevoise & Plimpton actively encourages the use of generative AI. *See In 2025, One of the Biggest AI Risks Is Not Letting Employees Use AI – Lessons from Off-Channel Communications*, DEBEVOISE & PLIMPTON LLP (July 8, 2025), https://www.debevoise.com/insights/publications/2025/07/in-2025-one-of-the-biggest-ai-risks-is-not-letting. Holding our firm to a different standard is hypocritical and it comes across that you are co-opting this position for strategic gain, instead of having legitimate data protection concerns.

Plaintiffs' proposed language specifically states that Defendants' protected data will not be used to train any Generative AI models.[1] Moreover, as described in the justification for this proposed order, "Disclosure and discovery activity in this action may involve production of

---

[1] "Protected Information shall not be processed using generative artificial intelligence *available to the public where the protected information is used to train the generative artificial intelligence model or is retained beyond the conclusion of the litigation*." (emphasis added on plaintiffs' proposed language from the December 2, 2025 draft that was deleted in defendants' edits in their December 5, 2025 draft).

**Robbins Geller**
**Rudman & Dowd LLP**

Mason Parham
SIDLEY AUSTIN LLP
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
December 8, 2025
Page 3

confidential, sensitive, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation would be warranted." A party's obligations do not change with by the use of generative AI tools to assist in document review or processing.

On the call, instead of engaging in a productive dialogue on how the parties could tailor the language to address your concerns, you suggested that Plaintiffs should seek your approval as to what eDiscovery platforms and tools we may or may not use. This approach is completely unjustified. The use of generative AI has not been a priority issue of yours throughout negotiations on this proposed order. You did not raise this as an issue until your November 22, 2025 draft, even though the parties have been negotiating since September 15, 2025. In your latest edits, you merely deleted Plaintiff's proposed language, and did not provide a counter with any potential carve outs. On the call, you conceded that you could not define generative AI, and your proposed language in the draft order does not define it either. Raising this as an issue over two months into negotiations and holding this as an almost non-negotiable position on a term that you do not define is demonstrative of bad faith.

Asking the Court to issue an order premised on speculation and fear of a technology that is in common usage in litigation, and both of your firms endorse and use, is not reasonable. We are willing to meet and confer again on this issue, but the parties negotiations over the protective order have gone on far too long already. If we are unable to reach an agreement on this issue this week we will seek the Court's intervention.

Very truly yours,

LUCAS F. OLTS

LFO:mmh

4902-5221-5424.v1

# EXHIBIT O

**Robbins Geller Rudman & Dowd LLP**

| Chicago | Melville | Nashville | San Diego | Wilmington |
| Boca Raton | Manhattan | Philadelphia | San Francisco | Washington, D.C. |

Lucas F. Olts
lolts@rgrdlaw.com

December 19, 2025

<u>VIA EMAIL</u>

Mason Parham
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, IL  60603

Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY  10001

Re:    *In re agilon health, inc. Securities Litigation*,
No. 1:24-cv-00297 (W.D. Tex.)

Dear Counsel:

I write following the parties' December 18, 2025 meet-and-confer call, which concerned Defendants' purported concerns regarding the use of any Generative Artificial Intelligence ("AI") tools in this action, and your latest edits to §4 of the Confidentiality and Protective Order, sent to Plaintiffs on December 17, 2025.  Plaintiffs brought Robbins Geller's Director of eDiscovery and Litigation Support on the call to provide an explanation of the safeguards in place to ensure that Protected Information would be secure with any given AI tool that we would use in this action, and to answer any questions you had regarding the technical elements of these issues.

Plaintiffs' proposed language is that Protected Information shall not be processed using generative artificial intelligence "available to the public where the protected information is used to train the generative artificial intelligence model or is retained beyond the conclusion of the litigation." December 2, 2025 Draft. As explained in my December 8 letter, this proposed language specifically prohibits the use of any generative AI models where any input, including confidential information produced in this matter,  would be available to anyone prohibited from accessing the data by the terms of the protective order, and thus adequately addresses any legitimate concern regarding security of Protected Information.

Defendants' latest draft insists that that "Protected information shall not be processed using generative artificial intelligence *except as specifically agreed to by the producing party*."  As we discussed on the call, Defendants' proposed language would require Plaintiffs to disclose all of the proprietary tools we use in this litigation to process and review discovery, and effectively gives Defendants indefinite veto power over Plaintiffs' use of those tools.  This is a complex securities class action that may go on for years, during which our Firm may choose to change tools or vendors, and it would not be practical to have to seek your approval beforehand.  Plaintiffs are obligated to vet

**Robbins Geller
Rudman & Dowd** LLP

Mason Parham
SIDLEY AUSTIN LLP
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
December 19, 2025
Page 2

its own tools, including AI tools, to ensure we are abiding by the terms of our various protective orders.  Therefore, it is not necessary or appropriate for Defendants to do so.

