**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

INDIANA PUBLIC RETIREMENT SYSTEM,   ) AU:24-CV-00297-DAE
                                    )
    Plaintiff,                      )
                                    )
v.                                  ) AUSTIN, TEXAS
                                    )
AGILON HEALTH, INC., ET AL.         )
                                    )
    Defendants.                     ) DECEMBER 10, 2025

        *********************************************
               TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE SUSAN HIGHTOWER
        *********************************************

APPEARANCES:

FOR THE PLAINTIFF:    LUCAS F. OLTS
                      CHRISTOPHER D. STEWART
                      ROBBINS GELLER RUDMAN & DOWD LLP
                      655 WEST BROADWAY, SUITE 1900
                      SAN DIEGO, CALIFORNIA 92127

FOR THE DEFENDANT:    MASON PARHAM
                      BARRET V. ARMBRUSTER
                      SIDLEY AUSTIN, LLP
                      2021 MCKINNEY AVENUE, SUITE 2000
                      DALLAS, TEXAS 75201

                      MAEVE O'CONNOR
                      DEBEVOISE & PLIMPTON
                      66 HUDSON BOULEVARD
                      NEW YORK, NEW YORK 10001

COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by electronic sound recording, transcript

produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

(Proceedings began at 10:57 a.m.)

THE CLERK:  The Court calls case 1:24-CV-297, *In re: Agilon Health, Inc. Securities Litigation.*

THE COURT:  Good morning, everyone, and thank you for being here so promptly so we can get started. We're actually a little bit early, and I appreciate that.

Let me just ask:  I'm not hearing myself. We've had a lot of audio issues in the courtroom.  Are you hearing me okay?  On the plaintiff's side?

MR. OLTS:  Yes ma'am.

THE COURT:  And the defense?

MR. PARHAM:  Yes, Your Honor.

THE COURT:  Okay.  Great.  Thanks.  So I'll go ahead and please ask counsel to make their announcements.

MR. OLTS:  Thank you, Your Honor.  Lucas Olts and Christopher Stewart from Robins Geller on behalf of plaintiffs.

THE COURT:  Thank you, gentlemen.

And for the various defendants?

MR. PARHAM:  Thank you, Your Honor. Mason Parham and Barrett Armbruster on behalf of Agilon Health and Defendant Steve Sell, Tim Bensley, Girish Venkatachaliah, and Heidi Hittner.

THE COURT:  Thank you, sir.

MS. O'CONNOR:  Good morning, Your Honor.

Maeve O'Connor from Debevoise & Plimpton on behalf of the CD&R defendants.

THE COURT:  And good morning to you as well, ma'am.  And I noticed you're using the tabletop lecterns, which is certainly fine.  When you want to come address the Court, you can come to the center instead or stay there.  It's whatever your preference is.  We added those during COVID, and people seem to like them a lot.  So it's up to you.

So I've read all your briefing and seen all your exhibits.  And my intention today is to rule from the bench, but I wanted to start out by asking:  It's been about a month since Agilon filed its motion, and I want to know first -- and we'll hear from the movant first, what's the current status of the negotiations?  It seemed like there was an indication you were negotiating a stipulated general confidentiality and protective order, and, also, have there been any developments with the third-party subpoenas?

So it's always my hope when we come in for a hearing like this that everything has been resolved in the time lapsed since the motion was filed.  But we'll see if you can fulfill those hopes or dash them today.

Mr. Parham?

MR. PARHAM:  Thank you, Your Honor.  So the

parties continue to negotiate an ESI protocol.  The ESI protocol would govern discovery between the parties.  And we're also continuing to negotiate the confidentiality order.  I think we're very close, but there is not a confidentiality order as of yet.

THE third parties, EY objected, and has sent their objection.  It was attached to Plaintiff's response to our motion.  Milliman is waiting to see what the resolution of this motion is and how it proceeds.  There haven't been any other developments.

THE COURT:  So there was also -- I do have the letter that you submitted from E&Y, or Ernst & Young, and I also have the correspondence with Milliman that looked like it was narrowing the time frame of the subpoena to Milliman.  But there hasn't been anything since then?

MR. PARHAM:  No, Your Honor.

THE COURT:  Okay.  I was hoping that at least --

MR. OLTS:  May I address that, Your Honor?

THE COURT:  I'm sorry.  Just a moment.  I was hoping that at least the stipulated general confidentiality and protective order would have been entered, because that could have made things a little bit easier today.

Was there something you wanted to add,

Mr. Olts?

MR. OLTS:  I just want to add we've had additional discussions with both of the third parties just to update them on the process.  And they both are aware that the motion was filed, and they both said we're just going to wait to produce anything until there's a resolution of the motion.  We asked both of them to continue to gather the documents that they had already agreed to gather, and they both agreed to do that.

So they're both just simply waiting to produce the documents until the Court rules and the entry of the protective order -- excuse me -- entry of the confidentiality order.

Just to give a little bit more detail on that --

THE COURT:  Let me just hold on a minute, Mr. Olts.  First of all, I'll ask the courtroom deputy, is Mr. Olts recording?

Okay.  I can't hear you all that well.  I think that you're not very close to the microphone.  You can tilt it up a little bit.

MR. OLTS:  My apologies.  Is that better?

THE COURT:  I think that at this point I did want to hear from the movant first as a proponent of the motion after we got through any updates.  So if you want

to go ahead, Mr. Parham.

MR. PARHAM:  Thank you, Your Honor.  So there are two subpoenas that are at issue.  There is a subpoena to Ernst & Young, which is the company's outside auditor, and a subpoena to Milliman, which is the company's actuarial consultant.  And we received notice of the subpoenas about three days after we served responses and objections to the plaintiff's discovery request to Agilon, to the defendants.

And the vast majority of the requests in those subpoenas are seeking information, Agilon's information, that is confidential information that we've -- that was requested from Agilon that we have, for the most part, agreed to produce with reasonable limitations.  And we're still negotiating ESI protocol, but it's information that was requested from Agilon.  It's Agilon's information.

And to give you kind of a concrete example of what type of information I'm talking about, so both of the subpoenas asked for information about Agilon's members, that is, individual beneficiaries within the Agilon platform.  The subpoena to Milliman asks for all documents and data about healthcare utilization by Agilon's members.

