# EXHIBIT H

EX-10.2 5 d144430dex102.htm EX-10.2

**Exhibit 10.2**

STOCKHOLDERS AGREEMENT

of

AGILON HEALTH, INC.

Dated as of April 16, 2021

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1 Certain Defined Terms | | 1 |
| 1.2 Other Definitional Provisions | | 4 |
| ARTICLE II CORPORATE GOVERNANCE | | 5 |
| 2.1 Board Representation | | 5 |
| 2.2 Available Financial Information | | 7 |
| 2.3 Other Information | | 8 |
| 2.4 Access | | 9 |
| 2.5 Termination of Rights | | 9 |
| ARTICLE III MISCELLANEOUS | | 9 |
| 3.1 Confidentiality | | 9 |
| 3.2 Amendments and Waivers | | 10 |
| 3.3 Successors, Assigns and Permitted Transferees | | 10 |
| 3.4 Notices | | 10 |
| 3.5 Further Assurances | | 11 |
| 3.6 Entire Agreement; No Third Party Beneficiaries | | 11 |
| 3.7 Restrictions on Other Agreements; By-laws | | 12 |
| 3.8 Governing Law | | 12 |
| 3.9 Jurisdiction and Forum; Waiver of Jury Trial | | 12 |
| 3.10 Severability | | 12 |
| 3.11 Enforcement | | 12 |
| 3.12 Titles and Subtitles | | 13 |
| 3.13 Effectiveness | | 13 |
| 3.14 No Recourse | | 13 |
| 3.15 Counterparts; Facsimile Signatures | | 13 |

Exhibit A – Joinder Agreement

- i -

THIS STOCKHOLDERS AGREEMENT is entered into as of April 16, 2021, by and among agilon health, inc., a Delaware corporation (and any successor in interest thereto, the "Company"), CD&R Vector Holdings, L.P., a Cayman Islands exempted limited partnership (and any successor in interest thereto, the "CD&R Investor"), and any Person who executes a Joinder Agreement in the form of Exhibit A hereto (each, a "Stockholder" and collectively, the "Stockholders"). Capitalized terms used herein without definition shall have the meanings set forth in Section 1.1.

RECITALS

WHEREAS, the Company intends to undertake an underwritten initial public offering (the "IPO") of Common Stock; and

WHEREAS, in connection with the IPO, and effective as of the date of the initial listing (the "Listing Date") of the Common Stock on the New York Stock Exchange (the "NYSE"), the Company and the CD&R Investor wish to set forth their respective rights and obligations on and after the Listing Date, including with respect to certain governance matters.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1 Certain Defined Terms. As used herein, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person directly or indirectly owning or controlling 10% or more of any class of outstanding voting securities of such Person or (iii) any officer, director, general partner or trustee of any such Person described in clause (i) or (ii).

"Agreement" means this Stockholders Agreement, as amended from time to time in accordance with Section 3.2.

"Annual Budget" has the meaning given to such term in Section 2.2(b).

"Applicable Law" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Entity, (ii) any consents or approvals of any Governmental Entity and (iii) any orders, decisions, injunctions, judgments, awards, decrees of or agreements with any Governmental Entity.

"beneficial owner" or "beneficially own" has the meaning given such term in Rule 13d-3 under the Exchange Act and a Person's beneficial ownership of Common Stock or other voting securities of the Company shall be calculated in accordance with the provisions of such Rule.

"Board" means the Board of Directors of the Company.

"By-laws" means the Amended and Restated By-laws of the Company, as in effect on the date hereof and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the Charter.

"CD&R Designee" has the meaning given to such term in Section 2.1(b).

"CD&R Investor" has the meaning given to such term in the Preamble.

"Chairman" has the meaning given to such term in Section 2.1(e).

"Charter" means the Amended and Restated Certificate of Incorporation of the Company, as in effect on the date hereof and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Common Stock" means the shares of common stock, par value $0.01 per share, of the Company including any shares of capital stock into which Common Stock may be converted (as a result of recapitalization, share exchange or similar event) or are issued with respect to Common Stock, including with respect to any stock split or stock dividend, or a successor security.

