# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § | Master File No. 1:24-cv-00297-DAE |
| | § | CLASS ACTION |
| This Document Relates To: | § | |
| ALL ACTIONS. | § | |
| | § | |

**AGILON DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF
DOCUMENTS TO LEAD PLAINTIFFS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Rule CV-26 of the Local Rules of the Western District of Texas, Defendants agilon health, inc. ("agilon"), Steven J. Sell, and Timothy S. Bensley (collectively, the "agilon Defendants") hereby request that Plaintiffs produce the following documents for inspection and copying within the time prescribed by the Federal Rules at a mutually agreeable location.

**DEFINITIONS**

1.     The term "agilon" refers to agilon health, inc.

2.     The term "agilon stock" or "stock" refers to agilon common stock.

3.     The term "agilon derivatives" or "derivatives" means any instrument or contractual arrangement the value, price, or performance of which is derived in whole or in part from agilon common stock.

1

4.     The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

5.     The term "Complaint" means the Consolidated Complaint for Violations of the Federal Securities Laws filed September 6, 2024 (Dkt. 36).

6.     The term "concerning" means relating to, referring to, describing, evidencing or constituting.

7.     The term "document" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

8.     The term "including" means "including but not limited to."

9.     The terms "person" and "persons" mean any natural person or business, legal or governmental entity or association.

10.     The terms "Plaintiff," "you," and "your" refer to each named plaintiff in this action—Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans (collectively, the "North Carolina Funds"), the Indiana Public Retirement System, and the North Atlantic States Carpenters Pension Fund and Guaranteed Annuity Fund ("North Atlantic Funds") and, where applicable, each of the foregoing's officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

11.     The term "Putative Class Period" means April 15, 2021, through February 27, 2024.

12.     The connectives "and" and "or" shall be construed conjunctively or disjunctively as necessary to bring within the scope of a request all responsive materials. Words used in the singular include the plural and vice versa.

## INSTRUCTIONS

13.     The scope of discovery shall be limited to matters that are relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues. The parties must cooperate in discovery and confer in good faith as required by Rule 26(f) and Local Rule CV-7(i) before seeking court intervention.

14.     Unless otherwise specified, these requests encompass documents created, sent, or received on or after April 15, 2021.

15.     Electronically stored information ("ESI") and hard-copy documents shall be produced in the format prescribed by the parties' agreed ESI protocol. If no protocol exists, documents shall be produced in a reasonably usable form as required by Rule 34(b)(2)(E), including text-searchable images and associated metadata where available.

16.     If any responsive material is withheld on the basis of privilege, work product, or any other protection, you must expressly make the claim and provide a description of the nature of the documents, communications, or tangible things not produced that is sufficient to enable other parties to assess the claim, as required by Federal Rule of Civil Procedure 26(b)(5)(A).

17.     Each objection must be stated with particularity as required by Rule 34(b)(2)(B)–(C). If an objection applies only in part, produce the remainder of the responsive material. General

3

objections are disfavored and do not preserve any ground for withholding responsive information that is not specifically stated.

18.     These requests are continuing within the meaning of Rule 26(e). If additional responsive information later comes into your possession, custody, or control, supplement your production within five (5) business days.

19.     Each definition and instruction shall be construed to achieve full disclosure. The use of identical terms in multiple requests is intended to have the same meaning in each unless context requires otherwise.

20.     Each document shall be produced in its entirety, including all attachments, appendices, enclosures, and metadata.

21.     Produce the best and most legible copy of each document. If multiple identical copies exist, only one need be produced; however, copies containing any notation, highlight, or alteration are considered distinct and must be produced.

22.     Discovery in this action is governed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Western District of Texas, and Judge Ezra's Court Fact Sheet and Standing Order on Discovery Disputes. The parties are expected to conduct discovery cooperatively and efficiently, consistent with the proportionality principles set forth in Federal Rule of Civil Procedure 26(b)(1).

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**    All documents you consulted, reviewed, or referred to in preparing the Complaint, including any materials received from, reviewed with, or provided to any third party.

4

**REQUEST NO. 2:**    All documents that you contend support your claims in the Complaint.

**REQUEST NO. 3:**    All documents and communications concerning any investigation you or anyone acting on your behalf conducted regarding agilon, its officers or employees, or the subject matter of the Complaint.

**REQUEST NO. 4:**    Any research, articles, analyst reports, Internet-based materials, or other documents (other than agilon's SEC filings) that you reviewed or relied upon in connection with your decision to assert claims in this action.

