# EXHIBIT V

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 19, 2021 (April 14, 2021)**

---

# agilon health, inc.
**(Exact name of registrant as specified in its charter)**

---

| Delaware | 001-40332 | 37-1915147 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1 World Trade Center, Suite 2000**
**Long Beach, California**     **90831**
(Address of principal executive offices)     (Zip Code)

**(562) 256-3800**
**(Registrant's telephone number, including area code)**

**N/A**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01. Entry into a Material Definitive Agreement.**

On April 14, 2021, agilon health, inc. (the "Company") priced the initial public offering ("IPO") of its common stock, par value $0.01 per share (the "Common Stock"), at an offering price of $23.00 per share, pursuant to the Company's registration statement on Form S-1, as amended (File No. 333-254435) (the "Registration Statement"). On April 15, 2021, the underwriters exercised their option to purchase an additional 6,990,000 shares of Common Stock. On April 19, 2021, the Company's sale of an aggregate of 53,590,000 shares of Common Stock was completed.

In connection with the completion of the IPO, the Company also entered into the following agreements previously filed as exhibits to the Registration Statement:

- a Registration Rights Agreement, dated as of April 16, 2021, by and among the Company and CD&R Vector Holdings, L.P., a copy of which is filed as Exhibit 10.1 hereto and incorporated by reference herein;

- a Stockholders Agreement, dated as of April 16, 2021, by and among the Company and CD&R Vector Holdings, L.P., a copy of which is filed as Exhibit 10.2 hereto and incorporated by reference herein.

The terms of these agreements are substantially the same as the terms set forth in the forms of such agreements filed as exhibits to the Registration Statement as described therein.

**Item 1.02. Termination of a Material Definitive Agreement.**

In connection with the completion of the IPO, the Consulting Agreement with Clayton, Dubilier & Rice LLC was terminated pursuant to the Termination Agreement, dated as of April 16, 2021, by and between Agilon Health Holdings, Inc., Primary Provider Management Co., Inc. and Clayton, Dubilier & Rice, LLC, a copy of which is filed as Exhibit 10.3 hereto and incorporated by reference herein. The terms of the agreement are substantially the same as the terms set forth in the form of such agreement filed as an exhibit to the Registration Statement as described therein.

**Item 3.03. Material Modifications to Rights of Security Holdings.**

The description in Item 5.03 below of the Amended and Restated Certificate of Incorporation and Amended and Restated By-laws is incorporated by reference herein.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On April 16, 2021, in connection with the IPO, the Company amended and restated its certificate of incorporation and the Company's Amended and Restated By-laws became effective, as previously reported in the Registration Statement. The descriptions and forms of the Amended and Restated Certificate of Incorporation and Amended and Restated By-laws are substantially the same as the descriptions and forms set forth in and filed as exhibits to the Registration Statement.

The Company's Amended and Restated Certificate of Incorporation is filed as Exhibit 3.1 hereto and incorporated herein by reference, and the Company's Amended and Restated By-laws are filed as Exhibit 3.2 hereto and incorporated by reference herein.

**Item 8.01. Other Events.**

On April 19, 2021, the Company issued a press release announcing the closing of the IPO, a copy of which is attached hereto as Exhibit 99.1 and incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of agilon health, inc. |
| 3.2 | Amended and Restated By-laws of agilon health, inc. |
| 10.1 | Registration Rights Agreement, by and among agilon health, inc. and CD&R Vector Holdings, L.P., dated as of April 16, 2021. |
| 10.2 | Stockholders Agreement, by and among agilon health, inc. and CD&R Vector Holdings, L.P., dated as of April 16, 2021. |
| 10.3 | Termination Agreement, by and between Agilon Health Holdings, Inc., Primary Provider Management Co., Inc. and Clayton, Dubilier & Rice, LLC, dated as of April 16, 2021. |
| 99.1 | Press Release dated April 19, 2021. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

AGILON HEALTH, INC.

By: /s/ Theodore Halkias
    Theodore Halkias
    Chief Business Officer

Date: April 19, 2021

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
AGILON HEALTH, INC.

agilon health, inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1. The name of the Corporation is agilon health, inc.

2. The original Certificate of Incorporation of the Corporation was filed for Agilon Health Topco, Inc. with the Secretary of State of the State of Delaware (the "Secretary of State") on April 21, 2017. Amendments to the Certificate of Incorporation were filed with the Secretary of State on March 9, 2021 to change the Corporation's name from Agilon Health Topco, Inc. to agilon health, inc., and on April 1, 2021.

3. This amendment and restatement of the Certificate of Incorporation of the Corporation has been duly adopted by the Board of Directors of the Corporation and by the written consent of the stockholders of the Corporation in accordance with the provisions of Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware (as amended from time to time, the "DGCL").

4. The Corporation's Certificate of Incorporation is hereby amended and restated pursuant to Sections 242 and 245 of the DGCL, so as to read in its entirety as set forth in the form attached hereto as Exhibit A and incorporated herein by this reference.

IN WITNESS WHEREOF, the undersigned officer of the Corporation has executed this Amended and Restated Certificate of Incorporation on the 16th day of April, 2021.

By:    /s/ Kenneth Bellendir

Name:  Kenneth Bellendir

Title:   Vice President and Secretary

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
AGILON HEALTH, INC.

FIRST. *Name*. The name of the corporation is agilon health, inc. (the "Corporation").

SECOND. *Registered Office*. The Corporation's registered office in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, State of Delaware, 19801. The name of its registered agent at such address is The Corporation Trust Company.

THIRD. *Purpose*. The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

FOURTH. *Capital Stock*. The total number of shares of stock which the Corporation shall have authority to issue is 2,100,000,000, consisting of: (x) 2,000,000,000 shares of Common Stock, par value $0.01 per share (the "Common Stock") and (y) 100,000,000 shares of preferred stock, par value $1.00 per share (the "Preferred Stock"), issuable in one or more series as hereinafter provided. Except as otherwise expressly provided herein or in a Preferred Stock Certificate of Designation (as defined herein), the number of authorized shares of the Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of at least a majority of the voting power of the stock of the Corporation entitled to vote generally in the election of directors irrespective of the provisions of Section 242(b)(2) of the DGCL or any corresponding provision hereinafter enacted and no vote of the holders of shares of Common Stock or Preferred Stock voting separately as a class shall be required thereof.

1. Provisions Relating to the Common Stock.

(a) Except as otherwise provided in this Amended and Restated Certificate of Incorporation or by the DGCL, each holder of shares of Common Stock shall be entitled, with respect to each share of Common Stock held by such holder, to one vote in person or by proxy on all matters submitted to a vote of the holders of Common Stock, whether voting separately as a class or otherwise.

(b) Subject to the preferences and rights, if any, applicable to shares of Preferred Stock or any series thereof, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property, stock or otherwise as may be declared thereon by the board of directors of the Corporation (the "Board") at any time and from time to time out of assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.

(c) In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, and subject to the preferences and rights, if any, applicable to shares of Preferred Stock or any series thereof, the holders of shares of Common Stock shall be entitled to receive all of the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

3

2. <u>Provisions Relating to the Preferred Stock</u>.

(a) The Preferred Stock may be issued at any time and from time to time in one or more series. The Board is hereby authorized to provide for the issuance of shares of Preferred Stock in one or more series and, by resolution adopted in accordance with common law and by filing a certificate of designation pursuant to the applicable provisions of the DGCL (hereinafter referred to as a "<u>Preferred Stock Certificate of Designation</u>"), to establish from time to time the number of shares to be included in each such series, and to fix the voting powers, designations, preferences and the relative participating, optional or other special rights and qualifications, limitations and restrictions of each series, including, without limitation, dividend rights, dividend rates, conversion rights, voting rights, terms of redemption and liquidation preferences.

(b) The Common Stock shall be subject to the express terms of the Preferred Stock and any series thereof.

(c) Except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation or to a Preferred Stock Certificate of Designation that alters or changes the powers, preferences, rights or other terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other series of Preferred Stock, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation or a Preferred Stock Certificate of Designation or pursuant to the DGCL as currently in effect or as the same may hereafter be amended.

3. <u>Voting in Election of Directors</u>. Except as may be required by the DGCL or as provided in this Amended and Restated Certificate of Incorporation or in a Preferred Stock Certificate of Designation, holders of Common Stock shall have the exclusive right to vote for the election of directors and for all other purposes, and holders of Preferred Stock shall not be entitled to vote on any matter or receive notice of any meeting of stockholders.

<u>FIFTH</u>. *Management of Corporation*. The following provisions are inserted for the management of the business, for the conduct of the affairs of the Corporation and for the purpose of creating, defining, limiting and regulating the powers of the Corporation and its directors and stockholders:

1. Except as may otherwise be provided by law, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

2. Subject to any rights granted to the holders of shares of any class or series of Preferred Stock then outstanding and the rights granted pursuant to the Stockholders Agreement, between the Corporation and CD&R Vector Holdings, L.P. (together with its successors and assigns, the "<u>CD&R Investor</u>"), to be effective as of the date of the initial listing of the Common Stock on the New York Stock Exchange (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "<u>Stockholders Agreement</u>"), the number of directors of the Corporation shall be fixed, and may be altered from time to time, exclusively by resolution of the Board, but in no event may the number of directors of the Corporation be less than one.

4

3. The directors of the Corporation, subject to any rights granted to holders of shares of any class or series of Preferred Stock then outstanding, shall be divided into three classes designated Class I, Class II and Class III. Each class shall consist, as nearly as possible, of one-third of the total number of such directors. Class I directors shall initially serve for a term expiring at the first annual meeting of stockholders of the Corporation following the effectiveness of this Amended and Restated Certificate of Incorporation (the "Effective Date"), Class II directors shall initially serve for a term expiring at the second annual meeting of stockholders following the Effective Date and Class III directors shall initially serve for a term expiring at the third annual meeting of stockholders following the Effective Date. Directors of each class shall hold office until the annual meeting at which his or her term expires and until his or her successor shall be elected and qualified, or his or her death, resignation, retirement, disqualification or removal from office. At each succeeding annual meeting, successors to the class of directors whose term expires at that annual meeting shall be elected for a term expiring at the third succeeding annual meeting of stockholders, subject to any rights granted to holders of shares of any class or series of Preferred Stock then outstanding to elect directors and the rights granted pursuant to the Stockholders Agreement. If the number of such directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, and any such additional director of any class elected to fill a newly created directorship resulting from an increase in such class shall hold office for a term that shall coincide with the remaining term of that class, but in no case shall a decrease in the number of directors remove or shorten the term of any incumbent director. The Board is authorized to assign members of the Board already in office to their respective class.

4. Subject to any rights granted to the holders of shares of any class or series of Preferred Stock then outstanding and the rights granted pursuant to the Stockholders Agreement, (a) following the Effective Date and until the first date (the "Trigger Date") on which the CD&R Investor ceases to beneficially own (directly or indirectly) at least forty percent (40%) of the outstanding shares of Common Stock, a director may be removed at any time, either with or without cause, upon the affirmative vote of the holders of at least a majority of the outstanding shares of Common Stock then entitled to vote in an election of directors and (b) from and after the Trigger Date, a director may be removed from office only for cause and only upon the affirmative vote of the holders of at least a majority of the outstanding shares of Common Stock then entitled to vote in an election of directors.

5. Subject to any rights granted to the holders of shares of any class or series of Preferred Stock then outstanding and the rights granted pursuant to the

5

Stockholders Agreement, and except as otherwise provided by law, any vacancy in the Board that results from an increase in the number of directors, from the death, disability, resignation, disqualification or removal of any director or from any other cause shall be filled solely by an affirmative vote of at least a majority of the directors then in office, even if less than a quorum, or by a sole remaining director. A director elected to fill a vacancy or a newly created directorship shall hold office until his or her successor has been elected and qualified or until his or her earlier death, resignation or removal.

6. No director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of his or her fiduciary duty as a director, provided that nothing contained in this Article FIFTH shall eliminate or limit the liability of a director (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (c) under Section 174 of the DGCL or (d) for any transaction from which the director derived an improper personal benefit.

7. To the fullest extent permitted by the DGCL, the Corporation shall indemnify and advance expenses (including reasonable attorneys' fees) to the directors and officers of the Corporation, provided that, except as otherwise provided in the By-laws, the Corporation shall not be obligated to indemnify or advance expenses to a director or officer of the Corporation in respect of an action, suit or proceeding (or part thereof) instituted by such director or officer, unless such action, suit or proceeding (or part thereof) has been authorized by the Board. The rights provided by this Section 7 of Article FIFTH shall not limit or exclude any rights, indemnities or limitations of liability to which any director or officer of the Corporation may be entitled, whether as a matter of law, under the By-laws, by agreement, vote of the stockholders, approval of the directors of the Corporation or otherwise.

SIXTH. *Stockholder Action by Written Consent*. Until the Trigger Date, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote of stockholders, if a consent or consents in writing, including by electronic transmission, setting forth the action so taken, are: (a) signed by the holders of the outstanding shares of Common Stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted (but not less than the minimum number of votes otherwise prescribed by law) and (b) delivered within 60 days of the earliest dated consent so delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of the stockholders are recorded. From and after the Trigger Date, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken only upon the vote of the stockholders at an annual or special meeting duly called and may not be taken by written consent of the stockholders.

6

SEVENTH. *Special Meeting of Stockholders*. Except as otherwise required by law and subject to any rights granted to holders of shares of any class or series of Preferred Stock then outstanding, special meetings of the stockholders of the Corporation for any purpose or purposes may be called only by the Chairman of the Board or pursuant to a resolution of the Board adopted by at least a majority of the directors then in office, provided that, until the Trigger Date, a special meeting of the stockholders may also be called by the Secretary of the Corporation at the request of the holders of record of at least a majority of the outstanding shares of Common Stock. From and after the Trigger Date, the stockholders of the Corporation shall not have the power to call a special meeting of the stockholders of the Corporation or to request the Secretary of the Corporation to call a special meeting of the stockholders.

EIGHTH. *Business Opportunities*. To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision), the Corporation, on behalf of itself and its subsidiaries, renounces and waives any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, directly or indirectly, any potential transactions, matters or business opportunities (including, without limitation, any business activities or lines of business that are the same as or similar to those pursued by, or competitive with, the Corporation or any of its subsidiaries or any dealings with customers or clients of the Corporation or any of its subsidiaries) (each a "Corporate Opportunity") that are from time to time presented to the CD&R Investor or any of its officers, directors, employees, agents, stockholders, members, partners, affiliates or subsidiaries (other than the Corporation and its subsidiaries), even if the transaction, matter or opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so. Neither the CD&R Investor nor any of its officers, directors, employees, agents, stockholders, members, partners, affiliates or subsidiaries shall be liable to the Corporation or any of its subsidiaries for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such person pursues, acquires or participates in such Corporate Opportunity, directs such Corporate Opportunity to another person or fails to communicate, offer or present such Corporate Opportunity, or information regarding such Corporate Opportunity, to the Corporation or its subsidiaries, unless, in the case of any such person who is a director or officer of the Corporation, such business opportunity is expressly offered to such director or officer in writing solely in his or her capacity as a director or officer of the Corporation. Any person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and have consented to the provisions of this Article EIGHTH. Neither the alteration, amendment or repeal of this Article EIGHTH, nor the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this Article EIGHTH, nor, to the fullest extent permitted by Delaware law, any modification of law, shall eliminate or reduce the effect of this Article EIGHTH in respect of any Corporate Opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this Article

7

EIGHTH, would accrue or arise, prior to such alteration, amendment, repeal, adoption or modification. If any provision or provisions of this Article EIGHTH shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article EIGHTH (including, without limitation, each portion of any paragraph of this Article EIGHTH containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) to the fullest extent possible, the provisions of this Article EIGHTH (including, without limitation, each such portion of any paragraph of this Article EIGHTH containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law. This Article EIGHTH shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Amended and Restated Certificate of Incorporation, the By-laws, applicable law, any agreement or otherwise.

NINTH. *Section 203 of the DGCL*. The Corporation elects not to be governed by Section 203 of the DGCL ("Section 203"), as permitted under and pursuant to subsection (b)(3) of Section 203, until the first date on which the CD&R Investor ceases to beneficially own (directly or indirectly) at least five percent (5%) of the outstanding shares of Common Stock. From and after such date, the Corporation shall be governed by Section 203 so long as Section 203 by its terms would apply to the Corporation.

TENTH. *Amendment of the Certificate of Incorporation*. The Corporation reserves the right to amend, alter or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed by the DGCL, and all rights herein conferred upon stockholders or directors are granted subject to this reservation, provided, however, that any amendment, alteration or repeal of Sections 6 or 7 of Article FIFTH shall not adversely affect any right or protection existing under this Amended and Restated Certificate of Incorporation immediately prior to such amendment, alteration or repeal, including any right or protection of a director thereunder in respect of any act or omission occurring prior to the time of such amendment, alteration or repeal. Notwithstanding anything to the contrary contained in this Amended and Restated Certificate of Incorporation, and notwithstanding that a lesser percentage may be permitted from time to time by applicable law, no provision of Articles FIFTH, SIXTH, SEVENTH, EIGHTH, NINTH, this Article TENTH and Articles ELEVENTH and TWELFTH may be amended, altered or repealed in any respect, nor may any provision or by-law inconsistent therewith be adopted, unless in addition to any other vote required by this Amended and Restated Certificate of Incorporation or otherwise required by law, (a) until the Trigger Date, such amendment, alteration or repeal is approved by the affirmative vote of the holders of at least a majority of the outstanding shares of Common Stock then entitled to vote at any annual or special meeting of stockholders, and (b) from and after the Trigger Date, an amendment, alteration or repeal of Articles FIFTH, SIXTH, SEVENTH, EIGHTH,

8

NINTH, this Article TENTH and Articles ELEVENTH and TWELFTH is approved at a meeting of the stockholders called for that purpose by the affirmative vote of the holders of at least two‑thirds (66 $^2/_3$%) of the outstanding shares of Common Stock then entitled to vote at any annual or special meeting of stockholders.

ELEVENTH. *Amendment of the By-laws*. In furtherance and not in limitation of the powers conferred by law, the Board is expressly authorized to amend, alter or repeal the By‑laws, without the assent or vote of stockholders of the Corporation. Any amendment, alteration or repeal of the By‑laws by the Board shall require the affirmative vote of at least a majority of the directors then in office. In addition to any other vote otherwise required by law, the stockholders of the Corporation may amend, alter or repeal the By‑laws, provided that any such action will require (a) until the Trigger Date, the affirmative vote of the holders of at least a majority of the outstanding shares of Common Stock entitled to vote at any annual or special meeting of stockholders and (b) from and after the Trigger Date, the affirmative vote of the holders of at least two‑thirds (66 $^2/_3$%) of the outstanding shares of Common Stock entitled to vote at any annual or special meeting of stockholders. In addition, so long as the Stockholders Agreement remains in effect, the Board shall not approve any amendment, alteration or repeal of any provision of the By‑laws, or the adoption of any new by‑law, that would be contrary to or inconsistent with the then‑applicable terms, if any, of the Stockholders Agreement, or this sentence.

TWELFTH. *Exclusive Jurisdiction for Certain Actions*. Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (the "Court of Chancery") shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, employee, agent or stockholder of the Corporation to the Corporation or the Corporation's stockholders (c) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right obligation or remedy under any provision of the DGCL, or as to which the DGCL confers jurisdiction on the Court of Chancery (including, without limitation, any action asserting a claim arising out of or pursuant to this Amended and Restated Certificate of Incorporation or the By‑laws), or (d) any action or proceeding asserting a claim that is governed by the internal affairs doctrine. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any action asserting a cause of action arising under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder. Any person or entity holding, owning, purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article TWELFTH.

9

AGILON HEALTH, INC.

AMENDED AND RESTATED BY-LAWS

Effective as of April 16, 2021

AGILON HEALTH, INC.

