## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br>ALL ACTIONS. | Master File No.: 1:24-cv-00297-DAE<br><br>CLASS ACTION |

## AGILON DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................................. 1

II.  RELEVANT FACTUAL BACKGROUND ........................................................................ 3

   A.  Order on Motion to Dismiss ................................................................................... 3

   B.  The Alleged Misstatements ..................................................................................... 3

   C.  The Alleged Corrective Disclosures ....................................................................... 3

III. ARGUMENTS AND AUTHORITIES .............................................................................. 4

   A.  Legal Standard for Class Certification .................................................................... 4

   B.  Plaintiffs Are Not Entitled to the *Basic* Presumption for Statements in 2021–22 .............. 4

      1.   Category A: Genericness Mismatch ........................................................... 5

      2.   Category B: Substantive Mismatch ............................................................ 8

      3.   Category C: Genericness & Substantive Mismatch .................................... 9

      4.   Category D: No Statistically Significant Price Impact ............................. 13

   C.  Plaintiffs' Damages Methodology Fails to Satisfy *Comcast*. ........................... 14

      1.   Plaintiffs' Model Fails to Isolate Inflation from Actionable Statements from Inflation Attributable to Dismissed or Non-actionable Statements. ........................................ 15

      2.   Plaintiffs' Model Fails to Account for Disclosed Risks that Later Materialized. ..... 16

      3.   Plaintiffs' Model Cannot Measure Inflation from 2/27/2024 Disclosure. ................ 17

   D.  The Section 20A Class Cannot Be Certified ........................................................ 18

      1.   The Proposed Class Period Is Overbroad for the Section 20A Claim ....................... 18

      2.   Plaintiffs' Failure to Demonstrate Price Impact Prior to January 9, 2023 Means a Section 20A Class Cannot Be Certified. ........................................................ 19

      3.   Plaintiffs Have Not Demonstrated that Section 20A Damages Are Capable of Measurement on a Classwide Basis. ........................................................ 19

IV. CONCLUSION ............................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ..............................................................................6–8, 12

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................... *passim*

*In re BP p.l.c. Sec. Litig.*,
  No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ................................14–16, 20

*In re BP p.l.c. Sec. Litig.*,
  No. 10-MD-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ....................................16, 17

*Chavez v. Plan Benefit Servs., Inc.*,
  957 F.3d 542 (5th Cir. 2020) ....................................................................................4

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  No. CV H-14-3428, 2017 WL 2599327 (S.D. Tex. June 15, 2017)........................................18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).................................................................................. *passim*

*In re Concho Res., Inc.*,
  No. 4:21-CV-2473, 2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ................................... *passim*

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  258 F. Supp. 2d 576 (S.D. Tex. 2003) ...................................................................18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) .........................................................................13

*Freitas v. Cricket Wireless, LLC*,
  No. C 19-07270 WHA, 2022 WL 3018061 (N.D. Cal. July 29, 2022)...........................15–16

*Gambrill v. CS Disco, Inc.*,
  No. A-24-CV-28-DAE, 2025 WL 3771433 (W.D. Tex. Dec. 16, 2025) .................................8

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)................................................................................ *passim*

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ...............................................................................13

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  No. 20-CV-4953 (JPO), 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024).............................7, 8

iii

*Ludlow v. BP, PLC,*
    800 F.3d 674 (5th Cir. 2015) ................................................................................15, 16

*MicroCapital Fund LP v. Conn's Inc.,*
    No. 4:18-CV-1020, 2019 WL 3451153 (S.D. Tex. July 24, 2019) ..........................................19

*In re MicroStrategy, Inc.,*
    115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................18, 20

*In re Vivendi Universal, S.A. Sec. Litig.,*
    634 F. Supp. 2d 352 (S.D.N.Y. 2009)...................................................................16

*Prantil v. Arkema Inc.,*
    986 F.3d 570 (5th Cir. 2021) ................................................................................5

*Ramirez v. Exxon Mobil Corp.,*
    2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)...................................................................7, 8

*Sampson v. United Servs. Auto. Ass'n,*
    83 F.4th 414 (5th Cir. 2023) ................................................................................4

*Schechner v. Whirlpool Corp.,*
    No. 2:16-CV-12409, 2019 WL 4891192 (E.D. Mich. Aug. 13, 2019)...................................15

*Shupe v. Rocket Companies, Inc.,*
    752 F. Supp. 3d 735 (E.D. Mich. 2024)...................................................................7

**Statutes**

15 U.S.C. § 78t-1 (Securities Exchange Act of 1934 § 20A) ..........................................1, 3, 17–20

15 U.S.C. § 78j (Securities Exchange Act of 1934 § 10(b)).................................................. *passim*

Securities Act of 1933 §§ 11, 12...................................................................1

Securities Exchange Act of 1934 §§ 10(b), 20A ...................................................1, 3, 20

**Other Authorities**

Fed. R. Civ. P. 23 ...................................................................1, 4

## I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs' Motion for Class Certification ("Motion") should be denied because they cannot satisfy Rule 23 for their claims under either Section 10(b) (15 U.S.C. § 78j) or Section 20A (15 U.S.C. § 78t-1) of the Securities Exchange Act of 1934 ("Exchange Act").

***First*, Plaintiffs are not entitled to the *Basic* presumption for alleged misstatements in 2021–22**.  Plaintiffs' class certification argument depends on *Basic*, which presumes that stock purchasers rely on information reflected in the market price of stock that trades in an efficient market. But that presumption applies only where an alleged misrepresentation actually affected a stock's price, and it is rebutted if the link between the disclosure and the stock price is severed. That link is absent for the statements Plaintiffs challenge in 2021 and 2022, all of which Plaintiffs argue were "corrected" by disclosures in late 2023 and early 2024.

