**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br>ALL ACTIONS. | Master File No.: 1:24-cv-00297-DAE<br><br>CLASS ACTION |

**APPENDIX II IN SUPPORT OF AGILON DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

agilon Defendants, by and through their undersigned counsel, hereby submit this Appendix II In Support of agilon Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification.

| Ex. | Description | APP |
|---|---|---|
| | Declaration of M. Parham | APP 001 - APP 004 |
| 1. | Expert Report of Professor Douglas Skinner, Ph.D | APP 005 – APP 079 |
| 2. | April 16, 2021, IPO final prospectus (excerpts) | APP 080 – APP 156 |
| 3. | May 26, 2021, 8-K, with attachment | APP 157 – APP 169 |
| 4. | May 27, 2021, 1Q 2021 Earnings Call | APP 170 – APP 188 |
| 5. | Oct. 28, 2021, 3Q 2021 Press Release | APP 189 – APP 198 |
| 6. | Oct. 29, 2021, 3Q 2021 Earnings Call | APP 199 – APP 218 |
| 7. | Jan. 10, 2022, JP Morgan Conference | APP 219 – APP 233 |
| 8. | Mar. 3, 2022, 8-K, with attachment | APP 234 – APP 247 |
| 9. | May 11, 2022, Bank of America Conference | APP 248 – APP 261 |
| 10. | June 8, 2022, William Blair Conference | APP 262 – APP 273 |
| 11. | Sept. 14, 2022, Morgan Stanley Conference | APP 274 – APP 287 |

1

| 12. | Nov. 3, 2022, 3Q 2022 Earnings Call | APP 288 – APP 310 |
|---|---|---|
| 13. | Mar. 1, 2023, 8-K with attachment | APP 311 – APP 323 |
| 14. | Nov. 2, 2023, 8-K, with attachment | APP 324 – APP 358 |
| 15. | Nov. 2, 2023, Q3 2023 Earnings Call Transcript | APP 359 – APP 378 |
| 16. | Nov. 2, 2023, 3Q23 Report on Form 10-Q | APP 379 – APP 420 |
| 17. | Jan. 5, 2024, Guidance Update Call Transcript | APP 421 – APP 441 |
| 18. | Jan. 5, 2024, 8-K with attachment | APP 442 – APP 463 |
| 19. | Feb. 27, 2024, 8-K with attachment | APP 464 - APP 500 |
| 20. | Feb. 27, 2024, 10-K (excerpts) | APP 501 – APP 553 |
| 21. | *In re Concho Res., Inc.*, 4:21-cv-2473, 2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) | APP 554 – APP 610 |
| 22. | Lead Plaintiff North Carolina Funds' Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs | APP 611 – APP 658 |
| 23. | Lead Plaintiff North Atlantic Funds' Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs | APP 659 – APP 706 |
| 24. | Lead Plaintiff Indiana Public Retirement System's Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs | APP 708 – APP 754 |
| 25. | "As Expected, Uptick in MA Utilization Pressures Costs Trends, Margins Once Again," *William Blair*, February 27, 2024 | APP 755 – APP 763 |
| 26. | "With MA industry expectations reset, focus could start to turn to 2025 and beyond," *Bank of America*, February 28, 2024 | APP 764 – APP 772 |
| 27. | "Revises 2024 Outlook Lower on Elevated Trend; Maintaining MO, Lowering Price Target," *JMP Securities*, February 28, 2024 | APP 773 – APP 780 |

Dated:  June 29, 2026

/s/  Mason Parham
SIDLEY AUSTIN LLP
Yolanda C. Garcia
Mason Parham
Barret V. Armbruster
2323 Cedar Springs, Suite 2600
Dallas, TX 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
mparham@sidley.com
ygarcia@sidley.com
barmbruster@sidley.com

*Attorneys for Defendants agilon health, inc., Steven J. Sell, Girish Venkatachaliah, Heidi Hittner, and Timothy S. Bensley*

## CERTIFICATE OF SERVICE

I certify that on June 29, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Mason Parham
Mason Parham

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION | Master File No.: 1:24-cv-00297-DAE |

**DECLARATION OF D. MASON PARHAM IN SUPPORT OF
AGILON DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Mason Parham, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The facts set out in this Declaration are based on my personal knowledge and, if called as a witness, I could competently testify to the following matters.

2.      I am an attorney licensed to practice law in the State of Texas. I am a Partner at the law firm Sidley Austin LLP. I am one of the attorneys responsible for the preparation of agilon Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Professor Douglas Skinner, Ph.D.

4.      Attached hereto as **Exhibit 2** are true and correct copies of excerpts from agilon's IPO Prospectus dated April 16, 2021.

1

**APP 001**

5.     Attached hereto as **Exhibit 3** is a true and correct copy of agilon's Form 8-K dated May 26, 2021, attaching agilon's Press Release dated May 26, 2021.

6.     Attached hereto as **Exhibit 4** is a true and correct copy of agilon's Q1 2021 Earnings Call Transcript dated May 27, 2021.

7.     Attached hereto as **Exhibit 5** is a true and correct copy of agilon's Q3 2021 Press Release dated October 28, 2021.

8.     Attached hereto as **Exhibit 6** is a true and correct copy of agilon's Q3 2021 Earnings Call Transcript dated October 29, 2021.

9.     Attached hereto as **Exhibit 7** is a true and correct copy of a transcript from the J.P. Morgan Healthcare Conference dated January 10, 2022.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of agilon's Form 8-K dated March 3, 2022, attaching agilon's Press Release dated March 3, 2022.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of a transcript from the Bank of America Conference dated May 11, 2022.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of a transcript from the William Blair Conference dated June 8, 2022.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of a transcript from the Morgan Stanley Conference dated September 14, 2022.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of agilon's Q3 2022 Earnings Call Transcript dated November 3, 2022.

15.     Attached hereto as **Exhibit 13** is a true and correct copy of agilon's Form 8-K dated March 1, 2023, attaching agilon's Press Release dated March 1, 2023.

2

16.    Attached hereto as **Exhibit 14** is a true and correct copy of agilon's Form 8-K dated November 2, 2023, attaching agilon's Press Release dated November 2, 2023.

17.    Attached hereto as **Exhibit 15** is a true and correct copy of agilon's Q3 2023 Earnings Call Transcript dated November 2, 2023.

18.    Attached hereto as **Exhibit 16** are true and correct copies of excerpts from agilon's Form 10-Q dated November 2, 2023.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of agilon's Guidance Update Transcript dated January 5, 2024.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of agilon's Form 8-K dated January 5, 2024, attaching agilon's Press Release dated January 5, 2024 and Investor Presentation dated January 5, 2024.

21.    Attached hereto as **Exhibit 19** is a true and correct copy of agilon's Form 8-K dated February 27, 2024, attaching agilon's Press Release dated February 27, 2024 and Investor Presentation dated February 27, 2024.

22.    Attached hereto as **Exhibit 20** are true and correct copies of excerpts from agilon's Form 10-K dated February 27, 2024.

23.    Attached hereto as **Exhibit 21** is a true and correct copy of the court's Order on Class Certification (Dkt. 121) entered in *In re Concho Res., Inc.*, No. 4:21-cv-2473, 2025 WL 1040379 (S.D. Tex. Apr. 7, 2025).

24.    Attached hereto as **Exhibit 22** is a true and correct copy of Lead Plaintiff North Carolina Funds' Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs.

3

25.     Attached hereto as **Exhibit 23** is a true and correct copy of Lead Plaintiff North Atlantic Funds' Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs.

26.     Attached hereto as **Exhibit 24** is a true and correct copy of Lead Plaintiff Indiana Public Retirement System's Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs.

27.     Attached hereto as **Exhibit 25** is a true and correct copy of the William Blair analyst report titled "As Expected, Uptick in MA Utilization Pressures Costs Trends, Margins Once Again," dated February 27, 2024.

28.     Attached hereto as **Exhibit 26** is a true and correct copy of the Bank of America analyst report titled "With MA industry expectations reset, focus could start to turn to 2025 and beyond," dated February 28, 2024.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of the JPM Securities analyst report titled "Revises 2024 Outlook Lower on Elevated Trend; Maintaining MO, Lowering Price Target," dated February 28, 2024.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  June 29, 2026                                    Respectfully submitted,

                                                          By: */s/ D. Mason Parham*
                                                              D. Mason Parham

4

**APP 004**

# EXHIBIT  1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| IN RE AGILON HEALTH, INC. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br>ALL ACTIONS. | Master File No.: 1:24-cv-00297-DAE |

**EXPERT REPORT OF PROFESSOR DOUGLAS SKINNER, PH.D.**

**June 29, 2026**

APP 006

# Table of Contents

I.      Qualifications ...................................................................................................... 1

II.     Assignment and Compensation ........................................................................... 2

III.    Summary of Opinions ......................................................................................... 3

IV.     agilon and Its Financial Reporting ..................................................................... 7

    A.      agilon ........................................................................................................ 7

    B.      agilon's Financial Reporting Practices ..................................................... 9

V.      Plaintiffs' Allegations ....................................................................................... 15

    A.      Alleged Misrepresentations .................................................................... 15

    B.      Alleged Corrective Disclosures .............................................................. 18

        1.      November 2, 2023:  agilon 3Q23 Earnings Disclosures and
                Earnings Call ................................................................................ 18

        2.      January 5, 2024:  agilon Guidance Update ............................... 19

        3.      February 27, 2024:  agilon 4Q23 Earnings Disclosure and Earnings
                Call .............................................................................................. 20

VI.     Dr. Cain Fails to Offer a Class-Wide Damages Methodology Capable of Reliably
    Measuring Damages Consistent with Plaintiffs' Theory of Liability ............... 21

    A.      Summary of Dr. Cain's Opinion Regarding His Proposed Approach to Calculate
        Damages on a Class-Wide Basis ............................................................ 22

    B.      By Itself, an Event Study Can Only Reliably Measure Inflation in Limited
        Circumstances ......................................................................................... 25

    C.      Dr. Cain Fails to Provide a Methodology That Can Account for Changes in
        Uncertainty in the But-For World .......................................................... 28

    D.      Dr. Cain Fails to Provide a Methodology That Can Account for Differences
        Between the Information Plaintiffs Allege as Corrective and Certain Alleged
         Misrepresentations in 2021 and 2022 .................................................... 33

        1.      The May 2021 Guidance and Financial Projections Statement ................ 34

        2.      The January 2022 Utilization Statement .................................... 37

        3.      Business Model Statements in 2021 and 2022 ......................... 39

    E.      Dr. Cain Fails to Provide a Methodology that Can Account for How Alleged
        Inflation May Have Evolved Over the Course of the Proposed Class Period ...... 41

        1.      Dr. Cain Fails to Establish How He Would Account for Changes in
                the Economic Impact of the Utilization Environment Over the
                Course of the Proposed Class Period .......................................... 42

2.	Dr. Cain Fails to Propose a Methodology to Account for Changes in the Composition of agilon's Membership and PCPs Due to Growth ................................................................................................ 45

F.	Dr. Cain Fails to Provide a Methodology Capable of Reliably Separating the Stock Price Effect of Potentially Confounding Information................................. 48

G.	Dr. Cain Fails to Address the Lack of Any Statistically Significant Stock Price Reaction to the February 27, 2024 Alleged Corrective Disclosures..................... 51

APP 008

**I.    Qualifications**

1.      I am the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business.  I have been a tenured full professor at the University of Chicago since 2005, and previously served as Deputy Dean for Faculty and Interim Dean.  Prior to my appointment at the University of Chicago, I was the KPMG Professor of Accounting at the Ross School of Business, University of Michigan, where I held tenured and tenure-track appointments from 1989 until 2005 and served as chair of the accounting department.

2.      I hold a B. Econ. (First Class Honors in Accounting and Finance) from Macquarie University in Sydney, Australia, and an M.S. and Ph.D. (Applied Economics:  Accounting and Finance) from the University of Rochester.  I have taught undergraduate upper-class students, full-time and part-time MBA students, Executive MBA ("EMBA") students, executives, consultants, and Ph.D. students.  I have taught introductory financial accounting, intermediate financial accounting, accounting for financial instruments, corporate financial reporting and analysis, financial statement analysis, managerial (cost) accounting, corporate finance, investments, valuation, and empirical methods in accounting research.  Most recently, I have taught Corporate Finance and Valuation, as well as Managerial Accounting, in the University of Chicago's EMBA program at campuses in Chicago, London, and Hong Kong and a Ph.D. class in empirical capital markets research.

3.      From 2006 to 2021, I was a Senior Editor of the *Journal of Accounting Research*, one of the preeminent academic accounting journals in the world.  Before moving to Chicago, I was Co-Editor of the *Journal of Accounting and Economics*, also one of the world's leading academic accounting journals.  I also served as editor of the *Review of Accounting Studies*, and for several terms on the editorial board of *The Accounting Review*.  I am a member of the American Accounting Association and the American Finance Association.  I frequently present my research at major accounting and finance conferences and prominent universities.  I have supervised doctoral students who have accepted faculty positions at major business schools including Stanford, Harvard, Wharton, MIT, Columbia, Cornell, Michigan, Yale, and Chicago.

4.      I have published research on a variety of topics in accounting, auditing, capital markets, investments, and corporate finance, including how security prices respond to corporate

disclosures (including event studies of earnings disclosures); corporate managers' incentives to disclose forward-looking information including guidance; the payout practices of public companies (*i.e.*, firms' dividend and repurchase decisions); corporate managers' financial reporting, disclosure, and capital management decisions; how accounting information is used in contracts between the various corporate stakeholders; and the nature of corporate debt agreements.

5.      My research is published in leading accounting and finance journals, including *The Accounting Review*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, the *Journal of Business*, *The Journal of Finance*, and the *Journal of Financial Economics*.

6.      I serve as an Independent Trustee and chair of the Audit Committee for Harbor Funds, Harbor Funds II, and Harbor ETF Trust.

7.      A copy of my curriculum vitae, including publications, is attached as **Appendix A**.  A list of my testimony over the last four years is attached as **Appendix B**.

## II.   Assignment and Compensation

8.      I have been retained by counsel for agilon health, inc. ("agilon" or "the Company") and individual defendants Steven Sell, Timothy Bensley, Girish Venkatachaliah, and Heidi Hittner (collectively, "Defendants") to review and respond to the expert report of Dr. Matthew Cain, dated April 6, 2026 ("Cain Report").[1]  I understand that the operative Complaint[2] alleges that Defendants made false and misleading statements and omissions (the "alleged misrepresentations") during the period between May 27, 2021 and February 27, 2024 ("Proposed Class Period").[3]  I have been asked to evaluate whether Dr. Cain has put forth a methodology that

---

[1] Expert Report of Matthew D. Cain, Ph.D., April 6, 2026 ("Cain Report").
[2] Consolidated Complaint for Violations of the Federal Securities Laws, *In re agilon health, inc. Securities Litigation*, United States District Court for the Western District of Texas, Austin Division, Case No. 1:24-cv-00297-DII, September 6, 2024 ("Complaint").
[3] Complaint, ¶¶ 1, 100; Order: (1) Granting in Part and Denying in Part agilon Defendants' Motion to Dismiss; (2) Granting Underwriter Defendants' Motion to Dismiss; and (3) Granting in Part and Denying in Part CD&R Defendants' Motion to Dismiss, *In re agilon health, inc. Securities Litigation*, United States District Court for the Western District of Texas, Austin Division, Case No. 1:24-cv-00297-DAE, August 15, 2025 ("MTD Order"), p. 26.  *See also* Cain Report, ¶ 1.

can reliably measure class-wide damages for agilon common stock in a manner consistent with Plaintiffs' theory of liability in this matter.[4]

9.      In formulating my opinions, I have relied on my knowledge, prior experience, academic research on relevant topics, experience as a journal editor reviewing academic research articles, and formal training in economics, finance, and accounting.  A list of materials considered in preparing this report is attached as **Appendix C**.

10.      I am being compensated at my standard billing rate of $1,325 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent on my opinion or the outcome of this or any other matter.  My work on this matter is ongoing; I reserve the right to modify or supplement my opinions in the event I become aware of additional information.

## III.  Summary of Opinions

11.      Based on my analysis to date, as well as my skills, knowledge, expertise, education, and training, I have formed the following opinions.

12.      As a matter of economics, Dr. Cain fails to provide a methodology capable of measuring class-wide damages in a manner consistent with Plaintiffs' theory of liability.  His purported approach is deficient in a number of respects.

13.      *First*, Dr. Cain's discussion of a damages methodology is largely generic.  He acknowledges that assessing damages requires a methodology that describes how inflation would be measured during the Proposed Class Period.  However, what Dr. Cain calls the out-of-pocket "method" is little more than a conceptual definition of damages under Section 10(b) and is not a methodology in the sense that term is used in economics.  His analysis is circular:  he invokes the out-of-pocket damages formula, but that formula merely defines damages as the difference

---

[4] I have not, at this time, been asked to evaluate Dr Cain's analyses and opinions regarding the efficiency of the market for agilon common stock during the Proposed Class Period.  For purposes of this report, I have been asked by counsel to assume that agilon common stock traded in a semi-strong form efficient market during the Proposed Class Period.  This should not in any way be taken to imply that I agree with Dr. Cain's opinions with respect to market efficiency including the methods he used to reach those conclusions, which includes his event study method; at this stage, I have not formed any opinions with respect to these matters.

between actual prices and prices in the "but-for" world—*i.e.*, the hypothetical world in which there were no alleged misrepresentations. It does not explain how to estimate the necessary but-for prices, how to measure inflation on each day of the Proposed Class Period, or how to tie that measurement to the facts and alleged corrective disclosures in this case. He instead relies on generic analyses and assumptions—such as measuring inflation by using stock price declines following the alleged corrective disclosures—without regard to whether they could be applied or have any relevance here. Dr. Cain therefore assumes away the central damages question rather than providing a methodology to address it.

14.     *Second*, Dr. Cain fails to provide a methodology that can account for changes in uncertainty in the but-for world. The alleged corrective disclosures concern, among other things, utilization levels in 2023 and (anticipated) in 2024 and their effects on FY23 medical margin and EBITDA, FY24 guidance, and reported medical margin for 2Q23 and 3Q23. Those disclosures appear to concern *new* developments that occurred in 2023 or were anticipated for 2024. Dr. Cain fails to explain how stock price declines following the alleged corrective disclosures could reliably measure inflation earlier in the Proposed Class Period, given that what agilon allegedly could and should have disclosed at the time of the earlier alleged misrepresentations would likely have differed from what was actually disclosed on the alleged corrective disclosure dates. Moreover, to the extent Plaintiffs claim agilon concealed or understated certain risks to which it was exposed, any inflation attributable to concealed or understated risks would, as a matter of basic economics, differ from the stock price declines that occurred when those risks materialized. This is because earlier knowledge of a heightened risk of an adverse outcome differs from and does not have the same economic impact as a later materialization of that risk. However, Dr. Cain fails to provide a methodology that accounts for any market misperception of such risks (let alone one that could account for any changes in those risks over the course of the Proposed Class Period).

15.     *Third*, Dr. Cain fails to provide a damages methodology that can account for apparent differences between the information Plaintiffs allege as corrective and what Plaintiffs allege was misrepresented in 2021 and 2022. In particular, certain alleged misrepresentations referenced agilon's visibility into revenues over the next 12 months, its visibility into how medical margins for current members were expected to expand as those members "matured" on its platform, and

the Company's actual and expected performance in 2021 and 2022. In contrast, the alleged corrective disclosures discussed utilization levels in 2023 and (anticipated) in 2024, and agilon's visibility into medical claims in those years. Based on my review of analyst reports published following the alleged corrective disclosures,[5] no analyst specifically referenced any of the alleged misrepresentations in 2021 and 2022. Given the lack of analyst commentary that connects the alleged corrective information to the 2021 and 2022 alleged misrepresentations, in addition to the apparent differences between the alleged corrective information and the alleged misrepresentations, Dr. Cain fails to offer any economic rationale to support his opinion that stock price declines following the alleged corrective disclosures can reliably measure inflation created (or maintained) by the alleged misrepresentations prior to 2023.

16.     *Fourth*, Dr. Cain fails to provide a methodology that can account for how alleged inflation (if any) may have evolved during the Proposed Class Period. In particular, the MTD Order groups the actionable misrepresentations into several categories; for some of these, the first alleged misrepresentation occurred well after the start of the Proposed Class Period. For example, one of the categories consists of statements regarding the utilization environment, for which the first alleged misrepresentation was made in January 2022—nearly eight months after the start of the Proposed Class Period. This suggests that any inflation may have changed over the course of the Proposed Class Period as new statements relating to new categories were made. Dr. Cain also fails to account for the fact that the economic implications of the alleged relevant truth (and any inflation) associated with the different alleged misrepresentations may have changed over time as agilon's business, industry conditions, and the overall economy changed during the nearly three-year Proposed Class Period. Most notably, Dr. Cain fails to propose a methodology that could account for the value implications of COVID-19 pandemic developments as they related to the Company's ability to predict and control medical costs attributable to changes in the utilization environment. Similarly, Dr. Cain fails to provide a methodology capable of measuring how inflation may have changed as a result of the Company's growth and changing membership composition and their effects on the Company's ability to predict and manage medical costs.

---

[5] I reviewed analyst reports covering agilon available to me that were issued during the seven calendar-day windows beginning with the dates of each of the alleged corrective disclosures. These reports were issued by a total of 26 unique analyst firms.

APP 013

17.    *Fifth*, Dr. Cain fails to provide a methodology capable of reliably separating the stock price effects of potentially confounding information, including information relating to categories of misrepresentations that I understand are no longer actionable.  For example, on the alleged corrective disclosure dates, agilon disclosed that its medical margin had been adversely affected by issues related to data integration and the onboarding of new primary care doctors in mature markets.  However, I understand the Court held that statements related to "data integration" and "growth strategy" are not actionable.  Dr. Cain fails to explain how his proposed approach would account for a determination by the finder of fact that, for example, disclosures regarding "system issues" or issues with onboarding new PCPs are not corrective of the alleged misrepresentations that remain actionable.

18.    *Finally*, Dr. Cain fails to provide a methodology capable of addressing the lack of any statistically significant stock price reaction to certain allegedly corrective disclosures.  Plaintiffs allege that certain information conveyed by agilon's 4Q23 earnings release and earnings call, made after market close on February 27, 2024, was corrective and caused declines in agilon's stock price over three trading days; on February 28, February 29, and March 1, 2024.[6]  However, in an efficient market, there is no basis to assume (and Dr. Cain does not provide one) that it would take more than one trading day for the price of agilon common stock to incorporate new information released after the close on February 27, 2024.  Moreover, according to Dr. Cain's event study, the abnormal return on agilon common stock on February 28, 2024 was not statistically significant.[7]  Dr. Cain fails to explain how he would employ an event study to measure the inflation allegedly dissipated on February 28, 2024 given the lack of any statistically significant abnormal return on this date.

---

[6] Complaint, ¶ 91.
[7] *See* Cain Report production, Cammer 5.xlsx.

## IV. agilon and Its Financial Reporting

### A.  agilon

19.     agilon is a healthcare services and technology company.[8]  Following its initial public offering on April 15, 2021 and throughout the Proposed Class Period, agilon common stock traded on the NYSE under ticker AGL.[9]

20.     Before and during the Proposed Class Period, agilon described its business as comprising "three key elements:"  (i) its "platform;" (ii) its "long-term … partnership" with primary care physicians ("PCPs"); and (iii) its "network" of "community-based physician partners."[10]  agilon's primary business (its "Total Care Model") covered patients enrolled in Medicare Advantage ("MA") plans and involved agreements with MA payors (including the insurance companies Humana, Aetna, and United Healthcare).[11]  agilon's Total Care Model also involved partnerships with regional physician groups, primarily through Risk-Bearing Entities ("RBEs"), through which physicians provided care to patients ("members").[12]  agilon explained that its long-term physician partner model "optimize[d] the long-term sticky relationship between a patient and their existing physician."[13]  Under this business model, agilon received defined per-member-per-month ("PMPM") fees from MA payors (sometimes known as capitation payments) in exchange for taking responsibility for the provision of healthcare services for its members.[14]  agilon characterized its Total Care Model as a "value-based health care model," as distinct from traditional fee-for-service reimbursement models.[15]  According to agilon, whereas fee-for-service

---

[8] agilon health, inc. Form 10-K for the year ended December 31, 2021, filed on March 3, 2022 ("agilon 2021 Form 10-K"), pp. 4–5.

[9] agilon health, "agilon health Announces Pricing of Initial Public Offering," April 14, 2021, available at https://investors.agilonhealth.com/news/news-details/2021/agilon-health-Announces-Pricing-of-Initial-Public-Offering/default.aspx.

[10] agilon 2021 Form 10-K, pp. 4–5.

[11] agilon 2021 Form 10-K, pp. 4, 9 ("As of December 31, 2021, the PCPs on our platform serve approximately 238,000 senior members, which includes 186,300 MA members … For the year ended December 31, 2021, Humana represented approximately 26% of our total revenue, and Humana, Aetna and United Healthcare collectively represented approximately 62% of our total revenue.").

[12] agilon 2021 Form 10-K, p. 4 ("Our model operates by primarily forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements).").

[13] agilon 2021 Form 10-K, p. 5.

[14] agilon 2021 Form 10-K, p. 8 ("We enter into contractual agreements with health plan payors in each of our geographies, under which we are financially responsible for our physician partners' provision of a defined spectrum of healthcare services to our members, in exchange for a defined PMPM fee for each of our members (which is also referred to as 'global capitation').").

[15] agilon 2021 Form 10-K, p. 7 ("Under our Total Care Model, which is a type of value-based care reimbursement model, we are responsible for managing the medical costs associated with our attributed members.").

models compensated healthcare providers based on the volume of services provided, value-based care models incentivize healthcare providers to improve care costs and quality.[16]

21.    During the Proposed Class Period, agilon also operated a "Direct Contracting" business (later referred to in Company disclosures as ACO REACH), which covered care for Medicare beneficiaries through direct contracting with the federal government (*i.e.*, the Centers for Medicare and Medicaid Services) rather than private payors.[17]

22.    During the Proposed Class Period, the Company recognized the PMPM fees received from MA payors as revenue, which it referred to as "medical services revenue."  These represented nearly all of agilon's reported revenues.  agilon's primary operating expense was "medical services expense," which comprised costs incurred for medical services provided to its members.[18]  agilon's profitability primarily depended on the difference between the medical services revenues it generated from pre-agreed PMPM fees and the medical services expenses it incurred; agilon reported this difference as "medical margin."[19]  During the Proposed Class Period, agilon reported its medical margin in aggregate dollar terms as well as on a per-member basis.[20]  agilon disclosed that a variety of factors affected its medical margin, including "utilization rates of healthcare services" by members (sometimes just "utilization"), "[c]hanges to the Medicare fee schedule," and "[c]ontractual rates paid to hospitals."[21]  agilon disclosed that

---

[16] agilon 2021 Form 10-K, p. 7 ("Under a traditional FFS reimbursement model, physicians are paid a fixed amount for services provided during a patient visit, regardless of a patient's medical need or health outcome.  As a result, physician reimbursement is solely related to the volume of patient visits and procedures performed, thereby offering limited financial incentive to focus on preventative care and cost containment.  Value-based care models offer alternative reimbursement models, which typically incentivize physicians for improving the cost and quality of healthcare provided for an attributed patient population.  Various types of value-based care reimbursement models exist, including capitation, bundled payments, or payments for attainment of improved quality metrics or medical cost efficiency.").

[17] agilon 2021 Form 10-K, p. 10 ("Under the Direct Contracting Model, CMS contracts directly with each of the [Direct Contracting Entities].").  *See also* agilon health, inc. Form 10-K for the year ended December 31, 2023, filed on February 27, 2024 ("agilon 2023 Form 10-K"), p. 7.

[18] agilon 2021 Form 10-K, p. 64 ("Our medical services revenue consists of capitation revenue under contracts with various payors … Medical services revenue constitutes substantially all of our total revenue, accounting for nearly 100%, 100%, and 99% of our total revenues for the years ended December 31, 2021, 2020, and 2019, respectively. … Medical services expense represents costs incurred for medical services provided to our members.").  *See also* the Results of Operations on p. 66 for a comparison of the cost of agilon's medical services expense with its other operating expenses.

[19] agilon 2021 Form 10-K, p. 62 ("Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted.").  Note that the results of the Company's direct contracting (ACO REACH) business were reported as equity income (and so not separately reported as revenues and expenses on its income statement) because the entities through which that business operated were not consolidated.  *See, e.g.*, agilon 2021 Form 10-K, p. F-35.

[20] *See, e.g.*, agilon 2021 Form 10-K, p. 62; agilon health, inc. Investor Presentation, June 2022, p. 17.

[21] agilon health, inc. Form 10-K for the year ended December 31, 2022, filed on March 1, 2023 ("agilon 2022 Form 10-K"), p. 25 ("To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business … factors that impact medical costs incurred by our members … including the following:  Changes to the Medicare fee schedule or other rate schedules that serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers … Contractual rates paid to hospitals, specialty and ancillary physicians and other providers … The utilization rates of healthcare services, including inpatient hospitalization, by our members.").

APP 016

its medical margin varied across cohorts, defined based on members' entry year to the agilon platform (sometimes called "member cohorts"), and that the medical margins for newer cohorts were typically lower.[22]

23.     agilon's business grew during the Proposed Class Period.  As shown in **Exhibit 1**, agilon's MA membership more than doubled, from approximately 165,300 to 388,400, between March 31, 2021 and December 31, 2023, while its Direct Contracting/ACO REACH membership grew from nothing to approximately 89,300 over the same period.[23]  This growth was due to new physician partnerships and geographic markets as well as growth within existing partnerships and geographic markets.[24]  This increase in membership contributed to growth in Company revenues, from around $1.52 billion in fiscal 2021 to around $4.32 billion in fiscal 2023.[25]

### B.   agilon's Financial Reporting Practices

24.     During the Proposed Class Period, agilon primarily operated a value-based care business model,[26] under which it was compensated for "standing ready" to provide medical care services to its members during the contract period.[27]  This type of arrangement is sometimes described as a "risk arrangement" that involves "risk contracts" because agilon bore the risk of the cost of the

---

[22] agilon health, inc. Form 8-K, filed on February 27, 2024, Exhibit 99.2, p. 10; agilon 2021 Form 10-K, p. 62 ("New membership added to the platform is typically dilutive to medical margin PMPM.").  In addition to disclosing medical margin for member cohorts, agilon also disclosed medical margin for its "market classes."  According to agilon, a member cohort "represents all the members … [brought] live on the agilon platform in [a given year]" and medical margin for a member cohort shows the "medical margin … for the same members over time."  Market class "represents all the markets that went live during [a given year] and how those full markets have progressed over time."  The medical margin for a market class "includes the dilutive impact from membership and PCP growth."  *See* agilon health, inc. Form 8-K, filed on February 27, 2024, Exhibit 99.2, p. 9; "agilon health inc Investor Day," *Refinitiv Streetevents*, March 30, 2023, p. 24.

[23] agilon health, inc., Form 10-Q for the quarterly period ended March 31, 2021, filed on May 26, 2021, p. 7.  *See also* agilon 2023 Form 10-K, p. 55.

[24] agilon 2023 Form 10-K, p. F-8.  *See also*, *e.g.*, agilon health, inc. Form 8-K, filed on May 5, 2022 ("Consolidated MA membership increased 51% year-over-year, with 20% growth in same geographies."); agilon health, inc. Form 8-K, filed on May 9, 2023 ("Medicare Advantage membership increased 61%, with 14% growth in same geographies.").

[25] agilon 2023 Form 10-K, p. 59.  These figures exclude revenues from certain discontinued operations.

[26] PricewaterhouseCoopers, "Health Care Entities," March 2023, available at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/health-care/asset/pwchealthcare0323.pdf ("Health Care Entities"), p. 4-2.  *See also* p. 4-9 for a description of the Accountable Care Organization (ACO) model used in agilon's ACO REACH business ("Accountable care organizations (ACOs) are specifically defined by the Centers for Medicare & Medicaid Services (CMS) as groups of doctors, hospitals, and other health care providers who come together to provide coordinated, high-quality care to patients in exchange for a portion of the savings that are achieved. ACOs strive for improved patient outcomes at a lower cost through care coordination and information sharing across the delivery network.").

[27] Health Care Entities, p. 4-2.  agilon was responsible for all expenses covered under Medicare Part A and Part B, and under some payor arrangements was also responsible for Part D prescription drug costs covered by the applicable MA plan.  *See* agilon 2022 Form 10-K, p. 8 ("The healthcare services for which we are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services costs.  In certain of our payor arrangements, we are also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members.").

APP 017

services it was obligated to provide to its members.[28]  An arrangement under which an entity assumes full responsibility for the risk of managing the health care services for a defined population, as agilon does, in exchange for a fixed fee for standing ready, is also known as a "capitated contract."[29]  Consistent with this, agilon disclosed that "[m]edical services revenue consists of capitation fees under contracts with various Medicare Advantage payors."[30]

25.     For entities, such as agilon, that are required to prepare financial statements according to U.S. GAAP,[31] these types of arrangements are typically accounted for under ASC 606 (Revenue from Contracts with Customers),[32] which describes both revenue recognition for these contracts as well as recognition of the associated medical expenses.[33]  Thus, ASC 606 is the primary basis for agilon's recognition and reporting of its medical margin, which, as discussed above, agilon defines as the difference between medical services revenues and medical services expenses.[34]

26.     According to its 10-K filings, agilon recognized medical services *revenues* in the month eligible members were entitled to receive healthcare benefits during the contract term,[35] consistent with ASC 606.[36]  agilon recognized medical services *expense* in the period services

---

[28] Health Care Entities, p. 4-2.

[29] Health Care Entities, p. 4-2 ("[A]n arrangement in which the provider assumes full responsibility for and 100% of the risk of managing the health care services for a defined population of patients …, for which a provider is paid a fixed fee for standing ready to provide defined services to a population of patients, is known as a capitated contract.").

[30] *See e.g.,* agilon 2021 Form 10-K, p. F-11.

[31] In the U.S., the SEC requires domestic public companies to prepare and report external financial statements that conform with U.S. GAAP.  *See* U.S. Securities and Exchange Commission, "Financial Reporting Manual: TOPIC 1 - Registrant's Financial Statements," November 18, 2020, available at https://www.sec.gov/corpfin/cf-manual/topic-1.  U.S. GAAP consists of a body of generally accepted accounting principles and procedures developed and promulgated by an independent, private-sector standard setter as well as related rules and interpretative releases of the SEC.  The Financial Accounting Standards Board ("FASB") is the independent, private-sector, not-for-profit organization that establishes financial accounting and reporting standards for public companies that are referred to as Generally Accepted Accounting Principles, "U.S. GAAP."  The FASB is recognized by the SEC as the designated accounting standard setter for public companies.  *See*, *e.g.*, Financial Accounting Standards Board, "About the FASB," June 2025, available at https://www.fasb.org/page/ShowPdf?path=About_FASB_June_2025.pdf.  The FASB Accounting Standards Codification ("ASC") is the source of authoritative U.S. GAAP recognized by the FASB for public companies.  Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.  *See* Financial Accounting Standards Board, "ASC 105-10-05: Generally Accepted Accounting Principles – Overall – Overview and Background," available at https://asc.fasb.org/1943274/2147479442, ASC 105-10-05-01.

[32] Financial Accounting Standards Board, "ASC 606-10-05: Revenue from Contracts with Customers – Overall – Overview and Background," available at https://asc.fasb.org/1943274/2147479991 ("ASC 606-10-05") is the U.S. GAAP accounting standard that "specifies the accounting for revenue from contracts with customers" and "establishes principles for reporting useful information to users of financial statements about the nature, amount, timing, and uncertainty of revenue and cash flows arising from the entity's contracts with customers."  *See* ASC 606-10-05-1; ASC 606-10-05-2.

[33] Health Care Entities, p. 4-2.

[34] agilon 2021 Form 10-K, p. F-11.

[35] agilon 2021 Form 10-K, p. F-11.

[36] Health Care Entities, p. 4-6 ("In a capitation arrangement, it is typically appropriate to utilize a time-based measure of progress and recognize the transaction price (any fixed capitation fees plus an estimate of the variable consideration from any risk-sharing pools) using a straight-line method over the contract period.").

were provided to members.[37]   However, because agilon did not directly provide the medical services for which it was financially responsible, it "accrue[d] the estimated costs of any services … for which payment has not been made as of the close of the fiscal period, even if the … provider has not submitted an invoice for those services."[38]   These costs are thus referred to as incurred but not reported (or "IBNR").[39]   agilon disclosed in its SEC filings that it relied on payors to "regularly provide … an array of data associated with patients" including "details associated with amounts paid by payors for medical services rendered to [its] members."[40]

27.      Under this accounting, agilon recognized the *estimated cost* of providing care as medical services expense and accrued a corresponding liability ("Medical claims and related payables") in the period the services were provided.[41]   As a general matter, estimating this cost involves significant judgment and complexity given the various factors involved, which can take substantial time to resolve and are subject to significant uncertainties.[42]   agilon provided substantial disclosure related to these estimates, including of the judgment, complexity, and uncertainty involved.   For example, in its September 2021 SEO prospectus, the Company disclosed:

> [Estimates of claims that have been incurred but have either not yet been
> received, processed, or paid and as such, not reported] are developed using

---

[37] Agilon 2021 Form 10-K, p. F-12.  According to the relevant accounting guidance and consistent with agilon's practice, for "contractual arrangements accounted for under ASC 606, the event that triggers a healthcare providers' recognition of expenses for medical services is the provision of those services to the patient … [which] should be reported in the periods in which those services are actually rendered."  *See* Health Care Entities, p. 4-12.

[38] Health Care Entities, p. 4-13.

[39] Health Care Entities, p. 4-13.

[40] *See*, *e.g.*, agilon 2021 Form 10-K, p. 34.

[41] agilon 2021 Form 10-K, p. F-12 ("Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which the Company is financially responsible and that are paid either directly by the Company or by payors with whom the Company has contracted.  Medical services expenses are recognized in the period in which services are provided and include estimates of claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported.").

[42] agilon disclosed that its revenue recognition under ASC 606 also entailed estimates, such as of certain "risk adjustments," subject to significant judgment.  *See, e.g.*, agilon 2021 Form 10-K, p. 77 ("The transaction price for our MA capitation contracts is variable as the PMPM fees to which we are entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology.  CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors.  Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings.  We and our healthcare providers collect and submit the necessary and available diagnosis data to payors and we utilize such data to estimate risk adjustment payments to be received in subsequent periods.  Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in our contracts with payors.  We recognize incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.  The determination of these estimates is subject to significant judgment.  If these assessments were to change, the timing and amount of our revenue recognized would be impacted, which may be material to our consolidated financial statements.").

**APP 019**

actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions including medical service utilization trends, changes in membership, observed medical cost trends, historical claim payment patterns and other factors. Generally, for the most recent months, the Company estimates claim costs incurred by applying observed medical cost trend factors to the average PMPM medical costs incurred in prior months for which more complete claims data are available.

Each period, the Company re-examines previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances.  As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates in the period in which the change is identified.  The difference between the estimated liability and the actual settlements of claims is recognized in the period the claims are settled.  The Company's medical claims payable balance represents management's best estimate of its liability for unpaid medical costs as of December 31, 2020 and 2019. The Company uses judgment to determine the appropriate assumptions for developing the required estimates.[43]

28.     Because U.S. GAAP required agilon to record (as an expense) the cost of medical services in the period services were provided to patients (*i.e.*, when the costs were incurred), the Company initially recorded estimates of the relevant costs as part of medical services expense. Subsequently, as more information became available, such as when the Company received and processed claims for medical services, the initial estimates were revised and recorded as adjustments (to medical services expense in the relevant period).  In particular, those adjustments were recognized as prior-period developments ("PPD") or prior-year developments ("PYD").[44] As a result of these periodic adjustments, agilon reported medical services expense (and so medical margin) for a specific quarter that sometimes reflected updated information regarding medical claims for services provided in prior periods, a normal feature of accrual accounting. For example, the Company could report PYDs based on information received in 2023 that reflected the resolution of claims for services provided in 2022.  Such PYDs reflected both the lag in the claims process and the fact that U.S. GAAP required the Company to estimate the

---

[43] agilon health, inc. Form 424(b)(4), filed on September 13, 2021, p. F-34.

[44] *See*, *e.g.*, agilon health, inc. Guidance Update Presentation, January 2024, p. 4, which refers to "Prior Year Development" and "PYD."  Analysts sometimes describe prior period developments using the acronym PPD.  *See*, *e.g.*, "A tale of two quarters, core outperformance while giving bears ammo," *Bank of America*, November 3, 2023, p. 1.

APP 020

expense in the period when services were provided.  In other words, agilon's reported financial results for a given period included estimates of the cost of medical services provided in that period as well as adjustments that reflected updated information and changes in estimates for prior periods.

29.    Because the estimates required to implement this accounting were complex, required significant judgment, and were material to the Company's reported financial results and position, agilon disclosed information regarding this accounting as part of its Critical Accounting Estimates,[45] included in the Management's Discussion and Analysis disclosures in the annual Form 10-K filing.[46]  For example, agilon's Critical Accounting Estimates disclosure in its 2021 Form 10-K noted:

> Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which we are financially responsible, and which are paid either directly by us or by payors with whom we have contracted.  Medical services expenses are recognized in the period in which services are provided and *include estimates of our obligations for medical services that have been rendered by third parties, but for which claims have either not yet been received, processed or paid.*
>
> *Such estimates are based on many variables, including utilization trends and historical and statistical lag analysis, among other factors.*  The assumptions for making such estimates and establishing liabilities are continually reviewed and updated, and any adjustments resulting therein are reflected in current period earnings.  *These estimates may differ from actual results, which could be material to our consolidated financial statements.  The difference between the estimated liability and the related actual settlement of claims is recognized in the period the claims are settled.*
>
> If it is determined that our assumptions in estimating such liabilities are significantly different than actual results, our results of operations and financial position could be impacted in future periods.  Adjustments of prior period estimates may result in additional medical care expense or a

---

[45] agilon's Critical Accounting Estimates disclosure included "a discussion of accounting policies that we consider critical in that they may require complex judgment in their application or require estimates about matters that are inherently uncertain."  *See*, *e.g.*, agilon 2021 Form 10-K, pp. 76–77.

[46] *See e.g.*, agilon 2021 Form 10-K, pp. 59–77.  The requirement to disclose critical accounting estimates is codified in SEC Regulation S-K, Item 303(b)(3) (17 C.F.R. § 229.303(b)(3)).  *See* U.S. Securities and Exchange Commission, "SEC Final Rule Release No. 33-10890: Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information," November 19, 2020, available at https://www.sec.gov/files/rules/final/2020/33-10890.pdf.

reduction of medical care expense in the period an adjustment is made. Further, *due to the considerable variability of healthcare costs, adjustments to claim liabilities occur each period and may be significant as compared to the net income (loss) recorded in that period.*[47]

30.    In addition, agilon's external auditor, EY, identified accounting for IBNR ("Valuation of incurred but not reported claims") as a "Critical Audit Matter" in its reports to shareholders included in the Company's Form 10-K filings.[48]  For example, as part of its audit report in the 2021 Form 10-K, EY stated:

As of December 31, 2021, the Company's medical claims and related payables totaled $239 million, substantially all of which related to the Company's estimate for claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported ("IBNR"). As discussed in Note 2 to the consolidated financial statements, management develops its IBNR liability estimate using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions, including medical service utilization trends, historical claims payment patterns, changes in membership, observed medical cost trends and other factors.

Auditing management's estimate of the IBNR liability was complex and required the involvement of actuarial specialists due to the highly judgmental nature of the factors and assumptions used in the measurement process.  These assumptions have a significant effect on the valuation of the IBNR liability.[49]

31.    The Company's accounting for both medical services revenue and medical services expense, and thus its medical margin, followed U.S. GAAP.  As agilon disclosed in its SEC filings and as noted by its auditor, the accounting judgements and estimates involved were necessarily complex and uncertain, involving significant judgment, given the nature of the Company's business.  agilon's external auditor issued clean (unqualified) audit opinions regarding its financial statements during all fiscal periods relevant in this matter, including fiscal

---

[47] agilon 2021 Form 10-K, p. 77 (emphasis added).

[48] *See e.g.*, agilon 2021 Form 10-K, p. F-3.  The Public Company Accounting Oversight Board (PCAOB) defines a Critical Audit Matter as "any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex auditor judgment."  *See* Public Company Accounting Oversight Board, "Audit Focus: Critical Audit Matters," November 2024, available at https://assets.pcaobus.org/pcaob-dev/docs/default-source/documents/audit-focus-cams.pdf, p. 1.

[49] agilon 2021 Form 10-K, p. F-3.

APP 022

years 2021, 2022, and 2023.[50]  I understand that the Company was never required to revise or restate any of its financial statements.

32.    In its 2023 Form 10-K filing (but not any prior Form 10-K filings), the Company disclosed a weakness in internal control over financial reporting ("ICFR") related to the controls around its reporting of its medical claims and related payables—*i.e.*, the liability related to its medical services expense accrual.[51]  This ICFR issue did not result in a restatement of prior period financial statements.  As noted above, EY issued an unqualified (clean) opinion which concluded that the Company's financial statements conformed, in all material respects, to U.S. GAAP.

33.    In sum, due to the nature of agilon's business and the relevant U.S. GAAP accounting rules it followed, the accounting determinations necessary to measure the revenues and expenses it reported in its periodic financial statements, including the medical margin reported in its earnings releases, were complex and relied on estimates subject to significant judgment and uncertainty, which agilon disclosed throughout the Proposed Class Period.

## V.   Plaintiffs' Allegations

### A.   Alleged Misrepresentations

34.    I understand that Plaintiffs allege a variety of misrepresentations, which the Court grouped into six categories in its MTD Order:  "(1) agilon's medical margin guidance and the bases of its financial projections; (2) agilon's business model; (3) agilon's data integration; (4) agilon's growth strategy; (5) healthcare utilization trends; and (6) agilon's reported financial results."[52]  I further understand that the allegations in categories (3) and (4) (the Company's data integration and growth strategy) were dismissed by the Court in its MTD Order and are no longer actionable.[53]  I understand that four categories of alleged misrepresentations remain actionable:

---

[50] These external auditor's reports appear on p. F-1 of each of agilon's Form 10-Ks for 2021, 2022, and 2023.

[51] agilon 2023 Form 10-K, pp. 48–49, 78.

[52] MTD Order, pp. 30–31.

[53] With respect to the statements about agilon's data integration, Plaintiffs allege that these statements "concealed from investors that agilon suffered from systemic data deficiencies that prevented the Company from accurately tracking, managing, reporting and forecasting medical margin and patients' medical costs." *See* MTD Order, p. 47.  The Court found that "these comments about agilon's data integration do not appear to be false or misleading, and Plaintiffs have failed to sufficiently allege facts in support of such." *See* MTD Order, p. 48.  With respect to the statements about agilon's growth, Plaintiffs allege that these statements were false and misleading because "although agilon did add hundreds of new physicians in mature markets, they failed to disclose that it did so without providing the physicians with the basic onboarding and education necessary to integrate

a. **Statements that relate to agilon's medical margin guidance and the bases of its financial projections** ("Guidance and Financial Projections Statements"):[54] Plaintiffs allege that Defendants misled investors by "conceal[ing] its lack of visibility into members' medical costs and agilon's medical margin"[55] and that agilon's guidance "masked the adverse impact unreliable payor data, soaring patient utilization rates and medical expenses, and massive pent-up demand from COVID-19 were then having on the company."[56] According to Plaintiffs, these statements were false or misleading both because they "vastly overstate[d] the Company's actual performance" and because they concealed that agilon relied on "grossly unreliable data."[57] According to the Complaint, agilon "was unable to reliably track, report and forecast medical expenses or medical margin … and issued financial guidance that was knowingly premised on insufficient, incomplete and faulty data."[58]

b. **Statements that relate to agilon's business model** ("Business Model Statements"):[59] Plaintiffs allege that Defendants misled investors about the "business model's alleged impact on the Company"[60] and, in particular, about agilon's "expertise in effectively controlling medical costs and utilization through its 'high-touch' model."[61] Plaintiffs claim these statements were misleading

---

into the agilon partnership, which adversely impacted the Company's medical margins." *See* MTD Order, p. 50. The Court found that "[a]lthough Plaintiffs have alleged that the problem with onboarding and education of new physicians may have existed for years, Plaintiffs have not sufficiently pled fraud in regard to the statements above about agilon's growth." *See* MTD Order, pp. 50–51.

[54] For example, Plaintiffs claim as an alleged misrepresentation a statement made by agilon's CEO, Defendant Steven Sell, during the March 1, 2023 earnings call: "Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally." *See* Complaint, ¶ 140. As another example, Plaintiffs claim as an alleged misrepresentation a statement made by agilon's CEO during the May 27, 2021 earnings call, noting that "Sell emphasized his '***high degree of visibility*** into future revenues and margin progression' as well as agilon's 'growth strategy, both with our existing partners and current geographies and with new partners in new markets.'" *See* Complaint, ¶ 100 (emphasis in original).

[55] Complaint, ¶ 112.

[56] MTD Order, p. 36.

[57] MTD Order, p. 36.

[58] Complaint, ¶ 84.

[59] For example, Plaintiffs claim as an alleged misrepresentation a statement made by agilon's CEO during an earnings call on October 29, 2021, in which he stated that the ability of agilon's model to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model" and "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." *See* Complaint, ¶ 109. I note that there is one alleged misrepresentation made on June 8, 2022 which the Court did not classify into any of the six categories. *See* Complaint, ¶ 131. From an economic perspective, the statement appears to broadly pertain to capabilities of agilon's business model. As such, for the purpose of my report, I have included this statement in the Business Model Statements category.

[60] MTD Order, p. 45.

[61] Complaint, ¶ 65.

because they concealed "pervasive struggles with tracking agilon's medical costs and margins."[62]  According to Plaintiffs, "[w]hile underscoring the purported competitive advantages and sustainability of agilon's business model, defendants were concealing the known adverse impact of the fundamental defects in agilon's model."[63]

c. **Statements that relate to healthcare utilization trends** ("Utilization Statements"):[64]  Plaintiffs allege that Defendants concealed that "since at least May 2023 agilon had been experiencing a large spike in member utilization and medical costs driven by higher specialist utilization, Part B drugs, and outpatient surgeries … agilon was not yet even 60% of the way through its backlog of pent-up demand."[65]  Plaintiffs allege these statements were false and misleading because Defendants "knew the pent-up demand existed as of January 10, 2022, and the Company also knew a significant backlog of this demand was due to COVID-19."[66]  According to the Complaint, "[w]hile agilon claimed its 'high-touch' approach had 'prevented a pent-up demand for care,'" agilon "was actively monitoring a progression of its massive 'backlog' of pent-up demand during the Class Period."[67]

d. **Statements that relate to agilon's reported financial results** ("Reported Financial Results Statements"):[68]  Plaintiffs allege that Defendants misled investors by "overstat[ing] its second and third-quarter [2023] medical margins by over $31 million."[69]  Plaintiffs allege that these statements were also false and

---

[62] MTD Order, p. 45.

[63] Complaint, ¶ 65.

[64] For example, Plaintiffs claim as an alleged misrepresentation a statement made by agilon's CEO during the earnings call on August 3, 2023: "Second point on differentiation.  For our members, our year-to-date composite utilization trend is in line or better than our expectations.  Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range.  Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.  All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date."  *See* Complaint, ¶ 162 (emphasis removed).

[65] Complaint, ¶ 173.

[66] MTD Order, pp. 53–54.

[67] Complaint, ¶ 72.

[68] For example, Plaintiffs allege as false and misleading that on June 7, 2023, "[n]ear the end of the call, Sell reiterated agilon's 'really strong start this year,' adding 'I don't know many businesses that show an 88% step-up in their main margin metric [medical margin].  We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent.'"  *See* Complaint, ¶ 156.

[69] MTD Order, p. 57.

misleading because they "concealed that agilon's reported results rested on grossly unreliable data."[70]

## B. Alleged Corrective Disclosures

35.     Plaintiffs allege the relevant truth concealed by the alleged misrepresentations was revealed on three corrective disclosure dates:  November 2, 2023, January 5, 2024, and February 27, 2024.[71]  I briefly summarize Plaintiffs' allegations with respect to each of these below.

### 1. November 2, 2023:  agilon 3Q23 Earnings Disclosures and Earnings Call

36.     After market close on November 2, 2023, agilon released its 3Q23 results and held an earnings call.[72]  With respect to these disclosures, Plaintiffs allege:

> The Company revealed medical margin of $108 million for the quarter, far below expectations.  In addition, the Company also disclosed that it suffered quarterly adjusted EBITDA of negative $6 million.  The Company also sharply lowered agilon's FY23 medical margins to a range of just $455-$470 million.  On the conference call, defendants Sell and Bensley revealed that agilon had suffered higher patient utilization rates earlier in the year (notwithstanding their prior representations to the contrary), had already significantly drawn down the reserves agilon had set aside earlier in the year to cover increased medical costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue in the future.[73]

37.     Plaintiffs allege that "[a]s a result of the disclosures on November 2, 2023, the price of agilon common stock dropped 13% from its close of $16.89 per share on November 2, 2023, to $14.66 per share on November 3, 2023," and "[t]he price of agilon common stock declined an additional 11% on November 6, 2023, closing at $13.11 per share … as the market continued to

---

[70] MTD Order, p. 57.
[71] Complaint, Section VII.
[72] *See* agilon health, inc. Form 8-K, filed on November 2, 2023; "Q3 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, November 2, 2023, p. 1.
[73] Complaint, ¶ 195.

APP 026

digest the news."[74]  According to Dr. Cain's event study, agilon's abnormal stock returns were -13.7% on November 3, 2023 and -11.2% on November 6, 2023.[75]

### 2.  January 5, 2024:  agilon Guidance Update

38.     Before market open on January 5, 2024, agilon released a guidance update for FY 2023 and held a guidance update call.[76]  According to Plaintiffs:

> agilon revealed that it had suffered dramatically higher prior medical expenses than previously revealed and, as a result, agilon was lowering its FY23 expected medical margin to $340-$360 million, or approximately $112 million (24%) below the already substantially reduced guidance and nearly $200 million (36%) below agilon's original FY23 medical margin guidance.  agilon also disclosed its FY23 adjusted EBITDA would not be $6-$18 million as previously represented in November 2023, but rather would be a loss of $55-$69 million.
> …
> agilon also provided a dismal FY24 outlook, including medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million, and withdrew its FY26 guidance, which the Company had reaffirmed only seven weeks earlier[77]

39.     Plaintiffs also reference the following disclosure from the Company:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions.  While a number of programs have been launched to improve visibility, balance risk-sharing and enhance

---

[74] Complaint, ¶ 196.

[75] Cain Report production, Cammer 5.xlsx.  I note that in an efficient market, and Dr. Cain opines that the market for agilon common stock was efficient throughout the Proposed Class Period, there is no basis to assume, and Dr. Cain does not provide one, that it would take more than one trading day (here, November 3, 2023) for the price of agilon common stock to incorporate any alleged corrective information disclosed after market close on November 2, 2023.  *See* Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991), pp. 1575−1617 at p. 1601 ("When the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of the stock-price response—the central issue for market efficiency. … The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.  The result is so common that this work now devotes little space to market efficiency.").  *See also* Cain Report, ¶ 3.

[76] *See* agilon health, inc. Form 8-K, filed on January 5, 2024; "FY 2023 agilon health, inc. Guidance Call," *Refinitiv Streetevents*, January 5, 2024, p. 1.

[77] Complaint, ¶¶ 198, 200 (emphasis removed).

predictability of results, management has assumed higher costs will continue into 2024.[78]

40.     Plaintiffs further allege that, during the call, agilon's CEO Sell stated that agilon had not previously incorporated the "magnitude and source of the utilization shifts" in its forecasts and that this increased utilization was related to a "backlog of pent-up demand from COVID."[79]

41.     According to the Complaint, "agilon's stock price sank 29% in response to the January 5, 2024 disclosures, from more than $12 per share at market close on January 4, 2024, to $8.63 per share on January 5, 2024."[80]  According to Dr. Cain's event study, agilon's abnormal stock return was -28.5% on January 5, 2024.[81]

### 3.   February 27, 2024:  agilon 4Q23 Earnings Disclosure and Earnings Call

42.     After market close on February 27, 2024, agilon released its Q4 2023 earnings and held an earnings call.[82]  Plaintiffs allege that agilon revealed it had missed the guidance provided in the January update, and reported several aspects of its performance for FY 2023:

> (i) it had suffered an additional $38 million in undisclosed net medical costs during 4Q23, as well as $13 million in additional medical costs from prior to 4Q23; (ii) its actual FY23 medical margin ($299 million) was $41-$61 million less than agilon had announced less than eight weeks earlier; and (iii) it incurred a FY23 net loss of $263 million, and FY23 adjusted EBITDA of negative $95 million. agilon also announced it had drastically lowered the FY24 guidance it had just given in January, including medical margin by 25%-29% (from $560-$600 million to $400-$450 million) and adjusted EBITDA guidance by 125%-250% (a $40-$60 million gain to a $15-$60 million loss).[83]

43.     Plaintiffs further allege that these results were accompanied by an ICFR disclosure related to agilon's processing of Information Produced by the Entity (IPE) for medical claims

---

[78] Complaint, ¶ 198.
[79] Complaint, ¶ 203.
[80] Complaint, ¶ 204.
[81] Cain Report production, Cammer 5.xlsx.
[82] *See* agilon health, inc. Form 8-K, filed on February 27, 2024; "Q4 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, February 27, 2024, p. 1.
[83] Complaint, ¶ 206 (emphasis removed).

and related payables.[84]  According to Plaintiffs, agilon also reported medical margin figures for several classes, which "indicat[ed] that the medical margin figures for multiple market classes reported during agilon's March 30, 2023 Investor Day … had been overstated, including by 8%-23% for FY21 and 12%-26% for FY22."[85]

44.    The Complaint states that "[a]s a result of the disclosures on February 27, 2024, the price of agilon common stock dropped from $6.48 per share to $6.04 per share on March 1, 2024."[86] According to Dr. Cain's event study, agilon's abnormal stock returns were -0.6% on February 28, 2024, -2.1% on February 29, 2024, and -2.7% on March 1, 2024.  According to his model, none of these returns are statistically significant.[87]

## VI.  Dr. Cain Fails to Offer a Class-Wide Damages Methodology Capable of Reliably Measuring Damages Consistent with Plaintiffs' Theory of Liability

45.    I understand that, at class certification, following the Supreme Court's ruling in *Comcast v. Behrend*, plaintiffs are required to demonstrate they will be able to employ a common class-wide methodology to measure damages attributable to their theory of liability.[88]  I understand that Dr. Cain was asked "to opine on whether damages for investors who purchased agilon's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under (i) § 10(b) of the Securities Exchange Act of 1934 (the 'Exchange Act') and U.S. Securities & Exchange Commission ('SEC') Rule 10b-5 adopted thereunder (collectively, the '§ 10(b) claims'); (ii) § 20(a) of the Exchange Act; and (iii) § 20A of the Exchange Act."[89]

46.    As I discuss in this section, as a matter of economics, Dr. Cain fails to provide a methodology capable of measuring class-wide damages in a manner consistent with Plaintiffs'

---

[84] Complaint, ¶ 207.  This ICFR disclosure was included in the Company's 2023 Form 10-K, filed the same day.  This issue was new in fiscal 2023 (it did not appear in the Company's 2022 or 2021 Form 10-K filings), implying the internal control issue pertained only to the Company's fiscal 2023 reporting period.

[85] Complaint, ¶ 208.

[86] Complaint, ¶ 211.

[87] Cain Report production, Cammer 5.xlsx.

[88] *Comcast v. Behrend*, 569 U.S. 27 (2013) ("*Comcast*"), p. 35 ("It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [Plaintiffs' liability] theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").

[89] Cain Report, ¶ 2.  I understand that Dr. Cain assumes that damages under Section 20(a) "can be calculated using the same methodologies for assessing § 10(b) damages."  *See* Cain Report, ¶ 98, footnote 93.  For ease of exposition, I will refer only to Section 10(b) damages throughout the report.

theory of liability. I first summarize Dr. Cain's opinions regarding his proposed damages approach (**Section VI.A**). I then explain why an event study, one of the tools Dr. Cain discusses in the context of his proposed damages approach, can only reliably measure inflation in limited circumstances (**Section VI.B**) and why Dr. Cain fails to show those circumstances are present here. In particular, Dr. Cain fails to provide a methodology that can account for: potential market misperceptions of risks related to agilon's business model (**Section VI.C**); differences between the alleged corrective disclosures and earlier alleged misrepresentations (**Section VI.D**); changes in industry and business conditions during the Proposed Class Period (**Section VI.E**); the price effect of potentially confounding information, including the effects of information regarding allegations the Court has dismissed as no longer actionable (**Section VI.F**); and the lack of any statistically significant stock price reaction to the February 27, 2024 alleged corrective disclosure (**Section VI.G**).

### A. Summary of Dr. Cain's Opinion Regarding His Proposed Approach to Calculate Damages on a Class-Wide Basis

47. Dr. Cain opines that "damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology."[90] Dr. Cain proposes to use the "out-of-pocket" formula to calculate damages for violations of Section 10(b) and states that "out-of-pocket" damages equal "the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale."[91] I understand that "artificial inflation" at any given point in time during a class period is usually defined as the difference between (a) the actual stock price on a given day, and (b) the "but-for" stock price that would have been observed that day absent the alleged misrepresentations or omissions. In other words, to measure inflation in this matter, one must estimate the stock price that would have prevailed each day during the Proposed Class Period had agilon disclosed the relevant truth Plaintiffs allege was concealed on each date (*i.e.*, the alleged relevant "but-for" disclosures).

---

[90] Cain Report, ¶ 3.

[91] Cain Report, ¶ 99. Dr. Cain also notes a limit on damages under the Private Securities Litigation Reform Act of 1995, December 22, 1995, for securities "not sold prior to the full revelation of the fraud" based on "the difference between the purchase price for the security and the 'mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *See* Cain Report, ¶ 99.

APP 030

48.     Dr. Cain's characterization of the "out-of-pocket" formula as a methodology is tautological and devoid of economic substance.  He points to a *formula* that identifies what must be measured (*i.e.*, inflation in the stock price at the time of purchase and inflation at the time of sale) and so fails to provide a *methodology* that could be applied to measure inflation.  Dr. Cain says that he will apply the "out-of-pocket" formula to measure damages, but this is effectively the same as saying he will measure inflation as inflation, or that he will calculate "but-for" prices by measuring "but-for" prices.  In other words, Dr. Cain fails to provide any indication of the approach he proposes to use to calculate "but-for" prices, which are, almost invariably, unobservable in the real world.  This is why a *methodology* is required to measure damages.

49.     Dr. Cain appears to understand that estimating "out-of-pocket" damages requires a methodology to reliably measure inflation.  He points to two generic examples of tools that he might use.  First, Dr. Cain claims that "[f]or example, event studies are widely employed to calculate artificial inflation"[92] and explains that "[e]vent studies measure stock price reactions to disclosures which dissipate the relevant truth that was concealed by alleged fraudulent misrepresentations."[93]  Second, Dr. Cain states that "valuation models can also be relied upon to estimate artificial inflation" and that "[f]or example, the widely-used discounted cash flow analysis ('DCF') valuation approach estimates changes to firm value based on changes in future expected cash flows"[94] and that "changes in valuation are also commonly measured through multiples analysis, in which a company's valuation is expressed as a multiple of financial performance, such as sales or earnings."[95]  Dr. Cain further explains that "[d]iscounting the changes in future expected cash flows resulting from alleged misrepresentations, omissions, and/or schemes to the net present value … based on a firm's risk-adjusted discount rate can provide an alternative, reliable measure of artificial inflation as the input to the out-of-pocket damages methodology."[96]

50.     Dr. Cain further points to the use of an event study with respect to measuring "how artificial inflation per share evolved throughout the Class Period:"[97]

---

[92] Cain Report, ¶ 101.
[93] Cain Report, ¶ 101.
[94] Cain Report, ¶ 102.
[95] Cain Report, ¶ 102.
[96] Cain Report, ¶ 102.
[97] Cain Report, ¶ 104.

One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures. Alternatively, one can measure "constant percentage inflation," which assumes that each day's share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.[98]

51.     That is, Dr. Cain suggests that an event study analysis of the alleged corrective disclosure dates could be used to measure inflation at any point in time during the Proposed Class Period with a back-casting approach—*i.e.*, by using a measure of the stock price declines that Plaintiffs attribute to alleged corrective disclosures to measure inflation at earlier points during the Proposed Class Period.

52.     At the same time, Dr. Cain appears to recognize the limitations of his proposed approach to estimate inflation throughout the Proposed Class Period. First, Dr. Cain notes the possibility that "reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud-related factors,"[99] and that the "value of any confounding information can … be subtracted from the price impact of corrective disclosures in calculating inflation."[100] Second, Dr. Cain acknowledges that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements."[101] Dr. Cain offers a largely generic laundry list of "methodologies" or "approaches" that in his view may be used to address these challenges.[102] However, as I further explain below, Dr. Cain fails to provide any indication as to which of these tools he would use to determine the "impact of … 'confounding information' on the price of agilon's Common Stock" and how "artificial inflation may have

---

[98] Cain Report, ¶¶ 104–106.
[99] Cain Report, ¶ 103.
[100] Cain Report, ¶ 103.
[101] Cain Report, ¶ 107.
[102] Cain Report, ¶¶ 103, 107.

APP 032

varied and could evolve throughout the Class Period,"[103] nor does he explain how such tools would allow him to measure damages consistent with Plaintiffs' theory of liability.  Instead, Dr. Cain simply asserts that "[a]ll of these loss causation calculations can be performed on a Class-wide basis and are not dependent upon individual Class member identities or circumstances."[104]

### B. By Itself, an Event Study Can Only Reliably Measure Inflation in Limited Circumstances

53.     Beyond generic references to an event study and unspecified valuation model, Dr. Cain fails to identify how these approaches could be applied to measure damages in this matter.  To the extent Dr. Cain intends to use an event study to measure inflation, he fails to provide a methodology for measuring inflation throughout the Proposed Class Period consistent with Plaintiffs' theory of liability.  If Dr. Cain instead intends to employ "valuation models" to measure inflation, he fails to explain which "model" he would use or how he would determine the necessary inputs given the complexities at issue here.[105]  As a result, Dr. Cain fails to provide a damages methodology consistent with Plaintiffs' theory of liability.

54.     An event study is, in essence, a statistical tool used to estimate a security's abnormal return on a specified event date (*i.e.*, the change in the security's price on that date after removing the effect of market and industry factors).  In this way, an abnormal return provides a measure of the effect of company-specific information on its security price on a given date (the event or impact date) conditional on the overall mix of information in the market at that time.[106]  Under the event study approach Dr. Cain describes, the level of any inflation in the price of

---

[103] Cain Report, ¶¶ 103, 107.

[104] Cain Report, ¶ 108.  *See also* Cain Report, ¶¶ 118–119.

[105] As discussed above, Dr. Cain points to DCF analysis as a possible approach that could be used to measure inflation. However, he fails to explain how he would determine the appropriate inputs to a DCF analysis, such as the discount rate or terminal value.  Identifying how such inputs could be determined is critical to devising a reliable DCF approach.  Further, Dr. Cain fails to address challenges specific to using a DCF analysis raised in the publication he cites in his report.  *See* Partnoy, Frank, "Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions," *The Business Lawyer* 77, no. 4 (2022), pp. 1059–1078 at p. 1077 ("The DCF methodology is not without challenges.  DCF analyses that use terminal values pose questions about how the terminal value is calculated, and to the extent event studies are used as part of such calculations the DCF methodology could pose similar questions to those posed by event studies.  The use of the DCF methodology also raises questions about what an appropriate range of assumptions is in the relevant models.  How should one calculate 'beta' in the capital asset pricing model context, or otherwise derive an appropriate discount rate, or range of discount rates? Are the errors in assumptions about cash flows in discount rates likely to be normally distributed, or have errors that suggest estimates will be reasonably correct, on average? Or are there likely to be systematic skews or biases in the analysis?").

[106] *See, e.g.*, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997), pp. 13–39.

agilon common stock will only change when an alleged corrective disclosure causes the Company's stock price to decline.

55.    As a matter of economics, abnormal stock price declines following alleged corrective disclosures can only reliably measure inflation during a class period if certain conditions hold. The key economic assumptions necessary include that, absent the alleged fraud:  (i) any new, corrective information disclosed in the alleged corrective disclosures would have been publicly disclosed or fully anticipated by the market from the beginning of the Proposed Class Period and so, in an efficient market, fully reflected in the Company's stock price at that time (in other words, the information that allegedly could and should have been disclosed instead of, or in addition to, the alleged misrepresentations—*i.e.,* the relevant truth Plaintiffs allege was concealed—on each date of the Proposed Class Period is the same as that which Plaintiffs allege as corrective); (ii) the implications for value (and so the stock price) of this information would not have changed over time, regardless of any changes in the Company's business, operations, or the macroeconomic environment in which it operates; and (iii) any abnormal stock price declines following alleged corrective dates exclusively represent the implications for value of the information that would have been available or anticipated at the beginning of the Proposed Class Period (*i.e.*, no other, non-allegation-related "confounding" information came to market on the alleged corrective dates).

56.    Dr. Cain fails to provide any economic analysis that might support the validity of these assumptions—which are a necessary basis for the use of an event study to reliably measure inflation—in this matter.  To the extent these assumptions are not satisfied in the present matter, then, as a straightforward matter of economics, the abnormal return will not reliably measure inflation throughout the Proposed Class Period.  The examples below illustrate how these assumptions can be violated.

57.    With respect to the *first* assumption—that any new, corrective information would have been disclosed or fully anticipated by the market from the beginning of the Proposed Class Period—I note that the abnormal return on a given day provides a measure of the effect on a security's value of all company-specific information that comes to the market that day.  It does not measure the valuation effect of some other piece of information, even if that other information is related to that which is disclosed or otherwise revealed.  Thus, as a matter of

economics, if the relevant truth that Plaintiffs allege was concealed differs from information Plaintiffs allege as corrective, an abnormal stock price decline following the alleged corrective disclosure may not reliably measure any inflation that dissipated on the alleged corrective disclosure date, much less inflation earlier in the class period.  For example, suppose a plaintiff alleges investment losses after a negative stock price reaction following disappointing financial results for 2025, and that the disappointing results are due to an unexpected adverse change in industry conditions that occurred *during* 2025.  This is not information that the plaintiff could reasonably allege the company could and should have disclosed *prior* to 2025, before the unexpected adverse change in industry conditions that caused the disappointing financial results.  Suppose further that the plaintiff proposes a class period starting in 2023.  In this case, any abnormal stock price decline in response to disclosure of the disappointing financial results for 2025 would not reliably measure the possibly less negative (or zero) stock price reaction, if any, that would have occurred had the company disclosed what it could in 2023.

58.	With respect to the *second* assumption—that the value implications of corrective information would not have changed during the Proposed Class Period—I note that although the abnormal return on a given day measures the effect of new company-specific information disclosed that day, that response is conditional on the mix of publicly available information on that day, including market, industry, and company conditions.  Any changes in the mix of information over time can change the valuation effect of a particular piece of information.  Thus, the market's reaction to an alleged corrective disclosure on one day may differ from how it would have reacted if the same allegedly corrective information had been disclosed on a different day.[107]  For example, suppose a company failed to disclose the impact on its financial performance of worsening industry conditions at a time when market participants saw the adverse industry conditions as temporary.  Suppose further that the company subsequently disclosed the disappointing financial results after it became clear the change in industry conditions would be permanent.  The impact on the stock price would reflect the market's understanding that the industry changes were permanent and so would not properly measure how the stock price would have responded had the company disclosed the impact of the industry changes at an earlier date when the market considered them to be temporary.

---

[107] Dr. Cain acknowledges that the "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements."  *See* Cain Report, ¶ 107.

APP 035

59.     With respect to the *third* assumption—that abnormal stock price declines following an alleged corrective disclosure do not reflect any confounding information—I note that the abnormal return on a given day measures the combined effect of all company-specific information released that day and not the individual impact of particular items of company-specific information that are disclosed or otherwise become known to the market the same day. Thus, if the allegedly corrective information is only one of several pieces of value-relevant, company-specific information disclosed or otherwise revealed on a particular day, an additional method is required to remove the effects of the non-allegation-related (confounding) information.[108]  For example, suppose that on the same day a company disclosed corrective information regarding disappointing financial results due to an adverse change in industry conditions, it also announced that a major client had unexpectedly decided not to renew its contract going forward.  The abnormal stock price decline that day (estimated using an event study) would capture the *combined* effect of the disappointing financial results and the news the client decided to not renew its contract (*i.e.*, it would not isolate the effect of the allegedly corrective disclosure of the disappointing financial results).

60.     If one or more of these assumptions do not hold, a methodology beyond an event study would be required to reliably measure inflation.  The following subsections illustrate how all three assumptions fail here.  Because Dr. Cain offers no reliable alternative or supplement to an event study,[109] he fails to provide a class-wide methodology that can reliably measure damages consistent with Plaintiffs' theory of liability.

### C.  Dr. Cain Fails to Provide a Methodology That Can Account for Changes in Uncertainty in the But-For World

61.     Dr. Cain indicates that an event study analysis of the alleged corrective disclosure dates is a "frequent method" for calculating per-share inflation.[110]  As explained above, a key economic assumption underlying an event study approach to measuring inflation from an alleged fraud is

---

[108] Dr. Cain acknowledges that "a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud-related factors."  *See* Cain Report, ¶ 103.

[109] Dr. Cain makes references to "valuation models" in his report, but he fails to explain which "model" he would use or how he would determine the necessary inputs given the complexities at issue here.  *See* footnote 105.

[110] Cain Report, ¶ 105 ("One frequent method for modeling the evolution of inflation is to assume 'constant dollar inflation.' This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period.  This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.").

APP 036

that the relevant truth plaintiffs allege was concealed is the same as the information they allege as corrective. Dr. Cain fails to show that this assumption holds in this matter.

62. As discussed in **Section V.B**, Plaintiffs point to three dates on which allegedly corrective disclosures were made and allege that the revelation of this purportedly corrective information caused declines in agilon's stock price. The alleged corrective disclosures contain, among others, disclosures about utilization levels in 2023 and (anticipated) in 2024, and the effect of utilization on agilon's medical margin and EBITDA for FY23, guidance for FY24, and reported medical margin for 2Q23 and 3Q23.[111] That is, the alleged corrective disclosures appear to be related primarily to *new* developments that took place in 2023 or were anticipated for 2024.

63. Plaintiffs' damages methodology must therefore account for the fact that a hypothetical earlier disclosure, before these developments took place, would likely differ from what agilon disclosed on the alleged corrective disclosure dates. Dr. Cain fails to explain how stock price declines following these later alleged corrective disclosures would reliably measure inflation earlier in the Proposed Class Period (e.g., during 2021 and 2022).

64. To the extent Plaintiffs claim the alleged relevant truth is that agilon concealed or understated certain risks to which it was exposed, rather than the adverse financial outcomes that materialized and were disclosed on the alleged corrective disclosure dates, any inflation attributable to concealed or understated risks would necessarily differ from the stock price declines that occurred when those risks later materialized. This follows as a matter of basic economic logic: earlier knowledge of a heightened risk of an adverse outcome differs from and does not have the same economic impact as a later materialization of that risk.

65. In *BP*, I understand that plaintiffs alleged that BP understated the risk of an oil spill and the court cited an example to illustrate why the stock price decline that follows the

---

[111] *See* Complaint, ¶ 195 ("On the [November 2, 2023] conference call, defendants Sell and Bensley revealed that agilon had suffered higher patient utilization rates earlier in the year (notwithstanding their prior representations to the contrary), had already significantly drawn down the reserves agilon had set aside earlier in the year to cover increased medical costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue in the future."); ¶ 198 ("On January 5, 2024 … [t]he Company also disclosed that: 'During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions.'"); ¶ 203 ("Sell and Bensley convened an investor call [on January 5, 2024], during which Sell admitted that agilon had failed to incorporate both 'elevated cost trends' and the 'magnitude and source of the utilization shifts' in the forecasts provided to investors."); ¶ 206 ("On February 27, 2024 … agilon revealed: (i) it had suffered an additional $38 million in undisclosed net medical costs during 4Q23, as well as $13 million in additional medical costs from prior to 4Q23; (ii) its actual FY23 medical margin ($299 million) was $41-$61 million less than agilon had announced less than eight weeks earlier; and (iii) it incurred a FY23 net loss of $263 million, and FY23 adjusted EBITDA of negative $95 million.") (emphasis removed).

materialization of a risk does not properly measure inflation due to an earlier failure to properly disclose the risk of that outcome:

> Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red. If the company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000. If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss. If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would still have fallen when the company drew a red marble. In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth. In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, not the $990,000 l[o]ss that would be implied by looking at the reaction to the drawing of a red marble.[112]

The court noted that "[s]imply invoking the event study methodology … does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* …."[113]

66.     The situation here is analogous. Plaintiffs allege that Defendants concealed the "adverse impact of the fundamental defects in agilon's model" by, for example, misrepresenting the ability of agilon's "high-touch" model to "effectively control[] medical costs and utilization."[114] However, early in the Proposed Class Period, agilon disclosed risks related to its ability to control "medical costs and utilization" due to the COVID-19 pandemic and the possibility that patients may have deferred some of their routine medical care. For example, in its Form 10-K for the year ended December 31, 2021, agilon disclosed:

> [T]he clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to

---

[112] Memorandum and Order, *In Re: BP p.l.c. Securities Litigation*, United States District Court for the Southern District of Texas, Houston Division, Case No. 4:10-md-02185, December 6, 2013, p. 29, footnote 15 (emphasis removed).
[113] Memorandum and Order, *In Re: BP p.l.c. Securities Litigation*, United States District Court for the Southern District of Texas, Houston Division, Case No. 4:10-md-02185, December 6, 2013, p. 30 (emphasis in original).
[114] Complaint, ¶ 65.

> manage their existing clinical conditions, and the amount of medical care which has been deferred during the [COVID-19] pandemic may exceed our expectations … due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past.
>
> [I]t is possible that the deferral of healthcare services, or the impact of our members (who are seniors typically with chronic conditions) being diagnosed with COVID-19, could cause additional health problems in our existing members, which could increase costs in the future.[115]

67.     Early in the Proposed Class Period, analysts discussed how demand for medical care, and as a result medical costs, could meaningfully and unpredictably increase in the future as a result of COVID-19, which would create uncertainty for agilon.  For example, a Wells Fargo report published on May 10, 2021 noted that "[t]he COVID-19 pandemic caused a dramatic decrease in health care utilization as states issued stay-at-home orders" and that "the potential for pent-up demand, higher acuity utilization, and untreated disease progression are difficult if not impossible to predict."[116]  Similarly, a William Blair analyst noted in a report on May 10, 2021 that "if capitated patients did not obtain the requisite care needed during the pandemic (due to office closures or fear of exposure), it could lead to an increase in medical claims expense in future quarters if patients delayed any critical preventive care during the pandemic.  This could increase their risk profile and potentially increase treatment costs in the intermediate term."[117]

68.     Based on my review of information, this risk appears to have materialized in 2023.  In particular, starting around mid-2023, analysts discussed increasing utilization in the healthcare industry.  Analysts noted that this increase was greater than what industry participants had been expecting, with some analysts highlighting the challenges in predicting utilization trends during the COVID-19 pandemic.  For example:

> Truist Securities, July 18, 2023:  United Health Group (UNH) … and Humana (HUM)… both have highlighted higher than anticipated utilization trends in recent months.  During its Q2 earnings call, **UNH**

---

[115] agilon 2021 Form 10-K, pp. 27–28, 61.

[116] "Compelling Model in a Compelling Market; Initiating at Overweight," *Wells Fargo*, May 10, 2021, p. 19.

[117] "Positioning the PCP at the Top of the Value Chain; Initiating Coverage With Outperform Rating," *William Blair*, May 10, 2021, p. 15.

**APP 039**

**flagged that in Q2, outpatient care activity among seniors was a few hundred basis points above its expectations**.[118]

J.P. Morgan, August 8, 2023:  Medicare Advantage took center stage heading into the quarter but outside of reports from HUM and UNH, there wasn't much notable to call out on MA.  **Every company cited pressure from higher than anticipated MA outpatient utilization**, particularly orthopedic surgeries.[119]

Bank of America, December 13, 2023:  The pandemic and subsequent recovery has been an unusually volatile period for health insurers. Historically, healthcare utilization was predictably growing in the low single digit range, with minimal standard deviation, meaning that if [managed care organizations] mispriced, [medical loss ratio] implications were generally in the dozens of basis points.  **However, COVID disrupted patient behavior at an unprecedented scale, driving a huge upfront drop in healthcare utilization, followed by difficult to predict surges in the recovery back to baseline, causing cycles of [medical loss ratio] beats and misses in the triple digits**.[120]

69.     Thus, if agilon had disclosed at the beginning of the Proposed Class Period that, for example, its business model was potentially less effective at controlling medical costs and utilization under healthcare industry conditions different than those during the height of the COVID-19 pandemic, the market may have perceived a higher *risk* of adverse future outcomes. Such a hypothetical but-for disclosure (that the level of risk was higher) would have had a different effect on agilon's stock price than a later disclosure that agilon's financial performance had been adversely affected when an increase in demand for certain types of medical care *actually materialized* in 2023.[121]

70.     However, Dr. Cain fails to provide a methodology that accounts for any market misperception of the risks resulting from the alleged misrepresentations (let alone one that can account for any changes in those risks over the course of the Proposed Class Period).  It is

---

[118] "Positioning vis-à-vis Recent Utilization Trends & 2024 Commentary Under Focus; CY2Q23 Earnings Preview," *Truist Securities*, July 18, 2023, p. 1 (emphasis added).

[119] "Thoughts on 2Q23 and Updating Our Estimates," *J.P. Morgan*, August 8, 2023, p. 1 (emphasis added).

[120] "Year Ahead: Happy New Year? 2024 about putting the past behind us – Own MCOs," *Bank of America*, December 13, 2023, p. 7 (emphasis added).

[121] As another example, a hypothetical but-for disclosure at the beginning of the Proposed Class Period that agilon's business model relied on, among others, estimates of risk adjustments and IBNR claims involving significant judgment and complexity, may have also caused the market to perceive a greater *risk* of future adverse outcomes.  Such a but-for disclosure would have resulted in a different stock price reaction than a later, specific disclosure in 2023 that agilon's estimates had *actually* been incorrect.

unreliable as a matter of economics to simply back-cast stock price declines attributable to specific realizations in an attempt to measure inflation attributable to an alleged earlier under-disclosure of the associated risks.  Instead, an appropriate damages methodology would need to estimate and account for the extent to which the relevant risks had been concealed from the market after properly considering the extent to which, in an efficient market, agilon's stock price reflected the information conveyed by the Company's risk disclosures, among other publicly-available information about the relevant risks.[122]

### D.   Dr. Cain Fails to Provide a Methodology That Can Account for Differences Between the Information Plaintiffs Allege as Corrective and Certain Alleged Misrepresentations in 2021 and 2022

71.    As explained in **Section VI.B**, a key economic assumption underlying an event study approach to measuring inflation from an alleged fraud is that any new, corrective information disclosed on alleged corrective disclosure dates could have been publicly disclosed or fully anticipated by the market from the beginning of the Proposed Class Period.  Dr. Cain fails to explain how his proposed approach is capable of measuring inflation when there are differences between the disclosures that agilon would have been able to make at the time of the alleged misrepresentations and the information Plaintiffs allege as corrective.  I provide examples of such differences below and explain their economic implications.

72.    As discussed above in **Section V.B**, Plaintiffs point to three dates on which allegedly corrective disclosures were made and allege the revelation of this purportedly corrective information caused declines in the price of agilon common stock on the relevant impact dates.  In addition, I understand that those alleged misrepresentations in 2021 and 2022 that remain actionable include:  (i) a Guidance and Financial Projections Statement in May 2021, specifically discussing Defendants' "visibility" into certain financial metrics; (ii) a Utilization Statement in January 2022; and (iii) several Business Model Statements.[123]  In the following subsections, I analyze apparent differences between these alleged misrepresentations and information that

---

[122] Dr. Cain opines that the market for agilon common stock was efficient throughout the Proposed Class Period, which means that its stock price would have quickly and fully impounded the information conveyed by the Company's disclosures, including the risk disclosures included in its SEC filings.  *See* Cain Report, ¶ 3(a).  As noted earlier, the relevant academic literature indicates that, in an efficient market, stock prices typically impound new public information within a single trading day.
[123] *See* MTD Order, pp. 34, 43, 46, 56.  As I discussed in **Section V.A**, a fourth category of alleged misrepresentations pertains to agilon's reported financial performance.  I understand that none of the actionable alleged misrepresentations in this category were made prior to 2023.  *See* MTD Order, p. 57.

**APP 041**

Plaintiffs allege as corrective. As I discuss below, given the lack of analyst commentary that connects the alleged corrective disclosures to any of the alleged misrepresentations in 2021 and 2022, in addition to apparent differences between the alleged corrective disclosures and certain of the alleged misrepresentations that I discuss above, Dr. Cain offers no reliable basis for assuming that any stock price declines attributable to the alleged corrective disclosures could provide a reliable measure of inflation created (or maintained) by the alleged misrepresentations in 2021 and 2022. As such, Dr. Cain fails to provide a methodology capable of measuring the inflation (if any) attributable to the alleged misrepresentations in 2021 and 2022.

### 1. The May 2021 Guidance and Financial Projections Statement

73.     I understand that, per the MTD Order, the first and only actionable Guidance and Financial Projections Statement prior to 2023 occurred at the start of the Proposed Class Period, on May 27, 2021.[124] Specifically, during agilon's 1Q21 Earnings Call, Mr. Sell stated:

> We have a <u>high degree of visibility into future revenues and margin progression.</u> From a revenue perspective, we implement new geographies up to 12 months in advance. For example, during 2021, we are currently implementing the 6 new geographies I mentioned with approximately 49,000 new members. These new geographies will start generating revenue in 2022.
>
> 70% of our current members have been on the platform less than 3 years. As these members mature on the platform, we believe this provides high visibility to consistent medical margin expansion over the next several years. The success of our early partners in terms of sustaining both strong membership and medical margin growth gives us confidence that we can successfully scale our platform into additional geographies.[125]

74.     In this statement, Mr. Sell referenced agilon's: (i) visibility into revenues over the next 12 months specifically with respect to expanding its operations into new geographies; and (ii) visibility as it relates to how medical margins for its current members were expected to expand as those members "mature[d] on the platform."[126]

---

[124] MTD Order, pp. 31–36, 43.
[125] I understand Plaintiffs have only alleged the text that is underlined here as a misrepresentation. I include the full quote to provide additional context into Mr. Sell's statement. *See* "Q1 2021 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, May 27, 2021, pp. 3–4 (emphasis added). *See also* Complaint, ¶ 100.
[126] "Q1 2021 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, May 27, 2021, p. 4.

75.    In contrast to the alleged misrepresentation, which described visibility into revenues and improvements in medical margin as members matured, I understand that the alleged corrective disclosures specifically relate to agilon's visibility into medical claims, particularly during the back half of 2023.[127] Given these differences, as a matter of economics, Dr. Cain offers no reliable basis for assuming, under Plaintiffs' theory of liability, that any stock price declines attributable to allegedly corrective disclosures regarding agilon's visibility into medical claims in 2023 and 2024 could measure inflation from the statement about agilon's visibility into revenues and medical margins progression as of May 27, 2021. While the resolution of medical claims impacts agilon's realized medical margin, visibility into these claims is distinct from whether or not agilon expected it could *improve* medical margins as patients and PCPs spent more time on agilon's platform.

76.    Further, based on my review of analyst reports published following the alleged corrective disclosures,[128] no analyst specifically referenced the Guidance and Financial Projections Statement from May 2021 or, more generally, discussed that agilon did not have visibility into revenues over the next 12 months or that agilon could not improve medical margins for its members as of May 2021. In fact, notwithstanding the issues regarding agilon's visibility into claims data discussed in the alleged corrective disclosures, some analysts commented that older cohorts had medical margins approximately six times higher than new members that joined agilon in 2023, and older PCPs had medical margins approximately four times higher than new PCPs that joined agilon in 2023:

> RBC Capital Markets, January 5, 2024:  New PCPs whether joining with a new cohort in a new market through the structured onboarding program or joining an existing market tend to contribute lower PMPM medical

---

[127] *See* Complaint, ¶¶ 198–199 ("The Company also disclosed that … a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results … Moreover, the Company revealed that its 3Q23 medical margin of $108 million had been overstated by at least $31 million (40%), and thus agilon's 3Q23 medical margin had been flat (at best) compared to 3Q22.  agilon also revealed that, due to higher-than-reported medical costs from 2Q23, rather than having increased 69% year-over-year versus 2Q22 … agilon's 2Q23 medical margin had remained relatively flat compared to 2Q22."), ¶ 207 ("In its FY23 Report on Form 10-K filed on the same day, agilon also revealed a previously undisclosed material weakness in the Company's ICFR concerning agilon's medical claims and related payables (*i.e.*, amounts agilon owed for its members' healthcare), acknowledging that the material weakness rendered agilon's DCP ineffective.").

[128] I reviewed analyst reports covering agilon available to me that were issued during the seven calendar-day windows beginning with the dates of each of the alleged corrective disclosures.  These reports were issued by a total of 26 unique analyst firms.

margins; **for example, mature PCPs average $161 compared to $34 with newer PCPs**.[129]

Benchmark, February 29, 2024:  For the year, management noted that the Classes of 2018-2020 were still averaging $150 PMPM (the low end of a $150-$200 target range) despite the cost trend.  **In contrast, the Class of 23 has significantly underperformed with $21 PMPM and a market EBITDA loss of ($32M)**.[130]

BTIG, February 28, 2024:  AGL's members that came on the platform from 2018 to 2020 are at or above its ~$150 PMPM target, but its 2023 member cohort shows the impact of higher utilization and starts off at a significantly lower margin, of ~$25 PMPM.[131]

77.     Instead, analysts commented on agilon's visibility into claims as it relates to the lag with which it received claims data.  For example:

RBC Capital Markets, January 5, 2024:  Data Visibility Issues on the MA Side Creating Forecasting Challenges.  *AGL receives data from its payer partners at a lag*—even slower than in CMS' ACO REACH program—which is a key reason behind the steep guidance cut relative to the Nov update.  The company has been working with its payer partners (the seven largest cover 74% of membership) on integrating technology that will allow data sharing in closer to real time and has overhauled its internal and external data/actuarial teams, which should help with both forecasting and operational execution.[132]

Stifel, January 5, 2024:  Claims visibility continues to be an issue as utilization has trended well above what the company projected at the beginning of the year. … We have elected to downgrade to a Hold due longer-term structural issues with margins and a *near-term lack of visibility on claims*, which could continue to weigh on results.[133]

J.P. Morgan, February 27, 2024:  *Management highlighted efforts to improve claims visibility* but it is difficult to have confidence in guidance at this stage.  AGL is firmly a 'show-me' story with the company needing

---

[129] "AGL Stumbles Again on Higher Utilization and Poor Data Visibility; Maintain OP, but Lower PT to $11," *RBC Capital Markets*, January 5, 2024, p. 2 (emphasis added).

[130] "Looking Through a 100-Year Storm; PT $9," *Benchmark*, February 29, 2024, p. 1 (emphasis added).

[131] "4Q:23 EBITDA Miss Due to Higher Utilization and Claims Costs; 2024E EBITDA Guide Reduced," *BTIG*, February 28, 2024, p. 1.

[132] "AGL Stumbles Again on Higher Utilization and Poor Data Visibility; Maintain OP, but Lower PT to $11," *RBC Capital Markets*, January 5, 2024, p. 1 (original emphasis removed, emphasis added).

[133] "Downgrade to Hold as Claims Visibility Issues Persist and Long-Term Margin Structural Issues Come into Focus," *Stifel*, January 5, 2024, p. 1 (emphasis in original, partial emphasis removed).

> to string together at least 3-4 clean quarters to rebuild investor confidence. … Going forward, a key factor will be onboarding payor data to improve visibility with AGL targeting payors providing claims for >50% of members in 1Q and 75% in Q2.[134]

78.　Given the lack of analyst commentary that connects the alleged corrective disclosures to the May 27, 2021 alleged misrepresentation at the beginning of the Proposed Class Period, in addition to the apparent differences between the alleged corrective disclosures and this alleged misrepresentation that I discuss above, Dr. Cain offers no reliable basis for assuming that any stock price declines attributable to the alleged corrective disclosures could provide a reliable measure of inflation created (or maintained) by the first and only Guidance and Financial Projections Statement prior to 2023.  As such, Dr. Cain fails to provide a methodology capable of measuring the inflation (if any) attributable to the Guidance and Financial Projections Statement in May 2021.

### 2.　The January 2022 Utilization Statement

79.　While the Proposed Class Period begins in May 2021, I understand that, according to the MTD Order, the first actionable Utilization Statement was made in January 2022 at a J.P. Morgan Healthcare Conference.[135]  I also understand that this is the only Utilization Statement prior to 2023.  The January 2022 Utilization Statement was part of Mr. Sell's response to a question posed by a J.P. Morgan analyst, who asked about the level of utilization the Company expected going into 2022:

> [Question:]  When we think about utilization, you touched a little bit on -- as we think about COVID, right? And as we think about that modest inpatient utilization.  And I think you made the comment that it's being offset right now by utilization on the other side.  ***So should we think that there's any pent-up demand around things like elective surgeries as we go into 2022?***
>
> [Answer (Steve Jackson Sell, CEO):]  Yes.  So we did see some bumps in the back half of '21 in terms of some discretionary surgeries.  <u>I don't know that we believe there's a massive set of pent-up demand, particularly in</u>

---

[134] "4Q Miss And Further 2024 Guidance Reductions On Higher Than Expected Costs," *J.P. Morgan*, February 27, 2024, pp. 1–2 (emphasis added).

[135] MTD Order, pp. 44–45.  I note that this is also the only alleged misrepresentation regarding healthcare utilization trends prior to 2023.  *See* MTD Order, p. 51.

> our model, because we've got those touchpoints, and we've been working very closely with those senior patients, particularly those high-risk patients.  That's why that 50% increase in terms of touches with those patients yields such positive results.[136]

80.    Importantly, this Utilization Statement was in response to a question about utilization in *2022*.  In contrast, as explained above in **Section V.B**, the disclosures Plaintiffs allege as corrective primarily relate to utilization the Company experienced in *2023* and anticipated for *2024*.[137]  Plaintiffs' damages methodology needs to take into account that what agilon allegedly could and should have disclosed in 2021 and 2022 concerning utilization appears to differ from what was disclosed on the alleged corrective disclosure dates.  Dr. Cain fails to explain how a proposed event study of the stock price reaction to alleged corrective disclosures about utilization in 2023 and anticipated utilization for 2024 could reliably measure inflation attributable to alleged misrepresentations about utilization the Company had anticipated for 2022.

81.    Further, based on my review of analyst reports published following the alleged corrective disclosures,[138] no analyst specifically referenced the Utilization Statement made in January 2022.  Instead, analysts pointed to developments in the healthcare industry *in 2023*, including how they affected the Company's financial performance.[139]  For example:[140]

> Goldman Sachs, November 3, 2023:  Recall, heading into 2Q[23], concerns focused on utilization headwinds but, at the time with just partial May data, the company had not yet seen an acceleration in claims that had been described by other payors.  Now with more complete data, AGL did in-fact see an acceleration in utilization during May, and while there has since been some moderation (June and July), utilization has run ahead of

---

[136] I understand Plaintiffs have only alleged the text that is underlined here as a misrepresentation.  I include the full quote to provide additional context into Mr. Sell's statement.  "agilon health, inc. at JPMorgan Healthcare Conference," *Refinitiv Streetevents*, January 10, 2022, p. 8 (emphasis added).  *See also* Complaint, ¶ 114.

[137] *See also* Complaint, ¶ 88 ("On November 2, 2023, agilon revealed that notwithstanding defendants Sell's and Bensley's prior claims to the contrary, agilon had experienced significant deterioration in key profit metrics due to an undisclosed utilization spike earlier in the year."), ¶ 198 ("The Company also disclosed that: … management has assumed higher costs will continue into 2024.").

[138] I reviewed analyst reports covering agilon available to me that were issued during the seven calendar-day windows beginning with the dates of each of the alleged corrective disclosures.  These reports were issued by a total of 26 unique analyst firms.

[139] Starting in mid-2023, analysts discussed an industry-wide increase in utilization, which was larger than industry participants had expected.  *See* **Section VI.C**.

[140] *See also* "'24 EBITDA Guide Below; '23 Lowered & '26 Withdrawn; Downgrading to Hold on Lower Visibility," *Truist Securities*, January 5, 2024, p. 2 ("The higher costs occurred in Q2-Q4 [2023] and became visible to the company in mid-December during its November close process given updated data from health plans. … With respect to accelerated utilization, key categories include specialist costs (episodes per 1,000 up 8% in 2023 vs. up 2.3% in 2022), Part B drugs (up 6.7% in 2023 vs. up 2.2% in 2022), and outpatient surgeries (up 7.3% in 2023, vs up 3.7% in 2022)").

**APP 046**

forecasts and is now expected to continue for the balance of the year driving the $30M negative Medical Margin adjustment.[141]

William Blair, January 5, 2024:  Management also noted three areas of accelerated cost categories during 2023, which we believe drove the higher medical costs.  Specialists saw an 8% utilization in 2023 versus just 2.3% in 2022; part B drugs had utilization of 6.7% in 2023, more than three times above 2022 utilization levels (2.2%); and outpatient surgeries had utilization of 7.3% in 2023, compared to 3.7% in 2022.[142]

J.P. Morgan, February 27, 2024:  AGL reported 4Q results that placed revenue ahead of expectations but lagged on margins with increased utilization weighing on the quarter, beyond what had been contemplated in AGL's January update.  … Claims data received following the January guidance update indicated that costs were higher than AGL previously expected, leading to $38M in added costs (between actual and increased reserves) relating to 4Q23 and ~$13M relating to prior periods. ***Consistent with industry commentary, management highlighted pressure from elevated outpatient surgery volumes, potentially driven by normal deductible trends at the end of 2023.***[143]

82.     Given the lack of analyst commentary that connects the alleged corrective disclosures to the Utilization Statement in January 2022, in addition to apparent differences between the alleged corrective disclosures and this alleged misrepresentation that I discuss above, Dr. Cain offers no reliable basis for assuming that any stock price declines attributable to the allegedly corrective disclosures could provide a reliable measure of inflation created (or maintained) by the Utilization Statement in January 2022.  As such, Dr. Cain fails to provide a methodology capable of measuring the inflation (if any) attributable to the Utilization Statement in January 2022.

### 3.  Business Model Statements in 2021 and 2022

83.     I understand that, according to the MTD Order, multiple Business Model Statements from 2021 and 2022 remain at issue.[144]  Certain of these Business Model Statements appear to

---

[141] "Utilization Pressures Hit 3Q and Outlook, Partly Offset by ACO Upside; 3Q First Look," *Goldman Sachs*, November 3, 2023, p. 1.

[142] "Agilon Lowers Outlook Given Higher Utilization; Disappointing Near-Term Performance Overshadows Robust Partnership Outlook," *William Blair*, January 5, 2024, p. 1.

[143] "4Q Miss And Further 2024 Guidance Reductions On Higher Than Expected Costs," *J.P. Morgan*, February 27, 2024, p. 1 (emphasis added).

[144] MTD Order, pp. 44–46.

APP 047

reference the Company's performance (or expected performance) in 2021 and 2022. In particular:

> October 28, 2021: **Our third quarter [2021] performance and updated guidance** demonstrates the power of our constantly improving platform and high-touch, high-visibility partnership model to shape the healthcare journey of senior patients and deliver predictable, quality outcomes.[145]

> January 10, 2022: **Looking back at '21, looking ahead at '22.** When you talk about '21, you perhaps have to start with COVID. I am still proud of our team and our partners and **the job we've done to manage through multiple surges throughout 2021.** I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver predictable results through each one of these surges. We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.[146]

> March 3, 2022: Our partnership model produced distinctive, predictable results **in 2021**, despite evolving COVID dynamics.[147]

84.    As I discussed in **Section V.B**, the alleged corrective disclosures primarily relate to agilon's financial performance (or expected financial performance) in 2023 and 2024, as opposed to 2021 or 2022. I further understand that Plaintiffs do not claim that any reported results in 2021 and 2022, or any guidance for 2021 or 2022, were misrepresented. Plaintiffs' damages methodology needs to take into account that what agilon could and should have disclosed in 2021 and 2022 concerning its financial performance (or expected financial performance) appears to differ from what was disclosed on the alleged corrective disclosure dates. Dr. Cain fails to explain how a proposed event study analysis of the stock price reaction to alleged corrective disclosures concerning the Company's financial performance in 2023 and 2024 could reliably measure inflation attributable to alleged misrepresentations about agilon's business model in 2021 and 2022.

---

[145] I understand Plaintiffs have only alleged the text that is underlined here as a misrepresentation. I include the full quote to provide additional context into the statement. *See* agilon health, inc. Form 8-K, filed on October 28, 2021, Exhibit 99.1 (emphasis added); Complaint, ¶ 108; MTD Order, pp. 44, 46.

[146] I understand Plaintiffs have only alleged the text that is underlined here as a misrepresentation. I include the full quote to provide additional context into the statement. *See* "agilon health, inc. at JPMorgan Healthcare Conference," *Refinitiv Streetevents*, January 10, 2022, p. 5 (emphasis added); Complaint, ¶ 113; MTD Order, pp. 44, 46.

[147] I understand Plaintiffs have only alleged the text that is underlined here as a misrepresentation. I include the full quote to provide additional context into the statement. *See* agilon health, inc. Form 8-K, filed on March 3, 2022, Exhibit 99.1 (emphasis added); Complaint, ¶ 116; MTD Order, pp. 45, 46.

APP 048

85.    Further, based on my review of analyst reports published in the wake of the alleged corrective disclosures,[148] no analyst specifically referenced any of the Business Model Statements from 2021 and 2022.  Instead, as discussed in **Section VI.D.1**, analysts discussed that new members and PCPs joining the Company in 2023 had contributed to the poor performance and guidance revisions, and as discussed in **Section VI.D.2**, analysts also commented that utilization trends affecting the healthcare industry in 2023 had negatively impacted agilon's financial performance for that year.

86.    Given the lack of analyst commentary that connects the alleged corrective disclosures to any of the Business Model Statements, in addition to the apparent differences between the alleged corrective disclosures and certain of the Business Model Statements that I discuss above, Dr. Cain offers no reliable basis for assuming that any stock price declines attributable to the allegedly corrective disclosures could provide a reliable measure of inflation created (or maintained) by the Business Model Statements in 2021 and 2022.  As such, Dr. Cain fails to provide a methodology capable of measuring the inflation (if any) attributable to the Business Model Statements in 2021 and 2022.[149]

### E.    Dr. Cain Fails to Provide a Methodology that Can Account for How Alleged Inflation May Have Evolved Over the Course of the Proposed Class Period

87.    The second assumption (discussed in **Section VI.B** above) that must hold for abnormal returns from an event study to reliably measure inflation is that the stock price implications of the alleged relevant truth would not have changed over time, regardless of any changes in the Company's business, operations, or the macroeconomic environment in which it operated.

88.    As an initial matter, Dr. Cain fails to show that this assumption holds in this matter given that the remaining categories of alleged misrepresentations (as well as the specific alleged misstatements) occurred at different points in time during the Proposed Class Period.  According to the MTD Order, the first statements in the different categories of actionable alleged misrepresentations occurred after the beginning of the Proposed Class Period.  For example, the

---

[148] I reviewed analyst reports covering agilon available to me that were issued during the seven calendar-day windows beginning with the dates of each of the alleged corrective disclosures.  These reports were issued by a total of 26 unique analyst firms.

[149] To the extent Plaintiffs claim that these Business Model Statements misled the market about the capability of agilon's business model under different industry conditions than those that prevailed in 2021 and 2022, stock price declines following the alleged corrective disclosures would represent the materialization of an allegedly under-disclosed risk and, thus, would not be a reliable measure of inflation throughout the Proposed Class Period.  *See* **Section VI.C**.

first Business Model Statement was made on October 28, 2021, while the first Utilization Statement was made on January 10, 2022.[150]  This suggests that, under Plaintiffs' theory of liability, any inflation may have changed over the course of the Proposed Class Period as new statements relating to each of the new categories were made.  Dr. Cain fails to show that an event study analysis of the abnormal stock price declines following the alleged corrective disclosures could reliably measure inflation throughout the Proposed Class Period given these differences in timing.

89.    Further, Dr. Cain fails to account for the fact that the economic implications of the alleged relevant truth (and thus any inflation) associated with the different alleged misrepresentations may have changed over time as agilon's business, the conditions of the industry in which it operated, and the economy more broadly changed during the nearly three years of the Proposed Class Period.

90.    I next provide examples of how inflation may have changed during the Proposed Class Period.  Thus, even if abnormal returns following the alleged corrective disclosures reliably measured the value implications of the relevant truth Plaintiffs allege was concealed at the time of the alleged corrective disclosures (a proposition Dr. Cain fails to support), they would still not serve as reliable measures of the value implications of the relevant truth Plaintiffs allege was concealed earlier in the Proposed Class Period.  Dr. Cain, however, fails to provide a methodology that he would use to account for changes in industry and business conditions during the Proposed Class Period and, thus, fails to provide a methodology for measuring class-wide damages attributable to Plaintiffs' liability theory in this matter.

### 1. Dr. Cain Fails to Establish How He Would Account for Changes in the Economic Impact of the Utilization Environment Over the Course of the Proposed Class Period

91.    As discussed in **Section IV.A**, agilon accepts financial responsibility for the provision of healthcare services to its members and, as a result, its medical margin—a profitability measure—is tied to utilization.  Dr. Cain fails to consider how any purported inflation would be affected by the actual and expected utilization environment that agilon faced at the time of a hypothetical earlier disclosure that the Defendants allegedly should have made.

---

[150] MTD Order, pp. 44, 51; Complaint, ¶¶ 108, 113, 114.

**APP 050**

92.     Based on my review of analyst commentary during the Proposed Class Period, analysts discussed shifting expectations for how the COVID-19 pandemic would affect healthcare utilization within the MA population and agilon's likely financial performance.  In particular, at the start of the Proposed Class Period in May 2021, analysts commented that they expected non-COVID services (utilization) to increase in the second half of 2021 as the effects of the COVID-19 pandemic stabilized.[151]  By September 2021, this outlook had changed as the Delta and Omicron variants of COVID-19 drove a surge in hospitalizations.[152]  Analysts commented that these "COVID gyrations add[ed] unusually high complexity to the 2H21 outlook."[153]

93.     After the Omicron variant declined in early 2022,[154] some analysts suggested the healthcare services industry had transitioned to a "benign utilization environment" given a lower risk of future COVID-19 outbreaks.[155]  During this period, analysts commented that "[f]uture COVID spikes aren't an issue for [managed care organizations],"[156] that there were "fading COVID headwinds,"[157] and that "[c]ost trend remains well controlled."[158]  As discussed in **Section VI.C**, in mid-2023, following comments by United Healthcare and Humana about

---

[151] *See*, *e.g.*, "1Q21 Follow-Up; Continue to Remain Positive On the Opportunity; Adjusting Estimates," *J.P. Morgan*, June 1, 2021, p. 1 ("utilization and non-COVID-19 costs increasing on a y/y basis back to the 2019 baseline in the back half of 2021 as vaccination rates rise and people are more comfortable using the healthcare system"); "Quick takes from the call," *Bank of America*, May 27, 2021, p. 1 ("AGL saw higher COVID costs at the beginning of the quarter and then it dropped while non-COVID volume rebounded.  Non-COVID costs will increase as the year goes on, still likely below 2019 in Q2 before moving back to normal in 2H.").

[152] *See, e.g.*, "INITIATING COVERAGE: HEALTHCARE FACILITIES & MANAGED CARE + VIDEO," *Cowen*, September 9, 2021, pp. 19, 99 ("The U.S. is experiencing a powerful recovery of post-pandemic medical utilization even as hospital admissions rise in Southern states from a fourth wave driven by the delta variant.").

[153] "Initiate at Outperform: Enabling Change With Exceptional Return Characteristics," *SVB Leerink*, September 27, 2021, p. 7. *See also* "Buy Initiation: Attractive Operating Model, >30% LT Growth Make AGL Top VB Pick," *Jefferies*, October 20, 2021, p. 3 ("We recognize investor concerns surrounding cost trend visibility – exacerbated by the recent COVID surge – which has put pressure on the whole value-based group.").

[154] The Wall Street Journal, "As Omicron Declines, U.S. Rethinks Mask Guidance and Covid-19 Measures," February 10, 2022, available at https://www.wsj.com/articles/omicron-peak-decline-covid-restrictions-11644514531 ("The seven-day average for newly reported cases fell to about 219,400 on Wednesday, according to Johns Hopkins University data.  Averages were above 800,000 a day in mid-January.").

[155] "Staying Ahead of the Curve: AGL Q2 Results," *Deutsche Bank*, August 4, 2022, p. 1 ("If we were to pick any bones, medical cost ratio of 87.7% came in above our estimate of 87.2%, which was a bit of a surprise given the benign utilization environment we continue to hear about from most of the MCOs and the company's commentary that utilization is generally running close to baseline.").

[156] "10 things we learned at 2022 Vegas HC Conference," *Bank of America*, May 16, 2022, p. 1.

[157] "Post-Q2 Updates for Value-Based Care; PRVA & CMAX Are Notable, D/G ONEM to Hold," *Jefferies*, August 15, 2022, p. 1.

[158] "10 things we learned at 2022 Vegas HC Conference," *Bank of America*, May 16, 2022, p. 1.  *See also* industry quotations cited by analysts at J.P. Morgan: "Management's intra-quarter utilization comments have been relatively benign, which we think could translate into EPS upside for managed care ([Humana]: guidance raise partially reflects a continued lower than expected medical cost trends in Medicare and Medicaid, coupled with a **lack of expected COVID headwinds**; CVS: noted utilization trends were largely consistent with 1H22; **[Centene] feels 'pretty good about the macro environment for utilization.'**" *See* "Managed Care: 3Q22 Earnings Preview: Managed Care, Facilities, & Select Healthcare Services," *J.P. Morgan*, October 6, 2022, p. 2 (emphasis added).

APP 051

higher than anticipated utilization, analysts commented that the healthcare industry was again facing "growing uncertainty."[159]

94.    Dr. Cain fails to show that his proposed damages approach could account for such changes in industry-wide expectations and uncertainty regarding utilization and any corresponding changes in the value implications of the alleged relevant truth, including agilon allegedly having (i) "a significant backlog of pent-up demand from COVID"[160] and (ii) a "lack of visibility into members' medical expenses."[161]

95.    Regarding the allegations related to pent-up demand, I understand Plaintiffs allege that agilon was "actively monitoring a progression of its massive 'backlog' of pent-up demand" and that it failed to disclose this backlog.[162]  In other words, Plaintiffs appear to allege that agilon should have disclosed the size of such "backlog" at each point in time during the Proposed Class Period.  However, Dr. Cain fails to provide a methodology to measure inflation that could account for how the magnitude of such "backlog" would have evolved as a result of previously described fluctuations in the severity of COVID-19.  As discussed in **Section VI.C**, agilon disclosed, and analysts commented, that the COVID-19 pandemic could lead to patients deferring routine healthcare check-ups and procedures.  The new COVID-19 variants that spread during the Proposed Class Period may have led to any alleged "backlog" during the Proposed Class Period increasing from that which existed at the beginning of the Proposed Class Period.[163]  Moreover, as a matter of economics, the value implications of any existing backlog at a particular point in time during the Proposed Class Period may depend on expectations regarding when the COVID-19 pandemic would subside, when patients were expected to resume routine,

---

[159] "Model Update for Equity Financing; Lower Price Target to $30," *SVB Leerink*, August 1, 2023, p. 1.  *See also* "2H MLR Analysis - Looking at 2H'23 MLR Seasonality Expectations Across the MCO Group," *Wolfe Research*, September 6, 2023, p. 2 ("We expect continued investor focus on utilization / cost trend dynamics into 2H with [UnitedHealth] / [Humana] comments on [Medicare Advantage] trend uncertainty **heightening uncertainty** ahead of 2Q prints") (emphasis added); "Framing the Recent Utilization Commentary from Payers as it Relates to VBC," *Truist Securities*, June 19, 2023, p. 1 ("Given the **recent uncertainty** around utilization and market sentiment, we are updating our PT on AGL to $27 (from $35 previously) … [Last week, Humana] provided an updated view around its [Medical Loss Ratio] being at the top end of its FY23 range vs it's [*sic*] prior expectation of being towards the upper half the range.  Importantly, in its release, [Humana] indicated that this expectation was primarily driven by the emergence of higher than anticipated noninpatient utilization trends") (emphasis added).

[160] Complaint, ¶ 137.

[161] Complaint, ¶ 137.  These disclosures are hypothetical and I do not take these to be the relevant truths.  Determination of the relevant truth is properly left to the finder of fact.

[162] Complaint, ¶ 72.

[163] For example, analyst commentary noted that as COVID-19 cases increased, non-COVID utilization had decreased.  *See*, *e.g.*, "What We Learned from the J.P. Morgan Healthcare Conference," *J.P. Morgan*, January 18, 2022, p. 1 ("Commentary across the managed care companies was consistent that it was too early to tell how Omicron will impact 4Q21 and 1Q22.  **Companies generally saw an uptick in COVID-related inpatient admits in late December-early January as well as a corresponding decline in non-COVID inpatient utilization**.") (emphasis added).

**APP 052**

non-COVID-related healthcare, how delays in getting routine healthcare would affect their health conditions, and how quickly the backlog would revert to more normal levels.[164] Dr. Cain fails to explain how his proposed damages approach would account for any such changes in expectations.

96.     Regarding allegations that relate to agilon's medical claims visibility, I understand part of Plaintiffs' allegations to be that agilon misrepresented "the predictability of its future medical costs."[165] To the extent agilon's ability to predict and manage medical costs was more limited than disclosed, especially under different industry conditions, the stock price implications of this alleged truth may have depended on the expected level of utilization and whether utilization was expected to be volatile or stable. In particular, more limited visibility into medical costs (e.g., more uncertainty about the ultimate medical costs) may have a relatively smaller impact on financial results in an environment where utilization (and therefore costs) is generally low or predictable compared to when utilization (and therefore costs) is higher or more unpredictable.[166] As discussed above, both the level of utilization and the degree to which the utilization environment featured "rising and unpredictable medical costs" varied during the Proposed Class Period. Dr. Cain fails to propose a methodology that could account for any changes in the value implications of alleged relevant truths regarding agilon's ability to predict and control medical costs resulting from changes in the utilization environment.

### 2.  Dr. Cain Fails to Propose a Methodology to Account for Changes in the Composition of agilon's Membership and PCPs Due to Growth

97.     As discussed in **Section IV.A**, during the Proposed Class Period, agilon's business underwent changes, both in its scale and in the composition of its patient cohort and physicians. Indeed, agilon publicly disclosed that its MA membership grew by over 150%, from 165,300 as of March 31, 2021 (prior to the start of the Proposed Class Period) to 420,300 by September 30,

---

[164] Because stock prices are based on discounted future expected cash flows, a company's stock price will be sensitive to changes in the timing of the company's future costs. For example, the effect of $100 of anticipated costs on a company's value depends on whether those costs are expected to arrive this year or next year. *See* Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011, pp. 78–79.

[165] Complaint, ¶ 65.

[166] Additionally, agilon shared its surplus with the physician groups, but absorbed all losses. *See*, *e.g.*, "Attractive Market, with a Compelling Model; Initiate at Buy," *Goldman Sachs*, September 12, 2022, pp. 18, 20 ("Docs have 0% downside risk but split savings 50/50. … The difference between the medical service revenue and all the medical costs required to care for patients is called the medical margin and this is split 50/50 with the physician partners.").

2023 (prior to the alleged corrective disclosures).[167]  Dr. Cain fails to provide a methodology capable of measuring how inflation may have changed as a result of agilon's growth and changing membership composition, and the effect of any such changes on its ability to predict and manage its costs.

98.    Throughout the Proposed Class Period, agilon repeatedly disclosed in SEC filings that "[n]ew membership added to the platform is typically dilutive to [the overall] medical margin PMPM,"[168] but that as new members matured, the associated medical margins typically increased.[169]  agilon's reported financial results were affected by this multi-cohort membership structure.  For example, in its IPO prospectus, agilon disclosed a chart which showed changes in medical margins as members matured.[170]  The chart categorized agilon's members into three geographies, and showed that the medical margin PMPM in "Geography 1" expanded from $76 in Year 0 to $201 in Year 3, representing a 38% compound annual growth rate; that medical margin PMPM in "Geography 2" expanded from $21 in Year 0 to $154 in Year 2, representing a 169% compound annual growth rate; and that medical margin PMPM in "Geography 3" increased from -$18 in Year 0 to $55 in Year 2.[171]

99.    Consistent with this, analysts commented that new cohorts typically had lower medical margins (or higher medical costs):

> J.P. Morgan, May 10, 2021:  As the company enters new markets and brings on new MA members, this should drive incremental medical margin dollars but could **dilute the consolidated Medical Margin** as a

---

[167] agilon health, inc. Form 10-Q for the quarterly period ended March 31, 2021, filed on May 26, 2021, p. 22; agilon health, inc. Form 10-Q for the quarterly period ended September 30, 2023, filed on November 2, 2023, p. 24.

[168] *See, e.g.*, agilon health, inc. Form 10-Q for the quarterly period ended June 30, 2021, filed on August 4, 2021, p. 25; agilon health, inc. Form 10-Q for the quarterly period ended March 31, 2022, filed on May 5, 2022, p. 22; agilon 2021 Form 10-K, p. 62; agilon 2022 Form 10-K, p. 60.  Analysts also discussed this margin dilution.  *See, e.g.*, "The Preferred Partner for Value-Based Care: Initiating Coverage at Outperform with a $33 PT," *RBC Capital Markets*, September 14, 2022, p. 20 ("New members are a temporary drag on margins due to an initial increase in services and diagnostics as well as the lag ahead of risk score—and corresponding PMPM payment—increases.").

[169] agilon disclosed its Medical Margins progression across member cohorts in the Investor Presentations and Earnings Presentations from Q1 2022 through Q3 2023; *See, e.g.*, agilon health, inc. 2022 Investor Day Presentation, March 2022, p. 79; agilon health, inc. Investor Presentation, May 2022, p. 19; agilon health, inc. 2023 Investor Day Presentation, March 2023, p. 60; agilon health, inc. Q4 2023 Earnings Presentation, February 2024, p. 10.

[170] *See, e.g.*, agilon health, inc. Form 424(b)(4), filed on April 16, 2021, p. 81; agilon health, inc. Form 424(b)(4), filed on September 13, 2021, p. 79 ("Medical margin profiles of cohorts of members grouped by enrollment year have historically improved over their duration on our platform.").  agilon also disclosed the dilutive effect of new geographies in its IPO and SEO prospectuses.  *See* agilon health, inc. Form 424(b)(4), filed on April 16, 2021, p. 81; agilon health, inc. Form 424(b)(4), filed on September 13, 2021, p. 79.

[171] *See, e.g.*, agilon health, inc. Form 424(b)(4), filed on April 16, 2021, p. 81; agilon health, inc. Form 424(b)(4), filed on September 13, 2021, p. 79.

APP 054

percent of sales, as those **new members are typically less profitable in the early years**.[172]

Cowen, October 31, 2021:  New members initially represent break-even to modest EBITDA losses.[173]

J.P. Morgan, June 30, 2022:  Management noted newer markets are starting off at higher medical margins compared to legacy markets, as the company is leveraging lessons learned to optimize the market maturation curve.  It is important to note that **new faster member growth is dilutive to margins over the near term as newer members join with lower risk scores**.[174]

J.P. Morgan, June 30, 2022:  Companies typically see a profit headwind from new office openings or expansion into new markets, as **new patients are typically less well managed initially** or may not have proper risk scoring.[175]

RBC Capital Markets, September 14, 2022:  **New members are a temporary drag on margins** due to an initial increase in services and diagnostics as well as the lag ahead of risk score—and corresponding PMPM payment—increases.  As a result, the company-wide average PMPMs can **cloud progress in older cohorts, particularly as new cohorts continue to increase in size**.[176]

100.    In addition to noting the likely dilutive effect of new members, analysts commented that new physicians could also lower overall PMPM medical margins.  For instance, an RBC report from January 5, 2024 commented that "New PCPs whether joining with a new cohort in a new market through the structured onboarding program or joining an existing market tend to contribute lower PMPM medical margins; for example, mature PCPs average $161 compared to $34 with newer PCPs."[177]

101.    Dr. Cain fails to provide a methodology that could account for how these factors may have impacted agilon's "visibility" into its financial results and any alleged inflation during the

---

[172] "Physician-Led Transformation of Value-Based Care; Initiating at Overweight with a $42 Price Target," *J.P. Morgan*, May 10, 2021, p. 22 (emphasis added).

[173] "3Q21 MODEL UPDATE," *Cowen*, October 31, 2021, p. 1.

[174] "Our Takes from the Inaugural J.P. Morgan Value Based Care Summit," *J.P. Morgan*, June 30, 2022, p. 10 (emphasis added).

[175] "Our Takes from the Inaugural J.P. Morgan Value Based Care Summit," *J.P. Morgan*, June 30, 2022, p. 2 (emphasis added).

[176] "The Preferred Partner for Value-Based Care: Initiating Coverage at Outperform with a $33 PT," *RBC Capital Markets*, September 14, 2022, p. 20 (emphasis added).

[177] "AGL Stumbles Again on Higher Utilization and Poor Data Visibility; Maintain OP, but Lower PT to $11," *RBC Capital Markets*, January 5, 2024, p. 2.

APP 055

Proposed Class Period.  As discussed in **Section IV.A**, during the Proposed Class Period, agilon's membership grew rapidly and at some points exceeded analysts' expectations.[178]  In 2023, the actual medical margin generated by new members underperformed compared to the Company's mature cohorts.  In particular, the 2023 cohort accounted for approximately one-third of agilon's members in 2023, but generated medical margin of only $25 PMPM.[179]  In contrast, the three mature cohorts (2018 members through 2020 members) generated medical margins between $142 and $160 PMPM.[180]  Analysts noted that, despite the high utilization environment in 2023, the medical margin for these older cohorts was close to the $150–$200 PMPM medical margin range agilon had guided to for mature (Year 5+) cohorts,[181] suggesting that agilon may have had more visibility for its mature cohorts than newer cohorts.  Dr. Cain fails to propose a methodology that could account for any changes in the value implications of alleged relevant truths regarding agilon's ability to predict and control medical costs arising from agilon's growth and changing membership composition.

### F.  Dr. Cain Fails to Provide a Methodology Capable of Reliably Separating the Stock Price Effect of Potentially Confounding Information

102.    As described in **Section V.A**, I understand the Court dismissed those alleged misrepresentations that fell within the "data integration" and "growth strategy" categories.[182]  Dr. Cain fails to show that any of his proposed approaches could be used to reliably separate the stock price effect of the remaining actionable alleged misrepresentations from other, potentially confounding information.

103.    Based on my review of the MTD Order, I understand that certain alleged misrepresentations that are no longer actionable were made on the same day (and as part of the same disclosures) as certain of those that remain actionable.  For example, Plaintiffs allege misrepresentations on May 27, 2021 that fall into both the "Guidance and Financial Projections"

---

[178] *See*, *e.g.*, "AGL continues to distinguish itself from disruptive peers," *Bank of America*, March 4, 2022, p. 1 ("The company now expects to add nearly 79k MA members from new partnerships, +2% above the prior guide and our est, and implying a lower revenue/member than we were modeling.").

[179] agilon health, inc. Q4 2023 Earnings Presentation, February 2024, p. 10.

[180] agilon health, inc. Q4 2023 Earnings Presentation, February 2024, p. 10.

[181] agilon health, inc. 2022 Investor Day Presentation, March 2022, p. 19.  *See e.g.*, "4Q:23 EBITDA Miss Due to Higher Utilization and Claims Costs; 2024E EBITDA Guide Reduced," *BTIG*, February 28, 2024, p. 1 ("AGL's members that came on the platform from 2018 to 2020 are at or above its ~$150 PMPM target.").

[182] MTD Order, p. 59.

APP 056

category (which remains actionable) and the "growth strategy" category (which is no longer actionable).[183]  Similarly, Plaintiffs allege Defendants made misrepresentations on May 11, 2022 that fall into both the "Business Model" category (which remains actionable) and the "data integration" category (which is no longer actionable).[184]  A reliable damages methodology (including an event study or  unspecified "valuation model") would have to be capable of separating any stock price effect of alleged misrepresentations that remain actionable, and thus the associated measure of inflation, from that of alleged misrepresentations that are no longer actionable.  However, Dr. Cain fails to indicate, beyond a cursory reference to "valuation models,"[185] how he would determine inflation attributable only to misrepresentations that remain actionable and exclude any impact on these dates of disclosures that are corrective with respect to statements that are no longer actionable.

104.    Moreover, certain statements that are no longer actionable appear similar to alleged misrepresentations that remain actionable.  For example, the Court dismissed the following statement made on May 11, 2022 regarding the Company's data integration:

> It has a dramatic impact on the cost areas that I just talked about, but *it really goes back to that high-touch relationship* between the physician and patient and *making sure they have the data they need* and they have the team around them that gives them the time to spend with those most complex patients.[186]

105.    However, the Court found that apparently similar statements regarding agilon's high-touch business model are actionable, including the following:

---

[183] For example, the Complaint alleges that defendant Sell "emphasized his 'high degree of visibility into future revenues and margin progression,' as well as agilon's 'growth strategy, both with our existing partners and current geographies and with new partners in new markets.'  Sell also underscored agilon's '[s]ame geography membership growth' as 'a key differentiator in our model'" *See* Complaint, ¶ 100 (emphasis removed).  The MTD Order characterizes this portion of the Complaint as both an alleged misrepresentation regarding agilon's guidance and financial projections and as relating to agilon's growth strategy. *See* MTD Order, pp. 34, 49.

[184] The MTD Order categorized the following statement as an alleged misrepresentation regarding agilon's business model: "I mean I think one of the real differentiators in our model is in the high-touch nature between the primary care physician and the patient. … In COVID, what we were able to maintain was the touch points with these senior patients … And I think that translated into more predictably from a cost perspective, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points.  And we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues."  The MTD Order characterized the following statement as an alleged misrepresentation regarding agilon's data integration and ruled that it is not actionable: "[i]t really goes back to that high-touch relationship between the physician and patient and making sure they have the data they need and they have the team around them that gives them the time to spend with those most complex patients." *See* MTD Order, pp. 45, 47; Complaint, ¶¶ 129, 130 (emphasis removed).

[185] Cain Report, ¶ 102.

[186] MTD Order, p. 47 (emphasis in original).

APP 057

January 10, 2022:  *I think our high-touch primary care model really distinguishes us.*  We've been able to manage costs and deliver predictable results through each one of these surges.  We've been able to maintain those touchpoints.  And so we don't see the volatility in our RAF that perhaps you do in other models.[187]

May 11, 2022:  I mean I think *one of the real differentiators in our model is in the high-touch nature* between the primary care physician and the patient.  Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade.  And so we understand those groups very well.  As we bring them on board, we have great visibility from a cost perspective because we've got that experience with them.  We take a 12-month implementation period, which I think is distinctive.  And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective.  And so that visibility and that continuity is a big differentiator.[188]

Dr. Cain fails to explain how his proposed damages approach would be able to account for a determination by the finder of fact that, for example, Defendants are not liable for these additional Business Model Statements, or that they are liable for a subset of statements different than what the Court found.

106.    Further, certain disclosures Plaintiffs allege as corrective appear to relate to categories of alleged misrepresentations that are no longer actionable.  For example, on November 2, 2023, as part of the alleged corrective disclosures, agilon disclosed that medical margin for 3Q23 had been affected by data integration issues and, specifically, "system issues with a single payer related to supplemental benefit costs."[189]  As another example, as part of the January 5, 2024 alleged corrective disclosures, the Company disclosed it "failed to appreciate … that material growth in mature markets has brought a significant number of new primary care doctors, and there is a low-hanging fruit opportunity to do a better job in terms of onboarding and educating these newer doctors" and that, as a result, these new primary care doctors had lower PMPM medical margin.[190]  As discussed in **Section V.A**, I understand that in the MTD Order, the Court dismissed alleged misrepresentations regarding agilon's data integration and growth strategy,

---

[187] MTD Order, pp. 44–46 (partial emphasis removed).
[188] *See* Complaint, ¶ 129 (partial emphasis removed); MTD Order, pp. 45–46.
[189] "Q3 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, November 2, 2023, p. 5.
[190] "FY 2023 agilon health, inc. Guidance Call," *Refinitiv Streetevents*, January 5, 2024, pp. 3–4.

including the onboarding of new PCPs in mature markets.[191]  Dr. Cain fails to explain how his proposed approach would account for a determination by the finder of fact that, for example, disclosures regarding "system issues" made on November 2, 2023, or issues with onboarding new PCPs made on January 5, 2024, are not corrective of the alleged misrepresentations that remain actionable.

107.    In sum, Dr. Cain fails to explain how his proposed damages approach would account for different liability findings with respect to the alleged misrepresentations.  Dr. Cain fails to provide a methodology that can separate the stock price effects of statements that have been dismissed from those (if any) that remain actionable.  To the extent Dr. Cain proposes to use an event study to measure abnormal stock price declines at the time of the alleged corrective disclosures, he fails to show that such an approach would be capable of measuring inflation if the finder of fact were to determine that certain information released concurrently with these disclosures is confounding.  Indeed, as discussed above in **Section VI.B**, an event study can only measure inflation if there is no confounding news that impacts the stock price at the same time.  While Dr. Cain acknowledges this as a limitation of event studies,[192] he fails to provide a methodology that can reliably separate the stock price effect of information alleged to be corrective from that of confounding news.

### G.  Dr. Cain Fails to Address the Lack of Any Statistically Significant Stock Price Reaction to the February 27, 2024 Alleged Corrective Disclosures

108.    As discussed in **Section V.B**, Plaintiffs allege that certain disclosures included in agilon's 4Q23 earnings release and earnings call, made after market close on February 27, 2024, represent corrective information that caused declines in agilon's stock price over three trading days:  *i.e.*, February 28, February 29, and March 1, 2024.[193]  However, in an efficient market (Dr. Cain opines that the market for agilon common stock was efficient during the Proposed Class Period), there is no basis to assume, and Dr. Cain does not provide one, that it would take

---

[191] MTD Order, pp. 50–51, 59.

[192] Cain Report, ¶ 103 ("To the extent that reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud-related factors, the impact of such 'confounding information' on the price of agilon's Common Stock can be determined on a common, Class-wide basis using various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation.").

[193] Complaint, ¶ 91.

APP 059

more than one trading day (here, February 28, 2024) for the price of agilon common stock to incorporate any allegedly corrective information released after the close on February 27.  As noted earlier, the relevant academic literature indicates that, in an efficient market, stock prices typically impound new public information within a single trading day.

109.    According to Dr. Cain's event study, agilon's abnormal return on February 28, 2024, the relevant impact date, is not statistically significant.[194]  That is, the results of Dr. Cain's event study do not support the claim that new, value-relevant information, including any alleged corrective information, came to the market in the Company's after-market disclosures on February 27, 2024.

110.    Indeed, a number of analysts characterized developments conveyed in the Company's February 27, 2024 disclosures as being largely expected in light of prior disclosures by other firms in the industry.  For example:

> William Blair, February 27, 2024:  After the markets closed on Tuesday, February 27, agilon health (AGL) reported fourth quarter 2023 results that printed below the prerelease commentary announced earlier this year; however, **we believe this was largely anticipated by investors following negative fourth-quarter announcements from several leading Medicare Advantage (MA) plans over the past few weeks**.[195]

> Bank of America, February 28, 2024:  In a repeat of the performance that we've seen play out at pretty much every other major MA exposed company, the fourth quarter missed on medical costs (after having cut its 2023 outlook 3 times) and as a result, AGL has already lowered the expectations for 2024 it had initially previewed in January.  While the results are far from ideal, **another guidance cut was largely expected heading into the quarter given the significant pressures larger peers discussed on earnings calls in the past few weeks**.[196]

> JMP Securities, February 28, 2024:  We characterize sentiment as weak going into results, despite management having revised its 4Q expectations as recently as January 5, while simultaneously issuing its initial view for 2024, as more recent commentary from a number of managed care organizations became more cautious across the past several weeks, and as

---

[194] *See* Cain Report production, Cammer 5.xlsx.

[195] "As Expected, Uptick in MA Utilization Pressures Costs Trends, Margins Once Again," *William Blair*, February 27, 2024, p. 1 (emphasis added).

[196] "With MA industry expectations reset, focus could start to turn to 2025 and beyond," *Bank of America*, February 28, 2024, p. 1 (emphasis added).

APP 060

one physician enablement peer took steps to reduce its full-risk exposure for 2024. **To a large extent we believe a guide down was expected and baked into shares, although the magnitude of the revision eclipsed our expectations.**[197]

111.    Dr. Cain fails to discuss this result of his own event study, and fails to explain how he would employ an event study to measure the inflation allegedly dissipated on February 28, 2024 given the lack of any statistically significant abnormal return on this date.[198]    That is, even assuming an event study analysis of stock price reactions following the alleged corrective disclosures is an appropriate methodology for measuring inflation throughout the Proposed Class Period (which he has not shown), Dr. Cain fails to explain how he would use an event study to measure inflation when such an analysis suggests the stock price did *not* react to the allegedly corrective information.    As such, Dr. Cain fails to provide a methodology capable of measuring class-wide damages consistent with Plaintiffs' theory of liability with respect to the February 27, 2024 alleged corrective disclosures.

Executed this 29th of June, 2026

_____

Douglas Skinner, Ph.D.

---

[197] "Revises 2024 Outlook Lower on Elevated Trend; Maintaining MO, Lowering Price Target," *JMP Securities*, February 28, 2024, p. 1 (emphasis added).

[198] Dr. Cain states that the event study he presents in his report was performed "to assist with the evaluation of market efficiency" and "was not intended to quantify artificial inflation." *See* Cain Report, footnote 95. This statement notwithstanding, Dr. Cain fails to discuss any alternative approach he would use to measure inflation allegedly dissipated following the alleged corrective disclosures on February 27, 2024.

APP 061

**Appendix A**

**DOUGLAS J. SKINNER**
Sidney Davidson Distinguished Service Professor of Accounting
The University of Chicago Booth School of Business
5807 South Woodlawn Avenue
Chicago, IL 60637
Phone: 773-702-7137
dskinner@uchicago.edu
Google Scholar
SSRN

## Education

B.Ec. (First Class Honours), Accounting/Finance, Macquarie University, 1985.
M.S., Applied Economics, University of Rochester, 1988.
Ph.D., Accounting (major area), Finance (minor area), University of Rochester, 1989.

## Appointments

University of Chicago, Booth School of Business
 Sidney Davidson Distinguished Service Professor of Accounting, 2023-
 Deputy Dean for Faculty, 2015-2016, 2017-2024.
 Interim Dean, 2016-2017.
 Eric J. Gleacher Distinguished Service Professor of Accounting, 2014-2022.
 John P. and Lillian A. Gould Professor of Accounting, 2006-2013.
 Executive Director, Accounting Research Center, 2011-2016.
 Professor of Accounting and Neubauer Family Faculty Fellow, 2005-2006.
 Neubauer Faculty Fellow and Visiting Professor of Accounting, 2003-2004.

Independent Trustee and Audit Committee Chair, Harbor Funds, Harbor Funds II, and
 Harbor ETF Trust, 2020-

Senior Fellow, Asian Bureau of Finance and Economic Research (ABFER), 2017-

*Journal of Accounting Research*
 Senior Editor, 2006-2021.

*Journal of Accounting & Economics*
 Editor, 2000-2005.
 Associate Editor, 1994-2000.

University of Michigan Business School (now Ross School of Business)
 KPMG Professor of Accounting, 1998-2005
 Accounting Area Chair, 2001-2003
 Professor of Accounting, 1997-2005
 Associate Professor of Accounting, 1993-1997
 Assistant Professor of Accounting, 1989-1993

APP 062

**Appendix A**

Coopers & Lybrand (Sydney)
   Auditor, 1980-82.

**Scholarly Honors and Awards**

FARS 2020 Best Paper Prize for "Run EDGAR Run: SEC Dissemination in a High Frequency World."  With Jonathan L Rogers and Sarah L. C. Zechman.

Distinguished Ph.D. Mentoring Award, 2020, Financial Reporting Section, American Accounting Association.

BlackRock prize for best paper, 2015 Review of Accounting Studies conference ("The role of the media in disseminating insider trading news."  With Jonathan Rogers and Sarah Zechman.)

Hillel J Einhorn Excellence in Teaching Award, 2014.

Emory Williams Award for Teaching Excellence, 2013.

FARS 2009 Best Paper Prize for "Earnings Momentum and Earnings Management."  With James Myers and Linda Myers.

Jensen Prize for best paper in Corporate Finance and Organizations published in the *Journal of Financial Economics* in 2004.  ("Are Dividends Disappearing?  Dividend Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda DeAngelo.)

CQA/IBES Research Competition, 1998. ("Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio."  With Richard Sloan.  Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.)

KPMG Peat Marwick Faculty Fellow 1993-1996.
KPMG Peat Marwick Research Fellow 1991-1993.
Deloitte Haskins & Sells Foundation Doctoral Fellow 1986-88.
University of Rochester Sproull Fellow 1985-1987.

**Main Publications**

"Options Markets and Stock Return Volatility."  Journal of Financial Economics 23, 1, June 1989: 61-78.

"Options Markets and the Information Content of Accounting Earnings Releases."  Journal of Accounting & Economics 13, 3, October 1990: 191-211.

**Appendix A**

"Dividends and Losses."  With Harry DeAngelo and Linda DeAngelo.  Journal of Finance 47, 5, December 1992: 1837-1863.

"The Investment Opportunity Set and Accounting Procedure Choice: Preliminary Evidence." Journal of Accounting & Economics 16, 4, October 1993: 407-445.

"Accounting Choice in Troubled Companies."  With Harry DeAngelo and Linda DeAngelo. Journal of Accounting & Economics 17, 1-2, January 1994: 113-143.

"How Do Taxes Affect Investors' Stock Market Realizations? Evidence from Tax-Return Panel Data."  With H. Nejat Seyhun.  Journal of Business 67, 2, April 1994: 231-262.

"Why Firms Voluntarily Disclose Bad News."  Journal of Accounting Research 32, 1, Spring 1994: 38-60.  (This article is abstracted in The CFA Digest 24, 4, Fall 1994.)

"Reversal of Fortune: Dividend Policy and the Disappearance of Sustained Earnings Growth." With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics 40, 3, March 1996: 341-371.

"Earnings Disclosures and Stockholder Lawsuits."  Journal of Accounting & Economics 23, 3, November 1997: 249-282.

"Determinants of the Valuation Allowance for Deferred Tax Assets under SFAS-109."  With Gregory S. Miller.  The Accounting Review 73, 2, April 1998: 213-233.

"An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium."  With Richard Frankel and Marilyn Johnson.  Journal of Accounting Research 37, 1, Spring 1999: 133-150.

"Earnings Management: Reconciling the Views of Accounting Academics, Practitioners, and Regulators."  With Patricia Dechow.  Paper delivered at the AAA/FASB Financial Reporting Issues Conference in December, 1999.  Accounting Horizons, 14, 2, June 2000: 235-250.

"Special Dividends and the Evolution of Dividend Signaling."  With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics, 57, 3, September 2000: 309-354.

"Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio."  With Richard Sloan.  Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.
- *Winner, 1998 Chicago Quantitative Alliance/IBES Research Competition.*

"Large Sample Evidence on the Debt Covenant Hypothesis."  With Ilia Dichev.  Journal of Accounting Research, 40, 4, September 2002: 1091-1123.

"The Role of Supplementary Statements with Management Earnings Forecasts."  With Amy P. Hutton and Gregory S. Miller.  <u>Journal of Accounting Research</u> 41, 5, December 2003: 867-890.

"Employee Stock Options, EPS Dilution, and Stock Repurchases."  With Daniel Bens, Venky Nagar, and M. H. Franco Wong.  <u>Journal of Accounting and Economics</u>, 36, 1-3, December 2003: 51-90.

"Are Dividends Disappearing?  Dividend Concentration and the Consolidation of Earnings."  With Harry DeAngelo and Linda DeAngelo.  <u>Journal of Financial Economics</u>, 72, 3, June 2004: 425-456.
- *Jensen Prize for best paper, Corporate Finance and Organizations*.

"Earnings Momentum and Earnings Management."  With James Myers and Linda Myers.  <u>Journal of Accounting, Auditing and Finance</u>, 22, 2, Spring 2007: 249-284.
- *FARS Best paper prize, 2009.*

"Does Earnings Guidance Affect Market Returns?  The Nature and Information Content of Aggregate Earnings Guidance."  With Carol Anilowski and Mei Feng.  <u>Journal of Accounting and Economics</u> 44, 1-2, September 2007: 36-63.

"The Evolving Relation between Earnings, Dividends, and Stock Repurchases."  <u>Journal of Financial Economics</u> 87, 3, March 2008: 582-609.

"Accounting for Intangibles – A Critical Review of Policy Recommendations."  <u>Accounting and Business Research</u> 38, 3, 2008: 191-204.

"A reply to Lev's rejoinder to 'Accounting for Intangibles – A Critical Review of Policy Recommendations.'"  <u>Accounting and Business Research</u> 38, 3, 2008: 215-216.

"The Rise of Deferred Tax Assets in Japan: The Role of Deferred Tax Accounting in the Japanese Banking Crisis."  <u>Journal of Accounting and Economics</u> 46, 2-3, 2008: 218-239.  Lead article.

"Corporate Payout Policy."  With Harry DeAngelo and Linda DeAngelo.  <u>Foundations and Trends in Finance</u> 3, 2-3, 2008: 95-287.

"Management Forecasts in Japan: An Empirical Study of Forecasts that are Effectively Mandated" (Previously titled "When Voluntary Disclosure Isn't Voluntary: Management Forecasts in Japan.")  With Kazuo Kato and Michio Kunimura.  <u>The Accounting Review</u> 84, 5 (September 2009): 1575-1606.

"Earnings Guidance and Market Uncertainty."  With Jonathan Rogers and Andrew Van Buskirk.  <u>Journal of Accounting and Economics</u> 48, 1 (October 2009): 90-109.

**Appendix A**

"Implications for GAAP from an analysis of positive research in accounting."  With S. P. Kothari and Karthik Ramanna.  (Previously titled: "What Should GAAP Look Like?  A Survey and Economic Analysis.")  Journal of Accounting and Economics 50, 2-3 (December 2010): 246-286.  (Invited review paper.)

"What Do Dividends Tell Us About Earnings Quality?"  With Eugene Soltes.  Review of Accounting Studies 16, 1 (March 2011): 1-28.

"Measuring Securities Litigation Risk."  With Irene Kim.  Journal of Accounting and Economics 53, 1-2 (February-April 2012): 290-310.

"Audit Quality and Auditor Reputation:  Evidence from Japan."  With Suraj Srinivasan.  The Accounting Review 87, 5 (September 2012): 1737-1765.

"The Politics of Accounting Standard-Setting: A Review of Empirical Research."  With Brandon Gipper and Brett J. Lombardi.  Australian Journal of Management 38, 3 (December 2013): 523-551.

"Payout policy through the financial crisis: The growth of repurchases and the resilience of dividends."  With Eric Floyd and Nan Li. Journal of Financial Economics 118, 2 (November 2015): 299-316.

"The role of the media in disseminating insider trading news."  With Jonathan L. Rogers and Sarah L. C. Zechman. Review of Accounting Studies 21, 3 (September 2016): 711-739.
- *BlackRock prize for best paper, Review of Accounting Studies conference, 2015.*

"Is Japan Really a "Buy"?  The Corporate Governance, Cash Holdings, and Economic Performance of Japanese Companies."  With Kazuo Kato and Meng Li.  Journal of Business Finance & Accounting 44, 3 & 4 (March/April 2017): 480-523.

"Run EDGAR Run: SEC Dissemination in a High Frequency World."  With Jonathan L Rogers and Sarah L. C. Zechman.  Journal of Accounting Research 55, 2 (May 2017): 459-505.
- *FARS Best paper prize, 2020.*

"Importing Activists: Determinants and Consequences of Increased Cross-border Shareholder Activism."  With Mark G. Maffett and Anya Nakhmurina.  Journal of Accounting & Economics 74, 2-3 (November-December 2022): 101538.

"Corporate Managers' Perspectives on Forward-Looking Guidance: Survey Evidence."  With Andrew C. Call, Paul Hribar, and David Volant.  Journal of Accounting & Economics, 78, 2-3 (November-December 2024): 101731.

"Why Did the Big 4 Get So Large?  Evidence from Australia."  (Previous title, "The Evolution of Audit Market Structure and the Emergence of the Big Four: Evidence from Australia.")  With Matthew Pinnuck and Colin Ferguson (deceased).  Review of Accounting Studies 30 (September 2025): 2508-2554.

**APP 066**

**Appendix A**

"Agency Costs of Free Cash Flow, Capital Allocation, and Payouts."  With Harry DeAngelo and Kathleen Kahle. Journal of Financial Economics 172 (October 2025): 104117.


**Conference Proceedings**

"Stock Returns, Trading Volume, and Bid-Ask Spreads Around Earnings Announcements: Evidence from the NASDAQ National Market System."  Proceedings: Seminar on the Analysis of Security Prices, 36, 1, May 1991: 289-329.  SSRN version https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2143649


**Current Working Papers**

"Moving Forward: Management Guidance and Earnings Announcement Returns."  With Yao Lu.  April 2020, Revised September 2020. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3687764

"Do Actions Speak Louder than Words?  The Relation Between Payouts and Guidance Since 2000."  With Yao Lu.  August 2023.  Revised February 2026.  Under review. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4322036


**Invited Discussions and Commentaries (non-refereed)**

"Are Disclosures About Bank Derivatives and Employee Stock Options 'Value Relevant'?" Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 393-405.

"What Motivates Managers' Choice of Discretionary Accruals?"  With Victor L. Bernard. Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 313-325.

"Do Options Markets Improve Informational Efficiency?"  Contemporary Accounting Research 14, 2, Summer 1997: 193-201.

"How Well Does Net Income Measure Firm Performance?  A Discussion of Two Studies." Journal of Accounting & Economics, 26, 1-3, January 1999: 105-111.

"Should Firms Disclose Everything to Everybody? A Discussion of 'Open versus closed conference calls: The determinants and effects of broadening access to disclosure.'" Journal of Accounting and Economics 34, 1-3, January 2003: 181-187.

'Comments on "The Effects of Taxes on Market Responses to Dividend Announcements and Payments: What Can We Learn from the 2003 Dividend Tax Cut?"' by Raj Chetty, Joseph Rosenberg, and Emmanuel Saez, in Alan J. Auerbach, James R. Hines, Jr., and

**APP 067**

**Appendix A**

Joel Slemrod, eds., <u>Taxing Corporate Income in the 21st Century</u> (Cambridge University Press, 2007): 36-40.

'Discussion of "The implications of unverifiable fair-value accounting: Evidence from the political economy of goodwill accounting"' <u>Journal of Accounting and Economics</u> 45, 2-3, August 2008, 282-288.

'Discussion of "Accounting standards and debt covenants: Has the "Balance Sheet Approach" led to a decline in the use of balance sheet covenants?"' <u>Journal of Accounting and Economics</u> 52, 2-3, November 2011: 203-208.

"Accounting research in the Japanese setting." <u>The Japanese Accounting Review</u>, 1, 2011: 135-140.

"How should we think about earnings quality?  A discussion of "Earnings quality: Evidence from the field."  With Mark W. Nelson.  <u>Journal of Accounting and Economics</u> 56, 2-3 (December 2013): 34-41.

"The Evolving Disclosure Landscape: How Changes in Technology, the Media, and Capital Markets Are Affecting Disclosure."  With Gregory S. Miller.  <u>Journal of Accounting Research</u> 53, 2 (May 2015): 221-239.

**Other Publications**

"Are the SEC's Safe Harbor Provisions Effective in Encouraging the Disclosure of Forward-Looking Information?"  <u>Financial Analysts Journal</u> 51, 4, July-August 1995: 38-44.

"Issues in Foreign Exchange Hedge Accounting."  With Michael H. Moffett.  <u>Journal of Applied Corporate Finance</u> 8, 5, Fall 1995: 82-94.

"Bad News Rings True."  With Amy P. Hutton and Gregory S. Miller.  <u>Investor Relations Quarterly</u> 6, 2, 2004: 49-56.

"Japan's Window Dressing Hid Olympus Fraud,"  Bloomberg Opinion, November 30, 2011, https://www.bloomberg.com/opinion/articles/2011-12-01/japan-s-window-dressing-hid-olympus-fraud-commentary-by-douglas-skinner

"Why U.S. Companies Continue to Pay Dividends," Bloomberg Opinion, April 11, 2012, https://www.bloomberg.com/opinion/articles/2012-04-11/why-u-s-companies-continue-to-pay-dividends

"Corporate America is Enriching Shareholders at the Expense of the Economy." fivethirtyeight.com  July 15, 2014. http://fivethirtyeight.com/features/corporate-america-is-enriching-shareholders-at-the-expense-of-the-economy/

**Appendix A**

The Financial Accounting Standards Committee of the AAA is charged with responding to requests by standards setters on issues related to financial reporting. As a member of that Committee from 1999 until 2002 I contributed to comment letters to the Financial Accounting Standards Board (FASB), the International Accounting Standards Committee (IASC), and the U.S. Securities and Exchange Commission (SEC).  Published versions of these comment letters for which I served as principal author are as follows:

- Response to the FASB Preliminary Views: Reporting Financial Instruments and Certain Related Assets and Liabilities at Fair Value.  (with J. M. Wahlen, Chair, J. R. Boatsman, R. H. Herz, G. J. Jonas, K. G. Palepu, S. G. Ryan, K. Schipper, and C. M. Schrand). Accounting Horizons December 2000, Vol. 14, No. 4, pp. 501-508.
- Implications of Accounting Research for the FASB's Initiatives on Disclosure of Information about Intangible Assets.  With L. A. Maines, Chair, E. Bartov, P. M. Fairfield, D. E. Hirst, T. E. Iannaconi, R. Mallett, C. M. Schrand, L. Vincent. Accounting Horizons June 2003, Vol. 17, No. 2, pp. 175-185.

**Selected Media Coverage**

"Dividends, Wall Street's Battered Status Symbol," The New York Times, February 13, 2016.

"As Stock Prices Slump, Don't Count on Buybacks," Wall Street Journal, January 25, 2016.

"Fast Traders Are Getting Data From SEC Seconds Early," Wall Street Journal, October 29, 2014.

"High-frequency traders said to get SEC filings early," Financial Times, October 29, 2014.

"Certain Traders May Get Early Looks at S.E.C. Filings, Paper Finds," The New York Times, October 29, 2014.

"Flush with Cash, Apple Plans Buyback and Dividend," The New York Times, March 19, 2012.

**Professional Activities**

*Journal of Accounting Research:* Senior Editor, 2006-2021.

*Accounting and Finance*, Editorial Board, 2012-2016.

*Asia-Pacific Journal of Accounting & Economics*, Associate Editor, 1999-2005.

*Journal of Accounting & Economics*:
Editor, 2000-2005.
Associate Editor, 1994-2000.

*The Accounting Review*, Editorial Advisory and Review Board, 1992-1996; 1997-1999.

*Review of Accounting Studies*, Co-Editor, 1999-2000.

**Appendix A**

Ad hoc referee for numerous accounting and finance journals.

Member: American Accounting Association, American Finance Association.

American Accounting Association Committees:
- Financial Accounting Standards Committee, 1999-2002.
- AAA/FASB Annual Financial Reporting Issues Conference Organizing Committee, 1999, 2000, 2005.
- 2001-2002 Competitive Manuscript Prize Committee.


**Ph.D. Committees (chronological order with initial placements)**

*At Michigan:*
Arun Kumar (Finance)
Christine Botosan.  Washington University, St Louis.
Li Li Eng.  Singapore National University.
Karen Nelson.  Stanford.
Lillian Mills.  Arizona.
Brian Bushee.  Harvard Business School.
Marlene Plumlee (Chair).  Utah.
David Heike (Finance).  Western Ontario.
Timothy Burch (Finance).  Miami (FL).
Gregory Miller (Chair).  Harvard Business School.
Mark Bradshaw.  Harvard.
Anchada Charoenrook (Finance). Vanderbilt.
Darren Roulstone (Co-chair).  Chicago.
Linda Myers (Chair).  Washington (Seattle).
Irem Tuna (Chair).  Wharton.
Scott Richardson.  Wharton.
Fai Cang (Finance).  Vanderbilt.
Jef Doyle.  Utah.
Irene Kim (Chair).  Duke.
Mei Feng (Chair).  Pittsburgh.
Wei Tang (Chair).  Georgetown.

*At Chicago:*
Regina Wittenberg Moerman.  Wharton.
Yu Gao.  Minnesota.
Eugene Soltes (Chair).  Harvard Business School.
Ningzhong Li.  London Business School.
Lawrence Takeuchi (finance).
Pepa Kraft.  NYU.
Jeff Ng.  Chinese University of Hong Kong.
Anna Costello. (Chair).  MIT.

**APP 070**

**Appendix A**

Alon Kalay. Columbia.
Jonathan Milian.  (Chair). Florida International University.
Meng Li (Co-chair). UT-Dallas.
Joao Granja.  MIT.
Christine Cuny.  NYU.
Joshua Madsen (Chair).  Minnesota.
Marina Niessner (finance). Yale.
Eric Floyd.  Rice.
Nan Li (Chair).  Toronto.
Gerardo Perez Cavazos (Chair).  Harvard Business School.
Frank Zhou (Chair).  Wharton.
Matthew Bloomfield.  Wharton.
Brett Lombardi (Chair).  Monash (Australia).
Oleg Kuriukhin.  Cornerstone Research.
Anya Nakhmurina.  Yale SOM.
Johanna Shin.  Capital Group.
Yao Lu. Cornell.
Yvonne (Yanzi) Han.  Cornerstone Research.


**Recent presentations, discussions, and talks.**

2024:  ABFER Singapore (discussant); FASB Financial Reporting Conference (discussant); Tulane mini-accounting conference; Japan Accounting Research Symposium, Tokyo (keynote), Yale School of Management.

2025:  National University of Singapore, LSU Regional Research Conference, Michigan Ross, UNSW Corporate Finance Conference (Coogee, NSW).

2026: Hong Kong University (HKU) Business School, Macquarie University (Sydney, via Zoom).

**Appendix B**

**Douglas J. Skinner, Testimony, last four years.**

Deposition. *In Re Google Play Developer Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:20-cv-05792-JD (2022).

Deposition. *In Re Google Play Store Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:21-md-02981-JD (2023).

Trial testimony. *Epic Games, Inc. vs. Google, LLC., et al.*, United States District Court Northern District of California, No. 3:20-cv-05671-JD (2023).

Deposition. *United States of America et al. vs. Google LLC*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:23cv00108 (2024).

Deposition. *Richard J. Tornetta, individually and on behalf of all others similarly situated and derivatively on behalf of nominal defendant Tesla, Inc., v. Elon Musk, et al., and Tesla, Inc., Nominal Defendant.* In the Court of Chancery of the State of Delaware, Civil Action No. 2018-0408-KSJM (2024).

Deposition. *The State of Texas, et al., vs. Google LLC.* United States District Court Eastern District of Texas Sherman Division, Civil No. 4:20-CV-957-SDJ (2024).

Deposition. *John Harvey Schneider et al., Individually and on behalf of others similarly situated v. Natera, Inc., et al.* United States District Court Western District of Texas, Austin Division, Civil Action No. 1:22-cv-00398-DAE (2024).

Deposition. *In re Upstart Holdings, Inc. Securities Litigation.* United States District Court Southern District of Ohio, Eastern Division. Case No. 2:22-cv-02935-ALM-EPD (2024).

Deposition. *In re: Google Digital Advertising Antitrust Litigation.* Case No. 1:21-md-3010 (PKC). Report relates to: *In re: Google Digital Publisher Litigation.* Case No. 1:21-cv-7034 (PKC) and *Inform Inc., vs. Google LLC; Alphabet Inc.; and YouTube, LLC.* Case No. 1:23-cv-01530 (PKC). United States District Court for the Southern District of New York. (2025).

Deposition. *Subhashi Patel, Individually and on behalf of others similarly situated v. Koninklijke Philips N.V. and Frans Van Houten.* United States District Court Eastern District of New York, Civil Action No. 1:21-cv-04606-ERK-MMH (2025).

Deposition. *In re Fidelity National Information Services, Inc. Securities Litigation.* United States District Court Middle District of Florida, Jacksonville Division. Case No. 3:23-cv-252-TJC-PDB (2025).

Deposition. *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund, on behalf of itself and all others similarly situated, v. iRhythm Technologies, Inc., et al.* United States District Court, Northern District of California. Case No. 3:24-cv-706-JSC (2026).

**Appendix C**

# List of Documents Considered

## Academic Articles

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991), pp. 1575–1617.

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997), pp. 13–39.

- Partnoy, Frank, "Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions," *The Business Lawyer* 77, no. 4 (2022), pp. 1059–1078.

## Analyst Reports

- Analyst reports covering agilon that were published from May 10, 2021 through April 2, 2024 and available from counsel, *LSEG Workspace*, or *S&P Capital IQ*. Analyst reports include those published by the following contributors: Bank of America; Barclays; Bernstein; BTIG; Cantor Fitzgerald; CFRA Research; Cowen and Company; Deutsche Bank; Evercore ISI; Goldman Sachs; Guggenheim; Jefferies; JMP Securities; J.P. Morgan; Morgan Stanley; Nephron Research; Piper Sandler; RBC Capital Markets; Stifel; SVB Leerink; TD Cowen; The Benchmark Company; Truist Securities; Wells Fargo; William Blair & Company; and Wolfe Research

## Books

- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011

## Conference Call Transcripts

- "agilon health, inc. at William Blair Growth Stock Conference (Virtual)," *FactSet CallStreet*, June 3, 2021.

- "agilon health, inc. at Goldman Sachs Global Healthcare Conference (Virtual)," *Refinitiv Streetevents*, June 8, 2021.

- "agilon health, inc. at Credit Suisse Healthcare Conference (Virtual)," *Refinitiv Streetevents*, November 10, 2021.

- "agilon health, inc. at Wolfe Research Healthcare Conference (Virtual)," *Refinitiv Streetevents*, November 18, 2021.

- "agilon health, inc. at JPMorgan Healthcare Conference," *Refinitiv Streetevents*, January 10, 2022.

**Appendix C**

- "agilon health, inc. Investor Day," *Refinitiv Streetevents*, March 11, 2022.

- "agilon health, inc. at Bank of America Healthcare Conference," *Refinitiv Streetevents*, May 11, 2022.

- "agilon health, inc. at William Blair Growth Stock Conference," *Refinitiv Streetevents*, June 8, 2022.

- "agilon health, inc. at Wells Fargo Healthcare Conference," *Refinitiv Streetevents*, September 8, 2022.

- "agilon health, inc. at Morgan Stanley Global Healthcare Conference," *Refinitiv Streetevents*, September 14, 2022.

- "agilon health, inc. at Wolfe Research Healthcare Conference," *Refinitiv Streetevents*, November 17, 2022.

- "agilon health, inc. at JPMorgan Healthcare Conference," *Refinitiv Streetevents*, January 9, 2023.

- "agilon health, inc. at Cowen Health Care Conference," *Refinitiv Streetevents*, March 8, 2023.

- "agilon health, inc. Investor Day," *Refinitiv Streetevents*, March 30, 2023.

- "agilon health, inc. at Bank of America Global Healthcare Conference," *Refinitiv Streetevents*, May 11, 2023.

- "agilon health, inc. at William Blair Growth Stock Conference," *Refinitiv Streetevents*, June 7, 2023.

- "agilon health, inc. at Wells Fargo Healthcare Conference," *Refinitiv Streetevents*, September 6, 2023.

- "agilon health, inc. at Morgan Stanley Global Healthcare Conference," *Refinitiv Streetevents*, September 12, 2023.

- "agilon health, inc. at Wolfe Research Healthcare Conference," *Refinitiv Streetevents*, November 14, 2023.

- "agilon health, inc. at JPMorgan Healthcare Conference," *Refinitiv Streetevents*, January 9, 2024.

## Earnings Call Transcripts

- "Q1 2021 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, May 27, 2021.

- "Q2 2021 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, August 5, 2021.

- "Q3 2021 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, October 29, 2021.

**Appendix C**

- "Q4 2021 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, March 4, 2022.

- "Q1 2022 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, May 5, 2022.

- "Q2 2022 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, August 4, 2022.

- "Q3 2022 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, November 3, 2022.

- "Q4 2022 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, March 1, 2023.

- "Q1 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, May 9, 2023.

- "Q2 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, August 3, 2023.

- "Q3 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, November 2, 2023.

- "FY 2023 agilon health, inc. Guidance Call," *Refinitiv Streetevents*, January 5, 2024.

- "Q4 2023 agilon health, inc. Earnings Call," *Refinitiv Streetevents*, February 27, 2024.

## Expert Reports

- Expert Report of Mathew D. Cain, Ph.D., April 6, 2026, and materials produced and cited therein.

## Legal Documents

- *Comcast v. Behrend*, 569 U.S. 27 (2013).

- Consolidated Complaint for Violations of the Federal Securities Laws, *In re agilon health, inc. Securities Litigation*, United States District Court for the Western District of Texas, Austin Division, Case No. 1:24-cv-00297-DII, September 6, 2024.

- Memorandum and Order, *In Re: BP p.l.c. Securities Litigation*, United States District Court for the Southern District of Texas, Houston Division, Case No. 4:10-md-02185, December 6, 2013.

- Order: (1) Granting in Part and Denying in Part agilon Defendants' Motion to Dismiss; (2) Granting Underwriter Defendants' Motion to Dismiss; and (3) Granting in Part and Denying in Part CD&R Defendants' Motion to Dismiss, *In re agilon health, inc. Securities Litigation*, United States District Court for the Western District of Texas, Austin Division, Case No. 1:24-cv-00297-DAE, August 15, 2025.

- Private Securities Litigation Reform Act of 1995, December 22, 1995.

**Appendix C**

**Online Content**

- agilon health, "agilon health Announces Pricing of Initial Public Offering," April 14, 2021, available at https://investors.agilonhealth.com/news/news-details/2021/agilon-health-Announces-Pricing-of-Initial-Public-Offering/default.aspx

- agilon health, "agilon health Announces Sale of MDX Hawaii," November 1, 2023, available at https://www.agilonhealth.com/news/press-release/agilon-health-announces-sale-of-mdx-hawaii/

- Centers for Medicare & Medicaid Services, "CMS Redesigns Accountable Care Organization Model to Provide Better Care for People with Traditional Medicare," February 24, 2022, available at https://www.cms.gov/newsroom/press-releases/cms-redesigns-accountable-care-organization-model-provide-better-care-people-traditional-medicare

- Financial Accounting Standards Board, "About the FASB," June 2025, available at https://www.fasb.org/page/ShowPdf?path=About_FASB_June_2025.pdf

- Financial Accounting Standards Board, "ASC 105-10-05: Generally Accepted Accounting Principles – Overall – Overview and Background," available at https://asc.fasb.org/1943274/2147479442

- Financial Accounting Standards Board, "ASC 606-10-05: Revenue from Contracts with Customers – Overall – Overview and Background," available at https://asc.fasb.org/1943274/2147479991

- PricewaterhouseCoopers, "Health Care Entities," March 2023, available at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/health-care/asset/pwchealthcare0323.pdf

- Public Company Accounting Oversight Board, "Audit Focus: Critical Audit Matters," November 2024, available at https://assets.pcaobus.org/pcaob-dev/docs/default-source/documents/audit-focus-cams.pdf

- The Wall Street Journal, "As Omicron Declines, U.S. Rethinks Mask Guidance and Covid-19 Measures," February 10, 2022, available at https://www.wsj.com/articles/omicron-peak-decline-covid-restrictions-11644514531

- U.S. Securities and Exchange Commission, "Financial Reporting Manual: TOPIC 1 - Registrant's Financial Statements," November 18, 2020, available at https://www.sec.gov/corpfin/cf-manual/topic-1

- U.S. Securities and Exchange Commission, "SEC Final Rule Release No. 33-10890: Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information," November 19, 2020, available at https://www.sec.gov/files/rules/final/2020/33-10890.pdf

**Appendix C**

## Presentations

- agilon health, inc. Investor Presentation, November 2021.

- agilon health, inc. Investor Presentation at JPMorgan Healthcare Conference, January 2022.

- agilon health, inc. 2022 Investor Day Presentation, March 2022.

- agilon health, inc. Investor Presentation, May 2022.

- agilon health, inc. Investor Presentation, June 2022.

- agilon health, inc. Investor Presentation, September 2022.

- agilon health, inc. Investor Presentation, December 2022.

- agilon health, inc. Investor Presentation at JPMorgan Healthcare Conference, January 2023.

- agilon health, inc. 2023 Investor Day Presentation, March 2023.

- agilon health, inc. Investor Presentation, June 2023.

- agilon health, inc. Investor Presentation, September 2023.

- agilon health, inc. at Wolfe Research Healthcare Conference, November 2023.

- agilon health, inc. Guidance Update Presentation, January 2024.

- agilon health, inc. Investor Presentation at JPMorgan Healthcare Conference, January 2024.

- agilon health, inc. Q4 2023 Earnings Presentation, February 2024.

## SEC Filings

- agilon health, inc. Form 8-K, filed on May 26, 2021.

- agilon health, inc. Form 8-K, filed on August 4, 2021.

- agilon health, inc. Form 8-K, filed on October 28, 2021.

- agilon health, inc. Form 8-K, filed on March 3, 2022.

- agilon health, inc. Form 8-K, filed on May 5, 2022.

- agilon health, inc. Form 8-K, filed on August 4, 2022.

- agilon health, inc. Form 8-K, filed on November 3, 2022.

- agilon health, inc. Form 8-K, filed on March 1, 2023.

- agilon health, inc. Form 8-K, filed on May 9, 2023.

**Appendix C**

- agilon health, inc. Form 8-K, filed on August 3, 2023.

- agilon health, inc. Form 8-K, filed on November 2, 2023.

- agilon health, inc. Form 8-K, filed on January 5, 2024.

- agilon health, inc. Form 8-K, filed on February 27, 2024.

- agilon health, inc. Form 10-Q for the quarterly period ended March 31, 2021, filed on May 26, 2021.

- agilon health, inc. Form 10-Q for the quarterly period ended June 30, 2021, filed on August 4, 2021.

- agilon health, inc. Form 10-Q for the quarterly period ended September 30, 2021, filed on October 28, 2021.

- agilon health, inc. Form 10-K for the year ended December 31, 2021, filed on March 3, 2022.

- agilon health, inc. Form 10-Q for the quarterly period ended March 31, 2022, filed on May 5, 2022.

- agilon health, inc. Form 10-Q for the quarterly period ended June 30, 2022, filed on August 4, 2022.

- agilon health, inc. Form 10-Q for the quarterly period ended September 30, 2022, filed on November 3, 2022.

- agilon health, inc. Form 10-K for the year ended December 31, 2022, filed on March 1, 2023.

- agilon health, inc. Form 10-Q for the quarterly period ended March 31, 2023, filed on May 9, 2023.

- agilon health, inc. Form 10-Q for the quarterly period ended June 30, 2023, filed on August 3, 2023.

- agilon health, inc. Form 10-Q for the quarterly period ended September 30, 2023, filed on November 2, 2023.

- agilon health, inc. Form 10-K for the year ended December 31, 2023, filed on February 27, 2024.

- agilon health, inc. Form 424(b)(4), filed on April 16, 2021.

- agilon health, inc. Form 424(b)(4), filed on September 13, 2021.

- agilon health, inc. Form 424(b)(7), filed on May 17, 2023.

**In addition to the documents listed above, I considered documents cited in my report.**

APP 078

**EXHIBIT 1**



## agilon health, inc.
## As-Reported Medicare Advantage and
## Direct Contracting/ACO REACH Membership[1]
### 1Q21 – 4Q23

Source: agilon Forms 10-Q and 10-K for the relevant periods; Centers for Medicare & Medicaid Services, "CMS Redesigns Accountable Care Organization Model to Provide Better Care for People with Traditional Medicare," February 24, 2022

Note:
[1] Reported Medicare Advantage and ACO REACH membership excludes membership from discontinued operations. agilon launched Direct Contracting on April 1, 2021. Starting January 1, 2023, agilon began referring to this segment as ACO REACH.

# EXHIBIT  2

**Table of Contents**

**Index to Financial Statements**

Filed pursuant to Rule 424(b)(4)
Registration No. 333-254435

## 46,600,000 Shares



# agilon health, inc.

### Common Stock

This is the initial public offering of shares of common stock of agilon health, inc. ("agilon health"). We are offering 46,600,000 shares of common stock. The initial public offering price per share is $23.00.

Prior to this offering, there has been no public market for our common stock. We have been approved to list our common stock on the New York Stock Exchange (the "NYSE") under the symbol "AGL".

After the completion of this offering, we expect to be a "controlled company" within the meaning of the corporate governance standards of the NYSE.

**We will be treated as an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, for certain purposes until we complete this offering. As such, in this prospectus, we have taken advantage of certain reduced disclosure obligations that apply to emerging growth companies. See "Prospectus Summary—Implications of Being an Emerging Growth Company."**

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 23 of this prospectus to read about factors you should consider before buying shares of our common stock.**

| | Per Share | | Total |
|---|---|---|---|
| Initial public offering price | $ 23.00 | $ | 1,071,800,000 |
| Underwriting discounts and commissions(1) | $ 1.15 | $ | 53,590,000 |
| Proceeds, before expenses, to agilon health, inc. | $ 21.85 | $ | 1,018,210,000 |

(1) See "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters also may purchase up to 6,990,000 additional shares from us at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus.

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved the securities described herein or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

One or more funds and/or accounts affiliated with Counterpoint Global (Morgan Stanley Investment Management), Capital World Investors, Wellington Management, Fidelity Management & Research Company LLC, and Rock Springs (collectively, the "cornerstone investors") have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering.

The underwriters expect to deliver the shares to purchasers on or about April 19, 2021.

| | | |
|---|---|---|
| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **BofA Securities** |
| **Deutsche Bank Securities** | | **Wells Fargo Securities** |
| **Nomura** | **William Blair** | **Truist Securities** |
| **Academy Securities** | **R. Seelaus & Co., LLC** | **Ramirez & Co., Inc.** | **Siebert Williams Shank** |

**Prospectus dated April 14, 2021**

APP 081

**Table of Contents**

**Index to Financial Statements**



"We believe that the long–term, independent relationship between a PCP and his/her patient is the most valuable relationship in the healthcare universe. It is the best way to drive behavior and thus, value."

– Gary Pinta, MD
*Pioneer Physicians, Akron*

Table of Contents

Index to Financial Statements



"This partnership provides physicians the ability to share in the development of a new payment model for PCPs. We are engaged and the model has physician fingerprints all over it."

– Mary Cook, MD
*Central Ohio Primary Care, Columbus*

Table of Contents

Index to Financial Statements



**Table of Contents**

**Index to Financial Statements**

TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 23 |
| Special Note Regarding Forward-Looking Statements and Information | 67 |
| Use of Proceeds | 70 |
| Dividend Policy | 71 |
| Capitalization | 72 |
| Dilution | 74 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 76 |
| Business | 103 |
| Management | 142 |
| Executive Compensation | 149 |
| Principal Stockholders | 159 |
| Certain Relationships and Related Party Transactions | 161 |
| Description of Capital Stock | 164 |
| Shares Available for Future Sale | 170 |
| Description of Certain Indebtedness | 172 |
| Certain U.S. Federal Income Tax Considerations for Non-U.S. Holders | 175 |
| Underwriting | 179 |
| Validity of Common Stock | 190 |
| Experts | 190 |
| Where You Can Find More Information | 190 |
| Index to Consolidated Financial Statements | F-1 |

**You should rely only on the information contained in this prospectus and any free writing prospectus we may authorize to be delivered to you. We have not, and the underwriters have not, authorized anyone to provide you with information different from, or in addition to, that contained in this prospectus and any related free writing prospectus. We and the underwriters take no responsibility for, and can provide no assurances as to the reliability of, any information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is only accurate as of the date of this prospectus, regardless of the time of delivery of this prospectus and any sale of shares of our common stock.**

i

**APP 085**

**Table of Contents**

**Index to Financial Statements**

**Certain Important Terms**

- "We," "us," "our," "agilon" and the "Company" mean agilon health, inc., a Delaware corporation and its consolidated subsidiaries, unless the context refers only to agilon health, inc., as a corporate entity (which we refer to as "agilon health").
- "Anchor geography" means the geographies in which our anchor physician groups operate.
- "Anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography.
- "Capitation" means a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.
- "CMS" means the Centers for Medicare & Medicaid Services.
- "CMS Innovation Center" means the Center for Medicare & Medicaid Innovation.
- "DCE" means a Direct Contracting Entity participating in the CMS Innovation Center Direct Contracting Model.
- "FFS" means fee-for-service.
- "Independent physicians" means physicians not employed by health systems or insurance providers.
- "Live," when referring to a physician partner or a geography, means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with payors.
- "MA" means Medicare Advantage.
- "Members" means the MA patients who are attributed to our PCPs (as defined below) by our payors (as defined below).
- "Payors" means health insurance providers.
- "Our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.
- "PCP" means primary care physician.
- "Physician partners" means our anchor physician groups and all other physicians with whom we have contractual arrangements.
- "PMPM" means per member per month.
- "RBE" means a risk-bearing entity.
- "STAR rating" means annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics.
- "Total Care Model" means a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients.

**Market and Industry Data**

This prospectus includes estimates regarding market and industry data and forecasts, which are based on publicly available information, industry publications and surveys, reports from government agencies, reports by market research firms and our own estimates based on our management's knowledge of, and experience in, the

ii

APP 086

Table of Contents

Index to Financial Statements

healthcare industry. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable.

Throughout this prospectus, all references to "net promoter score" or "NPS" are to a measure of satisfaction widely used in the healthcare industry. We calculate patient and provider net promoter score based on responses to patient and provider surveys, administered as electronic surveys annually, that ask the patient or provider to rank, on a scale of 0 to 10, how likely they are to recommend their (or their provider's) practice to a friend or family member. We assign the designation of "Promoter" to respondents who provide a score of 9 or 10, the designation of "Passive" to respondents who provide a score of 7 or 8, and the designation of "Detractor" to respondents who provide a score of 0 to 6. We then subtract the percentage of Detractors from Promoters to determine our overall net promoter score. We believe that this method of calculation aligns with industry standards and that this metric is meaningful for investors because of the correlation that we believe exists between net promoter score and patient and provider satisfaction.

Our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the captions "Risk Factors," "Special Note Regarding Forward-Looking Statements and Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Service Marks, Trademarks and Trade Names**

We hold various service marks, trademarks and trade names, such as "agilon health," "agilon" and our logo design, that we deem particularly important to the advertising activities conducted by each of our businesses. This prospectus also contains trademarks, service marks and trade names of other companies which are the property of their respective holders. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

**Basis of Presentation**

During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. As a result of the divestiture of all of our California operations, our financial statements included in this prospectus reflect discontinued operations presentation for all California operations. Financial and operating information contained in this prospectus is presented without California operations data unless expressly stated otherwise. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

iii

APP 087

**Table of Contents**

**Index to Financial Statements**

**PROSPECTUS SUMMARY**

*The following summary highlights selected information contained elsewhere in this prospectus. Because this is only a summary, it does not contain all of the information you should consider before investing in our common stock. You should carefully read the entire prospectus, including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as our consolidated financial statements included elsewhere in this prospectus, before making an investment decision.*

### Overview

Our business is transforming healthcare by empowering the primary care physician ("PCP") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming risk-bearing entities (each, an "RBE") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements), contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 16 anchor physician groups and 17 geographies in fewer than five years. Our platform has enabled us to grow our total membership by 45% and revenue by 53% from December 31, 2019 to December 31, 2020. Currently, the PCPs on our platform serve approximately 210,000 patients enrolled in Medicare Advantage ("MA"), which includes approximately 49,000 patients with physician groups contracted to go-live on January 1, 2022 (we refer to these patients as the "members on our platform"). In addition, through our participation in the Center for Medicare & Medicaid Innovation ("CMS Innovation Center") Direct Contracting Model, our PCPs are expected to serve over 50,000 Medicare fee-for-service ("FFS") beneficiaries through our five currently approved Direct Contracting Entities ("DCEs"). For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

APP 088

Table of Contents

Index to Financial Statements

**Empower PCPs to Transform Care in Their Communities**

| **What We Do** | **How We Do It** | **Powerful Results** |
|---|---|---|
| *Disrupt the rapidly-growing Medicare market for physicians, patients and payors* | *Migrate physicians, patients and payors from the traditional fee-for-service to a subscription-like Total Care Model* | *Since 2016, this capital-light, exportable and scalable model has grown* |
| • Empower community-based physicians to create a Medicare-centric globally capitated line of business | • Unified set of payment, data, clinical, quality and growth capabilities deployed as single platform | • 17 diverse geographies |
| • Enable PCPs to quarterback their patients' healthcare in a long-term, highly engaged relationship | • Deployed through a long-term partnership model based on aligned outcomes and economics | • 16 anchor physician groups; average tenure of 40+ years in their community<br>• 15 payors<br>• 210,000 MA members including approximately 49,000 that go-live in 2022 |
| • Transform the PCP business model from a transaction-based model to a long-term, holistic membership-based model | • Enhanced through a growing network of like-minded physician partners that enable powerful network effect | • NPS of 83 for patients and 73 for providers at five anchor physician groups |

The current state of the U.S. healthcare system is defined by the following key factors:

- Unsustainably high and rising costs characterized by waste, unnecessary variation in care and poor patient experience and health outcomes;
- FFS reimbursement model focused on units of service rather than a coordinated approach to meet the unique needs of individual patients;
- The Medicare population is projected to grow from approximately 62 million in 2020 to more than 70 million individuals in 2025 with a total spend of approximately $1.25 trillion, and MA enrollment is projected to comprise 47% of total Medicare enrollment (which we refer to as the "MA penetration rate"); and
- PCPs are positioned—but not currently empowered or incentivized—to act as the quarterback for healthcare delivery, with their decisions estimated to influence up to 90% of total healthcare spending according to a 2017 study.

We believe that failing to empower PCPs has fostered waste, needless variability in care and unsustainable growth in healthcare costs. According to a 2019 article entitled "Waste in the US Health Care System: Estimated Costs and Potential for Savings" published in the Journal of the American Medical Association, failure of care delivery, failure of care coordination and overtreatment or low-value care were estimated to represent $205.3 billion to $345.1 billion of waste annually in the U.S. healthcare system. While there is broad recognition of the need to move beyond a volume-based, FFS reimbursement model, structural hurdles have impeded rapid adoption of a PCP-led global capitation reimbursement model in which physicians receive a monthly payment from health plans to manage the total healthcare needs of their attributed patients, which we refer to as a Total Care Model. In this prospectus, we refer to "capitation" as a payment arrangement in which a set amount for each enrolled beneficiary is paid to a provider or entity during an agreed upon period, regardless of whether or not such beneficiary seeks medical services or treatment.

To overcome these hurdles and achieve our mission of being the trusted long-term partner to community-based physicians, we have developed what we believe is a first-of-its-kind Total Care Model for community-based physicians that focuses exclusively on Medicare and manages subscription-like per member per month ("PMPM") arrangements with health plans or directly with the government. The agilon Total Care Model is powered by our platform, enabled through a long-term partnership model and reinforced via our growing national

2

APP 089

**Table of Contents**

**Index to Financial Statements**

network of like-minded physicians. Our position as innovators is demonstrated by a series of transformative accomplishments since the formation of the company in July 2016, and our first partnership in 2017, many of which we believe to be industry-firsts:

- Implemented the first MA multi-payor, globally capitated risk model with a community-based physician group in all of our diverse geographies in which our anchor physician groups operate ("anchor geographies");
- Exported the Total Care Model from one to 17 geographies ranging from communities as small as Zanesville, Ohio to large and rapidly growing communities such as Austin, Texas;
- Grew from approximately 24,000 patients attributed to our PCPs by our payors ("members") to approximately 210,000 MA members on our platform;
- Expanded from two payors to 15 payors on our platform; and
- Poised to participate in the Direct Contracting Model, with over 50,000 Medicare FFS beneficiaries expected to be served by our existing PCPs contracted through our five currently approved DCEs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements:

- agilon's platform, which is holistic in enabling the rapid transformation to risk, is comprised of an integrated set of capabilities designed to continuously improve, and is delivered to our anchor physician groups through an aligned long-term partnership model;
- agilon's long-term physician partnership approach with community-based physician groups, which is designed to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician; and
- agilon's network of leading community-based physician partners, functioning as a collaborative group which can share best practices, influence the development of the platform, compare notes on the transition to a Total Care Model and learn from one another.

With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients. The combination of subscription-like PMPM agreements with payors, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue.

The result is PCPs transforming their historical transaction-based model to a long-term, holistic membership-based model that is reflective of the intimate and trusted relationship between physician and patient. Despite our history of net losses, we believe this membership-based model results in a recurring revenue stream and provides our anchor physician groups with access to an incremental profit margin opportunity based on delivering high-quality care and health outcomes. Freed from the constraints of the transactional FFS reimbursement model, our PCPs are empowered to practice team-based, coordinated care when addressing individual patient needs and transition to a sustainable long-term business model for their senior patients. We believe enabling PCPs to unlock the value of a Medicare-centric, globally capitated line of business while remaining independent can transform the community-based physician business model.

3

**APP 090**

**Table of Contents**

**Index to Financial Statements**

In this prospectus, when referring to a physician partner or a geography, "live" means implementation of our platform with the physician partner or in the geography is complete, and we are generating revenue and assuming financial risk pursuant to agreements with health insurance providers ("payors"). In addition, "anchor physician groups" means the physician groups with which we have long-term contractual arrangements, typically including joint governance, operations and leadership, and surplus sharing, and does not include physicians in our Hawaii geography. We refer to our anchor physician groups and the other physicians with whom we have contracted arrangements as our "physician partners." Finally, "our PCPs" means PCPs contracted by our anchor physician groups and our network of contracted physicians.

*The agilon Flywheel Effect*: Our platform, partnership and network model enable our physician partners to be the quarterback for healthcare delivery in their community, and successfully operate a Medicare-centric, globally capitated line of business. This generates improving quality and cost outcomes, growing membership and increasing medical margin per member, which we share with our physician partners pursuant to our long-term partnership model. We believe this continuous improvement in patient and physician engagement and experience leads to more PCPs joining our platform and ultimately improves the success of each physician partner on the platform. As our platform grows, we believe we will be able to leverage our scale to drive additional investment in our geographies to accelerate this flywheel for the benefit of our physician partners and their patients. The power of the agilon flywheel is highlighted by our total membership growth of 45%, of which 42% was driven by same geography membership growth and 58% was driven by entry into new geographies from December 31, 2019 to December 31, 2020, and general and administrative expenses per member contracted by 23% over the same period. Over the same period, we had revenue of $1.2 billion and a net loss of $60.1 million.



**Our Market**

In 2020, approximately 62 million Americans were enrolled in Medicare nationally, of which we estimate approximately 27 million to be affiliated with independent physicians. We define independent physicians as physicians not employed by health systems or insurance providers. We consider our current addressable market to be the estimated 17.5 million Medicare beneficiaries affiliated with independent PCPs in states in which we

4

**APP 091**

**Table of Contents**

**Index to Financial Statements**

already have a physician partner or a signed letter of intent with a physician group as of January 2021, and those in which we have identified near-term prioritized geographies. Based on 2021 estimated average annual revenue per Medicare member to us of approximately $10,000, we estimate that this represents a total addressable market ("TAM") size of approximately $175 billion in 2020. We believe this addressable market will increase to nearly 20 million Medicare beneficiaries and $253 billion by 2025, based on the Centers for Medicare & Medicaid Services' ("CMS") projected Medicare enrollment and spending per beneficiary growth rates.



**Rapidly Expanding Actionable TAM Growing at 8% CAGR**

| | 2020 | | Projected 2025 | |
|---|---|---|---|---|
| | # Patient | Spend[1] | # Patient | Spend[2] |
| Total Medicare beneficiaries | 61.7M | $859B | 70.3M | $1,250B |
| Medicare beneficiaries attributed to Independent PCPs | 26.7M | $267B | 30.4M | $389B |
| agilon TAM: Medicare beneficiaries attributed to Independent PCPs in Existing & Prioritized Geographies | 17.5M | $175B | 19.8M | $253B |

(1)    2020 Medicare spend for total Medicare beneficiaries is based on CMS spend per beneficiary.

(2)    2025 Medicare spend for total Medicare beneficiaries, beneficiaries attributed to independent PCPs and agilon total addressable market is based on CMS projected Medicare enrollment and spending per beneficiary growth rates.

Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021, and $24 billion is based in counties in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021. In addition to the MA members our physician partners currently serve, we estimate our physician partners also serve approximately 375,000 patients that are addressable, which includes all Medicare FFS beneficiaries and commercial patients expected to age into Medicare over the next five years. This represents a 2020 market size of approximately $3.8 billion, using the same assumed annual revenue per Medicare member to us.

In addition, we see an additional opportunity for growth of our addressable market in physicians currently affiliated with health systems or insurance providers who become increasingly dissatisfied with those models. In considering our total addressable market, please also see "Risk Factors—Risks Related to Our Business."

**Industry Challenges and Our Opportunity**

We believe there is a significant opportunity to impact growth in U.S. healthcare costs and change the trajectory of the primary care business model through a platform, such as ours, in which PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients and share in the financial surplus created to the extent premiums received exceed the cost of medical care.

*Unsustainably high and rising U.S. healthcare costs*

According to CMS, U.S. national healthcare expenditures are expected to increase from $3.81 trillion in 2019 to $4.01 trillion in 2020. CMS projects that by 2028, healthcare expenditures will reach $6.20 trillion and will account for 19.7% of the U.S. GDP, up from 17.7% in 2018.

5

**APP 092**

**Table of Contents**

**Index to Financial Statements**

*Patients are dissatisfied with the fragmented and uncoordinated healthcare experience*

In the current FFS model, reimbursement is focused on units of service rather than a coordinated approach to meet the unique needs of individual patients. As a result, care delivery is often uncoordinated, leaving patients frustrated and responsible to navigate their own way through a fragmented and complex healthcare system.

*PCPs are well-positioned to be agents of change*

According to Oregon's Patient-Centered Primary Care Home Program, every $1 spent on primary care services can save $13 of future healthcare costs. Across the U.S., there are more than 486,000 active PCPs who serve as patients' first and most frequent point of contact for their healthcare experience.

*The trajectory of the current independent primary care business model is unsustainable*

In the current FFS reimbursement model, as average reimbursement rates decline, PCPs must increase the number of patients they see to sustain their practice. This volume-based model perpetuates physician burnout and jeopardizes the long-term sustainability of the independent primary care business model. According to a 2019 report, more than 50% of family physicians show symptoms of burnout, driven in part the FFS reimbursement model and increasing administrative burden. We believe this has been exacerbated by the effects of COVID-19.

*Growth of the complex and costly Medicare population is accelerating pressure on primary care*

The Medicare population is expected to grow from approximately 62 million individuals in 2020 to approximately 70 million individuals by 2025. As the medically complex Medicare population disproportionately drives utilization and cost, and is typically reimbursed at a lower rate than the commercial population, the primary care delivery system and the overall healthcare system are further strained.

**Structural Hurdles to Adoption of a Total Care Model**

We believe that all key stakeholders—patients, physicians and payors—benefit significantly from an environment where PCPs are empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients versus operating in the current FFS reimbursement model that primarily rewards units of service. However, over time, the existing FFS system has created structural hurdles that now impede rapid and broad adoption of a PCP-led Total Care Model.

- PCPs lack the incentive structure to reorganize the healthcare delivery system.
- PCPs lack the infrastructure to participate in a multi-payor model.
- PCPs lack the breadth of capabilities and resources necessary to transition to a Total Care Model.
- PCP groups are highly fragmented and lack the benefits of scale.
- Limited long-term, deep collaboration between payors and physicians.

**Our Answer**

*We have created a Total Care Model for community-based physicians that focuses exclusively on Medicare and manages the comprehensive healthcare needs of our members through subscription-like PMPM arrangements with health plans or directly with CMS—powered by the agilon platform, enabled through a long-term partnership model and reinforced via a growing national network.*

**The agilon Platform:** The agilon platform is focused on existing community-based physician groups, senior patients within these practices and enabling our physician partners to rapidly move to a subscription-like Total

6

**APP 093**

Table of Contents

Index to Financial Statements

Care Model. Our platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital, and recognizes that enhanced capabilities are needed at multiple levels and must be deeply integrated within existing physician group operating processes to successfully execute the transition. The agilon platform was co-developed and has been continuously refined with our physician partners since the formation of the company. The agilon platform comprises an integrated set of capabilities, delivered as a unified platform to enable successful partnerships at the community level, create a national network of PCPs and physician groups and empower our PCPs to improve health outcomes for their patients.

### Our platform capabilities include:

- *Payor Engagement*: In each community, we connect multiple payors, patients and physicians around a single, purpose-built platform for MA patients with one approach to quality, patient experience, clinical program management and financial management.
- *Direct Contracting Model*: In each community we serve, our Total Care Model can be extended to patients enrolled in traditional Medicare through the CMS Innovation Center Direct Contracting Model.
- *Data Integration and Management*: Our purpose-built and flexible platform enables ease of integration with payor systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month.
- *Clinical Programs and Product Development*: Combining insights from evidence-based medicine and patient-level data, our medical leadership and local physician leaders develop high-value actionable playbooks for partner physicians to deliver quality care, which include operational plans, analytics and tracking metrics.
- *Quality (Clinical and Experience)*: The agilon platform provides actionable consolidated information, centralized and local resources and processes to expand access, strengthen the patient-physician relationship and reduce medically unnecessary drivers of healthcare costs.
- *Growth*: We enable our partners to extend their local brand into a senior care brand for their Total Care Model that embodies the history and culture of their local physician group. Through the development of this local brand and a Medicare-centric education approach, we enable our physician partners to actively engage with their approximately 220,000 patients that are currently Medicare-eligible but are not covered by an MA plan and their approximately 156,000 60-64 year-old patients, to enable their patients to make educated healthcare choices. These patients represent an embedded growth opportunity.
- *Performance Management Analytics*: One of the most powerful parts of our platform is enabled by the peer-to-peer comparison of efficiency and clinical metrics at the physician, population and network level.
- *Financial Management*: Leveraging our dedicated team of subject-matter experts, and our robust technologies and capabilities, our platform operationalizes the finance elements of a risk-bearing structure.
- *National Policy*: We believe we are able to unite the voices of our community-based physician leaders to inform and advance policy in Washington, D.C.

### agilon's Long-term Physician Partner Model

*Physician Relationships*

We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to address the need to move healthcare closer to the physician, be outcome-

7

APP 094

Table of Contents

Index to Financial Statements

centric and optimize the long-term sticky relationship between a patient and their existing physician. Our anchor physician group relationships have the following characteristics:

- Long-term partnership model that allows both agilon and physicians to take the long-term view and benefit from the maturity of a growing number of members on the platform;
- Shared governance and co-location of staff to manage our local partnerships;
- Local dyad leadership structure that includes a medical director from the local anchor physician group;
- Local brand which reflects the local anchor physician group or geography;
- Capital from agilon to support value-based care infrastructure supporting the delivery of high-quality healthcare, and 100% downside protection, which removes a major obstacle to physicians making the leap to a Total Care Model;
- Operating leverage created by amortizing centralized investments in the platform infrastructure across a growing number of physician partners; and
- Surplus dollars generated locally due to improvements in quality of care and healthcare costs are shared with the local anchor physician group.

Under the Total Care Model, we typically operate by RBE's within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups. Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. Through incentive compensation arrangements, we share with our anchor physician groups a portion of the RBE's savings from successfully improving the quality of care and reducing costs. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. Most of our contracts with our anchor physician groups contain exclusivity provisions, as well as termination rights that are triggered upon certain events.

*Payor Relationships*

In each of our geographies, we enter into subscription-like PMPM agreements with payors to manage the total healthcare costs of our attributed members. Through this partnership model, we believe we:

- empower PCPs to act as the quarterback for healthcare delivery;
- enable PCPs to define a tailored patient experience across multiple payors;
- create an operating partnership and economic model built around improved health outcomes instead of a transaction-based model; and
- align the physician business model with the strength of their long-term patient relationships enabling the long-term growth of independent, community-based physician groups.

8

APP 095

Table of Contents

Index to Financial Statements

Under a typical agreement, we are entitled to monthly PMPM fees, which are typically based on a defined percentage of the corresponding premium which payors receive from CMS. We generally accept full financial risk for members attributed to us through our contracted PCPs and, therefore, are responsible for the cost of all healthcare services required by those members, which generally includes healthcare costs which CMS considers Part A and B costs. Our agreements with payors may delegate claims payment to us, or such responsibility may be retained by the payor, as is the case today in the majority of our payor agreements. The majority of our agreements are for terms ranging from one to three years and contain automatic annual renewal provisions as well as various termination rights. We also typically agree to indemnify our payors against certain third-party claims. As we continue to expand the agilon platform and enter into additional long-term partnerships, we will negotiate payor agreements in new geographies, including with Humana, Aetna and United Healthcare.

The power of our local partnership model is defined by the scale, breadth and local brand of our physician partners. On average, our anchor physician groups have been serving their communities for more than 40 years, have a PCP tenure of approximately 13 years, and receive exceptionally strong NPS from their PCPs and patients in live geographies of 73 and 83, respectively. We believe this gives us the ability to influence the local healthcare delivery system at scale. We expect our physician partner patient panels to systematically migrate to MA as the patient population ages and our partnerships mature. We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000.

The table below presents an overview of our anchor physician groups:

| Go-Live Year | Geography | Anchor Physician Group | Founded | PCPs | Average PCP Tenure | Approx. MA, FFS, Commercial Lives |
|---|---|---|---|---|---|---|
| 2018 | Columbus, OH | CENTRAL OHIO PRIMARY CARE | 1996 | >100 | 13 | 265K |
| 2019 | Akron, OH | PIONEER | 1995 | 25-100 | 18 | 60K |
| | Austin, TX | AUSTIN REGIONAL CLINIC / PREMIER FAMILY PHYSICIANS | 1980/1994 | >100 | 10 | 375K |
| 2020 | Pittsburgh, PA | preferred | 1995 | 25-100 | 13 | 65K |
| | Dayton, OH | PriMED | 1995 | <25 | 13 | 30K |
| | Southeast OH | Physician Cross | 2001 | <25 | 14 | 35K |
| | Wilmington, NC | | 1971 | 25-100 | 14 | 115K |
| 2021 | Buffalo, NY | Buffalo Medical Group | 1946 | 25-100 | 10 | 70K |
| | Toledo, OH | Toledo Clinic | 1926 | 25-100 | 9 | 45K |
| | Hartford, CT | Starling | 1947 | 25-100 | 17 | 45K |
| 2022 | Syracuse, NY | FamilyCare Medical Group, PC | 1996 | 25-100 | 17 | 75K |
| | Pinehurst, NC | | 1952 | 25-100 | 10 | 60K |
| | Texarkana, TX | Collom & Carney Clinic | 1947 | <25 | 13 | 15K |
| | Longview, TX | DC Diagnostic Clinic of Longview | 1975 | <25 | 16 | 75K |
| | Grand Rapids & Traverse City, MI | answer HEALTH | 1986 | >100 | 10 | 120K |

In addition to our anchor physician groups in the table above, we have broadly contracted with PCPs across the state of Hawaii and have developed select deeper primary care relationships within that network.

9

APP 096

**Table of Contents**

**Index to Financial Statements**

*Our Network*

We believe the agilon network creates significant value for our patients, our physician partners, our payors and our organization. The ability to share best practices, compare notes on the transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians who intentionally choose an independent path rather than joining a health system or insurance provider. Our physician partners are both collaborative and constructively competitive in service of their patients. We believe the power of a like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

*Value Proposition to Stakeholders*

Our Total Care Model empowers community-based physician groups to lead local healthcare transformation and ensure the long-term sustainability of the community-based physician model.

We believe the benefits of this differentiated model to community-based physician groups and the patients they serve include:
- Rapid creation of a Medicare Total Care Model that enables our PCPs to take a long-term view of their relationships with their patients and allocate resources to meet individual member health needs.
- Sustainable long-term business model alongside commercial and Medicare FFS.
- Provides access to network of like-minded partners.
- Improved economics.
- Improving the physician experience.
- Improving the patient experience.
- Supporting superior health outcomes.

We have also become an important strategic partner for our payors, as we are a material portion of their membership base, delivery network and annual membership growth in many of the geographies we serve. Through our subscription-like agreements, we ensure a consistent gross margin on a growing membership base. The strength of our relationships with payors has resulted in our establishment of national joint-operating committees with five national health plans through which we develop, execute and monitor a strategy for growth and performance as part of their Medicare delivery network.

**Our Strengths**

*Local and National Leadership and First-Mover Dynamics*

Core to our model is partnering in local geographies with leading physician groups that have already built significant scale and strong brands in the communities they serve. Our local leadership is highlighted by our position in Columbus, Ohio, where we have more than 200 PCPs on our platform, whose patient panels include approximately 50% of total MA lives among independent PCPs.

We believe we are pioneers in providing a full-risk, multi-payor Total Care Model within our local geographies, our growing regional hubs and the country. We believe we are the only MA multi-payor, globally capitated risk vehicle available for independent physician groups to access a Total Care Model in our local geographies. The sustainability of this local leadership position is also enhanced by our long-term partnerships with our anchor physician groups.

10

**APP 097**

Table of Contents

Index to Financial Statements

We've established a strong local leadership position in 17 geographies creating what we believe to be the first national platform for a Medicare-centric, globally capitated line of business. We believe our position as a first-mover creates a competitive advantage, resulting in other independent physician groups viewing us as an established and trusted partner.

### Long-Term Economic Model

We believe our membership and per-member profitability will grow over time due to structural characteristics inherent to our long-term partnerships, durable and growing MA membership within our physician partners and the nature of the MA economic model. The key strengths of our economic model include:

- We believe we have the ability to generate significant, recurring and growing medical margin in concert with our physician partners over the course of our long-term partnerships and the inherently sticky physician-patient relationship.
    - Our physician partnerships are typically 20 years.
    - Average physician tenure within our anchor physician groups is 13 years.
    - Patients 65 years of age and older remain with their PCP for an average of 10 years, according to a 2004 study.
- Embedded same-geography, long-term organic membership growth resulting from our physician partners' existing patients who age into Medicare and elect to enroll in MA or who elect to convert from Medicare FFS to MA over the life of our long-term partnership.

Although we have incurred net losses since our formation in 2016, we believe that the combination of a growing membership base and improving medical margin over the life of our long-term partnerships creates a significant lifetime value ("LTV") for the geographies we enter. We are able to access this attractive LTV through what we believe to be a low-cost and increasingly cost-efficient model. We believe this low-cost and increasingly cost-efficient growth model represents a significant advantage supporting our rapid scaling to new geographies and sustainable existing geography growth.

### Model for Long-Term Sustainable Growth

We have created a multi-pronged growth strategy that has powerful tailwinds for our physician partners and our business by leveraging existing physician capacity in local geographies, establishing long-term partnerships with significant embedded growth opportunities and expanding through multiple regional levels. The "flywheel" nature of our model has allowed us to expand from one geography to 17 in fewer than five years and has resulted in an additional approximately 186,000 MA lives being attributed to our platform over the same time period.

### Purpose-Built, Exportable, Scalable Platform

The creation of the agilon platform and an aligned physician partnership approach has enabled the consistent deployment of a Medicare-centric, globally capitated line of business across 17 heterogeneous geographies, 16 anchor physician groups and multiple payors. The components of our Total Care Model (including data, payor engagement, clinical programs and growth) are discrete but are delivered as a unified platform through a highly-aligned model with physicians to optimize success. Our platform has enabled us to grow revenue 53% year-over-year for the year ended December 31, 2020, while operating costs to support live geographies and enterprise functions grew 12% over the same period. Our net loss for the year ended December 31, 2020 was $60.1 million, a 79% decline from losses of $282.7 million in the year ended December 31, 2019.

11

APP 098

**Table of Contents**

**Index to Financial Statements**

*Network Feedback Loop*

We believe our growing network of community-based physicians at the national, regional and local level drives continuous improvement of our platform, enables best practices sharing and innovation and accelerates the growth of independent physicians joining the agilon network. Many of our physician partners and individual physicians have joined our platform based on references from existing like-minded physician partners, and the credibility and quality of our physician partners is consistently cited as a deciding factor for joining the platform.

*Differentiated Physician and Patient Experience*

We designed our platform, partnership and network approach with the goal of delivering a superior and continuously improving experience to our physician partners and their patients. We believe our model enables PCPs to unlock the value in a Medicare-centric, globally capitated line of business while remaining independent. Subsequent to joining our platform, our PCPs have increased their average annual income by successfully managing healthcare costs and improving health outcomes. We believe that our PCPs' engagement is manifested through deeper relationships with patients and results in a greater opportunity to improve our members' health. For example, in 2019, 78% of our members attributed to our live anchor physician groups attended their wellness visits, compared to the FFS national average CMS Annual Wellness Visit completion rate of 35% in 2019.

*Mission-Driven Team and Culture*

We have a world-class management team, which is differentiated by its breadth and depth of expertise in healthcare. Our senior management team has an average of more than 15 years of experience in the healthcare industry and has significant exposure across all components of the payment and delivery continuum. We believe our management team's collective robust, diverse and complementary exposure to different facets of the healthcare industry positions our team to navigate and enable the shift to a physician-driven Total Care Model.

Our team is united by our mission of being the trusted long-term partner to community-based physicians and driven by our vision of transforming healthcare at the community level through exceptional patient-physician relationships.

12

**APP 099**

**Table of Contents**

**Index to Financial Statements**

**Our Growth Strategy**

We intend to utilize our competitive strengths and capitalize on favorable industry trends to increase the number of regional hubs, local markets within those hubs and ultimately physicians and members we serve. The key elements of our growth include:

*The power of our model at work: Case study of Ohio expansion*



**Establish New Regional Hubs across the Country**

We believe we are well-positioned to expand the number of our physician partners nationally across a diverse set of geographies. We have developed sophisticated business development capabilities and have established a robust pipeline with an array of physician groups across the country. We are also benefitting from the network effect of our growing network of like-minded physician partners.

*Access the Large and Embedded Membership Opportunity within Our Existing Networks*

We estimate that the number of Medicare FFS patients, Medicare-eligible patients and patients expected to age into Medicare over the next five years in our existing physician partner patient populations is approximately 375,000. As these patients enroll in MA through our payors, they become attributed to our platform with little incremental cost to us.

*Facilitate and Capitalize on the Growth of Our Physician Partners*

As the PCP base of our physician partners grows, our physician partners are better positioned to serve a growing Medicare population.

13

**APP 100**

Table of Contents

Index to Financial Statements

*Expand into Adjacent Geographies*

Once we establish a presence in a geography, we have the opportunity to accelerate the addition of new physician partnerships in the region. We leverage our multi-payor MA risk platform and regional infrastructure to efficiently grow into adjacent geographies. Of our estimated 2020 addressable market, $80 billion is concentrated in states in which we currently have a physician partner or a signed letter of intent with a physician group as of January 2021.

*Increase Quality and Improve Health Outcomes to Drive Profitability*

We believe our Total Care Model drives increased profitability per member over time through increasing quality and improving health outcomes. As members and physicians mature on our platform, we increasingly recognize the benefits of improved quality of care and effectively managed healthcare costs. We believe there is significant opportunity to improve profitability per member over the course of our long-term partnerships by improving healthcare outcomes and effectively managing costs, with 70% of our MA members as of December 31, 2020 on our platform for fewer than three years.

*Demonstrate Operating Leverage*

We expect to drive increasing profitability by leveraging both our market-level operating costs and centralized infrastructure, as we manage increased MA and DCE membership on our platform that has maturing medical margin over time.

*Capitalize on Emerging Value-Based Care Opportunities*

We believe we are positioned to capitalize on the shift from FFS towards a Total Care Model across the broader healthcare system. Through five currently approved DCEs, which encompass more than 500 of our existing PCPs, we expect to provide care to over 50,000 traditional Medicare members in seven geographies. For the year ended December 31, 2020, our DCEs did not contribute to our revenue.

**Impact of COVID-19 Pandemic on Our Business**

Commencing in March 2020, we implemented various measures to protect the health and safety of our employees, physicians and members in connection with the COVID-19 pandemic. These measures included relocating employees to home-based work settings, coordinating with physician partners to accelerate telehealth activity and coordinating daily huddles for physicians and team members on clinical and operational impacts of COVID, which included participation by nationally-recognized experts in infectious disease and epidemiology. Despite the challenges and uncertainties created by the COVID-19 pandemic, we believe that our response to the pandemic has reinforced the value of our platform, long-term partnership model and network.

Throughout most of 2020, our members incurred lower healthcare costs than we would have otherwise expected, which resulted in lower medical services expenses incurred. These costs may be incurred at future points in time and it is possible that the deferral of healthcare services could cause additional health problems in our existing members, which could increase our costs in the future. Additionally, our members' risk adjustment factors, which are reflective of documented clinical conditions during 2020 and which impact our 2021 revenues, may be lower than would have occurred without the impact of the COVID-19 pandemic, resulting from members' avoidance or deferral of care during 2020. We cannot accurately estimate the net ultimate impact, positive or negative, to revenue or medical services expense at this time.

Also see "Risk Factors—Risks Related to Our Business— The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this

14

**APP 101**

Table of Contents

Index to Financial Statements

situation precludes any prediction as to the ultimate adverse impact to us of COVID-19," "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of COVID-19" and "Business—Impact of COVID-19 Pandemic on Our Business."

**Company History**

The Company is ultimately controlled by an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm headquartered in New York, NY. Our business was formed in 2016 through the completion of two acquisitions by CD&R: In July 2016, Primary Provider Management Company, Inc. ("PPMC") was acquired, which, together with its affiliated independent practice associations ("California IPAs"), operated in Southern California. Also in July 2016, Cyber-Pro Systems, Inc. ("CPS") was acquired, which, together with its subsidiaries and affiliates, operates a network of contracted physicians in Hawaii and provides software and medical billing solutions to independent healthcare organizations. During 2020, we implemented a plan to divest all of our California operations, which includes the entirety of our Medicaid line of business, via three separate transactions with different parties. In February 2021, we completed the divestiture of our California operations. However, we will continue to be responsible for any liabilities arising from certain of the divested businesses which were incurred prior to the applicable closing date. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—California Operations" for additional information.

agilon health, inc., the issuer in this offering, was incorporated in the State of Delaware in April 2017 in connection with our entry into a physician partnership with Central Ohio Primary Care Physicians, Inc. ("COPC"), a physician-owned medical group, to establish a Medicare-centric, globally capitated line of business in the Columbus, Ohio region. Since that time, we have expanded and entered into new partnerships in Austin, Akron, Pittsburgh, North Carolina, Hartford, Buffalo, Toledo, Dayton and Southeast Ohio. In March 2021, we changed our name from Agilon Health Topco, Inc. to agilon health, inc., and changed the name of our subsidiary, agilon health, inc., to agilon health management, inc.

**Our Majority Shareholder and Organizational Structure**

*Clayton, Dubilier & Rice, LLC.* Founded in 1978, CD&R employs a distinctive approach to private equity investing, bringing together investment professionals and operating executives to pursue a strategy predicated on building stronger, more profitable businesses. Since inception, CD&R has managed the investment of more than $30 billion in 95 businesses with an aggregate transaction value of over $150 billion. CD&R has a disciplined and clearly defined investment strategy and has extensive experience investing across the healthcare industry.

After the completion of this offering, we expect that CD&R Vector Holdings, L.P. (the "CD&R Investor"), which is owned by investment funds managed by, or affiliated with, CD&R, will hold approximately 59% of our common stock (or approximately 58% if the underwriters exercise in full their option to purchase additional shares). As a result, we expect to be a "controlled company" within the meaning of the NYSE rules following the completion of this offering. This election will allow us to rely on exemptions from certain corporate governance requirements otherwise applicable to NYSE-listed companies. See "Management—Corporate Governance."

15

**Table of Contents**

**Index to Financial Statements**

The following chart presents an overview of our ownership and organizational structure, after giving effect to this offering. For additional information with respect to our ownership structure, see "Principal Stockholders":

1     Includes COPC, certain private investment funds and our physician partners with whom we have physician partner group equity agreements.

2     Includes indebtedness related to the 2021 Credit Facilities (as defined herein), including term loan indebtedness, revolver indebtedness and letters of credit. On February 18, 2021, we, through agilon health management, inc. ("agilon management"), entered in the 2021 Secured Credit Agreement (as defined herein) to refinance our outstanding indebtedness under the Credit Facilities (as defined herein). See "Description of Certain Indebtedness."

3     Operating subsidiaries include wholly-owned RBEs, independent practice associations and other immaterial subsidiaries, which have been omitted from this chart for convenience.

4     Ownership percentages assume no exercise of the underwriters option to purchase up to 6,990,000 additional shares of common stock in the offering, and are determined as described in "—The Offering."

**Our Corporate Information**

agilon health, inc. is a Delaware corporation. Our principal executive offices are located at 1 World Trade Center, Suite 2000, Long Beach, CA 90831, and our telephone number is (562) 256-3800. Our website is *www.agilonhealth.com*. None of the information contained on, or that may be accessed through, our website or any other website identified herein is part of, or incorporated into, this prospectus, and you should not rely on any such information in connection with your decision to invest in our common stock.

**APP 103**

Table of Contents

Index to Financial Statements

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows and results of operations that you should consider before making a decision to invest in our common stock. These risks are discussed more fully under the caption "Risk Factors." These risks include, but are not limited to, the following:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- significant reductions in membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies, our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- dependence on a limited number of key payors, including for membership attribution and assignment, data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts, which contracts generally provide that if the cost of care exceeds the corresponding capitation revenue we receive from payors in respect of attributed members we may realize operating deficits, which are typically not capped, and could lead to substantial losses;
- dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we drive substantially all of our total revenue;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and any impact on government funding, program coverage and reimbursements;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- ability to comply with federal, state and local regulations and laws we are subject to, or to adapt to changes in or new regulations or laws, including as such regulations and laws that relate to our physician alignment strategies with our physician partners or the corporate practice of medicine;
- our physician partners' compliance with federal and state healthcare fraud and abuse laws and regulations; and
- the influence of the CD&R Investor and our status as a "controlled company."

17

**APP 104**

Table of Contents

Index to Financial Statements

**Implications of Being an Emerging Growth Company**

As a company with less than $1.07 billion in annual gross revenue for the year ended December 31, 2019, we were an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). An emerging growth company may take advantage of specified reduced reporting and other reduced requirements that are otherwise applicable generally to public companies. These provisions include:

- in this prospectus, we may present only two years of audited financial statements and only two years of related Management's Discussion and Analysis of Financial Condition and Results of Operations disclosure; and
- in this prospectus, we are permitted to provide less extensive disclosure about our executive compensation arrangements such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, under the JOBS Act, emerging growth companies can also delay adopting new or revised financial accounting standards until such time as those standards would otherwise apply to private companies. We have elected to avail ourselves of this exemption from new or revised accounting standards and, therefore, will not be subject to the new or revised accounting standards other public companies will implement that are not emerging growth companies. As a result, our consolidated financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of the effective dates applicable to public companies.

We ceased to be an emerging growth company on December 31, 2020 because our annual gross revenues exceeded $1.07 billion for the year ended December 31, 2020. However, we will continue to be treated as an emerging growth company for disclosure purposes in this prospectus until the completion of our initial public offering. We have elected to take advantage of certain of the foregoing reduced burdens in this prospectus and, as such, the information in this prospectus may be different than the information provided by other public companies. Some investors could find our common stock less attractive as a result of our utilization of these or other exemptions. This could result in a less active trading market for our common stock and increased volatility in the price of our common stock.

APP 105

Table of Contents

Index to Financial Statements

**THE OFFERING**

| | |
|---|---|
| Common stock offered by us | 46,600,000 shares. |
| Common stock to be outstanding after this offering | 384,021,560 shares. |
| Option to purchase additional shares | The underwriters also may purchase up to 6,990,000 additional shares from us at the initial offering price less the underwriting discounts and commissions, within 30 days from the date of this prospectus. |
| Use of proceeds | We estimate that the net proceeds to us from this offering, after deducting estimated underwriting discounts and commissions and estimated offering expenses, will be approximately $1,009.6 million, or approximately $1,162.4 million if the underwriters exercise in full their option to purchase additional shares. |
| | We intend to use the net proceeds of this offering as described in "Use of Proceeds." |
| Dividend policy | We do not currently anticipate paying dividends on our common stock for the foreseeable future. Any future determination to pay dividends on our common stock will be subject to the discretion of our board of directors and depend upon various factors. See "Dividend Policy." |
| Risk Factors | Our business is subject to a number of risks that you should consider before making a decision to invest in our common stock. See "Risk Factors." |
| Reserved Share Program | At our request, an affiliate of BofA Securities, Inc., a participating underwriter, has reserved for sale, at the public offering price, up to 5% of the shares offered by this prospectus. If purchased, these shares of common stock will not be subject to a lock-up restriction. The number of shares of common stock available for sale to the general public will be reduced to the extent such shares of common stock are purchased pursuant to this program. Any reserved shares that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares of common stock offered by this prospectus. The underwriters will receive the same underwriting discounts and commissions on any shares of common stock purchased pursuant to this program as they will on any other shares of common stock sold to the public in this offering. |
| Indications of Interest | Prior to the date hereof, the cornerstone investors have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the |

19

Table of Contents

Index to Financial Statements

|  |  | cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering. |
| Proposed symbol |  | "AGL". |

The number of shares of our common stock to be outstanding immediately following this offering is based on 325,749,077 shares outstanding as of March 31, 2021, and excludes:

- 41,412,100 shares of common stock issuable upon exercise of options outstanding as of March 31, 2021 at a weighted average exercise price of $3.85 per share, of which 25,546,250 shares will be exercisable as of the consummation of this offering;
- 28,661,509 shares of common stock reserved for future issuance following this offering under our Omnibus Incentive Plan and ESPP; and
- 35,400 shares of our common stock subject to outstanding unvested RSUs granted to directors.

Unless otherwise indicated, all information in this prospectus:

- gives effect to a 100-for-1 stock split on our common stock effected on April 1, 2021;
- gives effect to the issuance of 46,600,000 shares of common stock in this offering;
- assumes no exercise by the underwriters of their option to purchase additional shares;
- gives effect to the issuance of 11,672,483 shares of common stock issuable under partner physician group equity agreements conditioned on completion of this offering (representing a number of shares equivalent to $268.5 million); and
- gives effect to amendments to our amended and restated certificate of incorporation (the "Certificate of Incorporation") and amended and restated by-laws (the "By-laws") to be adopted prior to the completion of this offering.

20

**APP 107**

Table of Contents

Index to Financial Statements

**SUMMARY HISTORICAL CONSOLIDATED FINANCIAL DATA**

The following tables set forth our summary historical consolidated financial data derived from our consolidated financial statements as of the dates and for each of the periods indicated. The summary historical consolidated financial data as of and for the years ended December 31, 2019 and December 31, 2020 are derived from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results to be expected for any future period.

You should read this summary historical consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements included elsewhere in this prospectus.

| | Year Ended December 31, | |
|---|---|---|
| (dollars in thousands) | 2020 | 2019 |
| **Consolidated Statement of Operations Data:** | | |
| **Revenues:** | | |
| Medical services revenue | $ 1,214,270 | $ 788,566 |
| Other operating revenue | 4,063 | 5,845 |
| Total revenues | 1,218,333 | 794,411 |
| **Expenses:** | | |
| Medical services expense | 1,021,877 | 725,374 |
| Other medical expenses | 102,306 | 40,526 |
| General and administrative | 137,292 | 122,832 |
| Depreciation and amortization | 13,531 | 12,253 |
| Total expenses | 1,275,006 | 900,985 |
| **Income (loss) from operations** | (56,673) | (106,574) |
| **Other income (expense):** | | |
| Other income (expense), net | 2,465 | 955 |
| Interest expense | (8,135) | (9,068) |
| **Income (loss) before income taxes** | (62,343) | (114,687) |
| Income tax benefit (expense) | (865) | 232 |
| **Income from continuing operations** | (63,208) | (114,455) |
| **Discontinued operations:** | | |
| Income (loss) before impairments, gain (loss) on sales and income taxes | (20,049) | (86,108) |
| Impairments | — | (98,343) |
| Gain (loss) on sales of assets, net | 20,401 | — |
| Income tax benefit (expense) | 2,804 | 16,166 |
| **Total discontinued operations** | 3,156 | (168,285) |
| **Net income (loss)** | (60,052) | (282,740) |
| Noncontrolling interests' share in discontinued operations | — | 152 |
| **Net income (loss) attributable to common shares** | $ (60,052) | $ (282,588) |
| **Consolidated Balance Sheet Data (at period end):** | | |
| Cash and cash equivalents | $ 106,795 | $ 123,633 |
| Total assets | $ 446,361 | $ 402,794 |
| Total liabilities | $ 421,591 | $ 353,822 |

21

APP 108

Table of Contents

Index to Financial Statements

| (dollars in thousands) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
|---|---|---|---|---|
| Contingently redeemable common stock | $ | 309,500 | $ | 281,000 |
| Total stockholders' deficit | $ | (284,730) | $ | (232,028) |

| (dollars in thousands) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
|---|---|---|---|---|
| **Consolidated Statement of Cash Flows Data:** | | | | |
| Cash flows from: | | | | |
| Operating activities | $ | (53,204) | $ | (103,861) |
| Investing activities | $ | 22,066 | $ | (5,060) |
| Financing activities | $ | 24,621 | $ | 176,298 |

| (dollars in thousands) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
|---|---|---|---|---|
| **Other Financial Data:** | | | | |
| Medical margin[1] | $ | 192,393 | $ | 63,192 |
| Network contribution[2] | $ | 99,016 | $ | 25,598 |
| Adjusted EBITDA[3] | $ | 5,827 | $ | (56,711) |

(1)  Medical margin represents medical services revenue after deducting medical services expense.

(2)  Network contribution is a non-GAAP financial measure. Network contribution represents medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Income (loss) from operations is the most directly comparable U.S. generally accepted accounting principles ("GAAP") measure to network contribution. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding network contribution and a reconciliation to income (loss) from operations.

(3)  Adjusted EBITDA is a non-GAAP financial measure. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for more information regarding Adjusted EBITDA and a reconciliation to net income (loss).

22

APP 109

Table of Contents

Index to Financial Statements

RISK FACTORS

*Risks Related to Our Business*

**We have a history of net losses, we anticipate increasing expenses in the future and we may not achieve or maintain profitability.**

We have incurred significant net losses in the past, including net losses (including discontinued operations) of $60.1 million for the year ended December 31, 2020 and $282.7 million for the year ended December 31, 2019. As a result of these losses, we had accumulated deficits of $551.2 million as of December 31, 2020 and $491.1 million as of December 31, 2019. We expect that our expenses will increase substantially in the foreseeable future and our losses will continue, including for the year ended December 31, 2021, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

**Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives may have a material adverse effect on our business, financial condition, cash flows and results of operations.**

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As an immature and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures

23

**Table of Contents**

**Index to Financial Statements**

to ensure compliance with requirements to which we are subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has increased the significant demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business, financial condition, cash flows and results of operations could be harmed.

*We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.*

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing upon these strategies, or we may fail to implement such strategies in future markets as effectively as with our initial markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows and results of operations.

Further, as a rapidly growing and relatively immature company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance and market adoption. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. Our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows and results of operations could be harmed.

*Amounts of medical expenses which are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.*

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses and adversely impact our business, financial condition, cash flows and results of operations.

Additionally, factors which impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:

- Changes to the Medicare fee schedule or other rate schedules which serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

24

**APP 111**

**Table of Contents**

**Index to Financial Statements**

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;
- The utilization rates of healthcare services, including inpatient hospitalization, by our members;
- Changes to member benefit levels established annually by payors; and
- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows and results of operations.

*As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.*

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and ,therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or which are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

*We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.*

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As a result, as our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows and results of operations could be materially adversely affected.

25

**Table of Contents**

**Index to Financial Statements**

*We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.*

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. As of December 31, 2020 and December 31, 2019, our cash and cash equivalents were $106.8 million and $123.6 million, respectively. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced extreme volatility and disruption, which has increased due to the effects of COVID-19. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our Credit Facilities.

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable time, or at all. Financings, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

*Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows and results of operations.*

A significant reduction in membership could adversely affect our business, financial condition, cash flows and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:
- failure to obtain new physician partners or members or to retain existing physician partners or members;
- decision by a payor to not renew the existing contractual agreement upon termination of such contract;
- low quality of care by our physician partners, including as a result of our failure to provide tools and information to deliver high-quality care;
- alternative care opportunities that are more attractive than those provided by our physician partners;
- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;
- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

26

Table of Contents

Index to Financial Statements

- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and
- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners the tools and information to provide high-quality care.

### The transition to a Total Care Model may be challenging for physician partners.

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows and results of operations could be materially adversely affected.

### If the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target geographies are inaccurate, our future growth rate may be impacted and we may generate losses in such markets, or we may fail to attain financial performance targets.

We often do not have access to reliable historical data regarding the size, revenue or medical expense levels of our target geographies or potential physician partners. As a result, our market opportunity estimates and financial forecasts developed as we enter into a new geography are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this prospectus relating to the size and expected growth of the market for our services and the estimates of our market opportunity may prove to be inaccurate.

Principal assumptions relating to our market opportunity include estimates of the total number and average length of relationships between MA patients and their physicians, historical MA patient growth rates, amount of revenue and medical expenses associated with MA members expected to be attributed to our physician partners and historical experience that physician partners have with a Total Care Model. Our opportunity is based on the assumption that our platform, partnership and network model will be more attractive to potential physician partners than competing options. However, potential physician partners may elect to pursue a different strategic option.

### The spread of, and response to, the novel coronavirus, or COVID-19, underscores certain risks we face and the rapid development and fluidity of this situation precludes any prediction as to the ultimate adverse impact to us of COVID-19.

COVID-19 continues to spread in the United States and throughout the world. COVID-19 and the efforts to contain the outbreak have led to significant economic disruption, including extreme volatility in financial markets, reduced economic activity and a sharp increase in unemployment claims, as well as disruption in some of our physician partners' businesses. The spread of COVID-19 underscores certain risks we face in our business described herein.

Governmental and non-governmental organizations may not effectively combat the spread and severity of COVID-19, increasing the potential for harm for our members. If the spread of COVID-19 is not contained, the

27

**APP 114**

Table of Contents

Index to Financial Statements

medical services revenue we receive may prove to be insufficient to cover the cost of healthcare services delivered to our enrolled members, which could increase significantly as a result of higher utilization rates of medical facilities and services and other increases in associated medical claims and related costs. Over time, we may also experience increased costs or decreased revenues if, as a result of our enrolled members being unable to see their PCPs due to actions taken to mitigate the spread of COVID-19, we are unable to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. In addition, the clinical disease burdens of our members may increase over time to the extent that members have received reduced preventative care to manage their existing clinical conditions, and the amount of medical care which has been deferred during the pandemic may exceed our expectations. Furthermore, we may experience reduced revenues as a result of changes to future capitation payment rates if Medicare members use fewer services due to COVID-19. For example, restrictions imposed as a result of COVID-19 may continue to decrease utilization of preventative or non-emergency healthcare, significantly decreasing provider costs. Should CMS adjust reimbursement rates based on margins during the pendency of COVID-19, our revenues in future periods and financial results may be materially adversely affected. Such measures and any further steps taken by us, or governmental action, to expand or otherwise modify the services delivered to our enrolled members, provide relief for the healthcare provider community, or in connection with the relaxation of stay-at-home and physical distancing orders and other restrictions on movement and economic activity intended to reduce the spread of COVID-19, including enhanced measures to implement widespread testing as a component of lifting these measures, could adversely impact our business, financial condition, cash flows and results of operations.

The spread of COVID-19, or actions taken to mitigate this spread, including the efficacy, ability to administer or extent of adoption of COVID-19 vaccines, could have material and adverse effects on our ability to operate effectively, including as a result of the complete or partial closure of facilities or labor shortages. Disruptions in public and private infrastructure, including communications, financial services and supply chains, could materially and adversely disrupt our normal business operations. We have transitioned a significant subset of our employee population to a remote work environment in an effort to mitigate the spread of COVID-19, which could exacerbate certain risks to our business, including an increased demand for information technology resources, increased risk of phishing and other cybersecurity attacks as well as other risks to the privacy and confidentiality of data, and increased risk of unauthorized dissemination of sensitive personal information or proprietary or confidential information about us or our members or other third parties. We have taken, and may take, further actions that alter our business operations as may be required by local, state, or federal authorities or that we determine are in the best interests of our employees. Such measures could negatively affect our ability to provide care to members, relationship with physician partners, marketing efforts, employee productivity, or customer retention, any of which could harm our business, financial condition, cash flows and results of operations.

Further, due to the COVID-19 pandemic, physician partners may not be able to complete the required annual wellness visits necessary to assess and document the health conditions of our members as comprehensively as we have in the past. Medicare pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient, based on each patient's documented clinical diagnoses activity in the preceding calendar year. Medicare requires that a patient's health issues be clinically assessed and sufficiently documented annually regardless of the permanence of the underlying clinical conditions. Historically, this clinical assessment and documentation was required to be completed during an in-person visit with a patient. As part of the Coronavirus Aid, Relief and Economic Security Act, or "CARES Act," Medicare is allowing documentation for conditions identified during video visits with patients. However, given the disruption caused by COVID-19, it is unclear whether our physician partners will be able to conduct patient interactions to clinically assess and accurately and sufficiently document the health conditions of our members, which could adversely impact our revenue in 2021 and beyond.

The rapid development and fluidity of this situation precludes any prediction as to the ultimate impact on us of COVID-19. We are continuing to monitor the spread of COVID-19, changes to our payors' benefit coverages, the

28

Table of Contents

Index to Financial Statements

ongoing costs and business impacts of dealing with COVID-19, including the potential costs associated with lifting restrictions on movement and economic activity and with administering vaccines, and related risks, as well as potential costs associated with provision of care to our members suffering from COVID-19. The magnitude and duration of the pandemic and its ultimate impact on us is uncertain as this continues to evolve globally, but such impacts could be material to our business, financial condition, cash flows and results of operations.

***Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.***

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant period to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services which have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter or annual period could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

***Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.***

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions

29

APP 116

**Table of Contents**

**Index to Financial Statements**

typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows and results of operations to be harmed.

*Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.*

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions which would adversely affect our business, financial condition, cash flows and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

*We rely on our management team and key employees and our business, financial condition, cash flows and results of operations could be harmed if we are unable to retain qualified personnel.*

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. All of our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. Prior to this offering, in order to retain and motivate valuable employees, in addition to salary and cash incentives, we provided stock options that either vest over time or are based on the equity return realized by our controlling stockholder. The value to employees of these stock options is significantly affected by movements in our stock price that are outside our control. The compensation and benefits we provide to our employees, together with the value of stock options that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows and results of operations. In such event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all. Following the offering, we intend to continue to use equity awards as part of our executive compensation program, and volatility or lack of performance in our stock price may also affect our ability to attract any replacements or retain these employees.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. New hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows and results of operations will be harmed.

30

**APP 117**

Table of Contents

Index to Financial Statements

*We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.*

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. As of December 31, 2020 and December 31, 2019, respectively, we had $102.0 million and $112.7 million of net intangible assets, including $41.5 million of goodwill. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. A detailed discussion of our impairment testing is included in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates."

Due to the continued deterioration in the performance of our California reporting unit, in the fourth quarter of 2019, we initiated a process to evaluate strategic alternatives for our California operations, including a sale or abandonment of all or substantially all of such operations. We therefore performed an assessment of the long-lived assets in the California reporting unit for impairment and determined that the carrying value of certain of those assets was not recoverable. Accordingly, we wrote-down such assets to fair value, resulting in the recognition of a $98.3 million impairment charge included in discontinued operations in the audited consolidated statement of operations for the year ended December 31, 2019. See "Note 19. Discontinued Operations" in our consolidated financial statements included elsewhere in this prospectus.

Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows and results of operations.

*Adverse determinations of tax matters could adversely affect our business, financial condition, cash flows and results of operations.*

We are subject to tax laws in the various jurisdictions in which we operate, and the application of these laws to us may be unclear. Some interpretations adopted by us could be challenged by the relevant tax authorities. A successful challenge could result in adverse consequences for us, including potentially the payment of taxes, penalties or interest in amounts that may be material. See "Note 11. Commitments and Contingencies" in our audited consolidated financial statements included elsewhere in this prospectus.

*Security breaches, loss of data and other disruptions to our data platforms could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.*

In the ordinary course of our business, we collect, store, use and disclose sensitive data, including what the law defines as protected health information ("PHI") and other types of personal or identifying information. Our member information is encrypted but not always de-identified. We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.

We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We utilize third-party service providers for important aspects of the collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The

31

Table of Contents

Index to Financial Statements

security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include ransomware, phishing, business email compromise and credential stuffing.

We have experienced cybersecurity incidents in the past and may experience them in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), potentially resulting in damages and regulatory penalties. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

***We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.***

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of

32

Table of Contents

Index to Financial Statements

system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;
- communications failures;
- software and hardware errors, failures and crashes;
- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and
- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information and know-how, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Our failure to protect the confidentiality of our know-how and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***We could be required to devote significant attention and resources to the provision of certain transition services in connection with the disposition of our California Operations.***

In February 2021, we completed the divestiture of our California Operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes in our financial statements included elsewhere in this prospectus.

In connection with the divestiture, we have agreed to continue to provide administrative support and transition services for a specified period of time. The transition services to be provided by us could require significant management attention and resources which could negatively affect our ongoing business. Additionally, we could experience operational difficulties and increased costs that exceed our estimates to provide the transition services if we are unable to perform such services with our existing resources at an acceptable level, or at all, or obtain them from a third party on reasonable terms.

33

Table of Contents

Index to Financial Statements

For the Southern California and Fresno divestiture transactions, we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus. We may not be successful in managing the risks associated with the divestiture of our California operations.

### Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may breach their payor contracts or incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Reliance on Third Parties

### We are economically dependent on maintaining our contracts with a limited number of key payors.

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

### Our contracts with our payors are for limited terms, and may not be renewed upon their expiration.

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors in respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. We have in the past, with respect to certain of our discontinued operations, and may in the future, recognize impairment charges for such terminations.

34

Table of Contents

Index to Financial Statements

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. For example, a group contract through which certain of our members in our Texas geography receive care was awarded to a new payor with whom we are not currently contracted to attribute members for 2021. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### *We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment.*

We rely on our payors for membership attribution and assignment, data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with complete or accurate data sets related to our members, or if we are unable to effectively ingest the information which payors provide to us, we and our physician partners may not be able to effectively ensure our members disease burdens are identified and may not be able to effective operate our business.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we

35

**Table of Contents**

**Index to Financial Statements**

do not directly employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists and ancillary providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not directly employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses.

### *Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

36

**APP 123**

**Table of Contents**

**Index to Financial Statements**

*We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and liability under the federal False Claims Act or through RADV audits.*

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business—Healthcare and Other Applicable Regulatory Matters—Health Care Fraud Statute."

In addition, CMS and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

In recent years, the U.S. Department of Justice has brought a number of investigations and actions under the federal False Claims Act against both physicians and payors for alleged upcoding or improper coding of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for penalties to the government under the FCA that range from $11,181 to $22,363 (adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting

37

**APP 124**

**Table of Contents**

**Index to Financial Statements**

documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows and results of operations.

*Risks Related to Our Industry and Government Programs*

***Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally,

38

**APP 125**

Table of Contents

Index to Financial Statements

consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows and results of operations.***

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for approximately 100% and 99% of our total revenues for the year ended December 31, 2020 and the year ended December 31, 2019, respectively. See "Note 3. Concentration of Credit Risk" in our audited consolidated financial statements included elsewhere in this prospectus. The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Furthermore, changes to Medicare or MA, such as if CMS were to scale back these programs or discontinue MA, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

***Uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets

39

**Table of Contents**

**Index to Financial Statements**

have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

### *We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows and results of operations will be harmed.*

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

Our primary competitors include ChenMed, Oak Street Health, Optum and VillageMD, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows and results of operations could be materially adversely affected.

40

Table of Contents

Index to Financial Statements

*Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.*

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as part of the Patient Protection and Affordable Care Act (the "ACA"), the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low quality rating for three consecutive years. Low quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows and results of operations.

*Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.*

The healthcare industry in the United States is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past and could in the future result in substantial reductions in our revenue and operating margins. For example, since the passage of the Sequestration Transparency Act of 2012, Medicare payments have been subject to a 2% sequestration reduction; these cuts were the result of a congressional deal to address the debt ceiling crisis. The CARES Act temporarily suspended the 2% sequestration payment adjustment on Medicare payments from May 1, 2020 through December 31, 2020, which was extended to March 31, 2021 by the Consolidated Appropriations Act, 2021. Further, the passage of the Improving Medicare Post-Acute Care Transformation

41

APP 128

Table of Contents

Index to Financial Statements

("IMPACT") Act imposes a stringent timeline for implementing benchmark quality measures and data metrics across post-acute care providers. CMS has promulgated, and may continue to promulgate, regulations to implement provisions of the IMPACT Act. The costs of implementation could be significant, particularly with respect to the design of a unified payment methodology for post-acute providers. Failure to meet implementation requirements could expose providers to payment reductions and penalties.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business.

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the Direct Contracting Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the Direct Contracting Model to allow a variety of different organizations called DCEs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and risks generated from managing such beneficiaries. We, in conjunction with some of our physician partners, have applied and been accepted to participate in the Direct Contracting Model in certain geographies beginning April 1, 2021. The Direct Contracting Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has not yet been finalized by CMS, particularly as CMS continues to address the COVID-19 public health emergency. Because the Direct Contracting Model is a new and evolving program, we are unable to determine how the Direct Contracting Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the Direct Contracting Model by utilizing, for example, MA-like market benchmarks, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Further, the CMS Innovation Center has not yet finalized its attribution methodology under the Direct Contracting Model's Geographic Population-Based Payment ("Geographic PBP") model option. If the CMS Innovation Center grants Geographic PBP DCEs an attribution advantage over other types of performance-based risk model participants, the impact on our business, financial condition, cash flows and operations may depend on our arrangements with CMS. In arrangements where we are contracted directly as a DCE, we may benefit, and in arrangements where we are downstream from a DCE, we may be adversely impacted. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

Additionally, we are unable to predict how states will regulate DCEs and our participation in the Direct Contracting Model. For example, certain states in which we operate may require DCEs to obtain specific

42

Table of Contents

Index to Financial Statements

licensure to participate in the Direct Contracting Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows and results of operations, including with respect to our contractual relationships with providers and payors.

***We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.***

Expansion of federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions or required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

***We have in the past, and may in the future, be subject to regulatory inquiries and CAPs imposed by our payors.***

We have in the past been, and may in the future be, subject to regulatory inquiries and corrective action plans ("CAPs") imposed by our payors, and the status of certain state regulatory and payor inquiries is uncertain. For example, in February 2018, our subsidiary, PPMC, self-disclosed to the California Department of Managed Health Care ("DMHC"), the California Department of Health Care Services, and our affected payors certain noncompliant practices in our claims and utilization management. We submitted an interim report on May 17, 2018 and coordinated with the DMHC and certain of our payors to remediate noncompliant claims and utilization management practices and implement improvements through various CAPs. On December 17, 2019, we completed substantial remediation of all known deficiencies identified by the DMHC's audit findings. In February 2021, we divested all of our California operations. On March 9, 2021, we received a set of investigative interrogatories from the DMHC pursuant to its investigation of conduct and matters described in our interim report. The interrogatories seek information concerning certain claims data and authorizations denied due to lack of medical necessity, including information regarding the health plans affected thereby. We are cooperating with the DMHC to provide all requested information. Any adverse review, audit or investigation could result in, among other things: refunding of amounts we have been paid pursuant to our contracts; or the imposition of fines, penalties and other sanctions on us, or certain of our payors. While we do not expect the amount to be material, we are unable to predict the potential dollar value of recoupments or fines, penalties or other sanctions that may be imposed on us or our payors related to the DMHC's audit findings, if any. Additionally, while our payors have not to date sought indemnification for penalties related to DMHC's audit findings, we are unable to predict the potential dollar value of claims or demands that could be asserted in the future, if any. While we have

43

Table of Contents

Index to Financial Statements

divested all of our California operations as of February 2021, for the Southern California and Fresno divestiture transactions we will continue to be responsible for any liabilities arising from the business which were incurred prior to the closing date of each transaction, including any fines, penalties and other sanctions relating to the DMHC matter described above, the payment of claims for medical services incurred prior to the effective date of each transaction, a liability for unrecognized tax benefits for which we are indemnified and other contingent liabilities that we currently believe are remote. See "Note 8. Medical Claims and Related Payables," "Note 14. Income Taxes" and "Note 19. Discontinued Operations" in our audited consolidated financial statements included elsewhere in this prospectus.

Further, we may be audited by payors and regulatory bodies, and we have been required to engage in and respond to payor corrective action plans and regulatory inquiries in the past. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. As of December 31, 2020, risk-bearing capital required across our geographies and payors totaled $38.8 million. There is also a risk that such amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

### *Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.*

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under an RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

### *CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.*

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. For 2020 and 2019, respectively, 50% and 25% of our MA members' risk adjustment factor was calculated from claims data submitted through EDS. In 2021, CMS increased that percentage to 75%. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows and results of operations.

44

**Table of Contents**

**Index to Financial Statements**

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues.

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;
- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or
- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

*Legal and Regulatory Risks*

***The healthcare industry is intensely regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our current conduct or even conduct that occurred a number of years ago, including prior to the acquisition of our subsidiary, PPMC, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law, or whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the False Claims Act and the Civil Monetary Penalties Law ("CMPL"), which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;

45

Table of Contents

Index to Financial Statements

- Federal and state anti-kickback laws, and related regulations, which generally prohibit transactions intended to induce or reward referrals for items or services reimbursable by a federal healthcare program;
- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing designated health services ("DHS") if the physician (or his/her immediate family member) has a financial relationship with that entity;
- Provisions of, and regulations enacted pursuant to, HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act") and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;
- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;
- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;
- State laws that govern the activities of third-party administrators and utilization review agents; and
- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business—Healthcare and Other Applicable Regulatory Matters."

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been and may be a party to various lawsuits, demands, claims, *qui tam* suits, government investigations and audits, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:
- suspension or termination of our participation in federal healthcare programs;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal False Claims Act, CMPL, Anti-Kickback Statute and Stark Law;
- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;
- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;
- mandated changes to our practices or procedures that materially increase operating expenses;

46

Table of Contents

Index to Financial Statements

- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;
- termination of various relationships or contracts related to our business; and
- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

***The healthcare industry is subject to antitrust scrutiny, and if it is found that we violate antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.***

The healthcare industry is subject to antitrust scrutiny. The federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. The Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice ("DOJ") and state Attorneys General actively review and, in some cases, take enforcement action against business conduct and acquisitions in the healthcare industry. Private parties harmed by alleged anti-competitive conduct can also bring antitrust suits. Violations of antitrust laws may be punishable by substantial penalties, including significant monetary fines and treble damages, civil penalties, criminal sanctions and consent decrees and injunctions prohibiting certain activities or requiring divestiture or discontinuance of business operations. If antitrust enforcement authorities conclude that we violate any antitrust laws, we could be subject to enforcement actions that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting the U.S. healthcare reform, our business may be harmed.***

Due to the importance of the healthcare industry in the lives of all Americans, federal, state and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect the healthcare industry. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. We cannot predict the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect our business or could change the operating environment of our primary care centers. It is also possible that the changes to federal healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in federal healthcare programs, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

47

Table of Contents

Index to Financial Statements

There can be no assurance that we will be able to successfully address changes in the current regulatory environment. Some of the healthcare laws and regulations applicable to us are subject to limited or evolving interpretations, and a review of our business or operations by a court, law enforcement or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, financial condition, cash flows and results of operations.

*If our physician alignment strategies with our physician partners—including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements—are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.*

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to (i) increase the quality of care while appropriately managing overall costs and (ii) participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Stark Law."

The laws and regulations, however, are complex, and we may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows and results of operations.

*Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.*

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms, but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

48

Table of Contents

Index to Financial Statements

Marketing and outreach activities undertaken in the healthcare industry—whether undertaken by or on behalf of providers and payors—are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business—Healthcare and Other Applicable Regulatory Matters— Federal and State Anti-Kickback Statutes" and "Business—Healthcare and Other Applicable Regulatory Matters—Civil Monetary Penalties Statute." Our physician partners and the payors with which we contract risk running afoul of applicable state and federal fraud and abuse laws—including the Anti-Kickback Statute and CMPL—and laws governing marketing and member outreach (*e.g.*, the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Our business development and member engagement activities may implicate the federal Telephone Consumer Protection Act ("TCPA"), related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business—Healthcare and Other Applicable Regulatory Matters—Consumer Protection Laws." A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's protected health information in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

***Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.***

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and False Claims Act and analogous state laws. See "Business—Healthcare and Other Applicable Regulatory Matters." Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business—Healthcare and Other Applicable Regulatory Matters—Other Laws and Regulations." If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

49

Table of Contents

Index to Financial Statements

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

*Our use, disclosure and processing of protected health information is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members and revenue.*

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, some states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Privacy and Security Requirements." These and other laws and regulations affecting data security and data privacy are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time to time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the

50

**APP 137**

Table of Contents

Index to Financial Statements

future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows and results of operations.

Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. To the extent the physician partners' non-compliance impacts members who are attributed to our RBEs (*e.g.*, through the loss of protected patient information), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows and results of operations.

*Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.*

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business—Healthcare and Other Applicable Regulatory Matters—Federal and State Insurance and Managed Care Laws." We therefore expect significant uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

*Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring, or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.*

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an

51

APP 138

Table of Contents

Index to Financial Statements

arrangement that confers too much control over a physician practice to a lay entity may violate the corporate practice of medicine doctrine. See "Business —Healthcare and Other Applicable Regulatory Matters—Corporate Practice of Medicine." A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows and results of operations. We have been the subject of regulatory inquiries regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.***

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person which could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

***We may face lawsuits not covered by insurance and related expenses may be material. Our failure to avoid, defend and accrue for claims and litigation could negatively impact our business, financial condition, cash flows and results of operations.***

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed

52

APP 139

**Table of Contents**

**Index to Financial Statements**

care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses or physician groups, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation, and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert officers and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims. All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

### *Risks Related to Our Indebtedness*

#### *We have substantial indebtedness and may incur additional indebtedness, which could adversely affect our financial health and our ability to obtain financing in the future, react to changes in our business or satisfy our obligations.*

As of December 31, 2020 we, through our wholly-owned subsidiary agilon health management, inc., had approximately $68.6 million of total long-term consolidated indebtedness outstanding under our secured credit agreement, dated as of July 1, 2016 (as amended from time to time, the "Secured Credit Agreement") governing the term loan and revolving credit facility (the "Secured Credit Facility"), and our unsecured credit agreement, dated as of December 22, 2017 (the "Unsecured Credit Agreement"), governing our unsecured term loan facility (the "Unsecured Term Loan Facility" and, together with the Secured Credit Facility, the "Credit Facilities"). As of such date, we also had $41.5 million of additional borrowings available under our revolving credit facility after taking into account $18.5 million of letters of credit outstanding. On February 18, 2021, we, through our wholly-owned subsidiary agilon health management, inc., entered into the 2021 Secured Credit Agreement to refinance our outstanding indebtedness under the Credit Facilities, consisting of (i) a senior secured term loan

Table of Contents

Index to Financial Statements

facility in an aggregate principal amount of $100.0 million and (ii) a senior secured revolving credit facility in an aggregate principal amount of $100.0 million. See "Description of Certain Indebtedness." In addition, we may incur additional indebtedness in the future, subject to the limitations contained in the agreements governing our indebtedness. Our substantial indebtedness could have important consequences to you. Because of our substantial indebtedness:

- our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements, pay dividends and make other distributions or to purchase, redeem or retire capital stock or for general corporate purposes and our ability to satisfy our obligations with respect to our indebtedness may be impaired in the future;
- a large portion of our cash flow from operations must be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available to us for other purposes;
- we are exposed to the risk of increased interest rates because a significant portion of our borrowings are at variable rates of interest;
- it may be more difficult for us to satisfy our obligations to our creditors, resulting in possible defaults on, and acceleration of, such indebtedness;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be at a competitive disadvantage compared to our competitors with proportionately less indebtedness or with comparable indebtedness on more favorable terms and, as a result, they may be better positioned to withstand economic downturns;
- our ability to refinance indebtedness may be limited or the associated costs may increase;
- our flexibility to adjust to changing market conditions and ability to withstand competitive pressures could be limited;
- our ability to pay dividends and make other distributions or to purchase, redeem or retire capital stock may be limited; and
- we may be prevented from carrying out capital spending and restructurings that are necessary or important to our growth strategy and efforts to improve our operating margins.

***Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the credit agreement, dated as of February 18, 2021 (the "2021 Credit Agreement") governing our term loan and revolving credit facility (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021, the "2021 Secured Credit Facilities") by and among agilon health management, inc., Agilon Health Intermediate Holdings, Inc. ("Intermediate Holdings"), the Lenders party thereto, the Issuers party thereto (each as defined therein), JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and JPMorgan Chase Bank, N.A. Bank of America, N.A., Wells Fargo Securities, LLC, Deutsche Bank Securities Inc. and Nomura Securities International, Inc., as joint lead arrangers and joint bookrunners does not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the 2021 Secured Credit Facilities, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the 2021 Secured Credit Facilities may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

Table of Contents

Index to Financial Statements

*Increases in interest rates would increase the cost of servicing our indebtedness and could reduce our profitability.*

A significant portion of our outstanding indebtedness bears interest at variable rates, including $48.6 million of outstanding borrowings and $41.5 million of additional borrowings available under our Secured Credit Facility after taking into account $18.5 million of letters of credit outstanding, as of December 31, 2020. As adjusted for the entry into the 2021 Credit Facilities, $100.0 million of outstanding borrowings and $81.5 million of additional borrowings available under the 2021 Credit Facilities bear interest at variable rates, after taking into account $18.5 million of letters of credit outstanding as of February 18, 2021. As a result, increases in interest rates would increase the cost of servicing our indebtedness and could materially and adversely affect our business, financial condition, cash flows and results of operations. As of December 31, 2020, assuming the London Interbank Offered Rate ("LIBOR") exceeded 1.00%, each one percentage point change in interest rates would have resulted in a change of approximately $0.5 million in the annual interest expense on our Secured Credit Facility. As of December 31, 2020, assuming availability was fully utilized, each one percentage point change in interest rates would have resulted in a change of approximately $1.1 million in annual interest expense on the Secured Credit Facility. The impact of increases in interest rates could be more significant for us than it would be for some other companies because of our indebtedness, thereby affecting our profitability.

Furthermore, uncertainty about the continuing availability of LIBOR may adversely affect our business, financial condition, cash flows and results of operations. On July 27, 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that after December 31, 2021, it would no longer compel banks to submit the rates required to calculate LIBOR. On March 5, 2021, the current administrator of LIBOR, ICE Benchmark Administration, announced that it would cease publication of certain tenors of U.S. dollar LIBOR on June 30, 2023. With this announcement, there is uncertainty about the continued availability of LIBOR after 2021 or, in certain circumstances, 2023. If LIBOR ceases to be available or the methods of calculating LIBOR change from the current methods, financial products with interest rates tied to LIBOR may be adversely affected. Even if LIBOR remains available, it is uncertain whether it will continue to be viewed as an acceptable market benchmark, what rate or rates may become accepted alternatives to LIBOR or what the effect of any such changes in views or alternatives may be on the markets for LIBOR-indexed financial instruments. As of December 31, 2020, adjusted to reflect the entry into the 2021 Secured Credit Facilities, all of our aggregate consolidated indebtedness was indexed to LIBOR. If any of the foregoing were to occur, the interest rates on such indebtedness may be adversely affected.

*The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.*

Our 2021 Secured Credit Facilities contain covenants that, among other things, restrict the ability of agilon management and its subsidiaries to:
- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;
- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and
- enter into lines of business.

55

**Table of Contents**

**Index to Financial Statements**

agilon management and its subsidiaries accounted for 100% of our total assets and 100% of our total liabilities as of December 31, 2020. Consequently, the restrictions in the 2021 Secured Credit Facilities may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the 2021 Secured Credit Facilities may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the 2021 Secured Credit Facilities, could proceed against the collateral securing the indebtedness. All obligations under the 2021 Secured Credit Facilities are guaranteed by Intermediate Holdings and each domestic subsidiary of agilon management other than certain excluded subsidiaries. All obligations of agilon management and each guarantor are secured by a perfected security interest in substantially all tangible and intangible assets of agilon management and each such guarantor, including the capital stock of each domestic subsidiary of agilon management and each such guarantor, and 65% of each series of capital stock of any non U.S. subsidiary held directly by agilon management or any guarantor, subject to certain exceptions. In any such case, we may be unable to borrow under the 2021 Secured Credit Facilities and may not be able to repay the amounts due under such facilities. This could materially and adversely affect our business, financial condition, cash flows and results of operations, and could cause us to become bankrupt or insolvent.

***Our ability to generate the significant amount of cash needed to pay interest and principal on our indebtedness and our ability to refinance all or a portion of our indebtedness or obtain additional financing depends on many factors outside our control.***

agilon management, the borrower under the 2021 Secured Credit Facilities, is a holding company, and as such it has no independent operations or material assets other than ownership of equity interests in its subsidiaries. agilon management depends on its subsidiaries to distribute funds to it so that it may pay obligations and expenses, including satisfying obligations with respect to indebtedness. Our ability to make scheduled payments on, or to refinance our obligations under, our indebtedness depends on the financial and operating performance of the subsidiaries of agilon management and their ability to make distributions and dividends to it, which, in turn, depends on their results of operations, cash flows, cash requirements, financial position and general business conditions and any legal and regulatory restrictions on the payment of dividends to which they may be subject, many of which could be outside our control.

We may be unable to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness. If our cash flow and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek to obtain additional equity capital or restructure our indebtedness. In the future, our cash flow and capital resources may not be sufficient for payments of interest on and principal of our indebtedness, and such alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations.

The final maturity date of the 2021 Secured Term Loan Facility and the 2021 Secured Revolving Facility is February 18, 2026. We may be unable to refinance any of our indebtedness or obtain additional financing, particularly because of our substantial indebtedness. Market disruptions, such as those experienced in 2008, 2009 and March 2020, as well as our indebtedness levels, may increase our cost of borrowing or adversely affect our ability to refinance our obligations as they become due. We may be unable to refinance our indebtedness, at

**APP 143**

**Table of Contents**

**Index to Financial Statements**

maturity or otherwise, on terms acceptable to us or at all. If we are unable to refinance our indebtedness or access additional credit, or if short-term or long-term borrowing costs dramatically increase, our ability to finance current operations and meet our short-term and long-term obligations could be adversely affected.

If agilon management cannot make scheduled payments on its indebtedness, it will be in default and the lenders under the 2021 Secured Credit Facilities could terminate their commitments to loan money or, in the case of lenders under the 2021 Secured Credit Facilities, foreclose against the assets securing their borrowings, and we could be forced into bankruptcy or liquidation. Any of these actions could have a material adverse effect on our business, financial condition, cash flows and results of operations.

### Risks Related to Our Common Stock and This Offering

#### An active trading market for our common stock may not develop, and you may not be able to resell your shares at or above the initial public offering price.

Prior to this offering, there has been no public market for shares of our common stock. Although our common stock has been approved for listing on the NYSE, an active trading market for our shares may never develop or be sustained following this offering. The initial public offering price of our common stock was determined through negotiations between us and the underwriters. This initial public offering price may not be indicative of the market price of our common stock after this offering. In the absence of an active trading market for our common stock, investors may not be able to sell their common stock at or above the initial public offering price or at the time that they would like to sell.

#### agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. See "Management's Discussion and Analysis of Financial Condition and Results of Operations." To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography and ranged from $50,000 to $10.0 million, or $38.8 million in the aggregate across all of our geographies and payors, as of December 31, 2020. In addition, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facilities to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our results of business, financial condition, cash flows and results of operations could be materially and adversely affected.

57

Table of Contents

Index to Financial Statements

***The market price of our common stock may be volatile and could decline after this offering.***

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. The market price of our common stock may fluctuate significantly. Among the factors that could affect our stock price are:

- industry, regulatory or general market conditions;
- domestic and international economic factors unrelated to our performance;
- changes in our physician partners' or their patients' preferences;
- new regulatory pronouncements and changes in regulatory guidelines;
- lawsuits, enforcement actions and other claims by third parties or governmental authorities;
- actual or anticipated fluctuations in our quarterly operating results;
- lack of research coverage and reports by industry analysts or changes in any securities analysts' estimates of our financial performance;
- action by institutional stockholders or other large stockholders, including future sales of our common stock;
- failure to meet any guidance given by us or any change in any guidance given by us, or changes by us in our guidance practices;
- announcements by us of significant impairment charges;
- speculation in the press or investment community;
- investor perception of us and our industry;
- changes in market valuations or earnings of similar companies;
- the impact of short selling or the impact of a potential "short squeeze" resulting from a sudden increase in demand for our common stock;
- announcements by us or our competitors of significant contracts, acquisitions, dispositions or strategic partnerships;
- war, terrorist acts and epidemic disease, including COVID-19;
- any future sales of our common stock or other securities;
- additions or departures of key personnel; and
- misconduct or other improper actions of our employees.

In particular, we cannot assure you that you will be able to resell your shares at or above the public offering price. Stock markets have experienced extreme volatility in recent years that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against the affected company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which could materially and adversely affect our business, financial condition, cash flows and results of operations.

***Our management will have broad discretion over the use of the proceeds we receive in this offering and might not apply the proceeds in ways that increase the value of your investment.***

Our management will have broad discretion to use the net proceeds we receive from this offering, and you will be relying on the judgment of our management regarding the use of these proceeds. Our management might

58

**APP 145**

Table of Contents

Index to Financial Statements

not apply the net proceeds of this offering in ways that increase the value of your investment. We expect to use the net proceeds from this offering for working capital and other general corporate purposes, including accelerating the growth of our existing geographies and our national network of partners, and to make available financing options to our physician partners in connection with taxes payable on shares to be distributed to them upon consummation of the offering under the partner physician group equity agreements, in an aggregate amount estimated to be approximately $90 million to $120 million. Additionally, because the gross proceeds from this offering exceed $1.0 billion, the 2021 Secured Term Loan Facility requires a mandatory prepayment and reduction in an amount equal to $50.0 million. In addition, we may also use a portion of the net proceeds to establish a foundation to advance our commitment to the future of diversity and growth in primary care leadership and education and training in value-based care. We do not currently have a specific plan for a significant portion of the remaining net proceeds. Our management might not be able to yield a significant return, if any, on any investment of the net proceeds received from this offering, which could compromise our ability to pursue our growth strategy. You will not have the opportunity to influence our decisions on how to use the net proceeds from this offering.

*Future sales of shares by us or our existing stockholders could cause our stock price to decline.*

Sales of substantial amounts of our common stock in the public market following this offering, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

As of March 31, 2021, adjusted to give effect to this offering, we had 384,021,560 outstanding shares of common stock. Of these shares, all of the 46,600,000 shares to be sold in this offering will be immediately tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any shares held by "affiliates," as that term is defined in Rule 144 under the Securities Act ("Rule 144"). We intend to file a registration statement on Form S-8 under the Securities Act to register the shares of common stock to be issued under our equity compensation plans and, as a result, all shares of common stock acquired upon exercise of stock options granted under our plan will also be freely tradable under the Securities Act, subject to the terms of the lock-up agreements, unless purchased by our affiliates. As of March 31, 2021, there were stock options outstanding to purchase a total of 41,412,100 shares of our common stock. Upon completion of this offering, 11,672,483 shares will be issued pursuant to our partner physician group equity agreements (representing a number of shares equivalent to $268.5 million). See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates—Stock-based Compensation" for additional information.

The remaining 325,749,077 shares of common stock outstanding as of March 31, 2021 are restricted securities within the meaning of Rule 144 under the Securities Act, but will be eligible for resale subject to applicable volume, means of sale, holding period and other limitations of Rule 144 under the Securities Act or pursuant to an exemption from registration under Rule 701 under the Securities Act, or "Rule 701," subject to the lock-up agreements to be entered into by us, the CD&R Investor, certain of our stockholders and our executive officers and directors.

The CD&R Investor, certain of our stockholders and our executive officers and directors have entered into lock-up agreements under which we and they have agreed not to, among other things and subject to certain exceptions, offer, sell, contract to sell, pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, engage in any hedging or similar transaction or arrangement, lend or otherwise transfer or dispose of, directly or indirectly, any of our securities that are substantially similar to the securities offered hereby, without the prior written consent of J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC for a period of 180 days after the date of this prospectus. See "Underwriting." Following the expiration of this 180-day lock-up period, 337,421,560 shares of our common stock will be eligible for future sale, subject to the applicable volume, manner of sale, holding period and other limitations of Rule 144 or

59

**Table of Contents**

**Index to Financial Statements**

pursuant to an exemption from registration under Rule 701. See "Shares Available for Future Sale" for a discussion of the shares of common stock that may be sold into the public market in the future. In addition, our significant stockholders may distribute shares that they hold to their investors who themselves may then sell into the public market following the expiration of the lock-up period. Such sales may not be subject to the volume, manner of sale, holding period and other limitations of Rule 144. Furthermore, the CD&R Investor and other significant stockholders have the right to require us to register shares of common stock for resale in certain circumstances. As resale restrictions end, the market price of our common stock could decline if the holders of those shares sell them or are perceived by the market as intending to sell them.

In the future, we may issue additional shares of common stock or other equity or debt securities convertible into or exercisable or exchangeable for shares of our common stock in connection with a financing, strategic investment, litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

### *If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts may publish about us or our business. We may never obtain research coverage by industry or financial analysts. If no or few analysts commence coverage of us, the trading price of our stock would likely decrease. Even if we do obtain analyst coverage, if one or more of the analysts that covers our common stock downgrades our stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of the analysts ceases coverage of our common stock or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our common stock price or trading volume to decline.

### *If you invest in our common stock in this offering, you will incur immediate and substantial dilution in the book value of your shares.*

If you invest in our common stock in this offering, your ownership interest will be immediately diluted to the extent of the difference between the initial public offering price per share of our common stock and the net tangible book value per share of our common stock immediately after this offering. Based on the initial public offering price of $23.00 per share, purchasers of our common stock in this offering will experience immediate and substantial dilution in net tangible book value of $20.57 per share. See "Dilution" for a more detailed description of the dilution to new investors in the offering.

### *Participation in this offering by the cornerstone investors could reduce the public float for our shares of common stock.*

The cornerstone investors have indicated an interest, severally and not jointly, in purchasing up to an aggregate of $500 million in shares in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investors may determine to purchase more, less or no shares in this offering or the underwriters may determine to sell more, less or no shares to any of the cornerstone investors. The underwriters will receive the same discount on any of our shares purchased by the cornerstone investors as they will from any other shares sold to the public in this offering. If the cornerstone investors are allocated all or a portion of the shares in which they have indicated an interest in this offering or more, and purchase any such shares, such purchase could reduce the available public float for our shares if the cornerstone investors hold these shares long term.

Table of Contents

Index to Financial Statements

***Fulfilling our obligations incident to being a public company, including compliance with the Exchange Act and the requirements of the Sarbanes-Oxley Act and the Dodd-Frank Act, will be expensive and time-consuming, and any delays or difficulties in satisfying these obligations could have a material adverse effect on our future results of operations and our stock price.***

As a public company, we will be subject to the reporting, accounting and corporate governance requirements of the NYSE, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Sarbanes-Oxley Act and Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") that apply to issuers of listed equity, which impose certain significant compliance requirements, costs and obligations upon us. The changes necessitated by being a publicly listed company and ongoing compliance with these rules and regulations require a significant commitment of additional resources and management oversight, which will increase our operating costs and could divert our management and personnel from other business concerns, particularly after we are no longer an emerging growth company. Further, to comply with the requirements of being a public company, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring additional accounting or internal audit staff.

The Sarbanes-Oxley Act requires us, among other things, to maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

In addition, our internal resources and personnel may in the future be insufficient to avoid accounting errors, and our auditors may identify deficiencies, significant deficiencies or material weaknesses in our internal control environment in the future. Any failure to develop or maintain effective controls or any difficulties encountered implementing required new or improved controls could harm our operating results or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE. As a public company, we are required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose, but we are not required to provide an annual management report on the effectiveness of our internal control over financial reporting until our second Annual Report on Form 10-K. Our independent registered public accounting firm has identified material weaknesses in the past, and the measures we implemented to remediate such weaknesses may be insufficient to identify or prevent material weaknesses in the future. As of December 31, 2019, these material weaknesses have been remediated. However, the measures we implemented may be insufficient to identify or prevent future material weaknesses.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until we cease to be an emerging growth company or a non-accelerated filer. We ceased to be an emerging growth company on December 31, 2020, and we do not expect to be a non-accelerated filer beginning as of December 31, 2022. As such, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting in our 2022 Annual Report on Form 10-K. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business, financial condition, cash flows and results of operations.

The expenses associated with being a public company include increases in auditing, accounting and legal fees and expenses, investor relations expenses, increased directors' fees and director and officer liability insurance costs,

**Table of Contents**

**Index to Financial Statements**

registrar and transfer agent fees and listing fees, as well as other expenses. As a public company, we are required, among other things, to define and expand the roles and the duties of our board of directors and its committees and institute more comprehensive compliance and investor relations functions. Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage us as a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, cash flows and results of operation. Failure to comply with the requirements of being a public company could potentially subject us to sanctions or investigations by the U.S. Securities and Exchange Commission (the "SEC") or other regulatory authorities.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us, and there could be a material adverse effect on our business, financial condition, cash flows and results of operations.

*Following the completion of this offering, the CD&R Investor will continue to control us and may have conflicts of interest with other stockholders.*

Following the completion of this offering, the CD&R Investor will own approximately 59% of the outstanding shares of our common stock (or approximately 58% if the underwriters exercise in full their option to purchase additional shares). As a result, the CD&R Investor will have sufficient voting power without the consent of our other stockholders to be able to control all matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which could reduce the market price of our common stock.

Because the CD&R Investor's interests may differ from your interests, actions the CD&R Investor takes as our controlling stockholder may not be favorable to you. For example, the concentration of ownership held by the CD&R Investor could delay, defer or prevent a change of control of us, impede a merger, takeover or other business combination that another stockholder may otherwise view favorably or cause us to enter into transactions or agreements that are not in the best interests of all stockholders. Other potential conflicts could arise, for example, over matters such as employee retention or recruiting, or our dividend policy.

Furthermore, as long as the CD&R Investor continues to beneficially own at least 40% of our outstanding common stock, the CD&R Investor will be able to determine the outcome of corporate actions requiring stockholder approval, including the election of the members of our board of directors and the approval of significant corporate transactions, such as mergers and the sale of substantially all of our assets. Even after the CD&R Investor reduces its beneficial ownership below 40% of our outstanding common stock, it will likely still be able to assert significant influence over our board of directors and certain corporate actions. Following the completion of this offering, the CD&R Investor will continue to have the right to designate for nomination for election at least a majority of our directors as long as the CD&R Investor beneficially owns at least 50% of our common stock and to designate our Chairman of the board of directors so long as it beneficially owns at least 25% of our common stock.

*Under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, any of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, will have no obligation to offer us corporate opportunities.*

The policies relating to corporate opportunities and transactions with the CD&R Investor set forth in our Certificate of Incorporation will address potential conflicts of interest between agilon health, on the one hand,

62

**APP 149**

**Table of Contents**

**Index to Financial Statements**

and the CD&R Investor and its officers, directors, employees, members or partners who are directors or officers of our company, on the other hand. In accordance with those policies, the CD&R Investor may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and the CD&R Investor and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

*Future offerings of debt or equity securities which would rank senior to our common stock may adversely affect the market price of our common stock.*

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Issuing additional shares of our common stock or other equity securities or securities convertible into equity may dilute the economic and voting rights of our stockholders or reduce the market price of our common stock. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock and may result in dilution to owners of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors outside our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings, reducing the market price of our common stock or diluting the value of their stock holdings in us.

*Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.*

Our Certificate of Incorporation and our By-laws will include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively will:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors to thwart a takeover attempt;
- provide for a classified board of directors, which divides our board of directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;
- limit the ability of stockholders to remove directors if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- provide that vacancies on our board of directors, including vacancies resulting from an enlargement of our board of directors, may be filled only by a majority vote of directors then in office;
- prohibit stockholders from calling special meetings of stockholders if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock;
- opt out of Section 203 of the DGCL, which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until the CD&R Investor ceases to beneficially own at least 5% of the outstanding shares of our common stock;
- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

63

**APP 150**

Table of Contents

Index to Financial Statements

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if the CD&R Investor ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and board of directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future. See "Description of Capital Stock—Anti-Takeover Effects of Our Certificate of Incorporation and By-Laws."

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that the CD&R Investor will continue to own following this offering, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We could be the subject of securities class action litigation due to future stock price volatility, which could divert management's attention and materially and adversely affect our business, financial condition, cash flows and results of operations.***

The stock market in general, and market prices for the securities of companies like ours in particular, have from time to time experienced volatility that often has been unrelated to the operating performance of the underlying companies. A certain degree of stock price volatility can be attributed to being a newly public company. These broad market and industry fluctuations may adversely affect the market price of our common stock, regardless of our operating performance. In certain situations in which the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders were to bring a similar lawsuit against us, the defense and disposition of the lawsuit could be costly and divert the time and attention of our management and could materially and adversely affect our business, financial condition, cash flows and results of operations.

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of our board of directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facilities significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock.

64

**Table of Contents**

**Index to Financial Statements**

In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***Although we ceased to be an "emerging growth company," we can continue to take advantage of certain reduced disclosure requirements in this registration statement, which may make our common stock less attractive to investors.***

We ceased to be an emerging growth company as defined in the JOBS Act on December 31, 2020, because our annual revenue for the fiscal year ended December 31, 2020 exceeded $1.07 billion. However, because we ceased to be an emerging growth company after we confidentially submitted our registration statement related to this offering to the SEC, we will be treated as an emerging growth company for certain purposes until the earlier of the date on which we complete this offering and December 31, 2021. As such, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies, including (i) reduced disclosure obligations regarding executive compensation in this prospectus and (ii) not being required to provide more than two years of audited financial statements in this prospectus. We cannot predict if investors will find our common stock less attractive because we have relied on these exemptions. If some investors find our common stock less attractive, there may be less demand for our common stock and the price that some investors are willing to pay for our common stock may decrease.

***We expect to be a "controlled company" within the meaning of rules and, as a result, we will qualify for, and currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

After the completion of this offering, the CD&R Investor will continue to control a majority of the voting power of our outstanding common stock. Accordingly, we expect to be a "controlled company" within the meaning of corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including:

- the requirement that a majority of the board of directors consist of independent directors;
- the requirement that our Nominating and Governance Committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
- the requirement that we have a Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
- the requirement for an annual performance evaluation of the Nominating and Governance and Compensation Committees.

Following this offering, we intend to continue to utilize these exemptions. As a result, we do not have a majority of independent directors, our Nominating and Governance Committee and Compensation Committees do not consist entirely of independent directors and such committees may not be subject to annual performance evaluations. Consequently, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance rules and requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

***At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of rules. However, we may continue to rely on exemptions from certain corporate governance requirements during a one-year transition period.***

At such time as the CD&R Investor no longer controls a majority of the voting power of our outstanding common stock, we will no longer be a "controlled company" within the meaning of the NYSE corporate

65

**APP 152**

**Table of Contents**

**Index to Financial Statements**

governance standards. The NYSE rules require that we (i) have a majority of independent directors on our board of directors within one year of the date we no longer qualify as a "controlled company," (ii) have at least one independent director on each of the Compensation and Nominating and Governance Committees on the date we no longer qualify as a "controlled company," at least a majority of independent directors on each of the Compensation and Nominating and Governance Committees within 90 days of such date and the Compensation and Nominating and Governance Committees composed entirely of independent directors within one year of such date and (iii) perform an annual performance evaluation of the Nominating and Governance and Compensation Committees. During this transition period, we may continue to utilize the available exemptions from certain corporate governance requirements as permitted by the NYSE rules. Accordingly, during the transition period, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. Furthermore, a change in our board of directors and committee membership may result in a change in corporate strategy and operation philosophies, and may result in deviations from our current strategy.

***Our Certificate of Incorporation will designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation will provide that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the Delaware General Corporation Law (the "DGCL"), or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation will provide that, unless we consent in writing to the election of an alternative forum, the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows and results of operations.

66

Table of Contents

Index to Financial Statements

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INFORMATION**

This prospectus contains forward-looking statements and cautionary statements. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this prospectus and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this prospectus. In addition, even if our results of operations, financial condition and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this prospectus, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;
- our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives;
- our ability to execute our operation strategies or to achieve results consistent with our historical performance;
- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;
- our ability to secure contracts with MA payors or to secure MA at favorable financial terms;
- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;
- our ability to obtain additional capital needed to support our business;
- significant reductions in our membership;
- challenges for our physician partners in the transition to a Total Care Model;
- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;
- the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us;
- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts;

67

APP 154

Table of Contents

Index to Financial Statements

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new RBEs within certain geographies in the future;
- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;
- our ability to retain our management team and key employees or attract qualified personnel in the future;
- our ability to realize the full value of our intangible assets and any impairment charges we have or may record;
- adverse determinations of tax matters;
- security breaches, loss of data or other disruptions to our data platforms;
- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations;
- our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses;
- our dependence on a limited number of key payors;
- the limited terms of our contracts with payors and that they may not be renewed upon their expiration;
- our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment;
- our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- difficulties in obtaining accurate and complete diagnosis data;
- our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect;
- our reliance on third-party software and data to operate our business and provide services to our members and physician partners;
- the impact of consolidation in the healthcare industry;
- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;
- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures;
- our ability to compete in our competitive industry;
- the impact of government performance standards and benchmarks on our compensation and reputation;
- statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements;

68

**APP 155**

Table of Contents

Index to Financial Statements

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;
- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;
- regulatory inquiries and corrective action plans imposed by our payors;
- repayment obligations arising out of payor audits;
- the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members;
- negative publicity regarding the managed healthcare industry;
- the extensive regulation of the healthcare industry at the federal, state and local levels;
- our substantial indebtedness and the potential that we may incur additional indebtedness;
- no public market for our common stock and the potential that one may not develop;
- the significant influence the CD&R Investor has over us; and
- risks related to other factors discussed under "Risk Factors" in this prospectus.

You should read this prospectus completely and with the understanding that actual future results may be materially different from expectations. All forward-looking statements made in this prospectus are qualified by these cautionary statements. These forward-looking statements are made only as of the date of this prospectus, and we do not undertake any obligation, other than as may be required by law, to update or revise any forward-looking or cautionary statements to reflect changes in assumptions, the occurrence of events, unanticipated or otherwise, and changes in future operating results over time or otherwise.

69

APP 156

# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 26, 2021**

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

| Delaware | 001-40332 | 37-1915147 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| 1 World Trade Center, Suite 2000 | | |
|---|---|---|
| **Long Beach, California** | | **90831** |
| **(Address of Principal Executive Offices)** | | **(Zip Code)** |

**Registrant's Telephone Number, Including Area Code: (562) 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02.   Results of Operations and Financial Condition.**

On May 26, 2021, agilon health, inc., a Delaware corporation ("agilon"), issued a press release setting forth its financial results for the quarter ended March 31, 2021. The press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01   Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated May 26, 2021. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

1

**APP 159**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date: May 26, 2021

By: /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

2

**APP 160**

Exhibit 99.1

# agilon health Reports First Quarter 2021 Results

LONG BEACH, Calif. – May 26, 2021 – agilon health, inc. (NYSE: AGL), the company transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients, announced results for the first quarter ended March 31, 2021.

**First Quarter 2021 Results:**

- Total revenue of $413 million increased 42% from 2020 and would have increased approximately 50% including a recently completed group Medicare Advantage (MA) contract that is retroactive to January 2021
- Members of approximately 165,300 as of March 31 increased 35% from 2020 and would have increased 42% to approximately 174,300 including the retroactive group contract
- Same geography membership growth of 8% from 2020 and same geography membership growth of 15% including the retroactive group contract
- Net loss from continuing operations of $14 million, compared to $8 million in 2020
- Medical Margin of $52 million, compared to $42 million in 2020
- Adjusted EBITDA of $4 million, compared to $3 million in 2020

"We are pleased with our first quarter results, highlighted by 42% revenue growth and 35% membership growth.  Including the retroactive group MA contract, same geography membership growth increased 15%, reflective of strong member retention and broad-based additions across all markets.  Our aligned partnership model is resonating with physician groups and we began implementing six new geographies with approximately 49,000 members that will go-live in January 2022." said Steve Sell, Chief Executive Officer. "With the completion of our initial public offering, we are well capitalized to support our growth strategy.  We plan to use the proceeds to scale our platform, support growth of our existing physician partners, and partner with additional groups to help transform senior care in local communities across the country."

**Outlook for Second Quarter and Fiscal Year 2021:**

|  | Quarter End June 30, 2021 | | Year End December 31, 2021 | |
|---|---|---|---|---|
|  | Low | High | Low | High |
| Ending members | 175,000 | 177,000 | 182,000 | 184,000 |
| Total revenues ($M) | $ 470 | $ 475 | $ 1,765 | $ 1,780 |
| Adjusted EBITDA ($M) |  |  | $ (41) | $ (38) |

Total revenue outlook for the second quarter 2021 includes an estimated $24 million associated with the group MA contract attributable to the first quarter.  Adjusted EBITDA loss reflected in the full year 2021 outlook is expected to be weighted to the back half of the fiscal year.

We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most directly comparable GAAP measure, and have not provided forward-looking guidance for net income (loss), because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation, that are not within our control or cannot be reasonably predicted.

*Membership Details*

Membership as of March 31, 2021 was approximately 165,300, an increase of 35% from 2020.  Average membership during the first quarter 2021 was approximately 163,000.  Including an estimated 49,000 members currently in implementation for 2022 go-live, total MA membership on the agilon platform was approximately 214,300 as of March 31, 2021.

Same geography membership increased 8% year-over-year during the first quarter 2021 and increased 15% including a recently completed group MA contract that is retroactive to January 2021.  During the first quarter, a group MA contract transitioned between two payers in one of our geographies.  Due to the timing required to complete the transition, agilon health's first quarter 2021 results do not include the revenue, membership, or costs of these members.  agilon health recently completed a new agreement covering this membership and this will be reflected in the company's financial results for the second quarter 2021, including retroactive amounts associated with first quarter 2021.  We estimate the retroactive revenue and membership associated with this contract for the first quarter 2021 are approximately $24 million and 9,000, respectively.  Importantly, patients covered by this group plan were under the continuous care of their primary care doctor during this transition.

**APP 161**

*Direct Contracting*

In collaboration with seven of our physician group partners, we launched five Direct Contracting Entities (DCE) with over 50,000 attributed beneficiaries on April 1, 2021. The DCE program allows physician groups on the agilon platform to operate a single line of business for Medicare patients. While the recent announcement from the Center for Medicare and Medicaid Innovation will limit new DCE entrants for 2022, we will be able to utilize existing DCEs as a vehicle for existing or new physician groups to participate in the Direct Contracting program.

*Initial Public Offering and Debt Refinancing*

On April 19, 2021, we completed the initial public offering of 53,590,000 shares of common stock at a price of $23.00 per share. The net proceeds of the offering were approximately $1.16 billion, after underwriting fees and other offering expenses.

On February 18, 2021, we executed a new credit facility agreement (2021 Secured Credit Facilities). The 2021 Secured Credit Facilities included an initial $100 million senior secured term loan and a $100 million senior secured revolving credit facility. Subsequent to the end of the first quarter and in connection with our initial public offering, we repaid $50 million of the senior secured term loan.

As of April 30, 2021, including the impact from the initial public offering, debt refinancing, debt repayment and other items, agilon health had approximately $1.1 billion of cash and $50 million of debt outstanding.

**Webcast and Conference Call:**

agilon health will host a conference call and webcast to discuss first quarter 2021 results on Thursday, May 27, 2021 at 8:30 AM Eastern Time. The conference call and webcast can be accessed by dialing (855) 435-0829 for U.S. participants, or +1 (639) 491-2399 for international participants, and referencing participant code 9436419, or visiting the "Events & Presentations" section of https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients. Through our partnerships and our platform, agilon is leading the nation in creating the system we need – one built on the value of care, not the volume of fees. We honor the independence of local physicians and serve as their partners so they can be the doctors they trained to be. agilon provides the capital, data, payor relationships, executive experience and contract support that allow physician groups to take on the risk of total care for their most vulnerable patients. The result: healthier communities, and doctors who can devote the right amount of time with the patients who need it most. With rapidly growing appeal, agilon is scaled to grow and is here to help our nation's best independent physician groups have a sustained, thriving future. Together, we are reinventing primary care.

**Forward Looking Statements**

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: (i) statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, dispositions, or other transactions discussed in this release; and (ii) statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plan including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operation strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market; the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us; security breaches, loss of data or other disruptions to our data platforms; the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; our substantial indebtedness and the potential that we may incur additional indebtedness; and risks related to other factors discussed under "Risk Factors" in our Registration Statement on Form S-1. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**APP 163**

# agilon health, inc.

**Consolidated Balance Sheets**

**In thousands, except share and per share data**

| | March 31, 2021 | | December 31, 2020 |
|---|---|---|---|
| | (unaudited) | | |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 105,289 | $ | 106,795 |
| Restricted cash and equivalents | 14,202 | | 28,383 |
| Receivables, net | 288,827 | | 144,555 |
| Prepaid expenses and other current assets, net | 9,314 | | 9,639 |
| Current assets held for sale and discontinued operations, net | — | | 4,825 |
| Total current assets | 417,632 | | 294,197 |
| Property and equipment, net | 4,799 | | 6,456 |
| Intangible assets, net | 61,609 | | 60,468 |
| Goodwill | 41,540 | | 41,540 |
| Other assets, net | 47,259 | | 43,700 |
| Non-current assets held for sale, net | 1,199 | | — |
| Total assets | $ 574,038 | $ | 446,361 |
| **LIABILITIES, CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Medical claims and related payables | $ 276,984 | $ | 162,868 |
| Accounts payable and accrued expenses | 95,122 | | 97,244 |
| Current portion of long-term debt | — | | 3,041 |
| Current liabilities held for sale and discontinued operations | — | | 3,682 |
| Total current liabilities | 372,106 | | 266,835 |
| Long-term debt, net of current portion | 99,412 | | 64,665 |
| Other liabilities | 91,264 | | 90,091 |
| Total liabilities | 562,782 | | 421,591 |
| Commitments and contingencies | | | |
| Contingently redeemable common stock, $0.01 par value: 76,201 shares issued and outstanding | 309,500 | | 309,500 |
| Stockholders' equity (deficit): | | | |
| Common stock, $0.01 par value: 500,000 shares authorized; 249,474 and 249,374 shares issued and outstanding, respectively | 2,494 | | 2,494 |
| Additional paid-in capital | 265,603 | | 263,966 |
| Accumulated deficit | (566,268) | | (551,190) |
| Total agilon health, inc. stockholders' equity | (298,171) | | (284,730) |
| Noncontrolling interests | (73) | | — |
| Total stockholders' equity (deficit) | (298,244) | | (284,730) |
| Total liabilities, contingently redeemable common stock and stockholders' equity (deficit) | $ 574,038 | $ | 446,361 |

# agilon health, inc.

**Consolidated Statements of Operations**
**In thousands, except per share data**
**(unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Revenues:** | | |
| Medical services revenue | $ 412,412 | $ 289,814 |
| Other operating revenue | 692 | 1,234 |
| Total revenues | 413,104 | 291,048 |
| **Expenses:** | | |
| Medical services expense | 360,354 | 247,653 |
| Other medical expenses | 23,661 | 18,426 |
| General and administrative | 37,777 | 27,605 |
| Depreciation and amortization | 3,427 | 3,198 |
| Total expenses | 425,219 | 296,882 |
| **Income (loss) from operations** | (12,115) | (5,834) |
| **Other income (expense):** | | |
| Other income (expense), net | 1,336 | 122 |
| Interest expense | (2,941) | (2,149) |
| **Income (loss) before income taxes** | (13,720) | (7,861) |
| Income tax benefit (expense) | (16) | — |
| **Income (loss) from continuing operations** | (13,736) | (7,861) |
| **Discontinued operations:** | | |
| Income (loss) before income taxes | (1,351) | (8,089) |
| Income tax benefit (expense) | (64) | (149) |
| **Total discontinued operations** | (1,415) | (8,238) |
| **Net income (loss)** | (15,151) | (16,099) |
| Noncontrolling interests' share in earnings (loss) | 73 | — |
| **Net income (loss) attributable to common shares** | $ (15,078) | $ (16,099) |
| | | |
| **Net income (loss) per common share, basic and diluted** | | |
| Continuing operations | $ (0.04) | $ (0.02) |
| Discontinued operations | $ (0.01) | $ (0.03) |
| **Weighted average shares outstanding, basic and diluted** | 325,659 | 321,250 |

# agilon health, inc.

**Condensed Consolidated Statements Of Cash Flows**

**In thousands, except per share data**

**(unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (15,151) | $ (16,099) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 3,481 | 3,363 |
| Stock-based compensation expense | 1,472 | 1,071 |
| Loss on debt extinguishment | 1,186 | — |
| Other noncash items | 1,766 | 837 |
| Changes in operating assets and liabilities | (33,582) | (15,299) |
| Net cash provided by (used in) operating activities | (40,828) | (26,127) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (178) | (345) |
| Purchase of intangible assets | (3,986) | (33) |
| Investment in loans receivable and other | (1,204) | (359) |
| Proceeds from repayment of loans receivable | — | 1,056 |
| Proceeds from sale of business, net of cash divested | (3,706) | — |
| Net cash provided by (used in) investing activities | (9,074) | 319 |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | — | 28,128 |
| Proceeds from exercise of stock options | 165 | — |
| Proceeds from the issuance of long-term debt | 100,000 | — |
| Debt issuance costs | (1,218) | — |
| Repayments of long-term borrowings | (68,649) | (760) |
| Net cash provided by (used in) financing activities | 30,298 | 27,368 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (19,604) | 1,560 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | 135,178 | 139,152 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | 3,917 | 6,460 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 139,095 | 145,612 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of period | 119,491 | 142,563 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of period | — | 4,609 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 119,491 | $ 147,172 |

**APP 166**

**agilon health, inc.**
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2021 | 2020 |
| Medical services revenue | $ 412,412 | $ 289,814 |
| Medical services expense | (360,354) | (247,653) |
| Medical margin | $ 52,058 | $ 42,161 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2021 | 2020 |
| Platform support costs | $ 28,408 | $ 23,520 |
| Geography entry costs[1] | 3,222 | 652 |
| Severance and related costs | 454 | 2 |
| Management fees[2] | 375 | 330 |
| Stock-based compensation expense | 1,472 | 1,021 |
| Other[3] | 3,846 | 2,080 |
| General and administrative | $ 37,777 | $ 27,605 |

(1)     Represents physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies for which we are contracted to go live in January of the following year.

(2)     Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R"). In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3)     Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

*NETWORK CONTRIBUTION*

|  | Three Months Ended March 31, | | | |
|  | 2021 | | 2020 | |
|---|---|---|---|---|
| Income (loss) from operations | $ | (12,115) | $ | (5,834) |
| Other operating revenue | | (692) | | (1,234) |
| Other medical expenses | | 23,661 | | 18,426 |
| Other medical expenses—live geographies[1] | | (21,916) | | (17,421) |
| General and administrative | | 37,777 | | 27,605 |
| Depreciation and amortization | | 3,427 | | 3,198 |
|    Network contribution | $ | 30,142 | $ | 24,740 |

[1]   Represents physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies for which we are contracted to go live in January of the following period. For the three months ended March 31, 2021 and 2020, costs incurred in implementing geographies were $1.8 million and $1.0 million, respectively.

*ADJUSTED EBITDA*

|  | Three Months Ended March 31, | | | |
|  | 2021 | | 2020 | |
|---|---|---|---|---|
| Net income (loss) | $ | (15,151) | $ | (16,099) |
| (Income) loss from discontinued operations, net of income taxes | | 1,415 | | 8,238 |
| Interest expense | | 2,941 | | 2,149 |
| Income tax expense (benefit) | | 16 | | 0 |
| Depreciation and amortization | | 3,427 | | 3,198 |
| Geography entry costs[1] | | 4,967 | | 1,658 |
| Severance and related costs | | 454 | | 2 |
| Management fees[2] | | 375 | | 330 |
| Stock-based compensation expense | | 1,472 | | 1,021 |
| Other[3] | | 3,846 | | 2,080 |
|    Adjusted EBITDA | $ | 3,762 | $ | 2,577 |

[1]   Represents direct geography entry costs, including investments to develop and expand our platform, physician incentive expense, employee-related expenses and marketing. For the three months ended March 31, 2021 and 2020, (i) $1.8 million and $1.0 million, respectively, are included in other medical expenses and (ii) $3.2 million and $0.7 million, respectively, are included in general and administrative expenses.

[2]   Represents management fees and other expenses paid to CD&R. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

[3]   Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner incentive and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for

greater transparency with re                                similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly-titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP of Investor Relations
investor.relations@agilonhealth.com

**Media Contact**
Shannan Siemens
Managing Director, Mercury
media@agilonhealth.com

**APP 169**

# EXHIBIT 4

C Corrected Transcript

27-May-2021

# Agilon Health, Inc. (AGL)

**Q1 2021 Earnings Call**



1-877-FACTSET    www.callstreet.com

Total Pages: 18

Copyright © 2001-2021 FactSet CallStreet, LLC

## Agilon Health, Inc. *(AGL)*
Q1 2021 Earnings Call

 Corrected Transcript
27-May-2021

# CORPORATE PARTICIPANTS

**Matthew Dale Gillmor**
*Vice President of Investor Relations, Agilon Health, Inc.*

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

**Timothy S. Bensley**
*Chief Financial Officer, Agilon Health, Inc.*

# OTHER PARTICIPANTS

**Lisa C. Gill**
*Analyst, JPMorgan Securities LLC*

**Justin Lake**
*Analyst, Wolfe Research LLC*

**Kevin Fischbeck**
*Analyst, BofA Securities, Inc.*

**Ryan Daniels**
*Analyst, William Blair & Co. LLC*

**George Hill**
*Analyst, Deutsche Bank Securities, Inc.*

**Stephen Baxter**
*Analyst, Wells Fargo Securities LLC*

**Sandy Draper**
*Analyst, Truist Securities, Inc.*

# MANAGEMENT DISCUSSION SECTION

**Operator**: Good day, and thank you for standing by. Welcome to the agilon health First Quarter 2021 Earnings Conference Call. At this time, all the participants are in a listen-only mode. After the speakers' presentation, there will be a question-and-answer session. [Operator Instructions]

I would now like to hand the conference over to your host, Matthew Gilmore, Vice President of Investor Relations. Please go ahead.

## Matthew Dale Gillmor
*Vice President of Investor Relations, Agilon Health, Inc.*

Thank you, operator. Good morning, everyone, and welcome to agilon health first quarter 2021 earnings conference call. With me this morning is our CEO, Steve Sell; and our CFO, Tim Bensley. Following prepared remarks from Steve and Tim, we'll conduct a Q&A session.

Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss in this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP

Copyright © 2001-2021 FactSet CallStreet, LLC

# Agilon Health, Inc. *(AGL)*
## Q1 2021 Earnings Call

 Corrected Transcript
27-May-2021

financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

With that, I'll turn the call over to Steve. Steve?

---

## Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

Thanks, Matt. Good morning, everyone, and thank you for joining our first earnings conference call as a public company. I'd like to start by welcoming our new shareholders. We really enjoyed meeting many of you last month on the IPO roadshow and appreciate the trust you've placed in agilon.

We're doing today's call from Columbus, Ohio which is home to our founding partner medical group, Central Ohio Primary Care. COPC is the largest independent primary care group in the country and, like all of our partner groups, is a leader in their community. In Columbus, as in all of our markets, agilon health is co-located with our partner groups and our employees work each day to enable our physician partners to transform the health of their local community.

We take our mission seriously to be the trusted long-term partner of community-based doctors. Today, our partner spans 17 diverse geographies and provide integrated total care to nearly 275,000 senior patients on the agilon platform. And while the last 15 months with the COVID pandemic have been extremely difficult for our senior patients, the dedication, innovation, and perseverance of our physician partners and our employees has been extraordinary and I could not be more proud of the positive impact they have made on patient and community health.

I will cover four areas in my prepared remarks. First, some background on agilon. Second, some highlights on our first quarter results. Third, an update on a new program, Direct Contracting. And fourth, our priorities following last month's IPO. Tim will provide a more detailed review of the numbers in our guidance. And after that, we'd be happy to answer your questions.

Some background on agilon and our strategy. Our focus is enabling primary care doctors to be the agent for transforming healthcare at the community level. We do this in a unique way by partnering with leading independent physician groups and entering into long-term exclusive joint venture agreements that focus on their senior patients in Medicare Advantage and, starting last month, in Direct Contracting.

Our partnerships move existing doctors, senior patients, and payers from a fee-for-service model to a long-term, value-based subscription model, in which the primary care doctor is responsible for a patient's total care, cost, and quality. Our platform and partnership provide doctors with information, resources, and time they need to meaningfully improve their patients' health, while aligning physician practice economics with improved patient outcomes.

In just four-and-a-half years, the momentum in the business is tremendous. We've entered into long-term partnerships across 17 diverse geographies, 11 of which are revenue-producing today, and 6 of which we're implementing for 2022. With our partners, we have nearly 225,000 Medicare Advantage patients and 50,000 Direct Contracting patients on the platform.

Our business model has three distinct components; platform, partnership, and network. The agilon platform includes people, process, capital, and technology, and provides the capabilities that are required to succeed in a value-based model such as payer contracting and clinical programs. Our platform is portable and scalable across

---

**APP 173**

## Agilon Health, Inc. *(AGL)*
### Q1 2021 Earnings Call

 Corrected Transcript
27-May-2021

markets. Through our long-term partnership with physician groups, we operate a new line of business focused on Medicare.

When our partnership generates a surplus by improving health outcomes of senior patients, we split it with our physician partners. Our platform and partnership model is deployed in a common way across markets and our success has created a growing network of like-minded entrepreneurial physician groups that are both learning from each other and constructively challenging one another.

With our approach, all stakeholders are winning. Patients and physicians report world-class Net Promoter Scores. Physicians are able to practice medicine the way they were trained to and access recurring subscription economics tied to the long-term health outcomes of their patients. Payers experience consistent growth and gross margins, while enjoying higher patient quality scores and retention. And Medicare and local communities benefit through more sustainable primary care and effective management of healthcare costs.

The financial attributes of our model are highly attractive. Our business is capital light. Member acquisition costs start at a relatively low level and then decline within a geography over time. Our same geography growth is driven by patients within existing physician panels choosing MA or new physicians join their anchor partner.

We don't spend money on brick-and-mortar or sales and marketing. This results in a highly efficient growth model with extremely strong returns on investment. Because our partners are leaders in their community and have scale at the local level, we have multiple levers to improve outcomes outside of the primary care office. This makes our model successful in diverse markets with varying plan offerings, which supports our ability to access a broad total addressable market.

We have a high degree of visibility into future revenues and margin progression. From a revenue perspective, we implement new geographies up to 12 months in advance. For example, during 2021, we are currently implementing the six new geographies I mentioned with approximately 49,000 new members. These new geographies will start generating revenue in 2022.

70% of our current members have been on the platform less than three years. As these members mature on the platform, we believe this provides high visibility to consistent medical margin expansion over the next several years. The success of our early partners in terms of sustaining both strong membership and medical margin growth gives us confidence that we can successfully scale our platform into additional geographies.

Now, let me discuss a few highlights from our first quarter results. We're pleased with our quarterly performance. Adjusted for the retroactive group MA contract, revenue growth was 50% and membership growth was 42%. We also reported positive year-over-year gains in medical margin, network contribution, and EBITDA. Same geography membership growth, a key differentiator on our model was 15% including the retroactive group contract.

In one of our markets, a group Medicare Advantage contract covering about 9,000 members shifted between two national payers effective January 2021. While we work with both health plans in multiple geographies, we did not have a contract in place with the receiving payer covering these members at the beginning of the year, primarily because of the timing required to complete the transition.

As a result, these members are not reflected in our first quarter financial results. We were pleased to complete a new multi-year agreement covering this membership within the past several weeks, and we expect to recognize some retroactive revenue during the second quarter. Most importantly, patients covered by this group plan were

Copyright © 2001-2021 FactSet CallStreet, LLC

**APP 174**

# Agilon Health, Inc. (AGL)
## Q1 2021 Earnings Call

 Corrected Transcript
27-May-2021

under the continuous care of their primary care doctor during the transition from 2020 into 2021. We think this helps to underscore the very sticky relationship between our physician partners and their patients and the power of our multi-payer model on patient retention and experience.

From a new market perspective, three new partners in Hartford, Buffalo and Toledo went live on the agilon platform in January 2021, covering approximately 33,000 members. Additionally, we signed six new partners to definitive agreements covering 49,000 members during the first quarter. These six partners began implementation on the agilon platform in late 2020 or early this year and will generate revenue starting in January 2022.

Our development team is now focused on signing letters of intent for new groups that will begin implementation during late 2021, early 2022 and generate revenue starting in January 2023. We are already in active dialogue with physician groups in multiple new states and markets and are encouraged by the growing and robust level of interest in partnering with agilon.

First quarter results also demonstrated the efficiency of our growth model, platform support costs, which includes local market and enterprise G&A, represent just 7% of revenue during the first quarter compared to 8% in the prior year. On a per member per month basis, platform support costs declined 11% year-over-year.

And now let me pivot to talk about Direct Contracting. On April 1, we launched five Direct Contracting Entities in conjunction with seven of our physician partners. These five DCEs cover more than 50,000 traditional Medicare patients in a value-based subscription model. And we believe agilon is one of the largest participants in this program. The agilon platform allows physician groups to operate a single line of business for their Medicare patients across both MA and direct contracting.

While it's still very early and government programs can change over time, our initial experience has been in line with our original expectations. Consistent with the idea of new government programs evolving over time, on April 8, the CMS Innovation Center announced its intention not to solicit applications for new DCEs for 2022. Despite this, we will be able to utilize existing DCEs as well as our four deferred DCEs as a vehicle for new or existing physician groups to participate in the Direct Contracting program.

More recently on May 21, CMS announced that next gen ACOs will be eligible to apply for new DCEs for 2022. We take these announcements and the recent conversations with the Innovation Center as encouraging as we believe the direct contracting program is aligned with the administration's goal of advancing primary care centric value-based care.

Finally, I'd like to touch on some key priorities following our IPO last month. We plan to increase our investments in the agilon platform and support our overall growth strategy both with our existing partners and current geographies and with new partners in new markets. In terms of technology platform investments, a key focus for us is to enhance our data ingestion and normalization capabilities which we expect, among other things, to accelerate clinical insights and further improve areas such as member attribution. We expect these technology investments will also improve internal efficiency and the scalability of our platform.

As an example, we recently deployed a referral insight program in our Akron market, which provides important cost and quality information about specialist care to our primary care partners. In just two months, our physician partners in Akron have increased referrals to identified high value cardiologists from 37% to 60%. While we're still early with this initiative, we expect our referral insight program will have a positive impact on patient outcomes.



## Agilon Health, Inc. *(AGL)*
Q1 2021 Earnings Call



Corrected Transcript
27-May-2021

From a growth perspective, the IPO not only increased agilon's capitalization, but it also increased the capital available for our physician partners to improve care delivery and accelerate growth in their markets. Our partners, through agilon, are now effectively some of the best capitalized physician groups in the country. Together, we can accelerate the transformation of care delivery for seniors. We see a tremendous runway in front of us and are excited to help more doctors, more senior patients, and more communities.

With that, I'll turn the call over to Tim.

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*

Thanks, Steve, and good morning, everyone. As Steve, mentioned we're pleased with our first quarter results. I'll review some highlights from our financial statements then provide an updated view on our cash and debt position post-IPO, as well as some details on our guidance for the second quarter and full-year 2021.

Starting with membership. Membership increased by 35% on a year-over-year basis during the first quarter to approximately 165,000. Including the recently completed group Medicare Advantage contract, membership at the end of Q1 would have increased 42% to approximately 174,000. Membership growth was driven by a combination of same geography growth and the impact from three new geographies that went live on the platform in January. Same geography membership growth was 8% for the first quarter and including the recently completed group contract, same geography membership growth was 15%.

Aside from the geography temporarily impacted by the group MA contract transition, all of our geographies grew membership at or above the national trend for MA enrollment growth. Several of our geographies were well above the national trend. As we previously discussed, a group Medicare Advantage contract in one of our geographies shifted from one national payer to another in January. This included about 9,000 patients attributed to our partners.

We completed an agreement during the second quarter with a new MA payer covering these members. These members are not included in our first quarter financial results, but will be included in our second quarter results including retroactive revenue and costs associated with the first quarter. We expect the retroactive revenue associated with the first quarter to be approximately $24 million.

Subsequent to the end of the quarter, we launched five Direct Contracting Entities with seven partners covering over 50,000 members. As a reminder, the revenue and costs for these members will not be consolidated in agilon's financial results. Including the estimated 49,000 members currently in implementation for 2022 go live as well as 50,000 Direct Contracting members, total membership on the agilon platform is now approaching 275,000.

Revenues increased 42% on a year-over-year basis to $413 million during the first quarter. Revenue growth was primarily driven by membership gains, the suspension of the Medicare sequester, and changes to CMS county benchmarks and member acuity or burden of illness.

On a per member per month basis, revenue increased 5.3%. Medical margin increased 23% during the first quarter to $52 million compared to $42 million in the prior year. Consolidated medical margin on a PMPM basis was $106 compared to $116 in the prior year. Medical margin PMPM performance reflects a number of factors including the positive impact from clinical programs deployed through the agilon total care model, the maturation of members that have not been on the platform – that have been on the platform for a longer period of time and lower non-COVID utilization. This was offset by the dilution from new members which typically start at a lower medical margin and COVID-related costs, which were higher in the earlier part of the quarter.


Network contribution, defined as medical margin less partner sharing and other medical expenses, increased 22% during the quarter to $30 million compared to $25 million in the prior year. All of our new geographies were profitable on a medical margin and network contribution basis during the first quarter, which demonstrates the efficiency of our growth and the implementation model.

Platform support costs, which include market and enterprise level G&A, increased 21% to $28 million. The increase in platform support costs was well below our revenue growth rate, highlighting the very light overhead structure that is associated with our partnership model. As a percent of revenue, platform support cost was 7% during the first quarter, down from 8% in the prior year. On a PMPM basis, platform support cost declined 11% to $58 compared to $65 in the prior year.

Adjusted EBITDA for the quarter was $4 million, which compared to $3 million in the prior year. The increase to adjusted EBITDA primarily reflects the higher medical margin and leverage against our platform support costs.

Turning to our balance sheet and cash flow, we ended the quarter with $105 million in cash and $100 million of debt outstanding under our secured term loan. Cash flow from operations during the quarter reflects a use of $41 million compared to a use of $26 million the prior year. The increase in net use of cash was primarily driven by the transition from a delegated claims payment model to a non-delegated model with a health plan in one of our geographies. Following the completion of our IPO on April 19, we have approximately $1.1 billion of cash and $50 million of debt outstanding under our term loan.

Turning to our financial guidance for the second quarter of 2021, for the second quarter, we expect ending membership in a range of 175,000 to 177,000 and revenue in a range of $470 million to $475 million. It is important to keep in mind our second quarter guidance includes the revenue and costs from the group MA contract we discussed earlier including retroactive amounts that are associated with the first quarter. We estimate the retroactive revenue and membership will be approximately $24 million and 9,000 members, respectively.

During the second quarter, we will also recognize one-time expenses associated with the completion of our IPO including $275 million in non-cash compensation associated with the issuance of stock to our physician partners. These one-time expenses will be excluded from our adjusted EBITDA. Finally, platform support costs will increase sequentially in the second quarter reflecting the ongoing public company costs such as increased D&O insurance.

For the full-year 2021, we are expecting ending membership in a range of 182,000 to 184,000, revenue in the range of $1.765 billion to $1.78 billion, and adjusted EBITDA loss of $41 million to $38 million. We expect revenue growth will be driven by similar factors that drove growth during the first quarter. From an EBITDA perspective, we expect non-COVID costs will increase on a year-over-year basis as vaccination rates rise and people feel more comfortable utilizing the healthcare system.

We anticipate this dynamic along with the increased platform support will more than offset the positive impact from members maturing on the platform resulting in lower medical margin PMPM in 2021 compared to 2020. As a result, we expect the adjusted EBITDA losses reflected in our guidance will be weighted towards the second half of the year.

With that, we're now ready to take your questions. Operator?



**APP 177**

## Agilon Health, Inc. (AGL)
### Q1 2021 Earnings Call

# QUESTION AND ANSWER SECTION

**Operator**: [Operator Instructions] Your first question is from the line of Lisa Gill with JPMorgan.

**Lisa C. Gill**     Q
*Analyst, JPMorgan Securities LLC*

Hi. Thanks very much and good morning. Congratulations on your first public quarter. Steve, I just want to go back to some of the comments around the medical margin and just kind of understand a couple things a little bit better. One, can you just maybe bifurcate the new versus the existing, more mature member when we think about the cost of those individuals? Number one.

And number two, I know Tim made a comment around COVID costs. Can you talk about what you saw for COVID costs in the first quarter and then the comments of non-COVID costs coming back? How do we think about the progression of medical costs for the second, third, and fourth quarter of this year?

**Steven J. Sell**     A
*Chief Executive Officer & Director, Agilon Health, Inc.*

Sure. Maybe I can start and Tim can fill in on that. So, I think we're pleased by continuing to see medical margin improvement in our recurring members, those that were with us four quarters ago. And so, that improved nicely. There's a dilutive effect that comes in from the new members that are coming on the platform which is reflected in the quarter and the strong growth has some of the effect on the medical margin.

Lisa, in terms of kind of the seasonality, we do expect to see a step-up in costs in the back half of the year as the country reopens. The vast majority of that is, I would call, tied to non-COVID utilization. We're seeing extremely high vaccination rates with our seniors. We expect that it's above the national average, which is now almost at 80% in terms of seniors with at least one shot and in the low-70s with those at two shots. Many of our communities are higher than that. So, we don't expect the COVID-related costs to be spiking up as much but there was some of that within the quarter that Tim can talk to.

**Timothy S. Bensley**     A
*Chief Financial Officer, Agilon Health, Inc.*

Yeah. Absolutely. Hey, Lisa. Good morning and thanks for the question. Just to amplify a little bit on what Steve said, I think the best way to think about the first quarter is, first of all, yeah, we're really happy with the overall increase in medical margin to $52 million, up $10 million year-over-year. On a PMPM basis, I think Steve did a good job of walking through the cause of change. We're seeing an increase in medical margin on a PMPM basis for our retained members on a year-over-year basis where that's obviously diluted by the high same geography growth in new members coming in as well as the 33,000 new members that we brought in in new geographies. So, both of those kind of diluting that number.

And then we did see some – continue to see some lower utilization in Q1 versus sort of our 2019 baseline, but still overall COVID utilization – our overall utilization in Q1, a bit higher than it was during the first quarter of last year, so that's still a bit of a headwind as well. So, the combination of that kind of drove the first quarter medical margin PMPM change over year ago.

APP 178

## Agilon Health, Inc. *(AGL)*
Q1 2021 Earnings Call

**C** Corrected Transcript
27-May-2021

And, yes, [ph] we worked through (00:25:53) the rest of the year a couple of factors; we expect to see utilization sort of start to track back towards that 2019 baseline as we move through the rest of the year. So, probably a bit better in Q2, but started to move back towards the 2019 levels in the second half of the year. And so, you can get a pretty good idea of the seasonalization of what we expect for medical margin and adjusted EBITDA from the adjusted EBITDA guidance that we've given.

I would expect that both medical margin and adjusted EBITDA will decline versus Q1 on an absolute basis in each of the subsequent quarters. But based on the real heavy overlap of COVID, we expect most of that EBITDA loss to be weighted towards the second half of the year. And one thing to just remember, as you're looking at that EBITDA progression, one of the things that I mentioned was and we are going to see some increase in platform support cost starting in the second quarter as well, that will be a driver of that, primarily related to the costs associated with being a new public company. We mentioned, for instance, significantly higher costs, for instance, for D&O insurance.

---

**Lisa C. Gill**
*Analyst, JPMorgan Securities LLC*

**Q**

Okay. Great. Thank you.

---

**Operator**: Your next question is from the line of Justin Lake with Wolfe Research.

---

**Justin Lake**
*Analyst, Wolfe Research LLC*

**Q**

Yeah. Thanks. Good morning. Wanted to go through the membership numbers in a little bit of detail. So, just looking at your year-end membership of 131,000 that included the 9,000 group MA, right. You had that in your membership at the end of the year, correct?

---

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

**A**

That's correct, Justin.

---

**Justin Lake**
*Analyst, Wolfe Research LLC*

**Q**

Good. So, then if I look at your guidance, you're assuming a little over 50,000 members or patient growth year-over-year and it looks like it's about evenly split between new markets and kind of same markets, right?

---

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

**A**

Yes. 33,000 from new markets and the balance from same geography growth.

---

**Justin Lake**
*Analyst, Wolfe Research LLC*

**Q**

Okay. Yeah, because you'd have to add the 9,000 would be also – okay, so new markets 33,000, so then call it 20,000, low-20s. So, that puts you at kind of high-teens membership growth on the same market, give or take, I think. Can you break it down for us between the existing docs, what you were talking about just core market growth and then the benefit from adding new docs that is part of the model...

---

**APP 179**

# Agilon Health, Inc. *(AGL)*
Q1 2021 Earnings Call

 Corrected Transcript
27-May-2021

[indiscernible] (00:28:30)

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yeah, Justin. I mean, it's almost half and half in terms of what we're seeing for the year in that sort of bread and butter core agents, people turning 65, choosing Medicare Advantage or fee-for-service conversions. And then, the other half being with new physicians joining in the existing markets, which we're already in.

### Justin Lake
*Analyst, Wolfe Research LLC*

Q

Okay. Great. And then, lastly, can you talk a little bit about the pipeline for 2023, both in terms of kind of how it looks now versus, let's say, the last couple of years? And then, the timing that investors should expect for you to be sharing kind of new – those new adds as they kind of happen through the year? When do you kind of typically sign those contracts? Thanks.

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yeah. Happy to do that. And I tried to lay out some of that in my prepared remarks. So, let me start by saying I think the 2023 pipeline is strong, it's robust, and we're seeing interest in new cities within our existing states, as well as a number of new states which are out there and I would say that that pipeline has only grown over the course of the last couple of months.

As per usual, our current partners have made introductions to a number of folks. Our business development team has done a great job identifying groups. But we're also seeing a higher level of inbound folks that we hadn't necessarily identified before that are aware of agilon and the partnership approach that we bring, and there's a lot of interest in that. So, I think it's strong and we're in active dialogue right now with a number of those groups.

In terms of kind of the timeline that you asked about, our biz dev team is really focused on signing letters of intent with these new partners for 2023, new geographies in the back half of this year. Immediately, once we have those letters of intent, we'll go into implementation because as we've shared, we really like to have up to a full year to be able to implement around that.

And then, next year, we will be signing definitive agreements with those groups. And our plan is to sort of share that at one time, Justin, in terms of those partners for 2023 and what that associated membership looks like. In the meantime, I think we point back to what we've shared previously about new geography members at about 40,000 for 2023 and that's what I'd point to, but we will be giving updates on that. And you didn't ask about 2022 but we've got those six new partners in geographies with the 49,000 members that we talked about. And as we move to the back half of this year, we'll be signing payer contracts and giving an update on that on our Q4 call in terms of what that looks like as well. So, that's kind of how the new markets are rolling out and what that timeline will look like.

### Justin Lake
*Analyst, Wolfe Research LLC*

Q

And I'm sorry, Steve. Just you mentioned the – you mentioned you'll be signing these payer contracts on the 49,000.

**APP 180**

## Agilon Health, Inc. *(AGL)*
Q1 2021 Earnings Call

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*



Yeah.

### Justin Lake
*Analyst, Wolfe Research LLC*

Q

Should I read that as you saying that the six groups that you signed up, the 49,000 patients that you've assumed probably had some discount in it for an assumption that you don't sign up every payer 411, but as you roll that forward you'll give us an update and there could actually be some upside to that number...

[indiscernible] (00:32:41)

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*



Yeah, I think that's a fair way to – we're comfortable with the 49,000 and we'll be updating that based on the progression with these payers. We'll be at – we have 16 payers today, Justin, and we'll be adding quite a few for 2022 given these new geographies that we're going into. And as we get into that, we always get more information. We're able to refine that.

### Justin Lake
*Analyst, Wolfe Research LLC*



Great. Guys, appreciate all the color.

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yes. No problem.

**Operator**: Your next question is from the line of Kevin Fischbeck with the Bank of America.

### Kevin Fischbeck
*Analyst, BofA Securities, Inc.*



Great. Thanks. We've heard a few companies talk about coding being a headwind I guess. How are you thinking about that in your business if it has been a headwind at all this year. If it has, how do you think about capturing that next year?

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*



Yes. So, I think folks have talked about the challenges of the pandemic, creating some headwind in terms of being able to capture codes. I think it's a real strength of our model, Kevin, that we have this physician-patient type relationship. We're able to maintain that through the pandemic both in terms of in-person and in terms of telehealth. And so, we are very strong from an annual wellness visit perspective, very strong from a reassessment perspective.

So, as it relates to activity last year for this year and activity for this year for next year, we have not seen maybe the headwind that some others have talked about. Just to remind you, we don't do in-home nurse-based

Copyright © 2001-2021 FactSet CallStreet, LLC

**APP 181**

## Agilon Health, Inc. *(AGL)*
### Q1 2021 Earnings Call

Corrected Transcript
27-May-2021

assessments for purposes of burden of illness or RAF. And that is an area that I think was much more challenged throughout the pandemic.

---

### Kevin Fischbeck
*Analyst, BofA Securities, Inc.*                                                          Q

Okay. That's great. And then, I guess, the MA contract as you guys were able to, I guess, transfer works well for you this time, I guess. What's the risk that you – in the future there's another large contract that shifts? I guess, A, how much visibility do you have into that? When do you know about this shift? And then, B, what's your track record on being able to keep contracts like this?

---

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*                                  A

Yeah, I mean, I think the group contracts don't move all that often. We don't have a ton of group business. So, it's somewhat limited by that. But when they do move, it's not uncommon to have this sort of long-term drawn out relationship, I think, in terms of process. In terms of exposure, I think it kind of speaks to the power of our model, right. So, when group contracts move, typically, the receiving payer wants [ph] domain (00:35:47) continuity particularly for seniors. And the power of this sticky patient-physician relationship and the multi-payer approach that we've got really allows us to support that in a meaningful way.

And so, I think as we look out, we did know about this one in advance, and we will know about other ones as they approach. But again, Kevin, they don't happen all that often. But I think given our approach, we believe that we're in a pretty strong position. Our partner, our leaders in their community and for the group contracts that they've got today, those patients and their sponsors are going to want to keep that relationship.

---

### Kevin Fischbeck
*Analyst, BofA Securities, Inc.*                                                          Q

All right. Great. Thanks.

---

### Matthew Dale Gillmor
*Vice President of Investor Relations, Agilon Health, Inc.*                                A

Thanks, Kevin.

---

**Operator**: Your next question is from Ryan Daniels with William Blair.

---

### Ryan Daniels
*Analyst, William Blair & Co. LLC*                                                        Q

Yeah. Guys, thanks for taking the question. Congrats on the first quarter out of the box. Can you speak a little bit more, Steve, to the investments you're making in regards to the referral management program? I assume number one outside of maybe oncology, cardiology is probably a fairly large specialty cost. So, a little bit about the potential to drive medical margins and how quickly something like that can be replicated and rolled out throughout the network. Thanks.

---

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*                                  A

Yeah. No. Thanks for the question, Ryan. I mean I think it's a great point. I think the fact that we're able to develop these programs and run them through our partnerships gives us an ability to affect an awful lot of markets. The

---

## Agilon Health, Inc. *(AGL)*
### Q1 2021 Earnings Call

Corrected Transcript
27-May-2021

specialty referral insight program that we talked about in the remarks was specifically in Akron around cardiology. And when you have a cardiac condition, you're with your cardiologist for a while. And so, the ability to increase referrals to these top tier specialists that have substantial cost savings, it can be as much as $100 per member per month for those cardiology patients, is really substantial and that would be across a long period of time.

But the insight program provides that primary care doctor at the point of referral information on those top tier specialists. And its cost savings but at equivalent or better quality, which is a really important component of it. It's exportable to other markets, but it's exportable to other specialties, oncology, GI, just to name a few. And so, the components that we're building around this, I think, give us that opportunity.

---

### Ryan Daniels
*Analyst, William Blair & Co. LLC*

Q

Great. That's very helpful color. And then a little bit off the cuff question, but I'm curious with the increased exposure as a public company that you're getting kind of notoriety. Is that actually opening up the partner recruiting pipeline at all where there's more inbound? I think you mentioned [audio gap] (00:38:56) just the market reality of MA or are you actually getting a little bit more inbound interest now given your growth and success in markets? Thank you.

---

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yes. No. Thanks for the follow-up. I think it's a little bit hard to separate exactly what's driving that. We are definitely seeing a step-up in terms of the inbound activity. Obviously, we do have a higher profile and that could be a part of it. But I think it's just a reflection of this interest in the move to value specifically for that over 65 Medicare population, and for independents who want to remain independent, which is a key differentiator for us. So, I think it's a combination of those factors that's driving it, but it has definitely stepped up in the last couple of months.

---

### Ryan Daniels
*Analyst, William Blair & Co. LLC*

Q

Okay. Great. Thank you, guys.

---

### Matthew Dale Gillmor
*Vice President of Investor Relations, Agilon Health, Inc.*

A

Thanks, Ryan.

---

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*

A

Thanks, Ryan.

---

**Operator**: Your next question is from the line of George Hill with Deutsche Bank.

---

### George Hill
*Analyst, Deutsche Bank Securities, Inc.*

Q

Good morning, guys, and thanks for taking the question. I guess I wanted to jump in with one on Direct Contracting. I wanted to just affirm that the – any kind of economic impact from Direct Contracting is still not

---

## Agilon Health, Inc. (AGL)
### Q1 2021 Earnings Call

included in the numbers for fiscal 2021. But, I guess, can you talk about when do you start to include, maybe when does it become material? And I'll start right there. Thank you.

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Do you want me to give the macro or do you want to give – why don't you answer...

[indiscernible] (00:40:30)

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*

A

Let me answer [ph] the specific (00:40:31) question. Then, maybe Steve you can come back and give some macro comments about DC. But yeah, so overall the economic impact of DC will be in our 2021. We just won't consolidate those results. So, you just see the net impact into the P&L. But your point, for the full year, we expect the impact of D.C. to be relatively slight loss to break even. So, you won't see a big impact in the 2021 results from that, but it will be actually in our results just not a big bottom line impact.

### George Hill
*Analyst, Deutsche Bank Securities, Inc.*

Q

Okay. Can you kind of quantify the top line expectation?

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*

A

We're not going to consolidate revenue, so there won't be any top line impact at all from DC.

### George Hill
*Analyst, Deutsche Bank Securities, Inc.*

Q

Okay. And then, yeah, Steve, would love kind of your comments on the macro front...

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yeah, I mean, just the context that I would give you is it's a new government program, right. So, it's subject to change, it's a six-year program and it started last month. So, I mean, we're literally in the early days. I think our initial view on performance is kind of in line with expectations and attribution. But we did talk with the Innovation Center just this week and I think they were very clear about this as part of their approach to how they can drive more primary care centric value-based care. And so, that's encouraging for us.

And I think they want this to be a successful program from a cost to quality and an access standpoint. So, we spent a fair amount of time talking to them about this idea of keeping independent physicians independent, increasing primary care in communities, diverse communities around the country. And so, I think that's just the added context that I would give. And there is the option, as I mentioned, with our DCEs to add in for January of 2022 and any of the membership numbers that we've talked about do not reflect that.

### George Hill
*Analyst, Deutsche Bank Securities, Inc.*

Q

That's helpful. Thank you.

# Agilon Health, Inc. *(AGL)*
Q1 2021 Earnings Call

**Operator**: Your next question is from the line of Stephen Baxter with Wells Fargo.

### Stephen Baxter
*Analyst, Wells Fargo Securities LLC*



Hey. Good morning. Thanks for the questions. So, as we look at the payer disclosures in your Q, it looks like the growth for your largest payer was fairly modest sort of well below the same geography growth that you saw. I was wondering if there's anything worth highlighting there about what that payer is doing, perhaps that was impacted by this group Medicare Advantage transaction...

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*



Yeah. Yes, it was, Steve.

### Stephen Baxter
*Analyst, Wells Fargo Securities LLC*



And whether [indiscernible] (00:43:02) about other – yeah. Sorry, go ahead.

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*



Yeah. Hey, Stephen. Yeah. Thanks. It's Tim. Yeah. 100% it doesn't have the – that is that payer and it doesn't have the $24 million retro revenue in it. So, when you put that revenue back in that payer's on par with the rest of the growth numbers on the page.

### Stephen Baxter
*Analyst, Wells Fargo Securities LLC*



Got it. Yeah. I was – go ahead.

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*



Well, Stephen, I mean I guess just the only other thing I would call out is we're up to 16 payers now. That number is going to go up again in 2020. So, just as kind of a trend, I think you are going to see – continue to see kind of a dilutive effect from regional payers that are coming on. I think we have fantastic partnerships with the nationals and we'll continue to grow with those. But it's going to be a balance in terms of what that looks like.

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*



And just specifically, you're talking about payer A in the release. If you put that $24 million retroactive and it would – it be about a 25% growth for that payer in the quarter.

### Stephen Baxter
*Analyst, Wells Fargo Securities LLC*



Perfect. That makes a lot more sense then. And then, you mentioned that you don't have a lot of group membership. I was wondering if you could talk about that a little bit and why that's the case, whether there's any structural barriers there and whether it could be more of an opportunity for you over time?

**APP 185**

## Agilon Health, Inc. *(AGL)*
### Q1 2021 Earnings Call

Corrected Transcript
27-May-2021

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Well, I think one is group's a minority in the country. And so, that's probably the biggest part of that. And so, that's what I was trying to call out is I don't think it's a big part of the membership overall. And then, two, it's group contracts don't move all that that often. So, that was really the point.

### Stephen Baxter
*Analyst, Wells Fargo Securities LLC*

Q

Got it. Okay. And then just one clarifying question on the pipeline for 2022. So, appreciate the color on the 49,000 members and some of the dynamics you were talking about an earlier question there. Should we think about the 49,000 members as those are the existing members today? Or as we think about what that will look like a year from now, is there also consideration that that would move higher as it relates to same market growth or those practices recruiting physicians in this calendar year? Thanks.

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yeah. I mean, like I said, I think we're comfortable with the 49,000 members. Those are members that are with those practices today in which our physician partners are seeing those and they would be, obviously, eligible for attribution. Need to get all those payer contracts done. And we'll refine that and let you know if there's some additional opportunity within that as we go forward. And then, there's also these partners are constantly growing within their communities and that can happen during implementation as well. So, that can be effective.

### Stephen Baxter
*Analyst, Wells Fargo Securities LLC*

Q

Got it. Thank you very much.

**Operator**: Okay. Your next question is from the line of Sandy Draper with Truist Securities.

### Sandy Draper
*Analyst, Truist Securities, Inc.*

Q

Thanks so much and good morning. A lot of questions have been asked. Maybe just [indiscernible] (00:46:16) question, rear look – rearview mirror looking but also forward. Last year, the new geography or geography entry costs were heavily weighted towards the fourth quarter. There was a pretty meaningful step up. When we're thinking about the new geographies you're already planning going to 2022, should we really think about the weighting towards the fourth quarter every year and that's where the bulk of the costs are? And is it really dependent on number of geographies? Could you actually have a situation where fewer geographies for whatever reason, there's more cost? Just trying to think about longer term how to be thinking about those geography entry costs. Thanks.

### Timothy S. Bensley
*Chief Financial Officer, Agilon Health, Inc.*

A

Yeah. It's a little – Sandy, thanks for the question. It's a little bit different for each geography and – but probably more a relationship with the number of members that we're bringing on than the number of geographies. It's not really dependent on the number of new partners as much as the number of members in each partner. Most of our new – our implementation costs are really the AWV incentives that we're paying to kind of get the system up and going during implementation.

APP 186

I think one of the things that drives it is just how much implementation time do you have. We're actually in pretty decent shape this year with a longer implementation time for most of those new members that'll be – or most of those new geographies and partners that'll be coming onboard in January of 2022. So, you would expect that those implementation costs or new geography costs this year would be more spread over the quarters than back-loaded into the second half of the year.

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

And I think there was some...

**Sandy Draper**
*Analyst, Truist Securities, Inc.*

Q

Okay. Great.

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

...COVID effect last year that made it a little bit more lumpy. It was just tough to be on the ground with partners earlier in in 2020 during those implementations. And so, that was probably some of the effect of that and getting control.

**Timothy S. Bensley**
*Chief Financial Officer, Agilon Health, Inc.*

A

And even the timing of when AWVs are complete [indiscernible] (00:48:11)...

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Yes. Correct.

**Timothy S. Bensley**
*Chief Financial Officer, Agilon Health, Inc.*

A

...but it should be – we're out there early this year in implementation with most of those partners. And so, you would expect it to be or we would expect it to be more evenly spread than back half-loaded as it was last year.

**Sandy Draper**
*Analyst, Truist Securities, Inc.*

Q

Okay. That makes a lot of sense. That's very helpful. Thanks again and congrats on a good first quarter.

**Timothy S. Bensley**
*Chief Financial Officer, Agilon Health, Inc.*

A

Sure. Thanks, Sandy.

**Steven J. Sell**
*Chief Executive Officer & Director, Agilon Health, Inc.*

A

Great. Thanks, Sandy.

APP 187

**Agilon Health, Inc.** *(AGL)*
Q1 2021 Earnings Call

 Corrected Transcript
27-May-2021

---

**Operator**: At this time, there are no further questions. I will now turn the call back to Steve Sell for any closing remarks.

---

### Steven J. Sell
*Chief Executive Officer & Director, Agilon Health, Inc.*

Great. I would just say thanks for the good questions in the discussion. We're obviously excited about our quarter and excited what's in front of us, and we look forward to speaking with each of you soon. So, thanks, everyone.

---

**Operator**: Thank you for joining today's conference call. You may now disconnect.

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2021 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.

**APP 188**

# EXHIBIT 5

EX-99.1 2 agl-ex99_1.htm EX-99.1



Exhibit 99.1

# agilon health Reports Third Quarter 2021 Results

*Revenue growth of 47%, driven by 43% growth in Medicare Advantage membership*

*Total membership growth of 83%, including Medicare Advantage and Direct Contracting*

*Raised 2021 guidance for membership, revenue, and Adjusted EBITDA*

*2022 total membership expected to grow 45%+, with 40%+ growth in Medicare Advantage*

**LONG BEACH, Calif., October 28, 2021** – agilon health, inc. (NYSE: AGL), the company transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients, announced results for the third quarter ended September 30, 2021.

**Third Quarter 2021 Results:**

 Total revenue of $459 million increased 47% from 2020, driven by 43% growth in Medicare Advantage membership and 15% growth in same geography membership.

 Total members live on the agilon platform increased 83% on a year-over-year basis to 236,500 as of September 30, including 184,100 Medicare Advantage members and 52,400 attributed Direct Contracting beneficiaries.

 Net loss of $36 million, compared to a net loss of $12 million in 2020.

 Medical Margin of $43 million, compared to $51 million in 2020.  The year-over-year change in part reflects the impact from COVID on healthcare utilization in the prior year quarter.

 Adjusted EBITDA of negative $14 million, compared to positive $2 million in 2020.

"Our third quarter performance and updated guidance demonstrates the power of our constantly improving platform and high-touch, high-visibility partnership model to shape the healthcare journey of senior patients and deliver predictable, quality outcomes," said Steve Sell, Chief Executive Officer. "With the continued momentum of the agilon network, we expect our total membership in 2022 will increase by more than 45%, as we foresee faster growth in new and existing geographies.  We are excited to support the continued expansion of a high-value primary-care model in a growing number of geographies, which will positively impact patients, physicians and communities."

**Outlook for Fiscal Year 2021:**

| | Year Ending December 31, 2021 | | | |
| --- | --- | --- | --- | --- |
| | Updated Guidance | | Previous Guidance | |
| | Low | High | Low | High |
| Ending MA Members | 185,000 | 186,000 | 184,000 | 185,000 |
| Ending DCE Members[1] | 50,000 | 52,000 | >50,000 | >50,000 |
| Total revenues ($M) | $1,820 | $1,825 | $1,810 | $1,820 |
| Adjusted EBITDA ($M)[2] | ($40) | ($37) | ($41) | ($38) |

[1]agilon's partnered Direct Contracting Entities (DCEs) are not consolidated within its financial results.  Previous guidance for DCE membership reflects attributed beneficiaries disclosed by management as of June 30, 2021.

[2]We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most comparable GAAP measure, and have not provided forward-looking guidance for net income (loss), because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation, that are not within our control or cannot be reasonably predicted.

*Platform Membership Details*

Total members live on the agilon platform as of September 30, 2021 was 236,500, an increase of 83% from 2020.  Total members live on the platform includes 184,100 Medicare Advantage members and 52,400 attributed Direct Contracting beneficiaries.

agilon's consolidated Medicare Advantage membership increased 43% from 2020, driven by contributions from new geographies and growth within same geographies.  Same geography membership growth was 15%, reflecting broad-based growth across markets and strong retention.  Average Medicare Advantage membership during the third quarter 2021 was approximately 184,000, an increase of 43% from 2020.

*Preliminary Membership Outlook for 2022*

agilon health expects total members live on the platform will increase by over 45% on a year-over-year basis during 2022, including over 40% growth for Medicare Advantage members and 60% growth for attributed Direct Contracting beneficiaries.  Based on our 2021 outlook for Medicare Advantage and Direct Contracting members, we expect over 340,000 members will be live on the agilon platform in 2022.

For Medicare Advantage, agilon anticipates 2022 ending membership will be over 260,000, supported by the addition of 50,000 members from six new geographies and low-to-mid-teens growth within same geographies.  agilon's membership outlook for Medicare Advantage in part reflects progress with new geography implementations, including health plan contracting, and contributions from additional groups joining the agilon network within same geographies.

For Direct Contracting, agilon expects seven additional physician groups with 30,000-35,000 attributed beneficiaries will participate in the program starting in January, bringing total attributed beneficiaries to 80,000-85,000.

**Webcast and Conference Call:**

agilon health will host a conference call and webcast to discuss third quarter 2021 results on Friday, October 29, 2021 at 8:30 AM Eastern Time. The conference call and webcast can be accessed by dialing (844) 200-6205 for U.S. participants, or +1 (929) 526-1599 for international participants, and referencing participant code 122631, or visiting the "Events & Presentations" section of https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients. Through our partnerships and our platform, agilon is leading the nation in creating the system we need – one built on the value of care, not the volume of fees. We honor the independence of local physicians and serve as their partners so they can be the doctors they trained to be. agilon provides the capital, data, payor relationships, executive experience and contract support that allow physician groups to take on the risk of total care for their most vulnerable patients. The result: healthier communities, and doctors who can devote the right amount of time with the patients who need it most. With rapidly growing appeal, agilon is scaled to grow and is here to help our nation's best independent physician groups have a sustained, thriving future. Together, we are reinventing primary care. For more information about agilon health, visit www.agilonhealth.com and connect with us on Twitter, Instagram, Linked In and YouTube.

**APP 191**

**Forward-Looking Statements**

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: (i) statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, dispositions, or other transactions discussed in this release; and (ii) statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plan including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operation strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market; the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us; security breaches, loss of data or other disruptions to our data platforms; the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; our substantial indebtedness and the potential that we may incur additional indebtedness; and risks related to other factors discussed under "Risk Factors" in our Registration Statement on Form S-1. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

---

**agilon health, inc.**
**Consolidated Balance Sheets**
**In thousands, except share and per share data**

| | September 30, 2021 | December 31, 2020 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,081,601 | $ 106,795 |
| Restricted cash and equivalents | 14,302 | 28,383 |
| Receivables, net | 342,500 | 144,555 |
| Prepaid expenses and other current assets, net | 14,463 | 9,639 |
| Current assets held for sale and discontinued operations, net | — | 4,825 |
| Total current assets | 1,452,866 | 294,197 |
| Property and equipment, net | 6,462 | 6,456 |
| Intangible assets, net | 58,147 | 60,468 |
| Goodwill | 41,540 | 41,540 |
| Other assets, net | 126,105 | 43,700 |
| Total assets | $ 1,685,120 | $ 446,361 |
| **LIABILITIES, CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 288,121 | $ 162,868 |
| Accounts payable and accrued expenses | 129,660 | 97,244 |
| Current portion of long-term debt | 5,000 | 3,041 |
| Current liabilities held for sale and discontinued operations | — | 3,682 |
| Total current liabilities | 422,781 | 266,835 |
| Long-term debt, net of current portion | 44,628 | 64,665 |
| Other liabilities | 90,272 | 90,091 |
| Total liabilities | 557,681 | 421,591 |
| Commitments and contingencies | | |
| Contingently redeemable common stock, $0.01 par value: 76,201 shares issued and outstanding at December 31, 2020 | — | 309,500 |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 391,548 and 249,374 shares issued and outstanding, respectively | 3,915 | 2,494 |
| Additional paid-in capital | 2,024,764 | 263,966 |
| Accumulated deficit | (900,956) | (551,190) |
| Total agilon health, inc. stockholders' equity (deficit) | 1,127,723 | (284,730) |
| Noncontrolling interests | (284) | — |
| Total stockholders' equity (deficit) | 1,127,439 | (284,730) |
| Total liabilities, contingently redeemable common stock and stockholders' equity (deficit) | $ 1,685,120 | $ 446,361 |

**agilon health, inc.**
**Consolidated Statements of Operations**
**In thousands, except per share data**
**(unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| **Revenues:** | | | | |
| Medical services revenue | $ 457,646 | $ 311,734 | $ 1,367,736 | $ 894,043 |
| Other operating revenue | 967 | 950 | 2,937 | 3,283 |
| Total revenues | 458,613 | 312,684 | 1,370,673 | 897,326 |
| **Expenses:** | | | | |
| Medical services expense | 414,202 | 260,933 | 1,217,039 | 728,949 |
| Other medical expenses | 29,454 | 26,325 | 86,809 | 79,512 |
| General and administrative | 34,683 | 30,368 | 114,001 | 91,200 |
| Stock-based compensation expense | 11,960 | 1,558 | 287,980 | 4,734 |
| Depreciation and amortization | 3,915 | 3,344 | 10,923 | 9,861 |
| Total expenses | 494,214 | 322,528 | 1,716,752 | 914,256 |
| **Income (loss) from operations** | (35,601) | (9,844) | (346,079) | (16,930) |
| **Other income (expense):** | | | | |
| Other income (expense), net | (269) | (469) | 4,034 | (421) |
| Interest expense | (867) | (1,953) | (5,306) | (6,182) |
| **Income (loss) before income taxes** | (36,737) | (12,266) | (347,351) | (23,533) |
| Income tax benefit (expense) | (256) | (35) | (707) | (74) |
| **Income (loss) from continuing operations** | (36,993) | (12,301) | (348,058) | (23,607) |
| **Discontinued operations:** | | | | |
| Income (loss) before income taxes | 1,117 | 584 | (1,781) | (11,845) |
| Income tax benefit (expense) | (82) | (110) | (211) | (385) |
| **Total discontinued operations** | 1,035 | 474 | (1,992) | (12,230) |
| **Net income (loss)** | (35,958) | (11,827) | (350,050) | (35,837) |
| Noncontrolling interests' share in (earnings) loss | 115 | — | 284 | — |
| **Net income (loss) attributable to common shares** | $ (35,843) | $ (11,827) | $ (349,766) | $ (35,837) |
| | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | |
| Continuing operations | $ (0.09) | $ (0.04) | $ (0.95) | $ (0.07) |
| Discontinued operations | $ — | $ — | $ (0.01) | $ (0.04) |
| **Weighted average shares outstanding, basic and diluted** | 391,229 | 324,563 | 365,018 | 324,068 |

**agilon health, inc.**
**Condensed Consolidated Statements Of Cash Flows**
**In thousands, except per share data**
**(unaudited)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (350,050) | $ (35,837) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 11,032 | 10,346 |
| Stock-based compensation expense | 287,980 | 4,918 |
| Loss on debt extinguishment | 1,590 | — |
| Loss (income) from equity method investments | (2,080) | (33) |
| Release of indemnification assets | — | 280 |
| Other noncash items | (111) | (276) |
| Changes in operating assets and liabilities | (47,623) | (19,263) |
| Net cash provided by (used in) operating activities | (99,262) | (39,865) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (3,164) | (1,257) |
| Purchase of intangible assets | (6,794) | (533) |
| Investment in loans receivable and other | (76,613) | (2,308) |
| Proceeds from repayment of loans receivable | 1,312 | 1,065 |
| Proceeds from sale of business and property, net of cash divested | (2,644) | 1,825 |
| Net cash provided by (used in) investing activities | (87,903) | (1,208) |
| **Cash flows from financing activities:** | | |
| Proceeds from initial public offering | 1,170,942 | — |
| Proceeds from other equity issuances, net | — | 33,590 |
| Proceeds from exercise of stock options | 1,606 | 814 |
| Repurchase of shares, net | — | (6,742) |
| Proceeds from the issuance of long-term debt | 100,000 | — |
| Equity and debt issuance costs and other | (9,928) | — |
| Repayments of long-term borrowings and other | (118,647) | (2,281) |
| Net cash provided by (used in) financing activities | 1,143,973 | 25,381 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | 956,808 | (15,692) |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | 135,178 | 139,152 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | 3,917 | 6,460 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 139,095 | 145,612 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of period | 1,095,903 | 126,493 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of period | — | 3,427 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 1,095,903 | $ 129,920 |

# agilon health, inc.
## Key Operating Metrics
### In thousands
### (unaudited)

*MEDICAL MARGIN*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2021 | | 2020 | |
| Medical services revenue | $ | 457,646 | $ | 311,734 | $ | 1,367,736 | $ | 894,043 |
| Medical services expense | | (414,202) | | (260,933) | | (1,217,039) | | (728,949) |
| Medical margin | $ | 43,444 | $ | 50,801 | $ | 150,697 | $ | 165,094 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2021 | | 2020 | |
| Platform support costs | $ | 33,547 | $ | 25,398 | $ | 92,622 | $ | 74,141 |
| Geography entry costs[1] | | 2,704 | | 1,959 | | 12,711 | | 6,338 |
| Severance and related costs | | 856 | | 825 | | 5,098 | | 3,516 |
| Management fees[2] | | — | | 452 | | 433 | | 1,135 |
| Other[3] | | (2,424) | | 1,734 | | 3,137 | | 6,070 |
| General and administrative | $ | 34,683 | $ | 30,368 | $ | 114,001 | $ | 91,200 |

(1)    Represents physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue.

(2)    Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R"). In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3)    Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

# agilon health, inc.
## Non-GAAP Financial Measures
## In thousands
## (unaudited)

*NETWORK CONTRIBUTION*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Income (loss) from operations | $ (35,601) | $ (9,844) | $ (346,079) | $ (16,930) |
| Other operating revenue | (967) | (950) | (2,937) | (3,283) |
| Other medical expenses | 29,454 | 26,325 | 86,809 | 79,512 |
| Other medical expenses—live geographies[1] | (25,977) | (24,377) | (78,794) | (75,420) |
| General and administrative | 34,683 | 30,368 | 114,001 | 91,200 |
| Stock-based compensation expense | 11,960 | 1,558 | 287,980 | 4,734 |
| Depreciation and amortization | 3,915 | 3,344 | 10,923 | 9,861 |
| Network contribution | $ 17,467 | $ 26,424 | $ 71,903 | $ 89,674 |

[1]    Represents physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the three months ended September 30, 2021 and 2020, costs incurred in implementing geographies were $3.5 million and $1.9 million, respectively. For the nine months ended September 30, 2021 and 2020, costs incurred in implementing geographies were $8.0 million and $4.1 million, respectively.

*ADJUSTED EBITDA*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Net income (loss) | $ (35,958) | $ (11,827) | $ (350,050) | $ (35,837) |
| (Income) loss from discontinued operations, net of income taxes | (1,035) | (474) | 1,992 | 12,230 |
| Interest expense | 867 | 1,953 | 5,306 | 6,182 |
| Income tax expense (benefit) | 256 | 35 | 707 | 74 |
| Depreciation and amortization | 3,915 | 3,344 | 10,923 | 9,861 |
| Geography entry costs[1] | 6,181 | 3,907 | 20,726 | 10,430 |
| Severance and related costs | 856 | 825 | 5,098 | 3,516 |
| Management fees[2] | — | 452 | 433 | 1,135 |
| Stock-based compensation expense | 11,960 | 1,558 | 287,980 | 4,734 |
| EBITDA adjustments related to equity method investments[3] | 1,655 | — | 2,307 | — |
| Other[4] | (2,712) | 1,734 | 2,651 | 6,070 |
| Adjusted EBITDA | $ (14,015) | $ 1,507 | $ (11,927) | $ 18,395 |

[1]    Represents direct geography entry costs, including investments to develop and expand our platform, physician incentive expense, employee-related expenses and marketing. For the three months ended September 30, 2021 and 2020, (i) $3.5 million and $1.9 million, respectively, are included in other medical expenses and (ii) $2.7 million and $2.0 million, respectively, are included in general and administrative expenses. For the nine months ended September 30, 2021 and 2020, (i) $8.0 million and $4.1 million, respectively, are included in other medical expenses and (ii) $12.7 million and $6.3 million, respectively, are included in general and administrative expenses.

[2]    Represents management fees and other expenses paid to CD&R. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

[3]    Includes direct geography entry costs of $1.2 million for the three and nine months ended September 30, 2021.

[4]    Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

**APP 197**

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician incentive expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner incentive and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) share-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity by entity basis.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
VP, Corporate Communications
media@agilonhealth.com

Source: agilon health

# EXHIBIT 6

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ3 2021 Earnings Call Transcripts

## Friday, October 29, 2021 12:30 PM GMT

## S&P Global Market Intelligence Estimates

| | -FQ3 2021- | | | -FQ4 2021- | -FY 2021- | -FY 2022- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | (0.09) | (0.09) | NM | (0.09) | (1.07) | (0.06) |
| Revenue (mm) | 450.46 | 458.61 | ▲1.81 | 453.73 | 1820.10 | 2518.17 |

Currency: USD
Consensus as of Oct-29-2021 5:08 AM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

| - EPS NORMALIZED - | | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| FQ1 2021 | (0.03) | (0.04) | NM |
| FQ2 2021 | (0.41) | (0.78) | NM |
| FQ3 2021 | (0.09) | (0.09) | NM |

COPYRIGHT © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ............................................................................ | 3 |
| Presentation | ............................................................................ | 4 |
| Question and Answer | ............................................................................ | 9 |

COPYRIGHT © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 201**

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor
Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Benjamin Whitman Mayo**
*SVB Leerink LLC, Research
Division*

**Gary Paul Taylor**
*Cowen and Company, LLC,
Research Division*

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research
Division*

**Ryan Scott Daniels**
*William Blair & Company L.L.C.,
Research Division*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC,
Research Division*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 202**

# Presentation

**Operator**

Hello, everyone, and welcome to today's agilon health Third Quarter 2021 Earnings Conference Call. My name is Emily, and I'll be coordinating the call today. [Operator Instructions]

I will now hand you over to our host, Matthew Gillmor, Vice President of Investor Relations. Matthew, please go ahead.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good morning, and welcome to our third quarter conference call. With me this morning is our CEO, Steve Sell; and our CFO, Tim Bensley. Following prepared remarks from Steve and Tim, we'll conduct a Q&A session.

Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

With that, I'll turn things over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good morning, and thank you for joining us. We're hosting today's call from Pittsburgh.

Before I get to the details of the quarter, I'd like to take a minute to discuss the positive results from our partnership with a leading independent physician group in this community, Preferred Primary Care Physicians, which has served the greater Pittsburgh area for nearly 3 decades.

In 2019, we collectively established the Preferred Senior Care Advantage line of business and moved all of the group's Medicare Advantage patients into a total care model in which the primary care physician is responsible for a senior patient's total health.

In just 2 years, Pittsburgh has become one of agilon's most successful markets and speaks to our ability to serve diverse geographies. Pittsburgh is a unique market in several ways. Medicare Advantage is the predominant product with a penetration north of 60%, and the majority of coverage in specialty care is delivered through 2 regional health plans with integrated provider capabilities.

Against this backdrop, our partnership with Preferred has yielded impressive quality, experience and cost results. 80% of Preferred's MA patients receive recommended cancer screenings, and 90% are adherent to medications for cholesterol, blood pressure and diabetes. Both indicators are in line with 5-star level care. Our concentrated scale in this geography, and Preferred's long history in this community, have enabled us to do creative things like execute on a Preferred skilled nursing facility strategy that drives length-of-stay reductions and improves hospital readmission rates.

In April 2021, we further strengthened our local scale and partnership through the Direct Contracting program. Now all of Preferred's senior patients are supported by agilon's total care model. The high-touch,

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 203**

high-visibility model used by Preferred has delivered world-class patient and physician Net Promoter Scores of 80-plus percent and a medical cost structure well below the community benchmark average.

As a result, MA growth has been 3x that of the overall market, and medical margin has accelerated faster than we have seen in prior year 2 markets. Our success in Pittsburgh reflects the power of the agilon platform and partnership model to get smarter, drive accelerated success in our newer markets and export these learnings to diverse markets across the country.

Now to the focus of our call. I will cover 4 areas in my prepared remarks. First, highlights from our third quarter results, second; our 2022 membership outlook; third, an update on our pipeline for the class of 2023; and fourth, an update on Direct Contracting in the broader federal policy environment.

Starting with a few highlights from the quarter. We were again pleased with our performance, both in terms of growth and medical margin. Our results were especially encouraging given broader dynamics around medical costs and the Delta variant. Total members live on the platform increased 83% to 237,000, including 184,000 Medicare Advantage members and 53,000 Direct Contracting beneficiaries. Our consolidated Medicare Advantage membership increased 43%, including 15% growth within same geographies. Same geography growth was again broad-based and continues to benefit from our ability to be a first-mover and purposely deploy a focused strategy in geographies that are earlier in their MA penetration life cycle. The growth in our MA membership translated into 47% year-over-year growth in total revenue.

Medical margin was $43 million in the third quarter or 9.5% of revenue, reflecting a year-to-date medical margin PMPM of $93. We were pleased with this performance, which was slightly ahead of our expectations, and consistent with the leading operational indicators we use to help manage the business.

We did observe an increase in COVID costs due to the Delta variant surge in numerous geographies. This was offset across the agilon network by lower non-COVID costs, including lower utilization of inpatient and skilled nursing facilities.

Our ability to drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model. Our partnership model with existing physician groups creates a unique level of proximity to a primary care physician, leverages an established relationship between patient and doctor, syncs practice economics with patient outcomes and provides a level of scale and history in a local geography to influence the health care system locally. Our platform is uniquely developed and leveraged through these partnerships to impact multiple levers that are central to the success of operating a value-based Medicare model.

We continue to increase our focus on how we influence the way patients access the health care system beyond the primary care physician's office. Through the agilon platform, we leverage algorithms to better identify specific cohorts of patients or physicians, stratify where care should optimally be delivered within that network and deploy the clinical support alongside our partners to drive sustainably lower cost and improved quality.

Two recent examples where our investments in connecting data to clinical process is translating to changes in how care is delivered differently. First, in Buffalo and Columbus, we have implemented a palliative care program for patients at end of life to improve the experience for the patient and the family, while avoiding an in-personal and costly health care stay in the hospital. And second, in multiple markets across multiple specialties, we have redefined the specialist network to tier providers based on quality and meaningful improvements in the use of our highest tier network.

Turning to our preliminary 2022 membership outlook. We project total members live on the platform, including Medicare Advantage and Direct Contracting, will increase more than 45% in 2022. Tim will provide details in a few moments, but I did want to call out some key drivers of that growth in both MA and Direct Contracting.

First, in Medicare Advantage, we now anticipate higher membership in our new geographies, reflecting progress with our implementation work and better visibility with health plan contracting. Additionally, we see continued strong momentum in same-geography growth. This is driven in part by a growing and

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

powerful local network effect. Community-based physician groups in our existing geographies are choosing to join the agilon platform. Our role in introducing risk for the first time in these markets provides a first-mover advantage that, along with the success of our partners, is attracting more groups to the agilon network. We believe more physicians joining the platform in our same geographies will be an important growth driver over the next several years.

Second, as it relates to Direct Contracting, more of our partners are seeing the benefits of operating a single Medicare line of business, encompassing MA and Direct Contracting. This creates a single experience for the physician and allows our partnership to maximize the scale advantage we have within a market, allowing us to proactively shape the senior patient's health care journey and effectively manage cost, quality and experience across both programs.

Partners in 4 additional markets will join the Direct Contracting program in 2022, bringing us to a total of 10 of 17 markets with both Medicare Advantage and Direct Contracting.

Moving to the 2023 new geography partner pipeline. We continue to make great progress, and the structural interest in high-value primary care has never been stronger among providers. On the back of growing MA penetration, demographic changes that challenge physician practice economics and the adoption of value-based care models like Direct Contracting, we are seeing broad-based interest in our partnership model from a diverse set of geographies and a diverse group of partner organizations. We have now signed definitive agreements and letters of intent for groups in new and existing states. We have begun implementation work for several of these new partners, which will help us drive strong performance out of the gate.

We will enter new states in 2023 and will immediately apply our hub-and-spoke model to unlock additional markets within those states. In Ohio, it took us just 3 years to expand from Columbus to 4 other cities. We think there is potential to move even faster within some of our newer states, given our successful track record and growing network.

Overall, we are very confident in our ability to execute against our new market growth objectives for 2023 and look forward to providing details during our next earnings call and this corresponding Analyst Day.

Let me close with an update on Direct Contracting performance and the broader policy environment. We are encouraged by the early results in this new program. We are seeing the leverage and scale benefit from operating a single, consistent approach across all senior patients sooner than we had expected.

In Q4, we will receive interim updates on 2 critical elements specific to the program: the retroactive trend adjustment and the coding intensity factor. We have incorporated a reserving estimate for these elements within our Q3 results, but continue to work with the innovation center on improving the visibility and predictability of these annual program components that will not be finalized until mid-2022. As a result, our Q4 forecast has a cautious outlook on the program's expected financial performance in 2021, but we do foresee the potential for Direct Contracting to be a larger contributor to our long-term financial performance.

On the broader policy front, it has been a productive last quarter in advocating for the funding and expansion of high-value primary care, and we have seen positive movement in both near- and long-term commentary from key policymakers.

On October 20, the Medicare Innovation Center released its refresh strategy for the next decade, which embraces total cost-of-care models and centrally positions accountable care and advanced primary care as core elements of innovation. With this release, CMMI embraced a recent National Academy of Medicine report that declared high-quality primary care as the foundation of a high-functioning health system and the key to improving population health, improving the experience of patients and core care teams and reducing costs.

This language has been a centerpiece of our work as part of the Primary Care for America coalition. While the strategy itself does not speak to the future of the Direct Contracting model, we have been encouraged to hear the agency staff speak publicly about plans for expanding the program with a potential

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 205

2023 cohort and their willingness to consider economic adjustments that will improve long-term financial stability for participants.

With that, I'll now turn the call over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve, and good morning, everyone. I'll review some highlights from our financial statements and provide some additional details on our updated guidance for 2021 and our membership outlook for 2022.

Starting with our membership growth rate for the third quarter. Total members live on the agilon platform increased 83% on a year-over-year basis to 237,000, including both Medicare Advantage and Direct Contracting. Our consolidated Medicare Advantage membership increased 43% to 184,000; and Direct Contracting members ended the quarter at 52,000. While our Direct Contracting members are not consolidated in our financial results, we wanted to provide a clearer view of the total members on the agilon platform as this better reflects our growth and scale.

For our Medicare Advantage membership, our growth rate was driven by 2 factors: first, the impact of 3 new geographies that went live in January, Hartford, Buffalo and Toledo, which now have approximately 36,000 members; second, strong growth within our same geographies, which was 15% for the quarter.

Revenues increased 47% on a year-over-year basis to $459 million. Year-to-date, revenues increased 53% to $1.37 billion. Revenue growth was primarily driven by membership gains in new and existing geographies. On a per member per month basis, or PMPM, revenues increased 2% during the third quarter.

Medical margin was $43 million during the third quarter compared to $51 million in the prior year. On a year-to-date basis, medical margin was $151 million compared to $165 million during the same period last year. The year-over-year change in medical margin primarily reflects the lower utilization experienced in 2020 due to the COVID pandemic.

On a PMPM basis, medical margin was $79 or 9.5% of revenue. Utilization during the third quarter of this year was in line with our expectations, with higher COVID costs offset by lower utilization of inpatient and skilled nursing services.

Our COVID costs peaked in August and early September, but remained below levels from early 2021. COVID costs subsequently moderated during the second half of September and into early October.

Network contribution, which is medical margin after surplus sharing with our physician partners, was $17 million during the quarter compared to $26 million in the prior year. On a year-to-date basis, network contribution was $72 million compared to $90 million last year. The year-over-year decline in network contribution reflects the impact COVID had on our prior year medical margin as well as the relative contribution of medical margin across our geographies.

Platform support costs, which includes market and enterprise level G&A, increased 32% to $34 million. On a year-to-date basis, platform support costs increased 25% to $93 million. The growth in our platform support cost remains well below our revenue growth and continues to highlight the light overhead structure of our model. As a percent of revenue, platform support was 7.3% during the third quarter, down from 8.1% in the prior year.

Adjusted EBITDA for the quarter was negative $14 million versus positive $2 million in the prior year. On a year-to-date basis, adjusted EBITDA was negative $12 million compared to positive $18 million last year. Adjusted EBITDA for the quarter includes $1.5 million in net contribution from our Direct Contracting entities. The margin performance for Direct Contracting continues to run ahead of our expectations, reflecting modest favorability to revenue and better visibility into costs. While we continue to expect margins for Direct Contracting will be below Medicare Advantage over the long term, we have been encouraged with our performance to date.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We ended the quarter with a strong balance sheet position, and we remain well capitalized. As of September 30, we had $1.1 billion of cash on hand and $50 million in outstanding debt, which is essentially unchanged from the second quarter. Cash flow from operations was negative $19 million for the quarter, which was in line with our expectations.

Turning now to our guidance for 2021 and our membership outlook for 2022. For the full year 2021, we have increased our Medicare Advantage membership outlook to a range of 185,000 to 186,000 and our revenue outlook to a range of $1.82 billion to $1.825 billion. We have also increased our adjusted EBITDA outlook and now expect a loss of $40 million to $37 million. We continue to expect utilization will approach pre-COVID levels as we close the year.

As Steve mentioned, we expect another strong year of growth in 2022. We project total members live on the platform, including Medicare Advantage and Direct Contracting, will increase over 45% by year-end 2022. We expect our consolidated Medicare Advantage membership will increase more than 40%, and Direct Contracting membership will increase by 60%. Based on our 2021 membership outlook, we expect total members live on the platform will increase to over 340,000 in 2022.

For Medicare Advantage, our 40% growth outlook assumes 50,000 members from new geographies and low to mid-teens membership growth within same geographies. For new geographies, we anticipate onboarding approximately 49,000 members in the first quarter, and this should build to over 50,000 as the year progresses due to attribution-working commercial agents.

For same geographies, we expect to benefit as more physician groups join the agilon network through our anchor partners. In aggregate, we would expect to end 2022 with more than 260,000 Medicare Advantage members.

For Direct Contracting in 2022, we are now able to share that approximately 30,000 to 35,000 attributed beneficiaries from 7 partners will join the program in January. This will bring our total Direct Contracting members to 80,000 to 85,000 entering 2022. For Direct Contracting, we would anticipate some moderation in our membership as we move through the course of the year.
With that, we're now ready for your questions. Operator?

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 207**

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Lisa Gill from JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

I just wanted to go back to the comments around utilization and just make sure that I understand your expectation for both the fourth quarter as well as going into 2022. Tim, I heard you talk about the fact that you expect to go back to pre-COVID as we close out the year. Can you just remind us what that would mean from a utilization perspective? And then you talked about COVID offsetting non-COVID during the quarter. Do you see any pent-up demand that will flow through to 2022?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks, Lisa. So composite utilization was in line with our expectations in the quarter, as we said. That was despite this COVID surge that Tim and I talked about in August and September, and we saw that across the majority of our geographies. There was this non-COVID offset, most significantly in terms of inpatient and SNF reductions. Outpatients is back up to that baseline, and we did see elective procedures up in the third quarter.

As we look towards Q4, we expect that, that baseline is going to return in that composite utilization towards the 2019 trend overall and will continue into next year. So that's how we're looking at it. Tim?

**Timothy S. Bensley**
*Chief Financial Officer*

No, I think that's right, Steve. I mean, I think if you if you just think about exactly what Steve said, we did see COVID utilization jump up. Although that -- as I said in my prepared remarks, that's really moderated quite a bit in the second half of September and now into October, from what we're seeing. And again, that was more than offset by non-COVID kind of acute utilization.

In terms of how much pent-up demand. I mean, perhaps the increase that we're seeing in elective outpatient procedures might be an indication of some of that catching up now. Although, again, overall, the composite utilization we've seen, although increasing in Q3, is still below 2019 baseline. We are seeing that number increasing though. And so we just want to be clear that as we move into the fourth quarter, we are expecting the composite utilization to continue to approach and move back to 2019 baseline, and that's reflected in our Q4 guidance.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Okay. Great. And if I can just sneak one more in. You talked about Direct Contracting now in 10 of the 17 regions that you're in. Is the goal over time to have Direct Contracting in all of the regions that you have physician membership?

**Steven Jackson Sell**
*President, CEO & Director*

Well, Lisa, we certainly see the benefit, and our partners are seeing the benefit, of operating a single line of business for their over 65 senior Medicare population. And it gives us tremendous leverage and scale benefit when we're able to do that, both within the primary care practice. And then in terms of downstream costs, in terms of specialty care, in terms of palliative care. And so that is certainly something that we're driving towards.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 208**

I think as we think about 2023, we believe you'll see a similar pattern to what we talked about in terms of the class of 2022 in that some of our existing geographies that are in MA but don't currently have Direct Contracting will add that. And then some of the new entrants and new geographies for 2023 will start with both MA and Direct Contracting on day 1 and year 1.

So our goal is to get more geographies to have MA and Direct Contracting side by side. And I think it just gives us those benefits in terms of experience, in terms of predictability. It really leverages our partnership model. And so that's what we're working hard on. And what I tried to called out in my prepared remarks is we're seeing a lot of interest from groups around the country in doing both of those side by side.

**Operator**

Our next question comes from Justin Lake from Wolfe Research.

**Justin Lake**
*Wolfe Research, LLC*

Wanted the first follow-up on Direct Contracting. It sounds like you booked a return there or positive results in the second quarter and the third quarter. What are you -- what is kind of in your guidance in terms of assumption for the fourth? Is it kind of to return to breakeven, so kind of losses in the fourth quarter?

And then I'm curious, you mentioned the true-ups in the fourth quarter around risk adjustment, especially. I'm curious with those true-ups, how close is the risk scoring of a -- in the revenue of a DCE patient to a Medicare Advantage patient in terms of -- effectively, how close do you get from a risk scoring perspective to kind of with that maximum revenue that you're able to get out of a Medicare Advantage pace? Because I know that was a big question as we went through DCE.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean, there's a lot in that question, Justin. First, let me start by saying we are encouraged, right? We are seeing results in the first 2 quarters with the program that went live in April, that are ahead of our expectations.

The back half of your question, there is a natural cap on the risk adjustment factor in the Direct Contracting program. And so most of the better-than-expected performance is based on lower medical costs.

There's 2 factors that we are awaiting updates on. One is the retro trend factor, which is a relationship between your local trend in the 6 markets that we're in right now, versus a national trend. And so if your local trend is lower than the national trend, when everything is rolled together at the end, there will be an adjustment in your revenue. That is separate from the second factor, which is the coding intensity or RAF factor that you talked about.

Both of those will get resolved in the middle of next year. We will get interim updates on it. I think, as we said, we're encouraged by what we've seen, but we really need to go through a full cycle with this program to be definitive around that.

And then, you want to talk about guidance for Q4?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Justin, yes, I think that's all right, Steven. And kind of just follow-up on the end of that, and then I'll talk about the first half of your question.

I mean, we are, of course, constantly looking at our numbers, examining them. We stay in contact with CMMI, and we're trying to stay as close as possible to where we think those adjustments might come out and, of course, bake that into our results. But as Steve said, we won't really know the final numbers until sometime into mid next year.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 209**

In terms of performance, yes, exactly right. I mean we booked about $4 million of positive EBITDA contribution from Direct Contracting so far this year, $1.5 million of that in Q3. I'm very obviously encouraged by the results, particularly, as we get better visibility to claims. We're seeing better overall cost performance in Direct Contracting. And with that rather than kind of an overall impression of Direct Contracting being in the breakeven area for the full year, and we would expect Direct Contracting to be most likely around breakeven for the fourth quarter now.

**Justin Lake**
*Wolfe Research, LLC*

Got it. That's helpful. And if I could squeeze in one more. The -- I know you've talked about, I believe, giving us an update on the kind of the maturity curve of your markets over time. And I think you said you'd try to do that by the fourth quarter. I was -- without getting specific, I was curious just what should we expect there? Is there going to be -- is there -- has there been variability? Or do you feel like there's been a pretty consistent curve so that when we see that, it's following that archetype model that we've heard about during the IPO process?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. No, Justin, thanks for the question. I mean I think we're seeing a cohort maturation and improvement in our partner markets, particularly in our earlier markets, we're sitting here with the Pittsburgh team in a year 2 market, but the class of '21, the class of '20, class of '19 are all accelerating at rates faster than what we had sort of initially projected as we look at that. And I think that portends well as we move into '22. We will give that update on the Analyst Day that will immediately follow our Q4 call and kind of walk through that.

And then we're looking at making investments in our non-partner market of Hawaii to get that, to see the similar sort of trajectory that we're seeing in these partner markets. So that's sort of the way that, that mix is kind of coming together. But I think the power in this partnership model and then the scale benefit that we're getting with adding Direct Contracting more, the ability to be able to invest in the programs that are the biggest cost drivers in the over 65 Medicare population like end of life and the examples that we gave, like the skilled nursing facility program we've got here in Pittsburgh, can really impact that.

**Operator**

Our next question is from Ryan Daniels from William Blair.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Yes. I wanted to ask a bit of a follow-up question to [ Gary's ]. Looking at the cohort models and the advancements you've seen there, number one. And the fact that it appears that once you're in a market, you really get a first-mover advantage, meaning both same-store growth and adding new groups and physicians, and then the additional value with Direct Contracting. I'm curious philosophically how that changes your intermediate or longer-term thoughts on new market ramp, meaning that markets are probably more valuable and doing better than they were just a few years ago. So how do you balance kind of the consistent growth work versus the ability to get a first-mover advantage in a market?

**Steven Jackson Sell**
*President, CEO & Director*

Well, we like being that first mover, Ryan. Thanks for the question. And I think as we -- with the class of '22, and as we look at the class of '23, we're seeing more interest from diverse geographies and diverse partners where we could be that first mover. So we are full speed on that. Our business development team is making great progress on that, as I talked about it.

But I do think that part of our update to you on 2022 membership really reinforces the power of the same geography growth. The critical scale that we're starting to reach in these communities, 15%, 20%, 25% of the adult primary care capacity in these markets, the ability to leverage across a practice's commercial

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 210

business doesn't run through our P&L. But when we start to do referral programs, like the specialists can impact that, is super powerful. And that is what we believe is driving some of the acceleration.

Our platform is getting smarter. The Pittsburgh team in year 2, the Pinehurst team that's implementing for January 2020 to go live, are benefiting from the learnings that have gone along the way. So it's a balance, but we're pushing hard on both fronts. This local network effect that I talked about within the same geographies is something that's accelerating. I think it's driving '22 growth. I think it's going to drive our growth for a long time, in addition to landing in new geographies as a first mover.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Okay. That's very helpful. And then as a follow-up, a little bit different question. Thinking about the investment opportunity for the company in 2 regards: one, you're sitting on more than $1 billion in net cash; and number two, there's probably an ability to advance internal technologies and infrastructure. So I'm curious if you could just speak a little bit to kind of capital use both internally and maybe through nonorganic investments.

**Steven Jackson Sell**
*President, CEO & Director*

Yes, sure, Ryan. So capital use. First, its growth, right? Our partners sit in these geographies, and they have the ability to add additional physicians and improve access within those communities, and that's part of what's fueling that growth. So that will be a use of capital for us going forward.

The investments in the platform will be another critical area for us, both from a technology perspective. Once you've got this partnership and you've got this great patient physician relationship and a partner like Preferred who understands the market, the ability to provide them with actionable information around patient data, physician data, where care should be delivered, is extremely powerful.

So we'll be investing more in technology and then clinical, right? As we're getting to scale, what are the clinical investments we want to be making around palliative, around skilled nursing facility partnerships, et cetera, that can really drive that. So those are all the areas that we're looking at right now. M&A is a possibility for us. There's nothing that we're prepared to talk about right now.

**Operator**

Our next question comes from Kevin Fischbeck from Bank of America.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

I was wondering if you could talk about the competitive environment a little bit. It seems like more and more companies have gone public this year, raked a lot of cash. Obviously, the managed care companies rolling this out. It sounds like you're having a lot of success in hiring new doctor groups, but can you just talk a little bit about the competition for those groups? If you don't win a group, what is it that they're looking for that you're not able to get? And then beyond just hiring these anchor or getting these anchor groups on board, the competition for these local physician groups adding in. Any color there?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. No, thanks for the question, Kevin. I mean I think the momentum that we're seeing with this local network effect, with the success of our partners locally and nationally is fueling the acceleration, the same geography growth that we talked about and the interest in the new geographies.

From a competition perspective, we are not finding ourselves in a lot of competitive situations. We do have the top of the funnel, with more and more groups talking to us about an interest in making this move because of the macro factors that I talked about are really tailwinds towards the move towards value. So I think that the biggest competition we typically face is inertia and probably not going to make that decision

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

this year. But even that is shortening, Kevin, based on those macro factors I talked about, and the power of what we've been able to demonstrate with our network and that sort of reference capability.

**Kevin Mark Fischbeck**
*BofA Securities, Research Division*

That's helpful. I guess to that inertia point, I mean, would you expect a bolus of these new additions to be really the next kind of 3 to 5 years? Because it seems like there's a lot of momentum behind moving to these types of payment models. And I wonder what would cause the physician group to make that decision in 10 years rather than the next 3 to 5?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean the delays are typically a year, right? We do this on an annual cycle, right? And so you would join on January 1. It's a year, maybe 2 years. But I would agree with your thesis that I think you're going to see a tremendous acceleration in same geography over that 3- to 5-year period. And I think you're going to see us in many more new geographies over that period of time.

**Operator**

Our next question comes from Stephen Baxter from Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

I was hoping you could talk a little bit more about the same geography outlook you provided for 2022. It feels like it should look more like this year than sort of the overall MA growth rate of 10%. I was wondering how we should think about how much visibility you have into that growth rate at this stage? How much of it is coming from physician recruiting? How much of it comes from MA conversions from fee-for-service? How much of it is just coming from the growth of the market? I'd love to understand that a little bit better.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So I mean, 15% same geography growth year-to-date in '21. Super pleased with that. The components that drive that, Stephen. Obviously, the organic growth in which existing patients in these practices that are turning age 65 choose Medicare Advantage or fee-for-service folks that move over. That's kind of the bread and butter. And we tend to do a little bit better than the local growth rate just on that component alone. Given the shop-and-compare program, we've got the retention rates that we're able to get the multi-payer experience.

What's becoming a growing piece of this is this improvement in access and other physicians joining locally. That's the biggest part of that 20% to 40-plus percent growth in MA and 45% growth overall in terms of membership is really the visibility. We know who those groups are that are joining in January. We know those groups are who are joining further out in the year. The timing might slide a quarter one way or other, but we have -- those groups are effectively in an implementation period of their own right now. And so that visibility forward to '22 and even into '23 is really pretty strong around that. And that will be a continued driver of same geography growth. That's why we've talked about low to mid-teens same geo growth on a kind of sustainable basis.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Got it. And then just a question on DCE. I guess would love to just know a little bit more about like what's the decision point for physicians about whether they're going to participate there. I mean they're clearly bought into the model on the Medicare Advantage side. So I guess, what is it if they're not participating in DCE, like what's giving them holdup? And then just can you confirm, again, like if it's not a downside

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 212

protection question, it sounds like that's still provided. I guess, what would keep them from wanting to take risk on that population as well?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean it's kind of a couple of factors that could have a group make a decision not to go. So we had 2 groups that did not go live in April, existing MA groups that went live in January. And in one case, they were below a member threshold. You have to have 5,000 within a Direct Contracting Entity. And so they were too low. And so by January, they were up above that. So that's just kind of a technical thing that affects that.

In other situations, we've had people sitting with an ACO, with local systems and others. And so they want to get to a point at which they could make the move beyond that. All of our partners have had their patients in an ACO, and they're making the move into Direct Contracting. So by definition, you're making that move over, and some of those local dynamics could affect that.

But I said, sort of earlier to Lisa's question, in '23, I think we'll see more of the 7 current markets that are in MA, but not in DCE, make that move into Direct Contracting. And then I think we'll have new geographies that will come on with both.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Got it. And just one last follow-up on that topic. Would love to just -- could you remind us why does it, you can't consolidate those results today, but you obviously can consolidate the Medicare Advantage results? And do you think this is something that could change at some point down the road?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, it's something that we could certainly consider in the future. I mean, at this point, we specifically set up the governance and the structure of the DCEs to not consolidate part of it. As we talked about earlier in the year, it was just around an abundance of caution of, hey, this is a new program. We're not sure exactly where it's going, and we thought it made more sense to do it in an unconsolidated governance structure. And so that is specifically the way that we set it up. Is it something that we could revisit in the future? I mean, yes, once -- if the program stabilize and out in future years, we could certainly revisit that decision.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I think getting through a full turn in the annual program is going to give all of us a lot of visibility to all of these components and how this plays through. We're encouraged for all the reasons we've talked about, but we need to learn more.

**Operator**

Our next question comes from Gary Taylor from Cowen.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

Three quick questions. As I look at your '22 membership guidance, it's a little ahead of our expectations, which is great. But I want to make sure I just understand the implications of that. When we think about the modeling and newer cohorts coming in at higher medical service expense, to the extent you're guiding above expectations on membership, we should think percentage medical service expense in a vacuum higher, but dollars of medical margin in a vacuum higher. Am I thinking about that correctly?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 213**

I think that's correct, right? So we will have higher '22 membership. There is a dilutive effect of these members coming on. So they come on at a lower medical margin. They historically have come on at a loss to breakeven from an EBITDA perspective. And so we would expect some of that dilution.

So as a percent of revenue, you are correct in the way you characterize that. In terms of total dollars, you are right that medical margin dollars would be higher as a result of that.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

Got it. And then my other question was, I think Tim said a $1.5 million Direct Contracting contribution to adjusted EBITDA this quarter. And I'm just trying to understand that versus the 10-Q disclosure that shows a touch worse than breakeven. So are there just -- is the difference just new geography adjustment for DCE?

**Timothy S. Bensley**
*Chief Financial Officer*

It is. And so if you look at the disclosure, you're looking at Note 4 that has a slight loss on a net income basis and then you just refer back to the back of the Q, where it shows the net income to adjusted EBITDA walk, you'll see a line on there for those entities. And you can see that we've got geographic entry costs for the new ones coming in. That basically bridged that gap.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

Okay. Last question. Can you remind us over what trailing period is a surplus to a physician group calculated? So obviously, this week, this month, there was a surplus. I'm sure that doesn't get paid out, I mean. But what's sort of the trailing period where you calculate that surplus before it's paid to the groups?

**Steven Jackson Sell**
*President, CEO & Director*

So we have a pretty structured...

**Timothy S. Bensley**
*Chief Financial Officer*

Or is it just quarterly?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. No, we have a very structured quarterly payment to make it predictable, but there is an annual true-up that's done on the lag. And there is sort of this holdback component, Gary, similar to how you'd see in other sorts of programs for that final true-up with it. So if there is significant retroactivity, that is ultimately flowed through in terms of those payments. But we really -- a big part of our partnership is really being predictable with our partners. And so we've set up a structure that allows us to do that and sort of calculate our final results.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

Is that a 4Q annual true-up across the platform? Or is that practice-specific dates? I'm just trying to think about, do we have to think about like at the end of the year in the 4Q, if there was something, that's when we'd see a bolus of this? Or is it really more practice-specific in terms of timing?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 214**

No. I mean I don't think there would be a material move in Q4 with that. I mean there is a true-up that occurs on the composite level, but it's a function of those practice-level specifics, Gary, if that's what you're asking.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I mean, I guess, to the extent that there was some wild deviation as we flowed into next year with run out, it could drive something. But I mean, generally speaking, we're pretty close on it. So we're keeping that -- we're estimating, obviously, those -- we're reporting those out on a quarter-to-quarter basis. And I wouldn't expect that at -- the true-up for the fourth quarter or year-end would be any large number versus what it is every other quarter.

**Operator**

Our next question comes from Brian Tanquilut from Jefferies.

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

This is Jack Slevin on for Brian. Thanks for all the color thus far, And wanted to continue on with that Pittsburgh case study a little bit. Two questions there. One, can you give us at least, in a rough sense, what the percentage of your members in that market are coming from UPMC or Highmark plans? And then two, as we think about portability of the model and sort of the maturation curve on medical margin, when we look at a market with that profile sort of dominant health systems, is it possible that those are going to skew to a quicker maturation towards sort of like the mature medical margin you've talked about? Or should we think about a lag there? I guess, trying to work through whether or not having that help system, the ability to coordinate across it, should help maturation? Or if there's a little bit of give maybe related to hindrances and inpatient spend?

**Steven Jackson Sell**
*President, CEO & Director*

There's a lot of that question. So first part of it, roughly 2/3 of the membership comes through the 2 plan/ systems that you talked about. As we highlighted, Pittsburgh is accelerating faster than we've seen in other markets. The skilled nursing facility program really leverages the strength of our partnership and the relationship that people have with their primary care physician. And given the data and insights from our technology, we've been able to really work with a local partner here that's trusted. We're seeing a higher enrollment into these preferred skilled nursing facilities.

And what we see is when the primary care partners here in Pittsburgh see patients in those preferred skilled nursing facilities, there's a significant reduction in terms of the overall MLR, really driven by much lower readmission rates. And so that's the power of this partnership and platform coming together.

I can't imagine operating in a market like Pittsburgh without the strength of a partner like Preferred. Their credibility, their history here, their knowledge of the ecosystem, combined with the alignment we've got through the partnership and the insights from the platform, allows us to drive those sorts of success.

So I don't know that a multi health system market says we're going to see slower progression on medical margin. I think our ability to serve diverse geographies like Pittsburgh, doing it through a partnership model and with our platform is the key to that. And so we can go to a lot of places, build around that right partner and have success.

**Operator**

Next question comes from Whit Mayo from SVB Leerink.

**Benjamin Whitman Mayo**
*SVB Leerink LLC, Research Division*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 215**

Just a couple ones here. maybe you answered this, but it wasn't clear to me. To Gary's question, is there anything about the characteristics of these new groups in '22 that's different when I look at either the PPO HMO mix? Anything about the composition of their panel that looks different than your legacy partners? I don't know, inpatient days per thousand, MA versus fee-for-service? Just anything when you sort of lay them side by side versus your legacy groups, you would say this is different, which makes us more or less confident in the implementation this year.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean, I think we've got a diverse set of new geographies coming on in '22. And the implementations have been going really quite well. When we look at the things like structured annual wellness visits that are going on, we're feeling very good about where we're at.

But to those -- to your question about kind of how they lay out, we've got primary care-only groups. We've got multi-specialty groups. We've got single-10 groups. We do have 1 multi-10 group with kind of an organizing entity across all of that, in Answer Health up in Michigan, that is just leads the state in terms of quality and is an exceptional partner for us.

And so those differences don't lead us to different expectations in terms of maturation around medical margins. Now they started different places with. And so as we've said all along, we're comfortable starting with groups that start at different places, great leader in their community, great credibility, good alignment with us. And with our platform, we're going to be able -- and the partnership, we're going to be able to drive that.

So PPO versus HMO mix for the class of '22 is roughly in line. We're still about 50-50 overall. PPO continues to be the fastest-growing product and growing faster than HMO. And so my guess is that will skew towards a more significant majority over time. But we feel really comfortable about our ability to manage full risk in a broad PPO market because of our focus around those big spend areas, those value areas within Medicare Advantage.

**Benjamin Whitman Mayo**
*SVB Leerink LLC, Research Division*

Okay. So when you sort of average everything together, they look reasonably in line with the groups that you've onboarded in prior years is I think what I'm hearing.

**Steven Jackson Sell**
*President, CEO & Director*

Yes, I think that's correct.

**Benjamin Whitman Mayo**
*SVB Leerink LLC, Research Division*

Yes. And can we just go just...

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

One thing I'd add here where the state -- the class of 2022 and some of the LOIs and DAs for 2023, the enrollment growth in these markets is a touch higher, and that will bring our overall average up.

**Steven Jackson Sell**
*President, CEO & Director*

So yes. As a composite, they are in lower MA-penetrated markets. It's a good point, Matt. And so we would expect that market growth will be higher, and then our multiple, on top of that, will drive strong same geography growth.

**Benjamin Whitman Mayo**

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 216**

*SVB Leerink LLC, Research Division*

Okay. And one quick last one. I just want to make sure I get this. I want to unpack this just for a second because you've referenced palliative care and maybe redefined specialist networks a few times. And I'm not exactly clear. Are these -- I mean, are you giving your physicians more tools and resources to manage this downstream risk? I thought I heard something around maybe a narrowed or tiered network. I'm just trying to understand exactly what's changing here. And maybe just remind us on the specialist side, what your medical cost spend is.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So I mean, 2 areas, right? So palliative and specialty. What we're doing with is we're leveraging the heck out of that partnership and that patient physician relationship and their scale and history. They understand the players within the market. We're better identifying in palliative, as an example, patients who are most likely to pass away in the next 12 months.

We're enabling that primary care physician to have a better quality conversation with that senior patient about what they'd like to do over this next year and what the options are available to them. And historically, that's a difficult conversation for primary care physicians to have.

In our markets, 25% to 40% of our costs sit in end of life. I mean that's sort of the range that you see within that. And so the ability to have a better identification of those most likely to pass away, the ability to have a better conversation means you get a higher enrollment rate. And then the ability to have a partner, local partner, that you can refer those people into and the primary care physicians can feel really good about is very important.

In Buffalo, we've seen almost a 90% reduction in terms of hospital deaths based on the pre and post in terms of rolling out that palliative care program. I mean that is substantial. It's substantial from a cost reduction perspective, but we're also seeing patient and physician satisfaction go up with this. This is an area of health care that's really sort of underserved and difficult to deal with. And so that's where this partnership and platform together can really affect it.

And then specialist costs follow a similar thing. We tier the specialists to better identify them. Our referrals go through a centralized referral entity, which means you end up with a higher pull-through of people getting to that top-tier specialist. The specialist doesn't have to do that on their own. And then there's a better outcome. Those top-tier specialists, the cardiology example that we've given on our previous call, it's like $100 PMPM better for people being referred to top-tier specialists. So hopefully, that gives you color.

**Operator**

Thank you, everyone, for your questions. Unfortunately, that is all the time we have for questions today. So I will now hand back to the management team for any closing comments.

**Steven Jackson Sell**
*President, CEO & Director*

Thank you, everybody, for being on our call. I mean I think we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market. I think we're excited about the scale that we're building locally in our communities and nationally. And we're really bullish on our future. So talk to everyone soon. Take care.

**Operator**
Thank you, everyone, for joining the call today. This now concludes our conference, and you may now disconnect your lines.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 217**

**AGILON HEALTH, INC. FQ3 2021 EARNINGS CALL | OCT 29, 2021**

Copyright © 2021 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2021 S&P Global Market Intelligence.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

19

**APP 218**

# EXHIBIT 7

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Company Conference Presentation

Monday, January 10, 2022 2:45 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 220**

# Table of Contents

Call Participants ............................................................................... 3

Presentation ............................................................................... 4

Question and Answer ............................................................................... 9

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 221**

# Call Participants

**EXECUTIVES**

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research
Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Good morning. My name is Lisa Gill. And I'm the health care services analyst with JPMorgan. It is with great pleasure this morning that I have agilon health. With us this morning, we have CEO, Steve Sell; as well as CFO, Tim Bensley; as well as IR, Matt Gilmor. There will be a Q&A session at the end, but I'm going to turn it over to Steve to start the presentation. Thanks very much, guys.

**Steven Jackson Sell**
*President, CEO & Director*

Great. Thanks, Lisa. It's great to be here. I wanted to do a few things this morning: one, give context on our business; two, talk about structural factors that are really driving the acceleration of value-based care in the senior patient markets; three, share a case study from our Akron markets in which we've just finished year 3 and showed the investments that we've made there and the outcomes, which are really remarkable; and then give a business update, including some observations on the future.

So if we go to Slide 3, context. Our vision is to transform health care at the community level. We do that by partnering with leading community-based physician organizations who've been in their communities for decades. And we transition their existing Medicare patients from fee-for-service to a full-risk Total Care Model in which the primary care physician is responsible for the total cost, quality and experience. We do that by providing them with a platform of capabilities that enables that movement success and a partnership that totally aligns physician economics with desired patient outcomes.

The results show the power of the model. We now have 16 anchor partners in 17 diverse geographies. And as of this month, 300,000 total members on the agilon platform in full-risk with Net Promoter Scores that are better than that of Apple and Southwest Airlines.

In terms of investment highlights, these are some real distinguishing facts for agilon. We're going after a very large growing addressable market, and the move to value is only enhancing that. We like to be first, and there's a real first-mover advantage as we move communities from fee-for-service to risk for the first time, and that gives us advantages in terms of cost quality experience.

We have great alignment with our local physician leaders who've been in their communities for decades and were able to drive outcome. Our platform allows us to unlock diverse geographies and partner types. Perhaps most importantly, physicians are winning in really meaningful ways. They're able to practice medicine the way they were trained to. They're able to invest in their patients' care more fully and they're reaping rewards from a personal financial perspective. And finally, our growth model is capital-light and incredibly efficient.

Going to the next slide, there are significant structural changes that are defining the future of value-based care. The senior population is growing. 10,000 people a day are turning to age 65. That's increasing demands. 25% of health care spend is estimated as waste and is there to be managed out. The largest purchasers in health care, CMS and health payers are looking at the move to value as the #1 solution to help manage out that waste and drive lower costs.

In fact, the Innovation Center with the recent strategy paper has laid out a goal by 2030 of all Medicare beneficiaries being in a Total Care Model relationship, which is an incremental 30 million senior patients that would move to value-based care.

With the challenges, primary care physicians are not ready for that. Everyone identifies them as a key to the solution, but they don't have the time. They're working on lot of administrative things and they're losing money on their Medicare businesses today. They need more support.

And so our solution is that we've created a new category. We call it high-value primary care. It takes the primary care physician and it moves them to that most important position that you see in the upper

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 223**

right, in which they can play that total care quarterback role. We surround them with care teams, and we surround them with actionable information to make that possible.

We're able to do that, as we go to the next slide, by providing them with the agilon Total Care Model. Our Total Care Model is expressly focused on the over-65 population and expressly focused on value. There are 3 elements: the platform that brings technology, people, process and capital. And it allows that to some fee-for-service to value. It's been built with doctors and for doctors. The partnership that creates that alignment of physician economics with patient economic outcomes and takes advantage of the unique proximity that we have by being co-located with primary care physicians.

And then finally, as we grow communities and doctors, we grow our network. We now have a national network of like-minded entrepreneurial physicians and they're sharing best practices and driving innovation faster.

Go to the next slide. Our purpose-built platform really enables the move to value at scale. It allows us to move these practices from fee for service to value for their senior patients, and it allows us to execute consistently across the country with a diverse set of payers.

We're able to bring the critical elements of value-based care like payer engagement, clinical programs and quality and execute those consistently across markets. That requires a technology engine that is flexible and agile and has the ability to be payer-agnostic, EMR-agnostic and pull data and provide insights regardless of the source of that data. We believe that our platform is increasingly a source of competitive differentiation.

Our partnership -- go 1 back, Matt. Our partnership is flipping Medicare to a single risk line of business, and it's taking practices from the status quo on the left in which their senior patients are in an uncoordinated and fragmented experience driven by payers with different expectations around incentive programs and quality programs to an integrated total care model that's built around that primary care physician and places them at the center. It provides for a single experience for patients, for the front office staff, for the physicians, regardless of who that payer is, whether it's CMS through direct contracting or Aetna or Anthem or Blue Cross. And it allows for far better-coordinated care and outcomes.

We believe there is a very powerful flywheel to value. And we are starting to see that as we go deeper in these communities and as we grow more fully across the country. What we're seeing is that as docs join our common platform and improve patient outcomes, that is creating incremental economics for that local system and for the doctors. As more doctors and groups join, our network grows, and we have better data insights. That too improves outcomes. As outcomes improve and there's more dollars to invest, we're able to invest more outside the walls of the primary care practice increasing touchpoints for seniors where the majority of spend actually occurs. And then finally, as more docs join, it keeps accelerating, and we're seeing this virtual effect.

The virtuous cycle expands patient access. We're able to increase the frequency and breadth of senior patient touchpoints, both within the office and outside of the office. We have found our partners opening panels to Medicare patients that were previously closed. We are increasing patient touchpoints. And importantly, we are stratifying those highest-risk patients that benefit the most from increased interaction with their primary care physician.

Outside the office, we're investing in ED diversion programs, predischarge programs that make sure that, that senior patients going to the most appropriate post-discharge setting, and targeted clinical programs like specialist referrals and end-of-life palliative care.

And so this is the Akron case study that I talked about at the beginning, which really sort of brings this together. I'm now on Slide 12. What you see is what Akron looked like in 2018 when we started. That was our implementation year. Our partner in that market pioneer exceptional group, really strong relationships with their patients. But that relationship was really a one-on-one relationship and largely confined to what occurred within that primary care setting. Once the patient moved out of that setting, there was poor coordination and limited data visibility.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 224**

What we've been able to do across 3 years is invest substantially. We placed that primary care physician and the patient at the very center. We've surrounded them with a care team of social workers and nurse practitioners and pharmacists and provided them with actionable data insights. When that primary care physician wants to send a patient to a specialist, they have a specialty referral team that makes sure that, that patient gets to the highest quality, top-tier specialist in that category.

And then our technology and our platform closes the loop. We know when that appointment has been scheduled. We know when it occurs and what happened during that visit. Similarly, within hospitals, we've been able to invest and have nurses within the ER. As senior patients go in, there's an opportunity to have a dialogue and say, is this something that needs to go into the hospital? Is this something that could be delivered at home with the support of a care team? And also at that predischarge level in terms of managing overall post-acute.

And so what have been the results in that market, it's been a dramatic improvement: 48% more touchpoints for high-risk patients, 70% referral rate to Tier 1 cardiologists, and each time we were referring to a Tier 1 cardiologist, we're saving, on average, $100 per member per month for that cardiology patient. And that's resulted in that economics that we talked about in the flywheel for the system and for the physician; an incremental $150,000 distribution to PCPs in 2020 as a result. That's allowed us to invest. That's allowed us to grow. We've gone from 8,000 patients in 2019 up to 18,000 at the end of 2021. And we know that, that number is going to grow quite a bit more in 2022.

And from a medical margin PMPM perspective, we've been able to grow from $40 PMPM in 2019 to $160 per member per month in 2021 on a preliminary basis. That's ahead of where we would expect a year 3 market to be and tracks very well.

We're doing this nationally. We're doing it in 17 communities, and we're able to improve patient experience and outcomes. In the middle of the page, we show you 5 Star performance from a HEDIS and STARS perspective. 90% adherence to medications for cholesterol, hypertension and diabetes and an 82% screening rate for breast and colorectal cancers.

We're also reducing inpatient visits, reducing readmission rates. And in a limited number of geographies, we're starting to dramatically reduce the total spend for end-of-life care. All of that is made possible by expanding access, both within that primary care office, where we've got increased touchpoints and with those critical high-risk patients, both in and outside of that office and our patients are incredibly satisfied with that.

We're doing this nationally. We're doing it in 8 states and 17 communities. And as we announced the class of '23 at our Investor Day, we'll expand that nicely. And it's a diverse set of geographies and partners, multi-specialty, primary-care only, rural, metro, single TIN entities and multi-TIN, multi-EMR entities. And we're able to be successful in diverse geographies as Pinehurst, which is small in a high-growth market and Buffalo, which is larger in a lower growth market, but in both places, we're performing quite well.

We have a highly actionable addressable market, 20 million Medicare beneficiaries with $250 billion in annual spending by 2025 is in front of us and we have a very effective method to go after them. If you go to the next slide, Matt.

We have a very predictable and highly visible growth algorithm. We grow in new geographies and we grow in same geographies. In new geographies, every time we enter a new state like we've entered Michigan for 2022, that opens up that entire state. We're then able to add in other communities within that state, as you see in Texas, where we've got 3 communities.

Once we're in a geography, we're able to consistently deliver growth rates in the low to mid-teens. That comes, both from an organic perspective of patients in the practice, moving into a full-risk relationship through Medicare Advantage or direct contracting and adding additional physicians. And that's a function of that first-mover advantage. Once we've set up that platform, once we're in a community, we become the preferred approach for physicians to move into value-based care.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 225**

I'm going to skip over the case study and just briefly highlight that we have a really highly attractive acquisition model, the LTV to CAC dynamics are incredibly strong. We start with a low cost of acquisition, $400 per member and go down from there.

We're able, by generating medical margins like you see here, and this is Akron, again, just as an example, to pay that back within 1 to 2 years. we're able to continue to add patients and the return on investment is compelling. And that gives us just tremendous momentum in the business. We're able to grow markets. We're able to grow members, and we're able to grow medical margin, and you can see the CAGRs that are here.

And Lisa, I thought I'd close with a January business update. Looking back at '21, looking ahead at '22. When you talk about '21, you perhaps have to start with COVID. I am still proud of our team and our partners and the job we've done to manage through multiple surges throughout 2021. I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver predictable results through each one of these surges. We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.

In terms of this most recent surge, we're only seeing modest COVID-related inpatient utilization. We are seeing continued suppressed non-COVID inpatient utilization, but that's partially offset by a shift from inpatient to outpatient that we've been seeing for a while.

When we talk about membership and margins, we're finishing the year in a very strong position. We're not reporting our Q4 results today, so I don't want to get out of our skis. But I think we're comfortable saying that we're ending the year with an incredible growth rate, 40% -- greater than 40% growth in Medicare Advantage membership, our really strong same-geography growth rates. Our medical margins, like we showed in that Akron case study are progressing very nicely in our 16-partner markets. That represents about 85% of our Medicare Advantage membership. As we go deeper in these communities, as we add direct contracting, we're finding tremendous leverage in our platform support costs, and we're consistently running below what we initially had forecasted for it.

And then finally, we're really proud that this year we ended direct contracting. It's a new government program. We're seeing the benefits of MA and direct contracting together, and we've consistently been able to deliver medical costs and RAF that are in line or better than our expectations. We are sharing that we now are expecting that direct contracting will move from a modest adjusted EBITDA gain to a modest adjusted EBITDA loss based on updates from the Innovation Center around what's called a retrotrend adjustments.

But all-in, a very successful year. We're closing very well, and we're entering '22 and taking off. We've had a great start to this year, an extremely strong AEP period, driven by, again, 90-plus percent retention. That's a function of our multi-payer model that allows us to really -- a patient can move from 1 health bed to another, but they stay with their physician and strong sales.

We've done a very good job onboarding 6 new markets with 50,000 MA patients and added another 30,000 direct contracting patients, and we now have direct contracting MA in 10 of our 17 markets. And we did reaffirm with an 8-K this morning, our confidence in a very strong growth rate for '22. And we're forecasting positive adjusted EBITDA for '22. We will give a full forecast on our Q4 call. This has really been driven by a maturing partner market -- medical margins, like we saw in that Akron case study in '21 and improvement in direct contracting and in our non-partner market of Hawaii.

Let me close with just a few observations on what we see for the year ahead. I think the structural factors that I talked about at the top cannot be overstated. There is going to be a dramatic increase in the depth of demand for primary care-centric value-based care for seniors. Doctors are eager to make the move from fee-for-service into value-based care, and they need a partner to do it. Health plans are feeling the pressure from a quality expectation, experience expectation and aggressively trying to move patients. And CMMI has really laid down the marker with their 10-year vision of 30 million incremental patients moving into value-based care.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 226**

The breadth of demand is going to continue to expand as the diversity of our partners, the diversity of payers and the diversity of geographies grows. We're reaching critical mass locally and nationally. As we go deep, we're seeing the ability to impact costs outside the walls of the primary care office like we showed in that Akron case study, and we're finding new partners in new geographies who are saying, "We need a partner and we'd like to grow with agilon."

Finally, the quality of our economic model has allowed us and will continue to allow us to deliver predictable results in periods of volatility. No one can predict exactly what the future is with this pandemic, but we know that we can deliver predictable results. New government programs evolve over time, but we can deliver predictable results.
And so with that, Lisa, I think we can go to Q&A.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Great. Thank you, so much for all the commentary, Steve. It was really helpful. Let me just start though. When we think about a number of these physician enablement, companies that have come to the marketplace, especially here in 2021 or last year in 2021. Can you maybe just talk about a couple of things? One would be the differentiation of your model; two, the key strengths of a partnership model; and then thirdly, if I'm sitting here and I'm a group of doctors, why don't I just take on the risk myself and cut out the middleman?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Well, there are a lot in that question, and it's a good one. I mean, I think there is a broad definition around enablement. But I think what's really distinctive about our model and what I tried to say in my remarks is that we're working with existing physicians, Lisa. And in a partnership model, we're moving them from fee for service to value in their existing patients.

Everything we do, from our technology, from our platform, from our partnership is oriented around that. We're able to take them from a transactional relationship into one that's built around a subscriber relationship. There are real distinguishing factors that come in that partnership model. There's advantages in terms of the predictability of what we're able to do. There's that first-mover advantage we pride ourselves on ongoing communities and being able to move people for the first time. There's an incredibly low cost of acquisition that we have as we grow in those communities. And as I said, we're able to enter at scale, which is different from a clinic model or someone who's selling technology services, and that allows us to impact those costs, which I tried to emphasize outside of the office.

I think those are key elements to that partnership model and why it resonates. And as we do this in more markets, the reference from our other partners is bringing in additional partners and additional physicians within those communities. So the growth model, the economic model are all a function of that.

And then why would a large group say, "Hey, I could do this on my own versus doing it with a partner like agilon?" I think start with Bill Wulf and Central Ohio Primary Care. Bill is the CEO. They're the largest independent primary care group in the country. Bill is the Chair of America's physician groups, incredibly well respected, but he concluded that they needed a partner.

They didn't have the technology that they needed to be able to deliver in risk. They didn't have the ability to invest ahead of the outcome, and they didn't have the expertise that was required to make that all possible. And so the combination of those things, I think, is what led Bill to make that decision and what we're seeing with others.

And then the track record, right? If people were wondering about it, I think the track record that agilon has now with partners in 17 communities really speaks to our ability to deliver results to do it in a set of diverse geographies, but we always try to find 1 or 2 partners that closely mirror a new partner that will be coming on.

So Pinehurst, as an example in North Carolina, the Wilmington team has worked very closely with them on their implementation. Syracuse, which went live just last week, worked very closely with the Pittsburgh team because of the similarities in those markets, the similarity of senior patients, payer types, whatever it is. And so that flywheel that I talked about, I think, is allowing that acceleration.

And the last thing I'll say is, if we're going to get to 30 million incremental senior patients in full-risk value-based care, you're going to need a partnership and platform model that's going to be able to move hundreds of communities that are full fee-for-service today into full-risk.

**Lisa Christine Gill**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 228**

*JPMorgan Chase & Co, Research Division*

And have them look similar, right? Like so that...

**Steven Jackson Sell**
*President, CEO & Director*

And have them look similar, that's right. Those components that I talked about, they're executed the same way, whether you're in Austin, Texas or in Toledo, Ohio. Whether you're in a multi-specialty group or you're in a primary care group, whether you're 25 primary care physicians or 100-plus primary care physicians.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

The other question that we get, Steve, is just that you're in some markets that we would consider somewhat nontraditional Medicare markets, right? Like, so most people think, "Oh, I'm going to go into Medicare Advantage and I'm going to go down to Florida," or "I'm going to go out to Southern California," or "Arizona." Can you maybe just talk a little bit about targeting the MA markets that you have, number one?

And number two, there are a lot of different players that are trying to work with physicians today. Do you still see a lot of opportunities with physicians that are still looking for partners in the marketplace? Or do you feel that it's a little bit more competitive today than it was a few years ago when you got started?

**Steven Jackson Sell**
*President, CEO & Director*

Again, a lot in that question. I mean I -- so I think there's more capital, and I think there's more players in the space. I think, Lisa, we have a pretty unique value proposition and the folks who are talking to us are typically, in terms of new partners, are not necessarily looking at others. The place, perhaps, where we see competition is once we're in a geography, a smaller practice that might historically have thought about selling to an Optum or hospital system is now coming to us. And that's why I said we are becoming that preferred vehicle in the communities we're in for independent docs that want to move to value-based care to come on that platform. And so that's a big part of it.

But why do we choose the communities that we do? We like being that first mover. We like moving the entire community from fee-for-service to risk. There are hundreds of communities out there, maybe thousands that are still at that fee-for-service level. But our -- that TAM that I showed you is really built around those communities, those groups that we could build around and what sits there.

And the advantages of doing that are significant. From that scale perspective, we're able to go in, once we're able to build that ecosystem, that technology and platform view that I showed connecting hospital systems, connecting specialists, having that closed loop back to that primary care physician, once that's implemented, it's very difficult to unsee.

It is -- investors ask us about our moat. That is a very powerful moat. And so the idea of going in, having critical mass, moving a market, patients, physicians into full-risk value-based care for the first time is something that we're pretty excited about, and I think we're doing pretty well there.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

And I've seen you talk about this in other presentations when you talk about the profitability of that member over time, right, and managing that patient and getting to that $160. But can you maybe just help me and investors understand kind of like the time line of how that works, right? So each year, is it simply that, that patient was somewhat unmanaged or wasn't seeing the right specialist or wasn't doing things from a wellness perspective? How do I think about how the patient is better managed to be able to get to those economics?

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 229**

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean, I think that there is a progression in terms of what we're implementing with these groups that help drive that medical margin progression. I think we said we're comfortable as long as we have alignment with the partner that perhaps -- they'll start in different places, but that we can drive that improvement over time.

The Akron example I showed is accelerating ahead of where we would expect that to be, and that's really a function of very strong alignment and our ability to invest outside of that primary care office and the scale that we've got there. But what does that look like? In year 1, we really want to operationalize the model, which means the team is in there and the basics of value-based care, getting people in for structured wellness visits are really important in increasing the number of touchpoints.

We spent a lot of time in that first year and even in implementation identifying where the cost opportunities are. Are they in a potential -- particular specialty? Is there a readmission issue across the market? Is that at a certain facility? Because that's going to allow where you're going to be able to make those investments and really impact that.

And the last thing is there's a lot of learning in that first year. We used the network to feed in those references that I talked from other markets about what might this plan look like. Then as we move to year 2, we really start saying, "We've got a year's worth of data. How are we going to reduce the variability among the physicians that are within that group? How do we reduce variability among the pods that sit within that group?"

And we begin to invest, we begin to improve processes. We're looking at those care points outside of that primary care office. Because in that first year, that care team is pretty strong within the office. And then in year 2, we begin to invest in growth. So the case study that I showed, as we begin to ramp up whether, that's practice acquisitions that our partner is going to be making, whether it's residents that are coming into primary care for the first time, whether it's smaller groups who decide to join into that partnership, there is a conscious effort with them.

Because value-based care is -- benefits from scale. And so growing -- starting with the critical mass and growing that gives you huge value over time. And we're so early in our cycle, but we're already starting to see the benefits of that scale. So that's what that progression looks like. That's how you're able to drive that $150 to $200 that we talk about by year 5. Obviously, there are markets like Akron that are tracking well, well ahead of that. And I think when we show you on Investor Day, you're going to see a very nice cohort progression across our partner markets.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

When we think about utilization, you touched a little bit on -- as we think about COVID, right? And as we think about that modest inpatient utilization. And I think you made the comment that it's being offset right now by utilization on the other side. So should we think that there's any pent-up demand around things like elective surgeries as we go into 2022?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So we did see some bumps in the back half of '21 in terms of some discretionary surgeries. I don't know that we believe there's a massive set of pent-up demand, particularly in our model, because we've got those touchpoints, and we've been working very closely with those senior patients, particularly those high-risk patients. That's why that 50% increase in terms of touches with those patients yields such positive results.

But the shift from inpatient to outpatient, I think that's systemic. I don't think that's just agilon. I think that you are going to see that in larger ways. And I think that's a positive for the overall health care

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 230**

system. But it does mean where we invest and how we use our platform to keep the primary care doctor in the loop evolves.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

And we talked a little bit up here about margins, but maybe we can talk about long-term margin targets. You talked about, today in the presentation, but you've also talked historically about adjusted EBITDA profitability in 2022. But how do we think about, one, your long-term margin target? And two, how you get there over time? Like, what are the -- going to be the key things that we'll be looking out for?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So we've talked about a -- and Tim, you can jump in here, but we've talked about a long-term adjusted EBITDA target in the low double digits. The way we get there is that we're ultimately able to provide medical margins that are in the 25% range. We do sharing and we back off our platform support costs, and that's what gets us to that level. What makes that possible? I think you start with the core ingredients of alignment that you have with those physicians. I think you start with touchpoints in the primary care office. I think you stratify your high-risk patients. Those are the patients that have the greatest amount of costs and the greatest opportunity to manage them, but you need to really be all that and not just with the primary care doctor, but that entire care team.

And then it's going after those big cost settings, right? Specialty costs and what's happening within inpatient facilities. And so the investments that I talked about that we showed in that case study ED diversion, having nurses at that point of intersection and reducing the amount of folks that are going into inpatient.

That predischarge planning and getting the person to the right place, getting a 48-hour follow-up with their primary care doctor after they're discharged has a dramatic impact on reducing readmission rates. And so it's a combination of those things, Lisa, that I think drives that. And I mean, Tim, would you add anything to what I said?

**Timothy S. Bensley**
*Chief Financial Officer*

Just super quick, Steve, the only thing that I would say is that we -- I don't like to ever talk about our margin progression without saying there's just 1 component of what is really a compelling economic return story for us, as Steve talked about in the example where we have a very low cost of acquisition. We obviously are generating this positive medical margin, positive market EBITDA pretty quickly on that very, very low cost of acquisition. I mean we're getting paybacks in like the 1- to 2-year range.

And the returns on our members that are typically on the platform for 7 to 10 years is really tremendous. That margin part is a big part of it. Just real quick to fill in some of the gaps for anybody that's trying to do the math. If we're looking at an $850-or-so revenue PMPM and we're going to generate $200 long-term medical margin PMPM, that's, that 24% -- 23%, 24% that Steve was talking about. We approximately split that in half. So say we're looking at 11% to 12% flowing through to agilon.

We expect over time that we're going to continue to get scale as we have been this year out of our platform support costs, and it will reduce to say, 2% to 3% of G&A coming off that number. But again, we're pretty confident and excited about the DCE program and expect that, that will generate, say, 1% to 2% of margins over time -- or contribution to EBITDA margins over time. And that kind of gets you into that double-digit math. And we showed you some examples. We certainly have markets that are getting there already today.

And within markets, our more mature cohorts are already getting to that above $200. And we're going to come back in Investor Day and actually go deeper into those cohorts. You can see that progression, but very encouraged by those earlier cohorts and of course, they're not affected by the dilution of new members coming on already getting over that $200 medical margin PMPM level.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Tim, you updated, ever so slightly, direct contracting. Previously, it was slightly profitable. Now it's slightly dilutive to -- or a slight loss on the numbers. Can you maybe just talk about kind of what's going on in that book of business? And your expectations kind of going into next year?

**Timothy S. Bensley**
*Chief Financial Officer*

Sure. Yes. I mean, again, strategically, we think direct contracting is super important for us. Our partners are seeing the benefits of that scale they've got within their practice, and the scale they've got within their community. And we're seeing it in the results of MA and direct contracting.

We've got our medical costs coming in at or below what we expected in our raft similarly at or above the performance level that we laid out. The update of moving from modest -- positive to modest negative from an adjusted EBITDA perspective is really based on the update from the innovation center in terms of how we get paid, which is a benchmark and there's something called a retro trend adjustment.

That's based on national trends. For '21, it will be based on the national trends for '20 and '21. And the latest update that we got is that national trend will be down from what they provided us initially from a prospective basis. And so that makes that adjustment.

Now a couple of points. One, it's totally manageable for us within the quarter and on a go-forward basis. But two is the innovation center is really committed to this program. We're great partners with them, and they want to come up with a program that's sustainable and predictable and works for existing players as well as new entrants.

They've talked about a class of '23, and I think we'll be rolling that out here very soon. And so we'll work with them. We'll get another update. We'll be able to update that on the Q4 call. But that's really the update in terms of what's changed. The core underlying cost in RAF continue to look very good.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Well, we're out of time. I wish we had more time together. I look forward to your Analyst Day in the fourth quarter, but thank you so much to the agilon team for joining us. If you have any questions, reach out to me or anyone on my team or to Matt Gillmor and the Investor Relations.

**Steven Jackson Sell**
*President, CEO & Director*
Thanks, Lisa. Appreciate it.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 232**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 03, 2022**

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

| Delaware | 001-40332 | 37-1915147 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 6210 E Hwy 290, Suite 450 Austin, Texas | 78723 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On March 3, 2022, agilon health, inc., a Delaware corporation ("agilon"), issued a press release setting forth its financial results for the quarter ended December 31, 2021. The press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated March 3, 2022. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 236**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:    March 3, 2022    By:    /s/ TIMOTHY S. BENSLEY
Timothy S. Bensley
Chief Financial Officer

**APP 237**

**Exhibit 99.1**



# agilon health Reports Fourth Quarter and Fiscal Year 2021 Results

*Revenue growth of 44% for the fourth quarter and 50% for fiscal year 2021*

*Total members live on the agilon platform grew 82% to 238,000, driven by 42% growth in Medicare Advantage and contribution from Direct Contracting*

*Guidance for 2022 includes significant gains in Adjusted EBITDA while maintaining strong revenue growth, reflecting agilon's capital efficient partnership model*

*Class of 2023 new partners expected to add 80,000 Medicare Advantage members across 7 physician groups, including entry into 4 states and 8 geographies*

*agilon health scheduled to host inaugural Investor Day on March 11*

**AUSTIN, T.X., March 3, 2022** – agilon health, inc. (NYSE: AGL), the company transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients, announced results for the fourth quarter and year ended December 31, 2021.

<u>Fourth Quarter and Fiscal Year 2021 Results:</u>

•Total revenue of $463 million increased 44% during the fourth quarter, driven by 42% growth in Medicare Advantage membership, including 15% membership growth in same geographies.  For fiscal year 2021, total revenues of $1.83 billion increased 50% from 2020.

•Total members live on the agilon platform increased 82% to 238,000 as of December 31, including 186,300 Medicare Advantage members and 51,700 Direct Contracting beneficiaries.

•Net loss of $57 million in the fourth quarter compared to a net loss of $24 million in the fourth quarter 2020.  For fiscal year 2021, net loss of $407 million compared to a net loss of $60 million in 2020. Net loss for the fiscal year 2021 includes $292 million in non-cash stock-based compensation expense primarily related to agilon's initial public offering in April 2021.

•Medical margin of $31 million in the fourth quarter compared to $27 million in the fourth quarter 2020.  For fiscal year 2021, medical margin of $182 million compared to $192 million in 2020.  The year-over-year change in medical margin during fiscal 2021 in part reflects the impact from COVID on healthcare utilization in the prior year.

•Adjusted EBITDA loss of $27 million during the fourth quarter compared to a loss of $13 million during the fourth quarter 2020.  For fiscal year 2021, Adjusted EBITDA loss of $39 million compared to a $6 million gain in 2020.

"Our partnership model produced distinctive, predictable results in 2021, despite evolving COVID dynamics," said Steve Sell, Chief Executive Officer. "Looking ahead to 2022, we expect to generate significant gains in profitability while maintaining strong growth in membership and revenue.  Our partnership model and purpose-built platform, supported by powerful structural drivers, has enabled us to make rapid progress against our vision to transform healthcare in 100+ communities by empowering primary care.

**Outlook for First Quarter and Fiscal Year 2022:**

|  | Quarter Ended March 31, 2022 | | Year Ended December 31, 2022 | |
| --- | --- | --- | --- | --- |
|  | Low | High | Low | High |
| Medicare Advantage Members[1] | 245,000 | 250,000 | 260,000 | 270,000 |
| Direct Contracting Members[1] | 85,000 | 90,000 | 80,000 | 85,000 |
| Total Members Live on Platform[1] | 330,000 | 340,000 | 340,000 | 355,000 |
| Total revenues ($M) | $635 | $650 | $2,505 | $2,590 |
| Medical Margin ($M) | $82 | $88 | $290 | $305 |
| Adjusted EBITDA ($M)[2] | $10 | $14 | $0 | $10 |

[1]Membership reflects management's outlook for end of period.  agilon's partnered Direct Contracting Entities (DCEs) are not consolidated within its financial results.

[2]We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most comparable GAAP measure, and have not provided forward-looking guidance for net income (loss), because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation, that are not within our control or cannot be reasonably predicted.

### Membership Details for the Year Ending 2021

Total members live on the agilon platform as of December 31, 2021, were 238,000, an increase of 82% from 2020.  Total members live on the platform include 186,300 Medicare Advantage members and 51,700 attributed Direct Contracting beneficiaries.

agilon's consolidated Medicare Advantage membership increased 42% during 2021, driven by contributions from new geographies and 15% growth within same geographies.  Average Medicare Advantage membership was 186,200 during the fourth quarter and 181,800 for the fiscal year 2021.

### Outlook for Class of 2023 New Partners

agilon health expects to add 80,000 Medicare Advantage members from 7 new partner groups in 2023, driving record growth and entry into 4 new states and 8 new geographies. With the addition of these new partner groups, agilon health will have long-term partnerships with 23 physician groups in 12 states and 25 geographies.  Management intends to provide additional details on the Class of 2023 new partners at the company's investor day on March 11, 2022.

### Webcast and Conference Call:

agilon health will host a conference call and webcast to discuss fourth quarter and fiscal year 2021 results on Friday, March 4, 2022 at 8:30 AM Eastern Time. The conference call can be accessed by dialing (844) 200-6205 for U.S. participants and +1 (929) 526-1599 for international participants, and referencing participant code 269811.  A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is transforming health care for seniors by empowering primary-care physicians to focus on the entire health of their patients. Through our partnerships and our platform, agilon is leading the nation in creating the system we need – one built on the value of care, not the volume of fees. We honor the independence of local physicians and serve as their partners so they can be the doctors they trained to be. agilon provides the capital, data, payor relationships, executive experience and contract support that allow physician groups to take on the risk of total care for their most vulnerable patients. The result: healthier communities, and doctors who can devote the right amount of time with the patients who need it most. With rapidly growing appeal, agilon is scaled to grow and is here to help our nation's best independent physician groups have a sustained, thriving future. Together, we are reinventing primary care. For more information about agilon health, visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: (i) statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, dispositions, or other transactions discussed in this release; and (ii) statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plan including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operation strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage payments at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target markets; the spread of, and response to, the novel coronavirus, or COVID-19, and the inability to predict the ultimate impact on us; security breaches, loss of data or other disruptions to our data platforms; the impact of devoting significant attention and resources to the provision of certain transition services in connection with the disposition of our California operations; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential False Claims Act or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; the potential that we may incur future indebtedness; and risks related to other factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2021. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

# agilon health, inc.
**Consolidated Balance Sheets**
**In thousands, except share and per share data**

| | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 1,040,039 | $ | 106,795 |
| Restricted cash and equivalents | 14,781 | | 28,383 |
| Receivables, net | 293,407 | | 144,555 |
| Prepaid expenses and other current assets, net | 18,968 | | 9,639 |
| Current assets held for sale and discontinued operations, net | — | | 4,825 |
| Total current assets | 1,367,195 | | 294,197 |
| Property and equipment, net | 9,161 | | 6,456 |
| Intangible assets, net | 55,398 | | 60,468 |
| Goodwill | 41,540 | | 41,540 |
| Other assets, net | 112,958 | | 43,700 |
| Total assets | $ 1,586,252 | $ | 446,361 |
| **LIABILITIES, CONTINGENTLY REDEEMABLE COMMON STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Medical claims and related payables | $ 239,014 | $ | 162,868 |
| Accounts payable and accrued expenses | 112,946 | | 97,244 |
| Current portion of long-term debt | 5,000 | | 3,041 |
| Current liabilities held for sale and discontinued operations | — | | 3,682 |
| Total current liabilities | 356,960 | | 266,835 |
| Long-term debt, net of current portion | 43,401 | | 64,665 |
| Other liabilities | 94,295 | | 90,091 |
| Total liabilities | 494,656 | | 421,591 |
| Commitments and contingencies | | | |
| Contingently redeemable common stock, $0.01 par value: 76,201 shares issued and outstanding at December 31, 2020 | — | | 309,500 |
| Stockholders' equity (deficit): | | | |
| Common stock, $0.01 par value: 2,000,000 and 500,000 shares authorized; 400,095 and 249,374 shares issued and outstanding, respectively | 4,001 | | 2,494 |
| Additional paid-in capital | 2,045,572 | | 263,966 |
| Accumulated deficit | (957,677 ) | | (551,190 ) |
| Total agilon health, inc. stockholders' equity (deficit) | 1,091,896 | | (284,730 ) |
| Noncontrolling interests | (300 ) | | — |
| Total stockholders' equity (deficit) | 1,091,596 | | (284,730 ) |
| Total liabilities, contingently redeemable common stock and stockholders' equity (deficit) | $ 1,586,252 | $ | 446,361 |

**APP 242**

# agilon health, inc.
**Consolidated Statements of Operations**
**In thousands, except per share data**

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| | (unaudited) | | | |
| **Revenues:** | | | | |
| Medical services revenue | $ 461,999 | $ 320,227 | $ 1,829,735 | $ 1,214,270 |
| Other operating revenue | 887 | 780 | 3,824 | 4,063 |
| Total revenues | 462,886 | 321,007 | 1,833,559 | 1,218,333 |
| **Expenses:** | | | | |
| Medical services expense | 430,620 | 292,928 | 1,647,659 | 1,021,877 |
| Other medical expenses | 22,678 | 22,794 | 109,487 | 102,306 |
| General and administrative (including noncash stock-based compensation expense of $4,414, $1,738, $292,394, and $6,472, respectively) | 53,840 | 41,358 | 455,821 | 137,292 |
| Depreciation and amortization | 3,621 | 3,670 | 14,544 | 13,531 |
| Total expenses | 510,759 | 360,750 | 2,227,511 | 1,275,006 |
| **Income (loss) from operations** | (47,873) | (39,743) | (393,952) | (56,673) |
| **Other income (expense):** | | | | |
| Other income (expense), net | (8,534) | 2,886 | (4,500) | 2,465 |
| Interest expense | (840) | (1,953) | (6,146) | (8,135) |
| **Income (loss) before income taxes** | (57,247) | (38,810) | (404,598) | (62,343) |
| Income tax benefit (expense) | (179) | (791) | (886) | (865) |
| **Income (loss) from continuing operations** | (57,426) | (39,601) | (405,484) | (63,208) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | (1,209) | (6,890) | (3,463) | (20,049) |
| Gain (loss) on sales of assets, net | — | 19,087 | 473 | 20,401 |
| Income tax benefit (expense) | 1,898 | 3,189 | 1,687 | 2,804 |
| **Total discontinued operations** | 689 | 15,386 | (1,303) | 3,156 |
| **Net income (loss)** | (56,737) | (24,215) | (406,787) | (60,052) |
| Noncontrolling interests' share in (earnings) loss | 16 | — | 300 | — |
| **Net income (loss) attributable to common shares** | $ (56,721) | $ (24,215) | $ (406,487) | $ (60,052) |
| | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | |
| Continuing operations | $ (0.14) | $ (0.12) | $ (1.09) | $ (0.20) |
| Discontinued operations | $ — | $ 0.05 | $ — | $ 0.01 |
| **Weighted average shares outstanding, basic and diluted** | 396,411 | 327,231 | 372,931 | 323,462 |

**APP 243**

# agilon health, inc.
## Consolidated Statements of Cash Flows
### In thousands, except per share data

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (406,787) | $ (60,052) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 14,670 | 14,099 |
| Stock-based compensation expense | 292,394 | 6,688 |
| Loss on debt extinguishment | 1,590 | — |
| Loss (income) from equity method investments | 6,766 | (514) |
| Deferred income taxes and uncertain tax positions | (3,231) | (2,809) |
| Release of indemnification assets | 1,705 | 3,475 |
| (Gain) loss on sale of assets, net | (473) | (20,401) |
| Distributions of earnings from equity method investments | 174 | — |
| Other non-cash items | 58 | (162) |
| Changes in operating assets and liabilities: | | |
| Receivables, net | (149,041) | (59,381) |
| Prepaid expense and other current assets | (3,916) | (5,085) |
| Other assets | 3,931 | (1,977) |
| Medical claims and related payables | 76,339 | 42,383 |
| Accounts payable and accrued expenses | 19,360 | 24,922 |
| Other liabilities | (1,698) | 5,610 |
| Net cash provided by (used in) operating activities | (148,159) | (53,204) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (6,564) | (1,775) |
| Purchase of intangible assets | (6,862) | (575) |
| Investment in loans receivable and other | (82,831) | (3,847) |
| Proceeds from repayment of loans receivable and other | 7,095 | 2,058 |
| Proceeds from sale of business and property, net of cash divested | (1,344) | 26,205 |
| Net cash provided by (used in) investing activities | (90,506) | 22,066 |
| **Cash flows from financing activities:** | | |
| Proceeds from initial public offering | 1,170,942 | — |
| Proceeds from other equity issuances, net | — | 33,590 |
| Proceeds from exercise of stock options | 18,086 | 814 |
| Repurchase of shares, net | — | (6,742) |
| Proceeds from the issuance of long-term debt | 100,000 | — |
| Repayments of long-term borrowings and other | (119,899) | (3,041) |
| Equity and debt issuance costs and other | (14,739) | — |
| Net cash provided by (used in) financing activities | 1,154,390 | 24,621 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | 915,725 | (6,517) |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | 135,178 | 139,152 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | 3,917 | 6,460 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 139,095 | 145,612 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of period | 1,054,820 | 135,178 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of period | — | 3,917 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 1,054,820 | $ 139,095 |

# agilon health, inc.
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

| | Three Months Ended December 31, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | **2021** | | **2020** |
| Medical services revenue | $ 461,999 | $ | 320,227 | $ 1,829,735 | $ | 1,214,270 |
| Medical services expense | (430,620) | | (292,928) | (1,647,659) | | (1,021,877) |
| Medical margin | $ 31,379 | $ | 27,299 | $ 182,076 | $ | 192,393 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended December 31, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | **2021** | | **2020** |
| Platform support costs | $ 30,899 | $ | 25,802 | $ 123,521 | $ | 99,943 |
| Geography entry costs[1] | 7,872 | | 11,607 | 20,583 | | 17,945 |
| Severance and related costs | 7,763 | | 493 | 12,861 | | 4,009 |
| Management fees[2] | — | | 395 | 433 | | 1,530 |
| Stock-based compensation expense | 4,414 | | 1,738 | 292,394 | | 6,472 |
| Other[3] | 2,892 | | 1,323 | 6,029 | | 7,393 |
| General and administrative | $ 53,840 | $ | 41,358 | $ 455,821 | $ | 137,292 |

(1)Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue.

(2)Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R"). In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3)Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

**APP 245**

# agilon health, inc.
**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

## NETWORK CONTRIBUTION

|  | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
|  | 2021 | 2020 | 2021 | 2020 |
| Income (loss) from operations | $ (47,873) | $ (39,743) | $ (393,952) | $ (56,673) |
| Other operating revenue | (887) | (780) | (3,824) | (4,063) |
| Other medical expenses | 22,678 | 22,794 | 109,487 | 102,306 |
| Other medical expenses—live geographies[1] | (18,704) | (17,957) | (97,498) | (93,377) |
| General and administrative | 53,840 | 41,358 | 455,821 | 137,292 |
| Depreciation and amortization | 3,621 | 3,670 | 14,544 | 13,531 |
| Network contribution | $ 12,675 | $ 9,342 | $ 84,578 | $ 99,016 |

(1)Represents physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2021 and 2020, costs incurred in implementing geographies were $4.0 million and $4.8 million, respectively. For the years ended December 31, 2021 and 2020, costs incurred in implementing geographies were $12.0 million and $8.9 million, respectively.

## ADJUSTED EBITDA

|  | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
|  | 2021 | 2020 | 2021 | 2020 |
| Net income (loss) | $ (56,737) | $ (24,215) | $ (406,787) | $ (60,052) |
| (Income) loss from discontinued operations, net of income taxes | (689) | (15,386) | 1,303 | (3,156) |
| Interest expense | 840 | 1,953 | 6,146 | 8,135 |
| Income tax expense (benefit) | 179 | 791 | 886 | 865 |
| Depreciation and amortization | 3,621 | 3,670 | 14,544 | 13,531 |
| Geography entry costs[1] | 11,846 | 16,670 | 32,572 | 27,100 |
| Severance and related costs[2] | 7,763 | 493 | 12,861 | 4,009 |
| Management fees[3] | — | 395 | 433 | 1,530 |
| Stock-based compensation expense | 4,414 | 1,738 | 292,394 | 6,472 |
| EBITDA adjustments related to equity method investments[4] | (571) | — | 1,736 | — |
| Other[5] | 2,642 | 1,323 | 5,293 | 7,393 |
| Adjusted EBITDA | $ (26,692) | $ (12,568) | $ (38,619) | $ 5,827 |

(1)Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2021 and 2020, (i) $4.0 million and $4.8 million, respectively, are included in other medical expenses and (ii) $7.9 million and $11.6 million, respectively, are included in general and administrative expenses. For the years ended December 31, 2021 and 2020, (i) $12.0 million and $8.9 million, respectively, are included in other medical expenses and (ii) $20.6 million and $17.9 million, respectively, are included in general and administrative expenses.

(2)For the three months and year ended December 31, 2021, includes taxes and related costs on stock option exercises for departed executives of $5.4 million.

(3)Represents management fees and other expenses paid to CD&R. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(4)Includes direct geography entry costs of $0.1 million and $1.3 million for the three and twelve months ended December 31, 2021, respectively.

(5)Includes changes in non-cash accruals for unasserted claims and contingent liabilities.

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner compensation and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization expense, (v) geography entry costs, (vi) stock-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity by entity basis.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications Officer
media@agilonhealth.com

Source: agilon health

# EXHIBIT 9

APP 248

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Company Conference Presentation

Wednesday, May 11, 2022 6:00 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 249**

# Table of Contents

Call Participants ................................................................. 3

Presentation ..................................................................... 4

Question and Answer ............................................................. 5

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 250**

# Call Participants

**EXECUTIVES**

**Kevin Spencer;Chief Clinical Partner**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 251**

# Presentation

**Kevin Spencer;Chief Clinical Partner**
agilon health is a company that enables physicians to take risk across their Medicare books of business. And presenting today, we have Steve Sell, CEO; we have Tim Bensley, the CFO; Matt Gillmor from Investor Relations is here. I think we'll just jump into the queue.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 252**

# Question and Answer

**Kevin Spencer;Chief Clinical Partner**

So I guess when we think about the model that you guys have, I mean, we're actually just kind of talking before this, but there's not a great comp to kind of what you guys do right now. Why the technology aspect of it versus kind of the clinic aspect of it and by enabling existing finish groups versus growing PCP clinics?

**Steven Jackson Sell**
*President, CEO & Director*

Sure. Yes. I mean I think what we're building is really what the market needs and what groups that are out there need. So there's a tremendous demand for a new primary care model that allows physicians who've been in their communities for decades to deal with the challenges of Medicare population that's aging. It's 30% of their practice. It's very challenging for them from an economics perspective. You have payers, whether it's CMS at the national level or national payers who are really pushing for more of a move to value-based care.

And so from the very beginning, we saw the opportunity around building a sustainable primary care model with our partners to be really distinctive. How we've done that from a technology perspective, from a partnership perspective, really is intended to build around the strength that fits with each one of our partners, the reputation they have in their geographies, the relationships they have with their senior patients. And we're really investing in things that drive differences, Kevin. So we're not building clinics. We're not spending a lot on an agilon brand out there.

Everything is focused on leveraging their existing patients as they turn age 65 and move into Medicare and how do we help them provide better quality and lower cost in a total care relationship. So I think that's really the logic around why we've done it. The success that we're seeing is really a fact that those macro factors have only accelerated in the last 5 years. Payers are looking for it much more. The pain that these groups are facing from an economic perspective with the aging population has grown really pretty dramatically. And then the success that our groups are seeing literally any medical group in the country can look at an agilon partner that sits across our network of 23 partners in 12 states and find a group that looks like them. And so we give them a 5-year pro forma of here's what this could look like. And they cannot just believe that based on the data that's there, but actually look at a group that looks like them and what their experience has been. So the combination of those things is really driving an incredible step in growth and in terms of performance.

**Timothy S. Bensley**
*Chief Financial Officer*

And Kevin, we have been talking about that before I walked up at your opening comment about, there isn't really necessarily another easy comp out there to us what we're doing, that our model is pretty unique. And one of the things that Steve talked about, of course, this idea of these long-term partnerships, the economic model that we bring and the alignment that drives with our physicians that really creates that opportunity for us to pretty rapidly grow members at the same time that we're growing margin. And I think that really was born true in our results that we just put up in Q1 is part of it.

But I don't let that comment go by ever without making this next comment. The capital efficiency of our model is phenomenally different than I think than anything else that is out there. We're not out there investing in member acquisition, marketing costs. We're not investing in building a clinic. We do invest pretty nicely with our partners to help drive growth and capabilities. But the capital efficiency of our model is really tremendous. And so the return of that we get on those investments is also really strong. And I think that's another huge differentiator.

**Kevin Spencer;Chief Clinical Partner**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 253**

Yes. So how do you think about the growth algorithm for agilon when you think about MA growth, capitation growth, and new contracts? And how should we think about the long-term growth here?

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think the success that we're seeing the acceleration in growth that we're seeing is a function of we grow in two ways. We enter new markets where we like to be first in terms of moving that market to risk, build around a scaled partner who's really well respected within that group, enter this 20-year exclusive joint venture, which is a true partnership. And then they're the vehicle that we're going to build around for the long term in that community. And so we've just gone from 8 to 12 states. We've just added 7 new partners. And so that side of it is going very well for the reasons that I mentioned, the macro forces and the proof of the success that we've had. And then the other side is the same geography growth rate, which is going in the mid-teens pretty consistently. And there's two sides to that.

There's the organic growth within Medicare Advantage running about 8% nationally. And we continue to gain our fair share with the existing patients that sit within that practice and roll over. And then the place we're seeing a real acceleration is other physicians within those communities that we've entered, choosing to join into that group or into the agilon platform. And so we've got 1% of the primary care physicians in the country, which has got over 2,000. There's about 200,000 primary care physicians. But when we look at those two sides of growth and the opportunity, there's just tremendous runway and momentum both for new markets, new partners, and the same geography. That's helpful.

**Timothy S. Bensley**
*Chief Financial Officer*

Now I just going to say, Steve, and this is another thing that we always talk about in our model is because we have these partnerships at scale with these primary care physician groups, we also have pretty good visibility into one big component of that growth. So when Steve talks about same geography growth, the big part of the same geography growth is either existing members in our existing patients on the panels of our PCPs, deciding to move from fee-for-service into MA, primarily happen to an AEP process. And of course, we see that. But the other thing is just people aging in during the year. And those are patients that are currently seeing our physicians that are on their panel. They know these people and they're aging into it.

When you look at our existing markets, we have something like 165,000 patients that are currently on our physician's panels that are going to age into Medicare in the next 5 years. And we know who they are. So we have visibility to that. I think there's something like another 100,000 that have already passed 65 and just haven't selected to move into Medicare yet, so we call them kind of extended agents. So that's 250,000 to 300,000 members that are on our physicians panels right now that we have visibility to. So our ability to have not only say, hey, we can drive that mid-teens kind of same geography growth or visibility to a big component there is just endemic in our model.

**Kevin Spencer;Chief Clinical Partner**

Yes. Actually, going to build the next I think capital efficiency dynamic is pretty compelling. And then we've seen agilon has performed quarter-to-quarter during COVID much more consistently than a lot of the peers who are doing similar things with the one clinic model. So maybe just expand a little bit more about maybe the visibility you have also from a cost perspective or coating perspective from the way that you've built your model or brand.

**Steven Jackson Sell**
*President, CEO & Director*

Yes, I'll start and Tim can jump in. I mean I think one of the real differentiators in our model is in the high-touch nature between the primary care physician and the patient. Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade. And so we understand those groups very well. As we bring them on board, we have great visibility from a cost perspective because we've got that experience with them. We take a 12-month implementation period, which I think is

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 254**

distinctive. And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective. And so that visibility and that continuity is a big differentiator.

In COVID, what we were able to maintain was the touch points with these senior patients. More of it was done via telemedicine that had been done historically. But our experience scores with patients actually went up during COVID. They said they felt cared for. They had a relationship. And I think that translated into more predictably from a cost perspective, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points. And we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues.

**Timothy S. Bensley**
*Chief Financial Officer*

Kevin, do you want me to touch on the actual the capital efficiency part of that.

**Kevin Spencer;Chief Clinical Partner**

Yes, sure.

**Timothy S. Bensley**
*Chief Financial Officer*

There's really, if you think about the two ways that we grow, we bring new markets like we just brought 60 markets live in January that were in implementation last year that are about 52,000 members that were reported in Q1. So that's one big way we've grown and the other way is the same geography growth. The cost for us to bring a new market on is essentially all of our costs for us, if you want to call it that, acquiring a new member. And for us, all of that is essentially the investment we make during that almost full year of implementation that we have before market goes live and we take full risk and start generating revenue. That cost to us is only about $400 to 500 I'd say, market to market per member.

When you think about the medical margin that we generate, even in the early years of lower medical margin PMPM rates over the first year and year half, we're paying that $400 back within a year to two years, usually closure to a year than 2 years. So the cost to acquire members, the cost to get that up and running on a per member basis, just phenomenally low and immediately paid back. The other way that we grow in same geography growth, I mean, that does not really cost us a lot of money at all. The way that we essentially support that growth is through some capital support that we can give to our partners that help them bring more physician groups or more physicians underneath the tent. And all of that comes in at even a lower cost than that $400. So across the board, our cost to acquire a member in any one year, and we went through the detailed economics and full at our investor conference in March is like on average, 400. It was actually a little bit less than that last year.

So if you think about our ability to grow as fast as we have, and we're only spending like $400 a member to do that, the sort of lifetime value to contact economics have you want to look at that are almost like ridiculously positive. So that's really not an issue for our model. I mean that would be very different, obviously, for other models.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

We're a multi-payer model moving the entire Medicare managed book [ risk ]. Churn is really low. The retention we have is north of 90%. And so we're hanging on to these patients.

**Timothy S. Bensley**
*Chief Financial Officer*

So if you take that into account and say you are holding on to a member for even 10 years on average, that our LTV to CAC on these things are 15-plus to 1. I mean it's just a phenomenal payback. But it's almost like it doesn't even matter to quote those numbers what it really means is we just don't need a

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 255**

huge amount of capital for us to deliver our growth plan over the next 5 to 10 years, and we can grow in a very capital-light capital-efficient way.

**Steven Jackson Sell**
*President, CEO & Director*

I would say the retention that Matt talked about is a huge differentiator. So I ran a payer for 2 decades. The best retention I ever saw was in a staff model with Kaiser in California, which was 80% retention. What he just told you is we're running in the low 90s. Now running 95% to 96% is the best you can ever do because of by definition, the senior population, you're going to have roughly 4% pass away a year. And so a subscription model across a 20-year partnership with physicians that are going to be in average in the practice for 13 years is with that sticky member relationship is just incredibly compelling. And so that's why we feel so comfortable about the visibility and the predictability as we look out years because we've got years now of experience with that, tracking at that retention level and the growth in margin.

**Timothy S. Bensley**
*Chief Financial Officer*

And I was talking maybe focusing on the cost side of the LTV to CAC, but the LTV side, the lifetime value of those members, the fact that we have this sticky relationship, and these are patients that have been seeing these doctors pre becoming a senior most likely and under the continual care may not just significantly helps to drive the overall outcomes and the cost down for those patients. So the other side of it or what's happening to the cost for those patients and more positive outcomes is a big part of the model as well and a big part of that equation?

**Kevin Spencer;Chief Clinical Partner**

Yes, that's helpful. I mean you guys have already talked about the 2023 pipeline. You've been strong. So we now talking about 2024 , so any initial thoughts or comments on kind of how 2024 is looking?

**Steven Jackson Sell**
*President, CEO & Director*

Well, the 24 pipeline is really robust. The success that we've had with 23 and the diversity of the types of groups, including our first health system, which is very visible, main Health incredibly well respected, has only sort of increased the interest in partnering with agilon. We have primary care only multispecialty scaled networks like IPAs and health systems all interested. And we think of it as a funnel. The top of the funnel is more full at this point in the year than we've ever seen it. And it's across that diversity and existing states, new states. So I think that's very encouraging. We always say we have to choose the partner wisely, make sure they fit those criteria that we talk about in terms of really well governed, primary care-centric, commitment to transparency, having that critical scale. And we need to choose well because we're going to build around them for the next two decades, but it's as encouraging as it's been.

**Kevin Spencer;Chief Clinical Partner**

So that point about picking the right partner, like do you actually get situations where you have two partners in the marketplace who both want to work with you and you actually see it between one of the other order you're saying, do you have finite resources, you can only do x number, and so you have to prioritize.

**Steven Jackson Sell**
*President, CEO & Director*

So in the same geography, we have had a couple of partners where we've gone live with both of them in one integrated entity and another in which we set up sort of two partnership relationships with them side by side. So we do have that. So yes, we do have that. Akron is a great example of how that happen kind.

So Akron Pioneer, one of our best performing groups came on in year two, primary care only group. There was another group in town called Community that they are basically one and two very well-run groups, community had never had a partnership and said, we're not ready for this right now. They've

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 256**

come on board as of January 1 this year, really based on what they saw happen with Pioneer. A Pioneer is transformed; they've grown 30%, 35% a year. They've seen an increase in PCP economics based on surplus of 100-plus percent. They are at such a scale position. They actually have at the local hospital where they admit most of their patients, they actually now have their own wing, where if you're a patient, you go in there, everyone who's seeing you either works for Pioneer or as an agent of pioneer. And that's a function of scale, but community said, "Wow, we need to get on that," and so they've joined this year.

**Kevin Spencer;Chief Clinical Partner**

And so when you say talk about picking the right partner, like how often does a physician group approach you and you say, you know what? No, versus.

**Steven Jackson Sell**
*President, CEO & Director*

Well, so we have said not right now. Here are things that we want to work on. A big part of it is kind of governance model and how they're committed around that. We would probably not work with a group in which the ownership of the group is concentrated in a few physicians within the group. We want much more sort of distributed. The idea is that the individual physicians' economics are driven based on how the group works, and you want this to be a team-based sport. So there's a lot of peer-to-peer reviews and other things that you want going on to stimulate improvement and understand what best practices are, that only works if they really have a commitment to distributing the economics across.

**Kevin Spencer;Chief Clinical Partner**

Yes. On the call, you guys talked about kind of year two economics and the ramp-up and there was pretty strong, I guess, up 30%. What's driving that? And I guess, what you're trying to think about how replicatable that type of us and how do we think about the year three or four from there?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean so what we talked about was about 160,000, the 250,000 sit within that year two plus set of cohorts, and they improved from $109 PMPM a year ago to $143. So pretty significant improvement within that period of time and that includes the 36,000 that just joined last year. And so they're obviously well below that level. So they're dilutive within that, and it includes the same geography growth that Tim talked about.

But even with that dilution, you're seeing that overall growth. If you look at the cost areas where it is you see it in inpatient spend, you see it in specialty costs coming down dramatically, readmission rates down pretty significantly and then post-acute, what's happening in terms of total cost and experience after discharge from the hospital. But what we've got now is enough reference points that we can say what is driving that because we have pretty consistent applications on specialty referral or palliative care across the network. The biggest differentiator is the quality upfront in terms of the primary care relationship that aligned PCP we talked about and the touch points they have, particularly their most complex patients. If they do that really well, they have a care team around them that's following up with them regularly. They're following up within two days post discharge from the hospital versus the norm used to be about a week for us.

It has a dramatic impact on the cost areas that I just talked about, but it really goes back to that high-touch relationship between the physician and patient and making sure they have the data they need and they have the team around them that gives them the time to spend with those most complex patients.

**Timothy S. Bensley**
*Chief Financial Officer*

All those things, Steve, that you're talking about that just allow us to execute on what we think is just one of the absolutely fundamental if you want to call it, headlines of our model, which is we can grow members at a pretty rapid flip at the same time that we're growing margins. And of course, we already said the third part, we can do that capital efficiently. But those numbers from now we have real proof

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 257**

points, right? Those numbers from Q1 are just a direct factual proof point of that, that we could take those 160,000 members that are partnership markets that have been on the market for at least a year, they absorbed 14% same geography growth, which is dilutive in the short term, and yet at the same time, we're able to have that overall medical margin blended improvement from what did we say, $109 up to $143 year-over-quarter.

I think the cohort data that we showed that you were referring to, Kevin, at the Investor Day in March showed the same thing we're now seeing. We've now got enough years in some of these markets to show hey, that idea that we can grow members at a rapid clip at the same time that we're growing margins is proving out for all the underlying operational reasons that are drivers that Steve was just talking about.

**Kevin Spencer;Chief Clinical Partner**

I guess from the outside, looking at sometimes it's harder to segregate like what was COVID and how that's impacted the numbers. So I mean, like the things you said don't speak to correlated, but any way to kind of...

**Timothy S. Bensley**
*Chief Financial Officer*

I think it's pretty easy. That's another nice thing about the Q1 results now that we just reported last week is that there's really pretty neutral year-over-year COVID overlap. Okay. So our COVID as a percentage of our costs in both the first quarter of last year and the first quarter this was about 2%. So there's not really a part of that increase is because you're overlapping high COVID cost or the other way around that you had big COVID suppression that we didn't have last year. So I think this quarter is a pretty clean example. So that 148 over 109 progression is a pretty apples-to-apples.

**Kevin Spencer;Chief Clinical Partner**

Okay. And then we've is a question I always ask you. I think you was interrupted the wrong way. So basically, the question ends up being this model, everything that you're doing right now, the acceleration and the physician engagement, it makes so much sense to me because it's working. But I almost wonder as we think about that growth algorithm for the next 5 years, I think it's going to be higher than what you're talking about. The problem which is pretty high, the problem I see is like what's the growth algorithm in year 6 through 10? Because it feels to me like every physician is going to even certainly the large ones that you target, right, are going to be sophisticated enough to have this type of model in place, I would think over some point of the next year. So how do you extend that growth after that?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean I think macro level, we've got 1% of the primary care physicians in the country. So there's a tremendous amount of run rate. We're in 12 states, right? So there's many more states in which it's 100% fee-for-service, and there are scale groups that are out there. There are hundreds, if not thousands of communities with that same sort of mercotype. And so I think we are seeing the acceleration that you talked about, right? So we added 600 primary care physicians here for January 1 of this year, it put us over 2,000, obviously, an acceleration. If you kept at that rate or more, what are you talking about, 3,000, 4,000, 5,000 primary care physicians over the next 5 years, that still puts you at 6,000, 7,000 against a total of 200,000 that's out there.

And I will say, Kevin, I think we uniquely create this opportunity in communities. You go in and the health plans are not built for risk. Majority of our health plans have never done it before. And the groups are not equipped to do that. And so I think we will continue to be that go-to source for that. I think adding new states gives us a huge infill opportunity in the out years, adding these four states, we will go and mine those states for the next five to ten years in terms of new communities and in terms of other physicians that join. So I think it will be lumpy, but I don't worry about 2030, 2035, what that long-term growth opportunity looks like. And it doesn't rub me the wrong way, by the way.

**Kevin Spencer;Chief Clinical Partner**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 258

So I guess when we think about your model because you're unique in that you have a solution for the Medicare business. I think your analysts talked a lot about how Medicare isn't really profitable positions. So you got a solution for the fastest-growing part of their panel, which hasn't historically been terribly profitable, but there are other companies that are helping physicians engage I care also helps you on the commercial side. So do you believe that not having a whole wrap around all payers? Is there any way disadvantage to you? Or why would someone choose your model versus another one that might [indiscernible]?

**Steven Jackson Sell**
*President, CEO & Director*

I mean I think the reason these scale groups are choosing us is for what we've talked about. The macro forces that challenges within Medicare, economically, capacity-wise, etcetera, and then the success it's seeing here. To be able to take your least profitable part of your practice and actually the one that is threatening your survival and turn it into this tremendous asset that really allows you to invest and create a new primary care model, I think, is pretty priceless for these groups. And so that's what, I think, drives it. But it doesn't mean that commercial is not super important to our model and that our groups don't dramatically see improvement in part from that commercial business. Commercial, well, it doesn't directly run through the partnership, indirectly has a massive impact. One is scale. So our groups have 20%, 25%, 30%, 35% of the adult primary care capacity in their communities. They're typically 70% commercial, 30% Medicare, but when we look at things like specialty cost referral around cardiology, oncology, ophthalmology retinal drugs, etcetera.

If you're an ophthalmologist, and we're asking you to substitute drug A versus drug B, and you have a scaled group, that scale has a major impact. They're going to take the call, they're going to make that adjustment in terms of that. And so commercial is important for scale. And then the second piece is what Tim talked about is the efficiency of the growth. So commercial is super important within that right now. Our groups are typically doing very well on the commercial side. And so right now, our plan is to keep going after that massive Medicare TAM, keep entering the 20-year exclusive joint ventures at other physicians and other parts of the state around it.

**Kevin Spencer;Chief Clinical Partner**

So you're not hearing from your partners if they want...

**Steven Jackson Sell**
*President, CEO & Director*

We're not.

**Kevin Spencer;Chief Clinical Partner**

What about Medicaid, that feels like the risk might make sense or can [indiscernible].

**Steven Jackson Sell**
*President, CEO & Director*

I have a lot of experience in Medicaid, right? So I mean I ran the biggest Medicaid plan in California for a long time. I don't think that's an area of focus right now. I mean it's different from a network perspective, different from a population perspective over time. Certainly, duals an area that we see more D-SNP is an area that we see more. So as those cross over, I think that would be sort of that logical growth point.

**Kevin Spencer;Chief Clinical Partner**

And you're somewhat unique disruptors in that you're basically profitable now and you've got $1 billion of cash on the balance sheet. So there's not really a funding issue to worry about. So what do you do with that much cash? Where is neurological acquisition.

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 259**

Well, I mean, as we said on the earnings, we really like having dry powder, particularly in this area of volatility. We are very close to generating positive cash. So that's not really a drain on it. There's the two areas that we talk about. The best use of our capital is putting our groups in a position to grow and be that aggregator within their communities, and we are aggressively pushing on that. The second side of that is capabilities that can really help us reduce cost, particularly in the communities where we have scale. And so as you think about post-acute, things within the home, as you think about the major cost categories, cardiology, oncology, GI. I think there are tremendous opportunities for us to really leverage that and get after those costs. But as we look at that today, that's not going to approach the majority of the capital that we've got. And I just come back to, again, I think we like having the dry powder.

**Kevin Spencer;Chief Clinical Partner**

Excellent. I think that's all we have time for. Thank you very much.

**Steven Jackson Sell**
*President, CEO & Director*

Great. Thanks, Kevin.

**Timothy S. Bensley**
*Chief Financial Officer*
Thanks, Kevin.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 260**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

**APP 261**

# EXHIBIT 10

APP 262

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Company Conference Presentation

<span style="color:red">Wednesday, June 08, 2022 2:40 PM GMT</span>

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 263**

# Table of Contents

Call Participants ............................................................................. 3

Presentation ............................................................................. 4

Question and Answer ............................................................................. 10

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 264**

# Call Participants

**EXECUTIVES**

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Ryan Scott Daniels**
*William Blair & Company L.L.C.,*
*Research Division*

**Unknown Analyst**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

**APP 265**

**AGILON HEALTH, INC. COMPANY CONFERENCE PRESENTATION | JUN 08, 2022**

# Presentation

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Good morning, everyone. Welcome to day 3 of our William Blair Growth Stock Conference. Great to have -- I've said this before, but all of you back in person today. Great to see a nice crowd this morning and very excited to have our team from agilon health here. Steven Sell, who's to my left is the company's CEO; and Tim Bensley is Chief Financial Officer, to his left. Also in the second row, we've got Matt Gillmor, who runs Investor Relations for the firm. I won't go into a lot of detail on agilon, as Tim and Steve will go through this both here and in the Q&A up in the model room afterwards. But great story, one we love because, number one, it's targeting what we view as probably the most attractive market in all of health care. That's Medicare Advantage, phenomenal long-term growth opportunity and really entering the prime of the best decade of growth in patients.

#2, a really impressive operating model that's capital light. They partner with existing provider groups and help them move Medicare risk. They do so without acquiring practices or opening practices. So start with groups of providers with large patient path, very efficient lifetime value for customer acquisition costs.

#3, and probably most important, great operating culture and business model that delivers improved care for patients, improved incomes and lifestyle for physicians and reduces the cost of care. So it really is a nice triple win solution, which we often don't see in health care. There's conflicting interest a lot, but this is really aligned with what we view as a future of health care in the United States. So super happy to have them here today.

With that 2 quick reminders, again, we'll have the breakout up in the model room afterwards. And I'm also required to inform everyone that our disclosures are available at williamblair.com. So with that, I'm going to turn it over to Steven.

**Steven Jackson Sell**
*President, CEO & Director*

Great. Thanks, Ryan. Well, it's great to be here. It's great to be in person. Feels like a long time coming and excited to talk to you today about Agilon. We are pretty excited about building a new primary care model, one that allows existing physicians, existing senior patients and existing health plans to move from the challenges of a transactional fee-for-service world into a subscription-based model that really allows that primary care physician to manage the total cost, quality and care for senior patients. We'll walk you through it. It's a much better model. We enter into exclusive 20-year joint venture partnerships with groups who've been in their communities for decades and are extremely well respected. And the company was founded in the middle of 2016.

We went live with our first partner group, implementing them in '17, went live January 1 of '18, and the business has taken off. If you look at the numbers on this chart, with the class of 23 that we've already announced that we're implementing, we'll be approaching 0.5 million senior risk members on the platform. We've gone north of 2,000 primary care physicians. Of note, that's roughly 1% of the primary care doctors within the country.

We've got a diverse set of partners. We started in primary care only groups, and we've really expanded. We added multispecialty groups within our second year, then scaled networks for people in health care, those are IPAs or physician organizations. And then most recently, we announced a partnership with MaineHealth, which is our first health system, which dramatically really expands that TAM overall.

Physicians are winning and benefiting. But from an investor perspective, things I would call out really large growing addressable market. Ryan talked about Medicare Advantage and Medicare going over $1 trillion here. We go after that in a unique way. We like to go to markets and partner with groups that are 100% fee-for-service. This has never been done before and really unlock those. Half of our health plans, we work with 22, have never done this before. So groups haven't done it, physicians haven't done it,

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 266**

**AGILON HEALTH, INC. COMPANY CONFERENCE PRESENTATION | JUN 08, 2022**

health plans haven't done it. So we're creating the market as we go. It gives us a really unique first-mover advantage. You start with a scaled partner, you have a 20-year exclusive joint venture partnership. You really control this move to value, and Tim will talk to you about it. It's the way we're generating mid-teens same geography growth quarter in, quarter out.

Alignment, super important. We have incredible alignment with our physicians in which the practice economics are aligned with better outcomes from a cost and quality experience. we take 100% of the downside. We split the upside 50:50 with them. And as a result, physicians are winning. They're not only able to practice medicine the way they were trained, spend more time with their most complex patients, but their personal economics have changed dramatically. The average primary care physician makes $180,000 to $200,000 a year. In this model, we're going between $300,000 and $400,000, and we have physicians that are doing much more than that.

And then finally, an incredibly efficient capital-light growth model, incredible visibility. Tim will walk you through a forecast out to '26 and why we have such high confidence in that. This is a scale issue and it requires a scale solution. The demographics are pretty massive, right? We're approaching 78 million seniors here by 2030. MA penetration is going to go well over 50%. That is pressuring these practices. These practices, on average, have been 75% commercial, 25% Medicare. That's moving to 70-30. It's moving up more and more. Historically, primary care physicians make a lot of money on their commercial business. They lose money on Medicare patients. And so if you just take that demographic trend, that's a major challenge.

Primary care physicians, we need more of them, but the reality is, they're burning out and they're leaving. A big part of it is the complexity of this population. They need to spend more time, but you're in a system which pays them $100, $200 for a senior visit, is just not economically sustainable. And then finally, you've got the biggest payer in the country saying, we want all seniors by 2030 in a total care relationship with a primary care physician, in part because of the variations that you see here, dramatic variances in terms of minorities and underserved populations.

So if you look at the right, that's what the chart looks like absent a new model for a primary care physician, less time, less economics. It's not a great outlook. That's where we've come in. We've created this new model. We basically moved people from the left in terms of a traditional transactional fee-for-service model in which those physicians don't have time. It's very fragmented. It's very payer driven. So depending upon the card you come in, the experience that you have in the office, the quality program, the incentive program is driven by that.

In the model on the right, we are multi-payer, but we have one approach. Regardless of what card you're coming in with, it's one incentive program. The people in the front office know how it works. The physicians, the care teams understand that. You're surrounding these physicians with far more resources, social workers, pharmacists, care managers, nurse practitioners. They have that total responsibility, their resources in the primary care office, but also outside embedding folks in ERs, in other places. And you have a subscription model that goes from that $100 a visit to roughly $850 a month that, that primary care physician in this partnership has got the total responsibility for.

The way we got here is we made a few key choices, and really, it's the advantages that I'm hoping that you'll take away. The partnership model is very conscious. We don't build facilities, we don't go out and buy doctors. As Ryan said, we focus on these geographies that are 100% fee-for-service. So we're not -- you're not going to find us in Southern California or Southern Florida where a lot of companies in value-based care grow up. Why? I grew 20 years in Southern California, that's where the ecosystems are. It's easier. There's a lot of things around you. So when we talk about creating this and then owning these markets for 20 years, it's a conscious choice.

We've purposely focused only on over 65 Medicare Advantage and a new program called direct contracting, which we are changing the name to REACH now. But the concept is it's a subscription model and you have the total responsibility. The advantage you get, you get that first mover advantage I talked about, scale with a partner and alignment.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 267**

Why is alignment so important? An aligned primary care physician behaves differently and drives outcome. The holy grail in health care, people can look at a lot of data and say, why are these decisions not changing? The reality is you have to get alignment with that physician. And when you do have alignment, you can make decisions and influence care delivery in the ways you see on here. Referrals to high-value cardiologists can save as much as $2,000 per patient. We stratify those patients, provide the physician with the top-tier cardiologists from a cost and quality perspective.

Prescription drug, huge in an over 65 population. You can save nearly $10,000 per patient by substituting a clinically equivalent drug. But there's a lot of incentives that sit within health care that make that more difficult. That's where that alignment comes in. And you can see the other examples, which are here. But the point being that's where the power of this aligned PCP is. Local market scale is crucial. Having 1% of the PCPs in the country is big, but it really starts at that local level.

Syracuse and Pinehurst are 2 of our newest markets. They literally went live in January, but look where we're starting. We just started generating revenue January 1. We've got 50 PCPs or roughly 1/4 of the primary care market. In Syracuse and in Pinehurst, 26 PCPs, 40% of the market. Look at the next largest players there. In Pinehurst, the next largest practice for PCPs, to PCPs. When those physicians decide to move to value, who do you think they're going to do it with? We control it, we guide that. Tim will talk to you about the same geography growth rates, but that's the point on this scale. You can influence care downstream and you become the vehicle for others to join in.

You put it together, scale and align PCP and you move from the picture on the left to the picture on the right. On the left, a world which is uncoordinated, no accountability. Basically, when the physician -- or when the patient leaves the office, primary care doctor really doesn't know what happens. They don't know if they're going to the ER. They don't know if they're going to the hospital. In the world on the right, there's way more resources. They're able to spend more time with the complex patients. They've got people embedded in the high-volume hospitals and the local ERs that's really allowing them to influence stat care delivery.

You've got prioritized skilled nursing facilities, you've got folks rounding within those. You can make major differences in terms of overall cost and quality. The first mover advantage the one I talked about, but the significance is now that we're doing this across diverse partners and geographies. So regardless of a geography you're in, what your MA penetration rate is, the type of group health system, multi-specialty group. You can find a group in the Agilon network that looks like you and it's why our growth is accelerating. It's not just the macro forces, but it's really the success that we've generated. All this leads to improving overall quality and experience.

You're seeing reductions in readmission rates. You're seeing world-class Net Promoter Scores of 80-plus, that's better than like Apple or Southwest Airlines. And in health care, it's really kind of off the chart. So seniors love it. Physicians love it, and you're getting the benefits from a cost and quality perspective.

I'll hand to Tim here. But quickly, just the results that he's going to talk to you about are driven by these business model advantages. We're able to grow quickly and efficiently. We're able to get to profitability within our markets within 1 to 2 years consistently across the board. He'll show you the cohorts with very predictable margins. We're comfortable working with groups of all different types, sizes, as long as they have those elements that we talked about. And we're able to drive improvement in them. And this is all laid across a very sticky patient-physician relationship 20-year joint venture. Our physicians on average have been in these practices 13 years, and their patients have been with them for a decade or more. So this is not new. This is really mature, and we're leveraging the power of what's there. Tim?

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve. All right. Let me just take 1 minute and Steve went through a really great description of how the model works operationally. Let me just take 1 second and ground us on how it works financially. So a really simple graphic of our financial model. As Steve said, we enter into the -- we enter a market at scale forming a risk-bearing entity with these large-scale primary care physician groups. It's essentially a 50:50 JV between us and that primary care physician group.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 268**

That RBE -- as that RBE, we then go contract with all of the payers in the market to take full risk on all those Medicare Advantage patients that are attributed to our PCPs. We usually get about 85% premium from -- that's flowing through from CMS to the payer through to us. So we take that 85% premium through the very aligned model, which I'll talk a little bit more about and that Steve just talked about. We drive positive outcomes, which results at the end of the day in a positive surplus or a positive medical margin, as we call it. After we take out some operating costs, we essentially have a positive market level surplus that we share 50:50 with our primary care physician groups.

I mean the remaining part of it flows through to agilon, sort of this is our gross margin, what we call network contribution. And sort of the impact of all the things that Steve just talked about in our financial results are kind of listed down here in these 4 other items. The 20-year partnership, the length of the partnership, the duration of the partnership in combination with that really tight alignment that 50-50 sharing generates ends up in a very, very nice, aligned model that aligns physicians to help drive economic outcome or financial outcome.

We have tremendous visibility into both growth and embedded margins in our existing PCP groups. I'll talk a little bit more about that in a second. As Steve talked about, the model is phenomenally capital-light. And I'm going to actually walk you through the economics of how that works and the low cost versus high return that we get when we bring new members on to the platform. And at the end of the day, as we bring members onto the platform, 2 important things. One is, we are bringing significant embedded margin along with them, and I'll show you how that margin -- that embedded margin then evolves over time. And the second thing is, all of that sits on top of a very leverageable platform support costs or G&A cost base that we leverage over time and will help, again, as I'll show you in the second, our long-term margin opportunities and long-term margin outlook.

So we've had really great momentum since we started -- started back in 2017, brought our first partnership market in 2018, had -- under 60,000 members back then, we are projecting this year to grow to 260,000 to 270,000 MA members. And when you put 80,000 to 90,000 direct contracting members on top of that, somewhere around 350,000 members live on the platform by the end of this year. That generates obviously significant revenue. We expect to report somewhere between $2.5 billion and $2.6 billion of revenue this year. And as we've been talking about, we are continuing developing medical margin through that time as those members are maturing the platform as we add more markets.

The medical margin progression has been tremendous. We'll show you in a second. We're actually growing medical margin year-over-year on a PMPM basis, as well as the significant growth in medical margin dollars. And again, we're guiding to and expect to generate somewhere around $300 million of medical margin in 2023. It's interesting as we grow that membership and you can see it kind of growing from that initial 30,000 members or so all the way through the 300,000-plus members that we're going to have this year. Each year, as we bring new members on, we do see dilution in our medical margin PMPMs or in our overall margin. And because those new members come on each year at a lower medical margin, I'll kind of show you how that works on a cohort basis in a second.

But even notwithstanding that, we've grown overall medical margins in absolute and in dollars significantly. And again, projecting out through 2022. And that sits on top of a very leverageable platform support cost model, very leverageable G&A. And with that now with this year's growth, we expect to move to EBITDA -- adjusted EBITDA positive of somewhere between $0 and $10 million this year. So this will be our year of a big move into positive EBITDA.

So I talked about when we bring new members on each year, be that through new markets that are entering or through the same geography growth or the growth of members in our existing markets, and they tend to have a dilutive effect on our overall medical margin PMPMs, although, of course, they are contributing to the overall growth in medical margin dollars. This slide essentially disaggregates that and says, let me take out the impact of dilution of new markets -- new members, rather, and just show you how individual cohorts have progressed over time.

So when you look at the first one here, about 24,000 members that came on in our first partnership cohort in 2020 -- I mean 2018. Started at a very high level. It was our first focus market. Columbus, Ohio, a very strong performer, started at about $133 medical margin PMPM and has now progressed up

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 269**

to about $193 medical margin. And that is -- that's with $251 number in 2020, but you have to kind of discount that, obviously because that was the year that was sort of aided by lower costs from COVID, but significant growth from just in that cohort.

If you look at all the other ones, these represent, for instance, the 2021. Or go down to the 2019 one, which is the green line, each of these next year started at a lower starting point medical margin as we brought these new groups on. They include both new markets that came on that year, as well as any members that came on through same geography growth in the existing markets. So for instance, the 2019 number, we started at about $39 medical margin PMPM across 35,000 members that were both the new markets plus any members that we grew in Columbus in our first group and essentially now have grown that to $161 over 3 years.

It's interesting. You can see the COVID year and there is about $152, which was aided by COVID in 2020. But even with that, we've grown that in the next year, being able to increase that up to $161. And you can kind of see that, that progression in year 2 has been about the same in our cost of 2020, which obviously started in the COVID-assisted year and then the 50,000-plus members that we brought on this year, starting around $51. But the individual cohort performance or as we're seeing each cohort, they're kind of one that same trajectory of rapid increase into year 2 and then continue to progress in year 3 and beyond.

Steve talked about -- and actually, Ryan did a great job introducing in talking about, this is a huge part of our model is that extremely capital efficient. So we have a really high lifetime value to customer acquisition cost kind of relationship. And so what I've done here is, really showing you all in what it cost us to bring a new member on and how that payback evolves over time. So if you look at all the members that we brought on in the 2020 cohort, that's about 41,000 members. It's a mix of both what came on in new geographies -- by what came on through same geography growth. And our cost to do that is only about $400 per member. So for each member that we're bringing on in a year, we're bringing in about -- it's costing us about $400. The costs are primarily represented by when we start up a new market, we go into up to 1 year of implementation in that market before we go live and start taking risk.

And during that year, we're doing things like paying incentives to the physicians to complete structured annual wellness visits and make sure that we get a good baseline burden of illness capture. We're also putting some infrastructure into the market during that year to kind of get things up and running. All those costs essentially -- that's 100% of our cost to bring a member on in a new market. And again, so those costs are about $400. When you look across how much medical margin we're generating in each year after that, how much network contribution is flowing through to us, I mean we're getting a payback based on [Indiscernible] 2020 and less than a year. And our LTV to CAC ratio or what we're generating over the lifetime of those members is something like 13:1. So it's just a really, really high positive economic return equation for us. And the class of 2021 very similar.

It actually came in at a little bit lower average cost per member, a little bit under $400. But again, tremendous generation of network contribution on a PMPM basis over the first couple of years and again, paying back in 1 year with double-digit 12:1 kind of LTV to CAC ratio. So the capital efficiency and quick payback of our model is really a key element. So this is kind of what this thing looks like looking forward to 2026, and Steve talked about just how much all of this alignment and leverage for us.

You can see that we've already gone out and said that we expect in 2023 to grow from the 260,000 to 270,000 or so MA members that we're going to end this year, growing to almost 400,000 MA members. When you tack on top of that, the expectation that we'll grow to over 100,000 direct contracting, I guess then they'll be called ACO REACH members. We'll get to something like 500,000 members live on the platform in 2023. Over 2,000 PCPs live on the platform. And then as we roll forward to 2026, if you would just assume that we continue to grow with sort of the same algorithm. So we've been growing in the mid-teens, same geography growth, say 13% to 15% a year. And adding, let's say, 50,000 members on or so through -- from new geography adds every year. That would get us from 390,000 MA members to something like 750,000 out in 2026.

You put a little bit of a premium on that, maybe we can grow a little bit faster, same geography. This year, we're bringing something like 80,000 new members. So perhaps we can grow more than -- or next year, 80,000 members. Maybe we can grow something more than 50,000 members a year. We can see

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 270**

this thing stretching up to like 850,000 members by 2026. And we've been a little conservative in these projections around what actually happens to new members coming on in the direct contracting or ACO REACH model as the model reaches maturity in 2026, so we've kind of held that flat. But at the end of the day, we would expect by 2026 to have something getting close to 1 million members on the platform, something getting close to 4,000 PCPs on the platform.

And that medical margin PMPM increasing to -- even with all the dilution of new members on average across all markets about $165, that's going to generate getting up there around $1.5 billion of medical margin. And when you look at the flow-through then and the leverage we're getting against our platform support costs, it would put us up there well over $0.5 billion of adjusted EBITDA by 2026.

Just real quick, when you look at the balance sheet, we've got a really strong balance sheet. Coming through the IPO, we still got around $1 billion. And as I talked about, we don't have a huge use for that in terms of needing that money to drive growth because we drive growth in a very capital efficient way. So -- and by the way, in addition to that, we would expect to move to cash flow positive through operations somewhere as we move through 2023, 2024. So all that adds up to, we just will not need to go raise capital anywhere to drive our growth through 2026.

Where we're using all that capital, I mean, pretty straightforward. Steve talked about a lot of the things we're trying to do. Essentially, we're using the capital, #1, to drive growth and to support our existing markets and how they're driving that double-digit same geography growth, as well as investing in increasing capability to do a lot of the things and get a lot of the clinical programs in place, as Steve talked about.

And Steve, going to close, I guess.

**Steven Jackson Sell**
*President, CEO & Director*

So I'll just close by saying, I think there's just a huge opportunity for value creation in this business. We've scratched the surface. We have 1% of the primary care physicians in the country across a diverse set of groups. That's accelerated pretty significantly. We added 600-plus for this class of 23, by far, the largest group of primary care physicians that are coming on.

And so what are the value drivers for us. We're going to continue to add new markets and new partners. We're going to continue to expand access to primary care by getting other physicians in these communities to come on. Tim showed you the cohort migration. We're going to continue to manage costs, driving really attractive economics both at the member level and at that primary care physician level. Those physicians need to keep winning to keep fueling this. And there is a massive amount of unmanaged spend opportunity for us that we can go after. We've got over $0.5 billion of impactable spend just in our existing markets today, and that grows over time as we talk about things like specialty referral programs or renal care programs or palliative care programs, those are things that really can drive that.
So that's what we got.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Have about -- Yes.

**Unknown Analyst**

[indiscernible]

**Steven Jackson Sell**
*President, CEO & Director*

Yes, so we -- so Jeff Loftsgaarden sitting right here. He runs our business development team. He does -- he lives here in Chicago, does an amazing job. And they have a really clear prioritization around what an attractive market looks like. You're looking at penetration rates from MA. You're looking at reimbursement rates, the benchmark rate that's there. But the biggest thing is that partner. So finding -- you're building around this partner for 20 years. You're getting married. They're going to be your growth vehicle, they're going to be your performance vehicle. And so finding a group that's primary care-centric believes in value, has a really strong governance model, so sort of constructive peer pressure and transparency is a big part of this.

The thing about alignment and taking down variation, and Jeff's team does an amazing job of really qualifying those groups that have those elements. If you add all that together, that becomes a pretty attractive market. The top of our funnel for '24 is more full than it's ever been based on the success that I talked about, but it is really around choosing wisely based on those criteria.

**Unknown Analyst**

[indiscernible]

**Steven Jackson Sell**
*President, CEO & Director*

So the question is for primary care physicians, what's kind of the breakout. So different data points, but independents used to be 50% in the country. Now it's like 30% to 35%. That's kind of where we started, but we're starting to see it sustain and grow in these communities. That's a big part of what we're doing. When you bring in health systems that we've just gone into, it's like 50% to 60% of the physicians in the country work for health systems. Now again, we have to choose wisely. MaineHealth, if you talk to their CEO, Andy Mueller, he sounds an awful lot like the other leaders of the other partners that we work with in terms of the value that primary care can really use to drive and transform their system.
Thank you. Appreciate it.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 272**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT 11

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Company Conference Presentation

Wednesday, September 14, 2022 8:30 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 275**

# Table of Contents

Call Participants ................................................................................... 3

Presentation ................................................................................... 4

Question and Answer ................................................................................... 5

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

APP 276

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Hua Ha**
*Morgan Stanley, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Hua Ha**
*Morgan Stanley, Research Division*

Hi, everyone. Welcome. My name is Michael Ha, the Managed Care and Health Care Services Analyst at Morgan Stanley. Our next session is with agilon health, one of the largest providers of physician services through its capitated physician JV model. Pleased to have with us today, Chief Executive Officer, Steven Sell; Chief Financial Officer; Tim Bensley, and Head of Investor Relations, Matt Gillmor.
And before I jump in, just some quick research disclosures. For important disclosures, please see the Morgan Stanley Research Disclosure website at www.morganstanley.com/researchdisclosures. If you have any questions, please reach out to your Morgan Stanley sales rep.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 278**

# Question and Answer

**Hua Ha**
*Morgan Stanley, Research Division*

So with that, thanks again. And maybe just to jump right into it. MLR utilization trends, how is it looking so far into 3Q and relative to your expectations?

**Steven Jackson Sell**
*President, CEO & Director*

Will you take that, Tim?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, absolutely. I mean I can talk about certainly through 2Q at this point. I mean we're pretty happy certainly with the way that the overall either MLR or we like to talk about in terms of medical margin on a PMPM basis is working out. Year-to-date, through the first half of the year, it's really tremendous. We -- our overall medical margin number in our long-term progression is up to about $109, 9 points up over a year ago, but that is pretty heavily also diluted by a pretty high level of growth this year. I think everybody knows, as we've talked about, we've got a particularly large class this year, about 56,000 new members that come on and new markets had a little bit lower medical margin. We're generating about 13% same geography growth, which is also very dilutive. And even with all that high growth, I think it adds up to about 44% MA growth, and we were still generating that really good pickup.

Interestingly, if you look at our partner markets 1 level below that, which is really encouraging, those markets that have been on the year -- on the platform for at least a year or so not diluted by those new market members, it's like $136 medical margin PM, which is like a -- PMPM, which is like a 26% pickup over a year ago. So really happy.

Certainly, one of the things that's driving that is we're continuing to see pretty good utilization trends. I don't have anything like major to say differently than what we've said almost every time we've asked this question, which is, you know what, overall blended utilization across all components is still kind of trending a little bit below that 2019 baseline number. I think the trend has been pretty consistent across the components. I don't know, Steve, do you want to jump in?

**Steven Jackson Sell**
*President, CEO & Director*

I mean, Michael, just 2 points I would add that I think is kind of distinctive about our model that allows us to deliver really predictable costs kind of quarter in, quarter out, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side. But the 2 things are: one, we work with existing doctors and existing patients and we take them through a 12-month implementation period. So when they go live, we have a very good idea of what that cost structure looks like and a very good idea along -- what the revenues like. But the second piece that I think is really important is, we have this high-touch model.

We make incredible investments around care team resources that allow that primary care doctor to touch that patient more often and in particular, the most complex patients who have the vast majority of the total spend. And the data says, if you're able to see those people more often, and you're able to surround that primary care doctor with social workers and care managers and pharmacists, the basics like medication adherence, making sure you're able to follow up with someone when they leave the hospital to reduce readmission rates, that's what translates into those cost trends that Tim talked about, but also the quality and the satisfaction that we've got in our model, which is top notch.

**Hua Ha**
*Morgan Stanley, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 279**

Great. Thank you. Appreciate the update there. Maybe taking a step back, so agilon went public in 2021. Just curious, what are some key areas of success, learnings over the past 12 to 18 months?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. We went public in April of last year. At the time, we talked about a new primary care model and that there was a tremendous need for primary care physicians to be able to spend more time with their most complex patients. And our approach around surrounding them with the care team would really enable that in changing the way they got paid. I think one of the first big learnings is the opportunity and the need for that primary care model is far greater than we ever would have expected. At that time, we had sort of talked about 2023 outlook for a class of maybe 40,000 new members. We're 2x that. We're 80,000. We've gone from 8 to 12 states, and we've expanded to 25 communities.

And so I think one of the biggest learnings is the macro drivers have gotten more powerful. So whether it's payers being CMS or Aetna, Anthem, United looking for more move into full risk value-based care, the demographic surge causing challenges or just the fee-for-service payment challenge for a primary care doctor, all of that is strong, but then the success that we've had, whether it's the ability to deliver predictable margins and generate surplus that allows us to reinvest, whether it is the great experience that the physicians and patients have had, more doctors are joining in. And today, we now work with virtually every type of medical group in the country. And so that wasn't true at the time of the IPO.

We added our first health system, which will go live as of January 1 of this year. And so I think the market opportunity is bigger. I think it's broader in terms of the diversity which is there. And then I guess the last thing I would say is, the network that we built, we knew that was a tremendous asset for us at the time of the IPO. It's far greater than we would have predicted. You can see it in growth, in terms of the reference capability for other doctors to get comfortable and in terms of the clinical innovation that we're able to do in 1 market and expand it out.

**Hua Ha**
*Morgan Stanley, Research Division*

Great. Thank you. And on top of that significant growth, you talked about medical cost trend earlier, and you just mentioned some clinical initiatives. Maybe just to double click into the clinical initiatives, could you talk about some of them that supports improving quality, cost? How does agilon's partnership with primary care physicians help to just improve care?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, absolutely. I totally appreciate the question. So I think it starts with everything we do is built around enhancing this patient-physician relationship. We work with doctors who've been in their communities for decades. But the reality is prior to our partnership, they didn't have a business model that allowed them to invest in the resources of a care team, those social workers or pharmacists or care managers. They weren't there prior to that. And so that care team that surrounds them is really at the heart of what we're trying to do, and that's a big change, and that's a big part of our kind of clinical baseline investment. The second thing is this investment in information and data that allows them to really understand where their patients are, those most complex patients. Are they going into ER? Are they going to the hospital?

And so we have sort of this surveillance capability that we've invested in that we have in all of our markets that allows us to know where those patients are at. Those 2 foundational things then allow us to add programs on top of them. But I'll just tell you, coming from a health plan side, like we have a transition of care program that we've implemented. We have nurses in the ER. We have nurses that are doing predischarge planning. The results in that program are significantly better than what I saw from the payer side because of that trust. When you go into the ER or you're in the hospital, if you're Dr. Ha's patient, if I round on you, I say, I'm part of a Dr. Ha's care team. The trust that, that patient has in you, and the likelihood for them to comply, the likelihood to follow up within 2 days is far greater than what you see in others. And so like in Pittsburgh, which is a market that's a couple of years old for us, we rolled out those resources last year. We put the surveillance system.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 280**

They've seen a 32% year-over-year reduction in their readmission rate for those most complex patients. Now that's world class. I mean that's really dramatic. We're not going to necessarily do it at that level in every single market, but it just shows you when you put those together what can happen.

Another example I'll give you is, work we're doing in now 7 markets with complex kidney disease patients and end-stage renal disease patients. And so we've been able to better identify who those patients are, and then work with 2 different partners to be able to provide home-based resources, whether they're nurses or whether they're physicians that really allow stabilizing these patients. These patients have been with their primary care physician all along, but they're not seeing their PCPs often. They're very difficult, it's difficult for them to come in to the office, as an example. And so the ability to have a home-based team that can go in and do that, but the patient has to be comfortable with that. And so these national partners have told us, on average, they have a 35% to 40% enrollment rate when they're offered this home-based team. Our enrollment rate is 80%.

And so I think you can talk about programs, and I've invested in them for decades. The return on investment of a program is directly correlated to the trust that, that patient has with the primary care physician, and how that's introduced to them. So those are 2 examples that, I think, really kind of call out the power of the model.

**Hua Ha**
*Morgan Stanley, Research Division*

Thank you for that. I think that speaks to the power of your model and just the [ segment ] between payers and the patients and providers where they fit into the mold. So in thinking about the growth algorithm, how does the company think about growth? I know you have a 2026 outlook for 750,000 to 850,000 MA members. What's embedded in that outlook?

**Steven Jackson Sell**
*President, CEO & Director*

You want to take that, Tim?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And from the -- just the growth part of the algorithm itself, getting to our 2026 overall outlook, getting to that 750,000-plus members is obviously a huge part of that. By the way, one of the reasons -- let me kind of just walk through the build and then we'll talk about some of the whys of why we think we can get to that number. But today, we've got -- just reported about 260,000 MA members on the platform. We think we're going to finish year around 270,000 but we've got a huge class starting next year, about 80,000 members. With this year's ending membership, put 80,000 on, get about -- continue to get kind of mid- to -- low to mid-teens same geography growth. We're going to be close to 400,000 MA members in 2023. So that's like a really good large starting point. From there, if we can -- and I'll talk to you about how we might be able to do this. But if we continue to run at, say, 50,000 to 60,000 new market members every year, which is well within what we've been doing in the last few years, and can maintain that kind of low to mid-teens same geography growth, that will get you to 750,000 members by 2026.

We have a ton of confidence in our ability to do that when you consider both the size of the TAM and the fact that we've really expanded our TAM over the last few years and the types of partners that we can -- or the types of PCP groups that we can partner with, not just the original groups that we partner with that are really pure PCP focused groups, but groups that are also multispecialty groups now that are kind of PO-based more distributed networks, especially like the large group we're bringing on next year with United Physicians outside of Detroit is in that kind of a model, and that's tremendously increased our TAM overall. And now, of course, we're going to our first health system with MaineHealth. So when you think about the amount that we've expanded the TAM because the diversity of groups that we can partner with, we're pretty confident in being able to get to those numbers from a growth perspective, certainly.

**Hua Ha**
*Morgan Stanley, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 281**

Great. Thank you. It's interesting. It sounds like you're doing a lot of interesting things on the specialist side. And on the health system side, the partnership, I guess, how should we think about the forward growth and entering potentially more health system partnerships?

**Steven Jackson Sell**
*President, CEO & Director*

I can start with that. I mean, I think that we're implementing MaineHealth, which is our first health system right now. I think as we look at our class of '24 and beyond, there is tremendous interest in health systems around the country. Andy Mueller is the CEO at MaineHealth. He's a primary care physician by training. If you listen to Andy, and he talks about the challenges and the role that primary care can play in transforming the overall health of the community in Maine and transforming MaineHealth overall, it sounds very much like others. Primary care is really that catalyst. They've got a real challenge in their Medicare business, which -- a lot of which our partners are facing and the challenges come from that fee-for-service world. So they're losing money on Medicare today. They've got a tremendous asset with 200 primary care plus physicians and the ability to change the way the model is paid, to be able to surround them with resources and leverage many of the existing resources they've got but can use them differently is why they made that decision.

Our implementation with them is going very well. We obviously don't have live results because we're not live as of yet. But what I would say is, in that robust pipeline, there is a lot of interest from health systems around that, and it's increasing. I think this -- where I started, which is the demand for this new primary care model is far greater than we predicted. The opportunity is bigger than we predicted even a year ago, is reflected in those health system conversations as well as independent groups and others.

**Hua Ha**
*Morgan Stanley, Research Division*

Got it. And when you look at new markets, it sounds like the quality of the provider group, is that the top priority in new market criteria selection? Or is it a combination?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean, we have an outstanding business development team. We were talking about it earlier. You know some of those folks, and we have a very focused view around the market in terms of the MA growth rate, in terms of penetration rate, in terms of the benchmark rate. But the single biggest factor around that is finding that quality group that you're going to build around. Because we're going to enter these markets at scale, so these groups typically have 15%, 20%, 25% of the adult primary care capacity in that market. We start with them and then other physicians join rapidly. Our same geography growth rate, Tim was talking about some mid-teens, each one of those. The big part of that is other physicians that are joining into that. And so that quality group is such a key part of our success in being able to build around them. I think what we're finding that's changed even the last 12 to 15 months is the breadth of those groups that are out there is far greater in the interest level and making this move has only accelerated it.

**Hua Ha**
*Morgan Stanley, Research Division*

So it sounds like the pipeline for new partners next year and in 2024, it's sounding pretty robust?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. The pipeline has expanded from the top of the funnel down, I would say it's more robust than it's been in any year. We have 2 letters of intent as we shared on our last Q call already signed. We've never had them this early on. We're in implementation. Those will be like 16-month implementations. Typically, we're doing 12. Each month, as you do that, allows you to start in a better place. And the breadth of folks that are interested at the top of the funnel is broader. So I think the opportunities we believe in the class

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 282**

of 24 and beyond are really great. I mean Tim talked about kind of the assumptions that build up in our multiyear model around that.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I would just say it's interesting, one of -- this expansion of the TAM for growth that we talked about and 2 of the biggest new partners that we're bringing on as part of this 80,000 member groups next year are in 2 of these newer models, a big kind of physician organization-type group in Michigan as well as MaineHealth. And it's allowed us to get more members of -- and we have a big group this year, too, like 56,000 members year-to-date that we brought on through new markets. So those are the 2 biggest classes we've done. And the fact that we're getting sort of that accelerated growth right now and get those members on early, that, in combination with a lot of the clinical programs that Steve was talking about that are driving this improved member -- or patient outcome, really puts us in a great position to just build that longer-term overall kind of P&L algorithm as well. Sort of the way it works is, if you think about today that I think I said upfront that we're getting like $109 medical margin PMPM blended across, although that's heavily diluted by newer members and newer markets.

Underneath there, if we have that -- markets that have been around for more than 1 year or for at least 1 year are running about $136. That's a big improvement over last year. I think we're up like 26% with that group on medical margin. When you take that all the way to the groups that are really mature in like 3-plus years that have been out there, they're running over $150 average medical margin now, and that includes dilution from the fact that they're growing same geography growth, which dilutes their overall number. And we see that number of course -- that $150 even that group will continue to improve. But the way the math works around this growth thing is interesting because, today, the -- only about 60% of our members are actually in markets that are at least 3 years old.

By the time we get out to 2026, because we brought so much growth on in this year and next year, 86% of our membership will be in markets that are 3 years-plus, and those are markets that, today, are getting like that $150 medical margin. Now, interestingly, to get all the way out to our 2026 margin targets with those 750,000 members, we have to get the average from $100 or so today all the way up to $165. But when you think about that it's being driven by those more mature markets, essentially, our medical margin ramp is driven by those markets maturing more than anything else. So that most mature group and much more of our membership being in that mature group gives us a lot of confidence that we can get to that, say, $165 medical margin number that will make our 2026 algorithm work.

And by the way, we have a number of markets blended today that are running well over $150 and pushing up towards $200. And even in those markets, when you think about the clinical programs that Steve talked about, we've got -- we have line of sight to at least $100 additional medical margin PMPM from driving those improved -- continued improved member outcomes behind those clinical programs. So we've got a lot of confidence that we can get to the 750,000 members that we talked about upfront, but that we can also get to that $165 medical margin PMPM. And by the way, the reason that's important to us is, when we grow that medical margin, it sits on top of an incredibly light operating model that's hugely leverageable. So our platform support costs, which is what all that sits on top of, year-to-date, this year, it's running at about a little over, I think, 5% of revenue. That's down more than a full percent for the year. We've been taking about a full percent off that every year. We have to get that number from that 5% range over the next 4 years down to about 3%.

So clearly, that growth is going to be able to drive that leverage in our minds. And when you put those together, you put on top of that, the assumption that, "Hey, we also have this direct contracting that will transition to ACO REACH program, that we do expect to be less profitable in MA, but still, we expect to get some pretty good performance out of it." You start getting that number with some reasonable expectations around medical margin and some light membership growth between now and 2026, and we get $50 million or so of adjusted EBITDA to that.

All of that adds up from the 750,000 members at $165 medical margin flowing through on top of our very leverageable platform, so [ report cost ] model with a little help from direct contracting. And we're really confident that we're going to get to a 2026 profitability number of like somewhere between the high

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 283**

$500 million to low $600 million of adjusted EBITDA. So we've got -- it all starts with that growth in those clinical programs, but that all -- I would say the success and the momentum that we've seen through the last few years gives us a lot of confidence that that's the way it's going to work, and we'll get to those numbers.

**Steven Jackson Sell**
*President, CEO & Director*

We have a growth algorithm, which we very simply say, grow markets, grow members, grow medical margin. Tim just described that. But what I would tell you is the way we're winning today is that our physicians are loving the model. Their experience is fantastic, and they're seeing the quality and the satisfaction from their patients be higher than they've ever seen. And these are patients who've been with them for a long time. On average, these patients are with their physicians for 13, 14 years before we start that partnership, and we build on that, which gives a lot of that continuity.

Those Net Promoter Scores, I talked about are north of 80%. And one of the keys to that is retention. If you look at the retention in our model, it's north of 90%. I mean, I think if you look at anyone else in the space, it's got to be 70% or lower, and it's really a function of what I just talked about. But when you really simplify it, if we keep delivering on a great experience and a great quality for physicians and patients, making those investments we talked about, we're going to win and other docs are going to want to join and you're going to do that and then some more.

**Hua Ha**
*Morgan Stanley, Research Division*

Right. And I think that was a major point of differentiation here. Your patient retention is significantly better than most of your peers, not to mention your physicians are more tenured. The average patient [ counts ] are much larger, and I think the quality of care is really different.

**Timothy S. Bensley**
*Chief Financial Officer*

It also drives tremendously lower sort of member acquisition costs for us as well. So we've got that kind of double good news that on the one hand, it doesn't cost us a lot to bring a member on board on the platform. At the same time that we're getting this great development of that member in terms of developing medical margin over time. And we've got, obviously, a really strong balance sheet. So we've got -- we're well capitalized, but don't have a high capital-intensive model. So that's really working well for us. And certainly, in this environment, to be able to say, we certainly don't have to raise any additional capital any time to hit our long-term objectives is a great place to be.

**Hua Ha**
*Morgan Stanley, Research Division*

That's great. Maybe shifting gears real quick to M&A. It's been very active to say the least with CVS, Signify, Amazon, One Medical. I guess my question is, what does it all mean to agilon?

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think -- I can tell you what I wrote our doctors, right, because it's just accelerating, there's like an announcement every couple of weeks. And I think our prediction is there's going to be more of them. I think what it says is, the world, depending from a variety of chairs, and people who are looking at opportunity are saying primary care is ripe for disruption. And I think you don't have to be a health care person. You can look at a lot of analogs from other industries to say, the access model can be better, right? The access for patients. The experience for the physician and for the patient can be a lot better and the efficiency and the effectiveness of the investment and the return on that investment in terms of better health and in terms of lower expenses can be a heck of a lot better.

And so we believe that for a long time, I think just a lot more people are sort of validating. I think the second thing it means is the competition for the scarce resource, which is the primary care physician,

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 284**

is being elevated. And so we have a head start. Our traction, the growth rates that we're seeing, the reputation we're building with physicians, we need to double down on that. Those care teams I talked about, those clinical investments, the ability to really provide a great experience for patients and physicians and have communities get the benefit of that. The more that we do around that, other physicians in these communities are going to see that, and they're going to continue to join in at the rate or even faster than that.

And so I think that's sort of the basis of competition is what I would say. And there's a lot of capital out there, but I think it really is in, if you're going to make that decision as a physician to make this move, where do you want to do that? And the track record that we're laying down around this is just so important to be able to continue that momentum and drive it going forward. So that's what we really see as a key part of that.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And Michael, one thing I'd add is if you think about sort of the way the health care industry has evolved for the last 40 years really defined fee-for-service. And that's obviously changing because of the macro items Steve talked about is changing because of government policy. But risk is moving down to the provider and PCPs are in the very best position to manage risk. And Steve talked about how the basis for competition is really for PCPs, but the value of a PCP on our platform continues to increase, and we just feel so confident that we are so differentiated in the value that we're creating for the PCPs and their patients is just head and shoulders above what some of these alternative strategies look like.

**Hua Ha**
*Morgan Stanley, Research Division*

I think that makes a lot of sense. Basically, all the value-based care companies have gone public. They talk about the white space opportunity, which is massive. But in 10 years from now, when it's a much more saturated mature market, I feel like your differentiated strategy in actually partnering with physicians, providing more incentives might be the competitive advantage that really shines in 10 years from now, and...

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think so. I mean I think that primary care physicians should be the most valued player in communities. They're not in the fee-for-service system. We changed that. We put them in a position to actually practice medicine the way they were trained and surround them with those resources. The patients get the benefit of that. And the ability to, a, change their economics but, b, really reinvest in the role of primary care within that local community, that care team, those programs that we talked about, I think is differentiated. I mean -- I'll tell you. I think our physicians really push us on let's keep pushing that quality lever, let's keep on pushing that clinical innovation side because if we do that, we'll win. And docs are smart. I mean they understand evidence-based medicine. They can understand outcomes, and they can see it. And our results have been super compelling, but we are scratching the surface in terms of where we can go, and that's our focus.

We try and not get distracted by kind of all the noise around because if we do that well, we'll win.

**Hua Ha**
*Morgan Stanley, Research Division*

Great. Thank you. Maybe I'll pause for any audience questions if you feel free to raise your hand.

Okay. Well, maybe I'll ask another question then. And this will just be the really high level. What are investors right now currently underappreciating about the agilon story that they'll come to appreciate in 12 to 18 months from now?

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 285**

Yes. I mean, why don't I start it off?

**Steven Jackson Sell**
*President, CEO & Director*

Yes.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

I think that the -- there's several companies similar to us that came all came public at the same time. And I think investors are still trying to figure out what that winning strategy will be. And we are still doing a fair amount of sort of education with investors about how we are differentiated. We do have a really incredible core group of shareholders that have a really deep appreciation for what we do. I think the things that really differentiate us that will start to shine through will be the level of scale we have in these markets. And Steve talked about these clinical investments, but they are really, to a certain degree, enabled by scale because you're leveraging these investments off a much bigger membership base.

The fact that we're a first mover in these markets, and that's reflected in the same geography growth, and also the fact that we just have this deep alignment with these physician groups, this isn't a short-term affiliation. This is a 20-year joint venture. There's tremendous value that we are delivering back into these communities. And I think those are the differentiators in the model that ultimately shine through. And we hope investors come to appreciate that more and more.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. And I would just say the combination of those things being first in 12 states, in 25 communities with these incredible partners has really kind of derisked the forward growth and that sort of progression that Tim talked about. I mean, I just -- I think everything has just happened to date puts us in such a great position going forward.

**Hua Ha**
*Morgan Stanley, Research Division*

Great. And I didn't realize you had almost 20% market share, PPPs in your markets. That's tremendous scale for -- and leverage for downstream provider rates or everything.

Well, we're right out of time. And thank you, guys, for your time. Thank you, and have a great day.

**Steven Jackson Sell**
*President, CEO & Director*

Great. Thank you.

**Timothy S. Bensley**
*Chief Financial Officer*
Appreciate it.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 286**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT 12

APP 288

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ3 2022 Earnings Call Transcripts

## Thursday, November 03, 2022 9:00 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ3 2022- | | | -FQ4 2022- | -FY 2022- | -FY 2023- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | (0.04) | (0.07) | NM | (0.05) | (0.10) | 0.08 |
| Revenue (mm) | 653.38 | 694.86 | ▲5.80 | 655.77 | 2632.82 | 3837.64 |

Currency: USD
Consensus as of  Oct-25-2022 5:42 AM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

- EPS NORMALIZED -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| FQ4 2021 | (0.10) | (0.13) | NM |
| FQ1 2022 | 0.01 | 0.01 | ❶ 0.00 % |
| FQ2 2022 | (0.01) | (0.01) | NM |
| FQ3 2022 | (0.04) | (0.07) | NM |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 289**

# Table of Contents

Call Participants .................................................................................. 3

Presentation ...................................................................................... 4

Question and Answer ........................................................................ 9

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 290**

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Adam Matan Ron**
*BofA Securities, Research Division*

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

**Taji Milan Phillips**
*Jefferies LLC, Research Division*

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 291**

# Presentation

**Operator**

Hello, and a warm welcome to today's agilon health Third Quarter 2022 Earnings Call. My name is Candice, and I will be your moderator on today's call. [Operator Instructions]

I would now like to pass the conference over to our host, Matthew Gillmor, Vice President of Investor Relations. Please go ahead.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good evening, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley. Following prepared remarks from Steve and Tim, we will conduct a Q&A session.

Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

With that, I'll turn the call over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good evening, and thanks for joining us.

Momentum across our business remains strong. And the success of our aligned partnership model is enabling agilon to make rapid progress against our vision to transform health care in communities by empowering primary care doctors. agilon's platform, partnership model and network create the local infrastructure that enables physician organizations to access a new and sustainable model for primary care. One that aligns physician outcomes with improvements in the quality and experience of their senior patients.

As a result, patients are receiving higher quality, comprehensive care from their trusted physician. And primary care doctors are enjoying greater satisfaction as they share in the value created from a more effective approach to care delivery.

In 2023, our national network will include 2,200 primary care physicians and 500,000 senior patients across 12 states, making agilon one of the largest organizations in the country, supporting full risk value-based care for senior patients. Our growth is a function of the value that agilon's platform delivers to physicians, patients and communities and the value we are delivering continues to expand.

Year-to-date, we have reinvested over $130 million back into local communities through surplus sharing from reductions in wasteful spending and quality incentives to doctors for spending more time with their most complex patients. This reinvestment is helping to sustain and grow access to primary care and transform health care delivery.

Turning to our results for the quarter. Membership, revenue and medical margins were above the high end of our guidance ranges, and adjusted EBITDA was in line even with a modest drag from direct contracting. Our core Medicare Advantage business performed better than forecasted on all key measures.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 292**

Year-over-year, MA membership grew 45%, medical margin increased 74%, and medical margin PMPM increased 19%. This reflects strong performance across our 16 partner markets, inclusive of higher-than-forecasted membership growth. This year, we are driving substantial growth in medical margin, PMPM, even as the proportion of members in year 1 markets has increased from 19% to 22%. This dynamic is powered by our more mature markets, accelerating their year-over-year performance, as evidenced by our 10 year-2 plus partners, increasing year-to-date medical margin, 24% from [ $1.04 to $1.28 ] per member per month.

At the same time, for the 6 year-1 partners that went live in January, medical margin PMPM has been trending towards the higher end of our expectations, as these new partners are benefiting from the platform getting smarter and the learnings of our mature markets. Our powerful same-store performance measured in this meaningful improvement to medical margin unit economics while generating same market growth of 14%, has been driven by: one, the local scale we leverage to improve care delivery; two, the ability to leverage common data and learnings on our purpose-built platform; and three, the embedded membership growth that comes from working through existing physician capacity in our partners' practices. These factors are all reinforcing our growing first-mover advantage as we introduce multi-payer full risk in more geographies across the country.

Direct contracting was a modest but manageable drag to our adjusted EBITDA this quarter due to the impact of an updated retro trend adjustment that Tim will walk through. Importantly, the program remains profitable on a year-to-date basis, and our underlying cost and quality performance remains strong.

For our direct contracting patients, our health care costs are significantly lower on a PMPM basis versus national benchmarks. And our year-over-year trend is 1% lower in 2022 versus the national reference population. Additionally, we are driving strong quality performance in areas such as post-hospital discharge, timely follow-ups.

We continue to view the program as highly strategic as direct contracting creates a single full risk experience for our primary care partners across their entire senior population. We remain engaged with the innovation center on potential program adjustments to create greater visibility and predictability for all participating groups and their senior patients.

From a guidance perspective, we are raising our full year 2022 outlook for MA membership, revenue and medical margins and tightening our adjusted EBITDA. This reflects strong performance in our MA business and an appropriately cautious approach in forecasting direct contracting.

Looking forward to 2023 and beyond, we continue to make great progress in fundamental areas that drive future performance such as renewing payer contracts, onboarding our new markets for 2023 and supporting our physician partners for a successful annual enrollment period. For payer contracting, we are on track to complete important renewals that are in line with our base case assumptions. This renewal activity with 10 different health plans constitutes a significant portion of our membership, revenue and earnings.

The overall positive tenor and success of this fall's renewal season reflects the significant value health plans enjoy with a scaled first-mover partner like agilon that moves the entire market to value while providing best-in-class member growth and consistently strong quality and member experience. Next year, with the addition of several new health plan partners, we will have full risk contracts with nearly 30 different payers.

Pivoting to the class of 2023. The onboarding of our largest class to date has gone quite well in terms of integrating with our partners' various electronic medical records, synthesizing payer and clinical data, negotiating value-based contracts, hiring and training local market staff and most importantly, increasing the level of access and volume of high-quality visits for senior patients.

In short, we are creating the building blocks for these partners to shape and control value-based care in these markets for decades. The significance of successfully onboarding partners in 4 new states cannot be overstated. While Medicare is a national program, health care ecosystems are effectively built at the state

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 293**

and local level. The ability to expand within a state and add additional doctors and senior patients in full-risk models is far easier once we have deployed local infrastructure and connected the ecosystem.

Similarly, the ability to actually change care delivery and reduce wasteful health care spending, while improving quality is materially improved when you are able to scale around a trusted medical group. Our experience in Ohio, Texas and now Michigan, are excellent examples of this phenomenon. In these states, we have added approximately 450 doctors and 190,000 senior patients since our initial year-1 anchor partnership.

Our growth in these states reflects both success within our partners' local geographies and the expansion with new partners into other cities or markets within these states. The concentration and scale within these markets has allowed agilon with our partners to make substantial infrastructure investments to improve care delivery with enhanced care team resources, including nurse practitioners, pharmacists, embedded nurses at high-volume ERs and in-home care teams for our most complex patients, including those with complex kidney disease or end-stage renal disease.

These investments and the resulting improvements in patient quality and cost have allowed the newer partners in these states to enjoy accelerated performance immediately in year 1 and which creates even more satisfaction and engagement for our partners. We will have the opportunity to replicate this performance across more and more states over time.

Before updating you on our future growth in the class of 2024, I wanted to highlight our performance on quality and STARS measures and how that connects to better patient health. Our partnerships continue to generate quality outcomes that are well above national benchmarks, which reflects the alignment between PCPs and their patients supported by agilon's platform.

For 2023 STAR ratings, a significantly higher percentage of agilon members will remain in 4+ STAR-rated plans compared to the national average. Additionally, drilling down to agilon's specific performance, we have maintained 4+ STAR performance across all of our partner markets, and our mature markets performed meaningfully above this average. We continue to excel in areas such as preventative cancer screenings, medication adherence and diabetes management.

For these measures, we are at 5-STAR performance levels across the entire network. Additionally, we have consistently demonstrated year-over-year improvements in quality gap closures well in excess of national trends. As an example, for diabetic patients, our PCP partners had driven a 2x greater improvement in A1C control compared to the national MA average.

We know that patients with better controlled diabetes spend less time in the ER and hospital. And in the long run, they are less likely to lose their vision or a limb, go on dialysis or suffer a heart attack or stroke. Preventing these long-term potentially debilitating complications and keeping our patients well is really the goal of our model and why our PCP partners are so deeply committed to our mission.

Looking ahead to 2024, our business development team has made significant progress over the past few months. The breadth and depth of the pipeline for 2024 remains very strong and includes diverse partner types and geographies, including independent groups and health systems in both new and existing states. The acceleration in demand we are seeing reflects both the success of our partners, and powerful macro forces, including payer demand for value and the growing senior population. These dynamics have also shortened our sales cycle.

I'm pleased to report that we have now signed 4 new partners for the class of 2024. These 4 new partners include groups in existing states and new states and include primary care only, multi-specialty and network organizations. We are excited to have made this much progress at this point in the cycle for 2024. The longer implementation for these groups along with their quality and strong governance will position our new partners to generate outcomes earlier in their life cycle.

With that, let me turn things over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 294**

AGILON HEALTH, INC. FQ3 2022 EARNINGS CALL | NOV 03, 2022

Thanks, Steve, and good evening, everyone. I'll review highlights from our third quarter results and our guidance for the full year 2022.

Starting with our membership growth for the third quarter. Consolidated Medicare Advantage membership increased 45% to approximately 267,000 above the high end of our guidance range. Direct contracting membership increased 71% to approximately 89,000. Total members live on the agilon platform, including both Medicare Advantage and direct contracting increased to 356,000.

Our Medicare Advantage membership growth was driven by the addition of 6 new geographies in January and 14% same geography growth in existing markets. Direct contracting growth was also driven by the addition of 4 markets that joined the program in January as well as growth within existing markets.

Revenues increased 52% on a year-over-year basis to $695 million during the third quarter. Year-to-date, revenues increased 47% to $2.02 billion. Revenue growth was primarily driven by MA membership gains from our new and existing geographies. Third quarter revenue included a modest benefit associated with member retroactivity.

On a per member, per month basis, or PMPM, revenue increased 3% during the quarter, which primarily reflects benchmark updates, market and member mix, along with year-to-date true-ups with health plans. Medical margin increased 74% year-over-year to $76 million during the third quarter.

Year-to-date, medical margin increased 62% to $244 million. Even with the dilution from our membership growth, along with a higher proportion of members in year-1 markets compared to last year, medical margins increased as a percentage of revenue and on a PMPM basis. Medical margins were 10.9% of revenue during the third quarter compared to 9.5% last year and medical margin PMPM increased 19% to $93 compared to $79 last year.

Medical margin growth was primarily driven by the maturation of our year-2 plus partner markets. For these markets, medical margin PMPM increased 24% from $104 to $128 on a year-to-date basis. Additionally, as Steve mentioned, we have also seen stronger performance across our year-1 market this year.

Utilization trends were consistent with our expectations. Inpatient services remain below pre-pandemic baseline levels, while outpatient utilization is now in line with pre-COVID levels. Physician office visits have seen a strong rebound among our members as we actively promote preventative visits, particularly for high-risk patients.

Network contribution, which reflects agilon's share of medical margin, increased 84% to $32 million during the third quarter. Year-to-date, network contribution increased 53% to $110 million. This year-over-year increase in network contribution reflects the gain in medical margin as well as the relative contribution of medical margin across our geographies.

Platform support costs which include market and enterprise level G&A, increased 4% to $35 million. On a year-to-date basis, platform support costs increased 13% to $105 million. Growth in our platform support cost continues to trend well below our revenue growth and highlights the very light overhead structure of our partnership model.

As many of you know, agilon incurs de minimis sales and marketing costs as our partnerships leverage existing PCP patient relationships and member churn is very low. As a percentage of revenue, platform support cost declined to 5% during the third quarter compared to 7% last year.

Our adjusted EBITDA was negative $4.7 million in the quarter compared to negative $14 million last year. On a year-to-date basis, adjusted EBITDA was positive $14.9 million compared to negative $11.9 million last year. The increase to our adjusted EBITDA reflects the gain in medical margin and network contribution combined with leverage against platform support. This more than offset the negative adjusted EBITDA contribution from direct contracting in the quarter.

Adjusted EBITDA from direct contracting, which is reflected on a net basis within other income, was negative $3 million in the quarter. This was below our expectation of positive low single-digit adjusted

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 295**

EBITDA for DC, primarily due to ongoing updates to the retrospective trend adjustment. While our guidance incorporated an estimate for the retro trend adjustment, we increased our estimate during the third quarter based on updates from CMMI with respect to observed expenditures for the national reference population.

On a year-to-date basis, adjusted EBITDA from direct contracting is positive $6 million. As Steve referenced, we continue to outperform national benchmarks from a cost and quality standpoint.

Turning to our balance sheet and cash flow. As of September 30, we had $959 million in cash and marketable securities and $45 million in outstanding debt. Cash flow from operations was positive $2.6 million for the quarter and consistent with our expectations.

As I mentioned on the last call, the timing of risk pool settlements within our health plans normalizes in the back half of the year, which benefits our cash flow. We remain extremely well capitalized and do not anticipate needing any external capital to drive our future growth.

Turning now to our updated financial guidance. For the full year 2022, we have raised our membership, revenue and medical margin outlook to reflect the strong performance in our MA business, both in terms of growth and profitability. We are also tightening our adjusted EBITDA outlook to incorporate an appropriately cautious view in forecasting direct contracting.

We now expect total membership on the agilon platform will grow over 50% year-over-year to 353,000 to 357,000 with revenue growth of 46% to a range of $2.67 billion to $2.68 billion. We continue to expect significant gains in medical margin and adjusted EBITDA. We now anticipate medical margin in the range of $300 million to $309 million and expect adjusted EBITDA in the range of positive $2 million to positive $7 million, which represents a year-over-year gain in adjusted EBITDA of approximately $40 million to $45 million.

With that, we're now ready to take your questions.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] So our first question comes from the line of Lisa Gill of JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Just really 2 areas I wanted to start with and one would be just around medical costs as we go into the fourth quarter. You talked about the third quarter coming in roughly in line with your expectation in-patient below, outpatient in line. How do we think about how you're thinking about the trend into the fourth quarter? And will flu play any part of this? I mean we're kind of watching the Southern Hemisphere and different parties are saying different things around flu. So that would be my first question. And then I just had a quick follow-up.

**Steven Jackson Sell**
*President, CEO & Director*

Yes, Lisa, I'll start. I think that from a medical cost perspective, we feel like our high-touch model is really helping us manage within kind of the ranges that Tim talked about. We are seeing a real uptake in terms of flu shots in this period, similarly to how we saw high vaccination rates around COVID boosters. And so we think that, that is going to help us. As we've thought about kind of our guidance, I think our -- we're looking at sort of a regular flu season and what we've laid out through Q4 based on those dynamics. So Tim, anything to add?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Lisa, thanks for the question. The only other thing I would say is we have seen kind of on a year-to-date basis, a pretty nice pickup year-over-year and however you want to look at this, either on medical cost, on an MLR basis. I think year-to-date, we're up like 110 basis points or something year-over-year or on a PMPM basis. We talked about our medical margin PMPM, obviously, being up significantly year-over-year as well.

As we move into the fourth quarter, I think everybody understands in our model now that the absolute numbers fall off a little bit as we move through the year as our mix of members gets less profitable, more agents as well as kind of the older patients falling off that are the most profitable. But in terms of improvement versus a year ago, we continue to expect to see the same kind of trends and improvement. And you can see that in the -- if you look at the midpoint of our guidance for the fourth quarter or the full year.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

That's really helpful. And then just as a quick follow-up, I just want to go back, Steve, to your comment on the renewal of the payer relationships being on track or in line with expectations. Is there anything that's new or unusual as to what payers are looking for? And when we think about capitated rates, are they roughly in line with what we've seen historically? Just any incremental color would be really helpful.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Lisa, I mean, I think we're extremely pleased with the renewal season that we've just come through and we're finalizing the new contracts for the groups that will go live on January 1. But all in, it's been a very successful season. I think that what we're finding is payers see extreme value in working with our partners. They are scaled within their regions. They have excellent retention and management with their folks and payers see real value within that.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 297**

And so I think when we think about the payer renewals, what we've heard from them is they're really valuing the scale that our partners are bringing the quality. I talked about the 4 and 5 stars that we're seeing, and I think that will serve us very well. And then just the retention, a key thing with the senior population is the year-in, year-out management of complex conditions. And so the ability to have strong retention really helps around that. So we're first to value in these communities and move them that way and payers see value in that, but all of the things we provide along the way.

**Operator**

Our next question comes from the line of Justin Lake of Wolfe Research.

**Justin Lake**
*Wolfe Research, LLC*

I'm going to apologize upfront guys. I'm going to ask you about RADV and how this might impact you. So the -- I know it's a painful topic, but getting a lot of questions on it. So maybe first, you can tell us the 2 questions I get the most often, how do your contracts work in terms of if there is an audit and there is some payment back to the plan or the plan has to pay CMS, I should say, if it's for your patient or your patients or a certain percentage of the panel, would you be on the hook for some percentage of that?

And then secondly, we all know that you guys do a good job on coding. Do you have any feedback from the plans in terms of how -- the plans are doing their own audits of their population, right, just to see how they're doing? Do you have any feel for how you're performing in those audits relative to their more generalized population?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Sure, Justin. So on the first one, for our contracts, if there was sort of a retro adjustment back on that payback, we would be on the hook for that. I think the periods that are being looked at are earlier than -- except for the very earliest market. So right now, the window we're in, there's probably not as much of an issue on that. But obviously, as it would roll forward as they roll these audits forward every year, that's how it would work if there was a claw back, as you said, on that.

And then feedback from plans on the audits. I think we work very closely with them on those audits. I think they feel like the information that we're providing to them and sort of the back and forth in terms of what we go through before they actually do that submission is a fairly tight process. So that's how I'd answer both those questions.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And Justin, the only thing that I would add is, I think we've said this a few times on previous calls, we do risk adjustment, we believe, the right way. We have a very tight process at the end of -- and almost all of our risk adjustment is done in the office through annual wellness visits or through the provider themselves through the PCP. At the end of the day, those risk adjustment items have to be -- the conditions themselves, of course, are validated and agreed to by the primary care physician that sees the patient.

And when all -- and we do it the right way in terms then of both when there are new conditions, we obviously capture them, and that's not only important for risk adjustment, but also important for the plan of the patient. But also, of course, as conditions fall off, at the least we handle that very well. And I think all of that shows up in the fact that when you look at our overall average risk adjustment score, our average wrap it's not really meaningful above a 1. I mean we're not really pushing the envelope in terms of having really out of balance risk adjustment. So I think across the board, we feel pretty comfortable also that we just have a very tight process.

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 298

And Justin, I'll just add, I think it's really important as part of our partnership that we do, do this the right way. And we have a very tight process. To Tim's point, we delete codes as well as add codes based on a constant review process. So I think integrity around this process is something that we pride ourselves on, our partners pride themselves on working with somebody that does this in the right way. And so we feel good about our approach.

**Justin Lake**
*Wolfe Research, LLC*

And if I could just go one layer deeper, Steve, on your contract structure. I just want to make sure I understand it from the perspective of the -- we know that they're only auditing a few hundred, a couple of hundred members in a contract, right? So the likelihood that they're actually auditing your member becomes infinitesimal, right, especially like a point, given your size at the moment. So how does it work in terms of -- is it just if there's 100,000 patients and your patients have to be -- happen to be I'm just going to pick a number, 1,000, right? So 1% of the membership are sitting at the contract is in -- if you have 1,000 patients out of 100,000, do you have to pay 1% of whatever they're asked for? Is that the way it works?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So I think without getting into the specifics of each of the individual contracts or each of the individual ways that this could come out. I mean generally speaking, if there is a RADV audit and there is a direct line that we can say, hey, that RADV audit applies to our members that we have [ cap data ] from that payer then, yes, I mean, we're -- ultimately, we're going to be on the hook for our portion of that.

Having said that, depending on what the actual content of the audit is and how that comes out and how we talk to the payer about it, we'll see on a case-by-case basis on how it works out. But obviously, if there is demonstrative line of sight to, yes, they should apply to us as part of their population then we'd be on the hook for it.

**Operator**

Our next question comes from the line of Kevin Fischbeck of Bank of America.

**Adam Matan Ron**
*BofA Securities, Research Division*

This is Adam Ron on for Kevin. I saw an interesting release in the quarter that one of your anchor partners in Ohio started doing an on-site clinic with JPMorgan and some sort of value-based construct arrangement. And given the interest from such a large client to do value-based care outside of Medicare, I'm curious why not just support them yourselves? Or I don't know if there's interest from such a large client, if that changes your view maybe about expanding beyond Medicare?

**Steven Jackson Sell**
*President, CEO & Director*

So thanks, Adam. Yes, the -- very familiar with -- it's Central Ohio Primary Care, our partner in Columbus and JPMorgan, who are doing their work on this together. They have another partner who works with them on that, that we know very well. And they're doing an excellent job around that. I think our focus has really been focusing on that over 65 population doing great work on that and really solving a major challenge for our groups. The optionality, obviously, is there down the road for that commercial business. But today, we feel very good about the focus on the Medicare population. And there's just to what we shared in the call, there's tremendous value and impact that we can have by focusing on that population.

**Adam Matan Ron**
*BofA Securities, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

If I could just ask one quick follow-up. The direct contracting, the ongoing refinement, that was related to what happened last quarter kind of on the retro trend. And then is anything -- does any of your conversations with CMS changing how you view, I guess, like the sustainability of direct contracting?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Well, let me answer the macro and then Tim can kind of walk through the mechanics because we literally get monthly updates on this. And so you're constantly sort of refining that. But one is, I think, we believe direct contracting is extremely strategic for our partners and for us in that there's a single experience for their primary care physicians, and there's one care model that gets applied across the entire senior population, which reduces variability and allows for much better care and less sort of variation.

The second would be were profitable year-to-date. As Tim said, we have [ $6 million ] of EBITDA. So that program is still profitable even given the adjustments that Tim talked about. And then the third that I tried to call out in my prepared remarks is we are beating national benchmarks in terms of utilization trend. If we continue to do that, that should drive increased profitability over time. And that's sort of the construct in which the program is laid out. We're working with them on adjustments that can be made to the program to take out some of the volatility, to improve the predictability and the sustainability, but that's sort of the macro view. Tim, do you want to talk about?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And Adam, not to belabor it, but I think everybody understands that the way this works is CMMI puts out an expected trend number at the beginning of the year. And after the year is over, they will say, "Hey, based on the actual observed trend for the full Medicare fee-for-service population," they will adjust that up or down depending on what they see. They provide interim updates during the year on how that's going. They don't actually tell you what the retro trend adjustment is going to be, but they do tell you how trend is looking at various points in the year. And what you're referring to last quarter was the first update came out in May and there was a pretty substantial indication that trend was way lower than what they had put out initially like as much as 8 points lower.

And so a lot of people in the industry at that point, you may remember saying, "Wow, we just had to take a big adjustment to revenue in our second quarter results because of that." Now you remember at the beginning of the year, we had said, "Hey, we anticipated there would be a pretty sizable retro trend adjustment because our analysis said that the trend that CMMI was guiding to at the beginning of the year was very aggressive or high to begin with." So when that second quarter update came out in May or the first quarter update that came out in the second quarter in May. We had to take a small adjustment last quarter, but it wasn't anywhere near probably what a lot of other people in the industry were taking if they hadn't already pre-assumed a retro trend adjustment.

Now another update came out in August. And then a few subsequent data feeds have come to us from CMMI as they're providing us some incremental data on a monthly basis. We've reassessed it and said, "Hey, there is another, we think, small movement down in what we assume the retro trend or movement up in what we assume the retro trend adjustment would be our movement down in our revenue." That caused us to take a smaller adjustment in Q3 as we closed and since it's retroed for the full year has an impact from adjusting the full year, year-to-date. Then we ended up with a $3 million negative impact to adjusted EBITDA versus our going into the quarter expectation that would be low single-digit positive.

Now as we move through the rest of the year, of course, there's less year left. So the chances that, that number will move a lot more or less and less because there's just less months ahead of us that can drive that number up or down. Right now, just to make sure that we're being completely cautious in how this is moving, we're being pretty cautious about our full year guidance and saying, you know what, in Q4, we're not expecting direct contracting to really be accretive to our fourth quarter adjusted EBITDA. Sorry, I didn't mean to belabor that, but I think that's the full story, yes.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 300**

**Operator**

Our next question comes from the line of Ryan Daniels of William Blair.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

I wanted to talk about the new partner pipeline with a focus on '24. Great to hear you added 2 more to the class. I'm curious, number one, if you can discuss what this looked like a year ago for the forward year basis? So is this an acceleration, I think, from what you've seen? And then number two, you talked a little bit about macro trends driving this, but I'm curious if you think the pending U.S. recession or global recession is actually helping your partner pipeline because providers can move to more recurring revenue models and see more income upside with your model than they otherwise would. So is this type of environment actually beneficial for you relative to kind of a more stable market?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, Ryan. Well, I think the headline is there is a tremendous inflection in demand. We've been seeing it for a while. It is accelerating. I think it's a combination of macro, CMS pushing more towards full risk value and looking by 2030 to have all seniors in a total care relationship with a PCP, individual health plans, pushing on that in a really significant way. But then I think the success that we're having for virtually every medical group in the country, you can find an agilon partner that kind of looks like you, is organized like you. And so that referenceability is just a huge asset for us.

Two is, I think, that more and more of these groups have come to the conclusion that they really need to make this move into full risk value-based care. And so the combination of the success and the desire is really shortening the sales cycle. And so to your question about to compare it to a year ago, we are well ahead to have 4 groups signed to have implementations that will be greater than 12 months, that puts us in really great stead for 2024 and how these groups should start.

And so that's really encouraging to us. The fact that you have a mix of primary care only, multi-specialty and distributed networks, partners within that is also really encouraging to us. And as I said in my prepared remarks, health systems remain very actively engaged with us in talking about partnerships. So I think what we've done with MaineHealth, which is going really well. I think the ability for people to be able to pick up the phone and talk with them about that experience really helps. And I think a number of health systems are feeling the need to make this move into value and get the benefits from that. And so all of that is sort of leading to the momentum that we're seeing and sort of being ahead of where we've been in prior years in the cycle.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Okay. That's very helpful. And then, Tim, one for you. I should probably know this nuance, but -- if we look back to the end of last quarter, I think you had about 261,000 MA lives a little bit above and ended this quarter at 266.6. But you referenced the average being over 270,000. So what's the nuance there that the average for the quarter is so much higher than the starting and ending period?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, any time that you see that, Ryan, what's going on is we have some retro members that we've got attributed to us or we have members that have been attributed to us that really should have been attributed as our members from the beginning of the year or near the beginning of the year. And in this quarter, it was about 1,000 or so members. So 3,000 members kind of above the ending time period, but really retro back over 3 full quarters gives you about 3,000 average members higher is the way that it works out.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 301**

I mean it's really an important part of our model that we're able to do that. Essentially, if you think about this, there's 2 different ways that we have members attributed. One is through members that are in an HMO couldn't be more straightforward, right? They have to actually name who their PCP is officially.

On the PPO side, which is now more than half of our business, that's often not the case or generally is not the case. And so we have to go through other attribution methods that we have worked out with the payers. And often cases, it's related to how many times has that patient seen the PCP in the last 6 months, 12 months or 18 months. We often have backup plans where we do things like recorded phone calls with the member to make sure that that's their PCP, et cetera. But we have a really good established process to do that.

But what happens is, at some point, we tend to pick up members that maybe should have been attributed to us early and now we catch later in the year. That's particularly true of new markets. And in fact, of the, let's say, 1,000 or so retro members that we picked up driving that difference in the quarter. I think the majority of them were actually in a couple of our newer markets, with newer payers.

**Ryan Scott Daniels**
*William Blair & Company L.L.C., Research Division*

Thank you so much, very helpful.

**Timothy S. Bensley**
*Chief Financial Officer*

And by the way, while we're switching to the next question, I'd just throw in, it's really important that we are able to do that in that half of our business -- being more than half of our business being in PPO membership is a big deal because that means we can essentially go into a market and bring -- and see if you can comment on this better than me, bring full risk to a market regardless of whether it's heavy PPO or HMO, unlike other markets that may be very heavy HMO that are very easy to get that attribution. Our TAM is wide open for PPO, HMO. We can go basically anywhere and bring full risk across that membership.

**Steven Jackson Sell**
*President, CEO & Director*

Yes, I think the feedback from the national payers is that we're fairly unique in our ability to take full risk on a PPO product. And that's the fastest-growing product. It's roughly half. It will be more here as you see further growth. And so we think we're set up well.

**Operator**

Our next question comes from the line of Whit Mayo from SVB Securities.

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

Yes. First question just on STARS. I mean there's been a lot of noise about certain plans going from 4 to 3.5. Maybe just frame how you guys are thinking about it and do your contracts have any contingency provisions that may protect you in the event that an H contract does slip to a 3.5 star rating.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean let me start with by saying what I said in my prepared remarks, which is our own performance is extremely strong. 4 stars across the board and 5 stars in the areas that we talked about. Two is there's obviously been this step down across the industry as some of the COVID provisions expired and the better of provision that went with that.

We're doing better than the industry average in terms of percent of members that are in 4-plus star plans, and that's a result of us really managing this extremely well. We do have one payer in particular that we have a decent chunk of membership with that has stepped down to 3.5 stars for the majority of theirs.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 302

We believe that, that's very manageable for us as we look at that in terms of what that could look like in terms of an impact from a PMPM perspective kind of low single digits in terms of -- for 2024.

So I think we believe it's really manageable. We're performing better than others across the industry. I think health plans would like to see more senior patients in agilon partners because of the strong quality performance. But specifically to your question, I think it's a very manageable impact for us.

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

Okay. Steve, you talked in your prepared comments, maybe this is new, maybe it's not, but I feel like you referenced diabetes, renal, maybe more in the context of perhaps a specialty program. And I think you've established a partnership with Monogram, not sure how new that is. But is there anything to elaborate as you kind of think about this diabetes, renal specialty program?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean we have a really strong partnership. I think we're in 6 or 7 markets to date, and I think we're expanding to 2 or 3 more by the end of the year. I think our early results in those programs are really exceptional. And in particular, the enrollment that we're seeing from patients because it is an opt-in is, in the mid-80s. I think that's a function of this tight relationship that we have between the primary care physician and the patient and when the PCP makes that recommendation, the patient is very likely to agree with that.

That is demonstrably different than what they've seen in other markets by working with payers. And so I think it just kind of speaks to the secret sauce that we've got on that. And I just think -- I called out sort of our strengths in terms of A1C control and the benefits that we've got around that which really is extremely strong. So that's what I'd call out.

**Benjamin Whitman Mayo**
*SVB Securities LLC, Research Division*

Okay. Can I just ask one quick one for Tim. Just these new territory costs, geography costs. Is this all 2023 go-lives or the implementations for 2024 too?

**Timothy S. Bensley**
*Chief Financial Officer*

It's almost very, very high 90-ish percent 2023 still at this point. We are now just getting into starting to implement 2024. We haven't put in place a lot of infrastructure or cost for that. We will have some in the fourth quarter that start to flow in because we are getting up and going with our implementation for 2024. But for right now, it's primarily going to be 2023 implementation costs. And remember, of course, very big class for 2023 that we're -- very big complex class that we're implementing for 2023.

**Operator**

Our next question comes from the line of Sean Dodge of RBC Capital Markets.

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

On margins for new year-1 classes, Steve, you mentioned the platform is getting smarter and more efficient. You pointed to the current year-1 members trending toward the high end of your targets for medical margins. You're also building out classes now than you have historically. You referenced the 4 already for 2024, which gives you more time to prepare for their launches. I guess when we think about the combination of the 2, I think you alluded to it a couple of times, but can you maybe put some bookends around how much you think these can help elevate the launch trajectories for margins for future classes?

**Steven Jackson Sell**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 303**

*President, CEO & Director*

Yes. No, I appreciate the question. So I think to your point, we are experiencing the benefits of learning from our platform that is allowing our newer partners to perform at the high end of our range, which is really fantastic and encouraging and they're able to get the advantage of some of the programs like we just talked about, complex kidney disease as an example, earlier in the life cycle. So I think that's kind of point one.

Point two is, every class is a little bit different in terms of where they start, did they have an ACO before. And so the starting points for each one of those is a little bit different and always takes us a little while with payer contracts and others as we understand what that starting point is. But I think in general, we figure like -- we feel like we're seeing an acceleration sooner for our year-1 markets in terms of the benefits of the high-touch model, and it's coming through in terms of better satisfaction, better health outcomes and ultimately lower costs and better margins overall. So those are the things that I would really call out.

**Timothy S. Bensley**
*Chief Financial Officer*

And one thing, Steve, maybe I would add, as we said for the last couple of years that we think the best time to look at that, although we can give you an indication, obviously, that as Steve did and I did in our comment that our year-1 markets are actually performing better than we thought they would this year, certainly at the high end of our expectation. The best time for us to talk about that and talk about that trajectory is when we have a full year of results. We did that at our Analyst Day and showed you -- you actually saw it last year with some of our early markets were actually some of the best performing and fastest trajectory and obviously, when we come back, once we have a full year results this year, we'll show you updated cohorts and how that's working as well.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. And then just one last point I would make. The fact that for this class of '24 that we're talking about that we're this early, and we're going to have that long of an implementation period, they should start in a very strong position as a result of that.

**Sean Wilfred Dodge**
*RBC Capital Markets, Research Division*

Okay. That's helpful. And then as we think about the runway for medical margin in some of the older cohorts, you guys have talked before about there being a significant amount of other impactable spending that you could start to address. I think you sized it at [ $98 ] per member per month. What are -- what's kind of the biggest bucket there? And I guess, have you started to make some inroads in trying to tackle some of those cost opportunities?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean it's stratifying the population and dealing with those most complex patients. And really, it's -- I mean it's not hard to understand, but it's being able to maintain a multi-chronic and have them spend less time crashing into the emergency room and less time in an inpatient setting. It is moving to more time in the home, and I talked about that the home-based teams that we've got, I think, is a tremendous opportunity for us.

COVID has really shifted kind of the site of care in terms of what senior patients are comfortable with around that. You've seen it from inpatient to SNF and now much more to home. And so I think those are the things that we can really go after. And then the other would be really on the drug side in terms of medication adherence and just making sure that you're substituting sort of appropriate therapies. So those would be the big buckets that I think we'll go after.

**Matthew Dale Gillmor**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 304**

*Vice President of Investor Relations*

Sean, as a good example, Steve, you might expand on this. These markets are all really early in their life cycle of moving to full risk. If you talk to any of our partners, they'll just say there's a huge amount of opportunity in my market, even in the most successful partners that we have, but there was this Akron Summit the other week. I think it's just a great example of how the market evolves.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. I mean now Akron is one of our more mature markets, and we have really exceptional -- 2 exceptional partners within that market that have a really meaningful share of the adult primary care capacity, which is one of those real keys to success, but they were able to bring in leaders from more than 100 specialty groups on a Saturday morning. Everybody showed up and really talked to them about, hey, we're not making the move in the full risk value-based care, we're there. And we want you to come with us, but we need a few things in order for that to be possible.

If you want to stay in kind of a preferred network tier, you need to share quality and efficiency metrics. We need you to ensure access with expedited appointments. We need to make -- have you used technology to ensure that patient visits are actually getting completed. And then we need all care decisions coming back to this primary care physician. So it's really kind of the shared partnership. And there was tremendous amount of embrace around that and excitement around that. And you can just see that market really beginning to change. And you talk about just scratching the surface in terms of what we could impact from a specialty and facility cost perspective.

Once you get -- this is a primary care only group, both of them to have the specialists that engaged around that is very exciting. And so I think we can see this happening in more and more markets as we build the scale. We always are building around those right partners and -- it was just a great sort of evidence of what we're trying to do.

**Operator**

Our next question comes from the line of Brian Tanquilut from Jefferies.

**Taji Milan Phillips**
*Jefferies LLC, Research Division*

This is Taji Phillips on for Brian. So as it relates to your 2022 guidance, just curious for Q4, I noticed in your guidance that you raised [ the 4 ] for the full year, but also mentioned that you didn't account for upside from direct contracting. So I just want to understand what's informing, I think, the raised floor for your 2022 guidance and if there's anything that we're missing, particularly for modeling purposes.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Taji, I don't think you're necessarily missing anything. I mean I think the way this works is the midpoint of the range for adjusted EBITDA guidance is relatively constant rate. We're going -- went from 0 to 10 with a [ 5 midpoint to 2 to 7 ] so I guess a $4.5 million positive midpoint. The ins and outs matter, basically, we are absolutely seeing better performance from our MA business, and you see that flowing through to the medical margin numbers, and we kind of upped the midpoint of our medical margin MA guidance by about $6 million, so you expect? That's actually probably -- that's helping us on a full year basis by about $3 million. You can see that flowing through from Q3 and an expectation for a decent Q4 as well.

The flip side to that, and the reason we took the top end of the range down is a little bit more caution around direct contracting, also the fact that we just obviously booked a $3 million loss for direct contracting in the third quarter. We don't expect that to be contributing -- and that's a retro adjustment, obviously. We don't expect that to be positive in the fourth quarter, but we don't expect it to be dilutive either. I think the common -- and then we're probably seeing a little bit better performance, a little bit more leverage out of our platform support costs, which is a huge component of our model. When you

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 305**

put all that together, we want to be a little cautious on the retro trend adjustments so we brought down the top end of the range. But certainly, the really, really strong performance in MA. It's giving us more confidence that we can tighten that up and bring up the bottom end of the range as well.

**Operator**

Our next question comes from the line of Stephen Baxter of Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

I just wanted to ask another one about direct contracting. I appreciate you guys have taken a cautious approach to how you forecast and accrue for the business. I think you said you're engaged with CMS to try to create increased visibility and predictability in the program. I guess what exactly would you be looking to see to achieve that outcome? And then what would the forum for any of those changes potentially to be made at some point down the road?

**Steven Jackson Sell**
*President, CEO & Director*

Sure. Thanks, Stephen. I appreciate the question. We have a great partnership with the Innovation Center. These are pilot programs. And so they typically have adjustments that are made each year. And so we, in concert with a coalition through APG, have been talking to them about potential adjustments that could be made within it that would create more of the stability and predictability. I mean it's a fairly technical calculation, but something that would smooth the revenue balance, which really is what's happening with the retro trend adjustment that Tim talked about.

There's like 3 or 4 factors that affect what that revenue number turns out to be. And so there's a lot of modeling going on and a lot of work around that. But I mean, I guess I would leave it there, but I think they are actively engaged. I think they too are surprised by the volatility that's occurring and it's really a function of coming out of this, hopefully, once in a generation COVID-type experience. And so that really swings when you start to do year-over-year and baseline year comparisons, you can see pretty significant adjustments around that. And so that's what we're working with them on as part of a larger coalition.

**Operator**

Our next question comes from the line of James (sic) [ Jamie ] Perse of Goldman Sachs.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

First one quick clarification. The upside on medical margin this quarter versus your guidance. Tim, you mentioned there was a positive retro adjustment on MA. Can you quantify what the benefit there was or if all of the upside was underlying performance?

**Timothy S. Bensley**
*Chief Financial Officer*

No, there's no retro trend adjustment or anything like that, that applies to the MA business. That's specifically just related to the direct contracting business. The MA performance overall is just improving in the fourth quarter based on the overall improvement in the model. I mean there are a lot of adjustments that you do in the third quarter. It's a quarter where we have the most data flowing in, in the year from our payers. So we made all the adjustments that we have on the -- from the payers to make sure we got the right mix of members and the right bid rates and the right [ RAF ] assumptions in there. And so all that helps. We actually got some help, obviously, in the quarter in terms of incremental medical margin dollars because of the retro members and being the top end of our membership range as well.

And then on the flip side, the same thing, we did all the updates that we got from the payer data, obviously, on cost as well. But the net of that, yes, is definitely demonstrating a stronger medical margin performance in dollars on a PMPM basis, on an MLR basis, however you want to look at it. And I think that

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 306**

just reflects the continuing strength of the model to drive positive outcomes. But there's no formulaic retro trend adjustment or anything like that on the MA side.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

Yes. I meant the patient attribution piece, but I think you...

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So on the patient attribution side, we picked up a -- yes, we picked up about 1,000 members, I think, retro. That's not really an adjustment. It's just, hey, these are members that are seeing our PCPs. They should be attributed to us. We've identified them and worked out with the various health plans that they should be. It's typically that starts to wind down as you get further through the year. But later in the year, we still have some of our new plans in our new markets that this whole attribution process is new to. And so most of those 1,000 members are across some of those payers in those markets. But yes, so that was a pickup of essentially the difference between average membership and ending membership as those retro members.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

Okay. And then just on MaineHealth, how is the integration going? And do you feel like you're ready for next year? You mentioned that's a complex one and different from your historical partnership. So anything to call out there just in terms of how you're going and how you're feeling in terms of getting that ready for year 1? And any economic considerations you should factor into our models versus your typical year-1 performance for traditional markets?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, well, first off, I'll tell you, it's going incredibly well. The engagement from the MaineHealth medical group who is our partner there, and Andy and the entire team, who's the CEO of the system has been first rate. I think we've been able to integrate very well with their EMR. I think the payer contracting is going extremely well. It takes a little while as you go through these to sort of finalize exactly where you're going to start. And they are a extremely large -- they're a very large group across the entire state.

And so I think I would say it's going very well. The engagement from them is quite strong. I think the integration with their electronic medical record is going to help quite a bit. They have extensive care team resources that are available that can really sort of help to drive performance over time. So I think we feel very good about that, and we'll update on kind of the class of '23 and what that looks like in terms of a starting point as we get a little further on our progression. But right now, I think we believe it will be within our historical ranges and should be good.

**Operator**

Our last question comes from Gary Taylor of Cowen.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

Just coming in at the finish here. A couple of questions. One, you beat your revenue guidance by $45 million to $50 million, and I just wanted to understand the components of that. I think enrollment was at the high end, but not materially above. I think the retro attribution was maybe $8 million or $9 million. So I guess most of it was per member per month. And just wanted to understand, it seems like a really significant magnitude revenue beat versus your guidance and wanted to understand that.

**Timothy S. Bensley**
*Chief Financial Officer*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 307**

Yes, absolutely, Gary. I think the components are how you're calling it out. Probably the biggest not the biggest, but the first thing is the retro membership that we're showing up that 1,000 members, but over the first full 3 quarters of the year, plus I think we beat the high end of the guidance by not quite 1,000 other members within the quarter. So both of those are contributing to definitely a double-digit millions of dollars of incremental revenue.

And then the rest of it is really just syncing up our member-level data with the health plans, which we get the most up-to-date information on in the third quarter. And it's a combination of factors, including just getting the appropriate final files on things like do we have the right bid rates in for the plans that our members are in and updating all that as well as any interim midyear updates to our expected risk adjustment scores, and that made up the rest of it.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

And then you beat your medical margin guide by $6 million to $11 million. It sounds like DCE was negative $3 million, you thought it might be low single digits, so maybe that was $5 million or $6 million swing and EBITDA came in at the low end. So anything on G&A? Or how should we think about that? I guess, given the $11 million medical margin beat even with DCE coming in below would have thought maybe a touch higher on EBITDA?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I think platform support cost continues to be in the range that we expect. You can see it running at about 5% of revenue kind of quarter in and quarter out right now. I think that will continue to be the case for the full year. I mean it's a big improvement over a year ago, but it's not a quarter-to-quarter huge driver of variance to our EBITDA guidance. As we go into the full year, there's probably $1 million or $2 million upside versus what was in our original expectations, but it's not a big driver.

I mean within the quarter itself, the medical margin be flowing through the network contribution was obviously positive, and we ended up kind of in the low end, but within our guidance range, rather than at the top end of the range or above the range because of the, as you said, $5 million or so difference in our expectation on direct contracting and adjusted EBITDA.

**Gary Paul Taylor**
*Cowen and Company, LLC, Research Division*

And just last one on DCE. I kind of been following this. So nearly 8% retro adjustment in April, you guys were orderly conservatively accrued for that. It looked like another 2% retro in August. You said there was a little bit of a hit there. But my understanding was in September, there was another interim update that swung 3 or 4 full year, 3 or 4 points to the positive to maybe full year only trending down 6% or 7%. So is that just incorrect? Or is there some nuance in your regional benchmarks versus what we might be seeing nationally?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. First of all, the retro trend adjustment is national. So the same retro trend will apply to all players in it. There's no regional retro trend adjustment. It is the full 30 million-plus Medicare fee-for-service members benchmark that applies to everybody. I think you're right, the original May adjustment was down about 8%, definitely came down further in August. They're giving us interim data updates, which we have seen another 2 of since that August update, which is indicating that it may be kind of trending back in the same direction. We're not seeing anything that would say it would be another, whatever you said 3 or 4 points back.

The other thing is when the numbers come out, they're basically just giving us raw data that says, hey, here's what the experience is year-to-date. And right now, we have it through September, I think, for the DC population. But we still have to go through and do our own analysis of what does that mean in terms

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 308**

of seasonality in the fourth quarter. And so what might that really mean for the full year. But right now -- and so obviously, when we came down a little bit further in the third quarter, we wouldn't expect that the full year would be -- rebound from what we saw that by 2 or 3 points by any stretch.

**Operator**

As that's all the questions we have time for, I'd now like to hand the conference back over to the management team for closing remarks.

**Steven Jackson Sell**
*President, CEO & Director*

Great. Thanks, everyone. We really appreciate it. Hope everyone has a good evening.

**Operator**
Ladies and gentlemen, this concludes today's conference call. Thank you for joining. You may now disconnect your lines.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT 13

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 01, 2023**

# agilon health, inc.

**(Exact name of Registrant as Specified in Its Charter)**

| **Delaware** | **001-40332** | **37-1915147** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**6210 E Hwy 290, Suite 450**
**Austin, Texas**                                    **78723**
**(Address of Principal Executive Offices)**        **(Zip Code)**

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**APP 312**

**Item 2.02 Results of Operations and Financial Condition.**

On March 1, 2023, agilon health, inc., a Delaware corporation, issued a press release setting forth its financial results for the quarter and year ended December 31, 2022. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibit 99.1 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated March 1, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

| | | | |
|---|---|---|---|
| Date: | March 1, 2023 | By: | /s/ TIMOTHY S. BENSLEY |
| | | | Timothy S. Bensley |
| | | | Chief Financial Officer |

**Exhibit 99.1**



# agilon health Reports Fourth Quarter and Fiscal Year 2022 Results

*Revenue increased 49% to $690 million, Medicare Advantage membership increased 45% to 269,500, and Medical Margin increased 93% to $61 million during the fourth quarter*

*Guidance for 2023 includes significant gains in Adjusted EBITDA to $75 million to $90 million while maintaining strong revenue and membership growth[1]*

*Class of 2024 new partners expected to add at least 80,000 Medicare Advantage members across 6 physician groups, driving growth of over 130,000 new Medicare Advantage members in 2024*

*Acquisition of mphrX enables faster onboarding of agilon physician partners and rapid integration of clinical data, accelerating performance and speed to value*

**AUSTIN, T.X., March 1, 2023** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the fourth quarter and fiscal year ended December 31, 2022.

### Fourth Quarter and Fiscal Year 2022 Results:

- Total revenue of $690 million increased 49% during the fourth quarter compared to $463 million in the fourth quarter 2021.  For the fiscal year 2022, total revenue of $2.71 billion increased 48% compared to $1.83 billion in the comparable 2021 period.
- Total members live on the agilon platform increased to 358,600 as of December 31, including 269,500 Medicare Advantage members and 89,000 Direct Contracting beneficiaries.  Medicare Advantage membership increased 45%, with 13% growth in same geographies.
- Medical margin of $61 million increased 93% during the fourth quarter compared to $31 million in the fourth quarter 2021. For the fiscal year 2022, medical margin of $305 million increased 67% compared to $182 million in 2021. Medical margin represented 8.8% of revenue during the fourth quarter and 11.2% for the fiscal year 2022, compared to 6.8% and 9.9% of revenue in the fourth quarter and full year 2021, respectively.
- Net loss of $57 million in the fourth quarter, compared to a net loss of $57 million in fourth quarter 2021. For the fiscal year 2022, net loss of $107 million compared to a net loss of $407 million in 2021. Net loss for the fiscal year 2021 includes $292 million in non-cash stock-based compensation expense primarily related to agilon's initial public offering in April 2021.
- Adjusted EBITDA of negative $11 million in the fourth quarter compared to negative $27 million during the fourth quarter 2021. For the fiscal year 2022, Adjusted EBITDA of positive $4 million compared to negative $39 million in the comparable 2021 period.  Adjusted EBITDA contribution from Direct Contracting was $8 million during the fourth quarter 2022 and $14 million for the for the fiscal year 2022.

"Our strong results in 2022 demonstrate the power of our aligned partnership model to drive consistently better outcomes for patients and physicians," said Steve Sell, chief executive officer.  "We are entering 2023 with incredible momentum and the Class of 2024 new partners will expand our national network to 2,700 primary care physicians and 30+ communities."

**APP 315**

***Outlook for First Quarter and Fiscal Year 2023***:

|  | Quarter Ended March 31, 2023 | | Year Ended December 31, 2023 | |
| --- | --- | --- | --- | --- |
|  | Low | High | Low | High |
| Medicare Advantage Members[2] | 385,000 | 390,000 | 400,000 | 410,000 |
| ACO REACH Members[2] | 85,000 | 90,000 | 85,000 | 90,000 |
| Total Members Live on Platform[2] | 470,000 | 480,000 | 485,000 | 500,000 |
| Total revenues ($M) | $1,070 | $1,090 | $4,280 | $4,370 |
| Medical Margin ($M) | $160 | $170 | $535 | $560 |
| Adjusted EBITDA ($M)[1] | $32 | $37 | $75 | $90 |

[1]We have not reconciled guidance for Adjusted EBITDA to net income (loss), the most comparable GAAP measure, and have not provided forward-looking guidance for net income (loss) because of the uncertainty around certain items that may impact net income (loss), including stock-based compensation and geography entry costs.

[2]Membership reflects management's outlook for end of period.  agilon's partnered ACO REACH Entities (formerly Direct Contracting) are not consolidated within its financial results.

Adjusted EBITDA contribution from ACO REACH (formerly Direct Contracting) is expected in a range of $5 million to $10 million for 2023.[1]

***Membership Details for the Year Ended 2022***

Total members live on the agilon platform increased to 358,600 as of December 31, 2022.  Total members live on the platform include 269,500 Medicare Advantage members and 89,000 attributed Direct Contracting beneficiaries.  Average Medicare Advantage membership was 272,000 during the fourth quarter and 264,000 for the fiscal year 2022.

***Acquisition of mphrX***

On February 28, 2023, agilon health completed the acquisition of mphrX, a leading provider of value-based care technology and interoperability solutions.  mphrX's Minerva Healthcare Data Platform uses FHIR-based standards to rapidly aggregate, access, and exchange data across healthcare delivery networks.  Minerva's integration into agilon's existing technology platform will enable faster onboarding of agilon partners and rapid integration of clinical data, accelerating performance and speed to value for patients and physicians.  Management does not anticipate mphrX will have a meaningful impact on agilon's Adjusted EBITDA during 2023.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss fourth quarter and fiscal year 2022 results on Wednesday, March 1, 2023 at 4:30 PM Eastern Time. The conference call can be accessed by dialing (844) 200-6205 for U.S. participants and +1 (929) 526-1599 for international participants and referencing participant code 553857. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups transition to a value-based Total Care Model for senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,200+ PCPs that allow physician groups to maintain

their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 25 diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

## Forward-Looking Statements

Statements in this release that are not historical facts are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "may," "will," "project," "expect," "believe," "intend," "anticipate," "seek," "target," "forecast," "plan," "potential," "estimate," "could," "would," "should," and other comparable and derivative terms or the negatives thereof. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, new partnership structures, financing activities, acquisitions and dispositions, or other transactions discussed in this release; and statements regarding growth opportunities, ability to deliver sustainable long-term value, business environment, long term opportunities and strategic growth plans including without limitation with respect to expected revenue and net income, total and average membership, Adjusted EBITDA, and other financial projections and assumptions, as well as comparable statements included in other sections of this release. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Further, we cannot guarantee the accuracy of any such forward-looking statement contained in this release, and such forward-looking statements are subject to known and unknown risks and uncertainties that are difficult to predict. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies, physician partners and payors, or to execute upon our growth initiatives; our ability to execute our operating strategies or to achieve results consistent with our historical performance; our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors or to secure Medicare Advantage payments at favorable financial terms; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; significant reductions in our membership; our ability to obtain additional capital needed to support our business; challenges for our physician partners in the transition to a Total Care Model; inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target markets; the spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics, and the inability to predict the ultimate impact of pandemics on us; inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings under payor contracts; the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities within certain geographies in the future; the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation; security breaches, loss of data or other disruptions to our data platforms; our subsidiaries' lack of performance or ability to fund their operations, which could require us to fund such losses; our dependence on a limited number of key payors; the limited terms of our contracts with payors and that they may not be renewed upon their expiration; our reliance on our payors for membership attribution and assignment, data and reporting accuracy and claims payment; our dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts; our dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate or incorrect; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue; statutory or regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; the impact on our revenue of CMS modifying the methodology used to determine the revenue associated with MA members; the potential that we may incur future indebtedness; our ability to successfully integrate acquired businesses; our ability to remediate material weaknesses in our internal control over financial reporting or if additional material weaknesses occur in the future; and risks related to other factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2022. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

# agilon health, inc.
**Consolidated Balance Sheets**
**In thousands, except per share data**

| | | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 497,070 | $ | 1,040,039 |
| Restricted cash and equivalents | | 10,610 | | 14,781 |
| Marketable securities | | 411,901 | | — |
| Receivables, net | | 497,574 | | 293,407 |
| Prepaid expenses and other current assets, net | | 34,119 | | 18,968 |
| Total current assets | | 1,451,274 | | 1,367,195 |
| Property and equipment, net | | 20,050 | | 9,161 |
| Intangible assets, net | | 67,680 | | 55,398 |
| Goodwill | | 41,540 | | 41,540 |
| Other assets, net | | 116,924 | | 112,958 |
| Total assets | $ | 1,697,468 | $ | 1,586,252 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Current liabilities: | | | | |
| Medical claims and related payables | $ | 346,727 | $ | 239,014 |
| Accounts payable and accrued expenses | | 183,364 | | 112,946 |
| Current portion of long-term debt | | 5,000 | | 5,000 |
| Total current liabilities | | 535,091 | | 356,960 |
| Long-term debt, net of current portion | | 38,482 | | 43,401 |
| Other liabilities | | 83,286 | | 94,295 |
| Total liabilities | | 656,859 | | 494,656 |
| Commitments and contingencies | | | | |
| Stockholders' equity (deficit): | | | | |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 412,385 and 400,095 shares issued and outstanding, respectively | | 4,124 | | 4,001 |
| Additional paid-in capital | | 2,106,886 | | 2,045,572 |
| Accumulated deficit | | (1,064,230) | | (957,677) |
| Accumulated other comprehensive income (loss) | | (5,560) | | — |
| Total agilon health, inc. stockholders' equity (deficit) | | 1,041,220 | | 1,091,896 |
| Noncontrolling interests | | (611) | | (300) |
| Total stockholders' equity (deficit) | | 1,040,609 | | 1,091,596 |
| Total liabilities and stockholders' equity (deficit) | $ | 1,697,468 | $ | 1,586,252 |

**APP 318**

# agilon health, inc.
### Consolidated Statements of Operations
### In thousands, except per share data

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| | (unaudited) | | | |
| **Revenues:** | | | | |
| Medical services revenue | $ 688,855 | $ 461,999 | $ 2,704,396 | $ 1,829,735 |
| Other operating revenue | 919 | 887 | 3,815 | 3,824 |
| Total revenues | 689,774 | 462,886 | 2,708,211 | 1,833,559 |
| **Expenses:** | | | | |
| Medical services expense | 628,163 | 430,620 | 2,399,798 | 1,647,659 |
| Other medical expenses | 51,615 | 22,678 | 196,127 | 109,487 |
| General and administrative (including noncash stock-based compensation expense of $9,951, $4,414, $28,381, and $292,394, respectively) | 75,207 | 53,840 | 218,945 | 455,821 |
| Depreciation and amortization | 3,907 | 3,621 | 13,772 | 14,544 |
| Total expenses | 758,892 | 510,759 | 2,828,642 | 2,227,511 |
| **Income (loss) from operations** | (69,118 ) | (47,873 ) | (120,431 ) | (393,952 ) |
| **Other income (expense):** | | | | |
| Other income (expense), net | 14,885 | (8,534 ) | 24,725 | (4,500 ) |
| Gain (loss) on lease terminations | — | — | (5,458 ) | — |
| Interest expense | (1,709 ) | (840 ) | (4,525 ) | (6,146 ) |
| **Income (loss) before income taxes** | (55,942 ) | (57,247 ) | (105,689 ) | (404,598 ) |
| Income tax benefit (expense) | (572 ) | (179 ) | (1,640 ) | (886 ) |
| **Income (loss) from continuing operations** | (56,514 ) | (57,426 ) | (107,329 ) | (405,484 ) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | (35 ) | (1,209 ) | 491 | (3,463 ) |
| Gain (loss) on sales of assets, net | — | — | — | 473 |
| Income tax benefit (expense) | — | 1,898 | (26 ) | 1,687 |
| **Total discontinued operations** | (35 ) | 689 | 465 | (1,303 ) |
| **Net income (loss)** | (56,549 ) | (56,737 ) | (106,864 ) | (406,787 ) |
| Noncontrolling interests' share in (earnings) loss | 83 | 16 | 311 | 300 |
| **Net income (loss) attributable to common shares** | $ (56,466 ) | $ (56,721 ) | $ (106,553 ) | $ (406,487 ) |
| | | | | |
| **Net income (loss) per common share, basic and diluted (continuing operations)** | $ (0.14 ) | $ (0.14 ) | $ (0.26 ) | $ (1.09 ) |
| **Weighted average shares outstanding, basic and diluted** | 412,103 | 396,411 | 408,154 | 372,931 |

# agilon health, inc.
**Consolidated Statements of Cash Flows**
**In thousands**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (106,864) | $ (406,787) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 13,772 | 14,670 |
| Stock-based compensation expense | 28,381 | 292,394 |
| Loss on debt extinguishment | — | 1,590 |
| Loss (income) from equity method investments | (10,720) | 6,766 |
| Deferred income taxes and uncertain tax positions | 532 | (3,231) |
| Release of indemnification assets | 553 | 1,705 |
| (Gain) loss on sale of assets, net | — | (473) |
| Distributions of earnings from equity method investments | — | 174 |
| Other non-cash items | 2,973 | 58 |
| Changes in operating assets and liabilities: | | |
| Receivables, net | (204,167) | (149,041) |
| Prepaid expense and other current assets | (16,620) | (3,916) |
| Other assets | (205) | 3,931 |
| Medical claims and related payables | 107,713 | 76,339 |
| Accounts payable and accrued expenses | 65,736 | 19,360 |
| Other liabilities | (11,892) | (1,698) |
| Net cash provided by (used in) operating activities | (130,808) | (148,159) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (15,426) | (6,564) |
| Purchase of intangible assets | (17,235) | (6,862) |
| Investment in loans receivable and other | (6,510) | (82,831) |
| Investments in marketable securities | (458,265) | — |
| Proceeds from maturities and sales of marketable securities and other | 52,548 | 7,095 |
| Proceeds from sale of business and property, net of cash divested | 500 | (1,344) |
| Net cash provided by (used in) investing activities | (444,388) | (90,506) |
| **Cash flows from financing activities:** | | |
| Proceeds from initial public offering | — | 1,170,942 |
| Proceeds from other equity issuances, net | 33,056 | 18,086 |
| Proceeds from the issuance of long-term debt | — | 100,000 |
| Repayments of long-term debt | (5,000) | (119,899) |
| Equity and debt issuance costs and other | — | (14,739) |
| Net cash provided by (used in) financing activities | 28,056 | 1,154,390 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (547,140) | 915,725 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of period | 1,054,820 | 135,178 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of period | — | 3,917 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 1,054,820 | 139,095 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 507,680 | $ 1,054,820 |

**agilon health, inc.**
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2022** | | **2021** | |
| Medical services revenue | $ | 688,855 | $ | 461,999 | $ | 2,704,396 | $ | 1,829,735 |
| Medical services expense | | (628,163) | | (430,620) | | (2,399,798) | | (1,647,659) |
| Medical margin | $ | 60,692 | $ | 31,379 | $ | 304,598 | $ | 182,076 |

Medical margin represents the amount earned from medical services revenue after medical services expenses are deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2022** | | **2021** | |
| Platform support costs | $ | 41,613 | $ | 30,899 | $ | 146,481 | $ | 123,521 |
| Geography entry costs[1] | | 19,434 | | 7,872 | | 43,890 | | 20,583 |
| Severance and related costs | | — | | 7,763 | | 2,470 | | 12,861 |
| Management fees[2] | | — | | — | | — | | 433 |
| Stock-based compensation expense | | 9,951 | | 4,414 | | 28,381 | | 292,394 |
| Other[3] | | 4,209 | | 2,892 | | (2,277) | | 6,029 |
| General and administrative | $ | 75,207 | $ | 53,840 | $ | 218,945 | $ | 455,821 |

(1)    Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue.

(2)    Represents management fees and other expenses paid to Clayton Dubilier & Rice, LLC ("CD&R") prior to our IPO. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

(3)    Includes non-cash accruals for unasserted claims and contingent liabilities.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

# agilon health, inc.
## Non-GAAP Financial Measures
### In thousands
### (unaudited)

### *NETWORK CONTRIBUTION*

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Income (loss) from operations | $ (69,118) | $ (47,873) | $ (120,431) | $ (393,952) |
| Other operating revenue | (919) | (887) | (3,815) | (3,824) |
| Other medical expenses | 51,615 | 22,678 | 196,127 | 109,487 |
| Other medical expenses—live geographies[1] | (38,653) | (18,704) | (172,276) | (97,498) |
| General and administrative | 75,207 | 53,840 | 218,945 | 455,821 |
| Depreciation and amortization | 3,907 | 3,621 | 13,772 | 14,544 |
| Network contribution | $ 22,039 | $ 12,675 | $ 132,322 | $ 84,578 |

[1]  Represents physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members in our live geographies. Excludes costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2022 and 2021, costs incurred in implementing geographies were $13.0 million and $4.0 million, respectively. For the years ended December 31, 2022 and 2021, costs incurred in implementing geographies were $23.9 million and $12.0 million, respectively.

### *ADJUSTED EBITDA*

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Net income (loss) | $ (56,549) | $ (56,737) | $ (106,864) | $ (406,787) |
| (Income) loss from discontinued operations, net of income taxes | 35 | (689) | (465) | 1,303 |
| Interest expense | 1,709 | 840 | 4,525 | 6,146 |
| Income tax expense (benefit) | 572 | 179 | 1,640 | 886 |
| Depreciation and amortization | 3,907 | 3,621 | 13,772 | 14,544 |
| (Gain) loss on lease terminations | — | — | 5,458 | — |
| Geography entry costs[1] | 32,396 | 11,846 | 67,741 | 32,572 |
| Severance and related costs[2] | — | 7,763 | 2,470 | 12,861 |
| Management fees[3] | — | — | — | 433 |
| Stock-based compensation expense | 9,951 | 4,414 | 28,381 | 292,394 |
| EBITDA adjustments related to equity method investments[4] | 749 | (571) | 3,737 | 1,736 |
| Other[5] | (3,391) | 2,642 | (16,144) | 5,293 |
| Adjusted EBITDA | $ (10,621) | $ (26,692) | $ 4,251 | $ (38,619) |

[1]  Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue. For the three months ended December 31, 2022 and 2021, (i) $13.0 million and $4.0 million, respectively, are included in other medical expenses and (ii) $19.4 million and $7.9 million, respectively, are included in general and administrative expenses. For the years ended December 31, 2022 and 2021, (i) $23.9 million and $12.0 million, respectively, are included in other medical expenses and (ii) $43.9 million and $20.6 million, respectively, are included in general and administrative expenses.

[2]  For the year ended December 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $2.0 million. For the three months and year ended December 31, 2021, includes taxes and related costs on stock option exercises for departed executives of $5.4 million.

[3]  Represents management fees and other expenses paid to CD&R prior to our IPO. In connection with our initial public offering, we terminated our consulting agreement with CD&R, effective April 16, 2021. We were not charged a fee in connection with the termination of this agreement.

[4]  Includes direct geography entry costs of $0.1 million and $1.3 million for the three and twelve months ended December 31, 2021, respectively.

[5]  Includes interest income and non-cash accruals for unasserted claims and contingent liabilities.

In addition to providing results that are determined in accordance with GAAP, we present network contribution and Adjusted EBITDA, which are non-GAAP financial measures.

We define network contribution as medical services revenue less the sum of: (i) medical services expense and (ii) other medical expenses excluding costs incurred in implementing geographies. Other medical expenses consist of physician compensation expense related to surplus sharing and other direct medical expenses incurred to improve care for our members. We believe this metric provides insight into the economics of our Total Care Model as it includes all medical services expense associated with our members' care as well as partner compensation and additional medical costs we incur as part of our aligned partnership model. Other medical expenses are largely variable and proportionate to the level of surplus in each respective geography.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) geography entry costs, (vi) stock-based compensation expense, (vii) severance and related costs, and (viii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Income (loss) from operations is the most directly comparable GAAP measure to network contribution. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe network contribution and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our live geographies by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe network contribution and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe network contribution and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate network contribution and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of network contribution and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

## Contacts

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health

**APP 323**

# EXHIBIT 14

APP 324

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

_____

# FORM 8-K

_____

## CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): November 2, 2023**

_____

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

_____

| Delaware | 001-40332 | 37-1915147 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| **6210 E Hwy 290, Suite 450** | | |
|---|---|---|
| **Austin, TX** | | **78723** |
| **(Address of Principal Executive Offices)** | | **(Zip Code)** |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

_____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On November 2, 2023, agilon health, inc. ("agilon" or the "Company"), a Delaware corporation, issued a press release setting forth its financial results for the three and nine months ended September 30, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

On October 31, 2023, agilon completed the disposition of its MDX Hawaii operations. On November 2, 2023, to assist investors' review and understanding of agilon's operating results, the Company issued supplemental financial information which summarize certain unaudited non-GAAP financial information, excluding MDX Hawaii for the periods reflected therein. This supplemental financial information is furnished herewith as Exhibit 99.2 and is incorporated by reference herein

The information set forth in this Item 2.02 of this Current Report on Form 8-K and the related information in Exhibits 99.1 and 99.2 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated November 2, 2023. |
| 99.2 | Supplemental Financial Information dated November 2, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

| Date: | November 2, 2023 | | By: | /s/ TIMOTHY S. BENSLEY |
|---|---|---|---|---|
| | | | | Timothy S. Bensley |
| | | | | Chief Financial Officer |

EX-99.1 2 agl-20230930xexx991.htm EX-99.1

**Exhibit 99.1**



# agilon health Reports Third Quarter 2023 Results

*Revenue increased 75% to $1.22 billion, Medicare Advantage membership increased 58% to 420,300, and total members live on the agilon platform grew to 508,000*

*Strong performance across core partner markets supported by membership growth and profitability gains in Medicare Advantage and ACO REACH*

*Sale of MDX Hawaii enables agilon to focus on its core partner markets*

**AUSTIN, T.X., November 2, 2023** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the third quarter ended September 30, 2023.

"Momentum across our business remains strong, driven by the power of agilon's physician network and platform to improve patient outcomes across the Medicare Advantage and ACO REACH populations," said Steve Sell, chief executive officer. "Our decision to sell MDX Hawaii and focus on our core partner markets, which leverage a common operating model, will better position agilon, our partner groups, and their patients for continued success in 2024 and beyond."

**Third Quarter 2023 Results:**

- Total members live on the agilon platform increased to 508,000 as of September 30, 2023, including 420,300 Medicare Advantage members and 87,700 ACO REACH beneficiaries. Medicare Advantage membership increased 58%, with 9% growth across same geographies.

- Total revenue of $1.22 billion increased 75% during the third quarter 2023, compared to $695 million in the third quarter 2022. Gross profit of $30 million in the third quarter 2023, compared to $26 million in the third quarter 2022. Net loss of $31 million in the third quarter 2023, compared to a net loss of $31 million in third quarter 2022.

- Medical margin of $108 million increased 42% during the third quarter 2023, compared to $76 million in the third quarter 2022. Medical margin for the third quarter 2023 included a negative $8 million net impact from prior year claims and revenue, consisting of $9 million in prior year claims and $1 million in prior year revenue.

- Adjusted EBITDA loss of $6 million in the third quarter 2023, compared to an Adjusted EBITDA loss of $26 million in the third quarter 2022. Adjusted EBITDA included $18 million in geography entry costs in the third quarter 2023, compared to $21 million in the third quarter 2022.

ACO REACH contributed $18 million to Adjusted EBITDA during the third quarter 2023, compared to a $3 million loss in the third quarter 2022.

- Due to the sale of MDX Hawaii, which closed on October 31, 2023, agilon is providing Adjusted (Non-GAAP) results for the company's core partner markets, which exclude MDX Hawaii. Adjusted (Non-GAAP) results for agilon's core partner markets for the third quarter 2023 included: Medicare Advantage membership of 384,100, total revenues of $1,137 million, gross profit of $37 million, medical margin of $111 million, net loss of $22 million, and Adjusted EBITDA of $6 million. See accompanying schedules with reconciliations to the most comparable GAAP measure.

***Reported – Key Financial and Operating Metrics ($M):***
*(Third Quarter 2023 vs. 2022)*

| | Three Months Ended September 30, | | Change |
|---|---|---|---|
| | 2023[3] | 2022[4] | % YoY |
| Medicare Advantage Members[1] | 420,300 | 266,600 | 58% |
| ACO REACH Members[1,2] | 87,700 | 89,400 | (2%) |
| Total Members Live on Platform[1,2] | 508,000 | 356,000 | 43% |
| Avg. Medicare Advantage Members | 425,100 | 270,100 | 57% |
| Total revenues | $1,216 | $695 | 75% |
| Gross Profit | $30 | $26 | 18% |
| Medical Margin | $108 | $76 | 42% |
| Net Loss | ($31) | ($31) | NM |
| Adjusted EBITDA | ($6) | ($26) | NM |
| Geography Entry Costs | $18 | $21 | (14%) |

1. Membership metrics reflect end of period results.

2. agilon's ACO REACH entities are not included within its consolidated financial results.

3. Third quarter 2023 results include the following attributed to MDX Hawaii: MA membership of 36,200, avg. MA members of 36,200, revenues of $79 million, gross profit of negative $6 million, medical margin of negative $3 million, net loss of $9 million, and Adjusted EBITDA of negative $11 million.

4. Third quarter 2022 results include the following attributed to MDX Hawaii: MA membership of 38,700, avg. MA members of 38,700, revenues of $81 million, gross profit of negative $4 million, and medical margin of $0 million.

***Adjusted to Exclude MDX Hawaii (Non-GAAP) – Key Financial and Operating Metrics ($M)[1]:***
*(Third Quarter 2023 vs. 2022)*

| | Three Months Ended September 30, | | Change |
|---|---|---|---|
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members[2] | 384,100 | 227,900 | 69% |
| ACO REACH Members[2, 3] | 87,700 | 89,400 | (2%) |
| Total Members Live on Platform[2, 3] | 471,800 | 317,300 | 49% |
| Avg. Medicare Advantage Members | 388,900 | 231,400 | 68% |
| Total revenues | $1,137 | $614 | 85% |
| Gross Profit | $37 | $30 | 23% |
| Medical Margin | $111 | $76 | 46% |

1. The Adjusted (non-GAAP) financial and operating metrics exclude MDX Hawaii in both periods presented as a result of the company's disposition, which closed on October 31, 2023; these financial metrics are non-GAAP, see accompanying schedules with reconciliations to the most comparable GAAP measure.

2. Membership metrics reflect end of period results.

3. agilon's ACO REACH entities are not included within its consolidated financial results.

*Reported – Key Financial and Operating Metrics ($M):*
(YTD 2023 vs. 2022)

| | Nine Months Ended September 30, | | Change |
|---|---|---|---|
| | 2023[3] | 2022[4] | % YoY |
| Medicare Advantage Members[1] | 420,300 | 266,600 | 58% |
| ACO REACH Members[1,2] | 87,700 | 89,400 | (2%) |
| Total Members Live on Platform[1,2] | 508,000 | 356,000 | 43% |
| Avg. Medicare Advantage Members | 411,500 | 261,200 | 58% |
| Total revenues | $3,501 | $2,018 | 73% |
| Gross Profit | $165 | $102 | 61% |
| Medical Margin | $408 | $244 | 67% |
| Net Loss | ($32) | ($50) | NM |
| Adjusted EBITDA | $28 | ($20) | NM |
| Geography Entry Costs | $49 | $35 | 40% |

1. Membership metrics reflect end of period results.

2. agilon's ACO REACH entities are not included within its consolidated financial results.

3. Year to date 2023 results include the following attributed to MDX Hawaii: MA membership of 36,200, average MA members of 36,200, revenues of $241 million, gross profit of $0, medical margin of $8 million, net loss of $4 million, and Adjusted EBITDA of negative $14 million.

4. Year to date 2022 results include the following attributed to MDX Hawaii: MA membership of 38,700, average MA members of 38,800, revenues of $245 million, gross profit of $7 million, and medical margin of $16 million.

*Adjusted to Exclude MDX Hawaii (Non-GAAP) – Key Financial and Operating Metrics ($M)[1]:*
(YTD 2023 vs. 2022)

| | Nine Months Ended September 30, | | Change |
|---|---|---|---|
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members[2] | 384,100 | 227,900 | 69% |
| ACO REACH Members[2, 3] | 87,700 | 89,400 | (2%) |
| Total Members Live on Platform[2, 3] | 471,800 | 317,300 | 49% |
| Avg. Medicare Advantage Members | 375,300 | 222,400 | 69% |
| Total revenues | $3,260 | $1,774 | 84% |
| Gross Profit | $165 | $95 | 72% |
| Medical Margin | $401 | $228 | 75% |

1.  The Adjusted (non-GAAP) financial and operating metrics exclude MDX Hawaii in both periods presented as a result of the company's disposition, which closed on October 31, 2023; these financial metrics are non-GAAP, see accompanying schedules with reconciliations to the most comparable GAAP measure.

2.  Membership metrics reflect end of period results.

3.  agilon's ACO REACH entities are not included within its consolidated financial results.

***Sale of MDX Hawaii:***

On October 27, 2023, agilon health entered into a definitive agreement to sell MDX Hawaii and its related operations. Acquired by agilon in 2016, MDX Hawaii is a provider network supporting approximately 600 physicians with fully-delegated risk contracts and management services organization capabilities, including claims processing and utilization management. MDX Hawaii's physician network provides care to approximately 36,000 members covered by two Medicare Advantage health plans on the islands of Oahu, Maui, and Kauai.

Management believes the sale of MDX Hawaii will allow agilon to focus on the company's core partner markets in the continental United States. In these markets, agilon leverages a common operating structure centered around long-term, joint venture partnerships with physician groups and health systems, and non-delegated, full-risk contracts across multiple health plans.

The sale of MDX Hawaii and its related operations closed on October 31, 2023. Financial terms are not being disclosed.

***ACO REACH Performance in 2022:***

On October 23, 2023, agilon health announced that its ACO REACH (ACOs) entities achieved $107 million in gross savings (9.7% gross savings rate), including $24 million savings to the Medicare Trust Fund, during the 2022 performance year. agilon's ACOs achieved a quality score of 99.8%, with 7 of 8 ACOs achieving a 100% quality score during the 2022 performance year. agilon ACOs performed better than mean performance across all four quality measures including: All Condition Readmissions, Unplanned Admissions for Patients with Multiple Chronic Conditions, Timely Follow Up, and the CAHPS Survey.

***Capital Position and Balance Sheet:***

agilon health's balance sheet as of September 30, 2023 included cash, cash equivalents and marketable securities of $574 million and total debt of $40 million.

**<u>Outlook for Fiscal Year 2023 ($M):</u>**

|  | Year Ended December 31, 2023 | | | |
|---|---|---|---|---|
|  | Updated Guidance[1] | | Previous Guidance | |
|  | Low | High | Low | High |
| Medicare Advantage (MA) Members[2] | 384,000 | 386,000 | 412,000 | 415,000 |
| ACO REACH Members[2,3] | 85,000 | 90,000 | 85,000 | 90,000 |
| Total Members Live on Platform[2] | 469,000 | 476,000 | 497,000 | 505,000 |
| Avg. Medicare Advantage (MA) Members | 377,000 | 378,000 | 409,000 | 410,000 |
| Total Revenues | $4,310 | $4,320 | $4,525 | $4,540 |
| Medical Margin | $455 | $470 | $500 | $530 |
| Adjusted EBITDA[4] | $6 | $18 | $0 | $23 |
| Geography Entry Costs[5] | $69 | $67 | $75 | $68 |

1. Updated guidance for the fiscal year 2023 excludes MDX Hawaii.

2. Membership reflects management's outlook for end of period.
3. agilon's partnered ACO REACH entities are not consolidated within its financial results.

4. Adjusted EBITDA contribution from ACO REACH is now expected to be approximately $39 million for fiscal year 2023. Management's previous outlook for Adjusted EBITDA contribution from ACO REACH was $30 million to $35 million for fiscal year 2023.

5.  Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

**Outlook for Fourth Quarter 2023 ($M)[1]:**

| | Quarter Ended December 31, 2023 | |
| --- | --- | --- |
| | Low | High |
| Medicare Advantage (MA) Members[2] | 384,000 | 386,000 |
| ACO REACH Members[2,3] | 85,000 | 90,000 |
| Total Members Live on Platform[2] | 469,000 | 476,000 |
| Avg. Medicare Advantage (MA) Members | 383,000 | 385,000 |
| Total Revenues | $1,050 | $1,060 |
| Medical Margin | $55 | $70 |
| Adjusted EBITDA[4] | ($36) | ($24) |
| Geography Entry Costs[5] | $20 | $18 |

1.  Guidance for the fourth quarter 2023 excludes MDX Hawaii.
2.  Membership reflects management's outlook for end of period.
3.  agilon's partnered ACO REACH entities are not consolidated within its financial results.
4.  Adjusted EBITDA contribution from ACO REACH is expected to be approximately $6 million for the fourth quarter 2023.
5.  Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss third quarter 2023 results on Thursday, November 2, 2023 at 4:30 PM Eastern Time. The conference call can be accessed by dialing (833) 470-1428 for U.S. participants and +1 (929) 526-1599 for international participants and referencing participant code 269354. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**
agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups transition to a value-based Total Care Model for senior patients. agilon provides the

technology, people, capital, process, and access to a peer network of 2,700+ PCPs that allow physician groups to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Twitter, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions and the realization of expected benefits of the sale of our Hawaii operations. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to, those factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

# agilon health, inc.
**Consolidated Balance Sheets**
**In thousands, except per share data**

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
|  | (unaudited) |  |
| **ASSETS** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 168,339 | $ 497,070 |
| Restricted cash and equivalents | 10,204 | 10,610 |
| Marketable securities | 395,878 | 411,901 |
| Receivables, net | 1,345,711 | 497,574 |
| Prepaid expenses and other current assets | 36,512 | 34,119 |
| Total current assets | 1,956,644 | 1,451,274 |
| Property and equipment, net | 26,203 | 20,050 |
| Intangible assets, net | 92,657 | 67,680 |
| Goodwill | 62,387 | 41,540 |
| Other assets, net | 140,184 | 116,924 |
| Total assets | $ 2,278,075 | $ 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** |  |  |
| Current liabilities: |  |  |
| Medical claims and related payables | $ 1,005,762 | $ 346,727 |
| Accounts payable and accrued expenses | 290,563 | 183,364 |
| Current portion of long-term debt | 5,000 | 5,000 |
| Total current liabilities | 1,301,325 | 535,091 |
| Long-term debt, net of current portion | 34,780 | 38,482 |
| Other liabilities | 70,370 | 83,286 |
| Total liabilities | 1,406,475 | 656,859 |
| Commitments and contingencies |  |  |
| Stockholders' equity (deficit): |  |  |
| Common stock, $0.01 par value: 2,000,000 shares authorized; 405,980 and 412,385 shares issued and outstanding, respectively | 4,060 | 4,124 |
| Additional paid-in capital | 1,970,930 | 2,106,886 |
| Accumulated deficit | (1,096,393) | (1,064,230) |
| Accumulated other comprehensive income (loss) | (6,230) | (5,560) |
| Total agilon health, inc. stockholders' equity (deficit) | 872,367 | 1,041,220 |
| Noncontrolling interests | (767) | (611) |
| Total stockholders' equity (deficit) | 871,600 | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ 2,278,075 | $ 1,697,468 |

# agilon health, inc.

**Consolidated Statements of Operations**

**In thousands, except per share data**

**(unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,212,132 | $ 693,934 | $ 3,494,006 | $ 2,015,541 |
| Other operating revenue | 3,528 | 924 | 6,853 | 2,896 |
| Total revenues | 1,215,660 | 694,858 | 3,500,859 | 2,018,437 |
| **Expenses:** | | | | |
| Medical services expense | 1,104,396 | 618,287 | 3,085,957 | 1,771,635 |
| Other medical expenses | 80,787 | 50,659 | 249,936 | 144,512 |
| General and administrative (including noncash stock-based compensation expense of $20,736, $7,907, $53,980 and $18,430, respectively) | 74,138 | 51,980 | 222,483 | 143,738 |
| Depreciation and amortization | 5,310 | 3,450 | 15,014 | 9,865 |
| Total expenses | 1,264,631 | 724,376 | 3,573,390 | 2,069,750 |
| **Income (loss) from operations** | (48,971) | (29,518) | (72,531) | (51,313) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | 14,659 | (4,314) | 24,507 | 3,473 |
| Other income (expense), net | 5,690 | 4,888 | 21,001 | 6,367 |
| Gain (loss) on lease terminations | — | — | — | (5,458) |
| Interest expense | (1,651) | (1,000) | (4,772) | (2,816) |
| **Income (loss) before income taxes** | (30,273) | (29,944) | (31,795) | (49,747) |
| Income tax benefit (expense) | (1,210) | (559) | (524) | (1,068) |
| **Income (loss) from continuing operations** | (31,483) | (30,503) | (32,319) | (50,815) |
| **Discontinued operations:** | | | | |
| Income (loss) before income taxes | — | (224) | — | 526 |
| Income tax benefit (expense) | — | (12) | — | (26) |
| **Total discontinued operations** | — | (236) | — | 500 |
| **Net income (loss)** | (31,483) | (30,739) | (32,319) | (50,315) |
| Noncontrolling interests' share in (earnings) loss | 47 | 71 | 156 | 228 |
| **Net income (loss) attributable to common shares** | $ (31,436) | $ (30,668) | $ (32,163) | $ (50,087) |
| | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | |
| Continuing operations | $ (0.08) | $ (0.07) | $ (0.08) | $ (0.12) |
| Discontinued operations | $ — | $ — | $ — | $ — |
| **Weighted average shares outstanding** | | | | |
| Basic | 405,787 | 411,065 | 412,077 | 406,823 |
| Diluted | 405,787 | 411,065 | 412,077 | 406,823 |

# agilon health, inc.
## Consolidated Statements of Cash Flows
### In thousands
### (unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (32,319) | $ (50,315) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 15,014 | 9,865 |
| Stock-based compensation expense | 53,980 | 18,430 |
| Loss (income) from equity method investments | (24,507) | (3,473) |
| Other noncash items | (1,511) | 4,261 |
| Changes in operating assets and liabilities | (105,690) | (59,617) |
| Net cash provided by (used in) operating activities | (95,033) | (80,849) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (11,898) | (11,937) |
| Purchase of intangible assets | (3,535) | (12,415) |
| Investment in loans receivable and other | (8,778) | (4,510) |
| Investments in marketable securities | (107,020) | (423,183) |
| Proceeds from maturities and sales of marketable securities and other | 133,894 | 15,127 |
| Net cash paid in business combination | (44,479) | — |
| Proceeds from sale of business and property, net of cash divested | — | 500 |
| Net cash provided by (used in) investing activities | (41,816) | (436,418) |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | 11,462 | 30,676 |
| Common stock repurchase | (200,000) | — |
| Repayments of long-term debt | (3,750) | (3,750) |
| Net cash provided by (used in) financing activities | (192,288) | 26,926 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (329,137) | (490,341) |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 507,680 | 1,054,820 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 178,543 | $ 564,479 |

APP 347

# agilon health, inc.
## Key Operating Metrics
### In thousands
### (unaudited)

### GROSS PROFIT

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Total revenues | $ 1,215,660 | $ 694,858 | $ 3,500,859 | $ 2,018,437 |
| Medical services expense | (1,104,396) | (618,287) | (3,085,957) | (1,771,635) |
| Other medical expenses[1] | (80,787) | (50,659) | (249,936) | (144,512) |
| Gross profit | $ 30,477 | $ 25,912 | $ 164,966 | $ 102,290 |

[1] Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended September 30, 2023 and 2022, costs incurred in implementing geographies were $10.3 million and $7.2 million, respectively. For the nine months ended September 30, 2023 and 2022, costs incurred in implementing geographies were $20.3 million and $10.9 million, respectively.

### GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Platform support costs | $ 46,629 | $ 34,764 | $ 141,176 | $ 104,868 |
| Geography entry costs[1] | 8,064 | 14,034 | 28,620 | 24,456 |
| Severance and related costs | — | 512 | 188 | 2,470 |
| Stock-based compensation expense | 20,736 | 7,907 | 53,980 | 18,430 |
| Other[2] | (1,291) | (5,237) | (1,481) | (6,486) |
| General and administrative | $ 74,138 | $ 51,980 | $ 222,483 | $ 143,738 |

[1] Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets.

[2] Includes interest income, non-cash accruals for unasserted claims and contingent liabilities, and transaction-related costs.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

# agilon health, inc.
## Non-GAAP Financial Measures
### In thousands
### (unaudited)

*MEDICAL MARGIN*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Gross profit[1] | $ | 30,477 | $ | 25,912 | $ | 164,966 | $ | 102,290 |
| Other operating revenue | | (3,528) | | (924) | | (6,853) | | (2,896) |
| Other medical expenses | | 80,787 | | 50,659 | | 249,936 | | 144,512 |
| Medical margin | $ | 107,736 | $ | 75,647 | $ | 408,049 | $ | 243,906 |

(1)    Gross profit is defined as total revenues less medical services expense and other medical expenses.

*ADJUSTED EBITDA*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Net income (loss)[1] | $ | (31,483) | $ | (30,739) | $ | (32,319) | $ | (50,315) |
| (Income) loss from discontinued operations, net of income taxes | | — | | 236 | | — | | (500) |
| Interest expense | | 1,651 | | 1,000 | | 4,772 | | 2,816 |
| Income tax expense (benefit) | | 1,210 | | 559 | | 524 | | 1,068 |
| Depreciation and amortization | | 5,310 | | 3,450 | | 15,014 | | 9,865 |
| (Gain) loss on lease terminations | | — | | — | | — | | 5,458 |
| Severance and related costs[2] | | — | | 512 | | 188 | | 2,470 |
| Stock-based compensation expense | | 20,736 | | 7,907 | | 53,980 | | 18,430 |
| EBITDA adjustments related to equity method investments | | 3,702 | | 1,325 | | 8,426 | | 2,988 |
| Other[3] | | (6,903) | | (10,089) | | (22,243) | | (12,753) |
| Adjusted EBITDA[3] | $ | (5,777) | $ | (25,839) | $ | 28,342 | $ | (20,473) |

**APP 350**

(1)     Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended September 30, 2023 and 2022, (i) $10.3 million and $7.2 million, respectively, are included in other medical expenses and (ii) $8.0 million and $14.1 million, respectively, are included in general and administrative expenses. For the nine months ended September 30, 2023 and 2022, (i) $20.3 million and $10.9 million, respectively, are included in other medical expenses and (ii) $28.6 million and $24.5 million, respectively, are included in general and administrative expenses.

(2)     For the three and nine months ended September 30, 2022, includes taxes and related costs on stock option exercises for departed executives of $0.6 million and $2.0 million.

(3)     Includes interest income, non-cash accruals for unasserted claims and contingent liabilities, and transaction-related costs.

# agilon health, inc.
## Non-GAAP Financial Measures
### In thousands
### (unaudited)

*Key Financial and Operating Metrics, Excluding MDX Hawaii (Non-GAAP)*

On October 31, 2023, we completed the disposition of our MDX Hawaii operations. For comparative purposes, total revenues, gross profit, medical margin, net income, and Adjusted EBITDA are presented to exclude the pre-disposition results of operations from our MDX Hawaii operations. The results of the MDX Hawaii operations presented have been calculated on the same basis as our consolidated results.

## Total Revenues

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2023** | **2022** | **2023** | **2022** |
| Total revenues | $ 1,215,660 | $ 694,858 | $ 3,500,859 | $ 2,018,437 |
| Less: MDX Hawaii total revenues | 78,797 | 80,606 | 240,569 | 244,900 |
| Total revenues, excluding MDX Hawaii (non-GAAP) | $ 1,136,863 | $ 614,252 | $ 3,260,290 | $ 1,773,537 |

## Gross Profit

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2023** | **2022** | **2023** | **2022** |
| Gross profit | $ 30,477 | $ 25,912 | $ 164,966 | $ 102,290 |
| Less: MDX Hawaii gross profit[1] | (6,362) | (4,015) | 428 | 6,821 |
| Gross profit, excluding MDX Hawaii (non-GAAP) | $ 36,839 | $ 29,927 | $ 164,538 | $ 95,469 |

---

(1)    For the three months ended September 30, 2023 and 2022, includes other medical expenses of $3.6 million and $4.2 million, respectively. For the nine months ended September 30, 2023 and 2022, includes other medical expenses of $7.5 million and $9.2 million, respectively.

# agilon health, inc.
## Non-GAAP Financial Measures
### In thousands
### (unaudited)

*Key Financial and Operating Metrics, Excluding MDX Hawaii (Non-GAAP)*

## Medical Margin

|  | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
|  | **2023** | | **2022** | | **2023** | | **2022** | |
| Medical margin | $ | 107,736 | $ | 75,647 | $ | 408,049 | $ | 243,906 |
| Less: MDX Hawaii medical margin | | (2,850) | | 20 | | 7,505 | | 15,627 |
| Medical margin, excluding MDX Hawaii (non-GAAP) | $ | 110,586 | $ | 75,627 | $ | 400,544 | $ | 228,279 |

## Net income (loss)

|  | Three Months Ended September 30, 2023 | | Nine Months Ended September 30, 2023 | |
|---|---|---|---|---|
| Net income (loss) | $ | (31,483) | $ | (32,319) |
| Less: MDX Hawaii net income (loss) | | (9,444) | | (4,205) |
| Net income (loss), excluding MDX Hawaii (non-GAAP) | $ | (22,039) | $ | (28,114) |

## Adjusted EBITDA

|  | Three Months Ended September 30, 2023 | | Nine Months Ended September 30, 2023 | |
|---|---|---|---|---|
| Adjusted EBITDA | $ | (5,777) | $ | 28,342 |
| Less: MDX Hawaii adjusted EBITDA[1] | | (11,330) | | (13,718) |
| Adjusted EBITDA, excluding MDX Hawaii (non-GAAP) | $ | 5,553 | $ | 42,060 |

**APP 354**

(1)    For the three months ended September 30, 2023, MDX Hawaii operations include ($3.3) million of interest income and non-cash accruals for unasserted claims, $1.2 million of depreciation and amortization, and $0.1 million of stock-based compensation. For the nine months ended September 30, 2023, MDX Hawaii operations include ($13.6) million of interest income and non-cash accruals for unasserted claims, $3.7 million of depreciation and amortization, and $0.4 million of stock-based compensation.

**APP 355**

# agilon health, inc.
### Supplemental Financial Information
### In thousands
### (unaudited)

| | Three Months Ended September 30, 2023 | | Nine Months Ended September 30, 2023 | |
| | Medicare Advantage (Consolidated) | ACO REACH (Unconsolidated) | Medicare Advantage (Consolidated) | ACO REACH (Unconsolidated) |
|---|---:|---:|---:|---:|
| Medical services revenue | $ 1,212,132 | $ 296,937 | $ 3,494,006 | $ 858,286 |
| Other operating revenue | 3,528 | — | 6,853 | — |
| **Total revenues** | 1,215,660 | 296,937 | 3,500,859 | 858,286 |
| Medical services expense | (1,104,396) | (242,431) | (3,085,957) | (741,752) |
| Other medical expenses | (80,787) | (31,970) | (249,936) | (71,138) |
| **Gross profit** | 30,477 | 22,536 | 164,966 | 45,396 |
| Other operating revenue | (3,528) | — | (6,853) | — |
| Other medical expenses | 80,787 | 31,970 | 249,936 | 71,138 |
| **Medical margin** | $ 107,736 | $ 54,506 | $ 408,049 | $ 116,534 |

Certain of our operations are not consolidated for the period presented because we do not have the ability to control certain activities due to another party's control of the entities' board of directors. Although revenues of the unconsolidated operations are not recorded as revenues by us, income (loss) from equity method investments is nonetheless a significant portion of our overall earnings. See Note 14 to the Condensed Consolidated Financial Statements in the Quarterly Report on Form 10-Q for the period ending September 30, 2023 for additional discussion on our equity method investments.

In addition to providing results that are determined in accordance with GAAP, we present medical margin and Adjusted EBITDA, which are non-GAAP financial measures. Additionally, we present the Adjusted (non-GAAP) key financial and operating metrics to exclude the impact of the disposition of our MDX Hawaii operations, which closed on October 31, 2023.

We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to medical margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe medical margin and Adjusted EBITDA, including Adjusted (non-GAAP) key financial and operating metrics, help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our

**APP 356**

recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health

**APP 358**

# EXHIBIT 15

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# FQ3 2023 Earnings Call Transcripts

## Thursday, November 02, 2023 8:30 PM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ3 2023- | | | -FQ4 2023- | -FY 2023- | -FY 2024- |
|---|---|---|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | (0.04) | (0.08) | NM | (0.07) | (0.07) | 0.17 |
| Revenue (mm) | 1136.78 | 1215.66 | ▲6.42 | 1117.96 | 4539.94 | 6112.41 |

Currency: USD
Consensus as of Nov-02-2023 5:00 AM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| | - EPS NORMALIZED - | | |
| FQ4 2022 | (0.05) | (0.06) | NM |
| FQ1 2023 | 0.06 | 0.04 | ▼(33.33 %) |
| FQ2 2023 | 0.00 | (0.04) | NM |
| FQ3 2023 | (0.04) | (0.08) | NM |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 360**

# Table of Contents

Call Participants .................................................................................. 3

Presentation .................................................................................. 4

Question and Answer .................................................................................. 9

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

**APP 361**

# Call Participants

**EXECUTIVES**

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

**ANALYSTS**

**Adam Matan Ron**
*BofA Securities, Research Division*

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

**Elizabeth Anderson**

**Gary Paul Taylor**
*TD Cowen, Research Division*

**George Robert Hill**
*Deutsche Bank AG, Research Division*

**Jack Wallace**

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

**Unknown Analyst**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**spglobal.com/marketintelligence**

APP 362

# Presentation

**Operator**

Hello, everyone, and welcome to the agilon health Third Quarter 2023 Earnings Conference Call. My name is Carla, and I will be your operator for today's call. [Operator Instructions]

I will now hand you over to your host, Matthew Gillmor, Vice President of Investor Relations. Matthew, please go ahead.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thanks, operator. Good afternoon, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley.

Before we begin, we'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss on this call are non-GAAP measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K.

Following prepared remarks from Steve and Tim, we'll conduct a Q&A session. During the Q&A session, we'd ask everyone to please limit themselves to one question so we can get through as many questions as possible.

With that, I'll turn things over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good evening, and thank you for joining us. Momentum across our business remains strong, and we are making rapid progress against our vision to transform health care in 100-plus communities by empowering primary care doctors.

As an indicator of our success, this year we are on track to reinvest more than $250 million into local primary care based on the high-quality cost-effective care being delivered by our partners. These results are enabling our partner groups to expand access to preventative services, improve quality outcomes and drive value for the communities they serve. I want to thank my agilon colleagues and our partners for their trust in each other and their belief and support in a network that is shaping a better health care system for our country.

Before discussing our performance for the quarter, I wanted to take a few moments to highlight our decision to sell our Hawaii business. As we have discussed with you, Hawaii operates very differently compared to our core partner markets in the Continental U.S. In our core partner markets, we leverage a common operating structure. This operating structure is centered around a long-term joint venture with a scaled physician group and non-delegated multi-payer relationships with health plans and CMS.

The key differences in Hawaii's operations, namely the lack of a joint venture partnership with a large physician group, a much smaller senior patient physician panel size and Hawaii's delegated MSO infrastructure made our Hawaii business increasingly less strategic to agilon and created a drag on our financial results.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 363

We are pleased to transition MDX Hawaii to a new owner that is better positioned to invest into the business and optimize its delegated infrastructure, which should benefit patients and the community at large. The sale of Hawaii will enhance our ability to focus even more specifically on our partner markets at a point in time when we are driving increasing success across a PCP's entire senior panel.

This quarter and going forward, you will hear us consistently highlight the power and importance of our integrated senior business across Medicare Advantage and the traditional Medicare populations. Our ability to generate successful outcomes for patients, PCPs and the system in a multi-payer full risk model is increasingly unique. Our focus on this opportunity will pay dividends in the years to come.

Turning now to the quarter. Partner market performance was again extremely strong across both MA and ACO REACH. All of our key financial metrics were generally in line or above our guidance ranges, especially on an underlying basis. Our results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth.

During the quarter, our total membership on the platform increased 43% to 508,000 members, and revenues increased 75% to $1.2 billion. This was above our guidance and was supported by the successful onboarding of new PCPs and faster pull-through of members, particularly in new markets.

Adjusted for the sale of MDX Hawaii, our partner market growth was even stronger with total membership up 49% and revenue up 85%. Even with our faster membership growth, adjusted EBITDA continues to inflect higher, increasing more than $20 million year-over-year to a loss of $6 million for the quarter. This was in line with our outlook and supported by strong medical margin gains in our partner markets across MA and REACH.

Adjusted for Hawaii, our partner market EBITDA was positive $6 million for the quarter, well above our outlook. And it was even stronger on an underlying basis as our results included some net negative development from 2022. Our combined medical margin across MA partner markets and REACH was strong in the quarter, with MA generating $111 million and REACH generating $55 million. These results demonstrate the power of a PCP focusing on the most complex patients across their entire senior panel with differentiated information and care team resources.

As an example, our year 2 plus partner markets in MA and REACH both generated over $130 per member per month in medical margins year-to-date. Think about the value delivery to our PCP partners and the health system when we generate this magnitude of savings across an average panel size of 400 to 500 senior patients.

From a guidance perspective, we have raised our membership revenue and adjusted EBITDA outlook for 2023. This was supported by the growth and margin progression in our MA partner markets, including REACH and the sale of MDX Hawaii.

We also plan to maintain a more conservative reserving approach as we exit 2023. And this is intentionally reflected in our medical margin outlook for MA and will support our future performance in 2024. Our ability to execute against our adjusted EBITDA targets during 2023 and enhance our visibility to 2024 continues to reflect the strength and durability of our model.

As I have discussed with you previously, the key differences in our model are driving differentiated clinical and financial performance. Unlike the traditional fee-for-service system, which predominates across health care, all patients in our model have a fully aligned or attributed relationship with their primary care doctor. And through agilon's platform, our PCP partners have the data and resources to proactively impact patient care. This translates into specific differences in the way health care is utilized and managed, and this shows up in our business in very tangible ways.

For example, we continue to have outstanding results in the standardized star ratings measures. For 2024 stars, the percentage of our membership in 4+ star plans will increase modestly to approximately 84%. However, as most of you know, plan-level star ratings also include the performance of non-agilon providers.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 364

For our year 2 plus partners agilon's specific performance is 4.3 stars and increased nicely year-over-year. This was despite more stringent cut points and relatively flat star ratings industry-wide. We continue to excel in areas like preventative cancer screens, diabetes control and medication adherence. Our quality results will drive meaningful value to our patients and the health care system in the years ahead. And because of our high member retention, agilon and our physician partners will share in this value over the long term.

Additionally, our ability to drive differentiated cost performance was clearly evident in the recently released ACO REACH results for 2022. This data allows agilon to compare our performance against the unmanaged fee-for-service system as well as other value-based care models. During 2022, our Reach ACOs drove nearly 10% savings relative to the Medicare benchmark. This was more than 2.5x better than the program average and our results included more than 90,000 beneficiaries in diverse markets.

agilon also returned nearly $30 million in guaranteed savings to the Medicare Trust Fund last year. As you can see from our REACH results this quarter, our differentiated cost performance has carried into 2023.

Looking forward, we believe our leadership position as the platform and network moving physicians to full risk has grown considerably. This is a function of the magnitude of savings we are generating across the entire senior panel of a primary care doctor.

Our timing is also important. As primary care physicians and the broader system increasingly need a scalable solution for multi-payer full risk. This dynamic is driving the ongoing inflection we are seeing from a demand perspective among both physician groups and health systems.

For the class of 2024 new partners, we now expect 25,000 new ACO REACH members, and we are increasing our expectation from 100,000 to 110,000 new MA members. At this point in the year, we are nearly complete with our payer contracted cycle, which gives us better visibility into the membership pull-through. We also now have a clear line of sight to a very strong class of 2025 with multiple new partners signed, including independent groups and health systems. Implementation for this class has already begun, which should bode well for future performance.

Before turning the call over to Tim, I wanted to offer a few comments on 2024. We remain highly confident in the trajectory of our adjusted EBITDA inflection and expect to share an initial view in early January. As we have discussed previously, we operate in a very forward-looking model, and our visibility into the key drivers for next year's performance are quite high.

First, we have a large and growing class of 2024 new partners with an attractive margin profile that should be meaningfully accretive to adjusted EBITDA. This is a function of the longer implementation cycle for this class and targeted investments we have made around technology and centralizing key processes.

Next, the combined strength of our 2023 run rate margins across our integrated senior business will have key positive implications for 2024. First, our REACH performance will carry forward, driven by our ability to maintain the cost differential compared to the benchmark. And second, the reserve actions we have taken in Medicare Advantage should reduce the risk of negative claims development next year.

Finally, we remain very confident in our ability to manage the new risk adjustment model starting in 2024. The impact to agilon from the V28 model change is relatively modest. And given the limited maturity of our partner markets and senior membership, our ability to mitigate this impact is very high.

With that, let me turn things over to Tim.

**Timothy S. Bensley**
*Chief Financial Officer*

Thanks, Steve, and good evening, everyone. I'll now review highlights from our third quarter results and our updated outlook for 2023.

Starting with our membership for the third quarter, total members live on the agilon platform increased to approximately 508,000 including both Medicare Advantage and ACO REACH. Our consolidated Medicare Advantage membership increased 58% to 420,000, driven by the addition of new partner geographies and

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 365

9% growth with our same geographies. Adjusted for Hawaii, MA membership in our core partner markets grew 69% to $384,000 and our same geography growth was 12%.

Reported revenues increased 75% on a year-over-year basis to $1.2 billion during the third quarter. Year-to-date, revenues increased 73% to $3.5 billion. Revenue growth was primarily driven by membership gains in new and existing geographies.

On a per member per month basis or PMPM, third quarter revenue increased 11%. This was primarily driven by benchmark updates and membership mix, including higher benchmarks in several new markets. Adjusted for Hawaii, revenues increased 85% to $1.1 billion and revenue PMPM increased 10% during the third quarter.

For our MA business, medical margin on a reported basis increased 42% year-over-year to $108 million during the third quarter. Year-to-date, medical margin increased 67% to $408 million. While this was below our outlook for the quarter, the difference was primarily driven by performance in Hawaii.

Adjusted for Hawaii, medical margins increased 46% year-over-year to $111 million for the third quarter and was in line with our expectation, even with approximately $6 million of net negative development. On a per member per month basis, medical margins across our core partner markets increased by 4% year-to-date to $119, driven by the maturation of markets and member cohorts. For our year 2 plus partner markets, medical margin PMPM increased 17% to $134 on a year-to-date basis.

MA medical margins for the quarter included a net $8 million in negative development, including $9 million in prior year claims, offset by $1 million in prior year revenue, $2 million of the net development was attributed to Hawaii and the remaining $6 million was attributed to our core partner markets. The negative claims development this quarter was almost entirely isolated to system issues with a single payer related to supplemental benefit costs. As we discussed last quarter, we are making focused investments to improve our visibility into data gaps with payers.

Excluding the year-to-date development, MA Medical margins would have been approximately $125 PMPM in our partner markets and $143 PMPM in our year 2 plus partner markets. We think this is an important metric as it better reflects the year-to-date run rate performance of our MA business in light of the sale of MDX Hawaii and the actions we have taken to minimize the risk of negative development in 2024.

For our ACO REACH business, we continue to be very encouraged with the performance, which again outperformed our guidance this quarter. REACH generated $55 million of medical margin in the quarter and $117 million year-to-date, which is a twofold increase from last year. Additionally, on a per member per month basis, REACH profitability this year is roughly comparable to the year 2 plus MA partner markets. This level of performance is encouraging and underscores the power of our multi-payer full risk platform.

While REACH is not consolidated in our financial results, we do think it is relevant to think about our medical margin performance on a combined basis across our MA partner markets and REACH. This is because our combined MA and REACH performance is what drives our key profitability metric, adjusted EBITDA.

For 2023, our combined medical margins for MA partners and REACH are consistent with our original guidance expectations. As Steve mentioned, this sets a strong foundation for performance in 2024. Our adjusted EBITDA on a reported basis was negative $6 million in the quarter compared to negative $26 million last year.

On a year-to-date basis, adjusted EBITDA was positive $28 million compared to negative $20 million last year. As a reminder, adjusted EBITDA includes geography entry costs primarily associated with new partners that would generate revenue in 2024. The year-over-year gain in adjusted EBITDA reflects the increase to our medical margins across both MA and REACH as well as platform support leverage, partially offset by performance in Hawaii and the net negative development.

Excluding Hawaii, our adjusted EBITDA would have been positive $6 million for the quarter and $42 million on a year-to-date basis. From a utilization standpoint, composite utilization across MA and REACH was

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

generally in line with expectations. For MA, we did observe an increase in utilization during May and early June, which resulted in some in-period development that we recognized during the third quarter. This was contemplated in our guidance, and trends moderated back towards normalized levels during the third quarter.

For REACH, utilization during the first half of 2023 developed favorably relative to our expectation. As a reminder, our results in REACH better reflect our real-time performance against the unmanaged fee-for-service system because of how the benchmark mechanics work.

Turning now to our outlook for full year 2023. Please note that our updated guidance excludes MDX Hawaii for the full year. We have raised and narrowed our adjusted EBITDA outlook to a range of $6 million to $18 million from a prior range of $0 to $23 million. We have also updated our membership and revenue outlook, which are both higher on an underlying basis, excluding MDX Hawaii.

From a medical margin perspective, our revised outlook is $455 million to $470 million and is approximately $50 million lower than our prior range. This reflects two factors: First, the removal of Hawaii represents about $20 million of this change; second, one of our primary goals is to exit 2023 with appropriately conservative reserving posture in MA. In light of this, we continue to proactively refine our model to account for utilization trends as well as any potential blind spots with health plans.

We have assumed utilization will not moderate any further from recent levels, which accounts for $30 million of the change to our MA medical margins. We think this is a prudent approach and is informed by our decision to maintain a more conservative reserving posture. We are pleased to make these decisions, which provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance. Full details on our fourth quarter and full year guidance can be found in the earnings press release.

With that, let me turn the call back to Steve for some brief closing comments.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks, Tim. Before opening up the lines, I want to emphasize three key points. First, the sale of our Hawaii business enhances our ability to focus even more specifically on our differentiated core partner business and positions us for continued success in '24 and beyond. Second, our leadership position as the platform and network, moving physicians to full risk has grown considerably, and you can see it in the clinical and financial results we are driving and in the accelerating demand from physicians in independent groups and health systems. And third, with access to better data, resources and incentives, our primary care doctors are actively managing the way health care is utilized across their entire senior panel, which is yielding meaningfully better outcomes for doctors, patients in agilon.
With that, we are now ready to take your questions.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] We will now take our first question, which comes from Lisa Gill from JPMorgan.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Congratulations on the sale of Hawaii. Wanted to just follow up on the medical cost side. So Tim, you talked about system issue with a single payer, data gaps with that payer. If I remember last quarter, you also talked about increasing reserves to try to account for some of this going into the back half of the year and then we saw that the prior period development here in this quarter. Can you just talk about where you are on that data gap, the systems issue? Do you feel like that's one fully behind you?

And then secondly, when talking about utilization, you said in line, you saw a little bit of a bump in May and June. What we saw with some of the Medicare Advantage players in the most recent quarter is that in the quarter, they actually saw higher costs than we're projecting even beyond May and June. And one of the largest players talked about some COVID hospitalizations that they saw towards the end of the September quarter. So just want to really understand what you saw, what your expectations were and if you have anything on the COVID side or if you've seen anything on the COVID side?

**Steven Jackson Sell**
*President, CEO & Director*

So Lisa, I'll start, and Tim can chime in. I mean, I think I'll start with we raised EBITDA guide on the year because of the strong overall performance across MA and REACH across nearly 500,000 senior patients, and that really sets a strong foundation for '24.

From a utilization perspective, composite utilization was in line with our overall expectations. As Tim kind of outlined, we did see a step-up in Q2 utilization in MA and REACH. The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period. In Q3, we've seen a deceleration. And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [ posture ] that Tim talked about in terms of an extra $3 million. But Tim, you want to talk about?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Lisa, just a couple of things specifically to your question. First of all, on the prior period development, I think we have made a lot of progress this year in partnering with the payers out there to try to close some of these gaps. Essentially, some of these information issues are caused by just the complexity of our model, and that's also -- it's also a feature of the model, right? We've got over 30 payers, over 100 payer contract combinations in our markets.

But having said that, I think we made good progress. The issue in this quarter was a very specific issue with just 1 payer. Hopefully, that was a lingering issue that we've now figured out where the gap was and should be okay with that going forward.

In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward. As it turned out, as we just reported, we did see some increased utilization in May that was -- greatly started to moderate in June. And as we've seen so far, started to -- continued to moderate in early Q3 as well.

I'm not completely surprised by that. Compared to some of the comments that I've made from some of the big payers, I mean I think our model and even some of them have said should be performing better

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 368

than the average out there. So the fact that we saw a spike up and some moderation down is probably just a factor also of the strength of our model.

On COVID specifically, we're actually seeing -- if you go back to last year, which is -- you might want to think about that as the first really sort of post big COVID year. We did actually see some seasonality with COVID start to spike up last year in kind of the August and September time frame in terms of utilization. We did see some of that again this year, although actually lower spike up in COVID this year than even what we saw last year. And the overall magnitude of hospitalization from COVID in terms of a spike up versus the baseline is not really material and not causing any material change in our medical margin performance or our medical margin outlook.

**Operator**

We will now take our next question from Justin Lake from Wolfe Research.

**Justin Lake**
*Wolfe Research, LLC*

I wanted to start off -- I've got a couple of questions, but want to start off on the REACH performance. So you said it was $55 million of medical margin. So give or take half your medical margin in the quarter, what were you expecting it to be in the original guide?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Justin, just real quick before -- we can obviously talk a lot about the performance of REACH was just really -- continue to be really positive in the quarter as it had kind of year-to-date so far, but the $55 million of medical margin that we talked about for REACH is not part of our consolidated results. So the $108 million of medical margin that we reported, which does include Hawaii. In addition to that, if you look at the footnote showing the unconsolidated ACO REACH entities, we had $55 million there and about $18 million of EBITDA [indiscernible].

**Justin Lake**
*Wolfe Research, LLC*

And I apologize, that's a very [indiscernible].

**Steven Jackson Sell**
*President, CEO & Director*

Justin, if I can just -- if I can just add to that, Justin. I mean I think we're driving really strong medical margin performance across the entire physician panel across both REACH and MA. And so the $55 million that Tim talked about is driven by beating that national benchmark by more than 300 basis points. In my remarks, I talked about the '22 results. You're seeing that in '23. But the same things that are driving success in REACH are driving success in MA, and our partner market medical margins came in at $111 million in MA which is sort of in our guide. And when you adjust for that PPD, it's actually at the high end of our guide. And I think it's just a function of this model that we've got around high touch and our ability to drive better access cost and quality outcomes. So that's what I'd highlight.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I mean the ACO REACH population has been more traditionally an unmanaged population. So there is a big opportunity for us there. We tended to be even as we move through this year. We have very good current data from CMS on our members and we tended to be a little bit conservative. So we actually saw even positive development as we moved into Q3. We had guided about a $12 million EBITDA flow-through for ACO REACH. We ended up with some positive development flowing through from the previous quarter -- $18 million overall, so far during the year. The way you make money in ACO REACH is -- the way you perform well in ACO REACH is essentially you just outperform the Medicare fee-for-service reference

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

population on cost performance, and we're outperforming that on a year-to-date basis by over 300 basis points. So the model really is starting to prove to be very valuable on the ACO REACH side.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And then Justin, what was your real question? Sorry.

**Justin Lake**
*Wolfe Research, LLC*

Well, the other question I was going to ask on ACO REACH, and again, I could be -- it's been a long couple of days, I might be off again. But my recollection of the Investor Day was that you guys actually kind of titrated lower your expectations for ACO REACH. I think I was looking at it and you would expect that, I think, in 2026 to be at -- am I recalling the number right, $35 million of profitability?

**Steven Jackson Sell**
*President, CEO & Director*

That's right.

**Justin Lake**
*Wolfe Research, LLC*

Okay. So it sounded like you had kind of gotten more conservative or is the thought process there like, hey, let's take that number down a bit. So 6 months later, you're running at that run rate already looks like. Is that a number that you think we should be looking at differently than from the Investor Day? Are you thinking about that business differently?

**Steven Jackson Sell**
*President, CEO & Director*

Yes, absolutely. I mean our emphasizing the power across the entire senior panel is hopefully one of the big takeaways that you're going to have. The way the mechanics and the ACO REACH model work is you carry forward your performance, and you need to beat that underlying benchmark, which we would expect we're going to do again next year. And so I think we feel like we're going to have much stronger performance going forward. We've already seen it this year-to-date. And it's -- we have much more valuable and readily available and consistent information, which is giving us high confidence in that.

**Operator**

We will now take our next question from Stephen Baxter from Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

I just wanted to try to clarify the discussion a little bit on the revisions to the medical margin guidance. So I think I'm following you that you're saying $20 million of the lower $50 million to $55 million revision on medical margins related to pulling Hawaii out. So I guess that leaves, call it, the $30 million for the continuing partner markets. I'm just trying to understand kind of the $30 million in the context of the quarter you just had. It does look like including -- I guess, I wanted to strip out the Hawaii results out of the quarter. It doesn't really look like you were kind of off your medical margin guidance that you provided for the third quarter. So just trying to understand why you have $30 million lower medical margin on a core basis if the quarter was relatively in line. Ex Hawaii, it kind of implies that it's primarily related to the fourth quarter. Just trying to correct my understanding of that, hopefully, if that made sense.

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 370**

I mean I think a key goal for us was to raise and be adjusted EBITDA in the year. We were able to do that based on the strong performance across REACH and across MA. To your point, in those partner markets, they were very strong.

The second goal was to really put ourselves in a position from a reserving standpoint in which we could significantly mitigate the chance of any negative development into 2024. And so I think that, coupled with this utilization outlook, which we think is prudent that the deceleration we're seeing in Q3 will not necessarily continue. That's what puts that $30 million on top of the $20 million that you take out for Hawaii. So that's really the logic around it.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, I think that's right. I mean we -- as we close Q3, if you put the prior period development aside and you take the Hawaii, which was -- did perform below our expectation for the quarter out of it, our overall medical margin PMPM did perform well within the range that we had guided to. So we were very happy with that.

On the other hand, that was a combination of higher revenue as we synced up our final -- got all the mid-years in and synced up our final or the next round of our rev estimates for the year as well as some higher medical expenses that flowed through from that May and early June spike that we saw.

So we just looked at the rest of the year and said, hey, if we just assume that there's not really any further moderation, and we want to continue to make sure that we minimize the possibility of any prior period development bleeding over into 2024, that's an additional $30 million of just medical expense versus what we had in our previous guidance. And we were able to do all that in addition with the strength of the ACO REACH business and the other actions that we just identified. We're on top of that in a position to essentially slightly increase our overall adjusted EBITDA guidance for the year.

**Operator**

We will now take our next question from Gary Taylor from Cowen.

**Gary Paul Taylor**
*TD Cowen, Research Division*

A couple of questions. The first one, just on Hawaii. Why was that -- I think I'm talking at the EBITDA line, if I wrote it down correctly. But why was that an $11 million drag in the third quarter when I think in the first half, it was only a $2.5 million drag? Like and all those sort of metrics on Hawaii got quite a bit worse in the third quarter.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. I mean, generally speaking, as we move through the year, there is a -- seasonally, our medical margin does drop down. In Hawaii and particularly, that drives some pretty big deleverage because it's a delegated model, we have a higher cost basis there. And so in the third quarter, without any acceleration of medical margin, you would see a bigger and bigger drag on EBITDA as we move through. And your math is correct, the absolute drag of Hawaii in the quarter was about $12 million on the EBITDA line.

**Gary Paul Taylor**
*TD Cowen, Research Division*

Got it. So just normal seasonality. The second one was, I guess, I'm kind of probably not the only one struggling a little bit with the negative PYD that keeps showing up, but the concept also that you've been building reserves. But net-net, how do we think about carrying?

End of the day, the PYD says the prior year's cohort medical margin wasn't as good as you originally thought. The boosting of reserves says this year, medical margin won't be as high. How do we think about

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 371**

carrying that in over the next couple of years? Like how does this development reserve building impact how you're thinking about modeling the cohort medical margin development?

**Steven Jackson Sell**
*President, CEO & Director*

I can start, Tim, and you can jump in. I mean, Gary, I think the thought process is we've been building this year to remove the issue for next year. And so this year, we have the impact of the negative PPD in our results.

We also have the impact of the build, which is there to try and put us in a position where we don't have it going forward to next year. So I think you step off with a very strong run rate across REACH and MA. I think we have a plan to not have PPD recurring, which we've had in the last couple of years. So that should really help as we do that.

And then we have a really strong class coming in for '24 that we just told you is larger than we had previously told you. And the performance of that class we expect to be at the very high end of our typical margin range. And so all of those things, I think as you look towards '24, are real positives for us. And that's been our goal, our goal has been to deliver on the EBITDA for this year and to try and take this issue around negative PPD off the table. And we've had the ability to do that because of the strong performance.

**Operator**

We will now take our next question from Jailendra Singh from Truist Securities.

**Jailendra P. Singh**
*Truist Securities, Inc., Research Division*

One quick clarification if you're willing to share, who was the buyer for Hawaii asset? Was it a related party? And then my main question is on the topic of utilization trends. Like one of your fair partners, Humana, talked about recently -- about having higher MLR from their PPO book of business, which I believe is like almost more than half of your membership, curious what you are seeing in terms of utilization trends among PPO members versus HMO members.

And one more kind of same topic, like some payers have talked about offering Flex cards and OTC benefits as they view this as an advantage next year, how have been your discussions with them about getting reimbursed for this pressure as you are effectively taking on for them?

**Steven Jackson Sell**
*President, CEO & Director*

So that's 3 questions in one. I'll go down -- so the buyer is an experienced California-based organization that's really strong in delegated model services, so really strong in claims, very strong in customer service. And we think they're a great match with MDX Hawaii. So that's the first point.

In terms of our PPO experience, we've talked about this before. We are probably the largest risk-based player in terms of PPO in the country. Our PPO business is just over 50% of our membership, it's also the fastest-growing component. And our PPO business is -- performance is in line with our HMO business.

And I think the reason for that is the differences in our model. a large payer with a broad network versus our high-touch PCP patient model, which has the ability to guide that patient on where they're going to go for specialty care. At our Investor Day, we shared over 90% of specialty referrals come through that primary care physician even in a PPO model, that is allowing us to really deliver cost-effective care. And so our PPO experience is very strong.

And then just on the -- I think your question is on the Flex card side, our conversations with folks is that on an aggregate basis, we're probably seeing a reduction in those year-over-year in terms of the total dollars across our population that will be out on those.

**Operator**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 372

Our next question comes from George Hill from Deutsche Bank.

**George Robert Hill**
*Deutsche Bank AG, Research Division*

One is actually pretty similar to Jailendra's that I want to ask at a higher level, that I know that kind of going into the back half of the year, we were looking at a lot of the Medicare Advantage ACOs to ratchet back on benefit design given the kind of the poor rate environment for '24 and the changes to the risk model. But it looks like most of them preserved benefits despite kind of the tough rate environment. I was wondering if you could -- and you kind of communicated that the negative rate environment would flow through to their risk-bearing care providers. So I guess maybe just walk us through at a high level how you guys are thinking about what looks like a preservation of benefits and what looks like a tougher revenue environment? And just kind of how you're thinking about that with respect to medical margin and EBITDA margin?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So I mean, George, I think our outlook on '24 is strong for the reasons I talked about strong run rate, strong class coming in for '24 being able to manage that new risk adjustment model very well.

I think our view on aggregate supplemental benefits is that there will be a net pullback on those for the markets that we're in. It's a market by market basis, we don't have a lot of D-SNP in our markets. And so that's kind of the view. And so that would be neutral to a net tailwind, meaning the supplemental benefit experience from '23 to '24. But the big drivers are really the step-off in the run rate, the strong class of '24 and then just our ability to drive kind of medical margin maturation year-over-year.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

And George, I'd add one thing. I think when you look at our geographic exposures relative to some of the companies you were referring to, we've got a very different geographic exposure and a very different patient population that we serve. And it -- that's what really drives our view that the changes that you talked about are very manageable for agilon.

**Operator**

Our next question comes from Whit Mayo from Leerink Partners.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

Yes, I've got just two really quick ones. But Steve, you've talked about the investments you guys are making, the 60s blind spots on trend. Is there any update or anything you can share that gives you confidence that you're seeing some of these gaps begin to be improved here. And I just want to be clear, I'm a little confused here on the guidance here. But I think it was last quarter, you guided to a $30 million increase in the reserves within the third quarter range. And so are you saying there's another $30 million now on top of the previously contemplated $30 million? Sorry, I'm just -- I think some of us are a little confused.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So maybe we can start with the guidance. I think last time we talked about a total of $60 million in Q3. And what we are saying is there's another $30 million in Q4. So that is the combination of those two. I think it's -- and we're able to do that because of the strong overall performance across.

In terms of the investments that we're making, I do think we're making progress with our payer partners on the data submission, I think it's really in terms of getting that information from there where we're getting it in a faster way. But the other thing I would tell you is that our REACH real-time data tells us

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 373**

that we're tracking pretty well with that. And that we're able to manage things within kind of the ranges that we expected. Inpatient continues to be down, outpatient is up, but we will take that trade kind of all day long. And that's true across MA and across REACH. But those investments we made and the new data officer we brought in is making us better for that. And we are building reserves so that we make sure we're adequately reserved if development does come through.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

So can I ask just one -- sorry, I'm confused on this point. So does the guidance -- is it 60 total? Or is it 90 now?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So when we came through the second quarter and said, hey, we're going to basically increase our outlook for reserves because we didn't feel like we had clear visibility to some of the increases in utilization that the big payers were putting out there. So now we've actually seen that. We did see that spike up in May, moderated a lot in June came back down, continued to come down in July. So we've now accounted for that, and that was part of our increase on a rate basis the $60 million of medical expense that we had forecast or that we had guided through coming out of the second quarter. And we've accounted for that all now in the third quarter results that we just published.

As we look forward now to the fourth quarter, we've assumed that even though the spike in May clearly has moderated down some that we're not going to forecast that it's going to moderate any further our guidance has then anticipated, it's going to moderate any further, and that would essentially represent an additional $30 million that we've put into our medical margin or medical expense forecast for the second half and is the second reason why our medical margin forecast for MA has come down.

So if an additional $30 million makes this assumption that we don't see any further moderation in claims and puts us, we believe, in a strong position to minimize the possibility that they'll be negative development bleeding through into 2023. And we're able to do that at the same time maintaining and actually slightly raising the midpoint of our overall EBITDA guidance for the year.

**Operator**

We will now take our next question from Adam Ron from Bank of America.

**Adam Matan Ron**
*BofA Securities, Research Division*

I have a quick one on cash flow. It seems like adjusted EBITDA is up $50 million year-to-date year-over-year, but cash flow from operations is actually down. It looks like working capital used to -- like doubled year-over-year. Just wondering what's driving that if it's a timing thing, if we should expect a step-up in Q4 and just generally, how we should think about EBITDA flow through into cash flow?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. Adam, thanks for the question. It's always a timing thing with cash flow. Our cash flow when you think about what our final payments and our big payments come in from payers when years are settled up and our surplus has settled up, we typically do have a lag of when EBITDA is generated versus when we actually see the cash for that. So the fact that we have a large number of new payers and a large number of new markets this year, I think something like 34% of our members are actually from this year or on the MA side are actually from our new markets, that just exacerbates that delay essentially.

So we always say that the EBITDA that we're generating this year, we would primarily see transitioning into improved cash flow in the next year. So a little bit in the third quarter, we also have just with the sheer number of new payers and new markets we have, a little bit of a timing issue even when we would normally get some of that settled up. And so we've got maybe a little bit less cash payments that came

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 374

in, in Q3 that will come in through the rest of the year. But yes, we always do have a timing disconnect between the EBITDA we're generating and the cash that we receive for that performance.

**Operator**

Our next question comes from Jamie Perse from Goldman Sachs.

**Jamie Aaron Perse**
*Goldman Sachs Group, Inc., Research Division*

First one, quick clarification on the $60 million medical margin reduction year-to-date. How much of that is from changes in utilization patterns that you've seen and how much of that is from insulation from future prior period development?

And then my second question, just on new membership for next year, the 25,000 from ACO REACH, 110,000 from MA. You guys have previously said a higher starting point on medical margin per member per month next year. I think you've given above 60 for that on the MA side. How should we think about that in light of what you're seeing in utilization and the new reserving policies? And a similar question on ACO REACH. Just do you think the 300 basis point delta versus the benchmark can hold next year?

**Steven Jackson Sell**
*President, CEO & Director*

So maybe I'll take the second one first. So I think that -- we think we're going to be really strong with this class of '24 next year and above that $60 PMPM range. And our implementation has gone extremely well around that. It's part of our investments in technology, it's part of a faster sales cycle. So there's a longer implementation period. So that's on the MA side.

On the REACH side, we believe our performance is going to carry forward for us. It's always in relation to sort of the net or the macro utilization across the entire Medicare book overall. But every year, we've been positive relative to that. Anywhere from 100 to 300 plus basis points. So I think we would expect for all the reasons we talked about earlier, that would continue for us on a go-forward basis.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And just to follow on then back to the beginning of the question, just to follow on the REACH question. I mean one of the things that we've talked about is, of course, REACH, the revenue benchmark, what we're going to get paid basically moderates within the year based on utilization. So as long as we continue to do a good job, which we have been doing of outperforming the Medicare fee-for-service benchmark performance, then we'll continue to drive really good performance on REACH. And as I said this year, we're outperforming that fee-for-service population with our population by over 300 basis points.

So our model is really having a very positive impact. You really see the power of the model on that. It was previously largely unmanaged population. In terms of the guidance that we put out for medical expense in the fourth quarter, we basically -- just to reiterate what I said before, looked at it and said, hey, let's kind of take a viewpoint that the spike up in May that moderated down somewhat in June and July is not going to moderate down further. And based on that, we're putting a full another $30 million into our medical expense forecast and therefore, medical margin forecast for the fourth quarter.

We think that, that puts us in a good position to meet one of our key objectives, which is let's be appropriately reserved to not have any prior period development bleed over into 2024. So I don't really want to divide it into categories as much as to say, we've looked at the expense trend and tried to be appropriately conservative to try to make sure that we're preventing or at least minimizing the possibility of that happening again next year.

**Operator**

We will now take our next question from Elizabeth Anderson from Evercore ISI.

**Elizabeth Anderson**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 375**

One, I was hoping you could speak sort of qualitatively on -- I know you've talked about how you're doing like additional reserving and et cetera to help sort of manage the utilization as we go into 2024. I think you also mentioned in your prepared remarks that you're also making some qualitative changes on that. So just wondering how you're sort of thinking about that in terms of the claim management. And then secondarily, I was just wondering if you could comment a little bit further on the change in trajectory of geographic entry costs and how that has sort of trended versus your initial expectations given the large size of the class.

**Steven Jackson Sell**
*President, CEO & Director*

So I think Elizabeth on your first one, Tim walked through the math on the reserves. I think maybe what you're speaking to is we have added an SVP of Data Solutions and we are working much more closely with payer partners to make sure that we're getting data in a consistent and more ready fashion around that. So we're making progress on that. Do you want to talk about geo entry cost?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And I was just going to say to add to that, I wasn't quite -- sorry, Elizabeth. I wasn't quite sure what the premise of the first question, but if it's along those lines. The other thing I would say is on prior period development is, obviously, we did have some key partner market prior period development in this quarter that we just reported. But the good news is I think we have made a lot of progress across our broad payer platform with improving the quality and the timeliness of information we're getting from them. And if there's a silver lining in this quarter, it was really a very specific limited issue with one payer. So hopefully, the investments we're making there, the investments and more expertise that we brought in is going to really pay some dividends going forward. So we're feeling better about that.

On geographic entry costs, we were a little bit better in the quarter than what we had forecast. We're trying to make sure that we're -- since that's a new way that we're essentially reporting our adjusted EBITDA this year that were a little bit conservative in that number, but we were a little bit better. But I think overall, going forward, our all-in geographic entry cost, we still expect to be in the $400 to $600 range per new member that we're implementing for the next year. So I don't think we're going to see a lot of movement and we'll probably continue to stay within that range.

**Operator**

Our next question comes from Sean Dodge from RBC Capital Markets.

**Unknown Analyst**

This is Thomas Keller on for Sean. Just one on the higher acuity clinical programs you'll have. With your capabilities already fully implemented across your -- the older cohorts 2018, 2019, I guess, during '22. And so I guess what I'm looking to understand is kind of your latest thoughts on the upside from the rollout of these capabilities for those cohorts that are already generating medical margin PMPMs kind of north of 200.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks for the question. I mean I think one of the distinctive parts of our model is that we've got these programs around renal, around palliative, around high risk managements, that are part of the care team around that PCP. We get much better enrollment rates and much better impact. That's how we're able to drive things like negative inpatient trends.

To date, we're about 60% implemented across all of our markets. Our earliest markets do have those rolled out. By the end of '24, we will have them across all markets, including the '24 markets. So I think we do believe that there's upside from these clinical programs as we get them more fully rolled out.

**Operator**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 376**

Our next question is from Jack Wallace from Guggenheim.

**Jack Wallace**

Just to follow up on the cash flow question from earlier. And just given the moving pieces this year, so Hawaii larger than normal, new class for next year, the incremental reserves. You do think that it's reasonable to expect the free cash flow positive next year? Is that maybe more realistic for '25 time line?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, we're still -- and one of the things I said before is we had a very big class coming this year. Actually, that class is performing really well. I think that 2020, cut to 2024 is going to be even a stronger performing class, but we're really pleased with the large class that we brought in this year and where they're performing. As all of the incremental EBITDA that we're generating this year kind of flows into next year, that's going to be a big supporter of our ability to generate positive free cash flow this year.

So for now, we're still on track to do that. Obviously, we'll keep you updated as things move through next year. But we're -- at this point, we're still feeling pretty good about next year being kind of a transition year into positive free cash flow.

**Operator**

We have no time for further questions. So with that, I will hand back to Steve Sell, CEO, for final remarks.

**Steven Jackson Sell**
*President, CEO & Director*

Thank you, everyone. We appreciate your interest in our company, and we look forward to updating you on future calls. So we will talk to you soon.

**Operator**

This concludes today's call. Thank you all for your participation. You may now disconnect your lines.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 377**

**AGILON HEALTH, INC. FQ3 2023 EARNINGS CALL | NOV 02, 2023**

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.

**APP 378**

# EXHIBIT 16

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

_____

# FORM 10-Q

_____

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended September 30, 2023**
**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number 001-40332**

_____

# agilon health, inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **37-1915147** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**6210 E Hwy 290, Suite 450**
**Austin, TX 78723**
(Address of principal executive offices)
**(562) 256-3800**
(Registrant's telephone number, including area code)
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.01 par value | AGL | New York Stock Exchange |

_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) YES ☐ NO ☒

At October 27, 2023, there were 406,040,924 shares of the registrant's $0.01 par value common stock outstanding.

Table of Contents

**agilon health, inc.**

**INDEX**

**PART I. FINANCIAL INFORMATION**

Item 1.       Financial Statements:

Condensed Consolidated Balance Sheets as of September 30, 2023 and December 31, 2022 ... 3

Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2023 and 2022 ... 4

Condensed Consolidated Statements of Comprehensive Income (Loss) for the Three and Nine Months Ended September 30, 2023 and 2022 ... 5

Condensed Consolidated Statements of Stockholders' Equity (Deficit) for the Three and Nine Months Ended September 30, 2023 and 2022 ... 6

Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2023 and 2022 ... 8

Notes to the Condensed Consolidated Financial Statements ... 9

Item 2.       Management's Discussion and Analysis of Financial Condition and Results of Operations ... 20

Item 3.       Quantitative and Qualitative Disclosures About Market Risk ... 37

Item 4.       Controls and Procedures ... 37

**PART II. OTHER INFORMATION**

Item 1.       Legal Proceedings ... 39

Item 1A.      Risk Factors ... 39

Item 2.       Unregistered Sales of Equity Securities and Use of Proceeds ... 39

Item 5.       Other Information ... 39

Item 6.       Exhibits ... 40

Signatures ... 41

2

APP 381

Table of Contents

PART I. FINANCIAL INFORMATION

**Item 1. Financial Statements**
**agilon health, inc.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share data)

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 168,339 | $ 497,070 |
| Restricted cash and equivalents | 10,204 | 10,610 |
| Marketable securities | 395,878 | 411,901 |
| Receivables, net | 1,345,711 | 497,574 |
| Prepaid expenses and other current assets | 36,512 | 34,119 |
| Total current assets | 1,956,644 | 1,451,274 |
| Property and equipment, net | 26,203 | 20,050 |
| Intangible assets, net | 92,657 | 67,680 |
| Goodwill | 62,387 | 41,540 |
| Other assets, net | 140,184 | 116,924 |
| Total assets | $ 2,278,075 | $ 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 1,005,762 | $ 346,727 |
| Accounts payable and accrued expenses | 290,563 | 183,364 |
| Current portion of long-term debt | 5,000 | 5,000 |
| Total current liabilities | 1,301,325 | 535,091 |
| Long-term debt, net of current portion | 34,780 | 38,482 |
| Other liabilities | 70,370 | 83,286 |
| Total liabilities | 1,406,475 | 656,859 |
| | | |
| Commitments and contingencies | | |
| | | |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value: $2,000,000 shares authorized; 405,980 and 412,385 shares issued and outstanding, respectively | 4,060 | 4,124 |
| Additional paid-in capital | 1,970,930 | 2,106,886 |
| Accumulated deficit | (1,096,393) | (1,064,230) |
| Accumulated other comprehensive income (loss) | (6,230) | (5,560) |
| Total agilon health, inc. stockholders' equity (deficit) | 872,367 | 1,041,220 |
| Noncontrolling interests | (767) | (611) |
| Total stockholders' equity (deficit) | 871,600 | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ 2,278,075 | $ 1,697,468 |

The condensed consolidated balance sheets include assets and liabilities of consolidated variable interest entities ("VIEs") as agilon health, inc., together with its consolidated subsidiaries and variable interest entities (the "Company"), is the primary beneficiary of these VIEs. The condensed consolidated balance sheets include total assets that can only be used to settle obligations of the Company's consolidated VIEs totaling $1.48 billion and $703.30 million as of September 30, 2023 and December 31, 2022, respectively, and total liabilities of the Company's consolidated VIEs for which creditors do not have recourse to the general credit of the primary beneficiary of $1.23 billion and $462.40 million as of September 30, 2023 and December 31, 2022, respectively. See Note 14 for additional details.

See accompanying Notes to the Condensed Consolidated Financial Statements.

3

**APP 382**

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,212,132 | $ 693,934 | $ 3,494,006 | $ 2,015,541 |
| Other operating revenue | 3,528 | 924 | 6,853 | 2,896 |
| Total revenues | 1,215,660 | 694,858 | 3,500,859 | 2,018,437 |
| **Expenses:** | | | | |
| Medical services expense | 1,104,396 | 618,287 | 3,085,957 | 1,771,635 |
| Other medical expenses | 80,787 | 50,659 | 249,936 | 144,512 |
| General and administrative (including noncash stock-based compensation expense of $20,736, $7,907, $53,980 and $18,430, respectively) | 74,138 | 51,980 | 222,483 | 143,738 |
| Depreciation and amortization | 5,310 | 3,450 | 15,014 | 9,865 |
| Total expenses | 1,264,631 | 724,376 | 3,573,390 | 2,069,750 |
| **Income (loss) from operations** | (48,971) | (29,518) | (72,531) | (51,313) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | 14,659 | (4,314) | 24,507 | 3,473 |
| Other income (expense), net | 5,690 | 4,888 | 21,001 | 6,367 |
| Gain (loss) on lease terminations | - | - | - | (5,458) |
| Interest expense | (1,651) | (1,000) | (4,772) | (2,816) |
| **Income (loss) before income taxes** | (30,273) | (29,944) | (31,795) | (49,747) |
| Income tax benefit (expense) | (1,210) | (559) | (524) | (1,068) |
| **Income (loss) from continuing operations** | (31,483) | (30,503) | (32,319) | (50,815) |
| **Discontinued operations:** | | | | |
| Income (loss) before income taxes | - | (224) | - | 526 |
| Income tax benefit (expense) | - | (12) | - | (26) |
| **Total discontinued operations** | - | (236) | - | 500 |
| **Net income (loss)** | (31,483) | (30,739) | (32,319) | (50,315) |
| Noncontrolling interests' share in (earnings) loss | 47 | 71 | 156 | 228 |
| **Net income (loss) attributable to common shares** | $ (31,436) | $ (30,668) | $ (32,163) | $ (50,087) |
| | | | | |
| **Net income (loss) per common share, basic and diluted** | | | | |
| Continuing operations | $ (0.08) | $ (0.07) | $ (0.08) | $ (0.12) |
| Discontinued operations | $ - | $ - | $ - | $ - |
| **Weighted average shares outstanding** | | | | |
| Basic | 405,787 | 411,065 | 412,077 | 406,823 |
| Diluted | 405,787 | 411,065 | 412,077 | 406,823 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

4

**APP 383**

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
(in thousands)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Net income (loss) | $ (31,483) | $ (30,739) | $ (32,319) | $ (50,315) |
| Other comprehensive income (loss): | | | | |
| Net unrealized gain (loss) on marketable securities, net of tax | 114 | (5,611) | (758) | (5,098) |
| Foreign currency translation adjustment | 25 | - | 88 | - |
| Total comprehensive income (loss) | (31,344) | (36,350) | (32,989) | (55,413) |
| Comprehensive (income) loss attributable to noncontrolling interests | 47 | 71 | 156 | 228 |
| Total comprehensive income (loss) attributable to agilon health, inc. | $ (31,297) | $ (36,279) | $ (32,833) | $ (55,185) |

See accompanying Notes to the Condensed Consolidated Financial Statements.

5

**APP 384**

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)
(unaudited)

For the three months ended September 30, 2023:

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **July 1, 2023** | 405,427 $ | 4,054 $ | 1,947,438 $ | (1,064,957) $ | (6,369) $ | (720) $ | 879,446 |
| Net income (loss) | - | - | - | (31,436) | - | (47) | (31,483) |
| Other comprehensive income (loss) | - | - | - | - | 139 | - | 139 |
| Exercise of stock options | 424 | 5 | 2,718 | - | - | - | 2,723 |
| Vesting of restricted stock units | 132 | 1 | (1) | - | - | - | - |
| Shares withheld related to net share settlement | (3) | - | (63) | - | - | - | (63) |
| Common stock repurchase | - | - | 102 | - | - | - | 102 |
| Stock-based compensation expense | - | - | 20,736 | - | - | - | 20,736 |
| **September 30, 2023** | 405,980 $ | 4,060 $ | 1,970,930 $ | (1,096,393) $ | (6,230) $ | (767) $ | 871,600 |

For the three months ended September 30, 2022:

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **July 1, 2022** | 408,204 $ | 4,082 $ | 2,076,329 $ | (977,096) $ | 513 $ | (457) $ | 1,103,371 |
| Net income (loss) | - | - | - | (30,668) | - | (71) | (30,739) |
| Other comprehensive income (loss) | - | - | - | - | (5,611) | - | (5,611) |
| Exercise of stock options | 3,390 | 33 | 10,356 | - | - | - | 10,389 |
| Vesting of restricted stock units | 149 | 2 | (2) | - | - | - | - |
| Shares withheld related to net share settlement | (2) | - | (28) | - | - | - | (28) |
| Stock-based compensation expense | - | - | 7,907 | - | - | - | 7,907 |
| **September 30, 2022** | 411,741 $ | 4,117 $ | 2,094,562 $ | (1,007,764) $ | (5,098) $ | (528) $ | 1,085,289 |

6

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)
(unaudited)

For the nine months ended September 30, 2023:

| | | | | | Total Stockholders' Equity | | |
|---|---|---|---|---|---|---|---|
| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interest | Total Stockholders' Equity (Deficit) |
| | Shares | Amount | | | | | |
| **January 1, 2023** | 412,385 $ | 4,124 $ | 2,106,886 $ | (1,064,230) $ | (5,560) $ | (611) $ | 1,040,609 |
| Net income (loss) | - | - | - | (32,163) | - | (156) | (32,319) |
| Other comprehensive income (loss) | - | - | - | - | (670) | - | (670) |
| Exercise of stock options | 2,691 | 27 | 13,241 | - | - | - | 13,268 |
| Vesting of restricted stock units | 584 | 6 | (6) | - | - | - | - |
| Shares withheld related to net share settlement | (65) | (1) | (1,805) | - | - | - | (1,806) |
| Common stock repurchase | (9,615) | (96) | (201,366) | - | - | - | (201,462) |
| Stock-based compensation expense | - | - | 53,980 | - | - | - | 53,980 |
| **September 30, 2023** | 405,980 $ | 4,060 $ | 1,970,930 $ | (1,096,393) $ | (6,230) $ | (767) $ | 871,600 |

For the nine months ended September 30, 2022:

| | | | | | Total Stockholders' Equity | | |
|---|---|---|---|---|---|---|---|
| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (loss) | Noncontrolling Interests | Total Stockholders' Equity (Deficit) |
| | Shares | Amount | | | | | |
| **January 1, 2022** | 400,095 $ | 4,001 $ | 2,045,572 $ | (957,677) $ | - $ | (300) $ | 1,091,596 |
| Net income (loss) | - | - | - | (50,087) | - | (228) | (50,315) |
| Other comprehensive income (loss) | - | - | - | - | (5,098) | - | (5,098) |
| Exercise of stock options | 11,392 | 113 | 31,349 | - | - | - | 31,462 |
| Vesting of restricted stock units | 289 | 3 | (3) | - | - | - | - |
| Shares withheld related to net share settlement | (35) | - | (786) | - | - | - | (786) |
| Stock-based compensation expense | - | - | 18,430 | - | - | - | 18,430 |
| **September 30, 2022** | 411,741 $ | 4,117 $ | 2,094,562 $ | (1,007,764) $ | (5,098) $ | (528) $ | 1,085,289 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

7

**APP 386**

Table of Contents

**agilon health, inc.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)
(unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (32,319) | $ (50,315) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 15,014 | 9,865 |
| Stock-based compensation expense | 53,980 | 18,430 |
| Loss (income) from equity method investments | (24,507) | (3,473) |
| Other noncash items | (1,511) | 4,261 |
| Changes in operating assets and liabilities | (105,690) | (59,617) |
| Net cash provided by (used in) operating activities | (95,033) | (80,849) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment, net | (11,898) | (11,937) |
| Purchase of intangible assets | (3,535) | (12,415) |
| Investment in loans receivable and other | (8,778) | (4,510) |
| Investments in marketable securities | (107,020) | (423,183) |
| Proceeds from maturities and sales of marketable securities and other | 133,894 | 15,127 |
| Net cash paid in business combination | (44,479) | - |
| Proceeds from sale of business and property, net of cash divested | - | 500 |
| Net cash provided by (used in) investing activities | (41,816) | (436,418) |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | 11,462 | 30,676 |
| Common stock repurchase | (200,000) | - |
| Repayments of long-term debt | (3,750) | (3,750) |
| Net cash provided by (used in) financing activities | (192,288) | 26,926 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (329,137) | (490,341) |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of period** | 507,680 | 1,054,820 |
| **Cash, cash equivalents and restricted cash and equivalents, end of period** | $ 178,543 | $ 564,479 |

See accompanying Notes to the Condensed Consolidated Financial Statements.

**APP 387**

Table of Contents

**agilon health, inc.**
**NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(Unaudited)

## NOTE 1. Business

*Description of Business*

agilon health, inc., through its partnerships and platform, provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. As of September 30, 2023, the Company, through its contracted physician networks, provided care to approximately 420,300 Medicare Advantage members enrolled with private health plans. Beginning January 1, 2023, the Company expanded its operations into: (i) Portland, Maine, (ii) St. Paul, Minnesota, (iii) Detroit, Michigan, (iv) Charleston, South Carolina; (v) Statesville, North Carolina; and (vi) Jackson, Tennessee, along with additional partnerships in the Company's existing Texas markets.

See Note 14 for additional discussions related to the Company's involvement with VIEs.

The Company's largest shareholder is an investment fund associated with Clayton Dubilier & Rice, LLC ("CD&R"), a private equity firm. All funds affiliated with CD&R are considered related parties.

*Subsequent Events*

On October 27, 2023, the Company entered into a definitive agreement to sell MDX Hawaii, Inc. ("MDX Hawaii"), a wholly-owned subsidiary, and its related operations. Acquired by agilon in 2016, MDX Hawaii is a provider network with fully-delegated risk contracts and management services organization capabilities, including claims processing and utilization management. The sale of MDX Hawaii and its related operations closed on October 31, 2023.

## NOTE 2. Summary of Significant Accounting Policies

*Basis of Presentation*

The accompanying condensed consolidated financial statements have been prepared by management in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The condensed consolidated financial statements include the accounts of agilon health, inc., its wholly-owned subsidiaries, and both joint ventures and VIEs that it controls through voting rights or other means. Intercompany transactions and balances have been eliminated upon consolidation. All adjustments (consisting of normal recurring adjustments unless otherwise indicated), which the Company considers necessary to present fairly its financial position, results of operations, and cash flows, have been included. Operating results for the three and nine months ended September 30, 2023 are not necessarily indicative of the results that may be expected for the year ending December 31, 2023. The accompanying condensed consolidated financial information should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2022 included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission.

*Use of Estimates*

Management is required to make estimates and assumptions in the preparation of financial statements. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates can include, among other things, those used to determine revenues and related receivables from risk adjustments, medical services expense and related payables (including the reserve for incurred but not reported ("IBNR") claims), and valuation of long-lived assets, goodwill and intangible assets (acquired in business combinations and analysis of impairment). Management's estimates for revenue recognition, medical services expense, and other estimates, judgments, and assumptions, may be materially and adversely different from actual results. These estimates are based on knowledge of current events and anticipated future events, and accordingly, actual results may ultimately differ materially from those estimates.

9

Table of Contents

*Property and Equipment*

As of September 30, 2023 and December 31, 2022, the Company's gross carrying amount of property and equipment was $ 38.6 million and $29.5 million, with accumulated depreciation of $12.4 million and $9.4 million, respectively. For the three months ended September 30, 2023 and 2022, the Company recognized $2.1 million and $1.4 million, respectively, in depreciation expense, which is included in depreciation and amortization expense in the condensed consolidated statements of operations. For the nine months ended September 30, 2023 and 2022, the Company recognized $5.6 million and $2.7 million, respectively, in depreciation expense, which is included in depreciation and amortization expense in the condensed consolidated statements of operations.

*Income Taxes*

The Company determined the income tax provision for interim periods using an estimate of the Company's annual effective tax rate, applied to year-to-date results, adjusted for discrete items arising in that quarter. In each quarter, the Company updates its estimated annual effective tax rate, and if the estimated annual effective tax rate changes, a cumulative catch-up adjustment is recorded in that quarter. The Company applied the intra-period tax allocation rules to allocate income taxes between continuing operations and discontinued operations as prescribed in U.S. GAAP, where the tax effect of income (loss) before income taxes from continuing operations is computed without regard to the tax effects of income (loss) before income taxes from the other categories.

## NOTE 3. Revenue, Receivables, and Concentration of Credit Risk

*Medical Services Revenue*

Medical services revenue consists of capitation fees under contracts with various Medicare Advantage payors ("payors"). Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members ("members") attributed to the Company's contracted primary care physicians. PMPM fees are determined as a percent of the premium payors receive from the Centers for Medicare & Medicaid Services' ("CMS") for these members. The Company generally accepts full financial risk for members attributed to its contracted primary care physicians and therefore is responsible for the cost of all healthcare services required by those members. Fees are generally recorded gross in revenue because the Company is acting as a principal in coordinating and controlling the range of services provided (other than clinical decisions) under its capitation contracts with payors. Capitation contracts with payors are generally multi-year arrangements and have a single performance obligation that constitutes a series, as defined by Accounting Standards Codification ("ASC") 606, *Revenue From Contracts With Customers* ("ASC 606"), to stand ready on a monthly basis to provide all aspects of necessary medical care to members for the contracted period. The Company recognizes revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term.

The transaction price for the Company's capitation contracts is variable, as the PMPM fees to which the Company is entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings. The Company and healthcare providers collect and submit the necessary and available diagnosis data to payors and such data is utilized by the Company to estimate risk adjustment payments to be received in subsequent periods. Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved. PMPM fees are also subject to adjustment for incentives or penalties based on the achievement of certain quality metrics defined in the Company's contracts with payors. The Company recognizes incentive revenue as earned using the most likely amount methodology and only to the extent that it is probable that a significant reversal of cumulative revenue will not occur once any uncertainty is resolved.

Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

*Receivables*

Receivables primarily consist of amounts due under capitation contracts with various payors. Receivables due under capitation contracts are recorded monthly based on reports received from payors and management's estimate of risk

10

**APP 389**

Table of Contents

adjustment payments to be received in subsequent periods for open performance years. Receivables are recorded at the amount expected to be realized.

*Concentration*

The Company contracts with various payors whereby the Company is entitled to monthly PMPM fees to provide a defined range of healthcare services for members attributed to its contracted primary care physicians. The Company generally accepts full financial risk for such members and therefore is responsible for the cost of all healthcare services required by them. Substantially all of the Company's receivable balances are from a small number of payors. Revenue from Medicare Advantage payors constitutes substantially all of the Company's total revenue for the three and nine months ended September 30, 2023 and 2022.

The following table provides the Company's revenue concentration with respect to major payors as a percentage of the Company's total revenues:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Payor A | 24 % | 26 % | 24 % | 25 % |
| Payor B | 14 % | 19 % | 15 % | 19 % |
| Payor C | 18 % | 14 % | 17 % | 14 % |
| Payor F | 10 % | * | 10 % | * |

_____
\*     Less than 10% of total revenues.

The following table provides the Company's concentration of credit risk with respect to major payors as a percentage of receivables, net:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Payor A | * | 13 % |
| Payor B | 18 % | 20 % |
| Payor C | 12 % | 10 % |
| Payor D | * | 10 % |
| Payor E | * | 11 % |
| Payor F | 26 % | * |

_____
\*     Less than 10% of total receivables.

**NOTE 4. Marketable Securities and Fair Value Measurements**

*Marketable Securities*

The following table summarizes the Company's marketable securities (in thousands):

| | September 30, 2023 | | | | December 31, 2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| **Marketable securities:** | | | | | | | | |
| Corporate debt securities | $ 241,723 | $ - | $ (3,515) | $ 238,208 | $ 255,613 | $ 60 | $ (3,240) | $ 252,433 |
| U.S. Treasury notes | 150,473 | - | (2,751) | 147,722 | 151,873 | - | (2,306) | 149,567 |
| Other | 10,000 | - | (52) | 9,948 | 9,975 | - | (74) | 9,901 |
| | $ 402,196 | $ - | $ (6,318) | $ 395,878 | $ 417,461 | $ 60 | $ (5,620) | $ 411,901 |

11

**APP 390**

Table of Contents

At September 30, 2023 and December 31, 2022, marketable securities of $ 373.3 million and $407.4 million, respectively, were in an unrealized loss position for less than twelve months. The Company's unrealized losses from marketable securities as of September 30, 2023 and December 31, 2022 were caused primarily by interest rate increases. The Company does not intend to sell marketable securities that are in an unrealized loss position, and it is not more likely than not that the Company will be required to sell the investments before recovery of their amortized cost bases, which may be at maturity. Therefore, the Company believes these losses to be temporary. There was no allowance for credit losses on available-for-sale marketable securities at September 30, 2023 and December 31, 2022.

The following table summarizes the Company's marketable securities maturity as of September 30, 2023 (in thousands):

| Year | Amortized Cost | Fair Value |
|------|---------------:|-----------:|
| 2023 | $ 27,922 | $ 27,826 |
| 2024 | 155,006 | 153,241 |
| 2025 | 183,796 | 179,855 |
| 2026 | 35,472 | 34,956 |
| | $ 402,196 | $ 395,878 |

*Fair Value Measurements*

The Company's financial instruments consist of cash and cash equivalents, restricted cash and cash equivalents, marketable securities, receivables, other liabilities, accounts payable, certain accrued expenses, and borrowings which consist of a term loan and a revolving credit facility. The carrying values of the financial instruments classified as current in the consolidated balance sheets approximate their fair values due to their short-term maturities. The Company's cash and cash equivalents are classified within Level 1 of the fair value hierarchy. The Company may be required, from time to time, to measure its loans to physician partner groups, primarily in connection with taxes payable on shares distributed to them upon completion of the initial public offering ("IPO"), at fair value on a nonrecurring basis. Such measurements are classified within Level 2 of the fair value hierarchy. The carrying values of the term loan and revolving credit facility are a reasonable estimate of fair value because the interest rates on such borrowings approximate market rates as of the reporting date. Such borrowings are classified within Level 2 of the fair value hierarchy. During the three and nine months ended September 30, 2023 and 2022, there were no material transfers of financial assets or liabilities within the fair value hierarchy.

The Company measures and discloses the fair value of nonfinancial and financial assets and liabilities utilizing a hierarchy of valuation techniques based on whether the inputs to a fair value measurement are considered to be observable or unobservable in a marketplace. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect the Company's market assumptions. This hierarchy requires the use of observable market data when available. These inputs have created the following fair value hierarchy:

- Level 1-quoted prices for identical instruments in active markets;

- Level 2-quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which significant inputs and significant value drivers are observable in active markets; and

- Level 3-fair value measurements derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable.

12

Table of Contents

The table below summarizes the Company's financial instruments measured at fair value on a recurring basis (in thousands):

| | September 30, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Level 1 | Level 2 | Level 3 |
| **Marketable securities:** | | | | | | |
| Corporate debt securities | $ - | $ 238,208 | $ - | $ - | $ 252,433 | $ - |
| U.S. Treasury notes | 147,722 | - | - | 149,567 | - | - |
| Other | 9,948 | - | - | 9,901 | - | - |
| | $ 157,670 | $ 238,208 | $ - | $ 159,468 | $ 252,433 | $ - |

## NOTE 5. Other Assets, net

The following table summarizes the Company's other assets, net (in thousands):

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Loans to physician partners | $ 70,475 | $ 69,383 |
| Health plan deposits | 12,051 | 11,728 |
| Equity method investments[1] | 39,170 | 17,352 |
| Right-of-use lease assets | 14,594 | 13,029 |
| Other | 3,894 | 5,432 |
| | $ 140,184 | $ 116,924 |

(1)    See Note 14 for additional discussion related to the Company's equity method investments.

*Loans to Physician Partners*

Loans to physician partners primarily represent loans in connection with taxes payable on shares distributed to them in connection with the IPO. These loans mature between 2026 and 2031 with nominal interest compounding annually and no prepayment penalties. Such loans are stated at the amount expected to be collected.

## NOTE 6. Medical Claims and Related Payables

Medical services expense represents costs incurred for medical services provided to members by physicians, hospitals and other ancillary providers for which the Company is financially responsible and that are paid either directly by the Company or by payors with whom the Company has contracted. Medical services expenses are recognized in the period in which services are provided and include estimates of claims that have been incurred but have either not yet been received, processed, or paid and as such, not reported.

Such estimates are developed using actuarial methods commonly used by health insurance actuaries that include a number of factors and assumptions including medical service utilization trends, changes in membership, observed medical cost trends, historical claim payment patterns and other factors. Generally, for the most recent months, the Company estimates claim costs incurred by applying observed medical cost trend factors to the average PMPM medical costs incurred in prior months for which more complete claims data are available.

Each period, the Company re-examines previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances. As more complete claims information becomes available, the Company adjusts its estimates and recognizes those changes in estimates in the period in which the change is identified. The difference between the estimated liability and the actual settlements of claims is recognized in the period the claims are settled. The Company's medical claims payable balance represents management's best estimate of its liability for unpaid medical costs as of September 30, 2023 and 2022. The Company uses judgment to determine the appropriate assumptions for developing the required estimates.

13

Table of Contents

The following table presents the components of changes in medical claims and related payables (in thousands):

| | September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Medical claims and related payables, beginning of the year** | $ 339,748 | $ 239,014 |
| Components of incurred costs related to: | | |
| Current year | 3,032,501 | 1,756,943 |
| Prior years | 53,456 | 14,692 |
| Discontinued operations - prior years | - | - |
| | 3,085,957 | 1,771,635 |
| Claims paid related to: | | |
| Current year | (2,046,004) | (1,283,242) |
| Prior years | (387,161) | (236,413) |
| Discontinued operations - prior years | - | (154) |
| | (2,433,165) | (1,519,809) |
| **Medical claims and related payables, end of the period** | $ 992,540 | $ 490,840 |

Medical claims and related payables also include $ 13.2 million and $7.0 million, as of September 30, 2023 and December 31, 2022, respectively, that is recoverable from other parties under risk sharing arrangements and is presented as prepaid expenses and other current assets, net in the condensed consolidated balance sheets. Medical claims and related payables presented in the periods above include immaterial balances related to claims liabilities associated with certain divested California businesses for which the Company has retained the liability for claims incurred prior to the date of divestiture.

## NOTE 7. Other Liabilities

The following table summarizes the Company's other liabilities (in thousands):

| | September 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| Other long-term contingencies | $ 49,523 | $ 62,931 |
| Lease liabilities, long-term | 11,975 | 9,885 |
| Equity method liabilities - ACO REACH | - | 4,657 |
| Other | 8,872 | 5,813 |
| | $ 70,370 | $ 83,286 |

As of September 30, 2023 and December 31, 2022, the Company's accruals for contingent liabilities related to unasserted claims were $49.5 million and $62.9 million, respectively. The accrued amounts represent the Company's estimate of probable losses in accordance with ASC Topic 450, *Contingencies*. The Company's estimate of the range of reasonably possible losses in excess of such accruals was $0 to $69.1 million as of September 30, 2023.

See Note 14 for equity method liabilities related to the Company's ACO REACH investments.

## NOTE 8. Debt

On February 18, 2021, the Company executed a credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021 and the Second Amendment to Credit Agreement, dated as of May 25, 2023, the "Credit Facilities"). The Credit Facilities include: (i) a $ 100.0 million secured term loan (the "Secured Term Loan Facility") and (ii) a $100.0 million senior secured revolving credit facility (the "Secured Revolving Facility") with a capacity to issue standby letters of credit in certain circumstances up to a maximum of $100.0 million. Subject to specified conditions and receipt of commitments, the Secured Term Loan Facility may be expanded (or a new term loan facility, revolving credit facility or letter of credit facility added) by up to (i) $50.0 million plus (ii) an additional amount

14

Table of Contents

determined in accordance with a formula tied to repayment of certain of the Company's indebtedness. The maturity date of the Credit Facilities is February 18, 2026.

As of September 30, 2023, the Company had $40.0 million outstanding under the Secured Term Loan Facility and availability under the Secured Revolving Facility was $32.9 million, as the Company had outstanding letters of credit totaling $67.1 million, of which $37.2 million was for the Company's ACO REACH investments. The standby letters of credit are automatically extended without amendment for one-year periods, unless the Company notifies the institution in advance of the expiration date that the letter will be terminated. No amounts have been drawn on the outstanding letters of credit as of September 30, 2023.

Effective with the Second Amendment to Credit Agreement on May 25, 2023, the Company transitioned to the Secured Overnight Financing Rate ("SOFR") as a benchmark interest rate used in the Credit Agreement. At the Company's option, borrowings under the agreement can be either: (i) SOFR Rate Loans, (ii) Daily Simple SOFR Rate Loans, or (iii) Base Rate Loans. Daily Simple SOFR Rate Loans and SOFR Rate Loans bear interest at a rate equal to the sum of 4.00% (stepping down to 3.50% on and following October 1, 2023) and the higher of (a) SOFR, as defined in the credit agreement, and (b) 0%. Base Rate Loans bear interest at a rate equal to the sum of 3.00% (stepping down to 2.50% on and following October 1, 2023) and the highest of: (a) 0.50% in excess of the overnight federal funds rate, (b) the prime rate established by the administrative agent from time to time, (c) the one-month LIBO rate (adjusted for maximum reserves) plus 1.00% and (d) 0%. Additionally, the Company pays a commitment fee on the unfunded 2021 Revolving Credit Facility amount of 0.50% (stepping down to 0.375% on and following October 1, 2023). The Company must also pay customary letter of credit fees. As of September 30, 2023, the effective interest rate on the Secured Term Loan Facility was 9.349%.

The Credit Facilities are guaranteed by certain of the Company's subsidiaries, including those identified as VIEs, and contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios. Failure to meet any of these covenants could result in an event of default under the agreement. If an event of default occurs, the lenders could elect to declare all amounts outstanding under the agreement to be immediately due and payable. As of September 30, 2023, the Company was in compliance with all covenants under the Credit Facilities.

## NOTE 9. Commitments and Contingencies

*Legal Proceedings*

From time to time, the Company is a party to, or has a significant relationship to, legal proceedings, lawsuits, and other claims. The Company is not aware of any legal proceedings or claims that it believes may have, individually or taken together, a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's policy is to expense legal costs as they are incurred.

## NOTE 10. Common Stock

*Common Stock*

*2023*. During the three months ended September 30, 2023, the Company issued approximately 0.6 million shares of common stock primarily in connection with exercises and vesting of stock-based awards. During the nine months ended September 30, 2023, the Company issued approximately 3.2 million shares of common stock primarily in connection with exercises and vesting of stock-based awards.

On May 18, 2023, the Company repurchased and retired 9.6 million shares of common stock pursuant to an underwritten secondary public offering of
94.6 million shares of its common stock by CD&R. The Company paid approximately $20.80 per share, which is the same per share price paid by the underwriters to CD&R in the offering.

*2022*. During the three months ended September 30, 2022, the Company issued approximately 3.5 million shares of common stock primarily in connection with exercises and vesting of stock-based awards. During the nine months ended September 30, 2022, the Company issued approximately 11.6 million shares of common stock primarily in connection with exercises and vesting of stock-based awards.

Table of Contents

**NOTE 11. Net Income (Loss) Per Common Share**

Basic net income (loss) per common share ("EPS") is computed based upon the weighted average number of common shares outstanding. Diluted net income (loss) per common share is computed based upon the weighted average number of common shares outstanding plus the impact of common shares issuable from the assumed conversion of stock options, certain performance restricted stock units, and unvested restricted stock units. Only those instruments having a dilutive impact on basic net income (loss) per share are included in diluted net income (loss) per share during the periods presented.

The following table illustrates the computation of basic and diluted EPS (in thousands, except per share amounts):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Numerator** | | | | |
| Income (loss) from continuing operations | $ (31,483) | $ (30,503) | $ (32,319) | $ (50,815) |
| Noncontrolling interests' share in (earnings) loss from continuing operations | 47 | 71 | 156 | 228 |
| Net income (loss) attributable to common stockholders before discontinued operations | (31,436) | (30,432) | (32,163) | (50,587) |
| Income (loss) from discontinued operations | - | (236) | - | 500 |
| Net income (loss) attributable to common stockholders | $ (31,436) | $ (30,668) | $ (32,163) | $ (50,087) |
| **Denominator** | | | | |
| Weighted average shares outstanding - basic | 405,787 | 411,065 | 412,077 | 406,823 |
| Weighted average shares outstanding - diluted | 405,787 | 411,065 | 412,077 | 406,823 |
| **Net income (loss) per share attributable to common stockholders** | | | | |
| Net income (loss) per common share from continuing operations, basic and diluted | $ (0.08) | $ (0.07) | $ (0.08) | $ (0.12) |
| Net income (loss) per common share from discontinued operations, basic and diluted | $ - | $ - | $ - | $ - |

The following table provides the weighted-average potential shares of common stock that were excluded from the calculation of diluted net income (loss) per share attributable to common stockholders because their effect would have been anti-dilutive (in thousands):

| | September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Stock options | 17,424 | 20,474 |
| Restricted stock units | 9,183 | 1,908 |

**NOTE 12. Goodwill and Amortizable Intangible Assets**

As of September 30, 2023 and December 31, 2022, the Company's goodwill balance was $ 62.4 million and $41.5 million, respectively, of which $39.0 million was allocated to the Company's Hawaii reporting unit. The carrying value of the Hawaii reporting unit was negative as of September 30, 2023 and December 31, 2022. There were no events or circumstances that warranted an interim impairment test for goodwill during the three and nine months ended September 30, 2023.

As of September 30, 2023 and December 31, 2022, the Company's gross carrying amount of amortizable intangible assets was $165.1 million and $130.8 million, with accumulated amortization of $72.4 million and $63.1 million, respectively. For the three months ended September 30, 2023 and 2022, the Company recognized $3.2 million and $2.1 million, respectively, in amortization expense, which is included in depreciation and amortization expense in the

16

**APP 395**

Table of Contents

condensed consolidated statements of operations. For the nine months ended September 30, 2023 and 2022, the Company recognized $9.4 million and $7.2 million, respectively, in amortization expense, which is included in depreciation and amortization expense in the condensed consolidated statements of operations.

*Acquisition*

On February 28, 2023, the Company completed the acquisition of My Personal Health Record Express, Inc. (the "Acquisition"), a leading provider of value-based care technology and interoperability solutions for cash consideration of $44.5 million, net of cash acquired and subject to certain post-closing adjustments. The Company accounted for the Acquisition utilizing the acquisition method of accounting, which requires assets and liabilities to be recognized based on estimates of their acquisition date fair values. The determination of the values of the acquired assets and assumed liabilities, including other intangible assets and deferred taxes, requires significant judgment. While the Company uses its best estimates and assumptions to accurately value assets acquired and liabilities assumed at the acquisition date, the Company estimates are inherently uncertain and subject to refinement. As a result, during the measurement period, which may be up to one year from the acquisition date, the Company may record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. Measurement period adjustments are recorded in the period in which they are determined, as if they had been completed at the acquisition date. Upon the conclusion of the final determination of the values of assets acquired or liabilities assumed, or one year after the date of acquisition, whichever comes first, any subsequent adjustments are recorded within the Company's consolidated results of operations. The following preliminary allocation of the purchase price related to the Acquisition based upon the fair value of assets and liabilities assumed included developed technology intangible assets of $25.7 million, customer relationship intangible assets of $1.9 million, and assumed net liabilities of $3.7 million, with the residual amount being recorded as goodwill of $20.6 million. The intangible assets acquired have a weighted-average life of 10 years.

## NOTE 13. Supplemental Cash Flow Information

The following table provides supplemental cash flow information (in thousands):

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| *Supplemental cash flow information:* | | |
| Interest paid | $ 4,519 | $ 2,878 |
| Income taxes paid | 5,156 | 4,223 |
| *Supplemental disclosure of non-cash investing and financing activities:* | | |
| Right-of-use asset obtained in exchange for new operating lease liability | 3,612 | 7,288 |
| Non-cash investment in unconsolidated subsidiaries | - | 190 |

The following table summarizes cash, cash equivalents and restricted cash equivalents from continuing operations (in thousands):

| | September 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| Cash and cash equivalents | $ 168,339 | $ 497,070 |
| Restricted cash and equivalents[1] | 10,204 | 10,610 |
| Cash, cash equivalents and restricted cash equivalents | $ 178,543 | $ 507,680 |

_____

(1) Restricted cash and equivalents primarily consist of amounts used as collateral to secure letters of credit that the Company is required to maintain pursuant to contracts with payors.

17

Table of Contents

**NOTE 14. Variable Interest Entities**

*Consolidated Variable Interest Entities*

agilon health, inc.'s consolidated assets and liabilities as of September 30, 2023 and December 31, 2022 include certain assets of VIEs that can only be used to settle the liabilities of the related VIE. The VIE creditors do not have recourse to agilon health, inc.

agilon health, inc.'s consolidated assets and liabilities include VIE assets and liabilities as follows (in thousands):

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $        86,581 | $        155,819 |
| Restricted cash equivalents | 10,202 | 10,610 |
| Receivables, net | 1,334,394 | 492,077 |
| Prepaid expenses and other current assets, net | 20,781 | 15,515 |
| Property and equipment, net | 1,817 | 1,567 |
| Intangible assets, net | 20,187 | 17,347 |
| Other assets, net | 9,790 | 10,371 |
| **Liabilities** | | |
| Medical claims and related payables | 962,505 | 300,798 |
| Accounts payable and accrued expenses | 259,553 | 159,526 |
| Other liabilities | 4,188 | 2,059 |

*Risk-bearing Entities.* At September 30, 2023, the Company operates 29 wholly-owned risk-bearing entities ("RBEs") for the purpose of entering into risk-bearing contracts with payors. Each RBE's equity at risk is considered insufficient to finance its activities without additional support, and, therefore, each RBE is considered a VIE. The Company consolidates the RBEs as it has determined that it is the primary beneficiary because it has: (i) the ability to control the activities that most significantly impact the RBEs' economic performance; and (ii) the obligation to absorb losses or right to receive benefits that could potentially be significant to the RBEs. Specifically, the Company has the unilateral ability and authority, through the RBE governance and management agreements, to make significant decisions about strategic and operating activities of the RBEs, including negotiating and entering into risk-bearing contracts with payors, and approving the RBEs' annual operating budgets. The Company also has the obligation to fund losses of the RBEs and the right to receive a significant percentage of any financial surplus generated by the RBEs. The assets of the RBEs primarily consist of cash and cash equivalents, receivables, net, intangible assets, net, and other assets, net; its obligations primarily consist of medical claims and related payables as well as operating expenses of the RBEs (accounts payable and accrued expenses), including incentive compensation obligations to the Company's physician partners. On February 18, 2021, the Company executed the Credit Facilities, which are guaranteed by certain of the Company's VIEs. Assets generated by the RBEs (primarily from medical services revenues) may be used, in certain limited circumstances, to settle the Company's contractual debt obligations.

*Unconsolidated Variable Interest Entities*

As of September 30, 2023, the Company had nine equity method investments (liabilities) that were deemed to be VIEs. The Company has determined that the activities that most significantly impact the performance of these VIEs consist of the allocation of resources to and other decisions related to clinical activities and provider contracting decisions. Because the Company does not have the ability to control these activities due to another party's control of the VIEs' board of directors, the Company has determined that it is not the primary beneficiary of and therefore does not consolidate these VIEs. The Company's maximum loss exposure as a result of the Company's involvement with the VIEs cannot be quantified as the Company has the obligation to provide ongoing operational support to the unconsolidated VIEs, as needed.

18

Table of Contents

*Equity Method Investments*

The following table summarizes the Company's equity method investments (in thousands):

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Equity method investments - Other[1] | $ 9,114 | $ 8,329 |
| Equity method investments - ACO REACH[1] | 30,056 | 9,023 |
| Equity method liabilities - ACO REACH[2] | - | (4,657) |

_____

(1)  Included in Other assets, net in the condensed consolidated balance sheets.
(2)  Included in Other liabilities in the condensed consolidated balance sheets.

The Company is a partner in eight wholly-owned ACO REACH entities in collaboration with 12 of its physician group partners operating in 10 geographies. The combined summarized operating results of the Company's ACO REACH entities are as follows (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Medical services revenue | $ 296,937 | $ 241,408 | $ 858,286 | $ 786,171 |
| Medical services expense | (242,431) | (231,910) | (741,752) | (735,924) |
| Other medical expenses[1] | (31,970) | (9,215) | (71,138) | (34,019) |
| Income (loss) from operations | 18,330 | (3,035) | 31,515 | 6,333 |
| Net income (loss)[2] | 14,628 | (4,361) | 24,388 | 3,345 |

_____

(1)  For the three months ended September 30, 2023 and 2022, includes physician incentive expenses of $25.1 million and $2.9 million, respectively. For the nine months ended September 30, 2023 and 2022, includes physician incentive expenses of $51.4 million and $15.0 million, respectively.
(2)  Included in Income (loss) from equity method investments in the condensed consolidated statements of operations.

The combined summarized balance sheet of the Company's ACO REACH entities are as follows (in thousands):

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Current assets | $ 165,257 | $ 70,625 |
| Noncurrent assets | 130 | - |
| Total assets | 165,387 | 70,625 |
| Current and total liabilities | 136,285 | 67,343 |

19

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*All references in this report to "agilon," "the Company", "we," "us" or "our" mean agilon health, inc., together with its consolidated subsidiaries. Unless the context suggests otherwise, references to "agilon health, inc." mean the parent company without its subsidiaries.*

**Cautionary Language Regarding Forward-Looking Statements**

Statements in this Quarterly Report on Form 10-Q (the "Report") that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in a number of places throughout this Report and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results of operations, financial condition, and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under Part I, Item 1A. "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. As explained in greater detail under Item 9A. "Controls and Procedures" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, we are undertaking a broad range of remedial procedures to address the material weaknesses in our internal control over financial reporting identified as of December 31, 2022. Our efforts to improve our internal controls are ongoing. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Report. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses, and our ability to achieve or maintain profitability in an environment of increasing expenses;

- our ability to identify and develop successful new geographies, physician partners and health plan payors, and to execute upon our growth initiatives and achieve required operational scale;

- our ability to execute our operating strategies or to achieve results consistent with our historical performance;

- our expectation that our expenses will increase in the future and the risk that medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive;

- our ability to secure contracts with Medicare Advantage ("MA") payors and to ensure such contracts are on financial terms sufficient to meet our financial targets;

- our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives;

- our ability to obtain additional capital needed to support our business;

- significant reductions in our membership;

- challenges for our physician partners in the transition to our "Total Care Model";

- inaccuracies in the estimates and assumptions we use to project the size, revenue or medical expense amounts of our target market;

20

APP 399

Table of Contents

- the spread of, and response to, COVID-19, potential new variants of COVID-19 and entirely new pandemics, and the inability to predict the ultimate impact of pandemics on us;

- inaccuracies in the estimates and assumptions we use to project our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings under payor contracts;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities (each, an "RBE") within certain geographies in the future;

- the impact of restrictive or exclusivity clauses in some of our contracts with physician partners that may subject us to investigations or litigation;

- our ability to retain our management team and key employees or attract qualified personnel in the future;

- our ability to realize the full value of our intangible assets and any negative impact from impairment charges we may record;

- security breaches, loss of data and other disruptions to our data platforms could adversely impact us;

- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;

- our responsibility for certain liabilities in connection with the disposition of our California operations;

- our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses;

- our dependence on a limited number of key health plan payors;

- our contracts with our payors are for limited terms and may not be renewed upon their expiration;

- our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment;

- our dependence on physician partners and other providers to effectively manage the quality and cost of care, and perform obligations under payor contracts;

- difficulties in obtaining accurate and complete diagnosis data;

- our dependence on physician partners to accurately, timely and sufficiently document their services and potential regulatory or other liability if any diagnosis information or encounter data are inaccurate or incorrect;

- we rely on third party software and data to operate our business and restrictions on the use of third-party resources could adversely affect us;

- our reliance on third parties for internet infrastructure and bandwidth to operate our business and provide services to our members and physician partners;

- consolidation in our industry could adversely impact us;

- reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs, from which we derive substantially all of our total revenue;

- uncertain or adverse economic conditions, including a downturn or decrease in government expenditures, including as a result of an inability or failure by the U.S. federal government to fund Medicare;

- our ability to compete in our industry;

- the impact of government performance standards and benchmarks on our compensation and reputation;

- statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements;

- regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models;

21

**APP 400**

Table of Contents

- we, our physician partners or affiliates being subject to federal or state investigations, audits and enforcement actions;

- regulatory inquiries and corrective action plans imposed by our health plan payors;

- repayment obligations arising out of payor audits;

- the impact on our revenue of Centers for Medicare & Medicaid Services' ("CMS") modifying the methodology used to determine the revenue associated with MA members;

- negative publicity regarding the managed healthcare industry;

- the extensive regulation of the healthcare industry at the federal, state, and local levels;

- if our physician alignment strategies with our physician partners, including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements, are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties;

- our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and the use of protected health information;

- our physician partners are subject to federal and state healthcare fraud and abuse regulations;

- our use, disclosure and processing of personally identifiable information, personal health information, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could adversely impact us;

- our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could adversely impact us;

- laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could adversely impact us;

- if we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions;

- we may face litigation not covered by insurance;

- our indebtedness and the potential that we may incur additional substantial indebtedness;

- the agreements and instruments governing our indebtedness contain restrictions and limitations that could adversely impact us;

- agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses;

- under our Certificate of Incorporation, the CD&R Investor and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of the CD&R Investor and its affiliates, have no obligation to offer us corporate opportunities;

- anti-takeover provisions in our certificate of incorporation and by-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock;

- we do not intend to pay dividends on our common stock for the foreseeable future and, consequently, a shareholder's return on investment depends on appreciation in the price of our common stock;

- our certificate of incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders;

- we identified material weaknesses in our internal control over financial reporting and, if our remedial measures are insufficient to address the material weaknesses, or if significant deficiencies or material weaknesses in our internal control over financial reporting are discovered or occur in the future, it may adversely affect us; and

22

**APP 401**

Table of Contents

- risks related to other factors discussed under "Risk Factors" in Annual Report on Form 10-K for the fiscal year ended December 31, 2022.

Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

The information set forth in this Item 2 is intended to provide readers with an understanding of our financial condition, changes in financial condition, and results of operations. We will discuss and provide our analysis in the following order:

- Overview and Recent Developments
- Key Financial and Operating Metrics
- Key Components of Our Results of Operations
- Results of Operations
- Non-GAAP Financial Measures
- Liquidity and Capital Resources
- Critical Accounting Policies and Estimates
- Recent Accounting Pronouncements

**Overview and Recent Developments**

Our business is transforming healthcare by empowering the primary care physicians ("PCPs") to be the agent for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost, and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we are poised to revolutionize healthcare for seniors across communities throughout the United States. Our purpose-built model provides the necessary capabilities, capital, and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by forming RBEs within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or, global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

***Third Quarter 2023 Results:***

- Medicare Advantage members of approximately 420,300 as of September 30, 2023 increased 58% from September 30, 2022.
- ACO REACH attributed beneficiaries of approximately 87,700 as of September 30, 2023 decreased 2% from September 30, 2022.
- Total revenue of $1.22 billion increased 75% from the third quarter of 2022.
- Gross profit of $30 million, compared to $26 million in the third quarter of 2022.
- Medical margin of $108 million, compared to $76 million in the third quarter of 2022.
- Net loss of $31 million, compared to $31 million in the third quarter of 2022.
- Adjusted EBITDA loss of $6 million in the third quarter compared to an Adjusted EBITDA loss of $26 million in the third quarter 2022.

23

**APP 402**

Table of Contents

*Year to Date 2023 Results:*

- Total revenue of $3.50 billion increased 73% from 2022.

- Gross profit of $165 million, compared to $102 million in 2022.

- Medical margin of $408 million, compared to $244 million in 2022.

- Net loss of $32 million, compared to $50 million in 2022.

- Adjusted EBITDA $28 million compared to an Adjusted EBITDA loss of $20 million in 2022.

*Membership Details*

Medicare Advantage members increased 58% from September 30, 2022, which includes contributions from new geographies and growth within geographies existing prior to 2023. Total members live on the platform includes 420,300 Medicare Advantage members and 87,700 attributed ACO REACH beneficiaries.

Average Medicare Advantage membership was 425,100 during the third quarter of 2023.

*Subsequent Events*

On October 27, 2023, we entered into a definitive agreement to sell MDX Hawaii, Inc. ("MDX Hawaii"), a wholly-owned subsidiary, and its related operations. Acquired by agilon in 2016, MDX Hawaii is a provider network with fully-delegated risk contracts and management services organization capabilities, including claims processing and utilization management. The sale of MDX Hawaii and its related operations closed on October 31, 2023.

**Key Financial and Operating Metrics**

*All of our key metrics exclude historical results from our California operations (which are included as discontinued operations in our condensed consolidated financial statements).*

We monitor the following key financial and operating metrics to help us evaluate our business, identify trends affecting our business, formulate business plans and make strategic decisions. We believe the following key metrics are useful in evaluating our business (dollars in thousands):

| | As of and For the Three Months Ended September 30, | | | As of and For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| MA members | 420,300 | 266,600 | 58 | 420,300 | 266,600 | 58 |
| Medical services revenue | $ 1,212,132 | $ 693,934 | 75 | $ 3,494,006 | $ 2,015,541 | 73 |
| Gross profit | $ 30,477 | $ 25,912 | 18 | $ 164,966 | $ 102,290 | 61 |
| Medical margin[1] | $ 107,736 | $ 75,647 | 42 | $ 408,049 | $ 243,906 | 67 |
| Platform support costs | $ 46,629 | $ 34,764 | 34 | $ 141,176 | $ 104,868 | 35 |
| Net income (loss) | $ (31,483) | $ (30,739) | (2) | $ (32,319) | $ (50,315) | 36 |
| Adjusted EBITDA[1] | $ (5,777) | $ (25,839) | 78 | $ 28,342 | $ (20,473) | 238 |

_____

(1)    Medical margin and Adjusted EBITDA are non-GAAP financial measures. Gross profit is the most directly comparable financial measure calculated in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") to medical margin. Net income (loss) is the most directly comparable financial measure calculated in accordance with U.S. GAAP to Adjusted EBITDA. See "-Non-GAAP Financial Measures" for additional information.

*Medicare Advantage Members*

Our MA members include all individuals enrolled in an MA plan that are attributed to the PCPs on our platform at the end of a given period.

Table of Contents

*Medical Services Revenue*

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to per member per month ("PMPM") fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium that payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

*Gross Profit*

Gross profit represents the amount earned from total revenues less medical services expense and other medical expenses. Total revenues include medical services revenue and other operating revenue. The Company's costs of revenues consist of medical services expense and other medical expenses, which represents the costs that are directly related to providing the services that generate revenue.

The following table presents our gross profit (dollars in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Total revenues | $ 1,215,660 | $ 694,858 | $ 3,500,859 | $ 2,018,437 |
| Medical services expense | (1,104,396) | (618,287) | (3,085,957) | (1,771,635) |
| Other medical expenses[1] | (80,787) | (50,659) | (249,936) | (144,512) |
| Gross profit | $ 30,477 | $ 25,912 | $ 164,966 | $ 102,290 |

_____

(1)    Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended September 30, 2023 and 2022, costs incurred in implementing geographies were $10.3 million and $7.2 million, respectively. For the nine months ended September 30, 2023 and 2022, costs incurred in implementing geographies were $20.3 million and $10.9 million, respectively.

*Medical Margin*

We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin PMPM may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to medical margin PMPM.

See "-Non-GAAP Financial Measures" for information regarding our use of medical margin and a reconciliation of gross profit to medical margin.

*Platform Support Costs*

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance, and legal functions.

The table below represents costs to support our live geographies and enterprise functions, which are included in general and administrative expenses (dollars in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Platform support costs | $ 46,629 | $ 34,764 | $ 141,176 | $ 104,868 |
| % of Revenue | 4% | 5% | 4% | 5% |

25

Table of Contents

***Net Income (Loss) and Adjusted EBITDA***

Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA. We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

See "-Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

**Key Components of Our Results of Operations**

***Revenues***

*Medical Services Revenue*

Our medical services revenue consists of capitation revenue under contracts with various payors. Under the typical capitation arrangement, we are entitled to PMPM fees to provide a defined range of healthcare services for MA health plan members through our contracted physician partners and affiliated PCPs. Such fees are typically based on a defined percentage of corresponding premium that payors receive from CMS. We recognize capitation revenue over the period eligible members are entitled to receive healthcare services.

Medical services revenue constitutes substantially all of our total revenue for the three and nine months ended September 30, 2023 and 2022.

***Operating Expenses***

*Medical Services Expense*

In each of our geographies, a network of physicians, hospitals, and other healthcare providers provide care to our members. Medical services expense represents costs incurred for medical services provided to our members. Our medical services expense trends primarily relate to changes in per visit costs incurred by our members, along with changes in health system and provider utilization of services. Medical services expenses are recognized in the period in which services are provided and include estimates of our obligations for medical services that have been rendered by third parties but for which claims have either not yet been received, processed, or paid.

*Other Medical Expenses*

Other medical expenses include: (i) partner physician compensation expense and (ii) other provider costs. Partner physician compensation expense represents obligations to our physician partners corresponding to a portion of the surplus generated in our geographies, which is a function of medical services revenues less the sum of medical services expenses, other provider costs and market operating costs, for the respective geography. Physician payment obligations are reconciled quarterly, and settlement payments are typically issued to providers on an annual basis in arrears, with interim payments issued periodically. Other provider costs include payments to support physician-patient engagement, certain other medical costs, and other care management expenses that help to create medical cost efficiency. Other provider costs include costs incurred for geographies that are in implementation and are not yet generating revenue.

*General and Administrative*

General and administrative expenses consist of market-based support personnel and other operating costs to support our geographies, personnel and other operating costs to support our enterprise functions, and investments to support development and expansion of our physician partners. Our enterprise functions include salaries and related expenses, stock-based compensation (including shares issued under partner physician group equity agreements), operational support expenses, technology infrastructure, finance, and legal, as well as other costs associated with the continued growth of our platform. For the purposes of calculating physician partner incentive expense, we allocate a portion of our enterprise general and administrative expenses to our geographies. General and administrative expenses also include severance and accruals for unasserted claims.

26

**APP 405**

Table of Contents

*Depreciation and Amortization*

Depreciation and amortization expenses are associated with our property and equipment and acquired intangible assets. Depreciation includes expenses associated with buildings, computer equipment and software, furniture and fixtures, and leasehold improvements. Amortization primarily includes expenses associated with acquired intangible assets.

**Other Income (Expense)**

*Income (loss) from equity method investments*

Income (loss) from equity method investments consists primarily of income associated with our participation in the ACO REACH program.

*Other Income (Expense), Net*

Other income (expense), net includes the following items:

- Interest income, which consists primarily of interest earned on our cash and cash equivalents, restricted cash and cash equivalents, and marketable securities, including amortization/accretion of discount/premium.

*Interest Expense*

Interest expense consists primarily of interest expense associated with our outstanding debt, including amortization of debt discounts and costs.

**Income Tax Benefit (Expense)**

We are subject to corporate U.S. federal, state, and local income taxation. Deferred tax assets are reduced by a valuation allowance to the extent management believes it is not more likely than not to be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income. Management makes estimates and judgments about future taxable income based on assumptions that are consistent with our plans and estimates.

27

APP 406

Table of Contents

**Results of Operations**

The following table summarizes key components of our results of operations (dollars in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,212,132 | $ 693,934 | $ 3,494,006 | $ 2,015,541 |
| Other operating revenue | 3,528 | 924 | 6,853 | 2,896 |
| Total revenues | 1,215,660 | 694,858 | 3,500,859 | 2,018,437 |
| **Expenses:** | | | | |
| Medical services expense | 1,104,396 | 618,287 | 3,085,957 | 1,771,635 |
| Other medical expenses | 80,787 | 50,659 | 249,936 | 144,512 |
| General and administrative (including noncash stock-based compensation expense of $20,736, $7,907, $53,980 and $18,430, respectively) | 74,138 | 51,980 | 222,483 | 143,738 |
| Depreciation and amortization | 5,310 | 3,450 | 15,014 | 9,865 |
| Total expenses | 1,264,631 | 724,376 | 3,573,390 | 2,069,750 |
| **Income (loss) from operations** | (48,971) | (29,518) | (72,531) | (51,313) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | 14,659 | (4,314) | 24,507 | 3,473 |
| Other income (expense), net | 5,690 | 4,888 | 21,001 | 6,367 |
| Gain (loss) on lease terminations | - | - | - | (5,458) |
| Interest expense | (1,651) | (1,000) | (4,772) | (2,816) |
| **Income (loss) before income taxes** | (30,273) | (29,944) | (31,795) | (49,747) |
| Income tax benefit (expense) | (1,210) | (559) | (524) | (1,068) |
| **Income (loss) from continuing operations** | (31,483) | (30,503) | (32,319) | (50,815) |
| **Discontinued operations:** | | | | |
| Income (loss) before income taxes | - | (224) | - | 526 |
| Income tax benefit (expense) | - | (12) | - | (26) |
| **Total discontinued operations** | - | (236) | - | 500 |
| **Net income (loss)** | (31,483) | (30,739) | (32,319) | (50,315) |
| Noncontrolling interests' share in (earnings) loss | 47 | 71 | 156 | 228 |
| **Net income (loss) attributable to common shares** | $ (31,436) | $ (30,668) | $ (32,163) | $ (50,087) |

28

**APP 407**

Table of Contents

The following table summarizes our results of operations as a percentage of total revenues:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenues:** | | | | |
| Medical services revenue | 100% | 100% | 100% | 100% |
| Other operating revenue | - | - | - | - |
| Total revenues | 100 | 100 | 100 | 100 |
| **Expenses:** | | | | |
| Medical services expense | 91 | 89 | 88 | 88 |
| Other medical expenses | 7 | 7 | 7 | 7 |
| General and administrative (including noncash stock-based compensation expense of 2%, 1%, 1% and 1%, respectively) | 6 | 7 | 6 | 7 |
| Depreciation and amortization | - | - | - | - |
| Total expenses | 104 | 104 | 102 | 102 |
| **Income (loss) from operations** | (4) | (4) | (2) | (2) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | 1 | (1) | 1 | - |
| Other income (expense), net | - | 1 | 1 | - |
| Gain (loss) on lease terminations | - | - | - | - |
| Interest expense | - | - | - | - |
| **Income (loss) before income taxes** | (2) | (4) | (1) | (2) |
| Income tax benefit (expense) | - | - | - | - |
| **Income (loss) from continuing operations** | (2) | (4) | (1) | (2) |
| Discontinued operations: | | | | |
| Income (loss) before income taxes | - | - | - | - |
| Income tax benefit (expense) | - | - | - | - |
| Total discontinued operations | - | - | - | - |
| **Net income (loss)** | (2) | (4) | (1) | (2) |
| Noncontrolling interests' share in (earnings) loss | - | - | - | - |
| **Net income (loss) attributable to common shares** | (2)% | (4)% | (1)% | (2)% |

*Comparison of the Three and Nine Months Ended September 30, 2023 to the Three and Nine Months Ended September 30, 2022*

*Medical Services Revenue*

| | Three Months Ended September 30, | | Change | |
|---|---|---|---|---|
| *(dollars in thousands)* | 2023 | 2022 | $ | % |
| Medical services revenue | $ 1,212,132 | $ 693,934 | $ 518,198 | 75% |
| *% of total revenues* | *100%* | *100%* | | |

Medical services revenue increased for the three months ended September 30, 2023 due primarily to growth in average membership of 57%, which was attributable to eight new geographies that began to generate revenue in 2023 and

29

Table of Contents

growth in our existing geographies. The increase in medical services revenue for the three months ended September 30, 2023 was also driven, to a lesser extent, by an increase in PMPM capitation rates of 11%.

| (dollars in thousands) | Nine Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Medical services revenue | $ 3,494,006 | $ 2,015,541 | $ 1,478,465 | 73% |
| % of total revenues | 100% | 100% | | |

Medical services revenue increased for the nine months ended September 30, 2023 due primarily to growth in average membership of 58%, which was attributable to eight new geographies that began to generate revenue in 2023 and growth in our existing geographies. The increase in medical services revenue for the nine months ended September 30, 2023 was also driven, to a lesser extent, by an increase in PMPM capitation rates of 10%.

### Medical Services Expense

| (dollars in thousands) | Three Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Medical services expense | $ 1,104,396 | $ 618,287 | $ 486,109 | 79% |
| % of total revenues | 91% | 89% | | |

Medical services expense increased for the three months ended September 30, 2023 due primarily to growth in average membership of 57%, which was attributable to eight new geographies that became operational in 2023 and growth in our existing geographies. The increase in medical services expense for the three months ended September 30, 2023 was also driven, to a lesser extent, by an increase in average medical services expense per member of 13%.

| (dollars in thousands) | Nine Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Medical services expense | $ 3,085,957 | $ 1,771,635 | $ 1,314,322 | 74% |
| % of total revenues | 88% | 88% | | |

Medical services expense increased for the nine months ended September 30, 2023 due primarily to growth in average membership of 58%, which was attributable to eight new geographies that became operational in 2023 and growth in our existing geographies. The increase in medical services expense for the nine months ended September 30, 2023 was also driven, to a lesser extent, by an increase in average medical services expense per member of 11%.

### Other Medical Expenses

| (dollars in thousands) | Three Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Other medical expenses | $ 80,787 | $ 50,659 | $ 30,128 | 59% |
| % of total revenues | 7% | 7% | | |

Other medical expenses increased by $30.1 million, or 59%, for the three months ended September 30, 2023 compared to 2022. Partner physician incentive expense increased by $16.5 million to $38.5 million in 2023 compared to $22.0 million in 2022. Other provider costs increased by $13.6 million to $42.2 million in 2023 compared to $28.6 million in 2022, resulting from the increase in the number of geographies and members on our platform. Other provider costs for the three months ended September 30, 2023 include $10.3 million of costs related to geographies that will become operational in January 2024, while other provider costs for the three months ended September 30, 2022 include $7.2 million of costs related to geographies that became operational in 2023.

30

**APP 409**

Table of Contents

| (dollars in thousands) | Nine Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Other medical expenses | $ 249,936 | $ 144,512 | $ 105,424 | 73% |
| *% of total revenues* | *7%* | *7%* | | |

Other medical expenses increased by $105.4 million, or 73%, for the nine months ended September 30, 2023 compared to 2022. Partner physician incentive expense increased by $65.1 million to $140.9 million in 2023 compared to $75.8 million in 2022. Other provider costs increased by $40.3 million to $109.0 million in 2023 compared to $68.7 million in 2022, resulting from the increase in the number of geographies and members on our platform. Other provider costs for the nine months ended September 30, 2023 include $20.3 million of costs related to geographies that will become operational in January 2024, while other provider costs for the nine months ended September 30, 2022 include $10.9 million of costs related to geographies that became operational in 2023.

### General and Administrative

| (dollars in thousands) | Three Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| General and administrative | $ 74,138 | $ 51,980 | $ 22,158 | 43% |
| *% of total revenues* | *6%* | *7%* | | |

General and administrative expenses increased $22.2 million, or 43%, for the three months ended September 30, 2023 compared to 2022. Operating costs to support our live geographies and enterprise functions (platform support costs) increased by $11.8 million to $46.6 million in 2023 compared to $34.8 million in 2022 due primarily to growth in operating costs incurred to support geographies that became operational in 2023. Operating costs to support our live geographies and enterprise functions as a percentage of revenue decreased to 4% for the three months ended September 30, 2023 compared to 5% for the same period in 2022. Investments to support geography entry declined to $8.0 million in 2023, compared to $14.1 million in 2022 due to increased costs associated with our geographies that become operational in the following calendar year and expansion into existing geographies. Stock-based compensation expense increased $12.9 million in 2023 primarily due to the granting of certain stock-based instruments to third parties after the third quarter of 2022.

| (dollars in thousands) | Nine Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| General and administrative | $ 222,483 | $ 143,738 | $ 78,745 | 55% |
| *% of total revenues* | *6%* | *7%* | | |

General and administrative expenses increased $78.7 million, or 55%, for the nine months ended September 30, 2023 compared to 2022. Operating costs to support our live geographies and enterprise functions (platform support costs) increased by $36.3 million to $141.2 million in 2023 compared to $104.9 million in 2022 due primarily to growth in operating costs incurred to support geographies that became operational in 2023. Operating costs to support our live geographies and enterprise functions as a percentage of revenue decreased to 4% for the nine months ended September 30, 2023 compared to 5% for the same period in 2022. Investments to support geography entry increased to $28.6 million in 2023, compared to $24.5 million in 2022 due to increased costs associated with our geographies that become operational in the following calendar year and expansion into existing geographies. Stock-based compensation expense increased $35.6 million in 2023 primarily due to the granting of certain stock-based instruments to third parties after the third quarter of 2022.

31

Table of Contents

*Income (loss) from equity method investments*

| (dollars in thousands) | Three Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Income (loss) from equity method investments | $ 14,659 | $ (4,314) | $ 18,973 | 440% |
| *% of total revenues* | *1%* | *(1)%* | | |

Income (loss) from equity method investments increased $19.0 million, or 440%, for the three months ended September 30, 2023 compared to 2022 primarily from our ACO REACH equity investments as a result of stronger performance driven primarily by increased PMPM capitation rates during 2023 compared to 2022.

| (dollars in thousands) | Nine Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Income (loss) from equity method investments | $ 24,507 | $ 3,473 | $ 21,034 | 606% |
| % of total revenues | *1%* | *-%* | | |

Income (loss) from equity method investments increased $21.0 million, or 606%, for the nine months ended September 30, 2023 compared to 2022 primarily from our ACO REACH equity investments as a result of stronger performance driven primarily by increased PMPM capitation rates during 2023 compared to 2022.

*Other income (expense), net*

| (dollars in thousands) | Three Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Other income (expense), net | $ 5,690 | $ 4,888 | $ 802 | 16% |
| *% of total revenues* | *1%* | *1%* | | |

Other income (expense), net increased $0.8 million, or 16%, for the three months ended September 30, 2023 compared to 2022 primarily from interest income as a result of our marketable securities investments, which were made at the end of the first quarter of 2022.

| (dollars in thousands) | Nine Months Ended September 30, | | Change | |
| | 2023 | 2022 | $ | % |
|---|---|---|---|---|
| Other income (expense), net | $ 21,001 | $ 6,367 | $ 14,634 | 230% |
| *% of total revenues* | *1%* | *-%* | | |

Other income (expense), net increased $14.6 million, or 230%, for the nine months ended September 30, 2023 compared to 2022 primarily from interest income as a result of our marketable securities investments, which were made at the end of the first quarter of 2022.

**Non-GAAP Financial Measures**

In addition to providing results that are determined in accordance with U.S. GAAP, we present medical margin and Adjusted EBITDA, which are non-GAAP financial measures.

We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars. However, medical margin PMPM may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically

32

**APP 411**

Table of Contents

dilutive to medical margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to medical margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

Adjusted EBITDA is not considered a measure of financial performance under U.S. GAAP, and the items excluded therefrom are significant components in understanding and assessing our financial performance. Adjusted EBITDA has limitations as an analytical tool and should not be considered in isolation or as an alternative to such U.S. GAAP measures as net income (loss), cash flows provided by or used in operating, investing, or financing activities or other financial statement data presented in our consolidated financial statements as an indicator of financial performance or liquidity. Some of these limitations are:

- Adjusted EBITDA does not reflect changes in, or cash requirements for, working capital needs;

- Adjusted EBITDA does not reflect interest expense or the requirements necessary to service interest or principal payments on debt;

- Adjusted EBITDA does not reflect income tax expense (benefit) or the cash requirements to pay taxes;

- Adjusted EBITDA does not reflect historical cash expenditures or future requirements for capital expenditures or contractual commitments;

- Although depreciation and amortization charges are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and Adjusted EBITDA does not reflect any cash requirements for such replacements; and

- The expenses and other items that we exclude in our calculation of Adjusted EBITDA may differ from the expenses and other items, if any, that other companies may exclude from similarly titled non-GAAP financial measures.

33

Table of Contents

The following table sets forth a reconciliation of gross profit to medical margin using data derived from our condensed consolidated financial statements for the periods indicated (dollars in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2023 | 2022 | 2023 | 2022 |
|---|---|---|---|---|
| Gross profit[1] | $ 30,477 | $ 25,912 | $ 164,966 | $ 102,290 |
| Other operating revenue | (3,528) | (924) | (6,853) | (2,896) |
| Other medical expenses | 80,787 | 50,659 | 249,936 | 144,512 |
| Medical margin | $ 107,736 | $ 75,647 | $ 408,049 | $ 243,906 |

_____
(1)    Gross profit is defined as total revenues less medical services expense and other medical expenses.

The following table sets forth a reconciliation of net income (loss) to Adjusted EBITDA using data derived from our condensed consolidated financial statements for the periods indicated (dollars in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2023 | 2022 | 2023 | 2022 |
|---|---|---|---|---|
| Net income (loss) | $ (31,483) | $ (30,739) | $ (32,319) | $ (50,315) |
| (Income) loss from discontinued operations, net of income taxes | - | 236 | - | (500) |
| Interest expense | 1,651 | 1,000 | 4,772 | 2,816 |
| Income tax expense (benefit) | 1,210 | 559 | 524 | 1,068 |
| Depreciation and amortization | 5,310 | 3,450 | 15,014 | 9,865 |
| (Gain) loss on lease terminations | - | - | - | 5,458 |
| Severance and related costs[1] | - | 512 | 188 | 2,470 |
| Stock-based compensation expense | 20,736 | 7,907 | 53,980 | 18,430 |
| EBITDA adjustments related to equity method investments | 3,702 | 1,325 | 8,426 | 2,988 |
| Other[2] | (6,903) | (10,089) | (22,243) | (12,753) |
| Adjusted EBITDA[3] | $ (5,777) | $ (25,839) | $ 28,342 | $ (20,473) |

_____
(1)    For the three and nine months ended September 30, 2022, includes taxes and related costs on stock option exercises for departed executives of $0.6 million and $2.0 million.
(2)    Includes interest income, non-cash accruals for unasserted claims and contingent liabilities, and transaction-related costs.
(3)    Effective 2023, we no longer exclude geography entry costs from our computation of Adjusted EBITDA. Adjusted EBITDA for the prior period presented has been restated to the current period computation methodology.

## Liquidity and Capital Resources

We have historically financed our operations primarily through funds generated from our capitation arrangements with payors, issuances of equity securities, and borrowings under credit agreements. We generally invest any excess cash in money market accounts, which are classified as cash equivalents, and marketable securities. Our investment strategies are designed to provide safety and preservation of capital, sufficient liquidity to meet the cash flow needs of our business operations, and attainment of a competitive return. As of September 30, 2023, we had cash and cash equivalents and restricted cash and equivalents of $178.5 million and investments in marketable securities of $395.9 million.

We expect to continue to incur operating losses and generate negative cash flows from operations for the foreseeable future due to the investments we intend to continue to make in expanding our business and additional general and administrative costs we expect to incur related to our operation as a public company. As a result, we may require additional capital resources in the future to execute strategic initiatives to grow our business.

Our primary uses of cash include payments for medical claims and other medical expenses, general and administrative expenses, costs associated with the development of new geographies and expansion of existing geographies,

34

Table of Contents

debt service, and capital expenditures. Final reconciliation and receipt of amounts due from payors are typically settled in arrears, following completion of the contractual program year.

Based on our planned operations, we believe that our existing cash and cash equivalents, investments in marketable securities, as well as available borrowing capacity under the credit facilities, will be sufficient to meet our working capital and capital expenditure needs over at least the next 12 months, though we may require additional capital resources in the future. We have based these estimates on assumptions that may prove to be wrong and we could utilize our available capital resources sooner than we expect.

We may require additional financing in the future to fund working capital and pay our obligations. We may seek to raise any necessary additional capital through a combination of public or private equity offerings and/or debt financings. There can be no assurance that we will be successful in acquiring additional funding at levels sufficient to fund our operations or on terms favorable to us, if at all. If adequate funds are not available on acceptable terms when needed, we may be required to significantly reduce operating expenses, which may have a material adverse effect on our business, financial condition, cash flows, and results of operations. If we do raise additional capital through public or private equity, the ownership interest of our existing stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our existing stockholders' rights. If we raise additional capital through debt financing, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures, or declaring dividends.

Our ability to pay dividends to holders of our common stock is significantly limited as a practical matter by our growth plans as well as our credit facilities insofar as we may seek to pay dividends out of funds made available to us by agilon health management, inc. ("agilon management") or its subsidiaries because our credit facilities restrict agilon management's ability to pay dividends or make loans to us. The borrower on our credit facilities is agilon management, our wholly-owned subsidiary. Our credit facilities are guaranteed by certain of our subsidiaries, including those identified as variable interest entities, and contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

### Cash Flows

The following summary discussion of our cash flows is based on the condensed consolidated statements of cash flows. The following table sets forth changes in cash flows (dollars in thousands):

| | Nine Months Ended September 30, | | |
|---|---|---|---|
| | 2023 | 2022 | Change |
| Net cash provided by (used in) operating activities | $ (95,033) | $ (80,849) | $ (14,184) |
| Net cash provided by (used in) investing activities | (41,816) | (436,418) | 394,602 |
| Net cash provided by (used in) financing activities | (192,288) | 26,926 | (219,214) |

### Net Cash Provided By (Used In) Operating Activities

Net cash used in operating activities was $95.0 million for the nine months ended September 30, 2023 compared to $80.8 million for the nine months ended September 30, 2022. The increase in net cash used in operating activities was primarily as a result of increased provider costs, including partner physician incentive expenses, and the timing of settlements with payors from new and existing geographies, partially offset by the increase in gross profit contributed from new and existing geographies. Our cash flow from operations is dependent upon the number of members on our platform, the timing of settlements with payors, and the level of operating and general and administrative expenses necessary to operate and grow our business, among other factors.

### Net Cash Provided By (Used In) Investing Activities

Net cash used in investing activities was $41.8 million for the nine months ended September 30, 2023 compared to $436.4 million for the nine months ended September 30, 2022. During the nine months ended September 30, 2023, we completed the acquisition of My Personal Health Record Express, Inc. for $44.4 million and made investments in marketable securities of $107.0 million, which were partially offset by proceeds from the maturity of marketable securities

Table of Contents

of $133.9 million. During the nine months ended September 30, 2022, we made investments in marketable securities of $423.2 million.

*Net Cash Provided By (Used In) Financing Activities*

Net cash used in financing activities was $192.3 million for the nine months ended September 30, 2023 compared to net cash provided by financing activities of $26.9 million for the nine months ended September 30, 2022. During the nine months ended September 30, 2023, we used $200.0 million to repurchase common stock. During the nine months ended September 30, 2023, we received net proceeds of $11.5 million from the exercise of stock options compared to $30.7 million for the nine months ended September 30, 2022.

### Debt Obligations

On February 18, 2021, we executed a credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021 and the Second Amendment to Credit Agreement, dated as of May 25, 2023, the "Credit Facilities"). The Credit Facilities include: (i) a $100.0 million senior secured term loan (the "Secured Term Loan Facility") and (ii) a $100.0 million senior secured revolving credit facility (the "Secured Revolving Facility") with a capacity to issue standby letters of credit in certain circumstances up to a maximum of $100.0 million. Subject to specified conditions and receipt of commitments, the Secured Term Loan Facility may be expanded (or a new term loan facility, revolving credit facility or letter of credit facility added) by up to (i) $50.0 million plus (ii) an additional amount determined in accordance with a formula tied to repayment of certain of our indebtedness. The maturity date of the Credit Facilities was extended to February 18, 2026.

Effective with the Second Amendment to Credit Agreement on May 25, 2023, we transitioned to the Secured Overnight Financing Rate ("SOFR") as a benchmark interest rate used in the Credit Agreement. At our option, borrowings under the Credit Facilities, as defined in the credit agreement, can be either: (i) SOFR Rate Loans, (ii) Daily Simple SOFR Rate Loans, or (iii) Base Rate Loans. Daily Simple SOFR Rate Loans and SOFR Rate Loans bear interest at a rate equal to the sum of 4.00% (stepping down to 3.50% on and following October 1, 2023) and the higher of (a) SOFR, as defined in the credit agreement, and (b) 0%. Base Rate Loans bear interest at a rate equal to the sum of 3.00% (stepping down to 2.50% on and following October 1, 2023) and the highest of: (a) 0.50% in excess of the overnight federal funds rate, (b) the prime rate established by the administrative agent from time to time, (c) the one-month SOFR rate (adjusted for maximum reserves) plus 1.00% and (d) 0%. Additionally, we pay a commitment fee on the unfunded 2021 Revolving Credit Facility amount of 0.50% (stepping down to 0.375% on and following October 1, 2023). We must also pay customary letter of credit fees.

The Credit Facilities contain customary covenants including, among other things, limitations on restricted payments including: (i) dividends and distributions from restricted subsidiaries, (ii) requirements of minimum financial ratios, and (iii) limitation on additional borrowings based on certain financial ratios.

For additional discussion on our debt obligations, see Note 8 to the Condensed Consolidated Financial Statements for additional information about our outstanding debt.

### Equity

As of September 30, 2023, we had 406.0 million shares of common stock outstanding. See Note 10 to the Condensed Consolidated Financial Statements for additional information about our equity transactions.

### Critical Accounting Policies and Estimates

Management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires us to use judgment in the application of accounting policies, including making estimates and assumptions. We base estimates on the best information available to us at the time, our historical experience, known trends and events, and various other assumptions that we believe are reasonable under the circumstances. These estimates affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting periods. If our judgment or interpretation of the facts and circumstances relating to various transactions or other matters had been different, it is possible that different accounting would have been applied, resulting in a different presentation of our condensed consolidated financial statements. From time to time, we re-evaluate our estimates and assumptions. In the event estimates

36

Table of Contents

or assumptions prove to be different from actual results, adjustments are made in subsequent periods to reflect more current estimates and assumptions about matters that are inherently uncertain. A summary of our critical accounting policies is included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022 in "Management's Discussion and Analysis of Financial Conditions and Results of Operations - Critical Accounting Policies" and Note 2 to the Condensed Consolidated Financial Statements. There have been no significant changes to our critical accounting policies during 2023.

**Recent Accounting Pronouncements**

There are no new accounting standards that have been issued and we have not adopted that are material to us as of September 30, 2023.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to various market risks, including the potential loss arising from adverse changes in interest rates. We do not use derivative financial instruments in the normal course of business or for speculative or trading purposes.

Our exposures to market risk for changes in interest expense relate primarily to the Credit Facilities. Indebtedness under the Credit Facilities is floating rate debt and is carried at amortized cost. Therefore, fluctuations in interest rates will impact our consolidated financial statements. A rising interest rate environment will increase the amount of interest paid on this debt. A hypothetical 100 basis point change in interest rates would not have a material impact on our interest expense.

We held cash, cash equivalents, restricted cash equivalents, and marketable securities of $574.4 million and $919.6 million as of September 30, 2023 and December 31, 2022, respectively, consisting of bank deposits, certificates of deposits, money market funds, U.S. Treasury notes, and corporate debt securities. Such interest-earning instruments carry a degree of interest rate risk. A hypothetical 100 basis point change in interest rates would not have a material impact on the fair value of our marketable securities. Declines in interest rates over time will reduce our investment income. The goals of our investment policy are liquidity and capital preservation. We do not enter into investments for trading or speculative purposes.

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures.* Our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), with the assistance of other members of management, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Our disclosure controls and procedures are intended to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms and (2) accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Based on this review, although we continue to work to remediate the material weaknesses in internal control over financial reporting as described in our Annual Report on Form 10-K for the year ended December 31, 2022, and progress has been made to date, our CEO and CFO have concluded that the disclosure controls and procedures related to these material weaknesses were not effective as of September 30, 2023.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect every misstatement. An evaluation of effectiveness is subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may decrease over time.

*Changes in Internal Control Over Financial Reporting.* Under applicable SEC rules (Exchange Act Rules 13a-15(d) and 15d-15(d)), management is required to evaluate any change in internal control over financial reporting that occurred during each fiscal quarter that had materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

As explained in greater detail under Part II, Item 9A. "Controls and Procedures" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, we are undertaking a broad range of remedial procedures to address the material weaknesses in our internal control over financial reporting identified as of December 31, 2022. Our efforts to improve our internal controls are ongoing. Therefore, while we determined, with the participation of our CEO and CFO, that there have been no changes in our internal control over financial reporting in the three-month period ended

APP 416

Table of Contents

September 30, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, we continue to monitor the operation of these remedial measures through the date of this report.

Table of Contents

**PART II. OTHER INFORMATION**

**Item 1. Legal Proceedings**

See the "Legal Proceedings" section of Note 9 to the Condensed Consolidated Financial Statements for information regarding legal proceedings, which information is incorporated by reference in this Item 1.

**Item 1A. Risk Factors**

In addition to the information set forth in this Form 10-Q, you should carefully consider the risk factors disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022. There have been no material changes to the risk factors disclosed in the Form 10-K.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

**(a)**

*None.*

**(b)**

*None.*

**(c)**

*None.*

**Item 5. Other Information**

On August 15, 2023, Veeral Desai, the registrant's Chief Strategy and Development Officer, adopted a Rule 10b5-1 plan intended to satisfy the affirmative defense of Commission Rule 10b5-1(c). The trading plan commences November 20, 2023, ends June 7, 2024 and covers 1,307,441 options to purchase common stock of the registrant.

39

**APP 418**

Table of Contents

**Item 6. Exhibits**

| Exhibit Number | Description |
|---|---|
| 31.1 | Certification by Steven J. Sell, agilon's Principal Executive Officer, Pursuant to Securities Exchange Act Rule 13a-14(a).* |
| 31.2 | Certification by Timothy S. Bensley, agilon's Principal Financial Officer, Pursuant to Securities Exchange Act Rule 13a-14(a).* |
| 32.1 | Certification by Steven J. Sell, agilon's Principal Executive Officer, Pursuant to Securities Exchange Act Rule 13a-14(b) and 18 U.S.C. Section 1350.** |
| 32.2 | Certification by Timothy S. Bensley, agilon's Principal Financial Officer, Pursuant to Securities Exchange Act Rule 13a-14(b) and 18 U.S.C. Section 1350.** |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because XBRL tags are embedded within the Inline XBRL document.* |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document.* |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document.* |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document.* |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document.* |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document.* |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document).* |

_____

\*      Filed herewith.
\*\*     Furnished herewith.

40

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: November 2, 2023                                                agilon health, inc.

                                                                     (Registrant)

                                              /s/ TIMOTHY S. BENSLEY
                                              Timothy S. Bensley
                                              *Chief Financial Officer*
                                              *(Principal Financial Officer)*

41

**APP 420**

# EXHIBIT 17

**S&P Global**
Market Intelligence

# agilon health, inc. NYSE:AGL
# Guidance/Update Call
Friday, January 05, 2024 1:00 PM GMT

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

1

APP 422

2

# Table of Contents

Call Participants ................................................................. 3

Presentation ................................................................. 4

Question and Answer ................................................................. 8

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**APP 423**

# Call Participants

### EXECUTIVES

**Matthew Dale Gillmor**
*Vice President of Investor
Relations*

**Steven Jackson Sell**
*President, CEO & Director*

**Timothy S. Bensley**
*Chief Financial Officer*

### ANALYSTS

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research
Division*

**David Michael Larsen**
*BTIG, LLC, Research Division*

**Elizabeth Anderson**

**Gary Paul Taylor**
*TD Cowen, Research Division*

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

**Justin Lake**
*Wolfe Research, LLC*

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research
Division*

**Shailendra Singh**
*The Trust Company Limited*

**Stephen C. Baxter**
*Wells Fargo Securities, LLC,
Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Hi and welcome to agilon health guidance update. I will now hand over to Matthew Gillmor.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Thank you, operator. Good morning, and welcome to the call. With me is our CEO, Steve Sell; and our CFO, Tim Bensley.

Before we begin, I'd like to remind you that our remarks and responses to questions may include forward-looking statements. Actual results may differ materially from those stated or implied by forward-looking statements, due to risks and uncertainties associated with our business. These risks and uncertainties are discussed in our SEC filings. Please note that we assume no obligation to update any forward-looking statements.

Additionally, certain financial measures we will discuss in this call are non-GAAP financial measures. We believe that providing these measures helps investors gain a better and more complete understanding of our financial results, and is consistent with how management views our financial results. A reconciliation of these non-GAAP financial measures to the most comparable GAAP measure is available in the earnings press release and Form 8-K filed with the SEC.

Following prepared remarks from Steve, Tim will join us for a Q&A session. With that, I'll turn things over to Steve.

**Steven Jackson Sell**
*President, CEO & Director*

Thanks, Matt. Good morning, and thank you for joining us on short notice. Our call this morning is intended to provide an update on how 2023 is finishing and our first look at 2024.

As called out in our press release, a significant increase in medical and nonmedical costs during 2023 has had a material impact on our full year results. I will walk you through what has changed since our last update, why our confidence in our business model remains high and how these factors impact our revised guide for '23 and our initial guide for '24.

My comments this morning will follow the presentation found on our Investor Relations website. Before I dive in, let me give you 3 framing thoughts. First, we are clearly living in an elevated utilization environment that is challenging, and we assume that environment will persist through 2024.

Second, our 2023 underperformance was largely driven by 2 issues: a forecast that failed to recognize these elevated cost trends and a data and analytics gap that led to our being late in both recognizing the magnitude and source of the utilization shifts. We can do better on both of these items and in fact, have made significant strides in the last few weeks.

Finally, growth has been a source of differentiation, as we have become the destination for primary care doctors looking to move to value. But one aspect that we failed to appreciate was that material growth in mature markets has brought a significant number of new primary care doctors, and there is a low-hanging fruit opportunity to do a better job in terms of onboarding and educating these newer doctors, so they fully understand and can perform well in our model.

Now as we turn to Slide 3 in the presentation. We are lowering our 2023 guidance for medical margin to a midpoint of $350 million and adjusted EBITDA to a midpoint loss of $62 million. Higher cost trends became visible to us starting in mid-December, as we closed our November results. We recognized at that time that we were seeing cost trends that were 2 to 3x higher what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 425

In the face of this change, we made a proactive decision to both adjust our Q2 and Q3 completion factors and increase our Q4 utilization assumption. We are carrying the higher utilization assumption into our initial 2024 adjusted EBITDA guidance of $40 million to $60 million.

Given the lower baseline and the elevated utilization assumption for 2024, we have made the decision to withdraw our 2026 outlook. While 2023 has not played out as we expected, we continue to drive value for primary care doctors. In fact, this year, we have reinvested over $200 million back into local primary care, which is up $40 million from last year.

It is very clear to us that we have a lot of work to do. We have identified a targeted set of actions we believe will drive performance in 2024. These include boosting our operating efficiency, leveraging our strong payor relationships, addressing our data visibility gaps and expanding support for our new primary care doctors.

On Slide 4, this is a chart that we showed you in November. Let me show you what has changed here in terms of medical margins. The most significant change has been in core medical performance, which is $110 million lower than our previous projections. $90 million is from higher costs, and you can see from the callout box, how that falls across the quarters. These are the elevated costs I just spoke to in terms of specialists, outpatient surgeries and Part B drugs.

$20 million of the core medical change is from negative revenue revisions tied to 2 year 1 payors, which provided updated data to us in December. The other change is an adjustment in terms of net prior year development, which resulted in a $3 million of lower revenue from Part D settlements.

On Slide 5, you can see how utilization has accelerated from 2022 to 2023. When we talk about areas in which our business model is working well, I would point out significant progress in terms of hospital inpatient costs. In fact, the clinical programs for renal, palliative and high risk management that we shared with you on our Investor Day, have driven a net decrease of 2.6% in terms of Inpatient Medical, which is roughly 10% of our total costs. This was not enough to offset a significant step-up in terms of utilization in key areas like specialists, Part B drugs and outpatient surgeries, which are running 2 to 3x higher than last year.

Our new projections assume these trends will persist through 2024. In fact, when we look at outpatient surgeries like hips and knees, we believe we are about 60% of the way through a backlog of pent-up demand from COVID.

On Page 6, you can see that despite the 2023 headwinds, we have made significant progress against our mission to increase value for primary care doctors. On this slide, we show you our Year 2+ partners, which enables you to see our performance on what is essentially a same-store basis across Medicare Advantage and REACH. By taking better care of patients, we have increased our combined medical margins by 19% and generated 22% better economics for our partners despite the difficult year. That yielded a 13% increase in terms of gross profit for agilon on a same-store basis across our Year 2+ partners. While this was below our expectations for 2023, it demonstrates the power and leverage inherent in our model.

At our company, we are constantly looking to adjust our people, processes and technology to changing market dynamics. For 2024, we have identified a clear set of actions to improve performance, balance risk sharing and enhance predictability.

For operating efficiency, you will see that our OpEx leverage has improved from 4% in 2023 to 3% in 2024, due to our ability to leverage both corporate and market investments that drive our efficiency and performance in 2024.

From a payor perspective, our relationships have never been stronger. We have found our payor partners willing to work with us to more economically manage the elevated utilization environment and to adjust for excess supplemental benefit costs. It's important to our payors they have a very successful delivery system, and in particular, a strong primary care delivery system.

And through an alignment of mutual need, our recent conversations have reflected that reality.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 426**

Better data visibility and analytics is a real opportunity for us, and we have executed changes in terms of our internal and external data and actuarial teams and externally created much better alignment with payor partners.

Finally, there is a real opportunity to better onboard and educate new physicians in our existing markets and reduce performance variability.

Turning to Page 8. When we talk about opportunities in our mature markets, this market is a great example. This market has seen 40% growth in primary care doctors and 75% growth in [indiscernible]. In addition to opportunities with payors and a new value-based care partnership, the big opportunity in this market is to focus on the 30% of primary care doctors that have joined post the market implementation. If we do this right, we should be able to move these new 76 PCPs from $34 PMPM of medical margin, up to the $161 PMPM level that our veteran PCP partners are seeing.

On Page 9, we have outlined our revised guidance update for 2023 based on the macro utilization trends that we are projecting through Q4, we are lowering our 2023 medical margin outlook to a midpoint of $350 million, and our adjusted EBITDA outlook to a midpoint of negative $62 million.

Our '23 revised outlook also reflects substantial investments that allowed us to add 270,000 members and 1,200 PCPs on the platform via the classes of '23 and '24.

On Page 10, our 2024 guidance assumes another year of high medical costs, with a 5% medical trend that matches what we have seen in 2023. This year, one key area of step-up will be a combined $150 million of incremental medical margin from those large new 2023 and 2024 classes.

Operating leverage acceleration from technology investments and centralized activities will yield $20 million of incremental improvement.

Page 11 shows you a straightforward medical margin bridge. From a $375 million incurred medical margin starting point, you can see the impact of our Year 2+ classes, with a $228 million revenue, a $141 million offset from a 5% medical cost trend less the impact of our clinical initiatives and $20 million in nonmedical supplemental benefit costs.

Finally, you see the $127 million lift from the class of '24, which is an all-time high level of $176 per member per month.

A few call-outs on the impact of this class. First, it reflects our entry into a very mature managed care and value-based care market of Dallas, Texas. This is important in that it both expands our TAM beyond 100% fee-for-service markets, and it also provides a much higher year 1 starting point for this group.

Second, this class also reflects our addition of 2 health system partners in Dayton, Ohio and Western Michigan that are coming on in existing markets and leveraging existed in infrastructure and contracts, which is also yielding a higher than average year 1 starting point. The output is a midpoint medical margin forecast of $580 million for 2024.

So in conclusion, we have had a challenging year, driven by a forecasting miss in an evolving environment, coupled with our data visibility issues. We are going to manage through these higher utilization levels via our initial 2024 guide and our action plans, but these headwinds have created a delay in our market cohort maturation. But when we look at the power of our business model, there is a clear long-term opportunity built around the following key factors: first, the demand for a new primary care model that rewards patient outcomes has never been higher, and the continuing pain of the fee-for-service system only accelerates that demand.

Second, the agilon platform is driving more value each year to our existing primary care doctors, making the case even stronger for prospective PCPs looking for an alternative.

Third, membership growth continues to accelerate, creating long-term value, with the addition of 270,000 members in the classes of 2023 and 2024.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 427**

And finally, as we talked about in our mature markets, variability in the system is our opportunity. And in fact, it's a central reason the company was created and the value proposition is so compelling that primary care doctors in every kind of medical group in the country are joining our network.

We will now go to questions.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 428**

# Question and Answer

**Operator**

Welcome to the Q&A portion of the call. [Operator Instructions] The first question comes from Justin Lake from Wolfe.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Justin, are you there?? Operator, we can't hear Justin.

**Operator**

I will move to our next question, and then I'll come back to Justin and see if the line is working okay for him then. Give me a few minutes. Okay. Our next question is from Lisa Gill from JP Morgan. If you could unmute your line and ask your questions.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Operator, do the participants need instructions that to unmute their line, is there a button they need to hit? .

**Operator**

No, they should be able to speak. Do you see if you could ask your question, Lisa?

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

I'm on the line. Can you hear me?

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

There you go. [indiscernible]

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

All right. Figured out something correct today. First off, thank you for doing this instead of next week. So I appreciate that for my end.

Just really want to understand something a little bit better. And you talk about the visibility going into 2024 and addressing data visibility. Just given the number of revisions in 2023, what are some of the differences of the level of visibility you now have going into 2024? And I appreciate your comments around elevated utilization trends, we have been seeing that. But really, it's more on the visibility side and the data that you're getting, for example, from the payors, et cetera, like how do we get more comfort that you do have that level of visibility going into '24?

**Steven Jackson Sell**
*President, CEO & Director*

Yes. Thanks for the question, Lisa. I mean I think when we look at this year, we've got this macro utilization that's up, but from our perspective, it's a forecasting issue and then there's visibility on a data lag.

To your question about what's changed is we've really worked intensively with our payor partners to be getting claims data information in faster. And so we've got payors that a year ago would have been a 2-

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APP 429

month lag that are moving to a 1-month lag, we're getting it earlier in a monthly cycle. So those things are very powerful for us.

We also have really, as I said in my prepared remarks, kind of overhauled our data and actuarial teams, both in terms of internal and external resources leases. So we've got a lot of external data points from a few firms that we're laying in with the payors. And then Tim and I and our data team are spending a lot more time with the leadership and the plans talking about exactly what we're seeing and what that means for us. And so I think it's a combination of those things that has given us better visibility, that's led us to the actions that we've taken in terms of revising the guidance and increasing the trend assumption for '23 and then the projection out to '24, basically maintaining it at these higher levels.

So more wood to chop on that. I mean this is a key area for us. But I think the combination of how we're forecasting to incorporate that and these other data points as well as the work to improve it is a key part of that.

**Lisa Christine Gill**
*JPMorgan Chase & Co, Research Division*

Steve, just as a follow-up to that. Like if I think about the comments that you made around physician interest in agilon and these types of platforms, is the reduction in your guidance, is that hurting you in any way in attracting or retaining physicians? Because my guess would be right that the payment to them, the maturation time line is longer. So is that having any impact when we think about the outer years of attracting new physicians?

**Steven Jackson Sell**
*President, CEO & Director*

So Lisa, I mean, I think there's great alignment between our physician partners and us. Both of us are very motivated in terms of driving improvements in medical margin by delivering great patient care. What we tried to show you in the presentation was that even in a difficult 2023 year, we showed a 22% increase in terms of the physician economics and a 13% increase in our agilon gross profit.

So we're making progress year-over-year. It's not at the level that we had initially projected. And then I'll just say what I ended with my comments with the alternative in fee-for-service is just so difficult for these docs, that I think the fact that we continue to show improvement, there's alignment around how can we get better. For example, this onboarding of PCPs in these existing markets so we can really narrow that gap relative to their veteran partners, we have the benefits of that learning when we [indiscernible] their markets. I think there are all things that we can do to address that.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Lisa, this is Matt. One thing I might add to this answer is the value prop that we offer physicians is really, really compelling and the magnitude is really impressive. So we're obviously disappointed that we're not achieving our expectations this year, but the value prop is still highly differentiated and very sizable. So just to throw that out.

**Timothy S. Bensley**
*Chief Financial Officer*

And Lisa, maybe just to [indiscernible] Steve talked about the 22% increase for that all of our partners have been here since '22 or before in terms of what is being pushed back to them for what they're being reinvested, that number is over $200 million now. So it's a very large number as well that we're essentially sharing back to the partners of reinvesting in our PCP groups.

**Operator**

The next question, we'll go back to Justin Lake, if you could ask your question as we see if we can hear you then.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 430**

**Justin Lake**
*Wolfe Research, LLC*

Just working now.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

We got you, Justin.

**Justin Lake**
*Wolfe Research, LLC*

All right. Thanks for the question and bearing with me. The -- so just to follow up a little bit on Lisa's question around the docs. I'd like to go backwards. And when you look at your doc groups now, some of the -- obviously, the year 1 docs are a much lower margin, but are there any doctors that aren't seeing profitability that are out beyond year 1? Are there any kind of one-offs, two-off? Are there any that just aren't making it through the process of kind of ramping?

**Steven Jackson Sell**
*President, CEO & Director*

So we do have markets that are off of our projecting, Justin, in terms of these mature markets that are below sort of the levels that we obviously forecasted that. In terms of year 2+ markets that are running negative relative to where we're at today.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, Justin, you are asking about are there individual doctors in those year 2+ markets that aren't getting any -- that aren't generating any profitability?

**Justin Lake**
*Wolfe Research, LLC*

Yes. Start there, just like, I guess, individual docs deals a little bit could be pretty variable. I was actually asking more about individual markets. Are there individual markets that are losing money overall? Is there anybody that you're actually having to take a loss on?

**Steven Jackson Sell**
*President, CEO & Director*

So yes, at the market level, we do have some groups with our revised utilization assumption that would run at a loss for 2023. So that they're off the trajectory that we would be laying out for those. So that only one market.

**Timothy S. Bensley**
*Chief Financial Officer*

We had one market that gets below breakeven market EBITDA in 2023 with these revised -- with these revisions.

**Justin Lake**
*Wolfe Research, LLC*

Got it. And what happens there? Do the docs start -- do you start thinking about saying it's just not going to work in this market or what has been some of the issues in that market specifically?

**Steven Jackson Sell**
*President, CEO & Director*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 431**

So in that market specifically, I mean, it's in some of the categories we're seeing nationally, but they're more exaggerated. So supplemental benefits has been an issue, in which there was a material change in that. And we saw the impact of that nationally, we ran $24 million over our expected budget for the year and supplemental benefits. But proportionally, this market was higher around that.

We've seen some of these outpatient surgeries running heavier than what we expected and the cost of those surgeries. So this opportunity for alternative sites of care for that surgery delivery is another opportunity which is there.

In terms of the things to do around that, Justin, I talked about the work we're doing with payor partners, and that's one of the markets where we're pretty actively engaged around the economics and the magnitude of the change from 1 year to another. And the ability to sort of have an economic arrangement that works for the payors and works for us so we can have kind of a sustainable delivery.

And as I said, I think there's pretty good alignment around that. Primary care doctors and health plans have this mutual interest and the health plans need a really strong primary care delivery system. So that -- those are the things that we're working on.

**Justin Lake**
*Wolfe Research, LLC*

Okay. And then I apologize if I missed it, but did you give a cash flow number associated with the 2024 guidance?

**Timothy S. Bensley**
*Chief Financial Officer*

We did not. But at this point, what we're saying is due to the much lower 2023 guidance that we just put out, our projection of getting to positive cash flow in 2024 is going to be pushed out to 2025.

**Justin Lake**
*Wolfe Research, LLC*

Okay. So the -- how much revision is there in '23? And how much do you burn in '24? What's the updated '23 cash flow number now? And what's the '24 cash flow number?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So right now, we would expect to end 2023 with over $500 million of cash on hand -- unrestricted cash on hand. That's about $150 million cash burn year-over-year from '22, and that number will be approximately cut in half in 2024 and then bring it to -- the burn cut in half '24. I'm sorry, not the cash but the burn from $150 million [indiscernible].

**Justin Lake**
*Wolfe Research, LLC*

[indiscernible]

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And then 2025, we would expect that to then turn back to positive cash generation.

**Operator**

Next question comes from Shailendra Singh from Truist.

**Shailendra Singh**
*The Trust Company Limited*

Can you guys hear me?

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 432**

**Steven Jackson Sell**
*President, CEO & Director*

We can hear you.

**Shailendra Singh**
*The Trust Company Limited*

Okay. Yes. Okay. So my first question, the medical margin guidance reduction of $105 to $110 million in '23, can you provide more color around like how much of that have you already experienced or observed, and how much is your estimate? What I'm trying to understand is, and I know this is not a traditional approach, but are you building any cushion in your '24 guidance for any negative PYD?

**Steven Jackson Sell**
*President, CEO & Director*

So thanks for the question, Shailendra. I mean I think we laid out proportionally where this extra $110 million sort of breaks out across that -- $90 million of cost breaks out across the quarters, $18 million in Q2, $31 million in Q3 and $41 million in Q4. And so you can see sort of the progression across time and what our expectation is as we go into Q4. We are at a, like I said, a 5% overall utilization expectation, and we think that's prudent. But the goal here is to really set a strong foundation to step off from '23 as we go into '24, and to make sure that we have really appropriate expense assumptions around that.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And Steve, the only thing I would add is, and Steve talked about this business in prepared comments but the changes that we have made to -- particularly as we closed November now as we're approaching December to work with payors to get better data, to get some accelerated additional information about what we think has happened to utilization.

Obviously, it was a big part of what led to this adjustment to our medical margin and medical expense outlook. But what that also does is just gives us greater confidence as we're closing out the year [indiscernible], we're closing the reserves that are now appropriate, and we're not building in or anticipating prior year development continuing into 2024 as it did in 2023.

**Shailendra Singh**
*The Trust Company Limited*

Just a quick clarification there. Steve, so how much complete data do you have? Is it through August or September?

**Timothy S. Bensley**
*Chief Financial Officer*

What our completion rates are?

**Shailendra Singh**
*The Trust Company Limited*

Yes.

**Steven Jackson Sell**
*President, CEO & Director*

[indiscernible]

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. So at this point, we would be highly -- it takes a while to get to 100% complete, obviously, in any quarter, but we are highly complete for Q2. I don't want to put a specific average depletion factor for

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 433**

Q3, but obviously less. And then for Q4, I'd say we have very good visibility in October, now some better visibility into November than we would have had because of some of the accelerated information we have from payors. And then December obviously is still largely incomplete.

**Shailendra Singh**
*The Trust Company Limited*

Okay. And then my follow-up was around like your decision to withdraw your long-term outlook. I understand, recent trends are creating uncertainty. But are you assuming these trends are more permanent in nature than temporary? And it clearly looks like your margin ramp assumption you've shared in the past to getting to like 200-plus PMPM no longer a good reference point. I'm just trying to understand your confidence in the long-term earnings power. I know in the first couple of questions, we spent time on the long-term thesis around kind of attracting provider growth. But earnings power, like how should investor growth or us get comfortable around that on the viability of this business model from a long-term earnings power point of view.

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think that the thesis remains intact. I mean what I said is I think this is a timing issue, and our cohort maturation is off. The decision to pull the '26 guide is really based on this utilization being elevated. It's a pretty material change in '23, north of 5%, projecting 5% again in 2024. And given that uncertainty, that was kind of that key driver around that.

And so I think that becomes the key part of us as we look at this maturation. We believe we can drive them up. The question is, will it be at that same slope that we had looked at historically? And that utilization piece is a critical element around that.

**Timothy S. Bensley**
*Chief Financial Officer*

Shailendra, just to go back to the previous question because the other [indiscernible] as a support and not just what we're assuming for completion factors. But what are we assuming for the actual utilization rates that we're building to our overall outlook. And just to reinforce what I think as Steve said earlier, and one of the other things that gives us more confidence, we are actually projecting, as we flow through the year now that Q4 utilization rates will be at the same elevated levels as they were in Q3 and before.

So previously when we gave guidance in Q3, we thought we're seeing moderating those ranges. We're no longer projecting that. So even though we have a lower completion factor in Q4, obviously, from the visibility that we have from real claims coming in. We are projecting is that when those plans are complete that they're going to be at the higher utilization rate than we've seen coming through Q3 now.

**Operator**

Next question comes from Whit Mayo from Leerink.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

Steve, can you maybe spend some time addressing the steps that you're taking to improve the physician variability, what you're doing, how you're holding the team, the physicians accountable for these changes. And given the rapid physician growth that you've had in some of your legacy markets, do you feel at some point that some of these physicians may not be an appropriate fit within your model?

**Steven Jackson Sell**
*President, CEO & Director*

Thanks for the question, Whit. So I think there's a real opportunity for us, agilon, to do a better job in terms of onboarding and educating our physician partners. We've done an extremely good job in our new markets, new partners. I just talked about adding 1,200 PCPs in the class of '23 and '24.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 434**

But we are also growing significantly in our existing markets as other docs want to join in. But we've -- the example I gave in this one market and the presentation was 30% of those docs have not had that onboarding and orientation. So we're taking the same team, the physicians who've been working with new folks, to go back and literally go through kind of the basics of the agilon partnership, what are the key things they need to be doing around access and quality and cost management, how they leverage the care teams that are around them and the resources that are there.

And so when I showed you this example in here and the opportunity of improvement, $161 PMPM for those veteran PCPs, $34 for the newer PCPs. That's a real opportunity for us to improve as we move those new PCPs up and they understand sort of what are the key things that can drive success in the model for themselves and for us. And so we work with our partners always and they are the ones who are really sort of clear eyed about who fits within this model. And so we operate at 50-50 within a partnership. So they're the ones that are only making those calls, and they've done a pretty good job on that. So I think this is more an issue of this gap, there's enough opportunity for us to do onboarding here and work and educate these newer PCPs.

**Benjamin Whitman Mayo**
*Leerink Partners LLC, Research Division*

Okay. And maybe just one other question. I've had a few emails here. People trying to understand the new markets, Dallas, Dayton, Western Michigan. What specifically makes these groups come in at a higher starting point? I mean I know you said that they were mature, you cited some infrastructure. But maybe just unpack that comment a little bit to give us the confidence on the medical margin for next year or this year.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So this class comes in at $76 PMPM by far, the best that we've seen to date, and it's obviously a very large class. I mean I think the significance is where these markets are at, in terms of sort of value-based care infrastructure and maturation. And in Dallas, this is a market that has seen a lot of progression. And our partner Catalyst, really outstanding group, has got a tremendous amount of experience around this. And so they come into a market with some existing infrastructure. They're a scale player, and then our partnership together should really sort of turbocharge that. So that's -- it's sort of the market and where that is at and our partner and kind of what they've done historically.

In these markets in Western Michigan and Dayton, Ohio, we're the one that's there. We're the one that changed the market. We have existing partners that are there. Two health systems are joining one in each one of these markets, but they take advantage of existing contracts, existing infrastructure, existing teams that are there, and they've got a very full and robust implementation we've talked about class of '24 having a very full longer period than any class we've had historically.

And so I think with the combination of those things, those markets will start higher than an average year 1 starting point, and they're all large groups. So that's really the combination of those things is what drives that.

**Operator**

The next caller is Stephen Baxter from Wells Fargo.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

A couple of questions for you guys. So wanted to ask on the 2023 cohort assumptions and the guidance for 2024. It seems like you're not really expecting a whole lot of improvement there on a PMPM basis, usually that would be a pretty big step up in the second year. So just trying to understand is that totally offset by the higher trend? And I guess just broadly, where should we look at the 2023 cohort contribution expecting to come in for 2023? And then a couple of follow-ups.

**Steven Jackson Sell**

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 435**

*President, CEO & Director*

So Stephen, we've called out in the medical margin bridge sort of the year 2+ step-up that you would see from '23 to '24. Obviously, strong revenue year-over-year, offset by the higher cost trend in the supplemental benefits. So that will be an important part of the step up. But within that, sits this class of '23 that takes a very meaningful step up year-over-year. And so the class of '23, taking that step from year 1 to year 2 is a very meaningful part of that. And then obviously, this class of '24 coming in.

The class of '23 adds 130,000 members and $23 million of that incremental medical margin that we show you in the bridge for those year 2+ markets.

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Stephen, Steve gave the PMPM for the class of 2024. Tim is going to provide the PMPM for the class of 2023 in just a second. So we'll give it to you.

**Stephen C. Baxter**
*Wells Fargo Securities, LLC, Research Division*

Okay. Got it. Yes, I was thinking it was like 15 PMPM. And I think historically when you think about the curves, it felt like there was something steeper than that typically factored in. But it sounds like one of the higher trend is part of the answer there.

So just the other couple of questions I had. Anything different about ACO REACH contribution either in 2023 or in 2024 that you wanted to flag? And then just last question would be, I assume the answer is probably not. But can you talk about whether the financial results you're seeing this year compel you to think about growth in any different way? Is there any thought to growing more slowly or maybe approaching market selection differently to hone in on more markets that potentially look like Dallas contribute early on with those partners are expected to?

And then I guess, just finally, what's the messaging going to be to the physician groups about the challenges you've seen this year? And do you think this is going to create any challenges as you look forward to adding future classes, some of the performance in 2023?

**Steven Jackson Sell**
*President, CEO & Director*

There's a lot of those questions. So first question, the ACO REACH contribution this year will be in line with what we expected, I think coming in at $39 million. Next year, roughly in line with that. So that -- that's point one.

New markets that we're looking at, I mean, we're working the class of '25, the class of '26. I think this opportunity to grow in existing states and existing infrastructure is one that continues to be a part of that, Stephen, because it's not just Dallas, but in Dayton and Western Michigan, you're getting that benefit of a new partner coming in with the existing geography. So that's the key part of it and making sure you get the right partner around it.

And then...

**Timothy S. Bensley**
*Chief Financial Officer*

Did you want to sort of [indiscernible]?

**Steven Jackson Sell**
*President, CEO & Director*

Well, let me do the messaging one, and then we'll come back. And then the messaging to our partners is our business is strong, we're aligned around driving medical margin across time. We showed you in here, even in a very difficult year, the progression that our year 2+ markets are seeing across their entire

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 436**

panel. And so the message is we're aligned to really go drive it. What are the areas that are driving the differences and how can we better work around that.

We're taking agilon this responsibility on really working this onboarding and education with the PCPs that are newer, and there's a better opportunity to drive performance there.

And then we're working extensively with payor partners, what's the site of service for hips and knees. And so we're doing it in partnership with them. I think they are very aligned and feeling good about where we're at. But we talked with them regularly about that, and I've got a great advisory board that gives us feedback around.

Tim, you want to add?

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. And Steve, I think your math was right, but just to quantify it in terms of PMPM that class of '23 over the year, we're going to run about $39 PMPM this year, which is just a little bit below what our original expectations were, and that should get us to about $54 next year, $54 is the assumption that we have in our bill for next year, about a $15 increase PMPM year-over-year across those 130,000 members.

**Operator**

Our next question comes from Gary Taylor from Cohen.

**Gary Paul Taylor**
*TD Cowen, Research Division*

Just had a few additional at this point. I guess, one, maybe just a little request. But I know at the last Investor Day, we had that cohort update, I think, for multiple classes. And I guess I'll just register a hope or a request that we could see that again, either at year-end or maybe at next Investor Day just to understand it could just trying to model all the cohort development would be easier with the update. So I'll just register that. I appreciate the '23 information just shared.

I wanted to make sure I understood. You're talking about is the difference between the 7.6% trend you're showing on Slide 8 for '23 and the 5% you're talking about carrying to '24, the 5% is just year 2 trend and the 7.6% is the overall company trend. Is that right?

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

Gary, the 7.6% was a specific mature market.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. The 5% is across our entire network. This was an example of mature markets, and we've got a lot of new docs that we can go educate. But we showed you, this market ran an even higher trend than our network average and what the things that were driving that was the PCP variability issue that we talked about, but also outpatient surgery running at higher trends than what we saw across our network and then supplemental benefit costs. So it was a market example, but the right number is, is that 5% trend across the network.

**Gary Paul Taylor**
*TD Cowen, Research Division*

Okay. Got you. Yes, I see the subtitle there now. My other question would be, unless I missed it, what about ACO REACH. Is there -- is all of this cost issue that you're describing today really in the MA book and ACO REACH is still performing better as it had through the first 3 quarters? Or is there anything significant to say there?

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 437**

**Timothy S. Bensley**
*Chief Financial Officer*

Yes, Gary. The -- our expectation for ACO REACH as we closed out the year is just right in line with what we said at the end of Q3. I would say we are seeing some additional cost pick up in ACO REACH as well. The only thing I would say is it's not going to be as dramatic a pickup versus a less expectation [indiscernible] we just have really more complete, more current information from CMS. So we're able to stay up with it pretty well.

The other thing is even as we're seeing some increased costs, there's also increased costs overall in the reference population that will make the [indiscernible] less punitive than we would have assumed. So some incremental cost, somewhat offset by some lower or less punitive [indiscernible] trend adjustment, and we believe ACO REACH will be pretty much in line with what we said at the end of Q3.

**Gary Paul Taylor**
*TD Cowen, Research Division*

And then just one more for me, I appreciate it. I know you -- I mean, so much of -- I mean, the majority of the medical margin improvement you're expecting in '24 is coming from this class of '24, I think 2 other analysts have sort of tried to delve into more detail on that. I guess mine would just be, is it -- I mean really does this -- how much of this comes down to that there's particular reasons why this group of physicians and patients are going to be at a more advanced coding level than you might initially see in initial class? Is that a big part of this initial -- this year 1 per member per month expectation?

**Steven Jackson Sell**
*President, CEO & Director*

Well, I think it's -- the 3 partners I talked about that are coming on in markets where we have more advanced infrastructure and they get to take advantage of that. In the case of Dallas, they've actually got a great track record around that. The revenue that you come on with is a component of that, Gary, but also just knowledge and savviness around managing the cost of care side.

So it is both of those things, but it's really a function of you're in a market in which you got a lot of infrastructure, you've got a partner who's pretty savvy on that. And then the last thing, as I said earlier, is we've had a full 12-month implementation that gives us a lot of visibility and comfort around that.

**Operator**

The next question comes from Elizabeth Anderson.

**Elizabeth Anderson**

I have a question on a couple of sort of cleanup things. With the $20 million negative revenue revision from those 2 plans, can you talk a little bit more about that? And is that something that just along with your sort of data and visibility improvements you don't expect to happen again? Or just sort of help us think about that.

And then if we think about the new geography cost being up for $2 million to $4 million for 2023 versus your prior expectations, is that what you're talking about in terms of like additional onboarding for physicians going forward? But more color on both of those will be helpful.

**Timothy S. Bensley**
*Chief Financial Officer*

Yes. On the first question, it really was to data update issues for 2 new regional payors in 2 of our new markets. So we've worked with a few payors on that. We understand what the -- what the change was and why it was, so that should not be a recurring issue on that $20 million revenue revision. I think we understand what was causing it, and we work with those payors to make sure that doesn't repeat.

On the second part of the question was your...

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

APP 438

**Steven Jackson Sell**
*President, CEO & Director*

So the higher new GO costs, Elizabeth, is really a result of a larger class of '24 and the onboarding to use your ward expenses that occur in that year 0 of implementation, incentives around any wellness visits. The things that you want to do to get patients in, so you have an appropriate baseline. And as you move to January 1, then you're in a good position to really manage that population. So that's really the driver.

**Operator**

Next question comes from Jack Slevin. Please ask your question.

**Jack Garner Slevin**
*Jefferies LLC, Research Division*

Two more for you, a lot of the ones that I wanted to touch on have already been asked. One, just on the revenue PMPM side for year 2+, trying to get an understanding of the shift in language there. Using the bridge on Slide 11, I'm computing something like a 5% step-up in rev PMPM for year 2+ versus, I think the last commentary you had said 1% to 2% positive for '24. Just trying to understand the gap there and get the commentary on some variability in PCPs and some new PCPs in existing markets, but struggling a little bit to understand why that wouldn't have been known. So any color there would be helpful.

And then the second piece, a little surprised it hasn't been touched on yet. But first, Tim, best wishes and good luck in retirement. And just sort of curious to hear high-level thoughts on what you might be looking for in the profile of the new CFO.

**Steven Jackson Sell**
*President, CEO & Director*

Sure. So the question on the revenue assumptions for the year 2+ markets, I think what we said was it'd be at least 2%, and we're obviously doing better than that.

Jack, one of the big things we invested in, in '23 that's really working very well for us across all of our markets is a centralized physician medical record review process that gets better information to all of our docs across the markets for the visits, with the patients, and they have the ability to acknowledge and understand the conditions of the disease burden that various patients might have.

And so new programs set up for us working very well, you understand how [ RAF ] works. I mean the work that gets done in '23 drives what happens in '24. We have shared that we had like 6x the level of chart reviews in '23 that we did in '22. That's tied around some of these centralized, standardized resources, and so we're getting some real economies of scale and efficiency, but we're getting some real performance out of that. So that's the piece around that.

I mean, we did put out the announcement on Tim and I just -- I want to thank him for everything he's done. He's not leaving. I mean, he's here for the next 9 months, and we're working through a search right now. But he's been really impactful, helped to build and scale our finance function and take our company public. So huge thanks to him.

In terms of a new CFO, I think you need to really understand this business. This is a risk business. It's complex. Understanding health plans, understanding risk contracting, understanding reserving are all key elements of that understanding physicians and how you work with different physician entities, I think, is really important. But those are the things that we've talked about as we look at this, and we expect to have a good search.

**Operator**

Our final question comes from David Larsen from BTG.

**David Michael Larsen**
*BTIG, LLC, Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**APP 439**

Can you talk a little bit about the utilization you're seeing with the specialists and the part B drugs. Are those -- is that oncology services? Or is it obesity and diabetes management? Any detail there would be very helpful.

And then also, like, do you enter into new markets where agilon is bearing 100% risk. So if you're an oncology specialist your cash is based on cost plus initially at least. So like can you maybe talk about the incentives that are in place, especially in the early years for the specialists to use lower-cost Part B drugs. So thanks very much, appreciate it.

**Steven Jackson Sell**
*President, CEO & Director*

Yes. So David, thanks. So taking the -- yes about Part B drug and the [indiscernible]. So in our markets, Part B drug, 40%, 50%, 60%, sometimes even more percent of that spend is oncology, and it is oncology infusions. And so there's a site of care opportunity that you've got that can reduce that cost. The changes in the 340b rates that occurred back at the beginning of last year, definitely have an impact and show up in that Part B drug spend. We talk about sort of the collaboration, the relationship we have with our payer partners. This is one that we're kind of working together on this, because it's a really meaningful change across the system in terms of those costs and kind of united, we have the opportunity to potentially move some of those sites of service.

In terms of specialist costs, the specialist costs are kind of associated with the activities we talk about. So ortho specialist costs tied to hips, knees, et cetera, is definitely an area of opportunity for us. I think site of service is a big one. We talked about that market examples that we gave you, the tour market that's grown a lot. There, we've entered into a value-based care partnership with a partner to take some risk around that and to help us guide to lower cost settings, and that's the benefit that we have with our primary care doctors is we can really guide referrals to those specialists.

So those are examples of the types of things that we're working on. The incentive is we've got the total cost of care. We've got partners that are oriented to working through that, and we are trying to guide for the most cost-effective specialists. Many of our groups have specialists within them. And so they're incented and aligned with us in terms of managing that. And so that's how [indiscernible].

**Matthew Dale Gillmor**
*Vice President of Investor Relations*

All right, operator, are there any further questions?

**Operator**

We have no further questions, I would like to pass back to Mr. Sell for final remarks.

**Steven Jackson Sell**
*President, CEO & Director*

All right. Thank you all for joining us. I just want to close by saying it's been a challenging 2023, but I think we see really a great long-term opportunity in our business and the thesis remains intact. And I think you can see it in terms of the physicians that are joining us, what we're doing for them and just this opportunity around variability over the long haul.
So thanks, everyone. Talk soon.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**APP 440**

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.

# EXHIBIT 18

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): January 5, 2024**

---

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

---

| | | |
|---|---|---|
| **Delaware** | **001-40332** | **37-1915147** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **6210 E Hwy 290, Suite 450** | |
| **Austin, TX** | **78723** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**APP 443**

**Item 2.02 Results of Operations and Financial Condition.**

On January 5, 2024, agilon health, inc. ("agilon health") issued a press release updating its full year 2023 guidance, providing its initial outlook for 2024 and withdrawing its 2026 outlook. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

**Item 7.01 Regulation FD Disclosure.**

agilon health will host a conference call on Friday, January 5, 2024 at 8:00 AM Eastern Time with management remarks and a question and answer session. The conference call can be accessed by dialing (800) 590-8290 for U.S. participants and +1 (240) 690-8800 for international participants and referencing participant code AGL2024. A simultaneous webcast may be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call. A copy of the investor presentation that will be used during the conference call is furnished herewith as Exhibit 99.2 and is incorporated by reference herein.

The information set forth in Items 2.02 and 7.01 of this Current Report on Form 8-K and the related information in Exhibit 99.1 and Exhibit 99.2 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated January 5, 2024. |
| 99.2 | Investor Presentation dated January 5, 2024. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 444**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

| Date: | January 5, 2024 | | By: | /s/ TIMOTHY S. BENSLEY |
|---|---|---|---|---|
| | | | | Timothy S. Bensley |
| | | | | Chief Financial Officer |

**APP 445**

**agilon health**

**Exhibit 99.1**

## agilon health Provides 2023 Guidance Update, Initial 2024 View

*Revised 2023 expectations and early outlook for 2024 reflect higher medical
and non-medical costs*

*Company is taking targeted actions to improve visibility, balance risk-sharing, and improve predictability of results in 2024 and over the long term*

*agilon health to host conference call at 8:00 AM Eastern Time today*

**AUSTIN, T.X., January 5, 2024** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced revised guidance expectations for 2023, reflecting higher-than-expected costs, and provided an initial outlook for 2024.

During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions. While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

"Higher-than-expected costs became visible to us in mid-December during the November close process given updated data from health plans and will impact our FY2023 medical margins. As a result, while Medicare Advantage membership growth and ACO REACH performance are in line with prior guidance, we are lowering Medicare Advantage medical margin guidance for 2023," said Steve Sell, chief executive officer, agilon health.

agilon's revised 2023 medical margin expectation is $340 million to $360 million, approximately $110 million below the previous guidance range. The reduction in core medical performance is due to $90 million in higher-than-expected medical costs, as well as $20 million of negative revenue revision with two regional health plans in new geographies.

Sell continued, "We have implemented a number of initiatives which we believe will enhance operating performance and improve the predictability of financial results in 2024 and beyond including accelerating operating efficiency, refining payor partnerships, improving data visibility and analytics, and expanding onboarding support for newer PCPs in mature markets. Taken together we believe these changes support Adjusted EBITDA growth in 2024 and beyond."

Given the lower-than-expected baseline now projected for 2023, agilon is withdrawing its previously issued target for 2026.

**agilon health**

**APP 446**

**Revised Outlook for Fiscal Year 2023 ($M)[1]:**

| | Year Ended December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Updated Guidance[1] | | Previous Guidance | |
| | Low | High | Low | High |
| Medicare Advantage (MA) Members[2] | 386,000 | 387,000 | 384,000 | 386,000 |
| Total Revenues | $4,295 | $4,305 | $4,310 | $4,320 |
| Medical Margin | $340 | $360 | $455 | $470 |
| Adjusted EBITDA[3] | ($69) | ($55) | $6 | $18 |
| Geography Entry Costs[4] | $71 | $71 | $69 | $67 |

1. Guidance for the fiscal year 2023 excludes MDX Hawaii.
2. Membership reflects management's outlook for end of period.
3. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $39 million for 2023.
4. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and we have not provided forward-looking guidance for net income (loss) because such reconciliation is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Initial Outlook for 2024 ($M):**

| | Year Ended December 31, 2024 | |
| --- | --- | --- |
| | Low | High |
| Medicare Advantage (MA) Members[1] | 548,000 | 553,000 |
| Total Revenues | $6,350 | $6,420 |
| Medical Margin | $560 | $600 |
| Adjusted EBITDA[2] | $40 | $60 |
| Geography Entry Costs[3] | $70 | $70 |

1. Membership reflects management's outlook for end of period.
2. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $39 million for 2024.
3. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and we have not provided forward-looking guidance for net income (loss) because such reconciliation is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss the company's updated guidance for 2023 and initial 2024 outlook on Friday, January 5, 2024 at 8:00 AM Eastern Time. The conference call can be accessed by dialing (800) 590-8290 for U.S. participants and +1 (240) 690-8800 for international participants and referencing participant code AGL2024. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups and health systems transition to a value-based Total Care Model for their senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,400+ primary care physicians that allows its physician partners to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is a trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on Instagram, LinkedIn, X and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our management's intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding our ability to enhance operating performance and improve the predictability of our financial results, including our ability to accelerate operating efficiency, refine payor strategies, enhance data intake and analysis capabilities, and expand onboarding support for newer PCPs, particularly in early market classes, expected revenue, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs, patients, market class and other financial projections and assumptions and the realization of expected benefits of the sale of our Hawaii operations. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses; our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies and physician partners and health plan payors; our ability to execute upon our growth initiatives and operating strategies, achieve required

**APP 448**

operational scale and achieve results consistent with our historical performance; our expectation that our expenses will increase in the future; medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors and to ensure such contracts are on financial terms sufficient to meet our financial targets; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; our ability to obtain additional capital; significant reductions in our membership; challenges for our physician partners in the transition to our "Total Care Model"; inaccuracies in our estimates and assumptions due to unknown factors at the time such estimates or assumptions were developed; the impacts of COVID-19 or other future pandemics or epidemics; restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities within certain geographies in the future or may subject us to investigations or litigation; our ability to retain our management team and key employees or attract qualified personnel in the future; our ability to realize the full value of our intangible assets; any impairment charges we may record; security breaches, loss of data and other disruptions to our data platforms; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; our subsidiaries' lack of performance or ability to fund their operations; our dependence on a limited number of key health plan payors; our ability to renew contracts with our payors; our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment; our dependence on physician partners and other providers; difficulties in obtaining accurate and complete diagnosis data; our reliance on third-party software and data to operate our business and provide services to our members and physician partners; consolidation in our industry; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs; uncertain or adverse economic conditions, including a downturn or decrease in government expenditures; our ability to compete in our industry; the impact of government performance standards and benchmarks on our compensation and reputation; statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; federal or state investigations, audits and enforcement actions; regulatory inquiries and corrective action plans imposed by our health plan payors; repayment obligations arising out of payor audits; actions by Centers for Medicare & Medicaid Services' to modify the methodology to determine revenue; negative publicity regarding the managed healthcare industry; our and our physician partners' ability to comply with federal, state, and local laws and regulations and any penalties or sanctions resulting from failure to comply with such laws and regulations; our ability to comply with HIPAA and state patient confidentiality laws; our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors; we may face litigation not covered by insurance; our indebtedness and the potential that we may incur additional substantial indebtedness; our dependence on our subsidiaries for cash to fund all of our operations and expenses; our governance structure and ability to comply with corporate governance requirements; the material weaknesses in our internal control over financial reporting; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, and in our subsequent interim reports on Form 10-Q, all of which can be found at the SEC's website at www.sec.gov. Except as

**APP 449**

required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**NON-GAAP FINANCIAL MEASURES**

This release includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe Medical Margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of Medical Margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures. Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements. Information reconciling guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and information regarding forward-looking guidance for net income (loss) is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation. For these reasons, we are unable to compute the probable significance of the unavailable information, which could have a potentially unpredictable and potentially significant impact on our future GAAP financial results.

**Contacts**

Investor Contact
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

Media Contact
David Tauchen
Senior Director, Communications
media@agilonhealth.com

Source: agilon health

**APP 450**



Guidance Update

January 2024

agilon health

Copyright © 2023 agilon health. Confidential internal document containing proprietary information. Do not distribute.

# Disclaimers and Forward-Looking Statements

**FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION**

Statements in this presentation that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our management's intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities, business strategies, including our action plan and its expected milestones, and strategic growth plans, expected revenue, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs, patients, market class and other financial projections and assumptions and the realization of expected benefits of the sale of our Hawaii operations.  Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses; our ability to achieve or maintain profitability in an environment of increasing expenses; our ability to identify and develop successful new geographies and physician partners and health plan payors; our ability to execute upon our growth initiatives and operating strategies, achieve required operational scale and achieve results consistent with our historical performance; our expectation that our expenses will increase in the future; medical expenses incurred on behalf of members may exceed the amount of medical revenues we receive; our ability to secure contracts with Medicare Advantage payors and to ensure such contracts are on financial terms sufficient to meet our financial targets; our ability to recover startup costs incurred during the initial stages of development of our physician partner relationships and program initiatives; our ability to obtain additional capital; significant reductions in our membership; challenges for our physician partners in the transition to our "Total Care Model"; inaccuracies in our estimates and assumptions due to unknown factors at the time such estimates or assumptions were developed; the impacts of COVID-19 or other future pandemics or epidemics; restrictive or exclusivity clauses in some of our contracts with physician partners that may prohibit us from establishing new risk-bearing entities within certain geographies in the future or may subject us to investigations or litigation; our ability to retain our management team and key employees or attract qualified personnel in the future; our ability to realize the full value of our intangible assets; any impairment charges we may record; security breaches, loss of data and other disruptions to our data platforms; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; our subsidiaries' lack of performance or ability to fund their operations; our dependence on a limited number of key health plan payors; our ability to renew contracts with our payors; our reliance on our health plan payors for membership attribution and assignment, data and reporting accuracy, and claims payment; our dependence on physician partners and other providers; difficulties in obtaining accurate and complete diagnosis data; our reliance on third-party software and data to operate our business and provide services to our members and physician partners; consolidation in our industry; reductions in reimbursement rates or methodology applied to derive reimbursement from, or discontinuation of, federal government healthcare programs; uncertain or adverse economic conditions, including a downturn or decrease in government expenditures; our ability to compete in our industry; the impact of government performance standards and benchmarks on our compensation and reputation; statutory or regulatory changes, administrative rulings, interpretations of policy, and determinations by intermediaries and governmental funding restrictions, and their impact on government funding, program coverage, and reimbursements; regulatory proposals directed at containing or lowering the cost of healthcare and our participation in such proposed models; federal or state investigations, audits and enforcement actions; regulatory inquiries and corrective action plans imposed by our health plan payors; repayment obligations arising out of payor audits; actions by Centers for Medicare & Medicaid Services' to modify the methodology to determine revenue; negative publicity regarding the managed healthcare industry; our and our physician partners' ability to comply with federal, state, and local laws and regulations and any penalties or sanctions resulting from failure to comply with such laws and regulations; our ability to comply with HIPAA and state patient confidentiality laws; our failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors; we may face litigation not covered by insurance; our indebtedness and the potential that we may incur additional substantial indebtedness; our dependence on our subsidiaries for cash to fund all of our operations and expenses; our governance structure and ability to comply with corporate governance requirements; the material weaknesses in our internal control over financial reporting; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, and in our subsequent interim reports on Form 10-Q, all of which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**NON-GAAP FINANCIAL MEASURES**

This presentation includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures. Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements. Information reconciling guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and information regarding forward-looking guidance for net income (loss) is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation. For these reasons, we are unable to compute the probable significance of the unavailable information, which could have a potentially unpredictable and potentially significant impact on our future GAAP financial results.



2

# Key Updates

### Lowering 2023 guidance due to higher costs and increased utilization assumptions

- Updated 2023 guidance for **Medical Margin to $340M-$360M and Adjusted EBITDA to loss of $69M-$55M.**
- Higher costs occurred in Q2-Q4 and became visible in mid-December during the November close process given updated data from health plans.  Guidance assumes utilization continued at elevated levels.
- Reflects a utilization trend ~2-3x vs 2022 in select core medical (Specialist, Part B drugs, OP surgeries) and non-medical (supplemental benefits) categories.

### Withdrawing 2026 outlook, providing initial 2024 Adjusted EBITDA guidance of $40M-$60M

### Increasing value for PCPs and agilon despite macro headwinds

- Reinvested greater than $200M into local primary care partners, an increase of $40M.

### Targeted actions and large new markets to drive performance in 2024+

- Accelerated operating efficiency, leveraging payor relationships, addressing data visibility, and expanded support for newer PCPs in existing markets.

 agilon health

3

# How Medical Margin Differed From Expectations





# Utilization Accelerated Across Key Categories During 2023

2022 Utilization Trend (Episodes/K)
2023 Utilization Trend (Episodes/K)

**Hospital Inpatient** (Medical & Surgical Admits) 24% of Total Costs — 2.2% / 0.1%

**Inpatient Medical** (Medical Admits) 10% of Total Costs — 3.0% / -2.6%

**Specialists** (Non-PCP Professional) 15% of Total Costs — 2.3% / 8.0%

**Part B Drugs** (Professional & Hospital) 10% of Total Costs — 2.2% / 6.7%

**Outpatient Surgeries** (Hospital Outpatient) 8% of Total Costs — 3.7% / 7.3%

Notes: Data based on same-geography trends in both periods; 2023 trend estimate uses payor data through August with IBNR estimate; 2022 trend estimate uses payor data for full year

agilon health

# Despite 2023 Headwinds, Increasing Value for PCPs and agilon



## agilon Year 2+ Partnership Growth
(Medicare Advantage + ACO REACH)

Medicare Advantage
ACO REACH

**Medical Margin (MA + REACH)**
2022: $371M ($291M) +19% → 2023E: $441M ($298M)

**PCP Partner Reinvestment (MA+REACH)**
2022: $170M ($131M) +22% → 2023E: $208M ($135M)

**Gross Profit (MA + REACH)**
2022: $159M ($132M) +13% → 2023E: $179M ($125M)

## Success of Year 2+ Markets Drives Model

- Year 2+ markets at 4+ Stars
- IP medical utilization trend (2.6%)
- >$200M of reinvestment back into local primary care during 2023
- ACO REACH performance is expanding value of platform to PCPs

agilon health

Note: Gross Profit for 2023E includes ~$15M impact from prior year development, net

6

# Actions to Improve Performance, Balance Risk Sharing, and Enhance Predictability

Enhancing processes and systems to address market dynamics and drive accelerated performance in 2024 and beyond

| Action | Timing | Details / Milestones |
|---|---|---|
| **Operating Efficiency** | Executed for 2024 | ▪ Accelerated platform support efficiency, reduce to 3% of revenues in 2024<br>▪ Leveraging corporate and market investments from 2023 |
| **Payor Partnerships** | Executed & In-Process for 2024+ | ▪ Tangible progress on strengthening relationships and outcomes |
| **Data Visibility & Analytics** | Executed & In-Process for 2024+ | ▪ Executed changes to internal and external teams – new actuary and Milliman relationship<br>▪ Created better alignment with payor partners |
| **Physician Onboarding & Continuous Education** | In-Process for 2024-2025+ | ▪ Reducing performance variability, especially for new PCPs in existing markets<br>▪ Accelerating and expanding clinical programs |

 agilon health

7

APP 457





# Guidance Update for 2023

- Lowering 2023 medical margin outlook and assuming higher utilization
- 2023 reflects investments to drive future performance
- Added 270K members and 1,200+ PCPs with class of 2023 and 2024

| 2023 Full Year Guidance | Updated Guidance (as of 1/5/24) | Previous Guidance (as of 11/4/23) |
|---|---|---|
| Medicare Advantage Members, Ending | 386,000-387,000 | 384,000-386,000 |
| Total Revenues ($M) | $4,295-$4,305 | $4,310-$4,320 |
| Medical Margin ($M) | $340-$360 | $455-$470 |
| Adjusted EBITDA ($M) | ($69)-($55) | $6-$18 |
| Geography Entry Costs ($M) | $71 | $69-$67 |

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

 agilon health

9

# Initial Outlook for 2024

- **Key Assumptions for 2024**
  - Year 2+ markets: 5% cost trend assumption matches 2023.
  - Class of 2023 (130K members) adds $23M of incremental medical margin.
  - Class of 2024 (140K members) generates $127M of medical margin ($76 PMPM).
  - Operating leverage creates $20M of incremental improvement

| 2024 Full Year Guidance | Initial Guidance (as of 1/5/24) |
|---|---|
| Medicare Advantage Members, Ending | 548,000-553,000 |
| Total Revenues ($M) | $6,350-$6,420 |
| Medical Margin ($M) | $560-$600 |
| Adjusted EBITDA ($M) | $40-$60 |
| Geography Entry Costs ($M) | ~$70 |

agilon health

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.    10

**APP 460**



# Conclusion

| Near-term Headwinds | Clear Long-term Value Opportunity |
|---|---|

- Forecasting miss driven by:
  - Higher-than-expected medical and non-medical utilization
  - Data visibility issues

- Delay in cohort maturation

- Demand from PCPs is structurally higher

- agilon platform driving more value to PCPs, patients, and payors

- Accelerating membership growth in 2023-2024

- Variability in healthcare delivery system creates opportunity

agilon health

12

**APP 462**

# EXHIBIT 19

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 27, 2024**

---

# agilon health, inc.
**(Exact name of Registrant as Specified in Its Charter)**

---

| | | |
|---|---|---|
| **Delaware** | **001-40332** | **37-1915147** |
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |
| **6210 E Hwy 290, Suite 450** | | |
| **Austin, TX** | | **78723** |
| **(Address of Principal Executive Offices)** | | **(Zip Code)** |

**Registrant's Telephone Number, Including Area Code: 562 256-3800**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AGL | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02 Results of Operations and Financial Condition.**

On February 27, 2024, agilon health, inc. ("agilon" or the "Company"), a Delaware corporation, issued a press release setting forth its financial results for the three and twelve months ended December 31, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated by reference herein.

**Item 7.01 Regulation FD Disclosure.**

On February 27, 2024, the Company issued an investor presentation regarding the Company's financial results for the three and twelve months ended December 31, 2023. A copy of the investor presentation is furnished herewith.

The information set forth in Items 2.02 and 7.01 of this Current Report on Form 8-K and the related information in Exhibits 99.1 and 99.2 attached hereto is being furnished herewith, and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be incorporated by reference in any filing with, the Securities and Exchange Commission under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference therein.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release dated February 27, 2024. |
| 99.2 | Investor Presentation dated February 27, 2024. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**APP 466**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

agilon health, inc.

Date:   February 27, 2024                                                    By:   /s/ TIMOTHY S. BENSLEY

Timothy S. Bensley
Chief Financial Officer

**APP 467**

Exhibit 99.1



**agilon health Reports Fourth Quarter 2023 Results**

*Revenue increased 72% to $1.06 billion in the fourth quarter 2023, Medicare Advantage membership increased 68% to 388,400, and total members on the agilon platform grew to 477,700 as of December 31, 2023*

*2023 performance impacted by acceleration in medical costs due to macro dynamics, revised 2024 guidance assumes continuation of higher medical cost trends*

*Executing targeted action plan with focus on measured growth, Class of 2025 expected to add at least 60,000 Medicare Advantage members across 5 physician groups*

**AUSTIN, T.X., February 27, 2024** – agilon health, inc. (NYSE: AGL), the trusted partner empowering physicians to transform health care in our communities, announced results for the fourth quarter and fiscal year ended December 31, 2023.

"agilon is navigating through a complex transition period for the Medicare Advantage industry and for our company, and we are taking significant actions to help mitigate the impact of this evolving environment and strengthening our reserves," said Steve Sell, chief executive officer. "While near-term dynamics are negatively affecting our financial results, demand for our platform and the fundamental drivers of our business remain strong as we continue to deliver significant value to patients, payors, and our PCP partners. We believe we are well positioned to accelerate performance over the medium and long-term."

**Fourth Quarter and Fiscal Year 2023 Results:**

- Total members on the agilon platform increased to 477,700 as of December 31, 2023, including 388,400 Medicare Advantage members and 89,300 ACO REACH beneficiaries. Medicare Advantage membership increased 68%, with 11% growth in same geographies.

- Total revenue of $1.06 billion in the fourth quarter 2023 increased 72% compared to $615 million in the fourth quarter 2022. For the fiscal year 2023, total revenue of $4.32 billion increased 81% compared to $2.39 billion in 2022.

- Gross profit of negative $95 million in the fourth quarter 2023 compared to $16 million in the fourth quarter 2022. For the fiscal year 2023, gross profit of $70 million compared to $111 million in 2022. Net loss of $230 million in the fourth quarter 2023 compared to a loss of $57 million in the fourth quarter 2022. For the fiscal year 2023, net loss of $263 million compared to a loss of $107 million in 2022.

- Medical margin of negative $102 million during the fourth quarter 2023, compared to $63 million in the fourth quarter 2022. For the fiscal year 2023, Medical Margin of $299 million, compared to $291 million in 2022. Medical Margin during the fourth quarter 2023 was negatively impacted by accelerating medical costs including prior period development from previous quarters.

- Adjusted EBITDA loss of $137 million in the fourth quarter 2023, compared to an Adjusted EBITDA loss of $32 million in the fourth quarter 2022. For the fiscal year 2023, Adjusted EBITDA loss of $95 million, compared to an Adjusted EBITDA loss of $45 million in the fiscal year 2022.

***Key Financial and Operating Metrics ($M):***
*(Fourth Quarter 2023 vs. 2022)*

| | Three Months Ended December 31, | | Change |
| --- | --- | --- | --- |
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members[1] | 388,400 | 230,800 | 68% |
| ACO REACH Members[1,2] | 89,300 | 89,000 | —% |
| Total Members Live on Platform[1,2] | 477,700 | 319,800 | 49% |
| Avg. Medicare Advantage Members | 391,700 | 233,300 | 68% |
| Total revenues | $1,056 | $615 | 72% |
| Gross Profit | ($95) | $16 | NM |
| Medical Margin | ($102) | $63 | NM |
| Net Loss | ($230) | ($57) | NM |
| Adjusted EBITDA[3] | ($137) | ($32) | NM |
| Geography Entry Costs | $26 | $32 | (19%) |

1.  Membership metrics reflect end of period results.
2.  agilon's ACO REACH entities are not included within its consolidated financial results.
3.  agilon's ACO REACH entities contributed $6 million and $8 million to Adjusted EBITDA during the fourth quarter 2023 and fourth quarter 2022, respectively.

***Key Financial and Operating Metrics ($M):***
*(Fiscal Year 2023 vs. 2022)*

| | Twelve Months Ended December 31, | | Change |
| --- | --- | --- | --- |
| | 2023 | 2022 | % YoY |
| Medicare Advantage Members[1] | 388,400 | 230,800 | 68% |
| ACO REACH Members[1,2] | 89,300 | 89,000 | —% |
| Total Members Live on Platform[1,2] | 477,700 | 319,800 | 49% |
| Avg. Medicare Advantage Members | 379,400 | 225,100 | 69% |
| Total revenues | $4,316 | $2,388 | 81% |
| Gross Profit | $70 | $111 | (37%) |
| Medical Margin | $299 | $291 | 3% |
| Net Loss | ($263) | ($107) | NM |
| Adjusted EBITDA[3] | ($95) | ($45) | NM |
| Geography Entry Costs | $75 | $68 | 10% |

1.  Membership metrics reflect end of period results.
2.  agilon's ACO REACH entities are not included within its consolidated financial results.
3.  agilon's ACO REACH entities contributed $39 million and $14 million to Adjusted EBITDA during the fiscal year 2023 and fiscal year 2022, respectively.

**APP 469**

***Medical Margin Performance Details***

For the fiscal year 2023, Medical Margin of $299 million was approximately $51 million below the midpoint of the company's guidance of range of $340 million to $360 million provided on January 5, 2024. The company estimates approximately $38 million of the lower Medical Margin is from costs and revenue attributable to the fourth quarter and $13 million of the lower Medical Margin is attributable to costs and revenue attributable previous periods.

Relative to the company's previous guidance, the lower Medical Margin was primarily driven by two factors. First, as the company completed the financial closing process in February, it received updated data including relatively complete claims data from its largest payors, and additional information such as seasonality factors and census data. The company completed its analysis of this data in mid-February, with support from internal and external actuaries, which indicated medical claims were higher than the company's previous estimate. Second, in light of this new information and the dynamic utilization environment, the company strengthened its reserve position for incurred but not reported medical claims. A range of reserve scenarios were developed and the company has reserved at the high-end of its estimates. The company believes this is a prudent approach given the environment.

***Performance Action Plan***

On January 5, 2024 agilon health announced a targeted action plan to improve performance. This plan includes expanding onboarding support for newer primary care physicians (PCPs) in mature markets, refining payor partnerships, improving data visibility and analytics, and accelerating operating efficiency. Management anticipates these actions will support growth in Adjusted EBITDA in 2024 and beyond.

The company has made solid progress on the targeted action plan. Progress to date includes physician trainings in mature markets with 90% of new physicians in those markets to be trained during the first half of 2024; increased data visibility from most all national and large regional payors as well as targeted changes to our percentage of premium rates in key markets; onboarding of payor data into the company's new financial pipeline with over 55% of membership data expected in the first quarter and over 75% of membership data during the second quarter; and a reduction in platform support to 3% of revenue in 2024.

***Class of 2025 New Partners***

agilon health anticipates the Class of 2025 new partners will include at least 5 physician groups with more than 60,000 new Medicare Advantage (MA) members. Beginning in 2025, the agilon health physician network will expand to at least 36 physician groups and 3,000 primary care physicians.

agilon health now anticipates geographic entry costs will be in the range of $55 million to $65 million, down from the company's previous expectation of ~$70 million. Given the current environment, agilon health is taking a measured approach to growth for the Class of 2025.

***Capital Position and Balance Sheet***

agilon health's balance sheet as of December 31, 2023 included cash, cash equivalents and marketable securities of $495 million and total debt of $39 million. In addition, agilon health has $22 million of cash associated with the company's unconsolidated ACO REACH entities.

**Outlook for Fiscal Year 2024 ($M):**

agilon health's updated guidance assumes that the higher medical cost trend from 2023 will continue in 2024. Revised guidance assumes a medical cost trend of approximately 6.6% in 2024 for Year 2+ markets, which is 250 bps above the company's prior expectation and compares to the 7.0% medical cost trend observed in 2023. Medical cost trend includes the impact of the company's clinical programs and excludes the impact from non-medical costs (e.g., supplemental benefits), which is expected to drive less impact to cost trend in 2024 compared to 2023.

| | Year Ended December 31, 2024 | | | |
|---|---|---|---|---|
| | Updated Guidance[1] | | Previous Guidance | |
| | Low | High | Low | High |
| Medicare Advantage Members[1] | 540,000 | 550,000 | 548,000 | 553,000 |
| ACO REACH Members[1,2] | 120,000 | 125,000 | N/A | N/A |
| Total Members Live on Platform[1] | 660,000 | 675,000 | N/A | N/A |
| Avg. Medicare Advantage Members | 527,000 | 536,000 | N/A | N/A |
| Total Revenues | $6,350 | $6,465 | $6,350 | $6,420 |
| Medical Margin | $400 | $450 | $560 | $600 |
| Adjusted EBITDA[3] | ($60) | ($15) | $40 | $60 |
| Geography Entry Costs[4] | $65 | $55 | $70 | $70 |

1. Membership reflects management's outlook for end of period.
2. agilon's partnered ACO REACH entities are not consolidated within its financial results.
3. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $40 million for fiscal year 2024.
4. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

**Outlook for First Quarter 2024 ($M):**

| | Quarter Ended March 31, 2024 | |
|---|---|---|
| | Low | High |
| Medicare Advantage Members[1] | 520,000 | 530,000 |
| ACO REACH Members[1,2] | 125,000 | 130,000 |
| Total Members Live on Platform[1] | 645,000 | 660,000 |
| Avg. Medicare Advantage Members | 516,000 | 525,000 |
| Total Revenues | $1,605 | $1,630 |
| Medical Margin | $155 | $170 |
| Adjusted EBITDA[3] | $15 | $25 |
| Geography Entry Costs[4] | $23 | $20 |

1. Membership reflects management's outlook for end of period.
2. agilon's partnered ACO REACH entities are not consolidated within its financial results.
3. Adjusted EBITDA contribution from ACO REACH is expected to be approximately $14 million for the first quarter 2024.
4. Geography Entry Costs represent the corresponding expense included in the low-end and high-end of management's outlook for Adjusted EBITDA.

We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking

guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

**Webcast and Conference Call:**

agilon health will host a conference call to discuss fourth quarter and fiscal year 2023 results on Tuesday, February 27, 2024 at 4:30 PM Eastern Time. The conference call can be accessed by dialing (833) 470-1428 for U.S. participants and +1 (929) 526-1599 for international participants and referencing participant code 615568. A simultaneous webcast can be accessed by visiting the "Events & Presentations" section of agilon's Investor Relations website at https://investors.agilonhealth.com. A replay of the call will be available via webcast for on-demand listening shortly after the completion of the call.

**About agilon health**

agilon health is the trusted partner empowering physicians to transform health care in our communities. Through our partnerships and purpose-built platform, agilon is accelerating at scale how physician groups and health systems transition to a value-based Total Care Model for their senior patients. agilon provides the technology, people, capital, process, and access to a peer network of 2,400+ PCPs that allow its physician partners to maintain their independence and focus on the total health of their most vulnerable patients. Together, agilon and its physician partners are creating the healthcare system we need – one built on the value of care, not the volume of fees. The result: healthier communities and empowered doctors. agilon is the trusted partner in 30+ diverse communities and is here to help more of our nation's leading physician groups and health systems have a sustained, thriving future. For more information visit www.agilonhealth.com and connect with us on X, Instagram, LinkedIn and YouTube.

**Forward-Looking Statements**

Statements in this release that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue, medical costs, net income and gross profit, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions, including our fiscal year and first quarter 2024 guidance. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses and the expectation that our expenses will increase in the future; failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives; success in executing our operating strategies or achieving results consistent with our historical performance; medical expenses incurred on behalf of our members may exceed revenues we receive; our ability to secure contracts with Medicare Advantage payors; our ability to grow new physician partner relationships sufficient to recover startup costs; availability of additional capital, on acceptable terms or at all, to support our business in the future; significant reduction in our membership; transition to a Total Care Model may be challenging for physician partners; public health crises, such as COVID-19, could adversely affect us; inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts; the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners; our to hire and retain qualified personnel; our ability

**APP 472**

to realize the full value of our intangible assets; security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; reliance on our subsidiaries; Environmental, Social, and Governance issues; reliance on a limited number of key payors; the limited terms of contracts with our payors and our ability to renew them upon expiration; reliance on our payors, physician partners and other providers to operate our business; our ability to obtain accurate and complete diagnosis data; reliance on third-party software, data, infrastructure and bandwidth; consolidation and competition in the healthcare industry; the impact of changes to, and dependence on, federal government healthcare programs; uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures; regulation of the healthcare industry and our and our physician partners' ability to comply such laws and regulations; federal and state investigations, audits and enforcement actions; repayment obligations arising out of payor audits; negative publicity regarding the managed healthcare industry generally; our use, disclosure and processing of personally identifiable information, protected health information, and de-identified data; failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization; lawsuits not covered by insurance; changes in tax laws and regulations, or changes in related judgments or assumptions; our indebtedness and our potential to incur more debt; dependence on our subsidiaries for cash to fund all of our operations and expenses; provisions in our governing documents; ability to achieve a return on your investment depends on appreciation in the price of our common stock; the material weakness in our internal control over financial reporting and our ability to remediate such material weakness; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**APP 473**

**agilon health, inc.**
Consolidated Balance Sheets
In thousands, except per share data

| | December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 107,570 | $ 465,302 |
| Restricted cash and equivalents | 6,759 | 10,610 |
| Marketable securities | 380,773 | 411,901 |
| Receivables, net | 942,461 | 492,364 |
| Prepaid expenses and other current assets, net | 42,513 | 31,572 |
| Current assets of discontinued operations | — | 39,525 |
| Total current assets | 1,480,076 | 1,451,274 |
| Property and equipment, net | 27,576 | 19,937 |
| Intangible assets, net | 63,769 | 18,448 |
| Goodwill | 24,133 | 2,513 |
| Other assets, net | 145,312 | 105,861 |
| Non-current assets of discontinued operations | — | 99,435 |
| Total assets | $ 1,740,866 | $ 1,697,468 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Medical claims and related payables | $ 737,724 | $ 300,798 |
| Accounts payable and accrued expenses | 233,182 | 177,428 |
| Current portion of long-term debt | 6,250 | 5,000 |
| Current liabilities of discontinued operations | — | 51,865 |
| Total current liabilities | 977,156 | 535,091 |
| Long-term debt, net of current portion | 32,308 | 38,482 |
| Other liabilities | 70,381 | 82,492 |
| Non-current liabilities of discontinued operations | — | 794 |
| Total liabilities | 1,079,845 | 656,859 |
| Commitments and contingencies | | |
| Stockholders' equity (deficit): | | |
| Common stock, $0.01 par value; 2,000,000 shares authorized; 406,387 and 412,385 shares issued and outstanding, respectively | 4,064 | 4,124 |
| Additional paid-in capital | 1,986,899 | 2,106,886 |
| Accumulated deficit | (1,326,826) | (1,064,230) |
| Accumulated other comprehensive income (loss) | (2,298) | (5,560) |
| Total agilon health, inc. stockholders' equity (deficit) | 661,839 | 1,041,220 |
| Noncontrolling interests | (818) | (611) |
| Total stockholders' equity (deficit) | 661,021 | 1,040,609 |
| Total liabilities and stockholders' equity (deficit) | $ 1,740,866 | $ 1,697,468 |

**APP 474**

**agilon health, inc.**
**Consolidated Statements of Operations**
**In thousands, except per share data**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | (unaudited) | | | |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,053,540 | $ 613,883 | $ 4,307,350 | $ 2,384,889 |
| Other operating revenue | 2,533 | 800 | 9,013 | 3,331 |
| Total revenues | 1,056,073 | 614,683 | 4,316,363 | 2,388,220 |
| **Expenses:** | | | | |
| Medical services expense | 1,155,393 | 551,133 | 4,008,659 | 2,093,860 |
| Other medical expenses | (4,452) | 47,659 | 238,034 | 183,000 |
| General and administrative (including noncash stock-based compensation expense of $15,676, $9,873, $69,326 and $28,069, respectively) | 64,696 | 70,228 | 285,760 | 207,789 |
| Depreciation and amortization | 4,735 | 2,686 | 16,043 | 8,949 |
| Total expenses | 1,220,372 | 671,706 | 4,548,496 | 2,493,598 |
| **Income (loss) from operations** | (164,299) | (57,023) | (232,133) | (105,378) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | (8,018) | 7,247 | 16,489 | 10,720 |
| Other income (expense), net | 7,438 | 7,613 | 27,840 | 13,930 |
| Gain (loss) on lease terminations | — | — | — | (5,458) |
| Interest expense | (1,993) | (1,668) | (6,658) | (4,484) |
| **Income (loss) before income taxes** | (166,872) | (43,831) | (194,462) | (90,670) |
| Income tax benefit (expense) | (267) | (572) | (791) | (1,640) |
| **Income (loss) from continuing operations** | (167,139) | (44,403) | (195,253) | (92,310) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | (15,797) | (12,146) | (20,002) | (14,528) |
| Gain (loss) on sales of assets, net | (47,548) | — | (47,548) | — |
| Income tax benefit (expense) | — | — | — | (26) |
| **Total discontinued operations** | (63,345) | (12,146) | (67,550) | (14,554) |
| **Net income (loss)** | (230,484) | (56,549) | (262,803) | (106,864) |
| Noncontrolling interests' share in (earnings) loss | 51 | 83 | 207 | 311 |
| **Net income (loss) attributable to common shares** | $ (230,433) | $ (56,466) | $ (262,596) | $ (106,553) |
| **Net income (loss) per common share, basic and diluted:** | | | | |
| Continuing operations | $ (0.41) | $ (0.11) | $ (0.48) | $ (0.22) |
| Discontinued operations | $ (0.16) | $ (0.03) | $ (0.16) | $ (0.04) |
| **Weighted average shares outstanding, basic and diluted** | 406,477 | 412,103 | 408,917 | 408,154 |

**APP 475**

**agilon health, inc.**
Consolidated Statements of Cash Flows
In thousands

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (262,803) | $ (106,864) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 20,161 | 13,772 |
| Stock-based compensation expense | 69,495 | 28,381 |
| Loss (income) from equity method investments | (16,489) | (10,720) |
| Deferred income taxes and uncertain tax positions | — | 532 |
| Release of indemnification assets | — | 553 |
| (Gain) loss on sale of assets, net | 47,548 | — |
| Other noncash items | (4,044) | 2,973 |
| Changes in operating assets and liabilities: | | |
| Receivables, net | (460,365) | (204,167) |
| Prepaid expense and other current assets | (6,120) | (16,620) |
| Other assets | (397) | (205) |
| Medical claims and related payables | 441,500 | 107,713 |
| Accounts payable and accrued expenses | 32,111 | 65,736 |
| Other liabilities | (16,796) | (11,892) |
| Net cash provided by (used in) operating activities | (156,199) | (130,808) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (15,830) | (15,426) |
| Purchase of intangible assets | (14,985) | (17,235) |
| Investment in loans receivable and other | (19,528) | (6,510) |
| Investments in marketable securities | (114,657) | (458,265) |
| Proceeds from maturities and sales of marketable securities and other | 164,040 | 52,548 |
| Net cash paid in business combination | (45,252) | — |
| Proceeds from sale of business and property, net of cash divested | 2,193 | 500 |
| Net cash provided by (used in) investing activities | (44,019) | (444,388) |
| **Cash flows from financing activities:** | | |
| Proceeds from equity issuances, net | 11,867 | 33,056 |
| Common stock repurchase | (200,000) | — |
| Repayments of long-term debt | (5,000) | (5,000) |
| Net cash provided by (used in) financing activities | (193,133) | 28,056 |
| Net increase (decrease) in cash, cash equivalents and restricted cash and equivalents | (393,351) | (547,140) |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, beginning of year | 475,912 | 1,049,373 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, beginning of year | 31,768 | 5,447 |
| **Cash, cash equivalents and restricted cash and equivalents, beginning of year** | 507,680 | 1,054,820 |
| Cash, cash equivalents and restricted cash and equivalents from continuing operations, end of year | 114,329 | 475,912 |
| Cash, cash equivalents and restricted cash and equivalents from discontinued operations, end of year | — | 31,768 |
| **Cash, cash equivalents and restricted cash and equivalents, end of year** | $ 114,329 | $ 507,680 |

**APP 476**

**agilon health, inc.**
**Key Operating Metrics**
**In thousands**
**(unaudited)**

*GROSS PROFIT*

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Total revenues | $ 1,056,073 | $ 614,683 | $ 4,316,363 | $ 2,388,220 |
| Medical services expense | (1,155,393) | (551,133) | (4,008,659) | (2,093,860) |
| Other medical expenses[1] | 4,452 | (47,659) | (238,034) | (183,000) |
| Gross profit | $ (94,868) | $ 15,891 | $ 69,670 | $ 111,360 |

(1)    Represents physician compensation expense related to surplus sharing and other care management expenses that help to create medical cost efficiency. Includes costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended December 31, 2023 and 2022, costs incurred in implementing geographies were $13.5 million and $13.0 million, respectively. For the twelve months ended December 31, 2023 and 2022, costs incurred in implementing geographies were $33.7 million and $23.9 million, respectively.

*GENERAL AND ADMINISTRATIVE COSTS, INCLUDING PLATFORM SUPPORT COSTS*

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Platform support costs | $ 36,729 | $ 40,921 | $ 163,652 | $ 127,458 |
| Geography entry costs[1] | 12,192 | 19,434 | 40,812 | 43,890 |
| Severance and related costs | — | — | 188 | 2,470 |
| Stock-based compensation expense | 15,676 | 9,873 | 69,326 | 28,069 |
| Other[2] | 99 | — | 11,782 | 5,902 |
| General and administrative | $ 64,696 | $ 70,228 | $ 285,760 | $ 207,789 |

(1)    Represents direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets.

(2)    Includes transaction-related costs.

Our platform support costs, which include regionally-based support personnel and other operating costs to support our geographies, are expected to decrease over time as a percentage of revenue as our physician partners add members and our revenue grows. Our operating expenses at the enterprise level include resources and technology to support payor contracting, clinical program development, quality, data management, finance and legal functions.

**APP 477**

**agilon health, inc.**
**Non-GAAP Financial Measures**
**In thousands**
**(unaudited)**

*MEDICAL MARGIN*

| | Three Months Ended December 31, | | | | Twelve Months Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Gross profit[1] | $ | (94,868) | $ | 15,891 | $ | 69,670 | $ | 111,360 |
| Other operating revenue | | (2,533) | | (800) | | (9,013) | | (3,331) |
| Other medical expenses | | (4,452) | | 47,659 | | 238,034 | | 183,000 |
| Medical margin | $ | (101,853) | $ | 62,750 | $ | 298,691 | $ | 291,029 |

(1)    Gross profit is defined as total revenues less medical services expense and other medical expenses.

*ADJUSTED EBITDA*

| | Three Months Ended December 31, | | | | Twelve Months Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Net income (loss)[1] | $ | (230,484) | $ | (56,549) | $ | (262,803) | $ | (106,864) |
| (Income) loss from discontinued operations, net of income taxes | | 63,345 | | 12,146 | | 67,550 | | 14,554 |
| Interest expense | | 1,993 | | 1,668 | | 6,658 | | 4,484 |
| Income tax expense (benefit) | | 267 | | 572 | | 791 | | 1,640 |
| Depreciation and amortization | | 4,735 | | 2,686 | | 16,043 | | 8,949 |
| (Gain) loss on lease terminations | | — | | — | | — | | 5,458 |
| Severance and related costs[2] | | — | | — | | 188 | | 2,470 |
| Stock-based compensation expense | | 15,676 | | 9,873 | | 69,326 | | 28,069 |
| EBITDA adjustments related to equity method investments[3] | | 14,268 | | 749 | | 22,694 | | 3,737 |
| Other[4] | | (6,861) | | (3,381) | | (15,448) | | (7,967) |
| Adjusted EBITDA | $ | (137,061) | $ | (32,236) | $ | (95,001) | $ | (45,470) |

(1)    Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended December 31, 2023 and 2022, (i) $13.5 million and $13.0 million, respectively, are included in other medical expenses and (ii) $12.2 million and $19.4 million, respectively, are included in general and administrative expenses. For the twelve months ended December 31, 2023 and 2022, (i) $33.7 million and $23.9 million, respectively, are included in other medical expenses and (ii) $40.8 million and $43.9 million, respectively, are included in general and administrative expenses.

(2)    For the year ended December 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $2.0 million.

(3)    The three and twelve months ended December 31, 2023 includes $15.2 million of physician compensation expenses to reduce the physician partners' compensation percentage in current and future years in exchange for the Company's common stock.

(4)    Includes interest income and transaction-related costs.

**APP 478**

**agilon health, inc.**
Supplemental Financial Information
In thousands
(unaudited)

| | Three Months Ended December 31, 2023 | | Twelve Months Ended December 31, 2023 | |
| | Medicare Advantage (Consolidated) | ACO REACH (Unconsolidated) | Medicare Advantage (Consolidated) | ACO REACH (Unconsolidated) |
|---|---|---|---|---|
| Medical services revenue | $ 1,053,540 | $ 302,692 | $ 4,307,350 | $ 1,160,978 |
| Other operating revenue | 2,533 | — | 9,013 | — |
| **Total revenues** | 1,056,073 | 302,692 | 4,316,363 | 1,160,978 |
| Medical services expense | (1,155,393) | (282,716) | (4,008,659) | (1,024,468) |
| Other medical expenses | 4,452 | (25,016) | (238,034) | (96,154) |
| **Gross profit** | (94,868) | (5,040) | 69,670 | 40,356 |
| Other operating revenue | (2,533) | — | (9,013) | — |
| Other medical expenses | (4,452) | 25,016 | 238,034 | 96,154 |
| **Medical margin** | $ (101,853) | $ 19,976 | $ 298,691 | $ 136,510 |

Certain of our operations are not consolidated for the period presented because we do not have the ability to control certain activities due to another party's control of the entities' board of directors. Although revenues of the unconsolidated operations are not recorded as revenues by us, income (loss) from equity method investments is nonetheless a significant portion of our overall earnings. See Note 18 to the Consolidated Financial Statements in the Annual Report on Form 10-K for the period ending December 31, 2023 for additional discussion on our equity method investments.

In addition to providing results that are determined in accordance with GAAP, we present Medical Margin and Adjusted EBITDA, which are non-GAAP financial measures.

We define Medical Margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect Medical Margin to increase in absolute dollars. However, Medical Margin per member per month (PMPM) may vary as the percentage of new members brought onto our platform fluctuates. New membership added to the platform is typically dilutive to Medical Margin PMPM. We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care.

We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the evaluation of ongoing operating performance. We reflect our share of Adjusted EBITDA for equity method investments by applying our actual ownership percentage for the period to the applicable reconciling items on an entity-by-entity basis.

Gross profit is the most directly comparable GAAP measure to Medical Margin. Net income (loss) is the most directly comparable GAAP measure to Adjusted EBITDA.

We believe Medical Margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe Medical Margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate Medical Margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of Medical Margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

**APP 479**

**agilon health, inc.**
**2023 Quarterly Consolidated Statements of Operations**
**In thousands, except per share data**
**(unaudited)**

| | Three Months Ended 2023 | | | |
| --- | --- | --- | --- | --- |
| | March 31 | June 30 | September 30 | December 31 |
| **Revenues:** | | | | |
| Medical services revenue | $ 1,053,119 | $ 1,067,234 | $ 1,133,457 | $ 1,053,540 |
| Other operating revenue | 1,193 | 1,881 | 3,406 | 2,533 |
| Total revenues | 1,054,312 | 1,069,115 | 1,136,863 | 1,056,073 |
| **Expenses:** | | | | |
| Medical services expense | 897,572 | 932,823 | 1,022,871 | 1,155,393 |
| Other medical expenses | 83,617 | 81,716 | 77,153 | (4,452) |
| General and administrative | 69,752 | 79,254 | 72,058 | 64,696 |
| Depreciation and amortization | 2,954 | 4,279 | 4,075 | 4,735 |
| Total expenses | 1,053,895 | 1,098,072 | 1,176,157 | 1,220,372 |
| **Income (loss) from operations** | 417 | (28,957) | (39,294) | (164,299) |
| **Other income (expense):** | | | | |
| Income (loss) from equity method investments | 1,376 | 8,472 | 14,659 | (8,018) |
| Other income (expense), net | 7,892 | 7,087 | 5,423 | 7,438 |
| Interest expense | (1,493) | (1,555) | (1,617) | (1,993) |
| **Income (loss) before income taxes** | 8,192 | (14,953) | (20,829) | (166,872) |
| Income tax benefit (expense) | 1,759 | (1,073) | (1,210) | (267) |
| **Income (loss) from continuing operations** | 9,951 | (16,026) | (22,039) | (167,139) |
| **Discontinued operations:** | | | | |
| Income (loss) before gain (loss) on sales and income taxes | 6,008 | (769) | (9,444) | (15,797) |
| Gain (loss) on sales of assets, net | — | — | — | (47,548) |
| **Total discontinued operations** | 6,008 | (769) | (9,444) | (63,345) |
| **Net income (loss)** | 15,959 | (16,795) | (31,483) | (230,484) |
| Noncontrolling interests' share in (earnings) loss | 63 | 46 | 47 | 51 |
| **Net income (loss) attributable to common shares** | $ 16,022 | $ (16,749) | $ (31,436) | $ (230,433) |
| **Net income (loss) per common share, basic and diluted:** | | | | |
| Continuing operations | $ 0.02 | $ (0.04) | $ (0.05) | $ (0.41) |
| Discontinued operations | $ 0.01 | $ — | $ (0.02) | $ (0.16) |
| **Weighted average shares outstanding:** | | | | |
| Basic | 413,136 | 410,338 | 405,787 | 406,477 |
| Diluted | 426,586 | 410,338 | 405,787 | 406,477 |

**APP 480**

**Contacts**

**Investor Contact**
Matthew Gillmor
VP, Investor Relations
investors@agilonhealth.com

**Media Contact**
Claire Mulhearn
Chief Communications & Public Affairs Officer
media@agilonhealth.com

Source: agilon health



Copyright © 2023 agilon health. Confidential internal document containing proprietary information. Do not distribute.

# Disclaimers and Forward-Looking Statements

**FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION**

Statements in this presentation that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include, among other things, statements regarding our and our officers' intent, belief or expectation as identified by the use of words such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Examples of forward-looking statements include, among other things: statements regarding timing, outcomes and other details relating to current, pending or contemplated new markets, growth opportunities, ability to deliver sustainable long-term value, business environment, long-term opportunities and strategic growth plans, expected revenue and net income, including our guidance for the fiscal year and first quarter 2024, total and average membership, Adjusted EBITDA, Medical Margin, geography entry costs and other financial projections and assumptions. Forward-looking statements reflect our current expectations and views about future events and are subject to risks and uncertainties that could significantly affect our future financial condition and results of operations. While forward-looking statements reflect our good faith belief and assumptions we believe to be reasonable based upon current information, we can give no assurance that our expectations or forecasts will be attained. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. These risks and uncertainties that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, but are not limited to: our history of net losses and the expectation that our expenses will increase in the future; failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives; success in executing our operating strategies or achieving results consistent with our historical performance; medical expenses incurred on behalf of our members may exceed revenues we receive; our ability to secure contracts with Medicare Advantage payors; our ability to grow new physician partner relationships sufficient to recover startup costs; availability of additional capital, on acceptable terms or at all, to support our business in the future; significant reduction in our membership; transition to a Total Care Model may be challenging for physician partners; public health crises, such as COVID-19, could adversely affect us; inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts; the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners; our to hire and retain qualified personnel; our ability to realize the full value of our intangible assets; security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems; our ability to protect the confidentiality of our know-how and other proprietary and internally developed information; reliance on our subsidiaries; Environmental, Social, and Governance issues; reliance on a limited number of key payors; the limited terms of contracts with our payors and our ability to renew them upon expiration; reliance on our payors, physician partners and other providers to operate our business; our ability to obtain accurate and complete diagnosis data; reliance on third-party software, data, infrastructure and bandwidth; consolidation and competition in the healthcare industry; the impact of changes to, and dependence on, federal government healthcare programs; uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures; regulation of the healthcare industry and our and our physician partners' ability to comply such laws and regulations; federal and state investigations, audits and enforcement actions; repayment obligations arising out of payor audits; negative publicity regarding the managed healthcare industry generally; our use, disclosure and processing of personally identifiable information, protected health information, and de-identified data; failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization; lawsuits not covered by insurance; changes in tax laws and regulations, or changes in related judgments or assumptions; our indebtedness and our potential to incur more debt; dependence on our subsidiaries for cash to fund all of our operations and expenses; provisions in our governing documents; ability to achieve a return on your investment depends on appreciation in the price of our common stock; the material weakness in our internal control over financial reporting and our ability to remediate such material weakness; and risks related to other factors discussed in our filings with the Securities and Exchange Commission (the "SEC"), including the factors discussed under "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, which can be found at the SEC's website at www.sec.gov. Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

**NON-GAAP FINANCIAL MEASURES**

This presentation includes references to non-GAAP financial measures, including but not limited to Medical Margin and Adjusted EBITDA. We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures. Medical Margin and Adjusted EBITDA have limitations as analytical tools and should not be considered in isolation or as an alternative to GAAP measures or other financial statement data presented in agilon's consolidated financial statements. Information reconciling guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and information regarding forward-looking guidance for net income (loss) is not available without unreasonable effort due to the high variability, complexity and uncertainty with respect to quantifying and forecasting certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation. For these reasons, we are unable to compute the probable significance of the unavailable information, which could have a potentially unpredictable and potentially significant impact on our future GAAP financial results.



# Key Messages

## 2023 Results and 2024 Guidance Impacted by Acceleration in Medical Costs

- Completed analysis of updated payor data in mid-February, including relatively complete data from largest payors. Analysis indicated medical costs for our members were higher than previous estimates.
- Strengthened reserves to high-end of internal estimates. Prudent approach given environment.
- Revised 2024 guidance assumes higher cost trends continue.

## Targeted Action Plan on Track and Business Model is Working

- Executing action plan discussed on January 5.
- Demand for platform among PCPs remains strong.
- Driving 4+ Star quality performance across Year 2+ market classes.
- Strong balance sheet with ~$500M in cash and short-term investments.

## Member Cohort and Market Class Medical Margin PMPM Progression

- Member cohort margins progressing or sustaining near ~$150 PMPM range despite elevated medical cost environment during 2023 relative to revenue benchmarks.
- Market class medical margins also impacted by dilution from membership and PCP growth.

 agilon health

3

APP 484

## 2023 Medical Margin Bridge - Change from Jan 5 Guidance





# 2022 - 2024 Adjusted EBITDA Bridge



# Class of 2023 and Class of 2024 Details

Year 1 Class Performance Expected to Significantly Improve in 2024

| Class of 2023 (2023 Results) | Class of 2024 (2024 Guidance) |
|---|---|

**Class of 2023** (2023 Results)

- **Performance driven by:**
  - Shorter implementation
  - Partner mix/less VBC experience
  - Macro environment
- **MA Membership: 132K**
- **Medical Margin PMPM: $21**
- **Market EBITDA: Loss of ($32)M**

**Class of 2024** (2024 Guidance)

- **Performance driven by:**
  - Longer implementation
  - Historical VBC experience of partners
  - Macro environment
- **MA Membership: ~145K**
- **Medical Margin PMPM: ~$52**
  - Compares prior estimate of ~$76
- **Market EBITDA: Positive ~$9M**

 agilon health

7

# Actions to Improve Performance, Balance Risk Sharing, and Enhance Predictability

Enhancing processes and systems to address market dynamics and drive accelerated performance in 2024 and beyond

| Action | Timing | Details / Milestones |
|---|---|---|
| Physician Onboarding & Continuous Education | In-Process for 2024-2025+ | • Reducing performance variability, especially for new PCPs in existing markets<br>• Accelerating and expanding clinical programs |
| Payor Partnerships | Executed & In-Process for 2024+ | • Tangible progress on strengthening relationships and outcomes |
| Data Visibility & Analytics | Executed & In-Process for 2024+ | • Executed changes to internal and external teams – new actuary and Milliman relationship<br>• Created better alignment with payor partners |
| Operating Efficiency | Executed for 2024 | • Accelerated platform support efficiency, reduce to 3% of revenues in 2024<br>• Leveraging corporate and market investments from 2023 |



8

**APP 489**

# Member Cohort and Market Class Margin Progression

## Member Cohorts Drive Long-term Earnings and Cash Flow Trajectory

### 2023 Member Cohort and Market Class Margin Progression Impacted by Elevated Costs

- Medical cost trends were above revenue benchmarks during 2023 and this is expected to continue in 2024.
- Medicare Advantage program is designed to adjust to changes in utilization over time.

### *Member Cohort* Medical Margin PMPM Progressing or Sustaining Near $150+ (Slide 9-10)

- Member cohort analysis shows medical margin PMPMs for the same members over time, which *eliminates* the dilutive impact from membership and PCP growth.
- Progressing or sustaining member cohort medical margin PMPMs at/towards the ~$150 range despite the higher utilization environment and payor benefit changes relative to revenue benchmarks.

### *Market Class* Medical Margin PMPM Progression Details (Slides 11-13)

- Market class analysis shows medical margin PMPMs across entire market classes, which *includes* the dilutive impact from membership and PCP growth.
- Market class margins showing less progression in 2023, reflecting the dilutive impact from member and PCP growth combined with the higher utilization environment relative to revenue benchmarks.

agilon health

9

**APP 490**



# Member Cohort Progression (Incurred Results)

## Medical Margin PMPM by Member Cohorts

Note 1: Reflects incurred results; Note 2: 2020 reflects COVID-19 impact; Note 3: Reflects full allocation of costs to member-level cohorts, including Part D and other (other risk pool, certain health plans with limited data)

agilon health    Copyright © 2023 agilon health    10

# Market Class Margin Progression Details

## *Market Class* Medical Margin Progression Includes Dilutive Impact from Growth:

- Over the past 6 years we have added >400 providers and >100,000 MA members to existing markets. New PCPs and members are typically dilutive in Year 1-2 and take time to mature on the platform.

- Medical Margin PMPM dilution from growth represents difference between margin performance of initial cohort compared to market class Medical Margin PMPM in 2023**

| Market Class | Membership CAGR Since Go-Live | Provider Adds Since Go-Live (PCPs and APPs) | Market Vintage | Member Vintage | Est. Medical Margin PMPM Dilution from Growth** |
|---|---|---|---|---|---|
| 2018 | 12% | 125 (43% of total) | 6 Years | 4.01 Years | ($36) PMPM |
| 2019 | 24% | 116 (40% of total) | 5 Years | 2.88 Years | ($86) PMPM |
| 2020 | 15% | 78 (31% of total) | 4 Years | 2.94 Years | ($44) PMPM |
| 2021 | 11% | 39 (20% of total) | 3 Years | 2.54 Years | ($55) PMPM |
| 2022 | 14% | 72 (15% of total) | 2 Years | 1.84 Years | ($8) PMPM |

 agilon health

11



APP 493



# Financial Outlook for Fiscal Year 2024

| | Year Ending<br>December 31, 2024 |
|---|---|
| Medicare Advantage Members | 540,000 – 550,000 |
| ACO REACH Members | 120,000 – 125,000 |
| Total Members Live on Platform | 660,000 – 675,000 |
| Avg. Medicare Advantage Members | 527,000 – 536,000 |
| Total Revenues ($M) | $6,350 – $6,465 |
| Medical Margin ($M) | $400 – $450 |
| Adjusted EBITDA ($M) | ($60) – ($15) |
| Geography Entry Costs ($M) | $65 – $55 |

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

 agilon health

14

# Financial Outlook for Q1 2024

| | Quarter Ending March 31, 2024 |
|---|---|
| Medicare Advantage Members | 520,000 – 530,000 |
| ACO REACH Members | 125,000 – 130,000 |
| Total Members Live on Platform | 645,000 – 660,000 |
| Avg. Medicare Advantage Members | 516,000 – 525,000 |
| Total Revenues ($M) | $1,605 – $1,630 |
| Medical Margin ($M) | $155 – $170 |
| Adjusted EBITDA ($M) | $15 – $25 |
| Geography Entry Costs ($M) | $23 – $20 |

Note: We have not reconciled guidance for Medical Margin to Gross Profit or Adjusted EBITDA to net income (loss), the most comparable GAAP measures, and have not provided forward-looking guidance for net income (loss) in each case because of the uncertainty around certain items that may impact Gross Profit or net income (loss), including non-cash stock-based compensation.

 agilon health

15



Non-GAAP
Reconciliations

agilon health

# Non-GAAP Reconciliations

## Medical Margin

| (Dollars in thousands) | Year Ended December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Gross profit[1] | $    69,670 | $    111,360 |
| Other operating revenue | (9,013) | (3,331) |
| Other medical expenses | 238,034 | 183,000 |
| Medical margin | 298,691 | 291,029 |

1)     Gross profit is defined as total revenues less medical services expenses and other medical expense.

 agilon health

17

# Non-GAAP Reconciliations

## Adjusted EBITDA

| (Dollars in thousands) | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Net income (loss)[1] | $ (262,803) | $ (106,864) |
| (Income) loss from discontinued operations, net of income taxes | 67,550 | 14,554 |
| Interest expense | 6,658 | 4,484 |
| Income tax expense (benefit) | 791 | 1,640 |
| Depreciation and amortization | 16,043 | 8,949 |
| (Gain) loss on lease terminations | — | 5,458 |
| Severance and related costs[2] | 188 | 2,470 |
| Stock-based compensation expense | 69,326 | 28,069 |
| EBITDA adjustment related to equity method investments[3] | 22,694 | 3,737 |
| Other[4] | (15,448) | (7,967) |
| Adjusted EBITDA | $ (95,001) | $ (45,470) |

1) Includes direct geography entry costs, including investments to develop and expand our platform and costs in geographies that are in implementation and are not yet generating revenue and investments to grow existing markets. For the three months ended December 31, 2023 and 2022, (i) $13.5 million and $13.0 million, respectively, are included in other medical expenses and (ii) $12.2 million and $19.4 million, respectively, are included in general and administrative expenses. For the twelve months ended December 31, 2023 and 2022, (i) $33.7 million and $23.9 million, respectively, are included in other medical expenses and (ii) $40.8 million and $43.9 million, respectively, are included in general and administrative expenses.
2) For the year ended December 31, 2022, includes taxes and related costs on stock option exercises for departed executives of $2.0 million.
3) The three and twelve months ended December 31, 2023 includes $15.2 million of physician compensation expenses to reduce the physician partners' compensation percentage in current and future years in exchange for the Company's common stock.
4) Includes interest income and transaction-related costs.

 agilon health

18

**APP 500**

# EXHIBIT 20

APP 501

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

_____

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the fiscal year ended December 31, 2023**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-40332**

_____

# agilon health, inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **37-1915147** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **6210 E Hwy 290, Suite 450** **Austin, Texas** | **78723** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(562) 256-3800**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value | AGL | The New York Stock Exchange |

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant; (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act.) Yes ☐ No ☒

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $5.2 billion.

As of February 24, 2024, there were 409,541,664 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the registrant's 2024 Annual Meeting of Stockholders have been incorporated by reference into Part III of this Report.

Table of Contents

**agilon health, inc.**
Form 10-K
For the Fiscal Year Ended December 31, 2023

**Table of Contents**

| | | |
|---|---|---:|
| **Cautionary Language Regarding Forward-Looking Statements** | | 1 |
| **Part I** | | **3** |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 49 |
| Item 1C. | Cybersecurity | 49 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| | | |
| **Part II** | | **52** |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | [Reserved] | 53 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 54 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 70 |
| Item 8. | Financial Statements and Supplementary Data | 71 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 76 |
| Item 9A. | Controls and Procedures | 76 |
| Item 9B. | Other Information | 79 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 79 |
| | | |
| **Part III** | | **80** |
| Item 10. | Directors, Executive Officers and Corporate Governance | 80 |
| Item 11. | Executive Compensation | 80 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 80 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 80 |
| Item 14. | Principal Accounting Fees and Services | 80 |
| | | |
| **Part IV** | | **81** |
| Item 15. | Exhibits and Financial Statement Schedules | 81 |
| Item 16. | Form 10-K Summary | 83 |
| | Signatures | 84 |

**APP 503**

Table of Contents

*All references in this report to "agilon," "the Company", "we," "us" or "our" mean agilon health, inc., together with its consolidated subsidiaries. Unless the context suggests otherwise, references to "agilon health, inc." mean the parent company without its subsidiaries.*

**Cautionary Language Regarding Forward-Looking Statements**

Statements in this Annual Report on Form 10-K (the "Report") that are not historical factual statements are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "shall," "should," "would," "could," "seeks," "aims," "projects," "is optimistic," "intends," "plans," "estimates," "anticipates" or the negative versions of these words or other comparable terms. Forward-looking statements include, without limitation, all matters that are not historical facts. They appear in several places throughout this Report and include, without limitation, statements regarding our intentions, beliefs, assumptions or current expectations concerning, among other things, our financial position, results of operations, cash flows, prospects, and growth strategies.

Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be outside our control. We caution you that forward-looking statements are not guarantees of future performance or outcomes and that actual performance and outcomes, including, without limitation, our actual results of operations, financial condition and liquidity, and the development of the market in which we operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Report. In addition, even if our results of operations, financial condition, and cash flows, and the development of the market in which we operate, are consistent with the forward-looking statements contained in this Report, those results or developments may not be indicative of results or developments in subsequent periods. A number of important factors, including, without limitation, the risks and uncertainties discussed under "Item 1A, Risk Factors" in this Report, could cause actual results and outcomes to differ materially from those reflected in the forward-looking statements. Furthermore, new risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Report. Factors that could cause actual results and outcomes to differ from those reflected in forward-looking statements include, without limitation:

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- medical expenses incurred on behalf of our members may exceed revenues we receive;
- our ability to secure contracts with Medicare Advantage ("MA") payors;
- our ability to grow new physician partner relationships sufficient to recover startup costs;
- availability of additional capital, on acceptable terms or at all, to support our business in the future;
- significant reduction in our membership;
- transition to a Total Care Model may be challenging for physician partners;
- public health crises, such as COVID-19, could adversely affect us;
- inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts;
- the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners;
- our ability to hire and retain qualified personnel;
- our ability to realize the full value of our intangible assets;
- security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems;
- our ability to protect the confidentiality of our know-how and other proprietary and internally developed information;

1

Table of Contents

- reliance on our subsidiaries;

- Environmental, Social, and Governance ("ESG") issues;

- reliance on a limited number of key payors;

- the limited terms of contracts with our payors and our ability to renew them upon expiration;

- reliance on our payors, physician partners and other providers to operate our business;

- our ability to obtain accurate and complete diagnosis data;

- reliance on third-party software, data, infrastructure and bandwidth;

- consolidation and competition in the healthcare industry;

- the impact of changes to, and dependence on, federal government healthcare programs;

- uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures;

- regulation of the healthcare industry and our physician partners' ability to comply with such laws and regulations;

- federal and state investigations, audits and enforcement actions;

- repayment obligations arising out of payor audits;

- negative publicity regarding the managed healthcare industry generally;

- our use, disclosure and processing of personally identifiable information, protected health information ("PHI"), and de-identified data;

- failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization;

- lawsuits not covered by insurance;

- changes in tax laws and regulations, or changes in related judgments or assumptions;

- our indebtedness and our potential to incur more debt;

- dependence on our subsidiaries for cash to fund all of our operations and expenses;

- provisions in our governing documents;

- ability to achieve a return on investment depends on appreciation in the price of our common stock; and

- the material weakness in our internal control over financial reporting and our ability to remediate such material weakness.

Except as required by law, we do not undertake, and hereby disclaim, any obligation to update any forward-looking statements, which speak only as of the date on which they are made.

2

**APP 505**

Table of Contents

**PART I**

**ITEM 1. Business**

<u>**Overview**</u>

Our business is transforming healthcare by empowering the primary care physicians ("PCP") to be the agents for change in the communities they serve. We believe that PCPs, with their intimate patient-physician relationships, are best positioned to drive meaningful change in quality, cost and patient experience when provided with the right infrastructure and payment model. Through our combination of the agilon platform, a long-term partnership model with existing physician groups and a growing network of like-minded physicians, we believe we are poised to revolutionize healthcare for seniors across communities throughout the United States ("U.S."). We believe our purpose-built model provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business. Our model operates by primarily forming risk-bearing entities ("RBEs") within local geographies, that enter into arrangements with payors providing for monthly payments to manage the total healthcare needs of our physician partners' attributed patients (or global capitation arrangements). The RBEs also contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more anchor physician groups pursuant to which the anchor physician groups receive a base compensation rate and share in the savings from successfully improving quality of care and reducing costs.

Our company was formed in 2016, and we established our inaugural partnership with an anchor physician group in 2017. Our ability to rapidly build scaled positions in local communities has allowed us to grow to 25 anchor physician groups and 24 geographies as of December 31, 2023. Our platform has enabled us to grow our total membership by 68% and revenue by 81% from December 31, 2022 to December 31, 2023. As of December 31, 2023, the PCPs on our platform serve approximately 388,400 MA members and 89,300 Medicare fee-for-service ("FFS") beneficiaries through eight Accountable Care Organizations ("ACOs") through our participation in the Centers for Medicare & Medicaid Services' ("CMS") Accountable Care Organization Realizing Equity, Access, and Community Health ("ACO REACH") Model. The ACO REACH Model was formerly known as the CMS Innovation Center Direct Contracting Model and was redesigned and renamed the ACO REACH Model on January 1, 2023.

For a description of our significant activities during 2023, see "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations-2023 Results" in this Report.

Our business model is differentiated by its focus on existing community-based physician groups and is built around three key elements: (1) agilon's platform; (2) agilon's long-term physician partnership approach; and (3) agilon's network. With our model, our goal is to remove the barriers that prevent community-based physicians from evolving to a Total Care Model, where the physician is empowered to manage health outcomes and the total healthcare needs of their attributed Medicare patients.

***The agilon Platform***: The agilon platform is holistic in supporting the rapid transition to a Total Care Model with technology, people, process and capital. Our purpose-built platform is comprised of an integrated set of capabilities designed to continuously improve. Our platform is delivered to our anchor physician groups through a long-term partnership model to support the adoption and success of a Medicare-centric, globally capitated line of business.

***agilon's Long-term Physician Partner Model***: We built the agilon platform to be deployed through an aligned long-term partnership model with community-based physician groups to move healthcare closer to the physician, be outcome-centric and optimize the long-term sticky relationship between a patient and their existing physician. Through this partnership, our physician partners' existing MA patient panels are attributed to our platform through our subscription-like per-member per-month ("PMPM") agreements with payors. The combination of these subscription-like agreements, the sticky patient-physician relationship and our long-term partnership model, which is typically 20 years in duration, results in a growing and recurring revenue stream and provides visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups. In January of each year, we typically have visibility into greater than 90% of that year's projected revenue. As earnings are generated at the local level due to improvements in quality of care and management of healthcare costs, we share those earnings with our anchor physician groups.

***agilon's Network***: Enhancing the power and growth of the agilon platform is the rapidly expanding group of leading community-based physician partners, functioning as a collaborative group through the agilon network. We believe the value of this network is demonstrated by our ability to add new physician partners and to attract additional PCPs to our physician partners. The ability to share best practices, influence the development of the platform, compare notes on the

3

APP 506

Table of Contents

transition to a Total Care Model and learn from one another represents a valuable opportunity for physicians. We believe this like-minded group of community-based physicians, many of whom are leaders in their community, will enhance innovation, growth, quality of care and patient experience, and ultimately strengthen the power of the independent physician business model in local communities across the country.

### Reimbursement Model and Organization

Under a traditional FFS reimbursement model, physicians are paid a fixed amount for services provided during a patient visit, regardless of a patient's medical need or health outcome. As a result, physician reimbursement is solely related to the volume of patient visits and procedures performed, thereby offering limited financial incentive to focus on preventative care and cost containment. Value-based care models offer alternative reimbursement models, which typically incentivize physicians for improving the cost and quality of healthcare provided for an attributed patient population. Various types of value-based care reimbursement models exist, including capitation, bundled payments, or payments for attainment of improved quality metrics or medical cost efficiency.

Under our Total Care Model, which is a type of value-based care reimbursement model, we are responsible for managing the medical costs associated with our attributed members. This structure empowers physicians to focus on the improvement of the quality of care provided, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care. Under such a structure, physicians are incentivized to improve the quality and efficiency of care as well as health outcomes for their patients.

### *Physician and Payor Contractual Relationships*

#### *Physicians*

Our business model combines the agilon platform, a network of like-minded physicians and a long-term partnership model in order to provide physician groups with the necessary capabilities, capital and business model to create a Medicare-centric, globally capitated line of business. We believe that failing to empower PCPs to drive meaningful change in quality, cost and patient experience has historically fostered waste, unnecessary variability in care and poor patient experience and health outcomes. We seek to partner with leading community-based physician groups under a Total Care Model. We have formed long-term partnerships with diverse leading community-based physician groups in geographies such as Ohio, Connecticut, Maine, Michigan, Minnesota, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, and Texas. By providing technology, people, process and capital, we aim to improve the quality and cost of healthcare and drive long-term growth while creating a sustainable business model for our physician partners.

Under the Total Care Model, we typically operate by forming RBEs within local geographies. These wholly-owned RBEs enter into risk-bearing, global capitation agreements with payors, contract with agilon to perform certain functions and enter into long-term professional service agreements with one or more partner primary care or multi-specialty physician groups. We refer to these groups as our "anchor physician groups." Individual MA members whose care is provided by PCPs employed or affiliated with our anchor physician groups are attributed to the RBE, which bears financial responsibility for the associated medical costs of such members. We have entered into long-term professional services agreements with our anchor physician groups, which typically have a contractual duration of 20 years. In accordance with relevant accounting guidance, each of these RBEs is determined to be a variable interest entity consolidated by agilon, as we have: (i) the ability, through the management services and governance arrangements, to direct the activities (excluding clinical decisions) that most significantly affect the RBE's economic performance; and (ii) the obligation to absorb losses of or the right to receive benefits that could be potentially significant to the RBE.

Through incentive compensation arrangements, we share a portion of the RBE's savings from successfully improving the quality of care and reducing costs with our anchor physician groups. Typically, our anchor physician groups receive a FFS base compensation rate for services rendered which is paid directly by health plan payors to our anchor physician groups or, in certain arrangements, paid from the health plan payor to the applicable RBE, who pays the compensation received to our anchor physician groups. In certain cases, our anchor physician groups may be entitled to a guaranteed minimum FFS base compensation rate from the RBE in the event that the FFS base compensation rate paid by the health plan payor does not meet the negotiated base compensation rate as agreed between the RBE and the anchor physician group, or if the FFS base compensation rate paid by the health plan payor falls below what the anchor physician group had received prior to joining our platform. Historically, the base compensation rates paid directly by the health plan payors to our anchor physician groups have met or exceeded applicable guaranteed minimum FFS base compensation rates. This base compensation is initially negotiated with the RBE for the first ten years of each agreement, subject to annual increases based on current market rates and other agreed upon adjustment factors, after which it is subject to renegotiation.

4

APP 507

Table of Contents

Although our RBEs are wholly-owned subsidiaries of agilon, our anchor physician groups participate in each RBE's governance, with individuals designated or nominated by the applicable anchor physician groups having representation on each RBE's board of directors. Most of our contracts with our anchor physician groups contain exclusivity or other provisions intended to promote interconnectedness with our physician partners for applicable lines of business in order to facilitate the longevity and stability of the partnership. Typically, these contracts provide for termination rights that are triggered upon certain events, subject to applicable cure periods, including bankruptcy or insolvency events, exclusion, suspension or debarment from state or federal government programs and the occurrence of government action that can be reasonably expected to negatively influence our business. We have historically issued certain stock-based instruments, which we refer to as "partner physician group equity agreements," to our anchor physician groups pursuant to which they are entitled to receive equity of their local RBE or agilon health, respectively, in the future only upon the occurrence of certain events deemed a "change of control" of the RBE. For additional discussion related the agilon health related instruments, see "Critical Accounting Estimates - Stock-Based Compensation."

In addition to our contractual arrangements with our physician partners, we also maintain relationships with other providers who care for our members, including hospitals, specialists and ancillary providers. Such providers either contract with agilon or directly with payors. We and our physician partners maintain effective working relationships with the majority of the higher-volume providers in our geographies in order to retain insight into the provision of care to our members and ensure care is rendered effectively and in a manner which supports the achievement of appropriate clinical outcomes.

*Health Plan Payors*

We enter into contractual agreements with health plan payors in each of our geographies, under which we are financially responsible for our physician partners' provision of a defined spectrum of healthcare services to our members, in exchange for a defined PMPM fee for each of our members (which is also referred to as "global capitation"). The healthcare services for which we are responsible under such arrangements generally include all healthcare costs which CMS considers as Part A and B costs, including hospitalization and facility costs, primary and specialty care provider costs, and ancillary services costs. In certain of our payor arrangements, we are also financially responsible for Part D pharmaceutical costs for prescriptions rendered to our members. Through these payor agreements, we help to create access for our physician partners to value-based care reimbursement structures through our Total Care Model, which allow our physician partners to focus on the improvement of the quality of care provided to their patients, and to share in the financial surplus created to the extent premiums received exceed the cost of medical care and certain operating costs.

The global capitation fees we are entitled to receive from our health plan payor contracts are typically based on a defined percentage of the corresponding monthly premium payments which the payor receives from CMS for members attributed to our PCPs and covered under such contracts. The premium payments to payors are based on county-level benchmark rates established by CMS and payors' annual bid of amounts necessary to cover the cost of a standard MA patient, and are influenced by several factors, including, but not limited to, the applicable MA plan's STAR rating and CMS' risk-adjustment model, which compensates payors based on the health status (acuity) of each individual patient in the preceding calendar year. For agreements where the payor retains responsibility for paying claims on our behalf, as is the case today in the majority of our payor agreements, funding under the applicable agreement is utilized by the payor to pay such claims, and we receive surplus distributions on a monthly or quarterly basis. In these arrangements, the payor maintains the responsibility for entering into contractual agreements with network hospitals, network specialty physicians, and ancillary or other providers. Additionally, certain of our contracts with payors incorporate provisions in which we are eligible to earn additional payments on top of our capitation payments based upon the attainment of defined quality performance criteria correlated to applicable STAR ratings criteria. Premiums received may be subject to future adjustment.

We have developed local contracts across multiple payors, along with national form contracts with certain key payors, which provide a consistency of non-financial contract terms, data sharing, operational processes and governance structures and support portability of the agilon platform. We typically maintain various contracts with a single national payor in order to reflect varying economic terms across our geographies, and to provide for distinct subsidiary entities of our company and a national payor as parties to these contracts. As of January 1, 2024, we have relationships with 29 health plan payors across 32 geographies. Payors with which we contract include large national health plans as well as smaller local and regional insurers. We believe our ability to offer multiple MA plans and products to our physician partners in each geography creates significant value for our physician partners and the members that they serve. Members are able to select the plan and benefit design that meets their individual needs while our platform enables a seamless experience regardless of plan or product for all patients and physician groups.

5

APP 508

Table of Contents

The agreements with our payors outline the range of healthcare services for which we are financially responsible and at risk, the services for which we are contracted to perform on the payor's behalf and the key financial terms. Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit, surety bonds, or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography, but typically averages between 1.0-3.0% of projected annual gross revenue attributable to the corresponding agreement.

Our payor agreements also typically incorporate various termination rights, which are negotiated based on the scope of the market-facing solutions that the payor has adopted and the duration of the contract. Most of our contracts include cure periods during which time we may attempt to resolve any issues that would trigger a payor's ability to terminate the contract. However, certain of our contracts are also terminable immediately upon the occurrence of certain events. For example, some of our contracts may be terminated immediately by the payor if we lose applicable licenses, go bankrupt, lose our liability insurance or receive an exclusion, suspension or debarment from state or federal government authorities.

The contracts with our payors impose other obligations on us. For example, we typically agree that all services provided under our contract and all employees, including affiliated and contracted providers, providing such services will comply with such payor's policies and procedures. We also typically agree to indemnify our payors against certain third-party claims.

*ACO REACH*

agilon, in conjunction with some of our physician partners, participated in the ACO REACH Model in certain geographies, through eight approved ACOs. The ACO REACH Model is a voluntary payment model option aimed at reducing expenditures and preserving or enhancing quality of care for beneficiaries in traditional Medicare FFS established by the CMS Innovation Center.

Under the ACO REACH Model, CMS contracts directly with each ACO pursuant to participation agreements, in which such ACO selects risk-sharing and fee payment options. The participation agreements included various terms and conditions each ACO must comply with, including meeting certain operational requirements. Each of the ACOs selected the Global risk-sharing option, in which the ACO assumes accountability for the total cost of care of the FFS beneficiaries aligned to such ACO. In addition, each of our ACOs selected the Primary Care Capitation Payment (the "PCC") option. The participation agreements between our ACOs and CMS expire two years after the "Model Performance Period" established by CMS, which lasts from April 1, 2021 through December 31, 2026. The ACO may terminate its participation agreement with CMS at any time upon advance written notice. CMS has certain additional termination rights, including in connection with the termination of the ACO REACH Model or non-compliance of the ACO. Additionally, CMS has the right to amend a participation agreement without the consent of the ACO for good cause, or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules.

The ACOs operate in partnership pursuant to participating medical group agreements with one or more of our physician partners in certain geographies. Our contracted physician partners provide Medicare services to their aligned beneficiaries, and bill CMS on a FFS basis for such services. In turn, in accordance with the PCC option, CMS compensates each physician partner for a portion of their billed services based on the applicable rate, and the remaining portion is paid to each ACO on a per Medicare beneficiary per month ("PBPM") basis based on a prospective estimate of such remaining portion of billed services. By 2025, CMS will no longer pay any portion to such physician partner based on FFS compensation rates, and will transition to compensating physician partners through their applicable ACO on a PBPM basis. Each ACO then remits payment out of the PBPM payments from CMS to its contracted physician partners on a monthly or quarterly basis pursuant to the applicable participating medical group agreement, which agreement also includes incentive compensation tied to the ACO's net profits received for aligned beneficiaries. Our ACOs' participating medical group agreements provide for mutual indemnification rights, and have an initial term through December 31, 2026, unless earlier terminated.

All ACOs are subject to the following requirements: (i) to develop and implement a robust health equity plan to identify and better serve underserved communities; (ii) 75% control of each ACO's governing body must be held by participating providers or their designated representatives and (iii) each ACO must have at least two beneficiary representatives on its governing board (at least one Medicare beneficiary and at least one consumer advocate), both of

6

Table of Contents

whom must hold voting rights. agilon implemented these changes for the 2023 performance year with minimal disruption. In addition, the CMS Innovation Center announced that ACO REACH would include technical adjustments to the model's parameters, including changes to benchmark calculations, and the adjustments will continue into 2024. The overall effect of these changes on our ACO's benchmarks has been minimal. The ACO REACH model, which formally launched on January 1, 2023, is largely the same as its predecessor model, Direct Contracting Model or Global and Professional Direct Contracting Model, which we participated in since April 2021.

**Marketing and Distribution**

In accordance with Medicare marketing guidelines, health plan payors are responsible for marketing directly to patients. Our focus is on outreach to existing community-based physician groups to join our platform, establishing and maintaining our local branding and strategies to support education for our Medicare-eligible members in evaluating their Medicare options.

Through our long-term partnership model, we partner with leading community-based physician groups in our existing geographies and aim to expand our geographic reach by partnering with community-based physician groups in new geographies, across the United States. Our growth strategy is supported by a dedicated business development team that works closely with physician groups, senior management and key stakeholders to identify potential physician groups to partner with and integrate onto our platform and into our network. Additionally, we believe our network of like-minded physician partners also attracts new physicians to join, as access to cross-market know-how and best practices encourages success in a Total Care Model.

Our enterprise marketing team develops branding strategies and identities in our geographies and supports the development of communication and branding materials to support the local growth of our physician partners and their Medicare patient population. This begins with our entry into a new geography. We create a local brand that embodies the value of the Total Care Model for patients as well as the history and culture of our physician partner. Each geography includes the anchor partner's name and "Senior Health Connect" as part of the naming convention to help reinforce the value of our national network to payors, policy makers and other industry constituents. To empower patients to make informed decisions about their coverage options, educational opportunities and materials are offered throughout the year, including educational physician presentations, monthly "Medicare 101" sessions across every geography, on-line resources, in-office materials that explain the difference between traditional Medicare and MA, and patient communications that highlight Medicare election coverage windows.

**Competition**

The healthcare industry is highly competitive and fragmented. We currently face competition in every aspect of our business, including in offering a favorable reimbursement structure for existing physician partners and attracting health plan payors and physician partners who are not contracted with us, from a range of companies that provide care under a variety of models that could attract patients, providers and payors. We compete against other entities that provider value-based care services, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed care services tools and may provide these services to their physicians and patients at discounted prices or may seek to expand their relationships with additional competing physicians or physician networks. Other organizations may also seek to apply specialized services or programs, including providing data analytics or disease-based programs, designed to enable physicians or payors to operate successfully under value-based care arrangements. Although some of our competitors utilize elements of our MA multi-payor, globally capitated risk model deployed with community-based physician groups, including in certain of the geographies we serve, we do not believe any of our competitors offer a model that captures all elements of the agilon model. Our competitors typically vary by geography, and we may also encounter competition in the future from other new entrants. Our growth strategy and our business could be adversely affected if we are not able to continue to access existing geographies, successfully expand into new geographies or maintain or establish new relationships with payors and physician partners.

The competitive factors in our business include the nature and caliber of relationships with physicians; patient healthcare quality, outcomes and cost; the strength of relationships with payors; the quality of the physician experience; local geography leadership position; and the strength of the underlying economic model. We believe our first-of-its-kind platform, partnership and network model enables us to compete favorably.

7

**APP 510**

Table of Contents

**Intellectual Property**

We rely on a combination of international and U.S. trademark law as well as confidentiality procedures and contractual provisions to protect our trade secrets, including proprietary technology, databases and our brand.

We have registered "agilon" and our logo as trademarks in the U.S. We also have filed other trademark applications that are meaningful to our business in the U.S. across various states and local jurisdictions, including for the use of the local brand created within each of our geographies, and will pursue additional trademark registrations to the extent we believe it would be beneficial and cost-effective.

We are the registered holder of a variety of domain names that include "agilon" and similar variations.

We have developed proprietary technology and processes that support our operational programs and clinical insights, including our "CORE" technology platform and HCC Manager risk adjustment software application, both of which are proprietary systems that aid in the aggregation and analysis of third-party data we collect. Our internally developed technology is continuously refined to support the needs of our platform and partners. Although we do not currently hold a patent for CORE or HCC Manager, we continually assess the most appropriate methods of protecting our intellectual property and may decide to pursue available protections in the future.

We maintain our intellectual property and confidential business information in a number of ways. For instance, all employees and consultants sign agreements and/or acknowledgments reminding them of their confidentiality obligations upon the commencement of an employment or consulting relationship with us. In addition, we have a policy of requiring individuals and entities with which we discuss potential business relationships to sign non-disclosure agreements. Lastly, our agreements with physician partners include confidentiality and non-disclosure provisions.

We may be unable to obtain, maintain and enforce our intellectual property rights, and assertions by third parties that we violate their intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

**Human Capital**

*Overview*

People join agilon because of our vision: To transform the future of healthcare in communities across the country by empowering exceptional patient-physician relationships. Together with our employees and physician partners, we have defined our company values and commitments to guide our everyday actions in executing our mission:

- Partnership and Collaboration: We are One Team. We collaborate deeply. We embrace diversity. Together with our physician partners, we empower the care that our families and friends deserve.

- Innovation: We rapidly adapt to our changing world and embrace the creativity of our physician partners and each other.

- Quality and Service Excellence: We value results, not activity. We serve others with passion and humility.

- Continuous Improvement: We are agile and move fast. We actively seek out and share feedback. We learn and improve every day.

- Expertise: We are curious. We aspire to be experts and share our knowledge.

- Accountability and Integrity: We celebrate our successes. We take ownership in everything we do.

Our human capital efforts are supported by our dedicated human resources team. This team supports the business in identifying and recruiting top talent, supporting the onboarding and orientation of new hires through a comprehensive new employee orientation, a manager's toolkit and resources to support onboarding, goal setting, and in-year management, as well as a comprehensive semi-annual review process that ties to our company values and supports continuous learning and improvement. Our efforts to promote a positive employee experience and build culture are further supported and enhanced by local and national in-person and virtual events, including town halls, in-office and/or virtual celebrations, employee activity committees and recognition awards, meant to champion our employees and create a sense of community. We conduct annual employee engagement surveys to solicit feedback and help guide annual planning on efforts and initiatives to support our team members.

APP 511

Table of Contents

### Total Rewards

We recognize how vital our employees are to our success and strive to offer comprehensive and competitive compensation and benefits to meet the varying needs of our employees. Our Total Rewards programs include short-term and long-term incentives, recognition programs, a 401(k) plan, health and welfare insurance benefits, unlimited paid time off for exempt employees and accrued paid time off for hourly employees, flexible work schedules, and family leave, among many others, depending on eligibility.

As part of our efforts to promote pay equity, we have implemented measures in our U.S. offices such as routinely benchmarking roles against market comparables, increasing pay transparency for applicants and associates, setting pay ranges based on role and experience, applying consistent processes for annual merit increases and bonuses and driving additional ongoing and future improvements.

### Diversity, Equity, Inclusion & Belonging ("DEIB")

We believe a great workplace fosters an environment where all employees can thrive and grow, and where differences are both encouraged and celebrated. We aim to attract, develop, retain and support a diverse workforce that reflects the many members, physician partners, and communities we serve. Under our DEIB Senior Executive Council each direct report to our CEO is responsible for supporting strategic direction and championing efforts and funding for programs and initiatives connected to one of the four pillars of our DEIB strategy. Our DEIB programs include a leadership development workshop and coaching program for high potential employees including those who have not previously had opportunities to develop leadership skills, employee resource groups to foster sense of community and inclusion, an unconscious bias curriculum, and other community-building events to deepen understanding and appreciation of our global workforce.

### Training and Development

We prioritize and invest in creating opportunities to help employees grow and build their careers through a multitude of training and development programs. These programs, in addition to focusing on career development, and professional development, reinforce the importance of compliance and ethical behavior embodied in our Code of Conduct and related policies and training, which all employees must complete upon hire and annually thereafter. We also include online courses designed to strengthen technical and hard-skills and enhance leadership development. We support career coaching, mentorship and accelerated leadership development programs to ensure mobility and advancement for our employees. Our employees are also encouraged to participate in mentoring programs with people of various backgrounds and cultures. We view mentoring as an essential development tool for sharing skills and knowledge so we can all succeed. Our commitment to mentoring feeds the successful future of our company.

### Health & Safety

The health, safety, and wellness of our employees are vital to our success. We have a strong commitment to providing a safe working environment.

As of December 31, 2023, agilon and its subsidiaries had 1,117 employees; substantially all were full-time. None of our employees are members of a labor union, and we have not experienced a work stoppage. Our employees do not include our physician partners, whom we do not directly employ.

### Healthcare and Other Applicable Regulatory Matters

The healthcare industry is highly regulated under state, federal, and international laws and regulations. Our operations and relationships with healthcare plans and providers are also subject to extensive and increasing regulation by numerous federal, state, and local government agencies including the Office of Inspector General ("OIG"), the Department of Justice ("DOJ"), CMS, the Office of Civil Rights ("OCR"), and various other authorities. Healthcare laws and regulations change frequently. Regulatory agencies have broad discretion to issue new regulations and enforce the laws and regulations and have been increasingly active in enforcing the laws and regulations against healthcare companies, including companies that provide managed care.

### Corporate Practice of Medicine

Some states in which we operate have laws prohibiting the corporate practice of medicine ("CPOM"); such laws generally prohibit business entities with non-physician owners, such as agilon and certain of its subsidiaries, from practicing medicine. States with CPOM laws limit the practice of medicine to licensed individuals or professional

9

**APP 512**

Table of Contents

organizations comprising licensed individuals; therefore, non-medical professional entities are prohibited from employing or contracting with physicians (unless the entity satisfies limited exceptions), exercising control over medical decisions, or engaging in certain arrangements with other physicians, such as fee-splitting. These laws vary from state to state and change frequently based on new case law, opinions from state attorneys general and regulations promulgated by medical boards. A majority of states have adopted express corporate practice of medicine prohibitions, and several states that have not explicitly adopted the doctrine, nonetheless, have regulations that echo CPOM principles. A violation of the CPOM prohibition constitutes the unlawful practice of medicine, which is a public offense punishable by fines or criminal penalties. A violation could also result in civil penalties or damages. In addition, any medical professional who participates in a scheme that violates a state's CPOM prohibition may be subject to disciplinary action, license revocation, or potential forfeiture of revenues from payors for services rendered or may be punished for aiding and abetting a non-medical professional entity in the unlawful practice of medicine. We typically operate by forming RBEs that contract with payors on the one hand and provide professional services through contractual relationships with PCPs on the other hand. While we believe that our practices are in substantial compliance with the CPOM laws to which we are subject, if a state determines that we are not in compliance that may result in a material adverse effect on our business, results of operations or financial condition.

### Fee-Splitting Prohibitions

The laws of some states prohibit medical professionals from splitting with anyone, other than providers who are part of the same group practice, any professional fee, commission, rebate or other form of compensation for any services not actually and personally rendered. Fee-splitting laws and their interpretations vary and are enforced by state courts and regulatory authorities that have broad discretion in their enforcement. Courts in some states have interpreted fee-splitting statutes as prohibiting all percentage of gross revenue and percentage of net profit fee arrangements, despite the performance of legitimate services. In addition, courts have refused to enforce contracts found to violate state fee-splitting prohibitions. Further, fee-splitting arrangements could implicate other laws applicable to our business, such as anti-kickback and CPOM laws and regulations.

While we believe we are in substantial compliance with fee-splitting laws in the states in which we operate, if we are found to be non-compliant, penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary action against our affiliated providers. It could also result in monetary damages and penalties.

### False Claims Acts

We are subject to numerous federal and state laws that prohibit the presentation of false information, or the failure to disclose information, in connection with the submission and payment of medical claims for reimbursement.

The federal civil and criminal false claims laws and civil monetary penalties laws, such as the federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), impose civil liability on individuals or entities that submit false or fraudulent claims for payment to the federal government. The FCA provides, in part, that the federal government may bring a lawsuit against any person whom it believes has knowingly or recklessly: presented, or caused to be presented, a false or fraudulent claim for payment or approval to the federal government; made, used or caused to be made or used a false statement or a false record to get a claim for payment approved, including a false or fraudulent claim; concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money or property to the federal government; or conspired to commit any of the foregoing. The government may deem entities to have "caused" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information, billing for services not rendered, billing services at a higher payment rate than appropriate and billing for care that is not considered medically necessary. Suits filed under the FCA are also known as "qui tam" actions. They are frequently brought by individuals known as "relators" or "whistleblowers," who may file a FCA lawsuit on behalf of the government. Relators and whistleblowers are incentivized to file such lawsuits because they may share in a percentage of any recovery.

Healthcare-related fraud continues to be the leading source of recoveries in FCA settlements and judgments.

The federal government has used the FCA to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare and other federal healthcare programs. The federal government, including as a result of the passage of the ACA, and a number of courts have taken the position that claims presented in violation of certain other statutes, including the federal Anti-Kickback Statute ("AKS") or the federal physician referral law, 42 U.S.C. 1395nn (the "Stark Law"), are a violation of the FCA. Some government healthcare programs, including, but not limited to,

10

Table of Contents

the MA program, use a risk-adjustment model that adjusts premiums paid to contracted payors to reflect the specific characteristics of each enrolled member (including demographics, government program eligibility and health status). Many payors and government healthcare programs have set forth specific documentation rules that must be followed in compliantly selecting allowable codes. We rely on physician partners to follow the CMS documentation rules and code their claim submissions with accurate and substantially documented diagnoses, which we send to the payors, some of whom, in turn, submit the data to government healthcare agencies including CMS.

In recent years, the DOJ has brought a number of investigations and actions under the federal FCA against both payors and providers for alleged upcoding or improper coding of diagnosis coding under the risk-adjustment methodology. The FCA and Social Security Act also prohibits the knowing retention of identified overpayments (known as "reverse false claims"). A number of states have enacted laws that are similar to the federal FCA. Under Section 6031 of the Deficit Reduction Act of 2005, as amended, if a state enacts a false claims act that is at least as stringent as the federal statute and that also meets certain other requirements, the state will be eligible to receive a greater share of any monetary recovery obtained pursuant to certain actions brought under the state's FCA. As a result, more states are expected to enact laws that are similar to the federal FCA in the future along with a corresponding increase in state false claims enforcement efforts.

Penalties for violations of the federal and state FCAs are severe. For example, if an entity violates the federal FCA, the government may seek up to three times the actual damages (known as "treble damages"), plus substantial penalties for each false claim. Exclusion from federal healthcare programs is also possible. Violations of federal and state fraud and abuse laws may be punishable by criminal and/or civil sanctions, including significant penalties, fines, disgorgement, additional reporting requirements and oversight under a corporate integrity agreement or similar agreement to resolve allegations of noncompliance with these laws, and/or exclusion or suspension from federal healthcare programs, such as Medicare, and debarment from contracting with the U.S. government. In addition to the provisions of the FCA, which provide for civil enforcement, the federal government also can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims to the government for payments.

### *Federal and State Anti-Kickback Statutes*

The AKS, set forth in Section 1128B of the Social Security Act, is a criminal statute that prohibits the knowing and willful offer, payment, solicitation or receipt of any form of remuneration in return for, or to induce, (i) the referral of a person for items or services reimbursable under federal healthcare programs, (ii) the furnishing or arranging for the furnishing of items or services reimbursable under federal healthcare programs or (iii) the purchase, lease or order or arranging or recommending purchasing, leasing or ordering of any item or service reimbursable under federal healthcare programs. The core of a violation of the AKS is an "inducement" to refer patients for services or items that are reimbursed under a federal healthcare program, such as Medicare, Medicaid, or Tricare (which covers military personnel). The AKS is based on the theory that kickbacks undermine the integrity of federal healthcare programs by tainting medical decision-making, increasing healthcare costs and negatively impacting competition. The ACA amended the AKS to make it clear that a person need not have actual knowledge of the statute, or specific intent to violate the statute, as a predicate for a violation. Court cases have resulted in the interpretation that a violation may occur even when only one of many purposes of the remuneration is to induce or reward referrals, and the OIG, which has the authority to impose administrative sanctions for violation of the statute, has adopted a similar standard.

There are certain AKS "safe harbors" which, if the respective requirements are met, would afford protection from the AKS. Failure to meet all requirements of an AKS safe harbor does not necessarily mean the arrangement violates the AKS, but it may be subject to scrutiny by legal authorities, in light of the parties' intent and arrangements. In other words, if an arrangement does not fit within a safe harbor, it does not necessarily mean that the arrangement is *per se* illegal-only that it is not shielded from regulatory scrutiny. The federal AKS provides criminal penalties for individuals or entities that knowingly and willfully solicit or receive any remuneration. A violation of the AKS is punishable by imprisonment of up to ten years, fines of up to $100,000 per offense, or both. Violation can also give rise to federal healthcare program exclusion, liability under the FCA and civil penalties, which may include monetary penalties of up to $100,000 per offense, repayments of up to three times the total payments between the parties to the arrangement and suspension from future participation in Medicare and Medicaid.

We have endeavored to structure our business arrangements with healthcare providers to comply with the AKS or fit within an AKS safe harbor. For example, a key managed care safe harbor under the AKS upon which we regularly rely allows for payments to providers for "healthcare services and items," but does not allow incentive payments for marketing or to encourage member enrollment. We therefore carefully analyze all payment structures to ensure that they

11

APP 514

Table of Contents

constitute "services and items" that fall within this safe harbor or are otherwise in compliance with the AKS. We similarly analyze other financial arrangements with healthcare providers to seek to comply with the AKS, including through application of other safe harbors and assessment of whether the arrangement reflects fair market value for the value of services provided without regard for the volume or value of referrals generated between the parties.

Additionally, some states have enacted statutes and regulations similar to the AKS, but which may be applicable regardless of the payor source for the patient. These state laws may contain exceptions and safe harbors that are different from and/or more limited than those of federal law and that may vary from state to state.

To help accelerate the U.S. healthcare system's transition from a FFS to a value-based system, the U.S. Department of Health and Human Services ("HHS") launched the "Regulatory Sprint to Coordinated Care" initiative ("Regulatory Sprint") in 2018, which aims to change the manner in which the healthcare regulatory framework has traditionally been applied to stakeholder arrangements. In connection with the Regulatory Sprint, the OIG issued final rules amending the AKS by adding new safe harbors and modifying existing safe harbors that protect certain payment practices and business arrangements from sanctions under the AKS in order to remove potential barriers to more effective coordination and management of patient care and delivery of value-based care. Among other changes, the new regulations contain safe harbors for value-based arrangements centering around value-based enterprises, which are enterprises composed of participants collaborating to achieve one or more value-based purposes, including coordinating and managing the care of a target patient population and coordinating and managing the care of a target population. These new final rules provide additional protections to our payment models with providers.

We have also endeavored to structure our participation in the ACO REACH Model to comply with waivers of the AKS issued by the Secretary of HHS. The conditions of such waivers are to ensure that protected arrangements: (i) are consistent with the quality, care coordination, and cost-reduction goals of the ACO REACH Model, (ii) are subject to safeguards designed to mitigate the risk of fraud and abuse; and (iii) can be readily monitored and audited.

*Stark Law*

The Stark Law generally prohibits a physician from referring Medicare and Medicaid patients to an entity providing designated health services ("DHS") if such physician, or a member of the physician's immediate family, has a financial relationship with the entity, unless a specific exception applies. DHS is defined to mean any of the following enumerated items or services: clinical laboratory services; physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; and outpatient speech-language pathology services. The types of financial arrangements between the referring physician and an entity providing DHS that trigger the Stark Law are broad, including direct and indirect ownership and investment interests, and compensation arrangements. The Stark Law also prohibits any entity providing DHS and receiving a prohibited referral from presenting, or causing to be presented, a claim or billing for the services arising out of the prohibited referral. Similarly, the Stark Law prohibits an entity from "furnishing" a DHS to another entity in which it has a financial relationship when that entity bills for the service. The Stark Law also prohibits self-referrals within an organization by its own physicians, although broad exceptions exist that cover employed physicians and those referring DHS that are ancillary to the physician's practice to the physician group. The prohibition applies regardless of the reasons for the financial relationship and the referral; intent to induce referrals is not required.

Like the federal AKS, the federal Stark Law contains statutory and regulatory exceptions intended to protect certain types of transactions and arrangements. If the Stark Law is implicated, the financial relationship must fully satisfy a Stark Law exception; if an exception is not satisfied, then the parties to the arrangement could be subject to sanctions. Sanctions for violation of the Stark Law include denial of payment for claims for services provided in violation of the prohibition, refunds of amounts collected in violation of the prohibition, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law prohibition, civil assessment of up to three times the amount claimed, and potential exclusion from the federal healthcare programs, including Medicare and Medicaid. Amounts collected on claims related to prohibited referrals must be reported and refunded generally within sixty (60) days after the date on which the overpayment was identified. Furthermore, Stark Law violations and failure to return overpayments in a timely manner can form the basis for FCA liability, as further discussed herein. Additionally, several states have enacted physician self-referral laws.

12

Table of Contents

Notably, compensation pursuant to a risk-sharing arrangement between a managed care organization or an independent practice association and a physician (either directly or indirectly through a contractor) for services provided to enrollees of a health plan (an MA plan, for example) does not constitute a financial arrangement for Stark purposes. Further, physician incentive plans ("PIPs") are allowable provided that (i) the compensation is not determined in any manner (withhold, capitation, bonus, or otherwise) that takes into account, directly or indirectly, volume or value of referrals and (ii) the PIP does not induce the reduction of medically necessary care to individual patients and does not place the physician at substantial financial risk for services not provided by the physician.

As part of the Regulatory Sprint, CMS also issued a sweeping set of regulations that introduce significant new value-based terminology and exceptions to the Stark Law. CMS has implemented new exceptions for certain remuneration exchanged between or among eligible participants in value-based arrangements. These exceptions and their various requirements apply based on the level of risk assumed by the arrangement's participants. These new regulations purport to ease the compliance burden for healthcare providers across the industry while maintaining strong safeguards to protect patients and programs from fraud and abuse. These or other changes may change the parameters of the Stark Law exceptions that we rely upon and impact our business, results of operations and financial condition.

*Section 1876 of the Social Security Act*

Section 1876 of the Social Security Act prohibits MA plans and their downstream entities from entering into compensation arrangements with physicians that may directly or indirectly have an effect of reducing or limiting services to individual members. We have sought to structure our compensation arrangements with physicians to ensure compliance with this requirement.

*Health Care Fraud Statute*

The Health Care Fraud Statute, 18 U.S.C. § 1347, is a criminal statute that prohibits any person from knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, which can be either a government or private payor plan. Violation of this statute, even in the absence of actual knowledge of or specific intent to violate the statute, may be charged as a felony offense and may result in imprisonment, fines or both. The False Statement Statute, 18 U.S.C. § 1035, prohibits, in any matter involving a federal healthcare program, anyone from knowingly and willfully falsifying, concealing or covering up, by any trick, scheme or device, a material fact, or making any materially false, fictitious, or fraudulent statement or representation, or making or using any materially false writing or document knowing that it contains a materially false or fraudulent statement. A violation of this statute may be charged as a felony offense and may result in imprisonment, fines, or both. Other federal criminal statutes similarly apply to healthcare, including Mail Fraud, 18 U.S.C. § 1341 and Wire Fraud, 18 U.S.C. § 1343. A violation of these statutes may be charged as a felony offense and may result in imprisonment, fines or both.

*Civil Monetary Penalties Statute*

The Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. § 1320a-7a, authorizes the imposition of civil monetary penalties, assessments, and exclusions against an individual or entity based on a variety of prohibited conduct, including, but not limited to: (i) presenting, or causing to be presented, claims for payment to Medicare, Medicaid, or other third-party payors that the individual or entity knows or should know are for an item or service that was not provided as claimed or is false or fraudulent; (ii) offering remuneration to a federal healthcare program beneficiary that the individual or entity knows or should know is likely to influence the beneficiary to order or receive healthcare items or services from a particular provider; (iii) arranging contracts with an entity or individual excluded from participation in a federal healthcare program; (iv) violating the federal AKS; (v) making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a federal healthcare program; (vi) making, using, or causing to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a federal healthcare program; and (vii) failing to report and return an overpayment owed to the federal government. We could be exposed to a wide range of allegations to which the federal CMPL would apply. We perform monthly checks on our employees, affiliated providers and certain affiliates and vendors using government databases to confirm that these individuals have not been excluded from federal programs. However, should an individual become excluded, and we fail to detect it, a federal agency could require us to refund amounts attributable to all claims or services performed or sufficiently linked to an excluded individual. Thus, we cannot foreclose the possibility that we will face allegations subject to the CMPL with the potential for a material adverse impact on our business, results of operations and financial condition. Substantial civil monetary penalties may be imposed under the federal Civil Monetary Penalty Statute and may vary, depending on the

13

Table of Contents

underlying violation. In addition, an assessment of not more than three (3) times the total amount claimed for each item or service may also apply, and a violator may be subject to exclusion from federal and state healthcare programs.

### Federal and State Insurance and Managed Care Laws

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. Some states require downstream entities and RBEs to obtain an insurance license, a certificate of authority, or an equivalent authorization, in order to participate in downstream risk-sharing arrangements with payors. In some states, statutes, regulations and/or formal guidance explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity. However, the majority of states do not explicitly address the issue, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements, as well as reporting obligations. Further, state regulatory stances regarding downstream risk-sharing arrangements can change rapidly and codified provisions may not keep pace with evolving risk-sharing mechanisms.

### Healthcare Reform

In March 2010, the Patient Protection and Affordable Care Act (the "ACA") and the accompanying Health Care and Education Affordability Reconciliation Act, collectively referred to as the ACA, were enacted. The ACA includes a variety of healthcare reform provisions and requirements, which continue to be implemented and substantially changed the way healthcare is financed by both governmental and private insurers.

However, due to government action over the last several years, a number of changes have been made to the provisions of the ACA since 2010, including reduced funding. Looking forward, the future of the ACA and its underlying programs are subject to continuing and substantial uncertainty, making long-term business planning exceedingly difficult. Because of the continued uncertainty about the implementation of the ACA, including the timing of and potential for further legal challenges, repeal or amendment of that legislation and the future of the health insurance exchanges, we cannot quantify or predict with any certainty the likely impact of the ACA on our business, financial condition, operating results and prospects.

The CMS Innovation Center continues to test an array of alternative payment models, including the ACO REACH Model, to allow ACOs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. State regulation of ACOs will likely be variable. For example, certain states may require ACOs to obtain specific licensure to participate in the ACO REACH Model and assume risk directly from CMS. There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare. Further, CMS also routinely adjusts the risk adjustment factor which is central to payment under the MA program. The monetary "coefficient" values associated with diseases that we manage in our population are subject to change by CMS. Such changes could have a material adverse effect on our financial condition.

### Federal, State, and International Privacy and Security Requirements

We are subject to various federal, state and local laws and rules regarding the use, security and disclosure of PHI, personally identifiable information, de-identified data and other categories of confidential or legally protected data that our businesses may handle. Such laws and rules include, without limitation, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") and the California Consumer Privacy Act, the California Privacy Rights Act, and other applicable state and international privacy and security laws, including Brazil and India. Privacy and security laws and regulations often change due to new or amended legislation, regulations or administrative interpretation. We are highly dependent on information technology networks and systems, including the internet, to securely process, transmit and store this information. We also utilize third-party service providers for important aspects of the collection, storage and transmission of such sensitive information.

Congress enacted HIPAA, in part, to combat healthcare fraud and to protect the privacy and security of patients' individually identifiable healthcare information. Among other things, HIPAA requires healthcare providers and their business associates to maintain the privacy and security of individually identifiable PHI. The HIPAA Security Rule requires both covered entities and business associates to develop and maintain policies and procedures with respect to PHI, including adherence to HIPAA's security standards through the implementation of administrative, physical and technical

14

**APP 517**

Table of Contents

safeguards to protect PHI. Additionally, the Privacy Rule contains requirements with respect to the use and disclosure of individuals' PHI, including a prohibition on a covered entity or business associate using or disclosing an individual's PHI unless the use or disclosure is authorized by the individual or is specifically required or permitted under the Privacy Rule. The Health Information Technology for Economic and Clinical Health of 2009 ("HITECH") dramatically expanded, among other things, (1) the scope of HIPAA to now apply directly to "business associates," or independent contractors who receive, create, maintain or obtain PHI in connection with providing a service to a covered entity or another business associate, (2) substantive security and privacy obligations, including a new federal security breach notification requirement that unauthorized acquisitions, access, use or disclosure of unsecured PHI that compromise the security or privacy of the PHI be reported to, depending on the number of people affected and their location, affected individuals, the Department of Health and Human Services and local media outlets, (3) restrictions on certain marketing communications, a prohibition on business associates from receiving remuneration in exchange for PHI, and a prohibition on covered entities from receiving remuneration in exchange for PHI without express patient authorization or applicable exception and (4) the civil and criminal penalties that may be imposed for HIPAA violations. Pursuant to HIPAA, as amended by HITECH, we are required to report breaches of unsecured PHI to our covered entity clients, such as our physician group partners, within the time period specified in our applicable business associate agreement, but in no case later than 60 days from the discovery of the breach, and notify certain agencies and potentially the media in accordance with clause (2) above. We have experienced cybersecurity incidents in the past and may experience them in the future. Any interruption in access to member information, unauthorized use of or access to information, improper disclosure or other loss of information could result in, among other things, federal or state government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties.

HIPAA mandates that the Secretary of HHS conduct periodic audits of covered entities and business associates for compliance with the HIPAA Privacy and Security Rules. HIPAA imposes penalties for certain violations, subject to a cap of $1.5 million for violations of the same standard in a single calendar year. A single data privacy or data security incident can, in the view of HHS, result in violations of multiple standards. HIPAA, as amended by the HITECH Act, also authorizes state attorneys general to file suit on behalf of their states' residents. While HIPAA does not create a private right of action allowing individuals to sue us in federal court for violations of HIPAA, its standards have been used as a basis for establishing a duty of care in state-law civil suits alleging negligence or recklessness for the misuse of PHI. A finding of liability under HIPAA could have a material adverse effect on our business, financial condition and results of operations. In order to ensure compliance, we encrypt and back up data, maintain company-wide security awareness training, enter into business associate agreements with our partners and vendors, as well as ensure our partners and vendors have implemented physical security and safeguards at the data centers where our data is stored and conduct regular security audits. Although we employ administrative, physical and technological safeguards to help protect confidential and other sensitive information from unauthorized access, use or disclosure, our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to attacks by hackers or viruses, failures or breaches due to third-party action and employee (including contractor) negligence, error or malfeasance.

Additionally, many states and foreign jurisdictions have also enacted laws that protect the privacy and security of confidential, personal and health information, which may be even more stringent than HIPAA and may add additional compliance costs and legal risks to our operations. Some state privacy and security laws overlap with federal law, some of which are preempted, in part, by federal laws, whereas others are not. States have also passed privacy and security laws and regulations that apply across sectors and go beyond federal law, such as data security laws, secure destruction, Social Security number privacy, online privacy, biometric information privacy, data breach notification laws. Some of these state and international laws may impose fines and penalties on violators and may afford private rights of action to individuals who believe their personal information has been misused.

We are also subject to a provision of the federal 21st Century Cures Act that is intended to facilitate the appropriate exchange of health information. In May 2020, the U.S. Department of Health and Human Services Office of the National Coordinator for Health Information Technology and CMS issued complementary new rules that are intended to clarify provisions of the 21st Century Cures Act. The rules, intended to enhance interoperability and prevent information blocking, create significant new requirements for healthcare industry participants, including requirements to (i) provide patients with convenient access to health care information, (ii) support electronic exchange of data for transitions of care and (iii) require participation in trust networks to improve interoperability. The 21st Century Cures Act authorizes civil monetary penalties up to $1 million per information blocking "violation." It is unclear what the costs of compliance with the rules will be, and what additional risks there may be to our business. It is possible that the American Data Privacy and Protection Act ("ADPPA"), a landmark federal privacy bill with significant bipartisan support, may gain traction. Although ADPPA would not apply to health data covered by HIPAA, it would apply to other health data, such as health data controlled by certain entities in the digital health space. Various other federal, state and foreign laws may apply that restrict the use and protect the privacy and security of individually identifiable information, as well as employee personal

15

Table of Contents

information, including laws modeled to some extent on the European Union's GDPR. Federal and state consumer protection laws, including laws that do not, on their face, specifically address data privacy or security, have been applied to data privacy and security matters by a range of government agencies and courts.

### Consumer Protection Laws

agilon may be subject to the Telephone Consumer Protection Act ("TCPA"), which regulates the manner in which a business may advertise its products and services to consumers by phone, text and fax. The TCPA was enacted by Congress to combat aggressive telemarketing and fax advertising practices believed to invade consumer privacy. The TCPA also regulates the use of automated equipment to deliver calls or text messages to mobile phones without prior express consent. Congress empowered the FCC to interpret the TCPA through rules, regulations and declaratory rulings. A 2015 order from the FCC clarified that calls or text messages that have an express healthcare-related purpose-such as treatment follow-up, appointment confirmations and reminders or pre-operative instructions-are exempt from the TCPA. In these instances, providers are not required to receive prior express consent from patients before reaching out by phone or text. As healthcare companies, such as ourselves, increasingly rely on mobile delivery platforms and other technologies to communicate with patients about appointments, billing and other issues, the potential for legal exposure under the TCPA also increases. Each call or text made in violation of the TCPA can cost up to $1,500 per instance in fines and damages. Because there is no cap on statutory damages, violations can result in millions of dollars in penalties.

### Competition and Antitrust Laws

We are subject to numerous statutes that govern competition in our industry, including the Sherman Act, the FTC Act and the Clayton Act. The Sherman Act, 15 U.S.C. §§ 1-7, outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." The penalties for violating the Sherman Act can be severe. Most enforcement actions are civil, but individuals and businesses that violate the Sherman Act may be prosecuted criminally by the DOJ. Criminal prosecutions are typically limited to clear violations, such as when competitors fix prices, allocate markets or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a corporation and $1 million for an individual, along with up to 10 years in prison. Under federal law, the maximum fine may be increased to twice the amount the conspirators gained from the illegal acts or twice the money lost by the victims of the crime, if either of those amounts is more than $100 million.

The FTC Act, 15 U.S.C. §§ 41-58, bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said that all violations of the Sherman Act also violate the FTC Act. Thus, although the FTC does not technically enforce the Sherman Act, it can bring cases under the FTC Act against the same kinds of activities that violate the Sherman Act. The FTC Act also reaches other practices that harm competition, but that may not fit neatly into categories of conduct formally prohibited by the Sherman Act. Only the FTC brings cases under the FTC Act.

The Clayton Act, 15 U.S.C. §§ 12-27, addresses specific practices that the Sherman Act does not clearly prohibit, such as mergers and interlocking directorates (that is, the same person serving as an officer or director of two competing companies). Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, 15 U.S.C. § 13, the Clayton Act also bans certain discriminatory prices, services and allowances in dealings between merchants. The Clayton Act was amended again in 1976 by the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, to require companies planning large mergers or acquisitions to notify the government of their plans in advance. The Clayton Act also authorizes private parties to sue for treble damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the alleged anticompetitive practice in the future.

In addition to these federal statutes, most states have antitrust laws that are enforced by state attorneys general or private plaintiffs. Many state statutory provisions are based on federal antitrust law, namely, Sections 1 and 2 of the Sherman Act, and Sections 3 and 7 of the Clayton Act. Further complicating matters, state lawmakers are increasingly seeking to exercise oversight over healthcare transactions and allow state agencies to analyze potential anticompetitive effects of healthcare consolidation, including smaller transactions that do not meet federal reporting thresholds. Private parties may also bring lawsuits to enforce antitrust laws.

As the healthcare industry has continued to evolve in response to consumer demand and competition in the marketplace, the effect of the antitrust laws in healthcare is also changing. We have expanded our operations significantly since our inception, organically as well as through acquisitions. Such growth, and our long-term contracts with physician

Table of Contents

partners, could expose us to risks related to antitrust investigations and litigation. Competition and antitrust law inquiries often continue for several years and, if violations are found, can result in substantial financial exposure.

### *U.S. Foreign Corrupt Practices Act of 1977 and Various Anticorruption Laws*

agilon is subject to the U.S. Foreign Corrupt Practices Act, as amended, 15 U.S.C. §§ 78dd-1, et seq. ("FCPA"). The FCPA prohibits offering, promising, providing or authorizing others to give anything of value to a foreign government official to obtain or retain business or otherwise secure a business advantage. The FCPA also requires public companies like aglion to maintain sufficient internal controls to prevent and detect FCPA violations and to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company. Violations of the FCPA can result in imprisonment, significant criminal and civil fines and penalties, and ongoing government supervision such as a monitorship. In addition, agilon is subject to various foreign anticorruption laws in locations in which it operates, including Brazil's Clean Companies Act and India's Prevention of Corruption Act, 1988.

### *Other Laws and Regulations*

Some states in which we operate require licensing or registration for operations related to, among others, utilization review on behalf of payors, including reviewing medical necessity and appropriateness of healthcare services, or processing claims in connection with insurance or managed care products. Such laws vary from state to state, and our operations may be subject to exemption in certain states.

Additionally, our physician partners are subject to numerous federal, state and local licensing laws and regulations, relating to, among other things, professional credentialing and professional ethics. Our physician partners, as well as their nurse practitioners and physician assistants, must satisfy and maintain their individual professional licensing in each state where they practice medicine.

Further, organizations that receive reimbursement from a federal or state government payor are expected by the federal government to have a compliance program. For those organizations that do not receive reimbursement from any federal or state government payors, a compliance program is not mandatory but is considered best practice. As a result, we maintain a program to monitor compliance with federal and state laws and regulations applicable to healthcare entities. We have a compliance department that is charged with implementing and supervising our compliance program, which includes the adoption of (i) a Code of Conduct for our employees and affiliates and (ii) a process that specifies how employees, affiliates and others may report regulatory or ethical concerns to our compliance officer. We believe that our compliance program meets the relevant standards provided by the OIG of the Department of Health and Human Services. An important part of our compliance program consists of conducting periodic audits of various aspects of our operations. We also conduct mandatory educational programs designed to familiarize our employees with the regulatory requirements and specific elements of our compliance program.

We are also impacted by federal and state laws and policies that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in its operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare.

### Available Information

Our website address is www.agilonhealth.com. We use our website as a routine channel for distribution of information that may be material to investors, including news releases, financial information, presentations and corporate governance information. Information contained or connected to our website is not incorporated by reference in this Report unless expressly noted. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available on our website, free of charge, as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the U.S. Securities and Exchange Commission ("SEC"). Additionally, the SEC maintains a website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us, at www.sec.gov.

APP 520

Table of Contents

**ITEM 1A. Risk Factors**

*Summary Risk Factors.* Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, cash flows, and results of operations that you should consider before making a decision to invest in our common stock. These risks include, but are not limited to, the following:

*Risks Related to Our Business*

- our history of net losses and the expectation that our expenses will increase in the future;
- failure to identify and develop successful new geographies, physician partners and payors, or execute upon our growth initiatives;
- success in executing our operating strategies or achieving results consistent with our historical performance;
- medical expenses incurred on behalf of our members may exceed revenues we receive;
- inability to secure contracts with MA payors;
- inability to grow new physician partner relationships sufficient to recover startup costs;
- availability of additional capital, on acceptable terms or at all, to support our business in the future;
- significant reduction in our membership;
- transition to a Total Care Model may be challenging for physician partners;
- public health crises, such as COVID-19, could adversely affect us;
- inaccuracy in estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts;
- the impact of restrictive clauses or exclusivity provisions in some of our contracts with physician partners;
- inability to hire and retain qualified personnel;
- ability to realize the full value of our intangible assets;
- security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems;
- ability to protect the confidentiality of our know-how and other proprietary and internally developed information;
- reliance on our subsidiaries;
- ESG issues;

*Risks Related to Our Reliance on Third Parties*

- reliance on a limited number of key payors;
- the limited terms of contracts with our payors and our ability to renew them upon expiration;
- reliance on payors for membership attribution and assignment, timely data and reporting accuracy and claims payment;
- dependence on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts;
- ability to obtain accurate and complete diagnosis data;
- dependence on physician partners to document their services and any inaccuracies could result in overpayments, recoupments or liability under the federal FCA or through RADV audits (defined below);
- reliance on third-party software, data, infrastructure and bandwidth;

18

APP 521

Table of Contents

*Risks Related to Our Industry and Government Programs*

- consolidation in the healthcare industry;
- discontinuance or reductions in federal government healthcare programs' reimbursement rates or methodologies applied to derive reimbursement;
- uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures;
- competition in our industry;
- dependence on government performance standards and benchmarks;
- government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions;
- regulatory proposals directed at containing or lowering the cost of healthcare, including the ACO REACH Model, and our participation, voluntary or otherwise, in such proposed models;
- federal and state investigations, audits and enforcement actions;
- regulatory inquiries and corrective action plans imposed by our payors;
- repayment obligations arising out of payor audits;
- modification the methodology utilized to determine revenue associated with MA members;
- negative publicity regarding the managed healthcare industry generally;

*Legal and Regulatory Risks*

- regulation of the healthcare industry at the federal, state and local levels and our ability to comply with applicable laws or regulations;
- our and our physician partners' ability to comply with federal and state fraud and abuse laws, including physician incentive plan laws and regulations;
- implication of laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information;
- our use, disclosure and processing of personally identifiable information, PHI, and de-identified data is subject to HIPAA and state patient confidentiality laws;
- failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization;
- regulation of the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations;
- inadvertent employment or contract with an excluded person by us or our physician partners;
- lawsuits not covered by insurance;
- changes in tax laws and regulations, or changes in related judgments or assumptions;

*Risks Related to Our Indebtedness*

- incurrence of substantially more indebtedness, which could increase the risks created by our indebtedness;
- restrictions and limitations in our agreements and instruments governing our indebtedness;

19

**APP 522**

Table of Contents

*Risks Related to Our Common Stock*

- dependence on our subsidiaries for cash to fund all of our operations and expenses;

- our Certificate of Incorporation, Clayton, Dubilier & Rice, LLC ("CD&R") and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of CD&R and its affiliates, have no obligation to offer us corporate opportunities;

- anti-takeover provisions in our Certificate of Incorporation and By-laws;

- ability to achieve a return on your investment depends on appreciation in the price of our common stock;

- exclusive forum provisions in our Certificate of Incorporation; and

- material weakness in our internal control over financial reporting and our ability to remediate such material weakness.

You should carefully consider each of the following risk factors and all of the other information set forth in this report. The risk factors generally have been separated into five groups: risks related to our business, risks related to our reliance on third parties, risks related to our industry and government programs, risks related to our indebtedness, and risks related to our common stock. Based on the information currently known to us, we believe that the following information identifies the most significant risk factors affecting our company in each of these categories of risks. However, the risks and uncertainties we face are not limited to those set forth in the risk factors described below. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business. In addition, past financial performance may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods.

If any of the following risks and uncertainties develop into actual events, these events could have a material adverse effect on our business, financial condition or results of operations. In such a case, the trading price of our common stock could decline.

## Risks Related to Our Business

### *We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability.*

We have incurred significant net losses in prior years and have a substantial accumulated deficit. We expect that our expenses will increase substantially in the foreseeable future and our losses may continue, in part as we invest in growing our business, expanding our management team, building relationships with physician partners and payors, developing new services and complying with the requirements associated with being a public company. These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. We may not succeed in sufficiently increasing our revenue to offset these expenses. Consequently, we may not be able to achieve and maintain profitability for the current or any future fiscal year. Our prior losses and potential for future losses have had and will continue to have an adverse effect on our stockholders' equity and working capital.

### *Any failure by us to identify and develop successful new geographies, physician partners and payors and to successfully execute upon our growth initiatives and achieve required operational scale to support our growth may have a material adverse effect on our business, financial condition, cash flows, and results of operations.*

Our business depends on our ability to identify and develop successful geographies and relationships with physician partners and payors, and to successfully execute upon our growth initiatives to increase the profitability of our physician partners. In order to pursue our strategy successfully, we must effectively implement our platform, partnership and network model, including identifying suitable candidates and successfully building relationships with and managing integration of new physician partners and payors. We contract with a limited number of physician partners and rely on physician partners within each geography. Our growth initiatives in our existing geographies depend, in part, on our physician partners' ability to grow their practices through the addition of PCPs to increase their capacity to service Medicare patients, and to effectively meet increased patient demand. Our physician partners may encounter difficulties in recruiting additional PCPs to their practices due to many factors, including significant competition in their geographies. Accordingly, the loss or dissatisfaction of any physician partners, our inability to recruit and integrate physician partners into our model, or the failure of our physician partners to recruit additional PCPs or manage and scale capacity to timely

20

Table of Contents

meet patient demand, could substantially harm our brand and reputation, impact our competitiveness, inhibit widespread adoption of our platform, partnership and network model and impair our ability to attract new physician partners and maintain existing physician partnerships, both in new geographies and in geographies in which we currently operate, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, our growth strategy depends, in part, on securing and integrating new high-caliber physician partners and expanding into new geographies in which we have little or no operating experience. Integration and other risks can be more pronounced for larger and more complicated relationships or relationships outside of our core business space, or if multiple relationships are pursued simultaneously. Additionally, new geographies may be characterized by stakeholder preferences for, and experience with, a Total Care Model, rates of MA enrollment, MA reimbursement rates, payor concentration and rates of unnecessary variability in and utilization of medical care that differ from those in the geographies where our existing operations are located. Likewise, new geographies into which we seek to expand may have laws and regulations that differ from those applicable to our current operations. As a young and rapidly growing company, we may be unfamiliar with the regulatory requirements in each geography that we enter, and we may be forced to incur significant expenditures to ensure compliance with requirements to which we may become subject. If we are unable or unwilling to incur such costs, our growth in new geographies may be less successful than in our current geographies.

Further, our growth to date has significantly increased the demands on our management, operational and financial systems, infrastructure and other resources. We must continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls and management and mitigation of enterprise and operational risks. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations, maintaining adequate financial and operating systems and controls, executing upon our growth initiatives and achieving required operational scale to support our growth. If we do not successfully manage these processes, our business, financial condition, cash flows, and results of operations could be harmed.

***We may be unsuccessful in executing our operating strategies, or we may not achieve results consistent with our historical performance.***

Our success is dependent on our ability to successfully execute upon defined operating strategies in our existing and future geographies. Such strategies include successfully growing our geographies through the addition of PCPs and our physician partners' capacity to serve new members, providing medical services for our members at appropriate levels of utilization and cost while sufficient to achieve expected profitability, and generating medical services revenue through appropriate and effective contracting strategies with our MA payors. We may not be successful in executing these strategies, or we may fail to implement such strategies in future markets as effectively as with our current markets. The failure to successfully execute upon such strategies or to produce results consistent with our historical results or the financial and operational models used in the analysis of our potential relationships may result in an inability to grow our business; may cause ongoing operating losses or achievement of profitability levels that do not meet expectations, asset write-offs, restructuring costs or other expenses; and may have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Further, as a young and rapidly growing company with a limited operating history, it is uncertain whether our platform, partnership and network model will achieve and sustain high levels of demand, physician and payor acceptance, market adoption and profitability. Due to our limited operating history, it is also difficult for us to evaluate our business compared to prior periods. If we do not develop, if we develop more slowly than we expect, if we encounter negative publicity or if our value propositions for physician partners, patients and payors do not drive sufficient member growth, the growth and profitability of our business will be harmed. Our success will depend to a substantial extent on our ability to demonstrate the value of our platform, partnership and network model to physicians and payors. We believe our ability to replicate the success of our model also enables us to attract and retain skilled physician partners. Accordingly, if we are unable to effectively manage our growth and replicate the success of our platform, partnership and network model in new geographies and with new partners, our business, financial condition, cash flows, and results of operations could be harmed.

21

APP 524

Table of Contents

***Amounts of medical expenses that are incurred on behalf of our members may exceed the amount of medical revenues we receive to provide care for such members.***

Under our agreements with our payors, we receive a PMPM-based capitation payment, and we assume financial risk for the expense of providing medical services on behalf of our physician partners. To the extent that utilization of medical services or the cost of providing such services increases beyond our expectations, the total cost to provide medical services to our members may exceed the corresponding amount of revenue we receive, which may result in losses or profitability that does not meet expectations and adversely impact our business, financial condition, cash flows, and results of operations.

Additionally, factors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following:

- Changes to the Medicare fee schedule or other rate schedules that serve as the basis for payments issued to hospitals, specialty and ancillary physicians and other providers;

- Contractual rates paid to hospitals, specialty and ancillary physicians and other providers;

- The utilization rates of healthcare services, including inpatient hospitalization, outpatient procedures, high risk and chronic conditions and other services that result in medical expenses, by our members;

- Changes to member benefit types, categories, and levels established and otherwise offered  by payors; and

- The utilization rate and cost of pharmaceuticals or specialty drugs utilized by our members.

Fluctuations in the magnitude of the hospital and physician network, including the discontinuation of a hospital or specialty or ancillary physician's participation in our MA payors' provider network, could adversely impact our business, financial condition, cash flows, and results of operations.

***As we expand into new geographies, we may be unable to secure contracts with MA payors, or such contracts may be established at less favorable financial terms than are necessary to meet our financial targets.***

As we enter into new geographies, potential physician partners will typically provide care to members affiliated with one or more MA payors, in a structure other than a Total Care Model. Our ability to successfully operate in a market is dependent upon our ability to enter into contractual relationships with MA payors which have an existing presence in that market under a global risk structure. MA payors may take the position that it is not in their strategic or financial interests to enter into a contract with us, or they may have already established exclusive relationships with other value-based care providers or affiliates in a geography and, therefore, elect to not enter into a similar arrangement with us. Therefore, we may be unsuccessful in executing contractual relationships with MA payors, or such contracts may be established at financial terms which result in lower revenues or higher costs than we project or that are necessary to generate profits in a given geography. To the extent we are unsuccessful in establishing contractual relationships with MA payors in new geographies, or such relationships are established at less favorable terms than we project, we may not be able to successfully launch into a given geography, or the membership or revenue levels we are able to attain will be lower than our projections.

***We incur startup costs during the initial stages of development of our physician partner relationships and program initiatives, and if we are unable to maintain and grow these physician partner relationships or program initiatives over time, we may not recover these costs.***

We devote resources to the establishment of new physician partner relationships, including costs relating to physician recruiting to enhance access and support growth of the network, physician incentives to support the transition to a Total Care Model and operational support. Our startup investment in new physician partners can be significant and the associated revenue must be earned and sustained over time in order for us to recoup these costs. As our business grows, our physician partnership startup costs could outpace our buildup of recurring revenue if we do not achieve economies of scale, and we may be unable to achieve profitability until our revenues associated with new partnerships are more mature. We may never recoup our startup costs in a physician partner relationship, including as a result of such physician partner's difficulty transitioning to a Total Care Model. Similarly, if physicians join a physician partner following the initial implementation period for a new partner market and we are unable to manage the integration of such new physician into our Total Care Model, the new physician may not achieve expected improvements in patient outcomes and related

22

Table of Contents

profitability. If we fail to achieve appropriate economies of scale, if we fail to manage or anticipate the evolution of the Total Care Model throughout our markets or if we fail to raise necessary capital to fund our startup costs, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

We also devote resources to establishing program initiatives to ensure a successful transition to a Total Care Model for members, physician partners and payors. Establishment of these program initiatives requires investments that may not be recouped. For example, investment in preventive care and incentivizing physician partners to complete annual wellness visits may increase our total medical services expense, particularly in the short term, and may fail to generate expected cost savings in the long term. If we fail to realize quality of care outcomes and projected revenues or cost savings due to effectively managed healthcare costs with these program initiatives, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

***We may require substantial additional capital to support our business in the future, and this capital might not be available on acceptable terms, or at all.***

Our operations have consumed substantial amounts of cash since inception, and we expect to spend substantial amounts of cash for the foreseeable future. If our cash and cash equivalents and any cash generated from operations are not sufficient to meet our future cash requirements, we will need to access additional capital to fund our operations and our continued growth and expansion.

We may seek to raise capital by, among other things, issuing additional shares of our common stock or other equity securities, issuing debt securities or borrowing funds under a credit facility. In the past, the securities and credit markets have experienced significant volatility and disruption. The availability of credit, from virtually all types of lenders, has at times been limited. In the event we need access to additional capital to pay our operating expenses, fund subsidiary surplus requirements, make payments on or refinance our indebtedness, pay capital expenditures, or fund acquisitions, our ability to obtain such capital may be limited and the cost of any such capital may be significant, particularly if we are unable to access our credit facility agreement (as amended by the First Amendment to Credit Agreement, dated as of March 1, 2021 and the Second Amendment to Credit Agreement, dated as of May 25, 2023, the "Credit Facility").

Our access to additional financing will depend on a variety of factors such as prevailing economic and credit market conditions, the general availability of credit, the overall availability of credit to our industry, our credit ratings and credit capacity and perceptions of our financial prospects. Similarly, our access to funds may be impaired if regulatory authorities or rating agencies take negative actions against us. If one or any combination of these factors were to occur, our internal sources of liquidity may prove to be insufficient, and in such case, we may not be able to successfully obtain sufficient additional financing on favorable terms, within an acceptable timeframe, or at all. Financing, if available, may be on terms that restrict our operational flexibility, dilute the economic or voting rights of our stockholders or reduce the market price of our common stock. If we require new sources of financing but they are insufficient or unavailable, we would be required to modify our operating plans to take into account the limitations of available funding, which would harm our ability to maintain or grow our business.

***Significant reduction in our membership could have an adverse effect on our business, financial condition, cash flows, and results of operations.***

A significant reduction in membership could adversely affect our business, financial condition, cash flows, and results of operations because our payor contracts compensate us on a per-member basis. Many factors that could cause such a reduction are outside our control.

Factors that could contribute to a reduction in membership include:

- failure to obtain new physician partners or members or to retain existing physician partners or members;

- decision by a payor not to renew the existing contractual agreement upon termination of such contract;

- low quality of care by our physician partners, including as a result of our failure to provide sufficient implementation in our Total Care Model, tools and information to deliver high-quality care;

- alternative care opportunities that are more attractive than those provided by our physician partners;

23

**APP 526**

Table of Contents

- premium increases, benefit revisions or other similar changes, which cause our current payor relationships to be less attractive to members than other alternatives, including traditional Medicare or MA plans with which we do not maintain a relationship;

- negative publicity, through social media, news coverage or otherwise, related to us, our physician partners, payors or MA;

- failure of our payors to maintain their annual ratings awarded by CMS to health plans which measure the quality of health services received by beneficiaries enrolled in MA based on various calculated quality metrics ("STAR ratings"), which leads to members disenrolling from such payors; and

- federal and state regulatory changes.

We contract with a limited number of payors, and our membership is dependent on such payors attracting and retaining members. In addition, if a payor fails to renew its contract with us or members disenroll from such payor, the members such payor attributes to our platform could transition to another payor which is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also fail to address factors within our control that could contribute to a reduction in enrollment, including providing our physician partners with sufficient implementation in our Total Care Model, as well as other tools and information to provide high-quality care.

### *The transition to a Total Care Model may be challenging for physician partners.*

The transition to a Total Care Model may be challenging for our physician partners, and fully capitated or other provider-risk arrangements have had a history of financial challenges for physicians. It may take time for physician partners to acclimate to a capitation model, and some physician partners may not be successful at transitioning to a Total Care Model. Similarly, if physicians join a physician partner following the initial implementation period for a new partner market and we are unable to manage the integration of such new physician into our Total Care Model, the new physician may not achieve expected improvements in patient outcomes and related profitability. If we are not able to attract or retain physician partners who are successful at transitioning to a Total Care Model, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

### *Public health crises, such as COVID-19, could adversely affect us.*

Public health crises (such as the COVID-19 pandemic) could cause unexpected changes in utilization of healthcare services, which could impact our business, results of operations, financial condition, liquidity and cash flows.  In particular, we have experienced, and may in the future experience, financial or operational impacts as a result of COVID-19 or other public health crises which may be material, including: impacts on our medical costs and medical services revenue, therefor affecting our total cost of care; increased delayed costs as a result of our enrolled members being unable to see their PCPs or long term complications of COVID-19; labor shortages; complete or partial closure of partner medical care facilities; and inability to implement clinical initiatives to manage healthcare costs and chronic conditions of our enrolled members and appropriately document their risk profiles. Additionally, COVID-19 has impacted and could continue to impact our ability to accurately project medical cost trends.

The impact of COVID-19 on the worldwide economy and the healthcare industry underscores risks we face related to public health crises and pandemics. Additionally, future public health crises or pandemics may increase the clinical disease burdens of our members over time, reduce preventative care to manage their existing clinical conditions and cause members to defer other care and elective procedures into future periods resulting in unexpected increased medical expense in such future periods, all of which may materially and adversely impact our business, financial condition, cash flows, and results of operations. The magnitude and duration of any pandemic and its ultimate impact on us are uncertain, but such impacts could be material to our business, financial condition, cash flows, and results of operations.

### *Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts could be inaccurate.*

Medical services revenue related to our members is based on clinical disease conditions identified and documented by physicians during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn based on physicians' clinical

24

Table of Contents

assessment and documentation of members' health status, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, which could cause our revenue estimates for the relevant or forecasted periods to be inaccurate.

We establish liabilities on our balance sheet for the amount of medical services that have been incurred but not reported ("IBNR") or paid as of the given balance sheet date. IBNR estimates are developed using actuarial methods and are based on many variables, including the utilization of healthcare services, historical payment patterns, cost trends, the timing of the receipt and accuracy of claims data and other information from our payors, product mix, seasonality, changes in membership and other factors. These estimation methods and the resulting reserves are periodically reviewed and updated. COVID-19 has also resulted in fluctuations in our medical expenses and increased challenges in accurately estimating the amount of medical expenses which have been incurred by our members.

Given the numerous uncertainties inherent in such estimates, our actual medical claims liabilities for a particular quarter or other period, including for forecasted periods, could differ significantly from the amounts estimated and reserved for that quarter or period. Our actual medical claims liabilities have varied and will continue to vary from our estimates, particularly in times of significant changes in utilization, medical cost trends and populations and geographies served. If our actual liability for claims payments is higher than previously estimated, our earnings in any particular quarter, annual period or forecasted periods could be negatively affected. Our estimates of IBNR liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period or for forecasted periods. Furthermore, if we are unable to accurately estimate adequate IBNR levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results of operations for completed periods or forecasted periods.

When we enter into a new physician partner relationship or when we prepare operating and financial forecasts, we and our payors estimate medical services expense. Our medical services expense may exceed our or our payors' estimates, which may result in our establishing unfavorable financial terms in our contractual agreements with our payors, or may result in our payors' actuarial projections submitted to CMS being inaccurate. In either case, we may incur higher medical expenses than we anticipated or in excess of the revenues we receive, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations. Additionally, we cannot be certain that the stop-loss coverage we maintain to protect us against certain severe or catastrophic medical claims currently is or will be adequate or available to us in the future or that the cost of such stop-loss coverage will not limit our ability to obtain it.

***Restrictive clauses in some of our contracts with physician partners may prohibit us from establishing new RBEs within certain geographies in the future, and as a result may limit our growth.***

Most of our contracts with our physician partners include restrictive provisions that, among other things, preclude us from establishing new RBEs within certain geographies in the future. These restrictive provisions typically preclude us or our RBEs from contracting to provide a Total Care Model in specific geographic areas other than through the relevant RBE, and in certain circumstances may limit the providers with which the RBE may contract. Any contracts with restrictive provisions may limit our ability to conduct business with certain potential partners, including partnering with or providing services to other physicians or purchasing services from other physicians within certain time periods, and in certain regions. Accordingly, these restrictive provisions may limit growth and prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition, cash flows, and results of operations to be harmed.

***Exclusivity provisions in some of our agreements with physician partners could subject us to investigations or litigation.***

Most of our contracts with our physician partners contain restrictive provisions that preclude our physician partners from providing specified services for the duration of our contracts. Such provisions could be the subject of investigations and enforcement actions by regulatory authorities and litigation by payors or physicians operating in the geographic areas where such contracts exist. Any such investigations, enforcement actions or litigation could require us to take actions that would adversely affect our business, financial condition, cash flows, and results of operations or could require us to pay substantial amounts of money. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources from other matters.

25

APP 528

Table of Contents

***We rely on our management team and key employees, and our business, financial condition, cash flows, and results of operations could be harmed if we are unable to hire and retain qualified personnel.***

Our success depends, in part, on the skills, working relationships and continued services of our senior management team and other key personnel. Our employees are "at-will" employees or have offer letters or employment agreements that allow their employment to be terminated by us or them at any time, for any reason and without notice, subject, in certain cases, to severance payment rights. In order to hire, retain, and motivate valuable employees, in addition to salary and cash incentives, we provide stock options and restricted stock units that either vest over time or are based on the performance against predetermined financial targets. The value to employees of these stock options is significantly affected by movements in our stock price that are substantially outside our control. The compensation and benefits we provide to our employees, together with the value of stock options and restricted stock units that we have granted, may at any time be insufficient to counteract offers from other organizations. The departure of key personnel could adversely affect the conduct of our business, financial condition, cash flows, and results of operations. In such an event, we would be required to hire other personnel to manage and operate our business, and we may not be able to employ a suitable replacement for the departing individual at favorable terms, or at all.

Competition for qualified personnel in our field is intense due to the limited number of individuals who possess the skills and experience required by our industry, particularly with respect to a Total Care Model. As a result, as we enter new geographies, it may be difficult for us to hire additional qualified personnel with the necessary skills to work in such geographies. If our hiring efforts in new or existing geographies are not successful, our business will be harmed. In addition, we have experienced employee turnover and expect to continue to experience employee turnover in the future. Continued increased competition for, or a shortage of, qualified personnel due to pandemics, general labor market conditions, low levels of unemployment, or general inflationary pressures, may require that we enhance our pay and benefits package to compete effectively for such personnel. Additionally, new hires require significant training and, in most cases, take significant time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain, train or integrate sufficient numbers of qualified individuals. Further, if we are unable to develop and maintain our desired corporate culture, we may be unable to attract and retain qualified and key personnel. If our retention efforts are not successful or our employee turnover rate increases in the future, our business, financial condition, cash flows, and results of operations will be harmed.

***We may never realize the full value of our intangible assets, which could cause us to record impairments that may negatively affect our financial condition and results of operations.***

We have a significant amount of intangible assets on our balance sheet, and we may never realize the full value of such assets. In addition to our annual goodwill impairment test in the fourth quarter, our intangible assets, including goodwill, are subject to impairment tests when events or circumstances indicate that the carrying value of the asset, or related group of assets, may not be recoverable. There are several factors that may be considered a change in circumstances indicating that the carrying value of our intangible assets, including goodwill may not be recoverable, including macroeconomic conditions, industry considerations, our overall financial performance (including an analysis of our current and projected cash flows), revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events (including changes in strategy, physicians, members or litigation). Where the carrying value of the asset, or related group of assets, is not recoverable, we would record an impairment charge that may negatively impact our financial condition and results of operations. Any future impairments could be significant and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Security breaches, cybersecurity attacks, loss of data and other disruptions to our information systems could compromise sensitive information related to our business and expose us to liability, which could adversely affect our operations, financial condition, cash flows and results of operation.***

We manage and maintain our business and data through a combination of data center systems and cloud-based computing center systems.  We are highly dependent on information technology networks and systems, including the internet, to securely access, process, transmit and store this information. We utilize third-party service providers for important aspects of the access, collection, storage and transmission of PHI and other sensitive information and, therefore, we may be unable to control the use of such information or the security protections employed by such third parties. The security of our technology platform and other aspects of our services, including those provided or facilitated by our third-party service providers, is important to our operations and business strategy because of the sensitivity of the PHI and other confidential information we and our providers access, collect, store, process and transmit. Our information technology and infrastructure, and that of our third-party service providers, may be vulnerable to various forms of attacks by hackers or to viruses, other technical failures or breaches due to third-party action, or due to employee and contractor negligence, error

26

**APP 529**

Table of Contents

or malfeasance. We may also experience cybersecurity and other breach incidents that may remain undetected for an extended period of time. Because the techniques used to obtain unauthorized access or to otherwise disrupt computer systems change frequently and generally are not identified until they are launched against a target, we or our third-party service providers may be unable to implement adequate preventative measures or effectively respond to breaches in a timely fashion. Examples of currently known data security threats facing us and our third-party service providers include, but are not limited to, ransomware, phishing, business email compromise and credential stuffing. Additionally, cyber threats and the techniques used in cyberattacks change, develop and evolve rapidly, including from emerging technologies, such as advanced forms of AI and quantum computing.

The risk of cyberattacks has also increased and will continue to increase in connection with Russia's invasion of Ukraine. In light of the Ukraine war and other geopolitical events and dynamics, including ongoing tensions with North Korea, Iran and other states, state-sponsored parties or their supporters may launch retaliatory cyberattacks or carry out other geopolitically motivated retaliatory actions that may adversely disrupt or degrade our operations and may result in data compromise. State-sponsored parties have, and will continue, to conduct cyberattacks to achieve their goals that may include espionage, monetary gain, disruption, and destruction.

We are subject to cybersecurity attacks and may experience cybersecurity incidents in the future. Such breaches of our infrastructure or information, or that of our third-party providers, whether as a result of physical break-ins, computer viruses, cyberattacks, or employee, vendor or contractor error, negligence or malfeasance, can create system disruptions, shutdowns or unauthorized access, use, disclosure or modification of sensitive information, including PHI. As a result, such data security breaches could result in the loss of data or inappropriate use of information. Any interruption in access to member information, unauthorized access to information, improper disclosure or other loss of information could also result in federal, state, or foreign government investigations and liability under laws and regulations that protect the privacy of member information, such as HIPAA, potentially resulting in damages and regulatory penalties. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Privacy and Security Requirements" in Item 1 above. Although we have implemented preventative measures, as described in Item 1C of this Annual Report, such measures may not be sufficient to prevent, mitigate or offset a cyber incident. Sustained or repeated system failures could damage our reputation and reduce the attractiveness of our platform, partnership and network model to members and physician partners, possibly resulting in contract terminations and reductions in revenue. Additionally, the detection, prevention and remediation of known or unknown security vulnerabilities, including those arising from third-party hardware or software, may result in additional material direct or indirect costs.

Any or all of these issues could adversely affect our ability to attract new physician partners and members, cause existing physician partners to fail to renew their agreements with us, cause existing members to disenroll or switch their coverage to non-contracted payors and result in reputational damage. Our general liability or data security insurance policies may not be adequate to cover all potential claims to which we are exposed and may not be adequate to indemnify us for the liability that may be imposed or the losses associated with such events, and in any case, such insurance may not cover all of the specific costs, expenses and losses we could incur in responding to and remediating a security breach.

***If we are unable to protect the confidentiality of our know-how and other proprietary and internally developed information, our operations could be adversely affected.***

Our business depends on internally developed information, including our databases, confidential information, know-how and brand, the protection of which is crucial to the success of our business. We may not be able to protect our know-how and other internally developed information, including clinical and analytical outcomes generated from data we collect from physician partners, payors and other relevant sources. Our physician partners, employees, consultants and other parties (including independent contractors and companies with which we conduct business) may unintentionally or willfully disclose our information to competitors. Enforcing a claim that a third party illegally disclosed or obtained and is using any of our internally developed information is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the U.S. are sometimes less willing to protect know-how and other proprietary information. We rely, in part, on non-disclosure or confidentiality agreements with our physician partners, independent contractors, consultants and companies with which we conduct business to protect our know-how and internally developed information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our know-how and other internally developed information. Further, we have registered trademarks and filed other trademark applications that are meaningful to our business and brand. Our failure to protect the confidentiality of our know-how, brand and other proprietary and internally developed information could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

27

Table of Contents

### *Our subsidiaries' lack of performance or ability to fund their operations could require us to fund such losses.*

If our subsidiaries suffer losses due to their lack of performance, our physician partners' failure to perform under their contracts or other reasons, we may be required to fund such losses or our subsidiaries may subject to allegations of breach of their payor contracts or may incur regulatory consequences. We have in the past chosen to or been required to, and may in the future choose to or be required to, fund our subsidiaries' losses. If unfunded, such losses have in the past, and could in the future, result in substantial doubt related to such subsidiary's ability to continue operating as a going concern, and the contractual and regulatory consequences of such failure could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *ESG issues may impact our business, our financial outcomes, and our reputation.*

Various stakeholders, including regulators, investors, physician partners, payors, and employees are increasingly concerned with ESG issues, including climate change and sustainability; diversity, equity, and inclusion; data privacy and security; and human capital management. Our actions and disclosures related to these and other ESG issues may impact our reputation and relationships with various stakeholder groups. Further, current and future mandated reporting requirements on ESG topics, including climate-related disclosures, may impact our reporting and compliance costs, and require a significant time investment.   Our failure to fulfill ESG disclosure requirements and to meet current and future commitments may result in litigation, liability, negative financial outcomes, and reputational damage.

## Risks Related to Our Reliance on Third Parties

### *We are economically dependent on maintaining our contracts with a limited number of key payors.*

We contract with a limited number of key payors, and we are economically dependent on maintaining our contracts with such payors. See "Note 3. Concentration of Credit Risk" in our Consolidated Financial Statements included elsewhere in this Report. As a result, our key payors may have increased bargaining power, and we may be required to accept less favorable contractual terms with them. Because we rely on a limited number of payors for a significant portion of our revenue, we depend on their creditworthiness. Our payors are subject to a number of risks including reductions in payment rates from governmental programs, higher than expected healthcare costs and lack of predictability of financial results when entering into new lines of business, particularly with high-risk populations. If the financial condition of our payors declines, our credit risk could increase. Should one or more of our significant payors declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, such payor may be unable to reimburse us for expenses incurred in managing patient care, and the members such payor attributes to our platform could transition to another payor who is not on our platform, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Future consolidation of payors in the healthcare industry could reduce the number of payors even further, increasing these risks.

### *Our contracts with our payors are for limited terms and may not be renewed upon their expiration.*

Our contracts with payors generally have terms of one to three years and are typically renewed for one-year periods unless terminated in accordance with the terms of such agreements. In the ordinary course of business, we engage in active discussions and renegotiations with our payors with respect of the services we collectively provide and the terms of our payor agreements. As our payors' businesses respond to market dynamics and financial pressures, and as our payors make strategic business decisions with respect of the lines of business they pursue and programs in which they participate, certain of our payors have sought, and we expect that in the future additional payors will, from time to time, seek to renegotiate or terminate their contracts with us. These negotiations could result in reductions to the economic terms and changes to the scope of services contemplated by our existing payor contracts and consequently could negatively impact our revenues, business and prospects and render our assumptions, estimates and reserves inaccurate. If any of our contracts with our payors is terminated, we may experience a reduction in the number of members attributed to our platform, which may result in a reduction of our revenues and may have a material adverse effect on our business. With respect to certain of our discontinued operations, we may recognize impairment charges for such terminations.

If a payor does terminate or elects not to renew its relationship with us, our ability to retain members associated with that payor is limited. We and our physician partners must comply with the CMS Medicare Marketing Guidelines regarding communication and information provided to members, which limits the types of permissible communications that may be made to members. In addition, in Ohio, we are contractually prohibited from forming our own

28

Table of Contents

health plan, which effectively prohibits us from directly marketing to members in accordance with the CMS Medicare Marketing Guidelines.

Additionally, if a payor with which we contract for these services loses its Medicare contract or CMS decides to discontinue its MA or commercial plans, decides to contract with another company to provide capitated care services to its members or decides to directly provide care, our contract with that payor could be at risk and we could lose revenue. Additionally, payors with whom we currently contract in a particular geography may not maintain their government-awarded contracts in future years. Moreover, our inability to maintain our agreements with payors, in particular with key payors such as Humana, Aetna and United Healthcare, with respect to their MA members or to negotiate favorable terms for those agreements in the future, could result in the loss of patients and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

### *We rely on our payors for membership attribution and assignment, timely data and reporting accuracy and claims payment.*

We rely on our payors for membership attribution and assignment, timely data and reporting accuracy and claims payment, and if our payors do not adequately fulfill these functions, fewer members may be attributed to our platform or we may not receive complete and accurate information necessary to effectively manage our business and forecast our expected profitability. We receive payments from payors based on the number of assigned or attributed members participating in Medicare, which can be based upon complex attribution algorithms provided by our payors that may not be accurate. Additionally, payors may choose to assign specific member populations to specialty risk-bearing organizations, which would decrease the number of members attributed to us. We may not be reimbursed for members that payors fail to assign or attribute to us, which could result in lost margin and disruption to member care. Such a failure could materially reduce our revenues and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Payors also regularly provide us an array of data associated with patients attributed to our physician partners, including information related to revenue and risk adjustment factors for our members, and details associated with amounts paid by payors for medical services rendered to our members. To the extent a payor does not provide us with timely, complete or accurate data related to our members, or if we are unable to effectively ingest the information that payors provide to us, we and our physician partners may not be able to effectively ensure our members' disease burdens are identified and may not be able to effectively operate our business or forecast our expected profitability.

In addition, we are exposed to various risks related to our incentive programs with our payors, including those in which the payor typically has not delegated claims payment services to us. If our payors do not timely and accurately process claims and reimburse us for all covered members, are unable to contract with providers at market-based rates, change their utilization management methodologies, or are unable to secure an adequate network of specialists, our business, financial condition, cash flows, and results of operations could be adversely impacted.

### *We are dependent on physician partners and other providers to effectively manage the quality and cost of care and perform obligations under payor contracts.*

Our success depends upon our continued ability to collaborate with and expand a network of high-caliber physician partners who can provide high quality of care, improve clinical outcomes and effectively manage healthcare costs, which are key drivers of our profitability. While the precise terms of each relationship vary, we do not employ our physician partners. Accordingly, our physician partners could demand an increased payment arrangement or take other actions, or fail to take actions, that could result in higher medical costs, lower quality of care for our members, harm to our reputation or create difficulty meeting regulatory or other requirements. Likewise, our physician partners could take actions contrary to our instructions, requests, policies or objectives or applicable law, or could have economic or business interests or goals that are or become inconsistent with our own. Further, our physician partners may not engage with our platform sufficiently to assist in improving overall quality of care and management of healthcare costs, which could produce results that are inconsistent with our estimates and financial models and negatively impact our growth.

In addition to receiving care from our physician partners, our members also receive care from an array of hospitals, specialists, ancillary, and other providers who typically contract directly with our payors. Similar to our physician partner relationships, we do not employ providers from whom our members receive care. As such, we cannot guarantee the quality and efficiency of services from such providers, over which we have no control. Members who receive

29

Table of Contents

poor quality healthcare from such providers may be dissatisfied with our physician partners, which would have a negative impact on member satisfaction and retention. Any of these consequences could adversely impact our business, financial condition and results of operations.

We could also experience significant losses if the expenses incurred to deliver healthcare services to our attributed members exceed revenues we receive from payors in respect of our attributed members. Under a capitation contract, a payor typically prospectively pays periodic capitation payments representing a prospective budget from which our physician partnerships manage healthcare expenses on behalf of the population enrolled with that physician partnership. To manage total medical services expense, we rely on our physician partners' ability to improve clinical outcomes, implement clinical initiatives to provide a better healthcare experience for our members and accurately and sufficiently document the risk profile of our members. While our contracts vary, generally, if the cost of medical care provided exceeds the corresponding capitation revenue we receive we may realize operating deficits, which are typically not capped, and could lead to substantial losses or otherwise impair our profitability.

### *Difficulties in obtaining accurate and complete diagnosis data could have adverse consequences.*

The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data may result in inaccuracies in our projections of medical services revenue, or in other estimation processes. We may be held liable for inaccuracies or deficiencies in the submitted encounter data and potentially could be subject to financial penalties imposed by government authorities and breach of contract claims by payors. We have experienced, and may in the future experience, challenges in obtaining complete and accurate encounter data due to difficulties with our internal compliance and monitoring systems receiving and processing data from multiple systems, with physicians and third-party vendors submitting claims in a timely fashion and in the proper format, and with payors properly recording and coordinating such submissions. We may not be successful in collecting accurate and complete encounter data, correcting inaccurate or incomplete encounter data and developing systems that allow us to receive and process data from multiple systems. Further, it may be prohibitively expensive or impossible for us to collect or reconstruct historical encounter data.

### *We depend on physician partners to accurately, timely and sufficiently document their services, and their failure to do so could result in nonpayment for services rendered or allegations of fraud. If any diagnosis information or encounter data are inaccurate or incorrect, claims or encounter data submissions to payors may not be compliant, resulting in potential overpayments, possible recoupments and possible liability under the federal FCA or through RADV audits.*

Our revenue will be negatively impacted if our physician partners or our network providers, including hospitals and specialist physicians, fail to accurately, timely and sufficiently document their services or if our internal compliance and monitoring programs fail to ensure that documentation is complete, timely and accurate. We rely upon physician partners to accurately, timely and sufficiently complete medical record documentation and assign appropriate reimbursement codes for their services. We also rely on our internal compliance and monitoring systems to ensure that documentation is complete, timely and accurate. However, we do not employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with documentation requirements are uncertain and unpredictable. Reimbursement is conditioned upon, in part, physician partners providing the correct procedure and diagnosis codes and properly documenting the services themselves, including the level of service provided and the medical necessity for the services. If our affiliated physicians have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring procedures to ensure complete, timely and accurate submission of data are ineffective, this could result in nonpayment for services rendered or lead to allegations of billing fraud. See "Business-Healthcare and Other Applicable Regulatory Matters-Health Care Fraud Statute."

30

Table of Contents

In addition, CMS and the HHS Office of Inspector General perform audits of selected MA contracts related to risk adjustment diagnosis data. In these Risk-Adjustment Data Validation Audits ("RADV audits"), the government reviews medical records to determine whether physician medical record documentation and coding practices are compliant, which can result in the recovery of payments and other monetary penalties from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. Disclosure of any adverse investigation or audit results or sanctions could negatively affect our reputation and make it more difficult to attract members, physician partners and payors. Additionally, exception rates of existing documentation identified through a RADV audit may be extrapolated to an overall population of members attributed to a payor, which may result in a reduction of our revenues.

The DOJ has brought a number of investigations and actions under the federal FCA against both physicians and payors, including MA plans, for alleged falsification of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate, we could be subject to potential civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues. Furthermore, in some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other fraud and abuse laws, such as the federal Anti-Kickback Statute. While we believe that our data recordation practices and relationships with providers comply with applicable laws and regulations, such arrangements may be subject to audits, reviews and investigation, and the government may disagree with our position. Furthermore, an audit, review or investigation may result in substantial costs and may divert management's attention and resources.

A health plan may seek repayment from us should CMS make any payment adjustments as a result of its audits or hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. We could, further, be liable for substantial penalties to the government under the FCA for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim.

In addition, payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was not adequate. Retroactive adjustments may change amounts realized from payors and result in recoupments or refund demands, affecting revenue already received.

Any of these consequences of inaccurate data recordation could have a material adverse effect on our business, financial condition cash flows and results of operations. Furthermore, a health plan may be randomly selected or targeted for review by CMS and the outcome of such a review may result in a material adjustment in our revenue and profitability, even if the information we submitted to the plan is accurate and supportable.

***We rely on third-party software and data to operate our business and provide services to our members and physician partners, and any restrictions on our use of, or ability to license, such third-party resources could adversely affect our business, financial condition, cash flows, and results of operations.***

We rely on software licensed from third parties, as well as data received from third parties, including government agencies, in order to operate our business. These licenses are generally commercially available on varying terms. It is possible that the licenses and rights necessary to use the software and data necessary for the provision of our services may not continue to be available on commercially reasonable terms, or at all, or that our use of such software or data may be restricted. Our suppliers of data may increase restrictions on our use of such data, fail to adhere to our quality-control standards or otherwise satisfactorily perform services or otherwise change the terms upon which we can access such data. Any loss of the right to use or receive any of this software or data could significantly increase our expenses and otherwise result in delays in the provision of our services until supplemental data is able to be obtained, or equivalent technology is either developed by us, or, if available from another source, is identified, obtained and integrated. In the future, we may need to obtain additional licenses from third parties in connection with our growth into new geographies or

31

Table of Contents

provision of new or supplemental services, and such additional licenses may not be available on commercially reasonable terms, or at all.

Furthermore, our use of additional or alternative third-party software or data requires us to enter into license agreements with third parties, and integration of new third-party software may require significant work and require substantial investment of our time and resources. Also, the software we license is complex and may contain errors or failures that are not detected until after the software is introduced or updated and new versions are released. In addition, it is possible that hardware failures or errors in the third-party software we use could result in data loss or corruption or cause the information to be incomplete or contain inaccuracies. Any undetected errors, defects or corruption in third-party software or data could prevent the deployment or impair the functionality of our software, delay new updates or enhancements to our services, result in a failure of our services and injure our reputation. We have limited control over such third-party providers, and these third parties may not continue to invest the appropriate levels of resources to maintain and enhance the capabilities of their software, continue to collect and disseminate relevant data, or even remain in business. Integration of software provided by various third parties is also less reliable than an owned, fully integrated network, which we do not have. Any failure or interruption in the services provided by these third parties could negatively impact our ability to operate, relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.

*We rely on third-party internet infrastructure and bandwidth providers for our operations, and any failure or interruption in the services provided by these third parties could negatively impact our ability to operate and our relationships with members and physician partners and adversely affect our business, financial condition, cash flows, and results of operations.*

Our ability to aggregate and evaluate member, physician partner, payor and other relevant data to facilitate our operations, including to process and adjudicate claims payments, provide data analytics and store data, depends on the development and maintenance by third parties of the internet infrastructure we use to operate our business. We rely on internal systems as well as third-party bandwidth and telecommunications equipment providers and other service providers to maintain and operate our internet-based services. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption. However, we may experience future interruptions and delays in services and availability from time to time. In the event of an interruption or a catastrophic event with respect to one or more of the systems we use, we may experience an extended period of system unavailability, which could negatively impact our relationship with members, physician partners and payors. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss, natural disasters and other events outside our control;

- communications failures;

- software and hardware errors, failures and crashes;

- data security breaches, ransomware attacks, computer viruses, hacking, denial-of-service attacks and similar disruptions; and

- other potential interruptions.

If any of the foregoing occur, our reputation, operations and financial results may be materially adversely impacted. Further, any failure of or by the systems we use to handle the volume of use, either by us or others on such systems, or any increased volume of use, could significantly harm our business. We have limited control over our third-party internet infrastructure and bandwidth providers, and, as a result, limited ability to independently address problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these providers' services could negatively impact our relationships with members, physician partners or payors.

### Risks Related to Our Industry and Government Programs

*Consolidation in the healthcare industry could have a material adverse effect on our business, financial condition, cash flows, and results of operations.*

Many healthcare industry participants, including physician groups and payors, are consolidating to create larger and more integrated healthcare delivery systems with greater bargaining power, given their market share. We expect regulatory and economic conditions to result in additional consolidation. Physician groups or payors that have consolidated and are not already part of our network may try to use their increased bargaining power to negotiate better terms upon

32

Table of Contents

which to join our network. Consolidation may also result in the acquisition or future development by our partners or unaffiliated third parties of products and services that compete with us. Finally, consolidation may result in physician groups merging with, or being acquired by, each other or by health plans or other types of providers such as hospitals, and such groups may not have a need for our services which could reduce our market opportunity. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

**Substantially all of our total revenues relate to federal government healthcare programs, and reductions in their reimbursement rate or methodology applied to derive reimbursement, or discontinuation of such healthcare programs, would adversely affect our business, financial condition, cash flows, and results of operations.**

Substantially all of our total revenues relate to federal government healthcare coverage programs. The MA program accounted for substantially all of our revenues for our immediately preceding fiscal years. While the ACO's are not consolidated, they still have an impact on our profitability.

The policies and decisions made by the federal government regarding these programs have a substantial impact on our profitability. We cannot predict changes to these programs, and we may be unable to adapt our business to such changes, either at all or in relation to our competitors.

On an annual basis, CMS issues a final rule to establish the MA county-level benchmark payment rates for the following calendar year. Rates we receive from payors may be reduced as a result of annual reimbursement changes, changes to the risk-adjustment methodology (including revisions to the FFS normalization rate, coding intensity adjustment or other elements of the methodology) for the services we provide or other changes to the CMS reimbursement model. Any reductions in rates that we receive from payors could have a significant adverse impact on our revenue and financial results. We cannot predict the nature of future changes. The final impact of the MA rates can vary from any estimate we may have and may be further impacted by the relative growth of our MA patient volumes across markets as well as by the benefit plan designs submitted by the health plans. It is possible that we may underestimate the impact of the changes in MA rates on our business, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. In addition, our MA revenues may continue to be volatile in the future, which could have a material adverse impact on our business, financial condition, cash flows, and results of operations. The rates we or our payors pay to physician partners are generally based on the Medicare FFS schedule, which is subject to change and outside our control. Increases in the Medicare FFS schedule could cause us or our payors to modify our physician partner reimbursement methodology in ways that we cannot predict, which would result in increases to our medical services expenses.

There are sometimes wide variations in the established reimbursement rates per member as a result of, among other things, members' risk status, acuity levels and age, plan benefit design and geography. As the composition of our membership base changes, due to programmatic, competitive, regulatory, benefit design, economic or other changes, there is a corresponding change to our premium revenue, costs and margins, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

The financial aspects of the ACO REACH Model are set forth in an agreement between the ACO and CMS. CMS has the right to amend the agreement without the consent of the ACO for good cause or as necessary to comply with applicable federal or state law, regulatory requirements, accreditation standards or licensing guidelines or rules. We cannot predict whether CMS will amend such agreements and, if CMS amends such agreements, the impact such amendments may have on the financial aspects of our participation in the model, including, but not limited to, risk adjustment models used to set benchmarks, the rate book, capitation payment mechanisms and the calculation of shared savings and losses. Furthermore, changes to Medicare (including the ACO REACH Model) or MA, such as if CMS were to scale back models or cut MA payments, could have a significant adverse impact on our membership levels, revenue and financial results. Changes in individual plan dynamics, such as changes in benefits provided by the payors, premiums charged by the payors or our payors' STAR ratings, could also adversely impact us.

**Uncertain or adverse economic and macroeconomic conditions, including a downturn or decrease in government expenditures, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.**

Historically, government budget limitations have resulted in reduced spending. The existing federal deficit and continued deficit spending by the federal government and significant economic pressure on state budgets have the potential to lead to reduced government expenditures, including for government-funded programs in which we participate such as

33

Table of Contents

Medicare. Any sustained failure to identify and respond to these trends could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Unfavorable economic conditions could also impact enrollment in MA plans with our payors, cause our payors to change the benefits structure that is offered to our members or weaken our ability to raise additional capital on acceptable terms. For example, unfavorable economic conditions could cause our payors to reduce the benefits that are offered to our members and could result in the cancellation by certain members of our payors' products and services, which would reduce our overall membership, premiums and fee revenues. Any reduction in membership, premiums or fee revenues would, in turn, adversely affect the financial position of physician practice groups.

In addition, the current macroeconomic environment is characterized by high inflation, supply chain challenges, labor shortages, high interest rates, foreign currency exchange volatility and volatility in global capital markets. Such adverse macroeconomic conditions may also affect our physician partners' or payors' operations and financial condition, which may in turn cause our physician partners or payors to elect not to renew their services agreements or affect their ability to pay amounts owed to us in a timely manner or at all, or adversely affect prospective partners' or payors' ability or willingness to enter into services agreements with us.

***We operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition, cash flows, and results of operations will be harmed.***

Our industry is competitive and we expect it to attract increased competition, which could make it difficult for us to succeed. We currently face competition in various aspects of our business, including in offering a favorable reimbursement structure for physician partners and potential physician partners and attracting payors and physician partners who are not contracted with us, from a range of companies that provide a Total Care Model under different care models that could attract patients, providers and payors, including hospitals, managed service organizations and provider networks and data analysis consultants. Further, individual physicians who are contracted within our network may affiliate with our competitors. Competition from hospitals, managed service organizations and provider networks and data analysis consultants, payors and other parties could result in payors changing the benefit structure that is offered to our members, which could negatively impact our profitability and market share.

We compete against other providers of value-based care, in addition to numerous local provider networks, hospitals and health systems. Moreover, large, well-financed payors have in some cases developed their own managed services tools and may provide these services to their physicians and patients at discounted prices, or may seek to expand their relationships with additional competing physicians or physician networks, including in geographic areas we serve. This may result in a more competitive environment and increased challenges to grow at the rates we have projected. We expect that competition will continue to increase as a result of consolidation in the healthcare industry and increased demand for a Total Care Model.

Some of our competitors may have greater name recognition, particularly in local geographies, longer operating histories, superior products or services and significantly greater resources than we do. Further, our current or potential competitors may be acquired by or partner with third parties with greater available resources than we have. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements and may have the ability to initiate or withstand substantial benefits structure and premium competition. In addition, current and potential competitors have established, and may in the future establish, cooperative relationships with providers of complementary services, technologies or services to increase the attractiveness of their services.

Accordingly, new competitors or alliances may emerge that have greater market share, a larger customer base, better data aggregation systems, greater marketing expertise, greater financial resources and larger marketing teams than we have, which could put us at a competitive disadvantage. Our competitors could also be better positioned to serve certain segments of the healthcare delivery industry, which could create additional pressure on the premiums that our payors are able to charge. If we are unable to successfully compete, our business, financial condition, cash flows, and results of operations could be materially adversely affected.

***Our compensation and reputation are dependent on government performance standards and benchmarks, some of which depend on factors outside our control.***

We contract with payors that participate in government healthcare programs and, as a result, are required to satisfy certain conditions, performance standards and benchmarks which we may not be able to control. For example, as

34

Table of Contents

part of the ACA, the level of reimbursement each MA plan receives from CMS is dependent, in part, upon the quality rating of the plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. The CMS STAR rating system considers various measures, including, among others, quality of care, preventive services, chronic illness management and customer satisfaction. Agreements with certain of our payors may condition amounts paid to us based upon improvements to contracted payors' STAR ratings. Further, on April 12, 2023 CMS published a Final Rule (the "2023 Final Rule") that sets forth several provisions that would, among other things, impact the STAR ratings program, including: (i) developing a health equity index to reward contracts that obtain a high measure-level score for the subset of enrollees with specified social risk factors, (ii) reducing the weight of patient experience/complaints and access measures, and (iii) removing select measures. If we are not eligible for quality bonuses or if we contract with payors who experience a reduction in their STAR ratings, we may experience a negative impact on our revenues, which could materially and adversely affect the marketability of our platform, partnership and network model to physicians, our membership levels and our business, financial condition, cash flows, and results of operations. Further, our payors' STAR ratings are based on the services they provide to their overall contracted attributed membership in a defined geography. As a result, even if we effectively engage and manage our membership, changes in such payors' STAR ratings are outside our control. Furthermore, CMS has terminated MA plans that have had a low-quality rating for three consecutive years. Low-quality ratings can potentially lead to the termination of certain plans with which we contract, or a shifting of beneficiaries to alternative plans with higher STAR ratings, which could in turn have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursements for both institutional and professional services.***

The healthcare industry in the U.S. is undergoing significant structural change and is rapidly evolving. Such changes could ultimately result in substantial changes in Medicare coverage and reimbursement, as well as changes in coverage or amounts paid by private payors, which could have an adverse impact on our revenues from those sources. The frequent enactment of, changes to or interpretations of laws and regulations relating to healthcare could, among other things: force us to restructure our relationships with payors and physician partners within our network; require us to implement additional or different programs and systems; restrict revenue and member growth; increase our medical and administrative costs; impose additional capital and surplus requirements; increase or change our liability to members in the event of malpractice by our physician partners and potentially increase, or add new, criminal, civil and administrative penalties that could be imposed on us in the event our operations were found to be non-compliant with new or existing laws and regulations. In addition, changes in political party or administrations at the state or federal level may change the attitude towards healthcare programs and result in changes to the existing legislative or regulatory environment.

Government funding for healthcare programs is subject to statutory and regulatory changes, administrative rulings, interpretations of policy and determinations by intermediaries and governmental funding restrictions, all of which could materially impact program coverage and reimbursement levels. Various legislative, judicial and executive efforts have made the status of federal healthcare program funding and many other aspects of the U.S. healthcare system, particularly the status of reforms implemented under the ACA, unclear. Budget pressures often lead the federal government to reduce or impose limitations on reimbursement rates, which has in the past resulted, and could in the future result, in substantial reductions in our revenue and operating margins.

There is also uncertainty regarding both MA payment rates and beneficiary enrollment, which, if reduced, would adversely affect our overall revenues and net income. Each year, CMS issues a final rule to establish the MA benchmark payment rates for the following calendar year. Any reduction to such benchmark rates may have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may be further impacted by the relative growth of our MA patient volumes across geographies. However, MA enrollment may not continue to grow at the same rate it has over the last decade. Further, we may not capture a material portion of enrollments, particularly since MA enrollment is increasingly concentrated amongst a small group of payors. Uncertainty over MA payment rates and enrollment presents a continuing risk to our business, particularly in recent years, as MA payment rates have been subjected to increased scrutiny. We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

APP 538

Table of Contents

We are unable to determine how any future federal spending cuts or other industry changes and reform will affect Medicare reimbursement and, accordingly, our business. There likely will continue to be legislative and regulatory proposals at the federal level directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our inability to keep pace with changes in government regulations and the healthcare industry could constrain our ability to grow and could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

***Regulatory proposals directed at containing or lowering the cost of healthcare, including the ACO REACH Model, and our participation, voluntary or otherwise, in such proposed models, could impact our business, financial condition, cash flows and operations.***

The CMS Innovation Center continues to test an array of alternative payment models that could impact our business, financial condition, cash flows and operations. For example, the CMS Innovation Center has created the ACO REACH Model to allow a variety of different organizations called ACOs to negotiate directly with the government to manage traditional Medicare beneficiaries and share in the savings and losses generated from managing such beneficiaries. We, in conjunction with some of our physician partners, began participating in the ACO REACH Model in certain geographies in 2023. The ACO REACH Model's economic structure, including risk adjustment methodologies, quality reporting and model timelines, has been built upon CMS' experience with other programs, including MA and the Medicare Shared Savings Program, but also has new elements, such as a risk adjustment model developed specifically for use in the ACO REACH Model. Likewise, the ACO REACH Model rate book is based on the same methodology used for the MA rate book but has been modified in light of the characteristics of the ACO REACH Model. Because the ACO REACH Model is a new and evolving program, we are unable to determine how the ACO REACH Model, or other alternative payment models promulgated by the CMS Innovation Center, will affect Medicare reimbursement and capitation benchmarks. For example, if the CMS Innovation Center fails to ensure the long-term predictability of revenue under the ACO REACH Model, such reimbursement instability could adversely impact our business, financial condition, cash flows and operations. Additionally, if the CMS Innovation Center fails to streamline incentive program requirements for physicians across payment models, such conflicting requirements may impose additional compliance burdens on our affiliated physician partners' practices, which may have a material adverse effect on process, quality and efficiency.

We are unable to predict how states will regulate ACOs and our participation in the ACO REACH Model. For example, certain states in which we operate may require ACOs to obtain specific licensure to participate in the ACO REACH Model and assume risk directly from CMS, which may require us to maintain certain levels of tangible net equity, meet working capital requirements, or expend significant resources on operational development. Alternatively, CMS may choose to limit additional new ACO entrants in future years to those who attend to underserved communities or are controlled by provider entities.

There likely will continue to be regulatory proposals directed at containing or lowering the cost of healthcare that, if adopted, could have a material adverse effect on our business, financial condition, cash flows, and results of operations, including with respect to our contractual relationships with providers and payors.

***We, as well as our physician partners and affiliates, have in the past, and could in the future, be subject to federal and state investigations, audits and enforcement actions.***

Federal, state and payor enforcement activity could adversely affect our business, financial condition, cash flows, and results of operations. Due to our payors' participation in government and private healthcare programs, we are from time to time involved in inquiries, reviews, audits and investigations by governmental agencies and private payors of our business practices, including assessments of our compliance with coding, billing and documentation requirements and compliance with rules governing delegation of insurance functions, ranging from claims management to utilization review. In this regard, both federal and state government agencies have active civil and criminal enforcement efforts against healthcare companies and their executives and managers. These investigations could also be initiated by private whistleblowers.

Responding to audit and investigative activities can be costly and disruptive to our business, even when the allegations are without merit. If we are subject to an audit or investigation, a finding could be made that we have violated relevant state or federal legal standards in our operations or in how we have structured our arrangements and relationships or that we or our affiliates have erroneously billed or were incorrectly reimbursed. At the conclusion of such audits or investigations, we may be required to repay such agencies or payors, and may be subjected to pre-payment reviews, which

36

Table of Contents

can be time-consuming and result in non-payment or delayed payments for the services we or our affiliates provide. We may also be subject to financial sanctions, exclusion, or may be required to modify our operations.

Investigations, audits or enforcement actions with respect to our physician partners could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding such government activities are outside our control and are uncertain and unpredictable.

***We may be subject to regulatory inquiries and corrective action plans imposed by our payors and may be required to contribute a material amount of risk-bearing capital to our local operating subsidiaries.***

We may be subject to regulatory inquiries and corrective action plans imposed by our payors and we may be audited by payors and regulatory bodies. In some cases, payors and regulatory bodies have required us to contribute a material amount of risk-bearing capital to our local operating subsidiaries in the form of letters of credit or restricted deposits, and we expect that payors and regulatory bodies will continue to require us to contribute risk-bearing capital going forward. There is also a risk that such risk-bearing capital amounts may be increased in the future as a result of regulatory changes, changes in performance by our local operating subsidiaries and physician partners and expansion of our business.

***Repayment obligations arising out of payor audits, such as CMS RADV audits, can be significant and adversely impact reimbursement rates.***

Our payors are subject to audit by government health plans, including, but not limited to, CMS, in connection with the MA program. CMS and the HHS Office of Inspector General perform RADV audits, which can result in the recovery of payments from managed care organizations if errors are identified and influence the calculation of premium payments by CMS to MA plans. In addition, certain of our payor contracts incorporate language that enables payors to recoup funding from us in the event that CMS requires payment under a RADV audit. As a result of such audits and contracts, our payors may demand recoupments or adjustments from us, bring recovery proceedings against us, require us to submit and implement corrective action plans, or terminate agreements with our physician partners. The results of RADV audits could also adversely impact the compensation we receive from payors, which could have a material adverse effect on our revenue. Disclosure of any adverse audit results could also negatively affect our reputation and make it more difficult to attract members, physician partners and payors.

***CMS may modify the methodology utilized to determine revenue associated with MA members, including but not limited to the CMS Risk Adjustment Processing System for calculating risk adjustment factors, which could adversely impact us.***

Changes to how CMS calculates revenues associated with MA members, as well as members' risk adjustment factors under the MA program, could adversely impact our revenues or understate risk adjustment factors for our members, causing us to be underpaid relative to expenses incurred, especially for members with severe or chronic medical conditions. CMS is currently phasing in the process of calculating risk adjustment factors using diagnosis data from the Encounter Data System ("EDS") rather than using diagnosis data from the CMS Risk Adjustment Processing System ("RAPS"). The RAPS process requires MA plans to apply a filter logic based on CMS guidelines and only submit diagnoses that satisfy those guidelines. Conversely, the EDS process requires MA plans to submit all encounter data, and CMS will apply the risk adjustment filtering logic to determine the risk adjustment factors. The phase-in from RAPS to EDS could result in different risk adjustment factors from each dataset as a result of plan processing issues, CMS processing issues and filtering logic differences between RAPS and EDS. Such changes in risk adjustment factors could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

CMS may annually adjust other components of the methodology utilized to determine revenues associated with MA members, including but not limited to the fee for service normalization factor, coding intensity adjustment or corridors utilized to determine calculations contributing to rebate amounts or STAR ratings. Such revisions could result in a reduction of our revenues. Our revenues could be further reduced by budget reconciliation bills, which could increase the MA coding intensity adjustment.

37

**APP 540**

Table of Contents

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the MA program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our platform and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs;
- adversely affecting our ability to market our services through the imposition of further regulatory restrictions regarding the manner in which plans market to MA enrollees; or
- adversely affecting our ability to attract and retain physician partners and have patients attributed to those physician partners.

**Legal and Regulatory Risks**

***The healthcare industry is heavily regulated at the federal, state and local levels and government authorities may determine that we fail to comply with applicable laws or regulations and take actions against us.***

As a company involved in the healthcare industry with substantially all of our revenue derived from government programs, our business activities are subject to substantial governmental regulation. There are significant costs involved in complying with these laws and regulations. If we are found to have violated any applicable laws or regulations, we could be subject to civil or criminal damages, fines, sanctions or penalties, including exclusion from participation in government healthcare programs, such as Medicare, and we may be required to change our method of operations and business strategy. These consequences could be the result of our prior or current conduct, and prior to existing physician partners joining our network. We have in the past incurred, and may in the future incur, significant costs to defend ourselves if we become the subject of an investigation or legal proceeding alleging a violation of these laws and regulations. A federal, state or local government could determine that we are not operating in accordance with the law. Further, it is unknown, whether, when or how the laws, or the interpretation thereof, will change in the future and impact our business, financial condition, cash flows, and results of operations.

In addition, some of the governmental and regulatory bodies that regulate us may consider enhanced or new regulatory requirements or may seek to exercise their supervisory or enforcement authority in new or more robust ways. Any of these possibilities, if they occur, could adversely affect us.

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Federal and state laws, and related regulations, including the fraud and abuse laws such as the FCA and Health Care Fraud Statute, which impose civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment, or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including *qui tam* or whistleblower suits, and impose civil monetary penalties on entities that fail to disclose and repay known overpayments;
- Federal and state anti-kickback laws, and related regulations, which generally prohibit arrangements intended to induce or reward referrals for items or services reimbursable by a healthcare program;
- Federal and state physician self-referral prohibition statutes, and related regulations, which generally prohibit physicians from referring a patient to an entity providing certain DHS if the physician (or his/her immediate family member) has a financial relationship with that entity;
- Provisions of, and regulations enacted pursuant to, HIPAA, as amended, HITECH, and the American Recovery and Reinvestment Act of 2009, as well as similar or more stringent state laws, regarding the collection, use and disclosure of health information;
- Provisions of, and regulations enacted pursuant to, the 21st Century Cures Act, regarding interoperability and prohibitions against information blocking;
- Federal laws and regulations that require providers to enroll in the Medicare program before submitting any claims for services, to promptly report certain changes in operations to the agencies that administer

38

Table of Contents

these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare;

- Federal and state laws that govern managed care organizations, such as our payors, and downstream contracted entities, such as our RBEs, including laws governing timely payment of claims, quality assurance, utilization review, credentialing, financial solvency, downstream transfers of risk and payor-provider contractual relationships;

- State laws that govern the activities of third-party administrators and utilization review agents;

- Laws relating to competition and anticorruption; and

- State laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions or engaging in certain practices, such as splitting fees with physicians.

These and other healthcare laws and regulations that may affect us are further described in "Business-Healthcare and Other Applicable Regulatory Matters" in Item 1.

The laws and regulations applicable to our business are complex, changing and often subject to varying interpretations. As a result, we may not be able to adhere to all applicable laws and regulations. Any violation or alleged violation of any of these laws or regulations by us or our affiliates, or our physician partners or payors, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may in the future be a party to various and material lawsuits, demands, claims, *qui tam* suits, government investigations and audits or government enforcement actions, of which any could result in, among other things, substantial financial penalties or awards against us, reputational harm, termination of relationships or contracts related to our business, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare and other healthcare programs and possible criminal penalties.

If we are found in violation of applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in federal or state health care programs;

- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal FCA, Healthcare Fraud Statutes, CMPL, Anti-Kickback Statute and Stark Law;

- enforcement actions by governmental agencies or claims for monetary damages by patients under federal or state patient privacy laws, including HIPAA;

- enforcement actions by governmental agencies or monetary penalties for violations of the 21st Century Cures Act;

- repayment of amounts received in violation of law or applicable payment program requirements, and related monetary penalties;

- mandated changes to our practices or procedures that materially increase operating expenses;

- imposition of corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices;

- termination of various relationships or contracts related to our business; and

- harm to our reputation which could negatively affect our business relationships, decrease our ability to attract or retain patients and physicians, decrease access to new business opportunities and impact our ability to obtain financing, among other things.

Responding to lawsuits and other proceedings as well as defending ourselves in such matters may require management's attention and cause us to incur significant legal expense. It is also possible that criminal proceedings may be initiated against us or individuals in our business in connection with investigations by the federal government.

We rely on our physician partners to comply with certain laws or regulations, including licensure and certification requirements to provide healthcare services, operate facilities or administer pharmaceuticals in the states in which we conduct business, and billing and coding compliance with respect to the provision of services. Although we

39

Table of Contents

provide some high-level training, and, if needed, supplemented clinical or coding staff as appropriate, to ensure that all health conditions are assessed and sufficiently documented by our physician partners and network providers, and we perform audits on this process, we do not as a general matter supervise or control our physician partners or network providers; accordingly, any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

*If our physician alignment strategies with our physician partners-including the formation of risk and shared savings pools, making downstream payments and joint venture arrangements-are not in compliance with the state and federal fraud and abuse laws, including physician incentive plan laws and regulations, we could be subject to penalties.*

A central component of our clinical and operational strategy is to encourage alignment with our physician partners so as to incentivize them to increase the quality of care while appropriately managing overall costs and participate in various care management and care coordination programs. Such alignment is often achieved through the design of risk or other incentive pools, with gating quality metrics that participating physicians must first satisfy before being allowed to share in cost savings. In other instances, we may support the delivery of care through a number of means, such as the provision of additional capital to improve and enhance the delivery of quality of care and improve access to quality care or by entering into a joint venture with a physician partner and other healthcare entities.

All such arrangements can implicate, and must be structured to be in compliance with, all applicable federal and state fraud and abuse laws including the federal Anti-Kickback Statute and the Stark Law. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Anti-Kickback Statutes" and "Business-Healthcare and Other Applicable Regulatory Matters-Stark Law" in Item 1.

The laws and regulations are complex and the interpretations of those laws continue to expand and evolve. We may not be successful in structuring our arrangements in compliance with them. Should government regulatory or enforcement authorities find any arrangement to be out of compliance with such laws or regulations, then criminal, civil and administrative penalties could be imposed on us or on our physician partners and affiliated entities.

In addition, all such arrangements can implicate, and must be structured in compliance with, state and federal laws and regulations that prohibit payors and their downstream entities from linking physician incentives to reducing or limiting necessary medical services to patients. Violation of such laws or regulations can subject payors to significant civil monetary penalties, as well as possible sanctions, such as suspension of the payor's enrollment of patients, suspension of communication activities to potential patients and exclusion from government healthcare programs. Our failure to comply with these laws could cause us to be in breach of our agreements with payors, which could lead to significant financial penalties or termination of our contracts with payors, all of which could materially and adversely affect our business, financial condition, cash flows, and results of operations.

*Our business development and member engagement activities may implicate laws and regulations regarding marketing, beneficiary inducements, telemarketing and use of protected health information.*

Medicare product marketing and sales activities are regulated by CMS and the states in which we operate. Medicare Managed Care marketing requirements are outlined in the Medicare Marketing Guidelines, a sub-regulatory guidance document updated annually. CMS has oversight over all MA marketing materials and outreach activities. To maintain appropriate beneficiary safeguards while not impeding the physician-patient relationship, the Medicare Marketing Guidelines set forth acceptable activities in the healthcare setting. For example, payors may not allow contracted physicians to accept/collect scope of appointment forms but may allow contracted physicians to make available communication materials regarding MA plans in areas where care is being delivered. Notably, the 2023 Final Rule includes, among other things, significant new MA marketing requirements and modifications. The 2023 Final Rule provisions are a response to increased congressional and press attention to MA marketing practices, including a 2022 U.S. Senate Finance Committee report that detailed deceptive marketing practices by MA plans; the report urged CMS to take action to protect Medicare beneficiaries. The 2023 Final Rule includes distinct changes to the marketing regulations as well as broad-ranging provisions that address potentially misleading advertising and require heightened broker oversight. In addition, through our participation in the CMS ACO REACH Model, we (either as an ACO or as a service provider to our physician partners who are participating in the model) must comply with provisions in the participation agreements with CMS regarding marketing and outreach activities. For example, ACOs must have their plans for marketing activities approved by CMS and are prohibited from engaging in some forms of marketing activities such as door-to-door solicitation. Similarly, state laws governing managed care organizations also address allowable marketing and enrollee communication practices.

40

Table of Contents

Marketing and outreach activities undertaken in the healthcare industry-whether undertaken by or on behalf of providers and payors-are subject to a complex web of laws and regulations designed to prevent fraud and abuse. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Anti-Kickback Statutes" and "Business-Healthcare and Other Applicable Regulatory Matters-Civil Monetary Penalties Statute" in Item 1. Our physician partners and the payors with which we contract risk violating applicable state and federal fraud and abuse laws-including the Anti-Kickback Statute and CMPL-and laws governing marketing and member outreach (e.g., the Medicare Marketing Guidelines). Failure to comply with such laws can lead to severe penalties, including sanctions, fees, civil monetary penalties, imprisonment and exclusion from participation in federal healthcare programs. The imposition of such penalties against our physician partners or the payors with which we contract, could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

Our business development and member engagement activities may implicate the TCPA, related Federal Communication Commission ("FCC") orders and analogous state laws which impose significant restrictions on the ability to utilize telephone calls and text messages to mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. See "Business-Healthcare and Other Applicable Regulatory Matters-Consumer Protection Laws" in Item 1. A determination that we, one of our affiliates, one of our vendors or one of our physician partners violated the TCPA or other communications-based statutes could expose us to significant damage awards that could, individually or in the aggregate, materially harm our business, financial condition, cash flows, and results of operations.

Certain failures by our physician partners to comply with these laws could have an adverse effect on us. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance are uncertain and unpredictable.

These activities also implicate privacy laws, such as HIPAA and analogous state laws, which limit how we and our affiliates can use an individual's PHI in connection with marketing activities and member outreach activities. A violation of such laws could subject us to significant penalties.

***Our physician partners are subject to federal and state healthcare fraud and abuse laws and regulations.***

Our physician partners are subject to various federal and state laws pertaining to healthcare fraud and abuse, including, among others, the federal Anti-Kickback Statute, Stark Law and FCA and analogous state laws. See "Business-Healthcare and Other Applicable Regulatory Matters" in Item 1. Violations of these laws can occur under many different circumstances, including, for example, if a physician partner is engaging in prohibited financial and referral relationships with other physicians or providers; is improperly documenting and coding for services; is making prohibited internal referrals for certain services covered by the Stark Law or analogous state laws or is providing benefits to induce patients to self-refer. Depending on the circumstances, violations of these laws can be punishable by criminal and civil sanctions, including exclusion from participation in federal and state healthcare programs, as well as significant potential monetary liabilities. Should government authorities find that our physician partners have violated applicable law or regulations, our physician partners could be subject to criminal and civil penalties that could adversely affect our reputation and have a material adverse effect on our business, financial condition, cash flows, and results of operations.

In addition, our physician partners are subject to federal, state and local licensing regulations relating to, among other things, professional credentialing, the ability to practice medicine, professional ethics and prescribing medication and controlled substances. See "Business-Healthcare and Other Applicable Regulatory Matters-Other Laws and Regulations" in Item 1. If our physician partners fail to obtain and maintain all necessary licenses, certifications, accreditations and other approvals and operate in compliance with applicable healthcare and other laws, their ability to provide medical services to members would be impaired.

Given our reliance on anchor physician practices in some geographies, such noncompliance could materially and adversely affect our business, financial condition, cash flows, and results of operations. We do not directly employ or control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with laws and regulations are uncertain and unpredictable.

41

Table of Contents

***Our use, disclosure and processing of personally identifiable information, PHI, and de-identified data is subject to HIPAA and state patient confidentiality laws, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, cause a material adverse effect on our members, revenue, and operations.***

Numerous state, federal, and international laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of PHI and, more broadly, personally identifiable information whether or not related to healthcare. These laws and regulations include HIPAA, as amended by the HITECH Act. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with which such covered entities contract for services. Components of our business are considered "covered entities" under HIPAA and others are considered "business associates" of our healthcare partners and payors.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

In addition to federal regulations issued under HIPAA, several states have enacted their own data privacy and security statutes or regulations that govern the use and disclosure of a person's health information or records. Such state laws, if more stringent than HIPAA requirements, are not preempted by the federal requirements, and we are required to comply with them. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Privacy and Security Requirements" in Item 1. These and other laws and regulations affecting data security and data privacy, including international laws and regulations relevant to our business, are often uncertain, contradictory and subject to changing interpretations, and we expect new laws, rules and regulations regarding data privacy and information security to be proposed and enacted in the future. This complex, dynamic legal landscape creates significant compliance issues and potentially exposes us to expense, adverse publicity and liability. The regulatory framework for data privacy and security issues worldwide is evolving and is likely to remain in flux for the foreseeable future, so it is unclear how regulatory changes could impact our business or the costs of compliance, though the impacts and costs seem likely to increase. The general legal trend in the data privacy and security area is toward the broader adoption of more stringent laws and toward more aggressive enforcement.

The data privacy and security measures we have implemented may not adequately protect us from the risks associated with the storage and transmission of customer information and PHI. The security measures that we, and our third-party vendors and subcontractors, have in place to promote compliance with data privacy and data security laws may not protect our facilities and systems from data security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors, or other similar events. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current safeguards. Changing our safeguards could be time-consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Under HIPAA, certain of our entities are directly liable for any data privacy and data security breaches that occur in our capacity as a covered entity. Under the HITECH Act, as business associates, our RBEs may also be directly liable under certain circumstances for data privacy and data security breaches and failures of our subcontractors. We from time-to-time experience security and privacy issues that require assessment of our duties and obligations under HIPAA, and we cannot guarantee that we will not face security or privacy breaches in the future. Additionally, the investigation and remediation of privacy breaches may result in additional material direct or indirect costs.

We incur substantial costs related to ordinary-course compliance with HIPAA and the HITECH Act. Such compliance could also require us to change our practices in a manner adverse to our business. Failure to comply with any applicable standards regarding patient privacy, or data privacy and data security more generally, may subject us to penalties, including significant civil monetary penalties and, in some circumstances, criminal penalties. In addition, any such failures may injure our reputation and adversely affect our ability to retain customers and attract new customers. Even an unsuccessful challenge by regulatory authorities could result in adverse publicity and could require a costly response. Additionally, on December 1, 2022, HHS OCR issued guidance on the use of tracking technologies on websites and mobile applications, indicating that certain information collected from websites and applications may implicate HIPAA. Although HIPAA does not itself provide a private right of action, it is commonly cited in consumer actions that allege improper use and disclosure of sensitive patient data: use of tracking technologies, such as cookies, web beacons, and pixels, by covered entities or their business associates has recently been subject to class action lawsuits alleging improper disclosure of patient

42

APP 545

Table of Contents

information. Any of the foregoing consequences could have a material adverse impact on our business, financial condition, cash flows, and results of operations. Certain failures or non-compliance by our physician partners under these laws could result in their being required as covered entities to report to governmental authorities and patients, implement expensive corrections and pay civil penalties. For example, we note that in 2019, the Office of Civil Rights announced the creation of its Right of Access Initiative, intended to support individuals' right of timely access to their health records. Since the creation of the Right of Access Initiative, there has been substantial enforcement activity related to covered entities' alleged failures to provide individuals with timely access to their health records. To the extent the physician partners' non-compliance with HIPAA rules and regulations impacts members who are attributed to our RBEs (*e.g.*, through the loss of PHI or failure to provide timely access to health records), or otherwise implicates our data processing or billing operations, we could suffer reputational harm or a material adverse effect on our business, financial condition, cash flows, and results of operations.

*Failure to obtain or maintain an insurance license, a certificate of authority or an equivalent authorization allowing our participation in downstream risk-sharing arrangements with payors could subject us to significant penalties and adversely impact our operations.*

Regulation of downstream risk-sharing arrangements, including, but not limited to, global risk and other value-based arrangements, varies significantly from state to state. See "Business-Healthcare and Other Applicable Regulatory Matters-Federal and State Insurance and Managed Care Laws" in Item 1. We therefore expect uncertainty regarding whether our operations fall within the scope of certain laws or regulations.

If a state in which we currently operate, or a new geography, views our participation in risk-sharing arrangements as the assumption of insurance risk, the arrangement may fall within the purview of state insurance or managed care laws. If so, in connection with our continued operations or our expansion into new geographies, we may be required to obtain a state insurance or managed care license (or some other type of registration) and comply with the state's insurance or managed care laws and regulations. Such laws and regulations may subject us to significant oversight by state regulators in the form of periodic reporting and audits, required financial reserves and refraining from taking certain actions without prior regulatory approval. The majority of states do not explicitly address whether and in what manner the state regulates the transfer of risk by a payor to a downstream entity, and in such states, regulators may nonetheless interpret statutes and regulations to regulate such activity. If downstream risk-sharing arrangements are not regulated directly in a particular state, the state regulatory agency may nonetheless require oversight by the licensed payor as the party to such a downstream risk-sharing arrangement. Such oversight is accomplished via contract and may include the imposition of reserve requirements and reporting obligations. Failure to comply with these direct and indirect oversight laws can result in significant monetary penalties, administrative fines, fraud or misrepresentation charges, denial of future insurer applications or loss of membership or suspension of membership growth.

*Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws, or any changes to such laws or regulations or similar laws or regulations could subject us to penalties and restructuring or have a material adverse effect on our consolidation of the accounts of our majority-owned subsidiaries.*

Some of the states in which we operate limit the practice of medicine to licensed individuals or professional organizations comprising licensed individuals, and lay business corporations generally may not exercise control over the medical decisions of physicians. Certain state regulatory bodies have taken the position that an arrangement that confers too much control over a physician practice to a non-medical professional entity may violate the corporate practice of medicine doctrine. See "Business-Healthcare and Other Applicable Regulatory Matters-Corporate Practice of Medicine" in Item 1. A violation of the corporate practice of medicine doctrine constitutes the unlawful practice of medicine, which is subject to fines and other legal consequences. Penalties for violating fee-splitting statutes or regulations may include medical license revocation, suspension, probation or other disciplinary actions.

It is possible that a state regulatory agency or a court could determine that under applicable rules governing the corporate practice of medicine, we are violating the corporate practice of medicine doctrine or that our arrangements constitute unlawful fee splitting. As a result, our arrangements could be deemed invalid, potentially resulting in a loss of revenues and an adverse effect on results of operations derived from such arrangements. We could be subject to civil or other legal consequences, and our agreements and the accompanying governance structures and arrangements could be found legally unenforceable (in whole or in part). Such a determination could force a restructuring of the arrangements with our RBEs and physician partners. Such a restructuring may not be feasible or acceptable to our partners and may not be accomplished within a reasonable time frame or on reasonable terms, any of which could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We have been the subject of regulatory inquiries

43

Table of Contents

regarding our compliance with the corporate practice of medicine doctrine, and we cannot guarantee that we will not be subject to such inquiries in the future.

Further, our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries, including RBEs, classified as variable interest entities. Such consolidation for accounting or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by the Financial Accounting Standards Board ("FASB") or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain such agreements or arrangements, we may not be permitted to continue to consolidate the revenues, expenses, assets and liabilities of our majority-owned subsidiaries classified as variable interest entities, which could have a material adverse effect on our business, financial condition, cash flows, and results of operations.

*If we or our physician partners inadvertently employ or contract with an excluded person, we may face government sanctions.*

Individuals and entities can be excluded from participating in the Medicare program for violating certain laws and regulations, or for other reasons such as the loss of a license in any state, even if the person retains other licensure. This means that the excluded person or entity is prohibited from receiving payments for such person's or entity's services rendered to Medicare or MA beneficiaries, and if the excluded person is a physician, all services ordered (not just provided) by such physician are also non-covered and non-payable. Entities that employ or contract with excluded individuals are prohibited from billing the Medicare program for the excluded individual's services and are subject to civil penalties if they do. We might inadvertently contract or do business with an excluded person or entity, such as a physician partner, contracted or employed physician, or any other contracted party, or with an excluded person who could become excluded in the future without our knowledge. If this occurs, we or our physician partnerships may be subject to substantial repayments and civil penalties. Physician partners are also expected to comply with these requirements. We do not directly control our physician partners, and accordingly any adverse effects on us regarding their noncompliance with these laws are uncertain and unpredictable.

*We may face lawsuits not covered by insurance and related expenses may be material. The costs to defend and pay any judgment or settlement could negatively impact our business, financial condition, cash flows, and results of operations.*

We are exposed to, and may become involved in, various litigation matters arising out of our business, including from time to time, actual or threatened lawsuits. Lawsuits for tort liabilities associated with managed care activities that we conduct in our managed care business are common in the healthcare industry. Common liability exposures we face include performance of utilization review, performance of credentialing and peer review, provider network contracting determinations, and vicarious liability for the conduct of affiliated providers. Liability exposures in the managed care industry in which we operate vary greatly by state. The status of tort reform, availability of non-economic damages or the presence or absence of other statutes, such as elder abuse or vulnerable adult statutes, influence the incidence and severity of managed care litigation. We may also be subject to other types of lawsuits, inquiries, audits, investigations or other proceedings, such as those initiated by our competitors, stockholders, employees, service providers, contractors or by government agencies, including when we terminate relationships with them, which could involve large claims and significant defense costs. Furthermore, lawsuits for tort liabilities arising out of business activities, including the acquisition of other businesses, also are common. Common liability exposures we face include interference with contract, interference with prospective economic advantage, violation of the Voidable Transactions Act, successor liability, and antitrust and unfair competition.

The results of any such lawsuits, inquiries, audits, investigations or other proceedings cannot be predicted, and determining reserves for pending litigation or other matters requires significant judgment. Further, the defense of litigation, including fees of legal counsel, expert witnesses and related costs, is expensive and difficult to forecast accurately. Such costs may be unrecoverable even if we ultimately prevail in litigation and could consume a significant portion of our limited capital resources. To defend lawsuits or participate in other proceedings, it may also be necessary for us to divert executives and other employees from our normal business functions to gather evidence, give testimony and otherwise support litigation efforts. If any such proceeding is not resolved in our favor, we could face material judgments or awards against us. An unfavorable resolution of one or more of the proceedings in which we are involved now or in the future could have a material adverse effect on our business, financial condition, cash flows, and results of operations. We may also in the future find it necessary to file lawsuits to recover damages or protect our interests. The cost of such litigation could also be significant and unrecoverable, which could also deter us from aggressively pursuing even legitimate claims.

44

Table of Contents

All of our physician partners are required to carry medical malpractice insurance. We also currently maintain managed care errors and omissions insurance. We cannot be certain that our insurance coverage will be adequate to cover liabilities arising out of claims asserted against us, our affiliated professional organizations or our affiliated physicians. Liabilities incurred by us or our affiliates in excess of our insurance coverage, including coverage for professional liability and other claims, could have a material adverse effect on our business, financial condition, cash flows, and results of operations. Our insurance coverages generally must be renewed annually and may not continue to be available to us in future years at acceptable costs and on favorable terms, which could increase our exposure to litigation. Further, such coverage typically has substantial deductibles for which we would be responsible.

*Changes in tax laws and regulations, or changes in related judgments or assumptions could materially impact our financial condition and results of operation.*

We are subject to federal and state taxes in the U.S. and other countries in which we conduct business, and such laws and rates vary by jurisdiction. Although we believe our tax practices and provisions are reasonable, the final determination of tax audits and any related litigation, changes in the taxation of our activities and proposed changes in tax laws and regulations could cause the ultimate settlement of our tax liabilities to be materially different from our historical tax practices, provisions and accruals. If we receive an adverse ruling as a result of an audit, or we unilaterally determine that we have misinterpreted provisions of the tax regulations to which we are subject, there could be a material effect on our tax provision, net income or cash flows in the period or periods for which that determination is made, which could materially impact our financial results. Further, any changes in the taxation of our activities, including certain proposed changes in U.S. tax laws, may increase our effective tax rate and adversely affect our financial position and results of operations. In addition, liabilities associated with taxes are often subject to an extended or indefinite statute of limitations period. Therefore, we may be subject to additional tax liability, including penalties and interest for a particular year for extended periods of time.

**Risks Related to Our Indebtedness**

*Despite our indebtedness levels, we and our subsidiaries may incur substantially more indebtedness, which could increase the risks created by our indebtedness.*

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of our Credit Facility do not fully prohibit our subsidiaries from incurring additional debt. If our subsidiaries are in compliance with certain coverage ratios set forth in the agreements governing the Credit Facility, they may be able to incur substantial additional indebtedness, which could increase the risks created by our current indebtedness. In addition, subject to certain conditions and without the consent of the then-existing lenders, the loans under the Credit Facility may be expanded (or new term loan facilities, revolving credit facilities or letter of credit facilities added) by up to $50.0 million plus an additional amount equal to the aggregate amount of certain prepayments, repayments and redemptions of term loans and/or permanent reduction in the revolving credit facilities.

*The agreements and instruments governing our indebtedness contain restrictions and limitations that could significantly impact our ability to operate our business.*

Our Credit Facility contains covenants that, among other things, restrict the ability of our subsidiary agilon health management, inc. ("agilon management") and its subsidiaries to:

- incur additional indebtedness and create liens;
- pay dividends and make other distributions or to purchase, redeem or retire capital stock;
- purchase, redeem or retire certain junior indebtedness;
- make loans and investments;
- enter into agreements that limit agilon management's or its subsidiaries' ability to pledge assets or to make distributions or loans to us or transfer assets to us;
- sell assets;
- enter into certain types of transactions with affiliates;
- consolidate, merge or sell substantially all assets;
- make voluntary payments or modifications of junior indebtedness; and

45

**APP 548**

Table of Contents

- enter into lines of business.

agilon management and its subsidiaries account for substantially all of our assets and total liabilities. Consequently, the restrictions in the Credit Facility may prevent us from taking actions that we believe would be in the best interest of our business and may make it difficult for us to execute our business strategy successfully or effectively compete with companies that are not similarly restricted. We may also incur future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We may be unable to refinance our indebtedness, at maturity or otherwise, on terms acceptable to us or at all.

The ability of agilon management to comply with the covenants and restrictions contained in the Credit Facility may be affected by economic, financial and industry conditions outside our control including credit or capital market disruptions. The breach of any of these covenants or restrictions could result in a default that would permit the applicable lenders to declare all amounts outstanding thereunder to be due and payable, together with accrued and unpaid interest. If we are unable to repay indebtedness, lenders having secured obligations, such as the lenders under the Credit Facility, could proceed against the collateral securing the indebtedness. This could materially and adversely affect our business, financial condition, cash flows, and results of operations, and could cause us to become bankrupt or insolvent.

### Risks Related to Our Common Stock

*agilon health is a holding company with no operations of its own, and it depends on its subsidiaries for cash to fund all of its operations and expenses, including to make future dividend payments, if any.*

Our operations are conducted entirely through our subsidiaries, and our ability to generate cash to fund our operations and expenses, to pay dividends or to meet debt service obligations is highly dependent on the earnings and the receipt of funds from our subsidiaries through dividends or intercompany loans. Deterioration in the financial condition, earnings or cash flow of agilon management and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Many of these subsidiaries are subject to regulatory, contractual or other legal restrictions that may restrict such subsidiaries' ability to pay dividends to us. To the extent our subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements or are otherwise unable to provide funds to the extent of our needs, there could be a material adverse effect on our business, financial condition, cash flows, and results of operations.

For example, we are currently contractually required, and may in the future be required by state laws or regulations, to maintain specific prescribed minimum amounts of capital in certain subsidiaries. When we enter into a new payor contract, we are typically required by the payor to contribute risk-bearing capital to the local operating subsidiary. This typically takes the form of letters of credit, surety bonds, or restricted deposits, or the payor may retain a percentage of the capitation payments due under the applicable contract. Risk-bearing capital required by payors varies by payor and geography. In addition, the agreements governing the Credit Facility significantly restrict the ability of our subsidiaries to pay dividends, make loans or otherwise transfer assets to us. Furthermore, our subsidiaries are permitted under the terms of the Credit Facility to incur additional indebtedness that may restrict or prohibit the making of distributions, the payment of dividends or the making of loans by such subsidiaries to us. If we are unable to obtain sufficient funds from our subsidiaries to fund our obligations, our business, financial condition, cash flows and results of operations could be materially and adversely affected.

*Under our Certificate of Incorporation, CD&R and its affiliates and, in some circumstances, each of our directors and officers who is also a director, officer, employee, member or partner of CD&R and its affiliates, have no obligation to offer us corporate opportunities.*

The policies relating to corporate opportunities and transactions with CD&R set forth in our Certificate of Incorporation address potential conflicts of interest between agilon health, on the one hand, and CD&R and its officers, directors, employees, members or partners who are directors of our company, on the other hand. In accordance with those policies, CD&R may pursue corporate opportunities, including acquisition opportunities that may be complementary to our business, without offering those opportunities to us. By becoming a stockholder in agilon health, you will be deemed to have notice of and have consented to these provisions of our Certificate of Incorporation. Although these provisions are designed to resolve conflicts between us and CD&R and its affiliates fairly, conflicts may not be resolved in our favor or be resolved at all.

46

**APP 549**

Table of Contents

***Anti-takeover provisions in our Certificate of Incorporation and By-laws could discourage, delay or prevent a change of control of our company and may affect the trading price of our common stock.***

Our Certificate of Incorporation and our By-laws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. For example, our Certificate of Incorporation and By-laws collectively:

- authorize the issuance of "blank check" preferred stock that could be issued by the Board of Directors (the "Board of Directors") to thwart a takeover attempt;

- provide for a classified board of directors, which divides the Board of Directors into three classes, with members of each class serving staggered three-year terms, which prevents stockholders from electing an entirely new board of directors at an annual meeting;

- limit the ability of stockholders to remove directors if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- provide that vacancies on the Board of Directors, including vacancies resulting from an enlargement of the Board of Directors, may be filled only by a majority vote of directors then in office;

- prohibit stockholders from calling special meetings of stockholders if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- prohibit stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders, if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock;

- opt out of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the time the person became an interested stockholder, until CD&R ceases to beneficially own at least 5% of the outstanding shares of our common stock;

- establish advance notice requirements for nominations of candidates for election as directors or to bring other business before an annual meeting of our stockholders; and

- require the approval of holders of at least 66 2/3% of the outstanding shares of our common stock to amend our By-laws and certain provisions of our Certificate of Incorporation if CD&R ceases to beneficially own at least 40% of the outstanding shares of our common stock.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context or from changing our management and Board of Directors. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future.

Our Certificate of Incorporation and By-laws may also make it difficult for stockholders to replace or remove our management. Furthermore, the existence of the foregoing provisions, as well as the significant amount of common stock that CD&R owns, could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***We do not intend to pay dividends on our common stock for the foreseeable future and, consequently, your ability to achieve a return on your investment depends on appreciation in the price of our common stock.***

We do not intend to declare and pay dividends on our common stock for the foreseeable future. We currently intend to use our future earnings, if any, to repay debt, to fund our growth, to develop our business, for working capital needs and for general corporate purposes. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future, and the success of an investment in shares of our common stock depends upon any future appreciation in their value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares. Payments of dividends, if any, are at the sole discretion of the Board of Directors after taking into account various factors, including general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications of the payment of dividends by us to our stockholders or

47

**APP 550**

Table of Contents

by our subsidiaries to us, and such other factors as the Board of Directors may deem relevant. In addition, our operations are conducted almost entirely through our subsidiaries. As such, to the extent that we determine in the future to pay dividends on our common stock, none of our subsidiaries will be obligated to make funds available to us for the payment of dividends. Further, the agreements governing the Credit Facility significantly restrict the ability of our subsidiaries to pay dividends or otherwise transfer assets to us, and we may enter into other credit agreements or borrowing arrangements in the future that restrict or limit our ability to pay cash dividends on our common stock. In addition, Delaware law imposes additional requirements that may restrict our ability to pay dividends to holders of our common stock.

***Our Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or stockholders.***

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, other employees, agents or stockholders, (iii) any action or proceeding asserting a claim arising out of or pursuant to or seeking to enforce any right, obligation or remedy under the DGCL, or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware (including, without limitation, any action asserting a claim arising out of or pursuant to our Certificate of Incorporation or our By-laws) or (iv) any action or proceeding asserting a claim that is governed by the internal affairs doctrine, in each case subject to such Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants. It is possible that a court could find that the exclusive forum provisions described above are inapplicable for a particular claim or action or that such provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. As permitted by Delaware law, our Certificate of Incorporation provides that, unless we consent in writing to the election of an alternative forum, the U.S. federal district courts will, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, the Exchange Act, and the rules and regulations thereunder. To the fullest extent permitted by law, by becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our Certificate of Incorporation related to choice of forum. The choice of forum provision in our Certificate of Incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or any of our directors, officers, other employees, agents or stockholders, which could discourage lawsuits with respect to such claims. Additionally, a court could determine that the exclusive forum provision is unenforceable, and our stockholders will not be deemed to have waived our compliance with the federal securities laws and the rules and regulations thereunder. If a court were to find these provisions of our Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial condition, cash flows, and results of operations.

***We have identified a material weakness in our internal control over financial reporting. If we are unable to remediate this material weakness, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial results, in which case our business may be harmed, investors may lose confidence in the accuracy and completeness of our financial reports and, as a result, our common stock price may be adversely affected and we may be unable to maintain compliance with NYSE listing requirements.***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on our system of internal control. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. As a public company, we are required to comply with the Sarbanes-Oxley Act and other rules that govern public companies. In particular, we are required to certify our compliance with Section 404 of the Sarbanes-Oxley Act, which requires us to furnish annually a report by management on the effectiveness of our internal control over financial reporting. In addition, our independent registered public accounting firm is required to report on the effectiveness of our internal control over financial reporting.

In connection with our year-end assessment of internal control over financial reporting, we identified a material weakness in our internal control over financial reporting as of December 31, 2023. For a discussion of our internal control over financial reporting and a description of the identified material weakness, see Part II, Item 9A, "Controls and Procedures."

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: February 27, 2024

agilon health, inc. (Registrant)

/s/ STEVEN J. SELL
_____

Steven J. Sell,
*Chief Executive Officer and President*
*(Principal Executive Officer)*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ STEVEN J. SELL<br>Steven J. Sell | Chief Executive Officer and President<br>(Principal Executive Officer), Director | February 27, 2024 |
| /s/ TIMOTHY S. BENSLEY<br>Timothy S. Bensley | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | February 27, 2024 |
| /s/ TIMOTHY GERTSCH<br>Timothy Gertsch | Chief Accounting Officer<br>(Principal Accounting Officer) | February 27, 2024 |
| /s/ RONALD A. WILLIAMS<br>Ronald A. Williams | Chairman of the Board | February 27, 2024 |
| /s/ RAVI SACHDEV<br>Ravi Sachdev | Vice Chairman of the Board | February 27, 2024 |
| /s/ SHARAD MANSUKANI, M.D.<br>Sharad Mansukani, M.D. | Director | February 27, 2024 |
| /s/ JEFFREY A. SCHWANEKE<br>Jeffrey A. Schwaneke | Director | February 27, 2024 |
| /s/ WILLIAM WULF, M.D.<br>William Wulf, M.D. | Director | February 27, 2024 |

84

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ KAREN MCLOUGHLIN<br>Karen McLoughlin | Director | February 27, 2024 |
| /s/ DIANA L. MCKENZIE<br>Diana L. McKenzie | Director | February 27, 2024 |
| /s/ SILVANA BATTAGLIA<br>Silvana Battaglia | Director | February 27, 2024 |

85

APP 553

# EXHIBIT 21

APP 554

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| | § | |
| IN RE CONCHO RESOURCES, INC. | § | CIVIL ACTION NO. 4:21-cv-2473 |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## ORDER ON CLASS CERTIFICATION

Pending before the Court is Lead Plaintiffs' Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). (Doc. No. 54). Defendants responded (Doc. No. 68) and Plaintiffs replied (Doc. No. 80). Having heard the parties' oral arguments and considered the parties' submissions, and the applicable law, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Class Certification. (Doc. No. 54).

### I.      Background

#### A. Procedural History

The Utah Retirement System and the Construction Laborer's Pension Trust for Southern California (collectively, the "Lead Plaintiffs") purchased common stock in Concho Resources, Inc. ("Concho") between February 21, 2018 and July 31, 2019. At this time, Concho was a publicly traded company. It has subsequently been acquired by ConocoPhillips.

The Lead Plaintiffs brought this action alleging violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 by Defendants. (Doc. No. 25 at 184–86). In addition to suing Concho, Lead Plaintiffs alleged violations of Section 20(a) of the Exchange Act against Defendants Timothy Leach, Jack Harper, C. William Giraud, E. Joseph Wright, and Brenda

**APP 555**

Schroer. (*Id.* at 187–88). This Court previously dismissed Defendants Schroer and Wright. (Doc. No. 43). Leach, Harper, and Giraud are collectively referred to as the "Individual Defendants."

Lead Plaintiffs have now filed a Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel. (Doc. No. 54). Lead Plaintiffs seek to certify a class composed of:

> themselves and all other persons and entities who purchased or otherwise acquired Concho publicly traded common stock during the period from February 21, 2018 through July 31, 2019 inclusive, and were damaged thereby.

(the "Proposed Class") (*Id.* at 1). Lead Plaintiffs also seek to exclude Defendants, present or former executives of Defendants, and all related parties of Defendants from the Proposed Class. (*Id.*). Lead Plaintiffs argue that class certification is appropriate because the Proposed Class and its counsel readily satisfy the four requirements of Rule 23(a), as well as the two requirements of Rule 23(b)(3)—that common questions of law or fact predominate over individual questions and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy. *See* (*id.*).

## B. Factual History

At all relevant times, Concho engaged in the acquisition, development, exploration, and production of oil and natural gas. (*Id.* at 9). During the Proposed Class period, Concho began construction on development projects where multiple wells were drilled in close proximity to each other. These projects were described using terms such as "large-scale development" or "manufacturing mode." (*Id.*). Decreasing the space between wells is often used to attempt to "reduce[ ] drilling cycle time and overall operation cost." (*Id.* at 19, 23). As part of its large-scale development plan, Concho built out a multi-well pad that they named "Dominator," its largest project to date. (Doc. No. 54 at 9). Concho informed investors that they had "valuable data" that they used to "optimize" well design (including spacing) and well completion. (Doc. No. 25 at 7).

2

APP 556

Specifically, Defendant Leach assured investors at the start of the Proposed Class period that "well spacing, lateral placement and completion design" for its manufacturing mode had been "validated." (*Id.*). Defendant Harper also told investors that Concho had "successfully made [the] transition" to large-scale development. (*Id.*).

During this same time period, Concho announced that it had reached a definitive agreement with RSP Permian, Inc. ("RSP"), under which Concho would acquire RSP in an "all-stock" transaction (the "RSP Acquisition"). (Doc. No. 25 at 74). Under the terms of the agreement, shareholders of RSP would receive 0.320 shares of Concho common stock in exchange for each share of RSP common stock, representing consideration to each RSP shareholder of $50.24 per share based on the closing price of Concho common stock on March 27, 2018. (*Id.*). The consideration given to RSP shareholders in connection with the RSP Acquisition represented an approximate 29% premium when valued by RSP's closing price of $38.92 on March 27, 2018. (*Id.*). Upon the closing of the transaction, Concho shareholders owned approximately 74.5% of the combined company, and RSP shareholders owned approximately 25.5%. (*Id.*).

Lead Plaintiffs allege that, instead of basing its large-scale development on accumulated data and knowledge, Concho's manufacturing mode "consisted of experimental and highly risky production methodologies involving tightly spaced wells which exposed [Concho] to potentially ruinous risk." (Doc. No. 54 at 9). Plaintiffs assert that, during the Proposed Class period, instead of disclosing the truth, Defendants: "(i) touted the transition to large-scale development as a success as well as its benefits with zero basis to do so; (ii) stated it was the product of gradual learning and verified techniques despite being experimental; (iii) issued non-risk adjusted production forecasts despite knowing such forecasts were overstated; and (iv) cast certain

3

'aggressive' projects as 'tests' despite having employed such 'tests' Company-wide." (*Id.*). Thus, Lead Plaintiffs contend that, though they were aware there was a general risk involved when investing in an oil exploration business, Concho misled investors to believe that, based upon its accumulation of data and production history, it had the knowledge and ability to effectuate a manufacturing mode production system that would maximize production and reduce costs. In reality, however, this mode was not proven as represented. (Doc. No. 109 at 273). Ultimately, they contend that Concho was forced to go "back to the drawing board on well spacing." (*Id.*).

The fact that these projects were not as established as previously conveyed allegedly became apparent after the close of trading on July 31, 2019. After the close of trading, Concho reported substandard second quarter 2019 financial results and "materially lowered current and forecasted production guidance." (Doc. No. 54 at 9). Specifically, in its earnings release for the second quarter of 2019, Concho stated "[w]hile the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates that well spacing was too tight." The next morning, prior to the start of trading, Concho held its second quarter 2019 earnings call. In that call, Defendants stated that while the Dominator was the most extreme spacing example, other "modestly more dense" projects had been constructed with tight spacing as well. (*Id.*). Concho's second quarter 2019 financial results and subsequent earnings call are collectively referred to herein as the "Corrective Disclosure." On July 31, 2019, Concho stock's closing price was $97.68 per share. (Doc. No. 25 at 139). After the release of the Corrective Disclosure, Concho shares dropped 22%, closing at $75.97 on August 1, 2019. (Doc. No. 54 at 9). This sharp loss of value precipitated this lawsuit.

4

Lead Plaintiffs filed this securities-fraud action alleging that Defendants violated securities laws and regulations when they made false or misleading statements on various dates throughout the Proposed Class period. *See* (Doc. No. 25). Plaintiffs claim that these allegedly false and misleading statements were then corrected when Concho released the Corrective Disclosure. (*Id.*). Plaintiffs' Consolidated Complaint and subsequent letter to this Court explicitly lay out the sections of the Corrective Disclosure that Plaintiffs contend correct the alleged misstatements. Plaintiffs describe these passages as follows: [1]

a. After the close of trading on July 31, 2019, Concho released its financial results for the second quarter 2019 (the "2Q2019 Earnings Release"). Concho reported a disappointing a net loss of $97 million, or $0.48 per share. The Company reported adjusted net income of $139 million, or $0.69 per share, which was below consensus estimates of $0.72 per share, down from the previous quarter's results of $0.72 per share and down 45% year-over-year. Concho also reported $717 million of adjusted EBITDAX, below consensus estimates of $736 million and down from the previous quarter's results of $755 million.

b. Concho also announced that it would be forced to scale back production targets for the rest of this year—without lowering its current budget—giving bearish production forecasts for the upcoming quarter of 316 MBoepd to 322 MBoepd, below consensus forecasts of 336 MBoepd. Concho also revealed that it had slashed its active rig count to 18, down from 33 in the first quarter 2019, and lower than that projected in the Company's first quarter 2019 earnings call commentary of low 20s by the summer and original guidance of 24 rigs by the second half of 2019.

> Costs incurred for exploration and development activities for second-quarter 2019 totaled $785 million. During the quarter, Concho averaged 26 rigs, compared with 33 rigs in first-quarter 2019. The Company is currently running 18 rigs, including 11 rigs in the Delaware Basin and seven rigs in the Midland Basin. Additionally, the Company is currently utilizing seven completion crews.

c. Dovetailing on the reduced rig count, Concho also disclosed for the first time that Dominator's 23 wells were spaced "too tight," and that Concho had "incorporated learnings from [Dominator] into its second half of 2019 program and future Delaware Basin projects."

---

[1] Plaintiffs submitted this letter in response to an order by the Court. The letter summarized and clarified the portions of the Corrective Disclosure that Plaintiffs contend correct the alleged misstatements, as set forth in the Complaint. The language set forth herein is taken directly from the letter received by the Court, but is an accurate reflection of what Plaintiffs pleaded in their Complaint. The Court is utilizing that summary here as it is more concise—especially when compared to the 190 page Consolidated Complaint.

5

In the Delaware Basin, Concho completed the 23-well Dominator project, a well-spacing test targeting multiple landings within the Upper Wolfcamp. The average lateral length for the project was approximately 4,400 feet, and all 23 wells were drilled, completed and put on production safely and ahead of schedule. While the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates the well spacing was too tight. The Company has already incorporated learnings from this project into its second half of 2019 program and future Delaware Basin projects.

d.  Concho held is second quarter 2019 earnings call on August 1, 2019. On the call Defendant Leach [Concho's Chief Executive Officer] stated that following Dominator's failure, Concho would be forced to retreat back to a more conservative approach to well spacing. Defendant Leach also attributed Concho's below-expected active rig count as a measure to avoid overshooting budgets.

> Thanks, Megan, and good morning. Yesterday's results and updated 2019 outlook reflect our continued move to a lower capital budget than originally planned this year and our desire to enter 2020 in the best position to deliver competitive production growth and increasing free cash flow.
>
> * * *
>
> In the Delaware Basin, the 23 well Dominator project was designed to test logistical capabilities and well spacing that was approximately 50% tighter than our current resource assessment. While initial rates were solid, current performance data indicates that we developed the Upper Wolfcamp too densely.
>
> We are incorporating the data into our development model to adjust spacing on future projects including those projects set to spud in the second half of '19.
>
> * * *
>
> Turning to our capital program; we averaged 26 rigs in the second quarter and capital totaled $785 million, which was down 15% compared to the first quarter. Year-to-date production volumes are ahead of schedule and today we're running 18 rigs, which is below our previous plan of 24. We've made the decision to adjust our drilling and completion schedule in the second half of the year to slow down and not chase incremental production at the expense of capital discipline.

e.  On the call Defendant Giraud [Concho's Executive Vice President at all revenant times and Chief Operating Officer starting January 2019] stated that at maximum there should be 12 wells per project in the Permian:

6

**APP 560**

> Yes, I mean, in terms of the project spacing, I don't know that it has taught us anything in terms of the optimal project size. The team has executed extremely well from a logistical standpoint, getting that much work done on time, actually ahead of schedule. So I do think, as we've talked about in previous calls, the optimal project size for us is probably in the 8 to 10 to 12 depending upon where you are in the Permian. But I'm not sure that Dominator gave us confidence that we can continue to push that up over time and find incremental efficiencies and how we do it.

f.  Additionally on the call, Defendant Giraud attempted to downplay that existing and upcoming 2019 projects had "modestly more dense" spacing, by stating the well spacing was not "anywhere close to Dominator."

> You know, I don't know the number off the top of my head. Typically, I would characterize '19 as the year that we were advancing our understanding of optimal lateral length, plcaement [sic] design and well-spacing being one of the critical variables there. Typically, where we've done that, we have added kind of one more well into a project. Dominator is the most extreme example where we went 50% beyond kind of our traditional resource spacing. So I would say that in a number of the projects we have this year and including a couple more coming on in the back half of this year, you're going to see them developed at a modestly more dense than our resource spacing, but nothing anywhere close to Dominator

(Doc. No. 25 at 134–39).

## II.     Legal Standard

Plaintiffs bear the burden of proof on class certification. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). For purposes of a class certification motion, the substantive allegations contained in the complaint must be accepted as true. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974); *Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988). The district court may certify a class only if a "rigorous analysis" convinces it that all conditions set out in Rule 23 are met. *Castano*, 84 F.3d at 740. In so doing, the Court must consider "how a trial on the merits would be conducted" if a class were certified. *Id.* A district court may look past the pleadings to determine if Rule 23's requirements have been met. *Id.* at 744. This necessitates looking "beyond the pleadings . . . [to] understand the claims, defenses, relevant facts, and applicable substantive

7

law in order to make a meaningful determination of the certification issues." *Id.* Nevertheless, for certification purposes, a plaintiff is not required to prove that it will prevail on its claims. *Id.* (indicating the strength of a plaintiff's claims should not affect the certification decision).

To obtain certification of the Proposed Class, Plaintiffs must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of either Rule 23(b)(1), (b)(2), or (b)(3). FED. R. CIV. P. 23. To satisfy the requirements of Rule 23(a), Plaintiffs must demonstrate that (1) the class is so numerous that joinder is impracticable; (2) common questions of law or fact exist among the class members; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately represent the interests of the class members. FED. R. CIV. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

With respect to Rule 23(b), Plaintiffs have moved for certification of the Proposed Class under Rule 23(b)(3), which requires that questions of law or fact common to the Proposed Class members predominate over any questions affecting only the individual members, and that a class action is superior to any other available method for fairly and efficiently resolving the controversy. FED. R. CIV. P. 23(b)(3). This requirement is more demanding than the commonality prong of Rule 23(a) because it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

### III.    Rule 23(a) Requirements

As noted above, Plaintiffs must meet each of the four requirements of Rule 23(a) to attain certification of the proposed class: numerosity, commonality, typicality, and adequacy. *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir. 2004); *Stirman v. Exxon Corp.*, 280 F.3d 554,

8

558–59 (5th Cir. 2002); FED. R. CIV. P. 23 (a)(1)–(4). Defendants do not argue that Plaintiffs have not satisfied the four Rule 23(a) requirements. *See* (Doc. No. 68) ("[E]ven where a proposed class satisfies the prerequisites listed in Rule 23(a), a plaintiff must show that 'questions of law or fact common to class members predominate' over individualized issues."). Since Defendants do not contest Plaintiffs' compliance with Rule 23(a), the Court will only briefly examine whether Plaintiffs have fairly demonstrated that each requirement is met.

### A. Numerosity

To satisfy the numerosity requirement, the court must inquire whether the class is so numerous that joinder of all members is impracticable. *See Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992); *see also* FED. R. CIV. P. 23(a)(1). A plaintiff need not, however, demonstrate with precision the number of persons in the class to satisfy the requirement that joinder is impracticable where such a conclusion is clear from reasonable estimates. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D. Tex. 2000); *see also Zeidman v. J. Ray McDermott Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). The Fifth Circuit favors the presumption that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" *Zeidman*, 651 F.2d at 1039.

Throughout the Proposed Class period, Concho common stock was listed on the New York Stock Exchange. (Doc. No. 54-3 at 13). During the Proposed Class period, the average weekly trading volume for Concho common stock was 10.04 million shares. (*Id.*). Based on the number of shares traded weekly on the New York Stock Exchange, the Court can reasonably assume that the Proposed Class members are sufficiently numerous to make joinder of all

9

members impracticable. *See Zeidman*, 651 F.2d at 1039. As such, Plaintiffs have satisfied the first requirement.

**B. Commonality**

Rule 23(a)(2) requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Commonality requires that Lead Plaintiffs' and the Proposed Class members' claims depend on a common contention that is capable of class-wide resolution, meaning determination of its truth or falsity will resolve an issue central to each Proposed Class members' claim in "one stroke." *Wal-Mart Stores*, 564 U.S. at 350. Furthermore, Lead Plaintiffs must demonstrate, not only that the Class Representatives and the Proposed Class suffered a violation of the same provision of law, but that they all allegedly suffered the same injury as a result. *Id.* at 349–50.

The claims of all Proposed Class members hinge on common contentions that are capable of being resolved class wide. For example, Lead Plaintiffs allege that Concho made various misrepresentations and omissions via public press releases, earnings calls, and SEC filings. The materiality and veracity of those statements will be proven class wide and are contentions common to the entire Proposed Class. Lead Plaintiffs further allege that those uniform misrepresentations and omissions resulted in inflated prices of Concho securities, an injury affecting the entire Proposed Class. Like the issue of whether Concho's statements were material and misleading in violation of the Exchange Act, whether the statements artificially inflated the stock price is a question common to all Proposed Class members. Furthermore, whether Concho possessed the scienter required to impose liability under § 10(b) of the Exchange Act is an issue common to all members of the Proposed Class, which will be resolved as to each Proposed Class member "in one stroke." *See id.* at 350. Due to the fact that resolution of these common issues

10

applies to the claims of each Proposed Class member, the Court finds that Lead Plaintiffs have satisfied the commonality prerequisite for class certification.[2]

## C. Typicality

Plaintiffs must also demonstrate that the claims or defenses of the representative parties are typical of the claims or defenses of the class. *See* FED. R. CIV. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Typicality exists when the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories. *Id.* Typicality does not mean that the claims of the representative parties be identical to those of the absent members. *See Phillips v. Joint Leg. Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981). Rather, typicality may be satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory. *See Ligon v. Frito–Lay, Inc.*, 82 F.R.D. 42, 47 (N.D. Tex. 1979) (finding "a class representative and a class member must be similarly, not identically, situated"). Factual differences do not defeat typicality. *Stirman*, 280 F.3d at 562.

Here, Lead Plaintiffs' claims and the Proposed Class members' claims arise from the same events and are based on the same legal theories. First, Lead Plaintiffs and the Proposed Class members complain of the exact same misrepresentations, omissions, and course of conduct by Concho. Lead Plaintiffs and the Proposed Class members both allegedly relied upon Concho's representations and omissions. They also contend that those same statements artificially inflated the value of Concho securities during the Class Period. Second, the claims alleged by Lead Plaintiffs, that would include the Proposed Class, are based on the same legal

---

[2] The Court will later address the issue of those who acquired their stock by virtue of the RSP Acquisition versus those who acquired their stock on the open market.

APP 565

theories—violations of Sections 10(b) and 20(a) of the Exchange Act. The Court finds that Plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

### D. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The class representatives' interests must be aligned with, and not antagonistic to, unnamed class members. *Mullen*, 186 F.3d at 625–26. A sufficient alignment of interests exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981).

Courts in the Fifth Circuit assess three factors when considering whether the class representatives will fairly and adequately protect the interests of the Proposed Class: (a) "the zeal and competence of the representative[s'] counsel"; (b) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (c) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)).

There is no evidence of any conflict between the interests of Lead Plaintiffs and those of the Proposed Class. The definition of the Proposed Class excludes potential members whose interests could be antagonistic to Plaintiffs' interests; specifically, Defendants, present or former executives of Defendants, and all related parties of Defendants. There has been no evidence or argument that Lead Plaintiffs are subject to legal defenses that are different from, or inapplicable to, the Proposed Class. The Court finds that Lead Plaintiffs' counsel is experienced in securities fraud disputes and have vigorously pursued the action to date. (Doc. No. 54-4). Nevertheless, for

12

the reasons below, the Lead Plaintiffs do not adequately represent the class as a whole. Instead, the named Lead Plaintiffs may be named as the class representatives for the Open Market Subclass. Since the Court finds that subclasses are necessary, Plaintiffs' counsel must propose an additional plaintiff or plaintiffs to act as the class representative for the RSP Acquisition Subclass.

Except for the issue noted above that will be remedied, Plaintiffs have satisfied their burden of showing that the Proposed Class meets each of the Rule 23(a) requirements for class certification. Having satisfied the threshold requirements of Rule 23(a), Plaintiffs must also satisfy the requirements under Rule 23(b)(3).

## IV.    Rule 23(b)(3) Requirements

Plaintiffs moving for certification under Rule 23(b)(3), like Lead Plaintiffs here, must also demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Requiring that common issues predominate over individual issues "prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)). The issues to be considered under Rule 23(b)(3) are referred to as "predominance" and "superiority." *See Henry*, 199 F.R.D. at 570. Defendants argue that the Court should not certify the Proposed Class because Plaintiffs have not satisfied the predominance requirement.

### A.    Predominance

The predominance and superiority requirements are "far more demanding" than is Rule 23(a)(2)'s commonality requirement. *Amchem*, 521 U.S. at 624. Rule 23(b)(3) does not require

13

all questions of law or fact be common; it only requires that the common questions predominate over individual questions. *Longden*, 123 F.R.D. at 556. In deciding whether this requirement is met, courts focus on issues relating to the defendants' liability. *See id.* If the liabilities are common to the class, common questions are held to predominate over individual questions. *See Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981); *see also Longden*, 123 F.R.D. at 556.

In determining whether legal issues common to the class predominate over individual issues, the Court must inquire how the case will be tried. *Castano*, 84 F.3d at 740. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. *O'Sullivan*, 319 F.3d at 738.

The substantive issues that will control the outcome at trial arise from Plaintiffs' claims that Defendants violated § 10(b) and the Individual Defendants violated § 20(a) of the Securities and Exchange Act of 1934, and thereby injured the Proposed Class members. To recover for violations of § 10(b) and Rule 10b-5, which prohibit material misstatements or omissions in connection with the purchase or sale of any security, Plaintiffs must prove: (1) a material misrepresentation or omission by Defendants; (2) made with scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*").

To recover for a violation of § 20(a), which imposes joint and several liability for an underlying securities fraud violation, Plaintiffs must prove the Individual Defendants had actual power over Concho and induced or participated in the alleged violations. 15 U.S.C.A. § 78t(a);

14

APP 568

*In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 749–50 (S.D. Tex. 2012). Since § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof. *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 699 (S.D. Tex. 2006). The additional substantive issue of whether the Individual Defendants had actual power over Concho and participated in or induced the fraud will be proven by the Individual Defendants' conduct, not by the conduct of any Proposed Class members. Therefore, individual issues will not predominate with respect to the § 20(a) claims. *Id.* at 700. Accordingly, the discussion of predominance is limited to the elements of § 10(b).

The issues as to whether Defendants made material misrepresentations and omissions, and whether those misrepresentations and omissions were made with the required scienter, are issues capable of class-wide proof. The same alleged misrepresentations and omissions that form the basis of each Proposed Class members' § 10(b) claims were made in press releases and earnings calls on thirteen dates through the Proposed Class period. The jury will make a single decision regarding the materiality and truthfulness of the alleged misrepresentations and whether Defendants acted with the requisite scienter based on common proof. That decision will apply to all Proposed Class members' claims. The entire Class will be cohesive with respect to its success or failure in proving the materiality of Defendants' misrepresentations and whether Defendants acted with the requisite scienter. *See Amgen, Inc. v. Conn. Ret. Plans & Tr.*, 568 U.S. 455, 460 (2013).

Nevertheless, Defendants argue that the predominance requirement is not met for two reasons: 1) Plaintiffs cannot demonstrate that individual issues of reliance on the alleged misrepresentations, an element of Plaintiffs § 10(b) claim, will not predominate; and 2)

15

Plaintiffs' damages cannot be measured on a class-wide basis consistent with Plaintiffs' theory of liability.

### 1. Reliance

As in many securities class actions, one critical issue lies at the intersection between the reliance element of a § 10(b) claim and the predominance requirement of Rule 23(b)(3). In securities fraud litigation concerning § 10(b)/Rule 10b–5 and § 20(a), Plaintiffs must demonstrate that individual issues of reliance will not predominate. *See, e.g.*, *See Basic v. Levinson*, 485 U.S. 224, 241–47 (1988) (discussing, in detail, a rebuttable presumption of reliance in a Rule 10b–5 setting); *Affiliated Ute*, 406 U.S. at 153–54 (presuming reliance in fraud action where defendants failed to disclose material information). Nevertheless, predominance is a test readily met in certain cases alleging securities fraud. *See Amchem*, 521 U.S. at 625. This is largely due to the *Basic* presumption, which excuses securities fraud plaintiffs from establishing individual reliance on an alleged misrepresentation in certain circumstances. *See Basic*, 485 U.S. at 241–47.

Here, Lead Plaintiffs seek to certify a class of Concho shareholders by invoking the *Basic* presumption endorsed by the Supreme Court in *Basic v. Levinson*. In *Basic*, the Supreme Court recognized that "requiring proof of the Class Members' individual reliance on Defendants' misrepresentations or omissions in a securities fraud case would overwhelm issues common to the Class and, therefore, preclude class certification under Rule 23(b)(3)." *Id.* at 245. To address this problem, the Supreme Court held that securities fraud plaintiffs can, in certain circumstances, satisfy the reliance element "by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Id.* at 247. This rebuttable presumption of reliance is based on the fraud-on-the-market theory. *Id.*

16

The fundamental premise of the fraud-on-the-market theory underlying the *Basic* presumption is "that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"). To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Halliburton II*, 573 U.S. at 268. If the investor did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, the investor could not have relied on the distorted price. *Id.* Still, the *Basic* presumption may be rebutted. The defendant may rebut the presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248.

Defendants do not contest that Lead Plaintiffs' pleadings invoke the *Basic* presumption.[3] Instead, Defendants seek to defeat class certification by rebutting the *Basic* presumption through

---

[3] The Court finds it prudent to briefly discuss whether the shareholders who acquired Concho stock as a result of the RSP Acquisition are entitled to utilize the *Basic* presumption. Since neither side briefed the issue, the Court attempted to gain insight at the recent evidentiary hearing. Nevertheless, neither side provided a satisfactory path to resolving what the Court sees as, at least, a legal speed bump to class certification. Still, the Court notes that the presumption requires that the plaintiff *trade* the stock between the time the time the misrepresentation was made and when the truth was revealed. *Halliburton II*, 573 U.S. at 268. The Court finds that the "forced seller" doctrine/"fundamental change in investment" test adds insight as to how one may perceive that the former RSP shareholders having "traded" the stock. The forced seller doctrine originally recognized standing for the shareholder under section 10(b) and Rule 10b-5 when the "nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." *Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303, 307 (5th Cir. 1971). The doctrine has since evolved into the "fundamental change in investment" test. "[W]here a securities transaction results in a fundamental change in the nature of a shareholder's investment, leaving the plaintiff with shares that represent a participation in a wholly new and different enterprise, the plaintiff may be considered to be a purchaser or seller." *Rathborne v. Rathborne*, 683 F.2d 914, 921 (5th Cir. 1982). The Court finds that this test allows the former RSP shareholders who acquired Concho stock during the Proposed Class period to utilize the *Basic* presumption. Nevertheless, as seen below, the Court has concerns about whether the requirements of Rule 23(b)(3) broadly apply to both individuals that acquired their stock on the open market as well as those who acquired Concho stock via the RSP Acquisition.

17

evidence that its alleged misrepresentations actually had no impact on its stock price. The Court, therefore, must determine whether Defendants have successfully rebutted the presumption of reliance. To carry its burden, Defendants "must in fact sever the link between a misrepresentation and the price paid by the plaintiff." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 125–26 (2021) (quotations omitted) ("*Goldman I*"). Thus, the Court is required to look at each misstatement separately to determine whether Defendants carried their burden.

Though the Court must look at each statement independently, Defendants have organized the alleged misrepresentations into four categories that they labeled based on their analysis of each statement:

i. Category A: "Generic Statements," which Defendants contend simply express "vaguely positive sentiments about Defendants' faith in one aspect of Concho's business plan." (Doc. No. 68 at 21). Thus, Defendants conclude, these statements are too generic to have been actually corrected by the alleged corrective disclosures. (*Id.* at 22).

ii. Category B: "Results and Observations from 2017 & 2018," which Defendants contend cannot be corrected by the corrective disclosures because "Concho's second quarter 2019 results cannot be attributed to factual observations about periods from months before." (*Id.* at 24).

iii. Category C: "Pre-2019 Projections," which Defendants contend cannot be corrected by the alleged corrective disclosures because these Category C statements involved financial projections for 2018, whereas the alleged corrective disclosures concerned results for the second quarter of 2019. (*Id.* at 25).

iv. Category D: "Other Statements," upon which Defendants do not challenge class certification on lack of price impact grounds. (*Id.* at 13).

18

While the Court is not bound by the grouping or categorization proposed by either party, it finds that Defendants' grouping of the statements provides a good starting place.[4] By using this approach, the Court is not commenting on the accuracy of any individual statement.[5]

Initially, the Court notes that the parties agree that the Category D statements can support class certification, at least insofar as Defendants have not attempted to rebut the presumption of reliance as to these statements. Thus, the Court finds that Lead Plaintiffs have satisfied their burden under Rule 23(b)(3) to demonstrate that individual issues of reliance on the Category D alleged misrepresentations will not predominate. The Category D statements are as follows:

| Number[6] | Source[7] | Statement[8] |
|---|---|---|
| D-1 | Q1 2019 Earnings Release | Production for first-quarter 2019 was 29.6 million barrels of oil equivalent (MMBoe), or an average of 328 thousand Boe per day (MBoepd), an increase of 44% from first-quarter 2018 and 7% from fourth-quarter 2018…. Net loss for first-quarter 2019 was $695 million, or ($3.49) per share, compared with net income of $835 million, or $5.58 per share, for first-quarter 2018. Excluding certain non-cash and special items, first-quarter 2019 adjusted net income was $144 million, or $0.72 per share, compared with adjusted net income of $149 million, or $1.00 per share, for first-quarter 2018. During the quarter, Concho generated adjusted EBITDAX of $755 million, compared with $570 million for first-quarter 2018. |
| D-2 | Q1 2019 Earnings Release | The Company successfully started production on nine projects during first-quarter 2019, including the Dominator, Eider and Jack projects in the Delaware Basin as well as the Mabee project in the Midland Basin. |

---

[4] Defendant has divided certain alleged misstatements, as pleaded by Plaintiffs, into separate categories based on their objection to specific sentences. The Court is hesitant to address a pleaded "misstatement" line by line, as it could affect the genericness or substance of the statement. As such, the Court has consolidated certain statements that had been separated by Defendants back to the format in which they were pleaded. Where the Court has done so, it has included a separate footnote to explain which statements were consolidated. Otherwise, the Court has adopted the numbers assigned to the misstatements by Defendants. Where Defendants did not number the statements, like in Category D, the Court has assigned each statement a number.

[5] At this stage, the Court must accept the substantive allegations contained in the complaint as true. *Eisen*, 417 U.S. at 177–78. Moreover, at the class certification stage, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 178. Thus, the Court does not opine and has not considered whether the alleged misrepresentations are, in fact, truthful.

[6] The column refers to the number assigned by Defendants to the alleged misrepresentation for ease of later reference, but, as noted above, the Court has renumbered some of the alleged misstatements from Defendants' original numbering.

[7] This column refers to the source of the alleged misstatement.

[8] This column refers to the alleged misrepresentation, as provided in Plaintiffs' Consolidated Complaint. (Doc. No. 25).

19

APP 573

| D-3 | Q1 2019 Earnings Release | During first-quarter 2019, Concho averaged 33 rigs, compared to 34 rigs in fourth-quarter 2018. The Company is currently running 29 rigs, including 20 rigs in the Delaware Basin and nine rigs in the Midland Basin. Additionally, the Company is currently utilizing eight completion crews. |
| --- | --- | --- |
| D-4 | Q1 2019 Earnings Call | Our focus paid off for us last quarter. We exceeded the high-end of our production guidance with strong oil volumes. Production for the quarter also benefited from strong early production out of our latest projects, including the Dominator, Eider and Mabee, as well as outside operated volumes. With solid cost control and production ahead of expectations, we also delivered strong financial performance. As expected, our capital investments, which are front-end loaded this year, exceeded operating cash flow during the quarter. Importantly, we're on track to deliver on the $2.8 billion to $3 billion capital program we laid out last quarter, and we have increased our estimates for oil production in 2019. |
| D-5 | Q1 2019 Earnings Call | We continue to learn from all these projects. And so using the Dominator one, just because it's a good example, that is our most extreme version of activity in a single square mile and also some of the more dense spacing we've tested. And so, yeah, the teams did a fantastic job on that, bringing that project and a couple of these other large ones this quarter and putting them on production actually ahead of schedule.<br><br>So we're continuing to figure out how to concentrate that much activity in one spot in the most efficient manner possible. We're continuing to play with spacing and also landing zones, and we're still continuing to tinker with combinations of different landing zones and to our whole completion design in them. So there is a lot to learn, but I think, at the same time, you've got a really competitive business that competes for investor capital. |
| D-6 | Q1 2019 Earning Call | It's going to range depending on where you are in the basin and also the zone you're drilling. On that one, we drilled at almost 50% more densely than kind of our - where we typically look at resource booking in that zone. So we will watch - we haven't hit for a, kind of, critical 60 days of production where we included that'll be next quarter's batch of wells to talk about, but certainly returns look pretty good for us. |
| D-7 | Q3 2018 Earnings Release | Oil production is expected to grow more than 25% from fourth-quarter 2018 to fourth-quarter 2019. Further, Concho's planned activity level is expected to drive two-year crude oil and total production compound annual growth rates of 30% and 25%, respectively, from 2018 to 2020. Importantly, disciplined capital allocation and high-margin oil growth is expected to drive strong free cash flow generation and improving ROCE in 2019 and 2020. |
| D-8 | Q4 & FY 2018 Earnings Release | Capital spending for 2019 is expected to be between $2.8 billion and $3.0 billion, representing a 17% reduction at the midpoint compared with the Company's prior capital guidance . . . . Approximately 94% of the 2019 capital program will be allocated to drilling and completion operations. The Company's activity will be primarily focused on large-scale manufacturing projects across Concho's portfolio and will keep the Company on track to deliver the value creation benefits of the RSP Permian, Inc. ("RSP") acquisition. Concho's planned activity for 2019 is expected to deliver oil growth of 26% to 30%, and the base plan for 2020 is expected to drive a two-year oil compound annual growth rate of 23% (from 2018 to 2020). For first-quarter 2019, Concho expects production to average between 300 MBoepd and |

APP 574

| | | |
|---|---|---|
| | | 306 MBoepd, and lease operating expense per Boe to average between $6.30 and $6.50. Additionally, Concho expects capital expenditures to total between $825 million and $875 million. Detailed guidance for 2019 is provided under "2019 Guidance" below. The Company's outlook for 2019 and 2020 excludes acquisitions and is subject to change without notice depending upon a number of factors, including commodity prices, industry conditions and other risks described under "Forward-Looking Statements and Cautionary Statements." |
| D-9 | Q1 2019 Earnings Release | Second-quarter 2019 production is expected to be 316 MBoepd to 322 MBoepd. The Company increased full-year 2019 total production growth guidance to 23% to 27%, reflecting first-quarter 2019 outperformance and strong execution of a disciplined capital program. Additionally, the Company increased full-year 2019 oil production growth guidance to 27% to 31%. |
| D-10 | Q1 2019 Earnings Release | We are delivering exceptional performance across our portfolio as we execute on our clear strategy to drive sustained, differentiated oil growth, free cash flow and corporate returns. Results for the first quarter of 2019 reflect our focus on large-scale development, controlling costs and generating solid returns on strategic investments, as demonstrated by the Oryx sale. During the quarter, we completed several important projects ahead of schedule, driving increased production that exceeded the high end of our guidance range. Given our strong start to the year, we are raising our full-year production growth outlook while maintaining our capital expenditure guidance. Our high-quality assets and returns-driven approach position us to extend our track record of enhancing value for shareholders. |
| D-11 | Q1 2019 Earnings Release | In the Delaware Basin, excluding the New Mexico Shelf, Concho added 23 wells with at least 60 days of production as of the end of first-quarter 2019. The average 30-day and 60-day peak rates for these wells were 1,817 Boepd (73% oil) and 1,647 Boepd (72% oil), respectively. These wells were drilled to an average lateral length of 9,125 feet. |
| D-12 | Q1 2019 Earnings Call | We raised our annual production growth outlook to account for the outperformance in 1Q as well as continued strong performance across the portfolio. At the midpoint, we increased our full-year oil production guidance to 29%. Relative to the 2-year outlook provided in February, we've clearly made a lot of progress and have a great deal of confidence in that plan. Full-field development is an important contributor to our momentum. This approach is all about optimizing spacing, timing and drilling and completion techniques to maximize program economics and recoveries. |
| D-13 | Q4 & FY 2018 Earnings Release | At December 31, 2018, Concho's estimated proved reserves totaled 1.2 billion Boe, compared to 840 million Boe at year-end 2017. The Company's proved reserves are approximately 63% oil and 37% natural gas. Proved developed reserves totaled 824 MMBoe, or 69% of total proved reserves. |
| D-14 | 2018 Form 10-K | At December 31, 2018, our 1,187 MMBoe total estimated proved reserves consisted of approximately 63 percent oil and 37 percent natural gas. We have assembled a multi-year inventory of horizontal development and exploration projects across our operating areas.<br><br>***<br><br>Delaware Basin. At December 31, 2018, we had estimated proved reserves in this area of 674 MMBoe, representing 57 percent of our total proved reserves. During the year ended December 31, 2018, we commenced drilling or |

21

| | | participated in the drilling of 281 (171 net) wells in this area, and we completed 239 (136 net) wells that are producing. |
|---|---|---|
| D-15 | Q1 2019 Earnings Call | Sure. I'd say the beat in the first quarter, which was pretty significant, was a combination of a couple of things, the non-op that we've highlighted, also getting a couple of these very sizable projects on ahead of schedule. And so, there was something a little unique to the quarter maybe in that. But, I mean, underlying all of that is, we continue to see really strong results across our portfolio. And so, I think, that's what gave us the confidence to raise the overall annual guidance. |

Defendants do, however, attempt to sever the link between the alleged misrepresentations and the stock price by alleging that there is a "mismatch" between the remaining alleged misrepresentations (the statements in Categories A, B, and C) and the Corrective Disclosure. Lead Plaintiffs, of course, disagree that there is any such mismatch. Defendants present two primary theories of "mismatch:" 1) that there is a "genericness" mismatch (meaning the misrepresentation is too generic to be corrected by the specific Corrective Disclosure); and 2) that there is a substantive mismatch (meaning the information contained in the Corrective Disclosure did not actually correct the information found in the misrepresentation). Defendant contends that the Category A statements fall into the former theory, while Categories B and C primarily fall into the latter.

i.      *Category A – Generic Mismatch*

As for the Category A statements, Defendants contend that the mismatch occurs due to the generic nature of a misrepresentations. The *Goldman I* Court explained:

> *The generic nature of a misrepresentation often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory.* Under that theory, price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.' Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation. *But that final inference—that the back-end price drop equals*

22

> *front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure.*

*Goldman I*, 594 U.S. at 123 (citations omitted) (emphasis added).

Plaintiffs have represented to the Court that they are proceeding solely under an inflation-maintenance theory of price impact. Under this theory, "a misrepresentation causes a stock price to *remain* inflated by preventing preexisting inflation from dissipating from the stock price." *Id.* at 119–20 (citation omitted) (emphasis in original). Plaintiffs concede that there was no statistically significant front-end price impact to Concho's stock after most, if not all, of the alleged misstatements. Front-end price impact is a statistically significant price movement of the stock that occurs contemporaneously or shortly after an alleged misstatement. Back-end price impact, on the other hand, is a statistically significant price movement of the stock that occurs after the issuance of a corrective disclosure. Nevertheless, front-end price impact may be inferred from a back-end price drop when a corrective disclosure shows that the defendant's previous statements were untrue or that the defendant failed to disclose the truth, and when the stock price falls after the truth is revealed.[9] *See id.* at 123. A back-end price drop supports this inference only when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See id.* If there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *See id.*

As an initial note, Defendants request that the Court look at the broader context of the alleged misrepresentations. During the evidentiary hearing, Defendants walked the Court through examples of Concho stating that it was continuously learning as they went into various projects and that the projects under scrutiny now were in the "early phases." While the "totality of the

---

[9] "Corrective disclosures" are often important in securities class actions to demonstrate that a company's misrepresentation kept its stock artificially high. If the stock price falls after the corrective disclosure, it can often be inferred that the misrepresentations had a price impact. *See Pub. Emps. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320–21 (5th Cir. 2014).

23

circumstances" or "context" may be important eventually, this approach at the class certification stage would conflict with the Supreme Court's decision in *Amgen*, 568 U.S. at 480–81. There, the defendants put forth a similar argument; yet, the Court found that this evidence was not appropriate for a court to consider in deciding whether a plaintiff's proposed class satisfies Rule 23(b)(3)'s predominance requirement. *Id.* at 481. Instead, that evidence is pertinent to the issue of materiality. *Id.* Since it is inappropriate to assess materiality at the class certification stage, the Court cannot consider the additional information that was available to an investor at the time the alleged misstatement was made.[10] *Id.*

The Court will first address Defendants "generic mismatch" contention. Defendants, citing *Halliburton II*, contend that, if the "alleged misrepresentation did not, for whatever reason, actually affect the market price . . . then the presumption of reliance would not apply." (Doc. No. 68 at 2). A price impact analysis must be conducted, where (1) there is a considerable gap in front-end–back-end genericness, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims, as Lead Plaintiffs claim here, that a company's generic risk-disclosure was misleading by omission. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*Goldman II*").

As noted, Plaintiffs acknowledge that they are proceeding under an inflation-maintenance theory. "Under that theory, price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." *Goldman I*, 594 U.S. at 123 (citation and quotations omitted). When, as here, Lead Plaintiffs proceed under an inflation-maintenance theory, "the generic nature of a

---

[10] The Supreme Court noted in *Goldman I* that, while *Amgen* directs courts to refrain from using evidence on materiality until consideration on the merits, there may be some overlap of evidence that bears on reliance and that which goes towards materiality. *Goldman I*, 594 U.S. at 122. Nevertheless, the *Amgen* Court specified that the context of each alleged misrepresentations is not an appropriate inquiry at the class certification stage. *Amgen*, 568 U.S. at 481.

misrepresentation often will be important evidence of a lack of price impact." *Goldman I*, 594

U.S. at 123.

Defendants contend that the following thirty-three alleged misstatements are too generic

to have been corrected by the Corrective Disclosure:

| Number | Source | Statement |
|---|---|---|
| A-1 | Q4 & FY 2017 Earnings Release | The fourth quarter was an excellent end to a great year for Concho. Our operational and financial performance demonstrated our ability to consistently execute, control costs and capitalize on opportunities that strengthen our competitive position. |
| A-2 | Q4 & FY 2017 Earnings Release | High-quality acreage and scale within the Permian Basin enables Concho to efficiently allocate capital while continuing to advance manufacturing style development with leading-edge drilling and completion techniques. |
| A-3 | Q4 & FY 2017 Earnings Release | From these projects, Concho is collecting valuable data that helps the Company optimize lateral placement, completion design and facilitates planning. |
| A-4 | Q4 & FY 2017 Earnings Release | Concho is utilizing leading-edge technologies, including fiber optic monitoring, to collect valuable proprietary data with real-time and long-term implications for full-field optimization. |
| A-5 | 2017 Form 10-K | Multi-well pad drilling and project development may result in volatility in our operating results.<br><br>We utilize multi-well pad drilling and project development where practical. Project development may involve more than one multi-well pad being drilled and completed at one time in a relatively confined area. Wells drilled on a pad or in a project may not be brought into production until all wells on the pad or project are drilled and completed. Problems affecting one pad or a single well could adversely affect production from all of the wells on the pad or in the entire project. As a result, multi well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production. These delays or interruptions may cause declines or volatility in our operating results due to timing as well as declines in oil and natural gas prices. Further, any delay, reduction or curtailment of our development and producing operations, due to operational delays caused by multi-well pad drilling or project development, or otherwise, could result in the loss of acreage through lease expirations.<br><br>Additionally, infrastructure expansion, including more complex facilities and takeaway capacity, could become challenging in project development areas. Managing capital expenditures for infrastructure expansion could cause economic constraints when considering design capacity. |
| A-6 | Q4 2017 Earnings Call | This industry is exciting: commodity prices change, new plays emerge, technology advance. Our strategy allows us to adapt quickly. And our history in the Permian, which is the best value-creating engine in our industry, |

25

| | | enables us to be a leader in the development here.<br>Developing large-scale projects, manufacturing mode, whatever you call it, is one way that we're doing that.<br>While our strategy is the same, the development of our inventory is more sophisticated and creates an opportunity to extend our competitive edge. |
|---|---|---|
| A-7 | Q4 2017 Earnings Call | Over the last few years, our transition to large-scale, multi-well projects has been an important development that will continue to drive growth, innovation and efficiencies. |
| A-8 | Q4 2017 Earnings Call | Our accomplishments last year paved the way for continued operational and financial performance for the next decade. Our development activities validated well spacing, lateral placement and completion design, and our strategic acquisitions and asset exchanges added complementary leasehold for long lateral development. The result is more high-quality reinvestment opportunities to fuel our growth. |
| A-9 | Q4 2017 Earnings Call | Analyst: Jack, most of your development to date, the tremendous growth over the last several years has, I guess, been single well pads as you've locked up your acreage and moved to an efficient mode of operation. How should we think about moving to field development as it relates to child wells versus parent, and how do you factor that into your thoughts in terms of guidance and so on?<br><br>Harper: Sure. And that is one of the reasons to move to the large-scale development as we have. And I think we've successfully made that transition. And so you will see more of that in the future to attempt to avoid creating child wells. Where there are child wells, which is a smaller percentage of our opportunities, we will continue to test that and make sure that we try not to leave any behind. |
| A-10 | March 2018 Raymond James Institutional Investors Conference | So manufacturing mode is a term we use. Other people call it cube development and there's other names as well. What we're trying to do is maximize the rate of return and the resource at the same time. And it's a work in progress, as you might guess. But some of the things that we're using as part of that is, clearly, technology. I said before, taking this empirical data combining it with modern technology helps us get to, we think, a better answer faster.<br><br>I think the drilling synergies are well documented. Walking rigs and drilling in nearby proximity. Certainly on the completion side, not only are our zipper-style completions efficient and may be a more effective way to complete the wells, they're increasingly being priced in a preferential manner as well.<br><br>And then production optimization is speaking to this sizing out facilities not for maximum – not necessarily for maximum production, but for a maximum return over a long period of time. |
| A-11 | March 2018 Investor Call | Analyst: Sure, understood. And then, I guess, second, the synergies you talked about and the advantages to quote-unquote manufacturing, can you just give a little bit of additional color detailing around what exactly it is that allows manufacturing mode on these assets to drive those synergies?<br><br>Leach: Yes. As Steve mentioned, I mean, the balance sheet to be able to do |

26

| A-12 | Q1 2018 Earnings Release | Our team achieved another outstanding quarter of operational and financial results, driving significant production growth while maintaining a disciplined capital program. Our results reflect our focus on large-scale project development, which enables us to maximize ultimate recovery, efficiencies and returns. Looking ahead, we intend to build on our strong momentum and capitalize on our execution strength, cost control and strong balance sheet to extend our track record of delivering growth and returns. |
|---|---|---|
| | | this intense development, instead of 1 or 2 well pads, to go to 8 well multi-well pads is one of the drivers. But it's also long laterals and all the infrastructure that we're going to be able to use together. Infrastructure, such as salt water disposal systems, water handling system that we built over time. All those things will be very additive. |
| A-13 | Q1 2018 Earnings Call | I want to focus on the value-creating opportunities driven by large-scale development. We believe this type of development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term. |
| A-14 | Q1 2018 Earnings Call | Analyst: You kind of talked about moving from the 2 to 4 well pads to 8 to 10, but you guys are testing upwards of 20 wells at 1 of these pads. Can you talk about maybe what the sweet spot may be? Is it 8 to 10? Does 20 make sense just for cash sources and uses? Leach: Well, I mean, when you talk about pads, it's a little bit more complicated than that. I think it's better to think about it as a project, a drilling project. Sometimes, we'll have 4 actual pads on the same project just so we can have rigs working at the same time. So we've been talking in terms mainly of half-section development, and we will have up to 5 landing zones in some of these areas. And if you're going 8 across on a section, so that's 4 wells in each landing times 5. So in a drilling project, you may have 20 wells in a half section. But then when we go to full-section development, it's twice that. So I think the answer to your question is these kind of drilling projects are going to grow in wells in the project over time and grow dramatically. And that's - - it drives a lot of value creation, as you can see on that Slide 16. |
| A-15[11] | May 2018 Citi Global Energy and Utilities Conference | The big thing that's going on in the business is this transition to development mode, and we've talked a lot about that. There's a lot of industry conversation around what that means, what that looks like. There's different terms, tanks, cubes, everybody has a little bit different definition. But for us, it means getting to what we think is the optimal development plan, recognizing that you're learning all the time, but trying to decide what the right spacing is, which is generally 8 across in the different zones, and really getting in, and both big multi-well pads and stringing together multiple multi-well pads into even larger projects, simultaneously developing a square mile. Simultaneously both from a - in the same horizontal zone, but also vertically. |

The table note below:

[11] Defendants separated the last three sentences into Category B ("And I think we're fortunate to have kind of learned along the way and evolved from first drilling a 2-well pad and then a 3-well pad and then 2 2- well pads together. So we've been building up to this kind of larger-scale development mode, and we're very excited about what we're seeing. And I think that's the power of what are causing things like the first quarter and the results we had there."). These sentences affect the genericness of the statement as pleaded by Plaintiffs and, thus, should be considered with the preceding sentences. The Court still considered Defendants' Category B objection, that there is a substantive mismatch between the Category B statements and the Corrective Disclosure. For the same reasons articulated below, there is no substantive mismatch between the Corrective Disclosure and this statement.

27

**APP 581**

| | | |
|---|---|---|
| | | And so we've talked a lot about these big multi-well pad projects. We've highlighted how we're doing them, both in the Midland Basin and in the Southern Delaware and also in the Northern Delaware. The projects that we've talked the most about, that have the most kind of age on them are the Mabee project up in the Northern Delaware - sorry, the Northern Midland, where we drilled 13 wells on a single half-mile section to 5 different zones, and we've talked a lot about the challenges of that. I think industry generally agrees that's a better way to do it, but you have to have a very sizable balance sheet and technical team, a big enough productive base to work through those challenges. The challenges of - that's the best way to do it, but it can be challenging getting up the learning curve. And I think we're fortunate to have kind of learned along the way and evolved from first drilling a 2-well pad and then a 3-well pad and then 2 2- well pads together. So we've been building up to this kind of larger-scale development mode, and we're very excited about what we're seeing. And I think that's the power of what are causing things like the first quarter and the results we had there. |
| A-16 | May 2018 Citi Global Energy and Utilities Conference | But I don't really view it as a dramatic change to development mode. Like I said, it's kind of an evolution going from 2-well pads to 3-well pads to 6-well projects to 8-well. So I think there's been an evolutionary - I don't think you can kind of see a switch get flipped. It's been a long time coming. We give quarterly guidance because of the - trying to give visibility into our business. And so I think that, plus the annual guidance, is a good way. We try to be very thoughtful in kind of showing you how we get there on an annual basis. But I don't expect there to be some big step change and all that. |
| A-17 | May 2018 Citi Global Energy and Utilities Conference | Giraud: I think, we're -- from the areas that we're focused on, I'll turn to this slide where we've kind of highlighted the different major pad projects that we're doing in '18 and '19. And the takeaway, I hope, from that map is, we're doing that everywhere. We're doing it in the Midland Basin, the Southern Delaware and the Northern Delaware. And what's nice about the RSP assets and what really attracted us to them is, they are already assembled and ready for this style of development. I think you can look at this map and see that while we have big blocks in Northern Delaware, there's work to be done still up there consolidating the overall position. But we're in a relative light [sic] stage in terms of under – we've kind of come through discovery, we've gone through delineation and now we're into development mode. And so in those different 3 main assets [Midland Basin, Southern Delaware, and Northern Delaware], we're there. But what I don't want to leave you with the impression is that we're not still learning. We did that fiber-optics project up on the Mabee Ranch, 13 well pad. And from that, we've learned some things that have caused us to tweak our completion design, actually make a little bit lower costs. So we continue to learn and then can move those learnings around to the other basins quickly. And so there's still work being done, but I think what we're seeing is, we think we know. And so we think we know in the Midland Basin how you need to match up the optimal spacing development of the Middle Spraberry, the Lower Spraberry, the Wolfcamp A and the Wolfcamp B. And we think we know what the spacing needs to be in all those and how you ought to develop it. But – so that specific example, I think, we're farther down the line. We're in a later stage of innings. But I think it's worth noting that there's still discovery and delineation work happening on our assets and around the Permian. I mean, just this last quarter, you saw RSP talk about the Jo Mill on their assets, and that's not a |

28

| | | |
|---|---|---|
| | | zone we've historically targeted, that's not part of that stack that I just talked about. So there's still discovery and delineation work happening. I think there's still opportunity. We've tried to kind of highlight a little bit how we're thinking about that. This last quarter we talked about multiple landings in the Bone Spring over in Eddy County. We've talked about multiple landings in the Bone Spring and Lea County before. So there's still discovery and delineation of additional resource and still at figuring out what the optimal kind of development stack is. I've never been very good at predicting the innings. I think we've historically been more conservative, and we're not very good at predicting additional operational efficiencies that we can gain out into the future. So... |
| A-18 | Q2 2018 Earnings Call | We talked about reaching inflection points in the past. The shift to horizontal development in 2011 is one example. Establishing a position in the Northern Delaware is another. And it was about a year ago that we described another inflection point, our progression to large-scale development. Horizontal drilling in the Northern Delaware turned out to be huge value drivers for the company. And we believe manufacturing mode will do the same thing. This transition has been one of our most important operational and strategic priorities. |
| A-19 | Q2 2018 Earnings Call Deck | "Concho provided investor with a presentation to accompany the 2Q 2018 Earnings Call" which "claimed that 'manufacturing mode' 'unlocks signficant [sic] value' and 'optimizes well performance and increases resource reovery [sic].'" (Presentation slides not included in the Complaint). |
| A-20 | September 2018 Barclays CEO Energy Power Conference | And those things I talked about that we are focused on that have created strategic advantages for us, I want to touch on those. The execution of my team, that's what allows us to run this large capital program and run these rigs. The asset base that we have built over the last decade provides balance both in the Midland Basin and in the Delaware Basin and it also gives us an inventory of premium locations that we have multiple decades of this type of drilling to do. Capital efficiency, we have focused on both sides of the efficiency equation. Our wells are continuing to get better and the costs continue to become more efficient, and we manage the cost side of the equation as well. That's what allows us to generate growth and free cash flow. And growth and free cash flow are going to be the name of the game for the next decade. We'll spend some time talking about that. |
| A-21 | September 2018 Barclays CEO Energy Power Conference | So what I really want to focus on today in my remarks are the execution, strength and scale that our company has and that our team has built. And I want to talk about it in the terms of what it means to us and why does it matter. And the - it really falls into three different buckets. There's the operational bucket, there's also the building for the future and how do you manage risk. And so the allocation of capital is probably the most important thing that our team does and the most important thing that we do that creates success for the company. That's what drives our production growth and free cash flow. Also, we run a very large and stable ship. This allows us to balance risk and kind of plow through the volatility of our business. As we're drilling these wells, we try to create a virtuous learning cycle, where we are continuing to learn as we drill. And, yes, I know that you probably heard it in this conference that maybe that we are at the end of gains and efficiency and improvements. And I would tell you, I think, we're at an inflection point. And the inflection point is probably just as important as when I stood up here |

29

| | | |
|---|---|---|
| | | and described an inflection point of going from vertical drilling to horizontal drilling in Permian several years ago, there's also an inflection point in our business, where we went from -- into the Delaware Basin and our team described why we thought the rock in the Delaware Basin were some of the best rock we've seen anywhere and why we were accumulating assets in the Delaware. Well, that type of efficiency and technology comes out of the wells that we're drilling and I'm telling you, I think, we are at a new inflection point. We also in execution and scale, focus on building for the future, and the assets that we've accumulated and the size and scale of those assets, and finally, the management of risk is, basically goes into the category, it's always something. We've had periods in the past, where whether it's weather or sand or frac spreads, this is a volatile business. The size and scale helps us manage the risk of those business. I'll spend some time talking about that. |
| A-22 | September 2018 Barclays CEO Energy Power Conference | At the same time, I will tell you, as the company has grown, our philosophy of having a portfolio approach to mitigate risk is going to apply to this as well. |
| A-23 | September 2018 Barclays CEO Energy Power Conference | So this inflection point that I was talking about is driven by manufacturing mode. And we increasingly are approaching developing our properties, not only from four different dimensions basically, there's a horizontal dimension, the vertical dimension, the sequencing between zones and the timing of what some in the industry call mowing the grass. So you do this to minimize the pressure syncs that create parent/child relationships between wells. This is the future of our business. And this transition to this style of development is just as important, I believe, as the transition we went through for horizontal drilling.<br><br>This is going to be a value creator and it optimizes recoveries, optimizes economics and reduces stranded wells. |
| A-24 | Q3 2018 Earnings Release | We have been disciplined over the last several years - generating free cash flow, prudently growing oil production, reducing our cost structure and building for the future with accretive acquisitions and strategic portfolio management. These efforts position us well for the next stage of our company, which includes delivering high-margin oil growth and initiating a return-of- capital strategy to our shareholders. We are a growth company, and our platform for delivering growth, demonstrating the benefits of scale and enhancing shareholder value, has never been better." |
| A-25 | Q3 2018 Earnings Call | I think the drilling side of our business is one of the best parts of our business. And I think the way we have approached that in the past will continue. I mean, you can see that it doesn't require that much of a growth in rigs to accomplish all the future, not just for '19 and '20, but beyond. So, by drilling longer laterals and the spacing we're using, the efficiency and all that, you can get a whole lot more done. And we do have rigs that now are on 6-months contracts or 1-year contracts but we do have kind of a portfolio approach on that. But I don't think you should expect us to - any change in strategy based on what we're seeing today. |

30

| A-26 | Q3 2018 Earnings Call | Analyst: I want to kind of take another run at that theme that Derrick had on his last question. So, as you guys are transitioning to these larger-scale pads, are there - the efficiencies, I think you guys have done a good job explaining, and I think the market's on top of that. But are there any challenges that are emerging, either ones that you anticipated or ones that you didn't anticipate that could lead to some nonobvious outcomes either in your CapEx profile quarter-to-quarter or your production ramp?<br><br>Harper: Sure. Yes, these large- scale projects, they really emphasize planning and planning ahead. And our team has done a good job of that. I think we're out in front, out here in the industry on this. So, yeah, there are midstream considerations, there's water delivery, there's water disposal, there's a lot of considerations, but - which typically can require up to a year of planning. And again, our team's doing a great job in managing that. And so, while there are challenges, we're up to it. And that is why we're increasing the percentage of capital towards this kind of projects. |
| A-27[12] | Q3 2018 Earnings Call | Analyst: Thanks. Appreciate the time. Yeah. There continues to be a lot of discussion about impacts of bounded versus unbounded well productivity on these pads in the Permian. What are you guys seeing on that front? And I guess how are you contemplating kind of parent-child relationships in the plan you've laid out? And how might that evolve as you think about moving more and more to these larger-scale projects?<br><br>Giraud: Sure. Big driver on going to these large-scale projects are; one, we think maximizing the resource by minimizing the impact of the parent-child effect; and then also getting the benefits on the capital side from efficiency. So those are kind of the two big drivers behind going to project development. As it relates to kind of what we're seeing compared to what we're expecting, we have built our type curves and our internal modeling based upon the results we have seen here. So I think everything we've seen has been consistent with what we were expecting and is baked into that outlook that we're talking about for 2019 and 2020.<br><br>Analyst: Okay. And do you have a kind of estimate of how you think about or how your programming in the relationship between single-well pad development versus multi-well pad development in that parent-child relationship?<br><br>Giraud: Yes. We definitely baked that into all of our plans and our forecast.<br><br>Analyst: Is that something you'd be willing to share. |

---

[12] Defendants separated certain sentences into Category D. Those sentences included "[a]s it relates to kind of what we're seeing compared to what we're expecting, we have built our type curves and our internal modeling based upon the results we have seen here. So I think everything we've seen has been consistent with what we were expecting and is baked into that outlook that we're talking about for '19 and '20," as well as "Analyst: Okay. And do you have a kind of estimate of how you think about or how your programming in the relationship between single-well pad development versus multi-well pad development in that parent-child relationship? Giraud: Yes. We definitely bake that into all of our plans and our forecast." The Court believes removing these sentences affects the alleged genericness of the statement. Thus, the Court has reintegrated the sentences into A-27, as originally pleaded by Plaintiffs.

31

**APP 585**

| A-28 | 2018 Form 10-K | Leach: It's different by zone and different by area. And it's extremely complicated. And we're developing a program to minimize it. I'm not sure that any company in any location can completely eliminate that because you always have edges of your leases and things like that. But I think with our asset base and the big blocky nature of our assets and the way we're prosecuting our development program, we're in the best position to kind of minimize that effect. And we think we have it estimated very well. |
| --- | --- | --- |
| A-28 | 2018 Form 10-K | Multi-well pad drilling and project development may result in volatility in our operating results. We utilize multi-well pad drilling and project development where practical. Project development may involve more than one multi-well pad being drilled and completed at one time in a relatively confined area. Wells drilled on a pad or in a project may not be brought into production until all wells on the pad or project are drilled and completed. Problems affecting one pad or a single well could adversely affect production from all of the wells on the pad or in the entire project. As a result, multi-well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production. These delays or interruptions may cause declines or volatility in our operating results due to timing as well as declines in oil and natural gas prices. Further, any delay, reduction or curtailment of our development and producing operations, due to operational delays caused by multi-well pad drilling or project development, or otherwise, could result in the loss of acreage through lease expirations. |
| A-29[13] | Q4 & FY 2018 Earnings Call | Operationally, things are proceeding as planned. During the fourth quarter, we ran 34 rigs, one of the largest programs in the basin. We continued to advance our style of returns-centric development, which focuses on large-scale and multi-well projects across our asset base. Our project results continued to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments. |
| A-30[14] | Q4 & FY 2018 Earnings Call | Analyst: Great, thanks. Maybe just a question on the large scale projects, you've seen strong results to-date on the various projects that you've developed. Can you provide any additional color on takeaways that you're seeing from these projects whether regarding proper development of multiple horizons, efficiency gains, potential impact to parent-child dynamics and well productivity things like this? |

---

[13] Defendants separated the first sentence into Category B ("Operationally, things are proceeding as planned. During the fourth quarter, we ran 34 rigs, one of the largest programs in the basin. We continued to advance our style of returns-centric development, which focuses on large-scale and multi-well projects across our asset base."). While the addition of this sentence does not affect the genericness of the statement as separated by Defendant, the Court still considers Defendants' Category B objection—that there is a substantive mismatch between the Category B statements and the Corrective Disclosure. For the same reasons articulated below, there is no substantive mismatch between the Corrective Disclosure and this statement.

[14] Defendants separated a fragment of one sentence into Category B. With respect to part of the sentence ("I'll just say we're obviously very pleased with what we're seeing and in terms of what we're expecting to see,"), Defendants contend that they have severed price impact because there is a substantive mismatch between the Category B statements and the Corrective Disclosure. As for the rest of the statement, Defendants contend it is too generic to support an inference of reliance. The Court again notes that Defendants' cherry-picking of certain statements is impermissible. It also disagrees with both contentions for the reasons outlined below.

32

**APP 586**

| | | |
|---|---|---|
| | | Leach: Sure, I mean, while it's still early it's been a slow evolution for us into these larger and larger project sizes. I'll just say we're obviously very pleased with what we're seeing and in terms of what we're expecting to see, and I think we also double downed on the necessity of doing it this way and that this is the better way to do it. I'm modestly optimistic with over measured in periods and years, we will continue to find more efficiencies out of doing it that way, in addition to just the base reasons to do it around mitigating parent-child impacts, things like that. |
| A-31 | Q4 & FY 2018 Earnings Call | Analyst: Okay. And – but I guess what I'm asking is what is it about 2020 that's going to make that performance even if the commodity assumption is lower? Is it just this continued push towards bigger and bigger projects and longer laterals, sort of what are some of the variables there?<br><br>Harper: Sure, I mean, our focus will be on the most efficient deployment of our capital under any circumstance, and that is further highlighted the lower the commodity prices, and I think it's actually an opportunity for us to differentiate ourselves. But you're right, it's making our investment better through large project development, lateral placement within the zones, well spacing all of the small knobs that can now be turned to increased efficiency |
| A-32 | March 2019 Raymond James Institutional Investors Conference | Harper: Sure. So the question was, what do we not know about well spacing and sand loading, and there's always a lot to learn. I think we're at an advantage because we've drilled more wells than anybody else and have empirical data to look at. And also, we study what our peers do. I'll tell you what we do know about sand loading is we have reached diminishing returns in some of our areas and even seen sand loading come down. So economically, when you can spend less and get a similar result, it increases the rate of return, so that's positive. Our well spacing, it's an extremely complicated multivariable equation that does take a lot of time to fully understand. I would remind people that we have historically been pretty conservative on the way we've accounted for inventory and well spacing, and I'm thankful that, that's been our view up till now. |
| A-33[15] | Q1 2019 Earnings Call | And so I think that's the exciting thing about what we've been able to do and are going to continue to do as - deliver really compelling returns while continuing to learn. |

In their attempt to sever the link between each alleged misstatement and the price impact, Defendants rely heavily on an ongoing analogy between the alleged misstatements in *Goldman I* and the alleged misstatements in the case at bar. (Doc. No. 68 at 14). In *Goldman I*, the Supreme Court explained that a gap between misrepresentation and corrective disclosure reduces the likelihood that investors would understand the "specific disclosure [to have] actually corrected

---

[15] Defendants categorized the rest of this statement into Category D. As Defendants do not contest reliance on any part of the statement except the sentence listed as A-33 above, the Court will focus solely on that sentence.

the generic misrepresentation," and, in such a scenario, the back-end-front-end inference starts to break down. *Goldman I*, 594 U.S. at 123.

The *Goldman I* Court provided an example of such a "mismatch." The Court explained that a "mismatch" occurs "when the earlier misrepresentation is generic (e.g., 'we have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')." *Id.* "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* Courts must perform this analysis at the class certification stage. *Id.* at 122.

In cases based on an inflation-maintenance theory, "a plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place." *Goldman II*, 77 F.4th at 102. The central focus, in other words, is to ensure that the front-end disclosure and back-end event stand on equal footing; a mismatch in specificity between the two undercuts a plaintiff's theory that investors would have expected more from the front-end disclosure. *Id.*

To demonstrate a lack of price impact, Defendants rely, in part, on their expert, Lucy P Allen ("Allen"), who testified live at the evidentiary hearing. Plaintiffs moved to exclude Allen's opinions (Doc. No. 85), and this motion was denied, for the most part, in a separate order. As such, the Court will consider, but not necessarily adopt, the majority of Allen's opinions in assessing the issues regarding Rule 23's predominance requirement.[16]

---

[16] The Court also considers, but does not necessarily adopt, portions of the testimony and opinions of Plaintiffs' expert, Chad Coffman.

34

As noted above, the parties adamantly dispute whether the Category A statements are generic. The Court may consider expert testimony regarding the generic nature of a statement, such as Allen's testimony, but may also use its "common sense in assessing whether a generic misrepresentation had a price impact." *Goldman I*, 141 S. Ct. at 1960. Attempting to sever the link between the back-end price impact and the misstatements, Allen analyzed the alleged misrepresentations in Category A and determined that they are "generic." As detailed above, her content analysis determined that none of the analysts referenced the alleged misstatements, nor did any analyst make a connection between the alleged misstatement and the corrective disclosure.

Defendants invite the Court to follow the Eastern District of Michigan's decision in *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 4349172 (E.D. Mich. Sept. 30, 2024).[17] In *Shupe*, the court found that the defendants successfully rebutted the *Basic* presumption by demonstrating that the alleged misrepresentations did not have an impact on the price of the company's stock. *Id.* at *26. The expert in *Shupe* opined, like Allen, that if the defendants' alleged misrepresentations had a price impact, those statements "would have been at least referenced in relevant sell-side analyst reports." *Id.* at *25. That court agreed with defendants' expert, calling the lack of reference to the alleged misrepresentations in reports issued throughout the class period "fatal" to plaintiff's class action hopes. *Id.* at *26.

Here, Lead Plaintiff's expert, Coffman, submitted a rebuttal report to Allen's conclusions and also testified live at the evidentiary hearing. He contends that Allen's "genericness" approach to the Category A statements (when assessing the analyst reports from the days after the alleged misrepresentation) "conflates a lack of change in price target from analyst coverage

---

[17] Notably, *Shupe* involved one of the Lead Plaintiffs, Construction Laborer's Pension Trust for Southern California, and the same Lead Plaintiffs' counsel as in this case.

35

with lack of relevance of the value of the information to the company's stock price." (Doc. No. 103-1 at 75). The Court agrees, as a general proposition, that there is little incentive for an analyst to reference an alleged misrepresentation if the alleged misrepresentations were supposedly intended to maintain the status quo. Significantly, on cross examination, Allen agreed that "in an efficient market, only new news should affect the stock price." (Doc. No. 109 at 202). After all, why would old news be newsworthy? While a lack of reference to the alleged misrepresentations may be some evidence that the misstatements are generic, it is not dispositive. Thus, the Court declines Defendants' invitation to blindly follow the reasoning in *Shupe*.

Nevertheless, the Court agrees with Defendants that they have successfully severed the link between some, but not all, of the Category A statements and the price of the stock. *See Basic*, 485 U.S. at 248. As discussed above, the Supreme Court in *Goldman I* found that the front-end-back-end price impact inference starts to break down then there is a mismatch between the generic alleged misrepresentations and the specific alleged corrective disclosure. *Goldman I*, 594 U.S. at 123. The statements at issue in *Goldman I* included:

- "We have extensive procedures and controls that are designed to identify and address conflicts of interest."

- "Our clients' interests always come first."

- "Integrity and honesty are at the heart of our business."

*Id.* at 120. The *Goldman I* defendants argued that these statements were "business principles" that equated to mere puffery, rather than statements that could be false and misleading to support a securities fraud action. Some, but not all, of the Category A statements similarly fall into the category of being general business principles and/or puffery.[18] The Court finds the following

---

[18] Plaintiffs argue that Defendants' reliance on *Goldman I* to support its "puffery" argument is irrelevant because "Defendants already raised this argument within their motion to dismiss and the Court rejected those very arguments." (Doc. No. 80 at 15). This Court previously adopted the majority of Magistrate Judge Sheldon's Report

36

Category A statements fall into that category: A-1, A-2, A-3, A-4, A-5, A-6, A-10, A-11, A-13, A-18, A-21, A-22, A-24, A-25, A-26, and A-31. Thus, Defendants have successfully "sever[ed] the link between back-end price drop and front-end misrepresentation" as to those statements. The remaining Category A statements are not so generic as to cause a mismatch; and, as to those statements, Defendants have failed to sever the link, at least at this stage. Therefore, the Court finds that individual issues of reliance will not predominate as to the remaining Category A statements.

    *ii.  Categories B and C – Substantive mismatch*

Defendants also contend that there is a mismatch between the representations in Category B and C and the Corrective Disclosure such that the Corrective Disclosure cannot substantively correct the alleged misstatement. Defendants contend the Category B cannot be corrected by the corrective disclosures because "Concho's second quarter 2019 results cannot be attributed to factual observations about periods from months before." (Doc. No. 68 at 24). The Category B statements are as follows:

| Number | Source | Statement |
|---|---|---|
| B-1 | Q4 & FY 2017 Earnings Release | Delivered outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin and in the Midland Basin. |
| B-2 | Q4 2017 Earnings Call | Analyst: So in terms of -- I guess you don't give a type curve as such, but as we look at the sort of productivity per lateral foot, I guess the best to think about your business, you don't see any degradation there at all.<br><br>Harper: Well, we've modeled the outcome as we see it based on the spacing that has either already happened or will happen in the future. |

---

and Recommendation. (Doc. No. 43). In his Report and Recommendation addressing Defendants motion to dismiss, Magistrate Judge Sheldon stated that "Defendants' puffery argument is without merit." (Doc. No. 38 at 31). This Court writes to reiterate that Plaintiffs pleading burden under Federal Rule of Civil Procedure 8 is independent from its burden under Federal Rule of Civil Procedure 23. Thus, while Defendants' puffery argument may have failed at the motion to dismiss stage, it does not necessarily follow that it must fail at the class certification stage.

| B-3 | March 2018 Raymond James Institutional Investors Conference | We've highlighted here on the left side of the page a couple of the upcoming large-scale projects and really just to show you that where some of them are. They're very dispersed amongst our asset base. And they are, in some cases, getting larger. We have a 20- plus well pad or project on here that we'll begin this year, but don't plan to see production until next year on that. |
|---|---|---|
| B-4 | Q1 2018 Earnings Call Deck | "The accompanying presentation to the May 2, 2018 earnings call incorporated an infographic map depicting Concho's 'Key Projects' for 2018 and 2019, all of which were multi-well and multi-zone projects, including the Dominator, a '20+ well multi-zone project' in the Northern Delaware Basin |
| B-5 | Q2 2018 Earnings Call | I think we've been one of the leaders in moving to these larger-scale development projects. And that's been a steady evolution over the last couple of years as we've tested different spacing between -- within a zone and between zones. And so these bigger and bigger projects, I think, are just the further evolution of that trend. Where you see some of the smaller projects, that's us continuing to test tighter spacing or different spacing within a zone or between zones, again. And so I think you're right. Longer term, you'll see an evolution to the bigger and bigger projects. However, we're still learning as we go. And so I think you'll see a blend of different sizes. |
| B-6 | September 2018 Barclays CEO Energy Power Conference | So as we drill these wells, we don't – we're not stamping out wells. Every one of these areas is – the rock is different and what we're going for is precision. And we are collecting a lot of information. This is just one example of – when you look over the past several years and you look at lateral length, what the average lateral length for the company has done, the stages per well for the company, what that's done, but then you look at the productivity. And you can see that we've been increasing the lateral length, we've been increasing the stages, but you can also notice that they kind of plateaued out in 2018. We have found the length that, we think, is optimal for these projects that we're drilling today. But look what's happening to the productivity of our wells. And this is an example of why that productivity continues to go up. This is the geo model for the Mabee area. That was driven a lot by fiber optics and by seismic. But I'm telling you, we've got a geo model like this for every area that we're drilling and it allows us, you probably can't see it on the screen, but the package is out there. You can see what the predrill well plan was. And then as we had this information, and we were using real-time information to |

38

**APP 592**

| | | |
|---|---|---|
| | | steer the well, how it helped us guide the well into the best rock, it allowed us to drill a 13,000-foot well with 1 drill bit. And so this kind of geo model is what we're using in every one of our areas to continue to increase the productivity and efficiency of the wells. So I really think, I mean, if you heard at this conference that the shale in the Permian is kind of reaching the end of the efficiency gain cycle, I completely disagree with that. I think that this transition to this type of development mode for the companies that can do it will continue to drive better and better productivity. |
| B-7 | September 2018 Barclays CEO Energy Power Conference | And I can tell you more and more those projects are going to be multi-well pads. We started out a few years ago that it was 2, 3, 4 wells a pad. We're right now – this is probably the extreme example, but the Dominator project in Lea County, New Mexico, is 23 wells being drilled by 7 rigs all at the same time on 1 section of land. That's probably going to be the most aggressive multi-well pad that we drill. Probably going forward, a normal development will be 8 to 12 wells per pad. So that kind of capital efficiency would generate free cash flow for us. |
| B-8 | Q3 2018 Earnings Call | Analyst: Got it. And perhaps for Will, with the understanding that you guys are still in the relatively early stages of large-scale development, are there any generalizations you can make regarding efficiencies, gain or challenges experienced? I know that you guys recently talked about sequencing and timing in your Barclays presentation.

Giraud: Sure. I mean, we continue to experiment with different completion designs, timings, spacing. There's still a lot of learning to be done there. But I mean, early benefits, I think you see it in 2019 and 2020 program and you see it in the confidence of making these average projects sizes bigger over time. We like what we're seeing. We like the benefits we get of efficiency with our vendors of concentrating that much activity in one spot. And we like the results we're getting out of them. So more to come. |
| B-9 | Q4 & FY 2018 Earnings Call | Analyst: Good morning, everyone. Just wanted to follow up on the last question on well performance improvements, can you speak to how much you think the well performance improvements have come from optimizing spacing and well design aside from -- and things targeting on the reservoir, as opposed to just completion design modifications?

Leach: That's a little hard to describe in a brief way. But certainly what -- I think what we're pleased by is that as we moved into this large-scale project development. We're seeing the results we expect and it's enabling us to do some pretty interesting things from testing and continuing to understand the best way to do it. |

Likewise, Defendants contend that there is a substantive mismatch between the representations in Category C and the Corrective Disclosure. Defendants argue that the Category C statements cannot be corrected by the alleged Corrective Disclosure because the Category C statements involved financial projections for 2018, whereas the alleged Corrective Disclosure

39

concerned results for the second quarter of 2019. (Doc. No. 68 at 25). The Category C statements

are as follows:

| Number | Source | Statement |
|---|---|---|
| C-1 | March 2018 Raymond James Institutional Investors Conference | Here, let's talk about the 2018 budget for just a moment.... Well, first of all, before we go there, let me say you should expect more of the same in '18 as you saw in previous years from Concho. It's going to be a budget focused on reinvesting our cash flow and an increased percentage of capital going towards these larger-scale projects that we've been describing to you. |
| C-2 | Q4 & FY 2017 Earnings Release | Concho expects 2018 capital spending to be at the midpoint of its capital guidance range of $1.9 billion to $2.1 billion, which reflects the Company's current outlook for service cost inflation. The 2018 capital program is expected to be funded with cash flows from operations and generate 20% crude oil growth and 16% to 20% total production growth year-over-year. Approximately 93% of the capital program is allocated to drilling and completion activities, with approximately 65% of that capital directed towards large-scale manufacturing projects. The Company's 2018 capital program is allocated among the following areas: Northern Delaware Basin (40%), Southern Delaware Basin (25%), Midland Basin (30%) and the New Mexico Shelf (5%). |
| C-3 | Q4 2017 Earnings Call | As we look to 2018, our total capital investment is expected to be $2 billion, with 93% allocated for drilling and completion activity. This level of investment is expected to grow oil approximately 20%. Importantly, approximately two-thirds of our development capital will be directed to large-scale, multi-zone projects.<br><br>In general, when we give guidance, we try to forecast the things that we're aware of at the time we give the guidance. |
| C-4 | Q4 & FY 2017 Earnings Release | The Company provided a new three-year production growth outlook. Concho expects to grow total production at a compound annual growth rate of 20% from 2017 to 2020. The outlook reflects the Company's high-quality production base and strong operating momentum. Additionally, the Company expects to deliver this growth within cash flows from operations at an average crude oil price (WTI) in the low-to-mid $50 per barrel range over the duration of the outlook.<br><br>As with the Company's 2018 outlook, growth over the three-year period from 2017 to 2020 is the output of reinvesting high-margin cash flow into its drilling program. |
| C-5 | Q4 & FY 2017 Earnings Release | At December 31, 2017, Concho's estimated proved reserves totaled 840 MMBoe, an increase of 17% from year-end 2016. The Company's proved reserves are approximately 60% crude oil and 40% natural gas. Proved developed reserves totaled 588 MMBoe, an increase of 26% from year-end 2016. The Company's proved developed reserves represent approximately 70% of total proved reserves. |

40

**APP 594**

| | | During 2017, Concho added 194 MMBoe of proved reserves primarily from drilling and completion operations, resulting in a reserve replacement ratio of 275%. The Company's proved developed finding and development cost was $8.68 per Boe for 2017. |
|---|---|---|
| C-6 | 2017 Form 10-K | At December 31, 2017, substantially all of our 840 MMBoe total estimated proved reserves were located in our core operating areas and consisted of approximately 60 percent oil and 40 percent natural gas. We have assembled a multi-year inventory of horizontal development and exploration projects across our four core operating areas.<br><br>***<br><br>Northern Delaware Basin. At December 31, 2017, we had estimated proved reserves in this area of 295 MMBoe, representing 35 percent of our total proved reserves.<br><br>***<br><br>Southern Delaware Basin. At December 31, 2017, we had estimated proved reserves in this area of 128 MMBoe, representing 15 percent of our total proved reserves |
| C-7 | March 2018 Investor Call | We will run the largest development program in the Permian and our combined position will be more than 640,000 net acres... I expect Concho to capture both operational synergies and corporate level savings. These synergies, which are estimated to have a present value exceeding $2 billion derive from the highly complementary and blocky nature of these assets.... In addition to operational synergies, there are financial benefits we expect from corporate level savings. And those come from the areas you would expect, including the overlapping public company cost and financing cost. In all, we estimate annual corporate cost savings of $60 million. |
| C-8 | March 2018 Investor Call | In addition to our size, scale and execution strength provide us with the unique ability to capitalize on these new complementary assets. This ability includes moving these assets into manufacturing mode, which generates cost savings and minimizes parent-child locations. |
| C-9 | March 2018 Investor Call | Yes. We've said in total, Scott, that it's in excess of $2 billion, and Tim really hit on the keys. It's long lateral, it's large-scale development, it's preventing the parent-child relationship with larger-scale development, it's that shared infrastructure. So those are the key drivers. And there's good value in each one of those. |

Again, the "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman I*, 594 U.S. at 123. Rather than a mismatch due to the generic nature of the statement, Defendants contend there is a substantive mismatch between the Corrective Disclosure and the alleged misrepresentation in Categories B and C.

41

As for the Category B statements, Defendants contend that the statements "describe operation facts and financial results from the fourth quarter of 2017 through the end of 2018." (Doc. No. 68 at 24). As such, the Corrective Disclosure could not have corrected any of the Category B statements because the Corrective Disclosure stated Concho's financial results for the second quarter of 2019. (*Id.*). The price movement following the Corrective Disclosure, therefore, cannot be attributed to the Category B statements regarding quarters from months earlier. (*Id.*). Thus, Defendants conclude that, because there is a mismatch between the contents of the misrepresentation and the Corrective Disclosure, they have successfully rebutted the *Basic* presumption by severing the link between price impact and the alleged misrepresentation in Category B.

Conversely, Plaintiffs contend that Defendants' argument misconstrues and misinterprets Plaintiffs' allegations. (Doc. No. 80 at 18). As stated above, Plaintiffs argue that the Corrective Disclosure corrects the Category B misstatements by revealing the omitted/concealed truth: that Concho continued to claim it had proven manufacturing mode methodologies when in reality they did not and needed to go "back to the drawing board on well spacing." (Doc. No. 109 at 273). Plaintiffs state that Defendants' repeatedly and baselessly "touted the benefits of the 'large-scale project development." (Doc. No. 80 at 19). Since Defendants had no evidence to support, or misrepresented, the evidence of the benefits of the large-scale project development, Lead Plaintiffs conclude that the Category B statements were subsequently corrected "upon revelation of Concho's well-spacing woes." (*Id.*). Specifically, the Corrective Disclosure revealed that Concho had to halve its active rig count while keeping its budget the same, which Lead Plaintiffs argue corrects the earlier statements that the large-scale project developments were generating cost savings for the company. (*Id.* at 18).

42

APP 596

The Court agrees with Plaintiffs with respect to a some of the Category B statements. If Plaintiffs relied solely on Concho's financial results for the second quarter 2019 as its corrective disclosure, the Court would be more persuaded by Defendants' argument that 2019 results cannot correct any of the 2017 and 2018 statements. Importantly, Plaintiffs rely on more than just the 2019 second quarter results. Plaintiffs also rely on the statements in the Corrective Disclosure that suggest that the manufacturing mode was not as efficient or proven as previously publicized. Therefore, there is not a substantive mismatch between the Corrective Disclosure and statements B-2, B-6, B-7, B-8, and B-9 above.

Nevertheless, the Court agrees with Defendants that there is a mismatch between the contents of the remaining Category B statements and the Corrective Disclosure. The remaining statements involve the actual results from 2017 and/or 2018 or otherwise discuss the switch to manufacturing mode generally. The Corrective Disclosure, therefore, does not actually correct these statements by disclosing the 2019 second quarter results, the decline in the number of active rigs, or that the Dominator's well spacing was too tight. Thus, Defendants have successfully "sever[ed] the link between back-end price drop and front-end misrepresentation" as to statements B-1, B-3, B-4, and B-5.

With respect to Category C, Defendants suggest there is a substantive mismatch between the statements and the Corrective Disclosure because: 1) statements C-1, C-2, and C-3 are financial projections of what Defendants expected to occur during the year 2018 and the alleged corrective disclosures pertain to results for the second quarter of 2019; 2) Statements C-4, C-5, and C-6 are projections for 2017 through 2020 that Concho met and therefore could not be corrected by the Corrective Disclosure; and 3) Statements C-7, C-8, and C-9 concern synergies

43

APP 597

that Concho expected to obtain from its merger with RSP in early 2018 and the Corrective Disclosure makes no mention of the merger. (Doc. No. 68 at 25–26).

On the other hand, Plaintiffs again argue that Defendants misinterpret its pleading. Plaintiffs allege "that Defendants' statements with respect to Concho's forecasts were misleading because they repeatedly represented that they were conservative and followed historical norms (untrue on both fronts, among others)." (Doc. No. 80 at 20). Plaintiffs state that these misrepresentations were subsequently corrected by the Corrective Disclosure, which "informed investors of a financial condition dramatically different than what investors were led to expect." (*Id.*).

Even assuming the Category C statements are misrepresentations, there is a substantive mismatch between the Category C misstatements and the Corrective Disclosure. As noted above, the Corrective Disclosure discusses, *inter alia*, 2019 second quarter results, the decline in the number of active rigs, and that the Dominator's well spacing was too tight. Plaintiffs contend that investors were led to expect "more of the same," and the Corrective Disclosure corrects that statement because Concho reported "disappointing" results. In drawing this conclusion, Plaintiffs reference statement C-1, in which investors were told to "expect more of the same in '18." The Corrective Disclosure, however, only relays the financial results for the second quarter of 2019. A statement to expect "more of the same" in one year cannot be corrected by a statement regarding the results in a different year.

Moreover, the remaining Category C statements are not corrected by the Corrective Disclosure. The statements do not pertain to the financial results for the second quarter of 2019. The Corrective Disclosure does not even implicitly mention the RSP Acquisition referenced in the remaining Category C statements. As such, Defendants have successfully "sever[ed] the link

44

between back-end price drop and front-end misrepresentation" as to statements C-1, C-2, C-3, C-4, C-5, C-6, C-7, C-8, and C-9.

In conclusion, Defendants have failed to rebut the *Basic* presumption for certain Category A and B statements, and all Category D statements.[19] Thus, with respect to those remaining statements, Plaintiffs have met their burden under Rule 23(b)(3) to show that questions of reliance common to class members predominate over any questions affecting only individual members.

### 2. Plaintiff's damages model

#### i.   *In general*

Now, moving away from reliance and the issue of front-end impact via the inflation-maintenance theory, the Court addresses Defendants' second issue regarding predominance—damages. Defendants argue that Plaintiffs have not demonstrated that damages can be calculated on a class-wide basis. As such, Defendants conclude that Rule 23(b)(3)'s predominance requirement is not satisfied, and the Court should not certify the class.

Defendants contend that, with respect to Lead Plaintiffs' damages model, Lead Plaintiffs are proceeding on a "materialization-of-the-risk theory" of loss causation.[20] For avoidance of doubt, inflation-maintenance theory, discussed above, is considered as part of the element of reliance, which is sometimes referred to as "transaction causation." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681 (5th Cir. 2015). Materialization of the risk (and the later discussed corrective disclosure theory), on the other hand, are considered as theories of the loss causation element of

---

[19] The following alleged misrepresentations, as numbered above, remain: A-7, A-8, A-9, A-12, A-14, A-15, A-16, A-17, A-19, A-20, A-23, A-27, A-28, A-29, A-30, A-32, A-33, B-2, B-6, B-7, B-8, B-9, D-1, D-2, D-3, D-4, D-5, D-6, D-7, D-8, D-9, D-10, D-11, D-12, D-13, D-14, and D-15.

[20] Plaintiffs need not prove loss causation at the class certification stage. *Halliburton I*, 563 U.S. at 813. Plaintiffs are required, however, to demonstrate that their proposed damages model is consistent with their theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

45

a § 10b cause of action. *Id.* "Loss causation is a legal requirement distinct from reliance that demands a causal connection between the misstatement and claimed economic loss." *Id.* at 681–82. Though easy to conflate the two theories (inflation-maintenance versus materialization of the risk), the Fifth Circuit has explained that "[i]t is helpful to focus on three 'occurrences'—the misrepresentation, security transaction, and economic loss—and two 'relationships,' transaction causation, which links the misrepresentation and security transaction, and loss causation, which connects the misrepresentation to the economic loss." *Id.* at 681. The Supreme Court has further explained that transaction causation (*i.e.* reliance) focuses on the "facts surrounding the investor's decision to engage in the transaction," whereas loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 563 U.S. at 812 (emphasis in original). Thus, our focus now shifts from the time an investor purchased Concho stock at an allegedly inflated price to the drop in the stock's price after the Corrective Disclosure that allegedly caused the damage.

As noted above, Plaintiffs are required to demonstrate that their proposed damages model is consistent with their theory of liability. *Comcast*, 569 U.S. at 35. Defendants contend that Plaintiffs have failed to meet their burden in this respect, relying heavily on a case from this District involving the BP securities litigation. *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6388408, at *16 (S.D. Tex. Dec. 6, 2013) ("*BP I*"). The *BP I* court held that plaintiffs proceeding with a materialization of the risk theory of loss causation must provide the specifics of their proposed methodology in order for the court to determine that that methodology will track the plaintiff's theory of liability, as required by *Comcast*. *Id.* at *17.

Defendants assert that Plaintiffs are proceeding on a "materialization-of-the-risk theory" of loss causation (as defined below)—and since Plaintiffs are relying on that theory, they must

46

**APP 600**

have more evidence at the class certification stage than just a plan to do an event study sometime in the future. (Doc. No. 68 at 5).[21] On the other hand, Plaintiffs explicitly state that they do not rely on a materialization-of-the-risk theory, as Defendants contend. (Doc. No. 80 at 26). Instead, Plaintiffs assert, and Plaintiffs' expert supports the claim, that Plaintiffs are proceeding solely on a "corrective disclosure" theory. (*Id.*); (Doc. No. 103-1 at 84–85). Defendants argue that Plaintiffs cannot disclaim a theory of liability pleaded in the Complaint. Plaintiffs contend that they pleaded the materialization-of-the-risk theory only in the alternative and that they have since abandoned that theory. *See* (Doc. No. 109 at 108).

The parties apparently disagree, at least to a certain extent, as to what the "materialization-of-the-risk" and "corrective disclosure" theories entail. Nevertheless, the Fifth Circuit has defined each theory. The "materialization-of-the-risk theory" is used where the "investors are harmed by [ ] corrective events that represent materializations of the risk that was improperly disclosed." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 689 (5th Cir. 2015). On the other hand, the "corrective disclosure theory" is used when "a release of information [ ] reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Amedisys*, 769 F.3d at 321.

Defendants contend that Plaintiffs' Consolidated Complaint alleges only that Defendants "understated the risk," which is consistent with the definition of materialization-of-the-risk theory. While it is true that Plaintiffs use the words "materialization" and "risk" in their Complaint, Plaintiffs argue that their allegations are not based upon a risk that eventually materialized. Plaintiffs concede that the investors were aware that some risk was involved in the large-scale development projects. Indeed, risk comes with any form of investing, and perhaps

---

[21] "'Event studies' [are] regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280.

47

especially in the oil business—sometimes a well produces, sometimes it does not. Rather, Plaintiffs contend that Concho misled investors into believing that it had accounted for the risk and acted according. Specifically, Plaintiffs aver that Defendants misrepresented that Concho had the capability to effectuate the large-scale development project when, in reality, they did not have the requisite knowledge and experience and were forced to go "back to the drawing board on well spacing." (Doc. No. 109 at 273). Moreover, Plaintiffs claim that Concho continued to mislead investors throughout the Proposed Class period that it had the ability to, and was, in fact, effectuating its large-scale development projects until it revealed the truth in the Corrective Disclosure. These allegations are consistent with a corrective disclosure theory, which applies when "a release of information [ ] reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Amedisys*, 769 F.3d at 321.

Several courts have already addressed and rejected similar arguments regarding materialization of the risk theory by other defendants opposing class certification under Rule 23(b)(3). *See Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc. HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) ("A number of courts have rejected similar attempts by defendants to reframe plaintiffs' theory of liability in order to prevent class certification in Rule 10(b)-5 securities fraud cases relying on the fraud-on-the-market theory of liability."); *see also Baker v. SeaWorld Ent., Inc.*, Case. No. 14-cv-2129, 2017 WL 5885542, at *14 (S.D. Cal. Nov. 29, 2017) (rejecting defendants' argument that plaintiffs' out-of-pocket damages calculation was not properly tied to their theory of liability); *see also Schleicher v. Wendt*, 618 F.3d 679, 683–84 (7th Cir. 2010). For example, in *Schleicher v. Wendt*, the Seventh Circuit rejected the

48

APP 602

defendants' attempt to recast the plaintiffs' fraud on the market case as a materialization of risk case, explaining that:

> Although "materialization of risk" runs like a mantra through the parties' briefs, we do not think that it has any significance . . . If a firm that is losing money says "we expect to lose $100 million next quarter" when the managers actually expect the loss to be $200 million, that statement will keep the price higher than it ought to be, and when the next quarterly results show the real $200 million loss the price will adjust . . . The parties are wont to call the bad outcome (the $200 million loss) a "materialization of the risk" that the loss would exceed $100 million . . . [but] [t]he phrase adds nothing to the analysis . . . [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.

*Schleicher*, 618 F.3d at 683–84. Here, Defendants' attempt to recast Plaintiffs' theory of loss causation does not preclude certification.[22] Based upon the pleadings, Plaintiffs' concessions, the briefing, and for the reasons above, the Court finds that Plaintiffs are proceeding on a corrective disclosure theory, rather than a materialization of the risk theory.

More importantly, the Court finds that the corrective disclosure theory is consistent with Plaintiffs' proposed theory of damages as required by *Comcast*. *See Comcast*, 569 U.S. at 35. In *Comcast*, the Supreme Court held that Rule 23(b)(3) requires that the method for calculating class damages be consistent with the theory of liability asserted in the case. *Id.* "The *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier*, 2019 WL 6111303, at *15. It is illogical that, at the class-certification stage, any method of measuring damages is acceptable so long as it can be applied class wide, no matter how arbitrary the measurements may be. *Comcast*, 569 U.S. at 36. Instead, a "plaintiff's damages case must be consistent with its liability

---

[22] The Court again notes that Plaintiff's concede that they pleaded both theories, though materialization of the risk theory was pleaded in the alternative. Whether one describes the pleading history as a switch in horses or merely the Plaintiffs finally choosing which horse to ride, they have clearly made their choice now. Plaintiffs may now proceed using *only* the corrective disclosure theory.

49

case," and must measure only those damages attributable to the theory of damages, though "calculations need not be exact." *Id.* at 35.

Coffman testified that if the class succeeds on the merits, damages can be calculated on a class-wide basis under the "well-accepted" "out-of-pocket" method. (Doc. No. 103-1 at 38–39). Out-of-pocket losses are the difference between the price paid for the stock and the "but for" value of the stock, or what its value would have been absent the misrepresentations and omissions. *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 716 (S.D. Tex. 2006) ([T]he out-of-pocket measure ... allows a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud ....") (quotations omitted). Coffman further testified that this methodology "aligns perfectly" with Plaintiffs' corrective disclosure theory of loss causation by "isolating the per share artificial inflation caused by the alleged misstatements and measuring the removal of this per share artificial inflation after corrective disclosures of the relevant truth concealed by the alleged misstatements." (Doc. No. 103-1 at 39). "Since this methodology ultimately identifies the inflation per share present on each day during the Class Period, the damages for any investor can be calculated formulaically based upon their specific trading." (*Id.* at 41). Thus, Coffman, or some other expert, can calculate the damages for each class member in a methodical manner.

While Plaintiffs may face a number of hurdles in actually proving loss causation, they are not required to make this showing until the merits stage. Moreover, Plaintiffs are not required to provide exact calculations to satisfy *Comcast*. *Comcast*, 569 U.S. at 35. Plaintiffs' burden at this stage is simply to propose a methodology for calculating damages that corresponds to their theory of liability and can be applied class-wide. They have done so here.[23] Plaintiffs proposed

---

[23] In a case involving the same Plaintiffs' counsel and expert, the defendants there lodged the same objection regarding the materialization of the risk theory. (*In re The Boeing Co. Sec. Lit.*, case No. 1:24-cv-151, Doc. No. 143

50

methodology, which applies on a class wide basis, is capable of measuring the out-of-pocket losses suffered by the Proposed Class.

### ii. RSP Acquisition

As noted above, Defendants complain that Coffman's methodology faces two glaring problems under *Comcast*, with respect to (1) pre-acquisition Concho shareholders; and (2) former RSP shareholders who converted their RSP stock. (Doc. No. 68 at 34). With respect to the pre-acquisition Concho shareholders, Defendants argue that, if it is true that the alleged fraud inflated the price of Concho's stock prior to the RSP Acquisition, then Concho necessarily used the inflated shares as merger consideration. (*Id.*). The pre-acquisition Concho shareholders thus received an economic benefit that Coffman's proposed damages methodology "makes no effort" to correct. (*Id.* at 35).

Defendants also argue that the premium a former RSP shareholders received in the RSP Acquisition (29% above the market price for their RSP stock) should "offset" any alleged loss suffered by a former RSP shareholder. (*Id.*). As such, Defendants contend that the former RSP shareholders cannot be included as members of the Proposed Class because the net benefit they received via the stock swap creates a fundamental conflict between the former RSP shareholders and the remaining Proposed Class members.

For their part, Plaintiffs argue that their proposed damages methodology can address any issues that arise as a result of the RSP Acquisition. (Doc. No. 80 at 32). With respect to the pre-

---

at 3). Perhaps more interesting is the *amicus* brief filed by various law professors in the appeal now pending before the Fourth Circuit. *See* Brief for Former SEC Officials and Law Professors as Amici Curiae Supporting Petitioners, In re The Boeing Co. Sec. Lit., No. 25-135 (4th Cir. Mar. 28, 2025). In their brief, *amici* claim, like Defendants here, that Coffman's "promise to do it later" approach does not comply with *Comcast,* and therefore the District Court erred in certifying a class. *Amici*, however, opine that in a case "premised on a financial statement subsequently revealed to be false by a 'corrective disclosure,'" Coffman's approach may be correct. *Id.* at 7. Thus, in a case like the case at bar involving an alleged correction of statements via a corrective disclosure, these professors (one of whom is a former Commissioner of the Securities and Exchange Commission) seemingly agree that the approach taken by this Court is both feasible and *Comcast* compliant.

51

acquisition Concho shareholders, Plaintiffs specify that the out-of-pocket methodology "would perform a simple adjustment to the inflation per share analysis based upon how the number of shares outstanding changed after the merger." (*Id.* at 33). Moreover, "[s]ince this methodology ultimately identifies the inflation per share present on each day during the Class Period, the damages for any investor can be calculated formulaically based upon their specific trading." (Doc. No. 103-1 at 41). The Court has no reason to conclude that Coffman's methodology cannot account for any issue that may arise in calculating the alleged damages of the pre-acquisition Concho shareholders.

As for the former RSP shareholders, Plaintiffs state that the 29% premium paid to the former RSP shareholders was not related to the alleged fraud. (*Id.* at 34). Instead, they contend that premiums are typically paid to the shareholders of the acquired company "for control." (*Id.*). Additionally, in this case, the higher amounts were paid due to the favorable acreage that Concho wished to acquire from RSP. (*Id.*). Thus, Plaintiffs' conclude that the premium paid to the former RSP shareholders should not affect the damages they may eventually be awarded due to the alleged fraud. Coffman's report explicitly addresses that the parties involved in a merger "negotiate a price that allows the target to share in the economic benefits of the business combination," and the damages model need not "treat this premium as a windfall by netting it from the RSP shareholders' losses suffered as a result of Defendants' fraud." Moreover, Plaintiffs contend that Defendants' "conflict of interest" argument is moot because the premium itself was not a product of the fraud and therefore should not affect the former RSP shareholders' damages.

The Court agrees, at least in part, with Plaintiffs. Defendants cite no precedent to support their contention that a premium paid to the shareholders of an acquired company should prevent

52

that shareholder from recovering any damages allegedly incurred by fraud. Moreover, premiums are frequently paid to the shareholders of an acquired company. To hold that former RSP shareholders cannot recover damages allegedly incurred from Defendants' alleged fraudulent conduct would be to punish those individuals who rightfully acquired Concho stock, albeit in a different manner than the remaining Proposed Class members. The Court declines to do so.

Nevertheless, the Court finds that former RSP shareholders should be separated into their own subclass. The Court finds that there could be issues involving both the merits and potential damages which might be unique to these shareholders. As such, it must consider "how a trial on the merits would be conducted" if a class were certified. *Castano*, 84 F.3d at 740. While the Court may disagree that the damages issues presented by Defendants preclude certification, it agrees that any grouping that includes open market purchasers and the former RSP shareholders may pose difficulties in managing the class action, particularly in trying the case. There are too many factors that may affect the former RSP shareholders damages that will not be factors for the open market purchasers, such as the premium discussed above. To group the two together would be to muddle a trial that will no doubt be complicated even if all the issues were the same. As such, the Court will certify two subclasses—one consisting of those who purchased Concho stock on the open market, and the second consisting of former RSP shareholders who acquired Concho stock via the RSP Acquisition. The subclasses are defined below. Since the Court is subdividing the Proposed Class, there is no fundamental conflict between the former RSP shareholders and those who obtained their stock on the open market that would require the Court to deny class certification.

For the reasons above, Plaintiffs have demonstrated that individual issues of reliance on the alleged misrepresentations, an element of Plaintiffs § 10(b) claim, will not predominate and

53

Plaintiffs' damages can be measured on a class-wide basis consistent with Plaintiffs' theory of liability. As such, Plaintiffs have satisfied their burden to show that questions of law or fact common to the Proposed Class members predominate over any questions affecting only the individual members. FED. R. CIV. P. 23(b)(3).

## B. Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). This requirement is easily met in this case. Typically, class actions are appropriate vehicles for adjudicating securities fraud cases because they "avoid the time and expense of requiring all class members to litigate individually." *BP I*, 2013 WL 6388408, at *18. The Court can assume, based on the number of outstanding shares that traded on a national exchange and the volume of put and call option contracts, that the Class will be so large and geographically dispersed as to make a class action superior to other methods for fairly and efficiently adjudicating the controversy. *See id.* (class action was vastly superior method for resolving the right to damages of approximately 900,000 securities purchasers). Further, the commonality of the subclass members' claims suggests that fairness and efficiency would be better served by certifying the two subclasses. *See id.* ("Given the large number of potential plaintiffs and the commonality of their claims, certifying the class will permit a fairer and more efficient adjudication of the controversy than requiring individual adjudications would."). As such, a class action is clearly "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

That being said, among the factors to be considered in determining whether Rule 23(b)(3)'s superiority requirement is satisfied are "the difficulties likely to be encountered in the

54

management of a class action." FED. R. CIV. P. 23(b)(3). In addition to the reasons discussed above, addressing a class of shareholders that purchased Concho stock on the open market versus those that received stock via the RSP Acquisition poses complications that also undermine the concept of superiority—at least between these two groups of Plaintiffs. Accordingly, as noted above, the Court is hereby certifying the subclasses listed below.

## C.     Conclusion

For the foregoing reasons, Plaintiffs' Motion for Class Certification in GRANTED IN PART and DENIED IN PART. (Doc. No. 54).

It is further ORDERED that the Court certifies the following Class that are further divided into two subclasses:

> All persons and entities who are a member of at least one subclass, as defined below. Excluded from either subclass are: (i) Defendants; (ii) present or former executive officers and directors of any Defendant, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, and any affiliate of any Defendant. For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Concho employees.

> The subclasses are defined as follows:

> 1. Open Market Subclass: All persons and entities who purchased Concho publicly traded common stock, or otherwise acquired Concho publicly traded common stock from someone who purchased said stock, during the period from February 21, 2018 through July 31, 2019 inclusive.

> 2. RSP Acquisition Subclass: All persons and entities who acquired Concho publicly traded common stock via Concho's acquisition of RSP Permian, Inc.

It is further ORDERED that Plaintiffs Utah Retirement Systems and Construction Laborers Pension Trust for Southern California are appointed as the Open Market Subclass Representatives.

55

**APP 609**

It is further ORDERED that Labaton Keller Sucharow LLP is appointed as class counsel for both the Open Market Subclass and RSP Acquisition Subclass.

It is further ORDERED that, within sixty days of the date this Order is filed, Plaintiff submit the names of the proposed RSP Acquisition Subclass representatives via a motion to which Defendants may respond according to the Rules.

SIGNED this 7ᵗʰ day of April, 2025.

Andrew S. Hanen
United States District Judge

56

**APP 610**

# EXHIBIT 22

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § | Master File No. 1:24-cv-00297-DAE |
| | § | <u>CLASS ACTION</u> |
| This Document Relates To: | § § § | |
| ALL ACTIONS. | § § § § | |

**LEAD PLAINTIFF NORTH CAROLINA FUNDS' AMENDED RESPONSES AND OBJECTIONS TO THE AGILON DEFENDANTS' FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFFS**

4937-5501-5859.v1

Pursuant to Federal Rules of Civil Procedure 26 and 33, the applicable Rules of Practice and Procedure of the U.S. District Court for the Western District of Texas ("Local Rules"), and the rules and orders of this Court, Lead Plaintiff Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans (the "North Carolina Funds"), by and through their counsel of record, hereby submit their responses and objections to agilon Defendants' First Set of Interrogatories to Lead Plaintiffs (the "Interrogatories," and each individually, an "Interrogatory"), served on February 27, 2026, as follows:

## I.     INTRODUCTION AND RESERVATION OF RIGHTS

1.     North Carolina Funds' responses to the Interrogatories are based only upon a reasonable investigation of the evidence currently available and reflect current knowledge, understanding, and belief, based upon information known at this time.

2.     Discovery in this matter is ongoing.  Additional contentions, facts, witnesses, documents, testimony, or other evidence may arise during the discovery process and during the review of discovery in preparation for trial.  North Carolina Funds are providing these responses based upon review of evidence available to date and expressly reserve the right to modify their position based upon further discovery.  By providing the responses and objections below, North Carolina Funds do not waive and expressly reserves the right to: (i) modify their position based upon further discovery; (ii) rely upon and use, at trial and otherwise, any other facts and information subsequently identified; (iii) supplement, clarify, revise, or correct any or all of the objections and responses herein; (iv) assert additional objections or privileges in subsequent supplemental responses; and (v) assert any and all objections as to the admissibility of such responses into evidence in this Action, on any and all grounds, including, but not limited to, relevance, materiality,

- 1 -

4937-5501-5859.v1

**APP 613**

and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in court.

## II.    GENERAL OBJECTIONS

North Carolina Funds generally object to the Interrogatories on the following grounds, each of which is incorporated by reference into the responses to each individual Interrogatory below.  All responses set forth herein are subject to and without waiver of any of these General Objections.

1.    North Carolina Funds object to each Interrogatory to the extent that it purports to require the disclosure of information and/or communications protected from disclosure by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity from disclosure, regardless of whether such privilege or immunity from disclosure is specifically identified in the response(s) to which it applies.  Any inadvertent disclosure of privileged or otherwise protected information shall not be deemed to be a waiver by North Carolina Funds of any applicable privilege or immunity from disclosure.

2.    No incidental or implied admissions are intended in these responses.  North Carolina Funds' response to all or any part of an Interrogatory should not be taken as an admission that: (i) North Carolina Funds accept or admit the existence of any facts set forth or assumed by the Interrogatories; or (ii) North Carolina Funds' responses constitute admissible evidence.  North Carolina Funds' response to all or any part of an Interrogatory also is not intended to be, and shall not be, a waiver by North Carolina Funds of all or any part of their objections to that Interrogatory.

3.    North Carolina Funds object to the Interrogatories to the extent they seek the discovery of information or materials that are not in North Carolina Funds' possession, custody, or control.

4.    Inadvertent disclosure of any information or materials subject to any applicable privilege or doctrine, including, but not limited to, the attorney-client privilege and the work product

4937-5501-5859.v1

doctrine, is not intended to be, and shall not operate as, a waiver of any such privilege or doctrine, in whole or in part, nor is any such inadvertent disclosure intended to be, nor shall it constitute, a waiver of the right to object to any use of such information and/or materials.

5.     In responding to the Interrogatories, North Carolina Funds do not concede the relevance, materiality, or admissibility of any information or materials sought.  North Carolina Funds' responses, including the identification of any document or thing, do not constitute an admission by North Carolina Funds that such response, document, or thing, including any information contained therein, is relevant, authentic, or admissible, and are not intended to waive or prejudice any objections North Carolina Funds may assert now or in the future.  This includes, without limitation, objections to the use or admissibility of any document or thing, including any information contained therein, at any trial or other proceeding in this or any other action.

6.     To the extent that defendants agilon health, inc. ("agilon"), Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah (collectively, "agilon Defendants") interpret the scope or relevant period of any Interrogatory to be different from that which North Carolina Funds has set forth herein, North Carolina Funds reserve the right to supplement their objections.

## III.    SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     North Carolina Funds object to the Definitions and Instructions to the extent they would require North Carolina Funds to respond to the Interrogatories beyond what is required by the Federal Rules of Civil Procedure, the Local Rules, or the rules and orders of this Court.

2.     North Carolina Funds object to Definition No. 11 ("electronically stored information" or "ESI") to the extent it purports to impose obligations beyond those required by the Federal Rules or the Local Rules.  North Carolina Funds will interpret "electronically stored information" or "ESI" in a manner consistent with the Federal Rules, the Local Rules, or the rules and orders of this Court.

- 3 -

4937-5501-5859.v1

**APP 615**

3.     North Carolina Funds object to Definition Nos. 3 ("person" and "persons"); 12 ("document"), 13 ("communication(s)"), 14 ("concerning"), and 24 ("identify") to the extent they require North Carolina Funds to respond to the Interrogatories beyond what is required by the Federal Rules of Civil Procedure, the Local Rules, or the rules and orders of this Court. North Carolina Funds will respond in accordance with their obligations under the Federal Rules of Civil Procedure and the Local Rules.

4.     North Carolina Funds object to Definition No. 17 ("lead counsel") as vague, ambiguous, overbroad, unduly burdensome, and not proportionate to the needs of the case because it includes "special counsel," "contractor," "agent," "consultant," and "any person acting or purporting to act on behalf of these law firms." North Carolina Funds also object to the Request to the extent it calls for documents not in North Carolina Funds' possession, custody, or control, including independent third parties. North Carolina Funds further object to this definition to the extent it calls for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege, protection, or immunity. In accordance with the Court's order on June 6, 2024, North Carolina Funds will interpret "lead counsel" to mean Robbins Geller Rudman & Dowd LLP. ECF 14 at 4.

5.     North Carolina Funds object to Definition No. 6 ("Exchange Act Defendants") as not conforming to the Court's order on August 15, 2025, which upheld Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., and CD&R Associates IX, L.P. as defendants under the Exchange Act in addition to agilon health, inc., Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah. ECF 63 at 1-2, 88-89.

6.     North Carolina Funds object to Definition No. 4 ("Plaintiff," "you," and "your") as overbroad, unduly burdensome, seeking information that is not relevant to the claims or defenses of the parties, not proportionate to the needs of the case, and purporting to impose requirements beyond

- 4 -

**APP 616**

those imposed by the Federal Rules of Civil Procedure and the Local Rules.  In responding to these Requests, North Carolina Funds will construe "Plaintiff," "you," and "your" as each named plaintiff in this Action, unless otherwise specified.

7.    North Carolina Funds object to Definition Nos. 5 ("agilon") and 16 ("agilon securities" or "security") as vague, ambiguous, overbroad, unduly burdensome, not proportionate to the needs of this case, and seeking information that is not relevant to the claims or defenses of the parties, including because No. 5 includes "any" of agilon's "subsidiaries," "divisions," "directors," "officers," "employees," "agents," "attorneys," and "other persons acting or purporting to act on [agilon's] behalf" and No. 16 includes securities that are not at issue in this Action.  North Carolina Funds will interpret the terms "agilon securities" and "securities" as referring to agilon common stock only, and North Carolina Funds will interpret "agilon" to mean agilon health, inc.  *See* Complaint, ¶250.

8.    North Carolina Funds object to Instruction No. 18 as overbroad, unduly burdensome, not proportionate to the needs of the case, and seeking information that is not relevant to any party's claims or defenses, including to the extent it seeks information and responses without limitation as to date.  Unless otherwise indicated in the specific responses below, North Carolina Funds' responses are based upon the time period of May 27, 2021 through February 27, 2024 (the "Class Period").

9.    North Carolina Funds object to Instruction No. 22 to the extent it purports to impose requirements beyond those required by Federal Rule of Civil Procedure 26(e)(1)(A).  North Carolina Funds will supplement their responses consistent with the Federal Rules of Civil Procedure, any applicable orders, and agreements of the parties.

4937-5501-5859.v1

## IV.    SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

INTERROGATORY NO. 7:

Identify all persons who have knowledge of facts relevant to the claims or defenses in this action – including, without limitation, facts concerning falsity, scienter, reliance, loss causation, or damages – and describe the subject matter of their knowledge, including any consultants, experts, litigation funders, or other persons or entities who have assisted any Plaintiff in the prosecution of this action, and each document, communication, analysis, or category of documents that Plaintiffs contend supports those allegations and the basis on which you contend each such item supports them.

AMENDED RESPONSE TO INTERROGATORY NO. 7:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Carolina Funds object to this Interrogatory because it is vague, ambiguous, overbroad, unduly burdensome, seeks information not relevant to any of the claims or defenses in the case, and is not proportionate to the needs of the case, including because it demands that North Carolina Funds identify "*all* persons who have knowledge of facts relevant to the claims or defenses in this action" and "describe the subject matter of their knowledge," identify *all* "consultants, experts, litigation funders, or other persons or entities who have assisted any Plaintiff in the prosecution of this action" in any form whatsoever, and identify *each and every* "document, communication, analysis, or category of documents that Plaintiffs contend supports" any of the "allegations" in the case, and the "basis on which you contend *each* [document, communication, analysis, or category of documents] supports them." North Carolina Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*,

- 6 -

4937-5501-5859.v1

2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018). North Carolina Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.

North Carolina Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See, e.g.*, *Alcala v. Tex. Webb Cnty.*, 2009 WL 10694159, at *3 (S.D. Tex. Dec. 7, 2009) ("'Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents.'"); *see also Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). North Carolina Funds also object to this Interrogatory as purporting to require North Carolina Funds to seek, obtain, and verify information in the possession of third parties. North Carolina Funds also object to this Interrogatory to the extent it seeks the identity and work product of non-testifying consulting experts, or prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures. North Carolina Funds also object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.

- 7 -

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows: Plaintiff believes the following persons may have knowledge of facts relevant to the claims or defenses in this action, including *inter alia*, on the following subjects: (i) agilon's business, business model, operations, performance, and financial results and forecasts; (ii) agilon's historical, reported, and projected medical margin and adjusted EBITDA; (iii) the basis for agilon's financial results and projections; (iv) patient utilization of medical care; (v) agilon's medical expenses and medical revenue; (vi) Defendants' misstatements and omissions alleged in the Complaint; (vii) Defendants' scienter as to the misstatements and omissions alleged in the Complaint; (viii) Defendants' communications with the public, government entities, healthcare industry entities, physician partners, and other third parties concerning the subject matters in the Complaint; (ix) Defendants' transactions in agilon common stock; (x) Defendants' control of other Defendants; (xi) the valuation and price movement of agilon common stock; and/or (xii) Plaintiffs' transactions in agilon common stock.  Defendants are in the best position to know the titles, current addresses, and telephone numbers of their current and former employees and directors.

| PERSON | CONTACT INFORMATION |
|---|---|
| Wellington Management Company LLP | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Brown Advisory Incorporated | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BlackRock | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Rhumbline Advisors Limited Partnership | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Artisan Partners Limited Partnership | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Matthew D. Cain, PhD | c/o Robbins Geller Rudman & Dowd 655 West Broadway, Suite 1900 San Diego, CA  92101 Telephone: 619/231-1058 |
| agilon health, inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Steven H. Sell | *See* Plaintiffs' Initial Disclosures dated |

- 8 -

4937-5501-5859.v1

**APP 620**

| PERSON | CONTACT INFORMATION |
|---|---|
|  | September 22, 2025. |
| Timothy S. Bensley | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Girish Venkatachaliah | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Heidi Hittner | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Clayton, Dubilier & Rice, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Vector Holdings, L.P. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Investment Associates IX, Ltd. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Associates IX, L.P. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ben Shaker | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Benjamin Kornitzer, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Clay Richards | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Denise V. Zamore | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Derek L. Strum | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Diana L. McKenzie | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Donald J. Gogel | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Karthik Rao, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Kevin Spencer, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Glenn Sobotka | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Jeffrey A. Schwaneke | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Karen McLoughlin | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Katie Boyer | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Kenny Bellendir | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Mat Varghese | *See* Plaintiffs' Initial Disclosures dated |

- 9 -

| PERSON | CONTACT INFORMATION |
|---|---|
| | September 22, 2025. |
| Michael L. Smith | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Michelle A. Gourdine | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nathan K. Sleeper | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Priscilla Kasenchak | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ravi Sachdev | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Richard J. Schnall | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Rima Simson | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ronald A. Williams | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Sarah Mokover | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Sharad Mansukani | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Silvana Battaglia | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Theodore Halkias | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Theresa A. Gore | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Veeral Desai | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| William Wulf | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Claire Mulhearn | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Dana Carne | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Matthew Gillmor | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Albert de Hombre | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Timothy Gertsch | 440 Polaris Parkway, Suite 550 Westerville, OH 43082 Telephone: 562/256-3800 |
| Kristin Xanders | 440 Polaris Parkway, Suite 550 Westerville, OH 43082 Telephone: 562/256-3800 |

- 10 -

4937-5501-5859.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| Samuel Rowland | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Jillian Griffiths | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| David Novak | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Daniel Malconian | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Arjun Bakre | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Steph Huang | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Jared Rock | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Brian Scheinberg | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800. |
| Dan Fitzpatrick | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Dale Luke | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Gijun Jin | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Jacques Braamse | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Jared Shaeffer | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Katie Kauachi | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Khanh Vo | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |

- 11 -

4937-5501-5859.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| Lauren Polt | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Murtaza Zaidi | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Michael Murray | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Mimi Yang | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Tom Harwood | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Tony Chhear | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Barclay Pearce Capital | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| The Benchmark Company, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BofA Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BTIG, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Citizens JMP Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Cowen and Company, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Deutsche Bank AG | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Evercore Group, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| The Goldman Sachs Group, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Guggenheim Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Jefferies LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| J.P. Morgan Chase & Co | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Leerink Partners, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Morgan Stanley & Co., LLC | *See* Plaintiffs' Initial Disclosures dated |

- 12 -

4937-5501-5859.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| | September 22, 2025. |
| Nephron Research LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| RBC Capital Markets LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Stifel, Nicolaus & Company, Incorporated | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| TD Securities (USA) LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Truist Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| UBS Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Wells Fargo Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| William Blair & Company, L.L.C. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Wolfe Research, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Centers for Medicare & Medicaid Services | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| U.S. Securities & Exchange Commission | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Aetna Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Humana | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| United Healthcare | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Milliman, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ernst & Young LLP | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Academy Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Deutsche Bank Securities Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Goldman Sachs & Co. LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| J.P. Morgan Securities LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nomura Securities International, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| R. Seelaus & Co., LLC | *See* Plaintiffs' Initial Disclosures dated |

- 13 -

| PERSON | CONTACT INFORMATION |
|---|---|
|  | September 22, 2025. |
| RBC Capital Markets, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Samuel A. Ramirez & Company, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Siebert Williams Shank & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| WR Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |

Plaintiff further directs Defendants to AGL_00000215-470, and CDR_AGILON0000388-389.  Plaintiff further identifies the following documents as supporting Plaintiffs' allegations:

- Publicly available documents cited in the Complaint.

- ECF 105-6: Expert Report of Matthew D. Cain, Ph.D.

INTERROGATORY NO. 8:

Identify verbatim each statement you contend is false and/or misleading in connection with your claim that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act, including (i) the person who made the statement, (ii) when the statement was made, (iii) where the statement was made (*e.g.*, earnings call, conference, etc.), and (iv) to the extent the statement is in a document filed with the Securities & Exchange Commission, each person who signed an accompanying certification.

AMENDED RESPONSE TO INTERROGATORY NO. 8:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Carolina Funds object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.  North Carolina Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of

- 14 -

Civil Procedure 33 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at \*6-\*9 (E.D. Tex. July 27, 2018). North Carolina Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action. North Carolina Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at \*5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'").

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows: The following statements were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of the Securities Exchange Act of 1934.

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| **No. 1** - Complaint, ¶100: May 27, 2021, Q1 2021 agilon health, inc. Earnings Call. | Sell emphasized his "***high degree of visibility*** into future revenues and margin progression." |
| **No. 2** - Complaint, ¶108: October 28, 2021, Form 8-K, agilon health Reports Third Quarter 2021 Results, signed by Bensley. | Sell touted agilon's "***high-visibility partnership model***," which he claimed "***deliver[s] predictable, quality outcomes***." |
| **No. 3** - Complaint, ¶109: | Sell touted agilon's full-risk model, claiming its ability to "drive |

- 15 -

4937-5501-5859.v1

**APP 627**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| October 29, 2021, Q3 2021 agilon health, inc. Earnings Call. | medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." Sell also boasted of agilon's ability to "*drive sustainably lower cost[s]*." |
| No. 4 - Complaint, ¶113: January 10, 2022, agilon health, inc. at JPMorgan Healthcare Conference. | Sell boasted of agilon's "distinguish[ed]," "high-touch" model and its ability to "manage costs" and deliver "predicable results" through "multiple surges" in utilization:<br><br>*I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver predictable results through each one of these surges.* We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.<br><br>* * *<br><br>[T]he quality of our economic model has allowed us and will continue to allow us to *deliver predictable results in periods of volatility*. No one can predict exactly what the future is with this pandemic, but *we know that we can deliver predictable results*. New government programs evolve over time, but *we can deliver predictable results*. |
| No. 5 - Complaint, ¶114: January 10, 2022, agilon health, inc. at JPMorgan Healthcare Conference. | In response to an analyst's question regarding whether "there's any pent-up demand around things like elective surgeries" among agilon's patients, Sell dismissed the analyst's concern while referring back to agilon's "high-touch" model:<br><br>I don't know that we believe there's a massive set of pent-up demand, *particularly in our model, because we've got those touchpoints*, and we've been working very closely with those senior patients, particularly those high-risk patients. That's why that 50% increase in terms of touches with those patients yields such positive results. |
| No. 6 - Complaint, ¶116: March 3, 2022, Form 8-K, agilon health Reports Fourth Quarter and Fiscal Year 2021 Results, signed by Bensley. | Sell underscored agilon's model's "*distinctive, predictable results* . . . despite evolving COVID dynamics." |
| No. 7 - Complaint, ¶129: May 11, 2022, agilon health, inc. at Bank of America Healthcare Conference. | During the presentation, an analyst asked Sell what "visibility you have . . . from a cost perspective . . . from the way that you've built your model." In response, Sell emphasized that thanks to agilon's "high-touch" model, agilon's patients had avoided a "huge amount of deferred issues," stating: |

- 16 -

4937-5501-5859.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | "I mean I think *one of the real differentiators in our model is in the high-touch nature* between the primary care physician and the patient. Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade. And so we understand those groups very well. As we bring them on board, *we have great visibility from a cost perspective* because we've got that experience with them. We take a 12-month implementation period, which I think is distinctive. And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective. And so *that visibility and that continuity is a big differentiator*."<br><br>"In COVID, what we were able to maintain was the touch points with these senior patients. . . . And I think that translated into *more predictably from a cost perspective*, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points. And *we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues*." |
| **No. 8** - Complaint, ¶131: June 8, 2022, agilon health, inc. at William Blair Growth Stock Conference. | Bensley claimed that agilon did not just have a good handle on growth, costs and margins, but assured analyst and investors that "*[w]e have tremendous visibility* into both growth and embedded margins in our existing PCP groups." |
| **No. 9** - Complaint, ¶134: September 14, 2022, agilon health, inc. at Morgan Stanley Global Healthcare Conference. | Sell boasted: "[Two] points I would add that I think is kind of distinctive about our model that allows us to deliver *really predictable costs kind of quarter in, quarter out*, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side. But the 2 things are: one, we work with existing doctors and existing patients and we take them through a 12-month implementation period. So *when they go live, we have a very good idea of what that cost structure looks like* and a very good idea along -- what the revenues like. But the second piece that I think is really important is, *we have this high-touch model.*" |
| **No. 10** - Complaint, ¶136: November 3, 2022, Q3 2022 agilon health, inc. Earnings Call. | In response to an analyst's question about the key drivers of agilon's medical margin, Sell emphasized that agilon's "newer partners" were excelling by leveraging agilon's platform and "high-touch model":<br><br>"[W]e are experiencing the benefits of learning from our platform that is *allowing our newer partners to perform at the high end of our range*. |

- 17 -

4937-5501-5859.v1

**APP 629**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | * * * <br><br> I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of **the benefits of the high-touch model**, and it's coming through in terms of better satisfaction, **better health outcomes and ultimately lower costs and better margins overall. So those are the things that I would really call out**." |
| **No. 11** - Complaint, ¶138: January 9, 2023, agilon health, inc. at JPMorgan Healthcare Conference. | Sell provided agilon's FY23 adjusted EBITDA guidance of $75 million to $90 million (compared to $4 million in 2022). |
| **No. 12** - Complaint, ¶140: March 1, 2023, Form 8-K, agilon health Reports Fourth Quarter and Fiscal Year 2022 Results, signed by Bensley; Q4 2022 agilon health, inc. Earnings Call. | agilon's results for the fourth quarter and full year ending December 31, 2022, included FY23 medical margin guidance of $535-$560 million and $75-$90 million adjusted EBITDA, respectively. The same day, Sell and Bensley convened an investor call to discuss agilon's 4Q22 and FY22 financial results, during which Sell stated agilon was on track to post FY23 medical margin of nearly $550 million (compared to $304 million in FY22), explaining: <br><br> "Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally." |
| **No. 13** - Complaint, ¶141: March 1, 2023, Q4 2022 agilon health, inc. Earnings Call. | Sell further stated the maturation of agilon's member cohorts was driving sustained earnings growth: <br><br> "Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year." |
| **No. 14** - Complaint, ¶143: March 30, 2023, agilon health, inc. to Host Investor Day. | Sell highlighted that agilon was on track to post FY23 medical margin of $550 million. During the call, Bensley again emphasized agilon's accelerated growth in medical margin and adjusted EBITDA, stating: <br><br> "Adjusted EBITDA at agilon is inflecting in a positive way. That's driven by a – that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage. All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability. . . . We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond. <br><br> * * * |

- 18 -

4937-5501-5859.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million.<br><br>* * *<br><br>Medical margins growing at even a faster rate with a 60% CAGR over that same time period. And we expect medical margin dollars to inflect up to about $550 million in 2023. That's an 80% year-over-year increase from what we just reported for 2022. And I think **that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership**." |
| **No. 15** - Complaint, ¶144: March 30, 2023, agilon health, inc. to Host Investor Day. | agilon published the below presentation slide in connection with the Investor Day, purporting to show the medical margin per-member-per-month ("PMPM") figures for each agilon "Market Class" from 2018 to 2023. Commenting on the slide during the Investor Day, Bensley underscored agilon's purportedly "**great visibility**" into the underlying drivers of agilon's medical margin.<br><br> |
| **No. 16** - Complaint, ¶146: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | agilon's financial results for the quarter ended March 31, 2023, reiterated agilon's FY23 medical margin and adjusted EBITDA expectations, confirming that agilon was on track to post FY23 medical margin of $535-$560 million. The release also explained that, beginning with its 1Q23 results, agilon was now including its geography entry costs in agilon's calculation of adjusted EBITDA, to comply with SEC guidance. Under its new calculation, agilon's FY23 adjusted EBITDA outlook from March 1, 2023 ($75-$90 million) was reduced by the amount of agilon's FY23 geography entry costs ($65-$78 million), yielding a FY23 adjusted EBITDA outlook of ($3 million) to $25 million. That same day, Sell and |

- 19 -

4937-5501-5859.v1

**APP 631**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | Bensley convened a conference call with investors to discuss agilon's 1Q23 financial results, during which Sell reiterated agilon's FY23 medical margin and adjusted EBITDA outlook previously provided on March 1, 2023, notwithstanding agilon's revised adjusted EBITDA calculation. |
| **No. 17** - Complaint, ¶148: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | agilon's 1Q23 results reflected $28.5 million in medical costs associated with medical services rendered in 2022. During the May 9 call, an analyst observed there were "a lot of questions around cost trends," and asked "what drove the [$28.5 million] PYD" (*i.e.*, the "prior year development"). Bensley downplayed the significance of the charge in response, assuring that it was largely due to "a couple of old" claims, and did not signify any fundamental issues with agilon's model or level of visibility. |
| **No. 18** - Complaint, ¶149: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | When asked by an analyst to discuss the cost trends agilon was seeing, Sell assured that "utilization was very much in line with what we would expect," while adding "the power of the primary care physician touch points were really strong in the quarter." |
| **No. 19** - Complaint, ¶151: May 11, 2023, agilon health, inc. at Bank of America Global Healthcare Conference. | Bensley attributed members' declining medical costs to agilon's model:<br><br>"[T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024. . . . *[O]ur model is so geared to improving the quality and outcome for our patients that actually drives cost down*."<br><br>"When there is a pretty good high benchmark year, the differential between that benchmark revenue rate and what we're doing in cost just gets wider. And so that drives a higher point of inflection because *our costs continue to just go in the right direction* because of all the things that Kenny [Bellendir, agilon's Markets CFO] was talking about." |
| **No. 20** - Complaint, ¶155: June 7, 2023, agilon health, inc. at William Blair Growth Stock Conference. | Bensley reiterated agilon's FY23 outlook of approximately $550 million in medical margin. After touting agilon's "tremendously high visibility to growth" and "really good forward-looking visibility to our future growth," Bensley added:<br><br>And we also have a process in which we implement our new markets up to 12 months before going live. *So long before we go live, we have really, really strong visibility into exactly what's happening*. So right now, for the class of 2024, we're already |

- 20 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | implementing those partners, and we have good visibility into not only what that membership is but what the economics for that cloud will look like going into 2024.<br><br>* * *<br><br>So as our members and our partners mature on the agilon platform, margins grow over time. And as Steve said, I'll show you a really great slide as exactly how that's been working in practice. ***So we have really great confidence and visibility in our long-term value drivers***. And right now, our EBITDA has actually been inflecting positive year-over-year. |
| **No. 21** - Complaint, ¶156: June 7, 2023, agilon health, inc. at William Blair Growth Stock Conference. | Near the end of the call, Sell reiterated agilon's "really strong start this year," adding "I don't know many businesses that show an 88% step-up in their main margin metric [medical margin]. We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent." |
| **No. 22** - Complaint, ¶158: August 3, 2023, Form 8-K, agilon health Reports Second Quarter 2023 Results, signed by Bensley. | agilon's financial results for the quarter ended June 30, 2023, reported a $138 million medical margin, $10 million adjusted EBITDA, and a $17 million net loss for 2Q23. The release also stated agilon's 2Q23 medical margin increased 69% compared to 2Q22 ($82 million). In the release, Sell claimed "[t]he ***durability and predictability of our partnership model*** enabled agilon to deliver strong performance during the second quarter and first half of 2023." |
| **No. 23** - Complaint, ¶159: August 3, 2023, Form 8-K, agilon health Reports Second Quarter 2023 Results, signed by Bensley. | The release also stated that agilon lowered its FY23 medical margin by approximately $32.5 million (from $535-$560 million to $500-$530 million), while ***raising*** its FY23 adjusted EBITDA guidance to $0-23 million. |
| **No. 24** - Complaint, ¶160: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell highlighted agilon's 69% year-over-year growth in medical margin, emphasizing that agilon's "profitability gains [were] even more outsized on an underlying basis" given "MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA." |
| **No. 25** - Complaint, ¶161: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell dismissed concerns that higher industry utilization rates were impacting agilon, asserting that agilon's model "insulated" agilon from "spikes" in utilization rates:<br><br>"One theme I would like to drive home, given all of the speculation on utilization trends is that ***different models will yield different outcomes***. ***agilon's model is distinctively different and more durable and predictable in driving cost and quality results*** compared to the broad fee-for-service system, which predominates across health care today. |

- 21 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | Let me highlight how we are producing such **strong and predictable results** and what drives our forward confidence in the business.  First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care.  We do not take risk on a broad set of patients in an unmanaged fee-for-service system.  Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.<br><br>* * *<br><br>**We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization**." |
| **No. 26** - Complaint, ¶162: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell further sought to quell concerns about utilization rates by assuring investors that agilon was actually "tracking ahead" of its expected utilization rates, stating:<br><br>"Second point on differentiation.  For our members, our year-to-date **composite utilization trend is in line or better than our expectations**.  Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range.  Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.<br><br>All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date." |
| **No. 27** - Complaint, ¶163: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell added that agilon's strong "visibility" and "active management" of utilization rates further bolstered the reliability of agilon's earnings estimates, stating:<br><br>Third, **our model has natural advantages in terms of leading indicators and visibility**.  From an operational standpoint, we are not just receivers of macro utilization trends.  Our teams are actively managing utilization on the ground every day.   This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers.  Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete.  **We have not seen any** |

- 22 -

4937-5501-5859.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *meaningful change in our expected cost trend, including outpatient procedures*. |
| **No. 28** - Complaint, ¶164: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell also claimed that agilon's unique business model "buffers our financial results up and down": <br><br> "Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down. As a result, *we are able to guide to relatively tight ranges* on medical margin and adjusted EBITDA *and absorb puts and takes* that may arise during a given period." |
| **No. 29** - Complaint, ¶165: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell further emphasized the "predictability" of agilon's business model, stating: <br><br> Ultimately, the *durability and predictability of our model* has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, *even as some health plans with broad fee-for-service networks are seeing pockets of higher costs*. Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability. <br><br> As we have discussed previously, we operate in a very forward-looking model. *And our visibility on the key levers for driving next year's performance is quite high*. <br><br> * * * <br><br> Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023. This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH. <br><br> On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations. This is obviously important as you think about the stepping off point for 2024. |
| **No. 30** - Complaint, ¶166: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Bensley highlighted agilon's 69% year-over-year medical margin growth, and touted that "the strength and durability of [agilon's] business model has enabled us to . . . improve our adjusted EBITDA outlook," adding that agilon's "updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend." Bensley also referred investors to the market class data from |

- 23 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | agilon's 2023 Investor Day (¶144), claiming the data presented a "really . . . good indicator of exactly where we expect them to be from a medical margin standpoint." |
| **No. 31** - Complaint, ¶167: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | In response to an analyst's request for "clarifications" regarding agilon's medical cost trend, and the reasoning behind increasing agilon's reserves, Bensley concealed the dramatic utilization spike witnessed in May-June, while assuring investors that the decision to increase agilon's reserves was merely a precaution for the possibility that "there could be a change, for instance, in utilization trends in the second half" of the year:<br><br>"So rather than saying, hey, this percentage of this is for this or this is for that, we've looked at the range of potential outcomes that can happen in the second half.  Want to make sure that we've got enough reserve to minimize the probability of any prior period development going into next year, and that would include things like ***being respectful of the fact that there could be a change, for instance, in utilization trends in the second half***.  So I don't want to quantify it and break it out into components other than to say, we've tried to increase the strength of the reserves to cover that sort of range of outcomes." |
| **No. 32** - Complaint, ¶168: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Bensley also reassured that agilon's increase in reserves was merely intended to cover the "possibility" of a "change [in] utilization in the back half of the year":<br><br>"And when we talk about then the strengthening of our reserves that are in our guidance, we've essentially said, hey, with the understanding that our reserve should probably be stronger in terms of the range of potential reserves that we could build, both because of those potential blind spots and also just to cover for the possibility and be respectful of the fact that ***there may be some change and [sic] utilization in the back half of the year***." |
| **No. 33** - Complaint, ¶169: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | In response to a Wells Fargo analyst's question regarding "how closely is ACO REACH claims data track with your actual [Medicare Advantage] claims experience," and corresponding request that Sell and Bensley "be as specific as possible about what your level of claims visibility is for [2Q23]," Sell assured that agilon possessed "incredible" visibility into its members' medical costs and utilization, stating:<br><br>"So I think ***our visibility is extremely strong***, Stephen, and we have high confidence.  I think ***it's a function of our model, which is very different***, right?  We are on the ground with PCPs every day, we are managing those most complex patients.  And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are |

- 24 -

4937-5501-5859.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | engaged in our clinical programs.<br><br>The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER. And we put that together, we're able to drive the type of results that I talked about with inpatient down in the flat to down in the midsingle digit range.<br><br>From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims. And so *there is incredibly high visibility*. There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis.<br><br>But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. *And so we feel like we have an incredible level of visibility on that*. And I think the last thing I would just say is, I think we've demonstrated that *our model really stands out in higher utilization periods that broader fee-for-service markets are seeing*.<br><br>* * *<br><br>Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year. It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range. So I think this is an area where we feel like we have incredible confidence. The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators." |
| **No. 34** - Complaint, ¶170: August 3, 2023, Q2 2023 Report on Form 10-Q, signed by Bensley. | agilon's 2Q23 Report on Form 10-Q included the medical margin and adjusted EBITDA results provided in the 2Q23 Release, and claimed that agilon's 2Q23 medical margin increased 69% compared to 2Q22. |
| **No. 35** - Complaint, ¶171: September 6, 2023, agilon health, inc. at Wells Fargo Healthcare Conference. | During the call, an analyst observed that "utilization has been a huge area of focus" and asked Bensley "what you're seeing on the utilization front." Concealing the significant utilization spike in May-June 2023, Bensley responded that agilon's "power[ful]" model was "*driv[ing] utilization down*," noting:<br><br>"[O]bviously, there has been a lot of focus on utilization coming through the first half of the year. And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model. I know that sounds like it's simple, but *our model is essentially designed to have a more efficient and really more consistent impact on utilization than probably just* |

- 25 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *any other model out there,* just certainly the normal fee-for-service environment.<br><br>. . . But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients that then essentially over time does have that kind of leveling impact on utilization.<br><br>It also helps us ***drive utilization down*** below what the overall, I think, fee-for-service environment would be. . . .<br><br>What we have much better continuity of care. We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen. I think that has the impact of both ***lowering utilization*** as well as having ***more consistent utilization*** over time. It may even have a positive impact on ***avoiding some of the pent-up demand issues that came out of post-COVID***.<br><br>Having said that, you can see the results in our numbers. So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side. And by the way, of course, inpatient is by far the largest part of our cost basis. We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2.<br><br>Now at the same time, of course, we have been seeing pretty large increases in outpatient. ***That's a smaller portion of the overall cost pie. And so the inpatient decrease is more than offsetting that***." |
| **No. 36** - Complaint, ¶172: September 12, 2023, agilon health, inc. at Morgan Stanley Global Healthcare Conference. | In response to an analyst's request for "a more recent update on utilization," Bensley responded that "we're seeing [] an absolute decrease in patient utilization," reassured investors of the "guidance that we put forward for the balance of the year," and reiterated agilon's 2023 profit outlook:<br><br>"Yes. I mean, we haven't given a kind of inter-quarter update. We'll give one here in a bit when obviously we report Q3. It was interesting when we were coming through Q2 that's where we started to – and everyone else are to hear some commentary from the big payers that, hey, there may be some kind of a spike going on utilization. Of course, when we reported Q2, we hadn't seen that in our numbers yet. And in fact, our performance is more along the lines of what Steve was saying. But even in that higher rate environment or ***even potentially***, I'm sorry, ***in that higher*** |

- 26 -

4937-5501-5859.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *utilization environment, we were pretty encouraged obviously by the overall trends that we're seeing in an absolute decrease in patient utilization*.  Mean we are seeing, and we have been seeing, just like everybody else was talking about an increase in outpatient, but that's not really new to us, right?"<br><br>We've been talking about that now for a number of quarters even coming through last year that there's been some shift, I think, going on in terms of side of service for procedures from inpatient to outpatient.  But *the overall decrease in inpatient, which is by far the largest bucket of cost for us has obviously been offsetting that*.  So – but the second thing that we did, of course, coming through that and hearing that commentary from the payers was we also strengthened our reserves for somewhat in Q2 and then also in our guidance for balance of the year, with the understanding that if there – *if we do that at some point, see that, that – there was some kind of a spike up or an increase in utilization* that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there.<br><br>And all of that, *notwithstanding any commentary from the payers and utilization leads us to believe we're well reserved* and we feel really confident with the guidance – with that guidance that we put forward for the balance of the year. |
| **No. 37** - Complaint, ¶174: November 2, 2023, Form 8-K, agilon health Reports Third Quarter 2023 Results, signed by Bensley. | agilon's financial results for the quarter ended September 30, 2023, reported a $108 million medical margin, negative $6 million adjusted EBITDA, and a net loss of $31 million.  agilon also reported that 3Q23 medical margin increased 42% compared to 3Q22 ($76 million), and confirmed the Company remained on track to post FY23 medical margin and adjusted EBITDA of $455-$470 million and $6-$18 million, respectively. |
| **No. 38** - Complaint, ¶176: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Sell reassured investors that, notwithstanding the utilization spike that began in May 2023, "[a]ll of [agilon's] key financial metrics were generally in line or above our guidance ranges," and that agilon's "results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth." |
| **No. 39** - Complaint, ¶177: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Sell further stated that agilon's "more conservative reserving approach" was "intentionally reflected in [its] medical margin outlook for [Medicare Advantage] and will support [its] future performance in 2024," and agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model." Sell also reassured investors that he "remain[s] highly confident in the trajectory of our adjusted EBITDA," adding "our visibility into the key drivers for next year's performance are quite high." |
| **No. 40** - Complaint, ¶178: | Referring to agilon's 3Q23 medical margin, Bensley assured that |

- 27 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | miss "was primarily driven by performance in Hawaii" – which agilon had recently sold – and a "negative claims development this quarter [that] was almost entirely isolated to system issues with a single payor related to supplemental benefit costs."  Bensley also emphasized that medical margin had "***increased 42% year-over-year***." |
| **No. 41** - Complaint, ¶179: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | In response to an analyst's question about the 2Q23 spike in medical costs and patient utilization, Sell again denied that agilon was experiencing abnormal utilization trends, stating:<br><br>    "From a utilization perspective, composite utilization was in line with our overall expectations.  As Tim kind of outlined, ***we did see a step-up in Q2 utilization*** in MA and REACH.  The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period.  ***In Q3, we've seen a deceleration***.  And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [posture] that Tim talked about in terms of an extra $3 million [sic]." |
| **No. 42** - Complaint, ¶180: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Bensley added that utilization trends had "greatly started to moderate in June," which he once again claimed demonstrated the "strength of [agilon's] model":<br><br>    "In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet.  We didn't have enough information from May or June to really see what some of the payers were referring to.  We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward.  As it turned out, as we just reported, ***we did see some increased utilization in May that was – greatly started to moderate in June***.  And as we've seen so far, started to – continued to moderate in early Q3 as well.<br><br>    I'm not completely surprised by that.  Compared to some of the comments that I've made from some of the big payers, I mean I think our model and even some of them have said should be performing better than the average out there.  So the ***fact that we saw a spike up and some moderation down is probably just a factor also of the strength of our model***." |
| **No. 43** - Complaint, ¶181: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | During the call, an analyst asked Sell what "you are seeing in terms of utilization trends," to which Sell responded:<br><br>    "In terms of our PPO experience, we've talked about this before.  We are probably the largest risk-based player in terms of PPO in the country.  Our PPO business is just over 50% of our membership, it's also the fastest-growing component.  And our |

- 28 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | PPO business is – performance is in line with our HMO business.<br><br>And I think the reason for that is ***the differences in our model***. [A] large payer with a broad network versus ***our high-touch PCP patient model, which has the ability to guide that patient on where they're going to go for specialty care***. At our Investor Day, we shared over 90% of specialty referrals come through that primary care physician even in a PPO model, that is allowing us to really deliver cost-effective care. And so our PPO experience is very strong." |
| **No. 44** - Complaint, ¶182: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Bensley assured that agilon's increased reserves simply reflected a "***more conservative reserving posture***," rather than any fundamental deterioration in the business, and would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance." |
| **No. 45** - Complaint, ¶183: November 2, 2023, Q3 2023 Report on Form 10-Q, signed and certified by Sell and Bensley. | agilon's Report on Form 10-Q for the 3Q23 included the medical margin and adjusted EBITDA results provided in the 3Q23 Release, and represented that agilon's medical margin increased 42% in 3Q23 compared to 3Q22. |
| **No. 46** - Complaint, ¶185: November 14, 2023, agilon health, inc. at Wolfe Research Healthcare Conference. | Sell reassured investors that adverse medical costs trends were "moderating," and that agilon remained on track to meet its FY23 guidance. Bensley similarly assured that "as we came through July and June, those same [utilization cost] categories continue to moderate – moderated back down," adding "[w]e didn't see like a huge spike up in utilization that's continue[d] . . . all 3 of them moderated back down." |
| **No. 47** - Complaint, ¶186: November 14, 2023, agilon health, inc. at Wolfe Research Healthcare Conference. | Bensley affirmed the Company's reserving included a "***decent amount of conservatism***," stating that agilon was appropriately reserved and that there would be no more negative surprises heading into 2024:<br><br>"Yes. I mean our objective is to say, hey, let's put enough into our outlook for the year to make sure that we're covering those – that potential that we could see actually higher utilization. So that's why we picked that right now, we picked that original 60 up to 90 when we saw what was actually coming through Q2. So that's what gets you that kind of $10 million incremental versus the asset that we would have given to go. But the idea is, yes, that we're going to end the year with that's going to be – put us in a very good position to be appropriately accrued for the year.<br><br>You can look at it on a net basis, but there's no reason why we would expect to have. We shouldn't be going into a year with a significant underaccrual of our cost stand-alone either." |
| **No. 48** - Complaint, ¶189: | agilon issued a release revising agilon's FY23 guidance, |

- 29 -

4937-5501-5859.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| January 5, 2024, Form 8-K, agilon health Provides 2023 Guidance Update, Initial 2024 View, signed by Bensley. | introducing its FY24 guidance, and withdrawing its FY26 guidance. agilon stated it would generate FY23 medical margin of $340-$360 million and adjusted EBITDA of negative $55-$69 million.  For FY24, agilon projected $560-$600 million of medical margin and adjusted EBITDA of $40-$60 million. |
| **No. 49** - Complaint, ¶190: January 5, 2024, agilon health, inc. Guidance Call. | In response to an analyst's question regarding whether any of agilon's "individual markets" were "losing money," Sell represented that only one market "would run at a loss for 2023," which Bensley confirmed stating "one market . . . gets below breakeven market EBITDA in 2023." |

INTERROGATORY NO. 9:

For each statement identified in response to Interrogatory No. 8, describe in detail how the statement was false or misleading when made, including any material fact that was omitted.

AMENDED RESPONSE TO INTERROGATORY NO. 9:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Carolina Funds object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.  North Carolina Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33.  *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018).  North Carolina Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.  North Carolina Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just recently begun to produce substantive numbers of

- 30 -

4937-5501-5859.v1

documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). North Carolina Funds further object to this Interrogatory on the grounds that it seeks or requires the disclosure of information that is protected from discovery by the attorney work product doctrine.

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows: Plaintiff incorporates its response to Interrogatory No. 8 herein. Statements 1, 8, 12-17, 20-23, 28-29, 33-34, 39-40, 44, 48-49 (*see* ¶¶100, 131, 138, 140-141, 143-144, 146, 148, 155-156, 158-159, 164-165, 169-170, 177-178, 182, 189-190) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's visibility into the Company's operations, financial performance, and results; (ii) the predictability of agilon's operations, financial performance, results, and drivers of key metrics; (iii) agilon's financial performance and results, including the accuracy of agilon's publicly-reported financial results; (iv) the reliability of agilon's financial results, guidance and forecasts; (v) the quality, reliability, completeness, or other features of the data and information underlying agilon's financial results, guidance, or forecasts; (vi) the impact on agilon's results and performance of, *inter alia*, unreliable or incomplete data and information, patient utilization rates (including changes or spikes in utilization rates), medical expenses, and pent-up demand or demand backlog; (vii) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; (viii) agilon's patient utilization and utilization rates (including changes or spikes

- 31 -

4937-5501-5859.v1

in utilization rates); and (ix) agilon's pent-up demand or demand backlog, including the impact of pent-up demand or demand backlog on agilon's financial performance and results. Additional reasons why the above statements were false and misleading can be found in the Complaint at ¶112 (regarding the statements in ¶100), ¶137 (regarding the statements in ¶131), ¶157 (regarding the statements in ¶¶138, 140-141, 143-144, 146, 148, 155-156), ¶173 (regarding the statements in ¶¶158-159, 164-165, 169-170), ¶188 (regarding the statements in ¶¶177-178, 182), and ¶191 (regarding the statements in ¶¶189-190), and are incorporated by reference herein.

Statements 2-4, 6-7, 9-10, 19, 22, 27, 30-31, 38-39 (*see* ¶¶108-109, 113, 116, 129, 134, 136, 151, 158, 163, 166-167, 176-177) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's visibility into the Company's operations, financial performance, and results; (ii) the predictability of agilon's operations, financial performance, and results; (iii) the impact on agilon's results and performance of agilon's business model or certain aspects or features of agilon's business model; (iv) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; and (v) agilon's exposure to pent-up demand or demand backlog. Additional details why the above statements were false and misleading can be found in the Complaint at ¶112 (regarding the statements in ¶¶108, 109), ¶137 (regarding the statements in ¶¶113, 116, 129, 134, 136), ¶173 (regarding the statements in ¶¶158, 163, 166-167), ¶188 (regarding the statements in ¶¶176-177), and are incorporated by reference herein.

Statements 5, 18, 25-26, 31-32, 35-36, 41-43, 46-47 (*see* ¶¶114, 149, 161-162, 167-168, 171-172, 179-181, 185-186) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of

- 32 -

4937-5501-5859.v1

the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's patient utilization and utilization rates (including changes or spikes in utilization rates); (ii) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; (iii) the impact on agilon's results and performance of, *inter alia*, patient utilization and utilization rates (including changes or spikes in utilization and utilization rates), or agilon's business model; (iv) agilon's pent-up demand or demand backlog, including the impact of pent-up demand or demand backlog on agilon's financial performance and results, and agilon's exposure to pent-up demand or demand backlog; and (v) agilon's exposure to changes or spikes in patient utilization and utilization rates, and ability to avoid or otherwise respond to changes or spikes in patient utilization and utilization rates.  Additional details why the above statements were false and misleading can be found in the Complaint at ¶137 (regarding the statements in ¶114), ¶157 (regarding the statements in ¶149), ¶173 (regarding the statements in ¶¶161-162, 167-168, 171-172), ¶188 (regarding the statements in ¶¶179-181, 185-186), and are incorporated by reference herein.

Statements 21-22, 24, 30, 37-38, 40, 45 (*see* ¶¶156, 158, 160, 166, 174, 176, 178, 183) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's financial performance and results for the second and third quarters of 2023 (including understatement of medical expenses and overstatement of medical margins); (ii) the impact on agilon's results and performance of, *inter alia*, unreliable or incomplete data and information, patient utilization rates (including changes or spikes in utilization rates), medical expenses, and pent-up demand or demand backlog; and (iii) agilon's ability to accurately and reliability track, report, and forecast key financial metrics.  Additional details why the above

- 33 -

4937-5501-5859.v1

statements were false and misleading can be found in the Complaint at ¶157 (regarding the statements in ¶156), ¶173 (regarding the statements in ¶¶160, 158, 166), ¶188 (regarding the statements in ¶¶174, 176, 178, 183), and are incorporated by reference herein. North Carolina Funds also direct Defendants to the Complaint, which contains additional details regarding how the alleged misstatements were false or misleading.

INTERROGATORY NO. 10:

For each statement identified in response to Interrogatory No. 8, explain in detail your contention that the facts stated or omitted were material.

AMENDED RESPONSE TO INTERROGATORY NO. 10:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. North Carolina Funds object to this Interrogatory as overbroad, unduly burdensome, and not proportionate to the needs of the case. North Carolina Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just recently begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). North Carolina Funds also object to this Interrogatory on the grounds that it seeks or requires the disclosure of information that is protected from discovery by the attorney work product doctrine. North Carolina Funds also object to this Interrogatory as overbroad and unduly

- 34 -

burdensome because it seeks information that is publicly available or already in Defendants' possession. North Carolina Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at \*6-\*9 (E.D. Tex. July 27, 2018). North Carolina Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows: A reasonable trier of fact could determine that the statements identified in response to Interrogatory No. 8 satisfy the standard for materiality based on the facts alleged in the Complaint, which the Court has determined to be legally sufficient to satisfy each element of the alleged claims, including materiality. In addition to the information set forth in the Complaint, Lead Plaintiffs incorporate by reference their Response to Interrogatory No. 9, which sets forth additional details as to why the alleged false and misleading statements were material.

INTERROGATORY NO. 11:

For each statement identified in response to Interrogatory No. 8, explain in detail your contention as to when and how the market learned the truth, including but not limited to the verbatim statement that revealed the truth, the person who made the statement, and where the statement was made (*e.g.*, earnings call, conference, etc.).

AMENDED RESPONSE TO INTERROGATORY NO. 11:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. North Carolina Funds object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a

- 35 -

4937-5501-5859.v1

contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun.  North Carolina Funds also object to this Interrogatory to the extent it prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures.  North Carolina Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33.

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows:

On November 2, 2023, after the market closed, agilon announced its financial results for the quarter ended September 30, 2023, and held a conference call with investors to discuss agilon's third quarter 2023 financial results.  The Company revealed medical margin of $108 million for the quarter, far below expectations.  In addition, the Company also disclosed that it suffered quarterly adjusted EBITDA of negative $6 million.  The Company also sharply lowered agilon's FY23 medical margins to a range of just $455-$470 million.  On the conference call, defendants Sell and Bensley revealed that agilon had suffered higher patient utilization rates earlier in the year (notwithstanding their prior representations to the contrary), had already significantly drawn down the reserves agilon had set aside earlier in the year to cover increased medical costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue in the future.

On January 5, 2024, before the market opened, agilon issued a release revising agilon's FY23 guidance, introducing its FY24 guidance, and withdrawing its FY26 guidance, and revealed that it

- 36 -

4937-5501-5859.v1

**APP 648**

had suffered dramatically higher prior medical expenses than previously revealed and, as a result, agilon was lowering its FY23 expected medical margin to $340-$360 million, or approximately $112 million (24%) below the already substantially reduced guidance and nearly $200 million (36%) below agilon's original FY23 medical margin guidance.  agilon also disclosed its FY23 adjusted EBITDA would not be $6-$18 million as previously represented in November 2023, but rather would be a loss of $55-$69 million.  The Company also disclosed that:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions.  While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

The Company revealed that its 3Q23 medical margin of $108 million had been overstated by at least $31 million (40%), and thus agilon's 3Q23 medical margin had been flat (at best) compared to 3Q22.  agilon also revealed that, due to higher-than-reported medical costs from 2Q23, rather than having increased 69% year-over-year versus 2Q22, agilon's 2Q23 medical margin had remained relatively flat compared to 2Q22.

agilon also provided a dismal FY24 outlook, including medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million, and withdrew its FY26 guidance, which the Company had reaffirmed only seven weeks earlier.  The Company also revealed that it had failed to provide new physicians that had joined agilon's mature markets with the basic onboarding and education needed to integrate into the agilon partnership, that these newer physicians had been dragging down medical margins as a result, and that agilon would need to provide the necessary onboarding and education to these physicians, meaning that agilon would incur additional onboarding and education costs in FY24 and going forward.

The Company also announced that Bensley would be stepping down as CFO of agilon.  Sell and Bensley convened an investor call that day, during which Sell admitted that agilon had failed to

- 37 -

incorporate both "elevated cost trends" and the "magnitude and source of the utilization shifts" in the forecasts provided to investors. Rather than the industry-leading utilization trends that defendants represented throughout the Class Period and held up as validation of agilon's business model, Sell stated that agilon was in fact suffering "cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs." Sell also acknowledged that the increased utilizations, which would "persist through 2024," were due to a "backlog of pent-up demand from COVID." Bensley, meanwhile, admitted that agilon was not on track to generate positive cash flow in 2024.

On February 27, 2024, after the market closed, agilon announced its 4Q23 and FY23 financial results, revealing that agilon's medical costs and patient utilization rates were even higher than the Company had previously reported, causing the Company to widely miss the guidance it had provided less than eight weeks earlier. agilon revealed: (i) it had suffered an additional $38 million in undisclosed net medical costs during 4Q23, as well as $13 million in additional medical costs from prior to 4Q23; (ii) its actual FY23 medical margin ($299 million) was $41-$61 million less than agilon had announced less than eight weeks earlier; and (iii) it incurred a FY23 net loss of $263 million, and FY23 adjusted EBITDA of negative $95 million. agilon also announced it had drastically lowered the FY24 guidance it had just given in January, including medical margin by 25%-29% (from $560-$600 million to $400-$450 million) and adjusted EBITDA guidance by 125%-250% (a $40-$60 million gain to a $15-$60 million loss).

In its FY23 Report on Form 10-K filed on the same day, agilon also revealed a previously undisclosed material weakness in the Company's ICFR concerning agilon's medical claims and related payables (*i.e.*, amounts agilon owed for its members' healthcare), acknowledging that the material weakness rendered agilon's DCP ineffective and noting:

- 38 -

Management has identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, risk adjusted premium revenue and certain care management expenses.

\*　　　\*　　　\*

In 2023, we identified certain sources of information utilized in our medical claims and related payables, risk adjusted premium revenue, and care management expense processes that contained specific data attributes utilized in executing an internal control by management. Management did not sufficiently design controls or control activities to ensure the completeness and accuracy of the related IPE in executing certain controls associated with these processes.

agilon also published the following slide on February 27, 2024, indicating that the medical margin figures for multiple market classes reported during agilon's March 30, 2023 Investor Day (*see* ¶144), and again highlighted on agilon's August 3, 2023 call (*see* ¶166), had been overstated, including by 8%-23% for FY21 and 12%-26% for FY22:



agilon further revealed that the Company was scaling back its aggressive membership growth, and that its next cohort of new Medicare Advantage members contained approximately 60,000 patients, less than half the size of the cohort that had went "live" in January 2024.

- 39 -

**As to Statements 1-36**, the alleged corrective disclosures set forth above on November 2, 2023, January 5, 2024, and February 27, 2024.

**As to Statements 37-47**, the alleged corrective disclosures set forth above on January 5, 2024 and February 27, 2024.

**As to Statements 48 and 49**, the alleged corrective disclosures set forth above on February 27, 2024.

INTERROGATORY NO. 12:

Explain in detail your contention that "all purchasers of agilon common stock during the Putative Class Period suffered similar injury through their purchases of agilon common stock at artificially inflated prices and a presumption of reliance applies" as alleged in paragraphs 248 and 249 of the Complaint.

AMENDED RESPONSE TO INTERROGATORY NO. 12:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. North Carolina Funds object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. North Carolina Funds also object to this Interrogatory to the extent it prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures.

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows: Plaintiffs allege that Plaintiffs and the Class have suffered damages in that, in reliance on

- 40 -

4937-5501-5859.v1

the integrity of the market, they paid artificially inflated prices for agilon common stock, and the price of agilon's common stock declined as artificial inflation came out of the stock's price through a series of partial disclosures.  Plaintiffs also allege that Plaintiffs and the Class would not have purchased agilon common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false and misleading statements and omissions.  Plaintiffs and all other members of the proposed class are entitled to invoke the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). This presumption recognizes that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation."  *Halliburton*, 573 U.S. at 283-84. As demonstrated in Plaintiffs' Opposed Motion for Class Certification (ECF 105) and in accompanying Expert Report of Matthew D. Cain, Ph.D. ("Cain Report"), agilon common stock traded in an efficient market throughout the Class Period.  *See* Cain Report, ¶¶37-95, 123.  Because all relevant factors are met, classwide reliance is presumed.  *Basic*, 485 U.S. at 242; *Halliburton*, 573 U.S. at 279; *see* Complaint, §VI (the alleged misstatements and omissions were made publicly); ECF 11-3 (Plaintiffs purchased agilon common stock between when the misstatements and omissions were made and the truth was revealed).

INTERROGATORY NO. 14:

For each Plaintiff individually, explain in detail your effort and time spent participating in, monitoring, supervising, and managing this action, including but not limited to steps taken to monitor lead counsel.

- 41 -

- 42 -

<u>AMENDED RESPONSE TO INTERROGATORY NO. 14</u>:

North Carolina Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. North Carolina Funds specifically object to this Interrogatory as premature, overbroad, and unduly burdensome. North Carolina Funds also object to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege, protection, or immunity. North Carolina Funds further object to this Interrogatory to the extent it seeks information that is not relevant to any party's claims or defenses.

Subject to and without waiving the foregoing objections, North Carolina Funds respond as follows: Since its appointment as Lead Plaintiff in this action, North Carolina Funds have demonstrated their willingness and ability to serve an active role in this case, and protect the interests of the members of the proposed Class. North Carolina Funds have done so by, among other things: (i) filing the Complaint; (ii) defending Lead Plaintiffs' and the proposed Class' claims through the motion to dismiss stage (ECF 55, 63); (iii) exchanging initial disclosures with Defendants pursuant to Federal Rule of Civil Procedure 26(a)(l)(A); and (iv) vigorously pursuing document and other discovery from Defendants, as well as third parties. In addition to pursuing discovery from Defendants and third parties, North Carolina Funds have also received, and submitted responses and objections to, 51 document requests propounded by Defendants, as well as gathered and produced documents in response to Defendants' requests; and have responded to Defendants' interrogatories. North Carolina Funds have, throughout the litigation, diligently supervised and directed the efforts of proposed class counsel to obtain the maximum recovery possible for the proposed Class, and will continue to do so. In addition, North Carolina Funds refer Defendants to Plaintiffs' Joint Declaration in Support of Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, filed May 20, 2024. *See* ECF 11-5.

- 42 -

4937-5501-5859.v1

DATED:  June 10, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS
(admitted *pro hac vice*)
CHRISTOPHER D. STEWART
(admitted *pro hac vice*)
EVELYN SANCHEZ GONZALEZ
(admitted *pro hac vice*)
JACK K. SCOTT
(admitted *pro hac vice*)


       s/ Christopher D. Stewart
CHRISTOPHER D. STEWART

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
cstewart@rgrdlaw.com
egonzalez@rgrdlaw.com
jscott@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel

- 43 -

4937-5501-5859.v1

**APP 655**

## VERIFICATION

We, William Watts and Jonathan Harris, state and declare as follows:

1.     I, William Watts, am the General Counsel of the North Carolina Investment Authority.   The North Carolina Investment Authority is the investment fiduciary for the investments held by the Treasurer of the State of North Carolina, including the North Carolina Retirement Systems.   I, Jonathan Harris, am the General Counsel for the North Carolina Department of State Treasurer.

2.     We have reviewed Lead Plaintiff Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans' ("North Carolina Funds") Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs (the "Interrogatory Responses").   To the best of our knowledge, information, and belief, the answers provided in the Interrogatory Responses are true and correct.

I, William Watts, declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of June, 2026, at ___10:57an_____ .

_____
WILLIAM WATTS
General Counsel, North Carolina Investment
Authority

I, Jonathan Harris, declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of June, 2026, at _____ .

_____
JONATHAN HARRIS
General Counsel, North Carolina Department of
State Treasurer

# DECLARATION OF SERVICE BY EMAIL

I, WILLIAM GRAVITT, not a party to the within action, hereby declare that on June 24, 2026, I caused to be served the attached LEAD PLAINTIFF NORTH CAROLINA FUNDS' AMENDED RESPONSES AND OBJECTIONS TO THE AGILON DEFENDANTS' FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFFS, by email on the parties to the within action addressed, as follows:

COUNSEL FOR PLAINTIFF RETIREMENT SYSTEMS:

| ROBBINS GELLER RUDMAN & DOWD LLP | |
|---|---|
| Lucas F. Olts | LOlts@rgrdlaw.com |
| Christopher D. Stewart | CStewart@rgrdlaw.com |
| Evelyn Sanchez Gonzalez | egonzalez@rgrdlaw.com |
| Jack K. Scott | JScott@rgrdlaw.com |
| **KENDALL LAW GROUP, PLLC** | |
| Joe Kendall | jkendall@kendalllawgroup.com |

ATTORNEYS FOR DEFENDANTS AGILON HEALTH, INC., STEVEN J. SELL, TIMOTHY S. BENSLEY, HEIDI HITTNER, AND GIRISH VENKATACHALIAH:

| SIDLEY AUSTIN LLP | |
|---|---|
| Yolanda C. Garcia | ygarcia@sidley.com |
| Mason Parham | mparham@sidley.com |
| Barret V. Armbruster | barmbruster@sidley.com |
| Nick C. Greenberg | ngreenberg@sidley.com |

ATTORNEYS FOR DEFENDANTS CLAYTON, DUBILIER & RICE, LLC, CD&R VECTOR HOLDINGS, L.P., CD&R INVESTMENT ASSOCIATES IX, LTD., CD&R ASSOCIATES IX, L.P.:

| DEBEVOISE & PLIMPTON LLP | |
|---|---|
| Maeve L. O'Connor | mloconnor@debevoise.com |
| Elliot Greenfield | egreenfield@debevoise.com |
| Brandon Fetzer | bfetzer@debevoise.com |
| **SCOTT DOUGLASS & MCCONNICO LLP** | |
| Santosh Aravind | saravind@scottdoug.com |

4937-5501-5859.v1

**APP 657**

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 24, 2026, at San Diego, California.

_____
WILLIAM GRAVITT

4937-5501-5859.v1

# EXHIBIT 23

APP 659

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § § § § § § § | Master File No. 1:24-cv-00297-DAE<br><br>CLASS ACTION |
| This Document Relates To:<br><br>　　ALL ACTIONS. | | |

**LEAD PLAINTIFF NORTH ATLANTIC FUNDS' AMENDED RESPONSES
AND OBJECTIONS TO THE AGILON DEFENDANTS' FIRST SET OF
INTERROGATORIES TO LEAD PLAINTIFFS**

4935-4602-4371.v1

**APP 660**

Pursuant to Federal Rules of Civil Procedure 26 and 33, the applicable Rules of Practice and Procedure of the U.S. District Court for the Western District of Texas ("Local Rules"), and the rules and orders of this Court, Lead Plaintiff North Atlantic States Carpenters Pension Fund and Guaranteed Annuity Fund (the "North Atlantic Funds"), by and through their counsel of record, hereby submit their responses and objections to agilon Defendants' First Set of Interrogatories to Lead Plaintiffs (the "Interrogatories," and each individually, an "Interrogatory"), served on February 27, 2026, as follows:

## I.      INTRODUCTION AND RESERVATION OF RIGHTS

1.      North Atlantic Funds' responses to the Interrogatories are based only upon a reasonable investigation of the evidence currently available and reflect current knowledge, understanding, and belief, based upon information known at this time.

2.      Discovery in this matter is ongoing.  Additional contentions, facts, witnesses, documents, testimony, or other evidence may arise during the discovery process and during the review of discovery in preparation for trial.  North Atlantic Funds are providing these responses based upon review of evidence available to date and expressly reserve the right to modify their position based upon further discovery.  By providing the responses and objections below, North Atlantic Funds do not waive and expressly reserves the right to: (i) modify their position based upon further discovery; (ii) rely upon and use, at trial and otherwise, any other facts and information subsequently identified; (iii) supplement, clarify, revise, or correct any or all of the objections and responses herein; (iv) assert additional objections or privileges in subsequent supplemental responses; and (v) assert any and all objections as to the admissibility of such responses into evidence in this Action, on any and all grounds, including, but not limited to, relevance, materiality, and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in court.

- 1 -

4935-4602-4371.v1

**APP 661**

## II.    GENERAL OBJECTIONS

North Atlantic Funds generally object to the Interrogatories on the following grounds, each of which is incorporated by reference into the responses to each individual Interrogatory below.  All responses set forth herein are subject to and without waiver of any of these General Objections.

1.    North Atlantic Funds object to each Interrogatory to the extent that it purports to require the disclosure of information and/or communications protected from disclosure by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity from disclosure, regardless of whether such privilege or immunity from disclosure is specifically identified in the response(s) to which it applies.  Any inadvertent disclosure of privileged or otherwise protected information shall not be deemed to be a waiver by North Atlantic Funds of any applicable privilege or immunity from disclosure.

2.    No incidental or implied admissions are intended in these responses.  North Atlantic Funds' response to all or any part of an Interrogatory should not be taken as an admission that: (i) North Atlantic Funds accept or admit the existence of any facts set forth or assumed by the Interrogatories; or (ii) North Atlantic Funds' responses constitute admissible evidence.  North Atlantic Funds' response to all or any part of an Interrogatory also is not intended to be, and shall not be, a waiver by North Atlantic Funds of all or any part of their objections to that Interrogatory.

3.    North Atlantic Funds object to the Interrogatories to the extent they seek the discovery of information or materials that are not in North Atlantic Funds' possession, custody, or control.

4.    Inadvertent disclosure of any information or materials subject to any applicable privilege or doctrine, including, but not limited to, the attorney-client privilege and the work product doctrine, is not intended to be, and shall not operate as, a waiver of any such privilege or doctrine, in

- 2 -

4935-4602-4371.v1

whole or in part, nor is any such inadvertent disclosure intended to be, nor shall it constitute, a waiver of the right to object to any use of such information and/or materials.

5.      In responding to the Interrogatories, North Atlantic Funds do not concede the relevance, materiality, or admissibility of any information or materials sought.  North Atlantic Funds' responses, including the identification of any document or thing, do not constitute an admission by North Atlantic Funds that such response, document, or thing, including any information contained therein, is relevant, authentic, or admissible, and are not intended to waive or prejudice any objections North Atlantic Funds may assert now or in the future.  This includes, without limitation, objections to the use or admissibility of any document or thing, including any information contained therein, at any trial or other proceeding in this or any other action.

6.      To the extent that defendants agilon health, inc. ("agilon"), Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah (collectively, "agilon Defendants") interpret the scope or relevant period of any Interrogatory to be different from that which North Atlantic Funds has set forth herein, North Atlantic Funds reserve the right to supplement their objections.

## III.    SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      North Atlantic Funds object to the Definitions and Instructions to the extent they would require North Atlantic Funds to respond to the Interrogatories beyond what is required by the Federal Rules of Civil Procedure, the Local Rules, or the rules and orders of this Court.

2.      North Atlantic Funds object to Definition No. 11 ("electronically stored information" or "ESI") to the extent it purports to impose obligations beyond those required by the Federal Rules or the Local Rules.  North Atlantic Funds will interpret "electronically stored information" or "ESI" in a manner consistent with the Federal Rules, the Local Rules, or the rules and orders of this Court.

3.      North Atlantic Funds object to Definition Nos. 3 ("person" and "persons"); 12 ("document"), 13 ("communication(s)"), 14 ("concerning"), and 24 ("identify") to the extent they

- 3 -

require North Atlantic Funds to respond to the Interrogatories beyond what is required by the Federal Rules of Civil Procedure, the Local Rules, or the rules and orders of this Court. North Atlantic Funds will respond in accordance with their obligations under the Federal Rules of Civil Procedure and the Local Rules.

4.      North Atlantic Funds object to Definition No. 17 ("lead counsel") as vague, ambiguous, overbroad, unduly burdensome, and not proportionate to the needs of the case because it includes "special counsel," "contractor," "agent," "consultant," and "any person acting or purporting to act on behalf of these law firms." North Atlantic Funds also object to the Request to the extent it calls for documents not in North Atlantic Funds' possession, custody, or control, including independent third parties. North Atlantic Funds further object to this definition to the extent it calls for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege, protection, or immunity. In accordance with the Court's order on June 6, 2024, North Atlantic Funds will interpret "lead counsel" to mean Robbins Geller Rudman & Dowd LLP. ECF 14 at 4.

5.      North Atlantic Funds object to Definition No. 6 ("Exchange Act Defendants") as not conforming to the Court's order on August 15, 2025, which upheld Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., and CD&R Associates IX, L.P. as defendants under the Exchange Act in addition to agilon health, inc., Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah. ECF 63 at 1-2, 88-89.

6.      North Atlantic Funds object to Definition No. 4 ("Plaintiff," "you," and "your") as overbroad, unduly burdensome, seeking information that is not relevant to the claims or defenses of the parties, not proportionate to the needs of the case, and purporting to impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules. In responding to these

- 4 -

4935-4602-4371.v1

APP 664

Requests, North Atlantic Funds will construe "Plaintiff," "you," and "your" as each named plaintiff in this Action, unless otherwise specified.

7.      North Atlantic Funds object to Definition Nos. 5 ("agilon") and 16 ("agilon securities" or "security") as vague, ambiguous, overbroad, unduly burdensome, not proportionate to the needs of this case, and seeking information that is not relevant to the claims or defenses of the parties, including because No. 5 includes "any" of agilon's "subsidiaries," "divisions," "directors," "officers," "employees," "agents," "attorneys," and "other persons acting or purporting to act on [agilon's] behalf" and No. 16 includes securities that are not at issue in this Action.  North Atlantic Funds will interpret the terms "agilon securities" and "securities" as referring to agilon common stock only, and North Atlantic Funds will interpret "agilon" to mean agilon health, inc.  *See* Complaint, ¶250.

8.      North Atlantic Funds object to Instruction No. 18 as overbroad, unduly burdensome, not proportionate to the needs of the case, and seeking information that is not relevant to any party's claims or defenses, including to the extent it seeks information and responses without limitation as to date.  Unless otherwise indicated in the specific responses below, North Atlantic Funds' responses are based upon the time period of May 27, 2021 through February 27, 2024 (the "Class Period").

9.      North Atlantic Funds object to Instruction No. 22 to the extent it purports to impose requirements beyond those required by Federal Rule of Civil Procedure 26(e)(1)(A).  North Atlantic Funds will supplement their responses consistent with the Federal Rules of Civil Procedure, any applicable orders, and agreements of the parties.

## IV.    SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

INTERROGATORY NO. 7:

Identify all persons who have knowledge of facts relevant to the claims or defenses in this action – including, without limitation, facts concerning falsity, scienter, reliance, loss causation, or

4935-4602-4371.v1

damages – and describe the subject matter of their knowledge, including any consultants, experts, litigation funders, or other persons or entities who have assisted any Plaintiff in the prosecution of this action, and each document, communication, analysis, or category of documents that Plaintiffs contend supports those allegations and the basis on which you contend each such item supports them.

<u>AMENDED RESPONSE TO INTERROGATORY NO. 7</u>:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Atlantic Funds object to this Interrogatory because it is vague, ambiguous, overbroad, unduly burdensome, seeks information not relevant to any of the claims or defenses in the case, and is not proportionate to the needs of the case, including because it demands that North Atlantic Funds identify "***all*** persons who have knowledge of facts relevant to the claims or defenses in this action" and "describe the subject matter of their knowledge," identify ***all*** "consultants, experts, litigation funders, or other persons or entities who have assisted any Plaintiff in the prosecution of this action" in any form whatsoever, and identify ***each and every*** "document, communication, analysis, or category of documents that Plaintiffs contend supports" any of the "allegations" in the case, and the "basis on which you contend ***each*** [document, communication, analysis, or category of documents] supports them." North Atlantic Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33.  *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018).  North Atlantic Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33 or in any subsequent Court order modifying such limitations in the above-captioned action.

4935-4602-4371.v1

**APP 666**

North Atlantic Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See, e.g.*, *Alcala v. Tex. Webb Cnty.*, 2009 WL 10694159, at \*3 (S.D. Tex. Dec. 7, 2009) ("'Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents.'"); *see also Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at \*5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). North Atlantic Funds also object to this Interrogatory as purporting to require North Atlantic Funds to seek, obtain, and verify information in the possession of third parties. North Atlantic Funds also object to this Interrogatory to the extent it seeks the identity and work product of non-testifying consulting experts, or prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures. North Atlantic Funds also object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows: Plaintiff believes the following persons may have knowledge of facts relevant to the claims or defenses in this action, including *inter alia*, on the following subjects: (i) agilon's business, business model, operations, performance, and financial results and forecasts; (ii) agilon's historical, reported, and projected medical margin and adjusted EBITDA; (iii) the basis for agilon's financial

- 7 -

4935-4602-4371.v1

**APP 667**

results and projections; (iv) patient utilization of medical care; (v) agilon's medical expenses and medical revenue; (vi) Defendants' misstatements and omissions alleged in the Complaint; (vii) Defendants' scienter as to the misstatements and omissions alleged in the Complaint; (viii) Defendants' communications with the public, government entities, healthcare industry entities, physician partners, and other third parties concerning the subject matters in the Complaint; (ix) Defendants' transactions in agilon common stock; (x) Defendants' control of other Defendants; (xi) the valuation and price movement of agilon common stock; and/or (xii) Plaintiffs' transactions in agilon common stock. Defendants are in the best position to know the titles, current addresses, and telephone numbers of their current and former employees and directors.

| PERSON | CONTACT INFORMATION |
|---|---|
| Wellington Management Company LLP | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Brown Advisory Incorporated | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BlackRock | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Rhumbline Advisors Limited Partnership | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Artisan Partners Limited Partnership | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Matthew D. Cain, PhD | c/o Robbins Geller Rudman & Dowd 655 West Broadway, Suite 1900 San Diego, CA 92101 Telephone: 619/231-1058 |
| agilon health, inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Steven H. Sell | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Timothy S. Bensley | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Girish Venkatachaliah | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Heidi Hittner | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Clayton, Dubilier & Rice, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Vector Holdings, L.P. | *See* Plaintiffs' Initial Disclosures dated |

- 8 -

4935-4602-4371.v1

| PERSON | CONTACT INFORMATION |
|---|---|
|  | September 22, 2025. |
| CD&R Investment Associates IX, Ltd. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Associates IX, L.P. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ben Shaker | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Benjamin Kornitzer, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Clay Richards | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Denise V. Zamore | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Derek L. Strum | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Diana L. McKenzie | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Donald J. Gogel | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Karthik Rao, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Kevin Spencer, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Glenn Sobotka | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Jeffrey A. Schwaneke | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Karen McLoughlin | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Katie Boyer | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Kenny Bellendir | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Mat Varghese | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Michael L. Smith | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Michelle A. Gourdine | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nathan K. Sleeper | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Priscilla Kasenchak | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ravi Sachdev | *See* Plaintiffs' Initial Disclosures dated |

- 9 -

4935-4602-4371.v1

| PERSON | CONTACT INFORMATION |
|--------|---------------------|
| | September 22, 2025. |
| Richard J. Schnall | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Rima Simson | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ronald A. Williams | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Sarah Mokover | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Sharad Mansukani | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Silvana Battaglia | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Theodore Halkias | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Theresa A. Gore | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Veeral Desai | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| William Wulf | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Claire Mulhearn | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Dana Carne | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Matthew Gillmor | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Albert de Hombre | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Timothy Gertsch | 440 Polaris Parkway, Suite 550 Westerville, OH 43082 Telephone: 562/256-3800 |
| Kristin Xanders | 440 Polaris Parkway, Suite 550 Westerville, OH 43082 Telephone: 562/256-3800 |
| Samuel Rowland | 440 Polaris Parkway, Suite 550 Westerville, OH 43082 Telephone: 562/256-3800 |
| Jillian Griffiths | 550 Madison Avenue New York, NY 10022 Telephone: 212/407-5200 |
| David Novak | 550 Madison Avenue New York, NY 10022 Telephone: 212/407-5200 |
| Daniel Malconian | 550 Madison Avenue |

- 10 -

4935-4602-4371.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| | New York, NY  10022<br>Telephone: 212/407-5200 |
| Arjun Bakre | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Steph Huang | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Jared Rock | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Brian Scheinberg | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800. |
| Dan Fitzpatrick | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Dale Luke | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Gijun Jin | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Jacques Braamse | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Jared Shaeffer | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Katie Kauachi | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Khanh Vo | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Lauren Polt | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Murtaza Zaidi | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Michael Murray | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Mimi Yang | 440 Polaris Parkway, Suite 550 |

- 11 -

4935-4602-4371.v1

| PERSON | CONTACT INFORMATION |
|---|---|
|  | Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Tom Harwood | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Tony Chhear | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Barclay Pearce Capital | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| The Benchmark Company, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BofA Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BTIG, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Citizens JMP Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Cowen and Company, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Deutsche Bank AG | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Evercore Group, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| The Goldman Sachs Group, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Guggenheim Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Jefferies LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| J.P. Morgan Chase & Co | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Leerink Partners, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Morgan Stanley & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nephron Research LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| RBC Capital Markets LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Stifel, Nicolaus & Company, Incorporated | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| TD Securities (USA) LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Truist Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated |

4935-4602-4371.v1

**APP 672**

| PERSON | CONTACT INFORMATION |
|---|---|
| | September 22, 2025. |
| UBS Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Wells Fargo Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| William Blair & Company, L.L.C. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Wolfe Research, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Centers for Medicare & Medicaid Services | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| U.S. Securities & Exchange Commission | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Aetna Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Humana | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| United Healthcare | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Milliman, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ernst & Young LLP | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Academy Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Deutsche Bank Securities Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Goldman Sachs & Co. LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| J.P. Morgan Securities LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nomura Securities International, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| R. Seelaus & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| RBC Capital Markets, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Samuel A. Ramirez & Company, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Siebert Williams Shank & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| WR Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |

- 13 -

Plaintiff further directs Defendants to AGL_00000215-470, and CDR_AGILON0000388-389.  Plaintiff further identifies the following documents as supporting Plaintiffs' allegations:

- Publicly available documents cited in the Complaint.

- ECF 105-6: Expert Report of Matthew D. Cain, Ph.D.

INTERROGATORY NO. 8:

Identify verbatim each statement you contend is false and/or misleading in connection with your claim that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act, including (i) the person who made the statement, (ii) when the statement was made, (iii) where the statement was made (*e.g.*, earnings call, conference, etc.), and (iv) to the extent the statement is in a document filed with the Securities & Exchange Commission, each person who signed an accompanying certification.

AMENDED RESPONSE TO INTERROGATORY NO. 8:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Atlantic Funds object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.  North Atlantic Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33.  *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018).  North Atlantic Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.  North Atlantic Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the

- 14 -

4935-4602-4371.v1

**APP 674**

litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'").

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows: The following statements were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of the Securities Exchange Act of 1934.

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| No. 1 - Complaint, ¶100: May 27, 2021, Q1 2021 agilon health, inc. Earnings Call. | Sell emphasized his "**high degree of visibility** into future revenues and margin progression." |
| No. 2 - Complaint, ¶108: October 28, 2021, Form 8-K, agilon health Reports Third Quarter 2021 Results, signed by Bensley. | Sell touted agilon's "**high-visibility partnership model**," which he claimed "**deliver[s] predictable, quality outcomes**." |
| No. 3 - Complaint, ¶109: October 29, 2021, Q3 2021 agilon health, inc. Earnings Call. | Sell touted agilon's full-risk model, claiming its ability to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." Sell also boasted of agilon's ability to "**drive sustainably lower cost[s]**." |
| No. 4 - Complaint, ¶113: January 10, 2022, agilon health, inc. at JPMorgan Healthcare Conference. | Sell boasted of agilon's "distinguish[ed]," "high-touch" model and its ability to "manage costs" and deliver "predicable results" through "multiple surges" in utilization:<br><br>*I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver* |

- 15 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *predictable results through each one of these surges*. We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.<br><br>* * *<br><br>[T]he quality of our economic model has allowed us and will continue to allow us to *deliver predictable results in periods of volatility*. No one can predict exactly what the future is with this pandemic, but *we know that we can deliver predictable results*. New government programs evolve over time, but *we can deliver predictable results*. |
| **No. 5** - Complaint, ¶114: January 10, 2022, agilon health, inc. at JPMorgan Healthcare Conference. | In response to an analyst's question regarding whether "there's any pent-up demand around things like elective surgeries" among agilon's patients, Sell dismissed the analyst's concern while referring back to agilon's "high-touch" model:<br><br>I don't know that we believe there's a massive set of pent-up demand, *particularly in our model, because we've got those touchpoints*, and we've been working very closely with those senior patients, particularly those high-risk patients. That's why that 50% increase in terms of touches with those patients yields such positive results. |
| **No. 6** - Complaint, ¶116: March 3, 2022, Form 8-K, agilon health Reports Fourth Quarter and Fiscal Year 2021 Results, signed by Bensley. | Sell underscored agilon's model's "*distinctive, predictable results* . . . despite evolving COVID dynamics." |
| **No. 7** - Complaint, ¶129: May 11, 2022, agilon health, inc. at Bank of America Healthcare Conference. | During the presentation, an analyst asked Sell what "visibility you have . . . from a cost perspective . . . from the way that you've built your model." In response, Sell emphasized that thanks to agilon's "high-touch" model, agilon's patients had avoided a "huge amount of deferred issues," stating:<br><br>"I mean I think *one of the real differentiators in our model is in the high-touch nature* between the primary care physician and the patient. Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade. And so we understand those groups very well. As we bring them on board, *we have great visibility from a cost perspective* because we've got that experience with them. We take a 12-month implementation period, which I think is distinctive. And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective. And so *that* |

- 16 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *visibility and that continuity is a big differentiator*."<br><br>"In COVID, what we were able to maintain was the touch points with these senior patients. . . . And I think that translated into *more predictably from a cost perspective*, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points.  And *we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues*." |
| **No. 8** - Complaint, ¶131: June 8, 2022, agilon health, inc. at William Blair Growth Stock Conference. | Bensley claimed that agilon did not just have a good handle on growth, costs and margins, but assured analyst and investors that "*[w]e have tremendous visibility* into both growth and embedded margins in our existing PCP groups." |
| **No. 9** - Complaint, ¶134: September 14, 2022, agilon health, inc. at Morgan Stanley Global Healthcare Conference. | Sell boasted: "[Two] points I would add that I think is kind of distinctive about our model that allows us to deliver *really predictable costs kind of quarter in, quarter out*, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side.  But the 2 things are: one, we work with existing doctors and existing patients and we take them through a 12-month implementation period.  So *when they go live, we have a very good idea of what that cost structure looks like* and a very good idea along -- what the revenues like.  But the second piece that I think is really important is, *we have this high-touch model.*" |
| **No. 10** - Complaint, ¶136: November 3, 2022, Q3 2022 agilon health, inc. Earnings Call. | In response to an analyst's question about the key drivers of agilon's medical margin, Sell emphasized that agilon's "newer partners" were excelling by leveraging agilon's platform and "high-touch model":<br><br>"[W]e are experiencing the benefits of learning from our platform that is *allowing our newer partners to perform at the high end of our range*.<br><br>* * *<br><br>I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of *the benefits of the high-touch model*, and it's coming through in terms of better satisfaction, *better health outcomes and ultimately lower costs and better margins overall.  So those are the things that I would really call out*." |
| **No. 11** - Complaint, ¶138: January 9, 2023, agilon health, inc. at JPMorgan Healthcare Conference. | Sell provided agilon's FY23 adjusted EBITDA guidance of $75 million to $90 million (compared to $4 million in 2022). |

- 17 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| **No. 12** - Complaint, ¶140: March 1, 2023, Form 8-K, agilon health Reports Fourth Quarter and Fiscal Year 2022 Results, signed by Bensley; Q4 2022 agilon health, inc. Earnings Call. | agilon's results for the fourth quarter and full year ending December 31, 2022, included FY23 medical margin guidance of $535-$560 million and $75-$90 million adjusted EBITDA, respectively.  The same day, Sell and Bensley convened an investor call to discuss agilon's 4Q22 and FY22 financial results, during which Sell stated agilon was on track to post FY23 medical margin of nearly $550 million (compared to $304 million in FY22), explaining:<br><br>"Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally." |
| **No. 13** - Complaint, ¶141: March 1, 2023, Q4 2022 agilon health, inc. Earnings Call. | Sell further stated the maturation of agilon's member cohorts was driving sustained earnings growth:<br><br>"Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year." |
| **No. 14** - Complaint, ¶143: March 30, 2023, agilon health, inc. to Host Investor Day. | Sell highlighted that agilon was on track to post FY23 medical margin of $550 million.  During the call, Bensley again emphasized agilon's accelerated growth in medical margin and adjusted EBITDA, stating:<br><br>"Adjusted EBITDA at agilon is inflecting in a positive way. That's driven by a – that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage.  All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability. . . . We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond.<br><br>* * *<br><br>So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million.<br><br>* * *<br><br>Medical margins growing at even a faster rate with a 60% CAGR over that same time period.  And we expect medical margin dollars to inflect up to about $550 million in 2023.  That's an 80% year-over-year increase from what we just reported for 2022.  And I think ***that's a real hallmark of the agilon model, our ability to*** |

- 18 -

4935-4602-4371.v1

**APP 678**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *grow medical margin at the same time that we're growing membership.*" |
| **No. 15** - Complaint, ¶144: March 30, 2023, agilon health, inc. to Host Investor Day. | agilon published the below presentation slide in connection with the Investor Day, purporting to show the medical margin per-member-per-month ("PMPM") figures for each agilon "Market Class" from 2018 to 2023.  Commenting on the slide during the Investor Day, Bensley underscored agilon's purportedly "***great visibility***" into the underlying drivers of agilon's medical margin.<br><br> |
| **No. 16** - Complaint, ¶146: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | agilon's financial results for the quarter ended March 31, 2023, reiterated agilon's FY23 medical margin and adjusted EBITDA expectations, confirming that agilon was on track to post FY23 medical margin of $535-$560 million.  The release also explained that, beginning with its 1Q23 results, agilon was now including its geography entry costs in agilon's calculation of adjusted EBITDA, to comply with SEC guidance.  Under its new calculation, agilon's FY23 adjusted EBITDA outlook from March 1, 2023 ($75-$90 million) was reduced by the amount of agilon's FY23 geography entry costs ($65-$78 million), yielding a FY23 adjusted EBITDA outlook of ($3 million) to $25 million.  That same day, Sell and Bensley convened a conference call with investors to discuss agilon's 1Q23 financial results, during which Sell reiterated agilon's FY23 medical margin and adjusted EBITDA outlook previously provided on March 1, 2023, notwithstanding agilon's revised adjusted EBITDA calculation. |
| **No. 17** - Complaint, ¶148: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | agilon's 1Q23 results reflected $28.5 million in medical costs associated with medical services rendered in 2022.  During the May 9 call, an analyst observed there were "a lot of questions around cost trends," and asked "what drove the [$28.5 million] PYD" (*i.e.*, the "prior year development").   Bensley downplayed the significance of the charge in response, assuring that it was largely due to "a couple of old" claims, and did not signify any |

- 19 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | fundamental issues with agilon's model or level of visibility. |
| **No. 18** - Complaint, ¶149: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | When asked by an analyst to discuss the cost trends agilon was seeing, Sell assured that "utilization was very much in line with what we would expect," while adding "the power of the primary care physician touch points were really strong in the quarter." |
| **No. 19** - Complaint, ¶151: May 11, 2023, agilon health, inc. at Bank of America Global Healthcare Conference. | Bensley attributed members' declining medical costs to agilon's model:<br><br>"[T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024. . . . *[O]ur model is so geared to improving the quality and outcome for our patients that actually drives cost down*."<br><br>"When there is a pretty good high benchmark year, the differential between that benchmark revenue rate and what we're doing in cost just gets wider.  And so that drives a higher point of inflection because *our costs continue to just go in the right direction* because of all the things that Kenny [Bellendir, agilon's Markets CFO] was talking about." |
| **No. 20** - Complaint, ¶155: June 7, 2023, agilon health, inc. at William Blair Growth Stock Conference. | Bensley reiterated agilon's FY23 outlook of approximately $550 million in medical margin.  After touting agilon's "tremendously high visibility to growth" and "really good forward-looking visibility to our future growth," Bensley added:<br><br>And we also have a process in which we implement our new markets up to 12 months before going live. *So long before we go live, we have really, really strong visibility into exactly what's happening*.  So right now, for the class of 2024, we're already implementing those partners, and we have good visibility into not only what that membership is but what the economics for that cloud will look like going into 2024.<br><br> * * * <br><br>So as our members and our partners mature on the agilon platform, margins grow over time. And as Steve said, I'll show you a really great slide as exactly how that's been working in practice. *So we have really great confidence and visibility in our long-term value drivers*.  And right now, our EBITDA has actually been inflecting positive year-over-year. |

- 20 -

4935-4602-4371.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| **No. 21** - Complaint, ¶156: June 7, 2023, agilon health, inc. at William Blair Growth Stock Conference. | Near the end of the call, Sell reiterated agilon's "really strong start this year," adding "I don't know many businesses that show an 88% step-up in their main margin metric [medical margin].  We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent." |
| **No. 22** - Complaint, ¶158: August 3, 2023, Form 8-K, agilon health Reports Second Quarter 2023 Results, signed by Bensley. | agilon's financial results for the quarter ended June 30, 2023, reported a $138 million medical margin, $10 million adjusted EBITDA, and a $17 million net loss for 2Q23. The release also stated agilon's 2Q23 medical margin increased 69% compared to 2Q22 ($82 million).  In the release, Sell claimed "[t]he *durability and predictability of our partnership model* enabled agilon to deliver strong performance during the second quarter and first half of 2023." |
| **No. 23** - Complaint, ¶159: August 3, 2023, Form 8-K, agilon health Reports Second Quarter 2023 Results, signed by Bensley. | The release also stated that agilon lowered its FY23 medical margin by approximately $32.5 million (from $535-$560 million to $500-$530 million), while *raising* its FY23 adjusted EBITDA guidance to $0-23 million. |
| **No. 24** - Complaint, ¶160: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell highlighted agilon's 69% year-over-year growth in medical margin, emphasizing that agilon's "profitability gains [were] even more outsized on an underlying basis" given "MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA." |
| **No. 25** - Complaint, ¶161: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell dismissed concerns that higher industry utilization rates were impacting agilon, asserting that agilon's model "insulated" agilon from "spikes" in utilization rates: <br><br> "One theme I would like to drive home, given all of the speculation on utilization trends is that *different models will yield different outcomes.  agilon's model is distinctively different and more durable and predictable in driving cost and quality results* compared to the broad fee-for-service system, which predominates across health care today. <br><br> Let me highlight how we are producing such *strong and predictable results* and what drives our forward confidence in the business.  First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care.  We do not take risk on a broad set of patients in an unmanaged fee-for-service system.  Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades. <br><br> &ast; &ast; &ast; |

- 21 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization*." |
| **No. 26** - Complaint, ¶162: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell further sought to quell concerns about utilization rates by assuring investors that agilon was actually "tracking ahead" of its expected utilization rates, stating: <br><br> "Second point on differentiation.  For our members, our year-to-date *composite utilization trend is in line or better than our expectations*.  Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range.  Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift. <br><br>       All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date." |
| **No. 27** - Complaint, ¶163: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell added that agilon's strong "visibility" and "active management" of utilization rates further bolstered the reliability of agilon's earnings estimates, stating: <br><br>       Third, *our model has natural advantages in terms of leading indicators and visibility*.  From an operational standpoint, we are not just receivers of macro utilization trends.  Our teams are actively managing utilization on the ground every day.  This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers.  Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete.  *We have not seen any meaningful change in our expected cost trend, including outpatient procedures*. |
| **No. 28** - Complaint, ¶164: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell also claimed that agilon's unique business model "buffers our financial results up and down": <br><br>       "Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down.  As a result, *we are able to guide to relatively tight ranges* on medical margin and adjusted EBITDA *and absorb puts and takes* that may arise during a given period." |
| **No. 29** - Complaint, ¶165: | Sell further emphasized the "predictability" of agilon's business |

- 22 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | model, stating:<br><br>Ultimately, the **_durability and predictability of our model_** has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, **_even as some health plans with broad fee-for-service networks are seeing pockets of higher costs_**.  Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability.<br><br>As we have discussed previously, we operate in a very forward-looking model.  **_And our visibility on the key levers for driving next year's performance is quite high._**<br><br>* * *<br><br>Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023.  This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.<br><br>On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations.  This is obviously important as you think about the stepping off point for 2024. |
| **No. 30** - Complaint, ¶166: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Bensley highlighted agilon's 69% year-over-year medical margin growth, and touted that "the strength and durability of [agilon's] business model has enabled us to . . . improve our adjusted EBITDA outlook," adding that agilon's "updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend." Bensley also referred investors to the market class data from agilon's 2023 Investor Day (¶144), claiming the data presented a "really . . . good indicator of exactly where we expect them to be from a medical margin standpoint." |
| **No. 31** - Complaint, ¶167: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | In response to an analyst's request for "clarifications" regarding agilon's medical cost trend, and the reasoning behind increasing agilon's reserves, Bensley concealed the dramatic utilization spike witnessed in May-June, while assuring investors that the decision to increase agilon's reserves was merely a precaution for the possibility that "there could be a change, for instance, in utilization trends in the second half" of the year:<br><br>"So rather than saying, hey, this percentage of this is for this |

- 23 -

4935-4602-4371.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | or this is for that, we've looked at the range of potential outcomes that can happen in the second half.  Want to make sure that we've got enough reserve to minimize the probability of any prior period development going into next year, and that would include things like ***being respectful of the fact that there could be a change, for instance, in utilization trends in the second half***.  So I don't want to quantify it and break it out into components other than to say, we've tried to increase the strength of the reserves to cover that sort of range of outcomes." |
| **No. 32** - Complaint, ¶168: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Bensley also reassured that agilon's increase in reserves was merely intended to cover the "possibility" of a "change [in] utilization in the back half of the year": <br><br> "And when we talk about then the strengthening of our reserves that are in our guidance, we've essentially said, hey, with the understanding that our reserve should probably be stronger in terms of the range of potential reserves that we could build, both because of those potential blind spots and also just to cover for the possibility and be respectful of the fact that ***there may be some change and [sic] utilization in the back half of the year***." |
| **No. 33** - Complaint, ¶169: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | In response to a Wells Fargo analyst's question regarding "how closely is ACO REACH claims data track with your actual [Medicare Advantage] claims experience," and corresponding request that Sell and Bensley "be as specific as possible about what your level of claims visibility is for [2Q23]," Sell assured that agilon possessed "incredible" visibility into its members' medical costs and utilization, stating: <br><br> "So I think ***our visibility is extremely strong***, Stephen, and we have high confidence.  I think ***it's a function of our model, which is very different***, right?  We are on the ground with PCPs every day, we are managing those most complex patients.  And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs. <br><br> The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER.  And we put that together, we're able to drive the type of results that I talked about with inpatient down in the flat to down in the midsingle digit range. <br><br> From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims.  And so ***there is incredibly high visibility***.  There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis. |

- 24 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. ***And so we feel like we have an incredible level of visibility on that.*** And I think the last thing I would just say is, I think we've demonstrated that ***our model really stands out in higher utilization periods that broader fee-for-service markets are seeing.***<br><br>* * *<br><br>Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year. It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range. So I think this is an area where we feel like we have incredible confidence. The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators." |
| **No. 34** - Complaint, ¶170: August 3, 2023, Q2 2023 Report on Form 10-Q, signed by Bensley. | agilon's 2Q23 Report on Form 10-Q included the medical margin and adjusted EBITDA results provided in the 2Q23 Release, and claimed that agilon's 2Q23 medical margin increased 69% compared to 2Q22. |
| **No. 35** - Complaint, ¶171: September 6, 2023, agilon health, inc. at Wells Fargo Healthcare Conference. | During the call, an analyst observed that "utilization has been a huge area of focus" and asked Bensley "what you're seeing on the utilization front." Concealing the significant utilization spike in May-June 2023, Bensley responded that agilon's "power[ful]" model was "***driv[ing] utilization down***," noting:<br><br>"[O]bviously, there has been a lot of focus on utilization coming through the first half of the year. And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model. I know that sounds like it's simple, but ***our model is essentially designed to have a more efficient and really more consistent impact on utilization than probably just any other model out there,*** just certainly the normal fee-for-service environment.<br><br>. . . But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients that then essentially over time does have that kind of leveling impact on utilization.<br><br>It also helps us ***drive utilization down*** below what the overall, I think, fee-for-service environment would be. . . .<br><br>What we have much better continuity of care. We're |

- 25 -

4935-4602-4371.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen.  I think that has the impact of both *lowering utilization* as well as having *more consistent utilization* over time.  It may even have a positive impact on *avoiding some of the pent-up demand issues that came out of post-COVID*.<br><br>        Having said that, you can see the results in our numbers.  So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side.  And by the way, of course, inpatient is by far the largest part of our cost basis.  We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2.<br><br>        Now at the same time, of course, we have been seeing pretty large increases in outpatient.  *That's a smaller portion of the overall cost pie.  And so the inpatient decrease is more than offsetting that*." |
| **No. 36** - Complaint, ¶172: September 12, 2023, agilon health, inc. at Morgan Stanley Global Healthcare Conference. | In response to an analyst's request for "a more recent update on utilization," Bensley responded that "we're seeing [] an absolute decrease in patient utilization," reassured investors of the "guidance that we put forward for the balance of the year," and reiterated agilon's 2023 profit outlook:<br><br>        "Yes.  I mean, we haven't given a kind of inter-quarter update.  We'll give one here in a bit when obviously we report Q3.  It was interesting when we were coming through Q2 that's where we started to – and everyone else are to hear some commentary from the big payers that, hey, there may be some kind of a spike going on utilization.  Of course, when we reported Q2, we hadn't seen that in our numbers yet.  And in fact, our performance is more along the lines of what Steve was saying.  But even in that higher rate environment or *even potentially*, I'm sorry, *in that higher utilization environment, we were pretty encouraged obviously by the overall trends that we're seeing in an absolute decrease in patient utilization*.  Mean we are seeing, and we have been seeing, just like everybody else was talking about an increase in outpatient, but that's not really new to us, right?"<br><br>        We've been talking about that now for a number of quarters even coming through last year that there's been some shift, I think, going on in terms of side of service for procedures from inpatient to outpatient.  But *the overall decrease in inpatient, which is by far the largest bucket of cost for us has obviously been offsetting that*.  So – but the second thing that we did, of course, coming through |

- 26 -

4935-4602-4371.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | that and hearing that commentary from the payers was we also strengthened our reserves for somewhat in Q2 and then also in our guidance for balance of the year, with the understanding that if there – *if we do that at some point, see that, that – there was some kind of a spike up or an increase in utilization* that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there. <br><br> And all of that, *notwithstanding any commentary from the payers and utilization leads us to believe we're well reserved* and we feel really confident with the guidance – with that guidance that we put forward for the balance of the year. |
| **No. 37** - Complaint, ¶174: November 2, 2023, Form 8-K, agilon health Reports Third Quarter 2023 Results, signed by Bensley. | agilon's financial results for the quarter ended September 30, 2023, reported a $108 million medical margin, negative $6 million adjusted EBITDA, and a net loss of $31 million.  agilon also reported that 3Q23 medical margin increased 42% compared to 3Q22 ($76 million), and confirmed the Company remained on track to post FY23 medical margin and adjusted EBITDA of $455-$470 million and $6-$18 million, respectively. |
| **No. 38** - Complaint, ¶176: November 2, 2023, Q3 2023 agilon health, inc.Earnings Call. | Sell reassured investors that, notwithstanding the utilization spike that began in May 2023, "[a]ll of [agilon's] key financial metrics were generally in line or above our guidance ranges," and that agilon's "results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth." |
| **No. 39** - Complaint, ¶177: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Sell further stated that agilon's "more conservative reserving approach" was "intentionally reflected in [its] medical margin outlook for [Medicare Advantage] and will support [its] future performance in 2024," and agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model." Sell also reassured investors that he "remain[s] highly confident in the trajectory of our adjusted EBITDA," adding "our visibility into the key drivers for next year's performance are quite high." |
| **No. 40** - Complaint, ¶178: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Referring to agilon's 3Q23 medical margin, Bensley assured that miss "was primarily driven by performance in Hawaii" – which agilon had recently sold – and a "negative claims development this quarter [that] was almost entirely isolated to system issues with a single payor related to supplemental benefit costs."  Bensley also emphasized that medical margin had "*increased 42% year-over-year.*" |
| **No. 41** - Complaint, ¶179: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | In response to an analyst's question about the 2Q23 spike in medical costs and patient utilization, Sell again denied that agilon was experiencing abnormal utilization trends, stating: <br><br> "From a utilization perspective, composite utilization was in line with our overall expectations.  As Tim kind of outlined, *we did* |

- 27 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *see a step-up in Q2 utilization*in MA and REACH. The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period. *In Q3, we've seen a deceleration*. And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [posture] that Tim talked about in terms of an extra $3 million [sic]." |
| **No. 42** - Complaint, ¶180: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Bensley added that utilization trends had "greatly started to moderate in June," which he once again claimed demonstrated the "strength of [agilon's] model": <br><br> "In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward. As it turned out, as we just reported, *we did see some increased utilization in May that was – greatly started to moderate in June*. And as we've seen so far, started to – continued to moderate in early Q3 as well. <br><br> I'm not completely surprised by that. Compared to some of the comments that I've made from some of the big payers, I mean I think our model and even some of them have said should be performing better than the average out there. So the *fact that we saw a spike up and some moderation down is probably just a factor also of the strength of our model*." |
| **No. 43** - Complaint, ¶181: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | During the call, an analyst asked Sell what "you are seeing in terms of utilization trends," to which Sell responded: <br><br> "In terms of our PPO experience, we've talked about this before. We are probably the largest risk-based player in terms of PPO in the country. Our PPO business is just over 50% of our membership, it's also the fastest-growing component. And our PPO business is – performance is in line with our HMO business. <br><br> And I think the reason for that is *the differences in our model*. [A] large payer with a broad network versus *our high-touch PCP patient model, which has the ability to guide that patient on where they're going to go for specialty care*. At our Investor Day, we shared over 90% of specialty referrals come through that primary care physician even in a PPO model, that is allowing us to really deliver cost-effective care. And so our PPO experience is very strong." |
| **No. 44** - Complaint, ¶182: November 2, 2023, Q3 | Bensley assured that agilon's increased reserves simply reflected a "*more conservative reserving posture*," rather than any |

- 28 -

4935-4602-4371.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| 2023 agilon health, inc. Earnings Call. | fundamental deterioration in the business, and would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance." |
| **No. 45** - Complaint, ¶183: November 2, 2023, Q3 2023 Report on Form 10-Q, signed and certified by Sell and Bensley. | agilon's Report on Form 10-Q for the 3Q23 included the medical margin and adjusted EBITDA results provided in the 3Q23 Release, and represented that agilon's medical margin increased 42% in 3Q23 compared to 3Q22. |
| **No. 46** - Complaint, ¶185: November 14, 2023, agilon health, inc. at Wolfe Research Healthcare Conference. | Sell reassured investors that adverse medical costs trends were "moderating," and that agilon remained on track to meet its FY23 guidance. Bensley similarly assured that "as we came through July and June, those same [utilization cost] categories continue to moderate – moderated back down," adding "[w]e didn't see like a huge spike up in utilization that's continue[d] . . . all 3 of them moderated back down." |
| **No. 47** - Complaint, ¶186: November 14, 2023, agilon health, inc. at Wolfe Research Healthcare Conference. | Bensley affirmed the Company's reserving included a "***decent amount of conservatism***," stating that agilon was appropriately reserved and that there would be no more negative surprises heading into 2024:<br><br>"Yes. I mean our objective is to say, hey, let's put enough into our outlook for the year to make sure that we're covering those – that potential that we could see actually higher utilization. So that's why we picked that right now, we picked that original 60 up to 90 when we saw what was actually coming through Q2. So that's what gets you that kind of $10 million incremental versus the asset that we would have given to go. But the idea is, yes, that we're going to end the year with that's going to be – put us in a very good position to be appropriately accrued for the year.<br><br>You can look at it on a net basis, but there's no reason why we would expect to have. We shouldn't be going into a year with a significant underaccrual of our cost stand-alone either." |
| **No. 48** - Complaint, ¶189: January 5, 2024, Form 8-K, agilon health Provides 2023 Guidance Update, Initial 2024 View, signed by Bensley. | agilon issued a release revising agilon's FY23 guidance, introducing its FY24 guidance, and withdrawing its FY26 guidance. agilon stated it would generate FY23 medical margin of $340-$360 million and adjusted EBITDA of negative $55-$69 million. For FY24, agilon projected $560-$600 million of medical margin and adjusted EBITDA of $40-$60 million. |
| **No. 49** - Complaint, ¶190: January 5, 2024, agilon health, inc. Guidance Call. | In response to an analyst's question regarding whether any of agilon's "individual markets" were "losing money," Sell represented that only one market "would run at a loss for 2023," which Bensley confirmed stating "one market . . . gets below breakeven market EBITDA in 2023." |

- 29 -

<u>INTERROGATORY NO. 9</u>:

For each statement identified in response to Interrogatory No. 8, describe in detail how the statement was false or misleading when made, including any material fact that was omitted.

<u>AMENDED RESPONSE TO INTERROGATORY NO. 9</u>:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Atlantic Funds object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.  North Atlantic Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33.  *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at \*6-\*9 (E.D. Tex. July 27, 2018).  North Atlantic Funds expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.  North Atlantic Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just recently begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun.  *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at \*5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'").  North

- 30 -

Atlantic Funds further object to this Interrogatory on the grounds that it seeks or requires the disclosure of information that is protected from discovery by the attorney work product doctrine.

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows: Plaintiff incorporates its response to Interrogatory No. 8 herein.  Statements 1, 8, 12-17, 20-23, 28-29, 33-34, 39-40, 44, 48-49 (*see* ¶¶100, 131, 138, 140-141, 143-144, 146, 148, 155-156, 158-159, 164-165, 169-170, 177-178, 182, 189-190) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's visibility into the Company's operations, financial performance, and results; (ii) the predictability of agilon's operations, financial performance, results, and drivers of key metrics; (iii) agilon's financial performance and results, including the accuracy of agilon's publicly-reported financial results; (iv) the reliability of agilon's financial results, guidance and forecasts; (v) the quality, reliability, completeness, or other features of the data and information underlying agilon's financial results, guidance, or forecasts; (vi) the impact on agilon's results and performance of, *inter alia*, unreliable or incomplete data and information, patient utilization rates (including changes or spikes in utilization rates), medical expenses, and pent-up demand or demand backlog; (vii) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; (viii) agilon's patient utilization and utilization rates (including changes or spikes in utilization rates); and (ix) agilon's pent-up demand or demand backlog, including the impact of pent-up demand or demand backlog on agilon's financial performance and results.  Additional reasons why the above statements were false and misleading can be found in the Complaint at ¶112 (regarding the statements in ¶100), ¶137 (regarding the statements in ¶131), ¶157 (regarding the statements in ¶¶138, 140-141, 143-144, 146, 148, 155-156), ¶173 (regarding the statements in

- 31 -

¶¶158-159, 164-165, 169-170), ¶188 (regarding the statements in ¶¶177-178, 182), and ¶191 (regarding the statements in ¶¶189-190), and are incorporated by reference herein.

Statements 2-4, 6-7, 9-10, 19, 22, 27, 30-31, 38-39 (*see* ¶¶108-109, 113, 116, 129, 134, 136, 151, 158, 163, 166-167, 176-177) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's visibility into the Company's operations, financial performance, and results; (ii) the predictability of agilon's operations, financial performance, and results; (iii) the impact on agilon's results and performance of agilon's business model or certain aspects or features of agilon's business model; (iv) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; and (v) agilon's exposure to pent-up demand or demand backlog. Additional details why the above statements were false and misleading can be found in the Complaint at ¶112 (regarding the statements in ¶¶108, 109), ¶137 (regarding the statements in ¶¶113, 116, 129, 134, 136), ¶173 (regarding the statements in ¶¶158, 163, 166-167), ¶188 (regarding the statements in ¶¶176-177), and are incorporated by reference herein.

Statements 5, 18, 25-26, 31-32, 35-36, 41-43, 46-47 (*see* ¶¶114, 149, 161-162, 167-168, 171-172, 179-181, 185-186) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's patient utilization and utilization rates (including changes or spikes in utilization rates); (ii) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; (iii) the impact on agilon's results and performance of, *inter alia*, patient utilization and

- 32 -

4935-4602-4371.v1

utilization rates (including changes or spikes in utilization and utilization rates), or agilon's business model; (iv) agilon's pent-up demand or demand backlog, including the impact of pent-up demand or demand backlog on agilon's financial performance and results, and agilon's exposure to pent-up demand or demand backlog; and (v) agilon's exposure to changes or spikes in patient utilization and utilization rates, and ability to avoid or otherwise respond to changes or spikes in patient utilization and utilization rates. Additional details why the above statements were false and misleading can be found in the Complaint at ¶137 (regarding the statements in ¶114), ¶157 (regarding the statements in ¶149), ¶173 (regarding the statements in ¶¶161-162, 167-168, 171-172), ¶188 (regarding the statements in ¶¶179-181, 185-186), and are incorporated by reference herein.

Statements 21-22, 24, 30, 37-38, 40, 45 (*see* ¶¶156, 158, 160, 166, 174, 176, 178, 183) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's financial performance and results for the second and third quarters of 2023 (including understatement of medical expenses and overstatement of medical margins); (ii) the impact on agilon's results and performance of, *inter alia*, unreliable or incomplete data and information, patient utilization rates (including changes or spikes in utilization rates), medical expenses, and pent-up demand or demand backlog; and (iii) agilon's ability to accurately and reliability track, report, and forecast key financial metrics. Additional details why the above statements were false and misleading can be found in the Complaint at ¶157 (regarding the statements in ¶156), ¶173 (regarding the statements in ¶¶160, 158, 166), ¶188 (regarding the statements in ¶¶174, 176, 178, 183), and are incorporated by reference herein. North Atlantic Funds also direct Defendants to the Complaint, which contains additional details regarding how the alleged misstatements were false or misleading.

- 33 -

INTERROGATORY NO. 10:

For each statement identified in response to Interrogatory No. 8, explain in detail your contention that the facts stated or omitted were material.

AMENDED RESPONSE TO INTERROGATORY NO. 10:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. North Atlantic Funds object to this Interrogatory as overbroad, unduly burdensome, and not proportionate to the needs of the case. North Atlantic Funds also object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just recently begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). North Atlantic Funds also object to this Interrogatory on the grounds that it seeks or requires the disclosure of information that is protected from discovery by the attorney work product doctrine. North Atlantic Funds also object to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession. North Atlantic Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018). North Atlantic Funds

- 34 -

4935-4602-4371.v1

expressly reserve all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows: A reasonable trier of fact could determine that the statements identified in response to Interrogatory No. 8 satisfy the standard for materiality based on the facts alleged in the Complaint, which the Court has determined to be legally sufficient to satisfy each element of the alleged claims, including materiality.  In addition to the information set forth in the Complaint, Lead Plaintiffs incorporate by reference their Response to Interrogatory No. 9, which sets forth additional details as to why the alleged false and misleading statements were material.

INTERROGATORY NO. 11:

For each statement identified in response to Interrogatory No. 8, explain in detail your contention as to when and how the market learned the truth, including but not limited to the verbatim statement that revealed the truth, the person who made the statement, and where the statement was made (*e.g.*, earnings call, conference, etc.).

AMENDED RESPONSE TO INTERROGATORY NO. 11:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Atlantic Funds object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun.  North Atlantic Funds also object to this Interrogatory to the extent it

- 35 -

4935-4602-4371.v1

prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures.  North Atlantic Funds also object to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33.

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows:

On November 2, 2023, after the market closed, agilon announced its financial results for the quarter ended September 30, 2023, and held a conference call with investors to discuss agilon's third quarter 2023 financial results.  The Company revealed medical margin of $108 million for the quarter, far below expectations.  In addition, the Company also disclosed that it suffered quarterly adjusted EBITDA of negative $6 million.  The Company also sharply lowered agilon's FY23 medical margins to a range of just $455-$470 million.  On the conference call, defendants Sell and Bensley revealed that agilon had suffered higher patient utilization rates earlier in the year (notwithstanding their prior representations to the contrary), had already significantly drawn down the reserves agilon had set aside earlier in the year to cover increased medical costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue in the future.

On January 5, 2024, before the market opened, agilon issued a release revising agilon's FY23 guidance, introducing its FY24 guidance, and withdrawing its FY26 guidance, and revealed that it had suffered dramatically higher prior medical expenses than previously revealed and, as a result, agilon was lowering its FY23 expected medical margin to $340-$360 million, or approximately $112 million (24%) below the already substantially reduced guidance and nearly $200 million (36%) below agilon's original FY23 medical margin guidance.  agilon also disclosed its FY23 adjusted

- 36 -

4935-4602-4371.v1

**APP 696**

EBITDA would not be $6-$18 million as previously represented in November 2023, but rather would be a loss of $55-$69 million.  The Company also disclosed that:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions.  While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

The Company revealed that its 3Q23 medical margin of $108 million had been overstated by at least $31 million (40%), and thus agilon's 3Q23 medical margin had been flat (at best) compared to 3Q22.  agilon also revealed that, due to higher-than-reported medical costs from 2Q23, rather than having increased 69% year-over-year versus 2Q22, agilon's 2Q23 medical margin had remained relatively flat compared to 2Q22.

agilon also provided a dismal FY24 outlook, including medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million, and withdrew its FY26 guidance, which the Company had reaffirmed only seven weeks earlier.  The Company also revealed that it had failed to provide new physicians that had joined agilon's mature markets with the basic onboarding and education needed to integrate into the agilon partnership, that these newer physicians had been dragging down medical margins as a result, and that agilon would need to provide the necessary onboarding and education to these physicians, meaning that agilon would incur additional onboarding and education costs in FY24 and going forward.

The Company also announced that Bensley would be stepping down as CFO of agilon.  Sell and Bensley convened an investor call that day, during which Sell admitted that agilon had failed to incorporate both "elevated cost trends" and the "magnitude and source of the utilization shifts" in the forecasts provided to investors.  Rather than the industry-leading utilization trends that defendants represented throughout the Class Period and held up as validation of agilon's business model, Sell stated that agilon was in fact suffering "cost trends that were 2 to 3x higher [than] what we had seen

- 37 -

in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs." Sell also acknowledged that the increased utilizations, which would "persist through 2024," were due to a "backlog of pent-up demand from COVID." Bensley, meanwhile, admitted that agilon was not on track to generate positive cash flow in 2024.

On February 27, 2024, after the market closed, agilon announced its 4Q23 and FY23 financial results, revealing that agilon's medical costs and patient utilization rates were even higher than the Company had previously reported, causing the Company to widely miss the guidance it had provided less than eight weeks earlier. agilon revealed: (i) it had suffered an additional $38 million in undisclosed net medical costs during 4Q23, as well as $13 million in additional medical costs from prior to 4Q23; (ii) its actual FY23 medical margin ($299 million) was $41-$61 million less than agilon had announced less than eight weeks earlier; and (iii) it incurred a FY23 net loss of $263 million, and FY23 adjusted EBITDA of negative $95 million. agilon also announced it had drastically lowered the FY24 guidance it had just given in January, including medical margin by 25%-29% (from $560-$600 million to $400-$450 million) and adjusted EBITDA guidance by 125%-250% (a $40-$60 million gain to a $15-$60 million loss).

In its FY23 Report on Form 10-K filed on the same day, agilon also revealed a previously undisclosed material weakness in the Company's ICFR concerning agilon's medical claims and related payables (*i.e.*, amounts agilon owed for its members' healthcare), acknowledging that the material weakness rendered agilon's DCP ineffective and noting:

> Management has identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, risk adjusted premium revenue and certain care management expenses.

*    *    *

> In 2023, we identified certain sources of information utilized in our medical claims and related payables, risk adjusted premium revenue, and care management

- 38 -

expense processes that contained specific data attributes utilized in executing an internal control by management. Management did not sufficiently design controls or control activities to ensure the completeness and accuracy of the related IPE in executing certain controls associated with these processes.

agilon also published the following slide on February 27, 2024, indicating that the medical margin figures for multiple market classes reported during agilon's March 30, 2023 Investor Day (*see* ¶144), and again highlighted on agilon's August 3, 2023 call (*see* ¶166), had been overstated, including by 8%-23% for FY21 and 12%-26% for FY22:



agilon further revealed that the Company was scaling back its aggressive membership growth, and that its next cohort of new Medicare Advantage members contained approximately 60,000 patients, less than half the size of the cohort that had went "live" in January 2024.

**As to Statements 1-36**, the alleged corrective disclosures set forth above on November 2, 2023, January 5, 2024, and February 27, 2024.

**As to Statements 37-47**, the alleged corrective disclosures set forth above on January 5, 2024 and February 27, 2024.

- 39 -

4935-4602-4371.v1

**As to Statements 48 and 49**, the alleged corrective disclosures set forth above on February 27, 2024.

INTERROGATORY NO. 12:

Explain in detail your contention that "all purchasers of agilon common stock during the Putative Class Period suffered similar injury through their purchases of agilon common stock at artificially inflated prices and a presumption of reliance applies" as alleged in paragraphs 248 and 249 of the Complaint.

AMENDED RESPONSE TO INTERROGATORY NO. 12:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Atlantic Funds object to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun.  North Atlantic Funds also object to this Interrogatory to the extent it prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures.

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows: Plaintiffs allege that Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for agilon common stock, and the price of agilon's common stock declined as artificial inflation came out of the stock's price through a series of partial disclosures.  Plaintiffs also allege that Plaintiffs and the Class would not have purchased agilon common stock at the prices they paid, or at all, if they had been aware that the

- 40 -

market price had been artificially and falsely inflated by Defendants' false and misleading statements and omissions.  Plaintiffs and all other members of the proposed class are entitled to invoke the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). This presumption recognizes that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton*, 573 U.S. at 283-84. As demonstrated in Plaintiffs' Opposed Motion for Class Certification (ECF 105) and in accompanying Expert Report of Matthew D. Cain, Ph.D. ("Cain Report"), agilon common stock traded in an efficient market throughout the Class Period. *See* Cain Report, ¶¶37-95, 123.  Because all relevant factors are met, classwide reliance is presumed. *Basic*, 485 U.S. at 242; *Halliburton*, 573 U.S. at 279; *see* Complaint, §VI (the alleged misstatements and omissions were made publicly); ECF 11-3 (Plaintiffs purchased agilon common stock between when the misstatements and omissions were made and the truth was revealed).

INTERROGATORY NO. 14:

For each Plaintiff individually, explain in detail your effort and time spent participating in, monitoring, supervising, and managing this action, including but not limited to steps taken to monitor lead counsel.

AMENDED RESPONSE TO INTERROGATORY NO. 14:

North Atlantic Funds incorporate herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  North Atlantic Funds specifically object to this Interrogatory as premature, overbroad, and unduly burdensome.  North Atlantic Funds also object to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege,

- 41 -

4935-4602-4371.v1

protection, or immunity.  North Atlantic Funds further object to this Interrogatory to the extent it seeks information that is not relevant to any party's claims or defenses.

Subject to and without waiving the foregoing objections, North Atlantic Funds respond as follows: Since its appointment as Lead Plaintiff in this action, North Atlantic Funds have demonstrated their willingness and ability to serve an active role in this case, and protect the interests of the members of the proposed Class.  North Atlantic Funds have done so by, among other things: (i) filing the Complaint; (ii) defending Lead Plaintiffs' and the proposed Class' claims through the motion to dismiss stage (ECF 55, 63); (iii) exchanging initial disclosures with Defendants pursuant to Federal Rule of Civil Procedure 26(a)(l)(A); and (iv) vigorously pursuing document and other discovery from Defendants, as well as third parties.  In addition to pursuing discovery from Defendants and third parties, North Atlantic Funds have also received, and submitted responses and objections to, 51 document requests propounded by Defendants, as well as gathered and produced documents in response to Defendants' requests; and have responded to Defendants' interrogatories. North Atlantic Funds have, throughout the litigation, diligently supervised and directed the efforts of proposed class counsel to obtain the maximum recovery possible for the proposed Class, and will continue to do so.  In addition, North Atlantic Funds refer Defendants to Plaintiffs' Joint Declaration in Support of Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, filed May 20, 2024.  *See* ECF 11-5.

DATED:  June 10, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS
(admitted *pro hac vice*)
CHRISTOPHER D. STEWART
(admitted *pro hac vice*)
EVELYN SANCHEZ GONZALEZ
(admitted *pro hac vice*)
JACK K. SCOTT
(admitted *pro hac vice*)

- 42 -

4935-4602-4371.v1

- 43 -

s/ Christopher D. Stewart
CHRISTOPHER D. STEWART

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
cstewart@rgrdlaw.com
egonzalez@rgrdlaw.com
jscott@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel

- 43 -

**VERIFICATION**

I, Nicola Favorito, state and declare as follows:

1.      I serve as Executive Director for the North Atlantic States Carpenters Pension Fund and Guaranteed Annuity Fund (the "North Atlantic Funds"). I am authorized to make this verification on the North Atlantic Funds' behalf, and make this verification for that reason.

2.      I have reviewed Lead Plaintiff North Atlantic Funds' Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs (the "Interrogatory Responses"). To the best of my knowledge, information, and belief, the answers provided in the Interrogatory Responses are true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of June, 2026, at Wilmington, Massachusetts.

_____
NICOLA FAVORITO
Executive Director

**APP 704**

# DECLARATION OF SERVICE BY EMAIL

I, WILLIAM GRAVITT, not a party to the within action, hereby declare that on June 24, 2026, I caused to be served the attached LEAD PLAINTIFF NORTH ATLANTIC FUNDS' AMENDED RESPONSES AND OBJECTIONS TO THE AGILON DEFENDANTS' FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFFS, by email on the parties to the within action addressed, as follows:

COUNSEL FOR PLAINTIFF RETIREMENT SYSTEMS:

| ROBBINS GELLER RUDMAN & DOWD LLP | |
|---|---|
| Lucas F. Olts | LOlts@rgrdlaw.com |
| Christopher D. Stewart | CStewart@rgrdlaw.com |
| Evelyn Sanchez Gonzalez | egonzalez@rgrdlaw.com |
| Jack K. Scott | JScott@rgrdlaw.com |
| **KENDALL LAW GROUP, PLLC** | |
| Joe Kendall | jkendall@kendalllawgroup.com |

ATTORNEYS FOR DEFENDANTS AGILON HEALTH, INC., STEVEN J. SELL, TIMOTHY S. BENSLEY, HEIDI HITTNER, AND GIRISH VENKATACHALIAH:

| SIDLEY AUSTIN LLP | |
|---|---|
| Yolanda C. Garcia | ygarcia@sidley.com |
| Mason Parham | mparham@sidley.com |
| Barret V. Armbruster | barmbruster@sidley.com |
| Nick C. Greenberg | ngreenberg@sidley.com |

ATTORNEYS FOR DEFENDANTS CLAYTON, DUBILIER & RICE, LLC, CD&R VECTOR HOLDINGS, L.P., CD&R INVESTMENT ASSOCIATES IX, LTD., CD&R ASSOCIATES IX, L.P.:

| DEBEVOISE & PLIMPTON LLP | |
|---|---|
| Maeve L. O'Connor | mloconnor@debevoise.com |
| Elliot Greenfield | egreenfield@debevoise.com |
| Brandon Fetzer | bfetzer@debevoise.com |
| **SCOTT DOUGLASS & MCCONNICO LLP** | |
| Santosh Aravind | saravind@scottdoug.com |

4935-4602-4371.v1

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 24, 2026, at San Diego, California.

_____
WILLIAM GRAVITT

4935-4602-4371.v1

**APP 706**

# EXHIBIT 24

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re AGILON HEALTH, INC. SECURITIES LITIGATION | § § § § § § § § § | Master File No. 1:24-cv-00297-DAE<br><br>CLASS ACTION |
| This Document Relates To:<br><br>    ALL ACTIONS. | | |

**LEAD PLAINTIFF INDIANA PUBLIC RETIREMENT SYSTEM'S AMENDED RESPONSES AND OBJECTIONS TO THE AGILON DEFENDANTS' FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFFS**

4904-7697-3491.v1

**APP 708**

Pursuant to Federal Rules of Civil Procedure 26 and 33, the applicable Rules of Practice and Procedure of the U.S. District Court for the Western District of Texas ("Local Rules"), and the rules and orders of this Court, Lead Plaintiff Indiana Public Retirement System ("Indiana"), by and through their counsel of record, hereby submit their responses and objections to agilon Defendants' First Set of Interrogatories to Lead Plaintiffs (the "Interrogatories," and each individually, an "Interrogatory"), served on February 27, 2026, as follows:

## I.    INTRODUCTION AND RESERVATION OF RIGHTS

1.    Indiana's responses to the Interrogatories are based only upon a reasonable investigation of the evidence currently available and reflect current knowledge, understanding, and belief, based upon information known at this time.

2.    Discovery in this matter is ongoing.  Additional contentions, facts, witnesses, documents, testimony, or other evidence may arise during the discovery process and during the review of discovery in preparation for trial.  Indiana is providing these responses based upon review of evidence available to date and expressly reserve the right to modify their position based upon further discovery.  By providing the responses and objections below, Indiana does not waive and expressly reserves the right to: (i) modify their position based upon further discovery; (ii) rely upon and use, at trial and otherwise, any other facts and information subsequently identified; (iii) supplement, clarify, revise, or correct any or all of the objections and responses herein; (iv) assert additional objections or privileges in subsequent supplemental responses; and (v) assert any and all objections as to the admissibility of such responses into evidence in this Action, on any and all grounds, including, but not limited to, relevance, materiality, and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in court.

- 1 -

4904-7697-3491.v1

## II.    GENERAL OBJECTIONS

Indiana generally objects to the Interrogatories on the following grounds, each of which is incorporated by reference into the responses to each individual Interrogatory below.  All responses set forth herein are subject to and without waiver of any of these General Objections.

1.    Indiana objects to each Interrogatory to the extent that it purports to require the disclosure of information and/or communications protected from disclosure by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity from disclosure, regardless of whether such privilege or immunity from disclosure is specifically identified in the response(s) to which it applies.  Any inadvertent disclosure of privileged or otherwise protected information shall not be deemed to be a waiver by Indiana of any applicable privilege or immunity from disclosure.

2.    No incidental or implied admissions are intended in these responses.  Indiana's response to all or any part of an Interrogatory should not be taken as an admission that: (i) Indiana accepts or admits the existence of any facts set forth or assumed by the Interrogatories; or (ii) Indiana's responses constitute admissible evidence.  Indiana's response to all or any part of an Interrogatory also is not intended to be, and shall not be, a waiver by Indiana of all or any part of their objections to that Interrogatory.

3.    Indiana objects to the Interrogatories to the extent they seek the discovery of information or materials that are not in Indiana's possession, custody, or control.

4.    Inadvertent disclosure of any information or materials subject to any applicable privilege or doctrine, including, but not limited to, the attorney-client privilege and the work product doctrine, is not intended to be, and shall not operate as, a waiver of any such privilege or doctrine, in whole or in part, nor is any such inadvertent disclosure intended to be, nor shall it constitute, a waiver of the right to object to any use of such information and/or materials.

- 2 -

4904-7697-3491.v1

5.      In responding to the Interrogatories, Indiana does not concede the relevance, materiality, or admissibility of any information or materials sought.  Indiana's responses, including the identification of any document or thing, do not constitute an admission by Indiana that such response, document, or thing, including any information contained therein, is relevant, authentic, or admissible, and are not intended to waive or prejudice any objections Indiana may assert now or in the future.  This includes, without limitation, objections to the use or admissibility of any document or thing, including any information contained therein, at any trial or other proceeding in this or any other action.

6.      To the extent that defendants agilon health, inc. ("agilon"), Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah (collectively, "agilon Defendants") interpret the scope or relevant period of any Interrogatory to be different from that which Indiana has set forth herein, Indiana reserves the right to supplement their objections.

## III.    SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Indiana objects to the Definitions and Instructions to the extent they would require Indiana to respond to the Interrogatories beyond what is required by the Federal Rules of Civil Procedure, the Local Rules, or the rules and orders of this Court.

2.      Indiana objects to Definition No. 11 ("electronically stored information" or "ESI") to the extent it purports to impose obligations beyond those required by the Federal Rules or the Local Rules.  Indiana will interpret "electronically stored information" or "ESI" in a manner consistent with the Federal Rules, the Local Rules, or the rules and orders of this Court.

3.      Indiana objects to Definition Nos. 3 ("person" and "persons"); 12 ("document"), 13 ("communication(s)"), 14 ("concerning"), and 24 ("identify") to the extent they require Indiana to respond to the Interrogatories beyond what is required by the Federal Rules of Civil Procedure, the

- 3 -

4904-7697-3491.v1

Local Rules, or the rules and orders of this Court. Indiana will respond in accordance with their obligations under the Federal Rules of Civil Procedure and the Local Rules.

4.      Indiana objects to Definition No. 17 ("lead counsel") as vague, ambiguous, overbroad, unduly burdensome, and not proportionate to the needs of the case because it includes "special counsel," "contractor," "agent," "consultant," and "any person acting or purporting to act on behalf of these law firms." Indiana also objects to the Request to the extent it calls for documents not in Indiana's possession, custody, or control, including independent third parties. Indiana further objects to this definition to the extent it calls for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege, protection, or immunity. In accordance with the Court's order on June 6, 2024, Indiana will interpret "lead counsel" to mean Robbins Geller Rudman & Dowd LLP. ECF 14 at 4.

5.      Indiana objects to Definition No. 6 ("Exchange Act Defendants") as not conforming to the Court's order on August 15, 2025, which upheld Clayton, Dubilier & Rice, LLC, CD&R Vector Holdings, L.P., CD&R Investment Associates IX, Ltd., and CD&R Associates IX, L.P. as defendants under the Exchange Act in addition to agilon health, inc., Steven J. Sell, Timothy S. Bensley, Heidi Hittner, and Girish Venkatachaliah. ECF 63 at 1-2, 88-89.

6.      Indiana objects to Definition No. 4 ("Plaintiff," "you," and "your") as overbroad, unduly burdensome, seeking information that is not relevant to the claims or defenses of the parties, not proportionate to the needs of the case, and purporting to impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules. In responding to these Requests, Indiana will construe "Plaintiff," "you," and "your" as each named plaintiff in this Action, unless otherwise specified.

7.      Indiana objects to Definition Nos. 5 ("agilon") and 16 ("agilon securities" or "security") as vague, ambiguous, overbroad, unduly burdensome, not proportionate to the needs of

- 4 -

this case, and seeking information that is not relevant to the claims or defenses of the parties, including because No. 5 includes "any" of agilon's "subsidiaries," "divisions," "directors," "officers," "employees," "agents," "attorneys," and "other persons acting or purporting to act on [agilon's] behalf" and No. 16 includes securities that are not at issue in this Action. Indiana will interpret the terms "agilon securities" and "securities" as referring to agilon common stock only, and Indiana will interpret "agilon" to mean agilon health, inc. *See* Complaint, ¶250.

8.      Indiana objects to Instruction No. 18 as overbroad, unduly burdensome, not proportionate to the needs of the case, and seeking information that is not relevant to any party's claims or defenses, including to the extent it seeks information and responses without limitation as to date. Unless otherwise indicated in the specific responses below, Indiana's responses are based upon the time period of May 27, 2021 through February 27, 2024 (the "Class Period").

9.      Indiana objects to Instruction No. 22 to the extent it purports to impose requirements beyond those required by Federal Rule of Civil Procedure 26(e)(1)(A). Indiana will supplement their responses consistent with the Federal Rules of Civil Procedure, any applicable orders, and agreements of the parties.

## IV.    SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

INTERROGATORY NO. 7:

Identify all persons who have knowledge of facts relevant to the claims or defenses in this action – including, without limitation, facts concerning falsity, scienter, reliance, loss causation, or damages – and describe the subject matter of their knowledge, including any consultants, experts, litigation funders, or other persons or entities who have assisted any Plaintiff in the prosecution of this action, and each document, communication, analysis, or category of documents that Plaintiffs contend supports those allegations and the basis on which you contend each such item supports them.

- 5 -

4904-7697-3491.v1

AMENDED RESPONSE TO INTERROGATORY NO. 7:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. Indiana objects to this Interrogatory because it is vague, ambiguous, overbroad, unduly burdensome, seeks information not relevant to any of the claims or defenses in the case, and is not proportionate to the needs of the case, including because it demands that Indiana identify "*all* persons who have knowledge of facts relevant to the claims or defenses in this action" and "describe the subject matter of their knowledge," identify *all* "consultants, experts, litigation funders, or other persons or entities who have assisted any Plaintiff in the prosecution of this action" in any form whatsoever, and identify *each and every* "document, communication, analysis, or category of documents that Plaintiffs contend supports" any of the "allegations" in the case, and the "basis on which you contend *each* [document, communication, analysis, or category of documents] supports them." Indiana also objects to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at \*6-\*9 (E.D. Tex. July 27, 2018). Indiana expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.

Indiana also objects to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See, e.g.*, *Alcala v. Tex.*

- 6 -

4904-7697-3491.v1

*Webb Cnty.*, 2009 WL 10694159, at \*3 (S.D. Tex. Dec. 7, 2009) ("'Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents.'"); *see also Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at \*5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). Indiana also objects to this Interrogatory as purporting to require Indiana to seek, obtain, and verify information in the possession of third parties. Indiana also objects to this Interrogatory to the extent it seeks the identity and work product of non-testifying consulting experts, or prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures. Indiana also objects to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.

Subject to and without waiving the foregoing objections, Indiana responds as follows: Plaintiff believes the following persons may have knowledge of facts relevant to the claims or defenses in this action, including *inter alia*, on the following subjects: (i) agilon's business, business model, operations, performance, and financial results and forecasts; (ii) agilon's historical, reported, and projected medical margin and adjusted EBITDA; (iii) the basis for agilon's financial results and projections; (iv) patient utilization of medical care; (v) agilon's medical expenses and medical revenue; (vi) Defendants' misstatements and omissions alleged in the Complaint; (vii) Defendants' scienter as to the misstatements and omissions alleged in the Complaint; (viii) Defendants' communications with the public, government entities, healthcare industry entities, physician partners, and other third parties concerning the subject matters in the Complaint; (ix) Defendants' transactions in agilon common stock; (x) Defendants' control of other Defendants; (xi) the valuation and price movement of agilon common stock; and/or (xii) Plaintiffs' transactions in agilon common

- 7 -

stock. Defendants are in the best position to know the titles, current addresses, and telephone numbers of their current and former employees and directors.

| PERSON | CONTACT INFORMATION |
|---|---|
| Wellington Management Company LLP | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Brown Advisory Incorporated | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BlackRock | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Rhumbline Advisors Limited Partnership | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Artisan Partners Limited Partnership | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Matthew D. Cain, PhD | c/o Robbins Geller Rudman & Dowd 655 West Broadway, Suite 1900 San Diego, CA 92101 Telephone: 619/231-1058 |
| agilon health, inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Steven H. Sell | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Timothy S. Bensley | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Girish Venkatachaliah | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Heidi Hittner | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Clayton, Dubilier & Rice, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Vector Holdings, L.P. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Investment Associates IX, Ltd. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| CD&R Associates IX, L.P. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ben Shaker | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Benjamin Kornitzer, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Clay Richards | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Denise V. Zamore | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Derek L. Strum | *See* Plaintiffs' Initial Disclosures dated |

- 8 -

| PERSON | CONTACT INFORMATION |
|---|---|
|  | September 22, 2025. |
| Diana L. McKenzie | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Donald J. Gogel | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Karthik Rao, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Kevin Spencer, M.D. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Glenn Sobotka | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Jeffrey A. Schwaneke | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Karen McLoughlin | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Katie Boyer | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Kenny Bellendir | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Mat Varghese | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Michael L. Smith | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Michelle A. Gourdine | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nathan K. Sleeper | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Priscilla Kasenchak | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ravi Sachdev | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Richard J. Schnall | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Rima Simson | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ronald A. Williams | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Sarah Mokover | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Sharad Mansukani | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Silvana Battaglia | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Theodore Halkias | *See* Plaintiffs' Initial Disclosures dated |

- 9 -

| PERSON | CONTACT INFORMATION |
|---|---|
| | September 22, 2025. |
| Theresa A. Gore | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Veeral Desai | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| William Wulf | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Claire Mulhearn | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Dana Carne | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Matthew Gillmor | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Albert de Hombre | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Timothy Gertsch | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Kristin Xanders | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Samuel Rowland | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800 |
| Jillian Griffiths | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| David Novak | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Daniel Malconian | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Arjun Bakre | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Steph Huang | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Jared Rock | 550 Madison Avenue<br>New York, NY  10022<br>Telephone: 212/407-5200 |
| Brian Scheinberg | 440 Polaris Parkway, Suite 550<br>Westerville, OH  43082<br>Telephone: 562/256-3800. |

- 10 -

4904-7697-3491.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| Dan Fitzpatrick | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Dale Luke | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Gijun Jin | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Jacques Braamse | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Jared Shaeffer | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Katie Kauachi | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Khanh Vo | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Lauren Polt | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Murtaza Zaidi | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Michael Murray | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Mimi Yang | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Tom Harwood | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Tony Chhear | 440 Polaris Parkway, Suite 550 Westerville, OH  43082 Telephone: 562/256-3800 |
| Barclay Pearce Capital | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| The Benchmark Company, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| BofA Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |

- 11 -

4904-7697-3491.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| BTIG, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Citizens JMP Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Cowen and Company, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Deutsche Bank AG | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Evercore Group, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| The Goldman Sachs Group, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Guggenheim Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Jefferies LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| J.P. Morgan Chase & Co | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Leerink Partners, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Morgan Stanley & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nephron Research LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| RBC Capital Markets LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Stifel, Nicolaus & Company, Incorporated | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| TD Securities (USA) LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Truist Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| UBS Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Wells Fargo Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| William Blair & Company, L.L.C. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Wolfe Research, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Centers for Medicare & Medicaid Services | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| U.S. Securities & Exchange Commission | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |

4904-7697-3491.v1

| PERSON | CONTACT INFORMATION |
|---|---|
| Aetna Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Humana | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| United Healthcare | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Milliman, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Ernst & Young LLP | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Academy Securities, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Deutsche Bank Securities Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Goldman Sachs & Co. LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| J.P. Morgan Securities LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Nomura Securities International, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| R. Seelaus & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| RBC Capital Markets, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Samuel A. Ramirez & Company, Inc. | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| Siebert Williams Shank & Co., LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |
| WR Securities, LLC | *See* Plaintiffs' Initial Disclosures dated September 22, 2025. |

Plaintiff further directs Defendants to AGL_00000215-470, and CDR_AGILON0000388-389. Plaintiff further identifies the following documents as supporting Plaintiffs' allegations:

- Publicly available documents cited in the Complaint.

- ECF 105-6: Expert Report of Matthew D. Cain, Ph.D.

INTERROGATORY NO. 8:

Identify verbatim each statement you contend is false and/or misleading in connection with your claim that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

- 13 -

thereunder, and Section 20(a) of the Exchange Act, including (i) the person who made the statement, (ii) when the statement was made, (iii) where the statement was made (*e.g.*, earnings call, conference, etc.), and (iv) to the extent the statement is in a document filed with the Securities & Exchange Commission, each person who signed an accompanying certification.

AMENDED RESPONSE TO INTERROGATORY NO. 8:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. Indiana objects to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession. Indiana also objects to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018). Indiana expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action. Indiana also objects to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'").

- 14 -

4904-7697-3491.v1

Subject to and without waiving the foregoing objections, Indiana responds as follows: The following statements were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of the Securities Exchange Act of 1934.

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| **No. 1** - Complaint, ¶100: May 27, 2021, Q1 2021 agilon health, inc. Earnings Call. | Sell emphasized his "***high degree of visibility*** into future revenues and margin progression." |
| **No. 2** - Complaint, ¶108: October 28, 2021, Form 8-K, agilon health Reports Third Quarter 2021 Results, signed by Bensley. | Sell touted agilon's "***high-visibility partnership model***," which he claimed "***deliver[s] predictable, quality outcomes***." |
| **No. 3** - Complaint, ¶109: October 29, 2021, Q3 2021 agilon health, inc. Earnings Call. | Sell touted agilon's full-risk model, claiming its ability to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." Sell also boasted of agilon's ability to "***drive sustainably lower cost[s]***." |
| **No. 4** - Complaint, ¶113: January 10, 2022, agilon health, inc. at JPMorgan Healthcare Conference. | Sell boasted of agilon's "distinguish[ed]," "high-touch" model and its ability to "manage costs" and deliver "predicable results" through "multiple surges" in utilization:<br><br>*I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver predictable results through each one of these surges.* We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.<br><br>* * *<br><br>[T]he quality of our economic model has allowed us and will continue to allow us to ***deliver predictable results in periods of volatility***. No one can predict exactly what the future is with this pandemic, but ***we know that we can deliver predictable results***. New government programs evolve over time, but ***we can deliver predictable results***. |
| **No. 5** - Complaint, ¶114: January 10, 2022, agilon | In response to an analyst's question regarding whether "there's any pent-up demand around things like elective surgeries" among |

- 15 -

**APP 723**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| health, inc. at JPMorgan Healthcare Conference. | agilon's patients, Sell dismissed the analyst's concern while referring back to agilon's "high-touch" model:<br><br>I don't know that we believe there's a massive set of pent-up demand, ***particularly in our model, because we've got those touchpoints***, and we've been working very closely with those senior patients, particularly those high-risk patients.  That's why that 50% increase in terms of touches with those patients yields such positive results. |
| **No. 6** - Complaint, ¶116: March 3, 2022, Form 8-K, agilon health Reports Fourth Quarter and Fiscal Year 2021 Results, signed by Bensley. | Sell underscored agilon's model's "***distinctive, predictable results*** . . . despite evolving COVID dynamics." |
| **No. 7** - Complaint, ¶129: May 11, 2022, agilon health, inc. at Bank of America Healthcare Conference. | During the presentation, an analyst asked Sell what "visibility you have . . . from a cost perspective . . . from the way that you've built your model."  In response, Sell emphasized that thanks to agilon's "high-touch" model, agilon's patients had avoided a "huge amount of deferred issues," stating:<br><br>"I mean I think ***one of the real differentiators in our model is in the high-touch nature*** between the primary care physician and the patient.  Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade.  And so we understand those groups very well.  As we bring them on board, ***we have great visibility from a cost perspective*** because we've got that experience with them.  We take a 12-month implementation period, which I think is distinctive.  And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective.  And so ***that visibility and that continuity is a big differentiator***."<br><br>"In COVID, what we were able to maintain was the touch points with these senior patients. . . . And I think that translated into ***more predictably from a cost perspective***, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points.  And ***we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues***." |
| **No. 8** - Complaint, ¶131: June 8, 2022, agilon health, inc. at William Blair Growth Stock Conference. | Bensley claimed that agilon did not just have a good handle on growth, costs and margins, but assured analyst and investors that "***[w]e have tremendous visibility*** into both growth and embedded margins in our existing PCP groups." |

- 16 -

**APP 724**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| **No. 9** - Complaint, ¶134: September 14, 2022, agilon health, inc. at Morgan Stanley Global Healthcare Conference. | Sell boasted: "[Two] points I would add that I think is kind of distinctive about our model that allows us to deliver *really predictable costs kind of quarter in, quarter out*, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side.  But the 2 things are: one, we work with existing doctors and existing patients and we take them through a 12-month implementation period.  So *when they go live, we have a very good idea of what that cost structure looks like* and a very good idea along -- what the revenues like.  But the second piece that I think is really important is, *we have this high-touch model.*" |
| **No. 10** - Complaint, ¶136: November 3, 2022, Q3 2022 agilon health, inc. Earnings Call. | In response to an analyst's question about the key drivers of agilon's medical margin, Sell emphasized that agilon's "newer partners" were excelling by leveraging agilon's platform and "high-touch model": |
| | "[W]e are experiencing the benefits of learning from our platform that is *allowing our newer partners to perform at the high end of our range*. |
| | \* \* \* |
| | I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of *the benefits of the high-touch model*, and it's coming through in terms of better satisfaction, *better health outcomes and ultimately lower costs and better margins overall.  So those are the things that I would really call out*." |
| **No. 11** - Complaint, ¶138: January 9, 2023, agilon health, inc. at JPMorgan Healthcare Conference. | Sell provided agilon's FY23 adjusted EBITDA guidance of $75 million to $90 million (compared to $4 million in 2022). |
| **No. 12** - Complaint, ¶140: March 1, 2023, Form 8-K, agilon health Reports Fourth Quarter and Fiscal Year 2022 Results, signed by Bensley; Q4 2022 agilon health, inc. Earnings Call. | agilon's results for the fourth quarter and full year ending December 31, 2022, included FY23 medical margin guidance of $535-$560 million and $75-$90 million adjusted EBITDA, respectively.  The same day, Sell and Bensley convened an investor call to discuss agilon's 4Q22 and FY22 financial results, during which Sell stated agilon was on track to post FY23 medical margin of nearly $550 million (compared to $304 million in FY22), explaining: |
| | "Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally." |
| **No. 13** - Complaint, ¶141: March 1, 2023, Q4 2022 | Sell further stated the maturation of agilon's member cohorts was driving sustained earnings growth: |

- 17 -

4904-7697-3491.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| agilon health, inc. Earnings Call. | "Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year." |
| **No. 14** - Complaint, ¶143: March 30, 2023, agilon health, inc. to Host Investor Day. | Sell highlighted that agilon was on track to post FY23 medical margin of $550 million. During the call, Bensley again emphasized agilon's accelerated growth in medical margin and adjusted EBITDA, stating:<br><br>"Adjusted EBITDA at agilon is inflecting in a positive way. That's driven by a – that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage. All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability. . . . We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond.<br><br>* * *<br><br>So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million.<br><br>* * *<br><br>Medical margins growing at even a faster rate with a 60% CAGR over that same time period. And we expect medical margin dollars to inflect up to about $550 million in 2023. That's an 80% year-over-year increase from what we just reported for 2022. And I think *that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership*." |
| **No. 15** - Complaint, ¶144: March 30, 2023, agilon health, inc. to Host Investor Day. | agilon published the below presentation slide in connection with the Investor Day, purporting to show the medical margin per-member-per-month ("PMPM") figures for each agilon "Market Class" from 2018 to 2023. Commenting on the slide during the Investor Day, Bensley underscored agilon's purportedly "*great visibility*" into the underlying drivers of agilon's medical margin. |

- 18 -

4904-7697-3491.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | |
| **No. 16** - Complaint, ¶146: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | agilon's financial results for the quarter ended March 31, 2023, reiterated agilon's FY23 medical margin and adjusted EBITDA expectations, confirming that agilon was on track to post FY23 medical margin of $535-$560 million. The release also explained that, beginning with its 1Q23 results, agilon was now including its geography entry costs in agilon's calculation of adjusted EBITDA, to comply with SEC guidance. Under its new calculation, agilon's FY23 adjusted EBITDA outlook from March 1, 2023 ($75-$90 million) was reduced by the amount of agilon's FY23 geography entry costs ($65-$78 million), yielding a FY23 adjusted EBITDA outlook of ($3 million) to $25 million. That same day, Sell and Bensley convened a conference call with investors to discuss agilon's 1Q23 financial results, during which Sell reiterated agilon's FY23 medical margin and adjusted EBITDA outlook previously provided on March 1, 2023, notwithstanding agilon's revised adjusted EBITDA calculation. |
| **No. 17** - Complaint, ¶148: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | agilon's 1Q23 results reflected $28.5 million in medical costs associated with medical services rendered in 2022. During the May 9 call, an analyst observed there were "a lot of questions around cost trends," and asked "what drove the [$28.5 million] PYD" (*i.e.*, the "prior year development"). Bensley downplayed the significance of the charge in response, assuring that it was largely due to "a couple of old" claims, and did not signify any fundamental issues with agilon's model or level of visibility. |
| **No. 18** - Complaint, ¶149: May 9, 2023, Form 8-K, agilon health Reports First Quarter 2023 Results, signed by Bensley; Q1 2023 agilon health, inc. Earnings Call. | When asked by an analyst to discuss the cost trends agilon was seeing, Sell assured that "utilization was very much in line with what we would expect," while adding "the power of the primary care physician touch points were really strong in the quarter." |
| **No. 19** - Complaint, ¶151: | Bensley attributed members' declining medical costs to agilon's |

- 19 -

4904-7697-3491.v1

APP 727

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| May 11, 2023, agilon health, inc. at Bank of America Global Healthcare Conference. | model:<br><br>"[T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024. . . . *[O]ur model is so geared to improving the quality and outcome for our patients that actually drives cost down*."<br><br>"When there is a pretty good high benchmark year, the differential between that benchmark revenue rate and what we're doing in cost just gets wider. And so that drives a higher point of inflection because *our costs continue to just go in the right direction* because of all the things that Kenny [Bellendir, agilon's Markets CFO] was talking about." |
| **No. 20** - Complaint, ¶155: June 7, 2023, agilon health, inc. at William Blair Growth Stock Conference. | Bensley reiterated agilon's FY23 outlook of approximately $550 million in medical margin. After touting agilon's "tremendously high visibility to growth" and "really good forward-looking visibility to our future growth," Bensley added:<br><br>And we also have a process in which we implement our new markets up to 12 months before going live. *So long before we go live, we have really, really strong visibility into exactly what's happening.* So right now, for the class of 2024, we're already implementing those partners, and we have good visibility into not only what that membership is but what the economics for that cloud will look like going into 2024.<br><br>* * *<br><br>So as our members and our partners mature on the agilon platform, margins grow over time. And as Steve said, I'll show you a really great slide as exactly how that's been working in practice. *So we have really great confidence and visibility in our long-term value drivers.* And right now, our EBITDA has actually been inflecting positive year-over-year. |
| **No. 21** - Complaint, ¶156: June 7, 2023, agilon health, inc. at William Blair Growth Stock Conference. | Near the end of the call, Sell reiterated agilon's "really strong start this year," adding "I don't know many businesses that show an 88% step-up in their main margin metric [medical margin]. We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent." |
| **No. 22** - Complaint, ¶158: August 3, 2023, Form 8-K, agilon health Reports Second Quarter 2023 | agilon's financial results for the quarter ended June 30, 2023, reported a $138 million medical margin, $10 million adjusted EBITDA, and a $17 million net loss for 2Q23. The release also stated agilon's 2Q23 medical margin increased 69% compared to |

- 20 -

4904-7697-3491.v1

**APP 728**

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| Results, signed by Bensley. | 2Q22 ($82 million).  In the release, Sell claimed "[t]he *durability and predictability of our partnership model* enabled agilon to deliver strong performance during the second quarter and first half of 2023." |
| **No. 23** - Complaint, ¶159: August 3, 2023, Form 8-K, agilon health Reports Second Quarter 2023 Results, signed by Bensley. | The release also stated that agilon lowered its FY23 medical margin by approximately $32.5 million (from $535-$560 million to $500-$530 million), while *raising* its FY23 adjusted EBITDA guidance to $0-23 million. |
| **No. 24** - Complaint, ¶160: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell highlighted agilon's 69% year-over-year growth in medical margin, emphasizing that agilon's "profitability gains [were] even more outsized on an underlying basis" given "MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA." |
| **No. 25** - Complaint, ¶161: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell dismissed concerns that higher industry utilization rates were impacting agilon, asserting that agilon's model "insulated" agilon from "spikes" in utilization rates:<br><br>"One theme I would like to drive home, given all of the speculation on utilization trends is that *different models will yield different outcomes.  agilon's model is distinctively different and more durable and predictable in driving cost and quality results* compared to the broad fee-for-service system, which predominates across health care today.<br><br>Let me highlight how we are producing such *strong and predictable results* and what drives our forward confidence in the business.  First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care.  We do not take risk on a broad set of patients in an unmanaged fee-for-service system.  Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.<br><br>* * *<br><br>*We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization*." |
| **No. 26** - Complaint, ¶162: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell further sought to quell concerns about utilization rates by assuring investors that agilon was actually "tracking ahead" of its expected utilization rates, stating:<br><br>"Second point on differentiation.  For our members, our year-to-date *composite utilization trend is in line or better than our* |

- 21 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *expectations*.  Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range.  Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.<br><br>        All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date." |
| **No. 27** - Complaint, ¶163: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell added that agilon's strong "visibility" and "active management" of utilization rates further bolstered the reliability of agilon's earnings estimates, stating:<br><br>        Third, *our model has natural advantages in terms of leading indicators and visibility*.  From an operational standpoint, we are not just receivers of macro utilization trends.  Our teams are actively managing utilization on the ground every day.  This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers.  Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete.  *We have not seen any meaningful change in our expected cost trend, including outpatient procedures*. |
| **No. 28** - Complaint, ¶164: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell also claimed that agilon's unique business model "buffers our financial results up and down":<br><br>        "Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down.  As a result, *we are able to guide to relatively tight ranges* on medical margin and adjusted EBITDA *and absorb puts and takes* that may arise during a given period." |
| **No. 29** - Complaint, ¶165: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Sell further emphasized the "predictability" of agilon's business model, stating:<br><br>        Ultimately, the *durability and predictability of our model* has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, *even as some health plans with broad fee-for-service networks are seeing pockets of higher costs*.  Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability. |

- 22 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | As we have discussed previously, we operate in a very forward-looking model.  ***And our visibility on the key levers for driving next year's performance is quite high***.<br><br>* * *<br><br>Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023.  This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.<br><br>On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations.  This is obviously important as you think about the stepping off point for 2024. |
| **No. 30** - Complaint, ¶166: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Bensley highlighted agilon's 69% year-over-year medical margin growth, and touted that "the strength and durability of [agilon's] business model has enabled us to . . . improve our adjusted EBITDA outlook," adding that agilon's "updated outlook reflects our decision to strengthen our MA reserves in 2023 while embedding a range of scenarios on utilization and cost trend." Bensley also referred investors to the market class data from agilon's 2023 Investor Day (¶144), claiming the data presented a "really . . . good indicator of exactly where we expect them to be from a medical margin standpoint." |
| **No. 31** - Complaint, ¶167: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | In response to an analyst's request for "clarifications" regarding agilon's medical cost trend, and the reasoning behind increasing agilon's reserves, Bensley concealed the dramatic utilization spike witnessed in May-June, while assuring investors that the decision to increase agilon's reserves was merely a precaution for the possibility that "there could be a change, for instance, in utilization trends in the second half" of the year:<br><br>"So rather than saying, hey, this percentage of this is for this or this is for that, we've looked at the range of potential outcomes that can happen in the second half.  Want to make sure that we've got enough reserve to minimize the probability of any prior period development going into next year, and that would include things like ***being respectful of the fact that there could be a change, for instance, in utilization trends in the second half***.  So I don't want to quantify it and break it out into components other than to say, we've tried to increase the strength of the reserves to cover that sort of range of outcomes." |

- 23 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| **No. 32** - Complaint, ¶168: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | Bensley also reassured that agilon's increase in reserves was merely intended to cover the "possibility" of a "change [in] utilization in the back half of the year": <br><br> "And when we talk about then the strengthening of our reserves that are in our guidance, we've essentially said, hey, with the understanding that our reserve should probably be stronger in terms of the range of potential reserves that we could build, both because of those potential blind spots and also just to cover for the possibility and be respectful of the fact that *there may be some change and [sic] utilization in the back half of the year*." |
| **No. 33** - Complaint, ¶169: August 3, 2023, Q2 2023 agilon health, inc. Earnings Call. | In response to a Wells Fargo analyst's question regarding "how closely is ACO REACH claims data track with your actual [Medicare Advantage] claims experience," and corresponding request that Sell and Bensley "be as specific as possible about what your level of claims visibility is for [2Q23]," Sell assured that agilon possessed "incredible" visibility into its members' medical costs and utilization, stating: <br><br> "So I think *our visibility is extremely strong*, Stephen, and we have high confidence. I think *it's a function of our model, which is very different*, right? We are on the ground with PCPs every day, we are managing those most complex patients. And so we're trying to better identify them and make sure the PCP and the care teams are aware of them and then make sure that they are engaged in our clinical programs. <br><br> The data that we are receiving is in particular, focused on those highest cost settings like inpatient and ER. And we put that together, we're able to drive the type of results that I talked about with inpatient down in the flat to down in the midsingle digit range. <br><br> From a claims perspective, to specifically answer your question, we are 90% complete on our May year-to-date reach claims. And so *there is incredibly high visibility*. There is a lag on the MA claims, and Tim talked about the actions we're taking from a reserving perspective to protect ourselves on a go-forward basis. <br><br> But same markets, same doctors, same clinical programs, we're able to correlate these clinical programs and indicators with claims. *And so we feel like we have an incredible level of visibility on that*. And I think the last thing I would just say is, I think we've demonstrated that *our model really stands out in higher utilization periods that broader fee-for-service markets are seeing*. <br><br>                      * * * |

- 24 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | Year-to-date, we have seen a 28% increase in the 2-day discharge visit back with the PCP versus where we were at last year. It substantially reduced the readmit rate and that has substantially led to that inpatient trend, which is flat to down in that mid-single-digit range. So I think this is an area where we feel like we have incredible confidence. The REACH comparison set gives us great visibility on the claims side that matches up with those operational indicators." |
| **No. 34** - Complaint, ¶170: August 3, 2023, Q2 2023 Report on Form 10-Q, signed by Bensley. | agilon's 2Q23 Report on Form 10-Q included the medical margin and adjusted EBITDA results provided in the 2Q23 Release, and claimed that agilon's 2Q23 medical margin increased 69% compared to 2Q22. |
| **No. 35** - Complaint, ¶171: September 6, 2023, agilon health, inc. at Wells Fargo Healthcare Conference. | During the call, an analyst observed that "utilization has been a huge area of focus" and asked Bensley "what you're seeing on the utilization front." Concealing the significant utilization spike in May-June 2023, Bensley responded that agilon's "power[ful]" model was "***driv[ing] utilization down***," noting:<br><br>"[O]bviously, there has been a lot of focus on utilization coming through the first half of the year. And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model. I know that sounds like it's simple, but ***our model is essentially designed to have a more efficient and really more consistent impact on utilization than probably just any other model out there,*** just certainly the normal fee-for-service environment.<br><br>. . . But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients that then essentially over time does have that kind of leveling impact on utilization.<br><br>It also helps us ***drive utilization down*** below what the overall, I think, fee-for-service environment would be. . . .<br><br>What we have much better continuity of care. We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen. I think that has the impact of both ***lowering utilization*** as well as having ***more consistent utilization*** over time. It may even have a positive impact on ***avoiding some of the pent-up demand issues that came out of post-COVID***.<br><br>Having said that, you can see the results in our numbers. So when we came out and talked about Q2, we said that we're not only |

- 25 -

4904-7697-3491.v1

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | seeing – that we're beating kind of the average utilization on the inpatient side.  And by the way, of course, inpatient is by far the largest part of our cost basis.  We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2.<br><br>Now at the same time, of course, we have been seeing pretty large increases in outpatient.  ***That's a smaller portion of the overall cost pie.  And so the inpatient decrease is more than offsetting that***." |
| **No. 36** - Complaint, ¶172: September 12, 2023, agilon health, inc. at Morgan Stanley Global Healthcare Conference. | In response to an analyst's request for "a more recent update on utilization," Bensley responded that "we're seeing [] an absolute decrease in patient utilization," reassured investors of the "guidance that we put forward for the balance of the year," and reiterated agilon's 2023 profit outlook:<br><br>"Yes.  I mean, we haven't given a kind of inter-quarter update.  We'll give one here in a bit when obviously we report Q3.  It was interesting when we were coming through Q2 that's where we started to – and everyone else are to hear some commentary from the big payers that, hey, there may be some kind of a spike going on utilization.  Of course, when we reported Q2, we hadn't seen that in our numbers yet.  And in fact, our performance is more along the lines of what Steve was saying.  But even in that higher rate environment or ***even potentially***, I'm sorry, ***in that higher utilization environment, we were pretty encouraged obviously by the overall trends that we're seeing in an absolute decrease in patient utilization***.  Mean we are seeing, and we have been seeing, just like everybody else was talking about an increase in outpatient, but that's not really new to us, right?"<br><br>We've been talking about that now for a number of quarters even coming through last year that there's been some shift, I think, going on in terms of side of service for procedures from inpatient to outpatient.  But ***the overall decrease in inpatient, which is by far the largest bucket of cost for us has obviously been offsetting that***.  So – but the second thing that we did, of course, coming through that and hearing that commentary from the payers was we also strengthened our reserves for somewhat in Q2 and then also in our guidance for balance of the year, with the understanding that if there – ***if we do that at some point, see that, that – there was some kind of a spike up or an increase in utilization*** that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there.<br><br>And all of that, ***notwithstanding any commentary from the*** |

- 26 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| | *payers and utilization leads us to believe we're well reserved* and we feel really confident with the guidance – with that guidance that we put forward for the balance of the year. |
| **No. 37** - Complaint, ¶174: November 2, 2023, Form 8-K, agilon health Reports Third Quarter 2023 Results, signed by Bensley. | agilon's financial results for the quarter ended September 30, 2023, reported a $108 million medical margin, negative $6 million adjusted EBITDA, and a net loss of $31 million.  agilon also reported that 3Q23 medical margin increased 42% compared to 3Q22 ($76 million), and confirmed the Company remained on track to post FY23 medical margin and adjusted EBITDA of $455-$470 million and $6-$18 million, respectively. |
| **No. 38** - Complaint, ¶176: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Sell reassured investors that, notwithstanding the utilization spike that began in May 2023, "[a]ll of [agilon's] key financial metrics were generally in line or above our guidance ranges," and that agilon's "results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth." |
| **No. 39** - Complaint, ¶177: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Sell further stated that agilon's "more conservative reserving approach" was "intentionally reflected in [its] medical margin outlook for [Medicare Advantage] and will support [its] future performance in 2024," and agilon's "ability to execute against [its] adjusted EBITDA targets during 2023 and enhance [its] visibility to 2024 continues to reflect the strength and durability of [its] model." Sell also reassured investors that he "remain[s] highly confident in the trajectory of our adjusted EBITDA," adding "our visibility into the key drivers for next year's performance are quite high." |
| **No. 40** - Complaint, ¶178: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Referring to agilon's 3Q23 medical margin, Bensley assured that miss "was primarily driven by performance in Hawaii" – which agilon had recently sold – and a "negative claims development this quarter [that] was almost entirely isolated to system issues with a single payor related to supplemental benefit costs."  Bensley also emphasized that medical margin had "*increased 42% year-over-year*." |
| **No. 41** - Complaint, ¶179: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | In response to an analyst's question about the 2Q23 spike in medical costs and patient utilization, Sell again denied that agilon was experiencing abnormal utilization trends, stating:<br><br>"From a utilization perspective, composite utilization was in line with our overall expectations.  As Tim kind of outlined, *we did see a step-up in Q2 utilization* in MA and REACH.  The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period.  *In Q3, we've seen a deceleration*.  And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [posture] that Tim talked about in terms of an extra $3 million [sic]." |
| **No. 42** - Complaint, ¶180: November 2, 2023, Q3 | Bensley added that utilization trends had "greatly started to moderate in June," which he once again claimed demonstrated the |

- 27 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| 2023 agilon health, inc. Earnings Call. | "strength of [agilon's] model": |
| | "In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward. As it turned out, as we just reported, *we did see some increased utilization in May that was – greatly started to moderate in June*. And as we've seen so far, started to – continued to moderate in early Q3 as well. |
| | I'm not completely surprised by that. Compared to some of the comments that I've made from some of the big payers, I mean I think our model and even some of them have said should be performing better than the average out there. So the *fact that we saw a spike up and some moderation down is probably just a factor also of the strength of our model*." |
| **No. 43** - Complaint, ¶181: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | During the call, an analyst asked Sell what "you are seeing in terms of utilization trends," to which Sell responded: |
| | "In terms of our PPO experience, we've talked about this before. We are probably the largest risk-based player in terms of PPO in the country. Our PPO business is just over 50% of our membership, it's also the fastest-growing component. And our PPO business is – performance is in line with our HMO business. |
| | And I think the reason for that is *the differences in our model*. [A] large payer with a broad network versus *our high-touch PCP patient model, which has the ability to guide that patient on where they're going to go for specialty care*. At our Investor Day, we shared over 90% of specialty referrals come through that primary care physician even in a PPO model, that is allowing us to really deliver cost-effective care. And so our PPO experience is very strong." |
| **No. 44** - Complaint, ¶182: November 2, 2023, Q3 2023 agilon health, inc. Earnings Call. | Bensley assured that agilon's increased reserves simply reflected a "*more conservative reserving posture*," rather than any fundamental deterioration in the business, and would "provide a strong foundation for future performance while still modestly raising our adjusted EBITDA guidance." |
| **No. 45** - Complaint, ¶183: November 2, 2023, Q3 2023 Report on Form 10-Q, signed and certified by Sell and Bensley. | agilon's Report on Form 10-Q for the 3Q23 included the medical margin and adjusted EBITDA results provided in the 3Q23 Release, and represented that agilon's medical margin increased 42% in 3Q23 compared to 3Q22. |
| **No. 46** - Complaint, ¶185: | Sell reassured investors that adverse medical costs trends were |

- 28 -

| STATEMENT | SPEAKER/FALSE AND MISLEADING STATEMENT |
|---|---|
| November 14, 2023, agilon health, inc. at Wolfe Research Healthcare Conference. | "moderating," and that agilon remained on track to meet its FY23 guidance. Bensley similarly assured that "as we came through July and June, those same [utilization cost] categories continue to moderate – moderated back down," adding "[w]e didn't see like a huge spike up in utilization that's continue[d] . . . all 3 of them moderated back down." |
| **No. 47** - Complaint, ¶186: November 14, 2023, agilon health, inc. at Wolfe Research Healthcare Conference. | Bensley affirmed the Company's reserving included a "***decent amount of conservatism***," stating that agilon was appropriately reserved and that there would be no more negative surprises heading into 2024:<br><br>"Yes. I mean our objective is to say, hey, let's put enough into our outlook for the year to make sure that we're covering those – that potential that we could see actually higher utilization. So that's why we picked that right now, we picked that original 60 up to 90 when we saw what was actually coming through Q2. So that's what gets you that kind of $10 million incremental versus the asset that we would have given to go. But the idea is, yes, that we're going to end the year with that's going to be – put us in a very good position to be appropriately accrued for the year.<br><br>You can look at it on a net basis, but there's no reason why we would expect to have. We shouldn't be going into a year with a significant underaccrual of our cost stand-alone either." |
| **No. 48** - Complaint, ¶189: January 5, 2024, Form 8-K, agilon health Provides 2023 Guidance Update, Initial 2024 View, signed by Bensley. | agilon issued a release revising agilon's FY23 guidance, introducing its FY24 guidance, and withdrawing its FY26 guidance. agilon stated it would generate FY23 medical margin of $340-$360 million and adjusted EBITDA of negative $55-$69 million. For FY24, agilon projected $560-$600 million of medical margin and adjusted EBITDA of $40-$60 million. |
| **No. 49** - Complaint, ¶190: January 5, 2024, agilon health, inc. Guidance Call. | In response to an analyst's question regarding whether any of agilon's "individual markets" were "losing money," Sell represented that only one market "would run at a loss for 2023," which Bensley confirmed stating "one market . . . gets below breakeven market EBITDA in 2023." |

INTERROGATORY NO. 9:

For each statement identified in response to Interrogatory No. 8, describe in detail how the statement was false or misleading when made, including any material fact that was omitted.

- 29 -

AMENDED RESPONSE TO INTERROGATORY NO. 9:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. Indiana objects to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession. Indiana also objects to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018). Indiana expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action. Indiana also objects to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just recently begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'"). Indiana further objects to this Interrogatory on the grounds that it seeks or requires the disclosure of information that is protected from discovery by the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Indiana responds as follows: Plaintiff incorporates its response to Interrogatory No. 8 herein. Statements 1, 8, 12-17, 20-23, 28-

- 30 -

4904-7697-3491.v1

**APP 738**

29, 33-34, 39-40, 44, 48-49 (*see* ¶¶100, 131, 138, 140-141, 143-144, 146, 148, 155-156, 158-159, 164-165, 169-170, 177-178, 182, 189-190) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's visibility into the Company's operations, financial performance, and results; (ii) the predictability of agilon's operations, financial performance, results, and drivers of key metrics; (iii) agilon's financial performance and results, including the accuracy of agilon's publicly-reported financial results; (iv) the reliability of agilon's financial results, guidance and forecasts; (v) the quality, reliability, completeness, or other features of the data and information underlying agilon's financial results, guidance, or forecasts; (vi) the impact on agilon's results and performance of, *inter alia*, unreliable or incomplete data and information, patient utilization rates (including changes or spikes in utilization rates), medical expenses, and pent-up demand or demand backlog; (vii) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; (viii) agilon's patient utilization and utilization rates (including changes or spikes in utilization rates); and (ix) agilon's pent-up demand or demand backlog, including the impact of pent-up demand or demand backlog on agilon's financial performance and results. Additional reasons why the above statements were false and misleading can be found in the Complaint at ¶112 (regarding the statements in ¶100), ¶137 (regarding the statements in ¶131), ¶157 (regarding the statements in ¶¶138, 140-141, 143-144, 146, 148, 155-156), ¶173 (regarding the statements in ¶¶158-159, 164-165, 169-170), ¶188 (regarding the statements in ¶¶177-178, 182), and ¶191 (regarding the statements in ¶¶189-190), and are incorporated by reference herein.

Statements 2-4, 6-7, 9-10, 19, 22, 27, 30-31, 38-39 (*see* ¶¶108-109, 113, 116, 129, 134, 136, 151, 158, 163, 166-167, 176-177) were materially misleading and contained untrue statements of

- 31 -

material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's visibility into the Company's operations, financial performance, and results; (ii) the predictability of agilon's operations, financial performance, and results; (iii) the impact on agilon's results and performance of agilon's business model or certain aspects or features of agilon's business model; (iv) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; and (v) agilon's exposure to pent-up demand or demand backlog. Additional details why the above statements were false and misleading can be found in the Complaint at ¶112 (regarding the statements in ¶¶108, 109), ¶137 (regarding the statements in ¶¶113, 116, 129, 134, 136), ¶173 (regarding the statements in ¶¶158, 163, 166-167), ¶188 (regarding the statements in ¶176-177), and are incorporated by reference herein.

Statements 5, 18, 25-26, 31-32, 35-36, 41-43, 46-47 (*see* ¶¶114, 149, 161-162, 167-168, 171-172, 179-181, 185-186) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's patient utilization and utilization rates (including changes or spikes in utilization rates); (ii) agilon's ability to accurately and reliability track, report and forecast medical costs, medical margin, medical revenue, and other metrics; (iii) the impact on agilon's results and performance of, *inter alia*, patient utilization and utilization rates (including changes or spikes in utilization and utilization rates), or agilon's business model; (iv) agilon's pent-up demand or demand backlog, including the impact of pent-up demand or demand backlog on agilon's financial performance and results, and agilon's exposure to pent-up demand or demand backlog; and (v) agilon's exposure to changes or spikes in patient utilization and

- 32 -

4904-7697-3491.v1

utilization rates, and ability to avoid or otherwise respond to changes or spikes in patient utilization and utilization rates. Additional details why the above statements were false and misleading can be found in the Complaint at ¶137 (regarding the statements in ¶114), ¶157 (regarding the statements in ¶149), ¶173 (regarding the statements in ¶¶161-162, 167-168, 171-172), ¶188 (regarding the statements in ¶¶179-181, 185-186), and are incorporated by reference herein.

Statements 21-22, 24, 30, 37-38, 40, 45 (*see* ¶¶156, 158, 160, 166, 174, 176, 178, 183) were materially misleading and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including because they misrepresented or omitted material facts regarding, *inter alia*: (i) agilon's financial performance and results for the second and third quarters of 2023 (including understatement of medical expenses and overstatement of medical margins); (ii) the impact on agilon's results and performance of, *inter alia*, unreliable or incomplete data and information, patient utilization rates (including changes or spikes in utilization rates), medical expenses, and pent-up demand or demand backlog; and (iii) agilon's ability to accurately and reliability track, report, and forecast key financial metrics. Additional details why the above statements were false and misleading can be found in the Complaint at ¶157 (regarding the statements in ¶156), ¶173 (regarding the statements in ¶¶160, 158, 166), ¶188 (regarding the statements in ¶¶174, 176, 178, 183), and are incorporated by reference herein. Indiana also directs Defendants to the Complaint, which contains additional details regarding how the alleged misstatements were false or misleading.

<u>INTERROGATORY NO. 10</u>:

For each statement identified in response to Interrogatory No. 8, explain in detail your contention that the facts stated or omitted were material.

- 33 -

AMENDED RESPONSE TO INTERROGATORY NO. 10:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  Indiana objects to this Interrogatory as overbroad, unduly burdensome, and not proportionate to the needs of the case.  Indiana also objects to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just recently begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun.  *See Blank v. Tomorrow PCS, L.L.C.*, 2018 WL 3136002, at *5 (E.D. La. June 27, 2018) ("'most courts agree that "[d]ue to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted – typically at the end of the discovery period"'").  Indiana also objects to this Interrogatory on the grounds that it seeks or requires the disclosure of information that is protected from discovery by the attorney work product doctrine.  Indiana also objects to this Interrogatory as overbroad and unduly burdensome because it seeks information that is publicly available or already in Defendants' possession.  Indiana also objects to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33. *See, e.g.*, *Moser v. Navistar Int'l Corp.*, 2018 WL 3614012, at *6-*9 (E.D. Tex. July 27, 2018).  Indiana expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent Court order modifying such limitations in the above-captioned action.

- 34 -

Subject to and without waiving the foregoing objections, Indiana responds as follows: A reasonable trier of fact could determine that the statements identified in response to Interrogatory No. 8 satisfy the standard for materiality based on the facts alleged in the Complaint, which the Court has determined to be legally sufficient to satisfy each element of the alleged claims, including materiality. In addition to the information set forth in the Complaint, Lead Plaintiffs incorporate by reference their Response to Interrogatory No. 9, which sets forth additional details as to why the alleged false and misleading statements were material.

<u>INTERROGATORY NO. 11</u>:

For each statement identified in response to Interrogatory No. 8, explain in detail your contention as to when and how the market learned the truth, including but not limited to the verbatim statement that revealed the truth, the person who made the statement, and where the statement was made (*e.g.*, earnings call, conference, etc.).

<u>AMENDED RESPONSE TO INTERROGATORY NO. 11</u>:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. Indiana objects to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun. Indiana also objects to this Interrogatory to the extent it prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures. Indiana also objects to this Interrogatory as compound, as it contains multiple subparts seeking discrete information, but

- 35 -

purports to count as only one interrogatory for purposes of the limitations set forth in Federal Rule of Civil Procedure 33.

Subject to and without waiving the foregoing objections, Indiana responds as follows:

On November 2, 2023, after the market closed, agilon announced its financial results for the quarter ended September 30, 2023, and held a conference call with investors to discuss agilon's third quarter 2023 financial results. The Company revealed medical margin of $108 million for the quarter, far below expectations. In addition, the Company also disclosed that it suffered quarterly adjusted EBITDA of negative $6 million. The Company also sharply lowered agilon's FY23 medical margins to a range of just $455-$470 million. On the conference call, defendants Sell and Bensley revealed that agilon had suffered higher patient utilization rates earlier in the year (notwithstanding their prior representations to the contrary), had already significantly drawn down the reserves agilon had set aside earlier in the year to cover increased medical costs, and was adding an additional $30 million to its reserves because of the potential for higher utilization trends to continue in the future.

On January 5, 2024, before the market opened, agilon issued a release revising agilon's FY23 guidance, introducing its FY24 guidance, and withdrawing its FY26 guidance, and revealed that it had suffered dramatically higher prior medical expenses than previously revealed and, as a result, agilon was lowering its FY23 expected medical margin to $340-$360 million, or approximately $112 million (24%) below the already substantially reduced guidance and nearly $200 million (36%) below agilon's original FY23 medical margin guidance. agilon also disclosed its FY23 adjusted EBITDA would not be $6-$18 million as previously represented in November 2023, but rather would be a loss of $55-$69 million. The Company also disclosed that:

> During 2023, agilon health experienced an increase in medical expenses attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical

- 36 -

**APP 744**

admissions.  While a number of programs have been launched to improve visibility, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

The Company revealed that its 3Q23 medical margin of $108 million had been overstated by at least $31 million (40%), and thus agilon's 3Q23 medical margin had been flat (at best) compared to 3Q22.  agilon also revealed that, due to higher-than-reported medical costs from 2Q23, rather than having increased 69% year-over-year versus 2Q22, agilon's 2Q23 medical margin had remained relatively flat compared to 2Q22.

agilon also provided a dismal FY24 outlook, including medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million, and withdrew its FY26 guidance, which the Company had reaffirmed only seven weeks earlier.  The Company also revealed that it had failed to provide new physicians that had joined agilon's mature markets with the basic onboarding and education needed to integrate into the agilon partnership, that these newer physicians had been dragging down medical margins as a result, and that agilon would need to provide the necessary onboarding and education to these physicians, meaning that agilon would incur additional onboarding and education costs in FY24 and going forward.

The Company also announced that Bensley would be stepping down as CFO of agilon.  Sell and Bensley convened an investor call that day, during which Sell admitted that agilon had failed to incorporate both "elevated cost trends" and the "magnitude and source of the utilization shifts" in the forecasts provided to investors.  Rather than the industry-leading utilization trends that defendants represented throughout the Class Period and held up as validation of agilon's business model, Sell stated that agilon was in fact suffering "cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs."  Sell also acknowledged that the increased utilizations, which would "persist through 2024," were due to a

- 37 -

"backlog of pent-up demand from COVID." Bensley, meanwhile, admitted that agilon was not on track to generate positive cash flow in 2024.

On February 27, 2024, after the market closed, agilon announced its 4Q23 and FY23 financial results, revealing that agilon's medical costs and patient utilization rates were even higher than the Company had previously reported, causing the Company to widely miss the guidance it had provided less than eight weeks earlier. agilon revealed: (i) it had suffered an additional $38 million in undisclosed net medical costs during 4Q23, as well as $13 million in additional medical costs from prior to 4Q23; (ii) its actual FY23 medical margin ($299 million) was $41-$61 million less than agilon had announced less than eight weeks earlier; and (iii) it incurred a FY23 net loss of $263 million, and FY23 adjusted EBITDA of negative $95 million. agilon also announced it had drastically lowered the FY24 guidance it had just given in January, including medical margin by 25%-29% (from $560-$600 million to $400-$450 million) and adjusted EBITDA guidance by 125%-250% (a $40-$60 million gain to a $15-$60 million loss).

In its FY23 Report on Form 10-K filed on the same day, agilon also revealed a previously undisclosed material weakness in the Company's ICFR concerning agilon's medical claims and related payables (*i.e.*, amounts agilon owed for its members' healthcare), acknowledging that the material weakness rendered agilon's DCP ineffective and noting:

> Management has identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, risk adjusted premium revenue and certain care management expenses.

*     *     *

> In 2023, we identified certain sources of information utilized in our medical claims and related payables, risk adjusted premium revenue, and care management expense processes that contained specific data attributes utilized in executing an internal control by management. Management did not sufficiently design controls or control activities to ensure the completeness and accuracy of the related IPE in executing certain controls associated with these processes.

- 38 -

agilon also published the following slide on February 27, 2024, indicating that the medical margin figures for multiple market classes reported during agilon's March 30, 2023 Investor Day (*see* ¶144), and again highlighted on agilon's August 3, 2023 call (*see* ¶166), had been overstated, including by 8%-23% for FY21 and 12%-26% for FY22:



agilon further revealed that the Company was scaling back its aggressive membership growth, and that its next cohort of new Medicare Advantage members contained approximately 60,000 patients, less than half the size of the cohort that had went "live" in January 2024.

**As to Statements 1-36**, the alleged corrective disclosures set forth above on November 2, 2023, January 5, 2024, and February 27, 2024.

**As to Statements 37-47**, the alleged corrective disclosures set forth above on January 5, 2024 and February 27, 2024.

**As to Statements 48 and 49**, the alleged corrective disclosures set forth above on February 27, 2024.

- 39 -

<u>INTERROGATORY NO. 12</u>:

Explain in detail your contention that "all purchasers of agilon common stock during the Putative Class Period suffered similar injury through their purchases of agilon common stock at artificially inflated prices and a presumption of reliance applies" as alleged in paragraphs 248 and 249 of the Complaint.

<u>AMENDED RESPONSE TO INTERROGATORY NO. 12</u>:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions.  Indiana objects to this Interrogatory on the grounds that it calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation, as fact discovery remains ongoing, Defendants had produced only minimal internal documents by May 2026, Defendants have just begun to produce substantive numbers of documents, Defendants have impeded the productions of documents by third parties, Defendants have not completed document production, and fact depositions have not yet begun.  Indiana also objects to this Interrogatory to the extent it prematurely seeks the disclosure of expert opinion before the Court-ordered deadline for expert disclosures.

Subject to and without waiving the foregoing objections, Indiana responds as follows: Plaintiffs allege that Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for agilon common stock, and the price of agilon's common stock declined as artificial inflation came out of the stock's price through a series of partial disclosures.  Plaintiffs also allege that Plaintiffs and the Class would not have purchased agilon common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false and misleading statements and omissions.  Plaintiffs and all other members of the proposed class are entitled to invoke the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224, 242

- 40 -

(1988), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). This presumption recognizes that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton*, 573 U.S. at 283-84. As demonstrated in Plaintiffs' Opposed Motion for Class Certification (ECF 105) and in accompanying Expert Report of Matthew D. Cain, Ph.D. ("Cain Report"), agilon common stock traded in an efficient market throughout the Class Period. *See* Cain Report, ¶¶37-95, 123. Because all relevant factors are met, classwide reliance is presumed. *Basic*, 485 U.S. at 242; *Halliburton*, 573 U.S. at 279; *see* Complaint, §VI (the alleged misstatements and omissions were made publicly); ECF 11-3 (Plaintiffs purchased agilon common stock between when the misstatements and omissions were made and the truth was revealed).

INTERROGATORY NO. 14:

For each Plaintiff individually, explain in detail your effort and time spent participating in, monitoring, supervising, and managing this action, including but not limited to steps taken to monitor lead counsel.

AMENDED RESPONSE TO INTERROGATORY NO. 14:

Indiana incorporates herein the Introduction and Reservation of Rights, General Objections, and Specific Objections to Definitions and Instructions. Indiana specifically objects to this Interrogatory as premature, overbroad, and unduly burdensome. Indiana also objects to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege, protection, or immunity. Indiana further objects to this Interrogatory to the extent it seeks information that is not relevant to any party's claims or defenses.

- 41 -

- 42 -

Subject to and without waiving the foregoing objections, Indiana responds as follows: Since its appointment as Lead Plaintiff in this action, Indiana has demonstrated their willingness and ability to serve an active role in this case, and protect the interests of the members of the proposed Class. Indiana has done so by, among other things: (i) filing the Complaint; (ii) defending Lead Plaintiffs' and the proposed Class' claims through the motion to dismiss stage (ECF 55, 63); (iii) exchanging initial disclosures with Defendants pursuant to Federal Rule of Civil Procedure 26(a)(l)(A); and (iv) vigorously pursuing document and other discovery from Defendants, as well as third parties. In addition to pursuing discovery from Defendants and third parties, Indiana has also received, and submitted responses and objections to, 51 document requests propounded by Defendants, as well as gathered and produced documents in response to Defendants' requests; and have responded to Defendants' interrogatories. Indiana has, throughout the litigation, diligently supervised and directed the efforts of proposed class counsel to obtain the maximum recovery possible for the proposed Class, and will continue to do so. In addition, Indiana refers Defendants to Plaintiffs' Joint Declaration in Support of Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, filed May 20, 2024. *See* ECF 11-5.

DATED: June 10, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS
(admitted *pro hac vice*)
CHRISTOPHER D. STEWART
(admitted *pro hac vice*)
EVELYN SANCHEZ GONZALEZ
(admitted *pro hac vice*)
JACK K. SCOTT
(admitted *pro hac vice*)


                    s/ Christopher D. Stewart
CHRISTOPHER D. STEWART

- 42 -

4904-7697-3491.v1

**APP 750**

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
cstewart@rgrdlaw.com
egonzalez@rgrdlaw.com
jscott@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel

- 43 -

4904-7697-3491.v1

**VERIFICATION**

I, Jeffrey Gill, state and declare as follows:

1.    I serve as the Chief Legal and Compliance Officer for Indiana Public Retirement System ("Indiana"). I am authorized to make this verification on Indiana's behalf, and make this verification for that reason.

2.    I have reviewed Lead Plaintiff Indiana Public Retirement System's Amended Responses and Objections to the agilon Defendants' First Set of Interrogatories to Lead Plaintiffs (the "Interrogatory Responses"). To the best of my knowledge, information, and belief, the answers provided in the Interrogatory Responses are true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th   day of __June__, 2026, at __Indianapolis__, Indiana.

Signed by:

_Jeffrey M. Gill_

296FE2138E584D2... JEFFREY GILL
Chief Legal and Compliance Officer

**APP 752**

## DECLARATION OF SERVICE BY EMAIL

I, WILLIAM GRAVITT, not a party to the within action, hereby declare that on June 24, 2026, I caused to be served the attached LEAD PLAINTIFF INDIANA PUBLIC RETIREMENT SYSTEM'S AMENDED RESPONSES AND OBJECTIONS TO THE AGILON DEFENDANTS' FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFFS, by email on the parties to the within action addressed, as follows:

COUNSEL FOR PLAINTIFF RETIREMENT SYSTEMS:

| ROBBINS GELLER RUDMAN & DOWD LLP | |
|---|---|
| Lucas F. Olts | LOlts@rgrdlaw.com |
| Christopher D. Stewart | CStewart@rgrdlaw.com |
| Evelyn Sanchez Gonzalez | egonzalez@rgrdlaw.com |
| Jack K. Scott | JScott@rgrdlaw.com |
| **KENDALL LAW GROUP, PLLC** | |
| Joe Kendall | jkendall@kendalllawgroup.com |

ATTORNEYS FOR DEFENDANTS AGILON HEALTH, INC., STEVEN J. SELL, TIMOTHY S. BENSLEY, HEIDI HITTNER, AND GIRISH VENKATACHALIAH:

| SIDLEY AUSTIN LLP | |
|---|---|
| Yolanda C. Garcia | ygarcia@sidley.com |
| Mason Parham | mparham@sidley.com |
| Barret V. Armbruster | barmbruster@sidley.com |
| Nick C. Greenberg | ngreenberg@sidley.com |

ATTORNEYS FOR DEFENDANTS CLAYTON, DUBILIER & RICE, LLC, CD&R VECTOR HOLDINGS, L.P., CD&R INVESTMENT ASSOCIATES IX, LTD., CD&R ASSOCIATES IX, L.P.:

| DEBEVOISE & PLIMPTON LLP | |
|---|---|
| Maeve L. O'Connor | mloconnor@debevoise.com |
| Elliot Greenfield | egreenfield@debevoise.com |
| Brandon Fetzer | bfetzer@debevoise.com |
| **SCOTT DOUGLASS & MCCONNICO LLP** | |
| Santosh Aravind | saravind@scottdoug.com |

4904-7697-3491.v1

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 24, 2026, at San Diego, California.

_____
WILLIAM GRAVITT

4904-7697-3491.v1

# EXHIBIT 25

APP 755

Equity Research
**Healthcare | Healthcare Services**

*William Blair*

February 27, 2024

**Ryan Daniels, CFA**  +1 312 364 8418
rdaniels@williamblair.com

**Jack Senft**  +1 312 801 7835
jsenft@williamblair.com

# agilon health, inc.

## As Expected, Uptick in MA Utilization Pressures Costs Trends, Margins Once Again

| | |
|---|---|
| Stock Rating: | **Outperform** |

| | |
|---|---|
| Symbol: | AGL (NYSE) |
| Price: | $6.48 (52-Wk.: $6-$29) |
| Market Value (M): | $2,505 |
| Dividend/Yield: | $0.00/0.00% |
| Fiscal Year End: | December |

### Summary

After the markets closed on Tuesday, February 27, agilon health (AGL) reported fourth quarter 2023 results that printed below the prerelease commentary announced earlier this year; however, we believe this was largely anticipated by investors following negative fourth-quarter announcements from several leading Medicare Advantage (MA) plans over the past few weeks. In addition, management updated the initial 2024 outlook that was provided in tandem with the prerelease, as it now projects even higher medical costs to pressure profits throughout 2024, despite a sales outlook that remains intact (actually modestly increased at the high end of the range).

### Punchline

While the organization underwent a challenging 2023, given the recent uptick in utilization trends in the MA marketplace, we remain encouraged with the company's long-term growth opportunity and competitive position. The company also has a strong balance sheet—with a roughly $495 million cash position and only $32.3 million in debt—and remains well positioned for sustainable long-term growth and profits as the business scales. We also do not view any risk of future financing needs, as management expects to burn roughly $150 million to $175 million before becoming sustainably cash flow positive (at which point it should still have in excess of $300 million in cash). Thus, we maintain our Outperform rating, given what we view an attractive risk-reward profile at current levels based on after-hours trading.

*To be fair, investor enthusiasm likely will be muted until signs of cost stabilization occur, but we believe most of the headwinds currently impacting margins should prove transitory (e.g., pent-up demand for care, near-term changes to risk adjustment model) and hope to see this stabilization—as well as novel cost-saving initiatives that also help with margins—begin to impact results by mid-2024. We also believe investors may applaud a novel CFO hire with deeper managed care experience, given the previously announced retirement of current CFO Tim Bensley, who will remain as CFO until his replacement is found.*

### Key Financial Metrics

Revenue rose 72% year-over-year to $1.06 billion, modestly above the $1.02 billion Street target; adjusted EBITDA (AEBITDA)—the key profit metric we monitor for the company—were negative $137 million, compared to the consensus expectation of negative $96.4 million.

| | | 2022A | 2023A | 2024E |
|---|---|---|---|---|
| **Estimates** | | | | |
| Sales (M) | Q1 | $653.4 | $1,136.1 | $1,612.9 |
| | Q2 | $670.1 | $1,149.1 | $1,592.4 |
| | Q3 | $694.9 | $1,215.7 | $1,607.9 |
| | Q4 | $689.8 | $1,056.1 | $1,587.4 |
| | FY | $2,708.2 | $4,556.9 | $6,400.6 |
| EBITDA (M) Adjusted | Q1 | $8.0 | $23.9 | $18.7 |
| | Q2 | $(2.7) | $10.3 | $(0.0) |
| | Q3 | $(25.8) | $(5.8) | $(20.4) |
| | Q4 | $(43.0) | $(137.1) | $(29.0) |
| | FY | $(64.0) | $(108.7) | $(30.7) |
| EPS | Q1 | $0.00 | $0.04 | $0.01 |
| | Q2 | $(0.05) | $(0.04) | $(0.05) |
| | Q3 | $(0.07) | $(0.08) | $(0.09) |
| | Q4 | $(0.14) | $(0.57) | $(0.13) |
| | FY | $(0.26) | $(0.65) | $(0.26) |
| **Valuation** | | | | |
| EV/Sales | | 0.7x | 0.4x | 0.3x |
| EV/EBITDA | | NM | NM | NM |
| FY P/E | | NM | NM | NM |

**Trading Data (FactSet)**

| | |
|---|---|
| Shares Outstanding (M): | 406.0 |
| Float (M): | 299.3 |
| Avg. Daily Volume (90-day): | 4,811,511 |

**Financial Data (FactSet)**

| | |
|---|---|
| Book Value Per Share (MRQ): | $2.15 |
| Return on Equity (TTM): | (9.1)% |
| Enterprise Value (M): | $1,972 |

**Two-Year Price Performance Chart**



Sources: FactSet, William Blair & Company estimates

Agilon health is a technology-enabled care management partner that works with independent primary care physician (PCP) groups to enable their transformation to risk-based care models. The company enters 20-year strategic agreements with existing PCP practices to convert their senior population to Medicare Advantage (MA) at-risk lives—bearing all potential downside risk and sharing residual earnings via a 50/50 share model with its PCP partners. The company integrates all components of a global risk model into a single operating platform to drive improved physician economics and satisfaction levels, superior clinical outcomes and overall experiences for patients, and reduced costs for the healthcare system.

**Please refer to important disclosures on pages 6 – 8. Analyst certification is on page 6. William Blair or an affiliate does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. This report is not intended to provide personal investment advice. The opinions and recommendations herein do not take into account individual client circumstances, objectives, or needs and are not intended as recommendations of particular securities, financial instruments, or strategies to particular clients. The recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein.**

**APP 756**

William Blair

Of note, the adjusted EBITDA weakness this quarter was driven by both current period utilization trends and the need to recognize negative prior-period developments (as discussed in detail in the January prerelease). Still, results were below even prerelease expectations, as final claim runouts from several large payers indicated even higher cost trends than initially anticipated—leading to both higher current-period expenses and an uptick in claims reserves. In sum, it was an even weaker quarter than we anticipated, mainly driven by the uptick in reserves (to the high end of internal estimates) that pressured fourth-quarter results beyond our (and investor) expectations.

### Key Operating Metrics

Agilon health ended the quarter with approximately 388,400 total MA members (up 68% and compared to management's guidance of 386,000 to 387,000 members); the company also reported 89,300 attributed ACO REACH members on the platform—bringing total members lives on the platform to 477,700—up about 50% year-over-year.

Lastly, the company ended the quarter with **only $32.3 million in debt and nearly $500 million in cash and marketable securities**, indicating no need for future capital raises, in our view, absent any sizable M&A activity.

### 2024 Outlook and First-Quarter Expectations

As previously noted, the company's *initial 2024 outlook* came in mixed when compared to Street's expectation exiting 2023. More specific, the company had anticipated total sales of $6,350 million to $6,420 million, above the $5,967 million Street target heading into the year; medical margin of $560 million to $600 million; and adjusted EBITDA of $40 million to $60 million, below the $96 million consensus estimate prior to the prerelease.

In tandem with tonight's release, *guidance was further reduced*, given expectations for even higher medical cost trends going forward (a roughly 250-basis-point increase in trend assumptions relative to January guidance). Now, management expects adjusted EBITDA to range between -$60 million and -$15 million, despite sales remaining intact (actually up $45 million at the high end of the range). MA lives are targeted at 545,000 with 122,500 ACO REACH lives (midpoint of ranges). Geographic entry costs were also lowered from $70 million to a new range of $55 million to $65 million.

For the first quarter, management anticipates $1.605 billion to $1.630 billion in sales, above the $1.566 billion consensus estimate; medical margin of $155 million to $170 million; adjusted EBITDA between $15 million and $25 million, versus the $41.4 million Street target; and total lives on the platform of between 645,000 to 660,000. Of note, Street targets for first-quarter adjusted EBITDA range from $12.7 million to $88.9 million (and it appears the Street forecasts were *not updated* post the prerelease), so we would take the first-quarter consensus with a grain of salt and rather look to full year 2024 targets instead (which, again, were still below expectations).

On the forecasting front, management noted its updated guidance reflects even more elevated utilization trends (up 250 basis points versus prior guidance from January) and expects these trends to continue throughout the year in guidance. In our view, the cause of the elevated utilization is likely a result of pent-up demand, some adverse cost trends with new providers/patients, and certain benefit design changes. As a result, we believe much of this cost pressure should subside over time—and expect that management has taken a conservative approach to its outlook. Still, we expect investors to remain skeptical until signs of stability in cost trends appear and/or quarterly results come in at, or above, guidance levels.

### Stock Thoughts

We continue to view AGL as a solid long-term growth story, as we believe the primary care model is set for material disruption over the coming years. We also believe that agilon health's positive macro tailwinds, myriad growth drivers, and scalable and capital-light business model will drive material expansion in both top- and bottom-line results going forward—especially after a difficult 2023 and result 2024 outlook.

Shares currently trade at about 0.3 times our 2024 sales target—which, in our view, grants room for expansion, given the company's market leadership position, strong balance sheet, long runway for organic growth, and long-term margin profile. Accordingly, we continue to favor agilon health shares for the long term, especially given the marked pullback seen of late, and maintain our Outperform rating. That stated, we continue to appreciate that the near-term outlook remains mixed (strong sales but weak margins) and thus believe investors in AGL shares will need to be patient as upside in the stock will require several quarters of strong performance to regain momentum.

### Risks

Margin volatility due to the company's capitated risk model, customer concentration risk, uncertainties surrounding MA payment rates and risk adjustments, operational pressures due to rapid growth, and the potential for competitive threats over time.

William Blair

**Guidance overview.** We provided a detailed overview of management's guidance in the exhibit below:

| | 2024 | | |
|---|---|---|---|
| | Low End | Mid-Point | High End |
| Total revenues | $6,350 | $6,407.5 | $6,465 |
| Medical margin | $400 | $425.0 | $450 |
| Adjusted EBITDA | -$60 | ($37.5) | -$15 |
| **Key operating metrics** | | | |
| Total MA members | 540,000 | 545,000 | 550,000 |
| ACO REACH | 125,000 | 127,500 | 130,000 |
| Total Members Live | 665,000 | 672,500 | 680,000 |

| | Q1'24 | | |
|---|---|---|---|
| | Low End | Mid-Point | High End |
| Total revenues | $1,605.0 | $1,617.5 | $1,630.0 |
| Medical margin | $155.0 | $165.0 | $175.0 |
| Adjusted EBITDA | $15.0 | $20.0 | $25.0 |
| **Key operating metrics** | | | |
| Total MA members | 520,000 | 525,000 | 530,000 |
| ACO REACH | 125,000 | 127,500 | 130,000 |
| Total Members Live | 645,000 | 652,500 | 660,000 |

**Financial Models**

In the exhibits that follow, we provide a review of the company's quarterly results as compared to our estimates and results from the year-ago period, as well as a summary version of our financial model (subject to change following our detailed review of the company's financials).

William Blair

## agilon health
### Fourth Quarter 2023 Review

| $ million, fiscal year ends December 31 | Q4'23 | Q4'22 | Year / Year Change | Q4'23E | Variance |
|---|---|---|---|---|---|
| **Total revenues** | **$ 1,056.1** | **$ 689.8** | **53.1%** | **$ 1,029.8** | **$ 26.3** |
| | | | | | |
| Medical services expense | $ 1,155.4 | $ 628.2 | 83.9% | $ 1,018.9 | $ 136.5 |
| Other medical expenses | (4.5) | 51.6 | (108.6)% | 65.9 | (70.4) |
| General and administrative | 64.7 | 75.2 | (14.0)% | 59.2 | 5.5 |
| Depreciation and amortization | 4.7 | 3.9 | 21.2% | 5.1 | (0.4) |
| Total operating expenses | $ 1,220.4 | $ 758.9 | 60.8% | $ 1,149.2 | $ 71.2 |
| | | | | | |
| **Income (loss) from operations** | **$ (164.3)** | **$ (69.1)** | **137.7%** | **$ (119.4)** | **$ (44.9)** |
| | | | | | |
| Total other income (expense) | (2.6) | 13.2 | (119.5)% | 13.4 | (16.0) |
| Net (inc.) loss attributable to NCI | (63.3) | 0.0 | N/A | - | (63.3) |
| **Net income (loss) attributable to the Company** | **$ (230.4)** | **$ (56.5)** | **308.1%** | **$ (108.2)** | **$ (122.3)** |
| | | | | | |
| Adjusted EBITDA | $ (137.1) | $ (43.0) | 218.6% | $ (85.2) | $ (51.9) |
| Shares outstanding (diluted) | 406.5 | 412.1 | (1.4)% | 408 | (1.3) |
| **Earnings per share (EPS)** | **$ (0.57)** | **$ (0.14)** | **313.7%** | **$ (0.27)** | **$ (0.30)** |
| | | | | | |
| **Percentage of revenue:** | | | Change | | |
| Medical services expense | 109.4% | 91.1% | 18.34 | 98.9% | 10.46 |
| Other medical expenses | (0.4)% | 7.5% | (7.90) | 6.4% | (6.82) |
| General and administrative | 6.1% | 10.9% | (4.78) | 5.8% | 0.38 |
| Depreciation and amortization | 0.4% | 0.6% | (0.12) | 0.5% | (0.05) |
| Total operating expenses | 115.6% | 110.0% | 5.54 | 111.6% | 3.96 |
| Operating income | (15.6)% | (10.0)% | (5.54) | (11.6)% | (3.96) |
| Other income (expense) | (0.2)% | 1.9% | (2.15) | 1.3% | (1.54) |
| Adjusted EBITDA | (13.0)% | (6.2)% | (6.74) | (8.3)% | (4.70) |
| Net income attributable to AGL | (21.8)% | (8.2)% | (13.63) | (10.5)% | (11.32) |

*For a more detailed version of our financial model, please contact your Blair representative.*

William Blair

**agilon health**
Operating Results Summary & Financial Analysis

Rating: Outperform

Fiscal year ends December
$ in millions, except per-share items

| | Q1'23 Actual | Q2'23 Actual | Q3'23 Actual | Q4'23 Actual | Q1'24 Forecast | Q2'24 Forecast | Q3'24 Forecast | Q4'24 Forecast | 2022 Actual | 2023 Actual | 2024 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | |
| **Revenues:** | | | | | | | | | | | |
| Medical services revenue | $1,134.8 | $1,147.0 | $1,212.1 | $1,053.5 | $1,610.4 | $1,589.9 | $1,605.4 | $1,584.9 | $2,704.4 | $4,547.5 | $6,390.6 |
| Other operating revenue | 1.3 | 2.0 | 3.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 3.8 | 9.4 | 10.0 |
| **Total revenues** | $1,136.1 | $1,149.1 | $1,215.7 | $1,056.1 | $1,612.9 | $1,592.4 | $1,607.9 | $1,587.4 | $2,708.2 | $4,556.9 | $6,400.6 |
| % growth | 173.9% | 171.5% | 175.0% | 153.1% | 140.4% | 131.0% | 152.2% | 150.3% | 47.7% | 68.3% | 40.5% |
| **Operating expenses:** | | | | | | | | | | | |
| Medical services expense | $972.8 | $1,008.7 | $1,104.4 | $1,155.4 | $1,445.0 | $1,477.7 | $1,518.9 | $1,516.2 | $2,399.8 | $4,241.4 | $5,957.8 |
| Other medical expenses | 86.0 | 83.1 | 80.8 | (4.5) | 92.7 | 79.6 | 80.4 | 79.4 | 196.1 | 245.5 | 332.1 |
| General and administrative | 66.8 | 81.5 | 74.1 | 64.7 | 76.6 | 63.7 | 60.3 | 59.5 | 218.9 | 287.2 | 260.1 |
| Depreciation and amortization | 4.2 | 5.5 | 5.3 | 4.7 | 8.1 | 8.0 | 8.0 | 7.9 | 13.8 | 19.7 | 32.0 |
| Total operating expenses | $1,129.9 | $1,178.9 | $1,264.6 | $1,220.4 | $1,622.4 | $1,629.0 | $1,667.6 | $1,663.0 | $2,828.6 | $4,793.8 | $6,582.0 |
| % margin | 99.4% | 102.6% | 104.0% | 115.6% | 100.6% | 102.3% | 103.7% | 104.8% | 104.4% | 105.2% | 102.8% |
| Income (loss) from operations | $6.3 | ($29.8) | ($49.0) | ($164.3) | ($9.4) | ($36.6) | ($59.7) | ($75.7) | ($120.4) | ($236.8) | ($181.4) |
| % margin | 0.6% | (2.6%) | (4.0%) | (15.6%) | (0.6%) | (2.3%) | (3.7%) | (4.8%) | (4.4%) | (5.2%) | (2.8%) |
| Total other income (expense) | 7.9 | 14.1 | 18.7 | (2.6) | 14.7 | 15.0 | 17.5 | 16.5 | 14.7 | 38.2 | 63.7 |
| **Net income (loss)** | $16.0 | ($16.8) | ($31.5) | ($167.1) | $4.7 | ($19.4) | ($38.0) | ($53.2) | ($106.6) | ($199.5) | ($105.9) |
| % margin | 1.4% | (1.5%) | (2.6%) | (15.8%) | 0.3% | (1.2%) | (2.4%) | (3.4%) | (3.9%) | (4.4%) | (1.7%) |
| Shares outstanding (diluted) | 426.6 | 410.3 | 405.8 | 406.5 | 408.5 | 410.6 | 412.6 | 414.7 | 412.1 | 406.5 | 414.7 |
| **Earnings per share (EPS)** | $0.04 | ($0.04) | ($0.08) | ($0.57) | $0.01 | ($0.05) | ($0.09) | ($0.13) | ($0.26) | ($0.65) | ($0.26) |
| % growth | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| **Adjusted EBITDA** | $23.9 | $10.3 | ($5.8) | ($137.1) | $18.7 | ($0.0) | ($20.4) | ($29.0) | ($64.0) | ($108.7) | ($30.7) |
| % margin | 2.1% | 0.9% | (0.5%) | (13.0%) | 1.2% | (0.0%) | (1.3%) | (1.8%) | (2.4%) | (2.4%) | (0.5%) |
| **Key Metrics:** *(members in thousands)* | | | | | | | | | | | |
| **Average MA members** | 399.8 | 409.7 | 425.1 | 379.4 | 511.1 | 528.3 | 536.2 | 543.6 | 264.0 | 394.1 | 529.0 |
| % growth | 161.2% | 154.4% | 157.4% | 139.5% | 124.8% | 124.3% | 141.3% | 143.3% | 45.2% | 49.3% | 34.2% |
| **Total ending membership** | 490.9 | 495.9 | 508.0 | 477.7 | 651.6 | 659.5 | 667.4 | 674.2 | 358.5 | 477.7 | 674.2 |
| % growth | 143.5% | 141.0% | 142.7% | 133.2% | 131.4% | 129.8% | 139.7% | 141.1% | 50.6% | 33.2% | 41.1% |
| **Balance Sheet and Cash Flow** | | | | | | | | | | | |
| Net working capital | $ 509.6 | $ 491.5 | $ 487.0 | $ 395.4 | $ 318.2 | $ 270.5 | $ 242.8 | $ 227.7 | $ 419.1 | $ 395.4 | $ 227.7 |
| Net debt | (356.9) | (155.0) | (133.6) | (75.3) | (176.1) | (210.6) | (211.4) | (200.0) | (458.6) | (75.3) | (200.0) |
| Total Stockholder's Equity | 1,081.8 | 879.4 | 871.6 | 661.0 | 677.9 | 674.8 | 653.5 | 616.9 | 1,040.6 | 661.0 | 616.9 |
| Total capital | $ 724.9 | $ 724.5 | $ 738.0 | $ 585.8 | $ 501.8 | $ 464.2 | $ 442.1 | $ 416.9 | $ 582.0 | $ 585.8 | $ 416.9 |
| *Selected measures* | | | | | | | | | | | |
| Net debt / total capital | (0.5x) | (0.2x) | (0.2x) | (0.1x) | (0.4x) | (0.5x) | (0.5x) | (0.5x) | (0.8x) | (0.1x) | (0.5x) |
| Stockholders equity / total capital | 1.5x | 1.2x | 1.2x | 1.1x | 1.4x | 1.5x | 1.5x | 1.5x | 1.8x | 1.1x | 1.5x |
| Leverage ratio (net debt / equity) | (0.3x) | (0.2x) | (0.2x) | (0.1x) | (0.3x) | (0.3x) | (0.3x) | (0.3x) | (0.4x) | (0.1x) | (0.3x) |
| Current ratio | 1.9x | 1.5x | 1.5x | 1.5x | 1.3x | 1.3x | 1.3x | 1.3x | 2.7x | 1.5x | 1.3x |
| Book value per share | $ 2.54 | $ 2.14 | $ 2.15 | $ 1.63 | $ 1.66 | $ 1.64 | $ 1.58 | $ 1.49 | $ 2.53 | $ 1.63 | $ 1.49 |
| Net cash from operating activities | $ (60.8) | $ (21.2) | $ (13.0) | $ (61.2) | $ 105.6 | $ 39.3 | $ 5.7 | $ (6.6) | $ (130.8) | $ (156.2) | $ 144.0 |
| CFO per share | $ (0.14) | $ (0.05) | $ (0.03) | $ (0.15) | $ 0.26 | $ 0.10 | $ 0.01 | $ (0.02) | $ (0.32) | $ (0.38) | $ 0.35 |
| Free cash flow (Operating Cash flow less CAPEX) | $ (64.5) | $ (25.3) | $ (17.1) | $ (80.1) | $ 100.8 | $ 34.5 | $ 0.8 | $ (11.4) | $ (146.2) | $ (187.0) | $ 124.8 |
| FCF per share | $ (0.15) | $ (0.06) | $ (0.04) | $ (0.20) | $ 0.25 | $ 0.08 | $ 0.00 | $ (0.03) | $ (0.35) | $ (0.46) | $ 0.30 |
| *as a % of adjusted EBITDA* | (270.4%) | (246.6%) | 296.1% | 58.4% | 539.5% | (204651.1%) | (4.1%) | 39.4% | 228.7% | 172.0% | (406.8%) |

Ryan S. Daniels, CFA • (312) 364-8418 • rdaniels@williamblair.com

Please consult **Important Disclosures** at the below link:
https://williamblair.bluematrix.com/sellside/Disclosures.action?ajax&page=ajax/williamblairDisclosures.jsp&firmId=18877&companySymbol=AGL

William Blair

**IMPORTANT DISCLOSURES**

William Blair or an affiliate was a manager or co-manager of a public offering of equity securities for agilon health, inc. within the prior 12 months.

William Blair or an affiliate is a market maker in the security of agilon health, inc..

William Blair or an affiliate expects to receive or intends to seek compensation for investment banking services from agilon health, inc. or an affiliate within the next three months.

William Blair or an affiliate received compensation for investment banking services or non-investment-banking services from agilon health, inc. within the last 12 months. agilon health, inc. is or was, within the last 12 months, an investment banking client of William Blair & Company and/or one or more of its affiliates.

Officers and employees of William Blair or its affiliates (other than research analysts) may have a financial interest in the securities of agilon health, inc..

This report is available in electronic form to registered users via R*Docs™ at https://williamblairlibrary.bluematrix.com or www.williamblair.com.

Please contact us at +1 800 621 0687 or consult https://www.williamblair.com/equity-research/coverage for all disclosures.

Ryan Daniels attests that 1) all of the views expressed in this research report accurately reflect his/her personal views about any and all of the securities and companies covered by this report, and 2) no part of his/her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed by him/her in this report. We seek to update our research as appropriate. Other than certain periodical industry reports, the majority of reports are published at irregular intervals as deemed appropriate by the research analyst.

DOW JONES: 39069.20
S&P 500: 5069.53
NASDAQ: 15996.80

**agilon health, inc. Rating History as of 02/26/2024**
powered by: BlueMatrix





Source: FactSet & William Blair

Additional information is available upon request.

**Current Rating Distribution (as of February 27, 2024):**

| Coverage Universe | Percent | Inv. Banking Relationships * | Percent |
|---|---|---|---|
| Outperform (Buy) | 70 | Outperform (Buy) | 8 |
| Market Perform (Hold) | 30 | Market Perform (Hold) | 2 |
| Underperform (Sell) | 1 | Underperform (Sell) | 0 |

6 | Ryan Daniels +1 312 364 8418

**APP 761**

William Blair

*Percentage of companies in each rating category that are investment banking clients, defined as companies for which William Blair has received compensation for investment banking services within the past 12 months.

The compensation of the research analyst is based on a variety of factors, including performance of his or her stock recommendations; contributions to all of the firm's departments, including asset management, corporate finance, institutional sales, and retail brokerage; firm profitability; and competitive factors.

**OTHER IMPORTANT DISCLOSURES**

Stock ratings and valuation methodologies: William Blair & Company, L.L.C. uses a three-point system to rate stocks. Individual ratings reflect the expected performance of the stock relative to the broader market (generally the S&P 500, unless otherwise indicated) over the next 12 months. The assessment of expected performance is a function of near-, intermediate-, and long-term company fundamentals, industry outlook, confidence in earnings estimates, valuation (and our valuation methodology), and other factors. Outperform (O) - stock expected to outperform the broader market over the next 12 months; Market Perform (M) - stock expected to perform approximately in line with the broader market over the next 12 months; Underperform (U) - stock expected to underperform the broader market over the next 12 months; not rated (NR) - the stock is not currently rated. The valuation methodologies include (but are not limited to) price-to-earnings multiple (P/E), relative P/E (compared with the relevant market), P/E-to-growth-rate (PEG) ratio, market capitalization/revenue multiple, enterprise value/EBITDA ratio, discounted cash flow, and others. Stock ratings and valuation methodologies should not be used or relied upon as investment advice. Past performance is not necessarily a guide to future performance.

The ratings and valuation methodologies reflect the opinion of the individual analyst and are subject to change at any time.

Our salespeople, traders, and other professionals may provide oral or written market commentary, short-term trade ideas, or trading strategies-to our clients, prospective clients, and our trading desks-that are contrary to opinions expressed in this research report. Certain outstanding research reports may contain discussions or investment opinions relating to securities, financial instruments and/or issuers that are no longer current. Always refer to the most recent report on a company or issuer. Our asset management and trading desks may make investment decisions that are inconsistent with recommendations or views expressed in this report. We will from time to time have long or short positions in, act as principal in, and buy or sell the securities referred to in this report. Our research is disseminated primarily electronically, and in some instances in printed form. Research is simultaneously available to all clients. This research report is for our clients only. No part of this material may be copied or duplicated in any form by any means or redistributed without the prior written consent of William Blair & Company, L.L.C.

This is not in any sense an offer or solicitation for the purchase or sale of a security or financial instrument. The factual statements herein have been taken from sources we believe to be reliable, but such statements are made without any representation as to accuracy or completeness or otherwise, except with respect to any disclosures relative to William Blair or its research analysts. Opinions expressed are our own unless otherwise stated and are subject to change without notice. Prices shown are approximate.

If the recipient received this research report pursuant to terms of service for, or a contract with William Blair for, the provision of research services for a separate fee, and in connection with the delivery of such research services we may be deemed to be acting as an investment adviser, then such investment adviser status relates, if at all, only to the recipient with whom we have contracted directly and does not extend beyond the delivery of this report (unless otherwise agreed specifically in writing). If such recipient uses these research services in connection with the sale or purchase of a security referred to herein, William Blair may act as principal for our own account or as riskless principal or agent for another party. William Blair is and continues to act solely as a broker-dealer in connection with the execution of any transactions, including transactions in any securities referred to herein.

This material is distributed in the United Kingdom and the European Economic Area (EEA) by William Blair International, Ltd., authorised and regulated by the Financial Conduct Authority (FCA). William Blair International, Limited is a limited liability company registered in England and Wales with company number 03619027. This material is only directed and issued to persons regarded as Professional investors or equivalent in their home jurisdiction, or persons falling within articles 19 (5), 38, 47, and 49 of the Financial Services and Markets Act of 2000 (Financial Promotion) Order 2005 (all such persons being referred to as "relevant persons"). This document must not be acted on or relied on by persons who are not "relevant persons."

"William Blair" and "R*Docs" are registered trademarks of William Blair & Company, L.L.C. Copyright 2024, William Blair & Company, L.L.C. All rights reserved.

**William Blair & Company, L.L.C.** licenses and applies the SASB Materiality Map® and SICSTM in our work.

7 | Ryan Daniels +1 312 364 8418

**APP 762**

*William Blair*

# Equity Research Directory

**John Kreger, Partner   Director of Research   +1 312 364 8612**
**Kyle Harris, CFA, Partner   Operations Manager   +1 312 364 8230**

**Scott Hansen   Associate Director of Research   +1 212 245 6526**

## CONSUMER

**Sharon Zackfia, CFA, Partner   +1 312 364 5386**
Group Head–Consumer
*Lifestyle and Leisure Brands, Restaurants, Automotive/E-commerce*

**Jon Andersen, CFA, Partner   +1 312 364 8697**
*Consumer Products*

**Phillip Blee, CPA   +1 312 801 7874**
*Home and Outdoor, Automotive Parts and Services, Discount and Convenience*

**Dylan Carden   +1 312 801 7857**
*Consumer Technology, Specialty Retail*

## FINANCIAL SERVICES AND TECHNOLOGY

**Adam Klauber, CFA, Partner   +1 312 364 8232**
Co-Group Head–Financial Services and Technology
*Financial Analytic Service Providers, Insurance Brokers, Property & Casualty Insurance*

**Robert Napoli, Partner   +1 312 364 8496**
Co-Group Head–Financial Services and Technology
*Financial Technology, Specialty Finance*

**Cristopher Kennedy, CFA   +1 312 364 8596**
*Financial Technology, Specialty Finance*

**Jeff Schmitt   +1 312 364 8106**
*Wealthtech, Wealth Management, Financial Services Distributors*

## HEALTHCARE

**Biotechnology**

**Tim Lugo, Partner   +1 415 248 2870**
Group Head–Biotechnology

**Sami Corwin, Ph.D.   +1 312 801 7783**

**Andy T. Hsieh, Ph.D., Partner   +1 312 364 5051**

**Myles R. Minter, Ph.D.   +1 617 235 7534**

**Matt Phipps, Ph.D., Partner   +1 312 364 8602**

**Healthcare Technology and Services**

**Ryan S. Daniels, CFA, Partner   +1 312 364 8418**
Group Head–Healthcare Technology and Services
*Healthcare Technology, Healthcare Services*

**Margaret Kaczor, CFA, Partner   +1 312 364 8608**
*Medical Technology*

**Brandon Vazquez, CFA   +1 212 237 2776**
*Dental, Animal Health*

**Life Sciences**

**Matt Larew, Partner   +1 312 801 7795**
*Life Science Tools, Bioprocessing, Healthcare Delivery*

**Andrew F. Brackmann, CFA   +1 312 364 8776**
*Diagnostics*

**Max Smock, CFA   +1 312 364 8336**
*Pharmaceutical Outsourcing and Services*

## GLOBAL SERVICES

**Tim Mulrooney   +1 312 364 8123**
Group Head–Global Services
*Commercial Services, Staffing*

**Andrew Nicholas, CPA   +1 312 364 8689**
*Consulting, HR Technology, Information Services*

**Trevor Romeo, CFA   +1 312 801 7854**
*Staffing*

## ECONOMICS

**Richard de Chazal, CFA   +44 20 7868 4489**

## ENERGY AND SUSTAINABILITY

**Jed Dorsheimer   +1 617 235 7555**
Group Head–Energy and Sustainability
*Generation, Efficiency, Storage*

**Tim Mulrooney   +1 312 364 8123**
*Sustainability Services*

## GLOBAL INDUSTRIAL INFRASTRUCTURE

**Larry De Maria, CFA   +1 212 237 2753**
Group Head–Global Industrial Infrastructure
*Industrial Machinery, Diversified, and Automation*

**Louie DiPalma, CFA   +1 312 364 5437**
*Aerospace and Defense, Smart Cities*

**Brian Drab, CFA, Partner   +1 312 364 8280**
*Advanced Manufacturing, Industrial Technology*

**Ryan Merkel, CFA , Partner   +1 312 364 8603**
*Building Products, Specialty Distribution*

## TECHNOLOGY, MEDIA, AND COMMUNICATIONS

**Jason Ader, CFA, Partner   +1 617 235 7519**
Co-Group Head–Technology, Media, and Communications
*Infrastructure Software*

**Arjun Bhatia   +1 312 364 5696**
Co-Group Head–Technology, Media, and Communications
*Software as a Service*

**Dylan Becker, CFA   +1 312 364 8938**
*Software, Software as a Service*

**Jonathan Ho, Partner   +1 312 364 8276**
*Cybersecurity, Security Technology*

**Maggie Nolan, CPA, Partner   +1 312 364 5090**
*IT Services*

**Matthew Pfau, CFA   +1 312 364 8694**
*Software as a Service*

**Jake Roberge   +1 312 364 8056**
*Software, Software as a Service*

**Ralph Schackart III, CFA, Partner   +1 312 364 8753**
*Internet and Digital Media*

**Stephen Sheldon, CFA, CPA, Partner   +1 312 364 5167**
*Vertical Technology – Real Estate, Education, Restaurant/Hospitality*

## EDITORIAL AND SUPERVISORY ANALYSTS

**Steve Goldsmith, Head Editor and SA   +1 312 364 8540**
**Audrey Majors, Editor and SA   +1 312 364 8992**
**Beth Pekol Porto, Editor and SA   +1 312 364 8924**
**Lisa Zurcher, Editor and SA   +44 20 7868 4549**
**Mubasil Chaudhry, Editor and SA   +44 20 7868 4453**

**APP 763**

# EXHIBIT 26

APP 764

**BofA GLOBAL RESEARCH**



**BofA SECURITIES**

# Agilon Health

# With MA industry expectations reset, focus could start to turn to 2025 and beyond

Reiterate Rating: BUY | PO: 13.00 USD | Price: 6.65 USD

## Thesis hinges 2025 profitability, aided by repricing

The magnitude of MLR pressure at both AGL and across the broader MA industry was higher than expected. However, we continue to believe that at a decent chunk of the earnings variance has been due to industry factors which should begin to normalize (improve) for insurers in 2025 and beyond. AGL had long discussed double-digit margins, however at this point investor expectations have gotten so low (understandably) that if AGL can simply become free cash flow profitable the stock should double. Based on current MCO commentary, we estimate repricing alone should be a 100-200bps MLR tailwind (50-100bps of EBITDA), which alongside at leastanother 50bps of G&A leverage, gives us confidence 2025 should see a major set up in profitability. While we are lowering our estimates and PO from $16 to $13) (prev. 35x multiple or 2025 EBITDA estimate) the fact AGLs commentary now more closely aligns with major MCOs should reduce the chances of future guidance cuts. Reiterate Buy.

## Fourth quarter looked similar to most MA companies

In a repeat of the performance that we've seen play out at pretty much every other major MA exposed company, the fourth quarter missed on medical costs (after having cut its 2023 outlook 3 times) and as a result, AGL has already lowered the expectations for 2024 it had initially previewed in January. While the results are far from ideal, another guidance cut was largely expected heading into the quarter given the significant pressures larger peers discussed on earnings calls in the past few weeks. For some context, after seeing more MA claims develop in late 2023 the company updated its 2024 projections to assume higher total net trend of 6.6% (increase of 250bps vs prior expectations), which compares to what it believes was a 7.0% net trend in 2023.

| Estimates(Dec) (US$) | 2022A | 2023A | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| EPS | (0.26) | (0.64) | (0.48) | (0.10) | 0.23 |
| EPS Change (YoY) | 76.1% | -146.2% | 25.0% | 79.2% | NM |
| Consensus EPS (Bloomberg) | (0.21) | (0.33) | (0.10) | 0.10 | 0.27 |
| **Valuation (Dec)** | | | | | |
| P/E | NM | NM | NM | NM | 28.9x |

BofA Securities does and seeks to do business with issuers covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.
Refer to important disclosures on page 6 to 8. Analyst Certification on page 4. Price Objective Basis/Risk on page 4.
12665184

Timestamp: 28 February 2024 11:16AM EST

**28 February 2024**

Equity

### Key Changes

| (US$) | Previous | Current |
|---|---|---|
| Price Obj. | 16.00 | 13.00 |
| 2024E Rev (m) | 6,364.3 | 6,407.1 |
| 2025E Rev (m) | 8,454.1 | 7,863.3 |
| 2026E Rev (m) | 10,728.1 | 9,498.3 |
| 2024E EPS | -0.16 | -0.48 |
| 2025E EPS | 0.16 | -0.10 |
| 2026E EPS | 0.45 | 0.23 |

**Adam Ron**
Research Analyst
BofAS
+1 646 743 2020
adam.ron@bofa.com

**Kevin Fischbeck, CFA**
Research Analyst
BofAS
+1 646 855 5948
kevin.fischbeck@bofa.com

### Stock Data

| | |
|---|---|
| Price | 6.65 USD |
| Price Objective | 13.00 USD |
| Date Established | 28-Feb-2024 |
| Investment Opinion | C-1-9 |
| 52-Week Range | 5.63 USD - 29.44 USD |
| Mrkt Val (mn) / Shares Out (mn) | 2,922 USD / 439.3 |
| Free Float | 74.0% |
| Average Daily Value (mn) | 37.48 USD |
| BofA Ticker / Exchange | AGL / NYS |
| Bloomberg / Reuters | AGL US / AGL.N |
| ROE (2024E) | -33.1% |
| Net Dbt to Eqty (Dec-2023A) | -10.4% |
| **ESGMeter™** | **Medium** |

**ESGMeter is not indicative of a company's future stock price performance and is not an investment recommendation or rating. ESGMeter is independent of BofA Global Research's equity investment rating, volatility risk rating, income rating, and price objective for that company.** For full details, refer to "BofA ESGMeter Methodology".

MA- Medicare Advantage

MCO- Managed Care Organiztion

**APP 765**

BofA GLOBAL RESEARCH

# iQprofile<sup>SM</sup> Agilon Health

**Income Statement Data (Dec)**

| (US$ Millions) | 2022A | 2023A | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Total Earned Premiums | NA | NA | NA | NA | NA |
| Net Investment Income | NA | NA | NA | NA | NA |
| **Total Revenue** | **2,708** | **4,557** | **6,407** | **7,863** | **9,498** |
| Total Cost of Benefits and Claims | (2,400) | (4,241) | (5,996) | (7,208) | (8,584) |
| S,G & A (Including Commissions) | NA | NA | NA | NA | NA |
| **Total Operating Expenses** | **(2,829)** | **(4,794)** | **(6,589)** | **(7,901)** | **(9,390)** |
| **Pre-Tax Operating Earnings** | **(120)** | **(237)** | **(182)** | **(38)** | **108** |
| Income Tax Expense | (2) | (1) | 0 | 0 | 0 |
| **Operating Earnings After Tax** | **(107)** | **(263)** | **(197)** | **(43)** | **104** |
| **Net Income (Reported)** | **(107)** | **(263)** | **(197)** | **(43)** | **104** |
| Diluted Shares | 408 | 409 | 409 | 413 | 445 |
| Operating Earnings Per Share | (0.26) | (0.64) | (0.48) | (0.10) | 0.23 |
| Net Income (Reported) Per Share | (0.26) | (0.64) | (0.48) | (0.10) | 0.23 |

**Balance Sheet Data  (Dec)**

| (US$ Millions) | 2022A | 2023A | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Fixed Income Securities | NA | NA | NA | NA | NA |
| Total Cash and Investments | NA | NA | NA | NA | NA |
| **Total Assets** | **1,697** | **1,741** | **2,043** | **2,539** | **3,054** |
| Reserves | NA | NA | NA | NA | NA |
| LT Debt | 38 | 32 | 32 | 32 | 32 |
| **Total Liabilities** | **657** | **1,080** | **1,517** | **1,993** | **2,341** |
| **Total Equity** | **1,041** | **662** | **528** | **547** | **714** |
| **Total Equity (Ex FAS 115)** | **NA** | **NA** | **NA** | **NA** | **NA** |
| Book Value per Share (Reported) | 2.55 | 1.62 | 1.29 | 1.32 | 1.71 |
| Book Value per Share (Ex FAS 115) | NA | NA | NA | NA | NA |

**Ratios (Dec)**

| (US$ Millions) | 2022A | 2023A | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Expense Ratio | NA | NA | NA | NA | NA |
| Loss Ratio | NA | NA | NA | NA | NA |
| **Combined Ratio** | **NA** | **NA** | **NA** | **NA** | **NA** |
| Avg Assets / Avg Eq (Ex FAS 115) Ratio | NA | NA | NA | NA | NA |

**Growth Rates (YoY) (Dec)**

| (US$ Millions) | 2022A | 2023A | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Total Earned Premium | NA | NA | NA | NA | NA |
| Net Investment Income | NA | NA | NA | NA | NA |
| Total Revenue | NA | NA | NA | NA | NA |
| Operating Earnings per Share | 76.1% | -146.2% | 25.0% | 79.2% | NM |
| Asset | NA | NA | NA | NA | NA |
| Reported Book Value per Share | NA | NA | NA | NA | NA |

**Performance Metrics (Dec)**

| (US$ Millions) | 2022A | 2023A | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Operating ROE | -10.0% | -30.8% | -33.1% | -8.0% | 16.5% |
| Operating ROE (Ex FAS 115) | NA | NA | NA | NA | NA |
| Operating Return on Average Assets | NA | NA | NA | NA | NA |
| Operating Margin | -4.4% | -5.2% | -2.8% | -0.5% | 1.1% |
| Long Term Debt to Cap Ratio (Ex FAS 115) | NA | NA | NA | NA | NA |
| Net Income % Operating Income | NA | NA | NA | NA | NA |
| Amtz of DAC % Pretax Profit bef Amtz of DAC | NA | NA | NA | NA | NA |

## Company Sector

Managed Health Care

## Company Description

Agilon Health (AGL) is a physician management company that focuses on value-based care, specifically in Medicare. By taking responsibility of all patient-related medical costs, including care delivered outside of affiliated clinics, AGL incentivizes doctors to focus on patient health and value rather than maximizing visit volumes. AGL leverages its technology platform, high-value referral networks, and clinical expertise to help close gaps in care, improve outcomes and save money for the system.

## Investment Rationale

Buy-rated AGL is a tech-enabled, fast growing, physician management company focused on converting MA patients to risk. Given its unique positioning in the fastest growing industry within Managed Care, we expect AGL to organically grow revenues 30%+ a year for the next several years. Growth is further supported by its LT contracts and pipeline, payer agnostic model, and ability to expand into new business line such as ACO REACH.

## Stock Data

| | |
|---|---|
| Average Daily Volume | 5,636,452 |

## Quarterly Earnings Estimates

| | 2023 | 2024 |
|---|---|---|
| Q1 | 0.04A | -0.07E |
| Q2 | -0.04A | -0.13E |
| Q3 | -0.08A | -0.11E |
| Q4 | -0.57A | -0.17E |

**APP 766**

BofA GLOBAL RESEARCH



**APP 767**

BofA GLOBAL RESEARCH

# Price objective basis & risk

### Agilon Health (AGL)

Ultimately, we value AGL using 20x EV/EBITDA on our 2026 estimate to arrive at $13 price obejctive (0.6x Adj. Revenues). This is in-line with how the market has similarly valued high growth healthcare services companies.

But in order to check our assumptions we use a 10YR DCF assuming a discount rate and exit multiple. For the DCF we use our free cash flow estimates from 2024-2032, but back out interest expense and stock compensation, apply an 'Exit Multiple' EBITDA multiple of 13x on 2032 EBITDA and a discount rate of 10%.

Risks to to our price objective are regulatory changes. Other risks difficulty expanding, or pricing pressures.

# Analyst Certification

I, Adam Ron, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject securities and issuers.  I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or view expressed in this research report.

**US - Facilities, Hospitals and Managed Healthcare Coverage Cluster**

| Investment rating | Company | BofA Ticker | Bloomberg symbol | Analyst |
|---|---|---|---|---|
| **BUY** | | | | |
| | Acadia Healthcare | ACHC | ACHC US | Kevin Fischbeck, CFA |
| | Addus HomeCare | ADUS | ADUS US | Joanna Gajuk |
| | Agilon Health | AGL | AGL US | Adam Ron |
| | Astrana Health Inc | ASTH | ASTH US | Adam Ron |
| | BrightSpring Health Services | BTSG | BTSG US | Joanna Gajuk |
| | Chemed Corporation | CHE | CHE US | Joanna Gajuk |
| | Elevance Health Inc | ELV | ELV US | Kevin Fischbeck, CFA |
| | Encompass Health | EHC | EHC US | Kevin Fischbeck, CFA |
| | HCA | HCA | HCA US | Kevin Fischbeck, CFA |
| | Humana Inc | HUM | HUM US | Kevin Fischbeck, CFA |
| | Option Care Health | OPCH | OPCH US | Joanna Gajuk |
| | Oscar Health | OSCR | OSCR US | Adam Ron |
| | Select Medical Corp. | SEM | SEM US | Kevin Fischbeck, CFA |
| | Service Corp. | SCI | SCI US | Joanna Gajuk |
| | Surgery Partners, Inc | SGRY | SGRY US | Kevin Fischbeck, CFA |
| | Tenet Healthcare | THC | THC US | Kevin Fischbeck, CFA |
| | The Cigna Group | CI | CI US | Kevin Fischbeck, CFA |
| | UnitedHealth Group | UNH | UNH US | Kevin Fischbeck, CFA |
| | Universal Health Services | UHS | UHS US | Kevin Fischbeck, CFA |
| | US Physical Therapy | USPH | USPH US | Joanna Gajuk |
| **NEUTRAL** | | | | |
| | Alignment Healthcare | ALHC | ALHC US | Adam Ron |
| | AMN Healthcare | AMN | AMN US | Kevin Fischbeck, CFA |
| | Brookdale | BKD | BKD US | Joanna Gajuk |
| | Centene Corporation | CNC | CNC US | Kevin Fischbeck, CFA |
| | Molina Healthcare, Inc. | MOH | MOH US | Kevin Fischbeck, CFA |
| | Privia Health | PRVA | PRVA US | Adam Ron |
| **UNDERPERFORM** | | | | |
| | AdaptHealth Corp. | AHCO | AHCO US | Joanna Gajuk |
| | Cross Country Healthcare | CCRN | CCRN US | Kevin Fischbeck, CFA |
| | DaVita Inc | DVA | DVA US | Kevin Fischbeck, CFA |
| | Enhabit Home Health & Hospice | EHAB | EHAB US | Joanna Gajuk |
| | Pediatrix Medical Group, Inc. | MD | MD US | Kevin Fischbeck, CFA |

APP 768

**BofA GLOBAL RESEARCH**

## *iQ*method℠ **Measures Definitions**

| Business Performance | Numerator | Denominator |
|---|---|---|
| Return On Capital Employed | NOPAT = (EBIT + Interest Income) × (1 − Tax Rate) + Goodwill Amortization | Total Assets − Current Liabilities + ST Debt + Accumulated Goodwill Amortization |
| Return On Equity | Net Income | Shareholders' Equity |
| Operating Margin | Operating Profit | Sales |
| Earnings Growth | Expected 5 Year CAGR From Latest Actual | N/A |
| Free Cash Flow | Cash Flow From Operations − Total Capex | N/A |

| Quality of Earnings | Numerator | Denominator |
|---|---|---|
| Cash Realization Ratio | Cash Flow From Operations | Net Income |
| Asset Replacement Ratio | Capex | Depreciation |
| Tax Rate | Tax Charge | Pre-Tax Income |
| Net Debt-To-Equity Ratio | Net Debt = Total Debt − Cash & Equivalents | Total Equity |
| Interest Cover | EBIT | Interest Expense |

| Valuation Toolkit | Numerator | Denominator |
|---|---|---|
| Price / Earnings Ratio | Current Share Price | Diluted Earnings Per Share (Basis As Specified) |
| Price / Book Value | Current Share Price | Shareholders' Equity / Current Basic Shares |
| Dividend Yield | Annualised Declared Cash Dividend | Current Share Price |
| Free Cash Flow Yield | Cash Flow From Operations − Total Capex | Market Cap = Current Share Price × Current Basic Shares |
| Enterprise Value / Sales | EV = Current Share Price × Current Shares + Minority Equity + Net Debt + Other LT Liabilities | Sales |
| EV / EBITDA | Enterprise Value | Basic EBIT + Depreciation + Amortization |

*iQ*method℠is the set of BofA Global Research standard measures that serve to maintain global consistency under three broad headings: Business Performance, Quality of Earnings, and validations. The key features of iQmethod are: A consistently structured, detailed, and transparent methodology. Guidelines to maximize the effectiveness of the comparative valuation process, and to identify some common pitfalls.

*iQ*database® is our real-time global research database that is sourced directly from our equity analysts' earnings models and includes forecasted as well as historical data for income statements, balance sheets, and cash flow statements for companies covered by BofA Global Research.

*iQ*profile℠, *iQ*method℠ are service marks of Bank of America Corporation. *iQ*database® is a registered service mark of Bank of America Corporation.



**APP 769**

BofA GLOBAL RESEARCH

# Disclosures
## Important Disclosures

**Agilon Health (AGL) Price Chart**



B: Buy, N: Neutral, U: Underperform, PO: Price Objective, NA: No longer valid, NR: No Rating

The Investment Opinion System is contained at the end of the report under the heading "Fundamental Equity Opinion Key". Dark grey shading indicates the security is restricted with the opinion suspended. Medium grey shading indicates the security is under review with the opinion withdrawn. Light grey shading indicates the security is not covered. Chart is current as of a date no more than one trading day prior to the date of the report.

**Equity Investment Rating Distribution: Health Care Group (as of 31 Dec 2023)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships [R1] | Count | Percent |
|---|---|---|---|---|---|
| Buy | 234 | 60.94% | Buy | 115 | 49.15% |
| Hold | 80 | 20.83% | Hold | 36 | 45.00% |
| Sell | 70 | 18.23% | Sell | 29 | 41.43% |

**Equity Investment Rating Distribution: Global Group (as of 31 Dec 2023)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships [R1] | Count | Percent |
|---|---|---|---|---|---|
| Buy | 1895 | 53.62% | Buy | 1083 | 57.15% |
| Hold | 832 | 23.54% | Hold | 454 | 54.57% |
| Sell | 807 | 22.84% | Sell | 383 | 47.46% |

[R1] Issuers that were investment banking clients of BofA Securities or one of its affiliates within the past 12 months. For purposes of this Investment Rating Distribution, the coverage universe includes only stocks. A stock rated Neutral is included as a Hold, and a stock rated Underperform is included as a Sell.

FUNDAMENTAL EQUITY OPINION KEY: Opinions include a Volatility Risk Rating, an Investment Rating and an Income Rating. VOLATILITY RISK RATINGS, indicators of potential price fluctuation, are: A - Low, B - Medium and C - High. INVESTMENT RATINGS reflect the analyst's assessment of both a stock's absolute total return potential as well as its attractiveness for investment relative to other stocks within its Coverage Cluster (defined below). Our investment ratings are: 1 - Buy stocks are expected to have a total return of at least 10% and are the most attractive stocks in the coverage cluster; 2 - Neutral stocks are expected to remain flat or increase in value and are less attractive than Buy rated stocks and 3 - Underperform stocks are the least attractive stocks in a coverage cluster. An investment rating of 6 (No Rating) indicates that a stock is no longer trading on the basis of fundamentals. Analysts assign investment ratings considering, among other things, the 0-12 month total return expectation for a stock and the firm's guidelines for ratings dispersions (shown in the table below). The current price objective for a stock should be referenced to better understand the total return expectation at any given time. The price objective reflects the analyst's view of the potential price appreciation (depreciation).

| Investment rating | Total return expectation (within 12-month period of date of initial rating) | Ratings dispersion guidelines for coverage cluster[R2] |
|---|---|---|
| Buy | ≥ 10% | ≤ 70% |
| Neutral | ≥ 0% | ≤ 30% |
| Underperform | N/A | ≥ 20% |

[R2]Ratings dispersions may vary from time to time where BofA Global Research believes it better reflects the investment prospects of stocks in a Coverage Cluster.

*INCOME RATINGS*, indicators of potential cash dividends, are: 7 - same/higher (dividend considered to be secure), 8 - same/lower (dividend not considered to be secure) and 9 - pays no cash dividend. *Coverage Cluster* is comprised of stocks covered by a single analyst or two or more analysts sharing a common industry, sector, region or other classification(s). A stock's coverage cluster is included in the most recent BofA Global Research report referencing the stock.

Price Charts for the securities referenced in this research report are available on the Price Charts website, or call 1-800-MERRILL to have them mailed.
BofAS or one of its affiliates acts as a market maker for the equity securities recommended in the report: Agilon Health.
BofAS or an affiliate was a manager of a public offering of securities of this issuer within the last 12 months: Agilon Health.
The issuer is or was, within the last 12 months, an investment banking client of BofAS and/or one or more of its affiliates: Agilon Health.
BofAS or an affiliate has received compensation from the issuer for non-investment banking services or products within the past 12 months: Agilon Health.
The issuer is or was, within the last 12 months, a non-securities business client of BofAS and/or one or more of its affiliates: Agilon Health.
BofAS or an affiliate has received compensation for investment banking services from this issuer within the past 12 months: Agilon Health.
BofAS or an affiliate expects to receive or intends to seek compensation for investment banking services from this issuer or an affiliate of the issuer within the next three months: Agilon Health.
BofAS or one of its affiliates is willing to sell to, or buy from, clients the common equity of the issuer on a principal basis: Agilon Health.



**APP 770**

BofA GLOBAL RESEARCH

BofA Global Research personnel (including the analyst(s) responsible for this report) receive compensation based upon, among other factors, the overall profitability of Bank of America Corporation, including profits derived from investment banking. The analyst(s) responsible for this report may also receive compensation based upon, among other factors, the overall profitability of the Bank's sales and trading businesses relating to the class of securities or financial instruments for which such analyst is responsible.

# Other Important Disclosures

From time to time research analysts conduct site visits of covered issuers. BofA Global Research policies prohibit research analysts from accepting payment or reimbursement for travel expenses from the issuer for such visits.

Prices are indicative and for information purposes only. Except as otherwise stated in the report, for any recommendation in relation to an equity security, the price referenced is the publicly traded price of the security as of close of business on the day prior to the date of the report or, if the report is published during intraday trading, the price referenced is indicative of the traded price as of the date and time of the report and in relation to a debt security (including equity preferred and CDS), prices are indicative as of the date and time of the report and are from various sources including BofA Securities trading desks.

The date and time of completion of the production of any recommendation in this report shall be the date and time of dissemination of this report as recorded in the report timestamp.

Recipients who are not institutional investors or market professionals should seek the advice of their independent financial advisor before considering information in this report in connection with any investment decision, or for a necessary explanation of its contents.

Officers of BofAS or one or more of its affiliates (other than research analysts) may have a financial interest in securities of the issuer(s) or in related investments.

Refer to BofA Global Research policies relating to conflicts of interest.

**"BofA Securities" includes BofA Securities, Inc. ("BofAS") and its affiliates. Investors should contact their BofA Securities representative or Merrill Global Wealth Management financial advisor if they have questions concerning this report or concerning the appropriateness of any investment idea described herein for such investor. "BofA Securities" is a global brand for BofA Global Research.**

Information relating to Non-US affiliates of BofA Securities and Distribution of Affiliate Research Reports:

BofAS and/or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") may in the future distribute, information of the following non-US affiliates in the US (short name: legal name, regulator): Merrill Lynch (South Africa): Merrill Lynch South Africa (Pty) Ltd., regulated by The Financial Service Board; MLI (UK): Merrill Lynch International, regulated by the Financial Conduct Authority (FCA) and the Prudential Regulation Authority (PRA); BofASE (France): BofA Securities Europe SA is authorized by the Autorité de Contrôle Prudentiel et de Résolution (ACPR) and regulated by the ACPR and the Autorité des Marchés Financiers (AMF). BofA Securities Europe SA ("BofASE") with registered address at 51, rue La Boétie, 75008 Paris is registered under no 842 602 690 RCS Paris. In accordance with the provisions of French Code Monétaire et Financier (Monetary and Financial Code), BofASE is an établissement de crédit et d'investissement (credit and investment institution) that is authorised and supervised by the European Central Bank and the Autorité de Contrôle Prudentiel et de Résolution (ACPR) and regulated by the ACPR and the Autorité des Marchés Financiers. BofASE's share capital can be found at www.bofaml.com/BofASEdisclaimer; BofA Europe (Milan): Bank of America Europe Designated Activity Company, Milan Branch, regulated by the Bank of Italy, the European Central Bank (ECB) and the Central Bank of Ireland (CBI); BofA Europe (Frankfurt): Bank of America Europe Designated Activity Company, Frankfurt Branch regulated by BaFin, the ECB and the CBI; BofA Europe (Madrid): Bank of America Europe Designated Activity Company, Sucursal en España, regulated by the Bank of Spain, the ECB and the CBI; Merrill Lynch (Australia): Merrill Lynch Equities (Australia) Limited, regulated by the Australian Securities and Investments Commission; Merrill Lynch (Hong Kong): Merrill Lynch (Asia Pacific) Limited, regulated by the Hong Kong Securities and Futures Commission (HKSFC); Merrill Lynch (Singapore): Merrill Lynch (Singapore) Pte Ltd, regulated by the Monetary Authority of Singapore (MAS); Merrill Lynch (Canada): Merrill Lynch Canada Inc, regulated by the Canadian Investment Regulatory Organization; Merrill Lynch (Mexico): Merrill Lynch Mexico, SA de CV, Casa de Bolsa, regulated by the Comisión Nacional Bancaria y de Valores; Merrill Lynch (Argentina): Merrill Lynch Argentina SA, regulated by Comisión Nacional de Valores; BofAS Japan: BofA Securities Japan Co., Ltd., regulated by the Financial Services Agency; Merrill Lynch (Seoul): Merrill Lynch International, LLC Seoul Branch, regulated by the Financial Supervisory Service; Merrill Lynch (Taiwan): Merrill Lynch Securities (Taiwan) Ltd., regulated by the Securities and Futures Bureau; BofAS India: BofA Securities India Limited, regulated by the Securities and Exchange Board of India (SEBI); Merrill Lynch (Israel): Merrill Lynch Israel Limited, regulated by Israel Securities Authority; Merrill Lynch (DIFC): Merrill Lynch International (DIFC Branch), regulated by the Dubai Financial Services Authority (DFSA); Merrill Lynch (Brazil): Merrill Lynch S.A. Corretora de Títulos e Valores Mobiliários, regulated by Comissão de Valores Mobiliários; Merrill Lynch KSA Company: Merrill Lynch Kingdom of Saudi Arabia Company, regulated by the Capital Market Authority.

This information: has been approved for publication and is distributed in the United Kingdom (UK) to professional clients and eligible counterparties (as each is defined in the rules of the FCA and the PRA) by MLI (UK), which is authorized by the PRA and regulated by the FCA and the PRA - details about the extent of our regulation by the FCA and PRA are available from us on request; has been approved for publication and is distributed in the European Economic Area (EEA) by BofASE (France), which is authorized by the ACPR and regulated by the ACPR and the AMF; has been considered and distributed in Japan by BofAS Japan, a registered securities dealer under the Financial Instruments and Exchange Act in Japan, or its permitted affiliates; is issued and distributed in Hong Kong by Merrill Lynch (Hong Kong) which is regulated by HKSFC; is issued and distributed in Taiwan by Merrill Lynch (Taiwan); is issued and distributed in India by BofAS India; and is issued and distributed in Singapore to institutional investors and/or accredited investors (each as defined under the Financial Advisers Regulations) by Merrill Lynch (Singapore) (Company Registration No 198602883D). Merrill Lynch (Singapore) is regulated by MAS. Merrill Lynch Equities (Australia) Limited (ABN 65 006 276 795), AFS License 235132 (MLEA) distributes this information in Australia only to 'Wholesale' clients as defined by s.761G of the Corporations Act 2001. With the exception of Bank of America N.A., Australia Branch, neither MLEA nor any of its affiliates involved in preparing this information is an Authorised Deposit-Taking Institution under the Banking Act 1959 nor regulated by the Australian Prudential Regulation Authority. No approval is required for publication or distribution of this information in Brazil and its local distribution is by Merrill Lynch (Brazil) in accordance with applicable regulations. Merrill Lynch (DIFC) is authorized and regulated by the DFSA. Information prepared and issued by Merrill Lynch (DIFC) is done so in accordance with the requirements of the DFSA conduct of business rules. BofA Europe (Frankfurt) distributes this information in Germany and is regulated by BaFin, the ECB and the CBI. BofA Securities entities, including BofA Europe and BofASE (France), may outsource/delegate the marketing and/or provision of certain research services or aspects of research services to other branches or members of the BofA Securities group. You may be contacted by a different BofA Securities entity acting for and on behalf of your service provider where permitted by applicable law. This does not change your service provider. Please refer to the Electronic Communications Disclaimers for further information.

This information has been prepared and issued by BofAS and/or one or more of its non-US affiliates. The author(s) of this information may not be licensed to carry on regulated activities in your jurisdiction and, if not licensed, do not hold themselves out as being able to do so. BofAS and/or MLPF&S is the distributor of this information in the US and accepts full responsibility for information distributed to BofAS and/or MLPF&S clients in the US by its non-US affiliates. Any US person receiving this information and wishing to effect any transaction in any security discussed herein should do so through BofAS and/or MLPF&S and not such foreign affiliates. Hong Kong recipients of this information should contact Merrill Lynch (Asia Pacific) Limited in respect of any matters relating to dealing in securities or provision of specific advice on securities or any other matters arising from, or in connection with, this information. Singapore recipients of this information should contact Merrill Lynch (Singapore) Pte Ltd in respect of any matters arising from, or in connection with, this information. For clients that are not accredited investors, expert investors or institutional investors Merrill Lynch (Singapore) Pte Ltd accepts full responsibility for the contents of this information distributed to such clients in Singapore.

General Investment Related Disclosures:

Taiwan Readers: Neither the information nor any opinion expressed herein constitutes an offer or a solicitation of an offer to transact in any securities or other financial instrument. No part of this report may be used or reproduced or quoted in any manner whatsoever in Taiwan by the press or any other person without the express written consent of BofA Securities.

This document provides general information only, and has been prepared for, and is intended for general distribution to, BofA Securities clients. Neither the information nor any opinion expressed constitutes an offer or an invitation to make an offer, to buy or sell any securities or other financial instrument or any derivative related to such securities or instruments (e.g., options, futures, warrants, and contracts for differences). This document is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of, and is not directed to, any specific person(s). This document and its content do not constitute, and should not be considered to constitute, investment advice for purposes of ERISA, the US tax code, the Investment Advisers Act or otherwise. Investors should seek financial advice regarding the appropriateness of investing in financial instruments and implementing investment strategies discussed or recommended in this document and should understand that statements regarding future prospects may not be realized. Any decision to purchase or subscribe for securities in any offering must be based solely on existing public information on such security or the information in the prospectus or other offering document issued in connection with such offering, and not on this document.

Securities and other financial instruments referred to herein, or recommended, offered or sold by BofA Securities, are not insured by the Federal Deposit Insurance Corporation and are not deposits or other obligations of any insured depository institution (including, Bank of America, N.A.). Investments in general and, derivatives, in particular, involve numerous risks, including,



BofA GLOBAL RESEARCH

among others, market risk, counterparty default risk and liquidity risk. No security, financial instrument or derivative is suitable for all investors. Digital assets are extremely speculative, volatile and are largely unregulated.  In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. Investors should note that income from such securities and other financial instruments, if any, may fluctuate and that price or value of such securities and instruments may rise or fall and, in some cases, investors may lose their entire principal investment. Past performance is not necessarily a guide to future performance. Levels and basis for taxation may change.

This report may contain a short-term trading idea or recommendation, which highlights a specific near-term catalyst or event impacting the issuer or the market that is anticipated to have a short-term price impact on the equity securities of the issuer. Short-term trading ideas and recommendations are different from and do not affect a stock's fundamental equity rating, which reflects both a longer term total return expectation and attractiveness for investment relative to other stocks within its Coverage Cluster. Short-term trading ideas and recommendations may be more or less positive than a stock's fundamental equity rating.

BofA Securities is aware that the implementation of the ideas expressed in this report may depend upon an investor's ability to "short" securities or other financial instruments and that such action may be limited by regulations prohibiting or restricting "shortselling" in many jurisdictions. Investors are urged to seek advice regarding the applicability of such regulations prior to executing any short idea contained in this report.

Foreign currency rates of exchange may adversely affect the value, price or income of any security or financial instrument mentioned herein. Investors in such securities and instruments, including ADRs, effectively assume currency risk.

BofAS or one of its affiliates is a regular issuer of traded financial instruments linked to securities that may have been recommended in this report. BofAS or one of its affiliates may, at any time, hold a trading position (long or short) in the securities and financial instruments discussed in this report.

BofA Securities, through business units other than BofA Global Research, may have issued and may in the future issue trading ideas or recommendations that are inconsistent with, and reach different conclusions from, the information presented herein. Such ideas or recommendations may reflect different time frames, assumptions, views and analytical methods of the persons who prepared them, and BofA Securities is under no obligation to ensure that such other trading ideas or recommendations are brought to the attention of any recipient of this information. In the event that the recipient received this information pursuant to a contract between the recipient and BofAS for the provision of research services for a separate fee, and in connection therewith BofAS may be deemed to be acting as an investment adviser, such status relates, if at all, solely to the person with whom BofAS has contracted directly and does not extend beyond the delivery of this report (unless otherwise agreed specifically in writing by BofAS). If such recipient uses the services of BofAS in connection with the sale or purchase of a security referred to herein, BofAS may act as principal for its own account or as agent for another person. BofAS is and continues to act solely as a broker-dealer in connection with the execution of any transactions, including transactions in any securities referred to herein.

BofA ESGMeter Methodology:

ESGMeter is a proprietary metric based on quantitative analysis and fundamental analyst inputs that reflects our assessment of a company's Environmental, Social and Governance-related attributes. The ESGMeter is intended to indicate a company's likelihood of experiencing stronger financial stability (higher return on equity and lower earnings and price volatility) over the next three years relative to peer group. There are three ESGMeter levels - Low, Medium, and High - which indicate whether a company has attributes most likely to translate into superior financial stability (in the case of a High level) or weaker financial stability (in the case of a Low level) over the next three years relative to its peer group. A Medium level suggests that a company exhibits ESG characteristics that are likely associated with financial stability results in line with its peer group over the next three years. Full details of our methodology, financial stability definition and disclaimers are available at BofA ESGMeter methodology. ESGMeter is not indicative of a company's future stock price performance and is not an investment recommendation or rating. ESGMeter is independent of the BofA Global Research fundamental equity analyst's investment rating, volatility risk rating, income rating or price objective for that company.

Copyright and General Information:

Copyright 2024 Bank of America Corporation. All rights reserved.  iQdatabase® is a registered service mark of Bank of America Corporation. This information is prepared for the use of BofA Securities clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of BofA Securities. BofA Global Research information is distributed simultaneously to internal and client websites and other portals by BofA Securities and is not publicly-available material. Any unauthorized use or disclosure is prohibited. Receipt and review of this information constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained herein (including any investment recommendations, estimates or price targets) without first obtaining express permission from an authorized officer of BofA Securities.

Materials prepared by BofA Global Research personnel are based on public information. Facts and views presented in this material have not been reviewed by, and may not reflect information known to, professionals in other business areas of BofA Securities, including investment banking personnel. BofA Securities has established information barriers between BofA Global Research and certain business groups. As a result, BofA Securities does not disclose certain client relationships with, or compensation received from, such issuers. To the extent this material discusses any legal proceeding or issues, it has not been prepared as nor is it intended to express any legal conclusion, opinion or advice. Investors should consult their own legal advisers as to issues of law relating to the subject matter of this material. BofA Global Research personnel's knowledge of legal proceedings in which any BofA Securities entity and/or its directors, officers and employees may be plaintiffs, defendants, co-defendants or co-plaintiffs with or involving issuers mentioned in this material is based on public information. Facts and views presented in this material that relate to any such proceedings have not been reviewed by, discussed with, and may not reflect information known to, professionals in other business areas of BofA Securities in connection with the legal proceedings or matters relevant to such proceedings.

This information has been prepared independently of any issuer of securities mentioned herein and not in connection with any proposed offering of securities or as agent of any issuer of any securities. None of BofAS any of its affiliates or their research analysts has any authority whatsoever to make any representation or warranty on behalf of the issuer(s). BofA Global Research policy prohibits research personnel from disclosing a recommendation, investment rating, or investment thesis for review by an issuer prior to the publication of a research report containing such rating, recommendation or investment thesis.

Any information relating to the tax status of financial instruments discussed herein is not intended to provide tax advice or to be used by anyone to provide tax advice. Investors are urged to seek tax advice based on their particular circumstances from an independent tax professional.

The information herein (other than disclosure information relating to BofA Securities and its affiliates) was obtained from various sources and we do not guarantee its accuracy. This information may contain links to third-party websites. BofA Securities is not responsible for the content of any third-party website or any linked content contained in a third-party website. Content contained on such third-party websites is not part of this information and is not incorporated by reference. The inclusion of a link does not imply any endorsement by or any affiliation with BofA Securities. Access to any third-party website is at your own risk, and you should always review the terms and privacy policies at third-party websites before submitting any personal information to them. BofA Securities is not responsible for such terms and privacy policies and expressly disclaims any liability for them.

All opinions, projections and estimates constitute the judgment of the author as of the date of publication and are subject to change without notice. Prices also are subject to change without notice. BofA Securities is under no obligation to update this information and BofA Securities ability to publish information on the subject issuer(s) in the future is subject to applicable quiet periods. You should therefore assume that BofA Securities will not update any fact, circumstance or opinion contained herein.

Subject to the quiet period applicable under laws of the various jurisdictions in which we distribute research reports and other legal and BofA Securities policy-related restrictions on the publication of research reports, fundamental equity reports are produced on a regular basis as necessary to keep the investment recommendation current.

Certain outstanding reports or investment opinions relating to securities, financial instruments and/or issuers may no longer be current.  Always refer to the most recent research report relating to an issuer prior to making an investment decision.

In some cases, an issuer may be classified as Restricted or may be Under Review or Extended Review. In each case, investors should consider any investment opinion relating to such issuer (or its security and/or financial instruments) to be suspended or withdrawn and should not rely on the analyses and investment opinion(s) pertaining to such issuer (or its securities and/or financial instruments) nor should the analyses or opinion(s) be considered a solicitation of any kind. Sales persons and financial advisors affiliated with BofAS or any of its affiliates may not solicit purchases of securities or financial instruments that are Restricted or Under Review and may only solicit securities under Extended Review in accordance with firm policies.

Neither BofA Securities nor any officer or employee of BofA Securities accepts any liability whatsoever for any direct, indirect or consequential damages or losses arising from any use of this information.

**APP 772**

# EXHIBIT 27

**JMP** A CITIZENS COMPANY

Healthcare Services |
February 28, 2024

## agilon health, inc. (AGL)
Revises 2024 Outlook Lower on Elevated Trend; Maintaining MO, Lowering Price Target

**MARKET OUTPERFORM**
Price: $6.48
Price Target: $8.00

**Constantine Davides**
cdavides@jmpsecurities.com
617-235-8508

## INVESTMENT HIGHLIGHTS

- **We maintain our Market Outperform rating on agilon health.** On Tuesday after the close, AGL reported 4Q23 results and issued revised 2024 guidance. While 4Q revenue exceeded consensus estimates ($1.06B vs. $1.02B), AGL's 4Q adjusted EBITDA of ($137.1M) trailed consensus of ($96.4M) and our ($111.1M) estimate. We characterize sentiment as weak going into results, despite management having revised its 4Q expectations as recently as January 5, while simultaneously issuing its initial view for 2024, as more recent commentary from a number of managed care organizations became more cautious across the past several weeks, and as one physician enablement peer took steps to reduce its full-risk exposure for 2024. To a large extent we believe a guide down was expected and baked into shares, although the magnitude of the revision eclipsed our expectations.

- **Trend gets even hotter in 4Q.** Full-year 2023 cost trend came in at 7%, but the 4Q cost trend accelerated to 7.7%. Management now expects an elevated net cost trend of 6.6% in 2024 for the company's Year 2+ markets, 250 bps above previous guidance.

- **Class of 2025 starting at 60K lives.** Management's early glimpse of the 2025 market class appears to be tracking well below the size of recent classes (145K lives in the class of 2024). Some of this appears purposeful, given challenges associated with historically robust same-geography growth (suboptimal in-market physician onboarding), in addition to pausing the pace of full-risk expansion, similar to what we saw with PRVA (MO, $27 PT) on Tuesday morning. As we have been increasingly of the mindset that AGL's management should decelerate growth until margin visibility returns and until physician training is completed throughout its existing markets, we are not overly concerned about the (currently more modest) 2025 class size. While management did not commit to a full-year expectation for the 2025 class, we are sizing our 2025 MA adds at 65K (down from our prior 110K), in order to ensure an optimal implementation timeline for that class.

- **Balance sheet remains solid.** Even after contemplating $150M in potential FCF burn in 2024, AGL should finish 2024 with over $330M in cash. Management noted 2025 use of cash would approximate $25M.

- **Lowering estimates.** We reduce our 2024, 2025, and 2026 adjusted EBITDA estimates to ($33M), $40M, and $100M, respectively. Our 2024 adjusted EBITDA estimate falls within management's adjusted EBITDA guidance of ($60M)-($15M). Our prior adjusted 2024, 2025 and 2026 EBITDA estimates stood at $47.6M, $161.6M, and $300.0M, respectively. Our adjusted EBITDA reductions are driven in large part by lower medical margin expectations; in 2024, our revised medical margin of $424M (+39% Y/Y) is roughly $145M lower than our prior estimate and sits within management's $400M-$450M guidance.

### MARKET DATA

| | |
|---|---|
| Price | $6.48 |
| 52-Week Range: | $5.63 - $29.44 |
| Shares Out. (M): | 417.5 |
| Market Cap ($M): | $2,705.4 |
| Cash (M): | $488 |
| Enterprise Value (M): | $3,046 |
| Total Debt (M): | $39 |

*Source: Company reports and Citizens JMP Securities, LLC*

| FY DEC | | 2023E | 2024E | 2025E |
|---|---|---|---|---|
| Revenue ($M) | 1Q | $1,136.1A | $1,611.3 | -- |
| | 2Q | $1,149.1A | $1,597.3 | -- |
| | 3Q | $1,215.7A | $1,600.1 | -- |
| | 4Q | $1,056.1 | $1,600.4 | -- |
| | **FY** | **$4,556.9** | **$6,409.1** | **$7,549.5** |
| EBITDA | 1Q | $23.9A | $14.0 | -- |
| | 2Q | $10.3A | ($5.3) | -- |
| | 3Q | ($5.8)A | ($25.1) | -- |
| | 4Q | ($137.1) | ($16.6) | -- |
| | **FY** | **($108.7)** | **($33.0)** | **$40.0** |
| Previous | FY | ($82.8) | $47.6 | $161.6 |

*Source: Company reports and Citizens JMP Securities, LLC*

### STOCK PRICE PERFORMANCE



**FOR DISCLOSURE AND FOOTNOTE INFORMATION, REFER TO JMP FACTS AND DISCLOSURES SECTION.**
This report should be read in conjunction with important disclosure information, including an attestation under Regulation Analyst certification.

APP 774

- **Maintaining MO rating.** While the company's conservativism has been difficult to gauge from an external vantage point, management did provide some incremental color around its updated reserve practices, completion rates, member cohort trend, and future trend assumptions that gives us some increased comfort that its revised guidance has more fully captured the industry's challenges, in addition to more company-specific headwinds. While we believe it will take some time to improve operations (data analytics/transfer, onboarding of in-market physicians, continued rollout of clinical programs and payor re-contracting), we believe management has incorporated this into its 2024 outlook and provided incremental color on its current/expected progress that we can track across the balance of 2024. We maintain our MO rating given our view that the cyclical managed care environment, and essentially historical cost trend, may begin to normalize in 1H24, particularly as Y/Y comps become more favorable, and that AGL's strategies to improve margins will begin to impact its P&L across 2024 and more meaningfully in 2025. Catalysts include the naming of a new CFO later this year, as well as potential CMS Medicare Advantage benchmark rate adjustments in April.

- **We lower our price target to $8 from $11**, derived by applying a 29x multiple against our revised 2026E adjusted EBITDA of $100M (prior 13.5x 2026E adj. EBITDA of $300M), in line with our projected 28% medical margin CAGR between 2024-2026. This also values AGL at roughly 0.45x 2024E revenue versus its 12-month average of 1.2x, a discount we view as warranted given questions around the platform's embedded margin opportunity.



Figure 1: AGL Income Statement

## AGL Income Statement ($M)

| | 1Q | 2Q | 3Q | 4Q | 2023 | 1Q | 2Q | 3Q | 4Q | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medical services revenue | 1,134.8 | 1,147.0 | 1,212.1 | 1,053.5 | 4,547.5 | 1,608.8 | 1,594.8 | 1,597.4 | 1,597.4 | 6,398.4 | 7,538.0 | 8,740.4 |
| Other revenue | 1.3 | 2.0 | 3.5 | 2.5 | 9.4 | 2.5 | 2.5 | 2.7 | 3.0 | 10.7 | 11.5 | 13.0 |
| **TOTAL REVENUE** | **1,136.1** | **1,149.1** | **1,215.7** | **1,056.1** | **4,556.9** | **1,611.3** | **1,597.3** | **1,600.1** | **1,600.4** | **6,409.1** | **7,549.5** | **8,753.4** |
| Medical svc expense | 972.8 | 1,008.7 | 1,104.4 | 1,155.4 | 4,241.4 | 1,448.8 | 1,483.2 | 1,512.4 | 1,529.5 | 5,973.9 | 6,974.7 | 8,041.1 |
| Other medical expense | 86.0 | 83.1 | 80.8 | (4.5) | 245.5 | 96.6 | 73.6 | 53.6 | 42.7 | 266.5 | 307.5 | 363.6 |
| GROSS PROFIT | 77.3 | 57.2 | 30.5 | (94.9) | 70.1 | 65.9 | 40.4 | 34.2 | 28.2 | 168.6 | 267.3 | 348.7 |
| General & administrative | 66.8 | 81.5 | 74.1 | 64.7 | 287.2 | 81.1 | 79.3 | 75.3 | 74.1 | 309.9 | 358.5 | 380.0 |
| Depreciation & amortization | 4.2 | 5.5 | 5.3 | 4.7 | 19.7 | 5.3 | 5.5 | 5.6 | 5.7 | 22.1 | 26.5 | 31.0 |
| **EBIT** | **6.3** | **(29.8)** | **(49.0)** | **(164.3)** | **(236.8)** | **(20.6)** | **(44.3)** | **(46.8)** | **(51.7)** | **(163.3)** | **(117.7)** | **(62.3)** |
| Income (loss) from equity method investments | 1.4 | 8.5 | 14.7 | (8.0) | 16.5 | 4.5 | 6.7 | (2.0) | 4.8 | 13.9 | 30.3 | 30.3 |
| Other income (expense) net | 8.1 | 7.2 | 5.7 | 7.4 | 28.4 | 5.6 | 5.4 | 5.1 | 4.7 | 20.7 | 30.3 | 30.3 |
| Gain (loss) on lease terms | | | | | - | | | | | - | | |
| Interest expense | (1.5) | (1.6) | (1.7) | (2.0) | (6.8) | (1.4) | (1.4) | (1.4) | (1.3) | (5.5) | (5.3) | (5.3) |
| Income (loss) before taxes | 14.2 | (15.7) | (30.3) | (166.9) | (198.7) | (12.0) | (33.6) | (45.0) | (43.5) | (134.2) | (62.3) | (6.9) |
| Income tax | 1.8 | (1.1) | (1.2) | (0.3) | (0.8) | | | | | - | | |
| Income from continuing operations | 16.0 | (16.8) | (31.5) | (167.1) | (199.5) | (12.0) | (33.6) | (45.0) | (43.5) | (134.2) | (62.3) | (6.9) |
| | | | | | | | | | | | | |
| **EPS, continuing operations** | **$0.04** | **($0.04)** | **($0.08)** | **($0.41)** | **($0.48)** | **($0.03)** | **($0.08)** | **($0.11)** | **($0.11)** | **($0.33)** | **($0.15)** | **($0.02)** |
| Share count | 426.6 | 410.3 | 405.8 | 406.5 | 412.3 | 407.0 | 407.5 | 408.0 | 408.3 | 407.7 | 409.0 | 410.0 |
| Severance and related costs | 0.2 | | | | 0.2 | | | | | - | | |
| Mgmt fees | - | | | | - | | | | | - | | |
| EBITDA adj related to equity meth inves. | 2.0 | 2.8 | 3.7 | 14.3 | 22.7 | 4.2 | 6.5 | (2.0) | 4.9 | 13.6 | 10.6 | 10.7 |
| Other adjustments | (11.9) | (3.5) | (6.9) | (6.9) | (29.1) | | | | | - | | |
| **Adj EBITDA** | **23.9** | **10.3** | **(5.8)** | **(137.1)** | **(108.7)** | **14.0** | **(5.3)** | **(25.1)** | **(16.6)** | **(33.0)** | **40.0** | **100.0** |
| Adj EBITDA, ex Hawaii | 24.0 | 12.5 | 5.6 | (137.1) | (95.0) | | | | | | | |
| **Medical Margin** | **162.0** | **138.3** | **107.7** | **(101.9)** | **306.2** | **160.0** | **111.6** | **85.0** | **67.9** | **424.4** | **563.3** | **699.3** |
| | | | | | | | | | | | | |
| **Margins** | | | | | | | | | | | | |
| Medical margin | 14.3% | 12.1% | 8.9% | -9.7% | 6.7% | 9.9% | 7.0% | 5.3% | 4.2% | 6.6% | 7.5% | 8.0% |
| Other medical expense | 7.6% | 7.2% | 6.6% | -0.4% | 5.4% | 6.0% | 4.6% | 3.3% | 2.7% | 4.2% | 4.1% | 4.2% |
| Gross margin | 6.8% | 5.0% | 2.5% | -9.0% | 1.5% | 4.1% | 2.5% | 2.1% | 1.8% | 2.6% | 3.5% | 4.0% |
| G&A | 5.9% | 7.1% | 6.1% | 6.1% | 6.3% | 5.0% | 5.0% | 4.7% | 4.6% | 4.8% | 4.7% | 4.3% |
| **Adj EBITDA** | **2.1%** | **0.9%** | **NM** | **NM** | **NM** | **0.9%** | **NM** | **NM** | **NM** | **NM** | **0.5%** | **1.1%** |
| Platform support | 4.2% | 4.1% | 3.8% | 3.5% | 3.9% | 3.4% | 3.5% | 3.3% | 3.2% | 3.4% | 3.2% | 3.0% |
| Capex as % of revneue | -0.3% | -0.4% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% |
| | | | | | | | | | | | | |
| **Growth** | | | | | | | | | | | | |
| MA members | 60.7% | 56.5% | 57.7% | 44.1% | 44.1% | 31.4% | 30.7% | 28.0% | 39.9% | 39.9% | 14.0% | 12.6% |
| ACO reach members | -3.4% | -3.9% | -1.9% | 0.3% | 0.3% | 42.1% | 43.2% | 40.5% | 38.7% | 38.7% | 1.7% | 1.7% |
| Total members | 43.5% | 41.0% | 42.7% | 33.2% | 33.2% | 33.3% | 32.9% | 30.1% | 39.7% | 39.7% | 11.7% | 10.8% |
| Med svcs revenue | 73.9% | 71.4% | 74.7% | 52.9% | 68.2% | 41.8% | 39.0% | 31.8% | 51.6% | 40.7% | 17.8% | 16.0% |
| **Total revenue** | **73.9%** | **71.5%** | **75.0%** | **53.1%** | **68.3%** | **41.8%** | **39.0%** | **31.6%** | **51.5%** | **40.6%** | **17.8%** | **15.9%** |
| Gross profit | 82.0% | 68.6% | 17.6% | -1049.1% | -37.6% | -14.8% | -29.3% | 12.1% | -129.7% | 140.6% | 58.5% | 30.4% |
| Medical Margin | 87.9% | 68.6% | 42.4% | NM | 0.5% | -1.2% | -19.3% | -21.1% | NM | 38.6% | 32.7% | 24.1% |
| G&A | 67.8% | 57.0% | 42.6% | -14.0% | 31.2% | 21.4% | -2.7% | 1.6% | 14.6% | 7.9% | 15.7% | 6.0% |
| Adj EBITDA | 196.6% | NM | NM | NM | NM | -41.4% | NM | NM | NM | NM | -221.3% | 149.8% |

*Source: Company documents and Citizens JMP Securities, LLC*

## Company Description

AGL is one of the largest physician enablement company's in the United States. AGL partners with physician practices and health systems to facilitate the migration of a provider's Medicare Advantage patient panels from fee-for-service to a risk-based reimbursement structure.

## Investment Risks

AGL's business model is based entirely upon Medicare Advantage and, as such, the company is exposed to structural and/or reimbursement changes to the MA program, which could limit the expansion of AGL's medical margins. Any execution challenges with larger customers such as health systems could render our revenue and EBITDA estimates aggressive. Meaningful changes to risk adjustment scoring could negatively impact medical margins and overall profitability. Recent data challenges with payor partners could persist, resulting in additional pressure to medical margins, as could higher than expected utilization trends. More intense competition from other value-based provider enablement companies and more aggressive physician practice acquisitions by health systems and strategic acquirers could limit the company's addressable market and result in slower membership growth than we have contemplated in our model, driving potential downside to our revenue and profit projections.

# JMP
## A CITIZENS COMPANY

## JMP FACTS AND DISCLOSURES

**Analyst Certification:**

**The research analyst(s) who prepared this report does/do hereby certify that the views presented in this report are in accordance with my/our personal views on the securities and issuers discussed in this report. As mandated by SEC Regulation AC no part of my/our compensation was, is or will be directly or indirectly related to the specific views or recommendations expressed herein. This certification is made under the obligations set forth in SEC Regulation AC. Any other person or entity may not use it for any other purpose. This certification is made based on my/our analysis on the date of this report's publication. I/We assume no obligation to update this certification to reflect any facts, circumstances, or events that may subsequently come to my/our attention. Signed Constantine Davides**

**JMP Securities Disclosures:**

Citizens JMP Securities, LLC, currently makes a market in the security of agilon health, inc.

Citizens JMP Securities, LLC, expects to receive OR intends to seek compensation for investment banking services from agilon health, inc. in the next 3 months.

For disclaimer details, please click on link. JMP Disclaimer

For applicable disclosures on companies mentioned in this report, please refer to the Citizens JMP Securities, LLC Facts and Disclosures page in the report link above.

**Citizens JMP Securities, LLC Investment Opinion Definitions:**

Market Outperform (MO): Citizens JMP Securities, LLC expects the stock price to outperform the Russell 3000® Index over the next 12 months.

Market Perform (MP): Citizens JMP Securities, LLC expects the stock price to perform in line with the Russell 3000® Index over the next 12 months.

Market Underperform (MU): Citizens JMP Securities, LLC expects the stock price to underperform the Russell 3000® Index over the next 12 months.

**JMP Securities Research Ratings and Investment Banking Services:** (as of February 28, 2024)

| JMP Rating | Regulatory Equivalent | # Co's Under Coverage | % of Total | Regulatory Equivalent | # Co's Under Coverage | % of Total | # Co's Receiving IB Services in Past 12 Months | % of Co's With This Rating |
|---|---|---|---|---|---|---|---|---|
| MARKET OUTPERFORM | Buy | 289 | 70.15% | Buy | 289 | 70.15% | 44 | 15.22% |
| MARKET PERFORM | Hold | 119 | 28.88% | Hold | 119 | 28.88% | 18 | 15.13% |
| MARKET UNDERPERFORM | Sell | 0 | 0.00% | Sell | 0 | 0.00% | 0 | 0% |
| COVERAGE IN TRANSITION | | 4 | 0.97% | | 4 | 0.97% | 0 | 0% |
| RATING SUSPENDED | | 0 | 0.00% | | 0 | 0.00% | 0 | 0% |
| TOTAL: | | 412 | 100% | | 412 | 100% | 62 | 15.05% |

**Stock Price Chart of Rating and Target Price Changes:**

Note: First annotation denotes initiation of coverage or 3 years, whichever is shorter. If no target price is listed, then the target price is N/A. In accordance with FINRA Rule 2241, the chart(s) below reflect(s) price range and any changes to the rating or price target as of the end of the most recent calendar quarter. The action reflected in this note is not annotated in the stock price chart. Source: Citizens JMP Securities, LLC.



**agilon health, inc.** (AGL)

**Rating and Price Target History for: agilon health, inc. (AGL) as of 02-27-2024**



**Created by: BlueMatrix**

**Disclaimer:**

Citizens JMP Securities, LLC (the "Firm") compensates research analysts, like other Firm employees, based on the Firm's profitability, which includes revenues from the Firm's institutional sales, trading, and investment banking departments as well as on the quality of the services and activities performed that are intended to benefit the Firm's institutional clients. These data have been prepared by Citizens JMP Securities, LLC for informational purposes only and are based on information available to the public from sources that we believe to be reliable, but we do not guarantee their accuracy or completeness. Any opinions and projections expressed herein reflect our judgment at this date and are subject to change without notice. These data are neither intended nor should be considered as an offer to sell or a solicitation or a basis for any contract for the purchase of any security or other financial product. Citizens JMP Securities, LLC, its affiliates, and their respective partners, directors, officers, and associates may have a long or short position in, may act as a market maker for, or may purchase or sell a position in the securities mentioned herein. Research is made available to investment advisory clients through CJMPR, LLC, an SEC-registered investment adviser and an affiliate of Citizens JMP Securities, LLC. Citizens JMP Securities, LLC or its affiliates may be performing, have performed, or seek to perform investment banking, advisory, or other services and may have acted as manager or co-manager for a public offering of securities for any company mentioned herein. The reader should assume that Citizens JMP Securities, LLC will solicit business from the company covered in this report. Members of our Sales and Trading Department provide oral and/or written market opinions and trading strategies to our clients that reflect their personal opinions about stocks that are the subject of the firm's research reports. Our research analysts discuss trading strategies with clients that sometimes reflect short-term expectations for the price of the securities that are the subject of research reports. These trading strategies are distinct from the analysts' fundamental rating for the stock, which is based upon the analysts' view compared to other stocks under coverage for the relevant time period. © Copyright 2024. All rights reserved by Citizens JMP Securities, LLC. Citizens JMP Securities, LLC is a member of FINRA, NASDAQ, and SIPC and is a subsidiary of Citizens Financial Group, Inc.



**Jeffrey H. Spurr**
**Director of Research**
(415) 835-3903

## RESEARCH PROFESSIONALS

### FINANCIAL SERVICES

**Alternative Asset Managers**
| | |
|---|---|
| Brian McKenna | (212) 906-3545 |
| Devin Ryan | (212) 906-3578 |

**Commercial Finance (BDCs)**
| | |
|---|---|
| Brian McKenna | (212) 906-3545 |
| Devin Ryan | (212) 906-3578 |
| Alex Jenkins | (212) 906-3556 |

**Consumer Finance**
| | |
|---|---|
| David M. Scharf | (415) 835-8942 |
| Zachary Oster | (212) 906-3507 |

**Investment Banks & Brokers**
| | |
|---|---|
| Devin Ryan | (212) 906-3578 |
| Brian McKenna | (212) 906-3545 |
| Brian Fitzgerald | (212) 906-3562 |

**Insurance**
| | |
|---|---|
| Matthew J. Carletti | (312) 768-1784 |
| Karol Chmiel, CFA | (312) 768-1786 |
| David Samar | (312) 768-1785 |

**Mortgage & Real Estate Finance**

**Residential Mortgage REITs**

**Mortgage Operating Companies**
| | |
|---|---|
| Steven C. DeLaney | (212) 906-3517 |
| Trevor Cranston, CFA | (415) 869-4431 |
| Mikhail Goberman | (212) 906-3543 |

**Commercial Mortgage REITs**

**Commercial R.E. Finance**
| | |
|---|---|
| Steven C. DeLaney | (212) 906-3517 |
| Chris Muller, CFA | (212) 906-3559 |

**Financial Technology**

**Consumer FinTech**
| | |
|---|---|
| Devin Ryan | (212) 906-3578 |
| Brian McKenna | (212) 906-3545 |
| Brian Fitzgerald | (212) 906-3562 |
| David Scharf | (415) 835-8942 |
| Zachary Oster | (212) 906-3507 |

**Enterprise FinTech**
| | |
|---|---|
| Devin Ryan | (212) 906-3578 |
| Brian McKenna | (212) 906-3545 |
| Brian Fitzgerald | (212) 906-3562 |
| Patrick Walravens | (415) 835-8943 |

**Digital Assets**
| | |
|---|---|
| Devin Ryan | (212) 906-3578 |
| Brian McKenna | (212) 906-3545 |
| Brian Fitzgerald | (212) 906-3562 |

**InsurTech**
| | |
|---|---|
| Matthew J. Carletti | (312) 768-1784 |
| Karol Chmiel, CFA | (312) 768-1786 |
| Andrew Boone, CFA | (415) 835-3902 |
| Matthew Condon, CFA | (617) 235-8502 |

**PaymenTech**
| | |
|---|---|
| David M. Scharf | (415) 835-8942 |
| Zachary Oster | (212) 906-3507 |

### HEALTHCARE

**Biotechnology & Biopharma**
| | |
|---|---|
| Reni J. Benjamin, PhD | (212) 906-3529 |
| Sam Rodriguez, PhD | (212) 906-3504 |
| Jason N. Butler, PhD | (212) 906-3505 |
| Jose Lora, PhD | (212) 906-3511 |
| Jonathan Wolleben | (312) 768-1788 |
| Catherine Okoukoni, MD, PhD | (646) 797-5637 |
| Roy Buchanan, PhD | (212) 906-3509 |
| Silvan Tuerkcan, PhD | (212) 906-3546 |

**Healthcare Services**
| | |
|---|---|
| Constantine Davides | (617) 235-8505 |

**Medical Devices & Supplies**
| | |
|---|---|
| David Turkaly | (212) 906-3563 |
| Daniel W. Stauder, CFA | (212) 906-3535 |

### REAL ESTATE

**Equity REITs**
| | |
|---|---|
| Aaron Hecht | (415) 835-3963 |
| Ryan Treais | (415) 869-4411 |
| Mitchell Germain | (212) 906-3532 |
| Jyoti Yadav | (646) 797-5636 |

**Residential**
| | |
|---|---|
| Aaron Hecht | (415) 835-3963 |
| Ryan Treais | (415) 869-4411 |

### TECHNOLOGY

**Cybersecurity**
| | |
|---|---|
| Trevor Walsh | (415) 835-3934 |
| Rustam Kanga | (415) 835-3914 |

**Communication Equipment & IT Infrastructure**
| | |
|---|---|
| Erik Suppiger | (415) 835-3918 |

**Internet**
| | |
|---|---|
| Andrew Boone, CFA | (415) 835-3902 |
| Matthew Condon, CFA | (617) 235-8502 |
| Brianna Diaz | (212) 906-3534 |
| Nicholas Jones | (212) 906-3528 |
| Timothy Shubsda | (212) 906-3532 |
| Luke Meindl | (212) 906-3593 |

**Software**
| | |
|---|---|
| Patrick Walravens | (415) 835-8943 |
| Aaron Kimson, CFA | (415) 835-8944 |
| Owen Hobbs | (415) 835-3961 |
| Austin Cole | (415) 835-8930 |
| Oliver Crookenden | (415) 835-8948 |

### CONSUMER

**Gaming, Online Gaming & Gaming Technology**
| | |
|---|---|
| Jordan Bender | (212) 906-3526 |
| Eric Ross | (646) 797-5635 |

### INDUSTRIALS

**Aerospace & Defense**
| | |
|---|---|
| Trevor Walsh | (415) 835-3934 |
| Rustam Kanga | (415) 835-3914 |

## ADDITIONAL CONTACTS

| | | |
|---|---|---|
| **James O'Day** | **Brendan Byrne** | **600 Montgomery Street, Suite 1100** |
| **Director of Equities** | **Director of Institutional Sales** | San Francisco, CA 94111 |
| (617) 235-8506 | (617) 235-8507 | www.jmpsecurities.com  **APP 780** |