**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **IN RE AGILON HEALTH, INC. SECURITIES LITIGATION** | § § § | **Master File No. 1:24-cv-00297-DAE** |
| **This Document Relates to:** **ALL ACTIONS** | § § § § | **CLASS ACTION** |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

**TO: THE HONORABLE DAVID A. EZRA**
**UNITED STATES DISTRICT JUDGE**

Now before the Court is Plaintiffs' Opposed Motion for Class Certification, filed April 6, 2026 (Dkt. 105).[1]

## I. Background

Plaintiffs, which are public pension funds and institutional investors,[2] bring this consolidated securities fraud class action against Defendants agilon healthcare, inc. and certain of its officers and directors ("agilon"), and Clayton, Dubilier & Rice, LLC, and related entities and individuals ("CD&R Defendants").[3]

[1] By Text Order issued April 7, 2026, the Honorable David A. Ezra referred the motion to this Magistrate Judge for a report and recommendation, pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas.

[2] The Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems; the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans; Indiana Public Retirement System; and the North Atlantic States Carpenters Pension Fund and Guaranteed Annuity Fund.

[3] The agilon individual defendants are Steven Sell, Timothy Bensley, Girish Venkatachaliah, Heidi Hittner, Glenn Sobotka, Priscilla Kasenchak, Michelle Gourdine, Michael Smith, Sharad Mansukani, Diana McKenzie, Karen McLoughlin, Jeffrey Schwaneke, and William Wulf. The CD&R entities are CD&R Vector Holdings, L.P.; and CD&R Investment Associates IX, Ltd. The CD&R individual defendants are Clay Richards, Ravi Sachdev, Richard J. Schnall, Derek L. Strum, and Ronald A. Williams.

### A. Plaintiffs' Allegations

Plaintiffs make the following allegations in their Amended Consolidated Complaint (Dkt. 36):

agilon, a Delaware healthcare corporation, was formed in 2016 by New York-based private equity firm CD&R "in order to take advantage of the billions of dollars paid each year by Medicare and Medicaid in connection with the provision of medical services to senior citizens." Dkt. 36 ¶ 3. Defendants made a series of false and misleading statements and omissions to investors about agilon's business model, healthcare trends, and profitability between April 15, 2021 and February 27, 2024 to artificially drive up its stock price. *Id.* ¶¶ 3-15. Plaintiffs allege: "While concealing the truth about agilon and its defective business model, agilon's insiders cashed in, selling ***billions*** of dollars worth of their agilon stock at artificially inflated prices as high as $28.98 per share." *Id.* ¶ 11.

On November 2, 2023, agilon cut its fiscal year 2023 outlook and revealed a previously undisclosed spike in patient utilization, causing its stock to fall 13%. *Id.* ¶¶ 195-96. On January 5, 2024, agilon revealed that its third quarter 2023 medical margin had been overstated by at least 40% and announced the departure of its chief financial officer. agilon stock fell 29%. *Id.* ¶¶ 198-204. On February 27, 2024, agilon disclosed that it had missed its fiscal year 2023 profit forecast, cut its fiscal year 2024 guidance, and reported material weakness in internal controls related to medical claims and payables, causing its stock to fall another 7%. *Id.* ¶¶ 91, 203-11. By the end of the proposed class period, agilon's stock price had declined by 85%, from a high of $44 per share to less than $6.50 per share. *Id.* ¶ 15.

### B. Procedural History

Plaintiffs asserted claims under §§ 10(b), 20(a), 20A, and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), and §§ 11, 12, and 15 of the Securities Act of 1933 ("Securities Act"). Dkt. 36. On August 15, 2025, and on reconsideration and clarification April 22,

2026, the Honorable David A. Ezra granted in part and denied in part Defendants' motions to dismiss. Dkts. 63, 120. Judge Ezra dismissed the underwriter defendants and Plaintiffs' Securities Act claims under §§ 11, 12, and 15. Judge Ezra also narrowed the proposed class period and Exchange Act claims by (1) dismissing the § 10(b) claim "as to statements made relating to agilon's data integration and growth strategy"; (2) dismissing the § 10(b) claim against Defendants Hittner and Venkatachaliah; (3) dismissing the § 20A claim against CD&R LLC, CD&R Investment Associates, CD&R Associates, and Vector; and (4) limiting the § 20(a) claim to "any false or misleading statements made after May 2023." Dkt. 63 at 89.