Moreover, we have provided you repeated assurances that any platforms and tools Plaintiffs may employ in this litigation would provide all reasonable safeguards.  As discussed during our call, and as memorialized here, to the extent our Firm utilizes any AI tools in connection with this litigation, such tools are evaluated and approved by the Firm's litigation support and information security teams, and we can represent:

- These vetted AI tools maintain industry-recognized security audits and certifications, including ISO 270001 and SOC 2 Type II, and they comply with HIPAA requirements.

- These products are specifically geared toward the legal industry – *i.e.*, they are designed to protect confidential data, and many eDiscovery vendors in the industry currently use these products.

- The data sent to these AI tools is not used to train, fine-tune or otherwise modify the underlying models and does not affect model weights.  Indeed, inputs are processed solely to generate outputs for authorized users.  The products employ closed models, and access is limited to only authorized individuals.

- Upon case closure, all data can be fully deleted.

In short, the Firm's vetted, and approved litigation support AI tools are secure and any and all use complies with the other provisions of the Confidentiality and Protective Order.

During the call, we asked you numerous times what specific security concerns Defendants have regarding the use of Generative AI that are not met by the above representations.  You did not provide an answer.  We also asked you what additional safeguards would need to be in place for your client to feel comfortable with the use of these litigation tools, but you did not provide an answer.  Plaintiffs are perplexed by Defendants' position, especially because Defendants themselves admitted to using Generative AI at their Firms, and generally endorse the use of Generative AI in litigation.

We understand that Defendants do not want unsecure use of Protected Information, and neither do Plaintiffs.  The above representations more than adequately address any legitimate concerns the Defendants may have regarding these issues, and we hope that we can move forward

4925-0486-1571.v1

**Robbins Geller
Rudman & Dowd** LLP

Mason Parham
SIDLEY AUSTIN LLP
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
December 19, 2025
Page 3

without having to involve the Court in finalizing the Confidentiality and Protective Order.  We are available to discuss the issues further in advance of the Court's December 22, 2025 deadline if you believe necessary.

Very truly yours,

LUCAS F. OLTS

LFO:lai

4925-0486-1571.v1

# EXHIBIT P

| From: | Armbruster, Barret V. |
|---|---|
| To: | Luke Olts; Parham, Mason; "Fetzer, Brandon"; Evelyn Sanchez Gonzalez |
| Cc: | Jack Scott; Shao-Jia Chang; Garcia, Yolanda; Greenfield, Elliot; O"Connor, Maeve; Christopher Stewart |
| Subject: | RE: In re agilon health, inc. Securities Litigation |
| Date: | Monday, December 22, 2025 11:13:04 AM |

EXTERNAL SENDER

Luke,

Thank you for your December 19 letter. We have considered Plaintiffs' proposed GenAI language and the representations described in your letter, but they do not change our view that we cannot agree—on a blanket, pre-authorized basis—to permit processing of our Protected Information through unspecified GenAI tools and configurations.

At this point, we do not expect the parties will be able to reach agreement on GenAI language in time to submit a single, fully agreed Protective Order. Accordingly, unless Plaintiffs are willing to accept Defendants' proposed GenAI provision, we propose that the parties prepare a joint submission to the Court presenting the competing GenAI language and each side's position in a concise manner.

Please let us know your position.

**BARRET V. ARMBRUSTER**
Senior Managing Associate

**SIDLEY AUSTIN LLP**
+1 214 981 3434
barmbruster@sidley.com

---

**From:** Luke Olts <LOlts@rgrdlaw.com>
**Sent:** Friday, December 19, 2025 4:49 PM
**To:** Parham, Mason <mparham@sidley.com>; 'Fetzer, Brandon' <bfetzer@debevoise.com>; Evelyn Sanchez Gonzalez <EGonzalez@rgrdlaw.com>; Armbruster, Barret V. <barmbruster@sidley.com>
**Cc:** Jack Scott <JScott@rgrdlaw.com>; Shao-Jia Chang <SChang@rgrdlaw.com>; Garcia, Yolanda <ygarcia@sidley.com>; Greenfield, Elliot <egreenfield@debevoise.com>; O'Connor, Maeve <mloconnor@debevoise.com>; Christopher Stewart <CStewart@rgrdlaw.com>
**Subject:** RE: In re agilon health, inc. Securities Litigation

Counsel:

Please see the attached correspondence.

Luke