This is only information that these third parties have because it comes through Agilon.  It's

Agilon's information provided in the course of the services they're providing. And that goes for most of the other requests: the underlying data for financial calculations, financial reporting procedures, considerations that go into calculations of medical services expenses, utilization trends. It's all information that comes from Agilon.

And we attached two declarations from the chief accounting officer and from the VP of --

THE COURT: And just to reiterate, I have read all your filings.

MR. PARHAM: Okay. There is no protective order. It's very confidential information and very sensitive information. It's Agilon's information. And even when there is a protective order that we've been negotiating *[unintelligible]*, Agilon should be responsible for invoking the protective order. If a document is going to be coded confidential or not, it should be Agilon's decision. It's Agilon's information.

And the alternative that the plaintiffs have proposed, that documents would be produced and then Agilon could go through and see whether they were confidential or not, it doesn't seem an efficient solution and I don't think adequately would protect information. You would have multiple versions of

documents, potentially, if we had to reproduce something with different confidentiality codes. You have the agreed order for negotiating any kind of redactions. So if we wanted to redact information, there would be a redacted version and unredacted version. So we don't think that is a viable alternative.

These issues are eliminated if we just go through the ordinary discovery process. Plaintiffs, you know, they made their requests for the information from Agilon. We're negotiating ESI protocol. For the information that overlaps with the subpoena, which is most of it, we have agreed to produce documents, again, with a reasonable limitation, because the subpoenas were very broad. They're broader even than the request to Agilon. But we've agreed to produce in response to most of the information that's been requested.

If we just go through the ordinary party discovery process, this issue is resolved. At a minimum, we would want to see documents before they were produced when it's Agilon's confidential information, and it is only with third parties because it was provided by Agilon.

THE COURT: Well, if the third parties are waiting to produce the documents until the stipulated protective order is entered into or the confidentiality

and protective order -- it can get a little confusing because of the name of the motion -- but what is the harm to Agilon?  Presumably, the negotiated order, the general order that will be in place through the litigation will apply to the third parties.  So what would be any harm to Agilon if the same documents come from the third parties subject to the same protective order?

MR. PARHAM:  So the protective order only applies to the extent it's invoked.  So it has to be invoked.  You have to mark a document as confidential, highly confidential.  It's a two-tier order that we're negotiating.  So just from that perspective, if a document is not appropriately marked as confidential -- and Agilon has the greater interest in confidentiality of this information than anyone else -- then the protective order doesn't help.

Now, their position is that Agilon could go back and take those documents and mark them confidential after they have been produced.  The problem there is you have a gap, one, because the document has already been produced so it's subject to whatever is -- it is not something subject to any protection during the time after it's produced and before it's reproduced with the appropriate code.

THE COURT:  Well, what if they're just produced

with a 30-day window for Agilon to mark the documents, if some sort of agreement like that could be made?  Because it sounds like these documents are already teed up and ready to go, and anything that they don't get from -- that the plaintiffs don't get from you, they will be able to get later.

So, no, it's not the most efficient way to do this, certainly.  But I'm not sure that there's any prejudice to Agilon by proceeding the way that the plaintiffs have *[unintelligible]*.

MR. PARHAM:  A 30-day window for --

THE COURT:  After the documents are produced, for Agilon to keep them attorneys' eyes only, and Agilon can review and mark as confidential or not confidential or anything else.  Is it your concern that some of them may be privileged, or are you -- it seemed like the focus of your briefing was more on trade secret and proprietary type information.

MR. PARHAM:  Trade secret information, medical information, so PHI.

THE COURT:  So they'd be redacted, ultimately, right?

MR. PARHAM:  Right.  And PII.  That seems to be alternative to the documents, to the extent that they are Agilon's documents, are produced to Agilon and then

Agilon produces them with the appropriate coding. Alternatively, there's a 30-day window where they're AEO. I think that accomplishes the same purpose.

I would just go back to the fact that there is authority that, when you can get the documents from a party, you should just get the documents from the party. And we've agreed to produce the documents. And we're negotiating -- we're going to be negotiating search terms on the ESI protocol, custodians, all of these things. And to have the same information requested from a third party defeats the spirit of discovery and negotiations that we've had, and it's not efficient

So I think the best approach is for the documents that are within Agilon's possession, custody, and control, they come through Agilon. And at a minimum, we need to see the documents before they go out and code them appropriately.

THE COURT:  Thank you.  Anything else for your opening argument, Mr. Parham?

MR. PARHAM:  No, Your Honor.

THE COURT:  And, Ms. O'Connor, we're only going to hear from you potentially on the scheduling issue, correct?

MS. O'CONNOR:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Olts?

MR. OLTS:  Thank you, Your Honor.  Can you hear me better now?  Is that better?

THE COURT:  I can.  Thank you.

MR. OLTS:  All right.  Thank you.  So just quickly to address the point that Mr. Parham made about the confidentiality order, the parties have been diligently working on it.  It's taking much longer than what normally happens, and that's on both of us.  It was the holidays, et cetera.

But, as of last week, we had a meet and confer where we accepted all of their last round of edits.  The only issue remaining was a question about whether or not the parties could use any sort of AI in the process of reviewing the documents.  And we don't need to go into that right now, hopefully.  We've proposed some language that we believe satisfies their issues about that.

This issue about designating Agilon, or any of the defendants being able to designate documents produced by third parties, is specifically addressed in the protective order.  It says in there that a party may designate documents produced by a third party as confidential.  But we want that as well.  We expect there could be third parties that produce documents on behalf of the plaintiffs.  We want that information in there.

It's also contemplated by the Court's standard order, that issue.

They have never raised this idea that they were worried about a gap in any of our negotiations about the confidentiality order.  It's been sent back and forth numerous times.  They've never mentioned it.  We are perfectly happy to include a 30-day window for a party to designate documents as confidential, and we're happy to hold them as attorneys' eyes only during that 30-day window.  That's very standard language.  They have never raised that issue during our weeks of negotiations, but we're certainly happy to do that.

So from our perspective, that clearly addresses any reasonable arguments that they have about the documents' confidentiality, any worries about these trade secrets, or anything else.  It's very amorphous about exactly what it is they are worried about.  But to the extent there is anything, we're happy to address that with the gap issue, and we can add that in the confidentiality order this week and hopefully get that signed and to the Court.