"Company" has the meaning given to such term in the Preamble.

"control" (including the terms "controlling", "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

"Director" means any member of the Board.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

2

"GAAP" means generally accepted accounting principles, as in effect in the United States of America from time to time.

"Governmental Entity" means any federal, state, local or foreign court, legislative, executive or regulatory authority or agency.

"Group" has the meaning given to such term in Section 13(d)(3) of the Exchange Act.

"Information" means all confidential information about the Company or any of its Subsidiaries that is or has been furnished to any Stockholder or any of its Representatives by or on behalf of the Company or any of its Subsidiaries, or any of their respective Representatives, whether written or oral or in electronic or other form and whether prepared by the Company, its Representatives or otherwise, together with all written or electronically stored documentation prepared by such Stockholder or its Representatives based on or reflecting, in whole or in part, such information; provided that the term "Information" does not include any information that (i) is or becomes generally available to the public through no action or omission by such Stockholder or its Representatives, (ii) is or becomes available to such Stockholder on a non-confidential basis from a source, other than the Company or any of its Subsidiaries, or any of their respective Representatives, that to such Stockholder's knowledge, after reasonable inquiry, is not prohibited from disclosing such portions to such Stockholder by a contractual, legal or fiduciary obligation, (iii) is independently developed by a Stockholder or its Representatives or Affiliates on its own behalf without use of any of the confidential information or (iv) was in such Stockholder's, its Affiliates' or its Representatives' possession prior to the date of this Agreement.

"IPO" has the meaning set forth in the Recitals.

"Issuer Competitor" means any Person that directly competes with the business of the Company and its direct and indirect Subsidiaries from time to time.

"Listing Date" has the meaning set forth in the Recitals.

"NYSE" has the meaning set forth in the Recitals.

"Permitted Transferee" means with respect to any Stockholder, an Affiliate of such Stockholder, including to any investment fund or other entity controlled or managed by, or under common control or management with, such Stockholder; provided, however, that any such transferee agrees in a writing in the form attached as Exhibit A hereto to be bound by and to comply with all applicable provisions of this Agreement. Any Stockholder shall also be a Permitted Transferee of the Permitted Transferees or itself.

3

"Person" means any individual, corporation, limited liability company, limited or general partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivisions thereof or any Group comprised of any two or more of the foregoing.

"Representatives" means with respect to any Person, any of such Person's, or its Affiliates', directors, officers, employees, general partners, Affiliates, direct or indirect shareholders, members or limited partners, attorneys, accountants, financial and other advisers, and other agents and representatives, including in the case of the CD&R Investor, any person designated for nomination by the Board as a Director by the CD&R Investor.

"Stockholder" and "Stockholders" have the meanings given to such terms in the Preamble.

"Subsidiary" means, with respect to any Person, any corporation, entity or other organization whether incorporated or unincorporated, of which (i) such first Person directly or indirectly owns or controls at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions or (ii) such first Person is a general partner, managing member or otherwise exercises similar management control.

"Transfer" means, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any shares of Common Stock beneficially owned by a Person or any interest in any shares of Common Stock beneficially owned by a Person.

1.2 Other Definitional Provisions.

(a) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article and Section references are to this Agreement unless otherwise specified. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(b) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

4

## ARTICLE II

## CORPORATE GOVERNANCE

2.1 Board Representation.

(a) Following the Listing Date, the CD&R Investor shall have the right, but not the obligation, to designate for nomination by the Board as Directors a number of designees equal to at least: (i) at least a majority of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 50% of the outstanding shares of the Common Stock; (ii) at least 40% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 40% but less than 50% of the outstanding shares of the Common Stock; (iii) at least 30% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 30% but less than 40% of the outstanding shares of the Common Stock; (iv) at least 20% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 20% but less than 30% of the outstanding shares of the Common Stock; and (v) at least 5% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 5% but less than 20% of the outstanding shares of the Common Stock. For purposes of calculating the number of CD&R Designees that the CD&R Investor is entitled to designate for nomination pursuant to the formula outlined above, any fractional amounts would be rounded up to the nearest whole number and the calculation would be made on a pro forma basis after taking into account any increase in the size of the Board. For the avoidance of doubt, if the CD&R Investor beneficially owns less than 5% of the outstanding shares of the Common Stock, the CD&R Investor shall no longer be entitled to designate any designees for nomination by the Board as Directors.