**REQUEST NO. 5:**    All documents you consulted, reviewed, identified, or referred to in any way in preparing the certifications filed with your Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Selection of Counsel (Dkt. 10) or the Complaint.

**REQUEST NO. 6:**    All communications between you or anyone acting on your behalf (including, but not limited to, your attorneys or investigators) and any current or former officer, employee, contractor, director, agent, or representative of agilon.

**REQUEST NO. 7:**    All documents sent by you or anyone acting on your behalf (including, but not limited to, your attorneys or investigators) to any current or former officer, employee, contractor, director, agent, or representative of agilon, excluding any filings and correspondence between the parties' outside counsel in connection with this case.

**REQUEST NO. 8:**    All documents reflecting any communications between you or anyone acting on your behalf and any current or former employee, contractor, or agent of any Medicare Advantage health plan regarding agilon.

**REQUEST NO. 9:**    All documents reflecting any communications between you or anyone acting on your behalf and any current or former member of agilon's physician network, including the signatories to the letter attached hereto as Exhibit A.

**REQUEST NO. 10:**    All documents reflecting any communications between you or anyone acting on your behalf and any third party concerning the allegations in the Complaint.

**REQUEST NO. 11:**    All documents you or anyone acting on your behalf received from, provided to, or discussed with any potential witness concerning agilon.

**REQUEST NO. 12:**    All documents concerning any communications between you or anyone acting on your behalf and the media, investment analysts, rating agencies, proxy advisor firms, or government agencies relating to agilon or the allegations in the Complaint.

**REQUEST NO. 13:**    Documents reflecting all transactions by you or on your behalf in agilon securities (including common stock and derivatives) during the Putative Class Period.

**REQUEST NO. 14:**    All documents concerning your purchase, acquisition, sale, disposition, or holding of agilon stock or agilon derivatives, including trade confirmations, brokerage statements, custodial reports, and account summaries.

**REQUEST NO. 15:**    All documents reflecting any gains or losses, whether realized or unrealized, on transactions by you or on your behalf in agilon stock or agilon derivatives, including

6

but not limited to daily, monthly, and quarterly profit and loss; tax-lot reports; realized/unrealized gain-loss reports; wash-sale reports; and any internal performance or attribution reports reflecting exposure to or results from agilon stock or agilon derivatives.

**REQUEST NO. 16:** Documents sufficient to identify each internal or external investment manager who purchased, held, or sold agilon stock on your behalf.

**REQUEST NO. 17:** All documents concerning powers of attorney, grants of discretionary authority, and trading authorizations for any account in which you held agilon stock during the Putative Class Period.

**REQUEST NO. 18:** All documents you read or received in connection with your decisions to buy, acquire, sell, or hold agilon stock or agilon derivatives.

**REQUEST NO. 19:** All documents that you or any investment manager relied upon in making any decision to buy, sell, or hold agilon stock or agilon derivatives.

**REQUEST NO. 20:** All brokerage or custodial agreements between you and any financial institution for accounts in which you held agilon stock during the Putative Class Period.

**REQUEST NO. 21:** All documents evidencing or concerning any transaction during the Putative Class Period involving hypothecation, rehypothecation, lending, or the use of agilon stock as collateral.

**REQUEST NO. 22:** All documents and communications analyzing or discussing agilon's stock-price movements or trading volume following the alleged corrective disclosures on November 2, 2023; January 5, 2024; and February 27, 2024.

**REQUEST NO. 23:** All documents and communications analyzing, discussing, or assessing the impact of the alleged misrepresentations and omissions identified in the Complaint on the value, pricing, volatility, liquidity, or trading of agilon stock or agilon derivatives, including any event studies, trading analyses, regression or econometric analyses, risk reports, or internal or external memoranda.

**REQUEST NO. 24:** All documents concerning any analyses, memoranda, correspondence, or reports regarding changes in agilon's stock price.

**REQUEST NO. 25:** All communications reflecting your or your agents' assessments of the causes of agilon's stock-price changes.

**REQUEST NO. 26:** All communications discussing investment gains or losses related to agilon stock or agilon derivatives, including but not limited to internal reports or emails discussing how such gains or losses were calculated, realized, deferred, or offset by positions in agilon stock, sector hedges, indexes, baskets, or other derivatives.

**REQUEST NO. 27:** All documents reflecting your monitoring or evaluation of agilon's public statements, filings, earnings calls, press releases, investor presentations, conference calls, or analyst reports.