BY-LAWS

Table of Contents

|  |  | Page |
|---|---|---|
| **ARTICLE I MEETINGS OF STOCKHOLDERS** |  | 1 |
| Section 1.01. | Annual Meetings | 1 |
| Section 1.02. | Special Meetings | 1 |
| Section 1.03. | Participation in Meetings by Remote Communication | 1 |
| Section 1.04. | Notice of Meetings; Waiver of Notice | 2 |
| Section 1.05. | Proxies | 3 |
| Section 1.06. | Voting Lists | 3 |
| Section 1.07. | Quorum | 4 |
| Section 1.08. | Voting | 4 |
| Section 1.09. | Adjournment | 4 |
| Section 1.10. | Organization; Procedure | 5 |
| Section 1.11. | Consent of Stockholders in Lieu of Meeting | 5 |
| Section 1.12. | Notice of Stockholder Proposals and Nominations | 6 |
| **ARTICLE II BOARD OF DIRECTORS** |  | 11 |
| Section 2.01. | General Powers | 11 |
| Section 2.02. | Number and Term of Office | 11 |
| Section 2.03. | Classification; Election of Directors | 11 |
| Section 2.04. | Regular Meetings | 11 |
| Section 2.05. | Special Meetings | 11 |
| Section 2.06. | Notice of Meetings; Waiver of Notice | 11 |
| Section 2.07. | Quorum; Voting | 12 |
| Section 2.08. | Action by Telephonic Communications | 12 |
| Section 2.09. | Adjournment | 12 |
| Section 2.10. | Action Without a Meeting | 12 |
| Section 2.11. | Regulations | 12 |
| Section 2.12. | Resignations of Directors | 12 |
| Section 2.13. | Removal of Directors | 13 |
| Section 2.14. | Vacancies and Newly Created Directorships | 13 |
| Section 2.15. | Compensation | 13 |
| Section 2.16. | Reliance on Accounts and Reports, etc | 13 |
| **ARTICLE III COMMITTEES** |  | 13 |
| Section 3.01. | Designation of Committees | 13 |
| Section 3.02. | Members and Alternate Members | 13 |
| Section 3.03. | Committee Procedures | 14 |

i

| | | |
|---|---|---|
| Section 3.04. | Meetings and Actions of Committees | 14 |
| Section 3.05. | Resignations and Removals | 14 |
| Section 3.06. | Vacancies | 14 |

ARTICLE IV OFFICERS · 15

| | | |
|---|---|---|
| Section 4.01. | Officers | 15 |
| Section 4.02. | Election | 15 |
| Section 4.03. | Compensation | 15 |
| Section 4.04. | Removal and Resignation; Vacancies | 15 |
| Section 4.05. | Authority and Duties of Officers | 15 |
| Section 4.06. | Chief Executive Officer and President | 16 |
| Section 4.07. | Vice Presidents | 16 |
| Section 4.08. | Secretary | 16 |
| Section 4.09. | Treasurer | 17 |

ARTICLE V CAPITAL STOCK · 18

| | | |
|---|---|---|
| Section 5.01. | Certificates of Stock, Uncertificated Shares | 18 |
| Section 5.02. | Facsimile Signatures | 18 |
| Section 5.03. | Lost, Stolen or Destroyed Certificates | 18 |
| Section 5.04. | Transfer of Stock | 19 |
| Section 5.05. | Registered Stockholders | 19 |
| Section 5.06. | Transfer Agent and Registrar | 19 |

ARTICLE VI INDEMNIFICATION · 19

| | | |
|---|---|---|
| Section 6.01. | Indemnification | 19 |
| Section 6.02. | Advance of Expenses | 20 |
| Section 6.03. | Procedure for Indemnification | 20 |
| Section 6.04. | Burden of Proof | 21 |
| Section 6.05. | Contract Right; Non-Exclusivity; Survival | 21 |
| Section 6.06. | Insurance | 22 |
| Section 6.07. | Employees and Agents | 22 |
| Section 6.08. | Interpretation; Severability | 22 |

ARTICLE VII OFFICES · 22

| | | |
|---|---|---|
| Section 7.01. | Registered Office | 22 |
| Section 7.02. | Other Offices | 22 |

ARTICLE VIII GENERAL PROVISIONS · 23

| | | |
|---|---|---|
| Section 8.01. | Dividends | 23 |
| Section 8.02. | Reserves | 23 |
| Section 8.03. | Execution of Instruments | 23 |
| Section 8.04. | Voting as Stockholder | 23 |
| Section 8.05. | Fiscal Year | 24 |

Section 8.06.      Seal                                                                                24
Section 8.07.      Books and Records; Inspection                                                        24
Section 8.08.      Electronic Transmission                                                              24

ARTICLE IX AMENDMENT OF BY-LAWS                                                                        24

Section 9.01.      Amendment                                                                            24

ARTICLE X CONSTRUCTION                                                                                  25

Section 10.01.     Construction                                                                         25

iii

AGILON HEALTH, INC.

<u>AMENDED AND RESTATED BY-LAWS</u>

As amended and restated effective as of April 16, 2021

ARTICLE I

<u>MEETINGS OF STOCKHOLDERS</u>

Section 1.01. <u>Annual Meetings</u>. An annual meeting of the stockholders of agilon health, inc. (the "Corporation") for the election of directors to succeed directors whose terms expire and for the transaction of such other business as properly may come before such meeting shall be held each year either within or without the State of Delaware on such date and at such place, if any, and time as exclusively may be fixed from time to time by resolution of the Corporation's board of directors (the "Board"), and set forth in the notice or waiver of notice of the meeting, unless, subject to the certificate of incorporation of the Corporation as then in effect (as the same may be amended from time to time, the "Certificate of Incorporation") and Section 1.11 of these By-laws, the stockholders have acted by written consent to elect directors as permitted by the General Corporation Law of the State of Delaware, as amended from time to time (the "DGCL"). In lieu of holding an annual meeting of the stockholders at a designated place, the Board may, in its sole discretion, determine that any annual meeting of stockholders may be held solely by means of remote communication in accordance with Section 1.03 of By-laws. The Board may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board.

Section 1.02. <u>Special Meetings</u>. A special meeting of the stockholders for any purpose may be called only in the manner set forth in the Certificate of Incorporation. Notice of every special meeting of the stockholders of the Corporation shall state the purpose or purposes of such meeting. Except as otherwise required by law, the business conducted at a special meeting of stockholders of the Corporation shall be limited exclusively to the business set forth in the Corporation's notice of meeting, and the individual or group calling such meeting shall have exclusive authority to determine the business included in such notice. Any special meeting of the stockholders shall be held either within or without the State of Delaware, at such place, if any, and on such date and time, as shall be specified in the notice of such special meeting. In lieu of holding a special meeting of the stockholders at a designated place, the Board may, in its sole discretion, determine that any special meeting of stockholders may be held solely by means of remote communication in accordance with Section 1.03 of By-laws. The Board may postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board.

Section 1.03. Participation in Meetings by Remote Communication. The Board, acting in its sole discretion, may establish guidelines and procedures in accordance with applicable provisions of the DGCL and any other applicable law for the participation by stockholders and proxyholders in a meeting of stockholders by means of remote

communications (including by webcast), and may determine that any meeting of stockholders will not be held at any place but will be held solely by means of remote communication (including by webcast). Stockholders and proxyholders complying with such procedures and guidelines and otherwise entitled to vote at a meeting of stockholders shall be deemed present in person and entitled to vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication (including by webcast); provided that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

Section 1.04. Notice of Meetings; Waiver of Notice.

(a) The Secretary or any Assistant Secretary shall cause notice of each meeting of stockholders to be given in writing in a manner permitted by the DGCL not less than 10 days nor more than 60 days prior to the meeting to each stockholder of record entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, subject to such exclusions as are then permitted by the DGCL. The notice shall specify (i) the place, if any, date and time of such meeting, (ii) the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, (iii) in the case of a special meeting, the purpose or purposes for which such meeting is called, and (iv) the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting). The notice may contain such other information as may be required by law or as may be deemed appropriate by the Chairman of the Board, the Secretary or the Board. If the stockholder list referred to in Section 1.06 of these By-laws is made accessible on an electronic network, the notice of meeting must indicate how the stockholder list can be accessed. If the meeting of stockholders is to be held solely by means of electronic communications, the notice of meeting must provide the information required to access such stockholder list during the meeting.

(b) A written waiver of notice of meeting signed by a stockholder or a waiver by electronic transmission by a stockholder, whether given before or after the meeting time stated in such notice, is deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in a waiver of notice. Attendance of a stockholder at a meeting is a waiver of notice of such meeting, except when the stockholder attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business at the meeting on the ground that the meeting is not lawfully called or convened.

2

Section 1.05. Proxies.

(a) Each stockholder entitled to vote at a meeting of stockholders or to express consent to or dissent from corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy.

(b) A stockholder may authorize a valid proxy by executing a written instrument signed by such stockholder, or by causing his or her signature to be affixed to such writing by any reasonable means, including but not limited to by facsimile signature, or by transmitting or authorizing an electronic transmission (as defined in Section 8.08 of these By-laws) setting forth an authorization to act as proxy to the person designated as the holder of the proxy, a proxy solicitation firm or a like authorized agent. Proxies by electronic transmission must either set forth, or be submitted with, information from which it can be determined that the electronic transmission was authorized by the stockholder. Any copy, facsimile telecommunication or other reliable reproduction of a writing or transmission created pursuant to this section may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used if such copy, facsimile telecommunication or other reproduction is a complete reproduction of the entire original writing or transmission.

(c) No proxy may be voted or acted upon after the expiration of three years from the date of such proxy, unless such proxy provides for a longer period. Every proxy is revocable at the pleasure of the stockholder executing it unless the proxy states that it is irrevocable and applicable law makes it irrevocable. A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or by filing another duly executed proxy bearing a later date with the Secretary.

Section 1.06. Voting Lists. The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare, at least 10 days before every meeting of the stockholders (and before any adjournment thereof for which a new record date has been set), a complete list of the stockholders entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is fewer than 10 days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder. This list shall be open to the examination of any stockholder prior to and during the meeting for any purpose germane to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of meeting or (ii) during ordinary business hours at the principal place of business of the Corporation. If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the

3

meeting. The stock ledger shall be the only evidence as to who are the stockholders entitled by this section to examine the list required by this section or to vote in person or by proxy at any meeting of stockholders.

Section 1.07. Quorum. Except as otherwise required by law or by the Certificate of Incorporation, the presence in person or by proxy of the holders of record of a majority of the shares entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business at such meeting.

Section 1.08. Voting. Except as otherwise provided in the Certificate of Incorporation or by applicable law, every holder of record of shares entitled to vote at a meeting of stockholders is entitled to one vote for each share outstanding in his or her name on the books of the Corporation (a) at the close of business on the record date for such meeting, or (b) if no record date has been fixed, at the close of business on the day next preceding the day on which notice of the meeting is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. All matters at any meeting at which a quorum is present, except the election of directors, shall be decided by the affirmative vote of the holders of at least a majority of the outstanding shares of common stock present in person or represented by proxy at the meeting and entitled to vote on the subject matter in question, unless otherwise expressly provided by express provision of law, the Certificate of Incorporation or these By-laws. The election of directors shall be decided by the affirmative vote of the holders of at least a plurality of the votes cast by the holders of the outstanding shares of common stock present in person or represented by proxy at the meeting and entitled to vote in an election of directors, unless otherwise expressly provided by express provision of law, the Certificate of Incorporation or these By-laws. The stockholders do not have the right to cumulate their votes for the election of directors.

Section 1.09. Adjournment. Any meeting of stockholders may be adjourned from time to time, by the chairperson of the meeting or by the vote of a majority of the shares of stock present in person or represented by proxy at the meeting, to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the place, if any, and date and time thereof (and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting) are announced at the meeting at which the adjournment is taken unless the adjournment is for more than 30 days or a new record date is fixed for the adjourned meeting after the adjournment, in which case notice of the adjourned meeting in accordance with Section 1.04 of these By-laws shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record as of the record date so fixed for notice of such adjourned. At the adjourned meeting, the Corporation may transact any business that might have been transacted at the original meeting.

4

Section 1.10. <u>Organization; Procedure</u>.

(a) At every meeting of stockholders the presiding person shall be the Chairman of the Board or, in the event of his or her absence or disability, the Chief Executive Officer and President or, in the event of his or her absence or disability, a presiding person chosen by resolution of the Board. The Secretary or, in the event of his or her absence or disability, the Assistant Secretary, if any, or, if there be no Assistant Secretary, in the absence of the Secretary, an appointee of the presiding person, shall act as secretary of the meeting. The Board may make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to any such rules and regulations, the presiding person of any meeting shall have the right and authority to prescribe rules, regulations and procedures for such meeting and to take all such actions as in the judgment of the presiding person are appropriate for the proper conduct of such meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the presiding person of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders or records of the Corporation, their duly authorized and constituted proxies or such other persons as the presiding person of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. The presiding person at any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding person should so determine, such presiding person shall so declare to the meeting and any such matter of business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

(b) Preceding any meeting of the stockholders, the Board may, and when required by law shall, appoint one or more persons to act as inspectors of elections, and may designate one or more alternate inspectors. If no inspector or alternate so appointed by the Board is able to act, or if no inspector or alternate has been appointed and the appointment of an inspector is required by law, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. No director or nominee for the office of director shall be appointed as an inspector of elections. Each inspector, before entering upon the discharge of the duties of an inspector, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall discharge their duties in accordance with the requirements of applicable law.

Section 1.11. <u>Consent of Stockholders in Lieu of Meeting</u>. Except as otherwise provided in the Certificate of Incorporation, stockholders may not take any action by written consent in lieu of action at an annual or special meeting of stockholders.

5

Section 1.12. <u>Notice of Stockholder Proposals and Nominations</u>.

(a) *Annual Meetings of Stockholders*.

(i) Nominations of persons for election to the Board and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders only (A) in accordance with the then-applicable terms, if any, of the Stockholders Agreement, between the Corporation and CD&R Vector Holdings, L.P. (together with its successors and assigns, the "CD&R Investor"), to be effective as of the date of the initial listing of the common stock on the New York Stock Exchange (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Stockholders Agreement"), (B) pursuant to the Corporation's notice of the meeting (or any supplement thereto) delivered pursuant to Section 1.04 of these By-laws, (C) by or at the direction of the Board or a committee of the Board appointed by the Board for such purpose or (D) by any stockholder of the Corporation who is entitled to vote at the meeting, who complies with the notice procedures set forth in clauses (ii) and (iii) of this Section 1.12(a) and who is a stockholder of record at the time such notice is delivered to the Secretary and at the date of the meeting, subject to paragraph (c)(ii)(D) of this Section 1.12.

(ii) For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to subclause (D) of Section 1.12(a)(i) of these By-laws, the stockholder must have given timely notice thereof in writing to the Secretary and, in the case of business other than nominations for persons for election to the Board, such other business must constitute a proper matter for stockholder action. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred and twenty (120) days prior to the first anniversary of the preceding year's annual meeting (which date shall, for purposes of the Corporation's first annual meeting of stockholders after its shares of common stock are first publicly traded, be deemed to have occurred on May 1, 2021); provided, however, that in the event that the date of the annual meeting is advanced by more than thirty (30) days or delayed by more than seventy (70) days from such anniversary date of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not earlier than one hundred and twenty (120) days prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting or the close of business on the tenth (10th) day following the day on which public announcement of the date of such meeting is first made. Such stockholder's notice shall set forth (A) as to each person whom the stockholder proposes to nominate for election or re-election as a director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to and in accordance with Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules and regulations promulgated thereunder, including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected; (B) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the text of the proposal or business (including

6

the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend the Certificate of Incorporation or these By-laws, the text of the proposed amendment), the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and of the beneficial owner, if any, on whose behalf the proposal is made; and (C) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (1) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner; (2) the class or series and number of shares of capital stock of the Corporation which are owned, directly or indirectly, beneficially and of record by such stockholder and such beneficial owner; (3) a representation that the stockholder is a holder of record of the stock of the Corporation at the time of giving the notice, will be entitled to vote at such meeting and will appear in person or by proxy at the meeting to propose such business or nomination; (4) a representation whether the stockholder or the beneficial owner, if any, will be or is part of a group which will (x) deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or elect the nominee and/or (y) otherwise to solicit proxies from stockholders in support of such proposal or nomination; and (5) a certification regarding whether such stockholder and beneficial owner, if any, have complied with all applicable federal, state and other legal requirements in connection with the stockholder's and/or beneficial owner's acquisition of shares of capital stock or other securities of the Corporation and/or the stockholder's and/or beneficial owner's acts or omissions as a stockholder of the Corporation. Notice of a stockholder nomination or proposal shall also set forth, as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (A) a description of any agreement, arrangement or understanding with respect to the nomination or proposal and/or the voting of shares of any class or series of stock of the Corporation between or among the stockholder giving notice, beneficial owner, if any, on whose behalf the nomination or proposal is made, any of their respective affiliates or associates and/or other person or persons (including their names) acting in concert with any of the foregoing (collectively, the "proponent persons"); (B) a description of any agreement, arrangement or understanding (including, without limitation, regardless of the form of settlement, any derivative, long or short positions, profit interests, forwards, futures, swaps, options, warrants, convertible securities, stock appreciation or similar rights, hedging transactions and borrowed or loaned shares) to which any proponent person is a party, the effect or intent of which is to transfer to or from any proponent person, in whole or in part, any of the economic consequences of ownership of any security of the Corporation, to increase or decrease the voting power of any proponent person with respect to shares of any class or series of stock of the Corporation and/or to provide any proponent person, directly or indirectly, with the opportunity to profit or share in any profit derived from, or to otherwise benefit economically from, any increase or decrease in the value of any security of the Corporation (a "Derivative Instrument"); (C) to the extent not disclosed pursuant to the immediately preceding clause (B), the principal amount of any indebtedness of the Corporation or any of its subsidiaries beneficially owned by such stockholder or by beneficial owner, if any, together with the title of the instrument under which such indebtedness was issued and a description of any Derivative Instrument entered into by or

7

on behalf of such stockholder or such beneficial owner relating to the value or payment of any indebtedness of the Corporation or any such subsidiary; and (D) any other information relating to such stockholder and beneficial owner, if any, required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for, as applicable, the proposal and/or for the election of directors in an election contest pursuant to and in accordance with Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder. The foregoing notice requirements shall be deemed satisfied by a stockholder if the stockholder has notified the Corporation of his or her intention to present a proposal at an annual meeting in compliance with Rule 14a–8 (or any successor thereof) promulgated under the Exchange Act, and such stockholder's proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for such annual meeting. A stockholder providing notice of a proposed nomination for election to the Board or other business proposed to be brought before a meeting (whether given pursuant to this paragraph (a)(ii) or paragraph (b) of this Section 1.12 of these By-laws) shall update and supplement such notice from time to time to the extent necessary so that the information provided or required to be provided in such notice shall be true and correct (x) as of the record date for determining the stockholders entitled to notice of the meeting and (y) as of the date that is fifteen (15) days prior to the meeting or any adjournment or postponement thereof, provided that if the record date for determining the stockholders entitled to vote at the meeting is less than fifteen (15) days prior to the meeting or any adjournment or postponement thereof, the information shall be supplemented and updated as of such later date. Any such update and supplement shall be delivered in writing to the Secretary at the principal executive offices of the Corporation not later than five (5) days after public announcement of the record date for determining the stockholders entitled to notice of the meeting (in the case of any update and supplement required to be made as of the record date for determining the stockholders entitled to notice of the meeting), not later than ten (10) days prior to the date for the meeting or any adjournment or postponement thereof (in the case of any update or supplement required to be made as of fifteen (15) days prior to the meeting or adjournment or postponement thereof) and not later than five (5) days after public announcement of the record date for determining the stockholders entitled to vote at the meeting, but no later than the date prior to the meeting or any adjournment or postponement thereof (in the case of any update and supplement required to be made as of a date less than fifteen (15) days prior the date of the meeting or any adjournment or postponement thereof). The Corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as a director of the Corporation and to determine the independence of such director under the Exchange Act and rules and regulations thereunder and applicable stock exchange rules. In addition, a stockholder seeking to bring an item of business before the annual meeting shall promptly provide any other information reasonably requested by the Corporation.

(iii) Notwithstanding anything in Section 1.12(a)(ii) of these By-laws to the contrary, in the event that the number of directors to be elected to the Board at an annual meeting is increased and there is no public announcement naming all of the nominees for director or specifying the size of the increased Board made by the Corporation at least one hundred (100) calendar days prior to the first anniversary of the preceding year's

8

annual meeting (which date shall, for purposes of the Corporation's first annual meeting of stockholders after its shares of common stock are first publicly traded, be deemed to have occurred on May 1, 2021), then a stockholder's notice under this Section 1.12(a) shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it is received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the tenth (10th) day following the day on which such public announcement is first made by the Corporation.