In assessing price impact at class certification, the court should consider "*all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense."  *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman I*").  The record and common sense point to the same conclusion: the alleged corrective disclosures did not "correct" the challenged 2021–22 statements.  Those statements consisted of general descriptions about agilon's business model, then-existing utilization trends, and its value-based care platform.  Many closely resemble statements in agilon's IPO offering documents that this Court has already dismissed, including statements about the "advantages of agilon's business model" and agilon's "ability to accurately predict and effectively manage . . . medical margin" and manage costs. CAC ¶¶ 61–62.  And critically, the 2021–22 statements addressed circumstances as they then existed—in many cases, expressly so.

By contrast, the alleged corrective disclosures consist of statements in late 2023 and early 2024 that addressed newly observed 2023 utilization increases, revised FY2023 guidance, and

1

updated 2023 financial results.  On their face, the alleged corrective disclosures did not "correct" statements from 2021 and 2022, and the analyst record confirms as much.  Moreover, one disclosure had no statistically significant price impact at all, further confirming it cannot be used to measure inflation for statements made years earlier. Because the front-end statements in 2021–2022 and back-end disclosures in 2023–2024 do not match in specificity, substance, or timing, the link between them is severed and Plaintiffs are not entitled to the *Basic* presumption for the 2021–2022 statements.

*Second*, **Plaintiffs' damages theory does not satisfy *Comcast*.**  Under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), Plaintiffs were required to show that their damages methodology can measure only those damages attributable to their surviving theory of liability. They failed to do so. Their expert points to a generic out-of-pocket framework and says that artificial inflation can later be calculated through event studies, analyst reports, valuation analyses, and other tools. But he does not explain how that model will isolate inflation attributable to the surviving statements from inflation attributable to dismissed or non-actionable statements; how it will separate the price effects of any actionable "correction" from confounding, non-fraud information; or how it will account for variability in disclosed risks that later materialized. *Comcast* requires that courts conduct a rigorous analysis at the class certification stage. Contrary to Plaintiffs' position, it is not enough to promise that an expert may later develop a workable methodology. Plaintiffs' failure to provide a damages methodology tied to their surviving liability theory independently precludes certification.

*Third*, **Plaintiffs' proposed class definition is wildly overbroad for the surviving Section 20A claim.** When the class period is properly limited to the stock purchases that were "contemporaneous" with Sell's September 14, 2021 sale of agilon stock—*i.e.*, purchases made on September 14 or a few days thereafter—a class cannot be certified because agilon's stock price was not inflated at the time of the alleged sale.  Plaintiffs also fail to propose a methodology for demonstrating losses under Section 20A that can establish losses on a classwide basis.

The Motion should be denied in full. At minimum, any certified class period must be limited to Plaintiffs' Section 10(b) claims and exclude statements in Categories A, B, C, and D discussed below—beginning no earlier than January 9, 2023 and ending on January 5, 2024.

## II.    RELEVANT FACTUAL BACKGROUND

### A. Order on Motion to Dismiss

The Court's August 15, 2025 MTD Order limited the scope of this case.  For one, the Court dismissed all of Plaintiffs' claims under Sections 11 and 12 of the Securities Act, which arose from statements in agilon's public offering documents regarding agilon's business model, its visibility into financial performance and ability to manage costs, and its use and integration of data.  The Court held that statements regarding agilon's business model were "generalized, positive statements about the company's competitive strengths" and that "Plaintiffs fail[ed] to allege facts which indicate that agilon knew, or should have known, that its business model was defective at the time of the IPO in April 2021, or any of the public offerings thereafter."  ECF No. 63 at 20. The Court also dismissed two of six categories of statements challenged under Exchange Act Section 10(b), including statements concerning agilon's data integration and growth strategy. *Id.* at 46–50.

### B. The Alleged Misstatements

Following this Court's August 15, 2025 MTD Order, the surviving front-end statements that Plaintiffs allege were false or misleading span from May 27, 2021 through January 5, 2024 and relate to (i) agilon's business model, (ii) healthcare utilization trends, (iii) agilon's FY2023 financial guidance, and (iv) agilon's financial reporting for the second and third quarters of 2023. *See* ECF No. 63 at 69.

### C. The Alleged Corrective Disclosures

Plaintiffs claim these challenged statements were "corrected" by three disclosures beginning when agilon released 3Q23 financial results and adjusted guidance in late 2023:

- On ***November 2, 2023***, during its Q3 earnings call, agilon reduced its FY2023 medical margin guidance—from $500–$530M to $455–$470M—due to newly-observed data showing an increase in healthcare utilization during May–July 2023 and "to account for utilization trends [and] any potential blind spots with health plans." Ex. 15 at 367.

- On ***January 5, 2024***, agilon further lowered its FY2023 medical margin guidance, explaining that higher cost trends "became visible to us starting in mid-December as we closed our November results." Ex. 17 at 425. agilon explained that "underperformance was largely driven by two issues: a forecast that failed to recognize these elevated cost trends and a data and analytics gap that led to our being late in both recognizing the magnitude and source of the utilization shifts." *Id.*

- On ***February 27, 2024***, agilon reported FY2023 medical margin of $299M, reflecting "updated data including relatively complete claims data from its largest payors, and additional information such as seasonality factors and census data . . . which indicated medical claims were higher than the company's previous estimate." Ex. 19 at 470.

## III.   ARGUMENTS AND AUTHORITIES

### A. Legal Standard for Class Certification

Plaintiffs bear the burden to prove—not merely plead—each requirement of Rule 23. *See Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 418 (5th Cir. 2023). That burden is especially demanding under Rule 23(b)(3).  Plaintiffs must show that common questions of law or fact *predominate* over individualized ones, and the Court must conduct a "rigorous analysis" before certifying a class. *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 544 (5th Cir. 2020).