On April 6, 2026, Plaintiffs filed this opposed motion for class certification under Rule 23, seeking to certify a class defined as:

> All persons and entities that purchased or acquired agilon health, inc. common stock between May 27, 2021 and February 27, 2024, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants and their families, legal representatives, heirs, successors, or assigns; officers and directors of agilon during the Class Period; any entity in which Defendants have a controlling interest; and any judicial officer to whom this litigation is assigned.

Dkt. 105 at 10. On October 21, 2026, the parties appeared and made arguments on the motion at a hearing before this Magistrate Judge.

## II. Legal Standards

Class certification requires plaintiffs to satisfy all requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy – and at least one of the three requirements listed in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345-46 (2011). Plaintiffs rely on Rule 23(b)(3), which applies when "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" for adjudicating the case.

"A party seeking class certification must affirmatively demonstrate his compliance with the Rule," and certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores*, 564 U.S. at 350-51. Although the court's analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (citation omitted). Merits questions may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.* at 466.

## III. Rule 23(a) Prerequisites

Defendants do not dispute any of Rule 23(a)'s prerequisites, but the Court still must determine whether Plaintiffs satisfy those elements. *Vizena v. Union Pac. R. Co.*, 360 F.3d 496, 503 (5th Cir. 2004).

### A. Numerosity

To meet the numerosity requirement, Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). This prerequisite "is generally assumed to have been met in class action suits involving nationally traded securities." *In re Enron Corp. Secs.*, 529 F. Supp. 2d 644, 672 (S.D. Tex. 2006).

The proposed class consists of all purchasers or acquirers of agilon common stock between May 27, 201 and February 27, 2024. Dkt. 105 at 10. Plaintiffs submit evidence that during the Class Period, agilon common stock traded on the NYSE with an average weekly trading volume of more than 12 million shares and a total trading volume of 1.71 billion shares. Cain Expert Report, Dkt. 105-06 at 16. During the Class Period, agilon's common stock was held by at least 489 unique institutional investors, which owned an average of 248.71 million shares. *Id.* at 53. This evidence shows that the proposed class is sufficiently numerous and joinder of all class

members is impracticable. *In re Anadarko Petroleum Corp. Sec. Litig.*, 351 F.R.D. 5, 18 (S.D. Tex. 2026) (finding that trading volume of 2.9 billion shares met the numerosity requirement).

**B. Commonality**

Commonality requires "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims. But this contention need not relate specifically to the damages component of the class members' claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). The requirement that class members have all suffered the same injury can be satisfied by "an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *Id.* at 810-11.

Nearly all questions of law and fact are common to the proposed class, including whether (1) Defendants violated the Exchange Act and Rule 10b-5, (2) Defendants omitted or misrepresented material facts, (3) the price of agilon stock was artificially inflated during the Class Period, and (4) the proposed class members suffered damages and, if so, the proper measure of damages. *See Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445-46 (W.D. Tex. 2019) (finding that the same allegations satisfied the commonality requirement). The Court finds that the commonality requirement is satisfied.

**C. Typicality**

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a). Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Angell v. GEICO Advantage Ins.*, 67 F.4th 727, 736 (5th Cir. 2023).

The Court finds that Plaintiffs' claims are typical of the proposed class because the securities claims are identical, arise from the same alleged fraudulent scheme by Defendants, and are based

on the same legal theories. *Rooney*, 330 F.R.D. at 446. While some of Plaintiffs' damages may be different than the proposed class, "such differences are typical in securities-fraud cases and do not render a lead plaintiff atypical." *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *13 (W.D. Tex. June 4, 2013). The Court finds the typicality prerequisite satisfied.

**D. Adequacy of Representation**

To meet the adequacy requirement, Plaintiffs must show that they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). Courts consider:

> (1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent.

*Angell*, 67 F.4th at 737 (citation omitted).

Plaintiffs meet all adequacy elements. Their interests are identical to the interests of the proposed class, and the parties identify no conflicts. Plaintiffs also have shown a willingness and ability to take an active role in and control the litigation and protect the interests of the proposed class. Plaintiffs' attorneys have extensive experience litigating securities' fraud class actions, Dkt. 105-5, and courts have found them to be zealous and competent. *Anadarko,* 351 F.R.D. at 19; *City of Pontiac Gen. Emps. Ret. Sys. v. Dell Inc.*, No. A-15-cv-374-LY, 2018 WL 1558571, at *4 (W.D. Tex. Mar. 29, 2018).