I would like to address this one other issue.

THE COURT:  Well, let me just ask you --

MR. OLTS:  Absolutely.

THE COURT:  -- have the plaintiffs done

negotiating with the third-party recipients of the subpoenas in terms of narrowing those subpoenas to only their documents, for example, and not Agilon's documents?

MR. OLTS: Yes, absolutely. And those negotiations, unfortunately, have stalled due to the fact that they filed this motion. E&Y -- both of the third parties are represented by sophisticated counsel. Obviously, E&Y produces documents in these securities litigations. Nearly every one of these litigations we are sending subpoenas to E&Y. This is not some unique situation. They are well versed in the production of documents. They are well-versed in the production of documents. They know -- and as you can see in, I believe, it's Exhibit A to our opposition, a letter that we sent to E&Y setting forth what happened in our first meet and confer call. And in that letter we specifically state -- you know, address the issue of there's attorney-client privilege documents and the narrowing of the scope to the issues that are clearly relevant.

I think it's very important to note, you know, a lot of the cases they cite in support of their motion are really dealing with the issue of relevance, whether or not the documents are relevant. There is no issue here that these documents are relevant. They don't make the argument that they're relevant. They're clearly

relevant.  So there are a set of documents --

THE COURT:  Actually, I don't think that's quite right, Mr. Olts.  I think that the defendants do argue, or at least Agilon does argue, that many of the requests are overbroad and will capture a lot of documents that aren't relevant to this litigation.

MR. OLTS:  But just to that point, I think we have sufficiently narrowed our subpoena in our meet and confer with E&Y to documents that are clearly relevant.

And just at that point, Your Honor, if you look at page 4 of their reply, we point out Ernst & Young has their audit work papers, for example, right? and the indices that go along with those work papers.  And one of the issues in those work papers is the material weakness that Agilon disclosed in February of 2024 in their 10-K, which is one of the corrective disclosures in this case.  So it's clearly -- those are clearly relevant, and they don't make an argument that they're not.

On page 4 of their reply, what they say is, yes, they concede that's a set of documents they do not have, contrary to counsel's argument that they have everything.  They don't have the work papers or they would have told us that they did.  They do not.  They don't have indices.  They don't have the underlying analysis that E&Y did.  E&Y has already agreed to search

and produce those documents.

What they say on page 4 is that, in what is a retreat, well, the Court can craft a protective order that limits production of other documents that they don't have. And that is really just a concession, Your Honor, that this motion is totally unnecessary. We don't need the Court to craft a new protective order based on what they say in their reply.

Counsel talked a lot about the normal course of discovery. The normal course of discovery is we get past the motion to dismiss, we send out discovery requests as we have done, we send out discovery requests to third parties as we have done. Parties produce documents, we have a protective order. That's the normal course of the discovery.

The normal course is not we wait until sometime in the future, which is very unclear, when they I guess deem that party discovery is completed, and only then do we send out third-party discovery. That is totally inefficient and not the normal course.

So what we would propose here, Your Honor, is simply deny the motion, let us move forward with the third-party discovery, let us get the protective order in place. We can add the 30-day gap so that they have time to designate any documents that they want.

Of course, Ernst & Young and Milliman, who are both represented by counsel, will be designating these documents confidential.  They're waiting until there is a protective order in place.  We also said, if you want to produce them early, we will treat them as attorneys' eyes only, as we have done with other documents that the defendants have produced.  They've already produced their insurance policies pursuant to the initial disclosures, and we treated those documents as attorney's eyes only.  We could do that as well with the third parties, if necessary.

THE COURT:  Well, the timing -- when you talked about the normal course of discovery, that you send out discovery requests to the defendants and to third parties, here the timing does look pretty suspicious, that you did it just a couple of days after you got their responses, which sounds like, I believe at least in the paper, they said there was 26 documents that have been produced.  So it looks like there was an attempt made to go to these third parties when you weren't satisfied with what you got from Agilon.

MR. OLTS:  The only thing we've received from Agilon so far, Your Honor, is their insurance policies.  That's it.  We haven't received any substantive documents in the case, whatsoever.  So the only matter of the

timing was getting past the motion to dismiss, getting the case off the ground.  We don't have a schedule in place yet.  If we wait too long to send out these third-party subpoenas, there could be an argument that we've -- that it's gone too far and we're getting past the discovery cutoff.

We want to get this done efficiently, we want to get it done right away, so that there aren't any delays at the end of the schedule.

THE COURT:  Well, and hopefully we will have a Schedule in place by the end of the hearing, at least an agreement.  But I certainly agree with the defendants, that this way of receiving is less efficient.  Would you like to comment on that?

MR. OLTS:  I would agree that, you know, in the litigation process there are inefficiencies.  I would agree with that 100 percent.  If we could know exactly what documents they are going to produce, we would love to not have to burden any third parties.

But as we just said, there are clearly documents, and they admit there are documents, that they do not have that E&Y has.  So the alternative to this is to parse it out and sort of say, okay, well, you only produce this document as opposed to this document.  It's much more efficient for the third parties for them just

to say, Here's our files. Now go away. They don't have to worry about this anymore. And that's the way it's working.

And I really don't think there's a way -- as much as we want to make it efficient and we are incentivized to make it efficient, it's just very difficult for us to say, okay, well, produce this document but not this document.

If they just respond to the document request as written and negotiated by the parties, again, E&Y, represented by sophisticated counsel, is not incentivized to produce every single thing they've gotten from Agilon. And they could clearly make that argument, right? and they haven't. They could be in here making a burden argument. They could file a motion for protective order.

They could even raise the issue with us. They could have said, you know, hey, all this stuff Agilon already has. Please go get it from Agilon. And in other cases, I've certainly see that with certain third parties. But with a sophisticated party like E&Y, that's just not the case. They didn't say that to us.

So clearly there are situations where it would be more efficient to get all the documents from them. And that is -- and you see that in some of the case law. I think one of the cases that they cite, the individual

at issue was employed by the party. That's not the case here. There are clearly documents that we need to get from E&Y. And asking the Court to revise the productive order motion that they're seeking now, that is the most inefficient, is for you to try and guess exactly what it is that they want.