(b) In the event that the CD&R Investor has designated for nomination by the Board less than the total number of designees the CD&R Investor shall be entitled to designate for nomination pursuant to Section 2.1(a), the CD&R Investor shall have the right, at any time, to designate for nomination such additional designees to which it is entitled, in which case, the Company and the Directors shall take all necessary action, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), to (x) enable the CD&R Investor to designate for nomination and effect the election or appointment of such additional individuals, whether by increasing the size of the Board, or otherwise, and (y) to designate such additional individuals designated for nomination by the CD&R Investor to fill such newly-created vacancies or to fill any other existing vacancies. Each such individual whom the CD&R Investor shall actually designate for nomination pursuant to this Section 2.1 and who is thereafter elected to the Board to serve as a Director shall be referred to herein as a "CD&R Designee."

5

(c) In the event that a vacancy is created at any time by the death, retirement or resignation of any Director designated by the CD&R Investor pursuant to this Section 2.1, the remaining Directors and the Company shall, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), cause the vacancy created thereby to be filled by a new designee of the CD&R Investor as soon as possible, and the Company hereby agrees to take, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), at any time and from time to time, all actions necessary to accomplish the same.

(d) The Company agrees, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law) and notwithstanding any mandatory Director retirement age that may be adopted by the Company, to include in the slate of nominees recommended by the Board for election at any meeting of stockholders called for the purpose of electing Directors the individuals designated pursuant to this Section 2.1 and to nominate and recommend each such individual to be elected as a Director as provided herein, and to solicit proxies or consents in favor thereof. The Company is entitled to identify such individual as a CD&R Designee pursuant to this Agreement.

(e) For so long as the CD&R Investor beneficially owns at least 25% of the outstanding shares of the Common Stock, a CD&R Designee shall serve as the Chairman of the Board ("Chairman") and in such capacity as Chairman shall preside over meetings of the Board and the stockholders, among other duties.

(f) Insofar as the Company is or becomes subject to requirements under Applicable Law or the regulations of any self-regulatory organization, including the NYSE or such other national securities exchange upon which the Common Stock is listed to which the Company is then subject, relating to the composition of the Board or committees thereof, their respective responsibilities or the qualifications of their respective members, the CD&R Investor shall cooperate in good faith to select for nomination its designees to the Board under this Section 2.1 so as to permit the Company to comply with all such applicable legal or regulatory requirements.

(g) No CD&R Designee shall be paid any fee (or provided any equity-based compensation) for service as Director or member of any committee of the Board, unless otherwise determined by the Board; provided that each CD&R Designee shall be entitled to reimbursement by the Company for reasonable expenses incurred while traveling to and from Board and committee meetings as well as travel for other business related to his or her service on the Board or committees thereof, subject to any maximum reimbursement obligations as may be established by the Board from time to time. Notwithstanding the foregoing, any CD&R Designee whom the Board determines to be "independent" as defined under NYSE and Exchange Act rules and regulations shall be entitled to participate in the Company's compensation arrangements in which non-CD&R Designees, or other "independent" Directors, participate.

6

2.2 <u>Available Financial Information</u>. Upon written request of the CD&R Investor, the Company will deliver, or cause to be delivered, to the CD&R Investor or its designated Representative:

(a) as soon as available after the end of each month and in any event within 30 days thereafter, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such month and consolidated statements of operations, income, cash flows, retained earnings and stockholders' equity of the Company and its Subsidiaries, for each month and for the current fiscal year of the Company to date, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of notes thereto), together with a comparison of such statements to the corresponding periods of the prior fiscal year and to the Company's business plan then in effect and approved by the Board;