**REQUEST NO. 28:** All documents reflecting your awareness of, or communications about, utilization trends, medical-cost trends, or other developments in the Medicare Advantage industry during the Putative Class Period.

8

**REQUEST NO. 29:** All documents reflecting any communications with consultants, investment advisers, or analysts concerning agilon's business model, data systems, utilization rates, or medical margins.

**REQUEST NO. 30:** All documents concerning the organizational structure of each Plaintiff, including documents identifying investors, beneficiaries, trustees, or other decision-makers.

**REQUEST NO. 31:** All documents concerning your decision to invest in agilon stock.

**REQUEST NO. 32:** All documents you intend to rely upon to establish adequacy and typicality to serve as class representatives, including any prior experience serving as a lead plaintiff or class representative.

**REQUEST NO. 33:** All contracts, retention letters, portfolio monitoring agreements, or other engagement documents between you and any law firm representing you in this litigation.

**REQUEST NO. 34:** All documents regarding any agreement for the payment of attorneys' fees, costs, or expenses in connection with this action.

**REQUEST NO. 35:** All documents concerning any compensation, reimbursement, or incentive you may receive as a result of serving as a representative plaintiff in this action.

**REQUEST NO. 36:** All documents concerning any understanding, arrangement, or agreement—written or oral—among your counsel regarding division of work or allocation of attorneys' fees or expenses in this case.

**REQUEST NO. 37:**  Documents sufficient to identify all prior cases in which you have served or sought to serve as a representative or lead plaintiff in a class action.

**REQUEST NO. 38:**  All transcripts of deposition, hearing, or trial testimony given by any Plaintiff in the past ten (10) years in any action alleging violations of state or federal securities laws.

**REQUEST NO. 39:**  All documents concerning any communications, analyses, or correspondence about Defendant Sell's sales, purchases, or holdings of agilon common stock.

**REQUEST NO. 40:**  All documents you reviewed, relied upon, or created that relate to your allegations that Defendant Sell traded agilon stock while in possession of material, non-public information.

**REQUEST NO. 41:**  All documents concerning any comparison of Defendant Sell's transactions to those of other agilon executives or to overall market activity.

**REQUEST NO. 42:**  All communications over the past ten years involving two or more Plaintiffs, excluding communications with outside counsel.

**REQUEST NO. 43:**  All documents that you have produced, or will produce, to any other defendant in this action, whether in response to requests for production, interrogatories, subpoenas, or any other form of discovery request.

**REQUEST NO. 44:**  All documents identified in your Fed. R. Civ. P. 26(a)(1) disclosures, including any amendments thereto.

**REQUEST NO. 45:**  Any communications with individuals identified in your Fed. R. Civ. P. 26(a)(1) disclosures, including any amendments thereto.

**REQUEST NO. 46:**  All documents and communications concerning your document and ESI retention, preservation, and/or destruction policies and practices in place during the Putative Class Period.

**REQUEST NO. 47:**  All documents that are produced to you pursuant to any subpoena served in this action.

**REQUEST NO. 48:**  All documents which any testifying expert for Plaintiffs references in drafting a written report for this matter, including all documents on which such testifying expert relies in support of any opinion(s) in this matter.

**REQUEST NO. 49:**  All documents concerning any monitoring, tracking, or analysis of social media platforms, news websites, financial blogs, or online forums for discussions, posts, or commentary about agilon, its stock price, or the subject matter of this litigation.

**REQUEST NO. 50:**  All documents concerning your investment policies, risk management procedures, compliance protocols, or internal controls relating to equity investments in healthcare or Medicare Advantage companies, including any documents reflecting changes to such policies during the Putative Class Period.

**REQUEST NO. 51:**  All documents reflecting communications between you or anyone acting on your behalf and other institutional investors, pension funds, or investment managers concerning agilon, including any discussions about coordinated investment strategies, shared research, or collective action regarding agilon securities.