(b) *Special Meetings of Stockholders*. Only such business as shall have been brought before the special meeting of the stockholders pursuant to the Corporation's notice of meeting shall be conducted at such meeting. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (1) in accordance with the then-applicable terms, if any, of the Stockholders Agreement, (2) by or at the direction of the Board or a Committee appointed by the Board for such purpose or (3) provided that the Board has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who is entitled to vote at the meeting, who complies with the notice procedures set forth in this Section 1.12(b) and at the date of the meeting who is a stockholder of record at the time such notice is delivered to the Secretary, subject to paragraph (c)(ii)(D) of this Section 1.12. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors of the Corporation, any stockholder entitled to vote at such meeting may nominate a person or persons, as the case may be, for election to such position(s) as specified by the Corporation, if the stockholder's notice as required by Section 1.12(a)(ii) of these By-laws shall be delivered to the Secretary at the principal executive offices of the Corporation not earlier than the one hundred and twenty (120) days prior to such special meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such special meeting or the tenth (10th) day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board to be elected at such meeting. In no event shall the public announcement of an adjournment or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

(c) *General*.

(i) Only such persons who are nominated in accordance with the procedures set forth in this Section 1.12 or in accordance with the then-applicable terms, if any, of the Stockholders Agreement shall be eligible to serve as directors and only such business shall be conducted at an annual or special meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section. Except as otherwise provided by applicable law, the Certificate of Incorporation or these By-laws, the presiding officer of a meeting of stockholders shall have the power and duty (x) to determine whether a nomination or any business proposed to be brought before the meeting was made in accordance with the procedures set forth in this Section 1.12 (including whether the stockholder or beneficial owner, if any, on whose behalf the nomination or proposal is made, solicited (or is part of a group which solicited) or did not

9

so solicit, as the case may be, proxies in support of such stockholder's nominee or proposal in compliance with such stockholder's representation as required by clause (a)(ii)(C)(4) of this Section 1.12), and (y) if any proposed nomination or business is not in compliance with this Section 1.12, to declare that such defective nomination shall be disregarded or that such proposed business shall not be transacted.

(ii) If the stockholder (or a qualified representative of the stockholder) making a nomination or proposal under this Section 1.12 does not appear at a meeting of stockholders to present such nomination or proposal, the nomination shall be disregarded and/or the proposed business shall not be transacted, as the case may be, notwithstanding that proxies in favor thereof may have been received by the Corporation. For purposes of this Section 1.12, to be considered a qualified representative of the stockholder, a person must be authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders.

(A) Whenever used in these By-laws, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Reuters Information Services, Inc., Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act and the rules and regulations promulgated thereunder.

(B) Notwithstanding the foregoing provisions of this Section 1.12, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 1.12. Nothing in this Section 1.12 shall be deemed to affect any rights of (x) stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act or (y) the holders of any series of preferred stock to elect directors pursuant to any applicable provisions of the Certificate of Incorporation or of the relevant preferred stock certificate of designation.

(C) The announcement of an adjournment or postponement of an annual or special meeting does not commence a new time period (and does not extend any time period) for the giving of notice of a stockholder nomination or a stockholder proposal as described above.

(D) Notwithstanding anything to the contrary contained in this Section 1.12, for as long as the Stockholders Agreement remains in effect, the CD&R Investor shall not be subject to the notice procedures set forth in paragraphs (a)(ii), (a)(iii) or (b) of this Section 1.12 with respect to any annual or special meeting of stockholders.

10

ARTICLE II

BOARD OF DIRECTORS

Section 2.01. General Powers. Except as may otherwise be provided by law or the Certificate of Incorporation, the affairs and business of the Corporation shall be managed by or under the direction of the Board. The directors shall act only as a Board, and the individual directors shall have no power as such.

Section 2.02. Number and Term of Office. The number of directors constituting the entire Board and the term of office for each director shall be as provided for in the Certificate of Incorporation.

Section 2.03. Classification; Election of Directors. The Board shall be classified into three classes as provided by the Certificate of Incorporation. Except as otherwise provided in Section 2.14 of these By‑laws, at each annual meeting of the stockholders, the successors of the directors whose term expires at that meeting shall be elected. At each meeting of the stockholders for the election of directors, provided a quorum is present, the directors who are standing for election shall be elected by a plurality of the votes validly cast in such election.

Section 2.04. Regular Meetings. Regular meetings of the Board shall be held on such dates, and at such times and places as are determined from time to time by resolution of the Board.

Section 2.05. Special Meetings. Special meetings of the Board shall be held whenever called by the Chairman or, in the event of his or her absence or disability, by the Secretary, or by a majority of the directors then in office, at such place, date and time as may be specified in the respective notices or waivers of notice of such meetings. Any business may be conducted at a special meeting.

Section 2.06. Notice of Meetings; Waiver of Notice.

(a) Notices of special meetings shall be given to each director, and notice of each resolution or other action affecting the date, time or place of one or more regular meetings shall be given to each director not present at the meeting adopting such resolution or other action, subject to Section 2.09 of these By‑laws. Notices shall be given personally, or by telephone confirmed by facsimile or email dispatched promptly thereafter, or by facsimile or email confirmed by a writing delivered by a recognized overnight courier service, directed to each director at the address from time to time designated by such director to the Secretary. Each such notice and confirmation must be given (received in the case of personal service or delivery of written confirmation) at least 24 hours prior to the time of a special meeting, and at least five days prior to the initial regular meeting affected by such resolution or other action, as the case may be.

(b) A written waiver of notice of meeting signed by a director or a waiver by electronic transmission by a director, whether given before or after the meeting time stated in such notice, is deemed equivalent to notice. Attendance of a director at a

11

meeting is a waiver of notice of such meeting, except when the director attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business at the meeting on the ground that the meeting is not lawfully called or convened.

Section 2.07. Quorum; Voting. At all meetings of the Board, the presence of a majority of the total authorized number of directors shall constitute a quorum for the transaction of business. Except as otherwise required by law, the Certificate of Incorporation or these By-laws, the affirmative vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board.

Section 2.08. Action by Telephonic Communications. Members of the Board may participate in a meeting of the Board by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this provision shall constitute presence in person at such meeting.

Section 2.09. Adjournment. A majority of the directors present may adjourn any meeting of the Board to another date, time or place, whether or not a quorum is present. No notice need be given of any adjourned meeting unless (a) the date, time and place of the adjourned meeting are not announced at the time of adjournment, in which case notice conforming to the requirements of Section 2.06 of these By-laws applicable to special meetings shall be given to each director, or (b) the meeting is adjourned for more than 24 hours, in which case the notice referred to in clause (a) shall be given to those directors not present at the announcement of the date, time and place of the adjourned meeting.

Section 2.10. Action Without a Meeting. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if all members of the Board consent thereto in writing or by electronic transmission, and such writing or writings or electronic transmissions are filed with the minutes of proceedings of the Board. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 2.11. Regulations. To the extent consistent with applicable law, the Certificate of Incorporation and these By-laws, the Board may adopt such rules and regulations for the conduct of meetings of the Board and for the management of the affairs and business of the Corporation as the Board may deem appropriate. Subject to the then-applicable terms of the Stockholders Agreement, the Board may elect from among its members a chairperson and one or more vice-chairpersons to preside over meetings and to perform such other duties as may be designated by the Board.

Section 2.12. Resignations of Directors. Any director may resign at any time by submitting an electronic transmission or by delivering a written notice of resignation, signed by such director, to the Chairman of the Board, Chief Executive Officer, President or the Secretary. Such resignation shall take effect upon delivery unless the resignation specifies a later effective date or an effective date determined upon the happening of a specified event.

12

Section 2.13. <u>Removal of Directors</u>. Directors may be removed in the manner set forth in the Certificate of Incorporation and applicable law.

Section 2.14. <u>Vacancies and Newly Created Directorships</u>. Any vacancies or newly created directorships shall be filled as set forth in the Certificate of Incorporation, subject to the then-applicable terms, if any, of the Stockholders Agreement.

Section 2.15. <u>Compensation</u>. The directors shall be entitled to compensation for their services to the extent approved by the stockholders at any regular or special meeting of the stockholders. The Board may by resolution determine the expenses in the performance of such services for which a director is entitled to reimbursement.

Section 2.16. <u>Reliance on Accounts and Reports, etc</u>. A director, as such or as a member of any committee designated by the Board, shall in the performance of his or her duties be fully protected in relying in good faith upon the records of the Corporation and upon information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees designated by the Board, or by any other person as to the matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

ARTICLE III

COMMITTEES

Section 3.01. <u>Designation of Committees</u>. The Board shall designate such committees as may be required by applicable laws, regulations or stock exchange rules, and may designate such additional committees as it deems necessary or appropriate (collectively, the "Committees"). Each Committee shall consist of such number of directors, with such qualifications, as may be required by applicable laws, regulations or stock exchange rules, or as from time to time may be fixed by the directors then in office and shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation to the extent delegated to such Committee by the Board but no Committee shall have any power or authority as to (a) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, (b) adopting, amending or repealing any of these By-laws or (c) as may otherwise be excluded by law or by the Certificate of Incorporation. Any Committee may be abolished or re-designated from time to time by the Board.

Section 3.02. <u>Members and Alternate Members</u>. The members of each Committee and any alternate members shall be selected by the Board. The Board may provide that the members and alternate members serve at the pleasure of the Board. An

13

alternate member may replace any absent or disqualified member at any meeting of the Committee. An alternate member shall be given all notices of Committee meetings, may attend any meeting of the Committee, but may count towards a quorum and vote only if a member for whom such person is an alternate is absent or disqualified. Each member (and each alternate member) of any Committee (whether designated at an annual meeting of the Board or to fill a vacancy or otherwise) shall hold office until the time he or she shall cease for any reason to be a director, or until his or her earlier death, resignation or removal.

Section 3.03. <u>Committee Procedures</u>. A quorum for each Committee shall be a majority of its members, unless the Committee has only one or two members, in which case a quorum shall be one member, or unless a greater quorum is established by the Board. The vote of a majority of the Committee members present at a meeting at which a quorum is present shall be the act of the Committee. Each Committee shall keep regular minutes of its meetings and report to the Board when required. The Board may adopt other rules and regulations for the government of any Committee not inconsistent with the provisions of these By-laws, and each Committee may adopt its own rules and regulations of government, to the extent not inconsistent with these By-laws or rules and regulations adopted by the Board.

Section 3.04. <u>Meetings and Actions of Committees</u>. Meetings and actions of each Committee shall be governed by, and held and taken in accordance with, the provisions of the following sections of these By-laws, with such By-laws being deemed to refer to the Committee and its members in lieu of the Board and its members:

(a) Section 2.04 (to the extent relating to place and time of regular meetings);

(b) Section 2.05 (relating to special meetings);

(c) Section 2.06 (relating to notice and waiver of notice);

(d) Sections 2.08 and 2.10 (relating to telephonic communication and action without a meeting); and

(e) Section 2.09 (relating to adjournment and notice of adjournment).

Special meetings of Committees may also be called by resolution of the Board.

Section 3.05. <u>Resignations and Removals</u>. Any member (and any alternate member) of any Committee may resign from such position at any time by delivering a written notice of resignation, signed by such member, to the Chairman of the Board, Chief Executive Officer, President or the Secretary. Unless otherwise specified therein, such resignation shall take effect upon delivery. Any member (and any alternate member) of any Committee may be removed from such position by the Board at any time, either for or without cause.

Section 3.06. <u>Vacancies</u>. If a vacancy occurs in any Committee for any reason, the remaining members (and any alternate members) may continue to act if a quorum is present. A Committee vacancy may be filled only by the Board subject to Section 3.01 of these By-laws.

14

ARTICLE IV

OFFICERS

Section 4.01. Officers. The officers of the Corporation shall be chosen by the Board and shall be a Chief Executive Officer and President (which offices shall be held by the same person) and a Secretary, provided that for so long as the Stockholders Agreement is in effect, the choosing of any such officer shall also be subject to the then-applicable terms, if any, of the Stockholders Agreement. The Board may also elect a Treasurer, Assistant Secretaries and Assistant Treasurers, and such other officers and agents as the Board may determine. In addition, the Board from time to time may delegate to any officer the power to appoint subordinate officers or agents and to prescribe their respective rights, terms of office, authorities and duties. Any action by an appointing officer may be superseded by action by the Board. Any number of offices may be held by the same person. Each officer shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal. No officer need be a director of the corporation.

Section 4.02. Election. The officers of the Corporation elected by the Board shall serve at the pleasure of the Board. Officers and agents appointed pursuant to delegated authority as provided in Section 4.01 (or, in the case of agents, as provided in Section 4.06) shall hold their offices for such terms as may be determined from time to time by the appointing officer. Each officer shall hold office until his or her successor has been elected or appointed and qualified, or until his or her earlier death, resignation or removal.

Section 4.03. Compensation. The salaries and other compensation of all officers and agents of the Corporation shall be fixed by the Board or in the manner established by the Board.

Section 4.04. Removal and Resignation; Vacancies. Any officer may be removed for or without cause at any time by the Board. Any officer granted the power to appoint subordinate officers and agents as provided in Section 4.01 may remove any subordinate officer or agent appointed by such officer, for or without cause. Any officer or agent may resign at any time by delivering notice of resignation, either in writing signed by such officer or by electronic transmission, to the Board or the Chief Executive Officer and President. Unless otherwise specified therein, such resignation shall take effect upon delivery. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise, may be filled by the Board or by the officer, if any, who appointed the person formerly holding such office.

Section 4.05. Authority and Duties of Officers. An officer of the Corporation shall have such authority and shall exercise such powers and perform such duties (a) as may be required by law, (b) to the extent not inconsistent with law, as are specified in

15

these By-laws, (c) to the extent not inconsistent with law or these By-laws, as may be specified by resolution of the Board, and (d) to the extent not inconsistent with any of the foregoing, as may be specified by the appointing officer with respect to a subordinate officer appointed pursuant to delegated authority under Section 4.01.

Section 4.06. <u>Chief Executive Officer and President</u>. The Chief Executive Officer and President shall, unless otherwise provided by the Board, be the chief executive officer of the Corporation, shall have general control and supervision of the policies and operations of the Corporation and shall see that all orders and resolutions of the Board are carried into effect. He or she shall manage and administer the Corporation's business and affairs and shall also perform all duties and exercise all powers usually pertaining to the office of a chief executive officer and a president of a corporation, unless otherwise specified by the Board. He or she shall have the authority to sign, in the name and on behalf of the Corporation, checks, orders, contracts, leases, notes, drafts and all other documents and instruments in connection with the business of the Corporation. He or she shall have the authority to cause the employment or appointment of such employees or agents of the Corporation as the conduct of the business of the Corporation may require, to fix their compensation, and to remove or suspend any employee or any agent employed or appointed by any officer or to suspend any agent appointed by the Board. The President shall have the duties and powers of the Treasurer if no Treasurer is elected and shall have such other duties and powers as the Board may from time to time prescribe.

Section 4.07. <u>Vice Presidents</u>. If one or more Vice-Presidents have been elected, each Vice President shall perform such duties and exercise such powers as may be assigned to him or her from time to time by the Board or the Chief Executive Officer and President. In the event of absence or disability of the Chief Executive Officer and President, the duties of the Chief Executive Officer and President shall be performed, and his or her powers may be exercised, by such Vice President as shall be designated by the Board or, failing such designation, by the Vice President in order of seniority of election to that office.

Section 4.08. <u>Secretary</u>. Unless otherwise determined by the Board, the Secretary shall have the following powers and duties:

(a) The Secretary shall keep or cause to be kept a record of all the proceedings of the meetings of the stockholders, the Board and any Committees thereof in books provided for that purpose.

(b) The Secretary shall cause all notices to be duly given in accordance with the provisions of these By-laws and as required by law.

(c) Whenever any Committee shall be appointed pursuant to a resolution of the Board, the Secretary shall furnish a copy of such resolution to the members of such Committee.

16

(d) The Secretary shall be the custodian of the records and of the seal of the Corporation and cause such seal (or a facsimile thereof) to be affixed to all certificates representing shares of the Corporation prior to the issuance thereof and to all documents and instruments that the Board or any officer of the Corporation has determined should be executed under seal, may sign (together with any other authorized officer) any such document or instrument, and when the seal is so affixed he or she may attest the same.

(e) The Secretary shall properly maintain and file all books, reports, statements, certificates and all other documents and records required by law, the Certificate of Incorporation or these By-laws.

(f) The Secretary shall have charge of the stock books and ledgers of the Corporation and shall cause the stock and transfer books to be kept in such manner as to show at any time the number of shares of stock of the Corporation of each class issued and outstanding, the names (alphabetically arranged) and the addresses of the holders of record of such shares, the number of shares held by each holder and the date as of which each such holder became a holder of record.

(g) The Secretary shall sign (unless the Treasurer, an Assistant Treasurer or an Assistant Secretary shall have signed) certificates representing shares of the Corporation the issuance of which shall have been authorized by the Board.

(h) The Secretary shall perform, in general, all duties incident to the office of secretary and such other duties as may be specified in these By-laws or as may be assigned to the Secretary from time to time by the Board or the President.

Section 4.09. Treasurer. Unless otherwise determined by the Board, the Treasurer, if there be one, shall be the chief financial officer of the Corporation and shall have the following powers and duties:

(a) The Treasurer shall have charge and supervision over and be responsible for the moneys, securities, receipts and disbursements of the Corporation, and shall keep or cause to be kept full and accurate records thereof.

(b) The Treasurer shall cause the moneys and other valuable effects of the Corporation to be deposited in the name and to the credit of the Corporation in such banks or trust companies or with such bankers or other depositaries as shall be determined by the Board or the Chief Executive Officer and President, or by such other officers of the Corporation as may be authorized by the Board or the Chief Executive Officer and President to make such determinations.

(c) The Treasurer shall cause the moneys of the Corporation to be disbursed by checks or drafts (signed by such officer or officers or such agent or agents of the Corporation, and in such manner, as the Board or the Chief Executive Officer and President may determine from time to time) upon the authorized depositaries of the Corporation and cause to be taken and preserved proper vouchers for all moneys disbursed.

17

(d) The Treasurer shall render to the Board or the Chief Executive Officer and President, whenever requested, a statement of the financial condition of the Corporation and of the transactions of the Corporation, and render a full financial report at the annual meeting of the stockholders, if called upon to do so.

(e) The Treasurer shall be empowered from time to time to require from all officers or agents of the Corporation reports or statements giving such information as he or she may desire with respect to any and all financial transactions of the Corporation.

(f) The Treasurer may sign (unless an Assistant Treasurer or the Secretary or an Assistant Secretary shall have signed) certificates representing shares of stock of the Corporation the issuance of which shall have been authorized by the Board.

(g) The Treasurer shall perform, in general, all duties incident to the office of treasurer and such other duties as may be specified in these By-laws or as may be assigned to the Treasurer from time to time by the Board or the Chief Executive Officer and President.


ARTICLE V

CAPITAL STOCK

Section 5.01. Certificates of Stock, Uncertificated Shares. The shares of the Corporation shall be represented by certificates except to the extent that the Board has provided by resolution that some or all of any or all classes or series of the stock of the Corporation shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock in the Corporation represented by certificates shall be entitled to have, and every holder of uncertificated shares may at the direction of the Board be permitted to receive upon request, a certificate signed by the appropriate officers of the Corporation, representing the number and class of shares registered in certificate form and owned by such holder. Such certificate shall be in such form as the Board may determine, to the extent consistent with applicable law, the Certificate of Incorporation and these By-laws.

Section 5.02. Facsimile Signatures. Any or all signatures on the certificates referred to in Section 5.01 of these By-laws may be in facsimile form. If any officer, transfer agent or registrar who has signed, or whose facsimile signature has been placed upon, a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

Section 5.03. Lost, Stolen or Destroyed Certificates. A new certificate may be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed only upon delivery to the Corporation of an affidavit of the owner or owners (or their legal representatives) of such certificate, setting forth such allegation, and a bond or other undertaking as may be satisfactory to a financial officer of

18

the Corporation designated by the Board to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

Section 5.04. Transfer of Stock.

(a) Transfer of shares represented by certificates shall be made on the books of the Corporation upon surrender to the Corporation of a certificate for shares, duly endorsed or accompanied by appropriate evidence of succession, assignment or authority to transfer, and otherwise in compliance with applicable law. Transfers of uncertificated shares shall be made on the books of the corporation as provided by applicable law. Within a reasonable time after the transfer of uncertificated stock, the corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to Sections 151, 156, 202(a) and 218(a) of the DGCL. Subject to applicable law, the provisions of the Certificate of Incorporation and these By-laws, the Board may prescribe such additional rules and regulations as it may deem appropriate relating to the issue, transfer and registration of shares of the Corporation.