### B. Plaintiffs Are Not Entitled to the *Basic* Presumption for Statements in 2021–22.

Reliance is an essential element of a Section 10(b) claim. *See Goldman I*, 594 U.S. at 118. Plaintiffs do not attempt to prove direct reliance.  Their reliance theory turns on *Basic*, under which investors are presumed to rely on misrepresentations reflected in a stock's market price. *See* ECF No. 105 at 13.  But that presumption is rebutted where "an alleged misrepresentation did not actually affect the market price of the stock." *Goldman I*, 594 U.S. at 119.[1] "Any showing that severs the link

---

[1] *See also Goldman I*, 594 U.S. at 117 ("[O]ur precedents require defendants to bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence. We emphasize, though, that the burden of persuasion should rarely be outcome determinative.").

between the alleged misrepresentation" and the price paid or received "will be sufficient to rebut the presumption of reliance." *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988).

That is precisely the issue with challenged statements in 2021–2022. For one, Plaintiffs do not show those statements increased agilon's stock price on the front-end (*i.e.*, price inflation). Instead, they argue that the challenged statements maintained artificial inflation that was later revealed on the back-end when the stock price declined after supposed "corrective" disclosures in late 2023 and early 2024 (*i.e.*, inflation maintenance). But *Goldman* precludes that approach where, as here, the front-end statements do not match the back-end disclosures. *See* 594 U.S. at 123.

The mismatches are fatal. In some instances, the statements are too generic given the specific issues that are addressed by the corrective disclosures (**Category A**). In other instances, there is a substantive mismatch because the statements pertain to a different time period or subject matter (**Category B**). Most statements fall into both categories (**Category C**). In addition, the two most recent statements have no evidence of a back-end price drop that could support an inference of price impact (**Category D**). The Court must look at each statement and deny certification as to any statements for which the *Basic* presumption does not apply or is rebutted. *See In re Concho Res., Inc.*, 2025 WL 1040379, at *9 (S.D. Tex. Apr. 7, 2025); *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 (5th Cir. 2021).

### 1. Category A: Genericness Mismatch

A genericness mismatch exists where "the earlier misrepresentation is generic (e.g., 'we have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')." *Goldman I*, 594 U.S. at 123. In that case, "it is less likely that the specific disclosure actually corrected the generic misrepresentation," and thus less likely that a back-end price drop shows front-end price impact. *Goldman I*, 594 U.S. at 123. In other words, this limits fraud by hindsight: "a plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, ***unless***

***the front-end disclosure is sufficiently detailed in the first place*.**" *Concho*, 2025 WL 1040379, at *9–10 (emphasis added) (quoting *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*Goldman II*")). Genericness is particularly important in inflation-maintenance cases, even if it overlaps with materiality. *Goldman I*, 594 U.S. at 122–24. Courts assess genericness "by referencing case law bearing on materiality." *Goldman II*, 77 F.4th at 96, 102.

Here, the Category A statements are generic, qualitative statements about agilon's "visibility" into future revenues, and ability to deliver "predictable quality outcomes" and "drive sustainably lower costs." *See, e.g.*, CAC ¶¶ 100, 109. Courts have held these types of statements are too generic to support fraud on the market in view of specific later disclosures addressing changed circumstances specific to a particular period. *See Goldman I*, 594 U.S. at 120. The Category A statements include:

- "*We have a high degree of visibility into future revenues and margin progression ....*" CAC ¶ 100 (May 27, 2021).

- "*[O]ur ability to drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model .... [W]e leverage algorithms to better identify specific cohorts of patients or physicians ... to drive sustainably lower cost and improved quality*." CAC ¶ 109 (Oct. 29, 2021).

Both of these statements occurred just months after agilon's April 2021 IPO and express little more than generalized confidence in agilon's business model. That puts them on all fours with *Goldman I*'s prototypical generic front-end statement: "we have faith in our business model." *Goldman I*, 594 U.S. at 120, 123*; see also Concho*, 2025 WL 1040379, at *12–14 (finding generic mismatch where company emphasized ability to "deliver attractive economic returns predictably and consistently over the long term," "plow through the volatility of our business," "consistently execute [and] control costs," and deliver results "predictably and consistently over the long term"). The conclusion is particularly strong for these two statements as they are substantially the same as other

6

generic representations from around the same period that this Court has held are not actionable.[2]

The alleged corrective disclosures, by contrast, pertain to a newly-observed utilization spike alleged to have occurred **in May 2023** that gave rise to missed guidance for FY2023—precisely the type of specific disclosure *Goldman* contemplates (e.g., 'our fourth quarter earnings did not meet expectations'). *See* CAC ¶ 12. None of these 2023–24 disclosures referred to any of the alleged misstatements in 2021–22, and Plaintiffs have identified no statement in the alleged corrective disclosures that "corrected" any 2021–22 statement. *See* Ex. 22 at 652; Ex. 23 at 699; Ex. 24 at 747; *see also Goldman II,* 77 F.4th at 99 ("[N]ot one of the corrective disclosures here expressly identifies [the front-end statements]").

The disconnect is further confirmed by the analyst record: not a single analyst referred to the 2021 or 2022 alleged misstatements in reports following the alleged corrective disclosures. Skinner Report, ¶¶ 15, 76, 81, 85. Courts have consistently held there is no price impact where "no analyst referenced Defendant['s] alleged misrepresentations in reports."[3] Analyst "commentary touching upon only the same subject matter ... cannot be enough." *Goldman II,* 77 F.4th at 104.

---

[2] *See* ECF No. 63 at 17–18 (dismissing claim based on statement that agilon's business model provided for "**successfully improving quality of care and reducing costs**"); *id.* at 19–20 (dismissing claim based on statement agilon's model "provides **significant visibility into the near-term and long-term financial trajectory** for both agilon and our anchor physician groups.").