Because Plaintiffs satisfy all Rule 23(a) prerequisites, the Court considers the predominance and superiority requirements of Rule 23(b)(3).

**IV. Predominance**

In securities class actions, "the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) (*Halliburton II*). To meet the predominance requirement, Plaintiffs must

show that "questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). The predominance inquiry

> asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3)

> requires district courts to consider "how a trial on the merits would be conducted if a class were certified." This, in turn, "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," a process that ultimately prevents the class from degenerating into a series of individual trials.

*Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (citations omitted). Accordingly, the Court looks to the causes of action at issue. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (*Halliburton I*).

### A. Section 20A Insider Trader Claims

To assert a claim under § 20A of the Exchange Act, the plaintiff must

> (1) allege a requisite independent, predicate violation of the Exchange Act . . . and (2) show that he has standing to sue under § 20A because he "contemporaneously with the purchase or sale of securities that is the subject of such violation has purchased . . . or sold . . . securities of the same class" as the insider defendant.

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003) (quoting 15 U.S.C. § 78t-1(a)). Courts in the Fifth Circuit have held that the contemporaneity requirement limits the relevant window for § 20A claims to a narrow period, the same day as the insider sale or a few days afterward. *See id.* (finding "two or three days" and "certainly less than a

week" reasonable); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *5 (S.D. Tex. June 15, 2017) (finding that "a six-day gap" was not "too long as a matter of law" to satisfy the contemporaneity requirement).

Defendants argue that a § 20A class cannot be certified because "Plaintiffs' proposed 3-year period ignores that Section 20A is statutorily limited to purchases that were 'contemporaneous' with Sell's September 14, 2021 stock sale." Dkt. 142 at 22. Plaintiffs do not dispute that there must be close temporal proximity to the insider transaction, but argue that the Court need not address this issue at the class certification stage. The Court disagrees.

> At the pleading stage, the named plaintiffs need only plausibly allege that their particular trades were contemporaneous with the trades of the insiders. But at the class certification stage, it becomes important to address the question with precision, because the class period needs to be defined. A court cannot certify a class that consists of some people who traded contemporaneously with the insiders and others who likely didn't.

*In re Vaxart, Inc. Secs. Litig.*, 813 F. Supp. 3d 970, 973 (N.D. Cal. 2025). Because a three-year class period does not meet the contemporaneity requirement and Plaintiffs propose no other period, the Court recommends that Judge Ezra deny the motion to certify Plaintiffs' § 20A claims.

**B. Rule 20(a) Control Liability Claims**

To recover for a violation of § 20(a) of the Exchange Act, which imposes joint and several liability for an underlying securities fraud violation, Plaintiffs must prove the individual defendants had actual power over agilon and induced or participated in the alleged violations. 15 U.S.C.A. § 78t(a). "Because § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof." *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *8 (S.D. Tex. Nov. 13, 2019), *R. & R. adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019). Whether the individual defendants had actual power over agilon and participated in or induced the fraud will be proven

by their conduct, not the conduct of any class members. *Id.* The Court thus finds that individual issues will not predominate with respect to the § 20(a) claims. *Id.*

**C. Section 10(b) and Rule 10b-5 Claims**

To prevail on their claim that Defendants made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61.[4]

**1. *Basic* Presumption**

Whether common questions of law or fact predominate in a securities fraud action "often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. Reliance is an essential element of the § 10(b) private cause of action because "proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Id.* "The 'traditional (and most direct) way' for a plaintiff to prove reliance is to show that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citation omitted). A plaintiff also may invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Under that theory, known as the *Basic* presumption, "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Goldman*, 594 U.S. at 118 (quoting *Halliburton I*, 563 U.S. at 813).

To invoke the *Basic* presumption, a plaintiff must prove that (1) the alleged misrepresentation was publicly known; (2) it was material;[5] (3) the stock traded in an efficient market; and (4) the

---

[4] At the class certification stage, Plaintiffs need not prove loss causation. *Halliburton I*, 563 U.S. at 815.

[5] At the class certification stage, Plaintiffs need not prove materiality. *Amgen*, 568 U.S. at 481-82.

plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Id.* If the plaintiff satisfies these elements, the court "may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their reliance on the integrity of the price set by the market." *Amgen*, 568 U.S. at 462. The presumption can be rebutted by appropriate evidence. *Id.* A defendant may rebut the presumption by a "showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248. If the defendant rebuts the presumption of reliance, the plaintiff must prove that it directly relied on the defendant's misrepresentation in buying or selling the stock.