THE COURT: And I think I have your argument at this point, Mr. Olts. Let me ask Mr. Parham once again: So we have a lot of gray area here or, I mean, a lot of options. I can grant the motion, I can deny the motion. But I think there might be a compromise among the parties that will get closer to what both of you want. And that's always my preferred resolution, is to reach an agreement while we're here today.

And it sounds like possibly the 30-day window to hold any third-party production as attorneys' eyes only while Agilon has a chance to review it would be helpful. I mean, we've also talked about some of the narrowing of the subpoenas, which I'm not sure I have the latest and greatest on that.

But, Mr. Parham, can you respond to whether there is some sort of agreement that could be made to allow Plaintiffs to move forward getting this production from the third parties at the same time you're going to be moving forward with your own *[unintelligible]*.

MR. PARHAM: Yes, Your Honor. Certainly. And we are very much open to an agreement and to an amicable resolution of this. The one concern I have with the 30-day window is that then you have multiple versions of documents. If there was a difference of opinion on how a document should be coded or whether it included confidential information and it was produced by E&Y or Milliman, we would have to reproduce the same document with the correct coding. Then there would have to be some deletion of the original document. There would be two versions of that document out there. It would lead to confusion.

And this isn't just a commercial sensitivity issue. At least that's not more important than the medical information, the patient and medical information, and not having that -- not having there be any way that that could be improperly released into the public. And it just strikes me that having two different versions of documents could create the risk or the risk of something being released.

THE COURT: Is there a different compromise that Agilon would like to propose?

MR. PARHAM: So our motion was never about EY's work papers. And that is one request in their subpoenas, and if it were the only request, this motion would never

have come into this court.

Our request is about all the other stock that is *[unintelligible]* that can only provided by Agilon, like the auditor, Milliman.  You didn't hear much about Milliman.  Milliman is a consultant.  Everything Milliman does is for Agilon.  It's Agilon's information.

So I think there is an agreement to reach.  I think the agreement should be that the work papers can follow the process we've outlined and will include provisions in the confidentiality stipulation.

And for Milliman, if there's going to be a production of additional information, I would like you to reconsider that Milliman produces that document or that information to us, since it is our information, our vendor, before it goes out, so you have one version with Agilon's confidentiality designation.

THE COURT:  So you were asking for that production to Agilon first for everything from Milliman and everything requested from EY, except their work papers?

MR. PARHAM:  Yes, Your Honor.

THE CLERK:  Okay.  All right.  Plaintiffs?

MR. OLTS:  Well, again, I think that this is, you know, we're revising their motion sort of on the fly here.  The law is very clear that they have a burden to

show specifically which requests -- they decided to file this motion as a broad stroke. We had one meet and confer call about this issue, and two days later they asked us to withdraw the subpoenas until party discovery was done. We politely declined. And two days later they filed a motion. So I think some of this could have been worked out, certainly.

I will point out that the protective order that we've negotiated -- and they've proposed language to address the patient issue. There's specific provisions in the law that they've included, and we have accepted, that treat that information as highly confidential. We don't want that information in the public. We're not going to turn around and send out patient information in 30 days to the newspaper or something. I think any implication of that is sort of silly.

Milliman, again, highly sophisticated consultant, represented by counsel. The idea that they're just going to send out, you know, private patient information without designating it confidential under the protective order, which specifically has a provision to protect that information, I think is fanciful.

And the more that we get into, well, okay, E&Y can produce the work papers, but they can't produce anything else, that is just rife with potential problems.

Like, does that include the indices to the work papers? Does that include the underlying analysis that they're doing? I think we're just opening this whole thing up to additional appearances in front of Your Honor arguing about these things, which we don't need to do.

We will have a protective order in place. The normal course of discovery is that they will have an opportunity to designate anything that they want as confidential.

Milliman, I am sure, they're hired by Agilon as a consultant to work on these actuaries. They know this information shouldn't be produced without designated confidential, and we're happy to reiterate that to them. And we're happy to treat it as attorney's eyes only until they have every opportunity to review it.

THE COURT: Well, I think a third alternative, based on what I'm hearing, would be to hold this motion in abeyance until the protective order, the agreed protective order, is entered. Because it sounds like it might address quite a few of the concerns raised by the motion.

MR. OLTS: I would just ask, I mean, since they've already conceded that the motion as filed is overly broad and seeking to protect documents that they now concede should be produced, such as the work papers,

if there is an issue that we are unable to negotiate regarding the confidentiality of documents, they should refile a more narrow motion that meets the standards set forth by the Fifth Circuit.

And I'm happy to stand here on the record and say we will treat anything that is even remotely close to confidential as attorneys' eyes only until they've had more than ample opportunity to review it and designate it. We have no incentive to produce any medical information to anyone.

THE COURT: All right. But I think, Mr. Olts, Mr. Parham didn't go for that option because he doesn't want duplicative sets of documents.

MR. OLTS: And I'd love to address that.

THE COURT: Sir, that sounds like it's off the table.

MR. OLTS: Well, I'd love to address that. The protective order specifically --

THE COURT: I'm just going to ask you to stop talking over me, Mr. Olts. You keep doing it. And I know you're enthusiastic to be here today, but please be a little more respectful, sir.

MR. OLTS: I deeply apologize. I'm very sorry.

The issue of re-designation of documents is specifically addressed in the draft protective order.

There are mechanisms by which parties can designate documents. And then let's say a document is designated as attorney's eyes only and there is some discussion about that, it can be de-designated. It's not a wholesale reproduction of the document. There is simply a way electronically to designate that document as either confidential, attorneys' eyes only, or not confidential at all. And that happens routinely in litigation.

THE COURT: Okay. Thank you, Mr. Olts.

So I think once again, Mr. Parham, the arguments I'm hearing from Mr. Olts are pointing to the wisdom of waiting -- and you can rise -- or waiting until this confidential order is entered to see what the impact is on the motion and the concerns, more specifically, that Agilon has raised.

MR. PARHAM: I'm happy to go through the Fifth Circuit standard, if Your Honor is interested in hearing that. On the agreement I'm very happy to continue to negotiate with them, with the third parties, to try to work some kind of resolution, if it takes this off the table, it takes this off the plate. I don't think it should be -- the motion be refiled. I don't think that's necessary. I think it's very inefficient to do it that way.