(b) an annual budget, a business plan and financial forecasts for the Company for the next fiscal year of the Company (the "<u>Annual Budget</u>"), no later than 30 days before the beginning of the Company's next fiscal year, in such manner and form as approved by the Board, which shall include at least a projection of income and a projected cash flow statement for each fiscal quarter in such fiscal year and a projected balance sheet as of the end of each fiscal quarter in such fiscal year, in each case prepared in reasonable detail, with appropriate presentation and discussion of the principal assumptions upon which such budgets and projections are based, which shall be accompanied by the statement of the chief executive officer or chief financial officer or equivalent officer of the Company to the effect that such budget and projections are based on reasonable and good faith estimates and assumptions made by the management of the Company for the respective periods covered thereby; it being recognized by the CD&R Investor that such budgets and projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by them may differ from the projected results. Any material changes in such Annual Budget shall be delivered to the CD&R Investor as promptly as practicable after such changes have been approved by the Board;

(c) as soon as available after the end of each fiscal year of the Company, and in any event within 90 days thereafter, (<u>i</u>) the annual financial statements required to be filed by the Company pursuant to the Exchange Act, (<u>ii</u>) a consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year, and consolidated statements of income, retained earnings and cash flows of the Company and its Subsidiaries for such year, prepared in accordance with GAAP and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and accompanied by the opinion of independent public accountants of recognized national standing selected by the Company and (<u>iii</u>) a Company-prepared comparison to the Annual Budget for such year as approved by the Board; and

7

(d) as soon as available after the end of the first, second and third quarterly accounting periods in each fiscal year of the Company, and in any event within 45 days thereafter, (<u>i</u>) the quarterly financial statements required to be filed by the Company pursuant to the Exchange Act, (<u>ii</u>) a consolidated balance sheet of the Company and its Subsidiaries as of the end of each such quarterly period, and consolidated statements of income, retained earnings and cash flows of the Company and its Subsidiaries for such period and for the current fiscal year to date, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of notes thereto) and (<u>iii</u>) a Company-prepared comparison to the corresponding periods of the previous fiscal year and to the Annual Budget then in effect as approved by the Board, all of the information to be provided pursuant to this Section 2.2(d) in reasonable detail and certified by the principal financial or accounting officer of the Company.

(e) Notwithstanding anything to the contrary in Sections 2.2(c) and (d), the Company may satisfy its obligations thereunder (other than its obligations under Sections 2.2(c)(iii) and 2.2(d)(iii)) by (<u>i</u>) providing the financial statements of any wholly-owned Subsidiary of the Company to the extent such financial statements reflect the entirety of the operations of the business or (<u>ii</u>) filing such financial statements of the Company or any wholly-owned Subsidiary of the Company whose financial statements satisfy the requirements of clause (i), as applicable, with the U.S. Securities and Exchange Commission on EDGAR or in such other manner as makes them publicly available. The Company's obligation to furnish the materials described in Sections 2.2(c) and (d) shall be satisfied so long as it transmits such materials to the CD&R Investor within the time periods specified therein, notwithstanding that such materials may actually be received after the expiration of such periods.

2.3 <u>Other Information</u>. The Company covenants and agrees to deliver to the CD&R Investor, upon written request, with reasonable promptness, such other information and data (including such information and reports made available to any lender of the Company or any of its Subsidiaries under any credit agreement or otherwise) with respect to the Company and each of its Subsidiaries as from time to time may be reasonably requested by the CD&R Investor; <u>provided</u> that the Company reserves the right to withhold any information under this Section 2.3 or access under Section 2.4 from the CD&R Investor if the Board determines that providing such information or granting such access would reasonably be expected to materially adversely affect the Company on a competitive basis or otherwise. The CD&R Investor shall have access to such other information concerning the Company's business or financial condition and the Company's management as may be reasonably requested, including all information that is necessary for (<u>x</u>) each of the CD&R Investor and its Affiliates to comply with income tax reporting and regulatory requirements and (<u>y</u>) the CD&R Investor to prepare its quarterly and annual financial statements.