11

Respectfully submitted,

/s/ Mason Parham____
SIDLEY AUSTIN LLP
Yolanda C. Garcia
Mason Parham
Barret V. Armbruster
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
ygarcia@sidley.com
mparham@sidley.com
barmbruster@sidley.com

*Attorneys for Defendants agilon
health, inc., Steven J. Sell, and
Timothy S. Bensley*

12

## <u>CERTIFICATE OF SERVICE BY EMAIL</u>

I hereby certify that I am counsel for the Agilon Defendants in the above-captioned action, and that on October 24, 2025, I caused a true and correct copy of the Agilon Defendants' First Request for Production of Documents to Plaintiffs and the accompanying CMS Letter (from the Defendants' Joint Appendix in support of Defendants' Motions to Dismiss) to be served by email upon all counsel of record, addressed as follows:

| **ROBBINS GELLER RUDMAN & DOWD LLP** | |
|---|---|
| Lucas F. Olts | LOlts@rgrdlaw.com |
| Christopher D. Stewart | CStewart@rgrdlaw.com |
| Justin G. Oetting | JOetting@rgrdlaw.com |
| Evelyn Sanchez Gonzalez | egonzalez@rgrdlaw.com |
| **KENDALL LAW GROUP, PLLC** | |
| Joe Kendall | jkendall@kendalllawgroup.com |

*/s/ Mason Parham*

13

# Exhibit A



**PHYSICIAN NETWORK**

May 29, 2024

The Honorable Chiquita Brooks-LaSure
Administrator
Centers for Medicare and Medicaid Services
200 Independence Avenue, SW
Washington, DC 20201

RE: Medicare Program; Request for Information on Medicare Advantage Data

Dear Administrator Brooks La-Sure:

Thank you for the opportunity to provide comments in response to CMS' request for information (RFI) on Medicare Advantage (MA) data. We applaud CMS for its attention to this important topic, particularly the ways in which MA data supports and interacts with value-based care arrangements between providers and MA plans. As MA enrollment grows, there is significant opportunity to leverage the program toward CMS' accountable care goals by improving the context in which risk-bearing providers and MA plans work together.

## About the agilon health Physician Network

The agilon health Physician Network is comprised of 2,400+ primary care physicians providing care for nearly 650,000 Medicare patients in 30+ rural and urban communities across 13 states. Our network includes independent primary care physician practices, multi-specialty practices, practice associations, hospital physician groups, and hospital systems.

We believe our nation's fee-for service (FFS) healthcare system is broken, and that fixing it is a social and moral imperative. Individually and as a Network, we are deeply committed to delivering patient-centered care resulting in better outcomes and a more satisfying experience for patients and providers. We believe that value-based care is the best path to achieving these goals. That's why, together with agilon health, we have invested in a Total Care Model that puts our partnership at 100% upside/downside risk (full-risk) for the total cost and quality of care for our entire Medicare population across Medicare Advantage (MA) and the ACO REACH Model. We also participate in the highest risk track of the Medicare Shared Savings Program (MSSP).

In 2022, our Network collectively achieved a 99.8% quality score and returned $24 million in savings to the Medicare Trust Fund through our participation in ACO REACH. In 2023, through our full-risk, shared savings agreements with Medicare Advantage plans and in combination with shared savings realized through REACH, our Network reinvested $200+ million into local primary care within the communities we serve. Since 2018, we've reinvested more than $550+ million in total. These figures collectively demonstrate our commitment to improving quality, bending the cost curve, and sustaining the primary care profession.

1

APP 968

 **agilon health** | PHYSICIAN NETWORK

## Background

Each of our Network partners, most of whom are independent primary care practices, have taken the leap into full-risk accountable care. As you know, accountable care is associated with lower costs to patients and the health care system as well as better coordinated, higher quality care. In accountable care relationships like ours, our most vulnerable patients are prioritized and closely managed by their doctor to ensure their health is protected. We provide them with wrap-around care which can include house calls, addressing social determinants of health (SDOH), and including family care givers in care plans. Moreover, we are enabled to coordinate the right care, at the right time, in the right setting, which protects our patients from unnecessary and expensive services that do not improve their health.

The agilon health Physician Network fully supports CMS' goal of ensuring that by 2030, 100% of Medicare enrollees have an accountable care relationship with a health care provider. As our health care system subsequently becomes more focused on person-centered, accountable care, the demand for and use of comprehensive patient data increases exponentially. Thanks to the many efforts at CMS and its sister agencies, providers have begun to leverage multiple data sources to build an ongoing, longitudinal understanding of their patients' health status, health care encounters and opportunities to improve outcomes and lower costs. These tools, coupled with the financial incentives inherent to value-based, accountable care arrangements empower providers to accept risk and reallocate resources to focus on individual patient needs. However, there are significant data gaps, particularly in MA, that should be addressed.