(b) The Corporation may enter into agreements with shareholders to restrict the transfer of stock of the Corporation in any manner not prohibited by the DGCL.

Section 5.05. Registered Stockholders. Prior to due surrender of a certificate for registration of transfer, or due delivery of instructions for the registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to receive dividends and other distributions, to vote, to receive notice and otherwise to exercise all the rights and powers of the owner of the shares represented by such certificate or of such uncertificated shares, and the Corporation shall not be bound to recognize any equitable or legal claim to or interest in such shares on the part of any other person, whether or not the Corporation shall have notice of such claim or interests. If a transfer of shares is made for collateral security, and not absolutely, this fact shall be so expressed in the entry of the transfer if, when the certificates are presented to the Corporation for transfer or uncertificated shares are requested to be transferred, both the transferor and transferee request the Corporation to do so.

Section 5.06. Transfer Agent and Registrar. The Board may appoint one or more transfer agents and one or more registrars, and may require all certificates representing shares to bear the signature of any such transfer agents or registrars.

ARTICLE VI

INDEMNIFICATION

Section 6.01. Indemnification.

(a) In General. The Corporation shall indemnify, to the full extent permitted by the DGCL and other applicable law, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding,

19

whether civil, criminal, administrative or investigative (each, a "proceeding") by reason of the fact that (x) such person is or was serving or has agreed to serve as a director or officer of the Corporation, or (y) such person, while serving as a director or officer of the Corporation, is or was serving or has agreed to serve at the request of the Corporation as a director, officer, employee, manager or agent of another corporation, partnership, joint venture, trust or other enterprise or (z) such person is or was serving or has agreed to serve at the request of the Corporation as a director, officer or manager of another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action alleged to have been taken or omitted by such person in such capacity, and who satisfies the applicable standard of conduct set forth in the DGCL or other applicable law:

(i) in a proceeding other than a proceeding by or in the right of the Corporation, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person or on such person's behalf in connection with such proceeding and any appeal therefrom, or

(ii) in a proceeding by or in the right of the Corporation to procure a judgment in its favor, against expenses (including attorneys' fees) actually and reasonably incurred by such person or on such person's behalf in connection with the defense or settlement of such proceeding and any appeal therefrom.

(b) Indemnification in Respect of Successful Defense. To the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise in defense of any proceeding referred to in Section 6.01(a) or in defense of any claim, issue or matter therein, such person shall be indemnified by the Corporation against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(c) Indemnification in Respect of Proceedings Instituted by Indemnitee. Section 6.01(a) does not require the Corporation to indemnify a present or former director or officer of the Corporation in respect of a proceeding (or part thereof) instituted by such person on his or her own behalf, unless such proceeding (or part thereof) has been authorized by the Board or the indemnification requested is pursuant to the last sentence of Section 6.03 of these By-laws.

Section 6.02. Advance of Expenses. The Corporation shall advance all expenses (including reasonable attorneys' fees) incurred by a present or former director or officer in defending any proceeding prior to the final disposition of such proceeding upon written request of such person and delivery of an undertaking by such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation. The Corporation may authorize any counsel for the Corporation to represent (subject to applicable conflict of interest considerations) such present or former director or officer in any proceeding, whether or not the Corporation is a party to such proceeding.

Section 6.03. Procedure for Indemnification. Any indemnification under Section 6.01 of these By-laws or any advance of expenses under Section 6.02 of these By-laws

20

shall be made only against a written request therefor (together with supporting documentation) submitted by or on behalf of the person seeking indemnification or advance. Indemnification may be sought by a person under Section 6.01 of these By-laws in respect of a proceeding only to the extent that both the liabilities for which indemnification is sought and all portions of the proceeding relevant to the determination of whether the person has satisfied any appropriate standard of conduct have become final. A person seeking indemnification or advance of expenses may seek to enforce such person's rights to indemnification or advance of expenses (as the case may be) in the Delaware Court of Chancery to the extent all or any portion of a requested indemnification has not been granted within 60 days of, or to the extent all or any portion of a requested advance of expenses has not been granted within 20 days of, the submission of such request. All expenses (including reasonable attorneys' fees) incurred by such person in connection with successfully establishing such person's right to indemnification or advancement of expenses under this Article, in whole or in part, shall also be indemnified by the Corporation.

Section 6.04. <u>Burden of Proof</u>.

(a) In any proceeding brought to enforce the right of a person to receive indemnification to which such person is entitled under Section 6.01 of these By-laws, the Corporation has the burden of demonstrating that the standard of conduct applicable under the DGCL or other applicable law was not met. A prior determination by the Corporation (including its Board or any Committee thereof, its independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct does not itself constitute evidence that the claimant has not met the applicable standard of conduct.

(b) In any proceeding brought to enforce a claim for advances to which a person is entitled under Section 6.02 of these By-laws, the person seeking an advance need only show that he or she has satisfied the requirements expressly set forth in Section 6.02 of these By-laws.

Section 6.05. <u>Contract Right; Non-Exclusivity; Survival</u>.

(a) The rights to indemnification and advancement of expenses provided by this Article VI shall be deemed to be separate contract rights between the Corporation and each director and officer who serves in any such capacity at any time while these provisions as well as the relevant provisions of the DGCL are in effect, and no repeal or modification of any of these provisions or any relevant provisions of the DGCL shall adversely affect any right or obligation of such director or officer existing at the time of such repeal or modification with respect to any state of facts then or previously existing or any proceeding previously or thereafter brought or threatened based in whole or in part upon any such state of facts. Such "contract rights" may not be modified retroactively as to any present or former director or officer without the consent of such director or officer.

(b) The rights to indemnification and advancement of expenses provided by this Article VI shall not be deemed exclusive of any other indemnification or

21

advancement of expenses to which a present or former director or officer of the Corporation seeking indemnification or advancement of expenses may be entitled by any agreement, vote of stockholders or disinterested directors, or otherwise.

(c) The rights to indemnification and advancement of expenses provided by this Article VI to any present or former director or officer of the Corporation shall inure to the benefit of the heirs, executors and administrators of such person.

Section 6.06. Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was or has agreed to become a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another Corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person or on such person's behalf in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article.

Section 6.07. Employees and Agents. The Board, or any officer authorized by the Board generally or in the specific case to make indemnification decisions, may cause the Corporation to indemnify any present or former employee or agent of the Corporation in such manner and for such liabilities as the Board may determine, up to the fullest extent permitted by the DGCL and other applicable law.

Section 6.08. Interpretation; Severability. Terms defined in Sections 145(h) or (i) of the DGCL have the meanings set forth in such sections when used in this Article VI. If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each director or officer of the Corporation as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation, to the fullest extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE VII

OFFICES

Section 7.01. Registered Office. The registered office of the Corporation in the State of Delaware shall be located at the location provided in the Corporation's Certificate of Incorporation.

Section 7.02. Other Offices. The Corporation may maintain offices or places of business at such other locations within or without the State of Delaware as the Board may from time to time determine or as the business of the Corporation may require.

22

ARTICLE VIII

GENERAL PROVISIONS

Section 8.01. Dividends.

(a) Subject to any applicable provisions of law and the Certificate of Incorporation, dividends upon the shares of the Corporation may be declared by the Board at any regular or special meeting of the Board and any such dividend may be paid in cash, property, or shares of the Corporation's stock.

(b) A member of the Board, or a member of any Committee designated by the Board shall be fully protected in relying in good faith upon the records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or Committees of the Board, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation, as to the value and amount of the assets, liabilities and/or net profits of the Corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid.

Section 8.02. Reserves. There may be set apart out of any funds of the Corporation available for dividends such sum or sums as the Board from time to time may determine proper as a reserve or reserves for meeting contingencies, equalizing dividends, repairing or maintaining any property of the Corporation or for such other purpose or purposes as the Board may determine conducive to the interest of the Corporation, and the Board may similarly modify or abolish any such reserve.

Section 8.03. Execution of Instruments. Except as otherwise required by law or the Certificate of Incorporation, the Board or any officer of the Corporation authorized by the Board may authorize any other officer or agent of the Corporation to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation. Any such authorization must be in writing or by electronic transmission and may be general or limited to specific contracts or instruments.

Section 8.04. Voting as Stockholder. Unless otherwise determined by resolution of the Board, the Chief Executive Officer and President or any Vice President shall have full power and authority on behalf of the Corporation to attend any meeting of stockholders of any Corporation in which the Corporation may hold stock, and to act, vote (or execute proxies to vote) and exercise in person or by proxy all other rights, powers and privileges incident to the ownership of such stock at any such meeting, or through action without a meeting. The Board may by resolution from time to time confer such power and authority (in general or confined to specific instances) upon any other person or persons.

23

Section 8.05. <u>Fiscal Year</u>. The fiscal year of the Corporation shall commence on the first day of January of each year and shall terminate in each case on December 31, unless otherwise fixed by the Board by resolution.

Section 8.06. <u>Seal</u>. The seal of the Corporation shall be circular in form and shall contain the name of the Corporation, the year of its incorporation and the words "Corporate Seal" and "Delaware". The form of such seal shall be subject to alteration by the Board. The seal may be used by causing it or a facsimile thereof to be impressed, affixed or reproduced, or may be used in any other lawful manner.

Section 8.07. <u>Books and Records; Inspection</u>. Except to the extent otherwise required by law, the books and records of the Corporation shall be kept at such place or places within or without the State of Delaware as may be determined from time to time by the Board.

Section 8.08. <u>Electronic Transmission</u>. "<u>Electronic transmission</u>", as used in these By-laws, means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

ARTICLE IX

AMENDMENT OF BY-LAWS

Section 9.01. <u>Amendment</u>. Subject to the provisions of the Certificate of Incorporation, these By-laws may be amended, altered or repealed, or new by-laws may be adopted:

(a) by the affirmative vote of at least a majority of the directors then in office at any special or regular meeting of the Board if, in the case of such special meeting only, notice of such amendment, alteration or repeal is contained in the notice or waiver of notice of such meeting, and

(b) (i) until the Trigger Date (the first date on which the CD&R Investor ceases to beneficially own (directly or indirectly) at least forty percent (40%) of the outstanding shares of common stock), the affirmative vote of the holders of at least a majority of the outstanding shares of common stock entitled to vote at any annual or special meeting of stockholders if, in the case of such special meeting only, notice of such amendment, alteration or repeal is contained in the notice or waiver of notice of such meeting, or

(ii) from and after the Trigger Date, the affirmative vote of the holders of at least two-thirds (66 2/3%) of the outstanding shares of common stock entitled to vote at any annual or special meeting of stockholders if, in the case of such special meeting only, notice of such amendment, alteration or repeal is contained in the notice or waiver of notice of such meeting.

24

Notwithstanding the foregoing, no amendment, alteration or repeal of Article VI of these By-laws shall adversely affect any right or protection existing under these By-laws immediately prior to such amendment, alteration or repeal, including any right or protection of a present or former director or officer thereunder in respect of any act or omission occurring prior to the time of such amendment.

ARTICLE X

<u>CONSTRUCTION</u>

Section 10.01. <u>Construction</u>. In the event of any conflict between the provisions of these By-laws as in effect from time to time and the provisions of the Certificate of Incorporation of the Corporation as in effect from time to time, the provisions of such Certificate of Incorporation shall be controlling.

25

REGISTRATION RIGHTS AGREEMENT

of

AGILON HEALTH, INC.

Dated as of April 16, 2021

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Incidental Registrations | 5 |
| | (a)  Right to Include Registrable Securities | 5 |
| | (b)  Priority in Incidental Registrations | 6 |
| 3. | Registration on Request | 6 |
| | (a)  Request by the Demand Party | 6 |
| | (b)  Priority on Demand Registration | 7 |
| | (c)  Cancellation of a Demand Registration | 8 |
| | (d)  Limitations on Demand Registrations | 8 |
| | (e)  Postponements in Requested Registrations | 9 |
| | (f)  Short-Form Registrations | 9 |
| | (g)  Shelf-Take Downs | 10 |
| | (h)  Registration Statement Form | 11 |
| | (i)  Selection of Underwriters | 11 |
| 4. | Registration Procedures | 12 |
| 5. | Indemnification | 19 |
| | (a)  Indemnification by the Company | 19 |
| | (b)  Indemnification by Holder of Registrable Securities | 20 |
| | (c)  Conduct of Indemnification Proceedings | 20 |
| | (d)  Contribution | 21 |
| | (e)  Deemed Underwriter | 22 |
| | (f)  Other Indemnification | 22 |
| | (g)  Non-Exclusivity | 22 |
| | (h)  Primacy of Indemnification | 22 |
| 6. | Registration Expenses | 23 |
| 7. | Rule 144 | 24 |
| 8. | Certain Additional Agreements | 24 |
| 9. | Miscellaneous | 24 |
| | (a)  Termination | 24 |
| | (b)  Holdback Agreement | 24 |
| | (c)  Amendments and Waivers | 25 |
| | (d)  Successors, Assigns and Transferees | 25 |
| | (e)  Notices | 25 |
| | (f)  Further Assurances | 26 |
| | (g)  Other Registration Rights Agreements | 26 |

i

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| (h) | Entire Agreement; No Third Party Beneficiaries | 27 |
| (i) | Governing Law; Jurisdiction and Forum; Waiver of Jury Trial | 27 |
| (j) | Severability | 27 |
| (k) | Enforcement | 28 |
| (l) | Titles and Subtitles | 28 |
| (m) | No Recourse | 28 |
| (n) | Counterparts; Facsimile Signatures | 28 |

Exhibit A Joinder Agreement

ii

This REGISTRATION RIGHTS AGREEMENT (the "Agreement") is entered into as of April 16, 2021, by and among agilon health, inc., a Delaware corporation (and any successor in interest thereto, the "Company"), CD&R Vector Holdings, L.P., a Cayman Islands exempted limited partnership (and any successor in interest thereto, the "CD&R Investor"), any Person who executes a Joinder Agreement in the form of Exhibit A hereto and any Person who becomes a party hereto pursuant to Section 9(d). Capitalized terms used herein shall have the meaning assigned to such terms in the text of this Agreement or in Section 1.

WHEREAS, the Company intends to undertake an underwritten initial public offering (the "IPO") of Common Stock; and

WHEREAS, in connection with the IPO, the Company desires to provide to the Holders rights to registration under the Securities Act of Registrable Securities, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual promises hereinafter set forth, the Parties hereto agree as follows:

AGREEMENT

1. Definitions. As used in this Agreement, the following capitalized terms shall have the following respective meanings:

"Affiliate" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person directly or indirectly owning or controlling 10% or more of any class of outstanding voting securities of such Person or (iii) any officer, director, general partner or trustee of any such Person described in clause (i) or (ii).

"Agreement" has the meaning given to such term in the Preamble, as the same may be amended, supplemented or restated from time to time.

"Automatic Shelf Registration Statement" has the meaning given to such term in Section 3(f)(iii).

"Board" means the Board of Directors of the Company.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York City.

"CD&R Investor" has the meaning given to such term in the Preamble.

"Charitable Gifting Event" means any transfer by a Holder of Registrable Securities, or any subsequent transfer by such Holder's members, partners or other employees, in connection with a bona fide gift to any Charitable Organization made in connection with sales of Registrable Securities by a Holder pursuant to an effective registration statement.

"Charitable Organization" means a charitable organization as described by Section 501(c)(3) of the Internal Revenue Code of 1986, as in effect from time to time.

"Common Stock" means the shares of common stock, par value $0.01 per share, of the Company including any shares of capital stock into which Common Stock may be converted (as a result of recapitalization, share exchange or similar event) or are issued with respect to Common Stock, including with respect to any stock split or stock dividend, or a successor security.

"Company" has the meaning given to such term in the Preamble.

"control" (including the terms "controlling," "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

"Covered Person" has the meaning given to such term in Section 5(a).

"Demand Follow-Up Notice" has the meaning given to such term in Section 3(a).

"Demand Notice" has the meaning given to such term in Section 3(a).

"Demand Registration" has the meaning given to such term in Section 3(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and any successor statute thereto and the rules and regulations of the SEC promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority.

"Free Writing Prospectus" has the meaning given to such term in Section 4(a).

"Holdback Period" means, with respect to a registered offering covered by this Agreement, 90 days after and during the 10 days before the effective date of the related Registration Statement or, in the case of a takedown from a Shelf Registration Statement, 90 days after the date of the Prospectus supplement filed with the SEC in connection with such takedown and during such prior period (not to exceed 10 days) as the Company has given reasonable written notice to the Holders, or such shorter period as may be agreed to by the managing underwriter(s).

"Holder" means any of (i) the CD&R Investor, (ii) any other Person entitled to incidental or piggyback registration rights hereunder upon entering into a joinder agreement substantially in the form of Exhibit A hereto or (iii) any direct or indirect transferee of a Holder who has acquired Registrable Securities from a Holder and who has entered into a joinder agreement substantially in the form of Exhibit A hereto, in each case so long as such Person continues to hold any Registrable Securities.

2

"Indemnified Party" has the meaning given to such term in Section 5(c).

"Indemnifying Party" has the meaning given to such term in Section 5(c).

"Indemnitors" has the meaning given to such term in Section 5(h).

"IPO" has the meaning given to such term in the Recitals.

"Losses" has the meaning given to such term in Section 5(a).

"Minority Holder" means any "Holder" as defined under the Minority Registration Rights Agreements.

"Minority Registration Rights Agreements" means the registration rights agreements between agilon health, inc. (f/k/a Agilon Health Topco, Inc.) and certain minority stockholders as of the date of the IPO.

"Minority Registrable Securities" means any "Registrable Securities" as defined under the Minority Registration Rights Agreements.

"Parties" means the parties to this Agreement.

"Person" means any individual, partnership, joint venture, corporation, limited liability company, trust, unincorporated organization, government or any department or agency thereof or any other entity.

"Prospectus" means the prospectus included in any Registration Statement (including, without limitation, a prospectus that discloses information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, relating to Registrable Securities, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus.

"Registrable Securities" means (a) any Common Stock held by a Holder and (b) to the extent held, or to be held, by a Holder, any other equity securities or equity interests issued or issuable, directly or indirectly, with respect to the securities described in clause (a) by way of conversion or exchange thereof or stock dividends, stock splits or in connection with a combination of shares, reclassification, recapitalization, merger, consolidation or other reorganization. As to any particular Registrable Securities, once issued such securities shall cease to be Registrable Securities when (i) they are disposed of pursuant to an effective Registration Statement under the Securities Act, (ii) they are sold to the public pursuant to Rule 144 or Rule 145 (or other exemption from registration under the Securities Act), (iii) other than with respect to Common Stock held by the CD&R Investor or its Affiliates who are Holders, they are able to be sold by their Holder in a single day pursuant to, and in accordance with, Rule 144, (iv) they shall have ceased to be outstanding, or (v) they have been sold in a private transaction in which the transferor's rights under this Agreement are not assigned to the transferee of the securities.

3

"Registration Statement" means any registration statement of the Company filed with the SEC under the Securities Act which covers any of the Registrable Securities pursuant to the provisions of this Agreement, including any Prospectus, Free Writing Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 144" means Rule 144 under the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.

"Rule 145" means Rule 145 under the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.

"Rule 405" means Rule 405 under the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.

"SEC" means the U.S. Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, and any successor statute thereto and the rules and regulations of the SEC promulgated thereunder.

"Shelf Registration Statement" has the meaning given to such term in Section 3(f)(i).

"Shelf Underwritten Offering" has the meaning given to such term in Section 3(g).

"Short-Form Registration" has the meaning given to such term in Section 3(f)(i).

"Subsidiary" means (i) any corporation of which a majority of the securities entitled to vote generally in the election of directors thereof, at the time as of which any determination is being made, are owned by another entity, either directly or indirectly and (ii) any joint venture, general or limited partnership, limited liability company or other legal entity in which an entity is the record or beneficial owner, directly or indirectly, of a majority of the voting interests or the general partner.

"Take-Down Notice" has the meaning given to such term in Section 3(g).

"WKSI" has the meaning given to such term in Section 3(f)(iii).

4

2. <u>Incidental Registrations</u>.