[3] *See Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 781 (E.D. Mich. 2024) ("And, **fatally for Plaintiffs here**, like in *Goldman*, Defendants have produced expert testimony suggesting that *no* analyst referenced Defendant['s] alleged misrepresentations in reports issued throughout the Class Period." (emphasis added)); *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *19 (N.D. Tex. Aug. 21, 2023) ("With the exception of a single analyst report issued after the alleged October 28, 2016 Corrective Disclosure … Plaintiff presents no evidence that the market connected the three earnings releases to Defendants' alleged misstatements … much less evidence that any connection between the releases and Defendants' alleged misstatements impacted the price of Exxon Mobil's stock."); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *12 (S.D.N.Y. Mar. 29, 2024) ("[N]o analyst who covered the Detour acquisition referred back to the [front-end statement] to state that Detour's failure to meet those targets resulted in the decline in share price" (emphasis and quotations omitted)).

### 2. Category B: Substantive Mismatch

A substantive mismatch also disables the presumption. The corrective disclosure must "actually correct" the specific content of the misrepresentation; subject matter overlap is insufficient. *Goldman II*, 77 F.4th at 100–01. A statement about one year's results or then-existing conditions "cannot be corrected by a statement regarding the results in a different year." *See Concho*, 2025 WL 1040379, at *17.[4] That is precisely the issue for the following statement:

- [Q.] "*So should we think that there's any pent-up demand around things like elective surgeries as we go into 2022?*" [A.] "*Yes. So we did see some bumps in the back half of '21 in terms of some discretionary surgeries. I don't know that we believe there's a massive set of pent-up demand, particularly in our model, because we've got those touchpoints, and we've been working very closely with those senior patients, particularly those high-risk patients. That's why that 50% increase in terms of touches with those patients yields such positive results.*" Ex. 7 at 230; CAC ¶ 114 (Jan. 10, 2022).

None of the alleged corrective disclosures address circumstances that existed in 2021 or going into 2022—both of which are periods when agilon met its financial guidance.[5] Plaintiffs admit that both the November 2 and January 5 disclosures addressed circumstances that existed in 2023. *See, e.g.*, Ex. 22 at 648–650 (interrogatory responses identifying alleged corrective statements). Nothing in those disclosures suggested that agilon's descriptions of its 2021–22 utilization and demand trends were incorrect. Just the opposite, the January 5 disclosure specifically distinguishes the circumstances

---

[4] *See also Gambrill v. CS Disco, Inc.*, 2025 WL 3771433, at *11 (W.D. Tex. Dec. 16, 2025) (Lane, M.J.) (recommending denial of class certification where "the Alleged Corrective Disclosures do not sufficiently match" most alleged misrepresentations and the "comparison reveals too great a distance between the content of what the statements discussed"); *Ramirez*, 2023 WL 5415315, at *19 (*Basic* presumption rebutted where "none of the … Corrective Disclosures pertained to [the front-end statements]"); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *8 (S.D.N.Y. Mar. 29, 2024) (finding mismatch where front- and back-end statements referred to different periods).

[5] In May 2021, agilon projected that it would be managing the care of 182,000 members by year-end, and predicted an adjusted EBITDA loss of $41 million for 2021. Ex. 3 at 161. agilon outperformed these estimates. Ex. 8 at 238. In 2022, agilon projected 340,000 members by year-end, an adjusted EBITDA of $0-$10 million, and a medical margin of $290-$305 million. *Id.* agilon met or exceeded guidance on all three measures. Ex. 13 at 315.

8

that existed in 2022 from those that existed in 2023—it does not purport to correct any statement about 2022, much less 2021.  Ex. 17 at 425–26 (noting cost trends in 2023 were "2 to 3x higher [than] what we had seen in 2022" and noting "utilization has accelerated from 2022 to 2023").  Because this statement specifically addresses circumstances occurring in 2021 and 2022, it could not be corrected by a disclosure about developments in 2023. *See Concho*, 2025 WL 1040379, at *13, 17.  The statement also primarily addresses a different subject matter: agilon's approach to value-based care and high-touch relationships between patients and physicians.[6]  It refers to "positive results" in 2021 for "high-risk patients"—meaning favorable health outcomes for patients at risk.  None of Plaintiffs' alleged corrective disclosures suggest this was inaccurate. *See, e.g.*, Ex. 22 at 646–51.

### 3.  Category C: Genericness & Substantive Mismatch

Finally, several 2021–22 statements qualify as both generic and substantive mismatches:

- "***Our third quarter performance*** *and updated guidance demonstrates the power of our constantly improving platform and high touch, high visibility partnership model to shape the healthcare journey of senior patients.*" CAC ¶ 108 (Oct. 28, 2021) (emphasis added).

This statement about agilon's 2021 "third quarter performance" explicitly addresses a different time period than the alleged corrective disclosures. Because the corrective disclosures in no way corrected agilon's 2021–22 financial results and guidance (which agilon met), there is a substantive mismatch. Additionally, agilon ***re-affirmed*** the benefits of its "high touch, high visibility partnership model" in the alleged corrective disclosures, it did not reveal them to be inaccurate.  *See* Ex. 15 at 369 (discussing benefits of "high touch" model); Ex. 17 at 425 ("our confidence in our business model remains high").  Further, the statement is substantially similar to statements the Court has already dismissed as "generalized, positive statements about the company's competitive strengths."[7]

---

[6] Additional context surrounding this statement, and others, is included in Appendix I.

[7] *See* ECF No. 63, at 17–18 (dismissing statement that agilon's "differentiated" business model is "transforming healthcare by empowering [physicians] to be the agents for change" and "successfully improving quality of care and reducing costs").