Plaintiffs invoke the *Basic* presumption and rely on evidence to show that they have met each required element: (1) Defendants' alleged misrepresentations were made publicly, Dkt. 36 ¶¶ 99-190; (2) Plaintiffs purchased agilon common stock between when the misrepresentations were made and the corrective disclosures were made, Dkt. 11-3; and (3) agilon common stock traded on the New York Stock Exchange in an efficient market, Dkt. 105-6 at 11-28. Defendants do not dispute that Plaintiffs meet the *Basic* elements, but argue that Plaintiffs cannot rely the *Basic* presumption for the alleged misrepresentations made between 2021 and 2022, during the proposed class period.

**2. Price Impact**

A defendant may rebut the *Basic* presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock. *Halliburton II*, 573 U.S. at 284. The defendant bears the burden of persuasion to prove a lack of price impact by a preponderance of the evidence. *Goldman*, 594 U.S. at 126-27. To carry that burden, the defendant "must in fact sever the link between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of *some* evidence relevant to price impact would rarely accomplish

that feat." *Id.* at 125-26 (cleaned up). The court must assess all direct and indirect evidence of price impact and determine whether it is more likely than not that the alleged misrepresentations had a price impact. *Id.* at 126-27.

Defendants argue that Plaintiffs cannot rely on the *Basic* presumption of reliance for alleged misrepresentations made between 2021 and 2022 because they contend that those statements are "too generic" and did not match the later corrective disclosures between November 2, 2023 and February 27, 2024. The Court finds that Defendants have not sustained their burden to prove a lack of price impact for statements made between 2021 and 2022.

First, Defendants attempt to reassert arguments that Judge Ezra rejected in deciding their motions to dismiss. Dkt. 63 at 46 (rejecting Defendants' arguments that statements about agilon's "high-visibility partnership model" and business model were too "vague" and "aspirational" to constitute fraud, finding that "they underscored and detailed the 'very specific benefits' of agilon's business model"). This Magistrate Judge is bound by Judge Ezra's earlier rulings. *See Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727 (5th Cir. 2012) ("Generally, under the law of the case doctrine, courts show deference to decisions already made in the case they are presiding over.").

Defendants also try to place on Plaintiffs their burden to show lack of price impact. For example, they argue that "Plaintiffs do not show" that statements made between 2021 and 2022 "increased agilon's stock price on the front-end (*i.e.*, price inflation)" or the price decrease on the "back-end" after the alleged corrective disclosures in late 2023 and early 2024. Dkt. 142 at 9. At the class certification stage, "plaintiffs need not directly prove price impact to invoke the *Basic* presumption." *Goldman*, 594 U.S. at 126. The defendant bears the burden of persuasion to prove a lack of price impact by a preponderance of the evidence. *Id.*

> If . . . the defendant could defeat *Basic's* presumption by introducing any competent evidence of a lack of price impact—including, for example, the generic nature of the alleged misrepresentations—then the plaintiff would end up with the burden of directly proving price impact in almost every case. And that would be nearly indistinguishable from the regime that *Halliburton II* rejected.

*Id.*

Nor does *Goldman* preclude a finding of price impact here. The "generic nature" of an alleged misrepresentation is relevant evidence of price impact because "a more general statement will affect a security's price less than a more-specific statement on the same question." *Id.* at 122-23. In *Goldman*, it was undisputed that the statements at issue were generic; they included, for example: "Our clients' interests always come first," and: "Integrity and honesty are at the heart of our business." *Id.* at 120. The court explained that there may be evidence of a lack of price impact when

> the earlier misrepresentation is generic (*e.g.*, "we have faith in our business model") and the later corrective disclosure is specific (*e.g.*, "our fourth quarter earnings did not meet expectations"). Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop.

*Id.* at 123. Such evidence should be considered at the class certification stage because it is "relevant to price impact." *Id.* at 122.