On the specific proposal, I'm afraid I'm going

to have to ask for a little bit of clarification on what the proposal on the table is.

THE COURT:  For the protective order or for resolving your motion today?

MR. PARHAM:  Yeah.  For resolving our motion.

THE COURT:  I don't think there's anything on the table right now.  I think you rejected my first idea. I haven't heard any others.  Well, I think that the plaintiffs rejected your idea.

So what I keep hearing is that some of the issues raised in your motion will be addressed by the protective order, which was what I had hoped had happened in the five weeks since the motion was filed, was that this had been negotiated and entered into.  Obviously, it's not filed on the docket yet, but I don't think that I can necessarily address all the concerns raised until the parties reach an agreement on their protective order.

MR. PARHAM:  In which case I think that we would continue to negotiate this issue specifically and try to reach a resolution pending the acceptance and entry of the protective order.

THE COURT:  I think that makes sense.  And rather than refiling the motion, the motion could simply be held in abeyance.  But if the parties can't reach an agreement, then I would ask you to update and file a

joint status report or individual status reports on what you haven't been able to resolve with regard to the nonparty discovery after the resolution of the protective order, because it will govern that discovery as well as party discovery.

MR. OLTS:  That's right.  We're happy to do that, Your Honor.

THE COURT:  Okay.  I think that makes sense. Is there any -- well, before we move on to the scheduling order, is there anything else we'd like to be heard on for the motion for protective order, Mr. Olts?

MR. OLTS:  Just on the issue of holding the motion in abeyance, I do think it would be a little bit confusing for the third parties.  Are they supposed to produce it?  They made a good point of saying we want -- we want to resolve this before we produce anything.

THE COURT:  Right.  The motion will remain pending, so they'll be in the same position they are now.

MR. OLTS:  And what would trigger the resolution of that motion?  It would be the parties negotiating and finishing production -- excuse me -- finishing negotiation of the protective order?

THE COURT:  Right.  Once you finish negotiating the protective order, it sounds like Mr. Parham is willing to continue talking to you about resolving the

issues resolved by the non-party discovery. And once you have the protective order in place, if the parties can reach an agreement that would obviate the motion and resolve it completely, that will obviously be the best outcome.

If you can't do that, then I'll ask you to file a status report and let me know what issues remain, because they did move from the opening brief to the reply brief. And it sounds like they've been a little bit frozen in amber since the briefing was concluded, but you may still be able to resolve a lot of these issues. You've made movement today, even though it hasn't been mutually agreeable.

Then I can issue an order for you to file a joint status report within ten days or something, when you've entered -- stipulated a protective order. Now, that means stipulated and you'd filed it for Judge Ezra's approval. That's not referred to me. It doesn't mean it has to be the day Judge Ezra approves it. It's once -- and files it on the docket. It's once you've stipulated to the protective order and presumably negotiated whatever issues you can resolve with regard to the non-party discovery.

I'm not sure either of you look very satisfied, but that's not that uncommon. Mr. Parham, would that

work for you?

MR. PARHAM:  The process makes sense to me.  A joint status report if we have a disagreement or a protective order if we do not.  And maybe a joint status report.

THE COURT:  Yes.  And say whether you can withdraw the motion or you can file a joint status report on what needs to be negotiated.  We don't necessarily -- or what needs to be decided still.  We don't necessarily have to come back here.  We could hold a Zoom hearing or no hearing.  I could resolve it on the papers and the arguments today.

MR. PARHAM:  This makes sense to us, Your Honor.

THE COURT:  Yes, sir.  Mr. Olts?

MR. OLTS:  In an effort to reach an agreement, I think we would be okay with that.  I think with one small -- the issue is just that the length of these negotiations have really dragged on.

THE COURT:  It really has.

MR. OLTS:  And look, I -- they are acting in good faith.  They've brought up several good points that we need to resolve.  They also have a motion for reconsideration in front of Judge Ezra pending that would potentially eliminate some of the defendants in this

case.  So I think that has caused the parties to drag out these negotiations a little bit unnecessarily.

So in order to resolve this, what we would ask is simply to have a status conference set with Your Honor so we could address any remaining issues regarding the confidentiality order.  And if we're able to reach an agreement on that, then we could take that off the calendar.

THE COURT:  Why don't we reverse that a little bit so it's not on my calendar.  But can you finish negotiating your general protective order within ten days from today?  I mean, obviously, we've got the end of the year and holidays approaching for some people.  It seems like the time to conclude the negotiations.  Can you commit to having that finalized from your end within ten days from today, Mr. Parham?

MR. PARHAM:  Your Honor, I think that we will be able to conclude the negotiations within ten days.  And whether we need to present something to Your Honor or can file an order for approval *[unintelligible]*.

THE COURT:  Okay.  And, say, in ten days, Mr. Olts?

MR. OLTS:  Absolutely, Your Honor.  They have our latest position.  I think ten days is perfectly reasonable and would alleviate any concerns we have.

Thank you.

THE COURT:  Okay.  I think that makes sense to keep things moving.  And, obviously, it's an extremely complicated case with many parties and many moving parts. But it does seem like this has been enough time to negotiate the protective order.  So if we can do that, that addresses your timing concern.

And once you've reach an agreement, after you've filed your proposed protective order on the docket, then I would like either a status report or withdrawal of the motion.

MR. PARHAM:  Absolutely, Your Honor.

MR. OLTS:  Thank you very much.

THE COURT:  Okay.  That makes sense.  Thank you.

MR. PARHAM:  Thank you, Your Honor.

THE COURT:  So perhaps an easier issue is our second issue, the motion for entry of a scheduling order, which is a joint proposed order.

Two separate issues here, obviously.  The first is that Defendants -- and will you be arguing, Ms. O'Connor, for the defendants?

MS. O'CONNOR:  Yes, Your Honor.

THE COURT:  Okay.  Thank you, ma'am.  The first is that defendants want a shorter time, which I calculate

is about 11 weeks, between the substantial completion of document discovery and the close of fact discovery.  The plaintiffs propose five months after the close of fact discovery.  And we can talk about that first.

The second issue obviously concerns the issue of a sur-reply and the expert evidence.