8

2.4 <u>Access</u>. Subject to Section 2.3, the Company shall, and shall cause its Subsidiaries, officers, Directors, employees, auditors and other agents to (<u>a</u>) afford the CD&R Investor and its Representatives, during normal business hours and upon reasonable notice, reasonable access at all reasonable times to its officers, employees, auditors, legal counsel, properties, offices and other facilities and to all books and records, and (<u>b</u>) afford the CD&R Investor the opportunity to discuss the affairs, finances and accounts of the Company and its Subsidiaries with their respective officers from time to time as the CD&R Investor may reasonably request upon reasonable notice.

2.5 <u>Termination of Rights</u>. This Agreement shall terminate on the earlier to occur of (<u>a</u>) such time as the CD&R Investor is no longer entitled to nominate a Director pursuant to Section 2.1(a) of this Agreement and (<u>b</u>) upon the delivery of a written notice by the CD&R Investor to the Company requesting that this Agreement terminate.

ARTICLE III

MISCELLANEOUS

3.1 <u>Confidentiality</u>. Each party hereto agrees to, and shall cause its Representatives to, keep confidential and not divulge any Information, and to use, and cause its Representatives to use, such Information only in connection with the operation of the Company and its Subsidiaries and monitoring and making voting and investment decisions with respect to the Company; <u>provided</u> that nothing herein shall prevent any party hereto from disclosing such Information (<u>a</u>) upon the order of any court or administrative agency, (<u>b</u>) upon the request or demand of any regulatory agency or authority having jurisdiction over such party, (<u>c</u>) to the extent required by law or legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (<u>d</u>) to the extent necessary in connection with the exercise of any remedy hereunder, (<u>e</u>) to other Stockholders, (<u>f</u>) to such party's Representatives that in the reasonable judgment of such party need to know such Information, (<u>g</u>) to any potential Permitted Transferee of a Stockholder to whom such proposed Transfer would be permitted in accordance with Section 3.3 as long as such potential Permitted Transferee agrees to be bound by the provisions of this Section 3.1 as if a Stockholder or (<u>h</u>) to any prospective purchaser of all of a Stockholder's shares of the Common Stock, provided that (1) such prospective purchaser shall have been advised of this Agreement and shall have expressly agreed to be bound by the confidentiality provisions hereof, (2) such prospective purchaser is not an Issuer Competitor or a Person who controls any Issuer Competitor, and (3) such prospective purchaser shall be responsible for any breach of or failure to comply with the confidentiality provisions of this Agreement by any of its Affiliates and such prospective purchaser agrees, at its sole expense, to take reasonable measures (including but not limited to court proceedings) to restrain its Representatives

9

and Affiliates from prohibited or unauthorized disclosure or use of any Information; provided further that, in the case of clause (a) or (c), such party shall notify the other parties hereto of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment, when and if available.

3.2 <u>Amendments and Waivers</u>. This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by the Company and the CD&R Investor. Neither the failure nor delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

3.3 <u>Successors, Assigns and Permitted Transferees</u>. This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. Any Stockholder may assign its rights and obligations hereunder to any Permitted Transferee.

3.4 <u>Notices</u>. All notices and other communications to be given to any party hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service, or when received in the form of a facsimile or other electronic transmission (receipt confirmation requested), and shall be directed to the address set forth below (or at such other address or facsimile number as such party shall designate by like notice):

(a) if to the Company, to:

agilon health, inc.
1 World Trade Center
Suite 2000
Long Beach, CA 90831
Attention: Chief Business Officer
Email: ted.halkias@agilonhealth.com

10

(b) if to the CD&R Investor, to:

> Clayton, Dubilier & Rice, LLC
> 375 Park Avenue
> 18th Floor
> New York, New York 10152
> Attention: Chief Financial Officer
> Email: Finance@cdr-inc.com

(c) if to any other Stockholder, to the address of such other Stockholder as shown in the stock record book of the Company.

in each case, with a copy (which shall not constitute notice) to:

> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Peter J. Loughran, Esq. and Paul M. Rodel, Esq.
> Fax: (212) 909-6836
> Email: pjloughran@debevoise.com; pmrodel@debevoise.com

3.5 <u>Further Assurances</u>. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder. To the fullest extent permitted by Applicable Law, the Company shall not directly or indirectly take any action that is intended to, or would reasonably be expected to result in, any Stockholder being deprived of the rights contemplated by this Agreement.