## Executive Summary

Comprehensive, actionable data is crucial to success in value-based care arrangements, particularly those involving full-risk for the total cost and quality of care. Providers like those in the agilon health Physician Network taking sub-capitated risk from MA plans carry the same risk for their attributed patient population that the MA plans do. Yet, the granular data available to CMS and the plans is not shared with those risk-bearing providers, disrupting their ability to make real-time care decisions as well as accurately project current and future utilization and cost trends.

**Recommendation: CMS should require MA plans to provide existing, complete data sets to downstream, risk-bearing providers for the patient population attributed to them.**
- These files should not be altered or masked, only filtered to include information for attributed patients.
- They should not be delayed more than two weeks from the time the data is sent to or received from CMS.

## Comments

The Medicare program holds great potential to achieve even greater quality, cost and outcomes improvement by equipping risk-bearing providers with more complete and timely data. The prospect of real-time or near-real-time data feeds to inform care decisions, clinical interventions and clinically appropriate diversion from high to low-cost settings is exciting. Some of this is possible through existing admission, discharge, transfer (ADT) feeds and health information

2

**APP 969**



exchange (HIE) relationships, though neither hold comprehensive, ongoing data sets for patient encounters at all the various entry points in health care.

### *Data Access in MA VBC Arrangements*

For providers like those in our Network who are committed to accountable care and have, as a demonstration of that commitment, taken full risk for Medicare Parts A & B from MA plans, the chief enabler for success is **predictability**. Through our partnership with agilon health, we can view a streamlined dashboard comprised of data from disparate sources to better understand who our most vulnerable patients are and when they are utilizing health care benefits through Medicare. To remain viable as a business model, we employ sophisticated forecasting techniques to help us predict utilization and cost trends to manage our financial risk for the total cost and quality of care for our attributed patients. Predictability allows us the confidence to remain engaged in total cost of care risk and make significant investments in practice transformation to better care for our patients.

However, such forecasting is predicated on comprehensive data access; claims, cost, coverage and risk data for each attributed patient becomes essential for VBC models like ours to thrive and self-sustain. This data is provided directly from CMS to risk-bearing providers in various Traditional Medicare ACO programs, and it works very well. Yet, in Medicare Advantage, MA plans offload financial risk to providers but are not required to – and therefore do not – share the comprehensive data necessary to manage that risk. Further, MA plans make independent decisions about their benefit structures, pricing/bids, utilization, cost-sharing, etc., which flow through to our costs as our attributed patients utilize their health benefits, but the specifics of those decisions are not visible in the data sets we receive from them.

By contrast, CMS and MA plans exchange very detailed, standardized data files outlining payment data, patient encounter data including detailed cost information (e.g., per-unit costs, cost-sharing, allowable amount, paid amount, etc.), and diagnosis codes related to risk adjustment. Rather than sharing these existing, standardized, comprehensive files with us, we instead receive significantly altered and often delayed, non-standard data files that vary in format and quality, with several fields masked, combined or otherwise distorted. These distortions, coupled with lags of up to three months, prevent us from understanding real-time developments and accurately forecasting future developments.

**Without complete and timely data, risk-bearing providers are challenged to manage the same risk that the plans manage for the same set of attributed patients, impacting our ability to drive value in Medicare.**

### *MA Data Files*

The data files containing the information we need to appropriately manage the risk we carry for our attributed patients are comprised of the following file formats, which are exchanged between CMS and MA plans today. The data fields in these files are not masked or altered in any way, avoiding the challenges we currently have with distortions, and are presented in a standard format across all

3



payors. Moreover, they are exchanged at a regular, timely cadence, shortening the lag time between a patient encounter and data delivery.