(a) <u>Right to Include Registrable Securities</u>. If the Company determines to register its Common Stock under the Securities Act (other than under Section 3, pursuant to a Registration Statement filed by the Company on Form S‑4 or Form S‑8, or any successor or other forms promulgated for similar purposes, or filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan), whether or not for sale for its own account, in a manner which would permit registration of Registrable Securities for sale to the public under the Securities Act, it shall, at each such time, give prompt written notice to all Holders of its intention to do so and of such Holders' rights under this Section 2. Upon the written request of any such Holder made within five Business Days after the receipt of any such notice (which request shall specify the Registrable Securities intended to be disposed of by such Holder and, in the case of the CD&R Investor and its Affiliates that are Holders of Registrable Securities, the intended method or methods of disposition thereof), the Company shall use its reasonable best efforts to effect the registration under the Securities Act of all Registrable Securities which the Company has been so requested to register by the Holders thereof, to the extent required to permit the disposition of the Registrable Securities so to be registered; <u>provided</u> that (<u>x</u>) if, at any time after giving written notice of its intention to register any securities and prior to the effective date of the Registration Statement filed in connection with such registration, the Company shall determine for any reason not to proceed with the proposed registration of the securities to be sold by it, the Company may, at its election, give written notice of such determination to each Holder and, thereupon, shall be relieved of its obligation to register any Registrable Securities in connection with such registration (but not from its obligation to pay the expenses in connection therewith) without prejudice to the rights of the Holders to request that such registration be effected as a registration under Section 3, and (<u>y</u>) if such registration involves an underwritten offering, all Holders requesting to be included in the Company's registration must sell their Registrable Securities to the underwriters selected by the Company on the same terms and conditions as apply to the Company, with such differences, including any with respect to indemnification and liability insurance, as may be customary or appropriate in combined primary and secondary offerings. If a registration requested pursuant to this Section 2(a) involves an underwritten public offering, any Holder requesting to be included in such registration may elect, in writing at least five Business Days prior to the effective date of the Registration Statement filed in connection with such registration, to withdraw its request to register such securities in connection with such registration. The Company shall not be required to maintain the effectiveness of the Registration Statement for a registration requested pursuant to this Section 2(a) beyond the earlier to occur of (<u>i</u>) 180 days after the effective date thereof and (<u>ii</u>) consummation of the distribution by the holders of the Registrable Securities included in such Registration Statement. Any Holder who has elected to sell Registrable Securities in an offering pursuant to this Section 2 shall be permitted to withdraw from such registration by written notice to the Company if the price to the public at which the Registrable Securities are proposed to be sold will be less than 90% of the average closing price of the class of stock being sold in the offering during the ten trading days preceding the date on which the Demand Notice of such offering was given pursuant to this Section 2(a).

5

(b) <u>Priority in Incidental Registrations</u>. The Company shall use reasonable efforts to cause the managing underwriter(s) of a proposed underwritten offering to permit Holders who have requested to include Registrable Securities in such offering to include in such offering all Registrable Securities so requested to be included on the same terms and conditions as any other shares of capital stock, if any, of the Company included in the offering. Notwithstanding the foregoing, if the managing underwriter(s) of such underwritten offering have informed the Company that in its (or their) good-faith opinion the total number or dollar amount of securities that are intended to be included in such offering is such as to adversely affect the success of such offering (including, without limitation, adversely affect the per-share offering price), then the amount of securities to be offered for the account of Holders (other than the Company) or Minority Holders shall be reduced to the extent necessary to reduce the total amount of securities to be included in such offering to the amount recommended in the good-faith opinion of such managing underwriter(s) by:

(i) in the case of an underwritten offering initiated by the Company or any Holder to register securities for its or their own account: first reducing, or eliminating if necessary, all securities of the Company requested to be included by the Holders (other than the CD&R Investor and its Affiliates that are Holders) requesting such registration *pro rata* among such Holders on the basis of the percentage of the Registrable Securities requested to be included in such registration by such Holders; second, by reducing, or eliminating if necessary, all securities of the Company requested to be included by the CD&R Investor or its Affiliates that are Holders or any Minority Holders, *pro rata* among all such Holders on the basis of the percentage of Registrable Securities requested to be included in such registration by such Holders, and in accordance with the Minority Registration Rights Agreements with respect to any Minority Registrable Securities requested to be included in such registration by such Minority Holders; and third, by reducing all securities of the Company requested to be included by the Company.

(ii) in the case of an underwritten offering initiated by a Minority Holder: first reducing, or eliminating if necessary, all securities of the Company requested to be included by the Holders (other than the CD&R Investor and its Affiliates that are Holders) *pro rata* among such Holders on the basis of the percentage of the Registrable Securities requested to be included in such registration by such Holders; second, by reducing, or eliminating if necessary, all securities of the Company requested to be included by the CD&R Investor or its Affiliates that are Holders, *pro rata* among all such Holders on the basis of the percentage of Registrable Securities requested to be included in such registration by such Holders; third, by reducing, or eliminating if necessary, all securities of the Company requested to be included by the Company; and fourth, by reducing all securities of the Company requested to be included by the Minority Holders in accordance with the Minority Registration Rights Agreements.

3. <u>Registration on Request</u>.

(a) <u>Request by the Demand Party</u>. Subject to Section 3(d), at any time, each of the CD&R Investor and its Affiliates that are Holders shall have the right to require the Company to register, pursuant to the terms of this Agreement, under and in accordance with the provisions of the Securities Act, the number of Registrable Securities of such Holder requested to be so registered pursuant to this Agreement, in each case by delivering written notice to the Company (any such written notice, a "<u>Demand Notice</u>" and any such registration, a "<u>Demand Registration</u>"). Subject to Section 3(d), following receipt of a Demand Notice for a Demand

6

Registration in accordance with this Section 3(a), the Company shall use its reasonable best efforts to file a Registration Statement as promptly as practicable, but no later than 30 days, and to cause such Registration Statement to be declared effective under the Securities Act as promptly as practicable after the filing thereof.

No Demand Registration shall be deemed to have occurred for purposes of the first sentence of the preceding paragraph if (x) the Registration Statement relating thereto (A) does not become effective, (B) is not maintained effective for the period required pursuant to this Section 3, or (C) the offering of the Registrable Securities pursuant to such Registration Statement is subject to a stop order, injunction or similar order or requirement of the SEC during such period, (y) more than 90% of the Registrable Securities requested by the demanding Holder to be included in such registration are not so included pursuant to Section 3(b) or (z) the conditions to closing specified in any underwriting agreement, purchase agreement or similar agreement entered into in connection with the registration relating to such request are not satisfied (other than as a result of a material default or breach thereunder by such demanding Holder) or otherwise waived by such demanding Holder; provided that the Company's obligation to pay expenses pursuant to Section 6 hereof shall still apply.

Within two calendar days after receipt by the Company of a Demand Notice in accordance with this Section 3(a), the Company shall give written notice (the "Demand Follow-Up Notice") of such Demand Notice to all other Holders and shall, subject to the provisions of Section 3(b) hereof, include in such registration all Registrable Securities with respect to which the Company received written requests for inclusion therein within three Business Days after such Demand Follow-Up Notice is given by the Company to such Holders.

All requests made pursuant to this Section 3 shall specify the number of Registrable Securities to be registered and the intended method or methods of disposition thereof.

The Company shall be required to maintain the effectiveness of the Registration Statement with respect to any Demand Registration for a period of at least 180 days after the effective date thereof or such shorter period during which all Registrable Securities included in such Registration Statement have actually been sold; provided that such period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such Registration Statement at the request of the Company or an underwriter of the Company pursuant to the provisions of this Agreement.

(b) Priority on Demand Registration. If any of the Registrable Securities registered pursuant to a Demand Registration are to be sold in a firm commitment underwritten offering, and the managing underwriter(s) advise the Holders of such securities that in its (or their) good-faith opinion the total number or dollar amount of Registrable Securities proposed to be sold in such offering (including, without limitation, securities proposed to be included by other Holders or Minority Holders entitled to include securities in such Registration Statement pursuant to incidental or piggyback registration rights), is such as to adversely affect the success of such offering, then there shall be included in such firm commitment underwritten offering the number or dollar amount of Registrable Securities that in the good faith opinion of such managing underwriter(s) can be sold without adversely affecting such offering, and such number of Registrable Securities shall be allocated as follows, unless the underwriters require a different allocation:

7

(i) first, to the CD&R Investor and its Affiliates that are Holders requesting such registration (whether pursuant to a Demand Notice or pursuant to incidental or piggyback registration rights) and the Minority Holders requesting such registration, *pro rata* on the basis of the percentage of Registrable Securities owned by each such Holder relative to the number of Registrable Securities owned by the CD&R Investor and its Affiliates that are Holders, and in accordance with the Minority Registration Rights Agreements with respect to any Minority Registrable Securities, until, with respect to each such Holder and Minority Holder, all Registrable Securities or Minority Registrable Securities, as applicable, requested for registration by such Holders or Minority Holders have been included in such registration;

(ii) second, among the Holders (other than the CD&R Investor and its Affiliates) requesting such registration pursuant to incidental or piggyback registration rights *pro rata*, with respect to the Holders, on the basis of the percentage of Registrable Securities owned by each such Holder relative to the number of Registrable Securities owned by all such Holders, until, with respect to each such Holder, all Registrable Securities requested for registration by such Holders have been included in such registration; and

(iii) third, the securities for which inclusion in such Demand Registration was requested by the Company.

(c) Cancellation of a Demand Registration. Each Holder that submitted a Demand Notice pursuant to a particular offering and the holders of a majority of the Registrable Securities that are to be registered in a particular offering pursuant to this Section 3 shall have the right, prior to the effectiveness of the Registration Statement, to notify the Company that it or they, as the case may be, have determined that the Registration Statement be abandoned or withdrawn, in which event the Company shall abandon or withdraw such Registration Statement. Any Holder who has elected to sell Registrable Securities in an underwritten offering pursuant to this Section 3 (including the Holder who delivered the Demand Notice of such registration) shall be permitted to withdraw from such registration by written notice to the Company (i) at least two Business Days prior to the effective date of the Registration Statement filed in connection with such registration, or, in the case of an underwritten offering, at least two Business Days prior to the earlier of the anticipated filing of the "red herring" prospectus, if applicable, and the anticipated pricing date, (ii) if the price to the public at which the Registrable Securities are proposed to be sold will be less than 90% of the average closing price of the class of stock being sold in the offering during the ten trading days preceding the date on which the Demand Notice of such offering was given pursuant to Section 3(a) or (iii) if more than 10% of the Registrable Securities requested by such demanding Holder to be included in such registration are not so included.

(d) Limitations on Demand Registrations. The CD&R Investor and its Affiliates that are Holders shall, collectively, be entitled to initiate no more than five Demand Registrations (other than any Short-Form Registrations or any Shelf Underwritten Offerings).

8

(e) Postponements in Requested Registrations. If the filing, initial effectiveness or continued use of a Registration Statement, including a Shelf Registration Statement, with respect to a Demand Registration would require the Company to make a public disclosure of material, non-public information, which disclosure in the good-faith judgment of the Board (after consultation with external legal counsel) (i) would be required to be made in any Registration Statement so that such Registration Statement would not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement and (iii) would reasonably be expected to have a material adverse effect on the Company or its business or on the Company's ability to effect a bona fide material proposed acquisition, disposition, financing, reorganization, recapitalization or similar transaction, and the Company furnishes to the Holders a certificate signed by the Company's Chief Executive Officer or Chief Financial Officer stating such, then the Company may, upon giving prompt written notice of such action to the Holders participating in such registration, delay the filing or initial effectiveness (but not the preparation) of, or suspend use of, such Registration Statement; provided that the Company shall not be permitted to so delay or suspend (x) more than once in any 12-month period or (y) for any single period of time in excess of 60 days. In the event that the Company exercises its rights under the preceding sentence, such Holders agree to suspend, promptly upon receipt of the notice referred to above, the use of any Prospectus relating to such registration in connection with any sale or offer to sell Registrable Securities. The Company covenants and agrees that it shall not deliver a suspension notice with respect to a suspension period unless all of the Company's employees, officers and directors who are subject to any of the Company's policies on trading in securities, and who are prohibited by the terms thereof from effecting any public sales of securities of the Company beneficially owned by them, are so prohibited for the duration of the suspension period. If the Company so postpones the filing of a Prospectus or the effectiveness of a Registration Statement, the demanding Holder shall be entitled to withdraw such request and, if such request is withdrawn, such registration request shall not count for the purposes of the limitations set forth in Section 3(d). The Company shall promptly give the Holders requesting registration thereof pursuant to this Section 3 written notice of any postponement made in accordance with the preceding sentence.

(f) Short-Form Registrations.

(i) The Company shall use its reasonable best efforts to qualify for registration on Form S-3 or any comparable or successor form or forms or any similar short-form registration (a "Short-Form Registration"), and, if requested by any of the CD&R Investor and its Affiliates that are Holders and available to the Company, such Short-Form Registration shall be a "shelf" registration statement providing for the registration of, and the sale on a continuous or delayed basis of, the Registrable Securities, pursuant to Rule 415 or otherwise (a "Shelf Registration Statement"). At any time and from time to time, the CD&R Investor and its Affiliates that are Holders shall be entitled to request an unlimited number of Short-Form Registrations, if available to the Company, with respect to the Registrable Securities held by such requesting Holder in addition to the other registration rights provided in Section 2 and this Section 3. In no event shall the Company be obligated to effect any shelf registration other than pursuant

9

to a Short-Form Registration, subject to the immediately following sentence. No such registration nor any other Short-Form Registration shall count as a Demand Registration for purposes of calculating how many Demand Registrations the CD&R Investor and its Affiliates that are Holders have initiated pursuant to the provisions of Section 3.

(ii) Upon filing any Short-Form Registration, the Company shall use its reasonable best efforts to keep such Short-Form Registration effective with the SEC at all times and to re-file such Short-Form Registration upon its expiration, and to cooperate in any shelf take-down, whether or not underwritten, by amending or supplementing the Prospectus related to such Short-Form Registration as may be reasonably requested by the CD&R Investor and its Affiliates that are Holders or as otherwise required, until such time as all Registrable Securities that could be sold in such Short-Form Registration have been sold or are no longer outstanding. To the extent that the Company becomes ineligible to use Form S-3, the Company shall file a "shelf" registration statement on Form S-1 not later than 45 days after the date of such ineligibility and use its reasonable best efforts to have such registration statement declared effective as promptly as practicable.

(iii) To the extent the Company is a well-known seasoned issuer (as defined in Rule 405) (a "WKSI") at the time any Demand Notice for a Short-Form Registration is submitted to the Company and such Demand Notice requests that the Company file a Shelf Registration Statement, the Company shall file an automatic shelf registration statement (as defined in Rule 405) on Form S-3 (an "Automatic Shelf Registration Statement") in accordance with the requirements of the Securities Act and the rules and regulations of the SEC thereunder, which covers the number or class of Registrable Securities which are requested to be registered. If registering a number of Registrable Securities, the Company shall pay the registration fee for all Registrable Securities to be registered pursuant to an Automatic Shelf Registration Statement at the time of filing of the Automatic Shelf Registration Statement and shall not elect to pay any portion of the registration fee on a deferred basis. The Company shall use its reasonable best efforts to remain a WKSI (and not to become an ineligible issuer (as defined in Rule 405)) during the period during which any Automatic Shelf Registration Statement is effective. If at any time following the filing of an Automatic Shelf Registration Statement when the Company is required to re-evaluate its WKSI status the Company determines that it is not a WKSI, the Company shall use its reasonable best efforts to (A) post-effectively amend the Automatic Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a new Shelf Registration Statement on Form S-3 or, if such form is not available, Form S-1, (B) have such Shelf Registration Statement declared effective by the SEC and (C) keep such Registration Statement effective during the period during which such Short-Form Registration is required to be kept effective in accordance with Section 3(f)(ii).

(g) Shelf Take-Downs. At any time that a Shelf Registration Statement covering Registrable Securities is effective, if any of the CD&R Investor or its Affiliates that are Holders delivers a notice to the Company (a "Take-Down Notice") stating that it intends to effect an underwritten offering of all or part of its Registrable Securities included by it on the shelf registration statement (a "Shelf Underwritten Offering"), then the Company shall amend or

10

supplement the Shelf Registration Statement as may be necessary in order to enable such Registrable Securities to be distributed pursuant to the Shelf Underwritten Offering (taking into account the inclusion of Registrable Securities by any other Holders pursuant to Section 3(g)(i)). The CD&R Investor and its Affiliates that are Holders shall be entitled to request an unlimited number of shelf take-downs to effect a Shelf Underwritten Offering, if available to the Company, with respect to the Registrable Securities held by such Holders in addition to the other registration rights provided in Section 2 and this Section 3. In connection with any Shelf Underwritten Offering:

(i) the Company shall also deliver the Take-Down Notice to all other Holders with securities included on such Shelf Registration Statement and permit each such Holder to include its Registrable Securities included on the Shelf Registration Statement in the Shelf Underwritten Offering if such Holder notifies the requesting Holder and the Company within two calendar days after distribution or dissemination (including via e-mail, if available) of the Take-Down Notice to such Holder; and

(ii) in the event that the underwriter advises such requesting Holder and the Company in its good-faith opinion that the total number or dollar amount of Registrable Securities proposed to be sold in such offering is such as to adversely affect the success of such offering (including, without limitation, adversely affect the per-share offering price), then the underwriter may limit the number of shares which would otherwise be included in such take-down offering in the same manner as described in Section 3(b) with respect to a limitation of shares to be included in a registration.

(h) <u>Registration Statement Form</u>. If any registration requested pursuant to this Section 3 which is proposed by the Company to be effected by the filing of a Registration Statement on Form S-3 (or any successor or similar short-form registration statement) shall be in connection with an underwritten offering, and if the managing underwriter(s) shall advise the Company that, in its (or their) good-faith opinion, the use of another form of Registration Statement is of material importance to the success of such proposed offering or is otherwise required by applicable law, then such registration shall be effected on such other form.

(i) <u>Selection of Underwriters</u>. If any of the CD&R Investor or its Affiliates that are Holders intends that the Registrable Securities requested to be covered by a Demand Registration or Take-Down Notice, as applicable, requested by such demanding Holder shall be distributed by means of an underwritten offering, such Holder shall so advise the Company as a part of the Demand Notice or Take-Down Notice, as applicable, and the Company shall include such information in the notice sent by the Company to the other Holders with respect to such Demand Registration or Shelf Underwritten Offering, as applicable. In such event, the lead underwriter to administer the offering shall be chosen by the demanding Holder, subject to the prior written consent, not to be unreasonably withheld or delayed, of the Company. If the offering is underwritten, the right of any Holder to registration pursuant to this Section 3 will be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise agreed by the demanding Holder) and each such Holder will (together with the Company and the other Holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting (including, without

11

limitation, pursuant to the terms of any underwriter option or "green shoe" option requested by the managing underwriter(s)), provided that (x) no Holder shall be required to sell more than the number of Registrable Securities that such Holder has requested the Company to include in any registration, (y) if any Holder disapproves of the terms of the underwriting, such Holder may elect to withdraw therefrom by written notice to the Company, the managing underwriter(s) and, in connection with an underwritten registration pursuant to this Section 3, the demanding Holder and (z) no such Person (other than the Company) shall be required to make any representations or warranties other than those related to title and ownership of, and power and authority to transfer, shares and as to the accuracy and completeness of statements made in a Registration Statement, Prospectus or other document in reliance upon, and in conformity with, written information prepared and furnished to the Company or the managing underwriter(s) by such Person pertaining exclusively to such Holder; provided, further, that no Holder shall be required to agree to any indemnification obligations on the part of such Holder that are greater than its obligations pursuant to Section 5.