- "*Looking back at '21, looking ahead at '22. When you talk about '21, you perhaps have to start with COVID. **I am still proud of our team and our partners and the job we've done to manage through multiple surges throughout 2021**. I think our high-touch primary care model really distinguishes us. **We've been able to manage costs and deliver predictable results through each one of these surges**. We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models …. [T]he quality of our economic model has allowed us and will continue to allow us to deliver predictable results in periods of volatility. No one can predict exactly what the future is with this pandemic, but we know that we can deliver predictable results. New government programs evolve over time, but we can deliver predictable results.*" Ex. 7 at 226–27; CAC ¶ 113 (Jan. 10, 2022) (emphasis added).

agilon's retrospective observation that it has been able to "manage costs and deliver predictable results through each one of these surges" relates to a different time period (2021 COVID-19 surges and looking ahead to 2022) than the corrective disclosures (addressing a new utilization environment in 2023 and into 2024). The alleged corrective disclosures had nothing to do with agilon's 2021 and 2022 financial results, which were never restated and are not challenged. This statement is therefore a substantive mismatch. There is also a genericness mismatch. *See Concho*, 2025 WL 1040379, at *12–14 (holding statements that a business model can "control costs," "plow through the volatility of our business," and "deliver attractive economic returns predictably and consistently" are generic).

- "*Our partnership model produced distinctive, predictable results **in 2021**, despite evolving COVID dynamics.*" Ex. 8 at 238; CAC ¶ 116 (Mar. 3, 2022) (emphasis added).

This statement is both generic and specifically tied to agilon's 2021 results. *See Concho*, 2025 WL 1040379, at *12–14, 17. Notably, Plaintiffs' Complaint strategically omits "in 2021," which again shows that the statement is wholly unrelated to the disclosures in late 2023 and early 2024 addressing agilon's FY2023 results and the broader industry conditions that led to those results. *See* CAC ¶ 116.

- "*I mean I think one of the real differentiators in our model is in the high-touch nature between the primary care physician and the patient …. [W]e have great visibility from a cost perspective because we've got that experience with them …. [T]hat visibility and that continuity is a big differentiator. **In COVID**, what we were able to maintain was the touch points with these senior patients …. And I think that translated into more predictably from a cost perspective …. [W]e're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues.*" CAC ¶ 129 (May 11, 2022) (emphasis added).

10

This past-tense statement about the "predictability" of costs and "healthcare demand" "*[i]n COVID*," and what the company was "seeing" in May 2022 addresses a different time period than the corrective disclosures, and emphasizes the benefits of agilon's model in the same generic terms discussed above.[8] *See* Ex. 17 at 434 ("It's a pretty material change in '23").

- "*We have tremendous visibility into both growth and embedded margins in our existing PCP groups.*" CAC ¶ 131 (June 8, 2022).

This statement underscores "visibility" into (i) growth, and (ii) embedded margins in "*existing* [primary care physician] groups." CAC ¶ 131. The Court held that such statements are not actionable with respect to agilon's "growth."[9] As to agilon's visibility into embedded margins in "existing" PCP groups, nothing in the alleged corrective disclosures suggests agilon lacked visibility into *existing* PCP groups. Rather, Plaintiffs allege the corrective disclosures attributed issues to *newly onboarded* PCP groups. *See* CAC ¶ 90; *see also* Ex. 17 at 427 (noting that new PCP groups substantially underperformed "veteran PCP partners"). Thus, there is a subject matter mismatch. Additionally, the "tremendous visibility" statement is generic. *See Concho*, 2025 WL 1040379, at *12–14.

- "*[O]ur model … allows us to deliver **really predictable costs kind of quarter in, quarter out**, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side …. [W]e work with existing doctors and existing patients and we take them through a 12-month implementation period. **So when they go live, we have a very good idea of what that cost structure looks like** and a very good idea along -- what the revenues like. But the second piece that I think is really important is, we have this high-touch model.*" CAC ¶ 134 (Sept. 14, 2022).

This statement was made in response to a question specifically asking about agilon's financial results in Q3 2022. *See* Ex. 11 at 279. Plaintiffs do not challenge agilon's financial results for Q3 2022, and the corrective disclosures do not purport to "correct" agilon's financials for Q3 2022. *See Concho*,

---

[8] *Compare* CAC ¶ 129 ("great visibility" and "predictability from a cost perspective"), *with Concho*, 2025 WL 1040379, at *12–14 ("consistently execute, control costs" and "deliver attractive economic returns predictably and consistently over the long term").

[9] *See* ECF No. 63, at 49–51, 69 (dismissing growth statements, including "[w]e have a very predictable and highly visible growth algorithm").

2025 WL 1040379, at *13, 17. Nor do the corrective disclosures call into question agilon's 12-month implementation for existing doctors. *See* Ex. 17 at 438 (discussing "12-month implementation that gives us a lot of visibility and comfort around" new physicians). The statement is also substantially similar to general statements about agilon's business model that the Court has already dismissed.[10]

- *"[W]e are experiencing the benefits of learning from our platform that is allowing our newer partners to perform at the high end of our range .... [W]e feel like we're seeing an acceleration sooner for our year-1 markets in terms of the benefits of the high-touch model, and it's coming through in terms of better satisfaction, better health outcomes and ultimately lower costs and better margins overall."* CAC ¶ 136 (Nov. 3, 2022).

This statement addresses what the Company was experiencing at the end of 2022—a different period than what was addressed in the alleged corrective disclosures. It was also an expressly preliminary observation. *See* Ex. 12 at 294. The last sentence also includes generically optimistic statements[11] similar to those the Court has already dismissed. *See* ECF No. 63, at 17–20.

The mismatch is confirmed by the analyst record. No analyst referenced these statements in any report following those disclosures, let alone attributed the price drop to a correction of these statements. *See* Skinner Report, ¶¶ 15, 76, 81, 85. The evidence therefore shows (and common sense dictates) that the market did not connect the Category B and C statements with the alleged corrective disclosures 1–2 years later. *See Goldman II,* 77 F.4th at 104.