The representations at issue here are distinguishable from the generic statements in *Goldman*. For example, Defendants argue that the alleged misrepresentations made on May 27, 2021 and October 29, 2021 were "too generic" to affect the price of agilon stock. Dkt. 142 at 10. Plaintiffs allege:

> <u>On May 27, 2021</u>, defendants Sell and Bensley convened a conference call with investors to discuss agilon's 1Q21 financial results, during which Sell emphasized his "***high degree of visibility*** into future revenues and margin progression," as well as agilon's "growth strategy, both with our existing partners and current

> geographies and with new partners in new markets." Sell also underscored agilon's "[s]ame geography membership growth" as "a key differentiator in our model."
>
> During the call, Sell touted agilon's ability to seamlessly add new doctors to existing partnerships in mature markets, claiming agilon's "same geography growth is driven" in large part by "new physicians joining our anchor partner," adding that "[t]his results in a ***highly efficient growth model*** with extremely strong returns on investment." In response to an analyst's question about the "benefit[s]" of "adding new docs" in existing markets, Sell boasted that a substantial portion of agilon's growth came from "new physicians joining into . . . existing markets."

Complaint, Dkt. 36 ¶¶ 100-01.

> <u>On October 29, 2021</u>, Sell and Bensley convened a conference call with investors to discuss agilon's 3Q21 financial results. During the call, Sell touted agilon's full-risk model, claiming its ability to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." Sell also boasted of agilon's ability to "***drive sustainably lower cost[s]***."
>
> During the call, Sell also highlighted agilon's "strong momentum in same-geography growth," which he contended is "going to drive our growth for a long time." In response to an analyst's question regarding Sell's "visibility" into agilon's "same geography" growth, Sell assured that agilon's growth from "other physicians joining locally" was "sustainable":
>
>> What's becoming a growing piece of this is this improvement in access and other physicians joining locally. That's the biggest part of that 20% to 40-plus percent growth in MA and 45% growth overall in terms of membership is really the visibility. We know who those groups are that are joining in January. We know those groups are who are joining further out in the year. The timing might slide a quarter one way or other, but we have – those groups are effectively in an implementation period of their own right now. And so that visibility forward to '22 and even into '23 is really pretty strong around that. And that will be a continued driver of same geography growth. That's why we've talked about low to mid-teens same geo growth on a kind of ***sustainable*** basis.

*Id.* ¶¶ 109-10.

These statements are not akin to the generic statements in *Goldman*. Even if any of the alleged misrepresentations in 2021-22 were generic and mismatched later disclosures, *Goldman* would not preclude a finding of reliance because Defendants do not dispute that the November 2 and

January 5 disclosures each were followed by a statistically significant stock price decline. Dkt. 142 at 17; Skinner Expert Report, Dkt. 144 ¶¶ 37, 41, 44, 108-99; Cain Expert Reply Report, Dkt. 147-2 ¶¶ 20, 63.

> This concession dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage.

*Monroe Cnty.*, 332 F.R.D. at 395.

Defendants argue that there was no statistically significant price movement after the February 27, 2024 corrective disclosure, but this argument is flawed from a statistical perspective. As the Honorable Sam Sparks explained in *Rooney*:

> Defendants suggest the lack of a statistically significant price adjustment following a corrective disclosure shows that whatever price adjustment has occurred must be due to "random chance" rather than a predicate misrepresentation. But that is not how hypothesis testing works. A statistically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price. The converse, however, is not true—the absence of a statistically significant price adjustment does *not* show the stock price was unaffected by the misrepresentation. Nor does it indicate that what price adjustment did occur must be attributed to "random chance."

330 F.R.D. at 450 (citations omitted). "A non-statistically significant decline simply does not 'sever the link' between the alleged misrepresentations and corrective disclosures." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019). The question of what caused the stock price to decline "is an ultimate merits question for which plaintiffs bear the burden at trial, not at class certification." *Id.*

For these reasons, the Court finds that Defendants have not sustained their "daunting" burden to prove by a preponderance of the evidence that there was a lack of price impact as to the 2021-

22 statements. *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014). Accordingly, Plaintiffs are entitled to rely on the *Basic* presumption of reliance, and common issues of law and fact will predominate on the element of reliance. *Rooney*, 330 F.R.D. at 450.

**D. Damages**

To show that damages can be calculated on a classwide basis, Plaintiffs must show that their proposed damages model is consistent with their theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Defendants argue that Plaintiffs fail to do so.