So I have a proposal here as well, and I look forward to hearing your comments and your thoughts about it.  It seems to me five weeks may be a little bit long, but eleven weeks -- sorry -- five months.  But eleven weeks would be too short.  I think even if the number of depositions is kept at ten per side, I think it would be quite difficult to conduct twenty depositions and conclude any follow-up discovery within eleven or so weeks.  And as Mr. Olts has already talked about, the negative aspects of coming back here to me or to Judge Ezra when there might need to be an extension of time.

Of course, the parties can extend their discovery period by agreement.  But I think four months would be more realistic to conclude the fact discovery after the close of document -- substantial completion of document discovery on April 21st.  So I would propose setting August 21st, 2026 as the close of fact discovery and then modifying those deadlines that flow from that

date accordingly.

So, Ms. O'Connor, would you like to address that in any fashion?

MS. O'CONNOR:  Sure.  Thank you, Your Honor.  I think that's a constructive suggestion.  And I'm not surprised the Court is looking for a way to split this in the middle.

Can you hear me okay?

THE COURT:  I can.  Thank you.

MS. O'CONNOR:  Okay.  So our concern, you know, has been that Plaintiffs are looking to sort of flip the default.  The default will be more than ten depositions. The law is to the contrary, and the schedule should not be otherwise.

I take Your Honor's point that 20.  I don't think it will be 20 from the defense side.  But, you know, you can call it 18, 17, 16, whatever the number is, in 11 weeks is a reasonably busy schedule.  It's certainly not unheard of to be doing three depositions in a week, so I don't think it's unreasonable.

I do firmly think that five months is extremely unreasonable and will just delay the end of the case. So, look, I think that we can live with four as long as that's not premised on an idea -- which I don't think it is, as I hear Your Honor speaking -- that Plaintiffs are

going to necessarily get more than ten depositions Because I haven't made a showing as to the ten, much less their showing as to the rest.  And as the Court can see, we cite numerous cases that are litigating against Mr. Olts' firm for 20 years, numerous cases where, despite the complexity, ten depositions is plenty.

THE COURT:  Thank you.  And, no, I'm not making any implication or ruling on the number of depositions that will take place.  My thought is not only for the scheduling and completion of the depositions, but as one of the parties pointed out also, for any limited follow-up discovery that may be required after those depositions.  I think four months is a little bit likely satisfactory.

So just on that issue, then, I'll hear from Mr. Olts, the four months.  Is there any specific concern on Plaintiff's side, or is that acceptable?

MR. OLTS:  No, Your Honor.  That's perfectly acceptable with us.  As Your Honor noted, these are somewhat aspirational.  We'll do everything we can to meet the deadlines.  If and when, you know, the circumstances change, then we will address that at the proper time.

THE COURT:  Thank you, sir.  So that leaves the last issue I think we need to take up today,

Ms. O'Connor. And I would like to make sure that I understand the issues with the expert evidence.

I would be inclined to permit Defendants to file a sur-reply brief. I honestly think in a very complicated case like this, it's helpful for both sides to get two briefs. And I don't see any reason that those couldn't each be accompanied, the four briefs, by expert evidence that's otherwise admissible. I think some of the arguments were directed to expert evidence that would be inadmissible in any event.

So can you comment on what would be -- whether what would be acceptable to the defendants would be, obviously, to grant the sur-reply and to have expert evidence admissible with all four briefs.

MS. O'CONNOR: Yes, Your Honor, we think it needs to be more limited than that to avoid a process that's chaotic. And so class certification -- and forgive me if I'm saying things that the Court is very familiar with. But in a securities class action, it is, as we said in our papers, it's a very well-trodden path.

The plaintiffs have the burden on most of the aspects of class certification, and they will provide an expert report with their motion. We will then depose their expert, and we'll provide an expert report with our opposition. And then typically, you know, they would

just have a reply brief and we're done.

Otherwise, if they have another expert report, then we have to depose their expert report and it just keeps going.  And we're prejudiced if there's any incentive other than for plaintiffs to put their very best foot forward in their very first brief, lay it all out, this is their actual position.

Now, in securities class actions, there is, I think, really just one potential class certification issue on which the defendants would bear the burden of proof.  And so our proposal is, if we were to raise that opposition, which is a price impact argument, if we were to raise that in opposition to class cert, then Plaintiffs would be able to depose our expert and have a reply expert report on that point.  And then we would have the reply brief.

So for each side, any class certification, on the issues where they bear the burden, each side gets the same thing.  They put their best foot forward with a brief and an expert report, the other side deposes the expert and has an opposition and an expert report, and then there's a reply brief which can make arguments based on the expert discovery.  But we don't keep deposing experts, and we don't keep having extra expert reports which creates a lot of prejudice and the process that

kind of never ends.

Does that make -- am I being clear, or am I being confusing?

THE COURT:  Well, I'm wondering what's the difference between the need to re-depose and to provide a rebuttal expert report.

MS. O'CONNOR:  So I think the difference is that if the plaintiffs provide another -- so take the scenario we are not making a price impact argument.  The plaintiffs just have the burden of proof on class certification.  They make a motion, and they have an expert report.  We depose their expert, we file an opposition, and we have an expert report.  Then they're going to have another expert report.

But why?  Because they have the burden of proof and they already made their points, and now why is it fair, then, if they're going to revisit the issues from their first expert report, why don't we then get to depose their expert and have a sur-rebuttal?  We're supposed to have -- you know, when does it end?

And I think the fair way to end it is they have an expert report, we have an expert report, they have a reply brief.  And then it's done, and the incentive structure is everybody put their best foot forward.  To the extent that we are making an argument on which we

have the burden, it would operate the same way.  They would have an expert report and we would have a reply brief as to that.

But, in general, for them to sort of say there's any number of reasons we could lead to in our -- in putting a reply brief for class certification, we might need to have more expert evidence on the issues as to which we have the burden where we -- that's very prejudicial to us, the notion that we could depose their expert and oppose their motion and then their expert can have a new report?  It seems very unfair and very prejudicial to us, and I would then be here saying I need to depose their expert and have a sur-rebuttal because this isn't fair.  This is a whole new argument that they've made with their expert.

So I think the path that we're trying to lay out is the path you would follow in many cases, where each side gets the same thing as to where they have the burden.  Plaintiffs have the burden on potentially everything in class certification if we don't make a price impact argument.  So let them make their motion and have their expert report, and we'll depose their expert. We'll have an opposition brief and an expert report, and then they'll have a reply brief and then we're done.

THE COURT:  But that's not exactly what you say

in the joint report, I don't believe.  You say the plaintiff's reply would be due X date, and then you say expert reply report, if any, limited to issues on which Defendants bear burden of proof.

So are you now asking for no expert reply report?

MS. O'CONNOR:  No.  I'm sorry.  I must be saying -- I must be confusing it somewhat.  What is meant to be laid out in the schedule request is that in the -- in briefing structure, there's two expert reports, right: opening brief, expert report, opposition brief, expert report, reply brief.

THE COURT:  Yeah.  It says expert reply report.

MS. O'CONNOR:  Well, then if, in opposing class certification we can raise brand-new issue in which we have the burden, as to that, we would say, sure, they should have a new expert report and then we should get a sur-reply brief.

So that's the structure we're trying to have, which I think creates the incentive for everybody to make their correct arguments up front and avoids the situation where we're very prejudiced by deposing their expert and doing an opposition brief, only to get a new expert report on the same issues that we just deposed their expert on.  It just doesn't make sense.  And then we

would need to depose their expert again, right?

So they would only be -- To the extent we raise a brand-new issue on which we have the burden, then they would get a reply expert report on that issue. And it does seem very complicated. We've done it in a number of cases. But am I making --

THE COURT: I do have one question. Are you contemplating, and is the normal course and you would anticipate this case to follow, that both sides would hire their own expert?

MS. O'CONNOR: Both sides would hire their own experts. Both sides would hire experts on class certification. And we're just trying to avoid Plaintiffs putting in an expert report, we depose their expert, we oppose, we have an expert report, and they say, Oh, we want to say a few things about the first topic. And then we just keep going.

THE COURT: Sure. And I certainly agree there needs to be a cutoff point, but I don't think it's that uncommon to go back to your same expert and have a reply to what the previous -- the other expert said.

MS. O'CONNOR: Well, in class cert briefing, if that would be the case, then I would ask that we have another -- that we have another opportunity to depose their expert, because we shouldn't be prejudiced by --

So here's the situation.  Plaintiffs could just say we're going to make most of our arguments, but we have one that we're a little bit on the fence.  We oppose, and then they say, Okay.  Now we really do want to make that argument.  They get a reply expert brief, and then where are we?  Right?  They should need to make all of their arguments up front, and make them correctly, and they can argue in a reply brief about anything they want based on their deposition of our expert.

But if they have a new expert report on the same topics of their first expert report, the things where they bear the burden -- numerosity, commonality, you know, efficient market, the things where they bear the burden -- if they come back with a new expert report on things where they bear the burden, well, then I think, in fairness, we need to depose their expert again and have a sur-reply.  And now we've spent a lot of money because we're deposing the same experts multiple times on the same topics.

THE COURT:  Right.  And the part where I diverge with you with what I see more commonly in this Court is the need to re-depose.  But I think I have your argument on this point, and so and I'll to -- is it Mr. Olts that's going to address the schedule for Plaintiffs?

MR. OLTS:  Yes, Your Honor.

THE CLERK:  So I do think I'm going to recommend, or at least I will issue or ask you to submit an order, that does include the opportunity for a sur-reply brief for the defendants because, as I said, I think that's helpful to the Court, to have four briefs on a complicated issue.

But I'd like to hear your position for the plaintiffs on the expert question.

MR. OLTS:  Thank you, Your Honor.  As Ms. O'Connor stated, we've both litigated these cases for upwards of 20 years now, and I've seen a whole host of different ways to address the issues that she has raised, which I believe are all legitimate questions.

The problem is that they are intensely fact-intensive, meaning it depends on what arguments they make, as her argument, I think, demonstrated.  If they make argument A, then we have path A.  If they make argument B, we have path B.

It's just to us -- well, first of all, we have the burden of proof at class certification.  And if you read -- and there's just a plethora of law now on the issue of class certification and the burdens that we have to meet.  We have every incentive to get the Court -- to get it right and to look at everything the Court needs to

look at in order to reach the right conclusion. We have no incentive to prevent them from making some argument and then having it overturned on a 23(f) to the Fifth Circuit. We simply don't.

Our point is simply we don't need to build this into the schedule now. We will work absolutely in good faith to address any legitimate concerns. And if our -- if the expert testimony which has become increasingly more complicated over the years that I've been litigating these cases at class certification requires an additional response by one of the experts in order for the Court to be able to make a fully informed decision, we fully represent we're happy to do that.

I think one point she brought up was she kept talking about the depositions. Well, the schedule they've submitted doesn't address depositions at all. It doesn't mention I don't think this schedule contemplated by that would address that issue.

And all of our firms have litigated innumerable of these cases, and we're almost always able to work out a schedule around class certification, based on the issues that are actually briefed, as opposed to now where everyone is sort of speculating about exactly what the issues will be.

We certainly know what -- you know, the issues

that we will lay out in our opening brief, and we will I'll certainly put in an expert report, I'm sure, to demonstrate, you know, that the market was efficient, for example. Now, if they put in an expert report that disputes the issue of market efficiency, maybe that requires a response by our expert in order to give the Court all the information it needs. Or perhaps it doesn't. I don't really know. And we won't know until we see their response.

But we have no incentive to deny them a sur-reply in the instance where they need to address new issues that are raised, because that will simply result in a 23(f) that gets the case reversed, which we certainly don't want to do.

And, you know, there are certainly situations, and we see these across the country, there are evidentiary hearings now that happen at class certification, where the courts want the experts to come in and testify. Maybe that happens here. I don't know. Again, that is a fact-intensive question, really depending on the issues that are raised in opposition to class certification.

And so we just don't want to set a precedent where we're just automatically filing sur-replies which are unnecessary. Perhaps they are necessary. And class

certification is an issue where they are necessary more often than in a normal motion. We will certainly concede that. Will we need one here? We don't know. But we have every incentive to be agreeable.

As Your Honor set forth today, your preference for the parties reaching agreements, we are trying to do that. And we will certainly not oppose a necessary sur-reply in the instance that it is required.

THE COURT: So I'm not sure that I heard you address the expert issue in terms of what you want. Obviously, from your proposed schedule, you've agreed on the dates except as to the sur-reply, but the plaintiffs don't want any language addressing expert reports.

MR. OLTS: As to the issue of the scope of the expert reports, we don't believe that, as of now, at this stage of the litigation, it's the correct time for the Court to determine what the scope of any reply expert report should be, without having any information about what are in those reports or what's in the opposition.

I do believe, for example, again, using the instance of market efficiency on which the plaintiffs have the burden to prove the market was efficient for Agilon stock during the class period in order to invoke a fraud on the market presumption, that if their expert were to raise some novel argument about that the market

was not efficient, for example, in a certain window or something like that, we would certainly want the Court to have the benefit of our expert's response to that.

But again, that is speculation. I just don't think that now is the time for Your Honor to make a ruling about what the scope of an expert report -- excuse me -- an expert reply report should be, you know, a year from now. That doesn't seem to be efficient to me, especially in light of the fact that our firms litigate these cases all the time. We're used to negotiating these things. We have every incentive for the Court to have all the information it needs to get it right.

THE COURT: Thank you, Mr. Olts. Anything further, Ms. O'Connor?

MS. O'CONNOR: Yes. I will just say the notion that the arguments are unpredictable is simply not accurate at all. There's a few points they have to make. They will put in an event setting. I can probably name the expert that will say that the stock traded in an efficient market. It's very clear what the arguments will be, so the notion that we need all this flexibility to react because we could raise something crazy, It's very well known.

We're just -- but the thing we're just trying to avoid -- and I do appreciate Your Honor's trying to

get to a place that makes sense here.  But we're just trying to avoid being disadvantaged by having deposed their expert and put in a report, only to have their expert change the report or add to the report, you know, on the same exact topic.  And if they do that, we will be saying we need to depose their expert again and we need another report.

And I'm not sure that that much expert work and briefing is an efficient process as compared to what we laid out, where each side has a good opportunity to have the expert report, have the opposing expert report, and have a reply brief as to the topics where that party bears the burden.

THE COURT:  And did you provide any examples in other cases where this kind of language has been included in the initial scheduling order, the language that the defendants propose?

MS. O'CONNOR:  I don't believe we did.  I think we ended up -- we weren't agreeing with the plaintiffs, and we had to just cram our proposal into our column in a funny little way at the last minute.  So I can look into that if that's helpful to the Court.

THE COURT:  Is that something that you commonly see in other cases?  Because I've never seen a scheduling order -- an initial scheduling order that includes this

kind of language governing the expert reports.

MS. O'CONNOR:  So it's something I believe we just had it -- I believe we just had it in another case against the same firm, different counsel.  I don't want to misspeak because I may be misremembering, but I believe we just had that in the Northern District of California, and I can take a look at that scheduling order.

THE COURT:  And did counsel for both sides agree to that?

MS. O'CONNOR:  That is farther back than I can recall, Your Honor.

THE COURT:  Well, I'm just not seeing at this time necessarily a reason to order this limitation here in December, although those dates are not so far into the future for expert discovery.  So if you had an example of where a court has ordered it and their reasoning, that would be helpful.

MS. O'CONNOR:  Okay.  Well, I can -- if I can identify one and submit it, I will do that.  And, again, I think, while I appreciate Mr. Olts' desire to be flexible and compromise, parties do tend to have trouble around these issues.

THE COURT:  Sure.

MS. O'CONNOR:  And I think it's more efficient

to create expectations today than not.

THE COURT:  Sure.

MS. O'CONNOR:  Thank you, Your Honor.

THE COURT:  Anything further from the plaintiffs?

MR. OLTS:  I would just point out in response to Ms. O'Connor's argument, the issues that we will be presenting, I think I agree with her.  They are very straightforward.  The question -- the whole sort of rub becomes, well, what are they going to say in response?  And I think we don't know that.  And in the process of negotiating this, we asked them:  Are you going to oppose class certification on the basis of a lack of price impact?  And as is their right, they said, We don't know.

So that's where the question arises, not what are the issues that we are going to address.  We are going to address the elements of Rule 23.  It's very clear, and those opening briefs are fairly routine.  I would agree with her on that.  It's the opposition and the arguments that they make in opposition, both in their brief and in their expert report, which creates this issue about, well, when would be the timing of making those responses.

THE COURT:  Okay.  Thank you.  So what I'll issue in my written order is for the parties to submit a

joint proposed scheduling order following Judge Ezra's proposed scheduling order, which is posted on our website You probably already have it.  If it doesn't -- if Judge Ezra's scheduling order doesn't accommodate or doesn't include all of the dates that you have agreed on, you can just add those in, but it should be in the form of his proposed scheduling order.

The close of fact discovery will be set for August 21st, 2026, and the dates that were varying between the parties that were pegged to that date should be changed commensurately.  For example, I think there will generally be about one month before what the plaintiffs proposed because the -- I think that the intervals of the various dates the parties agreed on how long, essentially, you want for rebuttal expert reports and so forth.  But you need to adjust those for the close of fact discovery date.

And then we'll have a two-week deadline for Defendants' sur-reply.  They will be permitted to submit a sur-reply.  But that will be July 24th, 2026.  And the order should not include the language proposed by the defendants about the expert reports at this stage.

So, again, I'll issue a written order to make sure that there aren't any misunderstandings on any of the motions -- either of the two motions taken up today.

Is there anything else that you would like the Court to address?  I guess we can start with Mr. Parham since you were the first to argue.

MR. PARHAM:  Nothing from Agilon, Your Honor. Thank you.

THE COURT:  Okay.  Thank you.

And Ms. O'Connor?

MS. O'CONNOR:  Nothing further.  Thank you, Your Honor.

THE COURT:  Thank you.  And Mr. Olts?

MR. OLTS:  Nothing else, Your Honor.  Thank you very much.

THE COURT:  Thank you very much, Counsel.  I wish you all safe travels home.  We're adjourned.

(Proceedings concluded at 11:59 a.m.)

**REPORTER'S CERTIFICATE**

I, Arlinda Rodriguez, do hereby certify that the foregoing was transcribed from an electronic recording made at the time of the aforesaid proceedings and is a correct transcript, to the best of my ability, made from the proceedings in the above-entitled matter, and that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

/S/ Arlinda Rodriguez                    December 17, 2025

ARLINDA RODRIGUEZ                         DATE

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)