3.6 <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement constitutes the entire agreement among the parties with respect to the subject matter of this Agreement and supersedes any prior discussions, correspondence, negotiation, proposed term sheet, agreement or understanding and there are no agreements, understandings, representations or warranties between the parties with respect to the subject matter of this Agreement other than those set forth or referred to in this Agreement, and this Agreement is not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

11

3.7 <u>Restrictions on Other Agreements; By-laws</u>. The provisions of this Agreement shall be controlling if any such provision or the operation thereof conflicts with the provisions of the By-laws. Each of the parties covenants and agrees to take, or cause to be taken, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), any action reasonably requested by the Company or any Stockholder, as the case may be, to amend the By-laws so as to avoid any conflict with the provisions hereof, including, in the case of the Stockholders, to vote their shares of Common Stock.

3.8 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof to the extent that such principles would require or permit the application of laws of another jurisdiction.

3.9 <u>Jurisdiction and Forum; Waiver of Jury Trial</u>. In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement, each of the parties unconditionally accepts the jurisdiction and venue of or, if the Court of Chancery does not have subject matter jurisdiction over this matter, the Superior Court of the State of Delaware (Complex Commercial Division), or if jurisdiction over the matter is vested exclusively in federal courts, the United States District Court for the District of Delaware, and the appellate courts to which orders and judgments thereof may be appealed. In any such judicial proceeding, the parties agree that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by delivery provided pursuant to the directions in Section 3.4. EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

3.10 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any Person or circumstance or in any jurisdiction, shall be held to be invalid or unenforceable to any extent, (<u>a</u>) the remainder of this Agreement shall not be affected thereby, and each other provision hereof shall be valid and enforceable to the fullest extent permitted by law, (<u>b</u>) as to such Person or circumstance or in such jurisdiction such provision shall be reformed to be valid and enforceable to the fullest extent permitted by law and (<u>c</u>) the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby.

3.11 <u>Enforcement</u>. Each party hereto acknowledges that money damages would not be an adequate remedy in the event that any of the covenants or agreements in this Agreement are not performed in accordance with its terms, and it is therefore agreed that in addition to and without limiting any other remedy or right it may have, the non-breaching party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically the terms and provisions hereof.

12

3.12 <u>Titles and Subtitles</u>. The titles of the articles, sections and subsections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

3.13 <u>Effectiveness</u>. This Agreement shall become effective upon the Listing Date.

3.14 <u>No Recourse</u>. This Agreement may only be enforced against, and any claims or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no past, present or future Affiliate, Director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

3.15 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of this Agreement by one party to the others may be made by facsimile, electronic mail, other electronic format (including any electronic signature complying with the Delaware Uniform Electronic Transactions Act, as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of page intentionally left blank]*

13

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date set forth in the first paragraph hereof.

AGILON HEALTH, INC.

By:  /s/ Theodore Halkias
     Name: Theodore Halkias
     Title: Chief Business Officer

[*Signature Page - Stockholders Agreement*]

CD&R VECTOR HOLDINGS, L.P.

By:  CD&R Investment Associates IX, Ltd., its general partner

By:  /s/ Rima Simson
Name: Rima Simson
Title:  Vice President, Treasurer and Secretary

[*Signature Page - Stockholders Agreement*]

<u>Exhibit A</u>

<u>JOINDER AGREEMENT</u>

Reference is made to the Stockholders Agreement, dated as of April 16, 2021 (as amended from time to time, the "<u>Stockholders Agreement</u>"), by and among agilon health, inc. (the "<u>Company</u>") and certain stockholders of the Company party thereto. The undersigned agrees, by execution hereof, to become a party to, and to be subject to the rights and obligations under, the Stockholders Agreement.

[NAME]

By: _____

    Name:
    Title:

Date:

Address:

Acknowledged by:

AGILON HEALTH, INC.

By: _____

    Name:
    Title:

Date:

A-1