1. Monthly Membership Report (MMR)
   - o Purpose: Provides payment and enrollment data from CMS to MA plans for all members.
   - o Use to risk-bearing providers: Ensures we know who the plan has attributed to us, which programs patients are associated with, and the current risk score of each attributed patient. This information is critical for sub-capitated models like ours.
2. Model Output Report (MOR)
   - o Purpose: Reports condition codes (HCCs) included in a beneficiary's risk score.
   - o Use to risk-bearing providers: Ensures conditions are correctly accounted for (including codes we have voided/deleted) and, if not, triggers an investigation of the data gap.
3. CMS Daily Transaction Reply Report (DTRR)
   - o Purpose: Provides detailed information to help drive valuable clinical programs, such as hospice, kidney care, and important program dates.
4. Medicare Advantage Organization (MAO)-004
   - o Purpose: Informs MA plans about the risk adjustment eligibility of diagnoses submitted on encounter data and chart review records.
   - o Use to risk-bearing providers: Allows for a reconciliation of diagnosis codes evaluated by providers to what has been accepted by CMS for risk adjustment.
5. Prescription Drug Event (PDE)
   - o Purpose: Reports standard fields summarizing prescription drug cost and payment data for Part D claims.
   - o Use to risk-bearing providers: Helps us understand the cost of Part D drug benefits for MA contracts in which we take Part D risk.
   - o Use to risk-bearing providers: Provides real-time information on our patients and the transactions initiated by the MA plan.
6. Encounter Data in 837 EDI Format
   - o Purpose: Plans send claims encounters and chart review records (CRRs) to CMS in this format, as required.
   - o Use to risk-bearing providers: This data, as sent to CMS, would provide us with a fuller picture and deeper understanding of utilization activity for our attributed patients. Access to the same file and format sent to CMS could replace the variety of files and formats we currently receive from MA plans.

## Recommendation

**The agilon health Physician Network recommends that CMS require MA plans to provide these complete data sets to downstream, risk-bearing providers for the patient population attributed to them.**

- These files should not be altered or masked, only filtered to include information for attributed patients.

4



**agilon health** | PHYSICIAN NETWORK

- They should not be delayed more than two weeks from the time the data is sent to or received from CMS.

We understand that MA plans may believe some of the data in these files is proprietary, and in the context of fee schedule contracting that may be sensible. However, when contracting to offload risk and share savings, downstream providers require this data to perform against the contract and ultimately drive value for each patient and the Medicare program.

### *Sub-capitated Arrangements with MA Plans*

To better illuminate how these value-based arrangements with MA plans work, we include modified excerpts from agilon health's S-1 form filed with the Securities and Exchange Commission (SEC) in Addendum 1. We understand there is an interest among policymakers in the mechanics of sub-capitated agreements between providers and MA plan. We hope this information is useful.

## Conclusion

The agilon health Physician Network remains steadfast in its commitment to driving value and improved outcomes through full-risk, accountable care across Medicare programs. We believe we are among the vanguard of providers advancing primary care-led accountable care models, in partnership with CMS and MA plans. We again urge CMS to consider ways in which it can leverage its authority to compel or require MA plans to provide comprehensive data necessary for VBC providers.

Thank you for your consideration. We stand ready as a resource, should any questions arise. Please do not hesitate to contact Claire Mulhearn, Chief Communications & Public Affairs Officer, at Claire.Mulhearn@agilonhealth.com  or Katie Boyer, Director of Policy & Government Affairs, at Katie.Boyer@agilonhealth.com.

Sincerely,

**Anas Daghestani, MD**
President & Chief Executive Officer
Austin Regional Clinic
Texas

**Frank Civitarese, DO**
President
Preferred Primary Care Physicians, Inc.
Pennsylvania

**Victoria DiGennaro, DO**
President & Family Physician
Pioneer Physician Network
Founding Member, agilon health Women
Physicians Leadership Council
Ohio

**Brady Steineck, MD, MBA**
President & CEO
Community Health Care, Inc.
Ohio

5

**APP 972**

**agilon** health | PHYSICIAN NETWORK

**Benjamin Williard, CPA, MBA**
Chief Executive Officer & Chief Financial
Officer
Family Practice Center, PC
Pennsylvania

**Christopher Crow, MD**
Chief Executive Officer & Co-Founder
Catalyst Health Group
Texas

**Larry Sapetti, MD**
Medical Director & Partner
Springfield Clinic
Illinois

**Randy Farrow, MBA**
Chief Executive Officer
Mankato Clinic
Minnesota

**Kurt Lindberg, MD**
President & Medical Director
Holland Physician/Hospital Organization
Michigan

**Todd Lisy, MD**
Vice President/Medical Director
Pioneer Physicians Network
Ohio

**Peter Christensen, D.O., FAAFP**
Associate Medical Director, Holland PHO
Holland Hospital Medical Group
Michigan

**Craig T. Kopecky, MD**
Internal Medicine Physician
Millennium-Texas/Premier Physicians
Texas

**David Sharkis, MD**
Central Ohio Primary Care
Ohio

**Jerry P. Roy, MD, MBA**
Board Chair
Graves-Gilbert Clinic
Kentucky

**Kathleen W. Harris, MD**
Internal Medicine
Diagnostic Clinic of Longview
Texas

**David Lieuwen, MD**
Grand Valley Medical Specialists
Answer Health
Michigan

**Stephen R. Buksh, MD**
Vice President
Catalyst Physicians Group
Texas

**Wendy Rissinger, MD**
Medical Director/Physician Owner
Family Practice Center, PC
Pennsylvania

**Justin Golden, MD**
Partner and Co-owner
Richfield Medical Group
Minnesota

**Richard Gadd, BBA**
President
Catalyst Health Group
Texas

**Gurneet Kohli, MD**
Chief Medical Officer
Premier Family Physicians, PLLC
Texas

**Patrick D. Goggin, MD, FACP**
Medical Director
Physicians Group of Southeastern Ohio
Ohio

6

**APP 973**

**Keith Eppich, MD**
Vice President, Village Health Partners
Regional Physician Lead, Catalyst Physician Group
Texas

**Michael J. App, MD, MPH**
President
Answer Health
Michigan

**Stephen J. Behnke, MD**
Chief Executive Officer
Lexington Clinic
Kentucky

**James DomDera, MD, FAAFP**
Vice President of Professional Standards and Governance
Pioneer Physicians Network
Ohio

**Jennifer Szurgot, MD**
Medical Director
Pinehurst Medical Clinic, Inc
North Carolina

**Brandon Enfinger, MBA**
Chief Executive Officer
Pinehurst Medical Clinic, Inc
North Carolina

**L. David Nave Jr., MD**
Family Practice Section
Pinehurst Medical Clinic, Inc.
North Carolina

**Kevin Nelson, MD**
President
Richfield Medical Group
Minnesota

**Alan Keister, MD, FACP**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Michael W. Morris, MD**
Vice President
Diagnostic Clinic of Longview
Texas

**Liam Fry, MD, CMD, FACP**
Chief Medical Officer
Austin Geriatric Specialists, PLLC
Texas

**Kristin Oaks DO**
Medical Director, Value Based Care
Central Ohio Primary Care
Ohio

**Robert Zielinski, MD**
Associate Medical Director
Buffalo Medical Group
New York

**Jan Froehlich, MD**
President
PriMED Physicians
Ohio

**Joseph Moran, MD**
Chairman, Primary Care Medical Director
Piedmont Health Care
North Carolina

**Ako Bradford, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Christopher Gulley, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Joanna Wilson, DO**
Amarillo Medical Specialists
Catalyst Health Group
Texas

7

agilon health | PHYSICIAN NETWORK

**Kaylee Shepherd, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Nam Do, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Nibras Talib Mamury, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Ryan Smithee, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Steven Norris, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Susan Neese, MD**
Amarillo Medical Specialists
Catalyst Health Group
Texas

**Don Deep, MD**
Chief Executive Officer
Central Ohio Primary Care Physicians
Ohio

**Steve Hatkin**
Chief Financial Officer
Mankato Clinic
Minnesota

**Christopher Russo, MD**
Chief of Surgery
Starling Physicians
Connecticut

**Michael D'Angelo MD, FACC**
Chairman, Board of Directors
Chair, Department of Cardiology
Buffalo Medical Group
New York

**Henry Naddaf, MD**
President
Toledo Clinic
Ohio

**Daniel J. Scully**
CEO
Buffalo Medical Group
New York

**Moshir Jacob, MD, CPE, CMD**
Chief Medical Officer
Toledo Clinic
Ohio

**Sandra Beulke, MD**
Medical Director
Lakeview Clinic
Minnesota

**Britt Kauffman, CPA, MPA**
Board Member
Premier Family Physicians
Texas

**Jeffrey W. Smith, CPA, MBA, FACMPE, CGMA**
Chief Executive Officer
Piedmont HealthCare
North Carolina

**Bryan Albracht, DO**
Springfield Clinic
Illinois

**David Lieuwen, MD**
Associate Medical Director
Grand Valley Medical Specialists
Answer Health
Michigan

8

**APP 975**

**agilon health** | PHYSICIAN NETWORK

**Paul Clippinger, MPA, MHA, FACHE**
Executive Director
Holland PHO
Michigan

**Jonathan Copeland, MD**
Director, Clinical Quality
Arcturus Healthcare, PLLC
United Physicians
Michigan

**Richard Cook II, MD**
Board Member, Associate Medical Director
Preferred Primary Care Physicians, Inc.
Pennsylvania

**Michael B. Daley, MD**
Internist & Medical Director
Pinehurst Medical Clinic
North Carolina

**Tim Hernandez, MD**
Chief Executive Officer
Entira Family Clinics
Minnesota

**Rishin Patel, MD**
Chief Medical Officer
Community Health Care, Inc
Ohio

**Amanda K Williams, DO, CMD**
Medical Director
Physicians Group of Southeastern Ohio
Founding Member, agilon health Women
Physicians Leadership Council
Ohio

**Michael J. App, MD, MPH**
President
Answer Health
Michigan

**Michael Williams, MD**
President & CEO
United Physicians
Michigan

**Mitchell Brodey, MD**
President & CEO
FamilyCare Medical Group
New York

**Michael E. D'Eramo, DHA**
Chief Executive Officer
Graves Gilbert Clinic
Kentucky

**Thomas Janda, JD, MBA**
Chief Operating Officer
Answer Health
Michigan

**Karen Kerkering, MPH**
ACO REACH Consumer Advocate
Texas

**Pamela Zelasko, MD**
West Michigan Family Health
Answer Health
Michigan

**Diane L. Pleiman, MBA, FACHE**
President & CEO
Premier Physician Network
Ohio

**Mary Elsa Theobald, MS, FNP-C**
Medical Director of Advanced Practice
Providers
Waldo County General Hospital/ Maine
Health
Maine

**Mike Cosper, CPA**
Chief Executive Officer
Center for Primary Care
Georgia, South Carolina

**David Jester, MD**
Physician – CPC North Augusta
Center for Primary Care
Georgia, South Carolina

9

**APP 976**

 | PHYSICIAN NETWORK

**John C. Notaro, MD**
Medical Director
Buffalo Medical Group
New York

**Jessica Pagana-DeFazio, DO**
Family Practice Center
Pennsylvania

**Gary Pinta, MD**
President, Ohio Independent Collaborative
Vice President, Pioneer Physicians Network
Ohio

**Bert Ratay**
Chief Executive Officer
Diagnostic Clinic of Longview

**Mai Yousef, M.D**
Preferred Primary Care Physicians, INC
Member, agilon health Women Physician
Leadership Council

**Wendy McNeill, MD**
Medical Director
Eagle Physicians & Associates
North Carolina

**Bobby Maynor, MD**
Pinehurst Medical Clinic
North Carolina

10

**APP 977**



PHYSICIAN NETWORK

# Addendum 1

*Sub-capitated Arrangements with MA Plans*

agilon health (agilon) enters into contractual agreements with payors in each of its geographies, under which agilon is financially responsible for the agilon health Physician Network partners' provision of a defined spectrum of healthcare services to attributed patients, in exchange for a defined PMPM fee for each of our members (which is also referred to as "global capitation"). The healthcare services for which agilon and the Physician Network are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services cost. In certain payor arrangements, agilon is also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members.

The global capitation fees agilon is entitled to receive from payor contracts are typically based on a defined percentage of the corresponding monthly premium payments which the payor receives from CMS for members attributed to PCPs within the Physician Network and covered under such contracts. Certain contracts between agilon and payors incorporate provisions in which agilon and its Physician Network are eligible to earn quality bonus payments based upon the attainment of defined quality performance criteria correlated to applicable STAR ratings criteria.

agilon has developed local contracts across multiple payors, along with national form contracts with certain key payors. As of December 31, 2023, agilon has relationships with 26 payors, including large national health plans as well as smaller local and regional insurers. Patients are able to select the plan and benefit design that meets their individual needs while the agilon platform enables a seamless experience regardless of plan or product for all patients and Physician Network partners.

Payors retain responsibility for paying claims. Funding under the applicable agreement is utilized by the payor to pay such claims, and agilon receives surplus distributions on a monthly or quarterly basis. In these arrangements, the payor maintains the responsibility for entering into contractual agreements with network hospitals, network specialty physicians, and ancillary or other providers. The agreements with payors outline the range of healthcare services for which agilon is financially responsible and at risk, the services for which we are contracted to perform on the payor's behalf and the key financial terms.

The majority of agilon's contracts are for terms ranging from one to three years and contain automatic annual renewal provisions. When agilon enters into a new payor contract, there are typically requirements by the payor for agilon to contribute risk-bearing capital to the local operating subsidiary or risk-bearing entity (RBE). This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography, but typically averages between 1.5-2.0% of projected annual gross revenue attributable to the corresponding agreement.

11

agilon health | PHYSICIAN NETWORK

APP 979