4. Registration Procedures. If and whenever the Company is required to use its reasonable best efforts to effect the registration of any Registrable Securities under the Securities Act as provided in Section 2 and Section 3, the Company shall effect such registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and, pursuant thereto, the Company shall cooperate in the sale of such Registrable Securities and shall, as expeditiously as possible:

(a) prepare and file, in each case as promptly as practicable, with the SEC a Registration Statement or Registration Statements on such form as shall be available for the sale of the Registrable Securities by the Holders thereof or by the Company in accordance with the intended method or methods of distribution thereof, make all required filings with FINRA, and, if such Registration Statement is not automatically effective upon filing, use its reasonable best efforts to cause such Registration Statement to be declared effective as soon as practicable and to remain effective as provided herein; provided that before filing a Registration Statement or Prospectus or any amendments or supplements thereto (including free writing prospectuses under Rule 433 (each a "Free Writing Prospectus")) and, to the extent reasonably practicable, documents that would be incorporated by reference or deemed to be incorporated by reference in a Registration Statement filed pursuant to a Demand Notice (other than a Shelf Registration Statement), the Company shall (i) furnish or otherwise make available to the holders of the Registrable Securities covered by such Registration Statement, their counsel and the managing underwriter(s), if any, copies of all such documents proposed to be filed (including exhibits thereto), which documents will be subject to the reasonable review and comment of such counsel, and such other documents reasonably requested by such counsel, including any comment letter from the SEC and (ii) if requested by such counsel, provide such counsel (A) reasonable opportunity to participate in the preparation of such Registration Statement and each Prospectus included therein and (B) such other opportunities to conduct a reasonable investigation within the meaning of the Securities Act, including reasonable access to the Company's books and records, officers, accountants and other advisors. The Company shall not file any such Registration Statement or Prospectus, or any amendments or supplements thereto (including such documents that, upon filing, would be incorporated or deemed incorporated by reference

12

therein and including Free Writing Prospectuses), with respect to a Demand Registration to which the demanding Holder, the holders of a majority of the Registrable Securities covered by such Registration Statement (or their counsel) or the managing underwriter(s), if any, shall reasonably object, in writing, on a timely basis, unless, in the opinion of the Company, such filing is necessary to comply with applicable law;

(b) (i) prepare and file with the SEC such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith and such Free Writing Prospectuses and Exchange Act reports as may be necessary to keep such Registration Statement continuously effective during the period provided herein, (ii) comply in all material respects with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement and (iii) cause the related Prospectus to be supplemented by any Prospectus supplement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of the securities covered by such Registration Statement, and as so supplemented, to be filed pursuant to Rule 424 (or any similar provisions then in force) under the Securities Act, in each case, until such time as all of such securities have been disposed of in accordance with the intended method or methods of disposition by the seller or sellers thereof set forth in such Registration Statement;

(c) notify each selling Holder, its counsel and the managing underwriter(s), if any, (i) when a Prospectus or any Prospectus supplement or post-effective amendment or any Free Writing Prospectus has been filed, and, with respect to a Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC or any other federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or for additional information, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceedings for that purpose, (iv) if at any time the Company has reason to believe that the representations and warranties of the Company contained in any agreement (including any underwriting agreement) contemplated by Section 4(n) cease to be true and correct, (v) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of such Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose, and (vi) of the happening of any event that makes any statement made in such Registration Statement, related Prospectus, Free Writing Prospectus, amendment or supplement thereto, or any document incorporated or deemed to be incorporated therein by reference, as then in effect, untrue in any material respect or that requires the making of any changes in such Registration Statement, Prospectus or documents so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the Prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (which notice shall notify the selling Holders only of the occurrence of such an event and shall provide no additional information regarding such event to the extent such information would constitute material, non-public information);

13

(d) use its reasonable best efforts to obtain the withdrawal of any order suspending the effectiveness of a Registration Statement or the lifting of any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction at the earliest date reasonably practical;

(e) if requested by the managing underwriter(s), if any, a Holder making a Demand Notice or Take-Down Notice with respect to such offering or the holders of a majority of the then issued and outstanding Registrable Securities being sold in connection with an underwritten offering, promptly include in a Prospectus supplement or post-effective amendment such information as the managing underwriter(s), if any, or such Holder or Holders, as the case may be, may reasonably request in order to facilitate the disposition of the Registrable Securities in accordance with the intended method or methods of distribution of such securities set forth in the Registration Statement and make all required filings of such Prospectus supplement or such post-effective amendment as soon as practicable after the Company has received such request (provided that the Company shall not be required to take any actions under this Section 4(e) that are not, in the opinion of counsel for the Company, in compliance with applicable law);

(f) deliver to each selling Holder, its counsel, and the underwriter(s), if any, without charge, as many copies of the Prospectus or Prospectuses (including each form of Prospectus) and each amendment or supplement thereto (including any Free Writing Prospectus) as such Persons may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities in accordance with the intended method or methods of disposition thereof (the Company, subject to the last paragraph of this Section 4, hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders and the underwriter(s), if any, in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any such amendment or supplement thereto);

(g) prior to any public offering of Registrable Securities, use its reasonable best efforts to register or qualify or cooperate with the selling Holders, the underwriter(s), if any, and their respective counsel in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or blue sky laws of such jurisdictions within the United States as any seller or underwriter reasonably requests in writing and to keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective and to take any other action that may be necessary or advisable to enable such Holders to consummate the disposition of such Registrable Securities in such jurisdiction in accordance with the intended method or methods of disposition thereof; provided that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 4(g), (y) subject itself to taxation in any jurisdiction wherein it is not so subject or (z) take any action that would subject it to general service of process in any such jurisdiction where it is not then so subject (other than service of process in connection with such registration or qualification or any sale of Registrable Securities in connection therewith);

14

(h) cooperate with the selling Holders and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates (not bearing any legends, unless required by applicable law) or book-entry positions representing Registrable Securities to be sold after receiving written representations from such selling Holders that the Registrable Securities represented by the certificates or book-entry positions so delivered by such Holder will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriter(s), if any, or the selling Holders may request;

(i) use its reasonable best efforts to cause the Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental agencies or authorities within the United States as may be necessary in light of the business or operations of the Company to enable the seller or sellers thereof or the managing underwriter(s), if any, to consummate the disposition of such Registrable Securities, in accordance with the intended method or methods thereof, except as may be required solely as a consequence of the nature of such selling Holder's business, in which case the Company will cooperate in all reasonable respects with the filing of such Registration Statement and the granting of such approvals, as may be necessary to enable the seller or sellers thereof or the underwriter(s), if any, to consummate the disposition of such Registrable Securities in accordance with the intended method or methods thereof;

(j) upon the occurrence of any event contemplated by Section 4(c)(vi) above, promptly prepare a supplement or post-effective amendment to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such Prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(k) prior to the effective date of the Registration Statement relating to the Registrable Securities, provide a CUSIP number for the Registrable Securities;

(l) provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of such Registration Statement (and in connection therewith, if required by the Company's transfer agent, the Company will promptly after the effective date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to and maintained with such transfer agent, together with any other authorizations, certificates and directions required by the transfer agent which authorize and direct the transfer agent to issue such Registrable Securities without any legend upon sale by the Holder or the underwriter(s) of an underwritten offering of Registrable Securities, if any, of such Registrable Securities under the Registration Statement);

15

(m) use its reasonable best efforts to cause all shares of Registrable Securities covered by such Registration Statement to be listed on a national securities exchange if shares of the particular class of Registrable Securities are at that time listed on such exchange prior to the effectiveness of such Registration Statement;

(n) enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other actions reasonably requested by a Holder submitting a Demand Notice or Take-Down Notice with respect to such offering, or the holders of a majority of the Registrable Securities being sold in connection therewith (including those reasonably requested by the managing underwriter(s), if any) to expedite or facilitate the disposition of such Registrable Securities, and including, whether or not an underwriting agreement is entered into and whether or not the registration is an underwritten registration, (i) making such representations and warranties to the Holders and the underwriter(s), if any, with respect to the business of the Company and its material Subsidiaries, and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by issuers to underwriters in underwritten offerings, and, if true, confirming the same if and when requested, (ii) using its reasonable best efforts to furnish to the selling Holders opinions of outside counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriter(s), if any, and counsels to the selling Holders), addressed to each selling Holder and each of the underwriters, if any, covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (iii) using its reasonable best efforts to obtain "cold comfort" letters and updates thereof from an independent registered public accounting firm with respect to the Company (and, if necessary, any other independent certified public accountants of any material Subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement) who has certified the financial statements included in such Registration Statement, addressed to each selling Holder (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, if any, with such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iv) if an underwriting agreement is entered into, causing such underwriting agreement to contain indemnification provisions and procedures that are customary for underwriting agreements in connection with underwritten offerings except as otherwise agreed by the parties thereto and (v) delivering such documents and certificates as may be reasonably requested by a Holder submitting a Demand Notice or Take-Down Notice with respect to such offering, the holders of a majority of the Registrable Securities being sold pursuant to such Registration Statement, its or their counsel, as the case may be, or the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to Section 4(n)(i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company (it being understood that the above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder);

16

(o) upon reasonable notice, make available for inspection by a representative of the selling Holders, the underwriter(s) participating in any such disposition of Registrable Securities, if any, and any attorneys or accountants retained by such selling Holders or underwriter at the offices where normally kept, during reasonable business hours, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries, and cause the officers, directors and employees of the Company and its Subsidiaries to supply all information in each case reasonably requested by any such representative, underwriter, attorney or accountant in connection with such Registration Statement (provided that any information that is not generally publicly available at the time of delivery of such information shall be kept confidential by such Persons unless (x) disclosure of such information is required by court or administrative order, (y) disclosure of such information, in the opinion of counsel to such Person, is required by applicable law or applicable legal process, or (z) such information becomes generally available to the public other than as a result of a disclosure or failure to safeguard by such Person; provided, further, that in the case of a proposed disclosure pursuant to clause (x) or (y) above, such Person shall be required to give the Company written notice of the proposed disclosure prior to such disclosure and, if requested by the Company, assist the Company in seeking to prevent or limit the proposed disclosure) (it being agreed, without limiting the foregoing, that no such information shall be used by such Person as the basis for any market transactions in securities of the Company or its Subsidiaries in violation of applicable law);

(p) cause its officers to use their reasonable best efforts to support the marketing of the Registrable Securities covered by the Registration Statement (including, without limitation, participation in such number of "road shows" and other customary marketing activities, including "one-on-one" meetings with prospective purchasers of the Registrable Securities, in each case as the underwriter(s) reasonably request);

(q) cooperate with each seller of Registrable Securities and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA;

(r) otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement, which earnings statement will satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 under the Securities Act; and

(s) cooperate with the Holders of Registrable Securities subject to the Registration Statement and with the underwriter(s) or agent participating in the distribution, if any, to facilitate any Charitable Gifting Event and to prepare and file with the SEC such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to permit any such recipient Charitable Organization to sell in the underwritten offering if it so elects.

17

The Company may require each holder of Registrable Securities as to which any registration is being effected to furnish to the Company in writing such information required in connection with such registration regarding such seller and the distribution of such Registrable Securities as the Company may, from time to time, reasonably request and the Company may exclude from such registration the Registrable Securities of any Holder who unreasonably fails to furnish such information within a reasonable time after receiving such request.

The Company agrees not to file or make any amendment to any Registration Statement with respect to any Registrable Securities, or any amendment of or supplement to the Prospectus or any Free Writing Prospectus used in connection therewith, that refers to any Holder covered thereby by name, or otherwise identifies such Holder as the holder of any securities of the Company, without the consent of such Holder, such consent not to be unreasonably withheld or delayed, unless and to the extent such disclosure is required by applicable law, in which case the Company shall provide written notice to such Holder no less than five Business Days prior to the filing of such amendment to any Registration Statement or amendment of or supplement to the Prospectus or any Free Writing Prospectus.

If the Company files any Shelf Registration Statement for the benefit of the holders of any of its securities other than the Holders, the Company agrees that it shall use its reasonable best efforts to include in such registration statement such disclosures as may be required by Rule 430B under the Securities Act (referring to the unnamed selling security holders in a generic manner by identifying the initial offering of the securities to the Holders) in order to ensure that the Holders may be added to such Shelf Registration Statement at a later time through the filing of a Prospectus supplement rather than a post-effective amendment.

Each Holder agrees that if such Holder has Registrable Securities covered by such Registration Statement that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 4(c)(ii), 4(c)(iii), 4(c)(iv), 4(c)(v) and 4(c)(vi), such Holder will promptly discontinue disposition of such Registrable Securities covered by such Registration Statement or Prospectus until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by Section 4(j), or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed and has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus; provided that the time periods under Section 3 with respect to the length of time that the effectiveness of a Registration Statement must be maintained shall automatically be extended by the amount of time the Holder is required to discontinue disposition of such securities.

Notwithstanding any provision hereof to the contrary, to the extent that any *pro rata* or other allocation or reduction of Registrable Securities is required pursuant to Sections 2(b), 3(b), 3(g)(ii) or any other section herein, (i) all Common Stock transferred by a Holder to a Charitable Organization in connection with an underwritten offering for which such *pro rata* or other allocation is required shall be included in the number of Registrable Securities deemed to be held by each Holder (or deemed to be included in such Holder's request for inclusion of Registrable

18

Securities) for purposes of calculating such Holder's *pro rata* allocation or reduction in such underwritten offering and (ii) the number of Registrable Securities that a Holder is otherwise entitled to include in such underwritten offering shall be reduced by the number of shares of Common Stock transferred by such Holder to a Charitable Organization in connection with such underwritten offering.

5. Indemnification.

(a) Indemnification by the Company. The Company shall, without limitation as to time, indemnify and hold harmless, to the fullest extent permitted by applicable law, each Holder whose Registrable Securities are covered by a Registration Statement or Prospectus, the officers, directors, partners, members, managers, shareholders, accountants, attorneys, agents and employees of each of them, each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) each such Holder and the officers, directors, partners, members, managers, shareholders, accountants, attorneys, agents and employees of each such controlling person, each underwriter, if any, and each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such underwriter (each such person being referred to herein as a "Covered Person"), from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, costs of preparation and reasonable attorneys' fees and any legal or other fees or expenses incurred by such Person in connection with any investigation or proceeding), expenses, judgments, fines, penalties, charges and amounts paid in settlement (collectively, "Losses"), as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Prospectus, offering circular, or other document (including any related Registration Statement, notification, or the like or Free Writing Prospectus or any amendment thereof or supplement thereto or any document incorporated by reference therein) incident to any such registration, qualification, or compliance, or based on any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation thereunder applicable to the Company and relating to any action or inaction in connection with the related offering of Registrable Securities, and will reimburse each such Covered Person for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such Loss; provided that the Company will not be liable in any such case to the extent that any such Loss arises out of or is based on any untrue statement or omission by such Covered Person relating to such Covered Person or its Affiliates (other than the Company or any of its Subsidiaries), but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such Registration Statement, Prospectus, offering circular, Free Writing Prospectus or any amendment thereof or supplement thereto, or any document incorporated by reference therein, or other document in reliance upon and in conformity with written information furnished to the Company by such Covered Person with respect to such Covered Person for use therein. It is agreed that the indemnity agreement contained in this Section 5(a) shall not apply to amounts paid in settlement of any such Loss or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld or delayed).

19

(b) <u>Indemnification by Holder of Registrable Securities</u>. As a condition to including any Registrable Securities in any Registration Statement filed in accordance with Section 4, the Company shall have received an undertaking reasonably satisfactory to it from the participating Holder of such Registrable Securities to indemnify, to the fullest extent permitted by applicable law, severally and not jointly with any other holders of Registrable Securities whose Registrable Securities are included in any such Registration Statement, the Company, its directors and officers and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) the Company and any other Person selling securities in such Registration Statement, from and against all Losses arising out of or based on any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, Prospectus, Free Writing Prospectus, offering circular, or other document, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company, such directors and officers, and controlling persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such Loss, in each case to the extent, but only to the extent, that such untrue statement or omission is made in such Registration Statement, Prospectus, Free Writing Prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Holder with respect to such Holder for inclusion in such Registration Statement, Prospectus, offering circular or other document; provided that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such Losses (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld or delayed); provided, further, that the liability of such Holder shall be individual, not joint and several, for each Holder and shall be limited to the net proceeds received by such selling Holder from the sale of Registrable Securities covered by such Registration Statement (less the aggregate amount of any damages which the Holder has otherwise been required to pay in respect of such Loss or any substantially similar Loss arising from the sale of such Registrable Securities).

(c) <u>Conduct of Indemnification Proceedings</u>. If any Person shall be entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall give prompt notice to the Party from which such indemnity is sought (the "<u>Indemnifying Party</u>") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; <u>provided</u> that the delay or failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any obligation or liability under this Section 5. The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding, to, unless in the Indemnified Party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such claim, assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; <u>provided</u> that an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (<u>i</u>) the Indemnifying Party agrees to pay such fees and expenses or (<u>ii</u>) the Indemnifying Party fails promptly to assume, or in the event of a conflict of interest cannot assume, the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party, in which case the Indemnified Party shall have the right to employ counsel and to assume the defense of such claim or proceeding at the Indemnifying Party's expense; <u>provided</u>, <u>further</u>, that the Indemnifying Party shall not, in

20

connection with any one such claim or proceeding or separate but substantially similar or related claims or proceedings in the same jurisdiction, arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one firm of attorneys (together with appropriate local counsel) at any time for all of the Indemnified Parties, or for fees and expenses that are not reasonable. Whether or not such defense is assumed by the Indemnifying Party, such Indemnifying Party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld or delayed). Without the prior written consent of the Indemnified Party, the Indemnifying Party shall not consent to entry of any judgment or enter into any settlement that (x) does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release, in form and substance reasonably satisfactory to the Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder or (y) involves the imposition of equitable remedies or the imposition of any obligations on the Indemnified Party or adversely affects such Indemnified Party other than as a result of financial obligations for which such Indemnified Party would be entitled to indemnification hereunder.

(d) Contribution. If the indemnification provided for in this Section 5 is unavailable to an Indemnified Party in respect of any Losses (other than in accordance with its terms), then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party, on the one hand, and Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made (or omitted) by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent any such action, statement or omission.

The Parties agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), the amount any Holder will be obligated to contribute pursuant to this Section 5(d) will be limited to an amount equal to the net proceeds to such Holder from the Registrable Securities sold pursuant to the Registration Statement which gives rise to such obligation to contribute (less the aggregate amount of any damages which the Holder has otherwise been required to pay in respect of such Loss or any substantially similar Loss arising from the sale of such Registrable Securities). No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. No selling Holder shall be liable for contribution under this Section 5(d), except under such circumstances as such selling Holder would have been liable for indemnification under this Section 5 if such indemnification were enforceable under applicable law.

21

Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten offering are more favorable to the Holders than the foregoing provisions, the provisions in the underwriting agreement shall control.

(e) Deemed Underwriter. To the extent that any of the Holders is, or would be expected to be, deemed to be an underwriter of Registrable Securities pursuant to any SEC comments or policies or any court of law or otherwise, the Company agrees that (i) the indemnification and contribution provisions contained in this Section 5 shall be applicable to the benefit of such Holder in its role as deemed underwriter in addition to its capacity as a Holder (so long as the amount for which any other Holder is or becomes responsible does not exceed the amount for which such Holder would be responsible if the Holder were not deemed to be an underwriter of Registrable Securities) and (ii) such Holder and its representatives shall be entitled to conduct the due diligence which would normally be conducted in connection with an offering of securities registered under the Securities Act, including receipt of customary opinions and comfort letters.

(f) Other Indemnification. Indemnification similar to that specified in the preceding provisions of this Section 5 (with appropriate modifications) shall be given by the Company and each seller of Registrable Securities with respect to any required registration or other qualification of securities under any federal or state law or regulation or governmental authority other than the Securities Act.

(g) Non-Exclusivity. The obligations of the Parties under this Section 5 shall be in addition to any liability that any Party may otherwise have to any other Party.

(h) Primacy of Indemnification. The Company hereby acknowledges that the CD&R Investor and its Affiliates that are Holders have certain rights to indemnification, advancement of expenses and/or insurance provided by certain of their Affiliates (collectively, the "Indemnitors"). The Company hereby agrees that (i) it is the indemnitor of first resort (i.e., its obligations to the CD&R Investor and its Affiliates that are Holders are primary and any obligation of the Indemnitors to advance expenses or to provide indemnification for the same Losses incurred by the CD&R Investor and its Affiliates that are Holders are secondary to any such obligation of the Company), (ii) that it shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement and the articles and other organizational documents of the Company (or any other agreement between the Company and the CD&R Investor or its Affiliates that are Holders), without regard to any rights the CD&R Investor and its Affiliates that are Holders may have against the Indemnitors, and (iii) it irrevocably waives, relinquishes and releases the Indemnitors from any and all claims (x) against the Indemnitors for contribution, indemnification, subrogation or any other recovery of any kind in respect thereof and (y) that the CD&R Investor and its Affiliates that are Holders must seek indemnification from any Indemnitor before the Company must perform its indemnification obligations under this Agreement. No advancement or payment by the Indemnitors on behalf of the CD&R Investor or its Affiliates that are Holders with respect to any claim for which the CD&R Investor or its Affiliates that are Holders has sought indemnification from the Company hereunder shall affect the foregoing. The Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery which

22

the CD&R Investor and its Affiliates that are Holders would have had against the Company if the Indemnitors had not advanced or paid any amount to or on behalf of the CD&R Investor and its Affiliates that are Holders. The Company and the CD&R Investor and its Affiliates that are Holders agree that the Indemnitors are express third party beneficiaries of this Section 5.

6. <u>Registration Expenses</u>. All reasonable fees and expenses incurred in the performance of or compliance with this Agreement by the Company including, without limitation, (<u>i</u>) all registration and filing fees (including, without limitation, fees and expenses (<u>A</u>) with respect to filings required to be made with the SEC, all applicable securities exchanges and/or FINRA and (<u>B</u>) with respect to compliance with securities or blue sky laws, including, without limitation, any fees and disbursements of counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities pursuant to Section 4(g)), (<u>ii</u>) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing Prospectuses if the printing of Prospectuses is requested by the managing underwriter(s), if any, or by a Holder submitting a Demand Notice or Take-Down Notice with respect to such offering or the holders of a majority of the Registrable Securities included in any Registration Statement), (<u>iii</u>) messenger, telephone and delivery expenses of the Company, (<u>iv</u>) fees and disbursements of counsel for the Company, (<u>v</u>) expenses of the Company incurred in connection with any road show, (<u>vi</u>) fees and disbursements of all independent registered public accounting firms referred to in Section 4(n) (including, without limitation, the expenses of any "cold comfort" letters required by this Agreement) and any other Persons, including special experts retained by the Company, (<u>vii</u>) fees and disbursements of separate counsel for the CD&R Investor and its Affiliates that are Holders if any of them is participating in the offering (which counsel shall be selected by such participating Holders) and one counsel for the other Holders whose Registrable Securities are included in a Registration Statement (which counsel shall be selected by the holders of a majority of the Registrable Securities included in such Registration Statement), (<u>viii</u>) all reasonable fees and disbursements of underwriters (other than those described in the next paragraph) customarily paid by issuers or sellers of securities and (<u>ix</u>) all other costs, fees and expenses incident to the Company's performance or compliance with this Agreement, shall be borne by the Company whether or not any Registration Statement is filed or becomes effective. In addition, the Company shall pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange on which similar securities issued by the Company are then listed and rating agency fees and the fees and expenses of any Person, including special experts, retained by the Company.

The Company shall not be required to pay (<u>i</u>) fees and disbursements of any counsel retained by any Holder or by any underwriter (except as set forth above in this Section 6), (<u>ii</u>) any underwriter's fees (including discounts, commissions or fees of underwriters, selling brokers, dealer managers or similar securities industry professionals) relating to the distribution of the Registrable Securities (other than with respect to Registrable Securities sold by the Company), or (<u>iii</u>) any other expenses of the Holders not specifically required to be paid by the Company pursuant to the first paragraph of this Section 6.

23

7. Rule 144. The Company covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder (or, if the Company is not required to file such reports, it will, upon the request of any of the CD&R Investor or its Affiliates that are Holders, make publicly available such information so long as necessary to permit sales of Registrable Securities pursuant to Rule 144), and it will take such further action as any Holder (or, if the Company is not required to file reports as provided above, any of the CD&R Investor or its Affiliates that are Holders) may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144. Upon the request of any Holder, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements and, if not, the specific requirements with which it did not so comply.

8. Certain Additional Agreements. If any Registration Statement or comparable statement under state blue sky laws refers to any Holder by name or otherwise as the holder of any securities of the Company, then such Holder shall have the right to require (a) the insertion therein of language, in form and substance satisfactory to such Holder and the Company, to the effect that the holding by such Holder of such securities is not to be construed as a recommendation by such Holder of the investment quality of the Company's securities covered thereby and that such holding does not imply that such Holder will assist in meeting any future financial requirements of the Company, or (b) in the event that such reference to such Holder by name or otherwise is not in the judgment of the Company required by the Securities Act or any similar federal statute or any state blue sky or securities law then in force, the deletion of the reference to such Holder.

9. Miscellaneous.

(a) Termination. The provisions of this Agreement (other than Sections 5 and 6) shall terminate upon the earliest to occur of (i) its termination by the written agreement of all Parties or their respective successors in interest, (ii) with respect to a Holder, the date on which all shares of Common Stock held by such Holder have ceased to be Registrable Securities, (iii) with respect to the Company, the date on which all shares of Common Stock have ceased to be Registrable Securities and (iv) the dissolution, liquidation or winding up of the Company. Nothing herein shall relieve any Party from any liability for the breach of any of the agreements set forth in this Agreement.

(b) Holdback Agreement. In consideration for the Company agreeing to its obligations under this Agreement, each Holder agrees in connection with any registration of the Company's securities (whether or not such Holder is participating in such registration) upon the request of the Company and the underwriter(s) managing any underwritten offering of the Company's securities, not to effect (other than pursuant to such registration) any public sale or distribution of Registrable Securities, including, but not limited to, any sale pursuant to Rule 144, or make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of, or enter into any swap or other arrangement that transfers to another Person any of the economic consequences of ownership of, any Registrable Securities, any other equity securities of the Company or any securities convertible into or exchangeable or exercisable for any equity securities of the Company without the prior written consent of the Company or such underwriters, as the case may be, during the Holdback Period.

24

If any registration pursuant to Section 3 shall be in connection with any underwritten offering, the Company will not effect any public sale or distribution of any common equity (or securities convertible into or exchangeable or exercisable for common equity) (other than a registration statement (i) on Form S-4, Form S-8 or any successor forms promulgated for similar purposes or (ii) filed in connection with any employee benefit or dividend reinvestment plan) for its own account, during the Holdback Period.

(c) <u>Amendments and Waivers</u>. This Agreement may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if any such amendment, action or omission to act, has received the written consent of the Company and each of the CD&R Investor and its Affiliates that are Holders, or if no such Holders remain, the holders of a majority of the Registrable Securities; <u>provided</u> that this Agreement may not be amended in a manner that would, by its terms, adversely affect the rights or obligations of the CD&R Investor or its Affiliates that are Holders without the consent of such Holders; <u>provided</u>, <u>further</u>, that this Agreement may not be amended in a manner that would, by its terms, adversely affect the rights or obligations of any Holder which does not adversely affect the rights or obligations of all similarly situated Holders in the same manner without the consent of such Holder. The failure of any Party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such Party thereafter to enforce each and every provision of this Agreement in accordance with its terms. Any Holder may waive (in writing) the benefit of any provision of this Agreement with respect to itself for any purpose. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Holder granting such waiver in any other respect or at any other time.

(d) <u>Successors, Assigns and Transferees</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns who agree in writing to be bound by the provisions of this Agreement. In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement that are for the benefit of Holders shall also be for the benefit of and enforceable by any subsequent Holder, subject to the provisions contained herein.

(e) <u>Notices</u>. All notices, requests and other communications to any Party shall be in writing (including e-mail transmission) and shall be given as follows, or to such other address or e-mail as such Party may hereafter specify for the purpose by notice to the other Parties:

if to the Company, to:

agilon health, inc.
1 World Trade Center
Suite 2000
Long Beach, CA 90831
Attention: Chief Business Officer
Email: ted.halkias@agilonhealth.com

25

with a copy (which shall not constitute notice) to:

> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Peter J. Loughran, Esq. and Paul M. Rodel, Esq.
> Email: pjloughran@debevoise.com; pmrodel@debevoise.com

if to the CD&R Investor, to:

> Clayton, Dubilier & Rice, LLC
> 375 Park Avenue
> 18th Floor
> New York, New York 10152
> Attention: Chief Financial Officer
> Email: Finance@cdr-inc.com

with a copy (which shall not constitute notice) to:

> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Peter J. Lougran, Esq. and Paul M. Rodel, Esq.
> Email: pjloughran@debevoise.com; pmrodel@debevoise.com

If to any other Holder, to the e-mail or address of such other Holder as shown in the stock record book of the Company.

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:30 p.m. on a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding Business Day in the place of receipt.

(f) Further Assurances. At any time or from time to time after the date hereof, the Parties agree to cooperate with each other, and at the request of any other Party, to execute and deliver any further instruments or documents and to take all such further action as the other Party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the Parties hereunder. To the fullest extent permitted by applicable law, the Company shall not directly or indirectly take any action that is intended to, or would reasonably be expected to result in, any Holder being deprived of the rights contemplated by this Agreement.

(g) No Inconsistent Agreements. Without the approval of the CD&R Investor or its Affiliates holding a majority of the Registrable Securities, subsequent to the date hereof, neither the Company nor any of its Subsidiaries shall enter into any agreement granting registration rights to any other Person; provided, that this Section 9(g) shall not apply the extension of customary registration rights in connection with the sale of debt securities or convertible debt securities.

26

(h) <u>Entire Agreement; No Third-Party Beneficiaries</u>. This Agreement (<u>i</u>) except as may be provided in a Joinder Agreement, constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes any prior discussions, correspondence, negotiation, proposed term sheet, agreement, understanding or agreement and there are no agreements, understandings, representations or warranties between the Parties other than those set forth or referred to in this Agreement and (<u>ii</u>) except as provided in Section 5 with respect to an Indemnified Party, is not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

(i) <u>Governing Law; Jurisdiction and Forum; Waiver of Jury Trial</u>.

(i) This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed and to be performed wholly within such State and without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.

(ii) Each Party irrevocably submits to the jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in such district any suit, action or other proceeding arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such suit, action or proceeding may be heard and determined in such court. Each Party hereby irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such suit, action or other proceeding. The Parties further agree, to the extent permitted by applicable law, that final and unappealable judgment against any of them in any suit, action or other proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment.

(iii) EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(j) <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

27

(k) <u>Enforcement</u>. Each Party acknowledges that money damages would not be an adequate remedy in the event that any of the covenants or agreements in this Agreement are not performed in accordance with its terms, and it is therefore agreed that in addition to and without limiting any other remedy or right it may have, the non-breaching Party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically the terms and provisions hereof.

(l) <u>Titles and Subtitles</u>. The titles of the sections and subsections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

(m) <u>No Recourse</u>. This Agreement may only be enforced against, and any claims or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as Parties hereto and no past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any Party hereto shall have any liability for any obligations or liabilities of the Parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

(n) <u>Counterparts; PDF Signatures</u>. This Agreement may be executed in any number of counterparts (including via facsimile and electronic transmission), each of which shall be an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of this Agreement by one Party to the others may be made by facsimile, electronic mail, other electronic format (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of page left intentionally blank]*

28

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

AGILON HEALTH, INC.

By: /s/ Theodore Halkias
      Name: Theodore Halkias
      Title: Chief Business Officer

[*Signature Page – Registration Rights Agreement*]

CD&R VECTOR HOLDINGS, L.P.

By:  CD&R Investment Associates IX, Ltd., its general partner

By:  /s/ Rima Simson
Name: Rima Simson
Title: Vice President, Treasurer and Secretary

[*Signature Page – Registration Rights Agreement*]

JOINDER AGREEMENT

Reference is made to the Registration Rights Agreement, dated as of April 16, 2021 (as amended from time to time, the "Registration Rights Agreement"), by and among agilon health, inc. (the "Company") and certain stockholders of the Company party thereto. The undersigned agrees, by execution hereof, to become a party to, and to be subject to the rights and obligations under, the Registration Rights Agreement, other than the obligations set forth in the first paragraph of Section 9(b) thereof.

[NAME]

By: _____
    Name:
    Title:

Date:

Address:

Acknowledged by:

AGILON HEALTH, INC.

By: _____
    Name:
    Title:

Date:

A-1

STOCKHOLDERS AGREEMENT

of

AGILON HEALTH, INC.

Dated as of April 16, 2021

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITIONS |  | 1 |
| 1.1 Certain Defined Terms |  | 1 |
| 1.2 Other Definitional Provisions |  | 4 |
| ARTICLE II CORPORATE GOVERNANCE |  | 5 |
| 2.1 Board Representation |  | 5 |
| 2.2 Available Financial Information |  | 7 |
| 2.3 Other Information |  | 8 |
| 2.4 Access |  | 9 |
| 2.5 Termination of Rights |  | 9 |
| ARTICLE III MISCELLANEOUS |  | 9 |
| 3.1 Confidentiality |  | 9 |
| 3.2 Amendments and Waivers |  | 10 |
| 3.3 Successors, Assigns and Permitted Transferees |  | 10 |
| 3.4 Notices |  | 10 |
| 3.5 Further Assurances |  | 11 |
| 3.6 Entire Agreement; No Third Party Beneficiaries |  | 11 |
| 3.7 Restrictions on Other Agreements; By-laws |  | 12 |
| 3.8 Governing Law |  | 12 |
| 3.9 Jurisdiction and Forum; Waiver of Jury Trial |  | 12 |
| 3.10 Severability |  | 12 |
| 3.11 Enforcement |  | 12 |
| 3.12 Titles and Subtitles |  | 13 |
| 3.13 Effectiveness |  | 13 |
| 3.14 No Recourse |  | 13 |
| 3.15 Counterparts; Facsimile Signatures |  | 13 |
| Exhibit A – Joinder Agreement |  |  |

THIS STOCKHOLDERS AGREEMENT is entered into as of April 16, 2021, by and among agilon health, inc., a Delaware corporation (and any successor in interest thereto, the "Company"), CD&R Vector Holdings, L.P., a Cayman Islands exempted limited partnership (and any successor in interest thereto, the "CD&R Investor"), and any Person who executes a Joinder Agreement in the form of Exhibit A hereto (each, a "Stockholder" and collectively, the "Stockholders"). Capitalized terms used herein without definition shall have the meanings set forth in Section 1.1.

RECITALS

WHEREAS, the Company intends to undertake an underwritten initial public offering (the "IPO") of Common Stock; and

WHEREAS, in connection with the IPO, and effective as of the date of the initial listing (the "Listing Date") of the Common Stock on the New York Stock Exchange (the "NYSE"), the Company and the CD&R Investor wish to set forth their respective rights and obligations on and after the Listing Date, including with respect to certain governance matters.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1 Certain Defined Terms. As used herein, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person directly or indirectly owning or controlling 10% or more of any class of outstanding voting securities of such Person or (iii) any officer, director, general partner or trustee of any such Person described in clause (i) or (ii).

"Agreement" means this Stockholders Agreement, as amended from time to time in accordance with Section 3.2.

"Annual Budget" has the meaning given to such term in Section 2.2(b).

"Applicable Law" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Entity, (ii) any consents or approvals of any Governmental Entity and (iii) any orders, decisions, injunctions, judgments, awards, decrees of or agreements with any Governmental Entity.

"beneficial owner" or "beneficially own" has the meaning given such term in Rule 13d-3 under the Exchange Act and a Person's beneficial ownership of Common Stock or other voting securities of the Company shall be calculated in accordance with the provisions of such Rule.

"Board" means the Board of Directors of the Company.

"By-laws" means the Amended and Restated By-laws of the Company, as in effect on the date hereof and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the Charter.

"CD&R Designee" has the meaning given to such term in Section 2.1(b).

"CD&R Investor" has the meaning given to such term in the Preamble.

"Chairman" has the meaning given to such term in Section 2.1(e).

"Charter" means the Amended and Restated Certificate of Incorporation of the Company, as in effect on the date hereof and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Common Stock" means the shares of common stock, par value $0.01 per share, of the Company including any shares of capital stock into which Common Stock may be converted (as a result of recapitalization, share exchange or similar event) or are issued with respect to Common Stock, including with respect to any stock split or stock dividend, or a successor security.

"Company" has the meaning given to such term in the Preamble.

"control" (including the terms "controlling", "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

"Director" means any member of the Board.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

2

"GAAP" means generally accepted accounting principles, as in effect in the United States of America from time to time.

"Governmental Entity" means any federal, state, local or foreign court, legislative, executive or regulatory authority or agency.

"Group" has the meaning given to such term in Section 13(d)(3) of the Exchange Act.

"Information" means all confidential information about the Company or any of its Subsidiaries that is or has been furnished to any Stockholder or any of its Representatives by or on behalf of the Company or any of its Subsidiaries, or any of their respective Representatives, whether written or oral or in electronic or other form and whether prepared by the Company, its Representatives or otherwise, together with all written or electronically stored documentation prepared by such Stockholder or its Representatives based on or reflecting, in whole or in part, such information; provided that the term "Information" does not include any information that (i) is or becomes generally available to the public through no action or omission by such Stockholder or its Representatives, (ii) is or becomes available to such Stockholder on a non-confidential basis from a source, other than the Company or any of its Subsidiaries, or any of their respective Representatives, that to such Stockholder's knowledge, after reasonable inquiry, is not prohibited from disclosing such portions to such Stockholder by a contractual, legal or fiduciary obligation, (iii) is independently developed by a Stockholder or its Representatives or Affiliates on its own behalf without use of any of the confidential information or (iv) was in such Stockholder's, its Affiliates' or its Representatives' possession prior to the date of this Agreement.

"IPO" has the meaning set forth in the Recitals.

"Issuer Competitor" means any Person that directly competes with the business of the Company and its direct and indirect Subsidiaries from time to time.

"Listing Date" has the meaning set forth in the Recitals.

"NYSE" has the meaning set forth in the Recitals.

"Permitted Transferee" means with respect to any Stockholder, an Affiliate of such Stockholder, including to any investment fund or other entity controlled or managed by, or under common control or management with, such Stockholder; provided, however, that any such transferee agrees in a writing in the form attached as Exhibit A hereto to be bound by and to comply with all applicable provisions of this Agreement. Any Stockholder shall also be a Permitted Transferee of the Permitted Transferees or itself.

3

"Person" means any individual, corporation, limited liability company, limited or general partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivisions thereof or any Group comprised of any two or more of the foregoing.

"Representatives" means with respect to any Person, any of such Person's, or its Affiliates', directors, officers, employees, general partners, Affiliates, direct or indirect shareholders, members or limited partners, attorneys, accountants, financial and other advisers, and other agents and representatives, including in the case of the CD&R Investor, any person designated for nomination by the Board as a Director by the CD&R Investor.

"Stockholder" and "Stockholders" have the meanings given to such terms in the Preamble.

"Subsidiary" means, with respect to any Person, any corporation, entity or other organization whether incorporated or unincorporated, of which (i) such first Person directly or indirectly owns or controls at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions or (ii) such first Person is a general partner, managing member or otherwise exercises similar management control.

"Transfer" means, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any shares of Common Stock beneficially owned by a Person or any interest in any shares of Common Stock beneficially owned by a Person.

1.2 Other Definitional Provisions.

(a) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article and Section references are to this Agreement unless otherwise specified. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(b) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

4

ARTICLE II

CORPORATE GOVERNANCE

2.1 <u>Board Representation</u>.

(a) Following the Listing Date, the CD&R Investor shall have the right, but not the obligation, to designate for nomination by the Board as Directors a number of designees equal to at least: (<u>i</u>) at least a majority of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 50% of the outstanding shares of the Common Stock; (<u>ii</u>) at least 40% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 40% but less than 50% of the outstanding shares of the Common Stock; (<u>iii</u>) at least 30% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 30% but less than 40% of the outstanding shares of the Common Stock; (<u>iv</u>) at least 20% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 20% but less than 30% of the outstanding shares of the Common Stock; and (<u>v</u>) at least 5% of the total number of Directors comprising the Board at such time as long as the CD&R Investor beneficially owns at least 5% but less than 20% of the outstanding shares of the Common Stock. For purposes of calculating the number of CD&R Designees that the CD&R Investor is entitled to designate for nomination pursuant to the formula outlined above, any fractional amounts would be rounded up to the nearest whole number and the calculation would be made on a pro forma basis after taking into account any increase in the size of the Board. For the avoidance of doubt, if the CD&R Investor beneficially owns less than 5% of the outstanding shares of the Common Stock, the CD&R Investor shall no longer be entitled to designate any designees for nomination by the Board as Directors.

(b) In the event that the CD&R Investor has designated for nomination by the Board less than the total number of designees the CD&R Investor shall be entitled to designate for nomination pursuant to Section 2.1(a), the CD&R Investor shall have the right, at any time, to designate for nomination such additional designees to which it is entitled, in which case, the Company and the Directors shall take all necessary action, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), to (<u>x</u>) enable the CD&R Investor to designate for nomination and effect the election or appointment of such additional individuals, whether by increasing the size of the Board, or otherwise, and (<u>y</u>) to designate such additional individuals designated for nomination by the CD&R Investor to fill such newly-created vacancies or to fill any other existing vacancies. Each such individual whom the CD&R Investor shall actually designate for nomination pursuant to this Section 2.1 and who is thereafter elected to the Board to serve as a Director shall be referred to herein as a "<u>CD&R Designee</u>."

5

(c) In the event that a vacancy is created at any time by the death, retirement or resignation of any Director designated by the CD&R Investor pursuant to this Section 2.1, the remaining Directors and the Company shall, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), cause the vacancy created thereby to be filled by a new designee of the CD&R Investor as soon as possible, and the Company hereby agrees to take, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), at any time and from time to time, all actions necessary to accomplish the same.

(d) The Company agrees, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law) and notwithstanding any mandatory Director retirement age that may be adopted by the Company, to include in the slate of nominees recommended by the Board for election at any meeting of stockholders called for the purpose of electing Directors the individuals designated pursuant to this Section 2.1 and to nominate and recommend each such individual to be elected as a Director as provided herein, and to solicit proxies or consents in favor thereof. The Company is entitled to identify such individual as a CD&R Designee pursuant to this Agreement.

(e) For so long as the CD&R Investor beneficially owns at least 25% of the outstanding shares of the Common Stock, a CD&R Designee shall serve as the Chairman of the Board ("Chairman") and in such capacity as Chairman shall preside over meetings of the Board and the stockholders, among other duties.

(f) Insofar as the Company is or becomes subject to requirements under Applicable Law or the regulations of any self-regulatory organization, including the NYSE or such other national securities exchange upon which the Common Stock is listed to which the Company is then subject, relating to the composition of the Board or committees thereof, their respective responsibilities or the qualifications of their respective members, the CD&R Investor shall cooperate in good faith to select for nomination its designees to the Board under this Section 2.1 so as to permit the Company to comply with all such applicable legal or regulatory requirements.

(g) No CD&R Designee shall be paid any fee (or provided any equity-based compensation) for service as Director or member of any committee of the Board, unless otherwise determined by the Board; provided that each CD&R Designee shall be entitled to reimbursement by the Company for reasonable expenses incurred while traveling to and from Board and committee meetings as well as travel for other business related to his or her service on the Board or committees thereof, subject to any maximum reimbursement obligations as may be established by the Board from time to time. Notwithstanding the foregoing, any CD&R Designee whom the Board determines to be "independent" as defined under NYSE and Exchange Act rules and regulations shall be entitled to participate in the Company's compensation arrangements in which non-CD&R Designees, or other "independent" Directors, participate.

6

2.2 <u>Available Financial Information</u>. Upon written request of the CD&R Investor, the Company will deliver, or cause to be delivered, to the CD&R Investor or its designated Representative:

(a) as soon as available after the end of each month and in any event within 30 days thereafter, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such month and consolidated statements of operations, income, cash flows, retained earnings and stockholders' equity of the Company and its Subsidiaries, for each month and for the current fiscal year of the Company to date, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of notes thereto), together with a comparison of such statements to the corresponding periods of the prior fiscal year and to the Company's business plan then in effect and approved by the Board;

(b) an annual budget, a business plan and financial forecasts for the Company for the next fiscal year of the Company (the "<u>Annual Budget</u>"), no later than 30 days before the beginning of the Company's next fiscal year, in such manner and form as approved by the Board, which shall include at least a projection of income and a projected cash flow statement for each fiscal quarter in such fiscal year and a projected balance sheet as of the end of each fiscal quarter in such fiscal year, in each case prepared in reasonable detail, with appropriate presentation and discussion of the principal assumptions upon which such budgets and projections are based, which shall be accompanied by the statement of the chief executive officer or chief financial officer or equivalent officer of the Company to the effect that such budget and projections are based on reasonable and good faith estimates and assumptions made by the management of the Company for the respective periods covered thereby; it being recognized by the CD&R Investor that such budgets and projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by them may differ from the projected results. Any material changes in such Annual Budget shall be delivered to the CD&R Investor as promptly as practicable after such changes have been approved by the Board;

(c) as soon as available after the end of each fiscal year of the Company, and in any event within 90 days thereafter, (<u>i</u>) the annual financial statements required to be filed by the Company pursuant to the Exchange Act, (<u>ii</u>) a consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year, and consolidated statements of income, retained earnings and cash flows of the Company and its Subsidiaries for such year, prepared in accordance with GAAP and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and accompanied by the opinion of independent public accountants of recognized national standing selected by the Company and (<u>iii</u>) a Company-prepared comparison to the Annual Budget for such year as approved by the Board; and

7

(d) as soon as available after the end of the first, second and third quarterly accounting periods in each fiscal year of the Company, and in any event within 45 days thereafter, (i) the quarterly financial statements required to be filed by the Company pursuant to the Exchange Act, (ii) a consolidated balance sheet of the Company and its Subsidiaries as of the end of each such quarterly period, and consolidated statements of income, retained earnings and cash flows of the Company and its Subsidiaries for such period and for the current fiscal year to date, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of notes thereto) and (iii) a Company-prepared comparison to the corresponding periods of the previous fiscal year and to the Annual Budget then in effect as approved by the Board, all of the information to be provided pursuant to this Section 2.2(d) in reasonable detail and certified by the principal financial or accounting officer of the Company.

(e) Notwithstanding anything to the contrary in Sections 2.2(c) and (d), the Company may satisfy its obligations thereunder (other than its obligations under Sections 2.2(c)(iii) and 2.2(d)(iii)) by (i) providing the financial statements of any wholly-owned Subsidiary of the Company to the extent such financial statements reflect the entirety of the operations of the business or (ii) filing such financial statements of the Company or any wholly-owned Subsidiary of the Company whose financial statements satisfy the requirements of clause (i), as applicable, with the U.S. Securities and Exchange Commission on EDGAR or in such other manner as makes them publicly available. The Company's obligation to furnish the materials described in Sections 2.2(c) and (d) shall be satisfied so long as it transmits such materials to the CD&R Investor within the time periods specified therein, notwithstanding that such materials may actually be received after the expiration of such periods.

2.3 Other Information. The Company covenants and agrees to deliver to the CD&R Investor, upon written request, with reasonable promptness, such other information and data (including such information and reports made available to any lender of the Company or any of its Subsidiaries under any credit agreement or otherwise) with respect to the Company and each of its Subsidiaries as from time to time may be reasonably requested by the CD&R Investor; provided that the Company reserves the right to withhold any information under this Section 2.3 or access under Section 2.4 from the CD&R Investor if the Board determines that providing such information or granting such access would reasonably be expected to materially adversely affect the Company on a competitive basis or otherwise. The CD&R Investor shall have access to such other information concerning the Company's business or financial condition and the Company's management as may be reasonably requested, including all information that is necessary for (x) each of the CD&R Investor and its Affiliates to comply with income tax reporting and regulatory requirements and (y) the CD&R Investor to prepare its quarterly and annual financial statements.

8

2.4 <u>Access</u>. Subject to Section 2.3, the Company shall, and shall cause its Subsidiaries, officers, Directors, employees, auditors and other agents to (<u>a</u>) afford the CD&R Investor and its Representatives, during normal business hours and upon reasonable notice, reasonable access at all reasonable times to its officers, employees, auditors, legal counsel, properties, offices and other facilities and to all books and records, and (<u>b</u>) afford the CD&R Investor the opportunity to discuss the affairs, finances and accounts of the Company and its Subsidiaries with their respective officers from time to time as the CD&R Investor may reasonably request upon reasonable notice.

2.5 <u>Termination of Rights</u>. This Agreement shall terminate on the earlier to occur of (<u>a</u>) such time as the CD&R Investor is no longer entitled to nominate a Director pursuant to Section 2.1(a) of this Agreement and (<u>b</u>) upon the delivery of a written notice by the CD&R Investor to the Company requesting that this Agreement terminate.

ARTICLE III

MISCELLANEOUS

3.1 <u>Confidentiality</u>. Each party hereto agrees to, and shall cause its Representatives to, keep confidential and not divulge any Information, and to use, and cause its Representatives to use, such Information only in connection with the operation of the Company and its Subsidiaries and monitoring and making voting and investment decisions with respect to the Company; <u>provided</u> that nothing herein shall prevent any party hereto from disclosing such Information (<u>a</u>) upon the order of any court or administrative agency, (<u>b</u>) upon the request or demand of any regulatory agency or authority having jurisdiction over such party, (<u>c</u>) to the extent required by law or legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (<u>d</u>) to the extent necessary in connection with the exercise of any remedy hereunder, (<u>e</u>) to other Stockholders, (<u>f</u>) to such party's Representatives that in the reasonable judgment of such party need to know such Information, (<u>g</u>) to any potential Permitted Transferee of a Stockholder to whom such proposed Transfer would be permitted in accordance with Section 3.3 as long as such potential Permitted Transferee agrees to be bound by the provisions of this Section 3.1 as if a Stockholder or (h) to any prospective purchaser of all of a Stockholder's shares of the Common Stock, provided that (1) such prospective purchaser shall have been advised of this Agreement and shall have expressly agreed to be bound by the confidentiality provisions hereof, (2) such prospective purchaser is not an Issuer Competitor or a Person who controls any Issuer Competitor, and (3) such prospective purchaser shall be responsible for any breach of or failure to comply with the confidentiality provisions of this Agreement by any of its Affiliates and such prospective purchaser agrees, at its sole expense, to take reasonable measures (including but not limited to court proceedings) to restrain its Representatives

9

and Affiliates from prohibited or unauthorized disclosure or use of any Information; provided further that, in the case of clause (a) or (c), such party shall notify the other parties hereto of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment, when and if available.

3.2 Amendments and Waivers. This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by the Company and the CD&R Investor. Neither the failure nor delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

3.3 Successors, Assigns and Permitted Transferees. This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. Any Stockholder may assign its rights and obligations hereunder to any Permitted Transferee.

3.4 Notices. All notices and other communications to be given to any party hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service, or when received in the form of a facsimile or other electronic transmission (receipt confirmation requested), and shall be directed to the address set forth below (or at such other address or facsimile number as such party shall designate by like notice):

(a) if to the Company, to:

agilon health, inc.
1 World Trade Center
Suite 2000
Long Beach, CA 90831
Attention: Chief Business Officer
Email: ted.halkias@agilonhealth.com

10

(b) if to the CD&R Investor, to:

>Clayton, Dubilier & Rice, LLC
>375 Park Avenue
>18th Floor
>New York, New York 10152
>Attention: Chief Financial Officer
>Email: Finance@cdr-inc.com

(c) if to any other Stockholder, to the address of such other Stockholder as shown in the stock record book of the Company.

in each case, with a copy (which shall not constitute notice) to:

>Debevoise & Plimpton LLP
>919 Third Avenue
>New York, New York 10022
>Attention: Peter J. Loughran, Esq. and Paul M. Rodel, Esq.
>Fax: (212) 909-6836
>Email: pjloughran@debevoise.com; pmrodel@debevoise.com

3.5 Further Assurances. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder. To the fullest extent permitted by Applicable Law, the Company shall not directly or indirectly take any action that is intended to, or would reasonably be expected to result in, any Stockholder being deprived of the rights contemplated by this Agreement.

3.6 Entire Agreement; No Third Party Beneficiaries. This Agreement constitutes the entire agreement among the parties with respect to the subject matter of this Agreement and supersedes any prior discussions, correspondence, negotiation, proposed term sheet, agreement or understanding and there are no agreements, understandings, representations or warranties between the parties with respect to the subject matter of this Agreement other than those set forth or referred to in this Agreement, and this Agreement is not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

11

3.7 <u>Restrictions on Other Agreements; By-laws</u>. The provisions of this Agreement shall be controlling if any such provision or the operation thereof conflicts with the provisions of the By-laws. Each of the parties covenants and agrees to take, or cause to be taken, to the fullest extent permitted by Applicable Law (including with respect to any fiduciary duties under Delaware law), any action reasonably requested by the Company or any Stockholder, as the case may be, to amend the By-laws so as to avoid any conflict with the provisions hereof, including, in the case of the Stockholders, to vote their shares of Common Stock.

3.8 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof to the extent that such principles would require or permit the application of laws of another jurisdiction.

3.9 <u>Jurisdiction and Forum; Waiver of Jury Trial</u>. In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement, each of the parties unconditionally accepts the jurisdiction and venue of or, if the Court of Chancery does not have subject matter jurisdiction over this matter, the Superior Court of the State of Delaware (Complex Commercial Division), or if jurisdiction over the matter is vested exclusively in federal courts, the United States District Court for the District of Delaware, and the appellate courts to which orders and judgments thereof may be appealed. In any such judicial proceeding, the parties agree that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by delivery provided pursuant to the directions in Section 3.4. EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

3.10 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any Person or circumstance or in any jurisdiction, shall be held to be invalid or unenforceable to any extent, (<u>a</u>) the remainder of this Agreement shall not be affected thereby, and each other provision hereof shall be valid and enforceable to the fullest extent permitted by law, (<u>b</u>) as to such Person or circumstance or in such jurisdiction such provision shall be reformed to be valid and enforceable to the fullest extent permitted by law and (<u>c</u>) the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby.

3.11 <u>Enforcement</u>. Each party hereto acknowledges that money damages would not be an adequate remedy in the event that any of the covenants or agreements in this Agreement are not performed in accordance with its terms, and it is therefore agreed that in addition to and without limiting any other remedy or right it may have, the non-breaching party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically the terms and provisions hereof.

12

3.12 <u>Titles and Subtitles</u>. The titles of the articles, sections and subsections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

3.13 <u>Effectiveness</u>. This Agreement shall become effective upon the Listing Date.

3.14 <u>No Recourse</u>. This Agreement may only be enforced against, and any claims or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no past, present or future Affiliate, Director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

3.15 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of this Agreement by one party to the others may be made by facsimile, electronic mail, other electronic format (including any electronic signature complying with the Delaware Uniform Electronic Transactions Act, as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of page intentionally left blank]*

13

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date set forth in the first paragraph hereof.

AGILON HEALTH, INC.

By:  /s/ Theodore Halkias
      Name: Theodore Halkias
      Title: Chief Business Officer

[*Signature Page - Stockholders Agreement*]

CD&R VECTOR HOLDINGS, L.P.

By: CD&R Investment Associates IX, Ltd., its general partner

By: /s/ Rima Simson
    Name: Rima Simson
    Title:   Vice President, Treasurer and Secretary

[*Signature Page - Stockholders Agreement*]

<u>Exhibit A</u>

<u>JOINDER AGREEMENT</u>

Reference is made to the Stockholders Agreement, dated as of April 16, 2021 (as amended from time to time, the "<u>Stockholders Agreement</u>"), by and among agilon health, inc. (the "<u>Company</u>") and certain stockholders of the Company party thereto. The undersigned agrees, by execution hereof, to become a party to, and to be subject to the rights and obligations under, the Stockholders Agreement.

[NAME]

By: _____
     Name:
     Title:

Date:

Address:

Acknowledged by:

AGILON HEALTH, INC.

By: _____
     Name:
     Title:

Date:

A-1

Exhibit 10.3

EXECUTION VERSION

TERMINATION AGREEMENT

This TERMINATION AGREEMENT (this "Agreement") is entered as of April 16, 2021, by and between Agilon Health Holdings, Inc. (f/k/a CD&R Vector Topco, Inc.), a Delaware corporation (the "Company"), Primary Provider Management Co., Inc., a California corporation ("Opco") and Clayton, Dubilier & Rice, LLC, a Delaware limited liability company ("CD&R Manager").

WHEREAS, the parties hereto are party to a Consulting Agreement, dated as of July 1, 2016 (the "Consulting Agreement"); and

WHEREAS, the parties hereto wish to terminate the Consulting Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. Termination of Consulting Agreement. Notwithstanding any provision of the Consulting Agreement to the contrary (including any provisions that purport to survive the termination thereof), effective as of the date hereof, the Consulting Agreement is hereby terminated without any obligation surviving such termination. Each party hereto hereby waives any notice, consent or other requirement in connection with such termination of the Consulting Agreement. As a matter of precaution each party hereto waives, effective as of the date hereof, any claims it may have against the other party under the Consulting Agreement.

Section 2. Governing Law. This Agreement shall be governed by the laws of the State of New York, without regard to the principles of conflicts of law thereof.

Section 3. Binding on Successors. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 4. Counterparts. This Agreement may be executed in counterparts (including via facsimile or scanned pages), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

CLAYTON, DUBILIER & RICE, LLC

By:  /s/ Theresa A. Gore
     Name:  Theresa A. Gore
     Title:    Chief Financial Officer and Vice President

AGILON HEALTH HOLDINGS, INC.

By:  /s/ Kenneth Bellendir
     Name:  Kenneth Bellendir
     Title:    Vice President and Secretary

PRIMARY PROVIDER MANAGEMENT CO., INC.

By:  /s/ Kenneth Bellendir
     Name:  Kenneth Bellendir
     Title:    Vice President, Treasurer and Secretary

[Signature Page to Termination Agreement (for CD&R Consulting Agreement)]

**agilon health Announces Closing of Initial Public Offering and Full Exercise of Underwriters' Option to Purchase Additional Shares**

LONG BEACH, Calif. – April 19, 2021 – agilon health, inc. (NYSE: AGL), which partners with primary care physicians to unlock value-based healthcare delivery, announced the closing of its initial public offering of 53,590,000 shares of its common stock at the public offering price of $23.00. The number of shares offered and sold by agilon health included the full exercise of the underwriters' option to purchase up to an additional 6,990,000 shares of common stock. The gross proceeds of the offering, before deducting underwriting discounts and commissions and other expenses payable by agilon health, were approximately $1,233 million.

agilon health's common shares began trading on the New York Stock Exchange on April 15, under the ticker symbol AGL.

J.P. Morgan, Goldman Sachs & Co. LLC, and BofA Securities acted as lead book-running managers for the proposed offering. Deutsche Bank Securities, Wells Fargo Securities, Nomura, William Blair, and Truist Securities acted as additional book-running managers.

A registration statement relating to these securities was declared effective by the U.S. Securities and Exchange Commission ("SEC") on April 14, 2021. The offering was made only by means of a prospectus. Copies of the final prospectus may be obtained from: J.P. Morgan Securities LLC, c/o Broadridge Financial Solutions, 1155 Long Island Avenue, Edgewood, NY 11717, or by telephone at (866) 803-9204, or by email at prospectus-eq_fi@jpmchase.com; or Goldman Sachs & Co. LLC, Attention: Prospectus Department, 200 West Street, New York, New York 10282, telephone: 1-866-471-2526, facsimile: 212-902-9316 or by emailing prospectus-ny@ny.email.gs.com; or BofA Securities, Attention: Prospectus Department, NC1-004-03-43, 200 North College Street, 3rd Floor, Charlotte, NC 28255-0001, or by email at dg.prospectus_requests@bofa.com.

This press release shall not constitute an offer to sell or the solicitation of an offer to buy securities, nor shall there be any sale of these securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction. Any offers, solicitations or offers to buy, or any sales of securities have and will be made in accordance with the registration requirements of the Securities Act of 1933, as amended.

**About agilon health**

agilon health is transforming healthcare by empowering community-based physicians with the resources and expertise they need to innovate the payment and delivery of care for seniors. agilon health enables physicians to create their own Medicare-centric globally capitated line of business. The agilon Total Care Model is powered by our purpose-built platform and enabled through a growing national network of like-minded physician partners. With agilon, physicians are freed from the constraints of the transactional fee-for-service reimbursement model and are able to practice team-based, coordinated care to serve the individual needs of their senior patients and to transition to a sustainable and predictable, long-term business model. The rapidly growing appeal of the agilon platform, partnership model and network of leading community-based physicians has allowed us to expand to 17 local communities with 16 anchor physician groups, as well as a network of physicians across Hawaii, in fewer than five years.

**Cautionary Note Regarding Forward-Looking Statements**

This press release contains statements that constitute "forward-looking statements," including with respect to the initial public offering. Forward-looking statements are subject to numerous conditions, many of which are beyond the control of agilon health, including those set forth in the Risk Factors section of the registration statement and the preliminary prospectus included therein. Copies are available on the SEC's website at www.sec.gov. agilon health undertakes no obligation to update these statements for revisions or changes after the date of this press release, except as required by law.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP of Investor Relations
investor.relations@agilonhealth.com

**Media Contact**
Shannan Siemens
Managing Director, Mercury
media@agilonhealth.com

Source: agilon health

# # #