Plaintiffs' attempt to "prove the amount of inflation indirectly"—by pointing to a stock price drop following a negative disclosure and connecting it to an earlier statement—thus fails for the statements in Categories A, B, and C. *Goldman I*, 594 U.S. at 123. Plaintiffs do not attempt to prove

---

[10] *See* ECF No. 63 at 19–20 (dismissing claims based on statement that agilon's model "provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups").

[11] *Compare* CAC ¶ 136 (explaining "the benefits of learning from our platform" and "the benefits of the high-touch model" in terms of "lower costs and better margins overall"), *with Concho*, 2025 WL 1040379, at *12–14 (explaining the "platform for delivering growth, demonstrating the benefits of scale and enhancing shareholder value, has never been better"); *and Goldman I*, 594 U.S. at 123 ("we have faith in our business model").

12

the amount of inflation *directly*—by pointing to a front-end price impact at the time of the 2021–22 statements. Nor could they; for example, as Plaintiffs' own expert acknowledges, there was no statistically significant stock price increase for six of the eight "News Days" in 2021–22. *See* Cain Report, Ex. 6. As for the two others, the statements did not introduce new information to the market—they merely repeated information already known.[12] Accordingly, Plaintiffs cannot point to any front-end price impact to rescue their bid for class certification. *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004) (it is "a market reality that a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market.").

### 4. Category D: No Statistically Significant Price Impact

Moreover, Plaintiffs' own expert admits that there was no statistically significant price movement following the final, February 27, 2024, alleged corrective disclosure. *See* Cain Report, Ex. 6. This lack of price impact is unsurprising—the analyst record confirms the market expected the Feb. 27 news.[13] Plaintiffs allege that the Feb. 27, 2024 corrective disclosure "corrected" the final two misstatements in the proposed class period: (i) agilon's January 5, 2024 revised FY2023 guidance and newly-introduced FY2024 guidance, CAC ¶ 189, and (ii) Defendants' January 5, 2024 statement that only "one market" would "run at a loss for 2023," CAC ¶ 190. Because the only evidence of price impact for these Category D statements is the Feb. 27 alleged corrective disclosure,

---

[12] The challenged statement on May 27, 2021—that agilon has a "**high degree of visibility** into future revenues and margin progression"—is substantively identical to similar statements in agilon's 2021 Registration Statement. CAC ¶ 95–96 (noting "**significant visibility into the near-term and long-term financial trajectory** for both agilon and our anchor physician groups"). The same is true of the challenged statement on March 3, 2022, which discussed agilon's "**distinctive, predictable results** in 2021, despite evolving COVID dynamics." CAC ¶ 116. *See, e.g.*, CAC ¶ 113 (January 10, 2022 statement: "We've been able to manage costs and deliver predictable results through each one of these [COVID-19] surges.").

[13] Ex. 25 at 756 ("we believe this was largely anticipated by investors."); Ex. 26 at 765 ("While the results are far from ideal, another guidance cut was largely expected."); Ex. 27 at 774 ("To a large extent we believe a guide down was expected and baked into shares.").

and there was no price impact from the Feb. 27 disclosure, there is no evidence of price impact for these statements. *See* Cain Report, ¶ 75 n.71 ("agilon's common stock responded to this [Feb. 27] earnings announcement on February 28, 2024, the first day following the end of the Class Period."); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015).

Since the 2021–22 statements and January 5, 2024 statements had no price impact, Plaintiffs are not entitled to a presumption of reliance and a class cannot be certified as to these statements. The class period must, at a minimum, be narrowed to exclude the statements in Categories A, B, C, and D, resulting in a class period beginning on January 9, 2023 and ending on January 5, 2024.

### C.  Plaintiffs' Damages Methodology Fails to Satisfy *Comcast*.

Plaintiffs' Motion must be denied in its entirety for an additional reason: they do not satisfy their burden to show a damages methodology "consistent with [their] liability case" and that can "measure ***only*** those damages attributable to [their] theory [of liability]." *Comcast*, 569 U.S. at 28, 35 (emphasis added). *Comcast* requires a "rigorous analysis" at class certification, and plaintiffs "cannot avoid this hard look by refusing to provide the specifics of their proposed methodology." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16–17 (S.D. Tex. Dec. 6, 2013) ("*BP I*").

Plaintiffs' expert, Dr. Cain, proposes to measure damages using an "out-of-pocket" "method" that measures "the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale." Cain Report, ¶ 99.  He states that quantification of artificial inflation "is based upon a detailed loss causation analysis" and lists several tools he could use, including an event study analysis. Cain Report, ¶¶ 101–102.  Dr. Cain further claims that "confounding" information—*i.e.*, non-allegation related information that affected the stock price—can be removed using "various accepted methodologies." Cain Report, ¶ 103.

The issue with Dr. Cain's proposed "method" is that it is not a methodology at all: it is a conceptual summary of how damages are calculated in a 10b-5 class action.  He provides no damages

14

methodology, nor even the outline of a methodology, that could be applied to reach a classwide damages calculation. Among other things, he does not explain—or even attempt to explain—how he would isolate inflation tied to actionable statements, adjust for changes over a three-year class period, or account for the value-impact of disclosed risks that later materialized.

### 1. Plaintiffs' Model Fails to Isolate Inflation from Actionable Statements from Inflation Attributable to Dismissed or Non-actionable Statements.

Dr. Cain does not explain how Plaintiffs would isolate any artificial inflation attributable to the surviving statements from inflation attributable to those that have been dismissed by this Court. *See* ECF No. 63. For example, the challenged statement on May 27, 2021 includes two statements: (a) that agilon had a "high degree of visibility into future revenues and margin progression," and (b) emphasizing agilon's "growth strategy" in existing and new markets. CAC ¶ 100. The Court unequivocally dismissed the second statement (growth strategy). *See* ECF No. 63, at 34, 49. Dr. Cain offers no explanation as to how his damages model would measure artificial inflation attributable to the first statement but not the growth strategy statement. *See* Skinner Report, ¶¶ 102–107.

This is the same deficiency at issue in *Comcast*, where the expert's model "assumed the validity of all four theories" of liability, but the court accepted only one. 569 U.S. at 32, 35–36. Because the model made no attempt to isolate damages from the surviving theory, the damages model was not consistent with the plaintiff's theory of liability. *Id.* at 37; *see also Ludlow v. BP, PLC*, 800 F.3d 674, 688 (5th Cir. 2015) (explaining a damages model allowing plaintiff to "recover damages other than those resulting from the particular ... injury on which [defendant's] liability in this action is premised" travels "to a place forbidden by *Comcast*" (citation omitted)). Although this Court dismissed statements related to (i) data integration and (ii) growth strategy, Dr. Cain offers no explanation as to how his damages model would account for dismissal of these allegations. *See* Skinner Report, ¶¶102–07. *Comcast* forecloses certification here, where the damages model

15

"identifies damages that are not the result of the wrong." 569 U.S. at 37.

Similarly, Dr. Cain does not explain how the methodology would isolate, on the back end, stock price declines from actionable statements for declines due to confounding information or non-actionable statements. *See* Skinner Report, ¶¶ 102–07.[14] Dr. Cain's assertion that confounding information can be addressed in the future using "various accepted methodologies, such as event study analysis" is not sufficient to satisfy *Comcast*. *See Freitas v. Cricket Wireless, LLC,* 2022 WL 3018061, at *4 (N.D. Cal. July 29, 2022, *see also BP I*, 2013 WL 6388408, at *17 ("Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages … the Court cannot certify this litigation for class action treatment.").

### 2. Plaintiffs' Model Fails to Account for Disclosed Risks that Later Materialized.

In addition, Dr. Cain does not explain how the methodology will account for the fact that agilon warned of the very risks that later materialized in 2023. *See* Skinner Report, ¶¶ 64–70. Where a plaintiff argues a known risk was inadequately disclosed, as Plaintiffs do here,[15] the market was aware of *at least some probability* that the risk would materialize, and any damages model must account for that.[16] *See In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20,

---

[14] *See also Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061, at *6 (N.D. Cal. July 29, 2022) (decertifying class because "damages model does not even attempt to control for confounding variables"); *Schechner v. Whirlpool Corp.*, 2019 WL 4891192, at *8 (E.D. Mich. Aug. 13, 2019) (denying certification because damages model did not exclude confounding factors).

[15] *See* ECF No. 55, at 15–16 ("[G]eneral cautionary language such as agilon's fails to excuse a failure to reveal known, material, adverse facts." (citation modified)). Moreover, the Court recognized Plaintiffs' risk-materialization theory in its MTD Order, relying on it in finding agilon's FY23 guidance fell outside the cautionary language Safe Harbor. *See* ECF No. 63, at 40–41 ("Plaintiffs allege the risks had already begun to materialize when agilon made the cautionary statements and risk disclosures.").

[16] Courts have noted the "potential confusion" that may arise where "the parties employ the 'corrective disclosure' term" in cases where the "'corrective' events are materializations of concealed or understated risks," as is the case here. *BP I*, 2013 WL 6388408, at *7 n.5 (citing *In re Vivendi Univ., S.A. Securities Litig.*, 634 F. Supp. 2d 352, 363 n. 9 (S.D.N.Y. 2009) (noting that "many courts in [this] district consider corrective disclosures to be a separate conceptual category

2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ("*BP II*"). For example, if a company disclosed a 10% risk of incurring a $100 cost, but the true risk was 20%, a plaintiff can only recover $10—or the difference in value between the disclosed risk and the true risk.[17] A plaintiff's recovery of anything more would be an impermissible windfall, untethered to their theory of liability. *See BP I*, 2013 WL 6388408, at *10. A plaintiff thus fails to meet their burden where the damages model fails to account for the risk already known to the market. *Id.* at *17.

Here, as one example, agilon warned in its April 16, 2021 IPO Registration Statement that its medical expenses depended on estimates, and actual expenses "have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served." *See* Ex. 2 at 116.  That risk materialized in late 2023, when an industry-wide post-pandemic surge in healthcare utilization drove costs above agilon's estimates, resulting in reduced guidance and the alleged corrective disclosures. *See* Skinner Report, ¶ 68. agilon warned of the very risks that later materialized and thus the market was aware (and the stock price reflected) some probability that these risks would materialize. *See id.* at ¶ 70. Plaintiffs' damages model must explain how it will account for the portion of the risk that was disclosed, and its failure to do so is "fatal to class certification." *BP II*, 2014 WL 2112823, at *10.

### 3.  Plaintiffs' Model Cannot Measure Inflation from 2/27/2024 Disclosure.

Lastly, Dr. Cain fails to explain how the February 27, 2024, alleged corrective disclosure could measure any artificial inflation, given that Dr. Cain's own analysis shows there was ***no statistically significant price movement*** following the corrective disclosure. *See* Cain Report, Ex. 6. In an efficient market, agilon's stock price would have impounded any new information from the after-close February 27 disclosure within a single trading day—i.e., on February 28. *See* Skinner

---

from 'materialization of the risk'")).
[17] *See BP I*, 2013 WL 6388408, at *16–17 n.15; *see also* Skinner Report, ¶ 65.

Report, ¶¶ 109, 111. Dr. Cain concludes there was no price impact, but offers no explanation for Plaintiffs' strained attempt to include the February 27, 2024 disclosure in its damages model.

### D.  The Section 20A Class Cannot Be Certified.

A Section 20A class cannot be certified because (*i*) Plaintiffs' proposed 3-year period ignores that Section 20A is statutorily limited to purchases that were "contemporaneous" with Sell's September 14, 2021 stock sale, (*ii*) properly limited to such purchases, a Section 20A class cannot be certified because Plaintiffs fail to demonstrate that any alleged misrepresentations made before January 9, 2023 impacted the price of agilon stock, and (*iii*) Plaintiffs fail to propose a methodology for determining any alleged Section 20A damages for individual class members.

### 1.  The Proposed Class Period Is Overbroad for the Section 20A Claim.

Plaintiffs' proposed class—consisting of those who purchased agilon stock "between May 27, 2021 and February 27, 2024"—is wildly overbroad with respect to the Section 20A claim because that statute provides a remedy only to those who traded "contemporaneously" with the alleged insider.  *See* 15 U.S.C. § 78t-1(a).  Here, the class must be limited to those who purchased agilon stock contemporaneously with Sell's sale of stock on September 14, 2021.  CAC ¶ 329.

"Contemporaneous" trading under Section 20A demands close temporal proximity to the insider's transaction.  *In re Enron Corp. Sec., Derivative & ERISA Litig*., 258 F. Supp. 2d 576, 600 (S.D. Tex. 2003).  Because "identifying the party in actual privity with the insider is virtually impossible in trades occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible avenue by which to sue insiders."  *Id.* (quoting *In re MicroStrategy, Inc.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000)).  A "restrictive reading of the term serves the 'privity-substitute function' of the provision while simultaneously 'guard[ing] against 'mak[ing] the insider liable to the world.'''  *Id.* (quoting *In re MicroStrategy*, 115 F. Supp. 2d at 663).

18

Accordingly, courts in this Circuit have held that the contemporaneity requirement limits the relevant window for Section 20A claims to a narrow period, either the same day as the insider sale or a few days afterwards. *See id.* (finding "two or three days" and "certainly less than a week" reasonable); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *5 (S.D. Tex. June 15, 2017) (agreeing with *In re Enron* and concluding that "a six-day gap" was not "too long as a matter of law" to satisfy contemporaneity requirement); *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *24 (S.D. Tex. July 24, 2019)*, report and recommendation adopted,* 2019 WL 4673209 (S.D. Tex. Sept. 24, 2019) (agreeing with *In re Cobalt* and concluding that purchases one to four days after the insider sale were sufficiently contemporaneous). Any class with respect to the Section 20A claim must reflect this narrow time period.

### 2. Plaintiffs' Failure to Demonstrate Price Impact Prior to January 9, 2023 Means a Section 20A Class Cannot Be Certified.

A class including only those who traded contemporaneously with Sell cannot be certified because, as discussed above, agilon's stock price was not inflated when Sell sold stock. The theory underlying Plaintiffs' Section 20A claim is that Sell allegedly sold agilon stock while its price was inflated in light of the Company's statements concerning the strength of its business model and financial prospects. Because agilon's stock price was not inflated on September 14, 2021, there can be no liability arising from that sale, and therefore a Section 20A class cannot be certified.

### 3. Plaintiffs Have Not Demonstrated that Section 20A Damages Are Capable of Measurement on a Classwide Basis.

A Section 20A class cannot be certified for the independent reason that Plaintiffs fail to propose any methodology for determining losses by individual class members, much less one that is capable of reliably establishing losses on a classwide basis. Plaintiffs therefore fail to satisfy their burden of showing their damages methodology is consistent with their liability case with respect to the Section 20A claims. *Comcast*, 569 U.S. at 28, 35.

19

The supposed "methods" for calculating damages set forth in Dr. Cain's report do no such thing. Cain Report, ¶¶ 111–14. Although Cain purports to tie those methods to Section 20A's text, he incorrectly conflates the statutory cap on damages with a "formula" for calculating losses. Cain Report, ¶ 109. As relevant here, the statute states: "The total amount of damages imposed under subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." *See* 15 U.S.C. § 78t-1(b)(1). That language provides only an overall cap on a defendant's liability; it is not a "formula" for calculating an individual plaintiff's loss.

Dr. Cain does not explain how he would calculate alleged damages suffered by an individual class member purportedly as a result of Sell's stock sale. This is precisely the disconnect *Comcast* forbids: a damages theory untethered from a theory of liability. *See In re BP*, 2013 WL 6388408, at *17. Dr. Cain says nothing about quantifying any individual's alleged damages; he addresses only the statutory cap on aggregate damages.

Moreover, although Cain asserts that the methods he proposes for calculating the cap on damages have been "employed" in other cases, none of those cases addressed a contested motion for class certification, much less held that calculating the cap on aggregate damages was sufficient to prove individual damages on a classwide basis. *See* Cain Report, ¶ 110. Those cases undermine, rather than support, Dr. Cain's opinions. *See, e.g.*, *In re MicroStrategy*, 115 F. Supp. 2d at 664–65 (stating damages "are limited to the profits or losses avoided by the illegal transactions").

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied in its entirety, or in the alternative, any certified class period must be limited to Plaintiffs' Section 10(b) claim and be narrowed to exclude all statements in Categories A, B, C, and D resulting in a Class Period beginning on January 9, 2023 and ending on January 5, 2024.

Dated:  June 29, 2026

*/s/  Mason Parham*
SIDLEY AUSTIN LLP
Yolanda C. Garcia
Mason Parham
Barret V. Armbruster
2323 Cedar Springs, Suite 2600
Dallas, TX 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
mparham@sidley.com
ygarcia@sidley.com
barmbruster@sidley.com

*Attorneys for Defendants agilon health, inc., Steven J. Sell, Girish Venkatachaliah, Heidi Hittner, and Timothy S. Bensley*

## CERTIFICATE OF SERVICE

I certify that on June 29, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Mason Parham*
Mason Parham

21