Plaintiffs rely on the "out-of-pocket" damages model to calculate the individual and classwide damages stemming from Defendants' alleged misrepresentations. Plaintiffs argue that their out-of-pocket damages methodology is consistent with Plaintiffs' theory of liability, can be applied commonly for all proposed class members, and "is the standard measure of damages under §§ 10(b) and 20(a)." Dkt. 147-2 at 67. Plaintiffs' expert, Dr. Matthew Cain, explains that the out-of-pocket method

> calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the Private Securities Litigation Reform Act of 1995 caps these investors' damages at the difference between the purchase price for the security and the "mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." This cap on damages is also applied class-wide.
>
> The claims process produces information necessary for the calculation of damages for each Class member was inputs to the formula above, including the purchase and sale information for each Class member's trades (including transaction dates and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions. If a finder of fact determines that agilon's Common Stock was inflated at any point during the alleged Class Period, investors who purchased agilon's Common Stock during that time period and who held the securities across at least one of the

> corrective disclosures identified by the finder of fact would be determined to have a valid claim. Once the full set of claims has been submitted, a claims administrator would provide each Class Member who submitted a valid claim with a pro-rata share of any agreed upon settlement or judgment based on their losses, subject to any de minimis thresholds.

Dkt. 105-6 ¶¶ 99-100. Dr. Cain adds that event studies, valuation models, and loss causation analysis tools will be used to estimate artificial inflation and that those tools can be performed on a classwide basis. *Id.* ¶¶ 101-02.

Many courts have recognized that the out-of-pocket damages model "is the standard measurement of damages in Section 10(b) securities cases." *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020); *accord Rougier*, 2019 WL 6111303, at *15; *Rooney*, 330 F.R.D. 439 at 451. Defendants do not dispute this, but argue that Dr. Cain relies on a "generic" out-of-pocket framework and does not explain how his proposed models will "isolate inflation attributable to the surviving statements from inflation attributable to dismissed or non-actionable statements," "separate the price effects of any actionable 'correction' from confounding, non-fraud information," or "account for variability in disclosed risks that later materialized." Dkt. 142 at 6. This level of specificity is not required at the class certification stage. *Monroe Cnty.*, 332 F.R.D. at 399 (collecting cases). "It is sufficient for class certification that [the expert] has specified a damages model that can be used to establish damages using a common methodology for all class members, even though certain of the inputs to that model are not yet ascertainable." *Id.* The Court finds that Plaintiffs proffer a damages model consistent with their theory of liability and capable of calculating damages on a classwide basis.

For these reasons, Plaintiffs have shown that questions of law and fact common to the class will predominate for Plaintiffs' § 10(b), § 20(a), and Rule 10b-5 claims.

## V. Superiority

Finally, the Court considers whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The Court considers:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

Defendants dispute none of these elements, and the Court finds all satisfied. First, there is no evidence that any class member would prefer to prosecute its own claim, "especially since this is a sophisticated action involving extensive discovery that would be impractical for any one individual to control." *In re Elec. Data Sys. Corp. Secs. Litig.*, 226 F.R.D. 559, 570-71 (E.D. Tex.), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). Second, there are no known individual actions brought by class members concerning this controversy. Third, concentrating litigation in this forum promotes judicial efficiency because the Court is familiar with the case and has made substantial rulings. Finally, aside from the usual complexities in class action litigations, there are no apparent management difficulties from litigating these claims as a class instead of individually. *See Enron*, 529 F. Supp. 2d at 698 ("Any administrative difficulties in handling this class action are preferable to duplicating judicial resources in several individual lawsuits and denying access to the courts for class members."). A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Because Plaintiffs meet all Rule 23 requirements, this Magistrate Judge recommends that Judge Ezra grant their motion for class certification as to their § 10(b), § 20(a), and Rule 10b-5 claims.

## VI. Recommendation

This Magistrate Judge **RECOMMENDS** that the Honorable David A. Ezra **GRANT IN PART and DENY IN PART** Plaintiffs' Motion for Class Certification (Dkt. 105) and:

(1) **GRANT** the motion as to the § 10(b), § 20(a) and Rule 10b-5 Exchange Act claims and **DENY** it without prejudice as to Plaintiff's § 20A Exchange Act claims;

(2) **CERTIFY** a class defined as:

> All persons and entities that purchased or acquired agilon health, inc. ("agilon") common stock between May 27, 2021 and February 27, 2024, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants and their families, legal representatives, heirs, successors, or assigns; officers and directors of agilon during the Class Period; any entity in which Defendants have a controlling interest; and any judicial officer to whom this litigation is assigned; and

(3) **APPOINT** Lead Named Plaintiffs as Class representatives, and Robbins Geller as Class Counsel under Rule 23.

The Court **ORDERS** that this case be removed from this Magistrate Judge's docket and returned to the docket of the Honorable David A. Ezra.

## VII. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C.

§ 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on November 18, 2026.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE